1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

9   Barry Lee Jones,                    )   No. CV 01-592-TUC-FRZ
                                        )
10              Petitioner,             )   <u>DEATH PENALTY CASE</u>
                                        )
11  vs.                                 )
                                        )
12                                      )   **MEMORANDUM OF DECISION**
    Dora Schriro, et al.,               )   **AND ORDER**
13                                      )
                Respondents.            )
14  ————————————————————————           )
                                        )
15

16          Petitioner Barry Lee Jones filed a Petition for Writ of Habeas Corpus alleging that he

17  is imprisoned and sentenced to death in violation of the United States Constitution.  In this

18  Order, the Court reviews the procedural status and merits of Petitioner's thirteen remaining

19  claims.  For the reasons set forth herein, the Court concludes that Petitioner is not entitled to

20  relief.

21              **<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>**

22          On April 14, 1995, Petitioner was convicted of one count of sexual abuse, three counts

23  of child abuse, and felony murder.  The convictions were predicated on the physical and

24  sexual injuries inflicted on four-year-old Rachel Gray, and the failure to obtain medical care

25  for her injuries, which led to her death.[1]  Pima County Superior Court Judge James C.

26  Carruth sentenced Petitioner to a term of years for the sexual abuse and child abuse counts.

27  After finding two statutory aggravating factors – that the crime was especially cruel and the

28          [1]  The facts of the crime are set forth in detail in Claim 1D.

victim was under the age of fifteen – and no mitigating factors sufficiently substantial to call for leniency, the judge sentenced Petitioner to death for the murder.  The Arizona Supreme Court affirmed the convictions and sentences.  *State v. Jones*, 188 Ariz. 388, 937 P.2d 310 (1997).  Petitioner filed a petition for postconviction relief (PCR) with the trial court; after an evidentiary hearing, the petition was denied in its entirety (ROA-PCR 31).[2]  The Arizona Supreme Court summarily denied Petitioner's Petition for Review.  (PR Dkt. 7.)

Petitioner initiated this federal habeas proceeding on November 5, 2001 (Dkt. 1), and filed an amended petition on December 23, 2002, raising twenty-one claims, including the subparts of Claim 1 (Dkt. 58).  The parties briefed the claims (Dkts. 69, 79) and motions for evidentiary development (Dkts. 89, 90, 101, 102, 108, 109, 113).  The Court denied Petitioner's motions for evidentiary development and dismissed Claims 2, 10, 11, and 16 for failure to state a cognizable claim, Claims 9 and 17 as procedurally barred, Claim 14 as premature, and Claim 15 on the merits.  (Dkt. 115.)  Additionally, the Court ordered supplemental briefing regarding Petitioner's allegation that it would be a fundamental miscarriage of justice not to review on the merits the entirety of Claim 1D, part of which the Court had found to be procedurally defaulted.  (*Id.* at 40.)

## **PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see*

---

[2]  "Dkt." refers to the documents in this Court's case file.  "ROA" refers to the consecutively-numbered pages of the five-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-95-0342-AP).  "ROA-PCR" refers to the docket numbers from the one-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-01-0125-PC); "PR Dkt." refers to the docket numbers of documents filed at the Arizona Supreme Court for that petition for review proceeding.  "RT" refers to the reporter's transcripts from Petitioner's state court proceedings.  The state court original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on December 12, 2001.  (Dkt. 16.)  The Court received the original trial exhibits from the Pima County Superior Court on October 7, 2004.  (Dkt. 122.)

*also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

1    Because the doctrine of procedural default is based on comity, not jurisdiction, federal

2    courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

3    468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a

4    procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure

5    to properly exhaust the claim in state court and prejudice from the alleged constitutional

6    violation, or shows that a fundamental miscarriage of justice would result if the claim were

7    not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

8    Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some

9    objective factor external to the defense impeded counsel's efforts to comply with the State's

10   procedural rule." *Id*. at 753. Objective factors which constitute cause include interference

11   by officials which makes compliance with the state's procedural rule impracticable, a

12   showing that the factual or legal basis for a claim was not reasonably available, and

13   constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488

14   (1986).

15   There are two types of claims recognized under the fundamental miscarriage of justice

16   exception to procedural default: (1) that a petitioner is "innocent of the death sentence," –

17   in other words, that the death sentence was erroneously imposed; and (2) that a petitioner is

18   innocent of the capital crime. In the first instance, the petitioner must show by clear and

19   convincing evidence that, but for constitutional error, no reasonable factfinder would have

20   found the existence of any aggravating circumstance or some other condition of eligibility

21   for the death sentence under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 336,

22   345 (1992). In the second instance, the petitioner must show that "a constitutional violation

23   has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513

24   U.S. 298, 327 (1995).

25   **LEGAL STANDARD FOR RELIEF UNDER THE AEDPA**

26   The Antiterrorism and Effective Death Penalty Act (AEDPA) established a

27   "substantially higher threshold for habeas relief" with the "acknowledged purpose of

28   'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v.*

1  *Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202,

2  206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings'

3  . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v.*

4  *Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333

5  n.7 (1997)).

6  Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

7  "adjudicated on the merits" by the state court unless that adjudication:

8  (1) resulted in a decision that was contrary to, or involved an unreasonable
   application of, clearly established Federal law, as determined by the Supreme
9  Court of the United States; or

10  (2) resulted in a decision that was based on an unreasonable determination of
    the facts in light of the evidence presented in the State court proceeding.
11

12  28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision

13  regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*

14  *Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664

15  (9th Cir. 2005).

16  "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

17  of law that was clearly established at the time his state-court conviction became final."

18  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

19  (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

20  the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

21  of the holdings of the Supreme Court at the time the petitioner's state court conviction

22  became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

23  *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

24  the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

25  advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

26  U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

27  2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent

28  may be "persuasive" in determining what law is clearly established and whether a state court

1  applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

2      The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

3  The Court has explained that a state court decision is "contrary to" the Supreme Court's

4  clearly established precedents if the decision applies a rule that contradicts the governing law

5  set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

6  Supreme Court on a matter of law, or if it confronts a set of facts that is materially

7  indistinguishable from a decision of the Supreme Court but reaches a different result.

8  *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

9  characterizing the claims subject to analysis under the "contrary to" prong, the Court has

10  observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

11  facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

12  clause."  *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir.

13  2004).

14      Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

15  may grant relief where a state court "identifies the correct governing legal rule from [the

16  Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

17  "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

18  where it should not apply or unreasonably refuses to extend that principle to a new context

19  where it should apply."  *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

20  application of Supreme Court precedent "unreasonable," the petitioner must show that the

21  state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."

22  *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

23      Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

24  court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

25  *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

26  determination will not be overturned on factual grounds unless objectively unreasonable in

27  light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340

28  (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In

1   considering a challenge under § 2254(d)(2), state court factual determinations are presumed

2   to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

3   convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El*

4   *II*, 545 U.S. at 240.

5                                       **DISCUSSION**

6   **CLAIM 1**

7       Claim 1 is comprised of five subclaims, all alleging ineffective assistance of counsel

8   (IAC) at trial and sentencing. IAC claims are governed by *Strickland v. Washington*, 466

9   U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's

10   representation fell below an objective standard of reasonableness and that the deficiency

11   prejudiced the defense. *Id.* at 687-88.

12       The inquiry under *Strickland* is highly deferential, and "every effort [must] be made

13   to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

14   challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

15   at 689. Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must

16   overcome "the presumption that, under the circumstances, the challenged action might be

17   considered sound trial strategy." *Id.*

18       Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court

19   "need not determine whether counsel's performance was deficient before examining the

20   prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697 ("if it

21   is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice

22   . . . that course should be followed"). A petitioner must affirmatively prove prejudice. *Id.*

23   at 693. To demonstrate prejudice, he "must show that there is a reasonable probability that,

24   but for counsel's unprofessional errors, the result of the proceeding would have been

25   different. A reasonable probability is a probability sufficient to undermine confidence in the

26   outcome." *Id.* at 694. The calculus involved in assessing prejudice "should proceed on the

27   assumption that the decision-maker is reasonably, conscientiously, and impartially applying

28   the standards that govern the decision." *Id.* at 695.

1

**Claim 1D**[3]

2     Petitioner was represented at trial and sentencing by Sean Bruner.  Petitioner alleges

3  his right to effective assistance of counsel was violated by trial counsel's failure to conduct

4  an adequate investigation, which derived from counsel's failure to consult sufficiently with

5  Petitioner regarding trial strategy.   Petitioner alleges specifically that his counsel:

6  (1) conducted insufficient trial investigation; (2) inadequately investigated the police work,

7  medical evidence, and timeline of death versus injury; and (3) failed to conduct sufficient

8  mitigation investigation for sentencing.  Respondents conceded, and the Court previously

9  agreed, that a narrow portion of this claim was exhausted to the extent it alleges ineffective

10  assistance based on counsel's failure to meet with Petitioner a sufficient number of times to

11  adequately prepare a defense for trial.  (Dkt. 115 at 8.)  That portion of the claim will be

12  addressed on the merits below.

13     The Court further determined that the remainder of the claim was procedurally

14  defaulted and that Petitioner had not established cause and prejudice to excuse the default,

15  nor a fundamental miscarriage of justice based on innocence of the death penalty.  (Dkt. 115

16  at 9-12.)  The Court requested and received supplemental briefing on whether Petitioner

17  could establish a fundamental miscarriage of justice based on innocence of the crime.  (*Id.*

18  at 12-13, 40; Dkts. 128, 130.)

19     Fundamental Miscarriage of Justice

20     To demonstrate a fundamental miscarriage of justice based on factual innocence of

21  the murder, the petitioner must show that "a constitutional violation has probably resulted

22  in the conviction of one who is actually innocent."  *Schlup*, 513 U.S. at 327 (1995).  To

23  establish the requisite probability, the petitioner must show that "it is more likely than not

24  that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id*.

25  The Supreme Court has characterized the exacting nature of an actual innocence claim as

26

27

28     [3]  The Court will address Claim 1D first, as it includes an extensive discussion of the
facts of the crime, which is helpful to review of the remaining claims.

1  follows:

2      [A] substantial claim that constitutional error has caused the conviction of an
       innocent person is extremely rare. . . . To be credible, such a claim requires
3      petitioner to support his allegations of constitutional error with new reliable
       evidence – whether it be exculpatory scientific evidence, trustworthy
4      eyewitness accounts, or critical physical evidence – that was not presented at
       trial.  Because such evidence is obviously unavailable in the vast majority of
5      cases, claims of actual innocence are rarely successful.

6  *Id.* at 324; *see also House v. Bell*, 547 U.S. 518, 538 (2006).

7      *Factual Background*

8      The main thrust of the prosecution's case against Petitioner was that Rachel was solely

9  in his care on the afternoon of May 1, 1994, when her injuries, including her fatal abdominal

10 injury, were inflicted.[4]  The State argued that no other adult had the opportunity to have

11 inflicted the injuries, which the experts deemed non-accidental.   Petitioner's defense was

12 that he had no motive to commit the crime, the evidence was all circumstantial, and the State

13 failed to prove beyond a reasonable doubt that he had inflicted the injuries.

14     Rachel's body was examined by Steven Siefert, an emergency room doctor, by

15 Sergeant Sonya Pesquiera of the Pima County Sheriff's Office, and by the medical examiner,

16 John Howard.  Dr. Siefert estimated that Rachel had been dead for two to three hours when

17 she was brought to the hospital at 6:16 a.m. on May 2, 1994.  (RT 4/6/95 at 77, 80.)  Rachel's

18 body was covered with bruises and abrasions, primarily on the front of her body and across

19 her face and forehead, but also on her back, arms, and legs.  (*Id.* at 81.)

20     Rachel had a large bruise, two-and-a-half to three inches in diameter, on each side of

21 her forehead, as well as intense coloration on the outer edge of her right eye and

22 discoloration below the eyes.  (*Id.* at 95-96.)  Dr. Howard assessed the purple coloration on

23 Rachel's face as injuries occurring probably one day prior to death, but there was also some

24 green discoloration which would have been present for several days.  (RT 4/12/95 at 116.)

25 Rachel had a head laceration, above and behind her left ear, which was one inch long and

26

27     [4]  The victim's mother, Angela Gray, was charged as a co-defendant and separately
   tried; on March 30, 1995, she was convicted of child abuse for failure to obtain medical care.
28 (*See* Dkt. 58 at 12.)

1  went down to the skull bone; Dr. Howard assessed it as having been inflicted one to two days

2  prior to death.  (*Id.* at 117.)  Because the edges of the wound were not uniform and were

3  scraped, it was not a cut from a sharp edge but was consistent with impact by a blunt object

4  with a relatively straight edge.  (*Id.* at 120-21.)  Rachel had bruising around the left side of

5  her face and behind her ear, as well as bleeding into both ear drums, consistent with an

6  impact to the side of the head.  (RT 4/6/95 at 90-91; RT 4/12/95 at 140-41.)  Rachel also

7  sustained internal bleeding due to blunt force trauma to the back of her neck, as well as

8  diffuse bleeding into the deep layers of her whole scalp.  (RT 4/12/95 at 137-38.)

9        Rachel had four or five small bruises on her right forearm and several on her right

10  hand, as well as six bruises on her left forearm and hand, injuries typically associated with

11  trying to ward off an impact (defensive type wounds).  (RT 4/6/95 at 85-87, 88-89; RT

12  4/12/95 at 39-40, 150-51.)  The medical examiner opined that the bruises and abrasions on

13  her hand and arm were inflicted approximately one day prior to death.  (RT 4/12/95 at 113-

14  14.)  This included swelling in her left middle finger that indicated injury to bone or

15  ligaments; that injury would have been painful and noticeable within an hour of its infliction.

16  (RT 4/6/95 at 89, 104-05; RT 4/12/95 at 114.)  The medical examiner identified abrasions

17  and contusions on Rachel's right and left thigh, both knees and her right leg; they varied in

18  appearance from less than a day old to approximately five days old.  (RT 4/12/95 at 113.)

19  He indicated that much of the bruising on Rachel's front side was consistent with having

20  been inflicted by knuckles but he could not identify with any particularity what actually was

21  used to inflict the injuries.  (RT 4/12/95 at 126, 160.)  Rachel had contusions and abrasions

22  on her back, her buttocks, and on the back of her left thigh, which were inflicted within one

23  to two days prior to her death.  (*Id.* at 112; RT 4/6/95 at 93.)  On her front torso, Rachel had

24  twenty to thirty bruises (most irregular, but one circular injury and some linear patterns),

25  large areas of abrasions, and a red bruise area under her right arm.  (RT 4/6/95 at 93-94; RT

26  4/12/95 at 115.)  Some of these bruises were recent, within the prior day to two days, while

27  others were of a coloration indicating an origin of several days prior to death.  (RT 4/12/95

28  at 115.)  There was a linear bruise pattern to the right of her navel; this injury was consistent

1   with the tire iron found underneath the driver's seat of Petitioner's van but could have been

2   caused by many different objects.  (RT 4/12/95 at 78, 128, 160.)

3        Rachel had blunt force injuries to her labia, bruising and scrapes, and her vagina had

4   a half-inch tear extending down from it.  (*Id.* at 134.)  The medical examiner determined that

5   the injury to Rachel's genitalia occurred about one day prior to her death.  (*Id.* at 133.)  These

6   injuries were nonaccidental, would have been painful, and were consistent with penetration

7   or attempted penetration.  (*Id.* at 134-36.)

8        Internally, Rachel had sustained blunt force injury to her abdominal organs, causing

9   a tear of the small bowel, and bruising of the tissues around the small bowel, the wall of the

10   large bowel, and the attachments of the intestine to the back of the abdominal wall.  (*Id.* at

11   141-42.)  The rupture of her bowel caused inflamation and irritation of the lining of the

12   abdominal tissues, a condition called peritonitis (*id.* at 145); when this type of damage is not

13   fixed, it causes death over a period of hours to days (RT 4/6/95 at 115).  The amount of force

14   required to rupture a healthy bowel is equivalent to a fall from more than two stories, an

15   automobile accident at greater than thirty-five miles per hour, or a forceful directed blow to

16   the abdomen (*id.* at 113-14; RT 4/12/95 at 151, 153-54); Dr. Siefert did not believe enough

17   force for such an injury could be inflicted by a child under the age of six (RT 4/6/95 at 116).

18   Rachel would have experienced pain at the time of the blunt force injury; Dr. Howard

19   indicated she would then have had continual abdominal pain while Dr. Siefert stated that the

20   initial pain could have diminished rather quickly.  (*Id.* at 119; RT 4/12/95 at 146.)  Over the

21   next several hours, a person with this condition would lose bowel function causing nausea,

22   vomiting, and dehydration.  (RT 4/6/95 at 119-20; RT 4/12/95 at 146.)  The medical

23   examiner opined that the injury was consistent with having occurred concurrent with many

24   of her other injuries, approximately one day prior to death; he stated that the abdominal

25   laceration could have occurred between 2:00 and 6:00 p.m. on May 1.  (RT 4/12/95 at 148-

26   49.)

27        Dr. Siefert opined that Rachel's bruising would have begun to appear within a few

28   hours of infliction, and he assessed that ninety-five percent of Rachel's injuries had occurred

1    within twelve to twenty-four hours before her death. (RT 4/6/95 at 121, 128, 103-108, 111,

2    127; RT 4/12/95 at 94.)  Some of the bruises were a few days old, including the bruising

3    beneath Rachel's eyes. (RT 4/6/95 at 103, 105, 111; RT 4/12/95 at 37.)  Dr. Siefert thought

4    some of the bruises and the head wound could have been incurred in a fall out of a van,

5    however, he concluded that Rachel had incurred nonaccidental trauma possibly at multiple

6    times by multiple mechanisms. (RT 4/6/95 at 128-29, 135; RT 4/12/95 at 35.)  Similarly, the

7    medical examiner explained that the number and multiple locations of the injuries were not

8    consistent with a simple childhood accident, but were consistent with having been beaten.

9    (RT 4/12/95 at 137.)  He concluded that the injuries he assessed as being approximately one

10   day old, which was the majority of them, were consistent with having been inflicted between

11   2:00 and 5:30 p.m. on May 1. (*Id.* at 117.)  Dr. Howard determined that Rachel died of blunt

12   abdominal trauma that caused a laceration of the small bowel and that it was a homicide. (*Id.*

13   at 155.)

14        Petitioner's twelve-year-old daughter, Brandi, testified at trial that on Saturday, April

15   30, 1994, she had seen a six-year-old boy hit Rachel in the stomach with a metal bar, causing

16   Rachel to cry for a few minutes. (RT 4/13/95 at 8-9, 16-17.)  After she stopped crying, she

17   was fine and went back to play with a friend. (*Id.* at 18.)

18        Joyce Richmond, a former girlfriend of Petitioner's, who described herself as still in

19   love with him at the time of trial, spent Saturday night April 30, with Petitioner until

20   approximately 3:00 a.m. (RT 4/11/95 at 135-36.)  She had recently come back to Tucson

21   with the hope of moving into Petitioner's trailer with him. (*Id.* at 129-31.)

22        Rebecca Lux, Rachel's ten-year-old sister, testified that she had been living with

23   Rachel, her brother, and her mom (Angela Gray) in Petitioner's trailer for the few months up

24   to and including May 1.  Petitioner never hit Rebecca, and she never saw him hurt Rachel

25   or her brother.  On Saturday night, April 30, Rachel seemed fine and ate dinner.  On Sunday

26   morning, May 1, Rebecca, Rachel, and their brother got up early, watched cartoons, and ate

27   lunch until Petitioner got up around 2:30 or 3:00 p.m.  She and her brother then asked if they

28   could ride their bikes; later when she put her bike away to go to a friend's house she saw

Rachel and thought she looked fine.  During that day she saw Petitioner and Rachel leave in Petitioner's van three times.  Petitioner told her the first time they left that they were going to the store to get some things for dinner; Rachel looked fine after the first and second trip with Petitioner.  The last time Petitioner and Rachel left, he told Rebecca they were going to his brother's house.  When she got back from her friend's house around 6:00 or 7:00 p.m., Rachel was on the couch; she was pale, throwing up, her head was bleeding, and she had bruises on her face, hands, and fingers.  Petitioner left for a time and when he returned, Rebecca's mother and Petitioner had an argument outside.  At some earlier time while they were living with Petitioner, Rachel had acted scared of Petitioner and did not want to be near him.  (RT 4/11/95 at 14-81.)

On May 1, the St. Charles family, who lived in a bus at a transient camp, got a visit from Petitioner around noon or thereafter; Ron St. Charles thought Petitioner seemed angry.  (RT 4/12/95 at 7-9, 17.)  That same day, Petitioner's neighbor at the Desert Vista trailer park, Michael Fleming, saw Rachel looking sick between 2:00 and 5:00 p.m.; she was pale with dark circles under her eyes, and she looked wet and like she wanted to vomit, but he did not see any blood.  (RT 4/7/95 at 164-66, 168, 171-73.)  Petitioner, Angela Gray, and the children were supposed to attend Petitioner's nephew's birthday party on May 1, but they never showed up.  (RT 4/11/95 at 119-24.)

On May 1, Norma Lopez sent her children Ray and Laura to the Choice Market on Benson Highway at three or four o'clock in the afternoon.  When they returned, they told her they had seen a white man with messy brown hair driving a yellow van and hitting a little blond-haired girl in the face and chest and the girl was crying.  The next day on the news Ms. Lopez heard that a man had been arrested in relation to the death of a little girl.  When she had the children watch the news they identified that person as the man they had seen in the van.  (RT 4/7/95 at 4-62.)  Nine-year-old Ray Lopez indicated that he had gone to the Choice Market with his twin sister around 5:00 p.m.  On the way home, he testified that he saw a white man with bushy hair driving by in a yellow van, hitting a little white girl in the chest with his fist and elbow.  He did not see the driver's face, only his hair from behind, but he

1   identified a picture of Petitioner at trial.  However, he stated that a photograph of Petitioner's

2   van was not the van he saw because the windows were different.  (*Id.* at 4-32.)  Ray's sister,

3   Laura Lopez, recalled going to Choice Market on a Sunday and on the way home seeing a

4   white man driving a yellow van.  She said the guy was ugly with puffy hair and he was

5   hitting a little white girl on the left side of her face with his elbow and the girl was crying.

6   Laura said she saw them through the front window of the van and could see part of the side

7   of each of their faces.  She remembered seeing the man from the van on the news that same

8   day.  (*Id.* at 32-46.)

9          Between 3:15 and 5:00 p.m. on May 1, 1994, Petitioner went into a Quik-Mart on

10   Benson Highway.  The store clerk testified that Petitioner got ice and that he was with a little

11   girl who sat on a ledge outside the store.  Although a lot of Rural Metro personnel regularly

12   came into the Quik-mart, the clerk did not notice an EMT treating the little girl outside the

13   store and believed she would have been aware if that had occurred.  (RT 4/7/95 at 142-149).

14   At trial, the State contended that Petitioner lied about having Rachel's head wound examined

15   at the fire station by a paramedic.  (RT 4/6/95 at 45-46.)  Petitioner's counsel countered that

16   Petitioner never said he went to the fire station but that a Rural Metro EMT who happened

17   to be at the Quik-Mart had examined Rachel's head wound.  (*Id.* at 71-72.)  In a pretrial

18   deposition, Petitioner's daughter, Brandi, said that her dad had told her his claim of taking

19   Rachel to see a paramedic was a lie; however, at trial, she claimed Richmond was the one

20   that had told her that her dad had never taken Rachel to a paramedic.  (RT 4/13/95 at 24-28.)

21          Other testimony at trial established that when the fire and/or ambulance crew from

22   Rural Metro goes out on a call, it is logged in; if they come across an emergency while

23   running an errand they call it into dispatch, which would be logged, and their unit is

24   considered out of service.  (RT 4/11/95 at 193, 197; RT 4/12/95 at 68-69.)  Their log gave

25   no indication, and the on-duty captain had no recollection, of providing treatment to a young

26   girl at the Quik-mart on May 1.  (RT 4/11/95 at 199-200.)  If treating a head wound, they

27   take spinal precautions and transport the person by ambulance; pursuant to their training, it

28   would not have been appropriate to send a child with head injuries home.  (*Id.* at 200-01; RT

1   4/12/95 at 69, 70.)

2          On May 1, between 7:00 and 8:00 p.m., Richmond stopped by Petitioner's trailer and

3   saw Rachel on the couch with a bleeding head; she said Rachel did not have bruises on her

4   face or hands. (RT 4/11/95 at 141, 151-53.)  Richmond's adult son was at Petitioner's trailer

5   with his mother on the evening of May 1 and saw that Rachel's head was bleeding; he saw

6   no bruising.  When he asked, Petitioner stated that he had taken Rachel to the fire

7   department.  (*Id.* at 154-65.)

8          Rebecca woke early in the morning on May 2 and found Rachel in the bedroom

9   doorway; she put her in bed.  Rebecca next woke to her mother yelling, and Petitioner and

10  her mother took Rachel to the hospital.  (*Id.* at 52-54.)  Between 6:00 and 7:00 a.m. that

11  morning, Petitioner knocked at Richmond's door and asked her to come with him; he was

12  upset and told her that something was wrong with Rachel and he was going to find out who

13  hurt her.  (*Id.* at 142-44.)  They took Rebecca and Brandi to the St. Charles's camp around

14  7:30 a.m.  (*Id.* at 55-56, 143; RT 4/12/95 at 10-11.)  Richmond took Petitioner's van to go

15  to the hospital to meet Angela and Rachel, but on the way there was pulled over by police

16  for driving erratically.  (RT 4/11/95 at 142-48.)

17         Ron St. Charles borrowed a truck, and he and Petitioner drove around and took the

18  girls to Petitioner's brother's house.  (RT 4/12/95 at 12-13.)  Petitioner was crying and very

19  distraught; Petitioner told St. Charles that he didn't want to go to the hospital because

20  Petitioner thought people would be suspicious that Rachel had suffered abuse.  (*Id.* at 22, 18.)

21  Later that morning, when they returned to the camp, Petitioner passed out, and St. Charles

22  and his wife helped Petitioner into a bed.  (*Id.* at 14-15; RT 4/11/95 at 179.)  Mrs. St. Charles

23  said that Petitioner was crying, moaning, and saying, "Rachel, I'm sorry, I love you."  (RT

24  4/11/95 at 174-83.)

25         Law enforcement located Petitioner at St. Charles's camp after 8:00 a.m. on May 2,

26  1994, and transported him to the Sheriff's Department.  (RT 4/6/95 at 167, 169, 172.)  On the

27  way there, Petitioner was upset, said there was something wrong with his little girl, and asked

28  if they would take him to see her.  (*Id.* at 173.)

1    Blood consistent with having come from Rachel was found on four pillowcases, a

2    wash cloth, a comforter, and a bed sheet found in Petitioner's trailer; the fingertip area, the

3    heal of the hand, and on one side of a glove found on the fence in front of Petitioner's trailer;

4    a Circle K bag, carpet samples, and the front passenger seat's upholstery from Petitioner's

5    van; and blue jeans worn by Petitioner at the time of his arrest.  (RT 4/7/95 at 85, 87-89, 107,

6    108-09, 118, 120-21, 126-27; RT 4/11/95 at 102-107, 109.)  A substance consistent with

7    vomit was found on Rachel's pajamas and a sleeping bag.  (RT 4/11/95 at 98-99.)  There was

8    a trace of blood not further identified on the red T-shirt and boots, but not the denim jacket,

9    worn by Petitioner at the time of his arrest; no blood was found on the tools tested from

10   Petitioner's van.  (*Id.* at 95, 100-01; RT 4/12/95 at 61-62.)  On the van carpet between the

11   seats, there appeared to be impressions stains (caused by a bleeding wound resting against

12   a surface) where blood had soaked through.  On the van's passenger seat and some of the

13   carpet there were spatter stains consistent with a person that has a bleeding injury being

14   struck or shaken causing the blood to spatter out.  (RT 4/12/95 at 72-73.)

15   *Analysis of New Evidence*

16   Petitioner's primary argument is that the fatal abdominal injury Rachel suffered was

17   not inflicted on Sunday, May 1; therefore, he contends there are many other possible

18   perpetrators that had access to Rachel in the relevant time period.  Further, he argues that

19   Rachel was a chronically abused child, which supports a theory that whoever was responsible

20   for the ongoing abuse is a more likely perpetrator of the fatal injury.

21   The central piece of evidence on which Petitioner relies is a 2002 declaration and

22   report by Dr. Janice Ophoven, a coroner and consultant with a specialty in pediatric forensic

23   pathology.  (Dkt. 89, Ex. 69.)  Dr. Ophoven stated Rachel's cause of death as "Dehydration

24   and shock due to blunt force trauma of the abdomen in the context of battered child

25   syndrome." (*Id.*, Ex. 69B at 5.)  She explained that a diagnosis of peritonitis can be delayed

26   for days and that a child can be up and about until the vital functions begin to fail.  (*Id.*)

27   Based on Rachel's post-mortem abnormal chemistries and weight, Dr. Ophoven opined that

28   Rachel's bowel laceration had to be present more than twenty-four hours, and possibly longer

1    than forty-eight hours prior to her death.  (*Id.* at 6.)   Further, she concluded that the

2    abdominal injury was inflicted significantly earlier than Rachel's vaginal injuries, perhaps

3    even days prior.  (*Id.*)  Finally, she stated that Rachel was subjected to "multiple episodes of

4    inflicted injury."  (*Id.*)  Dr. Ophoven also opined that Rachel's growth history and multiple

5    bruises were "consistent with a diagnosis of a chronically abused child."  (*Id.*)

6        At the request of Petitioner, Dr. Howard, the medical examiner that testified at trial,

7    submitted a 2004 declaration, in which he indicated that the laceration of Rachel's bowel

8    could have occurred greater than twenty-four hours before her death, perhaps longer than

9    forty-eight hours, as delayed onset of symptoms is possible with this type of injury.  (Dkt.

10   128, Ex. 1 at 1-2.)  Further, Dr. Howard stated, "The injuries to Rachel Gray's vaginal area

11   showed characteristics consistent with hours to perhaps days elapsing between the time of

12   her abdominal injury and her vaginal injury."  (*Id.* at 3.)  Similarly, Dr. Howard attested that

13   the older bruises on Rachel's body "could have been consistent with the blunt force trauma

14   to Rachel Gray's abdomen."  (*Id.*)

15       This new evidence, while significant, does not seriously call into question the jury's

16   verdict.  Dr. Howard has not retracted his testimony that the abdominal injury could have

17   occurred on Sunday afternoon while Rachel was with Petitioner.  Dr. Siefert also testified

18   that he believed ninety-five percent of Rachel's external injuries occurred twelve to twenty-

19   four hours prior to her death.  Further, Dr. Howard's revision, or clarification, is not entirely

20   reliable.  He states in his post-trial declaration that he answered only what was asked at trial

21   and, because no one asked if the damage to Rachel's abdomen could have happened greater

22   than twenty-four hours prior to death, he did not provide that information.  (*Id.* at 1.)  While

23   technically true that he was not asked that specific question, the following exchange took

24   place at trial:

25       Q    Based on the appearance of this area of Rachel's body upon autopsy, can
         you tell us what is most consistent with when this blow would have occurred
26       to Rachel?

27       A    The injury is typical of having occurred about one day prior to death.

28       Q    You say about one day.  We're talking about the same age range as the

- 17 -

1   laceration in her head, her genital injuries, and the external bruises you
    characterized from that time frame?
2
    A     Yes.
3

4   (RT 4/12/95 at 148.)

5          While Dr. Howard now states the abdominal injury could have occurred more than

6   twenty-four hours prior to her death, when given an open-ended opportunity to date the

7   injury at trial, he identified the time frame as within one day of her death.  Similarly, in a

8   pretrial interview, Dr. Howard stated that the inflammatory response of Rachel's body

9   indicated the injury had occurred hours to perhaps a day prior to death.  (Dkt. 89, Ex. 49 at

10  29, 35.)  Dr. Howard also now states that the abdominal injury and the vaginal injury could

11  have occurred days apart; however, in the exchange quoted above he testified that these

12  injuries were of a similar age.  These changes to Dr. Howard's testimony, ten years after the

13  fact, are not highly persuasive.

14         Dr. Ophoven's as-yet unimpeached testimony amounts to a disagreement with Dr.

15  Howard's trial testimony that Rachel's abdominal injury likely occurred in the twenty-four

16  hours prior to her death.   Dr. Ophoven does not call into question the trial testimony

17  regarding the time-frame for Rachel's other non-fatal injuries – within one day of her death.

18  Thus, a reasonable juror could believe that the abdominal injury happened in the twenty-four

19  hours prior to Rachel's death along with many of her other injuries, or that Petitioner was

20  responsible for all of the injuries even if some of them occurred prior to Sunday.  Petitioner's

21  alternative theory, that he did not inflict the abdominal injury, is less plausible because a

22  juror would have to believe that at least two days before her death someone inflicted a fatal

23  abdominal injury on Rachel (and she did not tell anyone) and that the following day she

24  received additional serious injuries and extensive diffuse bruising during the time she was

25  with Petitioner.  Dr. Ophoven's testimony is not enough to demonstrate that no reasonable

26  juror would have found Petitioner guilty beyond a reasonable doubt.

27         In support of his argument that Rachel's abdominal injury was inflicted prior to May

28  1, Petitioner cites two other documents.  First, in a May 19, 1994 police interview, a neighbor

- 18 -

1    in the trailer park, Isobel Tafe, stated that she saw Rachel on Saturday afternoon, April 30,

2    around 2:00 or 3:00 p.m. and thought she seemed scared and looked a little gray like she

3    might be sick. (Dkt. 89, Ex. 51 at 1-2, 3.) Second, Rachel's older sister Rebecca executed

4    a declaration in 2002 in which she stated, "On the weekend that Rachel died, I remember her

5    being pale as though she were not feeling well on Saturday for a while. She took a nap for

6    a couple of hours and then seemed to feel better." (*Id.*, Ex. 5 at 5.) This more recent

7    declaration is in direct contradiction to an October 1994 defense interview in which Rebecca

8    stated that on Saturday April 30, Rachel was normal and fine all day, and that she did not

9    look sick; Rebecca stated that they were awake watching television from noon until 9:00 p.m.

10   that day. (*Id.*, Ex. 70 at 45-47, 49-51.) Similarly, at trial, Rebecca testified that Saturday

11   evening Rachel was not sick and seemed okay. (RT 4/11/95 at 29.) There is also a

12   contradiction between Rebecca's 1994 statement, in which she said that Rachel watched

13   television at home all day Saturday and Tafe's statement that Rachel came over to play that

14   afternoon.

15          In sum, Rebecca's new declaration is not persuasive on this point, and the limited

16   statement from Tafe is not directly probative of when the abdominal injury occurred.

17   Further, another neighbor and Rachel's brother indicated that Rachel was riding her bike

18   around on Sunday afternoon and appeared to be fine. (Dkt. 89, Ex. 16(1) at 4, Ex. 24 at 3.)

19   Rebecca also testified that Rachel was fine Sunday morning and for much of the afternoon.

20   (RT 4/11/95 at 41-42, 70-72.) None of the experts suggested that, once Rachel began to feel

21   the ill effects of the abdominal infection, she could have had periods thereafter of being fine.

22   Although Dr. Howard and Dr. Siefert indicated that after the initial injury Rachel could have

23   functioned, they suggested that, once the irritation and inflammation progressed to a certain

24   point, the symptoms would have been ongoing and severe. (RT 4/6/95 at 119-20; RT 4/12/95

25   at 148.)   Multiple sources indicated that Rachel was fine as of Sunday morning.

26   Additionally, Dr. Howard testified that Rachel would likely have stopped wanting to eat

27   immediately after the injury. (RT 4/12/95 at 148.) There was no evidence suggesting Rachel

28   did not eat after Saturday morning; in fact, there was evidence to the contrary.

1    In support of a slightly different theory – that Rachel's fatal injury was inflicted by

2  a child and not by a chronic abuser – Petitioner has submitted three documents.  The first is

3  a report from a professional tracker, who studied the photographs of Rachel's body and

4  identified what he concluded were three bare footprint impressions on her abdomen, and

5  which he determined were deliberate and came from a child between the ages of four and

6  eight.  (Dkt. 135, Ex. 1 at 1-2.)  In conjunction with that report, Dr. Ophoven opined that

7  Rachel's abdominal injury was consistent with a child stomping or jumping on her.  (*Id.*, Ex.

8  2.)  Petitioner has also provided an additional declaration from the trial investigator, who

9  learned through interviews that Rachel was around other children the day before she died and

10  a forty pound, two-and-a-half year old was seen hitting Rachel in the stomach with a piece

11  of metal that day.  (*Id.*, Ex. 3 at 3-4.)

12    For this evidence to be of consequence, a juror would first have to determine that

13  Rachel's abdominal injury did not occur on the day of her death, when she was with

14  Petitioner; as discussed above, such a conclusion is not foregone in light of all the evidence.

15  Additionally, the trial testimony indicated that, with a few exceptions, the bruising on

16  Rachel's body had been inflicted within the prior twenty-four hours; there is no testimony

17  that significant portions of the abdominal bruising could have been forty-eight hours old or

18  older.  Despite the tracker's opinion, considering all the evidence, a reasonable juror could

19  conclude that the bruising on Rachel's body was not inflicted by a child's bare foot.  As Dr.

20  Howard testified at trial, much of the bruising on Rachel's torso was consistent with coming

21  from a person's knuckles, and the linear bruise pattern (which runs through the middle of the

22  left footprint as identified by the tracker) could have been caused by a tire iron.  (RT 4/12/95

23  at 126, 128.)  Ultimately, Dr. Howard concluded that there was "nothing particular about

24  those injuries which would allow you to identify with particularity the instrument that was

25  used to inflict them."  (RT 4/12/95 at 160.)  As a final matter, no evidence has been proffered

26  at trial or since that anyone witnessed a child forcefully stomp on Rachel.  Nor is there

27  evidence that she reported such an incident had taken place, and Petitioner has not suggested

28  a plausible reason Rachel would have kept such a significant occurrence secret for two days.

1    Finally, evidence that a child hit Rachel in the stomach with a piece of metal on the Saturday
2    before she died was already admitted at trial through the testimony of Petitioner's daughter
3    (RT 4/13/95 at 8-9, 16-17); therefore, the investigator's declaration to that effect adds
4    nothing to the analysis.

5         Petitioner also contests the blood spatter evidence presented at trial.  Specifically, he
6    argues that his new blood spatter expert contradicts Sergeant Pesquiera's testimony that
7    Rachel's scalp laceration occurred in Petitioner's van.  Sergeant Pesquiera did not testify that
8    the laceration occurred in the van; rather, she testified that Rachel bled in the van, which is
9    uncontested, and that the blood on the van seat could have been caused by her being struck
10   after her head was already bleeding, causing the blood to spatter out.  (*Id.* at 73.)  This is not
11   significantly different than the statement provided by Petitioner's expert, Stuart James, who
12   determined that the bloodstains on the van seat were "projected," meaning they were
13   produced by rapid movement of a person or object containing wet blood.  (Dkt. 89, Ex. 48
14   at 5.)  Sergeant Pesquiera did testify that blood droplets on the right sleeve of the driver of
15   the van would be consistent with the driver hitting Rachel in the passenger seat.  (RT 4/12/95
16   at 75.)  James stated that the presence of Rachel's blood on Petitioner's shirt was not
17   indicative of him inflicting the laceration; rather, he states that it means only that Petitioner's
18   clothing came into contact with some of Rachel's blood, which could have occurred by
19   lifting or attending to her.  (Dkt. 89, Ex. 48 at 6.)  The blood evidence at trial and the
20   statement by James are both inconclusive as to where the laceration occurred or who inflicted
21   it; it established only that Rachel bled in the van and that some of the blood got onto
22   Petitioner's shirt and was projected onto the seat by a rapid movement of Rachel's head.
23   Thus, Petitioner's "new evidence" is inconsequential.

24        As a final matter, Petitioner presents two declarations to undermine the testimony of
25   Ray and Laura Lopez – the twin children that testified they saw Petitioner hitting a little girl
26   in his van while driving.  The first is from the trailer park manager, who declared that Rachel
27   was too small to be seen when in Petitioner's van.  (*Id.*, Ex. 17 at 2.)  The second is a new
28   declaration from Rebecca, who states that she could only see Rachel's pony tail when Rachel

1   was sitting in the passenger seat of Petitioner's van.  (*Id.*, Ex. 5 at 6.)

2        Neither is persuasive evidence of actual innocence.  First, there are numerous

3   inconsistencies between Rebecca's pre-trial interview, her trial testimony, and her 2002

4   declaration – one example being her various recollections of how Rachel was feeling and

5   how she spent her time on the Saturday prior to her death, as discussed above.  Rebecca was

6   only ten at the time Rachel died, and her declaration nine years later does not seem the kind

7   of "trustworthy eyewitness account" referred to in *Schlup*.  513 U.S. at 324.  Similarly, the

8   trailer park manager's 2002 declaration was executed more than eight years after the murder.

9   Second, the Lopezes' testimony was impeached significantly at trial, in that Ray Lopez did

10  not see the face of the van's driver, Laura only saw his face "a little bit," and Ray testified

11  that a picture of Petitioner's van was not the van he saw because the windows were different.

12  (RT 4/7/95 at 25, 29, 36.)  The new declarations add slightly to the impeachment of the

13  Lopezes' testimony, but do not provide any direct exoneration of Petitioner's conviction for

14  inflicting the fatal blow to Rachel's abdomen.

15        It bears remembering that the fundamental miscarriage of justice standard is

16  "demanding and permits review only in the 'extraordinary' case."  *House*, 547 U.S. at 538

17  (quoting *Schlup*, 513 U.S. at 327.)  This is not such a case.  As argued by Petitioner, the

18  critical issue is the timing of Rachel's fatal abdominal injury because it is uncontested that

19  she spent the majority of her time on Sunday with Petitioner.  While the new testimony of

20  Dr. Ophoven is compelling and may have been persuasive to some jurors in the first instance,

21  it is not sufficient on collateral review to establish that no reasonable juror would have found

22  Petitioner guilty.  Dr. Howard's testimony remains that Rachel's abdominal injury could

23  have occurred on Sunday afternoon while she was with Petitioner.  The Court has considered

24  all of the new testimony submitted by Petitioner, as well as all of the evidence presented at

25  trial, and finds that Petitioner has failed to meet the *Schlup* gateway standard of actual

26  innocence. In assessing Petitioner's miscarriage of justice argument the Court assumed the

27  truth of Petitioner's new facts; because Petitioner cannot satisfy the actual innocence

28  standard even when his facts are taken as true, an evidentiary hearing is not warranted.  In

1  sum, to the extent any of Petitioner's claims are procedurally barred, he has not satisfied the
2  fundamental miscarriage of justice standard to overcome that default. The defaulted portions
3  of Claim 1D are denied.

4                          Analysis of Exhausted Portion of Claim 1D

5          The remaining aspect of Claim 1D alleges IAC for failure to meet with Petitioner a
6  sufficient number of times to adequately prepare a defense for trial. More specifically,
7  Petitioner contends Bruner did not establish a trusting attorney/client relationship allowing
8  Petitioner to discuss strategy and possible investigative possibilities.

9          At the evidentiary hearing during Petitioner's PCR proceedings, Petitioner testified
10  that Bruner came to see him approximately five times prior to his sentencing (RT 9/18/00 at
11  6-8, 18) and that Leslie Bowman, Bruner's law partner, came to the jail approximately a
12  dozen times (*id.* at 13). Bruner testified that a review of his records indicated one or both of
13  them went to see Petitioner approximately monthly at the jail. (*Id.* at 21-22.) Petitioner
14  testified that Bruner did not discuss with him what witnesses would be called or what the
15  defense would be (*id.* at 8), but that Bowman would inform him of what was going on in the
16  case (*id.* at 14). Bruner testified that he would have discussed with Petitioner the evidence
17  against him, and what Petitioner recalled happening. (*Id.* at 22.)

18          The PCR court noted that the claim was not factually supported because the testimony
19  established that Bruner met with Petitioner five or six times (ROA-PCR 31 at 4), and that de
20  facto co-counsel Bowman met with him numerous additional times. More importantly,
21  Petitioner failed to explain how he was prejudiced by counsel's allegedly limited contact with
22  him. (*Id.*) The court concluded that counsel was not deficient and there was no prejudice.
23  (*Id.*)

24          This claim, as set forth in the Amended Petition, suffers from the same fatal flaw as
25  it did when raised during the PCR proceedings – it does not allege any prejudice related
26  specifically to the allegation that counsel failed to have sufficient pre-trial meetings with
27  Petitioner. (*See* Dkt. 58 at 37-95.) All of Petitioner's assertions regarding prejudice tie to
28  Petitioner's defaulted allegations that his counsel failed to conduct a sufficient investigation.

1   (*Id.*)  Additionally, when the Court ordered supplemental briefing regarding this claim, it

2   specifically requested that Petitioner "re-brief the evidentiary motions with respect to the

3   exhausted portion of Claim 1D as if it is an independent claim." (Dkt. 115 at 35.)  Despite

4   that direction, Petitioner's supplemental brief did not request any evidentiary development

5   nor a hearing regarding the exhausted portion of the claim.  (Dkt. 128.)  None of the

6   development requested in the supplemental brief regarding the defaulted portion of the claim,

7   nor in the original evidentiary development motions, appears directly relevant to this portion

8   of the claim.  (*Id.*; Dkts. 89, 90.)

9          Based on the factual development in state court, which established that Petitioner was

10  visited on a regular basis by one or both counsel prior to trial, Petitioner fails to establish that

11  counsel's conduct was deficient.  Further, Petitioner has not alleged, much less proven, that

12  he was prejudiced by counsel's alleged failure to hold sufficient pre-trial meetings with him.

13  The PCR court's denial of this claim was not an objectively unreasonable application of

14  *Strickland*.  This part of Claim 1D is denied on the merits.

15  **Claim 1A**

16         Petitioner alleges counsel was ineffective for failing to request a mistrial after

17  Petitioner was seen by jurors in handcuffs and a leg brace.  Respondents concede this claim

18  was exhausted during Petitioner's PCR proceeding.  (Dkt. 69 at 15.)

19         Factual Background

20         At the beginning of the fourth day of trial, the judge addressed the prosecutor, Ms.

21  Mayer, and defense counsel, Mr. Bruner and Ms. Bowman, outside the presence of the jury:

22         THE COURT:    We have a problem.  We need to make a record.

23                Let the record show the absence of the jury.

24                My understanding – well, it's now 10:20.  About 10 minutes to 10 two
               deputies were escorting Mr. Jones to the courtroom and apparently three of our
25             jurors – you are sure they are ours?

26         MR. BRUNER:    Yes.

27         THE COURT:    Were able to see Mr. Jones as he was escorted from the
               prisoner elevator down the hallway, to the hallway that leads to my courtroom,
28             and I think we need to explore that.

First of all, he was obviously in custody, but dressed as he is now in civvies.  Was he handcuffed?

DEPUTY LUKER:     Yes, sir.

THE COURT:     What about his feet?

DEPUTY LUKER:     Leg brace.

THE COURT:     The one he has on now?

DEPUTY LUKER:     Right.

THE COURT:     Didn't have the leg shackles?

DEPUTY LUKER:     No.

THE COURT:     Hands front or back?

DEPUTY LUKER:     Front.

THE COURT:     Which – can you tell us where he was when the jurors kind of broke through the door?

DEPUTY LUKER:     Almost parallel to the door.  They pushed it through.  They started coming in.

THE COURT:     So it was kind of right there, and it was three jurors.  The door – for the record, I am going to say how this place is laid out.  I am more than a bit frustrated, and I'm going to say the Pima County court has nine floors.  Division V, which is my courtroom, is located on the fifth floor.  On the fifth floor there are three Superior Court divisions on each side of the building, that is the east side and west side, separated by a fairly large lobby.  In the middle or the north end of the lobby area is a bank of public elevators two on each side.  There is on the north side of the lobby an area waiting room for jurors and spectators.  On the south side of the fifth floor there is a hallway with a number of jury rooms, I think four, and, of course, the prisoner elevator where in-custody people are brought to the various divisions on this floor.

The people who designed this building causes [sic] us a daily proposition to have to deal with the possibility of jurors comingling or at least being able to observe in custody defendants being transported back and forth, which is a constant source of possible legal principle in any given criminal trial where an in-custody defendant is involved, and why this particular problem couldn't have been foreseen and avoided by simply making some sensible design changes so jurors were congregated on the other side of the building is utterly beyond me.  This kind of problem is needless and happens all too frequent.  Now, that's one thing.

I guess I should also say that the deputies necessarily to bring people to my courtroom have to transport them from the prisoner elevator located on the south side of the building and just immediately north of the passageway from the lobby area to the hallway then east to the corridor that leads to my courtroom which happens to be in the northeast corner of the fifth floor, and the courtroom – or rather the jury room where the jurors are located is located

- 25 -

1    in the east portion of the south side of this floor.

2        So apparently Mr. Jones and the two deputies who were escorting him
     were about even with the double doorway that leads to the south hallway when
3    the jurors kind of broke through.  It is a double doorway.  As I understand it,
     it was locked, which is usually how the deputies do that when people are being
4    escorted from either the holding area, which there is a holding area on the
     south side of this floor also or from the prisoner elevator to the various
5    courtrooms, but there was nobody standing guard.  The door was just locked,
     and apparently because of the way the doorway and the lock works it's
6    possible to break through it, inadvertently, no doubt, and evidently that's what
     happened here.
7
         So I think probably we need to find out if we can which three jurors
8    saw Mr. Jones and what they saw and whether they said anything about it and
     go from there.
9
         Counsel have any advice for me?
10
     MS. MAYER:    No.
11
     MR. BRUNER:    No, that seems fine.
12
     MS. BOWMAN:    I think you are handling it properly.
13
     THE COURT:   I don't want to make too much of this.  Probably a fairly, you
14   know, vexing – I feel in part has to do with the record we need to make.  I
     don't know it's a good idea to bring them all in here and say we got a problem
15   and here's what the problem is.  Maybe that three didn't think anything of it,
     haven't said anything and understand they must presume that Mr. Jones is
16   innocent and all of that.

17   MR. BRUNER:    I think if we just brought the three in and just asked them
     if they have spoken about it with the other jurors.
18
     (RT 4/11/95 at 3-7.)
19
         The three jurors were identified and brought into the courtroom for the following
20
     colloquy:
21
     THE COURT:     Folks, I need to find out whether we have any kind of
22   problem or not associated with anything you folks may have seen when you
     got here this morning.
23
         Did you observe Mr. Jones on your way to the jury room early this
24   morning?

25       (Whereupon, all answer affirmatively.)

26   THE COURT:    Tell us what you saw?  Were you three together?

27       (Whereupon, all answer affirmatively.)

28   THE COURT:    First thing I want to find out was if the three of you all at

1    once went through the doorway?

2    A JUROR:   Yes.

3    THE COURT:   Were any of the other jurors with you folks?

4    A JUROR:   No.

5    THE COURT:   Did you say anything to the others about what you saw?

6    A JUROR:   I didn't.

7    THE COURT:   What did you see?

8    A JUROR:   Just the defendant and an officer, and we stopped, and he asked us to go on the other side of the door.  We did that.

9    THE COURT:   Is that what you saw, Miss Haro?

10    A JUROR:   Yes.

11    THE COURT:   Miss Young?

12    A JUROR:   Yeah.

13

14    THE COURT:   Anything at all about what you saw that would in any way interfere with your following the instruction you heard me talk about, and you will hear some more at the end of the case, about presuming Mr. Jones to be innocent?

15

16    A JUROR:   No, just saw him walking.

17    THE COURT:   I don't think I have really anything more.  I don't want – you didn't do anything wrong okay?

18

19    Counsel have any further questions for either of these ladies?

20    MS. MAYER:   No.

21    MR. BRUNER:   No.

22    THE COURT:   Can they go back down with the others?  Do us a big favor and not mention what you were asked about.

23    (*Id.* at 10-12.)

24    After those jurors were dismissed, the court asked how counsel wanted to proceed:

25

26    MR. BRUNER:   Well, I have just spoken briefly to the defendant.  The – I mean, the jury has seen Miss Bowman and I leaving the courtroom alone on several occasions.  I think they probably could assume Mr. Jones is in jail. The deputies who are in the courtroom are dressed as deputies and are armed and – all of that.

27

28

1
2
> I don't think that there's any prejudice to the extent I'm going to ask for a mistrial.  I don't think this warrants retrying the case.  I am satisfied Mr. Jones is satisfied with the responses of the jurors.

3
4
> THE COURT:   I think they're all conscientious people and can do what they need to do.  It would be a grave injustice to have to start over.  I don't know.  What do you think?

5
6
7
> MS. MAYER:   I concur with Mr. Bruner.  We painstakingly made sure the jury is not composed with a bunch of peabrains, and I would be real – given the nature of the charges I would be real surprised anybody assumed he was out of custody.

8
9
> THE COURT:       I would not like to call any undue attention to it.  My instincts are simply to do nothing.  We made the record and keep our eyes and ears pealed, but I think it's okay.

10
(*Id.* at 12-13.)

11   The PCR court held an evidentiary hearing on this claim.  Petitioner recalled that he

12 and Bruner discussed the jurors seeing him in restraints, and Bruner "thought something

13 ought to be done," but Petitioner did not request any specific relief.  (RT 9/18/00 at 11.)

14 Bruner did not have an independent recollection of this issue prior to reviewing the

15 transcripts, but he testified that if he had thought that juror bias was a "serious problem" he

16 would have requested a mistrial.  (*Id.* at 26.)  Bruner thought they had a favorable jury, as

17 good as they could get, including minorities, and he did not want to lose that by seeking a

18 mistrial.  (*Id.* at 32.)  He did not recall whether he discussed this issue with Petitioner, but he

19 thought it likely that he did not.  (*Id.*)

20   In denying this claim the PCR court made the following ruling:

21
22
23
24
> First, the trial court addressed the fact that three jurors saw the Defendant in handcuffs, and the three jurors informed the court that they would not be prejudiced against Defendant.  Trial counsel raised the issue with the judge and with his client, and was satisfied that there would be no prejudice to his client.  This Court finds that counsel's performance was not deficient.  In the alternative, the Court finds no prejudice.

25   (ROA-PCR 31 at 3 (citation omitted).)

26   <u>Analysis</u>

27   Although brief, the trial court inquired with the jurors about what had occurred and

28 whether it affected them.  During that colloquy, the jurors conveyed three critical facts – the

- 28 -

1    essence of what they observed was Petitioner being escorted by officers, the encounter would

2    not interfere with their assessment of the evidence and ability to follow the court's

3    instructions, and they had not informed the other jurors about what they saw.  First, Petitioner

4    concedes that, at best, the prejudicial effect of "an inadvertent meeting with a defendant in

5    constraints is not well-settled" (Dkt. 58 at 32); in fact, the courts have indicated that the brief,

6    unintended glimpse of Petitioner in custody is not the kind of incident that is inherently

7    prejudicial.  *See Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (noting that the Ninth

8    Circuit has found that a jury's unintentional and brief look at a shackled defendant has not

9    warranted habeas relief); *cf. Holbrook v. Flynn*, 475 U.S. 560, 569 (1986) (sitting through

10   the **entirety** of a trial in prison attire or while visibly shackled is inherently prejudicial).

11   Prejudice is not inherent because Petitioner's brief encounter with three jurors did not create

12   an "unacceptable risk" that "impermissible factors" would influence the jury and deny him

13   a fair trial.  *See Holbrook*, 475 U.S. at 570.  Second, counsel had strategic reasons for not

14   wanting a mistrial because he thought they had a favorable jury.  Petitioner did not urge

15   counsel to seek a mistrial, and Bruner indicated that he and Petitioner were satisfied with the

16   jurors' responses.  Additionally, based on the jurors' observations of the movements of

17   Petitioner and his counsel in the prior days, as well as the nature of the charges against

18   Petitioner, counsel reasonably believed that the jury likely assumed Petitioner was in

19   custody.  Finally, the trial court was anxious not to draw excessive attention to the issue and

20   counsel concurred with that approach.  Petitioner has not indicated what critical additional

21   questioning counsel chose to forego.  In light of the circumstances and the assessments by

22   counsel, it was not objectively unreasonable for counsel not to pursue further questioning or

23   to seek a mistrial.  Thus, Petitioner fails to satisfy the performance prong of *Strickland*.

24          Petitioner argues that he was prejudiced by counsel's failure to question the jurors

25   because that prevented counsel from making an informed decision regarding whether the

26   jurors were biased against him.  First, as discussed above, the court questioned the jurors and

27   they all agreed that their deliberations would not be affected by what they saw.  Petitioner

28   presents no additional information suggesting that the jurors were biased by what they

1    witnessed.  Second, he has made no argument suggesting that further questioning would have

2    revealed any probative information or that moving for a mistrial would have been successful.

3    In fact, he does not provide any argument based on the standards for a mistrial in state court,

4    nor does he cite any state law indicating a mistrial was warranted.  The circumstances of the

5    situation – a brief chance encounter – are not of the kind with a high likelihood of creating

6    bias.  *Cf. Estelle v. Williams*, 425 U.S. 501, 504-05 (1976) (explaining that the concern

7    related to compelling a defendant to go to trial in prison attire is that it acts as a "constant

8    reminder" of the accused's status and is "so likely to be a continuing influence throughout

9    trial" that it creates an unacceptable risk that impermissible factors will influence the

10   verdict).  Petitioner has failed to establish that he was prejudiced by counsel's conduct.

11          The PCR court's denial of this claim was not an unreasonable application of

12   *Strickland*.  Claim 1A is denied.

13          **Claim 1B**

14          Petitioner alleges counsel was ineffective for failing to interview co-defendant Angela

15   Gray.  Respondents concede this claim was exhausted in Petitioner's PCR proceeding.  (Dkt.

16   69 at 19.)  In a prior order, the Court found that Petitioner had not been diligent in attempting

17   to develop this claim in state court as required by § 2254(e)(2); therefore, evidentiary

18   development in this Court was denied.  (Dkt. 115 at 32-34.)

19          During Petitioner's PCR proceeding, the court held a hearing at which Bruner testified

20   that he asked Gray's counsel for an interview with her and the request was denied; he did not

21   take any further steps to pursue an interview at that time or after she was tried.  (RT 9/18/00

22   at 25, 27.)  Bruner recalled that Gray's counsel had recounted what Gray would say if

23   interviewed and that it would not have been favorable to Petitioner.  (*Id.* at 26.)

24          The PCR court denied the claim because it was not supported by an offer of what

25   Gray would have said and how it would have been helpful to Petitioner's case; thus,

26   Petitioner failed to demonstrate actual prejudice.  (ROA-PCR 31 at 3.)  The court concluded

27   that Petitioner had not demonstrated that counsel's performance was deficient or that he had

28   been prejudiced.  (*Id.*)

1    In this Court, Petitioner alleges that if counsel had interviewed Gray, "crucial

2    information would have surfaced regarding other suspects." (Dkt. 58 at 34.) Petitioner's

3    more specific allegations are based on facts developed since the PCR proceeding, which this

4    Court is prohibited from considering pursuant to 28 U.S.C. § 2254(e)(2). The vague

5    allegations before the Court fall far short of affirmatively proving actual prejudice as required

6    by *Strickland*. 466 U.S. at 693. Petitioner has not alleged any facts, supported by the state

7    court record, demonstrating that if counsel had interviewed Gray there is a reasonable

8    probability he would not have been convicted. The PCR court's ruling to that effect is not

9    objectively unreasonable. Claim 1B is denied.

10   **Claim 1C**

11   Petitioner alleges his appointed counsel, Bruner, was ineffective for failing to pursue

12   appointment of second counsel. The Court found, in a prior order, that this claim was

13   properly exhausted. (Dkt. 115 at 7-8.) In that same order, the Court found that Petitioner had

14   not been diligent in attempting to develop this claim in state court as required by

15   § 2254(e)(2); therefore, evidentiary development in this Court was denied. (Dkt. 115 at 34-

16   35.)

17   Bruner moved for appointment of his law partner Leslie Bowman as second counsel.

18   (ROA 33-34.) At oral argument on the motion, Bruner urged the court to officially appoint

19   Bowman. In response, the court stated:

20       I can't let you do that, but I am not going to tie your hands. I think you would
         be justified in delegating some of the work that needs to be done to her and
21       asking when it comes time for me to evaluate how much we need to
         recompensate you telling me about that.
22

23   (RT 7/27/94 at 3.) The court then reiterated its preference to allow Bruner to delegate work

24   without formally appointing a second attorney. (*Id.* at 4.)

25   During the PCR evidentiary hearing, Petitioner testified that Bowman came to see him

26   approximately a dozen times at the jail, and that she was present during trial and sentencing.

27   (RT 9/18/00 at 13.) Bruner referred to Bowman as "second counsel" or "second chair," and

28   said that she helped interview witnesses and investigate the case. (*Id.* at 21.) The PCR court

1   denied this claim because the trial court, while denying official appointment of second

2   counsel, authorized counsel to bill for some amount of assistance from Bowman. (ROA-PCR

3   31 at 4.) The court found that "[t]rial counsel did in fact have assistance from his law partner

4   at all major phases of the proceedings, from pre-trial to sentencing." (*Id.*) Therefore, the

5   court concluded that counsel's performance was not deficient and Petitioner was not

6   prejudiced. (*Id.*)

7       As an initial matter, Petitioner appears to be contending, in part, that Bowman was not

8   qualified to be second counsel. In turn, he argues that counsel failed to conduct sufficient

9   investigation, delegated interviews to Bowman, and that Petitioner received what amounted

10   to no assistance of counsel.

11       This claim is quite different than that framed in state court and appears to be an

12   attempt to shoe-horn in a broad claim of insufficient investigation. As discussed in the

13   Court's prior order addressing exhaustion, the claim exhausted and properly before the Court

14   is only that Petitioner's appointed counsel, Bruner, did not sufficiently pursue or succeed in

15   getting second counsel appointed. (Dkt. 115 at 7.)

16       In that vein, Petitioner argues that Bruner should have followed up and again asked

17   for appointment of additional counsel. The trial court made clear that it was not going to

18   officially appoint second counsel; therefore, Bruner had no basis to re-urge that request.

19   Similarly, because the court agreed to provide compensation for the use of his partner,

20   Bruner had no reason to seek appellate review of that denial. Bruner's performance in this

21   arena was not objectively unreasonable. Additionally, Petitioner has not demonstrated how

22   he was prejudiced by not having a second chair officially appointed when second counsel

23   actively participated in the case. The quality of how counsel litigated the case and their

24   qualifications to defend a capital case are outside the scope of this narrow claim as exhausted

25   in state court.

26       The PCR court's finding that counsel was not deficient and that Petitioner was not

27   prejudiced and, therefore, not entitled to relief under *Strickland*, was not objectively

28   unreasonable. This claim is denied.

1      **Claim 1E**

2         Petitioner alleges his counsel was ineffective for failing to inform him of his right to

3 testify at trial.  Respondents concede this claim was exhausted during Petitioner's PCR

4 proceedings.  (Dkt. 69 at 31.)  The Court previously denied evidentiary development of this

5 claim (Dkt. 115 at 35-36); therefore, the Court's assessment of this claim is limited to the

6 state court record.

7         At the PCR evidentiary hearing, Petitioner testified that he and Bruner did not discuss

8 whether he would testify; Petitioner never told counsel he wanted to testify, and Bruner

9 informed him he would not be testifying.  (RT 9/18/00 at 9-10, 14, 16, 17.)  Bruner had no

10 recollection of discussing with Petitioner the possibility of Petitioner testifying, and he did

11 not think he ever contemplated Petitioner testifying.  (*Id.* at 23, 29.)  Bruner anticipated that

12 the prosecution would introduce Petitioner's videotaped statements, which ultimately it did

13 not do, and that he could use portions of those statements in support of the defense without

14 subjecting Petitioner to cross-examination. (*Id.* at 23, 29.)

15         The PCR court found Petitioner's assertion that he did not know he had a right to

16 testify not credible.  The court denied the claim because it determined there was no support

17 for Petitioner's allegation that he was denied the right to testify.  (ROA-PCR 31 at 5.)

18         As an initial matter, the Ninth Circuit has held that an IAC claim based upon counsel's

19 failure to inform a defendant of his right to testify is foreclosed by the holding in *United*

20 *States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990) – i.e., when a defendant is silent in the

21 face of his counsel's decision not to call him as a witness, he waives his right to testify.  *See*

22 *United States v. Nohara*, 3 F.3d 1239, 1243-44 (9th Cir. 1993).

23         Counsel's decision not to call Petitioner to testify was reasonable in light of his

24 concerns regarding Petitioner being subjected to cross-examination and the fact that

25 Petitioner never expressed a desire to testify.  *See United States v. Eisen*, 974 F.2d 246, 265

26 (2d Cir. 1992) (upholding counsel's choice not to call defendant to the stand, despite

27 defendant's repeatedly expressed desire to testify, because "[i]t was a reasonable tactical

28 decision to rely exclusively on attacking the Government's witnesses and presenting

1   independent testimony rather than to subject [defendant] to all of the risk attendant on cross-

2   examination").  Further, Petitioner has not alleged sufficient prejudice with respect to this

3   claim.  He states generally that he was not given the opportunity to "tell the jury that he had

4   not committed the crime."  (Dkt. 58 at 98.)  Petitioner did not assert in the PCR hearing, nor

5   does he assert here, that he would have testified if counsel had discussed the option with him.

6   Further, Petitioner does not allege anything specific to which he would have testified, nor

7   does he identify anything helpful he would have said beyond generally denying that he had

8   committed the crime.  This falls far short of demonstrating that if informed of his right to

9   testify, he would have done so, and if he had there is a reasonable probability that he would

10  not have been convicted.

11      The PCR court's denial of this claim was not an unreasonable application of

12  *Strickland*.

13                    **Cumulative Assessment of IAC Allegations**

14      None of Petitioner's claims of IAC warrant habeas relief.  In each instance Petitioner

15  has failed to demonstrate that counsel's performance was deficient and/or that he was

16  prejudiced by counsel's alleged shortcomings.  The Court finds that counsel's alleged

17  deficiencies, considered cumulatively, do not amount to prejudice rendering the proceedings

18  against him fundamentally unfair. *See Davis v. Woodford,* 384 F.3d 628, 654 (9th Cir. 2004).

19      **CLAIM 3**

20      Petitioner alleges the trial court erred in suppressing evidence that Petitioner's co-

21  defendant, Angela Gray, had physically abused her children.  Respondents concede this claim

22  was exhausted on direct appeal.  (Dkt. 69 at 35.)  The Court previously denied evidentiary

23  development of this claim because it is record-based, Petitioner was not diligent in

24  attempting to develop it in state court, and there is no material factual dispute requiring

25  resolution (Dkt. 115 at 37); therefore, the Court's assessment of this claim is limited to the

26  state court record.

27      On cross-examination, the following exchange took place while Rebecca, Rachel's

28  older sister, was testifying:

1    Q    Barry never hit you, did he?

2    A    No.

3    Q    He never was mean to you, was he?

4    A    No.

5    Q    Your mom used to hit you, didn't she?

6    A    Yes.

7    MS. MAYER:    Objection, irrelevant.

8    THE COURT:    Sustained.

9    MR. BRUNER:    Can we approach?

10   (Whereupon, the following bench conference was held out of the hearing of
     the jury.)

11

12   MR. BRUNER:    She was the one who got into this whether Barry was
     hitting the kids. I wanted to establish that Angela used to beat the heck out of
     this girl until she moved in with Barry, then it stopped.

13

14   THE COURT:    If it's not during the relevant time period.

15   MR. BRUNER:    It is – it's – I mean, we're talking about 90 days.

16   THE COURT:    No.  Objection sustained.

     (RT 4/11/95 at 65-66.)

17

18          At the end of Rebecca's testimony, defense counsel made the following offer of proof

19   regarding the evidence to which the court had sustained the objection:

20   Q    Sorry. Just want to ask you a couple more questions, and – well, did your
          mom used to spank you?

21   A    Sometimes.

22   Q    Did she used to spank you hard?

23   A    Yes.

24   Q    Did there come a time when she stopped spanking you?

25   A    Sometimes.

26   Q    Well–

27   A    When we did –

28   Q    Go ahead.

1    A    When we moved in with Barry.  The middle.

2    Q    The spankings then seemed to stop.

3    A    Yes.

4    Q    Do you know why they stopped?

5    A    No.

6    Q    Okay, but after that she didn't really –

7    A    Hit me that much.

8    Q    How would she discipline you after that?

9    A    Send me to the room.

10   Q    Is that the same discipline that Barry would do?

11   A    Yes.

12   (*Id.* at 82-83.)

13   The Arizona Supreme Court denied this claim on appeal:

14   Defendant offered evidence of a "hard spanking" by Gray of Rachel's older
     sister, which allegedly occurred more than ninety days before Rachel's
15   murder.  In our view, the evidence does not have an inherent tendency to
     connect Gray to the commission of the sexual abuse and murder of Rachel.
16   We find that the trial court did not abuse its discretion in precluding the
     introduction of the evidence.

17

18   *Jones*, 188 Ariz. at 395, 937 P.2d at 317.

19   The right to due process includes the right to present a defense and to defend against

20   the State's charges.  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  On habeas review,

21   the question is whether the court's refusal to admit the evidence rendered Petitioner's trial

22   fundamentally unfair.  *Id.* at 302-03.  Petitioner argues that evidence that Rachel's mom used

23   to hit and abuse her children was important to show motive or intent on the part of Angela

24   Gray, which made it admissible under Arizona law.  However, "the presence or absence of

25   a state law violation is largely beside the point."  *Jammal v. Van de Kamp*, 926 F.2d 918,

26   919-20 (9th Cir. 1991).

27   Petioner's claim as briefed relies significantly on new evidence; as noted above, the

28   Court's review of the claim is limited strictly to the state court record.  When paired down

to the record evidence and the due process standard, the question is quite narrow – whether exclusion of Rebecca's testimony, that her mother used to spank her hard prior to the family moving in with Petitioner, rendered Petitioner's trial fundamentally unfair. Petitioner's defense was that the prosecution failed to establish beyond a reasonable doubt that he inflicted the injuries on Rachel and it was possible someone else had injured her. The value of the contested testimony to Petitioner's defense was limited as it does little to implicate Gray as the perpetrator of Rachel's murder. Although the excluded testimony might have highlighted Petitioner's non-violent nature, the testimony also indicated that Gray was no longer hitting or using physical discipline on Rebecca in the weeks prior to Rachel's death. In contrast, the court admitted testimony that Gray was seen striking Rachel on the side of her head in the week prior to her death. (RT 4/11/95 at 160-63.) Additionally, Petitioner was allowed to elicit testimony that he had never hit Rebecca, and that she had never seen Petitioner hit her brother or Rachel. (*Id.* at 65, 66, 69.)

The value of the excluded testimony was nominal, particularly as it bore no direct relation to the events immediately preceding or causing Rachel's death. Therefore, the Court finds that the exclusion of this evidence did not render Petitioner's trial fundamentally unfair. Claim 3 is denied.

**CLAIM 4**

Petitioner alleges the trial court erred in denying his motion to suppress evidence obtained in an unlawful search of his trailer. Respondents concede this claim was exhausted on direct appeal. (Dkt. 69 at 41.)

Unlawful search and seizure claims are generally not subject to review by this Court. In *Stone v. Powell*, 428 U.S. 465, 494 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial." Pursuant to *Stone*, a prerequisite for consideration of Petitioner's Fourth Amendment claim is the denial of the chance to fully and fairly litigate the claim in state court. Petitioner does not allege he was denied such an

1   opportunity.  More significantly, the trial court held a hearing on Petitioner's motion to

2   suppress and issued written findings on the denial (RT 12/5/94 at 30-78; RT 1/9/95 at 4-20;

3   ROA 523-24), and the Arizona Supreme Court conducted a detailed analysis of the issue,

4   *Jones*, 188 Ariz. at 395-96, 937 P.2d at 317-18.  Therefore, Petitioner cannot obtain habeas

5   relief on this claim, and it is denied.

6   **CLAIM 5**

7   Petitioner alleges prosecutorial misconduct based on references to photographic

8   evidence that the trial court had excluded.  The parties agree this claim was fairly presented

9   on direct appeal, although Petitioner failed to object at trial, and the Court finds that it was

10  exhausted.  *See State v. Martinez*, 210 Ariz. 578, 580 n.2, 115 P.3d 618, 620 n.2 (2005)

11  (noting that failure to object at trial is not a waiver but claim reviewed only for fundamental

12  error).  The Arizona Supreme Court set forth two paragraphs of facts relevant to this claim

13  and concluded that the prosecutor's actions "did not approach fundamental error."  *Jones*,

14  188 Ariz. at 398, 937 P.2d at 320.

15  Factual Background

16  Dr. Howard identified the State's exhibits numbered 136 and 137 as photographs

17  taken during his autopsy showing Rachel's external genitalia, her buttocks and inner thighs.

18  (RT 4/12/95 at 130.)  After the doctor testified that the photographs would be helpful to

19  illustrate his testimony regarding Rachel's injuries, the State moved to admit them.  (*Id.*)

20  The court then held the following bench conference:

21      MR. BRUNER:   I strongly object to all of these things.  If I remember well,
22      I was told the pictures started people crying in the courtroom, including the
        prosecutor table last time.

23      THE COURT:    Objection to the other ones were, I believe, we just limited
        it to one.

24

25      MS. MAYER:    We did for the last case, but in this case I have a sexual
        assault charge to prove.  Both of those are important because there's evidence
26      of blood which goes to the approximate age of the injury as well as the
        laceration that you can't see until you open it up, and that's – both of those are
        essential to prove the age as well as the nature of the penetration.

27

28      MR. BRUNER:   There is no reason why we can't testify to that and use the
        diagram to explain that.  All those pictures are to inflame the jury.

1    MS. MAYER:      I believe the law is as long as they are relevant and have
2    probative value.  Though they maybe upsetting, that isn't a reason to exclude
     them.

3    THE COURT:      It seems to me you can get by explaining there was some
     blood, though not set out there.  I am going to suggest that you use that one
4    instead of that one, but not both.

5    (*Id.* at 131-32.)

6    Testimony continued:

7    Q   We have been asked to utilize State's 136 for our discussion, though there
     is a difference between 136 and 137, is there not?
8
     A    That's correct.
9
     Q    Describe the difference between State's 137, which will not be admitted,
10   and State's 136 which will be?

11   A    Both views are of the same part of the body from the same direction.  In
     one view the external genitalia are in their normal relaxed position.  Injuries
12   are visible and blood and fluid resulting from the injury are visible in the
     photograph pooled in the area of the laceration.
13
           In Exhibit 136 the photograph shows two gloved fingers pulling or
14   spreading the genitalia apart so that the injuries are more visible.  Also the
     blood and fluid that had pooled in the area of the injury has been cleaned
15   away, and the wound has been dried to allow the tissues themselves to be
     photographed.
16
     Q    Does the presence of the pooled blood that's reflected in State's 137 as
17   well as the appearance of the injury in general give you the ability to
     approximate the age of this injury?
18
     A    They assist in doing that, yes.
19
     Q     Based on that, what age approximation did you make for this injury to
20   Rachel's genitalia?

21   A    By both examining the area of injury with the naked eye and by looking
     at tissue samples from the area of injury microscopically, I would estimate that
22   the injury occurred about one day prior to death.

23   (*Id.* at 132-33.)  At the prosecutor's request, Dr. Howard subsequently provided a detailed

24   discussion of his findings regarding Rachel's genital injuries, using Exhibit 136 for

25   illustration.  (*Id.* at 133-35.)

26   In closing argument, the prosecutor stated:

27         State's 136, which is a photograph taken of Rachel at the autopsy of her
     torn vulva, is irrefutable proof of the severity and force of her rape.  Her rapist
28   left blood behind in her little vagina for Dr. Siefert to see, Detective Pesquiera

1  to take note of, and Dr. Howard to have to clean away before he could finally
2  see the extent of her injuries.

3  (RT 4/13/95 at 81.)

4  <u>Analysis</u>

5      Clearly established federal law provides that the appropriate standard of federal
6  habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and
7  not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181
8  (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Therefore, in order
9  to succeed on this claim, Petitioner must prove not only that the prosecutor's remarks were
10 improper but that they "so infected the trial with unfairness as to make the resulting
11 conviction a denial of due process." *Id.* In determining if Petitioner's due process rights
12 were violated, the Court "must consider the probable effect of the prosecutor's [comments]
13 on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12
14 (1985).

15     Petitioner acknowledges that the court gave permission for the prosecutor to
16 introduce, by way of testimony without using the illustrative photograph, the fact that Rachel
17 had blood pooled in her vagina. (Dkt. 58 at 117.) This was also acknowledged by defense
18 counsel at trial, who argued that the photographs were not necessary to prove the presence
19 of blood or other details of the injury because "[t]here is no reason why we can't testify to
20 that and use the diagram to explain that." (RT 4/12/95 at 131.) Despite these admissions,
21 Petitioner takes issue with the following testimony: the medical examiner noted that the
22 difference between the photographs is that Exhibit 137 shows the genitalia in a relaxed
23 position with injuries visible and blood and fluid pooled around the laceration; the medical
24 examiner opined on the timing of the injury based on his entire examination of the wound
25 including the pooled blood; and in closing argument the prosecutor noted that Rachel had
26 blood in her vagina. The fallacy in Petitioner's claim is that defense counsel did not request
27 and the court did not exclude all evidence regarding the details of Rachel's genital injury and
28 the presence of blood in her vagina. Rather, the court excluded only the admission of the

- 40 -

1    photograph.  The prosecutor did nothing improper by eliciting detailed medical testimony
2    about Rachel's injury, including the presence of blood pooled in her vagina.

3          Equivalent testimony had already been elicited from other witnesses.  Dr. Siefert
4    testified that he had noted some blood coming from Rachel's vaginal region when he
5    examined her body at the emergency room.  (RT 4/6/95 at 81, 98.)  Similarly, Sergeant
6    Pesquiera testified on direct and on cross-examination that during her examination of
7    Rachel's body she noted "pooled bright red colored blood" on the inside of Rachel's labia.
8    (RT 4/12/95 at 42, 94.)  Additionally, Dr. Howard provided detailed, no less potentially
9    inflammatory testimony regarding the genital injuries as reflected in Exhibit 136 – the labia
10   was bruised and scraped, the opening of the vagina had a one-half inch tear extending on to
11   the skin towards the anus, and the injuries were consistent with penetration or attempted
12   penetration.  (*Id.* at 134.)  Nothing in the testimony elicited from Dr. Howard specific to
13   Exhibit 137, nor the prosecutor's closing argument (which in no way refers to the excluded
14   exhibit), rendered Petitioner's trial fundamentally unfair in violation of his right to due
15   process.  Claim 5 is denied.

16         **CLAIM 6**

17         Petitioner alleges there was insufficient evidence to sustain his sexual assault
18   conviction.  Respondents concede this claim was exhausted on direct appeal.  (Dkt. 69 at 53.)
19   The Court previously denied evidentiary development because this is a record-based claim.
20   (Dkt. 115 at 37-38.)

21         The Arizona Supreme Court denied this claim on appeal, finding first that the
22   evidence supported that Rachel had been sexually assaulted by someone, a fact conceded by
23   Petitioner.  *Jones*, 188 Ariz. at 318, 937 P.2d at 396.  Next, the court conducted a lengthy
24   analysis of the evidence connecting Petitioner to the crime:

25              Evidence supports the conclusion that virtually all of Rachel's injuries
             occurred within a two-hour period.  Rachel's sister, Rebecca, testified that
26           Rachel spent the morning with her and their brother watching cartoons.
             Rachel "seemed fine" when her siblings went out to ride their bikes, about
27           3:00 p.m. Additionally, Rachel "seemed fine" after the first two times that she
             returned with defendant.  Rachel first accompanied defendant to the market.
28           Rebecca saw Rachel standing at the door when they returned, and she seemed

1
2
3
4
5
6
7
8
9
10

fine. The second time defendant returned with Rachel, Rebecca again saw her standing at the door, and Rachel appeared to be fine. If Rachel had already suffered genital injuries, she would have been in pain. The examiner testified at the aggravation/mitigation hearing that the genital injuries would have caused pain at basically all times. The third time that defendant went out with Rachel, he told Rebecca that he was going to his brother's house. However, his brother's wife testified that defendant never visited their house on that day. During defendant's third trip with Rachel, two children saw defendant hitting Rachel while he drove. One of the children placed the time at 5:00 p.m. Blood spatter in the van likely was created by defendant hitting Rachel after she had already suffered a head injury. Additionally, blood spatter consistent with Rachel's blood type was found on defendant's jeans, along with traces of blood on defendant's shirt and boots. The next time that Rebecca saw Rachel, at about 6:30 p.m., Rachel was in a lot of pain. Many of the injuries that Rachel now had were consistent with defense against a sexual assault. Thus, substantial evidence was introduced to conclude that Rachel's physical assault and sexual assault all occurred within the two-hour time period during which she was alone with defendant in his van.

11
12
13
14

The evidence of the time period of Rachel's injuries, the testimony that defendant was seen hitting her, the fact that Rachel was fine before she went out with defendant the third time and was injured when she returned, and the fact that defendant told others that he had taken Rachel to see the paramedics when he had not, support the finding that defendant committed the sexual assault along with, and as part of, the overall physical assault. Consequently, we find that sufficient evidence exists to sustain defendant's sexual assault conviction.

15  *Id.* at 319, 937 P.2d at 397.

16  The clearly established Supreme Court law governing this claim is set forth in *Jackson*

17  *v. Virginia*, 443 U.S. 307, 319 (1979), which holds that when assessing the sufficiency of the

18  evidence, "the relevant question is whether, after viewing the evidence in the light most

19  favorable to the prosecution, any rational trier of fact could have found the essential elements

20  of the crime beyond a reasonable doubt."

21  The Arizona Supreme Court thoroughly set forth the facts relevant to this claim and,

22  looking at them in the light most favorable to the prosecution, its recitation comports with

23  this Court's review of the record. While the evidence against Petitioner is circumstantial and

24  not extensive, it is sufficient for a reasonable juror to find the elements of sexual assault

25  beyond a reasonable doubt. Of critical significance is the testimony that the injury would

26  have been painful, and it obviously bled; within the time frames provided by the experts, one

27  could rationally conclude that the sexual assault had not been present for much of Sunday,

28  but rather occurred later in the day when Rachel was with Petitioner. At a minimum, it was

1   not objectively unreasonable for the Arizona Supreme Court to find there was sufficient
2   evidence to support the sexual assault conviction.  Therefore, Petitioner is not entitled to
3   relief on Claim 6, and it is denied.

4       **CLAIM 7**

5       Petitioner alleges that his death sentence is cruel and unusual punishment in violation
6   of *Enmund* and *Tison*.  In a prior order, the Court found that this claim was properly
7   exhausted but that evidentiary development was not warranted.  (Dkt. 115 at 15, 38.)

8       The Supreme Court holds that a felony-murder defendant can be sentenced to death
9   only if he actually killed, attempted to kill, or intended to kill, or if the defendant was a major
10  participant in the underlying felony and acted with reckless indifference to human life. *Tison*
11  *v. Arizona*, 481 U.S. 137, 157-58 (1987); *Enmund v. Florida*, 458 U.S. 782, 797 (1982).  The
12  Arizona Supreme Court found that because the jury convicted Petitioner of inflicting
13  Rachel's fatal abdominal injury, and he was the sole participant in the physical assault on her,
14  *Enmund/Tison* was satisfied.  *Jones*, 188 Ariz. at 321, 937 P.2d at 399.

15      Petitioner's objection to the *Enmund/Tison* finding is premised primarily on his
16  assertion that he did not inflict any injury upon Rachel and that there is insufficient evidence
17  to support his convictions.  The jury convicted Petitioner of inflicting the injuries on Rachel
18  and no court, including this one, yet has found grounds to overturn those convictions.  Those
19  convictions establish that the jury found Petitioner solely responsible for inflicting the fatal
20  injury on Rachel.  Therefore, as found by the Arizona Supreme Court, the convictions satisfy
21  the *Enmund/Tison* requirements.  The supreme court's denial of this claim was not an
22  unreasonable application of Supreme Court law, and Claim 7 is denied.

23      **CLAIM 8**

24      Petitioner alleges the trial court erred in finding the especially cruel aggravating
25  factor.  The Court found in a prior order that this claim was properly exhausted but that
26  evidentiary development was not warranted.  (Dkt. 115 at 18, 39.)

27      In determining that the crime was especially cruel, the trial court stated:

28      Here is a child in the 49th month of her life who suffered unspeakably for

1
2
3

> hours, whose suffering only ended when she became unconscious. The mother knew that, and even more, a fortiori, so did Mr. Jones knew that because he knew how badly she had been beaten, so if there was ever such a thing as an especially cruel crime, this was it.

4   (RT 7/6/95 at 35.)   The Arizona Supreme Court made the following findings regarding

5   cruelty based upon its independent review of the record:

6
7
8

> A murder is especially cruel when the murderer inflicts mental or physical pain upon a conscious victim before death.  When the suffering is experienced after the infliction of a fatal wound, that suffering must have been "objectively foreseeable" to support a finding of cruelty.  The defendant's subjective intent to cause suffering is irrelevant.

9
10
11
12

> Here, the evidence establishes that Rachel suffered from physical pain for many hours after she was assaulted.  She was crying and vomiting and had bruises on her face, fingers, and hands.  The emergency room physician testified that the blow to Rachel's bowel would have caused great pain initially and would have continued to cause pain to a lesser extent thereafter.  Rachel also experienced pain from her genital injuries.  The defensive wounds on her body show that she was conscious during her beating.

13
14
15
16
17

> Defendant knew how severely he had beaten Rachel.  Her body showed signs of being struck dozens of times by fists, elbows, and perhaps blunt instruments.    Rachel  was  physically  sick  for  the  rest  of  the  evening.  Additionally, defendant told others that he had taken Rachel to the paramedics even though he had not, which may have prevented others from seeking medical help for her.  He deliberately extended her suffering by not taking her to the hospital and by misleading others who might have.  It is beyond question that Rachel suffered especial cruelty within the meaning of section 13-703(F)(6) during her terrifying last day of life.

18   *Jones*, 188 Ariz. at 321-22, 937 P.2d at 399-400 (internal citations omitted).

19   On habeas review of a state court's finding of an aggravating factor, a federal court

20   is limited to determining "whether the state court's [application of state law] was so arbitrary

21   and capricious as to constitute an independent due process or Eighth Amendment violation."

22   *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  In making that determination, the reviewing

23   court must inquire "'whether, after viewing the evidence in the light most favorable to the

24   prosecution, *any* rational trier of fact could have found that the factor had been satisfied.'"

25   *Id*. at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

26   Petitioner first argues that he did not physically or sexually assault Rachel.  This

27   argument is meritless as it is contrary to the jury's standing verdict.  Second, he argues that

28   there is no evidence he intended Rachel to suffer and that given his use of methamphetamines

1   he could not have reasonably foreseen that Rachel would suffer.  As stated in the Arizona

2   Supreme Court's opinion as quoted above, it is sufficient if the victim's suffering is

3   objectively foreseeable; the State is not required to prove that a defendant in fact foresaw or

4   intended the suffering.  *See State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (the

5   requirement is that defendant knew or "should have known" the victim would suffer).  The

6   facts as set forth in the supreme court's opinion and as revealed in this Court's review of the

7   record are more than sufficient to demonstrate that Rachel unquestionably physically suffered

8   and that the suffering was necessarily foreseeable by Petitioner, who was convicted of

9   inflicting the many wounds and witnessed Rachel's physical reaction to her injuries prior to

10  her death.

11      A rational fact finder could determine that the especially cruel (F)(6) aggravating

12  factor was satisfied.  Claim 8 is denied.

13      **CLAIM 12**

14      Petitioner alleges that Arizona's statutory death penalty scheme is unconstitutional

15  because:  (1) it allowed the finding of the aggravating factors and imposition of the sentence

16  to be done by a judge not a jury; (2) it failed to require notice of the aggravating factors by

17  way of the indictment; and (3) it allowed the judge not the jury to make the *Enmund/Tison*

18  finding.  Respondents concede that subparts (1) and (3) are properly exhausted, but contend

19  that subpart (2) is procedurally defaulted.

20      Regardless of exhaustion, the Court will dismiss the entirety of this claim because it

21  is plainly meritless.  *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

22  Claim 12 is premised primarily on *Ring v. Arizona*, 536 U.S. 584, 609 (2002), which held

23  that Arizona's aggravating factors are an element of the offense of capital murder and must

24  be found by a jury.  However, in *Schriro v. Summerlin*, 524 U.S. 348 (2004), the Supreme

25  Court held that *Ring* did not apply retroactively to cases already final on direct review.

26  Because Petitioner's direct review was final in 1997 prior to *Ring*, he is not entitled to relief

27  premised on that ruling.

28      With respect to the portion of the claim regarding his indictment, Petitioner relies on

1    two cases, *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), and *Jones v. United States*, 526

2    U.S. 227 (1999).   *Sattazahn* relied on *Ring* for the principle that aggravating factors are an

3    element of the offense.  537 U.S. at 111.  As with *Ring*, that case involved the review of a

4    direct appeal; thus, there was no retroactivity bar at issue as there is for Petitioner. *Id.* at 105.

5    In *Jones*, the Supreme Court held that facts that constitute elements of a offense rather than

6    just sentencing enhancement must be charged in a *federal* indictment.  526 U.S. at 252.

7    However, the Supreme Court has long held that the Fifth Amendment provisions requiring

8    indictment by a grand jury are not part of the due process of law incorporated as to *state*

9    criminal prosecutions by virtue of the Fourteenth Amendment.  *See Hurtado v. People of*

10   *State of Cal.*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972).

11          With respect to subpart (3), the Supreme Court has held that findings pursuant to

12   *Enmund/Tison* may be made by the trial or appellate court; they are not required to be found

13   by a jury. *Cabana v. Bullock*, 474 U.S. 376, 387 (1986), *overruled on other grounds by Pope*

14   *v. Illinois*, 481 U.S. 497 (1987).

15          Claim 12 is denied.

16          **CLAIM 13**

17          Petitioner alleges that his incarceration on death row for more than nine years prior

18   to his execution and Arizona's method of execution violates his right against inhumane

19   treatment pursuant to the International Covenant on Civil and Political Rights, customary

20   international law, and *jus cogens*.   Respondents argue that this claim is procedurally

21   defaulted.  Petitioner contends that, while this claim was never presented in state court, it was

22   exhausted by way of the Arizona Supreme Court's independent sentencing review.

23          The Arizona Supreme Court has stated that it independently reviews each capital case

24   to determine whether the death sentence is appropriate.  In *State v. Gretzler*, 135 Ariz. 42,

25   54, 659 P.2d 1, 13 (1983), the court stated that the purpose of independent review is to assess

26   the presence or absence of aggravating and mitigating circumstances and the weight to give

27   to each.  *See also State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700 (1982).  Claim 13

28   goes far beyond the stated scope of that review, and the Court finds it was not exhausted

1    thereby. *Cf. Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir. 2005) (finding that

2    Arizona's independent sentencing review did not exhaust numerous claims including several

3    contesting the constitutionality of Arizona's death penalty statute).

4         Petitioner is now precluded by Arizona Rules of Criminal Procedure 32.2(a)(3) and

5    32.4 from obtaining relief on this claim in state court. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-

6    (h). Thus, this claim is technically exhausted but procedurally defaulted, absent a showing

7    of cause and prejudice or a fundamental miscarriage of justice.

8         As cause to overcome a finding of default, Petitioner alleges IAC on appeal. Before

9    any ineffectiveness may be used to establish cause for a procedural default, it must have been

10   presented to the state court as an independent claim. *Murray*, 477 U.S. at 489. While

11   Petitioner alleged other IAC allegations in his PCR proceeding, he did not allege in his PCR

12   petition or petition for review that his appellate counsel was ineffective for failing to raise

13   Claim 13. (ROA-PCR 13; PR Dkt. 1.) Ineffectiveness claims regarding appellate counsel

14   are now foreclosed in state court by Arizona Rule of Criminal Procedure 32.2(a)(3) and

15   32.4(a). *See Stewart v. Smith*, 202 Ariz. 446, 450, 46 P.3d 1067, 1071 (2002) (holding that

16   if additional IAC allegations are raised in a successive petition, the claims in the later petition

17   necessarily will be precluded). Because the Arizona Supreme Court has not had a fair

18   opportunity to rule on Petitioner's ineffectiveness claim alleged as cause, and Petitioner may

19   not exhaust this claim now, it is technically exhausted but procedurally defaulted. *See Gray*,

20   518 U.S. at 161-62; *Coleman*, 501 U.S. at 735 n.1. Therefore, Petitioner's allegations of

21   ineffective appellate counsel cannot constitute cause to excuse the default. *See Edwards v.*

22   *Carpenter*, 529 U.S. 446, 453 (2000) (ineffective counsel as cause can itself be procedurally

23   defaulted). Because Petitioner has not established cause to overcome the default, the Court

24   need not analyze prejudice. *See Thomas v. Lewis*, 945 F.2d 1119, 1123 n.10 (9th Cir. 1991).

25        Claim 13 is dismissed as procedurally defaulted.

26                                 **CONCLUSION**

27        The Court finds that Petitioner has failed to establish entitlement to habeas relief on

28   any of his claims. The Court further finds that an evidentiary hearing in this matter is neither

1    warranted nor required.[5]

2                      **CERTIFICATE OF APPEALABILITY**

3              In the event Petitioner appeals from this Court's judgment, and in the interests of

4    conserving scarce resources that might be consumed drafting and reviewing an application

5    for a certificate of appealability (COA) to this Court, the Court on its own initiative has

6    evaluated the claims within the petition for suitability for the issuance of a certificate of

7    appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

8    2002).

9              Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

10   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

11   COA or state the reasons why such a certificate should not issue.  Pursuant to 28 U.S.C.

12   § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of

13   the denial of a constitutional right."  This showing can be established by demonstrating that

14   "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

15   have been resolved in a different manner" or that the issues were "adequate to deserve

16   encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

17   *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will

18   issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

19   denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

20             The Court finds that its procedural ruling finding Claim 1D procedurally defaulted in

21   part, as discussed in this Order, is adequate to proceed on appeal.  The Court finds that

22   reasonable jurists, applying the deferential standard of review set forth in the AEDPA, which

23   requires this Court to evaluate state court decisions in light of clearly established federal law

24   as determined by the United States Supreme Court, could not debate its resolution of the

25   merits of Petitioner's remaining claims as set forth in this Order and its Order of September

26

27         [5] The Court previously denied Petitioner's request for evidentiary development as to
     specific claims (Dkt. 115), but conducted an independent review as to all claims as required
28   by Rule 8 of the Rules Governing Section 2254 Cases.

1  28, 2004 (Dkt. 115).  Further, for the reasons stated in this Order and the Court's Order

2  regarding Petitioner's motions for evidentiary development filed on September 28, 2004 (*id.*),

3  the Court declines to issue a COA with respect to its rulings regarding evidentiary

4  development or procedural bar.

5          Accordingly,

6          **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt.

7  58) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

8          **IT IS FURTHER ORDERED** that the stay of execution entered on November 8, 2001

9  (Dkt. 3) is **VACATED**.

10         **IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the

11  following issues:

12         Whether Claim 1D of the Amended Petition – alleging ineffective assistance of
       counsel for failure to conduct an adequate investigation for trial and sentencing
13     – is, in part, procedurally barred.

14         **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

15  to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

16  AZ 85007-3329.

17         DATED this 29th day of September, 2008.

18

19

20

21                                        FRANK R. ZAPATA

22                                        United States District Judge

23  **Copies Distributed MM 9/29/08**

24  **Resnick**

25

26

27

28