Jon M. Sands
Federal Public Defender
Cary Sandman (Arizona Bar No. 004779)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
407 W. Congress St., Suite 501
Tucson, Arizona 85701-1310
cary_sandman@fd.org
sarah_stone@fd.org
520.879.7622

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Barry Lee Jones, | ) | Case No. 01-0592-TUC |
| | ) | |
| Petitioner, | ) | **DEATH PENALTY CASE** |
| | ) | |
| vs. | ) | |
| | ) | |
| Charles Ryan, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**Petitioner's Supplemental Brief and
Request for Evidentiary Development**

# Table of Contents

I.   Introduction ........................................................................................... 1

   A.   Relevant Procedural History. ............................................................ 1

   B.   The standard for determining cause and prejudice to excuse procedural
default under *Martinez*. .................................................................... 2

II.   Mr. Jones was denied effective assistance of counsel during the guilt-
phase of the proceedings ........................................................................ 7

   A.   Introduction .................................................................................... 7

   B.   The fatal injury to Rachel's small intestine was not inflicted on May 1st .. 12

      1. Dr. Ophoven's Findings.............................................................. 14

      2. Dr. McKay's Findings. ............................................................... 21

      3. Dr. Howard................................................................................ 29

   C.   Rachel's other injuries were not inflicted on May 1st either, and her
injuries were not caused by a crow bar. ............................................ 32

      1. The Genital Injury. .................................................................... 32

      2. Bruising. ................................................................................... 34

      3. The scalp injury. ....................................................................... 36

      4. The tire iron or crow bar was not the cause of the scalp injury ............... 36

      5. The tire iron or crow bar was not the cause of the duodenal tear. ........... 38

      6. Conclusion................................................................................ 42

   D.   The claim that Mr. Jones beat, sexually assaulted and murdered Rachel
in his van during a third trip with Rachel on May 1st was a fabrication. .... 42

   E.   The claim that Rachel was being beaten in the van as Mr. Jones pulled
into the Choice Market parking lot around 4:00 p.m. is belied by the
record, which demonstrates Rachel was well and not physically harmed
or in distress after her trip to the Choice Market. .......................... 47

i

F. The interpretation of the blood evidence by the State was plainly invalid and misleading. ........................................................................................ 51

1. Bloodstains on the clothing Mr. Jones wore on May 2nd. ...................... 55

2. Bloodstains on the passenger seatback of the van. .................................. 56

3. Bloodstains just behind and between the driver and passenger seats. ..... 60

G. The evidence does not support an inference that Rachel was beaten or assaulted inside the van. ................................................................................ 61

H. There is no reliable evidence to support the conclusion that the Lopez children saw Mr. Jones beating Rachel as he entered the Choice Market Parking Lot. ..................................................................................................... 62

1. What the Lopez family described to police. ............................................ 64

2. What the Lopez family described to trial counsel. .................................. 68

3. How the Lopez family testified at Mr. Jones' trial. ................................. 69

4. What experts have discovered. ............................................................... 71

I. The legal argument on deficient performance. ............................................ 74

1. The standard for assessment of deficient performance. ........................... 74

2. Application of the deficient performance standard to Mr. Jones' case.        ..................................................................................................... 77

a. The failure to investigate the time between infliction of injuries and death. ...................................................................................... 78

b. The failure to investigate blood evidence. ...................................... 90

c. Failure to investigate whether the Lopez children could have seen what they *allegedly* reported. ....................................................... 92

3. Conclusion. ............................................................................................ 95

J. Mr. Jones' behavior on the night Rachel was discovered ill. ....................... 95

K. The legal argument on prejudice ................................................................. 98

ii

1. The Standard for assessment of prejudice. ................................... 98

2. Application of the prejudice standard to Mr. Jones' case. ........................ 99

L.   Mr. Jones has stated a colorable claim of ineffective assistance against trial counsel and he is entitled to an evidentiary hearing. ............................ 103

III.   Mr. Jones was denied effective assistance of counsel during the sentencing phase of the proceedings. ................................... 104

A.   Mr. Jones was denied his Sixth and Fourteenth Amendment rights to the effective assistance of counsel, when his counsel failed to investigate and present reasonably available and compelling mitigation evidence about Mr. Jones. ................................... 105

1. Procedural history. ................................... 106

2. A wealth of information was available if trial counsel had conducted a reasonable investigation. ................................... 111

a.   Jones' mental impairments. ................................... 112

b.   Mr. Jones' drug addiction. ................................... 114

c.   Mr. Jones' background and social history. ........................ 117

3. Trial counsel's performance was clearly deficient. ................................... 124

B.   Mr. Jones was prejudiced by counsel's multiple deficiencies. ................... 136

C.   Mr. Jones has stated a colorable claim against trial counsel and he is entitled to an evidentiary hearing ................................... 141

IV.   Mr. Jones' postconviction counsel was ineffective. ........................................ 141

A.   Introduction. ................................... 141

B.   Prejudice to the outcome of the PCR proceedings has been established. .. 142

C.   PCR counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the guilt-phase performance of trial counsel was constitutionally deficient. .... 144

D.  PCR counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the sentencing performance of trial counsel was constitutionally deficient. ... 152

E.  Conclusion ................................................................................ 155

V.  Mr. Jones is entitled to evidentiary development, discovery and an evidentiary hearing. .................................................................. 156

A.  Limitations on evidentiary development that may be implicit in cases governed by 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(e)(2), do not apply, and Mr. Jones is entitled to a hearing to prove his colorable claims ................................................................................ 156

B.  The standards for discovery, expansion of the record and evidentiary development. ............................................................................. 158

1. Standard for expansion of the record and evidentiary hearings. ............. 158

2. Standard for discovery and depositions. ...................................... 159

   a. Discovery under the Rules Governing Habeas Proceedings. ............. 160

   b. Discovery under the Federal Rules of Civil Procedure. ..................... 163

   c. The Importance of Discovery in a Capital Case. ............................... 163

C.  Expansion of the Record. ............................................................ 165

D.  Depositions and Discovery. ......................................................... 173

1. Depositions of Prior Counsel. .................................................... 174

2. Deposition of Dr. John Howard and Production of Documents. ........... 174

3. Depositions of Sgt. Sonya Pesquiera, Detective Bruce Clark and now imprisoned, former Detective George Ruelas. ................................... 175

4. Documents of the Pima County Medical Examiner's Office. ................. 177

5. The complete files of the Pima County Attorney, Pima County Sheriff's Department. ............................................................... 177

iv

E.    Evidentiary Hearing. ...................................................................... 177

VI.  Conclusion    ..................................................................... 178

# I.     Introduction.

## A.     Relevant Procedural History.

Within his habeas Claim 1D, Petitioner Barry Lee Jones alleged that his Sixth Amendment right to effective assistance of counsel was violated.  Mr. Jones supported his Claim with evidence that his trial counsel failed to conduct any outside investigation for the guilt-phase of Mr. Jones' trial and that no investigation was done to test the veracity or reliability of any of the State's evidence, including the medical evidence and the critical question of the timeline between injury and death. (Dist. Ct. Doc. Nos. 115 at 8:4-10; 58 at 28-66; 95, 96, 100, 128, 135.)   Mr. Jones also alleged that trial counsel failed to conduct a reasonably sufficient mitigation investigation for sentencing. (Dist. Ct.Doc. No. 58 at 66-95.)   Previously, this Court dismissed Claim 1D as procedurally defaulted. (Dist. Ct. Doc. No. 115 at 8:25 - 9:6.)   More recently, the court of appeals ordered this Court to reconsider its dismissal of Claim 1D in light of *Martinez v. Ryan*, __ U.S. __, 132 S.Ct. 1309 (2012) (holding there is cause to excuse procedural default of a "substantial" claim of ineffective assistance of trial counsel, when failure to present the claim is due to ineffective postconviction counsel).[1]   In its remand order, the court of appeals determined Mr. Jones' Claim 1D to be a substantial

---

[1] *Martinez* portends two other threshold requirements, namely, that the state PCR proceeding was the initial postconviction review proceeding and that Arizona law required the petitioner to bring the claim in the initial review collateral proceeding. *Id.* However, it is undisputed that those elements are satisfied.

1

claim, and as explained below, that finding has been held to satisfy the prejudice prong of the "cause and prejudice" inquiry.  *Claibourne v. Ryan, infra.* Therefore, the sole remaining question goes to whether there is cause to excuse the procedural default of Claim 1D, and the answer to this question turns principally on whether Mr. Jones' postconviction counsel was ineffective. *Id.*

In light of the foregoing court of appeals remand order, this Court ordered Mr. Jones to submit supplemental briefing with respect to: (1) whether there is cause to excuse the procedural default of the ineffective assistance of counsel claim 1D pursuant to *Martinez v. Ryan*, and (2) whether Mr. Jones is entitled to habeas relief on the subject claim. (Dist. Ct. Doc. No. 161.) The Court also ordered Mr. Jones to "include a discussion of the applicable standards of review and . . . include any requests for evidentiary development."   *Id.*   Below, Mr. Jones complies with the Court's order.

**B.**    **The standard for determining cause and prejudice to excuse procedural default under *Martinez*.**

In *Claibourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014), a panel of the Ninth Circuit waded through the plurality opinion published by the en banc court in *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013), to determine the law of the circuit with respect to the requirements for establishing cause and prejudice to excuse procedural default under *Martinez*.  The *Claibourne* panel held that the prejudice prong of the cause-and-prejudice test for excusing procedural default would be

satisfied by a showing that the underlying ineffectiveness claim against trial counsel is substantial.  *Id.* at 377.  As noted above, the court of appeals' remand order settles that Mr. Jones has met the substantiality requirement.

The *Clabourne* panel further held that to demonstrate cause—the first part of the showing of "cause and prejudice"—a petitioner must show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984).  *Id.* at 376. As the panel explained, to prove postconviction counsel's ineffectiveness "*Strickland* . . . requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* at 377 (citing *Strickland*, 466 U.S. at 687, 694).  With respect to this latter element, the *Clabourne* panel held that "[t]o demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the PCR proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Clabourne*, 745 F.3d at 378.  The *Clabourne* panel clarified this methodology later in its decision:

> "Determining whether the result of the post-conviction proceedings would have been different will require consideration of the underlying claim of ineffective assistance by [trial or] sentencing counsel and the questions of whether [trial or] sentencing counsel performed deficiently, and (b) whether there was a reasonable

probability that, . . . the result of the [trial or] sentencing proceedings would have been different."

*Id.* at 382.

A shorthand summary of *Clabourne* is this:

(A)   The prejudice prong of the cause-and-prejudice showing is satisfied by demonstrating that the underlying ineffectiveness claim against trial counsel is substantial.

(B)   The cause prong of the cause-and-prejudice showing is satisfied by demonstrating (1) post-conviction counsel's performance was deficient under the criteria established in *Strickland* and (2) post-conviction counsel's deficient performance resulted in prejudice under the test established in *Strickland* (i.e., absent post-conviction counsel's errors, there is a reasonable probability that the result of the PCR proceeding would have been different).

(C)   With respect to (B)(2) above, proving that post-conviction counsel's deficient performance resulted in prejudice to the outcome of the PCR proceedings, a petitioner must show: (1) trial counsel rendered constitutionally deficient performance under *Strickland* during the trial and/or sentencing proceedings and (2) trial counsel's deficient performance prejudiced the outcome of  the trial/and or sentencing proceedings.

4

For the record, Mr. Jones disagrees with the *Clabourne* methodology. The plain language of *Martinez* establishes that the decision only ascribed a test for the "cause" element of the cause and prejudice test, and for reasons explained below, the Court did <u>not</u> need to reach the prejudice prong of the cause and prejudice test, as that element was clearly settled under established precedent. The plain language of the *Martinez* decision clearly demonstrates that cause (and cause alone) will be satisfied with a showing that <u>deficient performance</u> by PCR counsel resulted in default of a <u>substantial</u> trial counsel ineffective assistance <u>claim</u>. *See Martinez* 132.S.Ct. 1319. We quote from the decision: "When faced with the question whether there is **<u>cause</u>** for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is **<u>insubstantial</u>**, . . . *or* that the attorney in the initial-review collateral proceeding did not **<u>perform</u>** below constitutional standards." *Id.* (emphasis added). Over and above these two elements (i.e, the substantiality of the underlying claim and PCR counsel's performance) nowhere in the decision does the Supreme Court mention that the State could challenge the showing of "cause" by arguing that the postconviction counsel's substandard performance did not prejudice the petitioner. Therefore, when *Clabourne* engrafts an additional prejudice requirement for the showing of the cause element, Mr. Jones submits its holding runs directly contrary to the holding in *Martinez*.

5

As mentioned above, the Court did not separately impart a test for the prejudice element of the "cause and prejudice" test in *Martinez*. This is not to say that petitioners are excused from showing default prejudice; clearly they are not. But the Court did not need to address the prejudice element, since the prejudice prong is indisputably settled under established law.  Generally, once cause has been shown, a federal court will consider whether there is prejudice based on the underlying constitutional claim. *See, e.g., Walker v. Martin*, 131 S.Ct. 1120, 1127 (2011) (describing cause-and-prejudice as "cause for the delay in asserting his claims and actual *prejudice resulting from* the State's alleged *violation of his constitutional rights*") (emphasis added); *Smith v. Murray*, 477 U.S. 527, 533 (1986) ("actual prejudice resulting from the alleged constitutional violation" (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1997).

By way of further example, the Supreme Court has held that a prisoner can overcome a procedural default in cases where the state has suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), by demonstrating default prejudice by satisfying the *Brady* prejudice standard.  *See, e.g., Strickler v. Greene,* 527 U.S. 263, 282 (1999) (equating prejudice standard for showing *Brady* violation with the prejudice standard for showing cause and prejudice to overcome default); *Banks v. Dretke*, 540 U.S 668, 691 (2004) (same).  Translating these generally accepted principles to the *Martinez* setting means that a petitioner will be

required show default prejudice by demonstrating he has a meritorious *Strickland* claim against trial counsel, which means he must show constitutionally deficient performance and prejudice affecting the trial and/or the sentencing phase.

In sum, the showing of "cause" under *Martinez* simply requires a showing that deficient performance by PCR counsel resulted in the default of a substantial trial counsel ineffectiveness claim. The ultimate showing of default prejudice awaits the showing that the claim against trial counsel is meritorious.

Although Mr. Jones disagrees with the *Clabourne* methodology he will adhere to its requirements below.

**II.    Mr. Jones was denied effective assistance of counsel during the guilt-phase of the proceedings.**

**A.    Introduction.**

As explained above, under *Clabourne*, the showing that there is cause to excuse procedural default is ultimately intertwined with the demonstration that there is a meritorious *Strickland* claim against trial counsel.  *See*, *Clabourne*, 745 F.3d at 382 (consideration of the actual merits of the claims of trial counsel's deficient performance and resulting prejudice is subsumed during the assessment of whether there was a reasonable probability of a different outcome in the state PCR proceedings).  Accordingly, Mr. Jones begins with the articulation of the guilt-phase claim against trial counsel.  The Court's review of the merits of the claim against trial counsel is de novo. *Dickens v. Ryan*, at 740 F.3d 1302, 1321-22

(9th Cir. 2014) (under *Martinez,* "if [a petitioner] can show cause and prejudice to excuse a procedural default, AEDPA no longer applies and a federal court may hear this new claim de novo").  This means that the provisions in 28 U.S.C. § 2254(d) and (e)(2) do <u>not</u> apply. *Id*. at 1320-22.  What's more, as further explained in section V below, in the *Martinez* context there is no bar to evidentiary development or discovery.  *Detrich v. Ryan*, 740 F.3d 1327, 1246-47 (2013) (the district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was cause under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been ineffective assistance of trial counsel); *Dickens*, 740 F.3d at 1221-22 (in the context of *Martinez*, an evidentiary hearing is a proper vehicle for determining whether PCR counsel and trial counsel were ineffective).

Mr. Jones was convicted and sentenced to death for the murder of Rachel Gray, the 4 year-old daughter of his live-in girlfriend, Angela Gray.  *State v. Jones*, 937 P.2d 310, 313 (1997).   During the past 20 plus years, Mr. Jones has consistently maintained his innocence, and for good reason.   Mr. Jones was convicted and sentenced to death based on a very specific timeline that allowed the State to argue that Rachel was fatally injured when she was alone with Mr. Jones. The State's own expert witness concedes that his autopsy findings support the conclusion that the injury was older than the timeline relied upon by the State.  As

we will make clear below, there is <u>no</u> reliable scientific evidence that <u>any</u> of Rachel's injuries occurred according to that timeline. Accordingly the prosecution's case, and Mr. Jones' ultimate conviction, were based on a scientifically flawed theory, propped up by false and misleading testimony.

Rachel died in the early hours of Monday, May 2, 1994, hours before her 6:15 a.m. admission to the hospital. (Ex. 1, Declaration of Dr. John Howard ¶ 5.) Dr. Steven Seifert, the emergency-room doctor who declared Rachel's death, calibrated the time of death as falling between 3:15 and 4:15 a.m. (Ex. 2, Interview of Dr. Seifert at 9.)  It is an undisputed fact that Rachel's death was caused by a small bowel laceration due to blunt abdominal trauma. (Ex. 1, Declaration of Dr. Howard ¶ 4.)  The placement of the laceration was such that it caused a retroperitoneal tear, meaning a rupture of the duodenum (small bowel) where it attaches to the back side of the abdominal wall. (*Id.*)  A blunt impact to Rachel's abdomen caused contusion, or bruising, or tearing of the tissue, causing spillage of fluid and growth of bacteria, ultimately causing inflammation and an eventual infection called peritonitis, which led to Rachel's death. (*Id.*)

Mr. Jones' conviction for Rachel's death rested on a distinct circumstantial premise; one that assumed as a fact, that he assaulted Rachel on the Sunday afternoon of May 1, 1994, when it is undisputed that Rachel was principally in Jones' care.  (Dist. Ct. Doc. No. 141 at 9:8-10.)  It was the dedicated assumption

that during a very small window during the afternoon of May 1st, Mr. Jones physically and sexually assaulted Rachel, and that all Rachel's injuries, including the fatal tear to her duodenum and the tear to her vagina, were caused during a singular criminal event on that afternoon.

In order to substantiate this critical, but circumstantial assumption—that Mr. Jones assaulted Rachel on the afternoon of May 1st—it became essential for the prosecution to rely on scientific evidence; which is to say this: the State needed to prove that Rachel could almost immediately develop deadly peritonitis within minutes of the injury and then die within 12 hours or less from the time of the infliction of her injuries. For this critical scientific proof, the prosecutor relied on unchallenged trial testimony from its pathologist expert witness, Dr. John Howard, who conveyed to Mr. Jones' unsuspecting jury, that medical science supported the essential element of the State's theory, that Rachel suffered her fatal injury on the afternoon of May 1st. (Tr. Apr. 12, 1995 at 101-63.)[2] Ultimately, Dr. Howard, the physician who conducted Rachel's autopsy, went the whole nine yards for the State, and he testified at Mr. Jones' trial that all of Rachel's injuries, the fatal tear to her duodenum, a small laceration on her head, her genital injury, and external bruising, were all consistent with injuries that were inflicted "sometime between the hours of 2:00 and 5:30 or 6:00 on the afternoon of May 1st." (*Id.* at 148-49.)

---

[2] Transcripts will be cited as "Tr.", followed by the date of the transcribed proceeding.

10

Dr. Howard also testified that Rachel would have been in immediate pain from a blow to her small intestine and the pain would continue until she died. (*Id.* at 147-48). As we explain below, each and every one of Dr. Howard's foregoing opinions regarding the timing of the injuries, as well as the pain that would have affected Rachel following the abdominal blow, are false and lacking in scientific validity.

Nevertheless, faced with a capital prosecution that would substantially turn on evidence dressed as "medical, scientific fact", the quantum of investigation conducted by trial counsel to challenge the "time of injury" and related medical evidence was zero.[3]  No defense investigation to assess the validity of any of the prosecution's evidence would be conducted.  (*See* discussion in section I(2) below).  Later we explain how this wholesale absence of any investigation, "so undermined the proper functioning of the adversarial process that [Mr. Jones'] trial cannot be relied on as having produced a just result," *Strickland*, at 466 U.S. 686, and that necessarily Mr. Jones' conviction must be overturned. (*See* section K below).  However, for now, we defer analysis of trial counsel's performance so that first, all of Rachel's injuries (and the time of their infliction) can be properly understood.  This is necessary because, it is vital to reaching the correct legal result, in respect to Mr. Jones' Sixth Amendment constitutional claim, that this be understood: the State's case was built around a false premise, as there is <u>no</u> reliable

---

[3] The absence of any investigation also befell the state post-conviction proceedings. *See* section IV below.

scientific evidence—none—to support the conclusion that <u>any</u> of Rachel's injuries (including the fatal tear to her small bowel and her genital injury) were inflicted on the afternoon of May 1, 1994, some 12 hours or much fewer, prior to Rachel's death.  We begin with the analysis of Rachel's duodenum tear, for all agree this was her fatal injury.

### B.   The fatal injury to Rachel's small intestine was not inflicted on May 1st.

The medical evidence demonstrating that Rachel's injuries were not inflicted on May 1st, comes principally from two sources: Dr. Janice Ophoven, who is board certified in forensic pathology, and Dr. Mary Pat McKay, who is board certified in emergency medicine, with specialization in trauma care.  (Current CV's for Dr. Ophoven and Dr. McKay are contained in Exhibits 3 and 9 respectively.) To a lesser but still important respect, Dr. Howard also figures into the medical evidence analysis, and we will demonstrate that the opinions expressed by Dr. Howard during Mr. Jones' trial were: (1) materially incomplete, demonstrably false and misleading; (2) in diametric opposition to well-established medical science and widely available medical literature; and (3) flatly inconsistent with statements he made during pre-trial interviews, flatly inconsistent with sworn testimony given during the co-defendant Angela Gray's trial, and flatly internally

inconsistent with sworn testimony given during Mr. Jones's trial.[4]  We begin with

a summary gleaned from an examination of Dr. Ophoven's findings.

Unbeknownst to Mr. Jones' jury, Rachel's autopsy results, including the

associated post mortem chemistries, capture in the most unequivocal scientific

terms, that it would have been impossible for her injuries to have occurred anytime

on May 1st; any suggestion to the contrary rests on an ultimate fabrication.  Dr.

Janice Ophoven, who has practiced pediatric forensic pathology for nearly 35

years, and who has participated in several dozen examinations of lethal abdominal

trauma in young children, put it this way, succinctly: "The evidence shows that the

fatal injuries to Rachel Gray **could not possibly have been inflicted on the day**

---

[4] Ultimately, however, the assessment of Dr. Howard's flawed testimony should
not rest on a paper record; the complete impeachment of the testimony given by
Dr. Howard at Mr. Jones' trial must await cross-examination at an evidentiary
hearing.  "'[C]ross-examination ... is beyond any doubt the greatest legal engine
ever invented for the discovery of truth.'"  *Ford v. Wainwright*, 477 U.S. 399, 415
(1986) (quoting, 5 J. Wigmore, Evidence § 1367, J. Chadbourn rev. 1974)).
Indeed, as we explain further below in our request for hearing and evidentiary
development, what the Supreme Court had to say about the necessity of cross-
examination of experts in *Ford* has equal application here. "Cross-examination of
the [experts] . . ., or perhaps a less formal equivalent, would contribute markedly to
the process of seeking truth . . . by bringing to light the bases for each expert's
beliefs, the precise factors underlying those beliefs, any history of error or caprice
of the examiner, any personal bias with respect to the issue of capital punishment,
the expert's degree of certainty about his or her own conclusions, and the precise
meaning of ambiguous words used in the report. Without some questioning of the
experts concerning their technical conclusions, a factfinder simply cannot be
expected to evaluate the various opinions, particularly when they are themselves
inconsistent." *Id.*

13

**prior to her death** as suggested by the state at Mr. Jones' trial. The veracity of this evidence is as scientifically precise as any forensic determination available in medical science." (Ex. 7, Report of Dr. Janice Ophoven at 2) (emphasis in original).

Someone at some time did fatally harm Rachel, but it was days before May 1st—not on May 1st—and the State has never investigated or suggested who the real guilty party might be. Dr. Ophoven put the State's case this way, and to the point: "[T]he statements and investigative reports in this case do <u>not</u> reasonably identify the specific time and in whose hands the child suffered her fatal injury." (emphasis added)   (*Id.*) With that said, we explain further the bases for Dr. Ophoven's ultimate findings.

### 1.    Dr. Ophoven's Findings

A.   "Rachael Gray died from a ruptured duodenum with subsequent severe dehydration, shock and eventually peritonitis. In order to understand the unique nature of this injury, it is important to understand the anatomy. The area of the bowel, which was injured, in this case involved a segment that lies in a space of the body known as the retroperitoneum. This space actually lies behind the abdominal cavity, not in the abdominal cavity. An injury to this area will cause very different signs and symptoms than an injury inside the abdomen. This fact has been discussed in the

14

literature and the problem with delayed diagnosis is a well-established challenge for the doctors who treat these patients." (Ex. 6, Report of Dr. Ophoven at 3.)   "The injury does not leak or bleed immediately into the abdominal cavity.  For this reason the typical symptoms observed with an injury [that] leaks blood into the abdomen will not develop until much later. When the blow impacts the wall of the duodenum, the tissue is squeezed between the impacting object and the vertebral bones. This pinching can do two separate things: (1) make a partial or full thickness tear of the [duodenum] wall and (2) cause bleeding into the wall. The latter is important because the blood will cause impairment of normal circulation to the tissue and later result in deterioration [known as necrosis] and eventually perforation of the wall. That is what occurred here. Dr. Howard describes these changes in his autopsy and I confirmed these changes in the autopsy slides provided for my review. The wall of the duodenum has obviously deteriorated over time until the wall had lost its integrity." (*Id.*)

B. "Even when the duodenum is no longer intact, the blood and contents will not immediately enter the abdominal cavity. It is the irritation of the peritoneal lining inside the abdomen that causes the typical symptoms seen from blood or inflammation within the abdominal cavity such as is

15

seen with appendicitis. This lack of obvious symptoms can be very misleading, often resulting in delay in diagnosis. These children can be up and around, able to walk, talk and most importantly drink." The symptoms may appear to wax and wane until the child slips into coma. For this reason the diagnosis may be delayed for 4-5 days**.** The initial symptoms will be related to the pain of the impact from which the child may recover within a few hours." (*Id.*)

C. "In investigating these cases it is imperative to distinguish an acute injury that causes deterioration and death within just a few minutes to hours from the delayed onset of shock and dehydration which may not result in collapse or death for days. If the injury is interpreted as fresh, the investigation can be misled or misguided into the wrong timeline. What is important in this case is the need to assemble the medical evidence with attention to the actual clinical progression associated with injuries of this nature." (*Id.*)

D. "There is no question that this child died from blunt force trauma to her abdomen. The circumstances are very suspicious for inflicted trauma. What has not been understood is what the medical evidence tells us about when this ultimately fatal injury took place. These injuries can occur accidentally as well as part of an abuse spectrum. What can be stated

16

with certainty is that the jury was not made aware of these critical factors when they were deciding the guilt or innocence of Mr. Jones." (*Id.* at 3-4.)

E. "Abdominal trauma is not an uncommon cause of death in victims of abuse in children of this age. Crushing injury from a blow or stomp to the upper abdomen will trap vital organs between the inflicting force and the spinal column. If there is no severe hemorrhage associated with the damage, the diagnosis may be delayed for days. This has repeatedly been published in the literature. It is not uncommon for these children to be up walking and talking until their vital functions begin to fail just before the fatal collapse. This was clearly confirmed by multiple witnesses in this case." (*Id.* at 4.)

F. "Many opinions were provided to the court and the jury but it is my opinion that the key findings in this case of abdominal trauma of many days duration were not made clear. The evidence shows that the fatal injuries to Rachael Gray could not possibly have been inflicted on the day prior to her death as suggested by the State at Mr. Jones' trial. The veracity of this evidence is as scientifically precise as any forensic determination available in medical science." (Ex. 7, Report of Ophoven at 2.)

G. "The abdominal injuries absolutely could not have occurred on [May 1st] date. The medical literature has for many years indicated that injuries in the exact location of Rachael's can be and often are occult, in other words, persons around the individual will not interpret the symptomology as serious until days after the injury. The individual can walk, talk, drink, and interact until the final stages of deterioration set in. The severe symptomology only will appear in a case such as this when the inflammation breaks through from the retroperitoneal space into the abdominal cavity causing peritonitis and terminal shock. The history verifies the progression of this condition as would be expected for a retroperitoneal injury around a duodenal tear. This information was not provided to the jury and incorrect assumptions about [what] the child could or could not have done were provided to the jury that are inconsistent with the medical evidence." (*Id.*)

H. "There is no question that the child suffered injuries at the hands of another or others. The evidence indicates that incorrect theories were presented to the jury that left little doubt as to the defendant's guilt. This evidence is absolutely incorrect and if a review of the findings were authorized today, it is my opinion. that there would be no disagreement

among knowledgeable forensic pathologists that the injuries were days old." (*Id.*)

Dr. Ophoven's findings are not only established by her professional experience and an expansive scientific literature to which she has made repeated reference above; her findings are supported by the physical evidence in this case. Dr. Ophoven conducted a complete scientific examination of the original autopsy slides, tissue samples, and other materials, and she prepared a photographic and digital atlas of the physical evidence taken at the time of the post-mortem.[5] As explained next below, the physical evidence demonstrates as a matter of indisputable scientific fact, that Rachel's injuries were days old when she died on May 2nd.  That evidence is summarized next below.

I. Autopsy photo 899 is a picture of the abdominal surface which is covered by a fatty layer called the omentum. The surface is discolored a tan-yellow-brown color from peritonitis. The arrow on the photograph points to fluid that reveals this tan-yellow-brown color. But the key point is this; "If the injury was fresh [< 24 hours] the fluid would have the appearance of blood." (Ex. 8, Photos of slides at 2.) The physical evidence depicting

---

[5] Selected photos from Dr. Ophoven's photographic and digital atlas are attached hereto as Exhibit 8.  A complete set of Dr. Ophoven's photographic and digital atlas was provided to the State in a previous filing.  (*See* Ninth Cir. Doc. No. 25 at Ex. 12.)

the discoloration in photo 899 demonstrates that the injury was older than 24 hours.

J.  Autopsy photo 904 a photo of the retroperitoneum nearer to the site of the injury also shows the same discolored fluid, depicting an injury over 24 hours old. (*Id.* at 3.)

K.  Autopsy photo 905 reveals a picture of the situs of the original injury. "[E]vidence of diffuse inflammation is evident . . . **[which] visually verifies the microscopic appearance of dense inflammation of days duration.**" (*Id.* at 4) (emphasis supplied).

L.  Microscopic examination of the autopsy samples taken from the adrenal gland and surrounding portions of the retroperitoneum reveal "purulent inflammation of periadrenal fat, and other inflammation, indicating tissue reaction [and date of injury] of > 24 hours." (*Id.* at 5-8.)

M. Microscopic analysis of the pancreas and duodenum reveals a "degree of deterioration and inflammation [that] is days of age and could not be <24 hours." (*Id.* at 9-17) (emphasis supplied).

N.  The inflammation of many days duration, which is depicted in the areas identified in paragraphs J-N, did not directly result in Rachel's death. For death to occur, the inflammation of many days next had to spread to the bowel surface.  Slide pages 18-21 show a "section of the bowel from

20

within the abdominal cavity, showing the spread of inflammation into the bowel surface. Once the inflammation [finally] reached the abdominal cavity it spread throughout causing a condition known as peritonitis," which caused Rachel's death. (*Id.* at 18-21.)

### 2. Dr. McKay's Findings.

The findings of Dr. Ophoven are given even greater dimension, when considered in light of corresponding findings of Dr. Mary Pat McKay. Dr. McKay is currently the Chief Medical Officer of the National Transportation Safety Board and an attending physician in Emergency Medicine at the INOVA Alexandria Hospital. Her professional career as a board certified emergency medicine practitioner, professor, research scientist, lecturer, and author in peer reviewed publications, books and journals, is summarized in her 30 page CV contained in Exhibit 9.

Dr. McKay reviewed a substantial case record as summarized in her October 29, 2009 report, and performed an intensive review of the medical and surgical literature to better understand the symptomatic presentation and course of Rachel's fatal injury, a retroperitoneal rupture and tear of the duodenum. (Ex. 10, Report of Dr. McKay at 1.) Dr. McKay "was asked to comment on the nature of [Rachel's] injuries, their potential etiology as well as the timeline from injury to symptoms and to death in this case." (*Id.*) Dr. McKay "reviewed more than 50 articles in the

21

medical literature and was able to identify reports of more than 200 cases of intestinal injury in children, including at least 160 cases of duodenal perforation with the timeline described from injury through diagnosis to treatment and outcome." (*Id.*)

Dr. McKay conducted a complete analysis of Rachel's injury and described its etiology, determining that Rachel's "duodenal injury occurred no sooner than 36 hours prior to death *and likely occurred much earlier*. There is absolutely zero evidence to suggest it could have occurred in less than 24 hours." (*Id.* at 5) (emphasis added).  Dr. McKay's relevant findings are summarized below.

A. "Rachel Gray's fatal injury was a perforation of the third portion of the duodenum as it passes through the retroperitoneum.  There are a few critical things to understand about this injury. In the gastrointestinal tract, the stomach empties into the duodenum, which is shaped like a "C".  The top of the 'C' is the first part and lies within the abdominal cavity. As it descends, the duodenum moves posteriorly and the vertical portion of the 'C' overlays and is stuck to the vertebral bodies.  This area is not free floating in the abdomen like the rest of the intestines.  In fact, these sections are separated from the abdominal cavity (the 'peritoneum') by a layer of tissue and are described as being 'retroperitoneal'.  Thus, injuries to these sections of the duodenum initially cause air and intestinal

contents to leak into the space around the kidney rather than into the abdomen and the initial symptoms are therefore somewhat isolated.  This is the area where Rachel's laceration occurred." (Ex. 10, Report of Dr. McKay at 2.)

B. "There are two potential causes of injury to this area of the duodenum.  The most likely is that gas became trapped in the hollow tube and a hard blow caused the wall to 'pop' in the manner of a balloon.  Contusion to other areas of the abdomen may occur but the 'softness' of other tissues and their ability to slide away can be protective.  An alternative theory is that a sudden blow pulls (shears) the vertical section away from the bottom of the 'C' where it is stuck against the bone.  Either way, the result is a ragged opening in the duodenum just to the right side of the spinal column." (*Id.*)

C. "Common accidental causes of this particular injury in children are moderate to high speed motor vehicle crashes (where this injury is seen among both occupants and pedestrians) or as the result of a sudden blow to the abdomen from a bicycle handlebar, a large or heavy object suddenly striking the upper abdomen, the steering wheel of a go-kart during a crash, or even from a heavy child kneeing or stepping on the

area during play.  It is not caused by direct blow to the back or flanks of the body." (*Id.*)

D. "Among the described *non-accidental* cases of pediatric duodenal laceration . . . children tended to present late to physicians and often the story failed to disclose any trauma.  In fact, the true injury was identified several times only when exploratory surgery was performed on children with peritonitis without external signs of trauma or the correct historical information, the surgeons suspected an alternative, non-traumatic cause of peritonitis on the way to the operating room." (*Id.*) (emphasis added).

E. "In Rachel's case, the report of injury to the right side of the transverse colon (hematoma or bruising in the wall) suggests that the major force of the injurious blow was focused on the right side of her abdomen.  This could have been someone stomping on the area from above (if Rachel were lying on the ground or a blow with a blunt object.  If the latter, the blow could have come from the left or the right depending on the relative positions of the attacker and Rachel and the angle of strike used." (*Id.*)

F. "If the diagnosis is not made or treated immediately, a series of biologic processes occur.  Acidic fluid from the stomach enters the duodenum along with pancreatic juices and bile and any food that the child eats.  Some of this leaks out the laceration into the retroperitoneal space,

causing an inflammatory reaction.  However, this fluid is very nearly sterile; stomach acid and food digesting enzymes kill most organisms. Thus, the focus of the initial response is inflammation rather than infection.  Inflammation is part of the body's natural process of healing any injury.   In this case, the body cannot seal up the laceration completely and the process continues." (*Id.* at 3.)

G. "In terms of symptoms, there undoubtedly is pain when the injury occurs. However, there may not be significant pain immediately after that.  As time goes on, there may be discomfort in the epigastrum (upper stomach) or in the flank but it is likely not very severe early on." (*Id.* at 3.)

H. "Adjacent tissues become inflamed as time progresses; this is likely the cause of the areas of hemorrhage, necrosis, and inflammation in [Rachel's] right adrenal gland.  The pancreas lies like a line across the middle of the 'C' with the head portion right at the middle of the vertical section.   There was some hemorrhage around the head which likely occurred during the injury itself, and inflammation that occurred as a result.  There may have been some initial contusion during the injury but much of the findings were likely due to the progression of inflammation. In addition, there was some evidence of contusion to the colon and mesentery overlying this area.  As time continued, the inflammation

25

spread to include the intra-peritoneal area with frank peritonitis evident at autopsy.  While there may have been some bacterial contamination of the inflamed tissue over time, the key event here was the inflammation itself." (*Id.*)

I.  "As the inflammation continues into peritonitis, the pain begins to increase until the child complains bitterly and begins to vomit.  Children with frank peritonitis have exquisitely painful bellies and complain even if the bed gets jiggled or when going over bumps on the road in a car. Breathing rate increases in an effort not to move the abdomen and also to compensate for systemic acidosis.  As the inflammatory process further progresses and becomes systemic the body stops being able to respond; it begins to shut down. The child becomes lethargic and then somnolent and finally breathing slows and the heart stops." (*Id.*)

J.  "The progression from injury to death in this case required a significant amount of time.  The body had to respond to the laceration, sending inflammatory cells to the area and that inflammation had to progress to out of control.  Again, because the duodenal contents are essential sterile, there were not initially any particularly virulent organisms that would have released toxins or otherwise caused shock directly." (*Id.*)

26

K. "The exact timing of the progression of inflammation is not clear. However, there are several documented cases where the diagnosis was delayed as long as 4-7 days after the injury and, after appropriate treatment, the child survived.  <u>I was unable to find a single reported case of death from an isolated duodenal laceration where death resulted in less than 48 hours</u>." (*Id.*) (emphasis supplied).

L. "The physiology of the body is not significantly different between a preschool child like Rachel and an older child of eight or ten.  However, the preschooler's ability to interpret and convey their degree of illness, particularly about abdominal pain, is significantly different.  Preschoolers lack the experience and vocabulary to explain to parents or caregivers that this particular stomachache is not the same as a simple 'stomach virus'.  The most obvious example comes from an associated disease, appendicitis.  While appendicitis itself is more common among older children, among those with appendicitis, the rate of rupture for preschoolers is nearly three times the rate for 10 year olds." (*Id* at 4.)

M. "It is not surprising that no adult noticed Rachel's degree of illness until the evening before her death; it may not have been that obvious. In the era before CT scanning, children thought to be at high risk were admitted to the hospital and underwent serial abdominal exams by the treating

27

trauma surgeons.  This means the surgeons saw the child and physically examined their abdomen several times a day.  Even so, surgery for many of these injuries was delayed for days or the injury was incidentally discovered when other symptoms (such as low blood pressure from blood loss) led to surgery for solid organ injury. Finally, given what I presume was chronic hunger, it does not surprise me that she is reported as eating earlier in the day before she died." (*Id.*)

N. "The description of Rachel as willing to eat and not looking severely ill the day or two before her death is consistent with other described cases, particularly given chronic hunger." (*Id* at 5.)

O. "Rachel Gray's duodenal injury occurred no sooner than 36 hours prior to death and likely occurred much earlier. <u>There is absolutely zero evidence to suggest it could have occurred in less than 24 hours</u>." (*Id.*) (emphasis supplied).

There are several unavoidable conclusions from Dr. McKay's findings.  First there is <u>not</u> a single known case in a vast scientific literature of a child suffering a duodenal tear like Rachel's and dying in less than 48 hours; <u>not</u> a single one.  This type of injury does not and cannot result in death in a matter of hours, as Mr. Jones' jury was misled to believe. But more to this point, the scientific literature is replete with examples of children who suffer this type of injury, whose diagnosis is

delayed for days; sometimes up to 7 days. Even hospitalized children had surgeries delayed for days, due to the difficulties in identifying this potentially fatal injury. Together Dr. Ophoven and Dr. McKay put the lie to Dr. Howard's claim that Rachel suffered a fatal injury during the afternoon of May 1st.  But as we show, Dr. Howard himself puts the lie to much of what he represented to Mr. Jones's jury.

### 3.    Dr. Howard.

Dr. Howard concedes that Rachel died sometime after midnight on May 2nd, which could put her death as early as 12:01 a.m., and he agrees that she had been dead hours before she was found at 6:00 a.m. on May 2nd. (Ex. 1, Declaration of Dr. Howard ¶ 5.) Dr. Seifert, who was first to examine Rachel, estimated that Rachel might have been dead for 2-3 hours, putting her death sometime between 3:00 and 4:00 a.m.  (Tr. Apr. 6, 1995 at 80.) Dr. Ophoven also agreed that Rachel was dead for many hours before 6:00 a.m. (Ex. 4, Report of Dr. Ophoven at 6.) During Mr. Jones' trial, Dr. Howard was asked whether Rachel's fatal small bowel injury was "consistent" with an injury inflicted on May 1st between 2:00 p.m. and 6:00 p.m. (Tr. Apr. 12, 1995 at 148-49.) Dr. Howard answered in the affirmative; without any qualification. This proposed timeframe poses an obvious question: could Rachel have died so quickly from an injury inflicted between 2:00 and 6:00

p.m.?  Dr. Ophoven and Dr. McKay have already answered this question in the negative; but unbeknownst to Mr. Jones' jury, so had Dr. Howard.

If Rachel died sometime soon after midnight, as Dr. Howard has posed for the timeline,  the prosecutor's hypothetical for time of injury would place Rachel's time of death at less than 12 hours from time of injury.  Even if Rachel had died between 3:00 and 4:00 a.m. as Dr. Seifert supposed, then much of the prosecutor's timeline for injury would have fallen under a 12 hour window from injury to death. What we show next is that when Dr. Howard told Mr. Jones' jury that the deadly injury was consistent with an injury occurring less than 12 hours before death, between 2:00 and 6:00 p.m.; he knew this was untrue and impossible.  Dr. Howard intentionally concealed two critical facts from the jury, and this concealment would have been fully known to and encouraged by the prosecutor.

The first concealment was this: during the trial of the co-defendant Angela Gray just 15 days earlier, Dr. Howard testified that death from Rachel's injury would NOT occur in fewer than 12 hours. (*See* transcript of Angela Gray's trial, March 28, 1995 at 101, previously filed with this Court as Dist. Ct. Doc. 96, Ex. 9.)  Asked specifically at Ms. Gray's trial "[w]hat would be the least amount of time that it would take from the injury until the time of death," Dr. Howard said the minimum was 12 hours. (*Id.*)  Therefore, given Dr. Howard's knowledge that Rachel had died possibly as early as near midnight, and at the latest, hours prior to

6:00 a.m., his unequivocal testimony at Mr. Jones' trial, that the injury could have been inflicted during the hours between 2:00 and 6:00 p.m. (less than 12 hours before her death), was flatly false and misleading, particularly in light of his testimony just two weeks earlier.

Just as corrupt, Dr. Howard apparently concluded (as did Mr. Jones' prosecutor) that it was proper to conceal from Mr. Jones' jury that Dr. Howard's actual findings at autopsy were that the fatal injury was "<u>most</u> <u>consistent</u>" with one that was inflicted at least 24 hours prior to death; which proves that the injury could <u>not</u> have been inflicted during the afternoon of May 1st. (Dist. Ct. Doc. No. 96, Ex.9, transcript of March 28, 1995 at 101.) When asked at Ms. Gray's trial specifically about the timing of the injury to Rachel's abdomen, Dr. Howard testified under oath that his findings were "<u>most</u> <u>consistent</u>" with 24 hours and he relegated the possibility of 12 hours to the absolute minimum in the realm of "conceivable", <u>not</u> probable. (*Id.*)

Encouraged by the prosecutor, Dr. Howard actively misled Mr. Jones' jury. He testified falsely when he concealed from the jury that his own findings showed that the most probable timeframe for the injury was at least 24 hours prior to death, and he testified falsely when he concealed that most if not all of the prosecutor's timeline for injury (between 2:00 and 6:00 p.m.) fell short of a 12 hour window,

31

which by his own previously sworn account, could <u>not</u> have been the time when Rachel was injured.

As Dr. Ophoven and Dr. McKay have demonstrated, neither 12 hours nor 24 hours are a conceivable timeframe for Rachel's injury, but the point being made here is that later, when this Court conducts an assessment of the prejudice caused by trial counsel's failure to investigate and present evidence that Rachel could not have been fatally injured anytime on May 1st, and that she was likely injured days prior, the calculus will not be one simply comparing Dr. Howard's testimony at Mr. Jones trial with the new evidence presented by Dr. McKay and Dr. Ophoven. This will not be a battle among opposing side experts.   Along with the new evidence from Dr. McKay and Dr. Ophoven, the new evidence also includes Dr. Howard's admissions in other sworn testimony that his own autopsy findings ran against any reasonable medical conclusion that the injury took place on the afternoon of May 1st.

There is no reliable medical evidence—let alone proof beyond a reasonable doubt—to demonstrate that Rachel was fatally injured on May 1st.

**C.    Rachel's other injuries were not inflicted on May 1st either, and her injuries were not caused by a crow bar.**

**1.    The Genital Injury.**

During Mr. Jones' trial the prosecutor needed Dr. Howard to say that the injury to Rachel's vagina occurred at the same time as the injury to her small

bowel on the afternoon of May 1st. Dr. Howard complied.  He swore that the vaginal injury was consistent with an injury inflicted between 2:00 p.m. and 6:00 p.m. on May 1st. (Tr. Apr. 12, 1995 at 148-49.)  Once again, however, both the prosecutor and Dr. Howard concealed Dr. Howard's actual autopsy findings. During Ms. Gray's trial, Dr. Howard testified that based on his examination of the microscopic evidence, the injury to Rachel's vagina was from one to two days old and the findings were most typical of at least "24 hours" old; taking the injury outside of the timeline of the afternoon of May 1st. (Dist. Ct. Doc. No. 96, Ex.9, transcript of March 28, 1995 at 99-100.)  In this respect, Dr. Howard's testimony at Ms. Gray's trial was consistent with his pre-trial interview, where he said, "cells in the bleeding area suggested one or two days before death."  (Ex. 11, Interview of Dr. Howard at 23.) Dr. Howard concealed these autopsy findings from Mr. Jones' jury.  The prosecutor was complicit in this concealment and Mr. Jones' lawyer had no grasp of the available impeachment evidence.

Meanwhile, Dr. Ophoven did her own microscopic examination of Rachel's vaginal injury.  She "requested special stains on the autopsy anogenital tissues. (Ex. 7, Report of Dr. Ophoven at 1.)  Dr. Ophoven found that the trichrome stain of the tissue revealed "clear evidence of vital reaction with deposits of collagen containing tissue and neovascularization in the wall of the vagina.  This indicates substantial healing and is not consistent with a fresh penetrating injury.  The age of

the injury cannot be precisely determined, but the injury did not occur in the few days prior to her death." (*Id.*)  In other words, the physical evidence dispositively demonstrates that the vaginal injury pre-dated Rachel's death by at least several days and it did <u>not</u> occur on the afternoon of May 1st. Belatedly, Dr. Howard has admitted what he concealed from Mr. Jones' jury: that the vaginal injury showed characteristics of occurring days apart from the time of her abdominal injury. (Ex. 1, Declaration of Dr. Howard at ¶ 13.)  There is no reliable medical evidence—let alone proof beyond a reasonable doubt—to demonstrate that Rachel's vaginal injury was inflicted on May 1st.

### 2.    Bruising.

The State also presented unchallenged evidence that the external bruises evident on Rachel's body also occurred during the afternoon of May 1st. (Tr. Apr. 12, 1995 at 148-49.)  This evidence also lacked any reliable scientific basis.  As explained by Dr. Ophoven: "Dr. Howard suggested to the jury that the time or age of the bruises on her body could be interpreted from the photographs.  Interpreting the age of bruises from physical appearance and color is recognized by the forensic community to be very inexact [i.e., inaccurate].  This kind of interpretation is not considered standard practice in the specialty." (Ex. 4, Report of Dr. Ophoven at 6.)

Dr. Ophoven expanded on the well-established scientific unreliability of aging bruises in her 2010 report. "The child had many bruises to the skin.  How

34

and when these bruises appeared cannot be determined at this time.  Bruises to the skin can be the result of rough handling/child abuse.  Bruises to the skin can be the result of rough play. Bruises can result from bleeding abnormalities [known as disseminated intravascular coagulopathy] that develop during shock and physiological chaos with metabolic acidosis.  Some of the marks may be the result of handling the body during her deterioration and attempt at resuscitation.  The pathologist cannot rely on witness statements regarding the presence or absence of bruises if those statements may be unreliable.   The only contribution the pathologist can make is to document as precisely as possible the nature and distribution of the bruises and marks and when appropriate take tissue samples to determine the age of the injury.   It has been well established that <u>visual determination of the age of any bruise is scientifically unreliable</u>." (Ex. 7 at 3) (emphasis supplied). There is <u>no</u> reliable evidence—let alone proof beyond a reasonable doubt—that any of Rachel's bruises were inflicted on the afternoon of May 1st.[6]

---

[6] Although we agree with Dr. Ophoven that dating bruises is essentially a fool's errand, we digress to point out Dr. Howard's more recent admission that he identified bruises on Rachel's body aged six days old, which could have been related to the cause of her duodenal tear.  (Ex. 1 ¶11.)

### 3.    The scalp injury.

The prosecutor elicited testimony from Dr. Howard that a small tear in Rachel's scalp was consistent with an injury inflicted between 2:00 p.m. to 6:00 p.m. on May 1st. However, once again Dr. Howard concealed from the jury his own autopsy findings, which he described in his pre-trial interview, where he said that "staining in one area of the scalp that would suggest [an injury] 72 hours or older." (Ex. 11 at 4.) Elsewhere, Dr. Howard stated in his pre-trial interview that the scalp injury was probably two days old. (*Id.* at 19.) Dr. Howard's testimony at Mr. Jones' trial is belied by his own contrary findings.[7]

### 4.    The tire iron or crow bar was not the cause of the scalp injury.

During Mr. Jones' trial, the prosecutor elicited Dr. Howard's opinion that Rachel's scalp injury and her duodenal tear were caused by a tire iron or crow bar found in Mr. Jones' van. (Tr. Apr. 12, 1995 at 123, 128-29.) Dr. Ophoven found no evidence supporting use of a tire iron to cause the small scalp injury and she determined to a reasonable degree of medical certainty that the head injury was "most consistent with a simple fall against a hard surface," and that a blow from a

---

[7] There is evidence that Rachel fell out of Mr. Jones van during the afternoon on May 1st causing her scalp to bleed. (Ex. 12, Statement of Barry Jones at 10-11; Ex. 13, Interview of Brandie Jones at 6-8.) However the chemistries Dr. Howard obtained at autopsy show the injury originated two or more days earlier. Therefore, Rachel's fall on May 1st must have re-opened or aggravated the earlier injury.

36

tire iron or crow bar "would have inflicted an entirely different injury."  (Ex. 4 at 6.)[8]

Dr. Ophoven's findings were corroborated by Dr. Patrick R. Hannon, an expert in biomechanics.  Dr. Patrick R. Hannon has over 25 years of experience in the field of injury-forensic biomechanics and human functional anatomy.   Dr. Hannon is an Associate Professor Emeritus at Northern Arizona University within the College of Engineering and Natural Sciences, Department of Biology.  He has testified and qualified in both civil litigation and criminal matters and has co-authored a textbook published in the United States in forensic biomechanics, entitled Forensic Biomechanics.   Dr. Hannon's 24 page CV summarizing his experience and qualifications is attached as Exhibit 14.[9]

Dr. Hannon found himself "[i]n agreement with Dr. Janice Ophoven, from a biomechanics perspective, [and his] opinion is that the scalp wound was most probably the result of her head coming in contact with a flat surface (e.g. fall) or alternatively the head of Rachel Gray was struck by a moving implement (focal

---

[8] Mr. Jones addresses the blood forensics later in section F below, but we note Dr. Ophoven's relevant findings related to this topic as it relates to Rachel's scalp injury. "Scalp trauma can result in significant bleeding even from a small injury. It is my opinion that this laceration did not contribute to her death. If she was carried while bleeding or transported in a vehicle (while bleeding) it would be expected to find her blood on clothing and in the van. (Ex. 7 at 1.)

[9] More recently Dr. Hannon's expert qualifications were summarized by the Arizona Court of Appeals in an unpublished decision. *Harvey v. Phoenix Airport Marriott*  2014 WL 346132 at * 5 (Ariz. App. 2014).

point impact) resulting from a relatively low load (low force level).  A crow bar or a 660 gram pry bar swung by an adult is not a good match for this scalp injury. The load magnitude of such a strike would most probably produce much more significant injury to Rachel Gray including a significantly depressed skull fracture. Finally, no blood was found on the pry bar belonging to Barry Jones." (Ex.15, Report of Dr. Hannon at 8-9) (internal citations omitted).

Together, Dr. Ophoven and Dr. Hannon expose another fallacy.  The crow bar did not cause Rachel's scalp injury.  Belatedly, Dr. Howard has admitted what he kept from the jury: that Rachel's scalp injury could have resulted from a simple fall. (Ex. 1 ¶ 14.)

### 5.    The tire iron or crow bar was not the cause of the duodenal tear.

Dr. Howard also readily conceded to the prosecutor's strategy to establish that the tire iron or crow bar was the murder weapon used to cause Rachel's duodenal tear. (Tr. Apr. 12, 1995 at 123, 128-29.)  This did not and could not have occurred for a variety of reasons, best explained by Dr. Hannon. We quote from his report, in relevant part below.

A. "Dr. Mary Pat McKay has opined that the fatal injury to Rachel Gray involved a perforation of the third portion of the duodenum as it passes through the retroperitoneum.  The mechanics of this injury are thought to result from an increase in gas/fluid pressure due to an abdominal blow

38

(compressed volume) of sufficient magnitude producing a rupture lesion. Hollow organs are more resistant to compression in genera. An alternative explanation as discussed by Dr. Mary Pat McKay indicates that a compressive blow to the abdomen results in a shear stress which moves the vertical section of the duodenum away from its boney attachment on the spine resulting in a retroperitoneal tear.  One or both of these injury mechanisms may have been operative in Rachel Gray and Drs. Mary Pat McKay and Janice Ophoven have indicated that due to the nature of this fatal injury, it was inflicted not hours but rather days before May 2, 1994 (day of documented death). Tolerance limits have not been established for this biomechanical insult to the abdomen in children and are limited in adults (e.g. Geoghegan and Brush, 1956).  Although not based upon empirical data, one certainly would not expect the soft tissue structural abdominal anatomy of a four year old underweight child to offer nearly as much resistance to a blow when compared to an older child of normal weight."  (Ex.15, Report of Dr. Hannon at 7.)

B. "An exemplar pry bar with a mass of 660 grams was acquired by investigator Sowards and sent to my office.  My understanding is that this exemplar pry bar (*see* Photos 3 and 4) is very similar to the pry bar belonging to Barry Jones. Although the linear ecchymosis of the upper

right abdominal quadrant is a pattern injury apparent at the autopsy in Rachel Gray, it is my opinion that this pattern injury trauma is not a match for the dimensions of the exemplar or the actual subject pry bar (belonging to Barry Jones).   Furthermore, a blow by this exemplar implement would have been a highly focal point impact and if a blow delivered by this instrument were sufficient to produce a duodenum perforation lesion, it would have also certainly produced an abdominal laceration most probably penetrating significantly into the superficial abdomen of Rachel Gray.  One can readily see how sharp this pry bar is at its straight end or hooked end.  When the force of a blow required to rupture the third portion of the duodenum is imposed by an adult swinging this pry bar, it would certainly have penetrated and cut through the skin, underlying fat tissue, connective tissue and penetrated muscle tissue of Rachel Gray.  No such trauma evidence existed at autopsy in Rachel Gray.  The third portion of the duodenum located near the vertebral spine is protected by these overlying tissues and by more anterior (front of body) organs.  A sharp focal point implement with enough velocity to produce duodenum rupture will absolutely produce more significant injury than what we see in the right side abdominal pattern injury of Rachel Gray at autopsy. (*Id.* at 7-8) (emphasis added).

40

C. One case study of a 3 year old child does indicate that reported minor blunt trauma resulted in a complete rupture of the duodenum just proximal to the vertebralcolumn without injury to neighboring parenchymatous organs (Saxena, A. and van Tuil, C. 2007).  This last finding is consistent with the review of the medical literature by Dr. Mary Pat McKay in that blunt trauma producing rupture or perforation of the duodenum (as opposed to focal point trauma) does not produce noticeable abdominal bruising (Ex. 10, Report of Dr. McKay at 5.) However, a significant sharp focal point blow produced by an implement such as a pry bar would also have the highest probability of producing severe trauma to parenchymatous organs such as the pancreas and the liver.  Although Rachel Gray did have some hemorrhage around the head of her pancreas (most probably due to duodenum perforation) and a contusion of her transverse colon, much more severe organ trauma would have been expected with a forceful blow produced by a pry bar implement and such trauma was not present at the autopsy of Rachel Gray.  The actual deep injuries of Rachel Gray are however, completely consistent with blunt force trauma produced by a significant momentum vector (mass x velocity with direction).  Such a momentum vector could have resulted from a kick, a foot stomp, or a punch from a fist.

41

Accidental trauma cannot be ruled out from a biomechanics perspective. However, the overall evidence strongly suggests a battered child syndrome in this subject case and therefore accidental abdominal trauma seems improbable. (Ex. 15, Report of Dr. Hannon at 8.)

Dr. Howard should be required to explain on cross-examination at a hearing how a crow bar could have been used as the murder weapon, in light of Dr. Hannon's findings that such a weapon would have caused considerable damage to Rachel beyond the tiny tear in the duodenum, that is located furthest away from a point of impact; attached to the spine in the retroperitoneal space.  That a crow bar could have been used as the murder weapon defies scientific analysis and common sense.  Both Dr. Ophoven and Dr. Hannon attached credence to the probability that the injury was caused by a foot stomp or fist. (*Id*. at 8; Ex. 5, Report of Dr. Ophoven; Ex.16, Report of Joel Hardin.)

### 6.    Conclusion.

None of Rachel's non-fatal injuries occurred on May 1st, and Mr. Jones' crow bar was not an implement causing Rachel's non-fatal scalp injury, or her fatal small bowel injury.

### D.    The claim that Mr. Jones beat, sexually assaulted and murdered Rachel in his van during a third trip with Rachel on May 1st was a fabrication.

One of the other prosecutorial premises at Mr. Jones' trial was that on May 1st Mr. Jones took Rachel on three separate trips in his van, and that it was on the

third and final trip that Mr. Jones beat Rachel with a crow bar and sexually assaulted her. We have already demonstrated that Rachel was not assaulted on May 1st.  (Tr. Apr. 13, 1995 at 92-94.)   Next we demonstrate there were <u>not</u> three trips in the van and the prosecution's theory on Rachel's physical and sexual assault are temporally implausible.

During co-defendant Gray's trial (which took place just days prior to Mr. Jones' trial) the prosecutor told the jury that Rachel's older sister Rebecca would testify that Mr. Jones "twice, at two different occasions in the afternoon on that Sunday, May 1st  . . . took Rachel off alone with him in this big yellow van." (Dist. Ct. Doc. No. 96, Ex.9, transcript of March 22, 1995 at 30.) When Rebecca testified at Ms. Gray's trial, she kept to the story she had maintained since the date Rachel had died: that Mr. <u>Jones</u> <u>took</u> <u>only</u> <u>two</u> <u>trips</u> with Rachel in his van and Rachel returned each time unharmed. (Dist. Ct. Doc. No. 96, Ex.9, transcript of March 24, 1995 at 68-71.)

During direct examination at Ms. Gray's trial, Rebecca was asked to describe each time she saw Rachel in the van with Mr. Jones. (*Id.* at 31.)  Rebecca described two trips Rachel took with Mr. Jones; one trip to the store and another to a friend's house. (*Id.* at 29, 31.)   Rebecca's testimony during Ms. Gray's trial is summarized as follows.

43

1.  Rebecca testified that when she went to visit her friend Suzie in the late afternoon of May 1st, Rachel was standing in the living room; Rachel was acting normal; there was nothing visibly wrong with Rachel; and Rachel did <u>not</u> look sick or hurt in any way. (*Id.* at 68-69) [Thus, in the late afternoon of May 1st, there was <u>no</u> evidence that Rachel had been harmed in any way].[10]

2.  Rebecca testified that after Mr. Jones awoke around 2:30 p.m. on May 1st, he went off with Rachel in the van to see one of his friends. (*Id.* at 69.)

3.  Rebecca testified that she saw Rachel when she returned from the first trip and Rachel was okay; she did not look hurt or sick. (*Id.* at 70.)

4.  Rebecca established the timeline further, by testifying that Rachel's second trip in the van with Mr. Jones took place at about 4:00 p.m. (*Id.*) Rebecca recounted that she saw Rachel return from the second trip and Rachel was again okay when she returned from the second trip, and Rachel remained well through the time she left home late on the afternoon of May 1st to visit Suzie. (*Id.* at 68-69, and 70-71.)

---

[10] Even before Ms. Gray's trial, in all her pre-trial police statements, Rebecca had always maintained that she saw Rachel before she left for her visit at around 5:00 p.m. and Rachel looked fine and not ill. (Ex. 17, Interview of Rebecca Lux on May 2, 1994 at 6-7; Ex. 18, Interview of Rebecca Lux on May 9, 1994 at 5-6, 8-14; Ex. 19, Interview of Rebecca Lux on Oct. 31, 1994 at 4-10.)

5. Rebecca was specifically asked if she was "**sure** [Mr. Jones and Rachel] left, they went and came back <u>two</u> separate <u>times</u>", and she answered unequivocally, "<u>yes</u>." (*Id.* at 71.) It was only after Rebecca returned from her friend Suzie's that Rachel was observed to be ill. (emphasis supplied) (*Id.*)

We stress that <u>Rebecca's</u> sworn <u>testimony</u>, at Ms. Gray's trial, was and remains entirely <u>consistent</u> <u>with</u> <u>the medical evidence</u> presented by Mr. Jones in this case as summarized above, which demonstrates that Rachel was not beaten about the head and abdomen with a crow bar and then raped in Mr. Jones's van on May 1st.   Rebecca was home all day until she went to visit Suzie in the late afternoon.   She saw Rachel take the two trips with Mr. Jones and Rachel looked well after each of these trips. Rachel evidenced not a single sign of being beaten with a crow bar and raped as Rebecca went off to Suzie's that late afternoon. *Id.*

At Mr. Jones' trial, Rebecca gave an <u>unimpeached</u> wholly contradictory story from the one she swore to at Ms. Gray's trial. By unimpeached we mean, she was <u>never</u> cross-examined regarding the inconsistencies in her testimony. She falsely testified at the Jones' trial that she saw Mr. Jones drive away in his van three times on May 1st (Tr. Apr. 11, 1995 at 37-38), in counter-position to her sworn testimony in Ms. Gray's trial that she was "sure they left, they went and came back two separate times."  (Dist. Ct. Doc. No. 96, Ex. 9, transcript of March

45

24, 1995 at 71.)  But this first <u>unimpeached</u> lie would not do. She also falsely testified to Mr. Jones' jury that she did <u>not</u> see Rachel before she went to visit her friend Suzie; allowing Rebecca to say that she was unaware of Rachel's condition after Rachel's return from the fabricated third trip. (Tr. Apr. 11 1995 at 71-73.) Again, however, Rebecca's unimpeached testimony at Mr. Jones' trial was in flat contradiction to testimony Rebecca had just given days earlier during Ms. Gray's trial, where she testified that <u>she had seen Rachel before going to her friend Suzie's</u>, and Rachel was standing in the living room; Rachel was acting normal; there was nothing visibly wrong with Rachel; Rachel did <u>not</u> look sick or hurt in any way. (Dist. Ct. Doc. No. 96, Ex. 9, transcript of March 24, 1995 at 68-69.) Even before Ms. Gray's trial, in all her pre-trial police statements, Rebecca had always maintained that she saw Rachel before she left for her visit to Suzie's and Rachel looked fine and not ill. (Ex. 17 at 7; Ex. 18 at 5-6, 12-14; Ex. 19 at 9-10.)

Rachel was taken on two trips with Mr. Jones and she was fine after both trips; indeed she still looked normal and well until Rebecca went off to Suzie's. There was no third trip where an alleged assault occurred. At around the time Rebecca was going off to visit Suzie, Rachel went over to play with some other children at the neighboring residence of Stephanie Fleming.  While there, Ms. Fleming and two of her guests, Julian Duran and Dawn Kopp, noticed that Rachel was sick, attempting to vomit. (Ex. 20 at 5-7; Ex. 21 at 19-21; Ex. 22 at 17-21; Ex.

23 at 2, 6-7.)  Rachel had been at the Flemings' for approximately 40 minutes. (Ex. 20 at 14-15.)  The peritonitis caused by an injury suffered days earlier was beginning to take hold.  Mr. Jones came and carried Rachel home, and it was only then, after Rachel became sick, that he took her on the third trip in the van. He eventually obtained some ice for her head wound at the nearby Quick Mart before taking her back home. (Ex. 20 at 10-11; Ex. 21 at 21, 28-29; Ex. 22 at 21-23; Ex. 12 at 19-22, 57.)

> **E.** **The claim that Rachel was being beaten in the van as Mr. Jones pulled into the Choice Market parking lot around 4:00 p.m. is belied by the record, which demonstrates Rachel was well and not physically harmed or in distress after her trip to the Choice Market.**

Mr. Jones' self-admitted trip with Rachel to the Choice Market figured prominently in the State's case. During Mr. Jones' trial, the State presented evidence from two children (Ray and Laura Lopez) in support of the contention that Mr. Jones was beating Rachel as his van entered the parking lot of the Choice Market. The prosecutor argued to the jury that the beating witnessed by the Lopez children was so severe that Mr. Jones caused Rachel's blood to spatter over his clothing and the seats of the van from her wounded scalp.[11]  (Tr. Apr. 13, 1995 at 98-100, 139.) The prosecutor leveraged her blood spatter argument to argue that the beating the Lopez children witnessed, as Mr. Jones entered the Choice Market,

---

[11] In section F we separately show that the blood evidence does <u>not</u> demonstrate that Rachel was beaten in the van.

occurred <u>after</u> Mr. Jones had assaulted Rachel with the crow bar, and sexually assaulted her. (Tr. Apr. 13, 1995 at 96-98.)

The Lopez children's mother told police she had sent the children to the Choice Market at around 4:00 p.m. (Ex. 24, Interview of Norma Lopez at 2.)   Mrs. Lopez's recollection of the children's trip to the market being at around 4:00 p.m. is not inconsistent with Mr. Jones' recollection, as Jones related in his statements to the police. (Ex. 12 at 56-57.)  That Mr. Jones was on the trip to the Market at around 4:00 is also corroborated by Rebecca's pre-trial statements, where she said that Mr. Jones and Rachel went to the store around 3:45. (Ex. 18 at 11-12.)  Further corroboration of the timeline comes from witness Terry Richmond, who told police he drove by Mr. Jones' residence at around 4:00 on May 1st and Mr. Jones van was not there.  (Ex. 25, Interview of Terry Richmond at 2-4.)

We address in a separate section of this brief (section H), the sheer physical impossibility for the Lopez children to have seen Rachel being beaten while Mr. Jones was driving in the van, but here we put a different lie to the State's claim that Rachel was beaten with a crow bar and sexually assaulted while on the trip over to the Choice Market.

Although Rebecca lied about the occurrence of three trips, she has never ever wavered from the fact that Rachel was fine after she went to the market with Mr. Jones for groceries. (Dist. Ct. Doc. No 96, Ex. 9, transcript of March 24, 1995

48

at 29-32,59, 69-71; Tr. Apr. 11, 1995 at 63-64, 69; Ex. 18 at 8, 11-12.)  It does more than stretch credulity to suggest that Mr. Jones was beating the terrified Rachel and spattering her blood over himself and the inside of the van as he entered the Choice Market, when in fact the evidence shows that  Rachel was fine and happy a few minutes later when she returns home. Accordingly, the evidence does not support any inference that Rachel was beaten with a pry bar and raped on the way to the Choice Market.

Of course, in the mind of the criminal investigators, the Choice Market parking lot was the scene of a major crime; the final scene, since the prosecutor argued the a vicious physical and sexual assault had just taken place, and that Mr. Jones continued to beat Rachel as he entered the Market parking lot. So naturally, there must be an official written report of that part of the police investigation, which would disclose that detectives interviewed employees of the Choice Market, to find out what they had seen. This is an especially inescapable conclusion, since Mr. Jones told police investigators that he took Rachel into the Choice Market to buy a few groceries (milk, cheese and bean burritos) and Rachel helped carry the milk.[12]  (Ex. 12 at 50.)   So where is the report of this portion of the police investigation? It does not exist!  It defies reason to conclude that the investigating detectives in this capital case did not interview anyone at the Choice Market. Mr.

---

[12] Rebecca confirmed the family ate the burritos for dinner. Pictures of the Choice Market Burrito wrappers are shown in (See Exh. 81.)

Jones reported that he was in the Market with Rachel within moments after the Lopez children claimed to witness an horrific assault. There is a record showing that the detectives interviewed each and every other person at each end every other location where Mr. Jones had reported that he had been on May 1st. The plain inference is that one or more police detectives must have interviewed the employees who were on duty at the Choice Market on the afternoon of May 1st, but the exculpatory evidence obtained from this portion of the police investigation, which must have taken place within a day or two of Rachel's death, was effectively deep-sixed and concealed. George Ruelas, the officer who did the some of the other interviews at locations Mr. Jones admitted taking Rachel, is currently serving a federal sentence for stealing cocaine from police property and selling it for profit.

The defense, of course, conducted no investigation of these matters or any other. The defense lawyer never bothered to interview any of the Choice Market employees to determine if an unharmed Rachel had been inside the store helping Mr. Jones with his shopping. What is more, Mr. Jones told police he did not pay with cash at the Choice Market. (Ex. 12 at 84.) Therefore, a credit card or check record would have been available identifying the exact time when Mr. Jones and Rachel were in the store, and this record could have dispositively demonstrated that the trip took place before Rebecca's late afternoon venture to Suzie's, when by all accounts Rachel was happy and in good health.

In any event, Rebecca has consistently insisted that Rachel was well after Mr. Jones' trip to buy groceries. (Tr. Apr. 11, 1995 at 63-64, 69-71.)  Mr. Jones did not beat Rachel before going to and on the way into the Choice Market. This must have been confirmed by police detectives during their investigation and interviews of Choice Market employees in the days after Rachel's death.

### F.      The interpretation of the blood evidence by the State was plainly invalid and misleading.

Rachel had a scalp wound that was bleeding on May 1st and she bled while inside Mr. Jones' van.  That much is undisputed. The question is whether there are innocent explanations for the blood evidence. There should be, and there is, particularly in light of the medical evidence summarized in sections B and C, which demonstrates that Rachel did not receive her fatal small bowel injury or her vaginal injury during anytime on May 1st.  But independent of the State's flawed "time of injury" evidence, its manipulation of the blood evidence was also forensically unsound and lacking in validity.

Mr. Jones saw Rachel fall from the van earlier that day on May 1st. (Ex. 12 at 10-11.)  Rachel herself reported that she fell from the van earlier in the afternoon that day.  (Ex. 26, Interview of Angela Gray at 4, 20; Ex. 17 at 2; Ex. 19 at 19; Ex. 26 at 8.)  Critically, however, there is no evidence that Rachel's scalp bled in the immediate aftermath of the fall. It was much later in the afternoon, near 5:30 pm. on May 1st, after Mr. Jones had discovered Rachel had become ill at Stephanie

51

Fleming's residence, that Rachel's scalp wound was first discovered. (Ex. 12 at 12, 17-19.) As to this point, Ms. Fleming also did not see any blood or any other injuries on Rachel's head, or elsewhere, before she sent Rachel home with Mr. Jones at around 5:30 p.m. (Ex. 20 at 6; Ex. 21 at 22.)

It was only after Mr. Jones brought Rachel home from the Flemings that he discovered the scalp wound, after noticing blood on Rachel's pillow where he had laid her down to rest. (Ex. 12 at 19.) Mr. Jones concluded then that a barrette in Rachel's hair had irritated a wound, that he thought may have originated with her earlier fall that day from the van. (*Id.* at 21.)  Consistent with Mr. Jones' perception; Rebecca, who had contact with Rachel throughout the day until she ventured off to Suzie's in the late afternoon, also did <u>not</u> see any blood or other wounds on Rachel.

Overlaying these facts, are Dr. Howard's microscopic autopsy findings which dated the origin of the scalp wound to a time some 48-72 hours prior to death. (Ex. 11 at 4, 19.)  Accordingly, Dr. Howard's findings suggest the bleeding first seen around 5:30 on May 1st was the result of the festering of an earlier injury.

With the above background stated, before we begin the disassembly of the State's misconstruction of the blood evidence, there are concerns independent of the misleading evidence actually supplied to the jury.  First, if Rachel was beaten

and raped on Sunday May 1st, where is the clothing she was wearing on that date? If she was beaten on May 1st, there should be blood on her clothing: but there is no evidence that any of the clothing Rachel wore on the afternoon of May 1st had any blood on it.

Second, as we explain below, there were only trace amounts of blood located on the blue jeans and red shirt Mr. Jones was wearing when he was arrested on Monday May 2nd. However, the point of significance here is this: there is <u>no</u> evidence he wore those same clothes on May 1st. In fact, Mr. Jones was reported to be wearing a blue shirt on Sunday May 1st and not the bright red one he wore on May 2nd. (Ex. 29, Interview of Ray Lopez at 14.) A police crime scene photograph of what appears to be Mr. Jones blue t-shirt is shown strewn on the floor next to his bed. (Ex. 38 ¶ 14.)

Third, and not least, with respect to the clothing that Mr. Jones was wearing on May 2nd, on the day after the alleged commission of the crime, the prosecutor argued at trial that blood could not have transferred from Rachel onto Mr. Jones or the van on May 2nd after she died. (Tr. Apr. 13, 1995 at 137.) This argument was contrary to the evidence, as Dr. Seifert testified that after death, gravity could cause drainage of blood from the cut ends of a blood vessel. What is more, this argument was contrary to the prosecutor's own argument in co-defendant Angela Gray's trial just days earlier. There, the prosecutor argued that admission of

53

multiple gruesome autopsy photos was necessary to demonstrate that Angela knew or should have known that Rachel was seriously injured, as her vaginal wound would have been bleeding, and the photograph showed that the wound was bleeding still.  (Tr. Mr. 28, 1995 at 33.) And proving this point, pictures taken at autopsy, nearly two days after Rachel died, reveal blood still seeping from Rachel's small scalp would onto the sheet where she lay. (Ex. 38 ¶ 16.) There is little question that blood could have transferred to the van or to Mr. Jones' clothing during resuscitation efforts and while Rachel was being transported to the hospital on May 2nd. One can imagine some small amounts of blood being transferred during the panicked, desperate resuscitation efforts that ensued that morning and in the van as Rachel's mother attempted to shake her back to life.[13] (Ex. 30, Declaration of Angela Gray at ¶ 12.)  To state the obvious: Rachel was still spilling some blood both on the morning of her death and even later, in light of the autopsy photos.

With all the above said, we next demonstrate how the blood evidence was falsified by the State at Mr. Jones' trial.

---

[13] An important footnote is this: there is no evidence that any of the clothing Ms. Gray wore on May 1st or May 2nd was tested for blood. However, it is inconceivable that her clothing would not also contain some transfer of Rachel's blood.

54

**1.   Bloodstains on the clothing Mr. Jones wore on May 2nd.**

As depicted on police photographs, Mr. Jones was wearing a red T-shirt and blue jeans on May 2nd.  (Ex. 38 ¶ 13A, Tr. Apr. 11, 1995 at 108-09.)  Photographs taken at the time of Mr. Jones' arrest, and the diagrams/bench notes prepared by the DPS criminalist Ed Lukasik, show that there were trace amounts of blood on Mr. Jones' T-shirt, but the amounts was so small they could not be characterized further. (Tr. Apr. 11, 1995 at 108; Ex. 38, ¶ 13A.)  There were also two small blood stains on the front right leg of Mr. Jones' blue jeans; with one of the stains corresponding to Rachel's blood group. (Tr. Apr. 11, 1995 at 109.)

After acknowledging that she was not a qualified blood interpretation expert Sgt. Pesquiera was allowed to testify that the stains on Mr. Jones' clothing were the result of blood spatter. (Tr. Apr. 12, 1995 at 64, 75, Ex. 38 ¶ 13

Then during argument, the prosecutor argued that the trace amount of bloodstain on the right side of Mr. Jones' clothing proved that Mr. Jones was beating Rachel with his fist and elbow, while driving into the Choice Market parking lot, as the Lopez children described.  (Tr. Apr. 13, 1995 at 100, 139.)

Apart from the fact that there is <u>no</u> evidence that Mr. Jones wore any of this clothing on May 1st, the testimony of Sgt. Pesquiera and the resulting argument of the prosecutor, were false and misleading. Mr. Jones had the blood evidence and Sgt. Pesquiera's testimony examined by Stuart H. James, a leading expert in

bloodstain pattern interpretation. (Mr. James current CV is attached as Ex. 31.)  As a general matter, Mr. James confirmed that Sgt. Pesquiera "was not qualified at the time of Mr. Jones's trial to offer expert opinion in the discipline of bloodstain pattern interpretation." (Ex. 32 at ¶8.)  There was no reliable foundation for any of her blood interpretation testimony.

As to the relevant point, with respect to the trace amounts of blood on Mr. Jones' clothing: Mr. James flatly rejected the claim that the small amount of blood on the clothing resulted from blood spatter caused by Mr. Jones' alleged assault of Rachel.  To the contrary, he  found that the small amount of blood "proves only that his clothing . . . was at some point in time close to and in contact with a bleeding source . . . [and] [t]hese stains could have occurred as the result of lifting or otherwise attending to an injured person." (Ex. 32 at ¶ 6.)  The blood on the clothing Mr. Jones' wore on May 2nd is <u>not</u> in any way suggestive of guilt.

### 2.     Bloodstains on the passenger seatback of the van.

The passenger seat-back area was found to contain small traces of blood. (Tr. Apr. 11, 1995 at 107-08; Ex. 38 ¶13C.) Of the three small samples of blood found on the seat-back, two were so small they could not be further characterized and one had characteristics consistent with Rachel's blood.  (Tr. Apr. 11, 1995 at 107-108.)   During Mr. Jones trial, the prosecutor told the jury to interpret this evidence as proof that Mr. Jones' assaulted Rachel while she sat in his van.  Sgt.

Pesquiera testified the seatback contained blood spatter. The following interchange took place.

A:  (by Pesquiera ) The spatter that is seen, for instance, on the seat (V12) is consistent with the diameter or the actually the spots, the stains are—consistent with them being at a point of confrontation being that the victim – being – Rachel in this case, would have been in that area at the time of the bleeding, but in this case from what I see – I found that the area of injury would have had to have had static blood on it, meaning there would have already had to have been blood on her, and it would have had to have been struck, shaken or in some way changed like a blow or blunt force trauma causing the blood to spatter out.

Q:  (by Ms. Mayer) In other words, at the time that Rachel was in that seat and deposited the spatter pattern on the seat, which is V12, she would have have been bleeding and – whatever was bleeding was either moved by being struck or shaken, do I understand your testimony correctly?

A:  Yes. The blood has broken apart prior to hitting the surface, and that is because it appeared to be that there was static blood already

there, and <u>some type of blunt trauma struck that static blood causing it</u>

<u>to go out</u>.

(Emphasis added) (Tr. Apr. 12, 1995 at 74.)   The prosecutor used the above

testimony to argue that:

When they were making – trying to make her shut up, he just

kept hitting her harder while she is sitting in that seat. . . Leaving

behind Rachel's blood on the seat in which she sat.

When you see how this is, little dots, little dots of blood as

opposed to the stains that have actually been allowed to soak in and

look much darker and saturated. This is spatter as Detective Pesquiera

told you. This is blood spatter from when you hit an already bleeding

wound. She referred to as static blood. Well, that's what was

happening with Rachel.

(Tr. Apr. 13, 1995 at 97-98.)  The argument continued:

… As he's driving with one hand and pounding Rachel with the

other, with this elbow as described by the children, with his fist as

described by the children.  Hitting her hard.  Causing Rachel's blood

from the bleeding laceration in the back, left back of her head, top of

her hear to spatter on the seats, on her own passenger seat.

State's 190 (V12) show the other area of the spatter on the seat itself adjacent to where it is on the side. Not a saturation stain, but spatter.

Showing you 191 (V12) you can see the spatter on the side of the seat. 192 where the detectives took and cut those stains out of the seat and submitted to Mr. Lukasik in the lab for analysis to have that blood come back as Rachel's. It's spattered on the seat . . . .

(Tr. Apr. 13, 1995 at 98-100.)

The evidence that the small stains on the seat should be considered as proof that Rachel was beaten while sitting in the van, was utterly misleading. Apart from the fact that Sgt. Pesquiera was not qualified to interpret any of the evidence, rather than being consistent with an assault, Mr. James actually found just the opposite: "[t]he area of small bloodstains [on the passenger seat] is not typical of those produced during a beating."  (Ex. 32 ¶¶ 5-6.) In this case "the blood [on the passenger seat] could have been projected or cast-off from the victim's hair as she was carried into the van, while the van was in motion or during resuscitation efforts." (*Id.* ¶ 7.)  Mr. James ultimately concluded that "the blood stains in the subject vehicle are not supportive of a conclusion that the child was beaten in the van and the testimony presented at trial was inaccurate and unreliable, and presented by an unqualified witness." (*Id.* ¶ 8.)

59

### 3. Bloodstains just behind and between the driver and passenger seats.

In between and near the back of the front seats of the van, there was a single small bloodstain on the carpet, described as V6. (Tr. Apr. 12, 1995 at 72.)  The small size of the stain can be seen in comparison to an index card placed next to the stain. (Ex. 38 at Ex. H.) Near the same location there was a spec of blood located on a tiny woodchip V7 and an even smaller drop on a tiny piece of cigarette packaging V8. (*Id.*)

Sergeant Pesquiera described the carpet stain as an impression stain . . . where it [the blood] soaks down through the carpeting." (Tr. Apr. 12, 1995 at 72.)[14] The prosecutor then argued to the jury that the impression stain proved that the beating and sexual assault of Rachel had taken place at the location of the V6 blood stain inside the van.  The prosecutor argued that "Rachel was laying in the back of that van after her head was bleeding, and her head was bleeding as she was laying in the back of that van because she had been beaten and hit with that pry bar as part of that sexual assault, and this is where the sexual assault occurred. This is on the third trip away from the house." (Tr. Apr. 13, 1995 at 96-97.)  This argument, and the evidence it was based on, was entirely false and misleading. The small bloodstain on the van carpet is, conclusively, <u>not</u> an impression stain.  As

---

[14] There is no physical evidence to support the claim that blood had soaked through the carpet.

explained by Mr. James, the stain on the carpet is evidence of a passive blood drip; it is neither an impression stain nor blood spatter. (Ex. 32 ¶ 3.) Contrary to the State's argument to Mr. Jones' jury, there is <u>no</u> evidence that Rachel had had ever laid down in the back of the van.

With respect to the small stain on the tiny woodchip (V7) Sgt. Pesquiera testified that the woodchip showed evidence of blood spatter. (Tr. Apr. 12, 1995 at 72-73.)  (She did not opine on the tiny spot of blood on the cigarette paper (V8)). The prosecutor again relied on Pesquiera's testimony to argue that V7 showed "[b]lood spatter from when Rachel's head is being hit and the blood from her bleeding head is flying around." (Tr. Apr. 13, 1995 at 100.)  But once again, the evidence and argument were false and misleading. The woodchip contains a small passive drop of blood, not spatter. (Ex. 32 ¶3.)

### G.   The evidence does not support an inference that Rachel was beaten or assaulted inside the van.

As explained above, analysis of the blood evidence by a qualified expert eliminates any inference that Rachel was brutally beaten with a pry bar and then sexually assaulted inside the van. The medical "time of injury" forensics already proved Mr. Jones did not assault Rachel in his van or anywhere else on May 1st, or at any other time.  On top of this, an examination of the inside of the van itself shows the State "assault in the van" theory to be incomprehensible.  Exhibits 165, 166, 167, 174 and 175 depict the back of the van which is almost entirely occupied

61

by a homemade tool organization system made of wood and covered by a large piece of plywood. (Ex. 38 ¶ 15 and Ex. F.)

The prosecutor theorized that the assault took place in the small space just behind the front passenger seat. The best view of this location is seen in Exhibit 38(F), which shows there would have been no space for Mr. Jones to assault Rachel in this location, unless he elected to do so in broad daylight with the door open. (*Id.* at ¶ 15.)  What is more, the floor of the van is covered in dirt, woodchips and debris and no such objects were located in the victim's matted hair. (Ex. 38 ¶ 15; Tr. Apr. 12, 1995 at 36.)

**H.    There is no reliable evidence to support the conclusion that the Lopez children saw Mr. Jones beating Rachel as he entered the Choice Market Parking Lot.**

We have already demonstrated above that the State theory that Mr. Jones fatally beat and sexually assaulted Rachel during the trip to the Choice Market was impossible to have occurred. The medical forensics prove that Rachel was not injured on May 1st and Rebecca reported Rachel to be well after her trip to the market. (*See* sections D and E above.)  Since it is established that Rachel was not harmed by Mr. Jones on May 1st there must be some rational explanation for the Lopez children mistaken reportage; and of course there is.

Child witnesses, Ray and Laura Lopez, after being influenced by parents, police, and prosecutors, testified that they saw Mr. Jones beating a little girl in his

van on the afternoon of May 1, 1994. The children claimed to have seen the man from a vantage point of about 20 feet away for about 10 seconds as he drove his van past them in a dirt lot next to the Choice Market. Their story does not withstand scrutiny.

Justice Kennedy highlighted the "serious systemic concerns" associated with obtaining the death penalty based upon the testimony of child witnesses. *Kennedy v. Lousiana*, 554 U.S. 407, 443-44 (2008).   There, the Court overturned the petitioner's death sentence for the aggravated rape of his eight-year-old stepdaughter, highlighting the fact that "[t]he problem of unreliable, induced, and even imagined child testimony means there is a special risk of wrongful execution." *Id.* (citation omitted) (internal quotation marks omitted).  The opinion relied upon scientific research outlining the suggestibility of child witnesses to support the proposition that children may exaggerate or fabricate testimony.  *Id.* at 444.

In this case, the risk that so worried Justice Kennedy is not merely hypothetical. An expert in eye-witness identification, Dr. Philip Esplin, found the Lopez children's identification was utterly "unreliable as the result of post event contamination, both with regard to interviewing the children with other witnesses present and information provided to the twins via the television coverage, as well as the use of interview procedures that did not involve scientifically sound

63

methods." (Ex. 72 at 13.)  As parents, police, and prosecutors emphasized for Ray and Laura the importance of their statements and indicated explicitly and implicitly that statements affirming the narrative that a man beat a little blonde girl in a yellow van were preferred, Ray and Laura told about the man on the news who hit a little girl in a van.

### 1.   What the Lopez family described to police.

The day after Ray and Laura Lopez allegedly watched a television news story reporting that Mr. Jones had been arrested for Rachel Gray's death, Detective Bruce Clark interviewed the eight-year-old twins and their mother in their home. Det. Clark first spoke with Norma Lopez, the twins' mother. She reported that when the children returned home from Choice Market around 4:00 p.m. on May 1st, they told her that they had seen a man who "looks like Alonzo in a yellow van . . . punching a little girl." (Ex. 24 at 3.)  Ms. Lopez then told Det. Clark that when she saw Mr. Jones on the news the following day, she "knew right away the kids saw the same guy that was in the van was, was the same guy that was on the news." (*Id.*) After discussing it with her husband, and at the urging of the children, Ms. Lopez called police the morning of May 3rd to report what the children had seen. (*Id.* at 5.)

With Ms. Lopez present, Det. Clark next interviewed young Ray Lopez. Without giving Ray the opportunity to develop a narrative about what he had seen

64

on May 1st, Det. Clark immediately presented a barrage of leading questions. Early in the interview, when Ray gave an unwelcome answer about the distance between his house and Choice Market, Det. Clark scolded him: "No, no, no, no. Okay, we gotta, we gotta be real serious about this, okay?" (Ex. 28 at 4.) Through a series of direct questions, Ray told Det. Clark that when he went to the Choice Market around 5:00 p.m. on May 1st, he saw a man with long, messed up, curly hair, wearing a blue shirt and a blue and white baseball cap hitting a little girl while driving a yellow van with one hand. (*Id.* at 3, 6, 7, 9.) When Ray said that he could not estimate the man's age, his mother suggested that the man was around "Uncle David's" age, or around 30-35 years old, and Ray agreed. (*Id.* at 7.) Ray told Det. Clark that he saw the man quietly hitting the girl with his fist and elbow—twice in the face and once in the stomach. (*Id.* at 10.) Ray then said that although he couldn't hear any noises from inside the van, he could see the girl was crying as the man hit her once with his elbow and five times with his fist. (*Id.* at 11.)

Det. Clark interviewed Laura Lopez last with Ms. Lopez in the room.[15] Laura told Det. Clark that when she went to the Choice Market with her twin brother between 3:00 and 4:00 p.m. on May 1st, she saw a man with long, brown, messed up, curly hair driving a yellow van with one hand while hitting a little

---

[15] In 2007, during a presentence interview, Laura Lopez revealed that her mother, a longtime drug abuser, physically abused her as a child. (Ex. 65 at 3.) Laura's abusive mother initiated the interaction with police and sat in on all interviews the children had concerning the case.

blonde girl with the elbow of his other arm.  (Ex. 64 at 6, 7, 8, 10.) Laura told Det.

Clark that the girl did nothing in response to getting hit. (*Id.* at 11.) Clearly not

satisfied with this answer, Det. Clark initiated the following exchange:

> Q. No, was she talking or you know could you hear her
> saying anything?
> A. No, I, I don't think.
> Q. Okay, just, just tell me what you remember. Do you
> know if the little girl's window was up or down?
> A. Um.
> Q. Do you remember?
> A. No.
> Q. You don't know?
> A. I don't know.
> . . .
> Q. Okay. Um, could you see if the little girl was laughing
> or crying?
> A. Crying.

(*Id.* at 11-12.) After posing this final leading question, Det. Clark then cemented

the idea in Laura's mind: "You're sure?" Laura answered, "Yeah." (*Id.* at 12.)

When pressed for details about how the girl looked, however, Laura's description

fell apart, and she said "I didn't see, I forgot." (*Id.*) Again later in the interview,

this time joined by Ms. Lopez, Det. Clark cajoled Laura into changing another of

her answers:

> Q. Did you, uh, when you came home from school
> yesterday . . .
> A. Yeah.
> Q. . . . did you watch any television?
> A. Yeah, but cartoons.
> Q. Okay. Did you watch the news?
> A. No.

66

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Q. Okay, did you think your brother watched the news?
> A. No.
> Q. You don't, you don't know?
> A. No.
> Q. You don't know, okay. <u>Mom, uh, let me just ask you,</u> did they both watch the news?
> A2. They both watched the news. Did we, yeah we watched the news. <u>Remember I, I told you to come and watch the news</u>?
> A. Yeah.

(*Id.* at 18-19 (emphasis added).) Laura also needed Det. Clark's help to make the connection between the man in the van and the man on the news:

> Q. Okay. And did you recognize the guy [on the news]?
> A. Yeah.
> Q. And who'd you, the guy that you saw on television, who did you think he looked like?
> A. Like Alonzo.
> Q. Like Alonzo?
> A. Yeah.
> . . .
> Q. Do you think the guy you saw on the news, did he look like anybody else?
> A. No.
> Q. Okay. You said that the guy in the van, that you saw hit that little girl, you said that he kinda looked like Alonzo.
> A. Yeah.
> Q. Okay, so did the guy on the news look like the guy in the van?
> A. Mm, hm (yes), yeah.
> Q. You think so, you're sure?
> A. Yeah.

(*Id.* at 19-20.)

## 2.    What the Lopez family described to trial counsel.

Ray Lopez admitted to defense counsel that he did <u>not</u> have an independent memory of many of the events of May 1, 1994; his answers derived from his reading of the transcript of his interview with Det. Clark months earlier. (Ex. 29 at 4-5.)  Ray stated that on his walk to the market, he saw a man in a van hitting a little girl. (*Id.* at 6.)  He described the van as a scratched, old solid yellow van without any windows. (*Id.* at 7-8.)  However, Mr. Jones van did have windows.  It is worthwhile to note here that, in the aerial photographs taken by the Pima County Sheriff's Office, an older model solid yellow van <u>without</u> any windows along the side panel, matching the description given by Ray Lopez, sat in the Choice Market parking lot. (Ex. 67.)  So not coincidentally, the same van described by Ray without windows, which is not Mr. Jones' van, can be seen in the Choice Market parking lot where Ray claimed to have seen the man hitting a girl.

Ray described the man as a white man with a black afro. (Ex. 29 at 9-10.) Ray retreated from his earlier statement to Det. Clark, telling counsel he did not know how many times the man hit the girl and he could <u>not</u> see the little girl crying. (*Id.* at 12-13.)  He also became uncertain whether he had seen the man from the van on the news. (*Id.* at 18-19.)

Laura Lopez spoke with counsel, but only after first listening to her brother's interview and his answers. (Ex. 66 at 1.)  Like her brother, Laura remembered that

the van was solid yellow without any windows along the sides. (*Id.* at 6.)  Laura

claimed to be able to see the driver of the van all the way down to the waist of his

pants, but she was unable to recall what the driver wore or what he looked like. (*Id.*

at 9.)  Again, like her brother, Laura described the man as having curly hair "[l]ike

a black guy's." (*Id.* at 10.)  Laura told counsel that she only saw the back of the

driver's head and she saw only some of the girl's face from the side, but she could

tell that the girl was crying because "[h]er face was red and watery." (*Id.* at 10, 11,

13.) Laura expressed doubt whether the man she saw on the news was actually the

man in the van, ultimately willing to commit to a statement that "[i]t . . . could be"

the same man. (*Id.* at 18.)

### 3.    How the Lopez family testified at Mr. Jones' trial.

At trial, Ray Lopez testified that he saw a white man with bushy hair hitting

a little girl in a yellow van the afternoon of May 1, 1994. (Tr. Apr. 7, 1995 at 9-

10.)  The prosecutor then had Ray come off the witness stand to sit right next to

her and demonstrate how he saw the man hit the girl; Ray stated that he saw the

man hit the girl three times. (*Id.* at 11-12.)   This demonstration bore no

resemblance to what could have possibly taken place in Mr. Jones' van, as the

space between the passenger side door and the driver side door in the van spanned

a full 6 feet. Defense counsel, however, raised no objection to the demonstration.

(*See* Tr. Apr. 7, 1995 at 12.) Just as he had described in his pre-trial interview with

69

defense counsel, Ray testified that he could <u>not</u> see the girl's face; however, the prosecutor impeached this testimony asking Ray whether he recalled telling defense counsel that he saw the little girl crying. (*Id.* at 13-14.) Thus, Ray's statements that he could not see the girls face but he saw her crying appeared to be in irresolvable conflict. After testifying that he saw Mr. Jones on television being put into a car by police, Ray failed to identify Mr. Jones in court. (*Id.* at 17-18.) Ray then identified Mr. Jones' booking photograph as the man he saw hitting the girl in the van. (*Id.* at 18.)

On cross-examination, Ray testified that he never saw the man's face because the man was turned toward the passenger and Ray looked into the van from the driver's side window as it passed him. (*Id.* at 25-26.)  Ray then denied defense counsel's suggestion that perhaps the van window was high enough that Ray would have to look up to see into the van. (*Id.* at 27.)  On redirect, the prosecution attempted to have Ray identify Mr. Jones' van as the van he saw on May 1st, but Ray testified that it was not the same van. (*Id.* at 29-30.)  The van Ray described however can be seen in a crime scene photograph in the Choice Market parking lot.  Ray was excused from the stand without any further questions from defense counsel.  (*Id.* at 32.)

Next, it was Laura's turn to testify. She told the prosecutor that she saw an ugly man with puffy hair hitting a little girl in a van, but she only saw the man's

70

face "a little bit." (*Id.* at 36.)  She testified that she did not see the girl's face at all. (*Id.*) The prosecutor then stood next to Laura and had her demonstrate how the man hit the girl. (*Id.* at 37-38.) The prosecutor then reminded Laura that she had previously stated that she saw the girl was crying; Laura testified that she remembered that the girl was crying. (*Id.* at 38.) This conflicted with Laura's initial statement to the police: when asked how the little girl looked she said she could not see. (Ex. 64 at 12.) After eliciting testimony that Laura identified the man she saw on the news as the man she had seen in the van, the prosecutor stated she had no further questions, notably choosing not to have Laura identify either Mr. Jones or a photograph of Mr. Jones' van in court. (Tr. Apr. 7, 1995 at 40-41.)

On cross-examination, Laura testified that she saw a little bit of the side of the girl's face even though the girl's face was not higher than the level of the van's windows. (*Id.* at 44.) Laura then contradicted herself, testifying that she could see the girl was crying because she could see her eyes watering, but Laura admitted that she could not see both of the girl's eyes. (*Id.* at 45.)

### 4.  What experts have discovered.

Dr. Patrick Hannon, an expert in biomechanics, analyzed the measurements of Mr. Jones' van and the Lopez children's vantage point and stature to determine what the children could have seen on May 1, 1994. Given the changing angles of the children's line of sight, the light reflecting off the glass window surfaces, the

71

structural components of the van that could obstruct views into the passenger compartment, and the positions of the driver and passenger in the van, Dr. Hannon determined that the upper limits of the Lopez children's observations of the van and its occupants would have been around 2 to 4 seconds. (Ex. 15 at 3-4.) He further found that (1) the children could not have seen more than the top six inches of Rachel Gray's head given her stature and the measurements of the interior of the van and (2) the children would have been unable to have a clear view of Mr. Jones' head and torso if he were reaching across the front of the van far enough to make contact with Rachel given the 6-foot width of the van and Mr. Jones' 5-foot, 6-inch stature. (*Id.* at 6.) It would have "required exceptional skill" for Mr. Jones to maintain control of the van while leaning far enough over to reach the passenger seat of the van to make any contact with Rachel Gray, as Mr. Jones would likely have had to move his buttocks over the edge of the driver's seat pan to reach. (*Id.*) Dr. Hannon found that "hypothesized actions by Barry Jones while driving the Ford van are extremely improbable." (*Id* at 6.)  He ultimately concluded that "[t]he observations and statements of Laura and Reynaldo Lopez (age eight years at the date of the incident) are not accurate. Accurate observations for reasons discussed are highly improbable. Furthermore, the physical actions of Barry Jones described by the two Lopez children while he was driving the Ford van are extremely improbable from a functional anatomy/biomechanics perspective." (*Id.* at 9.)

72

Paul Gruen, an accident reconstructionist with 32 years of experience,[16] echoed Dr. Hannon's findings. Mr. Gruen concluded that given the Lopez children's various statements, rife with inconsistencies, investigators should have obtained measurements of the vehicle, scene, and witnesses and verified whether the children could have observed what they claimed to have observed. (Ex. 69 at 4.) Having done these things, Mr. Gruen determined to a reasonable degree of scientific certainty that there was no physical evidence to support the Lopez children's claims. (*Id.* at 4-5.) The children were "too short in stature . . . to have accurately observed any activity inside the van." (*Id.* at 5.)

More recently, Ray Lopez has confirmed the findings of these experts. In 2009, Ray stated in a signed declaration that he "did not see the face of the man driving the yellow van." (Ex. 70 at ¶ 3.) Ray went on to state that he "saw the man making swinging motions, but did not see what he swung at." (*Id.* at ¶ 4.) In fact, Ray did not see anyone else at all in the van with the man. (*Id.*)

Unfortunately for Mr. Jones, defense counsel utterly failed to investigate the unreliable and inconsistent yarn the Lopez children spun. Counsel tasked their investigator, working without any funding, with measuring Mr. Jones' van, but they failed to explain the significance of these measurements. Then, after obtaining these measurements, ostensibly on some hunch that the Lopez children couldn't

---

[16] Mr. Gruen's current CV is attached as Exhibit 68.

have seen what they claimed to, counsel did nothing further. No further investigation, no requests for experts to analyze the data, nothing. Counsel inexplicably and inexcusably stopped short in their investigation, rendering their assistance constitutionally ineffective.

## I.     The legal argument on deficient performance.

Mr. Jones' ineffective assistance claim turns on application of the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* guarantees fulfillment of Mr. Jones' Sixth Amendment right to counsel. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012). "The right to the effective assistance of counsel at trial is a bedrock principle in our justice system." *Id.* The duty of effective counsel under the Sixth Amendment "is to make the adversarial testing process work on the particular case. " *Strickland*, at 466 U.S. 690.  As should be evident from the discussion which follows, a mockery was made of the adversarial testing process in Mr. Jones' case. Under the well-known two prong test, Mr. Jones must establish deficient performance by his trial counsel and prejudice.  *Strickland*, 466 U.S. at 688, 694.  Here we focus exclusively on deficient performance.

### 1.     The standard for assessment of deficient performance.

To establish deficient performance, Mr. Jones must show that "counsel's representation fell below an objective standard of reasonableness under prevailing

74

professional norms." *Strickland*, 466 U.S. at 688.  Several general propositions are attached to the assessment of deficient performance.

First, the reasonableness of counsel's challenged conduct on the facts of the particular case must be viewed as of the time of counsel's conduct, "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689-90.

Second, although Mr. Jones "must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance," *id.* at 689, strategic choices resulting from lack of diligence in preparation and investigation are not protected by the presumption in favor of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003); *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Third, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).  This means that with respect to the assessment of the attorney's decision not to investigate, the Court "must consider ... whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539

U.S. at 527. Therefore, "the strength of the general presumption that counsel engaged in sound trial strategy turns on the adequacy of counsel's investigation." *Francis v. Miller*, 557 F.3d 894, 901 (8th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690-91).

Finally, courts have found the various editions of the ABA Criminal Justice Standards and ABA Death Penalty Guidelines useful in assessing the reasonableness of counsel's performance. As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .'" (citing *Strickland*, 466 U.S. at 688; *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191 & n.6 (2004); *Wiggins*, 539 U.S. at 524; *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . . ."  *Id.* at 367.

We discuss the application of the above standards for assessment of trial counsel's performance next below.

76

### 2.    Application of the deficient performance standard to Mr. Jones' case.

At Mr. Jones' trial, the prosecutor presented expert forensic evidence which left the jury with only one conclusion: Rachel sustained all of her injuries, including the fatal small bowel injury, during a small window of time, over just a few hours on a Sunday afternoon on May 1, 1994. The State placed the entirety of its case against Mr. Jones on this single premise: Rachel was fatally injured, beaten and sexually assaulted by Mr. Jones during a single event, which occurred inside his yellow van, on a trip to the Choice Market during the afternoon of May 1st. From the very beginning, the State relied on what it purported to be scientifically valid proof that Rachel's injuries were actually inflicted on the afternoon of May1st. Dr. Howard told the jury that all of Rachel's injuries, her fatal small bowel injury; her torn vagina; her scalp injury; and bruises were consistent with injuries that were inflicted on the afternoon of May 1st. (Tr. Apr. 12, 1995 at 117, 133, 147-48.)  To top this off, the State presented the testimony from Sgt. Pesquiera to the effect that the blood found on Mr. Jones' clothing was consistent with proof that Rachel had been sexually assaulted and beaten in the van. The State used the testimony of the Lopez children to buttress the idea that Mr. Jones assaulted Rachel in his van on a trip to the Choice Market. None, we repeat, none of the state's evidence was subjected to any independent investigation or adversarial testing.

77

### a.    The failure to investigate the time between infliction of injuries and death.

There were profuse investigative failures in this case, and we address each of the most poignant below, but by far the most disastrous miscarriage occurred when counsel failed to investigate the basic scientific premise of the State's case: that Rachel's injuries were all consistent with infliction on the afternoon of May 1st. There can be no objectively reasonable basis for counsel's decision to essentially concede this fundamental forensic conclusion, so essential to the State's case, without conducting <u>any</u> independent investigation.  We are particularly sensitive to the Supreme Court's admonishment that the reasonableness of counsel's challenged conduct on the facts of the particular case must be viewed as of the time of counsel's conduct, "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689-90.  Therefore we view the deficient performance claims against trial counsel from that perspective.

We must begin with a singular fact which counsel well understood from the beginning: Mr. Jones was insisting on his innocence and the State's case rested almost entirely on circumstantial evidence. As we explain below, counsel received signals from multiple quarters alerting him to the urgent need for investigation.

<u>An independent investigator concluded Mr. Jones was probably innocent and the case demanded investigation</u>. Sean Bruner was Mr. Jones' court appointed trial counsel.  After his appointment, Mr. Bruner obtained an authorization from

78

the trial court for $500 for investigation.  (Ex. 33, Declaration of Sean Bruner, ¶ 7.)
Counsel retained George Barnett.  During 1969-1989, Barnett was an officer with
the Tucson Police Department.  He retired from the Department as a lead detective,
and he had served as lead investigator on at least 12 homicides, while assisting on
investigations of dozens more.  (Ex. 34 ¶ 2.)  After retiring from the police force,
Barnett established his own private investigation business, which he conducted
until his full retirement in 2007.  (*Id.*)

After expending the small allotment for his investigation, Barnett prepared a
detailed written report which he provided to trial counsel. (Ex. 35, Declaration of
George Barnet at Ex. 1.)  Barnett's initial conclusions were consistent with Mr.
Jones' own protestations of innocence. Barnett believed that Mr. Jones was
probably innocent and that someone else was responsible.  (Ex. 35 ¶¶ 8-9.)
Barnett's initial round of interviews of residents of the trailer park, where Mr.
Jones lived, consistently characterized Jones as a protector; not an abuser of
children. (*Id.* at Ex. 1, pgs. 1-10.)  On the other hand, there were several reports
that Rachel's mother was abusive.  (*Id.* at 2-3.)  There was absolutely nothing in
Mr. Jones' background that suggested he would be capable of beating and sexually
assaulting a four year old child.

Critically, the retired homicide detective Barnett also learned that another
child in the trailer park had struck Rachel in the stomach with a metal bar and he

found corroboration for the report that Rachel had fallen out of Mr. Jones' van, supporting Mr. Jones' report of how Rachel may have cut her head.  (Ex. 35 at Ex. 1, pgs. 6-7.)  Barnett advised trial counsel that Jones was probably innocent and that an investigation should continue.  (Ex. 34 ¶ 6.)  In response, Barnett was told that investigation funds had run out and his investigation services were no longer needed.[17]  (*Id.*)  Mr. Jones' case is the only homicide case Barnett ever worked on where he strongly believed the accused was not guilty. Inexplicably, Barnett's efforts to investigate Mr. Jones were frustrated by Mr. Jones' own counsel. (*Id.* ¶ 16.)

The initial police investigation revealed evidence suggesting that Rachel's injuries might not have been inflicted on May 1st. According to the State's own theory, there was a very small window on the afternoon of May 1st when Mr. Jones could have beaten and sexually assaulted Rachel. But to the contrary, Rachel's sister Rebecca had repeatedly stated in pre-trial interviews with the police that Rachel had gone on two trips with Mr. Jones on the afternoon of May 1st and Rachel appeared well and not injured when she returned from the trips, including a trip to the store for groceries.  Indeed Rebecca reported that Rachel appeared fine through late in the afternoon. (Ex. 17 at 6-7; Ex. 18 at 11-12.)

---

[17] There is no suggestion in this record that additional funding for investigation would not have been available.

80

Adding to the red flags rising all around trial counsel, Rebecca would verify her pre-trial statements under oath during Ms. Gray's trial, which preceded the trial of Mr. Jones. Counsel's billing records demonstrate that either he or his associate Ms. Leslie Bowman attended Ms. Gray's trial, where Rebecca testified that she was sure that Mr. Jones took Rachel on only two trips during the afternoon of May1st and she appeared well after each trip through the late afternoon, until she went to visit her friend, Suzie.  Surely the statements made by Rebecca prior to Mr. Jones' trial cast some doubt about whether Mr. Jones had beaten and sexually assaulted Rachel that May 1st afternoon. (Ex. 36, Billing records of Sean Bruner; Dist. Ct. Doc. No. 96, Ex. 9, trial transcript of March 24, 1995 at 69-71.)

Dr. Howard's own autopsy findings strongly indicated a compelling need to investigate the timing of Rachel's injuries.  The State theory had Mr. Jones beating and sexually assaulting Rachel on the afternoon of May 1st but Dr. Howard own autopsy findings contradicted the State's theory.   In a pre-trial interview, Dr. Howard  disclosed that he found "microscopic" evidence to put the time of Rachel's scalp injury as "probably two days old" and perhaps "72 hours and older." (Ex. 11 at 4, 19.)  Dr. Howard also disclosed in the same pre-trial interview that during his autopsy, he found "cells" associated with Rachel's genital injury that "would suggest they were inflicted [up to] . . . two days before death." (*Id.* at

23.) What is more, Dr. Howard reported that the abdominal injury could develop over a period of a day, meaning up to 24 hours. (*Id.* at 35.)

When Dr. Howard testified at Ms. Gray's trial he described the autopsy chemistries for the small bowel and vaginal injuries, as most consistent with injuries inflicted prior to the May 1st afternoon window, 24 hours prior to death, not 12 hours before death. (Dist. Ct. Doc. No. 96, Ex. 9, March 28, 1995 at 99-101.)

In toto, all of Dr. Howard's pre-trial statements, including his testimony at Ms. Gray's trial, pointed to a set of injuries that did <u>not</u> occur at any time on the afternoon of May 1st.  No objectively reasonable counsel could have failed to understand, that an independent medical investigation was essential to test the prosecution theory that Rachel was murdered on May1st while in Mr. Jones' care.

<u>Counsel's decision not to investigate the time of infliction of Rachel's injuries was objectively unreasonable and not supported by a reasonable trial strategy</u>. At the start of Mr. Jones' trial, defense counsel told the jury during opening statements (1) that the state did <u>not</u> have proof that Mr. Jones murdered Rachel, and (2) there was <u>no</u> physical evidence tying Mr. Jones to the crime. (Tr. Apr. 6, 1995 at 58, 73.)  This was the selected defense, but trial counsel was at best flat wrong about what the evidence would show, and at worst deceptive about the state of the evidence that the jury would receive during the trial. Counsel misled

82

the jury during his opening statement because (1) the State did have physical evidence that Mr. Jones had committed the crime; they would offer Dr. Howard to say that the physical evidence he uncovered at autopsy showed that all of the injuries were consistent with infliction during the afternoon hours of May 1st, when Mr. Jones had principal responsibility for Rachel's care; and (2) trial counsel came into the trial totally unprepared to offer any rebuttal to Dr. Howard's description of what the physical evidence showed.  This latter point is proven by the fact that in this deeply ingrained scientific case, all Mr. Jones' trial counsel could muster was just over two pages of ineffective cross examination of Dr. Howard.  (Tr. Apr. 12, 1995 at 158-160.)  That trial counsel was vastly unprepared to meet the State's forensic case is an understatement.

As explained above, "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521-22 (citing *Strickland v. Washington*, 466 U.S. at 690-91).

Here, trial counsel entered the trial with a not guilty defense, promising the jury he was prepared to prove there was <u>no</u> physical evidence tying his client to the crime; when in fact <u>he knew there was such evidence</u> aplenty coming from Dr.

83

Howard and Dr. Seifert. Apart from this mendacity, in light of trial counsel's selected defense, there can be <u>no</u> conceivable support for a decision to conduct absolutely <u>no</u> investigation which would support the chosen defense. This conclusion becomes a compelling one in light of Dr. Howard's and Rebecca's pre-trial statements suggesting a reasonable probability that the injuries were not inflicted on May 1st while Rachel was under Mr. Jones' care. Therefore, counsel had a duty to consult with a competent pediatric pathologist to determine the timeline between the infliction of Rachel's injuries and her death. *Elmore v. Ozmint*, 661 F.3d 783, 851 (4th Cir. 2011) ("the gross failure of Elmore's 1984 trial lawyers to investigate the state's forensic evidence—including the medical examiner's time-of-death opinion . . . had a palpably adverse effect on the defense"); *Duncan v. Ornoski*, 528 F.3d 1222, 1236 (9th Cir. 2008) (finding deficient performance where "the central role that the potentially exculpatory blood evidence could have played in Duncan's defense increased [counsel's] duty to seek the assistance of an expert"); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) ("[A] reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results."); *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) (finding deficient performance when counsel failed to hire an expert to rebut the State's expert testimony about physical evidence linking defendant to the crime scene

when the defense theory was that defendant was not at the crime scene), *remand order modified by stipulation*, 268 F.3d 485 (7th Cir. 2001) (vacated at request of parties when settlement was reached).

Forensic evidence was vital to proving the State's case against Mr. Jones. It was equally vital for defense counsel to understand that scientific evidence and be prepared to challenge it. Inherently, a defense-related expert investigation of the State's forensic evidence regarding the timing and causes of Rachel's injuries would be required.[18] Mr. Jones' trial counsel cannot be said to have made a reasonable strategic choice when he simply conceded to the State's interpretation of the forensic evidence. Indeed Mr. Bruner now concedes defense related forensic experts should have been retained.

In *Elmore,* the Fourth Circuit granted an ineffective assistance of counsel claim based on a failure to investigate the State's "time of injury" evidence. Although the state's case hinged on scientific evidence, the petitioner's trial attorneys "conducted no independent analyses of the State's forensic evidence" and "did not otherwise mistrust the State's case against [the petitioner]." *Elmore,* 661 F.3d at 853–54, 861. Regarding the duty to investigate under *Strickland,* the Fourth Circuit held: "A healthy skepticism of authority, while generally advisable,

---

[18] This conclusion is also supported by the Declaration of attorney Dan Cooper, the *Strickland* standard of care expert, who has presented a detailed Declaration submitted herewith. (Ex. 37.)

85

is an absolute necessity for a lawyer representing a client charged with capital murder. After all, the custodians of authority in our democracy are ordinary people with imperfect skills and human motivations. The duty of the defense lawyer "is to make the adversarial testing process work in the particular case." *Id.* at 859 (citing *Strickland* 466 U.S. at 690); and *see Rogers v. Israel*, 746 F.2d 1288, 1290, 1295 (7th Cir. 1984) (where prosecution hinged on medical forensic proof, it was unreasonable not to consult with an qualified defense expert).

The Supreme Court has recognized that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, __ U.S. __, 134 S.Ct. 1081, 1088 (2014) In *Hinton*, the Court determined that Mr. Hinton's case did require defense counsel to consult with and introduce expert evidence, where the "core of the prosecution's case [relied] on the state's experts' conclusion. *Id.* For the reasons already explained above, Mr. Jones' case was also a case where "the only reasonable and available defense strategy require[d] consultation with experts or introduction of expert evidence." *Id.*   As this Court has previously observed "the critical issue in [this case] is the timing of Rachel's fatal abdominal injury. (Dist. Ct. Doc. No. 141 at 22.)   Accordingly, like *Hinton*, this is a case where the "core of the prosecution's case [relied] on the State's experts' conclusions" and defense counsel was required to consult with, and present

available evidence from, an expert.  *Id*.  The Supreme Court made the following

observation which is apt here.

> That the State presented testimony from two experienced expert
> witnesses that tended to inculpate Hinton does not, taken alone,
> demonstrate that Hinton is guilty. Prosecution experts, of course, can
> sometimes make mistakes. Indeed, we have recognized the threat to
> fair criminal trials posed by the potential for incompetent or
> fraudulent prosecution forensics experts, noting that "[s]erious
> deficiencies have been found in the forensic evidence used in criminal
> trials.... One study of cases in which exonerating evidence resulted in
> the overturning of criminal convictions concluded that invalid forensic
> testimony contributed to the convictions in 60% of the cases. This
> threat is minimized when the defense retains a competent expert to
> counter the testimony of the prosecution's expert witnesses; it is
> maximized when the defense instead fails to understand the resources
> available to it by law.

*Id.* at 1090 (internal citations omitted);[19] and *see Beames v. Chappell*, No. 1:10cv-

01429-AWI, 2013 WL 5754938, at *14-15 (E.D. Cal. 2013) (where state's

pathologist found child's injuries were caused by pre-mortem child abuse, the

district court found that "[a] decision to concede these issues cannot reasonably

have been made [by defense counsel] without investigation into [the state's

pathologist's] methods and conclusions").

The jury at Beames' trial was only presented with the prosecution's expert's

medical opinion that the murder victim had been abused in the months before her

---

[19] *See* also, 1989 ABA Guideline 11.4.1(7)(A-C) which provides that defense
counsel "should secure the assistance of experts where it is necessary or
appropriate for preparation of the defense, for an adequate understanding of the
prosecution's case or for rebuttal of any portion of the prosecution's case at the
guilt/innocence phase or the sentencing phase of the trial."

death, and that the child died because defendant Beames hit her so hard that her liver was torn in half, causing death from internal bleeding.  No defense medical investigation was conducted for the trial proceedings. But investigation conducted during state postconviction proceedings upended the prosecution's case, when it was discovered that the child actually suffered from malnutrition; that she died from a massive infection which her weakened body was unable to fight off, and that Beames' efforts to revive her caused the tearing to her liver after her death. The district court determined Beames had presented a colorable claim that his trial counsel was ineffective. *Id.* at 19-20 ("competent counsel would have presented persuasive, forensically substantial evidence similar to Dr. Ophoven's opinion about [the child's] cause of death [and] [a]ccepting as true Dr. Ophoven's declaration stating that [the child's] cause of death was due to neglect, it is impossible to say that Beames would not be entitled to relief").

The ABA standards are also supportive of the conclusion that Mr. Jones' counsel performed deficiently, by essentially conceding the prosecution's "time of injury" theory. As far back as 1982, the American Bar Association Standards for Criminal Justice—which the Supreme Court has said are appropriately considered as guides to whether counsel's conduct was objectively unreasonable—provided that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

merits of the case . . ."  1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.); quoted in *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).  Mr. Jones' trial counsel failed to heed this admonition and he explained why in a Declaration that is being provided to this Court: he did not investigate because he probably thought Mr. Jones was guilty. (Ex. 33  ¶ 9.)  Deciding his client's guilt based only on the prosecution's evidence, Mr. Bruner committed a most egregious breach of the duties he owed to his capital client.

No duty is more sacred than the duty to investigate a capital crime. *Powell v. Alabama*, 287 U.S. 45, 58 (1932).  Mr. Bruner's concession that he waived any investigation based entirely on the State's version of the evidence, amounts to a frank admission of a lawyer whose performance was objectively unreasonable and constitutionally deficient.  As the Supreme Court said some four score and 3 years ago, "[i]t is not enough to assume that counsel . . . thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither [counsel] nor the court could say what a prompt and thorough-going investigation might disclose as to the facts." *Id*. Even in the case where a client has made admissions (a factor not present here), counsel must investigate, regardless. *See*, Guideline 11.4.1 of the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. "Counsel may not sit idly by, thinking that investigation would be futile". *Id*; and *see Anderson v.*

*Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (counsel was ineffective when "he relied exclusively on the investigative work of the state and based his own pretrial 'investigation' on assumptions divined from a review of the state's files").

Mr. Jones has made a compelling showing that his trial counsel's failure to secure experts to evaluate the State's "time of injuries" theory was objectively unreasonable and constitutionally deficient. "A lawyer [like Mr. Jones' trial counsel], who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." *Reynoso v. Giurbino,* 462 F.3d 1099, 1112 (9th Cir.2006) (quoting *Lord v. Wood,* 184 F.3d 1083, 1093 (9th Cir.1999)).

### b.    The failure to investigate blood evidence.

Counsel's decision not to investigate whether there were innocent explanations for the blood located in Mr. Jones' van was objectively unreasonable and not supported by a reasonable trial strategy. Had counsel investigated the "time of injury" evidence, he would have uncovered proof that Rachel's injuries could not have been inflicted anytime on May 1st; and to be sure, such evidence was readily at hand. (*See* discussion in sections B and C above). Proof that Rachel was not fatally injured or sexually assaulted on May 1st changes the entire evidentiary picture and if nothing else, the time of injury discovery would have driven

objectively reasonable counsel to examine every other piece of the State's case under a defense microscope. If Rachel was not assaulted on May 1st then there would have to be innocent explanations for the blood evidence, and of course there are. (*See* section F above).

The blood evidence in particular was crying out for a defense examination. There was blood on Mr. Jones' clothing and in his van. It would have been plain for Mr. Jones' trial counsel to see that the State would attempt to tie the blood to its claim that Rachel was sexually assaulted and beaten by Mr. Jones in his van. No reasonable defense counsel could miss the fact that the State would offer an interpretation of the blood evidence to bolster its case for conviction, and that is what happened. However, trial counsel conceded this territory to the State and no defense investigation of the blood evidence was conducted. This left counsel utterly unprepared to counter the State's blood interpretation evidence offered to prove that Rachel was raped and assaulted in Mr. Jones van. (Tr. Apr. 12, 1995 at 79- 96.)   No objectively reasonable strategy could be imagined or invoked here that might excuse trial counsel for his failure to consult with a competent blood interpretation expert and then obtain a forensically accurate assessment of the evidence. *Hinton*, at 134 S.Ct. 1088 (constitutional deficient performance is demonstrated "when the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence"). Trial counsel's

failure to investigate the blood evidence was objectively unreasonable and constitutionally deficient.

### c. Failure to investigate whether the Lopez children could have seen what they *allegedly* reported.

Counsel's decision not to investigate whether it was possible for the Lopez children to witness Mr. Jones assaulting Rachel as he drove into the Choice Market was objectively unreasonable and not supported by a reasonable trial strategy. At Mr. Jones' trial, his counsel told the jury that the Lopez children could <u>not</u> have seen what they claimed to have seen. (Tr. Apr. 6, 1995 at 65.) Counsel had good reason for making this avowal to the jury; although he never undertook any investigation to prove it, and of course he did fail to prove it.

We say that counsel had reason to believe that the Lopez children could not have seen what they claimed to have seen because trial counsel had obviously seen reports from the initial police investigation which contained the interview of one of Mr. Jones' neighbors, who told police Rachel was too small to be seen in Mr. Jones' van. (Ex. 82 at 5.)  A quick look at photographic depictions of the size and dimensions of this oversized van tells the same story, it would have been doubtful that the Lopez children; themselves short and diminutive, could have seen Rachel in the van. (Ex. 15 at 6.)  Mr. Jones' counsel was obviously curious about this evidence (that Rachel could not be seen sitting in the van) because nearly on the

eve of the trial he was out taking measurements of the van. (Ex. 36 at 25; Ex. 34 ¶ 6.)

Of course, despite trial counsel's independent assessment of the physical dimensions in play, he was not an expert; nor could he testify with respect to whether it would have been possible for the Lopez children to have seen what they saw. Yet without any expert assistance, he stuck to telling the jury in his opening statement (what he knew he could not prove) that he would present evidence that the Lopez children would not have been able to see what they said they saw. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)).  Here, where counsel had come to his own conclusion that Rachel would not have been visible to the Lopez children, he could not also come to a reasonable decision that made investigation of these facts unnecessary. Investigation was still needed to prove exactly what counsel told the jury in opening statement, that the Lopez children could not have seen what they reported. This investigatory duty also included the "obligation to conduct an investigation which will allow a determination of what sort of experts to consult." *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999); (quoting, *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) It was not objectively reasonable for counsel to cut short an

93

investigation that would have enabled him to gather the very evidence he promised to submit to the jury. And a reasonable investigation into "what sort of experts to consult," *id*., would have resulted in a finding made by federal habeas counsel, that some expert reconstruction and biomechanics evidence was needed. Trial counsel performed deficiently when he failed to investigate and present this biomechanical and reconstruction evidence.   (*See* section H(4) above for a summary of this evidence).

Beyond all of this, there would have been a much shorter route to proving what the Lopez children saw or didn't see. Mr. Jones told the police that Rachel went shopping with him at the Choice Market and that she went into the market and actually helped carry the milk he purchased. The Lopez children claimed they saw Mr. Jones beating Rachel as he entered the market parking lot. It would have been a simple matter, which no objectively reasonable lawyer would have missed, to interview the employees on duty at the Choice Market on the afternoon of May 1st.   Mr. Jones was a regular shopper at the market. (Ex. 18 at 12.) Presumably, those employees would have confirmed that Rachel did not appear to have been beaten as Mr. Jones entered the Choice Market parking lot, and that rather, she

came into the store happy and unharmed. Rebecca made the very same observation after Rachel returned from the market.[20]

### 3.   Conclusion.

Every facet of the State's evidence went uninvestigated and untested in this case. This outcome is attributable to trial counsel's deficient performance for the reasons explained above.

### J.   Mr. Jones' behavior on the night Rachel was discovered ill.

There is evidence that on the early evening of May 1st, after it was first noticed that Rachel had a wound to her scalp and she had become ill, that Mr. Jones took Rachel to the nearby Quick Mart to get ice to place on Rachel's head. After returning from the Quick Mart, Mr. Jones said that he had taken Rachel to the Rural Metro fire station where Rachel's wound was examined and he was told she was alright. This statement was not completely true. Mr. Jones accurately reported to law enforcement that someone he believed to be a paramedic did look at Rachel's wound, but he had not taken her to the fire station.   Mr. Jones explained during police questioning that he planned to take Rachel to the fire station, but he saw a police car at the station, and because he had only just recently been released from the Pima County Jail for driving on a suspended license; and

---

[20] Presumably police detectives obtained this inculpatory evidence from the market employees, but we remain under the unbelievable pretense, that the police conducted no investigation of this crime scene or the market employees. (See discussion of this obvious police misconduct in section E above).

because he still lacked a license, he was afraid to take Rachel to the fire station.[21]

(Ex. 12 at 32-33.) However, while at the Quick Mart, Mr. Jones did ask someone

who he described as a paramedic, to look at Rachel's head wound, and he was told

she was alright. (*Id.* at 33, 64.) When he returned from the Quick Mart, he told

Rachel's mother that he had taken the child to the fire station because he did not

want her to worry about the child's condition. (*Id.* at 47.)

The current defense investigation finds support for Mr. Jones' report that he

encountered a paramedic at the Quick Mart. (Ex. 38 ¶ 17.) Surely, Mr. Jones

should not have said he took Rachel to the fire station when he had not done so.

Surely also, both Rachel's mother and Mr. Jones each carry the burden of knowing

that they could have sought medical treatment for Rachel on the night of May 1st,

and possibly saved her life.

But the very poor decisions that Mr. Jones made on that Sunday evening

must be understood within the new evidentiary context: Rachel was not beaten and

sexually assaulted on May 1st and there is no reliable evidence that Mr. Jones is

responsible for causing her injuries or her murder.  When Mr. Jones miscast his

report about going to the fire station, he was not—as the prosecution portrayed at

trial—in the midst of covering up a brutal beating and sexual assault. Thus, (like

---

[21] There is evidence that Mr. Jones had indeed been recently incarcerated for driving on a suspended license. (See Pima County Sheriff's Department arrest reports for Mr. Jones, attached as Exhibit 71.)

the traces of blood in Mr. Jones van) Mr. Jones' actions and poor decision-making on the evening before Rachel's death must be understood in a different context.

Mr. Jones' character and his capacity for poor decision-making were shaped by extreme poverty, a childhood permeated by severe dysfunction and parental alcoholism. (*See* discussion in section III below). Mr. Jones grew into adulthood with significant cognitive impairments, brain damage, major emotional problems and serious substance abuse issues. (Exs. 42, 43, 44, 57. 58.)  Both Mr. Jones and Rachel's mother had methamphetamine addiction issues. (Ex. 12 at 10; Ex. 44; Ex. 57; Ex. 58; Ex. 48; Dist. Ct. Doc. No. 96 at Ex. 9, Transcript of May 1, 1996 at 9.) Mr. Jones was not law abiding in terms of his drug use and the minor theft he engaged in to support his drug habit. Mr. Jones' actions on the evening of May 1st correlate with his own personal frailties; but they are not evidence supportive of the prosecution theory that he was attempting a cover-up of a beating and sexual assault of Rachel Gray. Indeed, among those positive attributes of Mr. Jones' character that survived fully intact, despite his tumultuous life was this: he was not a violent man, he had no history of harming others, and he had a reputation as a protector, not an abuser of children.  (See Ex. 35, investigative report by George Barnett dated May 19, 1994 at 1-10; Ex 45 at 1; Ex. 59 at 5-6; Ex. 60.)

### K.    The legal argument on prejudice.

Above, Mr. Jones has demonstrated that his trial counsel's performance was constitutionally deficient within the meaning of *Strickland*. Next, Mr. Jones completes the circle and shows that counsel's deficient performance prejudiced the outcome of his trial proceedings.

### 1.    The Standard for assessment of prejudice.

In order to establish prejudice, Mr. Jones must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.   A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id*.   The relevant inquiry is whether there is a "reasonable probability" that, but for defense counsel's errors, at least one juror would have had "a reasonable doubt."   *Duncan v. Ornoski,* 528 F.3d at 1247; *Wiggins v. Smith*, 539 U.S. at 537 (prejudice established where there is a reasonable probability at least one juror would have decided outcome differently). In the Court's assessment of prejudice, it is immaterial that despite counsel's errors, there may be still be sufficient evidence to convict the petitioner; that is <u>not</u> the test. *Rompilla v. Beard*, at 545 U.S. at 393 ("although we suppose it is possible that a jury could have heard it all and still decided on the death penalty, that is not the test").   In its articulation of the prejudice standard the Supreme Court recognized the heightened probability for finding a prejudicial outcome, when

98

errors of counsel are shown to "have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." 466 U.S. at 695-96.  This is such a case.

### 2.    Application of the prejudice standard to Mr. Jones' case.

Rachel died as a result of an injury to her small bowel. Exactly when this injury was inflicted, and how and by whom it was inflicted, are not capable of being answered in this case.  Mr. Jones was convicted under the premise that he fatally beat and sexually assaulted Rachel (simultaneously causing all of her fatal and non-fatal injuries) during a third trip in his van with Rachel during the late afternoon of May 1st, on the way to the Choice Market, and that Jones was seen still beating Rachel as he entered the Choice Market parking lot. As an additional premise, traces of blood on Mr. Jones' clothing and in his van, as well as a pry bar located in his van, were tied to a beating and sexual assault that were presumed to have taken place that May1st day. Each and every one of these premises underlying Mr. Jones' conviction has been categorically refuted.  Mr. Jones has demonstrated:

▪ The injury to Rachel's small bowel occurred at least 48 hours (and probably many more hours) before her death. How and by whom this injury was caused is unanswerable. (Ex. 4, 6 and 7 at 2; Ex. 10 at 3, 5).

99

- Dr. Howard testified at Angela's trial that the autopsy chemistries are NOT most consistent with or typical of an injury inflicted during the afternoon of May 1st. His admissions made in these proceedings concede that the injury may have been inflicted days before Rachel's death.  (Dist. Ct. Doc. No. 96, Ex. 9, Transcript of March 28, 1995 at 101; Ex. 1 ¶ 7.)

- Rachel's small bowel injury and the injury to her vagina did not occur at the same time and there is evidence that the injury to Rachel's vagina occurred days before her bowel injury.  (Ex. 7 at 1.)

- Dr. Howard's pre-trial statements contain admissions that the vagina injury was not consistent with or typical of an injury occurring on the afternoon of May 1st. His admissions made in these proceedings concede that the injury may have been inflicted days before Rachel's death. (Ex. 11 at 22-23; Ex. 1 ¶ 13.)

- Rachel's scalp injury was not caused by the pry bar found in Mr. Jones' van; nor was the pry bar the instrumentality for Rachel's bowel injury.  (Ex. 7 at 1; Ex. 15 at 7-9.)

- Dr. Howard's pre-trial statements contain admissions that the origin of Rachel's scalp injury predated her death be two to three days. (Ex. 11 at 4, 19.) His admissions in these proceedings concede that Rachel's injury to her scalp is consistent with a simple fall. (Ex. 1 ¶ 14.)

100

▪ Bruises on Rachel's body cannot be reliably dated to May 1st. (Ex. 7 at 2.)

▪ Mr. Jones did not beat or sexually assault Rachel on a "third trip" in his van on the way to the Choice Market: (1) as verified by the medical evidence which demonstrates Rachel was not injured on May 1st; and (2) as verified by Rebecca in her pre-trial statements and in sworn testimony at Ms. Gray's trial, where she consistently maintained Mr. Jones went on two trips with Rachel and that Rachel was not ill or injured after each trip, including her trip to the store with Mr. Jones. (Ex. 7; Ex. 10; Ex. 17 at 6-7; Ex. 18 at 5-6; Ex. 19 at 4-10; Dist. Ct. Doc. No. 96 at Ex. 9; Transcript of March 24, 1995 at 29, 31, 68-71.)

▪ The traces of blood located on Mr. Jones clothing and in his van cannot be reliably associated with a beating and sexual assault of Rachel in the van: (1) as verified by the medical evidence which demonstrates Rachel was not injured on May 1st; and (2) as verified by Mr. Stuart James, the only qualified expert to examine the blood evidence in this case, who has determined that the blood interpretation evidence presented at Mr. Jones' trial was incompetent. (Exs. 7, 10, 32.)

▪ The Lopez children did not witness Mr. Jones beating Rachel on his way into the Choice Market, where he and Rachel went shopping: (1) as

verified by the medical evidence which demonstrates Rachel was not injured on May 1st; (2) as verified by the overwhelming evidence that their statements were tainted by suggestive coaching to the point where they have no reliable value; (3) as verified in the more recent Declaration of Mr. Ray Lopez who has recanted his testimony at Mr. Jones' trial; (4) as verified by Rebecca, whose pre-trial statements and sworn testimony at Mr. Jones' trial confirm that Rachel was well and uninjured after her trip to the market with Mr. Jones; and (5) as would have been verified if (a) the detective who interviewed the employees at the Choice Market had not concealed the subject matter of those interviews, or (b) Mr. Jones' counsel had conducted said interviews—either of which should have established that Rachel came into the store and she was not injured.  (Ex. 7; Ex. 10; Ex. 70, Ex. 72, Ex. 17 at 6-7; Ex. 18 at 5-6; Ex. 19 at 4-10, Dist. Ct. Doc. No. 96 at Ex. 9, Trial Transcript of March 24, 1995 at 68-71.)

The record now shows that Mr. Jones' jury was entirely misled to believe that Rachel was beaten and assaulted by Mr. Jones on May 1st. The irresistible conclusion here is that the identified deficiencies in trial counsel's performance must be held to undermine confidence in the outcome of the conviction. In such circumstance *Strickland* prejudice is established.  *Duncan*, 528 F.3d at 1240 ("If the difference between the evidence that could have been presented and that which

actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied."); *Elmore*, 661 F.3d at 871 (finding prejudice when the new forensic evidence "altered the entire evidentiary picture"). It is clearly established on this record that the negative consequences of defense counsel's failure to conduct a minimally adequate investigation results in more than a reasonable probability that at least one juror (and surely all) would have "had a reasonable doubt respecting guilt" and acquitted Mr. Jones of First Degree Murder. *Strickland*, 466 U.S. at 693.

> **L.    Mr. Jones has stated a colorable claim of ineffective assistance against trial counsel and he is entitled to an evidentiary hearing.**

In Section II A-K above, Mr. Jones' has stated a colorable claim that he was denied his Sixth Amendment right to effective assistance of counsel for the guilt-phase. This means that the claim is <u>not</u> subject to summary dismissal and an evidentiary hearing is required.  *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  To allege a colorable claim for habeas relief, a petitioner is only required to allege facts that, if proven true at a hearing, would show his entitlement to relief. *Id.* at 1170; *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) ("[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief").  Presentment of a colorable claim is "a low bar," *Earp* at 431 F.3d. 1170, and Mr. Jones has

103

more than met it.  Mr. Jones is entitled to an evidentiary hearing to prove his claim,

that he was denied effective assistance of counsel during the guilt-phase of the

proceedings.  Mr. Jones discusses his rights to a hearing, discovery and evidentiary

development further, below.

### III.   Mr. Jones was denied effective assistance of counsel during the sentencing phase of the proceedings.

Mr. Jones' trial counsel, Sean Bruner, failed to investigate his childhood,

social history, and history of alcohol and drug abuse, with the resultant failure to

present compelling mitigating evidence before the sentencing court.  This error

was compounded by the failure to provide such background evidence to a

psychologist, which left the psychologist with insufficient information to

accurately evaluate Mr. Jones.  Bruner also failed to challenge the State's evidence

in support of aggravation.

State postconviction counsel, James Hazel Jr., compounded the failure of

trial counsel where he, too, failed to conduct an adequate mitigation investigation,

failed to seek funds for, and obtain a single mental health expert, and failed to raise

claims regarding trial counsel's ineffective performance at the penalty phase.

During Mr. Jones' federal habeas proceedings, an appropriate investigation

into his childhood, social history, and battle with substance abuse has finally

ensued.   The investigation reveals evidence that (1) Jones' childhood was

characterized by extreme poverty and parental alcoholism, resulting in parental

neglect and violence; (2) Mr. Jones suffered from debilitating substance abuse problems and was using heavily at the time of the alleged offense; (3) as a result of the family's troubles, often with money, Mr. Jones' family moved often, creating an unstable foundation for the children; (4)  Mr. Jones' mother drank during her pregnancies, which likely resulted in impairment of his developing brain; (5) Mr. Jones endured multiple head injuries; (6) neuropsychological testing was conducted which shows that Mr. Jones is brain damaged, with impairments seriously impacting his executive functioning, and helping explain his alleged involvement in the subject offense.   Mr. Jones argues below that the evidence supporting his claim was not presented in state court thus leaving the claim that was presented in state court unexhausted, and now procedurally defaulted.  Under *Martinez*, the ineffective assistance of postconviction counsel provides a gateway for consideration of the underlying ineffective-assistance claim.

> **A.    Mr. Jones was denied his Sixth and Fourteenth Amendment rights to the effective assistance of counsel, when his counsel failed to investigate and present reasonably available and compelling mitigation evidence about Mr. Jones.**

Mr. Jones was denied his constitutionally guaranteed right to the effective assistance of counsel due to his counsel's failure to conduct an investigation and prepare for sentencing.  Mr. Jones' case was only Bruner's second capital case. Bruner was not prepared for the rigors of a capital sentencing and did little to represent Mr. Jones in this phase of the proceedings. Bruner did not hire an

105

investigator to conduct a mitigation investigation; instead he delegated the responsibility of interviewing potential witnesses to Leslie Bowman, his law partner with no capital and very little experience in general.

### 1.    Procedural history.

The mitigation investigation and presentation in this case was woefully insufficient.  Bruner was the only lawyer appointed to Mr. Jones' case and was overwhelmed and overworked with the responsibility of a complicated capital case on his shoulders.  Bruner had minimal capital experience; in fact Mr. Jones' was only his second capital case.  Bruner never requested funds for, and thus never retained a mitigation specialist or investigator to help with penalty phase.  (Ex. 33 ¶ 2; Ex. 36.)

Bruner filed a Motion for Appointment of Second Counsel in Mr. Jones' case saying "I can't do this all myself."  (Tr. July 27, 1994 at 3.)  Nonetheless the court denied his motion and suggested he "delegate things to someone else and thereby not have to charge us a full price for it." (*Id.* at 4.)  The only help Bruner got was from his law partner, Leslie Bowman, who had been in practice less than a year.   Despite not being formally appointed, and her woefully inadequate experience, Bruner left the bulk of the responsibility for mitigation to Bowman who was fresh out of law school.  (Ex. 40 ¶¶ 4, 8.)

One of the few appropriate steps Bruner did take on Mr. Jones' behalf was to hire a psychologist, Dr. Geffen, to evaluate Mr. Jones.  Dr. Geffen saw Mr. Jones for five hours in 1994 and found that he had a history of head injuries including periods of lost consciousness. (Ex. 41 at 3.)  Dr. Geffen also found that Mr. Jones had ringing in his ears, underreported psychopathology and sometimes heard a voice in his head of a "male kid voice."  (*Id.* at 4.)  Geffen also reviewed Mr. Jones' videotaped interview with police and found that he was possibly in a "dissociated state" during his interrogation.  (*Id.* at 7-8.)  Dr. Geffen concluded that Mr. Jones had major impairments on the Global Assessment of Functioning Scale. Dr. Geffen concluded his report by stating that he believed "the data would support the court's consideration of some psychological factors for mitigation, such as [Mr. Jones'] ability to conform to society's demands and expectations based on mental factors."  (*Id.* at 8-9.)

Dr. Geffen did not have the benefit of a complete social history or underlying documents, and he did not attempt to determine the cause of Mr. Jones' deficits, as he was not a neuropsychologist.  Dr. Geffen did, however, discuss with Bruner the importance of this information, but Bruner did not pursue the issue. Had he done so, significant mitigation would have been uncovered. Bruner admits that the failure to consult with mental health experts to determine whether Mr. Jones suffered from brain damage that could have explained his alleged behavior and

conduct was ineffective.  (Ex. 33 ¶¶ 11-12.)  Bruner agrees that at the time, he lacked the training and experience to realize the importance of hiring mental health experts to test and investigate potential mental health issues in support of mitigation. (*Id.* ¶¶ 12-13.)

Despite her inexperience, Bowman spearheaded all of the preparation for the sentencing hearing.  It is thus unsurprising that, in total, the penalty phase for Mr. Jones lasted less than a day.  Mr. Jones offered the statutory mitigating factor that pursuant to Ariz. Rev. Stat. § 13-703(G)(1), his ability to comprehend the wrongfulness of his conduct was significantly impaired (by his methamphetamine use) and the non-statutory mitigating factors of a troubled childhood and the responsibility that Rachel's mother bore in the crime.  Neither Bruner nor Bowman filed a sentencing memorandum with the court laying out these mitigating factors; nor did they file any supporting documentation or records in support of those factors.

One of the key witnesses in mitigation was Mr. Jones' mother, Florence Jones ("Florence").  She falsely testified that her second husband, Paul Jones, was Mr. Jones' father.  (Tr. June 13, 1995 at 48.)  She testified that the twins' health was normal and that she stayed home with them for six or seven years until she went back to work. (*Id.* at 53.)   Florence told the court that Mr. Jones attended school regularly, and other than normal childhood illness, he did not have periods

where he missed school.  (*Id.* at 55.)  Florence discussed what the children would do after school and claimed that friends would come and play at the house.  She presented a picture of a mostly normal childhood, even going to church on Sundays as a family.  (*Id.* at 61.)

Florence did admit that there was *some* violence in the house, she admitted to drinking to excess after her husband's death but denied doing so earlier.  (*Id.* at 48.)  She testified that Mr. Jones always had disciplinary problems and that he would get whippings.  (*Id.* at 60.)  Florence denied knowing of any times Mr. Jones had concussions or was knocked unconscious.  (*Id.* at 70.)  Florence admitted that there were some problems after moving to Arizona, but before that everything was "fine" and "normal."  (*Id.* at 64.)

Next to testify was Dr. Geffen, who testified that Mr. Jones was competent and sane, (Tr. June 13, 1995 at 76), but that he had a troubled childhood and fell into drug abuse and as a result, did not have the ability to apply right and wrong like other people and lacked impulse control. (*Id.* at 48.)  Although Dr. Geffen had recommended further neurological testing to counsel, no other experts testified.

The only witness called to testify about Mr. Jones' lengthy history of drug abuse was Ronnie Higgins, a former addict turned drug counselor who had met with Mr. Jones only the day prior to his testimony.  Higgins had no degree or formal education in substance abuse and had no records about Mr. Jones to review.

(Tr. June 13, 1995 at 128-29.)  Higgins testified that based on his meeting with Mr. Jones he was able to opine that Jones was a heavy user and would have been very irritable on the day Rachel died because he was coming down off of a "run."  (*Id.* at 129-30.)   Higgins could not and did not offer any testimony about how methamphetamine use affected Mr. Jones' brain, impulse control, judgment or a litany of other issues that counsel should have addressed with the court.

The only other mitigation witnesses were a former employer who testified that he never had any issues with Mr. Jones in the time he worked for him, (Tr. June 16, 1995 at 16-17), and two of Mr. Jones' ex-sisters-in-law and his ex-girlfriend, Joyce Richmond, whose collective testimony essentially amounted to vouching that Mr. Jones was a nice guy whom they trusted around their children. (*Id.* at 170-210.)

After such an anemic mitigation presentation, it is unsurprising the court found no statutory or non-statutory mitigating factors to exist which were sufficient to call for leniency.  (Tr. July 6, 1995 at 36-37.)  Specifically, the sentencing court took judicial notice that Mr. Jones took meth on the day before Rachel's death but did not find it mitigating because "no testimony establ[ished], either because of his use of drugs or because he was coming down off of the drugs, that [Mr. Jones] could not appreciate the wrongfulness of his conduct or conform his conduct to the law." *Jones*, 937 P.2d at 322.  The sentencing court also stated that Mr. Jones had

been given opportunities to address his substance abuse problems and had failed to do so.  (Tr. June 13, 1995 at 126.)  Finally, the sentencing court incorrectly ruled that its only relevant inquiry regarding drugs was whether Mr. Jones was "significantly impaired by methamphetamine use, either chronic or acute, as to constitute mitigation if not . . . a legal defense to the prosecution."  (Tr. July 6, 1995 at 36.)  Accordingly, the court found that such evidence was too speculative and did not apply.  (*Id.*)

As for Mr. Jones' social history and childhood, the court found that while Mr. Jones did not have a perfect childhood, "no evidence exists of a dysfunctional childhood that would affect his reasoning and conduct at the time of [the] incident. *Jones*, 937 P.2d at 322.   The court further relied on Florence's statement that she had taught Mr. Jones "right from wrong."  *Jones*, 937 P.2d at 322.

As discussed *infra*, trial counsel's failures to investigate and present compelling mitigating evidence clearly constitutes deficient performance, especially in light of the critical mitigation evidence easily available to him.

## 2.    A wealth of information was available if trial counsel had conducted a reasonable investigation.

Had counsel properly investigated his client's mitigation, a substantial body of mitigating evidence could have been presented to the sentencing court in order to provide a complete picture of Mr. Jones' troubled childhood, mental impairments, and battle with addiction and its consequences.

111

### a.  Jones' mental impairments.

As noted above, one of the few things trial counsel did do was retain Dr. Geffen as an expert to evaluate and testify about Mr. Jones in mitigation. However, Bruner did not follow up with Dr. Geffen's findings that Mr. Jones suffered from several impairments and that neuropsychological testing could help uncover the cause.   Had neuropsychological testing been conducted, the information could have helped to explain Mr. Jones' failure to attain appropriate adult developmental maturity, poor judgment, and behavior following Rachel's death.

Habeas counsel had Mr. Jones evaluated by Alan C. Goldberg, Ph.D, who completed a thorough neuropsychological examination.  Prior to his evaluation, Dr. Goldberg reviewed Mr. Jones' medical, legal and educational background material. Dr. Goldberg's examination took a total of sixteen hours.  Dr. Goldberg's testing showed that Mr. Jones had abnormalities of frontal lobe brain function, and right hemisphere motor and sensory function.   Further Dr. Goldberg concluded Mr. Jones' test results showed evidence of a seizure disorder and Attention Deficit Disorder. Dr. Goldberg concluded that Mr. Jones would benefit from a full neurological and psychiatric evaluation to determine the exact nature of his brain damage and that due to that damage, "it is unlikely [Mr. Jones] would've been

capable of violent acts without the influence of drugs and alcohol." (*See* Ex. 42, Report of Dr. Goldberg.)

Following Dr. Goldberg's recommendation, habeas counsel retained Dr. Pamela Blake, a board-certified neurologist who performed a four hour neurological evaluation of Mr. Jones.  Like Dr. Goldberg, Dr. Blake reviewed numerous records, as well as Dr. Goldberg's psychological assessment.  Dr. Blake noted that Mr. Jones' records showed numerous head injuries and that his failures in school, employment, family issues, suicidal gestures and spiraling substance abuse showed a life trajectory consistent with brain damage.  The neurologic examination revealed physical manifestations of that brain damage, including motor signs "normally seen in infants [that] then recede with maturation of the brain.  Their return indicated damage to the frontal lobes that should be suppressing them." (*See* Ex. 43, Report of Dr. Blake at 8.)

Like Dr. Goldberg, Dr. Blake found that as a child, Mr. Jones would have fulfilled the diagnostic criteria for Attention Deficit Disorder with Hyperactivity. But that was only part of the impairment that Mr. Jones has to his prefrontal cortex—the part of the brain where the cognitive process governing "executive function" occurs, which includes the ability to formulate plans, reason, and recognize consequences of actions and the ability to sustain concentration and focus for long term goals, among other important skills. (*Id.* at 8.)

Dr. Blake found that Mr. Jones suffers from prefrontal brain damage that is exhibited both in neurologic and neuropsychological examinations.

The findings of Drs. Goldberg and Blake paint a complete and thorough picture of the severity of Mr. Jones' deficits.   The sentencing court was denied such integral mitigation information due to Bruner's failure to follow up on Dr. Geffen's recommendation for additional expert testing.

### b.  Mr. Jones' drug addiction.

Bruner had an obligation to investigate and explain the effects of Mr. Jones' long-term methamphetamine abuse. As noted above, trial counsel's only witness had no credentials or education other than his history as a drug addict turned counselor.   He met with Mr. Jones only the day before his testimony.   Had an appropriate expert been retained and provided with a complete social history, the court could have been educated that Mr. Jones' drug abuse was relevant to much more than whether or not he was high at the time of the alleged offense.

Habeas counsel retained Dr. Lawson Bernstein, a licensed psychiatrist with a consulting practice in substance abuse.   Dr. Lawson met with Mr. Jones to document and evaluate his past drug use and ascertain any potential neurological impairments as a result of that abuse.   Dr. Lawson met with Mr. Jones for two hours and, prior to that evaluation, reviewed numerous records pertaining to Mr. Jones.   Dr. Bernstein based his expert opinion on Mr. Jones' history,

114

neuropsychological testing, and his evaluation and found them to confirm that Mr. Jones was suffering from acute amphetamine withdrawal at the time of the alleged offense. (*See* Ex. 44, Report of Dr. Bernstein at 1.)

Dr. Bernstein found Mr. Jones' admissions consistent with the habits of a habitual methamphetamine user.    According to Mr. Jones, he used methamphetamine almost every day for the four months he was involved with Angela and during the time they lived together, and that he also used cocaine and heroin intermittently during that period.  Mr. Jones was using between one and one and one half grams of methamphetamine a day and he would go on "runs" – prolonged continuous daily usage of the drug for a week at a time.  Mr. Jones would smoke and snort methamphetamine and supported his habit by stealing construction materials and trading them for drugs. (*Id.* at 3.)

Dr. Bernstein found that based on record review and Mr. Jones' admissions, Mr. Jones had consumed a quarter ounce of methamphetamine on Saturday, April 30, 1994, which kept him awake all day and night until he "crashed" the following day, the date of the alleged offense.  (*Id.* at 2.)  Dr. Bernstein concluded that Mr. Jones had a severe methamphetamine addiction at the time of the alleged offense. The characteristic "crash" Mr. Jones experienced when he burned through his supply of methamphetamine on the Saturday before Rachel's death depleted his

brain of key chemicals involved in the maintenance of normal neurological, cognitive and emotional state.  (*Id.* at 5.)

Most importantly, Dr. Bernstein opined that Mr. Jones' ability to control his methamphetamine abuse prior to his incarceration "would have been nil" because his daily consumption of meth (in the upper 10% of similar addicts Dr. Bernstein evaluated) "would be associated with profound cravings for continuous use of the drug, and concomitant diminution of brain catecholamine and dopamine neurotransmitters without which [Mr. Jones] could not function.  Put another way, over time [Mr. Jones'] brain would have required repetitive meth ingestion simply to function at all."  (Ex. 44 at 6.)  This point is crucial because, had counsel retained a qualified expert like Dr. Bernstein, the element of Mr. Jones' volitional ability to control his drug abuse would have been addressed, and the trial court could not have been left with the conclusion that Mr. Jones *chose* not to address his drug addiction.

Dr. Bernstein also opined in addition to Mr. Jones' own drug use, it was possible that his brain damage was due to his mother's alcohol abuse during her pregnancy with him.  Fetal alcohol exposure is known to result in impairment of neurologic functioning.  Exposure to alcohol in utero disrupts development of the fetal brain by impairment of the proliferation of neural cells, the migration of the cells to their appropriate areas, and the organization of the systems being formed in

the brain of the fetus.  (Ex. 44 at 6.)  Mr. Jones was also exposed to various toxic chemicals as an iron worker and a mechanic (exposure to organic solvents), and he experienced an episode of carbon monoxide poisoning. (*Id.* at 1.)

All of this information would have been important evidence in support of mitigation, especially before a judge who found that there was no testimony to support the claim that Mr. Jones' drug use impacted his ability to conform his conduct to the law.

### c.  Mr. Jones' background and social history.

Bruner's law partner, Leslie Bowman, had very little experience and massive responsibility in Mr. Jones' case, as Bruner left all of the mitigation investigation to her.  Trial counsel utterly failed in their duty to investigate and present mitigating evidence. Had trial counsel worked with Mr. Jones, and informed him about the purposes of mitigation, he could have pointed them toward people who could have provided important mitigating evidence.

Some of that mitigation evidence was readily available to Mr. Jones' trial counsel through following up on police reports and interviewing his neighbors in the trailer park.  Desert Vista was a rough neighborhood, and there was drinking and fighting and drug use.  By numerous accounts there were also several known child molesters living there.  Police interviews with the neighbors described Mr. Jones as a "little guy" who had a big heart for the underdog and children.  (Ex. 45,

117

Declaration of Joyce Richmond at 1.)  They also described Mr. Jones as someone who would not hesitate to intervene if he saw a woman or child in danger.

Had counsel interviewed family members, they would have realized the picture painted by Florence was at best gross minimization, but more realistically, an outright falsehood.  Mr. Jones grew up in an alcoholic, abusive, dysfunctional household and was not his mother's husband's son.

Mr. Jones' mother, Florence, was herself the product of an abusive and neglectful childhood.  Her mother died when she was seven, and her abusive father forced her to take over all of the household work.  She managed to graduate from high school and married a traveling salesman, J.T. Harris, around a decade her senior.  Florence and J.T. had a son who died of whooping cough as an infant.  When Florence gave birth to their second child, Otis, she weighed just 98 pounds.  J.T. and Florence split up while Otis was still an infant, and Florence would not allow J.T. to visit his son.  (Ex. 46, Declaration of Otis Harris Dec. ¶¶ 15-16.)

Florence soon remarried to a military man, Paul Jones.  (Ex. 47.)  Paul moved often, sometimes taking his family with him, and sometimes stationed without his family.  At one point Paul was stationed in Germany for six years.  (Ex. 46 ¶¶ 17-19.)  In his absence, Florence began to drink heavily and socialize with other men.  Different men would carry her home, and she would smell of booze.  (*Id.* ¶ 19.)  Although she testified at Mr. Jones' trial that she only began to drink

after her husband Paul passed away, Florence drank heavily before then and until the last ten years of her life.  She told Otis she knew she did not have as much in life because of her drinking and worried her children "were the way they were" because of her. (*Id.* ¶ 33.)

When Otis was six years old, Florence gave birth to Mr. Jones, and his twin brother, Larry.  (Ex. 49.)  Although she testified that Paul was Mr. Jones' father at his trial, Florence admitted to Otis that a man he remembered seeing bring his mother home more than the others, Jimmy, was the twins' father.  Otis was not surprised, as Paul was in Germany when Florence became pregnant and could not have been the twins' father.  Florence never told the twins the truth about their father.  (Ex. 46 ¶ 22.)

Even after the twins' birth, Florence continued to drink.  Otis tried to keep the family together and tried to take care of the twins, even changing their diapers, cooking for them, potty training them, and putting them to bed.  Otis cared for the twins until they were in 2nd or 3rd grade and old enough to play in the streets on their own.  They were alone most of the time because Florence was not around. Even after the twins were old enough to watch themselves, Otis was charged with making sure his family had something to eat.  He had to pull his red wagon four miles to the store to pick up food for his family. (*Id.* ¶¶ 25-26.)

119

All of the children did poorly in school because, as Otis put it, "nobody cared how they did in school or even where they were." (*Id.* ¶ 30.)  The boys would stay out for hours, and there was no one to make sure they were where they were supposed to be.  Adding to their instability, the family was poor and moved frequently.  None of the brothers finished high school, and they ran the streets, drinking and doing drugs.  Florence's own drinking worsened, and she would go on binges that lasted for days.  She would hear imaginary people talking to her during these binges. (*Id.* ¶¶ 31-32, 34.)

When the twins were about 11, Florence was hospitalized for what relatives characterized as a "nervous breakdown." (*Id.* ¶ 35.)  Larry was also hospitalized for seizures and diagnosed with epilepsy.  (Ex. 50 ¶ 2.)  Paul returned home from two voluntary tours in Germany and their youngest son, Philip Jones, was born. Two other siblings were lost in miscarriages.  (Ex. 46 ¶ 4.)

Paul's return did not bring stability.  Florence continued to drink heavily, and Paul drank as well.  The brothers never invited friends home because they did not know who would be there, who would be drunk or what state the house would be in.  Paul and Florence also fought violently, with Florence once stabbing Paul. (*Id.* ¶¶ 40-42.)

Florence's violence was not limited to her husband.  She once shot a man trying to break in their home.  On another occasion she beat up a man, chased him

across the yard, tied him to a tree and continued to beat him.  (Ex. 50 ¶ 5.) She was the family disciplinarian and would beat the children with a belt or razor strap, sometimes until they bled.  (Ex. 46 ¶ 43.)

Unsurprisingly, Mr. Jones began to struggle.   At fourteen, he had accumulated a history of stealing, helping run-away kids evade their parents and other instances of juvenile delinquency.  He underwent a psychological evaluation that suggested he had neurological impairment with the evaluator concluding his issues were more like an emotional disturbance versus organicity.  The family was encouraged to seek professional therapy for Mr. Jones and get a neurological evaluation to rule out impairment, especially since his twin brother Larry suffered from a seizure disorder.  Mr. Jones underwent an evaluation, but his examination found him to be normal and recommended psychiatric consultation and therapy. (Ex. 51.)

While Mr. Jones struggled with his mental health, Paul struggled with the physical.  After twenty years, he was forced to retire from the Army due to a heart attack.  (Ex. 52.)  In all, he had seven heart attacks.  (Ex. 50 ¶ 8.)  After another move, this one cross-country to Benson, Arizona to escape bill collectors, Paul died from a heart attack at age 44.  (Ex. 53.)

Paul's death only caused the last threads of the family unit to dissolve. Florence increased her already heavy drinking, and the twins were referred to a

program called VisionQuest to deal with their delinquency.   Mr. Jones was classified by the juvenile court as an incorrigible child. (Ex. 54 at 7.)  Mr. Jones briefly thrived at VisionQuest, living and working in a structured environment. However, Mr. Jones continued to struggle with drinking and other delinquent activities.  Mr. Jones was discharged and then readmitted into various programs. In his final discharge summary, a counselor stated that Mr. Jones' prognosis was guarded because it was "very easy for him to fall back into a negative behavior pattern" and that if Mr. Jones "continued to turn to alcohol and drugs for an escape or a crutch, he would always find himself falling back into his weaknesses and setting his strengths apart from himself." (*Id* at 13.)  Unfortunately for Mr. Jones, those words proved prophetic.

Mr. Jones tried to walk the straight path, meeting and marrying a woman named Carol Rollins.   Together they had three children, Brandie, James, and Andrew.  However, both Carol and Mr. Jones struggled with drug use, and by their last year together, Mr. Jones' methamphetamine addiction had escalated.  While Carol cheated on Mr. Jones, he began to spend time with Joyce Richmond and Angela Gray, women whom Carol characterized as prostitutes and drug addicts. (Ex. 55 ¶ 3; Ex. 56 ¶¶ 6- 7.)

Carol ultimately left Mr. Jones, and he fell apart.  He pulled his hair out and engaged in self-mutilation.  He became suicidal and pierced his arm with a knife

and took several pain killers.  He threatened to kill himself in front of his children, prompting Carol to seek and obtain a restraining order against him.  In the summer of 1992, Mr. Jones was forced by the Sheriff's department to seek outpatient mental health treatment.  Mr. Jones was diagnosed with an adjustment disorder, depressed mood, and alcohol and substance abuse.  He was forced to sign a nonsuicide contract.  He was quickly taken into custody for his own well-being after telling his therapist he had nothing to live for.  (Ex. 57.)

Mr. Jones was diagnosed with psychoactive or polysubstance dependence, abuse or intoxication.  Even inpatient, Mr. Jones remained unstable and suicidal. He was transferred to Kino Hospital but discharged after just seventy-two hours with recommendations for substance abuse treatment programs.  (Ex. 57; Ex. 58.) Despite not getting the substance abuse help he needed, Mr. Jones got back on "decent terms" with Carol and visited with the kids, and when he found out she was pregnant from another man, said only "don't hurt the kids."  (Ex. 59 at 5-6.) Mr. Jones' daughter Brandie was out of control, and Carol sent her to live with him.  (Ex. 56 at 12; Ex. 55 at 4.)  Although his methamphetamine addiction continued to rage, Mr. Jones tried to be a good father to her.  Mr. Jones also played parent to Elisha Lacey, the daughter of his live-in girlfriend Joyce Richmond. Elisha still considers Mr. Jones her father because he was kind to her and protected her from the "perverts" in the trailer park.  (Ex. 60 at 1-2.)  Sadly, Mr. Jones went

back to jail, and Brandie went back to Carol.  She has had many run-ins with the law throughout her life, and she slipped and fell while jumping trains, causing her leg to be amputated by the train.  She is now a single mother with one child.  Carol also struggled, having many children with different men, escalating drug use, and losing her parental rights to her children. (Ex. 61.)

In 1994, drawn together by a mutual love of methamphetamine, Mr. Jones met Angela Gray, who lived in a trailer park with her three children, Johnathan, Rebecca, and Rachel.  Shortly thereafter, Mr. Jones allowed Angela and her family to move in with him.  Angela was a drug addict who neglected and abused her children. (Ex. 48; Ex. 62.)  Approximately four weeks later, Rachel was dead from a blow she received at some time before that ruptured her intestines, and caused infection and death.

Mr. Jones' background was rich with evidence in mitigation, yet trial counsel failed to do even the most basic investigation; thus the judge who sentenced Mr. Jones was denied important information on which to base his decision.

### 3.   Trial counsel's performance was clearly deficient.

"There is no more important hearing in law or equity than the penalty phase of a capital trial." *Correll v. Ryan*, 539 F.3d 938, 946 (9th Cir. 2008) (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J.,

concurring and dissenting)). As such, a capital sentencer must be afforded the opportunity to assess "the character and record of the individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation marks and citation omitted). As the Supreme Court has explained, "[i]f the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring*); Eddings*, 455 U.S. at 111 (explaining that consideration of offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death").

Here, trial counsel failed to call several witnesses who could have shed light on valuable mitigation evidence that could have swayed the court to impose a life rather than a death sentence. Additionally, counsel failed to effectively prepare and question their own witnesses and allowed them to present an incomplete

125

picture that minimized the trauma in Mr. Jones' life.  These failures violated Mr. Jones' rights to due process and the effective assistance of counsel.

At the time of Mr. Jones' 1995 sentencing, counsel was required to make efforts "to discover all reasonably available mitigating evidence."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(C) (1989).   Here Bruner failed to talk to Mr. Jones' siblings, neighbors, teachers, religious counselors, doctors, or any other people who could have provided vital mitigating information. Bruner failed to conduct an adequate investigation for mitigation in Mr. Jones' case. (Ex. 37 ¶ 14; Ex. 33 ¶¶ 10-14.)

This failure constituted deficient performance. *See Porter*, 130 S. Ct. at 453 (finding counsel deficient for failing to interview witnesses and obtain records); *see also Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002) (finding counsel deficient when counsel spoke to only three of the defendant's family members and failed to uncover evidence reflecting "the root of [the defendant's] criminal behavior and his culpability"); *Silva v. Woodford*, 279 F.3d 825, 839 (9th Cir. 2002) (finding counsel deficient for failing to interview family members as part of the capital mitigation investigation); *Turner v. Calderon*, 281 F.3d 851, 891 (9th Cir. 2002) (finding deficiency when counsel failed to interview numerous witnesses who could have testified on the defendant's behalf and failed to uncover the defendant's history of drug use).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mr. Jones' entire mitigation presentation was completed in a single day. The mitigation presentation consisted primarily of lay witnesses who, despite knowing that Mr. Jones' life was on the line, minimized the abuse, neglect and trauma of his childhood. Trial counsel spoke only with the "women" of Mr. Jones' extended family who barely knew him and did not know about his abusive and neglectful childhood.  Bruner allowed Mr. Jones' mother to minimize what went on in their household and even conceal the truth about Mr. Jones' biological father.   Those few witnesses who were called were not adequately prepared to testify on Mr. Jones' behalf at the sentencing hearing.  According to Debbie Wheeler, Mr. Jones' older brother's ex-wife, she testified only about Mr. Jones' care and concern for children.  She was unaware she could tell the court about Mr. Jones' hard childhood, his mother's alcoholism, and his other difficulties in life.  (Ex. 63 ¶ 21.)  Although Bruner's goal appeared to be to paint Mr. Jones as a man who would never harm a child, he never talked to or called any neighbors who lived in the trailer park or any of the children Mr. Jones knew.  Additional witnesses who could have given a more accurate and complete picture of Mr. Jones' history were not called or even interviewed, and the court was left with an incomplete picture of Mr. Jones' life based on the incomplete investigation by counsel.

In addition to not interviewing important witnesses, trial counsel failed to obtain any of Mr. Jones' medical records, school records, employment records, juvenile records, or any other records that would contain possible mitigating evidence. These failures were clearly below the standard of care for capital trial attorneys at the time of Mr. Jones' trial. *See, e.g.*, *Correll*, 539 F.3d at 943-44 (noting that the constitutionally reasonable investigation discussed in *Summerlin* should also include examination of physical and mental health records, school records and criminal records); *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc) (noting that penalty phase investigations in capital cases should include inquiries into social background and evidence of family abuse, potential mental impairment, physical health history, and history of drug and alcohol abuse); *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) (criticizing counsel's performance as deficient for a similar failure).

Most egregiously, counsel failed to hire appropriate experts who would have allowed him to present testimony about Mr. Jones' organic brain dysfunction. The Ninth Circuit has found prejudice when a habeas petition has offered medical or psychological evidence to support a claim of ineffective assistance of counsel. *See, e.g.*, *Silva v. Woodford*, 279 F.3d 825, 847 nn.17 & 22 (9th Cir. 2002) (evidence of "organic brain disorders resulting from Fetal Alcohol Syndrome," was compelling; counsel's failure to investigate was prejudicial and undermined

confidence in the results of the penalty phase); *Mayfield*, 270 F. 3d  at 927-28 (drug abuse and diabetes); *Ainsworth*, 268 F.3d at 878 (troubled background and emotional instability); *Jackson*, 211 F.3d at 1163 (signs of mental  illness in childhood; failure to present medical evidence at sentencing); *Smith (Joe) v. Stewart*, 189 F.3d 1004, 1013-14 (9th Cir. 1999) (serious mental illness); *Caro*, 165 F.3d at 1226, 1258 (failure to present testimony explaining the effects of the "severe physical, emotional, and psychological abuse to  which Caro was subjected as a child. [] Because it has been established that Caro  suffers from brain damage, the delicate balance between his moral culpability and the  value of his life would certainly teeter toward life."); *Bean*, 163 F.3d at 1079 (brain damaged); *Smith* (Bernard), 140 F.3d at 1270-71 (antisocial personality disorder and   sociopathic); *Clabourne*, 64 F.3d at 1384-87 (schizophrenia).    Bruner acknowledges that he failed to request relevant medical records and consult a neurologist or neuropsychologist to determine how Mr. Jones' brain damage affected his behavior and conduct. (Ex. 33 ¶ 12.)  Evidence of Mr. Jones' serious neurological impairments was not only deficient sentencing investigation but "would have had implications during the guilt phase of the proceedings in shedding some light on some of Jones' [sic] poor judgment."  (Ex. 37 ¶ 15.)

A defendant's right to put all relevant mitigation in front of the sentencer is meaningless in the absence of competent counsel. In recognition of this, the

Supreme Court has repeatedly held, that with respect to mitigation, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Supreme Court later ratified this holding, stating that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Williams (Terry)*, 529 U.S. at 396.

These mandates have been further defined and explored in subsequent decisions of the Supreme Court and the Ninth Circuit, all of which require counsel to conduct a reasonable and adequate investigation of the defendant's history. *See, e.g.*, *Wiggins*, 539 U.S. at 537 (holding that investigations by counsel "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quoting 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases); *Williams (Terry)*, 529 U.S. at 396 (stating that counsel has an "obligation to conduct a thorough investigation of the defendant's background"); *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003) ("When it comes to the penalty phase of a capital trial, it is imperative that all relevant mitigation information be unearthed for consideration.") (citations omitted); *Allen v. Woodford*, 395 F.3d 979, 1001-02 (9th Cir. 2005) (holding that "[c]ounsel's obligation to discover and appropriately present all potentially beneficial

130

mitigating evidence at the penalty phase should influence everything the attorney does before and during trial . . . . The timing of this investigation is critical. If the life investigation awaits the guilt verdict, it will be too late"); *Stankewitz v. Woodford*, 365 F.3d 706, 716, 720 (9th Cir. 2004) (holding that counsel's duty to conduct a thorough investigation at the penalty phase "is not discharged merely by presenting some limited evidence[]" and that "tantalizing indications" in the record should have led counsel to investigate further); *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) (holding that "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase").

Further, counsel's duty is not "discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007); *see also Wiggins*, 539 U.S. at 524 (finding deficient performance where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); *Douglas*, 316 F.3d at 1090 (finding ineffective assistance where trial counsel "introduced some of [the defendant's] social history, [but] did so in a cursory manner that was not particularly useful or compelling."). "Only after a thorough investigation can a less than complete presentation of mitigating evidence ever be deemed reasonable, and only to the extent that a

131

reasonable strategy supports such a presentation." *Lambright*, 490 F.3d at 1120 (citing *Wiggins*, 539 U.S. at 527-28).

While counsel is not required to pursue every possible lead, counsel's assistance is considered deficient when he "ignore[s] pertinent avenues for investigation of which he should have been aware." *See Porter v. McCollum*, 130 S. Ct. 447, 453 (2009); *see also Lambright*, 490 F.3d at 1117 ("[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued.") (citations omitted). Here, counsel concedes "[t]here was no strategic reason" for the failure to collect critical mitigation records. (Ex. 33 ¶ 15.)

Finally, when assessing counsel's conduct, and more particularly the impact of that conduct on the reliability of the proceedings, counsel's deficiencies must be considered cumulatively as opposed to item-by-item. *See, e.g.*, *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (holding that when assessing prejudice, reviewing court must consider "the totality of the mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Martin v. Grosshans*,

132

424 F.3d 588, 590-92 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Lindstadt v. Keane*, 239 F.3d 191, 194, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by "cumulative effect of four errors" committed by trial counsel).

As discussed above, the record dispositively shows that trial counsel did not adequately investigate or prepare for the penalty phase of Mr. Jones' case.   Mr. Jones' trial counsel agree that with the benefit of their current level of training and experience, it is clear "[t]hat Mr. Jones' familial history and numerous head injuries were not investigated and adequately presented to the sentencing court as one of the many causal connections to the murder." (Ex. 33 ¶ 12; Ex. 40 ¶ 20.) Their failure to investigate, present, and explain the significance of all the available mitigating evidence, including evidence of Mr. Jones' background and family history and serious mental impairments presents the quintessential showing of deficient performance. *See Williams (Terry)*, 529 U.S. at 399; *Wiggins*, 539 U.S. at 523-25 (holding that abandonment of investigation into petitioner's background after acquiring only rudimentary knowledge of his history from a narrow set of sources fell short of well-defined norms); *Rompilla*, 545 U.S. at 387; *Lambright*, 490 F.3d at 1117 (holding that the mitigation investigation should include inquiries into social background and counsel has an affirmative duty to provide mental

health experts with information needed to accurately assess the defendant's mental health profile); *Correll*, 539 F.3d at 942 (in preparing for the penalty phase of a capital trial, defense counsel had a duty to "conduct a thorough investigation of the defendant's background"). Mr. Jones' counsel utterly failed to meet these standards.

The minute evidence that was presented was not only insufficient, but also misleading. Bruner's insufficient investigation led him to present "mitigation" evidence that minimized Mr. Jones' history of childhood abuse, substance abuse and mental illness. During the sentencing hearing, Bruner downplayed the abuse by eliciting testimony from Mr. Jones' mother that, until the move to Arizona, Mr. Jones had a fairly normal childhood with a mother who stayed at home to care for him.  Had counsel conducted a reasonable investigation, he would have known the testimony Florence gave could not have been further from the truth.

Furthermore, having failed to uncover any of the compelling mitigating evidence that existed, Bruner could not provide the probation officers with any of the vital information needed to make an accurate presentence report. Indeed, the reports submitted to the court were largely incomplete and failed to include any information about Mr. Jones' abusive childhood or mental health issues. What is more, as any reasonable attorney would have anticipated, the sentencing court reviewed and relied upon these incomplete presentence reports in determining

whether Mr. Jones would live or die. Bruner's incomplete and fragmented investigation and presentation of mitigation left the sentencing court with an incorrect perspective on Mr. Jones' troubled background and mental problems.

Bruner's failure to present available mitigation cannot be excused as a tactical decision because he conducted no investigation at all in order to make a reasonable decision. *See Williams (Terry)*, 529 U.S. at 364 (holding that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision because counsel "had not fulfilled their ethical obligation to conduct a thorough investigation of [the defendant's] background") As the Ninth Circuit has already made abundantly clear, "[a]n uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll*, 539 F.3d at 949 (citing *Strickland*, 466 U.S. at 690-91, for the proposition that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

While Bruner did present some evidence before the court, his anemic presentation of such limited mitigation, which was not supported by any evidence, does not satisfy counsel's duty. *See Douglas*, 316 F.3d at 1090 ("Although [counsel] introduced some of [the defendant's] social history, he did so in a cursory manner that was not particularly useful or compelling."). As the Ninth Circuit stated in *Stankewitz*,

> Together, *Wiggins* and *Williams* stand for the proposition that counsel's failure to investigate and present mitigating evidence presents serious constitutional concerns. Both cases emphasize counsel's duty to conduct a thorough investigation and *Williams* in particular shows that counsel's duty is not discharged merely by presenting some limited evidence. Rather, a penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.

365 F.3d at 716.

While Bruner did present some limited mitigation evidence at sentencing, it was constitutionally inadequate because, among other shortcomings, it failed to provide a complete picture of Mr. Jones' life history and trauma. Bruner's failure to properly investigate and prepare the witnesses he did call, and the failure to call witnesses with important insight into Mr. Jones' traumatic, abusive, and neglectful childhood, left the court with an incomplete and inadequate picture to make a fully informed decision on life or death.  The discrepancy between what Bruner should have presented and what he did present is significant, rendering his performance deficient.

## B.    Mr. Jones was prejudiced by counsel's multiple deficiencies.

The evidence gathered by habeas counsel, that both trial and postconviction counsel failed to investigate is the kind of evidence that when properly put in context and presented to the trial court, makes the difference between life and death.  *See Williams v.* Taylor, 529 U.S. 420 (2000).  Given that the sentencing

136

court was denied such powerful mitigating evidence, Mr. Jones was prejudiced by these failures.

Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id*. A reviewing court must evaluate "the totality of the evidence before the judge or jury." *Id.* at 695. The prejudice analysis does not depend on whether the outcome of the proceeding would have been different. "[T]he (outcome determinative) standard is not quite appropriate." *Id.* at 694. Rather, Mr. Jones must show "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). As the Ninth Circuit has also recognized, the "deficient performance and prejudice questions may be closely related." *Correll*, 539 F.3d at 951 (citations omitted). This is particularly true when counsel's deficient performance relates to a failure to develop and present mitigation in a capital sentencing proceeding. *Id*. (citing *Summerlin*, 427 F.3d at 643).

The Ninth Circuit has repeatedly found prejudicial ineffectiveness in cases where counsel neglected investigation of a capital defendant's background and mental health. *Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012); *Detrich v. Ryan*, 677 F.3d 958 (9th Cir. 2012); *James v. Ryan*, 679 F.3d 780 (9th Cir. 2012); *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010); *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009); *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009); *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008); *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007); *Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006); *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005); *Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005); *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002); *Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002); *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Smith v. Stewart*, 189 F.3d 1004 (9th Cir. 1999); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998). These cases control the analysis in Mr. Jones' case as well, especially under a *de novo* standard of review, where the strictures of 28 U.S.C. § 2254(d) do not apply.

When comparing the enormous body of mitigation showing Mr. Jones' traumatic childhood rife with alcoholism, violence, poverty, and neglect to the inadequate presentation Bruner put forth at sentencing, it is abundantly clear that the sentencing judge was never given an accurate picture of Mr. Jones' life. This is

138

glaringly evident in the sentencing judge's special verdict. (ROA 159.)[22] Bruner admits that he failed to exercise the skill, judgment and diligence expected of reasonably competent criminal defense lawyers.  (Ex. 33 ¶¶ 10-14.)

Had counsel presented evidence of Mr. Jones' chaotic and abusive childhood, mental impairments and chronic drug abuse immediately preceding the offense, the sentencing judge would have had a more complete picture of Mr. Jones.   Furthermore, had counsel obtained an appropriate independent expert to explain the effects of methamphetamine on Mr. Jones, as any competent counsel would have, the sentencing court would have been able to give proper effect to Mr. Jones' mitigating evidence. *See Mayfield v. Woodford*, 270 F.3d 915, 927-28 (9th Cir. 2001) (holding that to perform effectively counsel must engage in sufficient preparation to be able to explain "the significance of all the available mitigating evidence").

In one stark example, the trial court found that "no evidence exists of a dysfunctional childhood that would affect his reasoning and conduct at the time of [the] incident." *Jones*, 937 P.2d at 322. Had Bruner presented the abundant evidence of Mr. Jones' troubled childhood and mental problems, it is more likely than not that the outcome of the sentencing proceeding would have been different.

---

[22] Trial proceedings for the Pima County Superior Court are docketed under CR-45587.  References to this docket will correspond to the Pima County Superior Court Index of Record on Appeal and, henceforth, will be cited as "ROA."

Absent such important testimony, the sentencing court incorrectly perceived Mr. Jones' mitigation as insignificant. Counsel's repeated failures to present vital mitigating evidence clearly undermined confidence in the outcome of this case.

Finally, while this was undoubtedly a heartwrenching crime, one that Mr. Jones still maintains he did not commit, the Ninth Circuit has made clear that, "[e]vidence of mental disabilities or a tragic childhood can affect a sentencing determination even in the most savage case." *Lambright*, 241 F.3d at 1208; *see also Ainsworth*, 268 F.3d 868, 874-78 (9th Cir. 2001) (finding prejudice from counsel's failure to present evidence of the defendant's "troubled childhood, his history of substance abuse, and his mental and emotional problems" despite the brutal facts of the underlying crime).  In this case, as in *Rompilla*, the "evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the [sentencer], and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." 545 U.S. at 393. Trial counsel's failure to investigate, failure to present Mr. Jones' personal history to a competent mental health and substance abuse expert, and failure to present Mr. Jones' mitigation to the court resulted in prejudice for which the only remedy is a new sentencing.

1

2

### C.   Mr. Jones has stated a colorable claim against trial counsel and he is entitled to an evidentiary hearing.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Above, Mr. Jones has stated a colorable claim that he was denied his Sixth Amendment right to effective assistance of counsel for the sentencing phase. This means that the claim is <u>not</u> subject to summary dismissal, and an evidentiary hearing is required.  *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  To allege a colorable claim for habeas relief, a petitioner is only required to allege facts that, if proven true at a hearing, would entitle him to relief.  *Id.* at 1170; *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").  Presentment of a colorable claim is "a low bar," *Earp*, 431 F.3d. at 1170, and Mr. Jones has met it.  Mr. Jones is entitled to an evidentiary hearing to prove his claim.  Mr. Jones discusses his rights to a hearing, discovery and evidentiary development further, below.

20

21

### IV.   Mr. Jones' postconviction counsel was ineffective.

22

### A.   Introduction.

23

24

25

We return very briefly to *Clabourne* and its paradigm for establishing cause and prejudice under *Martinez*.[23]  *Clabourne* held the prejudice prong of the "cause

26

27

28

---

[23] As explained above, Mr. Jones disagrees with the *Clabourne* methodology. (*See* pp. 5-7 above) However, its application here should not prejudice Mr. Jones' rights.

and prejudice" showing is met if the underlying claim against trial counsel is substantial. 745 F.3d at 377. In Mr. Jones' case, the court of appeals has already settled that his ineffective assistance claims lodged against trial counsel are substantial for both the guilt phase and sentencing phase of the proceedings. This means that the prejudice component is settled.

With respect to the showing of the cause element, *Clabourne* held that to demonstrate cause—the first part of the showing of "cause and prejudice"—a petitioner must show that his postconviction relief counsel was ineffective under *Strickland*. *Id.* at 376. As the panel explained, to prove postconviction counsel's ineffectiveness "*Strickland* . . . requires him to establish that both (a) postconviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the postconviction proceedings would have been different." *Id.* at 377. For the sake of simplicity, we dispose of the prejudice prong of the ineffectiveness claim against PCR counsel first.

## B.    Prejudice to the outcome of the PCR proceedings has been established.

*Clabourne* holds that "[d]etermining whether the result of the postconviction proceedings would have been different will require consideration of the underlying claim of ineffective assistance by [trial or] sentencing counsel and the questions of whether [trial or] sentencing counsel performed deficiently, and (b) whether there

142

was a reasonable probability that, . . . the result of the [trial or] sentencing proceedings would have been different." *Id.* at 382.  As explained below, this showing has already been made in Sections II and III above.

In Section II above, Mr. Jones has already laid out his claim that he was denied effective assistance of counsel during the guilt phase of the proceedings. As explained there, his claim against trial counsel for ineffectiveness during the guilt phase is colorable. Therefore the claim is <u>not</u> subject to summary dismissal, and Mr. Jones is entitled to a hearing on the merits of his underlying guilt-phase claim. (*See* Section II L.) Accordingly, it must follow that Mr. Jones also qualifies for the same hearing on the claim against PCR counsel insofar "[d]etermining whether the result of the postconviction proceedings would have been different," *id.*, had PCR counsel brought the trial-phase ineffectiveness claim in the state postconviction proceedings.

Similarly, in section III above, Mr. Jones has already laid out his claim that he was denied effective assistance of counsel during the sentencing phase of the proceedings. As explained there, his claim against trial counsel for ineffectiveness during the sentencing phase is colorable. Therefore the claim is <u>not</u> subject to summary dismissal, and Mr. Jones is entitled to a hearing on the merits of his underlying sentencing-phase claim.  (*See* Section III C.) Accordingly, it must follow that Mr. Jones also qualifies for the same hearing on the claim against PCR

counsel insofar "[d]etermining whether the result of the postconviction proceedings would have been different," *id.*, had PCR counsel brought the sentencing-phase ineffectiveness claim in the state postconviction proceedings.

Accordingly, for the reasons explained above, prejudice to the outcome of the PCR proceedings has been established, sufficiently so to mandate a hearing. This leaves only one question remaining: whether PCR counsel's performance was deficient under the criteria established in *Strickland*. We address this question next below.

**C.    PCR counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the guilt-phase performance of trial counsel was constitutionally deficient.**

Although a court presumes that counsel acted competently, Mr. Jones rebuts this presumption and satisfies the burden of demonstrating the deficient-performance prong of his right to effective counsel, by demonstrating that PCR counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688-89, 694.  PCR counsel's performance was constitutionally deficient under this standard.

We begin with the oft-stated admonition set down by the Supreme Court, "that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . . .'" *Padilla v. Kentucky*, 559 U.S. at 366-67 (citing *Strickland*, 466 U.S. at 688; *Bobby*

144

*v. Van Hook*, 558 U.S. 4 (2009) (per curiam)).   At the time of Mr. Jones' state postconviction proceeding, it was well established that postconviction counsel had a duty to raise all potentially meritorious claims. ABA Guidelines for the Appointment & Performance of Counsel in Death Penalty Cases § 11.9.3(C) (1989) ("Postconviction counsel should seek to present to the appropriate court or courts all arguably meritorious issues. . . ."); Nat'l Legal Aid & Defender Ass'n, Counsel Standards § 11.9.3(c) (1985).

And, prevailing standards were clear that postconviction counsel had a duty to conduct a reasonable investigation of prior counsel's representation to ensure that the client had received effective assistance of counsel during the prior proceedings. *See, e.g.*, ABA Standards for The Defense Function § 4-8.5 (1979) (hereinafter "The Defense Function"). The same normative standards hold that PCR counsel has the same duties as trial counsel insofar as assuring that a reasonable investigation is conducted. Because "a postconviction proceeding is fundamentally an original jurisdiction proceeding, involving problems of investigation, preparation, and trial, the standards governing lawyers in these tasks are fundamentally the same as those outlined in these standards for the defense of a criminal case." *Id.* By definition, PCR counsel has the corresponding duty to investigate trial counsel's performance. *See* The Defense Function § 4-8.6 & cmt. (discussing investigation of prior counsel's performance).

145

Of course, perhaps most compelling, the *Martinez* decision itself contemplates as a given: that PCR counsel has a duty to reasonably examine the performance of trial counsel and that this examination will require PCR counsel to conduct a reasonable investigation within the context of the particular case. "Without the help of an adequate attorney, a prisoner will have similar difficulties vindicating a substantial ineffective assistance of trial counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Martinez*, 132 S. Ct. at 1317 (emphasis supplied). *And see id.* at 1318 (recognizing again that "ineffective assistance claims often depend on evidence outside the trial record" and counsel will need "adequate time . . . to investigate").

In Mr. Jones' case, his PCR counsel's performance departed from the normative professional standards, as well as the performance expectations embedded in the *Martinez* decision itself, and by any measure PCR counsel's performance was objectively unreasonable and deficient.

We begin with the observation that under the very competency standards adopted by the Arizona Supreme Court, PCR counsel was unqualified to represent Mr. Jones in the proceedings. (*See* Dist. Ct. Doc. No. 96, Exs. 10, 11.)

Of course any reasonable investigation requires that the lawyer communicate with the client. Communication would be useful when representing

any client, but it would be particularly useful for a client who is maintaining his innocence in a capital proceeding. In this case, PCR counsel barely communicated with Mr. Jones. PCR counsel was appointed in September 1999, but his billing records show he had only one brief visit with Mr. Jones in December 1999 and another brief meeting just as the PCR petition was coming due in March 1999. (Ex. 39.)

To be blunt, the billing records reveal that all PCR counsel did in this capital case was to review the file; he did one read through, concocted what amounted to a few frivolous claims for the PCR petition and he was done. (Ex. 39; PCR ROA 11.)[24] PCR counsel had a client maintaining his innocence; yet he continued to walk mostly in the same shoes worn by trial counsel. He accepted the prosecution's investigation as the case bible, and he conducted no outside investigation that would enable the prosecution's evidence to undergo the crucible of adversarial testing.

It would have been plain for PCR counsel to see that trial counsel conducted no outside investigation to assess or evaluate the prosecution's case.  He might have asked trial counsel why this was so, but he did not. The billing records reflect

---

[24] "PCR ROA" refers to the record in the Pima County Superior Court, Case No. CR-45587, prepared for Mr. Jones' appeal to the Arizona Supreme Court following the denial of his first state postconviction petition.

PCR counsel had no substantive communication with trial counsel beyond the billing of .3 of an hour with respect to obtaining the file. (Ex. 39.)

PCR counsel had the same red flags waving in his face that were waved in front of trial counsel, but still he conducted no investigation.  PCR counsel had Dr. Howard's testimony at Mr. Jones' trial that all Rachel's injuries were inflicted at the same time, but he also had his inconsistent pre-trial statements where Dr. Howard placed the scalp, genital and small bowel injuries as occurring at different times. (*See* Section II (B)(3) and II (C & D) above.) He had Dr. Howard's pre-trial statements which pointed to the scalp injury, the vaginal injury and even the small bowel injury as falling outside the prosecution timeline, and occurring well prior to the afternoon of May 1st. (*Id.*) PCR counsel's failure to investigate the question concerning the timing of Rachel's injuries was as objectively unreasonable as trial counsel's failure to investigate the question. This was especially so, given the fact that PCR counsel had Rebecca's pre-trial statements, where she reported that Rachel took only two trips with Mr. Jones during the afternoon of May 1st, including the trip to the Choice Market, and Rachel was well and uninjured after each trip. (*See* Section II (D)(E).) Of course this latter point would have raised doubts about the reliability of the Lopez children's testimony, since Rebecca verified Rachel was well after the trip to the Choice Market. (*Id.* and Section II (H).) And finally, PCR counsel would have seen from his review of the records

and transcripts that the only evidence concerning the interpretation of the blood in Mr. Jones' van and on his clothing came out of the mouth of a witness who admitted that she was not qualified to interpret the evidence. (*See* Section II (F)(G).)

In short, PCR counsel had the same evidence in front of him as trial counsel, and it was just as objectively unreasonable and deficient for PCR counsel to ignore the signs that an investigation was reasonably necessary as it was for trial counsel. Even more so, given that PCR counsel had a duty to review trial counsel's work, and any reasonably competent attorney would have recognized the lack of an investigation raised a viable postconviction claim, and thus a thorough investigation was necessary to show that trial counsel was deficient. The legal arguments in Section II (K) supporting this conclusion as to trial counsel's deficient performance also support the conclusion as to PCR counsel's deficient performance; particularly in light of the indisputable evidence that PCR counsel's duties encompass the requirement to evaluate trial counsel's performance and to conduct investigations that appear reasonably warranted. "Without the help of an adequate attorney, a prisoner will have similar difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Martinez*, 132 S. Ct. at 1317 (emphasis supplied).

149

Further proving the point, PCR counsel apparently had a passing thought that some investigation was needed, but he failed to grasp the legal requirements for obtaining funding. PCR counsel was appointed by the Arizona Supreme Court on September 22, 1999. (Ariz. Sup. Ct. Doc. No. 29.)  The order of appointment provided that counsel "shall direct requests for appointment of investigators and experts to the superior court pursuant to A.R.S. § 13-4013(B)." (*Id.*)  PCR counsel requested the assistance of an investigator to determine "if all necessary defense evidence was presented and to locate additional evidence." (PCR ROA 4.)  This request ignored the language of § 13-4013(B) and instead cited to Arizona Rule of Evidence 706(a), a rule that does not authorize investigative assistance to indigent defendants.   Using similar language to his investigation request, Hazel also requested a mitigation expert.  (PCR ROA 5.) The trial court denied both requests without prejudice because Hazel failed to support the need for an appointment at the present time. (PCR ROA 6.)  Hazel filed a Motion to Reconsider, but it was filed only weeks before the petition was due; it remained deficient, and it was denied.  (PCR ROA 7, 9.)

Prior to Hazel's appointment, the Arizona Supreme Court had clearly established the requirements under § 13-4013 (B) to obtain indigent defense assistance.   "At a minimum, funding requests had to demonstrate why the requested assistance was reasonably necessary, but relevant here, undeveloped

assertions that the requested assistance would be beneficial, would be considered insufficient." (Ex. 37 ¶ 26 citing *State v. Apelt*, 861 P.2d 654, 660 (Ariz. 1993).) Hazel's applications for an investigator and mitigation specialist failed to specify why he needed their assistance.  He did not detail what evidence he was seeking or that Bruner had abandoned the penalty phase of Mr. Jones' trial and left it in the hands of an associate with less than a year of experience. (PCR ROA 4 and 5.) The court denied those motions.  Hazel's motion for reconsideration was equally vague and came shortly before the petition was due.  (PCR ROA 7.)  Hazel's requests fell below the standard of reasonably competent postconviction counsel because they did not meet, and failed to even acknowledge, the requirements of Ariz. Rev. Stat. § 13-4013, a failure the court specifically recognized in its denial of the motion for reconsideration.  (PCR ROA 9.)

When an attorney fails to obtain defense assistance because he does not understand the very rules that regulate the funding, this perforce demonstrates deficient performance under *Strickland. See Hinton v. Alabama*, 134 S. Ct. at 1088-89. As the Supreme Court explained in *Hinton*, trial counsel's failure to obtain funding for a defense expert because of a mistaken understanding of indigent defense funding rules "is a quintessential example of unreasonable performance under *Strickland*." *Id.* at 1089.

Finally, Mr. Jones is prepared to provide expert testimony in support of the evidence demonstrating PCR counsel's deficient performance.  Mr. Jones had the case reviewed by Dan Cooper, an experienced capital litigator with expertise in cases involving injuries to or death of a child. (Ex. 37 ¶¶ 1-2.) Mr. Cooper adjudged both trial and PCR counsel's investigations as falling short of the norms of practice.   With respect to the performance of PCR counsel, Mr. Cooper concluded that: (a) the record supports the conclusion that Mr. Jones' PCR counsel lacked a proper understanding of how to investigate plausibly meritorious claims of ineffective assistance of trial counsel; (b) the record shows that counsel was ignorant of the standards governing application of the indigent defense, investigative assistance statute in A.R.S. § 13-4013(B); indeed he failed to cite this statute in support of his investigative funding requests, despite an admonition from the Arizona Supreme Court in its appointment order that he rely on this statute; and (c) his conduct evidences that he was incapable of adequately investigating the performance of trial counsel. (Ex. 37 ¶ 29.) This describes a PCR counsel whose performance was deficient under the rule in *Strickland.*

> **D.    PCR counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the sentencing performance of trial counsel was constitutionally deficient.**

Much of what is presented above with respect to the showing of deficient performance by PCR counsel in connection with the failure to present a substantial

claim that the guilt-phase performance of trial counsel was constitutionally deficient also applies to the failure to present the claim that the sentencing performance of trial counsel was deficient.  The arguments need not be repeated. Below we add to the showing of deficient performance as it concerns the sentencing claim.

The appointment of a mitigation expert was essential to present additional mitigation that should have been presented at sentencing and to support the asserted claims of ineffective assistance of trial counsel properly before the postconviction court.  As set forth above, habeas counsel has uncovered a wealth of mitigating evidence.  Not only does Mr. Jones suffer from Organic Brain Damage, but he also suffers from serious mental illnesses including Substance Abuse, AD/HD, and Mood Disorder.

None of the evidence above could have been developed by the mental health experts without the assistance of a mitigation specialist to develop the factual basis. The denial of this expert likewise precluded Mr. Jones from fully litigating his claim that counsel was ineffective for failing to engage in an appropriate investigation at sentencing.  The United States Supreme Court requires that an indigent defendant be provided with the necessary assistance of expert witnesses. *Ake v. Oklahoma*, 470 U.S. 68 (1985); *see also Little v. Armontrout*, 835 F.2d 1240 (8th Cir. 1987*)*; *Moore v. Keep*, 809 F.2d 702 (11th Cir. 1987). Courts have

expanded *Ake* to include not only a court-appointed psychiatrist/psychologist, but also an independent mental health expert to meaningfully assist at trial and at sentencing. *E.g.*, *Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992); *Smith v. McCromick*, 914 F.2d 1153 (9th Cir. 1990); *Cowley v. Stickland*, 929 F.2d 640 (1lth Cir. 1991).   The postconviction court's denial of funds ensured that postconviction counsel's performance would be deficient. And as we have already explained above, PCR's counsel shear inability to grasp indigent defense funding virtually guaranteed his own deficient performance. *See Hinton*, *supra*.

Hazel also attempted to interview Angela Gray; she refused.  When Hazel attempted to depose her, he again failed to follow rules of criminal procedure and the court denied the motion.  (PCR ROA 14.)  Hazel also failed to seek expert funds to hire mental health experts, as Dr. Geffen had recommended to trial counsel.   Hazel's failure to recognize the need for additional experts is unsurprising given the most egregious example of his failure to investigate the case—billing records show that Hazel never interviewed trial counsel.  Therefore he never attempted to assess the extent or sufficiency of their investigative efforts. (Ex. 39; Ex. 37 ¶ 28.)

Combined, the billing records, court record, and complete absence of a renewed mitigation investigation support the conclusion that:

Jones' postconviction counsel lacked a proper understanding of how to investigate plausibly meritorious claims of ineffective assistance of trial counsel. The record shows that counsel was ignorant of the standards governing application of the indigent defense assistance statute in A.R.S. § 13-4013(B); indeed he failed to cite this statute in support of his funding requests, despite an admonition from the Arizona Supreme Court in its appointment order that he rely on this statute, and his conduct evidences that he was incapable of adequately investigating the performance of trial counsel.

(Ex. 37 ¶ 29.) The above described inadequacies typify objectively unreasonable conduct for competent postconviction counsel and constitute deficient performance as described in *Strickland. See* 466 U.S. at 695; (*Id.*)

**E.     Conclusion.**

Mr. Jones has presented a colorable claim that PCR counsel's performance was deficient and that there was resulting prejudice. The statement of a colorable claim means that the claim is <u>not</u> subject to summary dismissal, and an evidentiary hearing is required. *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). To allege a colorable claim for habeas relief, a petitioner is only required to allege facts that if proven true at a hearing, would show his entitlement to relief. *Id.* at 1170; *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) ("[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief"). Presentment of a colorable claim is "a low bar," *Earp* at 431 F.3d. 1170, and Mr. Jones has met it with respect

155

to his allegations against PCR counsel.  Mr. Jones is entitled to an evidentiary hearing to prove his claim.  Mr. Jones discusses his rights to a hearing, discovery and evidentiary development further, below.

## V.   Mr. Jones is entitled to evidentiary development, discovery and an evidentiary hearing.

### A.   Limitations on evidentiary development that may be implicit in cases governed by 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(e)(2), do not apply, and Mr. Jones is entitled to a hearing to prove his colorable claims.

Mr. Jones has already demonstrated in Sections II, III, & IV that he has presented colorable claims of ineffective assistance against trial and PCR counsel. Mr. Jones is requesting evidentiary development, discovery and a hearing to prove the ultimate merits of the elements of "cause and prejudice," as well as the ultimate merits of the claims against his trial counsel.  Mr. Jones is entitled to factual development of these colorable claims and to prove his entitlement to relief at a hearing.  *Earp*, 431 F.3d at 1170.  An evidentiary hearing is required to allow a petitioner to prove his claim, "if the [petitioner has presented a colorable claim by] alleg[ing] facts, that if proven, would entitle him to habeas relief. *Id.* (quoting *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004)).

Mr. Jones asks the Court to observe that the usual limitations on evidentiary development imposed under the constraints of 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(e)(2) do not apply. To the contrary, under the umbrella of *Martinez*, a habeas petitioner is entitled to develop and present evidence to prove his claims

156

against trial counsel and PCR counsel, and in this respect neither the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) limiting review under subsection (d)(1) to the state court record, or the provisions in 28 U.S.C. § 2254(e)(2) apply. *See Detrich v. Ryan*, 740 F.3d at 1246-47 (in the application of *Martinez*, the restrictions on evidentiary development inherent in § 2254(d)(1) or § 2254(e)(2) do not apply to the district court's determination of the claims against trial counsel or PCR counsel); *Dickens v. Ryan*, 740 F.3d at 1320-22 (in the *Martinez* context neither *Pinholster* nor § 2254(e)(2) bar a petitioner from obtaining a hearing, or from presenting extra-record evidence); *Woods v. Sinclair*, 764 F.3d. 1109, 1138 (9th Cir. 2014); *Runningeagle v. Ryan*, 2014 WL 4954412 (D. Ariz. Oct. 2, 2014) (when considering application of Martinez, neither *Pinholster* nor 2254(e)(2) limit consideration of new evidence or expansion of the record under Habeas Rule 7); *Quintero v. Carpenter*, 2014 WL 7139987, at *79-81 (M.D. Tenn. Dec. 12, 2014) (relying on *Detrich* in support of grant of evidentiary hearing both with respect to showing of cause and prejudice under *Martinez* and with respect to showing of underlying claim of ineffective assistance against trial counsel).

It follows from the foregoing that limitations on discovery, which might otherwise apply in a case governed by *Pinholster* or 2254(e)(2), do not apply in the *Martinez* context. *See Dietrich* 740 F.3d at 1246-47 (recognizing it is appropriate

for district court to authorize discovery to aid in determination of cause and

prejudice under *Martinez* and holding that discovery is not proscribed by

*Pinholster* or § 2254(e)(2)).

**B.     The standards for discovery, expansion of the record and evidentiary development.**

**1.     Standard for expansion of the record and evidentiary hearings.**

As explained above, Mr. Jones is entitled to an evidentiary hearing to prove

his colorable claims. As is obvious, in material respects, his "colorable allegations"

rest, in part, on materials not presented in the state court proceedings.  It logically

follows that the Court must permit supplementation of the record so that it can

examine the materials not presented in state court proceedings, as part of its

assessment with respect to: (1) whether the fact allegations can be substantiated

and (2) whether to grant a hearing.  And this is precisely what is envisioned in

Rules 7 and 8 of the Rules Governing Section 2254 Cases.

In accordance with Rule 8, unless the petition has been summarily

dismissed, "the judge must review the answer, any transcripts of records of the

state-court proceedings, and any materials submitted under Rule 7, to determine

whether a hearing is warranted." *See also McDonald v. Johnson*, 139 F.3d 1056,

1060 (5th Cir. 1998) (expansion of the record under Rule 7 is appropriate to

determine whether an evidentiary hearing is necessary). Thus Rules 7 and 8 work

in tandem to assure that a habeas petitioner has the opportunity to substantiate his

allegations and to guide the court's discretion with respect to whether a hearing is required. *Loza v. Mitchell*, No. C-1-98-287, 2002 WL 31409881, at *2 (S.D. Ohio July 17, 2002) (ordering record to be supplemented with additional documents under Rule 7, "because they are relevant and might be helpful to the Court in deciding not only whether any of petitioner's claims are meritorious, but also whether an evidentiary hearing might be necessary" under Rule 8).

As explained in section C below, the records and materials proffered under Habeas Rule 7 below are relevant to the Court's assessment of the merits of the claims asserted against trial and PCR counsel and therefore, the Court "has a duty to expand the record [under Rule 7] to include the omitted material." *Jones v. Parke*, 734 F.2d 1142, 1148 (6th Cir. 1984). *And see* Adv. Comm. Notes to Habeas Rule 7 (materials relevant to consideration of the claims should be received under Rule 7). The proper application of Habeas Rule 7 requires that Mr. Jones be permitted to expand the record. Similarly, for the reasons already explained above, because the allegations supported by the expanded record unequivocally aid in the demonstration that Mr. Jones' allegations are colorable, the Court should order an evidentiary hearing pursuant to Rule 8. 2.

### 2.    Standard for discovery and depositions.

As explained below, Mr. Jones is requesting leave to conduct discovery to obtain additional information with which to support claims now before the Court.

159

Discovery procedures are clearly contemplated when *Martinez* issues are in play. *See Detrich*, 740 F.3d at 1246-47 (in the *Martinez* context "it is often necessary to authorize discovery").   Mr. Jones will address specific discovery requests in section D below.

### a. Discovery under the Rules Governing Habeas Proceedings.

Pursuant to Habeas Rule 6(a), "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  Under Habeas Rule 6, "[g]ranting discovery is left to the discretion of the court, discretion to be exercised where there is a showing of good cause why discovery should be allowed."  Adv. Comm. Notes to Habeas Rule 6 (citing *Harris v. Nelson*, 394 U.S. 286, 298-99 (1969)).

"Good cause" exists when (1) the petitioner makes credible allegations of a constitutional violation, and (2) the requested discovery will enable the petitioner to investigate and prove his claims.  *See Bracy v. Gramley*, 520 U.S. 899, 904, 908-09 (1997).  When there is "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id*. at 908-09; *see also McDaniel v. U.S. Dist. Court*, 127 F.3d 886, 888 (9th Cir. 1997) (citing *Harris*, 394 U.S. at 299); *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000) ("Petitioner need not show that the

160

additional discovery would definitely lead to relief.  Rather, he need only show good cause that the evidence sought would lead to relevant evidence regarding his petition.").

Here, where there are allegations of deficient performance and professional misconduct on the part of Mr. Jones' prior counsel, depositions of prior counsel are viewed as an appropriate discovery tool.  *See Payne v. Bell*, 89 F. Supp. 2d at 971 (court ordered deposition ordered in light of allegations of out-of-court misconduct on the part of counsel); *United States ex rel. Davis v. McMann*, 386 F.2d 611, 613-14 (2d Cir. 1967) (relying on deposition testimony in rendering ruling on ineffective assistance of counsel claim); *United States ex rel. Pecoraro v. Page*, No. 97C5361, 1998 WL 708856, at *1-8 (N.D. Ill. Sept. 30, 1998) (ordering deposition of prior counsel "to provide the facilities for an adequate inquiry, a duty to which we are especially sensitive in this capital case").

Mr. Jones has met the burden to establish "good cause."  Viewed broadly, the purpose of discovery in habeas cases is to assist the court in "dispos[ing] of habeas petitions 'as law and justice require.'"  *Bracy*, 520 U.S. at 904 (quoting *Harris*, 394 U.S. at 300).  In some cases, the discretion to grant discovery may rise to the level of a duty.  *Harris*, 394 U.S. at 300; *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991) (stating that

a court should exercise its discretion and grant discovery when "good cause" exists).

The Supreme Court has also suggested that district court judges should consider ordering discovery before deciding whether an evidentiary hearing is appropriate whenever the claim on which discovery is sought is not so "'palpably incredible' [or] 'patently frivolous or false' as to warrant summary dismissal." *Blackledge v. Allison*, 431 U.S. 63, 76, 82-83 (1977) (quoting *Herman v. Claudy*, 350 U.S. 116, 119 (1956)).  In fact, Habeas Rule 6 warrants discovery "when it would help the court make a reliable determination with respect to the prisoner's claim."  *Herrera v. Collins*, 506 U.S. 390, 444 (1993) (Blackmun, J., dissenting on other grounds).  "[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide" adequate discovery.  *Harris*, 394 U.S. at 300.  Having made these specific allegations in his habeas petition, Mr. Jones now asks this Court to grant him discovery so that he may more fully develop those allegations.

A district court may authorize discovery "[a]t any time in the proceedings, when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held . . . before or in conjunction with the hearing."  *Harris*, 394 U.S. at 300 (setting forth standards for discovery under the

162

All Writs Act, 28 U.S.C. § 1651).  Indeed, the United States Supreme Court has emphasized that district courts should authorize discovery procedures "reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require.'"  *Id*. at 290 (quoting 28 U.S.C. § 2243).

### b.   Discovery under the Federal Rules of Civil Procedure.

The scope of discovery under the Federal Rules of Civil Procedure is broad. *See, e.g.*, *Hickman v. Taylor*, 329 U.S. 495 (1947).  Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Consistent with its sweeping language, federal courts have uniformly construed Rule 26(b)(1) very broadly.  As the Ninth Circuit explained in *Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993), "[t]his broad right of discovery is based on the general principle that litigants have a right to every man's evidence, and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth."  *Id.* at 1292 (citations and quotations omitted); *see also Kerr v. U.S. Dist. Court*, 511 F.2d 192, 195 (9th Cir. 1975).

### c.   The Importance of Discovery in a Capital Case.

Because Mr. Jones has been sentenced to death, discovery is crucial to ensure the additional level of reliability that is demanded in capital cases.  Indeed,

163

as the Fifth Circuit has recognized, "if death is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims." *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987).  In fact, the capital petitioner who fails to request full discovery in his initial habeas petition may be denied relief because he failed to investigate his case earlier. *See, e.g.*, *Tucker v. Kemp*, 819 F.2d 978, 981 (11th Cir. 1987) (finding abuse of the writ and denying relief on eve of execution when capital petitioner failed to seek discovery during first habeas proceedings).

Allowing discovery will facilitate prompt resolution of this case.  "Because habeas corpus discovery is designed to aid courts in determining the validity of the petitioner's claims, it often can add—and may in fact be indispensable—to the reliability of habeas corpus proceedings in capital cases.  For this reason, liberal use of discovery is appropriate in such cases."  Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure 874 (5th ed. 2005).

The need for liberal discovery in capital cases is especially acute.  Capital cases require heightened reliability in the determination of both the defendant's guilt and sentence. *See Beck v. Alabama*, 447 U.S. 625, 637 (1980).  When an individual's life is at stake, the Supreme Court insists upon higher standards of reliability and fairness. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion) ("'[T]he penalty of death is

164

qualitatively different' from any other sentence.   We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.") (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).

In this case, Mr. Jones has presented colorable claims that both his trial counsel and postconviction counsel were ineffective. Therefore, because Mr. Jones has made the showing that there is "reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary [discovery] . . ." *Bracy*, 520 U.S. at 908-09. Mr. Jones will address his specific discovery requests in section D below.

### C.    Expansion of the Record.

### Exhibits 1 through 11, 14-16, 31, 32, 68, 69, 72

These Exhibits include the reports, interviews, CVs and declarations of medical and other forensic experts, who either testified at trial (Dr. Howard and Dr. Siefert) or who are providing evidence in these proceedings demonstrating that the evidence presented at Mr. Jones' trial was misleading, inaccurate and unreliable (Dr. Janice Ophoven, Dr. Mary Patricia McKay, Dr. Patrick Hannon, Mr. Joel Hardin, Mr. Stuart James, Mr. Paul Gruen and Dr. Phillip Esplin).

1

**Exhibits 12, 13, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 77, 82**

2

3

These Exhibits contain law enforcement interviews of witnesses who had

4

some first-hand knowledge relevant to the activities of Mr. Jones and Rachel on

5

May 1 and 2, 1994, as well as the appearance and condition of Rachel on those

6

dates, including interviews of Mr. Jones, Brandie Jones, Rebecca Lux, Stephanie

7

Fleming, Julian Duran, Dawn Kopp, Isobel Tofe, Judith Chavez and Angela Gray.

8

The video-taped law enforcement interview of Mr. Jones was previously submitted

9

to the Court and is located at Dist. Ct. Doc. No. 100, Exhibit 68.

10

11

**Exhibits 24, 28, 29, 64, 65, 66, 67 70, 80**

12

13

These Exhibits contain interviews of Ray Lopez, Norma Lopez and Laura

14

Lopez, as well as associated declarations and reports related to Ray and Laura

15

Lopez's alleged sighting of Mr. Jones beating Rachel as he entered the Choice

16

Market parking lot on May 1st. (Note expert reports from Dr. Esplin, Dr. Hannon

17

and Mr. Gruen [Exhibits 15, 69 & 72] already listed above, are also relevant to the

18

disputation of what the Lopez children claim they saw.)

19

20

**Exhibits 41, 42, 43, 44**

21

22

These Exhibits are principally relevant to the sentencing-phase

23

ineffectiveness claim, including the report of Dr. Joseph Geffen (who testified at

24

sentencing) and those of mental health experts who have evaluated Mr. Jones in

25

these proceedings; i.e., Dr. Alan Goldberg, Dr. Pamela Blake, and Dr. Lawson

26

27

28

Bernstein.   These exhibits are also relevant to the guilt phase, with respect to understanding Mr. Jones' psychological background and dysfunctional coping style, relevant to understanding his behavior on May 1 and 2, 1994.

### **Exhibits 46, 47, 49, 50, 51, 52, 53, 54, 56 57, 58, 59, 61, 63**

These Exhibits contain biographical records, mental health records, juvenile records, declarations and interviews; all of which contain relevant mitigation evidence or related relevant social history evidence relied upon by mental health experts who evaluated Mr. Jones.

### **Exhibits 33, 34, 35, 36, 37, 39 40**

These Exhibits contain declarations of trial counsel, Sean Bruner and Leslie Bowman, as well as the declarations of the short-lived trial team investigator, George Barnett, and include the trial team billing records.  These exhibits also include the billing records of PCR counsel James Hazel.  Other records showing that Mr. Hazel was unqualified for his appointment are in Dist. Ct. Doc. No. 96 at Exhibits 10 and 11. Included in these Exhibits at 37 is the Declaration of standard of care expert attorney Dan Cooper, who found the investigations of trial counsel and PCR counsel unreasonable and at variance with professional norms.

### **Exhibits 48, 62**

These Exhibits include the declaration of Donna Foster and a series of letters submitted in connection with the sentencing of co-defendant and Rachel's mother,

Angela Gray.   They provide evidence that Ms. Gray was physically and emotionally abusive and neglectful of her children, including Rachel.

### Exhibits 55, 60

These Exhibits contain a declaration (Exhibit 55) from Mr. Jones' daughter Brandie.   Brandie lived with Mr. Jones, Ms. Angela Gray and Gray's three children, Rachel, Jon and Rebecca.  Brandie provides relevant evidence concerning Rachel's exposure to adults and other children, including Ms. Gray's son Jon, who were known child molesters, or as in the case of Jon, who were known to act out with sexually inappropriate behavior.  Brandie also witnessed another child hitting Rachel in the stomach with a metal bar.  These Exhibits also contain a declaration of Elisha Lacy.  Elisha knew Mr. Jones very well from age 10 on and confirms he did not physically or emotionally abuse her or other children.  She describes Mr. Jones as a protector of children.  Elisha describes the inappropriate sexual acting out by various adults in trailer park where Mr. Jones lived.  She also describes Rachel's brother, Jon, this way: "One boy we were all afraid of was Rachel's brother Jon.  Jon was my age (14) at the time, but he was retarded or something.  Jon constantly chased the girls in the park.  He grabbed our breasts or bottoms or grabbed us in the crotch.  He was very rough.  And he went after the little girls as well as those of us who were a little older."

168

1

### **Exhibits 73, 74**

2

3

Exhibits 73 and 74 contain the declarations of Judith and Joseph Chavez

4

who were the managers of the Desert Vista Trailer Park where Mr. Jones lived.

5

Mrs. Chavez recounts her report to law enforcement after Rachel's death that

6

7

Rachel was too small to be seen in Mr. Jones' van.  Mr. Chavez recounts hearing

8

that another child in the trailer park had struck Rachel in the stomach with a metal

9

bar, and how that family moved away in a panic right after Rachel's death.

10

### **Exhibits 75, 76, 78, 79**

11

12

These Exhibits include a declaration (Exhibit 75) from Mr. Jones' niece,

13

Tara Jones.  Tara was eleven years old when Rachel died.  She witnessed Rachel's

14

15

mother abuse Rachel.  "Angela would spank her.  I saw Angela hit Rachel across

16

the face and back.  When Angela did this often she would cut Rachel because her

17

rings would turn around. I also remember Rebecca having a cut on her eye from

18

19

Angela smacking her."  Tara relates that one of Barry's neighbors was a suspected

20

child molester.  These Exhibits also include a declaration (Exhibit 76) from Wendy

21

Sloan.  She and her mother were friends of Mr. Jones from when Wendy was in

22

23

her mid-teens.  For a time, she lived in the same trailer park as Mr. Jones.  She

24

confirms Mr. Jones was not emotionally or physically abusive to children.  She

25

was also aware of child molesters in the trailer park, including a man named Glen

26

27

who had sexually assaulted his little sister.  Another neighbor, Ken was seen

28

169

sexually molesting a dog.  Wendy describes Rachel's brother Jon as sexually abusive, noting that Jon "constantly tried to feel us up or swipe his hand between our legs."  She says all the girls in the trailer park were very afraid of Jon. These Exhibits include a declaration (Exhibit 78) from Pauline Kinyon, an adult neighbor of Mr. Jones in the trailer park. Ms. Kinyon described that in the years she knew Mr. Jones, she never saw him abusive toward children; however, she described Rachel's mother Angela as abusive, noting that she witnessed Angela smack Rachel after Rachel said she was hungry.  On another occasion, Ms. Kinyon found Rachel's older brother Jon on a couch under a blanket with her five year old daughter and it appeared Jon was engaged in inappropriate sexual behavior.  Ms. Kinyon's daughter, Belinda Moyer, also provided a declaration (Exhibit 79).  She recalls Rachel's brother Jon touching her on her chest and legs when she was a very young child.  She also saw Angela smack Rachel in the face after Rachel said she was hungry. She also witnessed Rachel's bother Jon being physically abusive to Rachel; describing him pulling her hair, pushing her down to the ground and kicking her in the ribs so hard that Rachel could not breathe.

**Exhibit 38**

Exhibit 38 contains the nine page declaration of Andrew Sowards.  Mr. Sowards is an investigator with the Federal Public Defender's Office.  He has worked on Mr. Jones' case since 2008.  Mr. Sowards received a Master's Degree

170

in Criminal Justice from Boston University, he has specialized training and experience in forensic death investigation, blood stain pattern analysis, crime scene reconstruction and investigation and many other areas.  In his declaration, Mr. Sowards provides some of the results of his investigation, including interpretation of hospital and autopsy photos of Rachel; analysis of the causes of some of Rachel's bruising and other injuries, including bruising to her forehead that likely occurred when Rachel fell in the trailer hallway at or near the time of her death; the results of his investigation of the blood evidence in Mr. Jones' case; and his discovery of the existence of United States Border Medical Technicians, whose uniforms fit Mr. Jones' description of the kind worn by the EMT who looked at Rachel at the Quick Mart on May 1, 1994.

**Exhibit 30**

Exhibit 30 contains the Declaration of Rachel's mother, Angela Gray. Ms. Gray describes (1) the extent of bruising and injuries she noticed on Rachel in the hours before her death versus the bruises and injuries seen on the autopsy and hospital photos, which she had not seen the night before; (2) the efforts to revive Rachel, after she was discovered on the morning of May 2nd; (3) Mr. Jones never physically struck her, or her children, or his own children; (4) Mr. Jones never tried to dissuade her from taking Rachel to the hospital the night before her death or on the morning Rachel was discovered unconscious; (5) she is certain that Rachel

would have told her if Mr. Jones had sexually assaulted her or struck her, but no such disclosure was made; (6) the night of May 1st Rachel said some boys had hit her in the stomach; (7) Rachel referred to Mr. Jones as her best buddy, Rachel and Mr. Jones were very close, and Rachel loved him; noting that Rachel wanted to lie next to Mr. Jones in their bed the night she died; (vii) she believed Mr. Jones when he said an EMT had looked at Rachel because "[h]e had said things to me that the EMT had told him; I didn't think Barry would have known enough about medical issues to make up what he said."  Ms. Gray also describes that "[s]ometime prior to Rachel's death, maybe within a week of her death, my daughter Becky [Rebecca] had placed Rachel atop a clothes line in the yard of the trailer.  I understood that Rachel was seated or on the top of the octagon shaped metal bars that held the line and not hanging from the line.  Rachel fell from her position atop the clothes line because, according to Becky, she was moving around too much. I have reviewed the attached picture of the clothes line which is the one she fell from."  Ms. Gray does not believe Mr. Jones sexually assaulted or beat Rachel.

### **Other Documents**

The transcripts from Angela Gray's trial are already contained in Dist. Ct. Doc. No. 96, Exhibit 9

**D.    Depositions and Discovery.**

As explained above, under Habeas Rule 6, when there is "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. at 908-09; *Sivak v. Hardison*, 658 F.3d 898, 927 (9th Cir. 2011) (there is good cause for discovery under Habeas Rule 6 where allegations show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief).  "Petitioner need not show that the additional discovery would definitely lead to relief.  Rather, he need only show good cause that the evidence sought would lead to relevant evidence regarding his petition." *Payne*, 89 F. Supp. 2d at 970; *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir.1997) (holding that "discovery is available to habeas petitioners at the discretion of the district court judge for good cause shown, regardless of whether there is to be an evidentiary hearing").

Discovery in habeas cases, like all discovery in civil cases, may be used to bolster petitioner's claims. *Payne v. Bell*, at 89 F. Supp. 2d 970 (recognizing that habeas petitioner should not be hindered from using discovery to "bolster claims in his petition, to justify relief without a hearing, or to explain why certain defaulted claims should nevertheless be heard on the merits").

173

Presently Mr. Jones' allegations posed against trial and PCR counsel are colorable and he has shown good cause for discovery; i.e., there is reason to believe that "if the facts are fully developed" he may be able to show he is entitled to relief. *Bracy,* 520 U.S. at 908-909.

### 1. Depositions of Prior Counsel.

Mr. Jones submits that there is good cause for discovery in the form of depositions of trial counsel and PCR counsel. More pointed questions to counsel should elicit evidence to bolster the claims in the petition, which allege, that based upon the information counsel had before them, that the failure to conduct any outside investigation to test or challenge the prosecution's theory of the case was objectively unreasonable, resulting in deficient performance under *Strickland*. What is more, PCR counsel James Hazel, has outright refused to communicate with Mr. Jones' current counsel and he should be compelled to provide information respecting his representation.

### 2. Deposition of Dr. John Howard and Production of Documents.

Among other things, there is evidence that Dr. Howard concealed relevant evidence from Mr. Jones' jury and misrepresented his own autopsy findings. (*See* Section II(C)(D)). It suffices to say that there is good cause for deposing Dr. Howard and that evidence likely to be derived from that questioning will bolster Mr. Jones' claims. Part of Mr. Jones' burden (to prove *Strickland* prejudice)

includes subjecting Dr. Howard to the sort of crucible of cross-examination that comes only after the defense has conducted a robust defense investigation. Deposition of Dr. Howard will further demonstrate the severe weaknesses in the prosecution's case and help Mr. Jones prove that if trial counsel had investigated, he would have had a reasonable probability for a different outcome. There is also good cause for a subpoena to issue to Dr. Howard requiring him to produce any and all documents related to Rachel's death, the autopsy, or any of his activities related to his post-trial or pre-trial participation in this case.

### 3. Depositions of Sgt. Sonya Pesquiera, Detective Bruce Clark and now imprisoned, former Detective George Ruelas.

There is good cause for requiring the deposition of Sgt. Sonya Pesquiera, the lead investigating law enforcement officer in Mr. Jones' case. The law enforcement case record shows that Mr. Jones was considered the only suspect from near the moment of Rachel's death, before the cause of her death was even known. Major deficiencies in the law enforcement investigation contributed to Mr. Jones' wrongful conviction. These issues should have been explored by prior counsel, but they conducted no investigation, and therefore they were unable to effectively cross-examine Sgt. Pesquiera at trial. Part of Mr. Jones' burden (to prove *Strickland* prejudice) includes subjecting Sgt. Pesquiera to the crucible of cross-examination that comes only after the defense has conducted a robust defense investigation. Deposition of Sgt. Pesquiera will further demonstrate the

weaknesses in the prosecution's case and help Mr. Jones prove that if trial counsel had investigated, he would have had a reasonable probability for a different outcome.  Sgt. Pesquiera should also be questioned about the absence of reports of interviews of the employees of the Choice Market. (See Section II (E)).   The absence of reports of these interviews, whether they have been concealed, or whether the interviews were not done in the first instance, is relevant to the showing the weaknesses and flaws in the prosecution's case, and the demonstration that there would have been a reasonable probability for a different outcome, had counsel investigated these matters in the first instance.

For similar reasons, the Court should order the depositions of Detective Bruce Clark and former Detective George Ruleas. Detective Clark supervised the subject flawed homicide investigation.  Former Detective George Ruelas (now serving a lengthy prison sentence for stealing drugs from police property) conducted interviews, including, on information and belief, interviews of the employees of the Choice Market; who we allege on information and belief, saw Rachel in the store on May 1st unharmed; contradicting the prosecution claim that Rachel was beaten and raped during the trip to the Market.  Both Detective Ruelas and the supervising officer Clark should be questioned about the missing interview records. The absence of reports of these interviews, whether they have been concealed, or whether the interviews were not done in the first instance is relevant

to the showing the weaknesses and flaws in the prosecution's case; which Jones will show as part of his demonstration that there would have been a reasonable probability for a different outcome, had counsel investigated these matters in the first instance.

### 4.    Documents of the Pima County Medical Examiner's Office.

Given the flaws in the forensic evaluation of Dr. Howard, there is good cause for authorization of a subpoena requiring production of any and all records maintained by the Pima County Medical Examiner's Office should be produced.

### 5.    The complete files of the Pima County Attorney, Pima County Sheriff's Department.

Given the evidence showing that Mr. Jones' was wrongfully convicted, he should not be put to his proof at a hearing without being certain that all material evidence has been disclosed. There is good cause for production of all Sheriff's Department and County Attorney files and records.

### E.    Evidentiary Hearing.

As explained above, Mr. Jones has presented colorable allegations that his trial counsel and PCR counsel performed deficiently, which prejudiced the outcome of the sentencing and PCR proceedings. The colorable allegations are supported by the Exhibits submitted with this Motion. Under these circumstances, Mr. Jones has earned the right to a hearing. *Earp v. Ornoski*, 431 F.3d at 1170 (an evidentiary hearing is required to allow a petitioner to prove his claim, "if the

[petitioner has presented a colorable claim by] alleg[ing] facts, that if proven, would entitle him to habeas relief"); *Detrich*, 740 F.3d at 1246-47 (the district court should hold an evidentiary hearing where appropriate to determine whether there was cause under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been trial-counsel ineffective assistance of counsel); *Dickens*, 740 F.3d at 1221-22 (in the context of *Martinez*, an evidentiary hearing is a proper vehicle for determining whether PCR counsel and trial counsel were ineffective).   At his hearing, Mr. Jones will call witnesses from among those identified in the reports, declarations and interviews listed in Section C above, as well as additional witnesses that may be needed, to be disclosed on a schedule established by the Court.

## VI.    Conclusion.

For all the reasons set forth above, Mr. Jones requests that the Court find he has presented colorable allegations that his trial counsel performed deficiently during the guilt and sentencing phases of his capital proceedings, prejudicing the outcome of those proceedings.   Further, Mr. Jones requests the Court find that he has presented colorable allegations that his PCR counsel performed deficiently, prejudicing the outcome of those proceedings.   The Court should find that Mr. Jones has made a colorable showing of "cause" to excuse procedural default, sufficient to mandate a hearing.   It is further requested that the Court grant the

discovery and depositions sought above; that the Court permit the supplementation of the record with the Exhibits and records identified herein above, and that the Court grant Mr. Jones an evidentiary hearing so that he can prove cause and prejudice and his right to relief on the ultimate merits of his claims.

RESPECTFULLY SUBMITTED this 6th day of February, 2015.

JON M. SANDS
Federal Public Defender
Cary Sandman
Sarah Stone
Assistant Federal Public Defenders

/s/*Cary Sandman*
Cary Sandman
Counsel for Petitioner, Barry Jones

1

**CERTIFICATE OF SERVICE**

2

3

         I hereby certify that on this 6th day of February, 2015, I electronically

4

transmitted the attached document to the Clerk's office using the CM/ECF System

5

for filing and transmittal of a Notice of Electronic Filing to the following

6

registrant(s):

7

8

Lacey Stover Gard
Assistants Attorney General

9

Office of the Attorney General
Capital Litigation Section

10

200 W. Congress, Ste. S-315

11

Tucson, Arizona  85701

12

Jeffrey Sparks

13

Assistant Attorney General
Office of the Attorney General

14

Capital Litigaiton Section

15

1275 W. Washington
Phoenix, Arizona  85007

16

17

By: /s/ Tamelyn McNeill

18

19

20

21

22

23

24

25

26

27

28