# Exhibit 11

DATE:   NOVEMBER 28, 1994
DF:   DAVID FRUCHTMAN
LB:   LESLIE BOWMAN
BH:   BARB HARVELLE
JH:   DOCTOR JOHN HOWARD

DF:   Let's start.  Okay.  The date today is November 28th.  This interview is taking place at the office of the Medical Examiner, in Tucson, Arizona.  Present are myself, Dave Fruchtman -- and if everyone would announce their presence.

LB:   Leslie Bowman, for Barry Jones.

BH:   Barb Harvelle for the County Prosecutor.

DF:   And if you would state your full name, and spell the last name for the transcriptionist.

JH:   It's John Dale Howard. H-O-W-A-R-D.  I'm presently staffed as a Medical Examiner for Pima County.

DF:   Okay.  If you could go very briefly into your back ground, with respect to forensic pathology?

JH:   I have uh, a medical degree from University of Washington.  I internshipped in general surgery, emergency, coronary, and uh, environmental pathology -- and anatomic pathology, also with the University of Washington.  And did uh, forensic pathology, fellowship training with the King County Medical Examiner Office in Seattle.  All by the second year of fellowship training, with the state of Washington.  Uh, I was the, the Surgeon Medical Examiner for Pierce County, of Tacoma, Washington, prior to coming to Tucson in 1991.

DF:   Okay.  Now, uh, looking at an autopsy report of Rachel Gray, this is a -- let me get this.  What I have is an eleven page report, and added on the end, I have a University Medical Center Intoxiocology report, that is three pages.  Would that comply as your entire report in this case?

JH:   Yes.

DF:   Okay.  Have you had an opportunity to look it over?

JH:   Yes.

DF:   Okay.  Now, on your external examination, did you see any signs of uh, mistreatment, or mal -- I, I should say uh, uh, any signs of retarded growth, and development?

- 1 -

1 JH: Retarded growth and development -- nothing that I would say specifically right now.

2 DF: Okay. Nothing towards the area of malnutrition or neglect?

3  JH: No, I wouldn't say that. I wouldn't say anything that would be specifically to uh,
4      malnourishment, uh, neglect is more difficult to -- it depends on what you mean by
5      neglect.

6  DF: Okay. This child was being fed and cared for -- other than, other than the, the
7      external, and internal uh, injuries that you note later on -- this child was being cared
8      for, it, it appeared to have uh, uh been fed properly -- things like this?

9  JH: Don't see anything to go against that.

10 DF: Okay. Anything unusual in your external examination that isn't fully described in the
11     external evidence of injuries?

12 JH: No.

13 DF: Okay. That's getting on, getting on to the external, evidence of injuries. Now some
14     of these would be located in your, in your photographs?

15 JH: Uh, the photographs would explain the injuries, yes.

16 DF: Okay. If we could take a look at the pictures, so that we could uh, correspond with
17     each one of these -- the external evidence of injury points, here. Uh, can you put
18     the.....

19 JH: We can try. As I said, the slides are not in any, in any particular order. There are
20     the external, and internal.

21 DF: They all narrow down to external -- internal?

22 JH: Yes.

23 DF: Okay. Great.

24 JH: I brought the external findings first.

25 DF: We, we're looking at a photograph of uh, the child on the examining table.

26 JH: Uh-huh.

2     DF:    A lot of the uh, the dark -- the posterior darkness -- I assume, is post-mortem lividity?

3     JH:    Yes, on the poster part of her body. See this part here, most of it is dark
4             purple_____.

5     DF:    Okay.

6     JH:    All of her injuries are black_____(Dr. Howard is talking somewhere in
7             the background. Cannot make out what he's saying.)

8     DF:    Okay. I'm going to need you.....

9     JH:    .....scrapes, bruises, and.....

10    DF:    We're going to need you to speak up a little bit, because this tape recorder with the,
11           the fan going, and such, it's going to be tough to hear. Uh, now the injuries that are
12           on the, on the, on the front of the body, you would characterize these as bruises, or
13           would these be postmortem artifact?

14    JH:    She has bruises and abrasions.

      DF:    Okay. None of these, none of these you feel as any kind of postmortem artifact?

16    JH:    That's correct.

17    DF:    Okay. Uh, let's go to the next line, I guess. Okay. I'm looking at what I -- appears
18           to be the right knee?

19    JH:    Uh, the right thigh, knee, leg and ankle, and foot.

20    DF:    Okay. And, I'm trying to correspond it with one of the external evidence of injury
21           points.

22    JH:    Let's see. On page uh, 7, of the autopsy report.....13 and 14....13, 14, and 15 all
23           describe the uh, lower extremities injuries.

24    DF:    13 and.....

25    JH:    13 and 14.



DF:  Fourteen? An irregular dried abrasion -- faint light to dark purple, and faint green contusions are present on the anterior, proximal left thigh -- the lateral distal, right thigh.  The interior right knee, the lateral mid to distal, right leg regions.  I -- from the uh, the color of the abrasions, the, the  light to dark purple, and the faint green contusions -- are you able to approximate when these uh, when these took place?

JH:  Well, it's only on approximation -- somewhere, it would be very recent -- one or two days before death.  The ones that are green uh, indicate several days before death, at least.  Uh, variant ages  of injuries.

DF:  Okay.  Now you, you're estimating a couple of days, to several days before death, based on the color?

JH:  Uh, some purple can be the same day as death uh, to uh, four or five days prior to that.

DF:  Was there any iron -- did you do any iron staining on these?

JH:  I, microscopic sections were representative of uh -- most layers of the body were taken, and iron staining were included in this.

DF:  Okay.  And where would the uh, the iron staining results be in this?

JH:  Uh, they're not listed.

DF:  Okay.  Do you have those results somewhere?

JH:  Not in my department.  I have the slides from the_____.

DF:  Okay.  Would you be able to take uh, the results of your iron staining studies, and tell me whether these -- you know -- how old these particular injuries are?  Whether they're 72 hours, or more, old?

JH:  As I recall, looking through uh, the slides, they were uh, some staining in, in one area of the scalp, which would suggest 72 hours and older.  Uh, all the other ones had stains.

DF:  Okay.  So there were some stains taken from this, and it would have indicated that there were less than 72 hours?

JH:  In most cases uh, with significant hemorrhage, 72 hours is  lost on the_____.  So it would suggest_____at least, prior uh, to perhaps three days or less.

- 4 -

1   DF:   Okay.  I assume that, that bruise, about three inches above what appears to be a
2           hospital band on the ankle, is what you're referring to when you say "a partially
3           curved band of superficial abrasion...... and faint contusion?

4   JH:   Right here?

5   DF:   Yes.

6   JH:   Yes.

7   DF:   Are you able to draw any conclusions as to what would have caused that?

8   JH:   No, they're all blunt injuries, nothing that would allow me to identify any particular
9           object used.

10   DF:   Now these are pretty common types of injuries to children, aren't they?

11   JH:   Bruises and scrapes are common on kids,  especially on the knee or leg area.

12   DF:   Okay.  And, and this is not something that can be identified necesarlly as abuse.  Is
13           that correct?

     JH:   Not by itself, no.

15   DF:   Okay.  Is it -- are we looking at anything else that would have been described, in one
16           of the points here, or have we just completed point 13?

17   JH:   Let's see.  Probably_____was uh, 14 and 15 described uh, left side ones, which is
18           better visualized in one of the photos.

19   DF:   Okay.  Let's take a look at the next photo.

20   JH:   An overview of the body as viewed from  the right side.

21   DF:   Now, the scrape that I'm saying on the uh, posterior, right thigh -- or, I guess that's
22           the left thigh,  is it not?  The discoloration that I'm seeing.

23   JH:   Here?

24   DF:   No....right there.

25   JH:   That's the right thigh.

26   BH:   That's the right thigh.

DF:   That's the right thigh.  Uh, is that an abrasion?  Or is that some kind of a.....

2  JH:   It's  primarily bruising.  It's on the surface of breaking_____.

3  DF:   Okay.  I assume there's another photo that will go a little more into detail on that?

4  JH:   Let's see.   One of two photos here._____on this side.

5  DF:   Okay.  Now, the discoloration of the uh, of the forehead, would that uh, be uh,
6        lividity?

7  JH:   Uh, no, it's bruises.

8  DF:   Now, is this, is this photo showing us anything -- is this photo -- I should say, is there
9        anything that's described in the external evidence of injury, that isn't further covered
10       in another photo -- that's more specific?

11 JH:   Uh, not that I'm aware of.  Uh_____ and then, I believe we have  other
12       photographs that show different parts of the body as well.

13 DF:   Okay.  Then this is just another over-all shot?

   JH:   Correct.

15 DF:   Okay.

16 JH:   Those are lower extremities, with the tape measure in place.  It's relatively_____.

17 DF:   Okay.

18 JH:   Frontal view.

19 DF:   Now some of the bruising on the chest, is there any way that you can exclude that
20       uh, uh, as being the result of medical intervention?

21 JH:   You can absolutely exclude uh, the typical findings of bruising_____but, the
22       only things represented _____over here from CPR --typically related to it, but uh....

23 DF:   So, CPR was preformed, to your knowledge?

24 JH:   Uh, as far as I know, yes.

25 DF:   Okay.



1   JH:  She was in the hospital, so she must of received some medical attention.

2   DF:  Did you have the opportunity to look at the hospital records?

3   JH:  Uh_____

4   DF:  Okay. You had the opportunity.....

5   JH:  .....to see exactly what, what we've got. Just uh, basically _____ I just have
6       this for when she was pronounced dead. A description of that.

7   DF:  I assume right now we are looking at uh, probably, point number 12?

8   JH:  Yeah, under external evidence number 12, I have a paragraph describing in fact,
9       multiple injuries of visible type to the chest area.

10  DF:  Okay. And all of these are blunt force, uh, bruises, and contusions?

11  JH:  Yes.

12  DF:  Now, once again. Did you do the iron staining on any of these?

     JH:  Uh, sections were taken from the uh_____areas, and _____.

14  DF:  Okay. Now, are, are these in of themselves, any type of a fatal injury?

15  JH:  No. Bruising, uh, multiple bruises add to bleeding. People can die just from soft
16      tissue injuries, and she had plenty of them. It's a contributing factor, but it's not
17      expected to kill_____

18  DF:  Okay. Now, if, if this child had clothes on, would there be any uh, behavioral
19      abnormalities brought on by these -- this type of bruising?

20  JH:  What do you mean by_____

21  DF:  Would somebody seeing this child clothed, notice any kind of a difference, if they
22      didn't see these bruises in uh, the child's behavior -- in the child's reactions?

23  JH:  It could, it would probably be tender if she was touched, or bumped into something,
24      uh, it would be painful.

25  DF:  Any idea of the mechanism of injury here?



JH: _____some kind of blunt, blunt object, blunt surface.  Impact was extreamly suspicious_____blood vessel.

DF: Now, are any of these of the nature uh so specific, that if you were presented with an object that possibly caused these injuries, you would be able to match it up?

JH: I could uh, say whether it was consistent enough, to, to formulate a specific match uh, difficult -- there are some circular areas that appear, it could -- it has a rather specific shape to it, with a circular configuration that others _____as well.

DF: Now....

JH: The, the -- I could not match any particular object to these injuries with 100% _____.  You can include them, or exclude them in this, the inconsistency, or consistency, because of the_____.

DF: Now, the circular injury that you pointed out, that's not consistent with a bite mark?

JH: I don't think so, it's, it's a full circle rather than two semi-circular, and there aren't any of the individual uh, patterns to suggest to_____possible, but it's not like any bite mark I've seen.

DF: Was the body ever examined with an alternative light source, or with reflected ultra violet photography?

JH: No.

DF: Let's go on to the next one.

JH: Yes.  (Unintelligible)

DF: Okay.

JH: We're looking at the left side.

DF: Okay.

BH: That's the_____

DF: I assume we're looking at number 14, and 15 at this point?

JH: 14 and 15 are what we -- what's described. Here's the left eye, left ear, it pictures the other parts of the body as well.

- 8 -

1    DF:   Okay.

2    JH:   The left eye here, and ear and....

3    DF:   Now, the irregular abrasion, uh, which you described, "present on the lateral,
4          proximal to left thigh, to mid-left thigh region." This should be this particular dark
5          abrasion.......right there?  Okay.  Any idea, the cause or the age of this?

6    JH:   It's fairly recent, uh, it probably changes_____the shape of it would suggest
7          what caused it.

8    DF:   Okay. And there's -- this wouldn't uh, there was no underline break to this?

9    JH:   No.

10   DF:   No underline damage to, to movement.....other than.....

11   JH:   _____of deep injuries.

12   DF:   Okay.  Now the knees, once again.  Uh, same thing, is it a rather recent injury?

13   JH:   Yes.

14   DF:   Now do you know whether these were stained?

15   JH:   Uh, lets see, representative samples _____they are not matched to their exact
16         forms.

17   DF:   Okay.

18   JH:   (Unintelligible)

19   DF:   Now, injuries like this, is it correct to say that they are not specific to child abuse?

20   JH:   That's right. _____blunt injuries uh, accidental or not accidental.

21   DF:   Now, even the bruising to the knee, this would not cause uh, a problem in the knee
22         functioning, and in, in movement?  Is that correct, or....?

23   JH:   The joint is intact. It could be painful. Bruises uh, it's likely to be sore, but she could
24         still move it.

25   DF:   The patella wasn't fractured?

- 9 -

JH: No.

DF: Okay. Okay.

JH: Thanks. That's another upper body view, left side.

DF: Okay.

JH: (Unintelligible)

DF: Still wrapped in the sheet.

JH: _____ that's the left hand.

DF: The left hand? Which one? Which, point wherever you're looking at.

JH: Let's see. _____ paragraph 10_____ multiple injures to the left arm._____ .

DF: Now, once again, any idea of the age of this?

JH: Uh, color changes, probably would take, one, two, probably approximately, three days old.

DF: Okay. And uh, are you able to rule out medical intervention in this particular uh -- some kind of medical restraint, or some kind of a manual restraint?

JH: That would be extreamly uh, unlikely _____ .

DF: Okay. In it of it's self, certainly not life threating?

JH: No.

DF: And not something that's absolutely consistent with child abuse? Is that correct?

JH: Well, it's consistent_____ .

DF: Okay. Let's go on.

JH: Shows the upper left chest area.

DF: Okay. I'm looking for which point we're looking at now.

JH: That would be back in number 12.

- 10 -

DF:  Now, when you did the iron staining in the representative samples, were representative samples taken by region of the body?

JH:  Yes.  Chest, the abdominal region, extremities.

DF:  And they were analyzed independently by region of the body?

JH:  Yes.

DF:  Okay.  And did you get uh, specific results to different regions, or did you get the same result throughout the body?

JH:  I sent one area -- one, I took many pieces of scalp tissue_____and the others didn't, so, there was one injury that suggested that was 72 hours or older, and the others, less than that.

DF:  Okay.

JH:  (Unintelligible)

DF:  Now, I'm seeing a number of different bruises here, uh, is it possible this all this occurred at one time, or  is it uh, or is it definetly uh, repeated blunt injury?

JH:  Well, I described it as purple to green.  It' a fairly different injuries, some older than others.  So there had to be more than one period of time that she received these injuries -- sustained those injuries.

DF:  Now could the difference in color also account, uh, be accounted for as a different in pressure of severity of the abrasion, as opposed to differences in the time they were received?

JH:  No, uh, you know, with bruises, you have to break a blood vessel, so it would have to be a  bruise to do that.  Certainly, if it's a very large bruise, it would take longer for the entire bruise to change colors, than a small bruise_____But these changes suggest_____that it was more than one day.

DF:  But not different by more than 48, or 72 hours?

JH:  Probably not.

DF:  Was there any kind of uh, any kind of a  histal (ph) pathologic study of the bruises to determine  their exact age, or their.....?

JH: There is no such test. The iron staining, the inflammatory cells_____what we use, there is no way. It's not scientifically possible to determine_____.The iron staining usually shows up about 72 hours and older, less than the _____We have to check red cells up to, usually  about 24, 48 hours.......about every 24, 48 hours there are white cells. So all of these followed in that one very recent -- same day as death. Uh, 24 hours, up to 72 hours according to.....

DF: Do you still have sample -- tissue samples from the bruises?

JH: It's safe to say we still have the slides from all of these.

DF: Okay.

JH: I'm going to the next one.

DF: Uh-huh.

JH: It's showing the uh, chest and abdomen, on the right side.

DF: Okay.  I'm looking for where this is noted in the report.

JH: It's under number 12.

DF: Now,  the sharpness of these contusions -- this is not a healing laceration, is it?

JH: No.  Bruises and scraps.

DF: Now, is it, is it all direct blunt force, or is there some abrasion here?

JH: There are bruises and, and abrasions.  What do you mean by "direct blunt force?"

DF: What I'm asking.....

JH: Every place that -- every bruise and every abrasion means there is a -- at least in that area_____.

DF: What I'm asking, I guess, is whether the impact is direct, or whether there is a, a friction type uh, injury here?

JH: You mean 90 degrees verses, some angle?

DF: Yes.



JH:   I have no way to say to make certain. There wasn't any piling up of skin that would suggest uh, what reaction, what fall. But, it could be 90 degrees perpendicular to the skin, or at some angle, and still look the same.

DF:   Sir, that I don't have to keep asking the same question, is it fair to say that the external areas that we're looking at right now, that none of these are in themselves life threatening?

JH:   That's correct.

DF:   Okay. Is it also fair to say that uh, the external evidence of injury that we're looking at, none of this is in of itself, uh, disabling -- physical disabling?

JH:   It's painful, uh, but no, she would still be able to move around.

DF:   Okay.

JH:   (Unintelligible)

DF:   The abrasions under the eyes?

JH:   I _____ discoloration, accumulation of blood, uh......

DF:   This uh.....

JH:   .....dark circles under the eyes.

DF:   Is this what's called uh -- I'm trying to remember the exact term.

JH:   Rectronize (ph)

DF:   Exactly.

JH:   Uh, no, this really wouldn't be a classic rectronize. It's more _____ there's a lot of bruising up here on the forehead. Here, more of uh, settling of blood in those areas -- kind of sunken eyes, uh, not indicative of a basic skull fracture, which she did not have, and uh, not necessarily a direct blow to the eyes.

DF:   Okay. so you don't feel that this was a result of a direct trauma?

JH:   No. The, the forehead uh, is bruised_____

DF:   Okay. Any idea the age of this accumulation of blood?

- 13 -

JH:   Uh, same thing_____

DF:   Was there underline uh, accumulation of blood, or was this all in, in the cells?

JH:   Well, it's accumulated in the soft tissue. There's no bony_____.

DF:   Okay.

JH:   This is a side view of the face.

DF:   I'm just trying to find the point of which we're looking at? I guess we're looking at number nine?

JH:   Yeah. Number nine describes uh, the forehead, uh, eyelid regions, uh, that was everything.

DF:   Now the forehead, this looks like a rather diverse uh.....

JH:   It's a diffused contusion.

DF:   Yes, uh, and you feel that that's the result of some kind of an impact?

JH:   Yes.

DF:   Okay. That, that could not be uh, some kind of an inner, inner cranial pressure?

JH:   No.

DF:   Do you know how the child was transported to the hospital?

JH:   No, but I believe her mother got her there. I don't exactly know.

DF:   Do you know if there was anything used to uh, restrain the child's head and uh, cervical spine, uh, precautions?

JH:   I don't know that for sure.

DF:   Was anything noted about mass trausers (ph) in the uh, emergency room notes?

JH:   Mass trausers (ph) MOA which we noted in arrival, is uh, POV (ph) in a personal vehicle. She was closer to DOA , or dead on arrival, so.... there's nothing about mass trausers (ph) being used.

DF:   Okay. Do they also mention -- do they mention CPR?

- 14 -



JH: Uh, I think they did rectal temperature, it said, "the patient was cool, rigor mortis evident, positive lividity -- pupil not reactive, exponeneous respiration, or cardiac _____. So, it doesn't, it doesn't indicate any uh _____ Just those observations, I don't see any _____.They worked on her though. They just pronounced her dead.

DF: They didn't uh, run fluids?

JH: I don't recall. Let's see here. I didn't see any indication of that. They don't seem to mention any attempt to start an I.V. I don't see anything in the record at all.

DF: There's no uh, external evidence in medical intervention.....that you know?

JH: Uh, possible identification that they have_____.

DF: Okay.

JH: Go on?

DF: Yes.

JH: View of the legs, top and uh, left side.

DF: Okay.

JH: View of the chest and abdominal area.

DF: No, uh, no broken ribs?

JH: (Unintelligible)

DF: Did they give you a stamp (ph) series, or did you do a stamp series?

JH: We did_____

DF: Anything significant on that?

JH: Negative.

DF: Okay.

JH: (Unintelligible)

DF: Now, this uh, this bruising on the forehead, goes all the way across the forehead, and all the way down and around the ears -- from what I saw on the last side view.

- 15 -

JH:   Yes, most prominent on the central forehead, extending it into uh, the left forehead.

DF:   How big of an area of impact do you think it would have caused to uh -- would have taken to cause that?

JH:   Well, bruises can get larger if a person scurvies.  It certainly -- some kind of force all across the forehead_____.

DF:   This, would this also be indicative of some kind of a, something around the head that was compressing the head -- and not necessarily striking it in a traumatic way?

JH:   That's possible, uh, although it's unusual to get that kind of contusion_____on or around the_____blood vessels, it would be possible.

DF:   Can you draw any conclusions that you feel are, are the likely cause of this kind of defuse bruising?

JH:   No.

DF:   Okay.  Have you ever seen any bruising like this before?

JH:   Sure.  _____

DF:   Anything, as I was saying, anything that is that defused all the way down to the ears?

JH:   Yes.

DF:   What was the cause......the last time you saw that -- did, did you ever find out?

JH:   I see it in assaults, uh,_____from high falls_____

DF:   Okay.

JH:   This is the uh, this is the view of the left side of the head, and on the chest. This is the right hand.

DF:   Anything significant here?

JH:   This photograph shows uh _____the fingers that you can view_____.

DF:   The slightly darker color coloration around the uh, tips of the fingers, and the nail beds, would that be indicative of anything?

JH:   That's_____

- 16 -

DF: Okay.

JH: _____ Palm of the left hand.

DF: Okay.

JH: This is the fingers and back of the left hand with straight arms.

DF: Now, would you say that the uh, discoloration around the middle knuckle there, would be again, lividity?

JH: Yes, this is a bruise. The fingertips are lividity. This is a bruise here.

DF: Okay. On just that one finger?

JH: That's all you can see_____ This is a straight up of the face. This is a view of the back.

DF: Now, is it possible to see the bruises uh, even though the, the lividity is present?

JH: You can, yeah. Uh, she had scrapes. You can see the injuries on the buttock areas. Most of this purple is uh, lividity -- but there are areas of injury that you can see in addition to that. This area, is blank pressure.

DF: Now, the areas that you're pointing out, this are rather small areas of, of contusions?

JH: Contusions and abrasions, yes.

DF: Okay. I'm seeing one that the uh, bottom of the uh, well, I don't know what -- what would you call this? The bottom of the scapular (ph)?

JH: There's a -- I think it's called postal-lateral (ph)_____chest area. Here, and around the buttocks.

DF: Any idea what the mechanism of injury this type of thing would be?

JH: All blunt forces_____. No particular shape_____.

DF: Now these type of uh, small bruises are not uncommon in children?.......The back?

JH: That's correct.

DF: And uh, they're not specific to child abuse?

JH:    On individual bases, no.  I think what's present here it's different from the usual child sustained visual injuries, depending how many she has.  So if you take any one injury uh, any of these particularly smaller injuries and abrasions, and include it all in normal activates, she just has many bruises, many scrapes and_____.So all there is on that, is that she had many accidental injuries of the scenario that would explain that many injuries, or that many_____.

DF:    Okay.

JH:    Uh this is a view of that one area of her chest.

DF:    Okay.

JH:    (Unintelligible)

DF:    Now, would the small nature of these uh, contusions, indicate some kind of a pointed object?

JH:    Uh, it could be.  There was anything -- not, not a sharp point that punctures or....small round type of_____relatively small surface would_____.Another view of the_____.  Straight down on her back.

DF:    Okay.

JH:    View of the buttocks_____That's the face.

DF:    Now the small uh -- I don't know what you'd call -- punctate (ph) type mark just below the ear?

JH:    Right here?

DF:    Yes.

JH:    The area of the abrasion.

DF:    Now, would that be something that you would see with a pointed object?

JH:    Well, it's a -- with a pointed,  a sharp point, no._____but not a sharp point.

DF:    Okay.

JH:    This shows a circular injury throughout the left chest area, with uh_____.

DF:    This is what you would be characterizing in point number one, right ?

- 18 -



2    JH:   No. This is the upper left chest. What you have described, is upper and interior left chest in the outside_____.

3    DF:   Okay.

4    JH:   This area right here.

5    DF:   Okay.

6    JH:   Just another view of the same area.   This is a scalp injury.

7    DF:   This is a scalp laceration?

8    JH:   Just some other views that show that area.

9    DF:   This is the one behind the left ear?

10   JH:   Left posterior ,yes.

11   DF:   What you describe in number 7?

12   JH:   Yes, number 7.

13   DF:   Are you able to say how old this particular injury is?

14   JH:   Probably two days old_____older than that.

15   DF:   Okay. And what two days is based on just a visual examination of this?

16   JH:   Yes, this was also included in uh, the sample of  the scalp, for microscopic.

17   DF:   Okay. So this was iron stained?

18   JH:   Yes.

19   DF:   Any idea of the uh  -- what it would cause something like this?

20   JH:   It's a one impact. It's uh, sufficient_____tear of the skin. It's all the way down
21         to the outer surface of the_____. It's about an inch long.

22   DF:   This is the full thickness sutured laceration?

23   JH:   This would require sutures, right._____.

DF:   Now there is no underline brain injury as a result of this?

JH:   No.

DF:   Okay.  Now, would this have caused -- would this un-necessarily cause a behavioral abnormality.......other than the pain associated with it?

JH:   Pain for one, bleeding, but other that that -- it's hard to say.  You can have concussions uh, a person could be dazed after a head  injury -- that could be treatable, the contusions of the face and scalp area and the laceration.  But there's nothing, you know, specific damage to the brain_____.

DF:   Now, when you say that a person could be dazed after an injury such as this, that's a possibility, but not an absolute?   Is that correct?

JH:   That's correct.

DF:   And I assume that the bleeding would uh, clog normally on it's own?

JH:   At least it would bleed quite profusely, uh, and it would probably bleed for several minutes before it would clog, so.

DF:   Okay.

JH:   This is the right side of the abdomen.  This_____.

DF:   These are the linear (ph) abrasions that, or, contusions that you're describing?

JH:   Yes, the right side of the abdomen.

DF:   Okay.

JH:   This is another view of the hand -- the face.  _____this is all bloody back here.  The eyelids, the part that we talked  about before.  Under the eyes, I don't think these are direct impact, more uh_____.

DF:   Now, the eyelids you feel, is a result of an impact?

JH:   Yes. It shows here contusions and abrasions involving the eyes_____Another visual view of the_____.

DF:   That was the same injury, is that correct?

JH:   Yes, same injury.  These are all_____

- 20 -



DF:   Have you seen defensive injuries in uh, a child this age?

JH:   Uh, injuries_____

(End of side one)

JH:   The answer is yes, it can be seen.  An injury in the hands or forearms, or legs.  And it certainly could have occurred from the child pulling her arm or leg up to ward off the blows.  It could be used for defensive_____.

DF:   Now, how long would it take the bruising to show up -- the bruise that we're seeing, for example, on the hands and on the legs.  How long would it take that to show up?

JH:   Usually it could be seen immediately.  _____Uh, it could be light red, very light color, initially.

DF:   But when would the peak of uh, when would it peak visually?

JH:   Anywhere from one hour up to the first day, depending on how deep it is.  Usually the hand or the _____ is going to be viable within minutes to an hour or so.  Something very deep like the scalp, may not be -- may not ever be visible_____or or it may take a day to change colors.

DF:   Okay.

JH:   Overall views.  This is another view of the scalp laceration before it was_____.

DF:   Okay.

JH:   View of the chest and abdomen.  These are uh, incisions made on the uh, back, buttocks and thighs_____is a deep seated injuries and bruises.

DF:   Okay.

JH:   For example, bruising in this region it stays up in the skin, in the fat.  Other deeper visible in the back.  This is the neck area.  Now we are in the back area_____.

DF:   Okay.  Are we starting the -- is this the section on internal evidence of injury, or.....?



1  JH:   No, this was the uh, external injury under 16, page 7 -- the external genitalia bruising
2        and uh, abrasions, the labia, and the laceration. The vaginal opening -- this is front
3        an back, anal, in this region here.    There's bruising and there is a tear.
4        So_____ so it's one injury to this area, and scrapes, bruises, uh tearing. This one
5        is where the labia is spread apart.  It shows the area of laceration right here.  And
6        bruising and scraping on both sides.

7  DF:   Now, is this uh, this a result of forced intercourse, or, and -- object penetration, or....?

8  JH:   It could be uh, an inanimate object,  it could be a finger, or a -- I don't know -- it
9        could be an erect penis, any of those could do it

10 DF:   Okay, and how, how deep are the injuries?

11 JH:   Let's see.  The laceration is about 3/16th of an inch deep.

12 DF:   Now, internally, how deep did the injuries go?  Did you see deeper internal injuries?

13 JH:   The rest of the vaginal_____, is okay.  Internal injuries on the labia, and the
14        opening of the, of the vagina seem to be.....

15 DF:   So whatever caused this was not uh, inserted beyond uh, a rather shallow point?

16 JH:   I didn't see anything to indicate anything beyond this.

17 DF:   Okay.  Is it fair to say that something that cause these kind of injuries, if it had been
18        inserted deeply, would have caused internal injuries uh, further on?

19 JH:   Uh, not necessarily.  You could, you could put a finger in, and not necessarily tear,
20        or bruise the entire portion of the vaginal panel.

21 DF:   Okay.  Are we going to get in later to uh......

22 JH:   Depends on how....

23 DF:   ......acid phosphatase readings on this area?

24 JH:   Uh, we can do that now if you like, -- or, uh oral, anal, vaginal swab's were taken.
25        They were submitted for acid phoshstase levels -- the levels were low.  They were
26        typical background -- normal tissue levels_____.

27 DF:   So this is not something that happened to recently?  Well, I, I....

- 22 -



JH: Acid Phoshstase has to do -- and the reason to do that, is to look for seminal fluid. Seminal fluid is mostly produced by the _____. Acid Phosphatase can be found almost on all normal tissue, but it's the very high levels of prostatic (ph) fluid which produces mostly the volume of seminal fluid. So, acid phoshastase is high, and it probably suggested that several fluids were present. If it's low, it goes against that. So these, these are normal_____normal tissues level that are not elevated.

DF: Now, you're able to tell how old these injuries would be?

JH: Uh, the_____were taken. Uh, there was bruising and laceration. _____there was of inflammation_____the cells in the bleeding area would suggest uh, one or two days before death.

DF: Okay.

JH: (Unintelligible)

DF: Okay. Now, in a strictly external examination, would these injuries be evident?

JH: Uh, they would clearly be visible, yes, the redness.

DF: Just the redness, or the injuries themselves?

JH: The what?

DF: Just the redness, or the injuries themselves? Would they be evident?

JH: Yeah. There would be blood included in uh, the laceration, and all those areas together_____.

DF: Okay.

JH: Several different points. This shows the laceration_____see, right in the middle.

DF: Okay.

JH: This is the external photographs. Any you want to look at again?

DF: No. Let's make sure that we cover a few points here. You want to take a break for a quick second? You want to take a break real quick?

JH: Sure.

(Back on tape)

- 23 -

LB:   Doctor Howard, I just wanted to ask you -- all those little circular bruises, is that something that can be caused by like the tip of a finger?

JH:   Sure, could be.

LB:   And, the amount of force that would be necessary to cause a bruise like that, could it be by a child? Or would it have to be an adult?

JH:   It doesn't have to be an adult, uh, certainly one child uh, can injure another child in the same -- using the same kind of pattern.

LB:   Okay. Uh, and the, the darken -- spots, the two sort of darken, darker spots that we saw on the abdomen there -- are those the external signs of the perforation to the bowel?

JH:   There is some green discoloration on the abdomen, uh, in addition to the, to the bruising -- and that goes along with the bacterial inflammatory changes from the bowel, yes.

LB:   Okay. So it looks like those two round spots, are the injuries that would have caused the internal damage?

JH:   Well, there's -- there are number of injuries in the uh, upper abdomen that could relate to the internal linear, or round or oval abrasions. The area of injury, is probably on the upper abdomen, near the mid-line, and to the right.

LB:   Okay. But those three linear scraps, or abrasions, that we saw, could also be related?

JH:   Yes.

LB:   Okay. And do you have any idea what could have caused those circular bruises on her chest -- they seem so perfectly round.?

JH:   Yeah, it has to be something with a round -- a round object.

LB:   Okay. So it wouldn't be a part of, of a body that caused that?

JH:   No, some kind of object.

LB:   Okay. And the injuries, uh, to the vagina -- in terms of uh -- you, you indicated that something must have been inserted to cause the laceration?

JH:   It's a blunt, blunt object being impacted against that area.

- 24 -

1  LB:  Okay.

2  JH:  So she was actually torn.

3  LB:  And uh, were there any fragments of anything that, that would indicate what that
4       could of been?

5  JH:  No.  No residue, or pieces of_____material.

6  LB:  Now, uh, I know when the child's underwear was removed, there was blood in the
7       crouch of the underwear, is that from that laceration?  Or is that related to the
8       perforation of the bowel?

9  JH:  Uh, that would be from the laceration.....because there wasn't any blood on the
10      buttocks or anus, that would account clearly that laceration of the vaginal area was
11      bleeding -- had blood.

12 LB:  And is that injury -- would that be a very painful injury for a child like this?

13 JH:  Yes.

14 LB:  In other words, it's not something that could have gone unnoticed by the child,
       herself?

16 JH:  No.

17 LB:  I think that's all I have.

18 DF:  Okay.  Now, uh, one thing we didn't cover is uh, page, 8, #17.  I didn't see any
19      pictures there.

20 JH:  Uh....

21 DF:  It went to this.

22 JH:  Yes.  This is uh, looking in the ears with the scopes,_____scope.

23 DF:  Okay.

24 JH:  Uh, same thing that a doctor looks into for an ear infection.

25 DF:  What kind of conclusions can you draw from hemorrhage in the uh, in the ear
26      canals?



JH: Uh, there has been some kind of blunt injury to the head uh, in the ear region, causing the blood vessels to rupture. It's either explosions, or a blow to the ear, causes some increased pressure in the ear.

DF: Okay. A slap to the side of the head?

JH: A slap to the side of the head.

LB: Is it also possible that, that kind of hemorrhaging could come from the ear infection?

JH: Uh, this is, without -- no, this is different from uh, from a ear infection. An ear infection would have to be extreme to produce bleeding -- and didn't see other changes, other inflammatory changes_____approximate accumulation._____

LB: So you can clearly rule out that was from the infection?

JH: Yes, I can.

DF: Okay.

JH: Okay.

DF: I guess we're ready to move on to the uh, the internal examination.

JH: This is uh, a view of the chest and abdomen on the left side, with the skin and_____the whole back. You can see the areas of bleeding that began down here at the abdomen.

DF: Those.....

JH: The muscles, all here. These are all subcutaneous fat.

DF: Okay.

JH: _____next the the chest. Same thing from the right side. Muscle here, subcutaneous in the tissues. These are all the deep portions of the bruises that were visible on the_____.

DF: Now, there's only seven points of uh, internal evidence of injury, and I'm trying to uh, match these up. I don't know that you've mentioned this..

JH: These relate, these relate to the external findings.....

DF: Okay.

JH: .....since we've talking about the skin.  We just uh, are the areas of injury describe externally.   We're just looking at the under surface of the skin.

DF: Okay.

JH: Now this is uh, # 1, of  your internal _____ we're looking at the back of the neck. This was not viable  external_____  The head is here, the back is here -- and the   bruising   uh,   hemorrhage_____connected  tissues  of_____.   The  spinal column was_____and there is hemorrhage uh_____.

DF: Anything, any particular conclusion that you can draw from this?

JH: It's a blunt impact injury.  Uh, the bleeding took place, not in the skin, but down uh, deep tissue beneath the skin.

DF: Okay.  And there's no uh, there's no fracture of the_____bone, is there?  So there's no like a manual throttling, or.....

JH: Small, small  impact to the back of the neck.

DF: Okay.

JH: Well, this is uh, from the_____ to the back -- to the neck.  In this case the neck is _____ to the left.   There weren't any uh, other injuries -- the neck is still visible here.  But the rest of the back, other than those that have already been discussed_____. Now we're looking uh, inside the _____ of the muscle and_____. Her head is up here, and down here is the dark fluid which uh_____visible liver.

DF: This would be the uh, 85 millimeters, 85 ml of dark green to brown fluid in the peritoneal cavity?

JH: Right.  This is the whole peritoneal abdominal cavity.  It's been opened up.  This is the kind of dark fluid that normally is not.....

DF: Where do you think the fluid would have come from?  Which laceration?

JH: This is the -- there's inflammation involving the colon, small bowel, and the back of the retroperitoneal tissues.  The surface is _____cavity.

DF: Okay.  Would this be a decease or an injury pathology?

JH: Well, you can get it from uh, decease, like the appendix had ruptured, or gall-bladder was inflamed, the.....

- 27 -

DF:   In this case.....

JH:   She didn't have any of those.   This is all related to the inflammatory response to the blunt injury.   The traces, the hemorrhage here, the transverse colon is up here, here, in the bowel, so the transverse colon, from here to here,  is bruised and inflamed.

DF:   Okay.  In it of itself, would this be a life threating situation?

JH:   Yes.  Damage to the colon of this extent, can lead to peronitis and to uh, to death -- from the fluid changes and the vomiting, and _____.

DF:   Can lead to?  In this particular case, was it the cause of death?

JH:   Well, it contributed to the small bowel laceration.  The small bowel laceration_____

DF:   Now what would be.....

JH:   Clearly a, a fatal injury by itself.

DF:   What signs or symptoms would somebody manifest, externally, as a result of this injury?

JH:   Uh, abdominal pain, and nausea, vomiting.

DF:   Okay.  Can you tell for sure whether any nausea, or vomiting, or any vomiting occurred, or.....

JH:   Uh, you can't say absolutely.  Uh, most likely they'll be drinking, not keeping it down. May be thirsty.

DF:   Okay.  Was there an examination of the stomach contents?

JH:   Uh, stomach contents were uh -- let me see.  I did not do this specific examination. Let's see, there was about 10 ml of dark green to brown fluid_____samples.

DF:   So, apparently, she was, she was eating something?

JH:   Uh, at some point, but uh, only 10 ml isn't very much.

DF:   And it's, is it fair to say -- it's not possible to say whether this child ever vomited as a result of this injury?

JH:   Uh, she had -- no way to know absolutely.  No.

DF:    Now, the vomitus that was present in the uh, in the nostrils?

JH:    Right, she had -- that's what I was looking at that -- "scant amounts of dark vomitus like material are present in the nostrils." But that could happen just by moving the body out to_____ .

DF:    Okay.

JH:    That's not necessarily uh, specific for her body when she was alive. But it would be typical.

DF:    Would this kind of an injury have caused, other than the pain involved in it -- have caused any uh, behavioral changes?

JH:    I said, I think it would lead to dehydration. She'd would be thirsty. She wouldn't be eating, uh, listless, uh, fatigue, sleepy -- once the paranoitis uh, gets more advanced.

DF:    Okay. Was it -- do you feel it was very advanced in this particular case?

JH:    Yes. This isn't uh, you get hit, and an hour later you're dead. This took -- this inflammatory response is a matter of at least hours -- perhaps a day.

DF:    Hours? Hours to a day?

JH:    Hours, to a day.

DF:    Okay. Uh, progressively worsening?

JH:    Yes.

DF:    Now.....well, let's go on with the other one.

JH:    The other one?

DF:    Yeah.

JH:    This is a _____another view showing the small region of the small bowel.

DF:    And here....the pericardium has been removed?

JH:    Uh, no.....

DF:    Or , pulled back?



JH:    .....just the small bowel has been moved so that the_____small bowels show hemorrhage, and swelling. There's bleeding. The impact was all in this area -- bleeding spread out into the back of the abdomen.

DF:    Now, would this be the results of external trauma?

JH:    Yes. External trauma_____.

DF:    In it of itself, again, is this a life threating situation?

JH:    Yes.

DF:    What would be -- what would an observer note different about this child as a result of this injury?

JH:    Well, the same thing that we talked about. Abdominal pain, tenderness, uh, nausea, vomiting, uh, fatigue, listlessness, thirst, fever.

DF:    It depends -- and this are things that would progressively worsen?

JH:    Yes.

DF:    So it, right off the bat this is not something that would be completely evident?

JH:    Uh, the pain would be immediate, as soon as the impact occurred. Uh, she could have uh, basically gotten over the initial attack within a few minutes. Pain, she could deal with that. The abdomen, the inflammation would be bleeding continue then the other signs would uh, develop -- worsen.

DF:    Okay. Now, there was no dehydration in this child, was there?   There's no.....

JH:    Yes, the child uh -- the evidence suggested the child is dehydrated according to the electro lights.

DF:    Okay.

JH:    Uh, the estrogen was elevated, uh, sodium was elevated, according to the_____so, she is -- she has a pattern of_____

DF:    Now, are you able to test uh -- I guess uh, the nail beds had already showed some, some pooling of the blood, so you weren't able to check the nail beds -- but would you be able to check just.....

JH:    The nail beds for what?

- 30 -

DF: For, for any kind of uh -- are you able to test skin turter (ph) in a body that's been refrigerated and such?

JH: Uh, usually in children that's out of_____measurement. In a live child, I have seen this, but in a dead child that has been refrigerated_____.

DF: Okay.

JH: So_____that would be a valid observation, but not at this point._____

DF: Do you know if they noted any dehydration?

JH: Uh,____they said, "she's dead," when they got there. They sent her description. Well, she was already in rigor and there was some lividity showing

DF: How would the dehydration be most uh, evident externally?

JH: Well, that's a, that's a hard call. When you say skin turter (ph) it's one rough measure. The lips are dry_____dry nose.

DF: But it's not something that would be terribly evident?

JH: Not what I saw_____

DF: Okay.

JH: Now this is uh -- the colon has been lifted up, showing uh -- this is the back of the abdomen, so that the hemorrhage and inflammation has been altered all the way down to the back of the abdomen, and all the way up into the colon itself. The small_____up to the_____but it's all the way up to the_____. This is again looking at_____intestine to show hemorrhage down to the_____back of the_____. You're looking at the back of the abdomen. This is the chest is up here. This is the round area of the_____one of the actual tears.

DF: Okay. And that's, that's where most of this hemorrhage came from?

JH: Uh, there's really two main____the small bowel, with the spreading out and the colon. The colon basically, is in front of this area. See, both of those areas are bruised. Another view adding to uh, tissue right around the area. The laceration of the bowel, accumulation, fluid, blood, uh_____.

DF: Okay.



- 31 -

**JH:** Well, I _____ the scalp area. This is where the scalp has been reflected forward and backward. This is the skull itself. This is the deep layers of the scalp. This is called the _____ tissue, right between the bone_____scalp, so she has lots of hemorrhage, in many areas of the scalp.

**DF:** Now, what would this be a result of?

**JH:** (Unintelligible)

**DF:** Okay. This is not, in it of itself, life threating?

**JH:** Not by itself, no. It certainly can add to_____from blood loss. There's a lot of hemorrhage in the scalp laceration_____but, not expected to kill a child. The back of the head injury, over here, back here.

**DF:** Now, is it possible that defintivly, say that uh, uh, this type of a skull impact, would cause behavioral changes? Is it possible to say that -- should I say, to a medical definetly?

**JH:** No, it would be painful, it would be tender, uh, but behavioral changes_____

**DF:** Okay.

**JH:** This is a view from the -- straight down, in front. This is looking at the brain itself, which was, just_____blunt injury restricted to, to the scalp. The brain itself, did not show any uh_____.

**DF:** Okay.  Can you take a look through your section uh, starting on page 9, the internal examination, and tell me what if anything, is abnormal?

**JH:** Say that again now, page_____

**DF:** Will you take a look at your notes and.....

**JH:** Okay, not the internal evidence _____The general organ system, description?

**DF:** Right.

04508

JH: Okay, else -- other than body cavities, uh, you know, with the, the skull _____ and the changes of food accumulation uh -- from the neck, there's a poster (ph) injury, but everything else basically is normal form. So there is no uh, injuries. All she has is evidence of interior inflammatory changes related to that. She's uh, otherwise, normal developed. Did not find any evidence of natural decease. The brain is -- has some _____, or swelling, but again, that's a general response uh, indication of focal injury. It could be uh, related to blunt head injuries, but uh, it's not specific. You can't see it specifically in this case when you have abdominal injury as a result of death. You have a generalized uh _____ inflammatory change.

DF: Okay. Anything unusual in the uh, microscopic examination?

JH: Just the areas of injury. No uh, again, no natural decease.

DF: And the uh, toxicology report?

JH: The University Medical Center in Toxicology, which includes acid phosphatase studies, and the uh, electro lights. We talked about those, but uh, the only drug that was found, was caffeine. You can get that from almost -- tea, coffee, soda.

DF: Okay. Are you aware of what the level of that is?

JH: No.

DF: You have the ability to do that, incidently?

JH: Uh, it could be done.

DF: Okay.

JH: (Unintelligible)

DF: Okay. Going back to the first page of this -- page 2, I should say. "Death was caused by a small bowel laceration." The trauma is external?

JH: Well, the, the trauma is applied to external injuries. There's external, and internal injury that would be called -- it's a blow from the outside.

DF: Okay. So blow to the abdominal section, caused a tearing in the bowel.....

JH: Yes.

DF: .....which eventually led to death?

- 33 -

JH:  Yes.

DF:  Now the other pathologic diagnoses is the multiple contusions, and abrasions.  This is not a  life threating situation?  This is not something that brought death on her?

JH:  Not by itself.  As I say, it could contribute to it, but would not be uh, life threating by itself.

DF:  Okay.  And the laceration of the uh -- (I always have a hard time pronouncing this)

JH:  Duodenum.

DF:  Duodenum?  Uh, was this in of itself life threating?

JH:  Yes.

DF:  Okay.  And this would have resulted from the same external force to the abdomen?  It would have caused the laceration of the small bowel?

JH:  Well, duodenum is a part of the small bowel.

DF:  Okay.

JH:  So it's, the one particular -- first part of the small bowel.

DF:  All right.   Now the retroperitoneal hemorrhage,   fluid accumulation and gas formation -- is this just a reaction to the laceration?

JH:  Yes, it's a reaction to the, to the  blunt injury, the tear, into bruising, and fluid -- and inflammation and bacteria, out in tissues where they are not suppose to be.

DF:  Okay.  So that is, that is a normal reaction to the tears, there to the laceration?

JH:  Yes.

DF:  Okay.  The contusion to the transverse colon, is a separate injury, or is  this once again, a part of the blunt trauma that was applied externally?

JH:  Uh, part of the blunt trauma.  Externally the, the_____is in, is in front of the -- more towards the front of the abdomen.  So it's just in line with the uh, duodenum.  So it was bruised,  not torn, but uh, the same impact.

DF:  Okay.  Now the peritonitis is just a uh, what, a, a deceased pathology of uh......

- 34 -

JH:   It's the inflammation of the lining of the abdomen, related to the_____

DF:   Okay.  The blunt head/neck trauma, with multiple contusions, abrasions, and scalp lacerations -- I think we covered the fact that none of this was in itself, life threating?

JH:   That's correct.

DF:   Okay.  And the blunt extremity trauma with multiple contusions, and abrasions, once again, not a life threating situation?

JH:   That's correct.

DF:   And the blunt genitalia trauma -- not life threating?

JH:   That's correct.

DF:   Now, is there any of these that you can say, "absolutely would have had, would have caused a behavioral change?"

JH:   Let's see.  It would all be painful, uh, or tender, or cause pain -- or, or tenderness -- but beyond that, uh, no way to say.

DF:   Okay.  And is there anyway of, of timing how long it would have taken from injury, to the point where this child was exhibiting severe symptoms of injury -- uh, impact, to the point where the child was exhibiting severe symptoms of injury?

JH:   Uh, in terms of the uh, the abdominal injury, uh, I could say there would be the initial pain right away -- uh, and that would be severe.  Uh, but in terms of the related uh, nausea, vomiting, uh, fatigue, complaining of thirst -- those things would develop over hours to a day.

DF:   Okay.

JH:   And be progressive through that period of time.

DF:   What would be the -- what would be the uh, I guess, the final symptoms before the code arrest would occur?

JH:   Well, typically the uh, the fatigue, listless, or just, or, just lying there -- they're still breathing, or have a pulse, but they're uh, like comatose before the -- before they stop breathing -- and the heart stops.

DF:   Any idea how long that would last?

- 35 -

JH: Uh, it can last hours.

DF: Okay. So if that happened during the evening, that would be usually missed? Is that a fair statement?

JH: Uh, it depends on what you mean by "missed." Do you mean, somebody watching, or looking at the kid, uh -- the kid became, went to bed at a normal -- their usual bed time, and uh, didn't wake up -- and wasn't checked on during the night, you wouldn't notice that.

DF: Okay. Children at this age, tend to sleep at odd hours? Is that correct?

JH: No, my kids, you know, never seem to sleep at all! That's, they can. They can take naps in the afternoon, and then sleep through the night.

DF: (We've got one tape that's going.) Uh, is it possible for an untrained observer, who's taking care of this child, and doesn't know the immediate recent history -- to miss the signs before this child lapses into uh, a deep sleep, and eventual coma?

JH: You mean just from the uh, abdominal injury?

DF: (No audible response)

JH: It, it could be difficult. Kids get viruses, in fact, I think it would be obvious to anybody that the child was sick, and not well. But, uh, to be able to say, "oh, this is obviously a physical injury," verses, you know, some kind of virus -- that, that could be difficult. But the kid would not be acting normal.

DF: When you say, "not acting normal,"......

JH: It shouldn't be up running around, during the normal things that uh, a four year old would be doing. Not eating normally. Not uh, not expecting to have the same level of activity, the normal level of activity. She would be complaining of abdominal pain, other pain. Other pain from the other areas of injury.

DF: So something like this could be uh, misdiagnosed by a, a parent as a, just a virus?

JH: It could in terms of just the uh, abdominal symptoms. Uh, the vaginal injury and the scalp laceration, those are different issues.

DF: Okay. I think I'm all set.

LB: Um, Doctor Howard, if a body is moved after death, does it effect any of the findings that someone in your position comes across?

JH: Unless it's some of the -- what I described as "vomitus of the nose." You can have uh, fluid leak from the, from the stomach out below the abdomen, moving after death. But, uh, in terms of the bruising, uh, the internal changes now, there's nothing to see as changes. The lividity patterns can change in the first few hours after death, but, lividity is still visible.

LB: Um, and when you talked about the pain from the abdominal injury, um, you said, "it would be very painful." Is that excruciating pain -- unbearable, and what.....well, it's hard to describe pain.

JH: Uh, there's no way to, to exactly quantitate. Uh.....

LB: You mean, a child would cry?

JH: The child should be crying, complaining of pain, uh, be tender if anybody touched it. Or, she touched it. Uh, she probably would not want, want anybody, or try not to let anybody touch the abdomen.

LB: And you said that after that initial, which would be the -- possibly the worse pain, that it could subside to some extent?

JH: It can, uh, once the bowel stops moving and the initial uh, incident is over, uh, the pain can lessen. The child can still be up moving around. Uh, but then you get into the problem of the inflammatory change, you know, much like appendicitis, uh, the pain will get worse with time.

LB: So would it be, uh, strange or unusual, if this child were not complaining about a stomach ache, or fever, or something?

JH: I think that would be unusual, yes.

LB: And can you clearly rule out that this uh, blunt trauma force to the abdomen, was accidental?

JH: It would be physically possible, say in a motor vehicle collision, or a high fall off of something on to uh, an object that strikes that one localized area. But, uh, it's -- I've not seen any injuries of this type with uh, independently observed accidental nature. Uh, elbows, fists, being kicked, knee, or some object thrust in the abdomen in an unusual way.

LB: Okay. So she couldn't just, like in the course of regular childhood play, she couldn't of fallen on to something that would cause that severe of an injury?

JH: Never seen it. Never heard of uh, a fall like that.

- 37 -

LB: And the amount of force that it would take to cause that kind of injury in a child her age, besides uh, could that have been inflicted by either a child, or an adult, or would it take more force than a child could have.....

JH: It would be pretty unusual for another child of similar age -- certainly a teenager, or an adult could have.

LB: Is there a way to tell what the exact time of death was?

JH: No, uh, she's brought into the emergency room, physically without any sign of life, and uh, with rigor mortis evident of lividity -- she's probably been dead, one or two hours prior, prior to being brought into emergency room. There is no way to get an exact time. And the body temperature is -- rectal temperature is below normal. Again, usually uh, she could be hypo-thermic (ph) and still be alive. But, at the same time she could have gotten fever. Her body certainly cooled a little bit, so you put those together and say one or two hours. She was dead before she was brought into the emergency room.

LB: I guess that's all I've got.

BH: I have a couple of questions.

JH: Okay.

BH: Uh, the laceration to the head is, I guess, would require sutures to stop the bleeding? Or, would there be some coagulation going on?

JH: Uh, the bleeding could stop by itself.

BH: Uh-huh.

JH: But, uh, it's not going to heal very well, it will continue to ooze. Probably will bleed a little bit every time you touched it, or moved it. And uh, it's a kind of thing that uh -- certainly, if I saw any live child with that injury, I would say, "the child needs to go to a doctor, and make sure it gets sutured."

BH: Okay. And with the type of tear that you saw on the vaginal area, would it have been extreamly painful to urinate?

JH: Uh, I don't know about extremely, it would probably be painful to uh, have a bowel movement, or urinate.

BH: Uh-huh.

- 38 -

JH:   Because you have an open wound.

BH:   Uh-huh.

JH:   If you get any urine in that open wound.....

BH:   Right.

JH:   ....eventually, extremely, uh, it's_____quantity.  It should be painful -- it should be painful by itself.

BH:   Uh-huh.

JH:   And uh, yeah, putting urine or anything else, or wiping herself afterwards, after going to the bathroom, would all be painful.

BH:   Okay.  That's all I have.

DF:   I guess that's it.

JH:   Okay.

(End of interview)

- 39 -

**Exhibit 12**

THIS IS DET. MICHAEL O'CONNOR WITH THE PIMA COUNTY SHERIFF'S
DEPARTMENT HOMICIDE DETAIL.   THE DATE IS MAY THE 2ND, 1994.   IT'S
A MONDAY.   THE TIME NOW IS APPROXIMATELY UH, 10:07 IN THE A.M.
UH, CURRENTLY I'M AT THE SHERIFF'S OFFICE ADMINISTRATION
BUILDING.   THIS IN REGARDS TO PIMA COUNTY SHERIFF'S DEPARTMENT
CASE #940502025, DEATH INVESTIGATION INVOLVING A FOUR YEAR OLD
CHILD.   UH, I WILL SOON HAVE IN THE ROOM WITH ME A BARRY LEE
JONES.

LEGEND   Q  = DET. O'CONNOR   Q2 = DET. RANKIN
         Q3 = SGT. DOWNING    A  = BARRY LEE JONES

---

Q.   Uh, you can have a seat right there Barry.  I'm gonna put
     your jacket over here.  How you doing?
A.   Not real good.

Q.   All right.  Um, Barry uh, I don't know if anyone's told you
     yet, do you know why you're down here?
A.   No.  I took the little girl to the hospital and her mom this
     morning.

Q.   Okay.
A.   And I went and got _____ go be with her mom, I took care
     of the kids.  And I wasn't feeling so good and uh, I passed
     out and then the police woke me up.

Q.   Okay.
A.   I need to see my old lady to the baby.

Q.   Okay.  Is that your child?
A.   No.

Q.   Who's child is it?
A.   Don't mean nothing.

Q.   Okay.  She's very close to you?
A.   Yeah.

Q.   All right.  Um, I have some very, very tragic news for you.
     Barry, your uh, your baby has, has passed away?
A.   What!  No.

Q.   Yes.
A.   No!  That's not so.  You're lying.

Q.   I'm not lying Barry.
A.   No.

Q.   I'm sorry.
A.   She gonna be all right.  No. (starts crying)  No.  No.  No.

26 JUL 94 17   P.C.S.D.
04

No.  No.  No.  No.  She's all right.  She's all right.  Oh, no.  No.  No.  No.  God.

Q.  Barry, try, try to control yourself.
A.  Uh, I don't feel good.  I love you Rachel.  Oh.  God, no.  No.  I love you Rachel.

Q.  Okay, Barry.
A.  No.

Q.  Let me uh, let me talk to you just a little bit okay.
A.  I don't know if you need to.

Q.  Okay, Barry, le, let me talk to you just a minute okay?
A.  You got to take me to see Rachel.

Q.  Um, she, she's not at the hospital now, Barry, she's been taken over to the...
A.  No.

Q.  ...the Forensic Science Center.  Um...
A.  I _____

Q.  ...everybody's being talked to right now so, uh, even your uh, your wife is being talked to at the moment okay.  All right.  Barry, let me explain something to you.  First off, is your name Barry Lee Jones?
A.  Ye.

Q.  I'm sorry.
A.  Yes.

Q.  Okay.  Um, and where is it that you live Barry?
A.  (crying) █████████████████

Q.  I'm sorry.
A.  █████████████

Q.  Is there a space number there?
A.  Yes number █

Q.  Okay.  You have a phone there Barry?
A.  _____ phone.

Q.  Uh, Barry, Barry listen to me okay?  Can you listen to me for just a minute please?
A.  Yes.  _____.

Q.  I do not know what happened Barry.  Okay.  But I will tell you, you this.  That there, the, the wounds on the body are consistent with um, uh, on abused child okay.
A.  (screams).

STATEMENT OF BARRY JONES--CASE #940502025                          3

Q.    Now Barry.
A.    No, no, no, no, no.

Q.    Barry please listen to me.  I don't know what happened,
      okay.  Or how these things may have happened to this child,
      okay.  I do know...
A.    She's only four.

Q.    ...I know how old she is.
A.    Oh God.

Q.    Please Barry listen to me for just a minute okay.  I don't
      know what happened to the baby, I don't know what happened.
      I would like to hear your side of this story okay, about
      what happened.  Uh, everybody's is all, ever...
A.    There's no side, which side?

Q.    ...everybody is being um, talked to about this all right.

Q2.   Mike?

Q.    Yes.

Q2.   Do you need me or?

Q.    Uh, no I, I'm okay right now.  That was uh, Det. Ferrier,
      he's one of the officers.
A.    Oh, I want to see my little girl.

Q.    Okay, listen to me Barry.
A.    Oh God, no.

Q.    Barry.  Listen to me okay.  She's already been taken over to
      the Forensic Science Center, she's not anywhere where you
      can see her.  Okay.  Barry, I need you to understand
      something.  Okay.
A.    Somebody needs to give me a ride.

Q.    There's no place for you to, to go and see her right now.
      You can't go there.  Um, your, I don't is your, is that your
      wife?  Is Angela your wife?  Listen to me Barry.  Please.
      Is Angela your wife?
A.    No.

Q.    Is she your girlfriend?
A.    Yes.

Q.    A live in girlfriend?
A.    Yes.

Q.    Okay.  Barry I really want to hear what happened last night
      and what led up to this okay?  Please.  But before I do that

STATEMENT OF BARRY JONES--CASE #940502025                    4

> I have to read you something that, that's real important
> okay? And the reason I'm reading you this is because I
> don't know what happened. Uh, what I do know is that the
> baby has wounds...

A.   Oh God.

Q.   ...consistent with child abuse okay? Do you understand
that?

A.   Oh, I'm gonna be sick.

Q.   Listen to me Barry. Okay.

A.   Oh God.

Q.   Can you compose yourself for just a moment please? Okay.

A.   Oh God. Where's Angela?

Q.   She's being talked to by another officer over at the
hospital. All right. Okay. Uh...

A.   Oh God.

Q.   ...listen to me very carefully. I'm gonna read you
something, I want you to listen careful okay? You have the
right to remain silent. Anything you say can and will be
used against you in a court of law. You have the right to
the presence of an attorney to assist you prior to
questioning and to be with you during questioning if you so
desire. If you cannot afford and attorney, you have the
right to have an attorney appointed for you prior to
questioning. Do you understand these rights Barry?

A.   Uh huh (yes).

Q.   I'm sorry.

A.   Yes, yes, I do.

Q.   Now having been advised these rights and understand these
rights, will you answer my questions Barry?

A.   Uh huh (yes).

Q.   I'm sorry.

A.   Yes.

Q.   Okay. Barry, I, I know it's difficult for you. Uh, would
you like me to get you a, a drink of water, maybe some
tissues?

A.   Please. Oh God, please.

Q.   I will do that for you, hold on just a minute.

A.   Oh God. (crying) Oh my God. No. Rachel, no, baby. Oh.
Oh. Oh, Rachel. Oh God Rachel, no. Oh. Oh, baby. Baby.
Oh Rachel. Oh God no. Oh. Oh Rachel, please God no. No.
Ra, Rachel. Dear God not Rachel. I don't feel very well.

Pima County SO 05/17/02
Barry Lee Jones
000499

STATEMENT OF BARRY JONES--CASE #940502025                                5

Q.  I know, what, what's the matter?
A.  Feel like somebody just sucked everything out of my body.
    I'm in pain.  Four years old.

Q.  I know Barry.
A.  There's people out there that, that need to die and, and
    nothing ever happens to 'em and you just _____
    four years old child and you told me she passed on.  No.
    No, she didn't.

Q.  I, I know it's _____ difficult for you Barry.
A.  No.  No, you don't know.  No you don't.  She's my little
    baby.  My little Rachel.  Nobody can take that from me,
    nobody.  God, four years old.  Oh God.  Dear God in Heaven
    no.  No.  No.

Q.  Barry, do you know uh, about what time it is right now?  The
    time of day?
A.  No.  I have _____, I, I had _____.

Q.  Do you think, is it in the morning or afternoon or night
    time, do you know what time about is?
A.  It's in the morning.

Q.  I'm sorry.
A.  It's in the morning.

Q.  In the morning time?
A.  Yes.

Q.  Do you know what day it is?
A.  It, it's, it's uh, Monday.

Q.  Do you know what uh, what month it is right now?
A.  May.

Q.  Do you work somewhere Barry?
A.  I do, do odd jobs in the ne, uh, uh, uh.  Oh, I gotta lay
    down.  (crying)  Oh, oh, oh.

Q.  Barry is there anything that I can get for you that'd make
    you feel better?
A.  Uh, get me Rachel.  Oh.  No.  Oh.  I'm all right.

Q.  Okay.  Can you come back up and sit down for me please?
A.  Oh, my stomach hurts bad.

Q.  All right.
A.  Oh.

Q.  Can you tell me what happened to Rachel?
A.  No.  I, she was, she was in the, in, her mom, her mom was

STATEMENT OF BARRY JONES--CASE #940502025                         6

sleeping and, and I was napping off and on and uh, uh,
Rachel went out to play.  And uh, and uh, came, and went
outside she hit her _____ her and two little boys was
playing in my van.  And she said one of 'em pushed her out.
She had like, and she had my hat on and she, she didn't cry.
And, and uh, she, she had knot on her head and then I, I
gave her a half of a Tylenol and uh, and uh, then uh, she
went back out to play.  Everything oh, okay.  And, and, and
it was okay.  Oh.

Q.   Okay, Barry.  Do you know where this happened at?  Where the
     van was parked when this happened?
A.   It's in front of my house.

Q.   Is that the house on ██████████████
A.   That's my trailer.

Q.   Was anyone with her when she fell?
A.   Them two little boys.

Q.   Do you know who those two little boys are?
A.   I took her out riding her bike after, after that.  Ever,
     everything was okay and I took her for, pushed her on her
     bike and, and she seen them two little boys again she said I
     want, I want to play.  I said okay, well I'm gonna take,
     take your bicycle back over, _____ bicycle.
     And I took bicycle back over, (crying).

Q.   And then what happened?
A.   She played with the little boys and about 45 minutes later,
     Julian and Stephanie told me she was getting sick.  I went
     and got her and brought her home and then, I laid her down
     for a nap, it was pretty late.  She, she was getting sick I
     better lay her down for a nap.  Then her head started
     bleeding.  No, no.  (crying)

Q.   Barry, can you do me a favor and tell me who lives there in
     the trailer with you uh, on Benson Highway?  Who lives
     there?
A.   Angela.

Q.   And who is Angela?
A.   She's my girlfriend and Rachel's mother.

Q.   And who else lives there?
A.   Johnny, Becky and Brandy.

Q.   Who is uh, Johnny?  Who's Johnny?
A.   Johnny her son.

Q.   Who's son?
A.   Angela's son.  Rachel's brother.

Pima County SO 05/17/02
Barry Lee Jones
00501

STATEMENT OF BARRY JONES--CASE #940502025                    7

Q.   Okay.  And who's Becky?
A.   Rachel's sister.

Q.   And how old, and who is Brandy?
A.   Rachel's sister 'cause she, my daughter.

Q.   I'm sorry.
A.   My daughter, my daughter.

Q.   Brandy is your daughter?
A.   My daughter.

Q.   How old is Brandy?
A.   Eleven.

Q.   And how old's Becky?
A.   I think she's about ███████.

Q.   And how old's Johnny?
A.   About ███  They was, they was out riding the bike.  Told me
     ride my bike and keep an eye on Rachel.  And he didn't.  I
     took him _____ morning and I asked Becky where was
     your sister playing yesterday.  You wa, wa, wasn't watching
     her.  Oh God.

Q.   What time yesterday was it that she was playing with these
     two boys and she fell out of the van?
A.   About 2:00 o'clock.

Q.   In the afternoon?
A.   Yeah.

Q.   And the van was parked in front of your place there?
A.   Uh huh (yes).

Q.   Can you tell me where it was parked in front of your place?
A.   In my front.

Q.   What kind of uh, ground is there?  Is it dirt or pavement or
     what?
A.   It's dirt.

Q.   These two little boys who were playing with her, was anybody
     else playing that you're aware of?
A.   No.

Q.   I'm sorry.
A.   No.  _____ playing.  She ain't got many friends
     and.

Q.   How old were these boys who were playing with her?
A.   They were her age.

Pima County SO 05/17/02
Barry Lee Jones
00502

STATEMENT OF BARRY JONES--CASE #940502025                                    8

Q.   Do you know those little boys?
A.   No.  She, after, she didn't _____ back there no more.
     She was playing with two boys and, and, and, and, and
     Megan's and _____.

Q.   Do you think those boys live there in the same area, same
     complex?
A.   _____.

Q.   Do you know which trailer they live in?
A.   No I don't.

Q.   What do they look like?
A.   They were just kids.

Q.   Are they white children?
A.   Yes.

Q.   You, you don't even know their first names or anything?
A.   They're just kids in the neighborhood that was her friends
     and, oh God _____.

Q.   When you were in the trailer uh, were you taking a nap or
     something?
A.   I was napping on and off, yes.

Q.   Where were you napping?
A.   On, on, on the futon right there in the liv, living room.

Q.   And where was Angela?
A.   She was sleeping in the back bedroom.

Q.   And where was uh, Rachel?  I'm sorry, Rachel was outside.
A.   (starts crying).

Q.   Where was Johnny?
A.   Oh God.  He was riding the bike.

Q.   Around the same area?
A.   In, yes.

Q.   And where was Becky?
A.   Same thing.

Q.   Riding the bikes around?
A.   Uh huh (yes).

Q.   And how about Brandy, where was she?
A.   Uh, uh, uh, she was uh, she was down, down the road at, at a
     birthday party.

Q.   In the same complex or?

STATEMENT OF BARRY JONES--CASE #940502025                          9

A.    No.  No.

Q.    All right.  Where are uh, where's Brandy right now do you
      know?
A.    See I, I, uh, I Ron, me and Ron dropped her off over at my
      brother's house, told him to take care of the girls 'cause
      we had to take Rachel to the doctor this morning and, and I
      didn't think I could, you know, wind up taking care of the
      girls.  And uh, then uh, Ron took me out to his camp and,
      and uh, and uh, I opened the door and didn't remember no
      more and they told me I passed out.  And, then, and the
      police woke me up.  (crying)

Q.    Okay, so you were out at Ron's house?  Out, where is that?
      Where is that located?
A.    It's at uh, Wilmot Road.

Q.    Do you know what the cross street is?
A.    He lives out in the desert in a bus with his o, only friends
      I got _____ to go be with Angela 'cause she was up,
      upset and...

Q.    All right.
A.    ...and I wasn't feeling real good myself.  I's kind of
      upset...

END OF SIDE A, TAPE 1

A.    ...was to go be with Angela 'cause she was up, upset and...

Q.    All right.
A.    ...and I wasn't feeling real good myself.  I's kind of
      upset.  I got Ron to be with me and, and I don't know.  I
      opened the door and I, I didn't remember no more.  The
      police woke me, woke me up.  Rosemary give me a pill
A.    calm my nerves and.

Q.    What kind of pill did you take?
A.    Uh, I don't know, she uh, Percodan or something and...

Q.    And how many of those did you take?
A.    ...one.

Q.    And who's Percodan was that?
A.    Uh, I don't know.  Rosemary ga, gave it to me.

Q.    And who's Rosemary?
A.    Ron's wife.

Q.    What's Ron's last name?
A.    Um, St. Charles.  It's where nu, nu, the policeman got,
      came, came, came, came, came and got me.

Pima County SO 05/17/02
Barry Lee Jones
00504

STATEMENT OF BARRY JONES--CASE #940502025                        10

Q.   Is this uh, when was it that you took this pill?
A.   While ago.

Q.   And where was that at?
A.   At Ron's house.  He said I was awful upset and, and it would
     calm me down and settle my nerves.

Q.   Okay.  Have you had anything else?
A.   No.  No.

Q.   Ju, just that one pill that she gave you?
A.   Yeah.  And, and then I, it, and it don't seem to calm me
     down very much.

Q.   Did you have anything else Barry?
A.   No.

Q.   Did you have anything yesterday?
A.   No.

Q.   No, no pills?
A.   No, no, no.

Q.   How about any alcohol?
A.   No.  Don't drink.

Q.   So you haven't had any kind of drugs or anything?
A.   No.  No.

Q.   When was the last time you had any drugs?
A.   About oh, four or five days ago.

Q.   What was that?
A.   I did a little speed.

Q.   And how much of that did you do?
A.   Not much.

Q.   Did you have any other alcohol or anything yesterday?
A.   I don't drink alcohol.

Q.   Okay.  Did you have any other...
A.   I had nothing yesterday, nothing.

Q.   ...so it's been five days since you've done any?
A.   At least.

Q.   All right.  So yesterday you're at the house and, and Rachel
     comes in, was she crying or how did you become aware that
     she had fallen out of the van?
A.   I seen her fall out of the van.

Barry Lee Jones
00505

Q.    Oh you saw that.  Where were you when you saw it?
A.    I was right there in the living room.

Q.    Were you looking out?
A.    Uh huh (yes).

Q.    All right, what window were you looking out?
A.    I's looking out of the door.

Q.    And where did you see her fall out of?  What part of the
      van?
A.    The sliding door was open.

Q.    And which side is that on the van?  Is it on the...
A.    Passenger side.

Q.    ...and it was open?
A.    Uh huh (yes).

Q.    And she fell out?
A.    Yeah.

Q.    Did it appear that anyone pushed her or did she just fall
      out?
A.    Yeah.  It appeared maybe she was pushed.  You know, I mean
      it wasn't like she was standing on the doorway and fell out.
      I didn't see her at the doorway and then all of a sudden she
      come tumbling out.

Q.    But you didn't see someone push her?
A.    No.  No.

Q.    And when she fell out how did she fall on the ground?  What,
      what hit first?
A.    Well, I don't know.

Q.    Did she fall uh, face first or?
A.    No.

Q.    How did she fall?
A.    No.  She fell like she was halfway out of the van.  And then
      she fell on her head and then just rolled over.

Q.    Did, and you said something about her wearing your hat?
A.    She's wearing my hat.

Q.    What kind of a hat?
A.    State Farm Insurance hat.

Q.    Is it a, a ball cap or...
A.    Yeah.

STATEMENT OF BARRY JONES--CASE #940502025                    12

Q.    ...like a baseball cap?
A.    Yes.

Q.    Do you have any others of those hats?  Or just have one?
A.    Just that one.

Q.    And where is it now?
A.    I don't know.

Q.    Is it at your house or do you have any idea where it might
      be?
A.    _____.

Q.    Can you tell me what Rachel was wearing when she fell out of
      the van?
A.    Shorts and a shirt.

Q.    What shorts and shirt?  Which ones?
A.    I don't know.

Q.    Just shorts and a shirt?   I'm sorry Barry?
A.    Yes.

Q.    What happened after she fell out of the van?
A.    She didn't cry.  She, I went out there and her head hurt and
      I told her uh, you want to take a nap and she said no.  Her
      head just hurt.  And so I said well, no more playing in the
      van.  I went in the house and I got half a Tylenol and I
      think it was Tylenol, I mean it was an aspirin, I know that,
      but uh, and I, I gave it to her with a glass of uh, Pepsi
      and uh, and uh, and told uh, well ride your bike and uh,
      push her on the bike.  And them two boys I guess she was
      playing with was over there by the laundry room.  Not, _____
      _____ what the bathroom over there and she said she
      wanted to play with the boys.  That it was okay.  Well take
      your bike home so they don't tear it up.  Said I don't want
      'em riding your bike took the bike home.

Q.    Okay, when you brought her in the house uh, after she'd
      fallen out of the van.  Did you get a chance to look at her
      head?
A.    I, I didn't really look at her head.  No and she just said
      her, her head hurt.

Q.    Did she tell you where it hurt?
A.    No.  I seen her fall out of the van so I know her head would
      hurt.

Q.    Did you, could you see where she would have fallen on her
      head?
A.    No.

Pima County SO 05/17/02
Barry Lee Jones
00507

Q.   You, you, you didn't look at her head to see where it was hurt?

A.   No I didn't.  (crying)

Q.   Okay.  You said that you gave her some, some aspirin. Where'd that aspirin come from?

A.   Up there on, on my desk.

Q.   Where's your desk?

A.   Right there in the living room.

Q.   Is it, what kind of a pill bottle was it in?

A.   Uh, it wasn't in a pill bottle.

Q.   Okay.  How was it packaged?

A.   Uh, it was just laying there on the desk and uh, I had taken some aspirins the day before so I, I knew that that's what it was.  And uh...

Q.   You gave her half a one?

A.   ...yeah.

Q.   Where's the other half of that aspirin now?

A.   I ate it.

Q.   And are you sure it was aspirin?

A.   I...

Q.   I, I need to know.  If it wasn't in a package are you sure it was an aspirin?

A.   ...I'm sure it was.

Q.   Okay.  Uh, is there still some of those aspirin up there?

A.   (no response).

Q.   What happened to 'em?

A.   I didn't have many.  I don't, I don't keep, you know, things like that around the house.  And uh...

Q.   So they're all gone now?

A.   ...that was the only one.

Q.   All right.  So you went ahead and gave her that, did you um, did you check her head?  Did you put any ice on it or anything like that?

A.   No.

Q.   Um, did she say I want to go back out and play with the boys?  Or go outside?

A.   She wanted, wanted to ride her bike.

Q.   And did you go out and push her on her bike?

Pima County SO 05/17/02
Barry Lee Jones
00508

STATEMENT OF BARRY JONES--CASE #940502025                    14

A.    Yes sir.

Q.    And did she fall again that day?
A.    Not to my knowledge.

Q.    You didn't see her fall again?
A.    Not to, she rode the bike and _____ seen them boys and
      said she wanted to play and I told her well, take you bike
      home so they don't tear it up and, and...

Q.    Okay, so then she stayed there playing with the boys?
A.    ...and I took her bike home.

Q.    All right.  Did you stay home then or, or what happened at
      that point?
A.    I walked down there every once in a while and checked on
      her.

Q.    Was she okay?
A.    Seemed to be.

Q.    And was she complaining of, of _____...
A.    Never.  She didn't want to come home, nothing.

Q.    ...okay.  You had told me before that uh, uh, Angela was in
      the back bedroom sleeping and uh, Rachel was out playing
      with the boys and Johnny was uh, riding his bike, Becky was
      riding a bike and Brandy was at a party.  And so uh, was
      there anybody else there at the house besides you um, Angela
      and, and, Rachel when she came in?  Was anyone else there,
      any other friends of yours, anybody?
A.    Well, apparently when I was taking a nap a friend of mine
      came in and left a note.  I didn't even know she'd been
      there, you know, apparently she didn't want to wake me up so
      she left me a note.

Q.    And who's that?
A.    Uh, uh, Laura.

Q.    And who's she, who's Laura?
A.    Uh, just a friend from down the road.

Q.    Um, and what's her last name?
A.    Uh, it's uh, Figeroa, some, I don't, I, it's a Mexican name.

Q.    And where does she live and how do you know her?
A.    Her mom used to uh, manage the ██████████████

Q.    Where's the ███████████
A.    That's where I live. ██████████████████████

Q.    And where's the mom now?

STATEMENT OF BARRY JONES--CASE #940502025                    15

A.    Uh, she lives down at ~~████████████████████~~.

Q.    Is that where Laura lives too?
A.    I think so.

Q.    Uh, is the mom running the place at ██████
A.    No, no she...

Q.    What's the mom's name?
A.    ...Pat.

Q.    All right.  So she came over to your house, but you were
      asleep when she stopped by?
A.    Apparently, 'cause all I had wa, was the, the note.

Q.    All right, what'd the note say?
A.    It said something about a buddy of mine had a bunch of
      police at his house.

Q.    What buddy was that?
A.    Uh, guy named Hal.

Q.    Hal.  Where's he live?
A.    He lives down there by ████

Q.    She just said that there were a bunch of cops at his house?
A.    Yeah.

Q.    Anything else?  Did she say she wanted to talk to you later
      or something like that or anything?
A.    No.

Q.    All right.  And what time do you think she stopped by your
      house, best estimate?
A.    I don't know.  I didn't even see the note till Angela woke
      up and says there's a note for you.  And I thought maybe
      Angela wrote, wrote the note.  She just _____ give it
      to me and I read it, it was from Laura.

Q.    Do you know what time that was?
A.    About 5:00 o'clock I reckon.

Q.    And where was uh, Rachel at that point?
A.    She was out playing.

Q.    All right.  So let, let, so I understand kind of the time
      frame.  At about 2:00 o'clock in the afternoon um, Rachel
      had fallen out of the van and you picked her up, gave her an
      aspirin, um, and then pushed her on her bike for a little
      while and then...
A.    Not, not a little while.  Just three, four minutes.

Pima County SO 05/17/02
Barry Lee Jones
00510

STATEMENT OF BARRY JONES--CASE #940502025                    16

Q.   ...okay.  And then you let her go play with these boys
     again?
A.   Yeah.  The boys Mama and Megan's, see Rachel, there wasn't
     very many children in the trailer park um, um, um, Rachel's,
     Rachel's age.

Q.   So where, so where was it that they were playing?  Where'd
     you send her to play?
A.   I, I took her over there.

Q.   Okay.  And where is that?
A.   Then I brought her back, back home.

Q.   Where was it?
A.   It was over there by the bathroom.

Q.   Where's the bathroom?
A.   Oh, about 30 yards from my trailer.

Q.   Which way, which direction?
A.   West.

Q.   And that's where those little boys were playing?
A.   Uh, uh.

Q.   Was anyone else playing with them?
A.   Not, not at the time.  But when I went back to check on
     Rachel she was playing over there with, with uh, Mama and
     Megan's I guess.  I don't, I don't know their name, but
     those two little girls.  You know, there's a, a _____
     and Megan's I guess is what uh, Rachel says.

Q.   Okay.  I, I know Megan, but what you said something else,
     mama?
A.   Mama.

Q.   Who's that?
A.   Mama.  She's a, she's, she's a little girl.

Q.   Mamas is a little girl?
A.   Uh huh (yes).

Q.   And then there's also, what's the other little girl?
A.   Megan.

Q.   And then were the other two little boys there at that point
     too?
A.   Uh huh (yes), uh huh (yes).

Q.   So how long did, did they stay playing over there?
A.   Till, till they came in.

Pima County SO 05/17/02
Barry Lee Jones
00511

STATEMENT OF BARRY JONES--CASE #940502025                    17

Q.   What time was that?
A.   Well they didn't come in till after, uh, let's see Angela
     woke up. Angela woke up _____ maybe she woke
     up uh, Rachel came home for dinner after that.

Q.   Okay, what time?
A.   No, no, no, she, she didn't come home. I was out in the
     yard and, and, and Julian and Stephanie says uh, uh, uh,
     waved me over there and I went running over there and I said
     what's wrong. She, she says Rachel's getting sick. And I
     says she's getting sick. Says yeah. And I said okay, come
     on baby. And uh, I took Rachel over to the house and, and,
     and, and I laid her down. And she, she, she, she didn't
     have no nap and uh, so uh, you know, I figured that maybe
     she's tired, tired and, and, and I brought her home and I
     laid her down.

Q.   And what time was that?
A.   It was um, sometime after 5:00.

Q.   Okay. Who is Julian and Stephanie?
A.   They just some people live at the trailer park.

Q.   And what did they tell you about she wasn't feeling good,
     what did they tell you about that?
A.   They said she, she, she was getting sick.

Q.   Did they tell you how she was getting sick?
A.   They says she's throwing up.

Q.   And where was it that she was throwing up?
A.   I guess over by their house.

Q.   And where's their house?
A.   Well Julian and, Julian I guess lives in one of the
     apartments up front and uh, Stephanie lives in a trailer out
     behind the trailer park.

Q.   Is Julian and Stephanie both adults?
A.   Uh huh (yes).

Q.   Are they both females?
A.   Huh uh (no).

Q.   Julian's a male?
A.   Uh huh (yes).

Q.   And they told you that uh, she was getting sick?
A.   Uh, uh huh (yes).

Q.   So you went ahead and took her home?
A.   Uh huh (yes).

STATEMENT OF BARRY JONES--CASE #940502025                    18

Q. And you think that was sometime after 5:00?
A. I think so.

Q. Did you look at her at that point or did she talk to you about how she was feeling?
A. No. No. I just grabbed her and said little baby don't feel good. She's no and I said okay. So I, I went in and I laid her down for her nap.

Q. Okay. And did she take a nap?
A. Yeah, for just a little bit.

Q. Okay. Did anybody else come over at that point? Anybody else come over later?
A. Uh, yeah, later uh, Rose and Shane and Kimmy (ph) brought Brandy home from the birthday party.

Q. Who's Rose?
A. Uh, she, she, she used to be my old girlfriend. And uh, Brandy, Brandy likes her a whole bunch and uh, and uh, I guess uh, uh, Rose's daughter Alisha (ph) was having a, a birthday party and, and uh, so they over uh, Alisha's brother's house and had a birthday party and uh, they came, they came over later.

Q. All right. So who came over to the house later that night? It was Rose and I guess Brandy came home, who else?
A. Shane and Kimmy and Alisha. Rachel.

Q. All right, who is uh, Shane?
A. He's Rose's son.

Q. How old is he?
A. He's an adult.

Q. He's an adult?
A. Uh huh (yes).

Q. And how about Kimmy?
A. She's an adult.

Q. And Alisha?
A. Yeah.

Q. Alisha, who's that?
A. Rose's daughter.

Q. How old is she?
A. About ████████

Q. And they came, all came over to your house, do you know what time they would have come over?

A.   It was after dark.

Q.   And why did they come over, what was going on?
A.   Brought Brandy back from the birthday party.

Q.   And did they stay?
A.   No.

Q.   All right.  Did they come in?
A.   _____.

Q.   I'm sorry.
A.   Yes.

Q.   And when they came in did they uh, did they talk to you, did they see uh, Rachel at that point?
A.   Yeah.

Q.   Was Rachel asleep at that point or was she awake?
A.   She was awake.

Q.   And was she okay?  Was she feeling better then?
A.   She said she was feeling pretty good.  You know, every time, you know, I ask her, how you doing Rachel, fine.  I say you okay baby.  Much better.

Q.   Did you uh, did you ever look to see if she had any um, hurts on her, where she'd fallen or the damage when she fell out of the van?
A.   No.  When, when uh, I, I laid her down for her nap uh, um, I went in there about half hour later and uh, there was some blood on, on her pillow and uh, I looked uh, I looked at uh, at her head then and it was uh, bleeding.  And uh, her mom had gone to make a phone call and scared me to death.  So uh, I ran up, I's gonna get some uh, ice at the Quik Mart. I went by the fire station and there was a policeman there so I's gonna go get some ice at the Quik Mart and uh, there was a, a guy with a, a, an EMT thing and I told him I said, you know, my little girl's got cu, cut on her head and, and uh, and, and bleeding and he said, he uh, he uh, he uh, uh, he got one of them little lights, looks in the eyes and he says well head wounds bleed a whole bunch.  He says uh, put an ice pack on it and uh, and then he, he told me her eyes was uh, uh, reacting e, reacting equal and, and uh, that uh, just keep the ice pack on it and it'll be okay.  And, and uh, I, when I went, I seen her mom coming back from the telephone and I _____ get in the bed.  I said little girl's got a cut on, on her head.  Not a bump, it's a cut and, and she says yeah, well, you know, I used to be in nursing and, and I know, know head wounds bleed a little bit so no big deal.  So I held, I held her a little but and my _____ put a ice pack on, on her head and,

STATEMENT OF BARRY JONES--CASE #940502025                    20

and, and then I's gonna put some more ice on it and Angela
told me well, the ice probably give her a headache and just
keep pressure on it.  Well kept pressure on it and, and then
she says well we, we, we, might want to just get her ready
for bed and, and, and I says okay.  So she went to get her
some pajamas and, and we pulled off her shirt and she looked
like she'd fallen on a tire on her belly and, and uh, then I
told her about falling out, out the van and, and I told her
I didn't think she'd fell out the van 'cause the way she
came out the van.  Di, _____
and, and she says well and she says that don't look like,
you know, uh, what like that there tried to get it off,
didn't come off.  And I told her I says I never seen this
before till right now.  And I didn't know anything about it.
Put her pajamas on, on her and laid her down and, and stayed
up with her all night long.  Must have been 2:00 o'clock and
she kept, she kept wanting some, something to drink.  And we
give something to drink and it seemed like she, she'd always
throw up.  You know, 'cause she's drinking pre, pretty fast
and, and I told Angela I says don't let her drink so fast,
just give her a little bit at, at a time.  And she threw up
all over the bed, you know, and told her I, no problem.
It's okay.  Um, um, um, and she was sick.

Q.    You'd said that you uh, you stopped by uh, at the, the,
      where the paramedics were and EMT...
A.    No, no, no, no, I seen an EMT at, at the Quick Mart.

Q.    ...there was an EMT at the Quik Mart?
A.    EMT at the Quik.  Um, I's gonna go get some ice for an ice
      pack and, and I seen this guy and I, I told him hey, I says
      uh, _____ little girl got a cut on her head and it's
      bleeding and, and he had this little bag of things here on
      his arm and stuff, you know, and he just looked at her eyes
      and says something about 'em being equal and erect and, and,
      and uh, keep a ice pack on.  But I, you know, I didn't know
      anything about her stomach, you know, so I, I didn't tell
      him nothing about her stomach.  An, and I, I didn't know.

Q.    Did you happen to, to know that parame, that EMT's name?
A.    No, I don't...

Q.    Do you know what the person looks like?
A.    ...I don't, no. I don't know.

Q.    Was it a male?
A.    Yeah.

Q.    Okay.  Was he in a uh, par, or uh, some type of an emergency
      vehicle?
A.    There was no, no, no, no lights on it, I just, I just seen
      him, I said hey, check this out man.  You know, you know, I

didn't _____ some kind of lights.

Q.   Was he in a uniform?
A.   (no response).

Q.   What kind of uniform was it?
A.   Uh, uh, I keep thinking brown, I don't know.  It had pockets
     all over it and uh, it had uh, EMT on the shoulder.

Q.   Who was with you when you were talking to this EMT?
A.   Just, just me and Rachel.  The, and Becky.

Q.   I'm sorry.
A.   Becky and Johnny_____ I didn't know what to do.
     (crying)

Q.   All right.  Where was uh...
A.   _____ I...

Q.   ...where was Angela at this time?
A.   ...she had went to make a phone call.

Q.   Where at?
A.   Little pay phone.

Q.   Where is it?
A.   It's right down the ro, uh, about a bl, half a block from
     the house.

Q.   But you had gone down to the Quik Mart to get some ice for
     her head?
A.   Yes.

Q.   And you saw this EMT there.  You saw something that said EMT
     on it?
A.   Yes.  I, my brother used to be an EMT and I, you know, I
     knew that he had all these little things and I say, check...

Q.   Okay.
A.   ...my little girl.

Q.   So he looked at her and he, and he said uh, that head wounds
     will bleed like that?
A.   He said head wounds, you know, he's seen these they, don't
     freak out.  He said head wounds bleed a lot.  He said, he
     said and just keep an ice pack on it.  I said it wasn't
     bleeding before.  He said before what.  I said before I laid
     her, laid her down.  And he had some barrettes in her hair
     and he said well the barrettes probably aggravate it a
     little bit and so we took them out.  And, and, and I went
     and got her mama.  I don't know.  I don't know.

Pima County SO 05/17/02
Barry Lee Jones
00516

STATEMENT OF BARRY JONES--CASE #940502025                            22

Q.    When was it that you, you got the, your, the mom, Angela?
A.    Ri, right after I got from the Quik Mart.

Q.    And is that when you started to get her into her pajamas or
      something?
A.    Well, no.  We took her home and, and laid her down and, and,
      and, uh, took care of her.  And, and then, and her mom just
      uh, we went, we went to get, get ready for bed and I
      said okay so she went and got her some pajamas and then we
      started getting ready for bed.  She wasn't complaining or
      nothing.

Q.    So once you...
A.    She was laying there _____ bed and never complained.

Q.    ...did you look at her, her stomach?
A.    I just seen some marks on her stomach.

Q.    What'd it look like to you?
A.    Looked like she'd fallen on a tire.  You know how you get
      dirty when you fall over tire?  That's, that's what, I, I
      don't know that much about it.

Q.    So did you go ahead and, and try to clean it up?
A.    No, no.  Uh, her mom done like this on her stomach and said
      that's, it's not dirt.  And, and so, I, I don't know what it
      is, I hadn't seen 'em, she had a long shirt on.  I hadn't
      even noticed.

Q.    Uh, you, what do you think it was?
A.    And she had...

Q.    What do you think it is now after?
A.    ...bruises.

Q.    What kind of bruise?  Where do you think they came from?
A.    I didn't know.

Q.    Did you notice any other bruises on her?
A.    I didn't even notice that till getting her ready for bed.

Q.    Have you ever known uh, Rachel to fall any other times
      besides this time?
A.    She was no.  Not really.

END OF SIDE B, TAPE 1

START OF SIDE A, TAPE 2

Q.    ...all, any other times besides this time?
A.    She was, no.  Not really.

Pima County SO 05/17/02
Barry Lee Jones
00517

Q. Can you think of any other times where she's fallen?
A. Yeah. She, she was, she was always pretty good. She was uh...

Q. Did she ever complain to you that uh, anybody was hurting her?
A. ...no, she was always there. She's real innocent.

Q. Okay. Did...
A. _____ she says she, the uh, we had a problem with uh, about two weeks ago. Uh, uh, she uh, came home and uh, I took her over to my brother's house and uh, I's working on an air compressor and uh, and uh, uh, she had a bump or a knot on her head or something. And uh, she said uh, one of the kids hit her with a rake.

Q. ...which kid?
A. I don't know. Then she said uh, the dog pushed her over.

Q. At, at your brother's house?
A. Yeah.

Q. Where's your brother live? What's your brother's name?
A. His name's Larry. He wasn't even home.

Q. Larry wasn't home when this happened?
A. No.

Q. Where's Larry live? Barry, where's Larry live?
A. Uh, he uh, lives over by...

Q. Where abouts is that? What part of town?
A. ...Kolb and Escalante. But we never could figure out if one of the kids had hit her with a rake.

Q. But when this happened, Larry wasn't home?
A. No.

Q. Who was home?
A. Uh, um, his wife. Uh, the kids.

Q. What kids?
A. Uh, his kids, the neighbor's kids. All the kids. We asked her why didn't you say something baby. She says she was afraid the dog would get in trouble. Why would the dog get in trouble? Said he pushed me down.

Q. Does uh, your brother had a large dog?
A. Yes.

Q. What kind of dog is it?
A. It wasn't the dog she was talking about. Was the neighbor's

STATEMENT OF BARRY JONES--CASE #940502025                    24

dog that he's just keeping for the neighbor.

Q.   What kind of dog is that?
A.   Shepherd, big Shepherd.

Q.   And she said that it was the dog that had pushed her down
     and she hit her head?  Where did, where was this, you said
     there was a knot or lump or something, where was that?
A.   I'm not even really sure.  She uh, she uh, got home and then
     her uh, she started getting kind of a black eye.  And uh,
     then she went to bed and woke up and the other eye was
     starting to get black.  And I talked to the kids and I said,
     you know, 'cause I thought somebody had hit her while she
     was asleep.  And then uh, then I was gone for most the next
     day and I come back and uh, Angela said she called the
     doctor 'cause both of her eyes was black and it was steadily
     getting worse.

Q.   And when did, when did that happen?  When was it that um,
     you started to see a little black eye start to form and the
     next day it was more?
A.   Yeah.

Q.   When was that?
A.   Oh, I don't know, about two weeks ago I reckon.

Q.   And was that when you were, did that happen right after
     you'd been over at your brother Larry's house?
A.   Uh huh (yes).

Q.   Where was Larry?
A.   He was at work.

Q.   So he wasn't home when any of this happened?
A.   No.

Q.   Okay.  Who was there?
A.   I guess his wife and the neighbor kids and his kids and
     there's a whole bunch of kids in the back yard.

Q.   Were you there?
A.   Oh yeah, I was out on the garage working on the compressor.
     I didn't even notice it till she got home.

Q.   Did she cry at all?
A.   Never said anything about it.

Q.   Does Rachel ever cry much?
A.   She used to.  But then I'd call her whinny butt and uh, I'd
     tell her she'd have to go to her room for an hour.  She'd,
     told her there's a difference between whining and crying
     baby.  Crying there's a reason.  Whining just burns up more

STATEMENT OF BARRY JONES--CASE #940502025                    25

energy than it does telling somebody what's wrong.  And if you just tell me what's wrong then I can solve it for you baby.  But uh, if I don't know what's wrong I can't do nothing for you.  And I want to help you baby.  And now I can't.

Q.  Was she uh, a good kid, did she cry much around you?
A.  She was a great kid.

Q.  Did you, did she ever uh, do things that, that made you mad?
A.  (no response)

Q.  Never?  Well I, I have kids, they...
A.  When she whines I would tell her she had to go to her room, but uh, I've never had a, a more well behaved child.  I mean.

Q.  ...I'm sorry.  What?
A.  I've never had a more well behaved child in all my life.  I mean it was uh, she was, she was very intelligent.

Q.  Was she um, was she your child?  Or you, you're like her step-dad or what?
A.  No, no.  Um, I was, I wasn't.

Q.  I'm sorry Barry what?
A.  I, um, I was just her step-dad.

Q.  Okay.  Did, did you ever have to spank her or anything to make her...
A.  Never.  I never laid my hands on any of them children.  I don't, I don't spank Brandy.  Always got, _____
_____

Q.  Okay.
A.  I've restricted 'em.

Q.  Okay.  Barry, listen to me 'cause this is kind of important okay.  Um, I don't want to see you get um, caught up with something if you, if you're not being honest with me okay.  So you're telling me you never had to, to spank these children?
A.  Never.

Q.  I mean I, I have children.  I ha, I have to, you know, when they're growing up I had to spank 'em every once in a while just to get their attention.  You never had to do that? You've never done that with these children?  You know, we're gonna talk to the, the kids and everything.  Are you sure that they're not gonna say yeah, you've never touched them at all?
A.  I refuse.

Pima County SO 05/17/02
Barry Lee Jones
00520

STATEMENT OF BARRY JONES--CASE #940502025                    26

Q.   I'm sorry?
A.   I refuse.

Q.   You refuse...
A.   I refuse to _____ they can go their room and
     think about it and, you know, now you're grounded for a
     year, you know, and send 'em to their room and, but I, _____
     day maybe, you know, I go in there and I love all of 'em.
     Even my baby, I tell her, you know, whinny butt, you gotta
     go to your room for an hour and, and, after she'd been there
     about five minutes I would go in there and explain to her
     why she would stay in her room.  Any time I punished 'em  I
     would explain why I was punishing and, you know, it
     something you have to do with children.  You can't just send
     'em to their room.  You gotta go, go in and, and let 'em
     know this is why you've been punished.  This is what you
     should have done and the, the next time things, things will
     be different.  But if you just punish 'em and it don't help
     you, you gotta let 'em know what they did wrong and how they
     should have done it.

Q.   ...and when you would do that would you just talk to 'em?
A.   Uh huh (yes).

Q.   You'd never lay your hand on 'em again or you wouldn't...
A.   Again?

Q.   ...you wouldn't lay your hand on 'em at all?
A.   I never.

Q.   Okay.
A.   Never.

Q.   So the only thing you ever did to these kids to correct
     something that they did wrong is put them in their room and
     make them stay there for a while.
A.   That's it.  I never, I don't, don't believe in, in physical
     punishment.  It don't serve no purpose.  It, it, it just
     make, makes the child more angrier whereas when, when you go
     back and you talk to 'em and explain to 'em what they did
     wrong and how they should have done it they, they just
     rebel.  They don't, don't listen to you.  But if you send,
     send 'em to their room they're so anxious to get out the
     room that uh, they'll listen, listen to you.  But that,
     that's, that's the way it's gotta be done.  Done, you know,
     and, you know, I start, started out, you know, _____
     spend the rest of the day, day, you know, baby, EPA be a
     whinny butt you have to spend the rest of day in your room.
     Then, then, then, then her, her mom talked and decided maybe
     an hour be more appropriate and, and I told her oh, okay.
     Yeah, you're probably right, an hour's more appropriate.
     But she never was a whinny butt no, no more.

Pima County SO 05/17/02
Barry Lee Jones
00521

STATEMENT OF BARRY JONES--CASE #940502025                          27

Q.   What was it that she did that you sent her to her room?
A.   Whinny butt.

Q.   Just walking around whining?
A.   No.  Becky and Brandy, you know, they're older and, and they
     want to walk to the Quik Mart and, and I say okay, no
     problem.  You, you guys go to the Quik Mart and Rachel'd
     start whining 'cause she can't go and I have to explain to
     her I say you didn't come over, you should have come over
     and said, said I want, I want to go to the Quik Mart too and
     I could explain to you, but instead of doing that you just
     bust out whining so now you gotta go to your room for an
     hour.  What you should have, should have done is come over
     and say I would like to go to Quik Mart and then, then I'll
     walk with you.  But I don't, I don't trust Brandy and Becky
     to walk, I don't, I don't, I wouldn't give the
     responsibility of, of walking Rachel to the Quik Mart 'cause
     Benson Highway is, you know, they gotta cross four lanes of
     traffic and I just, that's my responsibility them children
     can't handle yet.  So uh, I just wouldn't let her go and,
     and she would whine.  Uh, I just sent her to her room for an
     hour.  But usually it was okay 'cause, you know, she would
     just lay there and take a nap anyway.  And she needed a nap.

Q.   When did that happen?
A.   Oh, I don't know, just she didn't mind very much.  Just, you
     know, every once in a while.

Q.   The thing about the Quik Mart, that was just an example that
     you gave me?
A.   Yes.

Q.   And that happened a while ago?
A.   Yeah.  If she, oh yeah.  If she couldn't do what the big
     kids did then, you know, she would feel left out then whine.
     I told her baby don't, don't whine.  Come and talk to me.
     We can work something out.  But if you don't tell me I can't
     help you.  I don't _____ I can't do something I
     don't know anything about.  You gotta help me.

Q.   All right Bar...
A.   Talk to me.

Q.   ...Barry.  Who takes care of Rachel the most?  Is it you or
     Angela or who?
A.   Angela.

Q.   How often do you take care of her?
A.   I really don't.

Q.   You don't take care of her?
A.   No, I really don't.  I, I mean hey, you know, if, you know,

Pima County SO 05/17/02
Barry Lee Jones
00522

STATEMENT OF BARRY JONES--CASE #940502025                    28

we're watching TV while Angela takes a shower or something
if you call that taking care of her, but no, I don't. I, I,
I don't babysit her or nothing, you know. Her ma's always
there. And, you know, I, I don't know.

Q. Were you taking care of her yesterday?
A. No. Not real good. Guess the little boys pushed her out
   the van. Her, her mom was asleep and I was napping off and
   on, on, on, on the couch.

Q. Were you responsible for taking care of her at that point?
   Did Angela ask you to watch her?
A. No. No.

Q. Well who was, who was responsible for taking care of her
   then?
A. Guess I was. Nobody asked me, but she was a child.

Q. I understand. But did, did Angela ask you hey, Barry, will
   you watch the kids while I take a nap?
A. No.

Q. I'm sorry.
A. No.

Q. So you just kind of took it upon yourself to watch the kids?
A. Yeah. _____

Q. Do you ever, do you ever help them take baths or, or help
   them get dressed? Do you ever help Rachel get dressed?
A. Sometimes I, I, I go in there and Rachel's sleeping in her
   clothes and I take her pants, pants off, but no I don't, I
   don't bath 'em and I don't dress 'em, you know. I don't
   know that much about little girls.

Q. Okay.
A. I, I ain't _____ color coordinated or _____ socks
   and, and Angela's got a room, you know, where she knows
   where everything's at. And I don't know where anything's
   at.

Q. Do you ever...
A. And would like to, but I don't.

Q. ...okay. Do you, you have recently seen her um, with her
   shirt off and those kind of things right?
A. No.

Q. You haven't?
A. No.

Q. You, you saw it last night though right?

Pima County SO 05/17/02
Barry Lee Jones
00523

STATEMENT OF BARRY JONES--CASE #940502025                29

A.   Uh huh (yes) when...

Q.   Okay, well prior...
A.   ...when I was changing her.

Q.   ...prior to that when was the last time you saw her where
     she just had her, her underwear on or something like that?
     When was that?
A.   Well, uh, I guess maybe two or three days ago.  Uh, I went
     in late at night and she was and, and _____
     pair of Levis she wore.  Her mom was bragging it's the first
     pair of Levis she wore and I guess he just plum wore 'em to
     bed.  And uh, it's pretty warm night so I went in there and
     took her Levis off of her and she, she, she didn't wake up
     or nothing, you know.

Q.   And that was a couple of days ago?
A.   Two or three days ago and _____ Levis she ever wore?

Q.   Did you noti, did you notice any bruises on her then?
A.   I wa, I, I didn't turn the light on.  I don't want to wake
     her up, I just, I just noticed she was sleeping with her
     pants on.  I like to go and check on the kids make sure
     they're all there and everything's okay and, and when uh,
     she wearing _____ Levis.  I know she'd proud of 'em,
     first, first pair of Levis, you know, but I couldn't let her
     sleep in 'em so I took her Levis off, you know, I just undid
     'em and pulled 'em at the bottom and they came off and I
     threw the cover up over her.  And...

Q.   Okay.  Prior to that when was the last time that you had
     seen her or changed her or did anything with her like that?
A.   I don't, I don't do them things.

Q.   Okay.  Are you sure you don't?
A.   No.

Q.   You know, I don't, I don't want you to, to feel
     uncomfortable telling me those things.  And I, I did that
     with my daughter, it's not...
A.   No, no, no.  I don't.  I don't, I don't _____

Q.   ...you would tell me if it really was true?
A.   It was just, you know, her girl things _____ her mom, you
     know, and, and and, you know, and I, I bought her some
     clothes, but uh, I, you know, she, she, I just said I hope
     they fit 'cause she didn't try 'em on.  You know.  Um, I, I,
     I'm just that type of person.  I, hey, this is, this is a
     girl thing, you know, this is a boy thing.  This is a girl
     thing.  And I took 'em home and, and then uh, you know, uh,
     we can try 'em on at home, you know.  And you know, you
     might try 'em on or something.

Pima County SO 05/17/02
Barry Lee Jones
00524

STATEMENT OF BARRY JONES--CASE #940502025                     30

Q.   All right.  I want, I want you to feel comfortable talking
     to me Barry.  I, I, I, I did that with...
A.   I feel comfortable with her. _____ (crying)

Q.   ...I, I understand Barry.  I understand.  But I mean it,
     this is important for my investigation okay.  I mean I know
     this is a very difficult time for you, I understand that.
     But what I want to tell you though is, is if you, you need
     to be honest with me.  If you, if you did take care of
     her...
A.   I'm telling you everything.

Q.   ...what, would you tell me if that was, that was true?
A.   If I gave the girl a bath I'd tell you.

Q.   Okay.  All right.
A.   These are, these are not things I'm ashamed of.  These are
     things I'm proud of.

Q.   No, no, that's fine, that's good.  Because, 'cause I am too.
     When I took care of my children I do the same thing.  I
     bathed 'em, I, I checked 'em, but what, what seems a little
     unusual to me and I, and I, I don't want you to feel
     uncomfortable talking to me about this, if those things
     happened tell me okay?  Would you tell me if those things
     happened?
A.   I would tell you.

Q.   Okay.
A.   I did...

Q.   'Cause what's, what's bothering me Barry is, is here you
     are, you're in this house, you're in there with these kids
     and apparently you're not taking care of 'em at all.  I mean
     is that, is it all Angela?
A.   ...no, no, no, no.  I'm sitting there, I'm there with Angela
     and I'm, I'm watching, if they need something ask me.  They,
     they want to play my game, my Sega game ask me.  You know.
     I, I went out and got another TV so Johnny could put, I put
     up a, a divider for Johnny so he got his own room.  And, and
     uh...

Q.   But as far as, as taking care of the kids and, and changing
     'em and specifically changing Rachel and stuff, you didn't
     do that.
A.   ...no, no.

Q.   Okay.
A.   I bought her some clothes and, and I took the Levis off of
     her.  But Rachel was mama's girl and, and, and mama was
     Rachel's girl.  And I didn't understand it.  You know, I
     mean it, you, you, you can't, you know, you got your, you,

Pima County SO 05/17/02
Barry Lee Jones
00525

STATEMENT OF BARRY JONES--CASE #940502025                    31

your youngest, you know, and you just love 'em and you hold
'em and, and, and I, I held her and, and I, I got this chair
_____ kind of like a rocker just, and, you
know, and, and I nev, I never, I never done that, you know.
I mean, I mean that good with girls and stuff, you know, and
she was in her pajamas and I just grabbed her and, and I
couldn't even remember that song Rock A My Baby in the
Treetop.  That was the only part I knowed, but I sang it to
her and I rocked her.

Q.   When was that?
A.   About two, three weeks ago.  And, and I held her and I
     rocked her and I sang to her and all and it was Rock A My
     Baby in the Treetop, but that was okay 'cause that was all
     she wanted to hear and, and then, and then bed time and her
     mom took her in there, put her to bed and, I built bunk beds
     I, I, I built some bunk beds for Brandy on the top and Becky
     down there.  And I built, I built little Rachel bed and, and
     she was all proud, proud of that little Rachel bed.  Boy,
     made me feel so good, you know.  She liked her little Rachel
     bed.  Even last night when she was sleeping with us she
     said, she said, she said I want, I want to go to my bed.
     And, and, and I told her, I told her mama I says hey, I'll
     stay out here on the futon and, you know, and you, you and
     Rachel sleep in the bedroom 'cause, you know, take care of
     her and everything, you know.  And, and, and her mom says
     well, I thought we're gonna sleep here with Rachel but we
     can do that, but we can do this.  I just wanted to give you
     the option, you know, to, you know, lot of people don't, you
     know, I'm full grown man I just slept on my bed so.  And,
     you know, and we up pretty near 2:00 o'clock, you know, I
     thought Rachel just wanting Pepsi, you know.  She say give
     me a drink, give a drink, you know.  And she drank it so
     fast and she wouldn't breathing and, you know, when she was
     drinking so fa, and she get sick.  And uh, _____ I
     passed out and uh, I don't know, I guess her and her mom
     went in the kitchen.  I think I heard the microwave kick on
     and then I was out.  And uh, and then this morning uh, I, I
     said Angela, Angela wake up, _____ I think that's the
     alarm going off.  'Cause Johnny got to get up 6:00 o'clock.
     And but she, she goes in there and uh, I guess she wakes up
     Johnny and she come back and she says where's Rachel.  But
     last I, I know I thought they got up and got something to
     eat 'cause I heard the microwave.  I said I got no idea.
     And then she goes in there and, and, and she gets in ah, ah,
     Rachel, I think hey, put some clothes on and she grabbed her
     up.  And I'm taking to the hospital right now.  I went to
     the hospital.  And then I came home and Johnny was already
     at the bus stop told him he'd be all right going to school.
     I said you girls get you some shoes on and we'll go over
     your Uncle _____.  And, and uh, I, I uh, went out, picked
     up Ron.  I went by Rose, Rose's house, I said Rose, I said

hurry up please, please, you gotta hurry up. I said I need some help. I said Angela she all upset at the hospital, she gonna need some help. She _____ help me. She got, I went out there and got Ron. I said Ron, I said I ain't, I ain't gonna make it. I say ain't never been through something like this before. I said little girl, you know, she's hurt and uh, and I need somebody with me. And, and Ron said okay. So I give Rose the van, I told her you go on down the hospital with, with, with Angela and, and uh, me and Ron went uh, took the girls over to my brother's house and he says uh, he managed to I ain't never seen you like this before Barry. I says Ron, I ain't never been like this before. He said well, take _____ on out to the house give you something to settle your nerves and. And we got to his house and uh, I opened up the door and I don't remember anything else except that uh, I guess they carried me in the house and uh, I's laying there. I says where am I and Rosie says here, you're at my house, take this. So I took that and, and then I, I went out again and, and, and the police came and got me sometime later. And uh.

Q.  All right. So last night did anybody else come over to your house?
A.  No.  No.

Q.  Was uh, what is uh, Angela's sister's name?
A.  Mandy.

Q.  Did she come over last night?
A.  No.

Q.  Well who else was there besides, was, was Rose there last night?  Or Rose Marie?
A.  Rose was there.

Q.  What time was she there?
A.  Uh, I guess about 7:00 you know. With Shane and bringing Brandy home from the birthday party.

Q.  Okay. Is that the same Rose that was in your van and, and drove it?
A.  She drove down the hospital. She _____ okay. Then Ron got a wife named Rose too.

Q.  Did you go to uh, the paramedic or the Rural Metro station there on Benson ever?
A.  No, no, no.

Q.  You, you just met him, that guy down at the Quik Mart?
A.  Yeah. See there was a police at the uh, Rural Metro when I got her and uh, I's gonna go up and get an ice pack and, and then I's gonna go back I don't have driver's license. But I

STATEMENT OF BARRY JONES--CASE #940502025                                    33

had to do something.  And I...

Q.   You don't have a driver's license and that why, is that why
     you didn't stop at the Rural Metro station?

A.   And, and there was a cop there and I didn't want, I's
     wanting to get some ice and, and, and when I come back the
     police be gone and I, I, I _____ and
     everything _____ when went up there, there was one of
     them uh, EMT fellows at the Quik Mart so I, that's how I
     came to tell him what was happening.  And uh, I remember
     very, very good.  He said something about her, her eyes
     being reactive equal, reacting equal, something and uh, you
     know, head wounds bleed a lot so don't freak out.  Keep an
     ice pack on it and, and, and that's what I done.  I went
     down and got her mom.  She's coming back from the phone,
     don't get mad, she's got a cut on her head.

Q.   Did you tell Angela before that that she'd fallen out of the
     van?

A.   No, no.

Q.   When was it that you told Angela that she fell out of the
     van?

A.   When she woke up.  About 5:00.

Q.   And what did Angela, did Angela go check to make sure she
     was all right?

A.   She says why, is she okay.  I says yeah.  She said did she
     cut it.  No, she didn't cut it.  She's out playing with,
     playing with the kids and, and, and, and, I (inaudible) she
     ain't got many kids to play with at the, _____ she'd
     be all right.  She wasn't bleeding when, when I gave her the
     aspirin.  I asked the paramedic she fell out of the van
     couple of hours ago, but she, she, she, you know, she wasn't
     bleeding.  He says well when you laid her down for a nap the
     barrette probably aggravated the wound and made her bleed
     and.

Q.   Did the paramedic look anywhere else on her body except for
     just on her head?

A.   No.  No.  I told him and she fell out of the van and bumped
     her head.  And then she's bleeding.  And...

Q.   Did he check to see if she had any more hurts on her
     anything like that?

A.   ...no, no.

Q.   You didn't see him doing that?

A.   No I just, I complained about the head, you know.

Q.   Was anybody else with the paramedic or the EMT when you were
     over there?

Pima County SO 05/17/02
Barry Lee Jones
00528

A.  I just seen him.  I about dragged him over there and I was
worried.

Q.  Was, was he in a police car or not a police car, in a uh...
A.  There was no emergency vehicle there.  I guess he's just
coming or going to work.  You know, I, I thought I done
right.  I didn't know.

Q.  ...okay.
A.  I didn't even, I didn't even notice her stomach until she's
getting ready for bed.  I would have had him check...

Q.  Did you...
A.  ...that too.

Q.  ...did you ever look at uh, and have someone check where she
had got these black eyes and stuff?  Anything like that?
A.  No, you know, it was a, a process of over about three days
both eyes got black.  You know, I mean first, you know, just
a little knot on the head or something.  I didn't remember
what it was.  But her eye started getting black and then she
woke up the next day and this eye started getting black and
Angela told me says well I called the doctor and he says
sounds like she broke her nose.  And I told the nose was all
straight and everything, you know, wasn't bent out of place
or nothing and he said there was nothing he could do.  I
says okay.  He says, but hey, he says be prepared 'cause,
you know, it'll be worse in the morning.  I said what do you
mean worse.  She's but, doctor say, you know, it get worse,
you know, look, I thought I, I never did really think so
'cause I had my nose broke and where I broke my nose it bled
like a stuck pig.  But she, she never had no bloody nose.
Never did.  So I don't, I don't, I don't know, you know, I
didn't know what was happening.

START OF SIDE B, TAPE 2

A.  ...broke and where I broke my nose, it bled like a stuck
pig.  She, she never had no bloody nose.  Never did.  So I
don't, I don't, I don't know, you know, I didn't know what
was happening.  But she seemed perfect, perfectly content ____
____ you know, that maybe, you know, a broken nose, but the
nose was fine and, and, you know, you get black eyes when,
when your nose is broke, but maybe you don't ble, maybe
everybody don't bleed.  But I bled like a stuck pig.

Q.  Does she have any other bruises on her?
A.  Not, not that I know.

Q.  Not that you saw?
A.  Her ma was the one mostly inspect her, you know.  I didn't,
I, that was a girl, girl thing and.

Pima County SO 05/17/02
Barry Lee Jones
00529

STATEMENT OF BARRY JONES--CASE #940502025                    35

Q.   Okay.  Is there anybody that's, that's gonna tell me that
     you actually did uh, scold the children and maybe spank 'em,
     is anybody gonna tell me that?
A.   No.  I yell and scream a lot, but no.

Q.   Okay.
A.   I don't.

Q.   So you don't...
A.   No, nobody'll tell you that.

Q.   ...so if I'm out there talking to other people they're gonna
     say yeah...
A.   Anybody.  Anybody in the neighborhood.  They could tell you
     that Barry loves all, all children.  (starts crying)  Oh-h-
     h-h-h.  I correct people sometimes on disciplining their
     children and uh, when I don't think something's right with a
     child I express myself.  And, and, and I'm not afraid to, to
     do so.  But I don't, you know, I'll tell anybody if they
     want to know on their children.  And man, do you got a home.
     If so, take that child home and do that.  This is not some,
     some, some, something I have to watch.  And I won't _____
     , I won't, I don't, just the same as, as beating your wife
     or something.  I won't, I won't sit there and watch a man
     whip a woman, won't do it.  It ain't right and there's got
     to be some other place you can do that besides here.  You
     can go home in the privacy of your home and do stuff like
     that, but I don't, I don't got to watch it and I won't, I
     won't put up, put up with it.

Q.   ...does anybody else take care of uh, Rachel besides you and
     Angela?
A.   No I don't, I don't believe so.

Q.   Are you sure?
A.   No.  But, you know, I'm gone a lot of times and I catch work
     where I can, you know, but I'm gone a lot of times, but no,
     I don't, I don't think, I don't think so. Uh, uh, that
     little girl dead.  (crying)

Q.   Were you, do you think that you were in charge of Rachel
     yesterday?
A.   (no response).

Q.   I'm sorry.
A.   I think I was uh, I was, I think so.  I mean, uh, me, me and
     Angela was laying in there sleeping and Roger come over.
     And told him to the, uh, my, my girl Brandy came back and
     woke us up and said they, Roger says he's gotta talk to you.
     He says something about Hal.  Said okay.  So I woke up and I
     went out there and, and uh, I talked to him and then uh, I
     laid back down on the futon and then I woke up and I laid

back down on the futon, I woke up and laid back down on the futon.  Nobody said hey Barry are you in charge of Rachel or nothing, but I was an adult and I was there.  And, and...

Q.  Who's Roger?
A.  ...he's a friend of Hal's.

Q.  Who's Hal?
A.  Hal.  He's the guy that lives down at, at 4662.

Q.  Is that the guy that was having the trouble with the cops?
A.  Apparently.

Q.  What time did Roger come over?
A.  Oh, I don't know.  Must have, must have been in the afternoon, 12;00, 1:00 o'clock sometime.

Q.  So he was over there before Rachel had fallen?
A.  Uh huh (yes).  Oh God.

Q.  So then after, after she fell and you gave her the stuff and you let her go play with the boys again, uh, what time was it when they came back over and told you that Rachel wasn't feeling well?
A.  Uh, her mom's already up, her ma got up about 5:00.

Q.  And they, and they came over and said Rachel's not feeling well?
A.  No, they said Rachel's getting sick.

Q.  And how long, that was 5:00?
A.  A little bit after 5:00 'cause Angela didn't wake up till 5:00.

Q.  So who was watching Rachel then?  Between the time that she fell off her bike and you said that was at around 2:00 o'clock and then...
A.  She didn't fall off her bike.

Q.  ...I'm sorry.  I'm sorry.  Fell out of the van.  And then you said you just, you, you gave her the stuff and then you were pushing her bike and she _____...
A.  I pushed her on the bike over to the kids and she wanted to play with the kids.

Q.  ...and how long of a time frame was that?  What time was it then when you said okay, you can play with these boys, I'm going back to the house?
A.  Just shortly after.

Q.  Was it, what time do you think?  You said it happened around 2:00 o'clock what time?

STATEMENT OF BARRY JONES--CASE #940502025                    37

A.   Oh, probably about 2:30.

Q.   Okay.  So who was watching her from 2:30 until 5:00 when
     they came over and said uh, it's time to, or she's not
     feeling well?
A.   Uh, I walked outside the door and I looked at her once in a
     while and, you know, walked around _____
     all you got to do is walk up _____ and I
     look over there and see her.

Q.   So...
A.   And I seen her a couple of times and...

Q.   ...you did that a couple of times?
A.   ...yeah.

Q.   And you were also sleeping some of that time?
A.   Yeah, I would nap on and off and, you know, but like a half
     hour at a time or something.  But uh, you know, I was
     checking on her just real regular and uh, you know, uh,
     Johnny and Becky, you know, I'd watch them ride by on their
     bike and make sure they was okay and, and, you know, I, I
     told Rachel is there anything wrong baby.  Noth, nothing
     wrong.  How you doing, say I'm doing fine.  You feeling
     okay, she say much better.

Q.   Did she eat last night?
A.   I don't know.

Q.   You don't know if she ate last night?
A.   No.

Q.   Once Angela woke up and um, you went and got Rachel and they
     said she wasn't feeling well and you brought her back to the
     house, uh, when was it that you went over to the Quik Mart?
A.   Oh, uh, 5:30 maybe.

Q.   It was about 5:30 when you went over to the Quik Mart?
A.   Probably.

Q.   So then you uh, you came back and you'd told Angela at that
     point that she'd fallen or something?
A.   No I told her hey, it's not a bump on her head.  There's,
     there's a cut, it's bleeding.

Q.   So is that when Angela inspected her and, and she saw the,
     the thing on her stomach?
A.   No, she didn't really inspect her.

Q.   Okay.  What happened then?
A.   Well we took her home and, and it scared me and I got a
     little nervous.  I's holding her, holding an ice pack on her

STATEMENT OF BARRY JONES--CASE #940502025                    38

head and, and, and, you know, says well good thing I was a
nurse or I'd be freaking out too, you know. When it come to
a child it scares me.

Q.   How come you didn't take her to the hospital at that point
     if you were scared?
A.   Well the guy at the Quik Mart said, you know, uh,
     everything, you know, uh, her eyes were reacting equal and
     uh, and uh, uh, keep an ice pack on it, they bleed a lot.
     And, and uh, I, I didn't know what to do. Uh, I went and
     got Angela and I say this, this is what the guy, you know,
     the EMT the, the guy said and, and uh, and uh, she says
     well, you know, 'cause she uh, she, I was a nurse and it
     won't bleed an awful lot. She seems to be okay and, and uh,
     and uh, that was that. You know, I, I figured, you know,
     her mom knows best. I don't, I don't, I don't know anything
     about that. Just, you know, whenever, you know, a child uh,
     gets hurt in any way it just, I don't know, it just bothers
     me.

Q.   Okay, all right.
A.   I don't like to see that.

Q.   So what time'd you guys go to sleep last night?
A.   Well, li, like I say, you know, it must have been about 2:00
     o'clock 'cause uh...

Q.   Did you guys just, just stay up in the house with Rachel?
A.   ...no, no, we went and laid down in bed with Rachel.

Q.   Okay.
A.   About 9:00, 9:30, maybe 10:00 o'clock, I don't know. But
     uh, but uh, she puked all over the bed. And uh...

Q.   Was she puking up blood or, or...
A.   ...no. Just whatever she drank, you know, like she would
     drink real fast and, and uh, that's what her mom says she,
     she's drinking too fast, you know. You gotta le, learn how
     to breathe when you're drinking Rachel. And uh, like I say
     the, the last thing, you know, I know remember was, you
     know, just vaguely her and her mom uh, getting up and uh,
     going uh, in the kitchen and I think, I think I heard the
     microwave kick on and, and I thought maybe, you know, little
     girl got hungry and her mom's making her something. I don't
     know.

Q.   ...so then in the morning did you not hear them come back to
     bed then? Is that the last you remember?
A.   That was the last I remember.

Q.   And what time do you think that was?
A.   Uh, uh, about 2:00 o'clock.

Pima County SO 05/17/02
Barry Lee Jones
00533

STATEMENT OF BARRY JONES--CASE #940502025                    39

Q.   Okay.  And so then the next thing you remember is what?
A.   Hearing the alarm go off and, and I's pushing Angela.  I say
     _____ said get up, I think that's the alarm.  And,
     and then I guess she uh, went in to wake Johnny up.

Q.   And then, then what happened?
A.   And then uh, she uh, getting real upset about Rachel and I
     said well hey, grab the baby, come on, we're going down to
     the Emergency Room.  And, and, you know, I had to drive.  I
     was already late and I, and, and then she says drop me off
     at the Emergency Room and take care of the girls.  Said
     okay.  I'm gonna, say I'll be back, I said I'm take care of
     the girls.  And uh, and then uh, I went home and made sure
     the girls is okay and Johnny was already standing out at the
     bus stop so I figured, you know, he gotta go early 'cause he
     goes to ASDB and uh, I figured well I'll just let him go on
     to school and uh, I got the girls.  I went down there and
     told Rose, said Rose help me please.  I'm scared, I'm
     confused, uh, uh, I'm bewildered I, I don't know.  And so
     uh, I told her I said well, you need to, you know, woman,
     you know, she needs to go be with Angela.  And I'm gonna run
     out and uh, maybe uh, take the kids out to Ron's.  Then when
     I's at Ron's, I told Ron I said, say I got Rose to be, be
     with Angela.  I need somebody to be with me.  I always been
     strong, I never needed nobody.  But I needed somebody and
     then we took the kids o, over, we give Rose the keys to the
     van because I shouldn't be driving no way and told her go on
     down to Kino with Angela and, and Ron be with me and so we
     took the girls over to my brother's house and I knew he had
     to go to work and so he couldn't be with me.  And, and I was
     crying and I didn't want the girls to see me crying and told
     Ron, you know, you know, maybe I go over to his place for
     calm down.  He says Barry he said I ain't never seen you
     like this.  So I guess he went and got uh, Percodan or
     Percoset from one of, one of his _____ and gave
     that to me and, and, and uh, 'cause I pulled up to his house
     and I opened the door and next thing I know I, I says where
     am I _____ I, I was in his bus.  And, and his
     wife had _____ 'cause this, this calm you down.

Q.   Who's taking care of the little girls right now?
A.   My brother.

Q.   Where is that?  Where's his house?
A.   ███████████████

Q.   Do you know the address there?
A.   Uh, no I, no I don't.  I know where it's at.

Q.   Do you know his phone number?
A.   Oh, he don't got a phone.  Oh, uh, oh.

Pima County SO 05/17/02
Barry Lee Jones
00534

STATEMENT OF BARRY JONES--CASE #940502025                    40

Q.   All right, I'll be back in just a minute.  Is there anything
     I can get for you, I'll be, I'll be right back?  (leaves
     room)
A.   Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.
     (blows nose) Oh, Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  Oh.
     Oh.  Oh.  Oh.  Oh.  Oh.  Oh.  (moaning)

END OF TAPE 2

START OF SIDE A, TAPE 3

A.   (still moaning, still alone)

START OF SIDE B, TAPE 3

Q.   (comes back into room)  Hi Barry.  How you doing?
A.   (moan)

Q.   You need some more water or anything?  You okay for now?
     Are you okay?
A.   (no response)

Q.   Barry I, I have some questions for you.  Um, I'm talking to
     a lot of different people out there um, did you ever, you
     had told me before that when Rachel was in the van um, you
     were in the house is that right?
A.   (no response)

Q.   Is it, and you looked out the door and you saw her fall out
     of the van.  Did, uh, did you see someone that pushed her?
A.   (no response).

Q.   Um, do you know who it was or do you have any idea?
A.   (no response)

Q.   What did you do right after you saw her fall out of the van?
A.   Went out there and got her.

Q.   You ran out and picked her up?  Did you get in the van
     yourself?
A.   (no response).

Q.   Did you see the little boys that were in the van?
A.   (no response).

Q.   Um, and what were they doing, did they say anything to you?
A.   They just playing in the van.

Q.   They were just playing in the van?
A.   Uh huh (yes).

Q.   Did they say why they had done it or anything like that?

Pima County SO 05/17/02
Barry Lee Jones
00535

STATEMENT OF BARRY JONES--CASE #940502025                    41

A.   (no response).

Q.   I'm sorry.
A.   No.

Q.   No?
A.   I just told 'em they couldn't play in the van no more.

Q.   And what'd they do then?
A.   They left.

Q.   okay.  Did you ever get inside the van yourself?
A.   Later that afternoon me and Angela cleaned the van out.

Q.   You and Angela?  When was that?  You hadn't mentioned that before.
A.   Sometime around I'm not sure.

Q.   Where was Rachel when you were cleaning out the van?
A.   Maybe she laid down for a nap.

Q.   Did she lay down for a nap after uh, after Angela had woke up?
A.   (no response).

Q.   I'm sorry.
A.   Yes.

Q.   Yes.  Did, did you ever have an argument with Angela about these uh, bruises on Rachel?
A.   I don't think so.

Q.   Well, I don't think so is not clear.  Do, do you remember having an argument?
A.   I don't remember having an argument.

Q.   Did she become upset with you about these uh, bruises that were on Rachel?
A.   Yes.

Q.   And what did she say?
A.   She just want, on her face right.

Q.   Yes.
A.   She uh, just uh, wanted to know what was happening and told her I don't know.  I says uh, uh, Rachel wanted to play in the back yard and I was out there working on the compressor and uh, that's all there is.  She says well uh, Rachel told me that Brutus done it.

Q.   That who did it?
A.   Brutus the dog.  Or that uh, one of the kids hit her with a

rake or.

Q. Did Rachel ever tell her mom that you did it?
A. No.

Q. Are you sure?
A. Uh huh (yes).

Q. Okay. Come on, um, Barry, I mean are you sure that, that that didn't happen? That Rachel didn't tell her mom that you had done that to her?
A. What? The bruises on her face, never.

Q. Okay.
A. No she was um, I don't, I, you know, we was talking to her and uh, she said it was uh, had two stories. The dog knocked her down and one of the kids had hit her with a rake and...

Q. And that was the incident that occurred about two weeks ago?
A. ...(no response).

Q. I'm sorry.
A. Yes.

Q. How about um, when this incident took place, this thing? Did, did she tell her mom that you had done that to her?
A. Then she, she told her mom that something about that I hit her in the head and her mom brought her out to the van. I told her I said Rachel I said listen baby, I said please tell your mama the truth. I says uh, I, said if I, if I hit you with something I says uh, go get it, show it to your mom. I said but if you're just mad at me say so. She says yeah, she was, she was mad that the boys had hurt her. And uh, I told Angela we were standing there and I, I said that hurt awful bad. I said because she, you know, be mad enough to say something like that.

Q. Was she talking about the thing with the van when she said that?
A. Yeah.

Q. All right. All right, now. Barry, I don't know why you might not have told me that before, but this is the first time this has come up, okay. Um, why didn't you tell me that before?
A. That was uh, late last night right before we's going to bed. I'm not...

Q. Okay.
A. ...my brain gets...

Q. All right. Barry. Barry, um, are you sure that, that

STATEMENT OF BARRY JONES--CASE #940502025                    43

Q.   something didn't happen in the van with Rachel?   I mean did, did she make you mad?   It's, it's okay Barry.
A.   ...did you see the little girl?

Q.   Yes I did.   Okay.   Now are you sure that something didn't happen because there's some people out there that...
A.   There's nothing in this whole world that could make somebody that mad.

Q.   ...I, I didn't, I'm, I don't, well, I'm telling you I've been doing this a long time Barry.   And I just want you to, to give me the opportunity now to tell me what happened okay.   I know it didn't happen the way with, with the little boys in there.   I know it didn't happen the way.   I talked to the neighbors.   We have other people out there talking to 'em.   Okay.   Please, Barry, tell, tell me what happened.   I know it's hard.   I know that the, you didn't mean for this to happen.
A.   I didn't...

Q.   Barry I know.   I know this is difficult okay.   But you need, but you need to be up front with me okay.   Please.
A.   ...I have been a honest with you as I possibly can.

Q.   Well there, there's...
A.   I haven't touched that, I didn't watch her_____
     (crying).

Q.   ...Barry, did, did she upset you?   I mean is that what happened Barry?   Did she...
A.   Rachel didn't get me upset at all.   Just that she was, she was, she was the epitome of, of good.

Q.   ...I understand.   What happened in the van though that, that this thing fell apart?   I mean...
A.   I got no idea.

Q.   ...okay, well people are telling me that you were in the van wi, with her when this happened okay.
A.   I was not.

Q.   Well Barry, Barry please, you know, I, I don't want this to get you to tell me stories that aren't correct okay.   Please tell me the truth about that.   You know.   Tell me what happened.   Please.
A.   I got no idea.   I was not in the van with her when it happened.

Q.   Well these...
A.   What, I got a uh, when I, when I went out to Ron's she was fine then.   No problems.

Pima County SO 05/17/02
Barry Lee Jones
00538

STATEMENT OF BARRY JONES--CASE #940502025                    44

Q.   ...when did you go to Ron's?
A.   Yesterday afternoon.  Must have been about 3:00 or 4:00.

Q.   Who'd you go out there with to Ron's?
A.   Just me and Rachel.  The other kids I told 'em if your mom
     wakes up tell her we'll be right back.

Q.   Ha, have a seat back over here please so I can, so I can sit
     here and write, it's, it's hard for me.  I'll, you know,
     just, just have a seat.
A.   _____ put my cigarettes.

Q.   Oh, I'm sorry.  Um, all right.  So yesterday afternoon you
     went out to see Ron?  Okay.  You didn't mention that either.
     What, what was going on with that?
A.   Uh, _____ get that thing with Hal and the police, he was
     there.

Q.   Who was there?
A.   Ron.

Q.   okay.
A.   And uh, me and Rachel just went to get uh, dinner and uh,
     and the food's out by Ron's.

Q.   What happened on the way out there?  I mean was a, Rachel
     acting up?
A.   No.  Sat there and was just real fine.  Never done nothing.

Q.   All right.  So how late did you stay out there?
A.   We, I, I was there couple of minutes.

Q.   And what did you do when you were out there?
A.   I just got out the van, talked to Ron, got back in the van
     and left.

Q.   Was it just Rachel and you?
A.   Uh huh (yes).

Q.   Um, was this before she had the, the cut on her head?
A.   Um, no, this was after.

Q.   It was after that?
A.   Before we noticed the blood, but after the falling out of
     the van.

Q.   Are you sure that, that she didn't get hit by something
     instead?  I mean she, Rachel told her mom and everyone that,
     that you had hit her with something?
A.   Uh huh (yes).

Q.   What did she get hit with?

Pima County SO 05/17/02
Barry Lee Jones
00539

STATEMENT OF BARRY JONES--CASE #940502025                    45

A.   I don't know.  She was talking something about a shot horn,
     something you put your shoe on with.  But then when I talked
     to her, you know, I mean her mom was right there and I told
     her I said Rachel, if you're mad that's okay, but please you
     got to tell your mom the truth.

Q.   Why was she mad with you?
A.   I don't know.  I don't know that she was mad at me.

Q.   Well why would she, why would she tell someone something
     like that that's not true?  Why would she say that?
A.   I don't know, but that hurt me really bad.

Q.   I know, I know Barry, I, I sometimes, sometimes we do
     stuff...
A.   I wasn't upset, I was hurt.

Q.   ...sometimes we do stuff that we don't think about what,
     what could happen down the road.
A.   That's what I told her and if you and Rachel want to go back
     there in the room said I'll sleep on the futon.  Because uh,
     if the girl's upset or angry or, or whatever I, I don't want
     to aggravate that.  I just, I'll be more than happy to sleep
     on the futon.

Q.   Okay.  Barry, um, there weren't any little boys in the van
     with her that, that pushed her out.
A.   Yes there was.

Q.   That, that's not true.
A.   No there was.

Q.   What happened in the van?  What happened?  How did, how did
     Rachel really get hurt?
A.   I don't know.  I don't know.

Q.   You don't know how she got hurt now?
A.   No I don't.  I, like I said when she come falling out of the
     van I uh...

Q.   All right.  There's people, I've talked to the people in the
     neighborhood.  The other deputies have.  I went out of the
     room a little while ago, you saw me leave, and I made some
     phone calls and I spoke to some deputies that have been out
     there.  And they told me that, that that's not what
     happened, okay.  So you need to be, you need to be up front
     with me okay.  I don't believe you.  Okay.  I don't believe
     that, that there were two little boys that pushed her out of
     the van.  And, and when I talked to the...
A.   Well, what'd she say there was?

Q.   ...she didn't say that.

A.   She did.

Q.   She told, she told her mother that you had done it.  Okay.
     I don't, I don't know why she did that.  And also that's not
     the only one.  Some other, or the other family members are
     telling me the same thing.  And now, now you're telling me
     different stories about what happened.  You did, you never
     mentioned before that you and Rachel went out to see, to
     Ron's house before that.  I went through the story several
     times Barry.

A.   Yeah.

Q.   Barry, please, okay, I don't want...
A.   I, I didn't do a run down, but I'm, I'm as sorry as I can
     be, but there was two boys in that van _____ Rachel and
     when we went and picked up her mom from the Quik Mart she
     told her mom the boys hurt me.  And she told her last night,
     the boys hurt me.  And uh, as far as Ron, I went up and I
     got some dinner and I went by Ron's and...

Q.   ...why...
A.   ...and you can ask Ron, he was standing right there.  She
     was just as well as could be and I mean the epitome of being
     a good girl.  There is nothing made me mad, I wasn't upset,
     I wasn't angry, I wasn't nothing.  And then last night I
     went to make a phone call, come back, and her mom says now
     what, what'd you get hit with.  I says what's up.  And she
     says well Rachel said you hit her with something.  I said
     well let me turn on the light.  I said Rachel if I hit you
     with something baby, please, show it to your mom, get it.  I
     says but if you're just upset, if you're just mad I said say
     so.  Now tell us please what happened.  And she said the
     boys hurt her.  And that was all she said.  And...

Q.   ...how do you think she got this big bruise on her stomach?
     How do you think she did that?  Little boys didn't do that
     to her.

A.   No they didn't.

Q.   How did she get that?
A.   I don't know.  But I told uh, I told uh, Angela last night.
     She says uh, well uh, well she said that you, you hit her
     with uh, something for the shoe you know.  I said baby I
     said look at that.  You don't get a bruise like that from
     getting hit.  I said you don't do that.  And that's why I
     gave her the option.  I say if Rachel feels uncomfortable
     around me I said I'll sleep on the futon.  But the last
     thing I...

Q.   Why would Rachel feel uncomfortable about you?  What
     happened?

A.   ...I don't know why she, I don't even know why she would say

STATEMENT OF BARRY JONES--CASE #940502025                    47

something I hit her with something you put your shoe on or
something.  Okay.  But if...

Q.    Do you have something like that at the house?
A.    ...no I, I, I wear boots, I wear tennis shoes, I don't, but
      if she was to say something like that apparently I, I
      bothered the little girl and, and, and if so I don't want to
      aggravate this.  She felt bad enough already.  And uh...

Q.    You had also told...
A.    ...I didn't want to do anything but help her.

Q.    ...you had also told some people that you took her over to
      the Rural Metro station.  You didn't take her to the Rural
      Metro station.
A.    No, no, I didn't.  No I didn't.

Q.    Why did you tell those people that you took her to the Rural
      Metro?
A.    I just told Angela that.  I didn't want her to worry, but I
      told her I, I had it checked out by _____.

Q.    Why did you take her over to the Rural Metro station or
      why'd you say you did that and you didn't really do it?
      Why'd you do that Barry?
A.    So her mom wouldn't worry so much about her.  I told her
      what the guy at Quik Mart told me.

Q.    There wasn't a guy at the Quik Mart.
A.    Goddamnit.  Why do you tell me what I see with my own eyes?
      As the person working there.

Q.    I, I will.  I, I'm going to.
A.    Please do.

Q.    But why did you tell 'em that...
A.    Keep telling me things that aren't right.

Q.    ...why did you tell 'em you went to the, to the Rural Metro
      station and you didn't?
A.    I didn't want to let her know that I was scared about that
      police being there.  I would have done anything for that
      little girl.

Q.    Did she know, did she know that uh, that you had a suspended
      license?
A.    Yes.  I got arrested a while back.  I would do anything for
      that little girl.  Anything.

Q.    Barry.
A.    Didn't harm in no way.

Pima County SO 05/17/02
Barry Lee Jones
00542

Q.   Barry.

A.   I done nothing but try to help this little girl.

Q.   Barry.  What happened inside the van?  What happened to Rachel?

A.   I have no idea.  She just came out of the van halfway and halfway out.  Fell on her head.  I went out there, picked her up, told the two little kids, I say no more playing in the van.  Rachel said her head hurt.  I took her inside.  I gave her half an aspirin and I started pushing her on her bike.

Q.   Do you ever, do you ever let the kids play in the van before?

A.   They've never wanted to before.  The opportunity never arose.

Q.   So you didn't ask these little boys, after Rachel had fallen out of the van, you didn't ask them what had happened?  How, how Rachel got hurt?  You didn't ask them that?

A.   I pretty much knew what had happened.  I, like I say it was later that her head even started, it was after she got sick over at Julian and, and Stephanie's that, that her head even started bleeding.  And, and, and, I didn't know anything about her stomach.  I, I didn't know anything about that.  I, her mama went to uh, change her into her, her uh, pajamas when uh, and says uh, what is this.  I said well it looked like she fell on a tire, but it don't come off.  And uh, and it didn't.  And Rachel says it, it happened when the boys pushed her out the van and, and I_____...

Q.   That's not what she said originally.  She said that you had hurt her.

A.   ...no.

Q.   Well, well, you just told me a minute ago that was what happened.

A.   Later that night when we getting ready for bed she said that.  And I told uh, Angela that uh, if I made the little girl uncomfortable at all that I would sleep on the futon and her and the baby could sleep in the back room.  She said no, she says it'll be okay and I gave the little girl a kiss and told her I love you and she said I love you too.

Q.   Did you uh, did you ever touch Rachel where she shouldn't be touched?

A.   No.  I didn't even change, I didn't change her, I didn't bathe her.  I done none of that.

Q.   Are you certain of that?

A.   Of that I am absolutely positive.

STATEMENT OF BARRY JONES--CASE #940502025                    49

Q.   Um, because she may have some, some damage to her vagina.
     Do you know how that happened?  Do you have any idea?
A.   What?

Q.   I already told you.  I said she had some damage to her
     vagina.  Do you know how that happened?  Do you know?
A.   I have no idea.

Q.   You've never touched her anywhere in a private place?
A.   I haven't spanked her, I haven't done any of that.

Q.   You, you've never touched her in...
A.   I have not touched her bottom much less her front.  She, was
     she sexually.

Q.   ...there's a possibility she was.  We'll know more when it
     goes to autopsy.
A.   Someone sexually abused that little girl?

Q.   Yes.  I believe there was.  Barry, please, tell me what
     happened out there.  Tell me what, what went on in the van.
     Tell me why Rachel was telling people that you had hurt her.
     Why did, why'd that happen?  I know that you, you didn't do
     these, these things on purpose.
A.   Why do these people abuse the little girl.

Q.   I know that you didn't do these things on purpose.
A.   I didn't do these things at all.  And the person that did,
     sexually abused my little girl.

Q.   What do you think should happen to someone who did that?
A.   They are not fit to live.  Four years old.

Q.   What do you think should happen to someone that, that uh,
     that things got out of hand and, and uh, and some little kid
     like that was, was spanked or, or, or beaten or thrown or
     something inappropriately, what should happen to someone
     that does that?  I mean even if, even if, if they were, you
     know, things, they're under a lot of pressure, they're under
     a lot of stress, they...
A.   There is not that much pressure.  There is not that much
     stress for somebody to do that to a child.  They don't make
     that much stress or that much anger.  Someone that does that
     to a child is just, a four year old girl.  What can someone
     see in a four year old girl.

Q.   ...well a four year old little girl can make someone very
     angry.  They can do that.  It happens all the time.
A.   Did, no, you cannot get that angry.

Q.   Yes you can.  Someone...
A.   No.

Pima County SO 05/17/02
Barry Lee Jones
00544

STATEMENT OF BARRY JONES--CASE #940502025                    50

Q.   ...someone can be that angered by...
A.   It's impossible.

Q.   ...yes it is.  Okay, it, it can happen.
A.   You can just look at that little girl and see the innocence
     and the sweetness.  To do something like that.

Q.   Why is it that, that people are telling me that you were in
     the van with her when she fell out?  When she, when she...
A.   No I wasn't.  I was in the house.

Q.   ...why are those, why are they telling that that's what
     happened?
A.   I don't know who they are or why they would tell you that.
     But it's not true.  I was not.

Q.   Are, are you sure that, that...
A.   I am absolutely positive.

Q.   ...you're sure that you weren't in the van with Rachel?
A.   I am absolutely positive.  I am absolutely positive.

Q.   Okay, Barry...
A.   And the person that, the person that has done this is not
     fit to live.  To do that.

Q.   ...how long were you gone from the house when you went over
     to Ron's house?
A.   _____about 20, 25 minutes.

Q.   And Rachel went with you?
A.   She carried the milk for me.  Went out, she always got a
     gallon of milk, che,  cheese and bean burritos, pack of
     cigarettes.  Uh, ran out to Ron's and came back home.

Q.   Is there anything else that you forgot to tell me about what
     happened yesterday?
A.   No.

Q.   Why is it that when you were driving back from Ron's house
     and you were going to Kino Hospital, did you pull over and
     say tell your girlfriend, not your girlfriend, your, I guess
     it's your, I guess it's Rosemary is that it?  Is that who,
     who was in your van?
A.   Rose.

Q.   Rose.  And you told Rose um, go on, I, I'm not gonna go back
     to the hospital.  Why didn't you go back there?  Were you
     scared that the police were gonna be there to talk to you?
A.   Oh no, no, no, I knew they was gonna be there.

Q.   Why didn't you go to the hospital and be with them?  Be with

Pima County SO 05/17/02
Barry Lee Jones
00545

STATEMENT OF BARRY JONES--CASE #940502025                    51

your, your, your girlfriend? Be there, you, you were, first
thing you were crying about when you came in here is oh, let
me see Rachel, I gotta see Rachel, get me to Rachel. Well
you could have gone back there then you didn't.

A.   Yeah.

Q.   Why didn't you?
A.   I just, I wanted to get Ron, somebody to be with me.

Q.   Well who was with you? Who was with you in the van?
A.   I don't know.

Q.   Rose was there.
A.   Was she?

Q.   And who was in the back? Who was in the, the, the truck.
     You pulled over near uh...
A.   Oh, yeah, the girls was still at Ron's so the girls were
     still at Ron's. We had to go back and pick the girls up and
     uh, take them to my brother's house.

Q.   Who was taking care of them when you were gonna go back to
     the hospital?
A.   They, I just left 'em at Ron's. At uh...

Q.   Well who was there with 'em?
A.   ...I told Rose, I says hey, get in the van. Go be there for
     Angela. I says Ron, we gotta go get the girls, gotta get
     'em over to my brother's house and uh, that's what we did.

Q.   Why didn't you go back and, and be at the hospital with your
     uh, your live in girlfriend?
A.   I told Angela that I was gonna take care of the girls and
     that's exactly what I done.

Q.   Why didn't you go over there and be, be with her later after
     you got the girls at your brother's house?
A.   I figured Rose was gonna be there for Angela.

Q.   But you wanted to, you were telling me you wanted to go see
     Rachel. But you didn't go see Rachel.
A.   And I wanted to make sure everything was okay first. I told
     Angela I would. And I did. Everything was okay. And I
     went over to Ron's and uh, I just remember opening the door
     and the next thing I remember is the ambulance. Rose says I
     was in the bus and _____...

Q.   Wait a minute, wait a minute, wait, wait a minute. I
     thought Rose had already gone to the...
A.   ...Ron's wife's name is Rose too.

Q.   ...okay.

Pima County SO 05/17/02
Barry Lee Jones
00546

A.   But uh, and uh, says Barry why don't you sit here in the bus
     and you need to calm down.  And that's the little pill and
     uh, I have no idea what it was but _____ she
     says it was a, a Percodan or a Percoset or.

Q.   Barry, did you ever, you, you've told me before, I want to
     go over this again, you've told me several different
     stories.
A.   No.

Q.   Did you ever hit Johnny, Becky or Brandy?
A.   No.

Q.   Are you sure?
A.   Uh huh (yes).

Q.   Why are they telling me that you have?
A.   I've hit 'em?  I've never hit 'em.

Q.   Why, why are they telling me that uh, that when you were
     talking to uh, when, when Rachel came in the house and she
     told her mother that, you came in and you were mad and say
     no that's not what happened.  And then that's when she...
A.   When?

Q.   ...when she changed her story.  Yesterday.
A.   When?

Q.   Yesterday.
A.   Oh.  I never hit them children yesterday.

Q.   No I'm not saying you hit the children yesterday.  I'm not
     saying that.  What I'm saying, you've told me before you've
     never hit them is that what you're gonna...
A.   I never did.

Q.   ...okay, all right that's fine.  All right, you've never hit
     them.  Um, why is it that, that when you came back in uh,
     Rachel was telling her mom, Angela, that you had hit her,
     you hurt her, and that was heard by the other kids.
A.   I know.

Q.   And you came in angry and said wait a minute, that's not
     what happened.  And you were...
A.   Yesterday?

Q.   ...yes.
A.   No.

Q.   And you were making her change her mind.
A.   No.  No.  Yesterday Angela met me out the van when I got
     back from telephone and she says uh, she says Rachel said

STATEMENT OF BARRY JONES--CASE #940502025

you hit her. I said well let me turn the light on. I said
Rachel, what did I hit you with.

Q. Wait, wait, wait, wait. When you got back from where?
A. The telephone.

Q. When did you use the telephone?
A. Last night.

Q. When?
A. Uh, just before bedtime.

Q. So you were gone from the house and Angela and Rachel were
there at the house?
A. All the kids were there at the house.

Q. And you had left for a minute, a little while, and came
back.
A. About five, ten minutes.

Q. And that's...

END OF TAPE 3

START OF SIDE A, TAPE 4

Q. And you had left for a minute, a little while, and came
back.
A. About five, ten minutes.

Q. And that's when, when Rachel had told Angela...
A. Her mama come out carrying Rachel, and uh, and I opened the
door to van and says uh, uh, now show me. I says show you
what. She says uh, that was a show horn thing you know.
She says uh, Rachel said uh, you hit her with a shoe horn or
something. And uh, I says uh, Rachel I says wait a minute,
let me turn the light on. I turned the lights on on the
inside of the van I says Rachel now if I really hit you with
something baby, says okay. I says you go get it and show it
to your mom. But if you just mad or you're angry or you're
just saying this, baby you gotta tell the truth 'cause no
matter what happened to you, you can always tell me and your
mom the truth, always. And she said the boys. I said
Rachel tell the truth. And her mom says Rachel you remember
I don't care how mad you get at somebody something, you ever
tell me something like this and you best be telling the
truth because somebody's gonna get hurt. And uh, she says
no, she says the boys. And I just laid down in the van
there for a minute and cried and smoked a cigarette. And I
came in there.

Q. Why'd you cry?

Pima County SO 05/17/02
Barry Lee Jones
00548

STATEMENT OF BARRY JONES--CASE #940502025                    54

A.   'Cause that hurt an awful lot.

Q.   You what?
A.   I hurt an awful lot.  Somebody to, God knows the reason,
     but, you know, if I've even made her angry enough or
     anything for her to say something like that about me.

Q.   Why would she say something like that if it's not true?
A.   I don't know 'cause that night I kissed her.  I said I love
     you baby she I love you too.  And her mom says, I said I'd
     take her down to the Emergency Room, but they'd take her
     away from me.

Q.   Why?
A.   Why would they take a woman's child from her.

Q.   When did uh, when did Rachel say that or not Rachel, Angela
     say that?  That she would take her to the Emergency Room,
     but they would take her away?
A.   When we was going to bed last night.

Q.   What time was that?
A.   About 9:00 or 9:30.

Q.   Whose idea was it to not take her to the hospital?
A.   That was the only thing I heard about the hospital.

Q.   Did you, did you suggest it or did uh, Angela suggest going
     to the hospital?
A.   It was never actually suggested.  She just said last night
     I'd take her to the Emergency Room, but they'd take her away
     from me.  And uh...

Q.   Why, why did she say that?
A.   ...that was all she said.  She...

Q.   Is it because that Rachel had a bunch of bruises all over
     her body and they were worried that, that uh, there's been
     some abuse going on?
A.   ...I, that wa, that was my thought.  But I didn't know.
     That was the first thing anything ever been brought up about
     it.  I don't know.

Q.   Barry, you saw those bruises.
A.   I certainly did.

Q.   And you saw those bruises how they were uh, had been on her
     for weeks and weeks.
A.   No.  No.

Q.   Yeah.  Yeah, there's, there's, there's bruises on her that
     have been there for weeks and weeks.

STATEMENT OF BARRY JONES--CASE #940502025                    55

A.    I, I, I didn't know about the ones on her stomach and they
      wasn't there three days ago when uh, I took her pants off
      when uh, uh, she was sleeping in her first pair of jeans.

Q.    You saw the, the bruises on her stomach?
A.    No they wasn't there.

Q.    Okay.  What about the other bruises that are on her?
A.    I don't know.  What other bruises?

Q.    She's, she's got bruises on her body that have been healing
      up for weeks.
A.    I don't know.  Her mama told me she bruised real easy.  But
      I didn't know anything about no bruises.

Q.    Did you, did you ever throw her, push her, spank her,
      anything like that?  Even on accident.
A.    No.

Q.    Are you sure?
A.    Absolutely.

Q.    Uh, I, you need to be clear with me on this because uh, when
      these other people come in and start telling me this stuff,
      you, you need to be clear with me on this.
A.    I didn't...

Q.    Are you sure that, you know, some, you just things have been
      hard for you, you know, and, and you may have just taken it
      out on her, pushed her once or twice?
A.    ...they don't get that hard.

Q.    Are you sure that that didn't happen?  Are you sure that
      something didn't happen in the van where, where, where did
      she normally ride in the van?
A.    Right there in the front seat.

Q.    She wear a seat belt?
A.    No.  But she never fell out of the seat.  She was always
      right there.  Always right there.  And uh, yesterday when I
      went up to Ron's she was just sitting there just pretty as
      you please.  Just, you know, the epitome of a big girl and
      uh...

Q.    Did she tell um, her mother that, that you hit her with a
      pipe?
A.    ...no.

Q.    You didn't hear her say that?
A.    No.  She said something last night about a shoe horn.  The
      thing with the shoe, the lace.  I told her I said well let
      me, let me turn the light on.  I said if it's in here I said

Pima County SO 05/17/02
Barry Lee Jones
00550

STATEMENT OF BARRY JONES--CASE #940502025                    56

Rachel grab it baby, show your mama.

Q.   Did you, did you hit her with something?
A.   I didn't hit her with nothing.

Q.   Did...
A.   Matter of fact, she was being so good yesterday uh, uh, I gave her what was left of my milk shake her mom made for me the night before.  I even offered her one of my root beer floats and.

Q.   ...who did you call last night when you made, went to make your phone call?
A.   A friend of mine.

Q.   What's his name?
A.   Uh...

Q.   _____.
A.   ...oh, Woody uh, Woody wasn't home from the mountains yet.

Q.   So you never got ahold of Woody?
A.   No I came back and told her I didn't get ahold of him.  I'd have to try again today.

Q.   Why were you trying to get ahold of Woody?
A.   Uh, 'cause I got some things there around the house I's gonna sell to him.  He's a auctioneer antique type guy.  I don't really know him that well.  I know him through Hal.

Q.   Did you see anybody else last night?  Did you call anybody else, did you see anybody?
A.   No.  No, I never did.

Q.   So you'd been out at Ron's house and you came back and was Angela asleep when you came home?
A.   Yes.

Q.   What time was it do you think that was?
A.   About 4:00, 4:30.

Q.   All right.  You'd told me just a minute ago that you went out and saw Ron at about 12:30 or 1:00.  It was before that Rachel had been hurt when you went out and saw him.
A.   I don't think uh, no.  I didn't wake up till about 12:00, 12:30.

Q.   Okay.  So when was it that you went out and saw Ron?  It's only yesterday.
A.   Yeah.  About I don't know, about 4:00, 4:30.

Q.   Okay, so it was after she had been hurt.

Pima County SO 05/17/02
Barry Lee Jones
00551

A.   Yeah, after she fell out the van. And then she came home, we came home and uh, uh, we came home and she went over playing with the kids and uh, Julian and Stephanie told me she was getting sick. So I ran over there and I got her and I brought her home and I laid her down. I figured maybe just too much excitement. And she hadn't taken a nap. So I laid her down and uh, and then uh, I ate me a bean and cheese burrito. And uh, Johnny came in and wanted something to eat and uh, I told him there's some bean and cheese burritos in there if he wanted some. Uh.

Q.   All right, just a minute. So she falls out of the van. You um, do you, do you take her out bike ride or you push her on her bicycle, does that happen? Is that, okay. And then you uh, she sees those other boys and she goes and plays with them. Are these the same boys that had just pushed her out of the van?

A.   No, there, there was Mamas and Megan was over there too.

Q.   All right. But these other boys were there also? So they uh, you go and drop her off and then a little while later uh, they come back and say that she's uh, she's not feeling well?

A.   No, no, no, no. Uh, during that time of uh, uh, uh, during the time I pushed her on her bike. Okay. We went over there by the bathroom. She wanted to play with the boys. I says okay. Okay, uh, we ain't got nothing in the house for dinner, so I figure I gotta go get something for dinner. So I ride over there, pick Rachel up, we run up to Choice. I get uh, the ten uh, cheese burritos, a gallon of milk, uh, run out by Ron's. I told him what's happening. Uh, he says well Hal had the SWAT team or something at his house. Okay, so I come back home. She wants to go play with the boys again. I says okay. So she goes over there play with the boys again. I check on her. You know. She's playing with the boys and Megan and uh, Mamas and uh, sit down eat me a burrito and then I, I don't know, about half hour later I go out there an uh, Julian's waving for me to come over. He says hey uh, she's, she's getting sick. So I grab her. I go to carry her home. And uh, I laid her down and, and then her mom wakes up just sit down. You know, five minutes later or something and I tell her about the van.

Q.   What'd you tell her about the van?
A.   I told her that uh, Rachel fell out of the van only I didn't think she fell out the van. I think she was pushed out the van. And uh, that she had a knot on her head and.

Q.   So then...
A.   I asked her...

Q.   ...later on you go and make a phone call right?

STATEMENT OF BARRY JONES--CASE #940502025                                    58

A.   ...about 7:00, 7:30.

Q.   And you come back and Rachel has told uh, Angela that it was
     you that had, had hurt her and pushed her out of...
A.   No, she just said I hit her on the head with uh, it's a shoe
     something or another.  And uh...

Q.   ...how did she say she got the hurt on her stomach?
A.   ...I don't know.

Q.   You were there.
A.   Yeah.  I, I left that all up to her mom.  I says Ra, uh,
     Rachel, you know, baby if uh, I hit you with something I
     says show it your mom.  Get it, get, let me turn the light
     on, get it.  Go in the van grab it and show it to your mom.
     I says but, baby if I didn't I, I said if you're mad at me
     or anything else I said say so baby.  I said, but this is,
     you gots to tell the truth.  Please tell the truth, baby.
     And she told her mom that uh, it was the boys.

Q.   How old are those boys?
A.   I don't know.  They was her age.  Maybe a little bit older.

Q.   And they were all able to push her out of the van and cause
     her to have the damage that she had on herself?
A.   I never said that.  I just said I seen her push her out the
     van.

Q.   You saw her pushed out of the van or you saw her...
A.   I seen her come out of the van okay.  And I told her mama
     that, that she fell out of the van, only I didn't think
     she'd fallen out the van.  Uh, but uh, she never cried or
     never nothing.  Just said she had a, her head hurt.

Q.   ...where, where was this, this cut on her head?  Where,
     point, can you point it to me where it was?  This cut.
A.   Oh, I don't know.  On top of her head back here some place.

Q.   And it was a, it was a cut?
A.   Yeah, definitely a cut.

Q.   I'll be back in just a minute.  You want some more water?
A.   Please.

Q.   Okay.  I'll get some.  (leaves room)
A.   (starts moaning after a few minutes)

Q.   _____ have a seat Barry.  Here's your water.  This is uh,
     Det. Sonia Rankin.

Q2.  Hi.

Pima County SO 05/17/02
Barry Lee Jones
00553

STATEMENT OF BARRY JONES--CASE #940502025                    59

Q.   She works with me.
A.   How are you.

Q.   Um, she has had an opportunity to speak with a lot of people
     out there.  She's had an opportunity to talk to uh, a lot of
     different people and she has uh, the benefit of, of, of
     talking to those people and, you know, and also, I've told
     her little bit about the things that you've told me.  Uh,
     and there's some inconsistencies and, and uh, I'd just like
     her to, you know, talk to you about some of the things.

Q2.  I am the one that uh, went to the hospital and had to check
     Rachel and um, I had to look at the injuries to her abdomen,
     the injuries to her head, the injuries on her little arms,
     the injuries on her hands.  Um, the old black eyes that she
     had, the new black eye that she has.  She's got bruises up
     on her forehead, um, she's got old bruising by the temple of
     her eye on the left side.
A.   I, I knew nothing except the black eyes.

Q2.  The kid has old bruises and new bruises.  And we all know
     that kids get bruises, but some of the bruises that she has
     Barry are not regular kid bruises.
A.   I know this.

Q2.  She has got bruises on her tummy, on her stomach and her
     abdomen area.
A.   And you don't get that by falling down.

Q2.  No you don't.  No you don't.  And in your trailer her head
     is bleeding pretty good.  Now that is understanding.  We
     know head injuries do that.
A.   _____

Q2.  What happened to her stomach?
A.   Got no idea.

Q2.  There is no way, no way, that a child can cause that to
     another child.
A.   I was just telling this gentleman here that the first I
     noticed of it last night was when her mom went to put her in
     pajamas.

Q2.  Did you know that um, Rachel tells her sister, Becky, that
     you would do things like this to her?
A.   Do what?

Q2.  Hit her?  Things like that.
A.   No.

Q2.  Did you know that your own daughter has said certain things
     about what you did to her?

Pima County SO 05/17/02
Barry Lee Jones
00554

STATEMENT OF BARRY JONES--CASE #940502025                    60

A.   I did to who?

Q2.  Did to Rachel?
A.   No I never done nothing to Rachel.

Q2.  Did you know that you could be facing first degree murder
     charges?  First degree murder Barry, that's what we're
     talking about.
A.   Me?

Q2.  You.  You.  Because everything points to you Barry.
A.   Man I've been nothing but good by that little girl.

Q2.  Somebody had to have struck that little girl hard.
A.   Several different times.

Q2.  And we understand that.  Mom wasn't there sometimes was she?
A.   No.  She was, she was with Rachel most all the time.  Just
     sometimes she was uh, asleep or.

Q2.  And I know that because I've been told that.  That you
     provided a lot for Rachel and that you were with her a lot.
A.   I made her a little Rachel bed.  The bed she slept on I made
     it.  I went out and bought her clothes and I didn't even
     know if they fit 'cause we never even tried 'em on her.

Q2.  You know what though?  Sometimes I've done it, lot of other
     people have done it, when kids get out of hand sometimes
     your temper flares.  And it happens.
A.   She never got out of hand.  She was always a good girl.

Q2.  Do you understand what I'm telling you though?  The best
     thing for you to do right now Barry, you've been sitting
     here with uh, Mike O'Connor going over and over and over and
     saying pretty much the same thing.  Okay.  As far as what
     happened.  It's time for you to tell the truth now.  Because
     that's the only thing that's gonna save you Barry, is the
     truth.
A.   I cannot believe that she would do that to something like
     that, to a four year old girl.

Q2.  I do think.  I think exactly that that's exactly what you
     did.  And that's why I want you to start explaining to us
     how.  How did it happen?

Q.   Did you plan to do this to her?  Did you plan to, to kill
     little Rachel?  I don't think you planned to do it at all.
     I believe that it got out of hand.

Q2.  Did something get out of hand Barry?

Q.   You knew last night that she was hurt very, very bad, didn't

Pima County SO 05/17/02
Barry Lee Jones
00555

STATEMENT OF BARRY JONES--CASE #940502025                     61

you Barry?
A.   I knew she was bleeding.

Q.   And, you knew, you knew she was hurt very bad didn't you?
A.   I know that she was bleeding really. I didn't think head
     wounds would bleed that much.

Q.   Well not, not just the bleeding, but you knew as soon as you
     saw that, her stomach, that she was hurt bad didn't you?
A.   I didn't, I didn't even know when that stomach thing
     happened.

Q.   Okay, but I understand. When you saw it and the way that
     she was acting and her throwing up, you knew she was hurt
     bad didn't you?
A.   I, I really didn't, I, I didn't know. I, I, I left that to
     her mom.

Q.   You didn't? This, this, this four year child was throwing
     up, it had a...
A.   I didn't know _____...

Q.   ...horrible bruises on her stomach and you didn't think she
     was hurt?

Q2.  Have you ever been punched?
A.   ...it was all the way across her stomach.

Q.   Well I know, well that, that's what I'm trying to tell you
     Barry. Are you telling me that you didn't know she was
     hurt?
A.   I knew she was hurt. I didn't know when...

Q.   Did you know, did you know that she was hurt...
A.   ..._____ happened. I didn't know if they had anything to
     do with it. The throwing up, I told her mom that maybe, and
     I, I gave her my, I'd given her my strawberry milk shake
     that she...

Q.   ...okay. But Barry...
A.   ...that she'd made the night before.

Q.   ...did, are you, are you gonna sit here right now with me
     and tell me that you didn't think she was hurt bad? I'm
     sorry, yes or no.
A.   No. I knew the little girl was hurt.

Q.   Did you know she was hurt bad?
A.   I didn't know how bad.

Q.   Why didn't you, you, are you a medical person?
A.   No, I was, I was, I was scared. I left that up to her mama.

Pima County SO 05/17/02
Barry Lee Jones
00556

STATEMENT OF BARRY JONES--CASE #940502025                    62

> Her mom says she used to be a nurse.  She says well if I
> hadn't have been a nurse uh, I'd probably be freaking out
> too.

Q.  Why didn't she take her to the Emergency Room?
A.  Well her mom said that she'd take her to the Emergency Room,
    but they'd take 'em away from her.

Q.  Why would she take her away from her?
A.  I don't know.  I, I was scared to death.  Uh, the little
    girl had been bleeding on the head, I didn't know what the
    hell was...

Q.  All right, all right, why were you scared to death?  Let's
    get into that.
A.  ...any time a child is bleeding.

Q.  Why didn't you do something about it Barry?
A.  I'm not her mom.

Q.  Well you said you were scared to death.  Why didn't you, you
    take her...
A.  I was sitting there on the couch and I was crying all right.
    And...

Q.  ...why were you crying?
A.  ...'cause the little girl was bleeding.  I didn't know
    anything about it.  Her mom said that if she hadn't been a
    nurse she'd be freaking out too.  I just, when I met her mom
    I told her I says hey, I just, I, I don't want to cause
    anybody no problems.  I, I liked you, I'd like to see you,
    but I don't want to cause anybody no problems.  I hurt so
    bad that I never, never want, want to hurt nobody, I never
    want to see nobody hurt.  That's why I never spanked the
    children, never.

Q2.  You know what though?  We're not talking about someone being
     hurt.  We're talking a four year old being dead.  She's
     dead.  Her mom's not gonna see her anymore.  That kid's not
     gonna grow up to see anything anymore.  She's lying in a
     freezer right now.
A.  (crying)

Q2.  Okay, Barry.  And now is the time seriously, seriously.
A.  (crying)

Q2.  To speak up and tell me what you know.  'Cause you know what
     Barry?  I think you put here there.  I think you put her in
     that freezer.
A.  No.  I did not.  (crying)

Q2.  You gotta tell us Barry.  You gotta tell us how it happened.

Pima County SO 05/17/02
Barry Lee Jones
00557

STATEMENT OF BARRY JONES--CASE #940502025                    63

Q.   Barry, I know, I know for a fact that you didn't do this on
     purpose. I know that. Okay.  But when you sit here and
     you act this way and...
A.   Oh God no.

Q.   ...when you do this way with me it starts to make me wonder
     well maybe did Barry do this on purpose.  Maybe he did
     intend to do this.
A.   I would never harm a child.

Q.   Well it happened Barry.  You, you're telling me you could
     never hurt a child, but you did.  Okay.
A.   No I didn't.

Q.   Yes you did Barry.  We, we have the facts.  We have it all
     together and you're going to uh, to be arrested for it, you
     understand?

Q2.  There's a different between whether you did it on purpose
     Barry or whether you didn't do it on purpose.
A.   Oh no.

Q.   That's what we're trying to get at Barry.  We're trying to
     get at the point whether this was something _____...
A.   I didn't do it at all.

Q2.  You know.
A.   And if you do charge me do not quit looking.  I don't...

Q2.  Who did it then Barry?
A.   ...my God.  You think I'd be sitting here if I knew.  And
     you told me she'd been sexually molested.  A four year old
     girl.

Q2.  I don't need you to yell at me Barry.  I need you to control
     your thinking right now and I need you to gather up what
     you're gonna say.
A.   A four year old girl.  What could somebody see in a four
     year old girl?  She was sweet and innocent and kind and
     never done nothing to nobody.

Q.   ...Barry what I said before about her being sle, sexually
     molested, I don't know that for a fact.  Her vagina looked
     unusual.  Okay.  I don't know that for a fact and I told you
     they would have that information at the uh, Forensic Science
     Center, okay.  I don't know that for a fact.
A.   Man, I've never even spanked that girl.

Q.   Are you, are you...
A.   Or played, played with her vagina or anything else.

Q.   ...are you certain of that?  You never spanked her, you

Pima County SO 05/17/02
Barry Lee Jones
00558

STATEMENT OF BARRY JONES--CASE #940502025                        64

A.    never hit her?
      Never.  I don't whup my own children much less somebody
      else's.  But you gotta find out who did.

Q.    Barry you were with her the whole time.  You were with her
      all yesterday afternoon when this could have happened.  And
      for, for prior times.  There is no one else.
A.    Yes there is.

Q2.   Who is it?
A.    You've gotta find 'em.

Q2.   So tell us.  How?  You were with her the whole time.

Q.    Barry I'd love to believe you.  I really would.  I've had
      lots of people sitting right where you are telling me the
      same thing and then it turns out it's false.  And here I am,
      I went through here for, for an hour talking to you and you
      left out major gaps in this thing.  Oh, this happened, this
      happened, I went down with times, specific.  Then all of a
      sudden after I come back in you tell me oh, yeah, yeah, I
      went to Ron's yesterday afternoon.  I mean what's going on?
      And then you're telling people yeah, I took her over to see
      the paramedic, I went over to Rural Metro and then it turns
      out you did not.
A.    I went to the Quik Mart.  I went to the Quik Mart.

Q.    Well why'd you tell everyone else that you had been to the
      uh...
A.    I didn't want her mom worrying.  I went to the Quik Mart,
      uh, the guy with the EMT shirt on.  Uh, I'm thinking brown
      uh, he got something, he looked in her eyes, he said they
      were uh, reacting equal, equal reacting something.

Q.    ...and when was that that you did that?
A.    Oh, about 5:30.

Q.    Is that before or after Rachel had told uh, Angela that
      you're the one that hurt her and you...
A.    Before.

END OF SIDE A, TAPE 4

START OF SIDE B, TAPE 4

Q.    Um, Angela that you're the one that hurt her and you're...
A.    Before.

Q.    ...that was before?
A.    Yes it was.

Q.    All right.  So you go over there and you have her checked

STATEMENT OF BARRY JONES--CASE #940502025                    65

> out and you bring her back to the home and you drop her off
> and then you go make a phone call is that what happened?

A.  No.

Q.  All right.  Tell me about this confrontation that you and
    Angela had.  Tell me about that.

A.  When?  When?

Q.  When she ca, when you came back from where ever you'd been
    and you said uh, tell me about that.

A.  I went and made a phone call and uh, I pulled back up in the
    yard and Angela's standing there and she says uh, uh, she
    said Rachel said something about you uh, hit her on the head
    with a shoe thing.  I said wait a minute.  Said I never hit
    the little girl.  Let me turn on the light and I went and
    turned on the light.

Q.  The light inside the van?

A.  Uh huh (yes).  I got a light in the back end and the front
    and I turned 'em both on.  I said okay, Rachel.  I said if I
    really hit you baby I says uh, get whatever I hit you with
    and show it to your mama.  And she, she, she wouldn't, you
    know, uh, she, she made, she made no stride to do nothing.
    I says Rachel please, baby, please, tell the truth.  If
    there's something wrong you can always tell your mother or
    myself.  I said Rachel, but if you're making this up baby,
    whether I made you mad or for whatever reason, please tell
    the truth, tell your mama now.  And she told her mom, the
    boys hurt me.  And uh, so, Rachel there's nothing you can't
    tell me or your mom.  There's nothing and uh, she uh, she
    went back inside and uh, uh, I sit out in the van and, and
    cried and had a cigarette.  I went back in and told her mom
    that hurt awful bad.  You know, even the thought of
    something like that hurt real bad and that it, her and
    Rachel wanted to sleep in, in the bedroom that I'd be more
    than willing to sleep on the futon and I would understand.
    And her mom said she thought we was all gonna sleep in the
    back bedroom.  I said we can if you want to, but she, she's
    mad or upset 'cause we for something or she would have never
    said something like that.  So, you know, if, if you want to
    get, you know, uh, you know, you just want to give her some
    space it's okay with me.  And, and she says no, it, it'll be
    okay.  So I, I sat back there with her and her mama.  And I
    gave her some water and, and, and, uh, I held the pan while
    she puked and, and, and I kissed her and told her goodnight
    baby, I love you.  And she and I love you too.  And I just
    went to sleep and, and, and oh, and...

Q.  Well where did you sleep?

A.  ...in the, in the bedroom.  I, I, I was sleeping on the
    outside of the bed, her mama sleeping in the middle and
    Rachel was sleeping towards the wall.  And I, I, you know, I

Pima County SO 05/17/02
Barry Lee Jones
00560

STATEMENT OF BARRY JONES--CASE #940502025                    66

don't know I just couldn't sleep very well and, and then uh,
Rachel kept getting sick and her mom kept smoking a
cigarette and about 2:00 o'clock in the morning I guess uh,
her and her mom got up and went into the kitchen and I, I
think I heard the microwave go on. So I guess one of 'em
was hungry. But nuh, that, that was that. And I, and I
don't know. (crying)   And then, then, this morning ah, ah,
ah...

Q2.  Where was she this morning?
A.    ...the, I, I didn't know. The, the alarm started, started
      going off and, and, and I told her mom, I said baby, I said
      that, that's the alarm and she says oh yeah, okay. And she
      goes in there to get Johnny up and turn the alarm off and
      then, then she does that and she comes back and says where's
      Rachel. And, and said I don't know. And, you know, 'cause
      last I'd seen her mom got up about 2:00 o'clock in the
      morning and I thought they was hun, hungry or something
      because I think I heard the microwave go off. But I didn't
      know. I did, I just didn't know.

Q.    So where was Rachel?
A.    I guess she was in there in, in her room on, on the bed.
      And, and, and...

Q2.  Why don't you take another drink of water Barry.
A.    ...and don't, don't need no more water.

Q2.  Okay. Yesterday you were with her because, 'cause why?
      Where was mom?
A.    Her mom was, was asleep.

Q2.  From what time to what time?
A.    Uh, she, she, she sleep most of the day till about 5:00,
      5:00, 5:00 o'clock.

Q2.  Okay, and you said that when, when Rachel says this about
      you, when Rachel says this about you, she says it and then
      you, you tell her to tell your mama the truth.
A.    No, her mom was holding her and I says baby, tell the truth.
      You, you, there's nothing, nothing that, that you can't tell
      your mother or myself. If, if there's something wrong baby,
      we can't make it right if you don't let us know what it is.
      But, but you gotta let us know what it is. And, and you,
      you, above all you must always tell the truth. And her mom
      told her, says baby, you gotta, you gotta tell the truth
      because if, if, if anybody hurts you then, and, and you tell
      me something like this, she says I'm gonna hurt 'em. And,
      and, and, and I gotta know who to hurt and Rachel says, she
      says well, it was the boys. I said Rachel baby, you can
      always tell, tell the truth.

Pima County SO 05/17/02
Barry Lee Jones
00561

STATEMENT OF BARRY JONES--CASE #940502025                    67

Q2.   Angela said she's gonna hurt the person that did this?
A.    That, yeah.  Yeah.

Q2.   Barry, you take care of Rachel a lot don't you?
A.    No, no.

Q2.   Do you take her to the store with you if you gotta go get a
      treat or something or do you buy her little things here and
      there?
A.    Not really.

Q2.   You said you went out and bought her some clothes?
A.    Yeah, about oh, I don't, about maybe ten days ago, some
      time.

Q2.   The people we said, or the people we talked to have said
      that, that Rachel really liked you and she always wanted to
      be next to you.
A.    Yeah, but, but she, she couldn't be with me a lot of the
      time because uh, I, you know, I, I ain't, I ain't never had
      no four year old, you know that?  And uh, little girls, I
      don't know how to take care of little, little girls, you
      know, when they gotta go to the bathroom and stuff.  And I
      don't, I don't know how to do that and, and even, even,
      the clothes I got her I didn't know if they'd fit.  I
      couldn't try 'em on her.  I just bought 'em and, and hoped
      they fit.  And I took 'em home and her mama tried 'em on.

Q2.   Okay.  How do you think a little four year old feels when
      um, she's being confronted like that?  You and her mother
      were her whole world.  You're her whole world.  And you're
      telling her tell the truth and her mom's saying I'm gonna
      punish the person that did this to you.  Do you think she
      wanted to punish you Barry?
A.    After, after...

Q2.   Do you think Rachel wanted you punished?
A.    ...after, after the uh, after Rachel said it was the boys
      okay, then uh, her mom said Rachel, you got, you know, you
      always can tell me the truth here.  I would hurt anybody
      that, that done something like this to you, but that was
      after Rachel said it was the boys.

Q2.   Oh, it was after now.
A.    Don't do this to me.

Q2.   I am gonna do it to you, you know why?  'Cause you're going
      to jail Barry.  That's why it's important for you to take a
      deep breath and start talking.  Tell us what happened, why?
A.    I did.

Q2.   Was it an accident?  If it's an accident...

STATEMENT OF BARRY JONES--CASE #940502025                    68

A.    I got no idea.

Q2.   ...tell us.
A.    I got no idea.

Q2.   The, an invisible man came into the trailer park and did it
      to her.
A.    You know better than that.

Q2.   Yeah I do.  That's why you're sitting right here.
A.    Don't quit looking.

Q2.   It took a lot of strength...
A.    Don't quit looking.

Q2.   ...to do that to that little girl.
A.    This could have happened somebody else.  Don't quit looking.

Q.    Barry I don't need to look any further.
A.    Please don't quit looking.

Q.    Barry you know why, you know what really torques me off
      about this?  You sit there and you say don't stop looking,
      get the person who did this.  I'll tell you what.  If that
      had been my kid or anybody else's, any other kid that had
      damage to their body like this kid had on it, I would have
      done everything I could, you know, take that kid to the
      hospital, whatever it took.  You didn't do any of those
      things.  So don't come to me now saying you're all sorry
      about...
A.    _____...

Q.    ...hold on just a minute.  Don't come to me and tell me oh,
      uh, go get the person that did this.  All right.  Do you
      understand what I'm saying?
A.    ...yes I do.

Q.    This kid had bruises from head to toe.  You saw those
      bruises, you knew what was going on and you never did
      anything about it.  So why do I, why do you think I should
      have to go look someplace else?
A.    Don't let 'em go.

Q.    I'm not letting him go.

Q2.   Barry if you have any, any remorse at all for what happened
      to Rachel...
A.    Remorse?

Q2.   ...yeah, remorse.  Not just sit here and put on a little
      show for us here okay.  Any remorse or, and a little bit of
      manhood, a little bit of manhood, you tell us why, how it

Pima County SO 05/17/02
Barry Lee Jones
00563

happened.  That's the only thing that's gonna save you is the truth Barry.  That's all.  Or you know what?  You're gonna go to jail and you're gonna have that guilty conscience here and in your heart.  In your heart knowing that you did this to this little girl and you did nothing, not even to tell the truth, not even to tell us the truth about how it happened.  You know why?  Because we're sitting here thinking that you're a cold blooded killer.  That you got this four year old little bony baby, she's a little tiny person.

A.   No, no, no.

Q2.  Then why?  If it wasn't intentional how did it happen?  She's a tiny little person Barry.  And you know what?  All I'm looking at is a cold blooded killer right now if you can't explain to me how.  I know how things happened.  I have known how, kids end up in accidents and sometimes things happen.  Things happen sometimes Barry, and sometimes yeah, they die.

A.   No, they should never die.

Q2.  But accidents happen.  If it's an accident...

A.   Four year old should never die.

Q2.  ...let us know.  No, she shouldn't be dead.  She shouldn't be.

A.   No.

Q2.  Why is she?  Explain it to us.

A.   No one should be dead _____.

Q2.  The truth is the only thing you got buddy.  That's all you got.

A.   No one should ever get that _____.

Q2.  And that's what you're gonna stick to?  And that's exactly what you're gonna stick to and you are going to be the cold blooded killer that killed four year old Rachel.

A.   No I'm not.

Q2.  Then what are you?  How did it happen?

Q.   I know you're scared Barry.  I know you're scared.  I understand why you're scared. I've seen a lot of people right where you are.  I don't believe, uh, Barry I'll tell you.  I'm a, a homicide detective, that's what I do for a living okay.  There's a lot of people that die out there for a lot of different reasons okay.  When people don't tell me stuff and they don't, they're not accurate with me, with the way that they do, tell, tell me what happened, I can think a lot of things.  One of 'em can be that I believe this person planned this out, did it intentionally, and murdered this

STATEMENT OF BARRY JONES--CASE #940502025                    70

person. That's one of the options. I don't think that's
what happened here. At least I hope that's not what
happened. If it did happen that way, well then, that's, the
cards are gonna fall where they may. If this was an
accident, if this was, was not an accident, but an e, uh,
you just, you got so angry with her that, that you just went
off, a temporary lapse, you couldn't control yourself, I
need to know that too. Okay. I'm here trying to help you
Barry. I mean you can deny it all you want and it's not
gonna change what has, what has already been done and what
has happened. Now it's time to move on and, and tell us
what, what really happened out there.

A.    I would tell you anything in the world to bring that little
      girl back.

Q.    Well it's not, it's not gonna bring her back. She's gone.
      But I, I want you to understand this too okay. I
      understand, if, if this happened the way that I think it
      happened, that you got angry with her, you went off and, and
      this happened and she was hurt real bad, all right. And now
      it's been done and you feel really bad about it and you
      chose, at that point, no I don't want to take her to, to the
      hospital because I know that I'll, I'll get in trouble for
      this. If that's what, what happened that's, I can almost
      understand this. But if you just let that kid suffer all
      night long, all night long, from the time this happened to
      the time she's throwing up to the time that, that her, her
      stomach had this huge mark on it on the, the bleeding head
      and you let her suffer all that night long, that is worth a
      lot to me too. Do you understand that?

Q2.   You were scared weren't you Barry, when she was sick?  Uh,
      and I think you were crying for a little bit more than just
      being accused of doing something. Being accused by little
      Rachel of doing this to her. I think it hurt more than just
      your feelings you think?

A.    Um, the accusation alone was just...

Q2.   Barry, come on man. Cut the crap okay? It's time to tell
      the truth. I can only barely imagine where you were when
      this little kid is out there and hurt and she's hurt and you
      know why and you don't know what to do at the time. You
      don't want to get in trouble. Are you a cold blooded killer
      Barry? Did you plan to hurt that little girl and crush her
      the way she was hurt and the way she ends up dead? Did you
      plan to have her suffer all night long? To where she's
      puking her guts out 'cause she can't, she's dying? You
      didn't plan it did you? Is that what we're gonna look at
      you as, as a person who intentionally planned to kill this
      little four year old girl?

A.    ...you didn't know Rachel. She was sweet...

Pima County SO 05/17/02
Barry Lee Jones
00565

STATEMENT OF BARRY JONES--CASE #940502025                               71

Q2.   I'm sure she was.  She was a beautiful little girl.  So you
      tell me what someone is gonna think when this gorgeous
      little girl with long hair and big brown eyes, you, you tell
      me.

A.    ...I can't tell you why somebody would hurt her.  Much less
      kill her.

Q2.   You can't tell us that you did it did you?  Can you?  You
      can't tell us that.

A.    Not honestly no.

Q2.   You're gonna go away with all that inside you.  You're gonna
      go away with all of that and you're not gonna let it go are
      you?  If that's all you have left, that's all you have left
      to do is tell the truth Barry.  If you want to go away a
      cold blooded killer of an innocent little tiny four year old
      girl, if not you let us know how it happened.  If it was an
      accident, if uh, if things just got a little carried away
      because you know what?  You know when they do the autopsy
      tomorrow, we're gonna know everything.  We're gonna know a
      heck of a lot more.  And I just, by looking at her I could
      tell pretty much what happened to that little girl.  I know
      you did it Barry, I know you did it.  But I don't want to
      take you to jail knowing that you're a cold blooded killer.
      I don't want to believe that.  I don't want to believe that
      you, and I don't think you are like that.  I don't think you
      want to know in your mind that you're holding it back,
      you're holding it back lying trying to cover up for
      something you know you did.  How can you have that in you?
      How can you hold it in you?  We're not talking about drug
      charges, about uh, not liking cops because of a traffic stop
      or whatever, we're talking murder one of a four year old
      baby.  Your heart is turning as black as can be right now.
      Right now it's as black as can be if you cannot even, not
      even tell an ounce of the truth.  I don't want to believe
      that I am sitting here looking at a person who would
      intentionally murder a tiny four year old little girl.  I
      want you to tell me the truth, I want you to tell me if it
      was an accident.

A.    _____.

Q2.   Things happen, we all know that.  But if you did it
      intentionally...

A.    No.

Q2.   ...then you're gonna go down hard, real hard.  I'm gonna
      make sure that you go down hard for it okay?  This is the
      time for you to start explaining it Barry, because I know
      it's inside you.  I know, I know if you want to tell the
      truth you better tell it right now.  If you were ever, ever
      raised or ever had any uh, belief in the truth in you and
      any type of good person in you, you would tell us the truth

Pima County SO 05/17/02
Barry Lee Jones
00566

right now.

A.    I was raised _____.

Q.    What?
A.    I was raised good too.  This is uh...

Q2.   Things happen Barry.  We know things happen.
A.    ...not those things.  Not those things.

Q2.   Yeah, but you know what, it did.  It did happen.
A.    You're right.

Q2.   And we're looking right at you.  Are you an intentional
      killer?
A.    No.

Q2.   Did you plan to kill her?
A.    No.

Q2.   Did you plan to kill Rachel?
A.    No.

Q2.   Nobody, nobody in the world likes to sit there and admit
      that they would do something like that to a child.  But if
      it happened Barry, it happened.  And that's the only thing
      that's gonna save you right now is the truth.  'Cause we're
      not gonna give you any more chances.  This is the last
      chance you're getting Barry, I'm serious.  Murder one,
      intentionally.  Intentionally pre-meditated murder one.  Is
      that what you did?
A.    No.

Q2.   Was it an accident?  How did it happen?
A.    I don't know.

Q2.   'Cause you know there's a lot more don't you Barry?  Is
      there a lot more?
A.    _____

Q2.   You didn't what?
A.    I _____my little girl.

Q2.   She's not your little girl either.  She's someone else's.
A.    She's my little girl.

Q2.   And you know what?  I think you looked at her that way.  I
      think you looked at her like a piece of property that you
      could do with whatever you wanted.  And that's exactly what
      you're gonna go down as looking like.  A piece of shit who
      does whatever he wants to this tiny little body.  Whatever
      he wants to this tiny little body and that's how she ends
      up.  On a slab.  Because of you.  And you don't have enough

of any type of manhood in you or any decency in you to come out and tell us the truth. That's a bad heart you got inside you guy, that is a bad heart you got inside you.

A. I have no heart in me.

Q2. No you don't.
A. It went with Rachel this morning.

Q2. And you know what you're gonna do to her mother? You're gonna cause, because of all this, her other kids aren't going home to her right away. Not only did you take Rachel's life, but you screwed up everybody else's too. You can't even come out and tell the truth. I don't believe, I can't believe that you can't come out here and tell the truth.

A. You just hurt me _____ just shoot me in the head.

Q2. It would be that easy for you. It's not that easy. Why can't, you can't even give it up?
A. I _____ Rachel.

Q2. You can't even give it up? I mean you've already done this. You've already done it and you can't even come out and explain, have some self-respect. At least for her, at least for the baby.

A. I can't believe you're that cold.

Q2. No I am looking at the person that's cold. You are the one that's cold if you can't come out and tell us the truth.
A. A beautiful little girl, she's a hunk of me. You never knew Rachel. So warm and tender and caring.

Q. You know what's been bothering me since I sat down here Barry? This little girl gets shoved out of the, out of the van. You said you saw that right?
A. (no response).

Q. I'm sorry.
A. I seen her, I told her mom I seen her fall out the van, but I didn't think she fell.

Q. What do you think happened to her?
A. I think she got pushed.

Q. And who would have pushed her? Barry. Who would have pushed her?

Q2. You saw her fall out of the van?
A. Yeah.

Q2. But if she got pushed then someone has to be inside your van don't, don't they? Who was in your van without you knowing

about it?

Q.   Who was in there Barry?  Barry, who was in your van?  You
     told me earlier who was in there, who's in the van?  Barry,
     who was in the van?  Barry, who was in the van?
A.   Rachel.

Q.   And who else was in the van?  Were there two little boys in
     the van?
A.   Uh huh (yes).

Q.   There were two little boys in the van when she fell out?
A.   Uh huh (yes).

Q.   All right.  So you went out and grabbed her.  Did you talk
     to the little boys?
A.   _____ van anymore.

Q.   What?
A.   Told 'em they couldn't play in the van anymore.

Q.   Okay, all right.  So here's Rachel, she's hurt and she's in,
     in bad shape...
A.   She wasn't really hurt.

Q.   ...why didn't you call the Sheriff's Office then and said
     these kids pushed my, my daughter or my step-daughter out of
     the van, why didn't you do that?  Do you, can you see my
     point of view Barry, why this isn't making not one bit of
     sense?
A.   Read, read your notes.  She, she, she didn't cry.  She just
     said her head hurt.

Q.   Well still, you said she was pushed out and you say...

END OF TAPE 4

START OF SIDE A, TAPE 5

Q.   She didn't cry, she just said her head hurt.

Q.   Well sill, you said she was pushed out and you say yourself,
     no little kid could have done this to her.
A.   I never seen that other stuff until that evening.

Q.   All right.
A.   She, her head started bleeding till...

Q.   Okay, okay, all right.  Why didn't you call the Sheriff's
     then?  When you saw this _____ that's not natural,
     that, someone did that to her.  Why didn't you call the
     police then?  Do you see why this ma, isn't making not one

bit of sense to me Barry?

Q2.  Whose two kids are they?  Whose kids are those?  You know
     what, if I saw someone push my little girl out of a van or
     out of something, if I saw them do anything to my little
     girl I would have those two little kids by the back of their
     necks and I'd be talking to their parents.  Right now.  I
     would get this resolved.

A.   Rachel got up and said she had a headache that was it.  I
     gave her half of a aspirin.  She said everything was fine.
     Kids push kids.

Q2.  You're a liar Barry.  You're lying.  Two little boys can't
     do that.  Little boys, little kids can't do that to another
     little kid.

A.   I didn't see nothing on the girl until afterwards.  I didn't
     know anything about this until afterwards.

Q.   Okay.

Q2.  So who are the two kids in your van?  Why are they in there?

Q.   Barry why didn't you call the police when you did see this,
     this major damage on her?  Why didn't you?  And this is not
     making any sense to me.  Here you are, you're trying to tell
     me and try to, to make me believe that you had nothing to do
     with this.  And then when you find that she's got this major
     bruise on her and everything, you're choosing that you don't
     want to call the police or do anything about it.  You let
     her die.

A.   _____

Q2.  Even if you didn't, even if you didn't know the extent...
A.   No I guess...

Q2.  ...of her injuries...
A.   ...I guess I, I did.

Q2.  ...and you didn't let it go overnight.
A.   I guess I let her die.

Q2.  Could you have know what you did, what you did when you hurt
     her that way?  What did you hit her with?
A.   I let her die.

Q2.  What did you hit her with Barry?  Did you hit her with your
     fist?
A.   I let that little girl die.

Q2.  That's not all you did Barry.
A.   Huh?

Pima County SO 05/17/02
Barry Lee Jones
00570

Q2.   That's not all you did.
A.    I let her die.

Q2.   You caused her to die.  You're the one that did that to her
      aren't you?
A.    I let you die.  I never thought about that.

Q2.   Look at your hands.  Look at your hands.  Your hands did
      that to that four year old little girl.

Q.    This is Det. O'Connor, I'll be back in a minute Sonia.
      (leaves room)

Q2.   I don't want to think of you that way Barry.  I don't want
      to think of you as intentionally hurting that little girl.
      Come on Barry.
A.    I would never intentionally do anything even remote _____
      no.  But I, I didn't, I didn't call the police.  I figured
      uh, maybe the police would say _____.

Q2.   And that's understandable.  You got two kids playing or
      whatever kids, however many you said.  And, and, and little
      Rachel playing.  Big deal.  Kids are playing, kids will get
      hurt.  We're not talking about that.  We're not talking
      about that.  It what, it's what those two hands of yours did
      to Rachel.  We want to know.
A.    I should have called the cops.

Q.    Let's uh, let's take a brake.  You've, you've been in here a
      while, do you want to use the restroom?  Barry?
A.    No.

Q.    Are you sure?  You don't have to go to the restroom?
A.    I let her die.

Q.    Do you have to go to the restroom Barry?  Let, let's, let's
      take a break for a minute Sonia.

Q2.   Has he been patted?

Q.    Yeah.

(detectives leave room)

A.    (Starts to moan)

Q.    Barry do you need anything?  Do you need me to take you to
      the restroom?
A.    _____.

Q.    You okay?  All right.
A.    I'm sorry I.

Pima County SO 05/17/02
Barry Lee Jones
00571

STATEMENT OF BARRY JONES--CASE #940502025                         77

Q.  Pardon me?
A.  I didn't mean to let her die.

Q.  Well that's not it Barry.  You know, you, you had an
    opportunity where you could have done something for her
    later that night, but that's not the main issue.  She would
    have never been in that condition if you hadn't done what
    you did earlier.  I know that for a fact, okay?  I know it
    and I'm gonna prove it later on down the road.  I don't care
    at this point if you want to tell me about it or not.  Okay.
    I do want to get some information from you.  Have you ever
    been arrested before?
A.  Yeah.

Q.  Yes?
A.  Uh huh (yes).

Q.  Where were you arrested?
A.  Pima County.

Q.  For what?
A.  Uh...

Q.  I'm gonna find out.  I'll go run your records and I'll get
    all that stuff.  But I want to hear it from you.
A.  ...uh, uh, suspended license.

Q.  What else?
A.  Uh, I don't know.

Q.  You don't know?  Have you ever been arrested anywhere else
    besides Pima County?
A.  Yeah.

Q.  Where were you arrested before?
A.  Cochise County.

Q.  For what?
A.  Uh, _____firearms.

Q.  Okay.  Have you ever been arrested anywhere else besides
    Pima County and Cochise County?
A.  No, I don't think so.

Q.  Were you, where were you born?
A.  _____

Q.  Where?
A.  _____

Q.  When did you move from Gaffney, how long did you live there?
A.  Ten, I don't, I don't think I ever lived there.

Pima County SO 05/17/02
Barry Lee Jones
00572

STATEMENT OF BARRY JONES--CASE #940502025                    78

Q.  You didn't even, you were just born there, you didn't live
    there?
A.  I think so.

Q.  Where did you move from there?
A.  I don't know.  I moved to, I lived in Aiken (ph), South
    Carolina.

Q2. I have  a phone call.
A.  _____.

Q.  I'm sorry.
A.  Aiken, South Carolina.

Q.  How long did you live in Aiken, South Carolina?
A.  Not long.

Q.  Where did you move from when you let Aiken, South Carolina?
A.  I went to Augusta, Georgia.

Q.  How long did you spend in Augusta, Georgia?

Q2. Excuse me.
A.  Long time ago.

Q2. Inaudible.
A.  _____

Q.  How long?
A.  _____.

Q.  I can't hear you, would you please speak up a little bit for
    me?
A.  I said I don't know.  _____.

Q.  You don't know how long you lived there?  Can you, can you
    speak up for me a little bit, Barry, I have bad hearing.
A.  No, I don't know how long I lived there.

Q.  Where'd you live after you moved from there?
A.  I moved to Belvedere (ph).

Q.  Belvedere where?
A.  South Carolina.

Q.  How long did you live there?
A.  I don't know.

Q.  Was it a year?
A.  Maybe.

Q.  Was it five years?

Pima County SO 05/17/02
Barry Lee Jones
00573

STATEMENT OF BARRY JONES--CASE #940502025                    **79**

A.   No.

Q.   So from Belvedere where'd you move?
A.   I think we moved out here.

Q.   And when you say we moved out here, who moved out here?
A.   My mom, my dad and my brothers.

Q.   Where's your mom and dad now?
A.   Father's dead.

Q.   And where's your mother?
A.   In Benson.

Q.   In Benson?  Do you know when it was that you moved out here to Arizona?  I'm sorry.
A.   No.

Q.   How long have you been living out here in Arizona?
A.   I don't know.

Q.   Is it over a year?
A.   Uh huh (yes).

Q.   Is it over five years?
A.   Uh huh (yes).

Q.   Yes?  Were you ever arrested in South Carolina?  I'm sorry.
A.   No.

Q.   No?  So you never were arrested in South Carolina?
A.   No.

Q.   The only, was the only place you were arrested is in Arizona?  And you were arrested in Cochise County for some firearms violations?
A.   Uh huh (yes).

Q.   How about um, in Pima County. What else were you arrested for besides driving violations?
A.   I don't know.

Q.   Have you ever had a, a psychological evaluation?
A.   _____

Q.   What?
A.   I don't know.

Q.   You don't know if you've ever had one?
A.   Huh uh (no).

Q.   Do you not want to talk to me anymore Barry?

Pima County SO 05/17/02
Barry Lee Jones
00574

STATEMENT OF BARRY JONES--CASE #940502025                    80

A.   I'll talk to you.

Q.   I'm sorry.
A.   I'll talk to you.

Q.   Do you want to talk to me still?
A.   Sure.

Q.   I'm sorry.
A.   Sure.

Q.   All right.  Well it seems unusual to me when I ask you a
     question and you, you've told me I don't know, I don't know,
     I don't know.  Do you know, or you just don't want to tell
     me?
A.   I don't know.

Q.   You don't know if you want to tell me or not?
A.   I don't know what it is.

Q.   If you had had uh, some type of evaluation, do you think you
     would know about that?
A.   _____.

Q.   You would?
A.   Probably.

Q.   What kind of jobs have you worked?
A.   Been an iron worker.

Q.   Been a what?
A.   Iron worker.

Q.   An iron worker.  And what is it that, that you do?
A.   Put up iron.

Q.   And do you still do that today?
A.   No.

Q.   No?  I'm sorry.
A.   _____.

Q.   Are you gonna answer me or?
A.   I don't do that.

Q.   You don't do that anymore?
A.   No.

Q.   Can, can you speak up just a little bit for me Barry.  I'm
     having a tough time hearing you.
A.   I'm sorry.

STATEMENT OF BARRY JONES--CASE #940502025                    81

Q.   Okay.  What kind of work do you do when you do work?
A.   Odd jobs.

Q.   Have you worked on cars lately?
A.   (no response)

Q.   I'm sorry.  Do you, did you work on cars lately?
A.   Ever once in a while I'll work on somebody's car.

Q.   When was the last time you worked on a car?
A.   I don't know.

Q.   How long has it been?
A.   (no response).

Q.   You don't know how long it's been since you've worked on a
     car?
A.   No.

Q.   Who pays the rent where you live?
A.   I do.

Q.   I'm sorry.
A.   I do.

Q.   And how do you afford to pay the rent?
A.   I do odd jobs.

Q.   You do odd jobs.  What kind of odd jobs?
A.   Well I put up awnings and skirtings and fix coolers and _____
     _____ somebody'll put a fence, you know.

Q.   How much money do you normally bring in, let's say every
     week?
A.   It varies.  Sometimes people need a lot done, sometimes they
     don't need nothing done.

Q.   Are you behind in your rent right now?
A.   (no response).

Q.   How much?
A.   $100 dollars.

Q.   And who is it that you pay your rent to?
A.   Manager.

Q.   What's his name?
A.   Don't know.

Q.   How do you, who, do you write a check or do you just give
     him cash?
A.   Just give him cash.

Pima County SO 05/17/02
Barry Lee Jones
00576

STATEMENT OF BARRY JONES--CASE #940502025                    82

Q.    Does he give you a receipt of something?
A.    (no response)

Q.    Where are those receipts now?
A.    At our house.

Q.    Do you keep 'em someplace special?  Barry, do you keep those
      receipts somewhere?
A.    Yeah.

Q.    Where are they?
A.    I don't know.

Q.    Barry, do you know what goes on when you're arrested and you
      go to trial?  Do you know what a trial is?
A.    I never been to one.

Q.    You've never been to a trial?  What happens uh, when uh,
      when you got arrested for having a problem with the
      firearms?  What happened then?
A.    The judge just said 90 days and plunk.

Q.    Okay.  How are did you go in school?
A.    Halfway through 10th grade.

Q.    You made it through 10th grade?  Halfway through?  That's
      very good.
A.    Not really.

Q.    You were like a, a sophomore in high school right?  That's
      very good.
A.    Huh uh (no).

Q.    I have a lot of people in here that, that don't go that far.
      That, that's pretty well.  Did you ever see or, or ever see
      on TV or do you understand what goes on at a trial?
A.    Huh uh (no).

Q.    Can you tell me some of the people that are there at a
      trial?
A.    The judge.

Q.    Okay, that's good.  Who else is there?  That's very good.
      Who else is there?
A.    Bunch of people.

Q.    Okay.  Yeah, there are a bunch of people there I understand,
      but can you tell me who some of 'em are, just so I
      understand?
A.    Got an idea who they are.

Q.    You don't know who any of the people are except the judge?

Pima County SO 05/17/02
Barry Lee Jones
00577

STATEMENT OF BARRY JONES--CASE #940502025                          83

A.    I don't even know the judge.

Q.    Well I know you don't know him, but where does the judge sit?
A.    Right in front of the court.

Q.    Okay.  Good.  Is, and how is he normally dressed?
A.    I don't know.

Q.    Does he dress differently than other people?
A.    Ain't been in court _____ I don't know.

Q.    Okay.  Um, do you know who else is there?  Are there any other people there inside the courtroom that you can think of besides the judge?
A.    The guy seeing the judge.

Q.    Pardon me?
A.    The guy seeing the judge.

Q.    And, and who is that?  Who's the guy seeing the judge?
A.    Who, whoever they think done wrong.

Q.    Okay.  Is there anybody else there usually standing with the guy that did something wrong or they thought...
A.    Probably.

Q.    ...who's that?
A.    Uh, some attorney.

Q.    An attorney?
A.    Yeah.

Q.    Do you know what a jury is?  Barry, do you know what a jury is?
A.    Right.

Q.    And what's their job?   Then what are they supposed to be doing there?
A.    They tell you what they think.

Q.    What they think about what?
A.    About the charges.

Q.    And how is it that they, they hear about the charges?
A.    You get to tell them.

Q.    Does anybody else tell them about the charges?
A.    I think it's against the law.

Q.    It's what?
A.    Against the law.

Pima County SO 05/17/02
Barry Lee Jones
00578

STATEMENT OF BARRY JONES--CASE #940502025                    84

Q.  It's, what's against the law?
A.  Telling people.

Q.  So they just listen to the judge?  Do they listen to anybody else?
A.  Think it's against the law.

Q.  What's against the law?
A.  For 'em to listen to anybody else.

Q.  Okay, so the only people that are there is the, the guy who, who they accused of doing something wrong, the attorney that's there and the judge and the jury and that's it, there's no one else there?
A.  I think so.

Q.  When's the last time that you shaved?
A.  I don't know.  Wasn't today.

Q.  Pardon me?
A.  Wasn't today.

Q.  It wasn't today.
A.  No.

Q.  When was it?  Was it yesterday?
A.  I don't know.

Q.  And when you shave, how do you usually shave?  How do you take care of yourself?  What kind of shaver do you have?
A.  Electric razor.

Q.  An electric razor.  Do you use anything on your face after you've used it?
A.  No.

Q.  You said yesterday that you went to the grocery store and you bought some things um, did you pay cash for that?
A.  (no response).

Q.  I'm sorry.
A.  Huh uh (no).

Q.  And what store did you go to?
A.  Choice.

Q.  And why was it that you uh, you went and bought those things?
A.  We didn't have nothing to eat.

Q.  And so you went to the store or you guys were hungry and you, you went to the store and bought stuff, right?  Is that

Pima County SO 05/17/02
Barry Lee Jones
00579

correct?

A.    _____.

Q2.   I can't, I'm sorry Barry, I, I'm trying to listen to you and
      I can't hear what you're saying.  If you would please just
      speak up a little bit.

A.    Okay.  Yeah.

Q.    You said yes?  I don't have anything else.  You have any
      questions of him Sonia?

Q2.   Uh, Sarge does.

Q.    Okay.  Uh, Sgt. Downing is gonna come in uh, he works with
      us and uh, he'd like to have a word with you also before you
      get out of here.  Were you ever abused as a child?  Did
      anybody ever hit you?

A.    Uh, I got whuppings.

Q.    You got whuppings?  Who whupped you?
A.    My mom.

Q.    Your mother?  How often would she whip you?
A.    When I did something wrong or anything.

Q.    Did she ever whup you when you didn't do anything wrong?
A.    Maybe sometimes.

Q2.   Barry, this is uh, Sgt. Downing.

Q3.   Hi, how you doing?
A.    _____.

Q.    I'm gonna leave the room for a while sir.

Q3.   Look at me.  We just came back from looking at Rachel.
A.    (starts sniffing)

Q3.   Look at me.  Look at me.  Now it is your chance right now to
      tell me, to tell me, look at me, look at me.  To tell me
      that you're not the animal that I saw her.

A.    _____

Q3.   You didn't mean to do it did you?  Come here.  You didn't
      mean to do it.
A.    (crying)

Q3.   You know I got a couple of kids of my own.  And sometimes,
      sometimes things happen.  You're not an animal.  Barry.
      Barry.  Get it all out.  Let's get it all out and get this
      thing cleared up.  Come on.  Come on.
A.    I, I should have call, called the police.  I, I, I le, I let

STATEMENT OF BARRY JONES--CASE #940502025                    86

her die.  She, she told me it did, it, ah, ah, I didn't mean
for her to die.  I want to call the police, I didn't know.

Q3. _____ Barry tell me what happened.
A.  Ohhhh.  I...

Q3. Tell me what happened.
A.  ...I, I didn't call the police.

Q3. Uh huh (yes) you didn't call the police.  Okay.
A.  So I let that little girl die.

Q3. But you didn't mean to did you?
A.  No.

Q3. No.
A.  I would have called _____

Q3. Because you love that little girl right?  You love that
    little girl.
A.  Made her her very own Rachel bed.

Q3. Made her what?
A.  Her very own little Rachel bed.

Q3. Her very own little Rachel bed.  Is that afterwards?
A.  No, about three weeks ago.

Q3. Three weeks ago.
A.  I made the other kids bunkbeds.  She's upset 'cause she
    didn't have a bunkbed.

Q3. Uh huh (yes).
A.  I made her a little Rachel bed.

Q3. Made her own little bed for herself.  So tell me what
    happened yesterday.
A.  I let her die.

Q3. I know you let her die.  And that's good that you're saying
    this.  It's good that you're, you're dealing with that right
    now.
A.  I should have called the police.

Q3. You should have called the police, I agree.  But what
    happened prior?  Did she do something?  I mean were the, I
    mean what did, what happened to make her like that?  What
    did you do?  I mean things get away from people.  I
    understand that Barry.  I understand that.  I don't think
    you're the animal that I saw.  Tell me how it happened.
A.  She, she, she was bleeding in the head.

Pima County SO 05/17/02
Barry Lee Jones
00581

STATEMENT OF BARRY JONES--CASE #940502025                    87

Q3.   Bleeding in the head.
A.    And we _____we didn't call the police.

Q3.   How did she get uh, how did she bleed out of the head? How
      did she get the wound to her head?  Huh?
A.    I let her die.

Q3.   Did you hit her?
A.    _____

Q3.   Barry.
A.    _____

Q3.   Barry.  Barry.  Look at me.
A.    _____

Q3.   Barry, look at me.  Don't play this game with me.  Okay?
A.    I let her die.

Q3.   Yeah, you did.  You let her die.  Okay.  So let, let's,
      let's stop this crap all right?  Barry look at me.  Let's
      stop this crap.  You let her die.  I understand that.
      There's nothing you, nothing you can do right now to bring
      her back.  At least you admitted that, that you let her die.
      How did she get the wound to her head?  What animal, what
      animal did this to this little girl?  What animal just, just
      did this to her, huh?  Is this someone that don't care about
      anything, that doesn't care about a little, tiny girl that
      doesn't care, is this what happened?  Is...

END OF SIDE A, TAPE 5

START OF SIDE B, TAPE 5

Q3.   ...doesn't care about a little, tiny girl that doesn't care,
      is this what happened?   Is this, an animal does this?   This
      what you're telling me?
A.    _____

Q3.   So you're, you're the animal huh?
A.    No.  But _____know Rachel _____.

Q3.   Maybe someone that just snapped for a second.  She make you
      mad huh?
A.    _____

Q3.   Did she make you mad?  Working, working on the van and what
      not huh?  And all of a sudden she just kind of picking and
      picking and getting on your nerves huh?  Just getting on
      your nerves a little bit Barry huh?  And all of a sudden you
      maybe you pushed her out of the van huh?  Huh?  Maybe you
      just kind of push her?  Huh?  Then you kind of maybe hit

STATEMENT OF BARRY JONES--CASE #940502025                                88

her?  Huh?

A.   Rachel's never like that.  She was sweet and kind.

Q3.  Yeah, maybe you were trying to get her to do something to
     you huh?
A.   No.

Q3.  Barry, Barry.  Look at me.  Were you trying to get her to do
     something, maybe she didn't want to do it?  Huh?
A.   No.  She was _____ girl.

Q3.  So why'd you, why did you, why did you do what you did to
     her?
A.   I should have called the police.  _____ I thought her
     mom would know.

Q3.  You told her mom what happened?
A.   Yeah.

Q3.  What'd you tell her mom?
A.   What happened.

Q3.  What, what, what, exactly what did you tell her?  I haven't
     talked with the mom so I don't know.  What did you tell mom?
A.   She fell out the van.

Q3.  That she fell out of the van.
A.   I didn't think she fell out, I thought she got pushed.

Q3.  Did you tell her mom who pushed her?  Come on.
A.   I really didn't know _____ that I just seen her fall out
     the van.  I didn't see nobody push her, I just thought she
     got pushed.  _____ she fell.

Q3.  Who was in the van?  She there by herself?
A.   No.

Q3.  She wasn't there by herself?  Were you outside?
A.   No.

Q3.  You weren't out, you were inside?
A.   Uh huh (yes).

Q3.  So how'd you see her fall out of the van?
A.   From the door.

Q3.  From the door.  And what'd she do when she fell out of the
     van?
A.   She kind of rolled _____.

Q3.  She sit up?  She stand up?
A.   Yeah.

Pima County SO 05/17/02
Barry Lee Jones
00583

STATEMENT OF BARRY JONES--CASE #940502025                     89

Q3.  What'd she say?
A.   That her head hurt.

Q3.  That you hit her?
A.   That her head was hurt.

Q3.  That her head hurt.  What'd you do?
A.   Gave her half an aspirin.

Q3.  Gave her half an aspirin.  Then what'd you do?
A.   Pushed her around on her bike.

Q3.  Pushed her around on her bike.  See any blood?
A.   No.

Q3.  Did you look?
A.   Not really.

Q3.  You didn't really look.
A.   There was nothing wrong, you know, I, there was dust and I
     brushed it off of her.

Q3.  Uh huh (yes).  So then you pushed her around on her bike.
     Then what happened?
A.   That was when the little boys and a couple of little girls
     she's okay.

Q3.  Then what happened?  Did you take her to get medical
     attention?
A.   No.

Q3.  You didn't take her up to RFD or anything?  Barry.  Barry,
     you take her up to RFD?  Look at me, look at me.  You take
     her up to RFD?  You know what RFD, Rural Fire Department,
     you take her up there?
A.   No.

Q3.  Do you take her to Quik Mart?
A.   Uh huh (yes).

Q3.  Uh huh (yes).  When'd you go up there?
A.   That was uh, after her mom woke up.

Q3.  That's after her mom woke up.  What'd you do up there?
A.   Uh, some guy looked at her head.

Q3.  Who?
A.   I don't know.

Q3.  Was he a doctor?
A.   No.

STATEMENT OF BARRY JONES--CASE #940502025                    90

Q3.   Was he a medic?
A.    I don't think so.

Q3.   You don't think so.  What'd he look like?
A.    There was an EMT on his shirt.

Q3.   What kind of a color was his shirt?
A.    Thought it was brown.

Q3.   Where did he work at?  Was he driving an ambulance?
A.    No.

Q3.   Why didn't you take him across, why didn't you take her
      across the street to the RFD?
A.    There was a police there.

Q3.   Because of the police were there.  And you didn't want to go
      around the police?
A.    I don't have a driver's license.

Q3.   You don't have a driver's license.  So when you took her up
      uh, to uh, the Quik Mart, was there blood on her then?
A.    Maybe just a little bit.

Q3.   Just a little bit.  Was there blood on her bed?
A.    Yeah.

Q3.   Uh huh (yes).  Was there a lot of blood?
A.    No, not at that time.

Q3.   Not at that time.  So you go up to the Quik Mart, then what
      happens?  The guy said oh, there's nothing wrong with her.
      Is that what he tells you, nothing's wrong with her?
A.    No.

Q3.   What'd he tell you?
A.    Said uh, something about her eyes being reacting equal. _____
      bleeding on her head.

Q3.   Then what'd you do?
A.    I went and got her mom.

Q3.   Took her back home?
A.    Went and got her mom.

Q3.   Was her mom, where was her mom?
A.    She went and made a phone call.

Q3.   To where?
A.    U.S. pay phone about half a block away.

Q3.   Who'd she call?

Pima County SO 05/17/02
Barry Lee Jones
00585

STATEMENT OF BARRY JONES--CASE #940502025                    91

A.   Uh, friend of mine.

Q3.  Who?
A.   Uh, Woody.

Q3.  Woody.
A.   _____

Q3.  Why did she call him?
A.   We got some things around the house I was gonna sell him.

Q3.  So you went and picked up her mom.
A.   Uh huh (yes).

Q3.  And then what happened?
A.   Then I told her mom_____ get in the van.  It's a, I think
     it's just a little bump on her head she got a cut on her
     head and she's bleeding.  Then I told her what happened at
     the Quik Mart.  I went home and I held the little girl and I
     held the ice pack on her head and then all the ice melted.
     And I laid her down on the couch.

Q3.  Was she awake?
A.   Uh huh (yes).

Q3.  She was awake.  What was she saying?
A.   Said she didn't feel good a couple of times.

Q3.  So you, mom laid her down on, on the couch.  Then what
     happens?
A.   Nothing.

Q3.  Well no something happened because we've still go a lot of
     hours before, before it's all over with.  What happened
     then?
A.   Um, we, we, I ate.

Q3.  You ate.
A.   Uh huh (yes).

Q3.  At home?
A.   Uh huh (yes).

Q3.  Did she eat?
A.   Uh, no.

Q3.  What'd she do, lay on the couch?
A.   Uh huh (yes).

Q3.  She talk?
A.   Huh uh (no).

STATEMENT OF BARRY JONES--CASE #940502025                    92

Q3.   What'd she say?  Was she bleeding at that time, still
      bleeding?
A.    Uh, no.  Lot of water was coming from her, where I had _____
      _____.

Q3.   So you finish eating, then what happens?  What happened?
A.    Nothing.

Q3.   No, something did happen.  Do you go to bed, what'd you do?
      You play cards what, what happened after that?
A.    _____I let her die.

Q3.   Do you, did you and her mom get in an argument over this?
A.    No.

Q3.   No.   Did you see uh, her head?
A.    Who's head?

Q3.   Rachel's head.
A.    Uh huh (yes)

Q3.   What'd it look like to you?
A.    There's a cut on her head.

Q3.   How big a cut was it?
A.    About like this here.

Q3.   That long or that wide?
A.    That long.

Q3.   That long.  How wide was it?
A.    I don't know.

Q3.   Was it open, was it closed, what was it?
A.    _____ blood _____

Q3.   Was it open or closed, what was it?  Draw me a picture what
      the wound looked like.  That's it.  Just a cut.  Now draw me
      a picture of what it really looked like and quit playing the
      game.
A.    _____

Q3.   Did mom look at it?
A.    I don't know.

Q3.   Did you show it to her?
A.    Yeah.

Q3.   Did she look at it?  I mean you're sitting right there, did
      she look at it?  Did she?
A.    I don't know.

Pima County SO 05/17/02
Barry Lee Jones
00587

STATEMENT OF BARRY JONES--CASE #940502025                    93

Q3.   Yes or no.  Did she look at it?  What did mom say _____
      after that?
A.    Nothing.

Q3.   Nothing.  So you and mom and, and Rachel go back to the
      house, she lays down on the couch, you guys eat dinner and
      Rachel's saying I got a headache.
A.    She didn't say she had a headache.

Q3.   She don't, uh, that she don't feel good.  But she had been
      bleeding right?  Do you ever put her in her bedroom?  Never
      put her in the bedroom?  Yes you did put her in the bedroom
      or no you didn't put her in the bedroom?
A.    Not at that time.

Q3.   Did she, not, not at that time huh.  Did you ever put her in
      the bedroom?
A.    Yeah.

Q3.   When?
A.    Uh, after her mom woke up.

Q3.   After her mom woke up.  What time was that?
A.    Around 5:30.

Q3.   So this is with the, is this prior to mom knowing about the
      cut or after?
A.    Uh, prior.

Q3.   Prior.  And that's when you take her up to, to uh, Quik
      Mart?
A.    Uh huh (yes).

Q3.   Do you put her in her bed after you go to Quik Mart?
A.    No.

Q3.   Does anybody?  Is she ever found in bed?  When she's found
      this morning where is she?
A.    I don't know.

Q3.   You don't know.  Where does she usually sleep at?
A.    In her room.

Q3.   Did she sleep with you last night?
A.    Yeah.

Q3.   When you woke up was she in your bed?
A.    No.

Q3.   Did you go looking for her when you woke up?
A.    Her mom asked me where she was and I said I don't know.  And
      then uh, her mom started hollering uh, I went in there and

Pima County SO 05/17/02
Barry Lee Jones
00588

STATEMENT OF BARRY JONES--CASE #940502025                    **94**

grab, grabbed Rachel from her.

Q3. Where was she at when, when she had Rachel?
A.  She was in the room.

Q3. What room?
A.  The kids room.

Q3. The kitchen.
A.  The kids room.

Q3. The kids room.  As you're walking through the door which way
    do you turn?
A.  I just went straight in.

Q3. Okay.  If you walk in through the front door, which way
    would you turn, right or left?
A.  To where?

Q3. To the kids room.
A.  Right.

Q3. Turn right, okay.  Go on.
A.  That was it.  I told her grab some clothes, we're going to
    the hospital Emergency Room.

Q3. So did you drive her by, the, the Emergency?
A.  Yeah.

Q3. What happened when you got there?
A.  Just tell her gonna take care of the kids.  I told her I'd
    be back.  And uh, _____.

Q3. So did you go take care of the kids?  And then where did you
    go?
A.  Uh, I passed out at Ron's house.

Q3. You passed out at Ron's house.  Why did you pass out at
    Ron's house?
A.  I don't know.

Q3. No, you, you do know.  So let's don't play the game I don't
    know stuff okay?  You know everything up until the point
    where you don't want to admit something and then I don't
    know.  So that's not working with me okay?  I'm here to help
    you.  This is not working.  You gonna pout?  You're gonna
    pout.  Kids pout.  Are you a kid?  Huh?  Or you just kill
    'em?  Huh?  Is that what you do?  You just kill 'em, right?
    Huh?  She pissed you of didn't she?  Didn't she?
A.  Rachel was a good girl.

Q3. I don't care if she was a good girl or not.  She is not a

good girl anymore, she is dead.  She made you mad didn't she?

A.   I let her die.

Q3.  She made you mad.
A.   She never made me mad.

Q3.  Then why would you kill her?  Huh, why would you kill her?  Huh?
A.   I let her die.

Q3.  You know you'd feel a lot better if you told me.  You know that?  What happened in the van?  What'd you hit her?  HOw'd you hit her?
A.   Huh?

Q3.  Hit her with your fist in the head?  Hit her with your fist?
A.   No.

Q3.  What'd you hit her with then?
A.   I didn't.

Q3.  You think she got those marks from just walking down the street?  You think she got those marks from just falling down?
A.   We both know better than that.

Q3.  You, yes we do sir.  Yes we do.  We both know better than that.  We both know better than that.  We both know what happened.  We both know that.  Yes we do.  And I can't help you if you don't tell me.  I don't think, I don't think you're the animal.  I think there's maybe an animal inside you.  Is there an animal inside you?  Huh?  Is there?  Huh?  But I know how things, sometimes things just (makes sound) snap.  I know that.  Every day.  See it every day.
A.   Not with a four year old.

Q3.  You think it's worse when people snap with four year olds?  Huh?  Barry.  Barry.  You think it's worse when people snap with four year olds?  Huh?
A.   Children.

Q3.  It's kind of hard to admit something like that with a four year old isn't it?  Well, you're having a hard time admitting to it so I would imagine it would be a hard time.  What'd you do, just push her?  Huh, things start going on?  You know, she gonna sleep a whole lot better.  You know that don't you?  With all the problems she had, things are a whole lot better.  Do you believe in God?  Well you know that's where she is don't you?

A.   _____

STATEMENT OF BARRY JONES--CASE #940502025                              96

Q3.   Oh, I'm sure she is.  I'm sure she is.
A.    Sure too. _____

Q3.   You probably taught her to when she did wrong to admit it
      right?  Huh?  _____ teach her the right things.  Wouldn't you
      say that?  I understand you're not her father, but, you
      know, how long was she with you?
A.    I was her father.

Q3.   Okay.  So you taught her right and wrong, right?  You taught
      her about lying.
A.    Yeah.

Q3.   And if she does something, Barry look at me, Barry.  Hello?
      You talked about right and wrong, right?  When she does
      something wrong she has to, she has to admit to that right?
      Has to say that.  No matter what.  I mean no matter what.
      You, you still gotta do it right?
A.    The truth.

Q3.   Because why?  'Cause that's the right thing to do, right?
A.    Truth.

Q3.   And when, yeah, the truth.  And when she did something wrong
      I bet she said dad.
A.    No.

Q3.   No she didn't. What'd she say?  She...
A.    Barry.

Q3.   ...Barry.  _____ she said Barry I, I messed up, this is
      what I did.
A.    _____

Q3.   Didn't she?  And you probably, you probably got angry, but
      you understood, right?  You under, 'cause kids do things,
      right?
A.    Kids do things.

Q3.   And you probably punished her.  Probably put your arm around
      her, told her don't do it again, right?  Barry?
A.    Told her to go to her room or something.

Q3.   Probably sent her to her room.  But the thing is she told
      the truth, right?
A.    All that mattered.

Q3.   That's all that mattered.  That's all that mattered.  But
      you know what Barry?  She's looking at us right now.  She's
      looking down on both of us.  On all three of us here.  And
      she's saying the guy taught me, he taught me right, he
      taught me wrong and I want to sleep.  I want to, I want to

have a peaceful sleep from here on after. But why, why does
he not tell them the truth when he's always told me to tell
the truth.  That things can only get better from the truth.
Can only get better.  They can't get any worse.  She's just
wants to sleep.  She wants to lay there next to Jesus and
saying Jesus, he hurt me.  But he knew how to take it.

A.    She wouldn't say that.

Q3.   Let me finish.
A.    She wouldn't lie Jesus.

Q3.   Will you please tell the truth.  Barry I need...
A.    I'd never lie to Jesus.

Q3.   ...I need to hear the truth Barry.
A.    She would never lie to Jesus.

Q3.   How did you hurt her?  You didn't mean to hurt her.  How did
      you hurt her?
A.    (crying)  I didn't call the police.  I let her die.

Q3.   You knew that she was gonna die didn't you?  You were scared
      to call the police weren't you?  That's why you didn't go
      over to the, the uh, where RFD was because of wh, how bad
      she was hurt.  You were afraid the police were gonna do
      something to you weren't you?
A.    That poor little child, nothing scared me.  I would have
      done anything for that baby.

Q3.   But it was too late Barry.  It was too late.  You know it
      don't you?  It was too late at that point wasn't it?  You
      knew she was gonna die didn't you?  You prayed that she
      wasn't, but you knew it was all over.
A.    She didn't have to.

Q3.   She didn't have to what?
A.    Die.

Q3.   No, she didn't have to.
A.    I should have called the police.  I should have.

Q3.   So how did you hurt her?
A.    _____ phone police.

Q3.   How did she get the wound to her head?  Huh?  How'd she get
      the marks on her?  Thump on her?
A.    No.

Q3.   Huh?
A.    No.

Q3.   Did mama do it?

STATEMENT OF BARRY JONES--CASE #940502025                              98

A.   No.

Q3.  Huh?  She's born that way?
A.   No.

Q3.  How did they come about then?
A.   I don't know.  (crying)

Q3.  So how'd you feel when you started beating on her?
A.   She wouldn't lie to Jesus neither.

Q3.  Well that's exactly what you're doing.
A.   No.

Q3.  You need to tell me the truth.
A.   Ain't no sense in telling you something you don't believe.

Q3.  Well like you said, we both know what happened.  You know my
     side of the story.  I'd love to hear your side of the story.
     So we can just go on about business and worrying about
     burying her.  That's what our next thing is, we got...
A.   (cries out)

Q3.  ...we need to bury her.
A.   (cries out)

Q3.  Here.
A.   (crying)

Q3.  Who hurt her?  Barry, who hurt her?
A.   Huh?

Q3.  Huh, who hurt her?  Barry, who hurt her?
A.   I _____

Q3.  You did didn't you?  You did.  You did Barry.
A.   Couldn't do that.

Q3.  Not you, not, not you Barry couldn't do that.  Not you
     Barry.  This is a different person.  This is that guy that
     lives in here, that lives in here, not Barry.  Not Barry who
     loves his wife, loves his children.
A.   I love all children.

Q3.  Loves all, I know.  That's what I'm saying.  Not Barry did
     that.  It's the person inside here, the person inside here
     did it.  Let me talk to that person Barry.  Go on.  Let me
     talk to that person.  Find him inside you Barry.  Let me
     talk to him.  Come on.  Let me talk to him Barry.  Come on.
     Find him.  Come on.
A.   Oh, I, I, I want to hurt that person real bad.

Pima County SO 05/17/02
Barry Lee Jones
00593

STATEMENT OF BARRY JONES--CASE #940502025                    99

Q3.   Huh?
A.    I want to hurt that person real bad.

Q3.   Okay, get him out.  Get him out.  Let me talk to him.
      'Cause I want to hurt that person real bad too.
A.    I don't know where he's at.

Q3.   Well, he's inside you.  He's inside you.  The guy that did
      this is inside you Barry.  Get him out.
A.    He's not.

Q3.   Get him out Barry, come on, get him out, he's inside you, he
      wants to come out, he wants to talk to me right now.
A.    No.

Q3.   Come on.  I want to hurt him just as much as you do.
A.    _____ me.

Q3.   I want to hurt him just as much as you do.
A.    NO!  (pounding sound)

Q3.   I want to hurt him just as much as you do Barry.  I want to
      do him Barry.
A.    He's not in there.

Q3.   Just like you.
A.    He's not in here.

Q3.   She pissed you off didn't she?
A.    He's not in here.

Q3.   She just got on, she just got on your nerves and all of a
      sudden boom!  You had to take care of it huh Barry, huh?
A.    No.

Q3.   Yeah.
A.    I wouldn't hurt nobody.

Q3.   Yeah, you did.  You did Barry.
A.    I wouldn't.

Q3.   You did.  You did.
A.    I wouldn't hurt nobody.

Q3.   I can see it in your eyes.
A.    I didn't hurt nobody.

Q3.   You killed her.  You killed her.  No.  No.
A.    _____

Q3.   I don't think so.  You let that kid die.
A.    That I did.

Pima County SO 05/17/02
Barry Lee Jones
00594

STATEMENT OF BARRY JONES--CASE #940502025                                    100

Q3.   Because of something you did.  And it's like you said...
A.    Something I didn't do.

Q3.   ...like you said, it's hard to admit that someone would hurt
      a four year old that's never hurt anybody.
A.    If there was anyway possible I would take that little girl's
      place.

Q3.   If there's anything possible what?
A.    I would take that little girl's place.

Q3.   You can't take the little girl's place.
A.    I wish I could.

Q3.   I know you do.  'Cause you feel bad.  Don't you?
A.    She never even experienced life yet.  And there's people out
      there that don't deserve to live.

Q3.   I know.
A.    And she doesn't deserve to die.

Q3.   So why'd you kill her?  Huh?
A.    _____

Q3.   You didn't mean to do it right, is that what you're telling
      me?  Say Mike, I didn't mean to kill her.  Is that what
      you're telling me?  'Cause everybody else is gonna believe
      that you intentionally tried to kill her.  There ain't
      nothing I can do about it.  Nothing.  People don't uh, it
      doesn't sit well with, with, with some people when um, when
      a child dies.  In fact I would say it probably doesn't sit
      well with anybody.  Especially if it's intentional.  But I
      don't think you meant to kill her.  I think things just got
      out of hand.  That's what I think.  And that she did and you
      got, you panicked.  You panicked.  Oh my God.  If I tell the
      police this, this is gonna get going, maybe she'll get
      better, maybe I'll pray all night and she'll get better and
      it didn't work.  It didn't work.  And now you gotta accept
      it.  Now you gotta take the punishment.  Are you a man
      Barry?  Huh?  How much of a man are you?  Are you, do you
      take punishment?  Huh?  When you're wrong, do you accept
      that?  Then why aren't you accepting it now?
A.    Not wrong.

Q3.   You're not wrong.
A.    I _____punishment _____.

END OF TAPE 5

START OF SIDE A, TAPE 6

A.    _____.  Hang me, shoot me.

Pima County SO 05/17/02
Barry Lee Jones
00595

STATEMENT OF BARRY JONES--CASE #940502025                    101

Q3. No we don't shoot people and we don't hang people.
A.  Well I wish you would.  I wish you would.  _____

Q3. So when she fell out of the van, let me uh, just one second
    here okay.  When she fell out of the van is that when you
    saw the mark on her head?
A.  I didn't really see the mark on her head then.

Q3. Okay.  Didn't see any blood?  You bring her inside the
    house?
A.  I gave her and aspirin.

Q3. I gave her an aspirin.  And, and you looked.  Did you look at
    her head at that time?
A.  She had my ball cap on.

Q3. Give me a break.  Did you take the ball cap off?  Hey, this
    is pretty cool now.
A.  No I just dusted her off.

Q3. And push her on her bicycle and then she says I want to go
    play.  And then when she comes, then that's when you see
    the, that's when you see the mark on her head?  Huh?  Then
    that's when you look at it?
A.  I never did really look at it.  I just noticed she's
    bleeding.

Q3. Well most people when they look at something when they bleed
    and they see blood they look at it.  But you said you saw a
    cut.  And you tell mom about it.
A.  Uh huh (yes).

Q3. Did mama look at it?
A.  I think, I don't know.

Q3. Oh, okay.  Then you just took her home after the Quik Mart,
    put ice on her head and laid her on the couch and let her
    kind of doze off huh?
A.  No she never dozed off.

Q3. Was she crying?
A.  No.

Q3. So you think she got the cut from falling out of the van?
    Huh?
A.  I don't know.

Q3. I don't think so.  Do you know what?  I just sit here and
    watched you beat your head against the, the table here.  You
    did a pretty good job.  Pretty good job.  And I would think
    that if somebody's head was gonna lay open, it'd be yours.
    I mean you got a little tiny scratch there.  So I don't

think she fell out of the van.  I think you smacked her with
something.  I do.  I think you smacked her with something.
And you know what?  You don't have the guts to admit it.
You're not a man.  You don't have the guts to admit what you
did to her.  You're a wimp Barry.  You are.  The only person
you could possibly ass kick is a little four year old girl.
Well my friend, and I say the, use the term lightly, you're
the one that's gotta live with it.

A.   No I don't.

Q3.  Well, I don't know what that means, but uh, you need to tell
     somebody what happened.  You need to get it off your chest,
     you can't carry this.  You need to let her sleep.  You need,
     if you don't do it uh, nothing the rest of your life,
     nothing, the rest of your life let Rachel sleep in peace.
     Tell us why she got hurt.  Tell the truth.  'Cause Barry
     that's the only thing that's gonna make her sleep.  That is
     the only thing.  But you don't even have ma, you're not even
     man enough to do it.  The only, only person you give a damn
     right now is you think you.  And to hell about the rest of
     the family, the hell about me, the hell about the detective
     here, hell about Rachel and stuff like that.  You don't man.
     You don't.

A.   You don't know.

Q3.  Well why don't you tell me?  Why don't you...
A.   I loved Rachel.

Q3.  ...why don't you tell me?  I know you loved that little
     girl.  But you're not acting like it.  You're acting like a
     little punk sitting over there.  Little baby.  Sitting over
     there crying.  And you know what, you know what makes me
     mad?  You're not crying because she's dead.  You're crying
     because of you.  Let her sleep Barry.

A.   Okay.

Q3.  Suck it up.  Be a man.  And tell us what happened.  You
     can't do that.  You can't do that can you?  Can you?  You
     can't cough it up.

A.   _____ know what happened.

Q3.  You know what happened.  You do.  And I thought there was
     more into you than that.  She was very pretty girl.

A.   _____ little girl.

Q3.  You want to tell us what happened?  Huh?  Don't, now don't,
     don't sit there and cry, I don't know, I _____
     yes or no, I want a yes or no answer.  You want to tell us
     the truth in what happened or not?  Yes or no.

A.   I already did.

Q3.  She sl, she sleeps or she don't sleep, yes or no?  You gonna

    tell us how, how she got hurt?

A.    I want her to sleep.

Q3.    Then tell me how she got hurt.  Tell me how she got hurt Barry.  Huh?  Huh?  You punch her?

A.    No.

Q3.    Huh?  Did you hit her?  Huh?

A.    No.

Q3.    You smack her?

A.    No.  I never laid a hand on the little girl.

Q3.    Never laid a hand on her.  Then what did you lay on her?  Huh?

A.    Made her go to her room.

Q3.    You made her go to her room.  What'd you do to her last night, yesterday?

A.    Nothing.

Q3.    Nothing.  Okay.  Good luck.  You need to think about this one real hard my friend.  I thought there was more inside you than that.  You didn't give her anything else?

A.    I should have called the cops.

Q3.    Yeah, you should have called the police.  You, yeah, you, you should have.  No, no doubt about it.  You didn't give her anything else in this life, at least give her something in, in, in, in death.  At least tell the detectives what the hell happened, huh?  At least do that.  At least do that to her.  Make some good out of it.  You took her damn life.  You're disgusting.  (leaves room)

Q2.    Barry you know what?  There's another scenario.  Another scenario is, is that you're even a worst animal than what's sitting there right now.  You know why?  Because maybe she was being molested sexually by you.  By you.  And then maybe she might have wanted to say something.  Is that, am I close?  'Cause I looked at her vaginal area.

A.    You're disgusting.

Q2.    You are the disgusting one.  You are the animal that killed this tiny little person.  She couldn't even defend herself.  She's got bruises all over her little hands, her finger's all swollen up, it's got bruises on it.  Yeah, you bang your head real nice here, little, little tiny scratch.  But you did a number on her didn't you?

A.    You're disgusting.

Q2.    That's exactly what you did.  And you are the cold blooded person that when I looked at her little body and I saw what

Pima County SO 05/17/02
Barry Lee Jones
00598

was wrong with her and I saw everything that you did to her that's exactly what I thought. And just like the sergeant said an animal did that to her. And we try to get you to tell us, tell us that no, you're not an animal. But guess what? You're just letting it lie, 'cause you are. You are a filthy, disgusting animal. And I hope you're freaking rotting inside. 'Cause that's exactly what's gonna happen. You're not even a man enough to come out and tell us and at least tell the truth. Admit to doing something wrong. Admit to losing it. Even if it was just for a couple of seconds, admit to it.

A.   I didn't call the police.

Q2.  What were you gonna tell the police if you called the police?

A.   She was sick.

Q2.  Wow, she's sick. How did she get that way? You got your chance to tell the police right now. I'm right here. Tell me.

A.   I don't know how she_____.

Q2.  And you didn't call the police when that poor little thing was over by a tree sitting there and the neighbor's had to watch her suffer.

A.   What?

Q2.  Huh? The neighbor's saw her crawling around the mobile home park, sitting there all by herself.

A.   She was playing.

Q2.  You, no.

A.   Yes she was.

Q2.  No. Because we've got witnesses. And then you say that she was thrown out of the van. But yet you didn't go and find out whose in your van? The story sucks buddy. You can't even get a good enough story. You can't even get a good enough story to say yeah, she was thrown out of the van, but you don't go find out by who.

A.   If I was making up stories I could make up a better one than that.

Q2.  Who was in the van? Who was in the van? Start with number one. Who was in the van? Two kids? One kid? How many kids? You know why, because that is a made up story. That's a bad one. I'm tired of you. I am disgusted by you because you're nothing but a filthy, disgusting person who would touch and do this to this tiny little person. This tiny little person that did never, nothing to you except, you know what? I bet you she wanted to tell on you.

A.   (blows nose)

STATEMENT OF BARRY JONES--CASE #940502025                    105

Q2.  I bet you she wanted to say something to you because I bet
     you you were molesting her.  That's exactly what I think.  I
     bet you were doing things...
A.   You have no right to say this to me.

Q2.  ...I have every right to sit here and talk to you like that.
A.   No you don't.

Q2.  'Cause it's what I believe and what I believe is what I'm
     saying to you.
A.   No you don't.  You don't have the right.

Q2.  Then why?  What did she do to make you do that to her?  The
     truth.  You don't even know what it is yourself huh, you're
     so full of yourself and that's the only person you care
     about.
A.   I care nothing about myself.

Q2.  Wait a minute.  Sit down a minute until I'm done with you.
     Sit down.  You're gonna go away and you're never gonna tell
     the truth 'cause you're gonna hold it in.  We gave you every
     chance we could give you and you're not doing it.  At least,
     at least for her.  And if you're not even thinking about her
     at least for yourself.  Think about yourself.
A.   I'm thinking about nothing but that little girl.

Q2.  I'll be back.  (leaves room)

Q.   Hi, Barry.  Sit down for a minute please.  I have to fill
     out some paperwork and then we're gonna take you over and
     get booked into the Pima County Jail.  How do you spell your
     last name please?
A.   J-o-n-e-s.

Q.   Is it a Junior or anything like that?  What's your first
     name?
A.   Barry.

Q.   And could you spell that for me?
A.   B-a-r-r-y.

Q.   And your middle name?
A.   Lee.

Q.   Is it L-e-e?  And what's your home address?
A.   ███████████████████████

Q.   What's your Zip Code over there?
A.   ██

Q.   Where were you born?
A.   _____, South Carolina.

Pima County SO 05/17/02
Barry Lee Jones
00600

STATEMENT OF BARRY JONES--CASE #940502025                    106

Q.   Can you spell that for me?
A.   G-a-n _____

Q.   Do you have a driver's license?
A.   No.

Q.   Was your driver's license taken away from you Barry?  Did
     you have an Arizona driver's license when that happened?
A.   (no response)

Q.   Do you have a phone at your home?
A.   (no response).

Q.   Are you working for someone right now?
A.   (no response).

Q.   You do odd jobs is that correct?
A.   (no response)

Q.   Do you know your Social Security number?
A.   (no response).

Q.   You don't know your Social Security number?  Do you have
     one, do you have a wallet or something with you?
A.   (no response)

Q.   You don't know your Social Security number?  What's your
     date of birth, when were you born?
A.   ███████.

Q.   How tall are you?
A.   ████.

Q.   And how much do you weigh?
A.   140.

Q.   Do you have any other names that you go by Barry?
A.   No.

Q.   None?  No AKA's, nothing?  In case of an emergency who would
     you like us to notify?
A.   _____

Q.   What about your mom?
A.   Huh uh (no).

Q.   Is she still living down in Benson?
A.   Uh huh (yes).

Q.   You don't want to contact her?  How about your brother?  Do
     you have a, would you like him notified?
A.   (no response).

Pima County SO 05/17/02
Barry Lee Jones
00601

STATEMENT OF BARRY JONES--CASE #940502025                     107

Q.   Does your brother have an address or a phone number or
     anything?
A.   (no response).

Q.   Would you like for me to get you a drink of water Barry?
     You're okay for now?  (leaves room)
A.   _____.  (starts crying and moaning)

Q.   Barry, please stand up.  Turn around.  Okay, Barry, let's
     go.

(they leave room)

END OF TRANSCRIPTION

WITNESSES:

_____
DET. M. O'CONNOR #642

_____
DET. S. RANKIN #672

_____
SGT. M. DOWNING #383

TRANSCRIBED BY:  CAROL MOORE, MAY 12, 1993

Pima County SO 05/17/02
Barry Lee Jones
00602

# Exhibit 13

THIS IS DET. GEORGE RUELAS OF THE PIMA COUNTY SHERIFF'S
DEPARTMENT, UH, THE FOLLOWING IS A TAPE RECORDED CONVERSATION
WITH A WITNESS, REFERENCE CASE #930502025, AND CORRECTION, THAT'S
94, THE FIRST TWO NUMBERS OF THAT CASE NUMBER.  TODAY'S DATE IS
MAY THE 2ND, 1994, THE TIME NOW IS 10:36.

LEGEND:  Q. DET. RUELAS    A. BRANDY JONES

---

Q.   Ok, Brandy, that's your name?
A.   Yes.

Q.   You don't talk too loud, it'll pick it up.  Br-, Brandy,
     what's your full name, your whole name?
A.   Brandy Elishia Jones.

Q.   Elishia, oh, that's nice.  What's your date of birth, do you
     know your date of birth?
A.   Uh, yes.  September the 4th, um, '82.

Q.   September the 4th, '82.  That makes you almost 12?
A.   Mm hm (yes).

Q.   You're gonna be 12 this year.  You goin' to school?
A.   Uh, yeah.

Q.   Where do you go to school at?
A.   Craycroft Elementary.

Q.   Oh, that's close.  Craycroft Elementary.  What grade you in?
A.   5th.

Q.   Who's your teacher?
A.   Mr. Brown.

Q.   Oh.  You like, you like Mr. Brown?
A.   Mm hm (yes).

Q.   I used to go to a school around here, too, I didn't go to
     Craycroft.  I'm, I, I was from this neighborhood.  Uh,
     we're, we're investigatin' somethin' that happened today,
     you know, and and we really don't know what happened but but
     you've been around the family.  How many brothers and
     sisters do you have?
A.   Um, two brothers.

Q.   Uh huh (yes).  What are their names?
A.   Andrew and James.

Q.   Ok.  Do you have any sisters?
A.   No.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
·June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    2

Q.   No?  Ok where do you guys live?
A.   Uh, the trailer before that one.

Q.   Ok the, the brown one?
A.   Yeah.

Q.   Oh, ok, the one that has a fence around the front?
A.   Mm hm (yes).

Q.   Who lives there with you?
A.   Me and my dad, Angela, Rachel, um, Becky and Johnny.

Q.   Ok.  Now I, you you went a little fast for me there.  Who's
     Angela?
A.   Uh, my dad's girlfriend.

Q.   Ok.  And and what, I'm sorry, what's your dad's name?
A.   Barry.

Q.   Ok.  And, and who else lives there, and just one at a time
     and kinda how old they are, it helps me, helps me tell..
A.   Ok.  There's Becky, she's ten, there's Rachel, she's four,
     there's Johnny, 'she's' 14, and there's me and I'm 11.

Q.   Ok.  And now..  Your, which ones, ok, your dad, uh, your dad
     is your dad but Angela's not your mom, right?
A.   No.

Q.   Ok.  Whose, who, who are Angela's kids?
A.   Becky, Rachel and Johnny.

Q.   Becky, Rachel and Johnny.  And your kids are, and and your
     brothers and sisters..
A.   Uh, is James and Andrew.

Q.   James and Andrew, ok.  Uh, and you all live here together,
     been living here for...
A.   Mm hm (yes).

Q.   ...awhile?  How long you guys been living here?
A.   About four months.

Q.   About four months, everybody's been livin' together.
     Where'd you live before that?
A.   Uh, with my Uncle Larry, right there.

Q.   Yeah?  Over on Winter...
A.   Yeah.

Q.   ...Palm?

03118

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    3

A.   Uh huh (yes).

Q.   That's your Uncle Larry, right?
A.   Yep.

Q.   Pretty nice guy.
A.   My favoritest uncle.

Q.   He's a nice guy, he came up and and we talked for a little
     bit and, uh, uh, I want you to know he, he care a lot about
     you, ok, and if there's any problem while we're sittin' here
     talkin' and or if, if you get upset or you need to talk to
     him or if, uh, you know, if you have any questions that you
     want to talk to him about, he's right there and you just,
     you just wave at him, ok?
A.   Ok.

Q.   Ok.  I mean 'cause, 'cause, uh, like I said, you're not in
     any trouble, we're just here to find out what happened.
A.   Ok.

Q.   Why don't..  Go ahead.
A.   I have a question to ask.  Um, what kid did my dad hurt?

Q.   I don't know that your dad hurt any kid.
A.   'Cause that's what everyone's tellin' me and my dad...

Q.   Well..
A.   ...didn't hurt any kids.

Q.   Who told you that?
A.   Um, the, my friends, um, her mom is my mom, her friend is,
     she, my mom, she's not my real mom but she's raised me since
     I was a little girl.

Q.   Uh huh (yes).
A.   And she told me that, uh, she's in there, uh, downtown for
     questions.

Q.   Oh, I see.  And and she said that your dad hurt somebody?
A.   Yeah, a little kid.

Q.   Oh ok.
A.   Ra...

Q.   Well, see a lot of, a lot of grown-ups say things, they get
     all excited and they, they say things that sometimes they
     don't know the whole story...
A.   I know.

RUELAS\HOMICIDE\JONES\#2336PENN

┌─────────────────────┐
│   SUPPLEMENTAL      │
│  ·June 10, 1994     │
└─────────────────────┘

STATEMENT OF BRANDY JONES--CASE #940502025                          4

Q.   ...ok?  So that's why we're here, that's what we try and do,
     we try and come here to find out the whole story and try,
     try and find out everything that happened.  What I want to
     know is, ok, let's, let's start with today, what happened
     today?
A.   Um, we woke up and, uh, Angela went...

Q.   How'd you wake up, did you wake up on your own or did you
     hear some noise or did...
A.   Yeah.

Q.   ...somebody wake you up?
A.   Well, um, uh, ok.  We, we were woken up because Angela's
     checkin' on Rachel every five hours, every hour because, um,
     she fell out of the van yesterday and hit her head.

Q.   Ok.
A.   And then she went over to play again because she said it
     didn't hurt or anything, they checked and everything, took
     her to paramedics, they said she was fine.  And, um, so she
     went back over to play and I guess and this boy hit her in
     the stomach with a metal bar, beat her in the stomach with a
     metal bar, and she's bleedin' internally and the mor-, and
     when she went down to sleep we tried to wake her up but see
     she just can't, she just wouldn't wake up.

Q.   Ok.  And so how did you wake up, did somebody wake...
A.   I..

Q.   ...you up?
A.   Yeah, they were screaming, Rachel, get up, Rachel, get up,
     come on, don't leave me now.  And it was scary.

Q.   Who was screamin' that?
A.   Angela.

Q.   That's a little bit scary, huh?
A.   I thought she was gonna die.

Q.   And so, so what happened?
A.   We went over to my friend's house because...

Q.   Who took you over there?
A.   My dad.  And..

Q.   Your dad said, come on let's, let's go?
A.   Yeah and...

Q.   What did..
A.   No he took her to the hospital first, took, um, her to the

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    5

hospital that..

Q.   Who'd he take?
A.   Angela and the kid, and he took us over to Ron's house
     'cause we can't be in the hospital, so we went over to Ron's
     house.

Q.   Ok.
A.   And...

Q.   Ok so, so your dad took Angela and Rachel...
A.   To the hospital...

Q.   ...to the hospital?
A.   ...real fast.

Q.   Ok in what car?
A.   In our yellow van.

Q.   The yellow van?
A.   But it belongs to my Uncle Larry right there.

Q.   Uncle Larry's van?  Ok.
A.   Mm hm (yes).

Q.   And then he came back and got you guys?
A.   Yeah and took us over to my fr-, my dad's best friend named
     Ron, 'cause we couldn't get in...

Q.   Over to Ron's house?
A.   Yeah, 'cause we couldn't be in the hospital.

Q.   Now who all went to Ron's house?
A.   Um, well, me, Becky...

Q.   Your dad took you..
A.   Me and Becky.

Q.   Becky.
A.   And that's it, 'cause Rachel's in the hospital and Johnny
     was at school.

Q.   Ok.  He went to school on his own?
A.   Yeah 'cause he, um, he'll start cryin' if he gets, if he has
     to stay home.

Q.   Ok was he here this morning though?
A.   Yeah he didn't know what was going on, he's deaf, he doesn't
     know what's...

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                            6

Q.   He's deaf?
A.   Yeah and he...

Q.   Oh ok.
A.   ...doesn't know what's going on.

Q.   Ok.
A.   So.

Q.   Ok.  You..  You said some things about Rachel fell out of
     the van.
A.   Yeah.

Q.   Were you there?
A.   Um, I think I was in the house when she fell out of the van.

Q.   Ok.
A.   I was here, I, I think I was in the house or I was out
     playing when she fell out of the van, because, um, like she
     tells my dad, when he works just so she'll have fun 'cause
     she, usually there's not no kids around here her age to
     play, so like when my dad works or something, she'll tell
     him how to work it, how to...

Q.   Who, Rachel will?
A.   Yeah.

Q.   Oh, oh...
A.   Tell him...

Q.   ...you mean Rachel'll hang around your dad like...
A.   Yeah and tells...

Q.   ...while he's like, while he's workin' on the van or
     workin'...
A.   Yeah or...

Q.   ...on a..
A.   ...she'll say oh you got that crooked and he'll have to go
     back over it and they like have a lot a fun together.  And
     she fell I guess, um, their friend came over and her
     brothers were in the van and she was oh can these guys come
     in and she, and he says, sure, the next thing I know, uh,
     Rachel fell out a the van, this boy pushed her out a the
     van, my dad jumped and that, and that thing he kinda worked
     with just got all over the place, like on the floor, but it
     didn't hurt anybody or anything, my dad jumped and stuff and
     then last night Angela said it was my dad, the one that did
     it and it wasn't him.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    7

Q.  Oh were your dad and Angela fightin' last night?
A.  Yeah, 'cause Rachel said that Barry was in the van and saw
    me fell and then she just misunderstood that to, um, well he
    pushed me out a the van and then _____ and then she
    said, he hit me with a metal bar, and then, 'cause, see she
    didn't say no name and then she was just talkin' about my
    dad, so she thought it was my dad, but then she said the
    name and it was over there..

Q.  Oh.
A.  So.

Q.  Were you there when Rachel said that?
A.  Yeah.

Q.  Ok.
A.  I was sittin' on the couch.

Q.  What, what are the names of the friends that Rachel plays
    with in the neighborhood?
A.  Uh, Mamas (ph), uh, let me think of her name, can't think of
    it right now (whispered).  Um, I don't know.

Q.  Ok.  When..
A.  All I know is Morton Mamas.

Q.  Ok.  So Rachel was playing inside the van, does the van have
    one of those sliding doors...
A.  Yeah.

Q.  ...on the side, is that what it is?  And the sliding door
    was open?
A.  Mm hm (yes).

Q.  And so..
A.  And my dad was workin' on his van, 'cause that's usually
    where he does all...

Q.  Dad was...
A.  ...his work.

Q.  ...workin' on the van and Rachel was playin' there, were any
    of the other kids there?
A.  Um, yeah.

Q.  Who was there?
A.  Uh, I, well I'm not sure.  All I know is Rachel got in the
    van and this boy pushed her out.  I don't know who was in
    the van, I don't know...

03123

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                8

Q.  Ok.
A.  ...who was with her.

Q.  How did you learn that Rachel got pushed out by somebody?
A.  'Cause she ran in and said that boy pushed me out, that boy
    pushed me out, and my dad couldn't have done it, 'cause he
    was under the van.

Q.  Were you in the house when, when she came in saying _____?
A.  Well I went out to the door when she was on the ground and
    my dad was under the van, I went to the door, and then, um,
    she...

Q.  Ok.
A.  ...ran up and says, ow, my dad took her to the paramedics
    real fast, she came...

Q.  Ok.
A.  ...back and said...

Q.  And so, so where was the, where was the boy when this
    happened, when you came outside...
A.  Oh he took...

Q.  ...and she was...
A.  ...off running.

Q.  ...layin' on the ground?
A.  He took off running.

Q.  Ok, and you didn't chase him or go after him or anything
    like that?
A.  Uh uh (no).  'Cause I don't like, you know, chasing, um,
    little kids and doing that.

Q.  Ok.  So what'd your dad do?
A.  So he just said, took her to the paramedics, uh..

Q.  How'd he take her to the paramedics?
A.  He grabbed her by 'his' arm and ran over there.

Q.  Uh huh (yes).
A.  Ran over there and said is she ok and then they said, yeah,
    she's gonna be fine..

Q.  Were you there?  Did you go with 'em over to the paramedics?
A.  Well I was running after 'em but I got there and then they
    were started to come back and I said is everything ok and
    they go yeah, there's nothing she can do, she's ok, and then
    she like said can I go play and that same boy hit her in

03124

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    9

the, beat her in the stomach with a metal bar.

Q.  Ok.  We'll go to that in a minute.  Ok so, so, so your dad
    picks her up and is he carrying her?
A.  Um..

Q.  Or does...
A.  Yes.

Q.  ...he put her in the car?
A.  He carries her like this and runs to the, um, paramedics.

Q.  Ok.  And so you saw him run that way, did you follow?
A.  I started to go after 'em...

Q.  Uh huh (yes).
A.  ...and, um, then guess, well the next thing I know I was by
    the street over there, almost to the fire station and she
    started walkin' back...

Q.  And he was comin' back?
A.  Yeah, she, Rachel had a smile and sucker in her hand, she
    was all happy and stuff.

Q.  Ok.  So your dad was, how long would you say he was gone?
A.  Oh about five minutes, no, about fifteen minutes, 'cause
    then right at five minutes after he left I started goin'
    goin' after him, and the paramedics checked 'him' out over
    there.

Q.  Who else was home at that time?
A.  Angela, Becky and Johnny.

Q.  Ok, but all you guys were in the house.
A.  No.

Q.  Ok.
A.  I'm not sure who was in the house, 'cause I just came in to
    go to the bathroom and then Rachel was laying on the ground
    when I walked back out.  And I said dad, look at Rachel, and
    he picked her up and..

Q.  Was Rachel bleeding?
A.  No, when at first when it happened, and then she started
    bleeding internally, puking up blood ...

Q.  How do...
A.  ...and stuff.

Q.  ...you know she was bleeding internally?

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    10

A.    'Cause, um, pe-, uh, uh, when we went over to our friend's
      house today she said, um, I said she was puking up blood and
      stuff and her head cou-, couldn't stop bleeding and she
      goes, and he goes, then she was bleeding internally 'cause,
      and I said, yeah she had bruises on her stomach where...

Q.    Ok.
A.    ...the boy hit her, and she says...

Q.    Ok.
A.    ...that's internal..

Q.    Let's find out about..  Ok.  So you come out and she's
      laying on the ground?
A.    Yeah.

Q.    Ok.
A.    And..

Q.    Is she crying or is she like dazed...
A.    Nuh uh (no).

Q.    ...a little bit?
A.    No, she...

Q.    Or is...
A.    ...she ...

Q.    ...she knocked out?
A.    ...started to get up and I said, dad, Rachel's on the
      ground, and he picked her up and ran her over to paramedics
      and they said she was fine, there's nothing 'she' can do,
      they can do.  _____

Q.    Ok.  So then Rachel's fine?
A.    Yep.  And then she came back and she was...

Q.    Ok so she's back, what'd she do then, your dad take her in
      the house or..?
A.    Yeah and then her mom checked her and said she was ok and
      then went back out and played and she came over, she st_____
      like that and her blood is...

Q.    She went out to play and she came back in?
A.    Yeah.

Q.    How long was she out playing?
A.    About 20 minutes.

Q.    Ok.

RUELAS\HOMICIDE\JONES\#2336PENN

03126

┌─────────────────────┐
│     SUPPLEMENTAL     │
│    June 10, 1994     │
└─────────────────────┘

STATEMENT OF BRANDY JONES--CASE #940502025                    11

A.   And then her, she came down and blood was rollin' down her
     head...

Q.   Ok.
A.   ...right down, and...

Q.   Is that the first time her head was bleedin'?
A.   Yeah.

Q.   Or did you see it bleed earlier?
A.   First time, yeah, it was bl-, it had blood.

Q.   Ok.  Ok go ahead, please.  You're doin' fine.
A.   And then, um, she started gettin' sick and stuff, we put her
     in the house and then she goes, my dad says, oh well I don't
     want to leave Rachel in case somethin' happens and _____
     doin' somethin' obvious he doesn't want to leave, 'cause
     usually he likes going places and stuff.

Q.   Uh huh (yes).
A.   And then he came back and then Rachel says, he did it, he
     did it, hit me, he, I fell, he pushed me out of the van and
     hit me in the stomach, and she just jumps to the conclusion
     it was Barry, she ran home and says, where did he hit you
     at, and Rachel says, no, not him, the other bo-, little boy
     over there.  And and then..

Q.   Well if, now when did Rachel go back out?  After your dad
     brought her back from the paramedics, when did she go back
     out?
A.   About 20 minutes later.

Q.   Ok.
A.   After her mom checked her and she went to the bathroom and
     got a drink.

Q.   Ok.  And she wasn't sick to her stomach then?
A.   Nope.

Q.   No.
A.   And then when she went back out to play over there, the
     little boy beat her in the stomach with the..

Q.   Ok how do you know that happened?
A.   'Cause she told us.

Q.   Ok.  Rachel told you that?
A.   Yeah.  She might've been lying or something but..

Q.   Ok.  So when did Rachel come home, what time?

RUELAS\HOMICIDE\JONES\#2336PENN

┌─────────────────────┐
│    SUPPLEMENTAL     │
│  'June 10, 1994     │
└─────────────────────┘

STATEMENT OF BRANDY JONES--CASE #940502025                    12

A.   Oh, it was about, I don't know, I wasn't paying attention to
     the time.

Q.   Ok.
A.   But if I was..

Q.   When did you notice when she came back in and her head was
     bleeding?
A.   Yeah.  About, she went to sit down and she went like this
     and then there was blood on her shirt, I said Rachel's
     bleedin', about five minutes after she came back in.

Q.   Ok.  And where was she bleedin' from?
A.   Her head.

Q.   You said she got sick to her stomach?
A.   Yeah then she started pukin' and she's sufferin', then she,
     my stomach hurts and that and she checked her stomach...

Q.   Uh huh (yes).
A.   ...and there was bruises all over _____ she goes how'd that
     happen, that boy, he, he, that boy hit me...

Q.   There were bruises 'acrost' her stomach?
A.   Yeah, like it was a metal bar or somethin' that hit her.

Q.   Ok.  And so Angela asked, right?
A.   Yeah, she went outside and said, what'd you hit her with, he
     goes, are you out-a your mind, ___, like 'cause my dad
     doesn't like bein' blamed for stuff and he would never hurt
     a kid, so he went outside in his van and thought why would
     someone blame it on me, and like, um, came back in and then
     they, __ talkin', he says, Rachel, why'd you say that, well
     I didn't do it, and then she goes, I didn't say you, it was
     that boy over there.

Q.   Were you there when they said this?
A.   Yeah.

Q.   Ok.
A.   I was standin' in the kitchen.

Q.   Ok.  And so then what happened?
A.   Uh, and then after that..

Q.   What time did you guys have dinner last night?
A.   Ooh um...

Q.   You did have dinner?
A.   Yes.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

Q. Ok.  What'd you guys have?
A. Uh, they had burritos and, 'cause they wanted burritos, I had fried chicken.

Q. Uh huh (yes).
A. And potato salad.

Q. What'd Rachel have?
A. Um, chicken and potato salad, I think, yeah, somethin'.

Q. Ok.
A. Either the burrito or somethin', but I think she had chicken, I'm not sure.

Q. Ok.  When did she start gettin' real sick?
A. Um, after she got done eating, 'cause she said my stomach hurts and my dad went up there and bought a strawberry milk, 'cause that usually helps him, so he got a strawberry milk and then brought it back and then she started pukin' after she got done with that strawberry milk, so they thought, well hey, _____ strawberry milk with, but and she couldn't, she started like that and this morning when she woke up she just wouldn't wake up and she was like real, real skinny and..

Q. Ok.
A. So I think e..everything she ate, she coulda gotten sick of and make her pass out or something, 'cause she was starved or..

Q. Yeah.  I'm not a doctor, uh, so I don't know.
A. Yeah.

Q. Uh.. We gotta talk to everybody and the only way we can really find out what happened is if everybody tells us the truth.  And I just want to make sure that, that what you're tellin' me is the truth, ok?
A. It is.  I'm not..

Q. 'Cause, uh, we're gonna talk to everybody and I know you love your dad, and you're...
A. Uh huh (yes).

Q. ...supposed to, ok.
A. But I wouldn't lie to stick up...

Q. I, I know.
A. ...for him or anything.

Q. I, I, well that's kinda what I'm just tryin' to say is I'm

03129

SUPPLEMENTAL
'June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    14

> not tryin' to say you're stickin' up for him.  I'm just
> sayin' that, uh, you know I know he's your dad and you love
> him very much and and and believe me, see the best thing if
> we can get the whole truth.  Because that's how we figure
> out what happened.  If, you know, uh, I don't think your dad
> would intentionally hurt a kid, you know, but sometimes
> accidents happen and...

A.   Yeah.

Q.   ...things happen and we just tryin' to find out maybe that's
what happened this time and and we try and find out as best
we can, that way, you know, everybody's satisfied with, with
the story.  Uh, I know you love your dad a lot...

A.   Uh huh (yes).

Q.   ...and and I, I just, best thing you can do to help your
dad, though, is tell the whole truth.  Uh, I gotta go find
the other kids in the trailer park and find out who, who
then, you know, is this kid.  Now you know the other kids
who play in the park.

A.   Yeah.

Q.   So who are these kids?
A.   Uh, there's Mamas, there's JJ, there's AJ...

Q.   And where do they live?
A.   Um, they live in that blue and white trailer right there.

Q.   Right there?
A.   Yeah.

Q.   Ok.
A.   And then there's, um, Mexican kids that lives the first
trailer out by the bar, ...

Q.   Ok.
A.   ...first trailer right there.  Then there's another one that
lives on the last trailer and, um...

Q.   Well which one is the one Rachel said hit her?
A.   I.. _____  And then there's kid, kids, um, right in front
of the first trailer by the bar, it's right there, across
from that white trailer right there...

Q.   Yeah..
A.   ...right 'acrost'.

Q.   She said, and you had to be listenin', you, I mean you heard
all these other things real good, you had to, you had to
hear who she said.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    15

A.   Not the name though.  I didn't hear the name.  It's, um,
     there's kids right over there and it was one of them kids
     but I can't remember all their names.  There's Ryan and
     then...

Q.   So the only way you know is...
A.   And after...

Q.   ...because..
A.   ...Ryan and Andrew, that's all I can remember.

Q.   Because that's what you heard.
A.   Yeah.

Q.   Ok.
A.   There's Ryan...

Q.   I know you, I know you talked with some grown-ups, all the
     grown-ups have been talkin' about this today...
A.   Mm hm (yes).

Q.   ...you know and they're all pretty upset and and they've
     been talkin' today, uh, what have they told you?
A.   Well what do you mean?

Q.   About what happened.
A.   Um, well they said that my dad hit, um, I don't know, um,
     hurt a little, a little kid.

Q.   But, but they weren't there, so they don't know.
A.   Yeah.

Q.   Ok.
A.   So so, uh..

Q.   Who said that?
A.   Um, lots a people, I can't exactly tell you who all, um,
     there was Ron, next door neighbor, there was, um, some
     people down in a different trailer court, um..

Q.   _____
A.   Ronnie told me in the trailer right there.

Q.   Oh they were all, they were all together talkin' about this
     today, huh?
A.   Yeah.

Q.   And what did they say happened?
A.   'Cause I called Mr. Ron, I said what's goin' on and he said
     there's a whole bunch a cops in front of Barry's house, I

SUPPLEMENTAL
·June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    16.

think he's goin' to jail, and then I said, ok, well fine, he goes, I guess he beats this little kid up, oh god, scared me.

Q.   Well don't be scared, I, see those grown-ups, they like to talk but they don't know what's gonna happen.  Just because they talk doesn't mean this is gonna happen or that's gonna happen.

A.   Yeah.

Q.   I mean that, you know, that's just how grown-ups are, they like to, does your mom and dad ever talk about, uh, you know people who like to spread rumors or ...

A.   Yeah.

Q.   ...tell stories or things like.. And that happens a lot down here, you know. 'Cause like I said, I grew up down here, too, so I know people always, they tell stories, they like to feel important.

A.   Yeah and then they...

Q.   And that's __...
A.   ...like to make them feel, that person...

Q.   Well that's...
A.   ...fell bad..

Q.   ...what makes it hard for us because so many people tell stories and we just try and find out the truth so we know what really happened.  Uh, you know you seem pretty bright, you know, you're pretty intelligent, you get pretty good grades?

A.   No.

Q.   No!  How come?
A.   I don't know, 'cause, um, like so worried about my life and stuff and so I, I been getting better grades this year but..

Q.   Good, you gotta do them grades, that way you, you, you know, you, you get a good job when you grow up or you marry a nice guy and ya, and ya, li-, life is good to you.  But you gotta work hard at those grades, too, I know they're tough, I, I didn't like school either so, sometimes school, I hated goin' to school.  So.  Ok, well maybe we can talk again soon.  Can you think of anything that you didn't tell me that that maybe I should know, that would help me out? 'Cause that's why I'm talkin' to you, I want you to help ...

A.   Um..

Q.   ...me.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
'June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    17

A.   And yeah, and one time the boy, he's a little boy, and he
     was over at my Uncle's Larry's house right there...

Q.   Mm hm (yes).
A.   ...and, um, he, uh, she was playing and she tripped over a
     doggie and hit her hea-, her arm, scratched it, and this
     little girl hit her in the nose with a rake.  Or a cra-, I
     don't remember what she said, a rake or a crate.

Q.   Uh huh (yes).
A.   And she fell or hit her, somethin', and then she woke up
     with two black eyes and Angela thought it was my dad but it
     wasn't, but..

Q.   Who'd that happen to?
A.   Um, Rachel, the same little...

Q.   Rachel, she...
A.   ...girl.

Q.   ...just tripped and..
A.   Yeah, same little girl.

Q.   And all of that.  How long ago was that?
A.   Ooh about three weeks ago.

Q.   Uh.
A.   Maybe two.

Q.   And and that was Rachel and your dad, were you there?
A.   Um, no, I was not there at that time.

Q.   But you said she tripped and fell and then got hit with a
     rake or hit a rake...
A.   Yeah.

Q.   ...or..
A.   Or fell on a crate or somethin'.

Q.   Mm, oh a crate.  Like a milk crate?
A.   Yeah or...

Q.   Oh.
A.   ...a crate or a rake, I'm not sure.

Q.   Ok.  And she had two black eyes, huh?
A.   Yeah and they were real bad.

Q.   Yeah.  And that was about three weeks ago?
A.   Mm hm (yes).

RUELAS\HOMICIDE\JONES\#2336PENN

03133

┌─────────────────────────┐
│      SUPPLEMENTAL       │
│    ·June 10, 1994       │
└─────────────────────────┘

STATEMENT OF BRANDY JONES--CASE #940502025                18

Q.  Uh, do your dad and Angela fight a lot?
A.  No.

Q.  No?  They don't fight a lot?  Do they, they argue, I mean I,
    I argue with my wife.
A.  Yeah, they argue.

Q.  Ok.
A.  But they don't like fight or argue a lot.

Q.  Ok they don't hit each other?
A.  No.

Q.  No.
A.  My dad does not hit girls.

Q.  Oh he doesn't hit 'em, believe in hittin' girls, huh.
A.  Nuh uh (no).

Q.  Ok, that's good, that's a good rule, I like that, I like
    that.
A.  My dad's never hit a girl in his solitary life.

Q.  Well that's good and that's the way it's supposed to be.
    Ok.  Well I appreciate you talkin' to me.  And like I say,
    we'll probably talk some more.
A.  Yeah.

Q.  Some more real soon.  Uh, I'm just tryin' to think now when,
    when Rachel was outside playin' in the van and dad was
    workin' on the van, was there anybody else out playin'?  Was
    there anybody else...
A.  In the van?

Q.  ...that saw..
A.  With her.

Q.  Yeah, that was out there that might have seen her fall.
A.  All I know is there was Mamas out there with her, Mamas and
    then there was two other little boys.

Q.  Mamos ..
A.  Mamas.

Q.  ...and two other little..  Mamas.
A.  Yeah, she's real big, she's a little girl, she's half
    Indian.

Q.  And they live here.
A.  That well blue and white trailer.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
'June 10, 1994

STATEMENT OF BRANDY JONES—CASE #940502025                    19

Q.    Blue and white trailer right there.
A.    Yeah.

Q.    Ok, that's Mamas lives there, anybody else?
A.    And her two brothers.

Q.    And those little ones that were over playin' when..
A.    No.  Just Mamas and, um, two other little boys of Stephanie.

Q.    Ok how old's Mamas?
A.    Uh, I think she's three.

Q.    Ok.  And the two boys, where do they live?
A.    Uh, the same place.

Q.    Ok.  The two boys that maybe were there though.
A.    Yeah they maybe have been there but I think they were
      Stephanie's kids.

Q.    Ok who's Stephanie's...
A.    Um..

Q.    ...kids?
A.    Uh, she has four, all I can remember is Ryan and Andrew.

Q.    Ok, and so you think it was Ryan and Andrew that may have
      been there?
A.    Andrew's just a little baby, but there, she has this one
      mean little kid that bashes her kids' head into the ce-,
      cement and stuff...

Q.    Uh huh (yes).
A.    ...and punches its legs and stuff, I think that was the one
      that pushed her out the van and hit her...

Q.    Ok.
A.    ...in the stomach.

Q.    What was his name?
A.    I cannot remember his name.

Q.    Ok but he's one of Stephanie's kids.
A.    Yeah.

Q.    Ok.
A.    If you talk to Becky, she'll, she can remember everyone's
      name in this trailer court and I lived here longer than her.

Q.    Ok.  Good.  Well I think we'll do that, I think we'll do
      that.  But those are the only ones you can think that were

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    20

     outside when, when Rachel fell.
A.   Yes.

Q.   You can't think of any others.
A.   Eh, um, all I know is there was Mamas and I think there
     could have been them two, there was, could've been some
     other two and then there could've been the Mexican kids.

Q.   Ok.  Well good, I'll I'll float around and see if I can talk
     to one a them.
A.   Yeah but I'm not sure.

Q.   Ok.  Anything else?
A.   Nope.

Q.   Alright, hey, I, I appreciate you talkin' to me, ok?
A.   No problem.

Q.   Thanks, let me shut off this tape recorder.  The time's now
     11:00 o'clock.

_CORRECTIONS MADE_
_BY 857_

WITNESS:

_[signature]_ 857
DET. RUELAS' #857
051194

TRANSCRIBED BY:

C. PENN, MAY 7, 1994

03136

SUPPLEMENTAL
June 10, 1994

**Exhibit 14**

# Hannon Biomechanics Analysis
# www. Hannonbiomechanics.com

Hannon Biomechanics Analysis is a Phoenix area based Arizona Corporation, providing consulting services and expert witness testimony in detailed biomechanics, functional human anatomy, neurosciences, and medical analyses.  When required, autopsies are also performed by this office.  We also have a satellite office in Dallas, Texas.  Our civil litigation casework includes over 2100 cases over the past 26 years including cases involving passenger motor vehicle accidents, large commercial truck accidents, pedestrian injuries, industrial injuries, human falls, surgical implant failures and sports/recreational injuries.  Criminal forensics cases addressed include physical assault/homicide including child abuse, shootings, beatings and vehicular homicide.  Computer modeling of the human body is performed when required in a cost effective manner (both simulations and videos).

Our core expertise is injury causation biomechanics relating traumatic forces, moments and torques to tolerance limits for the head, spine and all other human anatomical sites.  Injury analyses include medical chart reviews, human dynamics literature and product testing in cases involving personal injury.   Hannon Biomechanics Analysis medical opinion is offered by Michael Iliescu MD.

Dr. Patrick R. Hannon has been funded by the National Science Foundation, the Air Force Office of Scientific Research and the Department of Defense.  Dr. Hannon is a retired professor and Faculty Emeritus at Northern Arizona University, College of Engineering and Natural Sciences, Dept. of Biology.  He held a tenured full time faculty position for 28 years at Northern Arizona University prior to his retirement in May of 2008.   Dr. Hannon has addressed hundreds of injury biomechanics, neurosciences and functional anatomy injury issues and has testified nationwide in over 400 civil and criminal cases in county, state and federal courts over the past twenty-six years.  He has completed faculty fellowships at Wright-Patterson AFB (Ohio) in Biodynamics, Brooks AFB (Texas) in the neurosciences and accomplished a six month sabbatical at Thomas Jefferson Medical College (Dept. of Neurology) (Philadelphia).   Dr. Hannon has co-authored the first textbook published in the United States in forensic biomechanics, entitled <u>Forensic Biomechanics</u>, (2006; 2008) and additionally serves on the Board of Associate Editors for the new international journal entitled the " Journal of Forensic Biomechanics" (twenty-two associate editors worldwide). [ http://www.omicsonline.com/open-access/editorialboardJFB.php]

Dr. Michael Iliescu's professional background is in forensic pathology and the pathology of trauma.  His academic experience includes ten years of college and university teaching in these areas.  He has performed more than 2,000 forensic autopsies and has testified in criminal cases in County, State and Federal courts in Arizona and Florida.  Dr. Iliescu is board certified as a Forensic Physician by the American College of Forensic Examiners International.

**Affiliates Expertise:**

**Mechanical engineering issues can be addressed by:**

1) Gene Baxter Ph. D. (see our web page).

2) Forensic Engineering, Inc.-  David Bosch, PhD and Dean Jacobson Ph D-(see our web page)

**Sports and Recreational Safety issues are addressed by** Mr. Richard T. Ball PLLC (see our web page)

**Injury Biomechanics Simulations and Trial exhibits**- Dr. Michael Valdiserri- (see our web page)
Bio-Sim.com -  Intelligent simulations
Michael Valdiserri Ph. D. also operates Med-Sim and Digital Human Inc.
**Dr. Hannon has also worked and continues to work with numerous other mechanical, civil and structural engineers as well as automobile/truck/motorcycle accident reconstructionists who are ACTAR credentialed.**

# Dr. Patrick R. Hannon

Mailing Address:  13771 North Fountain Hills Boulevard, Suite 114-359, Fountain Hills, AZ  85268-3733
Phone: 480-816-0930 Scottsdale • Cell Phone: 928-607-0425 • E-mail: Hannon@hannonbiomechanics.com
Physical Office Address in Scottsdale, Arizona
- Dallas, Texas Office:  4848 Lemmon Ave, Suite 362, Dallas, TX 75219; Phone 214-295-9596.
- Skype Address :  Patrick.Hannon47
- Upload large files to me- up to 2.0 gigabytes to: https://www.hightail.com/u/Hannonbiomechanics

| | |
|---|---|
| BACKGROUND SUMMARY | Dr. Patrick R. Hannon has over 25 years of experience in the field of injury-forensic biomechanics, human functional anatomy, and issues regarding human neuroscience.  Dr. Hannon is an Associate Professor Emeritus at Northern Arizona University within the College of Engineering and Natural Sciences, Department of Biology.  He has testified and qualified in both civil litigation and criminal matters.  Dr. Hannon has co-authored a text book published in the United States in forensic biomechanics, entitled <u>Forensic Biomechanics</u>, (2006; 2008) Lawyers and Judges Publishing Co., Tucson, Arizona. |

| | | |
|---|---|---|
| EDUCATIONAL BACKGROUND | **University of Northern Colorado** | 1980 |
| | Greeley, Colorado | |
| | Ed.D. – Exercise Science- Biomechanics/Functional Anatomy/Neurosciences Emphases | |
| | **Northern Arizona University** | |
| | Flagstaff, Arizona | |
| | M.A. – Exercise Science | 1970 |
| | B.S. – Physical Education, Major/Geology- Minor | 1969 |

| | | |
|---|---|---|
| PROFESSIONAL EXPERIENCE | **HANNON BIOMECHANICS ANALYSIS** | 1988 to |
| | CONSULTING PRACTICE | Present |
| | Hannon Biomechanics Analysis provides consulting services and expert witness testimony with a core expertise in injury biomechanics relating traumatic forces, moments and torques to tolerance limits for the head, spine and all other human anatomical sites.  Injury analyses include medical chart reviews, human dynamics literature and product testing in cases involving personal injury. Expert resources include detailed biomechanics, functional human anatomy, neurosciences, medical analyses and human factors.   When required, autopsies are also performed by this office.  The civil litigation and criminal casework includes over 2000 cases over twenty five years, including cases involving passenger motor vehicle accidents, large commercial truck accidents pedestrian injuries, industrial injuries, human | |

**Dr. Patrick Hannon**
Page **3**

_____

falls, surgical implant failures and sports/recreational injuries.  Criminal forensic cases addressed include wrongful death, child abuse, shootings, beatings and vehicular homicide. Computer modeling of the human body is also available.  Medical opinions are addressed by Michael Iliescu, M.D.

We have acquired the General Motors Hybrid III biofidelic head form for drop tower impact. Coupled with a drop tower, we are able to collect force plate data and tri-axial accelerometry (Kistler piezoelectric) applicable to head injury cases.

**NORTHERN ARIZONA UNIVERSITY,** Flagstaff, Arizona
**Faculty Emeritus** – BIOLOGY DEPARTMENT- Awarded May 2009
Adjunct Faculty- Part time- Department of Physical Therapy- Midwestern University, Glendale, Arizona 2010-11- Kinesiology and Biomechanics
Part- time Faculty Spring 2013-Department of Physical Therapy-Northern Arizona University Phoenix Biomedical Campus- 1) Functional Anatomy/Kinesiology and 2) Neuroscience

1986-
**NORTHERN ARIZONA UNIVERSITY,** Flagstaff, Arizona -                                    2008
TENURED ASSOCIATE PROFESSOR
My past research experience includes working in the Locomotion Laboratory at the University.  Much of the work was collaborative with biology, engineering and physical therapy professors.  My publications and presentations range in diversity from the Journal of Biomechanics to Brain Research.  The nature and extent of completed projects is indicated by the publications, presentations and abstracts listed herein.

My affiliation with Northern Arizona University as a retired tenured professor with Emeritus status also allows for biomechanics, neuromechanics and functional anatomy work in our Northern Arizona University laboratory facilities in collaboration with colleagues in biology, engineering and physical therapy.  The University has acquired a kinematics system from Skill Technologies (6D-Research system) which makes use of electromagnetic transmitters which generate near field, low frequency magnetic field vectors.  This system allows us to produce real time graphics of human motion during experimental testing of exemplar subjects related to litigation.  Furthermore, we have an EMED system which measures foot compression stresses and has value in gait mechanics as well as in other cases where precise compressive stresses must be measured during loading of the human body. Recently (2012), we have acquired the ARAS 360 Crime Scene Investigation computer module which is able to input laser acquired coordinates for 3-dimensional reconstruction of crime scenes.  Therefore, we are able to collect data which will address many different types of biomechanical issues related to civil injury litigation and criminal forensics.
        Finally, I was able to make use of the NAU human cadaver laboratory in order to clarify issues related to structural and functional anatomy before my retirement. My cadaver laboratory work is supplemented by work with Dr. Michael Iliescu in assisting with a minority of his autopsies.

**Dr. Patrick Hannon**
Page **4**

---

**JEFFERSON MEDICAL COLLEGE**, Philadelphia, PA                      January 1991 –
SABBATICAL – NEUROLOGY DEPARTMENT                                     May 1991
The Spring 1991 semester was spent in residence as a visiting faculty member.


**UNITED STATES AIR FORCE, BROOKS AIR FORCE BASE**, Texas        Summer 1989
FACULTY RESEARCH FELLOWSHIP AWARD

Ten week contract for work in the Sustained Human Performance Laboratory examining factors which affect human performance along with endocrine hormone correlates.


**UNITED STATES AIR FORCE, WRIGHT-PATTERSON AIR FORCE**          Summer 1986
**BASE**, Ohio
FACULTY RESEARCH FELLOWSHIP AWARD
Ten week contract to work at the Armstrong Medical Laboratory, Biodynamics and Biomedical Engineering Division – modeling and Analysis Branch.  This time was spent modeling and simulating human body movements within the Biodynamics Laboratory.  This work included modeling human movement with the Articulated Total Body Model (ATB, Calspan Corp).  The major focus of my faculty fellowship was on human kinematics and kinetics during emergency ejection from high performance aircraft.


**MONTANA STATE UNIVERSITY**, Bozeman, MT                           1984 - 1985
FACULTY EXCHANGE PARTICIPANT
My faculty exchange experience at Montana State University allowed me to work with Dr. Ellen Kreighbaum in biomechanics in the area of high speed filming of human motion and with Dr. Jim McMillan in neurophysiology.


**NORTHERN ARIZONA UNIVERSITY**, Flagstaff, AZ                       1980 - 1985
ASSISTANT PROFESSOR –School of Health Professions


**MIDDLE TENNESSEE STATE UNIVERSITY**, Murfreesboro, TN             1974 - 1980
ASSISTANT PROFESSOR OF PHYSICAL EDUCATION

One year leave of absence from Middle Tennessee State University to complete the doctoral requirements for residence at the University of Northern Colorado; year was spent as the Graduate Research Assistant in the Motor Control/Neurosciences Laboratory at UNC


**MIDDLE TENNESSEE STATE UNIVERSITY**, Murfreesboro, TN             1972 - 1975
INSTRUCTOR OF PHYSICAL EDUCATION


**THE UNIVERSITY OF IOWA**, Iowa City, Iowa                            1971 –
GRADUATE ASSISTANT IN EXERCISE SCIENCE                             June 1972

**Dr. Patrick Hannon**
Page **5**

---

| | |
|---|---|
| EXPERT WITNESS WORK | **INJURY BIOMECHANICS, FUNCTIONAL ANATOMY-NEUROSCIENCES**  1988 to Present APPROXIMATELY 2000 plus CASES |

I have been qualified and have testified as an expert witness in the area of biomechanics and functional anatomy in Maricopa County, AZ, Pima County, AZ, Coconino County, AZ, Los Angeles County, CA (Federal Court), Clark County, Nevada, Daviess County, Missouri, Dallas Texas and in San Diego County, California, (Federal Court).

Criminal Matters: Prosecution and Defense- California, Arizona and Nevada:
My work in criminal forensics includes testimony as an expert witness  for the United States Dept.. of Justice, the United States Attorney's Office, the State of Arizona Attorney General's Office, the State of Arizona Public Defender's Office, the Maricopa County, AZ Public Defender's Office, the Clark County Attorney's office ( Nevada), the Pinal County, AZ Public Defender's Office,  the Coconino County's Attorney's  office and the Maricopa County Attorney's Office.

Depositions and criminal interviews:  Approximately 300 appearances
Trial Testimony:          Approximately 140 appearances
Arbitrations:             Approximately 13 appearances

---

RESEARCH AND TRAINING

Please note that my academic research is focused in biomechanics, functional anatomy, and the neurosciences related to human performance (mental/motor).  Biomechanics research and my past teaching responsibilities include undergraduate and graduate biomechanics and functional human anatomy and underlie my qualifications regarding the evaluation of these issues related to accidents and criminal forensics.  I have received biomechanics and neurosciences funding (see grants) from the National Science Foundation (principal investigator and project director), the United States Air Force Office of Scientific Research (principal investigator) and the United States Department of Defense.

---

PUBLICATIONS, ABSTRACTS and PRESENTATIONS

**BIOMECHANICS and NEUROSCIENCES:**

Refereed Publications

1.  Rasmussen, Stanley A. Goslow, George E. Jr., and Hannon, Patrick R. (1984). "Mirrored three-view cinematography in small animal locomotion studies." Research Quarterly for Exercise and Sport, 55, (2), pp. 201-205.

**Dr. Patrick Hannon**

Page **6**

_____

2. Hannon, Patrick R., Rasmussen, Stanley A., and DeRosa, Carl P. (1985). "Electromyographic patterns during level inclined treadmill running and their relationship to step cycle measures. Research Quarterly for Exercise and Sport, 56, (4), pp. 334-338.

3. Saczalski, Ken and Hannon, Patrick. (1988) "Multi-variable effects of side impact passive occupant protection materials". Presented at the Society of Automotive Engineers Meeting, Detroit, Feb.29-March 4, 1988. Paper in its entirety published in the SAE Proceedings- 1988 (13pp).

4. McMillan, James A., Hannon, Patrick, Stevenson, Leticea M., and Van Natta, Timothy L. (1991). "Effects of body position on crossed extension reflex in decerebrate cat: rectus femoris is more sensitive than is vastus medialis". Brain Research, 538, pp. 152-156.

5. Youberg, D. L., Cornwall, M. W.., McPoil, T.G. and Hannon, P.R (2005) "The amount of rearfoot motion used during stance phase of walking" Journal of American Podiatric Medical Association 95 (4): 376-382.

**Published Reports and Editorials**:

Hannon, Patrick R., and Jansen, David (1986) "Modeling of Human Body Movement" - Report submitted to and published by the Air Force Office of Scientific Research, 1986 USAF - UES Summer faculty Research Program.

Hannon, Patrick and Iliescu, Michael (2014) The role of forensic biomechanics/medicine in physical child abuse, Journal of Forensic Biomechanics- March,  Volume 5(1).

**Books and Book Chapters**:
**CHAPTERS:**

Hannon, Patrick and Knapp, Kerry, (2003) Causes of Injury: A review of the low-impact, human subject literature. Ch. 18; in the new 3rd Ed. of Low Speed Automobile Accidents, Watts, A.J., Atkinson, D. and Hennessy, C., Lawyers and Judges Publishing Co., Tucson, Arizona.

Hannon, Patrick (2009) Forensic Biomechanics-Motor Vehicle Accidents (Ch. 10) In The Claim Adjuster's Automobile Liability Handbook ; Editor-  Steve Plitt , West Thomson Reuters Professional Pub. November, 2009

Hannon, Patrick (2010) Forensic Biomechanics-Motor Vehicle Accidents (Ch. 10) In The Claim Adjuster's Automobile Liability Handbook ; Editor-  Steve Plitt , West Thomson Reuters Professional Pub. 2010 supplement to Forensic Biomechanics-Motor Vehicle Accidents.

**Dr. Patrick Hannon**

Page 7

_____

Hannon, Patrick (2013) Forensic Biomechanics-Motor Vehicle Accidents (Ch. 10) In The Claim Adjuster's Automobile Liability Handbook ; Editor-  Steve Plitt , West Thomson Reuters Professional Pub. 2013 supplement to Forensic Biomechanics-Motor Vehicle Accidents-In Press.

BOOKS:

 Hannon, Patrick and Knapp, Kerry,  (2006; 2008) Forensic Biomechanics,   Lawyers and Judges Publishing Co., Tucson, Arizona.

Presentations and Abstracts:

1.  Hannon, Patrick R., Rasmussen, Stanley A., and DeRosa, Carl P. (1984). "Electromyographic patterns during level and inclined treadmill running and their relationship to knee flexor extensor strength ratios". International Journal of Sports Medicine 5:163.

2.  Hannon, Patrick R., McMillan, James A., and Stevenson, Lisa, 1985. "Differential contributions of vastus medialis and rectus femoris to crossed extension reflex:  affects of body position" Presented by Dr. Hannon at the Society  for Neurosciences Convention, Oct., 1985.

3.  McMillan, James A., Hannon, Patrick R., and Stevenson, Lisa. 1985. "Differential contributions of the rectus femoris and vastus medialis to crossed extension reflex: prolonged central summation" Presented by Dr. McMillan at the Society for Neurosciences Convention Oct., 1985.

    The last two presentations are the result of work completed at Montana State University in 1984 - 1985. Supported by National Science Foundation Grant #ISP - 8011449 and NIH Grant #RR08218.

4.  Hannon, Patrick "Advances in kinematics and kinetics measurements of human performance"- Orthopedics Update sponsored by the Arizona Physical Therapy Association, Jan 17, 1989, Phoenix, Az.

5.  Hannon, Patrick "Kinematics and Kinetics of Human Motion" April, 1991 presented at Neurology Grand Rounds, Jefferson Medical College, Philadelphia, PA.

6.  Hannon, Patrick, Fukumoto, David, Fleming, Scott, Pappas, Angelo "Variant and invariant characteristics of the human step cycle during speed and grade perturbations" Funded by the National Science Foundation - Integrative Neural Sciences Division, Feb. 1986, BSN-86-09779, American Society of Biomechanics, October, 1991, Tempe, Arizona-presentation at the National meeting and published  in the Journal of Biomechanics.

**Dr. Patrick Hannon**

**Page 8**

_____

7.  Hannon, Patrick "Injury Biomechanics and Vehicle Accidents" Presented to the Northern Arizona University Chapter of the Society of Automotive Engineers, Feb., 1992.

8.  Hannon, Patrick "Injury Biomechanics under high and low loading" Presented to the College of Health Professions, Northern Arizona University, Oct. 1994.

9.  Hannon, Patrick, McClean, Ian, A cadaver study of cervical and lumbar intervertebral disk morphology.  Presented at the College of Health Professions Honors Day, April 2001.

10. Hannon, Patrick – Current Topics in Functional Anatomy and Biomechanics – SATAI Conference, Newport Beach, California, November 2000.  Co-presented with Kerry Knapp.

11. Hannon, Patrick- Biomechanical Contributions to Criminal Forensics presented at the Coconino County "Death Investigation Seminar" Presented by the Coconino County Medical Examiner's Office, April 2003.

12. Biomechanics of Traumatic Brain Injury – Presented August 14, 2006 at the Southwest Association of Traffic Accident Investigators, Phoenix, Arizona.  Co-presented with colleague Michael Iliescu MD.

13. Hannon, Patrick "The Role of the Expert Witness in Wrongful Death Claims" Presented at the National Business Institute Presentation of TRYING THE WRONGFUL DEATH CASE IN ARIZONA, Oct 11, 2007  CLE- 6.0 units

14. Hannon, Patrick " The role of Biomechanics in Criminal Investigations"  presented to Criminal Justice class "Death Investigation" Scottsdale   Community   College; Sept. 27, 2008.

15. Hannon, Patrick "Forensic Biomechanics"  Presented in a Crime Scene Seminar –Criminal Justice class- Scottsdale Community College, Feb. 20, 2009.

16. National Business Institute- Anatomy and Physiology 101 for Attorneys-  Phoenix Arizona, February 11, 2011.

17. Central Nervous System Injury- Auto Negligence Special Interest Group CLE, Arizona Association of Defense Council.  Phoenix, Arizona , May 16, 2013.

**Dr. Patrick Hannon**
Page **9**

| | |
|---|---|
| GRANT HISTORY | **HUMAN BIOMECHANICS** |

1. Start up funding from Northern Arizona University.
   Hannon, Patrick - Northern Arizona University Organized Research four years of funding 1981 - 1983 and 1986 - 1988. Funded- Approximately $40,000 in total- Area of research: Biomechanics/Neurosciences

2. 1986  "Equipment Proposal for Biomechanics/Motor Control Laboratory at Northern Arizona University" Six mini - proposals were submitted as part of this proposal package, **Project Director**:  Dr. Patrick Hannon, - **National Science Foundation - Integrative Neural Sciences Division, Feb**. 1986, BSN-86-09779, $35,700 funded for the WATSMART Spatial analysis system.  The computer configuration to drive the WATSMART System was acquired through Northern Arizona University Organized Research funding ($9,000), Sept. 1986. Funded

3. 1986 Hannon, Patrick - AFOSR/United States Air Force Summer Research Program - Funded for summer salary and expenses. Funded ($9,600), (1986)  Area of Research: High performance aircraft emergency seat ejection.

4. Hannon, Patrick Principal Investigator, Knapp, Kerry Co-investigator: Integration and examination of EMG motor patterns, force measures and three dimensional kinematics in human arm and forearm movement- submitted September 2000 to Office of Naval Research-Science and Technical Research Program: Cognitive, Neural and Biomolecular Biomimetic Robotics ($158,873) –Submitted/ Not funded.  Neurosciences

## Human Shift Work Performance- Cognition/Vigilance

Grants:

1. 1988 "Human cognitive and motor performance measures under typical cool white fluorescent illumination vs. relatively high illuminance/irradiance cool white lighting"- Principal Investigator:  Hannon, Patrick; Co-investigators: Arnall, David; Brainard, George; Gibson, William; and Howell, Brian.   June, 1988-Submitted to the Defense University Research Instrumentation Program, United States Dept. of Defense, $34,286 funded. DOD 88450-1384 and AFOSR 89-0164.

2. 1989 Hannon, Patrick-AFOSR/United States Air Force Summer Research Program- Funded for summer salary and expenses. Funded $10,400 (1989) Specific Area of Research: Sustained Human Performance involving vigilance, cognitive performance during night time work shifts in the military setting.

3.  1990 Hannon, Patrick- United States Air Force Office of Scientific Research- Proposal "Effects of broad spectrum illumination on circadian neuroendocrine responses, electrophysiological measures and human performance- $5,629 funded for Summer, 1990 salary supplement (AFOSR 90-0305).

4.  1991 "Effects of early bright, late bright and dim illumination on circadian neuroendocrine, electrophysioloical, and behavioral responses" Principal Investigators: Hannon, Patrick and Brainard, George; Co-investigators: French, Jon, Gibson, William and Hopson, Margaret.  Funded at a level of $75,489 for one year beginning May 15, 1991.  AFOSR-91-0271.

## Publications and Presentations- Human Shift Work Performance- Cognition/Vigilance

1.  Hannon, Patrick, "Illumination and human performance" - presented July 27, 1989, Brooks AFB Summer Seminar Series.

2.  Hannon, Patrick (1989) "The influence of broad spectrum illumination on circadian neuroendocrine responses and performance"- Report submitted to and published by the Air Force Office of Scientific Research, 1989 USAF - UES Summer faculty Research Program.

3.  French, J., P. Hannon, G.C. Brainard 1990  Effects of bright illuminance on human performance and body temperature. 4th Int. Conf. Chronopharmacology and Chronotherapeutics Nice, France, March 15.

4.  Brainard, G.C., P. Hannon, J. French, and W. Storm, 1990 Effects of bright illumination on plasma cortisol in normal volunteers during sustained performance.  Ann. Mtg. Society Light Treatment and Biological Rhythms, New York, NY, May 14.

5.  Brainard, G.C., M.D. Rollag, P. Hannon, J. French, and W. Storm. (1990)  Effects of bright illumination on plasma melatonin in normal volunteers during sustained performance. European Pineal Study Group, Guilford, England, September 2-7, 1990.

6.  Brainard, G.C., J. French, P.R. Hannon, M.D. Rollag, J.P. Hannon and W. Storm, The influence of bright illumination on plasma melatonin, prolactin, and cortisol rhythms in normal subjects during 30 hours of sustained wakefulness.  Sleep Res. 20:444, 1991.

7.  Hannon, P.R., G.C. Brainard, W. Gibson, J. French D. Arnall, L. Brugh, C. Littleman, S. Fleming and B. Howell, Effects of bright wide spectrum illumination on sublingual temperature and cognitive performance in humans during nighttime hours. Sleep Res 20:458, 1991.

**Dr. Patrick Hannon**
**Page 11**

_____

8.  Hannon, P.R., G.C.Brainard, W. Gibson, J. French, D. Arnall, L. Brugh, C. Littleman-Crank, S. Fleming, J. Hanifin and B. Howell. Effects of bright illumination of sublingual temperature, cortisol and cognitive performance in humans during the nighttime hours. Photochemistry and Photobiology 53:15S, 1991.

9.  Gaddy, J.R., K. Doghramji, W. Breuninger, P. Hannon, G.C. Brainard and J.S. Bryan. Assessment of sleepiness by computerized EEG analysis. Sleep Res. 21:340, 1992.

10.  Hannon, P, Brainard, G., Gibson, W, French, J, Arnall, D, Brugh, L., Littleman-Crank, C., Fleming, S., Howell, B., and Rollag, M. "Bright light suppresses melatonin and improves cognitive performance during nighttime hours in humans" Sleep Res. 21:340, 1992.

11.  French, J., P. Hannon, G.C. Brainard, and G. Armstrong. Bright light effects on melatonin and cognitive performance.  American Society Photobiology Ann. Mtg. Florida June 21-26, 1992.

12.  Hannon, P., G.C. Brainard,  R. Childs,  W. Gibson, J. French,  J. Hanifin, and M. Rollag. Bright light suppresses melatonin and improves cognitive performance during nighttime hours in humans. Society for Neuroscience. Anaheim, California Oct. 25-30, 1992. Results published in USA Today.

13.  Sanford, B., G.C. Brainard, S. Beacham, J. Hanifin, J. Markoff, L. Streletz, P. Hannon, and D. Sliney Dose-dependent effects of UV-A on visual evoked potentials in humans. American Society of Zoologists (1992).

14.  Sanford, Britt, Beacham, Sabrina Beacham, Hanifin, John, Hannon, Patrick, Streletz, Leopold, Sliney, David, and Brainard, George. (1996) "The effects of ultraviolet-A radiation on visual evoked potentials in the young human eye", Acta Ophthalmologica Scandinavica vol. 74 pp. 553-557.

_____

WORKSHOPS AND CONFERENCES ATTENDED

1.  19th Annual International Workshop on Human Subjects for Biomechanical Research, San Diego, Cal., Nov. 17, 1991.

2.  35th Annual Stapp Car Crash Conference San Diego, Calif. Nov. 18-20, 1991.

3.  Musculo-Skeletal Biomechanics, Prosthetics, and Robotics Workshop, Feb. 19, 1994 College of Medicine, University of Arizona.

**Dr. Patrick Hannon**
Page **12**

_____

4.  Southwestern Association of Traffic Accident Investigators Symposium July 20-21, 1995 Phoenix, Arizona (Low Speed Rear-end Collisions).

5.  Users symposium for experienced users of the Articulated Total Body Computer Model- Phoenix, Arizona-, Feb. 9, 1996.

6.  Southwestern Association of Traffic Accident Investigators Symposium March 29 and 30, 1996, Las Vegas, Nevada

7.  Southwestern Association of Traffic Accident Investigators Symposium; Low-Speed Impact Dynamics / Human Factors; April, 1997  Las Vegas, Nevada

8.  Southwestern Association of Traffic Accident Investigators Symposium July 17-18, 1998 Phoenix, Arizona (Training course Staged Collision Sequence #17/Motor cycle Dynamics/Vehicle Aerodynamics)

9.  Southwestern Association of Traffic Accident Investigators Symposium -Attitude, Perspective and Integrity in Accident Reconstruction / Linear Momentum: Facts and Myths; Southwestern Association of Technical Accident Investigators; Laughlin, Nevada March 1999

10. Southwestern Association of Traffic Accident Investigators Symposium July 16 and 17, 1999 Phoenix, AZ (Training course Staged Collision Sequence Vehicle/truck Underride Data Collection, Sleep Apnea and MVAs, and Antilock Brake Performance.

11. Southwestern Association of Traffic Accident Investigators Symposium March 14 and 15, 2000 Laughlin, Nevada- Training in yaw vehicle dynamics during braking and uncontrolled vehicle acceleration

12. Southwestern Association of Traffic Accident Investigators Symposium, July 14-15 2000 Phoenix, Arizona.  Speaker-Dept. of Transportation Crash Testing and Occupant Protection

13. Southwestern Association of Traffic Accident Investigators Symposium, Nov. 2000 Current Topics in Functional Anatomy and Biomechanics – SATAI Conference, Newport Beach, California, November 2000.  Presenters- Patrick Hannon and Kerry Knapp

14. Southwestern Association of Traffic Accident Investigators Symposium March 2001 Las Vegas, Nevada- Tire construction and failure; Momentum analyses

15. Arizona Homicide Investigators Association, Inc. August 2001, Payson, Arizona Blunt Force Trauma, Speaker: Dr. Mark Fischione

**Dr. Patrick Hannon**
Page **13**

16. Southwestern Association of Traffic Accident Investigators Symposium March 2002 Las Vegas, Nevada- Commercial vehicle braking and human factors analysis

17. Arizona Homicide Investigators Association, July 2003, Phoenix, Arizona – Sexual Related & Medicolegal Death Investigation Seminar, Speakers: Dr. Michael Baden, M.D. and Vernon Geberth

18. State of Arizona Ergonomics Workshop- Risk Management Section, Flagstaff, Arizona January 22, 2004.

19. Southwestern Association of Traffic Accident Investigators Conference July 2005 Crush Analysis in Motor Vehicle Accidents- July 15-16 Phoenix, Arizona.

20. Southwestern Association of Traffic Accident Investigators Conference July 2006- attendance- July; Phoenix, Arizona.

21. Southwestern Association of Traffic Accident Investigators Conference July 2007- attendance- July;  Phoenix, Arizona.

22. Southwestern Association of Traffic Accident Investigators Conference March, 2008 Laughlin, Nevada- Energy Analysis of Vehicle Accidents

23. Southwestern Association of Traffic Accident Investigators Conference July, 2008, Phoenix, Arizona

24. Southwestern Association of Traffic Accident Investigators Conference March 13-14, 2009. Laughlin, Nevada.  Motorcycle Braking Abilities-Motorcycle Crush Analysis Crash Avoidance/Motorcycle Safety/Evaluating Motorcycle Rider Response

25. Southwestern Association of Traffic Accident Investigators Conference July 10-11, 2009. Glendale, Arizona.  Biomechanical Analysis of Rollover Crashes, Seat Belts in Rollover Crashes, MADYMO in Reconstruction /Rollover Crash Test

26. Southwestern Association of Traffic Accident Investigators Conference July 16-17, 2010. Glendale, Arizona.  Collision Crash Sequence #29;  Safety in Mass Production Vehicles; Pedestrian Safety and the 2009 MUTA/EDR data from Non-CDR Supported Vehicles

27. Southwestern Association of Traffic Accident Investigators Conference July 16-17, 2010. Glendale, Arizona.  Collision Crash Sequence #30; Analysis of Collision Crash Sequence #30/Accident Investigation Approach to UTV Incidents/ Mechanics of One Dimensional & Planar Collisions

28. Southwestern Association of Traffic Accident Investigators Conference- Sept. 2011 - Staged Crashes,  Investigation of UTV Accidents, Planar Mechanics  - Glendale, Arizona .

**Dr. Patrick Hannon**
Page **14**

_____

29.  Southwestern Association of Technical Accident Investigators, Sept., 2012; Staged Crashes, Comm Vehicle Braking Systems, Comm Veh Accident Investigation- Glendale, Arizona

30.  Southwestern Association of Technical Accident Investigators, Sept. 27-28, 2013; Fundamentals of Video Analysis/Momentum and Simultaneous Equations/Tire Forensics- Glendale, Arizona

31.  Southwestern Association of Technical Accident Investigators, March 14-15, 2014; Reconstructing a nighttime car vs. pedestrian crash/Interviewing witnesses and drivers/headlight performance in pedestrian strikes-Laughlin, Nevada

32.  Southwestern Association of Technical Accident Investigators, Sept. 26-27, 2014; Collision Crash Sequence #35/Applied Physics and Rotational Mechanics/GM Ignitions/Rollover Analysis, Glendale, Arizona

During my tenure at Northern Arizona University- 28 years to 2008 and forward to present

TEACHING RESPONSIBILITIES

1.  Functional Anatomy and Kinesiology (Undergraduate level)

2.  Biomechanics (Undergraduate and Graduate level)

3.  Forensic biomechanics-  Biology 300 –A five week elective course offered to undergraduate Northern Arizona University students

4.  A two hour lecture presentation to the Forensic Pathology class in Criminal Justice- Fall semesters (functional anatomy and forensic biomechanics)- up to 2007

5.  Biomechanics and Functional Anatomy – Graduate level- Physical Therapy Department- Midwestern University, Glendale, Arizona, Fall 2010 -2011.

6.  Biomechanics and Functional Anatomy-Neurosciences- 2 courses-Graduate level- Physical Therapy Department-Northern Arizona University- Phoenix Biomedical Campus- 2013 forward

7.  Former teaching responsibilities include 25 years of teaching a senior/graduate level neurosciences course (Neural Control of Movement)

8.  Additional course work teaching includes graduate level research design and statistics. 600 level course (5 years).

**Dr. Patrick Hannon**
Page 15

| | |
|---|---|
| MASTER'S THESES CHAIRED | 1. Van Demark, Cheryl (1992) Scapular Posture and Strength of the Scapular Musculature: A Relationship Study |
| | 2. Tsutsumi, Toshito (1992) Effects of Mental Practice and Relaxation Technique upon isokinetic strength performance |
| | 3. Hails, Dale (1992) The Effects of Strengthening of Scapular Retractors and Lengthening of Pectoral Muscles on Postural Alignment |
| GRADUATE PROJECTS CHAIRED | Knapp, Kerry (1995) Modeling Human Response in Low Rear Impact Collision |
| MASTER'S THESES COMMITTEE MEMBER | 1. Youberg, Linda (2000) Passive and Dynamic Motion of the Subtalar Joint |
| | 2. Ganley, Kathleen (1996) Effects of supramalleolar orthoses on stance in children with Down Syndrome |
| | 3. Sawert, Mary (1995) The validation of two-dimensional measurement of tibial rotation using three-dimensional movement analysis |
| | 4. Cimaglia, Richard (1994) Hemoglobin desaturation during running and cycling in highly trained duathletes |
| | 5. Hopson, Margaret (1992) Motion of the first metatarsophalangeal joint: reliability and validity of measurement techniques |
| PROFESSIONAL ASSOCIATIONS | 1. Past member- 15 years-Society for Neurosciences- National-by nomination and application |
| | 2. American Society of Biomechanics-National-by nomination and application-current |
| | 3. Society of Automotive Engineers-National-by nomination and application-current |
| | 4. Past Member-International Brain Research Organization-by nomination |
| | 5. Southwestern Association of Traffic Accident Investigators-by application-current |

**Dr. Patrick Hannon**
Page 16

6.  Forensic Expert Witness Association-National- by application and three references-current

| OTHER PROFESSIONAL ACTIVITIES | 1.  Textbook reviewer for Lippincott Williams & Wilkins Publishers, Philadelphia |

Functional Human Anatomy

ACTIVITIES

2.  Nov. 2009 -Selected as a Research Paper reviewer and selected to serve on  the Associate Board of Editors for the international journal entitled the "Journal of Forensic Biomechanics" Ashton Publishing- Associate Board of Editors: 2010-forward.  One of approximately 11 board members nationwide USA  (22 worldwide).

3.  Reviewer for Engineering Journals -OMICS Group

4.  Participation in the Arizona Justice Project- Arizona State University- area of Forensic Biomechanics- Pro Bono work.

**Recent Research Papers Reviewed and Edited:**

**2013:**

Penzkofer, R., Barnsteiner, K. and Dendorfer, S (2013) The influence of age, shoe type and kicking direction on the severity of head trauma- Journal of Biomechanics

**2014:**

Ricci, S., Salesi, M., Ricci, P., Stagnitti, F., and Massoni, F. (2014) Traumatic hemipelvectomy: surgical and medical-legal aspects- Journal of Biomechanics

Kohles, S., Barki, A., Kendricks, K., and Tuttle, R. (2014) Biomechanical analysis of concealed pack load influences on terrorist gait signatures derived from Grobner Basis Theory- Engineering Journals-OMICS group

Desmoulin GT, Rabinoff, M., Stoltz, B., and Gilbert, M.  A biomechanical method for reconstruction of tumbling trampoline-associated cervical spine injuries using human and anthropometric test dummy data -Journal of Forensic Biomechanics

**Dr. Patrick Hannon**
**Page 17**

---

# Hannon Biomechanics Analysis

# Michael Iliescu, MD
Curriculum Vita
**Licensed Physician (Pathology) in Arizona**

**American College of Forensic Examiners International- Board Certification at the medical doctor level (Certified Forensic Physician)**

## EDUCATION – RESIDENCY & FELLOWSHIPS

1999-2000    **Broward County Medical Examiner's Office**
Fellowship in Forensic Pathology

1995-1999    **MD Residency**: **Winthrop University Hospital, NY**
AP/CP resident

1977-1983    **Medical Institute of Timisoara, Romania**
Doctor of Medicine

## HONORS AND AWARDS

1977-1983    **Timis Scholar-Tuition Scholarship**
Timis State Higher Education Coordinating Board.  Award recognizing academic achievement and leadership activities of two university students per legislative district

## EMPLOYMENT HISTORY

2004-Present  **Hannon Biomechanics Analysis**
Forensic Consultant and Associate

2007-2008    **King County Medical Examiner's Office**
Assistant medical examiner
- *performed forensic autopsies*
- *participated in the development and implementation of new/improved forensic protocols, presented at KCMEO conference*
- *coordinated with the Department of Health follow up investigation in infectious disease related death, participated in the management of a mass fatality incident (Yakima airplane accident)*

2006-Present  **US Department of Health and Human Services**
Training officer for NDMS-DMORT team 9

**Dr. Patrick Hannon**
**Page 18**

_____

- *coordinated mass disaster management team on the federal level*
- *organized and supervised training exercise for a team of 93 members covering the states of  AZ, CA, NV and HI*
- *participated in development and implementation of standard morgue operating procedures for DMORT-9 team*
- *participated for 52 days at Katrina mission*

2005-Present   **Scottsdale Community College**
Adjunct faculty
- *Teaching Web-based forensic pathology classes*
- *Provide students with career advice and guidance*

2002-12/2003   **Coconino County Medical Examiner's Office**
Associate Medical Examiner
- *performed forensic autopsies*
- *participated in the development and implementation of new/improved forensic protocols used during death investigation*
- *presented and organized two Death Investigation seminars for local and federal law enforcement agencies*
- *participated at weekly management meetings with Department of Health division managers*
- *participated and supervised in two mass fatality incidents (airplane accidents)*
- *managed budget, personnel, supplies, contracts and supervised a staff of three and 3 interns*

2000-01/2002   **Maricopa County Medical Examiner's Office**
Associate Medical Examiner
- *performed forensic autopsies*
- *participated in the development and implementation of new/improved forensic protocols used during death investigation*
- *coordinated with the Department of Health follow up investigation in infectious disease related deaths*
- *participated at weekly management meetings*

1983-1991   **Tomnatic Medical Clinic (Romania)**
Family Practitioner and clinic director
- *supervised the work of county staff paraprofessional staff for development and implementation of personal health services and programs such as: Immunizations, Healthy Pregnancy, Family Planning and Healthy Infant programs*
- *managed budget, personnel, supplies, contracts and supervised a staff of seven*
- *coordinated with state and municipal health department planning for health services*

**Dr. Patrick Hannon**
**Page 19**

_____

December, 1989
**City of Timisoara Department of Health**
Department Head
- *coordinated with municipal authorities health planning and implementation of personal health services for a population of 250,000*
- *managed budget, personnel, supplies, contracts and supervised a staff of 19*

## TEACHING EXPERIENCE

2013-Present- University of Science, Arts & Technology, Monserrat- Forensic Pathology- web based teaching

2007-Present   **Advisory board member, forensic section**
University of Washington Extension, Forensics program

2005-Present   **Adjunct Faculty**
Scottsdale Community College – Administration of Justice Department
- *Teaching two web-based forensic pathology classes (AJS 223 and AJ 245)*
- *Provide students with career advice and guidance*

2003-2004   **Adjunct Faculty**
Northern Arizona University – Administration of Justice Department
- *Taught a Forensic Pathology class*
- *Provided students with career advice and guidance*

2004   **Adjunct Faculty**
Coconino Community College – Administration of Justice Department
- *Taught a Forensic Pathology class*
- *Provided students with career advice and guidance*

1994-1995   **Instructor**
South Seattle Medical Assistant/Phlebotomist Academy
- *Taught Anatomy and Physiology classes, including one* anatomy lab
- *Provided students with career advice and guidance*

1990-1991   **Assistant Professor**
Medical University of Timisoara, Romania – Biochemistry Department
- *Taught Biochemistry classes and laboratory*
- *Provided students with career advice and guidance*

**Dr. Patrick Hannon**
Page **20**

_____

## PRESENTATIONS AND LECTURES

Michael Iliescu, MD and other speakers: The Sixth International Congress of Forensic Sciences, key note speaker (Forensic Autopsy), May 2010, Puerto Vallarta, Mexico

Michael Iliescu, MD and other speakers. "Basic Forensic Pathology; Death Investigation Techniques", Alaska police association annual conference, 2009 Kenai Police Department

Michael Iliescu, MD. "Basic Death Investigation Seminar" One day seminar organized and presented at Scottsdale Community College, 2009

Michael Iliescu, MD and other speakers. "NTSB mass fatality incident management." Organized and presented for NDMS, DMORT-9 annual training, 2007, Tucson

Mary Dudley, MD and Michael Iliescu, MD. "Forensic Medical Investigation, Comprehensive Review." Phoenix, Kansas City and Atlantic City, 2006 and 2007.

Michael Iliescu, MD. "Katrina Mission, how identification of the victims was made." Seminar organized and presented at Scottsdale Community College, 2006

Michael Iliescu, MD. "Biomechanics of motorcycle accidents." With Patrick Hannon "Brain Injuries" Southwestern Association of Traffic Accident Investigators Symposium, 2006

Michael Iliescu, MD. "Role of the medical examiner in death investigation." Chandler Citizens Police Academy, 2005 and 2006

Michael Iliescu, MD. "Death Investigation." Organized and presented for Arizona Funeral Home Directors Association, 2004 and 2005

Michael Iliescu, MD. "Role of the medical examiner in death investigation." Flagstaff Citizens Police Academy, 2002 and 2003

Michael Iliescu, MD. "Death Investigation Methodology." Seminar organized and presented for Coconino County Law Enforcement Agencies, Flagstaff, 2001

Michael Iliescu, MD. "Death Investigation Methodology." Seminar organized and presented for National Park Services and Coconino County Sherriff's Office, Tusayan, 2002

### Publications:

Hannon, Patrick and Iliescu, Michael (2014) The role of forensic biomechanics/medicine in physical child abuse, Journal of Forensic Biomechanics- March,  Volume 5(1).

**Dr. Patrick Hannon**
**Page 21**

_____

## MEMBERSHIPS/LICENSES

2006            **Southwestern Association of Traffic Accident Investigators**

2007            **Medical license in Arizona and Washington States (Current license 2012 forward in**
                **Arizona)**

2010             **Mexican College of Forensic Sciences**

2009             **Academy of Criminal Justice Sciences**

2012            **American College of Forensic Examiners International- Board Certification**
                **at the medical doctor level**

**Dr. Patrick Hannon**
**Page 22**

_____

**Hannon Biomechanics Analysis**

**Ms. Erin N. Harper**_____

**EDUCATION**

      **Miami University , Oxford, Ohio**
*Master of Science (2011)*
- Exercise and Health Studies
- Thesis: The effects of static and dynamic stretching on competitive gymnasts' split jump performance.

**Purdue University**
**West Lafayette, Indiana**
*Bachelor of Arts (2007)*
- Health and Fitness

**WORK EXPERIENCE**

Fall 2011-present **Arizona State University, Kinesiology Program**
**Phoenix, Arizona**
*Instructor*
- KIN 101: Introduction to Kinesiology
- KIN 335: Biomechanics
- KIN 334: Functional Anatomy/Kinesiology
- KIN 494: Experimental Neuromechanics
- KIN 484: Internship
- KIN 494: Pre Internship

Fall 2011-present **Miami University Hamilton**
**Hamilton, Ohio**
*Adjunct Faculty*
- KNH 381: Biodynamics of Human Performance
- KNH 381L: Biodynamics of Human Performance Laboratory

Fall 2014-present **Hannon Biomechanics Analysis**
*Biomechanic Injury Analysis Consultant*

Fall 2013-present **Crossfit Haboob, Tempe, Arizona**
*Coach & Internal Consultant*

Fall 2011-2012 **Augspurger Komm Engineering, Inc & BTI Consultants**
**Phoenix, Arizona**
*Biomechanic Injury Analysis Consultant*

**Dr. Patrick Hannon**
**Page 23**

_____

Fall 09- Spring 11 **Miami University, Department of Kinesiology and Health**
**Oxford, Ohio**
*Graduate Assistant*
- KNH 381L: Biodynamics of Human Performance Laboratory
- KNH 184L: Motor Skill Learning and Performance Laboratory
- KNH 382L: Fitness Assessment and Exercise Prescription Laboratory
- Biomechanics and Motor Control Laboratory – Project topics: altitude physiology, postural control, running and jumping mechanics with use of Vicon 3D motion capture

Spring 2010 & 2011 **Miami University, Department of Athletics**
**Oxford, Ohio**
*Strength and Conditioning Internship*

2007-2009 **Queen City Gymnastics/Kids First Sports Center**
**Cincinnati, Ohio**
*Level 5 Lead Team Coach, Level 6 Team Coach, BLAST Coordinator, Pre-school Instructor*

Summer 2007 **Indiana Golf Foundation**
**Franklin, Indiana**
*Junior Golf Program Tournament Coordinator (Internship)*

2005-2007 **Malone's Gymnastics Center , West Lafayette, Indiana**
*Manager, Team Coach, and Recreational Program Supervisor*

Summer 2005 **Camp Pontiac, Copake, New York**
*Director of Gymnastics*

1998-2002 **Southern Indiana Gymnastics School,  New Albany, Indiana**
*Recreational Gymnastics Instructor/Team Coach*

**CERTIFICATIONS & PROFESSIONAL DEVELOPMENT**
- Functional Movement Systems Levels 1 and 2 Seminar Attendee, September 2014
- American College of Sports Medicine Annual Meeting; Indianapolis, IN conference attendee, 2013
- Southwest American College of Sports Medicine Annual Meeting; Newport Beach, CA conference attendee, 2013
- Quality Matters Course, Applying the QM Rubric, 2012
- 16th annual Congress of the European College of Sports Science; Liverpool UK conference attendee and presenter, 2011
- XXXVIII Symposium of the International Society of Biomechanics in Sports; Marquette, MI conference attendee and presenter, 2010

- Collaborative Institutional Training Initiative (CITI), Human Subjects Research, 2009-present
- Miami University IRB Training Course, 2009
- USA Gymnastics Region 5 Congress attendee, 2007, 2008
- College Mentors for Kids, Purdue University Chapter, 2004-2006

## PUBLICATIONS

1. Vigotsky, A., **Harper, E.**, Ryan, D., & Contreras, B. Effects of load on good morning kinematics and EMG activity. (Under review at *PeerJ).*

2. Patterson, J., Oppenheimer, N., & **Harper, E**. Differences in unilateral chest press muscle activation and kinematics on a stable versus unstable surface while holding one versus two dumbbells. (Under review at the *Journal of Strength and Conditioning Research.*)

3. **Harper, E.N.,** Strang, A.J., Walsh, M.S., Caserta, B., Haworth, J., & Hieronymus, M. (2012). Contributions of respiration rate and volume to changes in postural control following a 5k-run. *Gazzetta Medica Italiana- Archivio per le Science Mediche, 171*(4), 437-446.

## CONFERENCE PRESENTATIONS

1. Patterson, J., Oppenheimer, N., & **Harper, E**. Differences in unilateral chest press muscle activation on a stable versus unstable surface while holding one versus two dumbbells. (Presented October 2013 at the 32nd annual Southwest American College of Sports Medicine meeting; Newport, CA)

2. Oppenheimer, N., Patterson, J., & **Harper, E**. Differences in unilateral chest press kinematics on a stable versus unstable surface while holding one versus two dumbbells. (Presented October 2013 at the 32nd annual Southwest American College of Sports Medicine meeting; Newport, CA)

3. **Harper, E.N.,** Walsh, M.S., Baldwin, C.C. The effects of static and dynamic stretching on competitive gymnasts' split jump performance. (Presented July 2011 at the 16th annual Congress of the European College of Sports Science; Liverpool UK)

4. Walsh, M., **Harper, E.,** Baldwin, C., Waxman, J. Running in traditional running shoes vs. minimalist running footware: A Kinematic comparison. (Presented July 2011 at the 16th annual Congress of the European College of Sports Science; Liverpool UK)

5. Baldwin, C., Walsh, M., Cox, R., Massie, B., **Harper, E.** The effect of simulated altitude exposure: via rebreathing on interval performance. (Presented July 2011 at the 16th annual Congress of the European College of Sports Science; Liverpool UK)

6. Strang, A.J., Smart, L.J., **Harper, E.,** Walsh, M. Postural control developed to facilitate target shooting for stance on a dynamic surface. (Presented July 2011 at the 8th Progress in Motor Control meeting; Cincinnati, OH)

**Dr. Patrick Hannon**
**Page 25**

7. **Harper, E**., Strang, A., Walsh, M., Caserta, B., Haworth, J., & Hieronymus, M. Effect of respiration dynamics on postural control following a 5k run. (Presented July 2010 at the XXXVIII Symposium of the International Society of Biomechanics in Sports; Marquette, MI)