**Exhibit 26**

ROUGH DRAFT PROOFREAD

THIS WILL BE A TAPED STATEMENT AS GIVEN TO DETECTIVE RANKIN
REFERENCE CASE 940502025.  THE DATE IS MONDAY, UM, MAY 2, AND THE
TIME IS APPROXIMATELY, UH, 0903 HOURS.  AND I'M SPEAKING TO
ANGELA RENEE GRAY.

LEGEND:   Q.   DETECTIVE SONIA RANKIN        A.   ANGELA RENEE
                                                  TAMARA GRAY

---

Q.   Angela, could you, is that you're full name?
A.   It's Angelia Renee Tamara Gray.

Q.   Angelia Renee Tamara Gray?  How do you spell you're last
     name?
A.   G-R-A-Y

Q.   Ok, now, I've met you here at the Emergency section of, uh,
     Kino Hospital.  Could you just tell me over all, uh, first
     of all, where you living at right now?
A.   On Benson Highway, the 4501 address, ap-, trailer #23.

Q.   How long have you been there?
A.   About a month.  I just moved in with Berry not too long ago.

Q.   Barry is who?
A.   My boyfriend.  Barry Jones.

Q.   Barry Jones?
A.   Yeah.

Q.   Where did you live at before?
A.   Um, 3331 N. Chapel, Trailer No. 6.  I still have the
     trailer.

Q.   Oh, you do?
A.   Mm, hm (yes).

Q.   Was he, was Barry living in this trailer _____?
A.   Yeah.

Q.   So you moved in with him?
A.   Uh, huh (yes).

Q.   Wha-, what caused you to move in with 'em?
A.   Just, we've date'n for like, uh, not that long really.
     Probably about three or four months.

Q.   You've only known him for three or four months or so?
A.   Yeah.  The kids seemed to have gotten along with him really
     well, and I was having problems with my ex-boyfriend at the

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

049333

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          2

trailer I was living with, uh, living at, and um, it just seemed like the easiest thing to do, was to move in with him.

Q.  Ok.  What's you're date of birth and how old are you?
A.  Um, March 18, of 64, I just turned 30.

Q.  Ok.  Now, your children, how many do you have?
A.  3.

Q.  3 children, and start from the oldest.
A.  There's Jonathan Anthony Larks, he's 14.  And then there's Rebecca Jenny Larks, she's just turned 11, and then there's Rachael.

Q.  Ok.  Now, yesterday, how did the day go yesterday?  What, what were your activities?
A.  I slept all day.

Q.  Why is that?
A.  I wasn't feeling well, I have, um, cancer and sometimes I get sick.

Q.  What kind of cancer do you have?
A.  Cervical Ovarian and Uterine, it just, they didn't catch it in time so it spread.  I got up at like 6:30 and Rachael was taking a nap.  Barry said Rachael was taking nap, and he asked me to run up the street and check on Brandy, his daughter, 'cause she had spent the night with a friend, and just, you know, make sure she was ok and stuff.  I went down there, I talked to the lady that Brandy was staying with for a-, ten, fifteen minutes and um, on my way back Barry was coming up in the van, he had Rachael with him, he said that Rachael had woken up and her head was bleeding.

Q.  What time was this?
A.  It was probably 7:15, 7:30 by this time.

Q.  In the morning?
A.  No, at night?

Q.  At night.
A.  It was last night.  And that, he said when she woke up her head was bleeding, so he took her to the fire station that's right there by the tr-, by the house.  There's a fire department right there.

Q.  Ok.  Wait a minute.  Let's start from Sunday, as far back as, as the morning.  You wake up in the morning.
A.  I didn't, I slept.

HOMICIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          3

Q.  You slept, ok.
A.  Yeah.

Q.  When was the first time that you saw Rachael yesterday?
A.  Would've been when he had her in the van, when he was coming
    back from the paramedics, from the fire station.

Q.  From 7:30 at night?  At 7:30 at night?
A.  It, it was probably about 7:15.

Q.  Ok.  When was the time you saw her before that?  Did you see
    her Saturday?
A.  Yeah, yeah, up till Saturday night.  When she went to bed
    which was 10:30.

Q.  10:30 at night?  So you don't see her from 10:30 Saturday up
    until, um, Sunday evening around 7:00, 7:30.
A.  W=, yeah, w-, when I first saw her.

Q.  Ok, um, and, and what is it that he, he's driving up or, are
    you up or how does that happen?
A.  Ok.  I was walking back from the lady's house.  And the van,
    he was in the van c-, and he pulled up to where I was
    walking, he had Rachael in the van.  He said that Rachael
    had woken up from her nap and her head was bleeding, so he
    took her right down to the fire station.  He said the
    paramedics looked at it and said that, um, I guess he told
    'em about her falling out of the van, and he says that the
    paramedics said that they couldn't stitch it up or anything
    'cause it had happened a couple hours before.  But
    apparently, sh-, she had her braid up, she had her hair up
    in, had it up in pony tails and braids, and she had little
    barrettes in her hair.  And he said that the paramedic said
    that the barrette probably irritated it and that's what
    started it bleeding.  And, I mean, she was, as soon as we
    got home I changed her 'cause she was soaking wet.

Q.  From what?
A.  Um, he said it was from the paramedic rinsing out the cut.
    You know, he had taken her braid, taken the braids out, and
    the pony tail out, he cut, cut the pony tail out and then
    rinsed her head with saline solution.  So that's what he
    said she was all wet from.

Q.  And you changed her?
A.  Yeah.  I put her in some warm clothes 'cause her, her hands
    and her feet were cold.  And that's when I noticed the
    bruises on her stomach.  And I asked her what happened.

Q.  What did they look like?  The bruises on her stomach that

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          4

A.   you're talking about?
     She had like a couple scratches, like little scratches, not
     bleeding or anything, but just like, like, like not
     scratches scratches, kind like sh-, you know, she'd rubbed
     against so-, like rub marks almost.

Q.   Ok.
A.   And I asked h-, and then she had some bruises, a couple of
     'em up here, and like one that went this way.  And I asked
     her what had happened to her.  And she said the little boys
     pushed her out of the van.  I asked her if anybody had hurt
     her, and she said, no, little boys just pushed her out of
     the van.  And she was acting ok, she was thirstier than
     normal.  She was real thirsty.

Q.   She was real thirsty?
A.   Mm, hm (yes).

Q.   What time is it now, when she's telling you she's thirsty?
A.   Um, 8:30?  Probably around there.

Q.   When she's thirsty, is she complaining about any pain?
A.   Uh, uh (no).  She said she didn't hurt at all.  I asked her
     if head hurt, 'cause I thought she might have a head ache,
     and she said her head didn't hurt.  She was just thirsty.

Q.   When, when you're changing her clothes, did you check her
     out completely?
A.   Mm, I just saw the bruises on her stomach and asked her
     about that.  And she didn't have none of the ones on her
     head.

Q.   She didn't have any on her head, 'cause she?
A.   I didn't see 'em.

Q.   What about the bruises around her eyes?
A.   Ok.  That, um, there's new ones there, but sh-, a couple
     weeks ago, she had, um, according to her, she'd got hit in
     the face with a rake by this little girl, and it, when she
     came home that day, she just had like a little bruise right
     here, and when she woke up the next morning, she had two
     black eyes.  SO I called the University and the doctor or
     nurse that I talked to there said that she'd probably had
     broken her nose, 'cause that's usually what happens.  Is you
     get two black eyes when you get your nose broke.  And, but
     they said if there was nothing, I mean if her nose was
     straight, it wasn't you know, like over here somewhere, that
     they couldn't do anything about it.  So, but she had two
     black eyes for awhile.  But that was pretty much faded away,
     I mean, she still had like little, little marks under here.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025            5

Q.   Ok.
A.   But they were pretty much faded away.

Q.   She's got a new one on her right eye...
A.   I saw that.

Q.   ...that extends from here...
A.   And it's.

Q.   ...in the corner of her eye and comes up to the lid.  What
     is that one?
A.   I saw that.  I don't know, she didn't have those last night?
     And the ones all over, that are up here.

Q.   On her forehead?
A.   Uh, huh (yes).  U-, she didn't s-, I, she didn't s- have
     those last night either.  I didn't notice them until this
     morning when.

Q.   At 8:30...
A.   She was in the room.

Q.   ...last night she didn't have those?
A.   Uh, huh (no).  I didn't see 'em.  And they're pretty
     obvious.

Q.   What about the ones that are on her abdomen?  The, the older
     bruises that are on her abdomen?
A.   She's um, she falls down sometimes, but, I mean she's not
     clumsy or anything.

Q.   Yeah, I know she's got some on her knees, and, and sometimes
     those are.
A.   And are, she get's 'em like on her shins sometimes.  But,
     yeah, she doesn't, she's not a clumsy child, she doesn't
     fall down all the time.

Q.   How much does she weigh?
A.   Um, last time she went to a doctor she weighed like, what
     did he say, either 28 or 38 pounds.  She's on the, she's on
     the chart, but she's on the lower part of the chart for her
     height and her weight.

Q.   Ok.  Now, ok, so you saw her late Saturday night, and then
     you don't see her again till 7:30 or so.
A.   Yeah.

Q.   What time do you, w-, when's the last time that you say
     good-bye to her or s-, or so on Sunday?  When you put her to
     bed or something?

04337

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025                6

A.   She went to bed with me.  I put her in bed with me.  Because
     I was worried about her head.

Q.   Who else was with you?
A.   And she wanted to sleep in between us 'cause she wanted to
     sleep by Barry too.

Q.   Ok.  Now, y-, sh-, are you awakened during the night at all?
A.   Um, she woke me up about 11:30, 12:00 o'clock and said that
     she was hungry and thirsty.  So we got up, and I gave her
     some milk, and sh-, I made her, she wanted a burrito, I made
     her a burrito, but she didn't wanna eat it.  She said she
     wasn't hungry anymore when I gave it to her.  And.

Q.   How much milk did she drink?
A.   She drank like a whole glass real quick and then she threw
     it back up.

Q.   She threw up.
A.   So then I gave her just a little bit at a time.  So we were
     up for like half hour, 45 minutes, 'cause I'd just give her,
     put a little bit in a glass, so she could only drink a
     swallow or two at a time, and then she seemed ok, and then
     she told me she was tired and she wanted to go back to bed.

Q.   What was Barry doing while she's sick like this?
A.   He was sleeping at that time.

Q.   Did you ask him anything about what had happened?
A.   Yeah, I asked him what had happened to her, and he said
     she'd fallen out of the van.  And, I asked, I asked her a
     couple times if somebody had done that to her, because it,
     it did seem like alot, mm.

Q.   What part?
A.   Her falling out of the van.  Her, just her stomach.
     Because, I mean, my son's like split his head open before
     too, so I wasn't too worried about that, but the bruises on
     her stomach seemed a little much.  And she kept telling me,
     no.  She kept wantin' to be by Barry, because when we went
     to bed, I had stuck her, like, in between the wall and me,
     and she asked if she could sleep in the middle so she could
     be by Barry too.  So I put her there, and then she woke me
     up, and we got up and w-, she drank some milk, and then we
     went back to bed.

Q.   Did you give her any medicine or anything?
A.   Uh, huh (no), no.

Q.   Did she tell you her head hurt?

0-3388

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          7.

A.   No.   She said s-, her head didn't hurt.

Q.   Does.
A.   I kept asking her if she had a headache and she kept telling me no.

Q.   Ok.   Did she tell you her tummy hurt at that time?
A.   No.

Q.   But she couldn't explain why she was throwing up or anything?
A.   Nuh, uh (no).   But she said nothing hurt.   And I kept asking her, especially about her head, 'cause I was worried maybe, you know, something happens with her head, even though that the paramedic had said she was ok.

Q.   Did she go back to bed?
A.   Yeah, we went back to bed.   She was tired, so we went back to bed, and then I got up about 6:00 o'clock this morning, when the alarm clock went off, to get my son up for school. And when I went to get back in bed, I noticed she wasn't there anymore.   So I woke up Barry and I asked him if he knew where she was.   And he said, no, she was sleeping right there.   So, I went into the girlses room and she was in her bed.   And I went to wake her up and that's when I noticed that she wouldn't wake up.

Q.   What time did you go to try to wake her up?
A.   It was probably 6:10, 6:15, maybe 6:20.   'Cause the alarm clock I think

Q.   And what do you mean sh- she...
A.   'Cause the alarm clock I think.

Q.   ...wouldn't wake up?
A.   She was already dead.

Q.   Ok.   So, when do you think she moved?   When you woke up at 6:00 to go get you're little boy up, was she in the bed still?
A.   She had gotten up and gone to her bed.

Q.   And you hadn't realized that she got up?
A.   Uh, huh (no).   Not until I went to crawl back in bed and saw she wasn't there.

Q.   Ok.   So what time was it that, um, you were, when she up throwing and and stuff?
A.   I-, it was around midnight, and we got back to bed about 1:00.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
·June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          8

Q.   About 1:00?  So when you wake up at 6:00 she's not in the
     bed anymore?
A.   Uh, huh (no).

Q.   Did you hear her stir or hear her wake up?
A.   I didn't even know she'd gotten out of bed.

Q.   What about Barry?  Do you know if he had woken up or _____?
A.   Um, I have no idea.  Like I said, I woke him up and asked
     him where she was, and he said he didn't know, and then
     that's when I went to get her up, you know, I went to go
     check on her and that's when everything happened.

Q.   Ok.  What was her appearance when you went to wake her up
     out of her bed?  What does she look like?
A.   Her eyes were kind open, but they were kind rolled back in
     her head, and so I started to yelling, it was like, Rachael
     wake up!  And she wouldn't wake up.  But she was warm.

Q.   Ok.
A.   So I made, I was screaming for Barry to get up.  And he got
     up and he came in and I was, I'm not quite su- too much what
     happened after that.  I remember screaming at him, we had to
     get her to the hospital.  I remember the other kids starting
     to get dressed and I remember yelling that we didn't have
     time for them to get dressed, to just get me to the
     hospital.  This was when he brought me here, and, s-,
     supposedly went back to go get the other kids, and then he
     was suppose to come back here.

Q.   Ok.  Alright.  I'm gonna break this interview for just a
     little bit to talk to the other detectives that have been
     out there, ok.  Um, i-, if you wanna have another smoke, you
     could, if you wanna step out there or so- you can.
A.   Ok.  Can I go sit back with my sister, _____?

Q.   Um, why don't you hang for that for a minute, 'cause I'm
     gonna come.
A.   Ok.  Well, 'cause they got the cigarettes.

Q.   Oh, ok.
A.   I, I didn't even bring my cigarettes, my purse or nothing.

Q.   Then, then you could go ahead and do that, and I'm gonna
     talk to them for just a little bit, and then I'll get right
     back to you.  But I'm gonna want you right back.  Ok?
A.   Could you find out anything about my other kids?

Q.   Uh, huh (yes).

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          9

UH, THE TIME NOW IS APPROXIMATELY, UH, 0917 HOURS, SAME DATE, I'M
GONNA STOP THE INTERVIEW MOMENTARILY.  THANKS.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          10

ALRIGHT, I'M GONNA START THE TAPE UP AGAIN.   THE TIME NOW IS
APPROXIMATELY, UH, 0930, 0934 HOURS, UM, AND I'M STILL SPEAKING
WITH ANGELA.

Q.   Angela, I got out to talk to the detectives and, and your
     sister and your aunt are there, um, we had a cigarette and
     all that, ok.  Did anybody talk to you while you were out
     there.  I mean ask...
A.   No.

Q.   ...any questions about this whole thing?
A.   Just my aunt and my sister.

Q.   Ok.  Um, I don't know whether they might be coming up right
     here in a little bit.  Um, basically, we, we left off with
     um, the fact that you, you put her to be back at, and then
     you woke...
A.   Yeah, with us.

Q.   ...this morning.  Hang on a second, let me stop the tape
     momentarily.  Ok.
A.   They're just worried.

Q.   Ok.  And, and I know they're worried about you.  We're gonna
     start the tape back up again at approximately 0935 with
     Angela again.
A.   _____.  They're trying right now, you know.

Q.   Yeah.  Your um, your aunt and your sister came up and asked
     if, if um, I had advised you of your rights, and, and they
     were concerned about your rights, and why you're sitting
     here in the car talking to me.  Um, I didn't advise you of
     your rights because I'm, I'm...
A.   Yeah, that's what I told 'em, I said, they have to arrest me
     before...

Q.   ...yeah...
A.   ...they can.

Q.   ...you're not under arrest right now Angela, and, and I'm,
     and I'm, didn't advise of your rights because of that.
     You're not in custody, and I'm talking to you as a mom, ok.
     Um, and I, I just wanna know what happened to your baby.
A.   So do I.

Q.   Ok.  And that's why I'm talking to you.  As soon as I'm done
     here with this interview, um, you'll be free to go.  Now,
     understanding that I need to know where you're at.
A.   Yeah.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          11

Q.   Ok?  And I needed to have your work that you're gonna keep
     in touch with me.
A.   Oh, not a problem, you've got it.

Q.   Ok.  Because we need to be able to let you know what's going
     on with your baby.
A.   I, I wanna find out what happened to her.

Q.   Ok?  And it is important that with your other children that
     they're safe and.
A.   Will I get my other kids?  'Cause the detective wasn't sure.

Q.   Well, w-, we're still thinking about that right now.  Ok?
A.   Um.

Q.   Have you ever been involved with CPS at all?
A.   Not as a mother.  I mean, I was, I've called on a couple
     people before, you know, that weren't taking care of their
     kids, and um, when I was a kid, I don' know, I don't think
     CPS was ever actually involved though, I got adopted and my
     adopted parents weren't like the nicest people in the world.
     But I don't think CPS was ever called.

Q.   So this is you're natural sister here?
A.   Yeah, this is my, these, this is my real family not my
     adopted family.

Q.   Ok.  So, as, as far as you know you don't, you haven't been
     reported by C-, or...
A.   Oh, no.

Q.   ...to CPS for your own children.
A.   No.  Nobody's ever.

Q.   Ok.  Now, when you went to pick her up this morning, and she
     was in her bed, um, and you said that, that you could
     already tell, ok.
A.   Yeah, ar-.

Q.   How'd you get her down here?
A.   Um, Barry brought me down here.  Like, my boyfriend, the one
     you guys just found.

Q.   And what about the other kids?
A.   Um, they were at the house getting ready for school, um, I
     guess, I think it was probably my fault they were left
     alone.  Because they were trying to get dressed and I was
     just telling 'em, screaming at 'em, we didn't have time,
     take me to the hospital now, and he came and brought me and
     then he was gonna go back and get the other kids.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          12

Q.   And do what with them?
A.   I thought he was coming back down here.  But, I guess not.

Q.   Ok.  Now we know that, that your son is at, at school.
A.   And he said they verified that the, my daughter was too.

Q.   Ok.  Now wh-, the Tucson Police said that to me.  That they
     verified that she was there.  We haven't verified it.
A.   Ok.

Q.   As the county Sheriffs, we haven't verified that she's there
     for sure, yet.
A.   Ok.

Q.   Um.
A.   Can't you just call them and ask 'em?

Q.   Yeah, yeah, we could, we could, and, and, from what the
     Tucson Police have, have said, we're just going by that
     right now.  Ok?  Um, so we're pretty much sure that, that
     she's there if they say she's there, ok.  But we'll make
     sure after we're done here with you.  Now, he says that he's
     gonna come back.  What does he transport you in, the van,
     or?
A.   Yeah, the van.

Q.   Ok.
A.   He brought me in the van.

Q.   Ok.  Now, he says he's gonna come back.
A.   Um, that's where I'm not quite sure.  I was not real
     together when all this was happening.  Um, I'm pretty sure
     when he dropped me off he said he was gonna go get the kids,
     but I didn't, I mean, I didn't wait or nothing.  I mean, I
     was out of the van before it even stopped.

Q.   Well what is her condition while you're transporting her?
A.   She was dead.  I mean, I was trying to do CPR on her and I
     kept, I couldn't count, I couldn't quite remember how to do
     it.  And, I mean, I remember him telling me, you can do
     this, you can do this, come on you can do this.  And, when
     we got here, I mean, he hadn't even really stopped and I was
     out of the van and in there.  But I think, I mean I know he
     went back to go get the other kids.  And I thought he was
     gonna come back down here with them, but he might've planned
     on taking them to school and then coming down or something.

Q.   What was his, uh...
A.   I don't know.

HOMICIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          13

Q.   ...demeanor while you were.
A.   He was real upset.  I mean, and...

Q.   Upset how?  What was he doing?
A.   He kept telling me that she was alright.  He was crying.  I
     mean, he kept, I mean, I just, mostly what I remember is him
     just telling me that I could, could do this.  I mean, y- you
     know, the CPR.  You know, that I could handle it, that I
     could do it.

Q.   Ok.  What about, um, when you discipline your children, or
     when you discipline Rachael.  When was the last time you did
     that?
A.   Um, Rachael, I hardly ever have to.

Q.   Why's that?
A.   She's, she's a great kid, I mean, sh-, the worst thing she
     ever does is she gets a snotty attitude now and then.  But
     other than that, I mean, she doesn't, she's not bad, she
     doesn't do things wrong, she doesn't, you know, break
     things, she doesn't hurt other kids, nothing.

Q.   And her sister's 11?
A.   Yes...

Q.   And her brother's 14?
A.   ...her sister just turned 11.  Now I have, uh, I have some
     problems with the 11 year old.  I mean, I have problems with
     her.  She's, last couple a years she's gotten real bad on
     lying and.

Q.   Yeah, that's how kids usually are sometimes.
A.   Yeah, but, my son I never had a real problem with, my 11
     year old did, and Rachael's never ever been a problem.

Q.   Now he goes, your son goes to ASDB.  Why?
A.   He's deaf.

Q.   He's deaf.
A.   Yeah.

Q.   Ok.  Um, h-, so he can communicate through sign language.
A.   Yeah, and he reads books too.

Q.   And you communicate...
A.   So.

Q.   ...through sign language.
A.   He reads lips, and I can understand him.  I've always been
     able to understand him.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

Q.  Ok.
A.  You know, what he's saying.  And um, most people after
    they're around him for awhile start being able to understand
    him too, but he reads lips.

Q.  Now, Rachael, when you do discipline her, how do you do
    that?
A.  Usually I just yell at her.  I mean that's all I...

Q.  Do you spank her?
A.  ...have to do.

Q.  When was the last time you spanked her?
A.  Um, I've never spanked her, spanked her.  I mean, she's
    gotten like one swat on the butt.

Q.  When was the last time you physically handled her, or, or
    di-, used any type of physical force on her?
A.  Would've been, _____ the worst thing she's ever gotten
    was a swat on the but.  I can't remember when the last time
    was.  I, 'cause she really never does anything wrong.

Q.  Ok.  What about the, the bruises and things that are on her
    back, um, that are on her stomach, on her legs?
A.  Like I said, the one's on her stomach I just noticed last
    night, a little bit.

Q.  What about the...
A.  The massive amounts of 'em.

Q.  ...the ones on her head?
A.  Um, other than the ones on her eyes?  They weren't there
    last night.  Or I didn't notice 'em.  If they were there
    they weren't that bad.

Q.  When you were looking at her, did you, did you have her in
    a, in a room where there's a light on?
A.  Um, yeah, the light was on, it's not real bright, it's one
    of those florescent lights.

Q.  Which room?
A.  The living room.

Q.  The living room?
A.  Mm, hm (yes).

Q.  Is it night time?
A.  Yeah.

Q.  _____ you're looking at her?

SUPPLEMENT
June 10

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          . 15

A.   Yeah.

Q.   Um, did you, did you lift up her, her hair to see anything,
     or?
A.   No, I, I looked at the cut on her head, but I didn't.  I
     mean, I didn't do a full body check.

Q.   Did, did she complain of anything to you?  Did she tell you?
A.   Just that she was thirsty.

Q.   She was thirsty.
A.   Uh, huh (yes).  That was it.

Q.   Ok.  Have you ever talked to Rachael about sexual abuse?
A.   Not so much, not as sexual abuse, I have my 11 year old.  I
     mean, I've sat her down and, my son and my 11 year old.
     I've sat them down and ex-, explained to 'em about it and
     stuff.  With Rachael, I've never like explained it to her,
     you know.  Like I, like said when, um, I saw the bruises on
     her stomach, I asked her if anybody had hurt her or anybody
     had touched her wrong.  And she knows, like, that nobody's
     allowed to touch here or in her private area.  You know, she
     that, that that's wrong.  Just, you know, from giving her
     baths and stuff,  Just like if now, if anybody ever touches
     you here, you let mommy know.  You know.

Q.   Who gives her a bath?
A.   Usually she goes takes a bath with my 11 year old.  She
     likes taking a bath with her.

Q.   Ok.  Does Barry ever take care of any of that?
A.   No.  No, he's never ever given her a bath.

Q.   Have you ever thought that there could be a problem with
     sexual abuse?
A.   No, not with her.  With, um, there was a while with my 11
     year old, just from things she was saying.

Q.   About who?
A.   Not, not with Barry, I mean, this was years ago, that, you
     know, I thought maybe she had been sexually abused.  And I
     had her in, uh, La Frontera, I got 'em to counseling there.
     Just because I thought maybe she had been and she wouldn't
     tell me, so she went to counselling for quite awhile.

Q.   What'd they tell you.
A.   That they couldn't find nothing.  That she was just more
     aware of sexual things than I thought was normal, but they
     didn't think she'd been abused.  And the doctor had checked
     her and, you know, there was no signs of it.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENT/
. June 10,

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          16

Q.   Have you ever had Rachael checked by a physician to, for any
     type of abuse.
A.   (Inaudible)

Q.   When was the last time she saw a doctor?
A.   Oh, when was the last time I took her?  It's been awhile,
     um, I can't remember when the last time I took her was.
     It's been awhile.

Q.   Who is her doctor?
A.   Um.

Q.   And where do you take her?
A.   She goes to University, the hospital, the pediatric
     department.  So her doctor, it changes every time she goes.

Q.   So is it through AHCCS?
A.   Yeah.  It was, I'm, I have been off AHCSS for a couple
     months now.

Q.   SO you don't have that anymore?
A.   Not right now.  No.

Q.   So if you had to take her somewhere, you would've brought
     her here to Kino?
A.   Yeah.

Q.   So she doesn't have her own?
A.   Or I would've, or I would've try to get her at the
     University, 'cause I like, I really like them there.

Q.   She doesn't have a regular Pediatrician?
A.   No.  Everytime she's gone, it's been a different doctor.

Q.   Is she up to date on her immunizations and all that?
A.   Mm, hm (yes).

Q.   When was the last time she had a meal other than the milk?
A.   Um, I can't say for sure Sunday 'cause like I said, I slept.
     So, I, I don't know for sure.  I mean, I can't positively
     say.  Um, I know she ate Saturday night.  I know that for a
     fact.  I mean, I can't imagine her going all day Sunday
     without eating, but, like I said I was sleeping so I don't
     know.

Q.   Ok.  Have you ever checked her private area?  Her vaginal
     area?
A.   Was she?

Q.   H-, I do-, I'm asking you if you've ever checked it over?

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

A.   Um, not, no, not really.

Q.   Has she ever complained to you about any pain.
A.   Uh, huh (no).  No, 'cause I would've checked her
     immediately.

Q.   Ok.  Had, I'm, I'm asked you if her demeanor has changed,
     um, recently, has she ever, i-, has she become withdrawn, do
     you know?
A.   No.

Q.   Um, has she started acting, uh, a little different than you
     think?
A.   She got, um, she's gotten a little snottier, you know, not,
     like bossier with the other girls.

Q.   Mm, hm (yes).
A.   'Cause she tends to get spoiled alot by everybody.  And,
     with, with Barry, at least, what I noticed was he spoils her
     rotten.  You know it's.

Q.   Like how?
A.   She can pretty much do whatever she wants to do.  You know,
     if, if the other girls yell at her for something, then he
     yells at them for yelling at her.  You know, you can't yell
     at her like that, and stuff.  So, the only thing she's
     really changing in that she's gotten, like, just a little
     snottier with the girls, you know.  T-, she's, telling them
     what to do more, you know, and like, instead of asking for
     them to do something sh-, she's been telling them.

Q.   Ok.  Angela who's gonna tell us that you were in bed most of
     the day yesterday?
A.   Um

Q.   Who can tell us that?
A.   Barry should and the kids, I mean my other two kids, and his
     daughter.

Q.   His daughter's how old?
A.   Um, 11, I think.

Q.   Ok.  What school does she go to?
A.   The same school my daughter does, Craycroft.

Q.   And what's her name?
A.   Brandy.

Q.   Brandy?
A.   Jones.  Mm, hm (yes).

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

Q. Ok. You've got alot of little cuts and, and bruises on you. Where do those comes from.

A. Yeah. No, the, um, when I moved into Barry's house, I, I've been like remodeling, and most of the ones on my leg here, I was putting a cupboard, he had this cupboard and I was putting it up, I tore down the old cupboards...

Q. Uh, huh (yes).

A. ...and I was putting the new cupboard up. And my son walked by me and I was standing up in a chair and ended up kind knocking into me.

Q. Oh, I see.

A. So I ended off falling off the chair and the cupboard fell on top of me.

Q. Ok.

A. But most of it's from, just like, I've got on my thighs. There's like a real heavy wood cabinet in the living room.

Q. Mm, hm (yes).

A. And from moving that, my arms aren't that strong, but my legs are, so I use my legs alot to move things.

Q. So, wh-, you said that you had another boyfriend back at the, at you're old, uh, address.

A. Yeah, he's my ex.

Q. Ok. Ex-husband or ex-boyfriend?

A. Just ex-boyfriend.

Q. Is he, who's the father of, of Rachael?

A. His name's um, Dana Osborne (ph), but he's never had anything to do with her. I mean, since he found out I was pregnant, he was gone.

Q. Ok, ok.

A. But um, I lived with Zoley (ph) for like 2 1/2 years. And, as far as ri-.

Q. Who's Zoley?

A. My ex.

Q. oh.

A. As far as Rachael new that, I mean, that was her dad. They were really close too.

Q. Did you ever have any problems with him? The way he treated her?

A. Not with the way he treated her. I did have some problems

04350

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025                19

with the way he treated me.

Q.  What would he do to you?
A.  So, he would, he'd just get drunk and slap me around.

Q.  What, would he do that to the children?
A.  No.  NO.

Q.  When was the last contact he had with the children?
A.  Um.

Q.  And with Rachael?
A.  He, for, for Rachael's birthday he came and saw her on her
    birthday.

Q.  When was that?
A.  Um, the 7th, April 7th.

Q.  April 7th?
A.  Yeah.  And we had a little party for her, so he came up and
    he just came up to see her 'cause she missed him and wanted
    to see him.

Q.  So April 7th was the last time he saw her?
A.  Yeah, he was only there for maybe half an hour.

Q.  Does Rachael go to school?
A.  Uh, uh (no).  She's not old enough yet.

Q.  Uh, huh (yes).  So what does she do during the day?
A.  Usually we just sit around and watch TV and since we moved
    into Barry's house we've been, he's got one of them big Lego
    sets.  So we, we play alot of Legos, building stuff and play
    outside with the puppies.

Q.  Does, uh, Barry work?
A.  Um, freelance like mechanic work.  He fixes people's cars.

Q.  So he's around you alot, then.
A.  No, he's gone most of the time.  He's, he's gone alot of the
    time.

Q.  Does he take, um, Rachael with him?
A.  Not very often.  She wants to go with him alot, but, he
    doesn't take her alot.

Q.  Ok.  He's a mechanic then?
A.  Mm, hm (yes).

Q.  Alrightee.  What else do you know about him?

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENT
June 10

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          20

A.   Not, not as much as I thought I did. Um, he's 35, he um, and he's been great as far as I know, I mean, he's been really good to us. He's, he's the first guy that's made me feel safe in a long time. I, that sounds stupid with all this that's going on, but my, um, my ex got drunk one night, and I'm so use to guys just standing around and watching Zoley slap me around and not do nothing, and Barry, like, as soon as he heard that Zoley was yelling at me, I mean, he was right up there and he, I mean, he protected me. And nobody's every done that. That's, like right after that was when I moved in. He's, um, he does tend to yell alot, but, I mean, he's not like hysterical or anything. And, like I told the other detective, the few times that we have argued, he just leaves. You know, he doesn't, he won't sit there and fight and argue. He just leaves until he calms down.

Q.   Ok. Have you ever questioned him or asked him about the bruises on, on Rachael?
A.   I asked him about, about them last night. And he said he didn't know, that she'd fallen out of the van. And I asked her a couple times about it. You know, I d-, I mean I didn't ask her specifically if he had hurt her 'cause I couldn't picture, you know, I just, I couldn't picture him doing that. But I did ask if somebody had hurt her. And she said, no, the little boy pushed her out of the van.

Q.   Did you, were you suspicious of, of him at all?
A.   No.

Q.   What about of her injuries?
A.   I was, the ones on her stomach I was, I just, I couldn't realize, I just couldn't think how she could've gotten 'em from falling out of the van. But, I mean, I couldn't picture him hurting her and when I asked her she s-, said the little boy pushed her out of the van.

Q.   What little boy was that?
A.   Um, some of the neighborhood boys she was playing with.

Q.   You don't know which ones?
A.   Like I said, I was sleeping.

Q.   Ok. Why were you sleeping so long?
A.   I have no idea why I slept so long. I wasn't feeling well, um, I'd been m-, up most of Saturday night with like the stomach flu or something, just throwing up and stuff. And I finally got to sleep, like 6, 7 o'clock in the morning, Sunday morning.

Q.   Who, um, diagnosed your cancer?

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          21

A.   Um, Dr. Purden (ph) at University.

Q.   Dr. Purdean?
A.   Yeah.  But it's pretty much, last, I haven't been going in
     like I was suppose to, but the last time that I went in,
     everything was pretty much ok.

Q.   Ok.
A.   You know.

Q.   So your rem-, in remission...
A.   Yeah.

Q.   ...that type thing.  And...
A.   Yeah, it was.

Q.   ...you haven't had any real bad symptoms?
A.   No.  Just, um, I get, I get tired alot.  But lately I've
     been feelin' pretty good up until this happened, until I got
     sick.  I don't know if it was like the stomach flu or what.

Q.   Ok.
A.   But um.

Q.   Do you have any other type of problems, any other type,
     hepatitis, or.
A.   No, I have, it's not epilepsy.  But I have, um, seizures.

Q.   Are you on medication?
A.   No, 'cause they don't happen that often, and the ones that
     I've been having lately.  I use to, when I was a kid, I was
     on phenobarbital.

Q.   Uh, huh (yes).
A.   For a long time, and I ended up getting addicted to it, so I
     don't want to get back on, on that.  I'm scared of going
     through that again.  But, um, the seizures that I was having
     when I started going back into the doctor, were, um, I was
     awake for 'em, and they weren't, they weren't like _____
     seizures, or anything, they weren't, you know, the full
     blown seizure.  I've, I would be like getting up and I'd
     start walking and I'd get real dizzy and then my whole body
     would just start shaking.

END OF TAPE 1, SIDE A

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENT
June 10

STATEMENT OF ANGELA GRAY---CASE NO. 940502025        22

OK, THE TIME NOW IT'S, T-, TURNED IT OVER TO SIDE B AND THE TIME
NOW IS APPROXIMATELY 0953 HOURS, UM, STILL SPEAKING WITH ANGELA.
ONE OF THE LAST QUESTIONS I, BEFORE THE TAPE CLICKED OFF WAS,

Q. I was asking you about Rachael. Did I ask you any other
   questions when I was turning it over?
A. No, just we had gotten into if Rachael had any medical
   problems.

Q. Does she have any other medical problems at all?
A. She's um, I think the biggest medical problem she's ever had
   is she's slightly anemic.

Q. She's anemic.
A. Yeah. It wasn't enough to where the doctors were really
   even worried about it, you know, where she had to be on me-,
   you know, take iron pills or anything like that.

Q. When was the last time that Rachael was bathed?
A. Um, Friday night, I know for sure.

Q. Friday night. Who bathed her?
A. Becky and Brandy. She like taking a bath with the big
   girls.

Q. Ok. Did you ever, did you notice any bruises then? Did you
   look at her?
A. No, and they didn't say anything. The girls didn't say
   anything.

Q. Does she come up to you and tell you when she's hurt, if
   she's got a booboo or anything?
A. Yeah, yeah, she comes to me right away.

Q. When was the last time she came up to you to tell you she
   had a booboo or, or a hurt or was injured?
A. Would've been, Friday or Saturday.

Q. Friday or Saturday?
A. Yeah. She um, fell off the, the stairs at the trailer. I
   guess she fell off just the bottom one. You know, not all
   of 'em. Just the one. She was playing with the puppies and
   she fell off the step. She came in and told me.

Q. Wh-, what was the injury?
A. I've, I didn't even really see anything. She had like a
   little, like a red mark. It wasn't even bleeding or
   nothing. A little red mark on her elbow and her knee was a
   little red. And she just came in and told me that the puppy
   knocked her off her. But, sh-, I mean it wasn't.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          23

Q.  She'll tell you what, what hurts?
A.  Yeah.  And she usually, she'll tell me why it hurt, you
    know, what happened.

Q.  Angela, she has got numerous bruises all over.
A.  I saw, I saw the ones on her stomach.

Q.  On her stomach, she's got some, some old ones, um, on her
    back, um, she's got scratches on her face, she's got th-,
    the uh, they're the uh, bruises around her eyes.  Some in a
    older stage than the others.  Um, she's got the ones on her
    forehead.  She's.
A.  I guess, I didn't notice ones until...

Q.  Her little fingers...
A.  ...she was laying there.

Q.  ...are bruised, her hands are bruised, her arms are bruised.
A.  I didn't notice all this.  I mean, I've noticed, you know, a
    bruise here and there.  And usually if it's something that I
    don't know what it is, I ask her if she knows what happened.
    And usually if, if it's not right after it happened, she
    says, I don't know.

Q.  Ok.  Th-, this.
A.  Or I fell down or something.

Q.  Alright.  And I, and I wanna stress that this is real
    important, ok.  That you understand and that you answer
    carefully as far as anything that you might know, I, I wanna
    know.  And I don't wanna have to drag it out of you, ok.
    But, I need to know if you know something, Angela, you gotta
    tell me.
A.  No.  I, I.

Q.  Ok?
A.  I know it looks like Barry probably did this right now, but
    I cannot picture him hurting her.  I just, I mean if he did
    it, I want to know too.  Because, and, and if he did it, I
    mean I don't know if you'd need me to press charges or what,
    and I, I mean I'll be more than willing to do whatever it
    takes.  But I just, I can't picture him hurting her.  And I
    can't, if he has been, I can't understand why she wouldn't
    tell me.

Q.  Ok.
A.  I know, um, I've had some problems with my daughter not
    like, hurting her, hurting her, but just being overly rough
    with her 'cause she's just a little bit jealous of her.
    Because Rachael gets, like all this good attention and Becky

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          24

        doesn't get all that much good attention.

Q.  Has Becky ever struck her in, in a more serious way?
A.  I've never seen it.  Um, she did a couple years ago she
    threw Rachael in front of a moving car, because she was
    upset 'cause Rachael was getting, you know, all this good
    attention.  'Cause like I said, Rachael, I mean, she doesn't
    really do anything wrong.  She's really happy, really
    loving, and Becky ten-, I mean, I tend to be really rough on
    Becky 'cause she's at that lying stage, um, she was caught
    stealing not too long ago.

Q.  Ok.  Let me, uh, go ahead and talk to the other detective
    that just arrive, 'cause I, I need her to, uh, to get to
    your sister and you aunt before, uh, do you guys can get
    going.  Um, it'll only take a couple seconds.  Unless you
    wanna step out on the front here and smoke your cigarette.
A.  Ok.  Well, yeah, they've got a lighter so that I can wait.

Q.  Ok.  Let me get.  Let me explain this to her.

I'M GONNA STOP THE TAPE MOMENTARILY AT APPROXIMATELY, UH, TEN
HUNDRED HOURS.

OK.  I'M GONNA START THE TAPE UP AGAIN.  UM, THE TIME NOW IS
APPROXIMATELY 1004 HOURS.

Q.  Um, Angela, I was out speaking to the detective about, you
    know, what needs to get done.
A.  Mm, hm (yes).

Q.  And you were talking about what, what your daughter, Becky,
    did you say?
A.  Yeah.

Q.  What Becky does to her as far as.  Is it just sibling
    rivalry or is it, are we talking...
A.  I.

Q.  ...anything extensive?
A.  It's.  Every once in a while it goes past that, but I mean,
    she's never actually like, really hurting her, she, I mean,
    she's like walks past her and pushes her down and stuff, I
    mean, she's like never just gone off and hit her or
    anything.

Q.  What are you wearing here?
A.  My night gown and, I didn't get dress when I brought her in.

SUPPLEMENTA·
· June 10,

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          25

Q.   So you got nothing covering the bottom?
A.   Uh, it's kind long, it comes down to here.

Q.   Ok.
A.   But my sister, when she got here she had this sweat shirt in her car.

Q.   And, and sh-, and somebody wrapped that blanket around you?
A.   Yeah, they're, I think the, the one _____.

Q.   So you just got up and ran, and uh.
A.   Yeah, I didn't take the time to get dressed.

Q.   Is there anything else you wanna tell me right now?
A.   I don't know, um, the time with the black eyes and then there was a time when the girls noticed she had, um, a hand mark on her butt, and she wouldn't tell me who did that.  I mean, everytime something's happened, she's been with Barry. But, I just, I can't see him hurting her and I can't see her not telling me.  One day, when um, the deal with the black eyes.  She wouldn't tell me who did it, she wouldn't tell me who did it.  My daughter and Barry's daughter took her in the bedroom, tried to find out, maybe they would tell her. So, Becky came and told me that Rachael said Barry did it. That Barry hit her with the rake.

Q.   So she'll talk to Becky?
A.   No.  Not usually.

Q.   Ok.
A.   But, um, she likes Brandy alot, she, she tends to talk to Brandy more.  Now Brandy said that Be-, that Rachael didn't say that.  When I asked Rachael if Barry had hurt her, you know, after Becky told me she said Barry had hurt her, she, Rachael said, no, the girl did it.  She, um, there was a couple days that she seemed to be scared of Barry.  And I kept, I'd ask her, you know, why, if he'd done anything, and she kept saying, no, and then found out a couple days later that my daughter, Becky, was telling her, like if, if Becky did something to Rachael, she'd tell her if she told then Barry would hurt her.  Or you know, if she didn't do what Becky wanted her to do, that Barry would hurt her.

Q.   Who would say this to who?
A.   Becky would tell this to Rachael.  But, um, when Becky came and told me that Barry, that Rachael had said Barry had hurt her, I mean, Rachael and I sat down and I asked her.  I said, Barry hurt you?  I'm like, you do know, no matter who it is that hurts you, mommy won't let them do it anymore. And she told me that it wasn't Barry.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENT?
June 10,

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          26

Q. So Becky would tell Rachael and Rachael would tell you that.
A. No, no, no. Ok. Rachael never told me that Barry hurt her.

Q. Ok.
A. Becky told me that Rachael told her, that time with the black eyes.

Q. Right.
A. When she had the black eyes.

Q. And that Barry said don't tell.
A. NO. That Becky said, ok.

Q. Now I got really confused.
A. Ok. Yeah. I, I'm trying to make sense here. Ok. Becky came out after talking to Rachael and told me that Rachael had said that Barry hurt her.

Q. Right.
A. So I talked to Rachael, and Rachael told me that Barry didn't hurt her, that it was a little girl that had hit her with the rake and that Barry's never hurt her and then she started acting scared of Barry. You know, just all of sudden she didn't wanna go anywhere with him for like two or three days. And we-, I couldn't figure out why. I kept sitting her down and talking to her, and you know, explaining to her that if somebody was hurting her to tell me, you know, if sh-, if she was scare of him to let me know. And she wouldn't tell me anything. And then we caught Becky telling her, that if somebody was hurting her that it was Becky had done to her. I don't know, it was nothing big, but I guess Becky thought she would get in trouble. So, I caught Becky telling Rachael that if, if Rachael told me what Becky did, that Barry would hurt Rachael. Is what Becky was telling Rachael.

Q. Ok.
A. So.

Q. And how'd you configure all of that. I mean, how did you get that.
A. Oh, I heard her.

Q. Oh, you heard her say this.
A. Yeah, I heard Becky, and so, I asked Becky, like, why would she do something like that? And she s-, I mean, she didn't wanna get in trouble. That was her only answer. She didn't wanna get in trouble.

Q. So. When Becky doesn't wanna get in trouble, she uses Barry

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          27

       as the person who's.

A.    I guess with Rachael.  Just, just with Rachael, I mean.

Q.    So Becky knows that Rachael's afraid of him, or was at the time?

A.    Um, I don't know.

Q.    How long ago was this?

A.    Week and half, two weeks ago.  It was right when the, that she got hurt and she got the black eyes.  It was right about that time.

Q.    What's the story about the black eyes?  She got hit by a rake?

A.    Uh, this I don't know for sure.  Like I said, Barry had taken her to his brother's house, and she was playing with the neighborhood kids in the back yard.  But what I finally got out of Rachael was.

Q.    Who else went with Barry?

A.    It was just Barry and Rachael.

Q.    Just Barry and Rachael?

A.    Uh, huh (yes).

Q.    Why?  Why is it just Barry and Rachael?

A.    Um, I do-, the other kids were at school, I think.

Q.    Where were you at?

A.    At home.

Q.    You didn't go?  Why didn't you go?

A.    I don't get along with Larry's wife too well.

Q.    Ok.

A.    SO I'm.  The story I finally got out of Rachael, was, they were playing outside, and she tripped over one of Larry's dogs, and that the girl hit her for tripping over the dog.

Q.    With the rake?

A.    Yeah.

Q.    Where, where did?

A.    It hit her right here, he said she hit her across the nose. And then I asked her, well why didn't you tell me.  'Cause it took her a couple days to, well, it took her about a day, maybe.

Q.    But there was no split here...

A.    No it was just a little...

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          28

Q.   ...cut or.
A.   ...bruise.  Just like this, this one right here...

Q.   On her.
A.   ...is all there was.  Just a little bitty mark.

Q.   And then she started getting the black eyes?
A.   The next day.

Q.   Ok.
A.   And um, she said that she didn't tell me because the little
     girl had said that the dog would get in trouble.

Q.   So Rachael tell you stuff like, I can't say that 'cause
     somebody'll get in trouble, or?
A.   Yeah, that's what she said when, um, with the thing with the
     eye.  She wouldn't tell me what happened.  She said somebody
     would get in trouble.  And I kept, I mean I, I probably made
     too big of a deal out of it, but I kept getting in her like,
     well, who's gonna get in trouble, like, nobody's gonna get
     in trouble, just tell mommy what happened.  I said, you
     know, if somebody's hurting you, I said, we'll take you
     away.  They won't be able to hurt you.  And then, like later
     on.  It'd been probably almost a full day, is when she told
     me about the dog and the little girl hitting her with the
     rake.  But I, I mean, I asked her then too, it's like, did
     Barry hurt you?  She's like, no.  And then after, like I
     said, there was a couple a days where she seemed scared of
     him, she didn't wanna go with him and stuff.  But after
     that, she started wanting to go everywhere with him.

Q.   Did that seem kind strange to you?
A.   That she was scared of him?

Q.   Mm, hm (yes).  Yes.
A.   It seemed really strange to me for a couple days.  Until I
     overheard Becky telling her that, and, I mean that's like,
     I've, I questioned her, I questioned Brandy, Barry's
     daughter, if, you know.  I asked her, had your dad every hit
     you or gotten really mad and angry at you and thrown things
     at you or anything?  And she said, no, he's never laid a
     hand on her.

Q.   What about, um, have you ever checked her vaginal area?
     Rachael's vaginal area?  When was the last time you looked
     at it?
A.   Um, it would probably been, couple, it's been, God, since
     the last time I gave her a bath.  About a m-, three weeks, a
     month.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1°

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          29

Q.   You know how little girls always, you know, sometimes if
     they gotta go potty they hold themselves...
A.   Mm, hm (yes).

Q.   ...things like.  Does she do that?
A.   Um, not too often, but every once in a while.  Like if she's
     outside playing, and she's gotta go.

Q.   What a-, does she itch down there?  Does she scratch at it?
A.   No.

Q.   Do you every catch her touching it?
A.   Nuh, huh (no).  The most, like I said, is like if she's, if
     she's outside playing and she's gotta go, and she doesn't
     wanna stop playing.  You know, then, then she like holds
     herself, but.

Q.   Have you seen her touch it?  Or, scratch?
A.   Not other than just holding it, no.

Q.   Ok.  How, have, uh?
A.   Are you, are you trying to say she has been?  I mean.

Q.   I just wanna see if you know if she has been...
A.   I don't know.

Q.   ...or have any idea...
A.   I have...

Q.   ...if she had been?
A.   ...I mean, it's never even crossed my mind, you know.  She's
     never given any, any indication.  Like I said, the only time
     she's ever touched herself is like, if she doesn't want to
     take the time out to go to the bathroom when she's gotta go.
     She like holds it.

Q.   Does she take...
A.   Trying to hold it in.

Q.   ...bubble baths at all?
A.   I, I don't think so.  I mean.

Q.   You don't have any bubbles?
A.   The three girls.  No.  Not any bubble bubble, sometimes they
     use the shampoo.

Q.   Ok.
A.   But no bubble bubbles.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENT
June 10,

Q.   Ok.  Can you think of anything else that you haven't talked
     to me about?
A.   Mmm, not really, just like I said, she was scared of him for
     a couple days, but then.

Q.   Have you ever touched her, her vaginal area like to put, um,
     any cream on it or anything?
A.   Oh, God, not in years.

Q.   Not in years?
A.   She's been out of diapers for three years now.

Q.   Yeah.  You know how sometimes little girls get irritated?  I
     know my six year old sometimes does, and.
A.   Yeah.  She's never complained about it and I haven't had to
     put anything on it.

Q.   Ok.
A.   It's been close to three years.

Q.   As far as, um, Barry's sexual habits, is there, is there
     anything that you find odd or anything?
A.   Only.

Q.   You guys have sex?
A.   Yeah, not, not often, no.

Q.   Not often?
A.   That's like, yeah, that's...

Q.   Why not?
A.   ...the only thing odd about it.  Usually he's really busy.
     And he's gone alot, and when he is home he's, he's tired
     alot.

Q.   When was the last time you guys had sex?
A.   Would've been day before yesterday.

Q.   Ok.
A.   And then it have been like three weeks before that.

Q.   The day before yesterday?
A.   Yeah.

Q.   Is it penile, vaginal penetration...
A.   Yeah.

Q.   ...or is there anything else?
A.   No, that's just about basically it.  I mean it's just like
     your basic normal average, missionary position type sex.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          31

Q.  Do you have any sexual paraphernalia at home?
A.  Mmm.

Q.  Do you know what I mean?
A.  There's some magazines, but that's it.  I mean, there's no.

Q.  Dildoes?
A.  Yeah, there's no toys or nothing.  No.

Q.  Uh, materials?
A.  Not that I know of.

Q.  Vibrators?
A.  No.

Q.  Anything like that?
A.  Uh, huh (no).

Q.  Ok.
A.  I know there's a few magazines, but.

Q.  Do the kids ever see any of those?
A.  No.

Q.  Have they talked to you about seeing any of them?
A.  No.

Q.  What about Rachael?
A.  No.  She's never said nothing.

Q.  Ok.
A.  And um.

Q.  So how long has Barry had contact with Rachael?
A.  Um, in, we started dating in February and she's pretty much always with me.  So.

Q.  But she's been with him alone.
A.  Not very often.  There's been like four or five times that they've actually, you know, like he's actually gone somewhere with her and it's just been the two of them.

Q.  But.
A.  Or like yesterday.  I was sleeping.

Q.  Do you sometimes take a nap and, and, and go take a nap and she'll be up and around?
A.  Not real often.  Usually if I take a nap, it's when she does.  And I always tell her to wake me up.  Or like the other girls.  You know, I'll tell the other girls when I

04353

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025                32

wake up.

Q.   Are there any, any times when, um, you're taking a nap or
     just ki-, just relaxing, and Rachael's running around
     somewhere else?
A.   If I, like.

Q.   That's not unusual.
A.   No, I mean there's times I like, go take a bath or something
     and relax in the bathtub if I get stomach cramps or
     something, but, I mean, she's never by herself.

Q.   Ok.
A.   And usually the other girls are there.

Q.   Ok.  What do you think about this whole thing?  If you had
     to sum it up, what do you think.
A.   I'm scared to death right now, I mean, this wasn't, this
     sexual thing wasn't, it didn't even cross my mind until you
     brought it up.

Q.   Ok.
A.   I'm trying to find out if.

Q.   That is, that.
A.   If she has been.

Q.   That's minimal compared to her being dead, Angela.
A.   Well, I know, I don't.

Q.   It's very minimal.
A.   I'm not.

Q.   I mean, and it, that's just one part of it.
A.   I don't.  I try not to think about her being dead.

Q.   Well she is and that's wh-, that's what you gotta face.
A.   I know she is.

Q.   That's why, that's why, you know, you gotta come out as a
     mother and say.
A.   That's why I'm trying to remain calm here so I can answer
     your questions so we can find out what's going on.

Q.   Who did it?
A.   I don't know.  The only thing I could think of would be
     Barry, and I cannot picture him hurting her.  I just, I
     can't see that happening.

Q.   Ok.  Another detective has just arrived and I want her to do

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          33

something for me.  Um, I want you to think about that right
now.  And I want you to think about it real hard.  Ok?
Because you're the mother, you're the primary care taker, y-
you have to be responsible for what happens to her.

A.   I realize this.  SO if he did hurt her, I'm just as
responsible as him because I put her in that position.

Q.   You have a-, you have alot of responsibility.  And I know
you understand that 'cause you just said that right now
yourself.
A.   I know, I realize this.

Q.   And I want you to think about it real hard, and I want you
to think about what you've forgotten to tell me.
A.   I can't think of anything.

Q.   I'll be right back with you in just a little bit.

I'M GONNA STOP THE TAPE AT ABOUT 1016 HOURS MOMENTARILY.


THIS IS DETECTIVE RANKIN BACK ON THE SAME SIDE B.  AGAIN, THE
TIME NOW IS NOW APPROXIMATELY 1028 HOURS.  I'M AGAIN WITH ANGELA
AFTER SPEAKING WITH DETECTIVE DOWNING.

Q.   You went out and smoked a cigarette, Angela, and I.  Did I
come up and ask you any other questions other than, just to
get back in here in the car?
A.   Uhhh, no.

Q.   Ok.  Um, what we were talking about and as we'd left it, I
asked you to think real hard about what you'd forgotten, um,
if there's anything else that you know.
A.   I can't think of anything.

Q.   Angela, did, did you cause any of these injuries?
A.   No.

Q.   To Rachael?
A.   No.  The only child of mine that I've ever slapped, spanked
or anything like that would be Becky.  I mean, I've never.

Q.   The 11 year old.
A.   Yeah.  I've never, I think maybe three times in her entire
life have I even swatted Rachael on the butt.  She's never
needed it.

Q.   She's real ti-, she's real tiny, small little thing, so.
A.   Sh-, I know, she was really tiny.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025                    34

Q.   She, she'd be real easy to, to kind handle as a far as if
     you wanted to hurt her.
A.   She's, she's never needed it.  She's never, she's never
     really been bad.  I mean, the worst that she does is she,
     she tends to wine.  Now like if she doesn't wanna take a
     nap, she'll start wining she doesn't wanna take a nap.  And,
     I mean, that's like the worst thing I can think of that that
     child has ever done.

Q.   Do you pay attention to all the little bruises and the
     little things that she has on her?
A.   If, n-, not everyone, 'cause I, I've, we've going through, I
     mean with my son, I was like one of those paranoid mothers.
     He gets a bruise on him and I have him in the emergency
     room.  And, with Rachael coming along, I, I mean, I realize
     that kids fall down and bump into things and stuff.  The,
     and other than the, the three times that I've told you
     about, she hasn't come up with like, excessive bruises or
     anything.  You know, there's just been, you know, a bruise
     here, maybe a couple on her leg.

Q.   Ok.  So you, as far as, what is your explanation for, for
     all of this?
A.   The only thing I can think of is that somebody hurt her.

Q.   What was she wearing when she came in here?
A.   Her baby pajamas.

Q.   Who dressed her in that?
A.   I did last night.  When I said, when she was cold.

Q.   She said she was cold?
A.   No, um, when he brought her back from the paramedics and
     they had rinsed her head out.

Q.   What paramedics did he say that he took her to.
A.   The fire department right there.

Q.   Right where?
A.   It's just there on Benson Highway.

Q.   Across the street from you guys?  It's right around there?
A.   It's, well it's on the same side of the street.  It was
     like, there's the trailer court and the motel, and then
     there's a bar, and then there's the fire station that's
     right there.  It's a Rural Metro or something like that.

Q.   We've been there and haven't found anybody to say that he
     was there.
A.   He said he went, he took her last night.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025           35

Q.   We sent our detectives there to find out and to check their
     records, their logs.
A.   Uh, huh (yes).

Q.   'Cause usually they have to document when anything they do.
A.   Yeah.

Q.   There's nothing there to indicate such.
A.   Oh no.

Q.   Did you ask her what happened about the back of her head or
     anything?
A.   Yeah.  And I even asked her.

Q.   Who wet her?
A.   Well, yeah.

Q.   Did sh-, did you go see the fireman or anything like that?
A.   I asked her if she went and saw the fireman and she said,
     yeah, she saw alot of 'em.  So, I mean, and she was, she was
     soaking wet.  From, and he said it was from rinsing off her
     head.  From, you know that paramedics rinsing, rinsing off
     her head.  And her, I mean, and h-.

Q.   When he was driving up, driving up, you said.
A.   Yeah, he was in the van.  He was _____ van.

Q.   Where were the other kids?
A.   Um, his daughter Brandy was with the lady that I went to
     check with.  That he had sent me to check with.  But she, he
     had left, she had left with her to this lady's son's house.
     Um, my daughter Becky was next, a couple trailer down at her
     friend's house and my son was riding his bike, just around
     the trailer court.

Q.   So, Rachael was alone with Barry again.
A.   Yeah, when I walked up to the phone.

Q.   Ok.  Did the kids tell you anything?  Rachael or Becky, um,
     or your son make any sense of this whole thing, as to what
     happened to the back of her head?
A.   No, they didn't, I, they didn't even really know about it.

Q.   Has R-, has Becky ever come to tell you, uh, Barry spanking
     her, or?
A.   No.

Q.   Has Ba-, has Rachael, I mean, um.  I'm sorry.  His daughter?
A.   No.  And I, I asked her if.

0337

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          36

Q. Brandy.
A. Yeah, Brandy.  I asked if her dad's ever hit her and she said, no.

Q. Have you asked her, have you ever seen him hit Rachael?
A. Yeah.  I've asked both the girls and then I've, I asked both he girls if they'd seen each other hit her.  You know, if like, Brandy saw Becky hit her or Becky saw Brandy hit her.

Q. They say?
A. No.  And, usually the three of them are together.

Q. And when we the last time you spanked her, you said?
A. It's gotta be like months.  And I, I mean, I've never even actually spanked her, spanked her.  She get like a swat on the butt and that's, I mean that's it.

Q. Before you met Barry, did you notice any of this kind of stuff on her, like black eyes, bruises.
A. She's, she's never gotten a black eye before.  She's had bruises like on her legs and her arms.  But not...

Q. On her tummy, on her back?
A. ...not, no.  I've never seen anything on her stomach like I did last night.

Q. So now Barry comes along and you see this.  When was the very first time you started seeing something a bit unusual?
A. Um, would've been with her eyes.

Q. The one, with the story...
A. The, the black eyes.

Q. ...with the rake in between her eyes?
A. Yeah.

Q. And you asked her and she said that the little girl did it.
A. Yes, well she finally told me that.  At first she was telling me she couldn't 'cause somebody would get in trouble.

Q. And last night you said that she was complaining, or actually throwing up and complaining of being thirsty.
A. Yeah.  And then she'd, I gave her like a great big glass of water and she drank it all, and she threw that back up, so then I started giving her, just, you know, a couple swallows in a glass at a time.

Q. Did you call anybody last night, any medical _____?
A. No, I thought he had taken her.  He's, 'cause he said he

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          37

took her and that she was ok.

Q.   About _____. But I mean about the uh, throwing up and the.
     Has anybody told you about a head injuries or abdominal
     injuries, about throwing up, complaining of thirst. No, um,
     I knew, I mean, I knew something about vomiting and head
     injuries, 'cause I'm a nurses aide. I haven't worked in a
     long time, but, and um, Barry I had talked about taking her
     to the doctor this morning if she wasn't ok. You know, if
     she was still throwing up. But, I didn't even think about
     the concussion 'cause he said he had took her to the fire
     station and that the firemen checked her eyes and everything
     and said she was ok.

Q.   What about abdominal injuries?
A.   I, I asked her if her stomach hurt and she said, no.

Q.   Have you ever been warned or told or know anything about
     abdominal injuries, um, complaining of, of, of, or actually
     complaining of thirst and throwing up.
A.   No.

Q.   Knowing that as a nurses aide?
A.   No-, nothing about abdominal, nuh, huh (no).

Q.   Ok. After looking at the bruises on her tummy, um, and no
     one could explain those.
A.   Just her saying that she had fallen out of the van.

Q.   And wh-, where did she fall out on to. There at Benson
     Highway?
A.   Yeah, I guess the van was parked in the driveway. From what
     I understand, it was just parked in the driveway, and her
     and these little boys, I don't know what they were playing,
     and I guess she fell out the doors.

Q.   Is it a type of van that it's got the bedding in the back or
     any type of sleeping.
A.   Well it's got now, no it doesn't have a bed in the back.
     It's, right now it's got.

Q.   Can you lie down in the back?
A.   Yeah, but it would be on wood. He's got like alot of his
     tools are in the back. So then there's like a big piece of
     wood that goes over the top. Plyboard or plywood, what ever
     it is.

Q.   Do the kids play in the van alot?
A.   This was the first time that I ever knew about it. He, he's
     normally not there, so the van's not there.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          38

Q.   Have you ever, have you ever had Rachael or found Rachael
     and Barry in the van together?
A.   No.  Other than when he's taken her somewhere.

Q.   How many times has he taken, if you can count and think real
     hard, how many times has he taken her somewhere alone in
     that van?  Even if it's to go to the store.
A.   Um, he takes her like the s-, to the Quick-Mart alot, you
     know, every few days, she'll go with him.  But they're gone
     for like five, ten minutes 'cause it's right there.

Q.   Then they come right back?
A.   Mm, hm (yes).  There's just been a couple times that he's
     been gone with her for any amount of time.  Probably five or
     six.

Q.   Ok.  Is there anything that she said to you before she went
     to sleep?
A.   Uh, huh (no).  Just, that, um, when we got back, when we got
     back into bed the last time, I stuck her up against the wall
     again like I did the first time, and she asked me to put her
     in the middle so she could sleep between us.  'Cause she
     wanted to sleep by Barry too.  So I put her over there and
     she went right to sleep and then I went to sleep.

Q.   And you didn't give her any medication or anything.
A.   Uh, huh (no).  We were all out of ty-, of the, her
     children's Tylenol.

Q.   Ok.  Where are you gonna go to right now?
A.   I, I don't know.  Somewhere with my sister probably.

Q.   Ok.
A.   I do have, um.

Q.   You guys aren't close you say.
A.   We're not like real, real close.

Q.   Is she a distant type relative type now even though she's
     your sister, she's kind of a distant relative.
A.   Kind of, she's um.

Q.   Is that 'cause you were adopted out or why is it?
A.   Well, we were adopted together.

Q.   Oh, I see.
A.   But I ran away from home when I was real young, so there was
     like ten years that I didn't really have any contact with
     her.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          39

Q.  Does she work and everything?
A.  Oh, yeah.  She's not working right now, but, um, she, the,
    not the Holiday.  She use to work at the Holiday Inn here.
    Mm, Ventana Canyon.  She ran the banquet department.

Q.  Oh.  D-, did you call her down here today.
A.  Um, yeah they asked me if I wanted anybody, you know,
    anybody down here with me, and I gave 'em, I didn't have her
    phone number, but the nurse called information and they
    called her.

Q.  Are you from Tucson?
A.  Originally, yeah.  I was born and raised here.

Q.  How long have you been here in Tucson?
A.  Um, I've been back this time for like four and a half years.
    I came back here when I was pregnant with Rachael.

Q.  Where wer-, where'd you come from?
A.  Oklahoma.

Q.  Oklahoma?  And that's where Rachael's daddy was.  Where else
    have you been other than Tucson?
A.  California.

Q.  California?  Where in California?
A.  Long Beach.

Q.  Long Beach?  What'd you do there?
A.  Um, I worked for collections and nurses aide work.  Mostly
    for collections and waitressing.  Um.

Q.  What's your Social Security Number.
A.  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.

Q.  So when you work, what do you do?
A.  Usually, either waitressing or nurses aide.  Like in nursing
    homes.

Q.  Uh, huh (yes).  Ok.  And you're not employed now?
A.  Uh, uh (no).  I haven't worked in year and a half, two
    years.

Q.  So do you get food stamps, stuff like that?
A.  I did, um, up until, mm, this month, no, last month was the
    first month that they, they had cut it out.  They were
    having problems with, um, child support.  Them getting ahold
    of my ex-husband and, I guess they didn't get some of the
    information I sent 'em or something, so I got a notice from
    my worker stating that I wouldn't be getting anything

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          40

because I didn't comply with the child support people.

Q. Oh.
A. So.  I've been trying...

Q. Do you?
A. ...to set up a new interview.

Q. You're not even getting child support then.
A. I never have.

Q. Oh.
A. They're, they have never been able to find Rachael's dad and.

Q. Or what about the other twos dad?
A. He, everytime they find him, he quits working.

Q. So who's your, your worker?
A. Um, oh God, what is his name?  I just got a new man not too long ago.  I've got the paperwork at my trailer.

Q. Who's the old man, or the old person that you were with?
A. Um, God what was her name?  Alice Bonds?

Q. What, uh, office is it?
A. Um, the one on Country Club.

Q. DES?
A. Uh, huh (yes).

Q. Ok.  On Country Club.
A. I've got, um, actua-, some of the paperwork's at Barry's trailer _____.

Q. Is most of your stuff there?
A. Um, yeah.  Most of, we still have like some clothes and some of the kids' toys and like all the furniture and stuff is at my old trailer.

Q. W-, where, what's his name, Zoley?
A. Uh, huh (yes).

Q. Is he still there?
A. No, no, he didn't, not at the trailer.

Q. He's gone.
A. Yeah.  He'd, we haven't been together for over a year.

Q. Over a year.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          41

A.   But he like, you know, he comes and sees the kids alot, you
     know.

Q.   Like if, as if he were they're father.
A.   Yeah.

Q.   'Cause he raised Rachael pretty much.
A.   Pretty much, yeah, he was, he was always there.

Q.   Was he abusive towards the kids?
A.   No.

Q.   Not at all?
A.   No, not at all.

Q.   Where's he living at?
A.   Um, he lives in the same trailer court that I do, in the
     first trailer.

Q.   What trailer number?
A.   Um, let's see, I'm six, seven.  I'd be like ten or eleven.

Q.   Ten or eleven.  What's his, what's his real name?
A.   Zoleton (ph).

Q.   Zoleton (ph).  What, what, wow.   Ok, go ahead.
A.   He's Hungarian.

Q.   Hungarian.
A.   And his last name is Inkubritson (ph).  I have no idea how
     to spell that.

Q.   Inkubritson.
A.   Mm, hm (yes).

Q.   In number eleven you said?
A.   Y-, yeah, I think it would be like ten or eleven.

Q.   And what's the address?
A.   3331 N. Chapel.

Q.   You guys just don't get along, huh?
A.   We get along great when he's sober.

Q.   What's his phone number?
A.   He doesn't have a phone.

Q.   Do you have a phone at your address on Benson?
A.   No.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

04373

SUPPLEMENTAL
·June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          42

Q.   Ok.  Has everything you told me today been the truth?
A.   Mm, hm (yes).

Q.   As far as you can remember?
A.   Yeah.

Q.   If I need something else, can I come back and talk to you?
A.   Yes, not a problem.  I can give you, I don't know where I'm gonna be staying.  If I go back to my trailer, I can give you the landlord's phone number.

Q.   You're not gonna le-, leave anywhere?
A.   No, no, not, no.

Q.   Are you going out of town at all?
A.   No.  Not until this is cleared up.

Q.   Are you gonna go stay with someone and not tell me where?
A.   I'm not going anywhere.  No, I w-, I'll let you know exactly where I am.

Q.   Ok.  So, for right now you might be with your sister for a little bit.
A.   Yeah, I don't know, I, they don't want to take me to my trailer and leave me alone right now.

Q.   Ok.
A.   So, I might just stay with.

(TAPE 1 SIDE B ENDS.)

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          43

(TAPE 2 SIDE A)

Q.   'Cause again it's starting to get a little hot.  If you
     want, I could turn the air on.
A.   I'm fine, I'm fine.

UM, I'M STARTING ON TAPE NUMBER TWO TH-, ON, UH, SIDE A, AGAIN
WITH ANGELA GREY ON CASE 940502025, UM.  THE TIME NOW IS
APPROXIMATELY 1044 HOURS.

Q.   Um, Angela, I was trying to switch the tapes over again, and
     uh, I was asking you to be helpful with us and to cooperate
     and it...
A.   And I'll do my best.

Q.   ...that we also need to find out what's gonna happen to your
     other kids as well.  I don't foresee that there would be any
     problem, um, that there would be any problem.  But, uh, I, I
     ask you and I, and I urge you to be honest with us, uh.
     You're the mom, so guess who we look at?
A.   I, I guessed that earlier.

Q.   Guess who we all look at right away.
A.   I guessed that earlier.  If, I mean I put her in that
     position.

Q.   No matter, no matter what happens to a kid, the mother is
     always looked at first, because, who, who does the kid.
A.   I understand that.

Q.   Who does the kid run to when they're hurt?  Who, who does a
     kid go to when they're hungry?
A.   Their mom.

Q.   Always.
A.   Yeah, I, I understand that.  And I understand that if, I
     mean, whatever happened to her is my responsibility too,
     'cause I'm the one that put her there.

Q.   It's true.  Le-, that's why I need you...
A.   Yeah.

Q.   ...to, to, and, and for you to be as cooperative as you can
     be.  Ok.
A.   I am trying.  Um, like I said, I've never, I've never seen
     him hurt a kid.  He does yell, everytime we argue, he
     leaves, you know.  Instead of arguing, he'll leave.

Q.   Ok.  And you've told me everything that's the truth.
A.   Um, yeah, the only other thing I could think of, I mean have

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          44

seen him get mad and kick his dog.

Q.  Mm, hm (yes).
A.  But other than that, I mean, I've never seen him hurt
    anybody.  I know he can.  I mean, I saw him in, when him and
    Zoley got into that fight that one day, and, I mean, he's a
    little guy, but he had Zoley down in like two seconds.

Q.  How much does he weigh?
A.  Probably, he can't weigh more than I do.  So, probably about
    110, 115.

Q.  Mm, hm (yes).  But he's a man, he's, you now, got some
    strength, right?
A.  He's, yeah, he's.  He's gotta be strong.

Q.  But, how do you think it would, how much strength do you
    need to hurt a little four year old?
A.  Not much.

Q.  She's skinny little thing too.
A.  She's tiny.

Q.  Who do you think hurt her, Angela?  Did a stranger come into
    your house during the night?  Were the doors locked?
A.  Yeah.

Q.  Doors were locked?  And you were up with her at one in the
    morning.
A.  Yeah.

Q.  And that's when she started.
A.  'Cause she'd woke me back up.

Q.  That's when she was throwing up and complaining of thirst.
A.  Yeah, but she said her tummy didn't hurt and her head didn't
    hurt.

Q.  Was there any evidence, or any signs of anybody else being
    in that house, other than you, Barry, the two girls and your
    son?
A.  Not that I noticed.  But I wasn't looking.

Q.  What about your son?  Has he ever hurt her?
A.  No.

Q.  Would he ever hurt Rachael?
A.  N-, I, no.

Q.  What about sexually?

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          45

A.   Nnno.  He was, when Rachael was first born, he was pretty
     mad 'cause the doctors had told us she was gonna be a boy.
     And he was all excited about having a little brother and he
     got, he was kind of pissed off when he found out she was
     girl.  But, ever since I brought her home, they've been
     pretty close.

Q.   Ok.  Is there anything else you wanna tell me right now?
A.   Just that, I mean, what ever it takes, I'm, I'm willing to
     help you guys with.

Q.   You under-, you understand that everything's preliminary
     right now?  Your baby's dead and we, yo-, you have to be
     able to look at it that way, Angela.
A.   I know.

Q.   That's why I want you to think real seriously about what...
A.   I know.

Q.   ...what you gonna do, and, and, and, um, what you tell me,
     if you have anything else you wanna tell me.
A.   N-, I've told you everything I can think of right now.

Q.   Everything's preliminary right now.  Like I said, you're the
     mother, we look at you too.
A.   The, I can, I can understand that.

Q.   And the last one that was with her was Barry and that's why
     we're talking to him as well.
A.   And if, I mean, if.  I can't picture him doing it, but then
     I know there's a million mothers out there that say the same
     thing too.

Q.   Ok.  So you gonna go with your sister right now?
A.   Yeah.  I don't know where, but.

Q.   Ok.
A.   If.  Do you have a card or something.  I have the other
     detective's card.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF ANGELA GRAY---CASE NO. 940502025          46

Q.   No, I don't.  But I'll tell you what, I ran out of cards.

LET ME STOP THIS TAPE, UM, AND END OUR INTERVIEW AT
APPROXIMATELY, UM, 1050 HOURS, SAME DATE.   THANK YOU VERY MUCH.


WITNESS:


_____

DET. SONIA RANKIN #672

TRANSCRIBED BY:

LETICIA LOPEZ ON MAY 11, 1994.

HOMOCIDE\GRAY.ANG\DEP RANKIN\#3221

```
SUPPLEMENTAL
 June 10, 1994
```

**Exhibit 27**

THIS IS DET. GEORGE RUELAS OF THE PIMA COUNTY SHERIFF'S
DEPARTMENT, UH, THE FOLLOWING IS A TAPE RECORDED CONVERSATION
WITH A WITNESS, REFERENCE CASE #930502025, AND CORRECTION, THAT'S
94, THE FIRST TWO NUMBERS OF THAT CASE NUMBER.  TODAY'S DATE IS
MAY THE 2ND, 1994, THE TIME NOW IS 10:36.

LEGEND:  Q. DET. RUELAS    A. BRANDY JONES

---

Q.   Ok, Brandy, that's your name?
A.   Yes.

Q.   You don't talk too loud, it'll pick it up.  Br-, Brandy,
     what's your full name, your whole name?
A.   Brandy Elishia Jones.

Q.   Elishia, oh, that's nice.  What's your date of birth, do you
     know your date of birth?
A.   Uh, yes.  September the 4th, um, '82.

Q.   September the 4th, '82.  That makes you almost 12?
A.   Mm hm (yes).

Q.   You're gonna be 12 this year.  You goin' to school?
A.   Uh, yeah.

Q.   Where do you go to school at?
A.   Craycroft Elementary.

Q.   Oh, that's close.  Craycroft Elementary.  What grade you in?
A.   5th.

Q.   Who's your teacher?
A.   Mr. Brown.

Q.   Oh.  You like, you like Mr. Brown?
A.   Mm hm (yes).

Q.   I used to go to a school around here, too, I didn't go to
     Craycroft.  I'm, I, I was from this neighborhood.  Uh,
     we're, we're investigatin' somethin' that happened today,
     you know, and and we really don't know what happened but but
     you've been around the family.  How many brothers and
     sisters do you have?
A.   Um, two brothers.

Q.   Uh huh (yes).  What are their names?
A.   Andrew and James.

Q.   Ok.  Do you have any sisters?
A.   No.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    2

Q.   No?  Ok where do you guys live?
A.   Uh, the trailer before that one.

Q.   Ok the, the brown one?
A.   Yeah.

Q.   Oh, ok, the one that has a fence around the front?
A.   Mm hm (yes).

Q.   Who lives there with you?
A.   Me and my dad, Angela, Rachel, um, Becky and Johnny.

Q.   Ok.  Now I, you you went a little fast for me there.  Who's
     Angela?
A.   Uh, my dad's girlfriend.

Q.   Ok.  And and what, I'm sorry, what's your dad's name?
A.   Barry.

Q.   Ok.  And, and who else lives there, and just one at a time
     and kinda how old they are, it helps me, helps me tell..
A.   Ok.  There's Becky, she's ten, there's Rachel, she's four,
     there's Johnny, 'she's' 14, and there's me and I'm 11.

Q.   Ok.  And now..  Your, which ones, ok, your dad, uh, your dad
     is your dad but Angela's not your mom, right?
A.   No.

Q.   Ok.  Whose, who, who are Angela's kids?
A.   Becky, Rachel and Johnny.

Q.   Becky, Rachel and Johnny.  And your kids are, and and your
     brothers and sisters..
A.   Uh, is James and Andrew.

Q.   James and Andrew, ok.  Uh, and you all live here together,
     been living here for...
A.   Mm hm (yes).

Q.   ...awhile?  How long you guys been living here?
A.   About four months.

Q.   About four months, everybody's been livin' together.
     Where'd you live before that?
A.   Uh, with my Uncle Larry, right there.

Q.   Yeah?  Over on Winter...
A.   Yeah.

Q.   ...Palm?

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    3

A.   Uh huh (yes).

Q.   That's your Uncle Larry, right?
A.   Yep.

Q.   Pretty nice guy.
A.   My favoritest uncle.

Q.   He's a nice guy, he came up and and we talked for a little
     bit and, uh, uh, I want you to know he, he care a lot about
     you, ok, and if there's any problem while we're sittin' here
     talkin' and or if, if you get upset or you need to talk to
     him or if, uh, you know, if you have any questions that you
     want to talk to him about, he's right there and you just,
     you just wave at him, ok?
A.   Ok.

Q.   Ok.  I mean 'cause, 'cause, uh, like I said, you're not in
     any trouble, we're just here to find out what happened.
A.   Ok.

Q.   Why don't..  Go ahead.
A.   I have a question to ask.  Um, what kid did my dad hurt?

Q.   I don't know that your dad hurt any kid.
A.   'Cause that's what everyone's tellin' me and my dad...

Q.   Well..
A.   ...didn't hurt any kids.

Q.   Who told you that?
A.   Um, the, my friends, um, her mom is my mom, her friend is,
     she, my mom, she's not my real mom but she's raised me since
     I was a little girl.

Q.   Uh huh (yes).
A.   And she told me that, uh, she's in there, uh, downtown for
     questions.

Q.   Oh, I see.  And and she said that your dad hurt somebody?
A.   Yeah, a little kid.

Q.   Oh ok.
A.   Ra...

Q.   Well, see a lot of, a lot of grown-ups say things, they get
     all excited and they, they say things that sometimes they
     don't know the whole story...
A.   I know.

RUELAS\HOMICIDE\JONES\#2336PENN

03119

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    4

Q. ...ok?  So that's why we're here, that's what we try and do,
   we try and come here to find out the whole story and try,
   try and find out everything that happened.  What I want to
   know is, ok, let's, let's start with today, what happened
   today?
A. Um, we woke up and, uh, Angela went...

Q. How'd you wake up, did you wake up on your own or did you
   hear some noise or did...
A. Yeah.

Q. ...somebody wake you up?
A. Well, um, uh, ok.  We, we were woken up because Angela's
   checkin' on Rachel every five hours, every hour because, um,
   she fell out of the van yesterday and hit her head.

Q. Ok.
A. And then she went over to play again because she said it
   didn't hurt or anything, they checked and everything, took
   her to paramedics, they said she was fine.  And, um, so she
   went back over to play and I guess and this boy hit her in
   the stomach with a metal bar, beat her in the stomach with a
   metal bar, and she's bleedin' internally and the mor-, and
   when she went down to sleep we tried to wake her up but see
   she just can't, she just wouldn't wake up.

Q. Ok.  And so how did you wake up, did somebody wake...
A. I..

Q. ...you up?
A. Yeah, they were screaming, Rachel, get up, Rachel, get up,
   come on, don't leave me now.  And it was scary.

Q. Who was screamin' that?
A. Angela.

Q. That's a little bit scary, huh?
A. I thought she was gonna die.

Q. And so, so what happened?
A. We went over to my friend's house because...

Q. Who took you over there?
A. My dad.  And..

Q. Your dad said, come on let's, let's go?
A. Yeah and...

Q. What did..
A. No he took her to the hospital first, took, um, her to the

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    5

hospital that..

Q.  Who'd he take?
A.  Angela and the kid, and he took us over to Ron's house
    'cause we can't be in the hospital, so we went over to Ron's
    house.

Q.  Ok.
A.  And...

Q.  Ok so, so your dad took Angela and Rachel...
A.  To the hospital...

Q.  ...to the hospital?
A.  ...real fast.

Q.  Ok in what car?
A.  In our yellow van.

Q.  The yellow van?
A.  But it belongs to my Uncle Larry right there.

Q.  Uncle Larry's van?  Ok.
A.  Mm hm (yes).

Q.  And then he came back and got you guys?
A.  Yeah and took us over to my fr-, my dad's best friend named
    Ron, 'cause we couldn't get in...

Q.  Over to Ron's house?
A.  Yeah, 'cause we couldn't be in the hospital.

Q.  Now who all went to Ron's house?
A.  Um, well, me, Becky...

Q.  Your dad took you..
A.  Me and Becky.

Q.  Becky.
A.  And that's it, 'cause Rachel's in the hospital and Johnny
    was at school.

Q.  Ok.  He went to school on his own?
A.  Yeah 'cause he, um, he'll start cryin' if he gets, if he has
    to stay home.

Q.  Ok was he here this morning though?
A.  Yeah he didn't know what was going on, he's deaf, he doesn't
    know what's...

03121

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    6

Q.   He's deaf?
A.   Yeah and he...

Q.   Oh ok.
A.   ...doesn't know what's going on.

Q.   Ok.
A.   So.

Q.   Ok.  You..  You said some things about Rachel fell out of
     the van.
A.   Yeah.

Q.   Were you there?
A.   Um, I think I was in the house when she fell out of the van.

Q.   Ok.
A.   I was here, I, I think I was in the house or I was out
     playing when she fell out of the van, because, um, like she
     tells my dad, when he works just so she'll have fun 'cause
     she, usually there's not no kids around here her age to
     play, so like when my dad works or something, she'll tell
     him how to work it, how to...

Q.   Who, Rachel will?
A.   Yeah.

Q.   Oh, oh...
A.   Tell him...

Q.   ...you mean Rachel'll hang around your dad like...
A.   Yeah and tells...

Q.   ...while he's like, while he's workin' on the van or
     workin'...
A.   Yeah or...

Q.   ...on a..
A.   ...she'll say oh you got that crooked and he'll have to go
     back over it and they like have a lot a fun together.  And
     she fell I guess, um, their friend came over and her
     brothers were in the van and she was oh can these guys come
     in and she, and he says, sure, the next thing I know, uh,
     Rachel fell out a the van, this boy pushed her out a the
     van, my dad jumped and that, and that thing he kinda worked
     with just got all over the place, like on the floor, but it
     didn't hurt anybody or anything, my dad jumped and stuff and
     then last night Angela said it was my dad, the one that did
     it and it wasn't him.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    7

Q.  Oh were your dad and Angela fightin' last night?
A.  Yeah, 'cause Rachel said that Barry was in the van and saw
    me fell and then she just misunderstood that to, um, well he
    pushed me out a the van and then _____ and then she
    said, he hit me with a metal bar, and then, 'cause, see she
    didn't say no name and then she was just talkin' about my
    dad, so she thought it was my dad, but then she said the
    name and it was over there..

Q.  Oh.
A.  So.

Q.  Were you there when Rachel said that?
A.  Yeah.

Q.  Ok.
A.  I was sittin' on the couch.

Q.  What, what are the names of the friends that Rachel plays
    with in the neighborhood?
A.  Uh, Mamas (ph), uh, let me think of her name, can't think of
    it right now (whispered).  Um, I don't know.

Q.  Ok.  When..
A.  All I know is Morton Mamas.

Q.  Ok.  So Rachel was playing inside the van, does the van have
    one of those sliding doors...
A.  Yeah.

Q.  ...on the side, is that what it is?  And the sliding door
    was open?
A.  Mm hm (yes).

Q.  And so..
A.  And my dad was workin' on his van, 'cause that's usually
    where he does all...

Q.  Dad was...
A.  ...his work.

Q.  ...workin' on the van and Rachel was playin' there, were any
    of the other kids there?
A.  Um, yeah.

Q.  Who was there?
A.  Uh, I, well I'm not sure.  All I know is Rachel got in the
    van and this boy pushed her out.  I don't know who was in
    the van, I don't know...

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    8

Q.   Ok.
A.   ...who was with her.

Q.   How did you learn that Rachel got pushed out by somebody?
A.   'Cause she ran in and said that boy pushed me out, that boy
     pushed me out, and my dad couldn't have done it, 'cause he
     was under the van.

Q.   Were you in the house when, when she came in saying _____?
A.   Well I went out to the door when she was on the ground and
     my dad was under the van, I went to the door, and then, um,
     she...

Q.   Ok.
A.   ...ran up and says, ow, my dad took her to the paramedics
     real fast, she came...

Q.   Ok.
A.   ...back and said...

Q.   And so, so where was the, where was the boy when this
     happened, when you came outside...
A.   Oh he took...

Q.   ...and she was...
A.   ...off running.

Q.   ...layin' on the ground?
A.   He took off running.

Q.   Ok, and you didn't chase him or go after him or anything
     like that?
A.   Uh uh (no).  'Cause I don't like, you know, chasing, um,
     little kids and doing that.

Q.   Ok.  So what'd your dad do?
A.   So he just said, took her to the paramedics, uh..

Q.   How'd he take her to the paramedics?
A.   He grabbed her by 'his' arm and ran over there.

Q.   Uh huh (yes).
A.   Ran over there and said is she ok and then they said, yeah,
     she's gonna be fine..

Q.   Were you there?  Did you go with 'em over to the paramedics?
A.   Well I was running after 'em but I got there and then they
     were started to come back and I said is everything ok and
     they go yeah, there's nothing she can do, she's ok, and then
     she like said can I go play and that same boy hit her in

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    9

the, beat her in the stomach with a metal bar.

Q.  Ok.  We'll go to that in a minute.  Ok so, so, so your dad
    picks her up and is he carrying her?
A.  Um..

Q.  Or does...
A.  Yes.

Q.  ...he put her in the car?
A.  He carries her like this and runs to the, um, paramedics.

Q.  Ok.  And so you saw him run that way, did you follow?
A.  I started to go after 'em...

Q.  Uh huh (yes).
A.  ...and, um, then guess, well the next thing I know I was by
    the street over there, almost to the fire station and she
    started walkin' back...

Q.  And he was comin' back?
A.  Yeah, she, Rachel had a smile and sucker in her hand, she
    was all happy and stuff.

Q.  Ok.  So your dad was, how long would you say he was gone?
A.  Oh about five minutes, no, about fifteen minutes, 'cause
    then right at five minutes after he left I started goin'
    goin' after him, and the paramedics checked 'him' out over
    there.

Q.  Who else was home at that time?
A.  Angela, Becky and Johnny.

Q.  Ok, but all you guys were in the house.
A.  No.

Q.  Ok.
A.  I'm not sure who was in the house, 'cause I just came in to
    go to the bathroom and then Rachel was laying on the ground
    when I walked back out.  And I said dad, look at Rachel, and
    he picked her up and..

Q.  Was Rachel bleeding?
A.  No, when at first when it happened, and then she started
    bleeding internally, puking up blood...

Q.  How do...
A.  ...and stuff.

Q.  ...you know she was bleeding internally?

03125

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    10

A.    'Cause, um, pe-, uh, uh, when we went over to our friend's
      house today she said, um, I said she was puking up blood and
      stuff and her head cou-, couldn't stop bleeding and she
      goes, and he goes, then she was bleeding internally 'cause,
      and I said, yeah she had bruises on her stomach where...

Q.    Ok.
A.    ...the boy hit her, and she says...

Q.    Ok.
A.    ...that's internal..

Q.    Let's find out about..  Ok.  So you come out and she's
      laying on the ground?
A.    Yeah.

Q.    Ok.
A.    And..

Q.    Is she crying or is she like dazed...
A.    Nuh uh (no).

Q.    ...a little bit?
A.    No, she...

Q.    Or is...
A.    ...she ...

Q.    ...she knocked out?
A.    ...started to get up and I said, dad, Rachel's on the
      ground, and he picked her up and ran her over to paramedics
      and they said she was fine, there's nothing 'she' can do,
      they can do.  _____

Q.    Ok.  So then Rachel's fine?
A.    Yep.  And then she came back and she was...

Q.    Ok so she's back, what'd she do then, your dad take her in
      the house or..?
A.    Yeah and then her mom checked her and said she was ok and
      then went back out and played and she came over, she st____
      like that and her blood is...

Q.    She went out to play and she came back in?
A.    Yeah.

Q.    How long was she out playing?
A.    About 20 minutes.

Q.    Ok.

RUELAS\HOMICIDE\JONES\#2336PENN

03126

┌─────────────────────┐
│     SUPPLEMENTAL     │
│   ·June 10, 1994     │
└─────────────────────┘

STATEMENT OF BRANDY JONES--CASE #940502025                    11

A.   And then her, she came down and blood was rollin' down her
     head...

Q.   Ok.
A.   ...right down, and...

Q.   Is that the first time her head was bleedin'?
A.   Yeah.

Q.   Or did you see it bleed earlier?
A.   First time, yeah, it was bl-, it had blood.

Q.   Ok.  Ok go ahead, please.  You're doin' fine.
A.   And then, um, she started gettin' sick and stuff, we put her
     in the house and then she goes, my dad says, oh well I don't
     want to leave Rachel in case somethin' happens and _____
     doin' somethin' obvious he doesn't want to leave, 'cause
     usually he likes going places and stuff.

Q.   Uh huh (yes).
A.   And then he came back and then Rachel says, he did it, he
     did it, hit me, he, I fell, he pushed me out of the van and
     hit me in the stomach, and she just jumps to the conclusion
     it was Barry, she ran home and says, where did he hit you
     at, and Rachel says, no, not him, the other bo-, little boy
     over there.  And and then..

Q.   Well if, now when did Rachel go back out?  After your dad
     brought her back from the paramedics, when did she go back
     out?
A.   About 20 minutes later.

Q.   Ok.
A.   After her mom checked her and she went to the bathroom and
     got a drink.

Q.   Ok.  And she wasn't sick to her stomach then?
A.   Nope.

Q.   No.
A.   And then when she went back out to play over there, the
     little boy beat her in the stomach with the..

Q.   Ok how do you know that happened?
A.   'Cause she told us.

Q.   Ok.  Rachel told you that?
A.   Yeah.  She might've been lying or something but..

Q.   Ok.  So when did Rachel come home, what time?

RUELAS\HOMICIDE\JONES\#2336PENN

┌─────────────────────┐
│     SUPPLEMENTAL     │
│   'June 10, 1994     │
└─────────────────────┘

STATEMENT OF BRANDY JONES--CASE #940502025                    12

A.   Oh, it was about, I don't know, I wasn't paying attention to
     the time.

Q.   Ok.
A.   But if I was..

Q.   When did you notice when she came back in and her head was
     bleeding?
A.   Yeah.  About, she went to sit down and she went like this
     and then there was blood on her shirt, I said Rachel's
     bleedin', about five minutes after she came back in.

Q.   Ok.  And where was she bleedin' from?
A.   Her head.

Q.   You said she got sick to her stomach?
A.   Yeah then she started pukin' and she's sufferin', then she,
     my stomach hurts and that and she checked her stomach...

Q.   Uh huh (yes).
A.   ...and there was bruises all over _____ she goes how'd that
     happen, that boy, he, he, that boy hit me...

Q.   There were bruises 'acrost' her stomach?
A.   Yeah, like it was a metal bar or somethin' that hit her.

Q.   Ok.  And so Angela asked, right?
A.   Yeah, she went outside and said, what'd you hit her with, he
     goes, are you out-a your mind, ___, like 'cause my dad
     doesn't like bein' blamed for stuff and he would never hurt
     a kid, so he went outside in his van and thought why would
     someone blame it on me, and like, um, came back in and then
     they, __ talkin', he says, Rachel, why'd you say that, well
     I didn't do it, and then she goes, I didn't say you, it was
     that boy over there.

Q.   Were you there when they said this?
A.   Yeah.

Q.   Ok.
A.   I was standin' in the kitchen.

Q.   Ok.  And so then what happened?
A.   Uh, and then after that..

Q.   What time did you guys have dinner last night?
A.   Ooh um...

Q.   You did have dinner?
A.   Yes.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    13

Q.   Ok.  What'd you guys have?
A.   Uh, they had burritos and, 'cause they wanted burritos, I
     had fried chicken.

Q.   Uh huh (yes).
A.   And potato salad.

Q.   What'd Rachel have?
A.   Um, chicken and potato salad, I think, yeah, somethin'.

Q.   Ok.
A.   Either the burrito or somethin', but I think she had
     chicken, I'm not sure.

Q.   Ok.  When did she start gettin' real sick?
A.   Um, after she got done eating, 'cause she said my stomach
     hurts and my dad went up there and bought a strawberry milk,
     'cause that usually helps him, so he got a strawberry milk
     and then brought it back and then she started pukin' after
     she got done with that strawberry milk, so they thought,
     well hey, _____ strawberry milk with, but and she couldn't,
     she started like that and this morning when she woke up she
     just wouldn't wake up and she was like real, real skinny
     and..

Q.   Ok.
A.   So I think e..everything she ate, she coulda gotten sick of
     and make her pass out or something, 'cause she was starved
     or..

Q.   Yeah.  I'm not a doctor, uh, so I don't know.
A.   Yeah.

Q.   Uh..  We gotta talk to everybody and the only way we can
     really find out what happened is if everybody tells us the
     truth.  And I just want to make sure that, that what you're
     tellin' me is the truth, ok?
A.   It is.  I'm not..

Q.   'Cause, uh, we're gonna talk to everybody and I know you
     love your dad, and you're...
A.   Uh huh (yes).

Q.   ...supposed to, ok.
A.   But I wouldn't lie to stick up...

Q.   I, I know.
A.   ...for him or anything.

Q.   I, I, well that's kinda what I'm just tryin' to say is I'm

03129

SUPPLEMENTAL
·June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    14

not tryin' to say you're stickin' up for him.  I'm just sayin' that, uh, you know I know he's your dad and you love him very much and and and believe me, see the best thing if we can get the whole truth.  Because that's how we figure out what happened.  If, you know, uh, I don't think your dad would intentionally hurt a kid, you know, but sometimes accidents happen and...

A.    Yeah.

Q.    ...things happen and we just tryin' to find out maybe that's what happened this time and and we try and find out as best we can, that way, you know, everybody's satisfied with, with the story.  Uh, I know you love your dad a lot...

A.    Uh huh (yes).

Q.    ...and and I, I just, best thing you can do to help your dad, though, is tell the whole truth.  Uh, I gotta go find the other kids in the trailer park and find out who, who then, you know, is this kid.  Now you know the other kids who play in the park.

A.    Yeah.

Q.    So who are these kids?
A.    Uh, there's Mamas, there's JJ, there's AJ...

Q.    And where do they live?
A.    Um, they live in that blue and white trailer right there.

Q.    Right there?
A.    Yeah.

Q.    Ok.
A.    And then there's, um, Mexican kids that lives the first trailer out by the bar, ...

Q.    Ok.
A.    ...first trailer right there.  Then there's another one that lives on the last trailer and, um...

Q.    Well which one is the one Rachel said hit her?
A.    I.. _____  And then there's kid, kids, um, right in front of the first trailer by the bar, it's right there, across from that white trailer right there...

Q.    Yeah..
A.    ...right 'acrost'.

Q.    She said, and you had to be listenin', you, I mean you heard all these other things real good, you had to, you had to hear who she said.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    15

A.  Not the name though.  I didn't hear the name.  It's, um,
    there's kids right over there and it was one of them kids
    but I can't remember all their names.  There's Ryan and
    then...

Q.  So the only way you know is...
A.  And after...

Q.  ...because..
A.  ...Ryan and Andrew, that's all I can remember.

Q.  Because that's what you heard.
A.  Yeah.

Q.  Ok.
A.  There's Ryan...

Q.  I know you, I know you talked with some grown-ups, all the
    grown-ups have been talkin' about this today...
A.  Mm hm (yes).

Q.  ...you know and they're all pretty upset and and they've
    been talkin' today, uh, what have they told you?
A.  Well what do you mean?

Q.  About what happened.
A.  Um, well they said that my dad hit, um, I don't know, um,
    hurt a little, a little kid.

Q.  But, but they weren't there, so they don't know.
A.  Yeah.

Q.  Ok.
A.  So so, uh..

Q.  Who said that?
A.  Um, lots a people, I can't exactly tell you who all, um,
    there was Ron, next door neighbor, there was, um, some
    people down in a different trailer court, um..

Q.  _____
A.  Ronnie told me in the trailer right there.

Q.  Oh they were all, they were all together talkin' about this
    today, huh?
A.  Yeah.

Q.  And what did they say happened?
A.  'Cause I called Mr. Ron, I said what's goin' on and he said
    there's a whole bunch a cops in front of Barry's house, I

03131

STATEMENT OF BRANDY JONES--CASE #940502025                    16

think he's goin' to jail, and then I said, ok, well fine, he goes, I guess he beats this little kid up, oh god, scared me.

Q.   Well don't be scared, I, see those grown-ups, they like to talk but they don't know what's gonna happen.  Just because they talk doesn't mean this is gonna happen or that's gonna happen.
A.   Yeah.

Q.   I mean that, you know, that's just how grown-ups are, they like to, does your mom and dad ever talk about, uh, you know people who like to spread rumors or ...
A.   Yeah.

Q.   ...tell stories or things like.. And that happens a lot down here, you know.  'Cause like I said, I grew up down here, too, so I know people always, they tell stories, they like to feel important.
A.   Yeah and then they...

Q.   And that's __ ...
A.   ...like to make them feel, that person...

Q.   Well that's...
A.   ...fell bad..

Q.   ...what makes it hard for us because so many people tell stories and we just try and find out the truth so we know what really happened.  Uh, you know you seem pretty bright, you know, you're pretty intelligent, you get pretty good grades?
A.   No.

Q.   No!  How come?
A.   I don't know, 'cause, um, like so worried about my life and stuff and so I, I been getting better grades this year but..

Q.   Good, you gotta do them grades, that way you, you, you know, you, you get a good job when you grow up or you marry a nice guy and ya, and ya, li-, life is good to you.  But you gotta work hard at those grades, too, I know they're tough, I, I didn't like school either so, sometimes school, I hated goin' to school.  So.  Ok, well maybe we can talk again soon.  Can you think of anything that you didn't tell me that that maybe I should know, that would help me out?  'Cause that's why I'm talkin' to you, I want you to help ...
A.   Um..

Q.   ...me.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    17

A.  And yeah, and one time the boy, he's a little boy, and he
    was over at my Uncle's Larry's house right there...

Q.  Mm hm (yes).
A.  ...and, um, he, uh, she was playing and she tripped over a
    doggie and hit her hea-, her arm, scratched it, and this
    little girl hit her in the nose with a rake.  Or a cra-, I
    don't remember what she said, a rake or a crate.

Q.  Uh huh (yes).
A.  And she fell or hit her, somethin', and then she woke up
    with two black eyes and Angela thought it was my dad but it
    wasn't, but..

Q.  Who'd that happen to?
A.  Um, Rachel, the same little...

Q.  Rachel, she...
A.  ...girl.

Q.  ...just tripped and..
A.  Yeah, same little girl.

Q.  And all of that.  How long ago was that?
A.  Ooh about three weeks ago.

Q.  Uh.
A.  Maybe two.

Q.  And and that was Rachel and your dad, were you there?
A.  Um, no, I was not there at that time.

Q.  But you said she tripped and fell and then got hit with a
    rake or hit a rake...
A.  Yeah.

Q.  ...or..
A.  Or fell on a crate or somethin'.

Q.  Mm, oh a crate.  Like a milk crate?
A.  Yeah or...

Q.  Oh.
A.  ...a crate or a rake, I'm not sure.

Q.  Ok.  And she had two black eyes, huh?
A.  Yeah and they were real bad.

Q.  Yeah.  And that was about three weeks ago?
A.  Mm hm (yes).

03133

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    18

Q.   Uh, do your dad and Angela fight a lot?
A.   No.

Q.   No?  They don't fight a lot?  Do they, they argue, I mean I,
     I argue with my wife.
A.   Yeah, they argue.

Q.   Ok.
A.   But they don't like fight or argue a lot.

Q.   Ok they don't hit each other?
A.   No.

Q.   No.
A.   My dad does not hit girls.

Q.   Oh he doesn't hit 'em, believe in hittin' girls, huh.
A.   Nuh uh (no).

Q.   Ok, that's good, that's a good rule, I like that, I like
     that.
A.   My dad's never hit a girl in his solitary life.

Q.   Well that's good and that's the way it's supposed to be.
     Ok.  Well I appreciate you talkin' to me.  And like I say,
     we'll probably talk some more.
A.   Yeah.

Q.   Some more real soon.  Uh, I'm just tryin' to think now when,
     when Rachel was outside playin' in the van and dad was
     workin' on the van, was there anybody else out playin'?  Was
     there anybody else...
A.   In the van?

Q.   ...that saw..
A.   With her.

Q.   Yeah, that was out there that might have seen her fall.
A.   All I know is there was Mamas out there with her, Mamas and
     then there was two other little boys.

Q.   Mamos ..
A.   Mamas.

Q.   ...and two other little..  Mamas.
A.   Yeah, she's real big, she's a little girl, she's half
     Indian.

Q.   And they live here.
A.   That well blue and white trailer.

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
'June 10, 1994

STATEMENT OF BRANDY JONES--CASE #940502025                    19

Q.   Blue and white trailer right there.
A.   Yeah.

Q.   Ok, that's Mamas lives there, anybody else?
A.   And her two brothers.

Q.   And those little ones that were over playin' when..
A.   No.  Just Mamas and, um, two other little boys of Stephanie.

Q.   Ok how old's Mamas?
A.   Uh, I think she's three.

Q.   Ok.  And the two boys, where do they live?
A.   Uh, the same place.

Q.   Ok.  The two boys that maybe were there though.
A.   Yeah they maybe have been there but I think they were
     Stephanie's kids.

Q.   Ok who's Stephanie's...
A.   Um..

Q.   ...kids?
A.   Uh, she has four, all I can remember is Ryan and Andrew.

Q.   Ok, and so you think it was Ryan and Andrew that may have
     been there?
A.   Andrew's just a little baby, but there, she has this one
     mean little kid that bashes her kids' head into the ce-,
     cement and stuff...

Q.   Uh huh (yes).
A.   ...and punches its legs and stuff, I think that was the one
     that pushed her out the van and hit her...

Q.   Ok.
A.   ...in the stomach.

Q.   What was his name?
A.   I cannot remember his name.

Q.   Ok but he's one of Stephanie's kids.
A.   Yeah.

Q.   Ok.
A.   If you talk to Becky, she'll, she can remember everyone's
     name in this trailer court and I lived here longer than her.

Q.   Ok.  Good.  Well I think we'll do that, I think we'll do
     that.  But those are the only ones you can think that were

RUELAS\HOMICIDE\JONES\#2336PENN

SUPPLEMENTAL
June 10, 1994

```
          outside when, when Rachel fell.
A.   Yes.

Q.   You can't think of any others.
A.   Eh, um, all I know is there was Mamas and I think there
     could have been them two, there was, could've been some
     other two and then there could've been the Mexican kids.

Q.   Ok.  Well good, I'll I'll float around and see if I can talk
     to one a them.
A.   Yeah but I'm not sure.

Q.   Ok.  Anything else?
A.   Nope.

Q.   Alright, hey, I, I appreciate you talkin' to me, ok?
A.   No problem.

Q.   Thanks, let me shut off this tape recorder.  The time's now
     11:00 o'clock.
```

*CORRECTIONS MADE BY 857*

WITNESS:

DET. RUELAS' #857

*051194*

03136

TRANSCRIBED BY:

C. PENN, MAY 7, 1994

SUPPLEMENTAL
June 10, 1994

**Exhibit 28**

OKAY.  AND I'M, UH, THIS IS BRUCE CLARK FROM THE PIMA COUNTY
SHERIFF'S DEPARTMENT.  TODAY'S DATE IS MAY 3, 1994, THE TIME IS
1530 HOURS.  I'M AT 5650 S. LESLIE AVENUE, SPACE #3.  UH, THIS
TAPE WILL BE IN REFERENCE TO CASE #940502025.  AND I'LL BE
SPEAKING WITH A, WITH A YOUNG MAN NAMED RAY LOPEZ.  UM, THIS IS
REFERENCE THE RACHEL GRAY INVESTIGATION.

LEGEND   Q = DET. CLARK    A = REYNALDO LOPEZ
         A2 = NORMA LOPEZ

---

Q.   Is it okay if I call you Ray?
A.   Yeah.

Q.   Tape recorder's gotta hear you, don't forget now okay?
A.   Yeah.

Q.   Okay.  Just speak up and then I won't have to remind you
     okay?  Okay?
A.   Yeah.
A2.  And he can go on to the next question okay?

Q.   Yeah.  Okay.  And I've, and I've asked mom to sit in on this
     interview with us.  Uh, she's also sitting here.  Okay, Ray
     can you nice and loud for the tape recorder and you tell me
     what your whole name is?
A.   Ray Robert Lopez.

Q.   Okay.  Can you speak just a little bit louder?
A.   Ray Robert Lopez.

Q.   That's great, okay.  How old are you?
A.   Eight.

Q.   Okay.  And when's your birthday?
A.   December 19.

Q.   You know what year?
A.   Uh, um, _____.

Q.   Okay.  But you, but you know you're eight years old?
A.   Yeah.

Q.   Okay.  Do you think you were born in 1985?
A.   Yeah.

Q.   You sure?
A.   Uh huh (yes).

Q.   Okay.  Uh, what school are you going to?
A.   Los Ninos.

Q.   Okay, and what grade are you in?

026621

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    2

A.    Second.

Q.    What's your teacher's name?
A.    Miss Florez (ph).

Q.    Do you like her?
A.    Little.

Q.    Just a little?  She's a good teacher though, right?  Right?
A.    Yeah.

Q.    That a boy okay.  Okay.  Um, your mom called me earlier
      today.  She called me at work and she told me about
      something that you saw the other day.  Okay.  Uh, I guess
      when you came home, she, she sent you to the store?
A.    Uh huh (yes).

Q.    And when you came home you, you told her a story about what
      you just saw?
A.    Yes.

Q.    And what I would like to do is just for you to explain to me
      what that was okay?
A.    Yes.

Q.    Okay.  Um, Sun, and we're talking about Sunday you saw this?
A.    Yes.

Q.    Two days ago?
A.    Yes.

Q.    Okay.  So would that be May 1st?
A.    Yes.

Q.    Okay 'cause today's May 3rd right?
A.    Yeah.

Q.    Today's Tuesday.
A.    Yes.

Q.    Okay.  Uh, okay.  Uh, why don't you tell me what happened
      and what I'd like, where I'd like to start is I think your
      mom sent you to the store for something.  So let's start
      there okay?
A.    Yeah.

Q.    Okay.  Uh, all right.  So this is on Sunday, May 1st your
      mom sent you to the store and you remember what she told you
      to go buy?
A.    Pepsi, two Pepsis and gum.

Q.    Okay.  What kind of gum did you get?

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    3

A.    Green stripe bubble gum.

Q.    Green stripe?  Okay.  That's not good for your teeth you
      know.  Okay.  Do you remember about what time of day your
      mom sent you to the store?
A.    5:00 something.

Q.    Okay, in the morning or in the afternoon?
A.    Afternoon when I came back from school.

Q.    Okay, so it was after school.
A.    Uh huh (yes) yes.

Q.    Wh, what, do you go to school on Sundays?
A.    No.

Q.    Okay.  So what did you do for the first part of the day?
      You did, you didn't go to school, what'd you do just
      playing?
A.    Yes.

Q.    Okay.  And you think about 5:00 o'clock your mom, did she
      give you some money?
A.    Yes.

Q.    Okay.  And about what time was it you think you went to the
      store?
A.    5:00.

Q.    About 5:00 in the afternoon, okay.  It was light out right?
A.    Uh huh (yes) yeah.

Q.    And it was kind of blue skies and sunny?
A.    Yeah.

Q.    Okay.  Um, who did you go to the store with?
A.    My sister Laura.

Q.    Laura?
A.    Yeah.

Q.    okay.  What store did you go to?
A.    Choice Market.

Q.    Choice Market?  Okay, how far away is that from here?
A.    Um...
A2.   Is it real close, close?

Q.    Is it...
A.    ...close.
A2.   Far?

02623

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    4

Q.    ...it's pretty close?
A.    Uh huh (yes) yeah.

Q.    Okay.  Like maybe just a block away or ten blocks away?
A.    Ten blocks away.

Q.    No, no, no, no.  Okay, we gotta, we gotta be real serious
      about this okay?  Let's, we can joke around later, but we
      have to be serious about this okay?  So how far do you
      really think it is from here?
A.    Block away.

Q.    Just about a block away?  Okay.  And you know the names of
      the streets around here?
A.    That one's Drexel.

Q.    Uh huh (yes).
A.    And that one's Drexel, no, no.

Q.    Okay, if you, if...
A2.   In front of Choice Market is what?

Q.    ...you know which street the Choice Market is on?
A.    No.

Q.    Um, if I said it was Benson Highway would you think that was
      right?
A.    Yeah.

Q.    Okay.  You, you're not just guessing to make me happy are
      you?
A.    Huh uh (no).

Q.    Are you sure?  Okay.  Anyway, if you go out your front door
      you could almost see the back of the store from here right?
A.    Yes.

Q.    So um, which way, if when you left your house, which way did
      you go to the store?
A.    That way.  That way.

Q.    Okay, you're, the tape recorder can't see you pointing so
      I'll just, you're pointing you went out the front door and
      you went to the left and then you went kind of like straight
      down the street here which is called Earp, the street is
      called Earp kind of like Wyatt Earp, the cowboy.
A2.   Do you walk right or do you walk left to the store?
A.    Right.

Q.    Okay, so you went out and you made a right and you, you kind
      of come to the back of the store first?  And then you go
      around the front?

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    5

A.    No.

Q.    okay.  You explain to me how you did it.
A.    Go through the, go through the front.

Q.    Okay.  So from here you just went out the front door and you
      just kind of went in a straight line to the store?
A.    Yeah.

Q.    Okay, good job.  And who were you with, your sister?
A.    Yes.

Q.    Were you with anybody else?
A.    No.

Q.    You just, okay.  And the whole time you left here, you went
      to the store and you saw something and you came back.  Were
      you with anybody besides your sister?
A.    No.

Q.    No, okay.  Some of these questions sound funny, but we have
      to ask 'em this way okay?  And don't forget, if you have any
      questions feel free to ask 'em okay?  Okay?
A.    Yes sir.

Q.    Okay.  Okay, so anyway it was about 5:00 in the afternoon,
      it was blue skies and sunny and warm?
A.    Yes.

Q.    The weather was nice?
A.    Yeah.

Q.    And it was real light out, you could see right?
A.    Yes.

Q.    Okay.  When you told your mom when you came home later that
      you saw somebody in a car.  Did you see him when you were on
      the way to the store or on the way back?
A.    On the way back.

Q.    Okay.  So you went in and got your Pepsis and your gum?
A.    Yes.

Q.    And you and your sister came out of the store?
A.    Yeah.

Q.    And is this when you saw what you told your mom about?
A.    Yes.

Q.    Okay.  Can you explain to me, and, and I won't ask any
      questions for a while, you walked out of the store and you
      saw something.  What did you see?

C02625

┌─────────────────────┐
│    SUPPLEMENTAL     │
│   June 10, 1994    │
└─────────────────────┘

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    6

A.   A guy in a van driving with one hand and hitting her.

Q.   Okay. Let's, let's...
A.   And then hitting uh...

Q.   ...let's go real slow here 'cause this is real important,
     okay? Um, you said he was in a van?
A.   ...yellow.

Q.   Do you know what, a yellow van? Do you know what kind of
     van it was? Do you know cars like Fords and Chevy's and
     stuff like that?
A.   Yeah.

Q.   Okay. Do you know what kind of van it was? And if you're
     not sure...
A.   Huh uh (no).

Q.   ...if you have to say I don't know, that's okay, that's the
     answer I want to hear. Okay. If you don't know that's
     fair.
A2.  You can say old or new.
A.   Kind of old.

Q.   Kind of old. Uh, okay, and wh, it was yellow?
A.   Uh huh (yes) yes.

Q.   Okay. And you said you saw a guy in the van? Was he the
     driver or the passenger?
A.   The driver.

Q.   Okay. And can you describe him to me? Do you, do you know
     what he looked like?
A.   Cur, had curly hair and um, kind of long nose.

Q.   Was it sh, was it short curly hair or long curly hair?
A.   Long curly kind of hair.

Q.   Long curly, was it nice and neat or was it messed up?
A.   Messed up.

Q.   Messed up, okay. Do you know about how old he was?
A.   No.

Q.   Okay. Was he old like me or young like you?
A2.  Was he one of my brothers age, I have six brothers.

Q.   Okay.
A2.  So that's easy to compare. I don't know.

Q.   Which one of your uncles was he about the same age of?
A.   Um...

026266

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    7

A2.   Young, David?
A.    ...David.
A2.   David's about 30, 35.

Q.    Okay, was he about like your Uncle David?
A.    Uh huh (yes).

Q.    About 30, 35?  Okay.  Um, could you see what he was wearing,
      what kind of clothes he had on?
A.    He had blue shirt and a hat.

Q.    What kind of hat?
A.    Kind of blue and white in the front.

Q.    Okay, was it like a cowboy hat or a baseball hat?
A.    Baseball.

Q.    Baseball hat, okay.  Um, how far away were you when you
      walked out of the store, how far away were you to the van?
      Like were you right at the store of the door?
A.    No.

Q.    Door of the store.
A.    No.
A2.   There's a desert in there right Ray?
A.    Yeah.
A2.   So think where were you in the beginning of the desert where
      there's a parking lot or...
A.    In the middle of the desert.
A2.   ...were you in the middle of the desert?
A.    In the middle of the desert.

Q.    Okay.
A.    And he was close to us.

Q.    Okay.  And was he driving on the street or was he in the
      desert?
A.    In the desert.

Q.    He was in the desert too?  Okay.  And if the store, just,
      just think, okay, and I'm pointing out on a piece of paper
      here just for the tape, uh, say your house is here and you
      walk over to the store over here, which is stri, straight
      out the front door right?
A2.   Yes sir.

Q.    This is the store over here and this is the main street in
      front...
A.    Uh huh (yes) yeah.

Q.    ...which is Benson Highway.  Where did you see the van in
      the desert?

C 02627

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    8

A.   Right out in the middle.

Q.   Okay.  So we're gonna say to the, to the left of the store
     there's a desert area.
A.   Uh huh (yes) yes.
A2.  Right, right in the middle.

Q.   Okay.  Okay.  And that's between the store and your house,
     that desert area is somewhere between the store and your
     house right?
A.   Yes.

Q.   Okay.  And is there any dirt roads or anything in there?  In
     the desert.
A.   Um...
A2.  It's just, it's just all desert.  Everybody uses it to go in
     and out.

Q.   But there's places that you can drive a car in there?
A.   ...uh huh (yes) yes.

Q.   Okay.  And were they moving, was the van moving or was it
     stopped?
A.   Moving.

Q.   Okay.  Did you ever see it stop?
A.   Nuh uh (no).

Q.   Okay.  So you, you and your sister came out of the store and
     you were coming home so you walked through the desert?
A.   Uh huh (yes).

Q.   And that's when you saw the van?
A.   Uh huh (yes).  Yes.

Q.   Which way was the van going?  Like here's the store and
     here's the, the desert.  Where was the van?
A.   He was going and then he turned like that.

Q.   Okay.  So was the van moving and going back behind the
     store?
A.   Yeah.

Q.   He was?
A2.  He was going to the store or going out of the store?

Q.   Was it going toward, it's in the desert.  Was it going
     toward the store?
A.   Go, it, it went in front of the go...
A2.  There's the desert right?
A.   ...uh huh (yes).
A2.  There's the store.  Here's Choice.  Was it coming this way

SUPPLEMENTAL
June 10, 1994

or that way or this way?
A.   It turned in front of the door.

Q.   In the front of the store?
A.   Uh huh (yes).

Q.   Okay.
A.   And then he kept on going.

Q.   Okay, but he came out of the desert and went toward the front door?
A.   Uh huh (yes).

Q.   Okay.  But you saw him hit somebody in the van when he was in the desert?
A.   Yes.

Q.   And then he drove past you and you really couldn't see anything after that what was going on inside the van right?
A.   Huh uh (no) no.

Q.   Okay.  So now explain, you're doing really good.  Okay. Explain to me uh, you said the guy that was driving was driving with one hand?
A.   Yes.

Q.   He was, so he was pretty close then, you could see his hands?
A.   Uh huh (yes).

Q.   Okay.  Um, was it from like me to that big football?
A.   Yeah.

Q.   Away, about that distance?  Or was it closer or further?  Or is that about right?
A.   Like the big football.

Q.   Okay.  So uh, I'm gonna estimate the distance between me and this football we're talking about is about uh, 20, 20 feet tops.  Uh, when you could see inside the front of his van you said the guy was driving with one hand and the van was kind of swerving?
A.   Yes.

Q.   And why did you think the van was swerving?
A.   'Cause he was hitting the girl.

Q.   He was hitting the girl?
A.   Uh huh (yes).

Q.   Okay.  Um, how, how was he hitting the girl?
A.   Like that and he went like that.

C 02629

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    10

Q.   Okay.  You're making a motion with your right hand.
A.   Yes.

Q.   Wi, with your right arm and your right hand and you have
     your fist closed right?  Was he hitting the girl with his
     fist?
A.   Yes.

Q.   And what part of the girl's body was he hitting with his
     fist?
A.   His, her face.

Q.   He was hitting her in the face?  Did you see how many times?
A.   Yeah.  Two in the face and one in the stomach.

Q.   With his fist?  Okay.  Did you ever see him hit the girl
     with a different part of his body?
A.   Um, elbow.

Q.   He hit, he also hit the girl with his elbow?  And where on
     the girl's body did he hit her with the elbow?
A.   In the fa, in the mouth.

Q.   In the mouth you think?  Okay.  Um, did you hear him yelling
     or was he quiet or?
A.   He was quiet.

Q.   He was quiet.  How about the girl?  Uh, you...
A.   Quiet, I can't hear.  The window was shut.

Q.   ...the windows were closed?
A.   Uh huh (yes).

Q.   Okay.  Did it look like sh, she was, you know, happy or sad
     or crying or yelling?
A.   Crying.

Q.   She was crying?
A.   Kind of yelling.

Q.   You could just like see that she was yelling and crying, but
     you, you couldn't hear her?
A.   Couldn't hear her.

Q.   Okay.  You're doing really good.  You're really remembering
     to say it instead of shaking your head, that's great.  Can
     you describe the little girl to me?  Like uh...
A.   Blond hair.

Q.   ...okay.  How...
A.   Short blond hair.

C2630

┌─────────────────────┐
│     SUPPLEMENTAL    │
│    June 10, 1994    │
└─────────────────────┘

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                11

Q.   ...short blond hair and you're pointing to your shoulders.
     So about not as long as your mom's hair?
A.   Nuh uh (no).

Q.   How about your sister?
A.   Nuh uh (no).

Q.   Not as long as your sister's hair?
A.   Nuh uh (no).

Q.   So you think the little girl's hair was just a little bit
     above her shoulders?
A.   Uh huh (yes).

Q.   Okay.  Could you tell, could you tell about how old the
     little girl was?
A.   She was about four, she four, three.  Four.

Q.   About four you think?  Okay.  And was she a white girl, a
     Mexican girl or black girl, could you tell?
A.   A white.

Q.   White girl, okay.  And you, and you couldn't hear anything
     from her, but you could see that she was crying?
A.   Yes.

Q.   Okay.  And when she was getting hit by the guy's fist or
     elbow, um, ho, let me back up a little bit.  How fast do you
     think the van was moving when it drove by you?
A.   Um...

Q.   Can you, do you...
A.   ...slow.

Q.   ...huh, you describe it as slow?  Okay.  And how many times
     do you think the guy hit her?
A.   Five, four.

Q.   Four or five?
A.   Yes.

Q.   And is that with his fist and his elbow or four or five with
     the fist and then more with the elbow?
A.   One with the elbow and five with his fist.

Q.   Okay, so once with the elbow and where did his elbow hit the
     girl on her body?
A.   In the stomach.

Q.   And the elbow, the elbow...
A2.  He hit her down here or...
A.   Uh huh (yes).

C02631

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    12

Q.   ...he hit her in the stomach?
A2.  ...here?

Q.   Okay.  And then with the fist where did he hit her?
A.   In the face.

Q.   In the face okay.  I think a little while ago you might have
     mentioned that he hit her in the mouth with his elbow.  Can
     you re, think real hard and remember just try to picture
     what was going on.  When he hit her with his elbow, where
     did he strike her?
A2.  When you went like this, did, did he do this?
A.   Uh huh (yes).
A2.  You remember where his elbow hit?
A.   On he?

Q.   Can you picture in your mind exactly where he hit her with
     the elbow?
A.   No.

Q.   Okay, so you, that's okay.  If you don't know that's, that's
     what I want you to say.  But he did hit her somewhere on her
     body right?  On her head or her body.
A.   Yeah.

Q.   And when he was hitting her could you see like, was he
     hitting her hard and was she like jerking back or was he
     just hitting her easy?
A.   He um, hitting her hard.

Q.   Okay, and could you see her head like doing anything or her
     body doing anything?
A.   Going like that.
A2.  May I ask something?

Q.   Yeah.  Just a second.  And you're going, you're saying going
     like that and you're jerking your head back.  Is that right?
A.   Yes.

Q.   Okay.  Um, could you see if she was trying to get out of the
     van or anything like that?
A.   No.

Q.   No.  Okay.  Mom you got a question?
A2.  I was gonna ask if uh, she was in a chair or in the middle.

Q.   Okay, that's a good question.
A.   In a chair.

Q.   She was sitting in the, you know, what the shotgun seat is
     by the passenger door?  You know what that means?
A.   Yes.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                13

Q.  The shotgun seat?
A.  Nuh uh (no).

Q.  Okay.  There's the driver's seat where the steering wheel is
    and then there's a, a seat where the passenger would sit by
    the other door.
A.  Yeah.

Q.  Okay.  And then there's a space in between where you could
    probably get up and walk in the back of the van.  Wh,
    where, was she in the middle or was she in that other chair?
A.  In the other chair.

Q.  Okay.  That's great.  Would, do you know if she was getting
    injured like could you tell if she was getting hurt or
    injured?
A.  Uh huh (yes).

Q.  Okay.  And, and what I'm asking is, was she maybe, was she
    bleeding.  You know what it means when you bleed and you cut
    yourself and stuff like that okay.  Could you see anything
    like that?  Was she bleeding?
A.  Huh uh (no).

Q.  Okay, they you probably just didn't notice that or, you
    know, maybe it didn't even happen.  I'm not trying to put
    words in your mouth.  Um, after, did you see anything else?
A.  No.

Q.  Okay.
A2. Did he stop at the store?
A.  Nuh uh (no).
A2. He didn't stop at all?

Q.  Okay, your mom's, your mom's asking you did the van stop at
    the store and you're saying no?  After it drove out of the
    desert past you it went past the front of the store and kept
    going?
A.  Yeah.

Q.  And did it go down that main road that's in front of the
    store?
A.  Yes.

Q.  Okay.  And which way did it go, down that way?  Okay, and
    I'm pointing to the east and you're saying...
A.  Yes.  Yes.

Q.  ...yes, okay.  Could you just lean forward a little bit so
    the tape recorder can hear us?
A.  Yes.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                14

Q.   We're, we're almost done okay.  How, how long, you walked
     out into the desert and you saw the van and you saw what was
     happening inside the van, from that time until it drove by,
     how, how much time went by?  Just a couple of seconds?
A.   Yes.

Q.   'Cause you said it was going pretty slow right?
A.   (no response).

Q.   Yes or no?
A.   Yes.

Q.   Okay.  Have you ever seen that van before?
A.   No.

Q.   Okay.  Have you ever seen that van since then?
A.   No.

Q.   Have you ever seen that driver before?
A.   No.

Q.   And have you ever seen that driver since then?
A.   No.

Q.   And how about the little girl?  Did you ever see her before?
A.   No.

Q.   You don't know her?
A.   Huh uh (no).

Q.   Okay.  And have you ever seen her since?
A.   No.

Q.   Okay.  Um, that all happened on Sunday afternoon right
     about, around 5:00 o'clock you think?
A.   Yes.

Q.   Okay.  Did you go to school the next day?
A.   Yes.

Q.   Okay.  Did anybody talk about or, or, let me back up a
     little bit.  After you saw all this, you came home and you
     told your mom about it.
A.   Yes.

Q.   Okay.  And did your mom say something about gees, maybe we
     should call the police?
A.   Yeah.

Q.   Okay.  And what'd you think about that?  Did you think that
     was a good idea or bad idea?
A.   Good idea.

02634

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    15

Q.  Gotta talk to the tape recorder buddy.
A.  Good idea.

Q.  Good idea huh, okay.  Um, and the next day you went to
    school?
A.  Um, yes.

Q.  Okay.  And when you came home from school or when you were
    at school did, did anybody talk about what happened or
    anything?
A.  No.

Q.  No, okay.  Uh, when you came home from school, did you watch
    television?
A.  A little while.

Q.  Okay.  Did you watch the news?
A.  Yes.

Q.  Okay.  And what did you see on the news?
A.  That guy only.

Q.  The guy that you saw driving the van?
A.  Yes.

Q.  And you think it was the same guy?
A.  Yes.

Q.  Are you pretty sure?
A.  Yes.

Q.  Okay, great.  You're doing really good.  Uh, did you hear
    what the news said about him?
A.  No.

Q.  You didn't, you're not, but you just, you just saw his
    picture and you knew that it was the same guy that was
    driving that van and hitting the girl?
A.  Yes.

Q.  Okay.  Can, can you answer that a little bit louder so the,
    the tape can hear.  You think the same guy in the news was
    the same guy in the van?
A.  Yes.

Q.  Okay.  And that's the one that you saw hitting the little
    girl?
A.  Yes.

Q.  Okay.  You have uh, does your mom have a friend named
    Alonzo?
A.  Yes.

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025                    16

Q.  You know Alonzo huh?
A.  Yes.

Q.  You know what he looks like?
A.  Yes.

Q.  Did you think the guy in the news kind of looked like Alonzo
    a little bit?
A.  Yes.

Q.  And did you say that to your mom?
A.  Yes.

Q.  Okay.  But the guy in the van wasn't Alonzo was he?
A.  No.

Q.  You don't, you're sure?
A.  Yes.

Q.  You're positive?
A.  Yes.

Q.  All right.  Okay.  Okay.  Is there anything else that, that
    maybe I forgot to ask you or I didn't think to ask you?  Is
    there anything else you think I should know about this?
A.  Um, no.

Q.  Okay.  If you think of anything else will you tell your mom
    and she can call me and we'll talk again is that okay?
A.  Yeah.

Q.  Okay.  You, you happy talking with me?
A.  Yes.

Q.  You're not nervous?
A.  No.

Q.  Okay.  Mom any questions?  Anything you think I missed?
A2. No.

Q.  Okay.  Okay, if, if nobody has anything else I'll just stop
    the tape okay?
A.  Yes.

Q.  Okay.  Thanks Ray.
A.  You're welcome.

OKAY.  THE TIME IS UM, 1552 HOURS.

WITNESS:

_____

SUPPLEMENTAL
June 10, 1994

STATEMENT OF REYNALDO LOPEZ--CASE #940502025     .                    17

DET. B. CLARK #569

TRANSCRIBED BY:   CAROL MOORE, MAY 4, 1994

REVISED PER DET. CLARK ON MAY 8, 1994 BY #1523

02637

SUPPLEMENTAL
June 10, 1994

**Exhibit 29**

```
 1                          LESLIE BOWMAN
                          DEFENSE COUNSEL
 2                            INTERVIEW
       State of Arizona v. Barry Lee Jones      Date:      January 20, 1995
 3
 4     Witness:   Reynaldo Lopez          Case Number:    CR-45587

 5     Attorney:     Leslie Bowman
       Interviewer:  Leslie Bowman
 6
       LB:  =    Interviewer Leslie Bowman - Defense Attorney
 7     RL:  =    Reynaldo Lopez - Witness
       DD:  =    David Darby - Attorney for Angela Gray
 8     DM:  =    Dave McDonald - County Attorney's Office

 9     ---------------------------------------------------------------

10     LB:  Alright today is Friday, January 20th and we are at the Lopez

11          home.   This is Leslie Bowman.   And I represent Barry Jones.

12          Also present are David Darby for Angela Gray.   Dave McDonald

13          from the County Attorney's Office.   Ah... Mrs. Lopez and ah...

14          Reynaldo and...   (inaudible)   is   that   right?    Okay   and

15          (inaudible).   Ah... we're gonna start with Reynaldo.   Did I

16          say that right?   And that is spelled R..e..y..n..a..l..d..o.

17          Is  that  right?   Lopez, L..o..p..e..z.   Yeah remember  that

18          because we're recording this, you have to say something out

19          loud so that later when we go to listen to it we can remember

20          what you said okay?   Ah...

21     DD:  Can you say yes?

22     RL:  Yes.

23     LB:  Reynaldo I'm... I'm a lawyer.   I don't know if... if anyone

24          explained that to you.   I'm ah... I have a client who is ah...

25          a man named Barry Jones.   Ah... 'cause I'm gonna ask you some

26          questions about some things that might have to do with him

27          and... and this case (inaudible).   Ah... can I just get you to

28                                     1
```

02639

```
 1        start out by telling me how old you are?
 2  RL:   (Inaudible).
 3  LB:   How old are you?
 4  RL:   Nine (9).
 5  LB:   You're nine (9)?  So you had a birthday since all of this
 6        (inaudible) stuff happened huh?
 7  RL:   Ah-huh.
 8  LB:   You were eight (8) then, now you're nine (9) okay.  And ah...
 9        what grade are you in at school?
10  RL:   First.
11  LB:   First grade?  Do you like school?
12  RL:   Ah-huh.
13  LB:   You do?  Doesn't matter I guess you have to go anyway don't
14        you?  That's nice that you like it.  Ah... are you a pretty
15        good reader?
16  RL:   Yeah.
17  LB:   Alright.  And... you got a copy ah... of... somebody typed up
18        last time when you talked into a microphone like this, someone
19        typed up what you said.  Ah... their questions and your
20        answers and did you get to see a copy of that?
21  RL:   Yeah.
22  LB:   Okay and did you read it?
23  RL:   Mmm... yeah.
24  LB:   Were you able to read all the words and understood it all?
25  RL:   Yeah.
26  LB:   If you needed help is there somebody who can help you
27        understand it?
28                                    2
```

02640

```
 1   RL:   (Inaudible).
 2   LB:   Okay.  Ah... well let me just ah... start by... out by... by
 3         asking you ah... this happened kind of a long time ago.  It
 4         was in May and that was quite a few months ago.  Ah...
 5         think... the day that we're talking about with you... was that
 6         May... 1st I believe.  It was a Sunday?
 7   RL:   Mmm... yeah.
 8   LB:   Do you remember?  If you... you know if you're... if there's
 9         something you don't remember you're aloud to say that and
10         that's okay.  Alright?  Don't... don't think you have to try
11         to tell me something that you really don't know.  Okay?  Ah...
12         so that was on a Sunday and ah... just start at the beginning
13         of the day.  Do you remember about what time you woke up that
14         day?
15   RL:   N... no.
16   LB:   That would be hard to remember.  Ah... do you remember... what
17         you did that morning when you did wake up?
18   RL:   No.
19   LB:   Was there a time during that day when you and your sister
20         ended up walking over to the store?
21   RL:   Five o'clock (5:00)?
22   LB:   At five o'clock (5:00).  Was that in the... in the afternoon?
23   RL:   Yeah.
24   LB:   Okay.  Ah... how do you remember that is was five o'clock
25         (5:00)?  (Pause)  Do you sometimes wear a watch or...
26   RL:   (Inaudible).  Yeah.
27   LB:   Ah-huh.  Do you think you were wearing a watch that day?
```

02641

3

| | | |
|---|---|---|
| 1 | RL: | No. |
| 2 | LB: | No.  What... what makes you remember that it was five o'clock |
| 3 | | (5:00)?  Is it because you read it in... in the... |
| 4 | RL: | Yeah. |
| 5 | LB: | ...papers you just read?  Okay.  So... when someone talked to |
| 6 | | you last time you remembered it was five o'clock (5:00).  But |
| 7 | | now it's kind of hard to remember, it's been so long.  Ah... |
| 8 | | had you had your dinner yet when you went over to the store? |
| 9 | RL: | No. |
| 10 | LB: | So it was before dinner time and ah... do you remember what |
| 11 | | the... the day was like?  Was it a hot day or a cool day or |
| 12 | | what (inaudible)? |
| 13 | RL: | Cool day. |
| 14 | LB: | It was a cool day?  Ah... do you remember what kind of clothes |
| 15 | | you were wearing? |
| 16 | RL: | No. |
| 17 | LB: | (Pause)  And ah... what... what was it that... that you went |
| 18 | | to the store for? |
| 19 | RL: | Pepsi and gum. |
| 20 | LB: | Sounds like you were (inaudible) a treat.  You must have been |
| 21 | | behaving nicely that day.  So ah... did your mom give you some |
| 22 | | money? |
| 23 | RL: | Yeah. |
| 24 | LB: | Do you remember how much? |
| 25 | RL: | No. |
| 26 | LB: | Ah... do you remember here today that it was Pepsi and gum or |
| 27 | | is that just from reading the... the papers that you just |

4

02642

1    read?

2  RL:  Reading the papers.

3  LB:  Alright.  Ah... and did you... did you actually go to the

4       store?

5  RL:  Yeah.

6  LB:  You got the Pepsi?  And the gum?

7  RL:  Yeah.

8  LB:  What kind of gum?

9  RL:  Mmm... I don't remember.

10 LB:  Okay.  And when you say you got Pepsi, was it like cans or a

11      big bottle or...

12 RL:  Mmm... cans.

13 LB:  Cans.  Ah... were they attached together like in a six-pack or

14      was it just that you got a can of Pepsi?

15 RL:  Six-pack.

16 LB:  Okay.  And ah... so you... you went into the store and who

17      picked up the Pepsi?

18 RL:  Me.

19 LB:  You did that?

20 RL:  Yes.

21 LB:  And... who picked up the gum?

22 RL:  (Inaudible).

23 LB:  Ah... lucky, lucky, lucky.  And after you bought it did the

24      people at the store put it in a bag?

25 RL:  Yeah.

26 LB:  Do you remember what kind of bag?  Was it a paper bag or that

27      plastic kind with the handles?

28                                5

02643

1  RL:  Plastic kind.

2  LB:  Like ah... a white... white plastic bag?

3  RL:  Yeah.

4  LB:  And ah... was... it was just the one (1) six-pack of Pepsi?

5  RL:  Yeah.

6  LB:  And who carried it home?

7  RL:  Me.

8  LB:  Kind of heavy wasn't it?  Reynaldo did anything... unusual

9       happen as you were walking to the store?

10 RL:  Yeah.

11 LB:  Can you tell... what's that?

12 RL:  Ah... a guy in the van hitting the girl.

13 LB:  Okay.  Ah... now was that when you were walking to the store

14      or were you already at the store?

15 RL:  Walking.

16 LB:  Okay.  Do you remember where you were?

17 RL:  Mmm... half way to the store.

18 LB:  Okay.  Could you see the store from where you were?

19 RL:  Yeah.

20 LB:  So you're half way between your house and the store?

21 RL:  Yeah.

22 LB:  And what street... do you remember what street you walked on

23      from your house over to the store?

24 RL:  No.

25 LB:  Have you gone to that store lots of times or... or just a

26      couple?

27 RL:  Lots of times.

28                                6

02644

1    LB:   Do you always go the same way?

2    RL:   Yeah.

3    LB:   Okay.  So if... if you saw it you would know which way you

4          went and you just can't remember the name of the street?

5    RL:   Mmm...

6    LB:   Like if we... if I said come on let's go to the store right

7          now, could you walk me the same way that... that you usually

8          walk?

9    RL:   Yeah.

10    LB:   Ah... (pause) do you remember what the van looked like?

11    RL:   Yellow... van.

12    LB:   Was it...

13    RL:   With scratches.

14    LB:   With scratches?  Like an old... kind of old looking one or...

15    RL:   Old.

16    LB:   Okay where were the scratches?

17    RL:   Every where.

18    LB:   Okay so it's just kind of a beat up old scratchy looking van?

19    RL:   Yeah.

20    LB:   Ah... was it all yellow?

21    RL:   Mmm... ah-huh, yeah.

22    LB:   There were no other colors on it?

23    RL:   No.

24    LB:   And did the van ah... have windows like just in the front so

25          where the people sit or did it have windows going all the way

26          around or did it have them just in the back or... do you

27          remember?

28                                  7

02645

```
 1   RL:  Where... people sit.

 2   LB:  Just where the people sit?  So not along the sides?

 3   RL:  Uh-huh.

 4   LB:  Okay was it like... like you could see in all along the side

 5        of the van?

 6   RL:  No.

 7   LB:  Okay just where the people sit.  Did you see the van when you

 8        were looking at it, were you looking from the front or from

 9        the side or from the back?

10   RL:  Ah... side.

11   LB:  From the side.  Ah... do you remember which side you were on?

12        Were you on the side where the person driving sits or were you

13        on the side where the person who's riding along would sit?

14   RL:  The person who drives.

15   LB:  You were on the driver's side?  Ah... was there anything

16        unusual about the van?

17   RL:  Mmm... no.

18   LB:  Okay just a plain yellow scratchy van?

19   RL:  Yeah.

20   LB:  Nothing ah... did you ever see the van from the back?  Or only

21        from the side?

22   RL:  From the side.

23   LB:  Okay.  And... (pause) was the van stopped or was it moving?

24   RL:  Moving.

25   LB:  This is a hard question.  Do you know how fast the van was

26        moving?

27   RL:  Slow.

28                                  8
```

02646

```
 1  LB:  Slow.  Like if you were walking along next to it, could you
 2       have kept up with it or would you have to run?
 3  RL:  Kind of run, jog.
 4  LB:  Okay.  But you could of kept up with it, it wasn't like really
 5       driving like driving down the street?
 6  RL:  Mmm...
 7  LB:  I know these are very hard questions.
 8  NL:  You can ask it (inaudible).
 9  LB:  Or to ask it different 'cause I know I don't ask a very good
10       question.  But it was going kind of slow and you think if you
11       were running along side you'd be able to sort of keep up with
12       it?
13  RL:  Yeah.
14  LB:  Okay.  Ah... now this was before you went into the store so
15       you did not have the Pepsi in your hand?
16  RL:  Mmm... no.
17  LB:  Okay.  (Pause)  Do you know how tall you are?
18  RL:  Mmm... no.
19  LB:  Okay we'll figure that out later.  Ah... can you tell me what
20       the guy looked like.  The guy that was driving?
21  RL:  Mmm... curly hair.
22  LB:  Okay when you say curly hair, you mean like mine?
23  RL:  No.
24  LB:  Or... like really curly?
25  RL:  No... really curly.
26  LB:  Really curly.  Ah... was it as curly as like an afro?
27  RL:  Ah-huh, yeah.
28                                    9
```

02647

```
 1 │ LB:  Like a black person's kind of curly?

 2 │ RL:  Yeah.

 3 │ LB:  Okay so it was really curly.  Is that... am I putting that in

 4 │      your mouth or is it... was it really curly?

 5 │ RL:  Really curly.

 6 │ LB:  Okay.  Ah... do you remember what color it was?

 7 │ RL:  Black.

 8 │ LB:  Black.  Black like your hair?

 9 │ RL:  Yeah.

10 │ LB:  Okay.  Ah... do you know what color the guy's skin was?  Was

11 │      he like a white guy or a black guy or mexican guy?

12 │ RL:  White.

13 │ LB:  A white guy?  But he had that especially curly hair, real

14 │      dark?

15 │ RL:  Yeah.

16 │ LB:  Ah... (pause) could you see... if somebody was sitting in the

17 │      passenger seat?

18 │ RL:  A little girl.

19 │ LB:  You could see the little girl?  Now you're on... the guy's

20 │      side of the van... and the van's driving along... so you're

21 │      looking like into his window to see her?

22 │ RL:  Yeah.

23 │ LB:  Was his window rolled down or was it rolled up?

24 │ RL:  Rolled up.

25 │ LB:  Ah... and when you say you saw him hitting her... can you kind

26 │      of describe that a little more?  Another words... say like I'm

27 │      the guy and Dave's the girl okay?

28 │                               10
```

02648

| | | |
|---|---|---|
| 1 | LB: | Say... |
| 2 | DD: | (Inaudible). |
| 3 | LB: | And ah... |
| 4 | DD: | (Inaudible). |
| 5 | LB: | ...the guy's sitting here driving.  Do you... could you tell |
| 6 | | what hand... the guy used to hit the girl? |
| 7 | RL: | His right. |
| 8 | LB: | His right hand.  So it'd be like... this?  And he hit... he |
| 9 | | hit her with his hand? |
| 10 | RL: | Yeah. |
| 11 | LB: | Alright so like... this?  Kind of like that?  Over to the side |
| 12 | | like? |
| 13 | RL: | Yeah. |
| 14 | LB: | Okay.  Ah... could you tell what part of her body... he hit? |
| 15 | RL: | Face and the stomach. |
| 16 | LB: | So something like... like something on the front of her body |
| 17 | | like this? |
| 18 | RL: | Yeah. |
| 19 | LB: | Okay.  But you think it was... when you say face and her |
| 20 | | stomach you think it was below her shoulders? |
| 21 | RL: | Ah-huh. |
| 22 | LB: | Ah... |
| 23 | DD: | Do you say facing her stomach or face and stomach? |
| 24 | RL: | Face and stomach. |
| 25 | LB: | Oh face and stomach?  Okay.  So like on her face and then on |
| 26 | | her stomach? |
| 27 | RL: | Yeah. |
| 28 | | 11 |

02649

```
 1  LB:  Okay.  Ah... did you see how many times he hit her?

 2  RL:  No.

 3  LB:  (Pause)  Were you scared?

 4  RL:  N... no.

 5  LB:  You felt like you were safe?

 6  RL:  Yeah.

 7  LB:  Did you think he saw you?

 8  RL:  No.

 9  LB:  Do you think the little girl saw you?

10  RL:  No.

11  LB:  Can you give me an idea about how far away from the van you

12       were?

13  RL:  Kind of close.

14  LB:  Like... as close as you are to Mr. Darby?

15  RL:  No.

16  LB:  Not that close.  As close as you are to the wall?

17  RL:  Yeah.

18  LB:  Okay.  (Inaudible).  Ah... (pause) can you give me an idea how

19       long you were looking at the guy?  Like what number could you

20       have counted to...

21  RL:  Mmm...

22  LB:  ...while you were looking if you can remember?

23  RL:  (Pause)  Ten (10).

24  LB:  Okay.  Ah... could you tell what the little girl did when she

25       got hit?

26  RL:  Mmm... cried.

27  LB:  And... what makes you think that she cried?  Are you just

28                                  12
```

02650

|     |     |                                                                                       |
|-----|-----|---------------------------------------------------------------------------------------|
| 1   |     | thinking that's what a kid would do if they got hit?  Or is                            |
| 2   |     | that something you saw?                                                                |
| 3   | RL: | She would be.                                                                          |
| 4   | LB: | So what you're thinking is if a guy hit a little girl in her                           |
| 5   |     | face and her stomach, she would cry?                                                   |
| 6   | RL: | Yeah.                                                                                  |
| 7   | LB: | But you didn't actually see her cry?                                                   |
| 8   | RL: | No.                                                                                    |
| 9   | LB: | (Long Pause)  Do you know how far away ah... the store is from                         |
| 10  |     | your house?                                                                            |
| 11  | RL: | Mmm...                                                                                 |
| 12  | LB: | Like how many blocks or something like that?                                          |
| 13  | RL: | A block.                                                                               |
| 14  | LB: | About a block?  And... are there more than one (1) door into                          |
| 15  |     | the store?                                                                             |
| 16  | RL: | Two (2) doors.                                                                         |
| 17  | LB: | There's two (2) doors?  Where... where are those?  Are they                            |
| 18  |     | like on the side or the front or the back?                                            |
| 19  | RL: | The middle.                                                                            |
| 20  | LB: | They're in the middle, like in the front?                                             |
| 21  | RL: | Yeah.                                                                                  |
| 22  | LB: | (Pause)  Now... after you saw the guy... in the van, then you                          |
| 23  |     | and your sister went into the store?                                                  |
| 24  | RL: | Mmm... no.                                                                             |
| 25  | LB: | What happened after you saw him?                                                       |
| 26  | RL: | Mmm... nothing.                                                                        |
| 27  | LB: | Okay.                                                                                  |
| 28  |     |                                                                                       |

02651

13

```
 1   NL:   (Inaudible).
 2   LB:   Yeah that's okay if you say that.  This isn't a test.  I'm not
 3         gonna give you a grade.  You just do the best you can, there's
 4         no right or wrong answers.   It's just whatever you can
 5         remember.  Ah... 'cause you remember... you said before that
 6         you remember carrying the Pepsi back in one of those plastic
 7         bags.   So sometime, you must have gone into the store.
 8         (Inaudible).  Ah... (pause) do you remember what the guy was
 9         wearing?
10   RL:   Mmm... a blue shirt.
11   LB:   Do you remember that or is that from reading?
12   RL:   I remember.
13   LB:   You remember that okay.  Was it a blue shirt like your's?
14         Like a t-shirt?  Or was it the kind that has like buttons and
15         a collar?
16   RL:   A t-shirt.
17   LB:   Ah... do you remember... what the little girl was wearing?
18   RL:   No.
19   LB:   Could you see what she was wearing?
20   RL:   No.
21   LB:   No.   Now when you saw the van, was it... I might have asked
22         him this earlier.  Was it in front of the store or next to it
23         or behind it or was it on the street?
24   RL:   Ah... next to it.
25   LB:   Next to the store?  Ah... like if you're facing the doors of
26         the store, was it to your right or to your left?
27   RL:   Ah... left.
28                              14
```

02652

1  LB:  Left okay.  You know your right from your left?  Okay.  Did

2      you watch which way it went?  Did it keep going straight or

3      did it turn or go back on to the street?  Did you see that

4      part?

5  RL:  Turned.

6  LB:  It turned which way?

7  RL:  Ah... right.

8  LB:  So it's on the left side of the store, it turned right.  Does

9      that mean passed by the store?

10 RL:  Yeah.

11 LB:  Okay.  Did it pass in front or in back of the store?

12 RL:  In front.

13 LB:  So is it like in a parking lot kind of area when it passed in

14     front of the store?

15 RL:  Yeah.

16 LB:  Did you ever see the van go back out on to the street?

17 RL:  No.

18 LB:  Okay.  Did you see it ever park or stop?

19 RL:  No.

20 LB:  (Long Pause)  And the way you remember it was that the guy hit

21     the girl with his hand?  It wasn't like with a stick or

22     wasn't... something?

23 RL:  His hand.

24 LB:  With his hand?  Okay.  Do you remember what color hair the

25     girl... the little girl had?

26 RL:  Kind of blonde.

27 LB:  Ah... did she seem like ah... a big girl or a little girl

28                                15

02653

```
 1        or...
 2   RL:  Little girl.
 3   LB:  Little, littler than you?
 4   RL:  Yeah.
 5   LB:  Like a baby or... not that little?
 6   RL:  Not that little.
 7   LB:  (Pause)  Do you have a guess about how old you think she was?
 8   RL:  Mmm... about four (4).
 9   LB:  Isn't that something ah... that you remember or is that from
10        reading this?
11   RL:  I remember.
12   LB:  (Long Pause)  Do you remember how close the little girl was
13        sitting to the guy?  Like was she as far apart as we are or
14        was she right up next to the guy?
15   RL:  As far as you.
16   LB:  As far as we are?  (Long Pause)  Now ah... when you came home
17        from the store that day, did you tell anybody about what you
18        saw?
19   RL:  Told my mom.
20   LB:  And... what made you think to tell her?
21   RL:  Mmm... I don't know.
22   LB:  Just seemed kind of weird?
23   RL:  Yeah.
24   LB:  It's always a good idea to tell adults (inaudible) something
25        you're worried about.  So that was... that was a smart idea.
26        Ah... (pause) what... who was the next person that you talked
27        about this to besides your mom?
28                              16
```

02654

| | | |
|---|---|---|
| 1 | RL: | Ah... no one. |
| 2 | LB: | Another words you mean you didn't talk to your friends or |
| 3 | | to... any other adults? |
| 4 | RL: | My dad. |
| 5 | LB: | Ah... did you and your sister talk about it? |
| 6 | RL: | Yeah. |
| 7 | LB: | And then ah... at some point you talked to the policeman or |
| 8 | | was it you?  You talked to the police about it? |
| 9 | RL: | Yeah. |
| 10 | LB: | Ah... and that's what... what this is, these papers that you |
| 11 | | were just reading.  That... that tells... it looks like you |
| 12 | | talked to Detective Clark.  How is that the police knew that |
| 13 | | you saw this? |
| 14 | RL: | Mmm... ah... my mom called. |
| 15 | LB: | Do you remember that or... or your mom just told you I called |
| 16 | | the police? |
| 17 | RL: | I remembered it. |
| 18 | LB: | Okay.  So you were there when she called?  Ah... did she call |
| 19 | | the police... (pause)... |
| 20 | DD: | Sorry about that.  I still got... |
| 21 | | (OFF TAPE) |
| 22 | | (BACK ON TAPE). |
| 23 | LB: | Yes.  (Pause)  Did she call the police right away when you |
| 24 | | came home and told her about this? |
| 25 | RL: | Mmm... no. |
| 26 | LB: | What... what happened in between... when you told her and when |
| 27 | | she called the police? |
| 28 | | |

02655

1 RL:  Mmm... I don't know.

2 LB:  Did you see something on t.v. that... that made you think

3      about this again?

4 RL:  Yeah.

5 LB:  What was that?

6 RL:  Ah... (pause) the guy.

7 LB:  You saw... like a picture of him?  And you thought hey that's

8      the same guy?

9 RL:  Ah... yeah.

10 LB:  Are you sure?

11 DD:  If you aren't sure (inaudible) I don't know.

12 LB:  Yeah.  (Long Pause)  It's okay if you don't remember.  But if

13      you do remember (inaudible).  (Inaudible).

14 RL:  I don't remember.

15 LB:  You don't remember?   Okay.   Ah... (pause) have you ever

16      seen... a picture of somebody that you recognized as this...

17      the same guy that was in the van?

18 RL:  Yeah.

19 LB:  When was that?

20 RL:  Ah... (pause)...

21 LB:  Did the police ever show you a picture?

22 RL:  No.

23 LB:  So when was it that you think you saw a picture of... of this

24      same guy?  (Long Pause)  Did... you definitely remember seeing

25      a picture or you think you saw a picture?

26 RL:  Think.

27 LB:  Okay.  (Pause)  Don't have any other questions.

28                              18

1  DD:  Reynaldo I'm ah... my name is David Darby.  I'm ah... I'm a

2       lawyer as well.  And ah... I want to ask you a few questions

3       (inaudible) recall about that... that Sunday.  Miss Bowman

4       just asked you about whether you saw a picture of the same

5       guy.  You think that you might have seen a picture of this

6       man?

7  RL:  Yeah.

8  DD:  Okay.  Do you have any... do you recall at all, do you

9       remember where it was you saw this picture?  Was it at home

10      or... was it ah... newspaper or did somebody show it to you

11      or... do you remember?

12 RL:  On the news.

13 DD:  In the news?  Would... would that be the newspaper or on t.v.?

14 RL:  T.V.

15 DD:  On t.v.  Do you remember... when it was that you saw this

16      paper... this picture on t.v.?

17 RL:  No.

18 DD:  Okay you just remember maybe seeing it on t.v.?

19 RL:  Yeah.

20 DD:  Okay.  Now Miss Bowman was asking you questions about... when

21      it was that you saw... saw the man hitting the little girl...

22      and ah... remember just a few minutes ago you told her that

23      you saw the man hitting the little girl and you guys were on

24      the way to the store?

25 RL:  Mmm... yeah.

26 DD:  Okay.  And is that... is that how you recall it now?  Today?

27      Is that you were going to the store?

28                                  19

```
 1   LB:   Hard to remember.
 2   NL:   (Inaudible).
 3   DD:   Well did... did you have the Pepsi and the gum when you saw
 4         the man hitting the girl?
 5   RL:   Mmm... mmm... no.
 6   DD:   You didn't have the Pepsi?  Alright.   The reason I asked you
 7         did you... were you able to read your statement, what you gave
 8         to us before?
 9   RL:   Yeah.
10   DD:   Did you read it before we started talking?
11   RL:   Yeah.
12   DD:   Did you get a chance to read all the way through it?
13   RL:   Yeah.
14   DD:   Alright.   'Cause the reason I'm asking you about when it was
15         you saw the man, because in the statement that you gave the
16         police you told them that you saw the man hit the girl after
17         you came out of the store.   And I just want you to tell me
18         what (inaudible).
19         (OFF TAPE)
20         (BACK ON TAPE)
21   DM:   As I told you all they're... all they're trying to do is to
22         find out... as much as you can remember.
23   LB:   And you're just helping us.   So... don't worry.
24   DD:   See Reynaldo just... just so you know we're not... there's no
25         right or wrong answer.   Okay?
26   LB:   And you can't be in any kind of trouble for anything you say.
27         You have not done anything wrong.   You're just trying to help.
```

02658

1  And we appreciate that.

2  DD: But you understand that there's... there's no right or wrong

3  answers.   Right?   All we want you to... you have to

4  (inaudible) out loud so we can...

5  LB: Speak up.

6  DD: You understand... you understand that there's no right or

7  wrong answers right?

8  RL: Yeah.

9  DD: Okay.  And you understand that all we want you to do is to...

10  to find out what it was that you really saw?

11  RL: Yeah.

12  DD: You understand that?

13  RL: Yeah.

14  DD: Okay.  Now let's... let's... let talk a little bit about you

15  seeing the man hitting the little girl.  Because you told

16  Miss Bowman just a few minutes ago that it was before you got

17  to the store and before you bought the Pepsi and the gum.

18  Okay you told her that right?

19  RL: Yeah.

20  DD: Alright.   Now in your statement that you gave the police,

21  on... on the 3rd of May...

22  ??: (Inaudible)?

23  RL: Yeah.

24  DD: Which is just a couple of days after you saw this you told him

25  that you saw the man after you had come out of the store.  And

26  I want you to think back as to when it was that you can tell

27  me.  When it was that you... you think that you saw this man

28

21

| | |
|---|---|
| 1 | hit the little girl.  (Pause)  I mean if you can't remember, |
| 2 | tell me Mr. Darby I don't remember whether it was before or |
| 3 | after. |
| 4 | RL: I don't remember. |
| 5 | DD: Now is that... is that true that really you can't remember or |
| 6 | is that you're tired and you just don't want to answer our |
| 7 | questions anymore? |
| 8 | RL: Just... I don't remember. |
| 9 | DD: Okay.  You want to... you want to... you want to keep on |
| 10 | answering our questions?  Is it okay with you? |
| 11 | RL: Yeah. |
| 12 | DD: Okay.  And you're gonna tell us the truth? |
| 13 | RL: Yeah. |
| 14 | DD: Okay to the best of your ability?  Yes? |
| 15 | LB: He acts like a lawyer huh? |
| 16 | DD: Well... 'cause if you don't want to answer our questions, if |
| 17 | it's like you'd rather do this another time that's okay. |
| 18 | 'Cause it's important that you tell us, you know and that you |
| 19 | pay attention to the questions and no you can't look at your |
| 20 | mother for the answer or you have to recall what you remember. |
| 21 | And if you don't remember any that's okay.  Alright?  Do |
| 22 | you... |
| 23 | ??: Do you want to... |
| 24 | DD: You want to answer, if you want to continue answer some of... |
| 25 | some more of my questions? |
| 26 | RL: Yeah. |
| 27 | DD: Okay.  'Cause I don't have many more.  Ah... (pause) when you |
| 28 | |

02660

```
 1        saw the man hitting the little girl, where was your sister?
 2   RL:  With me.
 3   DD:  Okay how far away from you was she?
 4   RL:  Close.
 5   DD:  Close.  Was she standing next to you?
 6   RL:  Yeah.
 7   DD:  Did you say anything to her when you saw the man hitting the
 8        little girl?
 9   RL:  No.  She told me.
10   DD:  She told you that the man was hitting the little girl?
11   RL:  Yeah.
12   DD:  Alright.  And then when she told you that did you look up and
13        look up to see?
14   RL:  Yeah.
15   DD:  Alright and what did you see after your sister told you the
16        man was hitting the little girl?
17   RL:  The guy's hitting her.
18   DD:  Alright.  And ah... you told Miss Bowman that... you looked up
19        and you would have been able to count to ten (10).  That's how
20        long you looked at him.
21   RL:  Ah-huh.
22   DD:  Alright now is that right?  Is that too long of a time that
23        you looked at him or is that too short of a time that you
24        looked at him?
25   RL:  No.
26   DD:  What do you think?
27   RL:  (Pause)  (Inaudible).
28                                  23
```

02661

```
 1  LB:  Or it can be right.

 2  DD:  Or it can be right.  Is that about right or is it too long or

 3       too short?

 4  RL:  Too... too short.

 5  DD:  Too short, so you think maybe you looked at him a little bit

 6       longer than... how long it would take you to count to ten

 7       (10)?

 8  RL:  Yeah.

 9  DD:  Alright.  Okay how fast can you count... count to ten (10) for

10       me.

11  RL:  1..2..3..4..5..6..7..8..9..10.

12  DD:  Okay so that's about how fast you would of counted to ten

13       (10), that's about how long you looked at this man who hit the

14       little girl?  Is that right?

15  RL:  Mmm... yeah.

16  DD:  Thanks a lot.  Alright.  Now and you were standing with your

17       sister... just outside the store?

18  RL:  Yeah.

19  DD:  Okay.  How far had you... how... how far away from the store

20       were you?

21  RL:  Ah... coming close.

22  DD:  Okay.  Now you've already indicated now that you don't recall

23       whether you were going into the store or coming out of the

24       store.  Right?  (Pause)  You don't know whether you were going

25       into the store?

26  RL:  Ah...

27  DD:  Or coming out of the store right?  Okay.  Do you remember what
```

02662

24

1      street you were standing on?

2  RL:  No.

3  DD:  Okay.   Ah... about how far does it take you to walk from

4      the... from your... from the house to the store?

5  RL:  A block away... I think.

6  DD:  Okay.  And how long did it take you to walk a block?

7  RL:  Ah... (pause)

8  DD:  Maybe just a couple of minutes?

9  RL:  Yeah.

10  DD:  Okay.  And when you left the house did you walk just right

11      straight to the house... right... right straight to the store?

12  RL:  Yeah.

13  DD:  Okay.  Ah... and then when you left the store did you come

14      straight home?

15  RL:  Yeah.

16  DD:  Alright.  Did you see any other cars or anything else unusual

17      on the way back from the store?  After you bought the Pepsi?

18  RL:  No.

19  DD:  Alright.  Did you see anything else unusual on your way to the

20      store?  Before you bought the Pepsi?

21  RL:  Ah... the guy (inaudible).

22  DD:  I'm sorry?

23  RL:  The guy hitting the girl.

24  DD:  Okay so... so you're telling me now then you recall that it

25      was on the way to the store when you saw the man hitting the

26      little girl?

27  RL:  Yeah.

28                    25

02663

| | | |
|---|---|---|
| 1 | DD: | Okay.  You're sure? |
| 2 | RL: | Yeah. |
| 3 | DD: | Okay.  Now when you... as soon as you got home, after you went |
| 4 | | to the store? |
| 5 | RL: | Ah-huh. |
| 6 | DD: | Okay?  Ah... how soon did you tell your mother what you saw? |
| 7 | RL: | Ah... (pause) |
| 8 | DD: | Did you tell her right away (inaudible)? |
| 9 | RL: | Yeah. |
| 10 | DD: | Right immediately you told her right away? |
| 11 | RL: | Yeah. |
| 12 | DD: | You said hey mom, I saw some guy hitting a little girl down by |
| 13 | | the store? |
| 14 | RL: | Yeah. |
| 15 | DD: | Oh, now... now those are my words.  What did you tell your |
| 16 | | mother?   If you don't recall just tell me that I don't |
| 17 | | remember. |
| 18 | RL: | I don't remember. |
| 19 | ??: | (Inaudible)? |
| 20 | RL: | Yeah. |
| 21 | ??: | (Inaudible)? |
| 22 | RL: | Yeah. |
| 23 | LB: | Do you want to take a little break? |
| 24 | RL: | Yes. |
| 25 | DM: | What are you smiling for?  You're next. |
| 26 | LB: | She's not smiling, she's nervous. |
| 27 | | (OFF TAPE) |
| 28 | | 26 |

02664

```
 1      (BACK ON TAPE)
 2  DD: Okay we're back on tape after just ah... a brief break.
 3      Alright now... after you told your mother, Reynaldo after you
 4      told your mother what you saw, did you... talk to anybody else
 5      about what you saw?
 6  RL: Mmm... just my dad.
 7  DD: You talked to your dad.  Do you recall what you told your dad?
 8      (Pause)  You don't recall the exact words?  (Pause)  And if
 9      you don't, that's okay.  Just tell me I don't remember what I
10      told my dad.
11  RL: I don't remember.
12  DD: Oh.  Did your dad say... do you remember your dad saying
13      anything to you about... about that?
14  RL: No.
15  DD: No?  Alright.  Did your dad do anything that you know of?
16  RL: No.
17  DD: About that?
18  RL: No.
19  DD: He didn't do anything?  (Pause)  Okay.  That's fine.
20  LB: Just one (1) more.  When we started you said you thought you
21      saw the van... when you saw the van you were probably about a
22      block away from the store?
23  RL: Yeah.
24  LB: But then you thought your house is about a block away from the
25      store?  You didn't see the van like right out here?
26  RL: Mmm... no.
27  LB: Do you... do you remember about... how close you were to the
```

27

|    |     |                                                                       |
|----|-----|-----------------------------------------------------------------------|
| 1  |     | store when you saw the van?                                            |
| 2  | RL: | No.                                                                    |
| 3  | DM: | Let me ask you this Reynaldo.  If we were to go... out the            |
| 4  |     | door right now, could you go and show us where you saw the            |
| 5  |     | van?                                                                  |
| 6  | RL: | Mmm...                                                                 |
| 7  | DM: | Could you point out... I mean could we like go and stand where        |
| 8  |     | you saw the van?  Do you remember?                                    |
| 9  | RL: | Mmm...                                                                 |
| 10 | DM: | And if you don't that's okay.                                         |
| 11 | LB: | It's alright.                                                         |
| 12 | DM: | Do you remember about where you were and about where the van         |
| 13 |     | was?                                                                  |
| 14 | RL: | Mmm... no.                                                            |
| 15 | DD: | Okay so let me ask you this, if we were to go and... and...          |
| 16 |     | and... pretend we're going to go to the store and buy Pepsi          |
| 17 |     | and gum, and try to recreate what happened on that day.  Could       |
| 18 |     | you tell us (inaudible) where you were and where your sister         |
| 19 |     | was and where the van was and ah... those things like that?         |
| 20 |     | Could you do that?                                                   |
| 21 | RL: | Mmm... no.                                                            |
| 22 | DD: | Couldn't do that?                                                    |
| 23 | RL: | (Inaudible).                                                          |
| 24 | DD: | You could do that?  You think you could do that?                    |
| 25 | RL: | Yeah.                                                                 |
| 26 | DD: | Would you be willing to do that?                                     |
| 27 | RL: | Yeah.                                                                 |
| 28 |     |                                                                       |

02666

28

```
 1  DD:  If we go like take a walk right now you think you could do
 2       that for us or would you like to do that at another time?
 3  RL:  Mmm...  (inaudible).
 4  DD:  Oh.  (Inaudible).
 5  DM:  He said he could take us and show us.
 6  DD:  (Inaudible).
 7  LB:  Yeah.
 8  DD:  Okay well that's fine.   Well  then  ah...  that's  all  the
 9       questions I have for now and then we'll just do that as soon
10       as finish with ah... your sister and your mom.  And that will
11       complete the interview with you.
12  DM:  You can go play for awhile if you want to okay?
13                     [END OF INTERVIEW]
14  [Transcriber's Certification Follows:]
15
16
17
18
19
20
21
22
23
24
25
26
27
28                          29
```

02667

1                         I certify that, to the best of my

ability, the foregoing is a true and

2                         accurate transcription of the

original tape recorded conversation

3                         in the case referenced on page 1.

4                         Transcription Completed:

5 March 24, 1995

6                         MICHELLE RAMIREZ LEGAL MEMORANDUM &

TRANSCRIPTION SERVICES

7

8

9                         BY:_____

                           MICHELLE RAMIREZ / NOTARY PUBLIC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                               30

026558

**Exhibit 30**

# DECLARATION OF ANGELA GRAY

I, Angela Gray, declare the following to be true to the best of my information and belief:

1.   My name is Angela Gray. I am the mother of Rachel Yvonne Gray.

2.   In 1995, I was convicted of Reckless Child Abuse relating to the death of my daughter, Rachel, and sentenced to over eight years in prison.

3.   I have had no contact with Barry Lee Jones since my conviction.

4.   On the night before Rachel died, I was with her helping her with a cut on her head.

5.   On that night, Rachel slept in my bed. I had originally put her between me and the wall near the bed, but Rachel asked to be near Barry too, so I put her between us because she asked to be next to Barry.

6.   During the night before Rachel died, the only injuries that I saw on Rachel was the cut on her head and a mark on her stomach. The mark looked more like ~~dirt~~ than a bruise. It looked like she bumped up *AG* against a ~~tire.~~ : a scuff. *AG*

7.   I have not looked at the photographs of Rachel after she died, but I have been told that she had a large bruise in the center of her forehead. I am positive that this bruise was not on Rachel's head the night before she died.

8.   I have also been told that Rachel had another large area of discoloration on the side of her head, I know that this was not present the night before she died.

9.   I was told that Rachel had a triangular shaped bruise in the corner of her right eye. This bruise was not there the night before she died.


A.G.

10.  I have been told that one of Rachel's fingers was severely swollen and bruised, however I did not see that any of her fingers were bruised or swollen the night before she died.

11.  I have been told that Rachel had several bruises on her chest, I did not see those bruises the night before she died.

12.  The morning that I found Rachel, I was freaking out. I carried Rachel from the house to the van and it is possible that I hit parts of her body against objects in the house as I did so.

13.  I attempted to perform CPR on the way to the hospital. I was freaked out about finding my daughter, and I don't know if I did it correctly. I may have attempted some type of chest compressions during this process.

14.  I did not observe any blood in Rachel's underwear that night and I had an opportunity to see as I had taken her to the bathroom that night.

15.  Barry did not stop me from taking Rachel to the  hospital or say that I shouldn't go to the hospital the night before Rachel died. I just didn't know Rachel was that sick and did not think she needed a doctor for the cut on her head, because Barry had told me that he had taken her to an EMT. A.G.

16.  Rachel never told me that Barry or anyone else had touched her inappropriately.

17.  While I was with Barry and lived with him, Barry never hit me, or his daughter Brandie, or any of my children, Jonathon, Becky or Rachel.

18.  Rachel was a very intelligent child who at the time of her death was already learning to read and write. She was verbal with me and I feel we were very close.  I spent all of my time with Rachel as I did not work when Rachel was a baby and child.

A.G.

19.   Rachel was not a whiny child.

20.   Based on our relationship, I believe that Rachel would have told me if Barry or anyone else had touched her, sexually assaulted her or struck her.

21.   While talking to Rachel that night, she told me that some boys had struck her in the stomach. At some point while she was telling me this, I misunderstood Rachel to say that Barry had hit her, but after talking about it, Rachel then went back to telling me the boys had struck her. I believed at the time and now that Rachel was telling me that some neighborhood boys had hit her, not Barry.

22.   Rachel referred to Barry as her "Best Buddy Barry" and was very comfortable with him. They were very close. Barry was one of only a couple people, other than me, that Rachel was comfortable leaving the house with. Whenever Barry was going somewhere, Rachel would always want to tag along, whether I went or not. I believe that Rachel liked Barry and liked being with him. I think she loved Barry - AG

23.   I do not believe that Barry would have sexually abused Rachel. I do not believe that he did because Rachel always wanted to be with him and that night requested to sleep next to him in the bed.

24.   When Barry told me that he had Rachel looked at by EMTs, I believed him because of the language he used. He had said things to me that the EMT had told him; I didn't think Barry would have known enough about medical issues to make up what he said.

25.   I did not know that Joyce Richmond was on the way to the hospital to be with me, at Barry's request, when she was stopped and arrested.

26.   I did not know that Barry had gone back to our house to get the older girls to school after he dropped me and Rachel off at the hospital.

27.   Barry did not hesitate to take me and Rachel to the hospital the


A.G.

morning we found her.

28.  I learned after I was charged, that Becky had found Rachel laying in the doorway during the night and had placed her back into her bed.

29.  I do not recall my attorney asking me if Barry's lawyers could talk to me. It may have occurred very early in the case, but I do not recall that.

30.  My daughter Becky had issues with telling the truth. She often stated what she thought the person talking to her wanted to hear. She was not a malicious or intentional liar, rather was just doing what she thought she had to do to please people. If she made statements during Barry's trial that she had not made before, she probably thought that she was trying to please whoever was asking or maybe had heard something prior to trial that made her believe she would be pleasing someone with a particular answer.

31.  Sometime prior to Rachel's death, maybe within a week of her death, my daughter Becky had placed Rachel atop a clothes line in the yard of the trailer. I understood that Rachel was seated or placed on the top of the octagon shaped metal bars that held the line and not hanging from the line. Rachel fell from her position atop the clothes line because, according to Becky, she was moving around too much. I have reviewed the attached picture of the clothes line, which is the one she fell from.

32.  I recall at one point Detective Rankin informed me that there were looking at my son Jonathan as the responsible person for Rachel's injuries. Detective Rankin told me that because Jonathan was at a curious age and because he may have psychological issues due to his deafness that he was being held at his school for questioning.

33.  In my heart, I do not believe that Barry sexually assaulted, or beat Rachel. The only things that ever led me to believe he may have was the fact that he did not take Rachel to the Rural Metro Fire Station

Page 4 of 5

_AG_
A.G.

like he said and that he didn't come back to the hospital after he dropped us off.  There was no other incidents that led me to believe Barry was capable of hurting Rachel as was alleged.

34.　I do not have any reason to be dishonest about my recollections and statements now as I have served my time. I hold no special affection for Barry that would influence my statements.

I declare under the penalty for perjury that the foregoing is true and correct.

Signed this __21st__ day __August__, 2009, in Tucson, Arizona.

___Angela R Gray___
Angela Gray

A.G.



**Exhibit 31**

# James and Associates Forensic Consultants, Inc.

## 1821 NW 36th Street
## Fort Lauderdale, Florida  33309

**Tel:**
**954-485-5904**

**E-Mail:**
**jamesforen@aol.com**

## CURRICULUM VITAE
## FOR
## STUART H. JAMES

### PERSONAL DATA

DATE OF BIRTH: January 12, 1941        PLACE OF BIRTH: New York City, NY

### CURRENT OCCUPATION

Forensic Scientist in Civil and Criminal Cases with James and Associates Forensic Consultants, Inc.,  Fort Lauderdale, Florida

### PROFESSIONAL SERVICES IN FORENSIC SCIENCES

Death Investigation and Crime Scene Reconstruction

Physical Evidence Examination and Photography

Bloodstain Pattern Analysis

### *ACADEMIC PROFILE*

| INSTITUTION | COURSES/DEGREE | YEAR |
|---|---|---|
| University of Arizona<br>Tucson, Arizona | Biology/Mammalogy | 1961 |
| Hobart College<br>Geneva, New York | BA Biology/Chemistry | 1962 |
| St. Mary's Hospital<br>Tucson, Arizona | Medical Technology<br>M.T. (ASCP) | 1963 |
| Elmira College<br>Graduate School<br>Elmira, New York | Physical Significance of<br>Bloodstain Evidence | 1977 |
| | Homicide Investigation | 1979 |
| | Forensic Microscopy | 1979 |

### *CONTINUING EDUCATION AND TRAINING IN FORENSIC SCIENCE*

| INSTITUTION | COURSE | YEAR |
|---|---|---|
| United States Department of Justice<br>Drug Enforcement Administration<br>National Training Institute<br>McLean, Virginia | Forensic<br>Chemistry<br>40 Hours | 1973 |
| Allegheny County Police Academy<br>Pittsburgh, Pennsylvania | Forensic Science<br>Death Investigation<br>40 Hours | 1974 |
| Forensic Sciences Foundation<br>National District Attorney's Assoc.<br>Snowmass, Colorado | Forensic Science<br>Death Investigation<br>40 Hours | 1979 |
| Post Graduate School of Medicine<br>New York University<br>New York, New York | Forensic Science<br>Death Investigation<br>40 Hours | 1980 |

| | | |
|---|---|---|
| New York State Fire Academy<br>Montour Falls, New York | Fire and Arson<br>Investigation<br>24 Hours | 1982 |
| Advanced Bloodstain Institute<br>Laboratory of Forensic Science<br>Corning, New York | Bloodstain Pattern<br>Analysis<br>40 Hours | 1983 |
| Colby College<br>Waterville, Maine | Forensic Science<br>Death Investigation<br>40 Hours | 1984 |
| John Jay College of Criminal Justice<br>New York, New York | Bloodstain Pattern<br>Analysis<br>8 Hours | 1985 |
| Advanced Bloodstain Institute<br>Laboratory of Forensic Science<br>Corning, New York | Bloodstain Pattern<br>Analysis<br>40 Hours | 1985 |
| Colby College<br>Waterville, Maine | Forensic Science<br>Death Investigation<br>40 Hours | 1986 |
| Advanced Bloodstain Institute<br>Laboratory of Forensic Science<br>Corning, New York | Bloodstain Pattern<br>Analysis<br>40 Hours | 1987 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Denver, Colorado | Bloodstain Pattern<br>Analysis<br>20 Hours | 1988 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Dallas, Texas | Bloodstain Pattern<br>Analysis<br>20 Hours | 1989 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Reno, Nevada | Bloodstain Pattern<br>Analysis<br>20 Hours | 1990 |

| | | | |
|---|---|---|---|
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>North Miami Beach, Florida | Bloodstain Pattern<br>Analysis<br>12 Hours | 1994 | |
| Annual Conference<br>Laboratory of Forensic Science<br>Corning, New York | Bloodstain Pattern<br>Analysis<br>40 Hours | 1997 | |
| Advanced Bloodstain Pattern Analysis<br>1998 Arnold Markle Symposium<br>University of New Haven and the<br>Henry C. Lee Institute of Forensic<br>Science. Mashantucket, Connecticut | Bloodstain Pattern<br>Analysis<br>16 Hours | 1998 | |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Tucson, Arizona | Bloodstain Pattern<br>Analysis<br>20 Hours | 2000 | |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Tucson, Arizona | Bloodstain Pattern<br>Analysis<br>20 Hours | 2001 | |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Harrisburg, Pennsylvania | Bloodstain Pattern<br>Analysis<br>20 Hours | 2002 | |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Odessa, Texas | Bloodstain Pattern<br>Analysis<br>20 Hours | 2003 | |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Tucson, Arizona | Bloodstain Pattern<br>Analysis<br>20 Hours | 2004 | |

| | | |
|---|---|---|
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Santa Barbara, California | Bloodstain Pattern<br>Analysis<br>20 Hours | 2005 |
| First International Conference<br>International Association<br>of Bloodstain Pattern Analysts<br>Middleburg, The Netherlands | Bloodstain Pattern<br>Analysis<br>20 Hours | 2006 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Corning, New York | Bloodstain Pattern<br>Analysis<br>20 Hours | 2006 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>San Antonio, Texas | Bloodstain Pattern<br>Analysis<br>20 Hours | 2007 |
| Medicolegal Investigation of Death<br>Sponsored by Wayne State University<br>School of Medicine<br>Las Vegas, Nevada | Death Investigation<br>24 Hours | 2007 |
| Second International Conference<br>International Association<br>of Bloodstain Pattern Analysts<br>Zurich, Switzerland | Bloodstain Pattern<br>Analysis<br>20 Hours | 2008 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Boulder, Colorado | Bloodstain Pattern<br>Analysis<br>20 Hours | 2008 |
| Bloodstain Pattern Symposium<br>Midwest Forensics Resource Center<br>Ames, Iowa | Bloodstain Pattern<br>24 Hours | 2009 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Portland, Oregon | Bloodstain Pattern<br>Analysis<br>20 Hours | 2009 |

| | | |
|---|---|---|
| Bloodstain Pattern Symposium<br>Midwest Forensics Resource Center<br>Ames, Iowa | Bloodstain Pattern<br>24 Hours | 2010 |
| Third International Conference<br>International Association<br>of Bloodstain Pattern Analysts<br>Lisbon, Portugal | Bloodstain Pattern<br>Analysis<br><br>20 Hours | 2010 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Atlantic City, New Jersey | Bloodstain Pattern<br>Analysis<br>20 Hours | 2010 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Milwaukee, Wisconsin | Bloodstain Pattern<br>Analysis<br>20 Hours | 2011 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Tucson, Arizona | Bloodstain Pattern<br>Analysis<br>20 Hours | 2012 |
| Fourth International Conference<br>International Association<br>of Bloodstain Pattern Analysts<br>Edinburgh, Scotland | Bloodstain Pattern<br>Analysis<br>20 Hours | 2012 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>San Diego, California | Bloodstain Pattern<br>Analysis<br>20 hours | 2013 |
| Annual Conference<br>International Association of<br>Bloodstain Pattern Analysts<br>Portland, Maine | Bloodstain Pattern<br>Analysis<br>20 hours | 2014 |

## *PROFESSIONAL EMPLOYMENT AND EXPERIENCE*

| LOCATION | POSITION | YEARS |
|---|---|---|
| Bio-Science Laboratories<br>Los Angeles, California | Clinical Chemist | 1963-1965 |
| Department of Pathology<br>Memorial Hospital<br>Culver City, California | Medical Technologist | 1964-1965 |
| Department of Pathology<br>Mercy Medical Center<br>Orlando, Florida | Chief Technologist<br>Autopsy Assistant | 1965-1967 |
| Department of Pathology<br>Boca Raton Community Hospital<br>Boca Raton, Florida | Chief Chemist<br>Blood Bank Supervisor | 1967-1968 |
| Department of Pathology<br>St. Francis Hospital<br>Wichita, Kansas | Teaching Supervisor<br>Autopsy Assistant | 1968-1969 |
| Department of Pathology<br>Wilson Memorial Hospital<br>Johnson City, New York | Chief Toxicologist | 1969-1975 |
| Department of Psychology<br>State University of New York<br>Binghamton, New York | Research Associate<br>Forensic Scientist | 1975-1977 |
| Department of Pathology<br>Binghamton General Hospital<br>Binghamton, New York | Supervisor of Forensic<br>Laboratory | 1977-1981 |
| Binghamton, New York | Private Consultant<br>in Forensic Science | 1981-1988 |

## *FORMAL TEACHING EXPERIENCE*

| INSTITUTION | COURSE | YEARS |
|---|---|---|
| State University of New York<br>Binghamton, New York | Toxicology of Drugs<br>and Alcohol | 1972-1975 |
| State University of New York<br>Binghamton, New York | Applications of<br>Forensic Toxicology | 1973-1975 |
| State University of New York<br>Binghamton, New York | Death Investigation<br>Physical Evidence<br>Forensic Toxicology | 1975-1982 |
| Broome Community College<br>Binghamton, New York | Pharmacology of<br>Drugs and Alcohol | 1978 |
| Advanced School<br>Law Enforcement Academy<br>Binghamton, New York | Death Investigation<br>Physical Evidence<br>Forensic Toxicology | 1981 |
| Department of Law Enforcement<br>Training Academy<br>Springfield, Illinois | Basic Bloodstain Pattern<br>Analysis | 1981 |
| Bloodstain Institute<br>Elmira College<br>Elmira, New York | Basic Bloodstain Pattern<br>Analysis | 1981 |
| State University of New York<br>Binghamton, New York | Forensic Science<br>Extern Program | 1983-1984 |
| Broome Community College<br>Binghamton, New York | Homicide<br>Investigation | 1984 |
| Broome Community College<br>Binghamton, New York | Homicide<br>Investigation | 1986 |
| Basic Recruit School<br>Law Enforcement Academy<br>Binghamton, New York | Death Investigation<br>Crime Scene<br>Reconstruction | 1986 |

| | | |
|---|---|---|
| Vestal Senior High School<br>Vestal, New York | Visiting Lecturer<br>in Forensic Science | 1984-1988 |
| Corning Community College<br>Corning, New York | Visiting Lecturer<br>in Forensic Science | 1987-1988 |
| Tampa Police Academy<br>Tampa, Florida | Basic Bloodstain Pattern<br>Analysis | 1990 |
| Oakland County Sheriff's Department<br>Pontiac, Michigan | Basic Bloodstain Pattern<br>Analysis | 1990 |
| Southern Police Institute<br>University of Louisville<br>Louisville, Kentucky | Bloodstain Pattern<br>Analysis | 1993 |
| Institute of Police Technology<br>and Management<br>University of North Florida<br>Tampa, Florida | Bloodstain Pattern<br>Analysis | 1993 |
| Law Enforcement Training Systems<br>Palm Beach  Community College<br>West Palm Beach, Florida | Crime Scene Processing.<br>Collection and Preservation<br>of Evidence. Bloodstain<br>Pattern Analysis | 1994 |
| Criminal Justice Institute<br>St. Petersburg Jr. College<br>St, Petersburg, Florida | Bloodstain Pattern<br>Analysis | 1995 |
| Criminal Justice Department<br>Fox Valley Technical College<br>Appleton, Wisconsin | Bloodstain Pattern<br>Analysis Course | 1998 |
| Criminal Justice Department<br>Troy State University<br>Troy, Alabama | Forensic Science<br>Summer Internship<br>Program | 2000 |
| Henry C. Lee Institute of Forensic Science<br>University of New Haven<br>West Haven, Connecticut | Geometric Interpretation<br>of Human Bloodstain<br>Patterns | 2001 |

| | | |
|---|---|---|
| Centre of Forensic Sciences<br>Toronto, Ontario<br>Canada | Basic Bloodstain Pattern<br>Analysis for<br>Forensic Scientists I | 2001 |
| Centre of Forensic Sciences<br>Toronto, Ontario<br>Canada | Basic Bloodstain Pattern<br>Analysis for<br>Forensic Scientists II | 2001 |
| Politie LSOP Institute for Criminal<br>Investigation and Crime Science<br>Zutphen, The Netherlands | Basic Bloodstain Pattern<br>Analysis Course | 2001 |
| Politie LSOP Institute for Criminal<br>Investigation and Crime Science<br>Zutphen, The Netherlands | Advanced Bloodstain Pattern<br>Analysis Course | 2001 |
| Politie LSOP Institute for Criminal<br>Investigation and Crime Science<br>Zutphen, The Netherlands | Advanced Bloodstain Pattern<br>Analysis Course | 2001 |
| Criminal Justice Department<br>Fox Valley Technical College<br>Appleton, Wisconsin | Basic Bloodstain Pattern<br>Analysis Course | 2001 |
| Mid-Atlantic Association of<br>Forensic Scientists Fall Workshop<br>Baltimore, Maryland | Bloodstain Analysis<br>Crime Scene to Bench Work | 2002 |
| Criminal Justice Department<br>Fox Valley Technical College<br>Appleton, Wisconsin | Basic Bloodstain Pattern<br>Analysis Course | 2002 |
| University of Newcastle upon Tyne<br>Newcastle upon Tyne<br>England, UK | Advanced Bloodstain Pattern<br>Analysis Course | 2003 |
| Suffolk University<br>Boston, Massachusetts | Advanced Bloodstain Pattern<br>Analysis Course | 2004 |
| James and Associates<br>Fort Lauderdale, Florida | Intern Program | 2004<br>2005 |

| | | |
|---|---|---|
| Redmond Police Department<br>Redmond, Oregon | Basic Bloodstain Pattern<br>Analysis Course | 2005 |
| Pennsylvania State Police<br>Harrisburg, Pennsylvania | Advanced Bloodstain<br>Pattern Analysis Course | 2005 |
| Metropolitan Police<br>London, England | Basic Bloodstain Pattern<br>Analysis Course | 2005 |
| Austin Police Department<br>Austin, Texas | Basic Bloodstain Pattern<br>Analysis Course | 2005 |
| Tombull Police Department<br>Tombull, Texas | Basic  Bloodstain Pattern<br>Analysis Course | 2006 |
| Western Australia Police Academy<br>Perth, Western Australia | Advanced Bloodstain<br>Pattern Analysis Course | 2006 |
| Metropolitan Police<br>London, England | Advanced Bloodstain Pattern<br>Analysis Course | 2006 |
| San Diego County Sheriff's Department<br>San Diego, California | Advanced Bloodstain Pattern<br>Course | 2006 |
| Des Moines Police Department<br>Des Moines, Iowa | Basic Bloodstain Pattern<br>Analysis Course | 2007 |
| Douglas County Sheriff's Office<br>Omaha, Nebraska | Basic Bloodstain Pattern<br>Analysis Course | 2007 |
| University of South Florida<br>Tampa, Florida | Basic Bloodstain Pattern<br>Analysis Course | 2008 |
| Elmira College<br>Elmira, New York | Advanced Bloodstain Pattern<br>Course | 2008 |
| Metropolitan Police<br>London, England | Basic Bloodstain Pattern<br>Analysis Course | 2008 |
| Elmira College<br>Elmira, New York | Advanced Bloodstain Pattern<br>Course | 2009 |

| | | |
|---|---|---|
| Metropolitan Police<br>London, England | Advanced  Bloodstain Pattern<br>Analysis Course | 2009 |
| University of South Florida<br>Tampa, Florida | Current Topics and Issues<br>in Bloodstain Pattern<br>Analysis | 2010 |
| James and Associates<br>Fort Lauderdale, Florida | Summer Intern Program | 2012 |
| Johnson County Sheriff's Office<br>Olathe, Kansas | Advanced Bloodstain Pattern<br>Analysis Course | 2012 |
| Metropolitan Police<br>London, England | Advanced Bloodstain Pattern<br>Analysis Course | 2013 |
| Korps Politie<br>Oranjestad, Aruba | Basic Bloodstain Pattern<br>Analysis Course | 2013 |
| Sarasota County Sheriff's Office<br>Sarasota, Florida | Basic Bloodstain Pattern<br>Analysis Course | 2013 |
| Keiser University<br>Tampa, Florida | Basic Bloodstain Pattern<br>Analysis Course | 2014 |
| Southwestern Association of<br>Forensic Scientists Conference<br>South Padre Island, Texas | Basic Bloodstain Pattern<br>Workshop | 2014 |
| Keiser University<br>Tampa, Florida | Current and Advanced Topics<br>in Bloodstain Pattern Analysis | 2014 |

## *MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS*

The  American Academy of Forensic Sciences. Fellow -Toxicology Section.

The International Association of Bloodstain Pattern Analysts.
Charter and Distinguished Member and Historian.

## PROFESSIONAL  ACTIVITIES

Board Member of the Broome County, New York Drug Awareness Center. 1970-1980.

Board Member of the State University of New York at Binghamton Drug Council, 1971-1979.

Exhibitor in the Scientific Section at the American Medical Association  Conference, New York,  New York, 1973.

Exhibitor in the Scientific Section at the American Academy of Pediatrics, Chicago, Illinois, 1973.

Medical  Volunteer and Toxicologist in the Medical  Facility  at the Watkins Glen, New York Rock  Concert, 1973.

Medical Volunteer and Toxicologist in the Medical Facility at the Peter Frampton Rock Concert at JFK Stadium in Philadelphia, Pennsylvania, 1975.

Member of the HEW Committee for Medical Care at Large Youth Gatherings in Washington, D.C., 1973.

Consultant to the Southern Tier of New York State Regional Criminal Justice Planning Board, Binghamton, New York, 1975-1981

Member of the New York State Crime Laboratory Advisory Board, 1975-1981.

Member of the Board of Editors of the American Journal of Forensic Medicine and Pathology, 1988 - 1991.

Consulting Bloodstain Analyst to the Florida Department of Law Enforcement, Tallahassee, Florida, 1990-1997.

Participant in Forensic Science Mentor Program for the American Academy of Forensic Sciences 1998-1999.

Member of the Forensic Science Review Board for CRC Press, LLC, Boca Raton, Florida 1999-present.

Member of the Scientific Working Group for Bloodstain Pattern Analysis (SWGSTAIN) sponsored by the FBI, Quantico, Virginia, 2002-2013.

Member of the Daubert Committee for the International Association of Bloodstain Pattern Analysts, 2003-present.

Editor of the International Association of Bloodstain Pattern Analysts News, 2004-2010.

Editor of the Journal of Bloodstain Pattern Analysis, 2011- present.

## *LICENSES – CERTIFICATIONS - AWARDS*

Licensed as Medical Technologist with the American Society of Clinical Pathologists Board of Registry.

Licensed as Legal Blood Alcohol Analyst for the State of New York, 1973-1981.

Appointed as Special Deputy Sheriff in Broome County, New York, 1981-1988.

Certified as Competent Forensic Expert in the Discipline of Bloodstain Pattern Interpretation by the Institute on the Physical Significance of Human Bloodstain Evidence, a division of the Laboratory of Forensic Science in Corning, New York in 1997.

Elected a Distinguished Member of the International Association of Bloodstain Pattern Analysts, 2004.

## *INTERNATIONAL EXPERIENCE IN THE FORENSIC SCIENCES*

In conjunction with the International Consortium for Education and Florida Atlantic University at Boca Raton, Florida, Forensic Science was studied in Italy, Germany, France, and England during the summer of 1978. Institutions visited included local Police Departments, Police Training Centers, Medical Examiner Offices, and Forensic Laboratories in each country. These studies and information exchanges included visits to the Landeskriminalamp in Munich, Germany, Interpol in St. Cloud, France, the Home Office Research Establishment in Aldermaston, England, and the Metropolitan Police Laboratory in London, England.

## *FORMAL SCIENTIFIC PRESENTATIONS*

DRUG ABUSE ANALYSIS IN THE CLINICAL LABORATORY: Presented at the New York State Medical Technology Seminar in Binghamton, New York. 10/71.

STREET DRUG ANALYSIS: Presented at the American Academy of Forensic Sciences National Meeting in Las Vegas, Nevada. 02/73.

WATKINS GLEN - A TOXICOLOGICAL ADVENTURE: Presented at the Interim Meeting of the Toxicology Section of the American Academy of Forensic Sciences in Philadelphia, Pennsylvania. 10/73.

EMERGENCY TOXICOLOGY IN THE FIELD: Presented at the American Academy of Forensic Sciences National Meeting in Dallas, Texas. 02/74.

UNUSUAL REQUESTS OF THE TOXICOLOGY LABORATORY: Presented at the Upstate, New York Section of the American Association of Clinical Chemists in Rochester, New York. 06/75.

FORENSIC INVESTIGATION OF CLANDESTINE LABORATORIES: Presented at the American Academy of Forensic Sciences National Meeting in San Diego, California. 02/77.

DRUG RELATED DEATH: Presented at Death Investigation Seminar at Broome Community College, Binghamton, New York. 06/78.

PHYSICAL EVIDENCE IN HOMICIDE INVESTIGATION: Presented at the Forensic Sciences Seminar, Tioga County Sheriffs Department, Owego, New York. 05/79.

MEDICAL-LEGAL ASPECTS OF DRUGS: Presented at the Ohio Drug Studies Institute, Columbus, Ohio. 06/79.

MEDICAL-LEGAL ASPECTS OF DRUGS: Presented at the Ohio Drug Studies Institute, Columbus, Ohio. 06/80.

PHYSICAL EVIDENCE IN HOMICIDE INVESTIGATION: Presented at the Forensic Science Seminar, Tioga County Sheriffs Department, Owego, New York. 10/80.

FORENSIC ASPECTS OF FIRE DEATHS AND COLLECTION OF PHYSICAL EVIDENCE AT FIRE SCENES: Presented at Arson Awareness and Recognition Seminar, Cayuga Community College, Auburn, New York. 04/81.

PHARMACOLOGY OF DRUGS AND ALCOHOL: Presented at the Ohio Drug Studies Institute, Columbus, Ohio. 06/81

15

PHARMACOLOGY OF DRUGS AND ALCOHOL: Presented at the Summer Drug Institute for Schools, Youth, and Substance Abuse, Wyoming Seminary School, Kingston, Pennsylvania. 06/81.

PRINCIPLES OF BREATH TESTING DEVICES FOR ALCOHOL: Presented at the Broome County Bar Association Educational Seminar in Binghamton, New York. 10/81.

INTERPRETATION OF BLOODSTAIN EVIDENCE: Presented at Security Officers Seminar, Owego, New York. 11/81.

SKULL SESSION - FACIAL RESTORATION: Presented at the International Association for Identification Conference in Rochester, New York. 07/82.

BLOODSTAIN EVIDENCE IN GUNSHOT WOUNDS AND TRAUMA CAUSED BY ACTS OF VIOLENCE: Presented at the Empire Nine EMT Regional Training Center, Canandaigua, New York. 11/82.

MEASUREMENT OF ALCOHOL IN BLOOD AND BREATH IN DRIVING WHILE INTOXICATED CASES: Presented at Seminar for Tioga County Law Enforcement Agencies in Owego, New York. 11/82.

BLOODSTAIN EVIDENCE IN HOMICIDE INVESTIGATION:  Presented at the Peter Vallas Forensic Science in Fire and Death Investigation Seminar, Saddlebrook, New  Jersey. 03/83.

BLOODSTAIN EVIDENCE IN UNUSUAL HOMICIDES:  Presented at the Western Conference on Criminal and Civil Problems in Wichita, Kansas. 05/85.

FORENSIC SCIENCE AND DEATH INVESTIGATION:  Presented at Law Day Seminar at Binghamton Senior High School, Binghamton, New York. 05/85.

FORENSIC SCIENCE AND DEATH INVESTIGATION:  Presented at Law Day Seminar at Binghamton Senior High School, Binghamton, New York 05/86.

PHYSICAL EVIDENCE IN ACCIDENT RECONSTRUCTION:  Presented at the Broome County Bar  Association Educational Seminar, Binghamton, New  York. 05/86.

CRIME SCENE RECONSTRUCTION:  Presented at the First Annual Forensic and Investigator  Forum of the New York State Defenders Association, Utica, New York. 05/87.

PHYSICAL EVIDENCE IN VEHICULAR ACCIDENTS:  Presented at the Peter Vallas Forensic Science in Fire and Death Investigation, Hasbrouck Heights, New Jersey. 06/87.

BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Twin Meetings of the Pan American Association of Forensic Sciences and the First World Meeting  of Police Surgeons and Medical Officers, Wichita, Kansas. 08/87.

TECHNIQUES OF  HOMICIDE CASE  PREPARATION:  Presented at the Fall Meeting of the International Association of  Identification, Oriskany, New York, 10/87.

ACCELERENT IDENTIFICATION IN FIRE INVESTIGATIONS:  Presented at  the Peter Vallas Associates, Inc. Seminar, Fort Lauderdale, Florida, 01/88.

BLOODSTAIN PATTERN INTERPRETATION AT SCENES OF VIOLENT CRIMES:  Presented as full day seminar for Evidence Technician Training School at Harrisburg Area Community College, Harrisburg, Pennsylvania, 02/88

BLOODSTAIN PATTERN INTERPRETATION AND CRIME SCENE RECONSTRUCTION: Presented as a five hour seminar for the Summer Training Program of the  Office of the  State of Vermont Defender General at Lyndon State College, Lyndonville, Vermont, 06/88.

BLOOD  EVIDENCE AT CRIME SCENES:  Presented at the National Conference on Death and Injury Investigation sponsored by INFORM and the Milton  Helpern Center  of  Wichita  State  University  in Wichita,  Kansas,  12/89.

INTERPRETATION OF BLOODSTAIN EVIDENCE AT CRIME  SCENES: Presented at the Conference on Death Investigation sponsored by the Jefferson Parish Coroner's Office in Harahan, Louisiana, 04/90.

BLOOD EVIDENCE AT CRIME SCENES:  Presented at the Mini-Western Conference on Crime Scene, Injury and Death Investigation sponsored by the Criminal Justice Department at Garden City Community College in Garden City, Kansas, 05/90.

BLOODSTAIN EVIDENCE AT CRIME SCENES: Presented at the Death Investigation  Seminar sponsored by the Pennsylvania  State Coroner's Association in Carlisle, Pennsylvania, 09/91.

CRIME  SCENE  WORKSHOP:  Presented  at  Nova  Southeastern  University  Law School in Fort Lauderdale, Florida, 01/92

CASE STUDIES IN BLOODSTAIN EVIDENCE: Presented at the Broward Forensic Association Meeting, Boca Raton, Florida, 03/92.

CRIME SCENE WORKSHOP:   Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 06/92.

CRIME SCENE RECONSTRUCTION:   Presented at the Florida Homicide Investigator's Association (FHIA) Fifth Annual Conference, North Redington  Beach, Florida, 11/92.

CRIME SCENE WORKSHOP:   Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 02/93.

BLOODSTAIN INTERPRETATION:   Presented at the Dade County Public Defender's Office in Miami, Florida, 08/94.

BLOODSTAIN INTERPRETATION:   Presented at the National Defender Investigator Association Annual Conference in Fort Lauderdale, Florida, 10/94.

CRIME SCENE WORKSHOP:  Presented at Nova Southeastern University Law School in Fort Lauderdale, Florida, 02/95.

CRIME SCENE DEMONSTRATION AND MOCK TRIAL:  Presented at Nova Southeastern Law School in Fort Lauderdale, Florida, 11/95

CRIME SCENE WORKSHOP:   Presented at Nova Southeastern University Law School in Fort Lauderdale, Florida, 01/96.

BLOODSTAIN EVIDENCE:  Presented at the Bergen County Bar Association Continuing Education Program in Hackensack, New Jersey, 04/96

CRIME SCENE WORKSHOP:  Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 01/97.

CRIME SCENE INVESTIGATION: Presented at the University of Miami School of Law in Coral Gables, Florida, 02/97.

BLOODSTAIN INTERPRETATION:  Presented at the Broward County Public Defenders Office in Fort Lauderdale, Florida, 05/97.

DEATH INVESTIGATION: Presented at the Dade/Broward Regional Meeting of the Florida Association of Licensed Investigators in Hollywood, Florida, 05/97.

CRIME SCENE WORKSHOP:  Presented at the Licensed Private Investigators 10th Anniversary Convention and National Association of Licensed Investigators Region IV Seminar in New Orleans, Louisiana, 09/97.

BLOODSTAIN PATTERN EVIDENCE VERSUS DEFENDANT'S STATEMENT (FACT OR FICTION):  Presented at the 1998 Arnold Markle Symposium on Advanced Bloodstain Pattern Analysis in Mashantucket, Connecticut, 03/98

PROBLEMS IN FORENSIC SCIENCE - A SCIENTIFIC AND LEGAL PERSPECTIVE OF BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Utah Association of Criminal Defense Lawyers Seminar in Salt Lake City, Utah, 03/98

CRIME SCENE ISSUES:  Presented at the Hialeah Gardens Police Department in Hialeah Gardens, Florida, 04/98.

PRACTICAL BLOODSTAIN PATTERN RECOGNITION:  Presented at the Pennsylvania Coroner's Association Continuing Education Seminar in Moosic, Pennsylvania, 05/98.

BASIC BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Office of the Public Defender in Kansas City, Missouri, 08/98.

FORENSIC SCIENCE AND BLOODSTAIN PATTERN EVIDENCE:  Presented at the Palm Beach County Public Defender's Office in West Palm Beach, Florida, 09/98.

USE AND UNDERSTANDING OF FORENSIC EVIDENCE:  Presented at the Southern District of Florida Federal Public Defender's and Criminal Justice Act Representation Conference in Duck Key, Florida, 09/98.

21 YEARS, 4 MONTHS AND 20 DAYS ( COMMONWEALTH OF PENNSYLVANIA v. DR. STEPHEN SCHER):  Presented with Herbert Leon MacDonell at the American Academy of Forensic Sciences National Meeting in Orlando, Florida, 02/99.

CIVIL AND CRIMINAL FORENSIC DEATH INVESTIGATION:  Presented at the 1999 Northeast Super Conference for the National Association of Licensed Investigators in Atlantic City, New Jersey, 03/99.

BLOODSTAIN PATTERN EVIDENCE VERSUS DEFENDANT'S STATEMENT (FACT OR FICTION):  Presented at the Pathology Resident Seminar at the University of  Tennessee School of  Medicine in Memphis, Tennessee, 05/99.

BLOODSTAIN EVIDENCE IN THE CASE OF THE COMMONWEALTH OF PENNSYLVANIA V. DR STEPHEN SCHER):  Presented at the Palm Beach County Criminal Defense Lawyers Seminar in West Palm Beach, Florida, 06/99.

FORENSIC SCIENCE AND BLOODSTAIN PATTERN EVIDENCE:  Presented at the Louisiana Crisis Assistance Center in New Orleans, Louisiana, 08/99.

BLOODSTAIN PATTERNS AT THE CRIME SCENE - WHAT IT ALL MEANS: Presented at the South Florida Forensic Association Training Seminar at the Fort Lauderdale Police Department in Fort Lauderdale, Florida, 11/99.

FORENSIC SCIENCE CASE STUDIES:  Presented at the Forensics and the Law Course at the University of Washington in Seattle, Washington, 12/99.

BASIC BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Missouri State Public Defenders Trial Skills Workshop 2000 in Lake Ozark, Missouri, 01/00.

FORENSIC SCIENCE AND VIOLENT DEATH - AN OVERVIEW OF PRACTICAL ISSUES AND PITFALLS:  Presented at the 2000 Northeast Super Conference for the National Association of Licensed Investigators in Atlantic City, New Jersey, 03/00.

UTILIZING THE FORENSIC NURSE FOR CASE PREPARATION:  Presented at the Dade County Public Defender's Office in Miami, Florida, 04/00.

PRACTICAL BLOODSTAIN RECOGNITION SEMINAR:  Presented at Martin Investigations, Palm Beach Gardens, Florida, 08/00.

BLOOD SPATTER EVIDENCE: Presented at the Louisiana Association of Criminal Defense Lawyers Capital Defense Seminar in Baton Rouge, Louisiana, 09/00.

BLOODSTAIN PATTERN ANALYSIS - THE BASICS: Presented at the American Criminal Justice Association (Lambda Alpha Epsilon) Region IV Conference of the Millennium in New Haven, Connecticut, 10/00.

BLOODSTAIN PATTERN WORKSHOP: Presented at the Henry C. Lee Forensic Science Institute, University of New Haven, West Haven, Connecticut, 10/00.

BLOODSTAIN PATTERN INTERPRETATION: Presented at the National Seminar on Forensic Evidence and the Criminal Law sponsored by the Federal Defender Training Group, Philadelphia, Pennsylvania, 11/00.

BLOODSTAIN PATTERN EVIDENCE: Presented at the Forensics and the Law Course at the University of Washington in Seattle, Washington, 12/00.

FORENSIC SCIENCE IN DEATH INVESTIGATION: Presented at the 35th Annual Educational Conference of the Wisconsin Association of Identification in Kenosha, Wisconsin, 03/01.

WALKING THE CRIME SCENE - DEAD MEN DO TELL TALES: Presented at the National Association of Criminal Defense Lawyers Annual Meeting and Seminar in Minneapolis, Minnesota, 08/01.

BLOOD ON THE CARPET – MORE THAN A STAIN: Presented at the 2001 Annual Conference of the Federal Defenders of Eastern Washington and Idaho in Boise, Idaho, 08/01.

BLOOD SPATTER EVIDENCE: Presented at the Training Seminar for the King County Associated Counsel for the Accused, Seattle, Washington. 03/02.

BLOODSTAIN PATTERN INTERPRETATION: Presented at the Second National Seminar on Forensic Evidence and the Criminal Law sponsored by the Federal Defender Training Group, New Orleans, Louisiana, 04/02.

CASE STUDIES IN BLOODSTAIN PATTERN INTERPRETATION: Presented at the Bloodstain Pattern Analysis and Violent Crimes Course at the University of New Orleans, New Orleans, Louisiana. 08/02

WHAT IS THIS FORENSIC THING? Presented at the Florida Public Defender Association Winter Conference, St. Petersburg Beach, Florida. 12/02.

INTERPRETATION OF BLOODSTAIN EVIDENCE: Presented at the National Defender Investigator Association National Conference and Seminar, Fort Lauderdale, Florida. 04/03.

PRACTICAL BLOODSTAIN RECOGNITION AND INTERPRETATION: Presented at Forensic Science Symposium-2004, Nova Southeastern University, Fort Lauderdale, Florida. 02/04.

RECOGNITION OF BLOODSTAIN PATTERNS – ISSUES AND PITFALLS: Presented at the Idaho Association of Criminal Defense Lawyers Winter Seminar, Sun Valley, Idaho, 03/04.

CRIME AND DEATH SCENE RECONSTRUCTION UTILIZING BLOODSTAIN PATTERN ANALYSIS: Presented at the Nebraska Institute of Forensic Science, Lincoln, Nebraska,  03/04.

BLOODSTAIN PATTERN CASE STUDIES: Presented at Basic Bloodstain Pattern Analysis Course in Corning, New York. 05/04

PRACTICAL BLOODSTAIN RECOGNITION AND INTERPRETATION: Presented at Forensic Science Symposium, Nova Southeastern University, Fort Lauderdale, Florida. 02/05.

BASIC BLOODSTAIN PATTERN RECOGNITION: Presented at the 1st Annual Homicide Conference sponsored by the Palm Beach County Sheriff's Office in Boca Raton, Florida. 12/05

THE SIGNIFICANCE OF LIMITED QUANTITIES OF IMPACT SPATTER ASSOCIATED WITH BEATING SCENES: Presented at the First European IABPA Conference held in Middelburg, The Netherlands. 02/06

THE SIGNIFICANCE OF LIMITED QUANTITIES OF IMPACT SPATTER ASSOCIATED WITH BEATING SCENES: Presented at the 18th International Symposium on the Forensic Sciences (Classroom to Courtroom) held in Fremantle, Western Australia. 04/06

CRIME AND DEATH SCENE RECONSTRUCTION UTILIZING BLOODSTAIN PATTERN ANALYSIS: Presented at the Nebraska Institute of Forensic Science, Lincoln, Nebraska,  10/06.

BLOODSTAIN ANALYSIS AND RECONSTRUCTION: Presented at the Louisiana Capital Assistance Center Training Seminar, New Orleans, Louisiana, 12/06.

BASIC BLOODSTAIN PATTERN RECOGNITION: Presented at the 2nd Annual Homicide Conference sponsored by the Palm Beach County Sheriff's Office in Boca Raton, Florida. 12/06.

BLOODSTAIN PATTERN WORKSHOP; Presented at Nova Southeastern University, Fort Lauderdale, Florida. 01/07.

BLOODSTAIN PATTERN RECOGNITION: Presented at North Broward Preparatory School, Coconut Creek, Florida. 03/07

BLOODSTAIN PATTERN RECOGNITION AND CASE REVIEW: Presented at the Iowa Division of the International Association for Identification, Marshalltown, Iowa. 05/07.

BASIC BLOODSTAIN PATTERN RECOGNITION: Presented at the 3[nd] Annual Homicide Conference sponsored by the Palm Beach County Sheriff's Office in Boca Raton, Florida. 12/07.

BLOODSTAINS AT OUTDOOR CRIME SCENES: Presented at the University of South Florida in conjunction with the Nebraska Institute of Forensic Sciences in Tampa, Florida. 12/07.

BLOOD SPATTER ANALYSIS IN HOMICIDE INVESTIGATIONS: Presented at the University of South Florida, Tampa, Florida. 03/08

BLOOD SPATTER ISSUES: Presented at the Wisconsin Association for Identification Conference, Wauwatosa, Wisconsin. 03/08

BLOODSTAIN PATTERN RECOGNITION: Presented at the South Florida Police Exposition, West Palm Beach, Florida, 06/08

BLOODSTAIN PATTERN ANALYSIS IN A QUADRUPLE HOMICIDE AND ATTEMPTED SUICIDE: Presented at the Second European IABPA Conference held in Zurich, Switzerland. 07-08

BLOODSTAIN PATTERN ANALYSIS: Presented at the Habeus Corpus Resource Center Fall Conference Series, San Francisco, California. 10/08

BLOODSTAIN PATTERN RECOGNITION: Presented at the Michigan Association of Medical Examiners Annual Conference in Mt. Pleasant, Michigan. 10/08

BLOODSTAIN PATTERN ANALYSIS WORKSHOP: Presented at the Palm Beach County Sheriff's Office Forensic Biology Section in West Palm Beach, Florida. 09/09

APPLICATION OF MATHEMATICS TO BLOODSTAIN PATTERN ANALYSIS: Presented at Mathematics Careers Discussion Panel at Palm Beach State College in Palm Beach Gardens, Florida. 04/10

BLOODSTAIN PATTERN ANALYSIS: Presented at the Forensic Science Training and the NAS Report sponsored by the Federal Public Defender's in the Southern District of Florida at Miami Dade College, North Campus in Miami, Florida. 04/10

THE USE OF BLOODSTAIN PATTERN ANALYSIS IN SELF DEFENSE ISSUES – TWO CASE EXAMPLES: Presented at the Third European IABPA Conference held in Lisbon, Portugal. 5/10

BLOOD SPATTER ANALYSIS IN HOMICIDE INVESTIGATIONS: Presented at the University of South Florida, Tampa, Florida. 09/10

BLOODSTAIN PATTERN RECOGNITION: Presented at the Forensic Science Training Seminar in Dothan, Alabama, 10/10

CURRENT ISSUES AND TOPICS IN BLOODSTAIN PATTERN ANALYSIS SEMINAR: Presented at the University of South Florida, Tampa, Florida, 12/10

BLOODSTAIN PATTERN ANALYSIS – SCIENCE OR INK BLOT TEST: Presented at the Florida Association of Criminal Defense Lawyers Conference in Tampa, Florida, 3/11

BLOODSTAIN PATTERN ANALYSIS AND DEATH INVESTIGATION: Presented at the Fact Investigator Training Conference of the Georgia Capital Defender's office, Atlanta, Georgia, 8/11

BLOODSTAIN PATTERN ANALYSIS AND CRIME  SCENE RECONSTRUCTION: Presented at the  South Florida Chapter of the  Association of Criminal Defense Attorneys Seminar in Miami, Florida, 3/12

BLOODSTAIN PATTERN ANALYSIS: Presented at the 24th Annual John R. Teggatz Forensic Science Seminar in Milwaukee, Wisconsin, 11/12

MEDICAL AND FORENSIC ASPECTS OF BLOOD CLOT FORMATION IN THE PRESENCE OF SALIVA – A PRELIMINARY STUDY: Presented at the Fourth European IABPA Conference held in Edinburgh, Scotland, 11/12

### *SCIENTIFIC  PUBLICATIONS*

FATAL DOXEPIN (SINEQUAN) OVERDOSE: Bulletin of the International Association of Forensic Toxicologists: Vol. 8, No. 3-4. 1972.

ANALYSIS OF STREET DRUGS IN A COLLEGE COMMUNITY:  Journal of Drug Education: Vol. 2, No. 2. June 1972.

DEVELOPMENT OF EMERGENCY DRUG SCREENING: Wilson Memorial Hospital Newsletter: Vol. 1, No.5. November 1972.

SERUM  ASSAY OF DIPHENYLHYDANTOIN (DILANTIN) AND
PHENOBARBITAL DURING MANAGEMENT OF CONVULSIVE  DISORDERS:
Wilson Memorial Hospital Newsletter. Vol. 2, No. 10, April 1974.

TREATMENT OF DRUG ABUSE INCIDENTS AT LARGE YOUTH FESTIVALS:
Addiction and Drug Abuse Report: Grafton Publications, April 1974.

EMERGENCY TOXICOLOGY:  Wilson Memorial Hospital Newsletter: Vol. 3.  No.
2, August 1974.

MEDICAL AND TOXICOLOGICAL ASPECTS OF THE WATKINS  GLEN
ROCK CONCERT: Journal of Forensic  Sciences: Vol. 20, No. 1. January 1975.

RECOVERY  FROM  MASSIVE  SELF-POISONING  FROM  ASPIRIN:  New York
State Journal of Medicine: Vol. 75, No. 9. August 1975.

PHENCYCLIDINE - STATES OF ACUTE INTOXICATION AND FATALITIES:
Western Journal of Medicine: 123. (345-349). November 1975.

PHENCYCLIDINE -TISSUE DISTRIBUTION IN THE RAT:  Clinical Toxicology:
9 (4), 573-582, 1976.

MEDICAL CARE AT LARGE GATHERINGS:  National Institute of Drug Abuse.
DHEW Publication  No. (ADM)  76-267, 1976.

CONSIDERATION OF BLOODSTAIN PATTERN INTERPRETATION IN
DEATH CASES: Peter Vallas Associates, Inc. Newsletter. Vol. 2. April 1984.

BLOOD EVIDENCE IN CRIME SCENE INVESTIGATION: Medico-Legal and
Forensic Investigation Monograph Series with Dr. William G. Eckert, MD,
International Reference Organization in  Forensic Medicine Publication, Wichita,
Kansas, 1987.

INVESTIGATION OF CREMATIONS AND SEVERELY BURNED BODIES:
The American Journal of Forensic Medicine and Pathology, Vol. 9, No. 3, September
1988.

INTERPRETATION OF BLOODSTAIN EVIDENCE AT CRIME SCENES:
Elsevier Series in Practical Aspects of Criminal and Forensic Investigations. Co-
authored with  Dr. William G. Eckert, MD. Elsevier Publishing Company, New York,
N.Y. Amsterdam, The  Netherlands. May 1989. Re-published by CRC Press, Boca
Raton, Florida, 1993.

DISINTERMENTS - THEIR VALUE AND ASSOCIATED PROBLEMS: The American Journal of Forensic Medicine and Pathology, Vol. 11, No 1, March 1990.

THE PRACTICAL METHODOLOGY OF FORENSIC PHOTOGRAPHY:  Elsevier Series in Practical Aspects of Criminal and Forensic Investigations. David R. Redsicker. Elsevier Publishing Company, New York, N.Y., Amsterdam, The Netherlands. July 1991. Re-published by CRC Press, Boca Raton, Florida, 1993, Contributing author.

PRACTICAL FIRE AND ARSON INVESTIGATION: 2nd Edition. CRC Series in Practical Aspects of Criminal and Forensic Investigations. David R. Redsicker and John O'Connor. CRC Press, Boca Raton, Florida, 1996, Contributing author.

INTRODUCTION TO FORENSIC SCIENCES: CRC Series in Practical Aspects of Criminal and Forensic Investigations. William G. Eckert, MD. CRC Press, Boca Raton, Florida, 1997, Co-author of the chapters, <u>The Role of the Forensic Laboratory</u> and <u>Bloodstain Pattern Interpretation</u>.

SCIENTIFIC AND LEGAL APPLICATIONS OF BLOODSTAIN PATTERN INTERPRETATION: CRC Series in Practical Aspects of Criminal and Forensic Investigations, CRC Press, LLC, Boca Raton, Florida, 1998, Editor.

INTERPRETATION OF BLOODSTAIN EVIDENCE AT CRIME SCENES: 2nd Edition. CRC Series in Practical Aspects of Criminal and Forensic Investigations. Co-authored with Dr. William G. Eckert, MD, CRC Press LLC, Boca Raton, Florida, 1998.

FORENSIC SCIENCE- *An Introduction to Scientific and Investigative Techniques:* Co-edited with Jon J. Nordby, CRC Press, LLC, Boca Raton, Florida, 2002.

FORENSIC SCIENCE- *An Introduction to Scientific and Investigative Techniques: Instructors Guide:* Co-edited with Jon J. Nordby and Sara Kreisman, CRC Press, LLC, Boca Raton, Florida, 2002.

FORENSIC SCIENCE- *An Introduction to Scientific and Investigative Techniques 2ⁿᵈ Edition:* Co-edited with Jon J. Nordby, CRC Press, LLC, Boca Raton, Florida, 2005.

PRINCIPLES OF BLOODSTAIN PATTERN ANALYSIS – *Theory and Practice*: Co-authored with Paul E. Kish and T. Paulette Sutton, CRC Press, Taylor and Francis Group, Boca Raton, Florida, 2005.

FORENSIC SCIENCE- *An Introduction to Scientific and Investigative Techniques 3rd Edition:* Co-edited with Jon J. Nordby, CRC Press, LLC,  Taylor and Francis Group, Boca Raton, Florida, 2009.

RECOGNITION OF BLOODSTAIN PATTERNS – Co-authored with Paul E. Kish and T. Paulette Sutton,  Forensic Science Series, Publication 313, Release 48, Chapter 37,  Matthew Bender, New York, NY, October 2009.

EVALUATION OF THE CELESTRON HAND-HELD DIGITAL MICROSCOPE FOR USE IN BLOODSTAIN PATTERN ANALYSIS: Co-authored with Daniel Mabel, Journal of Bloodstain Pattern Analysis, Vol. 27, No. 1, March 2011.

MEDICAL AND FORENSIC ASPECTS OF BLOOD CLOT FORMATION IN THE PRESENCE OF SALIVA – A PRELIMINARY STUDY: Co-authored with Celestina Rossi, Misty Holbrook and  Daniel Mabel, Journal of Bloodstain Pattern Analysis, Vol. 28, No. 3, September, 2012.

USING INFRARED PHOTOGRAPHY TO DOCUMENT CLOTHING EVIDENCE IN THE RECONSTRUCTION OF A HOMICIDE: Co-authored with Michael Gorn, Journal of Bloodstain Pattern Analysis, Vol. 28, No.4, December, 2012

### *GEOGRAPHICAL DISTRIBUTION OF CONSULTATION AND COURT TESTIMONY IN BLOODSTAIN PATTERN ANALYSIS AND FORENSIC SCIENCE*

| CONSULTATION | CONSULTATION AND TESTIMONY |
|---|---|
| Alabama | |
| Alaska | Alaska |
| Arizona | |
| Arkansas | Arkansas |
| California | California |
| Colorado | |
| Connecticut | Connecticut |
| Delaware | Delaware |
| District of Columbia | District of Columbia |
| Florida | Florida |
| Georgia | Georgia |
| Hawaii | Hawaii |
| Idaho | Idaho |
| Illinois | Illinois |
| Indiana | Indiana |
| Iowa | |

| | |
|---|---|
| Kansas | Kansas |
| Kentucky | |
| Louisiana | Louisiana |
| Maine | |
| Maryland | Maryland |
| Massachusetts | Massachusetts |
| Michigan | Michigan |
| Minnesota | |
| Mississippi | |
| Missouri | Missouri |
| Montana | |
| Nebraska | Nebraska |
| Nevada | Nevada |
| New Hampshire | |
| New Jersey | New Jersey |
| New Mexico | New Mexico |
| New York | New York |
| North Carolina | North Carolina |
| Ohio | Ohio |
| Pennsylvania | Pennsylvania |
| Rhode Island | |
| South Carolina | |
| South Dakota | |
| Tennessee | Tennessee |
| Texas | |
| Utah | Utah |
| Vermont | Vermont |
| Virginia | Virginia |
| Washington | Washington |
| West Virginia | |
| Wisconsin | Wisconsin |
| Wyoming | |
| | |
| Kandahar, Afghanistan | |
| Republic of South Korea | Republic of South Korea |
| Sydney, Australia | |
| Kingston, Canada | |
| Toronto, Canada | Toronto, Canada |
| Edmonton, Alberta, Canada | |
| Newfoundland | |
| San Juan, Puerto Rico | |
| St. Croix, U.S. Virgin Islands | St. Croix, U.S. Virgin Islands |
| St. Thomas, U.S. Virgin Islands | |

28

Mannheim, Germany                    Mannheim, Germany
Tuzla, Bosnia-Herzegovina
Amsterdam, the Netherlands
London, United Kingdom                            **11/14**

**Exhibit 32**

# James and Associates
## Forensic Consultants, Inc.

Telephone
954-321-8700

4800 SW 64th Avenue  Suite 105
Fort Lauderdale, Florida  33314

Telefax
954-321-8994

December 18, 2002

Sylvia Lett
Office Of The Federal Public Defender
97 East Congress, Suite 130
Tucson, AZ  85701

**STATE OF ARIZONA v. BARRY JONES**                    **02-030-AZ**

**AFFIDAVIT**

STATE OF FLORIDA

COUNTY OF   BROWARD

BEFORE ME, the undersigned Notary Public, in and for the County of Broward, State of Florida, personally appeared **Stuart H. James**, who after first being duly sworn did depose and state:

I am Stuart H. James. I am over the age of eighteen (18) years and of sound mind and believe in the obligations of an oath. I present this Affidavit for the use of Barry Jones, the Petitioner in the federal habeas case of the State of Arizona v. Barry Jones. The facts and opinions set forth in this Affidavit are based upon my personal knowledge gained during my investigation in this matter.

1.     I am a Forensic Scientist in Civil and Criminal Cases with *James and Associates Forensic Consultants, Inc.*, located at 4800 SW 64th Avenue, Suite 105, Fort Lauderdale, Florida 33314.

2.    I am a 1962 graduate of Hobart College, with a BA degree in Biology and Chemistry and have completed graduate courses in Physical Significance of Bloodstain Evidence, Homicide Investigation and Forensic Microscopy at Elmira College between the years of 1977-1979.

3.    I have been qualified in State and Federal Court and given testimony in the following areas of forensic science: Death Investigation and Crime Scene Reconstruction; Physical Evidence Examination and Photography; Bloodstain Pattern Interpretation; Accelerant Detection in Fire Investigation; and Forensic Toxicology.

4.    I possess the following licenses and certifications: Licensed as Medical Technologist with the American Society of Clinical Pathologists Board of Registry. I was certified as Competent Forensic Expert in the Discipline of Bloodstain Pattern Interpretation by the Institute on the Physical Significance of Human Bloodstain Evidence, a division of the Laboratory of Forensic Science in Corning, New York in 1997.

5.    I am also a member of the following professional organizations: The American Academy of Forensic Sciences, Fellow-Toxicology Section; The International Association of Bloodstain Pattern Analysts; and the South Florida Forensic Association.

6.    I have authored and co-authored numerous articles on forensic issues and am also the Editor or Co-Editor of the following books: *Forensic Science – An Introduction to Scientific and Investigative Techniques*, co-edited with Jon J. Nordby published in August 2002 by CRC Press. *Interpretation of Bloodstain Evidence at Crime Scenes* 2nd Edition 1998, CRC Press, co-authored with Dr.

Williams G. Eckert, M.D., *Scientific and Legal Applications of Bloodstain Pattern Interpretation,* 1998, CRC Press, Editor. I am a forensic scientist, with specialties, *inter alia,* in crime scene reconstruction and bloodstain pattern interpretation. Over the past thirty years, I have participated in approximately 500 investigations of death through crime scene reconstruction with an emphasis on bloodstain pattern interpretation. Approximately fifty percent of those cases have been capital cases at both the trial and post-conviction stages and where I investigated and/or testified for either the state or the defense.

7.   My complete Curriculum vitae is attached.

8.   I was retained by counsel for Barry Jones in this case to review case documents, photographs and physical evidence relative to the death Rachel Gray particularly the blood pattern evidence present in the van, her residence and various items of clothing. In order to render my opinion I have reviewed the following materials:

A.   Police reports

B.   Crime Laboratory reports

C.   Autopsy report of Rachel Gray

D.   Photographs of van

E.   Photographs of van carpet

F.   Photograph of Barry Jones

G.   Trial testimony of Sgt. Sonia Pesquiera Rankin

H.   Trial testimony of Dr. John Howard

I.   Trial testimony of Ed Lukasik

J.   Report from Arizona Dept. of Public Safety

K.   Investigative report of George Barnett

L.   Taped Statement of Judy Chavez

M.   Evidence examination at Pima County Sheriff's Office on 11/18/02

The following is a summary of my findings based upon my examination of the above materials including the interpretation of the bloodstain evidence.

1. Bloodshed attributed to Rachel Gray occurred as a result of a single laceration of the scalp located above and behind the left ear and the torn vaginal area. This laceration was produced by a blunt object. Death was caused by a bowel laceration due to blunt abdominal trauma. These findings are based upon my examination of the autopsy report performed by Dr. John Howard and review of his trial testimony.

2. A single blow with a blunt object that produces a laceration rarely produces spattered blood since the object must strike exposed blood in order for spatter to be produced. Therefore, any interpretation of spattered blood on the clothing of Barry Jones or in the van is likely not the blow to the head of Rachel Gray. Therefore, there is no conclusive scientific evidence to support the State's claim that Rachel Gray received the laceration to her head while in the van. This finding is based upon my training and experience in bloodstain pattern interpretation.

3. The bloodstains on the carpet of the van depicted in the photographs appear to be the result of passive dripping of blood with some accumulation or saturation of some areas of the carpet. Carpet samples V-6 and V-7 indicated the presence of blood consistent with Rachel Gray. This indicates that Rachel Gray was actively bleeding and moving around while in the van and may have made contact with the carpet with a bloody area at some point in time. It should be recognized that passive dripping of blood on a surface such as a carpet create very small stains due to the rapid absorption of the blood into the carpet fibers and should not be confused with

4

blood spatter. These findings are based upon my training and experience in bloodstain pattern interpretation and the laboratory reports.

4. The Circle K bag in the van depicted in the photographs and which I examined shows blood transfer staining that is the result of contact with an object or person containing wet blood consistent with that of Rachel Gray (V-4). This finding is based upon my training and experience in bloodstain pattern interpretation and the laboratory reports.

5. The bloodstains on the front passenger seat of the van have the appearance of a projected bloodstain pattern. Projected bloodstains may be produced by various mechanisms including rapid movement of an object or person containing wet blood or a castoff type activity. Stain V-12-A is consistent with the blood of Rachel Gray. These finding are based upon my training and experience in bloodstain pattern interpretation and the laboratory reports.

6. The red short-sleeved shirt of Barry Jones showed a few spatters of blood on the left and right sleeve areas with some blood transfer also present on the left sleeve and the rear of the shirt. Human blood was found to be present on this shirt but not characterized further. The blue jeans show some blood transfer. Stain S-2 on the jeans is consistent with the blood or Rachel Gray. The brown leather work boots show passive staining with some associated satellite spatters. Stains S-4-L and S-4-R on the boots were inconclusive for human blood. These observations indicate contact and proximity to a source of wet blood. These findings are based upon my training and experience in bloodstain pattern interpretation and the laboratory reports.

7. Although it is evident that Rachel Gray bled and moved around both in her residence and the van, the location where Rachel Gray received her vaginal and scalp lacerations cannot be determined with reasonable scientific certainty based upon the materials that were presented at trial that I have examined. Additionally, it is not possible to determine the involvement if any of the Barry Jones in the infliction of the injuries to Rachel Gray. There was a small amount of blood on his clothing with only the small transfer of blood on his jeans consistent with the victim. This proves only that his clothing whether he was wearing them or not was at some point in time close to and in contact with a bleeding source some of which was consistent with the blood of Rachel Gray. These stains could have occurred as the result of lifting or otherwise attending to an injured person.

8. It is my opinion that in order to present expert testimony in the area of bloodstain pattern interpretation a basic background in science is necessary. A 40-hour basic course in bloodstain pattern interpretation must be successfully completed and experience with casework must be substantial. It is highly recommended that a 40 hour advanced course be successfully completed. A continuing education process should be in place with membership in scientific organizations such as the International Association of Bloodstain Pattern Analysts and regular attendance at scientific meetings and seminars as well as keeping current with the scientific literature. In reviewing the trial testimony of Sgt. Sonia Pesquiera Rankin it was noted that her only reference to bloodstain pattern interpretation was a 40-hour basic course. She stated in her testimony on page 63 of her transcript that taking this bloodstain course does not make you an expert and further states on page 64 of her transcript that she is not an expert. She testified that she was a homicide

6

detective for a little over 4 years. The number of bloodstain cases that she worked on was not elicited in her testimony.  I would agree with her own statements that she was not qualified at the time of trial to offer expert opinion in the discipline of bloodstain pattern interpretation.

FURTHER AFFIANT SAYETH NAUGHT

Stuart H. James

Subscribed and sworn to, before me,

This _18_ day of December 2002.

Notary Public

My Commission Expires:

Barbara D Stewart
My Commission DD118884
Expires May 19, 2006

# James and Associates
# Forensic Consultants, Inc.

Telephone
954-321-8700

4800 SW 64th Avenue  Suite 105
Fort Lauderdale, Florida  33314

Telefax
954-321-8994

## CURRICULUM VITAE
## FOR
## STUART H. JAMES

### PERSONAL DATA

DATE OF BIRTH: January 12, 1941          PLACE OF BIRTH: New York City

### CURRENT OCCUPATION

Forensic Scientist in Civil and Criminal Cases with
James and Associates Forensic Consultants, Inc. , Fort Lauderdale, Florida

### PROFESSIONAL SERVICES IN FORENSIC SCIENCES

Death Investigation and Crime Scene Reconstruction

Physical Evidence Examination and Photography

Bloodstain Pattern Interpretation

Accelerant Detection in Fire Investigation

Forensic Toxicology Consultation

## *ACADEMIC PROFILE*

| INSTITUTION | COURSES/DEGREE | YEAR |
|---|---|---|
| University of Arizona<br>Tucson, Arizona | Biology/Mammalogy | 1961 |
| Hobart College<br>Geneva, New York | BA Biology/Chemistry | 1962 |
| St. Mary's Hospital<br>Tucson, Arizona | Medical Technology<br>M.T. (ASCP) | 1963 |
| Elmira College<br>Graduate School<br>Elmira, New York | Physical Significance of<br>Bloodstain Evidence | 1977 |
| | Homicide Investigation | 1979 |
| | Forensic Microscopy | 1979 |

2

## *CONTINUING EDUCATION AND TRAINING IN FORENSIC SCIENCE*

| INSTITUTION | COURSE | YEAR |
|---|---|---|
| United States Department of Justice Drug Enforcement Administration National Training Institute McLean, Virginia | Forensic Chemistry 40 Hours | 1973 |
| Allegheny County Police Academy Pittsburgh, Pennsylvania | Forensic Science Death Investigation 40 Hours | 1974 |
| Forensic Sciences Foundation National District Attorney's Assoc. Snowmass, Colorado | Forensic Science Death Investigation 40 Hours | 1979 |
| Post Graduate School of Medicine New York University New York, New York | Forensic Science Death Investigation 40 Hours | 1980 |
| New York State Fire Academy Montour Falls, New York | Fire and Arson Investigation 24 Hours | 1982 |
| Advanced Bloodstain Institute Laboratory of Forensic Science Corning, New York | Bloodstain Interpretation 40 Hours | 1983 |
| Colby College Waterville, Maine | Forensic Science Death Investigation 40 Hours | 1984 |
| John Jay College of Criminal Justice New York, New York | Bloodstain Interpretation 8 Hours | 1985 |
| Advanced Bloodstain Institute Laboratory of Forensic Science Corning, New York | Bloodstain Interpretation 40 Hours | 1985 |
| Colby College Waterville, Maine | Forensic Science Death Investigation 40 Hours | 1986 |

| | | |
|---|---|---|
| Advanced Bloodstain Institute<br>Laboratory of Forensic Science<br>Corning, New York | Bloodstain<br>Interpretation<br>40 Hours | 1987 |
| Advanced Bloodstain Institute<br>International Association of<br>Bloodstain Pattern Analysts<br>Denver, Colorado | Bloodstain<br>Interpretation<br>20 Hours | 1988 |
| Advanced Bloodstain Institute<br>International Association of<br>Bloodstain Pattern Analysts<br>Dallas, Texas | Bloodstain<br>Interpretation<br>20 Hours | 1989 |
| Advanced Bloodstain Institute<br>International Association of<br>Bloodstain Pattern Analysts<br>Reno, Nevada | Bloodstain<br>Interpretation<br>20 Hours | 1990 |
| Advanced Bloodstain Institute<br>International Association of<br>Bloodstain Pattern Analysts<br>North Miami Beach, Florida | Bloodstain<br>Interpretation<br>12 Hours | 1994 |
| Advanced Bloodstain Institute<br>Laboratory of Forensic Science<br>Corning, New York | Bloodstain<br>Interpretation<br>40 hours | 1997 |
| Advanced Bloodstain Pattern Analysis<br>1998 Arnold Markle Symposium<br>University of New Haven and the<br>Henry C. Lee Institute of Forensic<br>Science. Mashantucket, Connecticut | Bloodstain<br>Interpretation<br>16 hours | 1998 |
| Advanced Bloodstain Institute<br>International Association of<br>Bloodstain Pattern Analysts<br>Tucson, Arizona | Bloodstain<br>Interpretation<br>20 Hours | 2000 |
| Advanced Bloodstain Institute<br>International Association of<br>Bloodstain Pattern Analysts<br>Tucson, Arizona | Bloodstain<br>Interpretation<br>20 Hours | 2001 |

| Advanced Bloodstain Institute International Association of Bloodstain Pattern Analysts Harrisburg, Pennsylvania | Bloodstain Interpretation 20 hours | 2002 |

## PROFESSIONAL EMPLOYMENT AND EXPERIENCE

| LOCATION | POSITION | YEARS |
|---|---|---|
| Bio-Science Laboratories Los Angeles, California | Clinical Chemist | 1963-1965 |
| Department of Pathology Memorial Hospital Culver City, California | Medical Technologist | 1964-1965 |
| Department of Pathology Mercy Medical Center Orlando, Florida | Chief Technologist Autopsy Assistant | 1965-1967 |
| Department of Pathology Boca Raton Community Hospital Boca Raton, Florida | Chief Chemist Blood Bank Supervisor | 1967-1968 |
| Department of Pathology St. Francis Hospital Wichita, Kansas | Teaching Supervisor Autopsy Assistant | 1968-1969 |
| Department of Pathology Wilson Memorial Hospital Johnson City, New York | Chief Toxicologist | 1969-1975 |
| Department of Psychology State University of New York Binghamton, New York | Research Associate Forensic Scientist | 1975-1977 |
| Department of Pathology Binghamton General Hospital Binghamton, New York | Supervisor of Forensic Laboratory | 1977-1981 |
| Binghamton, New York | Private Consultant in Forensic Science | 1981-1988 |

## *FORMAL TEACHING EXPERIENCE*

| INSTITUTION | COURSE | YEARS |
|---|---|---|
| State University of New York<br>Binghamton, New York | Toxicology of Drugs<br>and Alcohol | 1972-1975 |
| State University of New York<br>Binghamton, New York | Applications of<br>Forensic Toxicology | 1973-1975 |
| Broome Community College<br>Binghamton, New York | Pharmacology of<br>Drugs and Alcohol | 1978 |
| Basic Recruit School<br>Law Enforcement Academy<br>Binghamton, New York | Death Investigation<br>Physical Evidence<br>Forensic Toxicology | 1973-1982 |
| Advanced School<br>Law Enforcement Academy<br>Binghamton, New York | Death Investigation<br>Physical Evidence<br>Forensic Toxicology | 1981 |
| Department of Law Enforcement<br>Training Academy<br>Springfield, Illinois | Bloodstain<br>Interpretation | 1981 |
| Bloodstain Institute<br>Elmira College<br>Elmira, New York | Bloodstain<br>Interpretation | 1981 |
| State University of New York<br>Binghamton, New York | Forensic Science<br>Extern Program | 1983-1984 |
| Broome Community College<br>Binghamton, New York | Homicide<br>Investigation | 1984 |
| Broome Community College<br>Binghamton, New York | Homicide<br>Investigation | 1986 |
| Basic Recruit School<br>Law Enforcement Academy<br>Binghamton, New York | Death Investigation<br>Crime Scene<br>Reconstruction | 1986 |
| Vestal Senior High School<br>Vestal, New York | Visiting Lecturer<br>in Forensic Science | 1984-1988 |

| | | |
|---|---|---|
| Corning Community College<br>Corning, New York | Visiting Lecturer<br>in Forensic Science | 1987-1988 |
| Tampa Police Academy<br>Tampa, Florida | Bloodstain<br>Interpretation | 1990 |
| Oakland County Sheriff's Department<br>Pontiac, Michigan | Bloodstain<br>Interpretation | 1990 |
| Southern Police Institute<br>University of Louisville<br>Louisville, Kentucky | Bloodstain<br>Interpretation | 1993 |
| Institute of Police Technology<br>and Management<br>University of North Florida<br>Tampa, Florida | Bloodstain<br>Interpretation | 1993 |
| Law Enforcement Training Systems<br>Palm Beach  Community College<br>West Palm Beach, Florida | Crime Scene Processing.<br>Collection and Preservation<br>of Evidence. Bloodstain<br>Interpretation. | 1994 |
| Criminal Justice Institute<br>St. Petersburg Jr. College<br>St, Petersburg, Florida | Bloodstain<br>Interpretation | 1995 |
| Criminal Justice Department<br>Fox Valley Technical College<br>Appleton, Wisconsin | Bloodstain<br>Interpretation | 1998 |
| Criminal Justice Department<br>Troy State University<br>Troy, Alabama | Forensic Science<br>Summer Internship<br>Program | 2000 |
| Henry C. Lee Institute of Forensic Science<br>University of New Haven<br>West Haven, Connecticut | Geometric Interpretation<br>of Human Bloodstain<br>Patterns | 2001 |
| Centre of Forensic Sciences<br>Toronto, Ontario<br>Canada | Bloodstain Pattern<br>Analysis for<br>Forensic Scientists I | 2001 |
| Centre of Forensic Sciences<br>Toronto, Ontario<br>Canada | Bloodstain Pattern<br>Analysis for<br>Forensic Scientists II | 2001 |

7

| | | |
|---|---|---|
| Politie LSOP Institute for Criminal Investigation and Crime Science Zutphen, The Netherlands | Basic Bloodstain Pattern Interpretation Course | 2001 |
| Politie LSOP Institute for Criminal Investigation and Crime Science Zutphen, The Netherlands | Advanced Bloodstain Pattern Interpretation Course | 2001 |
| Politie LSOP Institute for Criminal Investigation and Crime Science Zutphen, The Netherlands | Advanced Bloodstain Pattern Interpretation Course | 2001 |
| Criminal Justice Department Fox Valley Technical College Appleton, Wisconsin | Basic Bloodstain Pattern Interpretation Course | 2001 |
| Mid-Atlantic Association of Forensic Scientists Fall Workshop Baltimore, Maryland | Bloodstain Interpretation from Crime Scene to Benchwork | 2002 |
| Criminal Justice Department Fox Valley Technical College Appleton, Wisconsin | Basic Bloodstain Pattern Interpretation Course | 2002 |

## MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS

The  American Academy of Forensic Sciences. Fellow -Toxicology Section.

The International Association of Bloodstain Pattern Analysts.

The South Florida Forensic  Association

## PROFESSIONAL  ACTIVITIES

Board Member of the  Broome  County, New  York Drug  Awareness Center. 1970-1980.

Board Member of the  State  University of New  York  at  Binghamton Drug  Council, 1971-1979.

Exhibitor in the  Scientific Section at  the  American Medical Association  Conference, New York,  New York, 1973.

Exhibitor in the  Scientific Section at  the  American Academy of Pediatrics,  Chicago, Illinois, 1973.

8

Medical   Volunteer and Toxicologist in the Medical  Facility  at the Watkins Glen, New York  Rock  Concert, 1973.

Medical Volunteer and Toxicologist in the Medical Facility at the Peter Frampton   Rock Concert at JFK Stadium in Philadelphia, Pennsylvania, 1975.

Member of the HEW Committee for Medical Care at Large  Youth  Gatherings  in Washington, D.C., 1973.

Consultant to the Southern Tier of New York State Regional Criminal Justice  Planning Board, Binghamton, New York, 1975-1981

Member of the New York State Crime Laboratory Advisory Board, 1975-1981.

Member of the Board of Editors of the American Journal of Forensic Medicine and Pathology, 1988 - 1991.

Consulting Bloodstain Analyst to the Florida Department of Law Enforcement, Tallahassee, Florida, 1990-1997.

Participant in Forensic Science Mentor Program for the American Academy of Forensic Sciences 1998-1999.

Member of the Forensic Science Review Board for CRC Press, LLC, Boca Raton, Florida 1999-Present

Member of the Technical Study Group for Bloodstain Pattern Analysis (TWGSTAIN) sponsored by the FBI, Quantico, Virginia, 2002.

## *LICENSES AND CERTIFICATIONS*

Licensed as Medical Technologist with the American Society of Clinical Pathologists Board of Registry.

Licensed as Legal Blood Alcohol Analyst for the State of New York, 1973-1981.

Appointed as Special Deputy Sheriff in Broome County, New York, 1981-1988.

Certified as Competent Forensic Expert in the Discipline of Bloodstain Pattern Interpretation by the Institute on the Physical Significance of Human Bloodstain Evidence, a division of the Laboratory of Forensic Science in Corning, New York in 1997.

## *INTERNATIONAL EXPERIENCE IN THE FORENSIC SCIENCES*

In conjunction with the International Consortium for Education and Florida Atlantic University at Boca Raton, Florida, Forensic Science was studied in Italy, Germany, France, and England during the summer of 1978. Institutions visited included local Police Departments, Police Training Centers, Medical Examiner Offices, and Forensic Laboratories in each country. These studies and information exchanges included visits to the Landeskriminalamp in Munich, Germany, Interpol in St. Cloud, France, the Home Office Research Establishment in Aldermaston, England, and the Metropolitan Police Laboratory in London, England.

## *FORMAL SCIENTIFIC PRESENTATIONS*

DRUG ABUSE ANALYSIS IN THE CLINICAL LABORATORY: Presented at the New York State Medical Technology Seminar in Binghamton, New York. 10/71.

STREET DRUG ANALYSIS: Presented at the American Academy of Forensic Sciences National Meeting in Las Vegas, Nevada. 02/73.

WATKINS GLEN - A TOXICOLOGICAL ADVENTURE: Presented at the Interim Meeting of the Toxicology Section of the American Academy of Forensic Sciences in Philadelphia, Pennsylvania. 10/73.

EMERGENCY TOXICOLOGY IN THE FIELD: Presented at the American Academy of Forensic Sciences National Meeting in Dallas, Texas. 02/74.

UNUSUAL REQUESTS OF THE TOXICOLOGY LABORATORY: Presented at the Upstate, New York Section of the American Association of Clinical Chemists in Rochester, New York. 06/75.

FORENSIC INVESTIGATION OF CLANDESTINE LABORATORIES: Presented at the American Academy of Forensic Sciences National Meeting in San Diego, California. 02/77.

DRUG RELATED DEATH: Presented at Death Investigation Seminar at Broome Community College, Binghamton, New York. 06/78.

PHYSICAL EVIDENCE IN HOMICIDE INVESTIGATION: Presented at the Forensic Sciences Seminar, Tioga County Sheriffs Department, Owego, New York. 05/79.

MEDICAL-LEGAL ASPECTS OF DRUGS: Presented at the Ohio Drug Studies Institute, Columbus, Ohio. 06/79.

MEDICAL-LEGAL ASPECTS OF DRUGS: Presented at the Ohio Drug Studies Institute, Columbus, Ohio. 06/80.

10

PHYSICAL EVIDENCE IN HOMICIDE INVESTIGATION: Presented at the Forensic Science Seminar, Tioga County Sheriffs Department, Owego, New York. 10/80.

FORENSIC ASPECTS OF FIRE DEATHS AND COLLECTION OF PHYSICAL EVIDENCE AT FIRE SCENES: Presented at Arson Awareness and Recognition Seminar, Cayuga Community College, Auburn, New York. 04/81.

PHARMACOLOGY OF DRUGS AND ALCOHOL: Presented at the Ohio Drug Studies Institute, Columbus, Ohio. 06/81

PHARMACOLOGY OF DRUGS AND ALCOHOL: Presented at the Summer Drug Institute for Schools, Youth, and Substance Abuse, Wyoming Seminary School, Kingston, Pennsylvania. 06/81.

PRINCIPLES OF BREATH TESTING DEVICES FOR ALCOHOL: Presented at the Broome County Bar Association Educational Seminar in Binghamton, New York. 10/81.

INTERPRETATION OF BLOODSTAIN EVIDENCE: Presented at Security Officers Seminar, Owego, New York. 11/81.

SKULL SESSION - FACIAL RESTORATION: Presented at the International Association for Identification Conference in Rochester, New York. 07/82.

BLOODSTAIN EVIDENCE IN GUNSHOT WOUNDS AND TRAUMA CAUSED BY ACTS OF VIOLENCE: Presented at the Empire Nine EMT Regional Training Center, Canandaigua, New York. 11/82.

MEASUREMENT OF ALCOHOL IN BLOOD AND BREATH IN DRIVING WHILE INTOXICATED CASES: Presented at Seminar for Tioga County Law Enforcement Agencies in Owego, New York. 11/82.

BLOODSTAIN EVIDENCE IN HOMICIDE INVESTIGATION:  Presented at the Peter Vallas Forensic Science in Fire and Death Investigation Seminar, Saddlebrook, New Jersey. 03/83.

BLOODSTAIN EVIDENCE IN UNUSUAL HOMICIDES:  Presented at the Western Conference on Criminal and Civil Problems in Wichita, Kansas. 05/85.

FORENSIC SCIENCE AND DEATH INVESTIGATION:  Presented at Law Day Seminar at Binghamton Senior High School, Binghamton, New York. 05/85.

FORENSIC SCIENCE AND DEATH INVESTIGATION: Presented at Law Day Seminar at Binghamton Senior High School, Binghamton, New York 05/86.

PHYSICAL EVIDENCE IN ACCIDENT RECONSTRUCTION: Presented at the Broome County Bar Association Educational Seminar, Binghamton, New York. 05/86.

CRIME SCENE RECONSTRUCTION: Presented at the First Annual Forensic and Investigator Forum of the New York State Defenders Association, Utica, New York. 05/87.

PHYSICAL EVIDENCE IN VEHICULAR ACCIDENTS: Presented at the Peter Vallas Forensic Science in Fire and Death Investigation, Hasbrouck Heights, New Jersey. 06/87.

BLOODSTAIN PATTERN INTERPRETATION: Presented at the Twin Meetings of the Pan American Association of Forensic Sciences and the First World Meeting of Police Surgeons and Medical Officers, Wichita, Kansas. 08/87.

TECHNIQUES OF HOMICIDE CASE PREPARATION: Presented at the Fall Meeting of the International Association of Identification, Oriskany, New York, 10/87.

ACCELERENT IDENTIFICATION IN FIRE INVESTIGATIONS: Presented at the Peter Vallas Associates, Inc. Seminar, Fort Lauderdale, Florida, 01/88.

BLOODSTAIN PATTERN INTERPRETATION AT SCENES OF VIOLENT CRIMES: Presented as full day seminar for Evidence Technician Training School at Harrisburg Area Community College, Harrisburg, Pennsylvania, 02/88

BLOODSTAIN PATTERN INTERPRETATION AND CRIME SCENE RECONSTRUCTION: Presented as a five hour seminar for the Summer Training Program of the Office of the State of Vermont Defender General at Lyndon State College, Lyndonville, Vermont, 06/88.

BLOOD EVIDENCE AT CRIME SCENES: Presented at the National Conference on Death and Injury Investigation sponsored by INFORM and the Milton Helpern Center of Wichita State University in Wichita, Kansas, 12/89.

INTERPRETATION OF BLOODSTAIN EVIDENCE AT CRIME SCENES: Presented at the Conference on Death Investigation sponsored by the Jefferson Parish Coroner's Office in Harahan, Louisiana, 04/90.

BLOOD EVIDENCE AT CRIME SCENES: Presented at the Mini-Western Conference on Crime Scene, Injury and Death Investigation sponsored by the Criminal Justice Department at Garden City Community College in Garden City, Kansas, 05/90.

BLOODSTAIN EVIDENCE AT CRIME SCENES: Presented at the Death Investigation Seminar sponsored by the Pennsylvania State Coroner's Association in Carlisle, Pennsylvania, 09/91.

CRIME SCENE WORKSHOP: Presented at Nova Southeastern University Law School in Fort Lauderdale, Florida, 01/92

CASE STUDIES IN BLOODSTAIN EVIDENCE: Presented at the Broward Forensic Association Meeting, Boca Raton, Florida, 03/92.

CRIME SCENE WORKSHOP:  Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 06/92.

CRIME SCENE RECONSTRUCTION:  Presented at the Florida Homicide Investigator's Association (FHIA) Fifth Annual Conference, North Redington Beach, Florida, 11/92.

CRIME SCENE WORKSHOP:  Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 02/93.

BLOODSTAIN INTERPRETATION:   Presented at the Dade County Public Defender's Office in Miami, Florida, 08/94.

BLOODSTAIN INTERPRETATION:   Presented at the National Defender Investigator Association Annual Conference in Fort Lauderdale, Florida, 10/94.

CRIME SCENE WORKSHOP: Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 02/95.

CRIME SCENE DEMONSTRATION AND MOCK TRIAL:  Presented at Nova Southeastern Law School in Fort Lauderdale, Florida, 11/95

CRIME SCENE WORKSHOP:   Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 01/96.

BLOODSTAIN EVIDENCE:  Presented at the Bergen County Bar Association Continuing Education Program in Hackensack, New Jersey, 04/96

CRIME SCENE WORKSHOP:  Presented at Nova Southeastern University Law School in Fort  Lauderdale, Florida, 01/97.

CRIME SCENE INVESTIGATION: Presented at the University of Miami School of Law in  Coral Gables, Florida, 02/97.

BLOODSTAIN INTERPRETATION:  Presented at the Broward County Public Defenders Office in Fort Lauderdale, Florida, 05/97.

DEATH INVESTIGATION: Presented at the Dade/Broward Regional Meeting of the Florida Association of Licensed Investigators in Hollywood, Florida, 05/97.

CRIME SCENE WORKSHOP:  Presented at the Licensed Private Investigators 10th Anniversary Convention and National Association of Licensed Investigators Region IV Seminar in New Orleans, Louisiana, 09/97.

BLOODSTAIN PATTERN EVIDENCE VERSUS DEFENDANT'S STATEMENT (FACT OR FICTION):  Presented at the 1998 Arnold Markle Symposium on Advanced Bloodstain Pattern Analysis in Mashantucket, Connecticut, 03/98

PROBLEMS IN FORENSIC SCIENCE - A SCIENTIFIC AND LEGAL PERSPECTIVE OF BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Utah Association of Criminal Defense Lawyers Seminar in Salt Lake City, Utah, 03/98

CRIME SCENE ISSUES:  Presented at the Hialeah Gardens Police Department in Hialeah Gardens, Florida, 04/98.

PRACTICAL BLOODSTAIN PATTERN RECOGNITION:  Presented at the Pennsylvania Coroner's Association Continuing Education Seminar in Moosic, Pennsylvania, 05/98.

BASIC BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Office of the Public Defender in Kansas City, Missouri, 08/98.

FORENSIC SCIENCE AND BLOODSTAIN PATTERN EVIDENCE:  Presented at the Palm Beach County Public Defender's Office in West Palm Beach, Florida, 09/98.

USE AND UNDERSTANDING OF FORENSIC EVIDENCE:  Presented at the Southern District of Florida Federal Public Defender's and Criminal Justice Act Representation Conference in Duck Key, Florida, 09/98.

21 YEARS, 4 MONTHS AND 20 DAYS ( COMMONWEALTH OF PENNSYLVANIA V. DR. STEPHEN SCHER):  Presented with Herbert Leon MacDonell at the American Academy of Forensic Sciences National Meeting in Orlando, Florida, 02/99.

CIVIL AND CRIMINAL FORENSIC DEATH INVESTIGATION:  Presented at the 1999 Northeast Super Conference for the National Association of Licensed Investigators in Atlantic City, New Jersey, 03/99.

BLOODSTAIN PATTERN EVIDENCE VERSUS DEFENDANT'S STATEMENT (FACT OR FICTION):  Presented at the Pathology Resident Seminar at the University of Tennessee School of Medicine in Memphis, Tennessee, 05/99.

BLOODSTAIN EVIDENCE IN THE CASE OF THE COMMONWEALTH OF PENNSYLVANIA V. DR STEPHEN SCHER):  Presented at the Palm Beach County Criminal Defense Lawyers Seminar in West Palm Beach, Florida, 06/99.

FORENSIC SCIENCE AND BLOODSTAIN PATTERN EVIDENCE:  Presented at the Louisiana Crisis Assistance Center in New Orleans, Louisiana, 08/99.

BLOODSTAIN PATTERNS AT THE CRIME SCENE - WHAT IT ALL MEANS: Presented at the South Florida Forensic Association Training Seminar at the Fort Lauderdale Police Department in Fort Lauderdale, Florida, 11/99.

FORENSIC SCIENCE CASE STUDIES:  Presented at the Forensics and the Law Course at the University of Washington in Seattle, Washington, 12/99.

BASIC BLOODSTAIN PATTERN INTERPRETATION:  Presented at the Missouri State Public Defenders Trial Skills Workshop 2000 in Lake Ozark, Missouri, 01/00.

FORENSIC SCIENCE AND VIOLENT DEATH - AN OVERVIEW OF PRACTICAL ISSUES AND PITFALLS:  Presented at the 2000 Northeast Super Conference for the National Association of Licensed Investigators in Atlantic City, New Jersey, 03/00.

UTILIZING THE FORENSIC NURSE FOR CASE PREPARATION:  Presented at the Dade County Public Defender's Office in Miami, Florida, 04/00.

PRACTICAL BLOODSTAIN RECOGNITION SEMINAR:   Presented at Martin Investigations, Palm Beach Gardens, Florida, 08/00.

BLOOD SPATTER EVIDENCE: Presented at the Louisiana Association of Criminal Defense Lawyers Capital Defense Seminar in Baton Rouge, Louisiana, 09/00.

BLOODSTAIN PATTERN ANALYSIS - THE BASICS: Presented at the American Criminal Justice Association (Lambda Alpha Epsilon) Region IV Conference of the Millennium in New Haven, Connecticut, 10/00.

BLOODSTAIN PATTERN WORKSHOP: Presented at the Henry C. Lee Forensic Science Institute, University of New Haven, West Haven, Connecticut, 10/00.

BLOODSTAIN PATTERN INTERPRETATION: Presented at the National Seminar on Forensic Evidence and the Criminal Law sponsored by the Federal Defender Training Group, Philadelphia, Pennsylvania, 11/00.

BLOODSTAIN PATTERN EVIDENCE: Presented at the Forensics and the Law Course at the University of Washington in Seattle, Washington, 12/00.

FORENSIC SCIENCE IN DEATH INVESTIGATION: Presented at the 35th Annual Educational Conference of the Wisconsin Association of Identification in Kenosha, Wisconsin, 03/01.

WALKING THE CRIME SCENE - DEAD MEN DO TELL TALES: Presented at the National Association of Criminal Defense Lawyers Annual Meeting and Seminar in Minneapolis, Minnesota, 08/01.

15

BLOOD ON THE CARPET – MORE THAN A STAIN: Presented at the 2001 Annual Conference of the Federal Defenders of Eastern Washington and Idaho in Boise, Idaho, 08/01.

BLOOD SPATTER EVIDENCE: Presented at the Training Seminar for the King County Associated Counsel for the Accused, Seattle, Washington. 03/02.

BLOODSTAIN PATTERN INTERPRETATION: Presented at the Second National Seminar on Forensic Evidence and the Criminal Law sponsored by the Federal Defender Training Group, New Orleans, Louisiana, 04/02.

CASE STUDIES IN BLOODSTAIN PATTERN INTERPRETATION: Presented at the Bloodstain Pattern Analysis and Violent Crimes Course at the University of New Orleans, New Orleans, Louisiana. 08/02

WHAT IS THIS FORENSIC THING? Presented at the Florida Public Defender Association Winter Conference, St. Petersburg Beach, Florida. 12/02.

## SCIENTIFIC PUBLICATIONS

FATAL DOXEPIN (SINEQUAN) OVERDOSE: Bulletin of the International Association of Forensic Toxicologists: Vol. 8, No. 3-4. 1972.

ANALYSIS OF STREET DRUGS IN A COLLEGE COMMUNITY: Journal of Drug Education: Vol 2., No. 2. June 1972.

DEVELOPMENT OF EMERGENCY DRUG SCREENING: Wilson Memorial Hospital Newsletter: Vol 1. No.5. November 1972.

SERUM ASSAY OF DIPHENYLHYDANTOIN (DILANTIN) AND PHENOBARBITAL DURING MANAGEMENT OF CONVULSIVE DISORDERS: Wilson Memorial Hospital Newsletter. Vol. 2, No. 10, April 1974.

TREATMENT OF DRUG ABUSE INCIDENTS AT LARGE YOUTH FESTIVALS: Addiction and Drug Abuse Report: Grafton Publications, April 1974.

EMERGENCY TOXICOLOGY: Wilson Memorial Hospital Newsletter: Vol. 3. No. 2, August 1974.

MEDICAL AND TOXICOLOGICAL ASPECTS OF THE WATKINS GLEN ROCK CONCERT: Journal of Forensic Sciences: Vol. 20, No. 1. January 1975.

RECOVERY FROM MASSIVE SELF-POISONING FROM ASPIRIN: New York State Journal of Medicine: Vol. 75, No. 9. August 1975.

PHENCYCLIDINE - STATES OF ACUTE INTOXICATION AND FATALITIES: Western Journal of Medicine: 123. (345-349). November 1975.

PHENCYCLIDINE -TISSUE DISTRIBUTION IN THE RAT:  Clinical Toxicology:  9 (4) , 573-582, 1976.

MEDICAL CARE AT LARGE GATHERINGS:  National Institute of Drug  Abuse. DHEW  Publication No. (ADM)  76-267 , 1976.

CONSIDERATION OF BLOODSTAIN PATTERN INTERPRETATION IN  DEATH CASES: Peter Vallas Associates, Inc. Newsletter. Vol. 2. April 1984.

BLOOD EVIDENCE IN CRIME SCENE INVESTIGATION: Medico-Legal and Forensic Investigation Monograph Series with Dr. William G. Eckert, MD, International Reference Organization in  Forensic Medicine Publication, Wichita, Kansas, 1987.

INVESTIGATION OF CREMATIONS AND SEVERELY BURNED BODIES: The American Journal of Forensic Medicine and Pathology, Vol 9, No. 3,  September 1988.

INTERPRETATION OF BLOODSTAIN EVIDENCE AT CRIME SCENES:  Elsevier Series in Practical Aspects of Criminal and Forensic Investigations. Co-authored with Dr. William G. Eckert, MD. Elsevier Publishing Company, New York, N.Y. Amsterdam, The  Netherlands. May  1989. Republished by CRC Press, Boca Raton, Florida, 1993.

DISINTERMENTS - THEIR VALUE AND ASSOCIATED  PROBLEMS: The American Journal of Forensic Medicine and Pathology, Vol 11, No 1,  March 1990.

THE PRACTICAL METHODOLOGY OF FORENSIC PHOTOGRAPHY:   Elsevier Series in Practical Aspects of Criminal and  Forensic Investigations. David R. Redsicker. Elsevier  Publishing  Company, New York, N.Y., Amsterdam, The  Netherlands. July 1991. Republished by CRC Press, Boca Raton, Florida, 1993, Contributing  author.

PRACTICAL FIRE AND ARSON INVESTIGATION: 2nd  Edition. CRC  Series in Practical Aspects of Criminal and Forensic Investigations. David R. Redsicker and John O'Connor. CRC Press, Boca Raton, Florida, 1996, Contributing  author.

INTRODUCTION TO FORENSIC SCIENCES: CRC Series in  Practical Aspects of Criminal and Forensic Investigations. William G. Eckert, MD. CRC Press, Boca Raton, Florida, 1997, Co-author of the chapters, The Role of the Forensic Laboratory and Bloodstain Pattern Interpretation.

SCIENTIFIC AND LEGAL APPLICATIONS  OF  BLOODSTAIN  PATTERN INTERPRETATION: CRC Series in Practical Aspects of Criminal and Forensic Investigations, CRC Press, LLC, Boca Raton, Florida, 1998, Editor.

INTERPRETATION OF BLOODSTAIN EVIDENCE AT CRIME SCENES: 2nd Edition. CRC Series in Practical Aspects of Criminal and Forensic Investigations. Co-authored with  Dr. William G. Eckert, MD, CRC Press LLC, Boca Raton, Florida, 1998.

FORENSIC SCIENCE- *An Introduction to Scientific and Investigative Techniques:* Co-edited with Jon J. Nordby, CRC Press, LLC, Boca Raton, Florida, 2002.

FORENSIC SCIENCE- *An Introduction to Scientific and Investigative Techniques: Instructors Guide,* Co-edited with Jon J. Nordby and Sara Kreisman, CRC Press, LLC, Boca Raton, Florida, 2002.

## GEOGRAPHICAL DISTRIBUTION OF CONSULTATION AND COURT TESTIMONY IN DEATH INVESTIGATION AND FORENSIC SCIENCE

| CONSULTATION | CONSULTATION AND TESTIMONY |
|---|---|
| Alaska | |
| Arizona | |
| California | |
| Colorado | |
| Connecticut | Connecticut |
| Delaware | Delaware |
| District of Columbia | District of Columbia |
| Florida | Florida |
| Georgia | Georgia |
| Idaho | |
| Illinois | Illinois |
| Indiana | Indiana |
| Kansas | Kansas |
| Kentucky | |
| Louisiana | Louisiana |
| Maryland | Maryland |
| Massachusetts | Massachusetts |
| Michigan | Michigan |
| Minnesota | |
| Mississippi | |
| Missouri | Missouri |
| Montana | |
| Nebraska | |
| New Hampshire | |
| New Jersey | New Jersey |
| New Mexico | New Mexico |
| New York | New York |
| North Carolina | North Carolina |
| Ohio | Ohio |
| Pennsylvania | Pennsylvania |
| Rhode Island | |
| South Carolina | |
| South Dakota | |
| Tennessee | Tennessee |
| Texas | |
| Utah | Utah |
| Vermont | Vermont |
| Virginia | Virginia |
| Washington | Washington |
| West Virginia | |
| Wisconsin | Wisconsin |
| Wyoming | |

## CONSULTATION

Republic of South Korea
Sydney, Australia
Kingston, Canada
Toronto, Canada
St. Croix, U.S. Virgin Islands
St. Thomas, U.S. Virgin Islands
Mannheim, Germany
Tuzla, Bosnia-Herzegovina

## CONSULTATION AND TESTIMONY

Republic of South Korea

Toronto, Canada
St. Croix, U.S. Virgin Islands

Mannheim, Germany

12/02

20

**Exhibit 33**

# AFFIDAVIT

State of Arizona,  )
                   )  ss.
County of Pima     )

SEAN H. BRUNER, having been first duly sworn, upon his oath deposes and states:

1.    I am an attorney licensed to practice law in the State of Arizona since 1981. My state bar number is 007296.

2.    I received a criminal law specialist certification in October of 1990 and am currently in the private practice of law in my own law firm, Bruner & Upham, P.C.

3.    I was lead counsel in the case of *State of Arizona v. Barry Lee Jones*, Pima County Cause No. CR-45587 (hereinafter *"State vs. Jones."*) from approximately May 19, 1994 until the sentence was imposed.

4.    *State v. Jones* was the second capital case I tried.

5.    Leslie Bowman was my legal partner during the time I represented Mr. Jones. Although I tried to have her appointed second counsel, the trial court refused. Despite the court's refusal, I had her informally "second-chair" Mr. Jones's case and she appeared at trial with me. At the time she performed these duties, she had been practicing law for approximately one year.

6.    I delegated certain responsibilities in *State v. Jones* to Ms. Bowman including interviewing all of the State's witnesses.

7.    I hired George Barnett to investigate the case. I did not, however, have

him go beyond the initial $ 500.00 amount allotted to investigation expenses by the trial court. I did not request any additional funding from the trial court for more investigation.

8.     Although Mr. Barnett's preliminary report did list many other potential suspects, I did not have him follow-up and investigate nor did I undertake any investigation myself.

9.     I do not have an explanation for why we did no further investigation on Mr. Jones' case. In retrospect, it is possible I just assumed Mr. Jones was guilty based upon the State's version of the case.

10.     I hired a psychologist, Dr. Geffen, who evaluated Mr. Jones and found that while he was competent to stand trial, Mr. Jones had suffered from many past head injuries and periods of losing consciousness. Dr. Geffen evaluated Mr. Jones without any records pertaining to Mr. Jones and his family.

11.     Despite Dr. Geffen's indication and the information from witnesses regarding Mr. Jones' head injuries, I failed to request the relevant medical records and consult/retain a neurologist or neuropsychologist to determine whether Mr. Jones suffered from brain damage which may have affected his behavior and conduct.

12.     Mr. Jones' familial history, and numerous head injuries  were not investigated and adequately presented to the sentencing court as one of the many causal connections to the murder.

13.     It is now my opinion, as a result of the training and experience I gained in the years since Mr. Jones' trial, that the following independent outside expert

witnesses are critical in investigation and defending most capital cases: an investigator to investigate and interview potential witnesses to support an innocence claim; forensic scientists (an eyewitness expert to refute critical eyewitness testimony and a blood splatter expert) to support the innocence claim purported at trial; a mitigation investigator/specialist to begin sentencing phase investigation from the onset of the case; a forensic pathologist specializing in child deaths to review autopsy results in order to counter aggravation evidence; and a psychiatrist and/or psychologist to test and investigate the client's mental state at the time of the alleged crime and potential mental health issues supporting mitigation at sentencing.

14.    In hindsight, with my current level of training and experience, I am of the opinion that I should have requested funds from the trial court to retain the foregoing experts in *State v. Jones*.

15.    There was no strategic reason for my failure to collect the critical mitigation records stated above.

DATED this ___12___ day of November, 2002.

_____
SEAN BRUNER

Subscribed and sworn to before me by Sean Bruner on November _12_, 2002.

My commission expires: _Oct. 28, 2006_

_____
NOTARY PUBLIC

OFFICIAL SEAL
MARY A. VILLA
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Oct. 28, 2006

Page 3 of 3

**Exhibit 34**

## DECLARATION OF GEORGE E. BARNETT

I, George E. Barnett, declare as follows:

1.     I was contacted regarding Barry Jones and interviewed regarding my

investigative findings.  During this interview, I was made aware of information

that was not available to me when I investigated Barry's case.  I write this

supplemental declaration because this case has bothered me for many years, and

had I been retained to continue my investigation, I believe I would have been able

to prove Barry's innocence.

2.     I am a retired Tucson Police Department Police Officer, serving from

1968 until 1989. I retired as a Lead Detective for Operations South in August

1989.  I was lead  investigator in at least twelve homicide cases and assisted in

dozens more.  I started my own investigative agency called Barnett Investigations,

Inc. in September 1989.  I retired from my business in September 2007.  I was a

member of the Arizona Homicide Investigator's Association, and President of the

Metro Lodge Fraternal Order of Police from 2000-2006.

3.     In 1995, I met with attorney Leslie Bowman to discuss the case.   I never

met with Sean Bruner on this case, and it wasn't until later that I found out that

Sean Bruner was the lead attorney on the case.  I only met and briefed Leslie

Bowman on my findings.  I was authorized five hundred dollars to complete the investigation.   I was only able to obtain the face sheet after I went to the Pima County Sheriffs' Office.

4.      During my investigation, it was evident to me that Barry Jones was not involved in the death of Rachel Gray.  I conducted preliminary interviews of his neighbors, I visited the crime scene and reviewed the information that was provided to me at the time by the defense.  The results of my initial findings are set forth in the detailed letter to Ms. Bowman, dated May 19, 1994, attached as "Exhibit A".

5.      In March 1995, I was asked by Ms. Bowman to go to the Pima County Sheriff's Office impound lot to take copious notes, measurements, and pictures of Barry's  van.   I was not told why I was doing this or that there were child witnesses who claimed to have seen Barry and Rachel Gray driving in the van the afternoon before Rachel Gray died.

6.      I informed Ms. Bowman that I believed Barry was innocent.  I  requested additional funds to further the investigation and she told me she would see if she could get more funding.  I did not hear back from Ms. Bowman and only heard of the case when I read about the verdict in the local newspaper.  I then met with Ms. Bowman to discuss the case.  I told Ms. Bowman again of my belief in Barry's

Page 2 of 5

innocence. Ms. Bowman told me "it is over and done with now." I was surprised that I was never called to testify in Barry's case.

7.     Had I been authorized to continue my investigation, I would have focused on several key areas of concern.

8.     I believe scene reconstruction would have been vital to this case because, in my professional opinion, it does not seem possible, based upon my brief review of the van's dimensions, that two 8 year olds could see Barry hitting Rachel Gray from their vantage point, standing in the street.

9.     Had a professional interviewer spoken with the children in a timely manner, they might not have been influenced to readily identify Barry Jones. I spent 10 years as a school resource officer and I could have assisted in the interviews.

10.    I was never asked to investigate a specific murder weapon. I was not informed that the prosecution and police claimed at trial that the crow bar in Barry's van was the weapon used by Barry to inflict the fatal blow to Rachel Gray.

11.    I would also have contacted Stephanie Fleming and her family. Through interviews with Barry's neighbors, I learned that one of Stephanie Fleming's children was seen hitting Rachel Gray in the stomach with a piece of heavy rebar

Page 3 of 5

the  day before her death.  This child was big for his age, approximately 40 lbs and

he was 2.5 years old.  There were other children around Rachel Gray day before

her death.    The timing of a child hitting or stomping Rachel Gray, the day before

her death would be consistent with her injuries. I learned that when Stephanie

Fleming was told that her children could be involved, she moved out of the mobile

home park within hours of Barry's arrest.  Stephanie Fleming moved out before

the police began interviewing witnesses.

12.    I never met with Barry, and couldn't pick him out of a line up, or a

group of two.  I was never asked to  interview Barry.  Had I been authorized

to continue work on his case, I would have conducted extensive interviews

with him to obtain vital information to assist Leslie Bowman and Sean

Bruner in his defense.

13.    I find it hard to believe that Barry is guilty of this crime.  My

investigation revealed that Barry Jones had a good reputation with all of the

kids in the trailer park as an adult who was, firm, patient, and fair.  All the kids

seemed to love him.  He was never seen hitting any child when they became

unruly.  All of the children paid immediate attention to him.

14.    From my investigation, I also heard that Angela Gray was a boozer and a

druggie.

15.    I worked with Leslie Bowman and Sean Bruner on approximately 6-12 cases over the years, and this was their first homicide case.  In my opinion, homicide cases were not their forte.  I believe based on my training and experience, that they were poorly equipped to handle a capital murder case at the time.

16.    This is the only homicide case, including my 22 years with the Tucson Police Department, where I was strongly influenced that the person was not guilty.

17.    I feel a travesty of justice has occurred through errors and omissions in the style and presentation of facts.


Executed on ___JAN  10,_____, 2008

                                        Signed: _____

                                                **George E. Barnett**

**Exhibit 35**

## DECLARATION OF GEORGE E. BARNETT

I, George E. Barnett, declare as follows:

1.      I am a licensed private investigator who owns my own investigative agency called Barnett Investigations, Inc.  I am a member of the Arizona Homicide Investigator's Association and I have investigated many capital murder cases.

2.      Back in 1994, I was contacted by Leslie Bowman, one of the trial attorney's representing Barry Lee Jones in his capital case.  Ms. Bowman explained that her client, Barry Lee Jones ("Barry"), had been arrested and charged with the murder of his live-in girlfriend's daughter.  Ms. Bowman asked me to investigate  the case.

3.      After an initial briefing from Ms. Bowman, I went out to the Desert Vista Apartments, a trailer and apartment complex where Barry lived in a trailer. The results of my initial investigation are set forth in the detailed letter I sent Ms. Bowman, dated May 19, 1994, attached hereto as "Exhibit 1."

4.      Prior to my investigation, I was given no police reports or other documents to review regarding the case.

5.      After speaking with residents in the trailer park and obtaining preliminary information, I went to the police impound lot and took pictures and measurements of the van Barry drove.  I memorialized my findings in a report to

Ms. Bowman dated March 31, 1995 (attached hereto as "Exhibit 2").

6.   I debriefed with Ms. Bowman on May 18, 1994.  As is explained in my final letter to her (Exhibit 1), it was indicated to me at that time that the funding that trial counsel had set aside for my time, mileage, and expenses for this investigation were such that it would be financially unfeasible for me to continue investigating the case, as my time and acquired expenses has already far exceeded the amount designated to hire an investigator.

7.   Although I had previously investigated a half dozen to a dozen capital murder cases for ~~Ms. Bowman and her legal partner, Sean Bruner,~~ Pub. Defense Attorneys IN ARIZONA. it was financially difficult to do much work for them consistently because they did not pay mileage.

8.   Based on the preliminary investigation that was done on the case, it is my opinion that Barry was not involved in Rachel Gray's death.  I base my opinion on the fact that there was no information given by any witness to indicate that Barry had any history of violence toward children.

9.   Also, it seemed suspicious to me that one of Barry's neighbors, Stephanie Fleming, packed up and left town right after Rachel's death.  Other residents in the trailer park told me a rumor that one of Stephanie's sons had hit Rachel in the stomach with some type of object.

10. I also heard that Barry was having an affair with another woman and that Angela, Barry's live-in girlfriend and Rachel's mother, was very jealous and angry about it.

11. I would have liked to have been able to do more investigation on this case. Even after my preliminary investigation, the facts against Barry seemed highly circumstantial.

12. If I had completed my investigation, I would have followed up on all of the other potential suspects I learned about in my preliminary contact with the people in the trailer park where Barry and the victim had lived. To the best of my knowledge, no other investigation was performed in this case.

I declare under penalty of perjury under the laws of the State of Arizona and the United States that the foregoing is true and correct.

Signed this 5ᵗʰ day of _November_, 2002, in Tucson, Arizona.

George Barnett
Tucson Police Dept (Retired)

Exhibit 1

BAR**NETT** INVESTIGATIONS, INC.
GEORGE E. BARNETT, P.I.

P.O. Box 30644                                          (602) 722-6439
Tucson, AZ 85751-0644


May 19, 1994


RE:      Barry Lee Jones

### INVESTIGATIVE REPORT

On 05/09/94, we received an inquiry from Leslie Bowman, an Attorney at Law who works out of 78 W. Cushing, Tucson, Arizona.  This inquiry concerned if Barnett Investigations would, in fact, consider investigating the background concerning an incident whereupon a child died and Barry Lee Jones was under arrest at the present time.  We did inform Leslie Bowman that we would consider accepting this case for investigation after receiving additional information.   A conference was then conducted between this investigator and Leslie Bowman at her office on 05/09/94 from 1:00 to 2:30 P.M.

After our initial briefing with Leslie Bowman, we did respond to the Desert Vista Apartments, located at 4501 E. Benson Highway to speak with residents in this trailer park/apartment complex.

Our initial contact was Judy Chavez who is the manager at the Desert Vista Apartments at 4501 E. Benson Highway, along with her husband, Joe Chavez.  The telephone number at the manager's office is 574-2777.  I was informed by Judy that she and her husband, Joe, became the managers of Desert Vista in October of '93.  She further stated that Barry Lee Jones lived in space #23.  She stated she believed that Barry had lived in this trailer for approximately five years.  She further stated that on all occasions of contact with Barry, he was very quiet, polite, and commonly used "yes ma'am" and "no ma'am" in all of his conversations with Judy Chavez.  She stated he was a very agreeable type, that one would never see him drunk.  She had in the past offered him a beer and he had refused, opting for soda pop instead.  She further stated he had a daughter by the name of Brandie who seemed very happy to be with him, and he did spend as much time as he could (to her thoughts) with not only his daughter, Brandie, but quite some number of children in the trailer park, as they all seemed to like him very much, and tended to congregate in the area near his residence.  He was well liked by all the children in the trailer park.  I then asked about Angela and was told by Judy that Angela had moved in with Barry approximately five weeks prior to this date, 05/09/94.

Barry Lee Jones
Page 2

She stated that there were more people living in the trailer than what they normally would allow and she and her husband, Joe, were in the process of considering to draft a letter indicating that Angela and her children would have to move, as there were too many people residing in the mobile home in space #23 with Barry Jones. In further questioning, she indicated that Angela did not have their permission to be in the park and further that although she stayed mostly to herself within the trailer, when she was seen outside, she was frequently yelling at the children when Barry was not present at the residence.

When asked about Rachel, the deceased four-year-old daughter of Angela, it was indicated to me by Judy Chavez that she had observed Rachel approximately one-and-a-half weeks ago with two black eyes. Brandie, the daughter of Barry Jones, was queried by Judy Chavez as to how the black eyes occurred and was informed by Brandie that Rachel had tripped over a dog, or something to that effect and hit her face on a fence post or some other type of hard object, and that she had turned black and blue across the nose and both eyes shortly thereafter.

When further questioning concerning Angela was pursued, Judy reiterated that very rarely did she see Angela as she tended to stay confined within the trailer most of the time. She did volunteer information concerning a girl by the name of Rose (unknown last name) who she believed was a friend of Patty Bennett. It was further indicated that Patty Bennett had been the manager of the Desert Vista Trailer Park prior to she and her husband taking over in October of '93. Patty Bennett now resided in a trailer at the J & J Rentals, located at 4663 E. Benson Highway, and that Patty had been the manager for at least two years prior to she and her husband's arrival. She stated Patty Bennett drove a white-over-burgandy old Cadillac, and her trailer was located to the rear of the main building and parked parallel with the Benson Highway. Further information she was not able to supply.

We then contacted the occupant of trailer #22 at the Desert Vista Apartments, which is occupied by Susie (also known as Susan) Hopkins, along with her children. Susie Hopkins lives in the trailer directly south of the one occupied by Barry Lee Jones, and Angela, along with their children. In speaking with Susie Hopkins, she stated she had known Barry for approximately five years. She found him to be mostly quiet and extremely nice to all the kids in the park. He was usually very easy going and rarely lost his temper. If he did lose his temper, he would immediately leave the situation that had caused him to become angry, and his payback would be in the form of never assisting or helping that person who made him angry. He was not the type to become physical in any manner, and was extremely well-liked by all the kids in the trailer park. We were further informed by Susie that Angela had moved in approximately four to five weeks prior to this date, and was always

05212

Barry Lee Jones
Page 3

screaming at their four children when Barry was not present.  She
did appear to lose her temper, however was never observed to strike
any of the children, only threaten them with bodily harm and scream
obscenities on frequent occasions.

Susan Hopkins stated Barry Jones rarely drank alcohol and was
normally seen with a soda in his hand.  She did not believe she had
ever seen him drunk, although he had on occasion, drank a few
beers.  Susan stated Barry Jones was always busy trying to fix
things, that he was a pack rat and brought all kinds of broken
items to his residence and was a very good mechanic and assisted
many of the occupants at the trailer park with mechanical
difficulties they encountered with their vehicles and did so,
asking only compensation for the parts that he had purchased with
his own money to repair their mechanical difficulties.  She further
stated that Barry was extremely docile with the children, and all
of the parents felt very secure with their children playing in the
area when Barry was present, as he attended to them to keep them
from fighting with each other and seemed to have an extremely good
rapport with all the children, as they would mind him with no back
talk, although he never challenged or struck nor even yelled at any
of the children.  She stated his normal means of discipline when
any of the children were out of line, was to set them down for a
short period of time before allowing them to play with the other
kids in order to cool off.

Susan Hopkins' personal opinion of Angela was not very commendable,
as Angela stayed primarily in the trailer, was not sociable to any
of the neighbors, and was described by Susan Hopkins as a screamer
with a foul mouth.  She further stated that Angela was always
harping at something and/or somebody.  She stated that Barry would
often leave when Angela became overly aggressive and foul-mouthed
at the house, although she (Susan Hopkins) would attempt to stay
totally out of sight and not indicate that she was aware this was
occurring from time to time.

Our next contact was with Shirley DeVous in trailer space #24,
directly north of the space occupied by Barry Jones and Angela.
Shirley indicated that she had only met Angela on one occasion.
Her opinion of Barry was that he was an extremely nice guy.  She
has not let her kids play with the others near Barry's residence
since Angela moved in approximately four to five weeks from this
date.  She stated Angela yelled and was abusive towards the
children.  She therefore forbade her children to go over there,
although she considered Barry an extremely good person with all of
the kids, including her daughters who had played there for the last
several years with no problems whatsoever.  She further stated that
Barry Jones was always ready to help people and would loan tools
and his expertise in mechanical abilities to all neighbors within
the park.  He would rarely ask for anything in return other than
reimbursement for the parts money.  She stated she had seen Barry

Barry Lee Jones
Page 4

drink sodas, but does not recall him ever being drunk, although he may have had a beer now and then, but she could not really recall. Shirley DeVous described Angela as a "screamer" and has heard Angela and Barry involved in very strongly worded verbal fights, whereupon Angela would be screaming obscenities. She observed Barry get so mad at Angela that he would go outside and slug something, quite often a piece of half-inch or three-quarter-inch plywood and bloody his knuckles. She stated that Barry would never strike anybody. He had, in fact, made statements to her that if he ever got so mad that he wished to strike someone, he would rather go outside and slug something else to relieve his anger than to hurt another person. She stated that on Friday, April 29, 1994, she overheard Barry and Angela in their trailer sometime shortly after 8:00 P.M. having an extremely loud and verbal battle. She stated that Barry did come out of the trailer with Angela screaming at him using numerous obscenities. Shirley observed Barry attempting to ignore her by leaving the area, and in turn, turned up her television to cover the foul language used by Angela towards Barry to keep her children from overhearing this confrontation.

The following day, Saturday, April 30, 1994, Shirley mentioned to Barry that she had indication that Barry was given a hard time by Angela the previous night. Barry apologized for the loud and abusive language which Angela was using, and stated he was sorry that it had reached that point. Shirley then told him that she had turned up her television set so they didn't have to hear. This apparently was the end of the conversation concerning the previous Friday night.

When asked about Sunday, May 1, 1994, if she had observed the kids playing in the area, she stated they were all playing around in front of Barry's trailer and this was not unusual. She stated she had observed Rachel specifically, and that she was riding a bicycle in the late afternoon in the dirt driveway, adjacent to her trailer, and in front of and around the trailer residence occupied by Barry and Angela. She seemed to be happy and in good spirits with no physical difficulties that Sunday afternoon.

Shirley further verified that Barry would hardly or never raise his voice to the children and was probably more tolerant than any other individual in the entire trailer park and never abused the children in any manner. She further stated that Barry frequently stayed up all night and would work on vehicles or various things that he puttered with. She further stated he made signs quite often at his residence and she knew that he apparently had a previous love affair that he was still hurt by the ending. Shirley knew that Barry was not really in love with Angela at all, but was tolerating the presence of Angela to her observations, as he did not wish to kick her out and leave the children of Angela without any place to stay. She further continued that Barry had a brother by the name of Larry (they were twins) and both of them were almost identical

05214

Barry Lee Jones
Page 5

look-alikes. She stated Larry would come to visit fairly often and seemed like a very nice person. She further stated there were several other people who would come to visit, and she considered them really out in left field (weirdo type people), but they never bothered her or her children, and they did not seem to come by unless Barry was present and none of them were actually observed to be out of line, other than very spacey and weird in their general appearance and activities. Shirley stated that Barry did frequently drive the van which was described as an older model, white-over-orange van of unknown make or model. He seemed to always be busy and would work both day and night quite frequently.

Shirley DeVous stated, "can I tell you something without it sounding too opinionated?" I told her she absolutely could, and she then stated "I can't believe that Barry had anything to do with harming that child, Rachel. It had to be Angela who did something or someone else, but I know that Barry would never hurt a child, and I don't believe that it's possible that he, himself, did anything to abuse Rachel", as she had observed him for too many years and he was just "not the type".

Shirley further indicated that she had personally observed Barry and Angela get in a minor dispute when Barry wanted to throw a four-year birthday party a short time previous to this date for Rachel, and Angela seemed adamant that Rachel was too young to remember a birthday party, and she didn't wish to put herself out for any birthday party for Rachel. Barry himself took several of his personal possessions and sold them in order to obtain sufficient money to purchase a birthday cake and some small presents to allow several of the children in the trailer court to come to a small birthday party which was totally sponsored by Barry for Rachel.

Concerning Sunday afternoon, May the 1st, Shirley again reiterated that she had observed Rachel riding the bicycle around 3 to 4 P.M. and indicated she was not wearing a helmet, and Barry normally made her wear the helmet while riding the bicycle. Shirley found this somewhat unusual but did not say anything, as she did not consider it her business, as other children frequently would ride bicycles without a helmet, although Barry would often admonish the children, stating they should wear a helmet when riding about on the gravel roads within the park.

After completing our conversation with Shirley DeVous, we were returning back towards the office when we had a second short conversation with Susan Hopkins who further wished to indicate that she knew Barry had thrown a birthday party for Rachel and that Angela could have cared less, and she wished to express her opinion that Barry was simply not the type to take any physical action towards a child and that she wanted to express her opinion that Angela was a very jealous individual. Susan's belief was that

05215

Barry Lee Jones
Page 6

Angela knew what occurred and in reality, Barry probably had nothing to do with any assault on Rachel. At least, she really couldn't believe this to be the case. She then inquired, as she had heard via the grapevine, that Angela had another son that had died on a previous occasion, but this was strictly gossip from other neighbors and that this son had died through mysterious circumstances. She asked if I knew any information pertaining to this, and I did explain I had no knowledge. She further stated that another man was the real father, she believed of Rachel, and she was not certain of his name but that Angela had moved in with Barry under circumstances that she felt were somewhat forced upon Barry and that he allowed her to do it for the welfare of the children, not for any specific love that he had for Angela.

Susie indicated that on the night of Sunday, May 1, 1994, she did not hear Angela yell, that there was no undue excitement, and there was nothing out of the ordinary that she had noticed. She stated that she was getting ready for work at approximately 06:15 and leaves at 06:30 A.M. and did not see the van nor observe anything out of the ordinary at Barry Jones' residence.

I was then told by Susie Hopkins that if I could locate a person by the name of Patty Bennett, who was good friends with Barry. Patty Bennett was the previous manager of the Desert Vista Apartments prior to the current managers, being Judy and Joe Chavez. I was further informed that Patty lived just east, approximately one block, but she was not certain exactly where.

I then returned to the office area and spoke with Joe Chavez, husband of Judy, who managed the Desert Vista Apartment and Trailer Park. I was informed by Joe that he and his wife had taken over from Patty Bennett in October of '93. He stated that he was aware that a two-year-old boy who was slightly large for his age, had struck Rachel in the stomach with either a stick or an iron bar earlier in the day on Sunday, May the 1st. He informed me that the mother of this two-year-old boy is Stephannie Fleming, a white female approximately 24 years of age. She apparently is married to Mike Fleming. Mike and Stephannie along with their three children, lived in a small camper that was mounted on blocks rather than on a pickup truck located within the trailer park. Joe indicated that when Stephannie Fleming became aware of the arrest of Angela and Barry Jones, she packed her things and moved within two hours without notifying the office that she was, in fact, going to leave. Joe stated that he found out when he walked over into that area of the trailer park and was informed by neighbors that she was scared to death after hearing about the arrests and was further concerned that not only would Child Protective Services become involved concerning her children, but she was apparently in great fear that her son would be responsible for some of the injuries received by Rachel on Sunday, May the 1st. It was indicated that Stephannie Fleming may have somehow intervened between her two-year-old son

05216

Barry Lee Jones
Page 7

and Rachel and may have, herself, created some type of assault on Rachel late the afternoon of Sunday, May the 1st, and was therefore afraid for her own welfare, and did not wish to get mixed up with the police nor answer any questions. Joe Chavez indicated that Mike Fleming had moved to Phoenix approximately one day prior, that being Saturday, April 30th, and Stephannie was planning on staying for another several weeks until Mike Fleming, her husband, could get settled down in Phoenix. Apparently the episode concerning Rachel, changed her mind and she very suddenly left with no forwarding address, and they have no idea where in Phoenix she may be, or in fact, if they would even stop in Phoenix, as she apparently was extremely distraught after the arrests of Barry Jones and Angela. Joe further stated that Stephannie was hiding out and acting very weird when officers came to the apartment complex to speak with tenants. He stated two officers consisting of one male and one female were asking questions when Stephannie began acting weird when she knew they were present and disappeared. The officers did not speak with her, and within two hours after they left the trailer/apartment complex, she had packed all of her personal possessions and left reportedly for Phoenix.

I asked Joe Chavez if he had heard anything about Rachel falling out of the van and he stated yes, that he had heard this from several different sources and that it was unknown exactly which child had pushed Rachel from the van owned by Barry Jones. However, he stated that Rachel had apparently cut her head during the fall from the van. He also indicated that he had observed Rachel with two black eyes approximately one week to two weeks prior to this date and was informed that Rachel had fell, tripped, or something to that nature, and had struck a pipe. When asked about the general activities and conduct of Barry Jones, Joe Chavez indicated that he had never observed Barry drinking more than perhaps a beer, and he did not feel that Barry was into drugs very much, if any, and that he did wish to go on record as stating that Barry Jones was very tolerant of the children and would look after them frequently, and he felt that Barry Jones could be trusted with any of the children, due to his tolerance and the way the children all liked him. Joe stated his personal opinion is that he did not believe that Barry was capable of hurting any child during the periods that he had opportunity to observe Barry with the numerous children located within this trailer park area.

We then drove to 4663 E. Benson Highway and located directly behind the main office in a silver colored tattered and very ancient trailer, Patty Bennett, who currently has a telephone number of 574-2971. She indicated that she did know Barry. After being assured that I was investigating on behalf of the Attorney, Leslie Bowman who was representing Barry, she did concede that she would then speak with me. She indicated that she and Barry were the best of friends and had been for some number of years, as she had known him for approximately four years when she was the manager at the

Barry Lee Jones
Page 8

Desert Vista Trailer Park. She indicated she left in October of 1993, as the owners of this park wanted a husband/wife team rather than a single woman who was not able to produce the general maintenance around the park that the managers were required to cover for their rent, for managing said property. Patty Bennett indicated that Barry and his previous wife, Carol, did not get along very well. She stated in the old days, Barry would tend to get rowdy as heck, and he was definitely the man of the house. She indicated that Barry and Carol were never observed to get in a physical battle, but it all tended to be verbal. Patty indicated to me that Barry would confide as a personal confidante in Patty Bennett moreso than anyone else, other than possibly his own brother, Larry, who she indicated is an almost-identical twin. Patty indicated that Barry was a big help not only around the trailer park to her, but also would help anyone, and was never aggressive for the past two years since he quit drinking, and apparently was much less agitated since he and his ex-wife, Carol, had split up.

Patty Bennett indicated that Angela had lived with a man by the name of Zoly for approximately two years prior to Angela and Zoly breaking up, and Angela had been dated approximately three times by Barry whereupon she moved in and refused to move out of Barry's trailer on the Benson Highway. She apparently, along with her children and Zoly, had lived in a trailer over near Fort Lowell and Dodge prior to her leaving Zoly and moving in with Barry approximately five to six weeks prior to this date.

It was indicated by Patty Bennett that Angela was afraid of Zoly and made contact with a third party to go over and take her children away from Zoly and bring them to Barry in order to live in the trailer with Barry. Apparently, this situation did occur and this is the manner in which Angela moved in on Barry without invitation nor has it appeared to Patty, any type of urging from Barry Jones concerning her movement into his residence.

Patty further indicated that Barry Jones had gone above and beyond in order to put a big birthday party together for Rachel, and she indicated Angela could have cared less. In fact, she was not too excited about whether a party was held for Rachel or not.

Concerning Brandie, Patty Bennett indicated that Barry and Brandie were extremely close and that she had never observed Brandie overly disciplined, struck, nor in any way assaulted by Barry, as that was just not his way in dealing with children. She stated that Brandie was very obedient to Barry, however, in a way Brandie was a little bit of a brat and probably could have used more discipline than Barry tended to provide, and she further explained Brandie would tend to be a big liar and somewhat of a bully on occasions.

Patty Bennett indicated that Zoly and Barry were not really the

**Barry Lee Jones**
**Page 9**

best of friends and Zoly was jealous of Barry, especially concerning Barry's enlarging influence on Rachel, as Zoly was particularly fond of Rachel, and Barry did not feel Zoly to be a good influence on Rachel. Barry would tend to protect Rachel from both Zoly and Angela, which further infuriated Zoly and occasionally Angela as well.

Patty further stated that Angela was extremely jealous of Barry in that Barry tolerated Angela primarily to support and help the kids in his residence, however, was not in love with her which caused the jealousy Angela felt towards several other people that Barry would see during the past six weeks of their short, close relationship. Apparently, one girlfriend by the name of Laura, age 24, and Barry were somewhat in love. Laura is supposedly on the run and Patty would not reveal her true last name nor anything further concerning Laura, as she did not feel this was necessarily pertinent to the case. She did admit that she was aware that Barry did on occasion use amphetamines but stated he never used any needles nor any Cocaine nor any drugs like that. It was usually amphetamines and he did smoke cheap cigarettes, as his budget was extremely strapped in taking care of Angela and all the children which he seemed to inherit. Patty confirmed that Barry loved his original wife, Carol, very much but they did not get along very well when they were around each other for any period of time, and therefore, their separation was probably for the best.

In attempting to pursue further the relationship between Angela and Zoly, I was given to understand that Zoly used to live at the Desert Vista several years prior to this date. At that time, Patty stated he had a good personality, was a hard worker, and that Angela was pursuing him at that time. She stated that Angela would call looking for Zoly, however, Zoly would not wish to speak to Angela. The first year, things went along okay and the second year Angela was with Zoly, there were problems, as she felt Angela was so jealous of Zoly that he just couldn't tolerate her anymore, and things began to deteriorate. After Angela and Zoly broke up, Zoly was very upset primarily because he had come to really like Rachel and Angela knew both Zoly and Barry really liked Rachel and would tend to play both ends against the middle to her advantage whenever possible.

Patty indicated that Rachel, for the most part, was a very sweet little girl, however, did tend to be more aggressive and mean towards other children of her same age or smaller. Towards older children, she usually played very well and seemed to get along well, but not with those of her age or younger.

In discussing with Patty Bennett the activities concerning Barry's interaction with the children in the trailer park, Patty indicated he was extremely tolerant and he was only strict about very few things, which included bed time and any type of fighting between

Barry Lee Jones
Page 10

the children.  His punishments were always restriction by making them sit down, or in bigger cases, restricting them to their yard for a period of time.  She stated she had never in all her years, seen or heard him to strike a child nor do anything much more than a scolding for abnormal behavior concerning the children at the trailer park.  Patty was questioned concerning another subject by the name of Ron Saint Charles.  Patty responded that Ron Saint Charles was an acquaintance of Barry's that Barry was not particularly fond of, however, he did see him quite often, as the two of them would occasionally do business deals together.  She stated Ron Saint Charles is married to a girl by the name of Rosemary, and that Rosemary had a daughter from another man.  This girl's name is Ruthie, or Ruth, and is approximately 12 years of age.  Ron Saint Charles pulled all of the children from the school in which they were attending and they do supposedly attend school at home under the tutorage of Ron and Rosemary.  Patty Bennett felt that Ron Saint Charles, in all probability, has an affair going with Ruthie and rumors were rampant concerning Ron Saint Charles molesting the 12 year-old Ruthie and marrying Rosemary only to maintain his relationship with Ruthie.

Patty Bennett stated it was no secret that she had no respect for Ron Saint Charles, as she knew he had stole a purse with $425.00 on one occasion, that he deals with amphetamines, and is nothing more than a low class weasel, and she wouldn't trust him with anything.  She knew that Barry was aware of the shortcomings concerning Ron Saint Charles, however, the two of them did apparently conduct some business dealings which required Ron Saint Charles' presence in the daily activities of Barry Jones.

Patty Bennett indicated that Rosemary, the wife of Ron Saint Charles, and Ruthie, her daughter, were totally scared to death of Ron Saint Charles, and would in all probability, not admit to any type of molestation nor anything out of the norm, as they were in fear of their lives if they said anything out of line.  Therefore, any questioning pertaining to this would in all reality receive negative responses if I were able to contact Ron Saint Charles, Rosemary, or Ruthie.

It was indicated further, that Ron Saint Charles and his family lived in a converted old school bus and that Ron Saint Charles drives a converted old pickup truck which now has a homemade wood flat bed on it rather than a normal steel construction style pickup bed.  He is described as approximately 5'8" to 5'10", dark hair, approximately 160 pounds, slightly stocky.  It is known that he does not work and primarily hangs out around desert areas with his school bus and family when not dealing in amphetamine drugs.

Patty indicated that Ron Saint Charles picks up his mail once or twice a week at some location at the Town and Country Apartments, as he has a friend there who receives his mail.  Other than that,

05220

Barry Lee Jones
Page 11

she is uncertain as to his present location and has been told via the grapevine, that since the arrest of Barry Jones, that he has relocated but is known to be somewhere in the area at a new location, as she has personally observed him driving his pickup down the Benson Highway in the last two days. She stated Ron apparently has several different types of checks coming in, as he may be disabled and probably pulls ASI as well as ADC checks from the Department of Economic Security.

On this date while interviewing Patty Bennett, she indicated that slightly before or around 06:00 A.M. on Monday, May 2, 1994, that Barry along with his daughter, Brandie, had arrived at her trailer with a third female, Alice Knight. She stated that Alice is approximately fortyish and that Angela and Rachel had already been taken to the hospital and Barry was repeatedly stating that Rachel was very sick and he could not imagine how anyone would want to hurt a child like Rachel. It was apparently decided that Barry, along with Brandie and this woman known as Alice Knight, would attempt to find Ron Saint Charles, as Barry was very leery of staying at Kino Hospital with Angela, as he had no valid driver's license and the van he was driving was apparently not properly licensed either. He felt that Angela needed someone to be with her. They therefore decided to go to Ron Saint Charles' school bus out in the desert and have Ron Saint Charles drive Barry back to the hospital so that he would at least have a legal vehicle and source of transportation while at the hospital. They therefore left Patty's trailer and she saw them no more until she observed the van normally driven by Barry Jones, driving westbound on Benson Highway approximately 15 to 20 minutes later, and two police cars which had pulled into the trailer park area quickly gave pursuit of this van. She was not aware who was driving, but did assume that it was, in fact, Barry who had driven by early Monday morning. Patty then indicated all she knew from thereon is what she heard on the news along with rumors from various acquaintances to Barry Jones. We discontinued further conversation with Patty Bennett after giving her a business card and an indication that we would like to speak with her again perhaps in the future and/or if she heard anything that would be of value to please contact us.

On Tuesday, May 17, 1994, I received a telephone call from Patty Bennett who indicated that I should respond to her address on the Benson Highway and be present at exactly 4:00 P.M., as a telephone call would be coming from someone I really needed to speak with. She stated the woman who would call is Rose, and Rose was there and knew somewhat of what had occurred the morning of Monday, May 2, 1994. We did leave at 3:30 P.M., and were present at 4:00 P.M. with Patty Bennett when we received a long distance telephone call from Patty Bennett's daughter, Rose. A conversation extended for one-and-a-half hours concerning what had occurred early in the morning of Monday, May 2, 1994. Rose confided through much prompting and interviewing, that she and Barry had a relationship

05221

Barry Lee Jones
Page 12

She stated that Barry did love Rose, and Angela was aware of this continued said relationship for quite some period of time, and extremely jealous of Rose. She stated that Barry had been to a birthday party for Rose's daughter, Elishia, Sunday evening and that Angela was very angry that Barry was not present with her earlier in the day. It appears that when Barry returned Sunday evening, some words of anger were expressed by Angela towards Barry and Barry then left his residence along with Rose and his daughter, Brandie at approximately 7:00 to 8:00 P.M. that evening. Rose informed me that she and Brandie went to sleep while Barry was preparing to go out that night with another subject by the name of Hal to obtain things that they would work on in attempts to obtain money by the repair of these objects. It was then indicated that due to some mechanical problems on the van and the fact that Barry was attempting to build a heavy duty steel hoist onto the back of his van, that Barry and Hal worked well into the night and she, Rose, along with Brandie, went to sleep nearby where they were working on the Benson Highway. Rose stated that Angela was angry when they left their trailer earlier and that she had seen Rachel who was laying with her head on a pillow between 7:00 and 8:00 P.M. and was bleeding from a head wound. This appeared to be somewhat minor and they removed a barrette from her hair which was pulling the wound open and everything seemed to be in order at that time as far as Rachel was concerned prior to them leaving Sunday, May the 1st.

As the story then unfolds, Barry completed his work early about daybreak, perhaps 05:00 to 05:30 A.M. and woke Rose and Brandie, as Brandie should start getting ready for school. Barry then left in the van to make sure the kids were up at his residence where Angela was in charge of the kids prior to his return approximately 40 minutes later in a highly agitated condition, whereupon he informed Rose that he had gone to the house and was unable to awaken Rachel. Rachel appeared to be very sick and appeared to be in a coma. He then stated he had taken Angela and Rachel in his van to Kino Hospital whereupon he dropped them off and was returning in order to obtain transportation from another source, as he was in fear that the police would arrest him for not having a proper driver's license nor registration concerning his van. He asked Rose and Brandie to quickly get ready, as he was going out to Ron Saint Charles in order to obtain that transportation back to the hospital. The three of them then left in the van to go out in the desert area south of Interstate 10 and west of Wilmot into the desert area where Ron Saint Charles and his wife and family lived in an old school bus. Apparently upon reaching Ron Saint Charles' residence in the school bus, Barry Jones was in a very distraught condition and was so totally upset at the situation which was transpiring, that some other individual known only as C.J., offered him a Darvon to calm him down. Rose stated he took both a Darvon and a Flexeril tablet prior to Ron Saint Charles following Barry, Rose, and Brandie in the van out to an area near the Pima Air

05222

Barry Lee Jones
Page 13

Museum, whereupon Rose took the controls of the van, and at the
suggestion of Ron Saint Charles, Barry was persuaded not to go to
the hospital but instead, allow Rose to go to Kino Hospital in
order to accompany and assist Angela while Rachel was in the
emergency room at that location.   Apparently, this decision was
finally adhered to by Barry, and instead of going to the hospital,
returned with Ron Saint Charles to his bus out at the desert
location, as he could be of no value at Kino, and Angela would be
better able to handle the situation as Barry was extremely
distraught and in no condition to be present at a waiting room in
the hospital.   This then allowed Rose to be driving Barry's van
west on the Benson Highway towards Kino Hospital while Ron,
Brandie, and Barry returned to Ron's school bus residence in the
desert area as afore-mentioned.   Rose stated she was then stopped
by the police which she had observed near Valencia and the Benson
Highway when they boxed her in near Country Club and the Benson
Highway and pulled her to the side of the road.   She was told she
was being stopped as she was suspected of being a drunk driver and
an informant had told the police that in fact she was drunk.   Rose
explained that not only was she not drunk, she had not been
drinking nor did she ever drink.   She was then told to come to the
rear of the police cars, whereupon the officers drew their weapons
and approached the van.   She told the officers there was no further
people in the van and she was alone.   They did, in fact, search the
van and found no other people, however, did find a towel with blood
on it and apparently some conversation was held between the
officers whereupon this towel was of great significance to them,
although Rose was not even aware that it was in the van while she
was operating it en route to Kino Hospital.   Rose was then placed
in handcuffs and questioned extensively for several hours at this
location.   Rose did indicate to the officers that her name was
Alice Knight.   She had no identification with her, and after a long
period of interrogation, the police officers transported her to the
Pima County Sheriff's substation on the Benson Highway where a
detective known only as Mike, took a tape recorded statement from
her under the alias of Alice Knight.   Rose stated she did give a
truthful statement under the guise of Alice Knight concerning her
knowledge of what occurred with Rachel and the incidence which
transpired after Barry became aware upon his early morning return
to his residence that Rachel was extremely ill and possibly in a
coma.   Alice Knight as an alias (real name, Rose) apparently felt
in all truthfulness, that Barry felt the head injury which had
occurred to Rachel the day previous, was the total cause of
Rachel's sickness and/or coma which she was in upon his arrival at
the residence on Benson Highway prior to taking Rachel and Angela
to Kino Hospital.

After Rose completed the statement under the guise of Alice Knight,
she was then returned to the trailer park where she returned to her
mother and her daughter, Elisia, and explained the occurrences
which had happened after her stop and arrest on the Benson Highway

05223

Barry Lee Jones
Page 14

while driving Barry's van.  She had apparently given a sufficient amount of information concerning Barry's whereabouts, that the police did, in fact respond to Ron Saint Charles' school bus and completed the arrest of Barry Jones at that location.  It was shortly after this that Rose decided it was time for her to leave town, as she felt that she, herself, was in danger of arrest due to warrants that may or may not be outstanding for her arrest, due to a charge some years prior concerning her alleged friendship and participation in dope deals.  She then stated that she would be on the run and would not stay in any one place so that she could not be found, however, wanted the truth known that Barry had in no way harmed Rachel, but in reality, had told Rose that he, Barry, was suspicious and had a funny feeling about Angela taking advantage of Rachel in trying to further her relationship with Barry, which made Barry very angry that Angela would use the child, Rachel, in attempts to gain a relationship which Barry did not feel between he and Angela, and felt it very unjust that Rachel was being used as a medium to gain further attention from Barry.  Rose repeatedly stated that Barry was emotionally distraught at the circumstances, and repeatedly stated, "why would anyone want to hurt a child that way?".  That was all he would state, although he was in an extreme state of emotion during the period of time Rose was in his company the morning of Monday, May 2, 1994.

After listening to the unraveling of the afore-mentioned story concerning the activities of the morning of May 2, 1994, I then informed Rose that there may have been some indication that Rachel had at one time, been sexually molested.  I asked her if she had any knowledge of this.  After a long sigh and a pause, Rose informed me that she was aware that Angela had an affair with a bi-sexual female known as Sunny, and that the two, Angela and Sunny, called each other 'sisters'.  Zoly was knowledgeable about this, and Rose stated that the female lesbian, or bi-sexual, known as Sunny, was prone to and very attracted to young girls.  It was very possible that Sunny, due to her closeness with Angela, had possibly some type of sexual contact with Rachel, and if so, this would not surprise Rose in the least.  She stated Sunny did eventually marry another bi-sexual individual known as Wade.  Rose was not aware of the current residence of Sunny and Wade, however, did feel that Zoly would possibly know where they were as well as Angela, as it appeared they did occasionally still consort with each other.

Rose then stated she would make either contact with this investigator at a telephone number and/or information as to when she would call would be given through a third party and she would attempt to make contact once more in approximately one to two weeks concerning the status of this case.  Rose was very adamant that Barry neither knew of any mistreatment, nor would he himself harm Rachel in any manner.  She stated that the one who really knows what was going on, would be Angela, as she (Angela) had really only lived with Barry for approximately one month prior to this date,

05224

Barry Lee Jones
Page 15

and she was aware that Barry was actively attempting to get her to move, however, refused to throw her children out of the house without some proper care and guidance, and therefore condoned the continued presence of Angela at his residence in order to protect the kids from Angela and the environment from which she had come.

Several attempts were made to find Zoly, and no last name was ever encountered concerning Angela's ex-boyfriend/husband. We were able to ascertain that he did reside and/or is possibly still residing in a trailer park near the intersection of Dodge and Fort Lowell, although we have to date, been unsuccessful in speaking with Zoly.

A debriefing with Leslie Bowman on May 18, 1994, was completed whereby it was indicated to this investigator that the amount set aside for time, mileage, and expenses concerning this investigation were such that further pursuit of this matter has now become financially infeasible, as time and acquired expenses have far exceeded the amount designated to hire an investigator. Indication to this effect with Leslie Bowman was understood, and therefore we will terminate any further investigation concerning this matter and refer it to the attorney of record for Barry Jones, Ms. Leslie Bowman.

- END OF REPORT -

ARIZONA MOVING VIOLATION RECORD FOR PAST 39 MONTHS  AS OF 05/09/94   REG0318
                                                  RECORD SECTION  01 OF 02
NAME                          CLS   DOB   LICENSE  EXP DATE   ISS DATE
BARRY,LEE,JONES                D   082658 B10433128  082694   112792
STREET                        CITY                 ST ZIP      WGT EY HGT HR SEX
4501 E BENSON HWY #23         TUCSON               AZ 85706    145 BR 506 BR. M
MAILING ADDRESS               CITY                 ST ZIP
RESTRICTIONS:  NONE
ENDORSEMENTS:  NONE                      * NOT AN ORGAN DONOR *
             NO ADDITIONAL LICENSES AND/OR PERMITS ON RECORD
ST   EXPIRES  PREVIOUS LICENSE        ST   EXPIRES   PREVIOUS LICENSE
AZ   082694   B10433128               AZ   082689    T265684
AZ   082687   T220370
-----> STAT CODE   SUSPENSION - COURT ACTION REQUIRED
-----> STAT CODE   REINSTATEMENT FEE DUE
-----> STAT CODE   MUTILATED OR ALTERED LICENSE


   MVR FOR PAST 39 MONTHS  OF BARRY,LEE,JONES
                                          RECORD SECTION  02 OF 02
ACTDTE VIOL CODE        D E S C R I P T I O N
010684 DI ACTION    REVOCATION
                    F18832              AMENDED                      013086
                    NOTIFICATION STATUS: NOT APPLICABLE
103092 28-1251      MANDATORY INSURANCE CONVICTION
                    FTA - CIVIL VIOLATION
                    LOC: PIMA      FINE: 00000 CRT: 1041
                    PLT#: FSL135      AZ  FORD
103092 28-326C      VIOLATION OF REGISTRATION LAWS
                    FTA - CIVIL VIOLATION
                    LOC: PIMA      FINE: 00000 CRT: 1041
                    PLT#: FSL135      AZ  FORD
011993 CS ACTION    LICENSE SUSPENDED - 00C5194535
                    NOTIFICATION STATUS: ACKNOWLEDGED             020693
011993 CS ACTION    LICENSE SUSPENDED - 00A5194535
                    NOTIFICATION STATUS: ACKNOWLEDGED             020693
011993 CS ACTION    LICENSE SUSPENDED - 00B5194535
                    NOTIFICATION STATUS: ACKNOWLEDGED             020693
  * * * * * * * * * * * * * * END OF RECORD * * * * * * * * * * * * * * *

05226

Exhibit 2

## BARNETT INVESTIGATIONS, INC.
### GEORGE E. BARNETT, P.I.

P.O. Box 30644
Tucson, AZ 85751-0644

(602) 722-6439

### FACSIMILE COVER SHEET

TO: *Braver & Bowman*

ADDRESS:_____

TELEPHONE #:_____

FAX #:_____

FROM:_____

ADDRESS:_____

PHONE#:_____

FAX#:_____

TOTAL PAGES TRANSMITTED __4__ (includes cover sheet)

REMARKS: *Will Send Bill Later.*

*Maybe - Poss. Just Pro-Bono*

*No Good Deed Goes UN punished*

sent By _____   Date ___4-4-95___   TIME_____

05207

## BAR**NETT** INVESTIGATIONS, INC.
### GEORGE E. BARNETT, P.I.

P.O. Box 30644
Tucson, AZ 85751-0644

(602) 722-6439

March 31, 1995

Leslie A. Bowman, Attorney At Law
78 W. Cushing Street
Tucson AZ  85701

RE:  Barry Lee Jones

### INVESTIGATIVE REPORT & SUMMARY

On Thursday, 03/30/95, we responded to the Pima County Sheriff's
Office impound yard located on East Ajo.  We were requested to
measure and record said measurements regarding a 1972 Ford van,
white over yellow in color.  We observed no license plates on this
vehicle.  The V.I.N. Number is recorded as E38GHM71270.

Approximately 30 photographs were obtained along with the following
measurements.  Concerning the right side passenger seat, we find
the seat cushion is 15 inches above floor level, and there is a
distance of an additional 15 inches to the top of the right side
door sill.  A total of 30 inches from the floor to the top of the
right front door sill is recorded.  We observe there are three cut-
outs of the fabric in the passenger seat.  All cut-outs are
approximately three-and-one-half inches in width.  The lowest patch
was obtained from a distance of 10 inches above the seat cushion
continuing to 13 and one-half inches above the seat cushion.  The
mid patch was removed from a location 11 inches above the seat to
14 and one-half inches above the seat.  The highest patch was
obtained from the passenger seat at a distance of 17 inches above
the seat cushion continuing to 20 inches above the seat cushion.
Each patch as previously stated, is approximately three-and-one-
half inches wide.  Photos were taken concerning where the patches
were removed on the seat.

We observe and measure the driver's side window to begin from
ground level, a distance of 56 inches to the bottom of the window
sill.  The front windshield begins at 55 inches above ground level
to the top of the dash board located within the vehicle.  The
engine cowl is found to be 21 and-a-half inches in height above the
floor of the van.  We observe measurements concerning the seats in
the driver's seat and passenger's seat are 42 inches apart

RE:  BARRY LEE JONES
PAGE 2

is four-and-one half inches of padding raised non-seating area on
each front seat of this van.  A measurement from seat to seat of 27
inches is obtained concerning the separation between the driver and
passenger seats.

After obtaining above measurements and photographs, we discontinued
further investigation at the Pima County Sheriff's Impound Lot.

- END OF REPORT -


Sincerely,


George E. Barnett, P.I.
BarNETT INVESTIGATIONS, INC.

GEB:tam

05209