# Exhibit 39

STATEMENT OF SERVICES RENDERED BY COURT APPOINTED ATTORNEYS
Indigent Defense Services

Mail to:  Indigent Defense Services
          32 N. Stone Avenue,  Suite 1902          OR    Fax to: 520-882-8444
          Tucson, Arizona  85701

This form must be used to request expert witness fees, travel expenses for
attorneys, investigators and witnesses, and any other out of the ordinary
expenses paid by the Pima County Office of Indigent Defense Services.

PAYEE     JAMES W. HAZEL               DATE:  March 28, 2000
BUSINESS  P.O. Box 3052                              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
ADDRESS:  Payson, AZ          Zip 85541             Vender I.D. No.
Attorney Phone:   520-472-2284      Attorney Fax: 520-476-5103

Name of Defendant: BARRY LEE JONES            Case No.  CR 45587

Charges: 1st Degree Murder -Death Penalty-PCR     Judge: Quigley

Pima County cannot consider any claim unless submitted with six months after
the account accrues, Arizona Revised Statutes, §11-622.

| DATE OF APPOINTMENT | ATTACH MINUTE ENTRY AND STATEMENT OF SERVICES | DOLLAR AMOUNT |
|---|---|---|
| 9/22/99 | | |
| | TOTAL HOURS    98.7 | |
| HOURS TO DATE ON THIS CASE | LESS CONTRACT OBLIGATION ( N.A.        ) | |
| | BILLABLE HOURS 98.7 X Rate $ 100.00 =$ 9,870.00 | |
| 98.7 | | |
| | EXPENSES          $ | |
| | (if applicable attach original invoices. original receipts, and or copies of canceled checks | |
| | TOTAL AMOUNT DUE  $ 9,870.00 | |

therein have been incurred; that the same has not been paid and no claim
against the Pima County has before been made therefore.

Approved by:  Court/
Contract Administrator_____

ASSIGNMENT: For value received,
I hereby assign this claim to:

_____
Type of Print Name

Mail to:
Indigent Defense Services
32 N. Stone Avenue,  Suite 1902
Tucson, Arizona  85701

Tax I.D. No. 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

_Jones W Hazel_ 3-28-2000
Payee Signature      Date

| DATE | ACTION | HOURS |
|------|--------|-------|
| 9/13/99 | T/C TO DONNA HALLAM RE APPT. | .4 |
| 9/15/99 | LTR TO Harriet Levitt RE FILE | .3 |
| 9/15/99 | LTR TO Shawn Bruner RE FILE | .3 |
| 9/17/99 | T/c TO Harriet Levitt RE FILE | .3 |
| 9/22/99 | T/c TO SHAWN BRUNER RE FILE | .3 |
| 9/24/99 | Review Sup Crt orders re file | .3 |
| 9/29/99 | LTR TO Client RE FILE | .3 |
| 9/27/99 | T/C INDIGENT SERVICES | .4 |
| 9/30/99 | T/C to DOC re Laird visit | .4 |
| 10/15/99 | LTR TO Harriet Levitt RE FILE | .3 |
| 10/15/99 | T/c to client | .9 |
| 10/15/99 | FILE MTN on APPOINT MIT. EXPERT | .8 |
| 10/15/99 | T/C INDIGENT SERVICES | .3 |
| 10/15/99 | FILE MTN on APPOINT INVESTIGATOR | .8 |
| 10/27/99 | Pick up 2 boxes of file from Levitt | .3 |
| 10/27/99 | LTR TO Harriet Levitt RE FILE | .3 |
| 10/28/99 | Pick up 2 boxes of file from Levitt | .3 |
| 10/29/99 | Review first portion Clerk's file | 1.3 |
| 10/29/99 | Review reorganize box of case file That was damaged in shipping | 1.2 |
| 11/1/99 | REVIEW 7/6/95 TRIAL PROCEEDINGS | 1.1 |
| 11/1/99 | REVIEW 7/6/95 TRIAL PROCEEDINGS | 3.5 |
| 11/1/99 | Review Jury Questionaires | 1.1 |
| 11/5/99 | Review Special Action filed S. Bruner | 0.9 |
| 11/5/99 | Review B. Jones Video Deposition | 1.6 |
| 11/5/99 | Review Crt of App orders re Spec. Act. | .2 |
| 11/5/99 | Review State's response to Special Act. | .3 |
| 11/5/99 | Review Autopsy | 0.5 |
| 11/5/99 | Review second portion Clerk's file | 1.5 |
| 11/6/99 | Review Reply to Mtn to Remand | .2 |
| 11/6/99 | Review police statement of Amanda Gray | .3 |
| 11/6/99 | Review Jury Voir Dire Questions | .3 |
| 11/6/99 | Review Motion to Suppress Identification | .3 |
| 11/6/99 | Review State's Mtn to Admit Bad Acts | .4 |
| 11/8/99 | Review State's Motion to Admit Bad Acts | .3 |
| 11/8/99 | Review State's Mtn to Admit Victim Statements | .3 |
| 11/8/99 | Review Def. Mtn to preclude vicitm statements | .3 |
| 11/8/99 | Review State's Motion to Admit Def. Statements | .2 |
| 11/8/99 | Review Def Mtn to Preclude Def. Statements | .2 |
| 11/10/99 | Review State's Dis. Of 9/14/94 of Def. Letters | 1.4 |
| 11/10/99 | Review Grand Jury Transcipt | .9 |
| 11/11/99 | Review CPS records | 1.3 |
| 11/11/99 | REVIEW 5/23/94 TRIAL PROCEEDINGS | .1 |
| 11/11/99 | REVIEW 7/14/94 TRIAL PROCEEDINGS | .1 |
| 11/11/99 | REVIEW 7/27/94 TRIAL PROCEEDINGS | .1 |
| 11/11/99 | REVIEW 9/21/94 TRIAL PROCEEDINGS | .2 |
| 11/11/99 | REVIEW 9/26/94 TRIAL PROCEEDINGS | .1 |
| 11/11/99 | REVIEW 11/10/94 TRIAL PROCEEDINGS | .1 |
| 11/11/99 | REVIEW 11/21/94 TRIAL PROCEEDINGS | .2 |

Page Total    27.5

GG735

| DATE | ACTION | HOURS |
|---|---|---|
| 11/18/99 | LTR TO Client RE FILE | .3 |
| 11/19/99 | REVIEW 12/5/94 TRIAL PROCEEDINGS | 1.4 |
| 11/19/99 | REVIEW 1/9/95 TRIAL PROCEEDINGS | .5 |
| 11/26/99 | REVIEW 2/6/95 TRIAL PROCEEDINGS | .1 |
| 11/26/99 | REVIEW 2/24/95 TRIAL PROCEEDINGS | .1 |
| 11/26/99 | REVIEW 3/14/95 TRIAL PROCEEDINGS | .7 |
| 11/26/99 | REVIEW 3/21/95 TRIAL PROCEEDINGS | .1 |
| 11/26/99 | REVIEW 4/14/95 TRIAL PROCEEDINGS | .1 |
| 11/26/99 | REVIEW 5/15/95 TRIAL PROCEEDINGS | .1 |
| 11/26/99 | REVIEW 4/13/95 TRIAL PROCEEDINGS | 2.6 |
| 11/29/99 | REVIEW 4/12/95 TRIAL PROCEEDINGS | 3.1 |
| 12/3/99 | REVIEW 4/11/95 TRIAL PROCEEDINGS | 3.6 |
| 12/5/99 | REVIEW 4/7/95 TRIAL PROCEEDINGS | 2.9 |
| 12/5/99 | REVIEW 4/6/95 TRIAL PROCEEDINGS | 3.0 |
| 12/10/99 | REVIEW 6/22/94 TRIAL PROCEEDINGS | .3 |
| 12/10/99 | REVIEW 3/24/95 TRIAL PROCEEDINGS | 2.1 |
| 12/13/00 | Ltr to client re visit | .3 |
| 12/17/99 | REVIEW 4/5/95 TRIAL PROCEEDINGS | 3.6 |
| 12/27/99 | REVIEW 4/4/95 TRIAL PROCEEDINGS | 2.6 |
| 12/27/99 | REVIEW 3/13/95 TRIAL PROCEEDINGS | 2.1 |
| 12/30/99 | REVIEW 3/28/95 TRIAL PROCEEDINGS | 1.3 |
| 12/30/99 | REVIEW 3/24/95 Depo of S. Fleming | .8 |
| 12/30/99 | To DOC visit client | 1.5 |
| 12/30/99 | Review Superior Minute Entries | .4 |
| 12/31/99 | Prepare Motion for Extend Time | .7 |
| 12/31/99 | Prepare Motion for Reconsideration | 1.4 |
| 1/5/00 | Research R32 Petition | 1.1 |
| 1/7/00 | Ltr to Angela Gray | .3 |
| 1/8/00 | Review Joyce Richmond police interview | .8 |
| 1/8/00 | Review Joyce Richmond defense interview | .6 |
| 1/8/00 | Review Shane Richmond police interview | .3 |
| 1/8/00 | Review Dr. Siefert interview and report | .7 |
| 1/8/00 | Review Mike Fleming interview and report | .4 |
| 1/8/00 | Review Stef Fleming interview and report | .7 |
| 1/14/00 | Review Kim Hillman interview and report | .3 |
| 1/14/00 | Review Norma Lopez interview and report | .3 |
| 1/14/00 | Review Angela Gray police interview | 1.1 |
| 1/14/00 | Review Of. Belin interview and report | .4 |
| 1/14/00 | Review Of. Law interview and report | .8 |
| 1/15/00 | Prepare Subpeona re jail records | .3 |
| 1/15/00 | Review R. Lax interviews and report | .7 |
| 1/20/00 | Research R32 Petition | 1.3 |
| 1/22/00 | Review Carol Jones interview and report | .7 |
| 1/22/00 | Review E. Knight interview and report | .3 |
| 1/29/00 | Review R. St. Charles interview and report | .5 |
| 1/29/00 | Review Off. Ying interview and report | .4 |
| 1/31/00 | Ltr to Jail re records | .3 |
| 1/31/00 | Review Rose St. Charles interview and report | .4 |
| 1/31/00 | Research R32 Petition | 1.1 |
| 2/1/00 | Ltr to Angela Gray | .4 |

Page Total    55.6

| DATE | ACTION | HOURS |
|------|--------|-------|
| 2/4/00 | Review Off. Downing interview and report | .3 |
| 2/4/00 | Review Off. Rankin interview and report | .9 |
| 2/4/00 | Review Off. Petrilak interview and report | .5 |
| 2/5/00 | Review Vison Quest Records | .5 |
| 2/11/00 | Research R32 Petition | 1.4 |
| 2/21/00 | Ltr to client re visit of 3/9/00 | .3 |
| 2/21/00 | Research R32 Petition | 1.1 |
| 2/21/00 | T/C to Doc re visit of 3/9/00 | .3 |
| 3/9/00 | Visit with client at DOC | 1.5 |
| 3/10/00 | Ltr to Client re petition | .3 |
| 3/10/00 | Ltr to Angela Gray | .3 |
| 3/11/00 | Prepare R32 Petition | 1.3 |
| 3/13/00 | T/C to DOC re Angela Gray | .4 |
| 3/13/00 | Prepare MTN for Deposition Angela Gray | .8 |
| 3/16/00 | Prepare R32 Petition | 1.9 |
| 3/21/00 | T/C to DOC re Angela Gray | .3 |
| 3/24/00 | T/C to DOC re Angela Gray | .3 |
| 3/25/00 | Prepare Final version of R32 Petition | 1.6 |
| 3/28/00 | Interview Angela Gray at DOC | 1.3 |
| 3/28/00 | File R32 petition and supporting documents | .3 |

Page Total    15.6

Total Hours this Statement 98.7

SUPREME COURT OF ARIZONA

FILED

SEP 2 2 1996

NOEL K. DESSAINT
CLERK SUPREME COURT
BY_____

| | |
|---|---|
| STATE OF ARIZONA, | Supreme Court |
| Appellee, | No. CR-95-0342-AP |
| vs. | Pima County |
| | No. CR-45587 |
| BARRY LEE JONES, | O R D E R |
| Appellant. | |

Upon the Court's own motion,

IT IS ORDERED that James Hazel, Jr. is appointed to represent Barry Lee Jones in post-conviction proceedings pursuant to A.R.S. § 13-4041 and Rule 6.8(c), Ariz. R. Crim. P.   The requirement of prior experience as lead counsel in the appeal of at least three felony convictions is waived.  The Court finds that Mr. Hazel has the following compensating experience: lead counsel in 30 completed felony trials, lead counsel in a completed capital trial, and certification as a Criminal Law Specialist.

IT IS FURTHER ORDERED that counsel shall be compensated at the rate of $100.00 per hour plus reasonable costs incurred in the representation.  If counsel's work hours are over two hundred hours, the superior court shall review and approve additional reasonable fees and costs pursuant to A.R.S. § 13-4041(H).  Counsel shall direct requests for the appointment of investigators and

. . . .

experts to the superior court pursuant to A.R.S. § 13-4013(B) and

§ 13-4041(J).

DATED this 22nd day of September, 1999.

THOMAS A. ZLAKET
Chief Justice

Karyn

740-5393

00733

TO:
Hon. Janet Napolitano, Attorney General
   Attn:  Paul J. McMurdie, Esq., and Jim D. Nielsen, Esq.
James Hazel, Jr., Esq.
Barry Lee Jones, DOC #114690, Arizona State Prison-Florence
Hon. Gordon T. Alley, Presiding Judge, Pima County
   Superior Court
Hon. John S. Leonardo, Presiding Criminal Judge, Pima   520-740
   County Superior Court                                 8169
Patricia Noland, Clerk, Pima County Superior Court
Phil Maloney, Indigent Defense Services, 32 N. Stone Ave., Suite
   1902, Tucson, AZ 85701
Mike Baumstark, AOC, Supreme Court
Hon. Michael D. Ryan, Court of Appeals [Info Copy]
Jennifer Might, Administrator, Arizona Capital Representation
   Project  [Information Copy Only]
Paula C. Nailon, Project Manager, Arizona Capital Litigation Law
   Clerk Project  [Information Copy Only]

2

# JAMES W. HAZEL Jr.
## ATTORNEY AT LAW
### STATE BAR CERTIFIED CRIMINAL LAW SPECIALIST

FILED
PIMA SUPERIOR COURT

'00 DEC 27 PM 3 03

12-27-00

BY: M. ORTIZ. DEPUTY

P.O. BOX 3052
PAYSON, AZ 85547-3052

PHONE 520-472-2284
FAX     520 476-5103

December 1, 2000

The Honorable John M Quigley
Judge of the Superior Court
Pima County Courthouse
110 W. Congress
Tucson, AZ   85701

RE:   RE:  State v. Barry Lee Jones   No. CR  45587

Dear Judge Quigley:

As you are aware, the Arizona Supreme Court appointed me to represent Mr. Jones in the above captioned matter.

Please find a billing statement for work done through the granting of the Motion to Withdraw.  Therefore, based upon the work completed, I hereby request payment from the Pima County for Public Defender services rendered.  The amount due to date in case of the Barry Lee Jones  No. CR 45587 is $ 1,620.00

Thank you for your attention to this matter.

Sincerely,

James W. Hazel Jr.



STATEMENT OF SERVICES RENDERED BY COURT APPOINTED ATTORNEYS
Indigent Defense Services

Mail to:  Indigent Defense Services
          32 N. Stone Avenue,  Suite 1902
          Tucson, Arizona  85701      OR Fax to: 520-882-8444

This form must be used to request expert witness fees, travel expenses for
attorneys, investigators and witnesses, and any other out of the ordinary
expenses paid by the Pima County Office of Indigent Defense Services.

PAYEE      JAMES W. HAZEL_____DATE:  December 1, 2000
BUSINESS   P.O. Box 3052_____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
ADDRESS:   Payson, AZ_____Zip 85541_____Vender I.D. No.
Attorney Phone:  520-472-2284_____Attorney Fax: 520-476-5103_____

Name of Defendant: BARRY LEE JONES              Case No.  CR 45587

Charges: 1ˢᵗ Degree Murder -Death Penalty-PCR____Judge: Quigley

Pima County cannot consider any claim unless submitted with six months
after the account accrues, Arizona Revised Statutes, §11-622.

| DATE OF<br>APPOINTMENT<br>9/22/99 | ATTACH MINUTE ENTRY<br>AND STATEMENT OF SERVICES | DOLLAR<br>AMOUNT |
|---|---|---|
| | TOTAL HOURS___16.2_____ | |
| HOURS TO DATE<br>ON THIS CASE | LESS CONTRACT OBLIGATION (_N.A._____) | |
| 114.2 | BILLABLE HOURS 16.2 X Rate $_100.00_=$ 1,620.00_ | |
| | EXPENSES_____$_____<br>(if applicable attach original invoices.<br>original receipts, and or copies of<br>canceled checks | |
| | TOTAL AMOUNT DUE  $ 1,620.00 | |

therein have been incurred; that the same has not been paid and no claim
against the Pima County has before been made therefore.

Approved by:  Court/
Contract Administrator_____

Mail to:
Indigent Defense Services
32 N. Stone Avenue,  Suite 1902
Tucson, Arizona  85701

                              Tax I.D. No._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_

                              _____(12-1-2000
                              Payee Signature        Date



| DATE | ACTION | HOURS |
|---|---|---|
| 4/28/00 | T/C TO Court re billing. | .4 |
| 5/14/00 | Receive and Review State's Response | 1.1 |
| 5/16/00 | Work on draft of Reply | .7 |
| 5/17/00 | T/c TO Court re hearing | .2 |
| 5/17/00 | Work on draft of reply | .6 |
| 5/19/00 | Prepare final draft of reply | 1.3 |
| 6/29/00 | T/c TO Court re hearing | .2 |
| 7/6/00 | T/c TO Court re hearing | .2 |
| 7/11/00 | Prepare Mtn to transport | .4 |
| 7/26/00 | T/c to client | .5 |
| 8/4/00 | T/c from Court re hearing | .2 |
| 8/4/00 | T/c to client | .3 |
| 8/4/00 | T/c TO Court re hearing | .2 |
| 9/7/00 | Prepare for hearing | 1.5 |
| 9/18/00 | To court for hearing/meet with client | 4.0 |
| 10/19/00 | Letter to client | .3 |
| 10/19/00 | Review court minute entry | .5 |
| 10/19/00 | T/C to Attorney General RE FILE | .3 |
| 10/20/00 | T/c from Court | .2 |
| 11/2/00 | Prep Mtn for transcript | .4 |
| 11/2/00 | Prep Mtn for Extend time | .4 |
| 11/8/00 | T/C TO DONNA HALLAM RE APPT. | .3 |
| 11/9/00 | T/c from Court | .2 |
| 11/13/00 | T/c to DOC | .2 |
| 11/16/00 | T/C TO Client | .5 |
| 11/17/00 | T/C to Attorney General RE FILE | .3 |
| 11/17/00 | T/C TO DONNA HALLAM RE APPT. | .3 |
| 11/17/00 | Prepare mtn to withdraw | .3 |
| 11/17/00 | T/c from Court | .2 |
| 11/28/00 | Review Supreme Crt Orders | N/C |
| 11/28/00 | T/C to new counsel | N/C |

Total Hours   16.2



SUPREME COURT OF ARIZONA

FILED

NOV 2 7 2000

NOEL K. DESSAINT
CLERK SUPREME COURT
BY

| | |
|---|---|
| STATE OF ARIZONA, | ) Supreme Court |
| | ) No. CR-95-0342-AP |
| Appellee, | ) |
| | ) Pima County |
| vs. | ) No. CR-45587 |
| | ) |
| BARRY LEE JONES, | ) O R D E R |
| | ) |
| Appellant. | ) |

On September 22, 1999, this Court appointed James Hazel to represent Barry Lee Jones in post-conviction proceedings pursuant to A.R.S. § 13-4041 and Rule 6.8(c), Ariz. R. Crim. P. James Hazel has filed a Motion for Leave to Withdraw because he has been elected the Gila County Attorney. Presently, a Motion to Extend Time to File a Motion for Rehearing and a Request for a Transcript of the Evidentiary Hearing are pending in the superior court.

IT IS ORDERED that the Motion for Leave to Withdraw is granted. Pima County shall compensate James Hazel for work performed in this case to date.

IT IS FURTHER ORDERED that Michael Villarreal, Esq., is substituted as counsel and is appointed to represent Barry Lee Jones in post-conviction proceedings pursuant to A.R.S. § 13-4041 and Rule 6.8(c), Ariz. R. Crim. P.

IT IS FURTHER ORDERED that the Pima County Superior Court shall allow new counsel sufficient continuances to adequately take over the representation.

CR45587

IT IS FURTHER ORDERED that Michael Villarreal shall be compensated at the rate of $100.00 per hour plus reasonable costs incurred in the representation.  If counsel's work hours are over two hundred hours, the superior court shall review and approve additional reasonable fees and costs pursuant to A.R.S. § 13-4041(H).  Counsel shall direct requests for the appointment of investigators and experts to the superior court pursuant to A.R.S. § 13-4013(B) and § 13-4041(J).

DATED this 27TH day of November, 2000.

CHARLES E. JONES
Vice Chief Justice

TO:
Jim D. Nielsen, Esq., Assistant Attorney General
James W. Hazel, Esq.
Michael Villarreal, Esq.
Barry Lee Jones, DOC #114690, Arizona State Prison-Florence
Hon. John M. Quigley, Judge, Pima County Superior Court
Patricia Noland, Clerk, Pima County Superior Court
Phil Maloney, Indigent Defense Services, 32 N. Stone Ave., Suite
    1902, Tucson, AZ 85701
Mike Baumstark, AOC, Supreme Court
Hon. Michael D. Ryan, Court of Appeals
Julie Hall, Administrator, ACRP
Jonathan Bass, Arizona Death Penalty Judicial Assistance Program,
    Tucson

**Exhibit 40**

AFFIDAVIT

State of Arizona,      )
                       ) ss.
County of Pima         )

LESLIE BOWMAN, having been first duly sworn, upon her oath deposes and states:

1.     That I am an attorney licensed to practice law in the State of Arizona since May 1993.

2.     That I have been employed as private attorney specializing in criminal law since my bar admission in May of 1993.

3.     That I served as second attorney and "second chaired" the case of State of Arizona vs. Barry Lee Jones, Pima County Cause No. CR-34752 45587 *LB* (hereinafter "*State vs. Jones*.") from approximately May 19, 1994 until the sentence was imposed although I was never formally appointed as second counsel by the trial court.

4.     That *State v. Jones* was the second capital case I co-tried and when I worked on the case, I had been practicing law for just about one year.

5.     That Sean Bruner was lead counsel in *State v. Jones*.

6.     That Sean Bruner delegated certain responsibilities in *State v. Jones* to me.

7.     One of the responsibilities Mr. Bruner delegated to me was interviewing all of the State's witnesses in the case.

8.     Another responsibility of mine was to spearhead the investigation and interviews of all potential defense witnesses for the guilt/innocence and sentencing phases of the trial.

9.     That in my opinion, as a result of my training and experience, the following independent outside expert witnesses are critical in investigation and defending most capital cases: an investigator to investigate and interview potential witnesses to support an innocence claim; forensic scientists, (an eyewitness expert to refute critical eyewitness testimony and a blood splatter expert) to support the innocence claim purported at trial; a mitigation investigator/specialist to begin sentencing phase investigation from the onset of the case; a forensic pathologist specializing in child deaths to review autopsy results in order to counter aggravation evidence; a psychiatrist and

Page 1 of 3

psychologist to test and investigate the client's mental state at the time of the alleged crime and potential mental health issues supporting mitigation at sentencing.

10.     That in hindsight, with my current level of training and experience, I am of the opinion that I would have requested funds from the trial court to retain most, if not all of the foregoing experts in *State v. Jones*.

11.     That since any investigation would have been considered work-product, there is no strategic reason for not investigating the above issues.

12.     That prior to the trial, I read the preliminary investigation reports written by George Barnett. These reports contained other possible suspects in the death of Rachel Gray. However, I did not ask the trial court for additional funds for Mr. Barnett to continue his investigation of the case beyond what the initial $500.00 amount authorized by the trial court. I also did not follow-up and interview many of the potential witnesses and suspects George Barnett named in his report.

13.     That my attorney notes on George Barnett's report note that a witness told Mr. Barnett that a person, possibly the victim's brother, Jonathan Gray, had sexually abused the victim before she made contact with Mr. Jones, and also that the victim's brother had molested other children also.

14.     That despite this initial information, I do not remember gathering important, relevant, contemporaneous records or interview anyone to ascertain the veracity of this information.

15.     I also failed to ever make contact with or interview Jonathan Gray although he was both a potential suspect and a potential witness because he lived with the victim and was around her for much of the day before her death.

16.     That I do not remember requesting an interview with the victim's mother, Angela Gray, who was the co-defendant in the case before the case was severed into two actions. Instead, I relied on Angela Gray's attorney's statements that she would not say anything that would help Mr. Jones's case. In hindsight, that was an error.

17.     That my attorney notes reflect that I knew that Mr. Jones's parents may have been

alcoholics, but that I failed to have a psychologist determine what effect that mother's alcohol use had on Mr. Jones' pre-natal development.

18.    That to my recollection, a psychologist, Dr. Geffen, evaluated Mr. Jones and found that while he was competent to stand trial, Mr. Jones had suffered from many past head injuries and periods of losing consciousness. That my attorney notes reflect knowledge of many of Mr. Jones's head injuries.

19.    That despite Dr. Geffen's indication and the information from witnesses regarding Mr. Jones's head injuries, I failed to request the relevant medical records and consult/retain a neurologist or neuropsychologist to determine whether Mr. Jones suffered from brain damage which may have affected his behavior and conduct.

20.    That Mr. Jones's familial history, and numerous head injuries were not investigated and adequately presented to the sentencing court as one of the many causal connections to the murder.

DATED this _25_ day of November, 2002.

_Leslie Bowman_
LESLIE BOWMAN

Subscribed and sworn to before me by Leslie Bowman on November _25_, 2002.

My commission expires:

_July 17, 2005_

_Ana E. Padilla_
NOTARY PUBLIC

Page 3 of 3

**Exhibit 41**

*Joseph Geffen, Ph.D., P.C.*
*Licensed Psychologist*

800 N. Swan Rd., Suite 125
Tucson, Arizona 85711

*Telephone*
602-325-5033

11/4/94

Leslie Bowman
Attorney At Law
78 West Cushing Street
Tucson, AZ. 85701

Re: **BARRY LEE JONES**
    DOB: 08/26/58
    ID No.: CR-45587

Dear Ms. Bowman:

The following is my report of the evaluation of your client,
Mr. Barry Lee Jones.  It is my understanding that you referred
Mr. Jones in order to determine psychological factors that may be
relevant to the criminal case for which you are representing him.
Specifically, you asked me to address the following issues:

(1) his mental state at the time of the pre-trial and trial
proceedings, particularly with regard to his competency to assist
in his defense;

(2) his mental state at the time of his arrest, based on my
impression after interviewing the client and viewing a 5-hour
videotape of his questioning by police detectives.  Particularly,
you asked me to determine whether there is any evidence that Mr.
Jones was experiencing withdrawal symptoms from amphetamines
and/or other substances at this time and whether Mr. Jones
knowingly waived his Miranda rights; and

(3) whether there is any indication from the obtained data which
suggested that Mr. Jones harbors pedophilic and/or aggressive
characteristics/tendencies.

Method

I evaluated Mr. Jones on 08/25/94 at the Pima County Adult
Detention Center, together with Ms. Lisa Grencavage, a University
of Arizona doctoral student who assisted me.  The duration of our
examination of Mr. Jones was approximately 5 hours.
Additionally, Mr. Jones was seen on 08/26/94 for approximately 2
hours in order to complete the evaluation.  We conducted a
**structured clinical interview** which included obtaining from the

05374

*Specializing in Clinical, Consulting, Forensic and Medical Psychology*

2

client his statement of relevant personal history, performing a standard **Mental Status Examination** (MSE), and administering the following psychological tests and instruments:

(1) the **Ammons Quick Test**, to assess the client's intellectual functioning

(2) the **Wechsler Adult Intelligence Scale - Revised** (WAIS-R), to assess the client's intellectual functioning

(3) the **Wechsler Memory Scale - Revised** (WMS-R), to assess the client's memory and to screen for possible acquired organic impairment of brain functioning

(4) the **Minnesota Multiphasic Personality Inventory - 2** (MMPI-2), to assess the client's emotional and social adjustment and to determine the presence, type and severity of any psychopathology

(5) a **competency questionnaire**, designed to elicit from the defendant his level of knowledge and understanding of his legal status, including the name of his attorney, the charges against him and the possible maximum sentence he may be facing, the roles of various key persons in a trial (judge, jury, defense and prosecuting attorneys), and entering and negotiating a plea

In addition, I reviewed the collateral material which you made available to me, consisting of copies of medical records and evaluations from the client's previous treatment at Kino Community Hospital (covering the time period 05/06/92 through 06/29/92). I also viewed three videotapes (dated 05/02/94) of the client's questioning by police detectives at the time of his arrest.

<u>Background</u>

Barry Lee Jones is a thirty-six year old Caucasian male who has been incarcerated for (approximately) the past six months at the Pima County Adult Detention Center on charges of child abuse, sexual assault, and first degree murder. Mr. Jones reported that, prior to being arrested, he resided in a mobile home in Tucson with his "co-defendant" and four children, one of whom Mr. Jones is accused of murdering. According to Mr. Jones, he has lived in Tucson for the past eight years, and in Arizona for the past twenty-three years. He stated that he was born and grew up in South Carolina.

Significant events in the client's life, as obtained from his personal history, included the following:

Mr. Jones has been separated for the past two years from his wife of ten years. Together they have three children, ages eleven, nine, and five. He reported that his mother lives in Benson, AZ

3

and that she visits him in jail once a week.  He said that his
father died twenty-seven years ago from a heart attack.  He also
stated that he has an older brother, age forty, a (fraternal)
twin brother, and a younger brother, age thirty-one.  He reported
that his twin brother visits him 5-6 times per week but that he
has no contact with his other brothers.

When asked about his childhood, Mr. Jones replied that it was
"okay," recalling that he and his brothers would play in the
woods in South Carolina.  He added that the family had financial
problems, especially after his father died.  When asked about
whether he was physically and/or sexually abused as a child, Mr.
Jones replied, "No" but added that "Momma would lay a woopin' on
us."  He then said that he did not consider this abuse, because
he felt that they "deserved it."

Mr. Jones went on to report that he was placed in a residential
boy's home, from ages sixteen through eighteen, because of
fighting (which he described as "just kid fights"), stealing, and
marijuana use.  He stated that he was deemed "incorrigible" by
the police and added that he "didn't care for" being in the group
home.

When asked about physical health problems, Mr. Jones replied that
he is "pretty healthy" except for a bad back.  He elaborated that
he has a chronic lumbar sprain and a bulging disk in his back.
He said that he has been receiving Workman's Compensation and
that he has been in physical therapy but that this provides only
temporary relief.  He also reported that he has had numerous head
injuries during his lifetime and that he was knocked unconscious
"about ten times."  He reported that he was hit in the head with
a brick as an adult and knocked unconscious "for a couple of
hours."

Regarding emotional or psychological problems, Mr. Jones reported
that he is currently experiencing memory difficulties and sleep
problems.  He stated that he has difficulty remembering
"everything" and gave an example of not being able to remember
the dog's name on the "Jetsons" TV cartoon show.  Regarding his
sleep problems, Mr. Jones stated that he only sleeps 4-5 hours a
night, and that these problems have been going on for over two
years.  He went on to report that he frequently dreams about
Rachel, the four year old child (of his co-defendant) whom he is
accused of murdering.  Mr. Jones referred to Rachel as his
daughter, and became angry when asked whether he was biologically
related to her, saying, "No, but that don't matter."  He went on
to say that he likes children and that he would frequently give
them gifts.

When asked specifically about other psychological symptoms, Mr.
Jones answered that he is experiencing poor appetite, lack of
interest in activities, social withdrawal ("I keep to myself, I

4

don't like nobody"), depressed mood, mood swings, feelings of anger, lack of energy, fatigue, anxiety, agitation, difficulty concentrating and irritability. He also reported feelings of wanting to cry, although he does not do so because he "can't, not in here (i.e., jail)." The client elaborated that he feels angry about not knowing what happened to Rachel and not being able to do anything to find out because of being in jail. When asked about suicidal ideation and intent, Mr. Jones replied that he sometimes thinks about how he could do it, but that he doesn't think he would do anything to hurt himself. He did report that he is on 15 minute suicide watch in jail.

Mr. Jones also reported that he sometimes experiences ringing in his ears, and that he sometimes hears a voice, which he described as a "steady, male kid voice, a teen". He stated that he cannot make out what the voice says, that there is no emotion in this voice, and that it is not frightening. He reported that he first heard this voice "a couple of years ago" and that he hears it "especially when stressed-out."

Mr. Jones reported that he is currently taking doxepam and mellaril under the care of the prison psychiatrist, Dr. Gabriel Cata. According to him, these medications only help "a little" to relieve his current symptomatology.

Regarding alcohol and drug use, Mr. Jones stated that he began using marijuana as a teenager. He reported that he currently drinks no alcohol and that he "never drank much" because it makes him sick. He said that his drug of choice is methamphetamine or "crank" and reported that for a period of 6-7 months he used it on a continuous basis. He also stated that he last used "crank" five days before Rachel died. He reported that he drinks decaffeinated coffee and that he used to smoke cigarettes "a couple packs a day" before he was incarcerated. When asked about family substance abuse, he replied that his brothers "do drugs."

Regarding his educational and employment background, Mr. Jones reported that he completed the ninth grade of traditional high school and that he obtained his G.E.D. while in the boy's home through Vision Quest. When asked about his attitude toward school, he replied that he "didn't care for it." He denied any history of learning disabilities or special education classes.

Mr. Jones reported that he received training as a mechanic, his usual occupation, and that he has been employed as an iron worker. He stated that he was unemployed at the time of his arrest and that he last worked in December, 1993 as a mechanic at a Tucson Econo-lube. He reported that he was fired after four months and gave the reason as "something about a missing credit card." He also reported that he worked for Southwestern Construction two times "for about a year each time," in 1991 and 1989, and that he worked at Grant Road Chevron.

05377

5

The collateral medical records indicated that Mr. Jones was seen at Kino Community Hospital on two occasions. He was brought to Kino Hospital on 05/06/92 by Tucson Police for a psychiatric evaluation after having called the Southern Arizona Mental Health Center (SAMHC) Crisis Line. The Emergency Department Record indicates that he was very depressed over the (then) recent separation from his wife and children and his inability to find work. Apparently, he threatened to kill himself (references were made both to loaded firearms in the house and the client contemplating cutting his throat). He was released later that day after agreeing to a "no harm contract" and stating that he would seek treatment at SAMHC. He was diagnosed with Adjustment Disorder with depressed mood and (rule-out) Antisocial Personality Disorder. Also, it was noted in the Psychiatric Evaluation (which was dated 05/16/92) that a possible reason for the client's marital separation was that he was "physically abusive."

Mr. Jones was also seen at Kino Hospital a few weeks later. He was brought to Kino on 06/25/92 and was admitted for four days on the basis of being dangerous to himself and dangerous to others. The Admission Note, written by Hermes Gerundo, M.D., indicated that Mr. Jones was brought to Kino by the Tucson Police Department on a petition filed by Melanie Roberts of SAMHC after he stated to her that he would hurt himself or someone else. Apparently, he was in possession of a large knife. He was diagnosed with Adjustment Disorder with anxious mood, Polysubstance Abuse, and Antisocial Personality Disorder. Also, it was noted that the severity of psychosocial stressors was judged to be "severe." The Discharge Summary, dated 06/28/92 and written by the above named physician, noted that Mr. Jones was not considered to be homicidal or suicidal while in Kino Hospital and that he was stable at the time of discharge. Follow-up treatment was planned which included a 12-step program for substance abuse and continued outpatient psychotherapy at SAMHC with Melanie Roberts.

## Current Test Results and Interpretations

Behavioral Observation and Mental Status:

Mr. Jones was seen at the Pima County Adult Detention Center in a conference room which provided an adequate degree of privacy and comfort. He was dressed in standard institutional clothing and appeared clean and adequately groomed. He had a heart-shaped tatoo on the upper portion of his left arm. The client spoke with a Southern accent. Initially, he related to the examiners in a somewhat guarded, defensive manner. Later in the evaluation, however, he seemed to become more relaxed, open, and cooperative.

The Mental Status Examination revealed that the client was alert and that he was oriented in all the major areas (person, place,

6

time and situation).  His speech and thinking processes appeared to be clear, coherent and goal-oriented.  He showed no evidence of psychotic distortion of thinking or perception.  There was no overt evidence of gross impairment of memory or other cognitive functions, although he seemed to have a slight difficulty recalling dates.  The client's mood throughout the session was labile, but generally appropriate to the content of what was being discussed.  For example, he became tearful when discussing the death of Rachel, and displayed signs of anger when talking about being in jail and unable to find out what exactly happened to her.  He denied any current or past psychotic experiences such as hallucinations and delusions, even though he previously described hearing a voice.

Cognitive Functioning:

Mr. Jones was given two tests of intellectual functioning.  On the Ammons he obtained an I.Q. score of 108, which is in the average range of intellectual functioning.  On the WAIS-R, Mr. Jones obtained the following: Verbal I.Q. = 88; Performance I.Q. Score = 90 and Full Scale I.Q. Score = 90.  These scores fall in the low average to average range of intellectual functioning.  Although the two tests yielded somewhat different results, they are considered to be fairly reliable estimates of his intellectual capacity and, overall, do not indicate any significant limitation of mental ability which would adversely affect the client's ability to understand the proceedings against him.

On the WMS-R, Mr. Jones obtained the following:  Verbal Memory Quotient: 89; Visual Memory Quotient: 78; General Memory Quotient: 84; Attention/Concentration Quotient: 124; Delayed Recall Quotient: 86.  In all, these scores indicate no serious impairment of memory functioning.

Personality Functioning:

Results of the personality testing (MMPI-2) indicated that Mr. Jones is experiencing significant psychological and emotional problems but that he possesses limited personal resources for coping with them effectively.  In general, individuals with this profile have a poor self-concept, are self-critical and strongly dissatisfied with themselves but lack the skills necessary to change their situation.

Also, there was some indication that the client tended to underreport psychopathology.  This may be do to trying to appear better adjusted psychologically than is actually the case, and/or it may reflect defensiveness, denial, and/or a lack of insight into his own motivations and behavior.  As a result, the actual obtained scores on the clinical scales should be interpreted as probable underestimates of his actual psychopathology.  The

results also suggest that Mr. Jones tends to think in a very
concrete manner and that he rarely recognizes any emotional/
psychological contributions to his problems.  Rather, Mr. Jones
is more likely to report physical symptoms (as opposed to
psychological problems).

Mr. Jones' MMPI-2 profile indicated that his interpersonal
relationships are likely to be shallow and marked by
hypersensitivity to the evaluations and reactions of others.
Also, there was some indication that Mr. Jones frequently avoids
accepting personal responsibility.  The profile also showed
evidence of Mr. Jones' proneness for chemical addiction.

Conclusions and Recommendations

Based on the findings in this evaluation, the following
conclusions were reached:

(1) it is my opinion that Mr. Jones is currently able to assist
in the proceedings for which you are representing him.  He
exhibited adequate knowledge of legal proceedings on the
Competency Questionnaire and was aware of ways that he could
assist in his defense.  Further, he displayed no gross impairment
of cognitive functioning.

(2)  With respect to the question of the client's state of mind
at the time of the questioning by police, my impressions are
limited to indirect observation through the videotape you
provided me.  The quality of the tape (video, sound) was fairly
good and I was able to hear both the client's and the officer's
statements and observe their movements, etc.  However, there were
not many opportunities for seeing fairly closeup views of the
client's facial gestures, etc.  Overall, I found it quite helpful
to have the tape available.  Regarding the question of whether
Mr. Jones knowingly waived his Miranda rights at the time of his
arrest and questioning, it is my opinion that he may have been so
emotionally distraught once he was informed of Rachel's death
that his ability to make a considered and informed judgment was
impaired due to his emotional condition.  As shown on the
videotape, Mr. Jones became so overwrought that he repeatedly
banged his head on the wall and on the desk, and seemed to go
into a trance-like, possibly dissociated state during the
questioning by the police detectives.

While it is not possible to say for certain whether Mr. Jones was
experiencing amphetamine (or other substance) withdrawal at the
time of his arrest, based on his report that he last took crank
five days before Rachel's death, it seems unlikely that any
withdrawal symptoms would be severe enough, after five days, to
negatively impact his judgment.  Mr. Jones did report, however,
that he was given "pills" by a friend's wife on the morning of
his arrest.  He also stated that he was very stressed,

8

distraught, and had not been sleeping well the few days preceding the events in question. Therefore, it is possible that he may not have been fully alert, nor exercising his best judgment at that time. He stated that he recalled very little about the day he was arrested and questioned by police.

(3) With regard to the issue of Mr. Jones' mental state at the time of the alleged offense, in terms of the legal issue of culpability, the findings of this evaluation did not provide any evidence that he was incapable of knowing the difference between right and wrong of his actions. Also, there was no clinical evidence to demonstrate that he would not be capable of knowing that it would be wrong and punishable to commit the acts of which he is charged. Therefore, I do not think that the standards and criteria for an insanity defense (according to Arizona statute) are met in Mr. Jones' case. Nevertheless, his apparent confused state of mind, which he described and which may include partial amnesia, and the effects of intoxicating drugs, may have bearing on the legal case with respect to the "mens Rea" issue, that is the client's ability to form intent to commit murder.

Although you did not specifically ask for my opinion regarding the relevance of current findings for sentencing, in case that the client should be found guilty, or agree to plead guilty, I believe that the data would support the court's consideration of some psychological factors for mitigation, such as the client's lack of ability to conform to society's demands and expectations based on mental factors.

(4) Finally, in regard to whether the obtained data offers any indication of aggressive and/or pedophilic tendencies on the part of the client, unfortunately, the current state of psychological knowledge does not provide any guidelines for scientifically making such determinations. However, it seems that Mr. Jones has a history of domestic violence (although the collateral reports do not provide any more specific information of what and who was involved). There was nothing in the available history to indicate that the client had ever been accused, or treated for sexual deviance involving minors.

(4) <u>Diagnostic Impression (Based on the DSM-IV)</u>:

Axis I:      311         Depressive Disorder, not otherwise specified
             304.80      Polysubstance Abuse, in partial remission, in
                         a restricted setting

Axis II:    301.7        Personality disorder, with antisocial and
                         borderline features

Axis III: History (by patient) of back (disk) problem

05381

9

Axis IV:      problems with primary support group; problems related
              to the social environment; occupational problems;
              economic problems; problems related to interaction with
              the legal system.

Axis V:       Global Assessment of Functioning Scale (GAFS):
              current:        40 - major impairment in several areas
              past year:      40 - major impairment in several areas


Thank you for referring your client for this evaluation.  If I
can provide additional information or be of further assistance in
this case, please do not hesitate to contact me.

                         Sincerely,


                         Joseph Geffen, Ph.D.
                         Clinical Psychologist, Licensed
                         (Az. License No. 1005)

05382

**Exhibit 42**

## DECLARATION OF ALAN L. GOLDBERG, Psy.D., ABPP

I, Dr. Alan L. Goldberg, declare under penalty of perjury the following to be true to the best of my information and belief:

1.  I am a licensed psychologist.  A copy of my curriculum vitae, which reflects my education and experience is true and correct and attached hereto as "Attachment A".

2.  At the request of counsel for Barry Lee Jones ("Mr. Jones"), I conducted a neuropsychological evaluation of Mr. Jones on death row at the Special Management Unit II within the Arizona Department of Corrections in Florence, Arizona.  The evaluation took place on April 22, 23, and 24, 2002 for a total of 16 hours of direct contact time with Mr. Jones.

3.  The purpose of the testing was to complete a neuropsychological examination, and several neuropsychological evaluation instruments were utilized.  A wide variety of tests was administered in order to assess attention, concentration, memory, intelligence, language skills, visual-spatial analysis and organization, complex reasoning, motor efficiency of the upper extremities, lateral preference, personality, and mental status.

4.  The materials I reviewed to prepare for Mr. Jones' neuropsychological evaluation included legal, educational, and medical records (including psychiatric records).

5.  My observations, impressions, and professional opinions are set forth in the neuropsychological evaluation report signed by me on October 11, 2002, a true and correct copy of which is attached hereto as "Attachment B".

6.  The observations, impressions, and professional opinions set forth in the neuropsychological evaluation report are true and correct.

I declare under the penalty for perjury under the laws of the United States and the State of Arizona that the foregoing is true and correct.

Signed this __11__ day of ___October___, 2002.

_Alan L. Goldberg, Psy.D., ABPP_
Alan L. Goldberg, Psy.D., ABPP

## _ALAN L. GOLDBERG_

*4641 E. Coronado Drive*
*Tucson, AZ 85718-1643*
*(520) 529-0878 (telephone, voicemail, and FAX)*
*ALG2000@aol.com (e-mail)*

| **EDUCATION** | **DEGREE** |
|---|---|
| The University of Arizona College of Law | J.D., 1997 |
| Wright State University (APA accredited) | Psy.D., Clinical Psychology, 1983 |
| University of Minnesota (APA accredited) | M.A., Clinical Psychology, 1982 |
| University of California at Davis | B.S., Psychology, 1978 |

## HONORS

Governor's Award for Excellence, Department of Health Services, Arizona Kids with Traumatic Brain
  Injury, 2000.
Public Interest Law Organization Fellowship, 1997
Honorable Mention, Moot Court Oral Argument, The University of Arizona College of Law, 1996
The University of Arizona College of Law Graduate Fellowship, 1995-1996
National Institute of Mental Health Fellowships, 1978-1980
Phi Beta Kappa, Kappa of California

## PROFESSIONAL EXPERIENCE

Consulting Rehabilitation Neuropsychologist, Virginia Mason Medical Center, Seattle, WA, (June – August)
  2001, 2002.
Adjunct Faculty Member, The University of Arizona, Department of Special Education, Rehabilitation, &
  School Psychology, Tucson, AZ, 2000.
Private Practice of Psychology and Private Practice of Law, Tucson, AZ, 1998 – Present
Hearing Officer, State of Arizona, Department of Education, 1998 – Present
Mediator (Volunteer), State of Arizona, Office of the Attorney General, Tucson, AZ, 1997 - Present
Law Clerk (Rule 38(e) Certified), Child Advocacy Clinic, The University of Arizona College of Law, Tucson,
  AZ, 1997 - 98
Law Clerk, Center for Dispute Resolution, Arizona Superior Court, Pima County, 1996
Law Clerk, Arizona Center for Disability Law, Tucson, AZ, 1996
Neuropsychologist (per diem),  HEALTHSOUTH Rehab Institute of Tucson, Tucson, AZ, 1995 - Present
Clinical Lecturer, The University of Arizona, Department of Psychiatry, Tucson, AZ, 1994 - 97
Director of Neuropsychology, HEALTHSOUTH Rehab Institute of Tucson, Tucson, AZ, 1993 - 95
Private Practice of Psychology, Tucson, AZ, 1993 - Present
Director of Neuropsychology, Southern Arizona Rehabilitation Hospital, Tucson, AZ, 1992 - 93
Clinical Manager of Neurobehavioral Services, The Rehabilitation Institute of Pittsburgh, Pittsburgh, PA,
  1989 - 92
Neuropsychologist, The Rehabilitation Institute at Santa Barbara, Santa Barbara, CA, 1985 - 89
Staff Psychologist, Charlotte Rehabilitation Hospital, Charlotte, NC, 1984 - 85
Neuropsychology Assistant, Neuropsychology Laboratory, Indiana University School of Medicine,
  Indianapolis, IN, 1982 - 84

Alan L. Goldberg
Page 2

Clinical Psychology Intern, Indiana University School of Medicine (APA accredited), Indianapolis, IN,
   1981 – 82

## LICENSURE/CERTIFICATION
State of California Psychologist License Number PSY9180 (inactive)
State of Arizona Psychologist License Number 2005
Diplomate in Rehabilitation Psychology, American Board of Professional Psychology, Diploma #5377
State Bar of Arizona Bar Number 019098

## PROFESSIONAL AFFILIATIONS
American Association of Spinal Cord Injury Psychologists and Social Workers (Professional Issues Committee)
American Bar Association
American Psychological Association
   Rehabilitation Psychology Division (Executive Board 1992 – 95 and 1999 - Present; Committees: Program
   1985 - Present, Continuing Education 1989 - Present, Pediatric 1989 – Present, Social & Ethical Responsibility
   1998 - Present; Liaison to APA Committee on Disability Issues in Psychology  2001 - Present)
   Neuropsychology Division
   American Psychology - Law Society
Arizona Dispute Resolution Association
Arizona Psychological Association (Program Committee – 2001)
Brain Injury Association (Symposium Program Reviewer 1989 - Present)
Brain Injury Association of Arizona (Support Group Facilitator 1992 - 96)
Cardozo Society
International Neuropsychological Society
National Academy of Neuropsychology
Pima County Bar Association
Southern Arizona Psychological Association (Program Committee 1994 – 95 and 1999 - Present,
   Psychology-Law Committee 1997 – Present, Social Policy Committee 2001 – Present, President 2001.)

## PUBLICATIONS
Yablick, L. & Goldberg, A.  (in press).  New health and behavior CPT codes.  *SCI Psychosocial Process.*
Goldberg, A.  (2001).  [Review of the book Legal aspects of documenting patient care].  *Journal of Head Trauma Rehabilitation, 16,* 107-108.
Hendricks, J., Liss, M., & Goldberg, A.  (2000).  Psychological service provision in rehabilitation:  Implications for clinical practice. *Rehabilitation Psychology News, 27,* (2), 4-5.
Goldberg, A. & Daly-Rooney, R.  (1999).  Advocacy, consciousness raising, the state psychology board and the ADA (Abstract).  *Rehabilitation Psychology,* 44, 303.
Goldberg, A.  (1999).  Things you wanted to know about employer health insurance plans (but were afraid to ask). *Rehabilitation Psychology News, 26,* (2), 10-11.
Goldberg, A. (1996).  Bioethics, transplantation, and the law (Abstract).  *Rehabilitation Psychology,* 41, 162-163.
Goldberg, A. (Ed.) (1996). *Acquired brain injury in childhood and adolescence:  A team and family guide to educational program development and implementation.* Springfield, IL: Charles C. Thomas, Publishers.

Alan L. Goldberg
Page 3

Eubanks, J., Goldberg, A. and Fox, R. (1996).  Work force issues in psychology:  In Glueckauf, R., Frank, R., Bond, G., and McGrew, J. (Eds.) *Psychological Practice in a Changing Health Care System:  Issues and New Directions.*  New York: Springer.

Goldberg, A. & Janus, P. (1995).  The IDEA revisited:  Today's services for students with TBI (Abstract). *Rehabilitation Psychology*, 40, 147.

Goldberg, A. (1994).  Health care reform and pediatric rehabilitation:  Creative financing for success (Abstract). *Rehabilitation Psychology*, 39, 130.

Goldberg, A. (1994).  Ethics and practice:  Safeguarding data and our clients (Abstract).  *Rehabilitation Psychology*, 39, 135.

Goldberg, A. & Senf, G. (1993).  Neurodiagnostics and rehabilitation planning (Abstract).  *Rehabilitation Psychology*, 38,137.

Goldberg, A. & Janus, P. (1992).  Educational law and TBI:  New roles for psychologists (Abstract). *Rehabilitation Psychology*, 37, 218.

Goldberg, A. & Sachs, P. (1992).  A guide to evaluating post-acute programs for brain injured children and adolescents. *Journal of Cognitive Rehabilitation*, 10, 2-6.

Goldberg, A. & McNamara, K. (1987).  Internship training in clinical neuropsychology.  In R.H. Dana and W. May (Eds.) *Internship Training in Professional Psychology*. Washington, D.C.: Hemisphere Publishing Corporation.

Goldberg, A. & McNamara, K. (1984). Internship training in clinical neuropsychology. *Professional Psychology: Research and Practice*, 15, 509-514.

Bryan, J., Cherney, H., Goldberg, A., Newmeyer, W., & Seyden, N. (1982). *Beyond Coping:  A Resource Guide for People with Disabilities.* Davis: University of California.

Leon, G., Butcher, J., Kleinman, M., Goldberg, A., & Almagor, M. (1981). Survivors of the Holocaust  and their children: Current status and adjustment. *Journal of Personality and Social Psychology*, 41, 503-516.

Bryan, J., Cherney, H., Goldberg, A., Newmeyer, W., & Seyden, N. (1978). *Coping at U.C. Davis:  A Survival Guide for People with Disabilities*. Davis: University of California.

**JOURNAL REVIEWER**
*Professional Psychology:  Research and Practice, 1989 - Present*
*Rehabilitation Psychology, 1989 - 1998*

**PAPERS, SYMPOSIA, & POSTERS ACCEPTED FOR PRESENTATION AT SCIENTIFIC MEETINGS**
Goldberg, A. & Nierenberg, B.  Educating students with spinal cord impairment.  American Association of Spinal Cord Injury Psychologists and Social Workers Convention.  Las Vegas, NV, 2002.

Goldberg, A. & Norgard, K.  Psychology, social policy, & death penalty legislation.  American Psycholoical Association Convention.  Chicago, IL, 2002.

Kerkhoff, T. & Goldberg, A.  Ethical case analysis in rehabilitation psychology.  Rehabilitation Psychology 2002: Integrating science, practice & public policy.  New Orleans, LA, 2002.

Goldberg, A. & Hess, D.  The law and services for those with spinal cord injuries.  American Association of Spinal Cord Injury Psychologists and Social Workers Convention.  Las Vegas, NV,  2001.

Alan L. Goldberg
Page 4

Goldberg, A. Confidentiality and legal issues. In Kerkhoff, T., Babin, P., Bush, S., Goldberg, A., and Hanson, S. Individual and caregiver rights: Ethical challenges of competency and confidentiality. American Psychological Association Convention. San Francisco, CA, 2001.

Goldberg, A., Farmer, J., & Warschausky, S. Cerebellar disease and educational program planning. American Psychological Association Convention. San Francisco, CA, 2001.

Goldberg, A. Licensing dilemmas for the global practitioner. In Hanson, S., Counts, W., Glueckauf, R., Goldberg, A., & Mona, L. Global psychological practice: Opportunities and challenges of internet technology. American Psychological Association Convention. Washington, D.C., 2000.

Goldberg, A. The rehabilitation psychologist's role as school consultant. In Goldberg, A., Bruyere, S., Griesman, Z., & Kuczinski, C. Recent Supreme Court decisions and disability. American Psychological Association convention. Washington, D.C., 2000.

Bruyere, S. & Goldberg, A. Legislative and ADA-related decisions impacting persons with disabilities. Rehabilitation Psychology 2000 and Beyond. San Antonio, TX, 2000.

Goldberg, A. Elder law and the practicing psychologist. In Hanson, S., Kerkhoff, T., & Goldberg, A. Ethical and legal issues in geriatric practice. American Psychological Association Convention. Boston, MA, 1999.

Goldberg, A. Advocacy, consciousness raising, the state psychology board and the ADA. American Psychological Association Convention. Boston, MA, 1999. (Poster)

Goldberg, A. Feast or famine: Psychology training and Medicare law. In Goldberg, A., Lawlor, R., Patterson, D., & Benjamin, G. HCFA regulations and psychology. American Psychological Association Convention. San Francisco, CA, 1998.

Goldberg, A. Legal issues in geriatric practice. In Ashkenazi, G., Hanson, S., Kerkhoff, T. & Goldberg, A. Ethical and legal issues in geriatric practice. American Psychological Association Convention. San Francisco, CA, 1998.

Goldberg, A. Brain injury, mental health, and therapeutic jurisprudence. In Goldberg, A., Erlin, C., & Eskridge, L. Therapeutic jurisprudence: A medley of papers. American Psychological Association Convention. Chicago, IL, 1997.

Goldberg, A. Bioethics, transplantation, and the law. American Psychological Association Convention. Toronto, Canada, 1996. (Poster)

Goldberg, A. & Janus, P. The IDEA revisited: Today's services for the student with TBI. American Psychological Association Convention. New York, NY, 1995.

Goldberg, A. Survival of psychological practice in the rehabilitation setting. In Goldberg, A., Nierenberg, B., Diller, L., & Rosenthal, M. Psychological practice during troubled times: Survival tips from the trenches. American Psychological Association Convention. New York, NY, 1995.

Goldberg, A. & Janus, P. Educational issues in providing appropriate services for the student with TBI. In Nordlund, M.,, Goldberg, A., Pearson, S., & Tyler, J. Educational issues in school and home: The next step after rehabilitation. National Head Injury Foundation Annual Symposium. Chicago, IL, 1994.

Goldberg, A. Ethics & practice: Safeguarding psychological data and our clients. American Psychological Association Convention. Los Angeles, CA, 1994. (Poster)

Goldberg, A. Building bridges: Blending educational and medical service funding. In Goldberg, A., DiCowden, M., Nierenberg, B., & Pasino, J. Health care reform and pediatric rehabilitation: Creative financing for success. American Psychological Association Convention. Los Angeles, CA, 1994

Alan L. Goldberg
Page 5

Goldberg, A., Djergaian, R., & McNeely, J.  Creative advocacy:  Securing funding and success.  National Head Injury Foundation Annual Symposium.  Orlando, FL, 1993.

Goldberg, A. & Senf, G.  Neurodiagnostics and rehabilitation planning:  Collaborative pursuits involving psychometrics and imaging.  American Psychological Association Convention.  Toronto, Canada, 1993.

Goldberg, A. & Graham, L.  Meeting challenges under new special education law.  In Pasino, J., Goldberg, A., Graham, L., Kerr, M., & Pepitone, C.  Pediatric rehabilitation and school reintegration.  Southwest Brain Injury Symposium.  Santa Barbara, CA, 1993.

Goldberg, A. & Janus, P.  Educational law and TBI:  New roles for the psychologist.  American Psychological Association Convention.  Washington, D.C., 1992.  (Poster)

Goldberg, A. & Janus, P.  Public education & TBI:  The IDEA whose time has come.  16th Annual Postgraduate Course on Rehabilitation of the Brain Injured Adult and Child.  Williamsburg, VA, 1992.

Goldberg, A., Lyons-Holden, M., Graham, L., & Tognazinni, D.  Brain injured students in the classroom:  Development of collaborative consultation models.  National Head Injury Foundation Annual Symposium.  Los Angeles, CA, 1991.

Goldberg, A.  Practically speaking about brain injured children and adolescents.  In Goldberg, A., DiCowden, M., Bronheim, S., & Lawlor, R.  Practically speaking:  Writing pediatric psychological reports for multidisciplinary audiences.  American Psychological Association Convention.  San Francisco, CA, 1991.

Goldberg, A. & Graham, L.  School psychologists:  Program architects for services to brain injured students.  American Psychological Association Convention.  San Francisco, CA, 1991.

Goldberg, A.  Brainstorming:  Creative solutions for effective treatment planning.  Keystone State Head Injury Foundation Conference.  Champion, PA, 1990.

Graham, L., Lyons-Holden, M., Tognazinni, D., & Goldberg, A.  Neurosurgery, concussion, and coma:  School reentry of brain injured students.  National Association of School Psychologists Convention.  San Francisco, CA, 1990.

Goldberg, A. & Graham, L.  A model approach for reentry of brain injured students.  In Goldberg, A., Graham, L., Nordlund, M., Mira, M., Janus, P., & Paradise, S.  Enabling successful reentry of brain injured students:  Covering the bases.  National Head Injury Foundation Annual Symposium.  Chicago, IL, 1989.

Goldberg, A.  Rehabilitation psychology and the schools:  Cooperative ventures for successful reentry.  American Psychological Association Convention.  New Orleans, LA, 1989.

Graham, L., Goldberg, A., Lyons-Holden, M., & Rudometkin, D.  Education for reentry of brain injured students:  An integrative model approach.  California Association of School Psychologists Convention.  San Jose, CA, 1989.

Goldberg, A.  The neuropsychologist's role in cognitive and behavioral patient care management.  In Goldberg, A., Goll, S., Goka, R., Bloomquist, W., Carlander, M., Williams, D., & Wilson, L.  Will the real case manager please stand up?  National Head Injury Foundation Annual Symposium.  Atlanta, GA, 1988.

Goldberg, A., Sells, G., & Barry, B.  Case management of the head injured.  California Association of Rehabilitation Professionals Convention.  Santa Barbara, CA, 1988.

Goldberg, A.  Task for the 1980's:  Redefining the rehabilitation psychologist's role.  In Schiro-Geist, C. & Goldberg, A.  Rehabilitation psychology:  Future training and role issues.  American Psychological Association Convention.  Atlanta, GA, 1988.

Goldberg, A., Ostby, S., Cole J., Hogan, R., & Cox, D.  Transitional planning in head injury rehabilitation:  What treatment for whom?  American Psychological Association Convention.  Atlanta, GA, 1988.

Alan L. Goldberg
Page 6

Goldberg, A., Haussler, P., & Tate, K.  Friendly persuasion:  pragmatic interprofessional communication to enable successful postacute programming.  Southwest Head Injury Symposium.  Lake Tahoe, NV, 1988.

Goldberg, A., Haussler, P., & Tate, K.  Establishing and maintaining transitional living center placement for head injured clients.  National Head Injury Foundation Annual Symposium.  San Diego, CA, 1987.

Goldberg, A.  Rehabilitation neurospsychologist:  Cognitive and behavioral case manager.  American Psychological Association Convention.  New York, NY, 1987.

Goldberg, A.  Neuropsychologist as environmental engineer.  American Psychological Association Convention.  Washington, D.C., 1986.

Goldberg, A.  The role of neuropsychology in work with CVA patients.  Stroke Rehabilitation Conference of the American Heart Association.  Raleigh, NC, 1985.

Goldberg, A. & Hays, J.  Multiple videotape uses in head injury rehabilitation.  American Psychological Association Convention.  Los Angeles, CA, 1985.

Goldberg, A.  Predoctoral internship training in clinical neuropsychology.  American Psychological Association Convention.  Toronto, Canada, 1984.

Goldberg, A., Leon, G., Leonard, S., & Larson, R.  Juvenile diabetes:  Psychological aspects and adequacy of disease control.  Pediatric Behavioural Medicine Conference.  Ottawa, Canada, 1981.

Goldberg, A.  Eating patterns, personalities, and political attitudes of the Holocaust survivors.  1st World Congress on Behavioural Therapy.  Jerusalem, Israel, 1980.




**ALAN L. GOLDBERG, Psy.D., ABPP, J.D.**
Consultation, Evaluation & Rehabilitation Treatment
4641 East Coronado Drive
Tucson, Arizona 85718-1643
Telephone & FAX: (520) 529-0878
E-mail: ALG2000@aol.com

**CLIENT NAME: Barry Jones**
**DATES OF EVALUATION: April 22, 23, 24, 2002**

## NEUROPSYCHOLOGICAL EVALUATION REPORT

The reader of this report should note that sections entitled historical information, behavioral observations, and test results precede conclusions. These conclusions are in two sections (diagnostic impressions and implications/recommendations). Some readers may wish to concentrate on the conclusions, located toward the end of the report.

**BRIEF BACKGROUND**
This 43-year old right handed, married Caucasian male was referred for neuropsychological examinations to aid in the evaluation of cognition and mental status. Historical information was obtained from interview with the client, review of medical records, review of school records, review of records from previous psychological evaluation (and the psychologist's trial testimony, and review of family interviews. Note that much of the history was corroborated by information from these multiple sources.

The examinee was born in Gaffney, South Carolina. Gaffney is a small town in the heart of South Carolina's peach growing region. Gaffney is a blue collar town. It is the site of numerous picking and processing operations, and also site of the annual South Carolina statewide peach festival. The examinee's mother had five children (with at least 3 different men), Barry Jones and his twin brother being her second and third children. While his mother's pregnancy with him was reportedly without complications, his delivery was uncomplicated, there was mention that his mother drank significant amounts of alcohol during the pregnancy. His birth weight was reportedly under 5 pounds. Developmental milestones were said to have been reached on schedule.

Based on information from family interviews, this man was never made aware of the circumstances of his parentage. His biological father reportedly had sex with the mother, but she was married at the time to Paul Jones, who was overseas a great deal on military assignments. The examinee's mother was relatively unstable, and was from a poor background. She was reportedly alcoholic, and a harsh woman. She reportedly neglected her children, with a half sibling caring for the examinee and his twin brother during their early childhood years. This half-brother, Otis, changed diapers, cooked, shopped, watched them, put them to bed, and did the shopping. The examinee reported being "whooped" by his mother on numerous occasions. The military man who he knew as his father died of heart disease in his early 40s. The examinee's twin brother , and the examinee's own son both suffered from seizure disorders.

Arizona & California Licensed Psychologist
Diplomate in Rehabilitation Psychology, American Board of Professional Psychology
Member, State Bar of Arizona

The examinee indicated that he attended school in regular public schools until he dropped out, during his early teenage years (9th grade). He said that he obtained a GED while at Vision Quest. He had been expelled as early as the 5th grade for fighting. He had several legal infractions as a teenager, and was ultimately given a choice of going to Vision Quest voluntarily, or being admitted to a youth corrections facility. He chose the former, but was kicked out of that program as a result of behavior problems. He has a long history of drug abuse, and he reported using alcohol, marijuana, PCPs, mushrooms, LSD, valium, heroin, and qualudes. He stated that his drug of choice was amphetamines (crank).

This man has been married once, and he has three children. He was separated from his wife, and threatened to kill himself in 1992. At that time, he was admitted to Kino Hospital and had some therapy there. He has not been formally divorced.

This man reported a medical history with numerous injuries, including multiple head injuries with loss of consciousness. These histories are corroborated by information in his medical records and/or through family interview data. He reported that the axles from Hot Wheels cars were shoved into his ear, affecting his hearing at age 8. He fell off a slide while in 4th grade, fell off a bicycle with loss of consciousness, jumped from a tree to retrieve a basketball and hit his head (with loss of consciousness), he was hit in the head by a ball from an automatic pitching machine (loss of consciousness), he wrecked a car on El Capitan Pass with loss of consciousness and dislocated shoulder in his early 20s, he was punched and then fell, hitting his head and suffering loss of consciousness, and hit his head in fights numerous times. At age 30, he reported being in a car chase, and that he was hit in the head by a brick that came through a car window. He has also had stomach ulcers. He has a long history of depression. He has been medicated with Doxepin, Mellaril, Vistaril, and Trazadone over the time he has been incarcerated. He took no medication at the time of this evaluation. He stated that Doxepin had been helpful, but that the other drugs were not. He refused further drug therapy late in 2001, when the prison psychiatrist refused to prescribe Doxepin, and contact with psychiatry was conducted over closed circuit television.

This man was reportedly "incorrigible" from his middle school years on up. Behavior issues were reported by family members, with his half-brother stating that this man had difficulty sitting still in school during middle school years and on. Nonetheless, he was described by family members and friends as caring and sensitive. He reportedly had a good relationship with his daughter, sons, and the children of friends. Biological relatives, friends, and previous members of the family (now not family members as a result of divorce) all indicated that they did not believe that Barry Jones was capable of committing the murder for which he was convicted.

In May of 1994, the examinee was living with his girlfriend, reportedly a prostitute and drug abuser. Her children and at least his own daughter also lived with them. The girlfriend's 4 year old daughter was pronounced dead on arrival at a local hospital. The emergency room physician noted signs of suspected abuse including multiple bruises on the torso and head, bleeding from the ears, scalp laceration, and trauma to the genital area. Death was determined to be from blunt force trauma to the child's abdomen. Multiple contusions and

abrasions to the child's head, neck, trunk, and extremities, as well as a deep scalp laceration and damage to genitalia were all reported to be the result of blunt trauma. The examinee was convicted of murder and received the death penalty for this crime.

During leisure time, this man has enjoyed soap carving, hunting, fishing, motorcycling, woodworking, and working on cars. His vocational experience has involved working at gas stations, and at quick change oil and lube businesses. His longest length of employment was 3-4 years at a gas station.

## BEHAVIORAL OBSERVATIONS AND MENTAL STATUS EXAMINATION
### Appearance:

This short statured, heavyset (5 foot, 5 inches tall, 184 pounds), man with brown eyes, and thinning greying brown hair was seen on three days for testing and interviewing in a room of the Special Management Unit (SMU-II) of the State Prison at Florence. He had crow's feet around his eyes, and had a double chin. He was missing several teeth, and those he had were crooked. A cap was missing from one tooth, and the stump of the tooth was visible in his mouth. He sported multiple tattoos and his hands, fingers, legs. He stated that most were done by himself, using shaved pencil lead and shampoo, applied with a sharpened paper clip or a staple on the end of a pencil eraser. He also had three small "studs" in his left ear. He indicated that he had made the holes in his ear by shoving a paper clip through. When the examiner winced at the mention of this, the examinee stated , "You gotta do something every once in a while to prove you're alive. It's like indigestion – you need to eat bad food and have it to prove what good food is." This man also had numerous scars. He stated that ones on his hand were from knocking out doors. One on his left upper arm was from a self inflicted shotgun wound, and one was from being shot by a man whose wife the examinee was "hangin with". He said that the bullet was removed by a veterinarian, which was easier than answering lots of questions in a hospital. He had a large scar on his left chest from a fight, and other scars were reportedly from on the job injuries when he worked as an ironworker with hot metal. The degree of self-mutilation and seen in this man is unusual in the context of the normal population, and even for the prison population. He had a yellowed, third nail on his left hand, which appeared to have a fungus. His left thumbnail was misshapen. He stated that three of the five fingers of his left hand were severed in an accident. While he has nails on all of these digits, scars from reattachment were visible, and he said that he had limited sensation. He indicated that prisoners did not get to shower daily, and that he washed his hair in his cell, and shaved with an electric razor prior to our meeting. The skin on his neck was chafed and red, becoming more inflamed on subsequent visits. He was clean, wearing the standard orange prison jumpsuit, orange T-shirt, and slip on shoes to each appointment. His clothing was wrinkled, with collar untidy, and one closure partially open on the first day of testing. Posture was good, as was eye contact. He arrived for testing wearing handcuffs and a belly belt each day. He wore leg irons and was chained to the floor of the examination room. He wore a stun cuff on the first day of testing, and a stun belt during subsequent testing. He wore a gold chain with a cross, a wedding ring, and a watch on each day of testing and interviewing.

3

**Behavior:**

On each day of testing, this man was talkative and gregarious. He appeared calm and relaxed through most of the testing. While he asked few questions about test materials, protocols, or interpretation, he expressed a naive glee throughout testing. At times he made statements such as, "Oh wow!" or "That's a really tough one!" He showed a good sense of humor. When doing block designs, for example, he stated that it would be easier to make the designs if he was given a red marker and superglue.

During the course of testing, he was generally compliant with requests. Nonetheless, he became uncomfortable when asked to draw his family. He stated, "How do you draw freedom and life? That's what they mean to me. It's too important. I don't know how to draw it. It's like Faith Hill...beautiful and wholesome. You just can't put her in a nudie magazine. There is just nuthin' you can compare these people in my family to. I couldn't love 'em more. I just think about Larry – it's like I saw him yesterday. But, I can't put that on paper. They are the greatest things in the world."

This man was able to complete sentence completions, and used good creative powers to make up stories to cards of the Thematic Apperception Test. He tried to continue on a theme between cards, although this was not part of the directions. When presented with cards of the Rorschach, however, he stated that he didn't like that test. He took it once in adolescence with an examiner he did not like, and this time he simply said that the cards looked like inkblots. He appeared to have more difficulty putting organization on the relatively unstructured materials for this test. He was cooperative, but seemed somewhat frightened by this test, and the memories it invoked.

**Motor Control:**

Motor control of upper extremities was intact for work done at tabletop level.

**Speech:**

Speech was appropriate. He had a southern accent, and spoke with a simple vocabulary belying his measured skills.

**Mood:**

He was pleasant and amiable towards the examiner at all times. Mood was appropriate to situation. At times, he seemed depressed, stating that he served no useful purpose, and that he was "set to go." At other times, he seemed to take pride in himself, and tried to be appropriate and jovial in interactions.

**Affect:**

He showed a full range of affect, generally appropriate to situation.

**Thought Process:**

Thought process was intact. No overt reality contact problems were noted. No psychotic thought content was noted. Hallucinations were not reported.

**Orientation:**
The examinee was oriented to person, place, time, and circumstances on each test day. He was able to give personal history information.

**Insight:**
Insight was within normal limits.

**Judgment:**
Judgment appeared to be limited, based on observation, and on the content of interview.

**TESTS ADMINISTERED**
Several neuropsychological evaluation instruments were utilized. A wide variety of tests was administered in order to assess attention, concentration, memory, intelligence, language skills, visual-spatial analysis and organization, complex reasoning, motor efficiency of the upper extremities, lateral preference, personality, and mental status. The tests are listed on a separate score page at the end of this report.

Jeannette Sheldon, investigator for the Federal Public Defenders office introduced the examiner to Mr. Jones, and she observed portions of the testing.

**TEST RESULTS**
**Approach to testing:**
On the Test of Memory Malingering, this man produced a score that was within normal limits. While he made two errors of the Recognition trial, his scores on Trial 2 and on the Retention trial were perfect. This suggests that he performed with appropriate effort, and was not malingering.

**Attention/Concentration:**
Information processing speed was above average on simple tasks. On Trails A, his performance was at the 90th percentile for age (Tombaugh norms), and at T=61 using the Heaton norms. On Trails B, a more difficult task involving double conceptual tracking, he was at the 80th percentile for age (Tombaugh norms), and at T=63 using Heaton's norms. Attentional problems were noted, however, on other tests. He made no errors on Mental Control items of the WMS-III, yet his processing time increased disproprtionately as items became more difficult. On the Sbordone Attention Battery, he made multiple errors. Errors were on items as simple as serial 7 subtraction, and as difficult as indicating letters containing only straight lines when printed. He also made errors on serial 3 and 5 addition. In contrast, on the D2 Test of Attention, he scored at the 84.1 percentile for speed, and had good accuracy (above the 90th percentile for age). His scores on the Paced Auditory Serial Addition Test (PASAT) were nearly one standard deviation above the mean on trial 1 (2.4 sec per item), .5 standard deviation below the mean on trial 2 (2.0 sec/item), .3 standard deviation above the mean on trial 3 (1.6 sec/item), and more than .5 standard deviation above the mean on trial 4 (1.2 sec/item).

**Executive Functioning:**

This man appeared to have variable skills on structured tests measuring executive functions. On the Wisconsin Card Sorting Test, he achieved six categories in 71 trials. His score on the Category Test was in an average range (T=50 on the Heaton norms). On verbally mediated tasks sensitive to frontal lobe function, however, he produced scores in a below average range. His score on Controlled Oral Word Association was more than 1.5 standard deviations below the mean for individuals of his age and education, and below the 10th percentile (Tombaugh norms). On animal naming, a task with semantic organization, he scored nearly one standard deviation below the mean for individuals of his age and educational level, which placed his score below the 25th percentile (Tombaugh norms). Note that he had difficulty with organizing material for retrieval on the Rey Auditory Verbal Learning Test. He started with words in the middle of the list, rather than showing a primacy or recency effect at first. After a few trials, he showed learning, and began to use more successful strategies for memorization.

**Language Functioning:**

He was able to understand spoken language and could follow commands easily when his attention was on task. No unusual verbalizations were noted. Verbal IQ was in the High Average range.

**Memory Functioning:**

Memory was variable. He showed more difficulty on tasks requiring visual processing than on those requiring language processing. He benefited from experience and multiple exposure to stimuli. Scores ranged from the 1st percentile (Visual Delayed memory) to the 37th percentile for Auditory Recognition Delayed. His scores were nearly 2 standard deviations below the mean for individuals of his age on a rote learning task involving word lists. His ability to organize material for recall was definitely impaired.

**General Intellectual Functioning:**

This man's overall intelligence rated into the Average Range. Psychometric intelligence rated into the low end of the High Average Range for abilities involving comprehension and usage of language, and into the Average Range for abilities requiring visual analysis and manual manipulation of objects under timed conditions. Significant intersubtest score scatter was seen, with scaled scores ranging from a high of 16 on Comprehension to a low of 8 on Picture Arrangement.

Note that this man's scores were quite different from those produced in testing from 1994. Statistical properties of the Wechsler Adult Intelligence Scale-III are such that one expects WAIS-III scores to be less than corresponding IQ scores from the previous version of the test (WAIS-R). WAIS-III was administered recently; WAIS-R was administered in 1994. It is interesting to note that Mr. Jones produced a Verbal IQ 28 points higher than previously, a Performance IQ 8 points higher, and a Full Scale IQ that was 35 pints higher. Based on his scores on measures of cooperation, he was near the cutoff for malingering in 1994, but in a range found in non-malingerers in this most recent examination. This, along with observations in regard to cooperation, suggests that the current evaluation most accurately depicts this man's true relative strengths and weaknesses.

## Academic Achievement:

On a test of reading comprehension, this man performed at the 67th percentile in relation to his age peers. On a test of arithmetic, he scored at the 21st percentile. On a test of spelling, he performed at the 68th percentile.

## Motor Functioning:

Motor functioning was variable. His performances were within normal limits on a test of simple motor speed (T=55 for the right hand, T=54 for the left hand on Heaton norms). On a test requiring eye-hand dexterity and psychomotor speed, his performances were within normal limits for the preferred right hand (T=58), and well below average for the left (T=25). Note that he partially severed three fingers on the left hand in an accident several years ago and that sensory loss and poor fine motor dexterity may be impaired as a result.

## Sensory-Perceptual Functioning:

He was able to identify objects and draw them on direct copy. His drawing of a Greek cross was significantly impaired, being asymmetrical. His drawing of a key was poorly detailed. Placement of figures was unusual, in that they were placed in the center of the paper. His drawing of a clock was also asymmetrical. The right side of the clock had 7 digits rather than 6. When asked to draw a picture of himself, the left side of the body was asymmetrical. The arm was shorter, and the foot was shorter. The legs were not separated. This would make balance nearly impossible. His score on the Hooper Visual Organization Test was below average. On finger gnosis, he had difficulty with sensory information in the left hand. On perception of numbers written on his fingertips, his scores were significantly impaired bilaterally. On a complex perceptual-motor task, requiring solution of a formboard by tactile cues alone, without the aid of vision, he was able to complete all three trials. When using the right hand, his score was at T=42 (Heaton norms), when using the left hand, his score was at T=48, and when using the two hands simultaneously, his score was at T=40. On a test of speech perception, he scored within normal limits (T=58 on the Heaton norms), but on the Seashore Rhythm Test, he scored in a lower range (T=47). The tape needed to be turned to its loudest level for the test.

## Personality Functioning:

This man was administered a variety of personality tests. His score on the objective Beck Depression Inventory was in a severely depressed range.

On an incomplete sentences blank, responses were suggestive of depression, and control issues. He acknowledged problems with his lifestyle, and reported feeling bad about grief he has caused his family.

Further projective testing was done with the Thematic Apperception Test (TAT), the Rorschach Inkblot Test, and with projective drawings. On the TAT, stories had themes of frustration and loneliness. His stories were well elaborated, and all had happy endings. On the Rorschach, the examinee showed himself to be rather constricted. He was unable to let down his defenses in order to respond in a manner that would allow scoring. Projective drawings were unusual. When asked to draw his family, he refused (see behavior section on page 4.

7

## DIAGNOSTIC IMPRESSION

The pattern of test results is most consistent with variable attention, frontal lobe dysfunction, and with right hemisphere inefficiencies in general.  Results are consistent with damage to brain tissue.

## IMPLICATIONS & RECOMMENDATIONS

This man would benefit from a full neurological and psychiatric evaluation.  He exhibited a variety of signs/symptoms of depression.  His self mutilating behavior, including his tattoos and the manner in which they were made, as well as his piercings should be discussed in the context of psychiatric evaluation.  A complete review of his medication history would be appropriate in conjunction with interview and accumulation of additional medical test data.  This man reportedly did well on Doxepin, and a psychiatrist may wish to consider it again.  Given the variable attention noted in this evaluation, a neurologist may wish to investigate and rule out the following conditions:  Seizure disorder ( a disorder caused by abnormal electrical discharges within the brain) and Attention Deficit Disorder.

A hearing evaluation would also be appropriate.  He needed to have auditory-verbal materials presented at very loud levels.  He did not appear to hear extraneous noise outside the testing room at all.

Poor judgment, impulse control problems, inattention, poor organization/planning, and poor school and work histories are all hallmarks of untreated attention deficit disorders and/or frontal lobe disorders.  Violent behavior may result from a variety of root causes, involving neurological, toxic, characterological, social, and situational factors.  These factors most often appear act in combination, resulting in the violent behavior.  In short, a variety of factors existed for this man, that taken together may have resulted in violence.  Abuse, whether physical or emotional, may interact with other aforementioned factors.  This man's substance abuse may well have been a naïve attempt at self medication, that in conjunction with other previously mentioned factors ultimately led to violence.

Note that the IQ is a global measure of performance.  Individuals can show great variation (intersubtest score scatter) between different skills that are not well reflected in the actual IQ numbers.  Discrepancies that are statistically significant are frequently seen in individuals with neurological impairments.  In addition, while overall IQ may be in an average or higher range, individuals may still have significant cognitive problems that lead to behaviors that are outside the norm.

Counsel has requested that a statement be made about premeditation.  Based on information from this testing and interview, it is unlikely that his man would've been capable of violent acts without the influence of drugs and alcohol. This would be quite different from methodically carrying out criminal activity with intention, and after reflection.

8

Thank you for referring this fascinating, troubled man for evaluation. If I can be of additional assistance, please contact me.

Alan L. Goldberg, PsyD, ABPP

Alan L. Goldberg, Psy.D., ABPP
Arizona and California Licensed Psychologist
Diplomate, American Board of Professional Psychology (RP)

# NEUROPSYCHOLOGICAL REPORT -- ADULT

**Name: Barry Jones**　　　　**Age: 43**　　　**Education: 10+ (GED)**　　**Date: 4/22-4/24/02**

## HALSTEAD-REITAN ADULT TESTS:
### CATEGORY
1) 0　　2) 1　　3) 20　　4) 4　　5) 6　　6) 4
7) 3　　　　Total Errors: 38

### T.P.T. ( 10 blocks )
RH: 7.0　min. 10/10　Total Time:　16.6 min.
LH: 5.0　min. 10/10　Memory:　　7
BH: 4.6　min. 10/10　Location:　　2

### SEASHORE RHYTHM TEST
Raw Score: 25　　　　　Rank: 6

### SPEECH PERCEPTION: Errors: 3

### TAPPING　　　RH 55　　　LH 49

### LATERAL PREFERENCES:
Hand Preference　　R
Foot Preference　　R

### SENSORY IMPERCEPTION (errors)
Tactile　　R 0　　L 0　　Both R 0　　L 0
Auditory　R 4　　L 4　　Both R 4　　L 4
Visual　　R 0　　L 0　　Both R 0　　L 0
Finger Agnosia　R 1　　L 7
Fingertip #　　R 10　　L 11

### GROOVED PEGBOARD
RH 60 sec 0 dropped　　LH 119 sec 2 dropped

### TRAILS
A 20 sec  0 errors　　B 51 sec  0 errors

### WISCONSIN CARD SORT: 6  categories/71 trials

### REY AUDITORY VERBAL LEARNING TEST
I 6　II 9　III 7　IV 8　V 7　B 6　VI 6
Recognition  11
30 min recall  7　　30 min recog. 12

### REITAN-INDIANA APHASIA SCREENING TEST
### SBORDONE ATTENTION BATTERY
### D2 TEST OF ATTENTION
Speed  84.1%ile, Accuracy  >90%ile

### PASAT
I  53　II  37　III  37　IV  30

### HOOPER VOT  25

### CONTROLLED ORAL WORD ASSOCIATION
F- 7, A - 6 , S - 10
Animals – 16

### TEST OF MEMORY MALINGERING
Recognition Trial - 48
Trial 2 - 50
Retention - 50

### INCOMPLETE SENTENCES
### TAT
### RORSCHACH INKBLOT TEST
### BECK DEPRESSION INVENTORY – II  43

## WAIS-III
| | |
|---|---|
| Verbal IQ | 116 |
| Performance IQ | 98 |
| Full Scale IQ | 108 |
| Picture Completion | 11 |
| Vocabulary | 14 |
| Digit Symbol | 10 |
| Similarities | 13 |
| Block Design | 9 |
| Arithmetic | 15 |
| Matrix Reasoning | 11 |
| Digit Span | 9 |
| Information | 9 |
| Picture Arrangement | 8 |
| Comprehension | 16 |

## WIDE RANGE ACHIEVEMENT TEST-3:
| | |
|---|---|
| Spelling | %ile  68 |
| Arithmetic | %ile  21 |

## WOODCOCK READING MASTERY TESTS-R
| | |
|---|---|
| Passage Comprehension | %ile  67 |

## WECHSLER MEMORY SCALE - III
| | |
|---|---|
| Auditory Immediate | %ile  34 |
| Visual Immediate | %ile  2 |
| Immediate Memory | %ile  7 |
| Auditory Delayed | %ile  23 |
| Visual Delayed | %ile  1 |
| Auditory Recognition. Delayed | %ile  37 |
| General Memory | %ile  7 |
| Working Memory | %ile  27 |

**Exhibit 43**

## DECLARATION OF PAMELA BLAKE, M.D.

I, Dr. Pamela Blake, declare under penalty of perjury the following to be true to the best of my information and belief:

1.      I am a licensed neurologist.  A copy of my *curriculum vitae*, which reflects my education and experience, is true and correct and attached hereto as "Attachment A."

2.      At the request of counsel for Barry Lee Jones ("Mr. Jones"), I conducted a neurological evaluation of Mr. Jones on death row at the Special Management Unit II within the Arizona Department of Corrections in Florence, Arizona.  The evaluation took place on August 7, 2002, for a total of four (4) hours.

3.      The purpose of the testing was to complete a neurological examination and several neurological evaluation instruments were utilized.  A wide variety of tests was administered in order to assess attention, concentration, memory, intelligence, language skills, visual-spatial analysis and organization, complex reasoning, motor efficiency of the upper extremities, lateral preference, personality, and mental status.

4.      The materials I reviewed to prepare for Mr. Jones's neurological

1

evaluation included legal, educational, medical, and psychiatric records.

5.   My observations, impressions, and professional opinions are set forth in the Neurological Evaluation signed by me on December 20, 2002, a true and correct copy of which is attached hereto as "Attachment B."

6.   The observations, impressions and professional opinions set forth in the Neurological Evaluation are true and correct.

I declare under the penalty for perjury under the laws of the United States and the District of Columbia, that the foregoing is true and correct.

Signed this 20th day of December , 2002.

_Pamela Blake, M.D._ (signature)

Pamela Blake, M.D.

`

# CURRICULUM VITAE

**Pamela Young Blake, M.D.**

**Biographical Information**

**Home Address:**
1 Basildon Circle
Rockville, Maryland 20850
(301) 610-9304
pamelablakemd@msn.com

**Office Address:**
Department of Neurology
Georgetown University Medical Center
3800 Reservoir Road
Washington, D.C. 20007
(202) 784-2406
(202) 784-2261 facsimile
blakep@georgetown.edu

**Place and date of birth:**
Montclair, New Jersey
January 25, 1964

**Personal:**
Married, spouse Kevin Blake; 2 children

**Social Security Number:**
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

**Citizenship:**
United States

**Licensure:**
District of Columbia, #MD21165
Awarded 1/1/01, exp. 12/31/2002

Maryland, #D46060
Awarded 5/13/94, exp. 9/30/96

**Certification:**
American Board of Psychiatry and Neurology
April, 1996; expires 2006
Certificate #42774

**Education:**
June 2001
Visiting Fellowship
Harvard School of Medicine/ Massachusetts General Hospital
NMR Center
Cambridge, MA
fMRI: Clinical Applications (course audited)

July 1994 - June 1995
Fellowship
Department of Neuro-Ophthalmology

The Wilmer Eye Institute
The Johns Hopkins University Hospital
601 North Broadway
Baltimore, Maryland 21287-9204
Neil R. Miller, M.D., Director of Neuro-
Ophthalmology Unit
Morton Goldberg, M.D., Chairman
(including training in vestibular diseases with
David S. Zee, MD, and extensive training in
Transcranial Doppler with Alex Razumovsky,
    PhD)

July 1991 - June 1994
Residency
Department of Neurology
Georgetown University Medical Center
3800 Reservoir Road, N.W.
Washington, D.C. 20007
Jonathan H. Pincus, M.D., Chairman

July 1990-June 1991
Internship
Department of Internal Medicine
Washington Hospital Center
110 Irving Street, N.W.
Washington, D.C.
James Curtin, M.D., Chairman

August 1986-May 1990
Medical Degree
Georgetown University School of Medicine
3700 Reservoir Road, NW
Washington, D.C. 20007

August 1982-May 1986
B.S. Biology, *cum laude*
University of Scranton
Scranton, Pennsylvania 18510

**Professional Experience:**                Contracted provider, District of Columbia Superior Court
Performing neurologic evaluations and providing
neurologic/neuro-psychiatric treatment for juveniles and adults
in the court system
July 2002- present

Consultant, National Center for Alternatives and Institutions,
Alexandria, VA, performing neurological evaluations of
youths in the Maryland Dept of Juvenile Justice
March 2002 – June, 2002

Director, Georgetown University Headache Clinic
March 2001 - present

Assistant Professor, Department of Neurology

2

Georgetown University Medical Center
3800 Reservoir Road, N.W.
Washington, D.C. 20007
Michael Sirdofsky, M.D., Interim Chairman
July 1996 - present

Instructor, Department of Neurology
Georgetown University Medical Center
3800 Reservoir Road, N.W.
Washington, D.C. 20007
Stanley L. Cohan, M.D., Chairman
July 1995 - July 1996

Director, Neuro-Ophthalmology Laboratory
Georgetown University Medical Center
January 1998 - 2000

**Honors and Awards:**

1988 Doukas Award for Research
Georgetown University School of Medicine

1985 National Endowment for the Humanities
Fellowship for undergraduate study

**Professional Societies:**

American Academy of Neurology, 1993 - present
    Consortium of Neurology Clerkship
    Directors
    Section on Neuro-Ophthalmology and
    Neuro-Otology

North American Neuro-Ophthalmology Society, 1994 -
present

Benign Essential Blepharospasm Research
Foundation, 1998 - present

Pseudotumor Cerebri Society, 1998 - present

**Invited Lectures:**

**HOSPITAL**

1. Medical student lectures
Georgetown University Hospital
Approximately 12-14/year
1995 – present

2. Lectures to Residents and Staff
Departments of Neurology, Ophthalmology and
Otolaryngology
Georgetown University Hospital, Washington Hospital Center
5-10/year
1995 - present

3

**LOCAL/NATIONAL**

<u>Neurologic Dysfunction in Aggressive and Antisocial</u>
<u>Disorders</u>
National Association for Sentencing Advocates
2002 national meeting, Washington, DC

<u>Migraine-related dizziness</u>
Grand Rounds,
 Department of Otolaryngology
Georgetown University Hospital
February 2002

<u>PET and SPECT scanning: Clinical Applications</u>
NANOS annual meeting, Palm Springs, CA,
February 2001

<u>Medical Management of Blepharospasm</u>
The Northern Va. Chapter of the Benign Essential
Blepharosasm research foundation
November 2000

<u>Papilledema in Idiopathic Intracranial Hypertension and Dural</u>
<u>Sinus Occlusive Disease</u>
Grand Rounds, Dept of Ophthalmology
Georgetown University Medical Center,
April 2000

<u>Migraine: Current Concepts in Pathophysiology and Treatment</u>
Grand Rounds, Dept. Of Obstetrics and
Gynecology, Georgetown University Medical
         Center, September 1999

<u>Childhood Victimization: A Potential link to</u>
         <u>Violence</u>
Acute Brain Injury Foundation National Meeting
New Orleans, LA
November 1998

<u>Under-diagnosed Causes of Dizziness:</u>
         <u>Endolymphatic hydrops and Phobic Postural</u>
                 <u>Vertigo</u>
Grand Rounds, Department of Otolaryngology
Georgetown University Medical Center
October 1998

<u>Cortical Interpretation of Vision</u>
Grand Rounds, Department of Ophthalmology
Georgetown University Medical Center
         November 1997

<u>Vertigo, Hearing Loss and Tinnitus</u>
George Washington University Medical School
Washington, DC
April 1997

<u>Migraine: Current concepts in Pathophysiology, Diagnosis and Treatment</u>
Grand Rounds, Department of Internal Medicine
Georgetown University Medical Center
January 1997

<u>Acute Management of Stroke</u>
Calvert Memorial Hospital
November 1996

<u>The Stroke Clinical Process Team</u>
Grand Rounds, Department of Neurology
Georgetown University Medical Center
August 1996

<u>Cerebrovascular complications of cerebral angiography and angioplasty</u>
Division of Cardiology
Georgetown University Medical Center
June 1996

<u>Migraine: Diagnosis and Treatment</u>
Georgetown University Medial Center at Ballston, Va.
March 1996

**University Service:**

Georgetown University Hospital Clinical Services Task Force
October 2000

Chair, Clinical Pathways Sub-committee of Georgetown Medicare Demonstration Project; overseeing the production and implementation of algorithms to guide inpatient and outpatient care [disease management] of Medicare patients in the District of Colombia Funded by Healthcare Financing Administration
December 1998 – December 2000

Member, Committee on Medical Education, Subcommittee on Clinical Clerkships,
            March 1997-present

Member, Information Services Advisory Committee
September 1997 - 1999

Member, Committee for the Study of the Compensation for the Teaching Effort, March 1997 - 1998

Chair, Stroke Clinical Process Team,
Georgetown University Medical Center
December 1995 - January 1997

Member, Stroke Response Team

5

July 1995 - present

U. S. Senate Health Fair, June 1996
Stroke and Headache Lectures for U.S. Senate

**Teaching Activities:**

Director, Medical Student Neurology Clerkship
Georgetown University School of Medicine
July 1995 - present

Preceptor, First year course in Ambulatory Care
Georgetown University School of Medicine

Preceptor, Georgetown University School of Nursing
Nurse Practitioner Advanced Degree Program
November 1996 - 1998

**Scholarship and Research:**

**Research:**

Cortical Hyperexcitability in Migraine demonstrated by
functional MRI
Center for the Study of Learning/Department of Neurology
Georgetown University Hospital
November 2001 - present

Longitudinal Optic Neuritis Study
The Jaeb Health Center for Research, Tampa FL
March 2001- present

Clinical Events Committee, Embol-X clinical trials
Chilter International, Inc
Austin, TX
April 2000 – December 2001

Co- Investigator, Citicholine in Acute Stroke
Interneuron Pharmaceuticals
March 1997-1998

Lubeluzole in Acute Stroke
Janssen Pharmaceuticals
December 1995- 1997

Co-investigator, Ancrod in Acute Stroke
Ancrod Study group
Knoll Pharmaceuticals
July 1995 - 1997

**Media Appearances:**

"New Approaches to Headache"
WCBS, CBS affiliate, Washington, DC
March 2002

6

"Memory problems"
WJLA, ABC affiliate, Washington, DC
February, 2001

"Beta-blockers in Migraine"
ABC affiliate, Washington, DC
January, 2001

"Recent findings on the etiology of violent behavior"
CNN, August 2000

"Neurologic Dysfunction in Violence"
CNN, November 1998

"Risk associated with the use of Stadol"
ABC News, August 1995


## Publications:

**Original Papers:**

Ciolino J, Blake P.  Familial pseudotumor cerebri.  Journal of Neuro-ophthalmology, in press.

Sabet H, Nguyen D, Blake PY.  "Alexia without agraphia in Eclampsia." Journal of Neuro-ophthalmology, in press.

Blake PY, Van Meter J, Juhnson . PET and SPECT scanning in Neuro-ophthalmology.   Journal of Neuro-Ophthalmology, in press.

Blake PY, Miller, NM.  Bilateral homonymous hemianopsias due to steal phenomenon from a left occipital AVM.   European Journal of Neuro-Ophthalmology, 16: , 1997.

Blake PY, Pincus JH. Neurologic Abnormalities in Murderers [letter]. Neurology, 47(6): 1610-1611, December 1996.

Blake PY, Mark AS, Kattah J, Kolsky M. MR Imaging of Oculomotor Nerve Palsy (abs) Mosby Year Book of Diagnostic Radiology, 1995. Mosby Publishing, Chicago, IL

Blake PY, Mark AS, Kattah J, Kolsky M.  MR Imaging of Oculomotor Nerve Palsy.
American Journal of Neuroradiology 16:1665-1972, September 1995

Blake PY, Miller NR, Long DM.  Treatment of cavernous sinus meningiomas [letter].
Journal of Neurosurgery 1995; 82:180.

Blake PY, Pincus JH, Bruckner C.  Neurologic Abnormalities in Murders. Neurology.
1995; 45:1641-1647

Mark AS, Blake PY, Atlas SW, Ross M, Brown D, Kolsky M.  GD-DTPA Enhancement of the Cisternal Portion of the Oculomotor Nerve on MR Imaging; American Journal of Neuroradiology, 13;1463-1470, Sept/Oct 1992.

7

**Textbook chapters:**

Blake PY, Miller NR.  Neuro-Ophthalmology and the Orbit.  In: The Oxford Textbook of Ophthalmology, 1996.

**Abstracts:**

1. Blake PY, VanMeter JV, Moriarty-Sheehan, M., Zeffiro, T. Cortical hyperexcitability in migraine demonstrated by functional Magnetic Resonance Imaging.  2002 meeting of the American Neurological Asssociation, Chicago, IL.

2. Blake, PY, Ellison J, Kolsky MP.  Familial Pseudotumor: Report of two cases and Review of the Literature.  2000 North American Neuro-Ophthalmology Society meeting, Montreal Canada

3. Blake PY, Chrousos G, Mejico L.  Cyclophosphamide in the management of steroid-dependent optic neuritis.  1999 North American Neuro-Ophthalmology Society meeting, Snowmass, CO.

4. Blake PY, Scharper P, Wang CC, Cullen, K.  Sixth cranial nerve palsy after radiation therapy for nasopharyngeal carcinoma.    1999 North Americal Neuro-Ophthalmology Society meeting, Snowmass, CO.

5. Martin J, Chrousos G, Blake P, Kolsky, M.  Hyperhomocysteinemia in recurrent branch retinal arterial occlusions.  American Academy of Ophthalmology, New Orleans, 1998.

6. Martin J, Chrousos G, Blake PY.  Elevated serum homocysteine as a cause of branch retinal arterial occlusions in elderly patients.  ARVO meeting, 1997.

7. Blake PY, Miller NR.  An Unusual Cause of Bilateral Central Scotomas.  Presented at the 1995 annual meeting of the Frank G. Walsh Society, Washington, D.C.

8. Pincus JH, Blake PY, Lewis DO.  Neurological Abnormalities in Murderers (abs).  Annals of Neurology 1993; 34-250.  Presented at the 1993 Annual Meeting of the American Neurological Association.

9. Blake PY, Mark AS, Kolsky M, Kattah J.  Magnetic Resonance Imaging in Third Nerve Palsy (abs).  Annals of Neurology 1992; 32-260. Presented at the 1992 Annual Meeting of the American Neurological Association.

10. Mark AS, Blake PY, Atlas SW, Ross M, Kolsky M.  Enhancement of the Oculomotor Nerve on MR imaging.  Presented at the 1991 Annual Meeting of the North American Neuro-Ophthalmologic Society.

11. Mark AS, Blake PY, Atlas SW, Ross M. Kolsky M.  Enhancement of the Oculomotor Nerve on MR imaging.  Presented at the 77th Scientific Assembly and Annual Meeting, Radiologic Society of North America, 1991.

**Non-peer reviewed articles:**

Blake, PY: Visual loss during pregnancy.  Ophthalmology News, 1996.

**Pamela Blake, MD**
**Assistant Professor,**
**Department of Neurology**
**Georgetown University Hospital**

---

**December 20, 2002**

**Neurological Evaluation of Barry Lee Jones (DOB 8/26/58)**
**Date of evaluation 8/7/02**

Mr. Jones is a 43 year-old man who is referred for neurological evaluation in the course of legal proceedings. This evaluation is based on the following documents and interviews:

- Records from VisionQuest spanning the period 12/19/74 – 12/31/76
- Psychiatric assessment of Barry Lee Jones by Herbert Lazarus, M.D., 1/22/75
- Outpatient records from the Southern Arizona Mental Health Center, dates of treatment 6/8/92 – 6/30/92
- Inpatient records from Kino Community Hospital for admission dated 6/25/92 – 6/28/92
- Psychological assessment of Barry Lee Jones by Joseph Geffen, Ph.D., 11/4/94
- Videotape of Barry Lee Jones 5/2/94
- Videotape of Angela Gray 5/3/94
- Partial transcripts of the trial of Barry Lee Jones, 1995
- Report of the autopsy of Rachel Gray
- Neurospychological assessment of Mr. Barry Lee Jones by Alan Goldberg, Psy.D., 8/4/02
- Personal interview and examination of Mr. Barry Lee Jones at the Arizona Department of Corrections, Florence, AZ, 8/7/02

**Social/family history**

Barry Lee Jones is the son of Florence Jones, who died in 1997; his father has been listed in the records as being Mr. Paul Jones, although it has recently been suggested that Barry Jones's father may have in fact been a man named James Carter, with whom Mrs. Jones had a liaison while Mr. Jones was stationed away in the military. Almost nothing is known about Mr. Carter other than that he was engaged in an ongoing relationship with Ms. Jones during Mr. Jones' absences. Paul Jones died in 1973.

Florence Jones' marriage to Paul Jones was her second marriage, her first marriage was in about 1950 to J. T. Harris. Florence and J.T. had 2 sons: James, who was born in about 1951 but died in infancy, and Otis, born in 1952. Otis has done well, with no legal problems. He was instrumental in rearing Mr. Jones during his childhood, and then went on to serve in the military and then as a police officer. He is currently the director of plant security at Fort Huachuca in Arizona.

Florence had three more sons. Barry Jones and his fraternal twin, Larry, were born in 1958, while Paul Jones was stationed in Germany. Larry had behavioral problems similar to Mr. Jones's during his childhood and was enrolled in the same intervention programs. Larry died in 1994 from gastric ulcers. The final son in the family, Phillip, was born in about 1964. Mr. Jones believes Phillip to be a full brother, that is, the son of Florence and Paul Jones. Phillip is now 38 and living in Arizona. He has had problems with drugs and traffic violations. Phil has had very little contact with Mr. Jones and does not come to visit him in prison as he has outstanding warrants.

Barry Jones's early years were marked by the prolonged absence of his father, who served in the military from before the birth of Barry and Larry until the twins were about 11 years of age, and by the neglect and influence of his mother, whom Mr. Jones affectionately describes as "rowdy." For a period of several years Paul Jones prolonged his military service, stationed in Germany apparently in order to avoid living with Florence. Their relationship was marked with a fair amount of turmoil. The family was poor and moved around quite a bit, generally between South Carolina and Georgia. It was difficult, while obtaining the history, to keep track of where the family was living during various times of Mr. Jones's life. There is an air of inconstancy and frequent financial troubles. Mr. Jones intimated that some of the moves may have been precipitated in an effort to avoid some of the problems; for instance, the family moved to Arizona in around 1970 without family, a job for Mr. Jones, or any other compelling reason to make such a move. Otis states in a separate interview that that move was made to avoid bill collectors. During the time Paul was away, for the first several years of their lives, Otis was the primary caregiver for Mr. Jones and Larry, changing their diapers, providing meals for them and even toilet-training them.

Florence was reared by her father, James "Papa" Hall. He was an intimidating and perhaps abusive man who ruled "with an iron hand," according to Otis. Florence did graduate from school and served in menial tasks throughout her life. Florence was a heavy smoker for many years, and she died of complications from emphysema. She was also a heavy drinker, although she stopped drinking about 10 years before she died in 1997. Ms. Jones has been described in the records and also by Mr. Jones as having a volatile temper and, more importantly, as perhaps being psychotic. With respect to her temper, Mr. Jones recounted several incidents of outbursts and violent behaviors perpetrated by his mother and frequently fueled by alcohol. For example, Mr. Jones told us the story of how her mother once got so angry with her father once after they had both been drinking that, as he bent over to vomit into a toilet, she stabbed him in the back with a paring knife. Physical fights between Mr. and Ms. Jones were common and frequently followed nights of drinking in the bar. Mr. Jones also recounted with amusement an

incident in which his mother became so angry with a man (who was a soldier in the US Army) that he fled her attacks and wrapped his body around a tree to protect himself. Florence tried to pull him off the tree to continue beating him. Florence was not a squeamish woman; this is illustrated by the fact that she circumcised all of her sons.

Florence was hospitalized in Georgia when Mr. Jones and Larry were just a few years old for delusions. The full scope of the situation as described by Mr. Jones suggests that she was psychotic. Mr. Jones was able to give only a small amount of detail. He remembered that when he and Larry were young, and were largely being cared for by their older brother Otis, Florence began imagining that someone was hiding in the broom closet. These delusions persisted to a degree at which Otis sought help, which resulted in Florence's hospitalization. Florence remained an inpatient for several months. We do not have records from that hospitalization to confirm these dates, but it is noted that Paul Jones was called home from the military to care for the children. Mr. Jones fiercely defends his mother and refuses to accept or agree that there was anything seriously wrong with her.

Barry Jones married Carol Jones in 1984 and they separated in 1992. They had three children, Brandie, born 1982, James, born 1985, and Andrew, born 1989. Both boys are now in foster care. Brandie lives in Stafford, AZ, has a one-year-old child and is unmarried. Brandi in particular has had legal and behavioral problems. On her 13th birthday, while jumping train tracks, her leg was traumatically amputated. Brandie had been living with Mr. Jones and Angela Gray at the time of Rachel's death, but Mr. Jones has only seen Brandie once since then. She writes occasionally but has not come to visit him in prison.

**Past medical/behavioral history**

Mr. Jones's medical history is significant for headaches. The medical records indicate medical visits for headaches which were diagnosed as cluster headaches in the past but which are in fact more typical of migraine headaches. He experiences headaches above the right eye occurring several times a month. There was a family history of headaches in his mother. He also describes sleep problems with delayed sleep latency.

Mr. Jones has mixed handedness. He writes with his right hand and uses a knife with his right hand. He throws a ball with his left hand and punches with his left hand. He does not prefer one foot in particular for kicking a ball. He was more strongly right handed when he was younger, and has used his left hand more as he has gotten older. He did suffer a traumatic amputation of the tips of three fingers on the left hand in 1976, when he was 18.

Mr. Jones' educational history is outlined fully below. It is characterized by frequent changes in schools as the family moved, numerous behavior problems, and school suspensions for poor behavior. Mr. Jones describes himself as a child as always "really

active." He got in trouble a lot for disturbing the class, for being out of his seat, and for fighting. He recalls his punishment as consisting of being sent behind a wall partition to separate him from the rest of the class. He recalls spending a lot of time behind the wall partition. He recalls also frequently having to write statements such as "I will not..." 100 times. He remembers that he could not keep his books or belongings organized. He was never in special education classes.

Mr. Jones' employment history is equally spotty and abounds with inconsistency and failure. Following school and discharge from the VisionQuest program, Mr. Jones worked at several jobs, usually for brief periods of time. The longest job he held was at a Chevron gas station, where he was employed for 2 years. He left that job because he was stealing from the owner, who was his friend. He enjoyed that job and during that period of time he did not miss any work and did not have any new legal problems. Mr. Jones was subsequently employed as an ironworker, mechanic, and then was self-employed performing odd jobs.

Mr. Jones has had numerous head injuries, too many for him to recall and outline. He has lost consciousness many times. He did describe certain, more memorable episodes. As a child in Georgia, he was thrown off a bike into a ditch and was knocked unconscious. Also while in Georgia, he fell from the top of a playground slide onto the concrete ground below, hitting his head on the cement. He was awakened by a playground monitor. He recalls his head hurting later that day, and feeling "like I had bricks in my head." At about the age of 15, while at St. David School, he was struck in the head with a ball being emitted by a ball-throwing machine when he leaned down directly in front of the machine. The ball hit him with such force that it took off the top layer of skin from the side of his face and neck. Another incident occurred when he was about 21 during which he was punched in the head while working at a gas station. He fell and struck his head on the gas pump and was "knocked out cold." A final incident Mr. Jones described occurred when he was about 24. He stuck by his brother Larry so hard that he not only lost consciousness, but sustained an injury to his jaw with immense swelling that rendered him unable to chew food for a period of several days. He did not seek medical care. Finally, Mr. Jones recalled one other episode but cannot recall when it happened or where he was living. He was driving in a car when a brick was thrown through the window, striking him in the head and knocking him unconscious. He lost control of the car and drove the car into an object.

Mr. Jones has had numerous criminal charges brought against him, which are outlined further below. He has essentially been at least on probation since he was a young teenager. Mr. Jones described his behavior history and the accompanying legal problems and academic failures to me with a feeling of puzzled remorse. He stated, "I wish I'd been different...it just wasn't in me." Also, with respect to his childhood infractions, he indicated, "I wasn't a bad kid, really...I was just curious." He downplays the seriousness of the incidents he is accused of, both more recent and in the distant past.

An initial psychiatric assessment of Mr. Jones was performed in 1975 upon referral from juvenile authorities, when Barry was enrolled in the VisionQuest program for youth. The

exact nature of the offenses that brought him to that program are not known; VisionQuest papers indicate "general incorrigibility." The psychiatric examination found that Barry had "no insight into his difficulties," and that he was not able to conform his behavior to social expectations. He was described as having a very low frustration tolerance and high impulsivity. These traits were also noted in the discharge summary from VisionQuest prepared in December 1976.

Mr. Jones was again evaluated psychiatrically following suicide threats in 1992 shortly after the dissolution of his marriage. He was diagnosed with Adjustment Disorder with depressed mood and rule-out Antisocial Personality Disorder. Mr. Jones was placed in outpatient counseling. Several weeks later, he made suicidal and homicidal threats to his therapist, who had him admitted to Kino Hospital for observation. He was an inpatient for several days and was diagnosed with Adjustment Disorder with anxious mood, Polysubstance Abuse, and Antisocial Personality Disorder. He was discharged to ongoing outpatient psychotherapy.

Mr. Jones has been on Doxepin, an antidepressant, and Mellaril, a neuroleptic, in the past. He found the Doxepin to be helpful in allowing him to feel more relaxed, but the medication was discontinued when he developed some cardiac rhythm disturbances.

In November 1994, 6 months after the death of Rachel Gray, a psychological evaluation of Mr. Jones was performed by Dr. Joseph Geffen, in part to assess competency. At that time, Mr. Jones reported a history of sleep and memory disturbances. He also reported occasionally hearing voices. He indicated that the voice was a "steady, male kid voice, a teen." He could not discern what the voice was saying nor attach any emotional content to the voice. He had first heard the voice a few years prior to that time, and he was particularly likely to hear it when under stress. The examination showed no evidence of psychosis or a thought disorder at that time. Cognitive testing was limited to IQ testing. There were no tests aimed at determining frontal lobe function performed. Intelligence testing with WAIS testing found the Verbal IQ to be 88, and Performance IQ was 90, and the Full Scale IQ was 90. An MMPI revealed that Mr. Jones "tends to think in a very concrete manner." Impairments in recognizing his own emotional responses and shallowness of interpersonal relationships were noted. It was also determined that Mr. Jones responses to the MMPI were consistent with the underreporting of psychopathology, and that scores on the MMPI should be interpreted as an underestimate of his psychopathology. The final conclusions were that Mr. Jones was of average to low-average intelligence, and that he was competent to assist counsel and stand trial. Dr. Geffen also wondered if Mr. Jones may have gone into a dissociative state during the questioning by police following his arrest in Rachel's death. Final diagnoses included Depressive Disorder, Polysubstance Abuse, and Personality Disorder with antisocial and borderline features.

Neuropsychological testing was performed in August 2002. Tests of attention and concentration revealed for the most part good results. On Trails A he performed well, in the 90th percentile. On Trails B he performed in the 60th percentile. He made multiple errors on the Sbordone Attention Battery but performed well on a different test of

attention. Tests of executive function indicated variable results. On the Wisconsin Card Sort he showed impairments in the verbally-mediated tasks. He scored poorly on tests of controlled word association and semantic organization. He had particular difficulty with organization of materials but was able to incorporate effective learning techniques. He performed in the normal range on tests of general academic achievement and intellectual functioning. Motor functioning was variable, with some impairment on the left side. There were many abnormalities in testing of sensory perception in visual and tactile domains. Beck depression testing revealed severe depression. Thematic Apperception Testing revealed findings consistent with frustration and loneliness. Rorschach testing showed emotional constriction. Final impressions included abnormalities of frontal lobe function, including variable attention, and right hemisphere motor and sensory function. Neurological and psychiatric evaluations were recommended.

Mr. Jones is currently on no medications, although based on his past favorable response to Doxepin, he has asked to be placed back on medications to control moods.

**Legal history**

Barry Jones was paroled for a number of infractions as a youngster including theft. He was on probation beginning in about 1971, at the age of 13. In December 1974 he was charged with statutory rape and classified as "incorrigible" by the juvenile court. He was placed in a long-term outpatient program of supervision and behavior modification called VisionQuest. He was in that program from December 1974 to December 1976. The psychiatric evaluation noted above indicated problems with poor insight, inability to control or conform his behaviors, and low frustration tolerance. Barry was placed in a group home to try to give him the support and structure he could not receive at home, as, by that time, his father was dead and his mother was drinking heavily and unable to control Barry or Larry. While the records reflect that Barry did well while placed in a foster home, Barry states that he continued to carry on with poor behavior that he just managed to hide from his foster parents. Whether this is true or bravado is not clear to me. He did do well working with his foster father in a structured environment, particularly as he was using his hands, one of his strengths. When he was removed from the Enoch's home and placed on a wagon train, he did poorly. Presumably he deteriorated upon his removal from the structured environment of the foster home. He became involved again with incidents of drinking and fighting, and he was removed from the train and sent back to Tucson.

Upon his discharge from the VisionQuest program, Mr. Jones' behavior quickly returned to excessive drinking and illegal activities. While a better assessment of his strengths was obtained, for the most part his behavior had not really changed, and Barry continued to have legal problems.

**Educational history**

6

Mr. Jones could not remember much about his early school years, including the name of the elementary school he attended.  Because of the frequent family moves, he thinks he did not attend any one school for more than two years.

**Kindergarten – 4th grade:** Mr. Jones did not attend kindergarten.  First through fourth grades were apparently uneventful. Grades earned were generally Cs with some Bs.

**Fifth grade:** Mr. Jones was suspended in the 5th grade for hitting a girl.   He recalled the incident as involving a black girl, whose brother Barry had bumped into. She slapped him in retaliation and he hit her back.  Mr. Jones recalls his mother as endorsing this response.  Mr. Jones was suspended a second time for fighting with a boy who had taken his pencil.  Perhaps because of the disruption in his schooling that year, Mr. Jones was held back in the 5th grade.

Mr. Jones was involved in the burning of a hay barn when he was in about the 5th grade. He describes the event as a childhood prank with boys hiding in the barn and the fire staring accidentally.  Mr. Jones denies any other episode of fire-setting.

**Sixth grade:** Again, Mr. Jones cannot remember much of the 6th grade.  He thinks he was not suspended during this grade.  It was during the 6th grade that the family moved to St. David, Arizona.  Mr. Jones began attending St. David public school.  He continued to have behavioral problems.  He recalls his father getting upset with him, and him promising to behave better, but then not being able to.  Mr. Jones had no suspensions during the 6th grade.

**Seventh grade:** Mr. Jones was suspended from the 7th grade for breaking into the school cafeteria; he says he was breaking in to get food for a friend whose parents did not feed adequately.  Two friends who participated in the break-in went to juvenile court.

**Eighth grade:** The Jones family moved to Benson, AZ during this year, and Mr. Jones attended Benson Middle School.  He got in trouble repeatedly and was on probation for all of this year.   He was suspended at least once for being in possession of alcohol after having stolen some wine.  Mr. Jones noted that by this time he hade a "bad reputation." He was once picked up by the Chief of Police and returned to the school after having been picked up.

**Ninth grade:** Mr. Jones attended Benson High School.  He recalls not being allowed to use power tools, presumably because he could not be entrusted with them.  His school performance continued to be adequate from an academic standpoint, but behavior continued to be very problematic.  He was arrested for theft and robbery.  He completed the grade.

**Tenth grade:** Mr. Jones did not complete 10th grade.  Midway through the year he was sent to the VisionQuest Program following a rape charge.

Mr. Jones completed his GED while in VisionQuest. He recalls the test as being very easy and requiring almost no studying.

**Substance use history**

In about 1985 Mr. Jones started using cocaine on a regular basis. He also began using methamphetamine sporadically at about this time, but this usage increased over the next several years. He was using methamphetamine more often beginning in about 1988 or 1989; heavy use of this drug is well-documented in the records.

**Physical examination**

**General examination**  The general examination revealed a man of small stature who appeared older than his age of 43. He is 5'5" tall and weighs 185 lbs. Head circumference is 21-3/4 inches. There are no dysmorphic features. The midline facies was normally developed. The scars from the traumatic amputations then re-attachment of the fingers on the left hand were visible but the fingers had full range of motion. There were numerous, impressive scars throughout the body. There is a 2 cm healed incision over the anterior chest wall on the left with healed staple marks. Mr. Jones stated that the incision was from a stab wound and the staples were placed by a friend with a power carpet stapler. There are entry and exit wounds from a gunshot wound to the left upper arm. There are small linear incisions on the back the origin of which Mr. Jones was unable to tell me. There is a scar on the right forearm from an ironworking accident. There are several other small, self-inflicted tattoos.

**Mental status**  Mr. Jones' affect was slightly flat but he did appear to have a full range of affect. He expressed a sense of hopelessness about his status and the desire to have it all be over so he would not be a drain on the Federal Public Defender's Office. He was cooperative with the evaluation. He was defensive in discussing his mother and would not admit that there was anything abnormal about her behavior, other that acknowledging that she was "rowdy." He was unwilling to discuss her period of delusions. He discussed his history with a normal degree of detail, although his recollection of childhood events was poor. He had a constricted degree of insight. He scored 29/30 on the Mini-Mental Status Examination. Abstactions were slightly impaired. He was able to abstract the symbolic meaning of proverbs, but not with the normal facility that would be expected for his age. Verbal fluency, a frontal lobe function, was impaired. He was able to name 9 words beginning with the letter F in one minute (normal is 14).

We completed the Bellevue Dissociation Questionnaire. In response to some of the questions posed he acknowledged having a special place he could go to in his head when things were difficult. He called this "a bubble." He first started being able to go into the bubble when his father died. He said that when he is under tremendous stress, he goes "in a bubble where nothing can bother me." There is nothing in the bubble; it is completely blank. He went into the bubble when his mother died and when his children

8

were sent to foster care. He could not tell me if he went into the bubble when Rachel died or after her death. The longest he has been in the bubble is "days and days." He thinks that in general he would only go into the bubble if something stressful triggered it.

Mr. Jones also reported hearing voices on a somewhat frequent basis. He described three different voices he heard. The first he called the "Screamin' demon." He hears that voice whenever he becomes agitated or angry. That voice would scream in his head "You ought to throw water on him, you ought to fight him, not take s--- from him." He would hear that voice encouraging him to fight whenever he became provoked and was unable to stop himself from fighting. At other times he hears a second voice which he calls "Moses." That voice encourages him not to fight and to be calm. Mr. Jones described a third voice which he simply identified as "me" which sounds as if it may be his own thought or conscience. That voice is now telling him "You ought to just die." Mr. Jones says he hears these voices "all the time." He denies any other type of hallucinatory experience other than that associated with drug use.

Mr. Jones was questioned regarding any physical or psychological feelings he experiences with fighting. In response, he described feeling just prior to fight a sensation like a red-hot poker in the back of his neck. Once he feels that sensation, no matter what is said or done, he knows that he is going to fight. He frequently cannot recall the details of a fight. He described one incident in which he got into a fight with Angela Gray's boyfriend. He recalled the fight beginning but then has no memory of the remainder of the altercation until a headlight came on and he "came to." In another incident, he was fighting three men. He can't recall the details of the fight other than to become aware at some point that he was the only man standing. He remembers seeing the other men lying on the ground unconscious but not knowing how they got there.

In response to questions regarding discipline at home when he was younger, Mr. Jones indicated that his mother was the disciplinarian. She would use a strap or send the boys outside to get reeds, which she would use to spank them. They were only spanked on the bottom. With questioning regarding anything further, Mr. Jones became defensive and would not say anything more. He repeated, "My mother is a good woman."

**Neurologic examination** The cranial nerve examination normal. The motor examination showed full strength throughout. There was diffuse hyperreflexia, more on right. There was a Babinski on the right. The left toe was mute. There was no Wartenburg sign. There was trace paratonia throughout. Cerebellar testing showed a number of abnormalities. There was mild dysmmetria on finger-nose and heel-shin testing, worse on the left for both tests. Tandem gait was impaired and very slow. There was a brisk snout reflex and a slight jaw jerk. There was a positive suck reflex. Antisaccade testing was abnormal, with four errors in 12 trials.

**Diagnostic impressions**

Mr. Jones presents as a man with a long-standing history of behavioral traits that can be attributed to a certain pattern of neurologic dysfunction. His childhood behaviors are highly consistent with impairments in the ability to attend and focus. His inability to control his behaviors in school or to have academic success in school, despite repeated demonstrations of normal to even above-average IQ, are consistent with these impairments. He almost certainly would have fulfilled the diagnostic criteria for Attention Deficit Disorder with Hyperactivity. This condition encompasses only a portion of the abnormalities of the full scope of neurologic processes referred to as Executive function. The term 'executive function' comprises the cognitive processes mediated by the prefrontal cortex that are normally present in the individual with intact prefrontal cortical function. These processes include the ability to formulate plans, intellectual functioning involving reasoning and recognizing consequences of actions, the ability to sustain concentration and focus for long-term goals, language processing, foresight needed to regulate behavior, the ability to regulate behavior, the ability to recognize social cues, and the ability to understand abstract concepts.
Individuals with impairments in executive function, or frontal lobe function in general, may demonstrate distractibility, impulsivity, lack of guilt or shame, lability of mood, low frustration tolerance, periodic affective disorder such as depression or anxiety, rigidness of thought, concreteness, the inability to change set (perseveration), poor planning, poor concentration and attention, poor language function, difficulty regulating behavior, and the inability to recognize social cues. It is important to note that this constellation of findings may and frequently does occur in an individual with a normal IQ. Intelligence is a separate process of cognitive function, and a person with a normal IQ may harbor tremendous frontal impairment, as a person with significant impairment of frontal/executive function may have a perfectly normal IQ.

Mr. Jones childhood history suggests marked impairment in all areas of executive function. His psychiatric evaluations from the age of 14 suggest an inability to control and regulate his behaviors, and a seeming inability to learn from past mistakes. These areas of dysfunction are even more compelling in an individual with reasonable intellectual talents and manual skills. In a child or adolescent with this pattern of dysfunction, the term Attention Deficit disorder is frequently applied as it best describes the most obvious abnormality in the immature child, and that which poses the greatest problem in the classroom setting. Much research has been aimed at trying to understand this common neurologic problem. It has been determined that ADHD is a genetically inherited condition associated with alteration of brain neurotransmitter function. It is frequently amenable to medical intervention. Because of the numerous other abnormalities of behavior present in the child or adolescent with ADHD, the condition in some children is associated with conduct disorder, a pervasive pattern in youth of aggression to people or animals, destruction of property, deceitfulness or theft, or serious violations of rules. ADHD with CD is clearly a risk factor for violent behavior, and ADHD is in fact very commonly found in the prison population. Learning disabilities are a common co-morbid condition in children and adults with ADHD, and may alone also pose an increased risk for violence. The risks of substance abuse are also much higher in the untreated ADHD population.

10

Mr. Jones has documented abnormalities of frontal function on both the neurologic and neuropsychological examinations. The neurologic exam showed numerous motor signs, particularly the return of primitive reflexes such as the snout and suck reflexes. These reflexes are normally seen in infants and then recede with maturation of the brain. Their return indicates damage to the frontal lobes that should be suppressing them. The neuropsychological testing also indicated some patterns of frontal dysfunction.

Mr. Jones has many other factors that increase his risk for criminal or antisocial behavior. There is a probable family history of psychosis in his mother; further information on her hospitalization, if these can be obtained, will be helpful. Mr. Jones himself also seems to have some elements of psychosis. He described to me a recurrent pattern of auditory hallucinations; these were also reported in some of his previous psychiatric evaluations. Furthermore, there is some evidence of dissociation. Mr. Jones reports a recurrent behavior of going into "a bubble" when he is under stress. What role this may have played in the events surrounding the incident crime is unclear. Of note, Dr .Geffen's report from 1994 indicated similar symptoms of auditory hallucinations and the possibility of a dissociative state. Mr. Jones also has a history of numerous head injuries, which have been associated with increasing the chances of the subject participating in aggressive behaviors.

Childhood physical abuse is a factor that we have found to play a large role in the later commission of aggression. In a study we performed of 31 murderers, 29 had documented histories of childhood physical abuse. Mr. Jones' upbringing was certainly chaotic and violent, and although his unwillingness to discuss his mother prevented me from getting a full history in this regard, I think it is possible that abuse may have occurred in the home. Of note also in this respect is Mr. Jones' self-mutilating behaviors. Several studies have indicated this behavior is strongly associated with childhood abuse.

Another relevant issue is the role Mr. Jones methamphetamine use plays in his neurological state and also any role it may have had in the homicide. The neurotoxic effects of methamphetamine on the human and primate brain are well described. Reduced metabolism in areas of the brain that communicate with prefrontal cortex have been demonstrated, along with rewiring of cortical circuits in the brains of chronic methamphetamine users. Chronic substance abuse has been strongly associated with frontal impairment, and in particular with ADHD. Adolescents with untreated ADHD have a rate of substance abuse that is three times higher that of the control population (45% versus 15%); once the ADHD is treated with appropriate medications, the rate returns to the control rate. Although it has not been studied scientifically, one may assume that the greater the degree of frontal dysfunction, the less likely it is that one would be able to end the practice of drug use. The same qualities that are necessary to end a long-standing drug habit, such as self-control, motivation, and self-regulation, are the cognitive areas that are most impaired in a person with executive dysfunction.

A diagnosis of Antisocial Personality Disorder (APD) has at times been suggested for Mr. Jones. This condition encompasses significant impairment of socialization skills, usually related to childhood physical abuse and other significant family disruption,

11

usually occurring in the setting of an individual with frontal impairments of the type described above. In my encounter with Mr. Jones, I did not find strong indications of an antisocial personality disorder. In particular, Mr. Jones appeared to have remorse for the fact that Rachel was dead, a finding that other examiners have commented on over the years. It should be noted that many of the DSM-IV criteria for APD include many of the same features that we see in general in individuals with frontal impairment such as impulsivity and failure to conform to social norms.

**Diagnostic Impressions thus include:**

1. **Brain damage, particularly to the prefrontal cortex with a frontal lobe dysfunction**
2. **Depression**
3. **Polysubstance abuse**
4. **Possible or probable psychosis**
5. **Possible Dissociative Identity Disorder**
6. **Possible or probable history of childhood abuse**
7. **Migraine**

Sincerely.

**Pamela Blake, MD**
**Assistant Professor,**
**Department of Neurology**
**Georgetown University Hospital**

**Exhibit 44**

# DECLARATION OF LAWSON F. BERNSTEIN, JR., M.D.

I, Dr. Lawson F. Bernstein, Jr., declare under penalty of perjury the following to be true to the best of my information and belief:

1.        I am a licensed psychiatrist and an Assistant Professor of Psychiatry at the School of Medicine at the University of Pittsburgh Medical Center.  I also have a forensic and neuropsychiatric consulting practice with expertise in the assessment and treatment of closed head injuries, toxic environmental exposure, substance abuse and other neurological/neuropsychiatric conditions.  A copy of my *curriculum vitae*, which reflects my education and experience, is true and correct and attached hereto as "Attachment A."

2.        At the request of counsel for Barry Lee Jones ("Mr. Jones"), I evaluated Mr. Jones on death row at the Special Management Unit II within the Arizona Department of Corrections in Florence, Arizona.  The evaluation took place on May 29, 2002, for a total of two (2) hours.

3.        The purposes of the evaluation were to ascertain and document Mr. Jones' past drug use and medical history; and conduct an evaluation to ascertain any potential neurological impairments.

4.        The materials I reviewed to prepare for Mr. Jones' neuropsychiatric evaluation included legal, educational, medical, and psychiatric records.

1

5.          My observations, impressions, and professional opinions are set forth in the Evaluation Report signed by me on October 31, 2002, attached hereto as "Attachment B."

6.          The observations, impressions and professional opinions set forth in the Evaluation Report are true and correct.

I declare under the penalty for perjury under the laws of the United States and the State of Pennsylvania, that the foregoing is true and correct.

Signed this _4th_ day of _November,_ 2002.

_C. F. H_____

Lawson F. Bernstein, Jr., M.D.

2

# LAWSON F. BERNSTEIN, JR., M.D.

Assistant Professor of Psychiatry
UNIVERSITY OF PITTSBURGH MEDICAL CENTER
SCHOOL OF MEDICINE, DEPARTMENT OF PSYCHIATRY

*Correspondence Address*:
**Post Office Box #81977**
**Pittsburgh, Pennsylvania 15217**

*Office Telephone Number: 412-422-9240*
*Administrative Assistant, Mary Quinlisk - 412-600-7996*
*Fax Number: 412-422-5203*
*Federal Tax ID: # 25-176-2150 (Lawson F. Bernstein, M.D., P.C.)*
*Website: www.lfbmdpc.com*
*Email*: lawsonbernstein@hotmail.com

## PROFESSIONAL EXPERIENCE

1994-Present    **Lawson F. Bernstein M.D., P.C.**

Forensic & Neuropsychiatric consulting practice with expertise in the assesment and treatment of closed head injuries, stroke, toxic enviromental exposure, chronic pain conditions and other neurological/neuropsychiatric conditions.

2000 - present    **Advisor; State Senate Subcommittee on Youth & Aging – Initiative on Violence & Mental Illness, Harrisburg, PA**

Invited to present proposal to reform Mental Health Act and Uniform Firearms act in wake of two shooting rampages in Pittsburgh.

1998-Present    **Consulting & Teaching Staff, Greater Pittsburgh Rehabilitation Hospital**

Consulting neuropsychiatrist to brain injury & stroke programs.

1997-Present    **Consulting & Teaching Staff, St. Margarets Memorial Hospital**

Psychiatric Consultant to medically complicated patients, including Critical Care Units. Teaching within Family Practice Curricula (Critical Care Medicine Rotation)

1996-Present    **Physician Volunteer, Allegheny County Shelter for the Homeless**

1994-Present     Board Examiner, American Board of Psychiatry & Neurology

1994-Present     Forensic Psychiatric Consultant, Office of the Public Defender of
                 Allegheny County, Court of Common Pleas -Juvenile Division & Family
                 Division, Orphan's Court - Allegheny County, various other State &
                 Federal Agencies in Pa.

                 Forensic Psychiatric Evaluation of Criminal Defendants, Juveniles, Parents and
                 Adoptees, and testimony in various litigation procedings.

1991-Present     Harmarville Rehabilitation Center, Brain Injury Unit, Pittsburgh, PA,
                 Staff Psychiatrist

                 Consulting neuropsychiatrist to brain injury & chronic pain
                 programs.

1998-1999   Consulting Staff, UPMC/Passavant Hospital

                 Psychiatric Consultant to medically complicated patients, including
                 Critical Care Units.

1993 -1995      Member; Governor's Task Force for State Mental Health
                 Planning Council, Harrisburg, PA

                 Non-Voting member of committee delegated to assign 80 million dollars in
                 community block grants for mental health services

1992-1995       Western Psychiatric Institute and Clinic, Director, General Psychiatry
                 Training Program; Co-Director, Office of Residency Training

                 Responsible for monitoring education of 65 residents/fellows, and academic
                 teaching activities of 255 faculty, overseeing office staff of 6, monitoring budget of
                 2.8 million dollars, setting educational goals and initiatives for one of largest
                 training programs in the U.S.. Position involved major presentations, recruitment
                 activities and liaison with other medical specialty leadership at university, and
                 senior administration at WPIC.

1992-1994       Chairperson, AADPRT Committee on Managed care and Residency
                 Education

                 National Committee to evolve strategy to modify training and advocate for
                 continued government funding of psychiatric residency education. Involved liaison
                 with other American Psychiatric Association Committee chairpersons and various
                 managed care executives.

| 1992-1994 | UPMC Brain Injury Program, Attending Psychiatrist |
|---|---|

1992-1993    **Allegheny County Jail, Allegheny County MH/MR, Pittsburgh, PA, Psychiatric Consultant**

Performed psychiatric service assessment utilized by jail administration to obtain psychiatric nurse clinician from current health care vendor at this institution

1991-1993    **State Correctional Institute at Pittsburgh (SCIP) Department of Corrections, Pittsburgh, PA, Psychiatric Consultant**

Responsible for creating "team" concept of care delivery to inmates, utilizing multidisciplinary approach. Developed psychiatric formulary of drugs to decrease utilization and set practice guidelines.

1991-1995    **University of Pittsburgh Medical Center, Psychiatric Consultation-Liaison Program/Service, Attending Psychiatrist – Trauma & Toxicology Programs**

1989-1991    **New York Hospital Burn Center, New York, NY, Research Associate**

1983-1987    **Marketing Representative, Continental Wingate Capital Corporation**

1978-1979    **Union Organizer, District 65, New York, NY**

1975-1978    **Principal, Lone Star Trucking and Freight Co.**

## ACADEMIC APPOINTMENTS

1991            Assistant Professor of Psychiatry, University of Pittsburgh School of Medicine Western Psychiatric Institute and Clinic Pittsburgh, Pennsylvania

## EDUCATION AND TRAINING

### UNDERGRADUATE:

| 1979 - 1983 | Hunter College, CUNY New York, NY | BA 1983 English/Classics Major |
|---|---|---|

### GRADUATE:

| 1983 - 1987 | Cornell University New York, NY | MD 1987 Medicine |

### POST GRADUATE:

| 1987 - 1988 | New York Hospital New York, NY | Rotating Internship |

| 1988 - 1991 | New York Hospital Payne Whitney Clinic New York, NY | Residency in Psychiatry |

## CERTIFICATION AND LICENSURE

### SPECIALTY CERTIFICATION:

| 1992 | American Board of Psychiatry & Neurology #36050 |
| 1996 | American Board of Forensic Medicine #1164 |
| 1996 | Diplomate, American Board of Forensic Examiners #3505 |

### MEDICAL LICENSURE:

| 1988 | New York State Board of Medicine  #176951 |
| 1991 | Pennsylvania State Board of Medicine #MD-044058-L |

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| 1996- | American Society of Addiction Medicine |
| 1996- | American College of Forensic Examiners |
| 1995- | American Medical Association & Allegheny County Medical Society |

1994 -        Board Examiner, American Board of Psychiatry & Neurology

1992-1994     American Association of Directors of Psychiatric Residency Training

1991-         American Academy of Psychosomatic Medicine

1986-         American Psychiatric Association

## HONORS and AWARDS

1983          Salk Award; Outstanding Undergraduate Research in the Biological Sciences

              "Hyper Hydroxylation of Estradiols in Systemic Lupus Erythematosus"; Hunter

              College, CUNY

1987          Diethelm Award; Outstanding Medical Student/Psychiatry; Cornell University

              Medical College

1991          Llahmon Prize; Outstanding Psychiatric Resident Research; New York

              Hospital/Payne Whitney Clinic

1991          Outstanding Psychiatric Resident Research, 2nd Prize; American Psychiatric

              Association, Area 2 Council

1991          Granet Prize; Best Resident Consultation Psychiatry; New York Hospital/Payne

              Whitney Clinic

## PUBLICATIONS

REFEREED ARTICLE/CMES:

1. Bernstein, L., Jacobsberg, L., Ashman, T., Musagni, G., Goodwin, C., Perry, S.: Detection of

   alcoholism in burn patients. Hospital & Community Psychiatry 43(3):255-256; 1992.

2. Bernstein, L. & Daviss, S.: Organic anxiety disorder with symptoms of akathisia in a patient

   treated with the immunosuppressant FK506. General Hospital Psychiatry, 14:210-211;

   1992.

3. Bernstein, L.:  Trazodone treatment of targeted aggression in a mentally retarded man.  The Journal of Neuropsychiatry and Clinical Neurosciences, 4(3):348; Summer 1992.

4. Bernstein, L.:  Abrupt cessation of rapid-cycling bipolar disorder with the addition of low-dose L-Tetraiodothyronine (T4) to Lithium..  Journal of Clinical Psychopharmacology. 12(6):443-444; December 1992

5. Bernstein, L. & Levin, R.:  Catatonia responsive to intravenous Lorazepam in a patient with cyclosporine neurotoxicity and hypomagnesemia.  Psychosomatics 34(1); Jan/Feb 1993.

6. Bernstein, L:  Pain Perception and Serum Beta Endorphin in Trauma.  Psychosomatics 36 (3), May-June 1995


## REVIEW ARTICLE/CMES & BOOK CHAPTERS

A. Bernstein, L.:  Mental Disorders, Tests & Drugs  In Psychological and Scientific Evidence in Criminal Trials, 3d edition, JC Moriarity, Ed.., West Group, St. Paul, MN-2000/in press

B. Bernstein, L.:  Burn Trauma.  In Principles of Medical Psychiatry, 3d edition, Stoudemire & Fogel Eds., Oxford University Press, New York, NY; 1999

C. Bernstein, L.:  Mentally disordered prisoners.  Book review.   J. Gunn, T. Maden, & M. Swinton, Eds., The Home Office.  Journal Criminal Behavior & Mental Health; 1992.

D. Bernstein, L.:  Residency Training and Health Care Reform.  AADPRT Newsletter, Drell, Ed., School of Medicine, New Orleans, LA

E. Bernstein, L.:  Burn Trauma In Acute Pain Managemment., In Press/1998

## PEER REVIEWER, ACADEMIC JOURNALS

- Villanova University, Department of Psychology – 1998 to present

- American Journal of Psychiatry – 1994 to present

- Forensic Examiner – 1996 to present

## CONFERENCE PROCEEDINGS

1.     Co-author, Length of Antidepressant Therapy : Consensus Conference, University of
Minnesota, 1995

### PROFESSIONAL ACTIVITIES

## Visiting Professorships

| | |
|---|---|
| 3/94 | Visiting Professor, Cambria County Medical Society |
| 6/94 | Visiting Professor, Department of Psychiatry, Medical Center of Brazil at Sao Paolo |

## Individual Lectures/Presentations

| | |
|---|---|
| 3/02 | "Psychiatric Assessment of the 'Sexually Violent Predator', Practice & Pitfalls'", Pennsylvania Association of Criminal Defense Lawyers, Pittsburgh, Pa. |
| 1/02 | "Psychiatric Issues in Federal Sentencing Downward Departure", Pennsylvania Association of Criminal Defense Lawyers, Valley Forge, Pa. |
| 7/01 | "Fibromyalgia", Pennsylvania Bar Institute - Pittsburgh, Pa. |
| 6/01 | "Fibromyalgia", Pennsylvania Bar Institute - Philadelphia, Pa. |
| 8/00 | CLE Lecture - Lawyers Concerned for Lawyers - PA Chapter "Modern Rx" - m Pittsburgh, PA |
| 6/00 | Invited Presentation to Pa. Senate Subcommittee on Youth & Aging – "The Legal Rights of the Mentally Ill as pertains to Involuntary Commitment and gun ownership"; Public Hearing on Violence & Mental Illness, Sponsor : State Senator Murphy, Allegheny County Courthouse, Pittsburgh, Pa |
| 10/99 | CME Lecture – Medicolegal Seminar |

CV - L. Bernstein, M.D.                                                            Page 7
revised  3/02

"Dymanic Neuroimageing, the state of the art",

Pittsburgh, Pa

8/99        CLE Lecture – Lawyers Concerned for Lawyers –PA Chapter

"Stress, Burnout, Addiction and Depression in Professionals",

Pittsburgh, PA

5/99        CME Lecture -Allegheny County Workers  Compensation Information Exchange

"Demographic & Behavioral Predictors in the Acutely Injured Worker",

Pittsburgh, Pa

4/99        CLE Lecture – Lawyers Concerned for Lawyers –PA Chapter

"Addiction Issues and Downward Departure under Federal

Sentencing Guidelines",  Pittsburgh, Pa

3/99        CLE Lecture – Allegheny County Bar Association –

"Closed Head Injury, New Developments",  Pittsburgh, Pa

11/ 98      Grand Rounds – UPMC/Passavant Hospital –

"Psychopharmacology in the Critically Ill Patient",  Pittsburgh, Pa.

11/ 98      Teaching Grand Rounds – St. Margaret's Mem. Hospital –

"Emergency Psychiatry, Principles & Practice",  Pittsburgh, Pa.

10/ 98      Grand Rounds – St. Margaret's Mem. Hospital –

"Invasive Psychiatry – management  of the ICU patient with agitation",

Pittsburgh, Pa.

10/ 98      Seminar – Morgantown, WV. – "Daubert Issues in Neuropsychiatry",

presented at CLE Seminar for Northern West Virginia.

5/98        "Psychiatric Implications of Impairment", presented at *Worker's Compensation*

*Impairment Evaluation: Using the 4th Edition of the AMA Guidelines,*

Pennsylvania Orthopedic Society, Philadelphia, Pa.

9/97 Teaching Grand Rounds: "Management of Agitation in The ICU" - St. Margaret's Memorial Hospital. Pittsburgh, Pa.

6/97 Grand Rounds - Shadyside Hospital, "Depression in the Medically Ill"; Pittsburgh, PA

6/97 Presenter, CLE/CME Seminar, Duquesne University School of Law , "McN'aughton meets Buck Rogers, Forensically proving cognitive impairment into the 21st century ", Pittsburgh., PA.

3/97 Presenter, CLE/CME Seminar - , "Depression, Brain Injury and Reflex Sympathetic Dystrophy", Erie, PA.

1/97 Presenter, CLE/CME Seminar - "Tort Aspects of Neurotoxicolgy", Pittsburgh, PA.

11/96 Presenter, Pennsylvania Defense Institute CLE/CME course, "Depression, Brain Injury and Reflex Sympathetic Dystrophy", Pittsburgh, PA.

9/96 Grand Rounds-Harmarville Rehabilitation Center, "Pharmacology of the Newer Antidepressants", Pittsburgh, PA.

4/96 Presenter, Pennsylvania Association of Criminal Defense Lawyers 1996 Spring Meeting & CLE/CME Seminar, "The Effective Use of Psychiatric Evidence" Pittsburgh, PA

4/94 Presenter, Annual American Trauma Society Conference, Pennsylvania Division, "Neuropsychiatric Determinants of Repetitive Injury", Pittsburgh, PA

7/93 Grand Rounds-Harmarville Rehabilitation Center, "Treatment of Geriatric Depression"; Pittsburgh, PA.

| | |
|---|---|
| 4/93 | Presenter - Annual American Trauma Society Conference, Pennsylvania Division, "Neuropsychiatric Determinants of Repetitive Injury", Pittsburgh, PA |
| 4/93 | Grand Rounds - St. Francis Hospital, "Depression in the Medically Ill"; Pittsburgh, PA |
| 10/92 | Grand Rounds - University of Pittsburgh Medical Center Department of Critical Care Medicine, "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 9/92 | Medical Grand Rounds - University of Pittsburgh Medical Center, "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 9/92 | Grand Rounds - Center for Emergency Medicine, "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 5/92 | Grand Rounds - Montefiore University Hospital Department of Toxicology/ Emergency Medicine "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 4/92 | Grand Rounds - University of Pittsburgh Medical Center, Department of Critical Care Medicine, "Stress Management in the Critical Care Setting"; Pittsburgh, PA. |
| 3/92 | Eastern Emergency and Trauma Forum - University of Pittsburgh Medical Center, Departments of Trauma and Emergency Medicine "Neuropsychiatric Determinants of Repetitive Traumatic Injuries"; Pittsburgh, PA |
| 1992 | Lecturer, Psychiatry Rotation, to third year Medical Students; University of Pittsburgh Medical Center, Pittsburgh, PA |
| 10/91 | Grand Rounds - University of Pittsburgh Medical Center, Department of Critical Care Medicine, "Differential Diagnosis and Management of Agitation in the Critical Care Setting"; Pittsburgh, PA. |

| | |
|---|---|
| 10/91 | Teleconference - University of Pittsburgh Medical Center, Department of Toxicology/Emergency Medicine, "Assessment and Management of the Violent Patient";  Pittsburgh, PA. |
| 9/91 | Trauma Conference - University of Pittsburgh Medical Center, Department of Surgery, Trauma Service "Neurobiological Antecedents of Repetitive Traumatic Injury";  Pittsburgh, PA. |
| 12/90 | Grand Rounds - New York Hospital, Department of Psychiatry, "Psychiatric Management of the Severely Burned Patient"; New York, NY. |

TEACHING:

| | |
|---|---|
| 1997 -present | Clinical Preceptor, Western Psychiatric Institute & Clinic & St. Margaret's Memorial Hospital - Emergency Psychiatry Curriculum |
| 1997 -present | Guest Lecturer, Shadyside Hospital - Family Practice Curriculum |
| 1997 -present | Volunteer Faculty, St. Margaret's Memorial Hospital – Family Practice Curriculum |
| 1994-present | Volunteer faculty, University of Pittsburgh Medical Center - Psychiatry Residency Curriculum |
| 1992-95 | Curriculum Director, WPIC Office of Residency Training didactic curriculum; University of Pittsburgh Medical Center, Pittsburgh, PA |
| 1992-1995 | Program Development Consultant, Various Regional Health Care Organizations |
| 1991-95 | Supervisor, Psychiatric Residents and Medical Students on the Psychiatric Consultation-Liaison Service/Program; University of Pittsburgh Medical Center, Pittsburgh, PA |

● 1991-95     Examiner, Mock Board Examination as a component of the Residency Training Program at Western Psychiatric Institute and Clinic; University of Pittsburgh Medical Center, Pittsburgh, PA.

## RESEARCH: Past Grants

| Grant Number (Funded) | Grant Title | Role in Project and % Effort | Years Inclusive | Source |
|---|---|---|---|---|
| *[Internal Seed Funds]* | Undetected Alcoholism in the Acute Burn Trauma Patient | Principal Investigator; 50% FTE, 0% salary support | 1990-1991 $8,000 | NY Hospital/ Payne Whitney Clinic Training Grant |
| *[Internal Seed Funds]* [2-90871] | Beta Endorphin Levels in Acutely Traumatized Patients, Presbyterian University Hospital | Principal Investigator; 20% effort, 0% salary support | 12/91-11/92 $9,000 | Univ. Pittsburgh Medical Center - Seed Grant |
| 1-T15-MH19883-01 | HIV Infection and AIDS | Co-Principal Investigator; 10% effort, 10% salary support *[L Frank PhD, P.I.]* | 8/92-7/95 $157,211 (yrs 01 & 02) | NIMH Mental Health Care Provider Training Grant [University of Pittsburgh Dept Epidemiology] |

RESEARCH:  Presentations

| | |
|---|---|
| 3/91 | Young Investigators Poster Session - American Psychiatric Association Annual Meeting, "Undetected Alcohol Related Burn Trauma"; Washington, DC. |
| 6/91 | Grand Rounds - New York Hospital, Department of Psychiatry, "Undetected Alcohol Related Burn Trauma";  New York, NY. |
| 5/93 | Scientific Program Poster Session - American Psychiatric Association Annual Meeting, "Pain Perception and Beta Endorphin Level in Trauma"; San Francisco, CA |

Page 13

# Lawson Bernstein, M.D., P.C.

## P.O. Box 81977

## Pittsburgh, PA  15217

## Telephone:  412-422-9240

## Fax:  412-422-5203

10/31/02

Ms. Sylvia Lett, Esq.
Federal Public Defender
District of Arizona
Capital Habeas Unit
97 East Congress, Suite 130
Tucson, AR  85701-1716

RE:         BARRY LEE JONES
LFB#:      J02-001

Dear Ms. Lett:

I have had the opportunity to travel to Arizona and interview your client at the State Correctional Institution there (on May 29, 2002), to review the voluminous medical and other records referenced at the end of this report, and to render an opinion regarding your client's current and past neuropsychiatric status.  It is my opinion within a reasonable degree of medical certainty that:

1.       The Mr. Jones's clinical history, neuropsychological testing, and my examination confirm the presence of frontal lobe brain damage.

2.       The Mr. Jones was suffering from acute amphetamine withdrawal at the time of the alleged instant offence.

All of these opinions are rendered by me within a reasonable degree on medical certainty. Below is the factual basis for my conclusions.

Page 1

The events of this matter are well known to you and will not be fully recapitulated here. Suffice it to say the gentleman in question is a 43-year-old male who has been adjudicated as guilty for the death of his girlfriend's daughter. Briefly, this individual has a long history of amphetamine ("crank") abuse and was in the midst of a prolonged use of that drug when on May 1, 1994 his live-in girlfriend's daughter was found dead in their home. The child apparently had died secondary to a beating and had suffered sexual abuse as well. Your client claims to have not committed this event.

Per record review and discussion with your client, he had done a quarter-ounce of "crank" on the day prior to the night before the girlfriend's daughter died. Apparently, Mr. Jones used crank on April 29, 1994 all day and all night and then proceeded to "crash" on April 30, 1994. On the evening of April 30, he then went to bed. He states he also remembers the girlfriend getting up with the daughter in the middle of the night because the daughter was hungry.

In the six months prior to the incident, your client states he was doing crank every day, as well as intermittently doing cocaine and heroin. For the four months he was with the girlfriend in question, he was using crank anywhere from 1-to1.5 grams a day. He stated to me that he would go on "runs"[1] that would usually last a week, and that he had been using crank for the entire week prior to the event in question.

The Mr. Jones's previous medical history by his recounting is notable for a "bad stomach". His previous surgical history is notable for a foot operation in the 1970's and traumatic finger amputations on the right hand. He is allergic to no medications and was on no prescription medications at the time of the alleged event. He states that his family neuropsychiatric history is notable for a brother and son with epilepsy and a mother with alcoholism and psychiatric disease. He denies any family history of learning disability or need for special education, although neuropsychological testing in 1972 revealed test scores *in the borderline range for suspected neurological impairment or brain damage*[2]. This gentleman states that at age 15 he fell and suffered a closed head injury with associated 12-hour loss of consciousness. At age 14, he was hit in the head by a ball from a pitching machine and was knocked unconscious for a period of minutes-to-hours. He states that in his 20's he was struck on the left occipital aspect of his skull with a brick and suffered a closed head injury with brief loss of consciousness. At age nine, while riding a bike, he suffered a closed head injury with minimal loss of consciousness. He denies any frank diagnoses of seizure, stroke, or other neurologic disease. His own

---

[1] E.g.- prolonged continuous daily usage until the drug runs out, or exhaustion supervenes.
[2] Cochise County Psychological Services Report – 10/26/72

previous psychiatric history is notable for Mr. Jones's psychiatric hospitalization on two occasions for impulsive suicidal overdoses. He was also treated extensively with outpatient counseling.

Drug and alcohol history is notable for the fact that your client began abusing alcohol at age ten and has experienced blackouts. He began using methamphetamine in his teens, and identifies this as his drug of choice. He states that he has used this agent intranasally, has smoked it, and has used it intravenously. Other drugs he has abused include heroin, which he sporadically, cocaine, which he has smoked, used intranasally, and used intravenously, marijuana, and rare use of PCP, LSD, hallucinogenic mushrooms, and "downs"[3]. Your client denies any history of learning disability or need for special education, but did state that he flunked the fourth grade. He completed only the tenth grade of high school while incarcerated at a youth home in Arizona. Otherwise, he has no other formal education.

Social and developmental history is notable for the fact that his mother abused alcohol during the prenatal period of your client's gestation. He was a fullterm baby, albeit underweight at 4 lbs. as a twin, with no postnatal complications. Your client states that he was frequently beaten as a child, but denies any history of sexual abuse. He has never served in the military. Past work history includes working as an iron worker with exposure to various toxic chemicals and related sequelae, working as a mechanic with exposure to organic solvents, and an episode of carbon monoxide poisoning while employed in the latter position, which resulted in headache and possible loss of consciousness.

Your client's legal history commences at age 13 when he was arrested for "stealing, fighting, and trespassing". He was remanded to Vision Quest, a local youth program. Subsequent to this, he has had a number of minor arrests for theft less than $100, speeding tickets, and failure to appear at court hearings. He denies any prior history of felony arrests or convictions.

Your client states that prior to the event in question he was supporting his drug habit by stealing construction materials and trading these for money and drugs. He states that he would frequently buy an "eight ball" of crank and abuse half while selling the other half for cash. Your client states that he often could be violent while abusing crank and was in his words "close to uncontrollable" at times. However, he has no history of violence towards children.

---

[3] Sedative-hypnotic agents from multiple pharmacological classes such as benzodiazepines, barbiturates, etc.

Your client states in the past he has been married one time and has a 20-year-old daughter, a 13-year-old son, and a 17-year-old son, the latter of whom suffers from epilepsy.

On review of medical systems your client endorses the following temporal lobe epilepsy symptomatology:

A.    Episodes of "lost time".

B.    Olfactory auras of a chemical or smoke smell just prior to these episodes of lost time.

Physical examination was limited to inspection only since by institutional rules the gentleman was chained to his chair, had handcuffs, and thus was unable to perform the standard neurological evaluation.  However, a variety of tics were noted including:

A.    Repetitive eye blinking.

B.    Writhing movements of the upper extremities.

C.    Muscular twitching of the face.

Recent laboratory values are not available for my review.

Neuropsychological testing performed at your request reveals evidence of frontal lobe dysfunction as well as variable attention and right hemispheric cognitive abnormalities.

ASSESSMENT AND DISCUSSION: A 43-year-old gentleman with a long history of repetitive closed head injury and Polysubstance abuse. The DSM4 diagnoses associated with this matter are as follows:

AXIS I:

Cognitive Disorder. not otherwise specified – frontal lobe brain injury and associated dysfunction and other cognitive abnormalities – secondary to:
A.    Repetitive closed head injury.
B.    Methamphetamine abuse.
C.    Intrauterine exposure to alcohol

Secondary Personality Disorder – irritable/disinhibited type – secondary to:

A.    Repetitive closed head injury.
B.    Methamphetamine abuse.
C.    Intrauterine exposure to alcohol – rule-out fetal alcohol effect

AXIS II:

Deferred.

AXIS III:

Medical problems as noted above.

Your client recounts, and other individuals confirm a history of repetitive closed head injury and in-utero alcohol exposure, which would be consistent with his neuropsychological findings showing in particular frontal lobe brain damage and dysfunction.  As you may be aware, the frontal lobes of the brain are involved in, amongst other cognitive activities, those of premeditation, deliberation, and the formation of specific intent.   I would request that the Mr. Jones undergo an MRI of his brain with gadolinium to further evaluate any structural brain abnormalities present and definable by this methodology.

Please note the Mr. Jones appears to suffer from what sounds like temporal lobe epilepsy given his complaints of olfactory aura and "lost time".  He should have a 72-hour ambulatory EEG to evaluate this phenomenon. Given his robust family history of epilepsy, and his history of neurologic injury as delineated, he is at substantial risk for this disorder.

There is no doubt but that your client suffered from the disorders noted above as well as severe methamphetamine abuse at the time of the alleged offense.   Methamphetamine acts on the central nervous system by mimicking the effects of epinephrine, norepinephrine, and dopamine.  Over prolonged time the use of this agent in the manner described will deplete the brain of these chemicals, causing a characteristic "crash" when the individual stops using the methamphetamine. Put another way, not only does the Mr. Jones suffer from acute withdrawal from cessation of methamphetamine abuse, but his brain has been depleted of key chemicals, which are involved in the maintenance of a normal neurological, cognitive and emotional state.

An individual in the throes of either acute amphetamine intoxication and/or withdrawal[4] can become:

A.     Psychotic.

B.     Disinhibited.

C.     Aggressive in a way uncharacteristic for him.

D.     Amnestic for these and other events.

Whether or not your client committed the offense in question, it is highly probable that if he did it would be as the result of methamphetamine intoxication and withdrawal/ "crashing" in combination with his preexisting neuropsychological and neurological abnormalities. Finally, please note that individuals awakened while "crashing" from methamphetamine can be both violent and amnestic for that event, as noted above.

Please note that your client's ability to "control" his methamphetamine abuse prior to his incarceration would have been nil. The severity of his daily consumption of methamphetamine (in the upper 10% of similar addicts I have evaluated) would be associated with profound cravings for continuous use of the drug, and concomitant diminution of brain catecholamine and dopamine neurotransmitters without which the Mr. Jones could not function. Put another way, over time Mr. Jones's brain would have required repetitive methamphetamine ingestion simple to function at all.

In addition, Mr. Jones' history of frontal lobe brain damage (due to in utero alcohol exposure and otherwise) would be associated with a predilection for disinhibited behavior associated with poor decision making and impulse control. This factor alone also would have substantially diminished his capacity to "control" his methamphetamine usage.

Also, these two factors together (massive methamphetamine consumption coupled with brain damage) would have been exponentially additive in their clinical effect on Mr. Jones' volitional capacity to control or cease his methamphetamine abuse.

---

[4] E.g. – "crashing"

Unfortunately, Mr. Jones' received little or no drug treatment at a time when that intervention would have been most effective. It is my understanding that the Vision Quest program that Barry attended as a teen was notorious for its' lack of drug treatment, and was apparently known as a facility where drugs could be easily obtained. Thus a crucial juncture for effective substance abuse treatment was missed in this Mr. Jones.

In regards to Mr. Jones' trial, I must comment on the use of a recovering methamphetamine addict/counselor as an "expert" on methamphetamine addiction. While this individual's history of addiction recovery is laudable, it cannot be the basis for any scientific, medical or forensic opinion regarding Mr. Jones. Please note also that Mr. Higgin's would have no professional knowledge with which to evaluate Mr. Jones' history of in-utero alcohol exposure, repetitive closed head injuries, abnormal neuropsychological testing since 1972 and other medical data which would adversely effect an individuals ability to cease methamphetamine abuse. Frankly, I have never encountered a trial, let alone a capital case, where this type of individual has been admitted by the court as an "expert" in substance abuse. With all due respect to Mr. Higgins, his life experiences do not qualify him as a medical, neurological, psychiatric or neuropsychological expert in this area. His observations therefore are merely anecdotal, and not truly scientific or of any forensic value.

All of these opinions are rendered by me within a reasonable degree of medical certainty.  Thank you for the opportunity to provide this consultation.  Please call me with any questions regarding this report.

Sincerely,

Lawson Bernstein, M.D., P.C.

LB/cmc:lpw
D: 08/20/02
T: 08/20/02

Records reviewed: Please see attached.

Barry Jones – records reviewed

Report & test data of Alan L. Goldberg, Psy.D.
Letter from Arizona Dept of Corrections General Counsel regarding Mr. Jones' dental
health
VisionQuest
Southern Arizona Mental Health Center
Tucson Medical Center
Kino Community Hospital
Pima County Detention Center – Medical Unit
Arizona Department of Corrections – Inmate Health Services
Transcript of Trial Testimony of Ronny Higgins
Neurological Evaluation report of Pamela Blake, MD
Neuropsychological Evaluation report of Alan L. Goldberg, Psy.D.
Transcript of Telephone Call from Terry Richmond
Raymond W. Bliss Army Hospital – Fort Huachuca, AZ

**Exhibit 45**



## Declaration of Joyce A. Richmond

I, Joyce A. Richmond, declare, as follows:

I am 51 years old and the mother of four children. I am a former resident of Tucson, Arizona.

While living in Tucson in the early 1990's, I met Barry Jones and his daughter Brandie. I became very close with Barry and with Brandie, who still calls me her, "real mom".

Barry and I became intimate and my daughter Elisha and I lived with Barry and Brandie on and off for about a year. Elisha was around 13, and Brandie around 11 at the time. Barry was very good to the three of us. He loved and cared for us as though Elisha and I were his own. My daughter still considers him the only real dad she ever had.

Barry was very close to his daughter Brandie. Brandie and Barry did lots of things together, and had a great relationship. Barry spoiled Brandie a little but he was never mean or abusive to her or to my daughter.

Desert Vista, the trailer park we lived in on Benson Highway, was close to Barry's twin brother's house and to Brandie's school. But it was a rough neighborhood as well. Besides fights and drinking and some drugs, there were several known child molesters who lived there as well.

Because of this, Barry was very protective of all the children in the neighborhood. Anytime he saw anyone scare, be rough with, or hit a child he would go right over and intervene. Even though Barry was a little guy he was not afraid to stop a big guy from hurting a child or a woman either, for that matter. Barry beat up at least two guys because he found out they had messed with one of the girls.

In late 1993, or early 1994, Barry and I met Angela Gray. Angela had three children and was living in a trailer park near some friends of ours. We all did a little meth back then, including Angela. Angela brought her friend Sunny to Barry's once when I was there and Angela and Sunny did a line of meth. Another time Angela and Sunny came pounding on the door of the apartment I was visiting in Desert Vista, looking for a way they could get some meth.

One night Barry was at the trailer park Angela lived in and saw Angela's boyfriend

-1-

beating on her. Barry lost it and beat the crap out of the guy. Then he let Angela and her three children move in with him to get away from her boyfriend. Sometime after Angela and Barry got together I left and moved back to Montana.

Barry and I talked frequently while I was gone and in April of 1994 he asked me to move back to Tucson and move in with him. I told him I would not move back if he was still living with Angela. Barry told me she would be gone when I arrived. I got to Tucson around the last week of April. Once I got there I found out Angela and her children were still living at Barry's. Barry wanted me to move in with him anyway and said Angela would move out if I did. He said he did not have the heart to throw her and her kids out.

I would not move in with Barry as long as Angela was still there so I stayed with my girlfriend who lived in the area. I saw a lot of Barry the week and a half or so I was there. Barry spent most of the afternoon and evening with me on Friday , April 29. I saw him on and off during the day on Saturday, April 30,1994.

I went to Barry's just before dark Saturday night to get him. While I was there Angela was laying carpet in the living room, her daughter Becky was in her room and Rachel was in Jon's room playing Nintendo with him. Barry said he would come right down so I left. Barry showed up and I was with him most of Saturday night.

Barry told me Angela was mad at him for spending all that time with me and questioned him every time he left to see if he was going with me. He told her yes, hoping she would get the hint and move out.

Angela was also mad a Barry because she wanted his last 1/4 of meth and he would not give it to her. Barry finally gave in and gave it to her.

When Barry and I pulled up at his house in his van Sunday morning Angela hollered and screamed at Barry for being out all night with me. Later that day I went to Barry's to see if Brandie could come to my daughter's birthday party. Angela came to the door and yelled at me. She was still angry Barry had been out late the night before with me. She told me Barry was asleep so I did not go in.

After Barry was arrested I returned to my home in Montana. Dave Mc Donald, from the County Attorneys' Office, called me there and insisted I return to Tucson to testify for the State against Barry. Since I did not have anything to say against Barry and I did not want to return to Tucson to testify I was told they would treat me as a hostile witness. McDonald also told me I could come on my own or they would come and get me.

At the time I was wanted in Arizona in both Maricopa and Pima Counties on felony charges. Dave McDonald promised me the Pima County Attorneys' office would arrange things with the courts so I would get sentenced to Probation on my charges, if I came back and testified against Barry.

Harriette Leavitt was appointed to represent me in Pima County Superior Court and James Haas represented me in Maricopa County. I came back to Arizona and Dave McDonald took me to the court to meet my attorneys and do my plea bargain. Everything had been arranged previously by the Pima County Attorneys's office. All I had to do was show and sign the agreement and I was given a sentence of probation on my charges.

Before Barry's trial I was questioned by Barry's and Angela's attorneys. Dave McDonald from the Pima County Attorneys' Office was there with me. During the interview Mr. Darby began asking me about my criminal history. I told him my lawyer told me I would not have to discuss this. The lawyers stopped the tape and talked about it and decided not to ask me anymore questions without my lawyer. I did not ever talk to Harriette Leavitt about it as the County Attorneys' office handled it. Arlene Moore or Kathleen Mayer also told me not to worry because I had to admit doing drugs, that no charges would be filed against me for it.

The County Attorneys gave me a transcript of the taped interview to read over and over again in order to memorize it before court.

I did then testify against Barry. Ms. Mayer tried to get me to say things against Barry which were not true but I would not. She tried to get me to say Barry had a violent temper, that I saw him discipline the children in a cruel way and hurt them. But I would not say these things because they were not true.

While my daughter, Elisha and I were in Tucson, Kathleen Mayer showed up some pictures of Rachel's injuries. She showed up a picture of the wound to Rachel's vaginal area and told us that was what Barry had done to her. Ms. Mayer also showed us a blowup of Rachel's finger that looked broken and demonstrated how Rachel got that trying to protect herself from Barry. Ms. Mayer told us she would see that Barry got execution and would fight any appeals Barry files to her dying day.

The police and prosecutors seemed determined to get Barry no matter what. They would not listen to those of us who knew Barry and knew that he would never hurt a child like that.

I never understood why the police did not investigate child molesters who lived in the trailer park to see if they could have been the ones to hurt Rachel. Barry's neighbor, Bob Dresbach, had been reported to the police before for molesting one of the girls. And the teenage boy whose family lived near Barry's trailer got into trouble for sexually assaulting his little sister.

Rachel's own brother Jon, who was somewhat deaf and retarded acting, was one of the worst perverts. All the girls were afraid of him because he constantly tried to grab their breasts and shove his hands in between their legs.

I swear, under penalty of the laws of the state of montana and of the United states of America, that the foregoing is true and correct.

Executed on _10. 25. 02_

Joyce A. Richmond

Witness

-4-

# Exhibit 46



## DECLARATION OF OTIS HARRIS

I, Otis Harris, declare as follows:

1.    I am Barry Jones' half-brother and the son of Barry's mother, Florence Hall Jones and J. T. Harris.

2.    I was never interviewed by Barry's trial lawyer.  If he had interviewed me, I would have provided him with the following information in support of mitigation:

3.    I am married to Janet Harris.

4.    Besides myself and Barry,  we have only one other surviving sibling, Phil Henry, the youngest son of Florence and her second husband Paul Eugene Jones.

5.    Barry had a fraternal twin, Larry, who died in 1995, from a bleeding ulcer.

6.    Two other siblings were lost in miscarriages, one between the births of the twins (Barry and Larry) and Phil, and the other after Phil.  I don't know why the miscarriages occurred.

7.    My mother, Florence Della Hall, was born in April 1932, in Gaffney, Cherokee County, South Carolina. to James Hall and Della (maiden name unknown) Hall.

8.    When Florence was seven years old, her mother died suddenly, possibly from an aneurism.  Florence's father made her cook, do laundry (by hand on a wash board), and clean house.  She was so small she had to use a step stool to reach things.  He was mean to her as well.

9.    Florence had only one sibling, a brother Cepheus, who was five (5) to ten

Page 1 of 13

(10) years older. Cepheus did not finish school, he chased women, and was in and out of jail for "breaking and entering", panhandling, drunkenness, and fighting. Cepheus died in Columbia, South Carolina, in the mid to late 1960's when his liver burst from an alcohol overdose.

10.     Florence's father, James Hall ("Papa"), never remarried after his wife died. He retired from the Cotton Mill in Gaffney and spent his time reading the Bible, bird watching, whittling and fishing.  He was a good man and a hard worker.   In 1971 or 1972, at 90 years of age, Papa died of natural causes.

11.     While it is not known how far in school Cepheus went, Florence graduated from high school because her father, "beat her ass all the way to school" to make sure she went.

12.     While still in school, Florence met and had a serious relationship with Paul Jones.  After a "spat", they broke up and Paul went off and joined the Navy.

13.     Florence did not work after graduation as she met and married her first husband right out of high school.   J. T. Harris was a traveling salesman and was eight (8) to ten (10) years older than Florence.  When he married Florence, he already had a son by an older woman, whom I never met.

14.     J. T. and Florence had a son, James Arvine, who died of whooping cough or pneumonia when he was an infant. Later,  Florence weighed only 98 pounds when I was born.  I weighed twelve pounds, eight ounces.  All of Florence's children were born

vaginally.  Other than my weight, I do not know of any problems my mother may have had with my birth.

15.     J. T. and Florence split up in during my infancy. I never saw my father again.  Therefore, I don't know my father's first or middle names, his date of birth, exact age, or where he lived through out his life.

16.     When I was twelve, my father stopped by and wanted to see me but my mother would not allow it.  In 1973, my mother got a call that J. T. had just died.  She took me with her to Gaffney, South Carolina and then to Birmingham, Alabama, where J. T. was buried.

17.     After divorcing Harris, Florence hooked up again with Paul Jones and they got married. I don't know the date. Paul was also from the South, possibly from North Carolina.

18.     After they were married, we moved to Fairbanks, Arizona.  Paul ("Dad") worked on the Advance Crew for Fort Huachuca around 1953 or 1954.  He was stationed in Arizona for a couple of years then was sent to Augusta, Georgia.  After Augusta, Paul was sent to Germany for six (6) years.

19.     Dad was away for most of my childhood and Florence spent her time drinking and "socializing" with other men. I don't think Florence worked while Dad was away, although she may have tended the bar she frequented. I recall Florence coming home most nights drunk, smelling of booze and carried in by the different men she

brought home with her. I remember one man in particular who brought mother home a lot. He was a big, White man named Jimmy.

20.     When I was six (6) years old, my twin-half brothers, Larry and Barry, were born.  Florence later told my wife, Janet, she felt very limited movement from the twins when she was carrying them.  They weighed around three and one-half (3 ½) to four (4) pounds each. I believe they were born in a hospital, but I am not sure.

21.     Florence drank all the time, even while she was pregnant with Barry and Larry.

22.     Before she died, Florence admitted that Jimmy, the man who often brought her home at night,  was the twins' father.  I was not surprised to learn this because I knew Dad could not have been Barry and Larry's father since he was still in Germany.

23.     While Dad loved Florence, they were very different and Dad "could not live with her," so he stayed overseas as much as he could. I think Dad stayed away because of Florence's drinking.  Dad did not come home at all for six (6) years while he served in Germany, which includes the time the twins were conceived.

24.     I do not know anything about Barry's biological father other than his last name, which was Carter.  I am concerned that it would cause more hurt to Barry and possibly to Carter, should either one of them be told now about their relationship.

25.     Because Florence was still drinking and carousing, I cared for Larry and Barry until they were old enough to play out on the streets on their own.  I changed their



cloth diapers, cooked for them, watched them, and put them to bed.  I even potty trained them.  I cared for Barry and Larry until they were in the 2nd or 3rd grade.  Then, they were on their own most of the time because Florence was still not around.

26.     I got food for myself and my brothers by pulling my red wagon four miles to the little store every week.  I normally picked up two (2) packs of baloney, bread, a box of oatmeal (not instant) and sometimes Kool-Aid.  The food went on the family's bill at the store.

27.     Whenever we lived near Papa, we had some chicken, eggs, and plenty of vegetables from Papa's garden to help feed us.  I recall walking to lower school carrying baloney sandwiches, fat back or onions, tomatoes, and cucumber in a lard "lunch" bucket.

28.     I knew we were poor.  Although the houses we lived in had heat and roofs that did not leak, they were drab inside with torn wallpaper, dirty floors, and were broken-down.  We lived in 12-20 different homes while I was a child.  Most of the time, we lived in or around Gaffney, in neighborhoods that were not that great.  I can only really remember a mobile home in Grovetown, Georgia, a rental at 409 S. Palm Street in Aiken, Georgia, and our last residence in Belvedere, South Carolina.

29.     Dad sent us money from his Army pay and we had military benefits, although I don't recall ever going to the doctor.  In fact, Florence circumcised all of us boys herself.

30.     All of my brothers' grades were poor because nobody cared how they did in



school or even where they were. If Florence was not home, nobody was home so the boys and I would not come home for hours. There was no one to tell where we were going or where we had been. None of my brothers finished high school. I received my GED and attended two (2) years of college later. I recall receiving an award at school and my parents did not come to see me receive it.

31.     Since Dad was gone for so many years and Florence was out drinking, my brothers and I stayed out on the streets and were left to our own devices. We grew street smart and learned to survive in many situations. We also acquired some bad habits.

32.     My brothers and I drank as young kids. We were passed one (1) or two (2) beers to us under the table at the bar, or we had parties in the desert where someone would buy the alcohol for us. While I don't consider myself much of a drinker now, I started drinking very early. By the time I was thirteen (13) years old, I worked at the local pool hall/bar racking balls. I drank, smoked, got to know the local prostitutes, and became the bouncer there by the time I was fifteen (15) or sixteen (16) years old. My drinking increased later in the service.

33.     Florence started drinking very early, either in school or very soon after that. She drank as far back as I can remember. Florence quit drinking completely in the last ten (10) years of her life. She said it gave her headaches so she quit cold turkey. She told me she knew she did not have as much in life because she drank. She also worried that her boys "were the way they were" because of her.

34.     Florence would go on drinking binges that sometimes lasted for six to seven (6-7) days.  She would always hear imaginary people talking to her during drinking binges.

35.     When Barry and Larry were about eleven (11) years old, Florence went to the hospital for what I was told by relatives was a nervous breakdown.  When I got older, I believed she was hospitalized for a cross between the dt's (delirious tremons) and nervous breakdown.

36.     After returning from his voluntary tours in Germany, Dad returned stateside.  He was still in the Army and was assigned at Ft. Gordon near Augusta, Georgia.  As a Signalman, Dad installed electrical wires and communication equipment. ~~He was transferred several times back and forth between Augusta and Atlanta, taking us with him.~~

37.     Five (5) years after the birth of the twins, our youngest brother Phil was born.  I took care of him as I had done with Barry and Larry.

38.     I recall my parents working in several places during my childhood.  Florence worked days at the Ked's factory.  Dad worked days full-time in the service and worked part-time four (4) nights a week as well.  For a time both my parents worked at a local shirt factory.

39.     Dad was hard-working, partly because we always needed the money and partly to get away from his wife.



40.    Larry, Barry and I still never invited friends home because we did not know what would be going on there, who would be drunk, if anyone would be home, or how messy the house would be.  We went to school to see our friends or played with them on the streets.

41.    Even if we tried to be home by five (5) o'clock, my parents would usually be working and/or drinking.  Dad drank, but not as much as Florence.  I recall seeing Dad drunk only a few times.  When my parents drank, they argued about money and the bills. Florence was a yeller. Dad however, could not fight, he just wasn't that kind of guy.

42.    I think the cops may have been called for one (1) or two (2) of their fights. I recall a fight between my parents in which Florence stabbed Dad.  The fight happened while we were living in Grovetown, Georgia.

43.    When we were disciplined, we were made to drop our pants, but not our shorts, bend over the couch or bed, and were hit with the belt or razor strap.  Florence hit us ten (10) to fifteen (15) times, sometimes until we bled. I was punished this way if I did not come home and watch my brothers and Florence found out.

44.    Only once in my life did Dad ever hit me, striking me one time with the razor strap.  Dad did not believe in hitting children.  He cried when Florence gave us whippings.  Dad did not say anything or fight with Florence about how severely she punished us.  He just did not have it in him to fight with her.

45.    As a twelve (12) year-old, I cut tobacco in the fields and baled hay for



work. Then, I got the job at the pool hall. I got into some mischief growing up, but not criminal mischief. I did not do any drugs, even though they were available. I used chew or ~~tobacco~~, but never smoked cigarettes.

46.    After a tour of duty in the navy and a career in the army which included the Korean War and two (2) years in Viet Nam, Dad retired from the Army as an S. Sgt. (E6), after having a heart attack.

47.    After retiring from the service, Dad became the manager of a Bonanza Steak House in Georgia. Dad had gotten his foot in the door at Bonanza because for several years before getting out of the service, he spent his annual thirty-day leave working part time at Bonanza and full time at Kelly's (restaurant). Once Dad became the manager, I worked at Bonanza as a dishwasher and Florence worked as the cashier.

48.    We moved to Benson, Arizona, in 1970, to escape bill collectors. On May 21, 1973, at forty-four (44) years of age, Dad, Paul Jones died of a heart attack..

49.    I left home when I was seventeen (17) years old to get away. I joined the Army and was sent to Viet Nam. I spent seven (7) years in the Army as a Signalman. When I got out in 1976, I managed an ambulance company in Globe and then worked as a deputy sheriff for the Gila County Sheriff's Department. I also worked as a police officer in Kearney, Arizona and as a mine worker for the Inspiration Mines. I then moved to Ft. Huachuca (Sierra Vista, Arizona), where I am currently the director of physical security.

50.    I credit Papa (my maternal grand-father), as the reason I turned out so well,

despite the neglect I suffered as a child. Papa made the difference between how things turned out in my life and the way my younger brothers turned out.

51.     Papa ruled with a strong hand.  I walked to Papa's house many days after school.  If school got out at 3:00 p.m., I would have to be there by 3:22 p.m., and not a minute later, because that's how long it took to walk from school to Papa's house. I was never late because I knew, unlike at home, there would be consequences if I disobeyed. Even though Papa's house was old, had only an out house, a hand pump for water in the kitchen, and was a four (4) to five (5) mile walk from my house, I was always happy to go there.

52.     Papa lived a simple life.  He had an old Indian Motorcycle but no car.  He walked or took a taxi to go anywhere.  Papa spent hours sitting on the porch with me, talking, sharing his love of birds and teaching me to whittle. He was strong and quiet and I loved to be with him. I never had a serious talk with Dad until I was in the military.

53.     Papa's temperament was very quiet, but not moody or depressed.  He never yelled or screamed.  But if he had to tell you twice to do something, you got hit on the side of the head.  He was always fair in his punishment, he never over-did it.

54.     While Papa made strict rules and enforced them with a strong hand, he was a role model for me.  He knew right and wrong and offered me guidance.  At first, I did not want to go down the wrong path because I was afraid to answer to Papa if I did. Later, I chose not to do wrong because I did not want to hurt the one who was there for



me.

55.    I also spent many weekends fishing with Papa and his friend Clarence.  We packed the pick-up truck and drove out to the river.  We fished during the day and the adults stayed up at night drinking and talking.  I sometimes sat around with the adults, listening to them talk.  Other times I ran through the woods and played.

56.    Larry and Barry did not go to Papa's as I did.  They were very hyper and could not sit still the way I could.  They were bored just sitting around doing the things Papa and I did. Also they were not used to having rules abide by.  The twins were out on their own on weekends in the evenings when I was with Papa.

57.    Although all of us boys grew up street wise, Barry could sense what was going on with people and was more adept than Larry in that way.  When the twins were younger Barry was more like the leader of the two.  But as they got older, things switched around and Larry became the leader. Both went into Vision Quest and went on the wagon train, but Barry could not handle the program.  The train was only a week out of Arizona, New Mexico when Barry was kicked out of the program and Florence had to go get him.

58.    While I took advantage of the interest and support Papa gave me and made something of my life, my three younger brothers drank, did drugs and got into more and more trouble.

59.    In 1981 or 1982 Barry wrecked my dune buggy when he lost control of it, ran another car off the road, and ran off Airport Road (in ~~Globe~~ *Benson* OR). Even though Barry had





taken the buggy without permission, I paid the $1100 the incident costed to keep Barry from going to jail.

60.     Larry also had a history of speeding and reckless driving.  Phil has a drug problem and has also had a traffic violation for an SR22 on a suspended license.

61.     Although I love my brothers, I have told them not to come to my house while/when they were involved in drugs.  I recall seeing Barry on the news the day he was arrested.  I could tell from Barry's appearance he was high.

62.     Barry's wife, Carol, was a fairly decent person.  Barry did not want a divorce from her.  Barry and Carol were casual drug users before they broke up.  Carol got into drugs more heavily and ended up in jail after she and Barry separated.

63.     Florence was 4'10" and weighed 220 pounds before she died.  She passed away in her home in Benson, in her sleep.  She suffered from high blood pressure and emphysema and was taking at least ten (10) different medications.

64.     Florence was a very heavy smoker and coffee drinker as well, in addition to her alcohol use.  In the 1960's she worked with rubber and possibly other toxins while working in the factories.

65.     Florence died on February 27, 1997.  I believe she gave up and died after Barry got in trouble because she blamed herself for it.

66.     Barry did not get a fair trial because there was so much publicity about it.  Also, just prior to trial, the news was full of the story of a child molested who had been



released back into the community.  It was election time and the prosecutor and others were saying they would go after anyone who committed that type of crime and they were pushing sex offender registration which was not in place at that time.

67.     I do not think my brother was capable of harming a child.


I declare under penalty of perjury under the laws of the State of Arizona and the United States that the foregoing is true and correct.

Executed on _20 NOV. 2002_, 2002.


Otis Harris

**Exhibit 47**



..Marriage..          ..Certificate..

State of South Carolina,
County of Cherokee        } In Probate Court

To Whom It May Concern: This is to Certify, That on the 6 day of October, 19 55,
at Gaffney , in Cherokee County, State of South Carolina,
Paul Eugene Jones and Florence Bell Harris were united
in the Holy Bonds of Matrimony by Judge W. R. Douglas
in accordance with the laws of South Carolina in such cases made and pro-
vided, and, as shown by the records of this Court.

Recorded in Marriage License Book II

Witness my hand and seal of said Court, this the 6th day of
October 19 55.

_____
Judge of Probate Court.

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00078

**Exhibit 48**



## DECLARATION OF DONNA FOSTER

I, Donna Foster, declare as follows:

1.     I am Angela Gray's maternal aunt and the legal guardian of Rebecca and Jonathan Lux. My last name used to be Marini.

2.     The rest of Angela's biological family lived in Massachusetts and that is where *except grandmother her lived here for 20 years* Angela and Amanda were born. Their mother was my sister. She committed suicide at eighteen (18) years old. After her suicide Angela and Amanda's father took custody of them and brought them to Arizona.  At some point he decided he could not raise them and gave them up for adoption. Angela and Amanda's biological family did not see them again until their maternal grandmother came to Arizona to find them.

3.     By that time Angela was fifteen (15) or sixteen (16) years old and was already living on the streets.  Amanda lived with her grandmother for a year before going out on her own and was always closer to her than Angela.

4.     My former husband, Thomas Marini, and I moved to Arizona several years before Rachel's death.

5.     After reconnecting with Angela, I did not see a lot of her.  Angela was already into a lifestyle of drugs and abusive boyfriends.  She already had Jonathan and Rebecca and was pregnant with Rachel.

6.     Also, Angela did not keep in touch with us on her own. The few times I saw her, my mother or I would call and set up a time to go over.

7.     Jonathon, who was born deaf, could not talk until years later.  I recall him at eight (8) years old just sitting on the couch and screaming at us because he could not speak.

Page 1 of 7





8.     Jonathon's condition could have been helped with the use of hearing aids but Angela did not bother to get them for him.  She had him in public school until he was twelve (12) years old and he finally went to the Arizona School for the Deaf and Blind.  When Jonathon arrived at the school, they tested him and found he could only read at a 2nd grade level.

9.     With hearing aids Jonathon can hear vowels and consonants.  He reads lips very well and learned to sign.

10.     After having only had minium contact with Angela and the kids, I received a call one day at work telling me Rachel was dead and that I needed to go to the hospital.  I went to meet Angela and we were there for nine (9) hours that day.

11.     As the day went on, I began to feel things were not as I thought.  It became more and more clear to me Angela had not acted as a mother whose child was hurt by her boyfriend should.  Angela had been trained as a nurse's aid and knew Rachel should have been taken to the hospital.  Instead, she let Rachel die.

12.     One of the things that convinced me that Angela was not as innocent or naive as I thought, was the way Angela reacted when we got home that night.  We were sitting on the couch watching Barry's arrest on the news and I watched Angela takes off a bracelet and set it down on the coffee table very carefully.  She then patted the bracelet and said, "Barry gave that to me."  If Barry would have given it to me, I would have taken it off and thrown it across the room.

13.     Later, I learned  that Angela had even seen that Rachel was bleeding "down there" and just put her to bed without doing anything about it.

14.     Angela was told she would have to return to the Sheriff's department the next day.  I took Angela and by the afternoon, Angela was arrested and I, once again became a mom.





15.     That day I went to school to pick up Jonathon and Rebecca. Jonathon by then was already six (6) feet tall. He was wearing pants he had outgrown, which came down only half way between his knees and ankles. His hair was unkempt and hung down below his shoulders.

16. Rebecca had on a pair of plaid pants with a striped blouse. It took me two (2) hours that night to get Rebecca's hair untangled. At first I thought maybe the kids went to school that day that way because of everything that was going on. I later found out, from the schools, that Jonathon and Rebecca typically went to school that way.

16.     I knew Angela was into drugs and the drug crowd but I did not know how bad life had been for Angela's children until I learned what it had been like from Jonathon and, mostly, Rebecca.

17.     Angela's houses were filthy and messy, unlike the times when Angela knew we were coming to visit. The children did not know what it was like to have food in the house and had never seen a shopping cart full of groceries. Rebecca at nine (9) years old, had to sleep on the floor with three drunken men who were "friends" of Angela's.

18.     A day or two after I picked up the kids I was allowed to go to the trailer to pick up their clothes. I brought home what clothes I could find and sorted out the clothes on the back porch because I did not want to bring them in the house. I threw all the clothes away because there was not one thing I would put on them.

19.     The trailer was tiny, crowded, and filthy. With four (4) children in the house, the only thing to eat was a quart of milk that had gone bad and a bag of left over fries. Rebecca told me that when they were hungry Barry would give them $2.00 to go to Circle K and buy a burrito. The kids





were used to fast food places and had never eaten at a sit down restaurant. Jonathon did not like to eat in restaurants because he could not understand why he had to wait for his food.

20.    When I took the kids grocery shopping, Jonathon would look at the cart full of food and say, "So much food. Why so much food?" Apparently he had never seen someone do weekly grocery shopping before. Both kids would open the cupboard doors and look at all the food. For several months Jonathon asked constantly, "What's for breakfast? What's for lunch? What's for supper?"

21.    Angela had no furniture and usually left behind what few things she had whenever she moved. Rebecca and Jonathon rarely had a real bed to sleep on. The bed Jonathon was sleeping on in Barry's trailer was a bed made for a child to sleep on in the car, like a port-a-crib that converts to a sleeper.

22.    I took Jonathon and Rebecca for counseling for more than two (2) years. Most of what I learned of what they had been through with their mother came from those sessions. I called the police when I found out Rebecca had been sexually assaulted by a guy in the trailer park on Chapel Ave. where Angela and the kids lived before moving in with Barry. I never heard any more about it from the police.

23.    I also called DPS (CPS) when I went through a box of papers I brought from Barry's, which I thought were Angela's important papers, and found a letter from Barry's niece, Tera, to Jonathon. Tera and Jonathon were having sex and in the letter Tera was telling Jonathon exactly where to go (on the bed with the black sheets) and what to do. I could not believe Angela had the letter but didn't do anything about it.





24.     Although Jonathon could be difficult in some ways, I never had any trouble with him regarding sex.  I did however, have a hard time explaining to him when he got a girlfriend why she could not sleep over.  I explained to Jonathon all about sex and why a boy and a girl of their ages could not sleep together.  After forty-five (45) minutes of what I thought was a very thorough explanation, I asked him if he understood why his girlfriend could not sleep over.  Jonathon said he did then asked if she could stay over if her mother said she could.

25.     As I got to know Jonathon and Rebecca, I learned from them the physical abuse they had suffered from Angela.  Angela slapped and hit them frequently and even threw Rebecca off the porch.  Jonathon spent all of his time in his room playing Nintendo.  Rebecca had the responsibility of taking care of Rachel.  Even in 2nd grade, Rebecca walked home at lunchtime to make sure Rachel got something to eat.

26.     Rebecca and Jonathon were happy when they moved into Barry's trailer because Angela stopped hitting them.  Barry did not believe in hitting children and would not allow Angela to hit them when he was there.  The Jonathon and Rebecca told me Barry never hit them.  Instead, he would give them a talk or a little punishment, like going to their rooms.  Rebecca and Jonathon were fond of Barry and were not afraid of him in the least.

27.     I was surprised at all the good things everyone said about Barry during his trial.  No one had a bad thing to say about him.

28.     During all the years Rebecca and Jonathon were with me, I never spoke about my feelings toward Angela in front of them.





29.     I told Jonathon and Rebecca they could have as much contact with Angela as they wanted. They only wanted to see her twice and that was when she was at the county jail awaiting trial.

30.     Because Jonathon is deaf, he is very time oriented. Everything is done by time. He had to know what hour he was supposed to get up, at what the time to put his clothes on, what hours we would eat, etc. Jonathon has no common sense and takes things literally. I had a very hard time with him about personal hygiene as well. He would not wear deodorant. When I tried to tell him he needed it or his friend's would talk about him, he said they would not do that. When I tried to explain they would talk about it behind his back, he insisted he could see them behind his back and they would not talk badly about him.

31.     I do not think Jonathon has any learning disabilities or other special needs, other than the fact he really did not begin to learn until he was 12 years old. He could not talk and not hear before that so he really got no education before going to the deaf school.

32.     ~~I~~ Angela ~~had~~ to tell ~~Jonathon and~~ Rebecca the man they always thought was their biological father (Lux) was not. ~~I~~ she gave them the name of their real father and left it up to them if they wanted to contact him. Rebecca felt she had a real father in my current husband, David Foster, and had no need to contact whomever her biological father was.

33.     Jonathon and Rebecca were very close to Zolie, who was like a father to them. He contacted me about going to Rachel's funeral and being able to see the kids. I would not allow him to see Jonathon and Rebecca, because I felt they needed a separation from Zolie and Angela's lifestyle. Zolie showed up at the funeral, but kept his distance.





34.     Angela's sister, Amanda, did not stay in contact with Jonathon and Rebecca. Amanda was dating, and then married, a wealthy doctor who did not want any involvement with the kids. For a while Amanda lavished presents on Jonathon and Rebecca, but despite my request that she just spend some time with them, she did not. Eventually Amanda separated herself from us completely, not even going to her grandmother's funeral. The last I knew, Amanda and her husband built a million- and-a-half dollar home in Scottsdale and were living there.

I declare under penalty of perjury under the laws of the State of Arizona and the United States that the foregoing is true and correct.

Executed on ___11/21/___, 2002.

_Donna Foster_
Donna Foster



**Exhibit 49**



UNAUTHORIZED UNAUTHORIZED COPY COPY UNAUTHORIZED UNAUTHORIZED COPY COPY

11/18/02 Ofce of Vital Rec.
Barry Lee Jones
00001

NOV 13 2002

391508

Registration Dist. No. 1003

**CERTIFICATE OF BIRTH**
Vital Statistics — State Board of Health
South Carolina

Registrar's No. 1455

Birth No. 189

58 031736

| 1. PLACE OF BIRTH | 2. USUAL RESIDENCE OF MOTHER (Where does mother live?) |
|---|---|
| a. COUNTY Cherokee Co | a. STATE S.C. |
| | b. COUNTY Cherokee Co |
| b. CITY, TOWN, OR LOCATION Gaffney | c. CITY, TOWN, OR LOCATION Gaffney |
| c. NAME OF HOSPITAL OR INSTITUTION (If not in hospital, give street address) Cherokee Co. Mem. Hosp | d. STREET ADDRESS 11 Limestone Apt. |
| e. IS PLACE OF BIRTH INSIDE CITY LIMITS? YES ☐ NO ☐ | e. IS RESIDENCE INSIDE CITY LIMITS? YES ☐ NO ☐ | f. IS RESIDENCE ON FARM? YES ☐ NO ☒ |

CHILD

| 3. NAME (Type or print) First Barry Middle Lee Last Jones |
|---|
| 4. SEX M | 5a. THIS BIRTH SINGLE ☒ TWIN ☐ TRIPLET ☐ | 5b. IF TWIN OR TRIPLET, WAS CHILD BORN 1ST ☐ 2D ☒ 3D ☐ | 6. DATE OF BIRTH Month 8 Day 26 Year 58 |

FATHER

| 7. NAME First Paul Middle Eugene Last Jones | 8. COLOR OR RACE |
|---|---|
| 9. AGE (At time of this birth) 28 YEARS | 10. BIRTHPLACE (State or foreign country) Cherokee Co | 11a. USUAL OCCUPATION Service | 11b. KIND OF BUSINESS OR INDUSTRY |
| 12. MAIDEN NAME First Fiora Middle Della Last Hill | 13. COLOR OR RACE W |

MOTHER

| 14. AGE (At time of this birth) 25 YEARS | 15. BIRTHPLACE (State or foreign country) Cherokee Co | 16. PREVIOUS DELIVERIES TO MOTHER (Do NOT include this birth) |
|---|---|---|
| | | a. How many OTHER children are now living? 0 | b. How many OTHER children were born alive but are now dead? 0 | c. How many fetal deaths (fetuses born dead at ANY time after conception)? 0 |

17. I have reviewed the information on this, my child's birth certificate, and find it to be correct.
Fiora Della Hill Jones
(Signature of Mother)

17a. MOTHER'S MAILING ADDRESS
11 Limestone Apt

| 18. SIGNATURE | 18a. ATTENDANT AT BIRTH (If Other Specify) M.D. ☒ Midwife ☐ Other ☐ |
|---|---|
| 18b. ADDRESS Gaffney S C | 18c. DATE SIGNED 9-4-58 |

I hereby certify that this child was born alive on the date stated above.

| 19. DATE REC'D. BY LOCAL REC. 9-4-1958 | 20. REGISTRAR'S SIGNATURE Mrs. R. B. Bryant |

**Exhibit 50**

# DECLARATION OF PHILLIP HENRY JONES

I, Phillip Henry Jones, declare as follows:

1.      I am Barry Jones' youngest brother. Barry is five (5) years older than me. I was born in Augusta, GA, where our family lived until we moved to Arizona when I was six (6) or seven (7) years old. I remember my mother being hospitalized and my dad, who had to come home from the service to take care of us, taking me on the back of his motorcycle to see her.

2.      My older brother Larry, Barry's twin, used to get sick. I remember seeing him twitching and passing out. They later found out he had epilepsy. I passed out when I was around eleven (11) or twelve (12) years old and we were living at Ft. Huachuca. I didn't have epilepsy though.

3.      My mother took lots of medication, especially when she got older. Other than high blood pressure and nervousness, I don't know what they were for.

4.      I don't know anything about my father's family but my mother's family was interesting. My mother's mother was a full blooded Indian. My mother's only brother, Cepheus got in trouble for robbing a liquor store, and my maternal grandfather used to run moon shine.

5.      My mother was pretty tough. One time my mother shot a guy who was trying to break into the house. Another time she beat a guy up so much he ran and tried to climb up a tree. My mother caught up to him, tied him to the tree and kept hitting him.

6.      We left Georgia in a hurry. (I think it was right after my mother shot the guy). We moved at three (3) o'clock in the morning with just enough stuff to fit in the car with five (5) people and the dog.

7.      My oldest brother, Otis, went into the service about the same time the rest of the family moved to Arizona. I remember one of the few Christmases after Otis left when my dad was still alive. My dad had promised us mini bikes that year for Christmas. But he got really drunk and it looked like Christmas was going to be a bust. My mother had to call Otis and he helped her set something up for us.

8.   My dad had to retire from the service due to his heart condition.  I remember one time when he got into with Barry and had a heart attack.  In all he had seven (7) heart attacks before he died when I was eight (8) or nine (9) years old.

9.   Before Barry's arrest I lived in the Phoenix area with my family. After Barry's arrest I moved into his trailer to protect it because it was empty

10.   I know my brother Barry about as well as anybody could.  I know what he is like with children.  He would never do to any child the things they say were done to Rachel Gray.  I'm not saying this because Barry is my brother.  In fact, I would not be able to say the same about my brother, Larry.  Larry had already been in trouble for beating his own daughter and molesting my niece and his step-daughters.  Larry died in my arms shortly after Rachel was killed.  I just wish he had confessed before he died.

11.   Although I love my niece, Brandie, I know for a fact she had a violent temper and was very, very, possessive of her father. It would not surprise me if Brandie was responsible for Rachel's injuries.

12.   On at least two (2) occasions prior to this incident I witnessed Brandie being violent to other children. One time she was at her Aunt Leann's house and she was the only one in the other room with Leann's son. We heard a terrible scream and went in to find the boy crying and hurt. He had not fallen or hurt himself and the only one who could have hurt him was Brandie.  On another occasion I actually saw Brandie ~~hitting one of the other children~~ trying to choke her brother out.

13.   I hate to accuse a family member of anything like this but I feel Brandie had the temper and jealousy to commit this crime.  She was very upset about Angela and her children moving into Barry's trailer and about all the attention Barry was giving Rachel instead of her.

14.   I believe that there was some sexual activity going on between the kids in Barry's trailer at the time of the crime. The older children included Angela's son, Jonathan, fourteen (14) year's old, her daughter, Rebecca, eleven (11) year's old, Barry's daughter, Brandie, twelve (12) year's old and my daughter, Tera eleven (11) who often stayed there.  My suspicion that the kids were fooling around with each

other was confirmed when I found a note that went back and forth between the girls and Jonathan about having sex.

I declare under penalty of perjury under the laws of the State of Arizona and the United States that the foregoing is true and correct.

Executed on ___9ᵗʰ Dec___, 2002.

_Phillip Jones_
Phillip H. Jones

_Witness_
Witness
12-9-02
Date

-3-

# Exhibit 51

Ruth Godfrey
Psychometrists/                    COCHISE COUNTY
Social Workers          PSYCHOLOGICAL SERVICES CENTER

CHIEF ADMINISTRATOR                         RE CASE NO: 2174

Benson        SCHOOL DISTRICT

PLEASE NOTE:  The following is a report of Psychological Evaluation on
the student named below.  It is an "Official" evaluation and full jus-
tification for implementing the recommendations contained therein.  If
any additional information is desired, it will be furnished as soon as
time permits.  * * * * * * * * * * * * *

NAME    Jones,      Barry      Lee     M,F 26 August 1958    14-2
        (Last)     (First)    (M.I.)   (Sex)    (D.O.B.)     (Age)

        Benson Middle School      8      26 October 1972
        (School)              (Grade)   (Date of Evaluation)
"  ... involved in school incident involving potentially serious
                        (Reason for Evaluation)

injury ... "

* FORT HUACHUCA CASES ONLY: Sponsor's Name: _____
                                            (Last)    (First)   (M.I.)
Sponsor's SSAN: __4366____ Student's Address: _____
                                            (Number)        (Street)

I.    ATTITUDE OF PARENTS (GUARDIAN) REGARDING EVALUATION AND RECOMMEN-
      DATIONS:
      Mother:  Cooperative      Indifferent---------Uncooperative--
                     Comprehending    -Uncomprehending-
      Father:  Cooperative      Indifferent---------Uncooperative----
                     Comprehending    -Uncomprehending--

      SOCIAL WORKERS REPORT TAKEN:  Yes  -No-

II.   REACTION OF SUBJECT TO TASKS AND TO EXAMINER:

      RAPPORT       : -Good--    Average---->Poor      -Not Established-

      COOPERATION   ; Cooperative   -Indifferent------Uncooperative--

      EMOTIONALITY  : -Well Composed--    Average---->Lacked Composure

      ATTITUDE      : -Friendly- Accepting Indifferent-Guarded-Hostile--

      ATTENTION SPAN: Attentive      -Average---------Distractable--

      MOTOR ACTIVITY: -Hyperactive--    Average      -Hypoactive--

      VERBALIZATION : -Talkative---    Average         -Taciturn--

      MOTIVATION    : -Excellent--  Average  -Poor------Did Not Try--

# CONFIDENTIAL
## FOR PROFESSIONAL USE ONLY

Nat'l Pers Rec Ctr  08/15/02
Barry Lee Jones
00007

III.   TEST RESULTS:

1.  Intelligence Test:

| Instrument used | VIQ | PIQ | FSIQ | MA | %TILE | LEVEL |
|---|---|---|---|---|---|---|
| Wechsler Intelligence Scale for Children (WISC) | 89 | 90 | 88 | 12-6 | 21 | Dull Normal |

2.  The Bender Visual Motor Gestalt Test, a projective instrument, was administered.  When the results are evaluated according to the Hain Method, a score in the borderline range for suspected neurological impairment or brain damage emerges.  However, when the subject is evaluated according to Clawson, a number of anomalies more likely to be associated with functional (emotional) disturbance than with organicity are evoked.  These are:  minor rotation, closure and joining deviations, workover, and separation of subparts.

3.  The Hand Test, a projective instrument, was also administered with the following results:

INT=8     ENV=3     MAL=1     WITH=0     PATH=1
R=12      AIRT=2.8  H-L=3

ER=INT:ENV:MAL:WITH=8:3:1:0
AOR=(AFF+DEP+COM):(DIR+AGG)=3:5

Note:  The above scores suggest a significantly high propensity to act-out in a socially unacceptable manner.

4.  The Junior-Senior High School Personality Questionnaire (HSPQ) was also administered, and Barry scored above or below the average range on 8 of the 14 subscales measured by this instrument.  Significant deviations in response were noted in those areas pertaining to emotional immaturity and instability, super ego weakness, and susceptibility to group pressures.

5.  The Draw-N-Tell, a projective instrument, was also administered. In response to instructions to "draw a picture of a person--the whole person," Barry drew a male figure in profile with an inordinately large head and inordinately short arms.  In response to directions to "draw a picture of a person of the opposite sex of the first person you drew," Barry drew a picture of a one-eyed female lacking an ear, inordinately top-heavy, and drawn in a very sketchy manner.  Evaluation of Barry's responses to the projective questions on this instrument are being held, pending Barry's being seen by the Cochise County Family Guidance Clinic.

IV.   SUMMARY AND RECOMMENDATIONS:

On 16 November 1972, a conference was held in the office of Mrs. Betty Smith, Benson School nurse.

Nat'l Pers Rec Ctr  08/15/02
Barry Lee Jones
00008

IV.   SUMMARY AND RECOMMENDATIONS (Continued)

In attendance at said conference were Barry's parents, Mr. and Mrs.
Jones, Mr. Roland Dendy the principal of Benson Middle School, Mrs.
Elizabeth Lawhead, and the undersigned examiner.   The implications
of the foregoing psychometry were discussed and clarified at length
for the benefit of all concerned, and the following salient points
were brought out by Mr. and Mrs. Jones:  Barry has an identical twin
who has been diagnosed as an epileptic.  Both parents report that
Barry lies, tends to blame others at home consistently for his own
shortcomings.  When he is punished, frequently by whipping, the whip-
ping has little or no effect upon him.  The father sees Barry as
having done quite well until he failed the fifth grade, and then he
went "haywire."  The father feels that Barry learns much quicker than
his twin brother.

When seen by the examiner, Barry was somewhat responsive, tended to
guess when encouraged to do so, but frequently sat with his head
down and would talk with the examiner only when the examiner initiated
conversation.  He was quite polite and smiled infrequently.  It was
reported that Barry has a history of stealing, helping run-away chil-
dren evade their parents, and being involved in several school-related
incidents involving potential serious injury to other children.  The
psychometry suggests that he is functioning, generally, at the dull
normal range intellectually, and consistently with that intellectual
level, academically.  The psychometry suggests a rather high level of
tension and anxiety, but not strongly suggestive of organic impairment.
Generally, Barry's behavior impressed this examiner as being suggest-
ive of an emerging passive-aggressive behavior pattern.

The following recommendations were made to Mr. and Mrs. Jones: 1.That
the psychometry suggests the need for professional intervention and
that they should seek the assistance of the Cochise County Family
Guidance Clinic at an early date.  The necessary application materials
were provided for this purpose.

2. That although the psychometry does not strongly suggest the probabil-
ity of some neurological disorder, since Barry's twin brother has been
diagnosed as an epileptic, the possibility of some neurological impair-
ment should be ruled out by a qualified neurologist.

3.  Pending Barry's being seen by the neurologist and by the Family
Guidance Clinic, the parents should attempt to deal with him in as
consistent a manner as possible, establishing simple and consistent
limitations for his behavior and holding him to those limitations,
consistently.

Nat'l Pers Rec Ctr  08/15/02
Barry Lee Jones
00009

Standard Form 513
Rev. August 1954
Bureau of the Budget
Circular A–32

* U.S. GOVERNMENT PRINTING OFFICE : 1961 O—596373

| CLINICAL RECORD | CONSULTATION SHEET |
|---|---|

### REQUEST

| TO: | FROM: (Requesting ward, unit, or activity) | DATE OF REQUEST |
|---|---|---|

**REASON FOR REQUEST** (Complaints and findings)

Identical twin c̄ brother who has seizure disorder

**PROVISIONAL DIAGNOSIS**

| DOCTOR'S SIGNATURE | APPROVED | PLACE OF CONSULTATION ☐ BEDSIDE ☐ ON CALL | ☐ EMERGENCY ☐ ROUTINE |
|---|---|---|---|

### CONSULTATION REPORT

Barry Jones has an identical twin (Jerry), who has a diagnosis of epilepsy which is open to some question.

Barry was examined 2/16/72 & neurological exam was normal. He has been on probation for stealing and other encounters c̄ the law for past year.

I do not believe that his behavior can be explained in terms of organic brain disease or epilepsy. He should receive psychiatric counseling & therapy.

[signature]

(Continued on reverse side)

| SIGNATURE AND TITLE | DATE | IDENTIFICATION NO. | ORGANIZATION |
|---|---|---|---|

| PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility) | REGISTER NO. | WARD NO. |
|---|---|---|

CONSULTATION SHEET
Standard Form 513
513–104

Nat'l Pers Rec Ctr  08/15/02
Barry Lee Jones
00014

**Exhibit 52**

SPECIAL ORDERS)                                    HEADQUARTERS,
              )                             DEPARTMENT OF THE ARMY,
No. 168       )                         Washington, D. C., 27 August 1968

                              EXTRACT

273.  TC 447.  UP 10 USC 1202 FNE having been detm to be unfit for dy by reason of
phys disab is rel asg and dy on EDCSA at sta indic and on day fol EDCSA is placed
on temp disab ret list in gr indic.  HOSTWOY.  PCS.  TDN.  PPSIA.  MDC 7BE9.  SPN
270.
*           *           *           *           *           *
JONES, PAUL E   SSG (E-6)   RA 14340440   (SSAN 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)  MOS 31L40   MHC,
EDCSA:  3 Sep 1968                                         USAHSTC, Ft Gordon.
Date retired:  4 Sep 1968
Disab rating (percent):  30
Retired grade and SN:  SSG (E-6)
Place of retirement:  Gaffney, SC.
*           *           *           *           *           *

BY ORDER OF THE SECRETARY OF THE ARMY:


OFFICIAL:                              W. C. WESTMORELAND,
                                       General, United States Army,
                                       Chief of Staff.


KENNETH G. WICKHAM,
Major General, United States Army,
The Adjutant General.

A TRUE COPY:

T. A. HANSEN
2LT, AGC

DISTRIBUTION:
60--Trf Pt, USAS/TC & FG
 1--Cen F & AO
 2--AJGAG-PM
 2--AJGGP-ACS
 2--G2, USAS/TC & FG
 2--AJGAG-A
 1--G1, USAS/TC & FG
 5--Cen F & AO
 5--Sep Unit F&AO Bldg 31505
 5--MHC USAHSTC(M/R)
 5--SSG Jones, MHC USAHSTC

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00002

| SPECIAL ORDERS NUMBER | PARAGRAPH | DATE | | DEPARTMENT OF THE ARMY WASHINGTON, D.C.   20315 |
|---|---|---|---|---|
| 168 | 273 | 27 Aug 68 | MBQ/c1e | EXTRACT |

| CHECK | INDICATE PARAGRAPH TO BE USED BY ENTERING AN "X" IN THE APPROPRIATE BLOCK | |
|---|---|---|
| | TC 446  UP 10 U. S. C. 1201 FNE having been detm to be perm unfit for dy by reason of phys dsabl, is rel asg and dy on EDCSA at sta indic and on day fol EDCSA is placed on ret list in gr indic.  HOSTWOY PCS TDN PPSIA                                SPN 271. | |
| | TC 444  Having been detm to be perm unfit for dy by reason of phys dsabl, FNE will be rel from present asg and disch for convn of government UP AR 635-200 on EDCSA and on day fol EDCSA will be placed on ret list UP U. S. C. 1201 in gr and at sta indic.  HOSTWOY PCS TDN PPSIA            SPN 213 and 77M. | |
| XX | TC 447  UP 10 U. S. C. 1202 FNE having been detm to be unfit for dy by reason of phys dsabl, is rel asg and dy on EDCSA at sta indic and on day fol EDCSA is placed on temp dsabl ret list in gr indic.  HOSTWOY PCS TDN PPSIA                                SPN 270. | |
| | TC 445  Having been detm to be unfit for dy by reason of phys dsabl, FNE will be rel from present asg and disch for convn of government UP AR 635-200 on EDCSA and on day fol EDCSA will be placed on temp dsabl ret list UP 10 U. S. C. 1202 in gr and at sta indic.  HOSTWOY PCS TDN PPSIA            SPN 213 and 77N. | |

| NAME, CURRENT GRADE, SSAN, SN, MOS, AND ORGANIZATION | EDCSA | DATE RETIRED | DISABILITY RATING | RETIRED GRADE AND SN | PLACE OF RETIREMENT |
|---|---|---|---|---|---|
| Jones, Paul E. SSG (E-6) RA 14 340 440 (SSAN: 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) MOS: 31140 MHC, USAHSTC, Ft Gordon | 3 Sep 68 | 4 Sep 68 | 30% | SSG (E-6) | Gaffney, SC |

EXTRACT OF SPECIAL ORDERS - PHYSICAL DISABILITY RETIREMENT - ENLISTED PERSONNEL

By Order of the Secretary of the Army:

Official:
KENNETH G. WICKHAM,
*Major General, United States Army,*
*The Adjutant General.*

W.C. WESTMORELAND,
*General, United States Army,*
*Chief of Staff.*

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00003

AGPZ FORM-44,  1 Jul 68            PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE.

**RE-1**

LEGEND: Insert N/A to the items below which are not applicable

| PERSONAL DATA | | |
|---|---|---|
| 1. LAST NAME - FIRST NAME - MIDDLE NAME **JONES, PAUL EUGENE** | 2. SERVICE NUMBER **RA14 340 440** | 3a. GRADE, RATE OR RANK **Sp5 E5 (T)** / b. DATE OF RANK (Day, Month, Year) **20 Feb 61** |
| 4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS **ARMY   RA   SIGC** | 5. PLACE OF BIRTH (City and State or Country) **Gaffey, S.C.** | 6. DATE OF BIRTH — DAY **4** / MONTH **Jan** / YEAR **29** |
| 7a. RACE **CAU** / b. SEX **MALE** / c. COLOR HAIR **BROWN** / d. COLOR EYES **HAZEL** / e. HEIGHT **5'8"** / f. WEIGHT **173** / g. U.S. CITIZEN ☒YES ☐NO | | 9. MARITAL STATUS **Married** |
| 10a. HIGHEST CIVILIAN EDUCATION LEVEL ATTAINED **11 yrs** | b. MAJOR COURSE OR FIELD **Academic** | |

| TRANSFER OR DISCHARGE DATA | | |
|---|---|---|
| 11a. TYPE OF TRANSFER OR DISCHARGE **DISCHARGE** | b. STATION OR INSTALLATION AT WHICH EFFECTED **FORT HAMILTON, NY** | |
| c. REASON AND AUTHORITY **PARA 7 AR 635-205 SPN 411 PETS Early Release Overseas Returnee** | d. EFFECTIVE DATE — DAY **16** / MONTH **May** / YEAR **62** | |
| 12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND **Co B 97th Sig Bn  USAREUR** | 13a. CHARACTER OF SERVICE **HONORABLE** | b. TYPE OF CERTIFICATE ISSUED **DD FORM 256A** |

| SELECTIVE SERVICE DATA | | |
|---|---|---|
| 14. SELECTIVE SERVICE NUMBER **NA** | 15. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY AND STATE. **NA** | 16. DATE INDUCTED — DAY / MONTH / YEAR **NA** |
| 17. DISTRICT OR AREA COMMAND TO WHICH RESERVIST TRANSFERRED **NA** | | |

| 18. TERMINAL DATE OF RESERVE OBLIGATION — DAY / MONTH **NA** / YEAR | 19. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION a. SOURCE OF ENTRY ☐ENLISTED(First Enlistment) ☐ENLISTED(Prior Service) ☒REENLISTED ☐OTHER: | b. TERM OF SERVICE (Years) **14** | c. DATE OF ENTRY — DAY **31** / MONTH **May** / YEAR **56** |
|---|---|---|---|

| SERVICE DATA | | | | | |
|---|---|---|---|---|---|
| 20. PRIOR REGULAR ENLISTMENTS **One** | 21. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SERVICE **Pvt E2** | 22. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State) **Gaffey, S.C.** | | | |
| 23. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County and State) **173 Philer St. Gaffney (Cherokee Co) So Carolina** | 24. STATEMENT OF SERVICE | | YEARS | MONTHS | DAYS |
| | a. CREDITABLE FOR BASIC PAY PURPOSES | (1) NET SERVICE THIS PERIOD | 5 | 11 | 16 |
| | | (2) OTHER SERVICE | 8 | 1 | 6 |
| 25a. SPECIALTY NUMBER AND TITLE **291.10  Fld Carrier Reprm** | b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER **NA** | (3) TOTAL (Line (1) – line (2)) | 14 | 0 | 22 |
| | | b. TOTAL ACTIVE SERVICE | 14 | 0 | 22 |
| | | c. FOREIGN AND/OR SEA SERVICE **USAREUR** | 1 | 11 | 13 |

26. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED

**NONE**

27. WOUNDS RECEIVED AS A RESULT OF ACTION WITH ENEMY FORCES (Place and date, if known)

**NONE**

| 28. SERVICE SCHOOLS OR COLLEGES, COLLEGE TRAINING COURSES AND/OR POST-GRADUATE COURSES SUCCESSFULLY COMPLETED | | | 29. OTHER SERVICE TRAINING COURSES SUCCESSFULLY COMPLETED |
|---|---|---|---|
| SCHOOL OR COURSE | DATES (From - To) | MAJOR COURSES | |
| Field Carrier Repair | 1Aug59 to 1Feb 60 | Sig Co | NONE |

| VA DATA | | |
|---|---|---|
| 30a. GOVERNMENT LIFE INSURANCE IN FORCE ☐YES ☒NO | b. AMOUNT OF ALLOTMENT **NA** | c. MONTH ALLOTMENT DISCONTINUED **NA** |
| 31a. VA BENEFITS PREVIOUSLY APPLIED FOR (Specify type) **NONE** | b. VA CLAIM NUMBER c. **NA** | |

| AUTHENTICATION | |
|---|---|
| 32. REMARKS **Item 3a PFC E3 (P)   DOR 4 Aug 58   SSAN: 251 30 4366 Lump sum payment made for 60 days accrued leave Blood Group: A EM Entitled to reenlistment bonus Nr. 2 in pay grade E5.  U Ch 9 AR 37-104: Accumulative amount of bonuses and allowances paid subsequent to 1 Oct 49:Unkn REENLISTED** | |
| 33. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County and State) **303 Wood St. Gaffney, So Carolina** | 34. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED *[signature]* |
| 35a. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER **RITA S DANTON, CAPT, WAC, ASST ADJ.,** | b. SIGNATURE OF OFFICER AUTHORIZED TO SIGN *[signature]* |

| DD FORM 214 1 NOV 55 | REPLACES EDITION OF 1 JUL 52. WHICH IS OBSOLETE. | ARMED FORCES OF THE UNITED STATES REPORT OF TRANSFER OR DISCHARGE | NPRC-Paul Jones 11/05/02 Barry Lee Jones 00004 | 2 |
|---|---|---|---|---|

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT.

**PERSONAL DATA**

| 1. LAST NAME-FIRST NAME-MIDDLE NAME | 2. SERVICE NUMBER | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| JONES, PAUL EUGENE | RA 14 340 440 | 251 30 4366 |

| 4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS | 5a. GRADE, RATE OR RANK | b. PAY GRADE | 6. DATE OF RANK |
|---|---|---|---|
| ARMY    RA    SIG C | SSG E-6 (P) | E-6 | DAY 26  MONTH Oct  YEAR 66 |

| 7. U. S. CITIZEN | 8. PLACE OF BIRTH (City and State or Country) | 9. DATE OF BIRTH |
|---|---|---|
| [X] YES  [ ] NO | Gaffney, South Carolina | DAY 4  MONTH Jan  YEAR 29 |

**SELECTIVE SERVICE DATA**

| 10a. SELECTIVE SERVICE NUMBER | b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE | c. DATE INDUCTED |
|---|---|---|
| 38  11  29  301 | LB # 11, Gaffney, South Carolina | NA  DAY  MONTH  YEAR |

**TRANSFER OR DISCHARGE DATA**

| 11a. TYPE OF TRANSFER OR DISCHARGE | b. STATION OR INSTALLATION AT WHICH EFFECTED |
|---|---|
| RETIRED | Fort Gordon, Georgia |

| c. REASON AND AUTHORITY | d. EFFECTIVE DATE |
|---|---|
| Title 10 US Code Sec 1202 SPN 270 Placed on temporary disability retired list (See 30) | DAY 3  MONTH Sep  YEAR 68 |

| 12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 13. CHARACTER OF SERVICE | e. TYPE OF CERTIFICATE ISSUED |
|---|---|---|
| Co B 9th Bn Stu Bde USASESS 3d US Army | HONORABLE | NONE |

| 14. DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED | 15. REENLISTMENT CODE |
|---|---|
| NA | RE: 4 |

**SERVICE DATA**

| 16. TERMINAL DATE OF RESERVE/ UNTRS OBLIGATION | 17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION a. SOURCE OF ENTRY: | b. TERM OF SERVICE (Years) | c. DATE OF ENTRY |
|---|---|---|---|
| DAY  MONTH  YEAR | [ ] ENLISTED (First Enlistment) [ ] ENLISTED (Prior Service) [X] REENLISTED | 6 | DAY 17  MONTH May  YEAR 62 |
| NA | [ ] OTHER | | |

| 18. PRIOR REGULAR ENLISTMENTS | 19. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC | 20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State) |
|---|---|---|
| Two | SP 5 E-5 | Fort Hamilton, New York |

| 21. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County, State and ZIP Code) | 22. STATEMENT OF SERVICE | | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|
| 103 Wood Street Gaffney (Cherokee) South Carolina | a. STATEMENT OF SERVICE CREDITABLE FOR BASIC PAY PURPOSES | (1) NET SERVICE THIS PERIOD | 6 | 3 | 17 |
| | | (2) OTHER SERVICE | 14 | 0 | 22 |
| | | (3) TOTAL (Line (1) plus Line (2)) | 20 | 4 | 9 |
| 23. SPECIALTY NUMBER & TITLE | b. RELATED CIVILIAN OCCUPATION & D.O.T. NUMBER | b. TOTAL ACTIVE SERVICE | 20 | 4 | 9 |
| 311A1N Fld Carr Equip Rpmn | 823.281 Radio Mechanic | c. FOREIGN AND/OR SEA SERVICE Vietnam | 0 | 9 | 1 |

| 24. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED |
|---|
| National Defense Service Medal w/OLC    Vietnam Campaign Medal w/device 1960 Sharpshooter (Rifle) Vietnam Service Medal |

| 25. EDUCATION AND TRAINING COMPLETED |
|---|
| Emer Med Care IMD Crs CBR Tng |

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00005

**VA AND EMP. SERVICE DATA**

| 26. NON-PAY PERIODS TIME LOST (Preceding Two Years) | b. DAYS ACCRUED LEAVE PAID | 27a. INSURANCE IN FORCE (NSLI or USGLI) | b. AMOUNT OF ALLOTMENT | c. MONTH ALLOTMENT DISCONTINUED |
|---|---|---|---|---|
| NONE | 0 | [ ] YES [X] NO | $ NA | NA |
| | 28. VA CLAIM NUMBER | 29. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE | | |
| | C- NA | [X] $10,000 [ ] $5,000 [ ] NONE | | |

**REMARKS**

30. REMARKS    4 Years High School - GED
Blood Group: A
Item 11c: Para 273 DA SO 168 dtd 27 Aug 68
Severance pay not authorized.
Voluntary extension 3 months dtd 14 Jan 68.
Retained in service 17 days for the convenience of the Government.

Para 10 AR 601-210 applies.

Disability: 30%

**AUTHENTICATION**

| 31. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County, State and ZIP Code) | 32. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED |
|---|---|
| 317 Providence Road Gaffney (Cherokee) South Carolina 29340 | |

| 33. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER | 34. SIGNATURE OF OFFICER AUTHORIZED TO SIGN |
|---|---|
| T. A. HANSEN    2LT AGC    ASST AG | T. A. Hansen |

| DD FORM 214 JUL 66 | PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE EFFECTIVE 1 JAN 67. | ☆ GPO: 1967 O—268-718 | ARMED FORCES OF THE UNITED STATES REPORT OF TRANSFER OR DISCHARGE |
|---|---|---|---|

2

## JOINT MESSAGEFORM

SECURITY CLASSIFICATION

UNCLASSIFIED

| TYPE MSG | BOOK | MULTI | SINGLE |
|---|---|---|---|
| | | | S |

PRECEDENCE

ACTION   AIR MAIL

INFO

DTG

RESERVED FOR COMMUNICATION CENTER

SPECIAL INSTRUCTIONS

FROM: CG, USAS/TC & FT GORDON, FT GORDON GA   30905

TO:   TAG, DA, WASH DC   20315

UNCLAS   3 0 8 2     FROM:  AJGAG-PA

TAG, DA for AGPO-R

Subj:  Enl Svc Ret for 1 Aug 68

Ref:  C7, AR 635-230

SSG Paul E. Jones, RA14340440, Co B, 9th Bn, USASESS, has

suffered a heart attack and will be in the hospital for at least

one month.

| DATE | TIME |
|---|---|
| '23 | |
| MONTH | YEAR |
| Feb | 1968 |
| PAGE NO. | NO. OF PAGES |
| 1 | 1 |

DRAFTER

TYPED NAME AND TITLE

SP4 Morris

PHONE
4789

RELEASER

SIGNATURE

TYPED (or stamped) NAME AND TITLE
D. F. GILLICH
2LT, AGC, Asst Adj Gen

REGRADING INSTRUCTIONS

SECURITY CLASSIFICATION
UNCLASSIFIED

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00035

DD FORM 173

REPLACES EDITION OF 1 MAY 55 WHICH WILL BE USED.



**HEADQUARTERS**
**DEPARTMENT OF THE ARMY**
OFFICE OF THE ADJUTANT GENERAL
WASHINGTON, D.C. 20315

MBG/cis

IN REPLY REFER TO
AGPO-RE Jones, Paul E.
RA 14 340 440 (15 Jul 68) SSG (E-6)

28 August 1968

SUBJECT:   Retirement

TO:    Commanding Officer
       U. S. Army Hospital
       Specialized Treatment Center
       Fort Gordon, GA 80905

   1.  The retirement of the above named enlisted member is announced in the attached Department of the Army Special Orders (Extract).  Personnel officer will immediately review content of inclosures and inform enlisted member of retirement data as soon as possible.

   2.  The inclosed Appreciation Scroll is transmitted for presentation at such ceremony as may be held in connection with retirement.  However, any commander may withhold presentation of the scroll when he feels the character of service of the retiree is such that presentation is not warranted.  If the scroll is withheld it will be returned to this office thru channels stating reasons for not making presentation.

   3.  Any changes in the member's status, e.g. hospitalization, flagging action, or lost time as reported on the attached statement of service, will be reported to this office prior to the date of retirement.

*Use as file
copy*

       BY ORDER OF THE SECRETARY OF THE ARMY:

                                    Adjutant General

7    Incls
1    Extract of DASO XXXXXXXXXX
2    Copy TAG Message
3    Finance Memo
     DD Form 418
4    Statement of Service
5    XXXXXXXXXXXX BRI 80-54
6    Medical Records
7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX Appreciation Scroll
     Personnel Records Jacket

016292

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00048

AGPZ FL 173
1 May 66




PERMANENT

| SPECIAL ORDERS NUMBER 168 | PARAGRAPH 273 ✓ | DATE 27 Aug 68 | MBO/cia | DEPARTMENT OF THE ARMY WASHINGTON, D.C. 20315 **EXTRACT** |
|---|---|---|---|---|

| CHECK | INDICATE PARAGRAPH TO BE USED BY ENTERING AN "X" IN THE APPROPRIATE BLOCK |
|---|---|
| | TC 446  UP 10 U. S. C. 1201 FNE having been detm to be perm unfit for dy by reason of phys dsabl, is rel asg and dy on EDCSA at sta indic and on day fol EDCSA is placed on ret list in gr indic.  HOSTWOY PCS TDN PPSIA SPN 271. |
| | TC 444  Having been detm to be perm unfit for dy by reason of phys dsabl, FNE will be rel from present asg and disch for convn of government UP AR 635-200 on EDCSA and on day fol EDCSA will be placed on ret list UP U. S. C. 1201 in gr and at sta indic.  HOSTWOY PCS TDN PPSIA SPN 213 and 77M. |
| XX | TC 447  UP 10 U. S. C. 1202 FNE having been detm to be unfit for dy by reason of phys dsabl, is rel asg and dy on EDCSA at sta indic and on day fol EDCSA is placed on temp dsabl ret list in gr indic.  HOSTWOY PCS TDN PPSIA SPN 270. |
| | TC 445  Having been detm to be unfit for dy by reason of phys dsabl, FNE will be rel from present asg and disch for convn of government UP AR 635-200 on EDCSA and on day fol EDCSA will be placed on temp dsabl ret list UP 10 U. S. C. 1202 in gr and at sta indic.  HOSTWOY PCS TDN PPSIA SPN 213 and 77N. |

| NAME, CURRENT GRADE, SSAN, SN, MOS, AND ORGANIZATION | EDCSA | DATE RETIRED | DISABILITY RATING | RETIRED GRADE AND SN | PLACE OF RETIREMENT |
|---|---|---|---|---|---|
| Jones, Paul E. SSG (E-6) RA 14 340 640 (SSAN: 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) MOS: 31140 MHC, USAHSTC, Ft Gordon | 3 Sep 68 | 4 Sep 68 | 30% ✓ | SSG (E-6) | Gaffney, SC |

EXTRACT OF SPECIAL ORDERS - PHYSICAL DISABILITY RETIREMENT - ENLISTED PERSONNEL

By Order of the Secretary of the Army:

**PERMANENT**

Official:
KENNETH G. WICKHAM,
*Major General, United States Army,*
*The Adjutant General.*

W.C. WESTMORELAND,
*General, United States Army,*
*Chief of Staff.*

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00049

AGPZ FORM 44, 1 Jul 68                PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE.

| JOINT MESSAGEFORM | | | | RESERVED FOR COMMUNICATION CENTER |
|---|---|---|---|---|

**SECURITY CLASSIFICATION**

UNCLASSIFIED

| TYPE MSG | BOOK | MULTI | SINGLE |
|---|---|---|---|
| | | X | |

**PRECEDENCE**

ACTION   ROUTINE

INFO   ~~ROUTINEX~~ MAIL        DTG

SPECIAL INSTRUCTIONS

FROM:   TAG DA WASH DC

TO:   CO USAH SP TRMT CEN FT GORDON GA

INFO CHIEF RET PAY DIV FCUSA INDIANAPOLIS

UNCLAS                         FROM AGPO-RE / MBG

PARA 273 DASO 168   DATED 27 AUG 68

DIRECTED TEMP        DSABL RETIREMENT OF

NAME: SSG {E-6} PAUL E JONES

SN:   RA 14 340 440

AT:   GAFFNEY SC

REL ASG AND DY 3 SEP 68   AND PLACED ON TEMP

DSABL RET LIST 4 SEP 68   IN GRADE OF SSG {E-6}

INDIV WILL COMPL 20 YRS   4 MOS   9 DAYS

ACT SVC AND      20   YRS   4 MOS   9 DAYS

SVC FOR BP ON 3 SEP 68   PROV NTL UP 10 USC

972

SINCE 21 JAN 55 ✓

DSABL RATING 30   PER CENTUM.   EMRETIREAUTH.

# PERMANENT

| DATE 27 | TIME |
|---|---|
| MONTH AUG | YEAR 68 |
| PAGE NO. 1 | NO. OF PAGES 1 |

TYPED NAME AND TITLE

GORDON/CIE

PHONE 71580

SIGNATURE

TYPED (or stamped) NAME AND TITLE
A. G. GRUNDSET, LTC, AGC, CHIEF, EN-
SEC,SEP&RET AFF DIV, TAGO

SECURITY CLASSIFICATION

UNCLASSIFIED

REGRADING INSTRUCTIONS

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00050

DD FORM 173

| TYPE OF DATA | MBG/cie | DATA FOR RETIRED PAY |
|---|---|---|

☑ INITIAL SUBMISSION
☐ CHANGE
   ITEMS CHANGED: _____
☐ ADVANCEMENT *(Advancement in grade on retired list)*

| 1. LAST NAME - FIRST NAME - MIDDLE NAME | 2. RETIRED GRADE | 3. SERVICE NO. OF RETIRED GRADE | 4. SSAN |
|---|---|---|---|
| Jones, Paul Eugene | SSG (E-6) | RA 14 340 440 | 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 |

| 5. ACTIVE DUTY GRADE AND SERVICE NUMBER | 6. BRANCH OF SERVICE *(Officers only)* | 7. HIGHEST GRADE ATTAINED | 8. PERMANENT GRADE | 9. DATE OF BIRTH |
|---|---|---|---|---|
| SSG (E-6) RA 14 340 440 | | SSG (E-6) | NA | 4 Jan 29 |

### RETIREMENT ORDER

| 10. PARAGRAPH NUMBER | 11. SPECIAL ORDER NUMBER | 12. DATE OF SPECIAL ORDER | 13. LETTER ORDER DATED | 14. SPN |
|---|---|---|---|---|
| 273 | 168 | 27 Aug 68 | | 270 |

| 15. TYPE OF RETIREMENT AND FINANCE ALLOTMENT CODE NUMBER TYPE | CODE | 16. STATUTE AUTHORIZING RETIREMENT | 17. DATE PLACED ON RETIRED LIST |
|---|---|---|---|
| ☐ NON-DISABILITY ☒ TEMPORARY DISABILITY ☐ PERMANENT DISABILITY | 6 | TITLE 10 USC SECTION 1202  OTHER SECTION _____ | 4 Sep 68 |

| | 18. RETIRED PAY GRADE | 19. STATUTE AUTHORIZING RETIRED GRADE | 20. COMPONENT OF RETIRED PAY GRADE *(RA, USAR, ARNGUS, AUS)* |
|---|---|---|---|
| | SSG (E-6) | TITLE 10 USC SECTION 1372 | RA |

### COMPUTATION OF YEARS OF SERVICE CREDITED FOR RETIREMENT OR RETIRED PAY
*(and percentage of disability, if applicable (Section references applicable to Title 10 United States Code))*

| 21. VOLUNTARY RETIREMENT SECTION 1333, 3926, 3926 | | | 22. MANDATORY RETIREMENT SECTIONS 3888, 3927, - SEC 311, TITLE 37 | | | 23. YEARS OF SERVICE FOR PERCENTAGE PURPOSES *(1331-1333)* FRACTIONAL PARTS OF YEARS IN DECIMALS |
|---|---|---|---|---|---|---|
| YEARS | MONTHS | DAYS | YEARS | MONTHS | DAYS | |
| | | | | | | |

| 24. SECTION 1405 *(Applicable to voluntary and mandatory retirement)* | | | 25. DISABILITY RETIREMENT SECTION 1208 | | | 26. PERCENT-AGE OF DISABILITY | 27. AGE AND SERVICE - SECTION 1331 (C) |
|---|---|---|---|---|---|---|---|
| YEARS | MONTHS | DAYS | YEARS | MONTHS | DAYS | | ☐ WORLD WAR I |
| | | | 20 | 4 | 9 | 30% | ☐ WORLD WAR II ☐ KOREA |

### BASIC PAY - SECTION 202 ACT OF 12 OCTOBER 1949

| 28. | | | COMPLETED OVER 4 YEARS ACTIVE SERVICE AS AN ENLISTED MEMBER *(Applicable to commissioned officers in retirement pay grade O-1, 2, 3)* | | |
|---|---|---|---|---|---|
| YEARS | MONTHS | DAYS | ☐ YES | ☐ NO | ☒ NA |
| 20 | 4 | 9 | | | |

29. PHYSICAL DISABILITY INFORMATION PERTINENT TO THE DUAL COMPENSATION ACT OF 1964. *(Applicable to permanent and temporary disability retirements of regular commissioned and warrant officers)*

☒ NA   ☐ RETIRED FOR INJURY OR DISEASE RECEIVED IN LINE OF DUTY, AS A DIRECT RESULT OF ARMED CONFLICT

☐ RETIRED FOR DISABILITY CAUSED BY AN INSTRUMENTALITY OF WAR AND INCURRED IN LINE OF DUTY DURING A PERIOD OF WAR

30. RETIRED SERVICEMEN'S FAMILY PROTECTION PLAN
☐ NO DA FORM 1041 ON FILE   ☐ DA FORM 1041 ATTACHED

| 31. ELIGIBLE UNDER OTHER SECTIONS OF LAW FOR RETIREMENT AND RETIRED PAY | 32. COMPONENT OF RETIRED PAY STATUS IF MEMBER ELECTS CHOICE OF PAY INDICATED IN ITEM 30. |
|---|---|
| ☒ NO   ☐ YES *(Title 10 USC, Sections_____)* | |

| 33. SERVED AS MEMBER OF THE MILITARY OR NAVAL FORCES OF THE UNITED STATES PRIOR TO 12 NOVEMBER 1918 | 34. MAILING ADDRESS AFTER RETIREMENT |
|---|---|
| ☐ NA   ☐ YES   ☒ NO | 317 Providence Rd Gaffney, SC 29340 |

35. REMARKS

MOS: 31140

**PERMANENT**

| 36. DATE COMPLETED | 37. TYPED NAME AND GRADE | 38. SIGNATURE OF OFFICER |
|---|---|---|
| 27 Aug 68 | A. G. GRUNDSET, LTC, AGC | |

AGPZ FORM 977, 1 Feb 68   EDITION OF 1 JUN 66, MAY BE USED.

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00051

COPY FOR: TAG FILE   **2**

# STATEMENT OF SERVICE
## ENLISTED PERSONNEL - RETIREMENT

| DATE PREPARED |
| --- |
| 8 FEB 1968 |

**1. LAST NAME - FIRST NAME - MIDDLE INITIAL** — Jones Paul Eugene
USN 582 45 31  RA 14 340 440
**2. SERVICE NUMBER**

**3. DATE OF BIRTH (Day, Mo., Yr.)** — 4 Jan 29
**4. PLACE OF BIRTH** — Gaffney, S.C.
**5. CURRENT GRADE** — SFA (E 5)

**6. LIST ALL GRADES HELD** (which are higher than applicant's present grade), DATES OF PROMOTION THERETO, DATES OF REDUCTION, AND, IF REDUCED BY ADMINISTRATIVE ACTION, WHETHER MISCONDUCT OR INEFFICIENCY IS INDICATED, IF REDUCED BY COURTS-MARTIAL FURNISH FULL DETAILS. ("Remarks" column may be used if additional space is required)

**7. CHRONOLOGICAL DATES OF MILITARY SERVICE**

| ENL. WO. COM | COM-PONENT | FROM YEAR | MONTH | DAY | TO YEAR | MONTH | DAY | TIME LOST DAYS | YEARS | MONTHS | DAYS | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENL | USN | 46 | Jan | 16 | 48 | Dec | 29 | | 2 | 11 | 14 | | | |
| | USAF | 49 | Nov | 22 | 53 | Sept | 3 | | 3 | 9 | 12 | | | |
| | RA | 55 | Jan | 21 | 56 | May | 31 | * | 1 | 4 | 10 | | | |
| | | 56 | June | 1 | 62 | May | 16 | * | 5 | 11 | 16 | | | |
| | | 62 | May | 17 | 68 | Apr | 30 | * | 5 | 11 | 14 | | | |
| | | | | | 68 | Sep | 3 | | 6 | 2 | 10 | | | |

**8. TOTAL TIME LOST**

**9. QUALIFYING (Satisfactory) FEDERAL SERVICE (Creditable for Retirement) AS OF:** 20 Apr 68  3 Sep 67 — 20 | 4 | 9

**10. OTHER THAN QUALIFYING FEDERAL SERVICE (Creditable for Basic Pay Purposes Only)**

**11. TOTAL SERVICE FOR BASIC PAY PURPOSES (Item 9 + 10)** — 20 | 4 | 9

**12. REMARKS**
* S R not available
ETS 16 May 68
PERMANENT
No DA Form 1041 in file

**13. DATE OF COMPLETION OF 30 YEARS SERVICE (Day, Month, and Year)** — 24 Apr 78
**14. HIGHEST GRADE HELD** — Sep E-6

| COMPUTED BY (Initials) | DATE 8 FEB 1968 | CHECKED BY (Initials) | DATE 8 FEB 1968 | APPROVED |
|---|---|---|---|---|

*S AD-CAS-92!*

4 January 1974

SUBJECT:  Widow's Claim for the Survivor Benefits of SSG (Ret) Paul E. Jones
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

FROM:  CPT Jerry B. Reinoehl   Survivor Assistance Officer for:  Florence H. Jones
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                                                      P.O. Box 431
Co F, USAICS                                                     Benson, AZ 85602
Fort Huachuca, Arizona 85613

TO:  U.S. ARMY PERSONNEL SERVICES SUPPORT AGENCY
ATTN:  Board of Corrections
9700 Page Blvd.
St. Louis, MO  46429


1.  It is my contention that SSG (Ret) Paul E. Jones, 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, intended
to participate in the Survivors Benefit Plan (SBP) to the maximum allowable
amount but suffered a fatal heart attack prior to submitting the completed
SBP election form.

2.  This judgement is based upon discussion with his widow, Mrs. Florence H.
Jones, and statements received from two of his former acquaintances.  See
statements attached as Inclosures #1, #2, and #3.

3.  A brief history of the developments of this case began when I assumed the
function as Survivor Assistance Officer for Mrs. Florence H. Jones.  In that
capacity I was allowed to examine SSG Jones' personal papers.  During an
examination, I discovered a blank SBP election form (attached as Inclosure #4).
I asked the widow about the matter and she stated that her husband had
mentioned something about it (the SBP) some months earlier but that she left
all military matters to him.  That was evident to me since all his military
related records were kept apart from papers of mutual interest.  She further
stated that SSG Jones was the only person who worked with his military
records and that she had no idea of what was contained therein.

    Sometime after the widow' initial shock of the death, I again brought
up the matter of the blank SBP election form--this time probing deeper into
the subject.  This action, on my part, was taken since I was convinced SSG
Jones would not have allowed a matter of such importance go without action.
Mrs. Jones then recalled the matter in more detail and stated that the matter
had been discussed on several brief occasions.  She stated that her husband
was confused about some of the provisions of the SBP and that he had planned
to discuss the SBP with someone at Fort Huachuca.  She did not recall his
particular questions since she had always attempted to remain out of her
husbands military affairs.

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00072

SUBJECT:   Widow's Claim for the Survivor Benefits of SSG (Ret) Paul E. Jones
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

Up until his death, SSG Jones had been driving a gasoline tanker weekdays within the Benson, Arizona area.  Benson, Arizona is approximately 30 miles from the nearest military reservation--Fort Huachuca, Arizona.  In fact, he was working the morning of his death when he became very ill and asked Mrs. Jones to take him to Raymond W. Bliss Army Hospital, Fort Huachuca, Arizona where he died shortly thereafter leaving a widow and three dependent children. Since he worked weekdays he was unable to receive the guidance he desired in regard to the SBP because the Retired Services Division, Fort Huachuca is closed evenings and weekends.  The result was that the election form was never completed and returned to the Retired Pay Division, USAFSA.

The fact is that since he never submitted the form he then never elected or rejected coverage under the SBP.  Had he not intended to receive coverage then it would have been a simple matter to check the appropriate space, sign the document, and return the form.  Had he taken such action there would have been followup action by administrative officers to insure the spouse or the dependent children knew that such action had been taken.  But by SSG Jones not taking any action, either to elect or reject the program, this matter went unchecked until I examined his personal papers after his death.

Later, after discussing this case with the Retired Personnel Division, Fort Huachuca, I received a copy of DA Pam 600-1 dated October 1972.  After studying that document I can well understand why SSG Jones was confused and that he indeed wanted, and needed, professional guidance.  But professional guidance was not available to him so he turned to some of his friends. Unfortunately, though they were convenient, they new less of the program then did he and could only agree that he should receive professional guidance.

Another fact related to this problem is that SSG Jones was very concerned about the welfare of his wife and children.  This was displayed on several occasions when Mrs. Jones asked him to quite working and protect his health but SSG Jones did not want his family to suffer by that action and continued to work until the day of his death.  For that reason I do not think he would have purposefully ignored the SBP since he was extremely concerned over his families welfare.  If he had realized the true importance of the SBP and what benefits would be left to his family he would have certainly completed and returned the form.

4.  A portion of an article published in The Army Times dated October 31, 1973 is quite appropriate in this case:

When the Survivor Benefit Plan, P.L. 92-425, became law on Sept. 21, 1972, the accompanying House of Representatives report declared the Congress and the Armed Services Committee "does not want a benefit of this magnitude lost to an individual service family through lack of awareness.  It therefore wishes responsibility clearly placed on administrative officers to see that full counseling has been provided."

SUBJECT:   Widow's Claim for the Survivor Benefits of SSG (Ret) Paul E. Jones, 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

Full counseling was not provided in this case, infact it was not even available when it could and would have utilized.  Therefore, I feel that the administrators did not fulfill their responsibilities.  Because of the circumstances in this case, I feel that Mrs. Jones and her three dependent children should be declared eligible and begin receiving benefits under the Survivor Benefit Plan.

JERRY B. REINOEHL
CPT, MI
Survivor Assistance Officer

Inclosures: 6

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00074



..Marriage..                                    ..Certificate..

State of South Carolina,    } In Probate Court
County of Cherokee

To Whom It May Concern: This is to Certify, That on the 6 day of October 19 55, at _____, in Cherokee County, State of South Carolina, Gaffney

Paul Eugene Jones and Florence Hill Harris were united in the Holy Bonds of Matrimony by Judge W. R. Douglas II in accordance with the laws of South Carolina in such cases made and provided, and, as shown by the records of this Court.

Recorded in Marriage License Book _____

Witness my hand and seal of said Court, this the 6th day of October 19 55.

_____
Judge of Probate Court.

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00078

STATE OF ARIZONA

DEPARTMENT OF HEALTH — DIVISION OF HEALTH RECORDS AND STATISTICS

STATE FILE NO. 102-

# CERTIFICATE OF DEATH

| NAME OF DECEASED | A. FIRST PAUL | B. MIDDLE EUGENE | C. LAST JONES | 2. SEX MALE | 3. RACE OR COLOR CAU | 4. DATE OF DEATH MONTH MAY DAY 21 YEAR 73 |
|---|---|---|---|---|---|---|

| 5. PLACE OF DEATH | A. COUNTY COCHISE | B. TOWN OR CITY Ft HUACHUCA | 5. HOSPITAL OR INSTITUTION Raymond W. Bliss Army Hospital | IF RESIDENCE, GIVE STREET ADDRESS | 5. IN CITY LIMITS? YES ☒ NO | IF HOSPITAL, GIVE NAME |

| 6. DATE OF BIRTH MONTH Jan DAY 4 YEAR 29 | 7. AGE (LAST BIRTHDAY) 44 | 7A. IF UNDER 1 DAY DAYS HRS. MIN. | 8. MARITAL STATUS ☒ MARRIED ☐ WIDOWED ☐ NEVER MAR. ☐ DIVORCED. | 9. SURVIVING SPOUSE (IF WIFE, GIVE MAIDEN NAME) FLORENCE HALL | 10. WAS DECEASED A VETERAN? YES OR NO Yes | GIVE SERVICE DATES 1944-68 |

| 10. PLACE OF BIRTH A. STATE OR COUNTRY South Carolina | 11. CITIZEN OF WHAT COUNTRY? USA | SPECIFY | 12. SOCIAL SECURITY NO. 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 | 13A. USUAL OCCUPATION Retired | 13B. | D. ZIP CODE |

| 14. USUAL RESIDENCE A. STATE Arizona | B. COUNTY Cochise | C. TOWN OR CITY Benson | 14B. IN CITY LIMITS? YES ☒ NO | 15. HOW LONG LIVED IN ARIZONA? AT PRESENT ADDRESS 14 mos. IN STATE 3 yrs. | 16. PREVIOUS STATE OF RESIDENCE South Carolina | 85602 |

| 14A. STREET ADDRESS OR R.F.D. P.O. Box 431 | 404 S. SanPedro |

| 17. FATHER'S NAME | A. FIRST Henry | B. MIDDLE | C. LAST Jones | 18. MOTHER'S MAIDEN NAME | A. FIRST Florence | B. MIDDLE Elizabeth | C. LAST Webber |

| 19A. INFORMANT'S SIGNATURE *Florence H. Jones* | 19B. RELATIONSHIP TO DECEASED Wife | 19C. ADDRESS STREET OR CITY AND STATE P.O. Box 431 Benson, Az 85602 | ZIP CODE |

## 20. MEDICAL STATEMENT OF CAUSE OF DEATH

FILL OUT CAREFULLY

ENTER IMMEDIATE CAUSE ON LINE A. OTHER PRECIPITATING CAUSES SHOULD BE GIVEN ON LINES B AND C RESPECTIVELY. LIST UNDERLYING CAUSE LAST.

**PART I. DEATH WAS CAUSED BY:** (ENTER ONLY ONE CAUSE ON EACH LINE)

A. IMMEDIATE CAUSE Myocardial infarction

DUE TO OR AS A.
B. CONSEQUENCE OF: Arteriosclerotic Heart Disease

DUE TO OR AS A.
C. CONSEQUENCE OF:

| ESTIMATED TIME BETWEEN ONSET AND DEATH 1 hr 15 min |
| IF DECEASED WAS ADULT FEMALE, WAS SHE PREGNANT AT DEATH OR ANY TIME IN PAST YEAR? YES, NO, UNKNOWN. |

OTHER CONDITIONS OF SIGNIFICANT MEDICAL IMPORTANCE CONTRIBUTING TO DEATH BUT NOT DIRECTLY RELATED TO IMMEDIATE CAUSE

**PART II. OTHER SIGNIFICANT CONDITIONS**

Hypertension

| AUTOPSY? ☒ YES ☐ NO | 21. SPECIFY: | IF YES, WERE FINDINGS CONSIDERED IN DETERMINING CAUSE OF DEATH? YES OR NO 22B. SPECIFY— (CIRCUMSTANCES ONLY—NOT CAUSE) |
|---|---|---|

| 23. MANNER OF DEATH ☐ ACCIDENT ☐ SUICIDE ☐ HOMICIDE ☒ NATURAL CAUSES ☐ UNDETERMINED | 24. DATE OF INJURY MO. DAY YR. HOUR | 24B. AT WORK WHEN INJURED? YES, NO, UNK. | 26. HOW DID INJURY OCCUR? |
| | 24A. PLACE OF INJURY (HOME, STORE, FACTORY, STREET, ETC.) | 25. WHERE LOCATED? STREET ADDRESS CITY AND STATE | |
| | 27. SPECIFY: | | |

## PHYSICIAN OR MEDICAL EXAMINER

| 28. I (ATTENDED) (EXAMINED) THE DECEASED (FROM) (ON): MO. May DAY 21 YEAR 73 TO MO. DAY YEAR | CORONER FROM EXAMINATION OF THE BODY AND/OR MY INVESTIGATION, IN MY OPINION DEATH OCCURRED IN THE MANNER AND UNDER THE CIRCUMSTANCES STATED. |
| AND (SAW) (DID NOT SEE) HIM/HER ALIVE LAST TIME ON: MO. May DAY 21 YEAR 73 1:14 p.m. | 30. I (DID) (DID NOT) VIEW BODY AFTER DEATH ON: MO. DAY YEAR HOUR | 31. I (DID) (DID NOT) VIEW BODY AFTER DEATH. |
| 29B. DEATH OCCURRED AT: ON THE DATE AND AT THE PLACE LISTED ABOVE AND TO THE BEST OF MY KNOWLEDGE AND PROFESSIONAL JUDGMENT DUE TO THE CAUSES STATED. 30. I VIEWED BODY? Yes | 32A. SIGNATURE | PRECINCT OR DISTRICT |
| 1:15 p.m. SIGNATURE *Richard H Weyer MD* | | 33. |
| 29C. (TYPE NAME HERE) RICHARD H. WEYER, CPT MC | 32B. (TYPE NAME HERE) | DATE SIGNED |
| MAIL ADDRESS 30. Raymond W. Bliss Army Hospital 31. 22MAY73 | MAIL ADDRESS 34. | 35. |

| 36. SUPPLEMENTARY ENTRIES | | | |

| 37. TYPE OF BODY · BURIAL CREMATION OR REMOVAL Burial | 37A. DATE OF DISPOSITION May 24, 1973 | CEMETERY OR CREMATORY Benson, Arizona Cochise Gdns. ofRest | 38. EMBALMER SIGNATURE *M. R. Green* | 39. CERT. NO. 419 |
| | 37B. STREET ADDRESS | CITY AND STATE | 40. FUNERAL DIR. SIGNATURE *M. R. Green* | 41. CERT. NO. 232 |
| 4C. FUNERAL HOME BENSON MORTUARY 895 E. 4th St. Benson, Az. | | | 45. DATE REC'D STATE OFFICE MAY 30 1973 |
| 45. DATE REGISTERED 5-29-73 | 45. REG. FILE NO. 153 | 45. REGISTRAR'S SIGNATURE *Bonnie J Bright* | 46. REG. DISTRICT 0212 | 47. |

VS-2 REV. 12-68 20M 10-69

---

## CERTIFIED COPY OF VITAL RECORD

STATE OF ARIZONA )
                  ) ss
COUNTY OF MARICOPA )

Date Issued JUN 5 1973

This copy is a true and exact reproduction of the document officially registered and placed on file in the DIVISION OF VITAL RECORDS, ARIZONA STATE DEPARTMENT OF HEALTH, PHOENIX, ARIZONA.

Issued under the authority of ARS 36-341 and by direction of:

*Alfonso Bravo*

LOUIS C. KOSSUTH, M.D.                    ALFONSO BRAVO
Commissioner of Health                    Assistant State Registrar

NPRC–Paul Jones 11/05/02
Barry Lee Jones
00079

**CLINICAL RECORD COVER SHEET** *(For Addressograph)*
*(AR 40–400)  (AR 40–2 for preparation of Admitting Plate)*

GS

| 1. ADMISSION NOTES | 2–21. PATIENT DATA |
|---|---|

**2-21. PATIENT DATA**

224202 JONES PAUL E E-6
M 39 CAU USA P 20Y 1935 15 FEB 68
RA14340440  B-9          B 19
N 31L40 N 1 AUG 68
N DIRECT
FLORENCE H JONES W 3004 DEANSBRIDGES R
AUGUSTA GA
USAHSTC GORDON
DG POSS M.I. CPT ZAMUDIO CPS

No evid of A or N

**LINE        LEGEND        (2–21)**
1 REGISTER NO.–NAME–GRADE OR RATING
2 SEX–AGE–RACE–DEPT(USA, USAF, etc.)–RELIGION–LENGTH OF SERVICE–TIME OF ADM–DATE OF ADM
3 SERVICE NO.–ORG–WARD NO.–CASUALTY CODE INDICATOR
4 FLYING STATUS–AERONAUTICAL RATING OR DESIGNATION–MOS–BR OF SERVICE–NATIONALITY–PREVIOUS ADM–EXPIRATION DATE
5 DATE OF INITIAL ADM–SOURCE OF ADM
6 NAME OF SPONSOR OR PERSON TO BE NOTIFIED–RELATIONSHIP
7 ADDRESS OF SPONSOR OR PERSON TO BE NOTIFIED
8 AND 9 (For any local use desired at individual facility)
(See AR 40–2 for complete explanation)

**22. ADMITTING OFFICER**

**23. DIAGNOSES** *(See instructions for recording as shown on reverse side. Include all required related data)*

1. 4201 – Heart disease, arteriosclerotic, as manifested by acute inferior myocardial infarction without angina pectoris or symptoms of congestive heart failure; Class I-B.  LD: Yes.   Not PR.
2. 3983 – Impairment of hearing, neurosensory loss, bilateral.  LD: Yes.   Not PR.
3. 3800 – Refraction, error of, NEC, left, corrected. LD: Yes.
Dg#1- May be permanent disabling 30% disability.

**24. OPERATIONS AND SPECIAL THERAPEUTIC PROCEDURES** *(Show date for each; show anesthetic for each operation)*

**25. SELECTED ADMINISTRATIVE DATA** *(Show nature of and dates for board proceedings; show fact of and dates for leave, AWOL, subsisting elsewhere, etc.)*
Conv Lv – 15 Mar – 14 Apr 68          Disp insts rec'd – 29 Aug 68
Fr hosp to SE – 15 Apr 68
Med Bd Proceedings – 1615 Jun 68
Approved PEB referral – 3 Jul 68
PEB rec fwded to Sec – 18 Jul 68
Specialized Treatment - Jul General Medicine

HEALTH RECORD COPY

**26. PHYSICAL PROFILE**

| TYPE | SERIAL | | | | | | SUFFIX | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | P | U | L | H | E | S | R | T | D | O | N |
| PREVIOUS | 1 | 1 | 1 | 1 | 1 | 1 | | | | | |
| REVISED | 4 | 1 | 1 | 3 | 1 | 1 | | | X | | |

PROFILE UNCHANGED

| 27. DAYS DURATION | | | | | |
|---|---|---|---|---|---|
| ALL 201 | THIS FACILITY IN HOSPITAL OR INFIRMARY 31 | SUBSISTING ELSEWHERE 100 | QUARTERS OR DISPENSARY | LEAVE 29 | OTHER 41 |

**28. NATURE OF DISPOSITION** Retired for disability, temporary, Par 5-8 S (2), AR 635-40, due to Dg#1, 30% disability.
**29. DATE OF DISPOSITION** 3 Sep 68

**30. SIGNATURE OF ATTENDING PHYSICIAN** SHELDON V. SMITH, CPT, MC
**31. SIGNATURE OF REGISTRAR OR MEDICAL RECORDS OFFICER** ZENA BRUNSON, DAC, MED RECORDS OFFICER

**32. NAME AND LOCATION OF MEDICAL TREATMENT FACILITY** USAH SPECL TRMT CEN, FORT GORDON, GEORGIA
**33. REGISTER NUMBER** 224 202

**DA FORM 8-275-2** (1 APR 67)    EDITION OF 1 JUL 62, IS OBSOLETE.    NPRC-Paul Jones 11/05/02
Barry Lee Jones
00080

Standard Form 502
Re. August 1954
Bureau of the Budget
Circular A–32

U.S. GOVERNMENT PRINTING OFFICE: 828144

| CLINICAL RECORD | NARRATIVE SUMMARY | |
|---|---|---|
| DATE OF ADMISSION | DATE OF DISCHARGE | NUMBER OF DAYS HOSPITALIZED |
| 12 Jan 1970 | 12 Jan 1970 | 1 |

*(Sign and date at end of narrative)*

JONES, PAUL E., SSG E-6, 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, ATDRL, was admitted to the U. S. Army Hospital, Fort Jackson, S. C., on 12 Jan 1970.

INTRODUCTION:  The patient is a 41 year old Caucasian male who was placed on TDRL on 4 Sep 1968.  This is his first periodic TDRL examination.

The patient was previously admitted to the U. S. Army Hospital, Fort Gordon, Ga., on 15 Feb 1968 with chest pain, diaphoresis and nausea.  Electrocardiogram showed changes consistent with an acute inferior myocardial infarction.  The patient had a mild arrhythmia during convalescence but made an uneventful recovery.  He was subsequently presented to a Medical Evaluation Board, USAH Fort Gordon, Ga., on 1 Jul 68 with referral to a Physical Evaluation Board at Fort Gordon, Ga., 15 Jul 68.

INTERIM HISTORY:  The patient states he is able to walk up to 1-1½ miles without symptoms but cannot play golf due to leg weakness noted with prolonged activity. He can climb approximately four flights of stairs without symptoms.  He denies paroxysmal nocturnal dyspnea.  He sleeps on two pillows by habit through most of his life.  He is presently employed as a machinist.  He denies any real chest pain, shortness of breath or cough.

PAST MEDICAL HISTORY:  Up to age 13-14, the patient had attacks of asthma.  Hypertension was noted in 1966 for which the patient was treated with Diuril daily until his myocardial infarction; since then he has had no hypertension noted.  He has had a tonsillectomy and adenoidectomy.  An appendectomy was performed in 1942. He had smoked 2½ to 3 packs of cigarettes daily prior to his myocardial infarction. Allergies include reaction to flu shot.

FAMILY HISTORY:  His father died with a myocardial infarction at age 54.  His mother died with a stroke; and a sister is on Insulin for diabetes mellitus.

PHYSICAL EXAMINATION:  The patient was a well nourished, well developed male in no acute distress.  Blood pressure 120/80.  HEENT examination revealed no scleral icterus; the optic fundi were normal; throat was clear.  Neck - there was no adenopathy or thyroid enlargement.  The lungs were clear to percussion and auscultation. Heart - regular rhythm without murmur, gallop, rub or megaly.  The abdomen was nontender without organomegaly or bruit.  Genitalia - normal circumcised male without mass.  The prostate was normal.  There was brown stool.  Back, extremities and neurological examination were unremarkable.

*(Use additional sheets of this form (Standard Form 502) if more space is required)*

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00108

Standard Form 502
Rev. August 1954
Bureau of the Budget
Circular A-32

U.S. GOVERNMENT PRINTING OFFICE: 828244

| CLINICAL RECORD | NARRATIVE SUMMARY | |
|---|---|---|
| DATE OF ADMISSION | DATE OF DISCHARGE | NUMBER OF DAYS HOSPITALIZED |
| 12 Jan 1970 | 12 Jan 1970 | 1 |

*(Sign and date at end of narrative)*

JONES, PAUL E., SSG E-6, 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, ATDRL (page 2)

LABORATORY AND X-RAY DATA: Urinalysis - acid reaction, specific gravity 1.020, negative albumin and sugar; microscopic revealed no cells. SMA-12 - calcium 8.7, phosphorus 3.0, BUN 12, FBS 85, uric acid 3.7, cholesterol 265, total protein 6.4, albumin 3.9, total bilirubin 0.7, alkaline phosphatase 55, LDH 135, SGOT 35. A chest x-ray was negative. EKG showed a stable pattern with evidence of an old inferior myocardial infarction, and borderline left ventricular hypertrophy with strain pattern.
HOSPITAL COURSE: The patient was hospitalized for only a short time and had no problems.

CONSULTATIONS: None.

PRESENT CONDITION: Stable.

DIAGNOSES: 1) 4200 - Arteriosclerotic heart disease manifested by old inferior
              4201   myocardial infarction, AHA FC II-B.   (PR; USAH, Ft Gordon,
                     Ga., 15 Feb 68, Reg #224202, dg same).
           2) 3983 - Hearing loss, sensorineural, bilateral.  (PR, same as Dg #1).
                     HEARING:  Right ear - 70 DB at 4000 cycles.
                               Left ear- 45 DB at 4000 cycles.
           3) 3800 - Astigmatism, left eye; hyperopia, mild, right eye, with bi-
                     lateral presbyopia.  (PR, same as Dg #1).
           4) 4344 - Left ventricular hypertrophy, borderline, with strain pat-
                     tern as evidenced by electrocardiogram.  (Not PR).

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00109

Standard Form 502
Rev. August 1954
Bureau of the Budget
Circular A-32

| CLINICAL RECORD | NARRATIVE SUMMARY | |
|---|---|---|
| DATE OF ADMISSION<br>15 February 1968 | DATE OF DISCHARGE<br>Awaiting Board Action | NUMBER OF DAYS HOSPITALIZED |

*(Sign and date at end of narrative)*

**MILITARY HISTORY:** The patient is a 39-year-old Caucasian male staff sergeant who has been an Electronics Engineer and Instructor in the Signal School at Fort Gordon, Georgia. He has approximately 20 years of military service.

**PAST HISTORY:** The patient had the usual childhood diseases without sequelae. Until the age of 13, he had mild episodes of asthma but has had none since. He underwent a tonsillectomy and adenoidectomy in 1938 without complications. An appendectomy was performed in 1942 without complications. The patient states that he is allergic to flu shots. Prior to his hospitalization, he smoked $2\frac{1}{2}$ to 3 packages of cigarettes daily but does not smoke at the present time. There is no history of excessive alcohol. His only medication at the present time is Coumadin daily. There are no other significant adult illnesses or injuries, and there are no known drug sensitivities.

**FAMILY HISTORY:** The patient has a sister with diabetes mellitus. The remainder of the family history is noncontributory.

**REVIEW OF SYSTEMS:** The patient has been in good health all his life. He experienced frontal headaches for five years, but these were relieved by the obtaining of new glasses. He has a mild high-frequency hearing loss in his left ear. The remainder of the systemic review is negative other than for the symptoms noted in History of Present Illness.

**HISTORY OF PRESENT ILLNESS:** This patient was admitted to the Fort Gordon Hospital Specialized Treatment Center on 16 Feb 68 with the chief complaint of chest pain which radiated up to his shoulders and down both arms. The pain was associated with diaphoresis and nausea. Prior to admission, he had complained of three or four episodes of similar pain within the past year and a half. The pain was apparent after exertion and had been relieved by rest. He did not seek medical attention for this chest pain, however.

The patient had been treated with a low-salt diet and one Diuril tablet daily since May of 1967 for the diagnosis of hypertension. In October of 1967, his blood pressure was apparently normal; and he was taking no further medication. Because of the chest pain, the patient was admitted to the hospital for observation.

(Continued)

*(Use additional sheets of this form (Standard Form 502) if more space is required)*

| SIGNATURE OF PHYSICIAN<br>SHELDON V. SMITH, CPT, MC | DATE<br>14 Jun 68 | IDENTIFICATION NO.<br>RA14340440 | ORGANIZATION<br>Med Hold Co, Ft Gordon, Ga. |
|---|---|---|---|

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility).

JONES, PAUL E., SSG E-6
USAH SPECL TRMT CEN, FT GORDON, GA.

| REGISTER NO.<br>224 202 | WARD NO.<br>B-19 |
|---|---|

NARRATIVE SUMMARY
Standard Form 502
502-107-01

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00134

Standard Form 502
Rev. August 1954
Bureau of the Budget
Circular A-32

| CLINICAL RECORD | NARRATIVE SUMMARY | |
|---|---|---|
| DATE OF ADMISSION<br>15 February 1968 | DATE OF DISCHARGE<br>Awaiting Board Action | NUMBER OF DAYS HOSPITALIZED |

*(Sign and date at end of narrative)*

PHYSICAL EXAMINATION:   The patient was a well-developed, well-nourished Caucasian male in no acute distress.  Neck veins were not distended. Funduscopic examination was unremarkable.  Ears, nose, and throat were clear. The chest was symmetrical.  The lungs were clear to auscultation and percussion. Examination of the heart revealed a regular rhythm of 70 per minute; there was no enlargement to percussion; no murmurs, rubs, or gallops were heard.  The abdomen was soft, nontender; no masses or organs were palpable; no bruits were heard. The extremities were clear; pulses were everywhere full and equal; there was no edema or tenderness.  Neurological examination was within normal limits.

LABORATORY DATA:  An electrocardiogram showed marked elevated ST segments in II, III, and AVF, Q waves in II, III, and AVF, and a small Q in V5 and V6 suggesting an acute inferior myocardial infarction.  Chest x-ray revealed the heart size to be at the upper limits of normal; no evidence of fluid was present.  Hematocrit - 42%, hemoglobin - 14.6 gm; WBC - 14,800 with 79 neutrophils, 17 lymphocytes, and 4 monocytes.  Sedimentation rates were 20, 28, 50, and 52.  Serial enzymes revealed an SGOT of 34, 150, 150, and 86, respectively; SGPT of 30, 22, 37, and 47, respectively; and LDH of 305, 1655, 1710, and 1420, respectively.  Serum cholesterol - 246 mg%.  Fasting blood sugar - 114 mg%.  BUN on admission was 20.  VDRL - nonreactive.  $CO_2$ - 28, sodium - 142, potassium - 5.0. Urinalysis was cloudy with red and white cells per high-powered field.  Serum calcium was 9.2, phosphorus - 3.5 mg%.  Repeat urinalysis was clear and negative for sugar and acetone.  Glucose tolerance test on 18 Apr 68 was normal.

HOSPITAL COURSE:  The patient was admitted to the hospital and treated with oxygen, rest, and analgesics, and for a brief period on admission with vasopressors.  These were discontinued on his second hospital day when he was given small doses of Atropine for slight bradycardia.  A Foley catheter had to be passed by the urologist for bladder distention, but the blood pressure never dropped below 80 and urinary output remained essentially normal.  Occasional nodal beats, rare premature ventricular contractions, and a wandering pacemaker complicated the patient's course; however, his vital signs remained stable.  He was anticoagulated and easily controlled with Coumadin.  Mild temperature elevations subsided on his eleventh hospital day, and he was allowed to eat his meals while dangling his feet over the side of the bed.  The remainder of his hospital course was uncomplicated, and he was allowed convalescent leave during which time he was asymptomatic and treated with Coumadin daily.

(Continued)

Use additional sheets of this form (Standard Form 502) if more space is required

| SIGNATURE OF PHYSICIAN | DATE | IDENTIFICATION NO. | ORGANIZATION |
|---|---|---|---|
| SHELDON V. SMITH, CPT, MC | 14 Jun 68 | RA14340440 | Med Hold Co, Ft Gordon, Ga. |

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility)

| | REGISTER NO.<br>224 202 | WARD NO.<br>B-19 |
|---|---|---|

JONES, PAUL E., SSG E-6
USAH SPECL TRMT CEN, FT GORDON, GA.

2

NPRC-Paul Jones 11/05/02<br>Barry Lee Jones<br>00135

NARRATIVE SUMMARY
Standard Form 502
502-107-02

Standard Form 502
Rev. August 1954
Bureau of the Budget
Circular A–32

| CLINICAL RECORD | NARRATIVE SUMMARY | |
|---|---|---|
| DATE OF ADMISSION
15·February 1968 | DATE OF DISCHARGE
Awaiting Board Action | NUMBER OF DAYS HOSPITALIZED |

*(Sign and date at end of narrative)*

PRESENT CONDITION:  The patient is presently asymptomatic.  He is capable of walking at an ordinary pace without experiencing angina, he sleeps well at night, and he has no symptoms of congestive heart failure. He is in the process of losing some 10 to 15 pounds which he apparently gained while being in the hospital.  He continues on a regular diet without added salt and takes no antihypertensive medications.  On examination, his blood pressure is 120/80 in both arms, his pulse is 80 and regular, his lungs are clear to auscultation and percussion, his heart is not enlarged to percussion, rhythm is regular, and no murmurs are heard.  His abdomen is soft and nontender without organomegaly.  His extremities are nontender without edema.

The patient desires to work as a restaurant manager; and as he is asymptomatic at the present time, his present condition would not limit his ability to perform in this capacity.  However, his age, diagnosis, and family history of diabetes make his prognosis such that job opportunities in the future will be somewhat limited.

FINAL DIAGNOSES:  1.  4201 = Heart disease, arteriosclerotic, as manifested by acute inferior myocardial infarction without angina pectoris or symptoms of congestive heart failure; Class I=B.  LD: Yes.  AR 40=501, Chapter 3, Section XI, Paragraph 3=21a.

2.  3983 = Impairment of hearing, neurosensory loss, bilateral. LD: Yes.

3.  3800 = Refraction, error of, NEC, left, corrected.  LD: Yes.

RECOMMENDATIONS:  It is the opinion of the Medical Board that this man is unfit for retention because of arteriosclerotic heart disease with a documented inferior myocardial infarction according to the provisions of AR 40=501, Chapter 3, Section XI, Paragraph 3=21a.  It is, therefore, recommended that he be presented to the Physical Evaluation Board.

*(Use additional sheets of this form (Standard Form 502) if more space is required)*

| SIGNATURE OF PHYSICIAN
SHELDON V. SMITH, CPT, MC | DATE
14 Jun 68 | IDENTIFICATION NO.
RA14340440 | ORGANIZATION
Med Hold Co, Ft Gordon, Ga. |
|---|---|---|---|

| PATIENT'S IDENTIFICATION *(For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility).* | REGISTER NO.
224 202 | WARD NO.
B-19 |
|---|---|---|

JONES, PAUL E., SSG E-6
USAH SPECL TRMT CEN, FT GORDON, GA.

3

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00136

NARRATIVE SUMMARY
Standard Form 502
502-107-02

S, PAUL E
4 340 440

**MILITARY OCCUPATIONAL SPECIALTIES**

| VORR | TYPE | CODE | TITLE | DATE | SCR | DATE OF EVAL | SCR | DATE OF EVAL | SCR |
|---|---|---|---|---|---|---|---|---|---|
| V | 2ns | 9th | Fld Carr Rep Rpr | 1Mar60 | | | | | |
| | | 314µ4 | Fld Carr Equip Rprm | 26Oct66 | | | | | |

**MOS EVALUATION SCORES**

4 Jan 29  Cau

| DATE OF EVAL | SCR |
|---|---|
| May16 88 | |

**APTITUDE TESTS**

| FORM | SCORE | RETEST SCORE | APTITUDE AREAS | SCORE | RETEST SCORE |
|---|---|---|---|---|---|
| VE- | 1 | 128 | IN | | |
| AR- | 1 | 116 | AE | 113 | |
| SM- | 1 | 108 | EL | 111 | |
| PA- | 1 | 116 | GM | 116 | |
| ACL- | 1 | 113 | MM | 126 | |
| AI- | 1 | 127 | CL | 114 | |
| MA- | 5 | 124 | GT | 122 | |
| EL- | 1 | 108 | RC | None | |
| GIT- | | | CO-A | 116 | |
| CI- | | | CO-B | 121 | |
| ARC- | 1 | Unsat | | | |

**OTHER TESTS**

| TEST | SCORE | GROUP | DATE |
|---|---|---|---|
| MOB-1 | | | |
| Oct- 1 | 122 | II | 24Jan55 |
| ALAT- | | | |
| Dr 2 | 133 | | 2Aug58 |
| Dr 1 | 115 | | 25Jan55 |

PLACE TESTED: 24Jan55

**MILITARY EDUCATION**

| TITLE OF COURSE | MOS CODE | COMPLETED |
|---|---|---|
| Postal Ops | 714.10 | 24Mar55 |
| Fld Carr Eqp Rpr | 294.10 | 25Mar55 |
| Mil Pol Sch | 951.10 | 18Jun56 |
| | | 23Apr58 |

**SPECIALIZED TRAINING**

Ref Item 45

| TYPE | COMPLETED |
|---|---|
| Infil Crs | 24Mar55 |
| Close Combat | 25Mar55 |
| CodeofCondct | 18Jun56 |
| Mil Justice B | 23Apr58 |
| CBR Tng | 25Mar55 |
| Geneva Conv | 23Apr58 |
| CBR Indoc | 24Oct62 |

**QUALIFICATION IN ARMS**

| WEAPON | COURSE | QUAL SCORE | DATE OF TEST |
|---|---|---|---|
| Rifle M1C | C | SS PCF 24Mar55 | |

| | WEEKS | YEAR |
|---|---|---|
| | 5 | 55 |
| | 25 | 60 |
| | 7 | 50 |

**RESERVE COMPONENT INFORMATION**

RES COMM AND MO STATUS

DA FORM 67-5

**SERVICE DATES**

9 Aug 68
15 FEB 48

11 June 68

**PHYSICAL STATUS**

| FT. | IN. | WEIGHT | LBS. |
|---|---|---|---|

**BIRTHPLACE AND CITIZENSHIP**

| Gaffney SC | US |
| Gaffney SC | US |
| KingMountian NC | US |
| Blacksburg SC | US |

compl 30Apr64

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00151

* Space reserved for future coding.

**FOREIGN SERVICE**

| FROM | THROUGH | OVERSEA COMMAND | MONTHS | TYPE | RTC |
|---|---|---|---|---|---|
| Jul46 | Sep48 | PTO | 27 | D | USN |
| Apr49 | Apr51 | EUCOM | 24 | D | AF |
| 30Jun56 | 16May58 | AFFE | 23 | K | No |
| 4Jun60 | 11May62 | Germany | 23 | X | Yes |
| 29Aug66 | 29May67 | USARPAC Vietnam | 9 | V | No |

**CIVILIAN EDUCATION**

| NAME AND LOCATION OF SCHOOL | DEGREE AND/OR MAJOR SUBJ | YEAR COMPLETED |
|---|---|---|
| HS GED | HS GED | 1963 |

**SPECIAL SUBJECTS**

CIVILIAN OCCUPATION

MAIN OCCUPATION JOB TITLE / DOT CODE / MOS / MONTHS EMPLOYED  12

2ND OCCUPATION JOB TITLE / DOT CODE / MOS / MONTHS EMPLOYED

AVOCATIONS / SPORTS (Specify) / AMAT / PROF / CH

OCCUPATIONAL LICENSES OR CERTIFICATES HELD

**APPOINTMENTS AND REDUCTIONS**

| GRADE | DATE OF RANK | AUTHORITY |
|---|---|---|
| PVT E2 (P) | 21Jan55 | SR 615-120-2 1955 |
| PFC (T) | 18Oct55 | SO 226 Hq AEPG 1955 |
| SP3 (T) | 23Apr56 | SO 45 Hq Sp Trps A Elct PG Ft Huachuca 1956 |
| SP3 (T) | 1Jun56 | SO 107 Hq Trans Sta Per Gen Ft Lewis 1956 |
| PFC (T) | 15Jul57 | SO 84 Hq 8th Cav Regt 1957 |
| PVT E2 (P) | 12Mar58 | O 3 Hq Det 7th BPO 1958 |
| PVT E2 (P) | 12Mar58 | Conversion DA Cir 600-13 1958 |
| PFC E3 (T) | 4Aug58 | SO 103 Hq Sp Sp Trps 1958 |
| SP4 E4 (T) | 27May59 | O 92 HHC (6470) 1959 |
| PFC E3 (P) | 4Aug58 | SO 19 Hq 97th Sig Bn 1961 |
| SP4 E4 (T) | 27May59 | O 92 HHC (6470) 1959 |
| SP5 E5 (T) | 20Feb61 | O 37 Hq 97th Sig Bn 1961 |
| PFC E3 (P) | 4Aug58 | Reenlist AR 601-210 17May62 |
| SP5 E5 (P) | 20Feb61 | AR 601-210 1962 |
| SP5 E5 (P) | 20Feb61 | AR 624-200 1962 |
| SSG E6 (T) | 9Sep64 | SO 182 USASESCS Ft Gordon 1964 |
| SGT E5 (P) | 4Nov65 | SO244 USASESCS 1965 (Misconduct) |
| SP5 E5 (P) | 4Nov65 | SO 244 USASESCS 1965 |
| SSG E6 (T) | 26Oct66 | SO#281-MilistSigBn(GA) 1966 |
| SSG E-6(P) | 26Oct66 | Para7-22 AR600-200 |

| Date | Code | Principal Duty | Organization and Station or Theater | Conduct | Effi- ciency | Reason |
|---|---|---|---|---|---|---|
| 16Sep55 | 714.10 | Postal Clerk | Hq Co 9470-1 Ft Hauchuca Arizona | Exc | Exc | PCS |
| 18Jun56 | 714.10 | Parcel Post Clerk | USAG Cp Whitt APO 43 | Exc | Exc | PCS |
| 3Apr57 | 120.00 | Pioneer | Hq Co 1st Bn Co & Regt APO 201 | Good | Good | PCS |
| 5Aug57 | 714.10 | Postal Clk (Bulk Mail) | 7th Base Post Office Japan | Fair | Fair | PCS |
| 6Aug58 | 111.100 | Basic Airn Sch | 570th APO Ft Jackson Sc | Exc | Exc | PCS |
| 6Feb59 | 714.10 | Postal Clerk (AGP-Pers) | HHC 1st AGT 506th Inf Ft Campbell Ky | Exc | Exc | PCS |
| 14Aug59 | 294.10 | Svc Sch Fld Carr Eqp Rpmn | HHC (6470) Ft Hauchuca | Exc | Exc | PCS |
| 3Jun60 | 294.10 | Rpmn | S u Co TUSASTR Ft Gordon Ga | Exc | Exc | PCS |
| 5Dec60 | 294.10 | Rpmn | FDC 97th Sig Bn APO 46 | Exc | Exc | PCS |
| 5Mar62 | 294.10 | Fld Carr Equ Rpmn | Co B 97th Sig Bn APO 46 | Exc | Exc | PCS |
| 5Jun62 | 294.18 | Fld Carr Eqp Rpmn | Instr Co C USASTR Ft Gordon Ga | Exc | Exc | PCS |
| 1Jul62 | 294.18 | Fld Carr Eqp Rpmn | Instr Co C USASESGS Ft Gordon Ga | Exc | Exc | PCS |
| 30Oct62 | TDY | TDY | 519th Sig Co (RRVHF) Ft Gordon Ga | Exc | Exc | TDY |
| 16Nov62 | 294.18 | Fld Carr Rpmn | Instr Co C USASESGS Ft Gordon Ga | Exc | Exc | TDY |
| 30Nov62 | 294.18 | Instr | Instr Co B USASESGS Ft Gordon Ga | Exc | Exc | PCS |
| 31Jan63 | 294.18 | Instr | Instr Co D USATGS Ft Gordon Ga | Exc | Exc | PCS |
| 2Nov64 | 294.68 | Instr | Tng Co Q USATGS Ft Gordon Ga | Exc | Exc | PCS |
| 5Jan65 | 311AH | Instr | Tng Co E USATCS Ft Gordon Ba | Exc | Exc | PCS |
| 5Sep65 | 3112N | Instr | Tng CO M USATGS FtGordon Ga | Exc | Exc | PCS |
| 1Aug66 | 3112H | Casual | Enroute to Vietnam | 1/x | 1/x | – |
| Sep66 | | Instr | 178th Sig Co (SPT)- 41st Sig Bn (CA) | | Exc | RD |
| | | | (Unit Inactivated) | | | |
| 20Jun66 | 3112M O | Rad Carr Equip Rpmn | MHD 37th Sig Bn (Spt) | – | – | CTT |
| 26Oct66 | 311AMO | Rad Carr Equip Rpmn | HHD 37th Sig Bn (Spt) | | Exc | PCS |
| 11Nov66 | 311AM O | Rad Carr Eqip Rpmn | Co C 37th Sig Bn USARPAC | Exc | Exc | PCS |
| 27May67 | | CASUAL | ENROUTE TO CONUS | – | – | – |
| 4Jul67 | 3114H | Instr (31L-pr) | (Attch)CoB 8th-Bn StuBde USASESFtGordonGa | Exc | Exc | COM |
| 12Sep67 | 3114 | Instr (31L pr) | Co 9thBn Stu Bde USASESS Ft GordonGa | Exc | Exc | HOSP |
| 5Feb68 | --- | Patient | MHC, USAHSTC, Ft Gordon Ga 30905 | Exc | Exc | – |
| 22Jul68 | --- | EM PCS HQR AWAITING ORDERS FROM T.A.G. | | | | |
| 18Sep69 | | Retired-Temp Ret Disab | | | | |

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00153

**39.**

| CAMPAIGNS | | |
|---|---|---|
| DESIGNATION | AUTHORITY | |

**41. AWARDS AND DECORATIONS**

| TYPE | AUTHORITY | ISSUED |
|---|---|---|
| GCM (1) | SO 71 Tng Co E USATCS Ft Gordon Ga 20Mar65 | YES |
|  | AR 672-5-1 1966 | 20 |
| NDSM | AR 672-5-1 | 1/11 |
| VCM | AR 672-5-1 | ??? |
| VNSM | | |

**40. WOUNDS**

| BRIEF DESCRIPTION | DATE |
|---|---|

**42. REMARKS**

RE-4 Not elig for reenl

**44. TIME LOST UNDER SECTION 972, TITLE 10, UNITED STATES CODE AND SUBSEQUENT TO NORMAL DATE ETS**

| FROM | TO (Inc) | DAYS | REASON |
|---|---|---|---|

**45. ITEM CONTINUATION**

| ITEM NO. | DATA |
|---|---|
| 28 | ENERMEDCARE |
| 28 | TWD/2/7Aug67 |

**47. SIGNATURE OF INDIVIDUAL (Name, grade and date)**

Paul Q Jones. E-b. 29 Sept 65

**48. DATE OF AUDIT**

6 Sep 65

**43.** DATE DA FORM 20A FOR CONTINUATION OF ITEMS ON BASIC DA FORM 20 ADDED

DATE DA FORM 20b RECORD OF COURT-MARTIAL CONVICTION ADDED

SUBMISSION OF DUPLICATE DA FORM 20 AND REPORT OF CHANGES

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 |
| 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 88 | 89 | 90 | 91 | 92 |

**44. DATE DUPL DA FORM 20 SUBMITTED**

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00154



**Jones, Paul E., RA 14340440**

AGPE-VS **(21 Mar 68)**       1st Ind      **clr**

SUBJECT:   Statement of Service and Medical Records

HQ, U. S. Army Personnel Services Support Center, Fort Benjamin Harrison, Indiana 46249  **3 April 1968**

TO: **Commanding Officer, Registrar Division, U. S. Army Hospital Specialized Treatment Center, Fort Gordon, Georgia 30905**

**XX**  1.  A statement of service and medical records are inclosed. It is desired that all records listed on reverse side of DA Form 261 be returned to this office with the Physical Evaluation Board proceedings but not made a part thereof. In the event the board is not convened, the attached records will be returned to this office by indorsement, ATTN:  AGPE-VS.

     2.  The checked paragraphs are applicable.

        [  ]  Some medical records are in custody of the Veterans Administration. A request has been made to that agency to have medical records forwarded direct to your installation without delay. When they have served their purpose, disposition will be made in accordance with AR 930-15.

        [  ]  The                                 has been requested to forward statement of service to this office.

        [  ]  Records for period cannot be located. Prepare photostats of original separation certificates in the possession of the individual and forward them to this office with the Physical Evaluation Board proceedings.

        BY ORDER OF THE SECRETARY OF THE ARMY:

                        HERBERT L. CONNER
                        MAJ, AGC
                        Operations Officer

**1**  Incl                  **Adjutant General**
    as

**AGPERSCEN Form 37**
**1 Feb 66**



NPRC-Paul Jones 11/05/02
Barry Lee Jones
00155

FILE:
AGPERSCEN

**3 APR 196**

**REQUEST FOR RECORDS AND OFFICIAL STATEMENT OF SERVICE FROM THE ADJUTANT GENERAL**
*(See AR 40-3 Before Completing Form)*

1. LAST NAME - FIRST NAME - MIDDLE NAME: JONES, Paul Eugene
2. ALL SERVICE NUMBERS: RA14 340 440
3. CURRENT GRADE: E6
4. BRANCH AND COMPONENT: Army
5. LAST PERMANENT ORGANIZATION: Co B, 9th Bn, Stu Bde, Fort Gordon, Georgia
6. NAME AND LOCATION OF REQUESTING HOSPITAL: Registrar Division, USAH Specialized Tmt Ctr, Fort Gordon, Georgia 30905
7. DATE OF REQUEST: 21 Mar 68

8. STATEMENT OF SERVICE: SHOW ALL SERVICE CREDITABLE FOR LONGEVITY PAY PURPOSES UNDER PUBLIC LAW 351, 81ST CONGRESS

| SHOW ALL ENLISTED, WO, COMMISSIONED SERVICE IN CHRONOLOGICAL ORDER | COMPONENT: RA, RES, NG, AUS | FROM DAY | FROM MONTH | FROM YEAR | TO DAY | TO MONTH | TO YEAR | UNAUTHORIZED ABSENCE (In Days) | SERVICE CREDITED YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Enlisted | USN | 16 | Jan | 46 | 29 | Dec | 48 | 0 | | | |
| Enlisted | USAF | 22 (~~16~~) | Nov | 49 | 3 | Sep | 53 | 0 | | | |
| Enlisted | RA | 21 (~~12~~) | Jan (~~May~~) | 55 | 31 | May (~~Jan~~) | 56 | * | | | |
| Enlisted | RA | 1 | Jun (~~May~~) | 56 | 16 | May | 62 | * | | | |
| Enlisted | RA | 17 | May | 62 | to present | | | * | | | |
| | Prepared by HQ, DA, TAGO, 3 Apr 68 | | | | | | | | | | |
| | | | | | | | | TOTAL | | | |

SHOW ALL PERIODS OF ACTIVE SERVICE

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | TOTAL | | | |
| | | | | | | | | CONVERTED | | | |

9. DATE OF BIRTH: 4 Jan 29
9a. PLACE OF BIRTH: Gaffney, S. C.
10. INCLUSIVE DATES OF ALL UNAUTHORIZED ABSENCES DURING CURRENT PERIOD OF ACTIVE SERVICE: *Time lost not available. SR maintained by field installation.
11. GRADES HELD BY EM DURING CURRENT PERIOD OF ACTIVE SERVICE:
12. HIGHEST GRADE HELD ON ACTIVE DUTY AND DATE OF PROMOTION *(During Entire Service)*: E6 Oct 67
13. HAS MEMBER EVER APPEARED BEFORE ARMY RETIRING AND/OR PHYSICAL EVALUATION BOARD? IF YES, STATE WHEN AND WHERE. No
14. PLACES AND DATES OF PHYSICAL EXAMINATIONS AND/OR HOSPITALIZATIONS: Camp Drew, Japan - 1957
15. REMARKS
16. I HAVE STATED MY SERVICE TO THE BEST OF MY KNOWLEDGE *(Signature of Member Listed in Item 1)*: Paul E Jones
17. SIGNATURE AND TYPED NAME AND GRADE OF PERSONNEL OFFICER: EDWARD E. HARRIS, MAJOR, MSC, REGISTRAR

DA FORM 1 AUG 57 261 — PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE.

NPRC-Paul Jones 11/05/02
Barry Lee Jones
00156

**Exhibit 53**

STATE OF ARIZONA

DEPARTMENT OF HEALTH–DIVISION OF HEALTH RECORDS AND STATISTICS

**CERTIFICATE OF DEATH**

DEATH NO. D 102-

| | A. FIRST | B. MIDDLE | C. LAST | | SEX | | RACE OR COLOR | | DATE OF DEATH | MONTH | DAY | YEAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. NAME OF DECEASED | PAUL | EUGENE | JONES | | 2. MALE | 3. | CAU | | | MAY | 21 | '73 |

PLACE OF DEATH — A. COUNTY COCHISE — B. TOWN OR CITY Ft. HUACHUCA — C. HOSPITAL OR INSTITUTION Raymond W. Bliss Army Hospital — (IF RESIDENCE, GIVE STREET ADDRESS) — D. IN CITY LIMITS YES ☒ NO ☐

DATE OF BIRTH — MONTH Jan — DAY 4 — YEAR 29 — AGE (IF 1 YR.) 44 — IF UNDER 1 YR. MOS. DAYS — IF UNDER 1 DAY HRS. MIN. — MARITAL STATUS ☒MARRIED ☐WIDOWED ☐NEVER MAR.☐DIVORCED — SURVIVING SPOUSE (IF WIFE, GIVE MAIDEN NAME) FLORENCE HALL

PLACE OF BIRTH — STATE OR COUNTRY 10. South Carolina — CITIZEN OF WHAT COUNTRY? 11. USA — SOCIAL SECURITY NO. 12. 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 — USUAL OCCUPATION 13A. Retired — WAS DECEASED A VETERAN? YES OR NO 13B. Yes — IF YES, GIVE SERVICE DATES 13C. 1944-68

USUAL RESIDENCE — A. STATE Arizona — B. COUNTY Cochise — C. TOWN OR CITY Benson — D. ZIP CODE 85602

STREET ADDRESS OR R.F.D. 15a. P.O. Box 431 — IN CITY LIMITS 404 S. SanPedro☐YES ☒NO — HOW LONG LIVED IN ARIZONA AT PRESENT ADDRESS 15a. 14 mos. — IN STATE 3 yrs. — PREVIOUS STATE OF RESIDENCE 16. South Carolina

FATHER'S — A. FIRST Henry — B. MIDDLE - — C. LAST Jones 17. — MOTHER'S MAIDEN NAME — A. FIRST Florence — B. MIDDLE Elizabeth — C. LAST Webber — ZIP CODE

INFORMANT'S SIGNATURE 19A. Florence H. Jones — RELATIONSHIP TO DECEASED Wife — ADDRESS 19C. P.O. Box 431 Benson, Az 85602

20. MEDICAL STATEMENT OF CAUSE OF DEATH — FILL OUT CAREFULLY — ENTER IMMEDIATE CAUSE ON LINE A. THEN PRECIPITATING CAUSES SHOULD BE GIVEN ON LINES B AND C RESPECTIVELY. LIST UNDERLYING CAUSE LAST.

PART I. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE ON EACH LINE)

A. IMMEDIATE CAUSE Myocardial Infarction

DUE TO OR AS A
B. CONSEQUENCE OF: Arteriosclerotic Heart Disease

DUE TO OR AS A
C. CONSEQUENCE OF:

ESTIMATED TIME BETWEEN ONSET AND DEATH 1 hr 15 min

21. SPECIFY: IF DECEASED WAS ADULT FEMALE, WAS SHE PREGNANT AT DEATH OR ANY TIME IN PAST YEAR? YES, NO, UNKNOWN.

OTHER CONDITIONS OF SIGNIFICANT MEDICAL IMPORTANCE CONTRIBUTING TO DEATH BUT NOT DIRECTLY RELATED TO IMMEDIATE CAUSE

PART II. OTHER SIGNIFICANT CONDITIONS Hypertension

AUTOPSY? 22A. ☐YES ☒NO — IF YES, WERE FINDINGS CONSIDERED IN DETERMINING CAUSE OF DEATH? 22B. (CIRCUMSTANCES ONLY—NOT CAUSE)

MANNER OF DEATH 23. ☐ACCIDENT ☒NATURAL CAUSES ☐SUICIDE ☐UNDETER- MINED ☐HOMICIDE

DATE OF INJURY 24A. MO. DAY YR. HOUR 24B. — AT WORK WHEN INJURED? YES, NO, UNK. 25. — HOW DID INJURY OCCUR 26.

PLACE OF INJURY (HOME, STORE, FACTORY, STREET, ETC) 27. SPECIFY: — WHERE LOCATED STREET ADDRESS CITY AND STATE

PHYSICIAN OR MEDICAL EXAMINER

29A. I (ATTENDED) (EXAMINED) THE DECEASED (EXAMINED) THE DECEASED — MO. May — DAY 21 — YEAR 73 — TO

29B. AND (SAW) (DID NOT SEE) HIM/HER ALIVE LAST TIME ON: — MO. May — DAY 21 — YEAR 73 — HOUR 1:14p.m. — I (DID) (DID NOT) VIEW BODY AFTER DEATH? Yes

CORONER FROM EXAMINATION OF THE BODY OR/MY INVESTIGATION. IN MY OPINION DEATH OCCURRED IN THE MANNER AND UNDER THE CIRCUMSTANCES STATED.
DECEASED WAS PRONOUNCED DEAD ON: — MO. DAY YEAR — HOUR — I (DID) (DID NOT) VIEW BODY AFTER DEATH.

29C. DEATH OCCURRED AT: 1:15 p.m. — ON THE DATE AND AT THE PLACE LISTED ABOVE AND TO THE BEST OF MY KNOWLEDGE DUE TO PROFESSIONAL JUDGMENT (HOUR) SIGNATURE ► Richard H.Weyer MD — 32A. SIGNATURE ► — PRECINCT OR DISTRICT 33.

29D. (TYPE NAME HERE) RICHARD H. WEYER, CPT. MC — 32B. (TYPE NAME HERE)

MAIL ADDRESS 30. Raymond W. Bliss Army Hospital — 31. DATE SIGNED 22MAY73 — MAIL ADDRESS — 33. DATE SIGNED

SUPPLEMENTARY ENTRIES 36.

37A. CITY OF BODY BURIAL CREMATION OR REMOVAL Burial — 37B. DATE OF DISPOSITION May 24, 1973. — 38. CEMETERY OR CREMATORY Benson, Arizona Cochise Gdns. ofRest — 39A. EMBALMER'S SIGNATURE ► M. R. Green — 39B. CERT. NO. 419.

40. FUNERAL HOME BENSON MORTUARY 895. E. 4th St. Benson, Az. — 41. FUNERAL SIGNATURE ► M. R. Green — 42. CERT. NO. 232.

43. DATE REGISTERED 5-29-73 — 44. REG. FILE NO. 153 — 45. REGISTRAR'S SIGNATURE Onnie S Bright — 46. REG. DISTRICT 0212 — 47. DATE REC'D STATE OFFICE MAY 30 1973

---

**CERTIFIED COPY OF VITAL RECORD**

STATE OF ARIZONA )
                          ) ss
COUNTY OF MARICOPA )

Date Issued JUN 5 1973

This copy is a true and exact reproduction of the document officially registered and placed on file in the DIVISION OF VITAL RECORDS, ARIZONA STATE DEPARTMENT OF HEALTH, PHOENIX, ARIZONA.

Issued under the authority of ARS 36-341 and by direction of:

LOUIS C. KOSSUTH, M.D.

Alfonso Bravo
ALFONSO BRAVO

NPPC-Paul Jones 11/05/02
Barry Lee Jones
00073