**Exhibit 54**



# VisionQuest
# Lodgemakers


RECEIVED
MAY 1 0 1995

P. O. Box 12948 • Tucson, AZ 85732-2948 • (520) 795-5961 • Fax- (520) 881-3269

May 9, 1995

Ana Padilla
Bruner & Bowman P.C.
78 West Cushing St
Tucson AZ 85701

Dear Ms. Padilla:

Enclosed are copies of Barry Lee Jones' records that we had on file. We do not charge any coping fees.

Sincerely,

Noni O'Sullivan
Regional of Quality Care Director

Enclosures

NS/rh

05317

Lodgemakers; Giving Young People Tools to Build Honorable Families

## VISIONQUEST INFORMATION SHEET

Name __Barry Jones_____ Date entered VQ __12/19/74__

D.O.B. __8/26/58_____ Age _____ Ethnic Group __Anglo__

Soc. Sec. # __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__ Blue Cross,Blue Shield # __FO 2813__

Last school grade attended __10th__ School Address __N. Patagonia St.__
                                                      __Benson, AZ__
Work __n/a_____ Address __n/a_____ Phone __n/a__

Referral source __P.O. Dana Deeds_____

Funding source __CHAMPUS - DES_____

Probation Officer or Caseworker __Dana Deeds_____

Father's Name __Deceased_____ Address __n/a__

Home Phone __n/a____ Occupation __n/a_____ Bus. Phone __n/a__

Mother's Name __Florence Jones_____ Address __P.O. Box 431__
                                                __Benson, AZ  85602__
Home Phone __586-2567__ Occupation_____ Bus. Phone_____

Survival trip permission slip __xx__ Yes _____ No

Survival trip medical exam __✓__ Yes _____ No

Survival trip parent briefing __✓__ Yes _____ No

Medical History __✓__ Yes _____ No

Social History __✓__ Yes _____ No

If No to any of above, for what reason?_____

_____

Additional information or comments:_____

_Barry Jones address as of 11-26-74_

_2221 N. Miracle Mile #6      - Tucson_

_____

_____

VisionQuest Records 2

VQ  INTAKE INTERVIEW SUMMARY - YOUTH
Name of youth: Barry Jones
D.O.B. 8/26/58
Home Address: P.O. Box 431, Benson, AZ.  85602
Date:  December 14, 1974  Time from 11:00 to 12:00
Place of interview:  Bisbee group home (Oliver House)
Referring agency:  P.O. Dana Deeds, Juvenile Detention Center

Reasons for referral:  Barry has a choice, to enter VQ voluntarily,
or to be placed by the courts into AYC.

Assessments of youth's emotional state:  Stable

Feeling of self:  Seemed positive

Relationships with parents, siblings, peers:  Family relationships
seem fairly stable.  The problem seems to lie in the fact that
Barry questions his mother's authority.  Other than this, they
seem to have a fairly decent relationship.

Youth's interpretation of past, present difficulties:  Barry
has trouble in Benson, it is a rowdy town and he has a reputation.
Once you get a reputation, you are "marked" by the police.

Attitude toward program:  He had a good attitude toward the
program, "It's got to be better than AYC."  He was willing to
make a commitment to improve himself.

Specific problems:  drinking, a few fights

Michael S. McCormick
VQ Family Counselor

MSM/jm

VQ INTAKE SUMMARY - PARENTS/FAMILY

Name of Youth:  Barry Jones

Name of parents:  Florence Jones

Home Address:  P.O. Box 431, Benson, AZ

Home phone:  586-2567

Date:  12/14/74      Time from 11:00 to 12:00

Interview circumstances:  Barry voluntarily came into the program after being ruled incorrigible By the courts.

Emotional state of parents:  Stable

Parents reaction to possible placement:  She thought it was a great idea.

Attitude toward program:  Good

Attitude toward youth:  An attitude of "What can I do? He won't listen to me". She is desperate in her attempts to put down some controls on her son.

Family interrelationships:  Fair-- between the mother and son there seems to be a communication problem.

Family dynamics:  The father is dead and the mother works.  She has little time for her sons and is somewhat upset and surprised at their unwillingness to obey her.

Specific notable problems within family (alcoholism, etc):  none that I could tell.  Barry has a twin brother who is also in trouble.  He recently got into grand theft.

Willingness to participate in the program:  Seemed to be very willing to participate.

Michael S. McCormick
Family Counselor

MSM/jm

HERBERT R. LAZARUS, M. D., P. C.
310 NORTH WILMOT ROAD
SUITE 202
TUCSON, ARIZONA 85711
TELEPHONE 296-8589

PSYCHIATRIC CONSULTATION

BARRY JONES

JANUARY 22, 1975

This sixteen year old youngster was referred by his family as well as juvenile authorities. He has been on probation for a period of three years and was recently charged with statutory rape. Both Barry and his twin brother Larry are presently in the VisionQuest program. There are two other sibblings in the family. The family moved to Arizona from Georgia six years ago. He states that he was a trouble maker when he was twelve or thirteen, but that his problems increased significantly when his father died of a heart attack two years ago.

Mental status examination: Barry presents himself in a very low key. He is almost too cool in his approach to his problems. He has no insight into his difficulties and states that he "just felt like getting into trouble". He denies any active involvement in the rape of which he was accused previously. He does acknowledge having been kind of a wild youngster and drinking too much. While, in a general way, he accepts the need now to settle down and to conform his behavior to social expectations, it is not clear that he is either willing or able to do so. He appears to have a very low frustration tolerance and to be quite impulsive.

05321

Psychiatric consultation - Barry Jones

January 22, 1975

Page 2

Diagnosis:  Group delinquent reaction of adolescence.

Severity:  Moderate

Prognosis:  Fair

Advise:  1.  Individual therapy once a week.

2.  Group therapy twice a week.

3.  Recreational therapy three times a week.

4.  Return to school as soon as feasible.

5.  Vocational training.

6.  Family therapy to include his mother once a week.

Herbert R. Lazarus, M.D.,P.C.

HRL/bm

VISIONQUEST

DISCHARGE SUMMARY

NAME OF YOUTH:  BARRY JONES          DATE OF DISCHARGE:  12-31-76

ADMISSION CIRCUMSTANCES

Barry was referred to the VisionQuest program by the juvenile
court authorities of Cochise County.  He entered the program on
December 19, 1974.  The reason for his admission was the charge
against him of statutory rape which occured in Benson, Arizona.
Prior to this charge of December, 1974 he had been on probation for
a period of three years.  Both Barry and his twin brother Larry
entered the VisionQuest program within a short period of time of
each other, due to the fact that they both had similar problems
dealing with their mother at home and allowing her to place certain
controls on them.  Barry was classified as an incorrigible child
by the juvenile court system and was placed with the VisionQuest
program upon his request.  He had a choice of either entry into the
VisionQuest program for a period of a year or placing the decision
back in the authorities hands with the possibility of being referred
to Arizona Youth Center.  Barry felt at the time that anything would
be better than going to Arizona Youth Center so he decided to enter
the VisionQuest program.

INITIAL PROBLEMS AND STRENGTHS

Barry claims that he had been a very hard to control child
since the age of 11 or 12, always getting in trouble with his
peers back in his state of Georgia.  He also admits that from that
point on his problems increased significantly and until the time
his father died were not as serious as they later became.

Barry's father died of a heart attack in 1972 and from
that point on Barry had a very hard time understanding a lot of
things about himself and his family, thus acting out in the community
and putting himself in a position to be placed on probation.

Initially Barry presents himself in an almost too cool manner
to the approach of his problems.  He does not seem to have much
insight as to what troubles him other than the fact that he just
feels like getting in trouble.  He claims that he wants to conform
to society's expectations, yet it is unsure, and has been unsure for
quite some time while Barry has been involved in VisionQuest,
that he will be able to handle such tasks.  He appears to have a
very low frustration tolerance and though he has made changes in
this area, still is very quick to jump.

Upon entry into the VisionQuest program Varry was diagnosed
by Dr. Herbert Lazarus, VisionQuest psychiatrist, as "group delin-
quent reaction of adolescent".  This diagnosis goes hand in

05323

PAGE TWO
DISCHARGE SUMMARY
BARRY JONES

hand with how Barry feels about himself, more on the level of very uncontrollable youth rather than one that could consider the fact that setting himself up to get in trouble was just going to hurt him in the long run.

Though Barry may try to come across as thinking very highly of himself, it is quite the contrary and he places himself in positions with other youth to prove to them that he is something other than he actually is. This is evident in the fact that he is a very negative leader and will do almost anything to impress his peers. This shows many people that ie lacks self confidence and has a very poor self image.

Since the death of Barry's father the family situation has completely fallen apart. Due to financial difficulties, Mrs. Jones has taken to drinking alcohol in excess which in turn allows her to lose her effectiveness as a parent. Due to the whole family situation and the problems that he individually was having, Barry suffered a very negative profile in the community because of his past negative and delinquent behavior.

Barry was tested for learning disabilities and other learning problems upon entry into the VisionQuest Learning Center and at that time it was found that he had no learning problems other than his resistance to learn.

Barry is a very strong individual in that when he does set out to do something positive and there is someone there to reinforce him, he will nine times out of ten succeed. An example of this is that Barry is a very good worker and gets a lot of self satisfaction out of the fact that he is very good with his hands. This was noticed about him and could be used a great deal in reinforcing with him that he is his own man and needs not impress other peers to reach a point where he feels that he is being accepted.

TREATMENT COURSE

Barry's first few months in the program found him being very easily swayed by his peers to place him in situations to get in trouble with the VisionQuest staff. Even though Barry thought he was being rather impressive in doing what was expected of him by his peers, each incident would always turn back on him in a manner where he needed to be confronted and either placed on restriction or work crew or some other kind of discipline to make the point to Barry that he needs to change his attitude. Basically his initial attitude was that he was going to do his time in VisionQuest and then return home. Mrs. Jones understood all along that it would take quite a bit of time before Barry would reach the point where he could return to the home and handle the situation there, if at all.

VisionQuest Records  8

PAGE THREE
DISCHARGE SUMMARY
BARRY JONES

The group home situation found Barry succeeding in little things such as his chores and daily duties even though he had made little progress in the program initially.

In approximately September of 1975, Barry's attitude began to change. He no longer felt that he was doing time, but expressed a real desire to communicate with other people and try to reap the benefits that the VisionQuest program had to offer. At that time Barry was living in the Enochs House and relating to Jack and Jodie Enochs very well. There were still a lot of insecurities on Barry's part as far as the direction he was headed, knowing very well the weaknesses there were at home and how hard it would be to place controls on himself there.

The decision had been made previously that Barry would set his direction not toward public school, but toward his G.E.D. and he had been participating in structured G.E.D. course right along. Some mention was even made as to a heavy equipment operator at Pima College, yet this was more on a long term basis.

Barry's move to the Enoch's House also found him utilizing one of his main strengths, that being using his hands. He found himself working with Jack Enochs daily, working maintenance and inspecting houses, repairing and learning general maintenance. This was a very positive direction for Barry to live with his twin brother in a small group home because it gave him an opportunity to examine himself closer and work on his own needs without competing for attention.

As far as the family involvement, Barry was still visiting home on a once to twice a month basis, knowing very well that the direction to moving home was getting further and further away. He would go home and observe his mother and try to reinforce to her that their relationship need not be as it had been in the past, yet many times a lot of this was relieved due to the fact that Barry knew he was returning to VisionQuest and leaving home.

In January, 1976 the program found Barry approaching his G.E.D. rapidly. This also found Barry being aware of the fact that he needed some sort of vocational and educational goals. This awareness was a very positive change for Barry, completely contrary to his earlier direction of just letting "things happen".

The beginning of 1976 also found Barry proving his understanding of his attitude toward his family and establishing the idea that he must provide a positive influence for his mother and his younger brother. During this time Barry was having his wisdom teeth removed and also having surgical correction for some problems with his feet. The pre-operative diagnosis was bilateral halux valgus with metatarssus varus, bilaterally. Barry had casts on both feet for some times following surgery and tolerated his temporary handicap well. The results of surgical correction were good.

C5325

PAGE FOUR
DISCHARGE SUMMARY
BARRY JONES

Barry had been improving on his self control considerably, yet the residential setting still needed to place certain limitations on him, knowing very well the point that Barry gets to when too much trust is placed in him, that being usually throwing everything out the window.

As time passed Barry was removed from the Enoch's house and was involved in the VisionQuest wagon train that left from Douglas, Arizona and made its way toward Valley Forge, a period of approximately six months. Along this wagon train Barry found himself getting involved in incidents with drinking and having disputes with the housefather on the wagon train. Due to the fact that Barry seemed to be the first peer that tested the entire situation, he was removed from the wagon train and sent back to Tucson. This upset Barry quite a bit, especially as time passed on and he found stories of his brother Larry, and other peers on the wagon train having gotten in trouble but not being removed from it. This is the sort of situation Barry needed to be exposed to in that the fact remains that he will not get away with things that other people may, and yet may get away with things that other people may not. He did not deal with the feelings of being removed from the wagon train all along and just kept them inside of him, waiting for some situation to occur that would bring them out.

Upon his entry into Baker House he continued his involvement with electricity, carpentry, plumbing, etc., giving him the best on the job training that he could be exposed to at the time. Barry had been involved in the program for over a year, which he realized a while back, would be a reality for him, yet had not honestly dealt with the fact that his discharge would be approaching and he had no definite direction.

By April of 1976 he was becoming more uncomfortable with his mother due to the fact that he felt she was holding him responsible for her poor financial situation. Visits continued with his mother yet not on such a steady basis as prior to the wagon train.

Barry completed his G.E.D. and took no interest in furthering his schooling. His self esteem was poor. More responsibility was placed on him so that he could see himself begin projects and finish them.

Barry then turned himself around and was a more positive influence on his peers and took more control of the group home rather than setting back and letting other people tell him what to do and allowing his anger to build up to the point where he got into some kind of physical incident with another peer.

05326

PAGE FIVE
DISCHARGE SUMMARY
BARRY JONES

Barry set aside the fact that his independence was becoming more of a reality and this went hand in hand with the fact that he had no definite direction upon leaving the program. He was counseled time and time again in the fact that he needed to start making major steps in an independent direction and yet was not able to do that until he accepted the fact that he would have to take care of himself.

After Barry made a lot of positive changes within the program and seemed to be feeling rather healthy about himself, he again got involved with other peers at the Baker house and was involved in stealing the houseparents automobile and involving other youth in the program, resulting in an accident which could have been very harmful for everyone involved. Barry was discharged from the program, placed back into the Cochise County Juvenile Court Center hands to decide what the next step for him would be. He was very frightened at this time and, said and did everything he could to get back into the VisionQuest program.

Barry seemed to have made some changes while in juvenile hall and was accepted back into the VisionQuest program. Upon his return to Tucson he carried a very poor attitude about himself. Due to his age, that of approaching 18 very swiftly, he was placed in Hawthorne House, that being the transitional house. He set out in a direction of being involved through the courts with Project Work and found a very good electrician apprentice job in Tucson. Time after time Barry would be involved in incidents at the Hawthorne House where the housemother had no control over Barry at all. He tried again, as he had when he first entered the program, to impress his peers and show them what a "hot shot" he was.

As Barry's involvement in the transitional house continued he worked through many crisis situations from physical encounters with staff and peers to turning himself around and being more of a leader in the house as far as taking care of individual and group needs.

A very positive point to make about Barry was that he did retain his job, arrive on time, and return to the group home after work each day. He finally found himself in a position where he was allowed to purchase a vehicle which gave him transportation to and from work.

As the end of 1976 came closer, Barry found himself closer to removing himself from what had been his home for the past two years. He openly admitted that he was very scared of leaving the program and yet on the other hand he wanted to leave. These feelings were understood and dealt with on a daily basis with Barry until the point arose where he was involved again in another incident with alcohol and another youth losing complete control and having to be taken to Juvenile Hall. Barry tried not to accept responsibility for this youth's loss of control yet knew that he could have put a stop to it if he had put out enogh effort. Barry put himself in a position again where he was ashamed of himself and knew that if he had only taken a different course he could have prevented another

VisionQuest Records

05327

PAGE SIX
DISCHARGE SUMMARY
BARRY JONES

major incident, just as he had seen over the past several years
of his life.

It was stated to Barry at that time that in a period of two
weeks from that date he would be financially stable enough to move
out of the Hawthorne House into an apartment on his own.  He then
had a choice to keep involved with the program on the outpatient
program level, thus allowing the VisionQuest program to make payment
for the first month's rent on an apartment.  This allowed Barry to
not have to worry about his first month's rent and be able to put
a little more money away in his bank account for future use.

DISCHARGE CIRCUMSTANCES

Barry Jones was discharged from the VisionQuest program out
of the outpatient program.  Upon his leaving Hawthorne House, he
was placed in an apartment and his first month's rent was paid for
by the VisionQuest program due to him being involved in the street
program.  After one month of involvement in the outpatient program,
Barry contained himself and placed good controls on himself.  When
his brother Larry returned from Pennsylvania, Barry found himself
starting to go down hill and with the Christmas and New Year's
holidays approaching, he was involved in excessive drinking and
totaling his brother's car in an auto accident.  After this he was
involved in the court system on a citation and Barry was discharged
from the outpatient program to an independent living situation that
he had been involved in for the past month.  He still worked at his
electrician apprentice job in Tucson and still had a steady income,
being able to financially take care of himself.

FINAL PSYCHIATRIC AND PHYSICAL EVALUATIONS

Upon leaving the VisionQuest program, Barry was in satis-
factory health as upon his discharge physical.

Upon his leaving the program, psychiatric evaluation found
Barry still had many fears of being on his own, yet involvement with
the outpatient program would try to encourage him with the fact
that he did have someone to turn to.  After being involved in the
outpatient program for a month and getting involved in an incident
with the police around his excessive drinking, Barry had not seen
Dr. Lazarus from that point on.

PROGNOSIS

When Barry was released from the transitional house to the
street program there were questions about his ability to adjust.
Barry was invited to dinner with the family counselor of the tran-
sition house at which time they discussed the possibilities and
fears of him making it.  Barry kept a very positive attitude about
himself, stating time and time again that he was going to make it
but he wanted to hear it from some other people.  It was relayed
to Barry from many counselors and staff that he had been involved
with that if he really wanted to make it, he could, yet there

05328

PAGE SEVEN
DISCHARGE SUMMARY
BARRY JONES

were a lot of things that always seemed to get in his way.  It was reinforced with him that he had a good-paying job, an apartment to live in, and he should have no problem taking care of his bills. He also had a vehicle to drive that was totally insured and registered and a lot of things were looking real well for him.  Barry did not keep up his contact with the street program as he had agreed to and the counselor of the street program had a hard time tracing Barry down and communicating with him due to his always being away from his apartment.  Up to the point where Barry's brother, Larry, re-turned to town and they began to interact with each other, there were a lot of positive feelings about Barry making it, yet real-istically Barry will always have problems of not having enough self confidence when he enters situations.

Barry's tolerance level improved quite a bit while he was involved in the VisionQuest program, yet upon his release it was realized by the staff who had been involved with him that it was very easy for him to fall back into a negative behavior pattern. This was mainly due to the fact that if he continued to turn to alcohol and drugs for an escape or a crutch, he would always find himself falling back into his weaknesses and setting his strengths apart from himself.

How Barry handles the car accident and the excessive drinking of alcohol that he was involved in over the Christmas and New Year's holidays will be a deciding factor in how he handles the future, that being whether he keeps his job and apartment or decides to fall back to the position of allowing other people to run his life for him.

Stephen P. Bloom, Family
Counselors

05329

VISIONQUEST

TREATMENT PLAN

Name of Youth: Barry Jones

Barry entered the program on December 19, 1974 on referral of Dana Deeds, a probation officer of Cochise County Juvenile Court Center. Barry's court referrals were for petty theft, use of alcohol and drugs and incorrigibility. Barry's relationship with his mother is one of anxiety and frustration due to Barry's inability to communicate with or take direction from his mother. His inability to conform to any social norm or family expectations has created problems for Barry in social interaction at school and with peers and family. Barry has a twin brother who has similar problems with school, juvenile court and in the family. They have a tendency to influence each other toward delinquent behavior and resentment of any authority.

Barry's father died approximately two years ago and this has a direct relationship to his present attitudes and behavior. The family could not be considered a close family and rules, regulations and restrictions were lax even when the father was living. The death of the father created more economic hardship which resulted in increasing the drinking problems of Mrs. Jones which decreased her effectiveness as a single parent. The family, at the time of Barrys entrance, was one of turmoil due to lack of communication, expectations and fullfillments. Barry sufferred a negative profile in the community because of his past negative and delinquent behavior.

Barry has no severe health problmes and has developed physically without any major injuries or illnesses. He has reacted to adolescence with delinquent behavior in order to compensate for his low self-esteem. He feels that his peers expect such behavior and he fulfills these expectations. He has made little effort to change these habits and doesn't want or feel that he needs any help concerning his behavior, attitudes and feelings. Barry's attitude toward entrance to the VisionQuest Program was that he felt that VisionQuest would be better than the Arizona Youth Corp.

The social history, school and psychological records provide information that Barry is in great need of limits placed upon him which he will be able to understand and deal with. Barry needs individual counseling in the residential setting and school center. Barry will benefit from group counseling along with peer group interaction, to help him focus upon his attitudes, behavior and future direction in VisionQuest. Barry, at this time, would be unable to deal with public school and should be placed in the VisionQuest Learning Center. The VisionQuest school will provide educational needs along with vocational studies when Barry meets requirements for and is able to deal with the VisionQuest vocational department.

Mrs. Florence Jones should be contacted twice monthly for family counseling sessions to develop better communication with Barry and help develop Mrs. Jones' ability to understand and deal with her own personal problems, which are detrimental to the relationship of Barry and herself.

Barry should be placed in a residential setting which has other boys who have similar problems. The houseparents will need to set limits and restrictions and have Barry feel the consequences when they are not met. The houseparents will provide a setting of warmth, understanding and sincerity in dealing with Barry. The house rules and VisionQuest policies will be explained to Barry together with explanation of the reasons for these limits. The setting will provide constant and consistent reinforcement of positive behavior and confrontation on negative behavior and attitudes. The houseparents, supportive staff and family counselor, along with the entire Vision-Quest staff will provide alternatives to Barry's present behavior. The staff will present the idea that Barry alone, is responsible for his behavior and must accept the consequences of negative behavior as of positive behavior and attitudes.

One-to-one counseling will be provided by the houseparents, supportive staff, school staff and family counselor on a daily basis. The counseling will be directed toward building Barry's self-esteem, understanding of reasons for his behavior and alternatives for future direction. The confrontation will be limited to the severity of the problem and will be used as another building block for Barry. The individual counseling done by the family counselor will be directed toward the same issues as that of the residential staff counseling, but will also include insight and direction toward improving the relationship of Barry and his mother.

Group counseling will be provided weekly by the residential house staff. This will provide Barry alternatives offered by his house peers. The groups will help Barry to understand that negative communication and negative behavior have an alternative which other group members have chosen. The communication ability of Barry will also be developed. He will be given the opportunity to express criticism as well as learning to accept constructive criticism in a positive manner. Barry, after three months will be placed in a leadership role in the groups to have him see himself as a leader and to develop leadership skills in a positive setting. Barry will learn that peers also have family, personal and social problems such as his which are dealt with in the group and that his problems are not isolated to himself.

The school placement at VisionQuest Learning Center will take place following Barry's placement in a group residence. Barry will be examined in a wide range of tests to establish any learning defieiencies, scholastic maturity and level of placement. Barry's attitude and behavior will be closely watched and he will be confronted and given reinforcement by school and house staff when needed. Barry has been one year behind his twin in school and this seems to have created an idea of failure toward education. His school placement level should be where placement is a challenge, demanding and, most improtant, interesting to Barry. Barry's school work and behavior will also be monitored by houseparents as another stepping stone in developing responsibility for his own behavior.

Mrs. Jones, from information available, has some degree of problems in her own emotional stability. This halts the effectiveness

Tratment Plan, arry Jones   - page ?

of her direction and influence in a positive manner for Barry. Family counseling, provided by the family counselor and house-parents will be directed, after initial information about past behavior patterns of both Barry and his mother has been acquired, toward reduction of Mrs. Jones' anxiety, frustration and drinking problem. Mrs. Jones' emotional stability affects her attitude and behavior and these are reflected in Barry's attitude and behavior. The reduction of Mrs. Jones' personal problems will help toward her developing a better understanding of Barry and also set limits for him. This interaction or cycle in the family counseling during the first year at VisionQuest will help Barry alter his false beliefs. The objective is to have another positive change for Barry within his environment.

The VisionQuest survival experience will benefit Barry in having him succeed in a personal effort and also have him recog-nize that VisionQuest can hold a positive change for him. The medical and psychological records show no reason not to have Barry undertake the experience. The survival should take place in Barry's first few weeks in VisionQuest. The experience will also provide an outlook for Barry and staff to evaluate the manner in which he reacts to a stressful situation.

The long-term goal for Barry during his stay at VisionQuest is for him to develop his educational needs, to obtain a G.E.D. certificate or high school diploma. Barry will have gained the ability to select proper alternatives to his past negative behavior, alternatives in dealing positively with his family, and alternatives in recognizing his responsibilities toward society. During the year of Barry's stay, he and his family, through extensive counseling involvement, will be prepared for Barry's successful return to his home and his mother.

_Roger L. Jenson_

Roger L. Jenson, Family Counselor

**Exhibit 55**



# DECLARATION OF BRANDIE ~~ELISHA~~ JONES

*Alicia*

I, Brandie ~~Elisha~~ Jones, declare as follows:

*Alicia*

1. I am the oldest child of Barry Lee Jones and Carol ~~(Jenkins)~~ *Rollins* Jones. I am ~~nineteen~~ *twenty* years old and the mother of an infant ~~son.~~ *daughter*

2. By the time I was nine years old I knew my parents were doing drugs. When I was ten I started stealing and hiding drugs from my dad so he would have to stop. Mom and dad both did crystal meth, although mom wasn't doing as much as dad at the time.

3. My parents separated when I was nine or ten years old because my mother was doing a lot of drugs and fooling around on my father. My mom took me and my younger brothers, Andrew and James with her.

4. I was very upset about my parents separating and got into trouble for acting out because of it. My mom couldn't control me so she sent me back to live with my father.

5. My dad was a good father. He was real lenient some times, especially in his punishments. Dad would make me go to my room to ground me. Usually he would hear me crying and come in after a few minutes and give me a dollar to go to Quik Mart. Sometimes, if I did something more serious, like lying or smoking he would ground me for a whole week. The only time my father ever hit me was when I did something really bad like the time I cut the seat belts in the bus. Then he hit me with the leather part of his belt a few times, but not hard enough to really hurt me.

6. My dad never abused my mom, my brothers or me.

7. My dad was very strict with me about some things. He wanted me to stay away from the older boys in the park who he thought were "hoodlums" so I would not get in trouble with them. Even though my parents both smoked and did drugs, dad he did not want me to do those things.

8. My dad and I were very happy together. Things were great when it was just me and dad. That was the best time in my life. I went everywhere with my dad. I felt real secure then.

9. Then my dad had to go away for a while and he sent me to live with my uncle Larry. Uncle Larry was not like my dad. It was awful living with him. I hated it. Uncle Larry was a mean and angry person who never gave us any chances. He used to beat me real hard. Sometimes he would act crazy and it scared me real bad.

10. Uncle Larry used to take showers with his step daughters Heather and Chelsea and

-1-



with me. Supposedly he was showering with us to treat us for lice but after we got rid of the lice he kept doing it.

11. Uncle Larry would take the soap and wash all over our bodies, touching our breasts and in between our legs. His wife, Leann knew he was doing this but did not stop him. This was happening when I was ten or eleven.

12. One time my mom and I were at Uncle Larry's and I was really being bad. Mom made me go sleep outside in the camper. Later that night Uncle Larry came out to sleep (he was staying in the camper at the time) and got in bed with me. I woke up and Uncle Larry was lying beside me rubbing my side. I started yelling and told my mom something was wrong with my leg, so she let me come in and sleep inside.

13. My dad was very protective of his brother Larry.

14. Heather, Chelsea and I did tell on Uncle Larry but we said he also had sex with us. Later, we said we had lied. I did not know that what Larry was doing to us was molestation even though he wasn't having intercourse with us.

15. The happy times my dad and I had ended when Angela and her children moved in with us. My dad knew Angela but he was in love with Rose (Joyce Richmond). Rose had moved back to Tucson to be with my dad. Then, Angela's boyfriend, Zollie, beat her up in front of my dad. Dad fought with Zollie then let Angela and her kids move in with us.

16. When Angela's family moved in my dad told me they would not be there long and were not moving in so we could all live as a family. I was glad because, when my dad was not home, Angela was very abusive. She pulled her children's hair, smacked them in the face, and yelled right in their faces. The only one she seemed to go easy on was her son Jon. I think she felt sorry for him because he was deaf.

17. Angela did not work and just stayed at home doing crystal meth. When she wasn't yelling or hitting she would just ignore us and say things like what a burden it was to have children and she wished she never had any.

18. Angela's son, Jon was fourteen at the time. He was having sex with my cousin Tera and tried to have sex with me. He would come to my bed at night and put his hands down my pants and try to finger me. I told my dad about it and dad and Angela had a fight. Dad made Jon move out of the room and made a separate sleeping area for him.

19. Jon and my Uncle Larry were not the only ones in our lives who were into having sex with us kids. My dad's friend, Ron St. Charles was having sex with his step daughter, Ruth. Ruth was only thirteen or fourteen then. She told me Ron was having sex with her and showed me the "hickeys" he made on her breasts.





20. Later on I was told the cops helped Ron St. Charles get out of town and did not charge him for having sex with a minor because he agreed to testify against my dad about Rachel's death.

21. One of our neighbors was an old man, Bob Dresbach. One day when I went home for lunch he felt me up and said things to me that were disgusting. My dad's friend called the police and told them about it but I don't know if they ever did anything to him for it.

22. Angela and her children, Jonnie and Becky Lux, had only been with us for about a month when Angela's youngest daughter, Rachel Gray, died. I was not home much that weekend as I was with Rose and her family. I remember Dad and Angela having a fight on Saturday night. Dad and I then spent the rest of the night with Rose. Dad worked on his van and Rose and I just hung around.

23. When we went back to the trailer Sunday morning Angela was up and came out to yell at my dad. She was angry he had been with Rose and I all night. I did not stay home that day, but went back to be with Rose. By the time I got back at night Rachel was already on the couch bleeding. Angela said Rachel had fallen out of the van and hit her head.

24. Later on I leaned that Rachel had also been hit in the stomach and had been sexually abused as well. When I was interviewed I told people I had seen Stephanie Flemings' son hit Rachel with a piece of metal from a car but I don't know if anyone did anything about that.

25. I know my father could not have hurt Rachel or killed her. He loved her and took better care of her than her mother did. My father did not hurt children and he never, ever would do anything sexually to them.

I declare under penalty of perjury under the laws of the State of Arizona and the United States that the foregoing is true and correct.

Executed on _Dec 16,_____, 2002.

_Brandie A. Jones_
Brandie Jones

_Jeanett J. Shh_
Witness
_12.16.2003_
Date

-3-



# Exhibit 56

# DECLARATION OF JEANNETTE L. SHELDON

I, Jeannette L. Sheldon, declare as follows:

1.      I am an investigator for the Capital Habeas Unit of the Federal Public Defender for the District of Arizona, stationed in Tucson.

2.      In my capacity as an investigator for the Capital Habeas Unit I was assigned to assist counsel representing Barry Lee Jones in various aspects of his case, including interviewing witnesses.

3.      For that purpose,  I met with Barry's wife, Carol Jones,  about her past relationship with Barry, her knowledge of his family and his substance abuse.

4.      Subsequently, I have made numerous attempts to locate Carol Jones to ask her to review and sign her statement.  I have not been successful in finding or contacting her again.  Given the rapidly approaching deadline for the petition to be filed, I submit this declaration which is the substance of her statement to me.

5.      Carol and Barry have been separated since a year or two before the death of Rachel Gray. They have three (3) children together, Brandie, born September 4, 1982, James, born May 24, 1984, and Andrew, born September 15, 1989.  Carol was last known to be living in Safford, Arizona.

6.      Carol met Barry when she was eighteen (18) and he was twenty-three (23) years old. She lived in Phoenix, with her family, when they met. After being with Barry for a few months, Carol returned to Phoenix.  Shortly after, Barry went to Phoenix to get her. By

then, Carol had discovered she was pregnant, so she returned to Barry. To Carol, it seemed that every time she left Barry, she would find out she was pregnant and go back to him.

7.      Carol described Barry as a social drinker. Carol said Barry changed a lot the last few years they were together. Barry got more and more into drugs. Barry began to hang out more with women like Rose (Joyce Richmond) and Angela Gray, who Carol believed were both prostitutes and druggies.

8.      Carol stated Barry was not physically abusive with the children, but he was very strict with them. If he was playing video games and one of the children disturbed him, he would get angry and yell at them to go away, or make them all sit on the couch without moving.

9.      When Carol decided to leave him, Barry's behavior got very bizarre. At one point Barry starting pulling his hair out, lying on the bed at his mother's house, holding a gun and threatening to kill himself. He was picked up and placed in Kino hospital after that.

10.     Carol does not think Barry ever had a valid driver's license or any registered vehicles. He was always getting vehicles from his brother Larry. While Larry often had a regular job, Barry made his living doing "midnight auto" work and their brother Phil was a drug dealer. Phil was also really into guns and had the worst temper of any of the boys.

11.     One time when Carol had left Barry and gone back to her family, Barry and Phil went to Phoenix to try and bring her back. Phil actually grabbed Carol and started to force her into the car. Barry was the one who had to stop Phil and make him let her go.

12.     When Brandie was around twelve (12) years old, she developed a bad attitude and was very angry. Carol could not handle her so she sent Brandie to live in Tucson. Because Barry was away at the time, Brandie lived with her Uncle Larry for a few months, then she moved in with her father.

13.     At the time Larry was living with Carol's sister, Kim, as well as with his wife Leann. Kim and Larry had a nice home further east in Tucson, while Larry and Leann lived in the neighborhood Barry lived in.

14.     After Brandie returned to her Carol found out that while Brandie was living with Larry, he showered with her and his step daughters, who were Brandie's age and a little younger. Carol was very concerned and suspicious about Larry's behavior with Brandie.

15.     When Brandie first went back to live with her Carol, she was terrified of being in the bathroom alone. Brandie was "deadly afraid" to take a bath and refused to be left alone in the bathroom. It took several years for Brandie to lose the worst of these fears. While Brandie does not want to talk about why she is so afraid in the bathroom, Carol suspects Larry sexually abused her there.

16.     Although Carol has some negative feelings about Barry, she does not believe he would ever sexually assault a child. She never, ever worried or even had the thought cross her mind that Barry might be doing anything sexually inappropriate with children.

17.     Carol described Barry's mother, Florence, as a "victim of her own circumstances." Florence loved to gamble and spent her time and money that way. She also

protected her kids.  Carol could not offer much information about Barry's birth or the circumstances under which he grew up since Barry never talked about it.

18.    Barry's trial attorneys never asked her to testify on his behalf at the sentencing hearing.  Carol told me if they had asked, she would have.  She would have told the judge that as crazy as Barry could be while using drugs, she does not believe he could ever sexually assault or kill a little girl.  Also, she would have told them what little she knew of Barry's life history.

I declare under penalty of perjury under the laws of the State of Arizona and the United States that the foregoing is true and correct.

Executed on _December 1_, 2002.

Jeannette L. Sheldon

**Exhibit 57**

SOUTHERN ARIZONA MENTAL HEALTH CENTER

## DISCHARGE SUMMARY

CLIENTS NAME: Barry Jones          SAMHC # 10-35-98

DATE OF ADMIT: 6-8-92              BHMIS # BJ0826 5810

DATE OF DISCHARGE: 6-30-92        AHCCCS # _____

1.  Summary of services provided:
    6 sessions of Brief tx.
    Intake at Crisis Respite (AWOL)
    One Psychiatric Eval.

2.  Summary of goals achieved:
    Eliminated SI and HI

**CONFIDENTIAL**

**FURTHER DISCLOSURE PROHIBITED**

3.  Discharge Diagnosis:
    305.90 Psychoactive Substance Abuse or
    Intoxication

4.  Discharge Medication:
    none

5.  Reason for termination/Referrals made:
    Barry Jones was unwilling to comply with
    the program's recommendation for Substance Abuse
    treatment prior to Brief treatment for
    Depression.

6.  Re-Admission criteria:
    6 Months of Substance Abuse Treatment

Melanie Roberts M.S.        D.Y. __ M.D.        Deeta Johnson
Discharging Staff Person's       Physican/Psychologist        Supervisor
Signature                        (if Applicable)

05335

The following are suggestions and referrals for you to choose from for inpatient or outpatient treatment.

Gateway LARC - 620-0188
Primary Care:  Six week program for men and women who have not had previous treatment (inpatient)

CODAC Counseling Center - 327-4505
Individual, group for substance abuse

Amity, Inc. - 749-5980 - Amity at Circle Tree Ranch
Inpatient/residential treatment

**CONFIDENTIAL**
**FURTHER DISCLOSURE PROHIBITED**

Pasar - 884-0003 - 34 W. Franklin
Pima Alcohol and Substance Abuse Rehab:  Outpatient services

La Frontera Center - 884-9920
Outpatient individual and group treatment

Tucson Council on Alcoholism and Drug Dependence - 620-6615 - 1230 E. Broadway
Intensive outpatient treatment; introduction to 12 steps, aftercare services through individual and group therapy

Alcoholics Anonymous (central office) - 624-4183

I understand that I can return to SAMHC for brief treatment services when I have six (6) months of sobriety/abstinence and can make a commitment to treatment.

_Refused to Sign_                    6/30/92
Signature of client                  Date

_Melanie Roberts_                    6/30/92
Witness                              Date

SOUTHERN ARIZONA MENTAL HEALTH CENTER
**PROGRESS NOTES CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

| NAME | Jones Barry | CENTER NUMBER | PAGE |
|------|-------------|---------------|------|

| DATE | SERVICE TYPE | TIME SPENT | |
|------|--------------|------------|---|
| | | | Session 6 (BTS) |
| 6/30 | 05 | 45 | S: Barry said "Sometimes you just need someone to talk to." He was unhappy about this therapist and program Manager's decision to discharge Barry to a Substance A-program, but was directable after the program manager explained the purpose of BTS. |
| | | | O: Barry appeared rested an adequately groomed or he spoke in a loud voice. He denied intentions of committing suicide or Homicide. |
| | | | A: Barry is probably in denial regarding his ability to maintain sobriety or a drug-free existence due to his blasé at the suggestion of maintaining sobriety for 6 no before seeing a therapist or participation in BTS. |
| | | | P: Close Barry's chart. Referrals to Brewster Center and Substance Abuse Programs were given to Barry. |
| | | | Melanie Roberts M.S. MAPI. |

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME | Jones, Barry | CENTER NUMBER | PAGE |
|------|--------------|---------------|------|

| DATE | SERVICE TYPE | TIME SPENT | |
|------|------|------|------|
| 4/29 | 23 | 15 | CM<br>Barry was discharged friday according to some staff at Kino. He was expected to arrange his follow-up at BTS.<br>*Melanie Roberts M.S.*<br>*M+HP.I.* |
| 4/29 | 23 | 15 | CM<br>John Tharup from Sheriff's Civil Division called attempting to locate Barry Jones for a "custodial evaluation" issued by the court. The staff member or Mr. Tharup says Barry was suppose to have his rights read at Kino; and Kino should have held Barry for 72 hours. Mr. Tharup says he will return the documents to court.<br>*M. Roberts M.S. M+HI.* |

**CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

05388

ADHS/BHS/SAMHC-10 IPS—531 (Rev. 4-91)

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

**CONFIDENTIAL**
**FURTHER DISCLOSURE PROHIBITED**

| NAME | Joner Barry | CENTER NUMBER | PAGE |
|---|---|---|---|

| DATE | SERVICE TYPE | TIME SPENT | Case management |
|---|---|---|---|
| 6/15/92 | 23 | 230 | BTS |

Case management
BTS

**S:** Barry said he came to BTS to be admitted to Crisis Respite. He placed his knife in the car. He agreed to go with the police officers to Kino Comm. Hospital

**O:** Barry was disheveled and appeared frightened for he was handcuffed in the back seat of the police car.

**A:** Barry appears unstable and in need of residential treatment for substance abuse and/or supervision.

**P:** Contact Kino staff re: Barry. Meet with Barry regarding his tx plan for substance abuse tx. Discharge Barry Joner if he's unwilling to accept residential tx or substance abuse tx.

(Melanie Roberts M.S. MHPI )

| 6/09 | 23 | 15 | CM |

CM
Received a message from Barry from Friday today. Barry was not available at 798-1447 as suggested. The number was not operable. Kino says he isn't on the register. M Roberts M.S. MHPI.

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES CONFIDENTIAL

FURTHER DISCLOSURE PROHIBITED

NAME Jones, Barry        CENTER NUMBER ISSUE

Casemanagement

| DATE | SERVICE TYPE | TIME SPENT | |
|------|--------------|------------|---|
| 4/25/92 | 23 | S: | Barry Jones was homicidal and suicidal today. He stated "I'm going to hurt myself or someone else." He also mentioned he planned to go see his children and "say goodbye" because he won't be here anymore." |
| | | | Barry has presented since 6/8/92 with suicidal and homicidal ideation. His partner states he uses and abuse alcohol, crank, "sleeping pills." She says he was abusive locking she and the children in closets. He has also placed a gun to her head and cut himself with a knife in front of their children. |
| | | O: | Today Barry called. He was sobbing and unwilling to use the crisis respite or consider hospitalization. At approximately 330 he was pacing around BTS with what appeared to be a knife. |
| | | A: | Barry is unstable due to substance abuse and major depression. With his history of violence, Barry is dangerous. |
| | | P: | Admit to Kino or Petition. Melanie Roberts MS. MHPI. |

053410

**CONFIDENTIAL**

SAMHC
OUTPATIENT SERVICES **FURTHER DISCLOSURE PROHIBITED**
UTILIZATION REVIEW FORM

Client _Berry Jones_   Clinician _Melanie Roberts_   Unit _BTS_

Date _6/24/92_   Utilization Review Following _____5_____   Sessions/Days

WHEN IDENTIFYING PROBLEM BEHAVIORS, USE THE PROBLEM LIST FROM BHMIS-B

1. Presenting PROBLEM BEHAVIORS (For Hospital Step-Downs, Give Admit & D/C Dx):
   _Suicidal Ideation   Role Preformance: unemployment_
   _Depression   Substance Abuse   Domestic Violence_

2. What PROBLEM BEHAVIORS have been addressed and resolved?
   _none_

3. What PROBLEM BEHAVIORS, if any, require further treatment before discharge?
   _Legal problems; May need to discharge because he's a fugitive._

4. What are the specific BEHAVIORAL target outcomes?
   _Eliminate or decrease substance abuse_

5. Diagnostic impression (Axis I-V):
   _304.90 Psychoactive or Polysubstance Dependence_
   _R/O 305.90 Psychoactive Substance Abuse or intoxication._

6. Medications: _none_

7. Specific service recommendations (Treatment/Discharge Plan):
   ___ Complete Brief Treatment        ✓ Transfer to LFC
   ___ Begin Full Evaluation           ✓ Begin _____ Group
   ___ Authorize___Day LOS             ✓ Other: _Refer to La Frontera_
                                       _substance abuse program._

8. UR Committee Recommendations: _Approved_
                                  _— Needs treatment plan_

Signatures: _____   _Deela Johnson_

Rev 5/26/92

05341

SOUTHERN ARIZONA MENTAL HEALTH CENTER
# PROGRESS NOTES

CONFIDENTIAL

| NAME | | | CENTER NUMBER | | |
|------|---|---|---|---|---|
| Jones, Barry | | | | | FURTHER DISCLOSURE PROHIBITED |

| DATE | SERVICE TYPE | TIME SPENT | |
|------|---|---|---|
| 6/17 | 23 | — | CM Cont.<br>Also follow-up with police regarding his legal status and give possible locations of Barry.<br>Acquire a Dr's order for Drug Testing.<br>Melanie Roberts M.S.<br>M.H.P.T. |
| 6/24/92 | 23 | 45 | Casemanagement (BTS) (Session 5) |
| | | | S: Barry reports his eating and weighs 127 lbs. He also reports he has a job. He denys any abuse of substances but admits to use of alcohol and marijuana. |
| | | | O: Barry spoke in a loud voice, was restless and poorly groomed. He offered to "drop" or give a sample of urine to screen for drugs. Barry refused to respond to a question about S.I. directly. He said he's "the same (6/15)". He admits to hitting a guy and severely injuring him; and possibly a warrant for this arrest because he didn't go to court as ordered. Barry refused to go to substance abuse programs or support groups. |
| | | | A: Barry seemed hyperactive due to substance abuse or use. Today he's not depressed. |
| | | | P: Dr's order for urine. Contact Barry regarding the results and for the next appointment. |
| | 23 | 15 | Melanie Roberts M.S.<br>M.H.P.T. |

053421

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME Jones, Barry | CENTER NUMBER | PAGE |
| --- | --- | --- |

| DATE | SERVICE TYPE | TIME SPENT | |
| --- | --- | --- | --- |
| | | | CM BT3 |
| 4/24/92 | 23 | | Scheduled Barry for 1130 today. |
| | | | Melanie Roberts M.S. |
| | | | M.H.P. I |

CONFIDENTIAL

FURTHER DISCLOSURE PROHIBITED

053343

ADHS/BHS/SAMHC-10 IPS—531 (Rev. 6-91)

## SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME Jones Barry | | CENTER NUMBER | PAGE |
| --- | --- | --- | --- |

| DATE | SERVICE TYPE | TIME SPENT | |
| --- | --- | --- | --- |
| 4/23/92 | 23 | 15 | CM Returned Mr. Jones's call. Barry was not available at 574.1679. A man responded, indicating it was okay to call for Barry at this number although he doesn't live there. |
| | | | Melanie Roberts M.S. M.H.P.I. |

**CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

05344

# SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME | Barry Jones | CENTER NUMBER | Out of Sequence | PAGE |
|---|---|---|---|---|

| DATE | SERVICE TYPE | TIME SPENT | |
|---|---|---|---|
| | | | CM |
| 6/18 | 23 | 30 | The Sheriffs' dept reported that Barry isn't wanted although he's stolen his wife's convertor on 6/18 vehicle and has violated on 2 occasions, her order of protection. They recommended Brewster Center.   Melanie Roberts M.S. M+PT. |

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

SOUTHERN ARIZONA MENTAL HEALTH CENTER

**PROGRESS NOTES**

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

| NAME Jones Barry | CENTER NUMBER | PAGE |
|---|---|---|

CM BTS Cont.

| DATE | SERVICE TYPE | TIME SPENT | |
|---|---|---|---|
| 6/17/9x | 83 | | appears to be the main issue. |
| | | | P: Contact Police Dept regarding status of Barry and the petition on Monday. Barry needs to be referred for substance abuse tx (Pasar).      Melanie Roberts M.S. M.H.P.I. |
| 6/17 | 83 | 30 | CM Contacted TPP. Deputy Kummer was unavailable. The receptionist referred this therapist to another #.      Melanie Roberts M.S. M.H.P.I. |
| 6/17 | 23 | 30 | CM Reviewed Barry's case with Supervisor. |
| | | | S: Spouse and sister-n-law report Barry uses crank, alcohol, and sleeping pills. |
| | | | O: Barry appeared, exhibited signs of amphetamine use or cocaine use on 6/15. His eyes were dialated and he was restless. He was also dishelved and had psychomotor agitation. |
| | | | A: Barry's primary problem is substance abuse. |
| | | | P: With next contact with Barry request a drug test and refer to Pasar for polysubstance abuse tx. cont. |

05346

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

NAME Joner, Barry          CENTER NUMBER          PAGE

| DATE | SERVICE TYPE | TIME SPENT | |
|------|--------------|-----------|---|
| | | | CM   BTS |
| 4/16/92 | BTS | | "Barry phoned and left a message with the receptionist that he's "alright" and to tell their therapist "not to worry about him." |
| | | | Melanie Roberts M.S. MHPT |
| 4/17/92 | BTS | 2 hrs | CM (Session 4) |
| | | | S: Carol Joner reports Barry has abused she and her children psychologically. CPS was involved and removed Brandy their 9 yr. old daughter for approximately 1 week. Carol and her daughter report Barry uses "crank", alcohol, and sleeping pills. They also reported two incidents of suicidal gestures. Barry was cutting his wrist in the presence of his spouse and children. Two weeks ago Carol says Barry took their children and in the presence of his mother placed a gun to his head. Carol's sister reports Barry may be using drugs intravenously. |
| | | | O: Barry's wife and children are living in substandard conditions without water today. The children appeared to need a bath. She and her sister report substance abuse & DV/violence problems for Barry and his twin. Carol says Barry stole her car yesterday. Carol reports Barry may steal her children. |
| | | | A: Barry appears to abuse substances and his family. Substance abuse and DV |

cont.

SOUTHERN ARIZONA MENTAL HEALTH CENTER

P R O G R E S S       N O T E

NAME:                        CENTER NUMBER                **CONFIDENTIAL**
        JONES, BARRY              10 35 98

FURTHER DISCLOSURE PROHIBITED

DATE: 06/15/92     PSYCHIATRIC INTAKE - HUNTER YOST, M.D. - BRIEF TREATMENT SERVICES

**Identification of Patient:**  Mr. Jones is a 33-year-old man who recently separated from his wife and has lost his living quarters as of last Friday; he has been sleeping in the park for the last several nights; he is unemployed.

**Presenting Problem:**  "Emotional problems."

**History of Present Situation:**  Mr. Jones was reluctant to elaborate on his current emotional problems other than to talk about his living situation.  It is known from his therapist, Melanie Roberts, that he has recently separated from his wife and children  and that he is upset over this.  He states that he has been crying a lot, although, over the last day he states that he feels all better but did not elaborate.  He stated that previously he felt like a sponge soaking up other people's pain but now he has become a mirror and reflects it away.  He states that he has lost about 30 pounds over the last several months and is having poor sleep.  He also admits to having intermittent suicidal thoughts but has no immediate plans.

**Past Psychiatric History:**  He has not had any psychiatric hospitalizations or outpatient treatment.  He does admit to several suicide attempts such as stabbing himself, holding a loaded gun to his head, walking out into traffic, and most recently, approximately a month ago taking an overdose of Percodan.

**Substance Abuse History:**  He admits to using cocaine and marijuana on a daily basis  until March 1992.  He denies the use of alcohol.

**Medical History:**  No current medical problems.

**Mental Status Examination:** Mr. Jones was slightly shorter than average for a man and very slender.  It appeared as if he had not groomed or shaved for several days; he wore a trucker's cap, shirt with sleeves rolled up, jeans and boots; his clothes appeared worn and old.  He was very agitated during the interview needing to get up and pace around the room.  He was not very articulate in his speech; he would answer questions only in one or two word sentences, and it appeared that he had not had much practice in his verbal skills.  His thoughts appeared to be ordered but he was intentionally vague and hallucinative when asked specific questions about his situation and was noncommittal on whether or not he had current suicidal thoughts. There was no apparent hallucinations or delusions; he did not express any homicidal thoughts.  He was alert but quite agitated. He stated that he was not good on timeframes or dates, however, he knew who he was and where he was.  His attention and concentration were fairly good.  It is not possible to comment on his memory since he specifically said that he did not want to discuss past issues.  His insight and judgement were poor.

**Assessment:**  It appears that this man is agitated, stressed, and depressed.  I suggested to him that he go into the Crisis Respite Unit where he could receive some medication and calm down, however, he refused.

PSYCHIATRIC INTAKE/JONES, BARRY/PAGE 2
Plan:  Because of his being in a high risk category in his current agitated state and being noncommittal on revealing his suicidal thoughts, I would consider him to be petitional at this time, and we will give him the choice of going to the hospital voluntarily or being petitioned.

_____   H. Yost

Hunter Yost, M.D.


/jn

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

05349

SOUTHERN ARIZONA MENTAL HEALTH CENTER
# PROGRESS NOTES    CONFIDENTIAL

NAME  Jones Barry    CENTER NUMBER    FURTHER DISCLOSURE PROHIBITED

| DATE | SERVICE TYPE | TIME SPENT | CM |
|------|--------------|------------|----|
| 6/15/92 | 2B | 1:30 | Consulted Dr. and Program Manager. Dr. agreed to Petition Barry to Kino |
| | | S: | Barry was unavailable to Crisis Center staff. A client said he left the center. Barry contacted this therapist and said "I'm busting out" because he didnt want "to be locked down." He said "all I have left is my freedom." |
| | | O: | Barry stated over the phone "I want my family back" and also said "I dont have a family or anything to live for." This Therapist arranged for the phone call to be traced. Barry hung-up after becoming angry regarding the discussion of his family and stating he wont come here. Tucson Police Dept contacted this Therapist and indicated that they had Barry in custody. TPD later called to say they took custody of the wrong individual. |
| | | A: | Barry is very unstable. Possibly Homicidal or Suicidal. He currently is functioning in a dangerous level due to possibly Substance Abuse and Depression. |
| | | P: | Contact Carol Jones regarding Barrys instability due to possible HI |
| | | | Melanie Roberts M.S. M+PI. |

ADHS/BHS/SAMHC-10 IPS—531 (Rev. 4-91)

SOUTHERN ARIZONA MENTAL HEALTH CENTER
# PROGRESS NOTES
**CONFIDENTIAL**
FURTHER DISCLOSURE PROHIBITED

NAME _Jones  Barry_     CENTER NUMBER     PAGE

| DATE | SERVICE TYPE | TIME SPENT | CM |
|------|------|------|------|
| 4/15/22 | | 15 | Barry called and was difficult to comprehend. He said he lost all of his papers. He reports having difficulty thinking and "I've lost a couple days." He denied any substance abuse or use. He plans to attend the 2pm psych eval with their therapist. He says he plans to hitch hike to SAMHC. |
| | | | Melanie Roberts M.S. MHPT. |
| 6/15/22 | | 22.30 hrs | **CM** (Psychiatric Visit) (Session 3) |
| | | | S: Barry responded to the psychiatric questions regarding ST with "I think about it a lot, and I'm living minute by minute" |
| | | | O: Barry paced, seemed restless and his eyes appeared dialated. He demonstrated some psychomotor agitation. His legs and fingers moved frequently when he was sitting, and he discussed how small the room is. He vaguely reported SI but denied or didn't respond to questions regarding a plan for SI. He was also vague about his intentions on HI. |
| | | | A: Barry appears unstable. His condition is worsening due to Depression and possibly substance abuse. |
| | | | P: Dr suggested an evaluation by the crisis center and crisis Respite. Melanie Roberts M.S. |

065351

SOUTHERN ARIZONA MENTAL HEALTH CENTER
# PROGRESS NOTES

| NAME | Jones Barry | CENTER NUMBER 103598 | PAGE |
|------|-------------|----------------------|------|

| DATE | SERVICE TYPE | TIME SPENT | (BTS Session 2) |
|------|------|------|------|
| 6/10/92 | 205 | 1:30 | |
| | | S: | Barry describes his impending eviction, separation from his family and unemployment. "Can or "maybe this is fate." |
| | | O: | He reports he may be evicted today. He doesn't have money for transportation and he is intoxicating. He denied SI and HI stating "I don't want to die" and "I'm not going to kill myself." He also reported using 10 mg of Valium to induce sleep. |
| | | A: | Barry appears depressed and is probably actively using substances. |
| | | P: | Within BTS visit request a screening for substances cocaine, marijuana. Develop a Substance abuse plan requiring documentation of attendance. |

Melanie Roberts M.S.
M.H.P.T.

**CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

ADHS/BHS/SAMHC-10 IPS—531 (Rev. 4-91)

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME | Jones, Barry | | CENTER NUMBER | PAGE |
|------|------|------|------|------|

| DATE | SERVICE TYPE | TIME SPENT | |
|------|------|------|------|
| 4/10/92 | 23 | 15 | CM<br>Barry returned this therapist's call. He agreed to see this therapist 2pm.<br>Melanie Roberts M.S.<br>MHP I. |
| 4/10/92 | 23 | 15 | CM<br>Contacted Crisis Respite re: potential for placement in Crisis Respite.<br>Melanie Roberts M.S.<br>MHP I. |

**CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

005353

ADHS/SAMHC-10 IPS—531 (Rev. 4-91)

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

NAME Janer, Barry                CENTER NUMBER

| DATE | SERVICE TYPE | TIME SPENT | |
|------|--------------|------------|---|
| | | | CM |
| 6/10/92 | 23 | 15 | Received a call from Mac Team |
| | | | staff. Barry reported to the mac |
| | | | Team he doesn't have any plans |
| | | | to suicide or for homicide. They |
| | | | received a contract from him. He |
| | | | also agreed to make an appointment |
| | | | with this therapist according |
| | | | MAC Team staff member. |
| | | | |
| | | | Melanie Roberts M.S. 05354 |
| | | | MHPT. |
| 6/10/92 | 23 | 15 | CM |
| | | | Officer Kimmons Called from the |
| | | | (Deputy) Sheriff Dept. Made |
| | | | him aware of Barry's HI thoughts. (History H+F) |
| | | | the officer reported Barry was |
| | | | not expressing SI. |
| | | | |
| | | | Melanie Roberts M.S. |
| | | | MHPT. |
| 6/10/92 | 23 | 5 | CM |
| | | | Barry called. He was tearful, reporting |
| | | | spouse is calling. Offered crisis |
| | | | respite, he didn't respond. |
| | | | Offered to contact his spouse for family |
| | | | contact. He gave Permission. |
| | | | Came was unable to schedule |
| | | | with. Phoned Barry again and |
| | | | contacted the machine. |
| | | | Barry reporting no SI or HI, and |
| | | | said he will do the best he |
| | | | can with contract (Non Suicide) |
| | | | Roberts MS MHPI. |

MAC TEAM INTERVENTIONS   Health a Welfare

Date: 6/9/92
Time: 450
Request Worker: Melanie Roberts
Referral source: BTS

Priority (to be done stat)
Importanc (to be done on shift)

Routine (can be carried to following shift)

CLIENT NAME: Barry Jones     DOB: 8/26/58

ADDRESS: 4501 E Benson Hwy APT#: 23   CONF 74-2839

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

DIRECTIONAL ADDRESS: _____

PATIENT STATUS: ✓

VOL ✓   C.O.T. ___ DTO ___ DTS ___ GD ___ REVOG ___ - (COOP/COND)

DX: Adjustment Disorder w/ Depressed mood and SI
Alcohol a Cocaine abuse

SPECIFIC SERVICE REQUESTED: Welfare Check and request he contact
Melanie Roberts for appointment.

BRIEF CURRENT HX: (include meds, recent stressors, etc.)
In April seen at Palo Verde w/ spouse.
Symptoms SI Gestured with gun to head.
3 weeks ago took 20 Percodan. 6 weeks ago
Stuck himself w/ knife (no medical intervention
- Gestures)

05355

SPECIAL CONSIDERATION: (i.e. violence in past, weapons in house, violent roommates if c.o.t.
Please attach copy of c.o.t. plan; specify any substance abuse problems or any pertinenc medical
problems)     HI against spouse a kids.
HI and SI   Barry is a substance abuser with
guns in home. Recent DV. Charge

OUTCOME OF MAC CONTACT:     COMPLETED _____ ATL _____

PROBLEMS/NOTES: Sheriff's Dept was involved.
Barry didnt follow through w/ intake
at CRU. Completed intake but
didnt return to CRU. At CRU less
than 24 hours
Carol James wasnt available to notify
Contact Carol Jones at 574-0919
574-2772 re: spouse's Barry's HI   DATE COMPLETED: 6/9/92

MAC WORKER: Melanie Roberts BTS.

incevenc

MAC TEAM INTERVENTIONS   Health & Welfare

Date: 6/9/92
Time: 4:50
Request Worker: Melanie Roberts
Referral source: BTS

___ Priority (to be done stat)

✓ Important (to be done on shift)

___ Routine (can be carried to following shift)

CLIENT NAME: Barry Jones          DOB: 8/26/58

ADDRESS: 4501 E Benson Hwy APT#: 23   PHONE: 574-2839

**CONFIDENTIAL**
DIRECTIONAL ADDRESS: _____
FURTHER DISCLOSURE PROHIBITED

PATIENT STATUS: ✓

VOL ___ C.O.T. ___ DTO ___ DTS ___ GD ___ REVOC ___ – (COOP/COND)

DX: Adjustment Disorder w/ Depressed mood and SI
Alcohol & Cocaine abuse

SPECIFIC SERVICE REQUESTED:
Welfare Check and remind he contact
Melanie Roberts for appointment.

BRIEF CURRENT HX: (include meds, recent stressors, etc.)
In April been at Palo Verde w/ spouse.
Symptoms SI Gestured with gun to head
3 weeks ago took 20 Percodan. 6 weeks ago
Stuck himself w/ Knife (no medical intervention
w/ Gestures

SPECIAL CONSIDERATION:  (i.e. violence in past, weapons in house, violent roommates if c.o
please attach copy of c.o.t. plan; specify any substance abuse problems or any pertinent medf
problems) HI and SI   HI against spouse & kids.
Barry is a substance abuser with
gun in home.  Recent DV. Charge

OUTCOME OF MAC CONTACT: ___ COMPLETED ___ ATL ___

PROBLEMS/NOTES: Sheriff Dept was involved.
Barry didn't follow through w/ intake
at CRU.  Completed intake but
didn't return to CRU.  At CRU less
than 24 hours
Carol Jones wasn't available to notify
Contact Carol Jones at 574-0919
574-2772 re: spouse's Barry's HI

DATE COMPLETED: 6/9/92

MAC WORKER: _____
Melanie Roberts BTS.

intervention

053560

MEDICAL RECORD NO. _____   ROOM NO. _____

_____T DATE _____ TIME _____ TELEPHONE CALL MADE - DATE _____ TIME _____

____ESTED BY - NAME  *Dr Mc'Laughlin*   SERVICE **CONFIDENTIAL**

____NSULTANT - NAME _____   **FURTHER DISCLOSURE PROHIBITED**

____EASON FOR CONSULTATION  *Suval*

05357

## CONSULTANT'S NOTE

ID: Client is a 33 y/o separated wm currently residing @ 4501 E. Benson Hwy #23 alone. Client is unemployed x 18 months and unemployment ran out 6 months ago. Client has no insurance or other income. Client has not had any prior ψ hx.

CC: "I have no wife and my kids left me too."

HPI: Client had called S.A.M.H.C crisis line requesting 5+ statement and that he had loaded weapons in the house. PCSO responded to the home and client stated that he contemplated cutting his throat. Client was brought to KCH ER with blu petition

DTS: Client reports @ 3 children, ages 9, 7, 2 left him x 2 months ago without cause although it is suspected that client was physically abusive. Client report ↓ sleep x 3 days, ↓ poor appetite x 3 days. Client was very manipulative about 5+ statements and initially wouldn't contract to not harm self. Client can option of petition vs contract to not harm. Client agreed to not harm self and follow-up with S.A.M.H.C. Client denies drug use (etoh) x 2½ months although this is suspect.

PPHx: No previous ψ Tx and no prior substance Tx by client reported.

MedHx: Unremarkable side.

MSE: Client A+O x 3. Disheveled casually grooming disrupted ↓. Client affect angry; troubled with mood-anger. There is no evidence of hallucination + psychosis. Client denies ⊕ 5+ and overt ⊕ behavior contract. Client denies H+I. Guarded/mem ⊕ for b ot. Speech loud with slight pressure. Eye contact poor. Thought-rambling. Cognition-WNL. Client denies etoh use/drug x 2½ months.

Dx Imp:  I  Adjustment d/o with depressed mood & 5+  309.00

CONSULTANT CHECK ONE

II  dysthymia depressed/sad   301.70

9028 LIMITED
9029 EXTENSIVE
9030 COMPLEX

II  None

III  3 moderate

I  50 moderate to severe

DATE  *5-16-92*  TIME  *1530*  SIGNATURE  *Brad Howard Scott I*

## CONSULTATION FORM
### KINO COMMUNITY HOSPITAL
### TUCSON, ARIZONA

Plan: ① Client agrees to nothing contract
② Petition DTS dropped for Dr Sosa Roche
③ S.A.M.H.C DTS appt MAY 24TH 10:00AM

KR 12 REV. 7-86      CONSULTANT OR PRIMARY CARE PHYSICIAN

ADDRESSOGRAPH

958411      P01
JONES   BARRY   L
M  082658   315107
4501 E BENSON HWY 8576
527318632   05692
PCPPSN

# SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME | | | CENTER NUMBER | PAGE |
|------|--|--|---------------|------|
|      |  |  |               |      |

| DATE | SERVICE TYPE | TIME SPENT | 6/9/92 |
|------|--------------|------------|--------|
|      |              |            | "I AM NOT SUICIDAL AND I HAVE NO FEELINGS OR DESIRE TO HURT MY WIFE CAROL. I PROMISE TO CALL THE MAC TEAM IF I BEGIN FEELING LIKE HURTING MYSELF OR ANYONE ELSE. I WILL MAKE AND KEEP AN APPOINTMENT WITH MELANIE AT SAMHC" |

*Barry Jones*

*Robert Higgins J.D.*

05358

**CONFIDENTIAL**

**FURTHER DISCLOSURE PROHIBITED**

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME | CENTER NUMBER | PAGE |
|------|---------------|------|
|      |               |      |

| DATE | SERVICE TYPE | TIME SPENT | |
|------|--------------|------------|---|
| | | | 6/9/92 |
| | | | |
| | | | "I AM NOT SUICIDAL AND I HAVE NO |
| | | | FEELINGS OR DESIRE TO HURT MY WIFE |
| | | | CAROL. I PROMISE TO CALL THE MAC |
| | | | TEAM IF I BEGIN FEELING LIKE HURTING |
| | | | MYSELF OR ANYONE ELSE. I WILL MAKE |
| | | | AND KEEP AN APPOINTMENT WITH MELANIE |
| | | | AT SAMHC " |
| | | | *Barry Jones* |
| | | | *Robert Heggie, M.D.* |
| 6/9/92 | | | Intake dictated yster |

05359

**CONFIDENTIAL**

~~FURTHER DISCLOSURE PROHIBITED~~

## SOUTHERN ARIZONA MENTAL HEALTH CENTER
# PROGRESS NOTES

| NAME | Jones Barry | CENTER NUMBER | PAGE |
|------|-------------|---------------|------|

| DATE | SERVICE TYPE | TIME SPENT | |
|------|-------------|------------|---|
| 7/9/92 | 23 | 30 | CM Notified of Barry's disappearance by CRU. Barry didn't return to CRU as he agreed to do. CRU staff was unable to locate a # for wife or an emergency contact person. Contacted the Crisis Center. Staff advised contacting the Sheriffs Dept for an immediate welfare check. Contacted The Sheriffs Dept and CRU.   Melanie Roberts MS MHPI. |
| 7/9/92 | 23 | 100 | CM Consulted Supervisor regarding Barry's resistence to tx. Discussed the need to notify of HI. Received a message from an officer Kimmons indicating Barry Jones "is fine" and had too much to drink. Contacted Deputy Spencer regarding HI and Received ambulance, phone number for Barry's spouse Carol Jones. Officer/Deputy Spencer says Carol wasn't available at these numbers today. Contacted Crisis Center for welfare checks by phone for Barry Jones and Carol Jones.   Melanie Roberts MS MHPI. |

**CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

05360

SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

| NAME | CENTER NUMBER |
|------|---------------|

*Barry Jones*

*Crisis Respite*

| DATE | TIME | NOTES |
|------|------|-------|
| 6·8·92 | (11:30) | Client not returned to unit as of 11:30 pm |
|  |  | Dr Hegzel RN |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

(PROGRESS.DOC)  July 17, 199



SOUTHERN ARIZONA MENTAL HEALTH CENTER
## PROGRESS NOTES

NAME                                    CENTER NUMBER

*Terry Jones*

**CONFIDENTIAL**

FURTHER DISCLOSURE PROHIBITED

| DATE | TIME | NOTES |
|------|------|-------|
| 6-2-92 | 1130 | Client is a 33 year old white male, with brown eyes & brown hair, weights 120 lbs, and is 5'6" tall. Ct is currently separated from his wife & children and there's suspicion of him being physically abusive towards his family. Apparently Ct called SMHC crisis & made statement of having a loaded gun & threaten to cut his throat has been experiencing some SI thoughts - denied of not able to sleep & poor appetite. Ct is DX I adjustment D/O with depressed mood, II r/o anti Social III None IV moderate, V 50 moderate. No meds at this time. Ct goes hygiene, pressy back & fourth, some suspicious, but coherent, speech, all document. Ct assigned to House #2. Ct ate lunch and given a pass until 2 PM, because he needed to return vehicle to his friend ————————— J Gonzales PT2 |

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

NONSUICIDE CONTRACT

I, _Barry Jones_, agree not to attempt to hurt myself or anyone else in any way.  I also agree to contact my therapist or the on-call person in (628-5225) the Adult Outpatient Unit of Southern Arizona Mental Health Center if at anytime I feel I cannot keep this agreement.  If for any reason I cannot reach personnel at Southern Arizona Mental Health Center, I agree to go to the nearest hospital emergency room or urgent care center and seek help. (628-524)

Signed:     X _Barry Jones_
Date:       6/8/92
Witness:    _Melanie Roberts M.S._

05363

SOUTHERN ARIZONA MENTAL HEALTH CENTER
# PROGRESS NOTES

| NAME | Jones Barry | CENTER NUMBER | PAGE |
|------|------|------|------|

| DATE | SERVICE TYPE | TIME SPENT | |
|------|------|------|------|
| | | | CM |
| 4/1/92 | 23 | 15 | Attempted to schedule an appointment with Barry. Barry was not available by phone. Left a message to contact this therapist. |
| | | | Melanie Roberts M.S. |
| | | | MCTP I. |
| 4/1/92 | 23 | 15 | CM |
| | | | Reached Barry by phone and scheduled for Monday the 8th. |
| | | | Melanie Roberts MS MHP I |

05364

CONFIDENTIAL

FURTHER DISCLOSURE PROHIBITED

SOUTHERN ARIZONA MENTAL HEALTH CENTER **CONFIDENTIAL**
**PROGRESS NOTES** FURTHER DISCLOSURE PROHIBITED

| NAME | Joner Barry | | CENTER NUMBER | PAGE |
|------|-------------|--|---------------|------|

| DATE | SERVICE TYPE | TIME SPENT | |
|------|--------------|------------|--|
| | | | CM |
| 5/8/92 | 23 | 15 | Barry failed his intake appointment today at 11⁰⁰ A.M. His therapist was unable to reach him by phone |
| | | | Melanie Roberts MS MHPI. |
| 6/8/92 | 04 | | *Intake* |
| | | S: | Barry reports relationship problems, feeling lonely. His wife currently has a restraining order. He is unaware of her whereabout and the childrens. Barry has been separated from his family for one week. He also has DV charge). |
| | | O: | Barry reported SI, HI without intent. He appeared poorly groomed, dirty nails, long hair. He said 3 weeks ago he ingested 30 Percodan and 6 weeks ago he peirced his arm with a knife. Both gestures were without medical intervention. Barry paced frequently. He was willing to sign a nonsuicide contract. He was very talkative and cooperative but fear court commitment. He reports losing 30 lbs. Also complained of Insom |
| | | A: | Barry appears ~~emotion~~ unstable, but will accept treatment. He appears to be depressed due to Psychosocial stressor |
| | | P: | Crisis Respite. |
| | | | Melanie Roberts M.S. MHP |

05365

203937 [92]

PAGE   1

DAMON CLINICAL LABORATORY
2122 N CRAYCROFT   TE. 100
TUCSON, AZ 85712
DAVID P. ALTHAUS, MD

S.A.M.H.C.
1930 E 6TH ST
TUCSON, AZ 85719

| | | | | | | PATIENT I.D. |
|---|---|---|---|---|---|---|
| NAME | JONES, BARRY | | | | | DATE RECEIVED 06/24/92 |
| ACCESSION NO. 3059524 | AGE 33 | SEX M | | J.V/SOURCE | | DATE REPORTED 06/25/92 |
| REFERRING PHYSICIAN YOST | | | | CLIENT NO. 448712 | | CLIENT DATA |
| ORDER STATUS COMPLETE | | COLLECTION DATE/TIME 06/24/92 | | | | |

4
85

| TEST | OUTSIDE RANGE | WITHIN RANGE | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| | | | | NONE DETECTED |
| CANNABINOIDS, QUAL | DETECTED (VERIFIED BY REPEAT ANALYSIS) | | | NONE DETECTED |
| AMPHETAMINES, QUAL | | NONE DETECTED | | NONE DETECTED |
| COCAINE, QUAL | | NONE DETECTED | | |

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED.

053668



DAMON CLINICAL LABORATORY
2122 N CRAYCROFT STE. 100
TUCSON, AZ 85712
DAVID P. ALTHAUS, MD

S.A.M.H.C.
1930 E 6TH ST
TUCSON, AZ 85719

203937 [92]                     PAGE   1

| | PATIENT | | | | | PATIENT I.D. |
|---|---|---|---|---|---|---|
| JONES, BARN... | | | | | | |
| ACCESSION NO. | AGE | SEX | | T.V./SOURCE | | DATE RECEIVED |
| 3059524 | 33 | M | | | | 06/24/9 |
| REFERRING PHYSICIAN | | | | CLIENT NO. | | DATE REPORTED |
| YOST | | | | 448712 | | 06/25/9 |
| ORDER STATUS | | COLLECTION DATE/TIME | | | | CLIENT DATA |
| COMPLETE | | 06/24/92 | | | | |

| TEST | OUTSIDE RANGE | WITHIN RANGE | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| CANNABINOIDS, QUAL | DETECTED | | | NONE DETECTED |
| | (VERIFIED BY REPEAT ANALYSIS) | | | |
| AMPHETAMINES, QUAL | | NONE DETECTED | | NONE DETECTED |
| COCAINE, QUAL | | NONE DETECTED | | NONE DETECTED |

**CONFIDENTIAL**

**FURTHER DISCLOSURE PROHIBITED**

TREATMENT PLAN/SERVICE PLAN

05308

Pag ____ of ____

CLIENT NAME: Barry Jones

BHMIS #: BJ0826581D

ENTITY/AGENCY: SAMHC

ENROLLMENT SOURCE: ____

| PROB. # | TARGET/PROBLEM STATEMENT | GOAL (Circle) | OBJECTIVE | METHODS/FREQUENCY | DATE GOAL ACHIEVED |
|---|---|---|---|---|---|
| (1) | Substance Abuse: Reports from family members regarding abuse of family, alcohol, (Trek) and reloped? pills? | Improve Significantly<br>Improve Slightly<br>Maintain Status<br>Prevent Moderate Relapse<br>Prevent, Severe Relapse | Eliminate substance abuse and aggressive behavior | Referral and participation via a substance abuse program such ANeby or the Front Door | |

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

| APPROVAL CODE* | PROB. # | ACTION CODE | SERVICE CODE | SERVICE DESCRIPTION | BEGIN DATE | END DATE | TOTAL UNITS | PROVIDER ID | PROVIDER NAME | CLOSURE DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

If denied, give reason: ____

ENROLLMENT SOURCE SIGNATURE: William Brown Jr     DATE: 6/25/92

* A = APPROVED     D = DENIED     N/A = NOT APPLICABLE

Pa___ of ___

05369

TREATMENT PLAN/SERVICE PLAN:       SIGNATURE PAGE

CONSUMER NAME: _Barry Jones_

BHMIS #: _BJ08 7e 5810_

DATE: _____

AFTERCARE PLAN:

1. Anticipated discharge date (from services designated by this plan): _6/30/92_
2. Treatment plan for future services: _Substance Abuse tx program_
3. Treatment settings for future services: _Substance abuse tx program_
4. Type of living situation: _Homeless_
5. Educational/Vocational plan: _____
6. Involvement in discharge planning (check Y/N):

|   | Consumer YES | NO | Family* YES | NO |
|---|---|---|---|---|
| a. Understanding of Consumer's needs/problems. | | ✓ | ✓ | |
| b. Ability to anticipate problems. | | ✓ | ✓ | |
| c. Participates in TX/Discharge plan. | | ✓ | | |
| d. Understands Med. Regime. | | ✓ | | |

*Or Guardian

X _Melanie Roberts_  _6/30/92_
AUTHOR OF TREATMENT PLAN/AGENCY        DATE

X _Refused to Sign_  _6/30/92_
CONSUMER        DATE

_____  _____
RECEIVING AGENCY        DATE

_____  _____
FAMILY/GUARDIAN        DATE

ADAPT REVIEWER: _____  DATE

COMMENTS: (Response, lack thereof, etc.)

Review Date: _____

MULTI-DISCIPLINARY TEAM SIGNATURES

_Dexter Zimmerman_

**CONFIDENTIAL**
FURTHER DISCLOSURE PROHIBITED

HEALTH PLAN USE ONLY

PCP NOTIFIED _____
AUTHORIZATION # _____
ELIGIBILITY DATES _____

CONSUMER NAME: Barry Jones

DMIS #:

SERVICE MODEL: T

DATE: 5-16-92

CONSUMER STRENGTHS:

AXIS I: _____ St

AXIS II: 810 301.70

AXIS III: 799.90

AXIS IV: 3

AXIS V: 50

ENTITY/AGENCY: SAMHC

ENTITY/AGENCY CASE MANAGER

NAME: Jeff Thomas

PHONE: 628-5225

ENROLLMENT SOURCE:

PCP NAME:

| PROB. # | TARGET/PROBLEM STATEMENT | GOAL (Circle) | OBJECTIVE | METHODS/FREQUENCY | DATE GOAL ACHIEVED | CLOSURE DATE |
|---|---|---|---|---|---|---|
| 1 | Need for short-term, problem-focused mental health services | Problem resolution | Eliminate problem behaviors | Refer to SAMHC-BTS | | |

CONFIDENTIAL
FURTHER DISCLOSURE PROHIBITED

| APPROVAL CODE* | PROB. # | ACTION CODE | SERVICE CODE | SERVICE DESCRIPTION | BEGIN DATE | END DATE | TOTAL UNITS | PROVIDER ID | PROVIDER NAME | CLOSURE DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | 1 | W2300 | Psychotherapy | 5/25/92 | 8/25/92 | 48 | | SAMHC | |
| A | 1 | 1 | W2100 | Medications | | | 12 | | SAMHC | |
| A | 1 | 1 | LM060 | Case Management | | | 12 | | SAMHC | |

* A = APPROVED    D = DENIED    N/A = NOT APPLICABLE

If denied, give reason: _____

ENROLLMENT SOURCE SIGNATURE          DATE 5/15/92

ADAPT, INC.
BRIEF PSYCHOSOCIAL INTAKE FORM

Referral Source: SAMHC ✓ LFC ____ OTHER _____

DATE _____ PCP _____ Phone: _____

__Manager _____ Phone: _____ DOB: 8-26-5E

**CONFIDENTIAL**
**FURTHER DISCLOSURE PROHIBITED**

Name: JONES (last)   BARRY (first)   _____ (middle)   Phone: 574-2839

Street Address: 4501 E. BENSON HWY   Marital Status: SEPARATED

City: TUCSON   State: AZ   Zip: 85716   Gender: Female ____ Male ✓

Ethnicity: ANGLO

Housing Status: Homeless __ Indep ✓ Fam __ Friends __ Board __ Shelt __ Res __ Hosp __ Jail __ Other ____

Income (Amts): Emp ____ SSI ____ SSDI ____ SSA ____ GA ____ AFDC ____ Other ____

Employer: UNEMPLOYED   Occupation: _____   Phone: _____

Presenting Problem (Client's Words): "MY ♀ & KIDS LEFT ME AND I DON'T
HAVE ANY FAMILY ANYMORE"

History of Presenting Problem: Client reports ♀ + 3 children left him 2 weeks ago due
to client unemployed x 18 months. Unemployment ran out 2 weeks ago. It is suspected
that physical abuse is involved. Perhaps client denies. Client reports ↓ sleep &
appetite x 3 days. Client made vague SI statement and any manipulative
← money. Client reports his ♀ is in jail but refused to discuss why.
Client has had no previous ♀ TX or substance TX.

Mental Health Treatment (Attach additional pages if needed)

0537

| Agency/Hospital | Dates | Reason | | | |
|---|---|---|---|---|---|
| ⊗ | ___ | DTS__ | DTO__ | OTHER__ | Dx__ |
| ___ | ___ | DTS__ | DTO__ | OTHER__ | Dx__ |
| ___ | ___ | DTS__ | DTO__ | OTHER__ | Dx__ |
| ___ | ___ | DTS__ | DTO__ | OTHER__ | Dx__ |

Number of Days --- State Hospital: Past Year ⊗   Past Three Years ⊗

Number of Days --- Non-State Hosp: Past Year ⊗   Past Three Years ⊗

Substance Abuse: Behavior

| Type | this is suspect as to amount of use | Amount | Frequency | Began | Ended |
|---|---|---|---|---|---|
| Cocaine | | 1-2 lines | daily | refused | March ' |
| Marijuana | | 1-2 joints | daily | refused | |

Substance Abuse Treatment (Attach additional pages, if needed)

| Agency/Hospital | Dates | Reason |
|---|---|---|
| ⊗ | ___ | ___ |
| ___ | ___ | ___ |

...mily's Mental Health/Substa( Abuse History: _Client de_ _ my _____ regard__
_substance + MH issues in family_

...lopmental History (Abuse/Relationships/Etc): _____

...gal History (Current PO/Phone): _Client reports being loed of him in jail but denied_
_comment as to what he was incarcerated for_

...ducational/Vocational/Military History: _Client denied comment_

...edical History/Allergies: _Unremarkable medical Hx. Client not prescribed medication_
_and no known allergies_

...SE: _Client A+O₃ Dressed Casually / grooming disheveled. Affect - Tearful / guarded +
Mood - angry. There was no evidence of hallucination or psychosis. Client
denied ID S I and agreed to no harm contract. Denies H⁄o ○ Past / Pres, ○ Fut / Intent
Speech - louder slight pressure. Thought - organized. Client denies ETOH / Drug x 2
months_

Significant Risk Factors: DTO___  DTS _X_  AWOL___  Substance Abuse___  Explain _Client has
made St¹ THREATS ALTHOUGH NO FORMALIZED PLAN._

...visional Diagnosis:   AXIS    I: _Adj Do with depressed mood + anxious STK 309.00_
                        AXIS   II: _R/O Anti Social Personality DO 301.70_
                        AXIS  III: _None   799.90_
                        AXIS   IV: _3 moderate_
                        AXIS    V: _50 moderate to severe_

| Medications | Dosage | Schedule | Compliance |
| --- | --- | --- | --- |
| ⊗ | | | Y  N |
| | | | Y  N |
| | | | Y  N |
| | | | Y  N |

CONFIDENTIAL

FURTHER DISCLOSURE PROHIBITED

Psychosocial Assessment/Comments: _____

Initial Treatment Plan Recommendations: _Client has BTS ATPT MAY 24TH 10:00 AM Thursday_
_Client given Staff # & crisis PRN and refer F/U if appropriate._

Assignment Decision: _____

_Bud Howard MHP I 5-16-92_
Signature/Title/Date

Reviewer's Signature/Title/Date

(revised 2/26...

05372

## adapt, inc.

### ADULT BEHAVIORAL HEALTH SERVICES REFERRAL FORM

Consumer
Name: _BARRY_ _____ _JONES_
        FIRST     M.I.    LAST

e of Referral:    [✓] Emergency
                 [ ] Regular

SSN/AHCCCS#: _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_

DOB: _8-26-58_

tion 1:

Address: _4501 E. BENSON HWY_

e of this referral assessment: _5-16-92_

Phone #: _574-2839_

ferring Organization: _SAMHC_

Other Insurance:

dress: _1930 E. 6TH ST._

Name of Co.: _N/A_

one/Fax #s: _628-5241_

Policy No.: _____

rson making referral: _BUD HOWARD_

Guardian: _____

? (if different than above): _____

**CONFIDENTIAL**

Address: _____

ddress: _____

Phone #: ~~FURTHER DISCLOSURE~~ PROHIBITED

one #: _____

or Client/Family Who Self Refer: _____

pecific reason for referral: _CLIENT VAGUE S/I ; DEPRESSION RESULTING FROM_
          _(W) LEAVING HIM R/O DOM V ; PERSONALITY D/O_

05373

### Section 2:

ted Evaluation Scheduled:

Entity: ADAPT, INC.

Entity Contact Person: Melody Stobbe

Date/Time: _____

Address: 101 S. Stone, Tucson AZ 85701

Intake Person: _____

Phone: 884-0707    Fax: 624-4558

Location: _____         (Signature)        (Dat

Person completing this section: _____
                  (Print name)

Limited Evaluation Decision:           [ ] Crisis team    [ ] Full evaluation
[ ] No show    [✓] Acceptance for further service
                   [ ] Long-term non-SMI    [ ] Not accepted for further service
[ ] Brief treatment

Date and location of next scheduled appointment: _Apt. Pending —_

If not accepted, give reason: _Ira Smith_        _____    _5/18/9_

Person completing this section: _____    (Signature)    (Dat
                  (Print name)

---

ADAPT/CCATS OFFICE: 2075 N. 6th Ave., Tucson AZ 85705  Phone 628-5814   Fax 628-5488

Ref/Enrol Date: _5-16-92_      Sex: (M) F          T.C. _SAMHC_
Fund Code: _01_           Ethnicity: _ANGLO_     Team Referral Code:
           _9000_         DOB: _8-26-58_
Race Code: _NONE_      RTC: Y (N)         Emergency Team Disposition
Health Plan: _NONE_      RTC:             Non System
Diagnosis: _309.00/ 301.70_   AHCCCS: · Y (N)   (On-going)
Reviewer Initials: _____

rev. 7/16/91

**Exhibit 58**

JONES, BARRY L.                          SBS - DISCHARGE SUMMARY
MR# 315107                               PAGE 1

DATE OF ADMISSION:        06/25/92
DATE OF DISCHARGE:        06/28/92

ATTENDING:                HERMES GERUNDO, M.D.
RESIDENT:
INTERN:

DISCHARGE DIAGNOSES:
Axis I      Adjustment disorder with mixed emotional features.
            Polysubstance abuse.
Axis II     Antisocial personality disorder.
Axis III    Status post foot surgery.
Axis IV     Severity of psychosocial stressors - severe.
Axis V      Global Assessment of Functioning - 30/50.

CONSULTATION:  None.

LABORATORY DATA:  Laboratory reports were ordered but there were
none in the chart at the time of discharge summary, other than a
drug screen which was negative and a urine culture which was also
negative.

HOSPITAL COURSE:  The patient was brought to the hospital because
he was out at Southern Arizona Mental Health Center in the presence
of Melanie Roberts, and the patient stated that he was going to
kill himself or someone else because of the loss of his children
and wife through marital separation.

The patient was observed in the hospital.  No medications were
given to him.  During his time here he was neither homicidal nor
suicidal.  Additionally, it was suspected that this patient was
also abusing substances which he, apparently, had a negative drug
screen, although he did admit that he stopped his drug abuse about
two to three months ago.  Additionally, the patient indicated that
he would start a 12-step program, and was also willing to go for
outpatient treatment at Southern Arizona Mental Health Center with
Melanie Roberts, over his marital separation.  Additionally, he is
going to be residing with his brother rather than being alone.
Additionally, this patient has a job scheduled for 5:30 tomorrow
morning.

MENTAL STATUS EXAMINATION:  On discharge, the patient was alert,
cooperative, and oriented X4.  Mood was fine, and affect was
appropriate to thought content.  He showed a wide range of
emotionality.  Stream of thought showed normal speech production
and volume.  The patient denied any auditory or visual
hallucinations, suicidal or homicidal ideation, ideas of reference,
paranoia, or schneiderian criteria.  The patient also denied any
depressive symptoms.  Memory, both recent and remote, was grossly
intact.  Insight was fair, and judgement marginal.



**(CONTINUED ON PAGE 2)**
Kino Community Hospital
2800 East Ajo Way
Tucson, Arizona 85713
(602) 294-4471

4/4/02 Kino Hospital
Barry Jones
00004

JONES, BARRY L.                          SBS - DISCHARGE SUMMARY
MR# 315107                               PAGE 2

DISCHARGE MEDICATIONS: None.

DISCHARGE PLAN: Recommendation was to engage in a 12-step program.
The patient is also willing to go for outpatient psychotherapy with
Melanie Roberts, and the patient will call tomorrow for an
appointment. He has the telephone numbers of the crisis services,
as well as short-term psychotherapy at Southern Arizona Mental
Health Center and stated that he would follow through should his
situation worsen. The patient will be residing with his brother,
Larry Jones, and this was verified by the brother, when I talked
with him yesterday.


_____              _____
HERMES GERUNDO, M.D.

dd:06/28/92:HG
dt:06/28/92:pmt22:tag

**Kino Community Hospital**
2800 East Ajo Way
Tucson, Arizona 85713

4/4/02 Kino Hospital
Barry Jones
00005

JONES, BARRY                          SBS - HISTORY AND PHYSICAL
MR# 315107                            PAGE 1

DATE OF ADMISSION:          06/25/92

ATTENDING:                  DEAN W. MCKENZIE, M.D.
RESIDENT:
INTERN:

IDENTIFYING INFORMATION:   The patient is a 33-year-old male,
admitted by the psychiatric service for evaluation and treatment of
an adjustment disorder with suicidal ideation.

HISTORY OF THE PRESENT ILLNESS:  The patient states that the reason
he was admitted to the hospital is that there was concern that he
might harm himself and/or others.   He denies any major medical
problems.

REVIEW OF SYSTEMS:   HEENT - negative.   Cardiorespiratory - he
smokes one pack of cigarettes per day and denies any cough.   He
says in the last four months he has been having episodic tightness
of the chest, as if there was an Ace wrap around his chest with
sharp substernal pains.   He states that this seems to occur only
when he is quite nervous or under stress.  He states, however, that
after it is over, and it does last for variable periods of time, he
feels "weak."   Gastrointestinal - he states that his stomach is
nervous and that with a nervous stomach he gets abdominal pain and
some nausea, but he has no history of diarrhea.   Appetite is good,
but recently he did lose about 25 pounds of weight and has been
regaining it.    His   usual   weight   is   around   145   pounds.
Genitourinary - he has a past history of passing a kidney stone.
He has had none since.   This occurred approximately seven years
ago.    Neuromuscular - negative.   Skin - he has developed an
eruption over the right thorax in the past three months. He states
that it does not bother him in any way, but it just seems to have
appeared.   Yesterday, he hit a brick wall and now has pain in the
fourth knuckle of the right hand.

ALLERGIES:  None known.

PAST SURGICAL HISTORY:
     Bunionectomy of both feet.

PAST MEDICAL HISTORY:
1.    Kidney stone.
2.    He has fractured his right ankle.
3.    He has fractured his left hand.
4.    He sustained a right shoulder injury about four years ago in
      a fall off of an all-terrain vehicle.

FAMILY HISTORY: His mother is living and well.  His father died of
an acute myocardial infarction.  He has three brothers, one

(CONTINUED ON PAGE 2)



Kino Community Hospital
2800 East Ajo Way
Tucson, Arizona 85713
(602) 294-4471

4/4/02 Kino Hospital
Barry Jones
00006

JONES, BARRY                           SBS - HISTORY AND PHYSICAL
MR# 315107                             PAGE 2

overweight and with gout, and one has ulcer problems.  He has three
children who are living and well.

PHYSICAL EXAMINATION:  Blood pressure 130/80 mmHg, pulse 88 beats
per minutes an regular, respirations 16, temperature 99 degrees.
General - the patient is a thin, healthy appearing male in no acute
distress.  Ears - canals clear, drums normal.  Eyes - Pupils equal,
round, and reactive to light and accommodation.  Funduscopic
examination is normal.  Mouth - no intraoral lesions noted.  Head -
normocephalic.  Neck - supple, no nodes palpable, thyroid gland
unenlarged.  Lungs - clear to auscultation.  Heart - rhythm
regular, no rub, murmur, or gallop present.  Abdomen - soft,
without tenderness or guarding, no organs or masses palpable.
Extremities - no joint deformity noted.  Range of motion of all
joints is normal.  No cyanosis or clubbing present.  No edema of
the lower extremities present.  He has a very tender
metacarpophalangeal joint of the fourth digit of the right hand,
but no deformity is noted.  Deep tendon reflexes are
physiologically normal in the upper and lower extremities and equal
bilaterally.  Skin - she has essentially a flesh colored to
slightly darkish eruption over the right hemithorax extending on to
the upper abdomen.  The eruption consists of basically squamous
lesions which are somewhat dry and flaky.  No vesiculation is
noted.  Lymphatics - no nodes palpable in the neck, axillae,
inguinal, or femoral areas.  Genitalia - penis circumcised, testes
normal in size and descended bilaterally.  No hernia present.
Rectal - sphincter tone good.  Prostate soft, smooth, and
unenlarged.  No rectal masses palpable.

IMPRESSION:
1.   Adjustment disorder with suicidal ideation.
2.   Tinea versicolor probable.
3.   Rule out possible fracture of the right fourth metacarpal
     bone.


DAVID M. LOGAN, M.D.

dd:06/26/92:DML
dt:06/26/92:pmt22:tag

Kino Community Hospital
2800 East Ajo Way
Tucson, Arizona 85713
(602) 294-4471

4/4/02 Kino Hospital
Barry Jones
00007

JONES, BARRY                          SBS - ADMISSION NOTE
MR# 315107                            PAGE 1

DATE OF ADMISSION:

ATTENDING:                 HERMES GERUNDO, M.D.
RESIDENT:
INTERN:

**HISTORY OF THE PRESENT ILLNESS:** The patient is a 33-year-old white individual, who was brought to Kino Community Hospital by the Tucson Police Department on a petition as danger to self and danger to others, filed by Melanie Roberts of Southern Arizona Mental Health Center. The patient had stated to Melanie Roberts, "I am going to hurt myself or someone else." He had stated that he wanted to go and see his children and say goodbye to them because he would not be here any longer. There were no incisions or lacerations to indicate that the patient had cut himself. The patient was in the possession of a knife. The patient spoke of numerous psychosocial stressors, specifically estrangement from his wife and in the last month the wife was unwilling to let him visit with the children, although he states he does not know exactly where they are located. Psychosocial stressors include separation from wife and children and unemployment. The patient also has a court hearing pending on a domestic violence charge, a possible eviction from home.

**PAST PSYCHIATRIC HISTORY:** According to the records, the patient has a 30-day history of treatment at Southern Arizona Mental Health Center. The diagnosis then was adjustment disorder with depressed mood. The patient denied any previous psychiatric illnesses or hospitalizations.

**SOCIAL HISTORY:** He did admit to use of cocaine, but denied any use in the last four months. The patient also spoke of numerous incarcerations for minor theft, grand theft, disorderly conduct, and domestic violence. I spoke with his brother, Larry, whom I was able to reach at 748-1447, and his work number is 721-7744. He told me that the patient had never made any suicidal attempts, and that at one time the patient had gone for counseling for his wife and that the reason for the separation is suspicious extramarital affair on the part of the patient. When I asked him about any street drugs, Larry told me that the patient did not take any street drugs at all. When I confronted him that the patient himself admitted to that, he stated that both the patient and his wife were doing cocaine. When I asked Larry if there had been any jail terms for this individual, he told me that the patient had some warrants but he had actually lied, when I told him that the patient had numerous jail sentences for different charges. Again, Larry said that the patient would return to his house. Both Larry and the patient stated that the patient has a job starting next Monday at the Cypress Sahuarita Mines.

(CONTINUED ON PAGE 2)



Kino Community Hospital
2800 East Ajo Way
Tucson, Arizona 85713
(602) 294-4471

4/4/02 Kino Hospital
Barry Jones
00008

JONES, BARRY                            SBS – ADMISSION NOTE
MR# 315107                              PAGE 2

**FAMILY HISTORY:**  There is a family history of alcohol abuse.

**REVIEW OF SYSTEMS:**  Noncontributory.

**MENTAL STATUS EXAMINATION:**  The patient was alert, cooperative, and
oriented X4.  Mood was okay, and affect was appropriate to thought
content.  He showed a fair range of emotionality.  Speech was at
times very difficult to understand because of the southern accent,
and also at times this patient was extremely vague and he is also
untruthful.  Stream of thought showed normal speech production and
volume, and he was at times tangential.  Regarding thought content,
the patient denied any auditory or visual hallucinations, suicidal
or homicidal ideation, ideas of reference, paranoia, or
schneiderian criteria.  The patient also denied any dysphoria or
any sense of hopelessness, worthlessness, physical or mental
fatigue, or any problems with appetite.  The patient did state that
he usually sleeps only three and a half hours, and also spoke of a
sense of helplessness, "because I am here."  Memory, both recent
and remote, was grossly intact.  Insight and judgement were rated
as severely impaired.

**DSM-III-R MULTIAXIAL DIAGNOSES:**
Axis I      Adjustment disorder with anxious mood.
            Polysubstance abuse.
Axis II     Antisocial personality disorder.
Axis III    None.
Axis IV     Severity of psychosocial stressors - severe.
Axis V      Global Assessment of Functioning - current 30, past year
            50.


HERMES GERUNDO, M.D.

dd:06/29/92:HG
dt:06/29/92:pmt22:tag

**Kino Community Hospital**
2800 East Ajo Way
Tucson, Arizona 85713
(402) 204-4471

4/4/02 Kino Hospital
Barry Jones
00009

**Exhibit 59**

```
1                    LESLIE BOWMAN
                   DEFENSE COUNSEL
2                      INTERVIEW
   State of Arizona v. Barry Lee Jones      Date:    March 29, 1995
3                                           Time:    12:40 P.M.

4  Witness:  Carol Jones              Case Number:   CR-45587

5  Attorney:      Leslie Bowman
   Interviewer:   Leslie Bowman
6
   LB:  =      Interviewer Leslie Bowman - Defense Attorney
7  CJ:  =      Carol Jones - Witness
   AM:  =      Arlene Moore - County Attorney's Office
8  -----------------------------------------------------------------

9  LB:  This Leslie Bowman.  I represent Barry Jones.  We are at the

10       offices of Bruner and Bowman.  Also present is Arlene Moore

11       from the County Attorney's Office and this is the interview of

12       Carol Jones.  The time is approximately 12:40 P.M.  Miss Jones

13       could you just start out by ah... telling us your full name?

14 CJ:  Ah... my maiden name?  Well...

15 LB:  Is that the name you use now?

16 CJ:  No Jones.

17 LB:  Okay.

18 CJ:  It'd be Carol Elaine Jones.

19 LB:  Okay.  And how old are you Miss Jones?

20 CJ:  Thirty one (31).

21 LB:  Are you currently residing in Tucson?

22 CJ:  Yes I am right now.

23 LB:  Who do you live with here?

24 CJ:  Ah... I'm staying with a friend named Ray ah... Parish.

25 LB:  Okay.

26 CJ:  Yeah.

27 LB:  And is there anyone else living in the same household?

28                         1
```

02577

```
 1   CJ:  Ah... ah... one (1) of his friends.  Ah...

 2   LB:  Another adult?

 3   CJ:  Yeah it's an adult.  And me and my kids.

 4   LB:  Okay.  When you... what's the name of the other adult?

 5   CJ:  Fred ah... I'm not sure his last name but his grandfather owns

 6        a tire shop, E.W. Tires.  At the Swap-Meet.

 7   LB:  Okay.

 8   CJ:  Yeah.

 9   LB:  And you said...

10   CJ:  He's a respectable person.

11   LB:  Okay.

12   CJ:  Yeah.

13   LB:  And you said you're also ah... you have your... children

14        living with you.  Could you tell me their names please?

15   CJ:  I have my oldest daughter Brandy, Alecia and... James would...

16        Brandy's twelve (12), James is nine (9), James Lee, and Andrew

17        he's five (5), be Andrew Eugene and my new baby I just had,

18        which her name is Alecia.

19   LB:  Okay.

20   CJ:  But her name is Rolin so.

21   LB:  Okay.

22   CJ:  Okay.

23   LB:  Ah... why is that her last name is Rolins?

24   CJ:  'Cause she's not Barry's.

25   LB:  Okay.  Is... is she the child of the person you're living

26        with?

27   CJ:  No.

28                                 2
```

02578

1  LB:  Okay.  Do you have ah... a continuing relationship with the

2      child's father?

3  CJ:  No.  No.

4  LB:  Ah... Miss Jones could you tell us what your current

5      relationship is with Barry Jones?

6  CJ:  Actually I have not talked to him in almost a year.

7  LB:  Okay.  Do you remain (inaudible) to him?

8  CJ:  I talked to him on the phone, I take that back like two (2)

9      weeks ago.  He called at Rosa's and I told him I was gonna go

10     see him.  And I don't know Rosa's just been giving me a lot of

11     problems over that trailer and stuff and she gave me the wrong

12     directions to get to the place the next day and I asked her

13     not to show up there and she did anyway.

14  LB:  At the jail?

15  CJ:  At the jail.  That next day yes.  After I had... after she was

16     sitting right there and her... you tell Barry that I just want

17     to talk to him by himself.  And if she gives me the wrong

18     directions right, left, right, left something and ended up

19     showing there.  Showing up at the jail.

20  LB:  Ah... are you currently still legally married to Barry Jones?

21  CJ:  Yes I am.

22  LB:  How long is it that you two ah... have been separated?

23  CJ:  Ah... since Andrew was like a year and a half and he's five

24     (5) now, be six (6).  Say about... three and a half (3 1/2),

25     maybe four (4) years ago.

26  LB:  Okay.  So when you say that you've been separated for three

27     and a half (3 1/2) to four (4) years, you have not lived

28                              3

02579

1    together?

2  CJ:  No we haven't.

3  LB:  Okay.  Ah... but you maintain some kind of contact...

4  CJ:  Yes.

5  LB:  ...up about until a year ago?

6  CJ:  Yes.

7  LB:  And what was the nature of that?

8  CJ:  Ah... 'cause we have children and we would go into the park

9    and... we would have dinner together.  Christmas, Birthdays,

10    ah... I'd pick up Brandy and drop the boys off with them and

11    he would have like boy day and we'd have a girl day and... and

12    everything was okay.  You know there wasn't no problem or...

13  LB:  There was no animosity...

14  CJ:  No.

15  LB:  ...between the two (2) of you?

16  CJ:  No.  We were friends.

17  LB:  Was the ah... separation a mutual decision between the two (2)

18    of you?

19  CJ:  Ah... not really no.

20  LB:  Who's decision was it?

21  CJ:  It was mine.

22  LB:  Another words... Barry did not want to separate?

23  CJ:  No he didn't.

24  LB:  He wanted to continue the relationship and the marriage?

25  CJ:  Yeah he did, but I just kept... kept hearing all kinds of

26    things about him after... afterwards and... you know and that

27    was after we had already separated.

28               4

02530

1  LB:  Okay.

2  CJ:  But he didn't really cause me no trouble.  The first couple of

3       months he would come to steal my car and you know what I'm

4       saying, just let me know he's still there.  But after that, he

5       just... you know really didn't bother me.

6  LB:  Another words he calmed down...

7  CJ:  Yeah he calmed down.

8  LB:  ...and you two (2) got back on decent terms?

9  CJ:  Yeah.  And then he started visiting with the kids and had no

10      problem.  He never spanked 'em or... you know 'cause... I

11      don't know, we just don't spank the kids.  You know if they're

12      sick you take 'em to the doctors.  If they're hurt... if

13      they're you know.

14 LB:  Okay.  Ah... have you had any other ah... adult relationships

15      since the time you separated from Barry?

16 CJ:  Yes I did.

17 LB:  And was he aware of those?

18 CJ:  Yes he was.

19 LB:  Did that create any kind of problems...

20 CJ:  No.

21 LB:  ...in terms of you getting along with him?

22 CJ:  No a matter of fact ah... the baby's father, we had been... we

23      had been friends for almost a year.  Okay and then... I don't

24      know we... it just happened.  You know and I slept with him

25      and I ended up pregnant and moved to Phoenix and we were

26      already separated but he knew, Barry knew that you know I had

27      been going out with him and the only thing he said was don't

28                                5

02581

1        hurt the kids.  You know and...

2  LB:  Why do you think he said that?

3  CJ:  Well 'cause it... they're his you know his boys and his

4        daughter.

5  LB:  He meant for you not to hurt the kids?

6  CJ:  No I mean just let... let Shaun know that you know not to

7        touch the ah... kids.

8  LB:  So when he said...

9  CJ:  He's still the dad.  You know.

10  LB:  ...when he said hurt, he meant physically...

11  CJ:  Yeah.

12  LB:  ...don't hit (inaudible).

13  CJ:  Or don't be their dad.  They got a dad.  More or less.

14  LB:  Okay.

15  CJ:  Yeah that's the way I took it.

16  LB:  Okay.

17  CJ:  But that was okay though 'cause you know he never really lived

18        with me, I always lived by myself.  You know and... I won't

19        let him do that anyway so... so we would just... but we never

20        fought or argued or... not like that.

21  LB:  Okay.  Ah... up until the time you were separated, well let me

22        rephrase that.  When was it that you and Barry were married?

23  CJ:  Ah... well actually we lived together before we were married.

24  LB:  Okay.  So when... when was it that you first started living

25        together?

26  CJ:  Ah... when I was eighteen (18) 'cause he wouldn't touch me

27        until I was eighteen (18).

28

02582

1  LB:  When... do you remember the year?

2  CJ:  Ah... July 19th ah... let me see... Brandy is twelve (12),

3      that it'd be... about thirteen (13) years ago.

4  LB:  Okay.

5  CJ:  Be July ah...

6  AM:  '82?

7  CJ:  Yeah '82.

8  LB:  Okay.  That's when you first started living together?

9  CJ:  Yeah.

10  LB:  And how long after that did you two (2) marry?

11  CJ:  Ah... years later.  It was like when ah... James was a baby.

12      So it was... about nine and a half (9 1/2) years ago.

13  LB:  Okay.  Is James, Barry's son?

14  CJ:  Yes he is.

15  LB:  Is there a particular reason why you have not actually gotten

16      a divorce?

17  CJ:  No not really, I don't know.  I don't know.  Just don't know.

18      I know I still care for Barry and you know I do love him and

19      you know for my kids and all that and kind of a way of saying

20      I don't want to be with nobody else right now.  Just I don't

21      know.

22  LB:  So is it fair to say that...

23  CJ:  Not...

24  LB:  ...you're a little bit ambivalent about ah... your separation

25      from him?

26  CJ:  No.

27  LB:  You are definitely clear that you want to be separated from

28                                    7

1    him?

2  CJ:  Yeah.  Wouldn't want to live with him or nothing but me and

3    him could... I don't see why we should get divorced you know

4    unless we're ready to marry somebody else and... if he wants

5    to marry Rose, then I'll give him a divorce.  You know it's...

6    I just thought it would hurt him more by... by somebody

7    serving him papers for divorce.  You know my kids.

8  LB:  Okay.  (Pause)  Miss Jones do you remember on ah... May 3rd

9    you gave ah... tape recorded statement to a police officer

10    named Detective O'Connor?

11  CJ:  Ah-huh.  In Tucson?  Down there, yeah.

12  LB:  Okay.  Ah... and I gave you ah... a copy of the transcription

13    here before we started this.  Do you have... did you have a

14    chance to read through it?

15  CJ:  Yeah I did.

16  LB:  Okay.  Ah... you mentioned that there are some inaccuracies in

17    the transcription.

18  CJ:  Yeah.

19  LB:  Do you recall what they are?

20  CJ:  Ah... kind of ah... let me see... (pause) 'cause skimmed

21    through it a couple times and... (pause) okay and there was

22    another one (1) had like ten (10) years instead of one (1)

23    year... wasn't that right on here?  Oh when ah... they said

24    ah... the year that we separated... (long pause) that's going

25    to be hard to find you know, (inaudible).

26  LB:  That's okay, take your time.

27  CJ:  Okay.

28

02594

1  AM:  You want to go off tape while you... look?

2      (OFF TAPE)

3      (BACK ON TAPE)

4  CJ:  The car and the detectives.

5  LB:  The tape. Okay.  Ah... so at this point you weren't able to

6      find the inaccuracies?

7  CJ:  No 'cause...

8  LB:  But it was ah... small matters...

9  CJ:  Yeah it was little...

10  LB:  ...having to do with numbers or something like that?

11  CJ:  Yeah.  Years or something like that.

12  LB:  Okay.  Okay.  Other than that ah... does it look like... it

13      accurately...

14  CJ:  Yeah.

15  LB:  ...portrays what you told the officer?

16  CJ:  Yeah.

17  LB:  Okay.  Is there anything in there ah... looking back on it

18      now, that you told the police officer that is not true?

19  CJ:  Ah... no I...

20  LB:  Or maybe where you exaggerated it or embellished?

21  CJ:  Well that day I was nervous and I was crying and it was the

22      day that he had got arrested and... and I didn't know where my

23      daughter was and... and countless people were there right in

24      my face and all that and it's... I don't know, yeah I was

25      upset but most everything I said in my statement was... the

26      truth.  You know like... me taking him to the counselor's

27      or... just certain things.

28                              9

1  LB:  Okay.

2  CJ:  Other than you know them wanting me to say that he was real

3       abusive.  No he wasn't... real abusive.

4  LB:  Why... and why do you say that they wanted you to say that he

5       was abusive?

6  CJ:  Well not they really wanted... it's just I don't know made me

7       feel like you know I was describing somebody that wasn't their

8       dad.

9  LB:  Okay.

10 CJ:  You know what I'm saying?  Like that.  I know reading that

11      paper was kind of like... Barry being accused of something

12      like that.  You know I could not...

13 LB:  Is it fair to say that you were surprised?

14 CJ:  Yes I was very surprised because... like I say it had just

15      been a couple of months that I had seen him... and there was

16      no Angela there.  There was no kids.  And then when I moved up

17      to Phoenix, which is like in March... March-April right around

18      there... and the next ah... it's probably at least a couple

19      months, she had moved right in there and... you know and I

20      just can't see Barry... you know within a couple of months

21      changing that bad.  'Cause when I left him he was say... there

22      was nothing wrong with him.

23 LB:  Okay now you said earlier that you hadn't seen him about... in

24      about a year?

25 CJ:  Yeah from the time he got arrested.  To... today.

26 LB:  Oh I see what you're saying.

27 CJ:  Yeah.  Yeah.

28                              10

1  LB:  But you had seen him prior to the arrest?

2  CJ:  See it was... it was a year ago this month, is when I left

3       Ph... left Tucson and moved to Phoenix.

4  LB:  Okay.  Okay I understand.

5  CJ:  Yeah.

6  LB:  Now ah... are all three (3) of your children, children that

7       you have in common with Barry?

8  CJ:  Yes.  The... my three (3) older children.

9  LB:  Except for the ah... the new baby girl?

10  CJ:  Yeah.

11  LB:  Okay.  (Pause)  Now you said in your statement on the third

12       page here that ah... that Barry wasn't really violent...

13       (pause) and I think I see here where... where you said the

14       error was.  Then it says in the last ten (10) years...

15  CJ:  See yeah.

16  LB:  ...you started getting more angry and violent?

17  CJ:  See that's one (1) of them.  It should of been last year.

18  LB:  Okay.

19  CJ:  That we were together.

20  LB:  Okay.  So in the last year...

21  CJ:  Yeah.

22  LB:  ...that you were together...

23  CJ:  Yeah.

24  LB:  ...you said that Barry started getting more angry and violent?

25  CJ:  Yeah 'cause I was working.  He wasn't working and I was

26       ah... Assistant Manager of the Wilmot Swap Meet.  And... I

27       never slept around on him the whole time we were together.  I

28                                    11

1      never slept around on him you know 'cause I'm not like that.

2      I'm... I'm a good mom and... but he you know he did and... I

3      mean he loved me and he didn't want a divorce.  He didn't want

4      nothing like that, I just you know I couldn't... kids are more

5      important.

6  LB:  How... what... was the behavior that you saw... that makes you

7      describe him as more angry and violent?

8  CJ:  Well... I know he got into drugs more... okay and...

9  LB:  Okay but doing drugs isn't...

10  CJ:  No it's not.

11  LB:  ...violence.  What... what was the violence?

12  CJ:  Okay well the violence was when he was pulling out his hair.

13      And that...

14  LB:  So do you mean self-abusive behavior?

15  CJ:  Self-abusive...

16  LB:  Or violence towards others?

17  CJ:  Ah... to himself.

18  LB:  Okay it was more self destructive behaviors?

19  CJ:  Yes.  And then when he realized I was leaving him and I wasn't

20      coming back, he didn't punch on me or nothing.  He just... he

21      took off in the car, he didn't want me to leave.  Ah... he

22      flattened the tires ah... and then when I kept leaving he just

23      drag... he dragged me in the yard to get me back in the

24      trailer.  Okay but he never... I don't know he never punched

25      on me, he never punched on the kids.  I mean like if they were

26      in his way, he would like... you know get out of my way.  You

27      know what I'm saying like...

28                         12

02588

1   LB:  Did you think that was abusive?

2   CJ:  Well it was yeah because see I didn't come from abusive homes

3        so...

4   LB:  And when you say abusive do you mean emotionally or

5        physically?

6   CJ:  Ah... physically no he wasn't.  Not like his brother Larry.You

7        know to where he'd...

8   LB:  Okay.  Ah... so when you say abusive and he would say get out

9        of the way, you mean like he would hurt their feelings?

10  CJ:  No ah... okay like he would angry.  Okay and then the kids

11       would say something or get in his way then he would get a

12       little bit more angry and like knock 'em out of the way or

13       something.  But most of the time I was there you know and...

14       he'd be okay after you know a few minutes after he calmed

15       down, he'd be okay.

16  LB:  Can you describe to me what... say part of his body he would

17       knock them out of the way with?

18  CJ:  His elbow or... I know most of the time it was like... I don't

19       know.

20  LB:  Like the back of the hand?

21  CJ:  Yeah like... he didn't leave bruises on 'em or nothing.  Okay?

22       You know I'm not saying that or nothing but it's like... like

23       a shove out of the way, get out of my way.  You know and the

24       kids knew to stay out of his way.  Most of the time they were

25       excited... but a lot of times he would get over anxious and

26       make himself mad or something.

27  LB:  So when he would shove them out of his way... would they fall

28                                13

02589

1  down?

2 CJ: Ah... sometimes they would.  But like I said he... he really

3  didn't do that because I didn't let him do it.  I didn't let

4  him take it... unless I was not there... you know did he

5  really hurt the kids.

6 LB: So another words... you yourself never saw him hurt one (1) of

7  the kids?

8 CJ: No other than shoving 'em out of the way or... we got to where

9  we didn't even spank the kids with the belt.  You know and

10  when me and him separated we had the deal to where if you had

11  the kids, you didn't spank the kids.  You... you went to

12  counseling or... or you talk to me or you talk to you or...

13  you know and...

14 LB: So was there a time when ah... he did spank the kids?

15 CJ: Ah... there was once I thought maybe he did.  Brandy had

16  bruises up and down the back of her leg okay?  Now I don't

17  know where those came from.  I asked Brandy and she

18  wouldn't... you know she wouldn't say and I couldn't figure

19  out how she would get... and she says mom or something that

20  they... the playground, you know how they twist or something

21  like that and you can get bruises up.  You know but at the

22  time... I don't know I thought Barry had done it.  I thought

23  he took the belt to 'em and... you know so... I would get...

24  I had my sisters and my mom watch the kids.  And that was in

25  the last year of our relationship.

26 LB: Now was that an isolated incident, the bruises on Brandy or

27  was it something that you saw over and over again?

28         14

02590

1  CJ:  No it was just one (1) time only.

2  LB:  And you...

3  CJ:  Matter of fact I think they had been there a few days or

4       something you know because... they were bruises.

5  LB:  How old was Brandy at the time?

6  CJ:  Ah... let me think she's twelve (12) now... I'd say she's

7       probably about seven and a half (7 1/2), eight (8).

8  LB:  Okay so is it fair to say it was three (3) or four (4) years

9       ago?

10 CJ:  At least yeah.

11 LB:  (Inaudible)...

12 CJ:  I'd say more like four (4) years but... five (5), five (5).

13 LB:  Five (5) years ago?

14 CJ:  Five (5) years yeah.

15 LB:  Okay because you said you separated three and a half

16      (3 1/2)...

17 CJ:  Yeah.

18 LB:  ...to four (4) years ago.

19 CJ:  Yeah.

20 LB:  So you think it was five (5) years ago...

21 CJ:  Yeah.

22 LB:  ...when you saw bruises down her leg?

23 CJ:  It was about five (5) yeah.

24 LB:  And what made you think that Barry had done it?

25 CJ:  I don't know 'cause I... see I was working and... like I said

26      he had been doing drugs and know telling who was showing up at

27      the house and... and who was there and... I don't know and

28

15

then one (1) day I just look over there and there's bruises on the back of her leg and I said Brandy where did those come from? And she says... I don't know I forget what she tells me and I don't know I just started accusing Barry of it and he says I didn't do it, I didn't do it. I said well look what's gonna happen, a school nurse... we're gonna have... you know because at that time me and Barry had been fighting and... she had jumped out of my car right there at the interstate and ran up to the school. Well the school had called the C.P.S. and says me and Barry had been fighting. They went ahead and took her for a week, you know so...

LB: Was Barry with you in the car when she...

CJ: No he was not.

LB: ...jumped out of the car?

CJ: It was just me, her and my kids.

LB: Okay.

CJ: That was Andrew and James too. He was a little baby at the time.

LB: Was it ever confirmed that the bruises on Brandy came from Barry?

CJ: No.

LB: Did she ever say anything?

CJ: No she didn't.

LB: And he never admitted it?

CJ: No.

LB: Was she ever seen by a doctor?

CJ: Ah... no. Other than... the school nurse or (inaudible)

16

1      that... the kids never had you know... bruised... no records

2      of no child abuse or neglect or nothing like that.

3  LB:  Did C.P.S. get involved when you saw those bruises on her

4      (inaudible)?

5  CJ:  No they didn't.

6  LB:  So there's no official record...

7  CJ:  No.

8  LB:  ...from C.P.S. or any doctor about this?

9  CJ:  No that's just personal from... you know and after that he

10     never touched the kids.   You know?   I don't know... as a

11     mother you just... I don't know... I still don't know where

12     they came from but like I said, after that... after she stayed

13     with Barry she never had bruises.  She... the kids never had

14     bruises.  Ah... I mean he... he paid more attention to her

15     than he did the boys you know after... you know and...

16     Christmas time, things like that.  But... physical abuse, no.

17 LB:  Were you ever concerned that he might of been molesting her?

18 CJ:  No.  I never... never.

19 LB:  Do you...

20 CJ:  'Cause...

21 LB:  ...have a close relationship with Brandy?

22 CJ:  Yeah me and her's... were more like daughter and mother and...

23     I mean she's more grown up now than you know I remember so

24     it's kind of hard to... she's into makeup now and... this and

25     that.  She's going to be a teenager.  (Inaudible).

26 LB:  Do you think that she would confide in you if she was having

27     a problem or someone was hurting her?

28                              17

02593

1  CJ:  Brandy likes to lie a lot... you know make up things and you

2       can't always believe what Brandy says. Like ah... Dan Phoenix

3       with C.P.S.? She gave him... names of people that didn't even

4       you know exist and... you know and it was hard to... to try to

5       talk to people that didn't even know her and say well she's

6       telling the truth when she's not telling the truth. So it'd

7       make me look bad or something. You know they would say

8       well... we believe her.

9  LB:  Ah... now I wanted to back up to something that you said

10      earlier. You said that ah... at the end of your relationship,

11      before you separated and things were getting bad between you

12      and Barry, sometimes you would try to leave and he would drag

13      you back into the yard?

14 CJ:  Just one (1) time.

15 LB:  One (1) time?

16 CJ:  That was it one (1) time.

17 LB:  And... how... can you describe to me exactly what happened

18      physically?

19 CJ:  Well I had to ah... open the restaurant early that morning

20      okay because it was a Swap Meet and you had to open up like

21      six (6) in the morning to be ready. Okay well we had been

22      fighting like the week you know... prior to that and... and

23      they had given me the keys to the place because they had made

24      me Assistant Manager and... I don't know I guess he was really

25      jealous and he wanted to have sex all the time you know and

26      make me... it made me tired so I wouldn't want to go have sex

27      with nobody else. But I wasn't having sex you know? And...

28                              18

1      I don't know I was tired at the end of the day because I would

2      have to clean the machines and all that and... and so I would

3      go home and I would go to bed and... I don't know he just

4      like felt left out and stuff and...

5  LB:  So what... what did he do when he... dragged you back into the

6      yard?

7  CJ:  He just like took me by my shoulders and like dragged me and

8      got the side of my pants all muddy.  I had just gotten ready

9      for work.  And he had just tried to drag me back in the house.

10  LB:  Did you struggle... with him?

11  CJ:  Yeah.

12  LB:  Did you end up...

13  CJ:  But see me and him never really fought.  We didn't fist fight.

14      We didn't... I mean... I know when... whenever I got mad I got

15      quiet and I wouldn't talk.  Okay and then... a couple of days

16      or so and we would make up or whatever but we never

17      violently... no.. bruises... no we don't have no record.  One

18      (1) time on my birthday ah... he threw me out of the house but

19      the cops came and arrested him but it wasn't because you know

20      he... he just threw my purse out the door and he had kept the

21      kids.  He had the trailer.  I threw my purse out the door and

22      locked me out.  Okay well the cops said he couldn't do that

23      because it was my house and my kids and... so they took him

24      and that was on my birthday.

25  LB:  And is that basically how your relationship was...

26  CJ:  Yeah.

27  LB:  ...from the beginning?

28               19

02595

1  CJ:  Yeah all the time.   (Pause)   He's a good person, a good
2       father.   Just... I don't know.
3  LB:  There's something else in your statement here.   It says that
4       he was always picking on the kids.  What did you mean by that?
5  CJ:  I don't know just... like I say when I went to work or
6       something they didn't want to stay with him because they say
7       it'd be like go to your rooms, stay in your room.   They would
8       stay in their room or sit there on the couch or... or you
9       can't go nowhere, you can't leave the yard.  Ah... I don't
10      know it's... over strict dad.
11 LB:  Too much discipline?
12 CJ:  Too much discipline... verbally.
13 LB:  Okay.
14 CJ:  Okay not... 'cause most the time if he... if he beat on the
15      kids or something or if he spanked 'em, I don't mean beat on
16      them or nothing like that, but if he spanked them they would
17      let me know.  Mom, dad spanked us last night and I'd always
18      say something to him.  You know and... you know like I said,
19      they way they... they make him out to be... and the way I
20      remember him is not the same.  Same two (2) men.
21 LB:  Okay.  Did he spank the kids frequently?
22 CJ:  No.  No.
23 LB:  Can you... give me an estimate about how many times you think
24      he's spanked the kids?
25 CJ:  It's hard to say because... I know there are times where he
26      was in a real good mood all the time and he was working,
27      making money.  Ah... but then there were other times where he

28                            20

1   was in a bad and nothing went right and he couldn't get a job.
2   You know but he never... he never beat on the kids or he never
3   beat on me.   He just got verbally angry and... screaming,
4   embarrassing you in front of people, embarrassing the kids you
5   know in front of their cousins by... you know or I'm your dad,
6   I can tell you what to do.  Do it right now, you know what I'm
7   saying? And the kids did it.  You know or I'm gonna beat your
8   butt or whatever but he never... you know actually... I mean
9   they did get spankings.  But they never got beaten or abused
10  no.
11  LB:  Do you think the spankings were... appropriate?
12  CJ:  Yeah because he would only give 'em three (3) swats.  And that
13       was it... they'd get... my kids would get three (3) swats.
14  LB:  With what?
15  CJ:  With sometimes a belt or the hand.  They never got... I mean
16       if you were talking about like just being struck across the
17       room or something, no.  No, nothing like that.  Most of the
18       time I would discipline the kids.
19  LB:  Did you use spankings for discipline?
20  CJ:  Not really no.  We didn't... like I said we don't... my kids
21       run all over us.  Put it that way.  I mean (inaudible)...
22       other than a swat on the butt or something like that.  Most of
23       the time they were out riding their bike.  You know they knew
24       just to stay away sometimes when their dad was in a bad mood
25       or something.  They knew.
26  LB:  So there was never a time when you spanked them for
27       discipline?

28

21

1  CJ: Oh yeah but... I mean other than... like I said they never got
2      more than three (3) swats, if they did.  Ah... Andrew was a
3      little baby and James was small so no they never... I mean
4      maybe twice a month did they get ah... a swat on the butt or
5      a smack or... I don't know the most pressure they ever got is
6      when their dad was in a bad mood.  They knew to stay out of
7      his way.
8  LB: And so would the spankings be as a form of discipline or would
9      it just be Barry getting mad at and spanking them for no
10     reason?
11 CJ: No he wouldn't... I wouldn't let him spank 'em when he was
12     mad.  He would calm down then he'd be okay after that.  Okay
13     ah... like I was talking about... well Brandy and the bruise
14     you know... you know the bruise on the legs... you know I
15     still don't know what... you know how she got them bruises.
16 LB: Okay.
17 CJ: But I have seen Barry when he's gotten mad and wants to spank
18     the kids and I don't let him.
19 LB: Okay.  (Pause)
20 CJ: (Inaudible) where you're talking about the psychologist is
21     when he was hurting himself and that was like the last year of
22     our relationship.  He was taking bottles of pills... I don't
23     know some of his mom's pills or whatever... and just
24     swallowing 'em down and pulling out his hair and having his
25     kids watch him do that.  You know or... or taking the kids to
26     his mom and saying his going to kill himself or something.
27 LB: You know ah... on the top of the fifth page of your statement
28                              22

1    here you said that ah... one (1) time when you tried to leave
2    him, he put you and all the kids in the bed and took a gun and
3    said he was gonna shoot all of you?
4  CJ: He... he... not me but the kids yes.
5  LB: He told the kids that...
6  CJ: (Inaudible).
7  LB: ...he was going to shoot them?
8  CJ: Yeah he had all the kids.  He... it was at night time.  He
9    wouldn't let me... leave, take the kids... so he had... I
10   forget what kind of gun it was or whatever but he had put the
11   kids ah... back in bed with him and slept with them there.
12   And I slept out on the couch so that I could not sneak off in
13   the middle of the night and take the kids.
14 LB: (Pause)  Were the kids afraid of him?
15 CJ: Mmm... yes and no.  To this day they still can remember you
16   know... hey dad's coming, let's get out of his way or ah... is
17   he in a good or a bad mood or... but see they weren't afraid
18   to... he was gonna beat 'em or nothing.  They just didn't want
19   to be in his way if he's coming through the door and getting
20   knocked out of the way.  You know something like that.
21 LB: Did he ever ah... spank them or hit them or actually strike
22   them with his elbow?  Or was it...
23 CJ: Not with like elbows but I mean just like... I know they're
24   like right next to him, get out of my way.  You know and
25   like...
26 LB: Was it more like a shove or a push as opposed to...
27 CJ: It was yeah.  Yeah it wouldn't no... you know knock out no.

                              23

02599

1      It was like a shove to get 'em out of the way.

2  LB:  Okay.

3  CJ:  And... Andrew was a little baby so he was never in his way.

4      James was... oh no I want to be around his dad... so he was

5      always in his way.  James was.

6  LB:  Okay.

7  CJ:  Brandy was... I don't know she's...

8  LB:  Now... you also say in that same page of your statement, that

9      sometimes it was more than a spank that he would over due it

10     with the kids?

11  CJ:  Yeah that's what I'm saying.  You know like when he was mad he

12     was like... I don't know to me... when we were growing up you

13     know we got a spanking, it was a spanking for if you did

14     something wrong.  Well he had me know he wanted to do it when

15     he was mad.  You know that's what I meant by that.

16  LB:  And did he?

17  CJ:  Oh not recently after you know... prior to that he did.

18  LB:  Prior to what?

19  CJ:  To... the last year.  Okay the last year (inaudible) told

20     him... he hurt himself and not the kids.

21  LB:  Okay.

22  CJ:  Yeah.

23  LB:  So another words in...

24  CJ:  (Inaudible)...

25  LB:  ...(inaudible)...

26  CJ:  You know that was like years before you know... me and his

27     separation.  But he had already gotten over wanting to spank

28                            24

C2600

1   'em  when he was mad.

2   LB: Okay so you're...

3   CJ: See then it got to where he would just yell.  I mean he would

4   start an argument and stuff.

5   LB: So another words there were times early in your relationship,

6   where he would spank the kids when it was not for discipline,

7   it was just because he was angry?

8   CJ: Sometimes yeah.  Well they would make him mad.  They would do

9   something like he'd say don't move and they would move.  Then

10  he would you know... like I don't know... it's hard to...

11  LB: Ah... were you ever there to see him give one (1) of these

12  spankings that you say he was over doing it?

13  CJ: He hadn't done that in a long time.

14  LB: But when he did do it, you were there?

15  CJ: A couple... yeah.

16  LB: And can you describe to me... what he actually did?  That...

17  that was to you more than a spanking?

18  CJ: Well... yeah I mean for them being kids... he did leave marks

19  on them.  I mean like the belt but not bruises or nothing like

20  that and he only gave 'em three (3) swats.  But he was like

21  his anger... I don't know just like swat down on them with the

22  belt.

23  LB: On what part of their body?

24  CJ: Their butt.

25  LB: Always?

26  CJ: Yeah and sometimes they would move out of the way and he would

27  like get their arm or something like that.  You know but... he

28

25

1  never like continuously hit them and hit them and hit them,
2  no.  The most he ever did like I said was like three (3) swats
3  and me and him got into a lot of arguments about it and he got
4  to where he wouldn't even spank the kids.  You know because
5  that was a time Brandy had the... and that was like... I don't
6  know...

7  LB: Okay.  So you think... have... how many years do you think
8  it's been since he ah... spanked out of control like that?

9  CJ: That I know him... (pause) I'd say about... five (5) years,
10  six (6) years.  At least six (6) years.

11  LB: Okay.  So that would be about two (2) years before you
12  separated?

13  CJ: Yeah.

14  LB: Okay.  (Pause)  Did the kids ever to see the doctor because of
15  any of that?

16  CJ: No.

17  LB: Did... was there ever a report to C.P.S.?

18  CJ: No.  No if my kids went to doctors it was because they're
19  running, they had stitches in their eye or ah... ah... let me
20  see... I don't know but Barry was always there at the doctors.
21  He always was there with his kids.  But then you know the last
22  part when James had seizures, he really didn't have too much
23  to do with his boys.  You know which... but his boys still
24  would love to see him.  You know they still love their dad.
25  All my kids do.

26  LB: Now ah... it says here on the top of the sixth page of your
27  statement, that when he was losing control like that, spanking

28

26

02602

1     too much that would happen every day?

2  CJ: Uh-huh.

3  LB: That's not accurate?

4  CJ: That what it says?

5  LB: It says daily.

6  CJ: No.

7  LB: How often would this happen then?  And your answer was daily?

8  CJ: No that was not daily, no, no.

9  LB: Okay.  How often do you think it was?

10 CJ: Just like once.  Once a week or something.  But it wasn't...

11     continuously like that.  It was...

12 LB: Over how long of a period do you think that was going on?

13 CJ: Ah... I don't know it's hard to say because see there were

14     times when he was working, I was home all the time.  I had

15     been home all the time up till... Mmm... Andrew was a baby.

16     Which was like five (5) years ago and then I started working.

17 LB: Okay.

18 CJ: When he lost his job at... he... he really liked his job at

19     the ah... ah... what was it the mine out there?  He worked for

20     this guy... Jim.  And I mean and then he lost his job there

21     and that's when he just... you know...

22 LB: He got kind of depressed?

23 CJ: Got really depressed... and I don't know he just didn't care

24     no more.

25 LB: Okay.  Ah... now I'm looking at the sixth page of your

26     statement, ah... and you say that he called it a spanking but

27     you didn't call it a spanking.  You called it over doing it

28

27

02603

1      because he left bruises on their butt's.  Is that accurate?

2  CJ:  No bruises like... like belt slots.  The red marks.

3  LB:  Okay.  And in your opinion that was over doing it?

4  CJ:  Yeah.

5  LB:  Okay.

6  CJ:  'Cause see I can't sit back and watch somebody spank a kid you

7      know and not... 'cause I got spanked when I was a kid.

8  LB:  Ah... (pause) when he would... shove them out of his way, do

9      you know what part of their body... he would.. he would of

10     (inaudible)?

11  CJ:  It was usually their shoulder or... most of the time it was

12     their shoulder or... you know if he'd like butted over

13     something and then it would be their... their butt or

14     something.

15  LB:  Okay.  How about the head?

16  CJ:  No... actually... I know unless they were... they had...

17     leaned up at that time and he was doing that you know would

18     he... get 'em in the head or something like that.

19  LB:  So another words it might be their head but if it had been,

20     you would consider it to of been accidental?

21  CJ:  Yeah.

22  LB:  Okay.

23  CJ:  And that's when I would get up and say something.  But most of

24     the time... Barry you know wasn't there alone with the kids.

25  LB:  Okay.

26  CJ:  'Cause I know they say dad's mean or whatever you know.  He's

27     too strict or... you know so my sister would babysit.

28                     28

02604

1   LB:  Okay so there's a point where... you were not comfortable
2        leaving the kids with him?
3   CJ:  Yeah.
4   LB:  And... it wasn't... because... he was so grouchy or was it
5        because you were afraid that he would hurt them?
6   CJ:  Mmm... I don't (inaudible)... he... I don't know his bad
7        moods.  He was like... I didn't want the kids getting in... in
8        his way of what he was doing.  You know what I'm saying?
9        Kinda' like foresee what could happen.  Like you know they're
10       gonna get in the way, so you'd rather just... you know keep
11       'em out of the way and... that's how it was kinda'.
12  LB:  So you were just sort of trying to keep things...
13  CJ:  Avoid...
14  LB:  ...smooth?
15  CJ:  ...yes.  Avoid and... avoid stinks.
16  LB:  But you weren't concerned that he might... really seriously
17       hurt the kids?
18  CJ:  No, no.
19  LB:  And in fact he never did... seriously hurt any of the kids?
20  CJ:  No.  He never... uh-huh.
21  LB:  Okay.  (Pause)  Ah... up until the time Barry got arrested,
22       when was the last time that Brandy lived with you?
23  CJ:  Ah... she had lived with Larry and Barry for like the last
24       couple of years.
25  LB:  Okay.
26  CJ:  Okay.
27  LB:  And why was that decision made?
28                                    29

1  CJ:  Okay see I was working and I was... weren't getting no money

2  from none of them guys okay? And I had three (3) kids I was

3  taking care of and I was staying in a little motel with my

4  sister. We didn't even have a bed to our own. Okay? And I

5  was working and... I don't know I would work late at night and

6  come home and she... she had no discipline, she had no nothing

7  so I... her Uncle Larry had a four (4) bedroom house. Okay

8  and I asked Larry you know, would you mind taking her for

9  awhile because honestly she's starting a lot of trouble, she's

10  hanging out with gangs. I mean she was like nine (9) years

11  old and she's... I come home from work and she'd still be

12  outside. I mean this was like eight (8), nine o'clock (9:00)

13  at night. And... they... the managers wanted to call the cops

14  on her because she was stealing and so... I don't know I just

15  thought it for the best nature for me not to get all the kids

16  taken away you know because they were still small, that I

17  would let her go stay with at her Uncle's.

18  LB:  Okay.  And you thought that, that was in Brandy's best

19  interest?

20  CJ:  Yes I did.

21  LB:  Ah... did you have any concerns, you mentioned earlier that

22  Larry was kind of violent.  Were you concerned for Brandy's

23  safety?

24  CJ:  Ah... no because see he never touched my kids.  The whole

25  time.  I have known him... shoot I've known him ever since I

26  was seventeen (17) and he's... other than his kid, you know

27  did he spank.  Larry was the one (1) that had the violent

02606

```
 1      temper.
 2  LB: Okay.  And... did you have any concerns ah... for Brandy...
 3      being with Barry?  That she might not be safe?
 4  CJ: No because I kept checking up on 'em and... you know
 5      Christmas, Birthdays, all that and like I said she was always
 6      okay.  He would always let her come with me and I would leave
 7      the boys there and... I don't know she... it was okay.
 8  LB: Did any of the kids ever tell you that when they were alone
 9      with Barry that he did something inappropriate?
10  CJ: No.
11  LB: Either sexually or physically?
12  CJ: No not after we separated, no.
13  LB: Okay.  And not before you separated either?
14  CJ: No.
15  LB: Okay.
16  CJ: No sexual was never uh-huh.  Matter of fact they didn't even
17      see their dad naked or... or see him in the bath tub or in the
18      bathroom or nothing.
19  LB: Okay.  And ah... I know this is a little bit personal but do
20      you consider that you and Barry had ah... normal sex...
21  CJ: Yeah we did.
22  LB: Okay.  (Pause)
23  CJ: You're a pretty fast writer aren't you?
24  LB: (Inaudible).  (Pause)  Okay and now I'm looking at the top of
25      page twelve (12)... and it says is it fair to say that you
26      still have some feelings for him referring to Barry.
27  CJ: Ah-huh.
28                    31
```

02607

1   LB: And you said no because he hurt you so much.   Did you mean

2       hurt you emotionally?

3   CJ: Emotionally yes.

4   LB: And... as you're sitting here today you're telling us that you

5       do have some feelings for him.  Were you in a different state

6       of mind when you gave this?

7   CJ: Yeah I was.  See back then you know... I know he never really

8       hurt me, still seeing the kids and I had moved away and you

9       know and we never fought or argued like that.   But I still

10      remember you know the girls he slept with and he went out with

11      and... I mean just years and years and years you know.

12      Sometimes like mental abuse is you know worse than physical

13      abuse.

14  LB: That's certainly true.

15  CJ: You know.

16  LB: So is it fair to say that when you gave this statement, you

17      were feeling some animosity towards him?

18  CJ: Yes I was feeling a lot different 'cause it was when I found

19      out he... had been charged with that and... I was real

20      emotional... and I had just been foreseeing the camera people

21      thinking I was this girl Angela and... you know and it was

22      just and then looking on the front page and seeing your

23      husband you know... I couldn't q... quit crying I just...

24  LB: Ah... did the police say anything to you to try to convince

25      you that Barry was guilty of this crimes charged with?

26  CJ: No ah... I says well why... 'cause they hadn't let Angela out

27      or they hadn't arrested her, and I says well come on she's the

28                          32

1    mom, how can mom... how can a mom let somebody do something

2    like that and not (inaudible) and that's when he says oh she's

3    gonna be arrested or she's gonna be... or something like that

4    and then that next day she got arrested.   (Pause)   'Cause I

5    just you know could not picture Barry... till this day I still

6    cannot you know picture him being like that.   And I figured

7    you know my kids... mu kids have so much trust in him and

8    say... and Brandy says my... my dad didn't do that.   Mom my

9    dad you know never hurt her or this or that.   I mean

10   somebody's got to stand up for their kids you know for their

11   dad.

12  LB:  Ah... did Brandy talk to you at all about what... what

13       (inaudible) might of happened?

14  CJ:  Ah... she did some things but like I say she's a compulsive

15       liar.   Okay?   She was more afraid of her Uncle Larry than she

16       was her dad.   If she even thought her Uncle Larry was

17       coming... she... there were times where she... when I first

18       got her back she was afraid to go in the bathroom.   She would

19       not go in... she would not use... she would sit there and pea

20       her pants just so she didn't have to go to the bathroom.

21  LB:  And you don't think that, that's because Larry ever abused her

22       in any way?

23  CJ:  Well... on the report ah... Larry had taken showers with...

24       the kids.   And Leanne knew about it and didn't l... say

25       nothing and Larry says that they were all in there together.

26       That they all had shorts on.   Okay but I didn't find this out

27       till after the C.P.S. started questioning Brandy.

28

02609

1  LB:  Ah-huh.

2  CJ:  And then... I don't know she always... she was afraid of her

3       Uncle Larry.   Every time she thought... she would run and

4  hide.      She would... and then she was afraid to even sit on the

5       toilet.  You would have to be in there with her for like the

6       first six (6) months that I got her back.  She would not... I

7       don't know she was just... not...

8  LB:  And... do you have any concerns that this had anything to do

9       with something that Barry did to her?

10 CJ:  No because see she's... she always referred to her Uncle

11      Larry.  Like she said one (1) night she woke up and her... she

12      remembers seeing her Uncle Larry naked beside her or something

13      and... she's like where's my mom, where's my mom and she

14      starts running towards the door 'cause they're in their house

15      over there... and I guess Larry runs after her or something

16      and... he says no you can't wake up your mom, you can't tell

17      your mom or something like that... and go back to bed or

18      something like that.  And... I know I guess this is things

19      that happened whenever she was living with Larry.  And she

20      says that Larry threatened her.  The day... the night before

21      she came to me... when I got her back and said you better not

22      say nothing or you know else I'm coming to get you or

23      something.

24 LB:  Was he referring to you better not say anything about him or

25      about Barry?

26 CJ:  About him or Barry I have no idea.  Because I wanted to get

27      her hypnotized.  I wanted to get Brandy hypnotized because

28                              34

1  like I said, you can't believe everything she says.  Okay and
2  she... I don't know she would write these like letters... I
3  mean the way she wrote 'em you would think that she would have
4  studied it on t.v. or read it in a book like Aids ah... sexual
5  molestation, rape, (inaudible), things like that.  Like she
6  referred it to Rachel, the baby that died.  Okay, C.P.S. has
7  records of these letters.
8  LB:  Another words... Brandy... wrote letters talking about
9  molestation that referred to Rachel?
10 CJ:  Ah-huh.  Well... not ref... but I mean the way I see it is
11 like... I know she... it took her like five (5) minutes and
12 she would say... Aids ah...
13 AM:  Great.  (Inaudible).
14 LB:  One (1) second.
15 (OFF TAPE)
16 (BACK ON TAPE)
17 CJ:  Sit there and write ah... I mean a two (2) page letter in like
18 five (5) minutes and make it sound like it came out of a book
19 or something.
20 LB:  When did she write these letters?
21 CJ:  When I first got her back.  The first month that I had gotten
22 her back.  Which was...
23 LB:  Another words... May of 1994?
24 CJ:  May... yeah.
25 LB:  Ah... and what made you turn those letters over to C.P.S.?
26 CJ:  I don't know because at the time you know this is when she was
27 afraid to go the bathroom.  She was hiding out from her Uncle
28                                    35

02611

1   Larry. And you would read these letters... my Uncle Chris had

2   worked with ah... had worked in a ah... boy's home okay so we

3   had a little bit of training in ah... problems with kids and

4   stuff okay? So I let him see the letters okay and he said

5   yeah he says you know unless they... they been around it or

6   they... oh or know not would they... would she know how to sit

7   there and write a letter like that. Just like... like her

8   opinion of rape, or her opinion of... I mean if somebody in

9   your family rapes you it's okay, it's not your fault. The

10  person that's doing it, it's their fault. You know letter...

11  things like that.

12  LB:  Did she give you any kind of indication where she'd heard that

13       stuff? Whether it was something in school or...

14  CJ:  She says school.

15  LB:  Do you have copies of those letters?

16  CJ:  The C.P.S. does.

17  LB:  Do you remember specifically the name of the person that you

18       turned them over to?

19  CJ:  Ah... yeah her name is Barbara ah... I have her card a matter

20       of fact. Ah... Barbara ah... she's a State Appointed C.P.S.

21       for Phoenix.

22  LB:  Okay.

23  CJ:  Ah... Barbara... shoot.

24  LB:  Maybe when we're done with this you could...

25  CJ:  Yeah.

26  LB:  ...let us have a copy of the card.

27  CJ:  Yeah there's like three (3) letters.

28                        36

1  LB:  Okay.

2  CJ:  Yeah.

3  LB:  Ah... did Brandy ever specifically talk to you about Barry

4       harming Rachel?

5  CJ:  No.  But ah... after she came back I seen her doing things

6       that he had done when I... when I (inaudible) give him

7       treatment.  Like pulling out her hair or saying I want to die

8       or... you know and that's how it was with Brandy when I got

9       her back.

10 LB:  Okay she was pretty depressed?

11 CJ:  She was I mean out of control, depressed, peaing in her pants,

12      ah...

13 LB:  But she didn't talk to you... about anything that you think

14      might have caused of that?

15 CJ:  No I kept asking her.  I even... she was going to C.P.S.,

16      counselors, all that and... and the C.P.S. worker you know

17      thinks that she had may... may of been touched you know but

18      she wouldn't sure and... then they had a State Psychologist

19      come in and talk to her and say well don't... it's okay let

20      her be... let her wait till she's grown up and then all these

21      problems that come out and... I believer her, I believe

22      everything she says and... you know so it was more damage than

23      it was doing her good by... by them doing... I mean meeting

24      all these strangers.  It was hard for her.

25 LB:  Okay.  (Long Pause)  Is there anything else that... that you

26      think is significant or anything that's... important to this

27      case that I haven't asked you about?

28                              37

1  CJ: Oh no, other than you know... how you can feel different you
2      know from one (1) time to the next and... like you know if
3      you don't stand by your kids when they feel like their dad is
4      innocent you know then who's going to?  Because their Uncle
5      Philip or Rose or the Grandma, none of the family has nothing
6      to do with the kids... and I just want Barry to know that...
7      I don't know... well we're going to support him and all that
8      you know 'cause the kids want to.  And... I just can't see him
9      as a person they're saying he is.  I can't remember him like
10     that.  I remember him the way... you know when... last time I
11     seen him.
12 LB: So have you had an opportunity at all to see him?
13 CJ: Uh-huh.
14 LB: And you've spoken to him only once in this past...
15 CJ: Ah-huh.
16 LB: ...almost year?  And so have your kids had a chance to see
17     him?
18 CJ: Brandy has.
19 LB: Okay that was when...
20 CJ: They talked to him on the phone...
21 LB: ...Rose took him?  Took...
22 CJ: Yeah.
23 LB: Okay and the boys haven't seen him?
24 CJ: Uh-huh.
25 LB: Have you been in touch through the mail?  Have you written to
26     him or has he written to you?
27 CJ: He... he's written to us yeah.  He's written to the boys.
28                              38

02614

1  LB:  Okay.  Alright...

2  CJ:  Yeah a matter of fact he writes each one of 'em a letter

3       and... I don't think he know a lot of the things that's going

4       on you know... out here about the trial or his car and... and

5       how his Uncle Phil... how Philip's got power... Power of

6       Attorney but is not using it wisely.  You know he's... I don't

7       know.  All... I feel like the kids are being... hurt most of

8       all through this whole trial... because... see Rose, Philip

9       and Leanne (inaudible) are taken everything that belonged to

10      Barry... and his kids, out of that trailer.  Ah... threaten to

11      call the cops on his own kids if they go in the trailer park.

12      Go through my personal things that we have there.  Pictures

13      just stomped all over the ground.  Ah... I've had to call the

14      cops on Philip you know 'cause he's beating up on Debbie

15      and...

16  LB:  Who's Debbie?

17  CJ:  His wife.  See and when I told Barry, I said who's... who's

18      got Power of Attorney over you?  I mean this thing should

19      be... belong to the kids.  I mean that trailer's still ours.

20      He's... he's letting who knows live in that trailer.  They've

21      torn up that trailer so much.  Rose... I've had to throw

22      people out of that trailer because Rose won't do it.  I mean

23      and I'm not gonna sit back and I'm gonna be locked out... I

24      mean until my kids... she's gonna call the cops on 'em if

25      they... if they come to that trailer and that's... that's

26      their trailer.  Yeah and I mean... she won't get out, she

27      won't leave and whenever I told... talk to Barry, that's when

28                                     39

|   |   |   |
|---|---|---|
| 1 |     | they started making trouble for me.  Called C.P.S. on me, my |
| 2 |     | kids were take away.  Ah... I don't know just... |
| 3 | LB: | Hard times that's for sure.  Okay well ah... you understand |
| 4 |     | that you're still under Subpoena? |
| 5 | CJ: | Yeah. |
| 6 | LB: | Okay and that you need to sort of stick around and stay in |
| 7 |     | touch with Arlene? |
| 8 | CJ: | Okay. |
| 9 | LB: | (Inaudible). |
| 10 | AM: | I forgot to give you my... card but I'm gonna give you this |
| 11 |     | paper with my phone number on it. |
| 12 | CJ: | Okay. |
| 13 | AM: | And if you called me Tuesday. |
| 14 | CJ: | Tuesday okay. |
| 15 | AM: | Ah... you're not gonna be needed to testify Tuesday.  It will |
| 16 |     | be some time within the next couple of weeks though. |
| 17 | CJ: | Okay. |
| 18 | AM: | Okay? |
| 19 | LB: | Okay (inaudible)... |
| 20 | CJ: | Yeah I was thinking about... taking vacation up to Globe. |
| 21 | AM: | Don't do it now. |
| 22 | CJ: | Okay 'cause... |
| 23 | LB: | Not... |
| 24 | CJ: | No? |
| 25 | LB: | ...right now though. |
| 26 | CJ: | Stay here?  Okay. |
| 27 | LB: | Okay the time is now 1:35 and this concludes the interview |
| 28 |     | 40 |

02616

1    with Carol Jones.

2                              [END OF INTERVIEW]

3

4  [Transcriber's Certification Follows:]

5

6                              I certify that, to the best of my
                               ability, the foregoing is a true and
7                              accurate     transcription    of     the
                               original tape recorded conversation
8                              in the case referenced on page 1.

9                              Transcription Completed:

10  April 1, 1995

11                             MICHELLE RAMIREZ LEGAL MEMORANDUM &
                               TRANSCRIPTION SERVICES

12

13                             BY: _Michelle B. Ramirez_

14                                  MICHELLE RAMIREZ / NOTARY PUBLIC

15                             My Commission Expires 07/27/97

16

17

18

19

20

21

22

23

24

25

26

27

28                                          41

**Exhibit 60**

# Declaration of Elisha Lacey

I, Elisha Lacey, declare, as follows:

I am twenty-two years old, married, and the mother of three year old son.

When I was around ten years old my family and I met Barry Jones while we were leaving in Tucson, AZ. My mother, Joyce Richmond, and Barry were good friends and then became romantically involved. Mom and I lived with Barry and his daughter, Brandie, on and off for the next few years.

Even though Barry already had a daughter and they were very close, he found room in his heart for me. Barry has always treated me as though I were his own and I consider him my "dad" to this day.

Barry often took care of Brandie and I and was the father figure of the house. He was very fair with us, grounding us and talking to us. He was never mean or abusive to either Brandie or I.

All the kids in the neighborhood loved Barry because he was helpful and good to them. All the girls had wicked crushes on him and Brandie and I were proud of him.

When we disobeyed Barry would usually send us to our room. We would not be able to come out for ten or fifteen minutes. Even when the time was up, he would not un-round us until each one of us could tell him what we learned.

When I started smoking Barry told me I would have to read a section of a book every time he caught me. It didn't stop me from smoking but Barry tried.

Barry has never stopped being a father to me. He writes to me often, advises me, consoles me and still treats me like his very own. I know how Barry is with children and with little girls and I know he could never have hurt Rachel Gray. Barry would never hurt a child, especially not sexually.

In fact, Barry was the one who always tried to protect the girls in the park from all the perverts who lived there. When Steven Fernandez made a comment to Brandie and another girl that he would like to take them to bed if they were older, Barry went right over and got in his face and told him he better never say anything like that again, and that he had to speak to us with respect.

A grown man whose name was Kent tried to get in bed with me one night. He said he thought I was my mother, but he know it was me. The old man, Bob, who lived right across from Barry was always trying to feel us up. Barry even called the police on him. One of the grossest was a guy named Ken who we saw trying to have sex with my sister's dog.

One of the men who was always around was Ron St. Charles. Ron had married a woman name Rosemary who had a daughter my age named Ruthie. Ruthie and I were friends. Ruthie told me Ron was having intercourse with her. Just last year I saw Ruthie again. She and her step-father were married and she had just had his son.

One boy we were all afraid of was Rachel's brother Jon. Jon was my age (14) at the time, but he was retarded or something. Jon constantly chased the girls in the park. He grabbed our breasts or bottoms or grabbed us in the crotch. He was very rough. And he went after the little girls as well as those of us who were a little older.

I was very disappointed I was not allowed to testify at Barry's trial. The prosecution wanted me to say how mean he was but I would not lie. Even though I wanted people to hear the good things about him nobody seemed to care. Barry's own lawyers did not put me on.

I swear, under penalty of the laws of the state of Oklahoma and of the United states of America, that the foregoing is true and correct.

Executed on _10-25-02_

_Elisha Lacey_
Elisha Lacey

_Witness_

-2-

**Exhibit 61**

10-23-2002      04:13:58 PM                                    WHITTEN, DONNA

# CASE NOTES

**CASE NAME:** JONES, CAROL                          **CASE ID:**  117982

**CONTACT DATE:**  1/22/2001                           **TIME:**       8:30:00AM

**NOTE TYPE:**   TRANSFER SUMMARY                 **CONTACT TYPE:** OTHER

**IN PLACEMENT CONTACT:**  NO

**CONTACT WITH**                           **CONTACT ABOUT**

                                           ABSHIER, MONA
                                           GARNER, AMBER
                                           GARNER, JOSEPH
                                           GARNER, JOSEPH
                                           JONES, ANDREW
                                           JONES, CAROL
                                           JONES, JAMES
                                           ROLLINS, ALICIA

**NOTE CREATED DATE:**  1/22/2001    **TIME:**  10:00:35AM
**AUTHOR:**   DIXON, PATRICIA M
**TITLE:**    CHILD PROTECTIVE SERVICES SPECIALIST III
THIS IS A TRANSFER SUMMARY FOR CHILDS CASE # 117982 WITH THE CASE NAME OF CAROL JONES. THE CHILDREN IN THIS CASE ARE: JAMES JONES, AGE 15, ANDREW JONES, AGE 12, ALISIA ROLLINS, AGE 07, JOSEPH GARNER, AGE 4, AND AMBER GARNER, AGE 2. ANDREW AND JAMES'S FATHER IS BERRY JONES AND IS CURRENTLY INCARCERATED IN FLORENCE FOR THE MOLEST AND MURDER OF A FOUR Y.O. GIRL. HE AWAITS THE DEATH PENALTY. ALICIA ROLLINS' FATHER IS SHAWN RUTHERFORD AND PUBLICATION HAS BEEN MADE WITH NO RESULTS IN LOCATING HIM. THE CHILDREN JOSEPH AND AMBER CURRENTLY LIVE WITH THEIR FATHER, JOSEPH GARNER AND THIS DEPENDENCY WILL BE DISMISSED WHEN LEGAL CUSTODY IS ESTABLISHED FOR THE FATHER. ALL OF THE ABOVE PARTICIPANTS EXCEPT JAMES JONES) LIVE TOGETHER WITH MONA ABSHIRE, (SISTER OF JOSEPH GARNER) AND HER HUSBAND SHAWN AND THE GRANDMOTHER PEGGY.

CUSTODY OF THE CHILDREN OCCURRED ON 08/00 AND ANDREW, ALICIA, AND AMBER WERE PLACED INTO FOSTER CARE HOMES. LATER, THE ABSHIRES SECURED A NEW HOME LARGE ENOUGH FOR THE CHILDREN TO LIVE WITH THEM AND THE COURT ALLOWED THE TRANSFER TO THIS HOME AFTER A HOME STUDY WAS COMPLETED.

SINCE THIS PLACEMENT, THE CHILDREN ARE REPORTED AS DOING WELL AND WITHOUT SPECIAL INCIDENT. ANDREW IS STILL TRYING TO RESOLVE HIS PENDING SENTENCING FOR THE ROBBERY HE COMMITTED WITH HIS BROTHER JAMES. THE COURT DATES HAVE BEEN CANCELLED THREE TIMES DUE TO ATTY. CONFLICTS. A NEW DATE HAS NOT BEEN ASSIGNED AS OF THIS WRITING.

ALICIA HAS HAD HEAD LICE PROBLEMS IN THE PAST BUT IT SEEMS UNDER CONTROL AT THIS TIME. SHE IS BEHIND IN HER ACADEMIC STUDIES BUT IS SHOWING GREAT IMPROVEMENT. AT THE TIME OF CPS CUSTODY, LISA DID NOT KNOW HER COLORS, HOW TO TIE HER SHOES, AND OTHER BASIC TASKS. SHE IS LEARNING QUICKLY. A PSY. EVAL WAS COMPLETED BY DR SAZLO AND IS IN THE FILE. SHE IS SEEING BERT RAPIER AS COUNSELOR BUT BERT WILL TRANSFER THE CASE TO LORAIN LAMBIE WITHIN THE NEXT MONTH DUE TO LISA NEEDING EXTENSIVE ART THERAPY AS MOLEST IS NOW COMING OUT FROM LISA'S MEMORIES. LISA DOES NOT SHOW ANY HEALTH PROBLEMS AT THIS TIME.

11/7/02 CPS BJ
Barry Lee Jones
00157

10-23-2002        04:13:58 PM                                    WHITTEN, DONNA

ANDREW IS BEHIND IN HIS ACADEMIC SKILLS BUT IS ALSO IMPROVING. HE HAS HAD NO REPORT OF HEALTH PROBLEMS AND IS SEEING DON THOMAS AS HIS COUNSELOR. HIS BEHAVIOR HAD ADAPTED TO THE RULES OF THE HOME AND NO ACTING OUT HAS BEEN REPORTED BY THE ABSHIRES.

JAMES IS CURRENTLY IN THE SAFFORD DETENTION CENTER WITH A RELEASE DATE OF 02/24/2001. HE HAS BEEN GREATLY INFLUENCED BY HIS MOTHER AND PLANS TO JOIN HER WHEN HE IS RELEASED. THIS IS NOT THE CPS PLAN AND IS VIEWED A DISASTROUS FOR JAMES. IT IS RECOMMENDED AT THE RECENT STAFFING FOR JAMES THAT HE BE PLACED INTO A SECURE FACILITY THAT OFFERS EDUCATION ON SITE. THIS IS NOT DUE PARTICULARLY BECAUSE OF JAMES' BEHAVIOR BUT TO FORCE HIM TO FOCUS ON HIS PROBLEM AND LET GO OF HIS FEELING OF BEING RESPONSIBLE FOR HIS SIBLINGS. HE HAS BEEN THE 'PARENT' OF THE OTHER CHILDREN AND SEEM TO NEED THAT INVOLVEMENT. HOWEVER, HE NEEDS TO DEVELOP LIFE SKILLS FOR HIS IMPROVEMENT. A PSYCHO/EDUCATION EVALUATION WAS COMPLETED BY DR. CAMPBELL AND A PSY. EVAL BY DR. MOSCO IS SCHEDULED FOR 02/01/2001. INFORMATION HAS BEEN SENT TO PEGGY GARCIA AT YDI IN ATTEMPT TO HAVE JAMES NAME PLACE ON THEIR ELIGIBILITY LIST FOR PLACEMENT. JAMES HAS A HISTORY OF SEIZURES (NONE IN THE PAST TWO YEARS), DENTAL PROBLEMS, AND IS ON MEDICATION FOR A SKIN PROBLEM.

THE MOTHER CAROL JONES HAS NOT CONTACTED THIS OFFICE AS OF THIS WRITING TO MAKE ARRANGEMENTS TO SEE HER CHILDREN. SHE REPORTEDLY CAME TO MONA'S HOME DURING THE CHRISTMAS HOLIDAY BUT THE CHILDREN RAN INTO THE HOUSE AND ASKED 'DO WE HAVE TO GO WITH HER?' MONA IS VERY PROTECTIVE OF THE CHILDREN AND DOES A GOOD JOB MONITORING WHO HAS CONTACT WITH THEM. CAROL HAD NO CONTACT WITH THEM THAT NIGHT. CAROL HAS MADE SEVERAL CONTACTS WITH JAMES IN DETENTION IN SPITE OF THIS WORKER PLACING HER ON THE NO CONTACT LIST AT THE CENTER. ALL PHONE CALLS TO JAMES IS BEING MONITORED TO PREVENT THE MOTHER 'S CONTACT.

## COMMENTS

**COMMENT CREATED DATE:**   1/22/2001   **TIME:**   10:42:27AM
**AUTHOR:**    DIXON, PATRICIA M
**TITLE:**    CHILD PROTECTIVE SERVICES SPECIALIST III
IT IS IMPORTANT THAT CAROL DOES NOT HAVE CONTACT WITH THE CHILDREN UNTIL SHE MEETS WITH THIS AGENCY AND BECOMES PART OF THE CASE PLAN  BECAUSE SHE IS STILL LIVING A DESTRUCTIVE LIFE STYLE AND THIS WOULD DISRUPT THE PROGRESS THE CHILDREN HAVE MADE DURING THE PAST MONTHS.

THERE WAS AN FCRB REVIEW ON 01/18/2001 AND THEY ARE OPPOSING THE CASE PLAN OF REUNIFICATION OF THE CHILDREN TO THE PARENT AND ADVOCATING THE GUARDIANSHIP OF THE CHILDREN BY THE ABSHIRE FAMILY WHICH IS THE CONCURRENT CASE PLAN GOAL. THERE IS NO ASSIGN COURT DATE FOR REVIEW AT THIS TIME.

### End of Case Notes and Comments

11/7/02 CPS BJ
Barry Lee Jones
00158

10-23-2002       04:08:33 PM                                      WHITTEN, DONNA

# CASE NOTES

**CASE NAME:** JONES, CAROL                    **CASE ID:**  117982

**CONTACT DATE:**  3/19/2002                     **TIME:**       1:30:00PM

**NOTE TYPE:**   CLOSING SUMMARY                 **CONTACT TYPE:**   OTHER

**IN PLACEMENT CONTACT:**   NO

**CONTACT WITH**                                 **CONTACT ABOUT**

HOWARD, LINDA, L.                                ABSHIER, MONA
                                                 GARNER, JOSEPH
                                                 JONES JOHN, DOE
                                                 JONES, ANDREW
                                                 JONES, BARRY
                                                 JONES, CAROL
                                                 JONES, JAMES
                                                 NEWMAN, SHAUN
                                                 ROLLINS, ALICIA

**NOTE CREATED DATE:**  3/19/2002   **TIME:**  2:37:57PM

**AUTHOR:**   HOWARD, LINDA
**TITLE:**    CHILD PROTECTIVE SERVICES SPECIALIST II

In a response to a hot line investigation the Jones children were found neglected, unsupervised and without food in their mobile home. There had been several prior calls with the same allegations. In August 2000, the children were removed from the care of their mother and placed in the care and custody of CPS. After a period of placements, the Abshire family felt that they should be there for the Jones kids. Mr. Abshire's brother Joseph Garner, had lived with Ms. Jones and the parent of the two youngest children. He had already taken his two chldren to live with him. This is how the relationship started. Mr. Abshire felt love and a connection to the older children. So, his brother and his wife decided to take the children and raise them if they could. This was only accomplished after the Absire family made made significant changes in their life style. They past UA's for and extended period of time and were asked to clean up their records with the police. Today in court Mr. Abshish anounced that his record is clean. Ms. Jones never ever showed any interest in her children or the Case Plan.

There were problems with James the oldest child. (16) He had charges aganist him for theift and using drugs. He spent time in the Cayon State Acadamy. He was released on his recommended release date because he did so well. He went to school and took classess for his GED which he has attemped to pass and is still trying. He has a job and is doing well there. He is almost off his intense probation. He is deligently paying his resitution. Things are looking good for James.

Andrew Jones is 12 years-old. He is trying to have perfect attendence at school and be on the honor roll in Solomon. He is doing well.

Alicia who was the most abused, has changed the most. She was loud and out of control. Now she has calmed herself and is more like a normal child. She is doing well in school also.

Jeff Jorgensen is the counselor for the two boys and it is still important that he continue with that service.

All three of the children are in good health. Although Lisa had broken her leg it is now healing and half the cast is off. She is doing well with the leg.

Gary Griffith is the Lawyer for Carol Jones and he will be out of the picture from now on out. Wendell Hughs was Barry Jones

10-23-2002        04:08:33 PM                                    WHITTEN, DONNA

Lawyer and he has stepped out also.  Josi Lopez is the Attorney for Joseph Garner.  Judith Hieser is the GAL.

On this day Carol Jones and Barry Jones parental rights were severed and this case is moving to the Adoption Unit.

## COMMENTS

**COMMENT CREATED DATE:**   10/23/2002 **TIME:**  4:09:48PM
**AUTHOR:**    No Author
**TITLE:**    No Title
No comments at this time

### End of Case Notes and Comments

**11/7/02 CPS BJ**
**Barry Lee Jones**
**00086**

**Exhibit 62**

4/29/95

Your Honor:

I am writing to you concerning the case of Angela Gray. She is my sister, Rachel was my niece. I am concerned about the fact that much relevant information was not considered during her trial, as well as many untruths that were left unchallenged. I am asking that you consider these things now.

To begin with, I think it is important that this was not an isolated instance of poor judgment in choosing a partner. Angie has a history of involvement with physically abusive men who have drug and or alcohol problems. In her own words, she finds these men "exciting" and selects them over more stable "boring" men. She has never once shown the slightest concern for the possible danger she was putting her children in, or for the example she was setting. She was aware of how risky her lifestyle was, I personally discussed it with her numerous times, and yet she consistently surrounded herself with people of very questionable character, and continuously left her children in these people's care. As always, she chose herself and her own personal vanity over any needs her children might have, including their safety. I cannot adequately express the extreme nature of the people Angie associated with.

Angie professed during an interview that she had always prided herself on being a good mother. It utterly amazes me that she would have the audacity to make such a claim. Angie is about the worst mother anyone could imagine. Her home and all of the children were constantly filthy, in the true meaning of the word. Often, the places she choose to stay were more than filthy and actually bordered on dangerous. The children were starved for attention as Angie could never drag herself off the couch to pay them any attention at all. She did not cook for them, clean the house for them, clean them, provide them with decent clothes, read to them , provide them with medical care, pay attention to their schoolwork, know the people she left them with or anything else you would expect a mother to do for her children. The only thing Angie ever did for her children is give birth to them.

I am not the one to tell you of the enormity of the problems that Jonathan and Rebecca suffer due to the abuse and neglect at the hands of Angie and her friends. My Aunt Donna, who has provided them with the first home they have ever known, is better able to relate those to you. Again, I am asking that you take what she has to offer into consideration.

This was also not the first time that Angie has ignored her children's need for immediate medical care. When Rebecca was a baby, she became ill with a flu or infection of some sort. Angie refused to seek medical care, even though the need was obvious and was suggested to her by others, including myself. I finally decided that Rebecca needed to go to the hospital regardless what Angie said. I took her myself. At the emergency room the doctor informed us that without medical attention she would have been dead in the morning. The same doctor also informed us that the reason she had become so sick was that Angie was not keeping Rebecca clean and she was therefore constantly reinfecting herself. On another occasion I stopped by the house to find Rebecca on the couch, very ill.

She was extremely hot. Angie had not done anything for her, and was completely unconcerned. I insisted that we take Rebecca in. Her fever was 106+ and she required medical care.

Angie was always equally unconcerned about regular medical care. The children never saw a doctor for anything. Very much neglected was Jonnie's deafness. Jonnie receives SSI to pay for hearing aids, TDD equipment, therapy, training, etc. However, 90% of the time Jonnie did not have hearing aids or batteries for them, and he never had anything else to help him with his disability. Why? Because Angie spent all the money meant to pay for the extras that Jonnie needed to support herself. She could not be bothered to go to work. And even having spent all of Jonnie's money on herself, she still could have managed to provide for him but she could not be bothered to contact the appropriate agencies, fill out the necessary paperwork, keep the appointments etc. She received welfare on and off, but was often taken off, again, for not bothering to comply.

Another claim that Angie made during her interview was that she was severely physically abused as a child, often ended up in the hospital as a result, and has scars all over her body to prove it. That is a blatant lie and it infuriates me that she would make up such a story to excuse her own failure as a parent. Another blatant lie she told to excuse her reprehensible behavior was that she has "three kinds of cancer" that is too far along too treat. She has been claiming that for about 10 years, always to explain why she cannot work or why she sleeps all day and cannot be bothered to attend to her children.

Rachel's death was not a unforeseen, unavoidable, accidental situation. When I received the call from the hospital telling me that Rachel had had an accident, I knew what had happened. I have been waiting for that call for years, although I never allowed myself to imagine anything this severe. I have talked to Angie over and over and over about her lifestyle and how she was endangering her children. I have provided support, both emotionally and financially. I have helped Angie into better situations where she had a chance to start over, only to see her take advantage and return to her old life. Angie chose this life, and as far as I am concerned she chose Rachel's death. This is how she wanted to live, the kind of men she wanted in her life, and she never gave a damn how it might affect her children. She knew what she was setting her children up for, and she did it anyway. This is not a case of a mother not being smart enough to adequately judge a situation. This is a case of a mother being perfectly aware of what she was choosing, but doing it anyway because she only is concerned for herself. Angie has consitently shown only concern for herself, never for her children. She has consistently made choies that prefer her immediate desires, always conciously neglecting the needs of her children.

I believe that Angie was aware of the extent of Rachel's injuries, was aware of exactly how she had received those injuries, and chose to do nothing because she desired above all else to protect her relationship with the man who had inflicted them. She was willing, and in fact did, sacrifice her baby for the sake of keeping a boyfriend.

Thank you for your consideration.

Amanda M. Y. Gray

April 10, 1995

Dear Judge Carruth,

My name is Donna Marini and I am Angela Gray's aunt. My husband and myself have guardianship of Jonathon and Rebecca Lux.

Writing this letter has to be one of the hardest things I have ever done but feel very strongly about this matter of Angela's sentenceing I am very upset at the idea that she may get out on probation because I think that the jury made a decision without being told all the facts. The simple fact is that this was Angie's lifestyle. She has always put her needs and desires before that of her children and they have suffered greatly especially Rachel, she paid for it with her life.

The day after Rachels murder my husband went over to the trailer where they were living to see if we could get some clothes for the children. The place was so terrible and filthy that my husband was sick. There was only rice and sour milk for food with four children living there. He brought home clothes that he could only find all over the floor and after going threw them I had to throw them all away there was nothing that I could even force myself to put on the children. This was the way that they lived even before Barry Jones came in the picture.

The morning Angie brought the dead baby's body to the hospital and after Rachel had told her that Barry had done this to her she still was not concerned with the children as she sent Barry back to the trailer to take care of them. We thank God everyday that we have them. She knew that he had done this terrible thing and yet she was still going to let him take care of the other two.

During the trial of Angie, there were three more children here in this city to die under the hands of moms boyfriends. If Angie serves no time what is that telling other mothers? Mothers need to be responsible for their children's health and well being. Rachel thought mom would take care of her that was her job and Rachels life was in her hands.

She slept that day, all that day and that was very common for Angie, and while she slept her little baby was being raped and beaten. It was her responsibility for her children and because of her selfishness and lack of responsibility Rachel suffered a horrible rape and beating and died and Angie needs to see that and pay for her part in this tragedy

Never once in the past year has Angie said to any of us that she is sorry nor has she been concerned with how the children are dealing with any of this. All she has ever said is how is the children or are they behaving? I am not babysitting for

these two that have been left behind I am trying to reconstruct
their lives after all the damage.

Even after Rachels death she still was allowed to make decisions
for her. She literally signed off the babys body to a man she
knew three years earlier. A man that turned out to be a liar
and used the family. I had been making the arrangements and
Angie knew this but again she took the easy way out and never
asked any questions.

Angie needs to pay for her part in Rachels death. Little Rachel
did not get the luxury of a trial or a jury, her life and future
depended completely on mom who did not even try to get her the
help that would have saved her. I think the saddest of all is
that everyone knew that Rachel was mommies favorite, she ran
the whole house and if she allowed this to happen to her favorite
can you imagine what the other two have been through? I can
as I have been sitting in every week for the past year on
counseling sessions and at night when the nightmares begin.


                    Thank You Donna Marini

4/6/95

Dear Judge Carruth

I want my mom to stay in jail because she was always beating me up. My mom was always hitting me with something when I was growing up. She hurt me on my neck and back

I dont want my mom looking at me. I don't want her to visit me. I prefer to stay with Donna and Tommy and live with them. I want my mom to stay in prison the rest of her life because of the abuse, drugs, cocaine, and beating people. My mom won't take Rachel to the hospital. She won't take people to the hospital when they are sick or hurt, like when she hurt me. My mom was a nurse but she won't take care of the kids.

Jonathan
Lux

[Dictated to Nancy Eldredge]

**Exhibit 63**

DW (Deborah)

# DECLARATION OF DEBBIE WHEELER

DW Deborah

I, Debbie Wheeler, declare as follows:

1.      I am Barry Jones's sister-in law, the former wife of his older brother Otis Harris.  Barry and I are as close as siblings and he refers to me as his sister.

2.      I met Otis in 1977 in Claypool, Arizona.  At the time Otis was around twenty-five (25) years old and was working as an ambulance driver.  Otis and I went out for nine (9) months.  I had a son, William (Spider), who was four years old when I met Otis.

3.      Otis and I got married in 1978, but we divorced within a year.  He was very argumentative and always had to have the last word.

4.      Although Otis did not have a problem with alcohol or drugs, he told me he used to drink a lot and used ~~marijuana~~ DW chewing tobacco when he was young.

5.      Unlike his brother, Barry was very easy going.  He and Larry, who were twenty (20) years old when I met them and they were very kind and helpful to me and my children.  I met the boys (Barry and Larry) almost as soon as I met Otis, since they all lived in the same area.  When Otis and I came back from our honeymoon, Barry and Larry had spent the weekend digging,  had leveled the ground around my house and shoveled the dirt back four feet away from the house.  I did not even know they were going to do this, but Barry and Larry said they wanted it to look nice for me



when I returned.

6.   Barry and Larry also worked at Rips' Chevron. They often fixed my car and never let me pay a penny for it. Sometimes they would pick the car up and fix it and I would not even know until it was done.

7.   Barry and Larry would often show up and chop weeds or fix things at my house. They were at my bedside when my daughter Shondra was born, and went to see Spider whenever he was hospitalized as well.

8.   Barry often stayed with my kids. I have seen Barry around children and he would never frighten or spank a child. I would not hesitate to leave children with him again, even now if he ever got out of prison. I do not believe Barry did or would do anything to hurt a child, and especially not what he is accused of doing.

9.   Larry, however, did have a temper and was pretty strict with the children. He would swat them if they misbehaved. I visited both Larry and his wife, Kim, and Barry and his wife, Carol. Larry's house was messy and dirty, the couch stunk, and the babies were usually dirty as well. In contrast, Barry and Carol always had a clean house and the children were taken care of as well.

10.   Barry and Larry hated doctors and would never go to one. Whenever they got hurt they would show up at my house to fix them up. One time they were in a car accident in which Larry went through the windshield. He had a number of



serious cuts and I did not feel I could or should try to take care of him myself. I told Barry to take Larry to the doctors but they both refused, so I did the best I could to patch him up.

11.    Barry and Larry were so close they were like one. Many times something would happen to one and the other, even if he wasn't around, would have the same thing happen to him. This happened with things like flat tires and colds. One time when Barry was not with Larry, he broke his nose. At the same time, Larry also accidently broke his nose.

12.    I remarried and moved to Missouri for a while in 1982. I was not around when Barry's daughter Brandie was born. I later returned to Arizona and got to know all the boys (Barry, Larry and Phil) and their families.

13.    Four (4) years ago, Phil was out on the streets and I let him move in with me and my family. Unfortunately, he was tweaking (from drugs) and was involved with a chop shop with his friends so I had to ask him to leave. For a while, Phil was also ~~snorting heroine.~~ *doing some sort of drugs.*

14.    *I heard that* Larry was maintaining two (2) households. He was living with both Kim *Rollins* (~~Jenkins,~~ Carol Jones' sister) and at the same time he was living with his wife, Leann.

15.    For a while, Phil was sleeping with Larry's wife Leann. I am not certain when this began or how long it went on. Phil had a wife in Mesa at the time, with



whom he had two kids, Tera and Paul.

16.    Phil moved into Barry's trailer after Barry was arrested. Inside he found a note from Brandie to Angel Gray's son Jonnie. Phil had a theory about Brandie and what happened to Rachel Gray.

17.    My daughter Shondra, who is 23 now,  knew Barry's mother, Florence Jones, as Barry's brother Otis is her father and she often visited with Grandma Jones. Shondra says her grandmother was heavy and short and always smoked and coughed. Shondra told me her grandmother was very nice with her.

18.    Shondra was aware of a time when Grandma was not so nice. She often heard Grandma and her father talk about times when she (Grandma) would not let the kids (Barry, et. al.) in the house if they lost a fight.  They had to go back out and beat the kid up first.

19.    I know that one of Florence Jones' (Grandma's) husbands was extremely prejudice and was heavily involved in the KKK. However,  I do not know if it was J. T. Harris or Jones.

20.    I am limited in the contact I can have with Barry because I am employed by the State in the Juvenile Corrections system.  Although I cannot visit Barry, I am allowed to receive calls and correspond with him.  I was offered a job with the ~~Arizona Department of Corrections~~ w/ Maricopa Co. Sheriff Office as a Detention Officer   Washington State when I returned from ~~Missouri~~ but I did

not take it because they would not allow me to talk or even write to Barry.  It paid

much more than what I am making now but I would not give up my contact with my

brother so I took the job I have now.

21.    I testified on Barry's behalf at the aggravation/mitigation hearing.

However, I only testified about Barry's care and concern for children.  I was not told

by Barry's trial counsel to talk about Barry's hard childhood, his mother's alcoholism,

or the many difficulties in his life.

I declare under penalty of perjury under the laws of the State of Arizona and

the United States that the foregoing is true and correct.

Executed on  Nov. 21           , 2002.


*Deborah Wheeler*

Debbie Wheeler
Deborah DW

**Exhibit 64**

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    1

OKAY, THIS DETECTIVE BRUCE CLARK, PIMA COUNTY SHERIFF'S
DEPARTMENT.  TODAY'S DATE IS MAY 03, 1994, THE TIME IS, UH, 1558
HOURS.  I'M PRESENTLY AT 5650 SOUTH LESLIE, SPACE NUMBER 3.  UM,
I'LL BE SPEAKING WITH A GIRL NAMED LAURA LOPEZ.  IT'S GOING TO BE
IN REFERENCE TO CASE NUMBER 940502025.  THIS IS THE RACHEL GRAY
INVESTIGATION.  NOW, ALSO PRESENT IS GONNA BE LAURA'S, UH, MOM,
NORMA, I'VE ASKED HER TO SIT IN, IS THAT OKAY WITH YOU?

LEGEND:  Q.  DET. B. CLARK          A1.  LAURA LOPEZ
                                     A2.  LAURA'S MOTHER

---

A1.  Yeah.

Q.  Okay, I'm just going to ask you to speak up just a little
    bit, remember?
A1.  Yeah.

Q.  Okay, great.  Um, Laura can you tell me what your whole name
    is?
A1.  Laura Lorena Lopez.

Q.  Okay, it's Laura Lorena Lopez?
A1.  (No response)

Q.  You got to say yes or no.
A1.  Yeah.

Q.  Okay, and how old are ya?
A1.  Eight.

Q.  You know when your birthday is?
A1.  Yeah.

Q.  When is it?
A1.  December 19, 1985.

Q.  Okay, 1985?
A1.  Yeah.

Q.  Okay, great.  And you know your address?
A1.  Yeah.

Q.  What is it?
A1.  5650 South Leslie.

Q.  South Leslie?
A1.  Mm, hm (yes).

Q.  Is that yes?

HOMICIDE\LOPEZ.L\CLARK\#3169

02533

SUPPLEMENTAL
·June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    2

A1. Yeah.

Q. Okay, don't forget you got to talk loud.  And is there an apartment number or a space number?
A1. Yeah.

Q. What is it?
A1. Three.

Q. Three, okay.  What school do you go to?
A1. Los Ninos.

Q. Okay, what grade you in?
A1. Second.

Q. All right, and who's your teacher?
A1. Ms. Gonzalez.

Q. Okay, do you like her?
A1. Yeah.

Q. Is she a nice lady?
A1. Yeah.

Q. Okay.  You like school?
A1. A little.

Q. Just a little?
A1. (No response)

Q. You got to go though, huh?
A1. Mm.

Q. Okay.  Okay, before we turned the tape on, I explained to you a little bit about, um, last Sunday, two days ago.  You went to the store with your brother and you saw something happen, is that right?
A1. Yeah.

Q. Okay.  And what I wanta do, can, can I just slide, kneel on the floor here and get a little more comfortable?
A1. (No response)

Q. And I'll just get the tape a little closer to you.  What I wanta do is talk about what you saw that day, okay.  I just wanta make sure that we're talking about the same day, okay.  So today is Tuesday and it's May 3rd, and what you saw happened two days ago, is that right.
A1. Yeah.

HOMICIDE\LOPEZ.L\CLARK\F3169

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    3

Q.  And was it on Sunday?
A1. Yeah.

Q.  So that would be May 1st, right?
A1. (No response)

Q.  Okay.  Um, what did you do during the day that day, you know
    before you saw this happen?
A1. We were playing with, uh, my mom said, um, to go to the
    store to buy sodas and, uh, gum.

Q.  Okay, and do you know, and this is Sunday, right?
A1. Yeah.

Q.  Okay.  Do you know about what time of day that was?
A1. 3:00 or 4:00.

Q.  3:00 or 4:00 o'clock?
A1. Mm, hm (yes).

Q.  Okay, and it was light out, right?
A1. Yeah.

Q.  Were the skies nice and blue?
A1. Yeah.

Q.  Was it warm out?
A1. (No response)

Q.  You didn't have a big winter jacket on did you?
A1. No.

Q.  It was kind of warm, did you have shorts on?
A1. Yeah.

Q.  Okay.  So it was kind of warm day, huh?
A1. (No response)

Q.  And it was, was it kind of like in the afternoon?
A1. Yeah.

Q.  Okay.  So your mom asked you and your brother, what's your
    brother's name?
A1. Ray.

Q.  Okay, she asked you and Ray to go to the store to get, what
    you say, gum and some soda?
A1. Yeah, two.

Q.  Two?

HOMICIDE\LOPEZ.L\CLARK\#3169

02535

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    4

A2.  Two six-packs.

Q.  Okay.  Um, and which store did you go to?
A.  Choice.

Q.  Choice?
A.  (No response)

Q.  Is that the Choice Market?
A.  Yeah.

Q.  Do you know what street that's on?
A.  Um...

Q.  Is it this main street right outside the house over here?
A.  Yeah.

Q.  Okay, and do you know where Benson Highway is?
A.  No.

Q.  Not sure of the street names, huh?
A.  (No response)

Q.  Okay.  But, uh, it's the store, if you go straight out your
    front door,...
A.  Yeah.

Q.  ...and I'm pointing just a little left of your front door,
    is that where the store is?
A.  Yeah.

Q.  Is it pretty close, like you could almost see it from here?
A.  Yeah.

Q.  Okay.  How long did it take you to walk to the store?
A.  I don't know.

Q.  A couple of minutes?
A.  (Inaudible)

Q.  Okay.  It didn't take like two hours, because it's not far,
    right?
A.  No.

Q.  Okay.  So, so, just, just a couple of minutes?
A.  Yeah.

Q.  Okay, and when you went to the store, what you do?
A.  Mm, we went to go buy those, uh,...

HOMICIDE\LOPEZ.L\CLARK\#3169

┌─────────────────────┐
│   SUPPLEMENTAL      │
│  June 10, 1994      │
└─────────────────────┘

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                5

Q.   Can you just speak just a little bit louder.  It would
     really help, okay.
A.   Okay.  We, we went, we went in the store and we went to go
     buy, um, Pepsi and gum, and,...

Q.   Okay.
A.   ...and we went to go pay.

Q.   Okay, then you went to go pay for it?
A.   Yeah,...

Q.   Okay.
A.   ...then we went out.

Q.   And then you went outside, right?
A.   (No response)

Q.   And when you went outside and you had your Pepsi and your
     gum,...
A.   Mm, hm (yes).

Q.   ...did you get some change for your mom?
A.   Yeah.

Q.   Okay, put the change in your pocket?
A.   Yeah.

Q.   Okay.  Can you speak just a little bit louder?
A.   Yeah.

Q.   I know it's kind of a pain in the neck, but the tape has got
     to hear it, okay.  Uh, when you and your brother came out of
     the store, um, now this is the important part that I want to
     talk about.  Can you tell me what you saw?
A.   Mm, there is this guy, there's this guy he, he had a yellow
     van and, um,...

Q.   Okay.
A.   ...has this little...

Q.   Could we go just a little, uh, I told you I was gonna ask
     you some questions and, and you can do the same too, okay.
     When you walked out of the store, where was the van?
A.   Mm, right there, over there.

Q.   Okay.
A.   Where the dirt is.

Q.   Okay, so you walked out of the store, did you turn left, do
     you know left from right?

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                6

A.   Yeah.

Q.   Okay.  This is right, this left?
A.   (No response)

Q.   So you walked out of the store, did you, which way did you
     turn?
A.   Um, this way over here, right.
A2.  Left.

Q.   Coming left?
A.   Yeah, left.

Q.   Coming back home?
A.   Yeah.

Q.   Okay, and is there like a parking lot there or a desert?
A.   Uh, desert.

Q.   Okay.
A.   We _____ uh,

Q.   Okay, and is there where you saw the van in the desert?
A.   Yeah.

Q.   And what color did you say the van was?
A.   Yellow.

Q.   Okay, and let's see.  And did you say that somebody was in
     the van?
A.   Mm, hm (yes).

Q.   Okay.
A.   Yeah.

Q.   What was the van moving or was it stopped?
A.   Moving.

Q.   Okay, and it was in the desert?
A.   Yeah.

Q.   Okay.  And who was in the van?
A.   This guy and he had messy hair and, um, this little girl.

Q.   Okay.  What do you mean the guy had messy hair?
A.   He did though as,...

Q.   I'm gonna sit up here with you again, okay?  'Cause my foot
     is getting tired.
A.   Okay.

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                7

Q.   Okay, so we were talking about the guy's hair and you said
     it was messy.  Can you, can you tell me what color it was?
A.   It was little, it was brown.

Q.   Like your color?
A.   Yeah.

Q.   Okay, and how long was it?
A2.  Did he have short hair or long hair?

Q.   Was it short hair or long hair?
A.   A little bit long.

Q.   Okay.  Longer than mine, or shorter than mine?
A.   Longer.

Q.   Longer, okay.  And it was brown?
A.   Yeah.

Q.   Okay, and was it straight or curly?
A.   Curly.

Q.   Okay, and was it neat or messed up?
A.   Messed up.

Q.   It was messed up, okay.  And where was this guy sitting in
     the van?
A.   In front driving with one hand.

Q.   He was driving with one hand?
A.   (No response)

Q.   Okay, and, and why are you saying that he was driving with
     one hand?  Did you see him driving with one hand?
A.   Mm, hm (yes).

Q.   Okay, yes or no?
A.   Yeah.

Q.   Okay.  Or could it be that someone saw him driving with one
     hand and, and told you about that.  Did you see yourself
     that he was driving with one hand?
A.   Yeah.

Q.   Okay, and did you talk about it later and that's why it's
     kind of reminding ya?
A.   Yeah.

Q.   Okay.  Um, and the van was moving when you saw this guy in
     it?

02539

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    8

A.   Yeah.

Q.   Okay.  Was there anybody else in the van with him?
A.   No, just a little girl.

Q.   Okay, but there was the guy driving,...
A.   Mm, hm (yes).

Q.   ...and there was a little girl.  Was it a white guy or a
     black guy, do you know?
A.   White.

Q.   White guy?
A.   (No response)

Q.   How about the little girl, uh, was she a white girl, black
     girl, Mexican girl?
A.   A white.

Q.   A white girl, okay.  Do you remember how old she was?
A.   She was small.

Q.   Smaller than you, or bigger than you?
A.   Small.

Q.   Smaller?
A.   Yeah.

Q.   Okay, and you're eight, huh?
A.   Yeah.

Q.   So she was probably younger than you?
A.   Mm, hm (yes).

Q.   You think so?
A.   Yeah.

Q.   Okay.  And do you remember what color of hair she had?
A.   Blonde.

Q.   Okay.  When she was sitting in the van, how, how much of the
     little girl could you see?
A.   Like, um, right here.

Q.   So like you can see from the head, you could see her head?
A.   Yeah.

Q.   Okay, and the rest of it was kind of hidden by the door?
A.   Yeah.

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                9

Q.   Okay.  How far away were you from the van when you saw it?
A.   The van was right here, and I was about here.

Q.   Okay.  Would be like, uh, you see that football in the
     bedroom there?
A.   Yeah.

Q.   Would it be further than that, or closer?
A.   Further.

Q.   How much further?
A.   Um, like all the way to the fence over here.

Q.   To the fence over here?
A.   Yeah.

Q.   Okay.
A2.  Say like, how far away from the van were you, you were...
A.   Buy the fence.

A2.  You know where the, uh, pavement is over there?
A.   Yeah.

A2.  Okay.  Were you in the middle or by the pavement?
A.   By the pavement.

A2.  And he was in the middle of the desert?
A.   Yeah.

Q.   Okay, so about how far do you think that is?
A.   (No response)

Q.   And go by the football, like from, if, if we're sitting
     here, me and your broth-, say I'm your brother, okay.  It's
     me and you, and the football was the van, wo-, is that about
     how far away you were from the van?
A.   Yeah.

Q.   Okay.  Could it had been a little further or a little
     closer?
A.   A little further.

Q.   A little further, okay.  And that's okay, if you're not
     sure, um, you know it's certainly okay for you to say I
     don't know or I'm not sure.  That's, that's a good answer,
     okay.
A.   Okay.

Q.   All right.  And did you see, what brought your attention,
     like what made you look at the van?

SUPPLEMENTAL
June 10, 1994

A.    (No response)

Q.    Let me ask it this way, was, it is it kind of funny to see a
      van out there in the desert, is that odd or is there cars
      out there a lot?
A.    There's cars out there.

Q.    It, there's car is out there sometimes?
A.    Mm, hm (yes).

Q.    So it's not odd to see that, right?
A.    No.

Q.    Okay.  Wh-, do you remember what you saw when the van was
      going by?
A.    Yeah.

Q.    Well, you tell me what you saw?
A.    He, he was going like that and like that twice at the little
      girl.

Q.    Okay, and, and you're making a motion like with your right
      arm and you got your elbow sticking out.
A.    Yeah.

Q.    You're making a motion...
A.    Twice though.

Q.    Two times?
A.    Mm, hm (yes).

Q.    And what did he do with his arm or his elbow, was he you
      know waving it at somebody or...
A.    No.

Q.    ...what was he doing?
A.    He was going (makes sound) koo, koo, like that.

Q.    And you're making...
A2.   ___
A.    The little girl.

Q.    What, you're making like, uh, like a hitting motion.  Was he
      hitting something?
A.    Yeah the, but the little girl.

Q.    He was hitting the little girl?
A.    Mm, hm (yes).

Q.    Can you tell, and he was doing that with his elbow?

HOMICIDE\LOPEZ.L\CLARK\#3169

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                11

A.   Yeah.

Q.   And he was like doing a backwards...
A.   He was looking at her.

Q.   He was looking at her?
A.   Yeah.

Q.   Okay, and is that when you saw him driving with one hand?
A.   Yeah.

Q.   Okay.  So when he was doing this, it's kind of like a
     backwards hitting motion with his elbow,...
A.   Yeah.

Q.   ...when he was doing that, was he hitting the little girl?
A.   Yeah.

Q.   And you said he did that twice, or you saw it twice?
A.   Yeah, I saw it twice.

Q.   Okay.  Could you tell where his elbow was hitting the little
     the girl?
A.   Somewhere on the face though.

Q.   On her face you think?
A.   Yeah.

Q.   Was the little girl doing anything?
A.   No.

Q.   No, was she talking or you know could you hear her saying
     anything?
A.   No, I, I don't think.

Q.   Okay, just, just tell me what you remember.  Do you know if
     the little girl's window was up or down?
A.   Um.

Q.   Do you remember?
A.   No.

Q.   You don't know?
A.   I don't know.

Q.   Okay.  Could, okay, don't forget you got to speak up just a
     little bit, okay.  A little bit louder.
A.   Okay.

Q.   Okay.  Um, could you see if the little girl was laughing or

SUPPLEMENTAL
June 10, 1994

crying?
A.    Crying.

Q.    You're sure?
A.    Yeah.

Q.    Okay.  How, how do you know she was crying?
A.    Because, uh, I saw her face all red and tears.

Q.    Wh-, well I'm not sure you could see tears, maybe you
      just...
A.    But I saw her.

Q.    Maybe you just, you know like when you cry, you know there's
      tears.
A2.   Her mouth was open?
A.    Yeah.

A2.   Yeah.
Q.    Okay.  Her mouth was open and you said her face was red?
A.    Yeah.

Q.    Was it red from just like, 'cause she was excited and
      yelling you know and your face gets red when you get angry,
      ...
A.    Yeah.

Q.    ... or did she have like blood on her face?
A.    I didn't see, I forgot.

Q.    Okay, you didn't see any blood?
A.    I don't know.

Q.    Okay, and, and if you don't know, don't forget that's okay
      to say.  But you think her face was red like she was, uh,
      you know, you know what reasons your face gets red for, uh,
      it could be you're crying or yelling, or you're excited or
      something and your face gets kind of red.  Is, is that what
      you're talking about?
A.    Yeah.

Q.    That kind of red?
A.    Yeah.

Q.    Okay, great.
A.    But I saw him hit her real hard, fast.

Q.    He hit her with the elbow real hard and real fast, is that
      what you said?
A.    Yeah, yeah.

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                13

Q.   Okay.  And you saw him hit the little girl twice?
A.   Yeah.

Q.   And, and what part of her body do you think that he hit with
     his elbow?
A.   In the face.

Q.   In the face.
A.   Somewhere around the face.

Q.   Okay, so you're showing me with your hand your face, right?
A.   Yeah.

Q.   Okay.  Could, were you close enough to tell if, if he hit
     her on the side of the face or in the nose, or you know, do
     you remember where on her face?
A.   He, he hit somewhere right here.

Q.   Okay, and you're showing me kind of the, the left side, like
     the cheek side of your face or head?
A.   Yes.

Q.   Okay.
A.   I saw it hit right here.

Q.   Okay.  Um, did you ever see that guy before?
A.   No.

Q.   Did you ever see that van before?
A.   No, but my, my mom, my mom's friend.

Q.   Your mom's friend?
A.   Yeah.

Q.   Okay.  Who are you referring to?  Who are you talking about
     your mom's friend?
A.   Mm.

Q.   Is his name Alfonso?
A.   No.

Q.   Or Alonzo?
A.   Mm, hm (yes).

A2.  Are you talking about Alonzo?
A.   Yeah.

Q.   Okay.
A2.  Kind of looks like him?

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ—CASE #940502025                    14

Q.  And how, wo-, why are you talking about Alonzo now?
A.  I don't know.

Q.  Okay.  The guy that was driving the van with the one hand
    and was hitting the little girl, that wasn't Alonzo was it?
A.  No.

Q.  Okay.  Did that guy kind of look like Alonzo a little bit?
A.  Yeah.

Q.  Okay.  And how come, was it because of, uh, you know you
    tell me why you thought he looked like Alonzo.
A2. What does he have that's the same?
A.  The same hair.

Q.  Same hair?
A.  (No response)

Q.  And, and what do you think was the same about the hair?
A.  Um, I don't know.

Q.  Okay.  Um, how about the color, what color of hair does
    Alonzo have?
A.  A little bit black.

Q.  A little bit black?
A.  Yeah.

Q.  Okay.
A.  He's got the same hair that's like (?)...

Q.  And, and the guy that you saw in the van was it, was his
    hair kind of like the same color?
A.  Yeah.

Q.  Okay, so it was similar then, huh?
A.  (No response)

Q.  Okay.  Uh, is there any, were they about the same age?
A.  I don't know.

Q.  Okay, if you don't know, that's fine.  You're not sure?
A.  I'm not sure.

Q.  Okay.  And how about the little girl, did you ever see her
    before?
A.  No.

Q.  No, okay.  And after you saw that, what you guys do?
A.  (No response)

HOMICIDE\LOPEZ.L\CLARK\#3169

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    15

Q.   After you saw that van?
A.   We went straight home and...

Q.   Okay.  After the van drove pass you, where did the van go?
A.   He went over to there and turned that way.

Q.   Okay, so you're, you're kinda turning your body around and
     you're looking like out the front door toward the store.
A.   Mm, hm (yes).

Q.   So did the van come out of the desert and then go toward the
     store?
A.   Yeah.

Q.   In the front or the back?
A.   Front.

Q.   Okay, and then did he just continue on going in the same
     direction? And, and I'll point, in that direction?
A.   Yeah.

Q.   So that's, that's east.  Do you know like north, east,
     south, west, did you learn that in school?
A.   No.

Q.   Okay.  Uh, but anyway that's east if you, once you learn it.
     That's going to be east that way, and he just continued
     going the same way, like he went from the desert to the
     store, kept going, and he just kept going right down that
     main road?
A.   Yeah.

Q.   Kept going that way?
A.   (Inaudible)

Q.   Okay.  And then after, what you do, you came home?
A.   I came _____ where I came home, home and told my mom and
     dad.

Q.   Okay.  And you know, so far we're talking on the tapes here
     and this is the first time anybodys mentioned your dad so,
     what's your dad's first name?
A.   Ray.

Q.   Ray, okay.  Ray Sr., huh?
A.   (No response)

Q.   'Cause he's bigger.
A.   Yeah.

02547

┌─────────────────────┐
│   SUPPLEMENTAL      │
│  June 10, 1994     │
└─────────────────────┘

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                16

Q.   Okay.  Let me just look at my notes here, so I don't want to
     miss anything now.  You're doing a great job, I want to make
     sure we do it right, okay?
A.   Okay.

Q.   Okay, so you guys came home and you told your mom what you
     saw and the, did you call the police?
A.   No. We...

Q.   Did you think...
A.   When we went to the bus stop, I don't know when they called
     the (Inaudible).

Q.   Okay, when did you go to the bus stop?
A.   At 8:00.

Q.   The next day?
A.   Yeah.

Q.   Next morning for school?
A.   Mm, hm (yes).

Q.   Okay.  But when you guys came home from the store then you
     saw the van with the guy hitting a little girl.
A.   Yeah.

Q.   And you came home and you talked to your mom, right?
A.   Yeah.

Q.   Um, did anybody call the police then?
A.   No.

Q.   Not, not that you know of, huh?
A.   No.

Q.   Okay.  Um, and what did you do for the rest of the day, just
     played some more?
A.   Yeah.

Q.   And then when time do you...
A.   When I, when I told them I went outside.

Q.   Then you went outside to play?
A.   Yeah.

Q.   Okay.  And what time did you go to bed?
A.   9:00 or 8:00.  I forgot.

Q.   What time are you suppose to go to bed?
A.   8:00.

SUPPLEMENTAL
June 10, 1994

Q.   8:00, okay.  Did you cheat a little bit, go at 9:00 maybe?
A.   Yeah.

Q.   Uh, okay.  Mom let's you cheat now and then, huh?
A.   (No response)

Q.   If you're good maybe?
A.   Yeah.

Q.   Okay.  Uh, did you go to school the next day?
A.   Yeah.

Q.   Which one?
A.   Los Ninos.

Q.   Did you see your teacher?
A.   Yeah.

Q.   Okay.  Did you tell anybody at school what you saw?
A.   No.

Q.   Okay.  Uh, what time did you come home from school
     yesterday?
A.   (No response)

Q.   Regular time?
A.   At 3:00.

Q.   Okay, and is that the regular time you usually come home?
A.   Yeah, but on Wednesdays we come at 1:00 or 2:00.

Q.   Okay, but yesterday was Monday.
A.   Yeah.

Q.   So you came home what about 3:00 or a little bit after?
A.   Yeah.

Q.   Okay.  And did you, did you and your mom or your brother
     talk about what you saw anymore?
A.   I forgot.

Q.   Okay, that's fair.  Everybody forgets something.  Um, when
     is the next time that anything happens you know like, this
     incident that happened, the guy hitting a little girl, you
     guys talked about it with your mom and then the next day you
     went to school,...
A.   Yeah.

Q.   ...and did you talk to anybody else about it, between then
     and now?

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    18

A.   No.

Q.   No, okay.
A.   Just my mom and dad.
Q.   Okay, and then the next time you talked about it was with
     me?
A.   Yeah.

Q.   Okay.  Are you comfortable talking to me?
A.   Yeah.

Q.   Yeah, okay.  Is this okay?
A.   Yeah.

Q.   Not so bad, right?
A.   No.

Q.   Okay.  Um, so now today it's Tuesday, and we're talking
     about this incident, it was just two days ago that it
     happened.
A.   Mm, hm (yes).

Q.   And, and you think you remember if it's, you know your kind
     of like right on the money, or you're pretty accurate about
     what you're telling me.  Think it's pretty close to what
     happened?
A.   Yeah.

Q.   Okay, great.  Are you sure?
A.   Mm, hm (yes).

Q.   Okay, great.  Did you, uh, when you came home from school
     yesterday...
A.   Yeah.

Q.   ...did you watch any television?
A.   Yeah, but cartoons.

Q.   Okay.  Did you watch the news?
A.   No.

Q.   Okay, did you think your brother watched the news?
A.   No.

Q.   You don't, you don't know?
A.   No.

Q.   You don't know, okay.  Mom, uh, let me just ask you, did
     they both watch the news?
A2.  They both watched the news.  Did we, yeah we watched the

SUPPLEMENTAL
June 10, 1994

news.   Remember I, I told you to come and watch the news?
A.   Yeah.

A2.   Remember that day, remember I told you to watch the news so
we...
A.   That Sunday?

A2.   ...could talk about the little girl?
Q.   No?

A2.   No, yesterday.
A.   Oh, oh.

Q.   Okay.  Yesterday you came home...
A2.   Remember you saw the news?
A.   Yeah.

Q.   Yesterday you came home...
A2.   Can you tell him...

Q.   ...from school, right?
A2.   ...you saw the news?
A.   Yeah.

Q.   Okay.  All I want to know is you, you do remember watching
the news?
A.   No.

Q.   You're su-, okay, did you...
A2.   You don't remember when I called you and Ray in?
A.   Yeah, I remember that but I don't...

Q.   Did your mom ask you, did your mom ask you to come in and
watch the news?
A.   Yeah.

Q.   Okay.  And did you see anybody on T.V., on the news?
A.   Yeah, that guy.

Q.   Okay, that's what I'm gettin' at okay.  And I, and I'm not
trying to put words in your mouth, but do you, do you really
remember watching the news and seeing that guy?
A.   A little.

Q.   Okay.  And did you recognize the guy?
A.   Yeah.

Q.   And who'd you, the guy that you saw on television, who did
you think he looked like?
A.   Like Alonzo (Inaudible).

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                20

Q.  Like Alonzo?
A.  Yeah.

Q.  And that's your mom's,...
A.  I don't know how to say it.

Q.  ...that's your mom's friend?
A.  Yeah.

Q.  Okay.
A.  Or my dad.

Q.  Do you think the guy you saw on the news, did he look like
    anybody else?
A.  No.

Q.  Okay.  You said that the guy in the van, that you saw hit
    that little girl, you said that he kinda looked like Alonzo.
A.  Yeah.

Q.  Okay, so did the guy on the news look like the guy in the
    van?
A.  Mm, hm (yes), yeah.

Q.  You think so, you're sure?
A.  Yeah.

Q.  Okay.  Is it starting to come back to you now that you
    watched the news and you did see the guy on the news again?
A.  Yeah.

Q.  Okay.  Okay, I'm just going to look at my notes here and
    make sure we didn't miss anything, okay?
A.  Okay.

Q.  (Looking at his notes) Was there anybody else in the van
    besides that guy and that little girl?
A.  No, nobody else.

Q.  No.  Maybe there was somebody in the back, but you don't
    know that right?
A.  No, I don't know.

Q.  Okay, but all you saw was the guy driving?
A.  Yeah.

Q.  And the little girl sitting where?
A.  Uh, in there, over there in this front seat with the other
    guy.

HOMICIDE\LOPEZ.L\CLARK\JF3169

02552

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025                    21

Q.   Okay, so the one guy that you're talking about was, was the
     driver?
A.   Yeah.

Q.   He was sittin' behind the wheel, right?
A.   Yeah.

Q.   And the little girl was sittin' where, mm (clears throat) in
     the other seat?
A.   Yeah.

Q.   Was she sittin' in the middle or by the door, do you know?
A.   By, by the door.

Q.   By the door, okay.  And you've never seen that little girl
     or the guy before?
A.   No.

Q.   Okay.  The only other time that you saw him...
A.   Was, uh,...

Q.   ...that guy?
A.   Yeah.

Q.   Was, was where?
A.   In the T.V.

Q.   On T.V. and you, and you think that was the same guy?
A.   Mm, hm (yes).

Q.   Okay.  (Paused)  Is there anything that maybe I forgot to
     ask you that you think you should tell me about?
A.   No.

Q.   About that incident?
A.   No.

Q.   Okay.  Mom, you think I missed anything or...
A2.  No.

Q.   ...we covered, okay.  Um, is it okay if we turn the tape,
     um, off now Laura we, I think we're all done.
A.   Yes.

Q.   Okay.  All right, I'll stop the tape, it's, uh, 1622 hours,
     same date, thank you Laura.
A.   Your welcome.

SUPPLEMENTAL
June 10, 1994

TAPED STATEMENT OF LAURA LOPEZ--CASE #940502025          22

WITNESS:

---

DET. BRUCE CLARK #569

TRANSCRIBED BY:

S. AMPARANO, MAY 5, 1994

FINAL PRINTED WITH REVISIONS PER DETECTIVE, MAY 7, 1994

SUPPLEMENTAL
June 10, 1994