MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
CHIEF COUNSEL
JEFFREY L. SPARKS
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, AZ 85007
TELEPHONE: (602) 542-4686
Jeffrey.Sparks@azag.gov
CADocket@azag.gov
(State Bar Number 27536)

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Barry Lee Jones,<br><br>        Petitioner,<br><br>        -vs-<br><br>Charles L. Ryan, et al.,<br><br>        Respondents. | CV 01-00592-TUC-FRZ<br><br>DEATH PENALTY CASE<br><br>RESPONSE TO SUPPLEMENTAL<br>*MARTINEZ* BRIEF |

        Pursuant to the Court's Orders of August 25, 2014, March 24, 2014, and April 28, 2014, Respondents hereby respond to Petitioner Barry Lee Jones' supplemental *Martinez* brief.  For the reasons set forth in the following Memorandum of Points and Authorities, Jones has not overcome the procedural default of Claim 1D of the habeas petition, and this Court should affirm its prior ruling dismissing that claim as procedurally defaulted.  In the alternative, Claim 1D fails on *de novo* review.  Further, although Respondents do not object to limited expansion of the record for the sole purpose of determining the issue of cause under *Martinez*, Jones' claim does not warrant an evidentiary hearing or other evidentiary development.

1

DATED this 3rd day of June, 2015.

RESPECTFULLY SUBMITTED,

MARK BRNOVICH
ATTORNEY GENERAL

LACEY STOVER GARD
CHIEF COUNSEL

s/JEFFREY L. SPARKS
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR RESPONDENTS

1

**TABLE OF CONTENTS**

2

Memorandum of Points and Authorities ................................................................ 3

3    I.    Factual and Procedural History ........................................................ 4

4    II.   Scope and Applicable Legal Standards ............................................. 6

5          A.  Cause and prejudice under *Martinez* ........................................ 6

6          B.  *Strickland* standard for counsel's performance ....................... 9

7    III.  Jones Has Not Shown That Post-Conviction Counsel Was

8          Ineffective for Failing to Raise Claim ID ........................................ 11

9          A.  Post-conviction counsel did not perform deficiently ................ 11

10         B.  Trial counsel was not ineffective for failing to

11             adequately challenge the timing and cause of

12             Rachel's injuries .................................................................. 14

13         C.  Trial counsel was not effective for failing to further

14             challenge evidence that Jones beat, sexually assaulted,

15             and murdered Rachel in his van during the third trip

16             on the afternoon of May 1 ................................................... 30

17         D.  Trial counsel was not ineffective for failing to

18             investigate Jones' trip to the Choice Market ....................... 34

19         E.  Trial counsel was not ineffective for failing to more

20             robustly challenge the State's blood evidence ..................... 36

21         F.  Trial counsel was not ineffective for failing to argue that

22             the evidence does not support an inference that Rachel

23             was beaten and assaulted in the van .................................. 42

24         G.  Trial counsel was not ineffective for failing to

25             investigate and present evidence challenging the

26             testimony of Ray and Laura Lopez .................................... 43

27

28

H.  Trial counsel was not ineffective at sentencing for failing to investigate and present additional mitigation evidence ............ 49

I.   Jones has not shown cause under *Martinez* ............................... 63

IV.  Claim 1D Fails on *De Novo* Review and Jones Is Not Entitled to Evidentiary Development  ................................................ 64

A.  Standards for evidentiary development .................................... 64

B.  Evidentiary development for the "cause and prejudice" determination ............................................................ 66

C.  *De novo* review of substantive ineffective-assistance claims ... 70

**MEMORANDUM OF POINTS AND AUTHORITIES**

On December 23, 2002, Jones filed an amended petition for writ of habeas corpus.  (Dkt. # 58.)  In Claim 1D of the petition, he alleged, in relevant part, that counsel was ineffective for:

> 1) failing to adequately investigate potential other suspects and crucial witnesses; failing to raise legal challenges to eyewitness identifications; and failing to adequately challenge blood-spatter testimony;
>
> 2) failing to hire a forensic pathologist to challenge the State's evidence regarding the nature and timing of the victim's injuries; and
>
> 3) failing to have a qualified mental health expert examine Jones before sentencing; failing to adequately explain the effect of Jones' drug addiction to the sentencing court; and failing to investigate and present mitigating evidence of Jones' social history.

(*Id.* at 37–96.)  In response to Respondents' argument that Claim 1D is, in part, procedurally defaulted, Jones asserted PCR counsel's ineffectiveness as cause to excuse the default.  (Dkt. # 69, at 25–31; Dkt. # 79, at 25, 60–62.)  This Court agreed that all but a portion of Claim 1D[1] was procedurally defaulted, and determined, consistent with then-governing Supreme Court precedent, *see Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), that post-conviction relief (PCR) counsel's purported ineffectiveness did not constitute cause for the procedural default because "there is no constitutional right to counsel in state PCR proceedings."  (Dkt. # 115, at 9–13, 128, 130.)

This Court then ordered supplemental briefing addressing whether Jones could excuse Claim 1D's procedural default by showing a fundamental miscarriage

---

[1] This Court found that Jones had exhausted the portion of Claim 1-D challenging counsel's purported failure to meet with Jones with sufficient frequency and rejected that claim on the merits.

3

of justice based on actual innocence of the crime. *See Schlup v. Delo*, 513 U.S. 298, 326–37 (1995). (*Id.* at 9–13; *see* Dkt. # 128, 130.) Ultimately, this Court found that Jones had failed to establish his actual innocence of the crime and dismissed Claim 1D as procedurally defaulted. (Dkt. # 141, at 8–23.) This Court granted a certificate of appealability on the question whether Claim 1D was procedurally defaulted, and Jones filed a notice of appeal. (*Id.* at 49.)

The Ninth Circuit stayed Jones' appeal for over 2 years while he pursued post-conviction DNA testing under A.R.S. § 13–4240. (Ninth Cir. No. 08–99033, Dkt. # 8, 11, 52, 53.) Shortly after the Ninth Circuit lifted the stay and set a briefing schedule, the Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and Jones moved to remand his case to this Court to reconsider its dismissal of Claim 1D in light of *Martinez*. (Ninth Cir. No. 08–99033, Dkt. # 58.) The court granted Jones' motion, finding that "Claim 1D is for purposes of remand substantial," but otherwise expressing "no opinion on the merits of the claim" or whether evidentiary development is warranted. (Ninth Cir. No. 08–99033, Dkt. # 68.) Because the Ninth Circuit had found the claim substantial, and thus found the existence of *Coleman* prejudice under *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), this Court directed Jones to address whether cause exists to excuse the procedural default, specifically, whether post-conviction counsel's failure to raise Claim 1D was ineffective under *Strickland v. Washington*, 466 U.S 668 (1984). (Dkt. # 161.) This Court also ordered Jones to address whether he is entitled to habeas relief on his substantive ineffective-assistance-of-trial-counsel claims. (*Id.*) For the reasons set forth below, Jones has neither shown cause under *Martinez*, nor established that he is entitled to relief on his underlying ineffective-assistance claim.

I.   **FACTUAL AND PROCEDURAL HISTORY.**

In 1995, a jury found Jones guilty of one count of sexual assault, three counts of child abuse, and one count of first-degree felony murder for the death of

4-year-old Rachel Gray.  The trial judge found the existence of two aggravating factors: that the murder was especially cruel, A.R.S. § 13–703(F)(6), and that the victim was under the age of fifteen, A.R.S. § 13–703(F)(9).  *State v. Jones*, 937 P.3d 310, 313 (Ariz. 1997).  The judge sentenced Jones to death for the murder conviction.  *Id.*  The Arizona Supreme Court summarized the facts underlying Jones' convictions as follows[2]:

> Defendant lived in a trailer park in Tucson. At the time of the murder, he had shared his trailer with Angela Gray and her three children for about three months. Defendant's daughter also lived with them. The victim in this case was Gray's youngest child, Rachel, who was four years old. On the day preceding her death, Rachel was hit many times. One blow to her abdomen was so severe that it ruptured her small intestine. Rachel also received injuries to her labia and vagina with no associated injuries to her thighs or buttocks, indicating that she had been sexually assaulted. The injuries to Rachel's genitals were contemporaneous with her other physical injuries.

> The following evidence linked defendant to Rachel's injuries: on the day Rachel received her injuries, defendant left his trailer three times with Rachel in his van; two children saw defendant hitting her while he drove; defendant stopped at a Quik-Mart to get ice for Rachel's head injury; and police found traces of Rachel's blood type on defendant's clothing and in his van.

> Rachel was very ill between the time of the injuries and her death—vomiting, crying, and looking very pale. During the evening, a friend and her son came to defendant's trailer. While they were there, the friend's son noticed Rachel's condition and asked defendant about it. Defendant falsely stated that he had taken Rachel to the fire department, and that the paramedics had examined her and had said

---

[2] This Court should presume that the Arizona Supreme Court's recitation of the facts is accurate.  *See* 28 U.S.C. §§ 2254(d)(2), (e)(1); *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam); *Runningeagle v. Ryan*, 686 F.3d 758, 763 n.1 (9th Cir. 2012) (rejecting argument that statement of facts in Arizona Supreme Court opinion should not be afforded the presumption of correctness).

5

she was all right. By the time defendant and Gray took Rachel to the hospital the following morning, she was already dead of peritonitis—an infection of the lining of the abdomen caused by a ruptured intestine.

*Id.*   The Arizona Supreme Court affirmed Jones' convictions and sentences on direct review, and the United States Supreme Court denied his petition for certiorari.  *Id.*; *Jones v. Arizona*, 522 U.S. 1054 (1998).

In a petition for post-conviction relief (PCR), Jones argued that he was entitled to a jury trial on the existence of aggravating and mitigating factors and that he received ineffective assistance of counsel at trial.  (Dkt. # 69, Exhibit D.) After an evidentiary hearing, the trial court denied relief.  (*Id.*, Exhibit E.)  The Arizona Supreme Court subsequently denied Jones' petition for review.  (Id., Exhibits F, G.)  Jones initiated the instant proceeding by filing a petition for writ of habeas corpus on November 6, 2001.  (Dkt. # 1.)

## II.   SCOPE AND APPLICABLE LEGAL STANDARDS.

### A.  *Cause and prejudice under Martinez*

To excuse the procedural default of a habeas claim, a petitioner must show both cause and prejudice, or a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  "Cause" requires a showing that an external, objective factor impeded a prisoner's compliance with state procedural rules.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).   "Prejudice" requires a showing that the alleged constitutional violation worked to the prisoner's "actual and substantial disadvantage, injecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis deleted).

In *Martinez*, the Supreme Court held that an Arizona prisoner may establish cause to excuse the procedural default of an ineffective assistance claim by 1) showing that first PCR counsel was ineffective under the standards of *Strickland* for defaulting the claim, and 2) demonstrating "that the underlying ineffective-

1    assistance-of-trial-counsel claim is a substantial one, which is to say that the
2    prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at
3    1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

4         To establish PCR counsel's ineffective assistance, the petitioner must prove
5    both *Strickland* prongs: 1) that counsel's performance was deficient and 2) a
6    "reasonable probability that, absent the deficient performance, the result of the
7    post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at
8    377. To demonstrate PCR counsel's deficient performance, the petitioner "must
9    show that PCR counsel's failure to raise the claim that trial counsel was ineffective
10   was an error 'so serious that counsel was not functioning as the "counsel"
11   guaranteed the defendant by the Sixth Amendment,' and caused [the prisoner]
12   prejudice." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) (quoting
13   *Strickland*, 466 U.S. at 687). Because PCR "[c]ounsel is not necessarily
14   ineffective for failing to raise even a nonfrivolous claim," he "would not be
15   ineffective for failure to raise an ineffective assistance of counsel claim with
16   respect to trial counsel who was not constitutionally ineffective." *Sexton*, 679 F.3d
17   at 1157 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009)).

18        In *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013), a majority of the *en banc*
19   panel held that no showing of actual prejudice was required to overcome a
20   procedural default under *Martinez*; instead, the court concluded that, in the
21   *Martinez* context, a petitioner establishes 1) cause by showing that PCR counsel
22   was ineffective under *Strickland*, and 2) prejudice by showing that the defaulted
23   IAC claim was substantial. *Clabourne*, 745 F.3d at 377 (clarifying the multiple
24   opinions in *Detrich* and identifying the majority's holding). Acknowledging that
25   this Court is bound by the Ninth Circuit's decisions, *see Day v. Apoliona*, 496 F.3d
26   1027, 1031 (9th Cir. 2007), Respondents contend that the *Detrich* majority
27   incorrectly held that *Martinez* modified *Coleman's* actual prejudice requirement.
28   The decision in *Martinez* was limited to whether an attorney's errors in an initial-

1   review collateral proceeding could establish *cause*. 132 S. Ct. at 1318. The Court

2   did not address prejudice and did not purport to overrule *Coleman*, which holds

3   that a petitioner must show both cause *and actual prejudice* to overcome a

4   procedural default. 501 U.S. at 750; *see Martinez*, 132 S. Ct. at 1316 (observing

5   that a prisoner may obtain federal review of a procedurally-defaulted claim by

6   showing cause for the default and "prejudice from a violation of federal law"); *id.*

7   at 1321 (remanding for court of appeals to determine whether PCR counsel was

8   ineffective, whether underlying trial IAC claim is substantial, and "the question of

9   prejudice"); *see also Detrich*, 740 F.3d at 1261 (Nguyen, J., concurring in result)

10  (disagreeing with majority's holding that *Martinez* modified the prejudice prong of

11  *Coleman's* prejudice requirement).

12      Consequently, to overcome the procedural default of an ineffective-

13  assistance claim, a petitioner must establish cause, by showing that PCR counsel

14  was ineffective under both *Strickland* prongs and that the defaulted claim is

15  substantial, and prejudice, by showing that the underlying ineffectiveness "worked

16  to his actual and substantial disadvantage, infecting his entire trial with error of

17  constitutional dimensions." *Sexton*, 679 F.3d at 1158. However, without waiving

18  the argument that the *Detrich* majority incorrectly held that merely showing a

19  "substantial" defaulted claim satisfies *Coleman's* actual prejudice requirement,

20  Respondents will address Jones' claim under the framework set forth in *Clabourne*

21  since that case binds this Court.

22      Jones also disagrees with the *Detrich* majority, but for a different (and

23  incorrect) reason: he argues that to establish cause and prejudice under *Martinez*,

24  he need only show PCR counsel's deficient performance and that the defaulted

25  claim is substantial. Jones contends that the "substantial claim" showing is

26  sufficient to establish *Strickland* prejudice resulting from PCR counsel's deficient

27  performance. (Dkt. # 167, at 5–7.) In *Martinez*, however, the Supreme Court was

28  clear that a petitioner must show both that PCR counsel was ineffective under

8

1   *Strickland* (requiring a showing of deficient performance and prejudice), and "must

2   *also* demonstrate" that the defaulted claim is substantial.   132 S. Ct. at 1318

3   (emphasis added).   Thus, to establish cause under *Martinez*, a petitioner must show

4   not only that PCR counsel performed deficiently by defaulting a substantial

5   ineffective-assistance claim, but also that, had PCR counsel raised the claim in

6   state court, there is a reasonable likelihood that the state court would have granted

7   relief.   *See Clabourne*, 745 F.3d at 377 (noting that the *Detrich* majority rejected

8   the argument Jones advances here).

9       **B.** ***Strickland standard for counsel's performance.***

10      To warrant relief on an IAC claim, a prisoner must show that "counsel's

11  conduct so undermined the proper functioning of the adversarial process that the

12  trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at

13  686.   He must satisfy both prongs of *Strickland*'s test by demonstrating that (1)

14  counsel's performance was deficient under prevailing professional standards and

15  (2) he suffered prejudice as a result.   *Id.* at 687–88.   "[A] court is not required to

16  address both components of the *Strickland* test in deciding an ineffective assistance

17  of counsel claim 'if the defendant makes an insufficient showing on one.'"

18  *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998) (quoting *Strickland*, 466

19  U.S. at 697).

20      A prisoner demonstrates deficient performance by showing "that counsel's

21  representation fell below an objective standard of reasonableness."  *Strickland*, 466

22  U.S. at 699.  A petitioner's allegations and supporting evidence must withstand this

23  Court's "highly deferential" scrutiny of counsel's performance, and overcome the

24  "strong presumption" that counsel "rendered adequate assistance and made all

25  significant decisions in the exercise of reasonable professional judgment."   *Id.* at

26  689–90.   Under this deferential standard, a petitioner bears the heavy burden of

27  showing that counsel's assistance was "neither reasonable nor the result of sound

28  trial strategy,"  *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001), and

9

1   actions by counsel that "'might be considered sound trial strategy'" do not

2   constitute ineffective assistance. *Strickland*, 466 U.S. at 689 (quoting *Michel v.*

3   *Louisiana*, 350 U.S. 91, 101 (1955)).

4        Additionally, a reviewing court should "neither second-guess counsel's

5   decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v.*

6   *Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (en banc). Rather, as *Strickland* holds, "[a]

7   fair assessment of attorney performance requires that every effort be made to

8   eliminate the distorting effects of hindsight, to reconstruct the circumstances of

9   counsel's challenged conduct, and to evaluate the conduct from counsel's

10  perspective at the time." *Id.* at 689; *see also Coleman v. Calderon*, 150 F.3d 1105,

11  1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998) ("The test has

12  nothing to do with what the best lawyers would have done. Nor is the test even

13  what most good lawyers would have done. [This Court] ask[s] only whether some

14  reasonable lawyer at the trial could have acted, in the circumstances, as defense

15  counsel acted at trial.") (internal quotations omitted).

16       Even when a prisoner establishes that counsel has performed deficiently, he

17  must still show prejudice to be entitled to relief. *Strickland*, 466 U.S. at 691–92

18  ("An error by counsel, even if professionally unreasonable, does not warrant

19  setting aside the judgment of a criminal proceeding if the error had no effect on the

20  judgment."). A court cannot presume prejudice. *Jackson v. Calderon*, 211 F.3d

21  1148, 1155 (9th Cir. 2000). Rather, the petitioner must affirmatively prove actual

22  prejudice—the mere possibility that he suffered prejudice is insufficient to

23  establish *Strickland*'s prejudice prong. *See Cooper v. Calderon*, 255 F.3d 1104,

24  1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' . . . This

25  requires showing more than the possibility that he was prejudiced by counsel's

26  errors; he must demonstrate that the errors *actually* prejudiced him.") (quoting

27  *Strickland*, 466 U.S. at 693) (emphasis in original).

28

To make this showing, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (prejudice prong concerned with whether "counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair . . . [u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right"). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

## III. JONES HAS NOT SHOWN THAT POST-CONVICTION COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE CLAIM 1D.

As stated above, Jones must show PCR counsel's ineffectiveness under both prongs of *Strickland* to establish cause. Jones argues that PCR counsel's ineffective assistance in failing to raise claim 1D in the state post-conviction proceeding establishes cause under *Martinez* to excuse that claim's procedural default. For the reasons argued below, however, PCR counsel was not ineffective under *Strickland*, and Jones therefore has failed to establish cause under *Martinez*.

### A. Post-conviction counsel did not perform deficiently.

A PCR attorney, whose function is similar to that of an appellate attorney, *Martinez*, 132 S. Ct. at 1317, should not be expected to file "kitchen-sink briefs," despite what the ABA guidelines might instruct.[3] The "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v.*

---

[3] These Guidelines, of course, are only guides and confer no mandatory duties upon counsel. *E.g. Bobby v. Van Hook*, 558 U.S. 4, 17 (2009).

11

1   *Barnes*, 463 U.S. 745, 751−52 (1983)).  A PCR attorney's failure to raise meritless

2   claims does not constitute ineffective assistance.  *See Sexton*, 697 F.3d at 1157

3   ("[A] PCR counsel would not be ineffective for failure to raise an ineffective

4   assistance of counsel claim with respect to trial counsel who was not

5   constitutionally ineffective."); *see generally, e.g., Turner v. Calderon*, 281 F.3d

6   851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not

7   fall below the *Strickland* standard."); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th

8   Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not

9   constitute ineffective assistance when appeal would not have provided grounds for

10   reversal.").  Moreover, *Strickland* requires this Court to presume that counsel acted

11   competently, and made all decisions through the exercise of reasonable

12   professional judgment.  *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a

13   strong presumption that counsel's conduct falls within the wide range of

14   reasonable professional assistance.").  Because *Martinez* requires this Court to

15   evaluate PCR counsel's performance under *Strickland*'s standards, it also requires

16   this Court to apply *Strickland*'s presumptions and inherent deference to counsel's

17   decision-making.

18       Here, PCR counsel presented multiple ineffective-assistance-of-trial-counsel

19   claims in Jones' PCR petition, arguing that trial counsel was ineffective by failing

20   to: A) seek a mistrial after some jurors saw Jones transported to court in handcuffs

21   and a leg brace; B) interview co-defendant Angela Gray; C) further pursue his

22   motion for appointment of second counsel; and D) meet with Jones a sufficient

23   number of times to prepare for trial.  (Dkt. # 70, Exhibit D.)  The PCR court

24   granted an evidentiary hearing on several of these allegations.  (*Id.*, Exhibit E.)

25   PCR counsel also sought funding for 1) a mitigation specialist, for the express

26   purpose of locating "additional or new mitigation evidence," and 2) an

27   investigator, for the express purpose of developing "defenses to the offenses

28   charged" and locating new or additional defense evidence.  (9th Cir. No. 08-99033,

1  Dkt. # 63, Exhibits A, B.)  The PCR court denied these requests.  (*Id.* Exhibit C.)

2  PCR counsel thereafter unsuccessfully moved for reconsideration, arguing that a

3  mitigation specialist was necessary to contact witnesses, not previously

4  interviewed, who could establish that a third party (possible Angela Gray or her

5  son) caused Rachel's fatal wounds.  (*Id.* Exhibits D, E.)

6      Applying the strong presumption that PCR counsel acted competently and

7  made all decisions through the exercise of reasonable professional judgment, *see*

8  *Strickland*, 466 U.S. at 689, Jones has failed to show that counsel's performance

9  was deficient under *Strickland*.  Like an appellate lawyer, PCR counsel was not

10  required to raise every non-frivolous issue, but can—and did—instead decide

11  which issues to raise and argue.  *See Smith,* 477 U.S. at 536.  Although Jones now

12  asserts that PCR counsel made an inadequate showing under state law to obtain the

13  requested resources (Dkt. # 167, at 150–51), he previously attributed the denial of

14  funding to error by the trial court, arguing that the rulings had rendered his PCR

15  proceedings fundamentally unfair.  (Dkt. # 58, at 144–48.)  Furthermore, Claim 1D

16  is no stronger than those PCR counsel presented, and this Court should presume

17  that PCR counsel reasonably omitted them.  *See Smith v. Robbins*, 528 U.S. 259,

18  288 (2000) ("Generally, only when ignored issues are clearly stronger than those

19  presented, will the presumption of effective assistance of counsel be overcome")

20  (quotations omitted).[4]

21  _____

22  [4] Jones also includes a declaration from Attorney Dan Cooper, opining that trial
   and PCR counsel were ineffective.  (Dkt. # 167, Exhibit 37.)  Mr. Cooper's opinion

23  is irrelevant to the *Strickland* inquiry.  Whether counsel's trial tactics were
   reasonable under prevailing professional norms is a question of law, not a question

24  of fact.  *See Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998) ("The
   question of whether an attorney's actions were actually the product of a tactical or

25  strategic decision is an issue of fact…. By contrast, the question of whether the
   strategic or tactical decision is reasonable enough to fall within the wide range of

26  professional competence is an issue of law not one of fact….").  Expert testimony
   is admissible only to resolve factual issues.  *See* Fed. R. Evid. 702; *see also*

27  *Provenzano*, 148 F.3d at 1331–32 ("[I]it would not matter if a petitioner could

28  assemble affidavits from a dozen attorneys swearing that the strategy used at his
                                                                    (continued ...)

13

1    Under these circumstances, where PCR counsel raised multiple ineffective-

2    assistance-of-trial-counsel claims and attempted, albeit unsuccessfully, to secure

3    additional resources, Jones has failed to show that PCR counsel's performance fell

4    below reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at

5    688. Further, as the discussion below confirms, Claim 1D fails on the merits and

6    raising them would not have affected the PCR proceeding's outcome.

7    Consequently, even if Jones could establish PCR counsel's deficient performance,

8    he has still failed to establish cause under *Martinez* because he was not prejudiced

9    by PCR counsel's conduct because there is no "reasonable probability that, absent

10   the deficient performance, the result of the post-conviction proceedings would

11   have been different." *See Clabourne*, 745 F.3d at 377.

12   **B. *Trial counsel was not ineffective for failing to adequately challenge the***
13   ***timing and cause of Rachel's injuries.***

14   Jones first argues that the State's trial evidence regarding the timing and

15   cause of Rachel's injuries was false and that trial counsel was ineffective for

16   failing to use experts to more robustly challenge this aspect of the State's case.

17   Because, as discussed below, this trial IAC claim lacks merit, Jones cannot show

18   cause under *Martinez* based on PCR counsel's failure to raise it. *See Sexton*, 679

19   F.3d at 1157.

20   …

21   …

22

23   _____
     ( … continued)
     trial was unreasonable. The question is not one to be decided by plebiscite, by
24   affidavits, by deposition or by live testimony. It is a question of law to be decided
     by the … courts ….") And even if the issue of counsel's performance is a factual
25   one, Mr. Cooper is no more qualified than this Court to determine the prevailing
     professional norms at the time of Jones' trial and PCR proceeding, or to decide
26   whether counsel's acts or omissions were objectively reasonable under those
     norms. *See, e.g., Clemmons v. State*, 785 S.W.2d 524, 531 (Mo. 1990) ("A motion
27   court is at least as capable as another attorney in reaching a decision [on counsel's
     alleged ineffectiveness] based on the evidence presented, and therefore the opinion
28   of an attorney on the same subject is irrelevant and incompetent.").

14

### 1. The trial evidence.

As noted above, the trial evidence established that the cause of Rachel's death was peritonitis—an infection of the lining of the abdomen caused by a ruptured intestine. *Jones*, 937 P.2d at 313. Dr. Dale Howard, who performed Rachel's autopsy, testified that Rachel had suffered blunt force injuries "in her abdomen involving her intestine, both the large intestine or colon, the lining of the inside of the abdomen, and the first portion of her small bowel which is called the duodenum." (R.T. 4/12/95, at 141.) "There was a tear of the duodenum or small bowel, a laceration and bruising of the tissues of the abdomen primarily the tissue around the area of laceration, the small bowel and the wall of the colon or large bowel, and the attachments of the intestine to the back side of the abdominal wall." (*Id.* at 141–42, 144–45.)

Dr. Howard further explained that these injuries had resulted in peritonitis,

meaning inflammation of the lining of the tissues of the abdomen. It's the body's response to injury, spillage of fluid, the hemorrhage, the escape of bacteria from the lumen of the bowel out into the tissues and bile which is normally contained to the lumen of the liver and the gallbladder, and the small bowel leaks out into the tissue causing chemical irritation.

So the irritation and the inflammation were visible, and the term that's applied to that is called peritonitis.

(*Id.* at 145–46.)

Dr. Howard also described the symptoms of peritonitis that Rachel would have experienced leading up to her death, which include: lost bowel function; pain at the moment of the blunt impact that caused the injury and continuing abdominal pain; tenderness, "meaning more pain if any pressure was applied to the abdomen, more pain if there was any movement such as just taking a deep breath, getting up and walking around, [or] bending over"; the inability to "hold down any food"; nausea and possible vomiting; lack of appetite, dehydration and the desire to drink

water but the inability to "hold it down well"; and fever.  (*Id.* at 146–47.)  The pain would have begun immediately from the time of the injury and would have continued until Rachel lost consciousness and died.  (*Id.* at 147.)  The lack of appetite would have begun right away, and the nausea and vomiting would have developed over a period of several hours.  (*Id.*)  Ultimately, Dr. Howard stated that the internal abdominal injuries were "typical of having occurred about one day prior to death"; thus, it was possible that Rachel received the blow causing the internal laceration between 2:00 and 6:00 p.m. on May 1, 1994, the time she was with Jones.  (*Id.*)

Dr. Howard testified that injuries like the laceration to Rachel's duodenum are most commonly caused by a "blow to that central part of the abdomen, most commonly a punch with a fist.  Being elbowed.  Kneed.  Knee thrust into the abdomen or being kicked with a foot."  (*Id.* at 152.)

Dr. Steven Siefert, who examined Rachel when Angela Gray brought her to the hospital at about 6:00 a.m. on May 2, 1994, also explained the symptoms that Rachel would have exhibited immediately upon suffering the blow to her abdomen:

> [F]rom the original blow that produced rupture of the bowel she would have great pain.  This would be—the kind of injury that would knock the wind out of you that would be immediately painful.  I would expect the bruise to the abdomen that was related to would also continue to have some soreness associated with it, but over a relatively short period of time that pain might decrease initially.  Wouldn't go away, but it would decrease.
>
> As the inflammation of the peritoneum increased as more fluid leaked out from the bowel and irritated the lining of the interior of the abdomen, you would have more and more discomfort, pain, and you might see fever, you might see nausea and vomiting.  Certainly a child this old would be complaining of the symptoms.
>
> . . . .

16

> As you progress through the stages of peritonitis and proceed into clinical shock, the blood volume decreased for the amount that the blood capacity seems to expand and your blood pressure drops. This can trigger a thirst reflex.   Someone who had nausea and vomiting might also become dehydrated more rapidly over that period of time and thirst would develop from that . . . .

(R.T. 4/6/95, at 119–20.)

The evidence at trial also established that Rachel suffered numerous other injuries.   Dr. Siefert observed that Rachel "was covered with—abrasions and bruises, which we call ecchymosis. . . .   These occurred predominantly over the front part of the body, but were also present over portions of the back, the arms, legs." (R.T. 4/6/95, at 81.)  There was a laceration on the top left side of her scalp, toward the back; the left third finger was grossly swollen and discolored; there was a lot of bruising across her forehead, and there was blood in her eardrums.  (*Id.* at 81, 91.)  Dr. Siefert also noticed blood in Rachel's underwear, coming from the vaginal region.  (*Id.*; R.T. 4/11/95, at 91.)

Rachel's right arm exhibited "four or five ecchymosis bruises, small, about the size of a nickel"; there were more bruises on her hands, one on the knuckle of her little finger and two on the back of her hand near her thumb.  (R.T. 4/6/95, at 85–87.)  Her left arm had similar bruises: "at least half a dozen ecchymosis.  Most of them are about a nickel to quarter size."  (*Id.* at 87.)  A bruise on the back of Rachel's hand was the size of a half dollar.  (*Id.* at 87–88.)  There was blood under her thumbnail.  (*Id.* at 90.)  Dr. Siefert explained that these wounds appeared defensive.  (*Id.* at 86.)

Rachel's ears and face were also bruised.  "When you slap a broad area of the body, you get multiple small little breaks in blood vessels, and get these little punctate areas of bleeding."  (*Id.* at 91.)  "Extensive large bruises" covered her forehead, including a large bruise on the left side and "an equally large, appears to

17

1    be—say five centimeters, two and half, three inches in diameter ecchymotic area

2    above the right eyebrow and toward the temple." (*Id.* at 95.)  There was bruising

3    on the outer part of her right eye and discoloration collecting in the softer tissues

4    below each eye.  (*Id.* at 96.)  There were also about eight bruises on her legs,

5    mostly around her knees.  (*Id.* at 92.)  Rachel's torso and back also exhibited

6    bruising, as well as a bruise on her left lower rib cage, an abrasion and bruise on

7    her left hip, and small, linear marks on her buttocks.  (*Id.* at 93.)

8          The front of Rachel's body displayed "numerous, looks like 20 to 30

9    ecchymosis, large areas of abrasion which is scraping of the skin."  (*Id.* at 93.)

10    There was also a bruise under the right arm, "a fairly intense ecchymotic area," and

11    several bruises going down the right side of her chest.  (*Id.* at 94.)

12          Dr. Siefert estimated that the older bruises were about 3–4 days old and that

13    the most recent—which included about 95% of the total bruises—were between 12

14    and 14 hours old.  (*Id.* at 103–11, 127.)  The finger injury also occurred during the

15    more recent timeframe.  (*Id.*)

16          Dr. Howard also observed the numerous bruises, scrapes, tears, contusions,

17    abrasions, and lacerations on Rachel's body, and stated that most were inflicted

18    with a day of death.  (R.T. 4/12/95, at 111–12, 136.)  Like Dr. Siefert, he explained

19    that many of Rachel's injuries were consistent with defensive wounds.  (Id. at 150–

20    51.)

21          In addition to the bruising, Dr. Howard discovered a 1-inch laceration of the

22    skin "that went through all layers of the scalp down to the bone of the skull."  (*Id.*

23    at 111–17.)  This laceration was too jagged and irregular to have been caused by a

24    sharp object, but was "consistent with a blunt object, particularly one with a

25    relatively straight edge," such as a pry bar found in Jones' van.  (*Id.* at 121, 123.)

26    He also testified that some of the bruises on Rachel's chest could have been caused

27    by the pry bar.  (*Id.* at 128.)

28          Dr. Howard also discovered injuries to Rachel's genital area:

> The injuries that were visible involve blunt force type injuries, meaning bruising, involving the labia or outsides of the genitalia as I am indicating here.  Those same areas were abraded or scraped, and the opening of the vagina was torn in the posterior midline, meaning right in the middle of the body towards the back.
>
> The opening of the vagina was torn, and the tearing extended on to the skin toward her anus, and just above my left index finger is the location of the laceration, about one half inch in length, about 3/16ths of an inch in depth.

(*Id.* at 134.)   These injuries were consistent with penetration or attempted penetration and Dr. Howard "estimate[d]" that they occurred "about one day prior to death." (*Id.* at 133.)

On cross-examination, Jones' counsel obtained Dr. Howard's concessions that Rachel had no broken bones, and that a blow to the ribs or skull with the pry bar could easily have caused fractures.  (*Id.* at 158–60.)  Dr. Siefert conceded that the many of Rachel's bruises and the laceration on her scalp could have been caused by a fall from Jones' van.  (R.T. 4/6/95, at 128–29.)

## 2. Trial counsel did not perform deficiently.

First, this trial IAC claim would not have succeeded in the PCR proceeding because Jones has not shown that trial counsel performed deficiently.   The Supreme Court has stated that "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Cross-examination is thus sufficient to challenge the State's expert testimony and often, "the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Id.*  Here, although trial counsel did not use expert testimony to challenge the testimony of Drs. Siefert and Howard, he challenged the State's evidence in other ways, by emphasizing that Jones had no motive to commit the crimes, that the State's evidence was circumstantial, and that the State

1    failed to prove beyond a reasonable doubt that Jones inflicted Rachel's injuries.

2    (*See* Dkt. # 141, at 9.)   Furthermore, as noted above, defense counsel obtained

3    concessions from both doctors through cross-examination which suggested that the

4    pry bar found in Jones' van did not cause Rachel's scalp and abdominal wounds

5    and that many of the injuries could have been caused by a fall from Jones' van.

6    (R.T. 4/6/95, at 128–29; R.T. 4/12/95, at 158–60.)   And the reasonableness of the

7    tactics trial counsel used to address the State's doctors is further bolstered by the

8    fact that these witnesses testified only to the nature and extent of Rachel's injuries,

9    and were unable to connect the infliction of the injuries to Jones.   Under these

10   circumstances, Jones has failed to demonstrate a substantial likelihood that PCR

11   counsel would have been able to establish trial counsel's deficient performance in

12   the PCR proceeding.

13                        **3.  Jones has not shown prejudice.**

14        Second, the trial IAC claim would not have warranted relief in the PCR

15   proceeding because even had trial counsel presented the new evidence Jones

16   proffers now, there is no reasonable probability of a different outcome at trial.  *See*

17   *Strickland*, 466 U.S. at 694.   Respondents next address each category of new

18   evidence in turn.

19                        a. *Timing of the fatal injury.*

20        In his attempt to establish prejudice from the failure to use experts to

21   challenge the State's evidence regarding the timing of Rachel's fatal injury, Jones

22   relies primarily on findings from Drs. Janice Ophoven and Mary Pat McKay (Dkt.

23   # 167, at 12–29), and Dr. Howard's testimony from Angela Gray's trial (*Id.* at 30–

24   32; Dkt. # 96, Ex. 9).  In sum, Jones argues that this information shows that Rachel

25   suffered the fatal abdominal injury sometime before May 1, 1994, when

26   individuals other than Jones had access to her.   Jones cannot show prejudice,

27   however, because there is no reasonable probability of a different outcome of his

28

1 PCR proceeding had he produced such evidence there.  *See Strickland*, 466 U.S. at

2 694.

3 Most significantly, Dr. Ophoven states that Rachel's abdominal injuries

4 were days old when she died, the symptoms of the tear in Rachel's duodenum

5 could have been delayed for several days, and "the fatal injuries to Rachael [sic]

6 Gray could not possibly have been inflicted on the day prior to her death as

7 suggested by the State at Mr. Jones' trial." (Dkt. # 167, at 14–21.)  Similarly, Dr.

8 McKay states that Rachel's "duodenal injury occurred no sooner than 36 hours

9 prior to death and likely occurred much earlier.  There is absolutely zero evidence

10 to suggest it could have occurred in less than 24 hours."  (*Id.* at 22–28.)

11 Jones also points to Dr. Howard's testimony in Angela Gray's trial to

12 suggest he misled the jury in Jones' trial.  Jones claims that at Angela's trial, Dr.

13 Howard testified that it would have taken at least 12 hours for Rachel to die from

14 the duodenal tear, contradicting his testimony at Jones' trial that the fatal injury

15 could have been inflicted between 2:00 and 6:00 p.m. on May 1, less than 12 hours

16 before her death.  (*Id.* at 30–31.)  Additionally, Jones asserts, Dr. Howard testified

17 in the other trial that Rachel's injuries were "most consistent" with having been

18 inflicted about 24 hours before her death.  (*Id.* at 31.)

19 As this Court previously determined, Jones' new evidence "does not

20 seriously call into question the jury's verdict" (Dkt. # 141, at 17), and thus does not

21 raise a "substantial . . . likelihood of a different result."  *See Pinholster*, 131 S. Ct.

22 at 1402.  First, any apparent inconsistencies between Dr. Howard's testimony in

23 the two trials is the result of the different questions asked; even though Jones has

24 submitted a 2004 declaration from Dr. Howard, he has not retracted his testimony

25 from Jones' trial that Rachel's abdominal injury could have occurred on the

26 afternoon of May 1 while she was with Jones.  At Jones' trial, Dr. Howard testified

27 as follows regarding the timing of the fatal injury:

28

Q.   Based on the appearance of this area of Rachel's body upon autopsy, can you tell us what is most consistent with when this blow would have occurred to Rachel?

A.   The injury is typical of having occurred about one day prior to death.

Q.   You say about one day. We're talking about the same age range as the laceration in her head, her genital injuries, and the external bruises you characterized from that time frame?

A.   Yes.

Q.   Based upon the degree of disease process that you noticed with Rachel, would it be consistent with her having received a blow that caused that laceration sometime between the hours of 2 and 5:30 or 6 on the afternoon of May 1st?

A.   May 1st—she had died on—May 2nd—any time on the 24 hours prior to that would be consistent, so that time frame would be possible.

(R.T. 4/12/95, at 148.)

During cross-examination at Angela Gray's trial, Dr. Howard answered the following questions:

Q.   You indicated that the internal injuries that the child died from, the —just for clarification—were about 24 hours prior to her death is when she incurred the injury to her abdomen?

A.   The findings are most consistent with that.

Q.   . . .   What would be the least amount of time that it would take from that injury—from when the injury occurred until the time of death?

A.   Again, there would be a minimum of many—several hours. Perhaps 12 hours.   Again, to get the degree of inflammation, that's conceivable.

Q.   It would be from 12 hours on up to—say 24 to 36 hours?

22

1      A.  Yes.

2  (Dkt. # 96, Exhibit 9 [R.T. 3/28/95, at 101].)

3          As this Court previously observed, "when given an open-ended opportunity

4  to date the injury at trial, [Dr. Howard] identified the time frame as within one day

5  of her death."  (Dkt. # 141, at 18.)  Dr. Howard's somewhat equivocal statement at

6  Angela Gray's trial that 12 hours was "perhaps" the least amount of time from

7  injury to death does not contradict his testimony in the trial here that the injury was

8  likely inflicted sometime during the day before Rachel's death.  In fact, given Dr.

9  Siefert's testimony that Rachel died 2 to 3 hours before being brought to the

10  hospital at 6:16 a.m. on May 2 (R.T. 4/6/95, at 80), Dr. Howard's testimony that

11  the fatal injury could have occurred during the 2–6 p.m. window the day before is

12  consistent with his testimony that it was likely that at least 12 hours elapsed from

13  injury to death.  Nothing about Dr. Howard's testimony at Angela Gray's trial

14  suggests the reasonable likelihood of a different result had it been utilized at either

15  Jones' trial or in the PCR proceeding.

16          Second, the "as-yet unimpeached testimony" of Drs. Ophoven and McKay

17  amounts "to a disagreement with Dr. Howard's trial testimony that Rachel's

18  abdominal injury likely occurred in the twenty-four hours prior to her death."

19  (Dkt. # 141, at 18.)  But in light of the compelling circumstantial evidence

20  supporting the State's expert's opinion that the injuries occurred on May 1, 1994,

21  and showing Jones' consciousness of guilt, the jury would undoubtedly have

22  resolved this conflict in favor of the medical examiner's opinion.  *See Leavitt v.*

23  *Arave*, 682 F.3d 1138, 1141 (9th Cir. 2012).  The Arizona Supreme Court found

24  that the following facts supported a finding of Jones' guilt:

25              Evidence supports the conclusion that virtually all of Rachel's
26          injuries occurred within a two-hour period. Rachel's sister, Rebecca,
              testified that Rachel spent the morning with her and their brother
27          watching cartoons. Rachel "seemed fine" when her siblings went out
              to ride their bikes, about 3:00 p.m. Additionally, Rachel "seemed
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

fine" after the first two times that she returned with defendant. Rachel first accompanied defendant to the market. Rebecca saw Rachel standing at the door when they returned, and she seemed fine. The second time defendant returned with Rachel, Rebecca again saw her standing at the door, and Rachel appeared to be fine. If Rachel had already suffered genital injuries, she would have been in pain. The examiner testified at the aggravation/mitigation hearing that the genital injuries would have caused pain at basically all times. The third time that defendant went out with Rachel, he told Rebecca that he was going to his brother's house. However, his brother's wife testified that defendant never visited their house on that day. During defendant's third trip with Rachel, two children saw defendant hitting Rachel while he drove. One of the children placed the time at 5:00 p.m. Blood spatter in the van likely was created by defendant hitting Rachel after she had already suffered a head injury. Additionally, blood spatter consistent with Rachel's blood type was found on defendant's jeans, along with traces of blood on defendant's shirt and boots. The next time that Rebecca saw Rachel, at about 6:30 p.m., Rachel was in a lot of pain. Many of the injuries that Rachel now had were consistent with defense against a sexual assault. Thus, substantial evidence was introduced to conclude that Rachel's physical assault and sexual assault all occurred within the two-hour time period during which she was alone with defendant in his van.

17
18
19
20
21
22
23
24
25

*Jones*, 937 P.2d at 319. The jurors still would have found Jones guilty had counsel presented Dr. Ophoven's and Dr. McKay's opinions because of the evidence that Rachel was uninjured before she left her home in Jones' sole custody but injured when she returned; that Jones was observed striking Rachel; that her blood was found in his car and on his clothing; that he lied about seeking medical treatment for her (presumably to dissuade others from doing so[5]); and that he lied about his ultimate destination when taking her on the car ride from which she returned with obvious injuries. Given this record, Jones has failed to show prejudice.

26
27
28

[5] *See Jones*, 937 P.2d at 323 ("Not only did [Jones] not take Rachel to the hospital when he knew how much she was suffering, he also effectively dissuaded others from taking her to the hospital by telling them that he had taken her to the paramedics.").

24

1

   b. <u>Timing of the genital injuries.</u>

2      In his attempt to show prejudice from trial counsel's failure to challenge the

3   timing of Rachel's genital injury, Jones relies on Dr. Howard's testimony from

4   Angela Gray's trial, Dr. Howard's 2004 declaration, and statements from Dr.

5   Ophoven.   (Dkt. # 167, at 32–34.)   But this evidence does not establish a

6   reasonable probability of a different outcome either at trial or in the PCR

7   proceeding.

8      First, Dr. Howard's testimony at Angela Gray's trial does not call into

9   questions his testimony here.  At the other trial, Dr. Howard stated during cross-

10  examination that the genital injuries were "[a]bout one day of age."  (Dkt. # 96,

11  Exhibit 9 [R.T. 3/28/95, at 99].)  When asked whether he meant 24 hours when he

12  said "one day," Dr. Howard replied, "Based on the degree of inflammation that

13  would be common for several hours certainly, and up to about 24 hours prior to

14  death."  (*Id.*)  He further stated that the genital injuries were inflicted "[p]erhaps as

15  few as 12 hours," possibly up to 48 hours, and "more typical of around 24 hours"

16  prior to death."  (*Id.* at 99–100.)  At the trial here, Dr. Howard stated that the

17  genital injuries "occurred about one day prior to death," consistent with most of

18  Rachel's other injuries.  (R.T. 4/12/95, at 133, 148.)  As with his testimony

19  regarding the fatal injury, Dr. Howard's testimony regarding the genital injury was

20  generally consistent between the two trials, with any slight differences being

21  attributable to the differently phrased questions he was asked.  And once again, his

22  testimony in Angela Gray's trial that the genital injury may have occurred as few

23  as 12 hours before death fits within the time line argued by the State in Jones' trial.

24  The same is true for his 2004 declaration, in which he stated that the vaginal

25  injuries "showed characteristics consistent with hours to perhaps days elapsing

26  between the time of her abdominal injury and her vaginal injury."  (Dkt. # 167–2,

27  Exhibit 1, at ¶ 13.)

28

1    Second, Dr. Ophoven's disagreement with Dr. Howard's testimony does not

2    demonstrate prejudice.  Dr. Ophoven states that the genital injuries "did not occur

3    in the few days prior to her death."  (Dkt. # 167, at 34.)  But even had Jones

4    presented her testimony, the compelling circumstantial evidence recounted above

5    would still have led the jury to find him guilty.  *See Jones*, 937 P.2d at 319.

6    Moreover, Dr. Siefert testified that he observed blood in Rachel's underwear and

7    blood coming from her vaginal region (R.T. 4/6/95, at 81), thus suggesting that the

8    genital injuries were recent.  Jones has failed to establish prejudice regarding the

9    timing of Rachel's vaginal injuries.

10                    c.  Timing of the bruises.

11    Jones also argues that he was prejudiced by counsel's failure to challenge

12    the State's evidence that the majority of Rachel's bruises were inflicted on the

13    afternoon of May 1.  In support of this contention, he again relies on Dr. Ophoven,

14    who states that "visual determination of the age of any bruise is scientifically

15    unreliable."  (Dkt. # 167, at 35.)  Once again, even had Dr. Ophoven's testimony

16    been presented, there is no doubt the jury still would have convicted Jones because

17    the additional compelling circumstantial evidence corroborated Dr. Siefert's and

18    Dr. Howard's testimony regarding the timing of the bruises.  *See Jones*, 937 P.2d

19    at 319.

20                    d.  Timing of the scalp injury.

21    Jones next contends that he was prejudiced by counsel's failure to challenge

22    Dr. Howard's testimony regarding the timing of Rachel's scalp injury.  At trial, Dr.

23    Howard testified that the scalp laceration appeared "typical of one, possibly two

24    days prior to death."  (R.T. 4/12/95, at 117.)  Jones first points to a portion of Dr.

25    Howard's pretrial interview at which he stated, "I took many pieces of scalp tissues

26    _____ and the others didn't, so, there was one injury that suggested that was 72

27    hours or older, and the others, less than that."  (Dkt. # 167–3, Exhibit 11, at p. 11, l.

28

26

8–10.)  It is far from clear, however, that the 72 hour injury he referred to was the scalp laceration.  And given his testimony at trial, it is unlikely that it was.

Jones next points to another portion of the interview in which Dr. Howard stated that the scalp laceration was "[p]robably two days old."  (Id. at p. 19, l. 14.)  This equivocal statement, however, is not inconsistent with his trial testimony that the laceration was one or two days old and would not have significantly impeached Dr. Howard had it been raised at trial.  Moreover, as with the other areas of evidence listed above, the compelling circumstantial evidence that Jones inflicted Rachel's injuries on the afternoon of May 1 would nonetheless have led the jury to convict him.  *See Jones*, 937 P.2d at 319.

e.  <u>Whether the pry bar caused the scalp and duodenal injuries.</u>

At trial, Dr. Howard testified that the scalp laceration was "consistent with a blunt object, particularly one with a relatively straight edge," such as the pry bar found in Jones' van, and that some of the bruises on Rachel's torso also *could have* been caused by the pry bar.  (R.T. 4/12/95, at 121, 123, 128–29.)   As previously discussed, however, defense counsel also elicited Dr. Howard's testimony that a blow to the ribs or skull from the pry bar, especially on a person as small as Rachel, would likely result in broken bones, which Rachel did not have.  (*Id.* at 158–60.)  Additionally, Dr. Siefert conceded that the many of Rachel's bruises and the laceration on her scalp could have been caused by falling from Jones' van.  (R.T. 4/6/95, at 128–29.)

First, Jones asserts that he was prejudiced because Dr. Ophoven and Dr. Patrick Hannon, a biomechanics expert, agree that the scalp wound was more likely caused by something like a fall than by the pry bar, and because Dr. Howard stated in his 2004 declaration that the laceration "could have resulted from a fall

1   against a hard surface."[6]  (Dkt. # 167, at 36–38; # 167–2, Exhibit 1, at ¶ 14.)  Jones

2   cannot establish prejudice because this new evidence is cumulative to what was

3   presented at trial and because the jury did not need believe to believe that the pry

4   bar, or even Jones, inflicted the scalp wound to find him guilty.

5          Here, Dr. Howard did not testify that the pry bar was the conclusive cause of

6   Rachel's scalp laceration, but stated merely that the wound was "consistent" with a

7   blunt object, like the pry bar.  Moreover, he conceded that while a blow from the

8   pry bar would likely have fractured Rachel's skull, she suffered no such injury;

9   similarly, Dr. Siefert stated that the scalp wound could have been the result of a fall

10  from Jones' van.  Jones' new evidence, asserting that a fall rather than the pry bar

11  likely caused the injury, is cumulative to what was presented to the jury.

12  Consequently, there is no reasonable probability that the new evidence would have

13  affected the jury's verdict.  *See Mickey v. Ayers*, 606 F.3d 1223, 1247 (9th Cir.

14  2010) ("[I]t is widely accepted that the absence of marginal and cumulative

15  evidence is not prejudicial."); *Carriger v. Lewis,* 971 F.2d 329, 332–34 (9th Cir.

16  1992) (counsel's failure to introduce cumulative evidence does not constitute

17  ineffective assistance of counsel).

18         Furthermore, the jury would have convicted Jones even if it believed the

19  scalp injury was the result of something other than the pry bar, such as a fall from

20  the van.  As noted several times above, compelling evidence established that Jones

21  inflicted the majority of Rachel's injuries, including the genital and fatal injuries.

22  *See Jones*, 937 P.2d at 319.  Consequently, there is no reasonable probability of a

23  different outcome even if counsel had presented this additional evidence and the

24  jurors concluded that Jones did not cause the scalp wound with the pry bar.

25

26  _____

27  [6] Dr. Howard's statement in his declaration does not contradict his trial testimony,
    which was only that the scalp wound was "consistent" with having been caused by

28  a "blunt object."  (R.T. 4/12/95, at 121.)

1    Second, Jones asserts that he was prejudiced because counsel failed to
2    present evidence that the pry bar did not cause Rachel's duodenal tear.   Again,
3    Jones relies on statements from Drs. Ophoven and Hannon to support this point.
4    (Dkt. # 167, at 38–42.)   Jones has failed to establish prejudice because, like with
5    the evidence regarding the pry bar and the scalp wound, his new evidence is
6    cumulative to what the jury heard and because it fails to call into question the
7    evidence establishing that Jones inflicted Rachel's fatal injury regardless whether
8    he did so with the pry bar.

9    Like with the scalp wound, Dr. Howard did not testify that the pry bar
10    definitively caused Rachel's fatal wound, but stated instead that the pry bar was
11    "consistent" with possibly having caused linear bruising on Rachel's torso.   (R.T.
12    4/12/95, at 128–29.)   And importantly, Dr. Howard never testified that the pry bar
13    cause the duodenal tear, only that it could account for some of the abdominal
14    bruising.   He conceded, however, that a blow from the pry bar to Rachel's
15    abdomen would likely have caused broken ribs, which Rachel did not have.   (*Id.* at
16    158–60.)   Given this concession at trial, there is no reasonable probability that
17    additional, cumulative evidence that the pry bar did not cause the abdominal tear
18    would have changed the jury's verdict.   *See Mickey*, 606 F.3d at
19    1247; *Carriger,* 971 F.2d at 332–34.

20    Furthermore, the instrument Jones used to inflict the blow or blows on
21    Rachel's torso that resulted in her fatal injury did not matter.   Jones' new evidence
22    suggesting that the fatal injury was not caused by the pry bar does nothing to call
23    into question the compelling evidence that Jones caused the injury, no matter
24    whether he did it with the pry bar, part of his own body, or another object.   *See*
25    *Jones*, 937 P.2d at 319.   Consequently, there is no reasonable probability of a
26    different outcome even if counsel had presented this additional evidence.

27

28

f. <u>Conclusion.</u>

For the reasons above, trial counsel was not ineffective under *Strickland* by failing to provide expert testimony to challenge the State's evidence regarding the timing and cause of Rachel's various injuries—the fact that counsel might have challenged the State's evidence "more robustly" does not create a "substantial" likelihood that the result of Jones' trial could have been different but for their alleged shortcomings. *See Woods v. Sinclair*, 655 F.3d 886, 913 (9th Cir. 2011), *vacated on other grounds by Woods v. Holbrook*, 132 S. Ct. 1819 (2012) (citing *Harrington*, 131 S. Ct. at 792). For this reason, PCR counsel was not ineffective for failing to raise this aspect of Claim 1D in the PCR proceeding, *Sexton*, 679 F.3d at 1157, and Jones has failed to establish cause under *Martinez*. *See Clabourne*, 745 F.3d at 377.

**C.** ***Trial counsel was not ineffective for failing to further challenge evidence that Jones beat, sexually assaulted, and murdered Rachel in his van during the third trip on the afternoon of May 1.***

Jones next argues that trial counsel should have further challenged the State's theory that on the afternoon of May 1, Jones took Rachel on three separate trips in his van and beat and assaulted her during the third trip. (Dkt. # 167, at 42–47.) This claim, however, lacks merit and PCR counsel was not ineffective for not raising it.

At trial, Rachel's sister Rebecca, who was 10 years old at the time of the murder, testified that on the afternoon of May 1, she saw Jones drive away from the trailer park where they lived three times with Rachel as his passenger. (R.T. 4/11/95, at 37–39.) During that afternoon, Rebecca and her 14–year–old brother, Johnathan, had been riding their bikes; when Rebecca put her bike away, Rachel was in the living room and "looked fine." (*Id.* at 41–43.) By this time, it was "getting kind of late in the day." (*Id.* at 42.) Rebecca at that point had seen Jones return twice with Rachel, and each time she thought Rachel was okay. (*Id.* at 70–

30

72.)  The third time Jones left with Rachel, he told Rebecca that they were going to Jones' brother's house.  (*Id.* at 78–79.)  At around 5:00 p.m., after Jones and Rachel had returned, Rebecca went to see a friend named Susie.  (*Id.* at 71, 79.) Although Jones returned before Rebecca left for Susie's, she did not remember seeing Rachel before leaving.  (*Id.* at 79.)

When Rebecca returned from Susie's, at around 6:00 or 7:00 p.m., Rachel was on the couch; she "[l]ooked really sick," "[h]er skin was pale and she kept throwing up."  (*Id.* at 46, 72, 79–80.)  Her head was bleeding and she had bruises on her face, fingers, and hands.  (*Id.* at 46, 50.)  Rachel was also crying, it sounded "between a scream and a cry."  (*Id.* at 49.)

Jones now argues that trial counsel should have pointed out that Rebecca's testimony regarding the third trip was a "fabrication" because, at Angela Gray's trial, Rebecca testified that Jones and Rachel took only two trips in the van, and that Rachel seemed fine after the second trip.  At that trial, Rebecca testified that while she and Johnathan were riding their bikes outside on the afternoon of May 1, Jones said he was going to the store and left with Rachel in his van.  (Dkt. # 96, Exhibit 9 [R.T. 3/24/95, at 29].)  Sometime after returning from that trip, Jones told Rebecca that he was going to a friend's house, and again left with Rachel in his van.  (*Id.* at 31.)  Rebecca later asked Jones' permission to go to Susie's home, stayed there for about an hour-and-a-half, and returned home at about 6:30 p.m. (*Id.* at 32–33.)  During cross-examination, Rebecca reiterated that that saw Jones and Rachel leave and return twice:

> Q.  Now, you are sure that they left, they went and came back two separate times?
>
> A.  Yes.

(*Id.* at 70–71.)  Rebecca said that she saw Rachel when leaving for Susie's, and that when she returned from Susie's, Rachel looked sick.  (*Id.* at 71.)  Finally,

31

1   Rebecca's testimony in Gray's trial included one piece of information not included

2   in Jones trial: that on the evening of May 1, when Angela asked Rachel what

3   happened to her, Rachel said that Jones "hit her with the metal shoe bar." (*Id.* at

4   38–39.)

5         Trial counsel was not ineffective because nothing in Rebecca's testimony

6   from the Angela Gray trial would have been useful for cross-examination in Jones'

7   trial, much less established that her testimony regarding the third trip was

8   "fabricated."   First, Rebecca's testimony in the two trials was not necessarily

9   inconsistent.   Rebecca did not testify that there was no third trip, but rather

10   described seeing Jones and Rachel leave and come back twice.  She simply made

11   no mention of the third trip she testified about at Jones trial.  Nor was Rebecca's

12   testimony in the Gray trial that she saw Rachel looking fine before leaving for

13   Susie's inconsistent with her testimony in the Jones trial that Rachel looked okay

14   after the second trip, before Rebecca went to Susie's.  Moreover, any inconsistency

15   is most likely explained by the fact that the third trip was immaterial in the Gray

16   trial, where the issue was not who caused Rachel's injuries, but rather Gray's

17   failure to seek care for Rachel after she was injured.

18         Instead, counsel's cross-examination of Rebecca at Jones' trial focused on

19   the idea that she was at Susie's between last seeing Rachel looking okay and

20   returning and seeing Rachel looking sick, thus pointing out that Rebecca was

21   unaware what happened to Rachel to put her in that condition. (R.T. 4/11/95, at

22   69–77.)  Furthermore, although while at Susie's Rebecca would not have known

23   where Rachel was, defense counsel elicited her testimony that Ryan, the son of a

24   neighbor named Stephanie, could be a bully and had pushed Rachel on several

25   occasions; this line of questioning suggested the theory posited by Jones now, that

26   Rachel may have been hurt while at Stephanie's home. (*Id.* at 77–78; Dkt. # 167,

27   at 46.)

28

First, trial counsel did not perform deficiently.  "Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill," and decisions regarding cross-examination are the type of tactical decisions that receive "great deference and must similarly meet only objectively reasonable standards."  *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).  As noted above, the inconsistencies in Rebecca's testimony in the two trials were not material, and were likely explained by the differences in what was at issue in each proceeding.  Defense counsel's cross-examination emphasized that Rebecca was at Susie's during the time the State alleged Rachel was injured, and thus did not know what happened or who beat and assaulted her sister.  This was a reasonable strategy and trial counsel did not perform deficiently by failing to attempt to impeach Rebecca with her testimony from Gray's trial.  *See Strickland*, 466 U.S. at 687–88.  Moreover, challenging the accuracy of Rebecca's testimony may have backfired, causing her to double-down on her assertion that Rachel was injured upon returning from her third trip with Jones.  *See Brown v. Utrecht*, 530 F.3d 1031, 1036–37 (9th Cir. 2008) (counsel not ineffective for failing to cross-examine witness where doing so "might well have backfired").

Second, Jones was not prejudiced because, even if counsel had attempted to impeach Rebecca with her testimony from the Gray trial, there is no reasonable likelihood of a different result.   Even if the jury did not believe Rebecca's testimony that she saw Jones and Rachel leave on a third trip, the jury still would have convicted Jones based on the evidence that

> two children saw defendant hitting Rachel while he drove. One of the children placed the time at 5:00 p.m. Blood spatter in the van likely was created by defendant hitting Rachel after she had already suffered a head injury. Additionally, blood spatter consistent with Rachel's blood type was found on defendant's jeans, along with traces of blood on defendant's shirt and boots. The next time that Rebecca saw Rachel, at about 6:30 p.m., Rachel was in a lot of pain. Many of the injuries that Rachel now had were consistent with defense against a

33

1
2
3

> sexual assault. Thus, substantial evidence was introduced to conclude that Rachel's physical assault and sexual assault all occurred within the two-hour time period during which she was alone with defendant in his van.

4
5
6
7
8
9
10
11

*Jones*, 937 P.2d at 319.  The jurors would still have found Jones guilty had counsel impeached Rebecca's testimony that she saw Jones and Rachel leave on a third trip based on the evidence that Rachel was uninjured before Jones was observed striking Rachel; that her blood was found in his car and on her clothing; and that he lied about seeking medical treatment for her.   Consequently, trial counsel's failure to impeach Rebecca using her testimony from the Gray trial does not undermine confidence in the outcome at Jones' trial.  *See Strickland*, 466 U.S. at 694.

12
13
14

And finally, because trial counsel was not ineffective under *Strickland*, Jones cannot show cause under *Martinez* because PCR counsel cannot have been ineffective for failing to raise a meritless claim.  *Sexton*, 679 F.3d at 1157

15

### D. *Trial counsel was not ineffective for failing to investigate Jones' trip to the Choice Market.*

16
17
18
19
20
21
22
23

Jones next contends that trial counsel was ineffective for failing to conduct an investigation to undermine the State's theory that Jones beat and sexually assaulted Rachel during a trip to the Choice Market.  This claim fails because the State offered no such theory; rather, the State relied on testimony that two children were walking home from the Choice Market when they saw Jones drive by beating Rachel.  The State never contended, nor did any evidence suggest, that the sexual assault and fatal beating occurred during a trip Jones made with Rachel to the Choice Market.  Consequently, his claim of trial counsel's ineffectiveness fails.

24
25
26
27

At trial, Norma Lopez testified that in the "afternoon, 3, 4 o'clock" on May 1, she sent her children Ray and Laura to the Choice Market on Benson Highway.  (R.T. 4/7/95, at 50.)  Ray testified that they went to the market at 5:00 p.m.  (R.T. 4/7/95, at 8–9.)  While walking home, Ray and Laura saw an "ugly" white man

28

1    with "bushy" or "puffy" hair and a little girl while in a yellow van.  (*Id.* at 9–10,

2    36.)  The man was hitting the little girl and she was crying.  (*Id.* at 10–11, 13–14,

3    37–38.)   When the children arrived home, they told their parents what they had

4    seen.  (*Id.* at 17, 38, 45.)  When Norma had the children watch footage of Jones'

5    arrest on the television news, they both said that Jones was the man they had seen

6    hitting the little girl in a yellow van.  (*Id.* at 17–18, 36, 40, 54–55.)  In closing

7    argument, the prosecutor tied this testimony to the testimony that Rachel's blood

8    was found on Jones' clothing and in his van.  (R.T. 4/13/95, at 98–100, 139.)

9        A clerk testified at trial that Jones came into a Quik Mart between 3:15 and

10   5:00 p.m. on May 1.  He got a bag of ice and was with a little girl who stayed

11   outside when he came in.  (R.T. 4/7/95, at 142–47, 158–59.)  The prosecutor

12   argued that it was during the third trip that the Lopez children saw Jones beating

13   Rachel and that Jones went into the Quik Mart to get ice in attempt to stop the

14   bleeding from Rachel's head wound.  (R.T. 4/13/95, at 98–101.)

15       Jones' entire argument is based on the false premise that the beating the

16   Lopez twins witnessed took place during a trip *Jones made* to the Choice Market.

17   He argues that this cannot be the case because Rebecca stated that Rachel was

18   okay after returning with Jones from a trip to the store with groceries.  (Dkt. # 167,

19   at 47–49.)  Jones' argument fails because the State made no contention—nor did

20   the evidence suggest—that Jones beat Rachel on the way to or from the Choice

21   Market; the Lopez children's testimony was simply that they were walking home

22   from the Choice Market when they saw Jones drive by beating Rachel.   The

23   prosecutor did not argue that Jones was going *to* the Choice Market, but that the

24   Lopez twins saw Jones "as he's driving around in the vicinity of the Choice

25   Market." (R.T. 4/13/95, at 98.)  The fact that Jones may have made an earlier trip

26   with Rachel for groceries during which he did not violently assault her does

27   nothing to contradict what Ray and Laura Lopez saw.  In sum, because the State

28   never contended that Jones sexually assaulted and fatally beat Rachel on a trip

during which he entered the Choice Market, trial counsel was not ineffective for failing to point out that Rachel was okay after returning from grocery shopping with Jones, failing to look into police interviews of Choice Market employees, and failing to attempt to locate a purchase record to establish the time Jones was at the Choice Market.  In other words, trial counsel neither performed deficiently, nor prejudiced Jones, by failing to attack a nonexistent theory.

Because this claim of trial ineffectiveness is meritless, PCR counsel was not ineffective for failing to raise it.  *Sexton*, 679 F.3d at 1157.

### E.  Trial counsel was not ineffective for failing to more robustly challenge the State's blood evidence.

Jones next argues that trial counsel was ineffective for failing to investigate "innocent" explanations for the presence of Rachel's blood in his van and on his clothing, and for failing to establish that the blood evidence was "falsified" by the State.  PCR counsel was not ineffective for failing to raise this claim, however, because it is meritless.

At trial, the State presented evidence of blood found in various locations during the investigation.  For example, blood consistent with Rachel's was found on a plastic bag, carpet samples, and front passenger seat of Jones' van, as well as on the jeans Jones was wearing when he was arrested.  (R.T. 4/7/95, at 120–21, 126–27; R.T. 4/11/95, at 106–09.)  On the carpet between the van's seats there appeared to be impression stains—caused when a person rests an injury on a piece of material and the blood soaks through.  (R.T. 4/12/95, at 64, 72–73.)  There was also a trace of blood on the t-shirt and boots Jones wore when he was arrested.  (R.T. 4/11/95, at 95, 116; R.T. 4/12/95, at 61–62.)  The blood stains on Jones' t-shirt were on the right sleeve and lower abdomen; the blood stains on his jeans were on the right knee and thigh.  (R.T. 4/11/95, at 116.)  There was also blood on Rachel's panties and pajamas.  (*Id.* at 90–91.)

One of the State's witnesses at trial was Sergeant Sonya Pesquiera of the Pima County Sheriff's Office.  (R.T. 4/12/95, at 26.)  In addition to her experience as a homicide and child abuse/sex crimes detective, Sgt. Pesquiera testified that her training included a week-long course in homicide investigation, a week-long course in blood stain and blood spatter evidence, and courses in forensic pathology which included investigations of deaths caused by blunt force trauma and child abuse.  (*Id.* at 26–27, 28–29, 62–63.)    During her testimony, the sergeant explained the differences between different types of blood stains, such as low, medium, and high velocity, projected versus splashed blood, transfer stains, impressions stains, and spatter.  (*Id.* at 63–64.)

When the prosecutor asked Sgt. Pesquiera if any of the blood stains she observed in this investigation were "consistent with what you called an impression stain," defense counsel objected under Arizona Rule of Evidence 702, arguing that the sergeant did not possess sufficient expert credentials to answer the question.[7] (*Id.* at 65–66.)  The trial court overruled the objection, and Pesquiera testified that blood on the van's carpeting appeared to be an impressions stain "where the blood has actually soaked through and has been in that position for quite a while to where it soaks down through the carpeting."  (*Id.* at 66, 72.)

Sergeant Pesquiera also stated that some of the blood stains in the van exhibited a "spatter" pattern.  (*Id.* at 72–73.)  When the prosecutor asked what spatter stains like those in the van were consistent with, defense counsel again objected under Rule 702.  (*Id.* at 73.)  The court again overruled the objection, and

---

[7] Jones asserts that that Sgt. Pesquiera "acknowledge[ed] that she was not a qualified blood interpretation expert."  (Dkt. # 167, at 55.)  This is inaccurate. Specifically, she stated that although she was "not qualified as an expert to say what velocity [the blood stains] are," she "could say I could appreciate what type of stains they were in relationship to where the victim could have been and the assailant could have been."  (R.T. 4/12/95, at 64–65.)  Accordingly, she did not testify regarding the velocity of the blood stains, but rather what type of patterns they were, such as impressions or spatter.  (*Id.* at 66–67, 71–76.)

37

1   the sergeant stated that the blood spatter in the van suggested that "there was static

2   blood already there, and some type of blunt trauma struck that static blood causing

3   it to go out."  (*Id.* at 73–74.)  She also testified that blood droplets on the right

4   sleeve of the van driver's shirt would be consistent with the spatter in the van.  (*Id.*

5   at 75.)

6        When cross-examining Sgt. Pesquiera, defense counsel highlighted the fact

7   that no blood was detected on the pry bar or other metal pipes in Jones' van.  (*Id.* at

8   85–87.)  In closing argument, defense counsel argued that the blood in the van was

9   not "spatter," but simply "some drops of blood."  (R.T. 4/13/95, at 113.)  He

10  additionally emphasized that Sgt. Pesquiera was not a blood spatter expert and that

11  her testimony regarding the blood stains in the van was speculation.  (*Id.* at 113–

12  14.)

13       First, counsel was not ineffective in challenging the evidence of blood on

14  Jones clothing.  Although he points out that there was no evidence that he was

15  wearing the blood-stained t-shirt and jeans on May 1 (Dkt. # 167, at 55), defense

16  counsel alerted the jury to this very fact:

17           There's no evidence of anything about blood on Barry's
             clothing other than what the testimony was that he carried that girl out
18           to the van.  Those are the clothes he was wearing the day of his arrest.
             We don't know what he was wearing the day before.  There's no
19           evidence of that.
20

21  (R.T. 4/13/95, at 125.)  Counsel therefore could not have been ineffective for

22  failing to point out the lack of evidence that Jones wore the bloodstained clothing

23  on the day that the State alleged the assault occurred.

24       Jones also relies on the findings of a purported bloodstain interpretation

25  expert, Stuart James, who states that Sgt. Pesquiera was not qualified to offer her

26  opinions regarding bloodstain pattern interpretation.  James' assertion is irrelevant

27  to defense counsel's effectiveness, however, because counsel objected on that very

28  ground—albeit   unsuccessfully—to   Pesquiera's   testimony   interpreting   the

38

1    bloodstains.  (R.T. 4/12/95, at 65–66, 73.)  Moreover, defense counsel made this

2    same point when he addressed Pesquiera's testimony in closing argument.  (R.T.

3    4/13/95, at 113–14.)  *See McElvain v. Lewis*, 283 F.Supp.2d 1104, 1125 (C.D. Cal.

4    2003) (no factual basis for ineffectiveness claim based on failure to object when

5    record showed that counsel did object to the evidence at issue).

6        Jones also points to James' opinion that the blood on Jones' clothing "proves

7    only that his clothing whether he was wearing them or not was at some point in

8    time close to and in contact with a bleeding source some of which was consistent

9    with the blood of Rachel Gray.  These stains could have occurred as the result of

10   lifting or otherwise attending to an injured person."  (Dkt. # 167, at 56; Dkt. # 167–

11   18, Exhibit 32, at ¶ 7.)  James' opinion does nothing more than offer an alternative

12   explanation for the blood on Jones' clothing—that it could have come from Jones

13   simply having contact with Rachel while she was bleeding.  Counsel was not

14   ineffective because he achieved the same result by arguing that the evidence

15   showed that Jones carried Rachel to the van to go to the hospital the morning of

16   her death, thus establishing that this act could have been the source of the blood.

17   (R.T. 4/13/95, at 125.)  *Cf. Richter*, 562 U.S. 110–11 (counsel was not ineffective

18   for failing to call expert to counter testimony from State's forensic blood experts

19   where counsel used cross-examination to elicit concessions from State's experts

20   and draw attention to weaknesses in their conclusions).

21       Second, counsel was not ineffective in challenging Sgt. Pesquiera's

22   testimony about the blood in the van.  In attempting to fault trial counsel, Jones

23   relies on James' statements that the bloodstains on the passenger seat were "not

24   typical of those produced during a beating" and that the blood "could have been

25   projected or cast-off from the victim's hair as she was carried into the van, while

26   the van was in motion or during resuscitation efforts."  (Dkt. # 167, at 59.)  But

27   counsel was not ineffective because James' conclusions provide nothing more than

28   an alternative explanation for the blood in the van.  Here, defense counsel achieved

the same effect by relying on the evidence that was presented and focusing on its shortcomings:

> I mean, if the State's theory is Barry raped and murdered that girl in the van, why is there no physical evidence?  Why are they looking at this one picture with tiny dots on it and telling you that's blood spatter?  Why did they parade, go around with this pry bar and then neglecting to mention there were two other bars that are metal objects in that van that they sent up for some kind of analysis with the same results.  Nothing found.  *There's nothing in those pictures that indicates anything else but that little girl was in the van and she bled on the van.*

(R.T. 4/13/95, at 125.  Emphasis added.)  Because counsel made the same point through the State's own witnesses and evidence, he was not ineffective for failing to provide expert testimony that there was an alternative explanation for the blood in the van.  *See Richter*, 562 U.S. at 110–11.

Third, Jones addresses the sergeant's testimony that there was an "impression" stain on the van's carpeting and small drops of nearby blood spatter and the prosecutor's related argument that the impression stain showed the location where Rachel was lying, bleeding from her head wound, while she was sexually assaulted.  (Dkt. # 167, at 60 [citing R.T. 4/12/95, at 72; R.T. 4/13/95, at 96–97].)  Jones relies on James' opinion that the stain Sgt. Pesquiera described as an "impression" stain was passive blood drip and, thus, there was no evidence that Rachel had laid down in the back of the van.  (*Id.* at 60–61.)  James also states that blood droplets near the impression stain that Pesquiera characterized as spatter was also a "passive drop," not spatter.  (*Id.* at 61.)

Counsel was not ineffective because, as demonstrated above, he effectively established the weaknesses and limitations in the evidence of blood in the van by making arguments based on the State's own witnesses and evidence.  Under those circumstances, testimony from an expert such as James was unnecessary.  *See Richter*, 562 U.S. at 110–11.

40

1      Additionally, there was no prejudice because James' findings are not
2 inconsistent with, much less do they disprove, the State's theory that Jones
3 sexually assaulted and beat Rachel in the van.  For example, James' statements
4 regarding the bloodstain the sergeant called an impression stain are not inconsistent
5 with the State's theory that the stain evidenced a location where Rachel laid down
6 and may have been sexually assaulted—James states that those bloodstains
7 indicate "that Rachel Gray was actively bleeding and moving around while in the
8 van and may have made contact with the carpet with a bloody area at some point in
9 time." (Dkt. # 167–18, Exhibit 32, at p. 4, ¶ 3.)  Although he concluded that this
10 bloodstain "should not be confused with blood spatter" (*id.*), Sgt. Pesquiera
11 characterized that bloodstain as an impression, not spatter.   (R.T. 4/12/95, at 66,
12 72.)  Moreover, Rachel could have been "actively bleeding and moving around
13 while in the van," as James stated, while Jones sexually assaulted her. (*See* R.T.
14 4/13/95, at 96.)  Additionally, James' opinion that a bloodstain near the so-called
15 impression stain that Sgt. Pesquiera described as spatter does not mean that Rachel
16 was not assaulted in the van.

17      In sum, James' conclusions simply provide an alternate explanation for the
18 presence of Rachel's blood on Jones' clothing and in his van.  Regardless whether
19 the blood found was spatter, transfer, or passive droplets, the fact remains that
20 Rachel bled in Jones' van and on Jones' clothing.  And, even if the blood is not
21 spatter as a detective opined, that fact does not prove that Jones did not create the
22 injury that caused Rachel to bleed. In light of the evidence of Jones' guilt set forth
23 above—including the fact that Rachel was in visible pain when she returned from
24 her outing with Jones and that Jones had been seen striking her on that outing—the
25 jury would still have found Jones guilty.  Because this trial IAC claim is meritless,
26 PCR counsel was not ineffective for failing to raise it and Jones has failed to
27 establish cause under *Martinez*.  *Sexton*, 679 F.3d at 1157.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.  *Trial counsel was not ineffective for failing to argue that the evidence does not support an inference that Rachel was beaten and assaulted in the van.***

Jones next contends that the back of his van was too crowded with items for him to have assaulted Rachel there and that, although the van's floor was dirty, there was no debris in Rachel's hair, suggesting, apparently, that trial counsel was ineffective for failing to make these arguments.  (Dkt. # 167, at 61–62.)   These arguments, however—that the assault could not have occurred in Jones' van as the State contended—are essentially the same as that made by defense counsel at trial. As previously discussed, defense counsel argued that no evidence established that any assault or beating occurred in the van.  (R.T. 4/13/95, at 125.)  "The right to effective assistance extends to closing arguments, but counsel is allowed wide latitude with regard to 'which issues to sharpen and how best to clarify them.'" *Knight v. Spencer*, 447 F.3d 6, 18 (6th Cir. 2006) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003)).  Here, counsel's argument that no evidence proved there was an assault and beating in the van was consistent with the defense theme that the State simply had insufficient evidence to establish that Jones was responsible for Rachel's death.  Under these circumstances, counsel was not ineffective for failing to make a similar argument that it would have difficult or impossible to assault Rachel in the van.  *See id.* ("Courts are thus hesitant to find that an attorney's decision to leave out reference to particular aspects of the case in closing argument constitutes ineffective assistance.") (citing *Yarborough*, 540 U.S. at 5).  Nor can Jones show prejudice.  The jury found the State's evidence sufficient to convict Jones as charged, and there is no reasonable probability of a different verdict had defense counsel offered the argument he now suggests.  *See Strickland*, 466 U.S. at 694.

42

Because this trial IAC claim was meritless, PCR counsel was not ineffective for failing to raise it, *Sexton*, 679 F.3d at 1157, and Jones cannot establish cause under *Martinez*. *See Clabourne*, 745 F.3d at 377.

### G. *Trial counsel was not ineffective for failing to investigate and present evidence challenging the testimony of Ray and Laura Lopez.*

Jones also argues that trial counsel was ineffective for failing to present additional evidence challenging the eyewitness testimony of Ray and Laura Lopez. This claim fails because Jones has not established that trial counsel performed deficiently or that he was prejudiced. Therefore, PCR counsel was not ineffective for failing to raise this claim of trial counsel's alleged ineffectiveness.

As briefly discussed above, Ray Lopez testified that on May 1, while walking home from the Choice Market with sister, Laura, a yellow van went by driven by a white man with "bushy" hair who was hitting a little girl. (R.T. 4/7/95, at 9–10, 14.) Ray stated that the man had one hand on the steering wheel and was hitting the girl with the other hand, and demonstrated to the jury how the man was hitting the girl. (*Id.* at 10–12.) He said that the little girl was crying, but also testified that he could not see her face, so he wasn't sure if she was crying. (*Id.* at 13.) He had told the police, however, that he saw her mouth open and that she was crying. (*Id.* at 13–14.) When Ray arrived home, he told his mother what he saw. (*Id.* at 17.) He also testified that he saw the man again on the television news. (*Id.* at 17–18.) Ray was not able to identify Jones in court, but identified a photograph of Jones as the man driving the yellow van. (*Id.* at 18.)

On cross-examination, Ray said that he could not see the man's face as the van drove by. (*Id.* at 25–26.) Defense counsel had Ray stand up so that the jury could see his height and asked Ray if he had to look up to see inside the van, to which Ray replied, "No." (*Id.* at 27.) On redirect, Ray said that a photograph of Jones' yellow van was not the same van he saw "because it doesn't have windows in the side." (*Id.* at 29–30.)

43

1    Laura similarly testified that while walking home from the market she saw

2  "A guy in the yellow van hitting a little girl." (*Id.* at 36.)  She explained that she

3  was able to see through the van's front windows. (*Id.* at 36.)  Laura stated that the

4  man was white, had "puffy hair," and that she saw his face "[a] little bit." (*Id.*)

5  The man was hitting the little girl in the face. (*Id.* at 37–38.)  At trial, Laura said

6  she did not see the little girl's face, but she had told the police that she could see

7  the little girl's face and she was crying. (*Id.* at 38.)  When Laura arrived home, she

8  told her mother. (*Id.*)  Laura said that she later saw the man who had been hitting

9  the little girl on the television news. (*Id.* at 40).

10    On cross-examination, Laura testified that she saw the hitting through the

11  van's front window as it drove toward her. (*Id.* at 42–43.)  She said that she could

12  see the girl's face "[a] little bit" and saw that the girl's eyes were "watering." (*Id.*

13  at 44.)  Laura also explained that she saw the man on the news after her mother

14  called her into the room to watch. (*Id.* at 45–46.)

15    Ray and Laura's mother, Norma Lopez, also testified.  Norma stated that

16  when Ray and Laura arrived home from the market, they were "anxious" to tell her

17  that they saw a yellow van driven by a man who was hitting a little girl, who they

18  could see was crying. (*Id.* at 51.)  They described the girl as blonde and the man as

19  white with "real messy" brown hair. (*Id.* at 52.)  Norma "wanted to call" the

20  police, but several minutes had passed, so she "just didn't call." (*Id.* at 53.)  The

21  next day, however, she saw on the news that police had arrested a man related to

22  the death of a little girl and asked her kids to come in to watch the news. (*Id.* at

23  53–54.)  "Right away they both said, mom, that's him.  Mom, that's him.  That's

24  him." (*Id.* at 55.)  After thinking about it "for a day or two," Norma called the

25  police. (*Id.* at 56.)

26    Defense counsel addressed the Lopez's testimony at length in closing

27  argument:

28

You know, what the Lopez kids saw, they are cute kids and, you know, all that, but—try to convict a guy on that testimony, I don't know.  They did saw when she made—when Miss Mayer made the mistake of showing the second witness, but when she showed this to Ray Lopez he said, no, this wasn't the van, didn't have windows on the side.  It was a yellow van, but didn't have windows on the outside.

Miss Mayer will say and want you to believe, and she may be right, you know, well, you know, that's a minor detail.  Well, he was kind of certain about that.  He seemed certain about the fact that van didn't have windows, and you can't see from the State's photograph here, but a little bit can you see it also has a very distinctive thing on the back that is like a winch you can use to pick up engines out of cars and stuff, and if you see the inside of Barry's van, this is clearly a work van. . . .

They see his face.  They saw some wild bushy hair, and, yes, in the pictures that were shown Barry had wild busy hair.  Maybe that's enough for Miss Mayer, but it shouldn't be enough for you, ladies and gentlemen because there is no evidence from Becky Lux or anybody else that Barry at 5 o'clock was at the Choice Market.  There is no evidence of that.

(R.T. 4/13/95, at 120–21.)

Jones argues that trial counsel was ineffective for failing to investigate "whether it was possible for the Lopez children to witness Mr. Jones assaulting Rachel as he drove into the Choice Market."  (Dkt. # 167, at 92.)  Specifically, he suggests that counsel was ineffective for failing to: (1) utilize a statement by Jones' neighbor to the police that Rachel was too small to be seen in Jones' van; (2) use experts to testify that the reported observations of Ray and Laura were inaccurate, Jones' actions as described by Ray and Laura were anatomically and biomechanically improbable, and the children were too short to see any activity inside the van; and (3) interview Choice Market employees to determine whether Rachel appeared beaten.  (Dkt. # 167, at 92–95.)  For the reasons below, this claim lacks merit.

First, trial counsel was not ineffective for failing to use the neighbor's statement.  The comment Jones refers to took place during a police interview:

> Q. Do you recall if you ever seen, or, have you seen the little girl with him?

> A. No, no.  I, *if she did*, she was too little to see in the seat, but I'd just see him usually by himself.

(Dkt. # 167–26, Exhibit 82, at 5.  Emphasis added.)  It is clear that the neighbor did not say that Rachel was too small to be seen in the van, but that she had only seen Jones come and go by himself; thus, she explained, *if* Rachel had been with him, the neighbor didn't see her because she must have been too small to see.  The statement does not establish that Ray and Laura couldn't have seen Rachel in the van, but was simply a possible explanation for why the neighbor had never seen Jones and Rachel together.  Consequently, counsel did not perform deficiently and Jones was not prejudiced by counsel's failure to admit the neighbor's testimony.

Next, counsel was not ineffective for failing to interview Choice Market employees.  As recounted above, there was no suggestion that Jones was making a trip to the Choice Market simply because Ray and Laura were walking home from the market when they saw Jones drive by.  Instead, the evidence suggested that he went to the market on another trip earlier in the day.  In any event, this claim fails because Jones offers only speculation regarding what an interview of Choice Market employees would have uncovered: "Presumably, those employees would have confirmed that Rachel did not appear to have been beaten . . . ."  (Dkt. # 167, at 94.)  Such speculation is insufficient to establish ineffective assistance.  *See Bragg v. Galaza*, 242 F.3d 1082, 1087, *amended on denial of rehearing*, 253 F.3d 1150 (9th Cir. 2001) (failure to interview witness is not ineffectiveness where defendant offers only mere speculation that witness may have given helpful information).

46

Counsel also was not ineffective for presenting expert testimony to rebut Ray's and Laura's observations. Jones' newly-proffered expert evidence includes opinions that the Lopez children would have been able to see the van for only 2 to 4 seconds; that they could not have seen more than the top 6 inches of Rachel's head; and that they would not have had a clear view of Jones' torso if he were reaching across to strike Rachel. (Dkt. # 167, at 71–72.) Additionally, one of Jones' experts opines that it would have been very difficult for Jones to maintain control of the van while reaching over far enough to strike Rachel. (*Id.* at 72.) Jones' other expert concludes that, given the measurements of the van and the children, "there was no physical evidence to support the Lopez children's claims" because they were too short in stature "to have accurately observed any activity inside the van." (*Id.* at 73.)

As Jones admits, however, records establish that counsel investigated by viewing, measuring, and photographing the van. (*Id.* at 73, 92–93; Dkt. # 167–18, Exhibit 35, at ¶ 5; Dkt. # 167–19, Exhibit 36, at 25.) Notably, Jones does not include an affidavit or declaration from trial counsel explaining why the information obtained from this investigation was not used at trial. In light of this lack of any evidence to the contrary, it must be presumed that trial counsel was not ineffective, but instead made a strategic decision not to present or use the information learned from viewing, measuring, and photographing the van. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1404 (2011) ("[T]here is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect.") (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)); *Strickland*, 466 U.S. at 689 ("the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'"); *Murtishaw v. Woodford*, 255 F.3d 926, 952 (9th Cir. 2001) (without "supportable allegations to the contrary," court must assume that counsel notified defendant that he would waive his right against self-incrimination by submitting to

47

psychiatric interview).  Furthermore, because the jury saw pictures of the van and observed the size and stature of the Lopez siblings and Jones, counsel was not ineffective for failing to present expert testimony regarding the Lopez's ability to see or Jones' ability to hit Rachel while driving—the jurors did not need expert testimony to understand these topics, but could use their own observations, experience, and common sense.  *See Belmontes*, 558 U.S. at 24 (counsel not ineffective for failing to provide expert testimony in mitigation that "was neither complex nor technical," and where jury "could use its common sense or own sense of mercy").

Even if Jones could overcome this presumption, he still has failed to demonstrate prejudice.  Ray's and Laura's testimony was heavily impeached at trial, with Ray stating that he did not see the driver's face, Laura stating that she saw his face only a "little bit," and Ray stating that the van he saw was different from a photograph of Jones' van.   (R.T. 4/7/95, at 25–26, 29–30, 36.) Additionally, defense counsel cross-examined the children's mother on the possibility that she may have unintentionally influenced Ray and Laura to identify Jones as the man they saw in the van.  (*Id.* at 57–59.)  Consequently, no prejudice resulted from the lack of expert testimony because "[t]he likelihood of misidentification . . . was brought to the jury's full attention through cross-examination."  *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985) (no ineffectiveness from lack of expert in eyewitness identification where counsel raised the issue through cross-examination); *see also Richter*, 562 U.S. at 111 (counsel was able to draw attention to weaknesses in state's evidence through cross-examination and was therefore not ineffective for failing to call an expert witness).   For the same reason, additional evidence attacking the Lopez's testimony would have been cumulative and would not have affected the outcome, especially in light of the evidence recounted above, such as the blood on Jones' clothing and in his van and the fact that Rachel was in visible pain after returning

1    from her outing with Jones.   *See Belmontes*, 558 U.S. at 22–23 (counsel not

2    ineffective for failing to present cumulative evidence).

3        Finally, Jones also relies on a 2009 declaration from Ray stating that he did

4    not see the face of the yellow van's driver, he saw the man swinging but did not

5    see what he swung at, and he did not see anyone else in the van with the driver.

6    (Dkt. # 167, at 73; Dkt. # 167–25, Exhibit 70.)   Nothing about the declaration

7    indicates counsel's ineffectiveness, however; there is no explanation for why Ray

8    testified as he did at trial, nor any suggestion that counsel is somehow at fault for

9    failing to elicit testimony at trial consistent with the declaration.   Furthermore, the

10   declaration, created 15 years after the fact and without any explanation for the

11   delay or inconsistency with the trial testimony, is not persuasive.   *Cf. Morales v.*

12   *Johnson*, 659 F.3d 588, 606 (7th Cir. 2011) ("'11th hour' affidavits produced with

13   'no reasonable explanation' for a long delay are suspect.") (quoting *Herrera v.*

14   *Collins,* 506 U.S. 390, 423 (1993) (O'Connor, J., concurring)).

15       Because this trial IAC claim is meritless, PCR counsel was not ineffective

16   for failing to raise it, *Sexton*, 679 F.3d at 1157, and Jones cannot establish cause

17   under *Martinez*.  *See Clabourne*, 745 F.3d at 377.

**H. *Trial counsel was not ineffective at sentencing for failing to investigate and present additional mitigation evidence.***

20       In Claim 1D's final subpart, Jones argues that trial counsel failed to

21   adequately investigate and present mitigating evidence at sentencing.   Because trial

22   counsel was not ineffective, however, PCR counsel was not ineffective for failing

23   to argue this claim.

**1.  Mitigation presented to the sentencing court.**

25       At Jones' sentencing hearing before the trial judge, defense counsel

26   presented testimony from a psychologist and six lay witnesses.   Dr. Joseph Geffen,

27   a psychologist, conducted a mental health evaluation.    In performing his

28   evaluation, Dr. Geffen reviewed records which included materials from Kino

1    Hospital, the Pima County jail, Vision Quest, and Southern Arizona Mental Health
2    Center.  (R.T. 6/13/95, at 75–79.)  Dr. Geffen first discussed aspects of Jones'
3    childhood that impacted him as an adult.  For example, he stated that Jones'
4    mother administered "whoopings," drank excessively, and had difficulties taking
5    care of and disciplining her children.  (*Id.* at 80–82.)  Additionally, Dr. Geffen
6    related that Jones began getting into trouble after his father died, and was referred
7    to "Vision Quest," a juvenile program, at age 16 because his mother was unable to
8    guide and control his behavior.  (*Id.* at 83, 100.)  A doctor at Vision Quest
9    concluded that Jones had low frustration tolerance, was impulsive, lacked self-
10   confidence, and had "a very poor self image."  (*Id.* at 83–84.)  These findings were
11   consistent with what Dr. Geffen found, and Dr. Geffen explained that he would
12   expect a youth with Jones' problems to display an inability to control impulses,
13   anger, aggressiveness, and substance abuse.  (*Id.* at 84.)  Furthermore, Jones turned
14   to substance abuse because he had not learned or been taught socially acceptable
15   ways to deal with difficult feelings, emotions, thoughts, and ideas.  (*Id.* at 85.)

16   Dr. Geffen next addressed an incident in 1992 when Jones was referred to
17   Southern Arizona Mental Health for treatment, during which he exhibited similar
18   problems as documented at Vision Quest, only more severe.  (*Id.* at 86.)  Shortly
19   after his wife left him, Jones was referred for treatment by family members
20   because he had put a weapon to his head and threatened to commit suicide, said he
21   felt like killing someone, had been abusing drugs, and had become mentally and
22   emotionally disorganized, confused, depressed, and angry.  (*Id.* at 86–87, 102.)
23   Jones was discharged after only a few sessions, however, because he refused to
24   undergo substance abuse treatment; in Dr. Geffen's opinion, he "really was not
25   given the opportunity to deal with substance abuse in the kind of program that we
26   know to be effective."  (*Id.* at 88, 103, 126.)

27   Next, Dr. Geffen discussed Jones' substance abuse in more detail; Jones told
28   him that he had been using amphetamines heavily in the 6 months before the

1   murder.  (*Id.* at 88–89.)   Dr. Geffen explained that amphetamine use leads to

2   "uncontrollable actions," including agitation, aggressiveness, and violence.  (*Id.* at

3   89.)  Amphetamine use often coincides with extended periods of little to no sleep,

4   which contributes to "confusion, irritability, reacting, overreacting to situations,

5   [and] reacting with aggression," as well as a "very low ability to tolerate any kind

6   of frustration, any kind of difficulty with others."  (*Id.* at 90.)

7        Jones had also reported to Dr. Geffen a history of head injuries, including

8   once losing consciousness after being hit with a brick.  (*Id.* at 90–91.)   Such

9   injuries exacerbate any problems a person has, making someone "more vulnerable

10  to any kind of situational stress or drugs or anything that would tend to require the

11  ability to think, to reflect, to inhibit certain behaviors."  (*Id.* at 91.)  Head injuries

12  can also cause brain damage, which may affect a person behaviorally and

13  emotionally even if "it's not severe enough to be detected or to affect the person in

14  a cognitive level."  (*Id.* at 91–92.)

15       Dr. Geffen additionally noted that while incarcerated Jones had been treated

16  with Mellaril, an antipsychotic medication.  (*Id.* at 92–93.)  Jones received the drug

17  because he was agitated, expressed feelings of suicide and homicide, and needed

18  medication "to calm him down."  (*Id.* at 95–96.)

19       Ultimately, Dr. Geffen testified that Jones' mental health problems

20  originated when his father died due "the effect it had on him and his mother and

21  the rest of the family."  (*Id.* at 96–97.)  As a result, he "fell into a very vulnerable

22  situation . . . [and] he would begin to use drugs and look for acceptance and look

23  for good feelings from his peers" rather than from a positive, adult role model.  (*Id.*

24  at 97.)  Dr. Geffen stated that the lack of a source of "love and guidance" "was

25  ruinous in terms of his self-esteem in terms of him just plain simply learning

26  appropriate adaptive mechanisms to be able to survive in society and be a

27  successful citizen."  (*Id.*)  Furthermore, Jones' "very prolonged use of substances

28  has generated new problems" and prevented him "from learning how to solve

51

1   problems, how to cope with difficult situations, how to deal with strong emotions

2   that are to express how to learn the proper way to express those emotions." (*Id.* at

3   97–98.)   Though he concluded that Jones was legally sane, Dr. Geffen believed

4   that Jones was unable to apply right and wrong the way a normal person would.

5   (*Id.* at 98.)  In other words, "he should not have been expected nor is he capable of

6   functioning normally in conforming to society." (*Id.* at 99.)

7   Counsel also presented testimony from Jones' mother, Florence Jones.  She

8   had an older son, Otis, from a previous marriage, and with Jones' father had Jones

9   and his twin brother, Larry, as well as a younger son.  (*Id.* at 45, 47–48, 59.)

10   Florence testified that she was the disciplinarian in the household, and would spank

11   the children, or whip them with a belt or switch.  (*Id.* at 59–61, 66.)  At one point,

12   when Jones was about 12, his school recommended that Jones see a mental health

13   professional for depression and anxiety, but his father did not permit him to see a

14   counselor or doctor.  (*Id.* at 70.)  Florence also stated that she and Jones' father had

15   several bad fights, including one in which she stabbed her husband.  (*Id.* at 158–

16   59.)

17   Jones' father died in 1973, when Jones was about 15 years old.  (*Id.* at 141.)

18   After his father's death, Jones started getting into trouble and had several run-ins

19   with the police.  At around the same time, Florence started drinking excessively.

20   (*Id.* at 143, 144–47.)  Jones and Larry entered the Vision Quest program at age 16

21   because Florence "couldn't handle them."  (Id. at 143–44, 147–48.)  Later, after

22   Jones' marriage ended with his wife leaving him, he "went crazy." (*Id.* at 157–58.)

23   Dennis Hatt, who was a manager where Jones had worked as a mechanic,

24   testified that Jones was a very good employee and was dependable, polite, and

25   respectful.  (*Id.* at 15–18.)

26   Defense counsel also presented testimony from Ronny Higgins, a substance

27   abuse counselor.  (*Id.* at 127–28.)  Higgins spoke with Jones about his drug use,

28   and concluded that Jones was a "heavy" methamphetamine user. (*Id.* at 130.)  He

1   explained that during the 6 months preceding the murder, Jones would go on 6–day

2   "runs" of drug use with little to no sleep, after which he would sleep for up to 18

3   hours.  (*Id.* at 130–31, 139.)  Higgins testified that after the initial bout of sleep,

4   while "coming down off of a run is your worst period of time" because the person

5   is "very irritable [and] aggressive," and "able to go off on any given moment":

6   "Anything can set you off at that point in time."  (*Id.* at 132.)  Finally, Higgins also

7   explained that it was "not realistic at all" to expect Jones to have been able to end

8   his methamphetamine use on his own without appropriate treatment.  (*Id.* at 135–

9   36.)

10   Deborah Wheeler, the ex-wife of Jones' older brother Otis, testified that she

11   was close with Jones, he was a good father, was very good with her children, and

12   was respectful.  (*Id.* at 170–74.)

13   Joyce Richmond, Jones' girlfriend, testified that she often saw Jones

14   discipline his daughter Brandy, as well as Richmond's daughter, by talking to them

15   and briefly sending them to their rooms, but that he never hit them.  (*Id.* at 181–

16   82.)  She also stated that Jones used methamphetamine regularly and that when he

17   did so he would stay up for days at a time but would then sleep for 18 to 24 hours.

18   (*Id.* at 184–85.)  Richmond testified that when she saw Jones a day before the

19   murder, he was using methamphetamine.  (*Id.* at 187–88.)

20   Leanne Jones, Larry's widow, testified that Jones babysat her daughters and

21   that he never hit or was inappropriate with children.  (*Id.* at 197–99.)  She

22   confirmed that Jones was using methamphetamine in the days before the murder.

23   (*Id.* at 206–09.)

24   **2.  Trial counsel was not ineffective for failing to develop and**
   **present additional mental health experts in addition to Dr.**
25   **Geffen.**

26   Jones argues that trial counsel "failed to hire appropriate experts who would

27   have allowed him to present testimony about Mr. Jones' organic brain

28

53

1 dysfunction" and failed to provide Dr. Geffen with a complete social history "or

2 underlying documents." (Dkt. # 167, at 107, 128.) Jones has failed to establish

3 either deficient performance or prejudice.

4      First, trial counsel did not perform deficiently. The Ninth Circuit has stated

5 that "[w]here counsel is on notice that his client may be mentally impaired,

6 counsel's failure to investigate his client's mental condition as a mitigating factor

7 in a penalty phase hearing, without a supporting strategic reason, constitutes

8 deficient performance." *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir.

9 1995). Here, however, counsel investigated Jones' mental condition by hiring Dr.

10 Geffen, a licensed psychologist. As noted above, Dr. Geffen discussed Jones'

11 troubled childhood, history of psychological problems, substance abuse, history of

12 head injuries, and the effects these factors. To reach his conclusions, Dr. Geffen

13 conducted a forensic interview of Jones and relied on records supplied by counsel.

14 (Dkt. # 167–23, Exhibit 41, at 1–2; R.T. 6/13/95, at 75–79.) Moreover, Dr. Geffen

15 testified that Jones was unable to apply right and wrong the way a normal person

16 would and "should not have been expected nor is he capable of functioning

17 normally in conforming to society." (*Id.* at 98–99.)

18      Jones' contention that trial counsel failed to hire appropriate experts is

19 without merit because counsel had no reason to believe additional experts were

20 necessary. The cases on which Jones relies address situations where counsel failed

21 to conduct *any* investigation into mental health or to present any expert mental

22 health testimony. (*See* Dkt. # 167, at 128–29.) Here, in contrast, counsel

23 consulted with and presented testimony from a mental health professional.

24 Nowhere in his report did Dr. Geffen recommend that counsel seek any additional

25 testing or that he recommended consultation with any additional experts. (See Dkt.

26 # 167–23, Exhibit 42.) In the absence of any such recommendation, counsel was

27 under no obligation to seek additional mental health experts. *See Stokley v. Ryan*,

28 659 F.3d 802, 813 (9th Cir. 2011) ("In short, neither of the experts counsel hired

1    unequivocally stated that Stokley should be examined by a neuropsychologist—

2    and counsel was under no obligation to seek neuropsychological testing in the

3    absence of any such recommendation."); *Babbitt v. Calderon,* 151 F.3d 1170, 1174

4    (9th Cir. 1998) ("[C]ounsel did retain medical experts whom he thought well-

5    qualified.  The experts he had retained did not state that they required the services

6    of . . . additional experts.  There was no need for counsel to seek them out

7    independently.").

8         Next, Jones' contention that trial counsel was ineffective for failing to

9    provide Dr. Geffen with adequate records similarly fails.  Not only did trial counsel

10   provide Dr. Geffen with Jones' mental-health-related records (Dkt. # 167–23,

11   Exhibit 41, at 2; R.T. 6/13/95, at 75–79), but Dr. Geffen never indicated that he

12   required additional information or that the information provided was insufficient.

13   (Dkt. # 167–23, Exhibit 41.)  "Absent such a specific request for information,

14   [counsel] was not required to provide [Dr. Geffen] with additional information."

15   *Murtishaw v. Woodford*, 255 F.3d 926, 945 (9th Cir. 2001) (citing *Hendricks v.

16   Calderon*, 70 F.3d 1032, 1038–39 (9th Cir. 1995)); *see also Coleman v. Calderon*,

17   150 F.3d 1105, 1115 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998)

18   (counsel "not required to know what information his serology expert needed").

19        Finally, trial counsel's later statement that he was ineffective for failing to

20   consult with additional mental health experts should be accorded little weight.

21   (Dkt. # 167, at 107–08.)  Not only is his claim incorrect for the reasons above, but

22   it "is exactly the sort of Monday-morning quarterbacking the contemporary

23   assessment rule forbids."  *Hendricks*, 70 F.3d at 1040.  For these reasons, Jones'

24   claim that counsel was ineffective for failing to present additional mental health

25   experts fails because he cannot establish deficient performance.  *See Strickland*,

26   466 U.S. at 687–88.

27

28

1    Second, Jones has failed to establish prejudice.  In support of his contention
2    that trial counsel inadequately investigated and presented expert mental health
3    testimony, he proffers the following evidence:

4    - Report of Dr. Alan Goldberg (Dkt. # 167–23, Exhibit 42).  Dr. Goldberg
5        conducted a neuropsychological evaluation of Jones and states that he found
6        abnormalities of frontal lobe brain function and right hemisphere motor and
7        sensory function, evidence of seizure disorder, and Attention Deficit
8        Disorder.  (Dkt. # 167, at 112.)  Dr. Goldberg recommended a full
9        neurological and psychiatric evaluation.  (Dkt. # 167–23, Exhibit 42, at 8.)

10   - Report of Dr. Pamela Blake (Dkt. # 167–23, Exhibit 43). Dr. Blake is a
11       neurologist who performed a neurological evaluation of Jones.  She stated
12       that many of Jones' behavioral traits "can be attributed to a certain pattern of
13       neurologic dysfunction."  (*Id.* at 10.)  Dr. Blake also noted indications of
14       frontal lobe damage.  (*Id.* at 11.)  Additionally, she concluded that Jones
15       "almost certainly would have fulfilled the diagnostic criteria for Attention
16       Deficit Disorder with Hyperactivity."  (*Id.* at 10.)

17   Although Jones does not appear to specifically argue how he was prejudiced by the
18   lack of testimony presenting information such as that included in these reports, he
19   contends that the reports of Drs. Goldberg and Blake are significant because they
20   contain evidence of his organic brain dysfunction.  (See Dkt. # 167, at 128, 136–
21   40.)

22   These reports do not establish prejudice for several reasons, but primarily
23   because Dr. Goldberg's and Dr. Blake's conclusions add little to Dr. Geffen's
24   testimony.  Although they include additional diagnoses, such as frontal lobe
25   damage/dysfunction and Attention Deficit Disorder, Dr. Geffen had already
26   testified that the combination of Jones' dysfunctional upbringing, head injuries,
27   psychological problems, and heavy substance abuse rendered him unable to apply
28   right and wrong like a normal person and incapable of functioning normally in

society.  The new reports add little to Dr. Geffen's conclusions, would have been cumulative, and thus do not establish a reasonable probability of a different sentencing outcome.  *See Belmontes*, 558 U.S. at 23 (new evidence that was cumulative to that presented at trial "would have offered an insignificant benefit, if any at all"); *Dyer v. Calderon*, 113 F.3d 927, 942 (9th Cir. 1997), *vacated on other grounds*, 151 F.3d 970 (9th Cir. 1998) (no prejudice where newly proffered evidence mostly cumulative to what was presented at trial).

Additionally, to the extent Drs. Goldberg and Blake suggest that Jones' alleged brain damage would have resulted in impulsivity, such testimony would have been accorded little mitigating weight in light of the length of his attack on Rachel, the different types of injuries he inflicted, and his efforts to conceal his behavior after the attack by denying Rachel medical care.  *See State v. Kiles*, 213 P.3d 174, 191 (2009) (giving little weight to defendant's claim of impulsivity in light of "sustained attack" on the victim and the fact that he also murdered the victim's children).

Finally, the additional mental health testimony Jones now proffers would not have warranted a life sentence given the strength of the A.R.S. § 13–751(F)(6) especially cruel aggravating factor—which was based on Rachel's "many hours" of physical pain after her assault, during which she vomited and cried from the pain of a ruptured bowel, vaginal injuries, and extensive bruising—and the A.R.S. § 13–751(F)(9) factor, which was based on the fact that Rachel was a 4-year-old child and Jones was an adult. *Jones*, 937 P.2d at 321–22; *see Lopez v. Ryan*, 678 F.3d 1131, 1138–39 (9th Cir. 2012) (no prejudice in light of heinousness of crime). "In assessing prejudice, [courts] reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith,* 539 U.S. 510, 534 (2003).  Although significant aggravating circumstances do not preclude a finding of prejudice, *Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009), the newly proffered mental health evidence here is largely cumulative to that presented at trial and

would be entitled to little mitigating weight.   Consequently, Jones has failed to establish prejudice.  *See id.*

### 3.  Trial counsel was not ineffective for failing to present even more expert testimony regarding his drug addiction in addition to Dr. Geffen and Ronny Higgins.

Jones also argues that trial counsel failed to adequately investigate and explain the effects of his long-term methamphetamine abuse.  In support of this claim, he offers the report of Dr. Lawson Bernstein, a psychiatrist with expertise in substance abuse.  (Dkt. # 167–23, Exhibit 44.)  Dr. Bernstein states that Jones was suffering from methamphetamine withdrawal at the time of the offense and that his long-term methamphetamine abuse had depleted his brain "of key chemicals, which are involved in the maintenance of a normal neurological, cognitive and emotional state."  (*Id.* at 1, 2, 5.)  Dr. Bernstein also states that Jones would have been unable to "control" his methamphetamine use prior to incarceration.  (*Id.* at 6.)  Finally, Dr. Bernstein raised the possibility that Jones suffered brain damage from fetal alcohol exposure.  (*Id.* at 5.)

First, trial counsel did not perform deficiently by failing to hire an expert like Dr. Bernstein.  As recounted above, trial counsel presented evidence regarding Jones' drug addiction and its effects through Dr. Geffen and Ronny Higgins.  In short, Dr. Geffen explained that methamphetamine use causes uncontrollable actions, agitation, aggressiveness, violence, and low tolerance for frustration.  (R.T. 6/13/95, at 88–90.)   He further explained that Jones turned to substance abuse after his father's death and stated that Jones' drug addiction prevented him "from learning how to solve problems, how to cope with difficult situations, how to deal with strong emotions that are to express how to learn the proper way to express those emotions."  (*Id.* at 96–98.)   Higgins testified that Jones was a "heavy" methamphetamine user and would go on week-long "runs" of methamphetamine use, followed by a crash period.  (*Id.* at 130–31, 139.)   He

explained that a person coming down from a methamphetamine run is "very irritable [and] aggressive," and "able to go off on any given moment." (*Id.* at 132.) Other witnesses established that Jones was on a "run" of methamphetamine use in the days before the offense and was crashing on the afternoon he murdered Rachel. (R.T. 4/11/95, at 62; R.T. 6/13/95, at 187–88, 206–09.)

In light of his use of Dr. Geffen and Higgins, trial counsel was not constitutionally ineffective for failing to employ an additional expert to testify specifically about the effects of methamphetamine use. *See Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 2002) ("The gravamen of Turner's complaint is not that Dr. Hamm failed to testify about the likely effects of P.C.P. on Turner, but that because he was a general psychologist and not an expert on P.C.P. specifically, a more specialized expert would have been more persuasive. Such an argument, however, does not support a claim of ineffective assistance of counsel."). Counsel utilized Dr. Geffen and the other witnesses to explain the effects of Jones' drug use and to suggest that the specific effects of his addiction affected his actions on the day of the murder. Counsel "cannot be deemed ineffective because, with the benefit of hindsight, we now determine that other trial strategies or expert witnesses may have been a better choice." *Id.* at 876 (citing *Strickland*, 466 U.S. at 689–90).

Nor has Jones established prejudice. Almost all of Dr. Bernstein's conclusions regarding Jones' drug use—that Jones was a habitual methamphetamine user; went on week-long "runs" of methamphetamine use; used methamphetamine on Saturday, April 30 and "crashed" the day of the murder; and would not have been able to choose to stop his drug use—were presented at trial:

> An expert testified that defendant began using drugs when he was a teen and was a heavy user of methamphetamine at the time of the murder. The evidence of defendant's drug use at the time of the murder was self-reported; however, expert testimony corroborated defendant's testimony. The defense expert stated that

59

methamphetamine users tend to stay awake for several days and then "crash" for several days at a time.  Additionally, defendant's sister-in-law and girlfriend testified that defendant consumed methamphetamine on Saturday, the day before the incident.

*Jones*, 937 P.2d at 322.   Dr. Bernstein's cumulative opinion does not show prejudice.  *See Belmontes*, 558 U.S. at 23; *Dyer*, 113 F.3d at 942.   Moreover, nothing in Dr. Bernstein's report is sufficient to overcome the state court's observation that "no testimony establishes, either because of his use of drugs or because he was coming down off of the drugs, that defendant could not appreciate the wrongfulness of his conduct or conform his conduct to the law."  *Jones*, 937 P.2d at 322.  In light of the cumulative nature of Dr. Bernstein's opinions, the little, if any, mitigating weight they would have been afforded, and the significant aggravating circumstances of Rachel's murder, Jones has failed to establish prejudice. *See Strickland*, 466 U.S. at 694.

### 4. Trial counsel was not ineffective for failing investigating and presenting additional background and social history evidence.

Jones next contends that trial counsel was ineffective for failing to investigate and present additional evidence of Jones' background and social history.  This claim fails because much of Jones' proffered evidence either was presented at trial or is cumulative to what was presented at trial, and because he cannot establish either deficient performance or prejudice with respect to little that remains.

Significantly, this was not a case "in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face," *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009), failed to "even take the first step of interviewing witnesses or requesting records," or "ignored pertinent avenues of investigation of which he should have been aware."   *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009).  Instead, in addition to hiring a mental health expert and drug abuse counselor, counsel investigated and presented numerous lay witnesses

60

1    who knew Jones, including his girlfriend, his former employer, his mother, his

2    brother Otis's ex-wife, and his brother Larry's widow.  Counsel also requested and

3    obtained the numerous mental health records that were provided to Dr. Geffen.

4    (Dkt. # 167–23, Exhibit 41, at 2; R.T. 6/13/95, at 75–79.)  Counsel conducted a

5    reasonable and adequate investigation, and did not perform deficiently simply by

6    failing to attempt to obtain more information from additional collateral sources.

7    *See Van Hook*, 558 U.S. at 11 ("[T]here comes a point at which evidence from

8    more distant relatives can reasonably be expected to be only cumulative, and the

9    search for it distractive from more important duties.").

10        Moreover, even if Jones' counsel performed deficiently by failing to dig

11   deeper, he has not established any prejudice as a result.  Most significantly, much

12   of Jones' newly-proffered social history and background evidence either was

13   presented at sentencing or is cumulative to evidence presented at sentencing.  As

14   demonstrated above in describing the testimony from the sentencing hearing, trial

15   counsel presented evidence regarding Jones' good character toward children, his

16   mother's drinking and use of corporal punishment, Jones' juvenile delinquency and

17   adolescent use of drugs and alcohol, the effect of Jones' father's death on the

18   family, Jones' referral to Vision Quest due to his delinquency, Jones' relationship

19   with Carol Rollins, the mother of his three children, Jones' methamphetamine

20   addiction, Jones' mental health issues and suicidal threats after his relationship

21   with Carol ended, and the lack of substance abuse treatment assistance Jones

22   received.  Counsel was not ineffective for failing to present social history and

23   background information that is cumulative to what was actually presented to the

24   sentencing court because "adding it to what was already there would have made

25   little difference."  *See Belmontes*, 558 U.S. at 23; *Dyer*, 113 F.3d at 942.

26        The remaining newly-proffered evidence, provided mostly by Jones' older

27   brother Otis, pertains to events occurring before Jones' birth or during his early

28   childhood.  For example, Jones asserts that Florence was the product of an abusive

1   and neglectful childhood, Florence drank heavily before the death of Jones' father

2   and consorted with other men during his military absences, the man Jones regarded

3   as his father may not have been his biological father, Otis often took care of Jones

4   and his twin brother Larry, the family was poor, Florence was hospitalized for a

5   "nervous breakdown," the Jones children did not bring friends to their home, and

6   Florence once shot a burglar and on another occasion beat up a man.   (Dkt. # 167,

7   at 118–21.)    To the extent any of this newly-proffered evidence contradicts

8   Florence's general testimony at sentencing that Jones' childhood was not terribly

9   difficult before his father's death—*i.e.*, he exhibited average performance in school

10  and had friends (R.T. 6/13/95, at 53, 55–56, 58, 64, 68)—counsel was not

11  ineffective because nothing indicates that Florence or Jones himself provided

12  counsel with such information at the time of trial.  *See Payton v. Cullen*, 658 F.3d

13  890, 894 (9th Cir. 2011) (counsel not ineffective where "[n]othing that [counsel]

14  was told at the time of trial would have alerted him to a family history of the sort

15  that Payton now espouses").  Moreover, this additional evidence regarding Jones'

16  childhood would have received minimal mitigating weight since he a 35-year-old

17  adult when he killed Rachel.  *See, e.g., State v. Prince*, 250 P.3d 1145, 1170 (Ariz.

18  2011) ("Difficult childhood circumstances … receive less weight as more time

19  passes between the defendant's childhood and the offense."); *State v. Hampton*,

20  140 P.3d 950,  968 (Ariz. 2006) (defendant was 30 years of age at the time of his

21  crimes, "lessening the relevance of his difficult childhood"); *State v. McGill,* 140

22  P.3d 930, 944, ¶ 63 (Ariz. 2006) (abusive and neglectful childhood only slightly

23  mitigating given the time elapsed between murder and time childhood).  It also

24  does not explain why he killed Rachel.  *See State v. Hurles*, 914 P.2d 1291, 1299

25  (Ariz. 1996) ("A difficult family background, including childhood abuse, does not

26  necessarily have substantial mitigating weight absent a showing that it significantly

27  affected or impacted a defendant's ability to perceive, to comprehend, or to control

28  his actions.").

1 | In
2 | sum, Jones' newly-proffered background and social history evidence is cumulative
3 | to that presented at trial and would have received little mitigating weight given his
4 | age at the time of the murder and its failure to explain his actions.  Thus, in light of
5 | the strength of the aggravating factors—especially Rachel's young age and the
6 | especially cruel nature of the murder, which was based on Rachel's "many hours"
7 | of physical pain after her assault, during which she vomited and cried from the
8 | pain of a ruptured bowel, vaginal injuries, and extensive bruising, *Jones*, 937 P.2d
9 | at 321–22—Jones has failed to establish a "substantial" likelihood of a life
10 | sentence had counsel presented this additional information.  *See Pinholster*, 131 S.
11 | Ct. at 1402.

12 | For the reasons discussed above, none of the categories of newly-proffered
13 | mitigation, considered individually or cumulatively, demonstrate that trial counsel
14 | performed deficiently or that Jones would have received a life sentence.  As a
15 | result, PCR counsel was not ineffective for failing to this aspect of Claim 1D,
16 | *Sexton*, 679 F.3d at 1157, and Jones cannot establish cause under *Martinez*.  *See*
17 | *Clabourne*, 745 F.3d at 377.

18 | **I.  *Jones has not shown cause under Martinez.***

19 | As discussed above, PCR counsel was not ineffective under *Strickland* for
20 | failing to raise Claim 1D because his performance did not fall below an objective
21 | standard of reasonableness and because underlying ineffective-assistance-at-trial
22 | claims are without merit.  *Sexton*, 679 F.3d at 1157.  Jones' failure to establish
23 | PCR counsel's ineffectiveness means that he cannot show cause under *Martinez* to
24 | overcome Claim 1D's procedural default.  *Clabourne*, 745 F.3d at 377.
25 | Consequently, this Court should affirm its prior dismissal of Claim 1D as
26 | procedurally defaulted.

27 |
28 |

**IV.   CLAIM 1D FAILS ON *DE NOVO* REVIEW AND JONES IS NOT ENTITLED TO EVIDENTIARY DEVELOPMENT.**

Jones requests that this Court order expansion of the record, depositions, discovery, and an evidentiary hearing both in support of his claim of "cause and prejudice" under *Martinez* and the merits of his underlying IAC claims.  Although Respondents do not object to expansion of the record for the limited purpose of the cause determination under *Martinez*, Jones' remaining requests for evidentiary development should be denied.   Additionally, if Jones were to succeed in overcoming Claim 1D's procedural default, 28 U.S.C. § 2254(e)(2) would bar the introduction of any new evidence in support of the merits review of his habeas claim.  Moreover, Jones would not be entitled to habeas relief—whether or not this Court were permitted to consider his newly-proffered evidence—because Claim 1D lacks merit.

**A.  *Standards for evidentiary development.***

This Court may, in its discretion, permit evidentiary development on a *Martinez* claim, without requiring an inmate to satisfy 28 U.S.C. § 2254(e)(2).  *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) ("[A] petitioner, claiming that PCR counsel's ineffective assistance constituted 'cause,' may present evidence to demonstrate this point."). However, if the claim can be resolved based on the existing record, a court need not conduct a hearing or permit other evidentiary development.  *See id.* (stating that "a district court may take evidence *to the extent necessary*" to resolve the *Martinez* inquiry) (emphasis added); *see also Clabourne*, 745 F.3d at 382–83 (rejecting *Martinez* claim because the record established that the underlying ineffective-assistance claim failed); *Sexton*, 679 F.3d at 1159–61 (same); *see generally Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").  As will be discussed below, Respondents do not object to this Court expanding the record to

1  consider Jones' proffered exhibits in determining whether he has demonstrated

2  cause under *Martinez*, but Jones' additional requests for evidentiary development

3  should be denied.

4       Rule 7 of the Rules Governing § 2254 Cases allows district courts in their

5  discretion to expand the record to include additional materials relating to the

6  petition.  "Rule 7 of the Rules Governing § 2254 cases allows the district court to

7  expand the record without holding an evidentiary hearing."  *Libberton v. Ryan*, 583

8  F.3d 1147, 1165 (9th Cir. 2009) (quoting *Cooper-Smith v. Palmateer*, 397 F.3d

9  1236, 1241 (9th Cir. 2005)).  The rule provides, in pertinent part:

> **(a) In General.** If the [habeas] petition is not dismissed, the judge
> may direct the parties to expand the record by submitting additional
> materials relating to the petition.  The judge may require that these
> materials be authenticated.
>
> **(b) Types of Materials.**  The materials that may be required include
> letters predating the filing of the petition, documents, exhibits, and
> answers under oath to written interrogatories propounded by the
> judge.  Affidavits may also be submitted and considered as a part of
> the record.

16  Rule 7's purpose is to eliminate unnecessary evidentiary hearings.  *See Rule 7*

17  *Advisory Committee Notes* ("Authorizing expansion of the record will, hopefully,

18  eliminate some unnecessary hearings.").  Thus, "a district court in a habeas

19  proceeding need not conduct full evidentiary hearings, but may instead expand the

20  record . . . with discovery and documentary evidence."  *Williams v. Woodford*, 306

21  F.3d 665, 688 (9th Cir. 2002).

22       Regarding discovery, there "is no federal right, constitutional or otherwise,

23  to discovery in habeas proceedings as a general matter."  *Campbell v. Blodgett*, 982

24  F.2d 1356, 1358 (9th Cir. 1993) (citing *Harris v. Nelson*, 394 U.S. 286, 296

25  (1989)); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("A habeas

26  petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery

27  as a matter of ordinary course."); *Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir.

65

1   2003) ("Parties in habeas cases, unlike those in ordinary civil cases, have no right

2   to discovery.").  Although this Court "may, for good cause shown, authorize a party

3   to conduct discovery under the Federal Rules of Civil Procedure, and may limit the

4   extent of discovery," Rule 6(a), Rules Governing § 2254 Cases, habeas corpus

5   review "was never meant to be a fishing expedition for habeas petitioners to

6   'explore their case in search of its existence.'"  *Rich v. Calderon*, 187 F.3d 1064,

7   1067 (9th Cir. 1999) (quoting *Calderon v. United States Dist. Ct. (Nicolaus)*, 98

8   F.3d 1102, 1106 (9th Cir. 1996)).  "Good cause" supports a discovery request when

9   the "'specific allegations before the court show reason to believe the petitioner

10  may, if the facts are fully developed, be able to demonstrate that he is . . . entitled

11  to relief.'"  *Bracy*, 520 U.S. at 908–09 (quoting *Harris*, 394 U.S. at 300).

12          Finally, Jones argues that "discovery is crucial to ensure the additional level

13  of reliability that is demanded in capital cases."  (Petitioner's Brief, at 163.)  This

14  contention should be disregarded since he cites no authority from the Ninth Circuit

15  or the United States Supreme Court establishing that a prisoner has any greater

16  right to habeas discovery simply because he has been sentenced to death.  (*Id.*)

17          **B.  *Evidentiary development for the "cause and prejudice" determination.***

18                  **1.  Expansion of the record.**

19          Jones asks that this Court expand the record to include the exhibits attached

20  to his supplemental *Martinez* brief.  As discussed above, 28 U.S.C. § 2254(e)(2)

21  does not bar a habeas petitioner from presenting new evidence in an attempt to

22  show that PCR counsel's ineffectiveness establishes cause for a procedural default

23  under *Martinez*.  *Dickens*, 740 F.3d at 1321.  Respondents therefore do not object

24  to expansion of the record to include the exhibits attached to Jones' supplemental

25  brief solely for the limited purpose of determining whether he can establish cause

26  under *Martinez* to overcome Claim 1D's procedural default.

27

28

## 2.  Depositions and Discovery.

Jones next requests depositions of trial and PCR counsel, Dr. Howard, Sgt. Pesquiera, Detective Bruce Clark, and Detective George Ruelas.  He also asks this Court to order production of documents by the Pima County Medical Examiner's Office, Pima County Attorney's Office, and the Pima County Sheriff's Department.  This Court should deny Jones' these requests because they are unnecessary: as demonstrated above, the record is more than adequate to resolve whether he can establish cause under *Martinez*.  *See Landrigan*, 550 U.S. at 474; *Clabourne*, 745 F.3d at 382–83; *Sexton*, 679 F.3d at 1159–61.  Moreover, as discussed below, these requests should also be denied because Jones has not shown good cause.

### *Depositions of Prior Counsel*

Jones has already obtained declarations from his trial counsel and the trial investigator and has failed to explain what additional information he could obtain in depositions of trial counsel that would support his claim.  (*See* Dkt. # 167, Exhibits 33–35, 40.)  *See Calderon*, 98 F.3d at 1106 (federal discovery not to be used "for fishing expeditions").  Moreover, expansion of the record to include these declarations is sufficient to determine the *Martinez* issue.

With regard to PCR counsel, Jones again has not explained what information relevant to his *Martinez* claim he expects to obtain.  Given the similarities between claims asserting IAC of appellate and PCR counsel for failure to raise a certain claim, Jones' assertion of PCR counsel's ineffectiveness may be adequately resolved on the record without a deposition.  *See Gray v. Greer,* 800 F.2d 644, 647 (7th Cir. 1985) ("it is the exceptional case" where a claim of appellate IAC "could not be resolved on the record alone").

*Deposition and records of Dr. Howard; production of documents maintained by Pima County Medical Examiner's Office*

Jones has already obtained Dr. Howard's declaration (Dkt. # 167, Exhibit 1), and fails to explain what additional information in support of his IAC claims he expects to obtain from deposing Dr. Howard and requiring him to produce any relevant records from his participation in this case. *See Calderon*, 98 F.3d at 1106. Furthermore, for the reasons discussed above in addressing Jones' IAC claim regarding Dr. Howard's testimony, Jones is incorrect that there is evidence that Dr. Howard "concealed relevant evidence" from the jury and "misrepresented" his findings; as this Court previously observed in addressing Dr. Howard's declaration: "Dr. Howard's testimony remains that Rachel's abdominal injury could have occurred on Sunday afternoon while she was with Petitioner." (Dkt. # 141, at 22.)   Similarly, the record does not support Jones' assertion regarding "flaws in the forensic evaluation of Dr. Howard," and Jones has failed to explain what relevant evidence he expects to obtain from the medical examiner's office. (Dkt. # 167, at 177.)  Jones has not provided good cause for these requests.

*Deposition of Sgt. Pesquiera*

Jones' request for a deposition of Sgt. Pesquiera is based on the faulty premise that he was wrongfully convicted.  The claim here, however, is one of ineffective assistance of counsel, not wrongful conviction; in fact, this Court previously denied Jones' assertion of actual innocence. (Dkt. # 141, at 8–23.)  The only specific topic on which he states he wishes to depose Sgt. Pesquiera is "the absence of reports of interviews of the employees of the Choice Market." (Dkt. # 167, at 176.)  But this absence is irrelevant; as explained above, his claim that such reports would be relevant is based on the mistaken assumption that the State asserted that Jones actually went to the Choice Market when the Lopez children saw him hitting Rachel.  Because the State never asserted that theory, his stated reason for seeking to depose Sgt. Pesquiera is irrelevant.

> *Depositions of Detectives Bruce Clark and George Ruelas; production of files of the Pima County Attorney and Pima County Sheriff's Department*

Jones' reason for wanting to depose these detectives is entirely speculative and based on the same faulty premise as his request to depose Sgt. Pesquiera.  He claims, "upon information and belief," that they interviewed employees of the Choice Market who saw Rachel in the store on May 1st unharmed.  (Dkt. # 167, at 176.)  First, Jones provides nothing in support of his speculative contention that these detectives interviewed employees at the Choice Market.  *See Calderon*, 98 F.3d at 1106.  Second, he claims that the information he speculates they would provide would "contradict[] the prosecution claim that Rachel was beaten and raped during the trip to the Market."  (*Id.*)  Once again, this was not what the prosecution claimed.  The prosecution asserted that the evidence showed that Jones beat Rachel during their third outing on May 1, 1994; the State never asserted— nor did evidence suggest—that they went into the market on that trip.  Jones has failed to establish good cause for these depositions.

Jones' request for files from the county attorney and sheriff's office is similarly based on nothing more than speculation and the flawed premise that he was "wrongfully convicted."  *See Calderon*, 98 F.3d at 1106.  His bare assertions are insufficient to establish good cause.

### 3. Evidentiary hearing.

Jones' request for an evidentiary hearing on cause and prejudice under *Martinez* should also be denied.  Here, the record, including the exhibits attached to Jones' supplemental brief, is sufficient to resolve the *Martinez* issue.  *See Williams*, 306 F.3d at 688.  Moreover, for the reasons explained above, Jones has not presented a colorable claim of cause and prejudice.  Consequently, he is not entitled to an evidentiary hearing.  *See Landrigan*, 550 U.S. at 474.

**C. *De novo review of substantive ineffective-assistance claims.***

In the event this Court finds that Jones has established cause and prejudice to overcome Claim 1D's procedural default, 28 U.S.C. § 2254(e)(2) would bar consideration of Jones' newly proffered evidence in adjudicating the underlying trial IAC claim on de novo review. But in any event, for the reasons discussed above, Jones is not entitled to habeas relief on Claim 1D whether this Court considers his newly-proffered evidence or is limited to the state court record.

**1. 28 U.S.C. § 2254(e)(2) bars evidentiary development on the merits if Jones overcomes the procedural default.**

In the event this Court finds that Jones has established cause and prejudice to excuse Claim 1D's procedural default, the *Strickland* standard would govern this Court's review of the claim since it was never adjudicated on the merits in state court. *See Dickens*, at 740 F.3d at 1321–22. However, in that situation, Jones would still be subject to the limitations of 28 U.S.C. § 2254(e)(2), which provide:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"At a minimum, therefore, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011).

1   "Under the opening clause of § 2254(e)(2), a failure to develop the factual

2   basis of a claim is not established unless there is lack of diligence, or some greater

3   fault, attributable to the prisoner or the prisoner's counsel.  In this we agree with

4   the Court of Appeals and with all other courts of appeals which have addressed the

5   issue." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  "A petitioner's attorney's

6   'fault' is generally attributed to the petitioner for purposes of § 2254(e)(2)'s

7   diligence requirement." *Dickens*, 740 F.3d at 1321; *see also Holland v. Jackson*,

8   542 U.S. 649, 653 (2004) ("Attorney negligence, however, is chargeable to the

9   client and precludes relief unless the conditions of § 2254(e)(2) are satisfied.").

10   In Arizona, a prisoner may receive an evidentiary hearing on a post-

11   conviction relief (PCR) petition only by stating a "colorable claim":  a claim that

12   "presents a material issue of fact or law which would entitle the defendant to

13   relief."  Ariz. R. Crim. P. 32.6(c); *see also State v. Krum*, 903 P.2d 596, 600 (Ariz.

14   1995) (to obtain an evidentiary hearing under Arizona law, defendant must "make

15   a colorable showing that the allegations, if true, would have changed the verdict").

16   A petitioner cannot establish a "colorable claim" for relief without supporting his

17   PCR petition with "[a]ffidavits, records, or other evidence currently available to

18   the defendant supporting the allegations of the petition."  Ariz. R. Crim. P. 32.5;

19   *see also State v. Borbon*, 706 P.2d 718, 725 (Ariz. 1985) ("Rule 32 does not

20   require the trial court to conduct evidentiary hearings based on mere

21   generalizations and unsubstantiated claims.").  Failure to state a colorable claim, in

22   accordance with state procedural rules, precludes a finding of diligence.  *See, e.g.,*

23   *Smith v. Bowersox*, 311 F.3d 915, 921–22 (8th Cir. 2002) (no evidentiary hearing

24   required on habeas where petitioner failed to present a colorable claim in state

25   court, as required by Missouri procedural rules); *Baja v. Ducharme*, 187 F.3d

26   1075, 1079 (9th Cir. 1999) (same).

27   If a prisoner fails to diligently develop his claim in state court, a district

28   court may not conduct an evidentiary hearing unless the petitioner's claim falls

1    within one of the exceptions set forth in 28 U.S.C. § 2254(e)(2).  *See Bradshaw v.*

2    *Richey*, 546 U.S. 74, 79 (2005) (court of appeals erred by expanding the record

3    without first determining whether habeas petitioner "was at fault for failing to

4    develop the factual bases for his claims in state court" under *Williams* or whether

5    he satisfied 28 U.S.C § 2254(e)(2)'s criteria); *Holland*, 542 U.S. at 652–53 (a

6    district court may conduct an evidentiary hearing or expand the record under 28

7    U.S.C. § 2254(e)(2) only if the moving party "was not at fault in failing to develop

8    [the new] evidence in state court, or (if he was at fault) if the conditions prescribed

9    by § 2254(e)(2) were met").

10    28 U.S.C. § 2254(e)(2)'s restrictions affect not only evidentiary hearings,

11    but apply equally to requests to expand the record.  *Holland*, 542 U.S. at 653.

12    "AEDPA constrains when the district court may hold an evidentiary hearing or

13    expand the record pursuant to Rule 7 of the Rules Governing § 2254 cases if a state

14    prisoner seeking federal habeas relief has failed to develop the factual record that

15    supports a claim in state court." *Rhoades v. Henry*, 598 F.3d 511, 517 (9th Cir.

16    2010) (applying 28 U.S.C. § 2254(e)(2)); *see also Cooper-Smith v. Palmateer*, 397

17    F.3d 1236, 1241 (9th Cir. 2005) ((e)(2) applies to expansion of the record under

18    Rule 7).

19    Neither *Detrich* nor *Dickens* addressed whether the newly developed record

20    would be available in deciding the underlying issue of whether trial counsel was

21    ineffective.  But there is no basis in the language of the statute or controlling

22    authorities to avoid the application of § 2254(e)(2) to the merits of a claim after

23    that claim's procedural default has been excused.  Consequently, even if Jones

24    succeeds in demonstrating cause and prejudice under *Martinez*, he must overcome

25    § 2254(e)(2)'s restrictions before using his newly proffered evidence in support of

26    this Court's de novo review of Claim 1D.

27    Here, Jones effectively concedes that there was a lack of diligence on the

28    part of his PCR counsel in developing Claim 1D's factual record.  As Jones relates,

1  PCR counsel failed to conduct any investigation or develop any facts with respect
2  to both the guilt and sentencing aspects of Claim 1D.  (Dkt. # 167, at 147–51, 152–
3  55.)  PCR counsel failed to state any claim resembling Claim 1D, much less one
4  that was colorable and supported by affidavits, records, or other evidence.  *See*
5  Ariz. R. Crim. P. 32.5; *Borbon*, 706 P.2d at 725. This lack of diligence is
6  attributable to Jones, *Holland*, 542 U.S. at 653, and if he succeeds in overcoming
7  Claim 1D's procedural default, precludes expansion of the record or an evidentiary
8  hearing in this Court's de novo determination of Claim 1D on the merits.
9  Consequently, any de novo review of Claim 1D would be limited to the state court
10  record.  *See* 28 U.S.C. § 2254(e)(2); *Bradshaw*, 546 U.S. at 79.

11  Nor do either of § 2254(e)(2)'s exceptions apply.  Claim 1D does not rely on
12  a new rule of constitutional law, but rather the Supreme Court's 1984 decision in
13  *Strickland*.  *See* § 2254(e)(2)(A)(i).  Claim 1D also is not based on a factual
14  predicate that cannot have been previously discovered through the exercise of due
15  diligence.  *See* § 2254(e)(2)(A)(ii).  In fact, Jones argues to the contrary,
16  contending that PCR counsel should have developed the facts supporting this
17  claim.

18  In any case, even if Jones could satisfy § 2254(e)(2)(A)(i) or (ii), he still
19  may not receive evidentiary development on the merits because has not
20  demonstrated that the facts underlying Claim are "sufficient to establish by clear
21  and convincing evidence that but for constitutional error, no reasonable factfinder
22  would have found" him guilty.  *See* § 2254(e)(2)(B); *Taylor*, 529 U.S. at 435–36
23  (to meet § 2254(e)(2)'s exceptions, petitioner must show *both* that "there is a
24  convincing claim of innocence" *and* that "the legal or factual basis of the claims
25  did not exist at the time of state-court proceeding").  As a preliminary matter, this
26  exception can apply only to the guilt-phase aspects of Claim 1D because the
27  statutory language restricts its applicability to situations where no reasonable jury
28  would have found the petitioner "guilty of the underlying offense," not that no

1  reasonable judge or jury would have imposed a death sentence.  *See id.*; *see also*

2  *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1299 (7th Cir. 1996) (actual innocence

3  exception under § 2254(e)(2)(B) does not apply to challenge to eligibility for death

4  sentence), *vacated on other grounds*, 522 U.S. 802 (1997).   In any event, for the

5  reasons discussed above, at, none of Jones' newly-proffered evidence, whether

6  relevant to his convictions or his death sentence, demonstrates by clear and

7  convincing evidence that no reasonable jury would have convicted him or

8  sentenced him to death.   In fact, applying a test less exacting than §

9  2254(e)(2)(B)'s clear-and-convincing standard, this Court has already determined

10 that the evidence supporting the guilt-phase aspects of Claim 1D failed to

11 demonstrate that it was "more likely than not that no reasonable juror would have

12 found petitioner guilty beyond a reasonable doubt."  (Dkt. # 141, at 8 [quoting

13 *Schlup v. Delo*, 513 U.S. 298, 327 (1995)].)   Consequently, neither of §

14 2254(e)(2)'s exceptions apply to excuse Jones' lack of diligence in failing to

15 develop Claim 1D's factual basis, and if he can overcome the procedural default,

16 he is precluded from obtaining expansion of the record or an evidentiary hearing in

17 support of this Court's de novo review of the merits of his claim.

18      Finally, as discussed above in addressing Jones' claims of trial counsel's

19 alleged ineffectiveness, Jones has failed to state a colorable claim for relief.  This

20 Court should therefore deny his request for evidentiary development.  *Landrigan*,

21 550 U.S. at 474.

22               **2.  Claim 1D fails on the merits.**

23      Because Jones is barred from presenting any new evidence in support of this

24 Court's merits review of Claim 1D, he is unable to support his contention that trial

25 counsel was ineffective under *Strickland*.  Based on the state-court record alone,

26 Jones cannot overcome the "strong presumption" that trial counsel rendered

27 adequate assistance and cannot show that any alleged deficiency prejudiced his

28 defense.  *See Strickland*, 466 U.S. at 689–90.  Not only does Jones fail to make any

74

argument that he can establish Claim 1D without relying on his newly-proffered evidence, but without the additional evidence barred by § 2254(e)(2), Jones is left with only conclusory allegations that are insufficient to warrant habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).   Consequently, even if he can overcome Claim 1D's procedural default, he still is not entitled to relief.

Alternatively, Jones' claim would fail on the merits even if § 2254(e)(2) did not prohibit consideration of his new evidence.   For the reasons discussed throughout, Jones' underlying contentions that trial counsel was ineffective are without merit.   Even if Jones could overcome the procedural default, this Court should therefore deny habeas relief whether or not § 2254(e)(2) permits consideration of his newly-proffered evidence.

RESPECTFULLY SUBMITTED this 3rd day of June, 2015.

MARK BRNOVICH
ATTORNEY GENERAL

LACEY STOVER GARD
CHIEF COUNSEL


s/JEFFREY LEE SPARKS
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR RESPONDENTS

I hereby certify that on June 3, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Cary Sandman
Sarah Stone
Assistant Public Defenders
407 West Congress Street, Suite 501
Tucson, AZ  85701-1310

Attorneys for Petitioner

s/A. Kentla

4492645