Jon M. Sands
Federal Public Defender
Cary Sandman (Arizona Bar No. 004779)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
407 W. Congress St., Suite 501
Tucson, Arizona 85701-1310
cary_sandman@fd.org
sarah_stone@fd.org
520.879.7622

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Barry Lee Jones, | ) | Case No. 01-0592-TUC |
| | ) | |
| Petitioner, | ) | **DEATH PENALTY CASE** |
| | ) | |
| vs. | ) | |
| | ) | |
| Charles Ryan, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**Petitioner's Supplemental Reply Brief**

# Table of Contents

I.     Preliminary matters concerning the application of *Martinez v. Ryan*........................ 1

II.    Respondents fail to rebut the colorable showing that trial counsel's
       performance was constitutionally deficient and prejudicial to the outcome of
       the guilt phase of the proceedings.................................................................................. 4

       A. Standard of Review. ..................................................................................................... 4

       B. Respondents fail to rebut the colorable showing that Jones' trial counsel
          performed deficiently during the guilt phase of the proceedings. ......................... 5

          1.  Introduction ........................................................................................................ 5

          2.  Trial counsel's performance was constitutionally deficient. .......................... 10

              a.  *Richter* is inapposite. .................................................................................. 14

              b.  The strategies interposed on trial counsel by Respondents do not rebut
              Jones' showing of objectively unreasonable, deficient performance. .............. 18

       C. Respondents fail to rebut the colorable showing that Jones suffered prejudice.. 25

          1.  Review of the basic analytical framework for measuring prejudice. ............ 25

          2.  Respondents misapply the *Strickland* test for measuring prejudice. ............ 27

          3.  Summary of the totality of the new evidence ................................................ 31

              a.  The fatal injury to Rachel's small intestine was not inflicted on May 1,
              1994.        ...................................................................................................... 33

              b.  Rachel's genital injury was not inflicted on May 1, 1994. ........................ 34

              c.  There is no scientifically reliable evidence that Rachel's bruising was
              inflicted while she was in Jones' care on May 1, 1994. ................................... 35

              d.  Rachel's scalp injury cannot be reliably dated to May 1, 1994. ................ 38

              e.  Neither the scalp injury nor the abdominal injury was caused by a pry
              bar found in Jones' van.................................................................................... 39

              f.  Rachel could not have been injured on a third trip with Jones in his
              van because the injuries did not occur on that date, and in any event there

i

was no third trip that took place before it was discovered that Rachel was
ill. ................................................................................................ 41

g.  The blood evidence has no link to an alleged assault of Rachel in
Jones' van during a phantom third trip in the van on May 1, 1994. ................ 43

h.  There is no credible evidence to support allegations that the Lopez
children witnessed Jones assaulting Rachel in his van on May 1, 1994. ........ 47

3.  There is a reasonable probability that at least one juror would have had
a reasonable doubt respecting Jones' guilt. ................................... 49

III.  Respondents fail to rebut the colorable showing: (1) that PCR counsel
performed deficiently when he failed to investigate and present a substantial
claim that the guilt-phase performance of trial counsel was constitutionally
deficient, and (2) that PCR's counsel's deficient performance prejudiced the
outcome of the PCR proceedings. ............................................... 59

A. Introduction. ................................................................ 59

B. Respondents fail to rebut the showing that Jones' PCR counsel performed
deficiently under *Strickland*, when he failed to investigate and present a
substantial claim that the guilt-phase performance of trial counsel was
constitutionally deficient. .................................................... 60

1.  Respondents have applied an incorrect standard to the assessment of
PCR counsel's performance. ................................................. 60

2.  PCR counsel's failure to conduct any investigation during the PCR
proceedings, save an alleged interview of Rachel's mother, was
objectively unreasonable and not supported by reasonable professional
judgment. ................................................................... 67

IV.  Respondents fail to rebut the colorable showing that trial counsel's
performance was constitutionally deficient and prejudicial to the outcome of
the sentencing phase of the proceedings. ...................................... 77

A. Introduction. ................................................................ 77

B. Trial counsel rendered ineffective assistance to Jones during the penalty
phase of the proceedings when he failed to investigate and present mitigating
evidence. ..................................................................... 78

C. Trial counsel did not discharge his constitutional duty to investigate with the
incomplete and inadequate penalty phase investigation he conducted in
Jones' case. ................................................................. 83

D.  Retention of a mental health expert did not absolve counsel of the duty to conduct an adequate investigation into Jones' background. ............................ 88

E.  Counsel performed deficiently when he failed to investigate and discover relevant background information that could and should have been provided to mental health experts. ............................................................................... 89

F.  Counsel's duty to investigate encompasses a duty to determine which experts will aid the case. ...................................................................................... 93

G.  Jones suffered prejudice as the result of trial counsel's failures. ...................... 95

V.   Respondents fail to rebut the colorable showing: (1) that PCR counsel performed deficiently, when he failed to investigate and present a substantial claim that the sentencing-phase performance of trial counsel was constitutionally deficient, and (2) that PCR's counsel's deficient performance prejudiced the outcome of the PCR proceedings. .................................... 97

A.  Introduction. ................................................................................................ 97

B.  Respondents fail to rebut the showing that Jones' PCR counsel performed deficiently under *Strickland*, when he failed to investigate and present a substantial claim that the sentencing phase performance of trial counsel was constitutionally deficient. ................................................................................ 98

1.  Respondents have applied an incorrect standard to the assessment of PCR counsel's performance.......................................................................... 98

2.  PCR counsel's failure to conduct any investigation during the PCR proceedings, save an alleged interview of Rachel's mother, was objectively unreasonable and not supported by reasonable professional judgment.......................................................................................................... 99

VI.  Respondents have failed to rebut Jones' showing that he is entitled to expansion of the record, discovery and an evidentiary hearing............................. 100

A.  Jones has presented colorable claims, and is he entitled to a hearing. ............. 100

B.  28 U.S.C. § 2254(e)(2) does not apply to limit expansion of the record, discovery, other evidentiary development, or a hearing on the merits of the claims against trial counsel............................................................................. 100

C.  Jones has shown good cause for depositions and discovery. ........................... 103

1.  Depositions........................................................................................... 104

iii

2. Documents. ................................................................................................. 106

VII. Conclusion      ................................................................................................. 106

## I.      Preliminary matters concerning the application of *Martinez v. Ryan*.

As explained in Jones' Supplemental Brief, the court of appeals ordered this Court to reconsider its dismissal of procedurally defaulted Claim 1D in light of *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012). In its remand order, the court of appeals determined Mr. Jones' Claim 1D to be a substantial claim, and as explained below, that finding has been held to satisfy the prejudice prong of the "cause and prejudice" inquiry. *Clabourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014) Therefore, adopting the *Clabourne* formulary, the sole remaining question goes to whether there is cause to excuse the procedural default of Claim 1D.

In their response, Respondents misstate Jones' articulation of the elements of cause and prejudice under *Martinez*. They allege that: "Jones . . . argues that to establish cause and prejudice under *Martinez*, he need only show PCR counsel's deficient performance and that the defaulted claim is substantial. Jones contends that the substantial claim showing is sufficient to establish *Strickland* prejudice resulting from PCR counsel's deficient performance." (Resp., Dkt. 175 at 8:22-25.) The quoted assertion is plainly incorrect; Jones made <u>no</u> such argument. What Jones actually said was this: ". . . the showing of '**cause**' under *Martinez* simply requires a showing that deficient performance by PCR counsel resulted in the default of a substantial trial counsel ineffectiveness claim. The ultimate demonstration of default '**prejudice**' awaits the showing that the claim against trial counsel is meritorious." (Supplemental Br., Dkt. 167 at 7:5-9; *and see id.* at 5-

7:10.)   Nevertheless, apart from the foregoing, in his Supplemental Brief, Jones avowed that although he disagreed with *Clabourne*, and without waiving his objection to it, he would adhere to and satisfy the *Clabourne* formulation of the *Martinez* cause and prejudice test in these proceedings. (Dkt. 167 at 7:10-12.) Under that formulation, because the court of appeals' remand order found Jones' claims to be substantial, the prejudice prong of cause and prejudice is established. *Id.* at 377.

In order to demonstrate the cause prong necessary to excuse procedural default, *Clabourne* requires Jones to prove: (1) that his state PCR counsel performed deficiently under *Strickland v. Washington*, 466 U.S. 668 (1984), *id.* at 376, and (2) that ". . . there is a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* at 377. With respect to this latter element, the *Clabourne* panel held that "[t]o demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the PCR proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Id.* at 378. "Determining whether the result of the post-conviction proceedings would have been different will require consideration of the underlying claim of ineffective assistance by [trial or] sentencing counsel and the questions of whether [trial or] sentencing counsel performed deficiently, and (b) whether there

2

was a reasonable probability that . . . the result of the [trial or] sentencing proceedings would have been different." *Id.* at 382.

In accord with *Clabourne*, Mr. Jones' supplemental brief laid out a *prima facie* colorable case, sufficient to require an evidentiary hearing where he can prove both "cause" to excuse procedural default <u>and</u> the ultimate merits of his claim against trial counsel with evidence that: (1) his trial counsel performed deficiently at trial and sentencing; (2) there is a reasonable probability that the result of the trial and sentencing phases of the proceedings would have been different; (3) state PCR counsel performed deficiently by failing to present these substantial claims of trial counsel's ineffectiveness; and (4) the outcome of the PCR proceedings would have been different based on elements (1) and (2) above. (*See* Dkt. 167 at 7-156, 177.) Respondents disagree. They argue (1) that PCR counsel performed adequately, and (2) that PCR counsel cannot be faulted for failing to investigate and present the subject IAC claims against trial counsel because (ignoring the court of appeals remand order finding the claims against trial counsel substantial) there is simply no merit to the claims against trial counsel. As explained below, Respondents are indisputably wrong on all counts.

We reply first to Respondents' contention that trial counsel was not prejudicially ineffective during the guilt phase of Jones' trial. As explained above, under *Clabourne*, evidence of trial counsel's deficient performance, as well as the

resultant prejudice, is relevant to the showing that there is a reasonable likelihood that the outcome of the PCR proceedings would have been different. 745 F.3d at 382. Independently, the same evidence is obviously relevant to the ultimate merits of the IAC claim against trial counsel.

**II.    Respondents fail to rebut the colorable showing that trial counsel's performance was constitutionally deficient and prejudicial to the outcome of the guilt phase of the proceedings.**

**A.    Standard of Review.**

Respondents fail to mention or respond to a fundamental premise of Jones' supplemental brief. "At this stage, [Jones] does not need to prove . . . his [Sixth Amendment] . . . rights [to effective assistance of counsel] were violated; he only needs to allege a *colorable* claim for relief." *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (emphasis in original). (*See also* Dkt. 167 at 103.) To allege a colorable claim for habeas relief, a petitioner is only required to allege facts that, if proven true at a hearing, would show his entitlement to relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *id.* at 1170. "Th[is] standard to obtain an evidentiary hearing is less stringent than required to prove a *Strickland* claim." *Fairbanks v. Ayers*, 650 F.3d 1243, 1251 (9th Cir. 2011). "In these circumstances, a petition may be dismissed without a hearing only when it consists solely of conclusory, unsworn statements unsupported by any proof or offer thereof." *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001) (citing *Coleman v.*

4

*McCormick*, 874 F.2d 1280, 1284 (9th Cir. 1989) (en banc)). Alleging a colorable claim "is a low bar, and [Jones] has surmounted it." *Earp*, 431 F.3d at 1170.

**B.    Respondents fail to rebut the colorable showing that Jones' trial counsel performed deficiently during the guilt phase of the proceedings.**

**1.    Introduction.**

"[I]t is common knowledge among competent criminal defense counsel, that the prosecution will often attempt to establish the defendant's commission of [a child abuse] offense by presenting scientific, expert forensic evidence showing that the child's injuries were inflicted during a time when the child was in the defendant's custody, when conceivably the defendant would have had the opportunity to harm the child." (Declaration of standard of care expert Dan Cooper, Dkt. 167, Ex. 37, para. 2.) Common knowledge or not, this was the prosecutorial tactic adopted in Jones' case. He was circumstantially identified as the perpetrator with what purported to be scientific evidence that Rachel's injuries, including an alleged sexual assault injury, and the fatal injury to her small intestine, were inflicted on a date and time certain, on May 1, 1994, when she was in Jones' care.  It was the dominant theme of the prosecution's case that Rachel died from an injury inflicted on the afternoon of May 1.

Agreeing with Jones' articulation of the prosecution's chief premise, this Court has already said: "[t]he main thrust of the prosecution's case against Petitioner was that <u>Rachel was solely in his care on the afternoon of May 1</u>, 1994,

when her injuries, including her fatal abdominal injury were inflicted." (Dkt. 141 at 9:8-10 (emphasis added).) It is Jones' principal contention that (1) trial counsel was ineffective for failing to investigate or contest this central factual underpinning of the prosecution's case, (2) as a direct consequence, the jury never learned from the likes of Dr. Ophoven and Dr. McKay, that a competent autopsy and forensic analysis would have clearly established to a level of scientific certainty that Rachel's fatal injury was inflicted by an unknown, unidentified perpetrator days prior to May 1, 1994, and (3) that in fact, none of her injuries were inflicted when she was in Jones' sole care on May 1. As explained below, these exculpatory scientific conclusions dramatically "alter[ ] the entire evidentiary picture" and the "inferences to be drawn from the [trial] evidence." *Strickland*, 466 U.S. at 695-96 (recognizing that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture").

What seemed to be a simple explanation for the prosecution's theory of "who" killed Rachel: that it must have been Jones, since he had sole care of her when her injuries were inflicted on May 1, is now exposed as a canard. Her injuries have zero connection to May 1, 1994, or Jones' custody of her on that date. Respondents have offered no evidence to counter or dispute Jones' new medical evidence from Dr. Ophoven and Dr. McKay.

As we explain further below, in their response brief, the Respondents ignore how this single discovery—that none of Rachel's injuries were inflicted on May 1, 1994—dramatically alters the inferences that can be reasonably or legitimately drawn from what remains of the prosecution's residual circumstantial evidence. *Strickland*, 466 U.S. at 695-96 (recognizing that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture").

By way of example, the prosecution pointed to a fabled third trip in Jones' yellow van as the opportunity for Jones to fatally assault Rachel. (Tr. Apr. 13, 1995 at 88-94.) However, Rachel's injuries were <u>not</u> inflicted on May 1. Therefore, whether Jones took one, fifteen, or fifty trips with Rachel in his van on May 1 is immaterial: that was <u>not</u> the day she either received her fatal injury, or was sexually assaulted.[1]  Once the prosecution's May 1 date of injury thesis is exposed as a falsehood, the number of trips Jones took with Rachel on May 1 is irreducibly irrelevant.

Similarly, the prosecution proffered evidence to the jury that traces of blood on clothing Jones wore on May 2 (but <u>not</u> worn by him on May 1), and small traces of blood in the van (but an absence of blood on any of Rachel's clothing

---

[1] We reemphasize later below that Jones did <u>not</u> take three trips in the van with Rachel on May 1. But even if there were a shred of credible proof that he had, it would be immaterial for the reasons explained above.

worn on May 1) should be understood to substantiate that Jones had sexually assaulted and inflicted a fatal injury on Rachel in the van on May 1. However, the inferences drawn from the blood evidence are also dramatically altered. Rachel's injuries were <u>not</u> inflicted on May 1. <u>The blood evidence cannot prove infliction of injuries on May 1, when there is scientific certitude that the injuries were not inflicted on that date</u>. Therefore, it must be inferred that there are demonstrable, innocent explanations for the trace blood evidence, and of course, as we explain later below, there are.[2]

The prosecution also offered evidence from the eight-year-old Lopez twins, that they had seen Jones striking Rachel as Jones entered the Choice Market parking lot on May 1. The prosecutor argued that the assault allegedly witnessed by the Lopez twins supported the conclusion that Jones must have inflicted Rachel's injuries on May 1. (Tr. Apr. 13, 1995 at 98-99,139.) But the Lopez twins do not lend support for the inference that Rachel died from injuries Jones inflicted on May 1; because as a matter of medical scientific certitude her injuries were <u>not</u> inflicted on May 1. What is more, standardized, scientific, measurement-based evidence shows that the Lopez children could <u>not</u> have physically seen what the

---

[2] Innocent explanations for the blood evidence abound, as discussed at pages 43-47 below.

prosecution said they saw, and their testimony was also tainted by suggestive questioning rendering it both untrustworthy and unreliable.[3]

Finally, there is Jones' statement to Rachel's mother and others on the night of May 1, that he had taken her to the nearby Rural Metro fire department, where a paramedic examined the wound on the back of her head. This was untrue. But, as Jones explained to detectives during his police interview, he had instead asked a paramedic to look at Rachel's head at the Quick Mart late that Sunday afternoon. (Dkt. 167, Ex. 12 at 20, 32-33.) As explained in the Supplemental Brief and Declaration of Investigator Andrew Sowards, the brown paramedic uniform and insignia described by Jones uniquely fits the description of Federal Border Patrol EMTs. If Jones had engaged in an intentional deception, it is more likely that he would have described the typical blue uniform worn by TFD and Rural Metro. (Sowards Decl., Dkt. 167, Ex. 38, para. 17; Ex. 38 B.) Jones' failure to accurately report <u>where</u> Rachel had been seen by a paramedic does not substantiate or support an inference that Rachel was beaten and sexually assaulted on May 1 by Jones, because there is scientific certitude that her injuries were not inflicted that day. Jones' failure to explain on the evening of May 1, that Rachel had been seen by a paramedic at the Quick Mart, and not at Rural Metro, is evidence of poor judgment at worst, particularly in light of the fact that when Jones told Rachel's mother that

---

[3] *See* discussion at 47-49 below. This Court previously found that the Lopezes' testimony "was significantly impeached at trial." (Dkt. 141 at 22.)

he had taken Rachel to Rural Metro, Jones would <u>not</u> have been aware that Rachel was suffering from a fatal small bowel injury inflicted days earlier by a perpetrator unknown to him.[4]

Thus, as further elaborated below, "[n]o matter how much circumstantial evidence the prosecution could amass tending to link [Jones] to the crime . . . it had no case unless it could prove [Rachel's injuries were inflicted on May 1]." *Rivas v. Fischer*, 780 F.3d 529, 539 (2d Cir. 2015).

It is within the above factual setting that we turn to examine Respondents' argument that counsel performed effectively and reasonably when he failed to investigate or challenge the prosecution's  central factual premise: that Rachel was fatally injured and sexually assaulted by Jones on May 1, 1994, when she was in his care.

### 2.    Trial counsel's performance was constitutionally deficient.

Notably, Respondents do <u>not</u> dispute the fact that during Jones' trial, the prosecution relied on <u>unchallenged</u> scientific evidence to prove Rachel's injuries were inflicted on May 1, 1994, when Rachel was periodically in Jones' sole care. It is undisputed that counsel did <u>not</u> challenge the "time of injury" forensic evidence. There was no adversarial testing of this vital element of the prosecution's case.

---

[4] As we explain later at pages 53-54 below, Jones detoured from the fire station on the evening of May 1 because he saw a police car there, and he feared being arrested again for what would have been the third time, for driving on a suspended license.

With respect to the single, fatal small bowel injury that caused Rachel's death, the prosecution asked Dr. Howard to tell the jury what was the "<u>most</u> <u>consistent</u>" time when the injury was inflicted. (Tr. Apr. 12, 1995 at 148-49.) He answered the injury was typical of one inflicted between 2:00 and 6:00 p.m. on Sunday, May 1. (*Id.*) At Jones' trial, Dr. Howard dated Rachel's head injury and genital injury to the same timeframe. (*Id.* at 117, 133, 148-49.)  Dr. Howard and Dr. Seifert both also dated many of Rachel's bruises to May 1. (*Id.* at 148; Tr. Apr. 6, 1995 at 103-07.)

        As explained further below, it would have been plain for any reasonably competent defense counsel to see that the prosecution would need little in the way of additional circumstantial evidence to establish Jones' guilt, <u>if</u> the jury believed the prosecution's <u>unchallenged</u> scientific evidence regarding the time between infliction of injury and death.[5] This is particularly true, because if the injuries were

---

[5] "As courts have long recognized, [and any qualified capital defense lawyer has long known] forensic expert testimony can play an important role in criminal trials. Juries may give special weight to testimony by forensic scientists; the Supreme Court has cautioned that '[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.'" Brandon L. Garett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 9 (2009) (second alteration in original) (citing *Daubert v. Merrell Dow Pharmaceutical*, 509 U.S. 579, 595 (1993)). "[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors . . . ." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). "[A] certain patina attaches to expert testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve." *United States v. Hines*, 55 F. Supp. 2d 62, 64 (D. Mass. 1999).

inflicted on May 1, then all of the prosecution's remaining circumstantial evidence was in *arguable* symmetry with its medical evidence. On the other hand, it would have been equally clear to reasonably competent defense counsel that if Rachel's injuries could <u>not</u> be dated to May 1, then the residual circumstantial evidence would be reduced to irrelevance. Thus, from any angle, it is obvious; it surely was obvious to the prosecutor, and it should have been obvious to Jones' trial counsel, that the "time of injury" evidence would dictate the outcome of Jones' trial. It is inconceivable that trial counsel would fail to investigate the time of injury medical evidence in this capital case, but that is exactly what happened.

In response to the evidence of this obvious flaw in trial counsel's performance, Respondents cite to one case, the Supreme Court's decision in *Harrington v. Richter*, 562 U.S. 86 (2011). (*See* Dkt. 175 at 19.) The Respondents rely on *dicta* in *Richter* to the effect that "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert for the defense." (Dkt. 175 at 19 (quoting *Richter*, 562 U.S. at 111).)

Relying on *Richter*, Respondents claim (that in lieu of investigating and presenting expert evidence), "[c]ross-examination [can be] sufficient to challenge the State's expert testimony" and they again quote *Richter* to the effect that often

12

"the best strategy can be to say that there is too much doubt about the State's theory to convict." (*Id.*) From here, the Respondents make several arguments to advance their position:

- In lieu of investigating or presenting expert testimony to challenge Dr. Howard and Dr. Siefert, trial counsel "challenged the State's evidence in other ways, by emphasizing that Jones had no motive to commit the crimes, that the State's evidence was circumstantial, and that the State failed to prove beyond a reasonable doubt that Jones inflicted Rachel's injuries";

- "defense counsel obtained concessions from both doctors through cross-examination which suggested that the pry bar found in Jones' van did not cause Rachel's scalp and abdominal wounds and that many of the injuries could have been caused by a fall from Jones' van"; and

- "the reasonableness of the tactics trial counsel used to address the State's doctors is further bolstered by the fact that these witnesses testified only to the nature and extent of Rachel's injuries, and were unable to connect the infliction of the injuries to Jones."

(Dkt. 175 at 19-20.)

Below we demonstrate that *Richter* is inapposite and that Respondent's arguments are both unpersuasive and clearly inadequate to rebut Jones' showing that his trial counsel's performance was demonstrably constitutionally deficient in this case.

### a.    *Richter* is inapposite.

*Richter* does <u>not</u> support a finding that Jones' trial counsel could reasonably decide to completely forgo any defense investigation into the time when Rachel's injuries were inflicted, and whether the injuries were inflicted on May 1, as the prosecution insisted. In Jones' case, the indisputable <u>centrality</u> of the prosecution's medical opinions on the time between infliction of injuries and death, distinguish his *Strickland* claim from the claim rejected in *Richter*, where the expert evidence was tangential at best.[6]

The dispositive evidentiary issue in *Richter* was a credibility contest between the defendant and the surviving victim about the circumstances of the exchange of gunfire in which a second victim was killed. Joshua Richter alleged that his lawyer performed deficiently by failing to retain an expert to test whether a pool of blood at the crime scene was consistent with his version of events. The

---

[6] It is also important to note that the *Richter* holding did not result from a *de novo* review of the federal merits of the *Strickland* claim; instead the review was restricted under the constraints imposed on assessment of the state court's decision under the AEDPA. The Court remarked that it would not need to take the step to conduct a *de novo* review of the merits of the *Strickland* claim. 562 U.S. at 109.

14

prosecution did <u>not</u> conduct its own testing of the blood prior to trial and the Supreme Court observed that "it was far from a necessary conclusion [that the importance of the blood evidence] was evident at the time of the trial." 562 U.S. at 107. The Court held the state court's rejection of the claim was not unreasonable, because "[i]t was at least arguable that a reasonable attorney could decide to forgo inquiry" into the forensic evidence at issue. *Id.* at 106. The Supreme Court reasoned that even if expert testimony had been available, defense counsel was entitled not to use it because there was a "serious risk" that it could have "destroy[ed]" the defendant's case and distracted the jury from assessing the credibility of the defendant's testimony. *Id.* at 108. The Court explained, that "<u>making a central issue out of blood evidence</u> would have increased the likelihood of the prosecution's producing its own evidence on the blood pool's origins and composition; and once matters proceeded on this course, there was a serious risk that expert evidence could destroy Richter's case." *Id.* (emphasis added). Further, the serology evidence that Richter claimed his attorney should have presented, "established nothing more than a theoretical possibility" of a supporting defense theory, and "[a]t trial, defense counsel extracted a concession along these lines from the prosecution's expert." *Id.* at 112.

In sum, the forensic evidence in *Richter* was not a central issue in the case; indeed it was not deemed an important issue by the prosecution in the lead up to

15

the trial, and there were evident serious risks associated with presenting the defense version of the blood evidence. Moreover, the "theoretical" defense theory posed by the blood evidence was effectively presented to the jury from a concession obtained from the prosecution's expert during cross-examination.

In glaring contrast to *Richter*, in Jones' case, forensic evidence was always a vital component of the prosecution's case. Medical evidence was absolutely necessary to support "[t]he main thrust of the prosecution's case against [Jones]" that Rachel's injuries were inflicted on May 1, 1994. (Dkt. 141 at 9:8.) Unlike in *Richter*, in Jones' case there were never any risks associated with presenting the defense version of the medical evidence now in this record from Dr. Ophoven and Dr. McKay. Why? Because the evidence from Ophoven and McKay proves Rachel was not injured while in Jones' care on May 1. Moreover, unlike *Richter*, this was not a case where cross-examination substituted for investigation and presentation of defense evidence. Instead, the record shows that there was no cross-examination, none, which challenged the prosecution's medical evidence tying the infliction of Rachel's injuries to the afternoon of May 1. Trial counsel's 2 ½ page cross-examination of Dr. Howard did nothing more than suggest that Rachel's injuries may have been inflicted (but inflicted by Jones nonetheless) with some instrumentality other than a pry bar. (Tr. Apr. 6, 1995 at 121-33; Tr. Apr. 12, 1995 at 158-60.)

16

The prosecution's version of the medical evidence, which portrayed Rachel's injuries as being "most consistent" or "typical" of injuries inflicted on the afternoon of May 1, went to the jury as gospel, without any challenge to its reliability or veracity. The failure to investigate and present countervailing medical evidence rendered the likelihood for a finding of guilt at a near certainty. On facts like these, for obvious reasons, courts have held *Richter* inapposite. *See Elmore v. Ozmint*, 661 F.3d 783, 863-64 (4th Cir. 2011). The court's ultimate conclusion in Elmore's death penalty case is applicable here. "Here, in stark contrast to *Richter*, forensic evidence [including the medical examiner's time-of-death opinion] was always and obviously vital to the State's case . . . [and] [a]s such, the defense did not risk making a central issue out of the forensic evidence, because the State was already certain to do so. Rather, the circumstances necessitated that the defense work to engender doubt about the [State's] forensic evidence. [Jones'] lawyers attempted as much in their cross-examinations of the State's witnesses, but  . . . they were unarmed for the battle." *Id.* at 863 (internal citation and quotation marks omitted); *see also Thomas v. Clements*,789 F.3d 760, 769-70 (7th Cir. 2015) (distinguishing *Richter* in capital case, where medical examiner's opinion as to cause of death was central component of prosecution's case and counsel's cross-examination did not make up for lack of expert testimony); *Showers v. Beard*, 635 F.3d 625, 631 (3d Cir. 2011) (distinguishing *Richter* in capital case, because expert

evidence went to pivotal issue concerning whether death was suicide or murder); *State v. Denz*, 306 P.3d 98, 103-04 (Ariz. Ct. App. 2013) (finding *Richter* inapposite in child abuse case, given that "state's medical evidence was the cornerstone of its case" and "it was apparent from the outset that the state would rely heavily on expert testimony"). Respondents have misplaced reliance on *Richter*.

> **b.   The strategies interposed on trial counsel by Respondents do not rebut Jones' showing of objectively unreasonable, deficient performance.**

As explained above, the Respondents argue trial counsel could forgo any investigation of the State's medical evidence linking Rachel's injury to the afternoon of May 1, by opting for a cross-examination strategy. Supporting this argument, Respondents posit that "defense counsel obtained concessions from both doctors through cross-examination which suggested that the pry bar found in Jones' van did not cause Rachel's scalp and abdominal wounds and that many of the injuries could have been caused by a fall from Jones' van." (Dkt. 175 at 20). This is a specious argument. First, the record unequivocally demonstrates that trial counsel did <u>not</u> obtain any <u>relevant</u> concessions from the medical experts regarding the cause of Rachel's fatal abdominal injury. During cross-examination of Dr. Howard, counsel may have raised the idea that a pry bar could have caused a fractured skull, or caused a broken a rib—injuries Rachel did not have—but he

1  obtained **no** concession that the pry bar was <u>not</u> the weapon used to cause Rachel's

2  injuries. (Tr. Apr. 12, 1995 at 158-59.) In fact, the <u>only</u> concession trial counsel

3

4  obtained from Dr. Howard was not a relevant defense concession at all: he had Dr.

5  Howard agree that "any number of objects could have caused [Rachel's] injuries."

6  (*Id.* at 160.) This damaging cross-examination was taken full advantage of by the

7

8  prosecutor, who immediately followed up by having Dr. Howard concede that ". . .

9  whatever stuff was used to beat and murder Rachel  . . . didn't leave its little label

10  behind." (*Id.*) In addition, the Respondents' argument that trial counsel obtained a

11

12  concession that "many of [Rachel's] injuries could have been caused by a fall from

13  Jones' van," is <u>not</u> true. No such concession was obtained from Dr. Howard, and

14

15  Dr. Siefert only conceded that Rachel's head injury could have been caused by a

16  fall from Jones' van. (*Id.* at 158-60; Tr. Apr. 6, 1995 at 128-29.)

17      More to the point, however, <u>there was not a single cross-examination</u>

18

19  <u>question that challenged or refuted the prosecution's time of injury medical</u>

20  <u>evidence</u>. (Tr. Apr. 6, 1995 at 121-32; Tr. Apr. 12, 1995 at 158-60, 163.) Trial

21  counsel was totally unprepared to challenge the medical timeline evidence.

22

23      Respondents also argue that ". . . the reasonableness of the tactics trial

24  counsel used to address the State's doctors is further bolstered by the fact that these

25  witnesses testified only to the nature and extent of Rachel's injuries, and were

26

27  unable to connect the infliction of the injuries to Jones." (Dkt. 175 at 20.) This is

28

another specious argument. It is misleading to suggest that the doctors' testimony was limited to a description of the "nature and extent of the injuries." The medical experts also testified that the injuries were consistent with or typical of infliction on May 1, and of course this evidence <u>did</u> connect the infliction of the injuries to Jones, since on May 1, Rachel was in Jones' care.

It is exactly because the time-of-injury medical evidence was used to identify Jones as the perpetrator that investigation of that medical evidence by defense counsel was critical and essential. As explained by standard of care expert Dan Cooper:

> Based on my review, I can categorically say that this is a case in which forensic evidence played a critical role. In fact, <u>the state's main theory relied on the time of death to demonstrate that the child was injured while in Jones' care</u>. Under prevailing professional norms, an investigation of the time of the injury should have been the central focus of the defense lawyer and although it would have been objectively unreasonable, under the *Strickland* standard to forego such an investigation in this case, that is exactly what Jones' trial counsel, Sean Bruner did.

> In Jones' case the medical examiner determined that peritonitis was the cause of death. He then agreed to testify, and did testify, consistent with the prosecutor's theory, that the injury causing the peritonitis happened sometime on May 1, within a time frame that would have been 12 or fewer hours before the child died. It was incumbent on the defense lawyer to vigorously investigate and then present available evidence challenging the medical examiner's claim. That challenge could be done in several ways, but hiring an expert witness, as part of the implementation of a thorough investigation, would have been a necessary, and critical, first step in this case. <u>Yet in Jones' case - as an exemplar of trial counsel's objectively unreasonable performance - nothing was done to investigate or challenge the state's time of death</u>

claim, and defense counsel simply accepted the state's evidence, with devastating consequences on the defense of Jones' case. As a result of counsel's deficient performance, the jury never heard evidence from experts who would have testified that it was a scientific certainty that the victim, Rachel Gray, did not receive her fatal injuries on Sunday May 1, and that therefore, the state's case lacked proof of who harmed Rachel when she was injured days earlier.

(Dkt. 167, Ex. 37, paras. 8-9 (emphasis added).)[7]

Finally Respondents suggest that trial counsel's failure to challenge the prosecution's time-of-injuries medical evidence can be overlooked because trial counsel "challenged the State's evidence in other ways, by emphasizing that Jones

---

[7] Respondents challenge the admissibility of Mr. Cooper's Declaration, but the objection should be overruled. It is well established that courts may receive evidence from experts to establish the standard of practice, Fed. R. Evid. 702 (expert witnesses may testify if their specialized knowledge will help the court determine a fact in issue), and courts routinely do so, *see, e.g.*, *Karis v. Calderon*, 283 F.3d 1117, 1133 n.9 (9th Cir. 2002) (affirming district court grant of habeas relief and acknowledging district court's acceptance of and reliance on expert testimony regarding standard of practice); *Webster v. Chappell*, No. CIV S-93-306 LKK DAD DP, 2014 WL 2526857, at *20 (E.D. Cal. June 4, 2014) (citing with approval expert opinion on "minimally necessary tasks of a competent penalty phase investigation"); *Lang v. Cullen*, 725 F. Supp. 2d 925, 970 (C.D. Cal. 2010) (considering *Strickland* expert testimony); *Mak v. Blodgett*, 754 F. Supp. 1490, 1493 (W.D. Wash. 1991) (granting habeas relief after allowing evidence from expert on standard of care); *cf. Hovey v. Ayers*, 458 F.3d 892, 910-11 (9th Cir. 2006) (holding district court did not abuse discretion by denying expert opinion on standard of care, but emphasizing that district court may have "underestimated the potential value of the experts' testimony"). *And see Hamilton v. Ayers*, 583 F.3d 1100, 1130 (9th Cir. 2009). In *Hamilton*, the district court relied on trial counsel's testimony regarding the standard of practice in the community at the time of trial. *Id*. There, trial counsel had limited capital case experience and was unable to recall whether he had ever "look[ed] into the ABA standards before or during his representation of [the petitioner]." *Id*. In contrast, the petitioner's expert was able to testify to the standard of practice in a manner that was "consistent with established case law." *Id*.

had no motive to commit the crimes, that the State's evidence was circumstantial, and that the State failed to prove beyond a reasonable doubt that Jones inflicted Rachel's injuries. (Dkt. 175 at 19-20.) The Court should reject this line of reasoning. Trial counsel could <u>not</u> settle on a strategy to rely on these frivolous (Jones' lacked motive, the evidence is circumstantial) arguments, while ignoring a defense examination of a critical component of the prosecution's case. This is because "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690-91). "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (quoting *Strickland*, 466 U.S. at 690-91).

Here, every piece of the prosecution's case was ultimately in alleged synchrony with the medical evidence, which portrayed that Rachel's injuries were inflicted on May 1, when Rachel was in Jones' care. There is no conceivable, objectively reasonable basis that could support trial counsel's decision not to investigate this critical prosecution evidence and instead rely on (1) an ineffectual cross-examination of the medical experts and (2) an ultimate argument that Jones

should be acquitted because the prosecution failed to prove—what the prosecution is not required to prove anyway—that Jones lacked a motive.

Trial counsel's investigatory omission is quintessentially objectively unreasonable, satisfying the definition of constitutionally deficient performance. Trial counsel's decision not to investigate was not supported by reasonable professional judgment. This is <u>not</u> a case where Jones' trial lawyer conducted some investigation and made an informed decision to pursue another strategy. In fact, "[b]ecause [Jones'] lawyer's investigation into the State's forensic evidence never started, there could be no reasonable strategic decision either to stop the investigation or to forgo use of the evidence that the investigation would have uncovered." *Elmore*, 661 F.3d at 863-64. "[Jones'] lawyer disregarded [his] professional obligation to investigate critical prosecution evidence, thereby engendering 'a breakdown in the adversarial process that our system counts on to produce just results.'" *Id.* at 861 (quoting *Strickland*, 466 U.S. at 696).

In cases where forensic evidence lies at the heart of the prosecution's case, counsel have the duty to conduct an investigation and consult with necessary experts to determine if the evidence is vulnerable to attack. *Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007) ("[S]cientific evidence . . . was thus fundamental to the State's case. Yet Richey's counsel did next to nothing to determine if the State's arson conclusion was impervious to attack. . . . [W]e can

discern no strategic reason why counsel would have so readily ceded this terrain to the prosecution."); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (trial counsel had "affirmative duty to have the physical evidence [forensically] examined . . . and to introduce that evidence which offered a plausible explanation for the most damaging elements of the state's case"); *State v. Denz*, 306 P.3d at 102-04 (given that the "state's medical evidence was the cornerstone if its case against Denz," and the fact that the state's medical evidence was designed to rebut Denz's claim that the child's injuries were accidentally caused, "counsel's decision to not consult with an expert before settling on a defense strategy cannot qualify as a reasoned decision"); *Thomas v. Clements*, 789 F.3d at 768, 772 (where defendant's "intent was one of the linchpins of the case," trial counsel was ineffective for failing consult with pathologist to investigate medical examiner's opinion that victim died from intentional strangulation, when defendant claimed victim suffered accidental, unintentionally caused injury and death); *Couch v. Booker*, 632 F.3d 241, 247-49 (6th Cir. 2011) (defense counsel's failure to investigate medical examiner's opinion regarding cause of death constitutionally deficient); *Rivas v. Fischer*, 780 F.3d at 549-50 (where core of prosecution's case was that Rivas killed victim during narrow timeframe, and case turned on rebutting prosecution's theory as to time of death, trial counsel was ineffective for failing to investigate medical examiner's opinion regarding time of death); *Beames v.*

24

*Chappell*, No. 1:10cv-01429-AWI, 2013 WL 5754938, at *14-15 (E.D. Cal. Oct. 23, 2013) (where state's pathologist found child's injuries were caused by pre-mortem child abuse, district court found that "[a] decision to concede these issues cannot reasonably have been made [by defense counsel] without investigation into [the state's pathologist's] methods and conclusions").

For all of the above reasons, and the reasons set forth in the Supplemental Brief at 78-90, the Court should find that trial counsel's failure to investigate and present evidence challenging the prosecution's medical evidence purporting to show Rachel's injuries were inflicted on May 1, was objectively unreasonable and constitutionally deficient.

### C.    Respondents fail to rebut the colorable showing that Jones suffered prejudice.

#### 1.    Review of the basic analytical framework for measuring prejudice.

Because the Respondents have misapplied the framework for analyzing *Strickland* prejudice and thus have misapplied the *Strickland* test, we briefly review the underpinnings, objectives and proper method for application of the test.

When elaborating on the meaning of the constitutional right to effective counsel in *Strickland*, the Court went to great lengths to tie the purpose of this right to the right to counsel's "crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ***ample opportunity to meet the case of the prosecution*** . . . ."

25

466 U.S. at 685 (emphasis added) (internal citation and quotation marks omitted). The Court held that the purpose of the guarantee of effective counsel is "*to ensure a fair trial*," and that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so *undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.*" *Id.* at 686 (emphasis added). The Court reiterated the point later in the opinion, explaining counsel's duty is to assure that the trial will be a "*reliable adversarial testing process*." *Id.* at 688 (emphasis added).

With the above precepts and objectives in mind, the Court went on to hold that the test for measuring prejudice should be on equal footing with the test for measuring the materiality of exculpatory information not disclosed to the defense by the prosecution. *Id.* at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)). Accordingly, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* After announcing this test, the Court reiterated however, that "*the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable* because of a breakdown in the adversarial process . . ." *Id.* at 696 (emphasis added).

26

In specifically addressing claims of ineffective assistance during the guilt-phase of a trial, as Jones does here, the Court said the "question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. The Court then added this final directive to the conduct of the prejudice analysis:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

### 2. Respondents misapply the *Strickland* test for measuring prejudice.

There are a number of flaws in the Respondents' prejudice argument, but we address the overriding one first, here. When analyzing prejudice the Respondents dice the prejudice formulation into 10 categories or subcategories of evidence, and they ask whether any single category, alone, in isolation, would result in prejudice. (Dkt. 175 at 20-29, 33-34, 41, 48.) For example, the Respondents portend that an error in presenting the timing of Rachel's genital injury would not itself have

27

changed the outcome given all of the other evidence before the jury. (*Id.* at 26.) Respondents conduct this same mistaken analysis to each category of new evidence. This is <u>not</u> the proper mechanism for measuring prejudice and results in misapplication of the test.

*Strickland* and its corresponding insistence that the entire proceeding be fundamentally fair, and that the whole of the result of the proceeding <u>not</u> be unreliable, 466 U.S. at 694-96, signals that <u>all</u> of the evidence <u>not</u> presented due to the errors of trial counsel must be assessed globally against the evidence that was presented to the jury. As the Court said, "[t]he ultimate focus of inquiry must be on the fundamental fairness of the [entire] proceeding whose result is being challenged. In every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process . . . ." *Id.* at 696. It is obvious that reliability of the result cannot be measured if each category of evidence kept from the jury due to counsel's errors is measured in isolation. A verdict cannot be partly reliable, but that is the effect of Respondents' asking how each piece of new evidence has affected the reliability of the outcome of the proceedings.

*Strickland* commands a reviewing court to consider "whether there is a reasonable probability that, <u>absent [all] the errors</u> [plural], the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. In plain language, this

test plainly requires the reviewing court to consider <u>all</u> of the evidence that was before the jury at the trial, against all of the new evidence the jury never heard. It is only through this collective analysis of the totality of the evidence that the test (asking whether absent the errors, the factfinder would have had a reasonable doubt respecting guilt) can be applied. Post-*Strickland* the Court has clearly applied this totality of the evidence requirement to the measurement of prejudice.

In *Wiggins*, the Court quoted *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000), to explain that it "evaluate[s] the totality of the evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." 539 U.S. at 536 (second alteration in original).

Although *Wiggins* and *Williams* applied the *Strickland* prejudice test in the capital sentencing context, logic dictates that the same totality test must be applied when asking whether ". . . <u>absent [all] the errors</u> [plural], the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Other courts have held as much. *See Elmore v. Ozmint*, 661 F.3d at 868 (finding that state court had unreasonably applied *Strickland* when it failed to examine totality of new guilt-phase evidence and examined evidence in piecemeal fashion). In *Elmore*, the Fourth Circuit declared, "[T]he totality-of-the-evidence standard required the state PCR court to consider all of the trial and PCR evidence favoring . . . acquittal and then to reweigh that evidence against the State's evidence of guilt. Under that

standard, the court should have evaluated the collective trial evidence together with the collective evidence that a reasonable investigation of the State's forensic evidence would have uncovered." *Id.* "To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Cannedy v. Adams*, 706 F.3d 1148, 1162 -1163 (9th Cir. 2013)

Moreover, as explained above, in *Strickland*, the Court adopted the identical prejudice test applied in the *Brady* context when measuring the materiality of exculpatory information not disclosed to the defense. In *Kyles v. Whitley*, the Court held that when determining materiality, as well as the ultimate question of whether there is a reasonable probability for a different result, all of the suppressed evidence must be "considered collectively." 514 U.S. 419, 436-37, 440-41, 453-54 (1995). It is obvious that the same collective consideration of all of the evidence affecting confidence in the jury's verdict must be applied in the *Strickland* context.

Because the Respondents misapplied *Strickland* by failing to consider the totality of the new evidence favoring Jones' acquittal, their piecemeal defective prejudice analysis should be disregarded *in toto*. "Here, the totality-of-the-evidence standard require[s] the . . . court to consider all of the trial and [federal habeas] evidence favoring [Jones'] acquittal and then to reweigh that evidence against the

State's evidence of guilt." *Elmore*, 661 F.3d at 868. Since the Respondents failed to apply the required totality of the evidence test, we summarize the evidence of prejudice when applied under the correct measure.

### 3.    Summary of the totality of the new evidence

When the Arizona Supreme Court recited the evidence that it thought supported Jones' capital murder conviction:

- The court found that "[o]n the day preceding her death [May 1, 1994] Rachel was hit many times," and on that date a "blow to her abdomen was so severe it ruptured her small intestine." *State v. Jones*, 937 P.2d 310, 313 (Ariz. 1997). However, in truth, Rachel was not assaulted on May 1, and her fatal injury was suffered days earlier.

- The court found that Rachel's May 1 injuries included an injury to her labia, indicating she had been sexually assaulted on that date. *Id.* However, in truth, Rachel's labia was not injured on May 1, nor was she sexually assaulted on that date.

- The court found the following evidence linked Jones to Rachel's injuries. "[O]n [May 1,] the day Rachel received her injuries, [1] [Jones] left his trailer three times with Rachel in his van; [2] two children saw [Jones] hitting her while he drove; [3] [Jones] stopped at a Quik-Mart to get ice for Rachel's head injury; [4] . . . police found

31

traces of Rachel's blood type on [Jones'] clothing and in his van . . .

[5] [Jones] falsely stated that he had taken Rachel to the fire department, and that the paramedics had examined her and had said she was all right." *Id.* However, each of these five elements allegedly linking Jones to the crime is also linked to the assumption that Rachel's injuries were inflicted on May 1—a premise that is undermined by incontrovertible scientific evidence. Independently, there is substantial evidence controverting each of the five elements that were thought to link Jones to the offense.

With the foregoing in mind, we demonstrate the colorable showing that Jones suffered prejudice and later show that Respondents' arguments to the contrary are belied by the facts and the law.

## M E D I C A L   E V I D E N C E

It is fair to repeat that "[t]he main thrust of the prosecution's case against Jones was that <u>Rachel was solely in his care on the afternoon of May 1</u>, 1994, <u>when her injuries</u>, including her fatal abdominal injury <u>were inflicted</u>." (Dkt. 141 at 9:8-10 (emphasis added).) Trial counsel's deficient performance flows directly from his failure to investigate the truth of this premise. As a result, the jury was deprived of evidence demonstrating that this single vital premise was false. The jury was denied evidence that demonstrates that none of Rachel's injuries were

inflicted while she was in Jones' care. We begin then with a review of the medical evidence.

### a.   The fatal injury to Rachel's small intestine was not inflicted on May 1, 1994.

Collectively, the evidence from Dr. Ophoven and Dr. McKay reveal, in Dr. Ophoven's words, that "[t]he evidence shows that the fatal injuries to Rachel Gray **could not possibly have been inflicted on the day prior to her death** as suggested by the state at Mr. Jones' trial." (Report of Dr. Janice Ophoven, Dkt. 167, Ex. 7 at 2 (emphasis in original); *and see* Dkt. 167 at 12-29.) The above-quoted medical finding is supported by empirical evidence. Dr. Ophoven's analysis of the microscopic slides revealed deterioration and inflammation of many days' duration. (Dkt. 167 at 19-21.) We quote Dr. Ophoven again to the point that **"[t]he veracity of this [physical] evidence is as scientifically precise as any forensic determination available in medical science."** (Dkt. 167, Ex. 7 at 2 (emphasis added).) When and by whom Rachel received her days-old fatal injury is <u>not</u> revealed by any of the evidence presented to the jury.

Confronted with Dr. Ophoven's findings, Dr. Howard now agrees that the autopsy chemistries reveal that the injury to Rachel's small bowel could have been present 48 hours or longer; even up to six days, before her death. (Dr. Howard Decl., Dkt. 167, Ex. 1, paras. 7, 11). As explained in the supplemental brief, there is also substantial evidence that Dr. Howard misled the jury at Jones' trial when he

33

testified that the injury was consistent and typical of an injury occurring between 2:00-6:00 p.m. on May 1. (Dkt. 167 at 29-32.)

> **b.    Rachel's genital injury was not inflicted on May 1, 1994.**

Dr. Ophoven also conducted a microscopic examination of the physical evidence of Rachel's vaginal injury obtained during autopsy. She applied special stains on the autopsy anogenital tissues and found that the trichrome stain of the tissue revealed "clear evidence of vital reaction with deposits of collagen containing tissue and neovascularization in the wall of the vagina, indicating substantial healing and is not consistent with a fresh penetrating injury." (Dkt. 167, Ex. 7 at 1.) She found that the ". . . injury did not occur in the few days prior to her death." (*Id*.) In other words, the physical evidence dispositively demonstrates that the vaginal injury pre-dated Rachel's death by at least several days and it did not occur on the afternoon of May 1.

Confronted with Dr. Ophoven's findings, Dr. Howard no longer finds symmetry between the infliction of the small bowel injury and the genital injury (as he previously represented to Jones' jury). He now says that the "injuries to Rachel's vaginal area showed characteristics consistent with hours to perhaps days elapsing between the time of her abdominal injury and her vaginal injury." (Dkt. 167, Ex. 1, para. 13.)

### c. There is no scientifically reliable evidence that Rachel's bruising was inflicted while she was in Jones' care on May 1, 1994.

Since neither Rachel's fatal abdominal injury nor her genital injury can be dated to May 1, it must logically follow that bruises discovered on her body also would not be traceable to the afternoon of May 1, when Rachel was in Jones' care. At trial, Dr. Howard and Dr. Siefert suggested to the jury that many of Rachel's bruises could be linked to the afternoon of May 1. However, this unchallenged evidence also turns out to be scientifically unsupportable and untrue. As explained by Dr. Ophoven, "[i]nterpreting the age of bruises from physical appearance and color is recognized by the forensic community to be very inexact [i.e., inaccurate]." (Report of Dr. Ophoven, Dkt. 167, Ex. 4 at 6.) Dr. Ophoven could have provided evidence to the jury that "[i]t has been well established that visual determination of the age of any bruise is scientifically unreliable" and the only reliable method of assessing the age of a bruising injury is to take tissue samples and test them, which Dr. Howard failed to do. (Dkt. 167, Ex. 7 at 3.)

Therefore, Rachel's bruising injuries join her genital injury and abdominal injury as not causally relatable to the afternoon of May 1. There is, however, strong, consistent evidence from several disinterested witnesses that several bruises (including a large bruise covering most of Rachel's forehead, a bruise under her eye, and some bruises on Rachel's chest and finger) relate to medical and

35

accidental trauma occurring on May 2, on the morning of her death. (A picture of the forehead bruise and bruise at the corner of Rachel's eye is contained in Dkt. 167, Ex. 37 A.) Had Jones' trial counsel learned (as he should have) that Rachel's abdominal <u>and</u> genital injury could <u>not</u> have occurred on May 1, and that her bruising could <u>not</u> be reliably dated to May 1, he "could not reasonably have ignored . . . evidence or red flags . . ." solidly pointing to evidence that some of Rachel's bruises must have occurred from incidents on May 2. *See Rompilla v. Beard*, 545 U.S. 374, 391 n.8, 392-93 (2005) (*Strickland* prejudice includes evidence discovered by postconviction counsel's investigation of "red flags" that should have been discovered, but were <u>not</u> unearthed due to trial counsel's deficient performance); *Couch v. Booker*, 632 F.3d at 247-49 (citing *Rompilla*, 545 U.S. at 391, 393).

To begin, four witnesses saw Rachel <u>after</u> she became ill on the early evening of May 1, <u>after</u> the time the prosecution alleged Rachel had been assaulted, but each of these four witnesses confirm that Rachel did <u>not</u> have bruising on her forehead or the corner of her eye. First, a neighbor, Stephanie Fleming, discovered Rachel ill, dry heaving after 5:00 p.m. on May 1. (Dkt. 167, Ex. 20 at 5.) Fleming said Rachel felt cold and wet; she had a green pallor, but no bruises or bleeding. Rachel's mother, Angela, also reported that she did not see any bruises on Rachel's face or chest or hand on the evening of May 1. (Dkt. 167, Ex.

38 M, ¶¶ 7-9.) Joyce Richmond visited Rachel on the evening of May 1. (Tr. Apr. 11, 1995 at 141). Richmond observed Rachel after she had become ill; she observed Rachel's bleeding scalp wound, but also ratified that Rachel did not have any bruising or marks on her face or forehead or hand. Similarly, Terry Richmond saw Rachel the night of May 1 after she had become ill, but he, too, did not see any bruising on Rachel's face. (*Id.* at 164; Dkt. 167, Ex. 38, ¶ 10.)[8]

There are however, several innocent explanations for these bruises not seen by numerous witnesses on May 1 but first seen on the morning of May 2. As explained by investigator Sowards, the facial and finger bruises have likely connections to Rachel's fall in the hallway of the trailer, where her body was found the morning of Monday, May 2, or from her mother, Angela, banging Rachel into various objects, which was witnessed by Brandi Jones, as Angela ran about the trailer with Rachel in her arms in a panic, as they prepared to rush to the hospital. (Dkt. 167, Ex. 38, ¶ 11.) In addition, Sowards identified some of the chest bruising relatable to resuscitation efforts and an EKG lead placed on Rachel's chest at the hospital. (*Id.* ¶ 9.)

The bruising evident on Rachel has no reliable connection to the date of May 1, 1994.

---

[8] Parenthetically, Terry Richmond had been a police informant, and he voluntarily contacted the police on May 3, 1994 to report he had seen Rachel ill with a bleeding scalp wound. But he never mentioned a bruise covering almost the entire forehead. (Dkt. 167, Ex. 38, ¶ 10; Ex. 38 L.)

37

### d. Rachel's scalp injury cannot be reliably dated to May 1, 1994.

There appeared to be some uncertainty about the date of Rachel's scalp injury because both Rachel and Jones had independently reported that wound was caused by Rachel's fall from his van on the afternoon of May 1. (Dkt. 167, Ex. 12 at 10-11; Ex. 13 at 6-8.) On the other hand, no one noticed any bleeding from a scalp wound until long after the fall from the van; after Rachel was discovered ill by her neighbor, Stefanie Fleming. Fleming saw Rachel dry heaving after 5:00 p.m. on the evening of May 1, but reported Rachel was not bleeding. (Dkt. 167, Ex. 20 at 6.) Jones reported seeing blood from the scalp wound after he brought her home from Fleming's, when he noticed some blood on a pillow, where Rachel had been lying down for a nap. (Dkt. 167, Ex. 12 at 19.) Jones thought the bleeding may have been caused by a barrette aggravating a wound from the fall from the van earlier that day. (*Id.* at 21.) However, Dr. Howard's autopsy findings reported that with respect to the only scalp injury Rachel had: "staining in one area of the scalp would suggest [an injury] 72 hours or longer." (Dkt. 167, Ex. 11 at 4.)[9]

This much can be said about Rachel's scalp injury: If the injury was caused on May 1, it has no temporal relation to Rachel's fatal abdominal injury, or genital injury, neither of which was caused on May 1. In other words, the occurrence of a

---

[9] Elsewhere in Howard's pre-trial interview, he placed the time of the scalp injury as two days old; still outside the May 1 timeline. (Dkt. 167, Ex. 11 at 19.)

scalp injury on May 1, if it did occur on May 1, is not relevant to prove the timing of the abdominal or genital injury, because incontrovertible scientific evidence proves those latter injuries occurred well prior to May 1. That said, Dr. Howard's pre-trial statements show that according to his autopsy findings, the injury did not occur on May 1.

### e.   Neither the scalp injury nor the abdominal injury was caused by a pry bar found in Jones' van.

Had Jones' counsel not performed deficiently, he would have readily discovered that neither Rachel's abdominal injury, nor her genital injury or bruising had temporal relation to May 1 and that, therefore, the prosecution's premise that Rachel was beaten and sexually assaulted on May 1, while in Jones' care, was a falsehood. "With this information, counsel would have become skeptical  . . . and would unquestionably have gone further to build a  . . . case. Further effort would presumably have unearthed much of the material postconviction counsel found . . . ." *Rompilla*, 545 U.S. at 391; *Couch v. Booker*, 632 F.3d at 247-48 (evidence discovered by postconviction counsel would have been discovered by trial counsel had they been diligent in first instance). In this instance, surely the discovery that Rachel was not beaten or sexually assaulted on May 1 would have led reasonably diligent trial counsel to question and investigate the allegation that a pry bar found in Jones' van was the implement that caused Rachel's injuries. *See Rompilla*, 545 U.S. at 391. That investigation was conducted

39

by habeas counsel. Both Dr. Hannon and Dr. Ophoven have concluded that Rachel's scalp injury was <u>not</u> caused by the pry bar and that the injury is consistent with a fall onto a flat surface. (Dr. Ophoven Report, Dkt. 167, Ex. 4 at 6; Dr. Hannon Report, Dkt. 167, Ex. 15 at 8-9.) Belatedly, Dr. Howard also agrees that the scalp injury is consistent with a fall onto a flat surface. (Dkt. 167, Ex. 1, ¶ 14.) Similarly, careful investigation demonstrates that the pry bar did not cause the fatal injury to Rachel's bowel that took place several days prior to May 1. (Dr. Hannon Report, Dkt. 167, Ex. 15 at 7-8.)

## NON-MEDICAL EVIDENCE

It is elementary that had trial counsel discovered the readily available medical evidence that <u>none</u> of Rachel's injuries had a temporal connection to May 1, 1994, then in that event the strategy for defending the non-medical aspects of the case would have been correspondingly and significantly altered. *See, e.g.*, *Wiggins*, 539 U.S. at 535; *cf. United States v. Bagley*, 473 U.S. 667, 682-83 (1985) (recognizing question of reasonable probability for different outcome resulting from *Brady* violation concerns not only what jury heard but also how defense counsel's preparation and strategy may have been altered; so it is necessary to ask what competent counsel would have done with the new information); *Beames v. Chappell*, 2013 WL 5754938, at *20 (recognizing that trial counsel would <u>not</u> have

presented "hopelessly unbelievable and weak" defense presented to jury, if he had known of "forensically substantial evidence").

Accordingly, we examine the prejudice caused by the failure to discover the non-medical exculpatory evidence, in light of what reasonable trial counsel would have discovered had he known (as he should have) that Rachel's injuries were not inflicted on May 1. "With . . . information . . . [that Rachel was not injured on May 1] counsel would have become skeptical . . . and would unquestionably have gone further to build a . . . case. Further effort would presumably have unearthed much of the material postconviction counsel found . . . ." *See Rompilla*, 545 U.S. at 391.

> **f.    Rachel could not have been injured on a third trip with Jones in his van because the injuries did not occur on that date, and in any event there was no third trip that took place before it was discovered that Rachel was ill.**

Prior to Jones' trial, Rachel's sister Rebecca had given four separate statements outlining Jones' activities and her observations of Rachel on the afternoon of May 1. Rebecca gave two statements to the police, and she submitted to pre-trial interview by trial counsel. (Dkt. 167, Exs. 17, 18, & 19.) Rebecca also gave sworn testimony at her mother Angela's trial, and Jones' trial counsel attended that trial as an observer. (Dkt. 167, Ex. 36 at 24.) On each of these four separate occasions, including the one time she was under oath, Rebecca related that Rachel had taken just two trips in the van with Jones on May 1, and Rachel was fine after both trips. Rebecca also consistently stated that after Rachel returned

from the two trips unharmed, she again saw Rachel before going to visit her friend Suzie after 5:00 p.m. on May 1, and that Rachel was still unharmed and happy. (Dkt. 167, Ex. 17 at 6-7; Ex. 18 at 5-14; Ex. 19 at 4-10, 55-56, 58, 60-61; Dkt. 96 at Ex. 9; Tr. Mar. 24, 1995 at 29, 31, 68-71.)

Rebecca's four pretrial statements, including her sworn statement at Angela's trial, left the prosecution with a link missing in its circumstantial chain: there was no proof that Rachel had taken a trip in the van with Jones and then returned home injured or harmed. In that respect, Rebecca's four pre-trial statements are in synchrony with the scientific evidence presented by Dr. McKay and Dr. Ophoven, which demonstrates that Rachel's injuries have no temporal relation to May 1. This equilibrium is altered only because at Jones's trial, the prosecutor elicited false testimony from Rebecca: (1) that Jones took three trips with Rachel; and (2) that she did not see Rachel before going to her friend Suzie's house and therefore she did not observe Rachel's condition when Rachel arrived home from the third trip. (Tr. Apr. 11, 1995 at 37-38, 71-73.) Jones' trial counsel did not impeach Rebecca with any of her four prior inconsistent statements.

Jones' contention is twofold. First, it does not matter how many trips Rachel took with Jones on May 1 because, as explained by Dr. Ophoven and Dr. McKay, her injuries did not occur on that date. Nevertheless, had trial counsel discovered, as he should have, the compelling medical proof that Rachel's injuries had not

42

been inflicted on May 1, he would <u>not</u> have allowed Rebecca's trial testimony about a phantom third trip to go unimpeached. He would have impeached her testimony with her four prior inconsistent statements, one by one. *See Wiggins*, 539 U.S. at 535 (finding that trial counsel would have altered their strategy had they discovered evidence later found by postconviction counsel); *Bagley*, 473 U.S. at 682-83 (assessing prejudice in light of how competent counsel would have altered strategy in light of new information).

> **g.    The blood evidence has no link to an alleged assault of Rachel in Jones' van during a phantom third trip in the van on May 1, 1994.**

At trial, the prosecution presented unchallenged testimony that the small traces of blood found on Jones' clothing and inside the van had spatter and saturation characteristics consistent with an inference that Rachel was beaten and sexually assaulted inside the van on May 1, 1994. However, the evidence provided by Dr. Ophoven and Dr. McKay demonstrates that Rachel was <u>not</u> fatally injured on May 1, and this fact dramatically alters the inferences to be drawn from the blood evidence. If Rachel's fatal abdominal injury and her genital injury did not occur on May 1, then there must be innocent explanations for the blood evidence, and there are.

At trial, counsel presented closing argument to the jury, without <u>any</u> supporting evidence: (1) that "there was nothing in [the] van to suggest . . . that a

43

little girl was raped and murdered in there"; or (2) that the blood in the van was "some drops of blood," "not blood spatter." (Tr. Apr. 13, 1995 at 113.) As noted, counsel had not impeached the prosecution's blood interpretation evidence, nor had he presented any defense blood interpretation evidence. The only blood interpretation evidence before the jury supported the prosecution argument that Rachel had been beaten and sexually assaulted in the van.

Counsel's trial strategy not to challenge the prosecution's blood interpretation evidence was tainted by and intertwined with counsel's constitutionally deficient lack of knowledge of the medical and scientific facts: Rachel's injuries were not inflicted on May 1. All counsel knew was that the jury would hear unchallenged expert testimony from Dr. Howard, which foretold that the fatal abdominal injury, the genital injury and bruising were consistent with and typical of injuries inflicted during the afternoon of May 1. If counsel had known what he should have known – that Rachel's injuries pre-dated May 1 – then he would have seen a red flag indicating that the blood evidence must not be incriminating, and he would have investigated accordingly. Therefore, one must ask what would competent counsel have done in terms of investigating the blood evidence if he or she had known that there was commanding forensic evidence that Rachel had not suffered any injuries on May 1, 1994.

We submit the answer is plain to see. "With . . . information . . . [that Rachel was not injured on May 1] counsel would have become skeptical  . . . and would unquestionably have gone further to build a  . . . case. Further effort would presumably have unearthed much of the material postconviction counsel found . . .," *see Rompilla*, 545 U.S. at 391, including the expert blood evidence, which demonstrates that there are innocent explanations for the blood found on Jones' clothing and in the van. Whatever trial counsel's strategy might have been before the discovery that Rachel's injuries pre-dated May 1 is immaterial. *See Wiggins*, 539 U.S. at 535 (finding that trial counsel would have altered their strategy had they discovered the evidence later found by postconviction counsel); *Bagley*, 473 U.S. at 682-83 (assessing prejudice in light of how competent counsel would have altered strategy in light of new information); *Couch*, 632 F.3d at 247-49 (citing *Rompilla*, 545 U.S. at 391, 393) (assessing *Strickland* prejudice in light of evidence discovered by postconviction counsel's investigation of "red flags" that should have been discovered, but were not unearthed due to trial counsel's deficient performance).

The traces of blood located on the clothing Jones wore on May 2 (not on May 1) and the small traces of blood in his van <u>cannot</u> be reliably associated with a beating and sexual assault of Rachel in the van. This is principally true because the medical evidence now demonstrates Rachel was not injured on May 1. But the

45

absence of May 1 injury is not the lone attack on the prosecution's blood interpretation theory. Blood interpretation expert Stuart James, has determined that (1) the blood interpretation evidence provided to the jury at Jones' trial was presented by an unqualified witness, (2) in material respects, the blood evidence was incorrectly interpreted by the prosecution's witness at trial, and (3) a reliable blood evidence interpretation is consistent with Jones' innocence; i.e., the evidence is simply consistent with Rachel bleeding while in the van and being in close proximity to Jones.[10] (James Reports at Dkt. 167, Ex. 32; Supp. Ex. 83.); *see also* Sowards Decl., Dkt. 167, Ex. 38, paras. 13-16.)[11] There is no credible evidence that

---

[10] The blood interpretation evidence is already summarized in detail in the Supplemental Brief. (Dkt. 167 at 51-62.) There are, however, a couple of missing details, which we add here. First, after Rachel was discovered dry heaving and ill by Stephanie Fleming after 5:00 p.m. on May 1, Fleming reported seeing Jones drive off in the van with Rachel standing up just behind both front seats, in the area of the van she described as the doghouse. (Dkt. 167, Ex. 20 at 11-12.) The relevant point is that Fleming saw Rachel standing in the area of the van where blood evidence items V6 and V7 were located. The prosecution described the small trace of blood on the tiny wood chip on V7 as spatter and the blood on the carpet shown in V6 as an impression stain. Blood expert James disagreed, finding that V6 and V7 were the result of drops of blood. (*See* James Report, Dkt. 167, Ex. 32, ¶ 3.) Fleming's observation of Rachel standing just behind the front seats in the doghouse supports James' finding that the items V6 and V7 were the result of blood drops. Second, there is evidence that Jones carried Rachel to the van on the morning of May 2, explaining the traces of blood found on Jones' clothing worn on that date. (*See* Dkt. 167, Ex. 38.)

[11] Mr. James' Supplemental Report was inadvertently omitted as an Exhibit to the Supplemental Brief, but it is submitted here as Exhibit 83.

Rachel's injuries were inflicted on May 1, or that the blood in the van has any reliable nexus with a beating or sexual assault in the van.

### h. There is no credible evidence to support allegations that the Lopez children witnessed Jones assaulting Rachel in his van on May 1, 1994.

Jones agrees with this Court's earlier finding that the Lopezes' testimony "was significantly impeached at trial." (Dkt. 141 at 22.) The significant impeachment of the Lopezes' testimony can now be combined with the evidence that: (1) Rachel's injuries were not inflicted on May 1 when Rachel was in Jones' care; (2) there were not three trips in the van; and (3) the blood on Jones' clothing and in the van have entirely innocent explanations. But there is more.

At Jones' trial, his counsel told the jury that the Lopez children could not have seen what they claimed to have seen. (Tr. Apr. 6, 1995 at 65.) However, counsel presented no evidence to support this assertion. As with the blood evidence, we must ask, what would competent counsel have done in terms of investigating the veracity of the alleged eyewitness reports of the Lopez children if he or she had known that there was commanding forensic evidence that Rachel had not suffered any injuries on May 1, 1994. *Bagley*, 473 U.S. at 682-83 (assessing prejudice in light of how competent counsel would have altered strategy in light of new information); *Couch*, 632 F.3d at 247-49 (citing *Rompilla*, 545 U.S. at 391, 393) (assessing *Strickland* prejudice in light of evidence discovered by

postconviction counsel's investigation of "red flags" that should have been discovered, but were not unearthed due to trial counsel's deficient performance).

Had trial counsel learned that Rachel's fatal injury and genital injury had <u>not</u> occurred on May 1, he would have followed up on investigating the red flag he had already identified; a flag he unfurled during his opening statement when he told the jury, without any supporting evidence, that the Lopez children could <u>not</u> have seen what they claimed to have seen. (Tr. Apr. 6, 1995 at 65.) Had the investigation been done, counsel could have presented evidence to the jury that the Lopez children could not have witnessed Jones beating Rachel. As explained by Dr. Hannon, the "hypothesized actions by Barry Jones while driving the Ford van are extremely improbable . . ." and "[t]he observations and statements of Laura and Reynaldo Lopez (age eight years at the date of the incident) are not accurate. Accurate observations . . . are highly improbable. Furthermore, the physical actions of Barry Jones described by the two Lopez children while he was driving the Ford van are extremely improbable from a functional anatomy, biomechanics perspective." (Dkt. 167, Ex. 15 at 6, 9.) Dr. Gruen came to a similar conclusion when he found to a reasonable degree of scientific certainty that there was no physical evidence to support the Lopez children's claims. (Dkt. 167, Ex. 69 at 4-5.) The children were "too short in stature . . . to have accurately observed any activity inside the van." (*Id.* at 5.) Added to this, Dr. Esplin reached another important

conclusion, finding that ". . . the information obtained from the Lopez children regarding [Jones] is unreliable as the result of post event contamination, both with regard to interviewing the children with other witnesses present and information provided to the twins via television coverage, as well as the use of interview procedures that did not involve scientifically sound methods." (Dkt. 167, Ex. 72 at 59.)

The Lopezes' testimony does not credibly support an allegation that Jones fatally injured or sexually assaulted Rachel in his van on May 1, 1994.

### 4. There is a reasonable probability that at least one juror would have had a reasonable doubt respecting Jones' guilt.

When addressing claims of ineffective assistance during the guilt phase of a trial, as Jones does here, the "question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Stated differently, Jones needs to show that, but for counsel's allegedly deficient performance, there is a reasonable probability that at least one juror would have credited the additional evidence and harbored a reasonable doubt about his guilt. *Cannedy v. Adams*, 706 F.3d 1148, 1166 (9th Cir. 2013). Jones has satisfied this test.

"The main thrust of the prosecution's case against Petitioner was that <u>Rachel was solely in his care on the afternoon of May 1</u>, 1994, <u>when her injuries, including her fatal abdominal injury, were inflicted</u>." (Dkt. 141 at 9:8-10 (emphasis

49

added).) As explained above, the examination of the physical evidence, namely the autopsy tissues, empirically demonstrates that Rachel's fatal injury took days, not hours, to result in peritonitis causing her death. The underlying scientific premise on which the State's case was manufactured was fundamentally flawed and misleading: there is compelling scientific proof that Rachel's fatal abdominal injury, her genital injury and scalp injury "were _not_ inflicted" on May 1. What is more, the trial-phase characterization, that Rachel's bruising could be reliably dated to May 1, has been debunked.

The Respondents posit that the jury would still reject all of the new medical evidence and rely on Dr. Howard because the jury would unanimously believe Rebecca's story about the three trips in the van; they would unanimously believe that the blood evidence proved that Rachel had been assaulted in the van; they would unanimously credit the Lopezes' account of witnessing Jones' assault on Rachel. (Dkt. 175 at 24.) This argument, sprinkled throughout the Respondents' brief, ignores a central truth inherent in the evidence that Jones' jury never heard.

The truth is this: the medical evidence demonstrating that Rachel's injuries were _not_ inflicted on May 1 dramatically "alters the entire evidentiary picture" and the "inferences to be drawn from the [trial] evidence." *Strickland*, 466 U.S. at 695-96 (recognizing that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture").

50

Previously this Court recognized the powerful effects of the new medical evidence, stating, "the new [medical evidence] is compelling and may have been persuasive to some jurors . . ." (Dkt. 141 at 22.)

It is based on the new medical evidence that a reasonable juror, believing that Rachel's injuries could <u>not</u> have been inflicted on May 1, would also <u>not</u> be inclined to believe Rebecca's fabricated story about three trips, and instead such juror would credit each and every one of Rebecca's four earlier statements where she consistently reported that Rachel only took two trips with Jones on May 1, <u>and</u> that Rachel was healthy and uninjured after each trip with Jones that day. A juror believing what the science tells us—that the fatal abdominal injury and genital injury have no temporal relation to May 1—would not reasonably rely on Rebecca's testimony. *See Richey v. Bradshaw*, *supra*. In *Richey*, a capital murder arson case, a witness testified that Richey said that "Building A of the three-building apartment complex would 'burn' that night." 498 F.3d at 346-47. The building did "burn that night." Still, the court found that "there [was] a reasonable probability that had his counsel mounted the available defense that the fire was caused by an accident, and was not the result of arson at all, the outcome of either the guilt or the penalty phase would have been different." *Id.* at 364. Then, making an obvious reference to the highly incriminating witness testimony, that Richey planned to commit the arson, the court said that in light of the new evidence that

51

the fire was not caused by arson: ". . . witnesses are not always believed. Confronted with evidence debunking the State's scientific conclusions, the [jury] might have had a reasonable doubt about Richey's guilt . . . ." *Id.*[12] The same could be said about a jury's anticipated reaction to Rebecca's three-trip story, and that "[c]onfronted with evidence debunking the State's scientific conclusions, the [jury] might have had a reasonable doubt about [Jones'] guilt." *Id.*

Similarly, a juror believing that Rachel's injuries could <u>not</u> have been inflicted on May 1, would not credit the prosecution's scientifically unreliable account of the blood evidence. Instead, such a juror would reasonably credit blood interpretation evidence provided by Stewart James, a nationally recognized expert, which casts the blood evidence in a wholly innocent light.

What is more, the same juror believing that Rachel's injuries could <u>not</u> have been inflicted on May 1, would have reasonably concluded that the Lopez children could <u>not</u> possibly have witnessed Jones assaulting Rachel in the van on May 1, just as Jones' experts have explained. (Dkt. 167, Ex. 15; Ex. 69.) What is more, each of Rebecca's four pre-trial statements have Rachel returning unharmed from all her trips with Jones, and this also must mean that the Lopez children did not see Jones administering a beating to Rachel on May 1.

---

[12] Richey has been freed from prison in his capital case.
http://www.theguardian.com/uk/2008/jan/07/ukcrime.usa

This would leave the prosecution (1) with evidence that during the evening of May 1, Jones told Rachel's mother that he had taken Rachel to the fire station, and (2) with evidence that he failed to go to the hospital the morning of Rachel's death.

On the evening of May 1, Jones had planned to take Rachel to the fire station, but he saw a police car there and was afraid he would be discovered without a driver's license and current tags. Just a few weeks prior, Jones had been arrested and jailed for driving on a suspended driver's license, for fictitious use of license plates, due to an outstanding arrest warrant for a failure to appear in court on an earlier charge of driving on a suspended license. (Supp. Ex. 84 at 2.) Fearing re-arrest for the third time for driving on a suspended license, Jones decided to go to the Quick Mart to get some ice for Rachel's head. (Dkt. 167, Ex. 12 at 32-33.) Understandably, however, Jones is making this decision without knowledge that Rachel is suffering from a fatal injury; one that he did <u>not</u> inflict. Later, after running into the EMT at the Quick Mart, Jones foolishly told Rachel's mother that Rachel had been seen by an EMT at the fire station, because he did not want her to worry. (*Id.* at 47.) After Rachel died, when he was interrogated by the police, Jones did not lie; instead he told his interrogators that he had not gone to the fire station, but that Rachel had been looked at by a paramedic (in a uniform, we now know, that resembles a Border Patrol EMT). (Dkt. 167, Ex. 38, ¶17, Ex. J.) Jones' poor

judgment, avoiding the fire station but telling Rachel's mother he had been there, does not prove Rachel was fatally assaulted on May 1; science shows this would have been a scientific impossibility. *See, e.g.*, *Beames v. Chappell*, 2013 WL 5754938, at *3-4, *19-20 (counsel's failure to investigate and present forensic evidence showing cause of death was neglect, and <u>not</u> inflicted injury, resulted in colorable showing of prejudice, despite fact that Beames had failed to take child victim to hospital and he retained child's dead body in his car overnight). Jones' avoidance of the fire station was obviously reasonably related to his avoidance of re-arrest for driving on a suspended license.

Similarly Jones' behavior on the morning of Rachel's death is not evidence of Jones' guilt. His behavior surely cannot lead to an inference that he inflicted a fatal abdominal injury or sexual assault on Rachel the day prior: it is a medical fact, based on the age of the injuries, that those injuries have no temporal relation to May 1 or Jones' custody of Rachel on that day. On the morning Rachel was discovered unconscious, after dropping Angela and Rachel off at the hospital, Jones returned home to get the other kids (Rebecca and Brandie) to school. (Dkt. 167, Ex. 12 at 39.) After picking up Rebecca and Brandie, Jones went to his friend Joyce Richmond's house so she could help him. Richmond described Jones, not as a stoic killer, but as "really upset and  . . . crying and he kept [saying] that something was wrong with Rachel, and that  . . . she was in a coma." (Tr. Apr. 11,

54

1995 at 144; Dkt. 167, Ex. 12 at 39.) Richmond said Jones was too emotionally upset to drive, so she volunteered to go to the hospital to be with Rachel's mother, Angela. (*Id.*)  After Richmond left, Jones was taken to his friend Ron St. Charles' house, where Jones was given a sedative and allegedly overheard moaning, "I am sorry Rachel." (Dkt. 167, Ex. 12 at 39; Tr. Apr. 11, 1995 at 181.) Assuming Jones even made this "I'm sorry" statement, it is reasonably credited to the hindsight regret that neither Jones nor Angela had taken Rachel to the hospital the night before, but it is <u>not</u> and cannot be evidence that Jones assaulted Rachel on May 1. The medical evidence disproves that. *See Rivas v. Fischer*, 780 F.3d at 539 (finding reasonable probability of different outcome, where postconviction forensic expert seriously undermined prosecution's medical examiner's testimony on time of death, despite evidence of motive and defendant being overheard sitting at a bar, drinking heavily and crying, saying about victim, "Valerie, Valerie, I didn't mean to do it"); *and see State v. Denz*, 306 P.3d at 104 (although "Denz had fled after the infant was admitted to the hospital . . . [and] the medical evidence painted a convincing picture of Denz's guilt[,] . . . [the court found *Strickland* prejudice] because the independent expert's testimony would have directly contradicted much of that medical evidence—specifically, the severity of the infant's injuries and their likely cause").

55

Every piece of the prosecution's case is seriously undermined, and accepting Jones' allegation as true, which this court must when conducting the preliminary assessment of his claim, "it is impossible to say that [Jones] would not be entitled to relief." *Beames v. Chappell*, 2013 WL 5754938, at *19-20 ("Accepting as true Dr. Ophoven's declaration stating that [the child's] cause of death was due to neglect, it is impossible to say that Beames would not be entitled to relief."); *Elmore v. Ozmint*, 661 F.3d at 851 864-65, 871 ("the gross failure of Elmore's 1984 trial lawyers to investigate the state's forensic evidence—including the medical examiner's time-of-death opinion" had a palpably adverse effect on the defense). In *Elmore*, the court found that but for his lawyers' failure to investigate the State's forensic evidence there was a reasonable probability the defendant would have been acquitted, despite the State's insistence that its interpretation of the forensic evidence was still correct, and despite a fellow inmate's account of Elmore's confession and disputed evidence of Elmore's guilty conscience. The court noted, paraphrasing the Supreme Court's decision in *Rompilla*, that although it "suppose[d] that it is possible that a jury could have heard it all and still decided on a guilty verdict, that is not the test." *Id.* at 871 (quoting *Rompilla*, 545 U.S. at 393).[13] *And see Hinton v. Alabama*, 134 S. Ct. 1081 (2014). Hinton was linked to

---

[13] Elmore's ordeal is over, and after 30 years, his capital case concluded and he was freed from prison. http://www.lawschool.cornell.edu/spotlights/Edward-Lee-Elmore-Freed-after-30-Years.cfm

two capital murders and an attempted murder with the aid of an eyewitness and the State's ballistics experts connecting Hinton to all three crimes. *Id.* at 1083-84. Ultimately, Hinton produced convincing postconviction evidence from his own ballistics experts that his weapon had not been used in the crimes. The State argued that there was no possibility of prejudice; it still had the eyewitness, and it had presented "two experienced [ballistics] experts . . . ." *Id.* at 1090. The Supreme Court disagreed that a dispute among experts would settle the prejudice question adverse to Hinton. *Id.* The Court's resolution of the issue is relevant here:

> Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials. . . . One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases." *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009) (citing Garrett & Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 14 (2009)). This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses; it is maximized when the defense instead fails to understand the resources available to it by law.

*Id.*[14]

---

[14] Following remand to the state court for resolution of the prejudice issue, the state court found that Hinton had demonstrated a reasonable probability of acquittal. *Hinton v. State*, CR-04-0940, 2014 WL 6608067 (Ala. Crim. App. Nov. 21, 2014). Hinton has since been released from prison.
http://www.eji.org/deathpenalty/innocence/hinton

When the Supreme Court held that prejudice would be measured by asking whether there is a reasonable probability that the result of the proceeding would have been different, the Court reiterated that "*the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process* . . . ." *Strickland*, 466 U.S. at 696 (emphasis added). Here, Jones has made a colorable showing that his trial proceedings were both fundamentally unfair and unreliable precisely because of a breakdown in the adversarial process.[15] In this capital case, no investigation ensued to challenge any material component of the prosecution's evidence. Jones' case is a poster child for what can happen in a capital case, when an adversarial testing process is absent. The medical evidence used to convict Jones has been shown to be inherently unreliable; Rebecca's testimony about a phantom third trip has been shown to be inherently unreliable; the prosecution's interpretation of the blood evidence has

---

[15] The Supreme Court expressly cited its concern with protecting the adversary process no less than 12 times when explaining the objective of the Sixth Amendment right to effective counsel. 466 U.S. at 685-88, 690, 696. The Court's respect for the preservation of the adversarial process embodied in the Sixth Amendment is understandable. We rely on the adversary system "to preserve the integrity of society itself . . . [by] keeping sound and wholesome the procedure by which society visits its condemnation of an erring member." Monroe H. Freedman, *Our Constitutionalized Adversary System*, 1 Chap. L. Rev. 57, 61 (Spring, 1998) (quoting Lon L. Fuller, *The Adversary System*, *in* Talks on American Law, 35 (Harold Berman, ed., 1960)).

58

been shown to be inherently unreliable; and the testimony of the Lopezes has been shown to be inherently unreliable. The state of affairs is attributable to a "breakdown of the adversarial process," and it is self-evident that Jones' trial "cannot be relied upon as having produced a just result." *Id.* at 686, 696. Jones has colorably demonstrated that his trial counsel's performance was constitutionally deficient and he has been prejudiced thereby.

**III. Respondents fail to rebut the colorable showing: (1) that PCR counsel performed deficiently when he failed to investigate and present a substantial claim that the guilt-phase performance of trial counsel was constitutionally deficient, and (2) that PCR's counsel's deficient performance prejudiced the outcome of the PCR proceedings.**

**A. Introduction.**

As explained earlier above, under the *Clabourne v. Ryan* formulation of the *Martinez* rule, "cause" to excuse a procedural default is demonstrated by the showing (1) that state PCR counsel performed deficiently under *Strickland v. Washington*, 466 U.S. 668 (1984), 745 F.3d at 376, and (2) that ". . . there is a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id*. at 377.

With respect to the second prong; i.e., whether the outcome of the PCR proceedings would have been different, its resolution ". . . will require consideration of the underlying claim of ineffective assistance by [trial] counsel and the questions of whether [trial] counsel performed deficiently, and (b) whether there was a reasonable probability that . . . the result of the [trial] proceedings

59

would have been different." *Id.* at 382.  In light of this pass-through requirement, in Section II above, Jones has already laid out a colorable claim, demonstrating that his trial counsel's performance was constitutionally deficient during the guilt phase, which was prejudicial to the outcome of the trial proceedings. This means Jones has already satisfied the second prong of the *Clabourne* test by demonstrating that the outcome of his PCR proceedings would have been different.

Accordingly a single issue remains: whether PCR counsel's performance was deficient under *Strickland*. As explained at pages 4-5 above, "[a]t this stage, [Jones] . . . only needs to allege a *colorable* claim for relief." *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (emphasis in original). For the reasons explained below, Jones has satisfied this review standard.

**B.     Respondents fail to rebut the showing that Jones' PCR counsel performed deficiently under *Strickland*, when he failed to investigate and present a substantial claim that the guilt-phase performance of trial counsel was constitutionally deficient.**

**1.     Respondents have applied an incorrect standard to the assessment of PCR counsel's performance.**

It is undisputed that PCR counsel failed to raise what the court of appeals has already identified as Jones' "substantial claim" that this trial counsel was ineffective during the guilt phase of the capital proceedings. (Ninth Cir. Dkt. 68.) Respondents make a critical analytical error in their assessment of PCR counsel's performance. They incorrectly rely on *Martinez v. Ryan*, 132 S. Ct. at 1317, for the proposition that "a PCR attorney's function is similar to an appellate attorney."

60

(Dkt. 175 at 11.) *Martinez* does <u>not</u> hold or even suggest that PCR counsel have duties similar to appellate counsel. What the Court did say was that the ultimate state PCR court decision on a claim of ineffective assistance was the equivalent of a direct appeal decision, because the PCR court would be the first court to review the claim. *Martinez*, 132 S. Ct. at 1317. Here is what the Court said:

> Where, as here, the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim. This is because the state habeas court "looks to the merits of the clai[m]" of ineffective assistance, no other court has addressed the claim, and "defendants pursuing first-tier review . . . are generally ill equipped to represent themselves" because they do not have a brief from counsel or an opinion of the court addressing their claim of error.

*Id.* It is obvious from the above quote that the Court was <u>not</u> speaking to the duties of PCR counsel, or drawing a comparison between the duties of PCR and appellate counsel. The Court was simply remarking on the fact that ineffective assistance claims are typically reviewed for the first time in PCR proceedings, and petitioners would likely need effective PCR counsel to assist them in such proceedings. In fact, contrary to the Respondents' suggestion, the language in *Martinez* and *Trevino v. Thaler*, __ U.S. __, 133 S. Ct. 1911 (2013), make it abundantly clear that in material respects, the duties of PCR counsel are <u>not</u> similar to those of appellate counsel.

Appellate counsel's work is based on a fixed trial court record. Further, appellate counsel are at some liberty to either select or to reject legal claims subsisting within that fixed record. *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (recognizing appellate counsel's discretion to winnow claims and decide which claims to bring, based on analysis and research of potential claims apparent from record).

On the other hand, a claim of ineffective assistance of trial counsel presented in PCR proceedings is usually based upon facts <u>outside</u> of the fixed appellate record, and it is therefore universally recognized that (unlike appellate counsel duties) PCR counsel must investigate incident to discovery and development of claims of ineffective assistance of trial counsel. Unlike appellate counsel, PCR counsel does not have the luxury of picking and choosing among the best or most likely to succeed record-based claims. The Court recognized the critical role of PCR counsel's investigation in *Martinez* and *Trevino*.

As the Court said in *Martinez*: "Without the help of an adequate attorney, a prisoner will have similar difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." 132 S. Ct. at 1317. "While confined to prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on

evidence outside the trial record." *Id.* "[Because] [i]neffective-assistance claims often depend on evidence outside the trial record . . . [d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim." *Id.* at 1318.

It is also implicit in the Court's decision in *Trevino* that investigation and record expansion are essential components of PCR counsel's duties. "[T]he inherent nature of most ineffective assistance of trial counsel claims means that the trial court record will often fail to contain the information necessary to substantiate the claim." 133 S. Ct. at 1918 (internal quotations and citations omitted). The Court went on to recognize the obvious: it will take substantial time for PCR counsel to investigate and develop a claim of ineffective assistance of counsel. *Id.* at 1921 ("It would have been difficult, perhaps impossible, within th[e] time frame [for filing a motion for new trial] to investigate Trevino's background, determine whether trial counsel had adequately done so, and then develop evidence about additional mitigating background circumstances."). *Cf. Massaro v. United States*, 538 U.S. 500, 505-06 (2003) (requiring claims of ineffective assistance of federal trial counsel to "ordinarily . . . be litigated in the first instance in the district court" so the defendant can have the full opportunity to prove the facts establishing the claim). The Court in *Massaro* aptly observed: "Under *Strickland v. Washington*, a defendant claiming ineffective counsel must show that counsel's actions were not

63

supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." 538 U.S. at 505. "The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them . . . [and] [w]ithout additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Id.*

The Supreme Court's repeated references in *Martinez* and *Trevino* to the need for investigation in PCR proceedings is not a new concept. *See, e.g.*, ABA Standards for The Defense Function § 4-8.5 (1979) [hereinafter "The Defense Function"]. The comment to the foregoing section under the heading "Conduct of Lawyers in Postconviction Proceedings," provides that because "a postconviction proceeding is fundamentally an original jurisdiction proceeding, involving problems of investigation, preparation, and trial, the standards governing lawyers in these tasks are fundamentally the same as those outlined in these standards for the defense of a criminal case." *Id.* (emphasis added).[16] The just-quoted provision

---

[16] The just-quoted Defense Function standards date back in time near to when the standards were first published in 1974. "Warren Burger, chair of the Standards project until his appointment as chief justice of the U.S. Supreme Court, described the Standards project as 'the single most comprehensive and probably the most monumental undertaking in the field of criminal justice ever attempted by the American legal profession in our national history' and recommended that '[e]veryone connected with criminal justice . . . become totally familiar with [the

64

means what it says. PCR lawyers have the same duties to investigate as trial counsel, limited of course by the *Strickland* caveat, that decisions not to investigate must be supported by reasonable professional judgment.[17]

*Martinez* clearly contemplates that investigation may be necessary in PCR proceedings and that PCR lawyers will have a corresponding duty to investigate claims of ineffective assistance of counsel. Critically though, *Martinez* requires that PCR counsel's performance be judged under the same *Strickland* standard applied to trial lawyers. 132 S. Ct. 1318. Therefore, what goes for trial lawyers also goes for PCR lawyers, and the following standard must apply both to trial lawyers and their PCR lawyer counterparts:   "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, [trial and PCR] counsel ha[ve] a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).

---

Standards'] substantive content."' Martin Marcus, *The Making of the ABA Criminal Justice Standards, Forty Years of Excellence*, 23 Criminal Justice,  no. 4, 2009 at 10 (quoting Warren E. Burger, *Introduction: The ABA Standards for Criminal Justice*, 12 Am. Crim. L. Rev. 251 (1974)).

[17] *And see* The Defense Function § 4-8.6 (charging PCR counsel with duty to assert claims of ineffective assistance, "after investigation").

All of this is to say that Respondents' argument, that PCR counsel's duties and the assessment of PCR counsel's performance should be compared to the performance duties of appellate counsel, is simply wrong and <u>not</u> supported by *Martinez*. To state it pointedly, unlike appellate counsel working on a fixed record, Jones' PCR counsel had a duty to investigate, "or to make a reasonable decision that ma[de] [a] particular investigation[] unnecessary." *Id.* Respondents <u>never</u> apply this essential investigatory threshold standard to their assessment of PCR counsel's performance, and this failure renders their entire legal analysis nugatory.

Thus, Respondents have no legal support for an argument that "[l]ike an appellate lawyer, PCR counsel was not required to raise every non-frivolous issue, but can – and did—instead decide which issues to raise and argue." (Dkt. 175 at 13:9-11.) We stress that there is <u>no</u> legal support for this argument because it fails to ask the pivotal questions. (1) What investigation did PCR counsel conduct in order to decide which issues to raise? (2) If no investigation was done, was the decision not to investigate supported by reasonable professional judgment? Before, the assessment of PCR counsel's performance can begin, these preliminary investigation standards must but examined, but Respondents never address them, rendering their entire analysis of PCR counsel's performance fundamentally flawed and baseless.

### 2. PCR counsel's failure to conduct any investigation during the PCR proceedings, save an alleged interview of Rachel's mother, was objectively unreasonable and not supported by reasonable professional judgment.

PCR counsel plainly understood his obligation to examine the performance of trial counsel, as he embarked on such an examination of trial counsel's performance and asserted 4 meritless claims, which he gleaned solely from an examination of the trial record and a *portion* of trial counsel's file.[18] The Respondents never address the fact that PCR counsel conducted no investigation whatsoever, beyond reading portions of the trial record and purporting to interview Rachel's mother.[19] The ineffective assistance claims that PCR counsel did present are identified below.

- PCR counsel alleged trial counsel was ineffective because he failed to request a mistrial when a few members of the jury saw Jones in handcuffs. (PCR ROA 12 at 11-12.) However, trial counsel dealt with the issue at trial and made a record of his conclusion that Jones suffered no prejudice. Likewise the state PCR court found no deficient performance or prejudice under *Strickland*. (PCR ROA 31 at 3.)

---

[18] We allege that PCR counsel only reviewed an abridged version of the file because a recent reexamination of his billing records shows he did not record any time for review of a sizeable portion of trial counsel's file. (*See* Supp. Ex. 85, Declaration of Jennifer Schneider.)

[19] At an evidentiary hearing, Rachel's mother would testify she has no memory of any interview by Jones' PCR counsel.

67

- PCR counsel alleged trial counsel was ineffective for failing to interview Rachel's mother; however, PCR counsel failed to allege what she would have said or testified to. (PCR ROA 12 at 12.) This lack of evidence inexorably led the PCR court to deny the claim for lack of prejudice and lack of evidence of deficient performance. (PCR ROA 31 at 3.)

- PCR counsel alleged that trial counsel was ineffective for failing to insist on appointment of second counsel. (PCR ROA 12 at 12-13.) However, as the PCR court found, trial counsel did arrange with the trial court for his associate to work and bill for time worked on Jones' case; so this claim was rejected for lack of showing of either deficient performance or prejudice. (PCR ROA 31 at 4.)

- PCR counsel alleged trial counsel failed to meet with Jones a sufficient number of times to prepare an adequate defense. (PCR ROA 12 at 13.) The evidence presented in the proceedings disproved the allegation of insufficient communication between counsel and Jones; and ultimately, the PCR court found no evidence of deficient performance or prejudice. As to this latter point, PCR counsel presented no evidence supporting his allegation that trial counsel had presented an inadequate defense, and as explained below, such an allegation would require investigative support, but no investigation was done. (PCR ROA 31 at 4.)

- PCR counsel also argued that with respect to all of the ineffective assistance claims presented, Jones did <u>not</u> need to prove *Strickland* prejudice; i.e., a reasonable probability for a different outcome. Rather, he argued Jones could prove prejudice solely based on evidence that the proceedings were unfair or unreliable. (PCR ROA 31 at 4.) This claim was roundly rejected by the PCR court, and notably PCR counsel presented <u>no</u> evidence that the proceedings were either unfair or unreliable. (*Id.*) PCR counsel's allegation that the outcome of the proceedings was unfair and unreliable would require evidence derived from investigation, but no investigation was done.

- Finally, PCR counsel alleged that trial counsel was ineffective because he failed to have Jones testify or to inform Jones of his right to testify. The PCR court found no evidence to support this claim. (PCR ROA 31 at 5.) Notably, PCR counsel presented <u>no</u> evidence of what Jones would have said if called to testify; thus again, PCR counsel presented <u>no</u> evidence of prejudice to support this claim. (Tr. Sept. 18, 2000 at 5-18.)

Respondents posit that the ineffective assistance claim brought by Jones against trial counsel in these pending *Martinez* related proceedings (which is summarized in Section II above), "<u>is no stronger than those PCR counsel presented, and this Court should presume that PCR counsel reasonably omitted them</u>." (Dkt. 175 at 13:15-20.) The Respondents' suggestion that the frivolous,

unsubstantiated claims presented by PCR counsel are on the same footing as the guilt-phase ineffective assistance claim presented in these proceedings is a specious, even derisory argument, insulting to this Court's intelligence and undeserving of further reply. However, the Respondents' suggestion that this Court "should presume that PCR counsel reasonably omitted" our claim against trial counsel, must be answered.

There is no basis to presume that PCR counsel <u>reasonably</u> omitted the ineffective assistance claim against trial counsel made here, in Section II above. Implicit in Respondents' argument is that PCR counsel made a "reasoned" decision to omit the claim. But this is not the case. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91). In other words, PCR counsel had a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*

Here, PCR counsel's own billing records show that he conducted <u>no</u> investigation, save an alleged belated interview of Rachel's mother, Angela Gray, on the same date he filed the state PCR petition, when the time for investigation of potential claims was essentially over. Under these circumstances, *Strickland* requires that we ask whether "reasonable professional judgments support[ed] the

70

limitations on [PCR counsel's] investigation." *Id.* Here, the self-evident answer is that "reasonable professional judgment" played no role in any decision to limit investigation. Our conclusion, that there is <u>no</u> evidence to support Respondents' argument that PCR counsel made a reasoned decision to omit the subject ineffective assistance claim, is well-supported.

- Recent examination of PCR counsel's billing records reveal that he never bothered to review a substantial portion of trial counsel's file, including police reports, witness interviews, the pre-trial interview of Dr. Howard and other relevant records. (*See* Supp. Ex. 85.) PCR counsel could not make any reasonable professional judgment limiting investigation without reviewing the case file. *Vega v. Ryan*, 757 F.3d 960, 968-69 (9th Cir. 2014) ("[W]e can conceive of no circumstances where the decision not to read a client's file— a file prepared to answer the same charges—would be reasonable."); *Rhodes v. Cain*, No. 11-0399, 2014 WL 4686809, at *22 (E.D. La. Sept. 19, 2014) (citing postconviction counsel's typical duty to obtain and review trial counsel's file.

- Even more concerning, a careful examination of PCR counsel's billing records casts doubt on whether PCR counsel actually reviewed the materials, which his billing records report he reviewed. For example: (1) he billed only 1.6 hours for reviewing the 5 hour video statement that Jones gave to the

71

police. (Supp. Ex. 85 ¶ 8; Dkt. 167, Ex. 39 at 3.)[20] <u>The clear inference is that PCR counsel did not digest or understand the content of his own file, and therefore he was not in a position to make any reasonable professional judgments concerning the investigation of Jones' case.</u>

- Beyond this, the billing records show that PCR counsel failed to consult with or interview trial counsel. (Dkt. 167, Ex. 39) Worse, the billing records show that PCR counsel met with Jones just twice; once early on and once more just before filing the Rule 32 petition. (*Id.* at 3-4.) These deficiencies add to the already strong showing that PCR counsel was never in a sufficiently informed position to make any reasoned professional judgments regarding the investigation of Jones' case.

- Some of PCR counsel's disinterest in Jones' case may relate to the fact that he was in the midst of what would be a successful election campaign to become the Gila County Attorney. (PCR ROA 40.)

- The claims actually brought by PCR counsel included allegations that Jones' defense had been "inadequate" and that the results were "unfair" and "unreliable." (PCR ROA 31 at 4.) It is obvious that investigation and evidence would be needed to support allegations that the defense was inadequate and the outcome unreliable. There can be no serious argument

---

[20] These are but a few of examples, and others can be explored with PCR counsel at the evidentiary hearing and/or his deposition.

that reasonable professional judgment limited investigation needed to substantiate the very allegations made by the PCR lawyer.

- PCR counsel made repeated representations to the PCR court that investigation was necessary to review the trial defense investigation, to determine if all defense evidence was presented, to locate new defense evidence, to prove others may have caused Rachel's injuries, and to determine if the case was fully investigated during the trial proceedings. (PCR ROA 4, 5, 7.) Although the PCR court denied funds for a private investigator, PCR counsel's billing records show he personally failed to investigate any of the issues that he represented were required to be investigated in this case. (Dkt. 167, Ex. 39.) There can be no serious argument that reasonable professional judgment limited investigation into the very matters counsel said he had to investigate. If counsel had actually investigated the matters he said needed to be investigated, he would have learned that the trial team conducted no investigation of the prosecution evidence, including the pivotal time-of-injury evidence. Reasonable professional judgment would not have supported further neglect of that essential investigation in this case.

- PCR counsel ignored and disobeyed explicit instructions from the Arizona Supreme Court (that were issued to PCR counsel in the order of his

appointment), that <u>all</u> funding requests were to conform to the requirements of A.R.S. § 13-4013(B). Rather than adhere to the statutory funding requirements of the indigent defense statute in § 13-4013(B), as the Arizona Supreme Court had ordered, PCR counsel undergirded his requests for funding with citation to Rule 706(a) of the Arizona Rules of Evidence. Rule 706 does <u>not</u> authorize indigent defense funding; it authorizes a rarely used mechanism for court-appointed experts. (*See* Dkt. 167 at 150-52.) Prior to postconviction counsel's 1999 appointment, the Arizona Supreme Court had clearly established the requirements which needed to be met in order to obtain indigent defense assistance under §13-4013(B). At a minimum, funding requests had to demonstrate why the requested assistance was reasonably necessary, but relevant here, undeveloped assertions that the requested assistance would be beneficial, would be considered insufficient. *See State v. Apelt*, 861 P.2d 654, 660 (Ariz. 1993). PCR counsel demonstrably failed to satisfy the requirements of the indigent defense funding statute. (*See* Declaration of expert Dan Cooper, Dkt. 167, Ex. 37 at 9-13.) The PCR court ultimately denied PCR counsel's funding requests specifically because they failed to satisfy the § 13-4013(B) requirements, which required PCR counsel to spell out why the requested assistance was reasonably necessary. (PCR ROA 9.)

- PCR counsel did not make a reasonable strategic choice to forego investigation into trial counsel's performance. Instead, no investigation was done because counsel was ignorant of the legal requirements for obtaining funds to support indigent defense, and this makes for a quintessential showing of deficient performance under *Strickland*. *See Hinton v. Alabama*, 134 S. Ct. at 1089 (holding attorney's misunderstanding of indigent defense funding statutory requirements evidenced constitutionally deficient performance and admonishing "[a]n attorney's ignorance of the law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*"). As explained by standard of care expert, Dan Cooper, ". . . postconviction counsel . . . [should have had, but obviously did not have] a clear understanding of how to obtain funding for indigent defense assistance under the controlling statute in A.R.S. §13-4013(B)." (Dkt. 167, Ex. 37 at 11-13.)

Just like trial counsel's decision <u>not</u> to investigate or challenge any of the prosecution's evidence in this case, the PCR's counsel's identical decision <u>not</u> to investigate or challenge any of the prosecution's evidence in this case, was <u>not</u> supported by reasonable professional judgment. As expert Dan Cooper has explained, ". . . Jones' postconviction counsel lacked a proper understanding of

75

how to investigate plausibly meritorious claims of ineffective assistance of trial counsel. The record shows that counsel was ignorant of the standards governing application of the indigent defense assistance statute in A.R.S. §13-4013(B); indeed he failed to cite this statute in support of his funding requests, despite an admonition from the Arizona Supreme Court in its appointment order that he rely on this statute, and his conduct evidences that he was incapable of adequately investigating the performance of trial counsel." (*Id.* at 14.)  Beyond this, the record demonstrates that PCR counsel failed to review prior counsel's file; nor did he consult with or interview trial counsel.

All of the relevant facts point solidly to the conclusion that PCR counsel's failure to investigate and present Jones' claim of ineffective assistance of counsel, presented in Section II above, was <u>not</u> the result of reasonable professional judgment. The touchstone of the ineffective assistance claim against trial counsel (which is evidenced by trial counsel's wholesale default in his obligation to investigate the validity or reliability of the state's evidence) would have been prominently evident to any reasonably competent PCR counsel. However here, PCR counsel never reviewed substantial portions of prior counsel's file; he had no meaningful communication with Jones (or trial counsel) about the case; and he did not evince any understanding about how to investigate a postconviction capital case.  PCR counsel was not in a position to make any informed judgments about

how or what to investigate in Jones' case.  For all the reasons explained above, and for the reasons explained in Jones' Supplemental Brief, the Court should find that Jones has presented a colorable claim that PCR counsel's performance was deficient and objectively unreasonable under *Strickland*. (Dkt. 167 at 144-52.)

**IV.   Respondents fail to rebut the colorable showing that trial counsel's performance was constitutionally deficient and prejudicial to the outcome of the sentencing phase of the proceedings.**

**A.   Introduction.**

Here, we reply to Respondents' contention that trial counsel was not prejudicially ineffective during the sentencing/penalty phase of Jones' capital proceedings. As explained earlier above, under *Clabourne*, evidence of trial counsel's deficient performance at sentencing, as well as the resultant prejudice, is relevant to the showing that there is a reasonable likelihood that the sentencing outcome of the PCR proceedings would have been different. 745 F.3d at 382. (*See* Section I above at 2-4.) Independently, the same evidence is obviously relevant to the ultimate merits of the penalty phase ineffective assistance claim against trial counsel. Accordingly, in the section below, we demonstrate that trial counsel's performance was prejudicially deficient at sentencing, which makes the dual showing that (1) Jones' Sixth Amendment rights were violated at his sentencing

and (2) the outcome of his PCR proceedings would have been different, had the claim against trial counsel been presented.[21]

### B. Trial counsel rendered ineffective assistance to Jones during the penalty phase of the proceedings when he failed to investigate and present mitigating evidence.

With very little capital experience of his own, and no funds for an investigator or mitigation specialist, (Dkt. 167, Ex. 33 ¶ 2; Ex. 36), Jones' trial counsel was completely unprepared to provide competent representation during the penalty phase of the trial. In an apparent effort to make the overwhelming workload of this complex capital case more manageable, trial counsel delegated preparation of the mitigation presentation to his law partner—a recent law-school graduate without one iota of capital experience. (Dkt. 167, Ex. 40, ¶¶ 4, 8.) Without the necessary resources or experience, trial counsel provided ineffective assistance to Jones during his penalty-phase proceedings.

Trial counsel retained Dr. Geffen, a psychologist, to evaluate Jones for his mental state at the time of trial, with an eye toward competency to assist counsel; his mental state at the time of his arrest, with a focus on whether he knowingly and voluntarily waived his *Miranda* rights; and indications of "pedophilic and/or aggressive characteristics/tendencies." (Dkt. 167, Ex. 41 at 1.) Dr. Geffen and a medical student evaluated Jones for a total of seven hours over two days in August

---

[21] Further by way of introduction, as explained earlier above, Jones is only required to present a colorable claim at this stage of the proceedings. (*See* Section II A above at 4-5, incorporated herein by reference).

1994. (*Id.*) Dr. Geffen performed his evaluation without the benefit of a social history report or a complete set of relevant background records. Dr. Geffen relied on only copies of medical records from previous psychiatric treatment in May and June of 1992 and the videotape of the police interview from May 1994. (*Id.* at 2.) Ms. Bowman was sent a copy of Dr. Geffen's report on November 4, 1994, (*id.* at 1), but there are no records of any discussions with Dr. Geffen regarding his findings. The only record of an attorney conference with Dr. Geffen appears in Mr. Bruner's billing records. He billed for 1.5 hours for a conference with Dr. Geffen on June 12, 1995, the day before Dr. Geffen's testimony. (Dkt. 167, Ex. 36 at 29.)

The next arrow in counsel's mitigation quiver was Ronnie Higgins, a drug counselor whose useful counseling experience resulted from a personal history with drug abuse and addiction. Although Higgins had no formal education or records pertaining to Jones' drug history to guide his opinions, trial counsel presented Higgins' testimony to the sentencing court. (Tr. June 13, 1995 at 128-29.) Higgins relied on his brief meeting with Jones the day prior to his testimony to opine that Jones was a heavy methamphetamine user who was coming off a run the day Rachel Gray died. (*Id.*)

Jones' mother, Florence also testified—falsely—about Jones' family history and upbringing. Florence gave the impression that although things became rough for the family after Jones' father died, prior to that time the family had been

79

cohesive, functional, and happy. (*Id.* at 64.) Florence admitted that the entire family struggled with the loss of her husband, but she denied any knowledge of serious illnesses, injuries, or abuse within her family. (*Id.* at 48, 70.)

With the exception of some lay witness testimony that Jones was a nice guy, that was the sum total of counsel's mitigation. That was trial counsel's entire argument to save Jones' life. Had counsel conducted the constitutionally adequate investigation Jones was guaranteed, the picture painted during the penalty proceedings would have been vastly different.

Contrary to Florence's whitewashed image of Jones' upbringing, Jones did not grow up in a happy, safe home. Florence abandoned and neglected her young children, leaving the eldest son, Otis, to care for all three of his younger brothers though Otis was just six years older than Jones. (Dkt. 167, Ex. 46 ¶¶ 25-26.) When Florence did come home, she was brutal, beating the children with belts and razor straps until they bled. (Dkt. 167, Ex. 46 ¶ 43.) Florence and her husband also fought violently; Florence once stabbed him during one of their fights. (Dkt. 167, Ex. 46 ¶¶ 40-42.) But Florence did not only lash out at her family, she also beat and shot people in the neighborhood. (Dkt. 167, Ex. 50 ¶ 5.)

Likewise, the picture of Jones' drug addiction was not as simple as Higgins had portrayed to the sentencing court. Florence's negative influence on Jones began well before his birth. Florence drank heavily during her pregnancy with

Jones and his twin. Habeas counsel retained Dr. Lawson Bernstein, a licensed psychiatrist, to evaluate Jones, and his education and experience helped illuminate the severity of Jones' deficits due to his history of drug abuse. According to Dr. Bernstein, Jones' own drug abuse, his exposure to neurotoxins, his history of carbon monoxide poisoning, and his exposure to alcohol in utero all had a part to play in the damage to Jones' brain. (Dkt. 167, Ex. 44 at 1, 6.) Higgins, a former addict with no medical training, was unqualified to opine on any of these conditions.

Finally, although Dr. Geffen mentioned to the court that Jones' history of head injuries would put him at risk of having brain damage, Dr. Geffen was unqualified to opine on whether Jones had any physiological defects or what impact any physiological defects might have on Jones' behavior. Habeas counsel retained Dr. Alan Goldberg to conduct a neuropsychological examination. Dr. Goldberg's testing revealed deficits in Jones' frontal lobe function, right hemisphere motor function, and sensory function. When Dr. Goldberg recommended a full neurological evaluation, habeas counsel retained Dr. Pamela Blake, a board-certified neurologist.

Dr. Blake discovered that Jones had, in fact, suffered physical damage to his frontal lobe. The sheer number of risk factors and possible causes of this damage are staggering. Between the in utero exposure to alcohol, the spate of head injuries,

81

the exposure to neurotoxins, and the drug abuse, Jones' brain damage should come as no surprise. Dr. Blake documented a number of striking abnormalities in her neurological examination of Jones, all of which pointed to physiological defects in his brain. (Dkt. 167, Ex. 43 at 9, 12.)

As they did throughout their Response, the Respondents erroneously employed a divide-and-conquer strategy with regard to Jones' claim of ineffective assistance at sentencing. In order to defeat Jones' claim, the Respondents separate the cumulative claim into three discrete categories and ask whether any single category, on its own, would result in prejudice. (Dkt. 175 at 56-58, 59-60, 61-63.) As discussed in more detail in Section II(C)(2) above, Respondents' methodology does not comport with the framework set out in *Strickland*. *Strickland* demands that the entire proceeding be fundamentally fair and that the whole of the result of the proceeding be reliable. 466 U.S. at 694-96. Therefore, <u>all</u> of the evidence <u>not</u> presented due to the errors of trial counsel must be assessed globally against the evidence that was presented to the sentencing court. *See Wiggins*, 539 U.S. at 536 (explaining reviewing court must "evaluate the totality of the evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding[s]") (alteration in original) (quoting *Williams*, 529 U.S. at 397-98.)

**C.   Trial counsel did not discharge his constitutional duty to investigate with the incomplete and inadequate penalty phase investigation he conducted in Jones' case.**

The thrust of the Respondents' argument is that trial counsel conducted some investigation and presented some mitigation evidence; therefore, Jones cannot show deficient performance. (*See, e.g.*, Dkt. 175 at 54 (stating retention of mental health expert discharges duty to investigate and distinguishing Jones' case from cases where counsel presented no expert testimony).) Respondents do not accurately capture counsel's duty to investigate during the penalty phase of a capital trial. Even where counsel conducts some investigation, that investigation may be so meager that it is "on its face . . . constitutionally inadequate." *Sears v. Upton*, 561 U.S. 945, 951 (2010) (ellipsis in original). Counsel's duty is not "discharged merely by conducting a limited investigation . . . or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007). To the contrary, the investigation is deemed constitutionally inadequate where counsel "abandoned their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524.

Jones need not show that counsel undertook no investigation whatsoever during the penalty phase in order to establish that the representation fell below prevailing professional norms. That is not the test. Instead, Jones must show that

83

counsel's investigation was unreasonable under the circumstances. *Strickland*, 466 U.S. at 688.

"[G]eneral principles have emerged regarding the duties of criminal defense attorneys that inform [reviewing courts'] view as to the objective standard of reasonableness by which [courts] assess attorney performance, particularly with respect to the duty to investigate." *Lambright*, 490 F.3d at 1116 (internal citations and quotation marks omitted). Some of these general principles include the following: Objectively reasonable counsel must investigate the client's social background and history of familial abuse. *Id.* at 1117 (quoting *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005)). Counsel has a duty to investigate and present evidence of mental impairment, with an attendant "affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Id.* (quoting *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002)). Further, counsel must investigate the client's history of drug and alcohol abuse. *Id.* Despite Respondents' implications to the contrary, the law is clear: counsel does not complete the investigation by starting it.

The Supreme Court has established that the investigation underlying counsel's mitigation presentation is of paramount importance in determining whether counsel's actions were reasonable. *Wiggins*, 539 U.S. at 522-23. A reviewing court's "principal concern . . . is not whether counsel should have

presented a mitigation case. Rather, [courts] focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Id.* (emphasis in original). Lower courts have consistently applied this fundamental premise. *See, e.g.*, *Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011) ("[I]f counsel had failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing.") (emphasis in original); *Sowell v. Anderson*, 663 F.3d 783, 790 (6th Cir. 2011) (holding counsel's failure to investigate resulted in inability to "make a conscious, strategic decision about the type of mitigation case to present at sentencing"); *Johnson v. Sec'y, DOC*, 643 F.3d 907, 931-32 (11th Cir. 2011) ("The question under *Strickland* is not whether . . . trial counsel's overall performance at the sentence stage was exemplary or even average, but whether he conducted an adequate background investigation or reasonably decided to end the background investigation when he did."); *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) ("counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client") (emphasis in original).

Counsel in *Wiggins* retained a psychologist to evaluate the client, but the reports the psychologist generated did not reveal Wiggins' life history. 539 U.S. at 523. Counsel had reports including Wiggins' description of his childhood as a

"misery" and "disgusting." *Id.* Counsel also had copies of social service records documenting Wiggins' placement in various foster homes. *Id.* Counsel did not, however "expand their investigation beyond" the records in their possession. *Id.* at 524. The Supreme Court recognized that at the time of Wiggins' trial, counsel had a well-entrenched duty to investigate, which included a duty to prepare a social history report. *Id.* Counsel ignored this duty and left the "investigation" unfinished with the retention of a psychologist and a small stack of records, within which lay red flags of Wiggins' depraved upbringing hiding in plain sight. *Id.* at 524-25. The Court held that counsel provided ineffective assistance, as "any reasonably competent attorney would have realized that pursuing [the investigatory] leads was necessary to making an informed choice among possible defenses . . . ." *Id.* at 525.

Like counsel in *Wiggins*, Jones' counsel "abandoned [his] investigation of [Jones'] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. Trial counsel knew that Jones' mother doled out "whoopings," but he failed to interview anyone other than the mother about Jones' history of familial abuse. By doing so, counsel did not discover that Florence Jones drank heavily during her pregnancy with Jones; she abandoned her children, leaving Jones' six-year-old brother in charge of diapering and feeding him and his twin brother; she beat and stabbed her husband; she beat and shot men in the neighborhood; and importantly, she beat her children bloody.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Although trial counsel knew that Jones' mother drank heavily after Jones' father died, he did nothing to follow up on this lead with anyone other than the mother, who in light of her frequent intoxication, was not the most reliable historian with regard to her own behavior. This tantalizing indication of additional mitigation evidence "would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Jones' counsel, however, did not act reasonably.

Jones' counsel was also aware that Jones had suffered several head injuries in the past. "More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system." *Caro v. Woodford*, 280 F.3d at 1258 [hereinafter *Caro II*] (quoting 4 Blackstone, Commentaries *24-*25). Instead of following up on this knowledge to discover what type of experts may best help the sentencing court understand the impact of these injuries, trial counsel relied on Dr. Geffen to hypothesize that Jones suffered brain damage. Dr. Geffen was unable to diagnose Jones with brain damage, but since head injuries can cause brain damage, it was possible Jones had it. "[A]ny reasonably competent counsel would have realized that pursuing [this investigatory lead] was necessary" if he was to perform as the counsel contemplated by the Constitution. *Wiggins*, 539 U.S. at 525.

Jones' trial counsel failed his duty to conduct an adequate investigation. Respondents' arguments regarding trial counsel's performance fail to refute this

point; therefore, Respondents fail to refute Jones' claim of ineffective assistance. Jones has established that trial counsel's mitigation investigation was objectively unreasonable.

**D.    Retention of a mental health expert did not absolve counsel of the duty to conduct an adequate investigation into Jones' background.**

Respondents make the unsupported assertion that trial counsel fulfilled his constitutional duty to "investigate[ ] Jones' mental condition by hiring Dr. Geffen, a licensed psychologist." (Dkt. 175 at 54.) This is not a correct statement of the law. While it is true that "[t]rial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating a trial strategy . . .[,] this common-sense principle does not give trial counsel a free ride when it comes to the obligation to undertake a 'thorough investigation of law and facts relevant to plausible options' for a defense." *Couch*, 632 F.3d at 246-47 (internal citations omitted) (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has never endorsed a position that counsel's duty to investigate is fulfilled upon retention of an expert. The duty to investigate is placed squarely on the shoulders of counsel. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (emphasis added) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). In fact,

88

in *Rompilla*, counsel retained <u>three mental health experts</u> to examine the client's mental state, but the expert "reports revealed nothing useful." *Id.* at 382 (internal quotation marks omitted). The Supreme Court held that even after retaining multiple experts who found "nothing useful," counsel still provided ineffective assistance when he failed to conduct an adequate investigation. *Id.* at 383, 390. The retention of experts does nothing to unburden counsel from the duty to investigate.

Here, trial counsel enlisted Dr. Geffen to evaluate Jones, but he failed to conduct the background investigation and document collection that is essential to an accurate and reliable evaluation. Dr. Geffen had not been provided records of Jones' past suicidal gestures until the day before his testimony. (Tr. June 13, 1995 at 79.) Dr. Geffen was never provided with an accurate social or family history prior to his testimony. (Dkt. 167, Ex. 33. ¶ 10.) At the time of Jones' trial, however, counsel's duty to investigate the client's medical, social, and family histories was long established. Trial counsel's retention of Dr. Geffen to evaluate Jones did not fulfill the duty to investigate. As in *Rompilla*, Jones' counsel's retaining a mental health expert did not automatically result in a constitutionally adequate investigation.

> ### E.   Counsel performed deficiently when he failed to investigate and discover relevant background information that could and should have been provided to mental health experts.

The fact that Dr. Geffen did not specifically ask for particular information does not render counsel's decision not to investigate reasonable. Counsel has a

duty to provide experts with "information relevant to the conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) [hereinafter *Caro I*]. "An attorney cannot hire an expert, give him whatever evidence he happens to have on hand . . . and accept the report without further discussion." *Couch*, 632 F.3d at 246.

Respondents' reliance on *Murtishaw v. Woodford*, 255 F.3d 926, 945 (9th Cir. 2001), for the proposition that trial counsel had no duty to provide the mental health expert with adequate background information or records prior to or during his evaluation of Jones is misplaced. Respondents quote *Murtishaw* as follows: "Absent such a specific request for information [counsel] was not required to provide [Dr. Geffen] with additional information." (Dkt. 175 at 55:13-14 (alteration in original).) However, Respondents seem to have overlooked the footnote on that page of the *Murtishaw* opinion outlining exactly how the court's holding did not apply to cases involving counsel's failure to provide records to experts for purposes of a penalty-phase investigation. *See Murtishaw*, 255 F.3d at 945 n.9 ("In *Caro v. Calderon*, the panel found that counsel's failure to provide experts with relevant information was ineffective assistance of counsel only insofar as the penalty phase of the trial was concerned because counsel's failure prevented the jury from hearing the most important evidence of mitigation; it was not ineffective with regard to the guilt phase. In this case, Murtishaw does not argue

that his experts during the penalty retrial were deprived of potentially relevant information.") (internal citations and quotation marks omitted) (emphasis added).

In this case, unlike *Murtishaw*, Jones does "argue that his experts during the penalty [phase] were deprived of potentially relevant information." *Murtishaw* is inapposite.

In addition to misapplying Ninth Circuit precedent, Respondents also completely ignore the clear line of Ninth Circuit authority that has consistently held that capital defense counsel have "an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro II*, 280 F.3d at 1254. The "duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Id.* at 1255 (citing *Bean v. Calderon*, 163 F.3d 1073, 1079-80 (9th Cir. 1998)); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (counsel failed to provide any mental health expert with records sufficient to develop accurate psychological profile of defendant); *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (counsel has affirmative duty to provide mental health experts with social history information needed to develop accurate profile of defendant's mental health profile); *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997) (counsel ineffective for failing to provide sufficient background information to their psychologist).

In *Caro II*, counsel was aware of the client's exposure to neurotoxic chemicals, but he neither fully investigated these facts nor provided the information to mental health experts who examined the client. 280 F.3d at 1255. The court held this failure constituted deficient performance. *Id.* In another case, the Ninth Circuit held that despite their retention of three different mental health experts, counsel provided ineffective assistance by failing to adequately inform or prepare these experts. *Bean*, 163 F.3d at 1078-79. Bean's counsel did not even contact one of the experts to prepare him for the penalty phase until a day or two before his testimony, spending just a couple hours preparing the testimony. *Id.* at 1078. The court emphasized that "[a]lthough some mitigating evidence was presented, the representation in this case 'fell below an objective standard of reasonableness.'" *Id.* at 1079 (quoting *Strickland*, 466 U.S. at 688).

Like counsel in *Caro II*, trial counsel here was aware of Jones' history of head injury, but he failed to even request the relevant medical records much less provide them to Dr. Geffen to inform his evaluation. (Dkt. 167, Ex. 33, ¶ 11.) Counsel did not bother to collect social or family history records either; thus Dr. Geffen's evaluation also suffered from the lack of these important background records. (*Id.* ¶ 10.) Just like the ineffective counsel in *Bean*, Jones' trial counsel failed to meet with Dr. Geffen until the day before his testimony in a conference that lasted just one and a half hours. (Dkt. 167, Ex. 36 at ¶ 29.)

92

Respondents' argument that counsel had no duty to provide his mental health expert with background information is flatly wrong and should be disregarded. Counsel has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client facts that the experts do not request." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999). Trial counsel in this case abdicated his duty. Had counsel conducted an adequate investigation, he would have found readily available medical, social, and family history records that would have been vital to an accurate evaluation of Jones. It was objectively unreasonable under *Strickland* for counsel to neglect to provide Dr. Geffen with the records revealing the extent of Jones' troubled past.

### F.  Counsel's duty to investigate encompasses a duty to determine which experts will aid the case.

"Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult." *Caro I*, 165 F.3d at 1226. In *Caro I*, the court faulted trial counsel for failing to consult "either a neurologist or a toxicologist, experts on the effects of the chemical poisoning" when counsel was aware of the defendant's lifelong exposure to neurotoxic substances. *Id.* That trial counsel had retained a medical doctor, a psychologist, and a psychiatrist to evaluate Caro did not ameliorate trial counsel's failure. *Id.*

The Ninth Circuit took up Caro's case again in 2002. *Caro II*, 280 F.3d at 1247. There, the court held that Caro received ineffective assistance of counsel. *Id.*

93

at 1258. The court held that not only had Caro's counsel failed to retain an expert who could evaluate for and opine on the organic deficits caused by the neurotoxins but Caro's counsel had also failed to present testimony of the physical, emotional, and psychological abuse he had suffered as a child. *Id.* at 1255. Although counsel in *Caro* had presented the testimony of a psychologist who opined on Caro's level of functioning and grip on reality, the court held that this was not enough in light of the fact that "the evidence that was omitted is compelling." *Id.* at 1257-58. The court there found it significant that "[t]he jury was not afforded the benefit of expert testimony explaining the effects that Caro's *physiological* defects would have on his behavior . . . ." *Id.* at 1258 (emphasis in original).

Here, like in *Caro II*, trial counsel failed to conduct the investigation necessary to determine which experts to consult. Jones' counsel was aware of his history of head injuries, but he failed to understand that Dr. Geffen, as a psychologist, was unable to opine on the impact of these injuries or the "effects that [Jones'] physiological defects would have on his behavior." *See id.* Even though Jones' counsel, like the lawyer in *Caro II*, retained a mental health expert, he failed to investigate Jones' background, and failed to provide relevant social history and other evidence to appropriate experts who could have explained how Jones' impairments would affect his behavior. and performed deficiently.

### G.   Jones suffered prejudice as the result of trial counsel's failures.

In accordance with the framework set out in *Strickland*, prejudice is determined by assessing <u>all</u> of the evidence <u>not</u> presented due to the errors of trial counsel weighed against the evidence that was presented to the sentencing court. *See Wiggins*, 539 U.S. at 536.

Courts reviewing counsel's performance in a capital sentencing must determine whether there is a "reasonable probability that, absent [counsel's] errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "This inquiry compels [the reviewing court] to couple the omitted evidence with the mitigating evidence presented at trail and reweigh it against the aggravating evidence to determine whether the omitted evidence might well have influenced the jury's appraisal of . . . [the defendant's] moral culpability." *Caro II*, 280 F.3d at 1256-57 (ellipsis and second alteration in original) (quoting *Williams*, 529 U.S. at 397-98) (internal quotation marks omitted).

In *Caro II*, the Ninth Circuit held that counsel's failure to investigate prejudiced the petitioner and found it "significant, in considering the impact of the omitted evidence on the reliability of Caro's sentence, that the evidence presented by the defense as mitigation consisted primarily of lay background and character evidence. The only expert testimony presented relating to Caro's mental health did not shed light on his brain damage." *Id.* at 1257. Despite the highly aggravating

circumstances attending the crime in *Caro II*, the court held that "the delicate balance between [Caro's] moral culpability and the value of his life would certainly teeter toward life" in light of Caro's brain damage. *Id.* at 1258.

Similarly, in this case, sentencing counsel's mitigation presentation consisted primarily of lay witness testimony, and the expert testimony failed to explain Jones' brain damage. Further, the lay background and character evidence was stunted and incomplete. Counsel failed to fully investigate Jones' background, so the sentencing court did not hear of Jones' in utero exposure to alcohol or learn the extent of Jones' physical abuse and neglect as a child. Counsel failed to prepare the mitigation witnesses, so that one lay witness was unaware that she could provide information about Jones' difficult upbringing. (Dkt. 167, Ex. 63 ¶ 21.)

Trial counsel doomed Jones' chances of a life sentence during the penalty phase when he failed to conduct an adequate investigation. This failure to investigate led inexorably to a failure to retain an expert who could assist the sentencing court in understanding how the physiological effects of Jones' past head injuries impacted his behavior at the time of the crime and mitigated his culpability. Instead of finding a neurologist or neuropsychologist who could determine the impact of Jones' multiple head injuries, counsel retained Dr. Geffen, a psychologist who could not render any opinion on the subject. The constitutionally inadequate investigation also resulted in counsel's failure to

provide Dr. Geffen with the history and records necessary to complete an accurate and reliable evaluation. Ultimately, sentencing counsel's failures yielded an incomplete and misleading mitigation presentation, after which the sentencing court found no statutory or non-statutory mitigating factors sufficient to call for leniency. (Tr. July 6, 1995 at 36-37.)

Had trial counsel conducted this thorough investigation instead of making Jones wait until habeas counsel came along, there is a reasonable probability that the sentencing court would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

**V.   Respondents fail to rebut the colorable showing: (1) that PCR counsel performed deficiently, when he failed to investigate and present a substantial claim that the sentencing-phase performance of trial counsel was constitutionally deficient, and (2) that PCR's counsel's deficient performance prejudiced the outcome of the PCR proceedings.**

**A.   Introduction.**

As explained earlier above, under the *Clabourne v. Ryan* formulation of the *Martinez* rule, "cause" to excuse a procedural default is demonstrated by the showing (1) that his state PCR counsel performed deficiently under *Strickland v. Washington*, 466 U.S. 668 (1984), 745 F.3d at 376, and (2) that ". . . there is a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* at 377. With respect to the second prong; i.e., whether the outcome of the PCR proceedings would have been different, ". . . will require consideration of the underlying claim of ineffective

97

assistance by sentencing counsel and the questions of whether sentencing counsel performed deficiently, and (b) whether there was a reasonable probability that . . . the result of the sentencing proceedings would have been different." *Id.* at 382. In light of this pass-through requirement, in Section IV above, Jones has already laid out a colorable claim, demonstrating that his trial counsel's performance was constitutionally deficient during the sentencing phase, which was prejudicial to the outcome of the sentencing proceedings. This means Jones has satisfied the second prong of the *Clabourne* test by demonstrating that the outcome of his PCR proceedings would have been different.

Accordingly, a single issue remains: whether PCR counsel's performance was deficient under *Strickland*; and as explained at pages 4-5 above, "[a]t this stage, [Jones] . . . only needs to allege a *colorable* claim for relief." *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (emphasis in original). For the reasons explained below, Jones has satisfied this review standard.

**B.   Respondents fail to rebut the showing that Jones' PCR counsel performed deficiently under *Strickland*, when he failed to investigate and present a substantial claim that the sentencing phase performance of trial counsel was constitutionally deficient.**

**1.   Respondents have applied an incorrect standard to the assessment of PCR counsel's performance.**

We have already explained above, that Respondents adopted an incorrect standard to the assessment of whether PCR counsel's deficient performance caused the default of the guilt phase ineffective assistance claim against trial counsel. (*See*

98

Section III(B)(1)). What we said there applies equally to the sentencing phase. Therefore, for the reasons explained in Section III(B)(1), Respondents applied an incorrect standard to the assessment of whether PCR counsel's deficient performance caused the default of the sentencing phase ineffective assistance claim against trial counsel. This means that Respondents' entire analysis is defective and must be disregarded.

> **2.      PCR counsel's failure to conduct any investigation during the PCR proceedings, save an alleged interview of Rachel's mother, was objectively unreasonable and not supported by reasonable professional judgment.**

In Section III(B)(2), Jones showed that the Respondents failed to rebut the showing of PCR counsel's deficient performance with respect to his failure to present the guilt phase claim of ineffective assistance against trial counsel. The same reasoning applies to the assessment of PCR counsel's deficient performance in connection with his failure to present the sentencing phase claim against trial counsel. Therefore, for the reasons set forth in Section III(B)(2) and in the Supplemental Brief, at 152-55, the Court should find that Jones has presented a colorable claim that PCR counsel's failure to present the sentencing phase claim against trial counsel was a result of PCR counsel's deficient and objectively unreasonable performance under *Strickland*.

**VI.** **Respondents have failed to rebut Jones' showing that he is entitled to expansion of the record, discovery and an evidentiary hearing.**

    **A.** **Jones has presented colorable claims, and is he entitled to a hearing.**

Jones has presented colorable allegations, supported by a well-documented record, that make out colorable claims, demonstrating that trial counsel and PCR counsel were ineffective. Jones is entitled to factual development of these colorable claims and a hearing. *Earp*, 431 F.3d at 1170. An evidentiary hearing is required to allow a petitioner to prove his claim, "if the [petitioner has presented a colorable claim by] alleg[ing] facts, that if proven, would entitle him to habeas relief. *Id.* (quoting *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004)). Jones' submissions to the Court satisfy this colorable claim requirement with respect to his claims against both trial counsel and PCR counsel. Therefore, Jones' claims are not subject to summary dismissal, and he is entitled to a hearing. *Id. See also Detrich*, 740 F.3d at 1246-47 (district court should hold evidentiary hearing where appropriate to determine whether there was cause under *Martinez* for state-court procedural default and to determine, if default is excused, whether there has been trial-counsel ineffective assistance of counsel) (plurality opinion).

    **B.** **28 U.S.C. § 2254(e)(2) does not apply to limit expansion of the record, discovery, other evidentiary development, or a hearing on the merits of the claims against trial counsel.**

Respondents make a single concession regarding evidentiary development. They concede that Jones should be able to supplement the record with the exhibits

supporting his *Martinez* claim, to show that there is "cause" to excuse procedural default of his claims against trial counsel. (Dkt. 175 at 66.) However, they argue that this evidence is only admissible to prove "cause" to excuse procedural default and that the evidence may <u>not</u> be considered as proof of the merits of the underlying claims against trial counsel. This is plainly wrong. As explained below, (1) if Jones is <u>not</u> at fault for failing to bring the claims in state court, and consequently he is excused from procedural default under *Martinez*, then (2) he must also be deemed <u>not</u> at fault for having failed to develop the factual basis of the same claim under § 2254(e)(2). This conclusion is compelled by the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 420 (2000).

*Williams* settled that for a petitioner to be held at fault for the "failure to develop" the factual basis of a claim in state court under § 2254(e)(2), there would need to be proof of a petitioner's lack of diligence. 529 U.S. at 435-37. *Williams* also equated the diligence needed to excuse factual development of a claim in state court with diligence needed to excuse the failure to bring the claim in state court in the first instance. *Id.* at 433-34. In other words if a Petitioner has shown he is not at fault for failing to bring a claim and thus excused from procedural default, then he is not at fault for failing to develop that same claim under § 2254(e)(2). *Id.* at 444-45.

In *Williams*, the petitioner established that during the state court proceedings there had been concealment of juror misconduct and that consequently the petitioner was not reasonably able to discover the claim until his federal habeas proceedings. *Id.* at 442. The Court held that because petitioner was not at fault (not lacking in diligence), the claim was not subject to any prohibition on evidentiary development under § 2254(e)(2). *Id.* at 442-43. However, the Court also held that the same reasoning would excuse procedural default caused by the failure to bring the claim in state court in the first instance. *Id.* at 444-45.

It is only logical that a petitioner who has shown "cause" to excuse the failure to bring a claim in state court, which amounts to a showing of cause to excuse procedural default, has also by definition shown "cause" to excuse failure to develop that same claim within the meaning of § 2254(e)(2). This is the essence of the *Williams* holding.

Prior to *Martinez*, PCR counsel's fault or lack of diligence was attributable or imputed to the petitioner, which meant that counsel's failure to bring a claim of ineffective assistance against trial counsel would result in an inexcusable procedural default of that claim. 132 S. Ct at 1315. *Martinez* changed the imputation rule. After *Martinez*, PCR counsel's negligence, if it amounted to a *Strickland* violation, would amount to a showing of "cause" to excuse procedural default of a substantial claim of ineffective trial counsel. *Id.* at 1316-17. As

explained above, the showing of "cause" to excuse the failure to bring a claim (i.e., cause to excuse procedural default of a claim), must also excuse failure to develop that claim under § 2254(e)(2). *See Williams, supra.* Here, if Jones is not at fault for failing to bring the claim, and his procedural default is excused under *Martinez*, he is by extension not at fault for failing to develop the claim under § 2254(e)(2). *Id.*; *and see Detrich v. Ryan*, 740 F.3d 1237, 1246-47 (9th Cir. 2013) (en banc) (plurality opinion) (holding that in application of *Martinez*, restrictions on evidentiary development in § 2254(e)(2) do <u>not</u> apply to district court's determination of merits of claims against trial counsel or PCR counsel).[22]

The Court should reject Respondents' argument that § 2254(e)(2) prohibits evidentiary development of the merits of his underlying claims against trial counsel.

## C.   Jones has shown good cause for depositions and discovery.

The parties do not disagree on the governing standard. As explained above, under Habeas Rule 6, when there is "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. at 908-09 (1997); *Sivak v. Hardison*, 658 F.3d 898, 927 (9th Cir. 2011) (there is good cause for discovery

---

[22] Neither of the concurring judges, nor the dissenting judges, disagreed with the plurality on this point.

under Habeas Rule 6 where allegations show reason to believe that petitioner may, if facts are fully developed, be able to demonstrate he is entitled to relief). "Petitioner need not show that the additional discovery would definitely lead to relief. Rather, he need only show good cause that the evidence sought would lead to relevant evidence regarding his petition." *Payne*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000). Jones has clearly satisfied these standards; it is indisputable that he has made a quintessential showing that there is reason to believe that he may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. Likewise, he has shown good cause that the evidence sought would lead to relevant evidence regarding his petition.

### 1.    Depositions.

Jones has requested depositions of (1) trial counsel, (2) PCR counsel, (3) lead case detective Pesquiera, (4) supervising detective O'Connor, (5) participating investigating detective Ruelas and (6) the medical examiner, Dr. Howard.

Because trial counsel have previously consented to interview, Jones withdraws the request for deposition of trial counsel at this time. However, PCR counsel has refused to communicate with Jones' habeas counsel. Jones has shown good cause for deposition of PCR counsel, not only because he has refused to communicate, but also because Jones has made the threshold showing (1) that if the facts are fully developed, he may be able to demonstrate that he is entitled to

relief, and (2) that the evidence sought would lead to relevant evidence regarding his petition. Clearly, PCR counsel has evidence (and he is the likely repository of concessions) that would be relevant to the proceedings, and prudence dictates his deposition be taken to narrow the issues to be addressed at an ultimate hearing.

Under the same standards, Jones has shown good cause for depositions of the investigating detectives. In particular, Detective Pesquiera, was never cross-examined regarding the deficiencies of her blood interpretation evidence, and there is every reason to believe that she would now be forced to make concessions in light of the exposed clear flaws in her testimony.

Further, in aid of this Court's ultimate analysis of what Jones' jury would have done and whether there is a reasonable probability that Jones may have been acquitted, the Court should have the benefit of the cross-examination of lead detective Pesquiera addressing all of the flaws in her investigation, that the jury would have heard at Jones' trial, had he been represented by competent counsel.[23]

By the same standard, Jones should be permitted to depose Dr. Howard. He also was not cross-examined on the relevant subject matter; i.e., with respect to the obvious errors, if not outright falsehoods in his testimony. There is good cause for Howard's deposition within the meaning of Rule 6.

---

[23] Similarly, as explained in the Supplemental Brief, former investigator Ruelas and the supervising investigator should be held to account for missing investigative reports  that likely contained exculpatory information; and separately O'Connor should be cross-examined with respect to all the flaws in this murder investigation.

Finally Jones submits that the requested depositions may facilitate the settlement of this matter, saving this Court's precious judicial resources.

### 2. Documents.

Jones has shown Rule 6 good cause for his document discovery requests. Jones requested the Pima County Sheriff's Department file, the Pima County Attorney's file, and the Pima County Medical Examiner's file. There is every reason to believe that the requested documents would lead to relevant evidence regarding his petition.

## VII. Conclusion.

For all the reasons set forth above, Mr. Jones requests that the Court find he has presented colorable allegations that his trial counsel performed deficiently during the guilt and sentencing phases of his capital proceedings, prejudicing the outcome of those proceedings. Further, Mr. Jones requests the Court find that he has presented colorable allegations that his PCR counsel performed deficiently, prejudicing the outcome of those proceedings. The Court should find that Mr. Jones has made a colorable showing of "cause" to excuse procedural default sufficient to mandate a hearing. It is further requested that the Court grant the discovery and depositions sought above, that the Court permit the supplementation of the record with the proffered exhibits and records, and that the Court grant Jones an evidentiary hearing so that he can prove cause and prejudice and his right to relief on the ultimate merits of his claims.

RESPECTFULLY SUBMITTED this 8th day of September, 2015.

JON M. SANDS
Federal Public Defender
Cary Sandman
Sarah Stone
Assistant Federal Public Defenders

/s/*Cary Sandman*
Cary Sandman
Counsel for Petitioner, Barry Jones

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2015, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrant(s):

Lacey Stover Gard
Assistants Attorney General
Office of the Attorney General
Capital Litigation Section
200 W. Congress, Ste. S-315
Tucson, Arizona  85701

Jeffrey Sparks
Assistant Attorney General
Office of the Attorney General
Capital Litigation Section
1275 W. Washington
Phoenix, Arizona  85007

By: /s/ *Tamelyn McNeill*