**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Barry Lee Jones,

            Petitioner,

v.

Charles L. Ryan, et al.,

            Respondents.

No. CV-01-00592-TUC-TMB

DEATH PENALTY CASE

**ORDER**

This matter is before the Court on limited remand from the Ninth Circuit Court of Appeals. (*See* Doc. 158.)[1] The court of appeals has ordered this Court to reconsider, in the light of intervening law, including *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), Petitioner's claim of ineffective assistance of counsel ("IAC") in failing to conduct an adequate investigation at the guilt and penalty phases of trial ("Claim 1D").[2]

This Court ordered supplemental briefing to address whether cause exists under *Martinez* to excuse the procedural default of Claim 1D, and whether Petitioner is entitled to habeas relief under 28 U.S.C. § 2254 on the claim. (Doc. 161.) The Court also ordered Petitioner to include any requests for evidentiary development with the supplemental

---

[1] "Doc." refers to numbered documents in this Court's case file (prior to August 2005) and this Court's electronic case docket (beginning August 2005).

[2] This Court previously addressed a narrow subset of Claim 1D—the allegation of ineffectiveness based solely on counsel's failure to meet with Petitioner a sufficient number of times to prepare an adequate defense—and denied this portion of the claim on the merits. (Doc. 141 at 24.) That portion of Claim 1D is not at issue in this limited remand.

briefing. (*Id.*)

Petitioner filed a supplemental brief addressing the applicability of *Martinez* to Claim 1D, arguing that post-conviction counsel acted ineffectively in litigating claims against trial counsel in state court, and requesting evidentiary development and an evidentiary hearing on the procedural default of these claims. (Doc. 167.) Respondents filed a response, and Petitioner filed a reply. (Docs. 175, 180.) For the reasons set forth below, the Court finds that an evidentiary hearing is necessary to determine whether Petitioner can establish cause to excuse the procedural default of Claim 1D.

## PROCEDURAL BACKGROUND

On April 14, 1995, Petitioner was convicted of one count of sexual abuse, three counts of child abuse, and felony murder. *State v. Jones*, 188 Ariz. 388, 391, 937 P.2d 310, 313 (1997). The convictions were predicated on the physical and sexual injuries inflicted on four-year-old Rachel Gray, and the failure to obtain medical care for her injuries, which led to her death. The trial judge found the existence of two aggravating factors: that the murder was especially cruel and that the victim was under the age of 15. The judge found no mitigating factors sufficiently substantial to call for leniency, and sentenced Petitioner to death for the murder conviction. The Arizona Supreme Court affirmed Petitioner's convictions and sentences. *Jones*, 188 Ariz. 388, 937 P.2d 310. Petitioner filed a petition for post-conviction relief ("PCR") with the trial court. After an evidentiary hearing, the PCR petition was denied in its entirety. (ROA-PCR 31.)[3] The Arizona Supreme Court summarily denied Petitioner's Petition for Review. (PR 7.)

Petitioner initiated this federal habeas proceeding on November 5, 2001 (Doc. 1), and filed an amended petition on December 23, 2002, raising 21 claims. (Doc. 58). In

---

[3] "ROA-PCR" refers to the docket numbers from the one-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-01-0125-PC); "PR" refers to the docket numbers of documents filed at the Arizona Supreme Court for that petition for review proceeding. "RT" refers to the reporter's transcripts from Petitioner's state court proceedings. The state court original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on December 12, 2001. (Doc. 16.)

Claim 1D of the petition, he alleged, in part, that counsel was ineffective for:

> 1)   failing to adequately investigate potential other suspects and crucial witnesses; failing to raise legal challenges to eyewitness identifications; and failing to adequately challenge blood-spatter testimony;

> 2)   failing to hire a forensic pathologist to challenge the State's evidence regarding the nature and timing of the victim's injuries; and

> 3)   failing to have a qualified mental health expert examine Petitioner before sentencing; failing to adequately explain the effect of Petitioner's drug addiction to the sentencing court; and failing to investigate and present mitigating evidence of Petitioner's social history.

(*Id.* at 37–96.) The parties briefed the claims (Docs. 69, 79) and motions for evidentiary development (Docs. 89, 90, 101, 102, 108, 109, 113). Petitioner asserted PCR counsel's ineffectiveness as cause to excuse the procedurally defaulted portion of Claim 1D. (Doc. 79, at 25, 60–62.) This Court determined, consistent with then-governing Supreme Court precedent, *see Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), that PCR counsel's purported ineffectiveness did not constitute cause for the procedural default because "there is no constitutional right to counsel in state PCR proceedings." (Doc. 115, at 9–11.) The Court ordered supplemental briefing regarding Petitioner's allegation that it would be a fundamental miscarriage of justice not to review on the merits the entirety of Claim 1D. (*Id.* at 40.) The Court denied relief on September 29, 2008, concluding that Petitioner had not satisfied the fundamental miscarriage of justice standard to overcome the default of Claim 1D. (Doc. 141 at 23.)

While Petitioner's appeal from this Court's denial of habeas relief was pending, the Supreme Court decided *Martinez v. Ryan*, holding that where IAC claims must be raised in an initial PCR proceeding, failure of counsel in that proceeding to raise a substantial trial IAC claim may provide cause to excuse the procedural default of the claim. 132 S. Ct. at 1320. Subsequently, Petitioner moved the Ninth Circuit to stay his appeal and grant a limited remand in light of *Martinez*. The Ninth Circuit granted the motion and remanded for reconsideration of Claim 1D, stating that "Claim 1D is for purposes of remand substantial." (Doc. 158) (citing *Martinez*, 132 S. Ct. 1309; *Trevino v. Thaler*, 133 S. Ct. 1911 (2013); *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc);

1    *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc)).

2    In September 2015, the parties completed supplemental briefing in this Court.

3    ## DISCUSSION

4    Petitioner seeks reconsideration based on *Martinez* for allegations in Claim 1D

5    that trial counsel was ineffective for: (1) failing to investigate and present evidence to test

6    the veracity or reliability of any of the State's evidence, including the medical evidence

7    and the question of the timeline between injury and death; and (2) failing to conduct a

8    reasonably sufficient mitigation investigation for sentencing.[4]

9    To establish cause to excuse the default of Claim 1D, Petitioner argues that PCR

10   counsel performed deficiently within the meaning of *Strickland v. Washington*, 466 U.S.

11   668 (1984), when he failed to investigate and present a substantial claim that the guilt

12   phase and sentencing phase performance of trial counsel was constitutionally deficient.

13   (Doc. 167 at 141–156.) Respondents assert that Petitioner has not shown that PCR

14   counsel was ineffective in failing to raise Claim 1D because PCR counsel raised multiple

15   IAC claims and attempted to obtain additional resources. Respondents also argue that

16   Claim 1D fails on the merits and therefore Petitioner cannot establish cause under

17   *Martinez* because he was not prejudiced by PCR counsel's performance as there was no

18   "reasonable probability that, absent the deficient performance, the result of the post-

19   conviction proceedings would have been different." (Doc. 175 at 14) (quoting *Clabourne*

20   *v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v.*

21   *Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc)). After due consideration the Court

22   finds that an evidentiary hearing is necessary to determine whether Petitioner can

23   establish cause to excuse the procedural default of Claim 1D.

24   **I.    Applicable Law**

25   Because the doctrine of procedural default is based on comity, not jurisdiction,

26   ───────────────

27   [4] Hereafter, the Court will refer to this portion of Claim 1D alleging trial counsel was
28   ineffective for failing to investigate and present evidence in the guilt-phase and
     penalty-phase of trial as two separate sub-claims: "Claim 1D (Guilt Phase)" and "Claim
     1D (Penalty Phase)," respectively.

federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, habeas review of a defaulted claim is barred unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. In *Coleman*, the Court held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court established a "narrow exception" to the rule announced in *Coleman*. The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino*, 133 S. Ct. at 1918 (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding") (quoting *Martinez*, 132 S. Ct. at 1318–19, 1320–21).

Accordingly, under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance claim, "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . . ,' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.' " *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne*, 745 F.3d at

377; *Dickens*, 740 F.3d at 1319–20; *Detrich*, 740 F.3d at 1245.

In *Clabourne*, the Ninth Circuit summarized its *Martinez* analysis.[5] To demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must make two showings.

> First, to establish 'cause,' he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland. Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different.

*Clabourne*, 745 F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. Second, "to establish 'prejudice,' the petitioner must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

Under *Martinez*, a claim is substantial if it meets the standard for issuing a certificate of appealability. *Martinez*, 132 S. Ct. at 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). The United States Supreme Court has defined "substantial" as a claim that "has some merit." *Martinez*, 132 S. Ct. at 1318. Stated inversely, a claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Martinez*, 132 S. Ct. at 1319.

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland*, 466 U.S. at 674. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

---

[5] Though Petitioner and Respondents take issue with this methodology, both parties agree it is binding on this Court.

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* The court "cannot 'second-guess' counsel's decisions or view them under the 'fabled twenty-twenty vision of hindsight.'" *Edwards v. Lamarque*, 475 F.3d 1121, 1127 (9th Cir. 2007) (quoting *LaGrand v. Stewart*, 133 F.3d 1253, 1271 (9th Cir. 1998)). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## II.     Claim 1D (Guilt Phase)

Petitioner alleges his Sixth Amendment right to effective assistance of counsel was violated by trial counsels' failure to conduct a sufficient trial investigation and for inadequately investigating the police work, medical evidence, and timeline between Rachel's fatal injury and her death.  Petitioner further alleges that post-conviction counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present this substantial IAC claim, thus excusing its procedural default.

### A.     Relevant Facts

This Court previously summarized the facts relevant to Claim 1D (Guilt Phase) in its Order finding that Petitioner's new evidence was insufficient to demonstrate a

fundamental miscarriage of justice to excuse the procedural default of the claim. Therefore, most of the factual background, as well as much of the new evidence, set forth herein repeats what has previously been set out in the Court's September 2008 order addressing Claim 1D. (*See* Doc. 141 at 9–16.)

The main thrust of the prosecution's case against Petitioner had been that Rachel was solely in his care on the afternoon of May 1, 1994, when her injuries, including the fatal abdominal injury, were inflicted. The State argued that no other adult had the opportunity to inflict the injuries, which the experts deemed non-accidental. Petitioner's defense was that he had no motive to commit the crime, the evidence was all circumstantial, and the State failed to prove beyond a reasonable doubt that he had inflicted the injuries.

Rachel's body was examined by Steven Siefert, an emergency room doctor; by Sergeant Sonya Pesquiera of the Pima County Sheriff's Office; and by the medical examiner, John Howard. Dr. Siefert estimated that Rachel had been dead for two to three hours when she was brought to the hospital at 6:16 a.m. on May 2, 1994. (RT 4/6/95 at 77, 80.) Rachel's body was covered with bruises and abrasions, primarily on the front of her body and across her face and forehead, but also on her back, arms, and legs. (*Id.* at 81.)

Rachel had a large bruise on each side of her forehead, as well as intense coloration on the outer edge of her right eye and discoloration below the eyes. (*Id.* at 95–96.) Dr. Howard assessed the purple coloration on Rachel's face as injuries occurring probably one day prior to death, but there was also some green discoloration which would have been present for several days. (RT 4/12/95 at 116.) Rachel had a head laceration, above and behind her left ear, which was one inch long and went down to the skull bone; Dr. Howard assessed it as having been inflicted one to two days prior to death. (*Id.* at 116–17.) Rachel had bruising around the left side of her face and behind her ear, as well as bleeding into both ear drums, consistent with a slap or blow to the side of the head. (RT 4/6/95 at 90–91; RT 4/12/95 at 140–41.) Rachel also sustained internal

bleeding due to blunt force trauma to the back of her neck, as well as diffuse bleeding into the deep layers of her whole scalp. (RT 4/12/95 at 137–38.)

Rachel had four or five small bruises on her right forearm and several on her right hand, as well as six bruises on her left forearm and hand, injuries typically associated with trying to ward off an impact (defensive type wounds). (RT 4/6/95 at 85–87, 88–89; RT 4/12/95 at 39–40, 150–51.) Dr. Howard opined that the bruises and abrasions on her hand and arm were inflicted approximately one day prior to death. (RT 4/12/95 at 113–14.) This included swelling in her left middle finger that indicated injury to bone or ligaments; that injury would have been painful and noticeable within an hour of its infliction. (RT 4/6/95 at 89, 104–05; RT 4/12/95 at 114.) Dr. Howard identified abrasions and contusions on Rachel's right and left thigh, both knees, and her right leg; they varied in appearance from less than a day old to approximately five days old. (RT 4/12/95 at 113.) He indicated that much of the bruising on Rachel's front side was consistent with having been inflicted by knuckles but he could not identify with any particularity what actually was used to inflict the injuries. (RT 4/12/95 at 126, 160.) Rachel had contusions and abrasions on her back, her buttocks, and on the back of her left thigh, which were inflicted within one to two days prior to her death. (*Id.* at 112; RT 4/6/95 at 93.) On her front torso, Rachel had 20 to 30 bruises, large areas of abrasions, and a red bruise area under her right arm. (RT 4/6/95 at 93–94; RT 4/12/95 at 115.) Some of these bruises were recent, within the prior day to two days, while others were of a coloration indicating an origin of several days prior to death. (RT 4/12/95 at 115.) There was a linear bruise pattern to the right of her navel; this injury was consistent with the pry bar found underneath the driver's seat of Petitioner's van but could have been caused by many different objects. (RT 4/12/95 at 78, 128, 160.)

Rachel had blunt force injuries to her labia, bruising and scrapes, and her vagina had a half-inch tear extending down from it. (*Id.* at 134.) The medical examiner determined that the injury to Rachel's genitalia occurred about one day prior to her death. (*Id.* at 133.) These injuries were non-accidental, would have been painful, and were

consistent with penetration or attempted penetration. (*Id.* at 134–36.)

Internally, Rachel had sustained blunt force injury to her abdominal organs, causing a tear of the small bowel, and bruising of the tissues around the small bowel, the wall of the large bowel, and the attachments of the intestine to the back of the abdominal wall. (*Id.* at 141–42.) The rupture of her bowel caused inflammation and irritation of the lining of the abdominal tissues, a condition called peritonitis (*id.* at 145); when this type of damage is not repaired, it causes death over a period of hours to days (RT 4/6/95 at 115). The amount of force required to rupture a healthy bowel is equivalent to a fall from more than two stories, an automobile accident at greater than 35 miles per hour, or a forceful directed blow to the abdomen (*id.* at 113–14; RT 4/12/95 at 151, 153–54); Dr. Siefert did not believe enough force for such an injury could be inflicted by a child under the age of six (RT 4/6/95 at 116). Rachel would have experienced pain at the time of the blunt force injury; Dr. Howard indicated she would then have had continual abdominal pain while Dr. Siefert stated that the pain might decrease initially, but wouldn't go away. (*Id.* at 119; RT 4/12/95 at 146.) Over the next several hours, a person with this condition would lose bowel function causing nausea, vomiting, and dehydration. (RT 4/6/95 at 119–20; RT 4/12/95 at 146.) Dr. Howard opined that the injury was consistent with having occurred concurrent with many of her other injuries, approximately one day prior to death; he stated that the abdominal laceration could have occurred between 2:00 and 6:00 p.m. on May 1. (RT 4/12/95 at 148–49.)

Dr. Siefert opined that Rachel's bruising would have begun to appear within a few hours of infliction, and he assessed that 95 percent of Rachel's injuries had occurred within 12 to 24 hours before her death. (RT 4/6/95 at 121, 128, 103–108, 111, 127; RT 4/12/95 at 94.) Some of the bruises were a few days old, including the bruising beneath Rachel's eyes. (RT 4/6/95 at 103, 105, 111; RT 4/12/95 at 37.) Dr. Siefert thought some of the bruises and the head wound could have been incurred in a fall out of a van, however, he concluded that Rachel had incurred non-accidental trauma possibly at multiple times by multiple mechanisms. (RT 4/6/95 at 128–29, 135; RT 4/12/95 at 35.)

Similarly, the medical examiner explained that the number and multiple locations of the injuries were not consistent with a simple childhood accident, but were consistent with having been beaten. (RT 4/12/95 at 137.) He concluded that the injuries he assessed as being approximately one day old were consistent with having been inflicted between 2:00 and 5:30 p.m. on May 1. (*Id.* at 117.) Dr. Howard determined that Rachel died of blunt abdominal trauma that caused a laceration of the small bowel and that it was a homicide. (*Id.* at 155.)

Joyce Richmond, a former girlfriend of Petitioner's, spent Saturday night, April 30, with Petitioner until approximately 3:00 a.m. (RT 4/11/95 at 135–36.)

Rebecca Lux, Rachel's ten-year-old sister, testified that she had been living with Rachel, her brother, and her mom (Angela Gray) in Petitioner's trailer for a few months up to and including May 1. Petitioner never hit Rebecca, and she never saw him hurt Rachel or her brother. On Saturday night, April 30, Rachel seemed fine and ate dinner. On Sunday morning, May 1, Rebecca, Rachel, and their brother got up early, watched cartoons, and ate lunch until Petitioner got up around 2:30 or 3:00 p.m. She and her brother then asked if they could ride their bikes; later when she put her bike away to go to a friend's house she saw Petitioner and Rachel leave in Petitioner's van three times. Petitioner told her the first time they left that they were going to the store to get some things for dinner; Rachel looked fine after the first and second trip with Petitioner. The last time Petitioner and Rachel left, he told Rebecca they were going to his brother's house. When Rebecca got back from her friend's house around 6:00 or 7:00 p.m., Rachel was on the couch; she was pale, throwing up, her head was bleeding, and she had bruises on her face, hands, and fingers. Petitioner left for a time and when he returned, Rebecca's mother and Petitioner had an argument outside. At some earlier time while they were living with Petitioner, Rachel had acted scared of Petitioner and did not want to be near him. (RT 4/11/95 at 14–81.)

On May 1, the St. Charles family, who lived in a bus at a transient camp, got a visit from Petitioner around noon or thereafter; Ron St. Charles thought Petitioner

seemed angry. (RT 4/12/95 at 7–9, 17.) That same day, Petitioner's neighbor at the Desert Vista trailer park, Michael Fleming, saw Rachel looking sick between 2:00 and 5:00 p.m.; she was pale with dark circles under her eyes, and she looked wet and like she wanted to vomit, but he did not see any blood. (RT 4/7/95 at 164–66, 168, 171–73.) Petitioner, Angela Gray, and the children were supposed to attend Petitioner's nephew's birthday party on May 1, but they never showed up. (RT 4/11/95 at 119–24.)

On May 1, Norma Lopez sent her children Ray and Laura to the Choice Market on Benson Highway at three or four o'clock in the afternoon. When they returned, they told her they had seen a white man with messy brown hair driving a yellow van and hitting a little blond-haired girl in the face and chest and the girl was crying. The next day on the news Ms. Lopez heard that a man had been arrested in relation to the death of a little girl. When she had the children watch the news they identified that person as the man they had seen in the van. (RT 4/7/95 at 4–62.) Nine-year-old Ray Lopez indicated that he had gone to the Choice Market with his twin sister around 5:00 p.m. On the way home, he testified that he saw a white man with bushy hair driving by in a yellow van, hitting a little white girl in the chest with his fist and elbow. He did not see the driver's face, only his hair from behind, but he identified a picture of Petitioner at trial. However, he stated that a photograph of Petitioner's van was not the van he saw because the windows were different. (*Id.* at 4–32.) Ray's sister, Laura Lopez, recalled going to Choice Market on a Sunday and on the way home seeing a white man driving a yellow van. She said the guy was ugly with puffy hair and he was hitting a little white girl on the left side of her face with his elbow and the girl was crying. Laura said she saw them through the front window of the van and could see part of the side of each of their faces. She remembered seeing the man from the van on the news that same day. (*Id.* at 32-46.)

Between 3:15 and 5:00 p.m. on May 1, 1994, Petitioner went into a Quik-Mart on Benson Highway. The store clerk testified that Petitioner got ice and that he was with a little girl who sat on a ledge outside the store. Although a lot of Rural Metro personnel regularly came into the Quik-Mart, the clerk did not notice an EMT treating the little girl

outside the store and believed she would have been aware if that had occurred. (RT 4/7/95 at 142-149, 158–59). At trial, the State contended that Petitioner lied about having Rachel's head wound examined at the fire station by a paramedic. (RT 4/6/95 at 45–46.) Petitioner's counsel countered that Petitioner never said he went to the fire station but that a Rural Metro EMT who happened to be at the Quik-Mart had examined Rachel's head wound. (*Id.* at 71–72.)

On May 1, between 7:00 and 8:00 p.m., Richmond stopped by Petitioner's trailer and saw Rachel on the couch with a bleeding head; she said Rachel did not have bruises on her face or hands. (RT 4/11/95 at 141, 151–53.) Richmond's adult son was at Petitioner's trailer with his mother on the evening of May 1 and saw that Rachel's head was bleeding; he saw no bruising. When he asked, Petitioner stated that he had taken Rachel to the fire department. (*Id.* at 154–65.)

Rebecca woke early in the morning on May 2 and found Rachel in the bedroom doorway; she put her in bed. Rebecca next woke to her mother yelling, and Petitioner and her mother took Rachel to the hospital. (*Id.* at 52-54.) Petitioner took Rebecca and Brandi to the St. Charles's camp around 7:30 a.m. (*Id.* at 55–56, 143; RT 4/12/95 at 10–11.) Law enforcement located Petitioner at St. Charles's camp after 8:00 a.m. on May 2, 1994, and transported him to the Sheriff's Department. (RT 4/6/95 at 167,169, 172.) On the way there, Petitioner was upset, said there was something wrong with his little girl, and asked if they would take him to see her. (*Id.* at 173.)

Blood consistent with having come from Rachel was found on four pillowcases, a wash cloth, a comforter, and a bed sheet found in Petitioner's trailer; the fingertip area, the heal of the hand, and on one side of a glove found on the fence in front of Petitioner's trailer; a Circle K bag, carpet samples, and the front passenger seat's upholstery from Petitioner's van; and blue jeans worn by Petitioner at the time of his arrest. (RT 4/7/95 at 85, 87–89, 107, 108–09, 118, 120–21, 126–27; RT 4/11/95 at 102-107, 109.) A substance consistent with vomit was found on Rachel's pajamas and a sleeping bag. (RT 4/11/95 at 98–99.) There was a trace of blood not further identified on the red T-shirt and boots, but

not the denim jacket, worn by Petitioner at the time of his arrest; no blood was found on the tools from Petitioner's van. (*Id.* at 95, 100–01; RT 4/12/95 at 6 1–62.) On the van carpet between the seats, there appeared to be impression stains (caused by a bleeding wound resting against a surface) where blood had soaked through. On the van's passenger seat and some of the carpet there were spatter stains consistent with a person that has a bleeding injury being struck or shaken causing the blood to spatter out. (RT 4/12/95 at 72-73.)

B.    Analysis

Petitioner contends in Claim 1D (Guilt Phase) that counsel was ineffective for failing to conduct a sufficient trial investigation and for inadequately investigating the police work, medical evidence, and timeline between Rachel's fatal injury and her death. (Doc. 58 at 38–66.) Petitioner further contends the procedural default of this claim can be excused by the deficient performance of post-conviction counsel within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the guilt-phase performance of trial counsel was constitutionally deficient. (Doc. 167 at 144–52.)

Because the Ninth Circuit has already found the remanded claims substantial, "prejudice" under *Martinez* has already been established. (*See* Doc. 158.) Thus, whether this Court can consider the merits of the underlying trial IAC claim turns on whether Petitioner has demonstrated "cause" to excuse the procedural default—that is, whether post-conviction counsel's performance was ineffective under *Strickland*. Determining whether the result of the PCR proceedings would have been different requires consideration of the underlying claim of trial counsel IAC, including whether trial counsel performed deficiently and whether there was a reasonable probability that the result of the trial would have been different. *Clabourne*, 745 F.3d at 382.

For the reasons discussed below, the Court cannot say based on the available record that Claim 1D (Guilt Phase) is plainly meritless or that there is no reasonable probability of a different outcome had PCR counsel presented Petitioner's guilt-phase IAC claim to the state court. Therefore, a hearing is necessary to allow Petitioner an

opportunity to demonstrate "cause"—whether PCR counsel was ineffective—under *Martinez. See Dickens*, 740 F.3d at 1321. Because determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective," *see Clabourne*, 745 F.3d at 377–78, this Court begins its analysis with a look at the strength of Petitioner's guilt-phase IAC claim.

Petitioner's primary argument is that trial counsel failed to conduct any investigation to assess the validity of the State's evidence that Rachel suffered her fatal injury between 2:00 p.m. and 6:00 p.m. on Sunday, May 1, when it is undisputed that Rachel was principally in Petitioner's care. Defense counsel's theory at trial was that the State lacked proof that Petitioner murdered Rachel, and that there was no physical evidence tying Petitioner to the crime. (RT 4/6/95 at 58, 73.) Defense counsel presented no experts of his own, and conducted a weak cross-examination of the State's experts in an attempt to support this argument. Defense counsel was able to establish, through cross examination of Dr. Siefert, that his examination of Rachel's body was fairly cursory, and that her body did not look like it would have at the time of death. (*Id.* at 122, 126.) Dr. Siefert clarified on cross examination that the trauma that produced the majority of bruises would have occurred 12 to 24 hours before the time of death, but agreed that it could have taken several hours for them to actually appear as bruises, and that the appearance of bruises was dependent on many speculative factors. (*Id.* at 127–128.) Defense counsel also confirmed with Sergeant Pesqueira that the vast majority of bruises were caused within the same period of time. (4/12/95 at 94.) Defense counsel was able to elicit that Dr. Howard could not identify, with particularity, the instrument that inflicted Rachel's injuries. (*Id.* at 160.) Sergeant Pesqueira confirmed that numerous objects could have caused the abdominal injury, not just the pry bar. (*Id.* at 89.) Defense counsel was also able to establish that even though Rachel appeared to have injuries that could have been scratches, no fingernail scrapings were taken from Petitioner. (*Id.* at 91, 160.) Critically, defense counsel did not challenge any of the State's experts' conclusions

1    regarding the timing of Rachel's fatal injuries. Petitioner contends that forensic evidence

2    was vital to proving the State's case against Petitioner, and that it was equally vital for

3    defense counsel to understand that scientific evidence and be prepared to challenge it.

4          Petitioner contends that counsel was put on notice for the need to further

5    investigate by: (1) their own independently hired investigator, who, after conducting an

6    initial investigation, informed counsel that he believed Petitioner was innocent and

7    requested additional funds to further the investigation (*see* Doc. 167, Ex. 34 at ¶ 6.); (2)

8    Dr. Howard's pre-trial interview in which he disclosed that he found "microscopic"

9    evidence to put the time of Rachel's scalp injury as "probably two days old" and perhaps

10    "72 hours and older" (*see* Doc. 167, Ex. 11 at 4, 9) and his testimony at Angela Gray's

11    trial which described the autopsy chemistries for both the small bowel and vaginal

12    injuries as most consistent with infliction 24 hours prior to death (*see* Doc. 96, Ex. 9, RT

13    3/28/95 at 99–101); and (3) pre-trial interviews and testimony from Rebecca that

14    Petitioner had only taken two trips with Rachel in his van, and appeared fine after each

15    trip (*see* Doc. 167, Ex. 17 at 6–7; Ex. 18 at 11–12; Doc. 96, Ex. 9, RT 3/24/95 at 69–71).

16          Had counsel retained forensics experts and investigated the State's "time of

17    injury" evidence, Petitioner contends he would have uncovered proof that Rachel's

18    injuries could not have been inflicted any time on May 1. Petitioner asserts that there is

19    no reliable scientific evidence to support the conclusion that any of Rachel's injuries

20    were inflicted on the afternoon of May 1, 1994.[6] Petitioner's support for this argument

21    comes principally from three sources: declarations and reports from Dr. Janice Ophoven,

22    a forensic pathologist, and Dr. Mary Pat McKay, an emergency medicine physician,

23

24

_____

25        [6] In addition to failing to investigate and challenge the State's "time of injury"

26    evidence,  Petitioner also alleges that trial counsel and PCR counsel failed to investigate
    and challenge additional evidence and testimony elicited by the State during Petitioner's

27    trial in support of his conviction, such as blood evidence and eyewitnesses statements.
    Because the Ninth Circuit has already determined that Petitioner's claim is substantial,

28    and this Court has determined that Petitioner's claim is not plainly meritless based on the
    "time of injury" evidence, the Court does not summarize this additional evidence at this
    time.

1   specializing in trauma care (Doc. 167, Exs. 3, 9), and Dr. Howard's testimony from

2   Angela Gray's trial (Doc. 96, Ex. 9).

3        Petitioner submits a declaration and three supplemental reports by Dr. Janice

4   Ophoven. (Doc. 167, Exs. 4–7.) Dr. Ophoven reports that Rachel "died from a ruptured

5   duodenum with subsequent severe dehydration, shock and eventually peritonitis." (*Id.*,

6   Ex. 6 at 3.) Dr. Ophoven explains that, although the initial injury is painful, there can be a

7   recovery from this initial pain within a few hours, and a lack of obvious symptoms

8   thereafter. (*Id.*) A child can be "up and around, able to walk, talk and most importantly

9   drink" with waxing and waning symptoms "until the child slips into a coma." (*Id.*) For

10  this reason, the diagnosis may be delayed for four or five days. (*Id.*) Based on Rachel's

11  post-mortem abnormal chemistries, which showed a diagnostic pattern of dehydration,

12  and her significantly decreased weight, Dr. Ophoven opined that Rachel's bowel

13  laceration had to be present more than 24 hours, and possibly longer than 48 hours prior

14  to her death. (*Id.*, Ex. 7 at 1.) Dr. Ophoven concluded that "[t]he evidence shows that the

15  fatal injuries to Rachel Gray could not possibly have been inflicted on the day prior to her

16  death" and that the "veracity of this evidence is as scientifically precise as any forensic

17  determination available in medical science." (*Id.* at 2) (emphasis omitted). Further, she

18  concluded that the abdominal injury was inflicted significantly earlier than Rachel's

19  vaginal injuries, perhaps even days prior. (*Id.*, Ex. 6 at 3.) More recently, Dr. Ophoven

20  has concluded that the vaginal injury itself did not occur in the few days prior to her

21  death, (*id.*, Ex. 7 at 1), and that "the visual determination of the age of any bruise is

22  scientifically unreliable" (*id.* at 3). Finally, she stated that Rachel was subjected to

23  "multiple episodes of inflicted injury," and opined that Rachel's growth history and

24  multiple bruises were "consistent with a diagnosis of a chronically abused child." (*Id.*,

25  Ex. 6 at 4.)

26        At the request of Petitioner, Dr. McKay reviewed Rachel's case record and

27  medical reports to provide an opinion on the nature of her injuries and their potential

28  etiology as well as the timeline from injury to the appearance of symptoms to death.

(Doc. 167, Ex. 10-B at 1.) Additionally, Dr. McKay performed a review of the literature and identified at least 160 cases of duodenal perforation in children where the timeline was described from injury through diagnosis, treatment, and outcome. (*Id.*) Dr. McKay explained that, following injury, digestive fluids and food enter the duodenum leak into the retroperitoneal space, causing an inflammatory reaction. (*Id.* at 3.) Initially there is pain when the injury occurs, but it may not be significant immediately after that. (*Id.*) As time progresses, adjacent tissues become inflamed, and this continues into peritonitis. (*Id.*) At this time the child's pain will begin to increase and may be quite exquisite, the child will complain and begin to vomit, and ultimately the inflammatory response progresses and becomes systemic and the body begins to shut down. (*Id.*) The child becomes lethargic, then somnolent, and finally breathing slows and the heart stops. (*Id.*) The progression from injury to death in Rachel's case required a significant amount of time, though the exact timing in Rachel's case is not clear. (*Id.*) Dr. McKay found several cases in her literature review where the diagnosis was delayed as long as four to seven days, but even then, with appropriate treatment, the child survived. (*Id.*) Dr. McKay was unable to find any cases of death from an isolated duodenal laceration where death resulted in less than 48 hours, and found nothing in Rachel's medical history to suggest she was somehow more susceptible to early death from this injury. (*Id.*) Dr. McKay did note that it was likely that Rachel was underfed, but that nothing in the autopsy findings or photos suggests she was severely malnourished. (*Id.* at 4.) In Dr. McKay's opinion, Rachel's duodenal injury occurred no sooner than 36 hours prior to death and likely occurred much earlier. (*Id.* at 5.)

Dr. Howard, the medical examiner who testified at trial, submitted a 2004 declaration, in which he indicated that the laceration of Rachel's bowel could have occurred greater than 24 hours before her death, perhaps longer than 48 hours, as delayed onset of symptoms is possible with this type of injury. (Doc. 167, Ex. 1 at 1–2.) Further, Dr. Howard stated that the "injuries to Rachel Gray's vaginal area showed characteristics consistent with hours to perhaps days elapsing between the time of her abdominal injury

- 18 -

and her vaginal injury." (*Id.* at 3.) Similarly, Dr. Howard attested that the older bruises on Rachel's body "could have been consistent with the blunt force trauma to Rachel Gray's abdomen." (*Id.*) Petitioner asserts that the testimony of Dr. Howard at Angela Gray's trial demonstrates that Dr. Howard intentionally concealed two critical facts at Petitioner's trial. First, Dr. Howard testified in Angela Gray's trial that the least amount of time that it would take from the injury until the time of death was 12 hours. (Doc. 96, Ex. 9 at 100.) Petitioner asserts this testimony calls into question his testimony at Petitioner's trial, that the injury could have been inflicted during the hours between 2:00 and 6:00 pm. Second, Petitioner asserts that Dr. Howard concealed that his findings at autopsy were that the fatal injury was "most consistent" with one that was inflicted at least 24 hours prior to death; which proves that the injury could not have been inflicted during the afternoon of May 1. (*See* Doc. 96, Ex. 9, RT 3/28/95 at 101.)

The Court disagrees with this characterization of Dr. Howard's testimony. As previously noted, Dr. Howard has not retracted his testimony that the abdominal injury could have occurred on Sunday afternoon while Rachel was with Petitioner, or "any time on the 24 hours prior" to May 2. (RT 4/12/95 at 148; *see also* Doc. 141 at 17.) Nonetheless, as discussed below, the reports of Drs. Ophoven and McKay establish a colorable claim of IAC.

This Court previously analyzed much of the same new evidence Petitioner presents in his *Martinez* brief, and found that Petitioner failed to establish a fundamental miscarriage of justice under the "exacting" standard of an actual innocence gateway claim.[7] (Doc. 141 at 18.) Specifically, this Court found Dr. Ophoven's testimony was "not enough to demonstrate that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt" because it did not "seriously call into question the jury's verdict." (*Id.*) Nonetheless, this Court did state that Dr. Ophoven's testimony was

---

[7] To demonstrate a fundamental miscarriage of justice based on factual innocence of the murder, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

"compelling and may have been persuasive to some jurors in the first instance." (*Id.* at 22.) Moreover, Petitioner has now presented additional evidence that Rachel's vaginal injury was not inflicted on May 1, and that the reliability of dating injuries from bruises—a premise on which Dr. Siefert based his opinion that 95 percent of Rachel's injuries occurred on May 1—is scientifically unreliable. These facts, if true, challenge this Court's previous conclusion that "Dr. Ophoven does not call into question the trial testimony regarding the time-frame for Rachel's other non-fatal injuries—within one day of her death." (*See* Doc. 141 at 18.) These facts also make Petitioner's theory more, not less, plausible because a juror would not have to believe, as this Court previously found, "that at least two days before her death someone inflicted a fatal abdominal injury on Rachel (and she did not tell anyone) and that the following day she received additional serious injuries and extensive diffuse bruising during the time she was with Petitioner" (*Id.*).

Furthermore, in order to allege a colorable claim entitling Petitioner to an evidentiary hearing on this matter Petitioner must now meet a less demanding standard— he must allege facts that, if proven true, would "show that there was a reasonable probability that . . . the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Court finds that Petitioner has alleged facts, that, if true, could prove that Rachel's fatal injury could not have been inflicted during the afternoon of May 1, and call into question the evidence that the majority of Rachel's other injuries, including her vaginal injury, occurred on May 1. This significantly discounts a central premise the State relied on in arguing Petitioner's guilt, and establishes a reasonable probability of a different outcome during the guilt phase of Petitioner's trial had this evidence been presented.

Petitioner asserts that PCR counsel was also ineffective because, despite being on notice that trial counsel failed to conduct a reasonable investigation, he also failed to

conduct any outside investigation of Petitioner's case, performing only one read through of the file and failing to obtain funds for further investigation because he misunderstood the standards governing application of Arizona's indigent defense investigative assistance statute. Respondents argue that PCR counsel raised several IAC claims in Petitioner's PCR petition, and was granted an evidentiary hearing on several of those claims. Respondents assert that PCR counsel is not required to raise every non-frivolous issue, but can decide which issues to raise, and this Court should presume counsel reasonably omitted Claim 1D because it is not stronger than the claims PCR counsel presented. (Doc. 175 at 13) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Respondents' presumption, however, is not supported by the record. Petitioner has alleged facts that suggest that PCR counsel performed deficiently by failing to conduct any investigation of prior counsels' representation. PCR counsel's billing records provide factual support that PCR counsel only reviewed the record in this case, and conducted no outside investigation, despite being on notice, for the same reasons discussed above in regards to trial counsel, that further investigation may have been necessary to make an informed, strategic choice. (*See* Doc. 167, Ex. 39.) These facts demonstrating the lack of any serious investigation into trial counsel's performance suggest that PCR counsel may not have conducted a strategic "winnowing" of claims, but may have failed to conduct a reasonable investigation in the first instance. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.")

Respondents also assert that because Claim 1D fails on the merits, raising the claim would not have affected the PCR proceeding's outcome. Thus, Respondents conclude, even if PCR counsel performed deficiently, Petitioner has failed to establish cause under *Martinez* because there is "no reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." The Court disagrees. First, as explained above, Petitioner's claim is not plainly

meritless. In weighing the strength of Petitioner's trial counsel IAC claim, prejudice to the outcome of the PCR proceedings has been sufficiently alleged so as to mandate a hearing.

In conclusion, Petitioner has alleged a substantial claim of trial counsel ineffectiveness, thereby demonstrating "prejudice" under *Martinez*. Petitioner's claim is not plainly meritless. Because it is unclear from the record whether PCR counsel was ineffective under *Strickland* for failing to raise the claim in state court, a hearing is necessary to determine whether PCR counsel acted deficiently and whether there is a reasonable probability the result of the PCR proceedings would have been different. Assessing the latter will necessarily entail considering the strength of the defaulted IAC claim. *Clabourne*, 745 F.3d at 377–78.

## III.    Claim 1D – (Penalty Phase)

Petitioner alleges his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to conduct a sufficient mitigation investigation for sentencing. Petitioner further alleges that post-conviction counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the penalty-phase performance of trial counsel was constitutionally deficient, thus excusing the procedural default of this claim.

### A.    Relevant Facts

Following Petitioner's conviction, the trial court held an aggravation/mitigation hearing. Defense counsel presented testimony from a psychologist and six lay witnesses in an effort to establish both statutory and non-statutory mitigating factors. Dr. Joseph Geffen, a psychologist, conducted a mental health evaluation of Petitioner. (RT 6/13/95 at 75.) In preparation for the evaluation Dr. Geffen reviewed materials from Kino Community Hospital, the Pima County Jail, Vision Quest, and Southern Arizona Mental Health Center ("SAMHC"), and videotaped statements made by Petitioner to the police. (*Id.* at 75–79.) Dr. Geffen first discussed the kind of discipline Petitioner received as a child. Petitioner's mother, who had "involved herself in drinking alcohol" and found it

"extremely difficult to discipline" her children, administered "whoopings" to Petitioner. (*Id.* at 80–81.) Dr. Geffen reported Petitioner tended to minimize this experience by stating that it wasn't abuse because he "deserved them." (*Id.*) Dr. Geffen explained that the kind of physical abuse a child receives has an influence on the way that child will relate to other people when they are adults. (*Id.* at 8 1–82.) Dr. Geffen also related that after Petitioner's father died when Petitioner was 11 or 12 years old, he began getting into trouble. (*Id.* at 82.) Dr. Geffen explained that the death of a father at that age would have a serious effect on a child in terms of how that child adjusted to the loss and how the child functions at school, at home, and in relating to other people as an adolescent or as an adult. (*Id.*)

After his father's death, Petitioner was referred to "Vision Quest," a juvenile program, for his incorrigible behavior. (*Id.* at 83.) Dr. Geffen opined that the conclusions he made based on his observations of Petitioner were compatible with those described by a doctor at Vision Quest—Petitioner appeared to have a very low frustration tolerance, was quite impulsive, lacked self-confidence, and had a poor self-image. (*Id.* at 83.) This lack of impulse control, Dr. Geffen concluded, could lead to some "fairly serious problems." (*Id.* at 84.) Dr. Geffen explained that he would expect a youth with Petitioner's problems to display anger and aggressiveness, and to have substance abuse issues. (*Id.* at 84.) Petitioner turned to substance abuse because he had not learned or been taught socially acceptable ways to deal with difficult feelings, emotions, thoughts, and ideas. (*Id.* at 85.)

Next, Dr. Geffen discussed an incident that occurred in 1992, in which Petitioner was referred to SAMHC for treatment after he put a gun to his head and threatened to kill himself and others, was abusing drugs very seriously, particularly cocaine and amphetamines, and had become mentally and emotionally disorganized, confused, depressed, and angry. (RT 6/13/95 at 86–87, 102.) Petitioner was referred to SAMHC for treatment; while there he exhibited similar problems to those documented at Vision Quest, only more severe. (*Id.* at 86.) Petitioner was discharged after a few sessions

because he did not want to comply with the recommendation that he participate in a substance abuse program. (*Id.* at 88.)

Petitioner related to Dr. Geffen that he had been using amphetamines heavily in the six months prior to the murder. (*Id.* at 88–89.) Dr. Geffen explained that amphetamine use arouses physical and mental activity—predominantly uncontrollable, agitated, aggressive, and violent behavior.  (*Id.* at 89.) Additionally, amphetamine use often corresponds to extended periods of little to no sleep, which contributes to loss of control, confusion, irritability, and overreacting to situations with aggression. (*Id.* at 90.)

Petitioner reported numerous head injuries to Dr. Geffen, including an incident where he lost consciousness after being hit in the head with a brick. (*Id.* at 90–91.) Dr. Geffen explained that head injuries can exacerbate problems a person has, making them more vulnerable to situational stress, drugs, or anything requiring the ability to think, reflect and to inhibit certain behaviors. (*Id.* at 91.) These deficits in so-called "executive" or "higher" brain function can occur with or without demonstrable cognitive impairment. (*Id.* at 92.)

Dr. Geffen noted that while incarcerated, Petitioner was receiving an antipsychotic medication, used primarily in cases where a person is agitated and possibly having psychotic thoughts. (*Id.* at 92–93.) Petitioner received the medication because he was quite agitated, difficult to manage, and was expressing feelings of suicide and homicide. (*Id.* at 95–96.)

Dr. Geffen concluded that Petitioner has "several problems," and one way they manifest themselves is in antisocial behavior. (*Id.* at 96.) Dr. Geffen testified that Petitioner's mental health problems originated at about the time of the loss of his father. (*Id.* at 97.) Without a very clear adult authority model, he used drugs and sought acceptance and "good feelings" from his peers, the effect of which was "ruinous in terms of his self-esteem in terms of him just plain simply learning adaptive mechanisms to be able to survive in society and be a successful citizen." (*Id.*) Petitioner's prolonged use of substances "generated new problems" in terms of preventing him from learning how to

solve problems, cope with difficult situations, and deal with strong emotions properly. (*Id.* at 97–98.) Though he concluded that Petitioner was legally sane, Dr. Geffen believed that Petitioner was unable to apply right and wrong the way a normal person would. (*Id.* at 98.) In other words, "he should not have been expected nor is he capable of functioning normally in conforming to society." (*Id.* at 99.)

Defense counsel presented testimony from Ronny Higgins, a former methamphetamine user and a resident and substance abuse counselor at Amity House, a drug treatment program. (RT 6/13/95 at 127–28, 136.) Higgins spoke with Petitioner in an effort to determine if Petitioner was truly a methamphetamine user. (*Id.* at 129.) After speaking with Petitioner, Higgins concluded that he was a heavy methamphetamine user and addict, to the extent he would go on week-long "runs," where he used methamphetamine for a period of up to six days without sleep. (*Id.* at 130.) Higgins opined that if Petitioner slept for approximately 18 hours just prior to the murder, that indicated he was just coming down off of a run, and had probably used within 26 hours. (*Id.* at 131.) In Higgins' experience, a person coming down off of a run is very irritable, aggressive and violent. (*Id.* at 132–33.) Higgins believed it was not realistic to expect someone to stop using methamphetamine without support. (*Id.* at 135.)

Counsel presented testimony from Florence Jones, Petitioner's mother. Florence had an older son from a previous marriage, and had three sons, including Petitioner's twin, Larry, with her second husband. (RT 6/13/95 at 47–48, 59.) The marriage had its "ups and downs"; Florence recalled two "pretty bad fights" with her husband in front of the kids and recalled that one time, after her husband came home drunk, she stabbed him in the back with a paring knife. (*Id.* at 158–59.)

Of the twins, Petitioner developed normally and was the "happy-go-lucky" child, while Larry was "a little more serious." (*Id.* at 52-53.) As a young child, Petitioner received average grades, was never tested to see if he had any kind of learning problem, and behaved appropriately at school. (*Id.* at 55–56.) Florence was responsible for disciplining the children, and would use a switch or belt to give spankings or whippings a

"[c]ouple of times a month" and smacked the children "occasionally." (*Id.* at 60–61.) When Petitioner was 11 or 12 the family moved from Georgia to Arizona, and at that time Petitioner started getting into trouble at school. (*Id.* at 64, 66.) Florence continued to punish Petitioner by taking away privileges and hitting or whipping him when he needed it. (*Id.* at 66.) Florence did not recall Petitioner ever suffering any kind of head injury or being knocked unconscious. (*Id.* at 70.) The school recommended mental health services for Petitioner, but his father did not permit him to see anyone. (*Id.*)

When Petitioner's father's health began to decline, Petitioner started doing poorly in school. (RT 6/13/95 at 142.) Florence started receiving reports of serious problems a few months after Petitioner's father died, when Petitioner was about 15 years old. (*Id.* at 141, 143.) She became aware of Petitioner's use of marijuana around the same time. Florence did not recall any indication that Petitioner had any mental problems, but at the time she was drinking excessively. (*Id.* at 146.) Shortly after that he was sent to Vision Quest because he wouldn't mind and was getting into trouble with the police. (*Id.* at 143–44.)

After Petitioner left Vision Quest, at age 18, he lived on his own and was able to maintain a job "[o]ff and on." (RT 6/15/95 at 150.) In 1986 he married Carol, the father of his two children. (*Id.* at 153.) The couple lived with Florence for a time when Carol was first pregnant, and moved out when his daughter was three years old. (*Id.* at 154.) During the time Petitioner was with Carol, Florence did not notice that he had any problems and heard no complaints of domestic violence. (*Id.* at 154.) Petitioner did use marijuana, but it made him calmer. (*Id.* at 155.) Florence did not recall seeing Petitioner spank or act inappropriately with the children, and had never heard that Petitioner was mistreating anyone in his family. (*Id.* at 163.) At some point, the couple separated because Petitioner was having relations with other women; Carol took the children and Petitioner "more or less went crazy." (*Id.* at 157–58, 161.)

Deborah Wheeler, a detention officer for the Maricopa County Sheriff's Department, was married to Petitioner's older brother Otis and met Petitioner around

1977. (*Id.* at 170–71.) Although most of Wheeler's relationship with Petitioner was before he became a father, Wheeler had an opportunity to observe Petitioner with his children, and described him as a very good father. (*Id.* at 172–73.) Petitioner had a good relationship with Wheeler's children, and was very respectful around Wheeler. (*Id.* at 174.)

Dennis Hatt, a mechanic and former manager at a Chevron station where Petitioner worked for a year and a half, testified that Petitioner was a good, dependable, and respectful employee. (RT 6/13/95 at 15–17.)

Petitioner's girlfriend, Joyce Richmond, and her teenage daughter, lived with Petitioner and his daughter in his trailer on Benson Highway for approximately a year. (*Id.* at 178–81.) She moved out approximately three to four months before he was arrested. (*Id.* at 180.) Petitioner had responsibility for disciplining both girls when they were together. (*Id.* at 181.) The harshest discipline he handed out was to ground them to their rooms for 15 minutes. (*Id.* at 181–82.) Petitioner never hit or treated either girl inappropriately. (*Id.* at 182.) Richmond was aware that Petitioner was using methamphetamine during the time they were together. When he used he would stay up for three or four nights in a row, then sleep all night and most of the day. (*Id.* at 183–84.) When Petitioner was using, Richmond didn't notice any change in his behavior; he had a lot of hobbies and home projects he would do all night long, but he was never mean. (*Id.* at 185–186.) She saw him using methamphetamine on Saturday night prior to the murder. (*Id.* at 188.) She knew he had methamphetamine on Friday night, but couldn't tell if he was using it because, other than sleeping, he never acted any different when he was using. (*Id.* at 189.)

LeAnne Jones, Petitioner's sister-in-law, met Petitioner when she worked at a Chevron station where Larry worked. (*Id.* at 193–94.) Petitioner and his daughter lived with LeAnne and Larry, and LeAnne's two daughters, ages seven and nine, from approximately late 1992 to early 1994. (*Id.* at 195–96.) When he disciplined any of the children he would yell at them to behave, or talk to them. (*Id.* at 197–98.) He never

spanked the children, and they never complained that he was inappropriate with them. (*Id.* at 198.) LeAnne was aware that Petitioner used methamphetamine; when he did he seemed more "antsy, busy. In a hurry." (*Id.* at 202–03.) He would sit and "mess with his keys and locks and stuff" or play Nintendo for three or four days in a row. (*Id.* at 203.) On the Saturday before the murder, Petitioner and Ron St. Charles had stopped by LeAnne's house in the afternoon to use methamphetamine. (*Id.* at 207–08.)

###### B.   Analysis

Petitioner contends in Claim 1D (Penalty Phase) that counsel was ineffective at sentencing for failing to investigate and present reasonably available and compelling mitigation evidence. (Doc. 58 at 66–96.) Petitioner asserts that, but for counsel's failure to investigate Petitioner's mitigation, a substantial body of mitigating evidence could have been presented to the sentencing court in order to provide a complete picture of Petitioner's troubled childhood, mental impairments, and battle with addiction. (Doc. 167 at 111.) Petitioner further contends that post-conviction counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present a substantial claim that the penalty-phase performance of trial counsel was constitutionally deficient. (*Id.* at 152–155.)

Because the Ninth Circuit has already found the remanded claims substantial, "prejudice" under *Martinez* has been established. (*See* Doc. 158.) Thus, whether this Court can consider the merits of the underlying trial IAC claim turns on whether Petitioner has demonstrated "cause" to excuse the procedural default—that is, whether post-conviction counsel's performance was ineffective under *Strickland*. The Court concludes that Petitioner's underlying IAC claim does have some factual support, and its proper outcome is sufficiently debatable at this stage to warrant further proceedings. Because the Court cannot say based on the available record that Claim 1D (Penalty Phase) is plainly meritless or that there is no reasonable probability of a different outcome had PCR counsel presented Petitioner's penalty-phase IAC claim to the state court, it determines that a hearing is necessary to allow Petitioner to demonstrate "cause"

under *Martinez. See Dickens*, 740 F.3d at 1321.

"Counsel have a duty to make a reasonable investigation such that they are able to make informed decisions about how best to represent their clients," *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999), and are tasked with attempting to discover "'all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (emphasis in original) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c), p. 93 (1989)); *see also Caro*, 165 F.3d at 1227 ("It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase."). The failure to investigate a defendant's organic brain damage or other mental impairments may constitute ineffective assistance of counsel. *See Caro*, 165 F.3d at 1226. Petitioner asserts that a proper investigation by trial counsel would have revealed a substantial body of mitigating evidence that could have been presented to the sentencing court in order to provide a complete picture of Petitioner's mental impairments, difficult childhood, and drug addiction.

In support of his contention that trial counsel inadequately investigated Petitioner's mental impairments, he proffers new evidence from Dr. Alan Goldberg, a neuropsychologist, and Dr. Pamela Blake, a neurologist. (Doc. 167, Exs. 42–43.) Dr. Goldberg conducted a neuropsychological evaluation of Petitioner and reported abnormalities of frontal lobe brain function and right hemisphere motor and sensory function, evidence of a seizure disorder, and Attention Deficit Disorder. (Doc. 167, at 112, *id.*, Ex. 42.) Dr. Goldberg recommended a full neurological and psychiatric evaluation. (Doc. 167, Exhibit 42 at 8.)

Dr. Blake performed a neurological evaluation of Petitioner. She stated that many of Petitioner's behavioral traits "can be attributed to a certain pattern of neurologic dysfunction." (Doc. 167, Ex. 43 at 10.) Dr. Blake also noted indications of frontal lobe damage. (*Id.* at 11.) She concluded that Petitioner "almost certainly would have fulfilled the diagnostic criteria for Attention Deficit Disorder with Hyperactivity." (*Id.* at 10.)

Finally, Dr. Blake noted that Petitioner's history suggests marked impairment in all areas of executive function. (*Id.*) Dr. Blake explained that individuals with impairments in executive function, or frontal lobe function in general, may demonstrate distractibility, impulsivity, lack of guilt or shame, lability of mood, low frustration tolerance, periodic affective disorder such as depression or anxiety, rigidness of thought, concreteness, the inability to change set (perseveration), poor planning, poor concentration and attention, poor language function, difficulty regulating behavior, and the inability to recognize social cues. (*Id.*)

In support of his assertion that counsel failed to investigate and explain the effects of Petitioner's long-term methamphetamine abuse, Petitioner offers the opinion of Dr. Lawson Bernstein, a licensed psychiatrist with a consulting practice in substance abuse. (Doc. 167 at 114.) Dr. Bernstein reviewed records and conducted an evaluation of Petitioner, and concluded that Petitioner had a severe methamphetamine addiction and was suffering from acute amphetamine withdrawal at the time of the offense, which would have depleted his brain of key chemicals involved in the maintenance of normal neurological, cognitive, and emotional states. (*Id.*, Ex. 44 at 1, 5.) Dr. Bernstein opined that Petitioner would have had no ability to control his methamphetamine abuse prior to his incarceration. (*Id.* at 6.) Dr. Bernstein also suggested it was possible that Petitioner's brain damage was due to fetal alcohol exposure, in addition to toxic chemical exposure as an iron worker and mechanic. (*Id.* at 1, 6.)

Finally, Petitioner asserts that, had counsel interviewed family members, they would have realized that the picture painted by Petitioner's mother was "at best gross minimization" but more realistically "an outright falsehood" and that Petitioner grew up in an alcoholic, abusive, and dysfunctional household. (Doc. 167 at 118.)

Petitioner asserts that PCR counsel was also ineffective because, in addition to the deficiency noted above in relation to the guilt-phase portion of the claim, PCR counsel failed to obtain funding for a mitigation expert, failed to recognize the need and seek funds for mental health experts, and failed to interview trial counsel.

Petitioner has alleged a substantial claim of ineffectiveness, thereby demonstrating "prejudice" under *Martinez*. However, because it is unclear from the record whether PCR counsel was ineffective under *Strickland* for failing to raise the claim in state court, a hearing is necessary to determine whether PCR counsel acted deficiently and whether there is a reasonable probability the result of the PCR proceedings would have been different. Assessing the latter will necessarily entail considering the strength of the defaulted IAC claim. *Clabourne*, 745 F.3d at 377–78.

## IV.    Evidentiary Development

Petitioner seeks evidentiary development in the form of expansion of the record and authorization of discovery, and also requests that the Court grant an evidentiary hearing to prove the merits of the elements of "cause and prejudice," as well as the merits of the claims against his trial counsel. (Doc. 167 at 156–78.)

Petitioner seeks to expand the record under Rule 7 of the Rules Governing Section 2254 Cases, to include all of the Exhibits (Doc. 167, Exs. 1–82) cited in his supplemental *Martinez* brief in support of Claim 1D. Respondents concede that Petitioner should be allowed to supplement the record with the exhibits supporting his *Martinez* claim, to show that there is "cause" to excuse procedural default of his claims against trial counsel. (Doc. 175 at 66.) The evidentiary limitations described in *Cullen v. Pinholster,* 563 U.S. 170 (2011),[8] do not apply to Petitioner's procedurally defaulted ineffective assistance claims because they were not previously adjudicated on the merits by the state courts. *See Dickens*, 740 F.3d at 1320–21. Furthermore, the Court is not restricted, under 28 U.S.C. § 2254(e)(2)[9], from   holding an evidentiary hearing for Petitioner to show cause and prejudice under *Martinez* because Petitioner is not asserting a constitutional "claim" for relief. *See Dickens*, 740 F.3d at 1320–21. Accordingly, the Court considers the new

---

[8] Limiting a federal court's consideration of evidence in support of a claim to the evidence that was before the state court that adjudicated the claim on the merits. 563 U.S. at 180–81.

[9] Limiting the court's discretion to hold an evidentiary hearing on a claim for relief where the petitioner "failed to develop the factual basis of a claim in State court proceedings."

evidence Petitioner proffers in support of his *Martinez* claims for the limited purpose of evaluating Petitioner's cause and prejudice arguments.

Petitioner also asserts that he is entitled to factual development of his claims not only for purposes of resolving the *Martinez* issue, but also to resolve whether he is entitled to relief on the merits of the claim. Respondents contend that, in the event this Court finds cause and prejudice to excuse the procedural default of Claim 1D, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Pinholster*, 131 S. Ct. at 1401. For the reasons stated below, the Court finds that, if Petitioner can demonstrate cause and prejudice under *Martinez* to excuse the procedural default of Claim 1D, he is entitled to an evidentiary hearing on the merits to the extent such a hearing is necessary to resolve any disputed issues of material fact.

The Court's discretion to hold an evidentiary hearing to resolve disputed issues of material fact is circumscribed by 18 U.S.C. § 2254(e)(2). *See Baja v. Ducharme*, 187 F.3d 1075, 1077–78 (9th Cir. 1999). Section 2254(e)(2) provides, in pertinent part:

> (2)    If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence; and . . . the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Thus, if a court determines that a petitioner has not been diligent in establishing the factual basis for his claims in state court, it may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions, neither of which are present in this case. If, however, "there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." *Williams v. Taylor*, 529 U.S. 420, 437 (2000).

In *Williams*, the Supreme Court found that a lack of diligence, "attributable to the prisoner or the prisoner's counsel," would establish a failure to develop the factual basis of the claim. *William*, 529 U.S. at 432.

Several courts have noted that "the question whether a claim is procedurally defaulted and whether § 2254(e)(2) bars an evidentiary hearing related to that claim are analytically linked." *Wilson v. Beard*, 426 F.3d 653, 665–66 (3d Cir. 2005); *see also Barrientes v. Johnson*, 221 F.3d 741, 771 (5th Cir. 2000) (recognizing that the Supreme Court in *Williams* "linked" the "failure to develop inquiry" with the cause inquiry for procedural default, and holding that if petitioner establishes cause for overcoming the procedural default he has certainly shown that he did not "fail to develop" the record under § 2254(e).) The Supreme Court in *Williams*, however, noted its interpretation of the meaning of "failed" in § 2254(e)(2) was supported by the Court's earlier decision in *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), in which the Court borrowed the cause and prejudice standard applied to procedurally defaulted claims to determine if petitioner was entitled to an evidentiary hearing: "Section 2254(e)(2)'s initial inquiry into whether 'the applicant has failed to develop the factual basis of a claim in State court proceedings' echoes *Keeney's* language regarding 'the state prisoner's failure to develop material facts in state court.'" *Williams*, 529 U.S. at 433. The Supreme Court further concluded that "there is no basis in the text of § 2254(e)(2) to believe Congress used 'fail' in a different sense than the Court did in *Keeney* or otherwise intended the statute's further, more stringent requirements to control the availability of an evidentiary hearing in a broader class of cases than were covered by *Keeney*'s cause and prejudice standard. *Williams*,529 U.S. 433–34.

Prior to the Supreme Court's decision in *Martinez*, this would have made little difference to Petitioner's case. The ineffectiveness of PCR counsel could not provide cause to excuse the procedural default of a claim because PCR counsel was not constitutionally required and was treated as the agent of the petitioner. *Coleman v. Thompson*, 501 U.S. at 752–54. After *Martinez*, however, PCR counsel's deficient

performance, if it amounts to a *Strickland* violation, can establish "cause" to excuse procedural default of a substantial claim of ineffective trial counsel. *Martinez*, 132 S. Ct. at 1316–17. It follows from the line of reasoning in *Williams*, that a petitioner who has shown "cause" to excuse the failure to bring a claim in state court, which amounts to a showing of cause to excuse procedural default, has also by definition shown "cause" to excuse the failure to develop that same claim within the meaning of § 2254(e)(2). Were this Court to find otherwise, then the harm the Supreme Court envisioned in *Martinez*, that "no court will review the prisoner's [trial counsel IAC] claims," would become a certainty. *Martinez*, 132 S. Ct. at 1316.

Thus, this Court concludes, if Petitioner can demonstrate he is not at fault for failing to bring the claim, and his procedural default is excused under *Martinez*, he is by extension not at fault for failing to develop the claim under § 2254(e)(2). *See also Detrich*, 740 F.3d at 1246–47 (plurality opinion) ("[W]ith respect to the underlying trial-counsel IAC 'claim,' given that the reason for the hearing is the alleged ineffectiveness of both trial and PCR counsel, it makes little sense to apply § 2254(e)(2)").

Next, Petitioner submits that there is good cause for discovery in the form of depositions of PCR counsel,[10] Dr. John Howard, Sergeant Pesquiera, Detective Bruce Clark, and former Detective George Ruelas. Petitioner also requests that a subpoena issue requiring Dr. Howard to produce documents related to Rachel's death, the autopsy, or any of his activities related to his pre- and post-trial participation in this case. Respondents object to all of these requests, asserting that the requests are unnecessary as the record is adequate to resolve whether he can establish cause under *Martinez*, and because Petitioner has not shown good cause.

A habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery is authorized upon a showing of good cause, but the "party requesting discovery must provide reasons for the request. The

---

[10] Petitioner has withdrawn his request for the deposition of trial counsel at this time.

- 34 -

request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Rule 6(a) and (b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

"[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). However, courts should not allow a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. United States Dist. Ct. for the N. Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas corpus is not a fishing expedition for petitioners to "explore their case in search of its existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a habeas court to determine the essential elements of the substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

In light of Petitioner's assertions that PCR counsel has refused to communicate with Petitioner's habeas counsel, the Court finds that Petitioner has made a threshold showing of good cause because he has shown that the evidence sought would lead to relevant evidence regarding his petition. Accordingly, the Court will authorize the deposition of PCR counsel.

The Court finds, however, that at this time Petitioner has not demonstrated good cause for depositions of the investigating officers. Petitioner asserts Sergeant Pesquiera should be questioned about the absence of reports of interviews of the employees of the Choice Market, whether they were done in the first instance, and whether they have been

concealed. Petitioner asserts, on information and belief, that Detective Ruelas interviewed the employees of the Choice Market, and that the employees saw Rachel in the store on May 1 unharmed, contradicting the prosecution claim that Rachel was beaten and raped during the trip to the Market. Petitioner asserts that Detective Clark and former Detective Ruelas should be questioned about the missing interview records, as the absence of reports of these interviews is relevant to showing the weakness and flaws in the prosecution's case. The Court disagrees. First, Petitioner's assertions are highly speculative. Further, as Respondents point out, the absence of any interviews is irrelevant; Petitioner's claim that such reports would be relevant is based on the mistaken assumption that the State asserted that Petitioner actually went to the Choice Market when the Lopez children saw him hitting Rachel. The prosecution asserted that the evidence showed that Petitioner beat Rachel during their third outing on May 1, 1994; the State never asserted—nor did evidence suggest—that they went into the market on that trip. The prosecutor did not argue that Petitioner was going to the Choice Market, but that the Lopez twins saw Petitioner "as he's driving around in the vicinity of the Choice Market." (R.T. 4/13/95, at 98.) The State never contended that Petitioner sexually assaulted and fatally beat Rachel on a trip to the Choice Market. Petitioner has failed to establish good cause for these depositions. For the same reason, Petitioner is not entitled to the requested files from the county attorney and sheriff's office. Finally, Petitioner asserts that Detective Pesquiera was never cross-examined regarding the deficiencies of her blood interpretation evidence. But even if Detective Pesquiera were to concede that her blood interpretation was deficient, it would not be relevant to the Court's analysis of whether the outcome of the proceedings would have been different if trial counsel had investigated whether there were innocent explanations for the blood located in Petitioner's van.

Finally, Petitioner asserts that he should be permitted to depose Dr. Howard and require him to produce relevant records from his participation in this case because he was not cross-examined on the relevant subject matter, i.e., with respect to the obvious errors

1  if not "outright falsehoods" in his testimony. But Dr. Howard has already submitted a

2  declaration on Petitioner's behalf. (*See* Doc. 167, Ex. 1.) Neither statements from Dr.

3  Howard's declaration, nor the reports from Drs. Ophoven or McKay, support Petitioner's

4  characterization of Dr. Howard's testimony as "flatly false and misleading" or support a

5  finding that Dr. Howard, encouraged by the prosecutor, "actively misled" the jury, and

6  "concealed [his] actual autopsy findings." (*See* Doc. 167 at 31.) Accordingly, Petitioner's

7  deposition and production request for Dr. Howard is denied.

8                                              **CONCLUSION**

9       Pursuant to the Ninth Circuit's directive on remand, the Court has reconsidered

10  Claim 1D in light of *Martinez*. The Court finds that an evidentiary hearing is necessary to

11  determine whether Petitioner can establish cause to excuse the procedural default of

12  Claim 1D (Guilt Phase) and Claim 1D (Penalty Phase).

13       Based on the foregoing,

14       **IT IS ORDERED** that an evidentiary hearing to determine whether state PCR

15  counsel was ineffective for failing to raise Claim 1D (Guilt Phase) and Claim 1D (Penalty

16  Phase) in Petitioner's first PCR proceeding shall take place as soon as is practicable.  The

17  Court will issue a separate order setting this matter for a scheduling conference.

18       **IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Charles L.

19  Ryan, Director of the Arizona Department of Corrections, as Respondent in place of

20  former Director Terry Stewart, pursuant to Fed.R.Civ. P. 25(d)(1).

21       **IT IS SO ORDERED.**

22       Dated this 18th day of January, 2017.

23

24                          /s/ Timothy M. Burgess

25                          TIMOTHY M. BURGESS
                              UNITED STATES DISTRICT JUDGE

26

27

28