1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3  Barry Lee Jones,              )
                                 )
4            Petitioner,         )  CV 01-00592-TMB
                                 )
5        vs.                     )
                                 )  Tucson, Arizona
6  Charles L. Ryan, et al.,      )  November 2, 2017
                                 )  1:10 p.m.
7                                )
              Respondents.       )
8  _____)

9

10            TRANSCRIPT OF PROCEEDINGS
            EVIDENTIARY HEARING - DAY FOUR

11

12

13

14      BEFORE THE HONORABLE TIMOTHY M. BURGESS
            UNITED STATES DISTRICT JUDGE
15            405 W. CONGRESS STREET
              TUCSON, ARIZONA 85701

16

17

18

19

20        Cindy J. Shearman, RDR, CRR, CRC
          405 W. Congress Street, Suite 1500
              Tucson, AZ 85701
21              520-205-4286

22

      Proceedings Reported by Realtime Court Reporter
23    Transcript prepared by computer-aided transcription

24

25

1                          A P P E A R A N C E S

2

    For the Petitioner:
3
    Cary Sandman
4   Federal Public Defenders Office - Tucson
    407 W. Congress Street, Suite 501
5   Tucson, Arizona 85701

6   Karen S. Smith
    Federal Public Defenders Office - Phoenix
7   850 W. Adams Street, Suite 201
    Phoenix, Arizona 95007
8

9   For the Respondents:

10  Myles Braccio
    Arizona Office of the Attorney General
11  1275 W. Washington Street
    Phoenix, Arizona 85007
12
    Lacey Stover Gard
13  Arizona Office of the Attorney General
    Capital Litigation Section
14  400 W. Congress Street, Suite S315
    Tucson, Arizona 85701-1367
15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2    WITNESS                                           PAGE

3    PHILLIP W. ESPLIN, Ed.D.

4    Direct examination by Ms. Smith                     4
     Cross-examination by Mr. Braccio                   34
5    Redirect examination by Ms. Smith                  39
     Examination by the Court                           39
6    Follow-up examination by Ms. Smith                 42

7


8
                          E X H I B I T S
9
     IDENTIFIED                OFFERED        ADMITTED
10
     115A                         33            34
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          (Call to order of court, 1:10 p.m.)

3          MS. SMITH:  We're going to call Dr. Phillip Esplin.

4          THE COURT:  All right.  Sir, if you could please come

5    forward and if you wouldn't mind standing in this witness box

6    right here, madam clerk will swear you in.

7              PHILLIP W. ESPLIN, Ed.D., WAS SWORN.

8          THE COURT:  All right.  Ms. Smith.

9                      DIRECT EXAMINATION

10   BY MS. SMITH:

11   Q.  Would you please state your name for the record?

12   A.  Phillip W. Esplin.  You spell my last name E-s-p-l-i-n.

13   Q.  Good afternoon, Dr. Esplin.  Thank you for being here

14   today.  How are you currently employed?

15   A.  I am in private practice.

16   Q.  And what does your private practice consist of?

17   A.  Predominantly forensic psychology with a substantial

18   portion having to do with issues relating to children as

19   witnesses.

20   Q.  And do you frequently consult on criminal and civil cases?

21   A.  Yes, ma'am.

22   Q.  Could you briefly tell us about your educational

23   background?

24   A.  I've a bachelor degree obtained from Utah State University,

25   1967.  I then got some education in the Marine Corps.  When I

1   left active duty, I began graduate studies, Northern Arizona

2   University, got my master's in '73, continued on in their

3   doctorate program, got my degree in '78, took the national

4   licensure exam in November of '78, have been licensed since

5   that time.

6   Q.  And you're a licensed psychologist here in Arizona?

7   A.  Yes.

8   Q.  Are you a member of any professional organizations?

9   A.  Yes.

10  Q.  Can you tell us about a few of them?

11  A.  The American Psychological Association; within that

12  association, Division 41, which is the psychology and law

13  division; the American Psychological Society, which is

14  predominantly research oriented; the state psychological

15  association; and what's called IIIRG, which is the

16  Investigative Interview Research Group.  It's a predominantly

17  European organization.  But those are the ones that I currently

18  are active in.

19  Q.  Thank you.  Have you previously appeared as an expert in

20  court?

21  A.  Yes, I have.

22  Q.  And in which areas have you previously been qualified as an

23  expert?

24  A.  In the area of autobiographical memory, in the area of

25  forensic psychology, and in the area of investigating cases

1    where children may have been witness or victim to a crime.

2    Q.  And have you, in your career, worked with both prosecutors

3    and defense attorneys?

4    A.  Yes, I have.

5    Q.  And have you also worked with some law enforcement

6    agencies?

7    A.  Yes.

8    Q.  When did you begin working in the area of the reliability

9    of child witnesses?

10   A.  I submitted a paper to a NATO conference in nineteen

11   eighty -- the conference was held in 1987 in Italy and that was

12   the first time that I had published any works in the area.  So

13   it kind of began there.  I began an interest in it some years

14   earlier and studied with a German psychologist named Udo

15   Undeutsch with a system that had been developed in Germany that

16   there was some interest in, so -- but I jumped in with both

17   feet around 1988.

18   Q.  Okay.  Dr. Esplin, did you write a report in connection

19   with this -- your work in this case?

20   A.  Yes, I did.

21   Q.  Can we take a look at your report, which is Exhibit 115,

22   which has been admitted in evidence?  And, Dr. Esplin, this

23   first page, can you identify what we're looking at there?

24   A.  That's where I'm making a sworn declaration.

25   Q.  All right.  And then at page 49 -- oops, sorry.  I think we

1    need to go up one page or two -- let's go to page 47.  And is

2    this the report that you prepared in this case?

3    A.  Yes.

4    Q.  Now let's jump ahead to page 49.  Sorry about that.  And

5    can we highlight the second paragraph up there?  And in your

6    report you stated that by the mid-1990s there was a scientific

7    consensus regarding the general principles of investigative

8    interviews that would substantially reduce the risk of

9    obtaining unreliable information from child witnesses.  Is that

10   accurate?

11   A.  Yes.

12   Q.  And I think you've recently provided us an updated CV which

13   is Exhibit 117A.

14   A.  Yes.

15   Q.  Is that what we're looking at here?

16   A.  Correct.

17   Q.  We'll make it bigger when we dive in a little bit.

18   A.  Okay.

19   Q.  Were you conducting trainings related to interview

20   techniques or forensic interviewing of children by the early to

21   mid-1990s?

22   A.  Yes.

23   Q.  Can we take a look at page 19?  And just enlarge the top

24   half of that page.  And are these some examples of some of the

25   trainings that you were giving in the early '90s?

1   A.  Yes, it is.

2   Q.  And I guess late '80s also.  And some of those were in

3   Arizona?

4   A.  Yes.

5   Q.  I don't know that we need to go page by page but there's a

6   few pages in here of trainings that you were providing in the

7   early '90s.  Does that sound accurate?

8   A.  That's correct.

9   Q.  Have you also published scientific articles and book

10  chapters on this topic by the early 1990s?

11  A.  Yes, I have.

12  Q.  And if we can take a quick look at page 7.  If we could

13  highlight the last few entries on that top section.  Are these

14  examples of some of the book chapters that you had written in

15  the early '90s about the reliability of child witness

16  testimony?

17  A.  Yes.

18  Q.  And then if we go on to the next page, are these some

19  scientific papers that you published on that topic?

20  A.  Well, these would be considered papers presented at

21  scientific meetings.

22  Q.  Got it.  Excuse me.  So these are scientific papers that

23  you presented in the early '90s on this topic?

24  A.  Correct.

25  Q.  And were you testifying in cases in the early 1990s both in

1    Arizona and in other places about these topics?

2    A.  I'm sorry, counsel.  I was reading.  I apologize.

3    Q.  No problem.  Were you testifying in cases in the early

4    1990s about these topics?

5    A.  Yes, I was.

6    Q.  And if we could go back to Exhibit 115 quickly.  And if we

7    could take a look at page 43.  And, again, this is your report.

8    Attached to your report you included some lists of your prior

9    testimony.  If you could just enlarge some of the top of that

10   page so we can see what we're looking at.  Are these examples

11   of some of the testimony that you provided in the early 1990s?

12   I apologize, I think the years might be cut off on what we're

13   looking at but from some of the case numbers you can tell what

14   year we're in, I think.

15   A.  Yeah, I think that is the 1992-93 time frame.

16   Q.  Okay.  Thank you.  And the rest of your testimony is in the

17   record as attached to your report?

18   A.  Yes, sir -- or ma'am.

19   Q.  No worries.  When were training guidelines or protocols for

20   child witness interviewing developed?

21   A.  There were general guidelines that were published in the

22   mid-'80s and then across time those protocols began to be more

23   structured, more elaborate in their design.  So you saw the

24   beginnings around the mid-'80s.

25   Q.  And you've worked with a group at the National Institutes

1  of Child and Health Development in this area?

2  A.  Yes, I have.

3  Q.  And when did you begin working with that group?

4  A.  Congress funded a child witness project that was run within

5  NICHD as opposed to it being external.  And I began my

6  relationship on that project in 1988 and continued that until

7  2008 and then it was -- the database was shifted to Cambridge.

8  Q.  Okay.  In general terms, what are the -- some of the

9  principles to follow when conducting child witness interviews?

10  A.  Most of the public protocols will incorporate the following

11  protocols.  One of them is to establish rapport so that you

12  engage the child in casual conversation.

13      You want to have an objective but supportive stance.  You

14  want to -- once rapport's been established, you want to

15  question the child in a way that will assist them in practicing

16  narrative training.  For example, you may want to say:

17  Don't -- tell me what you did today.  Let's start with when

18  your foot got out of bed until you got to my office.  Because

19  children are not accustomed particularly to giving extended

20  responses so you want to engage the child and do practice.

21      If they've had a birthday recently or Christmas recently,

22  some other holiday, tell me everything about that.  Let's start

23  when you first got up.  Tell me everything that went on that

24  day.  Again, a type of practice.

25      After that's completed, you go through a rules portion.  If

1    I ask you a question and you know the answer, you need to tell

2    me.  If I ask you a question, you don't know the answer, don't

3    guess.  For example, if I ask you what my dog's name is, what

4    would you say?  That's particularly important with the younger

5    kids because you want to -- to verify that they conceptually

6    understand the rule and, second, seem prepared to follow it.

7        Jurisdictions vary but in a jurisdiction that requires what

8    we call a truth serum, the child is then engaged in that.  So

9    you want the child to understand that on the one hand, they

10   need to answer but, second, you don't want them to guess.  So

11   if they know the answer, they need to tell you; if they don't,

12   you don't want them to feel that pressure that sometimes

13   children can experience.

14       Once that's accomplished, you would transition to the

15   issues under investigation typically with a statement, "Tell me

16   why you're here seeing me today", so that you can get some idea

17   of what the child has been told about what's going to happen

18   and whether they know why they're there.  Sometimes they do,

19   sometimes they don't.

20       And if they answer, "Because of what Johnny did to me",

21   then you follow that with, "Tell me everything about that from

22   the beginning to the end."  So you're inviting them to tell you

23   their memory.

24       Now, sometimes if children have participated in multiple

25   episodes, they may say something like, "Well, it happened a

1    lot."  You would then want to ask them, "Did it happen one time

2    or more than one?"  If they say more, "Two times or more than

3    two?"  You don't want to ask them how many because they might

4    not know.  But you want to know whether it was a single episode

5    or multiple episodes.

6        If it's multiple episodes, then generally there are three

7    rules used.  One is the primacy rule, and that's a rule that

8    involves:  Tell me about the first time that happened.  Tell me

9    everything from the beginning to the end.  That's important

10   because the first time something happens to us that's

11   personally meaningful or important to us either positive or

12   negative, we think about it, we reflect on it, we go over it in

13   our minds.  So it's a memory cue but isn't suggestive.

14       The other rule is the recency rule.  So -- and that would

15   involve tell me everything about the last time something

16   happened.

17       And the third is what I call the best memory rule.  If a

18   child's experienced something on multiple times, you say:  Tell

19   me about the time you remember the best.  Because if you've

20   done something say, 20, 30 times, there may be a time that

21   stands out as somehow being different that will typically

22   happen.

23       Once that portion is complete, you then may need to focus

24   your questions, being careful not to be overly suggestive or

25   leading.  But you may need to get some clarification.  You told

1   me he took you into the bathroom.  Tell me everything that

2   happened from when you went into the room.  Tell me from the

3   beginning to the end.  So you're asking them a focus question,

4   and then pairing it with an open-ended invitational question.

5       Once you've obtained that information, you then shift to a

6   neutral topic so that you can end the conversation hopefully in

7   a positive way.

8   Q.  And, Dr. Esplin, many of these interview techniques were

9   developed in the context of child sexual abuse cases, correct?

10  A.  That was what provided the impetus for the tremendous

11  amount of research that was accomplished and the reason was

12  that in about 85 percent of the cases there isn't physical

13  evidence, it may even be a bit higher.  As a result, the

14  child's knowledge is a central piece of the investigation and

15  also they may possess information that would allow you to

16  independently corroborate or just disconfirm the story.  So the

17  information in many cases of child sex abuse, the child's

18  information is quite central.

19  Q.  But these rules apply to child interviews in general not

20  just in that context?

21  A.  Well, we carried out some studies involving physically

22  abused children because we were interested in having ground

23  truth so we wanted to know not the details but we wanted to

24  know whether the child, you know, had experienced physical

25  abuse with scarring or other implications.  So -- but the

1   utility of it, the momentum for it was related to children that

2   may have been sexually abused.

3       The other section would be kids that may have witnessed

4   something very significant, such as death of a parent, where

5   they're not an active participant in the event but they may be

6   a bystander, because there's a little bit of difference in

7   terms of the kinds of memories someone that is in the

8   experience may have from someone who's observing.

9   Q.  And in this case, you reviewed some statements by some

10  child witnesses, Reynaldo and Laura Lopez; is that correct?

11  A.  Yes, I did.

12  Q.  And you reviewed both their pretrial statements as well as

13  their trial testimony?

14  A.  That's correct.

15  Q.  And you authored a report regarding your conclusions about

16  the information that the Lopez children provided?

17  A.  Yes.

18  Q.  And I think we're looking at the end of that report, but

19  could we take a look at page 59?  And could we enlarge the

20  portion under "conclusion"?

21      And, Dr. Esplin, in your report, you said that given the

22  totality of the information you reviewed, it was your opinion

23  that the information obtained from the Lopez children regarding

24  the defendant is unreliable as the result of post-event

25  contamination, both with regard to interviewing the children

1  with others present and information provided to the twins via

2  the television coverage as well as the use of interview

3  procedures that did not involve scientifically sound methods.

4      Is that your opinion based upon the materials that you've

5  reviewed?

6  A.  Yes.

7          MS. SMITH:  Your Honor, I would like to use an

8  illustrative exhibit with this witness just so we don't have to

9  flip between transcripts.  It's been provided to the

10  respondent's counsel.  They -- my understanding is they don't

11  object to using it illustratively.

12          THE COURT:  Any objection?

13          MR. BRACCIO:  No objection.

14          THE COURT:  Okay.

15          MS. SMITH:  So we'll pull up what's been marked as

16  Exhibit 115A.  If you could go to the next slide.

17  BY MS. SMITH:

18  Q.  Dr. Esplin, did you provide some factors that are known to

19  potentially compromise the reliability of child witness

20  statements?

21  A.  Yes.

22  Q.  And those are listed both here and on the next slide?

23  A.  I assume the next slide, too.

24  Q.  Thank you.  Did you observe that some of these factors were

25  present in the interviews and testimony that you reviewed from

1    the Lopez children?

2    A.  Yes, I did.

3    Q.  And are there a few in particular that stood out to you?

4    A.  The interviews I reviewed could be characterized as having

5    excessive leading and suggestive questions as well as what's

6    called forced choice.  Forced choice would be:  Were your

7    clothes on or off?  Were you -- was the car going fast or slow?

8    They're questions that children have a tendency to pick an

9    alternative even when the alternative may not be present and so

10   they're questions that are better off -- well, you're probably

11   better off not using them with any age of a witness but I think

12   there's some -- some variables that also increase the risk with

13   children.

14        In looking at the selective reinforcement of responses, you

15   could see that present across the interviews.  You could see

16   with -- the one that I did not see was the single versus

17   multiple events because the episode was a single event.  I

18   noticed that the less confidence when initially questioned

19   leads to more susceptibility to internal or external

20   influences.  Internal would be where you're trying to reason it

21   out where you don't have a memory of it and external influence

22   would be where you're trying to pick up information from

23   someone else.

24        You see what I would consider evidence of altered or

25   uncertainty in some key elements of the events.  You see

1   examples of meta-cognition.  Meta-cognition is a type of source

2   monitoring.  So knowing what the origin is of your belief,

3   children are less capable than adults or older, say, kids, or

4   adolescents at that concept.  So at times they can get confused

5   about whether they remember it from the experience or whether

6   someone told them something about it and they then incorporated

7   that into their own belief.

8   Q.  And I think you provided some examples of each of these

9   things you just described in your report and what we've done is

10  put these into slides.  So if we can go to the next page.

11  A.  Okay.

12  Q.  So one of the issues you identified was direct or

13  suggestive questioning.  And you identified some direct or

14  suggestive questions in the police interview of Reynaldo Lopez

15  which was on May 3rd, 1994?

16  A.  Yes, and the other interesting issue here which is also

17  supported in the literature that when you ask kids forced

18  choice, some of them will always choose the first, some of them

19  will always choose the last.  And if you look here, every

20  answer was the second choice.  And --

21  Q.  And by "forced choice", you mean kind of like a multiple

22  choice question?

23  A.  Yes.  Long curly?  Was it nice and neat or was it all

24  messed up?  So he's given three choices.  First one was short

25  curly hair or long curly hair.

1    Q.  Could we take a look at the next slide?  And I think you

2    also saw some questions like this in the interview of Laura

3    Lopez that was conducted by the police?

4    A.  Yes.  And the other problem with a lot of these questions,

5    for example, was it short hair or long hair, you're asking the

6    child to classify something into a category, you're not asking

7    them to describe the appearance.  So it's a different kind of a

8    task as opposed to, say:  Tell me about what he looked like.

9    Q.  And does that affect the reliability of the answer?

10   A.  It -- these type of questions tap what's called recognition

11   memory.  The invitational type questions tap free recall

12   memory.  Free recall memory is significantly more accurate than

13   the other type of memory, than recognition memory, and that's

14   why you want to emphasize the types of questions that foster

15   free recall.

16   Q.  Let's go to the next page.  I believe one of the other

17   issues you identified in your report was that the children's

18   statements were inconsistent over time; is that true?

19   A.  Yes.

20   Q.  Okay.  So are you aware that the children were interviewed

21   by the police on May 4th, 1994?

22   A.  Correct.

23   Q.  And then they also had an interview with the defense

24   attorneys and I believe it was January of 1995?

25   A.  Correct.

1    Q.  And then they testified at Mr. Jones' trial in May of 1995?

2    A.  Correct.  They also had some unrecorded interview with the

3    mother and possibly the father that was the initial report.  So

4    those I considered also but there's not a record of them.

5    Q.  Okay.  And here we have some statements from Ray Lopez that

6    were given at his police interview in May of 1994 where he's

7    describing the appearance of the man that he saw in the van.

8    He said he had a hat on, it was kind of blue and white in the

9    front.

10        If we could look at the next page.  Here Ray Lopez is again

11   asked about the appearance of the man in the van.  We have some

12   questions and answers.  He describes the guy as having curly

13   hair, really curly like an afro.  And then can we look at the

14   next slide?  And then at the trial when he was asked about the

15   man's appearance, he said, did you notice anything about what

16   the man looked like?  And he said no.  Do you remember anything

17   about the man's hair?  And he said bushy.

18        Can you comment about Ray's testimony over time on that

19   topic?

20   A.  Well, the response that he doesn't recall anything about

21   the appearance.  I don't know, bushy's a little more confusing

22   to me.  What did he mean by "bushy"?  'Cause it could be curly.

23   So there's a relationship there but I don't know.

24   Q.  And notably he didn't mention a hat in his later statement;

25   is that true?

1    A.  Correct, he never mentioned a hat.

2    Q.  Let's take a look at the next page.  Now we're looking at

3    some statements made by Laura Lopez.

4    A.  Okay.

5    Q.  In this statement Laura is asked some questions about what

6    the man was wearing and what she could see.

7    A.  Correct.

8    Q.  And do you see some inconsistencies here in her statements?

9    A.  Yes.

10   Q.  And does that have an effect upon your opinion about the

11   reliability of her memory?

12   A.  The key concept that I'm exploring in this type of analysis

13   is how reliable is the information.  Another term would be how

14   trustworthy is the information across time because there needs

15   to be some level of trustworthiness in order to address the

16   other issues.

17       And researchers have tried to identify with some areas of

18   agreement, some areas of disagreement what core elements of an

19   experience would consist of and that's -- research has been

20   done by exposing kids to certain events, taping those,

21   questioning them, to see what categories of details tend to

22   form that -- the core elements.

23       And so statements across time with kids that have

24   experienced an event that has substantial meaning, that they've

25   thought about, those core elements will remain quite steadfast.

1   You will see some variations, some additions and omissions,

2   particularly with peripheral details that are not as important

3   in the event.

4       So it's important when possible to look at the shape of the

5   memories across time to see whether or not you can rely on what

6   they're saying.  If they differ with each time, they're not

7   reliable.  So I don't know how, then, a jury would try to

8   figure out how much weight to put on the statements without

9   looking towards independent corroboration as opposed to the

10  information directly.

11  Q.  Let's take a look at the next slide here.  And I believe

12  this -- I'm sorry, can we go one more ahead.  I believe this

13  may illustrate what you were just saying about some of the core

14  elements changing over time.  Here Laura is asked about what

15  she could see of the girl in the van and this was her response

16  in her initial police interview.

17  A.  Correct.

18  Q.  I believe you've also focused in on this last question here

19  before in your testimony -- I'm sorry, in your report, where --

20  as another forced question where she was asked if the girl was

21  laughing or crying?

22  A.  Yeah, the problem is, there's also indications from her

23  that she couldn't see it.

24  Q.  Right.

25  A.  And so you get an example of what I think is a child that's

1   acquiescing and then trying to pick one of the two answers,

2   which is very problematic.

3   Q.  If we can take a look at the next slide.  And this again is

4   a continuation of that questioning by the police of Laura Lopez

5   and do you see kind of more of what you were just describing

6   about Laura trying to come up with an answer that she thought

7   they wanted to hear?

8   A.  That's how I interpreted that.

9   Q.  And let's go to the next slide.  Again we're hearing Laura

10  talk about the girl crying.  If we go to the next slide, now

11  we're at Laura's trial testimony.  Here Laura's asked if she

12  could see the face of the little girl and she says no.  And

13  then she's presented with her prior statements about seeing the

14  little girl cry.  And if we could go on to the next slide.

15  Based upon this questioning and the previous questioning of

16  Laura, what do you think of her memory of what she saw of the

17  little girl and its reliability at trial?

18  A.  I think that it's contradictory, that statement.

19  Q.  And I believe you just talked about the importance of

20  allowing the jury to be aware of some of the factors that would

21  affect the reliability.  Do you think it would have been

22  important for Mr. Jones' jury to have some information about

23  why these statements might not have been reliable?

24  A.  Yes.  I think that this information goes well beyond the

25  common sense purview of the population of the jury.  I believe

1    that there's a lot of misinformation that they may hold.  I

2    think that in certain cases I think providing them an

3    educational foundation would hopefully have some positive

4    effect on their task.

5    Q.  Could we go to the next slide, please?  Actually, let's

6    skip a few ahead.  Okay.  So you mentioned earlier that there

7    was an -- your understanding was there was initial interview

8    with Mom and maybe Dad?

9    A.  Yes.

10   Q.  And did you -- do you recall that the mother, Norma Lopez,

11   was also interviewed by police?

12   A.  Yes.

13   Q.  And do you have an opinion about Mom's potential effect on

14   the kids' statements?

15   A.  One issue that was very troubling was that the children had

16   made a statement so you had a sense that they saw something

17   that was concerning and they reported that upon their return.

18   Then they're questioned, don't know to what extent, by Mom,

19   they're together apparently, and then they saw the news.

20   Q.  And I think if we go to the next slide, that comes out

21   here.

22   A.  Well, she describes when, you know, they saw the news and

23   there were at least three of them, mother and the twins, and so

24   there you create a circumstance where you get -- may get

25   contamination between the two witnesses.

1    Q.  So just to be clear, your understanding is that Mom,

2    Reynaldo, and Laura were all interviewed in each other's

3    presence by the police?

4    A.  I'm certain that the mother was present during the twins'

5    interview.  I do not know -- I don't think the girls were

6    present when the police interviewed the mother but I don't know

7    for sure.

8    Q.  And the twins were present for each other's interview?

9    A.  Correct.

10   Q.  All right.  I think we can skip a couple of slides ahead.

11   We also -- one back.  I'm sorry.  You also talked about the

12   fact that the kids watched TV.  They saw something on the news

13   that might have affected their recollection.

14   A.  May have affected their recollection, may have affected

15   their motivation or need to be helpful because --

16   Q.  Could you explain that a little bit more?

17   A.  There's a term that describes -- it's an appeal to

18   authorities.  What the term means is when a witness feels some

19   pressure to help out, then sometimes they'll try too hard to

20   remember.

21       The second problem is if the person of interest is

22   negatively stereotyped, cast in a negative light, that can

23   impact the child's motivation and attempts to try and help.

24   Q.  And I think if we go to the next slide, we even see some

25   inconsistency in reports about what they watched and what they

1   saw.

2   A.  Correct.

3   Q.  Do you have any opinion about what we could infer from

4   that?

5   A.  I don't know -- I don't know whether Laura was not paying

6   attention -- I don't know, so was it inattention, or why she

7   withheld that.  She later acknowledges that.

8   Q.  Yeah, I think on the next slide.  Here we see, I believe A2

9   is the mom participating in the conversation, A is Laura, Q is

10  the Detective Clark who is doing the interviews?

11          THE COURT:  Detective Clark is which, the A or the A2?

12          MS. SMITH:  The Q.

13          THE COURT:  A2?

14          MS. SMITH:  Is mom.

15          THE COURT:  A2 is mom.  A --

16          MS. SMITH:  Laura.  And Q is Detective Clark.

17          THE COURT:  And Detective Clark, he's Q.

18          MS. SMITH:  Exactly.  He's supposed to be asking the

19  questions.

20          THE COURT:  Yeah, no, I understand.  I'm sorry.

21  BY MS. SMITH:

22  Q.  And here we see some participation by Mom in Laura's

23  interview?

24  A.  Yes.  My concern there is you never want to have two

25  witnesses in the same room at the same time because of that

1   risk of contamination and you do not want to have your outcry

2   witness in the room.  Now, it gets to be a problem with

3   parents, mom and dads, because in a lot of cases I think they

4   would have the right to be there.  But it's better if it's

5   one-on-one, interviewer/child.  If other people need to see it,

6   they can observe it through closed circuit or one-way mirror

7   and, as you go through these interviews, you can see the

8   problems that is created by having that, in essence, group

9   interview.

10  Q.  And I think if we skip forward a few slides, we'll see some

11  evidence of the cross contamination that you identified.  Keep

12  going.  There we go.  And in your report, you identified some

13  places where you thought that the twins' answers might have

14  been contaminated by witnessing each other's interviews?

15  A.  Yes.

16  Q.  And here we're talking about the man in the van again and

17  his appearance.  You can just go to the next page.  The first

18  slide was Ray, the second slide here is Laura.  Here we see

19  Laura's asked:  Did you ever see that guy before?  She says:

20  No.  The next question is:  Did you ever see that van before?

21  And her answer is:  No, but my mom's friend.

22      Do you think that her answers might have possibly been

23  influenced by the previous discussion about the mom's friend

24  that was had with Ray?

25  A.  Yes, and Ray's question then was what was the scope and

1   duration of the conversations?

2   Q.  If we can go to the next slide.  This is just a

3   continuation of that conversation where we're talking about

4   Alonso again.  If you can go to the next slide.

5       All right.  So this again is an interview with Ray Lopez.

6   I believe in each case Ray went first and Laura went second.

7   This now we're looking at the defense attorney interview which

8   happened in January of 1995.  And here we have some questions

9   about the hair of the man that was in the car.

10          THE COURT:  I'm sorry.  Before you answer that

11  question, I just want to make sure so I know, this is

12  information that you've pulled from his report; is that

13  correct?

14          MS. SMITH:  Yes.

15          THE COURT:  So the same information in a different

16  format is in the report?

17          MS. SMITH:  I believe so.  He -- I don't know that he

18  had pulled out every single line of the transcripts as we have

19  here.  He identified some of the questions and answers and the

20  general issues.  All of these documents are in the record and

21  he commented upon all of them.

22          THE COURT:  No, I understand that, but --

23          MS. SMITH:  Dr. Esplin created a chart of all the

24  children's statements which included them.

25          THE COURT:  And that's in the report?

1          MS. SMITH:  In the report, yes.

2          THE COURT:  Okay.  Thank you.

3          MS. SMITH:  My only clarification is that I don't

4    think he directly quoted in every instance, he more described.

5    If that answers your question.

6          THE COURT:  So he took another step -- here you took

7    another step by identifying the portions of the record he was

8    referring to?

9          MS. SMITH:  Yes.

10         THE COURT:  But that's not in the report?

11         MS. SMITH:  Some of them are but not every single line

12   quoted here.

13         THE COURT:  Okay.

14         MS. SMITH:  This is -- at the bottom of every page

15   we've identified the exhibit that the -- which are all in

16   evidence, the exhibits that they directly come out of.

17         THE COURT:  That's fine.  Go ahead.

18   BY MS. SMITH:

19   Q.  I think we can go to the next page.  Now we're talking to

20   Laura and, again, we're talking about the description of the

21   man in the van?

22   A.  Yes.

23   Q.  And do you see any evidence of cross contamination here?

24   A.  Well, she sat through the brother's interview where he

25   described the hair, so you don't know if that's coming from her

1    memory or from brother.  She says she remembers.  I don't think

2    source monitoring works very well with eight-year-olds.

3        And then there's an example of this multiple choice

4    question that is difficult, maybe like a black person, like way

5    curly or do you mean, she says:  Yeah.  Just kind of puffy,

6    kind of curly?  Answer:  Like a black guy's.

7    Q.  So some of her answers might also be based upon the

8    questions that are posed to her?

9    A.  Correct.

10   Q.  Do you recall that there were some identification issues

11   also in the testimony at trial?

12   A.  Yes.

13   Q.  Could we take a look at the next slide?  And this is an

14   excerpt from the trial testimony of Ray Lopez in April of 1995.

15   A.  Yes.

16   Q.  And here Ray is shown a photograph, and did Ray have

17   trouble identifying the van that he claimed to have previously

18   seen?

19   A.  Yes.

20   Q.  And do you recall in both the children's testimony that --

21   whether there was a description of whether the van had windows

22   or not?

23   A.  Correct.

24   Q.  And the children said the van did not have win -- excuse

25   me.  The children had a different description of whether there

1   were windows or not than the photo of the van?

2   A.  Correct.

3   Q.  And let's take a look at the next slide.  Ray was also

4   asked to identify the defendant in court.  Do you recall that?

5   A.  Yes.

6   Q.  And he was unable to do that?

7   A.  Correct.

8   Q.  And he did, however, identify a photograph?

9   A.  Yes.

10  Q.  If we can go back to Dr. Esplin's report, which is

11  Exhibit 115, and if we could go to page 60.  I believe in your

12  report you also provided an opinion about what you could have

13  done had you been consulted by the trial lawyers in this case;

14  is that correct?

15  A.  Yes.

16  Q.  And what were some of the issues that you identified as

17  potential areas that you might have been able to assist?

18  A.  You summarized them right there, but optimizing

19  environment --

20  Q.  You summarized them, Dr. Esplin.

21  A.  I'm sorry.  Optimizing environment in which the child

22  interviews were conducted, means of minimizing cross

23  contamination of information, suggestions on specific

24  questioning format for the children's mother, same for the

25  father, and the same for each child.  I think there would also

1   have been a discussion about whether in these circumstances

2   they may want to use a well-trained forensic interviewer, which

3   could potentially be done, I think.

4   Q.  And do you have some knowledge, based upon your review of

5   the record, whether the interviewer who did the interviews of

6   the Lopez children was a qualified investigator as you've just

7   described?

8   A.  I looked at the background and training and there was not

9   any indications that there was formal training in forensic

10  fact-finding interviews.

11  Q.  And as we discussed earlier, you and others were conducting

12  such trainings at that time, correct?

13  A.  There was statewide trainings, I believe, in every state in

14  the country by then.  And those trainings were geared towards

15  law enforcement officers who may be doing sex crime

16  investigations, social workers who may be questioning a child

17  with certain principles and formats that were part of the

18  instruction.

19  Q.  Could we go on to the next page of Dr. Esplin's report?  I

20  think you also provided some opinions about some consultation

21  that you could have provided just before and during the trial?

22  A.  Potentially, yes, with this caveat.  I will not help an

23  attorney trick a child or mislead a child.  I will try to

24  assist them in questioning that will facilitate quality

25  information.  Now, the rules in trial procedures sometimes

1   don't jive exactly with how we may do it in an outside

2   courtroom setting but I don't want to teach them how to

3   mislead.  I don't think that's appropriate.

4       I want to -- if I give suggestions, they then have to

5   decide strategically what they may or may not do with it or

6   what approach they may or may not employ.  But my focus there

7   is enhancing the quality of information from the child one way

8   or the other.

9   Q.  And did your -- in your report, I think if we highlight

10  paragraph B there, I think you also suggested that you could

11  have consulted with the attorneys about whether there might

12  have been a scientific basis to move to preclude their

13  testimony; is that correct?

14  A.  Yes.

15  Q.  And you can close out of there.  I think you also suggested

16  that it might have been appropriate to have expert testimony at

17  the trial about the reliability of the children's testimony?

18  A.  Yes.  Well, about factors that may be present that would

19  increase the risk of obtaining unreliable information, staying

20  behind comments that could be interpreted as getting into

21  credibility issues because that's what the province of the jury

22  is, but educational information that hopefully would help them

23  evaluate and examine the children's testimony as well as prior

24  statements that may have come in.

25  Q.  And some of that would include those scientific factors

1    that we discussed --

2    A.  Yes.

3    Q.  -- at the beginning of your testimony?

4              MS. SMITH:  Could I have just a minute, Your Honor?

5              THE COURT:  Yes.

6              MS. SMITH:  Your Honor, just before I close

7    Dr. Esplin's testimony, I'd like to offer into evidence this

8    PowerPoint we put together.  It consists of statements from the

9    record, as we said.  I don't know if the respondents still have

10   an objection or not.

11             MR. BRACCIO:  Your Honor, I think at this point we

12   would object to that coming into evidence.  It's a

13   demonstrative exhibit, he's testified from it, and given that

14   it was disclosed to us a few hours ago and there appear to be

15   some problems with the statements and where they come from.

16             THE COURT:  Well, I will reserve admitting it in order

17   to give you an opportunity to, if you think that you want to,

18   challenge the accuracy but if the information is simply

19   information that he -- that's culled from his report, you know,

20   I would admit it.  But if you -- if you think that there's

21   something in there that is inaccurate, I'll reserve ruling on

22   that to give you an opportunity to review that.

23             MR. BRACCIO:  We'll waive the objection, Your Honor.

24   That's fine.

25             THE COURT:  Okay.  Well, all right.  That's fine.

1    It's admitted.

2         MS. SMITH:  We'll provide a copy to the clerk.  And I

3    don't have any other questions right now.

4         THE COURT:  Okay.  Thank you.

5      Cross-examination?

6                       CROSS-EXAMINATION

7    BY MR. BRACCIO:

8    Q.  Good afternoon, Dr. Esplin.

9    A.  Good afternoon.

10   Q.  Good to see you again.

11   A.  It's good to see you.

12   Q.  You testify quite a bit in Arizona, correct?

13   A.  I have over the years.

14   Q.  And in the vast majority of those cases in, say, the last

15   five years, you've testified for the defense, correct?

16   A.  It's been predominantly dominated by the defense.  I think

17   there was one case in Pima County, I don't know if it was

18   within that five years, in which I was a rebuttal expert for

19   the State.  But the majority of cases would have been all made

20   by the defense.

21   Q.  And how much have you charged so far in this case?

22   A.  I don't know.  I gave you an estimate when we visited and I

23   think I have, I want to say, another 10 hours at least,

24   somewhere in that neighborhood of 10 to 15 additionally.

25   Q.  I believe you indicated in the interview you had charged

1    about $26,000 by that point?

2    A.  That's correct.

3    Q.  Okay.  So probably around the area of $30,000?

4    A.  I would say that's a fair estimate.

5    Q.  You were asked in this case to determine and render a

6    professional opinion regarding the interview techniques used on

7    pivotal child witnesses and whether there was a likelihood of

8    misidentification by the child witnesses due to the way that

9    they were interviewed, correct?

10   A.  Yes.

11   Q.  This is not a misidentification of Barry Jones, correct?

12   A.  Well, my recollection is when they showed a photo, they

13   were shown a single photo so it wasn't a proper photo line-up.

14   There then was confusion in terms of not identifying him in

15   court.  But that could have been a change of appearance so I

16   haven't seen the photo.  Sometimes there will be some change of

17   appearance that will confuse a child.

18   Q.  In your review of the documents in this case, do you recall

19   that Barry Jones admitted he was in the Choice Market parking

20   lot on May 1st, 1994, along with Rachel Gray?

21   A.  Yes.

22   Q.  Driving a yellow van?

23   A.  Correct.

24   Q.  You agree that children over the age of four can be

25   reliable witnesses, correct?

1    A.  I think I wrote that, and we did a major study that

2    examined that because there was some skepticism about

3    four-year-olds and so we examined it and felt that, left to

4    their own devices, they can provide reliable information.

5    Q.  Okay.  Let me pull up Exhibit 207.  This is your interview

6    with us at page 27 --

7    A.  Okay.

8    Q.  -- lines 17 through 21, and you indicated to us in the

9    interview that you believed children by four years of age can

10   be reliable informants as long as the event under investigation

11   is not too remote and as long as they're interviewed in a way

12   that uses processes that lessen the chances for acquiescence,

13   correct?

14   A.  Yes.

15        MS. SMITH:  Your Honor, I would just object to the use

16   of the interview as I believe that's consistent with how the

17   witness just testified.  I don't know if we're trying to

18   impeach or refresh here.

19        THE COURT:  Yeah, hold on a second.  Give me a second.

20   Yeah, I'm not sure -- what's the basis -- I'm going to overrule

21   the objection.  Go ahead with your next question.

22   BY MR. BRACCIO:

23   Q.  One of the variables that you mentioned in your report is

24   remoteness, correct?

25   A.  Yes.

1    Q.  So the closer in time to the event the witness reports, the

2    more accurate their report is?

3    A.  As a generalization and everything else being equal, yes.

4    Q.  And you agree in this case that the Lopez children were

5    interviewed by detectives close in time to what they observed,

6    correct?

7    A.  Yes.  I wasn't as concerned with remoteness in time as I

8    was the other factors I mentioned.

9    Q.  Okay.  And you previously indicated that if an event is

10   very important and if there's reflection, that the memory will

11   consolidate, meaning the less important details, peripheral

12   details, things that are less important, fall out, correct?

13   A.  I would agree.

14   Q.  The core elements of the experience remain quite steadfast

15   if it's important?

16   A.  I would agree.

17   Q.  So kids could remember a traumatic event they saw but maybe

18   not remember insignificant details?

19   A.  If -- if the event has sufficient complexity, if they had

20   sufficient exposure time, if they had a emotional investment at

21   some level, then they tend to think about it and that

22   strengthens the memory traces, makes them less susceptible to

23   decay or alteration.

24   Q.  You would agree that if a child witnesses violence for the

25   first time, that would be an important salient event, correct?

1   A.  I would agree.

2   Q.  You agree that the Lopez children saw something, correct?

3   A.  It appeared to me that they saw something happen, they saw

4   something in the van that -- that had some emotional

5   significance.

6   Q.  So this was obviously a memorable event for them?

7   A.  Yes, because in my opinion it led to the immediate report

8   to Mom so it had to be of sufficient import to disclose that.

9   Q.  And seeing a man beat a young girl could be a traumatic

10  event, correct?

11  A.  Yes.

12  Q.  Especially to another young child?

13  A.  Yes, because sometimes -- it's an interesting topic, but

14  sometimes children that witness violence are more adversely

15  affected than children that experience violence.  And we think

16  it might be because they don't know how much it hurts and they

17  worry about it.  So there's some interesting data on children

18  witnessing violence as compared to children who experience

19  violence.

20  Q.  You believe that certain aspects of the Lopez children's

21  testimony was reliable, correct?

22  A.  Yeah, that they saw a van, apparently the van was moving,

23  they saw some objects in the van, and they saw some movement in

24  the van, and they saw what appeared to be swerving of the van.

25  That seemed to be -- those factors seemed to be consistent.

CROSS/REDIRECT EXAMINATION - PHILLIP W. ESPLIN, Ed.D.          39

1   Q.  And that was in the Choice Market parking lot?

2   A.  Correct.

3   Q.  And that van was yellow?

4   A.  Correct.

5   Q.  And I believe you previously indicated that Rachel's blood

6   in that van could also have some value for corroboration of the

7   Lopez children's account?

8   A.  Well, I would defer that to a blood splatter expert but I

9   think that that was noteworthy of something, somehow there was

10  some blood in the van.

11          MR. BRACCIO:  Thank you.  No further questions.

12          THE COURT:  Thank you.  Redirect?

13                      REDIRECT EXAMINATION

14  BY MS. SMITH:

15  Q.  I just have one brief question.  Do you know whether the

16  Lopez children had previously witnessed any violence?

17  A.  I do not know directly.

18          MS. SMITH:  That's all I have.

19                         EXAMINATION

20  BY THE COURT:

21  Q.  Just a couple of quick questions.  So I thought I

22  understood your introductory testimony to be that you

23  identified issues with the interview techniques that were used

24  with the children in this case; is that correct?

25  A.  Yes.

1   Q.  And can you tell me, were the principles that you rely on

2   to reach that conclusion principles that were established or

3   well established at the time of the investigation in this case?

4   And let me preface that by saying I understand that this is a

5   science and it's not static but are we looking at this through

6   the lens of 2017 or were some of these principles accepted at

7   the time of the interview in this case?

8   A.  In my -- there's an appendix in the report in which I

9   referenced literature 1995 back that addressed these various

10  issues.  So the answer would be by the early '90s there was a

11  massive effort, and these general principles were agreed upon

12  in the community, and states were developing child advocacy

13  centers across the country very rapidly.

14      What was not unsettled is the dosage level, what does it

15  take in terms of inappropriate questioning, you know, to get

16  acquiescence or influence.  But not that the -- the concepts

17  were there and were in the field.

18  Q.  Well, you anticipated my next question because were these

19  academic concepts or had they been transformed into practical

20  techniques in the field?

21  A.  Our -- the research that I was involved in for the 20 years

22  was what's called quasi-experimental field research.  All of

23  our research sciences were with police departments, child

24  advocacy centers that were involved in the live investigation

25  of kids and it was important for us to take the laboratory

1    research, the principles that had been defined in the

2    laboratory, and develop a way to apply them to the field.

3         So beginning -- and part of our enticement for various

4    locations was to provide free training to the social workers,

5    detectives, attorneys that wanted to participate, and we were

6    doing that across the country.  And there was also a lot of

7    other training occurring at that -- during that time frame.

8    Q.  All right.  And I don't have your CV in front of me but

9    were you -- were you an expert in this field at that time and

10   testifying on this topic at that time?

11   A.  By 1990, the answer was yes.

12   Q.  1990?

13   A.  1990.  I think the first case I testified in was in Ocala,

14   Florida, and it happened to be a child that I'd interviewed

15   there as part of that project and so I testified in a criminal

16   trial.

17        THE COURT:  Okay.  I don't know, again, if -- and I

18   want to give the parties an opportunity that if something I

19   have asked has suggested a follow-up question you think is

20   important, I want to give both of you the opportunity so let me

21   start with respondents, is there anything you want to follow up

22   on?

23        MR. BRACCIO:  No, Your Honor.

24        THE COURT:  Petitioners?

25        MS. SMITH:  Just a couple of quick things.

```
 1                    FOLLOW-UP EXAMINATION

 2   BY MS. SMITH:

 3   Q.  You were giving trainings to law enforcement agencies in

 4   the early '90s?

 5   A.  Correct.

 6   Q.  And you were testifying in cases here in Arizona in the

 7   early '90s also?

 8   A.  Yes.

 9             MS. SMITH:  That's it.

10             THE COURT:  Thank you.  You may step down, sir.

11             THE WITNESS:  Thank you, Your Honor.

12             THE COURT:  Okay.  Were there any other witnesses for

13   today?

14             MS. SMITH:  No, Your Honor.

15             THE COURT:  Okay.  So -- and I think you said there

16   were three witnesses for tomorrow.  And my question is this:

17   Are we better off starting at 8:30 or is 9:00 o'clock -- I just

18   don't want to run out of time if you've got witnesses, some of

19   whom are from out of town.  We can start at 8:00 o'clock if you

20   want.

21             MS. SMITH:  I think if we start at 9:00 o'clock we'll

22   be fine.

23             THE COURT:  Okay.  Okay.

24             MS. SMITH:  We finished quickly today so --

25             MR. SANDMAN:  We're in a rhythm.
```

```
 1              THE COURT:  All right.  Sounds good.  So three

 2     witnesses tomorrow.  Then I know we've got at least one witness

 3     on Monday.

 4              MR. BRACCIO:  Correct.  Sonia Pesquiera, and she's

 5     also indicated to me that she can be here all day so it's

 6     really up to Your Honor if you'd like to start in the morning

 7     or in the afternoon.  If we start in the morning, we'd likely

 8     finish her that day.

 9              THE COURT:  On Monday?

10              MR. BRACCIO:  Correct.

11              THE COURT:  Well, then let's start in the morning.

12              MR. BRACCIO:  Sounds good.

13              THE COURT:  No time like the present.  And then

14     Tuesday we have --

15              MR. BRACCIO:  Dr. Howard.

16              THE COURT:  And then is he the last witness?

17              MR. BRACCIO:  He's the last witness and he'll be

18     flying in here.  I'll be picking him up at the airport and

19     coming directly here and he'll testify at 1:00 o'clock.

20              THE COURT:  On Tuesday?

21              MR. BRACCIO:  Correct.

22              THE COURT:  And are we sure we can get through

23     Dr. Howard between one and five?

24              MR. SANDMAN:  I believe we can, yes.

25              THE COURT:  Let me phrase it this way:  We're going to
```

1    finish Dr. Howard on Tuesday.

2              MR. SANDMAN:  Yes, absolutely.

3              THE COURT:  Even if we have to run late.

4              MS. SMITH:  We'd really like to do that, Your Honor.

5              THE COURT:  Okay.  So I think then we should be in

6    good shape.  Anything else we need to discuss today?

7              MR. BRACCIO:  No, Your Honor.

8              MR. SANDMAN:  You know, we do have -- but not today

9    because I'm not ready to do it today but we had a bunch of

10   exhibits that we had proffered and there were some objections

11   from the respondents so maybe -- maybe Tuesday morning or

12   something before Dr. Howard comes in we could settle that.

13             THE COURT:  Yeah, I mean, so have -- have you -- are

14   these any exhibits -- I mean, because, frankly, on some of them

15   there have been -- there has been objections, for instance,

16   which one side or the other has finally said:  Look, I don't

17   object.  So maybe what I'm going to ask you to do is sit down,

18   see if you can narrow the field some and you've got some time

19   this afternoon, just --

20             MR. SANDMAN:  No, we will do that before we come back

21   to you on Monday.

22             THE COURT:  Okay.  That would be great.  I appreciate

23   that.  Anything else?

24             MR. SANDMAN:  That's it.

25             THE COURT:  Okay.  Thank you very much.  Have a

1    wonderful afternoon.  Hold on one second.  Yeah, that's it.

2    I'll see you in the morning.

3          MS. SMITH:  Thank you.

4          THE COURT:  And I'm assuming you all were not planning

5    on doing oral arguments, you're going to do written summations

6    once you've had a chance to -- because, really, I mean, it's

7    kind of a tough.  I think it would be a tough thing to sort of

8    formulate a closing argument absent having had a chance to

9    review the record that's been created.  So we'll just do that

10   in writing?

11         MR. SANDMAN:  Yeah, we all agree with that.

12         THE COURT:  Got it.  Thank you.  We've got consensus

13   breaking out all over the place.

14      (Whereupon, the matter was adjourned at 2:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6       /s Cindy J. Shearman_____          November 14, 2017
       CINDY J. SHEARMAN, RDR, CRR, CRC      DATE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25