1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3    Barry Lee Jones,              )
                                   )
4              Petitioner,         )  CV 01-00592-TMB
                                   )
5          vs.                     )
                                   )  Tucson, Arizona
6    Charles L. Ryan, et al.,      )  November 3, 2017
                                   )  9:08 a.m.
7                                  )
               Respondents.        )
8    _____)

9

10                   TRANSCRIPT OF PROCEEDINGS
                  EVIDENTIARY HEARING - DAY FIVE
11

12

13

14          BEFORE THE HONORABLE TIMOTHY M. BURGESS
                 UNITED STATES DISTRICT JUDGE
15               405 W. CONGRESS STREET
                  TUCSON, ARIZONA 85701
16

17

18

19

20            Cindy J. Shearman, RDR, CRR, CRC
            405 W. Congress Street, Suite 1500
21                 Tucson, AZ 85701
                     520-205-4286
22

23       Proceedings Reported by Realtime Court Reporter
        Transcript prepared by computer-aided transcription

24

25

1                          A P P E A R A N C E S

2

    For the Petitioner:

3

    Cary Sandman
4   Federal Public Defenders Office
    407 W. Congress Street, Suite 501
5   Tucson, Arizona 85701

6   Karen S. Smith
    Federal Public Defenders Office
7   850 W. Adams Street, Suite 201
    Phoenix, Arizona 95007

8

9   For the Respondents:

10  Myles Braccio
    Arizona Office of the Attorney General
11  1275 W. Washington Street
    Phoenix, Arizona 85007

12
    Lacey Stover Gard
13  Arizona Office of the Attorney General
    Capital Litigation Section
14  400 W. Congress Street, Suite S315
    Tucson, Arizona 85701-1367

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    WITNESS                                          PAGE

3    STUART H. JAMES

4    Direct examination by Ms. Smith                    5
     Examination by the Court                          25
5    Direct examination (cont'd) by Ms. Smith          27
     Cross-examination by Mr. Braccio                  36
6    Examination by the Court                          38

7    JAMES WILLIAM HAZEL, JR.

8    Direct examination by Mr. Sandman                 41

9

10

11                          E X H I B I T S

12   IDENTIFIED              OFFERED            ADMITTED

13   121A                       11                 11

14

15

16

17

18

19

20

21

22

23

24

25

                  UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S

 2           (Call to order of court, 9:08 a.m.)

 3           THE COURT:  All right.  So who do we have next?

 4           MS. SMITH:  We call Stuart James.

 5           THE COURT:  All right.  Mr. James, if you could please

 6  come forward and have -- well, don't have a seat yet.  Stand in

 7  that box.  That will be great.  Madam clerk will swear you in.

 8  She'll swear you in.  Go ahead and stand right there.

 9           THE WITNESS:  Yes, Your Honor.

10           THE COURT:  You can actually come in the box.

11           THE WITNESS:  Okay.

12              STUART H. JAMES, WITNESS, WAS SWORN.

13           THE COURT:  Have a seat, sir.

14           THE WITNESS:  Thank you.

15           MS. SMITH:  Make sure you have the right chair.

16           THE WITNESS:  Is that the right chair?

17           THE COURT:  That's the right one.

18           THE WITNESS:  There's a good chair and a bad chair.  I

19  heard there's a good chair and a bad chair, so -- okay, I'm

20  good.

21           THE COURT:  Well, I'm not even going there.

22      I'm sorry.  I don't know what -- I moved this over to the

23  side so I could actually see the witness and now I killed it.

24  It's blank.

25
```

```
 1                         DIRECT EXAMINATION

 2   BY MS. SMITH:

 3   Q.  Could you please state your name for the record?

 4   A.  Yes, my name is Stuart spelled S-t-u-a-r-t, middle initial

 5   H, and last name James, J-a-m-e-s.

 6   Q.  Great.  Good morning, Mr. James.  Thank you for coming.

 7   Could you tell us how you're currently employed?

 8   A.  I am currently employed as a forensic scientist with

 9   emphasis on bloodstain pattern analysis.  I have my own company

10   which is entitled James and Associates Forensic Consultants,

11   Incorporated, located in Ft. Lauderdale.

12   Q.  Great.  And what does your current practice consist of?

13   A.  It consists of case work both for prosecution and defense

14   attorneys in criminal cases, occasional civil case, cases now

15   and then, and an emphasis on teaching -- teaching both basic

16   and advanced courses in bloodstain pattern analysis.

17   Q.  Could you tell us about your educational background?

18   A.  Yes, I received a B.A. degree in biology and chemistry from

19   Hobart College in upstate New York back in 1962.  In 1963 I

20   completed a one year internship in medical technology here

21   locally at St. Mary's Hospital and that was 1963.  I became

22   licensed as a medical technologist, which I practiced for a few

23   years, and then between 1977-1979 I completed nine hours of

24   graduate study, including my first bloodstain pattern analysis

25   course, homicide investigation, and the third course was
```

 1   forensic microscopy, which is the study of trace evidence using

 2   magnification.  That's my formal education.

 3   Q.  Thank you.  And are you a member of any professional

 4   organizations?

 5   A.  Yes, I am.

 6   Q.  Could you tell us what those are?

 7   A.  Sorry?

 8   Q.  Which ones?

 9   A.  Oh, sorry.  I'm a fellow member of the American Academy of

10   Forensic Scientists.  I've been affiliated with that

11   organization since 1971.  I'm also a charter member of the

12   International Association of Bloodstain Pattern Analysts, which

13   was formed in 1983.  In that organization, I was a charter

14   member, I'm a distinguished member, and also for 12 years

15   ending last year I was the editor of their publication.

16   Q.  And could you just say one more time when that organization

17   was founded?

18   A.  1983.

19   Q.  So by the early '90s, were there a lot of bloodstain

20   pattern analysts in the field?

21   A.  There was an increasing number ever since 1971 when Herbert

22   MacDonell taught the first course in Jackson, Mississippi, and

23   he was my instructor as well.  And since '71 through the '80s

24   and '90s, and even through today there are many people who have

25   been trained, have worked many cases and do teaching in basic

DIRECT EXAMINATION - STUART H. JAMES

1  and advanced courses.

2  Q.  Could we pull up 120?  And could you just identify what

3  we're looking at here, Mr. James?

4  A.  Yes, that is the first page of my curriculum vitae.

5  Q.  And in there you list courses you've taught and some

6  publications, and your career history?

7  A.  Yes.

8  Q.  Could you just give us a brief overview of your

9  professional experience?  We won't go page by page.

10  A.  Well, in terms of my work experience?

11  Q.  Yes.

12  A.  Okay.  Well, as I said before, I was a medical technologist

13  for several years.  In nineteen -- let's see, it would have

14  been 1971, I then became a forensic toxicologist at Wilson

15  Hospital in Johnson City, New York, that's upstate.  And in

16  nineteen -- let's see, 1977 I then set up a crime laboratory

17  and became a supervisor of that crime laboratory in Binghamton,

18  New York.  That laboratory was open for four years and then it

19  was taken over by the New York state police and I became a

20  private consultant after that time.

21  Q.  And you've been doing bloodstain interpretation evidence

22  since that time?

23  A.  Yes.  I was a private consultant in upstate New York until

24  1988.  I then moved to Florida and eventually incorporated in

25  1994.

DIRECT EXAMINATION - STUART H. JAMES

1   Q.  And do you have some experience investigating crime scenes?

2   A.  Yes.

3   Q.  And in what capacity have you done that?

4   A.  Well, initially I was assisting a Dr. William Eckert

5   forensic pathologist in Wichita, Kansas, both with autopsy

6   assistance as well as crime scene investigation, and then in

7   New York state, I was the supervisor of the crime laboratory.

8   We served -- we did crime scene work for approximately

9   13 counties in New York state, in more or less the southern

10  tier of the state.  And currently for the past 12 years I've

11  been doing the crime scene work for the Palm Beach County

12  Sheriff's Office, as well as Collier County Sheriff's Office,

13  which is essentially Naples and Ft. Myers, Florida, and I've

14  done a couple of cases up in Port St. Lucie -- this is mostly

15  Florida -- and, let's see, also Orlando.  And I've done an

16  occasional prosecution case out of state such as about four or

17  five years ago in Tennessee.  My work is about 25 percent

18  prosecution and about 75 percent for the defense.

19  Q.  Great.  Thank you.  And you've appeared as an expert before

20  in court?

21  A.  Yes, I have.

22  Q.  And you've been qualified by courts as a bloodstain pattern

23  analyst expert?

24  A.  Yes, and as a crime scene reconstructionist as well.

25  Q.  Okay.  And back in 1994 and 1995, were you consulting with

1    both prosecutors and defense attorneys about bloodstain pattern

2    interpretation?

3    A.   What was that question again?   Sorry.

4    Q.   Sorry.   Back in 1994, and 1995, were you consulting about

5    bloodstain interpretation with prosecutors or defense

6    attorneys?

7    A.   Oh, yes, of course, I was.

8    Q.   And were there others in the field that were doing that

9    work at the time, too?

10   A.   Yes, many others whom I know through my association with

11   the international association of bloodstain pattern analysts.

12   Q.   Have you published articles, books, or scientific papers on

13   this topic?

14   A.   Yes, I have.

15   Q.   And those are included in your CV?

16   A.   Yes, they are in my CV.   The most current one was published

17   in 1995, I believe, or 2005, I'm sorry, Principles of

18   Bloodstain Pattern Analysis, Theory and Practice.   It was

19   co-authored by myself, Paul Kish, and Paulette Sutton.

20   Q.   And do you also teach courses on bloodstain pattern

21   interpretation?

22   A.   Yes, I've taught basic and advanced courses within the

23   state of Florida, New York state, let's see, California,

24   Michigan, and several other states, just to name a few.   I've

25   also taught basic and advanced courses in England, the

DIRECT EXAMINATION - STUART H. JAMES                           10

1   Netherlands, and also Canada and Aruba in the Dutch Antilles,

2   and also in Australia.

3   Q.  Thank you.  Could you give us a brief overview of some of

4   the general principles and processes that guide bloodstain

5   pattern analysis?  And I think in assisting you in your answer

6   you've provided us with a demonstrative exhibit which we could

7   pull up at this time, please.

8            MS. SMITH:  Do you have access to this now, Your

9   Honor?

10           THE COURT:  I do.  We're back in business.  Thank you.

11  BY MS. SMITH:

12  Q.  So my question was, if you could just give us an overview

13  of some of the principles that guide bloodstain pattern

14  analysis.

15  A.  Yes, this is a -- an example of the scientific method which

16  is more attributable to bloodstain pattern analysis where

17  starting you have a blood shed event that creates bloodstains

18  and then the physical characteristics, size, shape, and

19  distribution of the stains must be studied and documented.

20  Then utilizing one's knowledge of BPA, which is an acronym for

21  bloodstain pattern analysis, and experience and training, you

22  evaluate the case facts and by evaluating case facts in

23  addition to the bloodstain analysis, you must evaluate the

24  pathology, the forensic pathology, the types of injuries

25  incurred by a victim as well as, you know, blood typing

 1    including DNA which actually began around 1985.  Before that it

 2    was A, B, O grouping and enzyme markings, et cetera.  And then

 3    with this information you assess all the possible mechanisms

 4    that could be attributed to creating certain patterns of blood

 5    and you reconstruct these and draw conclusions.

 6            THE COURT:  I'm sorry.  He's been referring to a

 7    particular exhibit.  For the record, you want to identify that?

 8            MS. SMITH:  Sure.  These were a series of diagrams

 9    that were provided to us by Mr. James.

10            THE COURT:  Right.

11            MS. SMITH:  We provided them to the attorney general

12    and they've been marked as Exhibit 121A.  I don't know, do you

13    have an objection to offering them into evidence?

14            MR. BRACCIO:  No objection.

15            MS. SMITH:  So we'll move to have them admitted as

16    Exhibit 121A.

17            THE COURT:  Thank you.  They'll be admitted.

18    BY MS. SMITH:

19    Q.  Can we take a look at the next page, please?  Mr. James,

20    you've told us that there are some general categories that are

21    used when describing bloodstain?

22    A.  Yes.  This was created by myself and Paul Kish as part of

23    the production of our book that I mentioned in terms of

24    bloodstain pattern analysis, and what it is is it's a

25    classification system and there are other classifications but

1    this is the one that we feel is most significant, and starting

2    off with the bloodstain and usually the size, shape, and

3    distribution of the bloodstains we can categorize them into

4    these different categories, like, for example, passive stains

5    are those that require very little energy to produce such as

6    dripping blood, pool blood on a surface, flow patterns,

7    transfer stains.

8         And then we have another category which is -- we call

9    spatter.  And that's a general term at the top of the tree here

10   so to speak, and the size and shape come into play here.  The

11   spatter stains are much smaller in diameter because it's taken

12   more energy to create them and it breaks the blood source up

13   into smaller -- small droplets compared to passive stains and

14   we have impact spatter, we have secondary spatter, which is

15   actually from blood dripping and the blood creating

16   ricochetting or satellite spatters around it and then we have

17   projected spatter.

18        And of course the altered stains all these various things

19   can happen to blood which attribute themselves to passive or

20   scatter stains that is clotted, diluted, dried bloodstains,

21   diffuse, insects stains, and so forth.  So these are activities

22   that can affect the appearance of stains in the other two

23   categories.

24             THE COURT:  Can I ask you a question?

25             THE WITNESS:  Yes, sir.

1          THE COURT:  So for the first two categories, passive

2    and spatter, is the same -- do the same principles apply to any

3    liquid or are they specific to blood because of its make-up?  I

4    mean, I know the third category, altered, obviously would apply

5    really only to blood.

6          THE WITNESS:  Yes.

7          THE COURT:  But when you look at, for instance,

8    spatter, that could apply to almost any liquid.  Are there

9    specific characteristics that make it specific to blood in your

10   analysis?

11         THE WITNESS:  Well, we have the size, shape, and

12   distribution, but also blood is a fluid and follows the

13   principles of fluid dynamics.

14         THE COURT:  Right.

15         THE WITNESS:  So the raindrops and inkdrops and other

16   types of liquids will follow generally the same principles,

17   okay?  In teaching our courses, some instructors use red ink,

18   others use animal blood.  We use -- we try to use human blood

19   if possible, but all these liquids react pretty much the same

20   in terms of creating patterns.

21         THE COURT:  Right.

22         THE WITNESS:  But after that, there are obviously

23   physiological differences.

24         THE COURT:  Right.  Correct.  Thank you.

25

1    BY MS. SMITH:

2    Q.  And then the next slide I think you focus on different

3    types of passive stains?

4    A.  Yes, this is a further breakdown of the passive area of our

5    flow chart.  Transfer stains are listed here.  You have a swipe

6    which is simply the -- an object wet with blood is -- comes in

7    contact with a nonbloody surface and with a lateral motion

8    swipes.  We have another category which is not on here called a

9    wipe.  And if there's blood on a surface and you draw something

10   through it, it's called a wipe.  We have flow patterns, we have

11   drops of blood falling on surfaces, they can be a single drop,

12   they can be multiple drops in one area, or if there's a path of

13   blood drops we call it a drip trail so they're all pretty much

14   the same size stains.

15       Then with large volume stains we have saturation and

16   pooling of blood which are the most common.  The only

17   difference between saturation and pooling is the fact that

18   pooled blood falls -- forms on any -- a hard surface and

19   doesn't get absorbed whereas if that same amount of blood is

20   deposited on a mattress, for example, it absorbs in we call it

21   saturation.  It's just a matter of making a distinction between

22   the two surfaces.

23   Q.  And if we took a look at the next slide, we have a further

24   breakdown of the spatter categories?

25   A.  Yes.  Here we have what I mentioned before briefly, the

UNITED STATES DISTRICT COURT

1    secondary mechanisms, satellite spatter.  It's actually a

2    by-product of a passive dripping of blood but you get small

3    spots of blood that are created as blood falls into one drop

4    into the other, it creates the pattern of small spots.  We call

5    it satellite spatter.

6        More importantly, impact mechanisms, we recognize these

7    types of mechanisms, gunshot, beating and stabbings, and power

8    tools.  And there's other mechanisms in some like car

9    accidents, you may see impact spatters and things of that sort

10   but in our general work these are the common ones that I run

11   into.

12       And then we have projection mechanisms.  We break those

13   down into cast-off, which is having blood on an object or your

14   hand, and it's swung, the centrifugal force will cause the

15   blood droplets to fly off onto a nearby surface.  That's why we

16   call it cast-off.

17       Arterial, those are patterns created when there's a

18   breached artery, that is to say, for example, a cut in a

19   carotid artery will cause a spray of blood and it's very

20   characteristic in size and shape and this is due to the

21   pressure of the blood coming out of the artery.

22       And then finally, expirated blood by its name is blood that

23   is being forced out of the airway due to injury to the nose or

24   mouth, an oral cavity, or even the lungs, and those stains can

25   be very small as well.

 1        So when evaluating these bloodstains, you have to be aware

 2   of all the case facts that are present because, for example,

 3   impact mechanisms can overlap in size and shape with expired

 4   and cast-off, for example.  So that's why you need to be able

 5   to recognize this.  For example, expired blood, you can rule

 6   it out if there's no blood around the nose and mouth or in the

 7   chest injury.  So that's one way to, you know, substantiate

 8   your final conclusion.

 9   Q.  Thank you.  Let's talk about your involvement in this

10   particular case, the Barry Jones case.  Do you recall when you

11   were first contacted about this case?

12   A.  Yes, I believe it was back in -- hang on a second here.

13   Q.  If you know the general year, that's probably good enough

14   for us.

15   A.  It was approximately back in 2002.  Sorry.

16   Q.  And do you recall what you were asked to do at that time?

17   A.  I was asked to do a bloodstain pattern analysis of this

18   case based upon relevant materials that were sent to me as a

19   result.

20   Q.  Did you write a report back in 2002?

21   A.  Sorry?

22   Q.  Did you write a report at that time?

23   A.  An affidavit, yes.

24   Q.  An affidavit.  And you actually drafted that affidavit

25   yourself?

1    A.  Yes, I did this one.

2    Q.  Can we take a look at Exhibit 121?  And is this your

3    affidavit, Mr. James?

4    A.  Yes, yes, it is.

5    Q.  And could we take a look at page 3 and if -- is it possible

6    to see the top of page 4, too?  Perfect.  And in this affidavit

7    you list some materials that you reviewed related to Mr. Jones'

8    case?

9    A.  Yes, those are materials that I received that is A through

10   L and then M was an actual evidence examination done here in

11   Tucson on 11/18 of '02.

12   Q.  And when you came to Tucson to review physical evidence, do

13   you recall what evidence you looked at?

14   A.  I remember it was, I believe, clothing of Mr. Barry Jones

15   and I believe some of the carpet sections basically.

16   Q.  Let's take a look at Exhibit 65A at page 83.  Mr. James,

17   are these some of the carpet stains that you've previously

18   reviewed either in person or in photographs?

19   A.  Yes, that's true, correct.

20   Q.  And the top picture here is what the police identified as

21   V-6.  Could you describe what we're seeing here?

22   A.  Well, on this brown carpet, you're seeing an area of

23   saturation stain with some smaller spots of blood, apparent

24   blood, around it.  And that would allow me to draw a conclusion

25   it's most likely a drip pattern from blood falling into blood

1    and creating saturation and that is with the satellite spatters

2    around it.

3    Q.  And is that conclusion based upon the shape of the stain or

4    the volume of blood that you see here?

5    A.  Yes, the volume's difficult to determine but as far as the

6    area that's saturated, it's very small and you can see the

7    small stains around it that would -- it would fit the criteria

8    for a drip pattern.

9    Q.  And is that true of the stain that we're looking at in V-7

10   also?

11   A.  V-7 is extremely small but it does appear to be a small

12   saturation stain.

13   Q.  And does it also appear to be a drip pattern?

14   A.  Well, the stain, that irregularly shaped stain that is at

15   the edge of the paper, it's irregular because it's a drip stain

16   that fell on to a textured surface and you don't see a circular

17   stain you rather see one that's got spines and irregularities

18   around the periphery.

19   Q.  Thank you, Mr. James.

20           THE COURT:  I'm sorry.  You may have asked this

21   question and I've just forgotten but did you identify the

22   exhibit number this is?

23           MS. SMITH:  Of the exhibit?

24           THE COURT:  Right.

25           MS. SMITH:  This is Exhibit 65A.

DIRECT EXAMINATION - STUART H. JAMES

1              THE COURT:  Thank you.

2              MS. SMITH:  At page 83.

3              THE COURT:  Thank you.

4   BY MS. SMITH:

5   Q.  Let's go back to your original affidavit, Mr. James, which

6   is Exhibit 120.  And if we could take a look at page 4.

7              THE COURT:  And 120's been admitted?

8              MS. SMITH:  Yes, Your Honor.

9              THE COURT:  Thank you.

10  BY MS. SMITH:

11  Q.  I'm sorry.  I must have the wrong page.  I apologize, I

12  meant Exhibit 121.

13             THE COURT:  Same page number?

14             MS. SMITH:  Same page number.

15  BY MS. SMITH:

16  Q.  There we go.  And if we could enlarge paragraph 3 which

17  continues on to the very top of page 5.  And here in your

18  report you drew some conclusions about those two stains that we

19  just looked at, which was the carpet samples V-6 and V-7.  Your

20  review indicated that those stains indicated the presence of

21  blood consistent with Rachel Gray and you concluded that this

22  indicated that Rachel Gray was actively bleeding and moving

23  around while in the van and may have made contact with the

24  carpet with a bloody area at some point in time.

25      Is that true?

DIRECT EXAMINATION - STUART H. JAMES                    20

1   A.   Yes.

2   Q.   And you make a further comment about passive dripping of

3   blood on a surface such as carpet could create very small

4   stains due to the rapid absorption of blood into carpet fibers

5   and should not be confused with blood spatter.  I believe

6   you've already commented to us about how blood saturates into

7   carpet fibers; is that correct?

8   A.   That's correct, yes.

9   Q.   And these findings are based on your training and

10  experience?

11  A.   Sorry?

12  Q.   Are those findings based upon your training and experience?

13  A.   Oh, I'm sorry.  Yes, my training and experience in

14  bloodstain pattern interpretation and laboratory reports.

15  Q.   Thank you.

16       Could we go on to the next paragraph, please, paragraph 4

17  on page 5 of Exhibit 121?  Mr. James, did you also review some

18  bloodstains on the passenger's seat of the van?

19  A.   That's correct.

20  Q.   And did you have an opinion about what might have caused

21  these bloodstains?

22  A.   Yes.  Based on the evidence and the case facts that I was

23  able to study, I concluded that most likely the bloodstains on

24  the front passenger's seat of the van have the appearance of a

25  projected bloodstain pattern.  And the subcategory of that

1   would be sort of like a cast-off and the mechanism would be

2   based on, you know, the case facts from bloody hair possibly,

3   you know, swinging and causing blood to project from it onto

4   that surface.

5   Q.  And let's take a look at a picture of those bloodstains,

6   which is back in Exhibit 65A at page 120.  These are not the

7   greatest photographs.  But do these identify what you reviewed,

8   which was identified at trial as V-12, the spatter on the

9   passenger's seat?

10  A.  Yes, they're not as visible here as they were in other

11  photos, in another setting, but, yes, it's the areas --

12  Q.  Could we actually look at the next page?  I think it's a

13  little easier to see.  Is that a little bit better?

14  A.  Yeah, that's a little better, yes.

15          THE COURT:  I'm sorry.  Would that be -- are you

16  saying is that -- I'm a little confused.  I thought you said it

17  was projected.

18          THE WITNESS:  Yes.

19          THE COURT:  And from the original chart or one of the

20  earlier charts you were talking about swiping and wiping.  So

21  this is not a swipe or a wipe?

22          THE WITNESS:  No.

23          THE COURT:  What's the difference?

24          THE WITNESS:  The stains that were produced here were

25  airborne.  In other words, a swipe and a wipe have to have

1   direct contact.

2           THE COURT:  Direct contact?

3           THE WITNESS:  Direct contact with the surface,

4   correct.

5   BY MS. SMITH:

6   Q.  And I believe you described them as potentially cast-off?

7   A.  Yes, a type of cast-off.  Every cast-off is not a swinging

8   of an object, it can be bloody hair that is flipped. We've seen

9   that -- I've seen that several times in my casework.

10  Q.  Could we take a look at page 114 of this exhibit?

11  Mr. James, did you also take a look at this photograph of a bag

12  here in photo 950?

13  A.  Yes, that's a photograph of the Circle K bag, a white

14  plastic bag which has on it multiple transfer stains where

15  contact has been made from a bloody source onto that plastic

16  material.

17  Q.  And if we could go back to your report, which again is

18  Exhibit 121 at page 5.  Mr. James, your conclusions about the

19  bloodstains that you found in the van, are they consistent with

20  Rachel being carried or moved within the van while she was

21  bleeding from an open wound?

22  A.  Yes, I believe I put in my affidavit that the movement of

23  her was the blood source in different areas of the van, yes.

24  Q.  Did you do some further work on this case in 2012?

25  A.  Yes.

1   Q.  And did that include meeting with an investigator from our

2   office?

3   A.  With what again?  I'm sorry.  That microphone is a little

4   muffled for some reason.

5   Q.  I'm sorry.  Did that include meeting with an investigator

6   from our office?

7   A.  Yes.

8   Q.  And who was that?

9   A.  That was Mr. Sowards.

10  Q.  And when did you meet with Mr. Sowards?

11  A.  That was on December 18th in 2002 and --

12  Q.  2002 or 2012?

13  A.  I'm sorry?

14  Q.  Was it 2002 or 2012?

15  A.  Oh, I'm sorry.  It was actually 2011.

16  Q.  Okay.

17  A.  Yeah, I read the wrong -- I read the previous sentence.

18  This declaration is an addendum from my previous affidavit from

19  2002.  Sorry about that.  It was November 2nd, 2011, and after

20  my telephone conference we realized that I did not meet in

21  Tucson, I actually met in Salt Lake City.  Mr. Sowards came to

22  one of our bloodstain meetings and I met with him at that time.

23  Q.  And at that time did you sign a supplemental declaration?

24  A.  Yes.

25  Q.  Could we take a look at that declaration, which is

1    Exhibit 122?

2    A.  Yes, I have it in front of me.

3    Q.  Is this the declaration that you signed in 2012?

4    A.  That's correct.

5    Q.  Could we take a look at the second page?  That's your

6    signature?

7    A.  That's my signature, yes.

8    Q.  Mr. James, do you recall whether you actually typed out

9    this declaration or not?

10   A.  I'm sorry again?

11   Q.  Do you recall whether you typed this document?

12   A.  Actually, the typed font is the same but we realized later

13   that this declaration was actually typed out by Mr. Sowards

14   after consultation with me, so the thought process is mine and

15   the typing is his.

16   Q.  And by signing this declaration, did you agree that

17   everything in it was true and correct?

18   A.  I did, yes.

19   Q.  Could we take a quick look at Exhibit 49, which is a sealed

20   exhibit?  Mr. James, did you review this photograph?

21   A.  Yes, I did.

22   Q.  What do you see in this picture?

23   A.  Well, it's a photograph of Rachel, you know, at the post

24   mortem examination.

25   Q.  And do you see some blood in this picture?

DIRECT EXAMINATION - STUART H. JAMES

1  A.  Yeah, there's one transfer on the sheet and there's blood

2  -- apparent blood within her hair as well.

3  Q.  And you also rereviewed some of the photographs that we

4  just looked at in 2012?

5  A.  Yes.

6  Q.  Could we go back to your declaration, which is 122?  And if

7  we could enlarge paragraph 6.  Actually, can you do both 6 and

8  7?  In your 2012 declaration did you conclude that the small

9  bloodstains in the van were not typical of those produced

10 during a beating?

11 A.  Yes.

12 Q.  And what was the basis of that conclusion?

13 A.  Well, the fact that there was a single laceration on her

14 head that was described by the pathologist and, you know, the

15 photographs, and one laceration does not produce impact

16 spatter.  Impact spatter requires there to be exposed blood for

17 the object to strike and that will then spatter the blood.  The

18 first blow often just produces blood flow unless it's a massive

19 crushing injury, which is not this case, this type of case.

20                            EXAMINATION

21 BY THE COURT:

22 Q.  If I can ask a question.  So you're saying the projection

23 of blood wouldn't happen from the laceration?  Is that what I

24 understand your testimony to be?

25 A.  Not from that single blow.

1   Q.  But -- and I think the other piece of information you

2   testified to was it was blood projection from her hair?

3   A.  Right, that's from the swinging of her hair, yes.

4   Q.  Right.  But could the swinging be caused by blows to her as

5   opposed to just somebody carrying her or movement of the van?

6   A.  Well --

7   Q.  And is there a difference between what kind of pattern

8   would result from those two types of activities?

9   A.  Well, I would say just in the absence of other injuries to

10  her, that that was a less likely possibility.

11  Q.  What if blood had collected in her hair from the

12  laceration?  I mean, I'm assuming -- I'm assuming you're basing

13  your testimony on the fact that blood has collected in her hair

14  from the laceration, right?

15  A.  Yes, enough to be projected, you know, from movement, yes.

16  Q.  So here's what I don't understand.  Why do you assume that

17  the projection is only from her being carried or transferred

18  and not from being struck?

19  A.  Well, it would require additional striking of her, of which

20  there is no physical evidence to support that, no bruising or

21  anything like that.

22  Q.  Yeah, but I really want to focus on the blood on the seat

23  right now?

24  A.  Yes.

25  Q.  Is it as likely that blood would be projected from her hair

```
 1    if she was struck as it is if she were just simply being held

 2    and it's being projected from her head?

 3    A.  Well, there would have to be movement of her head while

 4    being carried.

 5    Q.  Either way?

 6    A.  Yes.

 7    Q.  So my next question is:  Can you, in looking at the blood

 8    pattern on the seat, make a distinction, without any other

 9    facts, as to whether that is a result of her being struck or a

10    result of her hair simply swinging because of the movement of

11    the van?

12    A.  Not without additional information.

13            THE COURT:  Thank you.

14                    DIRECT EXAMINATION (Cont'd)

15    BY MS. SMITH:

16    Q.  Mr. James, do you recall being interviewed a couple of

17    months ago?

18    A.  Yes, I do.

19    Q.  And at that time did we discuss what might happen if Rachel

20    had been repeatedly struck in the van with an overhead blow in

21    terms of what blood evidence you might see?

22    A.  Well, yes, the other -- the other facet of this -- of this

23    possibility would be that if she's being struck multiple times,

24    although not creating a laceration in the bloodied area, then

25    there's no cast-off on the underlining of the roof of the
```

```
 1   vehicle that, you know, we often -- often occurs, so that fact
 2   would be additional information as well and I did not see that.
 3   Q.  And if she was struck with a repeated lateral blow, would
 4   you see -- a repeated lateral blow in a bloody area, would that
 5   create a cast-off pattern as well?
 6   A.  Well, it depends on the directionality of the blow, if
 7   there was one, whether it's coming straight down with a back
 8   handed toward the ceiling, the underlining of the roof or a
 9   side blow, you would look for cast-off stains on the dashboard
10   or some other nearby surface.
11           THE COURT:  Do you know if those other surfaces were
12   inspected, the ceiling and the dashboard?
13           THE WITNESS:  I don't know.  I didn't do the crime
14   scene.  There was no mention of anything whether there was or
15   not that I recall.
16   BY MS. SMITH:
17   Q.  My next question was going to be whether you saw any
18   evidence of those types of cast-off in your review?
19   A.  Yes, certainly.
20   Q.  You saw those type of bloodstains?
21   A.  I'm sorry?
22   Q.  I'm sorry.  Let me be more clear.  Did you see in this case
23   in your review of the materials any evidence of those types of
24   cast-off stains in the van?
25   A.  No, and, again, I think more importantly I don't think
```

1    there were sufficient number of photographs but there was no

2    mention made of it by the investigator who actually did the

3    inspection of the van.

4    Q.  And, in general terms, how would you quantify the amount of

5    blood that was present in the van?

6             THE COURT:  I'm sorry.  Quantify it with what?

7    BY MS. SMITH:

8    Q.  Was it a large amount of blood, a small amount of blood in

9    your experience investigating crime scenes?

10   A.  Well, first of all, I can't quantitate it.

11   Q.  Sorry?

12   A.  I can only say qualitatively that from the photographs it

13   did not appear to be an excessive amount of blood.

14   Q.  Thank you.

15   A.  The quantitation of blood in any scene is very difficult to

16   accomplish.

17   Q.  I asked the wrong question, I apologize, that was what I

18   was going to.

19   A.  That's okay.

20   Q.  Mr. James, did you review the testimony of Detective

21   Pesquiera at Mr. Jones' trial as part of this case?

22   A.  Yes, I did.

23   Q.  I want to show you the transcript from April 12th, 1995, at

24   page 72.  And here Ms. Pesquiera is describing her

25   interpretation of some of the stains in the van; is that

1    correct?

2    A.  Yes.

3    Q.  And she describes stain V-6 as being an impression stain;

4    is that correct?

5    A.  Yes.

6    Q.  Sorry.  I'm looking at lines 4 through 16.  Thank you,

7    Jennifer.

8        And do you agree or disagree with Ms. Pesquiera's

9    conclusion?

10   A.  Well, I don't agree with the fact that she called it

11   impression -- an impression stain.  I see no impression of

12   anything.  I do agree that she stated that the blood is soaked

13   through but I don't think you can say how long it's been there

14   either or how long it took to do that.

15           THE COURT:  And can you just help me understand the

16   difference between an impression stain and another type of

17   stain?  I think you called this a saturation -- you called it a

18   saturation --

19           THE WITNESS:  Yes.

20           THE COURT:  -- earlier.  What's -- what's the

21   difference between saturation and an impression stain?  What's

22   an impression stain?

23           THE WITNESS:  An impression stain -- in fact, we don't

24   use that terminology but it has been used in the past.  For

25   example, and sometimes you can actually see them if someone

1   steps in blood and then creates some footwear impression,

2   sometimes you can see on the carpet especially you may be able

3   to see an outline of the shoe and that would be an impression

4   stain, okay?

5   BY MS. SMITH:

6   Q.  So it suggests that some object came in contact with the

7   surface?

8   A.  Some object, you know, compressing the area of blood

9   saturation.

10  Q.  And did you see any evidence of that type of compression in

11  your review in this case?

12  A.  No.  In my opinion, it was a drip pattern anyway, I

13  didn't --

14  Q.  If we could take a look at starting at line 17 on this page

15  and continuing on to the next page at line 3.  And here we have

16  some testimony about some of the other bloodstains, including

17  V-7 and V-12.  And the answer to -- and the answer to this

18  question, Sergeant Pesquiera describes V-7 as a pattern stain.

19  Do you agree with that?  And, again, V-7 was that picture we

20  looked at earlier with the little wood chip?

21  A.  Well, they're spatter stains but that's the top level of

22  the arrangement of the distribution of the categories.

23  Q.  And that stain that we saw, could we go back to Exhibit 65A

24  at page 83?  And the bottom picture here shows stain V-7.  Did

25  you agree with Sergeant Pesquiera that this is a spatter stain?

1    A.   I believe it's more consistent with a drip stain.

2    Q.   Okay.  And can we go back to the transcript at page 73?

3    And if we could look at line 25 on this page through line 15 on

4    the following page.  And here Sergeant Pesquiera's being asked

5    about the stains on the seat that we talked about and in her

6    answer she says that there was some type of blunt trauma that

7    struck the static blood causing it to go out.  Do you agree

8    with that conclusion?

9    A.   That's the one at the top of the page?

10   Q.   At the bottom of the page here.

11   A.   Your voice is still muffled.

12   Q.   I'm sorry.  At the end of her answer there at lines 14 and

13   15, she says it appears that there was static blood already

14   there and some type of blunt trauma struck that static blood,

15   causing it to go out.

16   A.   Again, I just touched that and made an arrow.

17   Q.   That's okay.

18   A.   She's saying some type of blunt trauma.  I mean, no, not

19   necessarily.  It can also be just from the movement and the

20   projection, so that's where we have the difference.

21   Q.   And if we could go back to your 2012 declaration, which is

22   122, and at paragraph 7.  Here you explain that the term

23   "projected" does not assume the act was violent.  "Projected"

24   could also be cast-off from the victim's hair as she was

25   carried into the van while the van was moving or during

1    resuscitation efforts, correct?

2    A.  Yes.

3    Q.  So the term "projected" doesn't necessarily imply some sort

4    of violent action?

5    A.  That's correct.

6    Q.  Did you also examine some bloodstains on the clothing that

7    Barry Jones had been wearing on May 2nd, 1995?

8    A.  Yes, I did.

9    Q.  Could we go back to your affidavit, which is Exhibit 121 at

10   page 5?  And in paragraph 6, you describe some of the blood

11   that was present on the clothing of Mr. Jones; is that correct?

12   Here you're describing some of the bloodstains present on

13   Mr. Jones' clothing?

14   A.  Yes.

15   Q.  And you said there's a few spatters on the sleeves of the

16   T-shirt?

17   A.  Yes.

18   Q.  And there's also some blood transfer present on the shirt

19   on both the sleeve and the rear of the shirt?

20   A.  That's correct.

21   Q.  The blue jeans also showed some blood transfer?

22   A.  Yes.

23   Q.  And then the brown work boots showed passive staining with

24   some satellite spatters that could not be determined to be

25   human blood but your observations were that this blood evidence

DIRECT EXAMINATION - STUART H. JAMES

1  indicated contact and proximity to a source of wet blood,

2  correct?

3  A.  Yes.

4  Q.  Do you recall that Sergeant Pesquiera also gave some

5  testimony at trial about the blood on Mr. Jones' clothing?

6  A.  I did.

7  Q.  Can we go back to the transcript from April 12th, 1995, at

8  page 74?  If we can take a look at line 24 through line 13 on

9  the next page.  And here Sergeant Pesquiera is asked a question

10  about the blood on the clothing that would be produced on the

11  driver of the van.  And she's asked:  If blood droplets on the

12  right sleeve were observed, would that be consistent with the

13  kind of static versus spatter pattern that you described?  And

14  she said:  Yes, it would.

15      Do you agree with Ms. Pesquiera that this spatter on the

16  sleeve is consistent with her earlier testimony?

17  A.  Well, first of all, the small spots could be -- are

18  classified as spatter.

19  Q.  Okay.

20  A.  But it's a matter of how much further you take that.  I

21  wouldn't agree that they would be consistent necessarily with

22  impact spatter because you can get small spatters of blood, you

23  know, from just carrying someone around.  The blood tends to,

24  you know, go through the air like that sometimes.  And it's

25  very few stains and a few stains do not make a pattern.  We

 1   teach that in both basic and advanced courses.  So that

 2   probably my best conclusion would be that there are too few

 3   stains to really interpret.

 4   Q.  That was going to be my next question.  Thank you.  So

 5   there's not enough blood present here to conclude anything

 6   about whether this was caused by a beating?

 7   A.  Yes, there's just too few stains.

 8   Q.  Could we go back to your affidavit, which is Exhibit 121?

 9   And if we look at paragraph 7 on page 6, these are some of your

10   conclusions about the blood that you observed in this case,

11   including the blood on Mr. Jones' clothing.  And, at the end of

12   this paragraph, you conclude that the bloodstains prove only

13   that his clothing, whether he was wearing them or not, was at

14   some point in time close to and in contact with the bleeding

15   source, some of which was consistent with the blood of Rachel

16   Gray.  These stains could have occurred as a result of lifting

17   or otherwise attending to an injured person; is that correct?

18   A.  Yes, that's my opinion.

19   Q.  And could we take a look at the next paragraph, which is

20   paragraph 8?  Oh, I'm sorry, I'm not going to refer to that

21   paragraph.

22       I don't have any other questions at this time for you,

23   Mr. James.

24            THE COURT:  Cross-examination?

25

1                           CROSS-EXAMINATION

2   BY MR. BRACCIO:

3   Q.  Good morning, Mr. James.

4   A.  Good morning, sir.

5   Q.  Do you recall how much you've billed so far in this case

6   for your time?

7   A.  I'm trying to think.  I didn't have any -- it was so long

8   ago, I don't have any record of it.  But I don't think it was

9   any more than 1,500 to 2,000 dollars for my work on the case so

10  far.

11  Q.  Okay.  If your invoices reflect that it was just over

12  $5,000, would you disagree with that?

13  A.  I'm sorry?

14  Q.  If your invoices indicated it was just over $5,000, would

15  you disagree with that?

16  A.  I'd have to see it, but if there is one available, it

17  likely includes my travel expenses as well.

18  Q.  There is no licensing for bloodstain interpretation,

19  correct?

20  A.  No, there is not.

21  Q.  And the organization that you are affiliated with, the

22  International Association of Bloodstain Pattern Analysts, is

23  not accredited by anyone, correct?

24  A.  You asked me that question in my -- in our discussion on

25  the phone.  I don't know of any organizations that are

CROSS-EXAMINATION - STUART H. JAMES

1    accredited so I'm not sure what you mean by that.

2    Q.  No law enforcement agency accredits that?

3    A.  We have many law enforcement personnel in the organization

4    but I don't know that it's been accredited by anybody.

5    Q.  It's a private organization?

6    A.  Private?  I suppose -- I suppose it is because it's not

7    limited -- people who join have to apply.  We have private

8    funding that allows for us to have conferences.  I mean, I

9    don't know.  Is the American Academy of Forensic Scientists

10   private?  I don't know that.

11   Q.  You teach law enforcement around the country on bloodstain

12   interpretation evidence, correct?

13   A.  Yes.

14   Q.  Including that week-long basic course in bloodstain

15   interpretation you previously mentioned?

16   A.  Yes, that's our primary basic course, yes.

17   Q.  And after you teach this course to officers and detectives,

18   they go out into the field and utilize those teachings at crime

19   scenes, correct?

20   A.  Well, yes, they're now getting prepared to do that.  But we

21   emphasize in our basic course that a basic course does not make

22   one an expert we emphasize that and we strongly recommend an

23   advanced course and case work and peer review as a general

24   procedure to follow.

25   Q.  Thank you.  I have no further questions.

1          THE COURT:  Any redirect?

2          MS. SMITH:  Nothing, Your Honor.

3                        EXAMINATION

4   BY THE COURT:

5   Q.  Okay.  I've got a couple of questions.  This kind of goes

6   back to a question I was asking you about the projection slash

7   cast-off analysis you did earlier, for instance, on the seat.

8   What other -- so, I think you understand the theory of the

9   prosecution was that Rachel being struck while she was in the

10  seat.  You understand that, is that your understanding of the

11  facts?

12  A.  Yes.  Yes, Your Honor.

13  Q.  Okay.  And I believe you testified that the blood evidence

14  was limited in scope.  When I say "scope", I mean of -- within

15  the van?

16  A.  Limited in scope, yes.  I think I said it was not an

17  excessive amount or something like that, I think.

18  Q.  My question is this:  I think you identified other areas

19  that would have been -- that you would expect to see blood if

20  she was being struck.  Is that what -- is that what you said?

21  A.  Yes, like cast-off in other areas, yes.

22  Q.  For instance the ceiling material, the covering --

23  A.  Right.

24  Q.  -- on the ceiling or the dashboard?

25  A.  Or any other nearby surface, yes.

 1    Q.  Okay.  Do you know if any blood collection in those areas

 2    was done?

 3    A.  I do not.

 4    Q.  Do you know, based on your experience, if one would look

 5    for blood in those areas if one were investigating this type of

 6    crime?

 7    A.  I would expect they would.

 8    Q.  Knowing the theory of the prosecution in this case, did you

 9    form an opinion as to whether or not you thought the blood

10    collection was sufficient?

11    A.  That's difficult to answer because I didn't have any

12    opportunity to examine the van, if I ever would have, so it's

13    difficult to say.

14    Q.  Let me ask this question another way.  Do you know if blood

15    was not collected from those other areas we just talked about

16    because there was no blood or because they didn't look for

17    blood there?

18    A.  I don't know whether it was A or B.

19    Q.  Did you review reports?

20    A.  Yes.

21    Q.  Did the reports give an indication that they either looked

22    for blood there or didn't look for blood there?

23    A.  I don't believe I have any recollection of that, no.

24    Q.  You have been testifying about principles of blood spatter

25    analysis that you used and brought to bear in this case; is

1   that right?

2   A.  Yes, sir.

3   Q.  Were the principles that you used in your analysis in 2002

4   and then more recently, were those principles in place in 1994?

5   A.  You mean the actual document?

6   Q.  No, no, no.  I mean the principles that you used to analyze

7   blood patterns, bloodstaining that you just testified to.  You

8   did this in 2002, right?

9   A.  Yes.

10  Q.  What I'm trying to ask you is, were the same principles

11  available in the early 1990s?

12  A.  Yes, they were.

13          THE COURT:  Would -- has my questions generated any

14  additional questions that the respondents would like to ask?

15          MR. BRACCIO:  No, Your Honor.

16          THE COURT:  That the petitioners would like to ask,

17  any questions?

18          MS. SMITH:  No, Your Honor, no.

19          THE COURT:  Okay.  Thank you very much, sir.  You're

20  excused.

21      Okay, your next witness.

22          MR. SANDMAN:  Your Honor, our next witness was to be

23  Judge Hazel and I'll check to see if he's arrived yet.

24          THE COURT:  That's fine.  I'm going to step out for a

25  second.

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.                41

1          (A recess was had.)

2               THE COURT:  Okay.  Your next witness?

3               MR. SANDMAN:  James Hazel.

4               THE COURT:  Pardon me?

5               MR. SANDMAN:  James Hazel.

6               THE COURT:  Sir, if you could please come forward.  If

7     you could just stand right there, madam clerk will swear you

8     in.

9               JAMES WILLIAM HAZEL, JR., WITNESS, WAS SWORN.

10              THE COURT:  Have a seat, please.

11        Mr. Sandman?

12              MR. SANDMAN:  Okay.  Thank you.

13                        DIRECT EXAMINATION

14    BY MR. SANDMAN:

15    Q.  Can you state your name for the record, please?

16    A.  James William Hazel, Jr.

17    Q.  Okay.  And can you tell us, what is your current

18    occupation?

19    A.  I'm a judge.

20    Q.  Okay.  And where are you sitting as a judge?

21    A.  I'm currently the presiding judge of the city of Apache

22    Junction, Arizona, in Pinal County, Arizona.  I'm the presiding

23    city magistrate for Pinal County, Arizona.  And I'm also an

24    initial appearance commissioner for Pinal County, Arizona.

25    Q.  And how long have you been in that position as a judge in

1    the Apache magistrate court there?

2    A.  Since December 15th, 2008.

3    Q.  Okay.  And can you tell us when you were admitted to the

4    Arizona bar?

5    A.  1988.

6    Q.  All right.  And so can you give us sort of a brief overview

7    of what you were doing between, say, 1988, and when you went on

8    the bench in 2008?

9    A.  After I passed the Arizona bar exam, I went to work for the

10   city of Phoenix as a prosecutor and I did that for two and a

11   half years.  In August of twenty -- August of 1990 I was hired

12   by the city of Mesa as a contract public defender.  I worked --

13   an attorney named Andy Biggs, who is now a United States

14   Congressman, him and I had an office together and we did city

15   court matters and city of Mesa, city of Phoenix, and then we

16   started out with representation contracts in Maricopa County

17   Superior Court.

18       In -- that eventually led to me having a contract in Gila

19   County, Arizona, in the mid-'90s, after Mr. -- Congressman

20   Biggs retired.  And in 2000 I was elected the Gila County

21   Attorney.  A year later I was appointed to the superior court

22   and then I lost a contested election I think in 2002 and a

23   couple of weeks later I was hired as a judge in the city of

24   Mesa and I stayed there until 2008.

25   Q.  Okay.  And do you remember that you were appointed to

 1   represent Barry Lee Jones in his state post-conviction

 2   proceeding?

 3   A.  Absolutely.

 4   Q.  And do you remember that was around September of 1999 when

 5   you were appointed?

 6   A.  Yes, if that's the date you say, I have no reason to

 7   disagree with you.

 8   Q.  Can we take a look at Exhibit 126?

 9   A.  Okay.  I'm going to look on the screen for that?

10   Q.  Yes, sir.

11          THE WITNESS:  If it's all right with Your Honor, can I

12   move a little closer because of my vision.

13          THE COURT:  Absolutely.

14          THE WITNESS:  It's difficult for me to see but I can

15   see that's an order.

16          THE COURT:  We can blow that up, too.

17   BY MR. SANDMAN:

18   Q.  If you can blow that up at the top there, I wanted you to

19   capture the date.

20   A.  I can see the September 22nd on it.

21   Q.  Okay.  And you recognize this is the order of appointment

22   to Mr. Jones' case?

23   A.  Yes, you showed me that at the deposition.

24   Q.  Okay.  And I want to direct your attention to, it's

25   actually the last sentence on that page that goes over onto the

 1   next page.  If we can just blow that up through there.  And do

 2   you see that the order of the -- this is an order from the

 3   Arizona Supreme Court appointing you, that it states that you

 4   should direct your request for the appointment of investigators

 5   and experts to the superior court pursuant to ARS

 6   Section 13-4013(b), as in boy, correct?

 7   A.  Yes, I can see that there.

 8   Q.  Okay.  Now, do you -- I just want to sort of skip ahead in

 9   time, but do you remember approximately when the Pima County

10   Superior Court denied relief to Mr. Jones in the

11   post-conviction proceedings?

12   A.  No, I don't remember the exact date.

13   Q.  Can we just look at Exhibit 137?  Do you recognize

14   Exhibit 137 as the October 11, 2000, decision of the Pima

15   County Superior Court deciding Mr. Jones' post-conviction

16   petition?

17   A.  Yes, and you showed me that at the deposition.

18   Q.  Okay.  And relief was denied to Mr. Jones in those

19   proceedings; is that right?

20   A.  That's what it says, yes, sir.

21   Q.  And then can we take a look at Exhibit 138?  So the

22   decision was made denying relief in October of 2000 and then do

23   you recognize Exhibit 138 as an order permitting you to

24   withdraw from representing Mr. Jones?

25   A.  Yes.

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.

1    Q.  And that looks like it was filed November 27, 2000,

2    correct?

3    A.  The order, the date that it was filed by the clerk you

4    mean, is that what you're asking me?

5    Q.  Yes.

6    A.  It appears to say November 29th that I see.

7    Q.  Okay.

8    A.  And then -- or it's file stamped and then there's another

9    date over on the other that says November 27th so there's two

10   dates at the top.

11   Q.  Right.  It appears as though the date on my right is the

12   clerk's stamp from the Arizona Supreme Court and -- excuse

13   me -- the stamp on the left is from the clerk in Pima County.

14   A.  Okay.  If you say so.  I can't read that writing so, I'm

15   sorry, yes, it looks like the November 27th date is Supreme

16   Court, yes.

17   Q.  So is that when you withdrew?  Is that when you took the

18   position as the Gila County Attorney in Arizona?

19   A.  I was sworn in right after the first of January of that

20   next year.

21   Q.  Okay.  Prior to representing Mr. Jones in his death penalty

22   post-conviction proceeding, had you ever represented a

23   defendant in a capital post-conviction proceeding?

24   A.  I want to answer it honestly.  I can't remember the order

25   of different appointments.  I know there was multiple

1    appointments so I can't tell you if this was the first one but

2    it wasn't a common occurrence, but I can't remember the order

3    of which I was appointed to persons then.

4    Q.  Okay.  Do you recall that technically you were not really

5    qualified experientially to post-conviction cases in capital

6    cases at the time that you were appointed to Mr. Jones' case?

7    A.  Yes, we discussed that at the deposition and I agreed with

8    you, yes.

9    Q.  I'd like to show you Exhibit 128.  If you could blow up

10   maybe the first three-quarters of that page there.  Do you

11   recognize Exhibit 128 as a billing statement or at least the

12   cover sheet of a billing statement that you submitted on or

13   about March 28, 2000, in connection with your work on

14   Mr. Jones' case?

15   A.  Yes.

16   Q.  And if you could turn to the final page of the exhibit,

17   which I believe is on page 4, if you could blow that up for us.

18   You see the total hours expended in this billing statement was

19   98.7 hours; is that right?

20   A.  That's what it says at the bottom, yes, sir.

21   Q.  And it looks like this is the final billing entry on that

22   page as March 28, 2000, which was the day you filed the state

23   post-conviction petition for Mr. Jones, correct?

24   A.  That's what the -- if you're asking me what it says there,

25   yes, sir.

```
 1   Q.  Okay.  Now, would you agree that the itemization or the
 2   description of your work on Exhibit 128, which is the work that
 3   you did from the time of appointment through the filing of the
 4   post-conviction petition, would you believe that that record,
 5   as well as the contents of your file, in other words, the work
 6   product portion of the file that you created, that those
 7   documents, the billing record and your file, would constitute
 8   the best record of what you did in Mr. Jones' case, the work
 9   that you did?
10   A.  Well, I always strive to be accurate with my bills and
11   other documents so -- and as we discussed in the deposition, I
12   believe that to be the case.
13            MR. SANDMAN:  And, Your Honor, just for the record,
14   the post-conviction file in Mr. Jones' state court proceedings
15   is marked as Exhibit 2 in these proceedings.  So that would --
16            THE COURT:  So 1 is the trial record and 2 is the
17   post-conviction relief record?
18            MR. SANDMAN:  Correct.
19            THE COURT:  Okay.
20   BY MR. SANDMAN:
21   Q.  Now, when you received your appointment, did you -- soon
22   after obtaining your appointment, did you present a funding
23   request to the Superior Court for investigative assistance?
24   A.  Yes.
25   Q.  And can we take a look at Exhibit 130?  And if you could
```

1    blow up the first -- that's good right there.  And I think we

2    said you were appointed in September of '99 and this document

3    appears to be file stamped October '99; is that right?

4    A.  Yeah, I can't read the date.  I'm sorry.

5    Q.  It looks like October 29th.  I want to direct your

6    attention to the -- down -- if we can capture lines 1 through

7    -- or 12 through 24 there.  Now, when we started our discussion

8    this morning, we looked at the Arizona Supreme Court order

9    which directed that you present funding requests pursuant to

10   Arizona statute, I believe it was 13-4013.  Do you remember

11   that?

12   A.  Yes.

13   Q.  And in your -- in this particular request that you filed,

14   you cited as authority Rule 706(a) of the Arizona Rules of

15   Evidence?

16   A.  Yes.

17   Q.  And do you know what is provided in Rule 706(a) of the

18   Arizona Rules of Evidence?

19   A.  I can't recall what was provided then.

20   Q.  Okay.

21   A.  I don't have the rule in front of me, so --

22   Q.  In any event, you didn't -- you didn't make the request

23   pursuant to the authority directed by the Arizona Supreme

24   Court; is that correct?

25   A.  As I mentioned in the deposition, the document speaks for

1   itself, so --

2   Q.  Okay.  Now, down on line it looks like starting around 19

3   or 20, you said:  An investigator is necessary to review the

4   defense investigation already submitted to the trial court to

5   determine if all necessary defense evidence was presented.

6   Correct?

7   A.  Yeah, the document speaks for itself, yes, sir.

8   Q.  And so at the time you filed this request, do you believe

9   that -- that you thought that some type of investigation was

10  necessary to assess the quality of the investigation that was

11  done by trial counsel?

12  A.  I wouldn't have filed the motion if I didn't believe that

13  to be true.

14  Q.  Okay.  And when you took on the appointment and at the time

15  you filed this initial request for assistance, did you believe

16  that a post-conviction investigation was necessary to allow for

17  the discovery of all reliable claims, including ineffective

18  assistance of counsel claims?

19  A.  Let me answer that and then if I didn't answer it the way

20  you want me to, you can correct me or ask me another question.

21  In any major case, I always believe that the use of a qualified

22  investigator was of the utmost importance.

23  Q.  And did you believe in this case that it was necessary to

24  allow for the potential of discovering claims, reliable claims,

25  of ineffective assistance of counsel against trial counsel?

1    A.  Yes, as made -- as the motion states.

2    Q.  Ultimately, was there any investigation that was done in

3    Mr. Jones' case during the post-conviction proceedings?

4    A.  You mean was there investigators?

5    Q.  Well, either -- well, let's break it down then.  Did you

6    obtain any assistance from an investigator in Mr. Jones' case?

7    A.  I don't recall that I did.  I think I had to do the

8    interviews and follow-up myself.

9    Q.  Okay.  And in terms of any investigation that you did, if

10   you did any, that would be reflected on your invoice, at least

11   anything you did prior to the filing of the petition?

12   A.  Absolutely.

13   Q.  And can you recall any investigation other than your

14   interview of the co-defendant, Angela Gray?

15   A.  Well, I don't have the bill in front of me but I know -- my

16   recollection is I spoke to the other lawyer as well.

17          THE COURT:  I'm sorry?

18          THE WITNESS:  I spoke to the other lawyer as well.

19          THE COURT:  No, I heard that.  I'm a little confused

20   about the question and answer that was mentioned earlier.  As I

21   understood it, you made an application for permission to hire

22   an investigator.

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Okay.  And then -- but then you said you

25   did the investigation yourself.  I'm sort of missing what

1    happened in between.  Did you -- were you not -- was the

2    request to hire an investigator not approved or did you just

3    decide that you're going to do the investigation yourself?

4              THE WITNESS:  Okay.  I can answer that question 'cause

5    I don't want to interfere with the lawyer part of what he's

6    trying to do.  If you'd like me to explain, I can.

7              THE COURT:  Please.

8              THE WITNESS:  As Mr. Sandman will bring out, there was

9    two, I believe, requests for investigators that were denied.

10   And then --

11             THE COURT:  You made two requests?

12             THE WITNESS:  Yes.

13             THE COURT:  Each one was denied?

14             THE WITNESS:  Yes.  And this was all discussed in the

15   deposition.  But my view I expressed to him, at that time, the

16   court did not favor appointing people to assist, and whether it

17   was in Maricopa, Pima County, that was just not how it was -- I

18   can't explain why, and I explained to all the attorneys in the

19   deposition that it has affected how I work as a judge because

20   you want to ultimately get to the merits of the case and so if

21   someone makes a reasonable claim, then you want to move forward

22   with that and try to do that.  That was just not the common

23   Arizona experience at that time.

24             THE COURT:  So you asked for the resources twice and

25   you were told no twice, which is why you ended up doing the

1    investigation yourself?

2              THE WITNESS:  Yes.  I hope that answers your question.

3              THE COURT:  That -- that answers my question.  Go

4    ahead.

5    BY MR. SANDMAN:

6    Q.  I was going to refer you to Exhibit 1 -- back to your

7    invoice which summarizes the work you did before.

8    A.  Go to another exhibit then?

9    Q.  This is Exhibit 128.

10   A.  Because Exhibit 130 is still up here, I'm sorry.

11   Q.  If you can go to page 2 and maybe blow up as much of that

12   page as you can.

13   A.  I can see it generally.  If you have a specific line you

14   want me to look at, I can get closer.

15   Q.  Let's just look at the first half.  Do you -- other than --

16   it looks like you had a three-tenths hour conversation with

17   Sean Bruner on September 15, '99.

18   A.  Okay.  That would be at the top of the page; is that

19   correct?

20   Q.  Right.

21   A.  Yes, I saw that there.

22   Q.  And then it looks like you had another conversation with

23   him a few days or a week later or so on the 22nd of September,

24   1999?

25   A.  I see the September 22nd.

1   Q.   Okay.

2   A.   I don't see the September 15th one.  You're referring to

3   the phone call?  I'm not trying to argue with you.

4   Q.   September 15th is about the third billing entry.

5   A.   Where where it says "letter", you mean?

6   Q.   I apologize.  My mistake.

7   A.   Okay.

8   Q.   The telephone call was actually on September 22nd, correct?

9   A.   Okay.

10  Q.   And that was before you had the file?

11  A.   I don't recall when I got the file.

12  Q.   Well -- but there aren't any billing records for any record

13  review until it looks like the end of October, is that right?

14  A.   What line would you like me to look at?  I'm sorry.

15  Q.   October 29th, 1999.

16  A.   Yes, I can see that it says that, yes.

17  Q.   Okay.  And then if you review the rest of the page through

18  November 11th, do you see any other activity other than

19  reviewing the file?

20  A.   There's a lot of reviews in there.  There's -- it talks

21  about picking up the boxes and the letters.  It says filing a

22  motion.  Are you talking about just November or --

23  Q.   Yeah, just through that page.  There's no investigation

24  that you conducted during that time period shown on those

25  entries, correct?

1   A.  That's correct.  And as I mentioned in the deposition that

2   the bill speaks for itself and --

3   Q.  All right.  So you're saying that if there was any

4   investigative activity on your part, that it should be

5   reflected on the bill if it happened during this time period?

6   A.  Well, as I told you on the deposition that I did my best I

7   could to do the bill and, unfortunately, traditionally I

8   underbilled but I certainly cannot testify under oath now that

9   a certain thing happened on a certain day that's not reflected

10  in a bill, and I wouldn't attempt to.

11  Q.  Now, if we can take a look at Exhibit 131.  And if we could

12  enlarge that.  Now, this was the court's order denying your

13  first request for investigative assistance; is that right?

14  A.  If you're saying that's what it is, then it is the first

15  one.

16  Q.  Okay.

17  A.  You know --

18  Q.  The funding request we looked at you had filed on

19  September 22nd, '99, and that's referenced in the minute entry?

20  A.  Yes, I can see that.

21  Q.  And the court indicated about six lines from the bottom

22  that none of the foregoing motions recites any specific reasons

23  to support the need for such appointments at the present time,

24  including the investigative assistance, correct?

25  A.  I think the order speaks for itself.

1    Q.  And do you know what the requirements are in ARS 13-4013,

2    which is the statute that the Arizona Supreme Court dictated

3    that you follow in requesting experts or investigative

4    assistance?

5    A.  I don't have the statute in front of me at this time.

6    Q.  Okay.  Let's take a look at Exhibit 132.  That's fine.

7    Now, this was a motion for reconsideration that you filed in

8    connection with your request for investigative assistance,

9    correct?

10   A.  That's how it's titled, yes, sir.

11   Q.  Okay.  And it looks like it's file stamped January 3, 2000;

12   is that right?  I'm not sure that date's showing but if the

13   record shows that, that's correct, right?

14   A.  I have no reason to disagree with the file stamp that you

15   say exists.  I can't see it but if you say it's there --

16   Q.  All right.  If we can enlarge 13 through 17 on that page.

17   And this is similar to the motion that you filed in September

18   of 1999?

19   A.  Uh-huh.

20   Q.  You're relying on legal authority in 706(a) of the Arizona

21   Rules of Evidence which permits the court and the parties, you

22   know, to agree that the court appoint experts that are to

23   report to the parties and the court.  You're citing that as

24   authority as opposed to the statute that actually regulates the

25   appointment of indigent defense services in ARS 13-4013,

1    correct?

2    A.   The motion speaks for itself.

3    Q.   Do you believe that in order to or do you expect that in

4    order to obtain funding in a state post-conviction proceeding

5    that you would need to demonstrate facial compliance with

6    ARS 13-4013?

7    A.   Are you asking me what's in the judge's mind?

8    Q.   No, I'm asking, as state post-conviction counsel, would you

9    have expected that, in accordance with the Arizona Supreme

10   Court order, that you would have to show some type of facial

11   compliance with ARS 13-4013 in order to get funding in an --

12   indigent defense funding in this case?

13   A.   Honestly, no.  I don't think the judge was going to grant

14   it no matter what I put down on that piece of paper.

15   Q.   Well, until you -- well, let me strike that.

16          THE COURT:  Mr. Sandman, let me ask a question.  Is

17   what you're getting at here, you think he's referring to the

18   wrong authority in making the request to the court, is that

19   your point?

20          MR. SANDMAN:  Well, ultimately the court makes a

21   ruling on that in response to this motion, but --

22          THE COURT:  And in any of these filings, did the court

23   point out to him that he was relying on the wrong authority?

24          MR. SANDMAN:  Yes.

25          THE COURT:  And did the court ask him to make a

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.                    57

1    request under the appropriate authority?

2             MR. SANDMAN:  Well, the court, and I'm about to get to

3    this but, yes, the answer is -- well, the court didn't --

4    didn't advise him to do anything.

5             THE COURT:  To resubmit his request?

6             MR. SANDMAN:  What the court said was that the request

7    failed to comply and cited the statute and the cases and then

8    left it to Mr. Hazel, I suppose.

9             THE COURT:  I'll let you continue but I have one more

10   question based upon the witness's answer to your last question.

11        Sir, I think what you said, if I understood correctly and I

12   just want to make sure I'm understanding what you're saying

13   correctly, is you believed that the court would not have

14   approved your authority whether or not you asked for it under

15   the right authority; is that what you were saying?

16            THE WITNESS:  Yes.

17            THE COURT:  Why?  Why do you say that?

18            THE WITNESS:  I did this extensively in Maricopa

19   County.  I know this is a different court and a different judge

20   but the culture at that time was that you didn't get experts,

21   you didn't get investigators, you didn't get transcripts.  I

22   had done prior death penalty cases.  Judges had denied

23   transcripts for a defendant that -- my client who had prior

24   trial where the prosecutor used the same confession in two sets

25   of facts.  That was just how it was done.

 1      And, for example, everything was denied.  So if you'd

 2   submit a bill -- a perfect example was one of the death penalty

 3   cases I did.  You'd submit the bill to the judge, she'd cut it

 4   in half and say:  Thanks, you've got experience at the benefit

 5   of the Arizona Superior Court.  It was just the culture of how

 6   it was done there.

 7      There was one case out of Coconino County that I worked on

 8   briefly and when I went over the transcripts, you could see how

 9   it's completely different there.  That judge, I forget his

10   name, actually provided resources to the attorneys.

11            THE COURT:  Thank you.

12      Go ahead, Mr. Sandman.

13   BY MR. SANDMAN:

14   Q.  In your experience in Pima County to date, can you point to

15   a case or an example of where you filed an application for

16   funding that cited the appropriate statutory authority and

17   provided the necessary elements required by that authority in

18   ARS 13-4013?

19   A.  No.

20   Q.  And would one expect that a lawyer who never complied with

21   ARS 4013 might have the experience of not obtaining funding as

22   easily as, for example, a lawyer who did comply with the

23   statutory requirements?

24   A.  That can be your opinion.

25   Q.  Did -- was your bill cut in this case?

1    A.  I don't recall.

2    Q.  The record will show whether your bill was cut?

3    A.  Well, of course.  I'm not trying to say this judge cut the

4    bill.

5    Q.  All right.  And at page 2 of Exhibit 132, at lines 10

6    through 12, in support of your request for an investigator, you

7    indicated you needed one to determine if the case was fully

8    investigated.

9        Do you see that during the trial proceedings?

10   A.  That's at line 11, yes, I can see that.

11   Q.  And so at least at this stage now, you were appointed in

12   September and you've reviewed a lot of the -- quite a bit of

13   the file, correct, by March of 2000?

14   A.  As the bill indicated, yes, sir.

15   Q.  Okay.  And you were -- after reviewing the trial attorney's

16   file, you had questions about whether they had fully

17   investigated the case, correct?

18   A.  Absolutely.

19   Q.  And if we could turn to page 133 or Exhibit 133, excuse me.

20   Now, this is the trial court ruling denying your motion for

21   reconsideration dated January 19, 2000; is that right?

22   A.  If that's what you say it is, or if you want me to read the

23   whole thing, I can.  I can see the date.

24   Q.  And if you can just blow up the ruling itself.  And you see

25   in the ruling that the court has denied the motion for

1    reconsideration because it failed to comply with

2    ARS 13-4013(b)?

3    A.  That was the judge's opinion.

4    Q.  Well, let me ask you this, if -- if your application for

5    funding failed to comply with ARS 4013(b), then the court had

6    no discretion to grant your request for funding, correct?

7    A.  That's your opinion.  I don't agree with you.

8    Q.  Is there --

9    A.  I guess it's your definition of "showing".  I think what I

10   laid out there was a showing.

11   Q.  Okay.  And then in explaining its decision as to why the

12   court determined that you had not complied with ARS 4013(b), if

13   we could blow up just the last few lines of the order, the

14   court there is quoting --

15   A.  Yes, I can read that.

16   Q.  The court is actually, in this section of its decision,

17   quoting from an Arizona Supreme Court case.  You agree that the

18   trial court is bound to follow the Arizona Supreme Court?

19   A.  I would hope so.

20   Q.  Okay.  And the court cites there that undeveloped

21   assertions that assistance would be beneficial are not enough.

22        Do you see that?

23   A.  I can read that.

24   Q.  Okay.  Now, did you -- after you received this ruling in

25   January of 2000, did you attempt to formulate a -- an

1    application for funding that addressed the trial court's

2    concerns about --

3    A.  The billing statement would show that.  I don't think I

4    did.

5    Q.  Okay.  Now, do you think that, as part of your

6    responsibility to Mr. Jones as his attorney in a capital

7    post-conviction proceeding, that it would have been important

8    to him for his attorney to take this ruling and then attempt to

9    craft an application that would satisfy the statutory

10   requirements instead of Rule 706 of the rules of evidence?

11   A.  I guess in hindsight it could have been done differently.

12   I've already expressed my opinion about what I thought the

13   judge was going to do.  And, as you can see from the motion,

14   the attorney general didn't oppose the appointment of an expert

15   so I --

16   Q.  Do you -- well, let me strike that and ask you, have you

17   undertaken some reexamination of your file in this -- in this

18   case since you've been identified as a witness and had your

19   deposition taken and so on?

20   A.  Well, you sent me a series of documents that you asked me

21   to review and then we had a lengthy deposition where you asked

22   me a number of questions and provided documents that you wanted

23   me to look at, of course.

24   Q.  Okay.  And based on your more recent examination of the

25   trial file and your file as well as some of the trial

1    transcripts, do you agree that the timing of Rachel's injuries

2    was a central issue at Mr. Jones' trial?

3    A.  Yes.

4    Q.  Now, since you -- since the timing of Rachel's -- and

5    that's apparent from the record, correct, from the trial

6    proceedings at Mr. Jones' case, that the timing of the injuries

7    was a central issue?

8    A.  I think it would be but I guess that would have been a

9    question for the jury at that particular point.

10   Q.  Well, the prosecutor -- the prosecution presented evidence

11   that Rachel's injuries were inflicted on Sunday, May 1st, 1994?

12   A.  We talked about that at the deposition.

13   Q.  Okay.  So the record that you reviewed demonstrated to you,

14   without any outside investigation at all, that the timing of

15   the injuries was a central issue at the trial?

16   A.  It showed what the state's position was, yeah.

17   Q.  And since the timing of Rachel's injuries were a central

18   issue and you have testified it was your objective to determine

19   if the case had been fully investigated by trial counsel, did

20   you ever investigate it -- excuse me -- did you ever

21   investigate whether trial counsel had adequately investigated

22   the timing of Rachel's injuries?

23   A.  If you could narrow the scope of the that question.  If

24   "investigate" means I talked to people about the case, I would

25   say yes but I think you're looking for something more.  I'm not

1   trying to be difficult but --

2   Q.  Well --

3   A.  If you're asking me if I went to the fire station and

4   talked to the firefighters, no.  If you're asking me if I

5   talked to Mr. Jones and others, including the original

6   co-defendant, the answer then is yes.  But, again, the bill

7   speaks for itself.  So I'm certainly not going to sit here

8   18 years or whatever after and try to claim that something not

9   on the bill happened at a date, time, and place.

10  Q.  Okay.  And if the billing record shows that nearly

11  100 percent of your time was spent reviewing documents and

12  records and writing the petition and meeting once or twice with

13  Mr. Jones and one time with the co-defendant, then that would

14  be a fair account of what you did if that's what the bill

15  shows, correct?

16  A.  I always testified, whether here or in the deposition, the

17  bill speaks for itself.  I'm not going to try to go back, and

18  I've told you before, I've had two major surgeries, regardless

19  of this new thing with my eye.  And so memory issues are not

20  the best.  So I'm certainly not going to try to claim that I

21  did something that's not reflected in the bill and I've told

22  you that before.

23  Q.  Do you recall, based on your review -- recent reexamination

24  of the records that Dr. Howard testified at Mr. Jones' trial

25  that all Rachel's injuries were consistent with infliction on

1    Sunday afternoon, May 1, 1994?

2    A.  That's what you told me at the deposition, yes.

3    Q.  Well, did you see that --

4    A.  You showed me that, yes; you showed me that at the

5    deposition.  I don't disagree.

6    Q.  All right.  So you satisfied yourself, based on the records

7    shown to you at your deposition, that that was Dr. Howard's

8    testimony, that the injuries were consistent with infliction on

9    May 1, correct?

10   A.  Yes, you presented that to me.

11   Q.  Now, did you also observe, based on your review of the

12   record, that trial counsel posed no questions to Dr. Howard on

13   the time of injuries, correct?

14   A.  You showed me that at the deposition, yes, sir.

15   Q.  And then trial counsel didn't present any evidence in

16   support of an alternative timeline at Mr. Jones' trial,

17   correct?

18   A.  You pointed that out at the deposition, yes, sir.

19   Q.  And all of that, at least in terms of what Dr. Howard said

20   and the absence of any cross-examination by defense counsel,

21   the failure to present any alternative timeline, that's

22   something you could determine just on reviewing the record

23   without any outside investigation, correct?

24   A.  It seems like there was a lot of compounds in there but,

25   yes -- yeah, obviously you get a feel for the case by reviewing

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.

1   the trial record, absolutely.

2   Q.  Okay.  Now, and so here's my question.  With the absence of

3   cross-examination of Dr. Howard by trial counsel and trial

4   counsel's failure to challenge the state's timeline -- timeline

5   with any defense evidence, would that give rise to a question

6   whether trial counsel had adequately investigated the time of

7   injuries question?

8   A.  Yes, I believe so.

9   Q.  Okay.  So reviewing the record and looking at the state's

10  theory, looking at the absence of any cross-examination,

11  looking at the absence of defense evidence, there's a question

12  regarding the adequacy of trial counsel's investigation at the

13  time of injuries, and what I would like to know is, is that

14  something that you could have conveyed and communicated to

15  Judge Quigley, who was the state post-conviction judge, in

16  support of funding so that you could investigate further

17  whether trial counsel's investigation was adequate?

18  A.  So are you asking me --

19  Q.  Let me start over.  What I'm trying to get at is whether

20  you could have taken all this information that you've just told

21  us, that the absence of cross-examination of Dr. Howard, the

22  lack of any defense alternatives to the time of injuries,

23  whether seeing that raised a question about the adequacy of

24  trial counsel's investigation.  Now you've already said yes,

25  that those record facts raise a question about the adequacy of

 1  trial counsel's investigation, correct?  You've said that --

 2  you've said that.

 3      And I want to know, could you have taken that information

 4  to Judge Quigley and said:  Judge, we've got a guy who's

 5  convicted on a timeline.  The evidence of the prosecution was

 6  never challenged.  There's not a single question by the trial

 7  lawyer contesting this timeline.  And this says to me that

 8  there may be some questions about the adequacy of trial

 9  counsel's investigation.  And now I need, you know, we need

10  money to begin to look at that.

11      That would be a specific articulation of a potential

12  failing in trial counsel's performance, correct?

13  A.  So now do I answer?  I'm not trying to give you a hard

14  time, I'm just trying to figure out --

15          THE COURT:  I think he wants an answer.

16          THE WITNESS:  Okay.  If -- if the question simply is,

17  could I have put more in the motion?  Well, of course I could

18  have put more in the motion.  I told you that in the

19  deposition.  I think our dispute is is what would it have

20  meant?  I guess that's speculation at this point.

21  BY MR. SANDMAN:

22  Q.  Okay.  I agree with that.  Now --

23          THE COURT:  Okay.  So we can stop the commenting.

24          MR. SANDMAN:  I'm sorry.

25          THE COURT:  Look, I think what he's trying to say is

1    this --

2          THE WITNESS:  Is this a question?  I'm sorry, Your

3    Honor.  I'm not trying to be disrespectful.

4          THE COURT:  No, I'm trying to follow up on his

5    question.  I'm trying to understand.  I think he's saying if

6    you had pointed out to the court that you think there were

7    problems with the timeline theory that the prosecution

8    presented at the trial, do you think that would have helped

9    convince the judge to give you the resources you needed to

10   pursue the investigation you wanted to pursue.

11         THE WITNESS:  I'm trying to understand the question.

12   And I'm not trying --

13         THE COURT:  So let me break it down a little more.  So

14   what he's trying to say is that the prosecution pursued a

15   theory at the trial that relied upon a particular timeline of

16   when events happened.  If you could have pointed out to the

17   judge in your request that there were serious flaws with that

18   timeline, would that have helped, do you think, convince the

19   court to give you the resources?  I think that's what you're

20   trying to ask.

21         THE WITNESS:  I don't think he's asking that.  I'm not

22   trying to interfere with that.

23         THE COURT:  Okay.  Well, I'm asking it.

24         THE WITNESS:  No, I don't.  That's my belief, sincere.

25   I don't.  I do agree that I could have put more in but I don't

1    think that's the case.  That's just the culture that we were

2    working.  Obviously I didn't get it and obviously it was

3    needed.  I'm not disagreeing with that.  I'm not making an

4    assertion here today that I had the ability to do this

5    investigation on my own because I wouldn't have asked if I

6    thought that was the case.

7            THE COURT:  Is it your belief that it doesn't matter

8    what you would have said in your pleadings, you would not have

9    been -- your request would not have been approved?

10           THE WITNESS:  That's what I believe, yes.

11           THE COURT:  And you believe that's because it was the

12   culture of the court at that time to deny those requests in

13   spite of what you -- how you would have framed it?

14           THE WITNESS:  Right.  And this is shown by the fact

15   that the Attorney General didn't even oppose this request for

16   the expert.

17           THE COURT:  Go ahead, Mr. Sandman.

18   BY MR. SANDMAN:

19   Q.  In other words, we're sort of going round and round on this

20   but you do agree that in order to get funding -- and let me

21   back up and ask it this way:  In order to appeal a denial of

22   funding under ARS 4013, you have to make a colorable showing

23   that you're entitled to indigent defense funding under that

24   statute, correct?

25   A.  I don't disagree.  I think we disagree on what's a

UNITED STATES DISTRICT COURT

 1    colorable showing.  I think that's what we disagree on.

 2    Q.  And certainly it wouldn't be your objective to withhold

 3    important information from the trial court that -- that's

 4    probably the most crucial, could be the most crucial evidence

 5    showing the need for investigation, correct?

 6    A.  You're talking about the trial court then, not today,

 7    you're not asking me if I'm trying to withhold something?

 8    Q.  Would you, out of your belief you couldn't get funding,

 9    would you withhold information central to your need for

10    investigation from the trial court?

11         THE COURT:  I'm not sure I even understand that

12    question.

13         MR. SANDMAN:  All right.  I'll move on.

14         THE COURT:  You can answer it if you understand the

15    question, sir.

16         THE WITNESS:  I think he's asking me if there would be

17    cases where I would withhold information that could be in a

18    motion that would make it be granted and honestly the answer to

19    that question would be on the particular case and the

20    particular facts.  If there were witnesses that we wanted to

21    investigate that the prosecutor hadn't got ahold of or at that

22    point, that could be the case.  But my -- the 30 years of being

23    a lawyer, I've always been honest and frank with the court.

24    I'm not going to try to file something untruthful or try to

25    play a game with the court.  I wanted to have the expert.

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.                70

1    Let's just be clear on that.  I wanted the expert and I had

2    done a number of these cases and not in Pima County but in

3    Maricopa County and I wanted that expert on whatever, whether

4    it was a trial investigation from the beginning or whether it

5    was a post-conviction proceeding, I wanted that.

6    BY MR. SANDMAN:

7    Q.  This was your only post-conviction case in Pima County,

8    correct?

9    A.  Yes, yes, you've asked me that before, yes.

10   Q.  And so you don't know anything or didn't know anything

11   about the culture in Pima County and whether those judges would

12   actually comply with the statutory requirements of funding?

13   A.  I don't think that's correct at all.  I don't agree with

14   your assertion at all.  I attended seminars, I talked to

15   lawyers from all over the state.  This was a common subject of

16   conversation at meetings, trainings.

17       In fact, at some of these we were trained to -- I remember

18   one of the trainings I went to, we were trained to be complete

19   idiots, and that way they can -- when it got to this stage,

20   something good would happen to them.  And I remember a lawyer

21   from the capital representation project telling me that.  Why

22   don't you just go to court and do nothing, say nothing, and be

23   completely ridiculous and that way this person will have an out

24   later on?  And I said:  I've taken an oath to be a lawyer.

25   I've worked hard to be -- for the client.  I'm not going to do

1    that.

2        So I don't agree with your assertion that I wasn't aware of

3    what was going on and my focus was very narrow.  I don't agree

4    with that question and that answer.

5    Q.  Not based on your own knowledge but what some people that

6    you haven't identified in documentation, you haven't -- you're

7    not prepared to give us, correct?

8    A.  Well, I don't have the speakers from the late 1990s capital

9    representation trainings that were held in Phoenix.  I was

10   there and we all talked and, you know.

11   Q.  Take a look at Exhibit 27 if you could.  And if you could

12   blow up lines 11 through 23.

13       Now, this was a motion filed by one of the trial counsel

14   during -- just before Mr. Jones' trial in April '95. It's

15   actually dated March 29.

16   A.  If that's what you say it is, yes.

17   Q.  Have you reviewed this document during --

18   A.  I think you showed me that during the deposition, if I'm

19   not mistaken; I've seen it before.

20   Q.  Okay.  And in this motion part of the trial file, there's a

21   request for a transcripts of John Howard who testified at the

22   trial of Arizona versus Angela Gray, correct?

23   A.  That's what it says there, yes.  I was trying to find where

24   you were on the line, yes.

25   Q.  Okay.  And they also requested a transcript from Becky Lux,

1   Rachel's sister, who testified at the Gray trial on March 24,

2   '95, correct?

3   A.  Her name is mentioned there, yes, sir.

4   Q.  And the motion says that these testimonies form a crucial

5   part of defendant's case.

6       Do you see that?

7   A.  Line 16, yes, sir.

8   Q.  All right.  And then if we skip ahead a couple of pages to

9   the final -- the third page of the exhibit, and there you see

10  that Judge Carruth entered an order to have those transcripts

11  prepared, correct?

12  A.  Yes.

13  Q.  And during your deposition, you indicated, based on billing

14  entries that you made, that you had actually reviewed those

15  transcripts for Dr. Howard and Becky Lux when they testified at

16  the Gray trial, correct?

17  A.  Yes.  If I testified to that, it was on my bill, I let the

18  bill speak for itself, sure.

19  Q.  And do you recall from your recent review of the record

20  that Dr. Howard testified at the Gray -- well, let me strike

21  that.

22      So at least at the time that you represented Mr. Jones,

23  since you billed for review of the transcripts, you had

24  knowledge of what Dr. Howard and Ms. Lux testified to at the

25  Gray trial, correct?

1   A.  At the time that I reviewed it, I had that knowledge, yes.

2   Q.  Okay.

3   A.  If you're asking if I have an independent recollection

4   today, the answer is no.

5   Q.  Okay.  And do you recall from your recent review of the

6   records that, at Ms. Gray's trial, Dr. Howard testified that

7   the small bowel injury suffered by Rachel was most consistent

8   with infliction 24 hours prior to death, during a time which

9   would have been prior to afternoon of May 1st?

10  A.  Yes, you showed me that at the deposition.

11  Q.  Okay.  And did you also understand, based on your

12  reexamination of the record, that Mr. Jones' jury never learned

13  that the fatal injury was most consistent with occurrence on a

14  day prior to May 1?

15  A.  Yes, you showed me that at the deposition.

16  Q.  And do you agree that when -- at the time that you reviewed

17  the record in this case, including Mr. Jones' trial transcripts

18  and these couple from Ms. Gray's trial, that that would have

19  raised additional questions whether trial counsel had

20  adequately investigated the central time of injuries issue?

21  A.  Yes, and I believe I answered yes at the deposition, too.

22  Q.  Okay.  And did you -- with that -- armed with that

23  additional information, did you include anything in your

24  funding request or could you have supplemented your request

25  with evidence that demonstrated a need to investigate the

 1    medical timeline from injury to death based on the inconsistent

 2    testimonies of Dr. Howard at these two trials?

 3    A.  I've already indicated that I could have put more in, if

 4    that's what you're asking me.  I said that repeatedly.

 5    Q.  So just to summarize, what you could have presented in your

 6    motion for funding -- and, by the way, Mr. Hazel, you agree

 7    that no matter what you thought would happen, you had a legal

 8    duty to comply with the funding -- indigent funding statute?

 9    Now, you may think you did comply but you would agree you had a

10    duty to comply, correct?

11    A.  Yes, and --

12    Q.  Okay.  So I think where we are at this point is that you

13    could have told Judge Quigley that the testimony as to the

14    central issue of the timeline went uncontested in Mr. Jones'

15    trial, defense presented no evidence or cross-examination, and

16    then at a trial two weeks earlier, the forensic pathologist

17    actually placed the time of injury on the day prior to May 1st,

18    correct?  All that could have been presented to Judge Quigley,

19    could it not?

20    A.  I think I've answered that yes many times, yes.

21    Q.  And now, with all that information, you're building a case

22    for the need for an appointment of a forensic pathologist to

23    assist Mr. Jones and yourself in this post-conviction case,

24    correct?

25    A.  I'm sorry.  I don't understand that question.  If you're

1  asking me if there could have been more in the motion, yes, I

2  can't disagree with you.  I look at this motion here that you

3  brought up, and we had this discussion at the deposition, he

4  simply says he needs it, that judge decided to give it to him.

5  You know --

6  Q.  Okay.  But Judge Quigley was not the trial judge in

7  Mr. Jones' case, was he?

8  A.  No, he wasn't.

9  Q.  And so he wouldn't have known anything about Dr. Howard's

10 testimony in the Gray case where he put the likelihood that the

11 injury occurred the day prior to May 1st as the most probable,

12 correct?

13 A.  That would be an assumption of what Judge Quigley and Judge

14 Carruth had talked about.  I can't answer that.

15 Q.  Okay.  Now, when you received this information that

16 Dr. Howard testifies at Mr. Jones' trial that the injuries

17 occurred on Sunday afternoon, May 1, and then you have this

18 testimony from the Gray trial where he puts the most likely

19 timing of the injury on the day prior to that, would it have

20 been reasonable to attempt to interview Dr. Howard to try to

21 understand his views on this and whether perhaps that could

22 advance your understanding of a possible claim of ineffective

23 assistance?

24 A.  Yes, and I think it all starts with the investigator.

25 Q.  Well, now, this is a capital case you're working on, right?

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.                    76

1    Mr. Jones is facing execution, correct?

2    A.  Yes, I don't dispute that.

3    Q.  You don't have an investigator, correct?

4    A.  Right.  I don't disagree with you.

5    Q.  Okay.  And my question was:  Would you have needed an

6    investigator to attempt to interview Dr. Howard given the

7    striking inconsistencies in his testimonies at the two trials?

8    A.  Would I have absolutely needed it, no.

9    Q.  Okay.  Could you think of any kind of strategy that you

10   were trying to further in this case that would contravene a

11   desire to talk to Dr. Howard?

12   A.  As I told you, I don't have independent recollection of

13   everything that happened in this case so I couldn't answer

14   that.

15   Q.  Now, let's take a look at Exhibit 45.  This is --

16   Exhibit 45 is in evidence as a declaration that John Howard

17   executed on 15 December, 2004.  Have you seen this before?

18   A.  You showed it to me at the deposition and I think you

19   showed it to me when you came to meet me in my office.

20   Q.  If you could blow up paragraph 3.  So if you had pursued a

21   conversation with Dr. Howard -- let me strike that.

22       In paragraph 3 he says that if trial counsel had asked him

23   whether the injury to Rachel Gray's abdomen had caused her

24   death could have happened more than 24 hours before her death,

25   "I would have answered the question in the affirmative."

1          Do you see that?

2   A.  Yes, I see that he said that five years after the fact.

3   Q.  And if we could take a look at page 2, paragraph 7, you see

4   there that he reports that there were actually physical

5   findings available from the autopsy done by Mr. Howard that are

6   consistent with an injury that could have been present greater

7   than 24 to 48 hours?

8          Do you see that?

9   A.  It says that there, yes, sir.

10  Q.  Okay.  And page 3, paragraph 11.  And you see there that he

11  has considered the possibility that the injury to Rachel

12  actually could be four to six days old prior to her death,

13  correct?

14  A.  It says that there, yes, sir.

15  Q.  And then down in paragraph 13, he reports that the injuries

16  to Rachel Gray's vaginal area showed characteristics consistent

17  with hours to perhaps days elapsing between the time of her

18  abdominal injury and her vaginal injury.

19          You see that also, I suppose?

20  A.  Yes, I see that there.

21  Q.  Okay.  Now, if you had called Dr. Howard to try to ferret

22  out some of the differences between the two testimonies you had

23  in your file and had obtained information which seems he was

24  readily willing to give if only trial counsel had asked him

25  about it, you could have presented this additional information

```
 1   in a motion for funding, further supporting your need for the
 2   assistance, let's say, for a forensic pathologist, correct?
 3   A.  I've already said that I could have put more in the motion.
 4   Q.  All right.  And just to be clear what we're talking about
 5   here, in the two funding requests that you made, you never
 6   asked for help from a forensic pathologist, correct?
 7   A.  No, I start -- my process was to start with a regular
 8   investigator, that's correct.
 9   Q.  And certainly even without talking to Dr. Howard, based on
10   the information you had just looking at the testimony from the
11   Gray trial and the Jones trial, you certainly had grounds to
12   present to Judge Quigley the need for a forensic pathologist
13   but you never asked for that, correct?
14          MS. GARD:  Judge, I object.  I think we've answered
15   these questions multiple times.
16          MR. SANDMAN:  I'll withdraw the question.
17   BY MR. SANDMAN:
18   Q.  Now, I want to go back to Exhibit 27 for a moment.  Do you
19   agree with Ms. Bowman's assessment in Exhibit 27 that
20   Dr. Howard's testimony at the Angela Gray trial was crucial to
21   Mr. Jones in his case?
22   A.  You're asking me if what the testimony in that case was was
23   important?  Yes, I do.
24   Q.  Well -- okay.  And that's because Dr. Howard put the likely
25   time of the injury on the day -- on April 30th, correct?
```

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.

1   A.  I'm not going to summarize the evidence but you asked me if

2   I thought it was important.

3   Q.  Okay.

4   A.  I'm not prepared to go over the evidence of the case again

5   unless you have a specific transcript and page you want me to

6   look at.

7   Q.  Now, the -- this motion also indicates that the testimony

8   of Becky Lux was also crucial to Mr. Jones' case, correct, to

9   his defense?

10  A.  It says that there, yes, sir.

11  Q.  And do you recall from your recent review of the record

12  that at the Angela Gray trial, which you said you reviewed that

13  transcript, Becky's testimony there, do you recall that Becky's

14  testimony at the Gray trial was that Rachel took two trips in

15  the van on Sunday afternoon with Mr. Jones and did not appear

16  harmed at all?

17  A.  You pointed that out at the deposition on a previous

18  occasion.

19  Q.  Okay.  And do you recall from your recent reexamination of

20  the record that during Mr. Jones' trial, she testified there

21  were actually three trips and she didn't see Rachel after the

22  third trip, correct?

23  A.  You pointed that out to me at the deposition and a previous

24  meeting, yes, sir.

25  Q.  Now, during your deposition, you testified that you could

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.                    80

1    have used the inconsistencies between Becky's testimonies at

2    the two trials as a basis to investigate a claim of ineffective

3    assistance and to bolster your request for funding in

4    Mr. Jones' case, correct?

5    A.  What page was that on?

6    Q.  Well, let's take a look at Exhibit 123, starting at

7    page 65.

8    A.  I'm not saying you're incorrect but if you're asking me to

9    recall something specifically I said at the deposition, I would

10   want to know the page.

11   Q.  So we're going to start at page 65, line 24, and the

12   question was:  Could you have used the inconsistencies between

13   Becky's testimonies at the Gray trial and the Jones trial as a

14   basis to investigate a claim -- a possible claim of ineffective

15   assistance of trial counsel?

16        And what was your answer?

17   A.  Like it is today, I think I've already answered that

18   question in the affirmative.

19   Q.  And is there any record in this case that you did that?

20   A.  I'm going to allow the records to speak for themselves.

21   Q.  And I'm just going to read the question at page 66 which

22   captures the next question about whether you could have used

23   this for a funding request.

24   A.  What line is that?  I'm sorry.

25   Q.  I'm sorry.  Page 66, line 8.  Could you have, in your

1    December 31, 1999, motion for investigative assistance, could

2    you have provided the trial judge, Judge Quigley, with

3    information about these inconsistencies in Becky's testimony to

4    bolster your request for expert assistance?

5        And what was your answer to that question?

6    A.  You want me to read it?

7    Q.  Yes.  At lines 13, 14.

8            THE COURT:  You're going to have to expand that.

9            THE WITNESS:  I can see it.  I'm sorry.  I think I

10   have already asked me that -- I think you have already asked me

11   that but, yes, I answered yes in the prior question.

12   BY MR. SANDMAN:

13   Q.  All right.  And so you had quite a bit of evidence that

14   gave rise to a suspicion that the trial counsel had

15   investigated inadequately, that there were serious

16   inconsistencies in testimony between the Gray trial and the

17   Jones trial that impacted directly on the timeline of injury to

18   death, and you never presented that in support of any of your

19   funding requests; is that right?

20   A.  I would answer the same way I did back then.  I think I've

21   already answered that.  I'm not trying to be difficult with you

22   but I think I've already answered that.  You have maintained

23   that I should have put more in the motion and I can't argue

24   with you on that.  The motion speaks for itself after this many

25   -- this long.

 1    Q.  Now, you were already out of the case but when this case

 2    went to the Arizona Supreme Court on the record that you made

 3    as Mr. Jones' counsel, the Arizona Supreme Court actually

 4    considered whether your funding requests were adequate and met

 5    the statutory requirements.

 6         Were you aware of that?

 7    A.  I think you may have discussed that with me.  If you have

 8    an exhibit you'd like me to look at, I'll look at it.

 9    Q.  Are you aware that the Arizona Supreme Court held that your

10    funding requests failed to meet the statutory requirements?

11    A.  I think you may have discussed that with me.

12    Q.  And the record in this case which, of course, contains the

13    Arizona Supreme Court decision following your Rule 32 petition,

14    the record will reflect what they said about that, correct,

15    Mr. Hazel?

16    A.  I don't have it in front of me but I have no reason to

17    disbelieve that the records of the Arizona Supreme Court

18    wouldn't be accurate.

19    Q.  Now, during your deposition, I asked you about some of the

20    bloodstain interpretation evidence that was presented at

21    Mr. Jones' trial.  Do you remember that?

22    A.  Yes, you asked me about that.

23    Q.  And you agreed that the trial record showed that counsel

24    made no direct challenge to the state's bloodstain

25    interpretation evidence, correct?

DIRECT EXAMINATION - JAMES WILLIAM HAZEL, JR.

1   A.  I recall that, but I don't know what page it is on the

2   deposition.  If you want me to look at a specific page, I'll be

3   glad to do so.

4   Q.  It's Exhibit 123 at 67, page 67, lines 5 through 9.

5   A.  Okay.  I'm on page 67 now.

6   Q.  And my question was, quoting from -- beginning at line 5 of

7   that page:  And during the review in preparation for this

8   deposition, did you -- were you able to confirm that Mr. Bruner

9   did not make any challenge to the bloodstain interpretation

10  evidence?

11      And your answer was?

12  A.  That's my recollection.  That's what the deposition says.

13  Q.  Now, knowing that -- now you have on top of the evidence

14  that you had raising questions about whether trial counsel had

15  adequately investigated the medical timelines, you also had

16  evidence raising questions about the adequacy of defense

17  counsel's interpretation of the blood -- or his work on the

18  bloodstain evidence, correct?

19  A.  Are you asking me that -- I'm not trying to be difficult.

20  Are you asking me that same question again?  I mean, I said

21  that was my recollection, so obviously I can't give an

22  inconsistent answer again.

23  Q.  Did you provide any evidence to the trial court in your

24  funding request that indicated that there was bloodstain

25  evidence presented that went unchallenged and that you needed

1   to find out whether there was any kind of defense to that

2   bloodstain evidence?  Did you ever inform Judge Quigley of

3   that?

4   A.  As I previously said, the motion spoke for itself.  I'm not

5   going to try to say that I said something to Judge Quigley

6   that's not in the record.  I can't; I don't have a recollection

7   of any of that.

8   Q.  At your deposition I asked you a question posed somewhat as

9   follows and that is:  If you had --

10  A.  What page is that on?  I'm sorry.  So I can follow along.

11  Q.  The question -- do you remember that I asked you at your

12  deposition that if you had been able to uncover evidence as

13  part of an investigation that would have been authorized by the

14  trial court that Rachel's injuries did not occur on May 1st and

15  if you had investigated the bloodstain interpretation evidence

16  and found that that evidence could be associated with

17  Mr. Jones' innocence, would you have gone further to try and

18  obtain funding in furtherance of a challenge to the eyewitness

19  testimony in Mr. Jones' case?

20  A.  I believe I said yes at the deposition.

21  Q.  Okay.  So as you -- if you had begun to build a case

22  incrementally to gather evidence that the medical timeline was

23  wrong, that the bloodstain evidence could be interpreted to

24  demonstrate innocence, you wouldn't have stopped there, you

25  would have looked at the next piece of evidence, that

 1   eyewitness testimony, and concentrated on how you could

 2   challenge that; is that right?

 3   A.  Well, I always try to do my best.  I would say yes.  I

 4   mean --

 5           MR. SANDMAN:  I have no further questions.

 6           THE COURT:  All right.  Thank you.

 7      Cross-examination?

 8           MS. SMITH:  We have no cross, Your Honor.

 9           THE COURT:  All right.  Thank you very much, sir.

10           THE WITNESS:  Am I excused, Your Honor?

11           THE COURT:  You are.

12           THE WITNESS:  Thank you, sir.

13           THE COURT:  Thank you.

14      Your next witness?

15           MR. SANDMAN:  Your Honor, can I have just maybe a

16   couple of minutes?  I think Mr. Cooper's here but just to run

17   to the rest room.

18           THE COURT:  Yes.  And we're going to have to break by

19   about 20 minutes to 12:00.  Do you want to just resume at

20   1:00 o'clock?

21           MR. SANDMAN:  I would appreciate that, Judge.

22           THE COURT:  And is Mr. Cooper the last witness of the

23   day?

24           MR. SANDMAN:  Yes.

25           THE COURT:  And do you believe we can finish with

1    Mr. Cooper before the end of the day?

2              MR. SANDMAN:  Easily.

3              THE COURT:  Okay.  Then we'll just resume at

4    1:00 o'clock.

5              MR. SANDMAN:  Thank you, Judge.

6              THE COURT:  Thank you.

7         (Whereupon, the matter was adjourned at 11:25 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    __/s Cindy J. Shearman_____        November 17, 2017
     CINDY J. SHEARMAN, RDR, CRR, CRC    DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT