1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF ARIZONA

3     Barry Lee Jones,              )  4:01-cv-00592-TMB
                                    )
4                Petitioner,        )
                                    )
5     vs.                           )
                                    )  Tucson, Arizona
6     Charles L. Ryan, et al.,      )  October 30, 2017
                                    )
7                Respondents.       )
      _____  )

8

9

10       BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE

11                      Transcript of Proceedings
                        Evidentiary Hearing - Day 1
12

13

14

15

16    Proceedings reported and transcript prepared by:

17        A. Tracy Jamieson, RDR, CRR
          Federal Official Court Reporter
18        Evo A. DeConcini U.S. Courthouse
          405 West Congress, Suite 1500
19        Tucson, Arizona 85701
          (520)205-4266
20

21

22

23    Proceedings reported by steno machine shorthand;
      transcript prepared using court reporting software.
24

25

```
 1                         APPEARANCES

 2    For the Petitioner:

 3        U. S. Federal Public Defender
          Cary Sandman, AFPD
 4        407 West Congress Street, Suite 501
          Tucson, AZ 85701
 5        (520) 879-7540

 6        U. S. Federal Public Defender
          Karen S. Smith, AFPD
 7        850 West Adams Street, Suite 201
          Phoenix, AZ  85007
 8        (602) 382-2706

 9

10    For the Respondents:

11        Arizona Office of the Attorney General
          Myles Braccio, AAG
12        1275 West Washington Street
          Phoenix, AZ 85007
13        (602) 542-4686

14        Arizona Office of the Attorney General
          Lacey Gard, AAG
15        400 West Congress Street, Suite S315
          Tucson, AZ  85701
16        (520) 628-6520

17

18

19

20    Also Present:

21    Barry Jones, Petitioner
      Jim D. Nielsen, AZAG
22    Jennifer Schneider, Paralegal with FPD
      Daniel Vidal, Paralegal with AZAG
23    Andrew Sowards, FPD

24

25
```

UNITED STATES DISTRICT COURT

1                     INDEX OF COURT PROCEEDINGS

2
                                                        PAGE
3
    Opening Statement - Plaintiff/Petitioner.................   5
4
    Opening Statement - Defendants/Respondents...............   30
5

6
                     INDEX OF EXAMINATIONS
7

8
WITNESSES:                                              PAGE
9

10  **LESLIE BOWMAN**

11

12      Direct Examination By Mr. Sandman....................   44

13      Cross-Examination By Mr. Braccio.....................   124

14

15

16

17

18

19

20

21

22

23

24

25

                     UNITED STATES DISTRICT COURT

```
 1                    (On the record at 9:19 a.m.)

 2          THE COURT:  All right.  Good morning.  We are on

 3    record in Jones vs. Ryan, CV-01-592.  This is the time set for

 4    an evidentiary hearing.

 5          Before we get to the opening statements of counsel, I did

 6    make a determination, in light of the Sanchez-Gomez case, on a

 7    level of restraint, and, after consultation with the marshals,

 8    I have decided to allow his writing hand to be free for

 9    purposes of the evidentiary hearing.

10          Let me ask, Mr. Sandman, any objection you want to make?

11              MR. SANDMAN:  No, Your Honor.

12              THE COURT:  Okay.  Thank you, very much.

13              In that case then, I thought the parties may have had

14    one or two things they wanted to raise before we got to --

15    before we got to the opening statements.

16              MS. SMITH:  Sure, Your Honor.  The parties have come

17    to agreement about several exhibits to be admitted without

18    objection, so we would just go ahead and move those into

19    admission on the record.

20              So that would be Petitioner's Exhibits 1, 2, 3, 5, 6,

21    9 through 12; 16 through 33; 35 through 43; 45 through 55; 58;

22    59; 59A; 61 through 67; 69 through 82; 86 through 94; 97; 103

23    through 111; 113 through 122; 124 through 138.  And then I

24    believe 139, the objection was overruled in your ruling this

25    morning.
```

Opening Statement - Plaintiff/Petitioner                    5

1        With respect to respondent's exhibits, we agree to
2   admit 180 through 202, and 211.  Thank you.
3        THE COURT:  Great.  So you all saw the order in regard
4   to the three outstanding motions in limine, which is what you
5   were referring to.
6        MS. SMITH:  Yes, Your Honor.
7        THE COURT:  The only other thing I would mention, as
8   we go through the hearing, I'll ask counsel to make sure to
9   periodically check with Madam Clerk to make sure that the
10  exhibits you think are in are actually in.  All right?
11       So, with that, unless there is anything else before we
12  get to opening statements....  Anything from respondent's?
13       MR. BRACCIO:  Not from respondent's.
14       THE COURT:  Anything from petitioner before we get to
15  opening statements?
16       MR. SANDMAN:  I don't have anything to turn the volume
17  up either.
18       THE COURT:  No, that's not a problem.
19       MR. SANDMAN:  I think Ms. Smith forgot to mention
20  Exhibit 12 as one that's going to be offered.  That was the one
21  we discussed with you earlier this morning.
22       THE COURT:  Okay.
23       MR. SANDMAN:  That would be it for us.
24       THE COURT:  Great.  All right.
25       MR. SANDMAN:  Your Honor, Cary Sandman here on behalf

Opening Statement - Plaintiff/Petitioner

1    of Mr. Jones; Karen Smith, of course, my co-counsel; and a

2    number of staff here, and some folks in the courtroom over here

3    on the left that actually are friends of Mr. Jones.

4           I thought what I would do to start is if we could put

5    up the slides of -- the aerial slides, please.

6        As soon as we can pull those up, Judge, I was going to go

7    through some aerials and some photographs of the park where

8    Mr. Jones lived, and so on, just to give you some familiarity

9    with some of the places we are going to be talking about.

10       This is the trailer park where Mr. Jones lived, which is on

11   the screen now.  Mr. Jones' trailer is Number 23.  There's an

12   arrow pointing to it up in the northeast corner there.  The

13   property consists there of a number of trailers and some

14   apartments down on the right side of the photo you can see

15   there.

16       Down at sort of the south end there's a little pad with an

17   F next to it.  That was where the Fleming family had sort of, I

18   guess you'd call it, a little trailer set up there.  It was at

19   that location at around 5:15, 5:30 on Sunday, May 1st where

20   Rachel was first discovered sick, at least where she was

21   visibly seen trying to vomit and so on.

22       The next slide.  You can see -- let me get it up.  You can

23   still see the trailer park there down on the lower right-hand

24   corner.  And then as you go north, you can see there's -- the

25   Rural/Metro station is the next little flag there.  And as you

1    go further up on the left, there's the Quik Mart that you read

2    about in some of the papers.

3         Can we see the next slide?  A little further north from the

4    other slide is where the Quik Mart -- the Choice Market is,

5    that was a little further north.  There's a little red circle

6    on the left-hand side where the Lopez family lived.  It's along

7    the north side of that Choice Market where the children said

8    they saw the van.

9         Next slide.

10        Is the slide show not working?  Apparently it is not

11   working.

12        Excuse me, Judge.  I'm sorry.

13             THE COURT:  We'll take a pause for a moment here.

14             MR. SANDMAN:  Your Honor, the next slide here is a

15   photo of, actually, Mr. Jones' trailer.

16             THE COURT:  A quick question.  Was that the middle of

17   those three trailers on slide one?

18             MR. SANDMAN:  Yes.

19             THE COURT:  Thank you.  Go ahead.

20             MR. SANDMAN:  Mr. Jones was living there at the time

21   with his daughter, Brandie, age 11, Angela Gray and her three

22   children:  Becky, age 10; Rachel, age 4; and John, 14.

23        Go to the next slide please.

24        This is the outside of Mr. Jones' trailer, Judge.  You'll

25   see a clothesline there.  According to Ms. Gray, there's a

1    statement that she gave -- that's cited down at the bottom of

2    the page in Bates Number 536 -- Becky had strung Rachel up on

3    that clothesline at least one time that the mother knew about.

4    And whether there were other times, of course, we don't know.

5    She was reported to have fallen off that clothesline.

6         I mention that not to suggest that -- well, just to suggest

7    that, as you'll see as we go through these slides, there are a

8    number of dangers surrounding this child in that trailer park.

9         The next slide.  Why don't we skip ahead a couple sides, if

10   we can.

11        That's the front entry.

12        We'll just go through them quickly, if we can.

13        Just the living room.

14        Just scroll through them.

15        This is Mr. Jones' bedroom.  If you look at the upper --

16   there's a blue garment.  There appears to be a blue garment on

17   the floor next to the bed.  Eight-year-old Ray Lopez said that

18   the man driving the van that he saw was wearing a blue shirt on

19   that Sunday afternoon.  Apparently that shirt -- as you'll hear

20   in testimony from Ms. Pesquiera eventually -- that shirt was

21   never recovered for testing for forensic evidence.  The lack of

22   any valuable forensic evidence on the shirt would have been

23   helpful.

24        The next slide is the children's bedroom.

25        On the bed on the left was where Rachel slept.  The bunk

1    beds were for Becky and Barry Jones's daughter, Brandie, at

2    least for a period of time.

3        And I should say, Judge, this family all -- these families

4    lived together for about three or four weeks total.  Initially,

5    14-year-old Johnny actually slept on the floor of that room,

6    and there were concerns about improper touching of Rachel I'll

7    talk about a little later this morning.  He was eventually

8    moved out of that room and a separate little alcove was made

9    for him.

10       The next slide.

11       This is the entry to the bedroom.  And on Monday morning,

12   in the wee hours of Monday morning, Rachel's sister, Becky,

13   found Rachel lying on the floor there next to that table and

14   put her back in bed.

15       Next slide, please.  Next slide.

16       That's Rachel on the left side of the screen, Your Honor.

17   She has a bruise on her eye and on her forehead.  And we were

18   interested in the fact that several adults who had visited the

19   trailer on Sunday night, when Rachel was sick, reported not

20   seeing that bruise.  And so we posed the question to Dr. Howard

21   and Dr. Ophoven, some of the doctors who will testify later

22   this week, and into next week, if Rachel had fallen into that

23   little table that you see in the photograph, where she was

24   found sort of laying in the doorway there, could that have

25   caused the injury that you're looking at in the photograph?

1    And the answer was yes, that it could.

2         The next photograph in the series is obviously not from the

3    trailer, but this was an autopsy photo.  What I wanted to show

4    you was there's blood on the sheet emanating from the scalp

5    wound that Rachel had.

6         One of the things that happened at the trial in this case

7    was that, as you'll know, there was some blood found in the

8    van, and the prosecutor argued that that could not have come

9    from Rachel being in the van Monday morning -- she was rushed

10   to the hospital -- because you don't bleed after you die.  And

11   this photo, which obviously trial counsel had, indicates that a

12   couple of days after her death that wound was still seeping

13   blood.  And the doctors will testify that, of course, the idea

14   the prosecutor suggested at the trial, that you don't continue

15   to see blood after you die, was incorrect.

16             THE COURT:  I want to make sure we're not going to

17   have any of the sealed photos or unredacted photos shown in --

18   to the gallery here today.

19             MR. SANDMAN:  There won't be any.

20             THE COURT:  Thank you.

21             MR. SANDMAN:  Can we go to the PowerPoint now.

22        Judge, what I wanted to do next is take a little bit of

23   time to go through some of the state's proposed findings of

24   fact.  You have those.  You've probably looked at them.  They

25   contain those citations to the record, and so I want to focus,

1   maybe take some time to go through some of them with you.

2       If we could pull up --

3           THE COURT:  You're referring to Docket 242?

4           MR. SANDMAN:  I believe that was the respondent's

5   proposed findings.

6           THE COURT:  Yes.

7           MR. SANDMAN:  On the screen we have the proposed

8   finding number one.  It makes a reference to Carol Jones, who

9   is Mr. Jones' former spouse.  You can see in the bold print

10  there she alleged that she left him due to domestic abuse

11  against her and her children.  Carol Jones also had obtained an

12  order of protection against the petitioner after he repeatedly

13  struck her children.

14          So here's the story with respect to this evidence, or

15  the allegations.  It was excluded by the trial court from the

16  trial.  We have a citation to the transcript of April 4, 1995.

17  There was an effort to introduce some of this evidence at the

18  trial, the trial court said no, and so it doesn't really have

19  any relevance, certainly to the *Strickland* weighing analysis,

20  and when you weigh what the jury knew versus what -- against

21  the new evidence.  This evidence was excluded.

22          In the next slide -- and maybe part of the reason it

23  was excluded -- I don't know whether there was a reason or

24  not -- the ex-wife made a lot of different kinds of statements

25  about her relationship with Mr. Jones.  One of the things she

1    said here on this next slide in an interview was that after she

2    obtained that order of protection several years before any of

3    these events, they got along just fine.

4          That's actually the slide after.  Excuse me.

5          Then she also said -- the next slide, this was an

6    interview I believe with defense counsel -- that when she was

7    initially interviewed on May 3rd, 1994, the sheriff's

8    detectives wanted her to say that Barry was real abusive when

9    they initially interviewed her, but he was not.

10         The next slide.

11      There was a single CPS investigation that found no evidence

12   of abuse.

13      So what I would say about all this evidence, it never went

14   in at the trial.

15      There is some evidence, of course, the trial counsel had

16   this information.  There was information that trial counsel had

17   that Mr. Jones was emotionally fragile at the time of his

18   separation from Carol Jones, he sought mental health treatment

19   at Kino Hospital, but none of that has anything to do with

20   evidence that the jury heard, and there is no witness who will

21   testify in these proceedings as to any of those facts.

22      Next slide, please.

23      This is proposed finding number two.

24      I want to concentrate on the bold print there:  Before

25   Angela moved into petitioner's trailer, none of her children

1   were abused or exhibited bruising.

2       Next slide, please.

3       The record doesn't substantiate that, Your Honor.  We're

4   looking at a letter written by Ms. Gray's 14-year-old son to

5   the Court before her sentencing, referencing the fact that he

6   wanted his mother to stay in jail because of "hitting me" and

7   "beating me."  Down at the bottom, a reference to "beating

8   people."

9       The next page, please.

10      The proposed finding asks you to find there was no bruising

11  on any of Angela's children.  And here is a statement made by

12  Angela's daughter, Rebecca, on May 9, 1994, this is right after

13  Rachel died, where she stated there had been bruises.  She had

14  been hit in the stomach, arm and face.

15      Of course, being struck in the stomach has resonance in

16  this case because that's exactly where Rachel was struck by

17  somebody.

18      Next slide, please.

19      Then, of course, we get into the question, well, who was

20  abusing these children while they were all living together.

21  There were a number of questions asked of these kids:  Did

22  Barry ever discipline you with a spanking?  And Rebecca said

23  no.  As this slide indicates.  What did he do if he lost his

24  temper?  He would tell us to go to our room.

25      Next slide, please.

1        More questions about Angela kicking and hitting her

2    children.

3        So the suggestion that Angela had not been abusive before

4    she lived with Mr. Jones just obviously appears to be

5    inaccurate.

6        Next slide.

7        This was an October 31, 1995 interview and excerpt from an

8    interview of the aunt who took custody of Becky and Johnny

9    after Rachel died, and she was asked some questions about

10   whether she felt those children had been sexually abused.  She

11   said not by Barry.  And asked why, at the bottom she references

12   family had been over to the house, walking in and "seen Becky

13   sleeping with a bunch of drunk men."

14       Again, I mention some of these things like the clothesline

15   and some of this other evidence because this was a very

16   dangerous environment for these children that had nothing to do

17   with Mr. Jones.

18       Next slide, please.

19       Again, going to the evidence of the mother's abusive

20   behavior, this is a continuation of an excerpt from Donna

21   Marini's interview where she's asked about whether the children

22   were abused, and she relates some of the information coming out

23   in counseling sessions, including Angela slamming the children

24   up against walls and throwing them down stairs.  She's asked if

25   those things were done recently, and she says they were done

1    all the time on and off.

2        Then the final question in this excerpt:  From what the

3    children have told you, was he abusive to them, Barry?  No.

4        Next slide, please.

5        This is an interview of Becky Lux, on October 30, '95.  An

6    excerpt regarding questions whether there were any -- she

7    noticed any unusual bruises on her sister, Rachel.  She

8    describes a handprint.  She says:  I guess my mom spanked her.

9    She did something bad and it bruised.

10       Again, this idea in the post finding that Angela never

11   abused her children.  Here, we have a bruise on Rachel.  This

12   was in April, according to this excerpt, which is right before

13   these events that, of course, we are here about today.

14       Next slide.

15       There were some questions about did Barry ever spank

16   Rachel.  She said a little whack on the behind, you know, a

17   little light whack.

18       Next slide, please.

19       More evidence of abuse witnessed committed by Angela Gray

20   on her children.  This has resonance.  This comes from the

21   trial April 11, Terry Richmond.  He was asked if he had seen

22   Angela Gray strike Rachel on the side of the head.  Yes, ma'am.

23   Now, that has resonance because we know -- you'll hear one of

24   the autopsy findings was she had some blood in the ears.

25       So next slide, please.

1        This is proposed finding number three, and it goes to

2   the -- it proposes that there wasn't any events that Rachel

3   played in petitioner's -- any of the children had played in

4   petitioner's van.

5        Next slide.

6        Part of the problem really knowing whether that happened is

7   that there are tons of kids out there in that trailer park, and

8   they just ran free, including four-year-old Rachel, as you'll

9   hear in a couple -- a few slides later.

10       Next slide, please.

11       This slide comes from an interview that investigator George

12  Barnett did around May 9th, a few days after the homicide.  He

13  interviewed Shirley DeVous, who lived on one side of Mr. Jones

14  in that trailer park.  I forget which side.  But she said that

15  on Sunday, May 1st, which is, of course, an important day, she

16  observed kids playing around the front of Barry's trailer, and

17  this was not unusual.

18       Next slide.

19       And Michael Fleming reported kids, including his son,

20  playing down there on that Sunday with other kids.

21       Next slide.

22       This is an excerpt from the interview of March 24, '95, of

23  Stephanie Fleming.  She saw these kids running around on May

24  1st, a whole bunch of kids playing right around her trailer.

25  Rachel was there.  And she goes on to conclude, you know, at

1    times they were playing unsupervised under a trailer.

2         Ms. Fleming had sort of an interesting story, because when

3    Mr. Barnett, the investigator, went out and interviewed people

4    in the trailer park, he was informed by the park manager that

5    Ms. Fleming moved the day Rachel died, concerned that either

6    she or one of her children would be accused of harming Rachel.

7         Next slide.

8         This is proposed finding five, Your Honor.  It alleges that

9    during a trip, alone with petitioner, Rachel suffered an injury

10   to her face resulting in two black eyes.  This doesn't have

11   anything to do with what happened on May 1st.  They're claiming

12   this happened sometime in the weeks prior, and that Rachel

13   expressed her fear of petitioner and that she confessed to

14   sister Rebecca.

15        Let's go to the next slide.

16        So let's see about this confession to sister Rebecca.

17        About four lines down:  Do you know at what point in time

18   it was that Rachel got these black eyes?  And she says the

19   second week of April.  And a few lines down she goes:  I

20   remember it was right after her birthday.  And she's asked:

21   How do you know -- do you know how she got the black eyes?  She

22   never says Mr. Jones did it, as her proposed finding of fact

23   tells you.  She says:  Rachel said that a girl had swung right

24   here with a broom and fractured it.  That's what Rachel said?

25   Yes.

1    So the proposed finding asks you to find that Rachel

2    confessed to Becky Mr. Jones had caused black eyes.  And here,

3    in this interview, October 1, '95 -- it should be '94.  I think

4    there was a mistake in the date.  But, in any event, long after

5    these events passed, she said Rachel gave some other story.

6        As far as Rachel being afraid of Barry, this next line,

7    which was gotten from the interview of the mother, Angela Gray,

8    says it was Becky who threatened Rachel and told her if she

9    didn't do what she wanted or tattled on her, that Barry would

10   get her.  If you want to know the root cause of Rachel being

11   afraid of Barry for a few days, that's what that resulted in.

12       Next slide.

13       This is proposed finding number six.  Angela discovered a

14   handprint on Rachel's buttocks, but Rachel would not reveal who

15   inflicted the abuse on her.  Well, we sort of touched on this.

16   And also this proposed finding says Jonathan Lux observed

17   petitioner hit Rachel.

18       So, as far as the handprint goes, Brandie, in an interview

19   of her, reported that she saw Angela smack Rachel, the next

20   morning she saw the handprint, and Angela said that she had

21   caused that bruising, which had to be a very substantial whack

22   to leave a handprint the next day.

23       Then the next slide.

24       Again, Becky Lux confirms that it's Angela who caused the

25   handprint, nothing to do with Mr. Jones.

1         Then the proposed finding that Jonathan Lux was witness to

2    some type of abuse by Mr. Jones on Rachel, he was asked about

3    that.  On May 2nd, 1994, the day Rachel died, he was asked:

4    Has Barry ever spanked the kids?  No.  He says:  If Rachel has

5    bad behavior, he tells her to go to her room.  That's all he

6    does.

7         Next slide.

8         This proposed finding number seven indicates three days

9    before her death, no one observed any significant injuries to

10   Rachel.  Amanda, Angela's sister, stopped by and only observed

11   Rachel's black eyes.

12        Next slide.

13        Oh.  You're there.  I'm sorry.

14        I think you skipped a slide.

15             THE COURT:  Yeah.

16             MR. SANDMAN:  Can you go back one?

17             So part of that proposed finding is accurate, that

18   Aunt Amanda saw dark circles under her eyes.  She also

19   exhibited the same dark circles under her eyes Sunday

20   afternoon, when she was a number of hours away from going into

21   shock and dying.  So to say that dark circles on the afternoon,

22   Friday afternoon, are unrelated to the injury that ultimately

23   killed her, I think is a stretch.

24             Next slide, please.

25        In addition, the suggestion that Rachel wasn't sick before

1    late Sunday afternoon, there is an interview that was done on

2    May 19, 1994, of one of the neighbors, Isobel Tafe.  She saw

3    Rachel on Saturday, April 30th.  Now, significantly, she sees

4    Rachel wandering around that trailer park without any adult

5    supervision.  She describes in the interview Rachel looking

6    scared.  She says Rachel's color wasn't natural; it was just

7    gray, pale grayish color.  Same way she was described late

8    Sunday afternoon by people who saw her then.

9         There's plenty of evidence here that, well, clearly

10   describes the fact that this child was showing signs of illness

11   way before Sunday.

12        The most clear example of that -- I don't have a slide of

13   this, but Dr. Howard gave a declaration to us.  He was the

14   original pathologist who did the autopsy.  In his declaration,

15   he says that there was evidence of bruising, you can't exactly

16   date bruises.  He said there was evidence of bruising dating

17   back six days on her abdomen.  So to suggest that -- and maybe

18   no one else saw it, but he saw it when he did the autopsy, and

19   it wasn't something that came from Sunday, May 1st.

20        Then the next slide.

21        Again, this is Mrs. Fleming reporting on Sunday, May 1.

22   She's describing the same discoloration under the eyes of

23   Rachel that was seen the day before by Ms. Tafe.

24        Next slide.

25        Now, finding number ten, which is proposed finding number

1    ten, I want to talk about for a minute.

2        Brandie Jones sort of became the focal point of a story

3    that she had seen a little boy in the trailer park strike

4    Rachel in the stomach with a metal bar.  And I should say, you

5    know, we're not claiming that she was killed by another child.

6    What we're talking about, again, is that this is a dangerous

7    area, we see this child after she dies with a number of marks

8    on her.  Did they come from falling off a clothesline? did they

9    come from the mother smacking her? did they come from another

10   child inflicting some harm to her?  I think it would have been

11   all of those things.

12       I don't want you to -- I am not suggesting that a child

13   killed her.  I am trying to make the point that this was an

14   unsafe environment, especially for a four-year-old

15   unsupervised.

16           THE COURT:  The child that supposedly struck her, I am

17   sorry to ask this question, but was it a two-year-old child?

18           MR. SANDMAN:  It was alleged to be a large

19   two-year-old child that had a metal bar.

20           THE COURT:  I just wanted to make sure I understood.

21           MR. SANDMAN:  But the problem we have now -- let's go

22   to the next slide -- why it became sort of Brandie's word

23   against the world, the reason that it turned out that way is

24   because leads that other people had seen this event were never

25   interviewed or contacted.

1      And this next slide I am showing you from March 21, 1995,

2  an interview of Michael Fleming, he says one of the kids who

3  saw the little boy hit Rachel with a stick or crowbar was the

4  10-year-old son of another neighbor, Pauline.  Don't know who

5  that is.  That person was never interviewed, it was a lead not

6  followed.

7      Next slide.

8      This is a slide from Brandie's interview where she

9  describes what she saw.

10      And the next slide.

11      She sort of described the shape of it, "a metal bar that

12  went like this and curved like that."  I'm not sure what that

13  means, but she said it "had a little curly thing right there at

14  the bottom."

15      The next slide.

16      The instrument she described fits sort of a pattern injury

17  that was seen on Rachel.

18      Next slide.

19      I think we may have made a reference to this, Isobel Tafe

20  making a reference to seeing her on the 30th looking scared.

21      Next slide.

22      Then Rachel had -- I know this became Brandie's sort of

23  cross to bear, if you will, but a number of people heard Rachel

24  say that she had been hit by a little boy with a metal bar,

25  including her sister Rebecca, who gave the statement on the day

1    Rachel died, May 2nd:  "She kept saying a boy pushed me out of

2    the van and hit me with a metal bar."

3         Next slide.

4         That story, Rachel told that to her mother.

5         Next slide.

6         In an interview with Stephanie Fleming about all this, she

7    told police that Don and Pete had heard that one of her sons

8    had hit Rachel with a stick.  Well, who are Don and Pete?  No

9    one ever follows up to see what those people knew about it.

10        Next slide.

11        Proposed finding number sixteen, that Mr. Jones made up a

12   false story that he saw Rachel fall out of his van sometime in

13   the afternoon.

14        Next slide.

15        Again, this is an interview of Rebecca, on May 2nd, the day

16   Rachel died, saying:  Rachel kept saying a boy pushed her out

17   of the van and "hit me with a metal bar in the stomach."  It's

18   not all coming from petitioner.

19        Next slide.

20        She told her mother the same thing.  She told Brandie the

21   same thing.

22        Next slide, please.

23        In this proposed finding they're asking you to find that

24   Rachel told Angela in the presence of her sister Rebecca and

25   daughter Brandie that petitioner hit her with a metal shoe bar

Opening Statement - Plaintiff/Petitioner

1    in the head and the stomach.

2        Now, supposedly -- I should step back a minute and say that

3    on Sunday evening, when Rachel was just a few hours from going

4    into shock and dying, she was making these statements.  She

5    must have been extremely ill.  I don't know how that would

6    affect the mental capacity of a four-year-old.  But at some

7    point in the midst of saying that these boys -- the boy had hit

8    her and pushed her, she said that Barry had hit her with the

9    metal bar in the head and the stomach.

10        And there was litigation in the trial court about whether

11    that should be admitted.  That's the next slide.  Whether that

12    was hearsay, whether it was some exception to the hearsay rule.

13    And in the midst of the pretrial argument, the day before the

14    trial started, on April 4th, 1995, the prosecutor said she was

15    withdrawing any effort to proffer that evidence.

16        So there was no evidence given to Mr. Jones' jury that he

17    had ever struck Rachel with a metal bar.  There will be no

18    witness in these proceedings who will testify that that ever

19    happened, and it's another example of something that really is

20    historical.  It has no relevance to the weighing process in

21    assessing what did Mr. Jones' jury hear versus, you know, what

22    should they have heard.

23        Next slide, please.

24        Again, it's just Angela's -- we've already gone over some

25    of this.  You can go ahead and go through the next couple of

1    slides.  I think we're about done with that.

2       So I think that one of the challenges in this

3    extraordinarily, oftentimes seemingly complex case, is I think

4    we need to strive to be careful about -- in grafting a lot of

5    statements in the records without thinking about whether a jury

6    ever really heard that evidence.  And I've touched on some of

7    that, but I think I have also hopefully been able to show you

8    that some of the things that I want you to find are really

9    contradicted by the record, particularly to suggest to you that

10   there was never any evidence that the mother abused her

11   children.  I think it is clearly refuted now.

12      I should say the jury didn't hear about any of that either.

13   So, you know, the question is though, you know, should defense

14   counsel have investigated that and pursued that.  In light of

15   all the evidence I have just discussed with you about the

16   mother's abusive behavior and hitting on the side of the head

17   and all these other things that she was doing, you know, should

18   that have been a focal point of their investigation?  And I

19   think you'll find that it wasn't.  And, certainly, if anything,

20   when they had all that evidence that the mother was abusive,

21   and they have their client saying that he's innocent, that

22   should have had some resonance, and maybe they should have paid

23   a little more attention to their client's innocence claim.

24      I want to shift from talking about what the case is really

25   not about to evidence that actually led to Mr. Jones'

1   conviction.  That's what we're here to talk about.  The

2   principal evidence that led to Mr. Jones' conviction was that

3   Rachel Gray suffered all of her injuries on Sunday afternoon,

4   May 1st, on a third trip she took with Mr. Jones in his van.

5   That's the focal point.  That's what he was arrested for even

6   before the autopsy was done.

7        That element of proof depended on medical evidence.  They

8   couldn't prove that he had done -- Mr. Jones had done anything

9   to Rachel without medical evidence, and they ultimately

10  presented medical evidence that was uncontested, tying all of

11  Rachel's injuries to the late afternoon of Sunday May 1,

12  including a fatal tear to her small bowel.  She had a vaginal

13  injury they dated to that time.  She had a scalp injury they

14  dated to that time.  We presented evidence that demonstrates

15  the state's medical evidence was incomplete, incorrect, and

16  unreliable, and that's the main focus of why we are here.

17       The state also presented blood evidence found on Mr. Jones'

18  clothing that they argued supported the conclusion.  I'd like

19  to see those blood slides.  They used this blood evidence to

20  argue that that proved that Rachel had been physically and

21  sexually assaulted in the van.

22       I just have a few slides I want to move on to with respect

23  to that.

24       So this first slide, Your Honor, is a red shirt, that's

25  Mr. Jones', on May 2nd.  The analyst found a trace of human

Opening Statement - Plaintiff/Petitioner                    27

1   blood too small to characterize on the shirt.  So this was not

2   a bloody gory scene on the shirt.

3        At trial, the prosecutor argued it was too small because

4   there were spatter pattern as a result of a beating, and that

5   was on the sleeve.  They never mentioned -- the prosecutor

6   never mentioned a transfer stain on the left sleeve or the rear

7   of the shirt.

8        You'll hear evidence from our blood interpretation expert,

9   Stuart James, that a transfer stain happens when you come into

10  touch with something.  Mr. James looked at the same evidence

11  and said the key point is, I think, what he says at the bottom

12  of the page:  These stains could have occurred as a result of

13  lifting or otherwise attending to an injured person.  Mr. Jones

14  had contact with Rachel on Sunday afternoon, when her scalp

15  wound started to bleed.

16       Now, let me just say about the scalp wound, the tissue

17  slides show that that wound was at least two days -- let me be

18  precise -- more likely than not, two days old.  The scalp

19  wound, to Rachel.  Way before May 1st.

20       And everybody around that child all day on May 1st, no one

21  sees her head bleeding.  When she starts to try to vomit at

22  5:15, at the Fleming trailer there, late Sunday, there is no

23  blood noticed there.  She's already sick, obviously, from

24  peritonitis that she's had stewing for a couple days.  She goes

25  home, Mr. Jones takes her home and lays her down and notices

1    blood on a pillow from where she had a barrette in her hair,

2    that's the first time anyone sees any blood.  And obviously we

3    will present evidence to show that it wasn't anything that

4    actually happened on May 1.  Quite frankly, it makes this whole

5    issue about falling out of the van almost irrelevant, because

6    the injury didn't even happen that day.

7         Next slide.

8         Again, you know, small amount of blood on the pants.  You

9    can't see it, but it's there, a little bit of Rachel's blood.

10   At trial, this was, again, presented as additional evidence of

11   an assault in the van.  And, again, Mr. James concluded the

12   small amount of blood on this clothing was only a small

13   transfer of blood on his jeans consistent with the victim.  So

14   that's the transfer of someone pushing something, it's not

15   beating someone and having spatter.

16        Next page.

17        There was a little bit of blood found on the carpet, and

18   the prosecutor argued that that stain is called V6, which was

19   evidence of the sexual assault occurred in the back of the van.

20   They presented evidence at trial that it was an impression

21   stain from her head, you know, laying against the carpet and

22   being assaulted.  Mr. James said it's not, it's a passive drop

23   of blood, and it wasn't in the back of the van.

24        Next line.

25        The stain was not in the back of the van, Your Honor.

1   There's the cut-out for V6.  It's right next to the chair.

2   Obviously, it dripped off Rachel's head at some point, perhaps

3   when she was being carried in the chair to the hospital on

4   Monday morning.  So it wasn't a transfer stain.  It wasn't even

5   in the back of the van.

6       Next slide.

7       There were some very small, again, stains on the seats

8   where you almost can't see.  And obviously Rachel was in those

9   seats.  Obviously she was bleeding.  The prosecutor, I think,

10  as I mentioned earlier, said it couldn't have been from Monday

11  morning when she was being transported to the hospital because

12  you don't bleed after you die, but we saw the pictures from the

13  autopsy.  You can't draw any conclusions of guilt from that.

14      Go on.  Next slide.

15      Let me just wrap up.

16      Of course, you're going to have evidence from three

17  different experts that the children, who claimed to have seen

18  an assault on Sunday while Mr. Jones was driving to the Choice

19  Market, couldn't have happened.  Their statements were tainted,

20  as you'll hear from Dr. Esplin.  At their height of around a

21  little over four feet tall, four feet one inch, it would have

22  been physically impossible for them to see Rachel in the van at

23  all, except for maybe the top of her head.

24      So the case just doesn't add up to prove Mr. Jones did

25  anything to Rachel on Sunday, May 1.  Nothing.

1       And could a jury have heard all this and convicted him?  I

2  don't think so.  But even if they could, that's not the test.

3  The test is whether there is a reasonable probability that the

4  outcome would have been different, one juror hearing all this

5  and saying this couldn't have happened Sunday.

6       You know, Mr. Jones was upset on the morning Rachel died

7  and didn't go to the hospital.  But nothing happened on Sunday,

8  he was just upset.  So all the inferences changed with this new

9  evidence.

10      You have our proposed findings and why we thought this

11  outcome related to the ineffective assistance of both trial and

12  PCR counsel.  I don't really have anything else to say other

13  than what we've already given in writing on that point.

14          THE COURT:  Okay.  Thank you very much.

15          MS. GARD:  May it please the Court, my name is Lacey

16  Gard.  I am here for respondents.  So the record is clear, at

17  counsel's table with us, in addition to me and Mr. Braccio is

18  Sergeant Pesquiera, the case agent; J. D. Nielsen, who is

19  co-counsel; and Daniel Vidal, who is our paralegal.

20          I thought it was interesting, with Mr. Sandman's

21  argument, we didn't really hear the *Strickland* standards

22  mentioned until the very end.  So I wanted to take a moment to

23  refocus on what we're here to talk about.  Because we're not

24  here to talk about whether Mr. Jones is guilty or innocent.  We

25  are here to talk about whether his attorneys performed

1  adequately in representing him, and, whether they did not,

2  there's a reasonable probability he would have been found not

3  guilty.

4      I would remind the Court that Mr. Jones raised and

5  litigated an actual innocence claim based on this same

6  evidence, and that was rejected, I believe.  I believe that was

7  Judge Zapata that rejected that.  But that's been litigated.

8      So here we are asking whether his attorneys effectively

9  represented him, which is a very deferential inquiry even on a

10  de novo review, and of course we're here on a de novo review

11  because this is arising in the context of *Martinez* and is not

12  governed by AEDPA.

13      I guess I'll just jump into the deficient performance

14  prong.

15      I didn't hear Mr. Sandman talk about that to -- in too much

16  detail this morning, but I'd like to just remind the Court that

17  when we look at what counsel did in the next few days, that we

18  need to assess their performance from their perspective at the

19  time and in light of the circumstances they faced at the time.

20      So what you'll see, I think, in the coming days is a

21  presentation that's been developed by the Federal Public

22  Defender, who has significantly more resources and more

23  manpower than trial counsel did.  Notwithstanding that, the

24  attorneys, you'll see in the coming days that Leslie Bowman and

25  Sean Bruner identified and investigated the very lines of

1    defense that Mr. Sandman identifies here today.

2         We expect that the attorneys, when they testify, won't

3    remember all that much about this case, which is to be expected

4    because it's 23 years after the fact.  But that doesn't defeat

5    or doesn't make their claim for a couple of reasons.  The first

6    being that a lapse in memory does not rebut *Strickland's*

7    presumptions.  The second being that, again, this is an

8    objective standard, where we need to see whether what they did

9    at the time was reasonable given the circumstances that they

10   faced.

11        And I am not certain whether any attorney will claim that

12   they were ineffective.  There is some suggestion that one

13   might.  To the extent that happens, again, that's not

14   dispositive because it's an objective standard, and we want to

15   look back at what they were faced with and whether a reasonable

16   attorney could have made the decisions that they made.

17        Mr. Sandman talked a good bit about the facts of the case,

18   and some of what he mentioned was not admitted at trial.  For

19   example, the statements by Rachel about the shoe bar.  Just for

20   the record, those are contained in Angela's Gray statement to

21   the police, the statements that Rachel made that the defendant

22   hit her.

23        But what -- the facts of the case are relevant for two

24   reasons.  Not just for *Strickland* prejudice, the prejudice

25   analysis, but also for counsel's decision making.  Because

1   counsel had before them the entire police investigation, which

2   did disclose and did contain information about Jones' prior

3   abuse.

4        Now, we can argue -- and perhaps it would be appropriate in

5   the coming days -- to argue about how extensive that was or,

6   you know, what the circumstances of that were, but that was

7   something that was known to counsel and was -- would have

8   focused into a reasonable attorney's decision making.

9        The facts of this case really -- and I am not certain at

10  this point exactly what Mr. Sandman's theory is of how Rachel

11  came to be injured, because I certainly saw suggestions

12  throughout the briefing and in the records that a child had

13  injured her.  It seems like that's not their theory any longer,

14  but the evidence as a whole points really only to Mr. Jones as

15  the perpetrator here.  Setting aside the medical evidence,

16  which we'll talk about in a second.

17       But Rachel was in Mr. Jones' care the entire day before she

18  died, Sunday, May 1st, was in Mr. Jones' care, beginning from

19  the time he woke up in the mid-afternoon through the rest of

20  the day while the mother was sleeping.

21       Despite what Mr. Sandman said about -- I think it was

22  Amanda Gray and Isobel Tafe -- I think the evidence will show

23  that Rachel was not ill.  There was no evidence of vomiting or

24  of pain or anything like that prior to Sunday.  The fact that

25  two children had seen Mr. Jones striking Rachel in the parking

1    lot was certainly something that was very difficult for counsel

2    to overcome, and that certainly went into their decision making

3    as well, as well as the blood being in Mr. Jones' car.  And

4    also we talked a minute ago about the statement that Rachel

5    made regarding the shoe bar, being struck by the shoe bar.

6        And I would note that, as Mr. Sandman had observed in his

7    PowerPoint, there was some litigation about that, and

8    ultimately the prosecutor withdrew her attempt to introduce

9    that statement, but that was opposed by counsel, right?  So

10   counsel at least expended effort trying to keep that statement

11   out and was ultimately successful.

12       A critical point as well -- and I didn't hear this

13   mentioned by Mr. Sandman -- that is reflective of Mr. Jones'

14   guilt is the fact that he dissuaded the mother, Angela Gray,

15   from seeking medical treatment by telling her falsely that he

16   had taken Rachel to see the paramedics.  I believe there is no

17   dispute at this point that it's false -- that was a false

18   statement, that Mr. Jones took her to a fire station.  That

19   never happened.

20       And the result of that, of course, was to prevent the

21   mother from getting medical treatment for Rachel.  And I think

22   Dr. Ophoven has acknowledged in one of her reports that

23   Rachel's death, although resulting from the injury to her

24   abdomen, resulted also from medical neglect, that she could

25   have been saved had she been taken to the hospital, and that

1    any caretaker should have recognized that she could have been

2    saved.

3        And the defendant also -- this was known to counsel, too,

4    this had to go into counsel's decision making process, the fact

5    that when Mr. Jones and Angela Gray found Rachel unresponsive,

6    Mr. Jones dropped Rachel and Angela off at the hospital and

7    then fled and hid out at a homeless camp, where he told people

8    he could not go to the hospital because the authorities were

9    going to be suspecting child abuse, and he was also overheard

10   muttering apologies to Rachel.

11       But notwithstanding all of that -- so that's a pretty --

12   that's pretty significant evidence of the defendant's guilt

13   that counsel had to work with.  But notwithstanding that,

14   counsel did investigate, as I mentioned before, every line of

15   defense that Mr. Sandman claims they should have.  And, again,

16   they were more limited in their resources than Mr. Sandman was.

17       However, with respect to the medical evidence, we have

18   admitted now, this morning, Trial Exhibit 1, which is the

19   totality of counsel's file.  So that will tell us what they did

20   and did not do.  But one of the documents in that file that's

21   going to be very important in this case, and it's separately

22   marked also as Exhibit 58, is a letter from Judge Bowman to

23   Dr. Phillip Keen.

24       Dr. Keen will testify here.  Dr. Keen is a very well known

25   and well respected expert in pathology here in the State of

1    Arizona.  He is a former medical examiner, chief medical

2    examiner, from Maricopa County and Yavapai County.  Judge

3    Bowman wrote him a letter and asked him to review the autopsy

4    report in this case.  In that letter, she also offered to make

5    available additional information he might need, including

6    tissue slides.

7        I expect you'll hear an allegation from Mr. Sandman that

8    Dr. Keen's evaluation was insufficient because he didn't have

9    those tissue slides.  I would submit that we don't know for

10   certain that he didn't have the tissue slides, but we do know

11   for certain that Leslie Bowman offered to make them available

12   to him.

13           THE COURT:  Can I pause you for a moment because

14   you're going fast.

15           MS. GARD:  I apologize.

16           THE COURT:  You said something a few moments ago that

17   I was waiting for a pause to ask you about.  But you were

18   talking about the extent of the investigation, said they did

19   what they could -- you essentially were saying -- I want to

20   make sure I am clear what you're saying.  You said they did

21   what they could based on the limited resources they had for the

22   investigation?

23           MS. GARD:  No, I'm not saying that at all.  I

24   apologize.  I didn't mean to say they were --

25           THE COURT:  I know you said they had limited

1    resources, but that doesn't drive --

2              MS. GARD:  It certainly doesn't.

3              THE COURT:  That doesn't drive the degree of

4    investigation they need to conduct, does it?

5              MS. GARD:  No, it absolutely does not.  The point I

6    was trying to get across is that -- is not that they didn't

7    request resources or get enough resources, but that the Federal

8    Public Defender has their own budget, and they were able to

9    secure very expensive experts and numerous experts.

10             Counsel, at trial, had to request funding for whatever

11   experts that they wanted to retain, and they did obtain funding

12   for a medical expert and for an investigator.

13        But, yes, that just --

14             THE COURT:  From the trial court?

15             MS. GARD:  The trial court.  I apologize.

16             THE COURT:  Not without some back and forth though.

17             MS. GARD:  Right.

18             THE COURT:  I think the trial court had some concerns

19   about the budget and how much experts were going to cost and

20   whether or not the experts were going to come from outside of

21   the local area, so on, so forth, right?

22             MS. GARD:  Correct.  But they were at least

23   recognizing they needed to ask for it.  They can't control what

24   the Court is going to do, and that doesn't make them

25   ineffective if they don't get the same amount of funding.  And

1    that goes to my argument before that -- that this has to be

2    assessed given the circumstances the Court was facing -- or

3    that counsel was facing at the time.

4        THE COURT:  So now to take you forward to where I

5    interrupted you.  You were talking about providing tissue

6    samples, and Judge Bowman offered those to -- offered to

7    provide those to the medical examiner?

8        MS. GARD:  Yes, that's correct.

9        THE COURT:  I think that's where we left off.

10       MS. GARD:  Okay.  In her letter, in addition to asking

11   him to review -- asking Dr. Keen to review the autopsy report,

12   she gave him specific referral questions, specific questions

13   that she wanted him to answer for her, including the timing of

14   Rachel's abdominal and vaginal injuries, and including the

15   injuries or the symptoms that she would have suffered after she

16   sustained her abdominal injury.  And those are -- as the

17   Court's aware, those are the exact medical questions that are

18   being presented now.

19       Also, around the same time they were consulting with

20   Dr. Keen, counsel had successfully delayed Rachel's burial in

21   the event that they wanted another autopsy, which they

22   ultimately did not pursue.  And then we'll see documentation

23   also -- I believe it's in the billing records -- about a

24   telephone call between counsel and Dr. Keen.

25       Now, this is where the kind of trail goes cold,

UNITED STATES DISTRICT COURT

1    because no one can remember what was discussed in that

2    telephone call.  Dr. Keen doesn't remember, and the attorneys

3    don't remember.  So we don't know what Dr. Keen may have told

4    them orally.  We don't know what they may have told him about

5    the case, in terms of what the police investigation had

6    collected or -- and we don't know if they told Dr. Keen what

7    strategy they were pursuing.  All we know was that there was

8    this phone call, after which counsel agreed to release Rachel's

9    body for burial because there wouldn't be another autopsy.

10         Now, Dr. Keen will tell you, when he testifies, what

11   opinions he holds today, in 2017, based on his current review

12   of the records.  But I would submit that that doesn't prove

13   what he told counsel twenty-something years ago.  We just

14   simply don't have a record or any kind of memory of that.  We

15   would submit also that the fact that counsel consulted with

16   Dr. Keen really defeats the *Strickland* claim on this issue.

17         Counsel also -- I'm sorry.  Was there a question?

18         THE COURT:  No.

19         MS. GARD:  Counsel also hired an investigator named

20   George Barnett.  Mr. Barnett is unfortunately deceased, so we

21   can't bring him in to talk about his investigation, but he did

22   leave some reports which are also part of counsel's file, and

23   we'll talk about that as well in the coming days.

24         George Barnett conducted interviews of the residents

25   of the trailer park where Mr. Jones lived.  Subsequently, upon

1    instructions from counsel, he photographed and measured Jones'

2    yellow van.  Now, presumably that had to do with -- or the

3    purpose of that was to test the veracity of evidence that

4    Mr. Jones had beaten Rachel in that van, as witnessed by the

5    Lopez children.  Again, memories are faded and Mr. Barnett is

6    deceased.

7           So, in light of all of that evidence, and in light of

8    counsel's investigative efforts, we would submit that you don't

9    even need to get to *Strickland* prejudice, that this can be

10   resolved based only on deficient performance because there

11   clearly was no deficiency.

12          But if you disagree, on the prejudice prong, I think

13   in analyzing this issue, it's important to keep in mind that

14   there are three predicate felonies for the felony murder in

15   this case, and to have that verdict set aside, Mr. Sandman is

16   going to have to show reasonable probability that all those

17   predicates fail.  Of course, one is based on the abdominal

18   blow, the sexual assault is the second, and then the failure to

19   render aid.  I think the most -- we'll spend the most time

20   probably on the medical evidence.

21          There were some -- and just to lead into this, there

22   were some statements made by Mr. Sandman throughout his opening

23   about Angela Gray having struck the children before, or

24   Jonathan Lux, who was the brother of Rachel, having engaged

25   allegedly in improper touching, but I think at the end of the

1   nine days you'll see that there really is no concrete evidence

2   of anyone else injuring Rachel, inflicting this fatal injury to

3   Rachel other than Mr. Jones.

4       There has been some suggestion in the pleadings that

5   Dr. Howard, who conducted the medical -- or the autopsy in this

6   case and testified at trial, has changed his opinion in some

7   way.  And that's, we will show, not accurate.  His opinions are

8   the same now as they were at trial.

9       THE COURT:  You're referring to the timing of the

10  his -- the assessment of the timing of the injury and that he

11  said one thing at trial and another thing at a different trial?

12      MS. GARD:  Correct.  I'd like to just talk about the

13  trial testimony a little bit, because I think the implication

14  of Mr. Sandman's argument today in some of the briefs is that

15  Dr. Howard said it absolutely happened that afternoon, and the

16  questioning is a little bit more vague and open-ended than

17  that.

18      Really, this comes down to a single question from Kathy

19  Mayer saying -- actually two questions, I apologize, from Kathy

20  Mayer, who was the prosecutor, asking Dr. Howard are these

21  injuries consistent with being inflicted between 2:00 and 5:30,

22  the day before Rachel's death -- this is on the April 12th

23  transcript at Page 117 -- and he said yes.  But subsequently in

24  his testimony he was asked a similar question by Kathy again --

25  or by Ms. Mayer again, I apologize -- and at that point he said

1    that at any time in the 24 hours prior to that would be

2    consistent, so that time frame would be possible.

3         In addition, Dr. Seifert, the emergency room doctor who

4    testified at trial, discussed the peritonitis, which is the

5    infectious process that ultimately took Rachel's life and

6    ultimately killed her, stated that process could take from

7    hours to days.

8         So the timing, while he did -- while Dr. Howard did agree

9    it was consistent with that short time period, I disagree that

10   the trial evidence absolutely said it had to be during that

11   time period.

12        But, regardless, I think that the evidence that we're going

13   to hear from Dr. Ophoven, who the Court may have encountered,

14   she's a well known defense expert, Dr. McKay, who is an

15   emergency room doctor, and Dr. Howard, will establish that

16   really the timing is variable here, that you can't completely

17   pinpoint when someone would suffer an injury like that.

18        So Dr. Ophoven has a little bit of a longer time window

19   than the afternoon of May 1st, but I think the experts will

20   agree there are some variables specific to each individual that

21   influence the timeline, which makes, of course, the

22   circumstantial evidence that the police developed much more

23   relevant to the analysis.

24        Finally, in addition to the medical evidence -- because

25   really this case comes down to three things:  The

1   circumstantial evidence of Jones' guilt, the eye witness

2   testimony from the Lopez children who saw him striking Rachel,

3   and then the medical evidence as well.

4        And Mr. Sandman will attempt to discredit the eye witness

5   testimony on various grounds.  He'll call an individual named

6   Mr. Gruen, and he'll opine that the Lopez children could not

7   see the attack in the van.  And you'll recall that the children

8   testified that they were standing in a parking lot and saw

9   Mr. Jones drive by in his car and saw him hitting Rachel Gray.

10  I think after cross-examination of Mr. Gruen is complete, it

11  will be clear that he can't conclusively say that the Lopez

12  didn't see what they said they saw.

13       In addition, Jones has admitted that he was driving in that

14  parking lot with his -- with Rachel in his yellow van.  So the

15  circumstantial evidence again corroborates what the Lopez

16  children are saying, regardless of what Mr. Gruen says.

17       So at the end of the hearing we'll ask the Court to reject

18  Mr. Jones' claim.  With that, I will conclude and turn to the

19  evidence, with the Court's permission.

20            THE COURT:  Yes.  Thank you.

21            Ready for your first witness?  Or do you want a moment

22  to shift gears?

23            MR. SANDMAN:  Could we, Your Honor, please?

24            THE COURT:  Okay.  We are going to take a 10-minute

25  break.  Thank you.

1      (A recess was taken from 10:27 a.m. to 10:45 a.m.)

2            THE COURT:  All right.  Mr. Sandman, will you call

3  your first witness.

4            MR. SANDMAN:  Your Honor, we'll be calling Leslie

5  Bowman.

6            THE CLERK:  If you'll please step into the witness

7  stand and remain standing to be sworn.  Please raise your right

8  hand.

9                 **LESLIE BOWMAN**, WITNESS, SWORN

10           THE COURT:  Mr. Sandman.

11           MR. SANDMAN:  Thank you.

12                       DIRECT EXAMINATION

13  BY MR. SANDMAN:

14  Q.  Good morning.

15  A.  Good morning.

16  Q.  Could you state your name for the record, please.

17  A.  Yes.  My name is Leslie Bowman.

18  Q.  Could you tell us, what is your current employment?

19  A.  Currently, working as a United States Magistrate Judge.

20  Q.  How long have you been in that position?

21  A.  It's been about five and a half years.

22  Q.  Can you tell us, when did you graduate from law school?

23  A.  I graduated from law school in May of 1982.

24  Q.  And when were you then admitted to the bar?

25  A.  On May 15th of 1993.

Direct Examination - Bowman                45

1   Q.  So you had a span there of a little over 10 years between

2   graduation and obtaining your license to practice law?

3   A.  Yes.

4   Q.  You're a member of the Arizona bar?

5   A.  Yes.

6   Q.  Can you tell us, what was your first job after gaining

7   admission to the bar?

8   A.  I went into private practice with Sean Bruner.

9   Q.  Did Mr. Bruner have an established practice at the time?

10  A.  He did.  He was practicing with a small firm, but he left

11  that firm when we went into practice together.

12  Q.  Was Mr. Bruner a law school classmate of yours also?

13  A.  He was.

14  Q.  So you established the firm in 1993?

15  A.  Yes.

16  Q.  And was the firm primarily, although not exclusively, a

17  criminal defense firm?

18  A.  Yes.

19  Q.  Did the firm handle privately retained criminal matters?

20  A.  Yes, it did.

21  Q.  Did some of those privately retained criminal matters

22  include drug cases?

23  A.  Yes.

24  Q.  Did Mr. Bruner have sort of a subspecialty in drug defense

25  cases and drug forfeiture cases?

Direct Examination - Bowman                    46

1   A.  Yeah --

2   Q.  Not specialty in the terms of being certified by the bar

3   necessarily, but was that a concentration of his practice?

4   A.  Yes.

5   Q.  Was he working on a lot of those types of cases when you

6   formed the partnership in '93?

7   A.  I don't remember specifically, but he probably was.

8   Q.  Okay.  And could the fees paid into those privately

9   retained drug cases go into the high five figures?

10  A.  Yes.

11  Q.  During the first couple of years of your practice, which

12  would -- I think you'll likely tell us that's when you started

13  representing Mr. Jones, was the firm generating those type of

14  high fee cases and drug cases and forfeitures?

15  A.  Yes, it was.

16  Q.  You know you're here today to discuss your prior

17  representation of Barry Lee Jones, is that right?

18  A.  Yes.

19  Q.  Did you represent him in connection with charges of the

20  murder of Rachel Gray?

21  A.  Yes.

22  Q.  And associated charges of sexual and physical abuse?

23  A.  Yes.

24  Q.  And were you ever formally appointed to represent

25  Mr. Jones?

Direct Examination - Bowman                                    47

1   A.  I was not.

2   Q.  Who was formally appointed to represent him?

3   A.  Sean Bruner was the counsel that was appointed.

4   Q.  Did you nevertheless assist Mr. Bruner in the

5   representation of Mr. Jones?

6   A.  I did.

7   Q.  Prior to today, have you had the opportunity to review the

8   Bruner and Bowman trial counsel file?

9   A.  Yes.

10  Q.  And you previously gave a deposition in this case, is that

11  right?

12  A.  Yes, I did.

13  Q.  Did you have an opportunity to review your deposition and

14  the attendant deposition exhibits?

15  A.  I did.

16  Q.  I want to show you a copy of the indictment, if we could,

17  that was filed against Mr. Jones.  Do you recognize that as the

18  indictment filed against Mr. Jones in case CR-45587?

19  A.  Yes, I do.

20        MR. SANDMAN:  I might just say for the record that

21  this is not part of the exhibits, Your Honor, but it is part of

22  the state court record which the Court has in its entirety.

23        THE COURT:  All right.  So there is no exhibit number

24  associated with this?  Again, for purposes of the record, I

25  want to make sure that we create a record that an appellate

UNITED STATES DISTRICT COURT

Direct Examination - Bowman

 1    court can follow.  If it's part of another file, if you could

 2    sort of indicate precisely where that can be found.

 3              MR. SANDMAN:  Okay.

 4              THE COURT:  It is a part of the record in this case.

 5              MR. SANDMAN:  It is part of the record in this case

 6    and it's part of the state court trial record, which was

 7    delivered or caused to be delivered to this Court by the

 8    Arizona Supreme Court some years ago.

 9    BY MR. SANDMAN:

10    Q.  I may have asked you this, but do you recognize this as the

11    indictment?

12              MR. SANDMAN:  And can we see the next page?  It goes

13    onto the next page.  Page 2.  No?

14    BY MR. SANDMAN:

15    Q.  While we're looking for that, the indictment charges that

16    the sexual and physical abuse of Rachel occurred on or about

17    May 1, 1994.  Is that what it says?

18    A.  Yes.

19    Q.  Do you recall whether Mr. Jones was convicted of murder and

20    the other charges in the indictment?

21    A.  Yes, he was.

22    Q.  And did you and Mr. Bruner both represent Mr. Jones at his

23    trial?

24    A.  We did.

25    Q.  Do you recall where Mr. Jones was living at the time of

Direct Examination - Bowman                          49

1   Rachel's death?

2   A.  He was living in a trailer park on Benson Highway; I don't

3   recall the exact address.

4   Q.  Do you remember who he was living there with?

5   A.  He was living with the mother of Rachel, which was Angela

6   Gray.  Also, I think Mr. Jones' daughter, Brandie.  I'm not

7   sure if she was there all the time, but she was there.  And

8   then Angela had two other children, I think Jonathan and Becky.

9   Or Rebecca.

10  Q.  In your review of the case materials, did that help refresh

11  your memory of the areas of responsibility, the chief areas of

12  responsibility, you had in connection with representation of

13  Mr. Jones?

14  A.  Yes, it did.

15  Q.  Could you tell us what were the areas that you primarily

16  focused on?

17  A.  I was responsible for conducting the pretrial interviews of

18  the witnesses.  I contacted the investigator, at least one of

19  the experts.  There may have only been one.  And also I had a

20  fair amount of contact with Mr. Jones and with his family.

21  Q.  Did you also attend some of the pretrial court hearings?

22  A.  Yes, I did.

23  Q.  I'd like to show you what's been marked as Exhibit 24A,

24  which is -- obviously it's one of the admitted exhibits, and it

25  is a transcript of a hearing dated June 22, 1994, which would

Direct Examination - Bowman                          50

1   have been just probably about five weeks after -- six weeks

2   after the indictment.  Or after the arrest of Mr. Jones for the

3   May 2nd death of Rachel.  Is that right?

4   A.  Yes.

5   Q.  If you could turn to Page 2.

6          THE COURT:  You said this is one of the admitted

7   exhibits?

8          MR. SANDMAN:  Yes, 24A.

9          THE COURT:  That's fine.  Go ahead.

10          MR. SANDMAN:  Is there any way to make that bigger?

11   Or is that as big as it...?

12   BY MR. SANDMAN:

13   Q.  Do you see -- I'm looking at down around Line 8 there.

14   Were you the attorney appearing for Mr. Jones at this hearing?

15   A.  Yes, I was.

16   Q.  Then down at around 18, if we could scroll down there.  Do

17   you see this is a pretrial conference hearing with the Court?

18   A.  Yes.

19   Q.  On the next page, Page 3, around Line 12 through 18.  Lines

20   12 through 18.  Do you see there the Court has asked about the

21   status of disclosure?

22   A.  Yes.

23   Q.  What is the Court referring to there, do you know?

24   A.  I believe the Court was -- well, the discussion had to do

25   with whether we'd received disclosure yet from the state.

Direct Examination - Bowman

1   Q.   Okay.  Is it part of the Arizona laws of a criminal

2   procedure that the prosecution discloses all the police reports

3   and other aspects of the investigation to defense counsel?

4   A.   Yes.

5   Q.   Ms. Mayer responds at page, excuse me, at Line 15.  Who is

6   Ms. Mayer?

7   A.   I think that was Kathleen Mayer.

8   Q.   Mayer.  Sorry.

9   A.   The prosecutor in this case.

10  Q.   And she indicates that since the beginning of the month,

11  which would be June, they started making their disclosure.

12  Correct?

13  A.   Yes.

14  Q.   So there hadn't been any disclosure in May.  They started

15  disclosing, according to her, in June.  Is that right?

16  A.   I don't remember.  And I am not sure if this was the

17  initial disclosure or if she was just talking about what she

18  disclosed --

19  Q.   Okay.

20  A.   -- that month.  I can't remember.

21  Q.   Fair enough.  On Page 6 of this transcript, at the top of

22  the page, there's a reference to setting a new trial date.  Do

23  you see that?

24  A.   Yes.

25  Q.   And the Court inquired -- or the Court noted a date of

Direct Examination - Bowman                                    52

1   October 11 and then inquired of you are you going to try the

2   case or Sean, do you see that?

3   A.  I do.

4   Q.  Could you read into the record what your response was?

5   A.  I responded:  At this point I have handled the entire case,

6   so I may be trying the case.

7   Q.  So at least as of the June 22nd hearing, you believed or

8   were forecasting that it might be you actually rather than

9   Mr. Bruner who would be trying the case, is that right?

10  A.  Yes.

11  Q.  And you indicated that you had been handling the whole

12  matter at least through May and most of June on your own.  Had

13  you ever represented a capital defendant on your own before?

14  A.  No.

15  Q.  Had you ever tried a capital case on your own before?

16  A.  No.

17  Q.  Was your law practice fairly busy at that point in time?

18  A.  It was.

19  Q.  Okay.  I'd like to show you Exhibit 12, if we could bring

20  that up.

21          THE COURT:  Again, this is already admitted?

22          MR. SANDMAN:  Yes, Your Honor.  I'll only be referring

23  to exhibits that have been admitted.

24          THE COURT:  That's fine.

25          MR. SANDMAN:  I'll be very careful not to refer to any

Direct Examination - Bowman                        53

1    that have not been.  But Exhibit 12, Your Honor, has been

2    admitted, and this is the summary of the billing record.  I

3    wonder if we could make that -- enlarge that picture of the

4    front page of the billing summary.

5    BY MR. SANDMAN:

6    Q.  Do you see there, on the left-hand column, there's dates

7    and descriptions of work?

8    A.  Yes.

9    Q.  If we can scroll down a little bit further to at least June

10   22nd.  There you go.

11       Do you see there's an entry there on June 22nd for

12   appearance of pretrial conference?

13   A.  Yes.

14   Q.  So even though you were not appointed officially as counsel

15   for Mr. Jones, is it true that you were recording your time and

16   submitting that time as part of the billing that went to the

17   Court in this matter?

18   A.  Yes.

19   Q.  Is it your -- is it true then that most -- at least most of

20   the work done throughout May and June was done by you, is that

21   right?

22   A.  It must have been, yes.

23   Q.  On the topic of billing, did the firm have -- what was the

24   billing system in place for recording and tracking time?

25   A.  We had -- we had time sheets.  This was quite a long time

Direct Examination - Bowman                                    54

1   ago; everything was done by hand.  But we had blank time sheets

2   that we always had with us, whether that be at our desk or in

3   our file.  And when we performed a task, we would put the date,

4   we would put the -- our file number, not the case number but

5   our own file number.  We would put our client's name, then a

6   brief description of whatever the task was.  And then, just

7   like you see on Exhibit 12, we had it broken down by in court,

8   out of court and different tasks, and then we would write a

9   number, billing by point one or in six-minute increments.

10  Q.  Okay.  With respect to a lot of criminal matters -- not

11  this case but on privately retained cases -- were those fees

12  just sort of paid?  They weren't hourly necessarily, were they?

13  A.  No, they weren't.  There was a retainer paid up front

14  and....

15  Q.  That was the fee.

16  A.  That was the fee.

17  Q.  And in appointed cases where you had to track time, did you

18  make an effort to try to keep track of your time and document

19  it appropriately?

20  A.  Yes, we did.

21  Q.  I'd like you to take a look at the last page of Exhibit 12.

22  That would be Page 6.  I wonder if we could scroll up just a

23  bit so we could see the categories at the top of the page.

24  Okay.

25       So this final page of the summary indicates some totals for

Direct Examination - Bowman                    55

1   various things that were done in the case, various work

2   performed.  And you see -- I'd like to draw your attention to

3   the bottom right-hand corner.  Actually, the bottom left-hand

4   corner, where it says total pretrial out-of-court time.  On the

5   bottom left side.

6   A.  Yes.

7   Q.  If you run over to the left-hand side you'll see 190.  In

8   this capital case there was 190.5 hours billed out of court.

9   A.  Yes.

10  Q.  Can you take that off the screen, please.

11      Do you see, with respect to out-of-court time, there was

12  billing -- out of 190 hours, of all of the pretrial time, there

13  are 50 -- a little over 50 hours for client contact and contact

14  with the client's family, do you see that?

15  A.  Yes.

16  Q.  That's in the second column over from the right -- left.

17  Do you see that column?

18  A.  Yes.

19  Q.  As between you and Mr. Bruner, was that mostly your time?

20  A.  Probably, it was.

21  Q.  Because you were spending more time with the client?

22  A.  Yes.

23  Q.  And his family?

24  A.  Yes.

25  Q.  And then I note there is some -- in addition, there is a

UNITED STATES DISTRICT COURT

Direct Examination - Bowman                                    56

1    column right in the middle or toward the right.  Amanda Gray

2    Trial.  Do you see that?  Attended Gray trial.

3    A.  Yes.

4    Q.  With 17.6 hours?

5    A.  Yes.

6    Q.  In your review of the record in this case, have you had --

7    determined who, between you and Mr. Bruner, attended that

8    trial?

9    A.  I believe that was me.

10   Q.  So you did that.  And then there was a -- there was witness

11   interviews in the case of 39 -- I guess it was 39.3 hours.  Was

12   that substantially all your time in the case, interviewing the

13   witnesses?

14   A.  I think it was.

15   Q.  If you total those up, that's about half the time of the

16   pretrial time, is that right?

17   A.  You're asking me to do math.  Can you remind me what you're

18   asking me to total?

19   Q.  It was 190 hours.

20   A.  Okay.  And you're asking for the total of the client and

21   family contact with the witness interviews?

22   Q.  And attending the Gray trial.

23   A.  Yes.

24   Q.  Did you also do some legal research and writing on the

25   case?

Direct Examination - Bowman                                    57

1   A.  I don't remember that.

2   Q.  And did you -- in order to do the witness interviews, did

3   you have to review records?

4   A.  Yes.

5   Q.  What is the total amount of out-of-court time on record

6   review on the billing?

7   A.  45.6.

8   Q.  45.6 hours?

9   A.  Yes.

10  Q.  Do you recall George Barnett?

11  A.  Yes.

12  Q.  I'd like to -- tell me what you recall about Mr. Barnett

13  and his role in this case?

14  A.  I remember that we contacted him early on and asked him to

15  help us with the investigation.

16  Q.  And do you remember -- well, let me withdraw that.

17      Let's take a look, if we could, at Exhibit 16, which is in

18  evidence.  If we could enlarge that somewhat.  If you could

19  scroll down.

20      Do you recognize Exhibit 16 as a report dated May 19, 1994,

21  you received from Mr. Barnett?

22  A.  Yes.

23  Q.  As part of your preparation, or as part of your review of

24  the record in this case, have you recently reviewed this

25  document?

Direct Examination - Bowman                                    58

1    A.  Yes.

2    Q.  I'd like to walk through some of this document in terms

3    of -- so we can establish some of the things that you learned

4    from Mr. Barnett and get those on the record.

5        Do you see in the first paragraph that Mr. Barnett

6    indicates that he received the inquiry regarding this case from

7    you rather than Mr. Bruner?

8    A.  Yes.

9    Q.  And at the bottom of the first paragraph he indicates that

10   he actually had a conference with you on May 9th, 1994,

11   correct?

12   A.  Yes.

13   Q.  That would have been less than a week after you were

14   appointed to represent Mr. Jones.  Excuse me, after Mr. Bruner

15   was appointed.

16   A.  Correct.

17   Q.  It indicates after the meeting he went out to 4501 East

18   Benson Highway.  Do you see that in the middle -- in the second

19   paragraph?

20   A.  Yes.

21   Q.  If we could scroll down a little bit to look at that bottom

22   paragraph.  Mr. Barnett made contact with a Judy Chavez, who is

23   the manager at Desert Vista Apartments.

24   A.  Yes.

25   Q.  She informed Mr. Barnett that Mr. Jones had lived in the

Direct Examination - Bowman                              59

1    trailer park for about five years.

2    A.  Yes.

3    Q.  She indicated that he was very quiet and polite.

4    A.  She did.

5    Q.  And that -- near the bottom of the page, I think the last

6    sentence there, that she said quite some number of the children

7    in the trailer park all seemed to like him very much.

8    Referring to Mr. Jones.

9    A.  Yes.

10   Q.  And she told him that he was well liked by all the children

11   and that they tended to congregate in the area near his

12   residence, do you see that?

13   A.  Yes.

14   Q.  Also at the very bottom of the page, she noted that it was

15   only five weeks prior to May 9th, which would have been early

16   April, that Angela had moved into the trailer.

17       Can we see the next page.  I think that's the last line of

18   that -- Page 1.

19       Did you see the reference to Angela moving in in early

20   April?

21   A.  Yes.

22   Q.  Okay.  In the top paragraph there, do you see Ms. Chavez

23   makes a reference at the bottom of the first full paragraph

24   that Angela was frequently yelling at the children when Barry

25   was not present at the residence?

Direct Examination - Bowman                                    60

1    A.  Yes.

2    Q.  And also, in the next paragraph, do you see that Ms. Chavez

3    indicates that she saw Rachel with two black eyes?

4    A.  Yes.

5    Q.  And that she had been informed that Rachel tripped over a

6    dog?

7    A.  Yes.

8    Q.  Then the next person that Mr. Barnett interviewed was

9    indicated at the bottom of that page, Page 2.  That he

10   contacted the occupant of Trailer 22, a Susan Hopkins, who

11   lived directly south of Mr. Jones.

12   A.  Yes.

13   Q.  And did Ms. Hopkins inform Mr. Barnett that she had also

14   known Mr. Jones for five years?

15   A.  Yes, she did.

16   Q.  And did she tell Mr. Barnett that Mr. Jones was extremely

17   nice to all the kids in the park?

18   A.  Yes.

19   Q.  And at the bottom of that page, did she also reiterate that

20   Angela had just moved in four to five weeks prior?

21   A.  Yes, she did.

22   Q.  And the next page.

23       And that Angela is always screaming at their four children,

24   that's at Page 3, when Barry was not present.  Do you see that?

25   A.  Yes.

Direct Examination - Bowman                    61

1   Q.  So now you have at least two people telling Barnett that

2   there's -- some of Angela's behaviors in respect to the

3   children that only happen when Barry is not there, is that

4   right?

5   A.  Yes, it is.

6   Q.  In the top paragraph there, Ms. Hopkins says that she's

7   observed Ms. Gray threaten the children with bodily harm.  Do

8   you see that at the top of the page there?

9   A.  Yes.

10  Q.  Then in the next paragraph, on Page 3, around the middle of

11  that paragraph, Ms. Hopkins indicates, in recounting her five

12  years of knowing this man, that he was extremely docile with

13  the children, and that all the parents felt very secure with

14  their children playing in the area when Barry was present.  Do

15  you see that?

16  A.  I do see that.

17  Q.  Then on the next paragraph, where it says Susan Hopkins'

18  personal opinion.  If we could scroll down.  Indicated that

19  Angela was a screamer.  Do you see that?  And that Barry would

20  leave when she became overly aggressive.  Do you see that?

21  Further down in that paragraph?

22  A.  Yes, I do.

23  Q.  Then the final person that Mr. Barnett spoke to in the

24  trailer park was a Shirley DeVous, from Space 24, who lived

25  directly north of Mr. Jones.  Do you see that?

UNITED STATES DISTRICT COURT

Direct Examination - Bowman                          62

 1   A.  Yes.

 2   Q.  She indicated to Mr. Barnett that from the time that Angela

 3   moved into the -- Mr. Jones' trailer, that she did not let her

 4   kids play with others near Barry's residence.  Do you see that?

 5   A.  I do.

 6   Q.  She also, by the way, ratified that Angela had only been

 7   there four or five weeks, correct?

 8   A.  Yes.

 9   Q.  And Ms. DeVous stated that, quote, Angela yelled and was

10   abusive towards the children.  Do you see that?

11   A.  I do.

12   Q.  And she went on to describe Mr. Jones as an extremely good

13   person with all the kids, including her daughters, is that

14   right?

15   A.  Yes.

16   Q.  She recounts that Mr. Jones went out of his way to help

17   people in the trailer park?

18   A.  Yes, she did.

19   Q.  And the next page.

20       At the top of the next page, Ms. DeVous, like Mr. Jones'

21   other neighbor, Ms. Hopkins, described Angela as a screamer?

22   A.  Yes.

23   Q.  And in that paragraph she indicates to Mr. Barnett, a few

24   lines down, that Barry would never strike anybody.  Do you see

25   that?

Direct Examination - Bowman                                63

1   A.  Yes.

2   Q.  Then if we go down a little bit further.  I want to ask

3   you -- this is the second to the last paragraph on the page.

4   So we have to go down to the -- down the page.

5       There is a discussion in this paragraph specifically about

6   Sunday, May 1st, 1994.  Do you see that?

7   A.  I do.

8   Q.  And Barnett learns from Ms. DeVous that she had observed

9   the kids playing in that area.  They were all playing around

10  the front of Mr. Jones' trailer, which was not unusual.  Right?

11  A.  Right.

12  Q.  And she said she observed Rachel specifically in the late

13  afternoon.

14  A.  Yes.

15  Q.  Does she anywhere in her description of Rachel there, in

16  late afternoon, indicate that Rachel looked like she had been

17  physically beaten and sexually assaulted in the late afternoon?

18  A.  No.  She said she seemed to be happy and in good spirits

19  with no physical difficulties.

20  Q.  Then on the final paragraph, Mr. Jones' neighbor here,

21  Ms. DeVous, tells Mr. Barnett Barry would hardly, or never,

22  raise his voice to children, and was probably more tolerant

23  than any other individual in the entire trailer park, and never

24  abused children in any manner.  Do you see that?

25  A.  Yes.

UNITED STATES DISTRICT COURT

Direct Examination - Bowman

1   Q.  Now, this -- had you been out to that trailer park when you

2   represented Mr. Jones?

3   A.  During the representation.  Maybe not before this, but,

4   yes, I was.

5   Q.  This was a lower economic type area in Tucson?

6   A.  Yes.

7   Q.  And amongst all the people living in the trailer park,

8   Mr. Barnett learned from Ms. DeVous that he's more tolerant

9   than anybody else living there, is that right?

10  A.  Yes.

11  Q.  Now, next page.  In the second paragraph, Ms. DeVous

12  recounts that, over Angela's objection, Barry -- excuse me.

13  Well, she says Barry would never hurt a child, in the second

14  paragraph.

15      I want to scroll down now to the second to the last

16  paragraph, because that gets back to Sunday afternoon, May 1st.

17      She says, concerning Sunday afternoon, May 1st, she had

18  observed Rachel on a bike around 3:00 to 4:00 p.m.  Do you see

19  that?

20  A.  Yes.

21  Q.  Again, no indication that Rachel looked like someone had

22  harmed her that late afternoon, is that right?

23  A.  That's correct.

24  Q.  Now, if we could go to the next page, Page 6.  The last

25  paragraph.

1      In that paragraph, Mr. Barnett indicates that he had

2   returned to the office and spoke with Joe Chavez, who

3   co-managed the property with Judy Chavez.  That was the -- Judy

4   was the first person named in the report, right?

5   A.  Yes.

6   Q.  And in the interview, Mr. Barnett's interview of Joe

7   Chavez, he states, quote:  He was aware that a two-year-old

8   boy, who was slightly large for his age, had struck Rachel in

9   the stomach with either a stick or an iron bar.  Do you see

10   that?

11   A.  I do.

12   Q.  Mr. Chavez goes on to inform Mr. Barnett that the mother of

13   the two-year-old boy, Stephanie Fleming, actually packed her

14   things the morning of May 2nd when she heard about Rachel's

15   death and moved within two hours without notifying the office.

16   Do you see that?

17   A.  I do.

18   Q.  And Mr. Chavez says that -- this is about five lines from

19   the bottom -- that he was informed by neighbors that Fleming

20   was scared to death after hearing about the arrest and was

21   further concerned that not only would Child Protective Services

22   become involved concerning her children, but she was apparently

23   in great fear that her son would be responsible for some of the

24   injuries received by Rachel on Sunday.  Do you see that?

25   A.  Yes, I do.

Direct Examination - Bowman                    66

1   Q.  Now, do you know or did you ever ask Mr. Barnett to find

2   out who those neighbors were, the neighbors that informed

3   Mr. Chavez for Ms. Fleming's motivation to pack up within two

4   hours of learning of Rachel's death and moving out?

5   A.  I don't remember, but I think if I had, there would have

6   been some kind of report about that.

7   Q.  If you had done it there would be a report.  And if there

8   is not a report, then you hadn't done it.  Is that what you're

9   saying?

10  A.  That's probably true.

11  Q.  He goes on to say, at the bottom of Page 3, it was

12  indicated that Stephanie Fleming may have somehow intervened

13  between her two-year-old son -- we have to go onto the next

14  page -- and Rachel (phonetic) may have herself created some

15  type of assault on Rachel late the afternoon of Sunday, May

16  1st, and was therefore afraid for her own welfare and did not

17  wish to get mixed up with the police.  Do you see that?

18  A.  Yes, I do.

19  Q.  Do you recall having Mr. Barnett follow up on that part of

20  the investigation to find out who was it that said that

21  Ms. Fleming was concerned that she might be implicated in

22  harming Rachel?

23  A.  I don't remember asking for follow-up.

24  Q.  Then at the bottom of that first paragraph on Page 7,

25  Mr. Chavez stated that Stephanie was hiding out and acting

Direct Examination - Bowman                    67

1  weird when officers came to the apartment complex to speak with

2  tenants.  Do you know whether Mr. Barnett was ever instructed

3  to follow up to see who could ratify that behavior?

4  A.  I don't remember asking for that.

5  Q.  Then in the next paragraph on Page 7, Mr. Barnett asked

6  Mr. Chavez if he had heard anything about Rachel falling out of

7  a van, and he stated, yes, that he had heard this from several

8  different sources.  Do you see that?

9  A.  Yes.

10  Q.  Did you ever -- to your knowledge, had Mr. -- did you ever

11  ask Mr. Barnett to follow up with respect to who those sources

12  were?

13  A.  I don't remember asking him to do that.

14  Q.  Then finally at the bottom of that paragraph, Mr. Chavez

15  also says that Mr. Jones was very tolerant of the children in

16  the trailer park.

17  A.  Yes, he did say that.

18  Q.  Now, the last paragraph of Page 7, Mr. Barnett indicates

19  that he next left the premises to a different location on

20  Benson Highway to speak to a Patty Bennett?

21  A.  Yes.

22  Q.  Who was the previous manager of the trailer park.

23  A.  Yes, he did.

24  Q.  And she had known Mr. Jones for approximately four years,

25  is that right?

1    A.  Yes.

2    Q.  And the next page.  Starting from the middle paragraph on

3    down.  Let me just go down from where you are on the page.

4        Okay.  This is Page 8 of Exhibit 16.

5        Mr. Barnett here learned about some information about the

6    man who Angela lived with before she lived with Barry, a guy

7    named Zoly.  Do you see that?

8    A.  Yes.

9    Q.  And in the third paragraph on Page 8, Ms. Bennett informed

10   Mr. Barnett that, quote, Angela was afraid of Zoly and made

11   contact with a third party to go over and take her children

12   away from Zoly.  Do you see that?

13   A.  Yes.

14   Q.  Did you ever ask Mr. Barnett to find out or to investigate

15   that point, as to the possibility that this Zoly fellow may

16   have been abusive or harmed any of the children?

17   A.  I don't remember if we asked him to do that.  I saw some

18   things in my notes that talked about trying to locate him, but

19   I don't think that was through Mr. Barnett because there is no

20   report.

21   Q.  Now, at the very final -- let me just ask you, do you

22   believe that Mr. Barnett provided you with some information

23   that was deserving of further investigation in this report?

24   A.  Yes.

25   Q.  If I could have you -- I'd like to turn to Page 15 of the

Direct Examination - Bowman                                   69

1   report, which is where the report ends.  Page 15.

2        I wanted to ask you about the large paragraph.

3        If we could enlarge that.  We need to scroll down a little

4   bit to see it.

5        In the final paragraph, Mr. Barnett reports that he had a

6   debriefing with you on May 18, 1994.  Do you see that?

7   A.  Yes.

8   Q.  And it was indicated to Mr. Barnett that the amount set

9   aside for time, milage and expenses concerning the

10  investigation had become financially infeasible, and so he was

11  basically told to stand down at that point.  Is that right?

12  That's what he reports.

13  A.  Yes.

14  Q.  Now I want to show you what's in evidence as Exhibit 20.

15  If we could enlarge that.  Exhibit 20, in evidence, is a motion

16  for appointment of investigator.  It is shown in the upper

17  right-hand corner as filed July 14, 1994.

18       Have you seen this document previously?

19  A.  I have.

20  Q.  If we could scroll down the page.

21       First of all, this motion seeks the appointment of an

22  investigator, is that right?

23  A.  Yes.

24  Q.  At the bottom of the page it indicates that the

25  investigator has billed $445 for services rendered?

UNITED STATES DISTRICT COURT

Direct Examination - Bowman                          70

1    A.  Yes.

2    Q.  There's a statement attached actually to.  It, we'll get to

3    that.  But the motion then goes on to say he's located and

4    interviewed potential witnesses that have provided information

5    relevant to possible -- we need to go to the next page, at the

6    top of the page.  So the sentence that I was just reading goes

7    on to say that Mr. Barnett had interviewed and located

8    potential witnesses that have provided information relevant to

9    possible defenses in this case.

10       Would you agree that the initial report did accomplish

11   that, the one that we just read, Exhibit 16?

12   A.  Yes, it did.

13   Q.  Then this motion goes on to say there remains several

14   unanswered questions and several potential witnesses that have

15   not been located.  This information is critical to the defense.

16   Do you see that?

17   A.  Yes.

18   Q.  Then there's a reference to the fact that Mr. Barnett is

19   willing to continue to work on the case.

20   A.  Yes.

21   Q.  Then if we can go to Page 4 of this document.  The next

22   page.  You've got to keep going until you get to the bill.

23   It's the second to the last page of the document.

24       While we're looking for that, in your examination of the

25   file, the trial counsel file, did you find any evidence that

1    Mr. Barnett had ever done any additional work on the case after

2    the filing of this July 14, 1994 motion?

3    A.  I think it was after that that we asked him to take some

4    measurements of the van.

5    Q.  Did you find any evidence though that he had ever tracked

6    down witnesses that were, according to this motion in Exhibit

7    20, that were critical to the defense?

8    A.  No.

9    Q.  And if he did do that work, should there be some evidence

10   either in your file, as well as the court file, containing the

11   billing records of investigators and experts?

12   A.  Yes.

13   Q.  And do you have any explanation for why additional work

14   product for Mr. Barnett does not appear in either the Superior

15   Court record or in your file?

16   A.  No.

17   Q.  We finally pulled up the attachment to Exhibit 20.

18       I was going to ask you, does this look -- is this the

19   billing that was initially submitted for the work Mr. Barnett

20   did in early May, '94?

21   A.  That's what it appears to be.

22   Q.  If we could take a look at Exhibit 21, please.

23       Exhibit 21 is an order that was filed in the state court

24   proceedings in Mr. Jones' case, dated July 14, 1994, and can

25   you tell us what this order is?

Direct Examination - Bowman                    72

1   A.  It indicates that the Judge approved $500 or authorized

2   $500 to be paid for the investigator.

3   Q.  I want to turn now to Exhibit 24D, as in "David."

4       Exhibit 24D is a transcript from the proceedings in the

5   state court in Mr. Jones' case dated July 14, 1994.

6       If you could take a look at Page 2.  Did you review this

7   document as part of your review of the record in connection

8   with these proceedings?

9   A.  Yes.

10  Q.  At the first page the Judge notes, at Line 13, there's a

11  serious question in front of him, is that right?

12  A.  Yes.

13  Q.  Then if we go ahead to -- well, I'm at Page -- is it

14  Ms. Mayer?  I always pronounce her name wrong.

15  A.  Yes.

16  Q.  At Line 17, she says that we knew that something was in the

17  works because there had been a request not to release the body.

18  Do you see that?

19  A.  Yes.

20  Q.  Is it your understanding based on your review of the record

21  and this transcript that now some -- over two months after

22  Rachel's death that she had not -- her remains had not been put

23  to rest.  Is that right?

24  A.  Yes.

25  Q.  And then at -- then on the next page, Mr. Bruner tells the

UNITED STATES DISTRICT COURT

Direct Examination - Bowman

1    Court that essentially that he needs an expert --

2         THE COURT:  I'm sorry, what line are you on?

3         MR. SANDMAN:  Starting at Line 8.

4         THE COURT:  Could you indulge me and make it a little

5    bigger?  Because I'm having a hard time seeing.

6         MR. SANDMAN:  Yeah, we'll need to enlarge that.  Just

7    really from Line 10 to the bottom, if we could enlarge that.

8         THE COURT:  Thank you.

9         MR. SANDMAN:  So we'll need to get the bottom half of

10   that page.

11   BY MR. SANDMAN:

12   Q.  So if we look at -- starting at actually Line 11,

13   Mr. Bruner indicates that he needs somebody independent to

14   review the autopsy report.  Do you see that?

15   A.  Yes.

16   Q.  And he goes on to say that he doesn't want to have another

17   autopsy done unless it would be absolutely necessary.  Correct?

18   A.  Correct.

19   Q.  And he notes at Line 21 that in the past what we had been

20   able to do was to get them to release the slides of the tissue

21   sections and whatever they use in determining this, just have

22   the report and those slides reviewed by somebody else, and he

23   would like that done.  Is that what he tells the Court?

24   A.  Yes, it is.

25   Q.  Then on the next page, Page 4, at the top of the page.

UNITED STATES DISTRICT COURT

Direct Examination - Bowman                    74

1    Mr. Bruner went on to say, that, quote, the sooner we can get

2    that done, the sooner we can -- I mean, I certainly don't want

3    to be the person who is holding up the burial of this baby, you

4    know, just a standard request.

5         So was it a priority at least at the time of this hearing

6    to get somebody to advise you whether the body could be

7    released or whether another autopsy would need to be done

8    first?

9    A.  Yes.

10   Q.  And at Page 5, if we could go there.  And scroll down just

11   a bit.  Line 7.  The Judge authorizes a maximum of a thousand

12   dollars, and indicates that he's appalled that the burial has

13   been pending, correct?

14   A.  That is correct.

15   Q.  If we could see Exhibit 22.  And make that a little bigger

16   so we can see it.  Just the bottom.  From around the middle of

17   the page down.

18             MR. SANDMAN:  This is in evidence, Your Honor.

19   Exhibit 22 is a minute entry, July 14, 1994.  We need to scroll

20   down so we can see what it says.

21             THE COURT:  For the record, what page of this exhibit

22   are you on?

23             MR. SANDMAN:  This is Page 1 of exhibit.

24             THE COURT:  Thank you.

25             MR. SANDMAN:  Exhibit 22.

Direct Examination - Bowman                                    75

1    BY MR. SANDMAN:

2    Q.  At the very top of the minute entry there, it says:

3    Hearing Re Defendant's Motion for Appointment of

4    Investigator/Ex Parte Motion for Appointment to Review Autopsy.

5    Is that right?

6    A.  Yes.

7    Q.  And the Court authorized a thousand dollars for that -- for

8    someone to review the autopsy, is that right?

9    A.  Yes, he did.

10   Q.  Now, as part of your review of the trial file, did you

11   review -- have an opportunity to review again the autopsy that

12   was done in this case by Dr. John Howard?

13   A.  I did.

14         MR. SANDMAN:  Can we see Exhibit 52, please.

15   BY MR. SANDMAN:

16   Q.  Exhibit 52 is in evidence as the autopsy performed on

17   Rachel Gray, May 3, '94.  Can we go to the next page?  We'll

18   need to enlarge that top half of the page.  Scroll down just a

19   little bit more.

20       Do you recognize this portion of the autopsy as describing

21   the injuries that were determined for Rachel at the time of the

22   autopsy?

23   A.  Yes.

24   Q.  Can you scroll down a little bit further, please, on the

25   document.  You can see there the ultimate opinion of

UNITED STATES DISTRICT COURT

1   Dr. Howard, the death was caused by small bowel laceration due

2   to blunt abdominal trauma.  It was signed by John Howard,

3   right?

4   A.  Yes, it is.

5   Q.  In your recent examination of this report, did you see

6   anything in the report where Dr. Howard described, in terms of

7   hours or days, the time between the infliction of Rachel's

8   injuries and her death?

9   A.  No, there's nothing in there like that.

10  Q.  We'll take a look next at Exhibit 58.  If we could blow up

11  the top half of that page.

12      Do you recognize what this is?

13  A.  Yes, it's a fax cover sheet.

14  Q.  And it's dated August 10, 1994?

15  A.  Yes, it is.

16  Q.  So this would have been a few weeks after that July 14

17  hearing, where there was some expressed concern about getting

18  the autopsy reviewed so we could decide -- so it could be

19  decided whether Rachel's body could be buried.  Is that right?

20  A.  Yes.

21  Q.  The fax cover sheet indicates that there's a transmission

22  from Bruner & Bowman, re Rachel Gray autopsy, 10 pages.  Is

23  that right?

24  A.  Yes.

25  Q.  Can we see the next page.  If we could scroll up just a

Direct Examination - Bowman                                    77

1   bit.  The second page of this exhibit, 58, if we could go up to

2   see the letterhead on the document.

3        Can you identify the second page of this exhibit?

4   A.  Yes.  It's a letter sent on July 20th, 1994, to Dr. Keen.

5   Q.  Did you send this letter?  Or did you sign it?

6   A.  I did.

7   Q.  If we could scroll down on that first -- further down on

8   the page.

9        This letter addressed to Dr. Keen, do you remember who

10  Dr. Keen was?

11  A.  I think -- I am not sure if he was the Maricopa County

12  medical examiner, but he was some type of a forensic expert in

13  Phoenix.

14  Q.  In the first paragraph of the letter, you thank him for

15  agreeing to review the autopsy report, correct?

16  A.  Yes.

17  Q.  Then you indicated to him that you had several questions,

18  and that when you next discuss the case, you hope to be able to

19  ask for more specific information.  Do you see that?

20  A.  Yes.

21  Q.  Then you confirm with him that Dr. Keen has explained to

22  you that his review may involve obtaining access to

23  photographs, slides, and other physical evidence.  Is that

24  right?

25  A.  Yes.

Direct Examination - Bowman                                          78

1    Q.  And you indicated that can be arranged.

2    A.  Yes.

3    Q.  Then you pose a series of questions, including in Paragraph

4    2:  How long after the injury occurred would this child die?

5    Do you see that?

6    A.  Yes.

7    Q.  You also posed a question:  Can the injury be dated?

8    Correct?

9    A.  Yes.

10   Q.  Then at the bottom of the page you ask him if the injury to

11   the genitalia can be dated.

12   A.  Yes.

13   Q.  Let's go on to the next page.  I think, as you indicated,

14   that on the second page you were the one who signed the letter.

15   A.  That's correct.

16   Q.  Now, in the letter, did you inform Dr. Keen of any findings

17   that Dr. Howard had made, if any, regarding the time between

18   Rachel's injuries and her death?

19   A.  No.

20   Q.  Do you know, from your review of your own file, could you

21   identify any evidence that at least at the time you wrote this

22   letter in January of '94 that you had any information at all

23   from Dr. Howard as to the timing of the injuries?  At least as

24   far as Dr. Howard was concerned?

25   A.  Not that I'm aware of.

Direct Examination - Bowman                                    79

1    Q.  Based on your examination of the file, did you find any

2    evidence that during the time that you represented Mr. Jones

3    that Dr. Keen had ever been informed of Dr. Howard's specific

4    findings as to the time between infliction of injuries and

5    Rachel's death?

6    A.  I didn't find anything like that.

7    Q.  Did you find any evidence in your file suggesting that

8    Dr. Keen agreed or disagreed with any findings that Dr. Howard

9    ultimately made regarding the timing of the injuries?

10   A.  I did not find anything like that.

11   Q.  We talked a few minutes ago about the motion that was filed

12   as to a need for further fact investigation by Mr. Barnett, and

13   I think you indicated you could not confirm that had ever been

14   done.  Do you remember that?

15   A.  Yes.

16   Q.  In your examination in the file, could you find any

17   evidence that Dr. Keen had actually reviewed tissue slides or

18   done any additional work other than reviewing the autopsy in

19   this case?

20   A.  No.

21   Q.  Now, do you remember looking at a billing entry that you

22   made for a telephone call with Dr. Keen in this case?

23   A.  Yes.

24   Q.  Can we see Exhibit 12?  We need to be on the second page of

25   that exhibit.  Near the top half of the page, for an August 18,

Direct Examination - Bowman

1    1994 date.  If we could just enlarge that, maybe we can see it.

2        Do you see the entry on August 18, 1994?

3    A.  Yes.

4    Q.  It indicates a telephone conference with Dr. Keen and a

5    charge of .7 hours?

6    A.  Yes.

7    Q.  Do you remember anything about that call?

8    A.  I don't.

9    Q.  I assume that means you don't know who participated in that

10   call, whether it was you or Mr. Bruner or anything else about

11   it?

12   A.  I don't have a specific memory of that.  I assume it's me,

13   since I was the one having contact with him.  But that may or

14   may not be correct.

15   Q.  I'd have to you I'd like to have you look at Exhibit 36.

16   If we could scroll down.

17       Exhibit 36 is a letter to Dr. John Howard from the Pima

18   County Attorney's Office dated August 22, 1994, just a few days

19   after you had your phone call with Dr. Keen.  Is that right?

20   A.  Yes.

21   Q.  In this August 22 letter, in Exhibit 36, Dr. Howard is

22   informed that defense counsel have agreed to allow the release

23   of Rachel Gray's body.  Do you see that?

24   A.  Yes.

25   Q.  My question to you is:  Can you rule out the possibility

Direct Examination - Bowman                              81

1    that all that you talked about with Dr. Keen during the

2    single .7-hour conversation you had with him was whether he

3    agreed with the -- essentially with the autopsy and that the

4    body could be released?

5    A.  I cannot rule that out.

6    Q.  Have you had an opportunity previously to review the

7    billing records to see whether there were any further billing

8    charges associated with Dr. Keen?

9    A.  I have reviewed them.

10   Q.  Did you see any further billing charges associated with

11   Dr. Keen?

12   A.  Not that I can recall.

13   Q.  Did you find in your review of the file that you had any

14   further communication or contact with Dr. Keen whatsoever?

15   A.  I don't -- I don't think I did.

16   Q.  Now I'd like to have you look next at Exhibit 54.

17           MR. SANDMAN:  Exhibit 54 is in evidence, Your Honor.

18   It is actually the emergency room hospital record dated May

19   2nd, 1994, in connection with Rachel's admission to the

20   hospital at Kino Hospital here in Tucson.

21   BY MR. SANDMAN:

22   Q.  Have you seen this record previously?

23   A.  Yes, I have.

24   Q.  Do you see at the top of the page, under arrival time, it

25   says May 2nd, '94, at 0616?

 1   A.  Yes.

 2   Q.  So arrived at the hospital at a little after 6:00 a.m., is

 3   that right?

 4   A.  Yes.

 5   Q.  Down further on the page, on the left-hand side, it says

 6   DOA, do you see that?

 7   A.  Yes.

 8   Q.  So Rachel was already deceased at the time she went to the

 9   hospital.

10   A.  Yes.

11   Q.  And at that time -- obviously that document doesn't

12   indicate when -- anything regarding the timing of the injuries

13   that were inflicted on Rachel, does it?  At least that

14   document, does it?

15   A.  No, it doesn't.

16            MR. SANDMAN:  Can we take a look at Exhibit 63.

17       Let me identify Exhibit 63 that's in evidence.  We've used

18   this document, Your Honor, at some of the depositions, but what

19   it is, it's the Arizona Supreme Court direct appeal decision in

20   Mr. Jones' case.

21   BY MR. SANDMAN:

22   Q.  Is that what you recognize it as?

23   A.  Yes.

24   Q.  In your recent review of the record have you looked at this

25   opinion again?

Direct Examination - Bowman                                    83

1    A.  I have.

2    Q.  Can we take a look at Page 5?  Okay.  If we could enlarge

3    the couple of paragraphs that are on the right side, the

4    right-side column, the first couple of paragraphs there, so we

5    can see it.

6        Ms. Bowman, there at the beginning of the opinion, the

7    Arizona Supreme Court summarizes some of the facts, key facts,

8    in Mr. Jones' case, is that right?

9    A.  Yes.

10   Q.  The Court describes, in the first full paragraph in that

11   right-hand column, that on the day preceding her death, Rachel

12   was hit many times, one blow to her abdomen was so severe that

13   it ruptured her small intestine.  And then the Court goes on to

14   describe her other injuries inflicted on the day prior to her

15   death.  Correct?

16   A.  Yes.

17   Q.  Then in the next paragraph the Court describes what linked

18   Mr. Jones to the crime, and they refer to the fact that

19   Mr. Jones left his trailer three times and the two children saw

20   defendant hitting her while he drove, that the defendant

21   stopped at a Quik Mart to get ice for Rachel's head injury, and

22   police found traces of Rachel's blood type on defendant's

23   clothing and in his van.  Do you see that?

24   A.  Yes.

25   Q.  You understand, or do you understand, that to describe some

Direct Examination - Bowman                                            84

1    of the key evidence that led to Mr. Jones' convictions?

2    A.  Yes.

3          MR. SANDMAN:  Judge, I'm at a point a fairly good

4    stopping point.  I know we have five minutes left 'til noon,

5    but it might --

6          THE COURT:  Okay.  We'll break for lunch and we will

7    resume at 1:00 o'clock.

8          MR. SANDMAN:  Thank you, Judge.

9          THE COURT:  Thank you.

10          (A recess was taken from 11:55 a.m. to 1:23 p.m.)

11          THE COURT:  All right.  Mr. Sandman, you may continue.

12          MR. SANDMAN:  Thank you, Your Honor.

13   BY MR. SANDMAN:

14   Q.  When we left off, where we left off at the lunch break, I

15   think we were looking at the Arizona Supreme Court direct

16   appeal opinion in Mr. Jones' case.

17   A.  Yes.

18   Q.  I think you had just testified that part of the factual

19   rendition in the case by the Arizona Supreme Court was based on

20   the assumption that all of Rachel's injuries were inflicted on

21   the day prior to her death, is that right?

22   A.  Yes.

23   Q.  I'd like to show you a portion of the opening statement

24   that Mr. Bruner made at Mr. Jones' jury trial, which is in

25   evidence as Exhibit 28.

Direct Examination - Bowman                                      85

1      You can see there, that's Jury Trial Day 2, April 6, 1995.

2  Do you see that?

3  A.  Yes.

4  Q.  I'd like to draw your attention to Page 5.  Actually, it's

5  Page 60 of the transcript, but it's Page 5 in this PDF series.

6           THE COURT:  Just to be clear, you're saying it's Page

7  5 of the exhibit or Page 5 of something else?  I want to make

8  sure we are clear about what --

9           MR. SANDMAN:  It's Page 5 of the exhibit.

10           THE COURT:  Okay.  Go ahead.

11  BY MR. SANDMAN:

12  Q.  It's recorded on what was Page 60 of the transcript for

13  that day.  I want to just draw your attention to that middle

14  paragraph there.

15      This is Mr. Bruner telling the jury that everything in this

16  case is going to center around what happened on Sunday, May

17  1st.  Specifically, a couple of disputed hours after Barry woke

18  up in the morning and the children were already up around the

19  house.

20      If we can go down a little bit further to pick up the rest

21  of that paragraph so we can see the whole sentence.

22      Ms. Bowman, did you have an understanding at the time the

23  trial began that the state was going to present evidence that

24  Mr. Jones inflicted Rachel's injuries when he was alone with

25  her on Sunday afternoon, May 1st?

UNITED STATES DISTRICT COURT

Direct Examination - Bowman                                    86

 1    A.  Yes.

 2    Q.  Necessarily, would it have been reasonable to anticipate

 3    that the state would present medical evidence that Rachel's

 4    injuries could be dated to that time period?

 5    A.  Yes, it would.

 6    Q.  Is it a fact that at the trial the state did present

 7    evidence from Dr. Howard that all of Rachel's injuries, her

 8    small bowel injury, the injury to her vagina, her scalp injury,

 9    much of the bruising could be dated as consistent with

10    infliction on the afternoon of Sunday, May 1st?

11    A.  Yes.

12    Q.  Did the defense challenge any of that evidence on

13    cross-examination of Dr. Howard?  The time of injury evidence?

14    A.  I don't believe it was challenged.

15    Q.  Would you like to take a look at the couple of pages of

16    transcript?

17    A.  Yes.

18    Q.  If we could look at Exhibit 47.  Do you recognize this,

19    Ms. Bowman, as the trial transcript for Mr. Jones' jury trial

20    dated April 12, 1995?

21    A.  Yes.

22    Q.  We're going to go to the transcript pages, beginning with

23    158.  Do you see that this is the cross-examination that

24    Mr. Bruner did of Dr. Howard?

25    A.  Yes.

Direct Examination - Bowman                    87

1  Q.  When you're ready to go to the next page, there's only

2  about two and a half pages of transcript for cross-examination.

3  Let me know if you're ready to go to the next page, 159.

4  A.  I'm sorry.  Can you remind me what you're asking me to look

5  for?

6  Q.  My question was whether any questions were posed on

7  cross-examination challenging Dr. Howard's timing of Rachel's

8  injuries.

9  A.  Not in these pages.

10  Q.  Do you believe that the state's unchallenged medical

11  evidence provided a strong circumstantial link tying Mr. Jones

12  to the infliction of Rachel's injuries on the afternoon of May

13  1st?

14  A.  It did.

15  Q.  With that, I am going to ask you some questions about what

16  the defense team did to prepare in light of the expectation

17  that the state would present medical evidence to tie Mr. Jones

18  to the commission of those offenses.

19      As part of doing that, I'd like to first bring you back to

20  the autopsy for a moment.  Exhibit 52, at Page 5, in the final

21  paragraph of that page.  There's Paragraph 7.  If you could

22  enlarge that at the bottom of the page.

23      Do you see there in the autopsy there's a reference to a

24  laceration of the left superior, posterior scalp region?

25  A.  Yes.

Direct Examination - Bowman                                    88

1    Q.  With that in mind, I want to turn next to Exhibit 46,

2    please.

3         Now, Exhibit 46 is in evidence as a November 28, 1994

4    interview of Dr. John Howard.  Do you see that?

5    A.  Yes.

6    Q.  Did you participate in that interview?

7    A.  Yes, I did.

8    Q.  And that interview took place, according to the date,

9    November 28, '94, correct?

10   A.  Yes.

11   Q.  This would have been a few months after you had your

12   telephone conversation with Dr. Keen, is that right?

13   A.  Yes.

14   Q.  I'd like to direct your attention to Page 19 of that

15   interview.

16        If you could enlarge from Line 6 down to Line 14.

17        Do you see there Dr. Howard provided you with some

18   information about the dating of the scalp injury?  He's making

19   reference to Item Number 7 in the autopsy report, which we just

20   looked at, is that right?

21   A.  Yes.

22   Q.  He was asked a question:  Are you able to say how old that

23   particular injury is?  Do you see what Dr. Howard's answer is

24   at Line 14?

25   A.  Yes, I do.

Direct Examination - Bowman                                    89

1   Q.  Probably two days old.  There is a gap there.  Older than

2   that.  Correct?

3   A.  Yes.

4   Q.  Then if you could enlarge the remainder of Lines 15 through

5   the end of the page there.

6       Now, the next question after he dated that injury as

7   probably two days old, the next question was whether he based

8   that opinion or finding on just a visual examination.  Do you

9   see that?

10  A.  Yes.

11  Q.  And Dr. Howard provided information to you that he actually

12  iron stained and looked at that injury under a microscope to

13  help determine the age, correct?

14  A.  Yes.

15  Q.  Now, the dating of that particular injury would at least,

16  in terms of the probability of it as stated by Dr. Howard that

17  it's probably two days, that would predate -- that would be --

18  let me ask you, would that predate the afternoon of May 1st?

19  A.  Yes, it would.

20  Q.  Now I'd like you to next look at Page 22.  If we could just

21  enlarge the first top third or so of that page.  Do you see

22  that begins a discussion of the injury to Rachel's genitalia?

23  A.  Yes.

24  Q.  If we could just skip down to the next page.  If we could

25  enlarge just the first 10 lines or so.  Here, again, Dr. Howard

Direct Examination - Bowman                              90

1    was asked a question at Line 7.

2         We need to go to the next page.  There we go.  Great.

3         At Line 7, in regard to this particular injury, Dr. Howard

4    was asked are you -- now, you're able to tell how old these

5    injuries would be, and Dr. Howard indicated one or two days

6    before death.  Correct?

7    A.  Yes.

8    Q.  And certainly two days before death, if that injury

9    occurred two days before death, that would not have occurred on

10   May 1st in the afternoon, correct?

11   A.  That's correct.

12   Q.  And when Dr. Howard said one day, do you know if he was

13   talking about a 24-hour -- 24 hours, or what he was talking

14   about there?

15   A.  It's not exactly clear.

16   Q.  Then at Page 35 -- I'm sorry.  My mistake.  Can we just go

17   back to Page 23 again?  Sorry.  And enlarge that same section.

18   The first 10 lines of Page 23.

19        After he indicates a dating of the injury at Lines -- I

20   guess that's Line 9, Dr. Howard describes cells.  Do you see

21   that?

22   A.  Yes.

23   Q.  Does that inform you that his dating of that injury was

24   associated with some type of microscopic analysis if he's

25   looking at, actually, cells?

Direct Examination - Bowman                                    91

1   A.  Yes.

2   Q.  Then if we could now go to Page 35.  We're going to be

3   looking at some questions he was asked about the timing of the

4   abdominal injury.  If we could enlarge Lines 14 through 20.

5       Do you see there now Dr. Howard is being asked about the

6   timing of the -- at least when the child would be exhibiting

7   symptoms of the abdominal injury, such as nausea and vomiting?

8   Do you see that?

9   A.  Yes.

10  Q.  And Dr. Howard provided information to you that, preceding

11  death, it could take up to a day just to develop signs of

12  vomiting and nausea.  Do you see that?  That would be at Lines

13  19 and 20.

14  A.  Yes.  Mmm-hmm.

15  Q.  Yes?

16  A.  Yes.

17  Q.  So if it can take up to a day just to become symptomatic,

18  would that tell you that the actual time to death would be even

19  longer than a day?  It would certainly occur after the symptoms

20  of nausea, correct?

21  A.  What he explained in this particular area was that it could

22  develop over hours to a day.

23  Q.  Right.

24  A.  For the symptoms.  So the time of death would have to be

25  after that.

Direct Examination - Bowman                                    92

1   Q.  Now, could you determine from your examination of the trial

2   file if the defense team had any information regarding

3   Dr. Howard's findings regarding the timing of the injuries

4   before the interview of November 28, 1994?

5   A.  Did the defense team have information about the timing of

6   the injuries before this interview --

7   Q.  Correct.

8   A.  -- of Dr. Howard?  I don't know.

9   Q.  Did you, in your examination of the file, find any evidence

10  that the defense team had any information regarding

11  Dr. Howard's findings as to timing before the November 28

12  interview?

13  A.  Not that I am aware of.

14  Q.  So were you provided information in the November 28th

15  interview that Rachel's injuries might be dateable to April

16  30th?

17  A.  Yes.

18  Q.  With that information at hand, did you find any record in

19  the trial file that the defense team ever conducted any fact

20  investigation focused on Rachel's activities on April 30 and

21  who was with her on that day?

22  A.  No.

23  Q.  The day before May 1st?

24  A.  No.

25  Q.  Would there have been any reason not to investigate the

Direct Examination - Bowman                                    93

1    subject matter of Rachel's activities on April 30th and who was

2    with her on that day?

3    A.  No.

4    Q.  I want to show you next an exhibit in evidence as 81.  If

5    we could just enlarge the first -- the entire top half of the

6    exhibit.

7        Do you see this was an interview dated May 19 conducted by

8    Detective Rankin, who is now Detective Pesquiera, of an Isobel

9    Tafe?

10   A.  Yes.

11   Q.  Did you examine this document as part of your reexamination

12   of the trial file?

13   A.  I did.

14   Q.  Did you see there that Ms. Tafe was told about an

15   investigation of a homicide of a four-year-old girl?  That's, I

16   think, the third question down.

17   A.  Yes.

18   Q.  And that she'd already talked to a detective on May 2nd,

19   correct?

20   A.  Yes.

21   Q.  Detective Rankin asked her:  You know, did you know the

22   little girl's name?  And Ms. Tafe said:  I don't know her name,

23   but I knowed her when I seen the pictures.  But I knowed the

24   little girl had been over here.

25       Do you see that?

Direct Examination - Bowman                                    94

1   A.  Yes.

2   Q.  Then she goes on to, does she not, describe the fact that

3   this four-year-old child was over at her house without adult

4   supervision on the Saturday before her death?

5   A.  I can only see the top line of that.

6   Q.  We need to go down, sorry, to expand the bottom half of the

7   page.  My apologies.  Do you see there --

8   A.  I'm not sure about the adult supervision part.  It says she

9   was there Saturday.

10  Q.  Some place in the trailer park where Mr. Jones lived?  And

11  she was without adult supervision.  The Saturday before she

12  died.

13          THE COURT:  Is there a specific line you're trying to

14  direct her attention to?  That would save some time, if there

15  is something specific you want to direct her attention to.

16  BY MR. SANDMAN:

17  Q.  The second question there from the bottom:  What day was

18  this?  This was the Saturday before the detective was here.

19  A.  Yes, I see that she was there Saturday.  I'm a little bit

20  lost on the lack of adult supervision.

21  Q.  And the question above that, she says that she was with her

22  sister, Becca.

23  A.  Yes.

24  Q.  Who was not an adult.

25  A.  Correct.

1    Q.  Then on the next page, if you could enlarge just the top

2    third.

3        Ms. Tafe was asked did you notice -- this is like the third

4    question down:  Did you notice any fading bruises on her?  Do

5    you see that Ms. Tafe indicated she had not, but that she

6    noticed, like, Rachel might be sick.  She wasn't natural, it

7    was just a pale grayish color.

8        Do you see that?

9    A.  Yes.

10   Q.  Do you think that evidence might have been in sync with

11   Dr. Howard's findings that Rachel's injuries could be dated

12   more than a day prior to her death?

13   A.  Yes.

14   Q.  Did you do anything further to investigate that?  Did you

15   provide that information, for example, to your medical expert?

16   A.  Not that I am aware of.

17   Q.  Now, if we could turn to -- this is going to be a document

18   within Exhibit 1, Page 1427.

19       MR. SANDMAN:  Your Honor, Exhibit 1 is a large,

20   probably almost 3,000 page exhibit, which is the trial file in

21   its entirety.  So I'm just -- we're going to look at Page 1427.

22       THE COURT:  That's the Bates number of the page from

23   Exhibit 1 that you're referring to?

24       MR. SANDMAN:  Yes, sir.

25       THE COURT:  Got it.  Go ahead.

Direct Examination - Bowman                                    96

1          MR. SANDMAN:  That should be the first page of

2    Dr. Seifert's interview.

3          THE COURT:  Is that the Bates number on the upper

4    right-hand column, where it says --

5          MR. SANDMAN:  I think we have to go --

6          THE COURT:  04205?

7          MR. SANDMAN:  I think we'll have to go to 1426.  There

8    we go.

9    BY MR. SANDMAN:

10   Q.  Do you recognize the page we're looking at there?

11         THE COURT:  Can I stop you for one minute?  I want to

12   make sure that we are clear on the numbers that are being used.

13   So at the top of the document I see the 1426.  It looks like

14   it's Exhibit 1426.  But then there's a Bates number on the

15   right-hand column on the page; that has nothing to do with the

16   numbers system we're talking about now, correct?

17         MR. SANDMAN:  It does have nothing to do with it, yes.

18         MS. SMITH:  Your Honor, if I could interrupt.  There's

19   also a Bates number on the bottom left of the page that does

20   correspond to what we are talking about.

21         THE COURT:  1426.  It's on the bottom left-hand side

22   of the page, just so we're clear.  Go ahead.

23   BY MR. SANDMAN:

24   Q.  This document references the January 20, 1995 interview of

25   Dr. Seifert?

Direct Examination - Bowman                                    97

1   A.  Yes.

2   Q.  And you participated in that interview?

3   A.  Yes, I did.

4   Q.  And do you remember that Dr. Seifert was the emergency room

5   doctor that declared Rachel's death at Kino Hospital?

6   A.  Yes.

7   Q.  If we could look at Page 1434, Bates page 1434, in that

8   document.  That middle paragraph that's partially highlighted,

9   if you could expand that.

10      If you could take a look at that paragraph there.  There,

11  Dr. Seifert was estimating the time of Rachel's death, do you

12  see that?

13  A.  Yes.

14  Q.  And he estimated that she had been deceased somewhere

15  between two and three hours before he saw her.

16  A.  Yes.

17  Q.  And remember earlier when we looked at the Kino Hospital

18  record, he had seen her -- she was admitted at around 6:16 in

19  the morning that Monday morning, correct?

20  A.  Yes.

21  Q.  So he's estimating that she would have been deceased around

22  3:00 to 4:00 a.m. that Monday morning, correct?

23  A.  Yes.

24  Q.  If we were to date that back, for example, 12 hours, that

25  would take us to around 3:00 or 4:00, 3 :00 to 4:00, Sunday

UNITED STATES DISTRICT COURT

Direct Examination - Bowman                                    98

1    afternoon, correct?

2    A.  Yes.

3    Q.  Now, can you think of any reason at this juncture, after

4    interviewing Dr. Seifert and Dr. Howard, for not investigating

5    further the medical question whether Rachel's injuries could be

6    reliably dated to sometime to the afternoon of May 1st?

7    A.  No, no reason.

8    Q.  I want to ask you to look at Exhibit 35 next.

9         If we could just blow up the title of that article there,

10   the first page.

11        This Exhibit 35 is in evidence.  It was retrieved from the

12   trial counsel file entitled Child Abuse:  Medical Diagnosis and

13   Management.

14        Do you see that?

15   A.  Yes.

16   Q.  Have you, as part of your review of the trial file, have

17   you looked at this article?

18   A.  Yes, I have.

19   Q.  Again, if we could look at Page 7.  The second full

20   paragraph down on the left column, if we could blow that up.

21        Is that Page 7?  I think we may need the paragraph above.

22   My apologies.  Hold on a second.

23        I'm sorry.  That's the correct paragraph we want to look

24   at, but the second --

25             THE COURT:  The second paragraph?

Direct Examination - Bowman                                99

1          MR. SANDMAN:  Yes.

2          THE COURT:  There's two there.

3          MR. SANDMAN:  I'm sorry?

4          THE COURT:  I just want to make sure which paragraph

5    you're referring to.

6    BY MR. SANDMAN:

7    Q.  The second paragraph states that because knowledge of the

8    time at which the injury occurred may be forensically useful,

9    surgeons treating children with peritonitis from unexplained

10   intestinal perforations should collect small mesenteric biopsy

11   samples to allow the pathologists to determine the stage of the

12   disease process?

13         Do you see that?

14   A.  Yes.

15   Q.  I think that you testified earlier that when Mr. Bruner was

16   in Court on July 14, '94, he mentioned his desire at least at

17   that time to have tissue samples examined.

18   A.  Yes.

19   Q.  I think you've testified this afternoon that when you

20   interviewed Dr. Howard and he was dating the injuries that he

21   was also referring to his microscopic examination of the

22   tissues, correct?

23   A.  Yes, that's correct.

24   Q.  Now, given the injury dating information in your file,

25   reference this article and what you learned from Dr. Howard

Direct Examination - Bowman

1   about the method for dating injuries associated with

2   microscopic examination, did you understand or did you have

3   enough information to put you on notice that if you were to --

4   if the defense were to conduct its own independent medical

5   investigation of the time of injuries, it would need to have an

6   expert review the tissue slides from Rachel's autopsy?

7   A.  Yes.

8   Q.  Do you know whether that was ever done?

9   A.  I don't think it was.

10  Q.  If Dr. Keen were to testify in these proceedings that he

11  needed to examine the tissue slides to reliably date the

12  injuries, would that appear to be consistent with the process

13  Dr. Howard described in his own interview as described to you

14  on November 28th, 1994?

15  A.  Yes.

16  Q.  So after Dr. Howard -- or after his interview, can you

17  think of any reason the defense didn't ask its medical expert

18  to be sure to review the tissue samples from Rachel's autopsy?

19  A.  I can't think of any reason.

20  Q.  Just a general question:  What was the strategy of the

21  defense team in Mr. Jones' case?

22  A.  I think the strategy was just that Mr. Jones didn't commit

23  these acts, that he didn't injure, injure the child, just to

24  challenge the state's evidence.

25  Q.  And I think you have already testified this afternoon, when

1   you looked at Mr. Bruner's cross-examination of Dr. Howard,

2   that essentially there was no challenge made to the state's

3   medical evidence tying Mr. Jones to criminal activity on the

4   afternoon of May 1st, correct?

5   A.  Correct.

6   Q.  Dr. Howard's testimony that the injuries were consistent

7   with Sunday afternoon was not challenged, is that right?

8   A.  That's right.

9   Q.  Now, in a case where the state was seeking to prove that

10  the injuries were inflicted on a certain date and time, would

11  it have been plausible to attempt to challenge the state's time

12  of injury evidence with defense medical evidence demonstrating

13  that the injuries were not inflicted on Sunday, May 1st?

14  A.  Yes.

15  Q.  I want to, in that regard, show you Exhibit 106, which is

16  in evidence.  It's a report submitted by Janice J. Ophoven,

17  dated February 1, 2010.

18      I would like you to look at the first -- at least the

19  second page of that exhibit.  There is sort of the first -- the

20  middle paragraph that has some bold print in it.  I'm going to

21  read to you what Dr. Ophoven said here, in that first paragraph

22  that's been enlarged:

23      Many opinions were provided to the court and the jury, but

24  it is my opinion that the key findings in this case of

25  abdominal trauma of many days' duration were not made clear.

Direct Examination - Bowman

1    The evidence shows that the fatal injuries to Rachel Gray could

2    not possibly have been inflicted on the day prior to her death

3    as suggested by the state at Mr. Jones' trial.  The veracity of

4    this evidence is as scientifically precise as any forensic

5    determination available in medical science.

6        Do you see that?

7    A.  Yes, I do.

8    Q.  So, my question, would the presentation of this type of

9    evidence, the evidence that I just read to you from

10   Dr. Ophoven, would that evidence have been consistent with the

11   strategy to challenge the state's evidence?

12   A.  Yes, it would.

13   Q.  So if you're challenging the state's evidence, you're not

14   absolutely constrained to just coming into the trial and

15   attempting to cross-examination or whittle away at the state's

16   case.  Consistent with the strategy to challenge evidence, you

17   can present your own defense evidence, correct?

18   A.  Yes, of course.

19   Q.  Now I want to head up to the first page of this exhibit,

20   106, in the first paragraph of that report.

21       In this paragraph, Dr. Ophoven indicates that she requested

22   special stains for the anogenital tissues, do you see that?

23   A.  Yes.

24   Q.  From Rachel's autopsy?

25           MR. BRACCIO:  Judge, I am going to object to this line

UNITED STATES DISTRICT COURT

Direct Examination - Bowman

1   of questioning on relevance.

2          MR. SANDMAN:  Well, the next question is going to be:

3   Would you have presented this evidence consistent with your

4   strategy?  And I think that is relevant because the state is

5   arguing that this strategy was confined to just cross-examining

6   witnesses, and the witness is now saying that the strategy to

7   challenge evidence includes presenting your own evidence.

8          We've already been through this when we went through

9   Page 2.  The question is:  Would you have presented this

10  consistent with your strategy?  That's what this whole case is

11  about.

12         THE COURT:  I'll allow the question.  Overruled.

13     Go ahead.

14  BY MR. SANDMAN:

15  Q.  In any event, Dr. Ophoven says, and I'll read this --

16         THE COURT:  I'm sorry.  You had a question to her and

17  now I think you're moving on.  So why don't you have her answer

18  the question that you posed to her?  The question was about the

19  slides, right?

20         MR. SANDMAN:  I don't remember now.

21         THE COURT:  Hold on.

22         MR. SANDMAN:  I think my last --

23         THE COURT:  So:  Would the presentation of this type

24  of evidence, the evidence that I just read to you from

25  Dr. Ophoven's, would that type -- would that evidence have been

Direct Examination - Bowman

1   consistent with the strategy to challenge the state's evidence?

2   That's the question.

3          MR. SANDMAN:  That was the question I asked with

4   respect to Dr. Ophoven's comments on Page 2 of her report.  Now

5   we're on Page 1 of the report.

6          THE COURT:  Go ahead and formulate your next question.

7          MR. SANDMAN:  I'm sorry.

8   BY MR. SANDMAN:

9   Q.  When we were looking at Page 2 of the report, we were

10  looking at Dr. Ophoven's opinion as to the dating of the

11  abdominal injury, correct?

12  A.  Yes.

13  Q.  Now I want to ask you a question about her opinion on the

14  dating of the vaginal injury.  Do you understand that?

15  A.  Yes.

16  Q.  Different injury.  I just want to read to you what

17  Dr. Ophoven said with respect to that injury, the vaginal

18  injury.  She said that the trichrome stain shows clear evidence

19  of vital reaction with deposits of collagen containing tissue

20  and neovascularization in the wall of the vagina.  This

21  indicates substantial healing and is not consistent with a

22  fresh penetrating injury.  The age of the injury cannot be

23  precisely determined, but the injury did not occur in the few

24  days prior to her death.

25         Do you see that?

Direct Examination - Bowman                                   105

1   A.  Yes.

2   Q.  So she's talking here about the vaginal injury being older

3   than a few days prior to Rachel's death, correct?

4   A.  Yes, correct.

5   Q.  Is this the type of -- would you have presented this

6   evidence consistent with your strategy to challenge the state's

7   evidence?

8   A.  Yes.

9   Q.  If you had forensic evidence that the vaginal injury showed

10  signs that it was weeks old and possibly predated Rachel's

11  residency with Mr. Jones, would you have presented that

12  evidence?

13  A.  We certainly would.

14  Q.  And during the course of representing Mr. Jones, did you

15  acquire any evidence that suggested Rachel maybe had been

16  exposed to sexual abuse prior to her residency with Mr. Jones?

17  A.  We did.

18  Q.  I'd like to show you Exhibit 30.  Do you recognize Exhibit

19  30 as your handwritten notes?

20  A.  Yes.

21  Q.  I'd like if we could enlarge the bottom third of that page.

22      This is your handwriting?

23  A.  It is.

24  Q.  Do you see where it says:  Zoly problems with Johnny and

25  Rachel sexually in the past?

Direct Examination - Bowman                          106

1    A.  Yes.

2    Q.  Who is Johnny?

3    A.  Johnny was Rachel's older brother.

4    Q.  Who was Zoly?

5    A.  Zoly was Angela's prior boyfriend.

6    Q.  Could we see the next page of Exhibit 30?  If we can

7    enlarge sort of the middle section of that page.

8        Is this also your handwriting on this page?

9    A.  Yes.

10   Q.  A has 14-year-old Johnny deaf/mute molesting kids.

11       Did you write that?

12   A.  I did.

13   Q.  I want to have you look at another exhibit that discusses

14   this topic.  It's in Exhibit 1, I believe beginning at Page

15   890.  I want to make sure we go to the first page of Brandie's

16   interview.

17       This is the videotape deposition of Brandie Elisha Jones

18   dated March 6, 1995, is that correct?

19   A.  Yes.

20   Q.  Who was Brandie?

21   A.  Brandie is Mr. Jones' daughter.

22   Q.  It looks like the first page of this document begins at

23   Bates Page 813.  I'd like to turn your attention to Bates Page

24   892.  If you could enlarge the question starting at Line 12

25   through 21.

1    Brandie was asked:  Did you ever see Johnny do anything to

2    Rachel?  And she says:  No, but Johnny -- Rachel always --

3    every time Johnny would, like, come in the room or something,

4    she (phonetic) would say, "Can I sleep with you, Brandie?"

5    "Can I sleep with you, Brandie?"  And one day we were -- and

6    Johnny -- when Johnny shared a room with us girls, Rachel

7    always was like scared, and she was always sleeping by the wall

8    next to me and stuff.

9    Do you see that?

10   A.  Yes.

11   Q.  Then at Page 893, which I believe is the next page, if you

12   could enlarge Line 6 through 17.  This is a further explanation

13   by Brandie of Rachel being concerned about Johnny in the

14   bedroom wanting to sleep next to Brandie, is that right?

15   A.  Yes.

16   Q.  Then if you could enlarge Lines 18 through 25, the last

17   three lines.  It reports that Brandie would let Rachel up in

18   her top bunk, and when Johnny would leave she'd go shut the

19   door and get back in her bed.  Is that correct?

20   A.  Yes.

21   Q.  Finally, the next page.  If you could enlarge the first 12

22   lines -- 13 lines.

23   Brandie was asked whether Johnny ever tried to do anything

24   to Brandie, do you see that?

25   A.  Yes.

Direct Examination - Bowman                              108

1   Q.  And she says:  He tried one time and I went and told Angela

2   and that's when he got his built-on room in the kitchen.

3   Correct?

4   A.  Yes.

5   Q.  So he was basically taken out of the bedroom, and they

6   tried to find someplace else for Johnny to sleep, is that

7   right?

8   A.  Yes, it is.

9   Q.  Actually, if you enlarge Lines 14 down.

10       Brandie was asked:  Was he sleeping in the same bedroom

11  with you girls?  And Brandie says:  Yeah, he was sleeping on

12  the floor and we on the beds.

13       Turning to the next page.  If you could enlarge the

14  first -- like Lines 3 through 13.  Here, Brandie was asked:

15  Can you remember that Johnny -- the best you can remember that

16  Johnny just tried to do something -- I'm sorry.  The question

17  is a little disjointed here on the page.  It's Line 3.

18       And so the best of your -- the best that you can remember

19  that Johnny just tried to -- to do something one time, what was

20  it that he tried to do?  And Brandie said basically that he

21  tried to touch her front.  That's what she says at Lines 8

22  through 13.  Correct?

23  A.  Yes.

24  Q.  With the information that you had in your own notes about

25  the possibility of sexual issues between Rachel and Johnny, and

Direct Examination - Bowman

1   the interview you had with Brandie, could you determine from

2   the review of your file whether you did any follow-up

3   investigation with respect to that topic?

4   A.  I don't think we did.

5   Q.  Could you think of any reason not to further that

6   particular investigation?

7   A.  No.

8   Q.  Just some general questions about your strategy to

9   challenge the state's evidence.

10      Do you remember that the state presented bloodstain

11  interpretation evidence of Mr. Jones' trial?

12  A.  Can you say that again?

13  Q.  Do you remember that the state presented bloodstain

14  interpretation evidence showing that the blood in Mr. Jones'

15  van and on his clothing was additional proof that he had

16  assaulted Rachel in the van?

17  A.  Yes.

18  Q.  Would it have been consistent with the defense team trial

19  strategy to challenge the state's evidence to present your own

20  bloodstain interpretation evidence from a qualified expert?

21  A.  Yes, it would have.

22  Q.  I guess I'd have the same question to the other key aspects

23  of the state's evidence.  Do you remember that there was

24  eyewitness evidence from two twins that they had seen Mr. Jones

25  assaulting Rachel in the parking lot of the Choice Market on

Direct Examination - Bowman

1    the afternoon of May 1st?

2    A.  I do remember that.

3    Q.  And would it have been contrary to the defense strategy to

4    present your own expert testimony challenging that eyewitness

5    testimony?

6    A.  No, it would not have been contrary.

7    Q.  I think you testified earlier this morning that you had

8    actually attended the Angela Gray trial, is that right?

9    A.  Yes.

10   Q.  I want to show you Exhibit 27.  Exhibit 27 is in evidence

11   and it is -- if you could just enlarge the caption there so

12   I'll see the caption.  This was a motion filed on behalf of

13   Mr. Jones for an order to produce the trial transcripts of

14   Dr. John Howard and Rebecca, Becky, Lux.

15       If we can enlarge Lines 11 through 23.

16       Now, you attended the Gray trial and you submitted this

17   motion, it's under your signature, correct?

18   A.  Yes.

19   Q.  You asked that the Court provide transcripts for Rachel's

20   sister Becky's testimony at the Gray trial, as well as

21   Dr. Howard's testimony at the Gray trial, correct?

22   A.  Yes.

23   Q.  And you indicate that these testimonies form a crucial part

24   of the defendant's case and there's a substantial need to have

25   them produced, do you see that?

1    A.  Yes.

2    Q.  With that request in mind, I want to turn next to what

3    Dr. Howard testified to at the Gray trial.  So we'll need to

4    look at Exhibit 48A.

5        48A is the trial transcript in the case of State of Arizona

6    vs. Angela Gray, dated March 28, 1995.  If we could key in on

7    at least the first page of Dr. Howard's testimony in that case.

8        Okay.  So we're at Page 39 of that particular transcript.

9    Or we were.

10           MR. SANDMAN:  The first page he testified.  I thought

11   you had just pulled that up.

12   BY MR. SANDMAN:

13   Q.  Page 39 of the transcript.  Dr. Howard is called to

14   testify, and I want to turn your attention to Pages 99 through

15   101 of that transcript, starting with Page 99.

16       Have you -- as part of your review of the record in the

17   case, did you review Dr. Howard's -- this portion of

18   Dr. Howard's testimony at Ms. Gray's trial?

19           MR. SANDMAN:  We need to get to Page 99 through 101.

20   BY MR. SANDMAN:

21   Q.  This was Mr. Darby's cross-examination.  Did you read it

22   previously?

23   A.  Yes.

24   Q.  Page 99 is the beginning of Mr. Darby's cross-examination.

25   Let's go to the next page, Page 100.

Direct Examination - Bowman                                    112

1        Do you see at Page 99 that Mr. Darby was asking about --

2   questioning Dr. Howard about the dating of the vaginal injury

3   that Rachel had?  The page before?  Do you want to look at the

4   page before again if you didn't see it?

5             THE COURT:  Are you asking her to look at 99 --

6             MR. SANDMAN:  Page 99.

7   A.  Yes.

8   BY MR. SANDMAN:

9   Q.  So, at Page 99, he begins questioning about the dating of

10  the vaginal injury.  And then at Page 100, at Lines 10 and 11,

11  if you could just enlarge that, he says that the dating of that

12  injury is more typical of around 24 hours.  Do you see that?

13  A.  Yes.

14  Q.  If we can enlarge Lines 3 through 8.  He puts the minimal

15  time from injury to death as perhaps as few as 12 hours and up

16  to 48 hours.  Correct?

17  A.  Yes.

18  Q.  So, just to break this down, the 24 hours, if Rachel died,

19  as Dr. Seifert advised you, between 3:00 and 4:00 in the

20  morning on May 2nd, the typical time between injury and death,

21  24 hours, that would be before Sunday afternoon, correct, of

22  May 1st?

23  A.  Yes.

24  Q.  Certainly, 48 hours would be well outside the window of the

25  afternoon of May 1st.

Direct Examination - Bowman

1    A.  It would.

2    Q.  And if we go with the minimum, 12 hours before death, we're

3    looking at an injury being inflicted between around 3:00 and

4    4:00 in the afternoon, correct?

5    A.  Yes.

6    Q.  Now, at Page 101, if you could enlarge Lines 3 through 7.

7    We are talking about the internal injuries, which would be the

8    small bowel injury Rachel suffered from, and he's asked for

9    clarification about the timing of that injury at about 24 hours

10   prior to death.  And Dr. Howard says that the findings, his

11   findings regarding the timing of the abdominal injury, would be

12   most consistent with 24 hours.  Correct?

13   A.  Yes.

14   Q.  And that is also outside the window of Sunday afternoon.

15   Is that correct?

16   A.  It is.

17   Q.  In connection with this injury, if we could enlarge Lines

18   10 through 17.  Dr. Howard is telling Ms. Gray's jury that,

19   again, the fewest number of hours between injury and death is

20   around 12 hours, and it could go up to, he says, 36 hours.

21   Correct?

22   A.  Yes.

23   Q.  So, somehow, if we were to follow the logic of Dr. Howard's

24   testimony in front of Ms. Gray's jury, these injuries would had

25   to have been inflicted -- even the minimum, 12 hour, would have

UNITED STATES DISTRICT COURT

1    to have been inflicted between 3:00 and 4:00 in the afternoon

2    on Sunday, correct?

3    A.  Yes.

4    Q.  Did you have information that Rachel appeared as though she

5    had not been assaulted that afternoon, as late as 3:00 or 4:00

6    in the afternoon?

7    A.  Yes.

8    Q.  Did you have that in your file?

9    A.  We did have that.

10   Q.  Do you remember -- we could look -- we looked earlier.  One

11   of the first things we did this morning is we looked at George

12   Barnett's report.  He reported to you that Mr. Jones' neighbor,

13   Shirley DeVous, said that she had seen Rachel out sitting on a

14   bicycle between 3:00 and 4:00 in the afternoon on Sunday, May

15   1st, correct?

16   A.  Yes.

17   Q.  Let me have you look at another source of evidence as to

18   Becky's -- excuse me -- Rachel's appearance at the time -- at

19   the day -- on Sunday by having you look at Exhibit 41A.

20         Exhibit 41A is a transcript dated March 24, 1995, in the

21   case of State of Arizona vs. Angela Renee Gray.  I want to ask

22   you some questions about Rachel's sister Becky's testimony at

23   the Gray trial.  By the way, this is one of the transcripts --

24   along with Dr. Howard's from the Gray trial -- that you asked

25   to be prepared because it was crucial to the defense, correct?

1   A.  Yes.

2   Q.  So if we look at Page 4, that's the beginning of Becky's

3   testimony, and I want to skip ahead to Page 61.

4       At Page 61, this also corresponds to Mr. Darby's --

5   Ms. Gray's attorney's questioning of Becky.

6       I'd like you to -- if you could enlarge starting at around

7   Line 18 through 25.   And so Becky tells Ms. Gray's jury that

8   this --

9           MR. SANDMAN:  Is this Page 68?  I'm sorry.  Did I give

10  you the wrong page number?

11          THE COURT:  Sixty-one is what you said.

12          MR. SANDMAN:  I'm sorry.  Too many pages and too many

13  transcripts.

14          THE COURT:  I thought you said 68 after that.

15          MR. SANDMAN:  I did.

16          THE COURT:  So it is 68?

17          MR. SANDMAN:  Yes.

18  BY MR. SANDMAN:

19  Q.  Then if you could enlarge Lines 18 through 22.

20      Mr. Darby is asking Becky:  Now, when you left at 5:00,

21  about 5:00 or 5:15, Rachel was standing in the living room?

22  And she answers yes.  Mr. Darby said:  She was just acting like

23  a normal kid when you left?  And she says yes.

24      If we could go to the next page, the questioning continues.

25  If you could enlarge the first 12, 13 lines there.

UNITED STATES DISTRICT COURT

1      Mr. Darby goes on to ask her if at 5:00, 5:15, on Sunday

2   afternoon, Rachel looked sick or hurt, correct?

3   A.  Yes.

4   Q.  And Becky said no.

5      And then Mr. Darby begins questioning her about some trips

6   that Rachel had in the van with Mr. Jones earlier that day,

7   correct?

8   A.  Yes.

9   Q.  And he has her confirm that Mr. Jones got up that day about

10  2:30 in the afternoon, correct?

11  A.  Yes.

12  Q.  And that they went somewhere in the van and came back.

13     Can we expand Lines 15 through 25.

14     They came back from that trip and she got out of the van.

15     Let's go to the next page to see what happened after the

16  first trip.  If we could enlarge the first half page there.

17     So they come back from the first trip, and Becky tells the

18  jury that Rachel didn't look hurt after that first trip in the

19  van, and that later they left on a second trip, at around 4:00

20  o'clock.  Do you see that?

21  A.  Yes.

22  Q.  If we can enlarge the bottom half of that page, starting at

23  Line 13 to the bottom.  She was asked:  Did you see them come

24  back again?  That's at Line 21.  And she says yes.

25     Let's go to the next page.  Then if you could enlarge the

Direct Examination - Bowman

1    first 12 lines.  She was asked:  Did Rachel appear to be okay

2    at that time?  Now, that's after the second trip.  And she says

3    yes.  Correct?

4    A.  Yes, she did.

5    Q.  And actually she's asked a very specific question at Line 5

6    and 6 by Mr. Darby.  He says:  Are you sure they left, they

7    went and they came back two separate times?  Do you see that?

8    A.  Yes.

9    Q.  And she answered yes.

10         Now, given your own conclusion, what you expressed in your

11   motion to get these transcripts from Dr. Howard and Dr. --

12   excuse me -- Becky, which you described as being crucial to

13   Mr. Jones' defense, can you think of any reason why neither

14   Dr. Howard or Becky were impeached with this testimony at

15   Mr. Jones' trial?

16   A.  No, no reason.

17   Q.  Do you remember that at Mr. Jones' trial Becky said there

18   were actually three trips in the van?

19   A.  She did.

20   Q.  Did she not?

21   A.  Yes.

22   Q.  Then the prosecutor argued that the injuries occurred on

23   the third trip.

24   A.  Correct.

25   Q.  And the jury was never told that Becky had testified under

Direct Examination - Bowman                    118

1   oath a couple of weeks earlier that there were just two trips

2   and Rachel was fine after two trips.  Correct?

3   A.  Correct.

4   Q.  Now, given Dr. Howard's testimony at the Gray trial, where

5   he said the injury was most consistent with occurring prior

6   to -- essentially prior to the afternoon of May 1st, and the

7   vaginal injury was also -- because it's typical of 24 hours

8   also would be prior to the afternoon of May 1st, on top of

9   which he testified that the minimum hours would be 12, which

10  dovetails with the time she appears not to have been beaten

11  that afternoon, in light of all that information, can you think

12  of any reason why you would not have further consulted with

13  your defense medical expert in pursuit of an independent

14  examination of the timing of Rachel's injuries and whether they

15  occurred when Rachel was alone with Mr. Jones on May 1?

16  A.  No, no reason.

17  Q.  Do you remember that Becky had also, before she testified

18  at the Gray trial, had given pretrial statements to the police

19  and to defense counsel?

20  A.  Yes.

21  Q.  And did she happen also on those occasions to describe only

22  two trips in the van with Mr. Jones that day?  That Rachel had

23  only two trips?

24  A.  I think that's true, but I am not sure if I remember that

25  specifically.

Direct Examination - Bowman

1   Q.  I'm going to shift topics with you at this point and ask

2   you, can you tell us whether either you or Mr. Bruner conducted

3   any independent investigation with respect to the bloodstain

4   evidence and how those stains should be interpreted?

5   A.  I don't think we did.

6   Q.  Would you have needed help from an expert to interpret

7   those bloodstains?

8   A.  Yes.

9   Q.  Can you think of any reason why an expert was not

10  consulted?

11  A.  No.

12  Q.  With respect to bloodstain interpretation?

13  A.  No.

14  Q.  I'd like you to take a look at Exhibit 17.

15          MR. SANDMAN:  Your Honor, Exhibit 17 is a fax cover

16  sheet dated April -- can you read the date at the bottom there?

17  Can we blow it up maybe?

18          THE COURT:  '95?

19          MR. SANDMAN:  It's April '95.

20          THE WITNESS:  April 8th.

21          THE COURT:  It looks like it's April 4.  That sort of

22  distorted it.

23          THE WITNESS:  I think it's April 8th.

24          MR. SANDMAN:  April 8th.  Okay.

25  BY MR. SANDMAN:

Direct Examination - Bowman                    120

1  Q.  Do you recall Mr. Jones' jury selection began on April 5th?

2  A.  I don't.

3  Q.  If the record shows that --

4  A.  That's what happened.  I don't remember.

5  Q.  Assuming that's the date, so this would have come in after

6  the start of the trial, correct, April 8th?

7  A.  Yes.

8  Q.  And Mr. Barnett, on the cover sheet, says:  Will send bill

9  later, possibly just pro bono.  Correct?

10  A.  Yes.

11  Q.  Let's look at the next page.  This is his report dated

12  March 31, '95.  If you could.

13      Did you have an opportunity to review this report recently?

14  A.  I did.

15  Q.  Could you tell us what this report was.

16  A.  This was the report where -- where Mr. Barnett went to the

17  impound yard to view the van, Mr. Jones' van, and take some

18  measurements and photos, things like that.

19  Q.  And anticipa- -- tell me the reason why you had Mr. Barnett

20  do this.

21  A.  We had him do that because we didn't think that the Lopez

22  children could have seen what they said they saw.  It was a big

23  van and Rachel was a small child, and the Lopez children were

24  children, they were small, and we just didn't think they'd be

25  able to see what they said they did.

Direct Examination - Bowman

1    Q.  So you received this information in the midst of the trial

2    on April 8th, and does the --

3        Let's go on to the next page of the report.

4        Does the report consist of anything more than measurements

5    and references to certain photographs Mr. Barnett took?

6    A.  No.

7    Q.  And does the report say anything about whether the children

8    could -- does this express any findings or opinions about

9    whether the children could see -- the children, the Lopez

10   children, whether they could see inside the van to see Rachel

11   being struck by Mr. Jones?

12   A.  No.

13   Q.  Could we see Exhibit 26?

14       Exhibit 26 is a Defendant's Rule 15.2 disclosure.  If we

15   could take a look at the bottom half of that page.  This was

16   something filed on -- I think the date there said March 31,

17   1995.

18       You listed Mr. Barnett as a possible witness to testify as

19   to measurements, correct?

20   A.  Yes.

21   Q.  And indicated that you might use photographs and notes

22   taken by Mr. Barnett regarding the van, correct?

23   A.  Yes.  You know, something else just occurred to me.  I

24   think we also asked him to take the measurements because the

25   van was so wide, and we weren't sure if the -- if the actions

Direct Examination - Bowman

1    that those children said they saw were even physically

2    possible.  In other words, whether Mr. Jones -- thinking about

3    Mr. Jones' reach and how far the seats were apart and that sort

4    of thing.

5    Q.  In your notice of disclosure, did you disclose that

6    Mr. Barnett would be expressing any opinions of an expert

7    nature regarding whether either the children could see in the

8    van, consistent with what they said they saw, or that he would

9    be testifying or offering expert opinions on whether Mr. Jones

10   could reach Rachel into the seat in the van?

11   A.  No.

12   Q.  Do you think based on your own suspicions that Mr. Jones

13   could neither reach Rachel, and that the children could not

14   have seen what they said they saw, in light of that, can you

15   think of any reasons why you wouldn't have consulted with an

16   expert who could have helped you answer the questions that you

17   posed?

18   A.  No, no reason.

19          MR. SANDMAN:  Your Honor, that's all I have.

20          THE COURT:  All right.  Thank you.  Cross-examination?

21          MR. BRACCIO:  Your Honor, may I approach the witness?

22          THE COURT:  You may.  Just make sure opposing counsel

23   knows what you're going to be providing the witness.

24          MR. BRACCIO:  The timeline change.  I have a copy for

25   Your Honor as well.

Direct Examination - Bowman

```
 1            MR. SANDMAN:  Your Honor, we were handed this 35-page
 2    timeline this morning, this is what it purports to be, and we
 3    have not had a chance to review or study it.  So I
 4    understand --
 5            THE COURT:  What are you asking me for?
 6            MR. SANDMAN:  I'm sorry?
 7            THE COURT:  Is there an objection?  Are you asking
 8    for --
 9            MR. SANDMAN:  We'll do the best -- no.  We'll do the
10    best we can in trying to determine whether we have any
11    objections as we go along.
12            THE COURT:  Well, it's noted.  If you have an
13    objection as we go forward, you can make your objection.
14        And this is not marked because this is for demonstrative
15    purposes?
16            MR. BRACCIO:  That's correct, Your Honor.
17            THE COURT:  Fine.
18            MR. BRACCIO:  For the record, I had e-mailed
19    Mr. Sandman about the disclosure of demonstrative exhibits a
20    week ago, if he requested that, we received no word on that.
21    As I indicated Friday at the status conference as well, we were
22    putting this together and I'd get it to him as soon as
23    possible.  It's a demonstrative exhibit, I don't intend to
24    introduce it.
25            THE COURT:  Fair enough.  Go ahead.
```

UNITED STATES DISTRICT COURT

1                    CROSS-EXAMINATION

2    BY MR. BRACCIO:

3    Q.  Good afternoon, Judge Bowman.

4    A.  Good afternoon.

5    Q.  We heard from Mr. Bruner that you actually clerked with his

6    firm for about a year before you two left, is that correct?

7    A.  I don't remember.  I know I did some work for the firm.  I

8    don't remember how much it was or how long -- for how long.

9    Q.  And then you were trying criminal cases at that time?

10   A.  With Mr. Bruner?

11   Q.  With Mr. Bruner, correct?

12   A.  Yes.

13   Q.  You had previously tried a capital case, shared a capital

14   case?

15   A.  Yes.

16   Q.  How would you describe your work ethic back in 1994?

17   A.  Wow.  That's a hard question.  I hope my ethics were

18   similar to what they are now.  I didn't have, of course, nearly

19   as much experience, but I know I took my work very seriously.

20   Q.  You were organized?

21   A.  I think so.

22   Q.  Prepared?

23   A.  Yes.

24   Q.  You have very little to no memory of this case, is that

25   right?

CROSS-EXAMINATION - BOWMAN

1   A.  That's correct.

2   Q.  Let's see if we can refresh your recollection with the

3   record in this case.  When you initially began your

4   representation of Mr. Jones, you read all the police reports,

5   police witness interviews, and the disclosures in this case as

6   they came in, correct?

7   A.  Yes.

8   Q.  As well as you interviewed nearly all the state's

9   witnesses, correct?

10  A.  Yes.

11  Q.  I counted 18 witnesses that you either interviewed or

12  deposed.

13       I'd like to go first --

14          THE COURT:  Was there an answer to that?

15  BY MR. BRACCIO:

16  Q.  Yeah.

17  A.  I don't specifically recall that, but just from the review

18  of the record, I think that's probably about true.

19  Q.  About 18 witnesses?

20  A.  Something like that.

21          THE COURT:  Thank you.

22  BY MR. BRACCIO:

23  Q.  I'd like to go through the facts that you knew going into

24  this case and see if that helps refresh your recollection.

25       Can we pull up 4443?

1            MR. BRACCIO:  Your Honor, for reference, I am going to

2    be referencing by the Bates number, which is at the bottom

3    left.  I believe these are almost nearly all contained in

4    Exhibit 1.

5            THE COURT:  Fine.  Thank you.  To the extent they're

6    not in Exhibit 1, if you would please indicate that for the

7    record.

8            MR. BRACCIO:  Absolutely.  Absolutely.

9            THE COURT:  Thank you.

10           MR. BRACCIO:  Trial Exhibit 65.

11       Is it not pulling up?  I guess can we get -- I guess if

12   there's any IT help?

13           MS. SCHNEIDER:  I have it on my screen, the problem

14   appears with this wire that they installed.

15           THE CLERK:  Okay.

16           MR. BRACCIO:  We can move on in the meantime.

17           THE COURT:  Hold on.  Give me a second.

18           (Pause in proceedings)

19           THE COURT:  We're going to take a brief break.  We're

20   going to try to get IT here to make sure this is working.

21   We'll try to give it five or ten minutes.

22       (A recess was taken from 2:36 p.m. to 2:57 p.m.)

23           THE COURT:  All right.  Did we get it fixed?

24           MR. BRACCIO:  Yes.  Thank you, Your Honor.  My

25   apologies.

CROSS-EXAMINATION - BOWMAN                                127

1          THE COURT:  Go ahead.

2     BY MR. BRACCIO:

3     Q.  Judge Bowman, the picture on the screen, this is trial

4     Exhibit 65.  Do you recognize this as Rachel Gray?

5     A.  I do from my review.  I wouldn't have remembered.

6     Q.  Do you recall that Rachel Gray had virtually no

7     documentation of any prior medical history?

8     A.  I don't remember that.

9     Q.  Do you recall that Angela Gray told detectives that she

10    never took Rachel to a regular doctor, just took her to the

11    university hospital if there was ever a problem?

12    A.  I don't recall that.

13    Q.  So at the top paragraph there, I'll give you a moment to

14    read that.

15    A.  Yes.

16    Q.  For purposes of this questioning, too, I'll presume that

17    you don't remember these things, we'll just bring up the

18    document to refresh your recollection.

19    A.  All right.  Thank you, very much.

20    Q.  Of course.  This is Exhibit 67, Bates Number 5573.

21         THE COURT:  Thank you.  You anticipated something I

22    was just about to ask you.

23    A.  Yes, I've read the top paragraph.

24    BY MR. BRACCIO:

25    Q.  Angela Gray told detectives that she never took Rachel Gray


UNITED STATES DISTRICT COURT

1    to a regular doctor, only to the university hospital when there

2    was a regular medical emergency.

3    A.  I don't exactly -- sorry.  This is moving around quite a

4    bit.

5         THE COURT:  Maybe we can just keep one up at a time.

6         MR. BRACCIO:  Scroll down, Daniel.  Keep going.

7    A.  It sounds like what she was saying is that the doctors that

8    she saw were at -- were at the university, at UMC, and that

9    they saw a different doctor each time.

10   BY MR. BRACCIO:

11   Q.  Okay.  Let's go to Exhibit 66, 5180.

12   A.  She says she can't remember when the last time was that she

13   took her to a doctor, it had been a while.  But she goes to the

14   university, the hospital, the pediatric department, her doctor

15   changes every time.

16   Q.  And Angela told detectives that Rachel was tiny and

17   slightly anemic, do you recall that?

18   A.  Is that in front of me?

19   Q.  Exhibit 66, Bates number 5186, at the top of that page.

20        MR. BRACCIO:  I apologize, Your Honor, this is a

21   little clunky.  A lot of these don't have page numbers on them.

22   We should pick up the pace with some of them.

23        THE COURT:  That's fine.

24        THE WITNESS:  I'm sorry, I don't see them.

25   BY MR. BRACCIO:

1    Q.  The second question down:  Does she have any other medical

2    problems at all?  She's -- I think the biggest medical problem

3    she's ever had is she's slightly anemic.

4    A.  Oh, yes, I see that.

5    Q.  5208.  Right in the middle of the page.

6            THE COURT:  Still the same exhibit?

7            MR. BRACCIO:  Still the same exhibit, yes.

8    BY MR. BRACCIO:

9    Q.  Right there, the third question down:  She's a skinny

10   little thing, too?  And Angela Gray replies:  She is tiny.

11   A.  Yes.

12   Q.  So based upon what Angela Gray is telling detectives, there

13   had never been any major medical issues with this child

14   requiring hospitalization, correct?

15   A.  I am not a hundred percent sure about that.

16   Q.  Okay.  In your files, did you have any other documentation

17   that Rachel Gray had ever had any other major medical injuries?

18   A.  No.

19   Q.  Prior to Angela and her children moving in with Barry

20   Jones, no one had ever hurt the kids, correct?

21   A.  I don't know that.

22   Q.  Okay.  This is Exhibit 1, Bates Number 576, at Line 5.

23   A.  I am not sure what you're asking me.

24   Q.  Okay.  I'm asking you if Angela had reported to detectives

25   that, prior to moving in with Barry Jones, no one had ever hurt

CROSS-EXAMINATION - BOWMAN

1   the kids before.

2   A.  You're asking me if that's what Line 5 says?

3   Q.  Correct.  And Line 21.

4   A.  Line 5 says:  He has never, ever hit the kids or me.  But I

5   don't know who she's talking about.

6         MR. BRACCIO:  Scroll.

7   BY MR. BRACCIO:

8   Q.  Okay.  Maybe Line 21 will clear it up for us.

9   A.  Line 21 says:  Oh, no, no, no.  He -- nobody has ever hurt

10  my kids.  He used to slap me.

11        THE COURT:  Okay.  Counsel, I'm sorry, but this keeps

12  referring to "he," and it's not clear from this document

13  whether -- who the "he" is that the witness is referring to --

14        MR. BRACCIO:  Back up a page.

15        THE COURT:  -- that Ms. Gray is responding.

16  BY MR. BRACCIO:

17  Q.  Do you recall that Angela was talking about her

18  ex-boyfriend, Zoly?

19  A.  No.

20  Q.  Let's scroll down to 575 at the bottom.

21        THE COURT:  Again, this is just earlier in the same

22  interview?

23        MR. BRACCIO:  Correct.

24        THE COURT:  I just want to make sure -- we're jumping

25  around a bit.

UNITED STATES DISTRICT COURT

1          MR. BRACCIO:  Right.

2          THE COURT:  Maybe you can help me understand.  This is

3     an interview by whom of --

4          MR. BRACCIO:  Sure.

5     BY MR. BRACCIO:

6     Q.  Do you recall that Angela Gray gave three statements to

7     detectives in this case?

8     A.  I don't recall that, but if that's what the record says --

9     Q.  Okay.

10    A.  -- then....

11         MR. BRACCIO:  Your Honor, this is -- I can pull them

12    up, each by individual Bates numbers, but Angela Gray gave --

13         THE COURT:  I just think you need to let the witness

14    know what interview you're talking about and who the "he" is

15    that Ms. Gray is referring to, because it's not clear to me who

16    she is talking about.

17         MR. BRACCIO:  Okay.

18    BY MR. BRACCIO:

19    Q.  Go back to 576 at Line 21.

20         At Line 21, Angela tells detectives "nobody has ever hurt

21    my kids," correct?  "Nobody."  She's not referring to a single

22    person.  She's saying "nobody has ever hurt my kids."

23    A.  Yes, she says, "he, nobody, has ever hurt my kids."

24    Q.  Angela's sister Amanda told detectives that she had also

25    never seen any children with bruising before Angela and the

1    kids moved in with Barry Jones, do you recall that?

2    A.  I don't.

3    Q.  Exhibit 1, 2294.   Last paragraph.

4    A.  Can you ask me the question again, please.

5    Q.  Of course.  If at any time you want me to pull this

6    interview back up to the front page so you can see who it is,

7    or the top of the page will usually indicate who is being

8    interviewed, I am happy to do that.

9    A.  This says "medical record."

10   Q.  Right.  Okay.

11   A.  I don't really know what this is.

12   Q.  Okay.

13   A.  Got it.  All right.  So it's from the University Medical

14   Center.  From....  I'm not sure what....

15           THE COURT:  I'm sorry.  Counsel, you know, look, this

16   isn't a guessing game where the witness is supposed to try to

17   figure out what the exhibit is.  Can you just identify what the

18   exhibit is, the proposition for which you're purporting this.

19           MR. BRACCIO:  Yes.

20   BY MR. BRACCIO:

21   Q.  Judge Bowman, this comes from your trial file, and this is

22   a document of the medical center report talking about the

23   children.  So you had this in your file when you were preparing

24   for Barry Jones' trial.

25   A.  Okay.  I see now it's dated May 9th, 1994.

1    Q.  Correct.  So at the bottom of that page they document that

2    Angela Gray's sister, Amanda, reported that she had never

3    observed any bruising on any of the children before, correct?

4    A.  She said she had not seen any bruising in the past.

5    Q.  Correct.

6        Okay.  Let's go to Exhibit 66, Bates Number 4904.  This is

7    Amanda's Gray's police interview.

8        At the very top of the page, the question is does she also

9    confirm this statement to detectives:  So this is the first

10   time you saw any kind of bruising on any of them?

11   A.  She said she hadn't seen the kids a lot, but she never felt

12   that the children were in physical danger.

13       I don't see anything about bruising.  In the question I do,

14   but not in the answer.

15   Q.  Okay.  Just establishing that she had never felt that the

16   children were in any danger anywhere else.

17   A.  Right.

18   Q.  Okay.  Let's pull up 4748.

19           THE COURT:  It's all from the same exhibit?

20           MR. BRACCIO:  There's four exhibits that these are in.

21   This, I believe, was from -- this is from the disclosure, Your

22   Honor.  I can find that number.

23           THE COURT:  I think it's important so that we have an

24   accurate record.

25   BY MR. BRACCIO:


UNITED STATES DISTRICT COURT

1  Q.  You learned that Barry Jones used methamphetamines pretty

2  extensively and sold drugs, correct?

3  A.  Yes.

4  Q.  According to Terry Shane, he sold a lot of drugs?  This is

5  Exhibit 66, Bates 4950.

6  A.  Terry -- this looks like Terry Richmond.

7  Q.  Correct.  If you'll recall, Terry Richmond was the son of

8  Joyce Richmond, who was Barry Jones' girlfriend.

9  A.  I don't exactly recall that, but -- and I am sorry, what's

10 the question?

11 Q.  The question was you knew that Barry Jones sold a lot of

12 drugs, methamphetamines.

13 A.  I did.

14 Q.  And his connection for his drugs, Hal, got busted and he

15 had a chop shop.  Do you recall that?

16 A.  I don't remember that.

17         MR. BRACCIO:  Scroll down.  This is 4950.

18         THE COURT:  This is Page 4950 of what?

19         MR. BRACCIO:  Bates number of Exhibit 66.

20     Tell you what, we'll move on.

21 BY MR. BRACCIO:

22 Q.  You recall that Barry Jones sold a lot of drugs.

23 A.  I don't know that I knew he sold a lot of drugs.  I knew he

24 was doing methamphetamine.  I knew that there were drugs sales.

25 I don't remember a lot of the detail about that.

1    Q.  Do you recall that numerous witnesses described that he

2    used a lot of drugs?

3    A.  I don't recall what witnesses exactly told me.

4    Q.  Okay.  Exhibit 66, Bates Number 926.

5         THE COURT:  Now this is going to be referring to

6    Exhibit 1?

7              MR. BRACCIO:  Exhibit 1.

8              THE COURT:  Page 926.

9              MR. BRACCIO:  Bates Number 926.

10             THE COURT:  What is it?

11             MR. BRACCIO:  This is a police interview of Carol

12   Jones, who was Barry Jones' ex-wife.

13             THE COURT:  Go ahead.

14   BY MR. BRACCIO:

15   Q.  Do you recall that Carol, Jones' ex-wife, indicated that he

16   was using coke, speed, whatever he could get his hands on?

17   A.  Yes.  She was asked what kind of drugs he was using then.

18   I'm not sure when "then" was.  But I knew he was using drugs.

19   Q.  Do you recall that Rosemary St. Charles also confirmed that

20   he was using drugs around the time that he was living with

21   Angela Gray and her children?

22   A.  I don't remember that it came from her.

23   Q.  Do you recall that Angela did methamphetamines?

24   A.  I knew that.

25   Q.  Do you recall that Angela and Barry did crystal

CROSS-EXAMINATION - BOWMAN                                    136

1    methamphetamines together four or five days before Rachel's

2    homicide?

3    A.  I think that's right.

4    Q.  Barry even admitted in a police interview that he did

5    methamphetamines four or five days before Rachel's homicide,

6    correct?

7    A.  I don't remember that it came from the police interview,

8    but I knew that information.

9    Q.  You did know that he was doing drugs four to five days

10   beforehand?

11   A.  Yes.

12   Q.  You had a lot of problems with witnesses in this case,

13   including Brandie Jones, correct?

14   A.  What do you mean?

15   Q.  I'll tell you what, I'll come back to that.  Let's start

16   with the timeline.

17        Through the police investigation and your own

18   investigation, you knew a lot of the following, correct?  At

19   one point Barry Jones had been charged with statutory rape?

20        MR. SANDMAN:  Your Honor, excuse me, I am sorry to

21   interrupt.  We saw that one item at the top of the timeline and

22   checked it out and noticed at Page 2404 of Exhibit 1 that

23   certain records regarding Mr. Jones as a juvenile were not even

24   subpoenaed until after the trial, on May 8th, 1995, and I don't

25   see how any of this would be relevant to what trial counsel

UNITED STATES DISTRICT COURT

1    knew before the trial.

2         Secondly, there is no record anywhere in Mr. Jones'

3    juvenile record that he was actually adjudicated for statutory

4    rape.  There is a reference to it, which I understand was

5    really two 16-year-old kids who may have had some kind of

6    consensual I-don't-know-what.

7         But there is no record of a statutory rape.  There's a

8    reference to it in some juvenile records that were received

9    after the jury trial.  Obviously this sort of character

10   evidence would never go to a jury, but if it's intended to show

11   what the lawyers knew before trial, they didn't have this

12   information.

13        THE COURT:  I think she can answer the question as to

14   whether or not she knew of it, because I think that's the

15   question.  So I understand your concern.  Because it's not

16   really framed as an objection, I'll take it as a concern.

17        Why don't you answer the question.

18   A.  I don't remember that.

19        MR. BRACCIO:  Let's pull up Exhibit 1, Bates 2248.

20        Go down to 2450, please.  That top paragraph there.

21   BY MR. BRACCIO:

22   Q.  Barry was referred to the Vision Quest program by the

23   Juvenile Court authorities of Cochise County.  He entered the

24   program on December 19th, 1974.  The reason for his admission

25   was the charge against him of statutory rape.

1        Do you recall that now?

2   A.  I don't.  I do remember something about Vision Quest, but I

3   don't remember any of the specifics.

4   Q.  Do you recall that Barry Jones also had a prior felony for

5   exhibiting a deadly weapon on June 12th, 1978?

6   A.  I remember there was some kind of prior criminal history,

7   but I don't remember the details or the timing.

8   Q.  On your screen should be that prior felony.

9           THE COURT:  Again, exhibit and page number?

10          MR. BRACCIO:  Yeah.  I'm sorry, Your Honor.

11      That's Exhibit 1, Bates 2302.

12          THE COURT:  Thank you.

13  BY MR. BRACCIO:

14  Q.  Do you recall that Barry Jones married a woman named Carol

15  and had children with her, including Brandie Jones?

16  A.  I knew that, yes.

17  Q.  And you learned from police reports that Carol showed up to

18  the police department the day after Rachel's death stating that

19  Barry Jones had previously beat their children?

20  A.  I remember that she came forward, and I remember she

21  provided some sort of negative information, but I don't

22  remember those specifics.

23  Q.  Okay.  This is Exhibit 1, Page 916.  This is an interview

24  with Carol Elaine Jones with Detective O'Connor?

25  A.  Yes.

1    Q.  In the highlighting there she indicates that she had been

2    married to Barry.

3    A.  Yes.

4          THE COURT:  She's waiting for a question.

5          MR. BRACCIO:  I thought I'd asked the question.

6    BY MR. BRACCIO:

7    Q.  So you learned from the police reports that Carol showed up

8    to the police department the day after Rachel's death stating

9    that Barry Jones had previously beat their children, correct?

10         MR. SANDMAN:  Your Honor, I object because -- I guess

11   I'm not seeing that in the document, any beating or the

12   reference to it.  Maybe I missed it.

13   A.   You're saying it was more than a spanking, it was, like,

14   overdoing it?

15   BY MR. BRACCIO:

16   Q.  Correct.

17   A.  I see that.  I don't remember that, but I see it.

18         THE COURT:  I'm sorry.  Your question is was she aware

19   of this information?

20         MR. BRACCIO:  Correct.

21         THE COURT:  So that's the question to you:  Were you

22   aware of this information at the time?

23         THE WITNESS:  I don't remember that, but I see it in

24   the transcript.

25         MR. BRACCIO:  Okay.

CROSS-EXAMINATION - BOWMAN

1    BY MR. BRACCIO:

2    Q.  Carol also told detectives that when they were married

3    Barry Jones lost his job and became increasingly violent and

4    was doing drugs.  Do you recall that?

5    A.  I don't recall.

6    Q.  918.  Go up right there at the very top.

7        That large paragraph right there, "was there ever a time?"

8    A.  Yes.

9    Q.  Does that refresh your recollection that she told

10   detectives that when she was married to Barry he lost his job

11   and became increasingly violent and was doing drugs?

12   A.  I don't recall it, but I see it in the transcript.

13           THE COURT:  I'm sorry.  Just to make sure that I am

14   following this, these exhibits that you are referring to are

15   exhibits that came from the witness' files in regard to this

16   case?

17           MR. BRACCIO:  Correct, Your Honor.  I'm sorry if I

18   have not been clear --

19           THE COURT:  I just want to make sure that we're all on

20   the same page here.  So that's the source of the exhibits

21   you've been referring to.  You're now asking her specific

22   questions about whether or not she remembers this information

23   that were in her files at that time.

24           MR. BRACCIO:  Correct.

25           THE COURT:  Go ahead.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN

1   BY MR. BRACCIO:

2   Q.  In your file, just to make sure we're very clear, you had

3   all the police reports in this case, all the police interviews,

4   all of your witness interviews, and the disclosures from the

5   state, correct?

6   A.  Yes.

7   Q.  That makes up almost the entirety of your file, with the

8   exception of your notes?

9   A.  Yeah, and maybe some motions, letters, you know, the

10  regular things that would be in the file.

11  Q.  Sure.  Carol also told police that Barry Jones threatened

12  to kill their children if she left, do you recall that?

13  A.  I don't.  I see it in the transcript.

14          THE COURT:  I think we moved to a different page.  So

15  if you can make sure that we're -- exhibit number and page.

16          MR. BRACCIO:  Sorry, Your Honor.  I will get that

17  down.  That is Bates Number 920.

18          THE WITNESS:  Yes.

19          MR. BRACCIO:  Bates Number 927.

20  BY MR. BRACCIO:

21  Q.  So between Pages 927 and 928 here, in Exhibit 1, Carol told

22  detectives that he had threatened to kill the children if she

23  left.

24  A.  It says he was calling her on the phone and saying he was

25  "going to kill me and the kids."  I'm not sure who "her" was.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN

1   But that's what it says.

2   Q.  You're indicating that you have a problem with what part of

3   that?

4   A.  No, I don't have a problem.

5          THE COURT:  She said it doesn't indicate who "her"

6   was.

7          MR. BRACCIO:  Got it.  That's okay.

8   BY MR. BRACCIO:

9   Q.  Carol reported to police that Jones had hit his children on

10  numerous occasions and that these hits were excessive, do you

11  recall that?

12  A.  Is that what we just looked at, where she said it was more

13  than a spanking?

14  Q.  Correct.

15      Why don't we pull up the defense interview.  This is

16  Exhibit 1, Page 962.  I have line numbers for this, Lines 5

17  through 27.  At Lines 5 through 27 there.

18  A.  You're asking me if she told me this or if she told the

19  police things?

20  Q.  Yes.  Carol Jones was interviewed by police, she came

21  forward the day after Rachel's death, correct?

22  A.  But this is an interview -- this is me interviewing her.

23  Q.  Correct.  So this would be part of your trial file, right?

24  A.  Right.

25  Q.  So this would be something that you were aware of in

CROSS-EXAMINATION - BOWMAN                                    143

1   preparing a defense for Barry Jones, correct?

2   A.  Yes.

3   Q.  So you did an interview of Carol Jones in this case,

4   correct?

5   A.  Yes.

6   Q.  And this is that defense interview?

7   A.  Yes.

8   Q.  So at Lines 5 through 27, Carol Jones tells you that he had

9   hit his children on numerous occasions and the hits were

10  excessive, correct?

11  A.  I'm sorry.  Where is that?

12  Q.  Lines 5 through 27.

13  A.  I can't see.

14          MR. BRACCIO:  Can we scroll up that Line 5, please.

15          THE COURT:  If you're asking to read all the way down

16  to 27, it only goes to 24.

17          MR. BRACCIO:  Oh, geez.

18          THE WITNESS:  I'm sorry, can you ask the question

19  again?

20  BY MR. BRACCIO:

21  Q.  No problem.  I think the difficulty is I'm trying to

22  refresh your recollection with the document but I am asking the

23  question beforehand.

24  A.  Yeah, this doesn't refresh my recollection.  If you're

25  asking me what's in the transcript --

1    Q.  Correct.

2    A.  -- I am happy to confirm that, but I don't remember this.

3    Q.  Okay.  Do you recall that he would use a belt or his hand

4    or his elbow and he struck them in the head or shoulder?

5    A.  Where is that?

6    Q.  It's on this page, Lines 18 through 22.

7        Well, yeah, I mean, for them being kids, he did leave marks

8    on them.  I mean, like the belt.  But not bruises or nothing

9    like that.  He only gave them three swats.  But it was, like,

10   his anger.

11            THE COURT:  So, counsel, I think what the witness has

12   said is that she's read it, she doesn't dispute what's in the

13   transcript, but it's not refreshing her recollection.

14            MR. BRACCIO:  Okay.

15            THE WITNESS:  Yeah, I just don't remember.  I know

16   there were problems in the marriage.  I know that she reported

17   that I think he was drinking and maybe using drugs, that he was

18   aggressive with her and the children.  I just don't remember

19   all the details that are in the interviews.

20       But if it's in these transcripts and I had these in my

21   file, I was aware of it because I read everything.

22   BY MR. BRACCIO:

23   Q.  Exhibit 66, Bates 4894.

24       Do you recall that Carol --

25            THE COURT:  I'm sorry.  This is again what?

UNITED STATES DISTRICT COURT

1          MR. BRACCIO:  This is Exhibit 66 --

2          THE COURT:  I know the number, but what is it?

3          MR. BRACCIO:  This is the police report by Detective

4    O'Connor that would have been part of the Bates -- part of the

5    original disclosures from the state, the police reports.

6          THE COURT:  Fine.  Go ahead.

7    BY MR. BRACCIO:

8    Q.  Do you recall that she told detectives that Barry would

9    elbow their child in a backhand fashion while they were trying

10   to leave a room at the same time?

11   A.  I don't recall it, but I see it in the report.

12   Q.  That he would backhand elbow them?  If they were behind

13   him, he would swing his elbow back and strike them?

14   A.  He would elbow the child in a backhand fashion while they

15   were trying to leave the room at the same time he was.

16         MR. BRACCIO:  Exhibit 1, 935.

17         THE COURT:  And this is?

18         MR. BRACCIO:  This is Exhibit 1.  I'm sorry.

19         THE COURT:  I heard the numbers, I just need to know

20   what it is.

21         MR. BRACCIO:  This is the Carol police interview.

22         THE COURT:  What's your question?

23   BY MR. BRACCIO:

24   Q.  That Barry Jones would, quote, backhand elbow them.  If

25   they were behind him, he would swing his elbow back and strike

CROSS-EXAMINATION - BOWMAN                        146

1    them?

2    A.  I'm sorry, where is that?

3              THE COURT:  I'm sorry.  Wait.  Are you asking her if

4    she remembers that information?

5              MR. BRACCIO:  Yes.

6              THE COURT:  So that's the first question to you:  Do

7    you remember that information?

8              THE WITNESS:  I don't.

9              THE COURT:  Is there someplace in here you want her to

10   read?

11   BY MR. BRACCIO:

12   Q.  At the top of that page.  When you say, "elbow," how would

13   you describe that?  On the way you're describing.  She answers:

14   Backhand, elbow.  Then he would swing his elbow back and

15   strike?  Yeah.

16   A.  I'm sorry.  Where?

17   Q.  It's right in the middle of the page.

18   A.  Okay.  I got it.  So the question is he would swing his

19   elbow back and strike them that way, and she said yeah.

20   Q.  Do you recall that Carol provided the names of her sisters

21   who would corroborate this abuse?

22   A.  I don't recall that.

23   Q.  Go to 922 at the bottom.  Keep going down.

24        This is, again, the police interview of Carol Jones.

25   A.  Yes.


UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN                          147

1   Q.  And she provided the names of her sisters who would

2   corroborate all the abuse of Barry Jones against his children?

3   A.  Yes.

4   Q.  Carol eventually got to a point where she was not

5   comfortable leaving the kids alone with Barry Jones and would

6   have her mother come stay with them, do you remember that?

7   A.  No.

8   Q.  This is Exhibit 1, 951, at Lines 15 through 25.

9   A.  I'm sorry, will you ask me the question again.

10  Q.  Sure.  Of course.  The question was Carol eventually got --

11  Carol told detectives that she eventually got to a point where

12  she was not comfortable leaving the kids alone with Barry Jones

13  and would have her mother come stay with them, correct?

14  A.  She said that she had her sisters and her mom watch the

15  kids in the last year of their relationship.

16  Q.  And the reason she said that is because they're talking

17  about the prior abuse, correct?

18  A.  She said she was worried about some bruising she saw on

19  Brandie and she thought that Barry had done that by taking the

20  belt to the kids.  She said it was just one time.

21  Q.  Okay.  Let's go to Exhibit 1, 966, 1 through 11.

22  A.  Oh, this one says that.  I asked her:  Were you not

23  comfortable leaving the kids with him?  And she said yeah.

24  Q.  Correct.  And Carol eventually had to get a restraining

25  order against Barry Jones because of the violence against his

UNITED STATES DISTRICT COURT

1    own children.  That's something you knew in this case, correct?

2    A.  I don't remember that now, but if it's in the file then I

3    knew it.

4    Q.  You don't recall the order of protection?

5    A.  I don't remember that.

6    Q.  Pull up 2238.  This is in exhibit -- oh, this is a

7    disclosure.

8        Go to 922, Exhibit 1.  Pull up the restraining order.  It's

9    2238.

10       Okay.  This is the order of protection that Carol Jones

11   filed against Barry Jones, correct?

12   A.  Yes.

13   Q.  Okay.  And she felt that they were, quote, in imminent

14   danger?

15   A.  I can't see that.

16   Q.  Right there.

17           MR. SANDMAN:  Your Honor, I'm sorry, I guess I have to

18   register an objection because that page is a CPS temporary

19   custody notice.  It has nothing to do with an order of

20   protection.  It's a completely different document.  The page

21   above it was an order of protection.  This is an Arizona

22   Department of Economic Security Temporary Custody Notice.

23           MR. BRACCIO:  I can clarify.

24   BY MR. BRACCIO:

25   Q.  As of April of '92, Carol Jones is reporting that Brandie

CROSS-EXAMINATION - BOWMAN

1    Jones, her daughter, is in imminent danger, correct?

2    A.  I don't know.

3            THE COURT:  Wait.  Are you saying this wasn't in her

4    file?

5            MR. SANDMAN:  I'm saying that we went from a question

6    about an order of protection to the document that is up on the

7    screen, which has nothing to do with an order of protection.

8    It's a temporary custody notice, which resulted from Brandie

9    jumping out of a moving car that her mother was driving.  And I

10   think we're going to need -- I'm sorry, I have to object

11   because there's -- counsel's characterizing this as a document

12   that it is not and is suggesting that the report resulted from

13   a report against Mr. Jones, which it is not.  It was related to

14   Brandie jumping out of a moving car that her mother was

15   driving.

16           THE COURT:  I think you've cleared it up.  Are you

17   disputing the fact that it's two different documents?

18           MR. BRACCIO:  Go to the top of the screen of the order

19   of protection.  I think this document may be attached to the

20   order of protection.

21           MR. SANDMAN:  I'm sorry, there is no evidence of that.

22   You know, I can't simply allow people to be guessing about

23   whether documents are attached or not attached.  There's an

24   entire CPS file regarding that temporary custody notice.  I

25   don't have it at my fingertips, but we could produce it fairly

UNITED STATES DISTRICT COURT

1   quickly if we had to.  It has nothing to do with the order of

2   protection.

3           THE COURT:  Could you go to the next page for me,

4   please.  Scroll down, please.

5           MR. SANDMAN:  Judge, I believe that CPS report is

6   dated in April of '92 and the protective order --

7           THE COURT:  July of '92.

8           MR. SANDMAN:  -- was May, so obviously the April

9   report couldn't be attached to the May report.

10          THE COURT:  Could you go up to the...?

11  BY MR. BRACCIO:

12  Q.  Do you recall in Carol Jones' interview that she told

13  police --

14          MR. BRACCIO:  I'm sorry, Your Honor.  Do you want us

15  to go back?

16          THE COURT:  I do.  I think we need to answer this

17  question.

18          MR. BRACCIO:  Okay.  I was trying to answer it in a

19  different fashion, because I believe Carol Jones told police

20  that she had taken out the restraining order on Barry Jones, so

21  I was just going to use her testimony to establish that point.

22      It sounds like Mr. Sandman's --

23          THE COURT:  Mr. Sandman is concerned that you're

24  conflating two different documents and that one may be

25  referring to -- not to Mr. Jones.  That the -- this is the

UNITED STATES DISTRICT COURT

1    first page.

2              MR. BRACCIO:  No.

3              THE COURT:  Hold on.  I can't even read the date on

4    this thing.  If you go down on this 5/30/ -- does that say '90?

5              MR. BRACCIO:  '92.  I believe it was 1992.  This was

6    two years before this case.

7              THE COURT:  If you'd go to on the next page.

8              MR. BRACCIO:  The date on that is 4/9/92.

9         So my understanding was the document was filed by Carol

10   Jones with the Department, with DES, reported that she felt the

11   children were in imminent danger and then ultimately obtained

12   the order of protection.

13             MR. SANDMAN:  You know, I'm sorry, Judge, but we

14   would -- there is just no evidence of that other than counsel's

15   interpretation.  I think -- I am very concerned combining

16   documents --

17             THE COURT:  I understand the objection.

18        Ask your next question.

19             MR. BRACCIO:  Sure.

20   BY MR. BRACCIO:

21   Q.  Judge, there is an order of protection in your files,

22   correct?

23   A.  Yes.

24   Q.  And this was about two years before Rachel's homicide?

25   A.  Can I see the order of protection again?  I'm sorry.

1    Q.  Yeah.  Scroll up.

2    A.  You're saying that says May, something, 1992?

3    Q.  Correct.

4    A.  I can't tell that that's what it says, but if it does say

5    that, it's about two years before Rachel's death.

6         THE COURT:  Just to add to the confusion, this

7    document is referencing concern about Mr. Jones committing

8    domestic violence upon Carol Jones.  And the next page is

9    discussing Brandie Jones.  Which, I tend to agree with

10   Mr. Sandman, these seem to be talking about two completely

11   different things.

12        MR. BRACCIO:  So, Your Honor, I guess it is ordered

13   that Barry Lee Jones -- the first box is checked -- shall

14   commit no domestic violence upon Carol E. Jones, comma; Brandie

15   Jones on the next line there, comma; I can't read the second

16   name, comma; Andrew Jones.  So it's all of the children.

17        THE COURT:  Well, if you can sometime in the future

18   establish that the second page was somehow attached to the

19   first page, I'll consider it.  But for the time being, I'm

20   sustaining the objection.

21     So go ahead and ask your next question.

22        MR. BRACCIO:  Sure.

23   BY MR. BRACCIO:

24   Q.  Carol eventually separated from Barry Jones, do you recall

25   that?

1    A.  Yes.

2    Q.  So, continuing on, you had reports very early on in your

3    investigation that Barry was suicidal, out of work, recently

4    separated from Carol, and in possession of loaded guns around

5    May of 1992, correct?

6    A.  I don't specifically remember all of those things.

7    Q.  Okay.  Exhibit 1, Bates 2304.  2309.

8        I can move on while we're waiting for that.

9        Let's talk about Angela and her children.  Do you recall

10   Angela lived with a man named Zoly for two and a half years

11   before she met and moved in with Barry Jones?

12   A.  Yes.

13   Q.  And Angela repeatedly told detectives that Zoly was really

14   good with the kids, he never abused any of them?

15   A.  I don't exactly remember that.  I remember she had to send

16   someone to get the children when she left.  I think he liked

17   them, but I don't remember what the situation was exactly.

18   Q.  This is Exhibit 66.  5183.

19       So this is a police interview with Angela Gray?

20   A.  Yes.

21   Q.  Angela told detectives that Zoly was really good with the

22   kids, he never abused any of them.

23   A.  Where is that?  Is that on this page?

24   Q.  Yeah, it should be.  Scroll up one more page, Daniel.

25       So at the bottom there, said:  I lived with Zoly for like

1   two and a half years.

2   A.  Yeah.

3   Q.  Zoly is the individual that you were referring to earlier

4   when it indicated that he may be a suspect in this case?

5   A.  I don't remember that.  I think it was information that he

6   gave about maybe -- maybe about Johnny.  I am not sure.  I

7   don't remember that.

8   Q.  Okay.  Scroll down.

9       So Detective Pesquiera, I believe in this case, was asking

10  you about -- asking Carol -- asking Angela Gray about Zoly --

11  A.  Yes.

12  Q.  -- and she indicated that she never had any problems with

13  him, he was really good with the kids.  At the very top of

14  that:

15      Question:  Did you ever have any problems with him the way

16  he treated her?

17      Not with the way he treated her.  I did have some problems

18  with the way he treated me.

19  A.  Is "her" Rachel?

20  Q.  Scroll up.

21      Rachel.

22  A.  Yeah, it says he was close to Rachel.

23  Q.  Correct.

24  A.  And that he had -- let's see.  He didn't -- she didn't have

25  problems with the way he treated Rachel.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN                          155

1    Q.  And right at the top of there, again, Exhibit 66, Bates

2    Number 5182, at the bottom, Carol Jones told detectives that

3    Rachel knew that Zoly was her dad and she was really close to

4    him, correct?

5    A.  Angela Gray said that as far as Rachel knew, that that was

6    her dad and that they were really close.

7    Q.  But you did learn that Angela spanked Rachel and Rebecca,

8    but not Johnny.  Do you recall that?

9    A.  I don't remember that.

10   Q.  Exhibit 1, Bates 1184, Line 1.

11   A.  I'm sorry, what is this?

12   Q.  This is Rebecca's defense interview with you.

13   A.  I don't see my initials on this.

14   Q.  The "DD" would be David Darby, who conducted all the

15   witness interviews with you.

16   A.  But I was present for this?

17   Q.  Correct.  You also asked questions during all of those,

18   correct?

19   A.  I think I -- I don't see me on here but --

20        THE COURT:  Is there some record or indication that

21   she was at this particular interview?

22        MR. BRACCIO:  Yes.  So if you go up to the top of this

23   interview.

24   BY MR. BRACCIO:

25   Q.  In fact, from looking at the witness interviews, you had

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN

1    begun all of the witness interviews, correct?

2    A.  I don't remember that, but I see that I started this one.

3    Q.  So this was your interview, your defense interview, with

4    Rebecca Lux, correct?

5    A.  Yes.

6    Q.  So you learned -- she told you that Angela spanked Rachel

7    and Rebecca but didn't hit Johnny?

8    A.  I don't remember that, but if it's in here....

9         THE COURT:  I'll tell you what, we're going to take a

10   brief break.  I'd like to meet with counsel back in the jury

11   room for a moment.  We're going to take about a five,

12   five-minute break.

13      (A recess was taken from 3:48 p.m. to 4:02 p.m.)

14        THE COURT:  All right.  Go ahead.

15   BY MR. BRACCIO:

16   Q.  Judge Bowman, do you recall that in your interview of

17   Rebecca....

18        MR. BRACCIO:  I'm sorry, Your Honor.  Can I have one

19   moment?

20        THE COURT:  Not a problem.

21   BY MR. BRACCIO:

22   Q.  Do you recall in your interview with Rebecca Lux on October

23   31, 1994, you asked her whether her older brother, Jonathan

24   Lux, had ever hit or hurt Rachel?

25   A.  I don't remember.

UNITED STATES DISTRICT COURT

1  Q.  1185.  Lines 6 through 19.

2      So you asked her:  Okay.  What about Johnny?  Did Johnny

3  ever hit Rachel?  Rebecca responded no.

4      I'm sorry.  David Darby asked:  Did you ever see Johnny hit

5  Rachel? Answer:  No.  All right.  What about you, did Johnny

6  ever hit you?  No.  Did you guys ever get into a brother and

7  sister fight?  Yeah.  Pushing and shoving sometimes?  Yes.  Did

8  he ever push you down?  We'd play fight.

9      Correct?

10  A.  Yes.

11  Q.  She also told you that Jonathan was always careful when he

12  played with Rachel so as not to hurt her because she was so

13  little, correct?

14  A.  Yes.

15  Q.  She said that Jonathan was never aggressive or mean, never

16  had tantrums or picked fights with people, he was a normal kid,

17  correct?

18          MR. BRACCIO:  Line 5.  I'm sorry, Daniel, it's --

19          THE COURT:  I think you had it and then you scrolled

20  up.

21          THE WITNESS:  It's asked if he was a pretty normal

22  kid, and she said yes.

23          MR. BRACCIO:  Scroll down.

24  BY MR. BRACCIO:

25  Q.  Then David Darby asked:  Okay.  Have you ever known him to

1   get aggressive or be mean or pick fights with people?  No.  He

2   was pretty mellow?  Yes.

3   A.  Yes.

4   Q.  Rebecca also said that she would never fight with or hurt

5   Rachel, do you recall that?

6   A.  I don't.

7   Q.  Again, for reference, this is Exhibit 1, Bates Number 1186.

8   Same interview.

9   A.  I'm sorry --

10  Q.  Lines 15 through 20.  David Darby asked her:  Did you and

11  Rachel ever have real fights?  Answer:  No.  Have you ever

12  pushed Rachel down?  No.  Has she ever got hurt?  No.

13  A.  Yes, that's what it says.

14  Q.  Confirming that these children were never seriously injured

15  in the past, Angela's aunt, Donna Marini, told you that she saw

16  the kids four or five times in the year before she moved out to

17  Tucson, before Rachel's death.  Do you recall that?

18  A.  I don't.

19  Q.  Exhibit 1, Bates 1248.

20          THE COURT:  That's an interview?

21          MR. BRACCIO:  Scroll up.  Yeah, thank you, Your Honor.

22          THE COURT:  Just so the record is clear, that's an

23  interview on --

24  BY MR. BRACCIO:

25  Q.  This was your interview of Donna Marini on October 31st,

1    1994?

2    A.  Yes.

3    Q.  At Line 25, you asked or David Darby asked:  Did you have

4    much contact with Angela and the kids prior to all this

5    business happening with Rachel?  Donna Marini responded:  No,

6    I'd only been out here about a year, it wasn't even a year,

7    when Rachel died, and I tried to make contact but she very much

8    kept to herself.

9         Then she answered at Line 32:  I'd only seen them maybe

10   four times in that year that I'd come out.

11        Correct?

12   A.  Yes.

13   Q.  The only evidence of any sort of sexual predator in Barry

14   Jones' trailer park was a report by Brandie that the neighbor,

15   Bob Dresbach, had touched her in June of '93.  Do you recall

16   that?

17   A.  No.

18   Q.  Exhibit 1, Bates 2196.  It indicates --

19             THE COURT:  No, what is it?

20   BY MR. BRACCIO:

21   Q.  This is, again, a DES report, Child Protective Services

22   Intake and Investigative Report, dated 7/14/93, correct?

23   A.  Yes.

24   Q.  This would have been, again, in your files?

25   A.  I don't remember it, but if it was in my file then I had

1   it.

2   Q.  So it states Rebecca states told babysitter that when she

3   went home to feed dogs, Robert, the suspect, said, quote:  I

4   would rather have you -- in essence, he'd fondled her breasts

5   over shirt, then moved hands to shoulders and began pelvic

6   thrust from behind her.  This is Brandie's accusation?

7   A.  Yes, that's what it looks like.

8   Q.  And Brandie's report was sent to detectives in the sex

9   crimes unit, correct?  Do you recall that?

10  A.  I don't know that.

11  Q.  So, Exhibit 1, this is a Pima County Sheriff's Department

12  report?

13  A.  Yes.

14          THE COURT:  The Bates number?

15          MR. BRACCIO:  The Bates number is 2198 to 2199.

16          THE COURT:  Is that part of Exhibit 1?

17          MR. BRACCIO:  Correct.

18          THE COURT:  It's dated when?

19          MR. BRACCIO:  This is dated June 15th of '93.

20          THE WITNESS:  Yes.

21  BY MR. BRACCIO:

22  Q.  So Brandie's report then was sent to detectives in the sex

23  crimes unit?

24  A.  If that's what this report means.  I don't know that.

25  Q.  Okay.  And there's nothing else in this record -- have you

UNITED STATES DISTRICT COURT

1  seen anything else in this record that anything has happened as

2  a result of this police report?

3  A.  No.

4  Q.  Whether the police could corroborate this or not?

5  A.  Not that I recall.

6       MR. SANDMAN:  Your Honor --

7       MR. BRACCIO:  I'm moving on from this, Your Honor.

8       MR. SANDMAN:  My objection is that the first document,

9  the first CPS report, was a complaint against one of the

10  neighbors of Mr. Jones.

11       THE COURT:  Correct.

12       MR. SANDMAN:  Now this report appears to be leveled

13  against a different individual, Ronald St. Charles, who is not

14  a neighbor of Mr. Jones.

15       THE COURT:  There's an inconsistency there.

16       MR. SANDMAN:  There's some conflating of these

17  documents again.  Yes, that's my objection.

18       THE COURT:  Are you asserting that the first report

19  that we looked at is the same person who's in this report?

20       MR. BRACCIO:  Scroll down, Daniel, to 2199.  Maybe

21  this is the better document.

22  BY MR. BRACCIO:

23  Q.  Why don't we just look at 2199.  This is the Pima County

24  Sheriff's Department report, where Brandie reports she was

25  touched inappropriately by a neighbor in the trailer park, Bob

UNITED STATES DISTRICT COURT

1    Dresbach, correct?

2              MR. SANDMAN:  Your Honor, I guess I would note a

3    relevancy objection to some third party inappropriately

4    touching one of Mr. Jones' children.  I'm not sure what that

5    has to do with any of the issues in the case.  It's obviously

6    an unfortunate incident, but I don't see the relevance.

7              THE COURT:  What's the relevance?

8              MR. BRACCIO:  I can certainly respond to that.  There

9    has been an accusation against these attorneys that they failed

10   to investigate any other suspects in the area and that they

11   exclusively focused on Barry Jones and only to that Sunday.

12   This establishes pretty clearly it's in her files, she's aware

13   of these other suspects or these other people in the trailer

14   park.

15             THE COURT:  I'm going to overrule the objection.  Go

16   ahead.

17             MR. BRACCIO:  We'll move on.

18   BY MR. BRACCIO:

19   Q.  Let's talk about the facts that detectives and you gathered

20   in the months before Rachel's homicide.

21        Do you remember Ronald St. Charles?

22   A.  Yes.

23   Q.  He was a friend of Barry Jones?

24   A.  Yes.

25   Q.  He used to live in the Desert Vista Trailer Park with Barry

CROSS-EXAMINATION - BOWMAN

1   Jones?

2   A.  I don't remember that.

3   Q.  Exhibit 1, 1537.  Hold on right there.

4       This is your interview of Ron St. Charles, correct?

5   A.  Yes.

6   Q.  In this interview, you actually didn't indicate what date

7   you were doing this on, correct?

8   A.  Correct.

9           MR. BRACCIO:  1537.

10          THE COURT:  Just a point of clarification.  Is it fair

11   to assume, Judge Bowman, this was done at the time you were

12   interviewing other witnesses in preparation for the trial in

13   this case?

14          THE WITNESS:  Yes, it is.

15          THE COURT:  Thank you.  Go ahead.

16   BY MR. BRACCIO:

17   Q.  Line 16:  Until about -- oh, Lord, I -- uh, about a month

18   before I left Tucson, I moved from the trailer court close to

19   where Barry lives out to the desert, and that's about the time

20   our visits became less and less frequent because of the

21   distance.

22       So he indicated that he moved out of the Desert Vista

23   Trailer Park into the desert?

24   A.  Yes.

25   Q.  So he was obviously not living in the trailer park when

1   Rachel was suffering the abuse in April of 1994, correct?

2   A.  Correct.

3   Q.  Do you recall that Angela had problems with Zoly and began

4   dating Barry Jones in early of 1994?

5   A.  Yes.

6   Q.  In April of 1994, Angela and her children, Rebecca,

7   Jonathan and Rachel, moved in with Barry Jones.

8   A.  Yes.

9   Q.  And Angela's sister Amanda described it as a "filthy, messy

10  hovel"?

11  A.  I don't remember that, but if she did she was right.

12  Q.  This would be Exhibit 66, 4902.  Right down there at the

13  middle.  This is the interview of Amanda Gray.  The police

14  interview.

15          THE COURT:  What date?

16          MR. BRACCIO:  Yeah.

17  BY MR. BRACCIO:

18  Q.  And she indicated it's just -- she said the court reporter

19  wrote it down as "hobble," but it's --

20          THE COURT:  Did you give the date?

21          MR. BRACCIO:  I'm sorry.

22  BY MR. BRACCIO:

23  Q.  This was her interview on May 2nd, 1994, correct?

24  A.  Yes.

25  Q.  And she had described it as a "filthy hovel"?

CROSS-EXAMINATION - BOWMAN

1      Question:  No, I haven't yet.  Answer:  It's just a hobble.

2   You know, I mean, it's just....

3      And the detective asked her:  And what do you mean by

4   "hobble"?  It's a mess or it's just in the bad area or what?

5   Answer:  It's in a bad area.  It's a filthy mess.  It's tiny,

6   it's falling apart, it's filthy.  It's -- I mean, I'm sure

7   everybody will go out and look at it.

8      Correct?

9   A.  Yes.

10   Q.  Do you recall a woman by the name of Joyce Richmond?

11   A.  Yes.

12   Q.  Do you recall that she had several aliases in this case?

13   A.  I think I remember one of them at least.

14   Q.  Which one was that?

15   A.  Was that Alice Knight?

16   Q.  Correct.  Alice Knight and Rose or Rosie?

17   A.  Yes.

18   Q.  Do you recall who she was?

19   A.  I know she was at least a friend of Mr. Jones, maybe a

20   girlfriend.

21   Q.  You do recall that she was his girlfriend?

22   A.  Yes.

23   Q.  Do you recall that she had a daughter named Alisha

24   (phonetic)?

25   A.  Yes.

CROSS-EXAMINATION - BOWMAN

1  Q.  And that she moved back from Montana in April of 1994 and

2  moved in with her mother Patty in the trailer park?

3  A.  I don't exactly remember that.

4  Q.  Do you recall that you interviewed Joyce?

5  A.  I know I did.  I don't exactly recall it, but I know I did.

6  Q.  1341.  Line 11.

7      And in your interview, you asked her:  Well, when you

8  say -- you asked her at Line 4:  Okay, can you give me an idea

9  about how often you would see Barry Jones?  And she indicated

10  every day.  Correct?

11  A.  Yes.

12  Q.  And you said:  In what time frame?  She says:  Well, when

13  you say every day, what are you talking about?  Like April?  Or

14  are you talking about months before that?  She answers:  Since

15  I came back from Montana, every day.  Correct?

16  A.  Yes.

17  Q.  And you asked her when was that that you came back?  She

18  said:  April, I think.  Correct?

19  A.  Yes.

20  Q.  You had asked her:  Okay, and where were you and your

21  daughter during that time, if you know?  She answered:  Alisha

22  stayed at our house because she was going to stay there with

23  Patty in case Laura had to run also.  Correct?

24  A.  That's what she said.

25  Q.  So Alisha and her mother, Joyce, moved back in with her

1    mother, Patty, in the trailer park, correct?

2    A.  Yes.

3    Q.  And she saw Barry Jones every day during that time that she

4    was there.

5    A.  That's what she said, yes.

6    Q.  Do you recall that Alisha said that she only saw Rebecca,

7    Johnny and Rachel three or four times during that month before

8    Rachel's death and only for a couple minutes each time?

9    A.  I don't remember.

10   Q.  This is Exhibit 1, 1341.  This is the same interview that

11   you did with Joyce.

12       I'm sorry.  It's 1457.

13       Do you recall that you interviewed Alisha as well?

14   A.  I don't recall it, but I see that this is a transcript.

15   Q.  You asked:  How many times do you think you've met them?

16   She indicated three or four.

17   A.  Yes.  I don't know who "them" is.  I don't know who she was

18   talking --

19   Q.  Right there at Line 23, this is Bates Number 1456, in that

20   same interview you asked:  Did you ever meet her children?  She

21   has three children, Becky, Johnny and Rachel.  She indicated

22   yeah.  You asked her:  How many times do you think you've met

23   them?  She answered three or four.  You asked:  Did you ever

24   spend any amount of time with them or did you just see them at

25   the trailer?  She answered:  I would just go in and they'd come

1    up and just talk to me for a couple minutes.

2        Correct?

3    A.  Yes.

4    Q.  You knew that Barry Jones was driving a yellow van that

5    belonged to his twin brother, Larry, correct?

6    A.  I remember the yellow van, I don't remember that it

7    belonged to Larry.

8    Q.  Detectives interviewed Larry -- let's pull up Exhibit 66.

9    The police interview with Larry Jones.

10       This is a police interview of Larry Jones, Barry Jones'

11   twin brother, on May 2nd, 1994, correct?

12   A.  Yes.

13   Q.  This indicates that Larry Jones let Barry Jones borrow his

14   van, correct?

15   A.  Yeah, it says -- they asked:  Who drives the van right now?

16   Excuse me.  He says:  My brother's in charge of the van.

17   Q.  Go one up.  265.  Right there.

18       Do you recall that that's the van?

19   A.  When I can see the inside of it, I can tell.  Otherwise, I

20   probably wouldn't recognize it.

21   Q.  Do you recall that Barry told the kids that they were not

22   allowed to play in the van because it didn't belong to him?

23   A.  I don't remember the part about it not belonging to him,

24   but I remember that he told the kids they couldn't play in the

25   van.

1    Q.  A number of witnesses interviewed by the police at the

2    trailer park confirmed that they had never seen any kids

3    playing in the van.  Do you recall that?

4    A.  I don't remember.

5    Q.  These are police reports dated May 2nd, 1994.  Right there,

6    you see Mack MacCloud?

7    A.  Yes.

8    Q.  Stated that he had only lived in the park for about a year

9    and didn't really know anyone.  I asked him if he had ever

10   noticed kids in the neighborhood being allowed to play inside

11   the vehicles, and he stated, no, he had never seen that.

12   A.  Yes.

13   Q.  5108.  This is a continuation of that police report.

14       Here is Bob Dresbach.  He states that he had lived in the

15   park for about 12 years and has known Barry for that length of

16   time.  When asked if he had ever seen children play in any type

17   of vehicle, he stated no.

18   A.  Yes.

19   Q.  (Reading)  I asked if he knew what type of vehicle Barry

20   drives and he said it was a yellow van.  And when asked if he

21   had ever seen children playing in that van, he said no.

22   Correct?

23   A.  Yes.

24   Q.  Do you recall that Angela Gray also said the kids never

25   played in the van?

UNITED STATES DISTRICT COURT

1   A.  I don't, I don't recall.

2   Q.  Exhibit 1.  Bates Number 532.  We'll get the date of this

3   interview.

4       So this is an undated interview.

5       Angela Gray was actually interviewed, I believe, all three

6   times on May 2nd, 1994, do you recall that?

7   A.  I don't recall.

8   Q.  Let's go to 532.  Lines 20 through 21.

9       Detectives asked Angela Gray if it was common for children

10  to play in his work van, and Angela Gray told detectives --

11  Detective Pesquiera here:  No.  No.  He never -- I mean, that I

12  know of, he never has before.  Correct?

13  A.  Yes.

14  Q.  Alisha, Joyce's daughter, who we spoke about a moment ago,

15  she also said no one ever played in the van.  Do you recall

16  that?

17  A.  I don't remember.

18  Q.  Exhibit 1, 1495.

19          THE COURT:  The date of the interview is?

20          MR. BRACCIO:  Yeah.  Thank you, Your Honor.

21  BY MR. BRACCIO:

22  Q.  The date of the interview for this is May 2nd, 1994,

23  correct?

24  A.  Yes.

25  Q.  Go down to 96.

1    Detectives asked Alisha:  Do you know if they play in the

2    van often?  And she said:  Um, no.

3    Correct?

4    A.  Yes.

5    Q.  Joyce said that Barry Jones kept them out of the van

6    because there were tools in there, correct?

7    A.  That sounds familiar.

8    Q.  And Barry himself told detectives that no kids had ever

9    played in his van before, correct?

10   A.  I don't remember.

11   Q.  Do you recall that Barry Jones was interviewed by police on

12   May 2nd, 1994?

13   A.  Yes.

14   Q.  This is Exhibit 66.  Bates Number 5321.  This is a police

15   interview of Barry Jones.  Right there.

16   The question asked:  Do you ever -- do you ever let the

17   kids play in the van before?  They've never wanted to before.

18   The opportunity never arose.

19   Correct?

20   A.  Yes.

21   Q.  Do you recall that Zoly came by Barry Jones' trailer to see

22   Rachel for her birthday in April, just after they had moved

23   into Barry Jones' trailer?

24   A.  I don't remember that.

25   Q.  Exhibit 66, Bates 5030.  This is an interview of Alisha

CROSS-EXAMINATION - BOWMAN

1    Richmond, Joyce Richmond's daughter, on May 2nd, 1994.

2         Scroll up.  Right there.

3         A2 of this is her mother, Joyce Richmond, who was also

4    present at the interview.  Do you recall that?

5    A.  I don't recall that.

6    Q.  Scroll up to the first page of that.  Right there.

7         So A is Alisha Knight, A2 is Alice Knight, and then the

8    detectives.

9    A.  Yes.

10   Q.  So Joyce responds:  He got in a fight with Zoly.  Angela's

11   ex, I mean?  Answer:  Rachel's dad.  And the detectives asked

12   about when was that?  Joyce responded about a month or so ago,

13   when they first moved in, when Angela first moved in with

14   Barry.

15        Correct?

16   A.  Yes.

17   Q.  And that, during this fight, Zoly pulled some of Barry's

18   hair out.

19   A.  Yes.

20   Q.  Go to 5208.  This is Exhibit 66.  This is the police

21   interview, the second police interview of Angela Gray, on May

22   2nd, 1994.

23        Angela Gray is telling detectives about this fight, and she

24   indicates:  I mean, I saw him in -- when him and Zoly got into

25   that fight that one day.  And, I mean, he's a little guy, but

CROSS-EXAMINATION - BOWMAN

1   he had Zoly down in like two seconds.

2       Correct?

3   A.  Yes.

4   Q.  Do you recall that Joyce told police that Zoly didn't come

5   around after that fight?

6   A.  I don't remember that.

7   Q.  This is Exhibit 1, Bates 1500.  Again, this is the

8   interview of Joyce Richmond on May 2nd, 1994.

9       After their discussion of the fight, the detective asked:

10  And you haven't seen Zoly come by at all?  No, he was supposed

11  to come by for Rachel's birthday.  I don't know if he did.  I

12  know her birthday's been in the last month.

13      Correct?

14  A.  Yes.

15  Q.  Now, during this month that they lived there, do you recall

16  that Angela told Detective Pesquiera that Barry took Rachel

17  alone anywhere from four to six times during that month?

18  A.  I don't exactly remember that, but I remember something

19  about him taking Rachel with him.

20  Q.  Okay.  This is Exhibit 66, Bates Number 5195, from the

21  second police interview of Angela Gray on May 2nd, 1994.  At

22  the bottom:

23      So how long has Barry had contact with Rachel?  We started

24  dating in February, and she's pretty much always with me.  But

25  she's been with him alone.  Not very often.  There's been like

1   four or five times that they've actually -- you know, like,

2   he's actually gone somewhere with her that's just been the two

3   of them.

4       Correct?

5   A.  Yes.

6   Q.  Do you recall that Larry Jones, Barry's twin brother, also

7   told detectives that Barry brought Rachel over two to five

8   times alone, especially when he was arguing with Angela?

9   A.  I don't remember that.

10  Q.  Exhibit 66, Bates 5471.

11      This is the May 2nd, 1994 interview with Larry Jones,

12  correct?

13  A.  I can't tell that.  But if that's --

14  Q.  Yeah, this is, yeah, the May 2nd, 1994 police interview

15  with Larry Jones.  He indicated:  Barry would bring Rachel over

16  to my house.  He brought her over to my house anywhere from two

17  to five times.  The detectives asked:  So would he be alone

18  with her there?  Would he be -- would he be alone?  He

19  indicated he would be alone with her or he would have his buddy

20  Ron with him.

21      Correct?

22  A.  Yes.

23  Q.  Let's talk about Rachel's health during that month that she

24  lived with Barry Jones.  Do you recall that Angela told you

25  that she hadn't bathed Rachel in three weeks to a month?

1   A.  I don't remember that.

2   Q.  This is Angela Gray's second police interview on May 2nd,

3   1994.

4       I'm sorry.  That was my mistake.  It's Bates Number 5193.

5       Angela indicated:  Since the last time I gave her a bath,

6   three weeks, a month.  Correct?

7   A.  Yes.

8   Q.  And Detective Pesquiera asked about any history of issues

9   with Rachel's private parts.  Correct?

10  A.  Yes.

11  Q.  And Angela denied that there were any issues?

12  A.  Yes, she denied it.

13  Q.  Angela admitted that she had only spanked Rachel

14  approximately three times on the butt in her entire life.

15  Correct?

16  A.  I don't remember that.

17  Q.  5197 at the bottom.

18  A.  Yes.  I'm sorry.  They were asking about the 11-year-old

19  there.

20  Q.  Actually, I think they're indicating to Rachel, and she

21  said no, indicating she doesn't cause any -- she did not cause

22  any of the injuries to Rachel.  She says:  The only child of

23  mine that I've ever slapped, spanked, or anything like that

24  would be Becky.  I mean, I've never -- and she says:  The

25  11-year-old?  Yeah.  She said:  I've never -- I think maybe

1    three times in her entire life have I ever swatted Rachel on

2    the butt.  She's never needed it.

3    A.  Yes.

4    Q.  She indicated that because Rachel was whiny, but otherwise

5    a really good child.  Do you recall that?

6    A.  I don't.

7    Q.  Question:  She's real ti- -- she's real tiny, small little

8    thing.  So I know she was really tiny.  Question:  She'd be

9    real easy to -- to kind of handle as far as if you wanted to

10   hurt her.  The answer is she's -- she's never needed it.  She's

11   never -- she's never really been bad.  The worst thing she does

12   is she tends to whine.  Correct?

13   A.  Yes.

14   Q.  Now, a month before her death, Angela stated that she heard

15   Rachel had fallen off a clothesline and was slightly injured.

16   Do you recall that?

17   A.  No.

18   Q.  This is Angela's third police interview on May 2nd, 1994.

19   Exhibit 1, Bates Number 536, at Line 7.

20       (Mr. Braccio speaking with Mr. Vidal)

21       THE COURT:  How much longer do you have with this

22   witness?

23       MR. BRACCIO:  Quite a bit.

24       THE COURT:  Can you put that into terms of time for

25   me?

1            MR. BRACCIO:  Probably three hours.  Four hours.

2            THE COURT:  Three?

3            MR. BRACCIO:  Mmm-hmm.

4            THE COURT:  Ms. Bowman, what's your schedule tomorrow?

5            THE WITNESS:  I know that they asked me to clear the

6     morning, so I cleared my morning calendar.

7            THE COURT:  My question to counsel is can we conclude

8     with this witness by lunch tomorrow?

9            MR. BRACCIO:  I certainly hope so, Your Honor.

10           THE COURT:  That's....

11           MR. BRACCIO:  Yes.  Yes, we can.

12           THE COURT:  Mr. Sandman, you still believe your prior

13    estimate is correct?

14           MR. SANDMAN:  As to the length of the hearing?  Or the

15    ability to get --

16           THE COURT:  No, I haven't gotten there yet.

17           MR. SANDMAN:  At this time --

18           THE COURT:  As to the length of your redirect.

19           MR. SANDMAN:  I don't see much redirect at this point,

20    Judge.

21           THE COURT:  Okay.

22           MR. SANDMAN:  I'm sorry, Judge.  I had had Dr. Keen

23    scheduled for 9:00 a.m. tomorrow.  I can put off --

24           THE COURT:  We can't have two witnesses on at the same

25    time.

1          MR. SANDMAN:  I could put him off 'til maybe after

2    lunch, but he's from Phoenix, and I've got to get him in and

3    out of here tomorrow.

4          THE COURT:  How long is he?

5          MR. SANDMAN:  I'm sorry?

6          THE COURT:  How long is he?

7          MR. SANDMAN:  Well, we have about an hour of direct,

8    but I don't know whether there's some plan to examine him for

9    six or seven hours.

10         MS. GARD:  No, Judge.  Dr. Keen may be an hour of

11   cross, at most.

12         MR. SANDMAN:  So we should be able to get him done.

13         THE COURT:  My suggestion is that we start at 8:30

14   tomorrow morning with Judge Bowman, and we're going to finish

15   by lunchtime.  So you need to --

16         MR. BRACCIO:  Sure.

17         THE COURT:  -- frame your questions in such a fashion

18   that we can finish by lunchtime.

19      This is probably an appropriate time to break, so we're

20   going to break for the day.  We'll start at 8:30 tomorrow

21   morning.  Judge Bowman, we'll finish with you by lunchtime.

22         THE WITNESS:  Thank you.

23         THE COURT:  Then we'll take up Dr. Keen after lunch.

24      All right?  All right.  Thank you, very much.  We'll be at

25   recess.              (Off the record at 4:42 p.m.)


UNITED STATES DISTRICT COURT

```
1                 C E R T I F I C A T E

2

3           I, A. TRACY JAMIESON, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true and accurate transcript of the proceedings

9    contained herein, held in the above-entitled cause on the date

10   specified therein, and that said transcript was prepared by me.

11          Signed in Tucson, Arizona, on the 17th day of

12   November, 2017.

13

14

15                              s/A. Tracy Jamieson
16                              A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT