```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3    Barry Lee Jones,           )  4:01-cv-00592-TMB
                                 )
 4              Petitioner,      )
                                 )
 5    vs.                        )
                                 )  Tucson, Arizona
 6    Charles L. Ryan, et al.,   )  October 31, 2017
                                 )
 7              Respondents.     )
      _____)
 8

 9


10       BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE

11

12                      Transcript of Proceedings
                       Evidentiary Hearing - Day 2
13

14

15


16
     Proceedings reported and transcript prepared by:
17
         A. Tracy Jamieson, RDR, CRR
18       Federal Official Court Reporter
         Evo A. DeConcini U.S. Courthouse
19       405 West Congress, Suite 1500
         Tucson, Arizona 85701
20       (520)205-4266

21

22

23   Proceedings reported by steno machine shorthand;
     transcript prepared using court reporting software.
24

25
```

UNITED STATES DISTRICT COURT

```
 1                        APPEARANCES

 2    For the Petitioner:

 3        U. S. Federal Public Defender
          Cary Sandman, AFPD
 4        407 West Congress Street, Suite 501
          Tucson, AZ 85701
 5        (520) 879-7540

 6        U. S. Federal Public Defender
          Karen S. Smith, AFPD
 7        850 West Adams Street, Suite 201
          Phoenix, AZ  85007
 8        (602) 382-2706

 9

10    For the Respondents:

11        Arizona Office of the Attorney General
          Myles Braccio, AAG
12        1275 West Washington Street
          Phoenix, AZ 85007
13        (602) 542-4686

14        Arizona Office of the Attorney General
          Lacey Gard, AAG
15        400 West Congress Street, Suite S315
          Tucson, AZ  85701
16        (520) 628-6520

17

18    Also Present:

19    Barry Jones, Petitioner
      Jim D. Nielsen, AZAG
20    Jennifer Schneider, Paralegal with FPD
      Daniel Vidal, Paralegal with AZAG
21    Andrew Sowards, FPD

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                    INDEX OF EXAMINATIONS

2

WITNESSES:                                              PAGE

3

4    LESLIE BOWMAN

5        Cross-Examination (Resumed) By Mr. Braccio............    4

6        Redirect Examination By Mr. Sandman...................   47

7

8    PHILLIP EARL KEEN, M.D.

9        Direct Examination By Ms. Smith.......................   61

10       Cross-Examination By Ms. Gard.........................   97

11       Redirect Examination By Ms. Smith.....................  113

12

13   SEAN BRUNER

14       Direct Examination By Mr. Sandman.....................  116

15       Cross-Examination By Mr. Braccio......................  142

16       Redirect Examination  By Mr. Sandman.................  151

17

18

19

20

21

22

23

24

25

                     UNITED STATES DISTRICT COURT

1                    (On the record at 8:46 a.m.)

2            THE COURT:  I understand we were having some technical

3     difficulties.  Have we gotten them worked out?

4            MR. VIDAL:  They appear to be working fine.

5            THE COURT:  Okay.  Great.  Thank you.

6        Anything we need to take up this morning?

7            MR. BRACCIO:  Not from the State, Your Honor.

8            THE COURT:  All right.  Mr. Braccio.  Go ahead.

9            **LESLIE BOWMAN**, WITNESS, PREVIOUSLY SWORN

10                   CROSS-EXAMINATION (RESUMED)

11    BY MR. BRACCIO:

12    Q.  Good morning, Judge Bowman.  You said Sean Bruner was lead

13    counsel on this case, right?

14    A.  Yes.

15    Q.  That means you would have discussed important matters and

16    case strategy with him?

17    A.  Yes.

18    Q.  I think you previously stated you interviewed approximately

19    18 individuals in connection with your investigation of this

20    matter, correct?

21    A.  Yes.

22    Q.  You also had hard copies of the interviews conducted by

23    your investigator -- I'm sorry -- by you as well as the police

24    investigators, correct?

25    A.  Yes.

CROSS-EXAMINATION - BOWMAN

1  Q.  As attorneys, you make strategic decisions regarding your

2  defense theories, what witnesses and evidence to present, and

3  how to present a defense, correct?

4  A.  Yes.

5  Q.  And different attorneys have different styles of

6  investigating cases and presenting defenses, correct?

7  A.  Yes.

8  Q.  You presently don't have much recollection concerning what

9  you investigated in this case and the way you did, would that

10  be fair to say?

11  A.  That is fair.

12  Q.  But that doesn't mean that back in 1994 and '95, your

13  investigation was not guided and driven by strategic decisions

14  made by you and Mr. Bruner, correct?

15  A.  I hope that's correct, yes.

16  Q.  Similarly, just because you don't presently remember why

17  you chose to present certain witnesses and evidence, that does

18  not mean that in 1995 your presentation of Jones' defense was

19  not guided and driven by well thought out strategic decisions

20  made by you and Sean Bruner, correct?

21       THE COURT:  So, Counsel, Madam Court Reporter is

22  indicating that --

23       MR. BRACCIO:  I apologize.

24       THE COURT:  I mean, I appreciate wanting to get

25  through this, but if you can slow it down just a little bit.

CROSS-EXAMINATION - BOWMAN                          6

1            MR. BRACCIO:  Sure thing.  Let me reask the question.

2            THE WITNESS:  Thank you.

3    BY MR. BRACCIO:

4    Q.  Just because you don't presently remember why you chose to

5    present certain witnesses and evidence, that does not mean that

6    in 1995 your presentation of Jones' defense was not guided by,

7    and driven by, well thought out strategic decisions made by you

8    and Sean Bruner, correct?

9    A.  Yeah.  Just because I don't remember doesn't mean that

10   didn't happen.

11   Q.  Correct.  That's a yes?

12   A.  Yes.

13   Q.  Now, in 1994, you were well aware that this was an

14   important case, right?

15   A.  Yes.  Every case was important.

16   Q.  And the stakes were particularly high here, correct?

17   A.  Yes.

18   Q.  This was, after all, a matter of life and death for

19   Mr. Jones?

20   A.  That's right.

21   Q.  And realizing these high stakes, you have no reason to

22   believe, as you sit here today, that given the circumstances

23   you faced in 1994 and 1995, you devoted anything other than

24   your best efforts on this case, correct?

25   A.  You're asking me that as I sit here today, with what I know

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN                                    7

1   now, and the experience I have now --

2   Q.  Well, no --

3   A.  -- I don't think our best efforts were put forward.

4   Q.  And that's with the benefit of hindsight, looking at all

5   the evidence that's been generated today, correct?

6   A.  Correct.

7   Q.  So we know, under *Strickland*, that this Court cannot take a

8   hindsight view of the case, it has to view the case from your

9   perspective at the time of trial, correct?

10  A.  I am not going -- I don't want to start saying what the

11  Court should do.  I'm just telling you what I know and what I

12  remember.

13  Q.  Are you aware of the *Strickland* decision from the United

14  States Supreme Court?

15  A.  Yes.

16  Q.  And you know then that from that decision the Court has to

17  look at this case from your perspective at the time of trial?

18  A.  Right, but I don't remember my perspective at the time of

19  trial.

20  Q.  If the records established in this case that Barry Jones

21  himself admitted to detectives on May 2nd, 1994 that he took

22  three trips with Rachel on Sunday, May 1st, 1994, you wouldn't

23  dispute that, correct?

24  A.  If the records show that, I don't dispute that.

25  Q.  So that would be a reasonable strategy not to impeach a

1   child witness with a prior inconsistency about two versus three

2   trips, when your own client admitted he took three trips,

3   correct?

4   A.  It might be.

5   Q.  Let's talk about your defense team in this case.

6       You agree with me that you had a defense team for this

7   case?

8   A.  Yes.

9   Q.  Sean Bruner was first chair.

10  A.  Yes.

11  Q.  David Darby was also with you for the vast majority of the

12  witness interviews?

13  A.  But I don't consider him part of our defense team.

14  Q.  But he got -- he had a chance to ask questions as you went

15  along with the witnesses and you heard those questions as well?

16  A.  He did -- I did hear those.  I mean, the defenses were

17  antagonistic, he wasn't part of our team.

18  Q.  And you also had your investigator, George Barnett?

19  A.  Yes.

20  Q.  When you stated that you had handled -- previously in your

21  testimony -- that you had handled the entire case by June 22nd,

22  1994, that was in no way implying that Sean Bruner had not

23  worked on the case up to that point, correct?

24  A.  All I have to remember that by is what I said, and I said I

25  had handled the whole case.  So I don't have any information

1    that Mr. Bruner had worked on the case.

2    Q.  And you said that on the day that Mr. Bruner filed the

3    motion to have you appointed officially as second counsel,

4    correct?

5    A.  I don't remember that.

6    Q.  Let's pull up Exhibit 24A.  Page 6.  Lines 9 through 10

7    there.

8         Judge Bowman, you stated:  At this point I've handled the

9    entire case, so I may be trying the case.

10   A.  Yes.

11   Q.  Let's pull up record on appeal 20.

12        Judge, if you'd see at the top there, this is Sean Bruner's

13   motion for appointment of second attorney to assist in the

14   defense of this case, filed on June 22nd, 1994, correct?

15   A.  Yes.

16   Q.  So he filed this motion on the day that you're in court

17   saying that you were very well aware of this case?

18   A.  I'm sorry, I don't understand.

19   Q.  He filed this motion on the day that you were in court

20   avowing to the judge that you were very familiar with the case.

21   A.  That I was very familiar?

22   Q.  Correct.

23   A.  I can't -- I can only see the caption, I don't know what

24   this motion exactly says.

25             THE COURT:  I'm sorry.  Counsel, is there something

CROSS-EXAMINATION - BOWMAN

1   stated in the motion or are you referring to statements that

2   were made at the hearing?

3          MR. BRACCIO:   I was -- I'm referring to the statements

4   made in the hearing.

5   BY MR. BRACCIO:

6   Q.  I am establishing that this motion was filed on the day

7   that you were making those statements to the Court.

8   A.  Oh, okay.  So I'm the one who said that I was handling the

9   case.

10  Q.  Correct.

11  A.  Yes.

12  Q.  Go to Page 15, Line 7, of Exhibit 24A.

13         The Court, in fact, during that hearing expressed

14  reluctance to appoint you to the case because he didn't want to

15  pay two attorneys, correct?

16  A.  I don't exactly remember that, but I know I wasn't

17  appointed.

18  Q.  Okay.  Referring you to Exhibit 24A, which is on the

19  screen, Page 15, at Line 7, the Court stated:  I am going to

20  think about it.  I don't know if I want to have to pay you

21  both.

22         Correct?

23  A.  Yes.

24  Q.  And you also knew that Mr. Bruner had done a substantial

25  amount of work by that point, correct?

1   A.  By what point?

2   Q.  By the point of this hearing, of June 22nd, 1994.

3   A.  I don't know that.

4   Q.  Let's pull up the index to the record on appeal.

5       Judge, showing in front of you the index to the record on

6   appeal.  The first one was Mr. Bruner's ex parte emergency

7   motion for an appointment of an investigator.  He filed that

8   document before his request to have you enter the case,

9   correct?

10  A.  I don't know if he filed.  I can't tell from this who filed

11  that.

12          MR. BRACCIO:  Judge, may I approach the witness?

13          THE COURT:  Yes.

14  BY MR. BRACCIO:

15  Q.  Judge Bowman, I'm handing you a binder of all of the

16  motions filed in this case by you and Mr. Bruner.

17  A.  Okay.

18          THE COURT:  Mr. Sandman, you have copies of and know

19  what he was going to be referring to?

20          MR. SANDMAN:  Yes, sir.

21          THE COURT:  Go ahead.

22  A.  That's a motion that I filed.  I signed it.

23  BY MR. BRACCIO:

24  Q.  You signed exhibit one -- record on appeal number one?

25  A.  Yes.

CROSS-EXAMINATION - BOWMAN

1    Q.  For Mr. Bruner, correct?

2    A.  Right.  Everything I did in the case was for him, because I

3    wasn't appointed.

4    Q.  Okay.  You agree with me you filed motions under your own

5    name in this case, correct?

6    A.  I'm not sure what you mean.  I signed this.

7    Q.  Right, for Mr. Bruner.

8    A.  But that probably means that I prepared it.  Otherwise he

9    would have just signed it if he prepared it.

10   Q.  There are subsequent motions in this case that you signed

11   for yourself.

12   A.  Yes.

13   Q.  Okay.  Okay.

14        THE COURT:  I'm sorry.  Now I am confused.  Can we be

15   clear?  She is saying that she prepared a motion, she signed

16   it, and then you said something.  You said there are motions

17   subsequent in this case that you signed yourself.

18   I just want to be clear, she's saying that if she prepared

19   a motion, she signed it.  I'm not sure what the point of your

20   statement is.

21   BY MR. BRACCIO:

22   Q.  Do you have any recollection of preparing that document?

23   A.  No.

24   Q.  Okay.  I'll move on.

25        Would you agree with me that the defense faced some fairly

UNITED STATES DISTRICT COURT

 1   strict limits on funding from the Pima County Superior Court

 2   when you and Sean Bruner tried this case in 1994?

 3   A.  I don't specifically remember that, but from that one

 4   statement that you pointed out to me where the judge didn't

 5   want to pay a second chair, I'm assuming that they were

 6   concerned about the funding.

 7   Q.  Let me pull up Exhibit 24A.  This is regarding the motion

 8   for appointment of an investigator.

 9        Do you recall that the Court, when talking about

10   appointment of an investigator, said that it was going to cap

11   the amount of money it would give for an investigator?

12   A.  I don't exactly remember that.

13            THE COURT:  Again, I appreciate your giving us the

14   exhibit number when you're going to be pointing out this

15   language; if you can indicate what the page number is.

16            MR. BRACCIO:  Absolutely, Your Honor.

17            THE COURT:  Thank you.

18            MR. BRACCIO:  Go up to Page 14, Line 23.

19   BY MR. BRACCIO:

20   Q.  Judge, I am showing you a status conference on June 22nd,

21   1994, at Page 14, Line 23.

22   A.  Yes.

23   Q.  And you indicated to the Court that you had the additional

24   motion for an investigator?

25   A.  Yes.

1  Q.  The Court told you at Lines 1 through 2 that it would put a

2  limit on how much money you got to spend for that investigator,

3  correct?

4  A.  Yes.

5  Q.  And as we just discussed, the Court indicated it didn't

6  want to have to pay two counsel?

7  A.  Right.

8  Q.  Do you recall that the Court, when speaking to Mr. Bruner

9  about the motion for the independent medical examination, told

10  him that -- made sure he was not talking about tens of

11  thousands of dollars?

12  A.  Yes.

13  Q.  Do you recall that the Court authorized that independent

14  medical examination up to a thousand dollars?

15  A.  Yes.

16  Q.  Only?

17  A.  Yes.

18  Q.  And the Court told Mr. Bruner, quote:  Not welcoming you to

19  spend all of it if you don't need to.

20  A.  Yes.

21  Q.  So the Court was only giving you a thousand dollars for the

22  independent medical investigation and telling you not to spend

23  all that money.

24  A.  I thought it was more like if you don't need it, you don't

25  need to spend the whole thing.

1   Q.  Okay.  As well, in that status conference David Darby, who

2   represented Angela Gray, also commented that he had discussed

3   the matter with you and you would share the results of that

4   independent medical investigation to, quote, save valuable

5   county resources?

6   A.  Yes.

7   Q.  Do you remember that?

8   A.  Yes.

9   Q.  So you did share the medical investigation with David Darby

10  in this case?

11  A.  I don't remember if that's what we did, but I know that we

12  were talking about it on the record.

13  Q.  Do you recall that Sean Bruner also asked for appointment

14  of a psychologist and the Court stated:  I'm not going to give

15  you cart blanche to hire some wacko just to come out here and

16  charge us $15,000?

17  A.  I remember asking for a mental health expert, I do not

18  remember that comment.

19  Q.  Judge, in front of you I am showing you the pretrial status

20  conference for July 27th, 1994, at Page 4.  So, at Lines 22

21  through 24, the Court stated that it wasn't going to give you

22  and Mr. Bruner cart blanche to hire some wacko just to come out

23  here and charge $15,000.  Correct?

24  A.  Yes.  I don't think I was at that hearing, but I see that

25  in the transcript.


UNITED STATES DISTRICT COURT

1   Q.  Thank you.

2       And Sean Bruner responded to the Court that:  No, it was

3   somebody local, I think we only asked for a thousand dollars?

4   A.  Correct.

5   Q.  And the trial court responded as long as it's understood

6   that whatever is done has to be reasonably warranted in your

7   judgment, and the cost of that is in line with others in the

8   community, medical community, charge for that, that's fine.

9   Correct?

10  A.  Right.  Mr. Bruner said that if we needed more we would

11  bring it back to the Court.

12  Q.  And the trial court also requested that Mr. Bruner use

13  someone approved on the county list because those experts,

14  quote, know the drill about how they charge?

15  A.  Can I see that?

16  Q.  Yeah.  Lines 21 through 23.

17  A.  Yes.

18  Q.  So isn't it true then that you and Sean Bruner faced

19  significant funding obstacles with the Pima County Superior

20  Court in 1994 and '95 regarding expert witnesses?

21  A.  I don't know if that's true.  I think if we wanted

22  something and thought it was important, we could have done

23  something about it through the Court.

24  Q.  Do you think Judge Carruth would have authorized more than

25  a hundred thousand dollars for half a dozen defense experts?

CROSS-EXAMINATION - BOWMAN                                    17

1    A.  I don't have a way of knowing that.  That sounds like a lot

2    of money, especially back in those days.  But I think that if

3    we had made an effort we probably could have come up with more

4    money.

5    Q.  You previously discussed that you contacted your

6    investigator, George Barnett, on May 9th, 1994, correct?

7    A.  Yes.

8    Q.  You communicated with Mr. Barnett quite a bit at the outset

9    of the case, correct?

10   A.  I'm not sure, I don't know exactly how many times I spoke

11   with him.

12   Q.  You had a telephone conference with him on May 9th, 1994,

13   do you remember that?

14   A.  Yes.

15   Q.  Pull up Exhibit 11.

16       And you met with him that same day for about an hour and a

17   half, correct?

18   A.  Yes.

19   Q.  And you provided him information about this case and what

20   was to be investigated, correct?

21   A.  Yes.

22   Q.  Because he wanted that additional information before he

23   agreed to take the case, correct?

24   A.  Yes.

25   Q.  So this is approximately a week after Mr. Jones' arrest?

1    A.  Yes.

2    Q.  So, one week in, you've got approval for an investigator,

3    you've given him a brief overview of the case, and you've sent

4    him to the trailer park to speak to witnesses and investigate,

5    correct?

6    A.  Yes.

7    Q.  Then you spoke to him again the following day, correct?

8    A.  I don't remember that.

9    Q.  169, Daniel, at the top.

10        Judge, I am showing in front of you Exhibit 11.  These are

11   the billing records for you and Mr. Bruner, where it indicates

12   on May 10th, 1994, you had an additional telephone conference

13   with George Barnett, your investigator.

14   A.  Yes, I did.

15   Q.  You also went out with George Barnett to the Pima County

16   police impound yard and viewed Barry Jones' van?

17   A.  I don't remember that, but if it's in there, then I did it.

18        Can you remind me, when was that?

19   Q.  Yeah, we'll pull it up.  186-5 in the billing records.

20        In front of you, Judge, this is your billing records.

21   A.  Okay.

22   Q.  186-5.  On the entry here in your billing records for March

23   30th, 1995, it indicates that you viewed Jones' trailer and you

24   viewed, measured and photographed Barry's van, correct?

25   A.  Somebody did.  It was either me or Mr. Bruner.

1   Q.  And given that you were working with Mr. Barnett, more than

2   likely it was you?

3   A.  I don't know that.  The connection to Mr. Barnett was

4   through Sean Bruner, I didn't know him before.

5   Q.  Let me show you Exhibit 1, Bates Number 265.  This is

6   Mr. Barnett's report.

7       It's addressed to you, correct?

8   A.  Yes.

9   Q.  And he indicates in the first sentence:  On Thursday, March

10  30th, '95, we responded to the Pima County Sheriff's office

11  impound yard located on East Ajo.  Correct?

12  A.  Yes.

13  Q.  So you personally assisted George Barnett in viewing,

14  measuring and photographing Barry's van, correct?

15  A.  That's what this letter sounds like, yes.

16  Q.  Let me pull up and show you Bates Number 267 through 283.

17  These are photographs that you and Mr. Barnett took that day.

18  And you took these photographs from different angles of this

19  van, correct?

20  A.  He took them, yes.

21  Q.  He took them.  The bottom picture here indicates probably

22  someone of smaller stature looking up into that van, correct?

23  A.  I don't know that.

24  Q.  Okay.  And the visibility on this van is pretty clear,

25  isn't it?

CROSS-EXAMINATION - BOWMAN

1          MR. SANDMAN:  Object to the form, Your Honor, form of

2     the question.

3     A.  I'm not --

4          THE COURT:  Hold on a second.  The question....

5     I'm going to overrule the objection.  Go ahead.

6     A.  You mean visibility into the van?

7     BY MR. BRACCIO:

8     Q.  Correct.

9     A.  Yes.

10    Q.  You can even see in this picture from this photograph the

11    cut-out from the passenger chair, correct?

12    A.  I'm not sure where that is.  What do you mean, "cut-out"?

13    Q.  So do you recall that law enforcement in this case cut out

14    swatches from the passenger seat --

15    A.  Yes.

16    Q.  -- that contained Rachel's blood?

17    A.  Yes.

18    Q.  And in this picture that Mr. Barnett took, you can see into

19    the van and you can actually see that top cut-out.

20    A.  Is that, like, sort of the light spot above the windshield

21    wiper blade?

22    Q.  Correct.

23    A.  Yes.

24    Q.  This picture is so clear you can also see some sort of tear

25    or panelling up in the roof in the back of the van there,

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN                                    21

1   correct?

2   A.  I -- I don't know if that's what I am looking at.

3   Q.  Okay.  Do you see something in the back of the van there on

4   the ceiling that looks different than the rest?

5   A.  I see a couple of different things that look different.  I

6   can't tell what's on the roof of that van.

7   Q.  Again, these are pictures that you and Mr. Barnett took,

8   these appear to be different vans.

9   A.  Yes, they do appear to be different vans.

10  Q.  Trying to get an idea of what -- how you could see into

11  those vans?

12  A.  I don't remember what the purpose of the different vans

13  was.

14  Q.  Again, additional photographs that you took here, or

15  Mr. Barnett took, on 270?

16  A.  Yes.

17  Q.  Go back to 270.  Top one.

18      Judge, in front of you is the top photograph on Bates

19  Number 270.  Again, you can clearly see, even from this

20  distance of the van, directly into that van, correct?

21          THE COURT:  I'm sorry.  This is 270, it's Exhibit?

22          MR. BRACCIO:  Exhibit 1, which is the trial file of

23  defense counsel.  I apologize, Your Honor.

24          THE WITNESS:  I'm sorry.  Can you ask that again?

25  BY MR. BRACCIO:

UNITED STATES DISTRICT COURT

1   Q.  And you can see clearly directly into that van, correct?

2   A.  Yes.

3   Q.  You can also see the cup on that dashboard there?

4   A.  I -- I am not sure what you're referring to.  I can't see

5   something that I would have identified as a cup.

6   Q.  Okay.  Scroll up.  Right there.

7       So the top photograph, Judge Bowman, at Bates Number 269,

8   shows the cup on the dashboard there?

9   A.  Yes.

10  Q.  So, going back to the picture on 270, you can see that cup

11  even from that distance of that photograph taken up on that

12  dashboard?  Correct?

13  A.  Is -- is that on the right side near the windshield wiper

14  blade?  I can't really see a cup.  I mean, I can tell there's

15  things in the windshield.

16  Q.  Okay.  Judge, I am showing you, in front of you, Bates 276.

17          THE COURT:  Again, this is Exhibit 1?

18          MR. BRACCIO:  Exhibit 1, yes.  These are all

19  photographs from Exhibit 1.

20  BY MR. BRACCIO:

21  Q.  Again, those are the swatches that were taken from the seat

22  that had Rachel's blood on them, correct?

23  A.  Yes.

24  Q.  And, again, pretty clear views through that windshield,

25  correct?

CROSS-EXAMINATION - BOWMAN                                    23

1  A.  Yes.

2  Q.  And but for this one picture, which appears to be a bad

3  picture on the top there, the bottom picture again shows a

4  photograph directly into that van, correct?

5  A.  Yes.

6  Q.  I'm showing you Bates Number 278.  Again, additional

7  pictures.  You can clearly see into the van.

8  A.  Yes.

9  Q.  And you and George Barnett were taking pictures of

10  different angles of this van, correct?

11  A.  Yes.

12  Q.  If you and George Barnett would have discovered that there

13  was some physical aspect that disproved the account of the

14  Lopez twins, who claimed they saw Mr. Jones striking Rachel in

15  this van, you would have called him as a witness to rebut them,

16  correct?

17  A.  Yes, if he -- if he could have testified to something,

18  yeah, we definitely would have.

19  Q.  And you subsequently noticed George Barnett as a witness in

20  this case, as well as the measurements and the photographs that

21  he took, correct?

22  A.  Yes.

23  Q.  So you did conduct an investigation into the Lopez

24  children's account.

25  A.  Yes.

1    Q.  Let's talk about your medical investigation into Rachel's

2    injuries.  You read the autopsy report.

3    A.  Yes.

4    Q.  You also had that article in your files which explained

5    duodenum injuries?

6    A.  Yes.

7    Q.  So you understood that a timeline was important in a case

8    like this.

9    A.  I understand that now.  I don't remember what I understood

10   then.  I hope I understood that.

11   Q.  Judge, let me show you Exhibit 1, Bates Number 206.

12        This is from yours and Mr. Bruner's files.  Do you recall

13   what this document is?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's a phone message from my legal assistant.

17   Q.  I believe it indicates it's from Jill Thorpe.

18   A.  Correct.

19   Q.  Do you know who Jill Thorpe is?

20   A.  Yes.

21   Q.  Who is she?

22   A.  She is an attorney.

23   Q.  And in this phone memo to you, it appears she provided you

24   the names of medical examiners, correct?

25   A.  Yes.

1    Q.  At some point you must have reached out to Jill Thorpe

2    about independent medical consultants?

3    A.  Yes, some of the writing on that is my handwriting.

4    Q.  Okay.  Can you identify which is yours?

5    A.  Yes.  Right under her name, where it says "formerly from

6    Tucson Arizona Board Medical Examiners," that's my handwriting.

7    At the very bottom where it says "Ventura, California," with a

8    phone number, that's my handwriting.  The phone numbers next to

9    the crossed out phone numbers, where it says "Maricopa County

10   Medical Examiner," that's my writing.  And the two numbers

11   under that.

12       And then also everything in the top-right corner, with the

13   exception of the date and the time, where it says

14   Dr. Kurnichnig, Former Chief, Ann Buckholds, phone number, and

15   Dr. Phil Keen, Chief, that's all my handwriting.

16   Q.  This message was delivered to you or written on July 20th

17   at 8:30 in the morning?

18   A.  Correct.

19   Q.  Yes.  And Ms. Thorpe referred you to Dr. Fred Walker, as

20   well as Dr. Keen?

21   A.  That's what I think from this message, yes.

22   Q.  Do you recall that you and Sean Bruner called the Maricopa

23   County medical examiner, Fred Walker, on that day, on July

24   20th, 1994?

25   A.  I don't recall that.

CROSS-EXAMINATION - BOWMAN

26

1    Q.  Exhibit 11, Bates Number 176.

2        Judge, I am showing you Exhibit 11.  Again, this is your

3    billing records for you and Mr. Bruner.

4    A.  Yes.

5    Q.  At the top entry there it indicates, on July 20th, 1994,

6    either you or Mr. Bruner had a conference with Fred Walker,

7    medical examiner, correct?

8    A.  Yes.

9    Q.  And then you subsequently spoke with Dr. Keen in this case,

10   correct?

11   A.  One of us did.

12   Q.  Judge, I am going to show you your letter to Dr. Keen.

13   This is Exhibit 1, Bates Number 204.  Do you recall that this

14   is your letter to Dr. Keen?

15   A.  Yes.

16   Q.  On July 20th, 1994?

17   A.  Yes.

18   Q.  And the letter indicates that you had actually previously

19   spoken to Dr. Keen the day before, correct?

20   A.  Yes, it does.

21   Q.  Now, you have no memory of this conversation, correct?

22   A.  I don't.

23   Q.  You understand that this case now is about the timing of

24   Rachel's injuries until her death.

25   A.  Yes.

1   Q.  And petitioner is alleging that you missed this critical

2   question.

3   A.  I think we did.

4   Q.  Well, I am not asking you what your thought is, I'm asking

5   what's being alleged.  Do you understand that that's what's

6   being alleged?

7   A.  Yes.

8   Q.  Let's go through your letter.  In Paragraph 1 there,

9   Dr. Keen agreed to review Dr. Howard's autopsy report and his

10  medical findings for the defense, correct?

11  A.  Yes.

12  Q.  Dr. Keen told you that he could also view photographs,

13  tissue slides and other physical evidence for his opinion,

14  correct?

15  A.  Right.

16  Q.  You indicated that you had several general questions you

17  wanted him to consider as you reviewed that report, correct?

18  A.  Yes.

19  Q.  Your first question to him was about the symptoms that

20  Rachel would experience from the lacerated duodenum, correct?

21  A.  Yes.

22  Q.  And let's focus right here on your second question.  Your

23  second question to Dr. Keen here is, quote:  How long after the

24  injury occurred would this child die?  Can the injury be dated?

25  Can the time of death be determined?

CROSS-EXAMINATION - BOWMAN

1      Correct?

2   A.  Yes.

3   Q.  Did I read that correctly?

4   A.  You did.

5   Q.  So you asked Dr. Keen the very question in this case, the

6   time from her injury to death, correct?

7   A.  Yes.

8   Q.  Your third question, you asked about the force it would

9   take to inflict this kind of injury, correct?

10  A.  Yes.

11  Q.  And whether another child could have inflicted this type of

12  injury?

13  A.  Yes.

14  Q.  And that was an important question, because Brandie claimed

15  that she had seen some child strike Rachel in the stomach with

16  a bar or pipe, correct?

17  A.  Yes, that's right.

18  Q.  So you were trying to corroborate this story on Barry's

19  behalf.

20  A.  Yes.

21  Q.  Your fourth question here was whether the small bowel

22  laceration could have been complicated by the laceration to

23  Rachel's head or whether they were two unrelated problems,

24  correct?

25  A.  Yes.

CROSS-EXAMINATION - BOWMAN

1    Q.  This was an important question because you were dealing

2    with multiple injuries, some potentially affecting others,

3    correct?

4    A.  Right.

5    Q.  Your fifth question here concerned the amount of injuries

6    to Rachel's body and whether there was an innocent explanation

7    for that, correct?

8    A.  Yes.

9    Q.  Your sixth question here concerned the blood found in

10   Rachel's underwear and pajamas and the source of that blood,

11   correct?

12   A.  Yes.

13   Q.  Either from the small bowel injury or the injuries to her

14   vagina, correct?

15   A.  Yes.

16   Q.  And that was an important question because it related

17   directly to the predicate felonies that Barry Jones was charged

18   with, particularly the sex assault, correct?

19   A.  Yes.

20   Q.  Your seventh question again went back to the timing of the

21   injuries, this time to her genitalia, correct?

22   A.  Yes.

23   Q.  Again, you're focused on the timing of this injury to

24   attempt to date that injury, correct?

25   A.  Yes.

1   Q.  And your final question was about the hemorrhage in

2   Rachel's ears and whether that could have resulted from a fall,

3   correct?

4   A.  Yes.

5   Q.  And that question was important also to corroborate Barry

6   Jones' story that Rachel fell or was pushed out of the van by

7   some boys, correct?

8   A.  Yes.

9   Q.  You also indicated to Dr. Keen that you would likely have

10  more questions when you spoke to him, correct?

11  A.  Yes.

12  Q.  So, putting all of this together then, you focused Dr. Keen

13  directly on the timing of the abdominal and vaginal injuries

14  until Rachel's death, correct?

15  A.  Yes.

16  Q.  So that way you could focus in on when Rachel was injured

17  and who injured her.

18  A.  That's right.

19  Q.  As well as how those injuries could have been inflicted.

20  A.  Yes.

21  Q.  And the symptoms she experienced.

22  A.  Correct.

23  Q.  You subsequently faxed this letter and the autopsy report

24  to Dr. Keen on August 10th, 1994, do you recall that?

25  A.  I'm not sure that's -- can you remind me the date of this

1   letter?

2   Q.  I absolutely can, Judge.  It's Exhibit 1, Bates Number 203.

3   Again, this is from your trial files.

4   A.  Okay.  I don't think these two documents go together.  I

5   don't think I would write a letter on July 20th and fax it on

6   August 10th.  If it was critical enough to go by fax instead of

7   mail, it just doesn't make sense to me that I would wait three

8   or four weeks to send it off.

9   Q.  Okay.  At least this letter -- maybe you did send the

10  letter to Dr. Keen, is that what you're saying, beforehand?

11  Closer in time to when you drafted it?

12          THE COURT:  I'm sorry, Counsel.  I think that's a

13  misstatement of what she just testified to.

14          MR. BRACCIO:  Okay.

15          THE COURT:  Pose your next question to her.

16  BY MR. BRACCIO:

17  Q.  I'm sorry, Judge, maybe I didn't understand, can you

18  explain?

19  A.  I don't think this fax cover sheet goes with that letter.

20  I don't know how I sent that letter or when I sent it, but I

21  don't think I'd wait 'til August 10th and send it by fax,

22  unless I was resending it.  I just -- I don't know.  But if I

23  wrote a letter on July 20th, it would have been my practice to

24  send it on July 20th, one way or another, by fax, or mail, or

25  something.

1          THE COURT:  Can I ask a follow-up question?

2          MR. BRACCIO:  Absolutely.

3          THE COURT:  Was it your practice, or do you remember

4    if it was your practice, on the letter itself to indicate the

5    method of transmission?  A lot of times people will put on

6    there "by mail," "by fax"?  It doesn't look like there's

7    anything indicated on there.

8          THE WITNESS:  It doesn't.  I think we did frequently

9    list if it was sent by fax, but I can't tell you that that

10   happened every time, so I'm just not sure how this letter was

11   sent.

12         THE COURT:  Okay.  Thank you.

13   BY MR. BRACCIO:

14   Q.  So, Judge Bowman, if I understand your testimony then, you

15   potentially sent this letter earlier to Dr. Keen after you

16   drafted it.

17   A.  I would think so.  I don't have a memory of it, but that

18   would make more sense to me.

19   Q.  And nonetheless, you faxed Dr. Keen a copy of the autopsy

20   report on August 10th, 1994, correct?

21   A.  Can you remind me how many pages the autopsy report is?  I

22   just -- it says it's regarding the Rachel Gray autopsy, I

23   assume that means that this was the autopsy report.  It also

24   says 10 pages, so if that's 10 pages that would make sense to

25   me.

1  Q.  You subsequently spoke with Dr. Keen on August 18th, 1994,

2  and he had reviewed the autopsy report and considered your

3  questions, correct?

4  A.  That sounds familiar.  I think that's in the billing

5  records, right.

6  Q.  Correct.  Let's pull up Exhibit 11, Bates Number 176, for

7  the entry, Your Honor, at 8/18/94.

8  A.  Yes.

9  Q.  You spoke with Dr. Keen.

10 A.  Yes.

11 Q.  Now, you have, again, no independent recollection of this

12 telephone conversation, do you?

13 A.  I do not.

14 Q.  Are you aware that both Mr. Bruner and Dr. Keen also have

15 no independent recollection of this phone conversation?

16 A.  Yes.

17 Q.  So you have no idea if Dr. Keen reviewed anything else,

18 correct?

19 A.  I have no idea.

20 Q.  If Dr. Keen would have said to you, "I need more

21 information to look at photographs, to view tissue slides or

22 review other evidence," would you have given that to him?

23 A.  I hope I would have.

24 Q.  Have you ever had a case in your career where your expert

25 asked for more information and you did not give it to him?

1    A.  Not that I can recall.

2    Q.  And you would have given Dr. Keen that because you actually

3    indicated in your letter that it could be arranged as

4    necessary, correct?

5    A.  Yes.

6    Q.  And if Dr. Keen would have rebutted Dr. Howard's medical

7    opinions, you would have called him as a witness, correct?

8    A.  I guess it depends what the rebuttal would have been.

9    Because Dr. Howard actually ended up testifying that the

10   injuries occurred prior to the time that the state alleged that

11   Mr. Jones was alone with Rachel.  So it depends on what part it

12   would have rebutted.  But if it was in Mr. Jones' favor, we

13   would have wanted to call him for sure.

14   Q.  If there was any part that he could offer rebuttal that

15   would have been favorable for Mr. Jones, you would have called

16   him as a witness, correct?

17   A.  Yes.

18   Q.  So the only conclusion we can draw from these records is

19   that Dr. Keen reviewed the autopsy report with your questions

20   in mind and agreed with the medical conclusions of Dr. Howard,

21   correct?

22   A.  Or that we dropped the ball and didn't follow up properly.

23   One or the other.

24   Q.  Okay.  You also subsequently interviewed Dr. Howard on

25   November 28th, 1994, correct?

 1   A.  I'm sorry, what was the date?

 2   Q.  November 28th, 1994.

 3   A.  I don't remember the date, but I know we interviewed him.

 4   Q.  Exhibit 46.

 5       Do you recall this document being the defense interview

 6   with Dr. Howard on November 28th, 1994?

 7   A.  Yes.

 8   Q.  So this was just months after you spoke to Dr. Keen,

 9   correct?

10   A.  Yes.

11   Q.  Do you recall in your interview that Dr. Howard dated the

12   vaginal injury to one or two days before death?

13   A.  Yes.

14   Q.  And that he also told you that the inflammatory response in

15   Rachel's body was anywhere from hours to days, correct?

16   A.  Yes.

17   Q.  Do you recall that you discussed with him the time from

18   injury to symptoms, with Dr. Howard?

19   A.  I think we did.

20   Q.  Page 35, Line 14.  Judge Bowman, I am showing you Page 35

21   of your report starting at Line 14.  You were focusing in on

22   Dr. Howard on the time from injury to symptoms, correct?

23   A.  That was actually the investigator for Ms. Gray.

24   Q.  Do you recall who that is?

25   A.  Just from looking at the transcript.

1    Q.  And Dr. Howard was asked about the pain from the injury.

2    It's Page 37, Line 6.

3    A.  Yes, from the abdominal injury, yes.

4    Q.  And Dr. Howard told you that after the initial pain, the

5    pain could subside somewhat, once the bowels stopped moving the

6    pain can lessen, but the child can still be up moving around.

7    But then you get into the problem of the inflammatory change.

8    Like appendicitis, the pain will get worse with time, and it

9    would be strange or unusual if Rachel were not complaining

10   about a stomach ache or fever or something.  Correct?

11   A.  Where is that?

12   Q.  That is 35, Page 35, Line 14, down to Page 36, Line 24.

13          THE COURT:  Let's make sure we give the witness --

14          MR. BRACCIO:  Absolutely.

15          THE COURT:  -- what you've just read.

16          THE WITNESS:  I'm sorry, where is this?

17          THE COURT:  Start with the first line that you were

18   reading from, put that up so she can follow up and read it and

19   then you can scroll when she's indicated she's had an

20   opportunity to read it.

21   BY MR. BRACCIO:

22   Q.  Absolutely.  Dr. Howard told you that after the initial

23   pain, the pain could subside somewhat, correct?  That's at

24   Lines 17 through 20.

25   A.  Where is the part -- I see that he says the pain would be

1    severe initially.

2    Q.  Okay.  Go down to 36.  Your question there is:  Any idea

3    how long that would last?

4           THE COURT:  Well, stop.  It's not her question.  She

5    said she's not conducting this questioning, it was the

6    investigator for Ms. Gray, I thought is what she said.  Your

7    question to her was now indicating that she was asking these

8    questions.  She's told you earlier she was not asking these

9    questions.

10          MR. BRACCIO:  Absolutely right.  I apologize, Your

11   Honor.

12   BY MR. BRACCIO:

13   Q.  You were present when these questions were asked, correct?

14   A.  Yes.

15   Q.  So you're understanding the questions.

16          You also observed Dr. Howard's testimony in the Angela Gray

17   trial, correct?

18   A.  Yes.

19   Q.  Do you recall that Dr. Howard testified that Rachel's

20   internal abdominal injuries, including the lacerated duodenum

21   and the damage to the transverse colon, appeared to be

22   approximately one day prior to death?

23   A.  I remember this more or less, I don't remember exactly what

24   he said.

25          MR. BRACCIO:  Let's pull up Exhibit 48.  These are the

UNITED STATES DISTRICT COURT

1   transcripts in the Angela Gray trial.  Ninety-four.  Go to

2   Bates 3464.

3        (Mr. Braccio speaking with Mr. Vidal.)

4             MR. BRACCIO:  We'll move on.

5   BY MR. BRACCIO:

6   Q.  Judge Bowman, we're going to move on from that.  I can

7   establish the timeline with Dr. Howard.

8        Let's talk about -- let me say this:  If the records in

9   this case indicate that Dr. Howard testified consistently that

10  her abdominal injuries could be anywhere from hours to days,

11  and most consistently for one day, you wouldn't dispute that,

12  correct?

13  A.  No.

14  Q.  And, as well with her vaginal injury, that that injury

15  could be anywhere from one to two days, but most consistently

16  with one day, correct?

17  A.  If that's what it says.  But I don't exactly remember that.

18  Q.  Let's talk about the defense's motion practice in this

19  case.

20       Do you recall that Sean Bruner filed a number of pretrial

21  motions in this case?

22  A.  Not specifically, but I'm sure he did.

23  Q.  I believe he's filed 25 substantive motions in this case.

24  A.  I don't remember that.

25  Q.  You have the binder in front of you of all of their

1   motions.

2   A.  Yes.

3   Q.  Would you take a quick look at that?

4           THE COURT:  Are you asking her to confirm the fact

5   that a certain number of motions were filed?  She's testified

6   that she doesn't have any independent recollection of how many

7   motions were filed.

8   BY MR. BRACCIO:

9   Q.  Would you dispute that Mr. Bruner filed 25 substantive

10  motions from May of 1994 until April of 1995?

11  A.  If that's in the record, I don't dispute that.

12  Q.  And Mr. Bruner challenged the legal bases for every stop,

13  detainment, search of the van and trailer, arrest, probable

14  cause to arrest, as well as the charges, correct?

15  A.  I don't remember that, but if it's in the record, I agree.

16  Q.  You also filed motions in this case?

17  A.  I think I did.

18  Q.  You successfully opposed the state's motion to admit

19  Rachel's statements to Angela about Barry Jones hitting her

20  with the shoe thing?

21  A.  Yes.

22  Q.  You recall that from your testimony yesterday?

23  A.  Yes.

24  Q.  As well as the state's motion to admit the uncharged acts

25  of violence by Barry Jones against his own children?

1    A.  I think that was successful.  I don't recall exactly.

2    Q.  Let's talk briefly about your billing records.

3         MR. BRACCIO:  Judge, may I approach?

4         THE COURT:  You may.  Just make sure opposing counsel

5    knows what you're going to be referring to.

6         MR. BRACCIO:  Opposing counsel handed it to me.

7    BY MR. BRACCIO:

8    Q.  Judge, I am handing you what's been marked as Exhibit 1.

9    These are billing records, yours and Mr. Bruner's.

10        Judge, I am going to put on the screen in front of you the

11   index to the record on appeal.

12        Now, looking at these billing records, these billing

13   records are not accurate at all, are they?

14   A.  I wouldn't say they're not accurate at all.

15   Q.  Okay.  It does document some of your time, yours and

16   Mr. Bruner's, correct?

17   A.  Yes.

18   Q.  Are you aware that you did not bill for a substantial

19   amount of work in this case?

20   A.  I am not aware of that.

21   Q.  Are you aware that you did not bill for your court

22   appearance on July 14th, 1994?  And I gave you Exhibit 11, in

23   front of you, so you can refer to that and determine whether or

24   not you or Mr. Bruner billed for your time during that hearing.

25   A.  Okay.  Can you remind me of the date again.

1  Q.  Of course.  July 14th, 1994.

2  A.  I don't see an entry for that.

3  Q.  Okay.  How about for September 16th, 1994?

4  A.  For something in court?

5  Q.  Correct.

6  A.  I don't see that.

7  Q.  How about for your court appearance on November 16th, 1994?

8  A.  I'm sorry.  Can you say the date again, please.

9  Q.  Absolutely.  November 16th, 1994.

10       MR. SANDMAN:  Judge, I guess I want to pose an

11  objection because there is no foundation that Ms. Bowman was

12  actually shown present at those hearings.  I was just looking

13  at the hearing for July 14, 1994, which he just asked about,

14  and she's not present at that hearing.  So he's asking her if

15  she billed for being there and the transcript in Exhibit 24D

16  shows that she's not present.

17       MR. BRACCIO:  I can rephrase my question.

18  BY MR. BRACCIO:

19  Q.  Were either you or Mr. Bruner present in the courtroom on

20  July 14th, 1994?

21  A.  I don't know.

22  Q.  Let's pull up record on appeal number --

23       THE COURT:  I'm sorry, I just want to make sure I know

24  where you're going with this.  So, again, you're asking her if

25  she was -- are you asking if she was present at a hearing?

1       MR. BRACCIO:  No, I was asking her if she or Sean

2  Bruner billed for either of their time for their court

3  appearance during any of these appearances.  Whether it's Judge

4  Bowman or whether it's Mr. Bruner in the courtroom.

5       THE COURT:  But I am assuming the only way she would

6  know -- anybody would know at this point -- is either looking

7  at her billing records or looking at a transcript or docket

8  entry for the proceedings at that hearing.

9       MR. BRACCIO:  Absolutely right.

10       THE COURT:  You're just asking did she bill for X?

11       MR. BRACCIO:  Correct.

12       THE COURT:  What are you trying to establish here?

13  Was she or was she not at a hearing, or was she or was

14  Mr. Bruner, did they or did they not bill for something?  I'm

15  confused.

16       MR. BRACCIO:  To explain, we have -- Exhibits Number

17  12 or 13 in this case is an analysis of trial counsel's billing

18  records?

19       THE COURT:  First of all, let's start off with, is it

20  12 or 13?

21       MR. BRACCIO:  Exhibit 12.

22       THE COURT:  And that is a what?

23  BY MR. BRACCIO:

24  Q.  An analysis of trial counsel's billing records prepared by

25  the Federal Public Defender Office that you previously

CROSS-EXAMINATION - BOWMAN

1   testified about yesterday, correct?

2   A.  I testified --

3           THE COURT:  There's an exhibit that they've pulled up.

4           MR. BRACCIO:  And it's been admitted into --

5           THE COURT:  He's referring you to an exhibit during

6   your direct examination that Mr. Sandman asked you questions

7   about.

8           THE WITNESS:  Okay.

9           THE COURT:  Next?  What are you getting at?

10  BY MR. BRACCIO:

11  Q.  So these billing summaries are not accurate for the true

12  amount of time that you and Mr. Bruner spent on this case,

13  correct?

14  A.  I don't know that.

15          MR. BRACCIO:  So what I am attempting to do, Your

16  Honor, is show they did not bill for a substantial amount of

17  the work.

18          THE COURT:  Just ask her that question.

19          MR. BRACCIO:  I did, and she said no.

20          THE WITNESS:  No, I said --

21          MR. BRACCIO:  That you didn't know.

22          THE WITNESS:  I don't know.

23          MR. BRACCIO:  Right.  So what I was going to do is go

24  through the record to show her either the court appearance or

25  the documents and to reflect that they're not reflected in the

CROSS-EXAMINATION - BOWMAN                                    44

1   billing.

2          THE COURT:  They're not reflected in the summary

3   chart.

4          MR. BRACCIO:  Or, or in the -- in the billing records,

5   which are Exhibit 11.

6          THE COURT:  So you have documents that you think show

7   that she and her colleague put in substantially more time than

8   is reflected either in this summary or in her billing sheets.

9          MR. BRACCIO:  Correct.

10         THE COURT:  Go ahead.

11         MR. BRACCIO:  Pull up record on appeal number 28.

12  BY MR. BRACCIO:

13  Q.  Judge, in front of you will be record on appeal number 28.

14  This is a minute entry for a status conference on July 14th,

15  1994.

16  A.  Can I see the top of that, please?

17      Yes.

18  Q.  So Mr. Bruner was present at this hearing on behalf of

19  Barry Lee Jones, correct?

20  A.  Could you go down a little further?

21      Yes.

22  Q.  As you previously just stated, you looked in the billing

23  records and you did not find any billing for this court

24  appearance, correct?

25  A.  I do not find that.

1    Q.  Are you aware that you also did not bill in this case for

2    19 different substantive motions?

3    A.  I am not aware of that.

4    Q.  Let me talk to you briefly about your strategy for this

5    trial.

6        You went into this case -- assuming Dr. Howard was

7    consistent from his interview and his testimony in the Angela

8    Gray trial, you went into this case with no real way to

9    challenge the medical evidence, having challenged all that you

10   could legally on the motion practice and facing fairly strict

11   funding.  Correct?

12              THE COURT:  I'm sorry, that's what we would call a

13   compound question.  Why don't you break that up into pieces

14   that somebody can understand and answer.

15   BY MR. BRACCIO:

16   Q.  Based upon your conversation with Dr. Keen, your pretrial

17   interview of Dr. Howard, and the testimony of Dr. Howard at the

18   Angela Gray trial, you had no real way to challenge the medical

19   evidence in this case, correct?

20   A.  I don't know that that's correct.  I don't remember the

21   conversation with Dr. Keen, and the testimony from Dr. Howard

22   was contradictory between the two trials and his pretrial

23   interview.  I think we could have used that to challenge it.

24              MR. BRACCIO:  Your Honor, can I have a moment?

25              THE COURT:  Yes.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BOWMAN                                    46

1    BY MR. BRACCIO:

2    Q.  In this case you attacked the circumstantial evidence,

3    correct?

4    A.  We tried, yes.

5    Q.  And insufficiency of the evidence is a perfectly reasonable

6    defense?

7    A.  It can be.

8    Q.  You've employed that defense before in your career?

9    A.  Yes.

10   Q.  Do you impeach a witness with every inconsistent statement?

11   A.  Only if it's important.

12   Q.  Let me take you to one final document.  Exhibit 1, Bates

13   Number 131 to 134.

14       This is a script for Barry Jones that you prepared for him

15   to testify to, correct?

16   A.  I believe I prepared it.

17   Q.  And in the proposed testimony you were going to have Barry

18   Jones rebut the account of the Lopez children, correct?

19   A.  Can I see that?

20   Q.  Absolutely.  Bates 134.  Again, this is Exhibit 1.

21   A.  What am I looking at?

22   Q.  Hold on one second, I'll direct you, Your Honor.

23            MR. BRACCIO:  I'll withdraw the question.  No further

24   questions.  Thank you.

25            THE WITNESS:  Okay.  Thank you.


UNITED STATES DISTRICT COURT

1          THE COURT:  All right.  Redirect.  Are you okay or do

2    you need a break?

3          THE WITNESS:  I'm fine.  Thank you.

4                      REDIRECT EXAMINATION

5    BY MR. SANDMAN:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  Do you remember a series of questions yesterday about

9    Mr. Jones' criminal record and his drug addiction problems and

10   other issues associated with his character at the time -- I

11   guess that were in existence before you represented him?  Do

12   you remember that?

13   A.  Yes.

14   Q.  Could you tell us, did any of that information factor into

15   a decision to investigate any questions that needed

16   investigating in this case regarding his innocence or other

17   defenses that he might have?

18   A.  Not that I recall.

19   Q.  And you were asked a question this morning about whether

20   Mr. Jones told the police that he had taken three trips in the

21   van, do you remember that?

22   A.  Yes.

23   Q.  Do you remember that he said that the final trip was after

24   she became sick and was throwing up, or trying to throw up at

25   the Fleming house, when she was already ill?

REDIRECT EXAMINATION - BOWMAN                                    48

1    A.  I don't really remember.

2    Q.  You would defer to his statement on that?

3    A.  Yes.

4            MR. SANDMAN:  Excuse me, Judge.  May I just...?

5    BY MR. SANDMAN:

6    Q.  Now, you were asked some questions about whether Judge

7    Carruth, whether he wanted to pay both lawyers, do you remember

8    those questions?

9    A.  Yes.

10   Q.  And did you nevertheless submit bills to Judge Carruth

11   recording your time?

12   A.  Yes.

13   Q.  And you would defer to the record as to whether those bills

14   were paid in full or not?

15   A.  Yes.

16   Q.  You were asked some questions about funding and whether you

17   could get funding in the Superior Court.  Do you remember in

18   your deposition that you were asked about funding and you said

19   that you couldn't recall ever having problems getting funding

20   for experts in Pima County and that it was easier than getting

21   funding in federal court?

22   A.  Yes.  Yes.  Yes, it's easier, it was easier in state court

23   than in federal court.

24   Q.  Is it still the case that you can't remember any occasion

25   when you had problems getting funding in Pima County?

1    A.  I don't remember ever having problems.

2    Q.  Do you remember you were asked in your deposition could you

3    have gone back to Judge Carruth and asked for additional

4    funding for experts in this case?  Do you remember being asked

5    that?

6    A.  Yes.

7    Q.  Do you remember what your answer was?

8    A.  We could have, and I think it was even indicated on one of

9    the transcripts in court that if we needed more funding we

10   would get back with the Court.

11   Q.  Now, do you think that, for example, if you needed to get

12   money to pay the Office of the Pima County Medical Examiner for

13   the creation of tissue slides and the copying of photographs,

14   do you think that you would have filed a motion to get funding

15   for that if you needed money for that?

16   A.  Yes.

17   Q.  Do you have any reason to believe that you would have been

18   denied funding to get reimbursement for the cost of reproducing

19   those slides and photographs?

20   A.  No.  The only reason I hesitated is because I am not sure

21   if that would have been a cost or if they would have just

22   provided that as part of the case.

23   Q.  Would you defer to the actual records of the Pima County

24   Office of Medical Examiner with respect to whether they charge

25   for that?

REDIRECT EXAMINATION - BOWMAN

1   A.  Yes.

2        MR. SANDMAN:  And, Your Honor, for the record, in

3   evidence as Exhibit 59A is the complete chronological file of

4   the Pima County Office of Medical Examiner, and it provides

5   documentation of each and every time a slide or a photograph

6   was copied for an expert, recently Dr. Howard, in the past

7   Dr. Ophoven, and so on, and there's documentation in there of

8   every time that's done and there is a cost associated with

9   that.

10  BY MR. SANDMAN:

11  Q.  Do you remember you were asked some questions about your

12  familiarity with the case when you met with George Barnett in

13  early May?

14  A.  Yes.

15  Q.  Of 1994?

16      I'd like to show you a copy of Exhibit 12.  If we could

17  blow up the left-hand column there, the first maybe half of

18  that page.

19      Do you see it looks like on May 9th you met with George

20  Barnett?

21  A.  Yes.

22  Q.  Now, before May 9th, do you have a single entry for

23  reviewing a case record in Mr. Jones' case?

24  A.  No.

25  Q.  And it looks like you've talked to Mr. Barnett on the 10th.

UNITED STATES DISTRICT COURT

1    At least at that time you had not -- either hadn't received or

2    hadn't yet reviewed any case records just a few days after

3    Mr. Jones was arrested, correct?

4    A.  Right.

5    Q.  You typically have to wait a period of at least some

6    reasonable amount of time before you get case records from the

7    police department and the, you know, autopsy reports, and

8    things of that nature?

9    A.  Yes.

10   Q.  Now, I want to go back and look at some of these

11   photographs that Mr. Barnett took.  I need to look first at

12   Exhibit 267.  Well, let me strike that.

13       It's Exhibit 1, Page 267.  I'm sorry.

14       It's really the bottom photograph that I want to draw your

15   attention to.  Correct me if I'm wrong, but you're looking at

16   that van head on, correct?  As if you're standing right in

17   front of it.

18   A.  Yes.

19   Q.  Now, do you recall in this case at any time the

20   eight-year-old children saying that they were standing directly

21   in front of a moving van moving toward them head on?

22   A.  No.

23   Q.  Do you think that the bottom picture in 267 is

24   representative of anything the Lopez kids said about where they

25   were standing?

1    A.  No.

2    Q.  Because in order for them to have had that view, they would

3    have had to be standing directly in front of a moving vehicle,

4    correct?

5    A.  Yes.

6    Q.  And you're not aware that at any time they said they were

7    about to get run over by a van, correct?

8    A.  No.

9    Q.  How about 276?

10           THE COURT:  Exhibit 1, 276?

11           MR. SANDMAN:  Exhibit 1, 276.

12   BY MR. SANDMAN:

13   Q.  There again, it looks like someone is standing right next

14   to the windshield of that van when they're taking a photograph,

15   doesn't it?

16   A.  Yes.

17   Q.  Is there any evidence in this record that the Lopez twins

18   were ever standing right on top of that vehicle so they could

19   see inside?  Are you aware of any evidence like that?

20   A.  No.

21   Q.  So is this photograph in any way representative of what the

22   kids could have seen?

23   A.  No.

24   Q.  How about photo 270?

25           THE COURT:  Same exhibit?

REDIRECT EXAMINATION - BOWMAN

1          MR. SANDMAN:  Yes, sir.

2    BY MR. SANDMAN:

3    Q.  Now, you were asked a question about the top photo in that

4    van, and that raises a question with respect to do you know,

5    sitting in that van, how tall -- where would Rachel's head be?

6    As a four-year-old child, where would her head reach on that

7    seat?  Do you have any information about that?

8    A.  No.

9    Q.  Do you know if Mr. Barnett had any information about that?

10   A.  I don't think he did.

11   Q.  Did you find anywhere in Mr. Barnett's report that he had

12   taken into account Rachel's size and where she would have been

13   sitting or could be seen in that size van?

14   A.  No.

15   Q.  Did you ever disclose in your written disclosure to the

16   Superior Court that anybody was going to offer any opinions

17   about what the Lopez children could see, in light of Rachel's

18   size, inside that van?

19   A.  No.

20   Q.  If we could see Exhibit 58 again.  That's the letter to

21   Dr. Keen.  Next page.  I want to see the first couple

22   paragraphs there.

23       I want to focus your attention there on the second

24   paragraph, where you indicate, and I'll quote this:  As you

25   explained, that may involve obtaining access to photographs,

1    slides and other physical evidence.  Closed quote.

2        Do you see that?

3    A.  Yes.

4    Q.  And I believe you testified yesterday that after

5    interviewing Dr. Howard a few months later that there were

6    reasons to go back to Dr. Keen at that point, or some other

7    qualified expert, whoever it was, to make sure that those

8    tissue slides were examined so that you could get some dating

9    on those injuries for the defense.  Is that right?

10   A.  Yes.

11   Q.  As far as you can tell from your review of the file, that

12   was never done.

13   A.  Correct.

14   Q.  Now, you were asked some questions about Dr. Howard's

15   testimony at the Gray trial.  That was Exhibit 48.  Mr. Braccio

16   asked you whether or not you would agree that during that

17   testimony Dr. Howard described the vaginal injury and the

18   abdominal injury as being about a day.  Do you remember he

19   asked you about that?

20   A.  Yes.

21   Q.  I would like to turn your attention to Exhibit 48 and we'll

22   start on Page 99.  We'll look at -- if you could blow up 12

23   through 14, on Page 99.  Page 99's fine.

24       I'm sorry.  Forty-eight.  It's my mistake.  48A is the

25   exhibit.  I'm sorry.

1            THE COURT:  And then you want a specific page?

2            MR. SANDMAN:  Yes, 99, 48A.  I'm sorry I said Exhibit

3    48.

4        If you could just blow up Lines 12 through 15 there.  Or

5    16.

6    BY MR. SANDMAN:

7    Q.  You see there that Dr. Howard is asked to describe the age

8    of the injuries to Rachel's genitalia?

9    A.  Yes.

10   Q.  If we could look at Page 100.  If you could blow up Lines

11   10 and 11.

12       He described the findings as being more typical of 24

13   hours, is that right?

14   A.  Yes.

15   Q.  He didn't say they were typical of one day, he categorized

16   it as 24 hours, right?

17   A.  Yes.

18   Q.  That would be outside the window -- that typical -- the

19   typicality there would be outside the window of the afternoon

20   of May 1st, would it not?

21   A.  Yes.

22   Q.  And the same series of questions now about the internal

23   injury and how Dr. Howard described those at the Gray trial.

24       And that would be at Page 101.  If you could blow up Lines

25   2 through 8 -- 7.

1      Once again, Dr. Howard described those injuries not in

2    terms of about a day, but he described them in terms of 24

3    hours, and actually said that they were most consistent, the

4    findings were most consistent with 24 hours, according to him.

5    Correct?

6    A.  Yes.

7    Q.  That would also be outside the window of afternoon of May

8    1st, would it not?

9    A.  Yes.

10   Q.  Is it based on those descriptions that you indicated that

11   you should have gone back and sought some assistance for the

12   defense with respect to investigating the time of Rachel's

13   injuries?

14   A.  That's right, yes.

15   Q.  Now, you were asked some final questions by Mr. Braccio

16   about your strategy of attacking the sufficiency of the State's

17   evidence, do you remember that?

18   A.  Yes.

19   Q.  And do you think that that strategy, at least as it was

20   employed in this case, was effective?

21   A.  No, it wasn't.

22        MR. SANDMAN:  Thank you.  That's all I have.

23        THE COURT:  Thank you.

24      Before I excuse you, let's take a brief recess and then

25   we'll resume.

1      Do you have your next witness?

2           MS. SMITH:  Your Honor, we had told Dr. Keen to arrive

3      at 11:00 because we thought we'd go a little bit later, but he

4      is apparently about 15 minutes away.  We do have a couple of

5      evidentiary issues we can deal with before then.

6           THE COURT:  All right.  We'll take a 10-minute break

7      right now.  Thank you.

8           (A recess was taken from 10:10 a.m. to 10:40 a.m.)

9           MR. SANDMAN:  Dr. Keen is in the courtroom, Your

10     Honor.

11          THE COURT:  Great.

12     Judge Bowman, we are done with you.  Thank you for your

13     indulgence.  You'll be excused at this time.

14     So, actually, I think we had some evidentiary issues we

15     need to discuss before the doctor testifies.

16          MS. SMITH:  Thank you, Your Honor.

17     There's been some concern about the photographs of Rachel,

18     so we just wanted to make a record on those and get them sealed

19     so we can deal with those properly.

20          THE COURT:  As I understand it, you want to seal the

21     proceeding?

22          MS. SMITH:  Not the proceeding.  I am going to move to

23     seal some specific exhibits.

24          THE COURT:  Are we then not going to put them on the

25     public screens?

UNITED STATES DISTRICT COURT

```
 1          MS. SMITH:  If that's possible, that would be great.

 2          THE COURT:  Anything's possible.

 3          MS. SMITH:  I will request -- I was going to

 4   officially request all of these things.

 5          THE COURT:  So let me -- I am not sure who has control

 6   over -- okay.  There we go.

 7       So you can better answer the question, Madam Clerk, than I

 8   can.  So can we only display them on counsel and the Court's

 9   screens and the witness box?

10          THE CLERK:  Correct, they will not be shown on the

11   gallery monitors.

12          THE COURT:  Does that satisfy the parties?

13          MS. SMITH:  Yes.

14          MS. GARD:  Yes.

15          MS. SMITH:  It's fine with us, Your Honor.

16          THE COURT:  However, I don't know what to say about

17   counsel's screens are facing the gallery, so I don't know if

18   you want to turn them somehow or what.

19          MS. SMITH:  We are going to limit the number of these

20   pictures we use, we just wanted to do this to be safe.

21          THE COURT:  Okay.  I think that takes care of that.

22       What else?

23          MS. SMITH:  Can I make a record of which exhibits

24   those are?

25          THE COURT:  Yes, please.
```

1          MS. SMITH:  So what we've done is --

2          THE COURT:  Are you going to put them in a block so

3    that we're dealing with all of them in one period of time?  Or

4    that's wishful thinking?

5          MS. SMITH:  Let me give you my proposal and see if

6    that works.

7          THE COURT:  Fire away.

8          MS. SMITH:  What we've done is Exhibit 65 was the

9    complete copy of the Pima County Sheriff's Office photos.

10         THE COURT:  Yes.

11         MS. SMITH:  We have split that into two exhibits, 65A

12    and 65B.  We've provided a copy of that to the state.  We also

13    have both a hard and electronic copy available for the Court.

14         THE COURT:  Yes.

15         MS. SMITH:  What we'd like to do is move to seal the

16    original Exhibit 65, which contains all the photos.  We'll also

17    move to seal Exhibit 65B, which contains the hospital and

18    autopsy photos.  Exhibit 65A contains the photos of the van and

19    the trailer, which do not need to be sealed.

20         THE COURT:  B does?

21         MS. SMITH:  That's A.

22         THE COURT:  A does.

23         MS. SMITH:  B will be sealed.

24      In addition to that, we need to move to seal Exhibit 49,

25    which is a single photograph of Rachel at autopsy, and Exhibit

UNITED STATES DISTRICT COURT

1    107, which is slides put together by Dr. Ophoven which contains

2    autopsy photos.

3            THE COURT:  Okay.  Any objection?

4            MS. GARD:  No, Judge.

5            THE COURT:  That's granted and we'll proceed that way.

6            MS. SMITH:  Great.  I'll try to note for the clerk

7    before I refer to an exhibit that has been sealed.

8            THE COURT:  Yeah, if we can -- I would rather have you

9    move slowly and deliberately when we're dealing with those

10   photos, if at all possible, please, to make sure that we don't

11   publish them in error.

12       Anything else?

13           MS. SMITH:  I don't think so, Your Honor.

14           THE COURT:  Respondents, anything on this issue?

15           MS. GARD:  No, Your Honor.

16           THE COURT:  So I think we're ready for your witness.

17           MS. SMITH:  Yes, we'll call Dr. Phillip Keen.

18           THE COURT:  Sir, if you could please come forward and

19   be sworn.  This box right here.

20       I don't know your practice, do you want him in the box?

21           THE CLERK:  Yes, please.

22           THE COURT:  Go ahead and you can have a seat.  This

23   chair right here.

24           THE CLERK:  You can remain standing and be sworn.

25   Raise your right hand.

1          **PHILLIP EARL KEEN, M.D.**, WITNESS, SWORN

2                        DIRECT EXAMINATION

3    BY MS. SMITH:

4    Q.  Could you please state your name for the record.

5    A.  I am Phillip Earl Keen, M.D.

6    Q.  Thank you, Dr. Keen.  We appreciate you being here today.

7        Dr. Keen, how are you currently employed?

8    A.  The only official employment that I have is I am the

9    Medical Director for Tissue Services for Donor Network of

10   Arizona.  But I am also self-employed and I do some consulting.

11   I currently cover the court docket for the medical examiners

12   who no longer work in the medical examiner's office in Maricopa

13   County.  That's '17, the last decade.  I also do private

14   autopsies at the request of families and of attorneys.

15   Q.  Could you just briefly tell us about your educational

16   background.

17   A.  I have an M.D. degree from the University of New Mexico,

18   1969.  Followed by a residency in anatomic and clinical

19   pathology at the University of New Mexico affiliated hospitals.

20   Then I had a fellowship.  I was one of seven LEAA fellowship

21   awardees from forensic pathology.  I could choose to go

22   wherever I wanted to go.  I went to the Office of Chief Medical

23   Examiner for the State of Oklahoma.  That's the extent of my

24   formal education.

25       Following my formal education, I am also board certified by

1    the American Board of Pathology, certified in anatomic,

2    clinical and forensic pathology as of November of 1975.

3    Q.  Great.  Thank you.

4        Dr. Keen, following your fellowship and your certification,

5    could you just give us a very brief overview of your career

6    history?

7    A.  I joined a group of pathologists for one year in Phoenix

8    and then I became the Chief of Pathology at the community

9    hospital in Prescott.  I served in that capacity for 17 years.

10   I also was a medical director of a private laboratory for 12

11   years.

12       My arrival in Prescott coincided roughly with the

13   transformation of Arizona from a coroner state to a medical

14   examiner state.  I became the first medical examiner for

15   Yavapai County.  And when there was a changeover with the

16   retirement of the chief in Phoenix, in 1992, I became the chief

17   medical examiner in Maricopa County.  After three years, they

18   asked me to also come back and resume doing the work in Yavapai

19   County, and I continued in those dual capacities with some

20   overlap, so that I have continued as a chief in Phoenix until

21   2006, officially in 2007, and I continued in Yavapai County

22   until the end of June of 2009.

23       So the end of the time, I had 29 years as chief in Yavapai

24   County, 14 years as a chief in Maricopa County, six years as an

25   associate in Maricopa County.

DIRECT EXAMINATION - KEEN

1  Q.  Are you a member of any professional associations or

2  organizations?

3  A.  I belong to the AMA.  I also am an active member in the

4  Arizona Medical Association, having served as their president

5  for one year, and also serving currently on their board of

6  directors.  I am a member and a fellow of the College of

7  American Pathologists and the Society of American Clinical

8  Pathologists.  Until I ceased being an active medical examiner,

9  I was also a fellow of the National Association of Medical

10  Examiners.

11  Q.  Thank you.

12     You've testified before in criminal and civil cases?

13  A.  Yes, ma'am.

14  Q.  And since you have left the office of the medical examiner,

15  have you continued to testify through your private practice?

16  A.  I do.

17  Q.  Are you called as a witness on occasion by both the

18  prosecution and the defense?

19  A.  Not only -- sometimes prosecution, sometimes defense.  And

20  actually I think we have two or three occasions in which it's

21  stipulated that I am the medical witness for both sides.

22  Q.  You also sometimes testify in civil cases?

23  A.  I do.

24  Q.  Also sometimes for the plaintiff, sometimes for the

25  defense?

DIRECT EXAMINATION - KEEN                    64

1    A.  Yes.

2    Q.  Do you frequently consult with public defenders offices?

3    A.  Not frequently, but it's not rare.

4    Q.  Okay.  Do you have any independent recollection of being

5    contacted about Mr. Jones' case back in 1994?

6    A.  I do not.

7    Q.  Have you retained any records from 1994 that might shed any

8    light on your involvement in this case?

9    A.  I would like to search it.

10   Q.  Okay.

11   A.  The places -- I'll get to the bottom line quickly here.  I

12   don't have any of the records.  But the -- where the records

13   would have been, had there been records, this was at a time

14   when I was the chief in Phoenix, Maricopa County, and all of

15   the written records and documents would have been on the

16   computers.  We've gone through about two or three generations

17   of computer switches in that office.  But I still have, on

18   those little old three-and-a-half-inch floppy drives, I have

19   the records of -- any of my files I have in there, and there is

20   nothing there.

21   Q.  You still have a drive that you can access those disks?

22   A.  I still do.

23   Q.  Do you recall when you were first contacted by the Office

24   of the Federal Public Defender about this case?

25   A.  Not precisely.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - KEEN

1   Q.  Was it sometime earlier this year?

2   A.  It was.

3   Q.  Did our office provide you with some documents to review?

4   A.  Yes, ma'am.

5   Q.  After reviewing those documents, did you sign a

6   declaration?

7   A.  I did.

8   Q.  I'd like to take a look at -- one moment -- Exhibit 57,

9   which is not yet in evidence.  I will move to have it admitted

10  momentarily.

11       Dr. Keen, can you identify this exhibit?

12  A.  Yes.  This is a copy of the declaration that I signed.

13  Q.  Can we take a look at Page 7.  Is that your signature on

14  Page 7?

15  A.  Yes, and the date of March 15th of this year.

16  Q.  Can we look at Page 9.  Is this a copy of your CV?

17  A.  Yes, ma'am.

18  Q.  Can we go back to the first page of the document again.

19  This is Plaintiff's Exhibit 57.

20       Dr. Keen, do you recall whether you actually typed out the

21  words in this declaration?

22  A.  I probably didn't.  I do, but I don't think I did in this

23  one.  I think this was after some verbal communication.

24  Q.  Is your recollection that you had a meeting with some

25  people from our office and then someone from our office

1    memorialized the contents of this declaration?

2    A.  That is correct.

3    Q.  Have you recently reviewed this document?

4    A.  I have.

5    Q.  Do you believe that everything in this is true and

6    accurate?

7    A.  Yes, ma'am.

8    Q.  By signing the document, did you adopt the statements in it

9    as your own?

10   A.  Yes, ma'am.

11          MS. SMITH:  Your Honor, I would move to admit this

12   document under Rule 801(d)(1) as a prior statement by a

13   witness.  Under the Advisory Committee rule to that note, a

14   prior out-of-court statement by a person now available for

15   cross-examination and in the presence of the trier of fact, if

16   the witness admits on the stand that he made the statement and

17   that it's true, he adopts the statement and there is no hearsay

18   issue.

19          THE COURT:  Is there objection?

20          MS. GARD:  Judge, I don't know that I agree with her

21   analysis, but I don't think it's worth litigating, so I don't

22   object.

23          THE COURT:  Okay.  It's admitted.

24          MS. SMITH:  Thank you, Your Honor.

25          THE COURT:  Just for the record, he's here, you'll

 1   have an opportunity to cross-examine him on that document or

 2   anything he testifies to here today.

 3         MS. SMITH:  Yes, there was a previous objection, so I

 4   just wanted to formally move it in.  Thank you.

 5         THE COURT:  Well, she's not agreeing with your

 6   analysis, but she's not objecting.

 7         MS. SMITH:  I understand.

 8   BY MS. SMITH:

 9   Q.  Can we look at Page 2 of Dr. Keen's declaration and can we

10   take a look at Paragraph 4.

11         Dr. Keen, in this paragraph you refer to being provided

12   with a letter dated July 20th, 1994, from Leslie Bowman.

13   A.  Yes, and I have no previous recollection of it and have no

14   documentation of it.  But that was provided to me.

15   Q.  Did reviewing the letter recently refresh your recollection

16   at all about any previous involvement in this case?

17   A.  No.

18   Q.  And you now have reviewed this letter and are familiar with

19   it?

20   A.  Yes, ma'am.

21   Q.  Let's take a look at that letter which is in Exhibit 58

22   which is in evidence.  Ms. Bowman testified this morning and we

23   took a look at this exhibit with her.  This first page is a fax

24   cover page dated August 10th, '94, from Leslie Bowman to

25   Dr. Phil Keen, regarding the Rachel Gray autopsy.


UNITED STATES DISTRICT COURT

1      If we flip to the next page, please.  And if we can blow up

2  from the date through the question number two.

3      Ms. Bowman testified this morning that she wasn't sure

4  whether the fax cover page in the letter went together, but,

5  regardless, there's two documents here indicating that there

6  was some communication between you and Ms. Bowman in July and

7  August of 1994, correct?

8  A.  Yes, ma'am.

9  Q.  Is it your understanding after reviewing this document that

10  Ms. Bowman sent you a copy of Rachel Gray's autopsy report to

11  review?

12  A.  That's what it says, and it's very possible that I may have

13  been sent that, I just have no independent recollection of it.

14  Q.  You're anticipating all my questions, Dr. Keen.  You have

15  no independent recollection of reviewing the autopsy report.

16  A.  No.

17  Q.  If Ms. Bowman, in fact, did send you the autopsy report and

18  requested that you looked -- that you look at it, do you think

19  you would have done so?

20  A.  Yes.

21  Q.  Have you recently reviewed that autopsy report?

22  A.  I have.

23  Q.  And that autopsy report was authored by Dr. John Howard?

24  A.  That is also correct.

25  Q.  All right.  Let's take a look at Exhibit 52 which is the

DIRECT EXAMINATION - KEEN

1    autopsy report.  Just for identification purposes, this is the

2    autopsy report that you've reviewed.

3    A.  Yes, ma'am.

4    Q.  Do you know Dr. Howard?

5    A.  I do.

6    Q.  In what capacity?

7    A.  I first met him when he was working here in the Pima County

8    medical examiner's office, and it would be almost concurrent

9    with this time, about 1994.  We were undergoing some changes in

10   Phoenix, and one of my employees, Dr. Ann Buckholds, had

11   formerly worked in the Pima County office and she knew John,

12   and through that connection he came up and he made, I think,

13   two visits to Phoenix and we discussed sort of what we do and

14   how we do things, at those times.  That was my first

15   introduction to him.

16       I haven't seen or talked with him very much.  After he left

17   here and went back to Washington, I think I had one interaction

18   with him at a meeting up in the Seattle area.  And I haven't

19   seen him in years.

20   Q.  You don't have any recollection of interacting with him

21   about this case?

22   A.  I have none.

23   Q.  All right.  Based upon your recent review of the autopsy

24   report, do you recall what Rachel Gray's cause of death was?

25   A.  I do recall from the report, yes.

1   Q.  What was that?

2   A.  Well, she died of complications of a ruptured small bowel

3   that goes into the retroperitoneal space, but essentially it's

4   a traumatic injury beneath and just distal to the stomach in

5   the abdomen.

6   Q.  We'll return to the details of that injury in a moment.

7       Do you recall whether the autopsy report contains any

8   findings regarding the timing of when Rachel may have incurred

9   that injury?

10  A.  No specific timing is reported in the report.

11  Q.  Do you recall whether it contains any findings about the

12  timing of any of Rachel's other injuries?

13  A.  Again, not with specificity.  There obviously are some that

14  are more recent than others, but it doesn't give a specific

15  chronology.

16  Q.  Do you disagree with any of the findings in Dr. Howard's

17  report regarding Rachel's cause of death?

18  A.  No.

19  Q.  Are there any other findings in the report that you

20  disagree with?

21  A.  I don't think there's anything I disagree with, no.

22  Q.  Let's go back to Ms. Bowman's letter, which, again, is

23  Exhibit 58, at Page 2.  Can we enlarge the first two paragraphs

24  and the first two questions, please.  In the second paragraph

25  here, there is an explanation from Ms. Bowman that she has

UNITED STATES DISTRICT COURT

1    several questions for you and she says:  As you explained,

2    answering these questions may involve obtaining access to

3    photographs, slides, and other physical evidence.

4       Why would obtaining that information be necessary to answer

5    these questions?

6    A.  I really need to look at things microscopically to get a

7    better look than you see grossly, particularly when you want to

8    come to physiology which is sort of implicit in the first

9    question here, the symptoms, and number two, the timeline.  You

10   really need to look at something that will tell you the

11   timeline otherwise you're still left with a rather nebulous

12   gross appearance.

13   Q.  Looking at slides is necessary to establish that?

14   A.  Yes.

15   Q.  Do you have any recollection of reviewing any photographs,

16   slides, or other physical evidence in 1994?

17   A.  No.  I'll have to caution it a little bit because I don't

18   know whether there would have been from the Pima County

19   office -- that's where we usually get the reports, directly

20   from them -- whether they would have had gross photos from the

21   autopsy.  I just don't know.  I don't have any recollection.

22   Q.  Okay.  If you did receive such evidence, do you think there

23   would be a record of that in the county medical examiner's

24   file?

25   A.  Well, there would be in two counties.  The county sending,

DIRECT EXAMINATION - KEEN

1    in Pima, and the county receiving, in Maricopa.  Both of them

2    would probably have a record, both of them.

3    Q.  When you were chief medical examiner in Maricopa County and

4    in Yavapai County, if somebody requested copies of tissue

5    slides from your office, would there have been some sort of

6    record created of that?

7    A.  There would be a record and also probably a billing, too,

8    because there is some expense involved.

9    Q.  Great.

10       Can we go back to Dr. Keen's declaration, which, again, is

11   Exhibit 57, and take a look at Page 5.  Can we enlarge

12   Paragraph 13.  13, and Part A under 13.

13       In your declaration you confirmed what you just testified.

14   Or you previously stated something consistent with your recent

15   testimony, that there would be expense associated with copying

16   the photographs, it should be recorded, documented, and

17   invoiced.  And you inferred from the absence of any

18   documentation that the autopsy photographs and tissue slides

19   were not provided to you.  Is that still your opinion?

20   A.  Yes, ma'am.

21   Q.  Thank you.  Let's go back to letter -- it's Exhibit 58, and

22   we'll take a look at Page 2.

23       In the second question here, Ms. Bowman wrote:  How long

24   after the injury occurred would this child die?  Can the injury

25   be dated?  Can the time of death be determined?

1       With respect to Ms. Bowman's question about the timing of

2   injury, is that a question that you would be able to answer

3   after having just reviewed the autopsy report?

4   A.  Not -- no.  The autopsy report does not tell you that much

5   information about the time.  It's generically, it's recent, but

6   it doesn't give you a timeline in terms of hours or days.

7   Q.  What other information would you need to review to answer

8   this question?

9   A.  Well, you always like to have as much clinical information

10  as you can to support, but, assuming you have none, then you

11  look at what you have that you can find from the microscopic

12  examination.  Primarily the focus is going to be on the wounds,

13  the injuries themselves, both the fatal ones and the non-fatal

14  ones, to see if you can establish a timeline.  And you do that

15  by looking at the body's inflammatory response, how did the

16  body respond to the injury, and that will give you some

17  indication as to the timeline.

18  Q.  Do you believe that when this question was posed to you in

19  1994, you would have provided an answer to it without receiving

20  additional information other than the autopsy report?

21  A.  Cannot be any more than generic.  Cannot be any kind of

22  specificity then, can't give you any specificity now, without

23  giving -- without relying upon the actual subject that will

24  tell you that.

25  Q.  Again, we'll just take another quick look at your

1    declaration, which is Exhibit 57 at Page 4.  If we could blow

2    up Paragraph 9.

3         In your declaration, you stated that you would not have

4    speculated about the time of injury based solely on the autopsy

5    report, is that still your opinion?

6    A.  Yes, ma'am.

7    Q.  Thank you.

8         Dr. Keen, we heard both yesterday and this morning that

9    there is some evidence in the record of a call between -- a

10   billing entry for a call between you and Mr. Jones' trial

11   attorneys.  They recorded .7 hours of time, and that was on

12   August 18th, 1994.  Do you have any recollection of that call?

13   A.  I do not.

14   Q.  In your experiences consulting on death cases, assuming

15   that you were consulted on this case, did a party ever ask you

16   to perform a second autopsy?

17   A.  That has occurred, yes.

18   Q.  Is it possible that Mr. Jones' trial lawyers were trying to

19   determine whether a second autopsy was necessary in this case?

20   A.  It's always a possibility.

21   Q.  If the lawyers had asked you whether you thought another

22   autopsy was necessary, what would you have told them?

23   A.  That actually goes in two steps.  One is the first, whether

24   it is or is not necessary.  To make a good and knowledgeable

25   response to that, I probably would have to look at the slides

1   again just to see what was -- what do we have in its entirety

2   from the first autopsy whether we need another one or not.

3       But beyond that, the second, if there was request, yes, it

4   could be done, and there were probably three or four avenues in

5   which that could be done locally.

6   Q.  If the lawyers had asked you whether you disagreed with any

7   of the findings contained in Dr. Howard's autopsy report, what

8   would you have told them?

9   A.  No, I have no disagreement.

10  Q.  Okay.  We're going to get a little bit more specific about

11  Rachel's fatal abdominal injury that you referred to earlier.

12      Did you review some additional documentation provided by

13  our office regarding Rachel's injuries and death?

14  A.  Yes.

15  Q.  Do you recall what those were?

16  A.  Well, I have several things.  I have a little bit more of

17  the background information surrounding the investigation of the

18  death.  We also have information that has been developed by

19  being able to actually look at some slides and look at the

20  inflammatory reaction and response in both in the fatal area

21  and in non-fatal areas.

22  Q.  Did you also look at some autopsy photographs?

23  A.  I've also looked at autopsy photographs.

24  Q.  And you reviewed reports by Dr. Ophoven and Dr. McKay?

25  A.  I have.

1   Q.  Based on your review of these materials, do you have an

2   understanding of the cause of death in this case?

3   A.  The cause of death hasn't really changed.  The cause of

4   death is still a complication of this abdominal traumatic

5   injury which tears the duodenum, or duodenum, and the

6   hemorrhage that's associated with it.

7   Q.  I'm going to have you take a look at Exhibit 54.  Exhibit

8   54 is a hospital record from Kino Hospital from the day that

9   Rachel arrived at the hospital and the day that she died.

10      If we could enlarge the portion of physician notes on

11  there.

12      Dr. Keen, can you read this handwriting?

13  A.  Yes.

14  Q.  Based upon the notes on this document and the other

15  materials that you've reviewed, do you have an opinion about

16  Rachel's likely time of death?

17  A.  Okay.  And I'll point out the basis for this, if we will,

18  here.

19      At this point in time she'd been pronounced dead, dead on

20  arrival, DOA.  The evaluation is in the second paragraph, which

21  is the patient is cool, rigor mortis, or rigor mortis, is

22  evident, and dependent lividity was positive.  The pupils were

23  dilated and non-reactive.

24      For anybody, but even this particular specific child, to

25  have rigor mortis, we're talking about a child that's probably

DIRECT EXAMINATION - KEEN                                    77

1    more than four hours dead.  The lividity is already being

2    described here.

3        What we don't know is whether it's blanchable, but it's

4    already dependent, it is fixed.  So we're, again, sort of in

5    that window somewhere between four and twelve hours to get

6    these kind of findings in a decedent.

7    Q.  Thank you.

8        Based upon your review of all the materials you received,

9    including the photo micrographs of the slides you reviewed, the

10   reports of Dr. Ophoven and Dr. McKay, the autopsy report, the

11   autopsy photos, do you have an opinion regarding the likely

12   timing of Rachel's fatal abdominal injury?

13   A.  That's switching a little bit from the time of death to the

14   time of injury.  The time of injury, absent any real objective

15   medical evaluation of what's going on with her a day earlier

16   than when she's pronounced dead, you have to infer what the

17   typical physiological response would be for this.  My estimate,

18   best estimate, for the time of the injury is going to be

19   approximately two days prior to her death.

20   Q.  Okay.  We're going to take another detailed look at the

21   autopsy report and then move on to some of the microscopic

22   evidence that you looked at.

23       First, let's take a look at the autopsy report again, which

24   is Exhibit 52.  We'll look at Page 8.  If we could enlarge the

25   last finding there under Internal Evidence of Injury.

1    Dr. Keen, is it your understanding that this is describing

2    the fatal injury to Rachel's abdomen that we've discussed?

3    A.  Yes, this is focusing on the bowel injury, to which we're

4    attributing death.

5    Q.  In your practice as a pathologist have you previously

6    observed this injury?

7    A.  Yes.

8    Q.  Do you have any knowledge about how these injuries are

9    usually caused?

10   A.  They usually are blunt force injuries.  Sometimes they are

11   assaults, sometimes they are in the realm of -- the big general

12   realm of accidents, particularly motor vehicle, and sometimes

13   even bicycle-type injuries.

14   Q.  In this finding, Dr. Howard refers to the laceration

15   extends through all layers of the bowel wall allowing direct

16   communication between the lumen of the small bowel and the

17   retroperitoneal connective tissues.  What is he talking about

18   here, what are the retroperitoneal tissues?

19   A.  That's the lining inside the abdomen on the posterior, back

20   side.  So that area behind the small bowel is where it's

21   impacted to that area and it's communicating with it.  The open

22   wound in the bowel is in contact with that area.

23   Q.  I'd like to show you a demonstrative exhibit.  This is an

24   anatomical illustration that I thought might just be helpful to

25   orient us all non-medical folks about what we're talking about.

1  So can you just describe, based upon this picture, what injury

2  we're talking about.

3          THE COURT:  Pause for a moment there.  So is this a

4  marked exhibit?

5          MS. SMITH:  No, this is just a demonstrative exhibit,

6  and it has previously been shared with the state.

7          THE COURT:  Do you have any objection to marking this

8  and including it as an exhibit, since he's going to be

9  testifying off of this?

10          MS. GARD:  I don't, Judge, no.

11          THE COURT:  Why don't we assign it a number.

12          MS. SMITH:  What's our last number?  Trying to make

13  sure we don't have any overlap.

14          THE COURT:  I understand.

15          MS. SMITH:  We'll move to mark it as 57A, and I'll

16  provide a copy to the clerk.

17          THE COURT:  That's fine.

18      So, it's admitted.

19      You may continue.

20  BY MS. SMITH:

21  Q.  Dr. Keen, can you just, based upon this diagram, kind of

22  describe what we're talking about here?

23  A.  Okay.  We have many things that are labeled here that sort

24  of distract from where the real focus is.  The real focus is on

25  the small bowel, which you see as you start going down from the

1  left column in the retroperitoneum.  There's one, two, three,

2  the fourth line down is an arrow that goes to the duodenum, or

3  the duodenum.  That's the portion of the bowel that's damaged.

4      We're describing here the kind of tissues that are in the

5  retroperitoneum, the vascular structures, the aorta, the vena

6  cava, the pancreas.  The damage that we have is in this loop

7  that's coming around to the small bowel.

8  Q.  Great.  Thank you.  I find pictures helpful, so thank you

9  very much.

10     Why is it significant that the laceration here was located

11 in the retroperitoneal space, as opposed to in the abdominal

12 cavity itself?

13 A.  It's somewhat indicative of the mechanism of the infliction

14 of the injury.  It isn't just an intrinsic or a stretching or

15 tearing from something that's happening inside the bowel, but

16 it's an outward force impacting it against where it begins to

17 get resistance, and it's getting resistance against the lining

18 in the back of the peritoneum.

19     This is a particular portion of the small bowel that its

20 motion is somewhat restricted by the blood supply to it, the

21 mesentery, also because of its proximity to the stomach and the

22 pancreas.  The common bile duct goes down through the head of

23 the pancreas and enters the small bowel in this early portion

24 of the duodenum.  And so it can't move much, and so it can't be

25 freely to just be impacted somewhere, it has to be impacted

DIRECT EXAMINATION - KEEN                                    81

1    there.  And because it is torn, it's a force that has gone

2    pretty firm through into the back.

3    Q.  Thank you, Dr. Keen.

4        What would happen if this injury is not treated?  And we

5    can start initially.

6    A.  Let's talk about this injury as opposed to --

7    Q.  "This injury" being --

8    A.  -- as opposed to any injury to this area.  Because if it

9    were an injury that were less severe, if it didn't go through

10   the full bowel wall, you could wind up with hemorrhage, you

11   could wind up with swelling, you could have decreased motility,

12   and you could get some indigestion because things are not

13   moving through the bowel.

14       But when you talk about this injury, to have one that's

15   this significant, you're going to have some of the same things.

16   You're going to lose the usual bowel motility, you're going to

17   have some abdominal discomfort, there will be some aching,

18   pain.  As you progress in response to it, you would not be at

19   all surprised there might be some vomiting.

20   Q.  What about the inflammatory response of the body?

21   A.  The inflammatory response is going to start with

22   neutrophils.  They are sort of scavenging white cell that comes

23   in to clean up wherever any damage is.  There would be some --

24   because it's a tear that has some bleeding associated with it,

25   there are going to be some macrophages that are going to come

1    in to gobble up the iron, because we want to recycle the iron.

2    And then, over time, we're going to change the character- -- if

3    it's just a massive acute inflammation, we're going to have

4    what we commonly refer to as "pus."  You're going to have an

5    exudate that's going to have a lot of those neutrophils in it.

6        But if you survive long enough to get a good reaction, you

7    can begin to see other things.  You could begin to see some

8    lymphocytes, which are going to give sort of an immune kind of

9    response to it.  You can also see some fibroblasts, that are

10   going to try to repair the area, to try to put down some

11   connective tissue, to try to essentially scar it back down so

12   that it doesn't leak and so it can heal.

13   Q.  Did you observe some of these inflammatory responses that

14   you just described in the photo micrographs that you reviewed?

15   A.  We actually do see some early what we call granulation

16   tissue.  These are the healing stages where you have the mixed

17   inflammatory cells, as well as the fibroblasts and fibrin,

18   where you begin to put down the collagen.

19   Q.  Was observing those inflammatory responses relevant to the

20   ultimate opinion you came to about the timing of the injury?

21   A.  Yes.  You don't get that within the first hours or two.

22   This is why I say we could go up to as much as two days back.

23   Q.  Great.  Let's take a look at some of those slides.  We're

24   going to take a look at Exhibit 107, which is one of the

25   exhibits that has now been sealed.  So if we could turn off the

1    monitors in the gallery.

2        Great.  Thank you.

3        Dr. Keen, can you just identify for us what we're looking

4    at here?

5    A.  This is the cover description of a report from Dr. Janice

6    Ophoven.

7    Q.  You reviewed this document?

8    A.  I did.

9    Q.  Let's take a look at Page 12.  Can you describe what we're

10   looking at here?

11   A.  We're seeing a couple of photo micrographs.  The upper

12   one's a 10 times or 10X.  The bottom one sort of a medium power

13   40X.  These are the things that you see down in the

14   retroperitoneum.  The first is the adrenal gland, and we see

15   some redness up in the top, which is actually some hemorrhage

16   in the gland.

17            THE COURT:  You're referring to the top photo?

18            THE WITNESS:  Top photo in this, yes.

19       The lower photo, we're talking about -- we're showing

20   mostly the adrenal gland at a higher power.  We're essentially

21   taking the same kind of area that we had in the upper photo in

22   the lower photo, but it's a little to the right.  It's down

23   below and to the right from where the upper one is, so we don't

24   see the hemorrhage.

25   BY MS. SMITH:

UNITED STATES DISTRICT COURT

1   Q.  Are there certain cells that you can observe in that bottom

2   picture?

3   A.  You see mostly -- yes.  Most of the cellularity that we're

4   seeing in the lower picture, it's a mixed cellularity.  We have

5   neutrophils and lymphocytes in there.  The normal adrenal gland

6   doesn't have any neutrophils.

7   Q.  And, again, can you just tell us what that means in terms

8   of timing.

9   A.  It's early granulation tissue.  It's an early reparative

10  kind of inflammatory response.

11  Q.  Can we take a look at Page 15.

12      All right.  What are we looking at here, Dr. Keen?

13  A.  Similar.  These are photo micrographs, but now the focus is

14  on the small bowel itself, on the duodenum.  It shows that

15  there is a lot of inflammation, and in the right photo there's

16  an arrow pointing to a cluster of darker cells, which are the

17  inflammatory cells.

18      And then there's also -- the lower one is showing that

19  there's a gap.  You don't see a continuity of the tissue, you

20  actually see a clear space, that's the actual tear in the wall.

21  And the inflammation is a pocket of inflammation here, as

22  opposed to just a whole sheet of inflammation.

23  Q.  Can we take a look at the next page, Page 16.  I believe

24  this might just be a larger --

25  A.  It is.  It's a larger photo micrograph and the upper arrows

1  are pointing to the areas where the inflammation is.  In fact,

2  this is essentially -- if you can think back to the previous

3  slide where we actually had a cluster of inflammation, that's

4  the upper inflammation that we see here with the upper arrow.

5  Down below where we see the smooth muscle, there's a gap in it.

6  This is a defect in the muscle, the muscle is torn, it's

7  separated in there.

8  Q.  What are you seeing in the inflammatory response here?

9  A.  It's pretty intense, but it's kind of a mixed -- it is a

10  mixed inflammatory response.  It's both mononuclear and

11  polymorphonuclear cells.

12  Q.  Does that mixed response imply that there's more than one

13  injury? or is it one injury that's in different stages of

14  healing? or is it just one ongoing response?

15  A.  More typical here, because we only have the one type injury

16  here, and we don't see a different age of injury, this is the

17  age of the body's response to it.

18  Q.  During your recent interview do you recall describing some

19  staining -- I'm sorry.  We need to move to the next slide.  I

20  apologize.  Page 17.

21      On this slide we have some different staining, correct?

22  A.  Yes.  We call this a trichrome stain.  It's a stain that we

23  specifically apply to tissues when we're looking for connective

24  tissue, we're looking for collagen, we're looking for things

25  that will eventually wind up being scar tissue, but we're

DIRECT EXAMINATION - KEEN                                    86

 1   trying to see the stages of the development of scar tissue.

 2   Q.  What do you see in the staining in the connective tissue

 3   here?

 4   A.  Well, we have the inflammatory cells, which, now instead of

 5   turning it blue, like they did in the H & E, they're turning it

 6   red.  This is a function of the stain.  But we're seeing the

 7   light blue in here.  This light blue is what's a little more

 8   important, because that's the development of the collagen, the

 9   transition from fibrin to collagen.  It actually starts from

10   fibrinogen to fibrin to collagen to scar tissue in the

11   spectrum.  We're developing some collagen in the tissue.

12   Q.  Is this type of collagen present -- in the inflammatory

13   response that you're observing, is that consistent with a few

14   hours or is it more consistent with a day or more?

15   A.  It's more consistent with days than it is hours.

16   Q.  Can we take a look at Page 23.

17       Can you describe what we're looking at here.

18   A.  This is -- well, it's bowel in the top.  But what we see at

19   the bottom is we're seeing more the surface of the bowel than

20   we are the bowel itself.  On the surface of the bowel we're

21   seeing this inflammatory response.  Essentially, as I sort of

22   made a reference to earlier, this is microscopic evidence of

23   some pus that's developing on the surface of the bowel.

24   Q.  Is this consistent with peritonitis?

25   A.  It is peritonitis.  Peritonitis is any inflammation of the

DIRECT EXAMINATION - KEEN

1   peritoneum, and the "itis" is our terminology for inflammation,

2   so peritonitis is inflammation of the lining.

3   Q.  That's what we're looking at on these slides?

4   A.  Yes.

5   Q.  Thank you.

6       Let's take a look at Page 4, and this does contain an

7   autopsy picture.

8       What do you see in this picture, Dr. Keen?

9   A.  This is early on in the autopsy.  We've made an incision,

10  we've exposed the abdominal contents.  To the left, towards the

11  numbers here, we see the liver, that is protruding below the

12  rib cage.

13      Then we see -- all the rest of this in the abdomen, we're

14  seeing two or three things.  We're seeing -- actually there

15  wasn't much comment made about it in the autopsy, but we're

16  seeing some reaction actually in the omental fat.  Sort of the

17  dominant thing that you're seeing here, this yellow

18  discoloration in the abdomen, that's the fat.  That's sort of a

19  fatty apron.  The omentum is a fatty apron that responds in the

20  abdomen.  It's spreading out over this area.  You're suspicious

21  that it's inflammatory, there's something going on.

22      If you look down, there's an arrow pointing to the bottom,

23  which is just above the pelvis.  This is some exposed leakage

24  of fluid.  It's a combination of both inflammatory, it's

25  cloudy, but it's also hemorrhagic, that's why it's got some of

DIRECT EXAMINATION - KEEN

1   this red tinge to it.  So we have some free fluid that's in the

2   abdomen.

3       At this point, this photo has been taken, and just the

4   mechanics of how we do an autopsy, this has been discovered as

5   they've opened and reflected.  Now we go get the identification

6   number and get the camera and take the picture.  Meanwhile

7   we're still continuing to lose, and we don't have an accurate

8   total quantity of the fluid.  We've lost some before we get to

9   here, and we're still losing some fluid at this point.

10  Q.  Understood.

11      And let's take a look at the autopsy report to see what

12  Dr. Howard documented.  So, again, this is Exhibit 52 and we're

13  at Page 8.  If we could highlight finding number three under

14  Internal Evidence of Injury.

15      Could you just read that for us, Dr. Keen?

16  A.  It says 85 milliliters of dark green to brown fluid are

17  present in the peritoneal cavity.

18  Q.  Is that consistent with what you were just describing?

19  A.  Well, yes.  But I would bring into question the accuracy of

20  85.  It may even be more than 85.  That's what he's measured

21  here, estimated, but he may have already lost a little.

22  Q.  Is that a relatively small or large amount?

23  A.  It's significant, it's more to the large, but it's not

24  real -- not a real large volume.

25  Q.  It's not showing a large amount of blood in the abdomen or

1   anything like that.

2   A.  No.

3   Q.  We're going to go back to Exhibit 107.  If we could take a

4   look at Page 3.  Again, this is another photograph of Rachel

5   from autopsy.

6       Do you see some bruising on Rachel's abdomen that might be

7   consistent with the infliction of her abdominal injury?

8   A.  Yes, we do.  This is the body and to -- just for points of

9   background, to interpret this, the livor mortis, the purple

10  discoloration of the settling of blood in the gravitational

11  field was described as being on the back side, even at the ER.

12  So this is not because the body has been turned to this

13  particular position, this is residual effects of something

14  happening to the front of the body.

15      We have a series of little red marks that are going across

16  the chest, they actually correspond pretty closely to the

17  underlying ribs, so there's been some pressure against the ribs

18  in that area.  But if you look right under, in the stomach area

19  there, and there's a little bit of more of a purple

20  discoloration to it and there's slight ovoid configurations of

21  that.  That's the kind of injury that I would be suspicious of

22  being a fist to that area of the abdomen, that this is a punch

23  just under the rib cage going to where the stomach and the

24  small bowel are.

25  Q.  Dr. Keen, I'd like to briefly show you Exhibit 45, which is

DIRECT EXAMINATION - KEEN                    90

1    in evidence.  This is a declaration from Dr. John Howard.  Can

2    we pull up Page 3.  If we could enlarge Paragraph 11, please.

3        Dr. Howard says that he testified that Rachel had some

4    bruises on her body which were consistent with having occurred

5    four to six days prior to her death, and, had he been asked, he

6    would have testified that those older bruises could have been

7    consistent with the blunt force trauma to Rachel's abdomen.

8        Do you agree with Dr. Howard's statement?

9    A.  I do.

10   Q.  Thank you.

11   A.  I'll have to modify that response a little bit.

12   Q.  Sure.

13   A.  I agree that that's what it means.  I'm not going to judge

14   him for his judgment on this at all.

15   Q.  We wouldn't want you to.  Thank you, Dr. Keen.

16       Based upon your review of the photo micrographs, the

17   autopsy report, the autopsy photos, do you feel comfortable

18   rendering opinion about the time of Rachel's injury?  Abdominal

19   injury.  Excuse me.  Let's be specific.

20   A.  Again, I can't give you a real precise day and time on it.

21   But it's more than hours.  And it's more in the days than it is

22   the hours.  More like a couple days.

23   Q.  Let's move on to talk about a couple of Rachel's other

24   injuries that were observed.

25       Dr. Keen, did you review any photo micrographs or slides of

1   tissue from Rachel's scalp?

2   A.  Yes, we have, but these have been -- I don't even know if I

3   have the actual slides myself for that, but I've seen others

4   have done that.

5   Q.  Okay.

6   A.  And I've seen the photographs of the scalp injuries.

7   Q.  Okay.  Let's take a look at Exhibit 107 at Page 2.  This is

8   a photograph of Rachel's scalp injury.  Just to clarify, within

9   this Exhibit 107, there are no photo micrographs of any

10  microscopic tissue from Rachel's scalp.

11  A.  Correct.

12  Q.  I believe you've seen gross photographs, but haven't

13  actually seen microscopic images.

14  A.  That is correct.  I don't even know if there was any slide

15  taken of this particular injury.  What we have here though is

16  at the time they're doing the autopsy they have shaved around

17  this, what we call, laceration.  It's a blunt force type injury

18  that has torn the scalp, as opposed to cut, and you can see it

19  goes virtually through the full thickness of the scalp.

20  Q.  Do you have any opinions about the cause or timing of this

21  injury based solely on review of the gross photographs?

22  A.  I have disqualified a little bit because it is just on the

23  photo here, but it appears -- and I don't know actually even

24  quite the timing of this, although it's likely to be within 30

25  minutes or so of the time -- of the start time that's on the

1    face sheet of the autopsy.  Because this is very early on in

2    the autopsy.  And there's nothing to say that this is done when

3    the body arrives before it's examined.  This is when it's being

4    examined.

5    Q.  You're referring to the time that the photograph was taken?

6    A.  The time of the photograph.  But based upon this

7    photograph, it's already showing some drying artifacts around

8    the edges of this.  That's the darker brown color that we see.

9    This is an area which has bled, is not bleeding now, and it's

10   beginning to dry a little bit.  But still an impressive wound.

11       When did that occur?  Which is, I suppose, the question.

12   When did this kind of injury occur?  That's probably at least

13   in the previous day.

14   Q.  Would it be helpful to review actual tissue slides of photo

15   micrographs to give a more precise timing to this injury?

16   A.  Yes.

17   Q.  Let's talk about Rachel's vaginal injury.

18       You did review some photo micrographs of tissue taken from

19   Rachel's vaginal injury, correct?

20   A.  I did.

21   Q.  Great.  Let's take a look at page 28.

22       What are we looking at here, Dr. Keen?

23   A.  Well, this is the microscopic appearance, as opposed to the

24   gross.  You don't want to go gross first?

25           THE COURT:  I think he's asking you a question.

1    BY MS. SMITH:

2    Q.  Do you think it's necessary to take a look at the gross

3    pictures?

4    A.  We don't have to, but we just realize the gross -- the

5    vaginal area has an injury and it's now been sampled, and these

6    are the microscopic sections through the area from the injury.

7         What we have is a rather -- the dark red swollen areas we

8    see, these are dilated blood vessels that are in response to

9    the injury.  There is slowed circulation of the area, they're

10   getting congestion and we're getting the hemorrhages.

11        But then we get over to the right-hand lower side, we again

12   go to trichrome, and we're seeing that there is some connective

13   tissue.  This is an older injury, it's even older than the

14   other injuries that we're seeing inside the abdomen.  These are

15   older than that even.

16   Q.  So multiple days old.

17   A.  Yes.

18   Q.  When you refer to the red parts of the images, we're

19   looking here, can you put any sort of time period on those

20   other than saying that they're newer than the older injuries?

21   A.  Most of this blood is still within vessels.  It's not

22   spreading out in sheets in the tissues, it's still within --

23   confined within confined spaces.  It's within capillaries, in

24   venules, so it's a little hard to tell exactly how long it's

25   been there.

1      What you look at, you look at the integrity of the red

2    cells.  Are they still individual or are they falling apart

3    into a sheet?  I can't tell.  So I can't be a whole lot more

4    refined in telling what this -- except it is older than the

5    abdominal injury, but it's still not an ancient injury.

6    Q.  Okay.  Do you have any opinion about whether the vaginal

7    injury is indicative of sexual abuse?

8    A.  I'll have to qualify a response to that a little bit, too.

9    Sexual, I think in legal terms, is probably -- is determined by

10   the geography of the anatomy.  If there is anything -- anything

11   that happens to male or female sexual areas, it's sexual.  It

12   does not necessarily mean that there was anything that was

13   specifically meant to damage or penetrate or otherwise do

14   something to the sexual areas.  But, yes, it's in the sexual

15   area, it's in the vaginal area.

16      The injury that we see here does not necessarily involve

17   even mechanical penetration or external injury to it.  You

18   could get many of these kinds of injuries even from some

19   abnormalities of stool.  Firm stool, soft stool, diarrhea, not

20   changing the diaper, all those sorts of things could do these

21   same sorts of things.  If you have poor hygiene, over time you

22   could get this same kind of picture.

23   Q.  Okay.  So this could be resultant irritation from clothing,

24   for example, poor hygiene, potentially rubbing up against some

25   object.

1   A.  Could certainly produce this, yes.

2   Q.  Let's take a look at your declaration again, which is

3   Exhibit 57.  We'll take a look at Page 4.

4       I'm sorry.  I want to take a look at Paragraph 10, which I

5   believe begins on the end of Page 4 and spans on to the top of

6   Page 5.  If we could enlarge Paragraph 10.

7       Dr. Keen, here you say that based upon your review of the

8   evidence, you agree with Dr. Ophoven that the key findings in

9   this case of abdominal trauma of many days' duration were not

10  made clear.  The evidence shows that the fatal injuries to

11  Rachel Gray could not possibly have been inflicted on the day

12  prior to her death, as suggested by the state at Mr. Jones'

13  trial.  The veracity of this evidence is as scientifically

14  precise as any forensic determination in medical science.

15      Do you still agree with that opinion?

16  A.  I agree with that.  I might modify the wording just

17  slightly in terms of -- basically the thought there is, yes, I

18  agree with that.

19  Q.  Can we take a look at Paragraph 11.

20      Here you say that based upon the stains of the anogenital

21  tissue that you reviewed, you also agree with Dr. Ophoven's

22  conclusions that the vaginal injury occurred days or perhaps

23  longer before her death, not on the afternoon of May 1st.

24      Is that correct?

25  A.  Yes, I agree with that.  And if you'll bear in mind this

1   wording and think of that same conclusion into the previous

2   paragraph, then my confidence level goes even up.

3   Q.  Great.  Thank you, Dr. Keen.

4       And you believe that -- do you believe that you have

5   reviewed sufficient evidence to render these opinions?

6   A.  Yes, ma'am.

7   Q.  Have there been any developments in medical research or any

8   other developments in pathology that have changed the

9   understanding of these types of injuries since 1994?

10  A.  I can't cite you specifics, but medicine is still pretty

11  dynamic, and we're doing lots of things with a different --

12  different level of precision now than we did 20 years ago.  But

13  I don't specifically have reference to specific injury

14  evaluations for timelines.

15  Q.  In terms of the process of evaluating tissue slides

16  microscopically, is that the same process that would have been

17  done in '94?

18  A.  For what we've done here, yes.  What you can do today that

19  we didn't do, still haven't done in this case, is there are

20  some biomarker things that you can look at, but it would not

21  even be particularly relevant in this case.  Today -- if this

22  were the case coming in today, we'd do the same sorts of things

23  as we've done here to try to establish a timeline.

24  Q.  If you had been provided with autopsy photographs and

25  tissue slides by Mr. Jones' trial lawyers back in 1994, and if

1    they had asked you to render an opinion about the timing of

2    injury, would you have testified consistent to how you've

3    testified today?

4    A.  I probably would.  And I have to qualify that again a

5    little bit, too.  Because what I would receive typically would

6    be H & E slides, just the regular H & E slides.  Unless they

7    also provided me a paraffin slice that was unstained, I

8    wouldn't be able to do a trichrome.  I could try to take the

9    cover slip off and try to restain it, but I think I would not

10   have had the evidence of the trichrome.

11       What I would have had though would have been a slide that

12   would have shown me the different kinds of inflammatory

13   response.  And you still see the pink kind of tissue that winds

14   up being blue in the trichrome, you still see that being

15   deposited down.  So I would have come up with a conclusion, I

16   think, that it would have certainly been longer than a day

17   between the injury and the death.

18           MS. SMITH:  Thanks, Dr. Keen.  I don't have any other

19   questions right now.

20           THE COURT:  Thank you.  Cross-examination.

21           MS. GARD:  Yes, Judge.

22                        CROSS-EXAMINATION

23   BY MS. GARD:

24   Q.  Good morning, Dr. Keen.

25   A.  Good morning.

1    Q.  I guess I'll start with your interactions between -- the

2    interactions you had with counsel in this case, which I

3    understand that you don't remember any of the details there.

4    But you were asked questions about whether it was possible that

5    you discussed the need for a second autopsy.  You recall that

6    line of questioning?

7    A.  Yes, ma'am.

8    Q.  Isn't it also possible that you did discuss those referral

9    questions in the letter?  The questions that --

10   A.  Who's discussing?  Counsel and me or --

11   Q.  You and the attorneys.  You and the attorneys.  When you

12   had the phone call that you were questioned about on direct.

13   A.  Okay.  The 1994 phone call?

14   Q.  Yes, the 1994 phone call.

15   A.  It's possible, depending upon the line of questioning, the

16   conversation.  That would -- if that was something that was on

17   their mind and mentioned, it certainly could have been brought

18   up.

19   Q.  And that brings up another point, too, is that you've

20   consulted on a number of cases, right?

21   A.  Over the years, yes.

22   Q.  And I'm certain that you have had conversations with

23   attorneys where they have maybe come to you and said, "this is

24   the theory I'd like to pursue, do you have any opinions that

25   would be helpful? " right?

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - KEEN

1   A.  You know, that might happen, but it's -- they know me

2   pretty well, know that's not the best way to approach me.

3   Q.  But it has happened in the past.

4   A.  It has happened, and usually the door gets shut.

5   Q.  But, on the same topic, you don't know if, for example,

6   they gave you -- they told you about the information that the

7   police had developed in their investigation, right?

8   A.  I don't know that, no.

9   Q.  And that would have been relevant to your opinion, correct?

10  A.  In terms of whether -- if the focus is whether you do need

11  a separate -- second autopsy or not, it would be pertinent to

12  that.  In terms of interpreting the autopsy, I don't know that

13  would make much difference, one way or the other.

14  Q.  If the police had collected information about the victim's

15  behavior in the days before her death, would that be relevant?

16  A.  That would be relevant.

17  Q.  And it would be relevant if the victim appeared uninjured

18  and fine for a certain period of time and then at some point

19  started showing symptoms of illness, right?

20  A.  If you have that you like to know that, and you like to

21  refine it a little bit more, what the changes were, when it

22  was, and was it something that just got progressive to that

23  point or was it something that was totally new.

24  Q.  Right.  And this type of injury -- I think you agreed in

25  your interview, but this type of injury would have immediate

1  pain, right?  Likely?

2  A.  You should have immediate pain.

3  Q.  Then you would never really recover fully from that pain as

4  the infection progressed, correct?

5  A.  That's also true.

6  Q.  So whoever suffered an injury like this should continue to

7  experience symptoms.

8  A.  Well, not only should they experience symptoms, but

9  there's the potential -- particularly in this age group of a

10  child -- the potential for expansion of the injury over time,

11  you have to look at that possibility as well.

12  Q.  What would that -- can you describe that a little bit?

13  A.  If you damage the small bowel, and you may have a surface

14  laceration but not a full thickness laceration, but if you put

15  more pressure to it over time and it gets to be bigger, then

16  you're going to have even more symptoms.  So if there's a

17  changing of symptoms and if there's a history of repetitive or

18  a second episode in there, I think that sort of thing you have

19  to take into account.

20      I listen to all the things, I listen to the attorney and I

21  listen to the police, but you have to evaluate them as is it

22  true? is it false? how does it match what we see?

23  Q.  There are a lot of variables that would influence the

24  timing of an injury between the injury and death, right, that

25  would influence that time period?

1   A.  Yes.

2   Q.  Some of those variables, I think you told us before, were

3   if someone tried to feed the victim?

4   A.  Whether they -- yeah, if they're not feeding, you don't

5   know whether they have any change in their digestion.

6       So, there's a change in digestion, you need to know

7   something about the intervals of trying to eat.  What you're

8   trying to put in, whether it's liquid or solid.  And also who's

9   observing, who's looking, do we have independent third parties

10  looking to see what's going on.

11  Q.  I think one of the things you mentioned to us at the

12  interview was that if the victim had attempted to ingest water

13  or food, that could irritate the bowel and accelerate the

14  process?

15  A.  Yes.

16  Q.  And other things that could accelerate the process or could

17  affect the progression are things like the general health of

18  the person who suffered the injury, right?

19  A.  That's also true.

20  Q.  So, in this particular case, I think there is some

21  suggestion this is a very small, almost underweight child,

22  right?

23  A.  Yes.

24  Q.  There is also a suggestion that she's living in sort of

25  suboptimum conditions, right?

CROSS-EXAMINATION - KEEN

1   A.  I would conclude that, yes.

2   Q.  And I think you agree that there is some evidence that she

3   is a chronically abused child, right?

4   A.  Yes.

5   Q.  In fact, you reviewed Dr. Ophoven's report, and she

6   diagnosed battered child syndrome, I think, right?

7   A.  I think she uses that terminology, yes.

8   Q.  So these are all things that would affect the general

9   health of the little girl in this case, right?

10  A.  Yes, ma'am.

11  Q.  And potentially affect the progression of this injury,

12  right?

13  A.  Yes.  But whether it accelerates or decelerates, you need

14  to know the history of what's going on.

15  Q.  And that's because everybody is different, right?

16  A.  Yes.

17  Q.  And there's just so many moving parts in all of these cases

18  that we can't really -- you know, we can't really give a

19  precise time table how long this process would take.

20  A.  I think that's correct.

21  Q.  Going back to your discussions with the attorneys in 1994,

22  you have no idea why you did not testify in this case, correct?

23  A.  I wasn't asked.

24  Q.  But you don't know why you weren't asked to testify.

25  A.  No.  And consistent with that also, with my lack of

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - KEEN

1   recollection and lack of documentation of any exchange other

2   than their comment that there was a long telephone

3   conversation, I didn't have enough upon which to form a basis

4   for an opinion to testify.

5   Q.  All right.  And you have no independent recollection

6   whether you received the slides in 1994, correct, tissue

7   slides?

8   A.  Number one, I have no recollection that I did, but I have

9   no evidence that I ever did.

10  Q.  Okay.  And your understanding of what is contained in the

11  Pima County medical examiner's file, that came from the Federal

12  Public Defender, right?

13  A.  Yes, I did not ask independently for them to research the

14  files.

15  Q.  And to this day, in fact, you haven't seen the actual

16  slides, you haven't been given those.  The actual physical

17  slides to look at under a microscope.

18  A.  And I've not asked for another set.

19  Q.  Right.  Right.  But you're relying on the pictures that

20  Dr. Ophoven took, correct?

21  A.  Yes.

22  Q.  And in terms of the information that you reviewed or that

23  you were given by the Federal Public Defender to review in this

24  case -- go ahead.

25  A.  Let me back up here a moment again.  I am not sure that's

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - KEEN

1    totally true, because these cases tend to blend over time here.

2    I know I've seen the photo micrographs, I don't know whether I

3    saw glass slides that Janice provided or not, I just don't

4    remember.

5    Q.  You don't remember one way or another?

6    A.  Pardon me?

7    Q.  You don't remember one way or another?

8    A.  I don't remember one way or another.  But I am dependent

9    upon the photo micrographs.

10   Q.  Do you recall being interviewed this summer by Mr. Braccio?

11   A.  Yes.

12   Q.  In August?

13   A.  Yes.

14   Q.  Do you recall at that point saying you hadn't seen any

15   tissue slides?

16   A.  That's still my opinion.  I don't think I have.

17   Q.  But you're just not certain.  Fair enough?

18   A.  Yes.

19   Q.  Okay.  Understood.

20       In terms of your understanding of the facts of this

21   particular case, you haven't seen the police reports, correct?

22   A.  Seen some, but not the full police reports, no.

23   Q.  Let me just back up a second.

24       You're relying in large part on what you see in

25   Dr. Ophoven's report for the factual basis of how this injury

1   developed and what happened to this little girl, is that

2   correct?

3   A.  I saw that, but I am not relying upon that.  I am trying to

4   draw my own conclusions of what I can see primarily from the

5   autopsy photos, from the autopsy itself, and then what we see

6   in the few things that we have sampled microscopically.

7   Q.  In terms of the collateral information that was available

8   to you though about the way the victim was behaving and what

9   the police investigation developed, you didn't get that

10  directly from police reports.

11  A.  I did not.

12  Q.  But you did meet with the Federal Public Defender and they

13  provided you orally some additional information about the case,

14  right?

15  A.  Yes.

16  Q.  You relied on that also in part to form your opinion?

17  A.  I relied upon it as a source of information, but it doesn't

18  really -- it's not definitive enough for me to really rely upon

19  to get the definitive opinion.

20  Q.  Okay.  So you would agree then that although you can give a

21  range that you think an -- where an injury -- a range of time

22  that you think an injury progressed between the time of

23  infliction and death, there is no way to precisely say an

24  injury happened at a certain time, right?

25  A.  I don't know of a way.

1    Q.  Okay.  So you can't rule out that the injury may have

2    been -- may have occurred less than 24 hours before her death,

3    for example.

4    A.  Some of the inflammatory changes are definitely longer than

5    24 hours.  But the real crux of that becomes is it this injury

6    or is it another injury superimposed.

7    Q.  Well, then let's talk about that.

8            THE COURT:  Can I ask you to clear up with the

9    witness?  Because you've made a general statement about

10   inflammatory injuries, are you talking about the inflammatory

11   injuries to the genitalia?  Are you talking about the

12   inflammatory injuries to the small -- small intestine?

13           MS. GARD:  Thank you.  Yes.

14           THE COURT:  I don't think you can approach it that

15   broadly, I think you need to break it down.

16           MS. GARD:  You're right.  That was just an oversight

17   on my part, Judge.

18           THE COURT:  Go ahead.

19   BY MS. GARD:

20   Q.  Let's start with the abdominal injury.  You can't rule out

21   that that injury happened, you know, less than 24 hours, is

22   that right?

23   A.  Okay.  I am going to have to expand your injury a little

24   bit, I'm going to make it plural instead of singular.

25   Q.  All right.

1    A.  The singular, which is the fatal one, but we have so much

2    evidence of the bruising that's occurring on the abdominal wall

3    that now the abdominal injuries become plural, and I don't know

4    the full time line of those.  The statement by Dr. Howard, who

5    was the examining pathologist, in his subsequent declaration, I

6    don't disagree with that.  I think all of us are probably

7    pretty much in that same ballpark, whether it's Ophoven, or the

8    trauma physician, or John, or myself.  We're all saying that we

9    have some injuries here that go back longer than a day to get

10   to this point.

11            THE COURT:  Are you talking about the --

12            THE WITNESS:  Talking about the bowel.

13            THE COURT:  The fatal injury.

14            THE WITNESS:  The fatal injury.

15            THE COURT:  Can you say again one more time how long

16   you think that time period is.

17            THE WITNESS:  I think it could be -- it's longer than

18   a day, but it could be up to a couple days.  In some ways it

19   could even be a little bit longer.  But I'm more of a two-day

20   person.

21   BY MS. GARD:

22   Q.  There is some amount of discretion, right, with the person

23   rendering the opinion, in terms of -- right?

24   A.  It isn't exactly a 12 hours and 53 minutes type thing, we

25   don't have that kind of precision.  We have a little bit of

1    overlap.  But we're all pretty much in the same ballpark,

2    Dr. Howard, Dr. Ophoven, and I.

3    Q.  I am going to direct you again back to your interview this

4    summer with Mr. Braccio.

5            THE COURT:  Before you go there, I'm sorry, while

6    we're still on this same topic, I just want to clear up.  I

7    understood your testimony to be, in regard to the vaginal

8    injuries, that those are -- could you tell me -- you tell me

9    how long you think those occurred before....

10           THE WITNESS:  The vaginal injuries began sometime in

11   the past.  And it's enough remotely past that we don't -- I

12   wouldn't even put it in the context of this same injury.  It's

13   not in the death timeline.  The vaginal irritations, the

14   vaginal trauma, the vaginal changes go back.  Those could go

15   for weeks.

16           THE COURT:  Thank you.

17           THE WITNESS:  As opposed to what's really the focus of

18   what causes the changes that lead to death.

19           THE COURT:  Okay.

20   BY MS. GARD:

21   Q.  Staying on the topic though of the vaginal injury, I think

22   you had told us at your interview, do you recall saying that

23   you saw evidence of a new injury superimposed on that old

24   injury?

25   A.  Yes.  You see that, you see the -- when you actually look

UNITED STATES DISTRICT COURT

1    at the gross photographs, you can draw that conclusion from the

2    character of the laceration that's occurring in the floor of

3    the vaginal vault there.  But when you look at it

4    microscopically, you're seeing older things.

5    Q.  So there is some sort of combination of an older healing

6    injury and a more fresh injury.

7    A.  In the vaginal.

8    Q.  In the vaginal.

9    A.  Yes.

10   Q.  Can you tell how fresh that new bleeding is, when that

11   would have occurred?

12   A.  I can't really.

13   Q.  You just know that it's more recent than the older.

14   A.  Yes.

15   Q.  So you agreed, I think, before that there is evidence of

16   repeat trauma to Rachel's vagina.

17   A.  Repeat injury.  I think I choose "injury" as opposed to

18   "trauma."  If "trauma" carries the implication of some

19   intentional infliction, let's stay with "injury."

20   Q.  Also on that same topic, you were asked hypothetical ways

21   that these types of injuries could have occurred to her vagina,

22   but another way is by attempted penetration, right?

23   A.  By an object, yes.

24   Q.  By an object, mmm-hmm.

25       So going back to -- I want to kind of narrow down this

1    abdominal injury just to make sure I understand.

2        You do recall your interview, again, this summer.  At that

3    interview, do you recall saying you couldn't rule out that it

4    was hours old but that it was more consistent with days?

5    A.  That's true.

6    Q.  So you can't 100 percent say it's not a few hours old, you

7    just say it's more consistent --

8    A.  Well, it's -- it's -- in the few hours, we're talking 12

9    plus as opposed to two plus.  It's more towards the daytime.

10   But it's still hours, as opposed to something that just

11   happened within minutes.

12       And part of the problem here is we have a death which I

13   think is occurring probably in the early morning hours and just

14   not discovered 'til later.  Because we're probably dealing with

15   somebody that's somewhere between four and eight hours dead by

16   the time they show up at the ER, and we're not going to have

17   progression of the physiologic response to the injury in this

18   period of time.  When we start looking at the timeline ahead of

19   that, it's prior to that death time.  So that puts us back

20   earlier.  If you follow what I'm --

21   Q.  Right.  So the injury would be, for example, a number of

22   hours before that actual time of death.  And that's what we're

23   charting from, is the time of death --

24   A.  Yes.

25   Q.  -- on back.

1          THE COURT:  Before we move on, I just want to make

2   sure I am understanding his testimony clearly.

3      I'm not trying to put words in your mouth, but I am trying

4   to repeat back what I think I understand you to be saying.  Are

5   you saying it's not sooner than 12 hours but more likely a

6   longer period of time?

7          THE WITNESS:  I am saying it's probably not less than

8   12 hours between injury and death.  The body is not going to

9   continue to try to -- there won't be much of a cellular

10  response at all to the injury.  Whatever the injury is,

11  that's...(slapping table)...the clock stops when they die.  And

12  so whatever we see when we're looking at the autopsy at that

13  point, and we're trying to go back prior to the death time to

14  when the injury began, it's going from earlier than the death.

15  So if we talk about a body that's already been dead for 12

16  hours and we're talking about an injury that might be 12 hours

17  old, we're talking at least a day.

18         THE COURT:  And so you're saying it's more likely it's

19  not less....

20         THE WITNESS:  The real crux here is we're talking

21  about an afternoon injury on the day prior to the pronouncement

22  of death.  Is that the injury -- is that the time of the trauma

23  that caused the death or is it earlier than that?  And the

24  evidence suggests that it's probably earlier than that, it's

25  probably not an afternoon injury.

1          THE COURT:  You cut to my question.  Thank you.

2     BY MS. GARD:

3     Q.  I noticed that you were talking in terms of probabilities

4     though.

5     A.  Yes.

6     Q.  That you can't absolutely say that it was not that

7     afternoon, right?

8     A.  What I can't say about the afternoon is -- as I've made a

9     reference to earlier here of superimposition, if you put

10    another injury in in the afternoon to somebody that has already

11    started having the injury earlier, I can't rule that out.

12    Q.  Oh, okay.  I understand.  So there could have been already

13    a preexisting injury that was injured again.

14    A.  That's already significantly injured, already torn, already

15    giving an inflammatory response.  But if we put more pressure

16    to it again, we may expand the injury.

17    Q.  And accelerate --

18         THE COURT:  That's the word I wanted to ask.  Go

19    ahead.

20    BY MS. GARD:

21    Q.  Accelerate the inflammatory response?

22    A.  Yeah, it could do that as well.

23    Q.  And accelerate death by doing that.

24    A.  Yes.

25    Q.  So because there is so much uncertainty, would you agree

1    that the collateral information might be helpful -- the

2    information about how the victim had behaved and her symptoms

3    might be helpful to pin this down?

4    A.  Yes, it would be, and definitely it would have been.  You

5    know, we're talking twenty-some years later here, which, the

6    accuracy of that information may not be the same as it would be

7    if we were doing a case today.

8    Q.  Again, you don't remember if you were given that

9    information at the time or not.

10   A.  Not in detail.

11          MS. GARD:  I have nothing further.  Thank you.

12          THE COURT:  Redirect?

13                    REDIRECT EXAMINATION

14   BY MS. SMITH:

15   Q.  Just a few follow-up questions, Dr. Keen.

16        Your understanding of Dr. Howard's opinion is based only of

17   your review of his declaration, you did not actually review his

18   testimony in this case, is that correct?

19   A.  That is correct.  The first statement of his opinion is the

20   autopsy report, he did the autopsy report.  The second is his

21   declaration of the interpretation of it.

22   Q.  But you haven't actually reviewed what Dr. Howard testified

23   to at Mr. Jones' trial.

24   A.  I have not.

25   Q.  Is your opinion based primarily on the microscopic review

1    of the tissue slides with respect to the timing of the

2    abdominal injury?

3    A.  It's a combination.  The microscopic slides confirm what

4    the suspicions are, grossly suspicion.  If this were just a

5    very acute process, I expect it not to be cloudy, not to be

6    green, not to be murky, but it would be much more hemorrhagic

7    and more liquid.

8    Q.  And I believe a moment ago you said that you wanted to

9    specify that the fatal injury that we were talking about was a

10   singular one, is that correct?

11   A.  Yes.

12   Q.  Did you see any evidence of more than one injury to

13   Rachel's duodenum?

14   A.  No, I think our focus is on the tear.

15   Q.  And that is one single injury.

16   A.  That's one single injury.

17   Q.  And Ms. Gard just referred you to the interview that was

18   conducted earlier this summer.

19   A.  Yes.

20   Q.  In that interview, do you recall saying that the shortest

21   time that you could talk about with respect to the abdominal

22   injury was probably at least two days?

23   A.  Yes.

24   Q.  Is that still your opinion?

25   A.  My comfort level is there, two days.  I just cannot be

1   persuaded into the less than a day.

2          MS. SMITH:  Thank you.  I don't have anything else.

3          THE COURT:  Thank you, very much.  I think we are done

4   with you and I appreciate you taking the time.

5          THE WITNESS:  Okay.

6          THE COURT:  You can step down now.

7       Mr. Sandman?

8          MR. SANDMAN:  Our next witness will be Sean Bruner.  I

9   think we initially anticipated a longer cross and so we asked

10  him to be here by 2:00, but we'll try to get him here as soon

11  as we can.

12         THE COURT:  Do you have somebody else in the interim?

13         MR. SANDMAN:  We don't have anyone else but Sean

14  Bruner.  All of these experts are coming from out of town.

15  There is no one else in Tucson.

16         THE COURT:  I understand.  How long will it take you

17  to find out if he can be here sooner?

18         MR. SANDMAN:  We can try to call him right now.

19         THE COURT:  Let's go off record for a few minutes,

20  because that will inform when we're coming back.

21         MR. SANDMAN:  Okay.

22      (Pause in the proceedings)

23         THE COURT:  We will resume at 1:15.  Thank you, very

24  much.

25      (A recess was taken from 12:02 p.m. to 1:29 p.m.)

1            THE COURT:  Your next witness, please.

2            MR. SANDMAN:  Sean Bruner.

3            THE COURT:  Sir, if you could please come and stand in

4    the witness box and Madam Clerk will swear you in.

5            MR. BRUNER:  Thank you.

6            **SEAN BRUNER**, WITNESS, SWORN

7            THE COURT:  Mr. Sandman, you may inquire.

8            MR. SANDMAN:  Okay.

9                         DIRECT EXAMINATION

10   BY MR. SANDMAN:

11   Q.  For the record, state your name, please.

12   A.  Sean Bruner.

13   Q.  Mr. Bruner, you previously represented Barry Lee Jones, is

14   that right?

15   A.  That's correct.

16   Q.  Did you represent him in connection with trial proceedings

17   in Pima County concerning charges of first degree murder and

18   other related charges?

19   A.  Yes.

20   Q.  And can you tell us how long you've been practicing law?

21   A.  Thirty-five years.

22   Q.  Are you currently employed?

23   A.  No, I am retired as of July 22nd.

24   Q.  What was your last employment?

25   A.  Last seven years I spent at the Pima County Public

1   Defender's.

2   Q.  You were previously deposed in this case?

3   A.  Yes.

4   Q.  On June 30, and then again on July 25, 2017?

5   A.  I'll accept those dates.

6   Q.  Were you offered the opportunity to review your deposition

7   and the appended exhibits?

8   A.  Yes, I was.

9   Q.  Did you take that opportunity to review your deposition?

10  A.  No, I did not.

11  Q.  I'd like to show you a copy of a Pima County Superior Court

12  Docket 7.

13          MR. SANDMAN:  Your Honor, this is from the Pima County

14  Superior Court file in Mr. Jones' case.

15          THE COURT:  When you say -- the exhibit number is in

16  this case or in the Pima County case?

17          MR. SANDMAN:  This is just out of the docket from the

18  Pima County Superior Court, just the order appointing counsel.

19  It is part of the record in this case.

20          THE CLERK:  This is Exhibit 7, which has not been

21  admitted.

22          MR. SANDMAN:  We won't be offering it.

23          THE COURT:  I'm sorry.  This is part of the trial

24  court docket?

25          MR. SANDMAN:  Yes.

 1            THE COURT:  Is it an exhibit in the case?

 2            MR. SANDMAN:  No, it's just --

 3            THE COURT:  Does it have a Bates number?

 4            MR. SANDMAN:  It's just part of the --

 5            THE COURT:  If there's no Bates number, there's no

 6  other way to refer to it other than the title of the document.

 7            MR. SANDMAN:  The order re court appointed counsel,

 8  yes.

 9            THE COURT:  Okay.  Go ahead.

10  BY MR. SANDMAN:

11  Q.  Mr. Bruner, do you recognize this as the order signed on

12  May 3rd, 1994, appointing you as counsel in Mr. Jones' case?

13  A.  I'll accept that's what it is.

14  Q.  Did you represent Mr. Jones in those proceedings, from May

15  3rd through the close of the sentencing proceedings?

16  A.  Yes.

17  Q.  And do you recall those sentencing proceedings concluded on

18  or about July 6th, 1995?

19  A.  I'll accept the date.

20  Q.  Were you associated with another lawyer at the time of your

21  representation of Mr. Jones?

22  A.  Leslie Bowman.

23  Q.  What was the nature of your law practice during the time

24  you represented Mr. Jones?

25  A.  Criminal defense.  Mostly federal criminal defense, but we

DIRECT EXAMINATION - BRUNER                    119

1   did some state cases, too.

2   Q.  The federal practice, what was that mostly primarily

3   related to?

4   A.  The docket in Tucson at the time was mostly drugs, so they

5   were mostly defense of drug charges, and then there were some

6   other miscellaneous federal charges that we would do.

7   Q.  Okay.  Did you have a very busy practice --

8   A.  Yes.

9   Q.  -- at that time?

10  A.  Yes.

11  Q.  Did Ms. Bowman take an active role in the representation of

12  Mr. Jones?

13  A.  Yes.

14  Q.  Do you recall the things that she concentrated on?

15  A.  She did the pretrial interviews.  Most, if not all of

16  those.  And she visited Mr. Jones quite a bit.  He got along

17  with her very well.  He and I got along okay, but he seemed to

18  prefer visits from her, so she would visit him.

19      I know that at least in one instance she -- she wrote the

20  letter, although I think it was a joint effort on her and my

21  part, but she wrote the letter to an expert witness that we had

22  consulted.

23  Q.  Do you recall whether Ms. Bowman attended the Gray trial,

24  Angela Gray trial?

25  A.  You know, that's something that I've been reminded of by

1    you, but I don't have an independent recollection of that.

2    Q.  I'm going to ask you a little bit about the pretrial

3    investigation that was done in Mr. Jones' case.

4        If we could put up Exhibit 16.  Exhibit 16 is in evidence

5    as a report of George Barnett, dated May 19, 1994.

6    A.  Yes.

7    Q.  Have you seen this document before?

8    A.  Yes.

9    Q.  Do you recall testifying in your deposition on June 30 that

10   all Mr. Barnett did was a few interviews, and that was the

11   extent of it?

12   A.  I don't recall the exact wording, but, yes, he went to the

13   trailer park and interviewed some people over there.

14   Q.  And that was the extent of it in terms of his interviewing

15   witnesses?

16   A.  He might have interviewed some family members, I can't

17   remember.  But that was the gist of it, yes.

18   Q.  Did you testify in your deposition that after Mr. Barnett

19   completed his investigation that you and Ms. Bowman did not go

20   out and beat the bushes or conduct any investigation yourself?

21   A.  I can't speak for Ms. Bowman, but, yes, I don't remember

22   doing any further.

23   Q.  Okay.  And asked in your deposition why you discontinued

24   your investigation, did you say that because the strategy was

25   to argue insufficient evidence in Mr. Jones' case?

1   A.  That -- that certainly was the defense, yes.

2   Q.  And was that the reason -- in your deposition, do you

3   recall stating that the reason you discontinued your

4   investigation was specifically because the strategy was to

5   argue insufficient evidence?

6   A.  I don't remember that, but if you say that that's --

7   Q.  Well --

8   A.  No, I'll accept that.

9   Q.  Well --

10  A.  You don't have to show it to me if you're quoting me, I'll

11  accept that.  You can show me if you want.  If you feel more

12  comfortable showing me, go ahead and show me.

13  Q.  Well, I don't want you to take my word for anything.  If

14  you don't remember something --

15          THE COURT:  I'll tell you what, you can just read

16  whatever the relevant portion is that you are interested in to

17  him.

18      Has this deposition been marked as an exhibit?

19          MR. SANDMAN:  Yes, it has, Your Honor.  I have the

20  clip ready to play.

21          THE COURT:  You have a clip ready to play?

22          MR. SANDMAN:  Yes.

23          THE COURT:  That's fine.

24          MR. SANDMAN:  Clip 7.  This is from the deposition --

25          THE COURT:  What's the exhibit number?

1          MR. SANDMAN:  -- of June 30.  It's Exhibit 7, at Page

2     30, Lines 19 through 31.

3          THE COURT:  Are you aware of that?  You've got -- go

4     ahead.

5          MR. BRACCIO:  Yes, Judge, we're aware of the

6     deposition.  I'm not sure he's -- he's attempting to use the

7     deposition as an impeachment at this point, I'm not sure

8     Mr. Bruner has disagreed with anything he's stated.

9          THE COURT:  Do you want to refresh his recollection?

10         MR. SANDMAN:  Yes.

11         THE COURT:  Fine.  Do you have a hard copy of it?

12         MR. SANDMAN:  We do have hard copies.  Everybody

13    except you probably don't have one in front of you.

14         THE COURT:  Yes, I don't.  No, I don't.

15         MR. SANDMAN:  The clip is synced to the transcript so

16    you can see the words in the video if we play the clip.  If you

17    would like a copy of the transcript, we can get that.

18         THE COURT:  Look, it's already an exhibit in the case,

19    you've got a relevant portion.  I understand your objection --

20         MR. BRACCIO:  We'll waive it.

21         THE COURT:  I'm overruling your objection.

22      Just play the clip.  Are you moving to admit?

23         MR. SANDMAN:  We had agreed to use the depositions

24    just for refreshing recollection and impeachment, so that's

25    essentially what we're doing.

1          THE COURT:  Fine.  Do you have any objection to that?

2          MR. BRACCIO:  None, Your Honor.

3          THE COURT:  Let's go ahead.

4     (Video playing)

5          THE COURT:  So, for the record, I want that portion of

6     the transcript marked.  You can mark it as 7A if you want, and

7     then that will be part of the record in this case.

8          MR. SANDMAN:  Thank you, Your Honor.

9          THE COURT:  Go ahead.

10    BY MR. SANDMAN:

11    Q.  I'd like to show you Exhibit 28, which is a portion of your

12    opening statement --

13         THE COURT:  Did you have any question?  You played the

14    tape --

15         MR. SANDMAN:  Yes.

16    BY MR. SANDMAN:

17    Q.  Does that refresh your recollection, Mr. Bruner, of the

18    reason you stopped your investigation?

19    A.  Well, I agree with the statement I made in the deposition.

20    Q.  Mr. Bruner, I'm showing you Exhibit 28, which is a

21    transcript of a portion of your opening statement at Mr. Jones'

22    jury trial.  It's dated April 6, 1995.  I'd like to direct your

23    attention to Page 5 of the exhibit, at Lines 9 through 12.

24         THE COURT:  Are you blowing that up?

25         MR. SANDMAN:  Yes.  Nine through twelve.

DIRECT EXAMINATION - BRUNER

1   BY MR. SANDMAN:

2   Q.  You see there, Mr. Bruner, you have told the jury that

3   everything in the case was going to center around what happened

4   on Sunday, May 1st, specifically a couple of disputed hours?

5   A.  Yes.

6   Q.  And did you have reason to expect that at some point during

7   the trial the state would present medical evidence tying

8   Rachel's injuries to those couple of disputed hours?

9   A.  Yes.

10  Q.  During your deposition did you agree that the state did

11  present evidence from Dr. Howard tying Rachel's injuries to the

12  afternoon of Sunday, May 1st?

13  A.  I believe I did.

14  Q.  During your deposition did you concede that you did not

15  cross-examine Dr. Howard with respect to Dr. Howard's timeline

16  for the injuries?

17  A.  As far as the 12-hour, 24-hour difference, yeah, I didn't

18  ask him about that.

19  Q.  You didn't ask him a single question about his testimony

20  regarding the timeline from injury to death, did you?

21  A.  Well, I don't remember.

22  Q.  Could we play Clip 9?

23          THE COURT:  Again, look, Counsel, we talked about this

24  before we started this evidentiary hearing.  So if you've got

25  clips or hard copies of this and you want to refresh his

UNITED STATES DISTRICT COURT

1   memory, I would prefer that we do it that way.

2        MR. SANDMAN:  Okay.

3   BY MR. SANDMAN:

4   Q.  Would it refresh your memory to see a portion of that

5   deposition?

6   A.  I -- I'm not -- I don't remember, I don't have an

7   independent recollection of my cross-examination of Dr. Howard

8   is what I am saying.  You know, as far as what was in the

9   deposition, yes, after reviewing the materials, and, you know,

10  I am aware of the fact that I didn't ask him those questions

11  that you're centering on.

12  Q.  Okay.  So after reviewing your cross-examination of

13  Dr. Howard, you agree that you did not ask him any questions

14  with respect to his testimony regarding the timeline from

15  injury to death.

16  A.  I don't remember what I asked him at trial.

17  Q.  Would it help refresh your recollection if I showed you a

18  portion of that deposition?

19  A.  Well, no, because I remember the deposition.  I don't

20  remember -- I don't know what you're trying to ask me.  You're

21  asking me two different things.  You're asking me about what I

22  did at trial, which I don't remember, and what I said in the

23  deposition just a month ago, which I do remember.  I do

24  remember the deposition.  So you're not going to refresh my

25  recollection of the trial by showing me the deposition.

1      But what I said in the deposition stands true today.  You

2  know, if it says in the record, I will stand by what's in the

3  record.  We're talking about stuff over 20 years ago, my memory

4  is not the greatest.

5  Q.  Mr. Bruner, I'd like to refresh your recollection with

6  respect to your sworn testimony at the deposition, and so I

7  would like to -- in the process of trying to refresh what you

8  testified to there -- play a portion of the June 30, 2017

9  deposition at Pages -- at 39, Line 8 through Page 40, Line 11.

10      THE COURT:  Do you not have hard copies you can just

11  show him and then he can read them and then you can pose your

12  question to him?

13      MR. SANDMAN:  I can do whatever you find preferable,

14  Judge.

15      THE COURT:  You've got the deposition and you've got

16  the pages, just show it to him, let him read it, and then you

17  can ask your question.  Just give opposing counsel page and

18  line, and me.

19  BY MR. SANDMAN:

20  Q.  Mr. Bruner, I'd like to direct your attention to Page 35.

21  Excuse me.  Page 39, Line 8.

22  A.  Of June 30th?

23  Q.  Yes.  Through 40, Line 11.

24  A.  Okay.

25  Q.  In your deposition, after looking at actually reviewing

1   your cross-examination of Dr. Howard, you testified that you

2   didn't ask a question about the timing of injuries, is that

3   correct?

4   A.  Yes.

5   Q.  Now, is it true that the timing -- the evidence with

6   respect to the timing of Rachel's injuries went unchallenged in

7   Mr. Jones' case at his trial?

8   A.  I believe that's correct.

9   Q.  Is it also true that when there wasn't a challenge to that

10  particular evidence, that left a strong circumstantial link to

11  Mr. Jones' guilt?

12  A.  That in and of itself?  I mean, there was more to the case

13  than just that.

14  Q.  Did that evidence help substantiate his guilt for the

15  crime?

16  A.  That evidence contributed to the state's case, yes.

17  Q.  If your strategy was to argue insufficient evidence at

18  least with respect to the medical timeline, the strategy was

19  not successful.

20  A.  I don't believe I argued the medical timeline.  I argued

21  that there was insufficient evidence to show that Barry had

22  committed the murder.

23  Q.  Did you personally -- do you personally recall a

24  consultation with Dr. Phillip keen?

25  A.  No, I do not.

DIRECT EXAMINATION - BRUNER

1   Q.  Do you have any personal knowledge, direct personal

2   knowledge, of writing any correspondence to Dr. Keen?

3   A.  Did I myself write correspondence to him?

4   Q.  I asked you if you have any personal knowledge.

5   A.  Well, I've seen a letter that purports to be a copy of a

6   letter that Leslie Bowman sent him.

7   Q.  Do you have any personal knowledge of any type of phone

8   call that took place between someone in your office and

9   Dr. Keen?

10  A.  I don't remember.

11  Q.  Do you recall of your own personal knowledge whether

12  Dr. Keen was consulted about whether another autopsy of Rachel

13  Gray would be required?

14  A.  You know, I remember that the -- the burial -- because that

15  was a big issue -- the burial was postponed because of the

16  possibility of that happening.  So I imagine there was some

17  kind of discussion about that, but I don't personally remember

18  anything like that.

19  Q.  Do you recall that approximately three months after the

20  telephone call with Dr. Keen, that's recorded in your billing

21  statement in August of '94, that Ms. Bowman interviewed

22  Dr. Howard?

23  A.  I don't remember the timeline on it, but I am aware that

24  she interviewed Dr. Howard, yes.

25  Q.  If we could put up Exhibit 46 just for a moment.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - BRUNER                    129

1       Do you recognize Exhibit 46 as the November 28, 1994

2   interview that the defense took from Dr. Howard, Ms. Bowman,

3   Ms. Harvelle, and Mr. Fruchtman?

4   A.  You know, I can't say I recognize it, but I accept it.

5   Q.  Do you remember in your deposition that we went through

6   various portions of Dr. Howard's pretrial interview?

7   A.  Yes.

8   Q.  Do you recall that when you reviewed it, that you concluded

9   that Dr. Howard had provided information that Rachel's scalp

10  injury was probably two days old?

11  A.  I remember the 24-hour -- that it was more consistent, the

12  fatal blow was more consistent, with 24 hours than 12 hours

13  that was presented at trial, but, no, I don't remember the

14  scalp injury.

15  Q.  Do you remember that the scalp injury, at least according

16  to Dr. Howard's interview, that he dated the scalp injury as an

17  injury occurring prior to May 1, 1994?

18  A.  I don't remember that, but I'll accept that if it's in

19  there.

20  Q.  If you could look at your deposition at Page -- this is,

21  again, the June 30 deposition, at Page 43.

22       I'd like to ask you if you could try to refresh your memory

23  to what you testified there.  It's Line 21.  Excuse me.  Page

24  41, Line 19 through Page 43, Line 7.

25  A.  Line 7 or?

1  Q.  41, 19.  Page 41, 19.

2  A.  I say I mean that could very well --

3       THE COURT:  I'd rather not have you testify from that.

4  If you can just read it and see if that refreshes your memory.

5       THE WITNESS:  Well, but that's not what it says.

6     It says that could very well be.  And that's what -- I

7  mean, I'll accept that, that it could very well be that that's

8  what -- what he said.

9  BY MR. SANDMAN:

10  Q.  Okay.  Did you inform Mr. Jones' jury through your

11  questioning of Dr. Howard at Mr. Jones' trial that he had

12  stated in his interview that the scalp injury could be up to

13  two days old?

14  A.  I don't think I did.

15  Q.  The record would reflect whether you did or didn't do that,

16  correct?

17  A.  That's correct.

18  Q.  Did you have any strategic reason for failing to mention

19  that during cross-examination of Dr. Howard?

20  A.  Not a strategic reason, no.

21  Q.  Would the reason that you did not impeach Dr. Howard with

22  available information that the injury to the scalp predated May

23  1st was that either you were unfamiliar with the content of

24  Dr. Howard's November 28 interview, or -- would that be one

25  possibility why you didn't impeach him?

1   A.  Certainly could be.

2   Q.  Would another possibility be that you didn't realize that

3   the medical timeline for the injuries was an important issue in

4   the case?

5   A.  Well, I mean, in our -- in our letter to Dr. Keen we

6   mentioned the dating of the fatal injury.  So, I mean, it was

7   something that we obviously considered, but perhaps by the time

8   we got to trial we didn't see that as a fruitful area.  That's

9   very possible.

10  Q.  Well, in your deposition, do you remember that in July --

11  on July 25, 2017, during your deposition, you testified that

12  you missed an important issue in the case with respect to the

13  timing of Rachel's injuries and that you should have done more

14  to determine the time of injuries?

15  A.  I would agree with that.

16  Q.  Okay.  And that's still your testimony today, correct?

17  A.  Yes, it is.

18  Q.  That would really go to -- that's the fundamental mindset

19  you had when you went into Mr. Jones' trial, is that you missed

20  an important issue with respect to the timing of the injuries

21  and you should have done more to determine the time of the

22  injuries, is that right?

23  A.  I would agree with that.

24  Q.  Now, the consult of Dr. Keen was in August, correct?

25  A.  I'll take --

DIRECT EXAMINATION - BRUNER

1  Q.  That's what the billing record shows?

2  A.  I'll take your word for it, yes.

3  Q.  In Dr. Howard's interview, in November, he also disclosed

4  to Ms. Bowman, who was present at that interview, that the

5  vaginal injury could be up to two days old, correct?

6  A.  I'll take your word for that also.

7  Q.  Then Dr. Howard testified at the Gray trial, correct?

8  A.  I believe so.

9  Q.  And he testified there -- you've reviewed that transcript

10  during the deposition?

11  A.  At some point I did.  In the last six months, I did.

12  Q.  There he testified that the abdominal injury, for example,

13  was most consistent with 24 hours?

14  A.  That's my understanding, yes.

15  Q.  And that would be outside the window of May 1st also, would

16  it not?

17  A.  If I remember correctly, they put the time of death at

18  around 3:00 a.m.  And the testimony at trial was that the

19  injury occurred approximately 12 hours earlier, to tie it into

20  the time that Rachel and Barry were alone together.  But he had

21  previously stated that it was most consistent with 24 hours.

22  Dr. Howard had stated that the injury was most consistent with

23  24 hours.  And I think he said anywhere from 12 to 24 hours,

24  but more consistent with 24 hours.  And I did not cross-examine

25  him on that.

1    Q.  That, again, was either due to inattention, not being aware

2    of what he had testified to at the Gray trial, or, again, as

3    you have acknowledged, you didn't recognize the importance of

4    the timing issue at the time of the trial, correct?

5    A.  Right.  It wasn't strategic.

6    Q.  And do you agree with me that you certainly could have

7    taken all the information that you were getting from Dr. Howard

8    about the timing of injuries and gone back to your medical

9    expert to consult further about whether you could get some

10   defense assistance on analyzing the time of injury?

11   A.  I could have, yes.

12   Q.  There was -- the fact that you didn't do that was not

13   related to some strategic reason, correct?

14   A.  That's correct.

15   Q.  Now I'm going to ask you some questions about the blood

16   stain interpretation evidence in the case.  Did you know before

17   Mr. Jones' trial that there was going to be evidence presented

18   with respect to the interpretation of blood evidence?

19   A.  Yes.

20   Q.  Did you consult with any experts to help you meet the

21   state's evidence?

22   A.  No.

23   Q.  Do you think you should have?

24   A.  I mean, it wouldn't have hurt, that's for sure.

25   Q.  Do you remember in your deposition that you -- you

DIRECT EXAMINATION - BRUNER

134

1    testified on June 30 -- when asked that question, that you said

2    you should have -- in retrospect, you should have consulted a

3    bloodstain interpretation expert?

4    A.  In retrospect, yes.

5    Q.  Did you also testify in your deposition -- this was on July

6    25 -- that you didn't think about consulting with the

7    bloodstain interpretation expert because you had never used one

8    before?

9    A.  That was probably one of the reasons, yes.

10   Q.  Do you recall there was eye witness testimony presented at

11   Mr. Jones' trial --

12   A.  Yes.

13   Q.  -- from eight-year-old twins?

14   A.  Yes.

15   Q.  Lopez twins?  Did you come to your own conclusion after

16   analyzing their statements and looking at the other physical

17   evidence that testimony from the children was not plausible?

18   A.  Yes.

19   Q.  And did you feel, at least in the lead-up to the trial,

20   that you needed to try to do something to try to attack the

21   credibility of the children?

22   A.  Yes.

23   Q.  And did you also believe -- going into the trial, did you

24   believe that the children's mother may have influenced their

25   statements?

DIRECT EXAMINATION - BRUNER                    135

1    A.  Yes.

2    Q.  Did you believe that Judge Carruth should have excluded

3    their testimony?

4    A.  Yes.

5    Q.  Now, if you wanted Judge Carruth to consider exclusion of

6    the testimony, you would have had to have filed a motion for

7    that, correct?

8    A.  Right.

9    Q.  So the record would inform us, would it not, whether such a

10   motion was filed?

11   A.  Right.

12   Q.  It's either there or it's not there.

13   A.  Right.  And we had discussed that.  Because I thought that

14   I had had a big fight with Judge Carruth over that very issue,

15   and you informed me that there was nothing in the record to

16   support that memory of mine.

17   Q.  Whatever I say about it, the record will either show or not

18   show that you've --

19          THE COURT:  I'm sorry.  Just as a point of

20   clarification, when you're referring to "the record," you're

21   referring to the docket sheet versus whether or not he could

22   have made an oral motion?  I am not clear if you're including

23   the possibility of an oral motion or you're only referring to

24   the docket sheet?  Do you understand my question?

25          MR. SANDMAN:  Yes.

UNITED STATES DISTRICT COURT

1          THE COURT:  Maybe you can clear that up.

2    BY MR. SANDMAN:

3    Q.  My understanding of the record -- and of course the record

4    will bear out what's there, what isn't there.  But when I say

5    the state court record, I am including everything that is in

6    the state court record, which would be every transcript, every

7    hearing, every written docket entry, every motion, and so on.

8    A.  Well, yes, and like I say, I had thought that I had at

9    least made an oral motion of some sort to Judge Carruth, but if

10   it's not in there, I guess it's a false fact, as our President

11   would say.

12   Q.  But if it's not in there, it's not because you didn't think

13   that there was a basis for the evidence to be excluded, is that

14   correct?

15   A.  Well, yes.  Yeah, that would be correct.

16   Q.  I'd like to show you what's marked as Exhibit 17.  This is

17   Mr. Barnett's fax cover sheet, it looks like it's dated April

18   8, '95, and the next page or two reports on his measurements of

19   the van.  Have you seen this before?

20   A.  Yes.

21   Q.  And did you disclose this to the county attorney as

22   possible evidence in the case?

23   A.  I don't remember.

24   Q.  Can we see Exhibit 18?  I thought Exhibit 18 was the

25   disclosure statement, but....

DIRECT EXAMINATION - BRUNER

1      (Attorneys conferring)

2   A.  Maybe you can just tell me, did I file a disclosure

3   statement with that information?

4   Q.  I think you did, but I don't know why we can't --

5   A.  Then I'll accept that.

6   Q.  I was only off by six numbers or so.  I'm sorry.

7      This is Exhibit 26, which is the Defendant's Rule 52

8   Supplemental Disclosure.  Can we just see the whole document

9   there for a moment.

10      Do you see that's dated 31 March, 1995, and signed by

11   Leslie Bowman?

12   A.  Right.

13   Q.  And it discloses that George Barnett is expected --

14   Mr. Barnett will testify as to various measurements taken from

15   the van?

16   A.  Correct.

17   Q.  And he might use photographs and so on?

18   A.  Correct.

19   Q.  Was he disclosed as a witness who would testify explicitly

20   that the children -- the eye witnesses could not -- were not

21   tall enough to see inside the van and see what was happening in

22   the van?

23   A.  I don't know if he would have been allowed to testify in

24   that fashion, but, yes, that was the gist of what we wanted to

25   show, was that they couldn't have seen what they claimed to

1    have seen.

2    Q.  Through the measurements?

3    A.  Due to the measurements, yes.

4    Q.  I'd like to take a look at your opening statement again in

5    Exhibit 28 regarding this topic of the -- whether the eye

6    witnesses could see in the van, and that would be, I believe,

7    at Page 9.  PDF Page 9 starting at Line 14.  Both pages, yeah,

8    14 and 15.

9         You lost one of the pages.  Why don't we just start, Page

10   9.  Okay.  If you could enlarge Lines 14 through 25, please.

11        Mr. Bruner, I'd like you to take a look at that if you

12   would.

13   A.  Yes.

14   Q.  In this portion of your opening statement you mentioned the

15   potential strength of this testimony.  You say because

16   obviously if that is believable testimony it's strong proof for

17   the state.  Do you see that?

18   A.  Yes.

19   Q.  Then you go on to say:  But the fact of the matter is when

20   we break down their testimony and when you hear what they

21   actually have to say and think about what they could have seen,

22   they -- next page please -- if you could enlarge the first 13

23   lines -- you say they couldn't possibly have seen what they

24   claim now, months later, to have seen.

25        So you're telling the jury basically that they couldn't

 1    have seen what they said they saw, correct?

 2    A.  Correct.

 3    Q.  And then you pose a question to the jury.  You say:  Why is

 4    that?  And your answer for the jury is:  I am not exactly sure.

 5    I'm not sure exactly.

 6         And the fact of the matter is, is that at least at the time

 7    the trial began, despite the doubts that you had about whether

 8    the physical evidence would have permitted the children to see

 9    what they reported, you were still not sure how to demonstrate

10    that, and you basically conceded that to the jury when you

11    said -- when you told them:  I don't think the kids could see,

12    but I don't know why that is.  Correct?

13    A.  No, the "why is that" refers to why they would claim they

14    saw something they didn't see, not that I didn't understand it.

15    Q.  Did you present any evidence at the trial in fulfillment of

16    your -- that your statement to the jury that they should

17    believe that the children couldn't see into the van, did you

18    present any evidence with respect to that that you recall at

19    the time of the trial?

20    A.  Just for cross-examination.

21    Q.  Well, the record I guess would show if you actually

22    presented any evidence on that particular topic of whether they

23    could physically see in there, correct?

24    A.  Well, I didn't present any witnesses, if that's what you

25    mean.

DIRECT EXAMINATION - BRUNER

1   Q.  And the record would show --

2   A.  I did cross-examine on that issue, and that's evidence.

3   Q.  Consistent with your trial strategy to challenge the

4   sufficiency of the state's evidence, would you have presented

5   expert testimony that could have explained to Mr. Jones' jury

6   that the blood found in the van had perfectly innocent

7   explanations?

8   A.  Through expert testimony?

9   Q.  Yes.

10  A.  Are you referring to the testimony that I objected to that

11  it was splatter, blood splatter?

12  Q.  My question was, consistent with your trial strategy, which

13  you said was to challenge the state's evidence, argue the

14  state's evidence was insufficient, here is the question:  Could

15  you have, consistent with that strategy, presented expert

16  testimony that would have explained to Mr. Jones' jury that the

17  blood found in the van had perfectly innocent explanations?

18  A.  Well, I could have presented -- I could have tried as we

19  discussed just a few minutes ago, I could have tried to get a

20  blood splatter expert to explain that that wasn't blood

21  splatter in the van.  I don't know that a judge would allow me

22  to bring a witness to say that there is a perfectly innocent

23  explanation as to --

24  Q.  Well, let me --

25  A.  -- the blood.  I don't think that's -- that's within the

1    purview of an expert, to make a --

2    Q.  Let me ask you if you could just look at Page 90, Line 22

3    of your deposition of June 30, through 91, Line 1.

4    A.  Okay.

5    Q.  Okay.  So what I am going to do, I would just like to read

6    this short question to you, Mr. Bruner, and I'd like you to

7    read the answer you gave.

8        Question:  And if you had an expert that could have

9    explained to Mr. Jones' jury that the blood found in the van

10   had perfectly innocent explanations, would you have presented

11   that to the jury?

12       What answer did you give on June 30th?

13   A.  I'm sure I would have.

14   Q.  And consistent with your trial strategy to challenge the

15   sufficiency of the state's evidence, would you have presented

16   expert testimony that could have explained to Mr. Jones' jury

17   that the children could not have seen what they reported

18   seeing?

19   A.  Yes.

20   Q.  And consistent with your trial strategy to challenge the

21   sufficiency of the state's evidence, would you have presented

22   expert medical testimony that could have explained to

23   Mr. Jones' jury that Rachel's injuries were not inflicted on

24   May 1st, when Mr. Jones was alone with her?

25   A.  Yes, definitely.

UNITED STATES DISTRICT COURT

1          MR. SANDMAN:  I don't have any other questions.

2          THE COURT:  Thank you.

3      Cross-examination.

4      Do you want to collect your exhibit from the witness?

5          MR. BRACCIO:  May I approach, Your Honor?

6          THE COURT:  Yeah, go ahead.

7          THE WITNESS:  You're not going to use that?

8          MR. BRACCIO:  That's your deposition?

9          THE WITNESS:  Yes.

10         MR. BRACCIO:  Actually, I'll leave that there.

11         THE COURT:  Okay.

12         THE WITNESS:  Just in case.

13                         CROSS-EXAMINATION

14  BY MR. BRACCIO:

15  Q.  Good afternoon, Mr. Bruner.

16  A.  Good afternoon.

17  Q.  Do you have any recollection, as you sit here today, why

18  you did or did not conduct any particular investigation in this

19  case?

20  A.  I don't have any concrete memory of that, no.

21  Q.  You were lead counsel on this case?

22  A.  Correct.

23  Q.  Would you have discussed important matters in case strategy

24  with Leslie Bowman?

25  A.  All the time, yes.

1  Q.  You were a certified criminal law expert?

2  A.  You know, I was for a long time.  I am not sure when I

3  first became, but probably by then I probably was, yes.

4  Q.  Do you recall that you were a certified criminal law expert

5  during Barry Jones' trial?

6  A.  That's what I can't remember, when I first became

7  certified.  But it was probably then, yes.  Because I think I

8  got certified when I still was in the Ralls & Bruner law firm.

9  So, yeah, I think I would have been certified then.

10  Q.  Do you recall how you were appointed in this case?

11  A.  In those days, that was back in the Dark Ages, and, as you

12  can imagine, a case like this, not everybody was chomping at

13  the bit to defend a case like this.  So the Judge would, you

14  know, I guess, just think of some people who he knew that might

15  be willing to take a case like this, and then either he or his

16  secretary would call around, and we got a phone call and I said

17  I would take the case.

18  Q.  So this Judge called you, said, "Mr. Bruner, would you take

19  this case on?"

20  A.  Correct.

21  Q.  And that's how you got the Barry Jones case?

22  A.  Back in those days that's how it was done.

23  Q.  You had handled a couple capital cases before Barry Jones'

24  case, correct?

25  A.  I -- yes, I had handled, I think, at least two others.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - BRUNER

1    Q.   The Trostle case being one of them, if you recall?

2    A.   Yes.

3    Q.   And the George Molina-Lopez case?

4    A.   Right.

5    Q.   Can you tell the Judge what your practice was like back in

6    1994 and 1995?

7    A.   We did a lot of CJA cases, that's the Criminal Justice Act,

8    which is where private attorneys are appointed by federal

9    judges to handle cases.  We also did a lot of retained cases.

10   We were a Spanish-speaking law firm, and, in Tucson, close to

11   the border, that gave us access to a large client base.

12        We did a few civil cases of a personal injury type of

13   nature.  We had a big police misconduct settlement right around

14   that time.  And then we did some, some state representation,

15   and I was a strong believer in accepting the more difficult

16   appointments from state court.

17   Q.   Substantial amount of work load back in 1994 and '95?

18   A.   We were very busy, yes.

19   Q.   But your workload never became unbearable for you, correct?

20   A.   That's correct.

21   Q.   Now, you had to fight to get second chair appointed in this

22   case, correct?

23   A.   Well, back in those days, it was not normal practice for

24   the judges to appoint second chair.  And in all those cases

25   that you just mentioned, the Lopez, Trostle, and Barry's case,

1   we applied for second chair appointments and were denied in all

2   three cases.  But we told the Judge, hey, we're going to have a

3   second chair, you know, anyway.  So we had -- I think Leslie

4   co-chaired the Trostle case.  And Jackie, I guess she goes by

5   "Rateau" now, she's a U.S. magistrate judge, she second chaired

6   the Lopez case with me.

7   Q.  Can you tell the Judge about funding for criminal cases in

8   Pima County in 1994.

9   A.  It was very underpaid.  We didn't do it for the money.  I

10  think we got 40 dollars an hour, or something ridiculous like

11  that, and then you'd have to go hat in hand to the judge to get

12  any additional funding for experts, what have you.  But up to a

13  certain point you never had real trouble getting experts.  I

14  don't think Judge Carruth would have denied us funding if --

15  you know, as long as it was reasonable.

16  Q.  I think you had previously indicated that you'd take your

17  bills, even if they were a reasonable accounting of your money,

18  and the judge would still cut them in half?

19          MR. SANDMAN:  I am going to object, Your Honor,

20  because I don't think there is any evidence in this case that

21  Judge Carruth cut any bills.  If the question is about other

22  cases then I object on relevance.

23          THE COURT:  What's the relevancy?

24          MR. BRACCIO:  Sure.  Just his general practice at this

25  time, the way that Pima County was conducting these criminal

1    cases.  In fact, I believe --

2         THE COURT:  I think if you've got questions -- because

3    I know in your line of questioning with another witness, you

4    had questions that go to whether or not counsel had approached

5    the Court for funding to put on a particular defense.  I think

6    you should focus on what happened in this case, not what the

7    judge's general practices were.

8    BY MR. BRACCIO:

9    Q.  You indicated that you took these cases not because of the

10   money but because you found them interesting?

11   A.  Interesting, and I felt a duty to give back.

12   Q.  How did you come to form a law firm with Leslie Bowman?

13   A.  She was working for me as a law clerk and I was in a law

14   practice with a fellow named Steve Ralls, a very well known

15   attorney here in town, and I wanted a little more autonomy, so

16   we broke off and formed a Bruner & Bowman.

17   Q.  You've previously seen your billing statements for the

18   Barry Jones case, correct?

19   A.  Correct.

20   Q.  And do you have an opinion about how accurate those billing

21   statements are?

22   A.  I would say over 90 percent accurate.

23   Q.  But you spent more time on this case than what is reflected

24   in those billing statements, correct?

25   A.  It could be.  I wasn't the greatest keeper of time.  And I

CROSS-EXAMINATION - BRUNER                           147

1   did notice -- I only noticed, when reviewing them, one thing

2   that stood out, and that was the letter to Dr. Keen was not

3   billed for, but I think -- I think they're probably pretty

4   accurate.

5   Q.  Do you recall that you reviewed the disclosure in this case

6   as it came in?

7   A.  Yes.

8   Q.  And you reviewed that disclosure with Barry Jones?

9   A.  I'm sure I didn't review all of it with Barry, but

10  generally, yes.  And I know Leslie did spend more time with him

11  than I did.

12  Q.  You previously indicated when you got the Barry Jones case

13  you went down and visited him for some time?

14  A.  I think the very same day I was appointed on the case I

15  went down and introduced myself to Barry.

16  Q.  In this case, you sent George Barnett out to investigate

17  the van because you thought that the Lopez children could not

18  see what they had claimed to see?

19  A.  I came to that conclusion, yes.

20  Q.  And that was based upon their height and the height of the

21  van?

22  A.  You know, I'm not sure exactly how we calculated it, but,

23  yeah, I mean, pretty much.  If they would have been looking up

24  and what they were testifying to would -- you would had have to

25  have been at least eye level with the windows, if not higher

CROSS-EXAMINATION - BRUNER

1    than.

2    Q.  Do you recall that you stayed pretty active in this case?

3    A.  I mean, I was -- I was somewhat active.  I mean, Leslie did

4    a lot of the leg work on it.  But, you know, I was up to speed

5    on what the state's case consisted of.  And we filed motions,

6    and, you know, did all the stuff you normally do in these kind

7    of cases.

8    Q.  Do you recall that you and Leslie Bowman consulted with

9    Dr. Keen about the timing of the injuries in this case?

10   A.  You know, I have no independent recollection of myself

11   consulting with Dr. Keen.  Reviewing the letter, the copy of

12   which was shown to me, I think it's pretty obvious that I had

13   input on the content of that letter, but I can't tell you that

14   I independently remember any of that, no.

15   Q.  If Dr. Keen had asked for additional follow-up evidence,

16   such as photos or tissue slides, you would have given it to

17   him, correct?

18   A.  Yes.

19   Q.  You wouldn't have just blown it off, not done anything.

20   A.  Not knowingly, no.

21   Q.  That wasn't your practice.

22   A.  No, it was not.

23   Q.  If Dr. Keen had come back and agreed with Dr. Howard's

24   medical conclusions, that would have been the end of the

25   medical investigation, correct?

1   A.  Probably, yes.

2   Q.  You stated in your deposition that you wouldn't keep

3   shopping for an expert until you found one that disagreed with

4   Dr. Howard?

5   A.  No, I wouldn't have.

6   Q.  Do you remember that from your deposition?

7   A.  I remember something along those lines, yeah.

8   Q.  And you would also have provided the facts of the case to

9   Dr. Keen, correct?

10          MR. SANDMAN:  I'm sorry, the question is?

11          THE COURT:  That he would have provided the facts to

12  Dr. Keen is the question.

13          MR. BRACCIO:  That's correct.

14          MR. SANDMAN:  There is no foundation to that.  I guess

15  there is no showing of personal knowledge that he did that.

16          THE COURT:  I'll sustain the objection.  If you want

17  to establish whether or not he has a personal knowledge of

18  what --

19          MR. BRACCIO:  Sure.

20          THE COURT:  -- what his discussions with Dr. Keen

21  were, you can do that.

22  BY MR. BRACCIO:

23  Q.  Mr. Bruner, do you recall if you provided facts of the case

24  to Dr. Keen?

25  A.  I don't recall doing that.

1          THE COURT:  I'm sorry, that's just asking the same

2    question in a different way.  You need to establish whether or

3    not he had a conversation with Dr. Keen, that he has a basis

4    for answering that question.

5    BY MR. BRACCIO:

6    Q.  Do you recall that you consulted with Dr. Keen?

7    A.  I don't recall.

8    Q.  You understood that without Dr. Keen, or any other evidence

9    to rebut Dr. Howard in this case, you were basically left to

10   attack the circumstantial evidence?

11   A.  Yes.  Yes, I guess I would agree to that.

12   Q.  And that's a reasonable strategy for your investigation.

13   From your investigation.  Correct?

14   A.  Well, I mean it was reasonable up to the point that I

15   didn't cross-examine him about the 24-hour/12-hour difference.

16   I don't think that was reasonable.  At this point, looking back

17   on it, I think, you know, that was a flaw in my defense.

18   Q.  So, in hindsight, based upon this evidence now, you're

19   saying you should have cross-examined him about the difference

20   between 12 and 24 hours?

21   A.  Yes, definitely.

22   Q.  If the records show that Dr. Howard was consistent in his

23   pretrial interview, his testimony in Angela Gray's trial, and

24   his testimony in Barry Jones' trial that it was possible for

25   this injury to be from 12 hours to 24 hours, you would have no

1    basis to attack that, correct?

2    A.  If that had been his testimony, but I believe he didn't

3    mention the 24 hours during Barry's trial.

4         MR. BRACCIO:  Judge, can I have a moment?

5         THE COURT:  Yes.

6         MR. BRACCIO:  No further questions.

7                   REDIRECT EXAMINATION

8    BY MR. SANDMAN:

9    Q.  Mr. Bruner, I just want to show you Exhibit 58, the letter

10   Ms. Bowman sent to Dr. Keen.  Go right to the second page

11   there.  If you could expand the first -- just the numbered

12   paragraphs.

13        Mr. Bruner, you were asked some questions about whether

14   Dr. Keen agreed with Dr. Howard.

15   A.  Right.

16   Q.  Do you see anything on Page 1 of the letter that discloses

17   to Dr. Keen any of Howard's opinions?

18   A.  No.

19   Q.  Could you take a look at the next page, please.  Do you see

20   anything on the final page where any of Dr. Howard's opinions

21   are disclosed to Dr. Keen?

22   A.  Well, there is this statement there:  I don't understand a

23   lot of the terminology.  And that would seem to suggest that we

24   sent a copy of the autopsy report with that letter.

25   Q.  Okay.  And do you know, of your own personal knowledge,

1   whether there is anything in the autopsy report regarding

2   Dr. Howard's opinions about the time of the injuries?

3   A.  I don't believe that would be in the autopsy report.

4           MR. SANDMAN:  That's all the questions I have.

5           THE COURT:  Thank you.

6       Mr. Bruner, you may step down.  Thank you, very much.

7       Your next witness?

8           MR. SANDMAN:  We have Dr. Ophoven tomorrow morning,

9   she's on her way in from Minnesota.  Then we have Dr. Esplin

10  coming from Phoenix tomorrow --

11          THE COURT:  Are there any other witnesses besides

12  those two?

13          MR. SANDMAN:  Then we have Thursday -- I'm sorry.

14  Tomorrow we have Dr. Ophoven and Mr. Gruen is coming up from

15  Sierra Vista.  Then we have on Thursday --

16          THE COURT:  Let me rephrase my own question.

17          MR. SANDMAN:  Yes, we don't have anyone else planned

18  for today.

19          THE COURT:  You have no other witnesses.

20          MR. SANDMAN:  No.  But I think we're on schedule to

21  complete all but four witnesses by Friday.  And then we have --

22  you know, we have four days next week which I don't think we

23  are going to need.

24      We discussed this earlier with other counsel, but we have,

25  you know, two witnesses planned for Monday, and then one

1    witness on Wednesday, and one on Thursday, and then --

2             THE COURT:  Of next week?

3             MR. SANDMAN:  Yeah.  We have Dr. Howard Wednesday of

4    next week.  We have Mr. Cooper and Mr.  Hannon on Monday.  We

5    should be done with -- we have actually two witnesses

6    Wednesday, Thursday and Friday, all those witnesses are coming

7    in from out of Tucson.

8             THE COURT:  Are you calling any witnesses?

9             MR. SANDMAN:  Just Dr. Howard, I think.

10            MR. BRACCIO:  Just Dr. Howard.  And then we're going

11   to make a decision with Detective Pesquiera.

12            MR. SANDMAN:  But I think, you know, since yesterday,

13   when we looked like we were getting a little bogged down, but I

14   think things are taking off now.

15            THE COURT:  Give me next week's schedule.  You've got

16   witnesses planned for which days?

17            MR. SANDMAN:  Dr. Hannon, he's the biomechanic expert,

18   and Mr. Cooper, the standard of care expert, on Monday.  Then

19   we have no one on Tuesday.

20            THE COURT:  Wait a second.  Are you telling me you've

21   planned for no witnesses at all on Tuesday?

22            MR. SANDMAN:  Well, we only have -- remember, next

23   week the only other witness then would be Dr. Howard, for sure.

24   He is not able to get here 'til Wednesday.

25            THE COURT:  Dr. Howard can't get here until Wednesday?

1           MR. SANDMAN:  Right.

2           MR. BRACCIO:  That's correct, Your Honor.  He's the

3    medical examiner for Spokane County.  His schedule is very

4    busy.  My understanding is he is the only one there.

5           THE COURT:  Okay.  But as far as taking witnesses out

6    of order, I am just wondering if there are -- if you are going

7    to have any other witnesses, if we can make use of Tuesday.

8           MR. SANDMAN:  We don't really have anybody else.

9    Unless we want to -- no, we don't -- we just don't have that

10   many witnesses, and, unfortunately, Dr. Howard couldn't get

11   here until Wednesday.

12          MS. SMITH:  I don't know about Dr. Pesquiera.

13          MR. BRACCIO:  Remember, she has a conflict Monday and

14   Tuesday.

15          THE COURT:  So you've got witnesses for Monday,

16   Wednesday and Thursday?

17          MR. SANDMAN:  Possibly Thursday, with Detective --

18   Ms. Pesquiera would be available on Thursday.  She has child

19   care duties earlier that -- in the week, next week.

20          THE COURT:  What do you mean by "child care duties"?

21          MR. SANDMAN:  I think grandchildren, is my

22   understanding.

23          MR. BRACCIO:  That's correct.  She also has medical

24   appointments, Your Honor, for Monday and Tuesday that were

25   previously scheduled.  We allotted the time.  We saw the two

UNITED STATES DISTRICT COURT

1    weeks and Dr. Howard was supposed to start Wednesday and she

2    was potentially Thursday.

3           THE COURT:  You know, it's 2:30 now and you're all

4    telling me now you've run out of witnesses for today.  So this

5    is my request, that you sit down and see what you can do to

6    fill in the time, because, you know, I would like to get

7    through this sooner rather than later.

8       So work some magic.  We've got all afternoon.  We'll start

9    at 9:00 o'clock tomorrow morning.  Before we put the witnesses

10   on, you can give me a report about how your magic is working.

11   It's Halloween.  Okay?

12      All right.  Anything else today?

13          MR. BRACCIO:  No, Your Honor.

14          MR. SANDMAN:  No.

15          THE COURT:  Okay.  So I would like counsel to confer

16   and see what you can come up with to try to advance the

17   witnesses, if at all possible, so that we're not just sitting

18   around waiting for witnesses.  Okay?

19      Thank you, very much.  I'll see you tomorrow morning at

20   9:00 o'clock.

21                   (Off the record at 2:30 p.m.)

22

23

24

25

```
 1                   C E R T I F I C A T E

 2

 3          I, A. TRACY JAMIESON, do hereby certify that I am

 4   duly appointed and qualified to act as Official Court Reporter

 5   for the United States District Court for the District of

 6   Arizona.

 7          I FURTHER CERTIFY that the foregoing pages constitute

 8   a full, true and accurate transcript of the proceedings

 9   contained herein, held in the above-entitled cause on the date

10   specified therein, and that said transcript was prepared by me.

11          Signed in Tucson, Arizona, on the 17th day of

12   November.

13

14

15
                               s/A. Tracy Jamieson
16                             A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25
```