1                   IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF ARIZONA

3        Barry Lee Jones,            )  4:01-cv-00592-TMB
                                     )
4                    Petitioner,     )
                                     )
5        vs.                         )
                                     )  Tucson, Arizona
6        Charles L. Ryan, et al.,    )  November 3, 2017
                                     )
7                    Respondents.    )
         _____)

8

9

10       BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE

11

12                      Transcript of Proceedings
                  Evidentiary Hearing - Day 5 (P.M. Session)
13

14

15

16

17       Proceedings reported and transcript prepared by:

18           A. Tracy Jamieson, RDR, CRR
             Federal Official Court Reporter
19           Evo A. DeConcini U.S. Courthouse
             405 West Congress, Suite 1500
20           Tucson, Arizona 85701
             (520) 205-4266
21

22

23

         Proceedings reported by steno machine shorthand;
24       transcript prepared using court reporting software.

25

                        UNITED STATES DISTRICT COURT

```
 1                        APPEARANCES

 2   For the Petitioner:

 3        U. S. Federal Public Defender
          Cary Sandman, AFPD
 4        407 West Congress Street, Suite 501
          Tucson, AZ 85701
 5        (520) 879-7540

 6        U. S. Federal Public Defender
          Karen S. Smith, AFPD
 7        850 West Adams Street, Suite 201
          Phoenix, AZ  85007
 8        (602) 382-2706

 9

10   For the Respondents:

11        Arizona Office of the Attorney General
          Myles Braccio, AAG
12        1275 West Washington Street
          Phoenix, AZ 85007
13        (602) 542-4686

14        Arizona Office of the Attorney General
          Lacey Gard, AAG
15        400 West Congress Street, Suite S315
          Tucson, AZ  85701
16        (520) 628-6520

17
     Also Present:
18
               Barry Jones, Petitioner
19             Jim D. Nielsen, AZAG
               Jennifer Schneider, Paralegal with FPD
20             Daniel Vidal, Paralegal with AZAG
               Andrew Sowards, Investigator with FPD
21

22

23

24

25
```

1                    INDEX OF EXAMINATIONS

2

3    WITNESSES:                                              PAGE

4    **DAN COOPER**

5

6        Direct Examination By Mr. Sandman.....................  4

7        Cross-Examination By Mr. Braccio.....................  33

8        Examination By the Court.............................  35

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (On the record at 1:08 p.m.)

2          THE COURT:  So I just wanted to let you know that

3   we're going to have to take a break a little before 2:00

4   because I've got a short hearing in Anchorage, trial prep, that

5   I need to meet with counsel on.  So we'll probably break a

6   little before 2:00 until about 2:15.

7          MR. SANDMAN:  We like breaks, especially after this

8   long week.

9          THE COURT:  Okay.

10          MR. SANDMAN:  Our next witness is Dan Cooper.

11          THE COURT:  Sir, if you could please come forward.

12   Don't have a seat yet.  If you could stand in the witness box

13   and be sworn in.

14                  **DAN COOPER**, WITNESS, SWORN

15                      DIRECT EXAMINATION

16   BY MR. SANDMAN:

17   Q.  Would you state your name, please.

18   A.  My name is Dan Cooper.

19   Q.  Mr. Cooper, what is your occupation?

20   A.  I am an attorney.

21   Q.  Can you tell us when and from where you graduated from law

22   school?

23   A.  Sure.  I went to Arizona State and graduated in December of

24   1976 and took the bar in the spring of 1977.

25   Q.  Can you sort of walk us through, in broad strokes, your

1    career and where you have worked and the sorts of things you've

2    been concentrating on as a lawyer?

3    A.  When I graduated law school, I went to work for -- it's an

4    agency called Vista, which is the Volunteers in Service to

5    America, as an attorney, working for Legal Aid as an attorney

6    doing unemployment hearings.

7        I then, in 1978, moved to Window Rock, Arizona.  I worked

8    for the Navajo Tribe as an attorney, trying cases off

9    reservation, in places like Flagstaff, Holbrook, Winslow, and

10   stayed there until the fall of 1979.  And I moved to Tucson and

11   began to work at the Pima County Public Defender's Office in

12   November of 1979.

13       I stayed there until the -- I believe it was the middle of

14   1984, I moved to a private firm in Phoenix called Treon,

15   Warnicke & Raush.  I stayed there about a year and a half and

16   then moved back to Tucson and went to the Public Defender's

17   Office, late 1985.  And I stayed there until 1992, June, and

18   Laura Udall and I formed Cooper & Udall in June of '92, and

19   we've been together ever since.

20   Q.  So it sounds like you started your criminal defense career

21   in 1979, when you started at the Pima County Public Defender's

22   Office?

23   A.  No, actually it was when I was in Window Rock, I was

24   defending Navajos in criminal cases in Superior Courts off the

25   reservation.

1   Q.  So it was a bit earlier than that.

2       After joining the Public Defender's Office in Pima County,

3   did you have a problem with a capital case shortly after

4   joining the office?

5   A.  I did.  In 1980, Don Harding killed two people in Tucson

6   and was arrested here.  He had actually killed about five other

7   people across the country before he wound up in Tucson.  I was

8   told to be second chair on the case, which was fine, until

9   about a year later the first chair quit the office and moved to

10  Phoenix.  I was basically left with the case.  At some point

11  prior to the trial, I advised Mr. Harding just to represent

12  himself and we'd see what happened down the road.  I was

13  censured by the Supreme Court for not being candid with the

14  tribunal.

15  Q.  That was around 1980?

16  A.  Well, the murder was in '80, I think the trial was in '82,

17  and I think the end of the Supreme Court issue was in '84.

18  Q.  And the relevant incident occurred about 1981 then?

19  A.  The murder was in '80.  The incident took place in '81,

20  correct.

21  Q.  Over the course of your career as a criminal defense

22  lawyer, how many cases have you tried to a jury?

23  A.  About 200.

24  Q.  And how many murder cases have you tried to a jury in

25  Arizona?

1    A.   Forty-one.

2    Q.   And of those, how many -- well, not of those, but how many

3    capital cases have you handled either through trial or through

4    a plea?

5    A.   Nine.

6    Q.   What about felony child abuse cases, have you handled

7    appreciable numbers of felony child abuse cases?

8    A.   I've had at least five where the baby died, and several

9    dozen others where I've represented people accused of various

10   types of child abuse.

11   Q.   Earlier in these proceedings, were you asked to prepare a

12   chart indicating the number of murder cases that you had tried

13   prior to 1996?

14   A.   Yes.

15   Q.   Before Mr. Jones' -- Mr. Jones' case actually went to trial

16   in '95, but --

17            MR. SANDMAN:   Your Honor, may I approach the witness?

18            THE COURT:   Sure.   Just as long as opposing counsel

19   knows what you're going to show him.

20            MR. SANDMAN:   Yeah.   They do.   Thank you.

21   BY MR. SANDMAN:

22   Q.   I'd like to show you what's marked as Exhibit 139B, as in

23   "boy."   Can you identify what that is?

24   A.   That's the chart I prepared of the trials, the murder

25   trials, that I did.   Basically it was -- prior to '96, although

DIRECT EXAMINATION - COOPER

1  I added a March of '97 trial as well, I also added a third --

2  there are two child killing cases prior to '96, but I added the

3  third and only other child killing murder that I've done from

4  February of 2010.

5  Q.  Does the chart reflect the case numbers and the outcome of

6  the cases?

7  A.  It does.

8  Q.  Whether there was an acquittal or a hung jury or a guilty

9  verdict?

10  A.  Right.

11  Q.  How many not guilty verdicts are on that list?

12  A.  Do you want me to count them?

13  Q.  Yeah.

14  A.  Eleven.

15  Q.  So you had 11 acquittals on murder cases tried before --

16  A.  That's pretty good.  Yeah.

17  Q.  I want to show you, if I could --

18       MR. SANDMAN:  Your Honor, may I show the witness

19  Exhibit 139C?

20  BY MR. SANDMAN:

21  Q.  Can you identify that exhibit?

22  A.  That's a chart of the capital cases that I have had all the

23  way to completion, whether by trial --

24       THE COURT:  Capital case...?  I'm sorry, you cut out

25  the last part.

1          THE WITNESS:  I'm sorry.  That I've had all the way to

2     completion.

3     BY MR. SANDMAN:

4     Q.  You said there was a total of nine, how many death sentence

5     verdicts resulted from those nine cases?

6     A.  Levi Jackson was sentenced to death.  I did Shad

7     Armstrong's ring retrial, and he was sentenced to death.

8     Q.  So there's two out of the nine?

9     A.  That's correct, two.

10    Q.  I want to go back to your experience in Pima County

11    beginning in 1979.  I think you testified you were there from

12    '79 to '84 and then from '85 to '92.  If we could sort of lump

13    those time periods together, because you were only gone for

14    about maybe less than a year.  During the time that you worked

15    at the Pima County Public Defender's Office, was there a

16    recognition of professional norms that dictated that defense

17    counsel should conduct a prompt investigation of the

18    circumstances of the case and explore all avenues leading to

19    the facts relevant to the merits of the case?

20    A.  Yes.

21    Q.  And when you went into private practice in 1992, were those

22    norms firmly in place and recognized by the private sector

23    defense bar in Pima County?

24    A.  Yes, they were.

25    Q.  Over the course of your multi-decade career -- as long as

1   mine actually -- have you been a frequent attendee at criminal

2   defense seminars and training sessions in the State of Arizona?

3   Criminal defense seminars and trainings?

4   A.  Both in the state and out of the state, yes.

5   Q.  Are the investigative duties and professional norms related

6   to those duties routinely reinforced at those trainings?

7   A.  They are.

8   Q.  Do they correspond to the norms that you said were

9   controlling in Pima County at the Defender's Office and in

10  private sector?

11  A.  Yes.

12  Q.  Have you also been a frequent speaker at criminal defense

13  seminars and training sessions in Arizona and elsewhere?

14  A.  In Arizona, yes.

15  Q.  And same question:  Have you lectured on topics relevant to

16  the importance of investigation in criminal defense work?

17  A.  I have.

18          MR. SANDMAN:  I want to, if I could, Your Honor,

19  approach the witness with Exhibit 13D.

20  BY MR. SANDMAN:

21  Q.  Can you identify Exhibit 13D, please?

22  A.  It's the American Bar Association Standards for Criminal

23  Justice.

24  Q.  And if you could turn the page to Page 2.  Can you tell us

25  what standard is indicated there at Page 2 of the exhibit?

1   A.  Standard 4-4.1.

2   Q.  Yes.

3   A.  It's the duty to investigate.

4   Q.  If we could just highlight just the top paragraph there.

5          THE COURT:  I'm sorry, you said these standards are

6   from when?

7          MR. SANDMAN:  Your Honor, these ABA Standards for

8   Criminal Justice were adopted, I believe, in 1993, which is

9   indicated -- there is a copyright notice actually on Page 2 of

10  the exhibit.

11         THE COURT:  And it indicates 1993?

12         MR. SANDMAN:  Yes, sir.

13         THE COURT:  Thank you.

14  BY MR. SANDMAN:

15  Q.  Focusing you on Standard 4-.41, what does that standard

16  provide in the first few sentences there?

17  A.  It basically says that defense counsel need to explore all

18  avenues leading to facts relevant to the merits of the case and

19  the penalty in the event of conviction.

20  Q.  Does that particular standard mirror the prevailing

21  professional norms, as you understood them, to be understood in

22  1994 and '95, in Pima County, Arizona?

23  A.  They were.

24  Q.  And way back to 1979?

25  A.  Correct.

1   Q.  I want to draw your attention to the last paragraph on that

2   page, at the beginning of the commentary, where it says:  Facts

3   form the basis of effective representation.

4   A.  Right.

5   Q.  Could you expand at least on your understanding of what

6   that means?

7   A.  There was an unwritten rule at the Public Defender's Office

8   that if you got a murder case, you had to be at the jail to see

9   the defendant within 24 hours.  And the reason for that -- and

10  normally you would try to take one of the public defender

11  investigators with you.  The reason for that was the importance

12  of investigating and getting started right away.  Because by

13  the time the person's arrested, has been to court and has had

14  their initial appearance, typically the police have already

15  begun a pretty extensive investigation, so it's critical that

16  the defense and their investigation begin right away.

17  Q.  And the notion that facts form the basis of effective

18  representation, does that continue until the case ends?  Is

19  that ever a consideration that goes away?

20  A.  You win or lose cases on the facts.  It's just that simple.

21  It's the only thing I remember from law school.  And it lasts

22  all the way through sentencing, if that happens.  But

23  certainly, through the guilt phase, facts are what matter.

24  Q.  And the next page --

25          THE COURT:  Before you ask the next question, on this

DIRECT EXAMINATION - COOPER                    13

1    last screen, and the screen before, there were interlineations

2    on the document.  Are those yours, Mr. Cooper, or are those

3    somebody else's interlineations?

4              THE WITNESS:  Those are mine.

5              THE COURT:  Thank you.

6              MR. SANDMAN:  Then at Page 2, if you could enlarge --

7    or the next page.  I'm sorry, Jennifer.  There you go.  My

8    apologies.  If you could enlarge the first paragraph there.

9    BY MR. SANDMAN:

10   Q.  About six lines -- five lines down, do you see where it

11   says:  The resources of scientific laboratories may be required

12   to evaluate certain kinds of evidence, analysis of fingerprints

13   or handwriting, clothing, hair, or blood samples or ballistics

14   tests may be necessary.

15        Do you find that?  What's you're -- do you agree with that?

16   A.  Well, especially -- yeah, outside of a confession, the most

17   compelling evidence there is in any case would be physical

18   evidence, whether it's fingerprints or blood evidence or

19   anything tying anybody to an offense, yeah, it's critical.

20   Q.  And the final sentence of that paragraph states:  Neglect

21   of any of these steps may preclude the presentation of an

22   effective defense.  Can you comment on that?

23   A.  Particularly -- well, when you -- when you begin a case,

24   you know that there are going to be speed bumps and there are

25   going to be issues and problems with the case or your client

1   wouldn't have been charged.

2        Particularly with physical evidence, you simply can't

3   ignore it.  And sometimes physical evidence really doesn't mean

4   anything; oftentimes it does.  But oftentimes it can be

5   interpreted different ways or it can be attacked in different

6   ways.  And you have to do that, you simply can't ignore it.

7   And if you neglect it, more than likely it's to the detriment

8   of your client.

9   Q.  Then on the following page, down at the bottom of the

10  second paragraph, are those your interlineations on the

11  document?

12  A.  They are.

13  Q.  And the last sentence indicates that the effectiveness of

14  advocacy is not to be measured solely by what the lawyer does

15  at trial.  Without careful preparation, the lawyer cannot

16  fulfill the advocate's role.  Failure to make adequate pretrial

17  investigation and preparation may also be grounds for finding

18  ineffective assistance of counsel.

19       In analyzing the prevailing professional norms, as you've

20  described them, is that a consideration?

21  A.  I've always thought, and I thought it was obvious, the

22  pretrial investigation is the key to any case, and the most

23  important person to me when I represent an individual is my

24  investigator.

25  Q.  Have you reviewed a considerable number of documents in

DIRECT EXAMINATION - COOPER                    15

1   this case?

2   A.  I have.

3           MR. SANDMAN:  If I could approach again, Your Honor.

4           THE COURT:  You may.

5   BY MR. SANDMAN:

6   Q.  I'll show you what's marked as 139A.

7           THE COURT:  I'm sorry, what was that?

8           THE WITNESS:  139A.

9   BY MR. SANDMAN:

10  Q.  Can you identify what that is?

11  A.  It's a list of items in this case that were sent to me to

12  review.

13  Q.  Have you reviewed those documents?

14  A.  Yes.

15  Q.  Have you reviewed some of them many times?

16  A.  Yes.

17          MR. SANDMAN:  I'd offer Exhibit 139A.

18          THE COURT:  139A?

19          MR. SANDMAN:  Yes.

20          THE COURT:  Any objection?

21          MR. BRACCIO:  These are the charts, Cary?

22          MR. SANDMAN:  That's the chart of materials he

23  reviewed.

24          THE COURT:  I've got D up on my screen.

25          MS. SCHNEIDER:  That's an error.


UNITED STATES DISTRICT COURT

 1             MR. SANDMAN:  Take that down.

 2             MR. BRACCIO:  We have no objection, Judge.

 3             THE COURT:  It's admitted.  But for purposes of your

 4      witness, I still have 139D up there.  Is that what you

 5      intended?

 6             MR. SANDMAN:  No.

 7             THE COURT:  Okay.  I didn't think so.

 8             MR. SANDMAN:  And I apologize, but did I offer A

 9      through C already?

10             THE COURT:  No, you offered A.

11             MR. SANDMAN:  I'm sorry.  I'd like to offer B and C as

12      well.

13             THE COURT:  Okay.  So he's offering A, B, and C, any

14      objection?  Counsel?

15             MR. BRACCIO:  I'm sorry, Your Honor.

16             THE COURT:  Any objection?

17             MR. SANDMAN:  The charts and the statements.

18             MR. BRACCIO:  No objection.

19             THE COURT:  They're admitted.  Go ahead.

20      BY MR. SANDMAN:

21      Q.  Mr. Cooper, did you sign a declaration in this case?

22      A.  Yes, I did.

23      Q.  I believe that's Exhibit 139.  Could we take a look at

24      that?

25      A.  I have four different 139s.

1  Q.  We're going to put up the original 139 in a moment.

2         MR. SANDMAN:  That's the declaration.

3         MS. SCHNEIDER:  You want the declaration?

4         MR. SANDMAN:  Exhibit 139.

5  BY MR. SANDMAN:

6  Q.  Do you recognize Exhibit 139 as being the declaration you

7  signed in this case?

8  A.  Yes, I do.

9         MR. SANDMAN:  Your Honor, I thought I had offered

10 139D, but if I didn't, I apologize.

11        THE COURT:  I thought you did, too.  So you are

12 offering A, B --

13        MR. SANDMAN:  A, B, C, and D.

14        THE COURT:  A, B, C, and D.

15        Any objection?

16        MR. SANDMAN:  I thought we had, but someone sent me a

17 note saying I didn't.

18        THE COURT:  Okay.  Well, I thought you did, but....

19        MR. BRACCIO:  Judge, I think we -- I think we launched

20 a prior objection to this document.

21        THE COURT:  Which one?  This one?

22        MR. BRACCIO:  Correct.  The declaration.

23        MR. SANDMAN:  Your Honor --

24        MR. BRACCIO:  This Court may have overruled that in

25 the order.  And then it would just strike any testimony or any

UNITED STATES DISTRICT COURT

1   statements that reflected the --

2           THE COURT:  I think I indicated I am capable of making

3   the distinction.

4           MR. BRACCIO:  Correct.  Yeah.

5           THE COURT:  So you don't have an objection?

6           MR. BRACCIO:  No, Your Honor.

7           THE COURT:  With that clarification?

8           MR. BRACCIO:  Yeah.

9           THE COURT:  So, admitted.

10          But you were circling around to D, but this is 139,

11  not D.

12          MR. SANDMAN:  Right, D is the list of records.  It's

13  pages of fine print of records he's reviewed.

14          THE COURT:  So they're in -- it's in as well.

15          MR. SANDMAN:  Right.

16          THE COURT:  So, next question?

17  BY MR. SANDMAN:

18  Q.  Mr. Cooper, in this declaration, did you ultimately express

19  some opinions about the type of investigation that should have

20  been done by Mr. Jones' lawyers, his trial lawyers?

21  A.  Correct.  Yes, I did.

22  Q.  If you could look at the bottom of Page 4, starting in

23  Paragraph 8, and then we -- first of all, you conclude there

24  that forensic evidence played a critical role in Mr. Jones'

25  case.  What do you mean?  What are you saying there?  What's

 1   your understanding?

 2   A.  Well, this --

 3          THE COURT:  Let me stop you.  You're not eliciting his

 4   opinion as to whether or not -- he's not evaluating performance

 5   of counsel below, right?

 6          MR. SANDMAN:  He is not going to comment on the

 7   effectiveness of counsel, he is simply going to describe the

 8   type of investigation that should have been done.

 9          THE COURT:  At that time.

10          MR. SANDMAN:  At that time.  Ultimately.  I'm a couple

11   of questions away from that, but, yes.

12          THE COURT:  But I want to make sure I know where we're

13   going with this.

14          MR. SANDMAN:  Okay.  But I've instructed the witness

15   not to express any opinion on the quality of the performance or

16   the effectiveness of counsel.

17          THE COURT:  All right.  Thank you.  Go ahead.

18   BY MR. SANDMAN:

19   Q.  But I just wanted to ask you briefly about your first

20   sentence in Paragraph 8, about the critical role that forensic

21   evidence played in Mr. Jones' case at trial.

22   A.  Sure.  This is a timeline case, and the state's entire

23   theory was that the murder took place during a specific period

24   of time, probably about a three-hour period of time, in which

25   Mr. Jones had custody of the child.  And they also had a

DIRECT EXAMINATION - COOPER                          20

1    specific cause of death, peritonitis, which means that the --

2    the way you would have to attack this case, defending it, is

3    somehow get Mr. Jones outside of that three-hour window, either

4    by showing that the injury didn't take place during that

5    three-hour period of time, and therefore he didn't do it, or

6    that somebody else did the injury, either way.

7        But, scientifically, you absolutely have to look at the

8    cause of death and determine whether or not that cause of death

9    could have happened in that window of time that the state was

10   alleging.

11   Q.  Okay.  I think you said you handled dozens of child abuse

12   cases, and is it often the case that there are no eyewitnesses

13   to child abuse cases?

14   A.  My experience has been most often.  I mean, there's usually

15   not an eyewitness to somebody beating a child.

16   Q.  In those cases is it common, commonplace, for the

17   prosecution to attempt to tie the defendant to the offense by

18   tying the time of injury to the time that the child was in the

19   defendant's custody?

20   A.  The state has to do that.  They don't have a case if they

21   can't tie a defendant to a particular period of time.

22   Q.  And what role does the state's medical evidence play in

23   that typical scenario?

24   A.  Well, most of the prosecutors that I know rely on the

25   medical evidence, either from medical examiners or the

1   pediatricians involved.  It's critical to most prosecutors.

2   Q.  If you could expand just the first three lines of the top

3   of Page 5 there.  Just the first three lines.

4       Then you conclude there that under prevailing professional

5   norms, an investigation of the time of injury should have been

6   the central focus of the defense.

7       Those are the professional norms we talked about earlier?

8   A.  That's right.

9   Q.  As applied to the facts of this case.

10  A.  That's right.  That's what this case was about, a window of

11  time where the state claimed Mr. Jones had the child and hurt

12  the child.

13  Q.  And I think you're saying that that should have been done,

14  that type of investigation should have been done, are you

15  saying in the records you reviewed did you find evidence that

16  that type of investigation was done in this case?

17  A.  No.

18  Q.  I want to turn from the injuries, just for a moment, to

19  some questions about the prevailing standards for indigent

20  defense funding --

21  A.  Sure.

22  Q.  -- in Pima County in 1994, '95, and then later in 1999 to

23  2001.  Or 2000.  Excuse me.

24      Was there a statute in Arizona that regulated a Court's

25  discretion to grant indigent defense funding?

1  A.  Yes, there was.

2  Q.  We heard earlier from a witness that the Arizona Supreme

3  Court actually ordered the application of that statute in the

4  state post conviction case.  Was that statute also applicable

5  in trial cases?

6  A.  Yes, it was.

7  Q.  Do you know what the standard -- what standard had to be

8  met in order to comply with that statute?

9  A.  It's a reasonable, reasonable standard; looking at the

10  witness you're requesting, whether it be a reasonable request

11  based on the evidence.

12  Q.  Do you have to set out specific reasons or can you just say

13  "I need an investigator," "I need an expert"?

14  A.  I've never done it that way.  Most judges in those days

15  wanted to know specifically why you were doing something, and

16  most of the judges wanted to know what are the facts that

17  you're basing this request upon.

18  Q.  Focusing on the period '94/'95 through 2000.

19  A.  Right.

20  Q.  Were you handling a lot of court appointed cases during

21  that time period?

22  A.  No, I was handling mostly retained cases.  The court

23  appointed cases that we accepted were only murder cases.

24  Q.  But you were handling, throughout that period, murder

25  cases?  In the '90s through 2000?

1   A.  Yeah.  Yeah.

2   Q.  And on an appointed basis, the murder cases.

3   A.  Well, most were appointed.  Every once in a while we had a

4   retained murder, but they were rare.

5   Q.  Did you ever present an application for funding in Pima

6   County Superior Court that was denied?

7   A.  Not that I remember.  There might have been, but I don't

8   remember it ever happening.

9   Q.  What would you have done in an instance where a court

10  denied funding?

11  A.  I would have done one of two things.  I would have decided

12  whether at that point I wanted to take a special action to

13  either the Court of Appeals or the Supreme Court.

14  Alternatively, I would have made an extensive fact-filled

15  record below for an appellate court to look at eventually.

16  Q.  So the factual record would demonstrate the reasonable

17  necessity for the expert or investigator or what have you.

18  A.  Right.

19  Q.  Were you attending conferences, capital case conferences,

20  in the State of Arizona in -- throughout the '90s and into

21  early 2000s?

22  A.  I was.

23  Q.  On a frequent basis?

24  A.  Yes.

25  Q.  Did you ever attend a capital case conference in Arizona

1   where speakers were instructing people not to ask for funds in

2   post conviction cases in Arizona?

3   A.  I've never heard that.

4   Q.  Have you ever heard as a general proposition that there was

5   a culture in the Pima County Superior Courts to deny funding to

6   indigent defendants?

7   A.  I had never heard that, no.

8   Q.  Do you remember a case called *Ake vs. Oklahoma*?

9   A.  *Ake vs. Oklahoma*?  Yeah.  Yeah, very well.

10  Q.  Do you know about when that case was decided?

11  A.  That case, I believe it was the late '80s, 1988 maybe.

12  Q.  Did the Arizona Supreme Court ultimately, after *Ake* was

13  decided, adopt the *Ake* standard for the constitutional

14  right for indigents to get defense funding --

15  A.  It was an Arizona Supreme Court case, I thought it was

16  *Knapp*, but I can't remember the name of the case that basically

17  adopts *Ake*, yes.

18  Q.  Can you envision a scenario where the Arizona appellate

19  courts would have tolerated a wholesale denial of funding in

20  any type of capital case at any stage?

21  A.  I can't envision that.  And, frankly, the trial court and

22  the judges in Pima County, you know, some of them were more

23  sensitive than others, but they were very sensitive,

24  particularly to murder cases and death penalty cases, about the

25  need for adequate and effective representation.  So they, every

1   once in a while, would question you about why you need that

2   kind of money, but there wasn't that much difficulty getting

3   it.

4   Q.  Have you ever worked with an expert by the name of Phillip

5   Keen?

6   A.  Dr. Keen?

7   Q.  Yes.  On an appointed case?

8   A.  Yes.

9   Q.  Were you able to get funding for him, too?

10  A.  I received funding for Dr. Keen, I have.

11  Q.  And I wanted to ask you, have you ever worked with an

12  expert by the name of Dr. Phillip Esplin, who is an expert in

13  child interviewing techniques?

14  A.  Yes, I have.

15  Q.  And have you sought funding to have Dr. Esplin appointed in

16  indigent defense cases that you handled in Pima County Superior

17  Court?

18  A.  Yes.

19  Q.  And how far back in time were you working with Dr. Esplin

20  in Pima County on indigent appointed cases?

21  A.  I know I knew of Dr. Esplin in about 1990 -- or 1988 or

22  '89, when a friend of mine, a defense attorney here in Tucson,

23  was using him, and I probably had Dr. Esplin on a case maybe a

24  year or two after that.  So it would have been in the early

25  '90s.

1   Q.  Were those cases where you thought that the jury might need

2   some assistance in understanding potential issues in connection

3   with interviews of young children?

4   A.  Yes.

5   Q.  I want to turn your attention back to your declaration, at

6   Page 6, in the middle paragraph there.  I guess that's

7   Paragraph 10.

8        We've talked a little bit about the -- earlier about the

9   time of injury.  We were talking about the fatal injury to the

10  small bowel earlier, about the need to investigate that.

11  A.  Right.

12  Q.  And in this paragraph, what did you find with respect to

13  the need for investigation of the balance of the prosecution's

14  forensic evidence?

15  A.  The medical examiner in this case tied the other injuries

16  to the injury to the bowel.  It's absolutely critical,

17  particularly blood, you have blood in Mr. Jones' van that has

18  to be addressed.  All of -- the bruises and the vaginal

19  injuries and the blood can all be addressed, and you really

20  can't defend it without doing that.

21  Q.  Given the record that you reviewed, you know, in connection

22  with the blood in the van, was there anything that caught your

23  attention that suggested a critical need for investigation of

24  the bloodstain interpretation evidence?

25  A.  Yeah, the -- there were witnesses who said they saw

1    Mr. Jones with the child on May 1st in the van, and the state's

2    claim was that's where the beating and the sexual assault took

3    place.  And there was a minimal drop of blood in the front

4    seat, and that drop of blood had to be addressed, how it got

5    there.  There were alternatives that -- clearly alternatives,

6    but you had to address those.

7    Q.  That, I guess, brings us to the two child eyewitnesses.

8    Have you reviewed their statements in interview and at trial?

9    A.  Yes.

10   Q.  Did that raise any flags for you, in terms of the need for

11   investigation?

12   A.  In two ways.  First would be basically eyewitness

13   identification, and second would be the size of the van.

14       I'm sorry.  And actually a third way would be -- well, just

15   the two ways:  The size of the van and the perception of the

16   children.  And, I'm sorry, the third way would be how the

17   children were questioned.  And that would be a Dr. Esplin type

18   of issue, whether they were contaminated, whether their

19   statements were consistent, that sort of thing.

20   Q.  Okay.  Did you see any evidence that the trial counsel had

21   investigated those areas?

22   A.  No.

23       MR. BRACCIO:  Judge, I am going to object to this line

24   of questioning.  I think this goes directly to the Court's

25   previous order.

1              THE COURT:  Sustained.

2    BY MR. SANDMAN:

3    Q.  What type of investigation of the physical evidence do you

4    think should have been done in respect to the size of the van

5    and so on?

6              MR. BRACCIO:  Objection.

7              MR. SANDMAN:  Can I be heard, Judge?

8              THE COURT:  Yes.

9              MR. SANDMAN:  I am not asking him to comment on

10   whether the performance was good or bad or effective, I am just

11   saying -- he's testified all along about the type of

12   investigation that should have been done, which comes within --

13             THE COURT:  He can testify about the nature of the

14   investigation that would be the prevailing standard at the

15   time, but, I mean, there's a line he can't cross, which is

16   evaluating whether or not the investigation that was done in

17   this case was appropriate.

18             MR. SANDMAN:  Right.  And I didn't ask him that.

19             THE COURT:  Okay.  Go ahead.

20   BY MR. SANDMAN:

21   Q.  Under prevailing norms in '94 and '95, what is the nature

22   of the investigation that should have been done?  Without

23   commenting on your view of the performance.  Just under

24   prevailing professional norms at that time, what type of

25   investigation should have been --

UNITED STATES DISTRICT COURT

1            THE COURT:  I don't think you can frame it as what

2     should have been done.  If you frame it as what investigation

3     would you have done --

4            MR. SANDMAN:  I'm sorry.

5            THE COURT:  -- at that time of this situation.

6        You know, why Mr. Braccio keeps standing up is because

7     you're framing it as focused on this particular investigation,

8     which is getting awfully close to the line about what I said

9     you can't --

10           MR. SANDMAN:  Okay.  And I don't want to go over the

11    line, believe me.

12           THE COURT:  Go ahead.

13           MR. SANDMAN:  I appreciate the help.

14    BY MR. SANDMAN:

15    Q.  What type of investigation would you have done under

16    professional prevailing norms with respect to the eyewitness

17    testimony?  Let's focus first --

18           THE COURT:  Again, just to complicate matters a little

19    bit more.  So, you know, it's not obviously fair to have you

20    evaluate it in terms of where we are today --

21           MR. SANDMAN:  Sure.

22           THE COURT:  -- which are techniques and forensic

23    evidence.  It's really, if you can, put yourself in the frame

24    of mind of '94/'95 and the standards that were prevailing at

25    that time and if you were faced with this situation, you know,

1    what would the standard be, what would people do.

2          MR. SANDMAN:  Sure.

3          THE WITNESS:  I can do that.

4          THE COURT:  Go ahead.

5          THE WITNESS:  There were two main areas that I think I

6    would have done that I think were critical here, and obviously

7    the first area is the children.  And by this point, in 1995, I

8    had already used Dr. Esplin, and I knew about his expertise.

9    And most defense lawyers in the country by this point knew

10   about the McMartin case and knew about the perils of

11   interviewing children and how it had to be done and how it

12   could be really dangerous if not done correctly.

13         So one of the first things I would have done was

14   looked at the interviews of the kids, looked at what their

15   mother said about the interviews, and I would have consulted,

16   if not Dr. Golden (phonetic), there was another expert to

17   Dr. Goldman (phonetic) -- not Dr. Goldman -- that Dr. Esplin

18   actually referred me to named "Golden," at the University of

19   Utah, and I would have consulted with them immediately about

20   the questioning and the accuracy and the expertise of the

21   questioner of the children to determine how accurate or

22   inaccurate or how much a trier of fact could rely on what the

23   children said.

24         The second thing I would have done was, looking at the

25   van, I would have -- I would have wanted to have some kind of

1   expertise, some expert, as to the measurements of the van and

2   the vantage point of the person who was viewing what they said

3   they saw in the van and whether it was physically possible.

4           And actually during that period of time, I had a case

5   where I had to do something similar.  Unfortunately, it didn't

6   work out real well.  But you still have to contact the expert

7   and try to determine whether or not what the witness says they

8   saw would be possible under the physical conditions.

9   BY MR. SANDMAN:

10  Q.  What kind of expert would you have consulted with back in

11  1995 about that issue?

12  A.  Well, probably at that time, possibly an accident

13  reconstruction person.  You know, somebody with the ability to

14  look at vehicles and take measurements and look at angles of

15  vehicles.  There were several types of people in those days

16  that you could use.  Accident reconstruction would be one.  And

17  certainly most investigators had some ability to take

18  measurements of where the child would be versus the angle of

19  the vehicle.

20  Q.  I want to turn your attention to Paragraph 12.  You don't

21  really have to enlarge it.  Just sort of a general question

22  about, do you remember reading different statements that Becky

23  Lux gave?

24  A.  I do.

25  Q.  What do you remember about the series of statements that

1   she made about Mr. Jones and Rachel on Sunday, May 1st?

2   A.  I know that Rebecca had made three prior pretrial

3   statements saying that Mr. Jones had left with the child on two

4   different occasions, and had returned each time and the child

5   was fine.  And I know that in the Gray trial that Rebecca had

6   basically said the same thing, that there were two different

7   trips, that on the return of the second trip the child was

8   fine.  I know that when she testified in Mr. Jones' trial,

9   there was a third trip, and she indicated she did not see --

10  see them when they returned from the third trip.

11  Q.  And how did that third trip factor into the prosecution's

12  case at Mr. Jones' trial?

13  A.  It was devastating.  It left you -- the testimony that

14  there were only two trips and that the child was fine --

15          MR. BRACCIO:  Your Honor, I am just going to continue

16  to object to this.

17          THE COURT:  Sustained.  You're having him evaluate --

18          MR. SANDMAN:  Okay.

19          THE COURT:  -- not in this case, as opposed to what he

20  would do in this case, and that's a major distinction.

21          MR. SANDMAN:  Yeah, I'm sorry.

22          THE COURT:  We've reached a point where I am going to

23  need to take a break to have this other hearing.  We're going

24  to break until 2:15.  Thank you, very much.

25      (A recess was taken from 1:53 p.m. to 2:40 p.m.)

 1              THE COURT:  My apologies.  I thought it was going to

 2   be 15 minutes, and it wasn't.

 3              So were you done on direct?

 4              MR. SANDMAN:  I've decided to be done, yes, Your

 5   Honor.

 6              THE COURT:  I'm going to have to take longer recesses.

 7              MR. BRACCIO:  We work it out, Your Honor.

 8              THE COURT:  Go ahead.

 9                       CROSS-EXAMINATION

10   BY MR. BRACCIO:

11   Q.  Good afternoon, Mr. Cooper.

12   A.  Hi.

13   Q.  How much have you billed in this case so far?  Do you

14   recall?

15   A.  I know that I haven't received a check yet.

16              THE COURT:  I don't think the question was money

17   received, I think it's --

18              MR. BRACCIO:  Yeah.

19   A.  I believe 40 hours previously.  And then this new cycle, I

20   think there's another, probably, 25 hours.

21   BY MR. BRACCIO:

22   Q.  Okay.  At about how much an hour?

23   A.  190.

24   Q.  190 an hour.

25   A.  Yeah.

1   Q.  By 1996, you had only tried one capital case to a verdict.

2   A.  That's correct.

3   Q.  That was the Jackson case?

4   A.  Levi Jackson, right.

5   Q.  You are not a certified criminal law expert, correct?

6   A.  That's correct.

7   Q.  And you recall, at the time of Barry Jones' trial, Sean

8   Bruner was?

9   A.  I didn't know that, I've been told that.

10          THE COURT:  I'm sorry.  Maybe you can -- or can you

11   just explain to us what a certified criminal law expert is?

12          THE WITNESS:  Sure.  The state bar offers a

13   certification in various areas of law, and it requires, I

14   think, testing, and you just get certified.  They do it in like

15   real estate and trusts, personal injury, criminal, different

16   areas of law.

17          THE COURT:  So criminal defense is one area of

18   certification?

19          THE WITNESS:  That's correct.

20          THE COURT:  And were you, at the time, certified?

21          THE WITNESS:  I have never been.

22          THE COURT:  So, even now?

23          THE WITNESS:  No.  I never applied, I never took the

24   test.  No.

25   BY MR. BRACCIO:

UNITED STATES DISTRICT COURT

1   Q.  And my next question actually was to the standard for that.

2   You agree that it's defined as a board certified specialist is

3   a lawyer who has demonstrated superior knowledge, skill,

4   integrity, professionalism, and competent in a specific area of

5   law, correct?

6   A.  Yeah.

7   Q.  You have never handled any post conviction relief

8   proceedings?

9   A.  That's not true.

10  Q.  So the one that you're doing?

11  A.  That's right.

12  Q.  So just that one that you're currently involved with.

13  A.  Correct.

14  Q.  Regarding your declaration in this case, you did not write

15  that, correct?

16  A.  That's correct.

17  Q.  Your understanding -- Mr. Sandman drafted that declaration

18  for you?

19  A.  That's correct.

20        MR. BRACCIO:  I have no further questions, Your Honor.

21  Thank you.

22                    EXAMINATION BY THE COURT

23  Q.  So I'm assuming you read the declaration before you signed

24  it.

25  A.  I did, Your Honor.

1  Q.  And you agree, even though it was written by Mr. Sandman,

2  you agree with the contents of the declaration that you signed?

3  A.  I agreed with all of the contents.

4          THE COURT:  Okay.  Thank you.

5      Does that generate any additional questions for this

6  witness?

7          MR. BRACCIO:  No, Your Honor.

8          MR. SANDMAN:  No, sir.

9          THE COURT:  Well, you know, I am sorry, I would have

10  finished up had I known it was going to be this short.

11      All right, sir.  You may step down.  We appreciate it.

12          MR. COOPER:  Thank you.

13          THE COURT:  Any other witnesses today?

14          MR. SANDMAN:  No, Your Honor.

15          THE COURT:  All right.  So we are set for Monday.  Can

16  you give me the game plan for Monday?

17          MR. BRACCIO:  Absolutely, Your Honor.  Cary and I will

18  discuss whether or not -- who's going to call her, but Sonia

19  Pesquiera will be the first witness Monday morning.  We'll see

20  how far she gets.  And then we have Dr. Howard flying in

21  Tuesday at noon.  I'll pick him up and we'll come straight here

22  and we can start his testimony at 1:00 o'clock.  And we will be

23  finished by Tuesday at the end of business.

24          THE COURT:  So we're going to have the detective all

25  of Monday?

UNITED STATES DISTRICT COURT

1           MR. BRACCIO:  I think that's just going to depend on

2  how much --

3           THE COURT:  I mean, she's available all Monday.

4           MR. BRACCIO:  Correct.

5           THE COURT:  You just don't know how many questions

6  y'all are going to have.

7           MR. BRACCIO:  That's correct.

8           MR. SANDMAN:  I think I have, you know, maybe 40

9  minutes, give or take.

10          MR. BRACCIO:  Yeah, mine won't be terribly long.  An

11  hour.

12          THE COURT:  And then that's it for Monday.  And then

13  on Tuesday Dr. Howard comes in at 1:00?

14          MR. BRACCIO:  At noon, and then he'll be here -- we'll

15  drive straight here.  He should be available by 1:00.

16          THE COURT:  And he's the last witness.

17          MR. BRACCIO:  Correct.

18          MR. SANDMAN:  I was just thinking, if Mr. Braccio only

19  has an hour and a half or so, and I only have maybe 45 minutes,

20  maybe we could just do it Tuesday morning, do everything in one

21  day.

22          MR. BRACCIO:  If Your Honor --

23          THE COURT:  That's fine with me if -- as long as

24  you -- I mean, again, we have Tuesday then.  As long as we can

25  finish on Tuesday and you're both confident we can finish on

 1   Tuesday --

 2          MR. SANDMAN:  Maybe we should just do it on Monday

 3   then.  I don't want to -- that's too much for us in one day.

 4          THE COURT:  Wait.  Wait.  I am not generating the

 5   stress, am I?

 6          MR. SANDMAN:  No, this is all internalized, believe

 7   me.

 8          THE COURT:  Good answer.

 9       So we'll just go ahead with Detective...

10          MR. BRACCIO:  Detective Pesquiera.

11          THE COURT:  ...Pesquiera on Monday.

12          MR. BRACCIO:  Correct.

13          THE COURT:  However long that takes, and then we'll

14   start on Tuesday afternoon with Dr. Howard.

15          MR. BRACCIO:  Right.  And I think, Your Honor, we

16   could take Detective Pesquiera in either the morning or the

17   afternoon and still have plenty of time.

18          THE COURT:  So would you prefer to start with her

19   after lunch on Monday?

20          MR. SANDMAN:  That sounds good to me.

21          MR. BRACCIO:  That would give us sufficient time.

22          THE COURT:  Okay.  So we'll start at 1:00 o'clock on

23   Monday.

24          MR. BRACCIO:  Okay.

25          MR. SANDMAN:  That's great.


                    UNITED STATES DISTRICT COURT

1            MR. COOPER:  Without getting in trouble, I took the

2    exhibits.  Sorry.  (Handing exhibits to the clerk.)

3            THE COURT:  All right.  Anything else today?

4            MR. BRACCIO:  No, Your Honor.

5            MS. SMITH:  No, Your Honor.

6            THE COURT:  Thank you, very much, then.  We'll be in

7    recess.

8                    (Off the record at 2:46 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, A. TRACY JAMIESON, do hereby certify that I am

4    duly appointed and qualified to act as an Official Court

5    Reporter for the United States District Court for the District

6    of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true and accurate transcript of the proceedings

9    contained herein, held in the above-entitled cause on the date

10   specified therein, and that said transcript was prepared by me.

11         Signed in Tucson, Arizona, on the 29th day of

12   November, 2017.

13

14

15
                                   s/A. Tracy Jamieson
16                                 A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25