1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF ARIZONA

3       Barry Lee Jones,              )  4:01-cv-00592-TMB
                                      )
4                    Petitioner,      )
                                      )
5       vs.                           )
                                      )  Tucson, Arizona
6       Charles L. Ryan, et al.,      )  November 6, 2017
                                      )
7                    Respondents.     )
        _____)

8

9

10        BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE

11

12                        Transcript of Proceedings
                          Evidentiary Hearing - Day 6
13

14

15

16

17      Proceedings reported and transcript prepared by:

18          A. Tracy Jamieson, RDR, CRR
            Federal Official Court Reporter
19          Evo A. DeConcini U.S. Courthouse
            405 West Congress, Suite 1500
20          Tucson, Arizona 85701
            (520) 205-4266
21

22

23

        Proceedings reported by steno machine shorthand;
24      transcript prepared using court reporting software.

25

```
 1                         APPEARANCES

 2   For the Petitioner:

 3       U. S. Federal Public Defender
         Cary Sandman, AFPD
 4       407 West Congress Street, Suite 501
         Tucson, AZ 85701
 5       (520) 879-7540

 6       U. S. Federal Public Defender
         Karen S. Smith, AFPD
 7       850 West Adams Street, Suite 201
         Phoenix, AZ  85007
 8       (602) 382-2706

 9

10   For the Respondents:

11       Arizona Office of the Attorney General
         Myles Braccio, AAG
12       1275 West Washington Street
         Phoenix, AZ 85007
13       (602) 542-4686

14       Arizona Office of the Attorney General
         Lacey Gard, AAG
15       400 West Congress Street, Suite S315
         Tucson, AZ  85701
16       (520) 628-6520

17
     Also Present:
18
             Barry Jones, Petitioner
19           Jim D. Nielsen, AZAG
             Jennifer Schneider, Paralegal with FPD
20           Daniel Vidal, Paralegal with AZAG
             Andrew Sowards, Investigator with FPD
21

22

23

24

25
```

1                        INDEX OF EXAMINATIONS

2

3    WITNESSES:                                            PAGE

4    **SONIA PESQUIERA**

5

6        Direct Examination By Mr. Braccio....................   5

7        Cross-Examination By Mr. Sandman....................  42

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (On the record at 1:04 p.m.)

2          THE COURT:  Everybody ready to go?

3          MR. SANDMAN:  Yes, Your Honor.

4          THE COURT:  You look like you're not quite ready to go

5   yet, you want to raise first.  I know that look.

6          MR. SANDMAN:  I do have that look.  But, Judge, I

7   wanted to correct a statement I made on Friday.

8          THE COURT:  Okay.

9          MR. SANDMAN:  During the cross-examination of

10  Mr. Hazel, there was a lot of back-and-forth about the

11  adequacies of his funding request.

12         THE COURT:  Yes.

13         MR. SANDMAN:  At one point I asked a question that

14  assumed as a fact that the Arizona Supreme Court had actually

15  adjudicated that funding issue adverse to Mr. Jones.  I know I

16  said that.

17         THE COURT:  Okay.

18         MR. SANDMAN:  And I was going through the file this

19  weekend and I noticed actually the Arizona Supreme Court only

20  denied discretionary review, which obviously is not an ad

21  adjudication.  I suppose that's a way of saying that the -- the

22  adequacy of the funding request was at issue in his appeal, but

23  it was just a discretionary review that was denied by the

24  Arizona Supreme Court.  So there was no actual adjudication of

25  that by the Arizona Supreme Court.  I just wanted to make sure

```
 1    I corrected that.

 2              THE COURT:  Okay.  Thank you for the clarification.

 3              So, with that.

 4              MR. BRACCIO:  Your Honor, respondents would call Sonia

 5    Pesquiera.

 6              THE CLERK:  If you would please raise your right hand.

 7              SONIA PESQUIERA, WITNESS, SWORN

 8              THE COURT:  Please have a seat.

 9         Mr. Braccio.

10                        DIRECT EXAMINATION

11    BY MR. BRACCIO:

12    Q.  Good afternoon, Mrs. Pesquiera.

13    A.  Good afternoon.

14    Q.  Would you state your name for the record.

15    A.  Sonia Pesquiera.

16    Q.  Spell your last name for us.

17    A.  It's P-, as in "Paul," -e-s-q-u-e-i-r-a.

18    Q.  Are you currently employed?

19    A.  I am not.

20    Q.  What do you do?

21    A.  I stay home and take care of my grand-babies.

22    Q.  Can you tell Judge Burgess about your career in law

23    enforcement.

24    A.  I have a career of -- well, actually 34 years.  32 years in

25    law enforcement was with the Pima County Sheriff's Department.
```

1    After working Patrol, I went into the Criminal Investigations

2    Division, where I worked for or in the Crimes Against Children

3    Unit, dealing with physical/sexual abuse, child sexual

4    exploitation, missing and abducted children, and also adult sex

5    crime related cases.

6         From there, I went to the Homicide Unit as a detective.  I

7    was there for maybe four and a half years before being promoted

8    to Sergeant.  Went back out to the field.  Eventually came back

9    into CID and then was assigned to a unit.  And then was later

10   assigned to the Crimes Against Children Unit as the supervisor,

11   and I was there for almost 14 years.

12        Then I was reassigned to Supervisor for the Homicide Cold

13   Case Unit, where we also did any kind of death-related cases

14   and officer-involved shootings.  And that's when I retired,

15   September of last year.

16   Q.  In this case, did you have a different name?  At trial?

17   A.  I had -- Rankin was my last name at the time.

18   Q.  Then you subsequently married?

19   A.  I married, yes.

20   Q.  Were you the lead investigator and the case agent for the

21   Rachel Gray death and the subsequent arrest of Barry Jones?

22   A.  Yes, I was.

23   Q.  I'd like to talk about your investigation.  Since your

24   deposition, have you had a chance to continue to review police

25   reports and witness statements in this case?

DIRECT EXAMINATION - PESQUIERA

1   A.  Some, yes.

2   Q.  Would it be fair to say at the time of your deposition you

3   had not had a chance to fully review all the police reports and

4   witness statements?

5   A.  Not all of them, no.

6   Q.  It's been 23 years since the crime?

7   A.  It has.

8   Q.  Would you have known the facts of this case a little bit

9   better back then?

10  A.  Yes.

11          THE COURT:  I'm sorry, back when?  At her deposition

12  or at the time --

13          MR. BRACCIO:  Great question.

14  BY MR. BRACCIO:

15  Q.  Back in 1994, when this crime took place?

16  A.  Yes.

17  Q.  I'd like to pull up Exhibit 50.

18      Mrs. Pesquiera, I'm showing you what's previously been

19  admitted into evidence as Exhibit 50.  This is a photograph

20  looking into the girls' bedroom of Barry Jones' trailer on the

21  right-hand side there.  Do you recall this picture?

22  A.  I do.

23  Q.  Do you recall that you were asked questions in your

24  deposition about whether Rachel could have fallen on that

25  little table depicted here in Exhibit 50?

1  A.  I do remember being asked questions in that area, yes.

2  Q.  And whether that fall could have caused this massive

3  bruising around her forehead and the injury to her eye?

4  A.  Yes.

5         THE COURT:  I'm sorry.  When you say, "table," which

6  table are you talking about?  It looks like there's a table on

7  the right, it looks like there's a tooler's (phonetic) table on

8  the left.

9         THE WITNESS:  There are two different photographs,

10  Your Honor.  And the one to the right, there's a doorway there,

11  and then there's like a little table off to the side, to the

12  right-hand side.

13         THE COURT:  Is that what you're testifying about in

14  regard to the fall?

15         THE WITNESS:  That's what I was questioned about.

16  That doorway leads into little Rachel's bedroom.  And the other

17  photograph is like the living room area, when you first walk

18  into the trailer that's what you see.

19         THE COURT:  Thank you.  Go ahead.

20  BY MR. BRACCIO:

21  Q.  I'd like to show you Exhibit 51.

22         MR. BRACCIO:  Before we pull that up, Your Honor, this

23  is the head shot from the autopsy of Rachel Gray.  Would you

24  like the screens darkened out for this?  I believe it's just

25  the head.

1          THE COURT:  Yeah, I'd prefer to have the screens

2     darkened out, the public screens.

3     BY MR. BRACCIO:

4     Q.  Were these the injuries that you were previously questioned

5     about?

6     A.  Yes.

7     Q.  Do you recall Rebecca's testimony in the Angela Gray trial?

8     A.  Some, some of it, yes.

9     Q.  Do you recall that Rebecca testified about where she found

10    Rachel the morning that she woke up, on Sunday -- excuse me --

11    Monday, May 2nd, 1994?

12    A.  That it was somewhere near the doorway, is what I am

13    recalling.

14    Q.  Did Rebecca testify to any other description beyond that

15    she found Rachel near the doorway?

16    A.  No.

17    Q.  So do you have any evidence that Rachel was even near that

18    table the morning that she collapsed and died?

19    A.  No, I do not.

20          MR. SANDMAN:  Judge, just a point of clarification,

21    I'm sorry.  Are we talking about testimony at Mr. Jones' trial?

22          THE COURT:  No, I think his question actually

23    encompassed both.  I think his first question was did she

24    recall testimony at Angela's Gray's trial, and then I think his

25    follow-up question:  Do you recall any testimony at all?

DIRECT EXAMINATION - PESQUIERA

1        MR. BRACCIO:  Correct.

2        MR. SANDMAN:  Could we have a reference to the date

3    and page number of this testimony that we're talking about, so

4    that we can understand it and maybe have an opportunity to

5    examine on it?

6        THE COURT:  Well, I don't think he can give you a page

7    number to the question "any testimony at all."  But maybe you

8    need to clear it up.

9      You're talking about two distinct events.  First, you

10    started asking questions about testimony of Rebecca at the Gray

11    trial.  And I am not sure if there's going to be a page and

12    reference if the question is there's an absence of any

13    testimony regarding the table.  I think that's what her

14    testimony was.  And then your follow-up question was:  Do you

15    recall any testimony whatsoever?

16      So I am not sure how I can give you a page and reference --

17    it's like proving a negative.

18        MR. BRACCIO:  That's exactly right.

19        THE COURT:  Go ahead.

20        MR. BRACCIO:  So I believe Rebecca testified only

21    about the description of where she found that body in the

22    Angela Gray trial, which is where that comes from.

23        THE COURT:  Right.  You'll have an opportunity to

24    cross-examine.  Okay?

25        Go ahead.

DIRECT EXAMINATION - PESQUIERA

1   BY MR. BRACCIO:

2   Q.  During the course of your career, have you had training

3   with respect to interviewing child witnesses?

4   A.  I have.

5   Q.  And did you interview children throughout the course of

6   your career as a detective?

7   A.  I did.

8   Q.  Can children make good eyewitnesses?

9   A.  They do.

10  Q.  And in this case, did you ever discover a motive for the

11  Lopez children to come forward with this evidence of seeing

12  Barry Jones striking Rachel in his yellow van in the Choice

13  Market parking lot on May 1st, 1994?

14  A.  A motive?

15  Q.  Correct.

16  A.  No.

17  Q.  Did the Lopez family receive a reward for their reporting?

18  A.  No, they did not.

19  Q.  Let's talk about the timeline in this case.

20      Do almost all of the crimes you investigate in your career

21  involve establishing a timeline of events?

22  A.  It's important to establish a timeline and to get a history

23  of, you know, various events surrounding different subjects,

24  yes.

25  Q.  Was this case any different?

1    A.  No, it was not.

2    Q.  When you interview witnesses, generally, do you ever just

3    limit them to a certain day?

4    A.  Limit them, no.

5          THE COURT:  I'm sorry, I don't understand the

6    question.

7    BY MR. BRACCIO:

8    Q.  So, for example, generally when you're interviewing a

9    witness, would you ever just limit the witness to the day that

10   the alleged crime occurred?

11   A.  No, because we want an overview, we wouldn't be just

12   speaking about that day.  Then we would be more precise and

13   eventually get to that certain day, yes.

14   Q.  You'd want to know as much information as possible?

15   A.  As much.  And we want them to talk.

16   Q.  Did you establish a timeline in this case based upon your

17   investigation and the witness interviews?

18   A.  Yes, we did.

19   Q.  Did you only focus on Sunday when Rachel was injured?

20   A.  No, I did not.

21   Q.  Do you recall that you questioned witnesses going back

22   years before this crime?

23   A.  Questioned them about years going back, yes.

24   Q.  Did you obtain information on Barry Jones' background going

25   back years before this crime?

DIRECT EXAMINATION - PESQUIERA

1  A.  We did, yes.

2  Q.  How about Angela Gray's background going back years?

3  A.  Yes, we did.

4  Q.  And Angela Gray's children going back years?

5  A.  Yes, that is correct.

6  Q.  Did you ever have evidence that Angela Gray's children

7  suffered significant injuries prior to moving in with Barry

8  Jones?

9  A.  No, there was no evidence of that.

10  Q.  During your investigation, did you receive information that

11  in April of 1994, when Angela Gray and her children moved in

12  with Barry Jones, he would take Rachel alone with him anywhere

13  from two to five times in that month?

14  A.  Yes, that came from his brother, Larry.

15  Q.  In the weeks before her death, did you receive information

16  about one such trip where Rachel received two black eyes while

17  she was with Barry Jones alone?

18  A.  Yes, we received information about that, yes.

19  Q.  Can you tell Judge Burgess about that information.

20  A.  We received information -- and some of them were

21  inconsistent -- from different subjects about her having two

22  black eyes that were -- that appeared older.  So we asked about

23  those, and his brother, Larry, talked to us about that as well

24  and talked to me about that, having seen them and being

25  concerned.

DIRECT EXAMINATION - PESQUIERA

1       I learned that there were some statements made that first

2   she tripped over a puppy, and then that a little girl hit her

3   with a rake, and then eventually she tells someone that Barry

4   is the one that hit her.

5   Q.   Do you recall where this alleged incident was to have taken

6   place?

7   A.   Initially they said that it happened at Larry's house.  And

8   Larry and his wife, Lee Ann (phonetic), I believe, were kind of

9   upset about this, that they were making this claim that it had

10  happened there.

11  Q.   And Larry didn't corroborate this story?

12  A.   No, he did not.

13  Q.   And Lee Ann Jones, Larry's wife, also did not corroborate

14  this story?

15  A.   They were pretty angry about it being alleged that it had

16  happened there.

17       THE COURT:  So I've given you a lot of leeway, but you

18  are asking a lot of leading questions.  This is not a hostile

19  witness, this is your witness.  So you're going to have to

20  formulate your questions in a non-leading fashion.

21       MR. BRACCIO:  Sure.

22  BY MR. BRACCIO:

23  Q.   Is this the incident where Rachel's black eyes come from?

24       MR. SANDMAN:  I'm sorry, I didn't hear that.  Excuse

25  me.

1  BY MR. BRACCIO:

2  Q.  Is this the incident where Rachel received her two black

3  eyes?

4          MR. SANDMAN:  I'm going to object to the form, and

5  foundation.

6          THE COURT:  Well, I'm going to sustain the objection

7  as to the form.

8  BY MR. BRACCIO:

9  Q.  Was the bruising around Rachel's eyes still evident at the

10  time of her death?

11  A.  She had what appeared to be contusions to her eyes that

12  were at various stages of healing, and then contusions that

13  appeared fresher.

14  Q.  And you indicated that Rachel said something about this

15  incident?

16  A.  Which one?

17  Q.  The two black eyes.

18  A.  Yes, that she had talked about that.

19  Q.  And what did Rachel say?

20  A.  Eventually she did say that Barry had done this.

21  Q.  Do you recall receiving information about how Rachel acted

22  afterwards?

23  A.  They said that she was afraid of Barry.

24  Q.  Did many people witness these black eyes?

25          THE COURT:  I'm sorry.  Your question is how Rachel

1  acted afterwards; after what?

2         MR. BRACCIO:  The incident where she received her two

3  black eyes.

4         THE COURT:  Okay.  Go ahead.

5         THE WITNESS:  Can you ask me that question again?

6         MR. BRACCIO:  Sure.

7  BY MR. BRACCIO:

8  Q.  Did many people witness these black eyes on Rachel Gray?

9  A.  Yes.  Several people, yes.

10  Q.  From your investigation and witness interviews, did you

11  also have information about Rachel's well-being on Friday,

12  April 29th, 1994?

13  A.  Yes, we did.

14  Q.  Did anyone describe Rachel as appearing sick or ill on

15  Friday?

16  A.  No.  Nobody said that she was sick on Friday.

17  Q.  Was Rachel bathed on Friday night?

18  A.  We received information that Rachel had been bathed by her

19  sister, Rebecca, and that Brandie was there as well.

20  Q.  Did either of them report any bleeding or bruising on

21  Rachel's body?

22  A.  They did not.

23         MR. SANDMAN:  Your Honor, I am sorry to interrupt.  I

24  just want to -- maybe I should have made this objection

25  earlier.  A lot of this testimony is based on hearsay, and I

1   have no objection to that if it's just to show what this

2   officer knew.  But none of this hearsay was ever admitted at

3   Mr. Jones' trial, so it shouldn't be considered for purposes of

4   analyzing what the jury would have done with the verdict when

5   you're doing a Strickland analysis.  So I don't have any

6   problem with the evidence insofar as it shows information she

7   thinks that she knew, but it's not --

8           THE COURT:  And I don't take it as having been

9   established at trial, I take it as the officer's state of mind

10  at the time she was conducting the investigation.  So thank you

11  for the clarification.

12      Go ahead.  You may want to repeat your last question.

13      The last question was:  "Did either of them report any

14  bleeding or bruising on Rachel's body?"

15      And I think you said:  "They did not."

16          THE WITNESS:  They did not.

17          THE COURT:  Then there was an objection.

18      So go ahead with your next question.

19  BY MR. BRACCIO:

20  Q.  Did anything else of significance happen Friday night?

21  A.  I do recall an incident where a friend of Mr. Jones comes

22  over to the house and he says -- he talks about hearing Barry

23  yelling --

24          THE COURT:  Hearing who?

25          THE WITNESS:  Hearing Barry Jones yelling about Rachel

DIRECT EXAMINATION - PESQUIERA                    18

1    because she was crying and whining.

2    BY MR. BRACCIO:

3    Q.  Did he indicate anything about getting the child away from

4    him?

5    A.  He said something about "get her away from me."

6    Q.  Do you recall, was that conversation overheard by anyone

7    else?

8    A.  Angela was there, and it was -- Barry Jones was there, and

9    it was Ron St. Charles.

10   Q.  Do you recall if another neighbor overheard that

11   conversation as well?

12   A.  There was a woman, I believe her last name may have been

13   DeVous.  D-e-V-o-u-s, I believe.  One of the neighbors there

14   had -- and I'm not sure of that last name.

15   Q.  Just so we're clear, to the best of your knowledge as you

16   sit here today, there was no one that described Rachel as

17   appearing sick, vomiting, or heaving through that Friday night,

18   correct?

19          MR. SANDMAN:  Object to the leading form of the

20   question.

21          THE COURT:  Sustained.

22          MR. BRACCIO:  I'll rephrase it.

23   BY MR. BRACCIO:

24   Q.  Was there anyone who described Rachel as appearing sick or

25   vomiting through Friday night, April 29th, 1994?

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - PESQUIERA

1   A.  No.  In fact, they said she was fine.

2   Q.  Did your investigation also uncover evidence of Rachel's

3   well-being on Saturday, April 30th, 1994?

4   A.  Yes, it did.

5   Q.  How did Rebecca describe Rachel that day?

6   A.  They were playing.  They had breakfast, they were playing

7   games.  They talked about, I believe, the other children having

8   to clean the yard, and that little Rachel stayed, pretty much,

9   indoors.

10  Q.  Did Brandie also indicate anything about Rachel that day?

11  A.  Brandie talked about the playing and that -- I believe she

12  talked about Rachel jumping up on her back wanting a piggyback

13  ride.

14  Q.  Do you recall Brandie stating that Rachel kept stealing

15  bacon off of her plate?

16  A.  That they were eating and she kept stealing bacon and then

17  that Rebecca was tickling her and things like that, yes.

18  Q.  Do you recall that you interviewed Brandie Jones?

19  A.  I did not interview Brandie Jones, no.

20  Q.  Do you recall that a detective interviewed Brandie Jones?

21  A.  Yes.

22  Q.  Did Brandie indicate to that detective that she observed a

23  boy strike Rachel with a metal bar?

24  A.  She did.

25  Q.  She said that to the detective?

                    UNITED STATES DISTRICT COURT

1    A.  I believe she said that to a detective, yes.

2         THE WITNESS:  Can I clarify?

3    BY MR. BRACCIO:

4    Q.  Go ahead, Mrs. Pesquiera.  Do you want to clarify your last

5    answer?

6    A.  Yes, sir, please.  Only because Brandie Jones was

7    inconsistent in a lot of different statements, so I may have

8    that confused.  So I'd have to look at something to be able to

9    refresh my memory exactly who she said it to.

10   Q.  Do you recall that Brandie Jones did not tell the detective

11   about this story?

12   A.  I would have to look at something to --

13        THE COURT:  So the witness has just said she needs to

14   review her report in order to refresh her recollection.  Do you

15   want to give her the opportunity to refresh her recollection?

16        MR. BRACCIO:  I do.  It's Exhibit 1.

17        THE COURT:  So, ma'am, you may read your report to

18   review, to refresh your recollection, but I don't want you

19   testifying from your report.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  So is this the report or her notes?  I

22   don't know what's up on the screen.

23        MR. BRACCIO:  Hold on.

24        MR. SANDMAN:  Your Honor, these are Leslie Bowman's

25   notes.

DIRECT EXAMINATION - PESQUIERA

1          MR. BRACCIO:  I understand, I haven't gotten to the

2    page yet.

3          THE COURT:  Then can we take these down, please?

4      Thank you.

5          THE WITNESS:  Because there were two different trials,

6    there was different depositions, and different things that came

7    out at different times, so that's the only reason I am saying

8    that.

9          THE COURT:  Sure.  No, I understand.  I think he's

10   trying to find your report.

11         MR. BRACCIO:  I am.

12         THE WITNESS:  And I don't know if it would be in my

13   report, that part of it.

14         THE COURT:  Okay.

15         THE WITNESS:  She may have said something like that in

16   a deposition or somewhere else.

17         THE COURT:  This is Brandie?

18         THE WITNESS:  Yes.

19         MR. BRACCIO:  I'll pull the document and hand it to

20   the witness and she can briefly review.

21         THE COURT:  Fine.

22         MR. BRACCIO:  This is Exhibit 1 at Bates Number 793 to

23   812.

24         THE COURT:  Before you look at your report, if I

25   understand your testimony, there were a number of places where

1   she might have made statements, she may have made statements to

2   you in your report, she may have had trial testimony, she may

3   have had deposition testimony, is that right?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  And at some point did you have a chance to

6   review all of that testimony to understand the full scope of

7   her statements?

8           THE WITNESS:  I have learned since then over all --

9           THE COURT:  But not at the time.

10          THE WITNESS:  At the time of the investigation, no.

11          THE COURT:  So at the time of the investigation, what

12  you knew would be reflected in your report.

13          THE WITNESS:  Correct.

14          THE COURT:  Okay.  Thank you.

15          MR. BRACCIO:  Your Honor, may I approach?

16          THE COURT:  Just make sure opposing counsel knows the

17  page of -- the document, and the page and the line number that

18  you're going to be pointing her to.

19          MS. SMITH:  Your Honor, could I ask a favor?  We

20  couldn't quite make out, I'm sorry, what you just said to

21  Detective Pesquiera.  Is there any way to have that read back?

22          THE COURT:  Well, I can summarize it for you.

23          MS. SMITH:  Thank you.  I'm sorry.  We just couldn't

24  hear.

25          THE COURT:  She said there is -- what she knew at the

DIRECT EXAMINATION - PESQUIERA

1    time of the events in question is reflected in her report, but

2    there has been a substantial amount of -- number of statements,

3    both of that witness and other witnesses, that have been

4    generated since then, in depositions and trials.  So that, as I

5    understood her testimony, it's not -- well, it's what I think I

6    just said:  What she knew at the time of the investigation is

7    what's reflected in her report, but there's been other

8    statements have been generated since then.

9            THE WITNESS:  Correct.

10           MS. SMITH:  Thank you.

11   BY MR. BRACCIO:

12   Q.  Did you know at the time that Brandie Jones had claimed she

13   had observed a little two-year-old boy strike Rachel with a

14   metal bar?

15   A.  I didn't learn about that until later.

16   Q.  So if that information was not in Detective Ruelas'

17   interview with Brandie Jones, you would not have known that,

18   correct?

19   A.  I would not have known that.

20           THE COURT:  When did you learn about that?

21           THE WITNESS:  It wasn't until later.  And I am not

22   sure which trial and which deposition, but over all later

23   learned that.

24           THE COURT:  Did you learn about it at Mr. Jones'

25   original criminal trial?

DIRECT EXAMINATION - PESQUIERA

1           THE WITNESS:  That's what I am saying, Judge, I don't

2   remember exactly when I learned about it.

3           THE COURT:  Okay.

4   BY MR. BRACCIO:

5   Q.  Would that have been in the March 6th, 1995 defense

6   deposition with Brandie Jones?

7   A.  It could have been, yes.

8           THE COURT:  So we got a little side-tracked.  You were

9   going to refresh her memory with her report.

10          MR. BRACCIO:  I believe her memory has been refreshed,

11  Judge.  I don't think I need to refresh it from the report.

12  She indicated that that was not a story she knew through her

13  investigation, so therefore that story is not contained in the

14  police interview of Brandie Jones.

15          Does that make sense?

16          THE COURT:  No, it doesn't.  Because she testified

17  that she didn't -- you posed a question to her that she didn't

18  know the answer to without looking at her report, and there's

19  been a lot of back-and-forth in between, but I don't think

20  she's had a chance to look at her report.

21      Would you like to look at your report?

22          THE WITNESS:  What I am saying, Judge, is I don't

23  think it would be in my report because I didn't learn about it

24  until later, because I believe she may have said it in a

25  deposition or something like that.

1          THE COURT:  Mr. Sandman, you look like you're about to

2    get up.

3          MR. SANDMAN:  The statement that was actually -- that

4    Mr. Braccio took out of the exhibits to present to

5    Ms. Pesquiera was an interview conducted by a completely

6    different officer, Officer Ruelas.  It wasn't a statement that

7    she took, in any event.

8          THE COURT:  Well, if the parties are satisfied, I

9    think she's made clear that the operative fact that Mr. Braccio

10   is asking her about she didn't know at the time she wrote the

11   report.  So, taking it from that point, next question.

12   BY MR. BRACCIO:

13   Q.  And, Mrs. Pesquiera, you read the police reports and

14   witness interviews of other detectives in this case, correct?

15   A.  Yes, I did.

16   Q.  As part of your duties with being the case agent?

17          MR. SANDMAN:  Objection.  Leading form of the

18   question.

19          THE COURT:  Sustained.

20   BY MR. BRACCIO:

21   Q.  Did you read all the reports from other detectives in this

22   case?

23   A.  I did.

24   Q.  Was that part of your duties as the case agent?

25   A.  Yes, it is.

DIRECT EXAMINATION - PESQUIERA

1    Q.  Have you subsequently learned that Brandie claimed she

2    witnessed this two-year-old strike Rachel?

3    A.  That is correct.

4    Q.  Did you interview Barry Jones?

5    A.  Yes, I did.

6    Q.  Did Barry Jones corroborate this story?

7    A.  No, he did not.

8    Q.  Did you interview Angela Gray?

9    A.  Yes, I did.

10   Q.  Did Angela Gray corroborate this story?

11   A.  No, she did not.

12          THE COURT:  I'm sorry.  Just to help me put this into

13   context, you might want to ask the witness when she conducted

14   these interviews in relation to the events in question.

15   BY MR. BRACCIO:

16   Q.  Mrs. Pesquiera, do you recall when you interviewed Barry

17   Jones?

18   A.  Yes.

19   Q.  When did you interview Barry Jones?

20   A.  It was that Monday, the 2nd, of when the -- the day of her

21   death.

22   Q.  Do you recall the date that you interviewed Angela Gray?

23   A.  I interviewed her two different times.

24   Q.  And do you recall when those were?

25   A.  Yes.  One was on the 2nd, and I believe the second one was

1   on the 3rd.

2   Q.  Did you also interview Stephanie Fleming?

3   A.  Yes, I did.

4   Q.  Do you recall when you interviewed Stephanie Fleming?

5   A.  I think I interviewed Stephanie a couple of weeks later,

6   maybe even on the 19th or something like that, but I am not

7   sure exactly on the date.  But it was after the incident.

8   Q.  Who is Stephanie Fleming, if you recall?

9   A.  Stephanie Fleming was a neighbor that lived just right

10  across and kind of in the corner area, and they lived in a

11  camper, the kind you put on the back of a pick-up truck, and it

12  was just on the ground.

13  Q.  Do you recall who she was in relation to this two-year-old,

14  Ryan Fleming?

15  A.  She was his mother.

16  Q.  Did Stephanie Fleming corroborate this story?

17  A.  No, she did not.

18  Q.  Do you recall Isobel Tafe?

19  A.  I do.

20  Q.  Do you recall the statement she gave to detectives the day

21  of Rachel's death?

22  A.  I recall her saying something about just seeing her out

23  next to her trailer, where her trailer was.

24  Q.  Do you recall if she commented about any bruising on

25  Rachel?

DIRECT EXAMINATION - PESQUIERA

1   A.  No, she didn't see any bruising at that time.

2   Q.  Did she say anything else to detectives at that time?

3   A.  Just that she saw her, I believe.

4   Q.  Did you subsequently interview Isobel Tafe?

5   A.  I did.  I talked to her later.

6   Q.  Do you recall when that interview took place?

7   A.  It was days after, but I don't recall exactly when.

8   Q.  Let's pull up Exhibit 66.  Bates Number 5142.

9       Mrs. Pesquiera, I am showing you what's been previously

10  marked and admitted into evidence as Exhibit 66.  Do you recall

11  this as the police interview that you conducted with Isobel

12  Tafe?

13  A.  Yes, I do, and it says May 19th.

14  Q.  Does that refresh your recollection that that interview

15  took place on the 19th of May?

16  A.  Yes, it does.

17  Q.  Do you recall what Isobel Tafe said when you interviewed

18  her?

19  A.  Yes, I do.

20  Q.  What did she say?

21  A.  She talked about seeing Rachel, and then later that Brandie

22  came over to take Rachel, and that she talked about her looking

23  grayish, I believe, something like that.

24  Q.  Did she indicate anything about Rachel being scared?

25  A.  She said that she said something about having to get back

1  or her dad or something like that would get mad.

2  Q.  Do you recall when Isobel -- what day Isobel indicated this

3  was?

4  A.  She said that it was the Saturday before detectives spoke

5  to her.

6  Q.  Did Ms. Tafe indicate -- or did you have a belief about

7  Ms. Tafe's statement about that day?

8  A.  I thought she was incorrect, I thought she was giving me

9  the wrong day.

10  Q.  And why was that?

11  A.  Because detectives spoke to her on Monday, and the incident

12  that we were discussing would have occurred on Sunday.  So

13  that's why that was confusing to me, as to why she said

14  Saturday that she looked the way she described her.

15  Q.  Did Isobel Tafe describe Rachel as looking sick?

16  A.  She said she looked grayish or something like that, and

17  that she looked scared.

18  Q.  Did she indicate if Rachel was vomiting?

19  A.  No, she did not.

20  Q.  Did she indicate if Rachel was heaving?

21  A.  No, she was not.

22  Q.  So, other than the statement by Isobel Tafe, did anyone

23  else describe Rachel as appearing sick through Saturday night?

24  A.  Through Saturday night, no.

25  Q.  Did others describe her as appearing well?

1   A.  Yes, they did.

2   Q.  Do you recall if Rachel ate dinner Saturday night?

3   A.  They all said that they had dinner and they watched TV,

4   then she went to bed, and that she was fine.

5   Q.  Did your investigation cover Sunday, May 1st, 1994?

6   A.  Yes, it did.

7   Q.  Did witnesses describe Rachel as appearing fine and playful

8   on Sunday morning?

9   A.  On Sunday morning, yes.

10  Q.  Did Rebecca indicate to detectives how Rachel appeared?

11  A.  In the morning?

12  Q.  Correct.

13  A.  Yes, that she was playful and they had -- they played some

14  games, and I believe they were looking for something to eat,

15  but there was nothing to eat in the house at the time.

16  Q.  Do you recall that Barry took several trips that day with

17  Rachel?

18  A.  Yes, I do.

19  Q.  How many trips did Mr. Jones take with Rachel?

20  A.  Three.

21  Q.  Do you recall where he went?

22  A.  Yes.

23  Q.  Where did he go?

24  A.  We had information that in one of the trips that he went

25  looking for information from Ron St. Charles, who lived in a

DIRECT EXAMINATION - PESQUIERA

1    camp somewhere out in the desert.  And then that he had gone to
2    the Choice Market.  And then that later on he had gone to the
3    Quik Mart.
4    Q.  Did you receive evidence that at some point that day Rachel
5    appeared unwell?
6    A.  Yes.
7    Q.  When did Rachel appear sick?
8    A.  The information that we had received was this was
9    approximately at 5:00 to 5:15, and that was from Stephanie
10   Fleming and some other people that she had there, because they
11   were having a barbecue.
12   Q.  Do you recall if Michael Fleming was there?
13   A.  Michael Fleming was there.  A guy named Julian Duran and a
14   woman by the name of Dawn Kopp.  K-n-o-p-p (sic), I believe.
15   Q.  Just generally what did they describe seeing?
16   A.  They said that they had seen -- first, it was Julian
17   talking about having seen a little girl go up underneath the
18   front part of the camper, the part that I believe goes over
19   like the truck.  And there was some plastic thrown over it so
20   it was kind of hard to see, but if they ducked down and lifted
21   it up, they could see that a little girl was curled up in one
22   of the corners near the plastic, and that she looked scared.
23   Q.  Do you recall if they described her as dry heaving?
24   A.  That was later, when she comes out of that little corner
25   area.

DIRECT EXAMINATION - PESQUIERA

1   Q.  Who described her as dry heaving, do you recall?

2   A.  That was Stephanie Fleming.

3   Q.  How else did Stephanie Fleming describe Rachel?

4   A.  She said that she was cold and wet and a greenish color,

5   because she held her.

6   Q.  What did Barry Jones do after that?

7   A.  Stephanie Fleming talked about --

8           THE COURT:  I'm sorry.  What did Barry Jones do after

9   what?

10  BY MR. BRACCIO:

11  Q.  After Stephanie Fleming was holding Rachel?

12  A.  Yes.

13          THE COURT:  Okay.  Well, I'm sorry, but I think the

14  question presumes that Barry Jones was in a position to know

15  that this other person was holding her.  So you might want to

16  just --

17          MR. BRACCIO:  Sure.

18          THE COURT:  -- I think ask her general questions so

19  that she can describe what happened.

20  BY MR. BRACCIO:

21  Q.  At some point was Barry Jones alerted to this situation?

22  A.  He was alerted to it by Julian Duran, who saw him.  He said

23  he saw Barry walking around looking for something, that it

24  looked like he was looking for something.

25          THE COURT:  So, I'm sorry, again, I didn't understand

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - PESQUIERA                    33

1    what situation you are talking about.

2            MR. BRACCIO:  Where Julian Duran observes Rachel Gray

3    dry heaving, soaking wet, and looking greenish.

4            THE COURT:  So you spoke with a witness that says she

5    saw Rachel looking ill?

6            THE WITNESS:  Yes, sir.

7            THE COURT:  And then this person was trying to comfort

8    her?

9            THE WITNESS:  Actually held her and was -- yes.

10           THE COURT:  What happened after -- in your

11   investigation, what happened after he -- she found Rachel in

12   this situation?

13           THE WITNESS:  She said she's holding her, and that

14   Rachel is cold and wet.  And that she is almost choking her,

15   because she's got her arms around her neck, around Stephanie

16   Fleming's neck, and that Rachel's legs are wrapped around her

17   waist really hard.  And that she's trying to pull her away to

18   hand her over to Barry Jones, and she does.

19           THE COURT:  Go ahead.  You might want to pick up from

20   there.

21   BY MR. BRACCIO:

22   Q.  What happened after that?

23   A.  She hands her to Barry Jones, and Barry Jones walks away

24   toward his trailer.

25           THE COURT:  With Rachel?

DIRECT EXAMINATION - PESQUIERA

1            THE WITNESS:  Holding Rachel.

2            THE COURT:  Thank you.

3  BY MR. BRACCIO:

4  Q.  What happened after they got back to the trailer?

5  A.  Later I learned that he had said that she was taking a nap.

6            THE COURT:  To whom did he say that?

7            THE WITNESS:  He says it to us later on in an

8  interview.

9            THE COURT:  So you asked him about this event later

10 on, and he says he went back to the trailer and put her down

11 for a nap?

12           THE WITNESS:  I learned that from, yes, Mr. Jones,

13 from Angela, later on, that she had been taking a nap, and the

14 fact that they had seen him going toward the trailer, yes.

15           THE COURT:  So Ms. Gray and Mr. Jones confirmed that

16 she was taking a nap, he brought her back to the trailer and he

17 put her down for a nap?

18           THE WITNESS:  That's what he had said, yes.

19           THE COURT:  Well, you just told me it was he and

20 Angela Gray said that.

21           THE WITNESS:  Right, Angela, at the time, she finds

22 out later, I believe, that she is taking a nap only from

23 Mr. Jones.

24           THE COURT:  So did she make any effort to

25 independently confirm that she is actually taking a nap?

UNITED STATES DISTRICT COURT

```
 1            THE WITNESS:  We asked her that, and she did not.

 2            THE COURT:  So am I correct in assuming from your

 3   investigation Ms. Gray didn't actually know whether or not

 4   Rachel was taking a nap?

 5            THE WITNESS:  That is correct.

 6            THE COURT:  Go ahead.

 7   BY MR. BRACCIO:

 8   Q.  What happened after that?

 9   A.  After she was taking a nap?

10   Q.  Correct.

11   A.  What happens is Angela wakes up, and this is around -- she

12   says there was some conflicting times.  After 6:30 to 7:00,

13   right around that time --

14            THE COURT:  P.m.?

15            THE WITNESS:  Yes, sir.

16            THE COURT:  On Sunday?

17            THE WITNESS:  On Sunday.

18            THE COURT:  Go ahead.

19            THE WITNESS:  She wakes up at that time and she comes

20   out and Barry tells her that Rachel is taking a nap and that

21   she had fallen out of the van and --

22            THE COURT:  Rachel, not Angela.

23            THE WITNESS:  That Rachel had fallen out of the van.

24            THE COURT:  Go ahead.

25            THE WITNESS:  And that she was taking a nap.
```

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - PESQUIERA

1              Then he asked Angela to go check on Brandie Jones.

2    BY MR. BRACCIO:

3    Q.  Did he send her out of the trailer?

4    A.  He sent her out of the trailer to where Brandie had been

5    staying with a friend, Alisha (Phonetic), and I think her

6    mother was -- I forgot her mother's name.

7    Q.  Does Joyce Richmond --

8    A.  Yes, it was Joyce Richmond, and that's -- that's Eilisha's

9    mother, yes.

10   Q.  You received this information from both the police

11   interviews of Barry Jones and of Angela Gray?

12   A.  Correct.

13   Q.  What did Barry Jones do after that?

14   A.  We learned that -- well, from Angela, that later on when

15   she was coming back, Barry Jones was coming up in the van with

16   Rachel.

17   Q.  Where did Barry Jones take Rachel?

18   A.  Barry Jones talked about taking Rachel to the Quik Mart.

19   Q.  After he got back from the Quik Mart, how did Rachel

20   appear?

21   A.  We learned that Rachel, according to Angela, was soaking

22   wet and that she was cold, her hair was soaking wet, and Angela

23   takes her into the house and changes her clothing.

24   Q.  Was Rachel bleeding at that point?

25   A.  She said that her head was soaking wet and, no.

DIRECT EXAMINATION - PESQUIERA                    37

1   Q.  What did Barry Jones tell everybody about that --

2           THE COURT:  I'm sorry.  I just want to make sure I

3   understand.  You're saying Ms. Gray told you that her hair was

4   wet, but she didn't notice any bleeding?

5           THE WITNESS:  She -- she takes her into the house, and

6   we specifically ask her if she checked the injury, and she said

7   something about not wanting to irritate it, but then later

8   talked about putting washcloths on it.

9           I don't recall if she specifically, when she took her

10  from the van, if she specifically saw blood at that time.

11  BY MR. BRACCIO:

12  Q.  Do you recall when Rachel pulled back up in the van with

13  Mr. Jones if she had anything on her head?

14  A.  She had a bag of ice.

15  Q.  And what did Mr. Jones tell Angela about where he had been?

16  A.  He said that he had gone to see paramedics at the fire

17  station that was nearby.

18  Q.  How did Rachel do as the night went on?

19  A.  She progressively got worse.  She started to -- Angela

20  talked about holding washcloths to her head, and that sometime

21  around closer to 8:00 o'clock she started to vomit.  She also

22  complained of a lot of thirst and so she was giving her water,

23  also gave her milk, and that she continued to vomit.

24  Q.  Did anyone else see Rachel that night in the trailer?

25  A.  Her sister, Rebecca, saw her.  And Barry Jones talks about

1   seeing her, yes, and seeing her vomit in the bedroom.

2   Q.  Do you recall if there were other witnesses who came by the

3   trailer that night?

4   A.  Yes.

5   Q.  Who came by the trailer that night?

6   A.  A guy by the name of Terry Shane Richmond.  I believe it

7   was his girlfriend, a woman by the name of Kim Hillman.  Alisha

8   (Phonetic), the little friend of Brandie Jones.  And Alisha's

9   mother, Joyce Richmond.  They came to the trailer.

10  Q.  Do you recall if any of them talked about Rachel's

11  condition?

12  A.  Yes, I do.

13  Q.  Who said what about Rachel's condition?

14  A.  Well, Terry Shane Richmond talked about getting there, I

15  think it was later that night, at about 9:00 or something like

16  that, and he talks about seeing her and he sees that there is a

17  lot of blood.  She was on a pillowcase and they could actually

18  see the blood.  He talks about actually going over there to see

19  the injury on her head.  And he said it was -- it was a big

20  one, it was a big injury.  And he told them, Angela and Barry

21  Jones, that she needed to go to the hospital.

22  Q.  Did Terry ask what happened to Rachel?

23  A.  They did.

24  Q.  And what did Barry or Angela tell Terry?

25  A.  They talked about her falling out of the van.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - PESQUIERA                     39

1   Q.  Who?

2   A.  That Rachel had fallen out of the van.

3   Q.  Who said that?

4   A.  Barry Jones.

5   Q.  Okay.

6   A.  Angela talked about it, too.  They also said that -- that

7   Barry had taken Rachel to see the paramedics at the fire

8   station.

9   Q.  Did Rachel eventually say anything later that night about

10  how she received these injuries?

11  A.  She did.

12  Q.  What did she say?

13  A.  She said eventually that Barry --

14          THE COURT:  To whom did she say this?

15          THE WITNESS:  She was talking to her mother, Angela.

16          THE COURT:  So you got this from interviewing Angela.

17          THE WITNESS:  Yes, I did.

18          THE COURT:  Go ahead.

19          THE WITNESS:  I guess Angela kept asking her, asking

20  Rachel over and over again, what happened.  And at this point

21  what I am getting from Angela is that she was very excited

22  about -- you know, kind of panicking about what had happened

23  and asking her what happened.  And Rachel talks about -- that

24  Barry hit her with the shoe thing.

25  BY MR. BRACCIO:

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - PESQUIERA

1   Q.  Were there other witnesses to that statement as well?

2   A.  The statement was overheard by Rebecca and I believe

3   Brandie overheard it as well.

4   Q.  And do you recall, in Rebecca's interview, if she also

5   mentioned Rachel stating that Barry Jones had hit her with this

6   metal shoe thing?

7   A.  Yes, they said "shoe thing," they also said a "black shoe

8   thing," and they also said a "metal shoe thing."

9   Q.  And then Rachel died sometime in the early morning hours of

10  Monday, May 2nd, 1994?

11  A.  That is correct.

12  Q.  Do you recall how she was found that morning?

13  A.  They talk about Rachel -- actually, Angela talks about

14  waking up in the morning, somewhere around 6:00 a.m. or so, and

15  going to check on her.  And that she's on -- it was like a

16  little crib mattress that was thrown on the floor next to the

17  doorway, and that she was there and that she could see her eyes

18  were rolled back.

19  Q.  What did they do with Rachel after that?

20  A.  They picked her up and they took her to the hospital.

21  Angela was screaming at Barry, "We need to go to the hospital."

22  And Angela said that Barry was telling her to give -- to do

23  CPR, perform CPR on Rachel, and he transported them to the

24  hospital and then he leaves from there.

25  Q.  Did Barry Jones ever come back to the hospital?

DIRECT EXAMINATION - PESQUIERA

1    A.   He did not.

2    Q.   Did he make any statements afterwards about Rachel?

3    A.   He did.

4    Q.   What did he say and who did he say them to?

5    A.   After leaving the hospital, he ends up at Ron St. Charles'

6    camp, that's in the desert, and he talks to Ron St. Charles.

7    And then Ron St. Charles gives a statement about what Barry

8    said.

9    Q.   And what did Barry say?

10   A.   He was talking about how they're going to think that it's

11   abuse, that he kept saying, "I'm sorry," "I'm sorry."

12   Q.   Let me ask you a few questions about the Choice Market

13   parking lot in 1994.  Do you recall that parking lot?

14   A.   I do.

15   Q.   Pull up Exhibit 65, Bates 4758.

16       Do a jump to this because there may be....  The top picture

17   there, if you can blow that up at all.

18       I'm showing you what's been previously admitted into

19   evidence as Exhibit 65.  This is the Choice Market parking lot.

20   Do you recall this parking lot?

21   A.   I do.

22   Q.   We've heard testimony that the slope of this parking lot

23   was nearly level.  Was that your recollection?

24   A.   No.

25   Q.   How would you describe this parking lot back in 1994?

CROSS-EXAMINATION - PESQUIERA

1    A.  Back then, I had this -- remember the little Dodge K-cars?

2    Is what I remember it being.  And I remember it having a lot of

3    dips and potholes and things, so I would bottom out.  I

4    remember driving onto it and bottoming out.  But there were

5    different levels to it, to the parking lot, because it was

6    dirt.

7    Q.  Is there also a slope to that parking lot?

8    A.  There is.

9            MR. BRACCIO:  I have no further questions.

10           THE COURT:  Cross-examination?

11           MR. SANDMAN:  May I have a moment, Your Honor?

12           THE COURT:  Yes.

13           THE WITNESS:  Could I get some water here?

14           THE COURT:  You have none there?

15           Absolutely.  Let me know if you don't have some, I'll

16   get you some.

17           THE WITNESS:  Okay.

18                       CROSS-EXAMINATION

19   BY MR. SANDMAN:

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  Ms. Pesquiera, I want to start out by going over some of

23   your direct testimony.

24       You testified here this afternoon that Rachel told her

25   mother that Barry gave her the black eyes, is that right?

CROSS-EXAMINATION - PESQUIERA

1    A.  Yes.

2    Q.  Can we pull up from Exhibit 1 the interview starting May

3    2nd, at 0903 hours, Page 472.  If you could go to Page 4.

4        Now, this is an interview, you're interviewing Angela,

5    correct, Rachel's mother?

6    A.  Yes.

7    Q.  And it's --

8            THE COURT:  The date?

9    BY MR. SANDMAN:

10   Q.  May 2nd, the day Rachel died, correct?

11   A.  Correct.

12   Q.  Right?

13           THE COURT:  She agreed.

14           MR. SANDMAN:  Okay.

15   BY MR. SANDMAN:

16   Q.  If you could blow up the last question and answer there.

17   You asked her -- you asked Angela how Rachel got the black

18   eyes.  And she told you that according to her -- that would be

19   Rachel -- she'd got hit in the face with a rake.

20       Do you see that?

21   A.  I do.

22   Q.  Did you forget that statement before you gave your direct

23   examination?

24   A.  No, I did not.

25   Q.  Then let's go to 498.  That would be Page 27.  Then if you

CROSS-EXAMINATION - PESQUIERA

1    could blow up sort of the bottom third of the page there.

2       She's again telling you in the statement that what she got

3    out of Rachel was that Rachel was playing outside and tripped

4    over a dog and got hit with a rake, correct?

5    A.  Correct.

6          MR. BRACCIO:  Judge, I am going to object to this line

7    of questioning.  Mrs. Pesquiera stated on her direct that this

8    information came to Angela through Rebecca and Brandie.

9          THE COURT:  Overruled.

10      You'll have an opportunity to correct this, if you think it

11   needs to be corrected, on redirect.

12   BY MR. SANDMAN:

13   Q.  If we could take a look at Exhibit 40.

14      Now, this was an interview of Rebecca Lux dated October 31,

15   1994.  Do you have a representative of the county attorney

16   there at that interview?  Mitch Eisenberg?

17   A.  There is Mitch Eisenberg, yes.

18   Q.  Let's go to Pages 1185.  I am not sure what page that is in

19   the exhibit.  I'm sorry.  Go to the next page.

20         MR. SANDMAN:  May I have a moment, Your Honor?

21         THE COURT:  You may.

22         MR. SANDMAN:  It should be 1187 to 88.

23   BY MR. SANDMAN:

24   Q.  So, you see in this statement that Becky is being asked how

25   Rachel got the black eyes?

1    A.   Yes.

2    Q.   And Becky, like Angela, says that Rachel reported that she

3    got the black eyes from a broom, a girl was swinging a broom

4    and hit her between the eyes.  She tripped over a dog at

5    Barry's brother's house.  Do you see that?

6    A.   I do see it.

7    Q.   Now, I want to turn briefly, just briefly, to the Tafe

8    interview.  Let's look at Exhibit 1 at 1843, first.  Page 1843.

9         Now, you were asked a series of questions on direct

10   examination about whether Rachel looked well on Saturday, April

11   30th, is that correct?

12   A.   Yes, sir.

13   Q.   And in order to reach that conclusion, you had to interpret

14   Isobel Tafe's statement to you, where she said that she saw

15   Rachel on Saturday, you had to interpret that as her meaning

16   Sunday.  Correct?  Is that what you testified to?

17   A.   I think I testified to different people seeing her on

18   Saturday, that she was well.

19   Q.   Okay.  So you agree with me then, correct, that it's

20   crystal clear, and was always crystal clear to you, and to

21   other detectives who interviewed Ms. Tafe, that when she

22   described Rachel's condition, she was talking about Saturday,

23   April 30th, correct?

24   A.   Crystal clear, no.

25   Q.   Let's -- can we look at -- I wanted to look at 1843 first,

1    which is the page I asked for.  Just blow up the narrative.

2         First of all, this is your report, Ms. Pesquiera.

3    A.  Yes, it is.

4    Q.  And you wrote this report on May 19th, 1994, correct?

5    A.  I am not sure if I wrote it on the 19th.

6    Q.  Is the document dated May 19th, 1994?

7         You see where it says "date"?

8    A.  It says dated on 5/2/94.

9    Q.  Can you blow up the date on there?

10   A.  5/2/94.  After my badge number.

11             MR. SANDMAN:  I'm sorry.  May I have a moment, Your

12   Honor?

13             THE COURT:  Yeah.

14             MR. SANDMAN:  Your Honor, may I just approach the

15   witness?

16             THE COURT:  Sure.

17             MR. SANDMAN:  We can't seem to get the document up.

18   It's in Exhibit 1.

19             THE COURT:  So just make sure you show opposing

20   counsel and that you identify it for the record, the exhibit

21   number and the page number.

22             (Discussion between counsel.)

23             THE COURT:  We're going to take a five-minute break.

24   10-minute break.

25         (A recess was taken from 2:06 p.m. to 2:30 p.m.)

CROSS-EXAMINATION - PESQUIERA

1            THE COURT:  Have we got our technical difficulties

2    worked out?

3            MR. SANDMAN:  Yes.  It was mostly my erroneous

4    notation on my document; but, yes, it's all worked out.

5            THE COURT:  So it wasn't necessarily a technical

6    difficulty.

7            MR. SANDMAN:  Exactly.

8            THE COURT:  That's really good of you to fall on the

9    sword like that, I'm sure your staff appreciates it.

10            MR. SANDMAN:  So we'd like to look at Exhibit 1, Page

11    1856.

12            THE COURT:  This is admitted?

13            MR. SANDMAN:  Yes, sir.

14            THE COURT:  Go ahead.

15            MR. SANDMAN:  It's part of Exhibit 1.  If you could

16    blow up the first half page.

17            THE COURT:  This is a different exhibit than we were

18    looking at before the break.

19            MR. SANDMAN:  Yes, it is.

20    BY MR. SANDMAN:

21    Q.  So where we left off, Ms. Pesquiera, is we were attempting

22    to determine your understanding, in May of 1994, whether Isobel

23    Tafe told you that Rachel was ill on Saturday, and, in fact,

24    you understood her to be saying that.

25            So the document we are looking at, you prepared this?

UNITED STATES DISTRICT COURT

1   A.  I did.

2   Q.  About 23 years ago, in May of 1994?

3   A.  Correct.

4   Q.  And you summarize an interview that you had with Isobel

5   Tafe, a neighbor in the trailer park?

6   A.  I did.

7   Q.  And you reflect your understanding of the information you

8   received from Ms. Tafe in this report?

9   A.  I did.

10  Q.  And it was your understanding when you wrote this report

11  that Ms. Tafe had told you that she had seen Rachel Gray on

12  Saturday, April 30th, correct?

13  A.  Correct.

14  Q.  Now if we look at her report in Exhibit 81.  By the way,

15  Ms. Pesquiera, before you interviewed Ms. Tafe, she had already

16  been interviewed by another officer in your department by the

17  name of Amado, is that correct?

18  A.  I believe so, yes.

19  Q.  And his report also documents that Ms. Tafe had seen Rachel

20  on April 30th, 1994, correct?

21  A.  It was her report, and I would have to look at it again

22  just to make sure.

23  Q.  Let's just take a quick look at Exhibit 66 at 4896.  Down

24  at the very bottom.  This is Officer Amado's report.  He spoke

25  to Ms. Tafe on May 2nd, 1994, correct?  Ms. Pesquiera?

CROSS-EXAMINATION - PESQUIERA

1    A.  She, yes.

2    Q.  I'm sorry.  Officer Amado is a she?

3    A.  Yes, she is.

4    Q.  Okay.  And Ms. Tafe reported to her, Ms. Amado, or Officer

5    Amado, that she had seen Rachel on April 30th, not May 1st,

6    correct?

7    A.  It says April 30th here, yes.

8    Q.  I'm sorry?

9    A.  It does say April 30th here.

10   Q.  Okay.  So are we clear, or are you clear, Ms. Pesquiera,

11   that Ms. Tafe saw Rachel on April 30th, 1994, not May 1st?

12   A.  I'm clear that that's what she reported.

13   Q.  Okay.  And you're clear that you unambiguously documented

14   her report, correct?

15   A.  I don't understand your question.

16   Q.  When you wrote your report, you didn't say in there, "well,

17   I think she really saw the child on May 1st."

18   A.  That is correct, I didn't say that.

19   Q.  Let's take a look at Exhibit 81.  Is this your May 19

20   interview of Ms. Tafe?

21   A.  Yes, it is.

22   Q.  On Page 2, she reports that she saw Rachel about 2:00 or

23   3:00 in the afternoon?

24   A.  That is correct.

25   Q.  And that was on a Saturday.  It says that right at the top

CROSS-EXAMINATION - PESQUIERA

1    of the page.  Correct?

2    A.  That's correct, that's a question I ask of her.

3    Q.  Could you blow that back up again, please?

4       She described Rachel as looking sick on Saturday, April

5    30th, correct?  And having a pale grayish color?

6    A.  It says:  Like she might be sick, wasn't natural, just a

7    pale grayish color.

8    Q.  And she was similarly described to have an ill fitting -- a

9    pallor similar to that on Sunday, correct?  The skin color she

10   had on Saturday, it continued over to Sunday, correct?

11   A.  It was described as greenish, sometimes grayish.

12   Q.  And when you received this information, you had already

13   decided Mr. Jones had committed this crime on Sunday, correct?

14   A.  Correct.

15   Q.  And so you didn't think for a moment that Rachel actually

16   could have been sick from developing sepsis on Saturday and

17   that therefore that should be investigated further, correct?

18   A.  I investigated it further, and I gathered other days and

19   information from different witnesses about other days.

20   Q.  We'll go over this later, but you testified in your

21   deposition, did you not, that you didn't consider any other

22   timeline for the infliction of Rachel's injuries other than

23   Sunday, May 1st.  You testified under oath to that distinctly,

24   didn't you?

25   A.  I would have to see that.

CROSS-EXAMINATION - PESQUIERA

1  Q.  We'll get to that.

2     Now, at Page -- but you don't remember testifying to that?

3  A.  I don't think that the medical information would have

4  curtailed my investigation to make it just focused on that

5  Sunday.  Is that what you're saying to me?

6  Q.  I'm asking if you remember -- did you read your deposition

7  before you came here today?

8  A.  You had told me you were going to provide me with that, but

9  I don't have it.

10  Q.  Did you ask the attorneys -- you're the case agent for the

11  attorneys behind me, correct?

12  A.  I am.

13  Q.  Did you ask them for a copy of your deposition?

14  A.  No, I did not.

15  Q.  Let's turn to Page 3 of the interview of Ms. Tafe, around

16  the middle of the page.  If you could blow that up.

17     THE COURT:  We've been jumping around.  Because you

18  were just talking about her deposition, now you're talking

19  about this interview.  So, again, for the record, this is the

20  interview of?

21     MR. SANDMAN:  Isobel Tafe.

22     THE COURT:  Thank you.  Go ahead.

23  BY MR. SANDMAN:

24  Q.  So you see, I think it's the second question on the page,

25  you asked her if there was anything else that Ms. Tafe noticed

1  about Rachel, correct?  And she said she had to go because she

2  didn't want her dad or someone to be mad.  Or "they would be

3  mad."  Do you see that?

4  A.  (Reading:)  It was something like, she says, I got to go,

5  and that, before someone gets, daddy gets mad, or someone gets

6  mad at her.  And I says, okay.  I says, you can come back when

7  you want to.

8  Q.  So she referred to "someone" or "they" or her dad, correct?

9  A.  "Someone" or "daddy" or "someone."

10  Q.  Or "they."

11        How long --

12              THE COURT:  I'm sorry, you posed a question and she

13  hasn't answered yet.

14              THE WITNESS:  I'm looking for the "they."

15              THE COURT:  Why don't you just point it out to her.

16              I think, ma'am, he's looking at the last portion of

17  that sentence that you see highlighted there.

18              THE WITNESS:  Yes, sir, I see it now.  It does say

19  "they."

20              THE COURT:  Next question.

21  BY MR. SANDMAN:

22  Q.  Could you tell me, where did you document in your

23  investigation documents, exactly how long Rachel was out

24  wandering around the trailer park, let's say, before and after

25  Ms. Tafe saw her?

1   A.  I don't know where that would be.

2   Q.  It's not in -- it clearly is not in your investigative

3   reports, is it?

4   A.  I'd have to look at that again to see that.

5   Q.  Well, if it's not in there, then you didn't document it,

6   correct?

7   A.  Are you telling me that it's not in there?

8   Q.  I'm just asking you a question if it's not documented that

9   you did that.  If it's not documented that you investigated how

10  long Rachel was out that day unsupervised by any adult, if it's

11  not in your record, you didn't document it, you never looked at

12  it, correct?

13  A.  If it's not in there, then I didn't document it.

14  Q.  And it's important that you document any kind of

15  significant aspect of your investigation, correct?

16  A.  That is correct.

17          THE COURT:  I'm sorry.  I think we need to be a little

18  clearer.  You were asking her two different questions.  First

19  you were asking her if it's not in there, it's not documented.

20  But I think your other question was if you -- if it's not in

21  there, you didn't do it, right?  You didn't investigate that

22  if -- if you investigated something, it's in your report, I

23  think is what he's trying to ask you.  Is that an accurate

24  statement?

25          THE WITNESS:  What I am saying, if I had done it, I

CROSS-EXAMINATION - PESQUIERA

1    would document that I did that.

2         THE COURT:  Right.  Which also means if it's not in

3    your report, you didn't look at it.

4         THE WITNESS:  I didn't document it, yes.

5         THE COURT:  There is a difference between you didn't

6    document it and you didn't do it.  If you did something, you'd

7    document it, right?

8         THE WITNESS:  That is correct.

9         THE COURT:  If you didn't do something, then it

10   wouldn't be in your report.

11        THE WITNESS:  That is correct.

12        THE COURT:  Go ahead.

13   BY MR. SANDMAN:

14   Q.  Do you think it would be relevant to the investigation of

15   this case to have learned and document how long on Saturday

16   Rachel was wandering the trailer park without any adult

17   supervision on April 30th?

18   A.  I had information that she was inside the trailer.

19   Q.  Ms. Pesquiera, let's go back to the Tafe interview.

20        She is outdoors at around 3:00 o'clock -- she is without

21   adult supervision, correct?

22   A.  Correct, until Brandie comes and gets her.

23   Q.  And Brandie is not an adult, correct?

24   A.  Correct.

25   Q.  All right.  And your answer, I think, stands, is that you

CROSS-EXAMINATION - PESQUIERA

1    don't know how long she was outside unsupervised before or

2    after Ms. Tafe saw her, correct?

3    A.  I do not know that.

4    Q.  And, by the way, if Rachel said that somebody might be mad

5    at her, do you think it's reasonable, you know, to expect that

6    maybe she knew if she was wandering around this trailer park

7    for maybe a little bit too long that somebody might be

8    concerned about her?

9    A.  Is that reasonable?  I guess if you pose it different ways,

10   yes, anything would be reasonable.

11   Q.  Maybe she ran out the door and her mom said, you know, "You

12   come back in an hour," or maybe she yelled that to Brandie and

13   Rachel, correct?  You don't know one way or the other.

14   A.  I don't know that, no.

15   Q.  Let's go back to Exhibit 50, where you started your

16   testimony earlier today.

17       Now, you were asked some questions about, you know, whether

18   Rachel could have knocked her head into the little table shown

19   on the page that's numbered 986, correct?  Do you remember

20   those questions that Mr. Braccio asked you?

21   A.  I remember the questions he asked, yes.

22   Q.  And you supported your understanding of the evidence by

23   referring to some testimony in the Angela Gray trial, is that

24   right?

25   A.  About which part though?

CROSS-EXAMINATION - PESQUIERA                    56

1   Q.  Well, when Mr. Braccio was examining you, he asked you

2   about your understanding of whether Rachel could have hit her

3   head on the little table shown on the right-hand picture, and

4   do you not remember that you made a reference to some evidence

5   in the Gray trial in answering that question?

6   A.  I remember talking about the doorway area, yes.

7   Q.  And do you not remember making a reference to your reliance

8   on evidence in the Gray trial to support your answer?

9   A.  About what I just said, no.  I remember talking about this

10  photograph, yes.

11  Q.  That wasn't my question.  During direct examination, in

12  explaining your understanding of where Rachel was lying and

13  where Becky picked her up, did you make a reference when

14  providing your answer to the testimony, Becky's testimony, in

15  the Gray trial?  Do you remember that or not?

16  A.  I remember saying that it was somewhere in that doorway

17  area.

18  Q.  Ms. Pesquiera, that wasn't my question.

19  A.  Okay.  I am not understanding.

20        THE COURT:  I think what he is asking you is did you

21  learn some information from the Gray trial about this.

22        THE WITNESS:  That it was speculated that she could

23  have hit herself on the table?

24  BY MR. SANDMAN:

25  Q.  Okay.  Let's move on and let's look at the testimony that

UNITED STATES DISTRICT COURT

1    Becky actually gave in Mr. Jones' trial.  This is Becky's

2    testimony, and if you blow up Line 7 through 16.

3        Becky says she had to go to the bathroom, she saw Rachel on

4    the way, and that Rachel was blocking the doorway.

5        Did I read that correctly?

6    A.  Correct.

7    Q.  And if we look at Exhibit 50 again.  That would be right

8    near where somebody could have fallen down right next to the

9    little table there, correct?

10   A.  Correct.

11   Q.  Okay.

12       Now, you testified on direct examination about three trips

13   in the van that Mr. Jones had with Rachel.

14   A.  Correct.

15   Q.  If I understood your testimony correctly, only two of those

16   trips that you identified took place before Rachel became sick.

17   I believe you testified that he went to the Quik Mart with

18   Rachel after Rachel was discovered sick at the Flemings'

19   residence.  Correct?

20   A.  Correct.

21   Q.  And it's always been your understanding, as I believe you

22   confirmed in your deposition, that Becky reported consistently

23   that Mr. Jones and Rachel only went on two trips in the van

24   with Rachel on Sunday, May 1st.  That was her consistent

25   statement four different times before Mr. Jones' trial,

1  correct?

2  A.  During the investigation it was the two times, yes.

3  Q.  And you remember that each time of the four times Becky was

4  asked about these two trips, she said that Rachel looked

5  unharmed after the two trips, correct?

6  A.  Do I remember if Becky knew that she was unharmed after the

7  two trips?

8  Q.  Nope, didn't ask that.

9  A.  Okay.

10  Q.  I just asked you a question about your understanding of the

11  record.

12       Do you remember at your deposition you reviewed Becky's

13  pretrial statements that she gave to Officer Downing in early

14  May of 1994, you reviewed Becky's testimony at the Angela Gray

15  trial, and then you agreed, based on your reexamination of

16  those records, that what Becky reported was that Mr. Jones and

17  Rachel went on two trips in the van that day and that when

18  Rachel returned from the trips, at least to Becky, Rachel

19  looked okay?  Correct?

20  A.  Okay.  So the first part of that question was that they did

21  go on two trips, and then she doesn't notice until after like

22  5:00 p.m. that she is looking sickly.

23  Q.  Okay.  Let's see what she said in the deposition.

24  A.  That would be good.

25       MR. SANDMAN:  May I, Your Honor?

1          THE COURT:  You may.

2    BY MR. SANDMAN:

3    Q.  This is marked for identification as Exhibit 60.

4        If you could turn to Page 136, Lines 18 through 34.

5    A.  It goes up to Page 94.

6    Q.  It's Page 136.  Have you gotten there?

7    A.  I only see it goes to Page 94.  It goes up to Page 94.

8    Q.  That's not the correct one.  I'm sorry.

9        This should work better.  (Handing witness document.)

10   A.  136.

11   Q.  So at Page 136, Line 18, I had asked you this question,

12   quote:  So consistent with Becky's testimony at the Gray trial,

13   she described to Detective Downing two trips that Rachel took

14   with Mr. Jones in the van and that she did see Rachel before

15   going to visit her friend Susie and Rachel was, quote, okay,

16   close quote.  Do you see that?

17   A.  Yes, I do.  I answer:  I do.

18   Q.  You understand that at the Gray trial, Rachel testified at

19   the Gray trial and told Detective Downing that she had observed

20   the two trips, and that Rachel was okay, at least according to

21   her observation, after both trips.

22   A.  Correct.

23   Q.  And then when you testified before the grand jury, you had

24   Detective Downing's statement, did you not?

25   A.  I believe I would have.

UNITED STATES DISTRICT COURT

1    Q.  And you told the grand jury, contrary to what Becky told

2    Detective Downing, you told the grand jury that Becky had not

3    seen Rachel after the second trip, correct?

4            MR. BRACCIO:  I am going to object on the relevance of

5    this.

6            THE COURT:  Hold on.

7            MR. SANDMAN:  Well, you know, part of our theory of

8    this case is that the Government never liked the two-trip

9    evidence.  Becky had made that statement four different times

10   before Mr. Jones' trial --

11           THE COURT:  I'm going to overrule the objection.  Go

12   ahead.  You can answer his question.  Do you need it repeated?

13           THE WITNESS:  Yes, sir, please.

14           THE COURT:  Okay.

15      "Well, you know part of our theory of this --"  Oh, I'm

16   sorry.

17      "You understand that at the Gray --"

18      "And you told the grand jury, contrary to what Becky told

19   Detective Downing, you told the grand jury that Becky had not

20   seen Rachel after the second trip, correct?"

21   A.  I don't remember what I specifically said at the grand

22   jury, that would have been 23 years ago.

23   BY MR. SANDMAN:

24   Q.  Well, we did talk about it at your deposition, correct?

25   A.  I'd have to see that.  If you could refresh my memory.

CROSS-EXAMINATION - PESQUIERA

1    Q.  Just before I have you do that, do you remember testifying

2    at your deposition that you concealed from the grand jury that

3    Becky saw Rachel return from the second trip appearing

4    unharmed?

5         MR. BRACCIO:  Objection, Your Honor.  I don't believe

6    that's what the deposition says.

7         THE COURT:  Well, the deposition will speak for

8    itself.

9    BY MR. SANDMAN:

10   Q.  Page 140, Ms. Pesquiera.

11   A.  140.  I'm on 140.

12   Q.  Lines 20 through 24.  The question was:  And when you

13   answered that question, you concealed from the grand jury the

14   fact that Becky had told Officer Downing that Rachel was okay

15   before she went to see her friend Susie after the second trip;

16   correct?  What was your answer?

17   A.  I said:  I did.

18   Q.  Now, after you concealed that, isn't it true --

19        MR. BRACCIO:  Your Honor, I'm going to object to that

20   and move for completeness, that he continue on to Page 142.

21        THE COURT:  You'll have an opportunity to redirect.

22   BY MR. SANDMAN:

23   Q.  Do you think you were confused when you testified in front

24   of the grand jury about the time?

25   A.  I do.  I can't imagine myself ever saying, yeah, I

1   concealed something from the grand jury.  I would think I would

2   have been confused.

3   Q.  You were asked some questions about Rachel making a

4   statement that Barry had hit her with a shoe bar, correct?  Do

5   you remember that?

6   A.  That I was asked some questions?  Your voice --

7   Q.  On direct examination, do you remember you were asked some

8   questions about whether Rachel had said that Barry hit her with

9   a shoe bar?  Some type of --

10  A.  A shoe thing.

11  Q.  A shoe thing.  Okay.

12      Now, that evidence was never admitted or disclosed to

13  Mr. Jones' jury at his trial, correct?

14  A.  I don't recall if that was.

15  Q.  When these -- when that statement was allegedly made, how

16  close was Rachel to going into a state of shock, do you know?

17  A.  That would just be speculation, I don't know that.

18  Q.  It could have been soon after that, correct?

19  A.  I don't know.

20  Q.  And did you also receive reports from both Angela and

21  Rachel's sister, Rebecca, that throughout that evening of

22  Sunday, May 1, that Rachel repeatedly reported that a boy had

23  hit her in the stomach with a metal bar?

24  A.  I remember her talking about or that it was said that she

25  fell out of the van.

1    Q.   Okay.  Let's take a look at Exhibit 38.

2         Exhibit 38 is a statement that was given by Rebecca, Becky

3    Lux, on May 2nd, 1994.  Do you see that at the top?

4    A.   I do.

5    Q.   That was the day Rachel died, correct?

6    A.   Correct.

7    Q.   This was the first statement that Becky gave, where she was

8    asked to recount the events of the day prior, correct?

9    A.   Correct, to Detective Ferrier.

10   Q.   And at Page 2, if you could blow up that question there.

11   Detective Ferrier is conducting this interview?

12   A.   Correct.

13   Q.   And he asked her, on Page 2:  Uh, can you tell me when you

14   first found out Rachel had been hurt and how you found out?

15   And Becky reported Rachel saying that a boy had pushed her out

16   of the van and hit her with a metal bar in the stomach.

17   Do you see that?

18   A.   I see it, yes.

19   Q.   Now, I want to turn from your direct examination to some

20   other questions.

21        You testified in your deposition, didn't you, that it was

22   important in a homicide investigation to thoroughly investigate

23   all of the findings of the forensic pathologist who has

24   conducted the autopsy, correct?

25   A.   I would think that's important, but I don't know if I

CROSS-EXAMINATION - PESQUIERA

1   testified to that or not.

2   Q.  Well, I don't need to refer you to your deposition.  Do you

3   agree that it's important that as a lead detective in a

4   homicide case that you thoroughly examine and understand all of

5   the findings of the forensic pathologist who has conducted the

6   autopsy?

7   A.  I agree.

8   Q.  And early on in this investigation of this homicide of

9   Rachel Gray, you concluded that the injuries to Rachel had

10  occurred no sooner than the afternoon of May 1st, after

11  Mr. Jones woke up that day about 2:30 in the afternoon,

12  correct?

13  A.  Whether I concluded that or whether I did more

14  investigation?  Which I did.

15  Q.  Nope, just the question I asked.

16  A.  I believe that it happened on that Sunday, yes.

17  Q.  My question was did you conclude early in your

18  investigation, for example, the day that Mr. Jones was

19  arrested, on the afternoon of May 2nd, had you concluded that

20  the injuries that Rachel suffered were inflicted on the day

21  prior, on Sunday?

22          THE COURT:  I'm sorry.  You're conflating two

23  different questions.  The first question is did she conclude

24  that it happened on the afternoon of -- Sunday afternoon.  I

25  think your response was yes.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA                                    65

1          THE WITNESS:  It could be, yes.

2          THE COURT:  I am not trying to suggest what the answer

3     is.  I thought your answer was, yes, you concluded that it

4     happened on Sunday afternoon, the injury.

5          THE WITNESS:  I concluded that that could have been,

6     but there was more investigation that I still had to do.

7          THE COURT:  Then his second question is when did you

8     conclude that it happened on Sunday afternoon.

9          THE WITNESS:  Well, I still needed to go and talk to a

10    lot of other people, and I did that.  After the autopsy and

11    after gaining some more information, I knew I still needed to

12    go back and talk to people.  So I can't tell you if at that

13    point I had concluded that specifically, but I believed at the

14    time that it would have occurred on Sunday.

15    BY MR. SANDMAN:

16    Q.  Could you tell us when and where did you document what

17    Dr. Howard told you about the timing of Rachel's injuries?

18    A.  I did not.  That wasn't part of his report at the time.

19    Q.  Well, we started a couple of minutes ago talking about the

20    duty and the importance of the lead detective in a homicide

21    case becoming familiar with the findings of the forensic

22    pathologist.  And you testified, I thought a few minutes ago,

23    that it was your responsibility to thoroughly investigate his

24    findings, Dr. Howard's findings.

25    A.  Correct.  But when they're doing the autopsy they don't

UNITED STATES DISTRICT COURT

1    give you timing and things like that at the time.  Especially

2    in their initial report, they won't.

3    Q.  So that still leaves a question, does it not, that you

4    could ask Dr. Howard the day after the autopsy or the week

5    after the autopsy, or at some point ever, correct, you could

6    ask him to share with you his findings on the timing of

7    Rachel's injuries, correct?

8    A.  Correct.

9    Q.  And the fact of the matter is that you can point to no

10   documentation that you investigated those aspects of

11   Dr. Howard's medical findings that go to his conclusions about

12   the timing of Rachel's injuries, correct?

13   A.  I do not believe I documented anything on those

14   conclusions, no.

15   Q.  And we've already, I think, agreed, or you testified, that

16   when you don't document an aspect of your investigation, that's

17   an investigation you did not conduct, correct?

18   A.  When it comes to the findings of an autopsy, we allow the

19   doctor to provide that report.  We don't go into what he is

20   going to say at a later time.  In our report, we document the

21   fact that we went there, that we witnessed an autopsy, and

22   that's protocol.  We go in there, we witness the autopsy, who

23   was present, what time it started, and photographs were taken,

24   things like that.  We don't document any of the findings at the

25   time because there is so much that the doctor still has to do.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA                    67

1    He still has to examine different tissue, things like that.  So

2    he wouldn't have told me about the timing and things like that,

3    or I would not have documented that.

4    Q.  I think my question was did you document.  Do you know what

5    I mean by that?

6    A.  I know what you mean by did I document.

7    Q.  Okay.  That means write it down, correct?

8    A.  Correct, or type it.

9    Q.  Did you document at any time, between the day of the

10   autopsy and Mr. Jones' trial, did you document any

11   investigation involving the timing, the medical timing, of

12   Rachel's injuries?

13   A.  I documented the fact of other people talking to me about

14   what had happened to her starting, you know, days prior and

15   going back.

16   Q.  Okay.  Is your answer to my question no?

17          MR. BRACCIO:  I am going to object to the form of this

18   question about what the medical conclusion even is, her

19   understanding of that.

20          THE COURT:  Well, if she knows, she knows.  If she

21   doesn't know, she doesn't know.

22          So I'm going to overrule the objection.

23          Maybe you need to reframe your question.

24   BY MR. SANDMAN:

25   Q.  In order to determine the timing of Rachel's injuries,

CROSS-EXAMINATION - PESQUIERA

1   that's at least in part a medical question, correct?

2   A.  It is a medical question, yes.

3   Q.  And all I really want to know is did you document an

4   inquiry to a medical professional about the timing of Rachel's

5   injuries.

6   A.  No, I did not document that.

7   Q.  In your deposition, do you remember I asked you about what

8   you learned from Dr. Howard about the timing of injuries, and

9   your answer was that all he told you was that the injuries were

10  caused by blunt trauma and the manner of death was homicide.

11  Do you remember that?

12  A.  Yes.  Could I refer to that, too?

13  Q.  That would be at Page 86.

14          THE COURT:  Is this of her deposition?

15          MR. SANDMAN:  Yes, Exhibit 60 at Page 86.  This would

16  be at 86, Line 3.

17          THE COURT:  I think he is pulling it up for you.

18          THE WITNESS:  Oh.

19          MR. SANDMAN:  If you could blow up the first 15 lines

20  or so.

21  BY MR. SANDMAN:

22  Q.  So my question was:  Did you -- as the lead homicide

23  investigator in this case, did you investigate vis-a-vis

24  Dr. Howard whether there was medical evidence to support the

25  conclusion that Rachel's injuries were inflicted during the

CROSS-EXAMINATION - PESQUIERA

1  time period that you've just mentioned, beginning on the

2  afternoon of May 1st and extending on into the time she died?

3      And your answer was, Ms. Pesquiera?

4  A.  I went by what the doctor said.

5  Q.  My question was:  You went by what the doctor said, what

6  did the doctor say?  And what was your answer?

7  A.  That it was caused due to blunt force to the abdominal

8  area.

9  Q.  If we could expand the rest of the dialogue there.

10      Then I asked you:  What else?  Referring to what else

11  Dr. Howard said.  And your answer was what?

12  A.  And the manner was homicide.

13  Q.  And what else?  The cause of death.

14      So when I asked you what you had done to investigate, all

15  you had to inform me of was that Dr. Howard reported that the

16  injuries were caused by blunt trauma and that it was a

17  homicide, correct?

18  A.  Correct.

19  Q.  So in conducting what you've described as all this

20  additional investigation, talking to people and so on, you did

21  that within the context of never investigating the medical

22  findings regarding the timing of Rachel's injuries, correct?

23  A.  I can't say that that's correct because I can't say that I

24  would have never investigated the timing.

25  Q.  Well, you've testified I think on several occasions in the

1    last 10 minutes that you never inquired of any -- you didn't

2    document an inquiry with any medical professional about the

3    timing of the injuries, correct?

4    A.  I did not document.

5    Q.  And you already said if you didn't document it, you didn't

6    do it, correct?

7    A.  I was there during the autopsy, I watched what he was

8    doing.

9    Q.  Let's go to Exhibit 45.

10       Now, Exhibit 45 is a declaration submitted by Dr. John

11   Howard.  I'd like you to blow up Paragraph 3.

12       Ms. Pesquiera, do you remember that we talked about this

13   document during your deposition?

14   A.  If it's in there then I'll agree to that.  I don't remember

15   that though independently.

16   Q.  Do you see there in Paragraph 3 that Dr. Howard says that

17   if petitioner's trial counsel had asked him whether the injury

18   to Rachel's abdomen that caused her death could have happened

19   more than 24 hours before her death, he would have answered the

20   question in the affirmative?

21   A.  I see this, yes.

22   Q.  Did you have any information to that effect before looking

23   at Dr. Howard's declaration?

24   A.  Did I have information at the time of the autopsy?

25   Q.  Did you?

CROSS-EXAMINATION - PESQUIERA

1    A.  Or when?

2    Q.  At any time before looking at Dr. Howard's declaration.

3    Before your deposition.

4    A.  If I had had information that he says if he had been asked?

5    I'm just not understanding the question then.

6    Q.  Do you understand what Dr. Howard is saying in Paragraph 3?

7    A.  I understand that he says if petitioner's trial counsel had

8    asked him.

9    Q.  That he would have said that the injury could have happened

10   more than 24 hours prior to her death; and that would be before

11   May 1st, correct?

12   A.  Correct.  He says I would have answered the question in the

13   affirmative.

14   Q.  Now, do you remember testifying in your deposition that you

15   didn't -- you weren't aware of this type of medical information

16   and that therefore you did not target your investigation on who

17   may have inflicted Rachel's injuries prior to the afternoon of

18   May 1st?

19   A.  I don't remember the specifics of what I said, but I know

20   that I -- my investigation did include and did other days prior

21   to her death.

22   Q.  Let's take a look at Page -- next page.  Paragraph 7.

23   A.  Do you have a page number?

24   Q.  I'm sorry.  Page 2, Paragraph 7.

25       Do you see there that Dr. Howard is reporting that Rachel's

CROSS-EXAMINATION - PESQUIERA                                72

1    chemistries were consistent with an injury that could have been

2    present greater than 24 to 48 hours before her death?

3    A.  I see that, yes.

4    Q.  Now, in your deposition at Page 99, Line 8, after reviewing

5    these very paragraphs of Dr. Howard's declaration, I asked you

6    the following question:  And you didn't target your

7    investigation at potential suspects, for example, that may have

8    inflicted injuries on Rachel longer than 48 hours before her

9    death, did you?  And your answer was?

10   A.  I had no reason to believe that it had gone that long, so,

11   no.

12   Q.  So you didn't, as you stated in your deposition, you didn't

13   target your investigation at any other suspects who might have

14   inflicted these injuries on Rachel 24 to 48 hours before her

15   death, did you?

16   A.  I knew that I needed to go back and find out days prior to

17   where she was and to gather some of that information, and

18   whether I developed another suspect, no, I did not, based on

19   that information.

20   Q.  You went out and looked for additional evidence against

21   Mr. Jones, but because you lacked the medical information about

22   the timing of the injuries, you didn't consider any other

23   people who may have taken care of or had care and custody of

24   Rachel during earlier days, did you?

25   A.  During my investigation, that was part of the questioning,

1    where she was, what she was doing, who she was with.

2              THE COURT:  Can I ask a question as a follow-up?

3    You've got that page open there.

4        So you're saying that you didn't have any reason to believe

5    that it had gone on more than a day, I take it is what you're

6    saying there.

7              THE WITNESS:  Correct.

8              THE COURT:  So if you had information that this injury

9    could have happened a few days before Sunday, would that have

10   had any impact on how you would have conducted your

11   investigation?

12       In other words, if there was medical evidence that showed

13   that it couldn't have happened on the day before, right, but

14   that it could have happened several days before, would that

15   have had an impact on how you conducted your investigation?

16             THE WITNESS:  Yes, it would have.  And I -- we did go

17   back several days, regardless of whether I had that information

18   at the time or not.

19             THE COURT:  So the answer is yes.

20             THE WITNESS:  Yes.

21             THE COURT:  Go ahead.

22   BY MR. SANDMAN:

23   Q.  Now, Ms. Pesquiera, in your deposition you testified that

24   if you had known Dr. Howard's opinion that the injuries could

25   have been inflicted more than 48 hours prior to death, you

1    said, and testified, quote -- this is at Line 17 and 18:  If I

2    had more information, I would have expanded my investigation.

3          Do you see the questions starting at Line 2 of Page 100

4    down to Line 18?

5    A.  I see those, and it went from 24 to 24 to 48, when you were

6    asking me, so....   My answer was I would have sought another

7    opinion from a pediatric specialist.

8    Q.  And then I asked you if the pediatric specialist had given

9    you the same opinion as Dr. Howard, would you then, finally,

10   after that, had gone out and expanded the investigation into

11   Rachel's homicide to potential suspects that may have inflicted

12   those injuries 48 hours or longer prior to death?  And what was

13   your answer?

14   A.  Mr. Braccio had some objections, it says there.  I don't

15   see what my answer is.

16   Q.  At Line 17.  At Lines 17 and 18.

17   A.  If I had more information, I would have expanded my

18   investigation.

19   Q.  So you would have done more than whatever you did do had

20   you had more precise medical information about the timing of

21   Rachel's injuries, correct?  That's what you said under oath in

22   your deposition at Page 100.

23   A.  I would accept that that's what I said, yes.

24   Q.  Now, is it true, Ms. Pesquiera, that you made a similar

25   assumption regarding the timing of the injury to Rachel's

CROSS-EXAMINATION - PESQUIERA                    75

1   genitals that you made with respect to the damage to her small

2   bowel; that you assumed, without getting any medical advice,

3   that occurred when Rachel was in the care and custody of

4   Mr. Jones on May 1st?

5   A.  You're asking me if I assumed that the vaginal injuries --

6   Q.  I am asking if you assumed those injuries occurred on May

7   1, 1994, in the afternoon of that day, based on the fact that

8   Rachel was in the care and custody of Mr. Jones on that date?

9   A.  I don't recall if I said that.  I assume that.  But I

10  believe that those injuries had happened during that same time

11  period, yes.

12  Q.  Well, let's take a look at Page 105 of your deposition,

13  starting at Line 10 through 23.

14      I asked you if you had any direct evidence that Mr. Jones

15  sexually assaulted Rachel on any day.  Excuse me.  I asked you

16  to concede that you had no direct evidence that Mr. Jones had

17  sexually assaulted Rachel.

18      Do you see that?  At Line 10 through 12?

19  A.  Yes, sir.

20  Q.  Then I asked you, at Line 16, I said:  You have no evidence

21  whatsoever of any sort that he sexually abused her on May 1st

22  or at any other time; correct?  And then what was your answer?

23  A.  I had the evidence obtained at the autopsy that she had

24  trauma to her vaginal area and that she was in his care and

25  custody at the time that that occurred, yes.

CROSS-EXAMINATION - PESQUIERA                    76

1   Q.  So we started with my question a few minutes ago, which is

2   that you made an assumption, without getting any medical

3   evidence from a medical expert such as Dr. Howard, that the

4   vaginal injury took place on May 1st based on the fact that, on

5   that day, on May 1st, Rachel was in Mr. Jones' care and

6   custody, correct?  That's what you just testified to in your

7   deposition.

8   A.  Correct.

9   Q.  And then you further testified in your deposition that you

10  had zero evidence that Mr. Jones had committed a sexual assault

11  prior to May 1st, 1994, correct?

12  A.  Did I say that in my deposition, you're asking?

13  Q.  I'm asking you if you said that at your deposition.

14  A.  I don't recall saying it, so I would have to look at

15  that --

16  Q.  Well, let me ask you, isn't it true that you had zero

17  evidence that Mr. Jones had committed a sexual assault on

18  Rachel prior to May 1st?

19  A.  I had no evidence that it was prior to May 1st, no.

20  Q.  You were a sexual abuse investigator before you became lead

21  detective in this case?

22  A.  Yes.

23  Q.  And so you had interviewed children about sexual abuse?

24  A.  I had.

25  Q.  And did you ever conduct an interview of any of the

UNITED STATES DISTRICT COURT

1    children living inside that tiny trailer about whether they had

2    information about any improper sexual touching going on in that

3    trailer between and amongst the children living there?

4    A.  I had another investigators assisting me, but I did not.

5    Q.  Could you tell us which investigator in this case

6    specifically interviewed any of the children living in the

7    trailer?  That would be Rebecca and Johnny and Brandie.  Which

8    one of your investigators, working under your leadership,

9    conducted a forensic interview concerning what those children

10   knew about any improper touching going on amongst and between

11   the children in the trailer?

12   A.  I don't recall that coming up.

13   Q.  And if there was such a record, it would be somewhere in

14   the sheriff's department file that we have in this case,

15   correct?

16   A.  I knew that Detective C. J. Downing had interviewed Rebecca

17   Lux and she was a forensic interviewer at the time.

18   Q.  And we all know, you know, I'm sure, Ms. Pesquiera, that in

19   that interview there is not a single solitary question posed to

20   Rebecca by Officer Downing about sexual abuse, correct?

21   A.  I don't recall that, no.

22   Q.  The record would show.

23   A.  I don't recall that, that it would have anything like that.

24          THE COURT:  I'm sorry.  You don't recall it has that

25   or you just don't recall --

CROSS-EXAMINATION - PESQUIERA

1          THE WITNESS:  I don't recall that -- that that is in

2     the report or that that was part of the questioning by

3     Detective Downing?

4          THE COURT:  So you're agreeing with his question.

5          THE WITNESS:  I agree that I don't recall that, yeah.

6          THE COURT:  Go ahead.

7     BY MR. SANDMAN:

8     Q.  I'd like to show you Exhibit 1 at 890.

9          And while that's being pulled up, can you think of any

10    reason why you would rule out such an investigation that might

11    involve interviewing the children about what they knew about

12    any improper touching going on in the household?

13    A.  Can I think of why I would rule that out?

14    Q.  Can you think of a reason why you would rule out

15    investigating that question, whether there was any improper

16    sexual touching going on in the household between and among the

17    children?

18    A.  If we had had information, no, I can't think of -- I can't

19    think of why I would rule that out.

20    Q.  It's clearly not something that should have been ruled out

21    in this case, correct?

22    A.  If we had had information, it wouldn't have been ruled out,

23    no.

24    Q.  What if you had no information?  You actually had no

25    information, correct, that there was any sexual touching

1   between and amongst the children, right?  You didn't have any

2   information about that.

3   A.  At the time, no.

4   Q.  Okay.  So my question was, would there be any reason to

5   rule out an investigation in that direction to consider all

6   possible sources of the genital injuries apparent on Rachel's

7   body?

8   A.  There would be no reason to rule it out, no.

9   Q.  Okay.  Fair enough.

10      Now, I am showing you a copy of Exhibit 1 at 890, which was

11  an interview of Brandie Jones.  If we could go on to the next

12  page, that interview.  892.  Can you go -- there we go.  If you

13  could blow up Lines 12 through 21.

14      There is a discussion here, or disclosure by Brandie, that

15  Rachel was scared when Johnny was in the room and she'd want to

16  sleep by the wall next to Brandie.  Do you see that?

17  A.  (Reading:)  Yes, Rachel always was, like, scared, and she

18  always was sleeping by the wall next to me and stuff.

19  Q.  Okay.  And these questions to Brandie, "did you ever see

20  Johnny doing anything to Rachel?" that's certainly a question

21  that one of you -- one of your skilled investigators could have

22  asked if you hadn't ruled out conducting that sort of

23  investigation, correct?

24  A.  They could have asked.  They asked it here, yes.

25  Q.  And the next page at Lines 13 through 25.

CROSS-EXAMINATION - PESQUIERA

1       Now, did you know that these four kids were sleeping in

2   that tiny bedroom, the picture we looked at earlier, for at

3   least a period of time?

4   A.  At one time or another, yes, that they were sleeping in the

5   same room.

6   Q.  This is Brandie giving additional details about Rachel's

7   concern about Johnny and that when Johnny would leave the room

8   she would go back into her own bed, correct?

9   A.  That's what it says here, yes.

10  Q.  Then on the next page -- before I have you look at that,

11  did you know that Mr. Jones had to make a special sleeping area

12  for Johnny because there were concerns in the household about

13  improper touching, Johnny improperly touching other residents

14  in the household?

15  A.  I didn't know until it was brought up here in Brandie's

16  deposition.

17  Q.  And on this page we're looking at now, 894, Brandie was

18  asked if Johnny ever tried to do anything to her, to touch her,

19  and she said, yes, and that's when he got his built-on room.

20  Do you see that?

21  A.  I see that, yes.

22  Q.  This is information that you would want to know before you

23  decide that you've completed a thorough and complete

24  investigation in this case, correct?

25  A.  Correct, I would want to question her further into this, to

UNITED STATES DISTRICT COURT

1    determine what type of -- what she's talking about.

2    Q.  And you can't find any of that out until you investigate,

3    correct?

4    A.  Until we talk to her, yes, and ask her those questions.

5    Q.  And we don't know where any of those leads would have taken

6    you, correct?  Had you investigated.

7    A.  It would just be speculation, yeah, if it wasn't done, I

8    wouldn't know.

9    Q.  Exactly.  It takes an investigation to really know what you

10   could find, correct?

11   A.  I would have to investigate, yes.

12   Q.  Can we take a look at Exhibit 30?  If we can blow up the

13   bottom half.

14        Do you remember who Zoly was?

15   A.  Zoly?

16   Q.  Zoly.  Tell me who he was.  Do you remember who he was?

17            THE COURT:  He is asking you if you know who Zoly was.

18            THE WITNESS:  Sorry.  I was concentrating on what this

19   is.

20            MR. SANDMAN:  I'm sorry.

21            THE WITNESS:  I knew that Zoly was an ex-boyfriend to

22   Angela, the mother.  Rachel's mother.

23   BY MR. SANDMAN:

24   Q.  Okay.  And she reported, Angela reported, to you that that

25   was an abusive relationship, that there was -- that Zoly

CROSS-EXAMINATION - PESQUIERA

1    inflicted violence on Angela during that relationship?

2    A.  Yes, that they had a domestic violence type of relationship

3    between the two of them.

4    Q.  Now, did you have any concern in this case that Angela

5    might have been abusive, physically abusive, to any of her

6    children, including Rachel?

7    A.  I don't recall if I had any concern.  That would be

8    something that I would think about, yes.

9    Q.  You would think about that.

10   A.  I don't remember if I had that concern though.

11   Q.  Do you know, does your investigation file document a

12   conversation with Zoly to learn from him anything about

13   Angela's treatment of the children?

14   A.  I -- I don't recall that.

15   Q.  If it's not in the file, then it wasn't done, correct?

16            MR. BRACCIO:  I'm just going to object to this

17   document.  This is Leslie Bowman's handwritten notes that were

18   in her protected file.

19            MR. SANDMAN:  It's an exhibit that's in evidence.  I

20   just want to ask her a question.

21            THE COURT:  You need to show it to her, she didn't

22   create this.

23            MR. SANDMAN:  I just wanted to ask her if she knew

24   anything about --

25            THE COURT:  His point is why are you showing her this

1    document.

2           MR. SANDMAN:  We can take it down.

3           THE COURT:  Take it down and you can ask her

4    questions.

5    BY MR. SANDMAN:

6    Q.  Did you receive any information at any time that there were

7    issues, sexual issues, between Johnny and Rachel?

8           THE COURT:  I'm sorry.  You were talking about Zoly.

9    You're done with Zoly, now you're --

10          MR. SANDMAN:  Well, she said she didn't talk to Zoly,

11   so I want to know if she learned from any other source that

12   there were sexual issues between Rachel and Johnny.

13   A.  Not sexual issues.  You showed me one where Brandie is

14   talking about Rachel being scared and then climbing up into the

15   bed.  I don't know if it referred to a sexual issue with

16   Rachel.

17   BY MR. SANDMAN:

18   Q.  Fair enough.

19       I want to touch just very briefly on Ms. Tafe again.

20       Do you remember in your deposition you testified that new

21   information that is discovered which might be relevant to a

22   child's medical condition should be provided to the

23   pathologist?  And in this case that's Dr. Howard.

24   A.  Do I remember saying that in my deposition?

25   Q.  Yes.

CROSS-EXAMINATION - PESQUIERA

1  A.  No.

2  Q.  Do you agree that new information that you received during

3  your investigation that might be relevant to Rachel's medical

4  conditions should have been shared with Dr. Howard?

5  A.  I would agree that if it's in my deposition then it would

6  be in there, yes.  That's what I am saying, if I could refer to

7  it....

8  Q.  Okay.  Fair enough.  Page 77, Line 7.

9        THE COURT:  So you don't have to refresh her memory if

10  she is not your witness.  If you just want to impeach her, you

11  can just read the testimony, you know.  "On your

12  deposition...," on whatever the date was, "...I asked you this

13  question, this was your answer."

14  BY MR. SANDMAN:

15  Q.  Ms. Pesquiera, Page 77, Line 7, I asked you:  If you find

16  additional information that might be relevant to the medical

17  condition, let's say, of a child after you first speak to a

18  forensic pathologist, would you relay that to the forensic

19  pathologist so they could have a full and complete

20  understanding of her medical condition at the time of her

21  death?  And your answer was:  If that is known, yes.

22  A.  I agree.

23  Q.  And you did acquire some potentially relevant medical

24  information from Ms. Tafe, did you pass that information along

25  to Dr. Howard?

CROSS-EXAMINATION - PESQUIERA                    85

1    A.  That I received medical information from --

2    Q.  You received some information from Ms. Tafe that Rachel

3    might be ill on April 30th, did you pass that information along

4    to Dr. Howard?

5    A.  I don't recall passing that on, no.

6         THE COURT:  Would it be documented somewhere if you

7    did?

8         THE WITNESS:  Yes, sir, it would.

9         THE COURT:  Where would it be?

10        THE WITNESS:  In my supplement.

11        THE COURT:  Supplement to your report?

12        THE WITNESS:  My supplemental report, yes.

13   BY MR. SANDMAN:

14   Q.  I want to talk to you a little bit about some of the

15   physical evidence in the case, namely, the clothing that was

16   worn by Rachel on Sunday, May 1st, and the clothing worn by

17   Mr. Jones on May 1st.  Do you remember we talked about that in

18   your deposition?

19   A.  Not specifically, no.

20   Q.  Is it true you didn't collect or examine any of the

21   physical evidence in the case at the time it was collected in

22   the trailer, Mr. Jones' trailer?  Correct?

23   A.  I did not collect evidence that was located in the trailer.

24   I was not present at the time, no.

25   Q.  Do you agree that the clothing worn by the victim of a

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA

1  physical or sexual assault at the time those assaults are

2  committed, that clothing may have critical forensic value?

3  A.  About any victim, yes, that would be critical.

4  Q.  And that clothing worn by the alleged victim could have

5  inculpatory or exculpatory value, correct?

6  A.  Correct.

7  Q.  In this case, should there have been a documented effort to

8  examine -- identify and examine the clothing worn by Rachel

9  Gray on the afternoon of May 1st?

10  A.  Should there have been?

11  Q.  Should there have been?

12  A.  If they had been located, yes.

13  Q.  My question was should there have been a documented effort

14  to try and identify that clothing so that we know that the

15  police officers are looking for the clothing that Rachel wore

16  on May 1st.

17  A.  Yes.

18  Q.  And in this case, if there is no documentation indicating

19  that either you or your subordinates in this investigation

20  actually made an effort to identify Rachel's clothing she wore

21  on May 1st, then that never happened, correct?

22  A.  I know that they were looking for evidence in the house

23  that could be related.  If you are asking me if -- so I don't

24  understand the question though.  If it had been -- if they had

25  been looking for that evidence, would it be documented, or if

1    they had found the evidence?

2    Q.  Let's take a look at Page 42, Line 12, of your deposition,

3    where we talked about this and I....

4        Let's look at 41 first.  I'm sorry, Ms. Pesquiera.

5        If you look at Lines 41 (sic) through 24.  We're talking

6    there about whether there had been an effort, a targeted

7    investigation, to identify and locate the clothing worn by

8    Rachel Gray on May 1st, correct?

9    A.  So he indicated this report.  Are you asking me about Line

10   24?

11   Q.  Line 21, I asked you:  If he was engaged in an effort to

12   identify and locate clothing worn by Rachel Gray on May 1st,

13   should that be indicated in his report?  And your answer was?

14   A.  It would be, yes.

15   Q.  Then the question, starting at the bottom of Page 41 onto

16   42:  And if there is an absence of any record in the report of

17   Detective Clark or any other officer involved in this homicide

18   investigation, if there's an absence of any record that anybody

19   attempted to identify or locate specifically the clothing worn

20   by Rachel Gray on May 1st, that would pretty much document that

21   it wasn't -- simply wasn't done; correct?

22       And your answer was:  That could be, yes.

23   A.  I thought, okay, Line 7:  If there's an absence of a

24   record, question.

25   Q.  Then your answer at Line 11 is:  That could be, yes.  If

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA

1    it's not documented, it didn't happen?

2    A.  "That could be, yes," is what I said, yes.

3    Q.  And in your deposition, isn't it true that you were unable

4    to identify a single sexual assault case where there was not a

5    targeted and documented effort to identify and locate the

6    victim's clothing?

7    A.  Are you asking me if I in the past --

8    Q.  You have a long history of investigating sexual assault

9    cases, correct?

10   A.  I do.

11   Q.  I'll just ask you again:  Can you think of any sexual

12   assault case where there was not a targeted, documented effort

13   to identify and locate the victim's clothing?

14   A.  There would be a documented effort, yes.

15   Q.  So you cannot think of a case where there was not such an

16   investigation, correct?

17   A.  Not off the top of my head, I can't think of a case like

18   that.

19   Q.  Now, we'll never know whether there was exculpatory

20   evidence on Rachel's clothing, correct, that she wore on

21   Sunday, May 1st?

22   A.  I don't know.  I don't know that.

23   Q.  And what about Mr. Jones' clothing that he wore on May 1st,

24   was there any documented effort to identify the clothing that

25   he wore on May 1st?

1  A.  There was an effort made by Detective Clark at the house to

2  collect items.

3  Q.  Did Detective Clark document that he was looking for the

4  clothing worn by Mr. Jones on May 1st?

5  A.  I don't know if he specifically documented that in his

6  report without looking at it, no.

7  Q.  In fact, in order to look for that evidence, Mr. Jones'

8  clothing or Rachel's clothing, somebody would have had to have

9  investigated what they were wearing on that day, correct?

10  A.  Correct.  That could be a way to look at that, yes.

11  Q.  Is there any documentation that you know of that was

12  provided to Detective Clark when he was rummaging through the

13  house as to what either Rachel or Mr. Jones were wearing on May

14  1st?

15  A.  At the time that he was rummaging through the house, no, I

16  don't know if there is anything like that.

17  Q.  Now, you were, on the day that this search took place, on

18  May 2nd, you still had the cooperation of Angela Gray, correct?

19  You were interviewing her on May 2nd, even before you gave her

20  Miranda warnings, correct?

21  A.  Did you just say "Rachel" or --

22  Q.  I'm sorry.  Angela.  My apologies.

23          THE COURT:  Angela Gray.

24          THE WITNESS:  Angela.

25          THE COURT:  Yes.

CROSS-EXAMINATION - PESQUIERA                    90

1              THE WITNESS:  Was I speaking to Angela Gray?  Yes.

2    BY MR. SANDMAN:

3    Q.  On May 2nd, she submitted to a lengthy interview, an

4    interview where you didn't even need to Mirandize her, or

5    didn't Mirandize her, correct?

6    A.  That is correct.

7    Q.  And you could have certainly asked her to identify the type

8    of clothing that Mr. Jones and Rachel were wearing on the day

9    prior, correct?

10   A.  Correct.

11   Q.  And the next day you continued to interview her during a

12   lengthy interview on May 3rd and could have asked her those

13   questions on May 3rd.

14   A.  I could have, yes.

15   Q.  And wasn't it also on May 3rd that Detective Clark

16   interviewed a young child by the name of Ray Lopez?

17   A.  I know he interviewed them, yes.  I don't remember exactly

18   what day that was.  It could have been May 3rd, yes.

19   Q.  And Ray Lopez described that the person he saw in the

20   yellow van, the adult person he saw, was wearing a blue shirt

21   and a hat.  Correct?

22   A.  Correct.

23   Q.  So now, on May 3rd, you know what Mr. Jones is wearing --

24   A.  Well, let me go back.  I don't remember the hat part, I

25   remember the blue shirt part, but maybe not the hat.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA

1  Q.  You do remember he identified the driver of the van wearing

2  the blue shirt, correct?

3  A.  Correct.  And they talked about his hair, so that's why I

4  don't remember the cap part, or hat.

5  Q.  Can we take a look at Exhibit 91 at 5.

6      Do you see the garment lying on the floor?

7  A.  I do.

8  Q.  In Mr. Jones' bedroom?  The blue garment?

9  A.  Correct, I see a garment there, yes.

10 Q.  Does it appear blue to you?

11 A.  It does here, yes.

12 Q.  Do you know whether there was any documented effort to

13 convey the information from young Mr. Lopez to either you or

14 somebody else on your team to see if they could locate the

15 clothing Mr. Jones wore on May 1st?

16 A.  When he was searching the trailer would have been the day

17 prior to having heard that from the child that said that he saw

18 him in the van.

19 Q.  So the Pima County Sheriff's Department, as it was

20 operating in 1994, could learn about the garment being worn by

21 the alleged suspect on the day after the initial review of the

22 trailer, and then they would never go back, under any

23 circumstances, to collect additional evidence, is that what

24 you're testifying to?

25 A.  No.

CROSS-EXAMINATION - PESQUIERA

92

1   Q.  They clearly could have gone back on May 3rd or May 4th or

2   May 5th to collect additional evidence that they had reason to

3   know about, correct?

4   A.  Correct, he could have.

5   Q.  So it doesn't matter that Mr. Lopez gave the statement

6   after the initial search of the trailer, does it?

7   A.  I agree, it doesn't matter.

8   Q.  I want to ask you -- well, before I do that.  So we'll

9   never know whether the clothing worn by Mr. Jones on May 1st

10  had zero blood on it, correct?

11  A.  No, I don't know if that would be possible at this point.

12  Q.  We'll never know it.

13  A.  I don't know if that -- no, I don't know that.

14  Q.  Now, you're the lead detective.

15  A.  Yes.

16  Q.  So ultimately the failure to engage in a documented effort

17  to locate this physical evidence, that's on your shoulders,

18  correct?

19  A.  That would come to me, yes.

20  Q.  I want to ask you some questions about the blood found on

21  the van, and I'd like you to look at Exhibit 89 at Page 10.

22  A.  The blood found on the?

23  Q.  On the van.  Do you remember that there was some of

24  Rachel's blood found on the carpet in the van?

25  A.  Correct.

CROSS-EXAMINATION - PESQUIERA

1   Q.  And we had an expert witness here last week -- I don't know

2   if you were here for that testimony from Stuart James -- and he

3   talked about item V6 -- V, as in "Victor," 6 -- and whether --

4   he thought that most probably that the blood on the carpet in

5   the van was a blood drop.  And I wanted to ask you if that

6   carpet cut-out shown in this picture could have, in fact, been

7   blood that dropped from Rachel's head, for example, as she was

8   being held in her mother's arms in that seat on the early

9   morning of May 2nd, 1994?

10  A.  You're asking me if it could have happened?

11  Q.  Well, when you were a homicide detective, did you examine

12  physical evidence?

13  A.  Yes.

14  Q.  And have to draw inferences about it?

15  A.  Yes.

16  Q.  You were comfortable with that?

17  A.  Yes.

18  Q.  You knew how to do it?

19  A.  Yes.

20  Q.  And so my question was, using your experienced homicide

21  investigator lens, do you agree that a drop of blood sitting

22  just adjacent to the passenger seat in the yellow van,

23  Mr. Jones' van, could have been a drop of blood that spilled

24  from Rachel's head as she was being held in her mother's arms

25  on the way to the hospital on May 2nd, 1994?

CROSS-EXAMINATION - PESQUIERA

1   A.  I could not because the target, the landing surface for

2   which that blood drop hits or lands on, has a lot to do with

3   what that blood drop is going to do, how it's going to alter

4   that.  And so, first of all, I couldn't say that it was a drop

5   at all.  I'd have to look at the evidence myself and be able to

6   look at that and go back to refresh my memory.  But also the

7   surface from which a bloodstain lands on, or, as you say, a

8   "drop," is altered because it's absorbed by the carpet and the

9   fibers.

10  Q.  Okay.  Well, I don't want to ask you anything about -- that

11  might elicit any testimony from you about your expertise in

12  characterizing blood evidence.

13      I think your answer to my question was you can't infer that

14  drops of blood may have spilled from Rachel's head as she was

15  being transported to the hospital, that's not an inference that

16  would come to your realization, correct?

17  A.  I can't infer, based on what you're showing me here and the

18  way you're asking me, no.

19  Q.  Now I want to ask you about the importance of another

20  aspect of this investigation that you were a leader of.

21      Was it important to the investigation to try and document

22  each and every place that Mr. Jones told you and your

23  colleagues that he had been on the Sunday afternoon of May 1st?

24  A.  Was it important to document that?

25  Q.  Was it important to document and verify whether he had

CROSS-EXAMINATION - PESQUIERA                    95

1    actually gone to the various locations with Rachel as he

2    described to you when you interviewed him?

3    A.  Yes, I would agree that that's true, yes.

4    Q.  And Mr. Jones told you about a number of places he had been

5    that day.  He told you he had gone to the Quik Mart late in the

6    afternoon after Rachel became sick, correct?

7    A.  He did.

8    Q.  And you directed Officer Ruelas to go out there and

9    interview the person that worked there that day, correct?

10   A.  Correct.

11   Q.  And she said -- I think her name was Petrilak, do you

12   remember her?

13   A.  I remember that it was a female, yes.

14   Q.  And she reported that she remembered Barry Jones, he was a

15   frequent customer there, and he came in and asked for a bag for

16   ice for Rachel's head, for a little girl's head.  Do you

17   remember anything about that?

18   A.  I do recall that.

19   Q.  And do you remember that she said that she saw Rachel

20   sitting on sort of the stoop outside the front door of the

21   store?

22   A.  That he had her come out and, yeah, sit on the curb.

23   Q.  And she never reported seeing the little girl crying or

24   upset or frightened or anything like that, did she?

25   A.  I don't recall her reporting that, no.

UNITED STATES DISTRICT COURT

1  Q.  In fact, even when Rachel was discovered sick by Stephanie

2  Fleming a little bit earlier from the trip to the Quik Mart,

3  when Stephanie called Barry over, he ran over, Rachel went

4  right to him willingly, didn't she, according to Stephanie

5  Fleming.

6  A.  No, she did not.

7  Q.  Let's take a look at -- when was the last time you looked

8  at the interview -- your interview of Stephanie Fleming?

9  A.  I don't recall exactly.  Maybe a few days ago.

10        MR. SANDMAN:  Your Honor, this is in evidence as

11  Exhibit 72.  It's an interview that Ms. Pesquiera conducted of

12  Stephanie Fleming on May 27, 1994.

13  BY MR. SANDMAN:

14  Q.  Do you see that on the first page, Ms. Pesquiera?

15  A.  I do.

16  Q.  If we could direct your attention to Page 10.

17        THE COURT:  This is already admitted?

18        MR. SANDMAN:  Yeah.

19        If you could blow up sort of the bottom third of the

20  page here.

21        THE COURT:  Are you refreshing her memory to impeach

22  her because she denied this statement you're trying to elicit

23  from her?

24        MR. SANDMAN:  I'd like her to read that paragraph --

25  BY MR. SANDMAN:

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA                               97

1    Q.  -- and tell me whether this refreshes your recollection

2    that when Stephanie Fleming called Barry to come over to

3    retrieve Rachel, who was ill, she said:  The man was concerned.

4    And then she also said:  When I handed Rachel to him, she went,

5    she did go to him willingly.  Do you see that?

6    A.  I see that now, yes.

7    Q.  Okay.  So this is -- I am asking you this as sort of

8    your -- with your lead homicide detective hat on:  Does Rachel

9    going to Barry willingly suggest to you...or does that suggest

10   that maybe he was not the person who just an hour earlier had

11   physically beat her and sexually assaulted her while she was in

12   his van?

13   A.  Well, I was referring to that she says she was just holding

14   onto her like she was choking her, she had her legs wrapped

15   around her, and she didn't want to let go.

16   Q.  That's before Barry got there, right, Ms. Pesquiera?

17   A.  And that's....   (Reading:)  When I ran around the corner,

18   Barry was running towards us.  Yeah.  And the man was

19   concerned.  Yes, I see that.

20   Q.  And she did go to him willingly.

21       And my question was, which I would like you to try and

22   answer --

23   A.  Okay.

24   Q.  -- does Ms. Fleming's report to you that Rachel went to

25   Mr. Jones willingly sound to you like the description of a

CROSS-EXAMINATION - PESQUIERA                    98

1    child who had just, within an hour or so before this, been

2    physically beaten and sexually assaulted?

3    A.  I would think that that's just her opinion.

4    Q.  Okay.  Then you would have dug a lot deeper into her

5    description there to try to find out more about that, correct?

6    You're apparently not willing to draw an inference from what

7    she in fact told you.

8    A.  About which part?

9    Q.  Let's go back to the Quik Mart.  Officer Ruelas went there

10   to verify whether Mr. Jones had been there and you said that

11   had been done.

12   A.  Correct.

13   Q.  He also went to the Rural/Metro Fire Station to see if they

14   had any record of Rachel being there on the day prior, correct?

15   A.  Correct.

16   Q.  Mr. Jones never told the police he had been to Rural/Metro,

17   he told the sheriff's department detectives that he had

18   actually gone to the Quik Mart and ran into an EMT at the Quik

19   Mart, correct?

20   A.  He talks about going to the Quik Mart and that there was an

21   EMT in there, yes.

22   Q.  And it was someone wearing a brown shirt with -- he

23   described it better than I can now, but he described its unique

24   characteristics during his interview, what the EMT was wearing.

25   A.  That it was brown, yes.

CROSS-EXAMINATION - PESQUIERA                    99

1    Q.  And he said that the person was driving a civilian car,

2    correct?

3    A.  I don't remember the civilian car part.

4    Q.  He told you he had been afraid to go to the Rural/Metro

5    because he had just got out of -- he was driving on a suspended

6    license and didn't want to be rearrested for driving without

7    registration and license, correct?

8    A.  I don't remember that portion.

9    Q.  If it's in the statement, it's in there.

10   A.  Okay.

11   Q.  The other place that Mr. Jones said he had been was to the

12   Choice Market, correct?

13   A.  Yes.

14   Q.  That's what he told sheriff's detectives.

15   A.  Okay.

16   Q.  And you testified in your deposition about what Mr. Jones

17   had told you about that visit, that it was around 4:00 o'clock,

18   and he had brought Rachel in the store and that she helped

19   carry the milk out of the store, correct?

20   A.  I'd have to refer back to the deposition because I don't

21   recall that specific.

22   Q.  So that would be at Pages 50, 51.

23       If you could actually just read to your....  Page 50, Line

24   7 through Page 51, Line 18.

25       Does that refresh your recollection that Mr. Jones had told

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA

1   you he had gone to the Choice Market with Rachel?

2   A.  (Reading:)  We run up to choice, I get 10 cheese burritos,

3   a gallon of milk.  And I say:  Let me see.  And so if you look

4   at my finger here --   So I ride over there, pick Rachel up, we

5   run up to choice.

6   Q.  And then on the next page, or on Page 53, Lines 2 through

7   4, you confirm that he recounted going to the store between

8   4:00 and 4:30 on Sunday afternoon, correct?

9   A.  (Reading:)  He recounts going to see a friend, Ron, and

10  going to the Choice Market between 4:00 and 4:30 on Sunday

11  afternoon, May 1st.  And I say:  Yes.

12  Q.  A little further down below, do you remember that that was

13  the same time that Norma Lopez said her children went to the

14  store?  That's at Lines 14 through 19.

15  A.  (Reading:)  I've handed you what's marked as Exhibit 30.

16  See that interview conducted by Detective Clark of Norma Lopez

17  dated May 3rd, 1994?  Correct.  And if you would look at Page 1

18  and then onto the very top of Page 2, do you see that Norma

19  Lopez is informing Detective Clark that her children went over

20  to the Choice Market at around 4:00 o'clock on Sunday

21  afternoon, May 1st?  Yes.

22  Q.  So at the deposition we went through Mr. Jones' statement

23  and Norma Lopez' statements, and we got both Mr. Jones and

24  Ms. Lopez saying that her children and Mr. Jones are converging

25  on the store around the same time.

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA                                        101

1   A.  I agree.

2   Q.  Now, would you want to verify and actually document that

3   Mr. Jones went into the store and that Rachel seemed fine at

4   around 4:00, 4:30 in the afternoon on Sunday, May 1st?

5   A.  Yes, I would look into that, yes.

6   Q.  And there is not any indication anywhere in the sheriff's

7   department record that that was done, correct?

8   A.  Not that I -- I don't recall that, no.

9   Q.  And if it's not documented, it was never done.

10   A.  If it's not documented, I wouldn't know about it.

11   Q.  Because somebody actually working under your auspices could

12   have gone in the store and they could have obtained information

13   that Mr. Jones was in the store at around 4:00 or 4:30, near in

14   time to the Lopez kids, and that Rachel appeared fine and then

15   they didn't prepare a report, correct?

16   A.  That could have been done, yes.

17   Q.  And, in fact, one of the officers working under you that

18   day, George Ruelas, who you just described going to the Quik

19   Mart and to Rural/Metro, he was not logged in on the radio that

20   day, was he?

21   A.  I don't know that.

22   Q.  Do you remember in your deposition that you reviewed the

23   radio log and you agreed that Officer Ruelas was operating off

24   the radio log on May 2nd?

25              MR. BRACCIO:  Your Honor, I am going to object to this

UNITED STATES DISTRICT COURT

1    line of questioning under relevance.

2            THE COURT:  Overruled.

3    BY MR. SANDMAN:

4    Q.  Do you remember testifying to that?

5    A.  If it's in my deposition, I agree to that.

6    Q.  Let's take a look at Page 61, Line 19 through 25 first.

7            You identified Officer Ruelas' report which identified his

8    badge number of 857, correct?

9    A.  Correct.

10   Q.  That portion of your deposition?

11   A.  857, yes.

12   Q.  And then I asked you, at Line 23:  Can you tell us whether

13   Mr. Ruelas has logged -- is he shown as logged into the radio

14   log on May 2nd, 1994?  And then there is a long discussion

15   that's immaterial to this question.  But at Page 63, Line 11, I

16   asked:  Let me go back to the original question.  Do you see

17   his badge number indicated on the radio log in Exhibit 35?  And

18   what was your answer?

19   A.  "I do not."

20   Q.  And then I asked you, and I guess I'll ask you again, can

21   you rule out the possibility that Mr. Ruelas went to the Choice

22   Market on May 2nd, 1994?

23   A.  I could say that it's not uncommon for detectives to not

24   use the radio, because sometimes they don't, so I wouldn't know

25   that by looking at the radio log, no.

CROSS-EXAMINATION - PESQUIERA

1    Q.  If you could try to answer this question yes or no,

2    Ms. Pesquiera.

3    A.  Okay.

4    Q.  If you can.  If you can't then, of course, that's fine.

5         Can you rule out the possibility that Mr. Ruelas went to

6    the Choice Market and interviewed personnel there on May 2nd,

7    1994?

8    A.  I can't rule that out.

9    Q.  Now, do you think if Mr. Ruelas did go there and the

10   personnel said we know that Jones guy, he hasn't been here in

11   weeks, do you think Officer Ruelas would have documented that?

12   A.  Do I think that?

13   Q.  If Officer Ruelas had gone in the store and he had learned

14   from the employees that Mr. Jones had not been there on the day

15   prior, that would have contradicted Mr. Jones' statement to the

16   sheriff's department, correct?

17   A.  I would assume he would have documented --

18   Q.  Yeah, he would document --

19   A.  Detective Ruelas.

20   Q.  But we're not sure he would have documented information

21   favorable to Mr. Jones, correct?  We don't know.

22   A.  I can't say that, no.

23   Q.  When did you eliminate Angela Gray as a suspect related to

24   the infliction of Rachel's small bowel injury?

25   A.  Based on interviews from the children and everybody that we

CROSS-EXAMINATION - PESQUIERA

1    had gathered, and her own statement that she had been sleeping

2    through that time period and had gotten up and then that's when

3    she saw Rachel soaking wet and injured and then she takes her

4    back into the trailer.

5    Q.  My question was when did you eliminate her as a suspect

6    related to the infliction of the injuries?

7    A.  After we had spoken to the majority of some of the major

8    witnesses --

9    Q.  Who are those?

10   A.  Such as Angela herself, Barry himself, Rebecca, Brandie

11   Jones, and even the brother Jonathan.

12   Q.  Are you telling us that if we go to the interview reports

13   of the children -- let's put Ms. Gray on the sidelines for a

14   minute, because she may have some self-interest in this.  But

15   if you go to the interviews you've just mentioned, of the

16   children, are you telling us that the Court will find targeted

17   questions of those children about the extent of the abuse by

18   their mother?

19   A.  It was a totality of the interviews.

20       I don't understand your question.  If you're asking me --

21   ask me again, because it's a compounded kind of thing.

22   Q.  Well, I think where we started was I asked you when you

23   decided Rachel -- excuse me -- Angela Gray was no longer a

24   suspect related to the infliction of the injuries, and you said

25   it was based on a bunch of interviews.  Is that what you said?

1    A.  It was based on interviews that we had gathered of

2    different people, yes.

3    Q.  And I think you had identified the people as Johnny and

4    Becky and Brandie.  Did I leave anybody out?

5    A.  Angela herself.  Barry Jones.

6    Q.  And if we look at any of those interviews, are you saying

7    that we will find in those interviews targeted questions about

8    the extent of any abuse that Angela may have inflicted on any

9    of the children?

10        You're saying that's actually in those interviews?  That's

11   what I want to know.

12   A.  I don't recall that, no.  I don't recall specifically if

13   it's in those interviews.

14        THE COURT:  Are you asking if the interviews touched

15   upon that?

16        MR. SANDMAN:  Yes.

17        THE COURT:  If the questions were asked at all about

18   Angela.

19        MR. SANDMAN:  Really, either.  I'd be happy if either

20   of those questions was answered.

21        THE COURT:  Let me just try to break this down for

22   you.

23        Do you know if that was a topic that was asked,

24   whether or not Angela inflicted any abuse on the children, in

25   her interview or anybody else's interview?

1          THE WITNESS:  Yes, we did talk about those things,

2     whether she disciplined her children, if she spanked them,

3     things like that, yes.

4     BY MR. SANDMAN:

5     Q.  Well, you talked to Angela about that, correct?

6     A.  We talked to Angela.  Her sister.  I know she had a sister,

7     Amanda.  The children about those things, as I recall.

8     Q.  We'll see if we can find those things then, that's fine.

9     A.  Okay.

10    Q.  Did Angela Gray tell you that she was afraid to take Rachel

11    to the hospital on the evening of May 1st because she was

12    personally afraid CPS, Child Protective Services, would allege

13    abuse and that she would lose custody of her child?

14    A.  She did discuss that, yes.

15    Q.  And she took full responsibility of that.  She said

16    that that was her fear, that was not something Mr. Jones told

17    her.  She expressed straight up that she was afraid to take

18    Rachel to the hospital out of her own concerns with CPS,

19    correct?

20    A.  And she said that he had said that they could go the next

21    day.

22    Q.  They both discussed going the next day.

23    A.  Right.

24    Q.  Did Angela Gray physically abuse her children by inflicting

25    blows to their stomachs?

1    A.  Not that I know of.

2    Q.  Would there be -- would that be something that if you

3    conducted a targeted interview of Rachel -- excuse me -- Becky

4    or Johnny or the others, is that something you think you might

5    want to ask about, since Rachel suffered an injury, a blow to

6    her stomach?

7    A.  I don't recall if we asked that or not, no.

8    Q.  It would be in the record if you asked about it.

9    A.  It could be in the statements, yes.

10   Q.  I'd like you to look at Exhibit 1 at 2294.  We better go to

11   Page 1 first.

12       So this, Ms. Pesquiera, is a May 23 -- excuse me.  I am

13   looking for the date of the report.  This is a May 9, 1994

14   report.  You don't have to keep it blown up there now.  It

15   involved an evaluation, psychosocial evaluation, for Rebecca

16   Lux.  Do you see that up in the upper right-hand corner?

17   A.  Yes.

18   Q.  This was done at the University Medical Center?

19   A.  I see that.

20   Q.  There was a physician involved by the name of Anna

21   Binkiewicz, do you see that?

22   A.  Yes.

23   Q.  Are you familiar with Dr. Anna Binkiewicz?

24   A.  Yes, I am.

25   Q.  What do you know about her?

CROSS-EXAMINATION - PESQUIERA

1  A.  I know that she would provide evaluations during that time

2  period for Child Protective Services.

3  Q.  If we could look at the patient interview.  She states that

4  her mother had hit her all sorts of places.  Do you see that?

5  That's down about six lines from the bottom of that paragraph.

6  A.  Yes.

7  Q.  Were you aware of that as a result of any of the sheriff's

8  department interviews?

9  A.  Not that I recall, no.

10 Q.  And Becky also stated that there had been bruises resulting

11 from this physical abuse, correct?

12 A.  Yes, it says bruises but no broken skin or bleeding.

13 Q.  And Rachel had bruises but no broken skin or bleeding,

14 didn't she?

15 A.  She had broken skin and bleeding.

16 Q.  She had a scalp injury, but on her abdominal area, the rest

17 of her body, she had bruises but no broken skin or bleeding,

18 correct?

19 A.  She did have broken skin to her vaginal area and bleeding

20 from the vagina.

21 Q.  Becky goes on to say that she was hit by her mother's open

22 hand to her stomach.  Do you see that?

23 A.  Yes.

24 Q.  Is this something that you would have wanted to have

25 investigated further if you had known about it?

CROSS-EXAMINATION - PESQUIERA

1  A.  That could have been, yes.

2  Q.  Because you'd probably want to know exactly how hard her

3  mother hit her, how often she was hit in the stomach, you'd

4  want to know all those things, correct?

5  A.  Correct.

6  Q.  And none of those questions were ever asked by the

7  sheriff's department?

8  A.  Not that I know of, no.

9  Q.  You'd also want to know if anybody saw that happen to

10  Rachel at Angela's hand, correct?

11  A.  Correct.

12  Q.  Now, let's take a look at Exhibit 32.  This is an October

13  31, 1994 interview of Donna Marini.  We can blow up the first

14  13 lines there.  You see Mitch Eisenberg is there again.  He's

15  a representative of the County Attorney's Office, correct?

16  A.  Correct.

17  Q.  Do you remember that Ms. Marini was the great aunt of Becky

18  and Johnny and Rachel, and that she took custody of Johnny and

19  Becky after Rachel died and Angela was arrested?

20  A.  I vaguely remember that, yes.

21  Q.  I think it's indicated there, a little further down on the

22  page, that she says that she has them.  If you go down to Line

23  24.

24      Do you see there -- I think your recollection is correct,

25  she says there she had custody of Angela's children, correct?

1    Ms. Pesquiera?  Do you see --

2    A.  (Reading:)  I currently have custody.

3        Yes, I see that.

4    Q.  Do you remember that you interviewed Ms. Marini, or someone

5    else with your department had a brief interview with her, at

6    the hospital on the morning of May 2nd, 1994, the day Rachel

7    died?

8    A.  I don't recall if that was me or who that was.

9    Q.  Do you know whether anybody followed up with her after she

10   took custody of the children to find out whether they had made

11   any statements about Mr. Jones being abusive or their mother

12   being abusive or anything else?

13   A.  I don't recall.

14   Q.  Page 24 of the exhibit.  If you could blow up the first 17

15   lines.

16       Do you see here Ms. Marini is being asked questions about

17   whether Becky or Johnny were ever abused?  Do you see that?  At

18   Lines 5 and --

19   A.  Yes, I see that.

20   Q.  -- 6?  And she reports that she's -- Ms. Marini is learning

21   things from the children as a result of the counseling sessions

22   she's in.

23   A.  Yes, she says that.

24   Q.  And what she's learning -- which I am sure you would have

25   been interested to know, Ms. Pesquiera -- is that the children

1   are disclosing that they had been slammed up against the wall

2   and thrown down stairs, do you see that?

3   A.  I see that, yes.

4   Q.  When you decided to close your investigation against Angela

5   Gray as being the most likely suspect who could have inflicted

6   these injuries on Rachel, would you have liked to have had this

7   type of information that the children are disclosing here and

8   that Becky disclosed in the earlier statement about being

9   struck in the stomach?

10  A.  Yes, that would have been a good thing to have.

11  Q.  And if you had or your subordinates actually had engaged in

12  carefully targeted forensic interviewing of these children, you

13  might have actually learned that before you closed your

14  investigation against Ms. Angela Gray, correct?

15  A.  I would agree that counseling sessions may get something

16  like that, but forensic interviews don't always.

17  Q.  So therefore you don't ever bother to do them because they

18  don't always get you information so you don't do them?  I'm not

19  sure, is that what you mean to say?

20  A.  No, sir, that's not what I am saying.

21  Q.  You do them -- when a lead takes you to the necessity of

22  doing a forensic interview, you make sure it's done in the most

23  appropriate setting that you can devise, correct?

24  A.  I would agree with that, yes.

25  Q.  You don't just not try because at the end of the interview

1   you may not get information.

2   A.  If we had that information, yes.

3   Q.  And then going on, looking at Exhibit 32.  Just stay -- if

4   you could keep that inflated there.  Let's go from Line 12 to

5   Line 24.

6       The questions went on to ask whether those things, the

7   slamming in the walls and the throwing down stairs, whether

8   those things were done recently, and Ms. Marini says they were

9   done all the time off and on.  That's another bit of

10  information you didn't have, correct?

11  A.  Yes.

12  Q.  Now, the next thing that Ms. Marini is asked is whether,

13  from what the children have said, was Barry Jones abusive to

14  them?  Do you see that at Lines 15 through 17?

15  A.  I see that, yes.

16  Q.  And now Ms. Marini has had these kids for about six months,

17  they've been told that Mr. Jones has killed their sister, and

18  yet in October of 1994, the children are still reporting that

19  Mr. Jones never abused them, correct?

20  A.  I see that they ask is he abusive to them and she says no.

21  Q.  Rachel had some blood in her ear canal that was seen at the

22  time of the autopsy, correct?

23  A.  I believe so, yes.

24  Q.  Did you have information near the beginning of your

25  investigation in this case that Angela was observed striking

1   Rachel on the head?

2   A.  I don't recall having that information.

3   Q.  Could we see Exhibit 66, please?  This is Pages 1 and 2, I

4   think.  I'm looking for the Terry Richmond interview.

5          MR. SANDMAN:  Obviously we're facing another technical

6   difficulty that I have created.

7          THE COURT:  This might be a good time to take a break.

8   We're going to take a 10-minute break.  Thank you.

9      (A recess was taken from 4:24 p.m.  to 4:45 p.m.)

10         THE COURT:  Mr. Sandman, did you get the technical

11  difficulties worked out?

12         MR. SANDMAN:  Yes.  Once again it was my fault.

13         THE COURT:  Okay.  That's the story of my life.  Go

14  ahead.  I have the same problems.

15  BY MR. SANDMAN:

16  Q.  We're going to look at Exhibit 66, the May 3rd, 1994

17  interview.  Page 57.  While we're waiting for that to come up,

18  before we broke I had asked you if you had any information from

19  any sources that Rachel had been struck in the head by her

20  mother.  Remember we were talking about she had blood on her

21  ear.  Did you remember anybody reporting that, did you?  That

22  she had been struck in the head?

23  A.  That I recall off the top of my head, no.

24  Q.  When you would get interviews from other people working on

25  the investigation, would you review their reports as lead

1    detective?

2    A.  Yes.

3    Q.  Well, we're looking now at a telephone interview received

4    on May 3rd, 1994, from a Terry Richmond.  This was an interview

5    conducted by Detective Clark.  Do you see that?

6    A.  Correct.  I see it.

7    Q.  If we could blow up the bottom third of the page.

8        Do you see there that Mr. Richmond is reporting that Angela

9    does the hitting on the kids and he's never seen Barry hit the

10   kids?

11   A.  I see that, yes.

12   Q.  On the next page, around the third question down, Detective

13   Clark asks if he thinks that Angela's hitting was in excess.

14   Do you see that?  And that would be an appropriate question for

15   Detective Clark to ask, right, whether the hitting of the

16   children was excessive?

17   A.  That would be appropriate, yes.

18   Q.  And Mr. Richmond says that sometimes it was excessive.

19   A.  He says "sometimes."

20   Q.  And do you remember who Terry Richmond was in this case?

21   A.  Yes.

22   Q.  Who was he?

23   A.  He was the son to Joyce Richmond.  And he had come later on

24   to -- later the night of Sunday night, on the 1st, he had

25   visited the trailer.

1    Q.  And then the interview goes on, the next question and

2    answer.  He says:  I've seen her smack her in the face before.

3    You know what I mean?

4        Do you know who he's talking about there?

5    A.  I'm assuming that he's referring to Angela, but I don't

6    know that by looking at just this part of it.

7    Q.  Let's go back to Page 1.  We better start over.  Let's

8    start at the bottom third of the page.

9        Ms. Pesquiera, do you see there this conversation begins

10   with a discussion of Angela, whether Angela strikes her

11   children?

12   A.  He says:  Yeah, a couple times spanked them on the --

13   spanked them on the butt.

14   Q.  Can you point to any discussion there about Mr. Jones

15   striking Angela?

16   A.  Mr. Jones striking Angela?

17   Q.  Well, Ms. Pesquiera, you testified --

18   A.  I don't see it in here, no.

19   Q.  It's not in there, is it?

20   A.  I don't see that.

21   Q.  Then when we go onto the next page and the discussion

22   continues at the top of the third page there, continuing to

23   discuss Angela's treatment of the children, correct?

24   A.  Yes, he says:  Sometimes I've seen her smack her in the

25   face before for -- and then he continues.

CROSS-EXAMINATION - PESQUIERA

1   Q.  So Mr. Richmond says, "I've seen her smack her," correct?

2   A.  Correct.

3   Q.  And so we're obviously not talking about Mr. Jones, who is

4   a him, striking anybody, correct?

5   A.  Yes, sir.

6   Q.  And when Mr. Richmond reports, "I've seen her smack her,"

7   who is he talking about?

8   A.  Apparently, Angela.

9   Q.  And who is she striking, do we know?

10  A.  I don't know that.

11  Q.  Would you want to follow up on that if you got this report

12  and reviewed it?

13  A.  Yes.

14  Q.  Let's take a look at Exhibit 1 at 1414.

15      Now, we were looking at Detective Clark's interview of

16  Mr. Richmond on May 3rd, and now we're looking at your

17  follow-up interview on May 17, correct?  Where you're

18  interviewing Mr. Richmond?

19  A.  Correct.

20  Q.  I don't want to take the time to go through this 12-page

21  document, but the document itself, which runs from Page 1414 to

22  Page 1426, should tell us whether you ever followed up with

23  Mr. Richmond about his report that Angela had excessively

24  physically spanked the children and smacked someone, some her,

25  in the face.  This interview on the 17th should tell us whether

1    you followed up on any of those matters, correct?

2    A.  It should, yes.

3    Q.  And if you never asked him a question about that, you would

4    expect it would not be in the interview, correct?

5    A.  If I had asked him, it would be in the interview.

6    Q.  And if you had not asked him, it would not be.

7    A.  If I had not asked him then it wouldn't be there.

8    Q.  Was Rachel at risk from other children in the trailer park?

9    A.  I don't know that.

10   Q.  I'd like to have you look at Exhibit 1 at Page 536.  I'm

11   sorry.  Page 518.

12       Do you recognize the photograph?  This is actually in

13   evidence at 65A, at Page 38.

14   A.  Do I recognize the photograph?

15   Q.  Yes.

16   A.  I do.

17   Q.  This is a photograph of the exterior of Mr. Jones' trailer?

18   A.  Correct.

19   Q.  And there's a clothesline there, do you see that?

20   A.  There's two.

21   Q.  And Angela reported to you that Becky had strung up Rachel

22   on the clothesline?

23   A.  Had put her up on the clothesline.

24   Q.  Which one?

25   A.  I don't know if she "strung" her up.  I don't know which

1    one.

2    Q.  And did you ever investigate, through interviews of the

3    children, how often that happened?

4    A.  I don't recall that.

5    Q.  And do you know how many times Rachel may have fallen off

6    that clothesline?

7    A.  I don't remember, no.

8    Q.  Now, Angela told you that she knew of one time that Rachel

9    had fallen off, correct?

10   A.  I believe so, yes.

11   Q.  And you never followed up through interviews of the

12   children to see if other similar -- if that happened more than

13   once or other similar actions like that would have happened,

14   correct?

15   A.  I don't recall asking, no.

16   Q.  And you agree that putting a four-year-old up on a

17   clothesline, as it's depicted in the photo that we're looking

18   at, would place Rachel at risk of harm, perhaps serious harm?

19   A.  A possibility of harm, yes.

20   Q.  I want to show you Exhibit 66, at 5154.

21       While we're looking for that, do you remember Julian Duran

22   and Dawn Kopp?  Do you remember interviewing them and being

23   informed by them that they were at Stephanie Fleming's on the

24   night -- late afternoon, after 5:00 o'clock, when Rachel got

25   sick there?

1    A.  Yes, I do.

2    Q.  And do you remember that during that interview Ms. Kopp,

3    Dawn Kopp, K-o-p-p, that she told you that one of Stephanie's

4    children, Patrick, told Stephanie that Ryan hit Rachel in the

5    stomach, and that after being hit that Rachel ran into the

6    bathroom at the Flemings' and tried to throw up?

7    A.  I don't recall that.

8    Q.  Can we see 5161?

9        If you could blow up the bottom third of the page.

10            THE COURT:  This is Exhibit 1?

11            MR. SANDMAN:  Actually, this is in Exhibit 66.

12            THE COURT:  And it's admitted?

13            MR. SANDMAN:  It's admitted.  It's actually a

14   compilation of sheriff's department interviews and reports

15   that's in evidence.

16            THE COURT:  So it's Exhibit 66, and what page?

17            MR. SANDMAN:  The interview starts at Page 5154, and

18   we're now looking at page 5161.

19            THE COURT:  This is this witness' interview?

20            MR. SANDMAN:  An interview of Dawn Kopp and Julian

21   Duran.

22   BY MR. SANDMAN:

23   Q.  I think, Ms. Pesquiera, you've testified they were at

24   Stephanie Fleming's trailer when Rachel got sick there late on

25   Sunday afternoon, after 5:00 o'clock Sunday afternoon, correct?

CROSS-EXAMINATION - PESQUIERA                                    120

1    A.  Correct.

2    Q.  And at Page 5161, A1, by the way, in this interview is

3    Ms. Kopp, correct?  That's what the front page of the interview

4    shows?

5    A.  It says Julian Duran at the top.

6             MR. SANDMAN:  Your Honor, may I approach?

7             THE COURT:  You may.

8    BY MR. SANDMAN:

9    Q.  Do you see that the first page of your interview that --

10            THE COURT:  You need to make sure you are near a mic.

11   BY MR. SANDMAN:

12   Q.  Do you the first page of the interview --

13   A.  Yes, I see.

14   Q.  You're interviewing them both together, correct?

15   A.  It says, A, Julian Duran, and A1 is Dawn Kopp.  Correct.

16   Q.  So A1 is Ms. Kopp.

17       Now I want to go back to Page 5161.  Do you see there that

18   Ms. Kopp is telling you -- you're the one who did this

19   interview, right?

20   A.  Correct.

21   Q.  She says Stephanie's got a kid, Patrick, the one that

22   supposedly has told Stephanie that Ryan hit Rachel on the

23   stomach, and that's when she went into the bathroom and tried

24   to throw up.  Do you see that?

25   A.  I see that.


UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA

1    Q.  And did you or any of your cohorts ever attempt to

2    interview Patrick Thorne about that incident?

3    A.  Not that I recall.

4    Q.  And do you know an officer by the name of Susie Dupnik?

5    A.  I know who Susie Dupnik is.

6    Q.  Who is Susie Dupnik?

7    A.  Susie Dupnik was married to the sheriff, Clarence Dupnik.

8    Q.  Was she a sheriff's department officer?

9    A.  At one time many, many years ago.

10   Q.  Did she also work for the County Attorney's Office doing

11   criminal investigations for them?

12   A.  I believe she did for a short period.

13   Q.  Okay.  And do you know if she ever interviewed Patrick

14   Thorne about -- that touched on the subject of whether his

15   younger brother Ryan had hit him with a stick and caused

16   damage, a damaging mark on his chest?

17   A.  I don't know that.

18            MR. SANDMAN:  Do we have another copy of Exhibit 83?

19            THE COURT:  So you might want to start thinking about

20   what would be an appropriate place to wrap up for the evening.

21   And while we're on the topic, how much longer do you both think

22   you're going to need with this witness?

23            MR. SANDMAN:  Your Honor, I wanted to offer into

24   evidence -- well, let me answer your question.  I only have a

25   few more questions, but I need to try to offer an exhibit as

1    part of those questions.

2          THE COURT:  That's fine.

3          MR. BRACCIO:  Your Honor, I have probably five to ten

4    minutes.

5          THE COURT:  Well, I may have some questions.  So we're

6    not going to finish tonight.

7          MR. BRACCIO:  Sure.

8          THE COURT:  So what do you think, do you think two

9    hours tomorrow is enough?

10         MR. SANDMAN:  I think I am almost done.  So I think

11   the answer would be yes, if you have questions and Mr. Braccio

12   has a few.  I'm happy to stop now and then deal with this

13   exhibit, which they have objected to, deal with that in the

14   morning.

15         THE COURT:  So why don't you highlight for me what

16   exhibit we're talking about and I can take a look at that this

17   evening.  Unless, Mr. Braccio, you're withdrawing your

18   objection.

19         MR. BRACCIO:  No, I'm not withdrawing my objection.  I

20   don't know where this document comes from, this is purported to

21   come from another case file --

22         THE COURT:  I have no idea what it is, what is it?

23         MR. SANDMAN:  Exhibit 83 is a January 13, 1995

24   interview by Susie Dupnik of Patrick Thorne, the older brother,

25   who Ms. Kopp said had witnessed Ryan striking Rachel with a

1  stick.  And in the course of this interview, Patrick reveals a

2  mark on his abdomen or chest.

3       THE COURT:  I'm sorry.  This is another child who says

4  that somebody else hit him?

5       MR. SANDMAN:  The same person that was seen striking

6  Rachel on May 1st, this individual says that that same

7  individual struck him, and he shows a mark.

8       THE COURT:  When was this interview?

9       MR. SANDMAN:  It was done in January of 1995.  We

10  don't know obviously what the mark looks like because nobody

11  followed up on --

12       THE COURT:  Who conducted the interview?

13       MR. SANDMAN:  Susie Dupnik.  Who I think was working

14  for the County Attorney's Office.  We actually obtained this

15  document from the Pima County Attorney's Office file.

16       THE COURT:  Was it an investigation related to this

17  case or a separate investigation?

18       MR. SANDMAN:  Well, the document was contained in the

19  Barry Jones file with the Pima County Attorney's Office.  It

20  was never disclosed, as far as I can tell, to Mr. Bruner.  We

21  sort of found it there.

22       THE COURT:  So it was in the prosecutor's file?

23       MR. SANDMAN:  In Barry Jones' case.

24       THE COURT:  So, Mr. Braccio, Mr. Sandman says it was

25  in the case file of the prosecutor.

1          MR. BRACCIO:  I still maintain our objections to the

2     foundation and relevance of this document.  I don't know where

3     they found this document.  I don't know in what context these

4     statements were made.  I don't know what they were

5     investigating --

6          THE COURT:  Let me stop you there.

7          MR. BRACCIO:  Sure.

8          THE COURT:  Do you dispute Mr. Sandman's assertion

9     that they were found in the prosecutor's files in the Barry

10    Jones case?

11         MR. BRACCIO:  Your Honor, I don't have the information

12    to be able to respond to that.  I don't know.  I understood at

13    the beginning of this case they had noticed their investigator

14    and their paralegal as a witness in this case, I think we could

15    have gotten to the bottom of those statements at that time

16    through those witnesses.  But here, attempting to introduce

17    this document through a witness who has no idea where those

18    statements come from or what they are.

19         THE COURT:  So do you have a witness that can indicate

20    where this was found?

21         MR. SANDMAN:  Yes, sir.

22         THE COURT:  Well, then you can --

23         MR. SANDMAN:  Maybe we could --

24         THE COURT:  -- on that way.

25         MR. SANDMAN:  We could do that first thing in the

1    morning and then I could try to get the exhibit --

2             THE COURT:  Fine.  9:00 o'clock.  How does that sound?

3             MR. SANDMAN:  Okay.

4             THE COURT:  Because, I mean, the more we talk, the

5    longer this sounds like it's going to take.  So we will begin

6    at 9:00 o'clock.  So you'll put on your witnesses to lay a

7    foundation for whatever this document is?

8             MR. SANDMAN:  Yes.

9             THE COURT:  Fair enough.  You'll have an opportunity,

10   Mr. Braccio, to cross-examine.

11            MR. BRACCIO:  Can I interview the witness before they

12   take the stand?

13            THE COURT:  Do you know who this person is?

14            MR. SANDMAN:  I believe it would be either Mr. Sowards

15   or Ms. Schneider, but I think we could certainly do that

16   informally for a few minutes tomorrow morning.  I wouldn't have

17   a problem --

18            THE COURT:  I can't imagine there's that many

19   questions.  You just want an opportunity to know what they're

20   going to say?

21            MR. BRACCIO:  I need to know what where the document

22   came from, in what context the statements were made.  I don't

23   have any of that information.

24            THE COURT:  Well, neither do I.  So you are willing to

25   make them available?

UNITED STATES DISTRICT COURT

1          MR. SANDMAN:  Yes.  I think what they would say is

2     they found the document in the Jones file at the Pima County

3     Attorney's Office.  That's probably all they know about it.

4          THE COURT:  It may be, but it may forestall the

5     objection if that's what they're going to say.

6          So let's do this, I still think if we -- if you all

7     were to meet here at, say, 9:00, do you want -- are you

8     planning to do this this evening or do you want to do this in

9     the morning with whoever the witnesses are?

10          MR. SANDMAN:  I think we can do it right now, as soon

11     as we recess.  It's not that much information.

12          THE COURT:  We'll start at 9:00 o'clock tomorrow

13     morning.

14          Okay.  Ma'am, we're going to have to bring you back

15     tomorrow.

16          THE WITNESS:  Yes, I'll be here.

17          THE COURT:  We will resume at 9:00 o'clock tomorrow

18     morning.  If you two can get together and have your witnesses

19     explain where they found this to Mr. Braccio, and we'll pick it

20     up.  Then you can put them on the stand first thing in the

21     morning.  Because we've got this outstanding objection to the

22     use of this exhibit with this witness.  Okay?

23          MR. SANDMAN:  Yes, sir.

24          THE COURT:  Good enough?

25          MR. BRACCIO:  Good enough.

1          THE COURT:  Okay.

2          Anything else we need to discuss this evening?

3          MR. SANDMAN:  No, Your Honor.

4          THE COURT:  Thank you.  We will resume tomorrow.

5          And then just by way of planning, at 1:00 o'clock we

6     have Dr. Howard, or does Dr. Howard land at 1:00 o'clock?

7          MR. BRACCIO:  No, Dr. Howard lands at noon.  I will be

8     picking him up, we will come straight here, we can start his

9     testimony at 1:00 o'clock.

10          THE COURT:  So if for some reason things don't go as

11    planned, which sometimes happens, when you say you're going to

12    be absent to go pick up Dr. Howard, is somebody else going to

13    be here to continue to -- because what I don't want to do is

14    take a break from working with Detective Pesquiera tomorrow so

15    that you can go pick up Dr. Howard; right?

16          MR. BRACCIO:  Sure.

17          THE COURT:  So we're powering through tomorrow, and it

18    may have to be somebody else is picking up Dr. Howard, is all I

19    am suggesting.

20          MR. BRACCIO:  We'll work that out.

21          THE COURT:  So we will pick up tomorrow with whoever

22    the witnesses are, they are going to lay the foundation for

23    Exhibit 83, I think is the number you mentioned, right?

24          MR. SANDMAN:  Yes, sir.

25          THE COURT:  If there's nothing else, we'll be in

UNITED STATES DISTRICT COURT

1    recess.  Thank you, very much.  Have a good evening.

2                    (Off the record at 5:08 p.m.)

3

4                    C E R T I F I C A T E

5

6         I, A. TRACY JAMIESON, do hereby certify that I am

7    duly appointed and qualified to act as an Official Court

8    Reporter for the United States District Court for the District

9    of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true and accurate transcript of the proceedings

12   contained herein, held in the above-entitled cause on the date

13   specified therein, and that said transcript was prepared by me.

14        Signed in Tucson, Arizona, on the 1st day of

15   December, 2017.

16

17

18

                              s/A. Tracy Jamieson
19                            A. Tracy Jamieson, RDR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT