1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3     Barry Lee Jones,            )  4:01-cv-00592-TMB
                                  )
4               Petitioner,       )
                                  )
5     vs.                         )
                                  )  Tucson, Arizona
6     Charles L. Ryan, et al.,    )  November 7, 2017
                                  )
7               Respondents.      )
      _____)

8

9

10      BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE

11

12                      Transcript of Proceedings
                        Evidentiary Hearing - Day 7
13

14

15

16

17    Proceedings reported and transcript prepared by:

18        A. Tracy Jamieson, RDR, CRR
          Federal Official Court Reporter
19        Evo A. DeConcini U.S. Courthouse
          405 West Congress, Suite 1500
20        Tucson, Arizona 85701
          (520)205-4266
21

22

23
      Proceedings reported by steno machine shorthand;
24    transcript prepared using court reporting software.

25

```
 1                          APPEARANCES

 2    For the Petitioner:

 3        U. S. Federal Public Defender
          Cary Sandman, AFPD
 4        407 West Congress Street, Suite 501
          Tucson, AZ 85701
 5        (520) 879-7540

 6        U. S. Federal Public Defender
          Karen S. Smith, AFPD
 7        850 West Adams Street, Suite 201
          Phoenix, AZ  85007
 8        (602) 382-2706

 9

10    For the Respondents:

11        Arizona Office of the Attorney General
          Myles Braccio, AAG
12        1275 West Washington Street
          Phoenix, AZ 85007
13        (602) 542-4686

14        Arizona Office of the Attorney General
          Lacey Gard, AAG
15        400 West Congress Street, Suite S315
          Tucson, AZ  85701
16        (520) 628-6520

17
      Also Present:
18
              Barry Jones, Petitioner
19            Jim D. Nielsen, AZAG
              Jennifer Schneider, Paralegal with FPD
20            Daniel Vidal, Paralegal with AZAG
              Andrew Sowards, Investigator with FPD
21

22

23

24

25
```

```
1                      INDEX OF EXAMINATIONS

2

3    WITNESSES:                                          PAGE

4

5    SONIA PESQUIERA

6        Cross-Examination (Resumed) By Mr. Sandman............    13

7        Redirect Examination By Mr. Braccio..................    33

8        Examination By the Court............................    45

9        Examination By the Court............................    56

10       Further Examination By Mr. Braccio..................    57

11       Examination By the Court............................    58

12       Further Examination By Mr. Sandman..................    59

13       Examination By the Court............................    59

14

15   JOHN D. HOWARD, M.D.

16

17       Direct Examination By Mr. Braccio...................    63

18       Cross-Examination By Mr. Sandman...................    90

19       Redirect Examination By Mr. Braccio.................   117

20       Examination By the Court...........................   118

21       Further Examination By Mr. Braccio.................   129

22       Further Examination By Mr. Sandman.................   132

23

24

25
```

UNITED STATES DISTRICT COURT

```
1                   P R O C E E D I N G S

2                (On the record at 9:16 a.m.)

3           THE COURT:  Good morning.  How are you?

4           PARTIES SIMULTANEOUSLY:  Good.  Thank you.

5           THE COURT:  So when we last met we were discussing

6   Exhibit 83.

7           MS. SMITH:  Good morning, Your Honor.

8       The State has informed us that they are going to waive

9   their foundational objection and that they don't need us to

10  call a witness, but they'd like me to make a record of how we

11  obtained this exhibit for the record.

12          THE COURT:  Go ahead.

13          MS. SMITH:  Okay.  In July 2009, our office requested

14  an opportunity to review the Pima County Attorney's case files

15  for Mr. Jones' case, pursuant to their open file policy.

16  Sometime later that year, our paralegal, Ms. Schneider, and our

17  investigator, Mr. Sowards, went to the Pima County Attorney's

18  Office and were let into a room with six or eight boxes that

19  they were told was Mr. Jones' case file.

20              The first box that they opened contained several audio

21  cassette tapes.  One of the tapes near the top of the box was

22  labeled "Thorne."  Mr. Sowards noticed the last name "Thorne"

23  because it was the same name as Stephanie Fleming's children,

24  who had come up in the investigation of Ms. Gray's death.

25              Mr. Sowards requested that they play the tape while
```

1    everyone was present, which they did.  As they listened to the

2    tape, they heard Susie Dupnik was interviewing Patrick Thorne,

3    one of the children.  Patrick reported that his brother had

4    previously taken a stick and sliced him, and that this happened

5    when they had lived somewhere else.

6         Mr. Sowards and Ms. Schneider determined that this

7    tape was potentially relevant to Mr. Jones' case and requested

8    a copy of it.  The interview was conducted in January of 1995,

9    about seven months after Rachel's death and about three months

10   before Mr. Jones' trial.

11        Once we received a copy of the tape, an assistant

12   paralegal from our office transcribed it.  And we still don't

13   know exactly how the tape ended up in Mr. Jones' case file, but

14   we assume that someone from the Pima County Attorney's Office

15   determined it was relevant to Mr. Jones' case.

16        THE COURT:  So I thought Mr. Sandman mentioned

17   yesterday that it was not provided in discovery at trial?

18        MS. SMITH:  That's true.

19        THE COURT:  And it wasn't provided to post conviction

20   relief counsel?

21        MS. SMITH:  We don't believe so.

22        THE COURT:  Did you make any effort to confirm whether

23   or not -- and I can't remember the gentleman's name now, it was

24   a judge.

25        MS. SMITH:  The file that we received from Mr. Hazel

1   did not contain the tapes.

2          THE COURT:  Do you know, did the State have a

3   discovery log that indicated what they had provided to

4   Mr. Jones?

5          MS. SMITH:  Sorry, we need the whole team to confer.

6          MR. SANDMAN:  Yeah, there is a record of what was

7   disclosed.  Every paper document has a disclosure date on it

8   stamped by the County Attorney's Office, and --

9          THE COURT:  What about non-paper documents?

10         MR. SANDMAN:  -- then tapes.  They also have a record,

11  some type of record on there.

12         THE COURT:  So did you make an effort to confirm

13  whether the -- I mean, I know what you said yesterday and

14  today, which is that the first -- the first time you all were

15  aware of this interview was when you found this in the box.

16         MR. SANDMAN:  There are declarations in the exhibits

17  lodged with the Court in the form of declarations from

18  Ms. Bowman and Mr. Bruner.  I don't have those numbers handy.

19  We didn't offer them in evidence, but they both did sign

20  declarations saying that they were never provided with this

21  information, this interview.

22         MS. SMITH:  They are in evidence.

23         MR. SANDMAN:  Excuse me.  I misspoke again.

24         They are in evidence as Exhibits 5 and 6.  Five and

25  eight, Your Honor.

1          THE COURT:  I just want to make sure the record is

2    complete here.  So there is no objection to 83 being admitted,

3    pending the background information you've provided, is that

4    correct?

5          MR. BRACCIO:  That's correct, Your Honor.  We are

6    preserving objections to the relevance and the speculation of

7    this --

8          MR. SANDMAN:  I'm sorry.  The declarations from

9    Ms. Bowman and Mr. Bruner about this subject are in exhibits,

10   in evidence, six and number ten.

11         THE COURT:  So the declarations that discuss the

12   finding of this, and then in those declarations did they

13   discuss whether they checked the disclosure logs to see if the

14   evidence had been previously disclosed?

15         MR. SANDMAN:  I don't believe so.

16         THE COURT:  So that there is disclosure -- hold on.

17         I'm sorry.  Go ahead.

18         MR. SANDMAN:  I think that's --

19         THE COURT:  So there is a discovery log and -- I just

20   want to make sure I understand what you're saying.  Because

21   what you're saying is you have an affidavit from a couple of

22   people from your office who say we found this and it was never

23   provided to trial counsel, and I am trying to get to the

24   understanding about how you can say it was never provided to

25   trial counsel.

1          It's because usually, you know, there is a way of

2     tracking what's disclosed.  So how do you get to the assertion

3     that it was never provided to trial counsel?

4          MR. SANDMAN:  Both trial counsel have said they

5     haven't received it, so they've signed declarations.  But all

6     of the disclosure that we have from the County Attorney's

7     Office is marked and stamped with a date and we don't have any

8     evidence of this particular interview.

9          And also when the county attorney would disclose

10    interviews that they did, they would provide us with the

11    paper -- not us, but provide trial counsel with a paper

12    record --

13         THE COURT:  They'd say, here you go, here's X, Y, and

14    Z, and these tapes, right?

15         MR. SANDMAN:  There was always a cover sheet with the

16    disclosure, and sometimes they would describe what was attached

17    and sometimes they wouldn't.

18         THE COURT:  So trial counsel in this case have both

19    said they never received this.

20         MR. SANDMAN:  Correct.

21         THE COURT:  And the first time they were aware of it

22    was when somebody from your office found it.

23         MR. SANDMAN:  And of course I can't speak for them,

24    but, you know, whether this Ryan had used a stick or a pipe to

25    harm Rachel was a big issue; at least, you know, in the

UNITED STATES DISTRICT COURT

1    pretrial setting.  And Brandie Jones testified about that at

2    the trial, and I am sure they would have liked to have had some

3    corroboration that that child actually used that sort of

4    implement to harm others.

5         THE COURT:  Can you tell me again, was it 2009 that

6    this was first discovered?

7         MS. SMITH:  Yes, Your Honor.

8         THE COURT:  And in your deposition of post conviction

9    relief counsel, Judge --

10         MR. SANDMAN:  Hazel.

11         THE COURT:  -- Hazel, did you ask him about this?

12         MR. SANDMAN:  I did not.

13         THE COURT:  Can I ask why you wouldn't ask him about

14    this?  I mean, this seems like it would be a relevant issue.

15         Let me ask this:  Were you aware of this at the time

16    you deposed him?

17         MR. SANDMAN:  Yeah, I became aware of this several

18    years ago and debated about whether we should try to amend the

19    habeas petition to add a *Brady* claim.  I think I was focusing

20    on it more in that context as a *Brady* issue, and I concluded

21    that there were some procedural default problems associated

22    with that, it's not covered by the *Martinez* case because

23    *Martinez* doesn't extend to Brady.  So I thought that there

24    would -- the only way I could actually bring a *Brady* claim

25    would be under *Schlup*, under the innocence gateway, and just

1   decided that -- not to bring it.  So I think I wasn't focused

2   on it in terms of a Constitutional claim.

3           When we got ready for the -- we were getting ready for

4   the hearing, we thought that it would have some bearing on the

5   quality of the police investigation because we didn't think

6   that there was appropriate followup with respect to the

7   evidence that the detectives had.

8           THE COURT:  Okay.  I understand your position.

9           Anything else?

10          I'm going to hear from respondents now because I am

11  sure they want to say something.  Was there anything else you

12  wanted to add before --

13          MS. SMITH:  I was going to clarify that we would like

14  to move to admit both Exhibit 83, which is the transcript, and

15  84, which is the recordings themselves.

16          THE COURT:  Okay.

17      Mr. Braccio?

18          MR. BRACCIO:  Yes, Your Honor.  I think you asked the

19  exact right question in this case, which is do we have any

20  evidence that this was or was not disclosed at trial.  And I

21  think the answer to that question is, no, we don't know.

22          THE COURT:  Hold on.  Let me pause you there.

23          MR. BRACCIO:  Sure.

24          THE COURT:  I thought I heard counsel for petitioner,

25  and maybe I misunderstood, tell me that there are affidavits

1   from trial counsel saying that they did not receive that.  That

2   would be evidence.

3          MR. BRACCIO:  Okay.  And I agree with that, although

4   no one did an investigation to determine whether this was or

5   was not disclosed.  We don't have the disclosure sheets showing

6   one way or the other that it was or was not disclosed.

7          There was an officer who interviewed these children,

8   she could have been called to determine when she provided this

9   document and to whom.  We could have done a lot more

10  investigation to determine when this particular file --

11         THE COURT:  When did this come to your attention?

12         MR. BRACCIO:  They withdrew their investigator and

13  their paralegal to establish the only foundation for this tape

14  and this transcript, so there was no other way for them to get

15  it into evidence.

16         THE COURT:  No, no.  I'm sorry.  My question is

17  different than your answer.

18         MR. BRACCIO:  Okay.

19         THE COURT:  My question is when did the issue of this

20  tape come to the state's attention.

21         MR. BRACCIO:  Your Honor, I believe they may have

22  filed this in a pleading in the Ninth Circuit, so at least

23  maybe going back a couple of years.

24         THE COURT:  Well, let me try again.

25         MR. BRACCIO:  Sure.

1          THE COURT:  Because it seems to me that if I

2     understood what they said -- and maybe you just have a

3     disagreement with what they're saying -- is that they ask to

4     see the evidence, they show up wherever you all store your

5     evidence, they open the box, and there it is.

6          Are you saying that they didn't at that time have

7     discussions with whoever the custodian was, there wasn't issues

8     raised at that point, that it was never brought to your

9     attention until it was mentioned in a Ninth Circuit filing?  Is

10    that what you're saying?

11         MS. GARD:  Judge, if I may, may I speak as well?

12         THE COURT:  Go ahead.

13         MS. GARD:  I'm sorry.  It was a different agency.  So

14    that file is maintained by the Pima County Attorney, so we

15    don't know what conversations they would have had with the Pima

16    County Attorney's Office.

17         THE COURT:  That helps.  Okay.  I was thinking of it

18    all as one state actor.

19         So they go to Pima County and this issue arises.

20    Okay.  So did Pima County raise this with you and say, hey, we

21    have a problem?

22         MS. GARD:  No, not that I recall, Judge.

23         THE COURT:  Well, it's kind of the way life works

24    sometimes, isn't it?

25         So the bottom line is this:  You're not objecting to

1    the -- now that we've sort of fleshed out the background here,

2    you are not objecting to 83 and 84, is that correct?

3            MS. GARD:  No, Judge, we still do have a relevance

4    objection to 83 and 84.

5            THE COURT:  And I am overruling it on that ground.

6            MS. GARD:  Okay.

7            THE COURT:  So any other objection?

8            MS. GARD:  No, Judge.

9            THE COURT:  I think we are prepared to go forward

10   then.

11           MR. SANDMAN:  We'll have Ms. Pesquiera resume.

12           THE COURT:  Ma'am, if you could please resume the

13   stand.

14           So if I remember my facts from yesterday, it was the

15   wife of the former sheriff who authored the report that we've

16   all been talking about, is that correct?

17           MR. SANDMAN:  Yes, Your Honor.

18           THE COURT:  I think that's sort of where we ended

19   yesterday.

20           MR. SANDMAN:  Correct.

21           **SONIA PESQUIERA**, WITNESS, PREVIOUSLY SWORN

22                   CROSS-EXAMINATION (RESUMED)

23   BY MR. SANDMAN:

24   Q.  Good morning Ms. Pesquiera.

25   A.  Good morning.

1          THE COURT:  You're still under oath, ma'am.

2          THE WITNESS:  Yes, sir.

3   BY MR. SANDMAN:

4   Q.  I'd like to retread just a few steps with you.

5          Do you recall yesterday you testified that in Rebecca's

6   first statement to the sheriff's department, on May 2nd, she

7   reported that Rachel kept saying a boy pushed her out of the

8   van and hit her with a metal bar in the stomach, correct?

9   A.  That is correct.

10  Q.  And then we talked about the interview you had with Dawn

11  Kopp, where she told you sometime later, in May of 1994, that

12  Patrick, Stephanie's son Patrick, supposedly told Stephanie

13  that Ryan hit Rachel in the stomach and then Rachel went to the

14  bathroom and tried to throw up.  Do you remember that?  You

15  learned that in the interview from Ms. Kopp?

16  A.  I wasn't sure exactly as to which boy did which thing.  I

17  wasn't sure on the names.

18  Q.  Well, if the interview statement says she reported to you

19  that it was Patrick who was the informant, do you remember

20  that?

21  A.  I don't recall exactly what it said, no.

22  Q.  But if it says Patrick, then you're willing to live with

23  that, correct?

24  A.  Yes.

25  Q.  Then when you learned from Ms. Kopp that Patrick had

CROSS-EXAMINATION - PESQUIERA                              15

1    eyewitnessed his brother hitting Rachel in the stomach and that

2    Rachel responded by running to the bathroom to throw up, what

3    did you do to further investigate that disclosure from

4    Ms. Kopp?  Did you try to interview Patrick?

5    A.  I did not interview Patrick.

6    Q.  But you knew Patrick, at least according to Ms. Kopp, had

7    firsthand eyewitness information regarding Ryan hitting Rachel

8    in the stomach and then Rachel running to throw up, correct?

9    A.  I had information that that's what was going around the

10   trailer park, that one of the Fleming children had done

11   something like that, yes.

12   Q.  And then, for whatever reason, you elected not to pursue

13   any conversation with Patrick about that, correct?

14   A.  After speaking to Stephanie Fleming, she told me that her

15   children had not done anything like that, so....

16   Q.  Well, Stephanie Fleming in fact told you that she had not

17   discussed it with Patrick, correct?

18   A.  I don't recall that part.

19   Q.  Let's see what you learned from Ms. Fleming.  If we could

20   look at Exhibit 72 at Page 9.  Let's go to Page 8 first.

21       Do you remember we looked at this document yesterday?

22   A.  Yes.

23   Q.  And at Page 8, if we can blow up the first half.  You're

24   the questioner in this interview, correct?

25   A.  I believe so, yes.

CROSS-EXAMINATION - PESQUIERA                    16

1          THE WITNESS:  Your Honor, I forgot my glasses this

2    morning, so I am having trouble seeing a little bit.

3          THE COURT:  I'm sorry, you're missing your glasses?

4          THE WITNESS:  Yes, sir.  I'm sorry.  But I can see

5    what's blown up.

6          MR. SANDMAN:  Okay.

7    BY MR. SANDMAN:

8    Q.  And the first -- second question on the page we're looking

9    at, you say allegedly there was something said about one of

10   your sons allegedly striking her with a stick.  Do you see

11   that?

12   A.  And it says I was told by Pete and Don --

13   Q.  Do you see the statement that you asked her?

14   A.  By whom were you told this?

15   Q.  You asked Ms. Fleming if she had heard something about one

16   of her sons striking Rachel, correct?

17   A.  By whom, yes.

18   Q.  And then a couple lines down, Ms. Fleming says she was told

19   by Pete and Don that they had heard something about that.  Do

20   you see that?

21   A.  And that they heard a rumor from somebody else.

22   Q.  Is it true that -- you never bothered to follow up with

23   Pete and Don about this either, did you?

24   A.  I did not speak to Pete and Don.

25   Q.  And then further down on the page she tells you that the

UNITED STATES DISTRICT COURT

1   manager of the apartment complex, Judy Chavez, said that

2   somebody told her that her son Ryan, who she characterizes as

3   the meanest one, said that Ryan hit Rachel.

4   A.  Right, and then it talks about how Brandie had said it.

5   Q.  Then further down on the page, if we could blow up the last

6   quarter of the page.

7       Then Ms. Fleming further informs you during this interview

8   that -- she says:  Some -- one of the other kids said, no, it

9   was some something, a piece of metal.

10      Do you see that?  Not a wood stick, but a metal stick?

11  A.  I see that it was something, a piece of metal.

12  Q.  Okay.  Did you ever try to -- did you make any inquiry as

13  to who the other kids were that might have known something

14  about this?

15  A.  I did not check to see who one of the other kids, which one

16  she was referring to.

17  Q.  You didn't want to know any more about this other than

18  getting this interview out of the way with Ms. Fleming, is that

19  really what it was?

20  A.  I was continually told that there were rumors that were

21  being spread, which wasn't hard in that little trailer court.

22  Q.  You are frequently, when you were lead detective or sex

23  abuse investigator, or any of the other positions you held over

24  decades, you would often start with rumors as leads and you

25  would investigate those, would you not?

CROSS-EXAMINATION - PESQUIERA                           18

1   A.  Yes.  Some of those, yes.

2   Q.  Yeah.  And then you went on to ask Ms. Fleming if Ryan, the

3   younger one, had ever struck any of the other children before,

4   and she told you:  The bigger ones, the bigger children, he has

5   struck bigger children.

6       Do you see that?  That's the last four or five lines up

7   from the bottom.

8   A.  Yes, I see he -- the bigger ones he does.

9   Q.  Yeah.  And who were those children that Ryan had struck,

10  Ms. Pesquiera, according to your investigation?

11  A.  And then --

12  Q.  Ms. Pesquiera --

13  A.  I'm sorry?

14  Q.  Who were the children she was referring to here, the bigger

15  children that Ryan had struck?

16  A.  I don't know.

17  Q.  Did you investigate that?

18  A.  I don't recall.

19  Q.  The next page.

20      Now, we started the reference to this exhibit because you

21  testified that you believed that Ms. Fleming had already talked

22  to her son Patrick about whether he saw anything regarding Ryan

23  hitting Rachel with a stick.  Do you remember you testified to

24  that a few minutes ago, before we looked at this document?

25  A.  I agree, yes.


                    UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA

1   Q.  And if you look at Page 9, the second question on the page,

2   if we could blow that up.

3       You, in fact, asked Ms. Fleming if she had asked her oldest

4   son if he saw Ryan do that, and Ms. Fleming told you that she

5   had never asked her older son whether he saw Ryan do that.

6   Correct?

7   A.  It says:  I didn't talk to him about that.

8   Q.  Ms. Pesquiera, this informed you, did it not, that

9   Ms. Fleming had never talked to her son about what he saw and

10  whether he saw Ryan hit Rachel in the stomach, correct?

11  A.  That's what that says, yes.

12  Q.  And knowing that, that no one had apparently talked to

13  Patrick about whether he had witnessed something, you still

14  elected not to talk to Patrick.

15  A.  I did not speak to Patrick.

16  Q.  And you did look at the interview this morning that

17  Ms. Dupnik had conducted with Patrick where he said that his

18  brother had left a mark on his chest from a piece of stick

19  which sliced him, correct?

20  A.  Yes, sir, you showed me the transcript, but I told you I

21  couldn't see it very well, it was a little blurry.

22      But I agree that if that's what you're saying that it says,

23  I can't see it, but --

24  Q.  Okay.  In your review of records, did your attorney show

25  you a copy of an investigative report done by George Barnett

CROSS-EXAMINATION - PESQUIERA

1    for the defense?

2    A.  I don't recall.

3    Q.  I wanted to ask you about the folks that were interviewed

4    in the trailer park.  I think you mentioned yesterday that it's

5    fairly routine to canvass the immediate area of the vicinity of

6    the crime scene to see if there were any witnesses.  Do you

7    remember that?

8    A.  The canvassing is routine, yes.

9    Q.  Would you agree with me that the most obvious people to

10   obtain statements from would be the neighbors living on either

11   side of Mr. Jones in the trailer park?

12   A.  I would agree to that.

13   Q.  And can you explain why it is that -- let me strike that.

14       It would be particularly important to interview those

15   people because they might have seen something on Sunday,

16   correct?  May 1st.

17   A.  That would be a correct statement, yes.

18   Q.  And they might have actually seen Rachel outside on -- late

19   afternoon on Sunday, correct?

20   A.  I don't know that.

21   Q.  You wouldn't know that unless somebody interviewed them,

22   correct?

23   A.  That is correct.

24   Q.  And can you explain why it is that there is no record in

25   the sheriff's department file of any interviews with Susan

CROSS-EXAMINATION - PESQUIERA

1    Hopkins and Shirley DeVous, who lived on either side of

2    Mr. Jones?

3    A.  I can't.  I don't have anything.

4    Q.  And if Mr. Barnett reported in his investigative reports

5    that Rachel was seen outside from 3:00 to 4:00 p.m. and seemed

6    okay, is that something you would have followed up on --

7    A.  Yes, I pro- --

8    Q.  -- Ms. DeVous?

9    A.  I'm sorry?

10   Q.  If Mr. Barnett reported in his -- or communicated in his

11   report that Ms. DeVous, who lived next door to Mr. Jones, saw

12   Rachel outside late afternoon on Sunday and she appeared okay,

13   that's something you would have wanted to follow up on,

14   correct?

15   A.  If I had that information, yes.

16   Q.  And you would have had the information if you or someone in

17   your department had interviewed her directly, correct?

18   A.  That is correct.

19   Q.  Now, another reason why it would be important to interview

20   the neighbors is because they might have some information about

21   Angela's behavior, correct?

22   A.  I would concede to that, yes, that's a possibility.

23   Q.  And if the neighbors, Ms. Hopkins and Ms. DeVous, reported

24   that Angela was extremely hostile to the kids and threatened

25   them with physical harm and screamed at them all the time,

CROSS-EXAMINATION - PESQUIERA

1   you'd have wanted to follow up on that, too, correct?

2   A.  If that was a possibility, yes.

3   Q.  Now, there was a co-manager of the trailer park by the name

4   of Joe Chavez, do you remember him?

5   A.  I remember the name.

6   Q.  Can you explain why he was not interviewed as part of this

7   investigation, if there's no record of an interview of him?

8   A.  I don't know if that was not done.

9   Q.  If Mr. Chavez had information about Stephanie Fleming's son

10  harming Rachel, would you have wanted to follow up on that?

11  A.  If that was the information, yes.

12  Q.  And if he reported to Mr. Barnett that Stephanie Fleming

13  fled the trailer park and moved out without notice the morning

14  that Rachel died because she was afraid that either her son or

15  herself would be implicated in Rachel's death, would that be

16  something you'd be interested in following up on?

17  A.  I remember that being discussed, but Michael Fleming had

18  said that it was because his wife Stephanie Fleming was having

19  a fling with Julian Duran, and they were going to leave anyway.

20  Q.  They were going to leave anyway within moments after they

21  learned that Rachel died, without giving any notice?

22  A.  She said -- there was something to the effect of they were

23  paid up and they were going to move out anyway.  So I don't

24  know where that is coming from, that she was moving out or that

25  she did leave immediately.  I know she was having problems with

1   her husband.

2   Q.  Apparently Mr. Barnett reported that it came from Joe

3   Chavez, the manager of the trailer park.

4   A.  And Michael Fleming had said that it was because they were

5   having marital issues.

6   Q.  We talked some about Angela's abuse of her children

7   yesterday, do you remember that?

8   A.  Yes.

9   Q.  And do you remember when you interviewed Angela that she

10  told you that at one time she had seen a handprint on Rachel's

11  butt, for lack of a better term?

12  A.  I don't remember specifically about the handprint part, no.

13  Q.  If it's in Angela's interview, you wouldn't dispute that

14  then, correct?

15  A.  I wouldn't dispute it if I could see that.

16          THE COURT:  I'm sorry.  Before we proceed, he's

17  representing -- are you representing to her that it's in the

18  interview?

19          MR. SANDMAN:  Yes, Your Honor.

20          THE COURT:  Because she's saying she's not going to

21  dispute it unless she sees it.

22          MR. SANDMAN:  Do we know where that is?

23  BY MR. SANDMAN:

24  Q.  While we are looking for that, Ms. Pesquiera, let me just

25  turn briefly to another topic and we'll come back to that

1    handprint.

2        You testified yesterday that you had driven in the Choice

3    Market parking lot with your vehicle and noted that it had

4    potholes and so on?

5    A.  Back in 1994, yes.

6    Q.  You're not representing to the Court that you ever

7    conducted any kind of physical examination of Mr. Jones' van to

8    determine whether the Lopez children could have seen,

9    accurately seen, what they reported seeing.  You're not

10   representing that, are you?

11   A.  I am not representing that.

12   Q.  You didn't conduct any examination of the van, and if you

13   had, you would have documented that, correct?

14   A.  I myself did not, other detectives did.

15   Q.  Other detectives examined the contents of the van.

16   A.  Over all.  And the van itself over all.

17           THE COURT:  I think, ma'am, what he's asking you is

18   this:  Did anybody conduct an investigation as to whether the

19   children could actually see inside the van in that parking lot?

20           THE WITNESS:  No, sir, not that I recall.  It would

21   have necessitated taking the van to that parking lot itself,

22   no.

23           THE COURT:  So the answer is no.

24           THE WITNESS:  The answer is no.

25           THE COURT:  Thank you.


UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - PESQUIERA                                    25

1              MR. SANDMAN:  We'll come back to this handprint thing.

2    BY MR. SANDMAN:

3    Q.  Do you recall interviewing a woman by the name of Judy

4    Chavez on around 19 May 1994, who told that you that she didn't

5    think that -- that she thought Rachel was too little to be seen

6    in the van, as a passenger in the van?

7    A.  The first part, I don't recall interviewing Judy Chavez,

8    and I don't recall the second part.

9    Q.  Let's take a look at -- I think this is in Exhibit 66, the

10   sheriff's department reports, Page 5147.

11             MR. SANDMAN:  And this is in evidence, Your Honor, as

12   part of Exhibit 66.

13   BY MR. SANDMAN:

14   Q.  We're looking at your interview of Judy Chavez, May 19,

15   1994?

16   A.  That is correct.

17   Q.  And Ms. Chavez was the co-manager of the trailer park where

18   Mr. Jones lived?

19   A.  I believe so.

20   Q.  And then at page -- I think it's Page 5 of this interview,

21   Ms. Chavez related to you, at the top of the page there, if you

22   had ever seen the little girl with him, meaning Mr. Jones, and

23   she said no, no, if she did -- she was too little to see in the

24   seat.

25             Do you see that?

UNITED STATES DISTRICT COURT

1    A.  I see that.

2    Q.  And can we take a look at Exhibit 92 at Page 2.

3        Do you recognize what's depicted in this paragraph?

4    A.  I recognize the van, yes.

5    Q.  That was the van Mr. Jones was driving on Sunday, May 1st?

6    A.  That is correct.

7    Q.  And you see the passenger seat is -- can you see it's

8    affixed to the floor on a piece of plywood?

9    A.  Okay.

10   Q.  Do you see also that the passenger seat is set further back

11   in the van than the driver's seat?

12   A.  I see that.

13   Q.  And so the passenger's seat is not only some distance away

14   from the driver's seat, but it's pushed even further away from

15   the driver because it's further back into the van, correct?

16   A.  In this photograph, that is true.

17   Q.  And the seats are nailed down, are they not, Ms. Pesquiera?

18   A.  I don't know if you could -- if you could push it back,

19   that's what I am saying.  I don't know if that's the way it was

20   found, if it was done later?  Usually we take overall

21   photographs and then if they move something they have to take

22   photographs of that.  So I would have to see a succession of

23   photographs to show that that was done or not done.

24   Q.  Okay.  And Exhibit 92 are the sheriff's department's

25   photos, Ms. Pesquiera.  Weren't those taken within a day or so

CROSS-EXAMINATION - PESQUIERA

1    of Rachel's death?

2    A.  I believe so, yes.

3    Q.  If Mr. Jones was trying to reach over to strike Rachel in

4    that passenger seat, do you think even a four-year-old would

5    move toward the window to be even further away?  Or do you

6    think she would actually move closer to someone striking her?

7    A.  I can't speculate to what a little four-year-old baby would

8    do in that seat.

9    Q.  She might respond instinctively by moving toward the door

10   and the window.

11   A.  I don't know that.

12   Q.  And I think you've already said that neither you nor anyone

13   else with your department made any analysis as to whether it

14   would have been possible for Mr. Jones to reach all the way

15   over there from the driver's seat over to the door and the

16   passenger seat, correct?

17   A.  I know they took measurements of the van itself.

18   Q.  And you think the sheriff's department took measurements?

19   You think those are somewhere in the file from the sheriff's

20   department?

21   A.  I don't know.

22           THE COURT:  If they were taken, would they be in the

23   file?

24           THE WITNESS:  Yes, sir.

25   BY MR. SANDMAN:

CROSS-EXAMINATION - PESQUIERA

1   Q.  Now, if we could go back to your statement, or the

2   interview that you took from Angela about the handprint.

3       MR. SANDMAN:  You did not locate it.

4   BY MR. SANDMAN:

5   Q.  Ms. Pesquiera, if you had evidence that suggested that

6   there were sexually active children living in the trailer,

7   would you have investigated that?  Sexually active children

8   living in Mr. Jones' trailer, would you have investigated that?

9   A.  If?  If there were --

10  Q.  If you had any evidence that suggested that there might be

11  sexually active children living in the trailer, would you have

12  investigated that, in light of the fact that Rachel evidenced

13  an injury to her genitals?

14  A.  If I did and if I may have, I don't know.  I didn't know

15  that part of it.

16  Q.  That wasn't my question.  My question is if you had

17  evidence -- for example, a document, just by way of example --

18  that suggested that the children living in the home might have

19  been sexually active, would you have investigated that?

20  A.  I may have.

21  Q.  And could you tell us the reasons why you would not have?

22  A.  I don't know.

23  Q.  You can't think of any reason why you wouldn't have

24  investigated that, correct?

25  A.  If that had happened, yes, I don't --

CROSS-EXAMINATION - PESQUIERA

1   Q.   Okay.  Now, do you --

2          THE COURT:  I want to make sure I understand your

3   answer.  Are you saying if you were aware that others had been

4   sexually active, you would have investigated it?

5          THE WITNESS:  If I had been aware that -- that the

6   children were sexually active and it was connected to the

7   family, yes, I would have investigated it.

8   BY MR. SANDMAN:

9   Q.   And just to follow up on the Judge's question, if you had

10  evidence that suggested at least the real possibility that

11  these young children were sexually active, would you have

12  investigated that?

13  A.   If I had that evidence, yes.

14  Q.   Now, you did not take the crime scene photographs, correct?

15  A.   I was not there, no.

16  Q.   Did you examine all the crime scene photographs at some

17  point in the case?

18  A.   At some point, yes.

19  Q.   That's something that you're absolutely certain, I mean,

20  you wouldn't have neglected that, you would have looked at

21  them?

22  A.   I would have looked at them.

23  Q.   Could we see Exhibit 31.

24         Exhibit 31 was extracted from what's in evidence as Exhibit

25  65A.  65A contained all of the crime scene photographs in this

1    case.

2         Ms. Pesquiera, do you remember looking at this photograph

3    of this letter that was found inside Mr. Jones' trailer?

4    A.  I don't remember looking at it 23 years ago, but I remember

5    looking at it sometime recently.

6    Q.  Is this a document that respondent's counsel showed to you

7    and asked you about?

8    A.  I believe so.  I can't see what it says.

9    Q.  You don't have -- you didn't -- you don't have your classes

10   today, correct?

11   A.  That is correct.

12   Q.  Do you see -- can you see at the very top, does it look

13   like a child's handwriting to you?

14              THE COURT:  Can I stop you for a moment?

15              MR. SANDMAN:  Yeah.

16              THE COURT:  We need to get her a pair of glasses or we

17   need to have her go get her glasses, because this is not

18   acceptable, for us to have planned for so long for this hearing

19   and have the witness now tell us that she can't read these

20   documents.

21              So do you have --

22              THE WITNESS:  I'm sorry, Your Honor.

23              THE COURT:  Do you have prescription glasses?

24              THE WITNESS:  I do.  I could see the "I heart you."

25              THE COURT:  How far do you live from here?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  About 30 minutes.

2          THE COURT:  How much more questioning do you have?

3          MR. SANDMAN:  I'm almost done.

4          THE WITNESS:  If he could read it to me?

5          MR. SANDMAN:  I think if we go to the third page where

6     there is sort of a transcript.

7          THE COURT:  Do you just need over-the-counter reading

8     glasses?

9          THE WITNESS:  Yes, sir.  I could go buy some.

10         THE COURT:  Here.  Try these.

11         MR. SANDMAN:  If we could go to Page 3 of the

12    document.

13         THE WITNESS:  That helps a lot.  I can read that.

14    Thank you.

15         THE COURT:  You don't get to keep them though.

16         THE WITNESS:  Okay.  I hope my head doesn't widen them

17    for you.  Oh, I see that very clearly now.

18    BY MR. SANDMAN:

19    Q.  This letter indicates that there is some communication

20    between Johnny and another child about engaging in sexual

21    activity, correct?

22    A.  Or the possibility of engaging?  I don't know.  They're

23    talking about it.

24    Q.  And you certainly had access to this letter, and, according

25    to your own testimony, you would have reviewed it 23 years ago

CROSS-EXAMINATION - PESQUIERA

1    in reviewing sheriff's department files, or photographs,

2    correct?

3    A.  I would have reviewed it, yes.

4    Q.  You conducted no further investigation to determine the

5    implications of this and who was maybe touching whom and how

6    often and whether perhaps somebody had touched Rachel, you

7    didn't pursue any of that, correct?

8    A.  I didn't check to see if Johnny and Brandie and Tera had

9    actually engaged in what they are talking about here.

10   Q.  Nor did you follow up to see if any of them knew anything

11   about anybody touching Rachel, correct?

12   A.  I believe that was asked of Becca, Rebecca, and I believe

13   that was asked of some of the children when they were spoken

14   to, if anybody had touched them.

15   Q.  If anybody -- so Becky was asked if someone had touched

16   her.

17   A.  Correct.  And then -- I believe they also asked her if

18   Johnny had ever done anything to Rachel.

19   Q.  And the answer, at least from Brandie, is she didn't know,

20   all that she knew was that Rachel was afraid every time Johnny

21   came in the bedroom, and that ultimately Johnny had to be moved

22   to his own bedroom in a cubby outside of the girls' bedroom,

23   correct?

24   A.  That wasn't Rebecca's response.

25   Q.  That was Brandie's response.

1    A.  Brandie's, right.

2             MR. SANDMAN:  I have no further questions.

3             THE COURT:  Redirect?

4             THE WITNESS:  Do you need your glasses, Your Honor.

5             THE COURT:  No, no, you can just hold onto them.

6             THE WITNESS:  Thank you.

7                      REDIRECT EXAMINATION

8    BY MR. BRACCIO:

9    Q.  Good morning, Ms. Pesquiera.

10   A.  Good morning.

11   Q.  Is it difficult to recall all the facts as you sit here 23

12   years later?

13   A.  It is.

14   Q.  Did you have this record memorized leading up to this

15   hearing here today?

16   A.  Not memorized, no.

17   Q.  Do you recall the questions about Rachel's black eyes and

18   who she reported that to?

19   A.  I do recall those questions.

20   Q.  Do you recall who Rachel reported those black eyes to?

21   A.  Yes.

22   Q.  Who did she report that to?

23   A.  I recall that she was continually asked, and then that

24   Rebecca and Brandie took her into a room and talked to her and

25   she said it to them.

REDIRECT EXAMINATION - PESQUIERA

1  Q.  You previously indicated in your testimony that Rachel was

2  jumping on Brandie's back on Saturday morning, do you recall

3  that testimony?

4  A.  I do recall.

5  Q.  Let me show you Exhibit 1, Bates Number 835, at Lines 20

6  through 25.

7       So just as a point of reference here, at the bottom they're

8  discussing Sunday morning, correct?

9  A.  Yes.

10      MR. SANDMAN:  I'm sorry, Your Honor.  Which interview

11  was this?

12      MR. BRACCIO:  I am showing the witness -- I apologize.

13  This is Brandie Jones' deposition of March 6, 1995.

14      THE COURT:  At what page?  Does it have an exhibit

15  number?

16      MR. BRACCIO:  Yes, it does.  It's Exhibit 1, Bates

17  Number 835.

18      And now we'll move to 837, Lines 1 through 8 there.

19      THE WITNESS:  I see that.

20  BY MR. BRACCIO:

21  Q.  And Brandie was indicating that Rachel was jumping on her

22  back while she was playing Nintendo on Sunday morning, correct?

23  A.  Correct.  Then I was incorrect in saying that it was

24  Sunday.  I got Saturday and Sunday mixed up.

25  Q.  So this document refreshes your recollection as to what day

REDIRECT EXAMINATION - PESQUIERA                    35

1   that that actually occurred according to Brandie?

2   A.  It does.

3   Q.  Do you recall your testimony about Isobel Tafe and her

4   confusion about the day?

5   A.  Yes, I do.

6        MR. SANDMAN:  I'm going to object to the leading form

7   of the question.

8        THE COURT:  Sustained.

9   BY MR. BRACCIO:

10  Q.  Do you recall your testimony about Isobel Tafe on

11  cross-examination?

12  A.  I do.

13  Q.  Do you recall that you indicated that Ms. Tafe had some

14  confusion about the day that this occurred?

15  A.  Yes.

16        THE COURT:  These are still leading questions.

17  BY MR. BRACCIO:

18  Q.  Let me show you Exhibit 81.  This is Bates Number 5142.  I

19  am showing you the police report.  Excuse me.  The police

20  interview that was conducted with Isobel Tafe.

21  A.  I see that.

22  Q.  Do you see at the bottom your discussion with Ms. Tafe?

23  A.  I do see that.

24  Q.  And why did you believe Ms. Tafe was confused about the

25  day?

UNITED STATES DISTRICT COURT

1    A.  A lot of these people, I mean, didn't anchor themselves to

2    a certain day, so I thought she had had it mixed up.

3    Q.  Do you recall that you asked Ms. Tafe about what day this

4    was?

5    A.  I do recall.

6    Q.  Do you recall what Ms. Tafe's answer was?

7    A.  She said she had been over here on Saturday.

8    Q.  Did she indicate any other reference?

9    A.  She referenced the Saturday before the detectives came to

10   talk to me.

11   Q.  And why is that significant to you?

12   A.  Because the detectives talked to her on Monday.

13   Q.  So what did that indicate to you?

14   A.  That it could have been Sunday.

15   Q.  Did any other witness describe Rachel, other than Isobel

16   Tafe's statement, as appearing sick on Saturday?

17   A.  No, nobody said that.

18   Q.  Do you recall your testimony earlier about your statements

19   to Mr. Sandman in the deposition?

20   A.  Yes.

21   Q.  And that was in reference to your testimony in front of the

22   grand jury?

23   A.  Yes.

24   Q.  I'd like to show you Exhibit 60 at Page 140.  Do you recall

25   discussing this document with Mr. Sandman on cross-examination?

 1    A.  Yes.

 2    Q.  And did he indicate to you that you concealed information

 3    from the grand jury?

 4          MR. SANDMAN:  I'm sorry.  I could not hear that

 5    question.

 6          THE COURT:  He's asking if you suggested that she had

 7    concealed information from the grand jury during her testimony.

 8          Go ahead.

 9    BY MR. BRACCIO:

10    Q.  I'd like to show you the rest of your answer at Page 141.

11    A.  It says:  I don't -- I mean, I answered an answer.  I

12    don't -- I don't know if I intentionally concealed that.

13    You're saying I concealed that?

14       That's what it says.

15          THE COURT:  I'm sorry.  Is there a question?

16          MR. BRACCIO:  Yes.

17    BY MR. BRACCIO:

18    Q.  And so your prior testimony on cross-examination, was that

19    accurate to say that you concealed evidence from the grand

20    jury?

21    A.  No, I -- his question was confusing to me, the way it was

22    put, I believe.

23    Q.  Did you conceal evidence from the grand jury?

24    A.  I -- I would not do that.

25          THE COURT:  I'm sorry.  I'm trying to understand your

1   answer here.  I'm looking at your answer on Line 1 and Line 2.

2   You appear to be saying there you don't know if you

3   intentionally concealed information; is that what you're

4   saying?

5            THE WITNESS:  That's what I am saying.  And then I

6   asked him "you're saying that I concealed?"  Because I don't

7   know what he's talking about at the time, or what he's

8   referring to.  To this day, I don't know what he is talking

9   about.

10  BY MR. BRACCIO:

11  Q.  Okay.  Just so the record is clear, have you ever concealed

12  evidence in this case from the grand jury?

13  A.  I have never done that, no.

14  Q.  Did you say in your deposition that you concealed evidence

15  from the grand jury?

16  A.  I don't think I said it that way, no.

17           MR. SANDMAN:  Your Honor, could we see the last

18  question on the previous page, and answer?

19           THE COURT:  Yeah, I'd like to actually see that

20  myself.

21           MR. BRACCIO:  Your Honor, we were going to get copies

22  of this and move to admit it later, these particular pages, 139

23  to 142.

24           THE COURT:  Do you have copies of it?

25           MR. BRACCIO:  We will get a copy at the break.


UNITED STATES DISTRICT COURT

 1            THE COURT:  All right.

 2            MR. BRACCIO:  Ms. Pesquiera was asked about her

 3    statement to --

 4            THE COURT:  This would be a good time to take a break,

 5    while we're on the topic, so why don't we take a break and I'd

 6    like a copy myself.  How long do you need?

 7            MR. BRACCIO:  Five minutes to run across the street.

 8            THE WITNESS:  Do you need your glasses, Your Honor?

 9            THE COURT:  No, no, you can -- I've got another pair

10    upstairs I'm going to grab.

11            MS. GARD:  Judge, I think we'll need about 10 minutes,

12    if that's okay, to get a copy.

13            THE COURT:  That's fine.

14       Just hold onto those and I'll get another pair.

15            THE WITNESS:  Yes, sir.

16       (A recess was taken from 10:09 a.m. to 10:36 a.m.)

17            THE WITNESS:  I got some glasses.

18            THE COURT:  You got some glasses.

19       Okay.  Go ahead.

20            MR. BRACCIO:  Judge, we have marked the relevant

21    portions of this deposition.  It is marked as Exhibit 215.  I

22    would move for its admission.  I've spoken with counsel for

23    petitioner and he has no objection to this coming into

24    evidence.

25            THE COURT:  That's fine.  It's admitted.

REDIRECT EXAMINATION - PESQUIERA                          40

1           So the deposition itself is already part of the

2    record.

3           MR. BRACCIO:  Correct.

4           THE COURT:  And now you've taken out a subsection of

5    that and you've marked it as an exhibit.

6           MR. BRACCIO:  Correct.

7           THE COURT:  So your colleagues are shaking their heads

8    no, so you might want to talk with them.

9           So my question was, was the deposition admitted, you

10   said yes.

11          MR. BRACCIO:  I apologize.  The deposition has been

12   marked, it has not been admitted.

13          We've now taken out the relevant portions that are

14   directly relevant to her testimony here that she was questioned

15   about, that has been marked as Exhibit 215, and those relevant

16   pages to this question, we now move for their admission.

17          THE COURT:  As Exhibit 215.

18          MR. BRACCIO:  Correct.

19          THE COURT:  And there is no objection?

20          MR. SANDMAN:  That's correct, Your Honor.

21          THE COURT:  And that's Pages 139 through 142?

22          MR. BRACCIO:  Correct.

23          THE COURT:  What's the exhibit number?

24          MR. BRACCIO:  215.

25          THE COURT:  215.  Got it.  It's admitted.

REDIRECT EXAMINATION - PESQUIERA

1   BY MR. BRACCIO:

2   Q.  Mrs. Pesquiera, have you had a chance, over the break, to

3   review Exhibit 215?

4   A.  Yes.

5   Q.  Does that refresh your recollection as to what you said in

6   the deposition?

7   A.  Yes.

8   Q.  What did you say?

9   A.  I was trying to explain that I was just trying to answer

10  the questions of the grand jury.

11  Q.  Did you conceal evidence to the grand jury?

12  A.  I did not.

13  Q.  Do you recall your questions on cross-examination about

14  whether detectives had investigated whether Rebecca had been

15  inappropriately touched?  Do you recall that line of

16  questioning?

17  A.  I do.

18  Q.  I'd like to show you Exhibit 39, which has been admitted

19  into evidence.  This is the May 9th, 1994 interview with

20  Rebecca Lux, at Bates Number 1149.  Do you see at the top of

21  that interview with Rebecca?

22  A.  I do.

23  Q.  What question did Detective Downing ask of Rebecca?

24  A.  Has anybody ever touched you or made you feel

25  uncomfortable?

1   Q.  And how did Rebecca respond?

2   A.  No.

3   Q.  Did she indicate whether -- did she have a follow-up

4   question to that?

5   A.  She says:  You sure?  She says yes.  And she asks what we

6   normally do:  What would you do if that happened to you?  She

7   says:  I would tell somebody I trusted.  And who would that be?

8   My Aunt Donna.

9   Q.  Does that refresh your recollection that detectives in this

10  case, whether they asked Rebecca about being touched

11  inappropriately?

12  A.  Yes, it does.

13  Q.  And did they?

14  A.  They did.

15  Q.  Do you recall the questions on cross-examination about

16  Michael and Stephanie Fleming?

17  A.  Yes.

18  Q.  And that they moved away immediately after this incident?

19  A.  That was discussed, yes.

20  Q.  Do you recall what Michael Fleming, just so we're clear,

21  what he told the defense attorneys in this case about why he

22  left that trailer park?

23  A.  He made reference to his wife having an affair or being

24  involved with Julian Duran, and that he was one of them that

25  had come over and they had that barbecue that Sunday.

1   Q.  And do you recall why Stephanie indicated she left the

2   trailer park?

3   A.  She said something about they were going to leave anyway,

4   they weren't going to be there that long, and they were paid

5   up, up to a certain amount.

6   Q.  And finally, do you recall the questions about the letter,

7   this alleged letter, indicating sexual activity between the

8   children?

9   A.  Yes.

10  Q.  Do you recall if Donna Marini, who took custody of these

11  children, if she had any questions or if she had any

12  information about the letter?

13  A.  I don't recall.

14  Q.  Let me show you Exhibit 1, Bates 1269.

15      Ms. Pesquiera, I am showing you Donna Marini's defense

16  interview from October 31st, 1994.  At Line 32, do you see that

17  Ms. Marini is discussing the letter she found?

18  A.  Yes, I see that.

19  Q.  On the second page there, does Ms. Marini indicate anything

20  about that letter?

21  A.  She says:  At first, no, I couldn't tell who it was written

22  by, and I was very concerned about it.  And then she says:

23  After figuring it out and after listening to Becky, I think

24  that the note was written by, um, Barry's daughter Brandie.

25  Q.  And did she say -- does she indicate as well that she

REDIRECT EXAMINATION - PESQUIERA

1   received any additional information to determine to make that

2   conclusion?

3   A.  She talks about the counselor discussing it with Johnny,

4   and that she was right, it came from Brandie.

5          MR. BRACCIO:  Thank you.  I have no further questions.

6          MR. SANDMAN:  Your Honor, I wonder if we could show

7   the witness, I think it's Page 5 of that interview, where she

8   says she reported the contents of the letter to the police.

9          Exhibit 32 at Page 5.  That same document.

10         THE COURT:  So Exhibit 32 was the document she was

11  just testifying from?

12         MR. SANDMAN:  Yes.

13         MR. BRACCIO:  That was Exhibit 1, Your Honor.

14         MR. SANDMAN:  I know, but we've extracted that

15  interview from Ms. Marini and marked it as Exhibit 32, and at

16  Page 5 of the interview she says she turned the letter --

17  that's the letter with the sexual commentary in it -- she

18  turned it over to law enforcement.

19         I'll withdraw my request.  We can cover it later in

20  written material.

21         THE COURT:  It's already part of the record, is it

22  not?

23         MR. SANDMAN:  Yeah.  That's fine.

24         THE COURT:  I think he was referring to it as a

25  different exhibit number.  So you're saying you created a

1    separate exhibit for --

2            MR. SANDMAN:  For that interview that was just up on

3    the screen.

4            THE COURT:  So if it's already part of the record, I

5    think you can make your argument later.

6            All right.  Thank you.

7        Give me a second.

8                    EXAMINATION BY THE COURT

9    Q.  Ms. Pesquiera, I've got a few questions for you.  When in

10   the course of your investigation did -- well, did you learn how

11   long Rachel and her family were -- how long they had been

12   living with Mr. Jones?

13   A.  Yes.  Angela had talked about moving in sometime in April.

14   Q.  So did you narrow it down any more?  Was it one week? two

15   weeks? three weeks?

16   A.  I don't recall the specific date.

17   Q.  So certainly no more than four weeks before the events

18   leading to Rachel's -- until Rachel's death.

19   A.  Correct.

20   Q.  But you don't know if it was four weeks or less than four

21   weeks?

22   A.  I know that it was during the month of April.

23   Q.  So it was in the previous month that they moved in with

24   Mr. Jones.

25   A.  Yes, sir.

1  Q.  Did your investigation indicate whether or not -- or what

2  relationship Ms. Gray had with Mr. Jones before then?  Before

3  she and the kids moved in.

4  A.  She had talked about dating him for a while or that she had

5  been seeing him for a few weeks and then moved in with him.

6  Q.  And she was seeing somebody else before she saw Mr. Jones,

7  right?

8  A.  A person by the name of Zoly.

9  Q.  Zoly.  So before living with Mr. Jones, Ms. Gray and her

10  children were living with Zoly, is that right?

11  A.  Correct.

12  Q.  And does a couple of years sound about right to you?  Is

13  that about how long they were living together?

14  A.  I don't recall exactly how much -- you mean with Zoly?

15  Q.  Yes.

16  A.  I don't recall exactly how long.

17  Q.  But you do know they were living with Zoly before they

18  moved in with Mr. Jones.

19  A.  Yes.  And she had discussed -- I recall discussing Zoly

20  being around I believe when Rachel was born or something like

21  that.

22  Q.  All right.  And did she indicate why she left Zoly and

23  moved in with Mr. Jones?

24  A.  She talked about Zoly being abusive with her and that one

25  day Mr. Jones beat up Zoly.

1    Q.  So Zoly was abusive to her.

2    A.  Yes.

3    Q.  And then Mr. Jones interceded and then she moved in with

4    Mr. Jones.

5    A.  Correct.

6    Q.  So Ms. Gray and the children were living with Mr. Jones no

7    more than a month, right?

8    A.  I believe so, yes.

9    Q.  What was the relationship and responsibility that Mr. Jones

10   had with the children?

11   A.  We asked her about that, and she would say that she was the

12   one that would watch the children and that Barry had provided a

13   place for them to live.  She talked about receiving money off

14   of Jonathan's disability, but that Mr. Jones had provided for

15   them.

16   Q.  Did Mr. Jones have responsibility for dressing and bathing

17   the children?

18   A.  No.

19   Q.  Your investigation focused early on on Mr. Jones, is that

20   right?

21   A.  Yes.

22   Q.  Is it fair to say that by 10:00 a.m. on Monday morning, you

23   suspected that he had committed the physical and sexual abuse

24   of Rachel?

25   A.  I had him as a suspect, yes, at that time.

1   Q.  Who were the other suspects you had at that time?

2   A.  Well, we were still gathering information.  And he was away

3   at Ron Charles' camp, so we had to try to locate him, and so we

4   were still trying to gather information.

5   Q.  At 10:00 a.m. on Monday morning?

6   A.  I am not sure on the time.

7   Q.  Well, at 10:00 a.m. on Monday morning you were interviewing

8   Mr. Jones.

9   A.  Okay.  I know that he was in the room with another

10  detective at the time and then I arrived just shortly after

11  that.

12  Q.  Correct, and you went in and out a couple of times.

13  A.  Yes, sir.

14  Q.  And he told you at that time that some other children had

15  pushed Rachel out of a van, right?

16  A.  He did.

17  Q.  And you didn't believe that, did you?

18  A.  No.

19  Q.  And what steps did you take to follow up on that

20  explanation by Mr. Jones?

21  A.  Based on her injuries, I didn't believe that that's what

22  occurred, because they were so extensive.  I did not interview

23  those children.

24  Q.  So you didn't follow up.

25  A.  I didn't follow up on interviewing those children, no.

1    Q.   That's not my question.  Did you follow up in any way on

2    the story that he provided to you that Rachel was pushed out of

3    the van?

4    A.   I think other people that were interviewed, we discussed

5    that part of it, where that had come from, and it had come from

6    Mr. Jones explaining it and also from different rumors.  So,

7    no, we believed it was a rumor and that that was it.  And that

8    Mr. Jones --

9    Q.   You didn't feel it was credible information that should be

10   followed up on?

11   A.   I didn't not feel it was credible.

12   Q.   In fact, neither you, nor no other detectives, followed up

13   on it.

14   A.   No.

15   Q.   I am assuming it was your operative theory at the time, and

16   I understand this is 23 years ago, but that Rachel's injuries,

17   both her physical injuries and her vaginal injuries, were very

18   recent, probably the day before she died, is that fair?

19   A.   That is fair, yes.

20   Q.   And would it have changed your investigation if you knew

21   that her vaginal injuries, for instance, could have been many

22   weeks old?

23   A.   Yes, it may -- yes.

24   Q.   And I think we touched upon this yesterday, but would it

25   have changed the scope or nature of your investigation if you

1   learned that the injury to her duodenum, which is the injury

2   that -- that was your understanding after the autopsy that

3   that's what led to her death?

4   A.  Right, and the onset of peritonitis.

5   Q.  Right.  Now, if you learned that this couldn't have

6   happened any sooner than 48 hours before she passed, would that

7   have changed the focus of what you did in your investigation?

8   A.  It was my belief that we were asking people what she did

9   days before that and what her condition was days before that.

10  We discussed that she was fine on Friday, people talk about her

11  being fine on Saturday, playing, eating, doing things like

12  that.  It was important to me to find out when she would have

13  started showing signs and/or symptoms of those injuries.

14  Q.  So that's important information obviously in your

15  investigation.

16  A.  Right, and I was narrowing it down to Sunday.

17  Q.  And, again, I think you testified earlier that was the

18  focus of your investigation, that the injury probably occurred

19  on Sunday.

20  A.  Narrowing it down to Sunday, yes.

21  Q.  You were asked a few questions about the blood in the van,

22  so let me turn my attention to that.

23      First, before I get to that, did your investigation reveal

24  how Rachel got to the hospital?

25  A.  We were told that she was driven there in the van by Angela

UNITED STATES DISTRICT COURT

1    and Barry.

2    Q.  And did you learn who was driving and who was in the

3    passenger seat?

4    A.  Angela describes holding Rachel and that Barry was driving.

5    Q.  So Rachel was in the passenger seat holding -- I'm sorry.

6    Angela was in the passenger seat holding Rachel while Barry was

7    driving.

8    A.  I don't recall her specifically saying the passenger seat,

9    but that Barry was driving.

10   Q.  So you don't know if Angela was in the passenger seat or

11   the back seat.

12   A.  Or how she was holding her, I don't know that.

13   Q.  But there was blood discovered on the passenger seat, was

14   there not?

15   A.  I believe so, yes.

16   Q.  And there was blood discovered on the carpeting next to the

17   passenger seat, was there not?

18   A.  Correct.

19   Q.  Wouldn't it be important to know where Rachel was when she

20   was being taken to the hospital if you found blood on the

21   passenger seat and next to the passenger seat?

22   A.  It would, but I don't recall specifically how Angela

23   described it.

24   Q.  So it would have been something you would have followed up

25   on.

EXAMINATION BY THE COURT - PESQUIERA                    52

1    A.  Yes.

2    Q.  And if you did, it would be in your report.

3    A.  Yes.

4    Q.  Lest me ask you, did you do the investigation of the van

5    and look at the blood in the van once -- as you were conducting

6    your investigation?

7    A.  I had other detectives doing that.

8    Q.  And do you know if they looked -- how thoroughly they

9    looked in the van for blood?

10   A.  I know that they did check and had other means of looking

11   for blood, yes.

12   Q.  Do you know if they checked the dashboard or the walls --

13   the interior walls of the van or the cover on the ceiling?

14   A.  I don't recall seeing photos of that, no.  I don't recall

15   that.

16   Q.  Would that be important if you were looking for blood

17   spatter from somebody being struck?

18   A.  Yes, sir, the entire interior of that vehicle would be

19   important, yes.

20   Q.  So if they looked in those other areas, that, again, would

21   be in the report?

22   A.  Yes, sir.

23   Q.  And you just today, sitting here, you don't recall if it

24   was or wasn't?

25   A.  I don't recall.

1   Q.  It's my recollection, and please correct me if I'm wrong,

2   but that you provided testimony that the blood located on the

3   floor next to the passenger seat was an impression stain.

4   A.  If I had said that in trial, I would agree with that, yes.

5   Q.  So, sitting here today, you don't recall?

6   A.  I know that I talked about the surface that blood lands on

7   is going to alter the interpretation of a stain.  So I believe

8   that that's what that was, like a soaking of blood or -- I

9   don't know if I used the word "impression," I don't recall

10  that.

11  Q.  Did you either testify about or develop a theory as to how

12  the blood got on the van carpet?

13  A.  I believe that it -- that that's where, at one point or

14  another, the baby's head, Rachel's head, could have been there,

15  at one point or another.

16  Q.  And was that part of your theory of the case?

17  A.  Or a portion of her body, not just her head.  A portion of

18  her body could have been on that and connected with that

19  carpet.

20  Q.  And transferred the blood.

21  A.  It was a transfer, yes.

22  Q.  And was that the -- was that your operative theory?

23  A.  I believe so, yes.

24  Q.  And can you tell me the rest of your theory?  Was it her

25  head?  Was it her body?  What did your investigation reveal to

1   you and lead you to conclude how that blood got there?

2   A.  That at one point or another Rachel's body -- and I don't

3   know exactly which part of her body it would have been, because

4   the stain -- first of all, the carpet, it's porous.  It's got

5   different fibers, it's moving, and you're able to move the

6   actual fibers of the carpet different ways.  So being able to

7   interpret that stain specifically is altered by the surface, a

8   porous surface.  So I don't know which part of her body that

9   would have been, but at one point or another, her body was --

10  Q.  So you think it was because of contact with her body on the

11  carpet, as opposed to just blood dripping onto the carpet.

12  A.  Correct.

13  Q.  And did the rest of your investigation reveal how that was

14  accomplished?

15  A.  I don't recall, I don't recall if that was brought up, no.

16  Q.  This fellow by the name of Zoly, what steps did you or

17  other investigators take to interview Zoly?

18  A.  I believe we tried to locate him, but I don't -- I never

19  spoke to Zoly myself.

20  Q.  Do you know if anybody else ever spoke to Zoly?  And when I

21  say, "anybody else," I mean anybody else in your department,

22  anybody else investigating the case.

23  A.  Not that I recall, no.

24  Q.  Were you the person in charge of the investigation?

25  A.  I was.

1   Q.  Would it be you that would give assignments to your fellow

2   investigators:  "You do this" and "You do this" and "You do

3   that"?

4   A.  I would request that.

5   Q.  So if you didn't interview Zoly, you would have given that

6   assignment to somebody else?

7   A.  Correct.

8   Q.  Do you know if you gave that assignment to somebody else?

9   A.  I don't recall that, no.

10  Q.  Do you know if Zoly was a person of interest during the

11  course of your investigation?

12  A.  He would have been a person of interest, yes.

13  Q.  When did Zoly become -- not become a person of interest?

14  When did you eliminate him as a suspect?

15  A.  I didn't consider him a suspect, I just considered him a

16  lead or -- to provide background information.

17  Q.  What was your understanding of Rachel's vaginal injuries?

18  A.  My understanding was that, when I looked at it during the

19  autopsy, that the injury appeared fairly recent.  It was still

20  dripping blood.

21  Q.  And did you confirm that with Dr. Howard?

22  A.  I don't specifically recall discussing that with him.  As

23  far as any kind of aging, the time period or anything like

24  that, no, I don't recall that at the time of the autopsy.

25             THE COURT:  Those are the questions I have, but I

1    don't know if it has generated any -- I mean, I want to give

2    everybody an opportunity to ask any follow-up questions if you

3    think I've made things less clear than you would like.

4            So do you need a moment to talk among yourselves?

5            MR. BRACCIO:  That would be great, Your Honor.

6            THE COURT:  I'll give you a moment.  We'll just go off

7    the record for a few minutes here.

8            (Pause in the proceedings)

9            MR. BRACCIO:  Your Honor, we have no questions.

10           MR. SANDMAN:  Your Honor, we have nothing further.

11           THE COURT:  Okay.  Well, I do.

12                    EXAMINATION BY THE COURT

13   Q.  I just want to make sure I understand, and I've asked you

14   this several times and I appreciate your patience, but I am

15   trying to understand why there was no followup with Zoly.  And

16   I ask this question because it's clear you had information that

17   he had committed domestic violence with at least Angela, right?

18   A.  Correct.

19   Q.  And that the family had been living with him for some

20   length of time, right?

21   A.  Yes, sir.

22   Q.  And that the family had been living with Mr. Jones for only

23   a very short period of time before this happened, right?

24   A.  Yes, sir.

25   Q.  And that Mr. Jones had no responsibility for bathing or

1    dressing the children.  Do you know if Zoly had any

2    responsibility for bathing or dressing the children?

3    A.  I don't know that, sir.

4    Q.  That would require interviewing him, right?

5    A.  Yes, sir.

6    Q.  So, again, my question comes back around to do you know if

7    you assigned somebody responsibility for interviewing Zoly?

8    A.  I don't recall that.  I know that there was attempts to

9    locate him, but I don't -- obviously that wasn't accomplished,

10   I didn't accomplish that.

11   Q.  And do you think that was important?

12   A.  Yes, sir.

13   Q.  So is it something that just slipped through the cracks or

14   did you make an affirmative decision that you weren't going to

15   follow up with Zoly?

16   A.  I didn't make an affirmative decision not to, I think I

17   just -- I didn't do it.

18            THE COURT:  All right.  Thank you.

19            MR. BRACCIO:  Your Honor, could I ask a brief

20   follow-up from that line of questioning?

21            THE COURT:  Yes.

22                        FURTHER EXAMINATION

23   BY MR. BRACCIO:

24   Q.  Mrs. Pesquiera, do you recall what Angela told detectives

25   about Zoly and the children?

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  What did she tell detectives about Zoly and the children?

3    A.  That Zoly never harmed the children, that they got along

4    well with him, and that Rachel was his favorite, and that he

5    only hit her.

6              THE COURT:  You might want to clear up who "her" is.

7              THE WITNESS:  Angela.  I'm sorry.  That he only hit --

8    that he was only abusive to Angela.

9    BY MR. BRACCIO:

10   Q.  So you had no evidence that Zoly ever inflicted any abuse

11   on any of the children?

12   A.  Angela never told us that.  No, we had no evidence of that.

13             MR. BRACCIO:  Thank you.

14                      EXAMINATION BY THE COURT

15   Q.  Did you ask the children whether or not Zoly ever inflicted

16   abuse on them?

17   A.  I think the detectives had talked to them about if they had

18   ever been touched or hit by anybody and things like that, yes.

19   Q.  And you've done -- you've got a lot of experience in

20   domestic violence cases, do you not?

21   A.  Some, yes.

22   Q.  You did it for a few years, didn't you?

23   A.  Yes.

24   Q.  And is it your experience that sometimes victims of

25   domestic violence are not always forthcoming?

1   A.  Correct.

2          THE COURT:  All right.  Thank you.

3          Any other questions?

4          MR. SANDMAN:  I just have one.  The famous "I only

5   have one question."

6          THE COURT:  Well, we all seem to be saying a lot of

7   that lately.

8                       FURTHER EXAMINATION

9   BY MR. SANDMAN:

10  Q.  If there was an effort to locate Zoly, should that have

11  been documented somewhere by some sheriff's department officer

12  who was doing that?

13  A.  Yes, sir.

14  Q.  And so if there's no documentation in the record that there

15  were efforts to locate Zoly, then it never happened, correct?

16  A.  They should have documented it, yes.

17                   EXAMINATION BY THE COURT

18  Q.  Well, now I need to follow up, because you say they should

19  have documented it, but I think your testimony yesterday and

20  today has been if something in the case was done, it was

21  documented, right?

22  A.  Yes, sir.

23  Q.  If it wasn't done then -- in other words, the absence of

24  information in the report would indicate that it didn't happen.

25  A.  I have an independent recollection that we made attempts or

 1  that I may have made an attempt to locate him, but I don't -- I

 2  don't have documentation of that.

 3  Q.  And do you know -- so you believe it was you who made the

 4  attempt to locate Zoly?

 5  A.  I remember making attempts to try to locate him, but --

 6  Q.  Do you know how many attempts you made?

 7  A.  No, sir.

 8  Q.  Would you write down information?  I mean, how would you go

 9  about trying to locate him?

10  A.  I should have gone back to where, you know, where he could

11  have been located at the trailer court that they lived at or

12  the past location that they lived at.

13  Q.  So you think you did that, but you don't -- there is no

14  documentation of it.

15  A.  I can't tell you.  Right, there is no documentation of

16  that.

17  Q.  So sometimes -- and maybe you can take a moment to think

18  back, because I want to be clear.  Is it something in

19  retrospect, now when you're looking at it, you would say,

20  "yeah, I should have followed up on it," or do you have a clear

21  memory that you did something?  Do you have a clear memory that

22  you made phone calls?  I am trying to find out exactly what

23  your memory is of what you did in regard to Zoly.

24  A.  I don't have a memory exactly what I did, and absolutely I

25  should have.

1        THE COURT:  All right.  Thank you, very much.  You may

2   step down.

3        So I think our next witness is at 1:00 o'clock, is

4   that correct?

5        MS. GARD:  I just wanted to notify the Court that it's

6   Dr. Howard that we are expecting, and I just looked up his

7   flight and it looks like it's delayed until 12:13, so he may be

8   a little bit --

9        THE COURT:  Well, I'll just plan on being upstairs,

10  you know, at 1:00 and you call me when you're ready to go.

11      Everybody is still quite confident that we'll be finished

12  by 5:00, right?

13       MR. BRACCIO:  Yes, Your Honor.

14       MR. SANDMAN:  Yes, sir.

15       THE COURT:  Boy, it's not very convincing, but I

16  understand the answer.

17      All right.  So I'll be ready at 1:00 o'clock when you're

18  ready.  Thank you, very much.  We'll be in recess.

19      (A recess was taken from 11:10 a.m. to 1:17 p.m.)

20       THE COURT:  I have one question I wanted to ask the

21  parties before we put the doctor on the stand.

22       So I know we had that issue that we spent some time

23  talking about this morning which had to do with the tape found

24  in the file, I heard your explanations on that.  It was also

25  brought to my attention, I want to make sure that we don't have

1    any other of those issues lying out there that I should be

2    aware of before the record and this case closes.

3         One that was brought to my attention, but I think it has to

4    do with the actual innocence claim and nothing to do with this

5    case, has to do with whether or not -- well, it sounds like

6    from what I reviewed that Rachel's underwear was lost, that

7    there was some testing associated with that, but I think that

8    has to do with the actual innocence claim and not the record in

9    this case, but I want to make sure I am correct on that.

10         MR. SANDMAN:  Judge, I do think you're correct on

11    that.

12         THE COURT:  Okay.  So there are no other evidentiary

13    issues as far as missing or newly found evidence for purposes

14    of this hearing, is that right?

15         MR. SANDMAN:  Yes.  Yes, sir.

16         THE COURT:  I just wanted -- and I wanted to ask that

17    question outside the doctor's presence.  So that was the

18    mystery, you've answered the question.  We're ready for the

19    doctor.

20         MR. SANDMAN:  Um.

21         THE COURT:  Apparently not.

22         MR. SANDMAN:  Well, he can come in.

23         We settled our remaining issues regarding the

24    exhibits, the last few exhibits to be admitted, except for one

25    little category.  So I could do that now or we could wait 'til

1   Dr. Howard's done, whatever you'd like to do.

2          THE COURT:  I don't know.  Are you planning to use the

3   exhibits with the doctor?

4          MR. SANDMAN:  No.

5          THE COURT:  Well, then we can get the doctor on the

6   stand and get the doctor on his way and we can take up these

7   questions later.

8          Sir, please, if you could come forward.  You may want

9   to take the seat closest to me, although a lot of people don't

10  like that seat because it's closest to me.

11      I'm kidding.  Don't worry.

12      Madam Clerk is going to swear you in.

13          **JOHN D. HOWARD, M.D.**, WITNESS, SWORN

14          THE COURT:  Mr. Braccio.

15          MR. BRACCIO:  And just for the record, Dr. Howard was

16  noticed as a witness by both parties, we've just agreed that I

17  would begin his direct examination today.

18                          DIRECT EXAMINATION

19  BY MR. BRACCIO:

20  Q.  Dr. Howard, would you state your full name for the record,

21  please.

22  A.  My name is John Dale Howard, H-o-w-a-r-d.

23  Q.  Are you being paid for your testimony here today?

24  A.  I am not.

25  Q.  How are you currently employed?

DIRECT EXAMINATION - HOWARD

1  A.  I am a forensic pathologist and medical examiner for

2  Spokane County in Spokane, Washington.

3  Q.  Can you tell Judge Burgess, what is a forensic pathologist?

4  A.  Pathology is a subspecialty of the practice of medicine

5  focusing on the study of injury and disease primarily by

6  anatomic and laboratory means.  Forensic pathologists have

7  additional trainings, particularly in legal matters that relate

8  to matters of sudden, unnatural or unexpected death, or

9  unlawful death, so the investigation of death or injury that is

10  of public concern.

11        THE COURT:  We heard some testimony earlier that there

12  is a distinction between forensic pathologists and coroner.  At

13  least I thought that was my understanding.  Is there a

14  difference?

15        THE WITNESS:  Yes, there are forensic pathologists,

16  coroners and medical examiners.

17        THE COURT:  Actually, now that you mention it, I think

18  it was medical examiner versus coroner.

19        THE WITNESS:  So a coroner dates back to the year 900

20  in England.  The term comes from Old English, "coruner,"

21  meaning someone who answered directly to the King of England,

22  the Crown.  Since most American laws are based on English laws,

23  we incorporated those into the United States.  Originally the

24  colonies and then many states kept those.  So in most

25  situations currently, a coroner is an elected official charged

1    with the responsibility of investigating public deaths.

2            A medical examiner, which began in Massachusetts in

3    1877, where the lawyers, primarily, wanted to abolish the

4    layperson coroners, thinking it was more political.  They

5    wanted more medical science, so they incorporated the

6    physicians in practice in the districts to serve also, in

7    addition to their medical practice, to be the medical examiner.

8    So that has evolved so that now medical examiners are an

9    appointed position, and in most situations would have training

10   in pathology, if not board certified in pathology.

11           So some are physicians but not forensic pathologists.

12   A coroner could be a forensic pathologist but doesn't

13   necessarily have to be.

14           THE COURT:  Thank you.

15   BY MR. BRACCIO:

16   Q.  Can you tell Judge Burgess about your educational

17   background.

18   A.  Certainly.  I have a degree in chemistry from Central

19   Washington University.  I attended the University of Washington

20   School of Medicine, graduating in 1982, with the MD or Medical

21   Doctor.  Stayed on at the University of Washington and its

22   affiliated programs and hospitals for a year of general

23   surgery; three years of anatomic pathology, which include

24   environmental pathology and toxicology; and then two years of

25   forensic pathology training with the King County Medical

1    Examiner's Office in Seattle and the University of Washington.

2         MR. BRACCIO:  Your Honor, may I approach?

3         THE COURT:  You may.

4         So Mr. Sandman is aware of this?

5         MR. BRACCIO:  Yes.

6         THE COURT:  Thank you.

7    BY MR. BRACCIO:

8    Q.  Dr. Howard, I've handed you what's been marked as Exhibit

9    214, do you recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's a copy of my curriculum vitae.

13        MR. BRACCIO:  Your Honor, at this time I would move

14   for admission of Exhibit 214.

15        THE COURT:  Any objection?

16        MR. SANDMAN:  No objection.

17        THE COURT:  It's admitted.

18        MR. BRACCIO:  Scroll down on that page, Daniel.

19   BY MR. BRACCIO:

20   Q.  Dr. Howard, on Page 1 of your CV it indicates you were the

21   president of the National Association of Medical Examiners?

22   A.  Yes, in 2009.

23   Q.  Can you tell the Court what that organization is?

24   A.  It is the primary organization representing the interests

25   of professional concerns for medical examiners nationwide,

DIRECT EXAMINATION - HOWARD                    67

1   although we have an international membership.

2   Q.  And you were the past president of that board?

3   A.  Yes.

4   Q.  As well as a past chairman?

5   A.  Chairman of the board of directors, yes.

6   Q.  Does this organization accredit medical examiners' labs?

7   A.  Yes.

8   Q.  Nationwide?

9   A.  Yes.

10  Q.  Do you also teach?

11  A.  Yes, I am a Clinical Associate Professor in the Department

12  of Pathology at the University of Washington.  So I teach

13  medical students and physicians in training.

14  Q.  How many years have you been a pathologist?

15  A.  I finished fellowship in 1988.  I have worked full time in

16  this field ever since.

17  Q.  Do you have any idea how many autopsies you have performed

18  during your career?

19  A.  Well, over 8,000.

20  Q.  And of those autopsies, any idea how many have been

21  conducted on children under five years of age?

22  A.  Oh, hundreds.

23  Q.  As part of your duties, do you keep up with current

24  knowledge and literature in the fields of pathology and child

25  abuse?

 1   A.  Yes.

 2   Q.  And you performed the autopsy on Rachel Gray in this case,

 3   correct?

 4   A.  I did.

 5   Q.  On May 3rd, 1994?

 6   A.  Correct.

 7            MR. BRACCIO:  Your Honor, may I approach?

 8            THE COURT:  You may.

 9   BY MR. BRACCIO:

10   Q.  Dr. Howard, I have handed you what's been admitted into

11   evidence as Exhibit 52.  What is this document?

12   A.  This is a copy of the autopsy report that I prepared

13   following the death investigation I conducted in the incident

14   of the death of Rachel Gray.

15   Q.  Can you provide a brief overview of the injuries you saw on

16   Rachel Gray before we take them individually?

17   A.  She had many blunt injuries, meaning blunt impact.  As

18   opposed to no gunshot wounds, not strangulation, or sharp

19   instrument injury.  But blunt impact injury to her head, chest,

20   abdomen, back, and all four extremities.  A laceration or tear

21   of her scalp.  Bruising in her forehead, bruising in the deep

22   layers of the scalp.  Bruising in the face, the neck.  Bruising

23   throughout the abdomen and chest.  Bruising of the extremities,

24   as well as abrasions involving the trunk and her extremities.

25   And she had an area of injury to her vaginal area; bruising,

1    abrasions and a laceration.  All blunt injury.

2          MR. BRACCIO:  Your Honor, at this time we are going to

3    move into an area of very sensitive photographs.  We've placed

4    the screens down and I'll place a sheet over the computer here

5    in front of me.

6       Let's pull up Exhibit 65, Bates 4698.

7       Your Honor, would it be possible to ask my questions over

8    here so I can see the screen?

9          THE COURT:  Yeah, that's fine.  Just make sure Madam

10   Court Reporter can hear you.

11         MR. BRACCIO:  Yes, sir.

12         Do we have portable microphones?

13         THE CLERK:  I have a hand-held.

14         THE COURT:  Maybe we can give him a hand-held.

15      We're going to give you a hand-held microphone.

16         MR. BRACCIO:  Your Honor, I can speak into the

17   microphone here at counsel's table if you'd like.

18         THE COURT:  Just as long as the witness, opposing

19   counsel and Madam Court Reporter can hear you.

20      Madam Court Reporter, are you able to pick him up all

21   right?

22         THE REPORTER:  (Nodding head.)

23         THE COURT:  Mr. Sandman, can you hear?

24         MR. SANDMAN:  So far.

25         THE COURT:  Okay.  Go ahead.

1    BY MR. BRACCIO:

2    Q.  Dr. Howard, let's begin with the external injuries to

3    Rachel's body.  I am showing you Exhibit 65, Bates 4698.  Can

4    you explain to the Court what you're observing here?

5    A.  This is a photograph taken at the time of autopsy.  It's a

6    view of her head, chest, right arm, left shoulder and part of

7    her abdomen.  It shows the condition of the body at the time of

8    the autopsy and shows the areas of bruising in her forehead,

9    around her eyes, her chest, her abdomen and her extremities.

10   Q.  Let me take you to the following Bates number, 4699.  Can

11   you explain to the Court what you see in this picture?

12   A.  This is a photograph again taken at autopsy, focusing

13   primarily on the abdomen and the lower chest down to the

14   external genitalia.  And a view of her left shoulder is still

15   visible.  And her right upper extremity down to the hand and

16   fingers are visible.  So it shows areas of both linear and

17   irregular bruising, as well as some abrasions in those areas.

18   Q.  Let me show you 4700.  We are going to show you the top

19   picture here on Bates 4700, again, of Exhibit 65.  Can you tell

20   the Court what you're seeing in this photograph?

21   A.  This is an autopsy photograph viewed from the left side of

22   her body.  So it shows injuries on the left side of her face,

23   as well as the chest, the abdomen, and her left upper

24   extremity.

25              THE COURT:  Let me ask a question.

1    Doctor, do any of the injuries to her chest, are any of the

2    markings on her chest a result of medical equipment that was

3    used on her when she came into the emergency room?

4         THE WITNESS:  It's possible that -- there is one area

5    that's a bit curved, it's possible that like a monitor pad

6    could produce that.  That would be the only one that I saw that

7    would be compatible with that.

8    BY MR. BRACCIO:

9    Q.  Dr. Howard, let me show you the bottom photograph there on

10   4700.  Does this picture reflect the injuries you were

11   previously discussing about her left leg and left arm?

12   A.  Yes.

13   Q.  Can you explain what you are seeing there?

14   A.  So, again, an autopsy photograph from the left side of her

15   body, from her chin down to her knees.  It shows the injuries

16   in the chest, abdomen, as well as better views of the injuries

17   particularly of her left forearm, hand and fingers, as well as

18   the outside or lateral aspect of her left thigh.

19   Q.  Okay.  Dr. Howard, let me show you Bates 4702.  What do you

20   see in this picture?

21   A.  This is a close-up view of her left hand, the back of her

22   hand, and it shows bruising of her hand and fingers.

23   Q.  Let me show you Bates 4708.  Focusing on the left picture,

24   is that a full view of the injuries to Rachel's torso?

25   A.  Yes.  This is a direct view of the front of the trunk, the

1   chest, the abdomen, showing injuries in the lower neck, chest,

2   abdomen area bilaterally, or both sides, as well as the upper

3   extremity injuries.

4   Q.  Dr. Howard, let me show you Bates 4715.  The left

5   photograph, can you describe for the Court what you are seeing

6   there?

7   A.  This is a photograph taken from above the body, she is on

8   her back so that the face to her feet are visible.  A tape

9   measure is next to the body for reference of her height and

10  relative position of injuries.  And it shows the upper

11  extremity injuries, the chest, abdominal injuries, as well as

12  injuries in her thigh and knee areas.

13  Q.  How about any bruising to the face?

14  A.  There is also visible bruising particularly around her

15  eyes.

16  Q.  Dr. Howard, let me show you Bates 4729, the top picture on

17  this exhibit.  What does this photograph depict?

18  A.  This is a view of her left hand, again, showing the

19  injuries to both the back of the hand and fingers.

20  Q.  And finally let me take you to Bates 4732, the top

21  photograph.  Can you explain to the Court what this picture

22  shows?

23  A.  This is a photograph taken at autopsy.  Her body is prone

24  position with her head turned to the right.  It shows the back

25  of her extremities, her back and her buttocks, and demonstrates

1    the areas of abrasion and contusion, to claim the back, the

2    buttocks, the back of the neck, and the posterior aspects of

3    the extremities.

4    Q.  What is the coloration around her body on the sides?

5    A.  Most of the dark purple is lividity, simply the pooling of

6    blood after death still in the blood vessels.  And then where

7    the pressure is in the back and the buttocks there is

8    blanching, so it does not accumulate there.

9    Q.  Why does the blood not accumulate there?

10   A.  From the pressure on the vessels by laying flat on the

11   table.

12   Q.  Dr. Howard, let me talk to you about the scalp laceration

13   on Rachel Gray.  Let me show you Bates 4703.  Can you tell the

14   Court what this picture shows?

15   A.  This is a view of basically the top of her head.  The hair

16   has been pushed aside to demonstrate the location of a

17   laceration that involved the full thickness of her scalp, going

18   all the way down to the outer table of the skull.  Appearance

19   of a fresh wound, there was no indication of any healing

20   visible to the naked eye.  And matted dried blood is present in

21   the hair surrounding the wound.

22   Q.  Is this a significant laceration?

23   A.  Yes.  As I said, it produced bleeding and went through the

24   full thickness, and there was more bleeding in the tissue

25   internally visible when the scalp is reflected.

DIRECT EXAMINATION - HOWARD                74

1   Q.  Would this injury have bled when first inflicted?

2   A.  Yes.

3   Q.  Let me show you Bates 4709.  Starting with the top

4   photograph, is this again a photo of the laceration to her

5   head?

6   A.  Yes.  As a part of the autopsy procedure some of the hair

7   is cut away so that the wound is better visible and better

8   photographed.  And the irregular shape of the wound is visible,

9   and the very pale area is the outer surface of the bone of the

10  skull visible in the base of the wound.

11  Q.  Let me show you the bottom photograph on that page, and

12  what is that photograph?

13  A.  That's a closer view demonstrating the same basic view, but

14  a closer image; also shows the hair remaining around it being

15  matted with blood.

16  Q.  Let me show you 4724, the top photograph on that page.  Can

17  you tell us about this photograph?

18  A.  This is the same view of the scalp wound.  It has a metric

19  ruler in place with centimeters.  The small ones are

20  millimeters, the larger ones are centimeters, for scale of how

21  large the wound is.

22  Q.  And does it indicate how large that wound is?

23  A.  Yes.  You can see it goes from about the half-centimeter to

24  the three-centimeter area there, so about two-and-a-half

25  centimeters, as viewed in this photograph.

UNITED STATES DISTRICT COURT

1   Q.  When you conducted your autopsy in this case, did you take

2   a tissue sample of this injury for microscopic examination?

3   A.  I took numerous tissue biopsies from the scalp, including

4   this area, but there were many areas of injury of the scalp

5   that were also biopsied.

6   Q.  And do you recall what your conclusion was about the dating

7   of this injury?

8   A.  My conclusion of this is an acute injury, it would have

9   occurred hours or a day prior to death.  No one can date it

10  exactly, but it is an acute injury, not one that has shown any

11  evidence of healing.

12  Q.  Have you recently reviewed the tissue slides again in this

13  case?

14  A.  Yes.  I received the histology slides, or the glass slides,

15  with all of the biopsies.  There were 52 case slides plus two

16  control slides for special stains.  The special stains are for

17  iron, that gives some indication of whether blood is broken

18  down or not as a part of the wound healing process, and also

19  what's called a trichrome, which would highlight any scar

20  tissue formation.  So I have looked at all of those in the last

21  few weeks.

22  Q.  And did that change your opinion about the timing of this

23  injury?

24  A.  For this particular injury, no.  Having studied it, having

25  been there at the autopsy, previously reviewed the slides, my

1  opinion is this is an acute injury.

2  Q.  Dr. Howard, let me show you Bates Number 4706.  This is a

3  photograph of the vaginal injury to Rachel Gray.  Can you tell

4  the Court the significance of this photo to you?

5  A.  This is a view of the external genitalia, so the buttocks

6  is down.  The belly or abdomen is up and her thighs have been

7  spread apart to show the labia majora, labia minora and the

8  entrance to the vaginal canal.  It shows bruising and abrasions

9  that are present in the tissue surrounding the vaginal opening,

10  and in the midline, as I am indicating here, is a laceration or

11  a tear.  And the photograph also shows that bloody fluid is

12  pooled in the vaginal canal and within the laceration itself.

13  Q.  Did you also examine tissue samples microscopically for

14  this injury?

15  A.  Yes.

16  Q.  And do you recall the date of this injury based upon those

17  tissue samples?

18  A.  My opinion is it's an acute injury.  There is no evidence

19  of healing.  There was evidence of some edema and clearly

20  bleeding into the tissue, so she was alive for some period of

21  time.  It could be a few hours, it could be a day.

22  Q.  Again, have you reviewed the vaginal tissue slides in this

23  case recently?

24  A.  Yes.

25  Q.  At the same time that you reviewed the scalp tissue slides?

1   A.  Yes.

2   Q.  And do you hold the same opinion about the dating of these

3   injuries?

4   A.  I do.

5   Q.  In your opinion, could this injury have been older, say a

6   week or longer?

7   A.  My opinion, no, it shows none of those characteristics that

8   would be expected for an older injury.

9   Q.  Dr. Howard, let me show you 4707, the bottom photograph.

10  What do you see in this photograph?

11  A.  Again, this is a view of the external genitalia.  Gloved

12  fingers are holding the tissue apart so that the laceration, as

13  it extends from the perianal tissue into the vaginal canal, is

14  more visible than the previous photograph.

15  Q.  Does that photograph show the depth and severity of this

16  that injury?

17  A.  Yes.

18  Q.  How severe was this vaginal injury to Rachel Gray?

19  A.  This is a tear all the way through the mucosa into the

20  underlying supporting tissues, producing bleeding both out of

21  the wound and into the surrounding tissue.

22  Q.  What kind of symptoms would she experience with an injury

23  of this magnitude?

24  A.  This would be very painful.

25  Q.  Would she have felt pain with bathing?

1   A.  Yes.

2   Q.  Would she have felt pain with urination?

3   A.  Most likely, yes.

4   Q.  And been bleeding in her underwear?

5   A.  Yes.

6   Q.  Dr. Howard, let me show you Exhibit 65, Bates 4738.  Can

7   you tell the Court about this photograph?

8   A.  As a part of the autopsy procedure, incisions -- typical

9   Y-shaped incisions made from the shoulder to the chest and down

10  through the abdomen.  The skin and subcutaneous tissues are

11  reflected so that the deep layers of the skin can be looked at

12  and the muscle of the chest and abdominal wall can be viewed

13  directly.  And this photograph is from the left side of the

14  body after that incision has been made.

15      And while most of the red is skeletal muscle, the areas of

16  darker red all represent dozens of areas of impact injury.

17  These are the deep representation of the bruises that could be

18  seen on the outside of the body, going all the way through the

19  skin, the subcutaneous tissues, to the muscle of the body wall.

20  Q.  And, Dr. Howard, I think if you touch your screen you can

21  actually circle those areas where you are identifying the

22  bruising underneath the skin.

23  A.  Here.  There are many of them.  But all of these are

24  abnormal areas of hemorrhage.  (Indicating.)

25  Q.  Did these injuries go into the muscle of Rachel Gray's

UNITED STATES DISTRICT COURT

1    body?

2    A.  Yes, it went down to the skeletal muscle of the body wall.

3    Q.  Dr. Howard, let me show you Bates 4739, the top photograph.

4    A.  This is a photograph taken from the right side of the body,

5    again, after that incision has been made, so the right side of

6    the body wall is exposed, the deep layers.  And, again, every

7    one of these dark areas, both in the muscle and in the limited

8    amount of fat she had beneath the skin, shows areas of

9    hemorrhage; each one of those is a separate impact site.

10   Q.  Let me show you 4739 -- oh.  Excuse me.

11       Let's talk about the internal injuries you found during the

12   autopsy.

13       I am showing you 4739.  Can you explain to the Court what

14   you are seeing in this picture and why it's relevant to your

15   opinion.

16   A.  This photograph at autopsy is after the muscle wall of the

17   abdomen has been dissected and reflected to right and left so

18   that the internal organs of the liver, the intestines, are all

19   exposed.  It shows areas of hemorrhage in this location below

20   the liver and an abnormal accumulation of kind of green-brown

21   fluid.  Normally the lining would just be smooth and glistening

22   and no fluid accumulation.  So this is a sign of injury that

23   particularly relates to the laceration of her small bowel.

24   Q.  So there should not be any fluid accumulating in this

25   picture is what you're saying?

1   A.  Correct.

2   Q.  Let me show you Bates 4740, the top photograph here.  Is

3   this another view of what you were just discussing?

4   A.  Yes.

5   Q.  Was this fluid contained in the retroperitoneal cavity?

6   A.  No, this fluid is free throughout the abdominal cavity.

7   The same kind of fluid was present around the lacerated small

8   bowel and in the tissues in the back of the abdomen, which is

9   called the retroperitoneal area.  So it was in both areas.

10  Q.  How long would it take from fluid leaking out into the

11  retroperitoneal cavity to make its way to the front here, to

12  the peritoneal cavity?

13  A.  It could just be a matter of minutes.

14  Q.  Let me show you Bates 4742, the top photograph.  Can you

15  explain to the Court what you're seeing in this photograph?

16  A.  This is a view of the chest and abdomen after opening.  The

17  stomach has been pulled up and the intestine, the first part of

18  the small bowel, is also being held with forceps to demonstrate

19  the area of injury.  There is bleeding, the discoloration from

20  the leakage of fluid, and the actual tear went all the way

21  through the full thickness of the bowel wall in that location,

22  the first part of the small bowel, or the duodenum.

23  Q.  Is this a significant tear to the duodenum?

24  A.  Yes, this is a fatal injury.

25  Q.  And you described this laceration in your autopsy report?

DIRECT EXAMINATION - HOWARD                                    81

1   A.  Yes.

2   Q.  And the bottom photograph on 4742, is this a close-up of

3   that injury?

4   A.  Yes, it's a closer view of the same area of injury.  So the

5   very center of the photograph shows the laceration, the

6   bleeding, the leakage of fluid into both the retroperitoneal

7   cavity and then out into the peritoneal cavity.

8   Q.  Are these types of abdominal injuries in child abuse

9   common?

10  A.  Head injury -- "fatal," in terms of fatal child abuse from

11  physical injury, head injuries are the most common; abdominal

12  injury is the second most common; and this particular type of

13  injury is perhaps the most common seen in fatal abdominal child

14  abuse.

15  Q.  Let me pull up Exhibit 57A.  Dr. Howard, I am showing you

16  what's already been admitted into evidence in this case as a

17  demonstrative exhibit of the anatomy of the body.  Can you

18  explain for the Court all the injuries to Rachel's internal

19  organs as you discovered them at autopsy?

20  A.  The evidence at autopsy was of a blunt impact to the

21  abdomen going front to back.  Basically like a crush injury

22  pushing the front wall back against the spine.

23      This diagram of internal structures shows the pancreas,

24  which is this pale area here; this C loop, which is the

25  duodenum or the first part of the small bowel.  The laceration

DIRECT EXAMINATION - HOWARD

1  involved this first part, and then there was hemorrhage

2  surrounding that, as well as surrounding the head of the

3  pancreas, or the first part, as opposed to the tail.

4      The colon is shown in pink here and here and in two

5  parallel dotted lines going across here.  So this is the cecum,

6  where the appendix would be, the ascending colon, and then the

7  transverse colon descending.  So the transverse colon was

8  bruised.  So there are contusions -- because this is all in the

9  same basic area, a punch or a kick or a knee, but basically a

10  front-to-back blow to this area sufficient to break blood

11  vessels and tear the full thickness of the duodenum.

12          THE COURT:  So you named three specific blows that

13  could cause that.

14          THE WITNESS:  Well, one blow to the same area could do

15  it.

16          THE COURT:  Right.  You listed a punch, a kick, or a

17  knee.

18          THE WITNESS:  That would be common mechanisms for this

19  type of injury.

20          THE COURT:  Would those be the only types of --

21          THE WITNESS:  It could be elbowed, being forced

22  violently down on an object that's relatively small that would

23  fit in that area.

24          THE COURT:  Could it be a foot?

25          THE WITNESS:  Certainly could be a kick.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - HOWARD                          83

1             THE COURT:  Could it be somebody jumping on a person?

2             THE WITNESS:  Yes.

3             THE COURT:  Could it be an auto accident?  A seat

4    belt?

5             THE WITNESS:  I've seen many seat belt injuries.  For

6    this localized area, without other areas, would be very

7    uncommon from a seat belt.

8             THE COURT:  Okay.

9    BY MR. BRACCIO:

10   Q.  And from the -- so you saw injury to three different

11   internal organs?

12   A.  Yes.

13   Q.  Can you tell the Court the effect of all of these internal

14   injuries as they related to Rachel's death?

15   A.  I think she would immediately have had pain.  The function

16   of the bowel would be lost.  She would not be able to hold down

17   fluids.  Depending on how long she survived, nausea/vomiting

18   would be common.

19        As the inflammation spread throughout the abdomen, that

20   leakage of fluid, it would cause an irritation, and she would

21   probably be what's called guarding or hold her abdomen stiff.

22   Any pressure put on her abdomen would increase the pain, and

23   the spillage of the bacteria ultimately would lead to

24   septicemia or systemic loss of blood pressure, and go into

25   shock and ultimately die.  That, in addition to the loss of

DIRECT EXAMINATION - HOWARD

1  blood out of circulation from both the abdominal injury and the

2  multitude of other injuries.

3  Q.  How soon could you observe inflammation in the cells?

4  A.  Well, the literature says you can see, in a contusion,

5  inflammatory cells visible microscopically as little as 20 to

6  30 minutes.  More commonly it would be several hours, four

7  hours or more.

8  Q.  And all of these processes to her internal organs were

9  documented in your autopsy report?

10  A.  All of the injuries are documented, yes.  I have discussed

11  the mechanisms, but the specific anatomic abnormalities are in

12  the autopsy report.

13        THE COURT:  In other words, the testimony you just

14  provided about when you would see inflammation is not in your

15  report.

16        THE WITNESS:  Correct.

17        THE COURT:  The injuries are in your report.

18        THE WITNESS:  The injuries and the microscopic

19  appearances are in there, but the sequence isn't specifically

20  outlined in the autopsy report.

21        THE COURT:  I understand.

22  BY MR. BRACCIO:

23  Q.  Did you examine tissue slides from any of these internal

24  organs?

25  A.  Yes.

1   Q.  Which ones?

2   A.  From the abdominal area.  The kidneys, the duodenum, the

3   colon, the pancreas, and adrenal glands.

4   Q.  What was your conclusion about the duodenum?

5   A.  It was an acute injury.  She survived for enough time for

6   inflammation to develop, but there was no sign of healing or no

7   fibrinous or fibrous adhesions forming.  My opinion again is

8   this is an acute injury, could be a few hours, typical of a day

9   or the same day as death.

10  Q.  Why would a pathologist know about these internal injuries

11  better than, say, an emergency room doctor?

12  A.  Because we directly see them.  We deal with deaths that

13  occur in the hospital, in trauma centers.  So someone gets

14  admitted to the hospital, we review all the medical records,

15  all the CT scans and do the autopsy, so that we see directly,

16  as opposed to the indirect.

17      So certainly surgeons, pediatric surgeons in particular,

18  have direct visualization because they're operating to try and

19  repair the damage, but the emergency room doctors would not do

20  that, or the pediatricians would not.

21      We have the privilege of doing an autopsy and seeing for

22  oneself directly.  We also see many deaths that occur outside

23  of the medical setting, never make it to the hospital.  So we

24  see all of that spectrum, as well as what the clinicians see.

25  Q.  I'd like to talk to you about how precisely a pathologist

1   can date an injury based upon the tissue slides.  Do you have

2   an opinion about that?

3   A.  I do.

4   Q.  Can you tell Judge Burgess?

5   A.  I wish we could.  We can't.  We can't date them exactly.

6       We're dealing with human biology.  Many of you are blessed

7   with hair; I am bald.  It's just the nature of individual

8   genetics, individual responses to injury, how much

9   inflammation, how much force is involved, whether there is

10  infection or not.  All of those have a role in altering what

11  the anatomy looks like with the naked eye or under the

12  microscope.

13      So there's a range of time that's been studied, and that's

14  reproducible, but there is always a range.  If you go to the

15  literature, there are clearly documented reports of

16  inflammatory cells showing up in as little as 20 minutes, more

17  commonly it would be over a period of hours.  So there is no

18  way for anyone, any of us pathologists, any physician to date

19  an injury with precision, we can only give a range.

20  Q.  Let me briefly ask you about the symptoms that Rachel Gray

21  would have experienced from these injuries.  Does everyone

22  respond to an injury in the same manner?

23  A.  No, not necessarily.

24  Q.  Depend upon a number of factors?

25  A.  Yes.

1   Q.  In this case, with all of these injuries, can you tell what

2   kinds of symptoms Rachel would have been experiencing?

3       I think you've previously talked about this.

4           THE COURT:  I think he's already -- you've already

5   answered that question.

6           MR. BRACCIO:  Yeah.

7   BY MR. BRACCIO:

8   Q.  Would Rachel at any point have acted normally with this

9   type of injury?

10  A.  My opinion is as soon as the abdominal injury was inflicted

11  she would no longer be exhibiting normal activity for her age.

12  Q.  Let me show you your declaration in this case, Exhibit 45.

13  How did this declaration come to be?

14  A.  At the time -- this, I believe, was back in -- about 13

15  years ago, 2004.  I was at that time the chief medical examiner

16  in Tacoma, for Pierce County, before I joined my medical school

17  classmate in Spokane.  So I was the chief medical examiner for

18  Pierce County at the time.  I basically was contacted pretty

19  much out of the blue to say -- by defense that they wanted me

20  to consider some additional questions that had not been asked

21  at trial.  So I agreed to do that.

22          THE COURT:  When you say, "defense," you mean

23  Mr. Jones' attorneys?

24          THE WITNESS:  Yes.  It may have been an investigator

25  initially.

1     So we discussed the case, particularly about -- this range

2     of timing of injuries was a critical part of it, as well as

3     symptoms, and they prepared a declaration which basically

4     captured the essence of our communication, and I agreed to sign

5     that.

6          THE COURT:  So they prepared it, you reviewed it, you

7     signed it.

8          THE WITNESS:  They prepared it after --

9          THE COURT:  Talking.

10         THE WITNESS:  -- discussion.

11         THE COURT:  Okay.

12    BY MR. BRACCIO:

13    Q.  Is this declaration consistent with your prior testimony in

14    this case?

15    A.  Yes.

16    Q.  Let me show you Paragraph 3.  Now, you agreed in this

17    deposition that:  If petitioner's trial counsel had asked me

18    whether the injury to Rachel Gray's abdomen that caused her

19    death could have happened more than 24 hours before her death,

20    I would have answered the question in the affirmative.

21    Correct?

22    A.  Yes.  Basically, as I've said, based only on what you can

23    see at autopsy and what you can see under the microscope, you

24    cannot date the injury exactly.  It could be just a few hours,

25    it could be 24 hours, it could potentially, or at least in

DIRECT EXAMINATION - HOWARD                          89

1    theory, be longer and still appear the same as I saw at

2    autopsy.

3    Q.  Does this change your opinion that Rachel's injuries were

4    consistent as having been inflicted on May 1st, 1994?

5    A.  No.

6    Q.  At Page 3 of this declaration, Paragraph 10, you agree that

7    the timing of the blow to Rachel Gray's abdomen could have been

8    expanded upon had you known that Rachel Gray appeared sick on

9    Friday, April 29th, 1994, before her death, correct?

10   A.  Yes.

11   Q.  And such a report could be consistent with an abdominal

12   injury being inflicted prior to that time?

13   A.  Correct.

14   Q.  So, conversely, if there was no evidence in this case that

15   Rachel Gray appeared sick on Friday, April 29th, 1994, would

16   that be consistent with your opinion that the injuries would be

17   consistent as having been inflicted on May 1st, 1994?

18   A.  Yes.

19   Q.  Do you hold the same medical opinion now that you held when

20   you conducted Rachel's autopsy and examined the tissue slides

21   of her injuries?

22   A.  Yes.

23   Q.  And all of your findings were consistent with the injuries

24   having been inflicted on the afternoon of Sunday, May 1st,

25   1994?

1    A.  In terms of her scalp laceration, her abdominal injury, the

2    vaginal injury and the majority of the bruises on her body,

3    those all appear acute, consistent with that time frame.  I

4    think there were some other injuries that had changed color

5    that could be older.  And looking at injury to the scalp -- not

6    the laceration but just areas of injury -- could be older.  But

7    in terms of the injuries that killed her, my opinion is

8    consistent with that time frame.

9              MR. BRACCIO:  Your Honor, may I have a moment?

10             THE COURT:  You may.

11             MR. BRACCIO:  I have no further questions.

12             THE COURT:  Mr. Sandman.

13                    CROSS-EXAMINATION

14   BY MR. SANDMAN:

15   Q.  Afternoon, Dr. Howard.

16   A.  Good afternoon.

17   Q.  You have testified now -- this would be the third occasion

18   you've testified under oath regarding the timing of Rachel's

19   injuries, is that correct?

20   A.  I believe that's correct.

21   Q.  And you also submitted to a pretrial interview?

22   A.  Yes.

23   Q.  And your sworn deposition.

24   A.  Correct.

25   Q.  And would you expect that there would be some consistency

1   between those testimonies you've given on the timing of

2   Rachel's injuries?

3   A.  Well, as I said in my declaration, it's all a matter of how

4   the question is worded as to what my response is.

5   Q.  So what we've heard so far today from you, Dr. Howard, is

6   answers to questions phrased by Mr. Braccio, correct?

7   A.  Correct.

8   Q.  And now, depending on the questions I ask you, you may have

9   different answers, is that right?

10  A.  Potentially, yes.

11  Q.  Could we take a look at the autopsy in Exhibit 52.  Page 5.

12  Item Number 7, if we could blow that up.

13      What is Item 7, Dr. Howard?

14  A.  This is the autopsy report.  Page 5, Item 7 has been

15  highlighted.  I could read it.

16      It says:  There is an obliquely oriented laceration of the

17  left superior and posterior scalp region positioned above and

18  behind the left ear approximately one-half inch below the top

19  of the head and one-and-one-half inches to the left of midline.

20      And then there's a lead-in to the next sentence.

21  Q.  Okay.  Did you testify this afternoon that that injury was

22  hours to a day old?

23  A.  Yes, my opinion would be that is consistent with being

24  hours to a day old.

25  Q.  When you say, "consistent," Dr. Howard, tell the Court what

CROSS-EXAMINATION - HOWARD                                    92

1    you mean by that, please.

2    A.  "Consistency" means typical or entirely possible.  Nothing

3    that makes it impossible for it to be that way.  Nothing

4    inconsistent with that.

5           THE COURT:  I'm sorry.  Now I am confused.  Are you

6    saying it's more likely than not?

7           THE WITNESS:  My opinion, more likely than not, it's a

8    few hours to a day old, yes.  But as I have said, there are

9    limits on what you can say with absolute certainty, in terms of

10   medical terms.  No one can date it absolutely.

11          THE COURT:  So that's why I think you testified

12   earlier that you speak in terms of ranges as opposed to

13   something precise.

14          THE WITNESS:  Correct.

15          THE COURT:  But I understood your testimony -- and I'm

16   sorry, Mr. Sandman, I'll let you get back to your line of

17   inquiry here.

18      But your testimony, as I understood it, was both this

19   injury, the laceration, and the abdominal injury -- and you

20   correct me if I'm wrong -- was more likely than not that it

21   occurred on the afternoon before her death.

22          THE WITNESS:  Yes.

23   BY MR. SANDMAN:

24   Q.  Dr. Howard, do you remember we discussed the topic of the

25   dating of this injury at your deposition?

UNITED STATES DISTRICT COURT

1   A.  Yes.

2   Q.  Did you review your deposition?

3   A.  I'd be happy to.

4   Q.  No, I said did you review it.

5   A.  Oh, did I?  It's been a few weeks.  But I have, yes.

6   Q.  And do you remember that the topic of the dating of the

7   scalp injury was a subject of your pretrial interview on

8   November 28, 1994, as well as your recent deposition?

9   A.  Yes.

10  Q.  Can we take a look at Exhibit 46?  At Page 19.  If you

11  could blow up the first half of the page down to Line 12.

12        Now, Dr. Howard, on this portion of your interview, do you

13  see that the gentleman asking the questions is inquiring about

14  autopsy number seven that we just referred to a few minutes

15  ago?

16  A.  Yes.

17  Q.  And that's the scalp injury we're talking about, right?

18  A.  I believe that is correct.

19  Q.  And the question posed to you in November 1994 was:  Are

20  you able to say how old this particular injury is?  Correct?

21  A.  Yes, that's --

22  Q.  Do you remember what your answer was then?

23  A.  I think I said a couple days.  Or two days, perhaps.

24  Q.  Let's take a look at the answer.  Blow up the rest of the

25  page.

1      So, at least in November of 1994, it was your opinion that

2   the scalp injury was probably two days old.

3   A.  Well, that sentence is incomplete, so it's not a correct

4   transcription of my complete answer.  Certainly, could be two

5   days, could be less.  Possibility of it being older than that.

6   We don't have the exact transcript, so I'm not going to test my

7   memory from that long ago to say whether I thought it could be

8   more or older.

9           THE COURT:  I'm sorry.  Sir, are you saying that you

10   don't believe that says your testimony was that it was probably

11   two days --

12           THE WITNESS:  Probably two days old, but there is a

13   blank, so I don't know what the rest of this is.  So the answer

14   is, yeah, it could be 48 hours old.  Certainly, having reviewed

15   it several times since, I can't eliminate it being two days

16   old.  But it appears more acute to me when I have reviewed this

17   case, including the microscopic slides, in recent time.

18           THE COURT:  Well, when you say, "it appears more

19   acute," help me understand what that means.  "Acute," to me,

20   means more serious.

21           THE WITNESS:  What's that?

22           THE COURT:  "Acute," to me, means more serious.  Maybe

23   you have a different --

24           THE WITNESS:  "Acute," in medicine, is timing.

25   "Chronic" versus "acute."  "Acute" has to do with --

UNITED STATES DISTRICT COURT

1            THE COURT:  Recent.

2            THE WITNESS:  Recent, short period of time.  As

3   opposed to "subacute," which would be two days or older, or

4   "chronic," which is something going on for many days or weeks

5   or months.

6            THE COURT:  So I just want to make sure I understand.

7   So when you answered this question, it appears that you were

8   saying, "probably two days old," at least in the first clause

9   of that answer, right?

10           THE WITNESS:  That's correct.

11           THE COURT:  And are you saying now, upon further

12  reflection, you think it's something other than that?

13           THE WITNESS:  Yes, I think, on further reflection, I

14  cannot eliminate it being older than 24 hours.  Having looked

15  at the slides numerous times since, and reviewed the

16  photographs, I think it's far more typical of being a shorter

17  time period.  Hours to a day, not two days.

18           THE COURT:  That's kind of a significant difference,

19  isn't it?

20           THE WITNESS:  It is.  But, again, this is not -- this

21  was, I believe, the pretrial, and --

22           THE COURT:  This was in -- I'm sorry.

23      When was this, again, Mr. Sandman?

24           MR. SANDMAN:  November 28, 1994.

25           THE COURT:  Go ahead.

CROSS-EXAMINATION - HOWARD                          96

1   BY MR. SANDMAN:

2   Q.  Dr. Howard, I have several more questions about this topic.

3   A.  Certainly.

4   Q.  For example, before you signed your declaration, at least

5   according to your declaration at Page 16, you reviewed the

6   autopsy tissue slides again at that time, correct?

7   A.  That's what I recall.

8   Q.  And, by the way, you reviewed the tissue slides of the

9   scalp injury before your interview in 1994, correct?

10  A.  Yes, I would have.

11  Q.  And so you reviewed the tissue slides twice before your

12  deposition that we took this summer, correct?

13  A.  Could you repeat that?  I am sorry.

14  Q.  You reviewed the tissue slides at least twice before your

15  deposition was taken in this case --

16  A.  Oh, the deposition.  That's correct.

17  Q.  -- on July 20, 2017.

18  A.  That's correct.

19  Q.  And in your deposition, under oath, you testified regarding

20  your statement in the interview and you stated that as a result

21  of the assessment that you made before your pretrial interview

22  that, quote, as a result of that assessment -- you agreed that

23  as a result of that assessment the injury was probably two days

24  old.  Correct?  That's what you testified to in July.

25  A.  I believe so.

UNITED STATES DISTRICT COURT

1  Q.  And then I asked you in the deposition -- this is at Page

2  28, Line 18.  I asked you:  Does "probably" mean more probably

3  than not?  Or do you not characterize it any further than just

4  "probably"?  And your answer was:  I think at that time, it

5  would be more probable than not.

6       Do you see that?

7  A.  Yes.

8  Q.  So in July, after looking at the tissue samples at least

9  twice that we know of, you testified under oath that the scalp

10 injury was, more probably than not, at least two days old,

11 correct?

12 A.  That's correct.

13 Q.  And then today it's now a matter of hours.  That's a pretty

14 big difference, isn't it, Dr. Howard?

15 A.  Well, at that time, as we spoke, it could have been hours.

16 I don't know exact.

17 Q.  And that's the point of your analysis of this entire

18 matter, in terms of all these injuries, is that you have a

19 significant amount of doubt about when these injuries occurred,

20 isn't that correct?  Within a range?

21 A.  There is a range.  I don't have doubt about the range, but

22 I certainly have doubt about being able to pinpoint it to any

23 particular time.

24 Q.  Can we rely on any of the statements you've made under oath

25 with respect to the timing of these injuries that you gave in

CROSS-EXAMINATION - HOWARD

1    July 2017?

2    A.  I think all of my testimony in this case for all the years

3    provides some context, yes.

4    Q.  Now, you testified this afternoon that the vaginal injury

5    could be "hours to a day," in terms of the time -- from the

6    time of injury.  Correct?

7    A.  The abdominal injury?

8    Q.  The vaginal injury.

9    A.  Oh, vaginal injury.  Yes.

10   Q.  And, Dr. Howard, what do you think the most typical time

11   for this injury would be?

12   A.  The most typical time?

13   Q.  Yeah, for when it was inflicted.

14   A.  Again, I can only give a range.

15   Q.  What is your range?

16   A.  It could be a few hours to -- based solely on the

17   appearance at autopsy of the microscopic, could be as little as

18   a few hours to more than 24 hours.

19   Q.  Okay.  And so this afternoon you're unable to tell us what

20   the more typical finding would be with respect to the timing of

21   this injury, correct?

22   A.  I think my opinion would be typical of about -- of having

23   occurred within a day of death.

24   Q.  How do you define that?

25   A.  What's that?

CROSS-EXAMINATION - HOWARD                          99

1   Q.  How do you define "a day of death"?

2   A.  Within 24 hours prior to death.

3   Q.  You testified at the Angela Gray trial, did you not?

4   A.  I believe so.

5   Q.  And you were asked questions specifically about the timing

6   of this injury and what the range would be, do you remember

7   that?

8   A.  I do.  I don't recall the specifics, but that was covered,

9   I believe.

10  Q.  Let's take a look at Exhibit 48A and see what you said when

11  you were under oath in that proceeding.

12  A.  Yes.

13  Q.  At Page 99.  Do you see there, there's beginning a

14  discussion about the timing of the vaginal injury?

15      And then -- whoops.

16      If we could go to Page 100.

17          MR. SANDMAN:  Can you not go to 100?

18          Could we get 48A, a paper copy?  Can someone hand me a

19  paper copy of 48A?

20      Your Honor, may I approach?

21          THE COURT:  You may.  Make sure opposing counsel

22  knows what you're --

23          MR. SANDMAN:  48A.

24          MR. BRACCIO:  Yes.

25  BY MR. SANDMAN:

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - HOWARD

1  Q.  Dr. Howard, today your testimony was that the vaginal

2  injury could be "hours to a day."  I assume that's under 24

3  hours, right?

4  A.  That would be typical.  And it's possible that it could be

5  longer.

6  Q.  Now, at Page 100, if you could take a look at Page 100.

7  A.  Page 100.

8  Q.  I guess we've got it up.

9       MR. SANDMAN:  Jennifer, if you could enlarge the first

10  12 lines.

11  BY MR. SANDMAN:

12  Q.  Okay.  So at Ms. Gray's trial, March 28, 1995, you were

13  asked about the timing of the injury and you said "perhaps as

14  few as 12 hours."  Correct?  At Line 7.

15  A.  Line 7.  Yes.

16  Q.  Then you were asked a question:  So it's anywhere from 12

17  to 48 hours.  And your answer was:  That's possible.  The

18  findings are more typical of around 24 hours.

19       Do you see that?

20  A.  Yes.

21  Q.  And you understand, Dr. Howard, that the timing of these

22  injuries, do you understand the relevance of those, the timing

23  of those injuries to this case, where the Government has

24  alleged that certain injuries were inflicted on Sunday

25  afternoon between 2:30 and 5:30 p.m. on May 1st?

UNITED STATES DISTRICT COURT

1  A.  Yes, I --

2  Q.  You do understand that.

3  A.  I certainly do.

4  Q.  And a vaginal injury that at least according to you is

5  typical of 24 hours old would be occurring at a time that falls

6  outside the window of May 1st in the afternoon, correct?

7  A.  I believe so.

8  Q.  Because as you indicated in your declaration and at your

9  deposition, Rachel could have died as early as 1:00 a.m. on May

10  2nd, correct?

11  A.  That's correct.

12  Q.  And the hours of 2:00 to 5:00 in the afternoon on Sunday

13  are far short of the typical 24 hours that you identified for

14  this injury under oath at the Gray trial, correct?

15  A.  That's correct.

16  Q.  And certainly you offered that opinion at the Gray trial

17  after reviewing the tissue slides and preparing yourself

18  appropriately, correct?

19  A.  I did.

20  Q.  And there really is no justification for testifying under

21  oath before that jury that the injuries are typical of 24 hours

22  and coming here today and telling us it's hours to a day;

23  that's different testimony, isn't it?

24  A.  It's different wording.  When you look at all of the

25  testimony, it's certainly within the same range of timing.

1   Q.  Dr. Howard, is the vaginal injury, in your opinion, typical

2   of an injury that predates the afternoon of Sunday, May 1?

3   A.  Yes.

4   Q.  Okay.  Now I assume that you held to that opinion when you

5   testified at Ms. Gray's trial on March 28, 1995, correct?  That

6   it was typical of --

7   A.  I don't recall the exact testimony.

8   Q.  -- occurring at a time prior to the afternoon of May 1,

9   just like you testified a few seconds ago?

10  A.  I believe so.

11      I guess I am not sure what your question is.

12          THE COURT:  Why don't you rephrase your question.

13  BY MR. SANDMAN:

14  Q.  When you testified just a few seconds ago, you said that

15  you -- I'll start over.  I'm sorry.

16      When you testified at the Gray trial that the injury was

17  typical of occurring 24 hours prior to death, you held to the

18  belief then that that injury occurred before, likely occurred

19  before the afternoon of May 1st, correct?

20  A.  I didn't state that that was my belief.  My belief was that

21  it's typical of 24 hours, and therefore the inference would be

22  that it would be before that period.

23  Q.  That was what you testified to on March 28, 1995.  And then

24  just a few weeks later, on April 12th, 1995, you testified at

25  Mr. Jones' trial, correct?

UNITED STATES DISTRICT COURT

1    A.  I believe so.

2    Q.  And knowing what you just said, which was the injury was

3    typical of something that occurred before May 1st, you came to

4    the courthouse at Mr. Jones' trial and you told his jury that

5    the jury was consistent with infliction on the afternoon of

6    Sunday, May 1st, between the hours of 2:30 and 5:00 p.m.

7    Correct?

8    A.  Yes.

9    Q.  And you did that because you weren't asked the right

10   questions to allow the jury to know that it was really your

11   belief that the injury was typical of the day prior?

12   A.  I believe it was a correct response to the question asked.

13   Q.  Okay.  So even though you held to the belief that the

14   injury was more typical of the day prior, you told Mr. Jones'

15   jury that the injury was consistent with the afternoon of May

16   1, correct?

17   A.  Correct.

18   Q.  And that could leave a jury with a misimpression of your

19   findings that that injury likely occurred on April 30th,

20   correct?  All because someone didn't ask you the right

21   question.

22   A.  That's entirely possible.

23   Q.  When did you develop this philosophy of, you know, that you

24   must not disclose the full range of your findings with respect

25   to questions about timing of injuries?

CROSS-EXAMINATION - HOWARD

1    A.  I don't believe that's my philosophy.  I am free, available

2    to discuss these matters, but I can only answer in court the

3    questions I am asked.

4    Q.  Now, let's move on to the -- by the way, when you looked at

5    the tissue slides of the vaginal injury, are you testifying

6    that you did not see neovascularization and collagen formation

7    with respect to that injury?

8    A.  I don't recall seeing that in those slides.

9    Q.  And Dr. Keen and Dr. Ophoven have testified in these

10   proceedings that they do recall seeing neovascularization and

11   collagen, and that that would indicate a substantial period of

12   a healing injury that could have dated back weeks.  I guess my

13   question is you don't recall one way or the other whether you

14   saw that on the slides, correct?

15   A.  I don't recall seeing any such change, and I spent many

16   hours looking at those.

17   Q.  You agree that if Dr. Ophoven indeed saw and Dr. Keen saw

18   evidence of neovascularization and collagen, that that would be

19   evidence that the injury was quite -- quite old, could be weeks

20   old, correct?

21   A.  Well, all the supportive tissues have some degree of

22   collagen, so simply having collagen present is not indicative

23   of an older injury.  And even if neovascularization were

24   present, it does not eliminate an acute injury being present

25   over an area of older injury.  The signs that I see under the

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION - HOWARD

1   microscope are of acute injury being present.

2           THE COURT:  So are you saying that there could be

3   older injuries and a newer injury as well?

4           THE WITNESS:  Well, I did not see evidence of an older

5   injury.  If someone else saw that, it does not eliminate the

6   fact that there could be an acute injury on top of an older

7   injury.

8           THE COURT:  So there could be both.

9           THE WITNESS:  Could be both.  If, in fact, those

10  changes were present and I didn't see them in the slides that I

11  have.

12  BY MR. SANDMAN:

13  Q.  Dr. Howard, you testified today that the small bowel injury

14  was days -- excuse me -- hours old.  Is that what your opinion

15  was?

16  A.  It could be.

17  Q.  What is your opinion as to the most consistent -- what is

18  the most consistent time for that injury, based on your

19  examination of the tissue slides and photographs and so on?

20  A.  Again, I think there is a range in which that injury could

21  have occurred time wise.  It's certainly typical of being at

22  least a few hours old.  It could be also typical of what it

23  looks like at 24 or more.

24  Q.  So do you remember testifying at the Angela Gray trial on

25  March 28, '95, regarding the specific question as to what your

1    findings were most consistent with in terms of the timing of

2    that injury?

3    A.  I don't recall that specific question.

4    Q.  If we could take a look at Exhibit 48A again, this time at

5    Page 101.  Dr. Howard, I think you have that deposition in

6    front of you, the testimony at Page 101.

7    A.  101.

8    Q.  If you would look at the question starting at Line 2 and

9    your answer at Line 7.

10   A.  Shall I read it?

11   Q.  Well, here was the question.  I'll read that and then you

12   can read your answer.

13       (Reading:)  You indicated that the internal injuries that

14   the child died from, the -- just for clarification, were about

15   24 hours prior to her death is when she incurred the injury to

16   her abdomen.

17       And your answer was?

18   A.  The answer is:  The findings are most consistent with that.

19   Q.  Is that still your opinion, Dr. Howard?

20   A.  Well, in the context of the additional responses to that

21   inquiry regarding that injury, yes.

22   Q.  Okay.  So now you weren't asked these specific questions

23   during your direct examination, but now being asked to tell the

24   Court what is the most consistent time for the infliction of

25   that injury, you are dating it at a time that was prior to the

CROSS-EXAMINATION - HOWARD

1   afternoon of May 1st, 1994, correct?

2   A.  Well, it is most consistent with being several hours to 24

3   hours, which would include being outside of that time frame.

4   Q.  Well, Dr. Howard, your testimony before the Gray jury was

5   that the injury was unambiguously most consistent with 24

6   hours, correct?

7   A.  That's correct.

8   Q.  And just so we don't veer off too far here, that's still

9   your testimony today.

10  A.  There is a range but it certainly is typical of 24 hours.

11  Q.  And most consistent with that, which would mean that

12  clinically, in your judgment, it's more than likely that the

13  injury occurred on April 30 than on May 1, correct?

14  A.  That's entirely possible.  Like I said, there's a range.

15  Q.  Now, once again -- and, by the way, you also told

16  Ms. Gray's jury that the -- you thought that the -- you thought

17  it was conceivable that the injury could be as few as 12 hours

18  old.

19  A.  That's correct.

20  Q.  And now, here today, it could be two hours, correct?

21  A.  Having reviewed the literature and the slides in

22  preparation for what I anticipated being questioned, yes, could

23  be a few hours, could be less than 12 hours.

24  Q.  And I think you have testified, and I think you did so in

25  your deposition, that you thought that if Rachel was injured at

CROSS-EXAMINATION - HOWARD

1    11:59 p.m., just before the clock ticked to May 2nd, if she had

2    been injured at 11:59 p.m., she still could have died at 1:00

3    in the morning from this injury.  Is that right, Dr. Howard,

4    according to your theory?

5    A.  Yes.  Correct.

6    Q.  Of how this works.

7         So it's almost instantaneous death from this type of

8    injury, according to you.

9    A.  Shock can cause that.  It would not be typical.

10   Q.  Now, after telling or testifying before Ms. Gray's jury

11   that the injury was most consistent with 24 hours, you were

12   asked by the prosecutor to tell Mr. Jones' jury what the most

13   consistent time for the infliction of Rachel's injury was.  So

14   you've already told the Gray jury a couple weeks earlier it was

15   24 hours.  Then you're asked the same question on April 12, to

16   tell the Jones jury what's most consistent, and you didn't tell

17   Jones' jury that the injury was most consistent with 24 hours,

18   did you?

19   A.  I don't recall.  Perhaps you can refresh my memory, or the

20   transcript, did that prosecutor actually ask me the "most

21   consistent" or was it consistent?

22   Q.  Okay.  Well, let's take a look at Exhibit 47.

23        So, Dr. Howard, just to be clear, if the prosecutor asked

24   you at Mr. Jones' trial to tell Mr. Jones' jury what was the

25   most consistent time for that injury, you should have given

UNITED STATES DISTRICT COURT

1    that jury the same answer that you gave Ms. Gray's jury, that

2    it was most consistent with 24 hours, correct?

3    A.  That would be fair, yes.

4    Q.  Well, let's take a look at Page 148.  This is in Exhibit

5    47.

6            MR. SANDMAN:  If we don't have the technology working,

7    could someone hand me a paper copy of that?

8        May I approach, Your Honor?

9            THE COURT:  You may.

10           MR. SANDMAN:  I have the page open for you there.

11           THE WITNESS:  Okay.

12   BY MR. SANDMAN:

13   Q.  Dr. Howard, you are looking at Page 148, Lines 12 through

14   15.  This is your testimony before Mr. Jones' jury.  You are

15   asked, are you not, to tell Mr. Jones' jury what is the most

16   consistent time when the small bowel injury would have been

17   inflicted, correct?

18   A.  Yes.

19   Q.  And you never informed Mr. Jones' jury that it was most

20   consistent with 24 hours, did you?

21   A.  No, my answer was, quote:  The injury is typical of having

22   occurred about one day prior to death.

23   Q.  And then if you would read just to yourself the rest of the

24   question there on Page 148.  Then we'll switch over to 149.

25   The prosecutor is asking you -- and the continuation of her

1   question on 148 -- whether your testimony should be interpreted

2   as meaning that the injury occurred between the hours of 2:00

3   and 5:30 and 6:00 on the afternoon of May 1st.

4       Do you see that?

5   A.  Let me make sure I am clear here.  So on the bottom of Page

6   148, Line 23, that question, which then goes into Line 1 of

7   Page 149?  Is that the --

8   Q.  Line 2.  Lines 1 and 2 on 149.

9   A.  So the question is:  Based on the degree of disease process

10  that you noticed with Rachel, would it be consistent with her

11  having received a blow that caused that laceration sometime

12  between the hours of 2:00 and 5:30 or 6:00 on the afternoon of

13  the 1st?  Answer:  May 1st -- she had died on -- May 2nd -- any

14  time on the 24 hours prior to that would be consistent, so that

15  time frame would be possible.

16  Q.  And you never disclosed that it was your opinion that the

17  most consistent time for this injury was prior to the afternoon

18  of May 1st, correct?

19  A.  I responded to that question saying it was typical of

20  having occurred about one day prior to death.  I did not use

21  the specific term "most consistent."

22  Q.  And I think, Dr. Howard, my question was you did not

23  disclose to Mr. Jones' jury that the injury was most consistent

24  as having occurred prior to May 1st, 1994, correct?

25  A.  Not in those terms, correct.

CROSS-EXAMINATION - HOWARD

1  Q.  And you didn't give the jury ultimately anywhere near those
2  terms because ultimately you got to the point where you told
3  them that the injury -- it was your opinion that the injury
4  occurred on Sunday afternoon, correct?
5  A.  I did not opine that that's when it occurred.  I said that
6  it is consistent with that and that the time frame would be
7  possible.
8  Q.  But if you were asked the right questions by the lawyers
9  for Mr. Jones, you certainly would have testified truthfully
10  that the injury was most consistent with having occurred prior
11  to May 1st, correct?
12  A.  Yes.
13  Q.  And you certainly want the Court in these proceedings to
14  understand very clearly that it's your judgment that this
15  injury to the small bowel was most consistent with occurring
16  prior to May 1, correct?
17  A.  Using the term "most consistent" or "typical" or
18  "possible," yes, all of those.
19  Q.  So that covers most of the injuries, right?  The scalp
20  injury, which you testified at least twice, was more likely
21  than not two days old.  The vaginal injury and the small bowel
22  injury are both typical of occurring prior to May 1.  Correct?
23      That's just a summary of what we've been talking about,
24  isn't it?
25  A.  Putting the time frames with my assessment of the injuries,

UNITED STATES DISTRICT COURT

1   that's correct.

2   Q.  Now, I want to ask you some questions about your testimony

3   at the Jones trial about bruising.

4        Even back in 1994, it was true, right, that the dating of

5   bruising would be an approximation, correct?

6   A.  Yes.

7   Q.  And that you couldn't very well, you know, date a bruise

8   within a range of 72 hours or so, you couldn't distinguish

9   something, you know, 12 hours versus 48 hours, correct?

10  A.  Correct, the timing of bruises, again, like other injuries,

11  is not precise.

12  Q.  And if Mr. Jones' attorneys had asked you about that at

13  Mr. Jones' jury trial, you would have frankly told them, as

14  you've just told us, that you can't really distinguish or date

15  bruises --

16  A.  That's correct --

17  Q.  -- to a specific day.  It's within a range.  And in this

18  case, you certainly can't distinguish a bruise between April 29

19  and May 1st, can you?

20  A.  No.

21  Q.  Now, there were some questions posed of you about whether

22  someone had seen Rachel ill in the days preceding her death, do

23  you remember that?

24  A.  Yes.

25  Q.  And would a description that Rachel looked sick and a

1    gray-pale color, would that be an indication to you that

2    perhaps she was sick when someone made that observation?  From

3    this small bowel injury?

4    A.  Certainly be compatible with that.

5    Q.  Okay.  So let's take a look at Exhibit 81.

6        And we've had a lot of testimony on this document,

7    Dr. Howard, before you arrived here.  This is an interview that

8    a detective took of a neighbor of Mr. Jones by the name of

9    Isobel Tafe, on May 19, 1994.  And you see there, if you blow

10   up the bottom half of the first page, they're talking about --

11   the witness is talking about seeing Rachel on Saturday, which

12   would be -- which would have been April 29th.  Correct?  That's

13   the -- Saturday was the 29th.  May 1st was Sunday.  Right?

14   A.  So I guess --

15   Q.  I didn't get to my ultimate question.  I'm just trying

16   to frame.

17   A.  All right.

18   Q.  I'm sorry.  The 30th.  She's talking about Saturday, the

19   30th.

20       And then if we go to the next page and just blow up the

21   first 10 lines or so.  You see underneath the third question on

22   the page she's describing Rachel as with a grayish look about

23   herself, that she might be sick, she wasn't natural, just a

24   pale grayish color.  Do you see that?

25   A.  Yes.

CROSS-EXAMINATION - HOWARD

1   Q.  Would that description be compatible with an injury to the

2   small bowel that occurred prior to April 30th?

3   A.  Compatible, yes.

4   Q.  Now, in your declaration that is in evidence, at Page 45,

5   you also indicated there that you thought there was some

6   bruising on Rachel's abdomen that would be consistent with the

7   injury to her small bowel occurring four to six days prior to

8   her death.  Do you remember that?

9   A.  Yes.  Some of her bruises clearly had the typical

10  appearance of being much older than the others.

11  Q.  And you would have -- if you had been asked the right

12  questions, you would have told that to Mr. Jones' jury as well,

13  correct?

14  A.  Well, I am not a lawyer, I don't know what the right answer

15  or questions are, but if different questions had been answered

16  (sic), I could have responded.

17  Q.  Do you remember in your deposition I asked you about the

18  potential cause of Rachel's -- the small tear, vaginal tear,

19  that Rachel had?

20  A.  Yes.

21  Q.  Do you remember you testified that you couldn't

22  characterize the cause of that injury other than the fact that

23  it looked like it was a result of blunt trauma?

24  A.  It's clearly a blunt trauma injury, but I cannot determine

25  the exact mechanism.

1   Q.  So I think you testified it could be unrelated to sexual

2   abuse, correct?

3   A.  Yes.

4   Q.  And do you remember that during your deposition we showed

5   you some photos of Rachel's eye and some pictures, or a

6   picture, of a table outside Rachel's bedroom, and you were

7   asked whether Rachel collapsing in that area and then colliding

8   with the table could have caused that bruising you see on her

9   eye and her forehead in the autopsy photos?  Do you recall

10  that?

11  A.  Yes.

12  Q.  Do you recall that you testified in your deposition that a

13  collapse or a fall in that area could have caused the injury to

14  her head and possibly to her finger?

15  A.  Yes.

16  Q.  Now, you talked a little bit about your experience as a

17  pathologist versus a clinician, such as an emergency room

18  doctor, do you remember that?

19  A.  Yes.

20  Q.  And if you -- can you imagine that an emergency room doctor

21  who had treated or diagnosed several of these types of

22  injuries, duodenal tears in children, would they have an

23  opportunity to, let's say, for example, observe the amount of

24  pain that the patient was in?  As a clinician looking at a live

25  patient, as opposed to a dead person.

UNITED STATES DISTRICT COURT

1   A.  Correct.

2   Q.  They would.  They would have the opportunity to observe how

3   much pain or lack of pain the person was in?

4   A.  Pain, tenderness, gaurding, yes.

5   Q.  And they would have an opportunity to learn about how much

6   the person was eating, in terms of, you know, how their

7   appetite was, whether they were continuing to eat even days

8   after the injury; they could learn about that, correct?

9   A.  Yes.

10  Q.  And that clinician could then make their own judgments, and

11  even testify in these proceedings, about those observations of

12  those very matters that they had seen in patients they had

13  treated with duodenal tears, correct?

14  A.  I would think so.

15          MR. SANDMAN:  Dr. Howard, those are all the questions

16  I have for you.  Thank you.

17          THE COURT:  Redirect?

18          MR. BRACCIO:  Your Honor, could we take a brief

19  recess?

20          THE COURT:  Sure.  Take a 15-minute recess.

21          You can step down, sir.  We are going to break for 15

22  minutes.

23          THE WITNESS:  Thank you, Your Honor.

24     (A recess was taken from 2:49 p.m. to 3:17 p.m.)

25          THE COURT:  All right.

```
 1                    REDIRECT EXAMINATION

 2  BY MR. BRACCIO:

 3  Q.  Dr. Howard, is there a difference in your mind between the

 4  words "typical" versus "most consistent"?

 5  A.  I think that deals with the unfortunate imprecision of the

 6  English language.  They're certainly similar, the same intent

 7  of expression.

 8  Q.  Let me show you your testimony from the Barry Jones trial.

 9  April 12th, 1995, at Page 148, Line --

10             THE COURT:  Is this an exhibit?

11             MR. BRACCIO:  I think this is the record, Your Honor.

12  We've consistently referred to it as "the record."

13             THE COURT:  Just for purposes of --

14             MR. SANDMAN:  It's actually Exhibit 47 in this case,

15  Your Honor.

16             MR. BRACCIO:  The pages are the same in 47?

17             MR. SANDMAN:  Yes.

18             MR. BRACCIO:  Do you want to pull up Exhibit 47?  Page

19  148.

20  BY MR. BRACCIO:

21  Q.  Dr. Howard, I am showing you Exhibit 47, which has been

22  admitted into evidence, Lines 16 through 17.

23      What did you tell the jury in the Barry Jones case about

24  this injury?

25  A.  Line 16?
```

1    Q.  Sixteen through seventeen.

2    A.  The answer, so, A:  The injury is typical of having

3    occurred about one day prior to death.

4    Q.  And that was consistent with the other injuries.

5              MR. SANDMAN:  I object to leading.

6              THE COURT:  Sustained.

7              MR. BRACCIO:  I'll withdraw.  No further questions.

8              THE COURT:  All right.

9              Can you leave that back up, please?

10             MR. BRACCIO:  Forty-seven.

11                     EXAMINATION BY THE COURT

12   Q.  While we're here, let's talk about this for a moment.

13       Do you see Line 89, the question is:  You say about one

14   day.  Are we talking about the same age range as the laceration

15   in her head, in her genital injuries, in the external bruises,

16   they're all characterized from that time frame?

17       That was your testimony?

18   A.  Correct.

19   Q.  So you're saying that it was all within about a day.

20   A.  Typical of about a day, yes, for those -- for the scalp

21   laceration, for most of the bruises, the abdominal injury, and

22   the vaginal injury.  There were some bruises that were older,

23   some injury in the scalp that would be older, but the

24   laceration, the majority of the bruises, the abdominal injury,

25   intra-abdominal injury, and the vaginal laceration are about a

1    day old.

2    Q.  And how did you evaluate bruises?  Did you evaluate them by

3    coloration?

4    A.  And microscopically.

5    Q.  So coloration was important in determining age?

6    A.  Yes, in general.  Again, there's wide variation.  If a

7    bruise takes on a green, yellow or brown, that's typical of

8    being older than something that has blue or purple appearance;

9    that is typical of something more recent.

10   Q.  Is that still a practice that you use?

11   A.  As a generalization, yes.  But you can't use colorization

12   by itself to precisely pinpoint how old the bruise is, whether

13   it's two hours old or 12 hours old or 48 hours old.

14   Q.  But relying on colorization of the bruise was a standard in

15   '94?  Was it a common practice?

16   A.  It's a common practice, continues to be a common practice,

17   and the science behind the breakdown of the blood and the

18   various colorations is supportive of that, but you just can't

19   use it with precision.

20   Q.  Are you aware of medical literature that calls that

21   practice into question?

22   A.  Yes.  Meaning it shouldn't be used -- should not be

23   attempted to use that to specify a specific time of an injury,

24   based on the color.

25   Q.  So you did or you didn't rely on the color of the bruises

1   in 1994 --

2   A.  It was one factor that I considered.  I did not rely on it

3   only.  The microscopic looking for the changes, as well as the

4   special stains, also yield additional information.

5   Q.  Going back to the testimony you see up on the screen --

6           THE COURT:  And, I'm sorry, this is the Jones trial?

7           MR. BRACCIO:  That's correct, Your Honor.

8   BY THE COURT:

9   Q.  Line 18.

10      I want to make sure my language is precise so that we are

11  on the same page.

12      I read your answer to the question that was posed to you as

13  saying, her vaginal injuries, her internal injuries, and the

14  laceration on her scalp are all consistent with having occurred

15  at the same time.  Same time frame.

16  A.  Yes.

17  Q.  Then how do we explain your testimony, I believe it was in

18  your deposition, in which you said the head laceration was

19  probably more consistent with two days?

20  A.  I don't have a good answer for that, other than I have

21  spent much more time reviewing the slides and studying this

22  since that pretrial issue and during this time, and I can't

23  eliminate two hours (sic), but more typical of about a day.

24  Q.  I am assuming you did prepare for your testimony when you

25  testified in the Gray trial.

1    A.  Yes.

2    Q.  And that you did prepare for your testimony in the Jones

3    trial.

4    A.  Correct.

5    Q.  Because it's important, right?

6    A.  Oh, I agree.

7    Q.  You were asked on cross-examination why you testified as to

8    one time frame in the Gray trial and what can be interpreted as

9    a different time frame in the Jones trial.  Do you remember

10   that?

11   A.  Yes.

12   Q.  Did I understand your answer to be that it's because of the

13   questions you were asked?

14   A.  I think it's because there is a range of possibility and

15   because of how I perceived -- what I perceived I was being

16   asked, the questions I was being asked.

17   Q.  Did you work with the prosecution in advance of your

18   testimony in the Jones trial?

19   A.  I am sure that we met, discussed the case.  I don't recall

20   any specific conversation.

21   Q.  Were you aware of the prosecution's theory that the

22   injuries occurred sometime in the late afternoon of May 1,

23   Sunday?

24   A.  I may have been aware of that as a possibility, I don't

25   recall.

1   Q.  If someone asked you if the injuries were consistent with

2   having happened on the afternoon of May 1, and you agreed that

3   your analysis was that they could have happened at that time,

4   you also -- I'm trying to frame this, so just bear with me

5   here.

6   A.  Certainly.

7   Q.  You testified in the Gray trial that it was more likely

8   that it could have happened on April 30, right?

9   A.  Correct.

10  Q.  Now the focus in the Jones trial is on the afternoon of May

11  1, right?

12  A.  That's my understanding.

13  Q.  Wouldn't it be important for you to explain why you are

14  coming up with a different time frame when you testify in the

15  Jones trial?

16  A.  I may have reviewed the case more and given it more

17  thought, I can't recall.

18  Q.  So just, what, 30 days prior, you didn't give it as much

19  thought?  It wasn't important when you testified in the Gray

20  trial?

21  A.  It was important, I don't have a specific recollection of

22  that time period.

23  Q.  Well, I mean, you understand that in these trials there was

24  a lot at stake, right?

25  A.  Absolutely, Your Honor.

 1   Q.  Especially for the defendants, right?

 2   A.  And if I misspoke or mischaracterized my understanding of

 3   the case, I apologize, but I have tried to be as consistent as

 4   I can, the idea of a range.

 5   Q.  Forgive me, I am going on my notes here.

 6       How many autopsies have you performed where there was a

 7   similar injury to the duodenum that resulted in peritonitis?  I

 8   know you said you've performed approximately 8,000 autopsies,

 9   how many of those involved a similar type of injury and

10   peritonitis?

11   A.  Dozens of cases.  I don't know the exact number.

12   Q.  How many of those cases had peritonitis as the cause of

13   death?

14   A.  Probably most of those had peritonitis as one of the

15   causative factors in the death.

16   Q.  To be clear, peritonitis was the cause of death in this

17   case.

18   A.  It's peritonitis on top of blood loss.  So those are the --

19   the inflammation within the abdomen and the blood loss from all

20   of the injuries are the mechanisms of death.

21   Q.  Maybe I am misunderstanding.  Is peritonitis really the

22   inflammation of the abdominal cavity --

23   A.  Yes.

24   Q.  -- as a result of the injury?

25   A.  Yes.

1    Q.   So it's really the same thing, right?

2    A.   Well, the cause is the blunt impact.

3    Q.   Correct.

4    A.   The mechanism is the peritonitis.

5    Q.   How many autopsies of children under the age of five have

6    you performed?

7    A.   Oh, hundreds.

8    Q.   How many of those autopsies had a similar injury to the

9    duodenum?

10   A.   Again, several dozen.

11   Q.   How many in 1994 had you performed of children under the

12   age of five that had an injury to the duodenum?

13   A.   I can't give you an exact number.  It would have been

14   several prior to this case.

15   Q.   So this was not the first.

16   A.   Not the first, no.

17   Q.   How many of those resulted in peritonitis and death as the

18   cause of death?

19   A.   Again, several of them.

20   Q.   A dozen?

21   A.   Maybe a dozen.

22   Q.   In those cases now, I am asking you -- I know I'm asking

23   you a lot by having you turn your mind back to 1994.  So it

24   sounds like you had performed autopsies on children under the

25   age of five at that time, you performed autopsies on children

1    who had an injury to the duodenum, and you performed autopsies

2    on children who had injuries to the duodenum that resulted in

3    peritonitis and death?

4    A.  Yes.

5    Q.  How many of those instances did the death occur within 24

6    hours of the injury to the duodenum?

7    A.  I'd say most of them, as I recall, but I can't be certain.

8    Some received medical care which would have prolonged their

9    life.

10   Q.  So let me ask you, in 1994, how many instances -- whether

11   you personally worked on them or it's a result of your review

12   of the literature -- was there an injury similar to this that

13   resulted in death in 24 hours or less?

14   A.  I can't put a number on it.  There are many recorded cases

15   of that.

16   Q.  So your testimony is you think there are many recorded

17   cases in which there has been a similar jury to a duodenum that

18   resulted in death in 24 hours or less?

19   A.  In reviewing medical records, being on child death review

20   teams, and reading the literature, yes.

21       Now, as I said, some children survive longer with

22   peritonitis, depending on --

23   Q.  Yeah, I'm really focused on the death part of it, that they

24   sustained this injury and they die.

25       Let me ask this question another way.

1    A.  Okay.

2    Q.  This Court has received information in this hearing that

3    there are no reported cases in medical literature in which this

4    type of injury has resulted in death in less than 48 hours.

5    A.  Hmm.

6    Q.  Are you aware of that?

7    A.  I am not aware of that.

8    Q.  And you think that you have personally seen instances that

9    you've worked on in which this has happened?

10   A.  Yes.

11   Q.  In less than 24 hours?

12   A.  Yes.

13   Q.  And you think the literature supports the fact that this

14   has happened in less than 24 hours.

15   A.  Certainly the totality of all the literature I have read,

16   and particularly not just literature, but having reviewed cases

17   that aren't necessarily published literature -- most medical

18   knowledge is not published but it's in the medical records --

19   yes, I am aware of --

20   Q.  Well, again, you know, I think words are important.  So I

21   am not asking you what may be contained in some medical file in

22   some physician's office, I am asking you published medical

23   literature.

24   A.  Published medical literature.

25   Q.  I think the testimony that was presented to this Court

1   earlier in this hearing was a reference to the medical

2   literature, not what's in somebody's file.

3   A.   Okay.   I guess I would have to go back and do a literature

4   search to know whether I could answer your question with --

5   definitive.   Certainly in terms of timing of injury,

6   descriptions of injury, textbooks and literature do speak to

7   this type of injury.   I just was not prepared --

8   Q.   This type of injury that results in death.

9   A.   Yes.

10   Q.   In less than 48 hours.

11   A.   Less than 48 hours, yes.

12   Q.   Are you aware of instances in which there has been a delay

13   in the onset of symptoms after this type of injury?

14   A.   Certainly after abdominal injury there can be a delay and a

15   longer survival time than 24 to 48, particularly with medical

16   care it can occur.   But this particular injury, in terms of,

17   you know, things like appendicitis rupture, other things that

18   cause peritonitis, certainly there can be some delay.

19        The degree of injury in this particular case, I am not

20   aware, I can't point to the literature that says something that

21   has the specific identical injury here where there was a delay

22   in symptoms.   I can't rule it out.

23   Q.   You're going to have to forgive me for asking you what may

24   sound like the same questions, but I've heard a couple of

25   different takes on the injury and what you view as the onset of

1    the injury in this case.  Are you saying that you think that

2    the injury could have happened as much as 24 hours before --

3    and I'm talking about the injury to the duodenum -- as much as

4    24 hours before Rachel passed?

5    A.  Before she died?

6    Q.  Yes.

7    A.  That's possible.

8    Q.  Do you think it would be more than 24 hours?

9    A.  I can't absolutely rule it out.  I think it's less likely.

10   Based on everything I know about the case, 24 hours or less,

11   but it is possible.

12   Q.  And I thought I heard you, in response to

13   cross-examination, say that it could have happened as soon as

14   midnight.  In other words, a couple of hours before she

15   presented in the hospital, that it could have happened as soon

16   as that.  Is that your testimony, that that is likely or

17   possible?

18   A.  It's possible.  I think it's not -- my opinion is that it

19   usually is several hours before someone would die from this,

20   not just a few.  But inflammation and death from shock can

21   occur very quickly in some cases.  I can't eliminate that.  I

22   think it's more typical of several hours to a day.

23   Q.  But you don't disagree with the questions that were put to

24   you on cross-examination that there was a difference between

25   your testimony in the Gray trial and the Jones trial, do you?

1    A.  I do not.

2           THE COURT:  I have no other questions.

3        Any questions that the respondents want to ask?

4           MR. BRACCIO:  Thank you, Your Honor.  I'll be brief.

5                      FURTHER EXAMINATION

6    BY MR. BRACCIO:

7    Q.  Let me pull up the transcripts from the Angela Gray trial.

8    This is Exhibit 48A, Page 94.

9        Dr. Howard, I'd like you to review all of your statements

10   from the Angela Gray trial regarding the duodenal laceration.

11       At Line 22, on Page 94, you were asked the question:  Based

12   upon your autopsy of Rachel Gray, can you provide us with the

13   approximate age of the injury to Rachel's duodenum?

14       What was your answer to that?

15   A.  The answer was:  The injuries to the duodenum and abdomen

16   indicate approximately one day prior to death.

17   Q.  Approximately one day prior to death.

18       Let's turn to Page 101, Line 3 through 7.

19       What do you indicate here regarding the timing of those

20   internal injuries?

21   A.  So this is Page 101, the question is Line 2, and the

22   question is:  That's where the word comes from?  Okay.  You

23   indicated that the internal injuries that the child died from,

24   just -- just for clarification, were about 24 hours prior to

25   her death, is when she incurred the injury to her abdomen?

1    Q.  What was your response to that question?

2    A.  On Line 7 the answer is:  The findings are most consistent

3    with that.

4    Q.  Most consistent with 24 hours.

5    A.  Yes.

6    Q.  Let me show you Lines 10 through 15 of that same page.  And

7    again you were asked, right there at Line 10:  What would be

8    the least amount of time that it would take from that injury,

9    from when the injury occurred until the time of death?

10       What was your response to that question?

11   A.  Answer:  Again, there would be a minimum of many -- several

12   hours.  Perhaps 12.  Again, to get the degree of inflammation,

13   that's conceivable.

14   Q.  Then you were asked:  It would be from 12 hours on up to

15   any -- 24 to 36 hours, correct?

16   A.  That's the question.

17   Q.  What did you answer to that question?

18   A.  Yes.

19   Q.  Let me take you back to the Barry Jones trial.  Exhibit 47,

20   at Page 148, Lines 16 through 17.  This is in the Barry Jones

21   trial.

22       You were asked:  Based on the appearance of this area of

23   Rachel's body upon autopsy, can you tell us what is most

24   consistent with when this blow would have occurred to Rachel?

25       What was your answer to that question?

1   A.   The answer was:   The injury is typical of having occurred

2   about one day prior to death.

3   Q.   And then at Line 23 there, you were asked:   Based upon the

4   degree of disease process that you noticed with Rachel, would

5   it be consistent with her having received a blow that caused

6   that laceration sometime between the hours of 2:00 and 5:30 or

7   6:00 on the afternoon of May 1st?   Correct?

8   A.   Yes.

9   Q.   What was your answer to that question?

10  A.   The answer was May 1st -- she had died on -- May 2nd -- any

11  time in the 24 hours prior to that would be consistent, so that

12  time frame would be possible.

13  Q.   Does that refresh your recollection that you told the jury

14  in the Angela Gray case the same thing that you told the jury

15  in the Barry Jones case about the range of time for this

16  injury?

17          MR. SANDMAN:   Object.   Leading.

18          THE COURT:   Sustained.

19  BY MR. BRACCIO:

20  Q.   In your opinion, is the testimony that you gave in the

21  Angela Gray trial the same as the testimony you gave in the

22  Barry Jones trial?

23  A.   Again, the exact wording is different, but my intent of

24  describing my best opinion as to the timing of the events and

25  the death, yes, the same.

1        MR. BRACCIO:  Thank you.  No further questions.

2                    FURTHER EXAMINATION

3  BY MR. SANDMAN:

4  Q.  Dr. Howard, you just told the Judge a couple of minutes ago

5  that your testimony in the Gray trial and the Howard (sic)

6  trial were different, weren't they?  You didn't mean it be, but

7  they were, the testimonies were different.

8  A.  Well, it depends on which -- if we're talking about the

9  abdominal injury --

10 Q.  Yes, that's what we're talking about right now.

11     Did you tell the Judge that or not?

12 A.  I believe so.

13 Q.  Okay.  And you were clear on cross-examination when I was

14 questioning you that whatever you said about these injuries

15 today or the other times you've testified, you testified today

16 that, as you did in the Gray trial, that the injury to the

17 small bowel is most consistent with 24 hours, correct?

18 A.  Yes.

19 Q.  And that's not on the afternoon of May 1st, correct?

20 A.  That's correct.

21 Q.  All right.  And just one other question related to

22 something that the Judge asked you, and that is with respect to

23 the dating of these bruises, a process that you engaged in in

24 1994.  If the attorneys had asked you in 1994 whether the

25 dating of the bruises was an estimate, would you have told them

1    that it was an estimate in 1994?

2    A.  An estimate would be a fair characteristic, yes.  I think

3    that would have been my response.

4    Q.  And then you would have told them that you couldn't, for

5    example, distinguish between a bruise 24 to 72 hours old,

6    correct?

7    A.  Not with precision, no.

8              MR. SANDMAN:  That's all I have.

9              THE COURT:  Thank you, very much.  You may step down,

10   sir.

11             DR. HOWARD:  Thank you, Your Honor.

12             THE COURT:  I assume that closes the evidence?

13             MR. SANDMAN:  We just have a few of these exhibits we

14   want to sort out and then we're done.

15             THE COURT:  Okay.

16             MR. SANDMAN:  So we have agreed, or the respondents

17   have agreed, to withdraw their objection to Exhibit 85, which

18   are the radio logs.  We talked about those yesterday with

19   Officer Pesquiera.

20             THE COURT:  Yeah.  Yeah.  Right.

21             MR. SANDMAN:  That's Exhibit 85.  So we'll offer

22   Exhibit 85.

23             THE COURT:  Admitted.

24       I mean, no objection, right?

25             MS. GARD:  Correct.

1          THE COURT:  Admitted.

2          As long as there's not -- you don't need to spend a

3    lot of time.  If you've got a list of exhibits that there are

4    no objection to, just tell me the numbers and they're admitted.

5          MR. SANDMAN:  Okay.  96A is offered for admission.

6          THE COURT:  It's admitted.

7          MR. SANDMAN:  Now there are three exhibits, there are

8    only three left and they're all in the same category and they

9    do have some objection to them.  They are Exhibits 100, 101,

10   and 102.

11         THE COURT:  What are they?

12         MR. SANDMAN:  Those exhibits contain some news items,

13   news articles, about the Border Patrol EMS units that were in

14   operation from the late 1980s forward.  And there is evidence

15   of the type of uniform that they wore, was a brown-type uniform

16   that Mr. Jones described during his police interrogation.  So

17   we're offering those exhibits, and I believe they have a

18   relevance objection to those.

19         THE COURT:  What's the objection?

20         MS. GARD:  Judge, we'll waive the objection.

21         THE COURT:  Yeah, I understand the theory that you're

22   offering them.  They've waived it.  They're admitted.

23         MR. SANDMAN:  That's it, Judge.

24         THE COURT:  That's it?

25         MR. SANDMAN:  Yeah.

1          THE COURT:  All right.  Thank you.

2          Well, let's talk about timing here.

3      Rather than giving closing arguments, what I would really

4  appreciate is a closing argument along with proposed final

5  findings of fact and conclusions of law with pinpoint citations

6  to the record we've established in this case and the underlying

7  record.

8      I think Madam Clerk (sic) said it's going to be about 30

9  days before you can complete the transcripts, is that right?

10         THE REPORTER:  That would be preferable, Your Honor.

11  I could offer to send the attorneys and Your Honor the

12  transcripts as I do them.

13         THE COURT:  I would appreciate if you do that, take

14  that approach.

15      So you all are going to have to order the transcripts, then

16  Madam Court Reporter is willing to provide them as she

17  completes them, rather than providing them to you all in one

18  lump sum.  But I think a 30-day period of time is reasonable,

19  considering the volume of the record that's been created in

20  this case.

21      That being said, this is what I would like to do as far as

22  a briefing schedule.  Considering the 30 days Madam Clerk (sic)

23  is going to need, I would like the -- I am going to call it

24  your "opening," but your opening closing brief -- I'm going to

25  stagger this.  I'm going to give each side an opportunity to

1    file a summation filing with the findings of fact and

2    conclusions of law, and it's going to be a 75-page limit.  And

3    then you'll both have -- this will be a simultaneous deadline,

4    so you'll both file them simultaneously.  And then I'll give

5    you an opportunity to file a response, if you want to, to what

6    the other side has filed; that will be 35-page limit.  The

7    deadline for the opening closing will be January 2nd, and the

8    deadline for the replies will be January 16th.

9        That's building in the time Madam Court Reporter needs to

10   complete the transcripts in this case.  However, you're going

11   to be getting them as you go along, and you're obviously

12   familiar with the evidence that's come out here now, and you

13   have a basis to build upon from your proposed findings of fact

14   and conclusions of law.

15       So I know it sounds onerous, but, you know, I think there

16   are some things there that will make it a little easier.

17       Questions?

18           MR. SANDMAN:  Your Honor, would you be willing to move

19   the deadline maybe just a couple of weeks into January?  From

20   January 2nd with a -- I don't know what to say.  We're just

21   coming into a season where, you know, there are family

22   obligations and over Christmas holidays.  And I know, probably

23   speaking for all of the attorneys, we haven't worked for any

24   other clients for many, many weeks.

25           THE COURT:  I am just trying to get you to the point

1    where you can start working with other clients.

2         MR. SANDMAN:  But I was just wondering if you would

3    agree to maybe move that deadline to maybe, you know, a few,

4    couple weeks into January so that we can get that done in a

5    proper manner.

6         THE COURT:  So I am assuming that respondents don't

7    disagree with that request?

8         MR. BRACCIO:  We'll do whatever you tell us to do.

9         THE COURT:  All right.  Here's what we'll do.  The

10   opening closing brief will be due on January 16th and the

11   response will be due on January 30th.

12        And I am sympathetic to the time of year and other

13   obligations you may have, so I'll push everything back two

14   weeks.  Okay.

15        MR. SANDMAN:  Yes.  Thank you, Your Honor.

16        THE COURT:  And, again, in order to make things a

17   little easier for me, I would like, again, pinpoint citations

18   not only to the record but to your case citations.

19        Were there any other questions that any of the parties

20   have?

21        MR. SANDMAN:  No.

22        THE COURT:  All right.  Well, between now and when

23   your opening brief is due, after I've had some time to think

24   about this, there may be some particular issues that I ask you

25   to focus on in your briefs, I'll obviously let you know that as

1    we go forward.  And I think that's all I had.

2            I know I had told you before that we're going to

3    immediately begin discovery on the penalty phase.  I actually

4    think at this point it would be good for everybody to focus

5    their efforts on this briefing.  Once the briefing is complete

6    we can then turn our attention to the next phase, if that makes

7    sense.

8        Unless either of you want to jump up and argue against

9    that.

10       No?

11           MR. BRACCIO:  God, no, from the respondents.

12           THE COURT:  All right.  Anything else we need to

13   discuss today?

14           MR. SANDMAN:  I don't think so, Judge.

15           THE COURT:  Okay.  So if I see the need for any

16   additional briefing or specific briefing in your briefs, I'll

17   let you know and then we'll sort of take it from there.

18           I don't know if I -- if I decide I'm going to need any

19   additional oral argument on this, I will let you know and we'll

20   set something up.  Otherwise I will look for your filings and

21   you can look for my additional orders.

22       Okay.  Thank you, very much.  We'll be at recess.

23                   (Off the record at 3:52 p.m.)

24

25

1                         C E R T I F I C A T E

2

3            I, A. TRACY JAMIESON, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true and accurate transcript of the proceedings

9    contained herein, held in the above-entitled cause on the date

10   specified therein, and that said transcript was prepared by me.

11           Signed in Tucson, Arizona, on the 7th day of

12   December, 2017.

13

14

15                              s/A. Tracy Jamieson
16                              A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT