UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA


BARRY LEE JONES,                    )
                                    )
          Petitioner,               )
                                    )
     vs.                            )     CASE NO. CV-01-000592-TUC-TMB
                                    )
CHARLES L. RYAN, et al.,            )
                                    )
          Defendants.               )
_____)



TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE
October 27, 2017; 10:25 a.m.
Anchorage, Alaska


**FOR THE PETITIONER:** (Present Via Videoconference)
         Office of the Federal Public Defender
         BY: CARY SANDMAN and KAREN SINGER SMITH
         850 West Adams Street, Suite 201
         Phoenix, Arizona  85007
         602-382-2816


**FOR THE RESPONDENT:** (Present Via Videoconference)
         Office of the Attorney General
         BY:  MYLES AUSTIN BRACCIO
         1275 W Washington Street
         Phoenix, Arizona 85007
         602-542-8592


         Office of the Attorney General
         BY:  LACEY STOVER GARD
         400 W Congress Street, Suite S315
         Tucson, Arizona  85701
         520-628-6520

_____

**R. JOY STANCEL, RMR-CRR**
Federal Official Realtime Reporter
222 West 7th Avenue, #4
Anchorage, Alaska  99513
Proceedings Recorded by Mechanical Stenography
Transcript Produced by Computer

```
 1              (Call to Order of the Court)

 2              DEPUTY CLERK:  All rise.  His Honor, the Court, the

 3    United States District Court for the District of Alaska is now

 4    in session with the Honorable Timothy M. Burgess presiding.

 5              Please be seated.

 6              We're on record in Case Number 4:01-CV-592, Barry Lee

 7    Jones versus Charles L. Ryan, et al.  Counsel, can you please

 8    state your names and who you're here for?

 9              MR. SANDMAN:  Good morning, Your Honor.  Cary Sandman

10    and Karen Smith for the petitioner, Mr. Jones.

11              MR. BRACCIO:  Good morning, Your Honor, Myles

12    Braccio.

13              MS. GARD:  And good morning, Judge, this is Lacey

14    Gard with the AG's office in Tucson.

15              THE COURT:  Good morning, everybody.  I was going to

16    say, it doesn't feel like I'm in Arizona here, but -- that was

17    a joke, but you don't have to laugh.  All right.  How is

18    everybody doing?

19              So I don't know what's going on with the -- oh, there

20    we go.  All right.  Yeah, I was going to say I couldn't see

21    anybody in Tucson.  And Mr. Braccio, your camera is pointed

22    sort of down.  Is there any way you can raise it up?  You're

23    kind of halfway cut off there.

24              MR. BRACCIO:  Your Honor, I can barely make out what

25    you're saying, and I don't think I heard Tucson very well,
```

```
 1    either.
 2              THE  COURT:  Is it any better if my mouth is on the
 3    microphone?
 4              MR.  BRACCIO:  That's a little better.
 5              THE  COURT:  Can you hear me in Tucson?
 6              MR.  SANDMAN:  Your Honor, Cary Sandman here.  We're
 7    hearing you a little better, now that you're a little closer to
 8    the mic.
 9              THE  COURT:  Okay.  So what I guess I need to know is
10    are you hearing me well enough for us to proceed or do we need
11    to do some additional work on this?  Because you know, I don't
12    want to have a hearing where we can't understand each other.
13              MR.  SANDMAN:  From Tucson, Judge, we think we can
14    hear well enough.
15              THE  COURT:  What about from Phoenix?
16              MR.  BRACCIO:  We can try to proceed.  I think I can
17    hear if everybody stays close to the microphone.  I think I can
18    hear okay.
19              THE  COURT:  And there's no way you can turn the
20    volume up from your end?
21              MR.  BRACCIO:  It's not the volume, Your Honor.  It's
22    coming across very, very muffled.
23              THE  COURT:  I'm wondering if we ought to just make
24    this a telephonic conference.  I'm wondering if part of the
25    problem is the video.
```

1          MR. SANDMAN:  I think we're hearing well enough now,

2     Judge, at least in Tucson.

3          THE COURT:  How about in Phoenix?

4          MR. BRACCIO:  I've got you turned up pretty high,

5     Your Honor.  I think we can try to proceed.  If I'm having any

6     problems, I'll let you know that we should move to the

7     teleconference.

8          THE COURT:  Most people want to put me on mute, so

9     we're making progress.

10          All right.  Good morning.  There's, you know, several

11     things that we need to take up, and including I want to give

12     both sides an opportunity to present any additional argument

13     you want to make on the three pending motions in limine.  I'm

14     assuming you do want an opportunity to argue the motions in

15     limine; is that correct?

16          MR. BRACCIO:  Your Honor, I guess I'll go first,

17     since they were our motions.  I can address each of them

18     briefly.  I think, by and large, we're going to rest on the

19     pleadings.

20          THE COURT:  I'm sorry, I had a hard time

21     understanding what you said.  Are you saying you want to rest

22     on the pleadings?

23          MR. BRACCIO:  I'll briefly address the motions.

24          THE COURT:  Okay, all right.  So why don't we do that

25     first.  I was going to give each side 20 minutes to address

1    anything you want, any additional argument you want to present

2    in regard to the three motions.  You don't have to use the 20

3    minutes, but I figured that 20 minutes would be sufficient.  So

4    why don't we have respondents, you can start.  Let me get my

5    timer going here.  And then we'll shift gears and we'll talk

6    about some of the additional information we need to talk about

7    in preparation for Monday.

8              Does 20 minutes a side sound sufficient?

9              MR. BRACCIO:  I'll need five minutes, Your Honor.

10             MR. SANDMAN:  Yes, Your Honor, Cary Sandman here in

11   Tucson.  We won't need much of that 20 minutes allowed.

12             THE COURT:  I'm not going to start my timer then.

13   I'm going to trust -- this is the first exercise in trust.  So

14   go ahead.  Why don't we have respondents start, and you can

15   talk about it.

16             Could I just pose one question I have for you in

17   formulating your remarks?  And it was on your -- it's on

18   your -- well, I'm calling it a third motion in limine.  Maybe

19   I'm wrong, chronologically, but it's the motion to limit

20   evidence, and you gave two concrete examples.  I've got to get

21   my iPad open here.  The first one had to do with the

22   investigator, and the second one had to do with the Lopez

23   twins, I think.  You gave two concrete examples.

24             So my question was, were there other examples or were

25   those the only two examples that came to mind at the time you

```
 1   wrote the motion?

 2            MR. BRACCIO:  I think those were the two largest

 3   examples that we saw from the case.  When you took a look back

 4   at the amended habeas petition, and compare that to the

 5   Martinez brief, I think we saw both are probably the two

 6   largest areas, whereas the petitioner expanded it exponentially

 7   to include all the additional claims and additional evidence.

 8   So our main goal is really to anchor this back to the specific

 9   claims with the specific evidence alleged in the amended habeas

10   petition.

11            THE COURT:  Thank you.  You answered my question.

12   And I didn't have any specific questions beyond that.  So why

13   don't you go ahead and provide me with any other additional

14   argument you want to make on those three motions.  And for the

15   record, we are discussing the motions at Docket 229, which is

16   the motion to preclude Strickland experts, the motion at

17   Docket 232, which has to do with Sergeant -- is it Pesquiera.

18            MR. BRACCIO:  Yes.

19            THE COURT:  Sergeant Pesquiera, her expertise as --

20   regarding the blood stain testimony.  And then the third one is

21   the motion at Docket 234, which is what we were just talking

22   about, which is the motion to limit evidence.

23            So, go ahead.

24            MR. BRACCIO:  Okay.  Your Honor, briefly on the

25   motion to limit evidence, as I previously stated, this case has
```

1    expanded so exponentially from the original habeas claim in the

2    Martinez briefing, and we are essentially retrying the whole

3    case at this point.  This Court has already ruled that all of

4    this evidence does not prove Barry Jones's innocence.  That is

5    the law of this case.

6             After the Court denied the actual innocence claim,

7    much of this evidence and many of these claims then

8    subsequently made their way into the Martinez briefing, and

9    I'll just briefly state, we feel that their claims should be

10   identified clearly, and limited to the original amended habeas

11   petition.

12            THE COURT:  And did you have anything you wanted to

13   add on the other two motions?  My thought was see what you have

14   to say about all three motions.  I'll then hear from

15   petitioners, and then since you filed the motions, I'll give

16   you any sort of rebuttal you want to make to petitioners.

17            MR. BRACCIO:  Okay.  Very good.  Let me start with

18   the motion to preclude, then, Docket Number 232.  I should have

19   moved to preclude Pesquiera entirely, Your Honor.  First, this

20   Court has already found her potential testimony irrelevant to

21   the claims.  Second, I view this as petitioner's attempt to

22   essentially harass the original case agent and to have a second

23   shot at her through cross examination, which I find incredible.

24   If there are things she missed in the case, petitioner could

25   have called his investigator to investigate those deficiencies

1    and what he found.  As for her blood stain interpretation,

2    petitioner is calling his own expert now, Mr. Stuart James, to

3    testify about his own view of the evidence.

4            The only reason to allow petitioner to recall the

5    case agent is to essentially harass and embarrass her.  It

6    sheds no light whatsoever on the (indiscernible - poor

7    connection) of counsel if he can offer no new evidence in this.

8    I believe that is exactly what this Court previously held,

9    finding that any potential testimony was irrelevant.

10           And in terms of the waiver, I made it very clear

11   before we started the deposition that I felt the Court's order

12   was clear that it was irrelevant and it was not granting

13   discovery into those areas.  So for those reasons, I would -- I

14   would ask the Court to preclude the petitioner from bringing

15   Pesquiera back, and at least preclude him from going into these

16   areas.

17           With respect to the motion to preclude the IT expert,

18   one of the things that I wanted to make very clear was that no

19   witness in this case may opine about whether Bruner & Bowman

20   constitutionally represented petitioner.  That is a legal

21   conclusion for this Court, alone.  Any witness attempting to do

22   that is essentially usurping this Court's role.

23           Mr. Cooper offers nothing to these proceedings and

24   will likely come dangerously close to commenting on the legal

25   performance of trial counsel.  He should be precluded, Your

1  Honor.

2          THE COURT:  But don't you think that's something I

3  would be capable of separating the wheat from the chaff, as it

4  were?

5          MR. BRACCIO:  Sure.

6          THE COURT:  Okay.  Go ahead.

7          MR. BRACCIO:  I would just say we believe you're in

8  the best position to make that call.  We don't need to have a

9  witness come into the courtroom to tell you, in essence, how to

10  rule on the case.  Certainly, I think Your Honor is absolutely

11  capable of distinguishing that testimony and making the

12  decision on your own.

13          THE COURT:  Okay.  Anything else?

14          MR. BRACCIO:  And that would be all my comments.

15  That would be all my comments on the motions.

16          THE COURT:  Okay.  Great.  Thank you.  Let me hear

17  from petitioners, then.

18          MR. SANDMAN:  Your Honor, Cary Sandman here.  I'm

19  going to argue two of the three motions.  Ms. Smith will argue

20  the Strickland response.  Let me turn first to the challenge to

21  the Court's receipt of evidence regarding Ms. Pesquiera's lack

22  of expertise in the area of blood interpretation.  Of course

23  the jury heard evidence from Ms. Pesquiera that she was not an

24  expert in blood interpretation, and under Strickland,

25  eventually, when you get to the prejudice prong of the

1   Strickland claim, you have to consider everything the jury

2   heard, which would obviously include Ms. Pesquiera's admission

3   with respect to her lack of expertise, and our contention is

4   have competent counsel present their own blood interpretation

5   expert.  With Ms. Pesquiera's expertise already an issue, that

6   expert in this case would be Mr. James, could certainly express

7   agreement with Ms. Pesquiera that one blood interpretation

8   class does not make one an expert.

9           So I just think it's not very complicated.  I think

10  it's -- I don't have anything else to say about it.  I guess I

11  sort of repeated what I said in the written brief.

12          With respect to the motion to exclude evidence, I

13  guess I would start by saying, Judge, that at least before

14  Mr. Braccio entered his appearance in this case, we had an

15  agreement to take the deposition of Ms. Pesquiera.  It was

16  submitted in writing to the Court.  And then there was a joint

17  expression of the parties that Ms. Pesquiera should be deposed

18  because her deposition might elicit evidence to show that new

19  forensic evidence undermines the homicide investigation.  So we

20  sort of had an agreement, at least at one point, that in light

21  of the new medical evidence, there could possibly be evidence,

22  in turn, elicited from Ms. Pesquiera to show that her

23  investigation was deficient in some respect.

24          And then, of course, after they agreed we could take

25  the deposition for that purpose, we elicited testimony from

1   Ms. Pesquiera which probably explains why they want to exclude

2   this, but she basically said she came to a judgment on her own

3   with respect to the medical activities, and of course she's not

4   a physician or a medical person -- professional.  And then when

5   we showed her the medical evidence that we had gathered,

6   including our new evidence from Dr. Howard, the original

7   medical examiner, she agreed that, yes, had she been aware of

8   that evidence, that she would have investigated that.  And in

9   this case, that means she would have attempted to find out who

10  was with Rachel in the days earlier than May 1st, April 30th,

11  April 29th, and so on, which of course was never done during

12  the homicide investigation.

13          So it seems to me respondents have already agreed

14  that that evidence was relevant.  We've now elicited it and it

15  helps demonstrate a prejudice from trial counsel's failure to

16  acquire the medical evidence they should have acquired.  I

17  mean, all of this is really under the umbrella of the principal

18  claim, which is trial counsel failed to investigate the medical

19  evidence.  Had they done that, there's a whole series of things

20  certainly competent counsel would have done with that evidence.

21          With respect to the testimony that we have from

22  Mr. Gruen and Dr. Hannon, that goes to the showing that

23  physical evidence in this case demonstrates that the two

24  children would not have been able to have seen what they said

25  they saw.  It's sort of a physical impossibility.  Once again,

1   at least at one point in this litigation, respondents agreed

2   that the Court could consider their reports and that evidence

3   as relevant under Rule 7.  So I think at least at one point,

4   the respondents recognized that this evidence was relevant to

5   the amended petition, and of course it is, because the amended

6   petition, at Pages 40, 41, alleges that counsel were aware that

7   it was not physically possible for the children to have

8   witnessed the assault, and they, using the words from the

9   amended petition, it was an egregious failure to cut the

10  investigation short after they had simply taken the

11  measurements in advance.

12           I've cited other briefings in the written brief,

13  Judge, with respect to why the evidence is prejudice.  You

14  don't have to plead all of your evidence of prejudice in the

15  amended petition.  Rule 6, 7, and 8 envision that when you

16  preface this for your claim, you can further present evidence

17  to support the Rule 7 -- 6, 7, and 8.  And of course, at one

18  point, respondents agreed to that.

19           I think that's all I had on those two, Judge, and

20  Ms. Smith will address the third one.

21           MS. SMITH:  Good morning, Your Honor, this is Karen

22  Smith in Tucson.  With regard to the respondents' motion to

23  preclude our expert, we are not arguing that he needs help in

24  (indiscernible - poor connection) what that standard is.  What

25  our expert intends to do is assist in the factual issue of what

1    prevailing standard of care was at the time of Mr. Jones's

2    trial.  Respondents, in their interviews from witnesses and in

3    the depositions, the attorneys asked questions related to what

4    exactly was happening at that time with respect to funding and

5    position of experts.  They have made a factual issue out of

6    standard of care at the time of the trial, and Mr. Cooper can

7    testimony that would be helpful to the Court concerning what

8    the prevailing standards would be.  Mr. Cooper has tried

9    numerous child homicide cases.  Here in Pima County, he was

10   given it at the time of the trial, so he could provide that

11   factual evidence that is relevant to the (indiscernible - poor

12   connection) claim.  And I believe that's all I have.

13           THE COURT:  So just to be clear, you're saying his

14   testimony is going to be limited as to what the standard of

15   care -- what the standard was at the time and he's not

16   intending to offer any opinion as to whether or not that

17   standard was met?

18           MS. SMITH:  We have -- we're not agreeing to limit

19   his testimony in any way, but we do think that he should not be

20   precluded, because he can provide that relevant factual

21   testimony.

22           THE COURT:  Well, you may not limit his testimony,

23   but I might.

24           MS. SMITH:  I'm sorry, I couldn't understand that,

25   Your Honor.

1          THE COURT:  I said, you may not limit his testimony,

2     but I might.

3          MS. SMITH:  Yes, of course.  I'm just saying we're

4     not -- we're not making any --

5          THE COURT:  So I just want to be clear.  You're not

6     offering him in any kind of limited purpose?  In other words, I

7     understand that you're saying, oh, yeah, he can educate the

8     Court as to what the appropriate standard should have been at

9     the time of the case, but are you saying -- are you suggesting

10    that you want him to go beyond that and offer some sort of

11    legal conclusion?

12         MS. SMITH:  In his declaration, Mr. Cooper has

13    offered those opinions, but of course if Your Honor saw it was

14    prudent to limit his testimony, then we would follow your

15    order.

16         THE COURT:  Okay.  Well, I think I understand your

17    answer.  Was there anything else?

18         MS. SMITH:  I don't think so.

19         THE COURT:  All right.  Then I think we are back to

20    Mr. Braccio.

21         MR. BRACCIO:  Your Honor, can I briefly -- yeah, this

22    is Mr. Braccio from Phoenix.  Let me just bring up that last

23    point.  I heard that exactly as Your Honor heard, that is, her

24    saying on the one hand that they will limit him to the

25    factual -- the factual issue about the standard of care in 1994

 1    in Pima County, but then they're not willing to agree that his

 2    testimony should be limited.  So they're going to make me

 3    potentially push to have him offer legal opinions, and that's

 4    not --

 5              THE COURT:  Well, here's the thing -- here's the

 6    thing.  I will give them guidance as to what I will let him

 7    testify to and what he won't testify to, but I think I'm

 8    capable of separating -- even if he does, I'm capable of

 9    separating the wheat from the chaff, as I said earlier.  So I

10    understand your concern about that.  It's duly noted, and I

11    will take that into consideration.

12              MR. BRACCIO:  Okay.  With respect to the other two

13    motions, again, petitioner's counsel has proved my point.  They

14    want to make an issue of Detective Pesquiera's expertise as a

15    blood stain expert, and I think what's really important in this

16    case is petitioner counsel has attempted to capitalize on a

17    gross misunderstanding in this case.  He's consistently gone

18    after Sergeant Pesquiera saying, "You're not an expert and

19    you're not an expert."  Sergeant Pesquiera is not an attorney.

20    She doesn't understand the legal definition of what qualifies a

21    person as an expert, and her layperson's understanding of what

22    an expert is.  I since clarified with her that she meets the

23    standard.  Whether she considers herself a preeminent expert in

24    blood stain interpretation in the country is a different

25    matter.

1          THE COURT:  I'm sorry, can you clear something up for

2    me?  At trial, was she qualified as an expert in blood spatter?

3          MR. BRACCIO:  Yes.

4          THE COURT:  So she -- the Court qualified her in

5    front of the jury as an expert?

6          MR. BRACCIO:  That Mr. Bruner made a Rule 702

7    objection to her qualification at two different times during

8    her testimony and she qualified her answers appropriately in

9    front of the jury in saying what she would have --

10         THE COURT:  I understand your answer, but that's not

11   my question.

12         MR. BRACCIO:  Yes.

13         THE COURT:  So I don't know about Arizona, but the

14   way it works here is someone is proffered as an expert.  They

15   provide their education, their background, their qualifications

16   as an expert, and then the Court qualifies them as an expert in

17   front of the jury, so the jury knows this person has an

18   expertise, and then there's -- as I'm sure is the practice down

19   there -- a follow-up qualification explained to the jury as to

20   whether or not they, you know, need to -- explaining what it

21   means to be an expert.

22         So I guess my question is this -- I want to make sure

23   I understand your answer.  Are you saying that she was

24   proffered and qualified as an expert during the trial?

25         MR. BRACCIO:  Yes.  The only thing I cannot comment

1    on is whether or not she was proffered as an expert in this in

2    terms of any sort of pretrial notice.  She was the case agent

3    detective at the time, and a lot of these law enforcement

4    officers are trained to look and interpret blood stain

5    evidence.  So she is -- she does qualify under the rule as an

6    expert.

7            And again, this gets back to my point that this is

8    not an issue in this case, whatsoever.  This is an ineffective

9    assistance of counsel claim.  If Mr. Sandman believes that the

10   blood evidence shows something else and he's willing to put

11   forward an expert to say that, then that's how he rebuts

12   Sergeant Pesquiera.

13           THE COURT:  I understand your argument and I've read

14   your argument, and I think you've answered my question.  The

15   answer to my question that I heard -- and I accept your

16   qualification that you're saying you don't know if she was

17   proffered as an expert, but you're saying she was qualified as

18   an expert in what?

19           MR. BRACCIO:  In blood stain interpretation and

20   Mr. Bruner twice made a Rule 702 objection and the Court

21   overruled him, finding that she was qualified to give testimony

22   in that area.

23           THE COURT:  Okay.  Go ahead.  I don't want to cut you

24   off.  Anything else you want to add?

25           MR. BRACCIO:  I would just point out that based on

1    petitioner counsel's arguments about limiting the hearing back

2    to the amended petition, he essentially concedes that the

3    Martinez briefing has expanded the claims beyond what was in

4    the amended habeas petition.  His petition now is, well, we've

5    agreed to consider that, and we've never agreed that these are

6    relevant claims.

7            We believe that the focus of the hearing needs to be

8    limited to what was alleged in the original amended habeas

9    petition, upon which the Ninth Circuit granted this remand, and

10   that would be my last comment.  Thank you, Your Honor.

11           THE COURT:  All right.  Thank you.  All right.

12           I don't mean to draw this out, but Mr. Sandman, I

13   don't -- we've had an extended discussion on whether or not the

14   detective was qualified as an expert.  I don't know if -- you

15   were standing at the podium.  I was interpreting that as you

16   having something to say.  Was there something you wanted to say

17   on that?

18           MR. SANDMAN:  Well, Your Honor, the answer to the

19   question as you framed it, the answer is no.  But the Court did

20   not go through the steps of qualifying Ms. Pesquiera as an

21   expert and explain that to the jury, and so on and so forth.

22   That was clearly not done.  That's all I was going to say.

23           THE COURT:  Okay.  Thank you.

24           All right.  I'm going to put out a written order

25   before Monday, or before we start on Monday, in regard to these

```
 1    motions in limine.  So you'll have some guidance from me

 2    shortly.

 3            Let's talk a little bit more about some other

 4    outstanding matters we need to talk about.  Let me start with a

 5    few easy preliminary matters.

 6            Is either side going to be invoking the witness

 7    exclusion rule?

 8            MR. SANDMAN:  Your Honor, we would request that the

 9    witness exclusion rule be invoked.

10            THE COURT:  Okay.  So again, I will ask both sides --

11    I mean, I don't know who these people are.  You're going to

12    have to keep track of it.  Go ahead, Mr. Braccio?

13            MR. BRACCIO:  Yeah -- thank you, Your Honor.  This

14    actually was an issue that I raised with Mr. Sandman last week,

15    I believe.  We are not going to ask for the exclusion of

16    witnesses for the hearing under Rule 615.  In fact, we would

17    request that Detective Pesquiera, Mr. Bruner, and Ms. Bowman

18    all be present in the courtroom when they testify.  Of

19    course -- of course, under Rule 615, the case agent -- can you

20    hear me okay?

21            THE COURT:  I can, but Mr. Sandman, your

22    paper-shuffling is cutting us off.  Go ahead, Mr. Braccio.

23            MR. BRACCIO:  Your Honor, under Rule 615, the case

24    agent is a well-established exception to the exclusion of

25    witnesses.  Having all present will greatly, greatly expedite
```

1    this hearing.

2            THE COURT:  Well, 615 says one.

3            MR. BRACCIO:  I beg your pardon?

4            THE COURT:  You're allowed to have a party

5    representative, not multiple party representatives.

6            MR. BRACCIO:  No, I agree with that, and so our one

7    representative, our one case agent, would be Detective

8    Pesquiera.  And my other argument is that we would request that

9    Mr. Bruner be present in the courtroom, particularly when

10   Ms. Bowman testifies, not as some sort of case agent, but just

11   to hear her testimony, for a number of reasons.

12            THE COURT:  Can you remind me who Bruner is again?

13            MR. BRACCIO:  He's -- both of them are the two trial

14   defense attorneys.

15            THE COURT:  And what theory would I allow the trial

16   attorney to sit in the courtroom in spite of the 615 witness

17   exclusion rule?

18            MR. BRACCIO:  So there are exceptions, and this is

19   something I can brief if Your Honor would like.  But there are

20   exceptions to the rule of exclusion.  I believe the standard is

21   if there's a necessity for the witness to be present in the

22   courtroom.  And we believe in this case there is that

23   necessity.

24            THE COURT:  Here's what we're going to do.  My

25   inclination would be to say no.  You're allowed to have one

1   party representative.  If you want to argue for an exception to

2   that ruling, and you have some authority that you can rely on,

3   you can provide it to me, and I'll give Mr. Sandman an

4   opportunity to respond to it.

5          MR. BRACCIO:  Okay.

6          THE COURT:  But we're going to have to get it done

7   before Monday morning.

8          MR. BRACCIO:  Right.

9          THE COURT:  Because otherwise, I'm going with what I

10   usually go with, which is you get one party representative

11   each.  The exception would be expert witnesses, obviously, if

12   the expert witness has to listen to some testimony as part of

13   their testimony about -- but you know, so Mr. Sandman, do you

14   want to weigh in on this?

15          MR. SANDMAN:  Well, I think that this is a hearing

16   that's going to take place almost 23 years after the events

17   that are relevant to the Court's ultimate decision-making.

18   Both attorneys, quite frankly all three, including Mr. Hazel,

19   the post conviction attorney, are struggling to remember a lot

20   of things related to their representation.  To have Mr. Bruner

21   in the courtroom getting advance notice of the questions from

22   the lawyers here and answers from his co-counsel, Ms. Bowman, I

23   guess that's something that Rule 615 is intended to prevent.

24          And there can't possibly be an exception.  You know,

25   Rule 615 -- excuse me, 615 talks about having a person who is

1    essential to presenting the party's defense in the courtroom,

2    and obviously, Mr. Bruner is being brought down here, against

3    his will.  He'd rather be doing other things, I'm sure.  He's

4    not a person essential to anybody's defense in this case.

5    Obviously, Mr. Braccio -- you've granted leave to brief this

6    and we'll wait to see what he has to say, but I can't imagine

7    that we will find any exception that would allow Mr. Bruner to

8    sit in the courtroom and watch the examination of his former

9    co-counsel.

10           THE COURT:  Sure.  Well, I mean, absent the

11   additional authority, we're going to go with the way I usually

12   proceed in these things, which is you can have a party

13   representative.

14           So if you want me to reconsider that, I'll look for

15   your briefing.

16           MR. BRACCIO:  Your Honor, could I briefly respond?

17           THE COURT:  Yes.

18           MR. BRACCIO:  Part of the reason that I wanted to

19   have Mr. Bruner in the courtroom is I -- my plans were starting

20   off the cross examination with Ms. Bowman is to establish the

21   timeline that Mr. Sandman contends does not exist in this case,

22   and it is entirely record-based, and it is going to take a

23   substantial amount of time.  And so there's -- there's nothing

24   from Ms. Bowman's memory that's going to be elicited in a

25   substantial initial portion of her testimony, and by having

1    Mr. Bruner sit in the courtroom and hear all that, we can

2    expedite this hearing and he can just affirm everything that he

3    heard that came directly from this recreated record.

4              THE COURT:  No, I understand that it may be, from

5    that standpoint, more efficient, but there are other

6    considerations.  But you've got my ruling, and if you want me

7    to reconsider something, you want to provide me some authority,

8    you're welcome to do it.

9              MR. BRACCIO:  Okay.  Thank you, Your Honor.  We won't

10   be filing a motion on that.  I just wanted to give you my

11   reasons for --

12             THE COURT:  No, and I understand.  You know, I'm not

13   discounting your reasons, but there are reasons why Rule 615 is

14   in place and I think it's best to go with the decision I've

15   made.  Thank you.

16             All right.  So that was witness exclusion.  Do both

17   of you -- I'm assuming you want to make some sort of opening

18   statement?

19             MR. SANDMAN:  Your Honor, Cary Sandman here.  We

20   would, Judge.

21             THE COURT:  Okay.

22             MR. BRACCIO:  Your Honor, Mr. Braccio here.  We

23   don't.  We would waive opening statements and get right to the

24   evidence.

25             THE COURT:  All right.  Well, here's what we're going

```
 1    to do.  How much time do you think you need, Mr. Sandman?

 2              MR. SANDMAN:  I think probably about 40 minutes,

 3    Judge.

 4              THE COURT:  All right.  How about I'll give each side

 5    45 minutes.  You can use them or not use them, as you see fit.

 6    How about that?

 7              MR. SANDMAN:  Thank you, Judge.

 8              THE COURT:  Okay.  I don't know if you were planning

 9    to do this, but you know, one of my practices is I like to make

10    sure that you let the other side know at least the day before,

11    you know, who you're going to be calling the next day so that

12    counsel has time to prepare, and you know, you may have already

13    worked this out, as far as like who you're calling and what

14    order you're calling them in.  So maybe this is not an issue,

15    but if you can at least let the other side know the day before

16    who's going to be on the stand so they can be prepared for that

17    person, I would appreciate it.  All right?

18              MR. SANDMAN:  Yes, sir.

19              THE COURT:  I think I already mentioned this in the

20    past, but after the hearing, once we've got a transcript

21    ordered, I'm going to want to have, you know -- I know you've

22    given preliminary proposed findings of fact and conclusions of

23    law.  Obviously, those may change as the evidence unfolds

24    during the course of the hearing, and so I'm going to be asking

25    for post briefing along the same lines that I can then use, as
```

1   far as crafting my decision.  I think I mentioned that to you

2   in the past, though.

3           I'm trying to remember what I saw it in, but I was

4   reading -- I was reading something.  I think it was -- I think

5   it was a police report of an interview with Mrs. Lopez that

6   included the officer eliciting from her her Social Security

7   number, and it's still in -- it's in the pleadings I have,

8   which are -- which have a docket number on them, and I just

9   want to make sure that we've made an effort to go through and

10  block out any personal information like that.

11          MR. SANDMAN:  And we'll take -- we will try to get

12  that done, Judge.  I agree that should have been done.

13          THE COURT:  Okay.  And then, you know, there were

14  some photographs of -- nude photographs of the victim, and we

15  were going to have those sealed.  I want to make sure that's

16  been done, because I'm not sure that's been done yet.

17          MR. SANDMAN:  Judge, Cary Sandman here.  What we did

18  after the last pretrial conference is we went back to try to

19  find whether there were any nude photographs in the record

20  already.  We didn't find any.  We did find some other

21  photographs that were sort of partials and we -- I believe we

22  submitted a -- an unopposed motion to have those sealed.  I

23  don't remember if I ever got an order.

24          MS. GARD:  I apologize, I'll take responsibility.

25  They sent me a draft, Your Honor, to review.  This is Lacey

1   Gard.  So I think we can get a motion together.

2           MR. SANDMAN:  That would take care -- I thought it

3   was filed.  It was (indiscernible - poor connection) on my

4   part.  So Judge, sounds like that's going to get filed, and

5   that will address some pictures in the record which are not --

6   they're not nude, but we decided we would seal them anyway.

7           That then leaves the question of some of the

8   documents that we have lodged as exhibits for the hearing, and

9   we are going to have to go through and make arrangements.  A

10  number of those photographs do get sealed and we'll work with

11  counsel.  We'll make sure that that gets done during the course

12  of the hearing.

13          THE COURT:  Okay.  I appreciate that.  I know that

14  there were a number of exhibits that have been -- that you've

15  stipulated that you agree to, while we're talking about

16  exhibits, and there are a number of exhibits that there are

17  still some ongoing objections to.  In all honesty, some of

18  these I'm probably going to rule on as we're going through on

19  the hearing, because some of them, I may want the benefit of

20  having the objection at the time.  It puts things into context

21  a little better for me, if that makes sense.

22          MR. SANDMAN:  Yes.  I had that note written down as

23  to one of my exhibits, but actually, I think it makes sense to

24  all of the ones that we have disagreements on, because I think

25  it will be helpful for you to hear -- start hearing some of the

1  evidence and you'll have more context and we won't, obviously,

2  make reference to any of those that respondents have objections

3  to until, you know, we can -- we present them and get a ruling

4  at that point.

5            THE COURT:  Okay.

6            MS. GARD:  That's fine with me.

7            THE COURT:  Okay.  Let's see, hold on.  I'm going

8  through my list here.  There were some undisputed facts, and on

9  contested issues of law that are contained that Pages 3 and 6

10  of the joint prehearing statement, and I'm going to adopt

11  those, and I don't have the docket number in front of me,

12  because I left my giant binder at home, and I'm flipping back

13  and forth on my iPad, and it's a little cumbersome.

14            MS. SMITH:  (Indiscernible - poor connection)

15  Docket 243.

16            THE COURT:  Thank you.  Okay.  So it's Pages 3

17  through 6 is where that's listed on Docket 243.  There is an

18  issue of restraints and shackling.  I don't know what the

19  practice is in Arizona.  I know what the practice is here

20  because it's obviously something we've been working on in light

21  of the Ninth Circuit's decision, and I know the Court's going

22  to have to make an individualized assessment, and I have not

23  had a chance to speak with the marshals in Arizona, to be

24  honest with you.

25            MR. SANDMAN:  Judge, I think, you know, it would be

1   okay to get some input from the marshals.  I know we -- our

2   office, actually Ms. Gard had a hearing with Judge Zapata

3   couple months ago and I believe in that case, the petitioner

4   was allowed to have his writing hand free so he could take

5   notes, or what have you.  So I don't think it will end up being

6   a problem, but I think we could probably wait until Monday to

7   see what the marshals --

8           THE COURT:  I just wanted to front that out.  It was

9   something in the back of my mind I've been thinking about and I

10  just hadn't had a chance to talk with the marshals yet.

11          Okay.  Let's see, I'm just going through my list here

12  to make sure I've touched on everything.

13          Oh, time, so again, you know, I know you all are

14  making your best efforts to, you know, be as efficient as

15  possible and be as accurate in your predictions as possible,

16  and I know both of you say, well, we're going to need both

17  weeks to get this done.  So you know, I don't know what the

18  practice there is.  I mean, my practice is generally to, you

19  know, start at 9 and try to wrap up by 4:30 or 5 every day.  I

20  would, frankly, like to shoot for 4:30, just to give us all a

21  little bit more time in the evening, you to prepare and

22  frankly, me to keep, you know, looking at material.  But you

23  know, if you all think that we're going to be really pressed,

24  because we only have nine days -- you know, we've got five days

25  the first week and four days the second week because that last

1    Friday is a holiday.  I think it's Veteran's day.  You know,

2    I'm certainly prepared to go, you know, 9 to 5 or 8:30 to 5 if

3    you think we're going to be really jammed up if we go from 9 to

4    4:30.  So I guess I need a little input from counsel on that.

5              MS. GARD:  Judge, I think -- this is Lacey Gard.

6    With my own schedule, it would be to go from 8:30 to 5.  I

7    don't know what Mr. Sandman --

8              MR. SANDMAN:  Well, going to 4:30 -- starting at 9

9    and ending at 4:30 would be a luxury, so yes, I would accept

10   that offer from the judge.

11             THE COURT:  8:30 to 5 is that what I'm hearing?

12             MR. SANDMAN:  9 to 5, Judge.

13             THE COURT:  9 to 5?

14             MR. SANDMAN:  9 to 4:30 is what I think the original

15   offer is.  We both agree to that.

16             THE COURT:  So everybody thinks -- look, I guess what

17   we can do is we can reassess as things get going and if we need

18   to extend the time, then we can extend the time.  So am I

19   hearing everybody is in agreement that for now, we're going to

20   start off at 9 to 4:30 with an hour for lunch?

21             MR. BRACCIO:  Your Honor, this is Myles Braccio, that

22   works.

23             THE COURT:  And Mr. Sandman, is that what -- you

24   know, I want to make sure you're in agreement with that?

25             MR. SANDMAN:  Yes, sir.

```
1              THE COURT:  Okay.  So again, you know how long you
2   think this testimony is going to take to come in.  If you see
3   that it looks like we're going to get jammed up, I'm really
4   relying on you to let me know so that.  If we need to put the
5   pedal down, then we can do that.  All right?
6              MR. SANDMAN:  Yes, Judge.  I think probably by maybe
7   Wednesday, at the end of the day Wednesday, we'll have a pretty
8   good idea if we're -- the case is moving the way we anticipate,
9   and if not, that would probably be a good time to reassess.
10             THE COURT:  And you know, there's seven days in a
11  week.  I'm just saying.
12             MR. SANDMAN:  That's true.  That would be really
13  bogged down, but yes, I understand.
14             THE COURT:  I got it.  Oh, okay.  One thing I think
15  is really important, as far as making sure we've got a good
16  record in this case, is that we are precise and consistent in
17  referring to exhibit numbers as we go through.  So if we can
18  make sure that we've got exhibits marked and we're making
19  reference to those exhibit numbers, that would be great.
20             MR. SANDMAN:  Judge, we've got -- we brought them all
21  down to the clerk -- to the courtroom this morning.  They're
22  all marked, and I believe respondent have marked theirs, and we
23  should be in good shape.
24             THE COURT:  Great.  Okay.  I think those were -- the
25  only other thing I would ask is when you are, you know,
```

1    questioning, just a few points of my preferences, when you are

2    asking questions of the witness, I would prefer that you do it

3    from the podium.  I prefer that you use their proper name.  You

4    know, no first names.  If you need to approach the witness with

5    an exhibit, if you would, ask for permission ahead of time.  If

6    you've got a number of documents that you're going to be

7    working with with a particular witness, you know, it's

8    generally better if you can provide them with those documents

9    rather than going back and forth between the podium and the

10   witness, and then they can just refer to those.

11           There is a difference between -- you're all

12   experienced counsel, but there's a difference between

13   impeachment and refreshing recollection, and if you're going

14   to -- if a witness establishes that he or she needs their

15   recollection refreshed, I mean, as a predicate, you're going to

16   need to establish that they need it refreshed and that there's

17   something that would refresh their recollection.  I would ask

18   that you provide whatever it is that refreshes their

19   recollection to them, and then that they resume their

20   testimony, not testifying from, for instance, a document, if it

21   is not an exhibit in the case, but they can use that document

22   to refresh their recollection, then they can provide their

23   testimony, but not testify from that document by way of

24   example.  Does that make sense to everybody?

25           MR. SANDMAN:  Yes.

1              THE COURT:  If you're going to impeach with a

2    document or prior testimony, please let -- and this goes for

3    any time you're going to be, you know, approaching a witness,

4    please just make sure that you provide notice to opposing

5    counsel, you know, of the exhibit number and the page number,

6    or whatever it is you're going to be referring to so that they

7    can be literally on the same page with you when you're posing

8    your questions to the witness.

9              As far as the witnesses are concerned, you know, the

10   proponent of the witness has an opportunity to ask questions on

11   direct, then there's cross, then there's redirect.  And then

12   that's it; we're done with the witness.  It is only in rare

13   circumstances that I will allow recross, because frankly, you

14   know, I would expect that we would be limiting the testimony so

15   that we don't have the necessity for recross.

16              Any questions about that?

17              MR. SANDMAN:  Judge, Mr. Sandman here.  I've got a

18   couple of questions about the exhibits and the use and handling

19   of exhibits in the courtroom.  We're going to try to use the

20   electronic facilities in the courtroom to display exhibits.  We

21   won't be -- we can avoid a lot of paperwork going back and

22   forth.  The other thing is a lot of -- well, almost all the

23   witnesses, except for the attorneys, are experts, and so their

24   reports are being admitted as exhibits, and, you know, with

25   respect to the experts, they're going to be adopting what

1    they've written and we intend to ask them questions about what

2    they said in the reports and then ask them to expound on that

3    and explain it, and I just want to make sure that that's

4    acceptable to the Court as a way of proceeding.

5              THE COURT:  As long as -- they're already exhibits;

6    right?

7              MR. SANDMAN:  Yes.

8              THE COURT:  You're going to be offering reports as

9    exhibits?  Yeah, I have no problem with that.

10             MR. SANDMAN:  Yes, okay.  And the other thing is,

11   Judge, this really pertains mostly to the three attorneys in

12   the case, and I'm -- I don't know, I imagine that the

13   respondents intend to do the same thing that I intend to do,

14   but there's a lot of information in the records that were in

15   their files.  They have the information, and I don't know

16   whether they ever read it or -- it's not really a matter of

17   refreshing your recollection, but it is a matter of saying,

18   well, this is in your file, and then maybe asking a series of

19   questions about that information and what implications it might

20   have had on the strategy or things they did or didn't do.  So I

21   think the parties are using some of the attorney file documents

22   in that fashion with the lawyers, not necessarily to refresh

23   their memory, but to establish, you have this record, you have

24   this information, and you know, perhaps later the judge, Your

25   Honor would draw certain inferences about all that, but I do

```
1    envision using some of the records with the lawyers from their

2    files in that fashion.  I wanted to make sure that was okay.

3             THE COURT:  I guess I'm -- so are you intending to

4    introduce these as exhibits?

5             MR. SANDMAN:  Yes.  I'll be -- actually, the entire

6    file, all the files of the lawyers will be -- they will be

7    exhibits.  And actually, we have agreement almost about

8    everything going into evidence, with the exception of several

9    documents we disagree on, but yeah, everything's going to be

10   exhibits.  We won't be asking anybody about anything that's not

11   in evidence.

12            THE COURT:  So I just want to make sure I understand

13   what you -- I want to make sure I understand what you're

14   asking.  So just by way of example, you're going to, say,

15   you've got a witness on the stand, you've got, you know,

16   documents that come from that person's file, and you want to

17   ask them questions about it.  I mean, I don't see what the

18   problem is.  But you're saying they may not have any

19   independent recollection?  I mean, I -- what you've described,

20   I don't see what the problem is, but --

21            MR. SANDMAN:  Okay.  Yeah, I didn't expect there

22   would be, but because you gave some narrow examples of what you

23   wanted us to do, I just wanted to make sure that the things we

24   want to do are -- we're going to be able to.

25            THE COURT:  Well, it's different, though -- I see the
```

```
1    situation you're describing is a little different than what I

2    was describing.  You're talking about an exhibit from a

3    document from somebody's file that there's no dispute it's from

4    that person's file, they just can't remember what was in that

5    file 23 years ago.  So you know, I mean, that's different than,

6    I guess, refreshing somebody's recollection, because it's

7    actually an exhibit in the case.  They can look at it, they can

8    read it, they can testify about it.

9           MR. SANDMAN:  A lot of it is, you know, because it's

10   an ineffective assistance case, it's a matter of -- it's really

11   for the purpose of drawing the Court's attention to some of the

12   things that the parties think are important that are in the

13   records.  And certainly, that's -- that's how I think a lot of

14   the -- a lot of that evidence will be handled with the lawyers

15   but it sounds like it shouldn't be a problem.

16          THE COURT:  Okay.  Let me see, those were the main

17   points I wanted to cover with you.

18          Anybody have anything else they want to add?

19          MR. BRACCIO:  Your Honor, this is Myles Braccio from

20   Phoenix.  The only other thing we didn't cover that I had,

21   demonstrative exhibits.  I sent Mr. Sandman an email about a

22   week ago asking him if he wanted to exchange demonstrative

23   exhibits, or if he didn't want to exchange and just wait to

24   produce them at the hearing, and I haven't heard back on that.

25          THE COURT:  So you're asking him through me?
```

1          MR. BRACCIO:  No.  Essentially, do you want us to

2   disclose demonstrative exhibits ahead of time?  Usually, our

3   practice is we can make demonstrative exhibits as we go through

4   the hearing, because they're all record-based.

5          THE COURT:  All right.  Well, so you've got some

6   demonstrative exhibits and you think Mr. Sandman does as well?

7          MR. BRACCIO:  I can't speak for Mr. Sandman.  I'm

8   just curious, just to make sure that there's no disclosure

9   issues --

10          THE COURT:  So Mr. Sandman, I think you're being

11   asked through me, do you have demonstrative exhibits and are

12   you intending to share them before trial.  That's the question.

13          MR. SANDMAN:  Yeah, we don't have any right now and

14   you know, I thought that during my opening statement I would --

15   I'm probably going to try to use Power Point, which I haven't

16   written yet, but other than that, we don't have any

17   demonstrative exhibits.

18          THE COURT:  Okay.  I think we're all clear then.

19   Okay.  Anything else?

20          MR. SANDMAN:  The only thing I was going to add is

21   that on Monday morning, I think because we have very few

22   disagreements on the exhibits, we'll go ahead and plan on

23   simply offering them en masse, subject to the exceptions which

24   we still have to deal with.

25          THE COURT:  That makes sense to me.  Mr. Braccio, any

1    problem with that?

2              MR. BRACCIO:  None whatsoever, Your Honor.  Sounds

3    great.

4              THE COURT:  Okay, sounds good.  Well, thank you very

5    much.  I appreciate everybody's time.  I know you've been

6    working very hard and we've got a -- we're going to have a hard

7    couple weeks ahead of us, but I think it's going to go well,

8    and I appreciate everybody's continued efforts.  I look forward

9    to seeing you Monday morning at 9 a.m.

10             MR. BRACCIO:  Thank you, Judge.

11             MR. SANDMAN:  Thank you, Your Honor.

12             THE COURT:  Thank you.  Bye-bye.

13             (Proceedings concluded at 11:22 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, R. Joy Stancel, Federal Official Realtime Court Reporter in and for the United States District Court for the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of December, 2017.

/s/ R. Joy Stancel
_____
R. JOY STANCEL, RMR-CRR
FEDERAL OFFICIAL COURT REPORTER