MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD (STATE BAR NUMBER 022714)
MYLES A. BRACCIO (STATE BAR NUMBER 027332)
JOHN PRESSLEY TODD (STATE BAR NUMBER 003863)
J.D. NIELSEN (STATE BAR NUMBER 007715)
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, AZ 85004
TELEPHONE: (602) 542–4686
CADOCKET@AZAG.GOV

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Barry Lee Jones, | CV 01–0592–TUC–TMB |
| Petitioner, | **CLOSING MEMORANDUM** |
| -vs- | |
| Charles L. Ryan et al., | |
| Respondents. | |

Petitioner Barry Lee Jones is not entitled to habeas relief because his conviction for child abuse (Count IV), which does not depend on the timing of the fatal injury or the identity of the assailant, independently supports his felony murder conviction (Count V). In addition, Jones' claims of ineffective assistance of trial counsel are meritless and his post-conviction counsel was not ineffective for failing to raise them. Jones' predominant argument, that the defense must call rebuttal experts at trial to be constitutionally effective, has been soundly rejected by controlling federal law.

## I. INTRODUCTION.

The initial question at issue at this phase of the proceedings before this Court is a narrow one: whether, under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), post-conviction counsel's alleged deficient performance should excuse the procedural default of Jones' claim that trial counsel were ineffective for failing to conduct an

adequate investigation and present relevant evidence during the guilt phase at trial. (*See* Doc. 185, at 1; *see also* Doc. 158.)[1]

The current proceedings are *not* concerned with any allegations that Jones is actually innocent[2]—this Court has previously adjudicated and rejected that argument. (*See* Doc. 141 at 23 ("[Jones] cannot satisfy the actual innocence standard even when his facts are taken as true[.]").)[3] Furthermore, the current proceedings do not concern the adequacy of the law enforcement investigation into Jones' crimes, except to the extent that any alleged deficiencies in that investigation might have impacted trial counsels' duty to render constitutionally adequate performance.[4]

## II.  PROCEDURAL AND FACTUAL HISTORY.

### A.  *Direct appeal proceedings*.

After Jones was convicted and sentenced to death, the Arizona Supreme Court affirmed his convictions and sentences on direct appeal. *State v. Jones*, 937 P.2d 310, 313 (Ariz. 1997). The Arizona Supreme Court's findings of fact are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1).

The United States Supreme Court denied Jones' petition for a writ of certiorari on January 12, 1998. (Doc. 69, Exhibit C.)

### B.  *State post-conviction proceedings*.

After conducting an evidentiary hearing, the state post-conviction court denied Jones' petition for post-conviction relief on October 11, 2000. (Doc. 69, Exhibit E.) The Arizona Supreme Court summarily denied Jones' petition for

---

[1] "Doc." refers to numbered documents in this Court's case file (prior to August 2005) and this Court's electronic case docket (beginning August 2005).

[2] *See* Doc. 185 at 1; Doc 158.

[3] Additionally, this Court has already addressed, and rejected on its merits, Jones' argument that there was insufficient evidence to sustain his sexual assault Conviction (Count I). *See* Doc. 141, at 41–43.

[4] *See* Doc. 185 at 1; Doc 158.

1  review on November 1, 2001. (*Id*., Exhibit G.)

2        **C.**     *Current federal proceedings*.

3        After this Court had denied habeas relief, the Ninth Circuit Court of Appeals

4  remanded for further consideration of Claim 1D under *Martinez*. This Court held

5  that an evidentiary hearing was necessary to determine whether Petitioner could

6  establish cause, under *Martinez*, to excuse the procedural default of Claim 1D. (*Id*.

7  at 37.) In October and November 2017, this Court conducted that evidentiary

8  hearing for Petitioner's guilt-phase claims. (Docs. 256–60, 262, 264–66.)

9  **III.**   **LEGAL BACKGROUND.**

10        **A.**     *The right to effective assistance of trial counsel*.

11        The Supreme Court set forth the clearly established federal law governing

12  ineffective-assistance claims in *Strickland v. Washington*, 466 U.S. 668 (1984); *see*

13  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). To obtain relief, a prisoner must

14  show that "counsel's conduct so undermined the proper functioning of the

15  adversarial process that the trial cannot be relied on as having produced a just

16  result." *Strickland*, 466 U.S. at 686. He must satisfy both prongs of *Strickland*'s

17  test by demonstrating that: (1) counsel's performance was deficient under

18  prevailing professional standards, "meaning his errors are 'so serious' that he no

19  longer functions as 'counsel,'" and (2) he suffered prejudice as a result, "meaning

20  [the] errors deprive[d] the defendant of a fair trial." *Maryland v. Kulbicki*, 136 S.

21  Ct. 2, 3 (2015) (per curiam) (quoting *Strickland*, 466 U.S. at 687). "[A] court is not

22  required to address both components of the *Strickland* test in deciding an

23  ineffective assistance of counsel claim 'if the defendant makes an insufficient

24  showing on one.'" *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998)

25  (quoting *Strickland*, 466 U.S. at 697).

26        A prisoner satisfies *Strickland*'s deficient performance prong by showing

27  "that counsel's representation fell below an objective standard of reasonableness."

28  *Strickland*, 466 U.S. at 688. The prisoner's allegations and supporting evidence

must withstand a reviewing court's "highly deferential" scrutiny of counsel's performance, and overcome the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90. Under this deferential standard, a prisoner "bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001). Actions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

A court reviewing counsel's performance must not "indulge[] in the 'natural tendency to speculate as to whether a different trial strategy might have been more successful.'" *Kulbicki*, 136 S. Ct. at 4 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 377 (1993)). Nor should a reviewing court "second-guess counsel's decisions," or "apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir. 1994) (en banc). Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" he made the decision at issue. *Strickland*, 466 U.S. at 689.

Even when a prisoner establishes that counsel performed deficiently, he must still show prejudice to obtain relief. *Id.* at 691–92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). The court cannot presume prejudice, but must require a petitioner to affirmatively prove actual prejudice; the mere possibility of prejudice is insufficient to meet *Strickland*'s requirements. *Id.* at 693; *see Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) (*Strickland* prejudice "requires showing more than the possibility that [a petitioner] was prejudiced by counsel's errors; he must demonstrate that the errors

*actually* prejudiced him.") (emphasis in original). To prove prejudice, a prisoner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**B.    *Expansion of "cause" under Martinez.***

In general, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause'" to overcome a procedural default. *Maples v. Thomas*, 565 U.S. 266, 280–81 (2012) (citing *Coleman*, 501 U.S. at 753). However, in *Martinez*, the Supreme Court created a narrow exception to this principle by holding that, when an initial-review collateral proceeding is a prisoner's first opportunity to raise ineffective-assistance-of-counsel claims, counsel's ineffective-ness at that proceeding "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. To establish cause under *Martinez*, an inmate must show that: (1) post-conviction relief counsel "was ineffective under the standards of *Strickland*," and (2) the underlying, defaulted ineffective-assistance claim "is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 14; *Clabourne v. Ryan*, 745 F.3d 362, 375–78 (9th Cir. 2014); *see also Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) ("*Martinez* made clear that a reviewing court must determine whether the petitioner's attorney in the first collateral proceeding was ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial counsel is substantial, *and* whether there is prejudice.").

To demonstrate post-conviction counsel's deficient performance, the prisoner "must show that post-conviction relief counsel's failure to raise the claim that trial counsel was ineffective was an error 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,' and caused [the prisoner] prejudice." *Sexton*, 679 F.3d at 1157 (quoting *Strickland*,

466 U.S. at 687). Because post-conviction "[c]ounsel is not necessarily ineffective for failing to raise even a nonfrivolous claim," he "would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton*, 679 F.3d at 1157 (citing *Mirzayance*, 556 U.S. at 127). In the *Martinez* context, "'prejudice' for purposes of the 'cause and prejudice' analysis requires only a showing that the trial-level ineffective assistance of counsel claim was 'substantial,'" but this does not diminish the requirement … that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." 745 F.3d at 377. And "[t]o demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Id.* at 377−78; *see Pizzuto v. Ramirez*, 783 F.3d 1171, 1179 (9th Cir. 2015) (acknowledging that *Clabourne* generally requires that a prisoner prove that his post-conviction relief counsel was ineffective under the *Strickland* standard in order to obtain relief under *Martinez*).

The prisoner bears the burden of proving ineffectiveness of post-conviction relief counsel under *Martinez* to excuse a procedural default. *Martinez*, 566 U.S. at 14 (in order to excuse a defaulted claim under *Martinez*, a petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"); *Cook v. Ryan*, 688 F.3d 598, 610−12 (9th Cir. 2012) ("When faced with the question whether there is cause [under *Martinez*] for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or that it is wholly without factual support…") (quoting *Martinez*, 566 U.S. at 16).

**IV.    JONES HAS NOT PROVEN THAT HIS POST-CONVICTION COUNSEL RENDERED DEFICIENT PERFORMANCE OR THAT HE SUFFERED ACTUAL PREJUDICE.**

In this *Martinez* proceeding, before Jones can reach the question of trial counsel's ineffectiveness, he must first prove that his post-conviction counsel, Judge James W. Hazel, Jr., provided constitutionally deficient assistance and there is a reasonable probability that the post-conviction court would have granted relief. *Martinez*, 566 U.S. at 14. Jones has failed to overcome the strong presumption that Judge Hazel's choices were reasonable. Jones has also failed to prove that, had Hazel presented a better-worded motion for expert assistance, it would have been granted and he would have been able to secure experts who would have provided testimony in 1999 sufficient to create a reasonable probability of a different result. *See id*.

The record demonstrates, and there is no dispute, that the Arizona Supreme Court found Judge Hazel qualified to represent Barry Jones, a capital defendant. (ROA 126.) The record also proves that Judge Hazel: (1) reviewed the record, (2) spoke with trial and appellate counsel, (3) met with Jones, (4) repeatedly requested funding for an investigator, (5) requested a mitigation specialist, (6) repeatedly requested to speak with Angela Gray, eventually obtaining an interview with her, (7) filed a post-conviction petition, and (8) obtained an evidentiary hearing on a claim of ineffective assistance of trial counsel. (ROA 128.) This record does not show deficient performance. *Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("It is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy.")

Jones' ineffective assistance claim appears to be based solely on the assertion that, if Hazel had written a better motion, the post-conviction court would have provided funding sufficient to re-investigate the case as Jones' current counsel has. (*See* R.T. 11/3/2017 a.m., at 51–58.) At the time of Jones' post-conviction proceedings, the governing statute for the funding of expert witnesses

and investigators in capital cases required a showing that such persons were "reasonably necessary adequately to present his defense at trial and at any subsequent proceedings." (Exhibits 130–33.) In denying Judge Hazel's motion for reconsideration, the court simply stated that the previous motion did not establish "why the experts defendant seeks to have appointed are reasonably necessary." (*Id*.) From this record, Jones argues Judge Hazel could have met that standard by discussing the "time line," the purported difference in testimony of Dr. Howard and Rebecca Lux in the two trials, and the blood stain evidence. (R.T. 11/3/2017 a.m., at 62, 73, 80, 83.)

However, based on Judge Hazel's prior experience with capital post-conviction cases, he believed that the motion would have been denied, regardless how he wrote the motion or what authority he cited. (*Id*. at 56–68.) Hazel testified, "[T]he culture at that time was that you didn't get experts, you didn't get investigators, you didn't get transcripts. […] That was just how it was done." (*Id*. at 57.) Jones has offered no evidence to contradict that opinion, and only speculates that a better drafted motion would have succeeded. However, a *Strickland* claim cannot succeed based on mere speculation. *Hurles v. Ryan*, 752 F.3d 768, 782 (9th Cir. 2014); *Cooks v. Spalding*, 669 F.2d 738, 740 (9th Cir. 1981). Rather, as discussed herein, the record shows that the superior courts in Pima County were careful in dispensing funds for experts, certainly nothing close to what current counsel has been able to spend.

And the record shows that Hazel reviewed the record. (Exhibit 128.) Hazel was obviously aware of defense counsel's focus at trial on the timeline of Rachel's injuries until her death, based upon the letter to Dr. Keen and the pre-trial witness interviews. It was reasonable under these circumstances not to seek experts to relitigate a non-viable claim under *Strickland*. There was also no reasonable basis to seek a blood expert, as there was no question it was Rachel's blood in Jones' van and on his clothes, particularly when defense counsel highlighted alternative

1 innocent explanations for the jury. Post-conviction counsel is only required to
2 make a reasonable appraisal of the claim's prospect for success. *See Knowles v.*
3 *Mirzayance*, 556 U.S. 111, 127 (2009); *Zapien v. Davis*, 849 F.3d 787, 798 (9th
4 Cir. 2015). Jones has failed to overcome the strong presumption that Judge Hazel
5 made reasonable, competent choices in how he proceeded.

6 **V.    BECAUSE JONES HAS NOT PRESENTED ANY EVIDENCE TO CONTRAVENE HIS
7 CHILD ABUSE CONVICTION (COUNT IV), WHICH SERVED AS A PREDICATE
8 FELONY FOR HIS FELONY MURDER CONVICTION (COUNT V), HE CANNOT
9 PROVE PREJUDICE FOR ANY OF HIS CLAIMS. JONES IS NOT ENTITLED TO
RELIEF AS A MATTER OF LAW.**

10 Because Jones failed to present *any* evidence that his trial counsel were
11 ineffective in defending against the charge of child abuse based on failure to render
12 aid (Count IV), this felony conviction independently supports Jones' felony murder
13 conviction (Count V). Jones therefore cannot obtain relief as a matter of law for
14 any of his claims because he cannot show that "the result of the proceeding would
15 have been different." *Strickland*, 466 U.S. at 694.

16 **A.    *Factual and procedural background.***

17 The State charged Jones with sexual assault of a minor under the age of 15
18 (Count I), three counts of child abuse (Count II, based upon Jones causing the
19 rupture of Rachel's duodenum; Count III, based upon Jones causing Rachel's
20 bruising and head laceration; Count IV, based upon Jones' failure to seek medical
21 aid for Rachel prior to her death); and first-degree murder (Count V). Counts II and
22 IV were charged under A.R.S. § 13–2623(B)(1) (circumstances likely to produce
23 death or serious physical injury). Count III was charged under A.R.S. § 13–
24 3623(C)(1) (non-death or serious physical injury). The State also alleged Counts I,
25 II, and IV as dangerous crimes against children pursuant to 13–604.01, and filed

26
27
28

allegations of predicate felonies with respect to Counts II and IV. (ROA 4–7.)[5]

Noting that Count IV (failure to seek medical aid for Rachel prior to her death) "forms the predicate offense for first degree felony murder," Jones' trial counsel filed a motion to dismiss that count, alleging that he did not have "care or custody" of Rachel pursuant to A.R.S. § 13–3623(B). (ROA 156.) The trial court denied Jones' motion as premature. (R.T. 12/5/94, at 15; ROA 192–95.) After the presentation of evidence at trial, Jones moved for a directed verdict on Count IV, which the Court denied. (ROA 633.) The State subsequently withdrew its allegation of premeditation with regard to Count V (first-degree murder), choosing to submit the count to the jurors only under the felony-murder theory. (*Id.*)

The trial court instructed the jurors that the sexual assault charge (Count I) and the charges of child abuse under circumstances likely to cause death or serious physical injury (Counts II and IV) could serve as predicate felonies to support the felony murder charge (Count V). (R.T. 4/13/95, at 71–72, 147–49; ROA 673.) The court further instructed the jurors that the child abuse charges (Counts II and IV) could only be considered predicate felonies if they were committed intentionally or knowingly and if the circumstances were likely to produce death or serious physical injury, and included special interrogatories to that effect on the verdict forms. (R.T. 4/13/95, at 148–49; ROA 682, 684.) The court further instructed the jurors that "all 12 jurors must agree on whether the defendant is guilty of any crime with which he is charged." (R.T. 4/13/95, at 144.)

The jurors returned unanimous guilty verdicts on all counts. (ROA 658–59.) With respect to the child abuse counts (Counts II and IV), the jurors answered interrogatories finding the crimes were committed under circumstances likely to produce death or serious physical injury and that Jones committed these crimes

---

[5] "ROA" refers to the Record on Appeal, which was filed with the Court on November 29, 2001. *See* Docs. 14, 16.

1    intentionally and knowingly. (ROA 658–59, 682, 684.)[6]

2         On direct appeal, Jones challenged, *solely on state law grounds*, both his

3    conviction on Count IV, as well as whether Count IV was properly used as a

4    predicate to support his conviction on Count V (felony murder). (Doc. 69, Exhibit

5    B, at 19–21.) The Arizona Supreme Court rejected Jones' arguments:

6         A person is guilty of child abuse under A.R.S. § 13–3623(B) if,
7         while having "care or custody of [a] child," the person causes or
          permits the health of a child to be injured or causes or permits the
8         child "to be placed in a situation where its person or health is
9         endangered." Defendant's challenge to his conviction for child abuse
          revolves around the statutory words "care or custody" and particularly
10        the word "care." He claims that he did not have "care" of Rachel
11        within the meaning of section 13–3623(B) and, therefore, could not be
          convicted of child abuse. *See* A.R.S. § 13–3623(B). On these grounds,
12        defendant urged a Rule 20 motion for judgment of acquittal on Count
          Four, which the trial court denied.
13                                    * * *

14        In this case, substantial evidence exists for a jury to find that
15        defendant had "care" or "custody" of Rachel. He accepted
          responsibility for Rachel by his actions. Angela Gray and all three of
16        her children moved into defendant's trailer about three months before
17        Rachel died. Defendant provided food and shelter for the family. He
          acted as a caregiver to all of Gray's children and was, in essence, their
18        stepfather, although not married to their mother. Rebecca, Gray's
19        eleven-year-old daughter, testified that she had to ask permission of
          her mother or defendant before she could go outside and play. On the
20        day that Rachel's injuries occurred, Rebecca had asked defendant's
21        permission twice to go outside: once to go to a friend's house and
          once to ride her bike. Rebecca testified to the manner in which
22        defendant disciplined—by sending the child to his or her room.
23        Additionally, defendant told the children that they were not allowed to
          play in his van because he had tools and other things in it that might
24        hurt them. Defendant clearly accepted responsibility for Rachel by
25        taking her out alone with him on three separate occasions on the
26        fateful day. He continued to assert responsibility over her by telling
          people who were concerned about her condition that he had taken her

27

28   _____
     [6] *Jones*, 937 P.2d at 313.

                                      11

1  to the paramedics and they had pronounced her all right.

2       Having assumed responsibility for Rachel, it would be
3  anomalous in the extreme to find that defendant's responsibility for
4  her ended when he deliberately inflicted the fatal injuries upon her.
5  The jury received substantial evidence to find that defendant had care
6  or custody of Rachel within the meaning of A.R.S. § 13–3623.

                              * * *

       Our holding that the child abuse conviction is proper disposes
of defendant's argument that it cannot be used as a predicate felony
for felony murder.

*Jones*, 937 P.2d at 314–16 (1997) (footnote omitted).[7]

**B.    *Jones cannot prove prejudice*.**

Jones presented *no evidence* in these proceedings that his trial counsel were ineffective in failing to investigate and challenge his child-abuse conviction (Count IV), which served as a predicate felony for his first-degree murder conviction (Count V). Further, the factual and legal findings with respect to these convictions are presumed correct. *See* 28 U.S.C. § 2254(e)(1) (A petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence.") Thus, Jones cannot prove prejudice with respect to the guilt-phase portion of Habeas Claim 1D, *as a matter of law*. His convictions for child abuse (Count IV) and felony murder (Count V) remain unchallenged on this record.

Jones' own medical experts agree that Jones' failure to take Rachel to the hospital either caused, or contributed to, her death. In her December 18, 2002 report, Jones' expert, Dr. Janice Ophoven, opined:

---

[7] The legal definition of "care or custody," as used in the Arizona statute for child abuse, is a matter of state law. Therefore, this Court has no jurisdiction to review the Arizona Supreme Court's decision regarding either Jones' child abuse conviction on Count IV or the use of that conviction as a predicate felony to support his conviction for felony murder on Count V. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Deck v. Jenkins*, 814 F.3d 954, 977 (9th Cir. 2016) (same).

> In the hours before Rachel, Angela and Barry [Jones] went to bed, it would have been evident to *anyone* with Rachel that she was in need of immediate medical attention. *It is my opinion that the decision to withhold medical care is consistent with fatal neglect.*

(Exhibit 103, at 4266; emphasis added.) Ophoven reiterated her fatal-neglect opinion in her February 1, 2010 supplemental report, as well as during the recent evidentiary hearing:

> Q.    And you are also not backing down from your opinion that a caretaker of the child should have known that [Rachel] needed immediate medical attention.
>
> A.    I am not.
>
> Q.    And you still hold that opinion today.
>
> A.    I do.

(Exhibit 106, at 4276; R.T. 11/1/17, at 60.) Ophoven testified that Rachel's abdominal injury was "potentially survivable" had she been taken for medical care. (*Id.* at 61–62.)

Similarly, Jones' other medical expert, Dr. Mary McKay, opined: "There is no question in my mind that *neglect of the child's medical condition significantly contributed to her death*." (Exhibit 113, at 6634-28; emphasis added.) McKay testified that Rachel's duodenal injury, if left untreated, would cause infection, "overwhelming sepsis, and finally death as a result of the sepsis." (R.T. 11/2/17 a.m., at 13.)

Thus, this Court cannot excuse the procedural default of Jones' guilt phase portion of Claim 1D under *Martinez* because Jones has not met his burden of proving prejudice with respect to his underlying claim of ineffective assistance of trial counsel. Even if trial counsel failed to reasonably investigate and present evidence regarding the State's investigation, the State's medical evidence, and/or the timeline between Rachel's injury and death, Jones would *still* have been convicted of first-degree murder (Count V), based solely upon his failure to render aid for Rachel (Count IV). Jones' conviction on Count IV did not depend upon the

1    timing of Rachel's injuries, nor did it require proof that Jones inflicted the fatal

2    injury.

3    　　　Because Jones' conviction on Count IV alone supported his felony-murder

4    conviction on Count V, Jones is not entitled to relief. *Gallegos v. Ryan*, 820 F.3d

5    1013, 1027–29 (9th Cir. 2016). As the Ninth Circuit Court of Appeals held in

6    *Gallegos*:

7    　　　　　[U]nder the *Strickland* prejudice prong, ineffective assistance
         with regard to premeditated murder, even if it occurred, cannot
8    　　　　　provide a "reasonable probability that, but for counsel's
         unprofessional errors, the result of the proceeding would have been
9    　　　　　different" at the guilt phase, *Strickland,* 466 U.S. at 694, 104 S.Ct.
         2052, unless Gallegos would also likely have prevailed on the felony
10   　　　　　murder issue. The focus of our inquiry, therefore, is on the felony
         murder charge, and specifically on the predicate felonies themselves.
11

12

13   *Id.*, *opinion amended on reh'g,* 842 F.3d 1123 (9th Cir. 2016); *cf. Sandford v.*

14   *Ryan*, 692 Fed. Appx. 339, 341 (9th Cir. 2017) ("[I]neffective assistance claims

15   based on a duty to investigate must be considered in light of the strength of the

16   government's case.") (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th

17   Cir. 1985)).

18   **VI.   JONES HAS FAILED TO PROVE THAT HIS TRIAL COUNSEL WERE INEFFECTIVE**

19   **UNDER *STRICKLAND* AFTER THEY CONSULTED WITH AN INDEPENDENT**
     **MEDICAL PATHOLOGIST ABOUT THE NATURE OF THE VICTIM'S INJURIES.**
20

21   　　　Jones cannot prove that his trial counsel were constitutionally ineffective

22   when they consulted with Dr. Keen, an independent medical pathologist, regarding

23   the nature and timing of Rachel's injuries. Jones' argument to the contrary assumes

24   a constitutional obligation that defense counsel "shop" for an expert until they find

25   one that disagrees with the State expert's medical conclusions. That argument has

26   been soundly rejected by controlling United States Supreme Court and Ninth

27   Circuit precedent.

28

14

1    **A.    *Factual and procedural background.***

2        On May 3, 1994, defense attorney and certified criminal law specialist[8] Sean

3    Bruner was personally appointed by the trial court to represent Barry Jones. (R.T.

4    10/31/17, at 142–43.) Bruner had previously handled "at least two other[]" capital

5    cases before accepting the Jones case. (*Id*. at 143–44.) Bruner accepted the difficult

6    assignment because he found death penalty cases "[i]nteresting, and [he] felt a duty

7    to give back." (*Id*. at 146.) Bruner was lead counsel in the matter. (*Id*. at 142–43.)

8    Both Bruner and co-counsel Leslie Bowman have little to no independent

9    recollection of the actions they undertook in representing Jones. (*Id*. at 142; R.T.

10   10/30/17, at 124–25.)

11       Upon receiving the case, Bruner immediately filed a motion with the trial

12   court for funding for an investigator, which the court granted. (ROA 1.) Bruner

13   also met with Jones at the jail the day he was appointed, as well as the following

14   day for several hours. (R.T. 10/31/17, at 147; Exhibit 37, at 5686.) Bruner

15   thereafter filed numerous motions, including an *ex parte* motion for appointment of

16   an independent medical examiner to review the autopsy report and the medical

17   conclusions, as well as appointment of second counsel to the case.[9] (ROA 19–20,

18

19   [8] Jones' legal expert, Dan Cooper, agreed at the hearing that "a board certified

20   specialist is a lawyer who has demonstrated superior knowledge, skill, integrity,
     professionalism, and compe[tence] in a specific area of law." (R.T. 11/3/17 p.m., at

21   35.) Cooper is not so qualified. (*Id*. at 34.)

22   [9] At the federal hearing, Jones contended that Bowman had handled the entire case

23   by June 22, 1994, based upon her comments to the trial court at the status
     conference on that day. (*See* R.T. 6/22/94, at 6.) As evidenced by the record,

24   however, Bruner had accomplished a significant amount of work on Jones' behalf
     up to that point. Bruner filed numerous motions on Petitioner's behalf; read the

25   police reports, witness interviews, and disclosure as they were disclosed by the

26   State; met with Petitioner for several hours over the course of several days at the
     jail; and spoke with Petitioner's family and friends. (R.T. 10/31/17, at 147; ROA 1,

27   13, 18–20, 22–24; Exhibit 11, at 168–70.) Bowman's comments, placed into

28   context, are readily understood as argument to the trial court to have her appointed

26.)

Bruner associated his law partner, Bowman, into the case, and they both began work immediately. (*Id.*; R.T. 10/31/17, at 118–19.) Bruner subsequently moved the trial court to have Bowman formally appointed as co-counsel. (ROA 20.) At the following June 22, 1994 status conference, the trial court expressed reluctance to grant the motion because it did not want to have to pay two defense attorneys. (R.T. 6/22/94, at 15.) At the July 27, 1994 status conference, Bruner argued for the appointment of Bowman to the case, citing the Pima County Public Defender's policy of typically appointing two attorneys, "one very experienced and one less experienced attorney," in every capital case. (R.T. 7/27/94, at 2–4.) Bruner told the trial court that Bowman's involvement, whether officially appointed or not, was "the reality of what's happening anyway." (*Id.* at 3.) The trial court denied the motion, but told Bruner that it would consider compensating Bowman for any delegated work. (*Id.* at 3–4.) The court told Bruner, "In fact, it helps if you can delegate some things to somebody else and thereby not have to charge us a full price for it. I [would] rather leave it that way."[10] (*Id.* at 4.) Thereafter, Bowman appeared at numerous pre-trial proceedings and filed numerous pleadings as Petitioner's second counsel. (*See* R.T. 6/22/94; R.T. 7/14/94; R.T. 9/21/94; R.T. 11/10/94; R.T. 11/21/94; R.T. 12/5/94; R.T. 1/9/95; R.T. 2/6/95; R.T. 2/24/95; R.T.

---

to the case in light of the work she had already done on behalf of Petitioner, *not* that Bruner had done nothing on the case.

[10] As further evidence of financial constraints placed upon the defense, when Bruner requested a psychologist to evaluate Jones, the trial court responded, "I am not going to give you carte blanche to hire some wacko just to come out here and charge [us] $15,000." (R.T. 7/27/94, at 5.) Bruner replied, "No. It was somebody local. I think we asked for a $1,000." (*Id.* at 4–5.) The court responded, "As long as it's understood that whatever is done has to be reasonably warranted in your judgment and the cost of that is […] in line with what others in the community, medical community charge for that, that's fine." (*Id.* at 5.) The court granted the motion, and requested Bruner use someone approved on the county list because those experts "know the drill about how they charge." (*Id.* at 5–6.)

1   3/13/95; R.T. 3/14/95; R.T. 3/21/95; R.T. 4/4/95; ROA 63, 67, 70, 72–74, 88–89,

2   93, 104, 109–10, 113, 115, 117, 119, 123, 130.) The trial court recognized Bowman

3   as Jones' second counsel. (*Id.*)

4        Bruner and Bowman thoroughly investigated the medical nature of Rachel's

5   numerous injuries, particularly the time from injury to death. The attorneys read

6   the autopsy report, the medical records, and an article disclosed by the State about

7   the nature of duodenal injuries and the importance of determining the time from

8   injury to death. (Exhibit 1, at 221–29; Exhibit 11, at 170; Exhibit 52; R.T.

9   10/31/17, at 24, 147–48.) They also contacted Dr. Howard on June 3, 1994, and

10   spoke to him for approximately 15 minutes. (Exhibit 11, at 169.)

11        On June 22, 1994, Bruner filed an *ex parte* motion for the appointment of an

12   independent medical expert to review the autopsy report. (ROA 29.) At the

13   following status conference on July 14, 1994, Bruner explained to the trial court

14   that he had filed similar motions in other criminal cases, and he wanted another

15   pathologist to review the autopsy report and the tissue slides to assess whether Dr.

16   Howard had performed the autopsy correctly and whether his conclusions were

17   sound. (R.T. 7/14/94, at 3.) Bruner stated that time was of the essence, as he did not

18   want to hold up Rachel's burial if the defense's independent medical expert did not

19   need to conduct an additional autopsy. (*Id.* at 4.) After the trial court confirmed

20   with Bruner that he was *not* asking for "tens of thousands [of] dollars," the trial

21   court granted the motion for $1000, but cautioned Bruner, "Not welcoming you to

22   spend all of it if you don't need to." (*Id.* at 4–5.) David Darby, the attorney for

23   Angela Gray, stated that Angela Gray's defense team would share the independent

24   examination with Bruner and Bowman to "sav[e] valuable county resources." (*Id.*

25   at 6.) Bruner agreed to "coordinate with Mr. Darby." (*Id.*) Bruner also filed a

26   motion to preserve all biological samples from Rachel for potential future forensic

27   testing. (ROA 35.)

28

Bowman subsequently contacted Jill Thorpe, a fellow defense attorney, about contacts for an independent medical examination. (R.T. 10/31/17, at 24–25; Exhibit 1, at 206.) Thorpe provided Bowman the names of several pathologists, including Drs. Philip Keen and Fred Walker, who could conduct an independent medical examination. (*Id*.) That same day, the defense consulted with Dr. Walker for approximately 20 minutes. (Exhibit 11, at 176; R.T. 10/31/17, at 26.)[11]

On July 19, 1994, Bowman contacted Dr. Philip Keen, the former (and first) Chief Medical Examiner for Yavapai County and then-current Chief Medical Examiner for Maricopa County.[12] (Exhibit 1, at 204.) Dr. Keen agreed to review the autopsy report and Dr. Howard's medical findings for the defense. (*Id*. at ¶ 1.) Dr. Keen told Bruner and Bowman that he could also view photographs, tissue slides, and other physical evidence, if necessary for his opinion. (*Id*. at ¶ 2.) Bowman memorialized their conversation in a letter she wrote the following day, on July 20, 1994. (*Id*.) Both Bruner and Bowman collaborated on drafting the letter. (*Id*.; R.T. 10/31/17, at 119, 148.)

In their letter, Bruner and Bowman asked Dr. Keen a number of significant questions about the timing and nature of Rachel's injuries, as follows:

> I have several general questions that I ask you to consider as you review this report. When we next discuss this case I hope to be able to ask for more specific information. As you explained, that may involve obtaining access to photographs, slides and other physical evidence. That can be arranged as necessary.
>
> 1. Could you please tell me what kind of symptoms this child would have experienced from a small bowel laceration?
>
> **2. *How long after the injury occurred would this child die? Can the injury be dated? Can the time of death be determined?***

---

[11] Bowman has no independent recollection concerning this consultation. (R.T. 10/31/17, at 25–26.)

[12] Bowman has no independent recollection concerning this conversation. (R.T. 10/31/17, at 25–26.)

3. Could such an injury have been inflicted by another small child? In other words, what kind of force would it take to inflict this injury?

4. Would the small bowel laceration have been complicated by the head wound? Or are they two separate, unrelated problems?

5. In your opinion, are the multiple contusions and lacerations consistent with child abuse or could they be within the normal range of injuries sustained by a rough or clumsy child?

6. There was blood found in this child's underwear and pajamas. Could that have been from hemorrhaging from the small bowel laceration? What other explanation could there be? Could it be from the injury to the genitalia?

7. *Can the injury to the genitalia be dated?* Is there any explanation aside from sexual abuse?

8. Is the hemorrhage behind the tympanic membranes consistent with a fall that resulted in a bumped head?

(Exhibit 1, at 204–05 (emphasis added); R.T. 10/31/17, at 26–30.)[13]

In short, Bruner and Bowman "focused Dr. Keen directly on the timing of the abdominal and vaginal injuries until Rachel's death" so the defense "could focus in on when Rachel was injured and who injured her, [a]s well as how those injuries could have been inflicted [a]nd the symptoms she would have experienced." (R.T. 10/31/17, at 30.) The questions also related directly to the charged predicate felonies, and attempted to corroborate Jones' fictitious story about Rachel's injuries. (*Id*.) The letter also indicated that Bruner and Bowman would likely have more questions when they spoke to Keen. (Exhibit 1, at 205.)

The defense subsequently sent the letter and the autopsy report to Dr. Keen. (*Id*. at 203.) On August 18, 1994, Bruner and Bowman spoke with Keen by

---

[13] Bruner, like Bowman, has no independent recollection of the circumstances regarding the letter. (R.T. 10/31/17, at 148.)

telephone about his review of the autopsy report and his consideration of their questions. (Exhibit 1, at 176.) Bruner, Bowman, and Keen have no independent recollection of this telephone conversation. (R.T. 10/31/17, at 33, 74, 148.) Keen had no further involvement in the case, and defense counsel did not consult with any other independent medical experts. (*See id*. at 148–49.)

If Keen would have requested more information than just the autopsy report for his evaluation, such as photographs, tissue slides, or other evidence, Bruner and Bowman would have provided such evidence to him. (*Id*. at 33–34, 148–49.) And if Dr. Keen would have rebutted any of Dr. Howard's medical opinions, Bruner and Bowman would have called him as a witness at trial to rebut those medical opinions. (*Id*.) The only conclusion to be drawn from this evidence, by law, is that Dr. Keen reviewed the autopsy report with Bruner and Bowman's questions in mind, and agreed with the medical conclusions of Dr. Howard. (*Id*.) And as Bruner succinctly stated in his deposition and confirmed at the evidentiary hearing, he "wouldn't keep shopping for an expert until [he] found one that disagreed with Dr. Howard." (*Id*. at 149.)

Thus, within months of Jones being arrested for Rachel's homicide, Bruner and Bowman had reviewed the autopsy report and accompanying medical records, sought out an independent medical pathologist, and consulted with Dr. Keen about the timing and nature of Rachel's injuries and death. And from the defense letter to Dr. Keen, Bruner and Bowman focused directly and repeatedly on the timing from Rachel's multiple injuries until her death.

On November 28, 1994, after their consultation with Dr. Keen, Bowman interviewed Dr. Howard and again continued to question the timing from Rachel's injuries until her death. (Exhibit 46.) Bowman conducted the interview with David Fruchtman, an investigator for Angela Gray. (*Id*.; R.T. 10/31/17, at 35.) During the interview, Dr. Howard was asked about the time from Rachel's various injuries (scalp, bowel, and vaginal) until her death. (Exhibit 46, at 19, 23, 29–30.) Based

upon his examination of her injuries and the tissues slides he personally cut, he approximated the timing as follows:

> **Scalp Laceration:** probably two days old or older than that, based upon tissue slides (*id*. at 19);
>
> **Vaginal Injuries:** one or two days before death (*id*. at 23); and
>
> **Internal Injuries:** the inflammatory response in the body would be "Hours to a day," progressively worsening (*id*. at 29–30).

Dr. Howard was also asked about the timing from the internal injury to any symptoms, including pain. (*Id*. at 35–37.) Dr. Howard explained that, after the initial pain, the pain could subside somewhat once the bowel stopped moving; however, the pain would get worse with time, given the inflammation, and it would be unusual if Rachel were not complaining about pain, a stomach ache, or fever. (*Id*. at 37.)

Dr. Howard opined that Rachel's injuries could be caused by a motor vehicle collision or a high fall off of something onto an object, or "elbows, fists, being kicked, kneed, or some object thrust in the abdomen in an unusual way." (*Id*. at 37.) Bowman asked Dr. Howard if Rachel's injuries could be "regular childhood play," like having "fallen on to something that would cause that severe of an injury." (*Id*.) Dr. Howard responded, "Never seen it. Never heard of uh, a fall like that." (*Id*.)

Bowman also asked Dr. Howard about the amount of force required to cause the kind of internal injuries in a child Rachel's age, and whether that force could have been inflicted by another child. (*Id*. at 38.) Dr. Howard responded, "It would be pretty unusual for another child of similar age," but maybe a teenager, or an adult could have."[14] (*Id*.)

---

[14] Notably, this is also the opinion held by Jones' current biomechanics expert, Dr. Patrick R. Hannon. (R.T. 11/2/17 a.m., at 70.) Dr. Hannon testified, "I threw [age 13] out as a ballpark estimate. Someone fairly big, this would not be produced by

Finally, Bowman asked Dr. Howard if there was any "way to tell what the exact time of death was," to which Dr. Howard answered, "No." (*Id*.) Dr. Howard opined that Rachel died about one or two hours before she was brought in to the hospital, based upon her loss of body temperature. (*Id*.)

On January 20, 1995, Bowman also interviewed Dr. Seifert, the emergency room physician who attended to Rachel when she was brought in by Angela Gray.[15] (Exhibit 1, at 1426–1452.) Bowman went through Seifert's report with him, as well the photographs taken at the time Rachel was brought in. (*Id*. at 1426, 1432, 1445.) Dr. Seifert noted the significant bruises and injuries on Rachel's head, forehead, face, chest, abdomen, arms, finger, and legs, as well as the hemorrhage in her eardrums and the blood in her vagina and underwear. (*Id*. at 1430, 1437.) Dr. Seifert told Bowman that he did not document the "many, many more minor injuries" covering Rachel's body. (*Id*. at 1433.)

Consistent with Dr. Howard, Dr. Seifert also concluded that Rachel had been dead "two to three hours," based upon the rectal temperature, rigor mortis, and lividity. (*Id*. at 1434.) Dr. Seifert explained that there would be no new bruising on Rachel's body because blood had stopped circulating in her body after death. (*Id*. at 1435, 1438.) Regarding the laceration to Rachel's head, Dr. Seifert stated that it was caused by blunt force. (*Id*. at 1435.) Bowman asked Dr. Seifert whether he saw any rocks or dirt near the wound, attempting to corroborate Barry Jones' story that Rachel fell out of the van onto her head. (*Id*. at 1435–36.) Dr. Seifert responded that neither he nor anyone else at the hospital had cleaned out the wound, and they

---

another six or seven-year-old child, but typically someone in the early teens on up, of course, a significant blow." (*Id*.) Dr. Steven Siefert, the emergency room doctor who attempted to treat Rachel when she was brought in also testified that this injury could not be caused by another 4- to 6-year-old. (R.T. 4/6/95, at 116.)

[15] Petitioner did not call Dr. Steven Seifert as a witness at the federal evidentiary hearing, or challenge his opinions in any way. As such, Dr. Seifert's opinions remain uncontroverted for these proceedings.

1  did not find any debris. (*Id*.)

2       Significantly, Bowman again asked Dr. Seifert about the age of the

3  laceration on Rachel's head. (*Id*. at 1446.) Dr. Seifert told Bowman and Darby that

4  he could give a range of 12 to 24 hours for the laceration wound, consistent with

5  Rachel's other injuries. (*Id*. at 1446.) Bowman also asked Dr. Seifert about the time

6  it would take for the bruises to appear on Rachel's body, attempting to still find a

7  way to date Rachel's injuries. (*Id*. at 1438.) Dr. Seifert stated that the bruising

8  could appear within seconds to hours from the injury. (*Id*.) Dr. Seifert also

9  discussed Rachel's vaginal injuries, noting the blood in her underwear and in the

10  opening of the vagina, as well as bruising. (*Id*.)

11       Bowman also asked Dr. Seifert about Jones' story that he took Rachel to the

12  fire station and was told that she did not need any further medical attention,

13  attempting to corroborate aspects of the account. (*Id*. at 1441.) Dr. Seifert,

14  however, dismissed those suggestions. Dr. Seifert stated that some of the injuries

15  could be consistent with such a story, but not the vaginal injury and the marks on

16  Rachel's buttocks. (*Id*. 1441.) Seifert also told Bowman that he did not think it was

17  possible that a "child with this much trauma and a significant [and] suture

18  repairable laceration to the scalp, would be looked at by [a] trained person and uh,

19  not told to present for, for evaluation and repair at the time." (*Id*.)

20       Based upon all of Rachel's injuries, Dr. Seifert opined that she appeared to

21  be the victim of child abuse, based upon the trauma and neglect. (*Id*. at 1442.) Dr.

22  Seifert stated that "90, 95% of the injuries appeared to have all been sustained in []

23  one occurrence." (*Id*.) Dr. Seifert stated that the vaginal trauma was "concerning,"

24  but that he could not date the injury. (*Id*. at 1442–43.)

25       During pre-trial interviews of numerous witnesses, Bowman continued to

26  focus on the timing from Rachel's injuries until her death, proving her attention to

27  the timeline issue. (Exhibit 1, at 633–34 (Kim Hillman); 813–912 (Brandi Jones);

28  1150–52 (Rebecca Lux); 1340–46, 1354–55 (Joyce Richmond); 1454–56, 1458–63

(Elishia Knight); 1531–56 (Ronald St. Charles); 1593–94, 1602 (Rosemary St. Charles).)

Before the criminal trial against Jones, Bowman attended the Angela Gray criminal trial, and observed a substantial portion of the State's presentation of evidence that would be subsequently admitted against her client. (Exhibit 11, at 186-4 to 186-5.) In particular, Bowman observed Dr. Howard's testimony regarding the timing of Rachel's injuries until her death. (R.T. 10/31/17, at 37.) Dr. Howard estimated bruising on Rachel's legs and thighs, as well as contusions and abrasions to her buttocks and upper thighs, to be about one to two days before death. (Exhibit 48a, at 47–50.)

Dr. Howard repeatedly clarified that his description of the bruising as "typical" or "one day of death" included the hours before Rachel's death. When asked about his description of "[o]ne to two days," Dr. Howard responded, "One to two days. Most of the bruising appears to be more recent, typical of the same day of death." (*Id*. at 50.) Dr. Howard further explained, "Yes. Probably up to 24 hours would be typical of these changes. […] Up to one day prior to death, 24 hour period prior to death, so up to one day. *It could be as much as a few hours before death*." (*Id*. at 50–51; emphasis added.)

Consistent with the statements in his pre-trial interview, Dr. Howard testified on direct examination to the following timing of Rachel's injuries:

**Vaginal Injuries:** approximately one to two days old (*id*. at 85); and

**Internal Injuries:** approximately one day prior to death (*id*. at 94–95).

Dr. Howard was not asked about the timing of the scalp laceration from injury to death. (*Id*. at 39–99.)

On cross-examination, Dr. Howard further clarified his opinions about the timing from Rachel's vaginal and internal injuries to death:

Q.     Dr. Howard, you described the injuries to the child's genitalia as being from one to two days old; is that right?

24

A.     *About one day of age* based on the external and microscopic findings.

Q.     Okay, when you are talking about one day, is that 24 hours?

A.     Based on the degree of inflammation that would be common *for several hours certainly, and up to about 24 hours prior to death*.

Q.     All right, so then it's possible those injuries could have been inflicted in as little as one to two hours prior to her death; is that right?

A.     No. The amount of inflammation generally takes *at least several hours* to develop to the extent they did in this case.

Q.     Okay, so what if we were to categorize it in a range, what is your comfort level as far as minimal amount of hours you would safely say could be attributed to those injuries?

A.     *Perhaps as few as 12 hours.*

Q.     So it's from anywhere from 12 to 48 hours then?

A.     *That's possible. Findings are more typical of around 24 hours.*

(*Id*. at 99–100; emphasis added.) Dr. Howard described the internal abdominal injuries in the same way, testifying that the injuries were anywhere from 12 to 24 hours, but "most consistent" with "about 24 hours prior to her death." (*Id*. at 101.)

The cross-examination of Dr. Howard comprised exactly 6 pages of testimony in the Angela Gray criminal trial. (Exhibit 48a, at 99–104.) Thus, from Bowman's pre-trial interview with Dr. Howard and his testimony in the Angela Gray criminal trial, he consistently described the inflammation process from hours to days, and approximated Rachel's injury to death to be "typical" and "most consistent" with infliction occurring one day before death.

In light of the evidence, Bowman requested copies of the testimony of Dr. Howard and Rebecca Lux. (ROA 123.) The trial court granted the motion, and ordered the transcripts produced. (*Id*.)

At trial, and consistent with his prior statements, Dr. Howard testified on direct examination to the following timing of Rachel's injuries:

**Vaginal Injuries:** approximately one day prior to death, consistent with all her other injuries (R.T. 4/12/95, at 133); and

25

1  **Internal Injuries:** "most consistent" and "typical" of one day prior to death
2  (*id.* at 94–95).
3  Without any ability to challenge the consistent medical evidence, and absent
4  engaging in 'expert-shopping,' Bruner and Bowman challenged the circumstantial
5  evidence of Barry Jones's guilt at trial. (R.T. 10/31/17, at 149–50.)

6  ## B. *Jones' trial counsel did not render deficient performance.*

7  Jones cannot meet his burden of demonstrating ineffective assistance of
8  counsel, as a matter of law, when the record proves that his trial attorneys sought
9  out, and consulted with, an independent medical pathologist about the timing and
10  nature of Rachel's injuries and death. The record proves that Jones' defense
11  counsel focused directly and repeatedly on the timing from Rachel's multiple
12  injuries until her death.

13  There is no constitutional duty to "shop" for experts who might have
14  provided a different opinion. *See Turner v. Calderon*, 281 F.3d 851, 875–76 (9th
15  Cir. 2002); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998); *Hendricks v.
16  Calderon*, 70 F.3d 1032, 1038–39 (9th Cir. 1995). "In many instances cross-
17  examination will be sufficient to expose defects in an expert's presentation."
18  *Richter*, 562 U.S. at 111 ("*Strickland* does not enact Newton's third law for the
19  presentation of evidence, requiring for every prosecution expert an equal and
20  opposite expert from the defense ...."); *Bonin v. Calderon*, 59 F.3d 815, 838 (9th
21  Cir. 1995) ("[W]hile the Constitution requires that a criminal defendant receive
22  effective assistance of counsel, the presentation of expert testimony is not
23  necessarily an essential ingredient of a reasonably competent defense"); *Miller v.
24  Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) ("A defendant's lawyer does not have
25  a duty in every case to consult experts even if the government is proposing to put
26  on expert witnesses.").

27  Here, Jones cannot prove that his trial counsel were constitutionally
28  ineffective merely for failing to "expert shop." To the contrary, the record shows

defense counsel thoroughly investigated Rachel's medical injuries. *Strickland*, 466 U.S. at 690 (holding that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Jones' trial counsel, Sean Bruner, had previous experience with criminal cases involving complex internal injuries which required additional independent medical evaluation, and both he and Bowman were familiar with the medical injuries to Rachel based upon their review of the autopsy and medical reports. (Exhibit 1, at 221–29; Exhibit 11, at 170; Exhibit 52; R.T. 10/31/17, at 24, 147–48.) Bruner and Bowman then sought out, and consulted with, Dr. Keen, an independent medical pathologist, regarding the nature and timing of Rachel's injuries. Because Bruner, Bowman, and Keen have no independent recollection of this meeting, this Court *by law* must presume that Dr. Keen did not provide any helpful rebuttal to the defense and they thus did not pursue the medical findings further. *Pinholster*, 563 U.S. at 191 (holding that "there is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect"); *Atwood v. Ryan*, 870 F.3d 1033, 1055 (9th Cir. 2017) (reviewing court must presume "that counsel's attention to certain issues to the exclusion of others *reflects trial tactics rather than sheer neglect*") (emphasis added) (quoting *Richter*, 562 U.S. at 109).

That Bruner and Bowman understood Rachel's injuries and *consulted* with an independent medical pathologist soundly defeats any notion that they did not adequately investigate Rachel's fatal injuries. *See Richter*, 562 U.S. at 106–07 (holding that counsel need not even seek out experts for the defense; "defense counsel could follow a strategy that did not require the use of experts," and counsel are "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies"). Moreover, Bruner and Bowman's letter to Dr. Keen proves that they were focused directly on the nature and timing of Rachel's many injuries until her death. (Exhibit 1, at 204–05.) As stated above, from their letter, Bruner and Bowman asked Dr. Keen: "How

long after the injury occurred would this child die? Can the injury be dated? Can the time of death be determined?" (*Id.*) As Bowman conceded at the hearing, she and Bruner asked Dr. Keen "the very question in this case, the time from [Rachel's] injury to death." (R.T. 10/31/17, at 28.)

Furthermore, both trial counsel testified that, had Dr. Keen asked for additional evidence, they would have provided that additional evidence to him consistent with their practice at the time. (*Id.* at 33–34, 148.) Bruner testified that he would have given Dr. Keen any requested additional evidence, and "wouldn't have just blown it off, not done anything." (*Id.* at 148.) Similarly, Bowman replied that she "hope[d]" she would have given Keen any requested additional evidence, and testified she could not recall a single case in her entire career in which she did not give additional information to an expert after such a request. (*Id.* at 33–34.) Bowman conceded that, had Dr. Keen provided any helpful rebuttal evidence for Jones, the defense would have called him as a witness. (R.T. 10/31/17, at 34.) As Bruner testified, if Dr. Keen had agreed with Dr. Howard's medical conclusions, that would have been the end of the defense's medical investigation and he would not have shopped for an expert until he found one that disagreed with Dr. Howard. (*Id.* at 148–49.)

Accordingly, Jones has offered no evidence that Keen asked to be provided with additional evidence, disagreed with Dr. Howard's medical conclusions, or indicated that he might be able to provide evidence favorable to Jones. Nor has Jones produced any evidence that Dr. Keen, a "well-qualified"[16] medical expert,[17] suggested in 1994 that trial counsel should consult with other medical experts. *See Stokley v. Ryan*, 659 F.3d 802, 813 (9th Cir. 2011) (counsel not required to seek out additional medical experts where the expert consulted does not recommend speaking with additional medical experts). Moreover, because Jones' trial counsel

---

[16] *Stokley*, 659 F.3d at 813.
[17] (R.T. 10/31/17, at 61–63.)

have no independent recollection of their consultations with Keen, their mere speculation at the recent hearing—that, contrary to their normal, conscientious approach to the practice of law, it is *possible* that they were both negligent in failing to follow-up with Keen—is not enough to rebut the presumption that they actually rendered adequate performance.[18] *Pinholster*, 563 U.S. at 191 ("[T]here is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect[.]"); *See, e.g., Greiner v. Wells*, 417 F.3d 305, 326 (2nd Cir. 2005) ("Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the *Strickland* presumption of effective performance. Without evidence that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude, *Strickland*'s strong presumption must stand.") (quotations omitted); *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").

Moreover, under an objective analysis, reasonable trial counsel would have had a strategic reason *not* to present expert medical evidence at the trial. Absent Dr. Keen's ability to rebut Dr. Howard's medical conclusions, it was a reasonable defense strategy to focus on the circumstantial nature of the evidence against Jones, rather than find another expert to quibble over the numerous injuries to the body of a 4-year-old child. Moreover, by focusing on the circumstantial evidence rather than the medical aspects of the injuries, counsel avoided highlighting those injuries repeatedly for the jury.

Second, as demonstrated through two of Jones' current medical experts, Drs. Ophoven and McKay, calling independent medical experts would have been catastrophically prejudicial to Jones' defense. Both Drs. Ophoven and McKay agreed that Jones' failure to take Rachel to the hospital constituted fatal neglect

---

[18] Bruner's status as a certified criminal law specialist makes it even less likely that he committed gross negligence by failing to follow-up with Dr. Keen.

because such failure either caused, or contributed to, Rachel's death. (R.T. 11/1/17, at 60–63; R.T. 11/2/17 a.m., at 13; Exhibit 103, at 4266; Exhibit 105, at 4273; Exhibit 106, at 4276; Exhibit 113, at 6634–28.) That evidence alone would have supported a conviction for felony murder. In addition, Dr. Ophoven opined in two of her earlier reports that Rachel had suffered the trauma to her vagina "*shortly before her death*." (Exhibit 103, at 4266; Exhibit 105, at 4273; emphasis added.) In short, Jones' counsel did not render deficient performance by not calling independent medical experts like Drs. Ophoven and McKay at trial; *rather, trial counsel would have rendered deficient performance had they done so*.

Thus, Jones has failed to meet his burden of proving that trial counsel rendered constitutionally-deficient performance with regard to their investigation of Rachel's injuries and their consultation with Dr. Keen, including their subsequent decision not to consult with or call additional medical experts. *See Atwood*, 870 F.3d at 1055–56 (a reviewing court must give "a heavy measure of deference to counsel's judgments" regarding the scope of an investigation).

### C.   *Jones cannot prove prejudice.*

Regardless, even if trial counsel performed deficiently in failing to consult with additional medical experts, Jones has not met his burden of proving actual prejudice. *Pinholster*, 563 U.S. at 691–692. "Ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Sandford*, 692 Fed. Appx. at 341 (quoting *Eggleston*, 798 F.2d at 376). Here, there is no reasonable probability of a different outcome had counsel presented medical evidence.

### 1.   The internal injuries.

Jones has not proven, through his new medical experts, that Rachel suffered an internal injury at some previously undetermined time. Beginning with Dr. Ophoven, her opinion that Rachel's duodenal injury did not occur on the afternoon before her death is not reliable because it is inconsistent with the facts in this case.

In her reports, Ophoven opined that the fatal internal injury to Rachel was inflicted "24 to 48 hours, and perhaps longer[,]" prior to her death.[19] (Exhibit 103, at 4266; Exhibit 105, at 4273; Exhibit 106, at 4275.) At the hearing, however, Ophoven changed her timeline, testifying that the small intestinal injury occurred at least "[t]wo to three days [before] or more." (R.T. 11/1/17, at 85.) This dramatic change in opinion alone calls into question Ophoven's credibility.

Further, in her December 18, 2002 report, Ophoven stated that "there is no documentation of when Rachel was last observed to be well." (Exhibit 103, at 4262.) This assertion ignores the record. Numerous witnesses reported Rachel appearing well in the days before her death. On Friday, April 29, 1994, Rebecca Lux (Rachel's sister) and Brandi Jones (Barry Jones' daughter) gave Rachel a bath, and did not report any health issues with her, such as a torn or bleeding vagina, abdominal bruising, or an open and bleeding laceration to her head. (Exhibit 1, at 493, 574, 1171, 1266; Exhibit 66, at 5186.) Even Barry Jones told detectives he took off Rachel's jeans when she fell asleep and he did not notice any bruising. (Exhibit 66, at 5328.) The record does not contain any evidence that Rachel was sick or unwell on Friday.

On the morning of Saturday, April 30, 1994, Rebecca saw Rachel as she was watching cartoons. (Exhibit 1, at 1194.) Rebecca talked to Rachel, and Rachel appeared normal and okay. (*Id*. at 1194–95.) Rebecca did not see any bruises on Rachel, nor did she look sick. (*Id*. at 1195.) Rebecca told defense counsel that she was with Rachel all day, and they stayed in Jones' trailer. (*Id*. at 1196, 1198; *see also* Exhibit 42, at 29–30.) Brandi also claimed to have seen Rachel that morning, and she did not notice anything unusual about her. (Exhibit 1, at 833.) Brandi claimed that she arrived back at Jones' trailer at noon, and the family was preparing to eat breakfast. (*Id*. at 829.) Brandi claimed she sat right next to Rachel,

---

[19] As discussed later, Ophoven's opinion conflicts with Dr. McKay's theory that this injury cannot cause death within 48 hours. *Infra*. pp. 37–39.

1  and Rachel was fine and "in a good mood." (*Id*. at 831.) Brandi said that Rachel

2  "kept stealing [her] bacon off [her] plate." (*Id*.) Brandi claimed that she pretended

3  to tickle Rachel, and Rachel was laughing. (*Id*. at 831–32.) Brandi stated she did

4  not notice anything unusual about Rachel, and only saw one small, really light

5  bruise from a scrape on her arm.[20] (*Id*. at 832.)

6  That Saturday afternoon, Angela Gray went to Stephanie Fleming's trailer,

7  carrying Rachel, and asked her if she would babysit Rachel the following day.

8  (Exhibit 1, at 359–61.) Stephanie recalled that Rachel "was fine," she "looked

9  healthy," and had a "normal color." (*Id*. at 362.) Stephanie did not see any bruising

10  on her. (*Id*.) Stephanie reported that Rachel had been riding her bicycle earlier that

11  day. (*Id*.) Terry Shane Richmond, the son of Barry Jones' girlfriend (Joyce

12  Richmond), arrived at Jones' trailer that afternoon and saw Rachel with two black

13  eyes from Jones' previous assault.[21] (Exhibit 66, at 5136–37.) When he asked what

---

14  [20] Brandi claimed that that was the only time she saw Rachel on Saturday. (Exhibit

15  1, at 833.) However, Brandi then proceeded to invent a new story about witnessing

16  Rachel get hit in the stomach *once* by a little boy swinging a metal bar. (*Id*. at

17  849–55, 899–904.) For many reasons, Brandi's story about the little boy was an

18  obvious lie intended to help her father, Barry Jones. Brandi had not told law

   enforcement this story when interviewed shortly after the crimes. (*Id*. at 793–812.)

19  In this new story, in the defense deposition 10 months later, Brandi claimed she

20  took the little boy home to his mother, and then took Rachel home to Barry Jones

   and Angela Gray and explained what happened. (*Id*. at 849–55, 903–04.) However,

21  defense counsel interviewed Stephanie Fleming, and none of the witnesses

22  (Stephanie Fleming, Barry Jones, or Angela Gray) corroborated Brandi's story. (*Id*.

23  at 414–616; 686–791; Exhibit 66, at 5442–43.) In addition, Rachel had several

   lateral bruises on her stomach, which further invalidated Brandi's story that she

24  saw the little boy strike Rachel *once* with the metal bar. And as Drs. Siefert and

25  Howard, as well as Jones' current biomechanics expert, Dr. Hannon, all testified,

   the abdominal injury could not have been inflicted by a child or anyone under the

26  age of 13. (R.T. 4/6/95, at 116; R.T. 11/2/17 a.m., at 70; Exhibit 46, at 38.) Brandi

27  also subsequently admitted she lied about watching Rachel fall out of the van and

   about Jones taking Rachel to the Fire Department. (Exhibit 1, at 902, 906–07.)

28  [21] Barry Jones previously assaulted Rachel when he was alone with her, causing

   her black eyes. (Exhibit 1, at 1187–88; Exhibit 66, at 5191–92, 5200; Exhibit 67, at

happened, "they" told Terry "she fell over a dog." (*Id.*) Terry Richmond did not see any other injuries on Rachel, such as a bleeding head laceration. (*Id.*)

The <u>only</u> person who described Rachel as appearing anything other than fine during the day on Saturday, April 30, 1994, was Isobel Tafe, a neighbor in the trailer park. In her first report to detectives the day after Rachel's death, Tafe stated she saw Rachel on Saturday afternoon and she "did not have any bruises on her that she could remember." (Exhibit 66, at 4896.) Tafe did not report *any* signs of injury or illness. (*Id.*) However, when Sergeant Pesquiera interviewed her weeks later, on May 19, 1994, Tafe reported that Rachel "looked ok," but "like she was scared." (*Id.* at 5142.) Tafe told Pesquiera that Rachel had "a grayish look about herself, I mean like, uh, like she might be sick or somethin', just like a, wasn't natural, it was just a pale grayish color." (*Id.* at 5143.) Tafe reported that Rachel "was scared" and "had to go because she didn't want, uh, her dad or someone to be mad, or they would be mad." (*Id.* at 5144.) Tafe also reported that she had seen Brandi Jones scared before, as Barry Jones had "grabbed her by the hair of the head and pulled her into the house." (*Id.*)

Tafe's statement does not demonstrate that Rachel was sick or unwell on Saturday, April 30, 1994. Tafe's statement equally suggests Rachel appeared pallid from fright over Barry Jones. In addition, Rachel still had the bruising and black eyes from being beaten by Jones weeks earlier. *Supra.* p. 32 n.21. And, it appears Tafe was confused about the day, indicating that she saw Rachel the day before the detectives were at the trailer park. (Exhibit 66, at 5142.) To the extent Tafe's statement can be read to suggest Rachel was sick on Saturday, her observation is contrary to the observations of Rebecca Lux, Brandi Jones, Shirley DeVous, and Stephanie Fleming, who all reported that Rachel did not appear ill until late

---

5572.) Rachel eventually told Rebecca and Brandi that Barry Jones had hit her with a rake. (Exhibit 66, at 5189.) Rachel acted scared of Barry Jones for days afterward, and did not want to go anywhere with him. (*Id.* at 5189–94.)

Sunday afternoon. Jones has offered nothing to suggest that Tafe's sole statement is more credible than the observations of multiple other witnesses, particularly that of Rebecca, who spent significantly more time with Rachel that day.

On Saturday evening, the family all ate dinner, including Rachel. (Exhibit 1, at 1200–01; Exhibit 66, at 5180.) They watched television until the kids all went to bed about 9:30 to 10:00 p.m. (Exhibit 1, at 1202–03; *see id.* at 521.) Rebecca reported that Rachel was fine, and got up and walked to her bedroom. (*Id.* at 1203.) Angela Gray corroborated Rebecca's account that the girls went to bed about 10:30 p.m. (*Id.* at 521.)

On Sunday, May 1, 1994, Rebecca recalled that she, her brother, Jonathon Lux, and Rachel got up that morning and watched cartoons, and Rachel was fine. (*Id.* at 1203–05, 3202–03; *see* Exhibit 42, at 31–35, 43.) Rebecca recalled that there was no cereal or anything to eat for breakfast, so they decided to wait for lunch to have a burrito. (Exhibit 1, at 1204.) Brandi stated that she arrived back at Jones' trailer before noon, and played video games with Rebecca and Rachel. (*Id.* at 836.) Brandi recalled that Rachel was fine, even in a playful mood. (*Id.* at 837.) Brandi claimed that Rachel kept jumping on her back, begging for "a piggyback ride." (*Id.*) Brandi also recalled that, when Rachel jumped on her, she lost while playing her Nintendo game. (*Id.*) A neighbor, Shirley DeVous, reported that she also saw Rachel sometime that afternoon; Rachel was riding her bike, and "seemed to be happy and in good spirits with no physical difficulties." (*Id.* at 251.) And Stephanie Fleming reported that she also went by Jones' trailer to ask Angela Gray if Stephanie was still babysitting Rachel that evening. (*Id.* at 335, 365–66.) Stephanie claimed she also saw Rachel riding her bicycle, and did not notice anything wrong with her. (*Id.* at 335–36.)

For the remaining Sunday afternoon, Rachel was with Barry Jones on his various trips until she returned with him, bleeding from her head and appearing unwell. (Exhibit 1, at 301–05, 371–76, 396, 1116–17, 1131–35, 1153–58, 1532–33,

1543–44; Exhibit 66, at 4896, 5071, 5155–62, 5317, 5329–30, 5428–30, 5439–41.) After returning with Jones hours later, Rachel eventually became very ill; others in the trailer park noticed that her face was "a greenish color," she had bags under her eyes, her hair "was soaking wet, plastered to her head wet[,]" and she was "constantly dry heav[ing]." (Exhibit 1, at 337–38, 371–73; R.T. 4/7/95, at 160.)

Thus, *numerous witnesses* reported that Rachel was fine on Friday, Saturday, and as late as the early afternoon on Sunday, May 1, until she returned with Jones. (*Id.*; *see also* R.T. 4/11/95, at 31–35, 43.) And importantly, most of these accounts of Rachel appearing well come from her sister, Rebecca, who was with Rachel on Friday night, all day and night Saturday, and Sunday morning. Moreover, Rebecca had no reason to be deceptive regarding Rachel's health; if anything, she would have noticed something wrong with her little sister and reported it immediately to her mother and subsequently to law enforcement.

Ophoven disregarded all of this evidence in the record, asserting without any support that "[t]here is no evidence that Rachel was well on May 01, 1994." (Exhibit 103, at 4263.) Similarly, Ophoven's statement that "[t]here is no evidence that [Rachel] ate at anytime [*sic*] that day [May 1st]" (exhibit 103, at 4263), is also contrary to the record. Rebecca told the defense attorneys, including Bowman, and testified at trial that on Sunday, May 1st, Rachel ate a bean burrito for lunch with the other children. (Exhibit 1, at 1204; R.T. 4/11/95, at 34–35.) In fact, Dr. McKay *accepted* the fact that Rachel had eaten earlier in the day, given Rachel's likely "chronic hunger." (Exhibit 113, at 6634-30.) And during the last hours of her life, Rachel repeatedly threw up after she was constantly given food, milk, and water. (R.T. 4/11/95, at 49; Exhibit 1, at 423, 477, 533, 539, 541, 544, 563, 705, 1127, 1167, 1217, 1221; Exhibit 66, at 5170, 5200, 5338–39; Exhibit 67, at 5572, 5576.)

Ophoven admitted that she "disregarded" all of this evidence because it did not support her opinions:

Q.     Well, at your deposition do you recall -- or your interview it was -- do you recall telling me that you disregarded any information that [Rachel] was well on Sunday?

A.     Yeah, *I disregarded anyone describing that she was well, given the fact that she -- that based on what I know about the pathology and history of an injury the day before*.

(R.T. 11/1/17, at 66, emphasis added.) Ophoven asserted that she disregarded observations of Rachel appearing fine from those who were not "medically informed," such as a "13- or 14-year-old," like Rachel's sister, Rebecca. (*Id*. at 66–67.) However, Ophoven also disregarded evidence from Stephanie Fleming—an adult, rather than a "13- or 14-year-old"—that Rachel appeared fine on Saturday and Sunday, yet credited the testimony of Isobel Tafe—who was not "a medically informed person"—simply because Tafe's statement fit Ophoven's narrative. Ophoven offers nothing to suggest that Tafe's statement is more credible than those of the multiple other witnesses. (*See* R.T. 11/1/17, at 78.) Ophoven's disregard of the facts that contradict her opinion is disingenuous, at best.

Ophoven also attempted to change or modify facts in order to make the record fit her narrative:

Q.     All right. You -- I believe there was some testimony that weekend, maybe even Sunday, [Rachel] may have been riding a bike, did you recall reading anything like that?

A.     Yeah, that she was outside, that she was outside for a period of time. I don't know what exactly she was doing. What I could say is that *if she had gone outside, because that's where [Jones] was or something, and then she was sitting on a bicycle, that's one thing. If she felt like going whoopee up and down the driveway, wildly cycling, I would consider that to be inconsistent with the injury -- injuries that I know she suffered*.[22] *So I am not sure, the first thing I'd do is get*

---

[22] As previously mentioned, Ophoven also chose to ignore the fact that Rachel was "rough-housing" with Brandi Jones on Sunday morning. As previously discussed, Brandi stated that Rachel kept jumping on her back that morning, "begging" Brandi to give her "a piggyback ride." (Exhibit 1, at 837.)

36

1    *more information about the being outside bicycling question.*

2    (*Id*. at 85; emphasis added.) However, there is no evidence that Rachel was simply

3    "sitting on a bicycle" in a stationary fashion; both Stephanie Fleming and Shirley

4    DeVous reported that they had seen Rachel "riding" a bicycle. (Exhibit 1, at 251,

5    335–36, 362.) DeVous specifically told Jones' trial investigator that she observed

6    Rachel "riding a bicycle … in the dirt driveway, adjacent to her trailer, and in front

7    of and around the trailer residence occupied by [Jones] and Angela [Gray]."

8    (Exhibit 1, at 251.) Ophoven reimagined the facts in the record to fit her opinion,

9    rather than accept the facts as they are.

10    Similarly, Ophoven also opined that Rachel's fatal injury could have been

11    inflicted by a 2-year-old child (R.T. 11/1/17, at 58), *despite* the fact that Jones'

12    own biomechanics expert testified that a 2-year-old child could <u>not</u> have caused

13    Rachel's fatal injury by hitting her with a stick or metal bar. (R.T. 11/2/17 a.m., at

14    70.) Doctors Siefert and Howard likewise concluded a child could not have

15    inflicted such an injury. (R.T. 4/6/95, at 116; Exhibit 46, at 38.) Ophoven also

16    stated that Rachel could have bruised after death, seeking to explain away and

17    minimize various bruises on Rachel's body. (R.T. 11/1/17, at 54.) However,

18    Ophoven's mysterious bruising theory is contradicted by every other doctor that

19    was asked in this case. Drs. Howard, Siefert, and McKay all specifically refuted

20    any such notion of bruising after death, given the incontrovertible fact that the

21    heart has stopped and blood is no longer circulating in the body postmortem.

22    (Exhibit 1, at 682–83 (Howard), 1437–38 (Siefert); R.T. 11/2/17, at 29 (McKay).)

23    Thus, had Jones presented Dr. Ophoven as an expert witness at trial, the jury

24    would have learned of all the facts she disregarded for her injury timeline; that she

25    deliberately ignored facts that were contrary to her opinions; and that she

26    attempted to change or modify facts she could not ignore in order to make them fit

27    her narrative. Therefore, Jones cannot prove actual prejudice, because he cannot

28    demonstrate that Ophoven's testimony would have changed the jurors' verdict for

sexual assault, two counts of child abuse, or felony murder. And as previously discussed, had trial counsel called Ophoven as a witness, her testimony would have actually prejudiced Jones, *because it would have independently supported a guilty verdict on the child abuse and felony murder charges*.

Similarly, Jones' other expert, Dr. McKay, does not help his case. As she admitted, her expertise is in emergency medicine, not pathology. (R.T. 11/2/17, at 25–26.) While she reviewed literature regarding duodenal injuries, she admitted that she could not provide her complete list of reviewed articles prior to her testimony, and agreed that "many, many, many more cases" of duodenal injury do not make it into the literature. (*Id*. at 26–27.) McKay only reviewed articles for diagnosis and treatment, and testified that she "looked for information in the pathology literature and found nothing." (*Id*. at 28.) McKay also admitted that several of the literature references acknowledged that the timing of an injury in non-accidental trauma was "uncertain," and stated that that was "particularly true in child abuse cases." (*Id*.) McKay also agreed that the timing for non-accidental injuries was "not always reliable." (*Id*. at 29.)

Most importantly, Dr. McKay testified repeatedly that she did not find any cases in which a child succumbed from an injury in less than 48 hours, but, because there could be unreported cases, she was willing to opine that the injury did not occur within 36 hours of death. (*Id*. at 9, 30.) First, every other doctor in this case disputed McKay's novel 36/48-hour theory, including Dr. Ophoven, Jones' other medical expert. Ophoven concluded, to a reasonable degree of medical certainty, that Rachel's duodenal injury was "24 to 48 hours" prior to her death. (Exhibit 103, at 4266; Exhibit 105, at 4273; Exhibit 106, at 4275.). Doctor Keen also admitted that duodenal injuries could be "hours to days," exactly as Drs. Howard and Siefert testified. (R.T. 10/31/17, at 110; R.T. 4/12/95, at 148–49; R.T. 4/6/95, at 115.) Thus, McKay's own theory is invalidated by every other doctor in this case, particularly the pathologists who see the entire scope of these injuries

1 from infliction until death. (R.T. 11/7/17, at 85.)

2  Dr. McKay's opinion is not supported. Her lack of expertise in pathology

3 and her limited literature review do not prove that Jones suffered prejudice as a

4 result of some alleged deficient performance by his counsel. McKay's opinion is

5 entirely refuted by all the other doctors in this case, especially the pathologists.

6 And as both she and Dr. Keen admitted, the time from injury to death for duodenal

7 injuries depends upon a variety of factors, and therefore has a variable range of

8 time. (R.T. 11/2/17, at 27–28; R.T. 10/31/17, at 100–02, respectively); *see also*

9 Exhibits 180, 185, 188–89, 191, 194, 197 (supporting the conclusion that the

10 nature of duodenal injuries depend on a variety of factors).

11  Jones also called Dr. Phillip Keen, his original independent consultant,

12 regarding the dating of the injury. (R.T. 10/31/17, at 61.) Dr. Keen testified that his

13 opinion was "in [the] same ballpark" for the timing from injury to death as that of

14 Doctors Ophoven, McKay, *and Howard*. (*Id*. at 107–08.) Dr. Keen stated, "[W]e're

15 all pretty much in the same ballpark, Dr. Howard, Dr. Ophoven, and I." (*Id*. at

16 108.) Thus, Dr. Keen *agreed with* the range provided to the jurors by Dr. John

17 Howard, the autopsy pathologist.

18  Doctor Keen admitted that he could not give a "precise" opinion concerning

19 when the injury occurred, due to a number of variables that could have influenced,

20 and perhaps accelerated, Rachel's death. (*Id*. at 100–02, 105.) Those variables

21 included: (1) the fact that Rachel had attempted to ingest water and food after the

22 injury, irritating the bowel and accelerating the process;[23] (2) Rachel's general

23 health and the fact that she was "very small, almost underweight;" (3) Rachel was

24 living in suboptimum conditions; and (4) Rachel was a chronically abused child.

25

---

26 [23] As mentioned above, during the last hours of her life, Rachel repeatedly threw

27 up after she was constantly given food, milk, and water. (R.T. 4/11/95, at 49;
Exhibit 1, at 423, 477, 533, 539, 541, 544, 563, 705, 1127, 1167, 1217, 1221;

28 Exhibit 66, at 5170, 5200, 5338–39; Exhibit 67, at 5572, 5576.)

Given these variables, Keen agreed that he "[could not] really give a precise time table how long this process would take." (*Id*. at 102.) Dr. Keen also admitted that he "couldn't rule out that [Rachel's abdominal injury] was hours old but that it was more consistent with days." (*Id*. at 109–10.) Keen continued:

> Q.     So you can't 100 percent say it's not a few hours old, you just say it's more consistent --
>
> A.     Well, it's -- it's -- in the few hours, we're talking 12 plus as opposed to two plus. It's more towards the daytime. But it's still hours, as opposed to something that just happened within minutes.
>
> * * *
>
> Q.     [By the Court.] [A]re you saying it's not sooner than 12 hours but more likely a longer period of time?
>
> A.     I am saying it's *probably* not less than 12 hours between injury and death. [. . .]
>
> Q.     And so you're saying it's more likely it's not less. . . .
>
> A.     The real crux here is we're talking about an afternoon injury on the day prior to the pronouncement of death. Is that the injury -- is that the time of the trauma that caused the death or is it earlier than that? And the evidence suggests that it's probably earlier than that, it's probably not an afternoon injury.
>
> * * *
>
> Q.     [By Ms. Gard.] I noticed that you were talking in terms of probabilities though.
>
> A.     Yes.
>
> Q.     That you can't absolutely say that it was not that afternoon, right?
>
> A.     What I can't say about the afternoon is -- as I've made a reference to earlier here of superimposition, if you put another injury in in the afternoon to somebody that has already started having the injury earlier, I can't rule that out.
>
> Q.     [S]o there could have been already a preexisting injury that was injured again.
>
> A.     That's already significantly injured, already torn, already giving an inflammatory response. But if we put more pressure to it again, we may expand the injury.

Q.   And accelerate --

Q.   [By Ms. Gard]. Accelerate the inflammatory response?

A.   Yeah, it could do that as well.

Q.   And accelerate death by doing that.

A.   Yes.

(*Id.* at 110–12; emphasis added.)

In addition, Dr. Keen also testified that Rachel would have suffered immediate pain after the injury, which would have continued as the infection progressed. (*Id.* at 99–100.) Keen also agreed that Rachel would have continued to experience symptoms from the abdominal injury. (*Id.*)

Despite agreeing with the range provided by Dr. Howard, Dr. Keen's opinion is entitled to less weight because: (1) he did not independently review the tissue slides in this case, but relied on the photographs taken by Ophoven; and (2) he admitted that he saw "some" of the police reports, "but not the full police reports." (*Id.* at 103–05.) Keen admitted that he relied on representations from the Federal Public Defender's Office, rather than the actual police reports. (*Id.* at 105.)

Had Keen been better informed, he would have known that Rachel never exhibited any credible signs of illness or discomfort, nor did she complain of any stomach pain, in connection with her duodenal injury, until after she returned from her last trip in the van with Jones on Sunday. *See supra*, pp. 31–37.

As demonstrated above, Dr. Keen not only admitted that his opinion concerning the timing of Rachel's fatal injury was imprecise, but also stated that he could not rule out the possibility that Rachel had a preexisting injury to her duodenum that was reinjured on Sunday. Moreover, because there is no credible evidence that Rachel was ill or in any physical distress until late Sunday afternoon, Keen's opinion—that Rachel's fatal injury was inflicted prior to Sunday afternoon—is contrary to his own testimony that Rachel would have experienced immediate and continuing pain once her duodenum was torn. Therefore, Jones

41

cannot prove actual prejudice, because even had Dr. Keen testified at trial, Jones cannot meet his burden of demonstrating that Keen's testimony (or the testimony of a similar expert) would have changed the jurors' verdict on the murder charge.

## 2.    The vaginal injury.

Jones also has not proven actual prejudice from his new experts in regards to Rachel's vaginal injury. Jones' experts for this issue, Drs. Ophoven and Keen, actually provided additional support for his sexual assault conviction, and Jones cannot show that the result of the proceeding would have been different had that testimony been presented.

In her first report, from December 18, 2002, after reviewing tissue slides with various stains, Ophoven concluded: "The presence of genital trauma without evidence of ejaculate leaves only the conclusion that the child suffered acute injuries, most probably penetrating, *shortly before her death*." (Exhibit 103, at 4266; emphasis added.) In reaching this conclusion, Ophoven reviewed tissue slides, particularly "Sections from vagina, labia minora/genital skin shows acute hemorrhage (< 6 hours prior to death)." (*Id.* at 4264–65.) Ophoven concluded the vaginal injuries were recent, "to a reasonable degree of medical certainty," given that "the injuries to the vaginal area and to the abdomen were separated by a significant time span, perhaps days," and the abdominal injuries were "greater than 24 to 48 hour[s] and perhaps longer." (*Id.* at 4265–66.) Ophoven repeated these findings in her subsequent April 20, 2009 report. (Exhibit 105, at 4273.)

However, in her February 1, 2010 report, Ophoven suddenly changed her opinion about the vaginal injuries, acknowledging the change with brackets: "The presence of genital trauma without evidence of ejaculate leaves only the conclusion that the child suffered acute injuries, most probably penetrating *some time [days or perhaps longer] before her death*." (Exhibit 106, at 4276; emphasis added.) Ophoven continued: "She has evidence of trauma in the genital region consistent with penetrating sexual injury *of indeterminate age.* […] It cannot be determined

how or when this injury occurred." (Exhibit 106, at 4276; emphasis added.) Ophoven appears to have based this change on her review of additional tissue slides and staining (*id.*), although there is no evidence that these slides or stains were *not* available to Ophoven before she authored her first report.

During her direct examination, Ophoven testified that Rachel's vaginal injuries were inflicted "weeks" before her death. (R.T. 11/01/17, at 43.) However, during cross-examination, Ophoven admitted that she could not rule out the possibility that Rachel was sexually assaulted shortly before her death:

> Q.    [Y]ou recall being interviewed a few months ago, right?
>
> A.    Yes. […] I remember that.
>
> Q.    [D]o you recall at that time telling me that you couldn't exclude a fresh trauma to the vagina?
>
> A.    No, I couldn't, but what I was answering to you -- and I already said that direct -- I couldn't say that somebody didn't reinjure her or didn't cause newer bleeding or trauma, but the initial injury could not have been recent.
>
> Q.    Right. So just to make sure I understand, there is an injury that's older, that's what you're saying.
>
> A.    Yeah, that wound that's unhealing (phonetic), that's weeks old, and then I can't say -- I can't say that she had been sexually misused multiple times, for instance.
>
> Q.    Including shortly before her death.
>
> A.    Well, there is no evidence of it,[24] there is not a lot of fresh blood, but I can't exclude that possibility, no.

(R.T. 11/01/17, at 63–64.)

Despite Ophoven's changing opinion about the timing of the vaginal injury, she cannot exclude the possibility that Jones sexually assaulted Rachel on Sunday,

---

[24] As discussed below, Dr. Keen disagreed with Ophoven's opinion, and agreed with Howard's opinion, regarding the evidence of a new vaginal injury. Keen testified that he at least found a newer injury superimposed upon Rachel's older vaginal injury. (R.T. 10/31/17, at 108–09.)

May 1, 1994. (*Id*.) Therefore, the failure to present Ophoven's testimony could not have prejudiced Jones with regard to the sexual assault charge because she admits the recency of the vaginal injury.

Further, Ophoven's opinion—that Rachel's original vaginal injury occurred weeks before her death—is simply not credible in light of the record. Given the extensive nature of Rachel's vaginal injuries, the fact that neither Rebecca nor Brandi noticed any injuries to Rachel while bathing her on Friday night,[25] that Rachel was able to ride her bicycle on Saturday or Sunday,[26] and engage in rough-housing with Brandi on Sunday morning,[27] Ophoven's opinion that Rachel's vaginal injuries occurred "weeks" before her death is incredible on its face.

Thus, even had she been called by Jones as an expert trial witness, Jones cannot demonstrate that Ophoven's testimony would have changed the jurors' verdict on the sexual assault charge, and he cannot prove actual prejudice under *Strickland*.

Doctor Keen offered the same testimony at the hearing. Although Keen testified that the vaginal injury could have occurred "weeks" before, he still concluded that there was evidence of a new injury superimposed on an older one. (R.T. 10/31/17, at 108–09.) Keen admitted that there was a "combination of an older healing injury and a more fresh [vaginal] injury." (*Id*.) Keen admitted that he could not tell how fresh the bleeding was, only that it was more recent. (*Id*.) Thus, Keen is unable to offer an opinion concerning when the more recent injuries occurred to Rachel's vagina, and he obviously could not exclude the possibility that Jones sexually assaulted Rachel on Sunday.

And Keen's opinion suffers from the same contrary factual record as Ophoven's opinion. As previously discussed, Rachel was bathed Friday night by

---

[25] Exhibit 1, at 493, 1171.
[26] Exhibit 1, at 251, 335.
[27] Exhibit 1, at 837.

Rebecca and Brandi, and neither reported seeing any injuries to Rachel's vagina, nor did they report that Rachel appeared to suffer any vaginal pain or discomfort when she entered the water. (Exhibit 1, at 493, 1171.) Moreover, Rachel was seen by witnesses riding her bicycle on Saturday and Sunday, with no apparent signs of vaginal pain or distress. (*Id.* at 251, 335.) Additionally, Rachel engaged in playful "rough-housing" with Brandi on Sunday morning, repeatedly jumping on Brandi's back. (*Id.* at 837.) Yet after Rachel had spent significant time alone with Jones on Sunday afternoon, by the time Rachel's body was taken to the hospital on Monday morning, the emergency physician found blood in Rachel's underwear, and blood coming from her vaginal region. (R.T. 4/6/95, at 81.) Dr. Howard, the forensic pathologist who performed Rachel's autopsy, specifically noted the horrific nature of Rachel's injuries:

> The injuries that were visible involve blunt force type injuries, meaning bruising, involving the labia or outsides of the genitalia as I am indicating here. Those same areas were abraded or scraped, and the opening of the vagina was torn in the posterior midline, meaning right in the middle of the body towards the back.
>
> The opening of the vagina was torn, and the tearing extended on to the skin toward her anus, and just above my left index finger is the location of the laceration, about one half inch in length, about 3/16ths of an inch in depth.

(Exhibit 47, at 134.) Given the extensive nature of these injuries, the fact that Rachel never complained to anyone about vaginal pain or bleeding; neither Rebecca nor Brandie apparently noticed any injuries to Rachel while bathing her on Friday night; Rachel never raised any complaints concerning vaginal pain or discomfort while being bathed on Friday night; Rachel never complained while riding her bicycle on Saturday or Sunday; and Rachel did not complain while rough-housing with Brandi on Sunday morning; Keen's opinion that Rachel's vaginal injuries occurred "weeks" before her death is likewise incredible. There is no evidence in the record that Rachel ever complained of vaginal pain, proving that

1    these injuries were inflicted shortly before her death. (*See* exhibit 66, at 5192–94.)

2          Thus, even had he been called by Jones as an expert trial witness, Jones

3    cannot demonstrate that Keen's testimony would have changed the jurors' verdict

4    on the sexual assault charge.

5    **VII.   TRIAL COUNSEL INVESTIGATED AND PRESENTED EVIDENCE CONCERNING**

6          **THE RELIABILITY OF THE TESTIMONY OF THE LOPEZ TWINS.**

7          Jones argued that post-conviction counsel was constitutionally ineffective

8    for failing to raise a claim that trial counsel were ineffective for failing to

9    investigate and present evidence to challenge the reliability of the trial testimony of

10   Reynaldo ("Ray") and Laura Lopez. In support of this claim, Jones presented

11   testimony from: (1) an accident reconstructionist, Paul Gruen; (2) a biomechanics

12   analyst, Dr. Patrick Hannon; and (3) a forensic psychologist, Dr. Phillip Esplin.

13   However, as demonstrated below, Jones has failed to prove that either post-

14   conviction counsel, or trial counsel, were ineffective in their investigation of the

15   eye-witness accounts of the Lopez children.

16         **A.     *Factual and Procedural Background*.**

17         At some time between 3:00 to 5:00 p.m. on May 1, 1994, Ray and Laura

18   Lopez went to the Choice Market, and were walking back home when they saw a

19   man resembling Jones, driving a yellow van with one hand while swerving, and

20   striking a little blonde girl. (Exhibit 76, at 1052; Exhibit 77, at 1055–71; Exhibit

21   79, at 1008–28.) Ray described that the van was moving "slow," and Laura stated

22   they saw the van for "a while." (Exhibit 77, at 1065; Exhibit 79, at 1043.) The guy

23   in the van was "close" to them. (Exhibit 77, at 1061, 1065.)

24         Ray observed that the driver had "messed up" and "[l]ong curly kind of hair"

25   (*id*. at 1060), while Laura described him as a white guy with "messy hair" (Exhibit

26

27

28

46

79, at 1012–14).[28] Ray and Laura thought the man looked like their mom's friend, Alonzo, who had "Frank Zappa type look, flying hair." (Exhibit 76, at 1052; Exhibit 77, at 1069–70; Exhibit 79, at 1019–20, 1026.)

They saw the man hitting the little blonde girl, who was sitting in the passenger seat. (Exhibit 77, at 1063–64; Exhibit 79, at 1011–15.) Ray saw the man hitting the little girl "hard" with his right fist, hitting her twice in the face and once in the stomach. (Exhibit 77, at 1064–66) And the man also "elbowed" the little girl in the mouth and in the stomach. (*Id.*) Laura saw the man "elbow" the little girl twice, striking her in a "backwards" swinging motion. (Exhibit 79, at 1016–17.) The man struck the little girl in the face, and hit her "real hard, fast." (*Id.* at 1017–19.) Both Ray and Laura had never seen the guy or the little girl before, or the yellow van. (*Id.* at 1019–20, 1027; Exhibit 77, at 1068.)

Ray and Laura ran home immediately and told their parents what they saw. (Exhibit 77, at 1068; Exhibit 79, at 1021, 1024.) When they got home, they were both "dying to tell [mom] the same story." (Exhibit 76, at 1052.) Ray and Laura told their mother they saw a man, who looked like their parent's friend Alonzo, driving a yellow van and "punching a little girl." (*Id.* at 1052.) Ray and Laura told their mother the man was driving with one hand, swerving like he was drunk, and hitting the little girl in the chest and face with his elbow. (*Id.*)

After Jones was arrested for the homicide of Rachel, he admitted to detectives that he had taken Rachel to the Choice Market store on Sunday for food and cigarettes, and that she "carried the milk for [him]." (Exhibit 66, at 5323, 5330, 5357.) By his own admission, Jones confirmed that he was in the Choice Market parking lot with Rachel when seen by the Lopez children. (*Id.*)

Days after Jones' arrest, Bruner and Bowman retained George Barnett, a retired Tucson Police Officer with 21 years of law-enforcement experience and 5

---

[28] Photographs of Jones at arrest, fitting this description, are contained in Exhibit 65, at 4748, 4749, 4750, 4754, 4755.

years of independent investigative experience. (R.T. 10/31/17, at 17; Exhibits 15, at 4369.) Barnett: (1) met with Bruner and Bowman to obtain an understanding of the case; (2) visited the Desert Vista trailer park; and (3) interviewed all the available trailer park residents. (R.T. 10/31/17, at 17–18; Exhibit 16.) After his investigation, Barnett produced a lengthy, single-spaced, 16-page report documenting his investigation. (Exhibit 16.) Barnett met with Bowman just over two weeks after Jones' arrest, and briefed her about his investigation and his findings contained in his report. (Exhibit 11, at 169; Exhibit 16.)

Bowman subsequently traveled to the Lopez home to interview Ray and Laura about seeing Jones striking Rachel.[29] (Exhibits 78, 80.) Bowman interviewed the children along with David Darby, defense counsel for Angela Gray, and David McDonald, an investigator with the Pima County Attorney's Office. (*Id*.) Both Ray and Laura confirmed seeing Jones strike Rachel while driving the yellow van. (*Id*.) At the end of the interview, Bowman had Ray and Laura take them out to the Choice Market parking lot and identify where they were standing when they observed the van traveling through the dirt lot. (Exhibit 78, at 1099–1100; *see* R.T. 4/7/95, at 41.)

After the interviews, Bruner and Bowman directed Barnett to take photographs and measurements of Jones' van in an attempt to discredit the eye-witness accounts of Ray and Laura Lopez. (Exhibit 17; R.T. 10/31/17, at 18–19, 23.) Bowman personally accompanied Barnett to the Pima County Sheriff's impound lot, and assisted Barnett in viewing, measuring, and photographing Jones' van. (R.T. 10/31/17, at 19; Exhibit 11, at 186-5; Exhibit 17.) Barnett took numerous photographs depicting: (1) the view into the front and side of the

---

[29] Bowman also interviewed Norma Lopez, but that transcript is not in the record nor has it been disclosed by Jones. (*See* R.T. 4/7/95, at 58: "Miss Lopez, you recall when I was at your home interviewing you, I believe it was on January 20th?" Norma Lopez answered, "Uh-huh (Affirmative), yes.") Bowman then showed Norma Lopez a copy of the transcript of the interview.

1  windshield of similar vans (Exhibit 18, at 268–73); (2) various views from the

2  front and side of Jones' van, facing the front windshield (*id*. at 267, 270, 274,

3  276–80); and (3) various views from the inside of the van (*id.* at 273–83).

4  Barnett also took height measurements from: the ground to the bottom of the

5  driver's side window (274), what appears to be the floorboard to the top of the

6  passenger side window (274–75), and the height of the swatches removed by law

7  enforcement from the passenger seat (273), as well as the distance between the

8  driver and passenger seats (281). (Exhibit 18.) After completing the investigation

9  of the van, Bruner and Bowman thereafter noticed Barnett as a witness for trial,

10  and provided notice of his measurements and photographs to the State. (Exhibit

11  26.) If Barnett and the defense would have discovered that there was some physical

12  aspect that disproved the account of the Lopez twins, Bruner and Bowman

13  "definitely would have" called him to testify. (R.T. 10/31/17, at 23.)

14  At trial, the State offered the testimony of Ray and Laura Lopez about their

15  witnessing Jones striking Rachel in his yellow van while driving through the

16  Choice Market parking lot on Sunday, May 1, 1994. (R.T. 4/7/95, at 4–46.) The

17  State also called their mother, Norma Lopez. (*Id*. at 47–61.) Ray testified that he

18  often walked to the nearby Choice Market with his twin sister, Laura. (*Id*. at 5–8.)

19  On the afternoon of Sunday, May 1, 1994, his mother sent Ray and his sister to the

20  market to buy Pepsi and gum. (*Id*. at 8–9, 21, 50.) On their way home, Ray saw a

21  white man with "[b]ushy" hair, driving a yellow van, and hitting a "[l]ittle white

22  girl." (*Id*. at 9–10, 21, 25.) As the van approached, Ray saw through the front

23  window that the man had his left hand on the steering wheel, and that he was

24  forcefully striking the little girl in her chest with his elbow and the back of his right

25  fist. (*Id*. at 11–14.) The little girl, who appeared to be around 4-years-old, appeared

26  to be crying. (*Id*. at 13–14.) Ray did not know either the man or the girl. (*Id*. at 17.)

27  Ray had never seen a person hitting someone else in a vehicle before, and it made

28  him "[a] little" upset. (*Id*. at 28.)

Laura similarly testified that, after leaving the Choice Market with her brother, she saw a white man striking a little blonde girl while driving his yellow van through the Choice Market parking lot. (*Id.* at 36–37.) Looking through the van's front windshield, she saw the "puffy hair[ed]" white man, driving with one hand on the steering wheel, hitting a little girl on the left side of her face with his elbow. (*Id.* at 36–38, 42.) The incident "kind of scared" Laura. (*Id.* at 39.)

Both Ray and Laura testified they immediately ran home and told their mother, Norma, about the incident. (*Id.* at 17, 38.) Norma testified that, when Ray and Laura returned from the Choice Market that afternoon, "they were out of breath and anxious … talking at the same time." (*Id.* at 51.) The children told Norma that they saw "a yellow van with a man inside hitting a little girl." (*Id.*) The children explained that the man was driving with one hand, and hitting the little girl in her face and on her chest with the closed fist of his other hand and with his elbow. (*Id.* at 51–53.) Norma testified that, the following day, she saw a 5:00 p.m. television news report concerning Jones' arrest. (*Id.* at 53–54, 57.) When the news story re-aired at 6:00 p.m., Norma called Ray and Laura in to watch, and they identified Jones as the man they had seen striking the girl. (*Id.* at 18, 40–41, 45, 54–55.)

At trial, Ray was unable to recognize Jones in court, but he did identify Jones as the man who was driving the yellow van when he was shown a past photograph of Jones.[30] (*Id.*) If Barnett's investigation would have discredited any aspect of the Lopez children's eyewitness account, Bruner and Bowman would have called him to testify about any such findings. (R.T. 10/31/17, at 23.)

Without any expert rebuttal, Bruner and Bowman challenged the accounts of

---

[30] In addition to Ray Lopez, witness Sara Petrilak also had trouble identifying Jones in Court. (R.T. 4/7/95, at 101–03.) Jones' former neighbor, Michael Fleming, explained during his testimony that Jones appeared "[a] lot more clean cut" at his 1995 trial than he did in 1994. (*Id.* at 161.)

Ray and Laura through cross-examination. Bruner established that Ray did not see Jones' face or any facial hair, and questioned whether he could see into the van from his height. (R.T. 4/7/95, at 25–27.) Bowman established that Laura only saw the side profile of Jones' face, and that she only saw a "little bit" of the little girl's face. (*Id*. at 44.) Bowman also cross-examined Norma Lopez, and established that she waited days before calling the police. (*Id*. at 60.) Bowman also attempted to establish that Norma and her children had discussed their recollections "many times" before their testimony in court. (*Id*. at 61.) At the evidentiary hearing, Bowman admitted that they "did conduct an investigation into the Lopez children's account." (R.T. 10/31/17, at 23.)

Bruner and Bowman also prepared questions for Jones to testify at trial, to offer specific rebuttal to the testimony of Ray and Laura Lopez. (Exhibit 1, at 131–36.) In the script, Bruner and Bowman prepared Jones to testify that he went to the Choice Market with Rachel, but did not hit her or do what the Lopez children described. (*Id*. at 131–32.) In addition, Jones would have specifically rebutted the differences in the van windows described by the Lopez children, the direction of his travel, and the time that he was at the store. (*Id*.)

**B.**   ***Jones' trial counsel investigated the reliability of the Lopez children's account, and he cannot prove deficient performance or prejudice.***

Like his claims above, Jones cannot prove that his trial counsel were ineffective for failing to call a host of additional, high-priced experts to attack the testimony of the Lopez children. Jones' trial counsel investigated the statements of the Lopez children, and ultimately, and reasonably, determined that the Lopez accounts could not be impeached by the defense investigator. Instead, the defense relied on cross-examination to illustrate problems with their account, and anticipated calling Jones to rebut aspects of their accounts. Further, Jones' current experts conceded that significant portions of the Lopez children's testimony were

reliable: the Lopez children could see into the yellow van driven by Jones, and they obviously saw some "important salient" event, such as an assault.

First, Jones cannot establish that his trial counsel deficiently investigated Ray and Laura Lopez. As detailed above, defense counsel reviewed the police reports and interviews of Ray, Laura, and Norma Lopez. (R.T. 10/30/17, at 125; R.T. 10/31/17, at 147.) Counsel then drove to the Lopez home and, along with David Darby, interviewed Ray, Laura, and Norma about their observations. Bowman and Darby questioned Laura and Ray in depth about their observations and their statements in the police reports. At the end of those interviews, defense counsel had Ray and Laura take them to the Choice Market parking lot and recreate what they saw.

After the interviews, Bruner and Bowman directed Barnett to take photographs and measurements of Jones' van in an attempt to discredit the accounts of Ray and Laura. (Exhibit 17; R.T. 10/31/17, at 18–19, 23.) Barnett took photographs of the front and side of the windshield of Jones' van, as well as height measurements of the driver and passenger side door windows, attempting to cast doubt on Ray and Laura's ability to see. (Exhibit 18, at 267–83). As Bowman admitted at the hearing, the defense "did conduct an investigation into the Lopez children's account." (R.T. 10/31/17, at 23.)

At trial, Bruner and Bowman challenged the accounts of Ray and Laura through cross-examination at trial, and anticipated calling Jones to specifically rebut the children's account. Bruner established that Ray did not see Jones' face or any facial hair, and questioned whether he could see up into the van from his height. (R.T. 4/7/95, at 25–27.) Bowman established that Laura only saw the side profile of Jones' face, and that she only saw a "little bit" of the little girl's face. (*Id*. at 44.) Bowman also attempted to establish that Norma and her children had discussed their recollections "many times," insinuating that their recollections were not the product of free recall. (*Id*. at 61.) Thus, Bruner and Bowman did challenge

1  the Lopez twins' ability to see into the van, and suggested that their testimony was
2  the product of collaboration.

3      Although, Bruner and Bowman noticed Barnett as a witness for trial, and
4  provided notice of his measurements and photographs to the State, Barnett was not
5  able to provide any such rebuttal at trial. (Exhibit 26.) As conceded by Bowman, if
6  Barnett and the defense would have discovered that there was some physical aspect
7  that disproved the account of the Lopez twins, Bruner and Bowman "definitely
8  would have" called him to testify. (R.T. 10/31/17, at 23); *Strickland*, 466 U.S. at
9  690 ("[S]trategic choices made after thorough investigation of law and facts
10  relevant to plausible options are virtually unchallengeable[.]")

11     Likewise, Bruner and Bowman apparently decided not to call Jones to
12  testify, even after preparing his script for trial, after full investigation and based
13  upon tactical reasons. Bruner and Bowman knew that it was Jones' word against
14  the testimony of the Lopez family, and Jones even admitted to police that he was at
15  the Choice Market. (Exhibit 66, at 5323, 5330, 5357.) Had Jones testified, he also
16  would have been impeached with his prior felony conviction. (Exhibit 1, at
17  2302–03.) Thus, in the absence of any evidence from Jones during the hearing on
18  this point, this Court must presume that counsel did not call Barnett or Jones "for
19  tactical reasons rather than through sheer neglect." *Pinholster*, 563 U.S. at 191.

20     In short, trial counsel rendered adequate performance by: (1) reviewing the
21  police interviews of Norma, Ray, and Laura Lopez; (2) interviewing the three
22  before trial; (3) recreating the event in the Choice Market parking lot with the
23  Lopez children; (4) investigating Jones' van with their investigator, taking
24  measurements and photographs in an attempt to disprove the observations of the
25  Lopez children; (5) cross-examining Ray, Laura, and Norma at trial about their
26  accounts; and (6) preparing Jones to testify in specific rebuttal to Ray and Laura's
27  eye-witness accounts. (Exhibits 76–80; R.T. 4/7/95, at 18–28, 41–46, 57–62; R.T.
28  10/30/17, at 125; R.T. 10/31/17, at 147; R.T. 11/1/17, at 157); *Strickland*, 466 U.S.

1  at 690; *Pinholster*, 563 U.S. at 191.

2      Jones' current experts change nothing, and Jones cannot prove prejudice.

3  Contrary to Jones' assertions, neither his accident reconstructionist nor his

4  biomechanics expert provided reliable evidence that the children *could not have*

5  *seen* Jones striking Rachel. Paul Gruen, Jones' automobile accident-

6  reconstructionist, offered opinions which appeared to be based upon unknown or

7  incorrectly-determined variables. And Gruen's own animation admitted into

8  evidence *proved* that the Lopez children could have seen Jones and Rachel inside

9  the moving van, based upon their angles of sight. In his report, Gruen concluded

10  that Ray and Laura "could not have seen inside the van, nor observed any of the

11  activities to which they testified, based on their angles of observation, visual

12  obstructions, speed of the van, and the duration of the event." (Exhibit 110, at

13  3929.)

14      Gruen's conclusion, however, is not scientifically reliable because it is based

15  upon unknown or incorrectly-determined variables. Gruen guessed about the

16  variables on which he relied. Gruen testified that he approximated the location of

17  the Lopez children and Jones' van in the Choice Market parking lot. (R.T. 11/1/17,

18  at 144–45.) Gruen testified that these locations were based upon Ray Lopez' trial

19  testimony, which Gruen himself believed was unreliable, and upon information

20  supplied by Jones, which is inherently unreliable because it is unsworn,

21  uncorroborated hearsay, and comes from an obviously-biased source. (*See id.* at

22  141–45, 152, 158.) Gruen admitted that he did not know where the van was located

23  when the Lopez children first saw it, where the Lopez children were standing in the

24  parking lot, how close the van was to them in the parking lot at any point, or where

25  the van traveled in the parking lot. (*Id.* at 144, 147.)

26      Gruen's estimation that Jones was driving the van through the parking lot at

27  approximately 15 to 20 miles per hour also has no scientific basis or support in the

28  record. His opinion is, in fact, contradicted by the record and the statements by Ray

and Laura Lopez. Gruen admitted that his approximation was not record-based; rather, he reached this estimated range of speed by "just driving [his own pickup truck] through the parking lot at speed." (*Id.* at 145–46.) Moreover, Gruen approximated this speed *despite* the fact that Ray Lopez told detectives that the van was traveling so slow that he could have jogged alongside it. (*Id.* at 146–47.) Gruen admitted that a 8-year-old child could not run 15 to 20 miles per hour. (*Id.* at 146.)

Gruen's opinion that the van was traveling in a straight line through the parking lot, as shown in his demonstrative exhibit, is also contradicted by the record that he reviewed in this case. (*Id.* at 147–48.) Ray had informed his mother that the van was swerving as if the driver were drunk, and both Ray and Laura told Detective Clark that the driver was driving with one hand. (*Id.* at 148; Exhibit 77, at 1060; Exhibit 79, at 1013.) Gruen admitted that his analysis did not account for any swerving of the van. (R.T. 11/1/17, at 151.)

Based on these unreliable approximations (locations of van and children; rate of speed; direction of travel), Gruen's opinion that the Lopez children could have observed the van for a period of only 2.6 to 3.4 seconds is therefore not reliable. (*Id.* at 151–53.) Gruen's conclusion is also again contrary to the record in this case. Ray told Jones' trial counsel, Leslie Bowman, that he watched the van for at least 10 seconds or longer. (*Id.* at 153.) And Laura told Bowman that she could see the van for "a while." (Exhibit 80, at 1043.) Thus, as Gruen admitted at the hearing, the two eye-witnesses in this case contradicted his own analysis. (R.T. 11/1/17, at 153.)

Although Gruen testified that he subsequently based his opinion—that the children could not have seen Jones striking Rachel in the van—on the changing light conditions, he conducted no analysis of those lighting conditions on May 1, 1994, and admitted that he produced no evidence to substantiate his theory. (*Id.* at 164.) Although he could not recall specifically, Gruen believed he photographed

the van and conducted his analysis sometime between June and September 2008, at approximately 10:00 or 11:00 a.m. (*Id*. at 133.) Thus, Gruen failed to even attempt to replicate the lighting conditions from the time of day (late afternoon) and the time of year (May 1st) of the Lopez children's observations, even though admitting that the lighting conditions would change depending on those variables. (*Id*. at 133, 166.) Gruen also claimed that the side windows on the van were tinted, based solely upon his own lay observations; however, he never conducted any scientific tests to determine whether the windows were actually tinted. (*Id*. at 165–66.)[31] In short, Gruen provided no evidence or analysis to substantiate his theory about the changing light conditions.

In sum, Gruen's opinion that the Lopez twins could not have seen Jones assaulting Rachel inside the van is not scientific or reliable. And, Gruen's report and opinions are the product of his own personal bias against eye-witness testimony, which he admitted at the hearing:

> Q.     [I]n your report you stated: As most investigators know, eyewitness accounts are typically unreliable, inaccurate, and problematic at best. Especially when the witnesses are children. Correct?
>
> A.     Yes, sir, that's correct.
>
> Q.     So you already come to this case with this skepticism already then, correct? [*Sic*]
>
> A.     Not—well, yes. Yes. I believe that is true, yes.

(*Id*. at 133.)[32] Gruen was also not a neutral witness, as Jones' defense paid him approximately $8,200 for his opinion, not counting his accrued additional

---

[31]  Regardless, both Ray and Laura testified that they were looking through the van's *front window* when they observed Jones beating Rachel. (R.T. 4/7/95, at 11–14, 37–38, 42.)

[32]  Gruen's bias against child eye-witness testimony was also specifically rebutted by Jones' actual eye-witness forensic psychologist, Dr. Esplin, and Sgt. Pesquiera. (R.T. 11/2/17, at 35–36; R.T. 11/6/17, at 11.) Doctor Esplin testified that children as young as 4-years-old could "provide reliable information. (R.T. 11/2/17, at 36.)

1   preparation and appearance time for the hearing. (*Id*. at 132.)

2   Gruen made numerous admissions which also undercut his opinions. From

3   the photographs he took, Gruen admitted that the interior of the van was visible.

4   (*Id*. at 166–68.) In fact, in *all* of the photographs Gruen took of the van, the interior

5   of the van is visible to an outside observer. (Exhibit 110, at 3935; Exhibit 110a, at

6   3937.1–.10, 3937.33–.60, 3937.66–.67.) Additionally, Gruen admitted that, in at

7   least one of the photographs of the exterior of the van taken by Jones' trial

8   investigator, George Barnett, not only was the interior of the van visible, but

9   Rachel would have been visible from the outside of the van had she been sitting in

10   the passenger seat at the time the photograph was taken. (R.T. 11/1/17, at 168–69.)

11   Further, Gruen testified that Jones *admitted* he was able to see the Lopez children

12   as he drove through the parking lot. (*Id*. at 173.) Finally, Gruen's own

13   demonstrative animation *proved* that the Lopez children could have seen both

14   Jones and Rachel as the van approached, based upon their angle of sight. (*Id*. at

15   163–64.) Thus, Gruen's report and testimony fail to prove that the Lopez twins

16   could not have seen Jones assaulting Rachel in his yellow van as he drove through

17   the Choice Market parking lot on May 1, 1994.

18   Likewise, Jones' biomechanics expert, Dr. Patrick R. Hannon, also admitted

19   that the Lopez children could have seen Jones beating Rachel inside his van.[33] For

20   his opinion, Hannon relied extensively on the calculations produced by Mr. Gruen,

21   which are not scientifically sound. (Exhibit 119, at 3994.) For example, Hannon

22   relied upon the speed-of-the-van ("15 to 20 miles per hour") and the time-of-

23   observation ("two to four seconds") calculations done by Gruen, which as

24   discussed above are not scientifically reliable and are actually contradicted by the

25   record. (Exhibit 119, at 3988.) Ray Lopez told Jones' trial counsel that he observed

26   the van for at least 10 seconds, rather than the "two to four seconds" postulated by

27   ───────────────

28   [33] Dr. Hannon was paid approximately $25,000 for his review and opinion in this case. (R.T. 11/2/17, at 59.)

Hannon; additionally, the van could not have been traveling 15 to 20 miles per hour, because Ray told detectives that the van was traveling slow enough that he could have jogged alongside it. (R.T. 11/01/17, at 146–47, 153.)

Hannon also relied on Gruen's changing-light-conditions theory, which was not supported or proven at the hearing. (Exhibit 119, at 3988–89.) Hannon's reliance on these "factors," and Gruen's opinions therefrom, discredits those aspects of his opinion.

And most important, Hannon *admitted* that the children could have seen Jones' upper torso and head, and Rachel's head, through both the front and side windows of the van, at various times as it traveled through the parking lot. (R.T. 11/2/17, at 61–64.) This conclusion is supported by the photographs Hannon took, which show that the interior of the van was visible to an outside observer. (Exhibit 119, at 4001–11, 4014–23.)

Finally, Hannon also corroborated Ray Lopez's statement concerning his observation of the moving van. In his report, Hannon offered demonstrative photographs simulating Jones' positioning in the van if, as the Lopez children testified, Jones had one hand on the steering wheel as he struck Rachel. (Exhibit 119, at 3996, 4025–28.) At the hearing, the following dialogue took place:

> Q.   [Y]ou were able to hold onto the steering wheel with one hand and hit the passenger seat with your elbow, correct?
>
> A.   That is correct.
>
> * * *
>
> Q.   It's your opinion that the position with your foot on the accelerator, you would not have had good control over the van, correct?
>
> A.   That is my opinion, yes. That the right foot probably could reach the accelerator, no problem there, but having good control would have been difficult.
>
> Q.   *Depending on what was happening with your body in that position, holding onto the steering wheel and striking, the van could swerve, correct?*

A.     *Yes, if striking occurred, then certainly the steering wheel could move in that position up or down a little bit and that would produce a change in direction, which you've just termed as a "swerve."*

(R.T. 11/2/17, at 73–74, emphasis added.) This is precisely what Ray Lopez observed—he told his mother that the van was swerving as if the driver were drunk. (R.T. 11/1/17, at 148.) Thus, the testimony and evidence from Gruen and Hannon actually prove the accounts of Ray and Laura, including the assault.

Jones also presented evidence from forensic psychologist, Dr. Phillip Esplin,[34] in order to prove that the Lopez twins *did not* see Jones' brutal assault on Rachel and their testimony was unreliable, based upon suggestive questioning. Esplin's testimony, however, proved the opposite. Esplin admitted that many aspects of Ray and Laura's testimony were reliable and independently corroborated.[35] (R.T. 11/2/17, at 38–39.) For example, Jones admitted that on May 1, 1994, he was driving the yellow van, in the Choice Market parking lot, with Rachel, and that he saw the Lopez children in the parking lot.[36] (*See* R.T. 11/1/17, at 141–44, 152; R.T. 11/2/17 p.m., at 35; *see also* Exhibit 1, at 742; Exhibit 212, at 6422.) Esplin agreed that major aspects of the children's testimony were reliable:

Q.     You believe that certain aspects of the Lopez children's testimony [were] reliable, correct?

A.     Yeah, that they saw a van, apparently the van was moving, they saw some objects in the van, and they saw some movement in the van, and they saw what appeared to be swerving of the van. That seemed to be—those factors seemed to be consistent.

---

[34] At the hearing, Dr. Esplin agreed that he testified "predominantly" for the defense, and was paid approximately $30,000 for his involvement in this case. (R.T. 11/2/17, at 34–35.)

[35] Unlike Gruen, Dr. Espin, a child forensic psychologist, testified that children as young as 4 years old "can provide reliable information." (R.T. 11/2/17, at 36.)

[36] Additionally, Rebecca Lux, Angela Gray's other daughter, testified at trial that Jones told her he was taking Rachel to the Choice Market on Sunday, May 1, 1994. (R.T. 4/11/95, at 69.)

Q.     And that was in the Choice Market parking lot?

A.     Correct.

Q.     And that van was yellow?

A.     Correct.

Q.     And I believe you previously indicated that Rachel's blood in that van could also have some value for corroboration of the Lopez children's account?

A.     Well, I would defer that to a blood splatter expert but I think that that was noteworthy of something, somehow there was some blood in the van.

(R.T. 11/2/17 p.m., at 38–39.)

Esplin also admitted that Ray and Laura saw something that day that had "emotional significance" to them:

Q.     You agree that the Lopez children saw something, correct?

A.     It appeared to me that they saw something happen, they saw something in the van that—that had some emotional significance.

Q.     So this was obviously a memorable event for them?

A.     Yes, because in my opinion it led to the immediate report to Mom so it had to be of sufficient import to disclose that.

Q.     And seeing a man beat a young girl could be a traumatic event, correct?

A.     Yes.

Q.     Especially to another young child?

A.     Yes, because sometimes—it's an interesting topic, but sometimes children that witness violence are more adversely affected than children that experience violence. []

(*Id*. at 38.) Thus, Esplin's own testimony—concluding that major aspects of the Lopez' statements were reliable and independently corroborated, as well as his own opinion that the children saw something of "emotional significance"—did nothing to prove that Ray and Laura did *not* see Jones violently assaulting Rachel. His testimony does not support Jones' claim, to any extent, that his trial counsel were ineffective in failing to call such a forensic child psychologist.

60

1    Accordingly, if Jones' trial counsel would have presented the evidence from
2    each of these experts, they would have *prejudiced* his case. Each expert would
3    have damaged Jones' defense by agreeing that portions of the Lopez children's
4    account were credible.

5    Finally, had trial counsel more aggressively challenged the reliability of the
6    testimony of the Lopez children, counsel might have opened the door for the State
7    to present the most damning rebuttal evidence of all: that Jones had previously hit
8    his own children with his elbow, much as he pummeled Rachel. (Exhibit 1, at
9    916–37); *See e.g., State v. Woratzeck*, 134 Ariz. 452, 454, 657 P.2d 865, 867 (Ariz.
10   1982) (defendant opens door to further inquiry on a topic by introducing that topic
11   while examining a witness); *State v. Mincey*, 130 Ariz. 389, 405, 636 P.2d 637,
12   653 (Ariz. 1981) ("We agree with the state that appellant opened the door to this
13   line of questioning during his opening statement"). Defense counsel had already
14   successfully defeated the State's motion to admit this evidence at trial, and would
15   not have risked potentially opening the door to such evidence. (ROA 102, 117,
16   124.)

17   **VIII. TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING CALL A BLOOD
18        SPATTER EXPERT.**

19   Jones next argues that trial counsel was ineffective for failing to call a
20   bloodstain interpretation expert to provide alternative explanations for the presence
21   of Rachel's blood in his van. Post-conviction relief counsel was not ineffective for
22   failing to raise this claim, however, because it is meritless. Counsel strategically
23   challenged Pesquiera's qualifications at trial, rather than seek out and call an
24   additional expert. And counsel highlighted those shortcomings in expertise and
25   testimony for the jury. That was a strategic decision, and Jones cannot prove
26   deficient performance. In addition, Jones has not proven prejudice because his new
27   expert, Stuart James, largely agreed with Pesquiera's findings.

28

1    **A.    *Factual and Procedural History*.**

2         At trial, the State presented evidence of blood found in various locations

3    during the investigation. For example, blood consistent with Rachel's was found on

4    a plastic bag, carpet samples, and the front passenger seat of Jones' van, as well as

5    on the jeans Jones was wearing when he was arrested. (R.T. 4/7/95, at 120–21,

6    126–27; R.T. 4/11/95, at 106–09.) On the carpet between the van's seats there

7    appeared to be impression stains—caused when a person rests an injury on a piece

8    of material and the blood soaks through. (R.T. 4/12/95, at 64, 72–73.) There was

9    also a trace of blood on the t-shirt and boots Jones wore when he was arrested. (*Id*.

10   at 61–62; R.T. 4/11/95, at 95, 116.) The blood stains on Jones' t-shirt were on the

11   right sleeve and lower abdomen; the blood stains on his jeans were on the right

12   knee and thigh. (R.T. 4/11/95, at 116.) There was also blood on Rachel's panties

13   and pajamas. (*Id*. at 90–91.)

14        Sergeant Pesquiera testified that, in addition to her experience as a homicide

15   and child abuse/sex crimes detective, her training included a week-long course in

16   homicide investigation, a week-long course in blood stain and blood spatter

17   evidence, and courses in forensic pathology which included investigations of

18   deaths caused by blunt force trauma and child abuse. (R.T. 4/12/95, at 26–29,

19   62–63.) During her testimony, Pesquiera explained the differences between

20   different types of blood stains, such as low, medium, and high velocity, projected

21   versus splashed blood, transfer stains, impressions stains, and spatter. (*Id*. at

22   63–64.) Pesquiera qualified her opinion to the jury, testifying that, although she

23   was "not qualified as an expert to say what velocity [the blood stains] are," she

24   "could appreciate what type of stains they were in relationship to where the victim

25   could have been and the assailant could have been." (*Id*. at 64–65.) Accordingly,

26   Pesquiera did not testify regarding the velocity of the blood stains, but rather what

27   type of patterns they were, such as impressions or spatter. (*Id*. at 66–67, 71–76.)

28

When the prosecutor asked Pesquiera if any of the blood stains she observed were "consistent with what you called an impression stain," defense counsel objected under Arizona Rule of Evidence 702, arguing that the sergeant did not possess sufficient expertise to answer the question. (*Id*. at 65–66.) The trial court overruled the objection,[37] and Pesquiera testified that blood on the van's carpeting appeared to be an impressions stain "where the blood has actually soaked through and has been in that position for quite a while to where it soaks down through the carpeting." (*Id*. at 66, 72.)

Sergeant Pesquiera also stated that some of the blood stains in the van exhibited a "spatter" pattern. (*Id*. at 72–73.) When the prosecutor asked what spatter stains like those in the van were consistent with, defense counsel again objected under Rule 702. (*Id*. at 73.) The court again overruled the objection, and Pesquiera stated that the blood spatter in the van suggested "there was static blood already there, and some type of blunt trauma struck that static blood causing it to go out." (*Id*. at 73–74.) She also testified that blood droplets on the right sleeve of the van driver's shirt would be consistent with the spatter in the van. (*Id*. at 75.)

When cross-examining Sgt. Pesquiera, defense counsel highlighted the fact that no blood was detected on the pry bar or other metal pipes in Jones' van. (*Id*. at 85–87.) In closing argument, defense counsel argued that the blood in the van was not "spatter," but simply "some drops of blood." (R.T. 4/13/95, at 113.) He additionally emphasized that Sgt. Pesquiera was not a blood spatter expert and that her testimony regarding the blood stains in the van was speculation. (*Id*. at

---

[37] The admissibility of Sergeant Pesquiera's testimony as an expert in this area is a matter of Arizona law, and this Court does not have jurisdiction to consider it. *Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Deck*, 814 F.3d at 977 ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (quoting *Bradshaw*, 546 U.S. at 76).

113–14.)

**B.    *Jones' counsel strategically exploited the weaknesses in the bloodstain interpretation evidence, and Jones cannot prove deficient performance.***

Defense counsel were not ineffective at trial because they made the strategic decision to attack Pesquiera's qualifications in bloodstain interpretation, and argue those qualifications and the deficiencies in the testimony to the jury in closing argument, rather than call an expert. *Richter*, 562 U.S. at 111 (recognizing that *Strickland* does not require "for every prosecution expert an equal and opposite expert from the defense," and in many instances cross-examination will be sufficient to expose defects in an expert's presentation). Bruner and Bowman challenged the bloodstain evidence, and Jones cannot show otherwise.

In attempting to fault trial counsel, Jones relies on Stuart James' statements that the bloodstains on the passenger seat were "not typical of those produced during a beating" and that the blood "could have been projected or cast-off from the victim's hair as she was carried into the van, while the van was in motion or during resuscitation efforts." (Exhibit 122, at 6635.) But counsel was not ineffective because James' conclusions provide nothing more than an alternative explanation for the blood in the van. At trial, defense counsel achieved the same effect by relying on the evidence that was presented and focusing on its shortcomings:

> I mean, if the State's theory is Barry raped and murdered that girl in the van, why is there no physical evidence? Why are they looking at this one picture with tiny dots on it and telling you that's blood spatter? Why did they parade, go around with this pry bar and then neglecting to mention there were two other bars that are metal objects in that van that they sent up for some kind of analysis with the same results. Nothing found. There's nothing in those pictures that indicates anything else but that little girl was in the van and she bled on the van.

(R.T. 4/13/95, at 125. Emphasis added.) Because counsel made the same point

64

through the State's own witnesses and evidence, he was not ineffective for failing to provide expert testimony that there was an alternative explanation for the blood in the van. *See Richter*, 562 U.S. at 110–11 (counsel was not ineffective for failing to call expert to counter testimony from State's forensic blood experts where counsel used cross-examination to elicit concessions from State's experts and draw attention to weaknesses in their conclusions); *see McElvain v. Lewis*, 283 F.Supp.2d 1104, 1125 (C.D. Cal. 2003) (no factual basis for ineffectiveness claim based on failure to object when record showed that counsel did object to the evidence at issue).

Additionally, counsel highlighted for the jury the fact that there was no evidence that Jones was wearing the blood-stained t-shirt and jeans on Sunday, May 1st:

> There's no evidence of anything about blood on Barry's clothing other than what the testimony was that he carried that girl out to the van. Those are the clothes he was wearing the day of his arrest. We don't know what he was wearing the day before. There's no evidence of that.

(R.T. 4/13/95, at 125.) Counsel therefore could not have been ineffective for failing to point out the lack of evidence that Jones wore the bloodstained clothing on the day that the State alleged the assault occurred. *Wong v. Belmontes*, 558 U.S. 15, 23–24 (2009) (holding counsel need not introduce any expert evidence where the subject is not technical and requires "only that the jury make logical connections of the kind a layperson is well equipped to make").

Jones also cannot prove prejudice because his new purported bloodstain interpretation expert, Stuart James, agreed with many of the findings of Sgt. Pesquiera. Where James differed from Pesquiera, the differences are insignificant and immaterial.

### 1.    Item V6 – the carpet bloodstain.

For Item V6, the bloodstain on the carpet behind the passenger seat of the

1   van, Pesquiera testified it was "an impression stain *or a stain where the blood has*

2   *actually soaked through* and has been in that position for quite a while to where it

3   soaks down through the carpeting." (R.T. 4/12/95, at 72; emphasis added.)

4       In his December 18, 2002 report, reviewing the same bloodstain, James

5   agreed that Rachel "may have made contact with the carpet with a bloody area at

6   some point in time." (Exhibit 121, at 4072.) Thus, James *agreed* with Pesquiera's

7   finding that Rachel may have made contact with the carpet, causing it to be

8   saturated or soaked with her blood. (*Id*.; *see* R.T. 11/3/17, at 17.) At the hearing,

9   James could only testify that he disagreed with Pesquiera's characterization of the

10  stain as an "impression," instead describing it as "an area of saturation" and "most

11  likely a drip pattern." (R.T. 11/03/17 a.m., at 17, 30–31.) James testified, "I do

12  agree that she stated that the blood is soaked through[.]" (*Id*. at 30.)

13       **2.**    **Item V7 – another carpet sample.**

14       Item V7 was another carpet sample containing Rachel's blood, seized from

15  behind and partially underneath the front passenger seat of the van. (R.T. 04/12/95,

16  at 56–57, 74.) Pesquiera testified that Item V7 was "spatter," caused when "the

17  blood breaks apart prior to hitting the point of target or the target surface[.]" (*Id*. at

18  72–73.) Pesquiera testified that, to cause this spatter effect, Rachel would have had

19  to have blood on her, and that "static" blood "would have had to have been struck,

20  shaken or in some way changed like a blow or blunt force trauma causing the

21  blood to spatter out." (*Id*. at 73.)

22       James agreed with Pesquiera that V7 was a "spatter stain," but opined that

23  he would have further defined it in the *sub-category* as a "drip stain." (R.T. 1/03/17

24  a.m., at 31–32.) James agreed with Pesquiera, but added that it could also "be just

25  from the movement and projection." (*Id*. at 32.)

26       **3.**    **Item V8.**

27       Item V8 was a piece of paper, seized from between the two front seats of the

28  van, which contained blood from an undetermined source. (R.T. 04/12/95, at 58,

74.) Pesquiera characterized it as containing blood spatter: "it appeared to be that there was static blood already there, and some type of blunt trauma struck that static blood causing it to go out." (*Id.* at 74.)

James did not review Item V8. (*See* R.T. 11/02/17 a.m., at 4–40; Exhibits 121, 122.)

### 4.     Items V12A, B, C.

Items V12A, B, and C were pieces of upholstery seized from the front passenger seat of the van. (R.T. 4/12/95, at 59, 72–73; Exhibit 121, at 4073.) Blood found on V12A was consistent with Rachel's blood,[38] while the analyst did not "characterize [the blood on Items V12B and C] any further" because they were "smaller blood stains." (R.T. 4/11/95, at 108.) At trial, Pesquiera described the stains in the following manner:

> The spatter that is seen, for instance, on the seat is consistent with the diameter or actually the spots, the stains are -- consistent with them being at a point of confrontation being that the victim -- being -- Rachel in this case, would have been in that area at the time of the bleeding, but in this case from what I see -- I found that the area of injury would have had to have had static blood on it, meaning there would have already had to have been blood on her, and it would have had to have been struck, shaken or in some way changed like a blow or blunt force trauma causing the blood to spatter out.
>
> * * *
>
> The blood has broken apart prior to hitting the surface, and that is because it appeared to be that there was static blood already there, and some type of blunt trauma struck that static blood causing it to go out.

(R.T. 4/12/95, at 73–74.)

At the hearing, James largely agreed with Pesquiera's opinions that the staining on Item V12 were caused by "spatter" and "airborne" blood. (R.T. 11/3/17,

---

[38] Jones concedes that the blood found on Item V12A was consistent with Rachel's blood. (Exhibit 121, at 4073.)

at 21.) James testified:

> Based on the evidence and the case facts that I was able to study, I concluded that most likely the bloodstains on the front passenger's seat of the van have the appearance of a projected bloodstain pattern. And the subcategory of that would be sort of like a cast-off and the mechanism would be based on, you know, the case facts from bloody hair possibly, you know, swinging and causing blood to project from it onto that surface.

(*Id.* at 20–21.) Upon being questioned by the Court, James testified that he assumed the blood came from Rachel being carried or transferred and not from being struck, because "there is no physical evidence to support that, no bruising or anything like that." (*Id.* at 26.) Such a conclusion all but ignores the record in this case, including the testimonial evidence of Ray and Laura Lopez, as well as the voluminous amount of injuries and bruising to Rachel's body. (*Supra*. pp. 46–50; Exhibit 65, at 4693–4800 (autopsy photographs).)

James then admitted that the blood could have come from Rachel's hair if she were struck in the van. (*Id.* at 26–27.) James testified:

> Q.   So my next question is: *Can you, in looking at the blood pattern on the seat, make a distinction, without any other facts, as to whether that is a result of her being struck or a result of her hair simply swinging because of the movement of the van?*
>
> A.   *Not without additional information.*

(*Id.* at 27; emphasis added.) Thus, James could not rule out Rachel being struck in the van while bleeding, and his opinion was consistent with Pesquiera's at trial.

### 5.   Item S1 – Jones' shirt.

Item S1 was the shirt that Jones was wearing at the time of his arrest. (R.T. 4/12/95, at 62.) Laboratory analysis revealed traces of human blood on the shirt, but the amount of blood present was too small to be characterized. (R.T. 4/11/95, at 108.) At trial, Sgt. Pesquiera agreed with the prosecutor's questions that the pattern of blood droplets on the right sleeve of the driver would be consistent with Rachel having been struck in the van. (R.T. 4/12/95, at 74–75.) That was the only

testimony given by Pesquiera regarding Item S1, and she did not characterize it. (*Id.*)

At the hearing, James characterized the blood on the right sleeve as "spatter," but testified he "wouldn't agree that they would be consistent necessarily with impact spatter because you can get small spatters of blood, you know, from just carrying someone around. […] So that probably my best conclusion would be that there are too few stains to really interpret." (R.T. 11/03/17 a.m., at 34–35.) James' conclusion that Jones could have gotten small drops of blood spatter on his sleeve from carrying Rachel around defies logic, and does nothing to impeach Pesquiera's testimony.

## C.   *Jones also cannot prove prejudice.*

In sum, Jones has not shown that counsel were ineffective, and that he suffered prejudice, in light of James' testimony. Jones' trial counsel effectively established the weaknesses and limitations of the bloodstain interpretation evidence by making those arguments based on the State's own witnesses and evidence. Under those circumstances, testimony from an expert such as James was unnecessary. *See Richter*, 562 U.S. at 110–11.

And, there was no prejudice because James' findings are not inconsistent with, much less do they disprove, the State's theory that Jones sexually assaulted and beat Rachel in the van. Rachel was "actively bleeding and moving around while in the van," as James stated, while Jones sexually assaulted her. (R.T. 4/13/95, at 96; Exhibit 121, at 4072.)

James' opinions simply provide an alternate explanation for the presence of Rachel's blood on Jones' clothing and in his van. Regardless whether the blood found was spatter, transfer, or passive droplets, the fact remains that Rachel bled in Jones' van and on Jones' clothing. And, even if there are nuanced differences in bloodstain interpretation, that fact does not prove that Jones did not create the injury that caused Rachel to bleed. In light of the evidence of Jones' guilt set forth

1  above—including the fact that Rachel was in visible pain when she returned from

2  her outing with Jones and that Jones had been seen striking her on that outing—

3  Jones cannot prove that the proceedings would have been different if he had

4  produced Stuart James to testify. Because this IAC claim is meritless, post-

5  conviction counsel was not ineffective for failing to raise it and Jones has failed to

6  establish cause under Martinez. *Sexton*, 679 F.3d at 1157.

7  Finally, and most important, had James testified at trial, his testimony would

8  have *actually prejudiced* Jones. James' opinion, that Rachel "may have made

9  contact with the carpet" with regard to Items V6 and V7,[39] *supports* the State's

10  theory that Rachel was lying on the floor of the van as Jones sexually assaulted and

11  continued to beat her. (*See, e.g.,* R.T. 4/13/95, at 95–97.)[40] Thus, trial counsel

12  likely would have been constitutionally ineffective had they called James as a

13  witness.

14  **IX.   CONCLUSION.**

15  As demonstrated above, Jones has not shown cause to excuse Claim 1D's

16  procedural default and he is not entitled to habeas relief, because his conviction for

17  child abuse (Count IV), which did not require Jones to have inflicted the fatal

18  injury, independently supports his murder conviction (Count V). Notwithstanding

19  that, Jones is still not entitled to relief because his underlying claim (and associated

20  sub-claims) of ineffective assistance of trial counsel have no merit. As a result,

21  post-conviction counsel was not ineffective for omitting them.

22

23  [39] Exhibit 121, at 4072.

24  [40] There is no evidence that Rachel was ever on the floor of the van, bleeding or

25  not, when Jones took her with him to the Quik Mart, or when he transported Rachel to the hospital. (*See* R.T. 4/11/95, at 38 (each of the three times Rebecca

26  saw Rachel riding in the van with Jones on Sunday, Rachel was sitting in the passenger seat); *see also, generally*, Exhibit 1, at 414–26, 472–616, 686–91.)

27  Additionally, regarding Jones' dubious tale that two boys pushed Rachel out of the van, Jones admitted that Rachel was not bleeding at that time. (Exhibit 1, at 691,

28  704, 706, 773.)

1

2       DATED this 16th day of January, 2018.

3                                    Respectfully submitted,

4                                    Mark Brnovich
                                     Attorney General
5
                                     /s/  Lacey Stover Gard
6                                    Chief Counsel

7
                                     /s/ John Presley Todd
8                                    Special Assistant Attorney General

9
                                     /s/  Myles A. Braccio
10                                   Assistant Attorney General

11
                                     /s/  J.D. Nielsen
12                                   Assistant Attorney General

13                                   Attorneys for Respondents

14

15   I hereby certify that on this 16th day of January, 2018, I electronically transmitted

16   the attached document to the Clerk's Office using the CM/ECF System for filing

17   and transmittal of a Notice of Electronic Filing to the following CM/ECF
     registrant:
18

19   Cary Sandman
     Karen Smith
20   Assistant Federal Public Defenders
     407 W. Congress St., Suite 501
21   Tucson, AZ 85701–1310

22
     Attorneys for Petitioner
23

24   s/  S. Finch

25

26   6717416

27

28
                                       71

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28