MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

MYLES A. BRACCIO
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004-1580
TELEPHONE: (602) 542-4686
CADocket@azag.gov
(STATE BAR NUMBER 027332)

ATTORNEYS FOR RESPONDENT

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Barry Lee Jones,

        Petitioner,

    -vs-

Charles L. Ryan, et al.,

        Respondents.

CV 01–0592–TUC–TMB

**RESPONSE TO CLOSING MEMORANDUM**

In this *Martinez* proceeding, Jones seeks reversal of his 23-year-old felony convictions and sentences, based on claims he has never asserted in any Arizona court, with evidence he has never presented to any Arizona court. Jones has failed to provide any challenge to his conviction for child abuse (Count IV), which alone serves as a predicate for his felony murder conviction. With a seemingly limitless budget, full-time counsel, investigators, support staff, and a horde of new experts, Jones has spent the past 15 years re-investigating his case and generating new evidence on the remaining claims. Yet with all of those resources and that time, he has still failed to present this Court with any evidence proving his innocence[1] or that he did not receive a constitutionally adequate trial. *See Murray v. Carrier*, 477 U.S. 478, 486 (1986) ("We have long recognized, however, that the Constitution

---

[1] Doc. 141, at 23 ("[Jones] cannot satisfy the actual innocence standard even when his facts are taken as true[.]")

1  guarantees criminal defendants only a fair trial and a competent attorney. It does
2  not insure that defense counsel will recognize and raise every conceivable
3  constitutional claim.") (quoting *Engle v. Isaac*, 456 U.S. 107, 133–34 (1982)).
4  Jones' request for federal habeas relief is extraordinary, and this Court, without the
5  benefit of seeing any of the trial evidence against Jones, should view his claims
6  from the outset with great skepticism and deference to the State court record. *See*
7  28 U.S.C. § 2254(e)(1).

8       From Jones' initial briefing, it is clear that he incorrectly believes he is
9  retrying his criminal case before this Federal Court. Although paying lip service to
10 the law that "*Strickland* does not permit the court to reimagine the entire trial,"
11 (Doc. 288, at 68; citing *Hardy v. Chappell*, 849 F.3d 803, 823 (9th Cir. 2017)), that
12 is essentially what Jones has done. Despite recognizing his claim as one of
13 ineffective assistance of counsel, Jones instead omitted every inculpatory piece of
14 evidence showing his guilt, quibbled over small differences in witness testimony,
15 and attempted to discredit law enforcement's investigation. Jones offers nothing
16 more than gross speculation about other assailants, accusing Angela Gray, Rebecca
17 Lux, Jonathan Lux, and Zolie without a shred of evidence. (Doc. 288.) Jones did
18 not call *any* of these witnesses at the hearing to substantiate any of his speculative
19 accusations, or to corroborate any aspect of his new claims, despite having access
20 to all of them. For all the foregoing reasons, and those in Respondent's Closing
21 Memorandum (Doc. 289), Jones' *Martinez* claims to overcome the procedural
22 default should be denied.

23 I.  **BRUNER AND BOWMAN FACED A DAUNTING RECORD OF THEIR CLIENT'S
24     GUILT FROM THE POLICE REPORTS AND WITNESS INTERVIEWS.**

25      When Sean Bruner and Leslie Bowman agreed to handle Jones' defense,
26 they learned the following factual history from the police reports, witness
27 interviews, and other reports gathered during their investigation:

28      Years before Jones committed the crimes against Rachel, he was violently

1  abusive to his own children in a similar manner to that observed by the Lopez

2  children of Jones striking Rachel in his van. Before Jones dated Angela Gray, he

3  had married a woman named Carol, and together they had children, including

4  Brandi. (Exhibit 1, at 922–24, 926, 935; Exhibit 66, at 4894.) At one point, Jones

5  lost his job and started using drugs, and became increasingly violent towards their

6  children. (Exhibit 1, at 918.) Jones hit their children excessively with his leather

7  belt on numerous occasions, often daily. (*Id.* at 921–24, 926, 935, 962; Exhibit 66,

8  at 4894.) It was more than spanking; Jones was "over-doing it." (Exhibit 1, at 920.)

9  Jones appeared to lose control of himself when he was mad. (*Id.* at 926, 962.)

10  On occasion, Carol Jones "had observed Barry 'elbow' [their] child in a

11  back hand fashion while they were trying to leave a room at the same time[.]" (*Id.*

12  at 1791.) Jones would "backhand, elbow" them; if they were behind him, Jones

13  would swing his elbow backwards and strike them.[2] (*Id.* at 935.) Jones also

14  threatened to kill the children if Carol ever left him. (*Id.* at 920, 927–28, 960.) As

15  the abuse continued, Carol was uncomfortable leaving their kids alone with Jones,

16  and would have her mother come stay with the children when she had to work. (*Id.*

17  at 951, 966.) Eventually, the abuse became so severe that Carol obtained an order

18  of protection against Jones in 1992, and they separated. (*Id.* at 916, 922, 924,

19  2238–39.) In documents that Jones' trial counsel possessed, Jones admitted that he

20  had been drinking and committing domestic violence. (*Id.* at 2242.) Carol

21  subsequently reported the abuse to law enforcement in this case, and told

22  detectives that her sisters had also witnessed the abuse against Jones' children and

23  would corroborate her account. (*Id.* at 922–23; Exhibit 66, at 4895.) Jones also had

24

25  [2] Notably, Carol Jones went to the Pima County Sheriff's Department the day after

26  Jones was arrested for Rachel's homicide and gave her statement at 10:05 a.m. (Exhibit 1, at 916.) Carol thus provided her statements *before* Norma Lopez and

27  her children provided their statements to law enforcement, at 3:15 p.m. later that day, that her children had seen Jones "elbowing" Rachel in his van in the Choice

28  Market parking lot. (*Id.* at 931, 935, 1050.)

1   a long history of violence and drug use, as well as a prior felony conviction for

2   misconduct involving weapons. (Exhibit 1, at 1568–69, 2309–15, 2448, 2450;

3   Exhibit 66, at 5014, need felony.)

4       When Angela and her children moved into Jones' trailer in April 1994, Jones

5   told the kids they were not allowed to play in the van because it belonged to his

6   brother Larry. (Exhibit 66, at 5051 (Larry Jones); Exhibit 41(a), at 37, and Exhibit

7   42, at 40 (Rebecca Lux).) No kids ever played in the van. (Exhibit 1, at 532

8   (Angela Gray), 1496 (Joyce Richmond), 1495–96 (Elishia Knight); Exhibit 66, at

9   5107–08 (trailer park residents).) Even Jones told detectives that the kids had never

10  played in the van before Rachel was allegedly injured by falling out of it. (Exhibit

11  66, at 5321.) In the weeks leading up to Rachel's homicide, both Angela and Jones

12  continued to use methamphetamine. (Exhibit 1, at 1335.)

13      Approximately two weeks before Rachel's homicide, Jones took Rachel

14  alone, allegedly to his twin-brother Larry's house, and she arrived home later with

15  a mark on the bridge of her nose. (*Id.* at 1187–88; Exhibit 67, at 5572.) The

16  following morning, she awoke with two pronounced black eyes. (Exhibit 67, at

17  5572.) Rachel would not tell anyone what happened because she "didn't want

18  somebody to get in trouble." (*Id.*) Rachel eventually said she tripped over a dog

19  and got hit in the face with a rake by a little girl. (*Id.* at 5168, 5572; Exhibit 1, at

20  1187–88.) However, Jones' brother Larry and his wife Leanne both disputed that

21  this happened.[3] (Exhibit 1, at 985, 995; Exhibit 66, at 5466.) Rebecca also disputed

22  significant aspects of the story. (Exhibit 1, at 1188.)

23      Eventually, Rebecca and Brandi took Rachel into the bedroom and tried to

24  find out what had happened to her; Rebecca came out and told Angela that Rachel

---

26  [3] Leanne Jones also testified at trial that she was aware of the two times Rachel had
    been at their residence, and she had never been hit between the eyes with a rake or
27  tripped over a dog and hurt herself. (R.T. 4/11/95, at 121–22.) Leanne Jones
    testified that Rachel never received black eyes from any injury at their residence.
28  (*Id.* at 122.)

had said Jones had hit her with a rake. (*Id.* at 552–53, 562, 582; Exhibit 66, at 5189.) Angela confronted Rachel, but Rachel said the "girl did it." (Exhibit 66, at 5189.) Rachel, however, was scared of Barry Jones for two to three days afterward, and did not want to go anywhere with him.[4] (*Id.*) At some point, Rachel also had "a hand mark on her butt," but she would not tell Angela who struck her.[5] (*Id.* at 5189–90, 5192, 5194.)

Thereafter, numerous witnesses at the trailer park saw Rachel with the black eyes. (Exhibit 1, at 632–34 (Kim Hillman), 1421 (Terry Shane Richmond); Exhibit 66, at 4896, 5149 (Judy Chavez), 5107 (Jonathan Hallenbeck), 5217 (County investigator).) At one point while at Jones' trailer, Larry Jones also noticed significant bruising on Rachel's shoulder. (Exhibit 66, at 5482–86.) Jonathan Lux also observed Jones spank Rachel, and Angela appeared fine with it. (Exhibit 1, at 1109.) The second time Jones struck Rachel, Angela yelled at him. (*Id.*; *see also id.* at 1172–76 (Rebecca Lux also observed Jones spank Rachel and hit Brandi).)

Jones and Angela Gray continued to use methamphetamines on Tuesday and Wednesday, four to five days before Rachel's death. (*Id.* at 569–73.) Days later, Angela and Joyce Richmond, Jones' other girlfriend, got into an argument over Jones. (*Id.* at 1396–97.)

On Friday, April 29, 1994, Angela's sister, Amanda Gray, stopped by Jones' trailer to see her. (Exhibit 66, at 4905–08.) Amanda saw Rachel's black left eye, with bruising extending into the temple area. (*Id.* at 4898, 4903–04, 4907–08.) Amanda had never seen bruising on any of the children before, and had never

---

[4] Rebecca also testified in both Angela Gray's trial and Jones' that Rachel was scared of Jones and did not want to go for a ride with him. (Exhibit 41(a), at 22–23; Exhibit 42, at 25–26.)

[5] Jones cited this evidence in his Proposed Findings of Fact in support of showing *Angela's* abuse towards Rachel. However, there is conflicting evidence in the record on this point. Angela asserted that she noticed the handprint and attempted to find out who caused the mark to Rachel (Exhibit 66, at 5189–94), while Brandi claimed that Angela had spanked Rachel (Exhibit 1 at 891, 1171).

1  suspected that they were in physical danger or that someone had beaten them. (*Id*.
2  at 4904–05.)

3      That Friday night, Jones was overheard yelling loudly at Rachel and Angela
4  about Rachel's whining. (Exhibit 1, at 1554, 1561.) Rachel stood inside the trailer
5  and she looked scared. (*Id*.) Jones was "vehemently" yelling, using swear words,
6  cussing and complaining, and screaming at Angela about Rachel's "whining." (*Id*.
7  at 1560.) Jones yelled something akin to, "shut the child up," or "get her away
8  from me because I don't want to hear the whining." (*Id*.) Jones' screaming was
9  overheard by his friend, Ronald St. Charles, as well as another resident in the
10  trailer park, Shirley DeVous. (*Id*. at 251, 1554, 1561.)

11      At some point that evening, Rebecca and Brandi gave Rachel a bath.[6]
12  (Exhibit 66, at 5186.) Rebecca and Brandi did not say anything about any bruising,
13  blood, or injuries. (*Id*.; Exhibit 1, at 1171.) Rebecca did not notice any unusual
14  bruises, cuts, scrapes, or injuries on Rachel's body. (Exhibit 1, at 1171.)

15      On Saturday, April 30, 1994, Rebecca was with Rachel all day. (*Id*. at
16  1194–98, 3201.) Rachel and Rebecca stayed at Jones' trailer, and Rachel was okay.
17  (*Id*.) Brandi also claimed to have seen Rachel that morning, and observed that
18  Rachel was fine, eating, and in a good mood. (*Id*. at 831–33.) Notably, Rebecca did
19  not corroborate Brandi's later story that Rachel was struck by a little 2-year-old
20  boy with a metal bar. (*See id*. at 849–55, 899, 903–04; Exhibit 41(a), at 29.)
21  Angela was also with the girls for most of the day, except from 1:00 p.m. to 4:00
22  p.m., and when she was lying down until 6:00 p.m. (Exhibit 1, at 1195–1200.)

23      That Saturday afternoon, Joyce Richmond spent time with Jones, and told
24  him that she was leaving to go back to Montana. (*Id*. at 1394.) Jones was upset.
25  (*Id*.) In addition, law enforcement raided the workplace of Jones' drug dealer, Hal.

---

26

27  [6] Rebecca subsequently told defense attorneys that it was her "job to give Rachel a
28  bath." (Exhibit 1, at 1171; *see id*. at 1266.)

(*Id.* at 1527–28, 4950.) Saturday night, Jones was with Joyce and then left around 2:00 to 3:00 a.m. "to work." (*Id.* at 600, 1331–32, 1348.)

On Sunday, April 31, 1994, Jones' friend Roger came by the trailer to tell Jones the news of Hal's workplace raid by law enforcement the day before. (*Id.* at 1106, 1131, 1153, 1204; Exhibit 66, at 5309.) Despite conflicting estimates, Jones believed he woke up about 12:00 or 1:00 p.m. (Exhibit 66, at 5309; *see also* Exhibit 1, at 1116 (Rebecca Lux stating the time was 1:00 or 2:00 p.m.) Shortly after Roger came over, Jones took Rachel and left to go to the desert encampment residence of Ronald and Rosemary St. Charles, and their children.[7] (Exhibit 1, at 1532–33; Exhibit 66, at 5113.) Ron recalled that Jones arrived just after noon, although he could not be sure of the time. (Exhibit 1, at 1532.) Jones came by the camp "for about a minute," pulled up and asked what had happened at Hal's place. (*Id.*) Jones was "very angry" about what happened. (*Id.* at 1532, 1543–44.) Ron could see the anger in Jones' face and from the tone of his questions. (*Id.* at 1544.)

At some point, Jones returned to his trailer; but 30 minutes later, he left again with Rachel, telling Rebecca they were going to the store.[8] (*Id.* at 1116, 1134–35, 1155–57.) While driving through the Choice Market parking lot sometime between 4:00 and 5:00 p.m., Ray and Laura Lopez saw Jones striking Rachel with his fist and elbow. (*Id.* at 1007–1101.)

Sometime after Jones and Rachel returned to the trailer park, neighbors saw Rachel appearing very ill. Rachel crawled underneath the front part of the camper belonging to Michael and Stephanie Fleming, and curled into a ball position. (Exhibit 66, at 5155.) One of the witnesses, Julian Duran, saw Jones walking around the trailer court like he was looking for something. (*Id.*) Jones finally saw

---

[7] Jones admitted to detectives he took Rachel to Ronald St. Charles' camp. (Exhibit 66, at 5317, 5329–30; Exhibit 212.)
[8] Jones admitted to detectives he went to the Choice Market with Rachel. (Exhibit 66, at 5323, 5330.)

Rachel under the front part of the camper and he went over and talked to her. (*Id*.) Jones told her he was going to come back in a few minutes and he walked away. (*Id*.) Five minutes later, Rachel walked into the Fleming's trailer, something she had never done before. (*Id*. at 5071, 5155, 5439, 5453; Exhibit 1 at 374.)

When Stephanie went into the trailer to check on her, Rachel "appeared dazed," and had a "greenish color" to her face and skin, with "black bags under her eyes." (Exhibit 1, at 371–72; Exhibit 66, at 5071, 5439, 5441.) Rachel was also cold and "soaking wet."[9] (*Id*.) Stephanie took Rachel to the bathroom and Rachel constantly "dry-heaved." (Exhibit 66, at 5440, 5453.)

Stephanie came outside and told the others to get Jones. (*Id*. at 5155.) Julian Duran went running and waved down Jones. (*Id*.) When Stephanie picked Rachel up, Rachel grabbed onto her so hard, she was choking her. (*Id*. at 5444.) Rachel wrapped her legs around Stephanie, and did not want to let go. (*Id*.) Stephanie handed Rachel to Jones and told him that Rachel "need[ed] to go to the hospital, she's sick." (*Id*.) When Jones left with Rachel, Stephanie told her husband Michael that Jones said he was going to take Rachel to the fire station right down the road. (*Id*. at 5430.)

Jones, however, carried Rachel back to his trailer and put her down for a "nap." (*Id*. at 5279.) Jones also saw that Rachel's head was bleeding. (*Id*.) Shortly after, between 6:30 and 7:00 p.m., Angela awoke. (*Id*. at 5166; Exhibit 67, at 5569, 5571.) Jones told Angela that Rachel had been playing earlier with "Stephanie's boys," the two "blond headed kids," and they had either pushed her out of the van

_____

[9] While Stephanie and other witnesses did not notice any blood coming from Rachel's head, Rachel was "soaking wet." When Rachel returned with Jones after the Quik-Mart, she was also soaking wet. Jones lied to Angela that he had taken Rachel to the Fire Department and the paramedics had washed her head with a "saline" solution. This evidence suggests that Jones rinsed the blood from Rachel's head to conceal the injury just before Rachel was found in Stephanie Fleming's camper. There is no other evidence in the record to explain why Rachel was so wet at this point.

or she had fallen out of the van, but that "she was okay." (Exhibit 1, at 529.) Jones told Angela that he had put Rachel down for a nap. (Exhibit 1, at 601.) Angela asked why Rachel had napped so late, and Jones said she had been playing and having fun and did not want to lie down. (*Id*.) Jones did not tell Angela about the bleeding gash on Rachel's head, or her poor condition, saying only that she had a "couple of little bruises." (*Id*.)

Around 7:00 p.m., Jones asked Angela to run up the street to check on Brandi at the trailer where she had stayed the night before. (*Id*. at 523.) When Angela left, Jones got Rachel and took her to the Quik-Mart. (Exhibit 66, at 5292, 5310, 5362.) When they arrived at the convenience store, Jones set Rachel down on the curb out front and went in alone. (Exhibit 1, at 1877.) The clerk, Sarah Petrilak, recognized Jones as a "regular" at the store. (*Id*. at 1275, 1283.) Petrilak found it strange that Jones "sat the [little girl] right outside the door" rather than bring her inside. (*Id*. at 1284, 1286.) Jones asked for a plastic grocery bag, went to the ice machine, got some ice in the bag, and left the store.[10] (*Id*. at 1288, 1877.)

When Jones and Rachel returned, Jones saw Angela walking back to the trailer. (Exhibit 66, at 5292.) Jones told Angela that Rachel had woken up from her nap and her head was bleeding, so he took her down to the Rural Metro Fire Department next to the trailer park. (*Id*. at 5166, 5198; Exhibit 67, at 5569; Exhibit 1, at 523, 527, 564.) That was the first time Angela saw Rachel that day; Rachel was "soaking wet," and had an ice pack on her head. (Exhibit 1, at 522, 529, 550; Exhibit 66, at 5167.) Jones repeated his story to Angela that Rachel had fallen out of the van earlier. (Exhibit 1, at 528; Exhibit 66, at 5167.)

---

[10] While Jones later invented a story that an EMT looked at Rachel, Petrilak told defense attorneys that, while the EMTs came in every day, they always arrived late at night, just before Letterman came on the television. (Exhibit 1, at 1293–94.) Petrilak said they never came in "during the day or in the afternoon." (*Id*. at 1294.) Petrilak testified at trial that she did not see "any Rural Metro personnel, EMT personnel or paramedic" look at Rachel while she was outside. (R.T. 4/7/95, at 148–49, 154–55.)

Jones told Angela that the paramedics looked at the laceration and said that they could not stitch it up because it happened "a couple hours ago."[11] (Exhibit 1, at 528; Exhibit 66, at 5167.) Jones claimed that the "paramedics thought that maybe the cut wasn't bad enough [to] bleed then, but that her barrette, you know -- laying on her barrette -- irritated the wound and caused it [to] bleed." [*sic*] (Exhibit 1, at 529.) Jones claimed that Rachel was wet because the paramedics cut her pony tail and rinsed her head with saline solution.[12] (Exhibit 66, at 5167.) Jones also claimed the paramedics told him there was no need for stitches because "head wounds bleed a lot." (Exhibit 67, at 5569.) Jones said the firemen "checked her eyes and everything and said she was ok." (Exhibit 66, at 5201.)

Angela asked Rachel if she had gone to the fire station and seen the firemen, and Rachel said, "yeah, she saw the firemen, and she liked the firemen." (Exhibit 1, at 530.) Angela looked at the bleeding cut, and thought it should have stitches, but Jones said the paramedics could not stitch the wound because it was "old." (*Id*.) Angela did not really look at the wound because she was "scared to irritate it [and] make it keep bleeding." (*Id*. 551, 563.)

Angela changed Rachel right when they got home because she was so wet. (Exhibit 66, at 5167.) Angela noticed the "massive amounts" of bruises on Rachel's stomach, which looked like "rub marks." (*Id*. at 5167–68, 5178, 5198; Exhibit 1, at 530.) Jones stated that the bruises on her stomach were from falling out of the van. (Exhibit 1, at 565.) Jones repeated his story that "the little boys pushed her out of the van." (*Id*. at 530.)

While Rachel was lying on the couch, Angela repeatedly asked her what happened, and Rachel stated "the little boys just pushed her out of the van." (*Id*. at 530–31; Exhibit 66, at 5168, 5170.) Jones told Angela "*he saw her fall out*, and he

---

[11] From Jones' own statements, he dates the laceration to Rachel's head to mid- to late Sunday afternoon. (Exhibit 1, at 528; Exhibit 66, at 5167.)

[12] *Supra.* p.8, n.8.

1   was really impressed because she didn't even cry." (Exhibit 1, at 531–32; emphasis

2   added.) Jones claimed he watched her "tumbl[e] out" of the van. (*Id*. at 532.) Jones

3   claimed he "checked her over, and she looked okay," and that he "didn't notice"

4   the laceration on her head. (*Id*. at 533.) Jones stated that it happened sometime that

5   afternoon. (Exhibit 67, at 5578.)

6        When Rebecca later returned to the trailer, she saw Rachel on the couch with

7   a washcloth on her head, bleeding. (Exhibit 1, at 1118–19, 1137.) Jones told her, at

8   the time Rachel was injured, he rushed her to the paramedics and they said they

9   could not do anything for her. (*Id*. at 1119, 1145–46.) Rebecca did not believe

10   Jones. (*Id*. at 1145–46.) As the evening continued, Rachel cried and bawled loudly,

11   and threw up every time she attempted to eat or drink. (*Id*. at 1219, 1221; Exhibit

12   66, at 5200; Exhibit 67, at 5576.)

13        Between 7:00 and 9:00 p.m., numerous people came by Jones' trailer and

14   observed Rachel bleeding and in the process of dying. (Exhibit 1, at 841, 845, 902,

15   906–07 (Brandi Jones); 1302–05, 1320–21 (Joyce Richmond), 1418–19 (Terry

16   Richmond); Exhibit 66, at 5121, 5123, 5127–28 (Kim Hillman); 1470, 1474–76

17   (Elishia Knight).) One of those people, Kim Hillman, had never seen that much

18   blood from a child, and believed Rachel "couldn't be okay" because there was

19   "just too much blood." (Exhibit 66, at 5127.) The laceration on her head was

20   "deep" and "really big." (*Id*. at 5125.)

21        Several of the individuals told Jones and Angela to take Rachel to the

22   hospital. (*Id*. at 5122–23; Exhibit 1, at 643, 1304, 1418–19.) Jones told everyone

23   that some kids were playing in the van that afternoon and that they either pushed

24   Rachel or she fell out of the van and hit her head. (Exhibit 1, at 902, 1303–04,

25   1320–21, 1418–19; Exhibit 66, at 5125.) Jones told them *he was asleep when it*

26   *happened*, and some kids came and told him about it. (Exhibit 1, at 1322.) Jones

27   claimed he carried her up "to the fire station to see if her head was okay," but the

28   paramedics told Jones that Rachel did not need to go to the hospital because she

was "fine" and "would be okay." (*Id*. at 902, 1304, 1418–19; Exhibit 66, at 5125.) Terry and Kim, however, repeatedly told Jones to take Rachel to the hospital. (Exhibit 1, at 643.)

After everyone left, Jones got back into his van and left. (*Id*. at 539, 551, 3214–15.) While Jones was gone, Angela repeatedly asked Rachel who had injured her. (*Id*. at 555, 1127, 1139–40, 1160.) Rachel finally admitted that Jones had pushed her out of the van and had hit her with a "metal shoe bar in the head." (*Id*. at 555, 799–803, 1125–27, 1139–40, 1160.) Rachel admitted "a couple of times" that it was Jones who hurt her. (*Id*. at 1226.) Rachel also said Jones hit her with a metal or "black shoe thing." (*Id*. at 587.) Rachel said Jones hit her in the stomach with the metal bar, as well as "across the head with a crowbar." (*Id*. at 1168; Exhibit 66, at 5398, 5401.) Rebecca thought Rachel was referring to the various metal bars Jones kept in his van, underneath the wooden plank. (Exhibit 1, at 1140.) Angela really thought Jones harmed Rachel, and told her they would not see him again if he admitted it. (*Id*. at 1141.)

When Jones arrived back home, Angela took Rachel outside to confront him. (*Id*. at 556, 1125–26, 1141–42, 1224–25.) Jones denied that he hit Rachel, and claimed she "wasn't bleeding at first" when she fell out of the van. (*Id*. at 1128.) Later that night, Jones and Angela again saw the bruising on Rachel's stomach, but decided not to take Rachel to the hospital out of fear that Child Protective Services would remove her from their care. (*Id*. at 557–58, 562, 566.)

Even though Jones and Angela placed Rachel between them in their bed that night to sleep, Jones admitted that Rachel wanted to sleep in her own bed. (Exhibit 66, at 5304.) At some point that night, Rachel attempted to make it back to her own bedroom, collapsed somewhere in the doorway, and ultimately perished from her injuries. (Exhibit 1, at 1230–32.)

The following morning, when they discovered Rachel deceased, Jones drove Angela and Rachel to the hospital. (Exhibit 66, at 5172, 5175, 5406.) While

1  driving, Angela performed CPR on Rachel in the van, while Jones kept saying that
2  she knew CPR, she "could handle it" and "could do it." (*Id*. at 5177.) Angela had
3  previously worked as a nurse's aide. (*Id*. at 5201, 5203.) When they arrived at the
4  hospital, Angela jumped out of the van and ran inside with Rachel; Jones,
5  however, fled. (Exhibit 1, at 418; Exhibit 67, at 5562, 5577.)

6  Jones returned to the trailer park, picked up Joyce Richmond, and drove out
7  to Ronald St. Charles' camp. (Exhibit 1, at 1121, 1306–08, 1522–23.) While
8  driving around with Joyce and Ron, Jones told them the story that the day before,
9  Rachel "had come in and told him, one of the few time he had woke up, Angela
10  had been asleep, and that sh–, the baby, Rachel, had come in and told him that
11  some boys had pushed her out of the van and she had fallen and 'hitten' [*sic*] her
12  head and she was bleeding." (*Id*. at 1522, 1525, 1529.) Jones told them he "had had
13  the paramedics check her out, they had said she was alright[.]" (*Id*. at 1522, 1529.)
14  Ron wondered if Jones had "lost his temper and maybe smacked the child or
15  something," because Barry was "acting awful funny" and kept "beatin' himself up
16  mentally badly." (*Id*. 1523, 1525)

17  Ron told Jones, "[W]ell let's go to the hospital and see how the baby's
18  doing," and Jones replied, "[N]o, I can't go there, I don't want to go anywhere
19  where that baby's been" because it was too much of an "emotional strain." (*Id*. at
20  1523; Exhibit 66, at 5112.) Jones said he did not want to go to the hospital and see
21  "that innocent child layin' there." (Exhibit 1, at 1311.) Jones kept saying, "They're
22  gonna look at that baby and call it abuse," so Ron thought Jones lost his temper
23  and slapped her. (*Id*. at 1525–26; Exhibit 66, at 5112, 5114.) Jones also made it a
24  point to say to Ron: "[W]ell when I was out at your camp yesterday, Rachel was
25  fine, wasn't she." (Exhibit 1, at 1532–33.) Ron thought that Jones had been doing a
26  lot of methamphetamine for 3 or 4 days and had not slept in days. (*Id*. at 1526,
27  1530.)

28  While continuing to drive around, Ron thought Jones' actions were

1  "plastic." (Exhibit 66, at 5114.) When they arrived back at Ron's camp, Jones

2  feigned falling out of the truck, "but at the last min. [*sic*] he put his hands out to

3  kind of break the fall." (*Id*. at 5112.) While lying down in Ron's bus, Jones

4  repeatedly mumbled, "I love you Rachel," and "I'm sorry, Rachel, I'm sorry."

5  (Exhibit 1, at 1572; 1597.) Rosemary St. Charles believed Jones "was faking it,"

6  and wanted them "to believe he was not totally with it." (*Id*. at 1597.)

**II.   JONES' PASSING CHALLENGE TO COUNT IV CONTRADICTS THE RECORD, ARIZONA LAW, AND THE VERY EVIDENCE HE ADMITTED DURING THE EVIDENTIARY HEARING.**

During these proceedings, Jones failed to present *any* evidence that his trial

counsel were ineffective in defending against the charge of child abuse based on

his failure to render aid to Rachel (Count IV), which independently supported his

felony murder conviction (Count V). In his briefing, with little analysis or

explanation, Jones urged this Court to find that Count IV was "intertwined with the

claims that Jones had inflicted the injuries on Rachel on May 1," based on the

State's theory at trial and the prosecutor's closing argument. (Doc. 288, at 71.)

Jones' argument, however, fails in light of the record, Arizona law, and the very

evidence he admitted during these proceedings.

**A.   *The jury instructions and the verdicts.***

During trial, Bruner and Bowman challenged the legality of the child abuse

felony charge in a motion *in limine* (ROA 156), attempted to establish that Jones

did not make medical decisions on behalf of Rachel, and requested dismissal under

Rule 20 of the Arizona Rules of Criminal Procedure after the presentation of the

State's case (Exhibit 42, at 74–75; R.T. 4/13/95, at 3–4, 31–35). There was nothing

more trial counsel could have done to challenge the child abuse count (Count IV),

and Jones has not offered any new evidence or argument now.[13]

---

[13] Jones also challenged the legality of this conviction on direct appeal, but the Arizona Supreme Court affirmed his conviction and sentence on that count, finding

(continued ...)

At Jones' trial, the court instructed the jurors that "the State must prove every part of each charge on the evidence and law applicable to it *uninfluenced by your decision as to the other charges*." (R.T. 4/13/95, at 65–66, emphasis added; ROA 135.) For purposes of Count IV, the trial court instructed the jurors that the crime of child abuse under circumstances likely to cause death or serious physical injury required proof of the following three elements:

1. The defendant acted under circumstances likely to cause death or serious physical injury;
2. The defendant caused physical injury to a child, or, having custody or care of the child, the defendant allowed the health of the child to be endangered; and
3. The defendant acted with one of the following mental states: (A) intentionally or knowingly, (B) recklessly, or (C) with criminal negligence.

(R.T. 4/13/95, at 67–69; ROA 135, at 670.)

The court also instructed the jurors that, if they found that Jones acted recklessly, he would not be guilty of the greater offense. (R.T. 4/13/95, at 68; ROA 135, at 671.) The jurors also had the option of finding that Jones was guilty of child abuse under circumstances *other than* those likely to cause death or serious physical injury. (R.T. 4/13/95, at 69; ROA 135, at 672.) The court noted that the distinction between the two offenses was "the gravity" of the circumstances under which Jones acted: "The greater offense requires proof that the circumstances were such as were likely to produce death or serious physical injury to the child, whereas the lesser offense does not require proof of such circumstances." (R.T. 4/13/95, at 69–70.) The court then defined the applicable mental states for the jury. (*Id*. at 72–73.)

The trial court also instructed the jurors that the child abuse charges (Counts II and IV) could only be considered predicate felonies for felony murder if they

_____

( ... continued)

that he had care and custody of Rachel as a matter of State law. *State v. Jones*, 937 P.2d 310, 314–16 (Ariz. 1997.)

15

were committed intentionally or knowingly and if the circumstances were likely to produce death or serious physical injury; the court included special interrogatories to that effect on the verdict forms. (*Id.* at 148–49; ROA 682, 684.) The court further instructed the jurors that "all 12 jurors must agree on whether the defendant is guilty of any crime with which he is charged." (R.T. 4/13/95, at 144.)

The jurors returned unanimous guilty verdicts on all counts. (ROA 658–59.) With respect to the child abuse count for failure to render aid (Count IV), the jurors answered interrogatories finding the crime was committed under circumstances likely to produce death or serious physical injury and that Jones committed these crimes intentionally and knowingly. (ROA 658–59, 682, 684.) The Arizona Supreme Court affirmed Jones' conviction on this count, finding both that there was sufficient evidence for the jury's verdict and that Count IV was a predicate for felony murder. *State v. Jones*, 937 P.2d 310, 314–16 (Ariz. 1997) (footnote omitted).

Thus, the record proves beyond any doubt that the jury considered: (1) each crime separately; (2) all lesser-included offenses; and (3) all mental states. For the child abuse conviction (Count IV), the jury specifically considered whether Jones acted (a) intentionally or knowingly, (b) recklessly, or (c) with criminal negligence for failing to render aid for Rachel. The jury concluded the evidence proved that Jones was guilty of *that* child abuse count, apart from any other counts or lesser-included offenses, *and* that he acted intentionally or knowingly. The jury *specifically rejected* the notion that he acted recklessly. Jones' speculative argument that the jury might have found him guilty of reckless conduct had it heard the evidence presented in this hearing would contravene this record and Arizona law, which presumes that the jury followed the instructions for each verdict.[14] *State v. Newell*, 132 P.3d 833, 847, ¶ 68 (Ariz. 2006). This Court has no

---

[14] To the extent Jones is arguing that he cannot be guilty of felony child abuse if he

(continued ...)

1    jurisdiction to second-guess those verdicts or Arizona law. *Estelle v. McGuire*, 502

2    U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to

3    reexamine state-court determinations on state-law questions."); *Deck v. Jenkins*,

4    814 F.3d 954, 977 (9th Cir. 2016) (same).

5         Jones' assertion that the prosecutor somehow comingled these crimes during

6    closing argument, and his suggestion that this Court may evade the jury's

7    unanimous guilty verdict of the predicate child abuse felony (Count IV), are also

8    erroneous. The trial court instructed the jury that "[w]hat the lawyers said *is not*

9    *evidence*," but may help to understand the law and the evidence. (*Id.* at 64;

10   emphasis added.) Once again, Arizona law presumes that the jury followed these

11   instructions regarding the lawyers' closing arguments. *Newell*, 132 P.3d at 847,

12   ¶ 68 ("[A]s a part of the standard jury instructions, the superior court instructed the

13   jury that anything said in closing arguments was not evidence. We presume that

14   the jurors followed the court's instructions.") (citing *State v. Ramirez*, 871 P.2d

15   237, 248 (Ariz. 1994)).

16        **B.    *Jones is also not in the same position as Angela Gray*.**

17        Based on his "intertwined" theory, Jones speculates that he would have been

18   in the same legal position as Angela Gray, and likely would have been found guilty

19   of only reckless child abuse on Count IV. (Doc. 288, at 2–3.) First, this Court

20   cannot legally compare Jones's case with Angela Gray's jury. The law is well-

21   settled that juries in similar cases, even juries in the trials of co-defendants, may

22   reach different results. *United States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v.*

_____
( ... continued)

24   did not know how Rachel was injured, or that her injuries were extensive, he is
     again in error. Under Arizona law, a defendant's knowledge of how a child came to

25   be injured is, or the extent of her injuries, are both irrelevant -- guilt is established
     if the defendant intentionally or knowingly failed to obtain medical care for the

26   child when the circumstances likely to result in death or serious physical injury
     existed. *State v. Payne*, 314 P.3d 1239, 1260–61 ¶¶ 68–73 (Ariz. 2013) (holding

27   that the State does *not* need to prove the defendant intend or know that his actions
     occur under circumstances likely to produce death or serious injury, only that there

28   is objective evidence of the existence of such circumstances).

1    *United States*, 284 U.S. 390, 393 (1932); *United State v. Hughes Aircraft Co., Inc.*,

2    20 F.3d 974, 977–78 (9th Cir. 1994); *United States v. Hart*, 963 F.2d 1278, 1281

3    (9th Cir. 1992).

4        Second, Jones and Angela Gray were not similarly situated. Jones attempts

5    to portray himself as a hapless victim of circumstance and police incompetence,

6    when nothing could be further from the truth. Jones' trial counsel successfully

7    moved to preclude an immense amount of highly relevant and inculpatory evidence

8    against their client, proving their understanding of the case and their effectiveness.

9        Unlike Angela Gray, the evidence against Jones regarding the felony child

10   abuse count for failure to render aid to Rachel (Count IV) was overwhelming. The

11   most dispositive fact distinguishing Jones from Angela Gray was the fact that

12   Jones tried to hide Rachel's injuries and falsely claimed that he had taken Rachel

13   to be evaluated by paramedics at the Rural Metro Fire Department next to the

14   trailer park. As recounted above, after Jones and Rachel returned from their trips to

15   Ronald St. Charles' residence and the Choice Market that Sunday afternoon,

16   Rachel was observed to be hurt and very ill. (Exhibit 66, at 5155.) Jones was seen

17   walking around the trailer park looking for her, obviously aware that something

18   was wrong with her. (*Id*.)

19       After neighbors flagged down Jones and Stephanie handed Rachel back to

20   him, Stephanie specifically told Jones to take Rachel to the hospital, alerting him to

21   the fact that Rachel appeared gravely ill.[15] (*Id*. at 5444.) Jones apparently agreed

22   with Stephanie to take Rachel to the fire station next to the trailer park to have her

23   medically evaluated. (*Id*. at 5430.) But that is not what Jones did. Rather, he went

24

25   [15] Jones argues that Rachel would not have willingly gone to him after he

26   committed a brutal rape and assault. First, Rachel was *given* to Jones by Stephanie
     Fleming, so she did not "willingly" go back to him. Second, Jones forgets Rachel's

27   behavior just before she was placed back in his arms: that she was terrified, curled
     up in a ball, and hiding from Jones in a camper shell, severely wounded. Rachel

28   also clung to Stephanie Fleming so tightly she choked her.

1   back to his trailer and put Rachel down for a "nap," hiding her and her injuries

2   away from anyone else. (*Id*. at 5279.)

3       When Angela awoke and asked Jones why he had put Rachel down for a nap

4   so late in the day, an obviously unusual occurrence, Jones lied to her, claiming she

5   had been out playing and having fun and did not want to take a nap, when in reality

6   Rachel was severely injured and very sick. (Exhibit 1, at 601.) Jones invented the

7   story that Rachel fell out of the van earlier, although he did not tell Angela about

8   the bleeding, gaping, inch-long laceration to Rachel's head, which penetrated

9   through all layers of her scalp to her skull. (Exhibit 52.)

10       Still attempting to hide her injuries from others, Jones sent Angela out of the

11   trailer to "check" on Brandi presumably as a ruse to get her out of the trailer so he

12   could deal with Rachel. Jones knew that Brandi was with Joyce Richmond and her

13   family for Joyce's daughter's birthday party that afternoon. (Exhibit 1, at 836,

14   1324, 1351, 1463–64, 1468.) Once Angela was out of the trailer, Jones took Rachel

15   to the Quik-Mart for ice for her bleeding head. (*Id*. at 523; Exhibit 66, at 5292,

16   5310, 5362.) Once at the convenience store, Jones again hid Rachel and her

17   injuries from the Quik-Mart clerk, Sarah Petrilak, placing her outside on the curb

18   to wait while he went inside. (Exhibit 1, at 1877.) Tellingly, Petrilak saw Rachel

19   sitting outside and found Jones' conduct in leaving her outside strange. (*Id*. at

20   1284, 1286.)

21       When Jones and Rachel returned to the trailer park, Jones knew that others

22   would see Rachel's injuries, so he repeated his story about her falling out of his

23   van earlier and repeatedly lied to Angela about what had happened. Jones stuck to

24   his van story, despite the fact that he had previously told the children they could

25   not play in the van, and no one in the trailer park had ever observed any children

26   playing in the van. (Exhibit 1, at 532, 1495–96, Exhibit 66, at 5051, 5107–08,

27   5321; R.T. 3/24/95, at 37.) Even Barry Jones told detectives that the kids had never

28   played in the van before this alleged incident. (Exhibit 66, at 5321.)

1    Jones could not keep his "van" story straight, telling some that he had

2    personally watched Rachel fall out of the van (Exhibit 1, at 531–32; Exhibit 66, at

3    5284, 5361, 5374), while telling others that he had been asleep when it happened

4    and she had come inside to tell him what happened (Exhibit 1, at 1322, 1522, 1525,

5    1529). Jones also told Angela that he had "checked [Rachel] over" and he "didn't

6    notice the laceration on her head," which defied common sense and the medical

7    fact that this significant wound would have bled immediately. (*Compare id.* at

8    531–33 *with* R.T. 11/7/17, at 73–74 (the wound "went through the full thickness"

9    of Rachel's scalp and would have bled when first inflicted); Exhibit 52.)

10    In addition, many people who saw Rachel in her poor condition specifically

11    told Jones to immediately take her to the hospital, which he did not. Jones was

12    repeatedly told to take Rachel to the hospital by Stephanie Fleming, Kim Hillman,

13    and Terry Richmond, but Jones ignored their concerns. Rather, Jones continued to

14    assert that Rachel had been medically evaluated and was fine.

15    If the above facts were not enough, the most important and dispositive fact

16    that separated Jones from Angela is the fact that Jones lied repeatedly to many

17    people, including Angela, about Rachel's injuries and having taken her to the Rural

18    Metro Fire Department. Jones claimed he took Rachel to the fire department next

19    to the trailer park, the paramedics there evaluated her, and they concluded that her

20    injuries were not serious. Thus, Jones *affirmatively dissuaded* many others,

21    including Angela, from seeking medical help for Rachel, with elaborate stories that

22    she had already been evaluated by medical experts and they determined that her

23    injuries were not serious. *Jones*, 937 P.2d at 316 (holding that Jones "continued to

24    assert responsibility over [Rachel] by telling people who were concerned about her

25    condition that he had taken her to the paramedics and they had pronounced her all

26    right").[16]

27    _____

28    [16]   The Arizona Supreme Court's findings in this regard are entitled to a

(continued ...)

1   And finally, Jones fled after dropping Angela and Rachel off at the hospital
2   on Monday morning, even though he had the legal responsibility for her well-
3   being. Afterwards, Jones feared to his friend Ronald St. Charles that the hospital
4   staff would suspect him of "abuse," based upon Rachel's horrific condition and her
5   death.

6   Thus, from the evidence in the record and his own admissions, Jones knew
7   that Rachel was gravely hurt, and the evidence before the jury proved he
8   affirmatively prevented others from getting medical help for her. Even if Jones
9   could legally circumvent: (1) the trial court's instructions to the jury to consider
10  each count separately and not consider the lawyers' arguments as evidence; (2)
11  Arizona law which presumes the jury followed those instructions; (3) Federal law;
12  and (4) the jury's unanimous verdict finding Jones guilty of intentional or knowing
13  child abuse (Count IV), and rejecting recklessness, Jones *still* cannot show that the
14  evidence would have somehow favored a different verdict.

15  **C.**   ***Jones' own experts concluded he fatally neglected Rachel.***

16  As discussed at length in Respondents' Closing Memorandum, Jones' own
17  medical experts in this evidentiary hearing *agreed* that Jones' failure to take
18  Rachel to the hospital either caused, or contributed to, her death. Doctor Ophoven
19  opined, "In the hours before Rachel, Angela and [Jones] went to bed, it would have
20  been evident to *anyone* with Rachel that she was in need of immediate medical
21  attention. *It is my opinion that the decision to withhold medical care is consistent*
22  *with fatal neglect*." (Exhibit 103, at 4266; emphasis added.) Ophoven reiterated her
23  fatal-neglect opinion in her subsequent report and in her testimony before this
24  Court. (Exhibit 106, at 4276; R.T. 11/1/17, at 60.)

25  _____
    ( ... continued)
26  presumption of correctness. 28 U.S.C. § 2254(e)(1). Jones' reimagining of this
    evidence in his proposed findings of fact, and his claim that he was simply "afraid
27  to go to the fire station because the police were there" and "he did not want
    [Angela] to worry" must be rejected as a violation under federal law. (Doc. 288, at
28  11); *Id.*

1  Similarly, Jones' other medical expert, Dr. Mary McKay, opined: "There is
2  no question in my mind that *neglect of the child's medical condition significantly*
3  *contributed to her death*." (Exhibit 113, at 6634-28; emphasis added.) McKay
4  testified that Rachel's duodenal injury, if left untreated, would cause infection,
5  "overwhelming sepsis, and finally death as a result of the sepsis." (R.T. 11/2/17
6  a.m., at 13.)

7  Even if trial counsel failed to reasonably investigate and present evidence
8  regarding the State's investigation, the State's medical evidence, and/or the
9  timeline between Rachel's injury and death, Jones would *still* have been convicted
10 of first-degree murder (Count V), based solely upon his failure to render aid for
11 Rachel (Count IV). Jones' conviction on Count IV did not depend upon the timing
12 of Rachel's injuries, nor did it require proof that Jones inflicted the fatal injury.
13 Jones cannot prove his counsel rendered constitutionally deficient performance or
14 that he suffered *any* prejudice as a matter of law.

15 **II.   JONES' TRIAL COUNSEL ALSO PERFORMED EFFECTIVELY IN MANY OTHER**
16 **RESPECTS.**

17 **1.   *Evidence of Jones' guilt and counsel's successful efforts to preclude evidence.***

18 The police- and witness-interview record admitted at the hearing also
19 illustrated the daunting task Sean Bruner and Leslie Bowman faced, based on the
20 overwhelming record of Jones' guilt. And, in fact, Bruner and Bowman limited the
21 evidence the jurors heard. As discussed above, law enforcement learned quickly
22 that Jones had previously assaulted his own children in a manner similar to the
23 assault the Lopez children observed: by elbowing them in a backwards fashion
24 about the head and body. His abuse became more severe after the loss of his job
25 and his persistent use of drugs, the exact circumstances occurring in the month he
26 lived with Angela and her children. This powerful evidence should have been
27
28

1    admitted at trial under Rule 404(b), of the Arizona Rules of Evidence, to prove

2    *inter alia* Jones' identity based upon a sufficiently distinctive assault.[17] *See*

3    *generally State v. Stuard*, 863 P.2d 881, 889 (Ariz. 1993) (holding that, "[t]he

4    identity exception to Ariz. R. Evid. 404(b) applies if identity is in issue, 'and if the

5    behavior of the accused both on the occasion charged and on some other occasion

6    is sufficiently distinctive, then proof that the accused was involved on the other

7    occasion tends to prove his involvement in the crime charged.'"); *State v. Stein*, 735

8    P.2d 845, 849 (Ariz. App. 1987) (holding that, where defendant argued heroin in

9    home sent to him mistakenly, evidence of other drugs admissible to prove absence

10   of mistake). The State sought *in limine* to admit this evidence at trial (ROA 102),

11   but Bruner and Bowman argued that it showed propensity and therefore should be

12   precluded under Rule 404(b) (ROA 117). The court *agreed* with Bruner and

13   Bowman, and prohibited any evidence regarding Jones' prior assaults of his own

14   children. (ROA 124.)

15        Bruner and Bowman also successfully prevented the State from admitting

16   Rachel's statements to Angela, Rebecca, and Brandi, the night before her death,

17   that Jones injured her with the "metal shoe bar" or the "black shoe thing."[18] (ROA

18   106.) Bruner and Bowman thus successfully prevented the jury from hearing

19   Rachel's direct confession that Jones was the assailant, a stunning defense pre-trial

20   victory. (*Id.*) It is noteworthy that Rachel's statements *did* come into evidence in

21   Angela Gray's criminal trial. (Exhibit 41(a), at 38–39.)

22   

-----------------------------------

23   [17] There were a number of other admissible purposes for the evidence under
     Arizona law. For example, Jones repeatedly lied to law enforcement that he had
24   never hit any of the children (Exhibit 66, at 5298–99, 5337), and his prior acts of
     violence towards his own children would also have been admissible to show his
25   deceit to law enforcement, *particularly* when Jones' current counsel has accused
     law enforcement of such profound ineptitude.
26   [18] Law enforcement obviously focused immediately on Jones because detectives
     knew that Rachel was with Jones all Sunday afternoon before showing up
27   significantly harmed, and they knew that the night before her death, Rachel
     admitted that Jones had inflicted the injuries with a "shoe thing" or a "metal bar."
28   (Exhibit 1, at 1115–16 (Rebecca Lux); 552–56 (Angela Gray).)

1    **2.**    ***Bruner and Bowman's extensive trial preparation.***

2    From the inception of the case until trial, Bruner and Bowman filed

3    numerous substantial motions *in limine*, attacking nearly every legal aspect of the

4    case against Jones and preparing for trial.[19] Despite Jones' current claim, there was

5    no legal basis for Bruner and Bowman to exclude the statements of the Lopez

6    children. At best, the reliability and credibility of the statements by Norma, Laura,

7    and Ray Lopez were questions for the jury. And as discussed previously, Jones'

8    own experts confirm that the Lopez children could have seen Jones and Rachel

9    through the van, and many of their statements were independently corroborated

10   and reliable. (Doc. 289, at 7–70.) Bruner and Bowman also successfully continued

11   Jones' trial for nearly a year so that they could continue to investigate the case and

12   prepare for trial, despite the 1994/1995 Arizona criminal rule of procedure

13   requiring trial to commence within 90 days. (Ariz. R. Crim. P. 8 (1994)) (*See* ROA

14   2; R.T. 4/4/95.)

15   **3.**    ***Bruner and Bowman's billing records.***

16   Jones' argument that Bruner and Bowman did not spend much time on his

17   case in light of their billing records is also incorrect. Bruner failed to bill for all of

---

19   [19] Bruner and Bowman's motions included: **(1)** Change of judge (ROA 2); **(2)**
20   Probable cause for his arrest based upon Sergeant Pesquiera's statements to the
     grand jury (ROA 38, 54); **(3)** Change of venue (ROA 41); **(4)** Validity of the notice
     of death penalty (ROA 43); **(5)** Suppression of evidence based upon law
21   enforcement's search of Petitioner's van (ROA 98); **(6)** Suppression of evidence
     based upon law enforcement's search of Petitioner's trailer (ROA 65); **(7)**
22   Severance for trial (*Bruton* and antagonistic defenses) (ROA 53); **(8)** Preclusion of
     other act/404(b) evidence (ROA 57); **(9)** Legal challenge to the child-abuse charge
23   (Count IV) for Jones' failure to render aid (ROA 63); **(10)** Suppression of Jones'
     statements (Fourth Amendment, *Miranda*, and voluntariness) (ROA 65 and 66);
24   **(11)** Preclusion of a death-qualifying jury (ROA 78); **(12)** Pre-trial determination of
     admission of photographs at trial (ROA 79); **(13)** Permission for attorney-
25   conducted voir dire (ROA 82); **(14)** Production of the pre-trial testimony of police
     officers (ROA 83); **(15)** Suppression of the stop of the van (ROA 84); **(16)**
26   Limitation on Sergeant Pesquiera's testimony (ROA 113); **(17)** Suppression of the
     out-of-court and in-court identification of a material witness (ROA 121); **(18)**
27   Permission to voir dire the court after presiding over co-defendant Angela Gray's
     trial (ROA 122); and **(19)** Production of the trial testimony of Dr. John Howard and
28   Rebecca Lux from Angela Gray's criminal trial (ROA 123).

1  his and Bowman's time. At the evidentiary hearing, Bruner guessed that his billing

2  statements were "over 90 percent accurate," but admitted that he "wasn't the

3  greatest keeper of time" and acknowledged he had discovered that they had not

4  billed for their time drafting the letter to Dr. Keen. (R.T. 10/31/17, at 146–47.)

5      Bruner also failed to bill for a substantial additional amount of work,

6  including the drafting of 51 different documents and motions, court appearances,

7  witness interviews, and record review. When compared with his billing invoices

8  (Exhibit 11), Bruner and Bowman did not bill for drafting: 10 Notices of Hearings

9  (ROA 17, 46, 61, 75, 81, 86, 95, 105, 112, 116), 8 Subpoenas (ROA 48, 69–70, 73,

10  88–89, 92, 96, 103, 119), 4 Motions to Shorten Time (ROA 33, 47, 62, 110), and

11  *19 substantive pre-trial motions* (ROA 13, 20, 26, 27, 35, 36, 41, 45, 63, 65 (x3),

12  74, 78, 79, 82, 106, 109, and 115). Bruner did not bill for 4 court appearances.

13  (ROA 28, 34, 64, 107.) Bruner did not bill for the witness interviews of Norma,

14  Laura, and Ray Lopez, as well as the time spent traveling out to the Lopez home.

15  (Exhibit 1, at 1007–1101; Exhibit 11.) Bruner did not bill for the interviews of

16  Ronald St. Charles and Rosemary St. Charles. (Exhibit 1, at 1521–1602; Exhibit

17  11.) Bruner did not bill for his or Bowman's time spent reviewing the police

18  reports and witness interviews. (*See* R.T. 10/31/17, at 147.) Bruner did not bill for

19  his time consulting with Bowman after she conducted witness interviews or other

20  aspects of the investigation. (*Id*. at 4, 142.) And finally, Bruner admitted at the

21  hearing that he did not bill for their initial consultation with Dr. Keen or the time

22  spent drafting the letter to Dr. Keen. (*Id*. at 146–47.) Thus, Bruner's billing records

23  in this case do not accurately account for a the time counsel spent preparing the

24  case. The actual time spent was far greater.

25  **III.   JONES' CURRENT EXPERTS CORROBORATE THE EVIDENCE OF JONES'**

26       **GUILT.**

27      As previously briefed, Jones' current experts *confirm* the evidence of Jones'

28  guilt. And the evidence refutes Jones' argument that counsel failed to investigate

1  and challenge the crimes. (Doc. 288, at 6.) While Jones asserts that Bruner and

2  Bowman offered no evidence to rebut aspects of the trial, Jones' argument fails to

3  acknowledge the black-letter law that cross-examination *is evidence*, and of the

4  kind long-recognized as effective and even highly-successful trial strategy.

5  *California v. Green*, 399 U.S. 149, 158 (1970) (the Supreme Court has long

6  recognized that cross-examination is the "greatest legal engine ever invented for

7  the discovery of truth.") (quoting 5 J. Wigmore, Evidence § 1367, p. 29 (3d ed.

8  1940)); *Richter*, 562 U.S. at 110–11 ("In many instances cross-examination will be

9  sufficient to expose defects in an expert's presentation. When defense counsel does

10  not have a solid case, the best strategy can be to say that there is too much doubt

11  about the State's theory for a jury to convict.")

12       Jones has also not shown prejudice given that his own experts confirmed the

13  evidence of his guilt. Jones could have easily called numerous witnesses to

14  corroborate or support any of his allegations, but he has not done so. For example,

15  Jones could have called: (1) Angela Gray to testify how she was holding Rachel in

16  the van while driving to the hospital to account for his speculative theory of the

17  dripping bloodstains in the van; (2) Rebecca Lux to testify where she found Rachel

18  in the doorway; or (3) Norma, Ray, and Laura Lopez about where they saw Jones

19  striking Rachel in the yellow van in the Choice Market parking lot. As this Court

20  discovered when questioning Jones' bloodstain interpretation expert, the expert

21  admitted that Rachel's blood in the van could have been projected from her hair as

22  she was struck by Jones or if she were carried. (R.T. 11/3/17, at 26–27.) Thus,

23  Jones' own expert could only speculate about the State's case, and he did not even

24  bother to view and inspect the van for further bloodstains. (*Id*. at 38–39.) The law

25  is clear that a *Strickland* claim cannot succeed based on mere speculation. *Hurles*

26  *v. Ryan*, 752 F.3d 768, 782 (9th Cir. 2014); *Cooks v. Spalding*, 669 F.2d 738, 740

27  (9th Cir. 1981).

28

1    **IV.    TWO TRIPS VERSUS THREE.**

2        Jones continues to argue there was a profound difference between Rebecca's

3    testimony at Angela Gray's trial that she saw Jones take two trips with Rachel

4    versus her testimony at Jones' trial that Rachel took three, and that his counsel was

5    constitutionally ineffective for failing to impeach Rebecca with the prior

6    testimony. (Doc. 288, at 28–29.) Jones' argument, however, is erroneous for many

7    reasons, most importantly because Rebecca testified consistently that she did not

8    notice Rachel injured until *after* Rebecca returned from her friend's house. In

9    addition, Rebecca suggested in her interview with Bowman that Jones and Rachel

10   took three trips. And, as Bowman admitted at the hearing, it would be a reasonable

11   trial strategy for counsel *not* to impeach a child witness on the inconsequential

12   difference between two trips versus three when their own client *admitted* he took

13   three trips with Rachel on Sunday. (R.T. 10/31/17, at 7–8.)

14       In her first interview with police after Rachel's death, Rebecca told

15   detectives that she recalled that Jones took Rachel to the store and to his friend's

16   house. (Exhibit 38, at 1116.) Rebecca told detectives that she saw Rachel before

17   she left for her friend's house, and she appeared okay. (*Id*. at 1112–13.) After she

18   returned from her friend's house, Rebecca noticed that Rachel was hurt because

19   she was lying on the couch and there was blood on the pillow. (*Id*. at 1112.)

20   Rebecca told detectives that Rachel's injuries could have happened earlier that day,

21   when Jones was at his friend's house. (*Id*. at 1121–22.) In her second police

22   interview, Rebecca guessed that Rachel *was probably already hurt* before she left

23   for Susie's, given the short amount of time she was gone. (Exhibit 39,[20] at 1129.)

24   When asked again, Rebecca stated that she did not know whether Rachel was hurt

25   at that point. (*Id*. at 1135–36.)

26   _____

27   [20] Jones has incorrectly labeled this Exhibit, admitted at the hearing, as "R. Lux
     Interview 5-9-94.pdf." The interview was actually conducted on May 2, 1994, the
28   day of Rachel's death, but not *transcribed* until May 9, 1994.

1    During her defense interview with Leslie Bowman, Rebecca again
2 confirmed that Jones took Rachel with him to his friend's house and the store.
3 (Exhibit 1, at 1155–56.) At one point, Rebecca suggested that Jones took *three*
4 trips with Rachel, stating: "[S]he was with Barry when he went to his friends, his
5 brothers,[21] and the store." (*Id.* at 1208.) However, Rebecca made clear that she did
6 not personally see Rachel hurt until after she returned from her friend's house later
7 that evening. (*Id.* at 1206–10.) Then, at Angela Gray's criminal trial, Rebecca
8 testified that she saw Jones take Rachel to his friend's house and the store, and
9 Rachel was with Jones all day. (Exhibit 41(a), at 29–35.) Rebecca testified that she
10 did not see Rachel appear sick or injured in any way until she got back from her
11 friend Susie's house. (*Id.* at 34–35, 69, 71.)

12    At Jones' trial, Rebecca testified that she saw Jones take three trips with
13 Rachel.[22] (Exhibit 42, at 38.) However, Rebecca testified *consistently* with her
14 prior statements that she saw Rachel standing in the living room watching
15 television before she left for her friend's house, and "she looked fine." (*Id.* at
16 40–43.) Rebecca testified that, after she returned from her friend Susie's house,
17 Rachel appeared injured and "really sick" on the couch. (*Id.* at 44–47.)

18    Thus, contrary to Jones' claim, Rebecca testified *consistently* with her pre-
19 trial interview statements to Jones' trial counsel. To the extent Bruner failed to
20 impeach Rebecca with her prior statements that Jones took two trips versus three,
21 the difference is so immaterial it is frivolous. Rebecca testified consistently with all
22 of her prior accounts that she did not observe Rachel to be significantly injured
23 *until* she returned from her friend Susie's house.

24    _____

25 [21] Rebecca's memory appears to be based on the fact that Jones and the children
   were supposed to go to his brother Larry's house for a birthday party for one of
26 Larry and Leanne's children, but they never went. (R.T. 4/11/95, at 122–24.)
   [22] Rebecca's testimony in Jones' trial was consistent with her statements to defense
27 counsel Bowman. Rebecca stated that Jones left to go to the Choice Market, his
   friend's house, and his brother's house. (*Compare* Exhibit 1, at 1208, *with* Exhibit
28 42, at 70–72, 79.)

1      Jones has not suggested any motive or bias on Rebecca's part as a result of

2  testifying about two trips versus three. Rebecca was not an eye-witness to any of

3  the abuse, but only testified, consistently, that she first observed Rachel injured

4  after returning from her friend's house. The import of Jones' claim for

5  impeachment is that Rebecca was lying, but Jones admitted he went on all 3 trips

6  with Rachel before Rebecca first saw Rachel injured. (Exhibit 66, at 5310, 5317,

7  5323, 5329, 5330, 5337, 5362.) Jones' claim for constitutional error, on the basis

8  of counsel's failure to impeach Rebecca with two trips versus three, is frivolous.

9      And Bruner cross-examined Rebecca effectively. Bruner established with

10  Rebecca that Jones had never hit her, and she had never seen Jones hit Jonathan or

11  Rachel.[23] (*Id*. at 65–69.) Bruner established that Rebecca had seen Rachel "at least

12  once" when they came back from the Choice Market, and "she seemed okay," she

13  "didn't act sick or wasn't crying or anything." (*Id*. at 70.) Bruner established with

14  Rebecca that she only saw Jones leave with Rachel to go to the store and one other

15  time before she left for her friend Susie's house. (*Id*. at 70–72.) Bruner established,

16  several times, that Rebecca *only* saw Rachel on the couch, injured and sick, when

17  she returned from her friend Susie's house. (*Id*. at 73, 79–80.)

18      Under *Strickland*, trial counsel's performance must be judged on the facts of

19  the case, viewed from his perspective at the time, and recognizing that "counsel is

20  strongly presumed to have rendered adequate assistance and made all significant

21  decisions in the exercise of reasonable professional judgment." *Strickland*, 466

22

---

23  [23] The trial record shows that, during Bruner's cross-examination, Rebecca had a

24  difficult time testifying. (Exhibit 42, at 62.) When Rebecca testified that she "[s]ometimes" remembered the day of Rachel's death, Bruner responded, "Just going to ask you a few questions, Honey, then you can go." (*Id*.) This testimony

25  and response illustrate the difficulty with examining a child witness, and Bruner was in a far better position to determine how to question Rebecca in front of Jones'

26  jury, instead of Jones' current counsel on a cold record. *See, e.g.*, *United States v. Wadlington*, 233 F.3d 1067, 1077 (8th Cir. 2000) ("When engaging in this analysis,

27  we are mindful that the [trial] court 'is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the

28  cold record.'") (quotations omitted).

1    U.S. at 690. This is not a case where defense counsel completely refused to cross-

2    examine the prosecution's key witness. Here, Jones has not demonstrated that the

3    failure of trial counsel to attempt to impeach Rebecca with a minor, immaterial

4    inconsistency fell outside the wide range of reasonable professional assistance. Nor

5    has petitioner demonstrated that this impeachment would have sufficiently

6    undermined Rebecca's credibility so as to create "a reasonable probability that, but

7    for counsel's unprofessional errors, the result of the proceeding would have been

8    different." *Strickland*, 466 U.S. at 694.

9    **VI.   OTHER SUSPECTS.**

10   Despite having had more than 15 years to re-investigate Jones' case, with a

11   seemingly limitless budget, Jones has produced exactly *no evidence* that someone

12   else raped and beat Rachel to death. His brief is replete with speculation that others

13   harmed Rachel, yet the law is clear that a *Strickland* claim cannot succeed based on

14   mere speculation. *Hurles*, 752 F.3d at 782; *Cooks*, 669 F.2d at 740.

15   Undeterred, Jones accuses several others of potentially being responsible for

16   inflicting the numerous head, internal, and vaginal injuries, suggesting *without any*

17   *proof whatsoever* that they caused Rachel's injuries and law enforcement was

18   deficient in their investigation. Jones has not called any witnesses, such as Angela

19   Gray, Zoleton Inkubritson, Rebecca Lux, Jonathan Lux, or Brandi Jones, to

20   substantiate his claims. Nonetheless, for each of those accused by Jones, the record

21   does not support his baseless allegations.

22   **A.   *Zoleton Inkubritson ("Zolie").***

23   Jones suggests that Angela Gray's ex-boyfriend, Zoleton Inkubritson

24   ("Zolie") could be a suspect based upon his prior history of abuse towards *Angela*.

25   (Doc. 288, at 12, ¶ 43.) However, what Jones conspicuously omitted is the fact that

26   Angela Gray and Rebecca Lux specifically disavowed any violence by Zolie

27   towards the children.

28   Angela told detectives that she and the children lived with Zolie for 2½

1    years and she repeatedly stated that *he never abused any of her children*. (Exhibit

2    1, at 255, 512, 576; Exhibit 66, at 5183, 5205.) Angela claimed that Zolie used to

3    punch and slap her around when he was drunk, but "never the kids." (*Id*. at 576.)

4    Angela stated that Zolie saw the kids a lot, "as if he were [their] father," and that

5    he "raised Rachael [*sic*] pretty much." (*Id*. at 512.) Rebecca also told the trial

6    defense attorneys that Zolie never hit any of the children. (*Id*. at 1180–81.) Angela

7    Gray's sister, Amanda, also told detectives that she never saw any bruising on the

8    children, including when they lived with Zolie. (Exhibit 66, at 4902–04; *see also*

9    Exhibit 1, at 2294.)

10       In April 1994, Angela and the kids moved away from Zolie, into Barry

11   Jones' trailer. (Exhibit 66, at 5165–67.) Shortly thereafter, Zolie stopped by to see

12   Rachel for her birthday. (Exhibit 66, at 5030.) However, when he arrived, Zolie

13   and Jones got into a fight, and Jones took Zolie to the ground. (*Id*.; Exhibit 1, at

14   515, 599, 1413.) Zolie did not come by the trailer park again and was not around

15   when Rachel was severely injured. (*Id*. at 1500.)

16       Thus, law enforcement had no reason to search for Zolie or investigate him

17   for the numerous and brutal injuries to Rachel. Zolie had no history of abuse

18   towards the children, there are no records in these proceedings that Rachel was

19   ever seriously hurt before living with Jones, and Zolie was not present during the

20   time that Jones inflicted the injuries on her. Jones has not called Zolie during these

21   proceedings, or produced any witnesses or testimony which would corroborate his

22   speculation that Zolie injured Rachel. Jones' rank conjecture must be rejected by

23   law. *Hurles*, 752 F.3d at 782.

24       Further, defense investigator George Barnett obtained significant

25   information about Zolie from the trailer park residents immediately after the crimes

26   and Jones' arrest. (Exhibit 1, at 255–56.) Barnett gathered information that Zolie

27   lived in the Desert Vista trailer park several years prior to Rachel's homicide, and

28   he had dated Angela for years. (*Id*. at 256.) Barnett made "[s]everal attempts" to

1   find Zolie, but could not locate him. (*Id.* at 262.) Jones' trial attorneys also

2   understood who Zolie was and what role he played in the lives of Angela Gray and

3   her children, as shown by their questioning in the defense interviews. (*Id.* at

4   1180–81 (Rebecca), 1539 (Ronald St. Charles).)

5       **B.**    ***Angela Gray.***

6       Jones also suggests that Angela may have been the assailant. (Doc. 288, at

7   19.) Again, Jones has presented no witnesses or evidence to support his claim.

8   Jones has not called Angela Gray as a witness, despite having contact with, and

9   access to, her during these proceedings. (*See* Doc. 167, Exhibits 30, 55.) Jones has

10  not called Rebecca or Jonathan Lux to testify about any alleged abuse. Rather, he

11  has simply reimagined the factual record, in violation of federal law. *Hardy*, 849

12  F.3d at 823 (holding that "*Strickland* does not permit the court to reimagine the

13  entire trial"). His allegations against Angela Gray should be rejected.

14      Jones details Rebecca's recounting of abuse that *she* suffered from Angela,

15  but again omits additional facts from the record that conflict with his retelling. For

16  example, Angela Gray admitted to detectives that she had spanked Rachel by

17  giving her "like a swat on the butt," but that she had not spanked Rachel in months

18  before her death. (Exhibit 66, at 5200.) Angela also stated that Rachel had never

19  before had a black eye or bruises on her stomach or back prior to living with Jones.

20  (*Id.*) Angela's aunt, Donna Marini, also told detectives that Angela was "very

21  protective" of Rachel, and loved her the most. (Exhibit 1, 1243, 1246) Rebecca

22  told Bowman in her interview that Angela would "kick" her, but that she only did

23  that to her, and not to the other kids. (Exhibit 1, at 1165–66.) Rebecca specifically

24  told Bowman that Angela did not abuse Rachel like she did with her; she only

25  spanked Rachel. (*Id.* at 1171.)

26      More important, Bruner and Bowman established at trial that Angela was

27  abusive to the children—the exact point argued by Jones' current counsel. At trial,

28  Bruner and Bowman established through Rebecca that Jones never hit her, and that

1    she never saw Jones hit her brother Jonathan or Rachel. (Exhibit 42, at 65–69.)

2    However, Bruner established that *Angela* used to hit Rebecca. (*Id.*) Bruner was

3    precluded by the trial court from further establishing that Angela's abuse to

4    Rebecca stopped when they moved in with Jones. (*Id.* at 66.) Bruner subsequently

5    made an offer of proof, through Rebecca's testimony, that Angela used to spank

6    her hard, but that the abuse stopped after a couple weeks of living with Jones. (*Id.*

7    at 82.) Bruner's offer of proof formed the basis for the challenge to the trial court's

8    exclusion of the evidence on direct appeal. *Jones*, 937 P.2d at 316–17.

9        Thus, for purposes of trial counsel's effectiveness, Bruner and Bowman

10    established *more evidence* against Angela Gray than Jones' current counsel,

11    despite their claims being identical. Jones has presented no evidence during these

12    proceedings, other than rote speculation, that Angela Gray caused the injuries to

13    Rachel. As such, his claim must be rejected. And for her part, Angela Gray was

14    appropriately prosecuted for her failure to seek aid for her gravely hurt child.

15    **C.    *Jonathan Lux.***

16        Other than the highly-questionable, uncorroborated statements from Brandi

17    Jones about Rachel acting scared of Jonathan,[24] there is no evidence in the record

18    that Jonathan Lux sexually abused his own sister, 4-year-old Rachel, while living

19    with Jones. And again, the record provides a different reality. Rebecca, who grew

20    up with Jonathan, told the defense attorneys in her interview that Jonathan never

21    hurt her or Rachel. (Exhibit 1, at 1185.) Rebecca testified similarly in Jones' trial,

22    and that Rachel was never afraid of Jonathan. (Exhibit 42, at 50.) Rebecca also

23    stated that she would never hurt Rachel. (Exhibit 1, at 1186.) Angela Gray also told

24    detectives that Jonathan had never hurt or physically abused Rachel. (*Id.* at

25    _____

26    [24] As previously mentioned, Brandi Jones invented the story of the 2-year-old,
     metal-bar-wielding child assailant to help her father. Brandi subsequently admitted

27    she lied about watching her father take Rachel to the Fire Department. (Exhibit 1,
     at 901–02.) Brandi was therefore willing to say anything to help her father, and

28    these comments are certainly in-line with that behavior.

1   515–16.)

2   Jones argued that a note found in the trailer showed Jonathan was a sexual

3   predator, as evidenced by the letter's vulgarity. (Exhibit 31.) Again, Jones' claim

4   ignores the record in this case. After law enforcement arrested Gray and Jones for

5   Rachel's homicide, Angela Gray's aunt, Donna Marini, took custody of Rebecca

6   and Jonathan (Exhibit 1, at 1253, 1265.) Donna and several family members went

7   to Jones' trailer to get the kids' paperwork and found the note. (*Id*. at 1253.) Donna

8   subsequently gave the note to police. (*Id*.) However, Donna later learned that the

9   letter was actually written by *Brandi* to Jonathan. (*Id*. at 1269–70.) Thus, the

10  record, and the sexually-laden note, do *not* show that Jonathan was a sexual

11  predator, but that Brandi was a troubled child.

12  Jonathan and Rebecca also went to live with Donna Marini after the arrests.

13  (*Id*. at 1265.) Donna reported that Jonathan had no discipline problems whatsoever,

14  and was "twice as easy as Rebecca [was]." (*Id*.) Donna reported that Rebecca just

15  had normal discipline matters, such as failing to do her chores or cleaning up her

16  bedroom. (*Id*.) Donna also stated that Jonathan and Rebecca were very protective

17  of each other. (*Id*.)

18  **D.**     ***Rebecca Lux*.**

19  Jones also suggests that Rebecca could be Rachel's violent assailant, given

20  some statements by Angela. As with his other claims above, none of the statements

21  are corroborated, Jones has not called any witnesses to substantiate any part of his

22  allegations, and he has produced no evidence during these proceedings proving his

23  speculations. Rebecca refuted any claims that she abused Rachel when she testified

24  in Angela Gray's trial. (Exhibit 41(a), at 20.) Jones' speculative claims must be

25  rejected as a matter of law. *Hurles*, 752 F.3d at 782; *Cooks*, 669 F.2d at 740.

26  **VII.   THE LAW ENFORCEMENT INVESTIGATION.**

27  Although Jones has no claim before this Court that law enforcement's

28  investigation was deficient, he has nonetheless directed the Court's attention

towards this irrelevant issue. Law enforcement followed the evidence of guilt for Rachel's injuries, and that road led directly to Jones. As explained above, law enforcement learned very early in their investigation that Jones had previously violently assaulted his own children, Rachel had repeatedly accused Jones of inflicting the significant injuries on her, and he was alone with Rachel the entire day before she was discovered profoundly harmed.

As a final point of clarification, Jones contends that Sergeant Pesquiera testified falsely and concealed evidence from the grand jury, based on her testimony at the hearing and from her pre-hearing deposition. (Doc. 288, at 9, 29.) However, as the transcript from Sgt. Pesquiera's deposition (Exhibit 215) proves, Pesquiera did *not* conceal evidence from the grand jury and Jones has misrepresented her testimony. (Exhibit 215.) Exhibit 215—the selected pages from Pesquiera's deposition—proves that she did not admit in the deposition that she concealed information from the grand jury, but rather she stated she was not asked questions about Rebecca's statement that Rachel appeared well before Rebecca left for her friend's house. (*Id.*) At the deposition, Pesquiera did *not* agree with counsel's accusation that she concealed information from the grand jury. (*Id.*) If there was any doubt, Sergeant Pesquiera confirmed during her testimony that she did not conceal any information from the grand jury. (R.T. 11/7/17, at 36–41.)

## IX.   CONCLUSION.

As demonstrated above, Jones has not shown cause to excuse Claim 1D's procedural default and he is not entitled to habeas relief, because his conviction for child abuse (Count IV), which did not require Jones to have inflicted the fatal injury, independently supports his murder conviction (Count V). Notwithstanding that, Jones is still not entitled to relief because his underlying claim (and associated sub-claims) of ineffective assistance of trial counsel have no merit. As a result, post-conviction counsel was not ineffective for omitting them.

RESPECTFULLY SUBMITTED this 30th day of January, 2018.

Mark Brnovich
Attorney General

[Lacey Stover Gard]
Chief Counsel

s/ Myles A. Braccio
Assistant Attorney General

Attorneys for Respondents

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on January 30, 2018, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

3

4

Cary Sandman
Karen Smith
Assistant Federal Public Defenders
407 W. Congress St., Suite 501
Tucson, AZ 85701–1310

5

6

7

Attorneys for Petitioner

8

9

s/ S. Finch

10

6759593

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28