Jon M. Sands
Federal Public Defender
District of Arizona
Cary Sandman (AZ No. 004779)
Karen S. Smith (AZ No. 033494)
Assistant Federal Public Defenders
407 West Congress, Suite 501
Tucson, Arizona 85701
cary_sandman@fd.org
karen_smith@fd.org
520.879.7622 Telephone
520.622.6844 Facsimile

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barry Lee Jones,<br><br>　　　　　Petitioner,<br><br>　vs.<br><br>Charles L. Ryan, et al.,<br><br>　　　　　Respondents. | No. 01-CV-00592-TMB<br><br>DEATH-PENALTY CASE<br><br>**Petitioner's Response to Respondents'<br>Closing Memorandum** |

Petitioner, Barry Lee Jones, through undersigned counsel, hereby files his response to Respondents' Closing Memorandum.

Respectfully submitted this 30th day of January, 2018.

Jon M. Sands
Federal Public Defender, District of Arizona
Cary Sandman
Karen S. Smith
Assistant Federal Public Defenders

*/s/ Cary Sandman*
Counsel for Petitioner

1

2

# TABLE OF CONTENTS

3

I.    Introduction. ...................................................................................................1

4

II.   Despite Respondents' arguments to the contrary, Jones has demonstrated that

5     trial counsel performed deficiently. ..........................................................1

6           A.    Trial counsel's brief consultation with Dr. Keen did not excuse their
                  duty to thoroughly investigate the timing of Rachel's injuries. .................1

7           B.    Trial counsel's failure to investigate innocent explanations for the
                  bloodstain evidence is not excused by invocation of an alleged
8                 strategy to attack Det. Pesqueira's expert qualifications.............................5

9           C.    Trial counsel failed to present available evidence that the Lopez
10                children's testimony was unreliable and lacking in trustworthiness. ........ 10

11    III.  Jones has demonstrated prejudice from trial counsel's deficient performance
            with respect to all of the counts of which he was convicted. ............................... 14

12          A.    Jones has demonstrated prejudice from trial counsel's failure to adequately
13                investigate the medical, blood, and eyewitness testiomny. .................   14

14          B.    Jones has met the *Strickland* prejudice standard with respect to all
15                counts in the Indictment, including Counts IV and V. ............................. 25

16    IV.   Jones has shown cause and prejudice under *Martinez* to overcome the
            procedural default of his trial IAC claim by demonstrating that PCR
17          counsel's performance was deficient.................................................................... 29

18    V.    Conclusion........................................................................................................ 34

19

20

21

22

23

24

25

26

27

28

i

## I.      Introduction.

"The right to the effective assistance of counsel is [] the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656–57 (1984). By any measure, Jones's trial proceedings lacked this attribute for reasons of ineffective counsel. He has met his burden to show a reasonable probability sufficient to undermine confidence in the outcome of his trial, entitling him to relief under *Strickland*. Nothing Respondents have said or presented alters this compelling conclusion. Accordingly, the writ should be granted.

## II.     Despite Respondents' arguments to the contrary, Jones has demonstrated that trial counsel performed deficiently.

### A.      Trial counsel's brief consultation with Dr. Keen did not excuse their duty to thoroughly investigate the timing of Rachel's injuries.

Jones has demonstrated that he was denied effective assistance of counsel because his attorneys failed to present available scientific evidence showing that Rachel's injuries were not inflicted on May 1, 1994, when Rachel was in Jones's care. The Respondents argue that the failure to present such evidence was not the result of the incompetency by trial counsel, because trial counsel "thoroughly investigated" the timing of Rachel's injuries. (Resp. Br. at 17:4-5.) The crux of their argument is that trial counsel wrote a letter to Dr. Philip Keen posing questions about the timing of Rachel's injuries and therefore, "[t]he only conclusion to be drawn . . . is that Dr. Keen reviewed the autopsy report with [the time of injury] questions in mind, and agreed with the medical conclusions of Dr. Howard." (Resp. Br. at 20:11-13.) The Respondents' factual contentions are unsupported by the evidence and are clearly erroneous. What Respondents characterize as the "only conclusion to be drawn" is in fact the opposite— the only conclusion that *can* be drawn from the evidence concerning Dr. Keen's brief 1994 engagement is that he did *not* agree with Dr. Howard's testimony at Jones's trial concerning the timing of Rachel's injuries.

1

First, the record fails to support an inference that Dr. Keen must have agreed with Dr. Howard. Why? Because the record unequivocally demonstrates that Dr. Keen does *not* agree with Dr. Howard's characterization that Rachel's injuries can be reliably dated to the afternoon of May 1st. Rather, now, after having reviewed the physical evidence in the case, Dr. Keen agrees with Dr. Ophoven and Dr. McKay that the injuries did not occur that afternoon. (Ex. 57 at ¶¶ 7, 10, 11; Hrg. Tr. 10/31/17 at 77:8-19, 86:12-15, 95:2-12.) Dr. Keen has testified that he would have come to the same conclusion in 1994. (Hrg. Tr. 10/31/17 at 96:24-97:17; Ex. 57 at ¶¶ 12, 13d.) It is therefore inconceivable that Dr. Keen advised Jones's trial counsel that he had come to some sort of agreement with Dr. Howard that Rachel's injuries could be reliably dated to the afternoon of May 1st.[1]

Second, the record fails to support any inference that Dr. Keen could have offered trial counsel any conclusions whatsoever with respect to whether Rachel's injuries could be dated to the afternoon of May 1st. This is because Dr. Keen has been steadfast in his insistence that in order to come to any reliable conclusions as to the timing of the injuries, he would have needed to examine the physical evidence at a microscopic level via the tissue slides and autopsy photographs. (Ex. 57 at ¶¶ 9-10; Hrg. Tr. 10/31/17 at 71:4-14, 73:7-24.) Here, the record dispositively shows this examination by Dr. Keen never took place. For one thing, if he had conducted the review, he would have provided the linchpin to the defense; more to the point, the records of the Pima County Medical

---

[1] There is no evidence that trial counsel had any opinions from Dr. Howard concerning the timing of Rachel's injuries to share with Dr. Keen when they consulted with Keen in July-August 1994. Counsel did not have Dr. Howard's opinions on injury timing until his pre-trial interview on November 28, 1994 (Hrg. Tr. 10/30/17 at 78:3-79:10) and later when he testified at the Gray trial. What they learned from the interview and testimony only amplified the urgent need for a defense investigation that was never undertaken and trial counsel was unable to offer a strategic reason for not further pursuing a medical investigation in light of the later discoveries from Dr. Howard. (Hrg. Tr. 10/30/17 at 118:4-16; Hrg. Tr. 10/31/17 at 133:6-14.)

1    Examiner's Office, which trace transmittal of tissue samples and autopsy photographs to

2    third parties, contain no record of the physical evidence being provided to Dr. Keen.

3    (Ex. 59A at 5581-5652.9.) Dr. Keen testified that this same record-keeping methodology

4    was in place at the Office of Maricopa County Medical Examiner. (Hrg. Tr. 10/31/17 at

5    71:22-72:8.) Dr. Keen never examined the physical evidence needed to entertain the

6    crucial timing issues in this case during his brief consultation with Jones's trial lawyers.

7         Respondents point out that attorney Bowman—*as she should have*—wrote Dr.

8    Keen a letter posing questions as to the timing of Rachel's injuries. But just posing a

9    question, albeit a pivotal question that needed to be investigated in this case, is not

10   determinative as to whether trial counsel failed "to make reasonable investigations, or to

11   make . . . reasonable decision[s] that ma[de] particular investigations unnecessary."

12   *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). Respondents settle this

13   *Strickland* inquiry based on an unsustainable argument that counsel *reasonably*

14   terminated their investigation after their brief consult with Dr. Keen during a short

15   phone call on August 18, 1994. (Resp. Br. at 19:24-20:13.) However, the record clearly

16   demonstrates that on August 18, the investigation had not yet begun. As explained

17   above, Dr. Keen had not completed his own examination of the physical evidence and

18   was in no position to inform counsel what he has since explained to this Court: that

19   Rachel's injuries cannot be reliably dated to the afternoon of May 1st, when Rachel was

20   in Jones's care. (Hrg. Tr. 10/31/17 at 111:20-25, 114:20-115:1.)

21        In light of the evidence showing that Dr. Keen never began the necessary

22   investigation into the timing of Rachel's injuries before Jones's trial, Respondents

23   appear to place the blame on Dr. Keen; they proffer self-serving statements from trial

24   counsel, that *if* Dr. Keen had asked to examine physical evidence, they would like to

25   believe they would have made sure it was furnished to him. (Resp. Br. at 28:5-7.)

26   Implicit in this characterization is that the investigation never happened because Dr.

27   Keen never asked to review the physical evidence.  This argument is fallacious.

28        Because it was known to counsel that Dr. Keen's investigation into the timing of

3

Rachel's injuries had not begun, it was counsel's duty to take steps to assure that the expert completed the investigation. As explained in Jones's Proposed Findings of Fact (ECF No. 288 at Findings of Fact 145-152), trial counsel knew the autopsy tissue slides needed to be examined incident to an evaluation of the timing of the injuries. Ms. Bowman testified that she knew, based on her pre-trial interview with Dr. Howard (where he said he relied on microscopic analysis to date the injuries), that their defense expert would need to examine the tissue slides in order to date the injuries. (Hrg. Tr. 10/30/17 at 99:15-100:9.) Despite counsel's knowledge, the record shows counsel did nothing to have the necessary medical investigation completed.  In fact, there is no evidence that counsel had any contact with Dr. Keen or any other potential medical expert after gaining this crucial evidence from Dr. Howard in his November 1994 interview. And to be clear, this is not a case where Jones is urging that his counsel needed to go expert witness shopping; counsel simply needed to have Dr. Keen complete the investigation, but they never took this basic step.

"A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what the expert is doing. . ." *Richey v. Bradshaw,* 498 F.3d 344, 362-63 (6th Cir. 2007). "[T]he mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable." *Id.* at 362. Trial counsel's failure to have Dr. Keen complete an examination of the medical evidence as to the timing of Rachel's injuries was inexcusable and amounted to deficient performance.

The Respondents' entire argument is based on the premise that Dr. Keen had given counsel reason to terminate their investigation into the timing of Rachel's injuries. This premise has been proven to be false. The brief consult with Dr. Keen did not absolve trial counsel of their duty to investigate, nor provide a reasoned basis to terminate an investigation essential to the defense. (*See* ECF No. 288 at Findings of Fact 136-152.) Jones has clearly demonstrated that he was denied effective assistance of

1  counsel when his attorneys failed to present available scientific evidence showing that

2  Rachel's injuries were not inflicted on May 1, 1994, when Rachel was in Jones's care.

3  (ECF No. 288 at Conclusions of Law 1-2.)[2]

> ### B.   Trial counsel's failure to investigate innocent explanations for the bloodstain evidence is not excused by invocation of an alleged strategy to attack Det. Pesqueira's expert qualifications.

6  At Jones's trial, the elements of the prosecution's case worked in harmony. Dr.

7  Howard would testify that Rachel's injuries corresponded with infliction on Sunday

8  afternoon May 1. Becky's story about a third trip gave credence to the idea that Jones

9  had *opportunity* to harm Rachel during the identified medical timeline. The Lopez

10  children's story added to the weight of the evidence pointing to a Sunday afternoon

11  beating. And of course, the bloodstains were interpreted by Det. Pesqueira as consistent

12  with a rape and beating in the van, and in turn the State would argue the Lopez children

13  witnessed the actual beating that resulted in the blood spatter. The prosecutor concisely

14  combined each of these integrated factual components in her closing argument. (Tr.

15  4/13/95 at 95-100.)

16  During Bruner's closing argument, he let go of any pretense of an actual defense,

17  telling the jury that "[m]aybe Barry did take her out and rape and murder her," but the

18  State failed to prove motive for the rape of a four-year-old child *as if a motive for such*

19  *an act was really needed*. (Tr. 4/13/95 at 130:22-24.) After essentially conceding the

20  possibility of guilt, Bruner had virtually nothing to offer the jury to counter the

21  bloodstain evidence or its synchrony with the other elements of the prosecution's

22  evidence. (Tr. 4/13/95 at 109-131.)

23  Although the prosecutor argued extensively that the carpet stain revealed an

24  impression stain left on the surface where Rachel was raped, Mr. Bruner never

---

26  [2] Respondents conclude their discussion of this issue with an argument that if defense

27  counsel had called medical experts to testify that Rachel was not injured on May 1, that would have been "catastrophically prejudicial." (Resp. Br. at 29:23-30:9.) This is a

28  seriously flawed argument which Jones will address at Section III.B below.

mentioned this evidence. (Tr. 4/13/95 at 109-131.) Bruner offered no argument to refute evidence that the bloodstains on the seats of the van were spatter from Jones beating Rachel. (Tr. 4/13/95 at 109-131.) Although the prosecutor connected all the blood spatter to the events allegedly eye-witnessed by the Lopez children (Tr. 4/13/95 at 98-99), once again Bruner offered no counter-argument. (Tr. 4/13/95 at 109-131.) Bruner did argue that the blood on item V8 (a tiny shred of cigarette packaging shown in Ex. 65A at 4863-64) was a drop of blood, not spatter, but there was no evidence before the jury to support his argument. (Tr. 4/13/95 at 113.)

Respondents point out that in his argument to the jury, trial counsel argued that there was no physical evidence, and that this was an effective alternative to presentment of exculpatory forensic evidence. (Resp. Br. at 64:21-27.) But there was physical evidence: blood. And Det. Pesqueira tied each and every stain to a physical beating of Rachel in the van. Arguing there was no physical evidence—when there was physical evidence—is not an example of effective advocacy, nor was it a substitute for presenting alternative innocent interpretations of the blood evidence.

Bruner did remind the jury that Pesqueira had testified she was not an expert in blood spatter, and he muttered a complaint that the State had not called an actual expert, *as if the jury would understand the difference*. (Tr. 4/13/95 at 113:21-114:1.) On the other hand, a jury would expect that if Pesqueira was not sufficiently qualified, the defense counsel would present some contrary evidence or impeachment. But, counsel presented neither. During cross-examination, Bruner failed to ask Pesqueira a single question about her qualifications or her interpretation of the bloodstain evidence. (Tr. 4/12/95 at 79-96.)

There were numerous red flags waving at trial counsel that suggested it was plausible that Rachel was *not* assaulted and raped by Jones on May 1st. Foremost, these leads should have caused counsel to investigate the medical timeline from injuries to death. (ECF No. 288 at Findings of Fact 136-142.) That medical investigation never took place. These same red flags, essentially positing Jones's plausible innocence, would

1    have alerted competent defense counsel that it was reasonably necessary to investigate

2    whether there might be innocent explanations for the bloodstains inside Jones's van and

3    on his clothing. (ECF No. 288 at Findings of Fact 153-154, 157.)

4        Nevertheless, no investigation was ever conducted with respect to whether there

5    might be innocent explanations for the bloodstain evidence. (ECF No. 288 at Finding of

6    Fact 155.) The Respondents argue it was reasonable for trial counsel not to conduct an

7    investigation of this evidence, because trial counsel could reasonably decide to employ a

8    strategy to attack Det. Pesqueira's qualifications. However, Bruner did not make an

9    election between investigating possible innocent explanations for the blood evidence on

10   the one hand, and invoking a simple strategy to attack Det. Pesqueira's qualifications on

11   the other hand. Bruner testified his decision not to investigate was driven by his lack of

12   experience, not strategy. (Hrg. Tr. 10/31/17 at 133:15-134:9.)

13       The Respondents' desperate effort to link the failure to investigate to a trial

14   strategy is nothing more than an effort to "indulge '*post hac* rationalization' for

15   counsel's decisionmaking that contradicts the available evidence of counsel's actions."

16   *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins v. Smith*, 539 U.S. 510,

17   526-27 (2003). A "habeas court's commission is not to invent strategic reasons or accept

18   any strategy counsel could have followed, without regard to what actually happened."

19   *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007); *accord*, *Hernandez v.*

20   *Chappell*, 878 F.3d 843, 851 (9th Cir. 2017). To put a finer point on it, "Counsel cannot

21   justify a failure to investigate simply by invoking strategy." *Weeden v. Johnson*, 854

22   F.3d 1063, 1070 (9th Cir. 2017) "Under *Strickland*, counsel's investigation must

23   determine strategy, not the other way around." *Id.*

24       Not only did counsel not weigh the cost-benefit of investigating innocent

25   explanations for the blood evidence, counsel did *not* investigate Det. Pesqueira's

26   qualifications prior to trial. During the pre-trial interview of Det. Pesqueira, she

27   disclosed that she had training in blood spatter evidence. (Ex. 1 at 1802.) But the subject

28   of her qualifications was not further explored. (Ex. 1 at 1799-1839.) Information bearing

1    on Det. Pesqueira's degree of expertise did not arise until the actual trial when Pesqueira

2    volunteered that she was not an "expert in the field of bloodstain evidence," but that

3    aside, from her training she had learned how to interpret bloodstains within a crime

4    scene. (Tr. 4/12/95 at 63:4-19.) The record shows that evidence bearing on Det.

5    Pesqueira's qualifications came up by happenstance at trial; it was not a subject

6    embraced by counsel as a pre-trial strategy.

7        The question Respondents never pose, but that must be asked when considering

8    the decision not to investigate, is "whether the known evidence would lead a reasonable

9    attorney to investigate further." *Wiggins*, 539 U.S. at 527. Here, the answer is clear: trial

10   counsel had evidence suggesting Rachel had not been assaulted on May 1, they had

11   evidence suggesting that there could be innocent explanations of the blood in the van,

12   and they did not believe it would have been possible for Jones to have assaulted Rachel

13   in the van as reported by the Lopez children given the size and dimensions of the van

14   and the children. (ECF No. 288 at Findings of Fact 153, 154, 157.) A "reasonable

15   attorney [would have] investigate[d] further." *Id.* As explained by standard of care

16   expert Dan Cooper, it was critical to investigate alternatives to the prosecution's theory

17   with respect to the blood evidence. (Hrg. Tr. 11/3/17 p.m. at 26:16-27:6.)

18       Incident to an investigation of the blood evidence and its interpretation, trial

19   counsel acknowledged they would have needed help from an expert. (Hrg. Tr. 10/30/17

20   at 119:1-13.) Rightly so. "It is especially important for counsel to seek the advice of an

21   expert when he has no knowledge or expertise about the field." *Duncan v. Ornoski,* 528

22   F.3d 1222, 1235 (9th Cir. 2008); *see also* 1989 ABA Guideline 11.4.1(7)(A-C) (Defense

23   counsel "should secure the assistance of experts where it is necessary or appropriate for

24   preparation of the defense, for an adequate understanding of the prosecution's case or for

25   rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the

26   sentencing phase of the trial.").

27       Respondents rely heavily on the Supreme Court's decision in *Harrington v.*

28   *Richter*, 562 U.S. 86 (2011), to support an argument that trial counsel needn't have

1    consulted with an expert. However, *Richter* is inapposite. First, the *Richter* holding did

2    not result from a *de novo* review of the federal merits of the *Strickland* claim; instead the

3    review was limited under AEDPA. 562 U.S. at 109. Here, Jones's ineffective assistance

4    claim will be reviewed *de novo. Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014).

5          Second, the blood evidence in *Richter* was not a central issue in the case; indeed

6    it was not deemed an important issue by the prosecution in the lead up to the trial, and

7    there were evident serious risks associated with presenting the defense version of the

8    blood evidence. Moreover, the theoretical defense theory posed by the blood evidence

9    was effectively presented to the jury from a concession obtained from the prosecution's

10   expert during cross-examination. 562 U.S. at 106-108, 112.   None of these

11   considerations apply to Jones's case. In glaring contrast to *Richter*, in Jones's case, the

12   bloodstain evidence was always a vital component of the prosecution's case, there were

13   never any risks associated with presenting defense evidence, and the defense theory was

14   not presented during cross-examination; as explained above, the defense failed to

15   impeach the bloodstain interpretation evidence. On facts such as these, courts have

16   repeatedly held *Richter* inapposite. *See Elmore v. Ozmint*, 661 F.3d 783, 863-64 (4th Cir.

17   2011); *Thomas v. Clements*, 789 F.3d 760, 769-70 (7th Cir. 2015); *Showers v. Beard*,

18   635 F.3d 625, 631 (3d Cir. 2011); *State v. Denz*, 306 P.3d 98, 103-04 (Ariz. Ct. App.

19   2013).

20          Jones's trial counsel could have presented forensic evidence that there were

21   innocent explanations for the blood in the van; the failure to do so resulted from their

22   constitutionally deficient performance.[3]

23

24

25

---

26   [3] The Respondents also present a mythical argument that trial counsel performed

27   competently because expert Stuart James's testimony was not different than the evidence
     presented to Jones's jury. There were obvious and material differences in the evidence,

28   and they are addressed in the discussion of *Strickland* prejudice in Section III.A below.

**C.    Trial counsel failed to present available evidence that the Lopez children's testimony was unreliable and lacking in trustworthiness.**

The discussion here assumes that effective trial counsel could have presented credible defense medical evidence to the jury demonstrating Jones did not rape or assault Rachel on May 1st. The jury would also have learned from effective counsel that there were purely innocent explanations for the blood in Jones's van. Finally, the jury would have understood that Rachel did not appear to have been harmed by Jones during her two trips in the van with him that day before she was observed to be ill, and that the fabled third trip, when the crime was to have occurred, was just that—a fable and a falsehood. The jury would also have learned that there were significant flaws in the police investigation, disturbingly suggesting that the investigation was incomplete and resulted from a rush to judgment by the lead detective. (ECF No. 288 at Findings of Fact 58-67.)

Any juror swayed by the above evidence would be susceptible to entertaining serious doubts as to the testimony of the Lopez children who claimed to see Jones repeatedly striking Rachel in the face and mouth with his fists and his elbow as he drove through the Choice Market parking lot. The blows were described to be real hard. (Ex. 77 at 1064-66; Ex. 79 at 1016-17). Yet, strikingly, six adults who came in contact with Rachel on Sunday evening, *after* she was already ill from her fatal small bowel injury, reported that they did not see a single bruise or injury to Rachel's face. (ECF No. 288 at Findings of Fact 40, 45, 46, 126, 128.) Apparently, this inconsistency between what the children reported and what was observed in reality did not imbue the detectives or defense counsel with curiosity. Subsequently in these proceedings, multiple medical experts agreed that bruising to Rachel's forehead and eye, seen on postmortem photographs, was consistent with a fall into a table at the doorway to Rachel's bedroom, where she was found by her sister on Monday morning May 2nd. (ECF No. 288 at Finding of Fact 185; Hrg. Tr. 11/1/17 at 56:15-57:2; Hrg. Tr. 11/7/17 at 115:4-15; Exs. 50-51.)

1    Jones has claimed that his lawyers performed deficiently when they failed to
2  present any evidence that the children's alleged eyewitness accounts were unreliable and
3  highly improbable. Evidence presented by any one of the three experts (Hannon, Gruen
4  or Esplin) could have accomplished the task. Jones's case would already have been at a
5  tipping point in light of all the other defense evidence that could have been presented.

6    The crux of the Respondents' argument here is that counsel "reasonably
7  determined that the [children's] accounts could not be impeached by their investigator,"
8  so they relied on cross-examination to challenge the evidence. (Resp. Br. at 51:23-26.)
9  This is a highly dubious contention. The record shows that counsel never got around to
10 the task of *thoroughly* investigating their own calculation that the statements were
11 unreliable and highly improbable. Assuming counsel thought the measurements of the
12 van alone were not sufficiently helpful does not mean that a thorough investigation had
13 been conducted in the first instance.

14    Counsel were dilatory. They delayed until just a few days before the trial to have
15 the van measured. Investigator Barnett measured the van on March 31, 1995. (Ex. 17.)
16 Trial counsel did not receive the measurements until April 4 (Ex. 17 at 265), the day
17 before jury selection. (Tr. 4/5/95.) The measurements of the van took no account of
18 Rachel's size or the size of the Lopez children or Jones. (Ex. 17 and Hrg. Tr. 10/30/17 at
19 121:4-12.) However, counsel knew that an attack on the children's statements would
20 need to take account of the size of the Lopez children and Rachel in order to calculate
21 what the Lopez children could actually see. (Hrg. Tr. 10/30/17 at 120:19-122:4.) Despite
22 this, they never acquired the needed information, even though they knew it needed to be
23 done.

24    For example, during her interview with Ray Lopez several months before
25 the trial, Ms. Bowman asked Ray if he knew how tall he was, and when he said
26 no, she said "Okay we'll figure that out later." (Ex. 78 at 1080:17-19.) But it was
27 never figured out later, despite the simplicity of getting an answer to the question
28 of Ray's height.

1    Counsel believed it would not have been possible for the children to witness the
2    events they described. But they never completed the investigation to test the plausibility
3    of that theory. As conceded by Bowman, the Barnett measurements did not express any
4    findings or opinions about whether the children could see Rachel being struck by Jones,
5    nor did they have a witness to analyze all of the necessary data and testify to that critical
6    issue. (Hrg. Tr. 10/30/17 at 121:4-12, 122:5-18.) Since they did not begin this
7    investigation until the eve of trial, the clock ran out before the investigation could be
8    completed.

9    Similarly, trial counsel believed the children's statements had been influenced by
10   their mother and should have been suppressed, but no investigation was conducted nor
11   was expert assistance sought to address this issue, despite the fact that the need for
12   expert assistance to evaluate potential challenges to the reliability of children's
13   statements was well understood in the defense legal community by the time of Jones's
14   trial. (ECF No. 288 at Finding of Fact 158.)

15   The foregoing makes for a quintessential showing of ineffective assistance. A
16   tardy, incomplete investigation that did not result in the discovery of the very evidence
17   that counsel had set out to find does not satisfy *Strickland.* Jones's trial counsel failed
18   "to make reasonable investigations or to make a reasonable decision that makes
19   particular investigations unnecessary." *Wiggins*, 539 U.S. at 521-22 (citing *Strickland*,
20   466 U.S. at 690-91).

21   Respondents argue that Jones's counsel could reasonably decide to challenge the
22   children's statements through cross-examination. This is *post hoc* rationale for counsel's
23   conduct. The actual strategy was to investigate to show the children could not see what
24   they reported. That investigation was not completed. The relevant question is "whether
25   the known evidence would lead a reasonable attorney to investigate further." *Wiggins*,
26   539 U.S. at 527. That question has been answered in the affirmative.

27   Moreover, counsel's failure to complete their investigation led to disastrous
28   results in the courtroom. The Respondents claim that Mr. Bruner effectively "questioned

whether [Ray] could see up into the van from his height." (Resp. Br. at 51:23-24.) But his examination had a decidedly adverse outcome, all due to counsel's failed investigation. Bruner asked Ray how tall he was, to which Ray said that he did not know, and then with that out of the way, Ray said he could see straight into the van window without even having to look up. (Tr. 4/7/95 at 26:25-27:22.)

Further, although the Respondents argue that trial counsel effectively challenged the reliability of the children's statements, the record shows that trial counsel did not impeach the children with their prior inconsistent statements, nor did they alert the jury to the leading and suggestible nature of the pre-trial interview by Detective Clark. (Tr. 4/7/95 at 18-28, 41-46.) Instead the prosecutor used the prior suggestive questioning to manipulate the trial testimony. (ECF No. 288 at Findings of Fact 112-115.)

Finally, during the trial, counsel appeared to have no cognizance of actual measurements they obtained from Barnett. The prosecutor arranged for the Lopez children to demonstrate how Jones was able to strike Rachel by having them sit or stand right next to her. (Tr. 4/7/95 at 11-12, 37-38.) Trial counsel made no objection to this misleading demonstration despite the fact that the seats were 42 inches apart from center to center according to Barnett. (Ex. 17.)

In closing argument, Bruner was unable to frame any argument to challenge the reliability of the children's statements or what they reported seeing. In typical fashion he conceded defeat, stating "I don't know. I suppose if you are going to beat a kid up you might take them in the back of the store. . ." (Tr. 4/13/95 at 120:1-122:3.)

Jones's trial counsel could have presented evidence that would have shown that the Lopez children's statements were untrustworthy and unreliable, and the failure to do so resulted from their constitutionally deficient performance.

**III.    Jones has demonstrated prejudice from trial counsel's deficient performance with respect to all of the counts of which he was convicted.**

    **A.    Jones has demonstrated prejudice from trial counsel's failure to adequately investigate the medical, blood, and eyewitness testimony.**

Jones has shown that his trial counsel, had they not failed to investigate the case, could have offered expert testimony to discredit the eyewitness testimony of the Lopez children, to explain why the blood stain evidence was not inculpatory, and, most importantly, to disprove the key medical evidence establishing the timeline that tied Rachel's injuries to the afternoon of Sunday May 1, when she was in Jones's care.  (ECF No. 288 at Findings of Fact 165-207.)   Respondents incorrectly attempt to assess prejudice with respect to each individual error made by trial counsel. However, the Supreme Court has made clear that a defendant "shows that he was prejudiced by his attorney's ineffectiveness by demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381, (1986) (quoting *Strickland*, 466 U.S. at 694) (emphasis added); *see also id*. ("Where a defendant challenges his conviction, he must show that there exists 'a reasonable probability that, absent the *errors*, the factfinder would have had a reasonable doubt respecting guilt.'") (quoting *Strickland*, 466 U.S. at 695). "And, in determining the existence *vel non* of prejudice, the court 'must consider the totality of the evidence before the judge or jury.'" *Id.* Accordingly, when determining whether Jones has shown prejudice resulting from his trial counsel's deficient performance, it must weigh all of the evidence Jones has presented that could have been presented by trial counsel had they sufficiently investigated against the evidence that was actually presented to Jones's jury.

"[B]ecause the jury was required to reach a unanimous verdict on each count, the outcome could have differed if even 'one juror had struck a different balance.'" *Weeden*, 854 F.3d at 1071 (quoting *Wiggins*, 539 U.S. at 537). The Supreme Court has recognized the heightened probability for a prejudicial outcome, when errors of counsel

14

1    are shown to "have had a pervasive effect on the inferences to be drawn from the

2    evidence, altering the entire evidentiary picture," *Strickland,* 466 U.S. at 695-96, as is

3    clearly the case here.  (*See* ECF No. 288 at Conclusion of Law 6.)

4          Respondents attempt to argue that Jones cannot show prejudice because the

5    expert testimony he now offers does not coalesce around a precise timeline of when

6    Rachel suffered her fatal abdominal injury or vaginal injury. (Resp. Br. at 38-41.) But

7    Respondents miss the point of Jones's argument. To show prejudice, Jones is not

8    required to prove who actually caused Rachel's fatal injuries or when those fatal injuries

9    were inflicted; sadly, due to the insufficient investigation by Jones's trial counsel and

10   law enforcement in the immediate aftermath of Rachel's death, that will likely remain

11   unknown.  The key is that Jones's jury was never presented *any* medical evidence to

12   counter the state's narrative at trial that all of Rachel's injuries were inflicted by Jones

13   on the afternoon of May 1 when she was in his custody. Jones's counsel offered zero

14   evidence from any witness to suggest that this timeline was improbable or that the

15   medical evidence actually suggested that Rachel's injuries were inflicted prior to that

16   Sunday afternoon.  Counsel did not even attempt to impeach Dr. Howard's testimony

17   that all of Rachel's injuries were consistent with infliction on the afternoon of Sunday

18   May 1—despite Dr. Howard's testimony to the contrary at the Gray trial only weeks

19   earlier.  (ECF No. 288 at Findings of Fact 82, 86, 90, 92.)

20         Respondents' attempts to point out inconsistencies in the medical evidence does

21   not defeat Jones's showing of prejudice.  First, *all* of Jones's medical experts agree that

22   Rachel's fatal abdominal injury and her vaginal injury were *not* inflicted on the

23   afternoon of Sunday, May 1. (ECF No. 288 at Findings of Fact 166-182.) Even Dr.

24   Howard admitted on cross-examination at the recent hearing that Rachel's abdominal

25   injury was most consistent with infliction *before* the hours of Sunday afternoon, May 1,

26   and that he did not make this finding clear to Jones's jury.  (ECF No. 288 at Finding of

27   Fact 177.)  If Jones's counsel had presented medical evidence from any of these medical

28   experts—or even just impeached Dr. Howard's testimony with his prior inconsistent

15

1  statements—Jones's jury would have been presented with key evidence that it did not
2  hear during Jones's trial: that Rachel's injuries were not consistent with all having been
3  inflicted on the afternoon of May 1, when she was in Jones's care, as the prosecution
4  alleged.

5       Respondents' attempt to discredit Jones's medical experts with inconsistent
6  hearsay evidence is also unavailing.  (*See, e.g.*, Resp. Br. at 30:26-28 ("Beginning with
7  Dr. Ophoven, her opinion that Rachel's duodenal injury did not occur on the afternoon
8  before her death is not reliable because it is inconsistent with the facts in this case.")) As
9  a preliminary matter, Respondents ignore the basis for Dr. Ophoven's (and for that
10  matter, Dr. Keen's) opinion—the pathology she observed in the physical evidence
11  through reviewing the tissue samples taken from Rachel at autopsy.  Dr. Ophoven's
12  medical opinions are based on the physical evidence and what the cells show.  Her
13  ultimate opinion is that the inflammatory response evident in her microscopic review of
14  Rachel's tissue samples is not consistent with the injuries having been inflicted on the
15  day prior to her death as suggested by the state at Jones's trial. (ECF No. 288 at Findings
16  of Fact 167-169.) Second, Respondents improperly attempt to discredit Dr. Ophoven's
17  statements with evidence that was neither presented at Jones's trial nor used to attempt
18  to impeach Dr. Ophoven at the evidentiary hearing. During the hearing, Dr. Ophoven
19  was asked questions about Becky's statements that Rachel looked fine to her on Sunday
20  and various witnesses' accounts that they saw Rachel on a bike on Sunday. (Hrg. Tr.
21  11/1/17 at 66:12-21, 85:9:11.)  Dr. Ophoven explained that Becky's statement that
22  Rachel seemed "okay" likely was not an accurate diagnosis of Rachel's actual well-
23  being (Hrg. Tr. 11/1/17 at 66:15-67:6) and that, while Rachel may have been sitting or
24  being pushed on a bicycle on Sunday, she would think that a statement that Rachel was
25  "going whoopee up and down the driveway, wildly cycling" was inconsistent with the
26  medical evidence (Hrg. Tr. 11/1/17 at 85:9-20). Witness that saw Rachel on her bike on
27  Sunday did not see her venture far from the trailer, and thus their statements do not
28  undermine Dr. Ophoven's conclusions. (*See, e.g.*, Ex. 16 at 251 (Neighbor Shirley

1   DeVous indicated that Rachel was "playing around in front of Barry's trailer" and "was
2   riding a bicycle in the late afternoon in the dirt driveway adjacent to the trailer and in
3   front of and around the trailer residence occupied by Barry and Angela.") At the hearing,
4   Respondents did not confront Dr. Ophoven with any of the specific witness statements
5   that they cite of pages 31-35 of their brief.  Their attempt to now weigh these hearsay
6   statements, such as observations of Brandie and Becky when they bathed Rachel on
7   Friday evening—which were not admitted at Jones's trial—in the prejudice analysis is
8   improper.  What is more, Angela claimed Rachel bathed with Brandie and Becky, but
9   we don't know that ever happened; Becky and Brandie were never questioned about
10   their observations of Rachel, so we have no idea what they saw, assuming they did bathe
11   with her. Moreover, that Rachel's young siblings or her neighbors did not realize that
12   Rachel was suffering from a serious injury on Saturday or Sunday is not inconsistent
13   with Dr. Ophoven's medical opinion. As both she and Dr. McKay explained, the
14   seriousness of Rachel's injury may not have been apparent until she entered the final
15   stages of peritonitis, sepsis, and shock.  (ECF No. 288 at Findings of Fact 168, 171-172;
16   *see also* Hrg. Tr. 11/1/17 at 15:15-22; Hrg. Tr. 11/2/17 a.m. at 11:12-12:9, 13:22-14:5,
17   17:16-18:5.)  And numerous witnesses' statements that Rachel was not bleeding, and did
18   not appear to have just been severely beaten and raped in the late afternoon of Sunday
19   May 1, when she first began to appear outwardly ill, is *consistent* with Jones's medical
20   experts' testimony that Rachel did not suffer her injuries on that afternoon. (*See, e.g.*,
21   Ex. 72 at 338; Ex. 73 at 691, 696; Ex. 41A at 68-71.) Finally, Respondents completely
22   misrepresent Dr. Ophoven's testimony with respect to the apparent bruising on Rachel's
23   body.  Dr. Ophoven does not have a "mysterious theory" regarding "bruising after
24   death" as alleged by the Respondents.  (Resp. Br. at 37:15-22.)  To the contrary, Dr.
25   Ophoven agreed that many of Rachel's injuries were consistent with traumatic infliction,
26   but that she believed some of the marks apparent on Rachel's body after death were
27   more consistent with the types of discolorations caused by disseminated intravascular
28   coagulation ("DIC").  (ECF No. 288 at Finding of Fact 184.)  Contrary to Respondents'

contentions, Dr. Ophoven's description of DIC is not "contradicted by every other doctor" in this case;[4] Dr. McKay agreed that Rachel may have suffered from DIC during the final stages of her sepsis and shock. (ECF No. 288 at Finding of Fact 184.)  And as explained below in Section II.B, neither Dr. Ophoven's nor Dr. McKay's testimony supports Jones's conviction on Count Four.

Similarly, Respondents' allegations that witnesses saw Rachel with two black eyes on Saturday and that Jones previously caused Rachel's black eyes (Resp. Br at 32:11-13 and n.21) is completely unsupported by the evidence they cite. (*See* Ex. 1 at 1187-88 (Becky told Det. Downing that Rachel got the black eyes after a girl hit her with a rake after Rachel tripped over a dog); Ex. 66 at 5136-37 (Terry Richmond explains that he saw Rachel with a black eye about a week before the Sunday she became very ill and was told that Rachel tripped over a dog); *id.* at 5191-92, 5200 (Angela similarly explained that Rachel got black eyes when a girl hit her with a rake after she tripped over the dog); *id.* at 5189-90 (Rachel explained to Angela that a little girl, not Barry, hit her with the rake, and that Becky would threaten Rachel with getting in trouble with Barry to avoid getting in trouble herself).)[5] Respondents' argument becomes almost absurd when they try to argue that Dr. McKay's opinion that Rachel's

---

[4] Further, Respondents' blanket assertion that, because Dr. Seifert was not called by either side at the recent evidentiary hearing, Jones has "not challenged in any way" his opinions and they are therefore "uncontroverted" (Resp. Br. 22 n.15) is fallacious. (Resp. Br. 22 n. 15.)  Jones has challenged Dr. Seifert's opinions by presenting the contradicting opinions of his own medical experts—Dr. Ophoven, Dr. Keen, and Dr. McKay.  It is also curious that Respondents put so much credit on Dr. Seifert's prior testimony while dismissing Dr. McKay's expert opinions because "her expertise is in emergency medicine, not pathology."  (Resp. Br. at 38:5-6, 39:2-4.)  To the contrary, as evidenced by Respondents' reliance on Dr. Seifert's medical opinions, the expertise of an emergency medical practitioner is relevant and helpful to the analysis of the issues in this case.

[5] Additionally, Respondents' attempt to change the date on which Isobel Tafe said she observed Rachel looking ill in the trailer park does not comport with the record in this case, in which the Sheriff's department repeatedly documented that Tafe said she saw Rachel on Saturday, April 30.  (See Hrg. Tr. 11/6/17 at 47:21-50:7; Ex. 1 at 1852, 1856; Ex. 66 at 4896; Ex. 81.)

abdominal injury was likely not incurred within 48 hours of her death should be discredited because it is inconsistent with those of Dr. Ophoven and Dr. Keen. (Resp. Br. at 38:17-39:1.) To the contrary, this is exactly what Dr. Ophoven and Dr. Keen testified to. (*See, e.g.*, Hrg. Tr. 10/31/17 at 114:20-115:1 (Keen) ("My comfort level [with respect to the timing of the abdominal injury] is . . . two days [prior to death]. I just cannot be persuaded into the less than a day."); Hrg. Tr. 11/1/17 at 29:8-10 (Ophoven)  ("In my opinion, we're talking about the development of peritonitis being at least, at least, 48 hours here for this degree of inflammation and extension.").) While Dr. Keen, like all of the other experts, could not precisely determine the timing of Rachel's abdominal injury, after cross-examination and questioning by the Court, he ultimately concluded that he could not agree with the injury timeline presented at Jones's trial:

> Q: And so you're saying it's more likely it's not less. . .
>
> A: The real crux here is we're talking about an afternoon injury on the day prior to the pronouncement of death.  Is that the injury – is that the time of the trauma that caused the death or is it earlier than that?  And the evidence suggests it's probably earlier than that, it's probably not an afternoon [of May 1] injury.

(Hrg. Tr. 10/31/17 at 111:18-25). Respondents also misrepresent Dr. Keen's expressed agreement with the other pathologists.  While Dr. Keen did testify that his opinion was "in that same ballpark" as Dr. Ophoven's and Dr. Howard's, he continued to say that "we're all saying that we have some injuries here that go back longer than a day to get to this point," and specifically stated that he "do[es]n't disagree with Dr. Howard's statement *in his subsequent declaration*." (Hrg. Tr. 10/31/17 at 107:1-10 (emphasis added).) Moreover, Dr. Keen later clarified that his understanding of Dr. Howard's opinion regarding timing of injury was based on his review of Dr. Howard's 2004 declaration—the only statement of Dr. Howard other than the autopsy report that Dr. Keen reviewed—and not based on the opinion expressed by Dr. Howard in his testimony at Jones's trial.  (Hrg. Tr. 10/31/17 at 113:15-24.)  In the 2004 declaration that Dr. Keen reviewed, Dr. Howard agreed that "the injury to Rachel Gray's abdomen that

1    caused her death could have happened more than 24 hours before her death," and that

2    Rachel had bruising consistent with her abdominal injury being inflicted four to six days

3    prior to death. (Ex. 45 at ¶¶ 3, 11.)

4        Respondents are also incorrect in arguing that Jones has not shown prejudice with

5    respect to his sexual assault conviction from, among other evidence, the new medical

6    evidence surrounding Rachel's vaginal injury. (*See* Resp. Br. at 42-43.) After reviewing

7    slides of anogenital tissue containing special staining,[6] both Dr. Ophoven and Dr. Keen

8    agreed that Rachel's vaginal injury showed evidence of a vaginal injury that was

9    "weeks" old.  (ECF No. 288 at Findings of Fact 178-179.) Moreover, Respondents

10   mischaracterize both Dr. Ophoven's and Dr. Keen's testimony regarding a "newer"

11   vaginal injury.  Both Dr. Keen and Dr. Ophoven specifically disclaimed that there was

12   evidence of a new intentional sexual trauma to Rachel's vaginal area on the day before

13   her death (*see e.g.*, Hrg. Tr. 10/31/17 at 109:15-19; Hrg. Tr. 11/1/17 at 44:11-45:2, 64:4-

14   5), but rather suggested that the evidence of fresher blood in the vaginal area could have

15   resulted from irritation of an older injury, poor hygiene, itching or scratching, or

16   reopening of an older wound during the final stages of shock and death.  (*See* ECF 288

17   at Finding of Fact 180.)

18       Respondents are correct that Jones's medical experts cannot pinpoint with

19   precision when Rachel suffered her fatal abdominal injury—or any of her injuries for

20   that matter.  But, as explained above, is not Jones's burden to prove when exactly

21   Rachel suffered her fatal injury.  Rather, Jones has shown prejudice because he has

22

23   [6] Respondents admit that "Ophoven appears to have based this change [of opinion with
     respect to the timing of the vaginal injury] on her review of additional tissue slides and

24   staining," but strangely suggest that "there is *no* evidence that these slides or stains were
     *not* available to Ophoven before she authored her first report."  (Resp. Br at 43:2-4.)

25   However, Dr. Ophoven has consistently stated that she requested additional, special
     staining of the vaginal tissue before rendering her opinion that the injuries were weeks

26   old.  (Hrg. Tr. 11/1/17 at 39:5-16; Ex. 106 at 4275.)  Respondents did not challenge this

27   representation on cross examination, and there is no evidence that Dr. Ophoven *did* have
     slides with the special stains when she authored her initial report.

28

presented medical evidence that suggests it is more likely than not that Rachel was not injured on Sunday, May 1, as alleged by the state at his trial.  His trial lawyers could have presented similar evidence suggesting that the injuries were inconsistent with infliction on the afternoon of May 1 if they had sufficiently and effectively investigated the case; their failure to do so resulted in Jones's jury hearing only Dr. Howard's testimony that all of Rachel's injuries were consistent with infliction that afternoon. Had Jones's lawyers presented *any* medical evidence that Rachel's injuries likely were incurred before Sunday, May 1st—let alone all that Jones has now offered—there is more than a reasonable probability that the outcome of his trial would have been different.

Respondents similarly fail in attempting to argue that Jones cannot show prejudice from his attorneys' failure to call experts to challenge the blood stain interpretation evidence or the Lopez children's testimony by considering each proffered expert's testimony in isolation.  However, as explained above, this is not the proper inquiry under *Strickland*; rather, the question is whether counsel's deficient performance so affected the proper functioning of the trial that it "cannot be relied on as having produced a just result." 466 U.S. at 686. This is a case where trial counsel's failure to investigate the key medical issue so "altered the evidentiary picture" that the result of Jones's trial cannot be relied upon.  *Hardy v. Chappell*, 849 F.3d. 803, 824 (9th Cir. 2016).

With respect to the bloodstain evidence, Respondents argue that Jones cannot show prejudice because Jones's expert, Stuart James "agreed with many of the findings of Sgt. Pesqueira."  (Resp. Br. at 65:23-26.)  First, the testimony of Jones's blood stain interpretation expert must be considered in the context of the other evidence that Jones's trial counsel could have presented—namely, that the medical evidence suggests that Rachel was not beaten or raped in the van on Sunday May 1.  In this context, James's testimony that there were potentially innocent explanations for all of the blood evidence obtained in the van clearly could have made a difference to the outcome of the trial.

Moreover, Respondents are simply incorrect in their suggestion that Mr. James agrees with Sgt. Pesqueira's interpretation of the evidence.  With respect to Item V6, a carpet stain, Pesqueira testified at Jones's trial that this was "an impression stain or a stain where the blood has actually soaked through and has been in that position for quite a while."  (Tr. 4/12/95 at 72:11-16.)  With respect to Item V7, another carpet stain, Pesqueira testified that this was blood spatter consistent with Rachel being struck or receiving "a blow or blunt force trauma causing the blood to spatter out."  (Tr. 4/12/95 at 73.) The prosecutor later argued in closing that these stains were evidence that Rachel's head had been pushed against the floor of the van while she was being raped, and that Jones then beat her in the van as part of the sexual assault and to stop her crying and whining. (Tr. 4/13/95 at 96:20-97:2, 97:7-98:9.)  James's opinion of the carpet stains (Items V6 and V7 is entirely at odds with this interpretation. James testified that these stains appear to be the result of passive dripping of blood, which indicate only that Rachel was in the van and moving around at some point in time while she was actively bleeding; he disagreed with Pesqueira's opinion that the carpet stains be identified either a saturation stain or spatter. (ECF No. 288 at Finding of Fact 202; Hrg. Tr. 11/3/17 a.m. at 17:20-20:1; *see also* Ex. 121 at 4072.)

With respect to the stains on the passenger seat of the van (Item V12), Pesqueira testified that these were also spatter stains, and opined that "there was static blood already there [on Rachel], and *some type of blunt trauma struck that static blood* causing it to go out." (Tr. 4/12/95 at 73:25-74:15) (emphasis added).  This testimony is completely different from Mr. James's conclusion that the blood stains on the passenger seat are most consistent with a projected or cast-off pattern from Rachel's hair swinging as she was being moved inside the van.  (ECF No. 288 at Finding of Fact 203; Ex. 122 at 6635.) And Pesqueira's testimony that the spatters of blood on Jones's shirt were consistent with his having beat Rachel in the van (*see* Tr. 4/12/95 at 74:24-75:13), is completely at odds with Mr. James's opinion that these stains are insufficient to draw any inferences about a beating and could have resulted from lifting, carrying, or

otherwise attending to Rachel while she was bleeding.  (ECF No. 288 at Finding of Fact 204.)  Had Jones's trial counsel presented an expert to counter the interpretation of Pesqueira that the blood stains were evidence of a rape and beating having occurred in the van on May 1, the prosecutor would not have been able to use the blood evidence to tie together all the circumstantial evidence that Jones caused Rachel's injuries.  (*See, e.g.*, Tr. 4/13/95 at 100:3-101:6.)  Thus, in concert with trial counsel's other errors, Jones has shown prejudice arising from the failure to present testimony from a blood stain pattern expert at his trial.

Finally, Respondents argue that Jones cannot show prejudice related to his trial counsel's failure to properly investigate and challenge the Lopez children's testimony. (Resp. Br. at 54-61.)  Again, Respondents improperly attempt to analyze the potential prejudice from each expert's testimony in a vacuum.  However, as explained above, counsel's errors with respect to their failure to impeach the Lopez children's testimony must be considered *in toto* with their other errors when evaluating whether Jones has demonstrated prejudice. Contrary to Respondents' allegations, Jones's experts—both Mr. Gruen and Dr. Hannon—offered credible expert opinion testimony that the Lopez children could not have seen what they claim to have seen on Sunday, May 1.  (*See* ECF No. 288 at Findings of Fact 193-198.)  Despite Respondents' focus on several "unknown or incorrenctly-determined variables" (Resp. Br. at 54), Mr. Gruen specifically noted that due to the children's stature and their viewing angle relative to the van, the children's exact location relative to the van would not have affected their ability to see inside.  (ECF No. 288 at Finding of Fact 194.)  Respondents also suggest that Mr. Gruen's opinions should be disregarded because of some inconsistencies between his assumptions and some of the statements made by the Lopez twins.  However, as previously noted, the Lopez twins' testimony changed with respect to many of these issues over time.  For example, Ray stated both at trial and in his pre-trial interview that he saw Jones and Rachel through the driver's side window—not the windshield. (Tr. 4/7/95 at 25:4-18; Ex. 78 at 1079:7-22, 1081:16-22.)  Further, Ray told Detective Clark

that he only saw the van for a couple of seconds (Ex. 77 at 1068) and was unable to identify a photo of Jones's van at the trial (Tr. 4/7/95 at 29:15-24.)   Respondents do not directly counter Dr. Hannon's key opinion—that it would have been highly improbable for Jones to be able to drive the van through the parking lot while hitting Rachel in the manner described by the Lopez children.  (ECF No. 288 at Findings of Fact 197-198.) Moreover, the evidence presented by Dr. Hannon was certainly counter to the story presented at trial—including the unrealistic reenactment the prosecutor orchestrated in which she and Ray Lopez sat side-by-side, not several feet apart at Jones and Rachel would have been in his van. Finally, Respondents mischaracterize Dr. Esplin's testimony. Contrary to Respondents' suggestion, Jones is not presenting Dr. Esplin's testimony in an attempt to prove that the Lopez twins did not see Jones and Rachel in the van on May 1 (*see* Resp. Br. at 59), but rather to explain why the Lopez children's testimony was unreliable for a number of reasons.  (ECF No. 288 at Findings of Fact 199-200.)  The evidence offered by Dr. Esplin could have affected the outcome of Mr. Jones's trial in a number of ways: had trial counsel consulted with an expert like Dr. Esplin they could have more successfully impeached the Lopez twins' testimony or even moved to have the testimony excluded altogether as insufficiently reliable; at a minimum, an expert like Dr. Esplin could have explained to Jones's jury why the Lopez children's trial testimony might not be accurate or reliable despite their seeming to be neutral eyewitnesses.  (ECF No. 288 at Finding of Fact 201.)

Respondents' argument that Jones's challenge to the reliability of the Lopez children's testimony would have "opened the door for the most damning rebuttal evidence of all: that Jones had previously hit his own children with his elbow, much as he pummeled Rachel" is misguided. (Resp. Br. at 61:4-8.) First, Respondents misrepresent the statement given by Jones's ex-wife Carol Jones with respect to Jones's alleged acts of violence toward children.  Contrary to Respondents' representations, Carol told police that Jones "wasn't really violent . . . he never beat up on me or nothing like that."  (Ex. 1 at 918.)  Carol admitted that Jones occasionally used a belt to spank

the older kids, but never on their youngest child Andrew, who was only two years old at the time. (Ex. 1 at 918-920.) However, Carol never described Jones "pummeling" the children with his elbows; she stated that Jones would sometimes "elbow 'em" when they were in the way if he was trying to get out the door." (Ex. 1 at 921.) Carol simply does not describe Jones beating her children with his elbow in the manner described by the Lopez kids. Moreover, when evaluating whether counsel's errors prejudiced the outcome of the trial, "*Strickland* does not permit the court to reimagine the entire trial;" instead, the reviewing court "must leave undisturbed the prosecution's case" and cannot "invent arguments the prosecution could have made if it had known its theory of the case would be disproved." *Hardy v. Chappell*, 849 F.3d 803, 823 (9th Cir. 2017).

In this case in which Jones alleges ineffective assistance of counsel, to show prejudice, Jones is required only to show a reasonable probability—that is, even less than a fifty-fifty chance –that at least one juror would have declined to convict Jones of the crimes of which he was convicted if his counsel had adequately investigated and presented evidence to counter the state's medical, physical, and eyewitness testimony. *Hernandez v. Chappell*, 878 F.3d 843, 846 (9th Cir. 2017). Jones has made this showing. (See ECF No. 288 at Conclusions of Law 4-8.)

### B. Jones has met the *Strickland* prejudice standard with respect to all counts in the Indictment, including Counts IV and V.

For the reasons explained above, Jones has shown a reasonable probability that at least one juror would have had a reasonable doubt that he actually assaulted Rachel on Sunday afternoon, May 1, 1994, as alleged by the prosecution. Accordingly, Jones has demonstrated *Strickland* prejudice. (See ECF No. 288 at Conclusions of Law 4-8.) Respondents argue, however, that "Jones failed to present *any* evidence that his trial counsel were ineffective in defending against the charge of child abuse based on failure to render aid (Count IV)," and that Jones therefore cannot show prejudice because the Count Four child abuse conviction is a predicate for Jones's felony murder conviction under Count Five. (Resp. Br. at 9:10-15.) Respondents' argument misses the point. In

order to show deficient performance and prejudice with respect to *all* counts of the indictment, Jones must allege that trial counsel was deficient in their failure to investigate and present evidence that he was not the perpetrator of the physical and sexual assault on Rachel.  For the reasons explained in Section II, above, Jones has done so. Counsel's failure to investigate and present this evidence amounts to deficient performance with respect to Counts Four and Five as well.  Clearly, the issue of whether Jones was the actual inflictor of the injuries upon Rachel is intertwined with whether he was guilty of the Class 2 felony child abuse charge for knowingly or intentionally failing to seek medical treatment for Rachel's injuries and whether Jones is guilty of felony murder.

Respondents acknowledge that the state ultimately charged first-degree murder only under the felony murder theory (Resp. Br. at 10:8-10) and that the court properly instructed the jurors that the child abuse charges could only be considered predicate felonies if they (i) were committed intentionally or knowingly and (ii) if the circumstances were likely to produce death or serious physical injury.  (Resp. Br. at 10: 15-19; Tr. 4/13/95 at 148-49.)  Jones's jury found him guilty of Count Five of the Indictment only after finding, via special interrogatories, with respect to Counts Two and Four *both* that the crimes were committed under circumstances likely to produce death or serious physical injury *and* that Jones committed these crimes with a knowing and intentional mental state. (Verdict 4/14/95, ROA 139.)

Respondents allege that Jones cannot show prejudice with respect to Count IV because he already argued—and lost—in the state courts that he did not have "care or custody" of Rachel on Sunday, May 1. (Resp. Br. at 11-12.)  However, the issue of care or custody is not relevant to Jones's current claims. Jones instead argues that he has shown prejudice with respect to Count Four because the state's theory of culpability for that child abuse count was that, because Jones actually caused the injuries to Rachel, he knew that she had suffered a serious injury, requiring medical treatment, and intentionally withheld treatment to conceal his own actions. (*See*, *e.g.*, Tr. 4/13/95 at

104:21-105:2 ("[O]nly the defendant [Jones] knew how badly she was hurt, only the defendant had the means of taking that baby to the hospital, but for obvious reasons he could not, and so he let her die."))  The state's theory with respect to showing that Jones acted with criminal intent in not taking Rachel to the hospital was totally dependent on the narrative that Jones actually inflicted the injuries on Rachel.

Respondents argue that Jones's own experts, Dr. Ophoven and Dr. McKay, show that he has not demonstrated prejudice with respect to Count Four because they both opined that Rachel's injury was potentially treatable and her life may have been able to be saved if medical treatment had been sought sooner.  (Resp. Br. at 12-13.)  While the language quoted by the Respondents may support a theory of proximate causation between failure to take Rachel to the hospital and her ultimate death, this is not enough to sustain a Class 2 felony child abuse offense, which requires the state to show that the defendant had the requisite criminal *mens rea*—in this case that Jones acted knowingly or intentionally.  "It is not sufficient if Petitioner intentionally undertook the act.  Rather, he must have known or intended that the act would result in the possibility of harm to the child."  *Varela v. Ryan*, No. CV-15-01971-PHX-JJT-JFM, 2016 WL 8252819, at *14 (D. Ariz. Nov. 15, 2016), *report and recommendation adopted*, No. CV-15-01971-PHX-JJT, 2017 WL 568326 (D. Ariz. Feb. 13, 2017) (citing *State v. Fernane*, 185 Ariz. 222, 224, 914 P.2d 1314, 1316 (Ariz. App. 1995), corrected (Nov. 1, 1995) (finding mens rea requirement satisfied where appellant knew that victim would be in danger because she knew that the perpetrator had previously harmed the victim when left alone with him)).  Here, in light of the medical evidence showing that Jones did not perpetrate the injuries to Rachel on the afternoon of May 1, there is no evidence that Jones knew the seriousness of Rachel's injuries and intended to harm her by preventing her from seeking treatment.  At a maximum, the statements made by Dr. Ophoven and Dr. McKay may support a finding of "criminal negligence," the mens rea associated with the lesser-included class 4 child abuse felony, which is *not* a predicate felony for felony murder.  (*See* Resp. Br. at 13, quoting Ex. 103 at 4266 ("It is my opinion that the

decision to withhold medical care is consistent with fatal *neglect*.") (emphasis added) and Ex. 113 at 6634-28 ("[N]*eglect* of the child's medical condition significantly contributed to her death.") (emphasis added).)   Moreover, Dr. Ophoven's and Dr. McKay's testimony that the seriousness of an injury like Rachel's would likely *not* be apparent until the final stages of peritonitis, sepsis, and shock set in, cuts against any finding that Jones acted with any criminal mental state in failing to take Rachel to the hospital.  (*See, e.g.*, Hrg. Tr. 11/1/17 at 15:15-22; Hrg. Tr. 11/2/17 a.m. at 11:12-12:9, 13:22-14:5, 17:16-18:5.)

That Jones has demonstrated prejudice with respect to Counts Four and Five— i.e., a reasonable probability that he would not have been convicted as charged had counsel performed effectively—is further supported by the fact that Angela Gray's jury—who was presented with the prosecution's narrative that Angela's boyfriend, Mr. Jones, was the perpetrator of Rachel's injuries and that Angela purposefully did not take Rachel to the hospital in order to protect herself and Mr. Jones—did *not* convict her of the class 2 felony child abuse count—but rather only of the lesser included class 3 felony, which requires only a reckless mental state—and therefore acquitted her of felony murder.  (ECF No. 288, Supp. Exs. 1 & 2.)  Moreover, Det. Pesqueira admitted during her testimony at the hearing that it was Angela who decided not to take Rachel to the hospital on the evening of May 1st because she was scared that Child Protective Services would assume abuse and take Rachel away from her.  (Hrg. Tr. 11/6/2017 at 106:10-23.)

Jones has shown that had trial counsel performed effectively, they would have created a reasonable doubt that Jones inflicted the injuries on Rachel, and therefore there is more than a reasonable probability that he would not have been convicted of "intentionally or knowingly" putting Rachel in danger by failing to take her to the hospital as charged in Count Four.  Since there is a reasonable probability that at least one juror would not have found that Jones committed the class 2 felony child abuse with a knowing or intentional mental state as charged in Count Four, Jones has therefore also

shown prejudice with respect to Count Five, since the lesser-included child abuse felonies are *not* predicate felonies for first-degree felony murder.

**IV. Jones has shown cause and prejudice under *Martinez* to overcome the procedural default of his trial IAC claim by demonstrating that PCR counsel's performance was deficient.**

As explained in Petitioner's Proposed Findings of Facts (ECF No. 288 at Conclusion of Law 11), the Ninth Circuit has already determined that Jones's claim of ineffective assistance of trial counsel (Claim ID) is a "substantial" claim, thus satisfying the prejudice prong of *Martinez's* cause and prejudice inquiry.  *See Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).  In order to show cause to excuse default under *Martinez*, Jones must show that PCR counsel was ineffective under *Strickland*, which he has done in these proceedings. The Court should reject the Respondents' argument that PCR counsel's performance was constitutionally adequate. Jones has made the convincing showing that his PCR counsel, James Hazel, was presented with compelling grounds to investigate the same claim of ineffective-assistance brought against trial counsel in these proceedings. (ECF No. 288 at Findings of Fact 208-216.) Yet, the record clearly demonstrates that Hazel ignored these investigative leads and conducted no investigation prior to filing the PCR petition, thus defaulting a substantial claim that Jones was denied his Sixth Amendment right to effective assistance of counsel at trial. (ECF No. 288 at Findings of Fact 208-214.)

In this case, the investigation Hazel never pursued would have required expert assistance. As an example, any reasonable lawyer in Hazel's shoes would have recognized the crucial need for assistance from a forensic pathologist and would have sought funding for such assistance. This is particularly so in light of Hazel's own admission that there were questions apparent from the cold record pointing to the inadequacy of trial counsel's investigation of the dominant issue in Jones's case—the medical evidence bearing on the timing of Rachel's injuries. (ECF No. 288 at Findings of Fact 210-211.) During the recent hearing Hazel acknowledged that there was

substantial evidence in the record which would have supported a request for appointment of an expert pathologist in pursuit of an investigation of this critical issue. (Hrg. Tr. 11/3/17 a.m. at 74:12-75:5.). Yet, the record shows that Hazel *never* requested funding for a forensic pathologist. Instead, the legally insufficient funding requests that he did file were limited to a request for a fact investigator and mitigation investigator. (Exs. 130, 132.) Clearly, the PCR court could not divine from Hazel's request for an investigator that he needed assistance from a forensic pathologist.[7] Hazel's failure to properly elicit the assistance of a forensic pathologist to aid in the investigation of Jones's case was objectively unreasonable under *Strickland v. Washington,* 466 U.S. 668, 688 (1984).

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 134 S. Ct. 1081, 1088, (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011)). Jones's case "was such a case" *id.,* where expert assistance was needed, as a starting point, from a forensic pathologist. *See Elmore v. Ozmint*, 661 F.3d 804-820, 859-67 (4th Cir. 2011)[8] (defense counsel ineffective for failing to consult with forensic pathologist and several other experts to aid in the investigation of forensic evidence that was vital to the State's case); *Thomas v. Clements*,789 F.3d 760, 769-70 (7th Cir. 2015) (where medical examiner's opinion as to cause of death was central component of prosecution's case and counsel's cross-examination did not make up for lack of expert

---

[7] Nor did Hazel, ever attempt to communicate with Dr. Keen, despite the fact that (1) the record showed that Keen had been consulted by the trial counsel and (2) the same record showed that Dr. Keen had never addressed the central issue regarding the timing of Rachel's injuries.

[8] In *Elmore,* state PCR counsel presented five expert witnesses, among them, a forensic examiner, a medical examiner, a serology bloodstain expert, and a fingerprint expert. *Id.* at 804-820. Noting that that *Elmore's* trial lawyers "had conducted no independent analysis of the State's forensic evidence," *id.* at 854, the court found trial counsel had disregarded their professional obligation to investigate critical prosecution evidence. *Id.* at 861-62.

1   testimony, defense counsel were ineffective for failing consult with forensic

2   pathologist); *Showers v. Beard*, 635 F.3d 625, 631 (3d Cir. 2011) (defense counsel

3   ineffective for failing to consult with forensic pathologist when medical evidence was

4   essential to the determination of the pivotal issue concerning whether death was suicide

5   or murder); *Rivas v. Fischer*, 780 F.3d 529, 547, 549-50 (2d Cir. 2015) (where core of

6   prosecution's case   was that Rivas killed victim during narrow timeframe, and case

7   turned on rebutting prosecution's theory as to time of death, trial counsel was ineffective

8   for failing to consult with forensic pathologist and investigate medical examiner's

9   opinion regarding time of death); *State v. Denz*, 306 P.3d 98, 103-04 (Ariz. Ct. App.

10  2013) (counsel ineffective for failing to consult with forensic pathologist, given that

11  "state's medical evidence was the cornerstone of its case.").

12       The Respondent's answer to this state of affairs is to argue that Hazel believed

13  that any funding motion would have been denied "regardless [of] how he wrote the

14  motion or what authority he cited." (Resp. Br. at 8:10-12.) The Court should reject this

15  reasoning as specious.[9] A lawyer who just throws his hands up and gives up has by

16  definition not fulfilled the *Strickland* duty to investigate, "or to make a reasonable

17  decision that ma[de] [a] particular investigation[] unnecessary." 466 U.S. at 690-91. At a

18  minimum, Hazel's duty to investigate included the duty to formulate a proper expert

19  funding request in accordance with A.R.S. § 13-4013(B) as he had been ordered to do in

20  the order of appointment issued by the Arizona Supreme Court. (Ex.126.) In fact, Hazel

21  agreed he had this duty: he testified that no matter what he may have assumed about the

22  negative prospects of his funding motions, that he still had a duty to comply with the

23  indigent funding statute. (Hrg. Tr. 11/3/17 a.m. at 74:5-11.)

24  _____

[9] Hazel had no justification for making any assumptions that a properly formulated
25  funding request would be denied. There is no evidence that Hazel had any prior capital
    PCR experience (Ex. 124 at 6217) and he had never handled a case in Pima County.
26  (Hrg. Tr. 11/3/17 at 70:7-9.) What is more, Hazel testified that he was granted indigent
    defense funding in other cases outside Maricopa County, thus rendering his assessment
27  of funding prospects in Pima County wholly conjectural. (Hrg. Tr. 11/3/17 a.m. at 58:7-
28  10.)

1    As explained by Jones's standard of care expert Dan Cooper, under prevailing
2    professional norms, requests for funding must be supported by an extensive fact-based
3    record showing of reasonable necessity, as required by the governing statute. (Hrg. Tr.
4    11/3/17 p.m. at 21:18-23:18.) Hazel ignored this duty in toto.[10] His performance was
5    manifestly unreasonable. Adopting a defeatist attitude, abandoning any semblance of
6    client advocacy and then blatantly ignoring the statutory legal requirements incident to
7    obtaining indigent funding for an expert constitutes deficient performance under
8    *Strickland*. *Hinton v. Alabama*, 134 S. Ct. at 1088-89; *Apelt v. Ryan*, 878 F.3d 800, 831
9    (9th Cir. 2017) ("The trial court's reluctance [to provide indigent defense funding] does
10   not excuse [counsel's] failure to make the supplemental showing [in support of funding]
11   requested by the trial court. . . .").

12   Respondents also argue that Jones's claim alleging deficient performance by PCR
13   counsel should be rejected because the Court would need to "speculate" whether a
14   proper funding request seeking expert assistance would have been granted. This is not
15   correct. The record shows that properly formulated funding requests were routinely
16   granted in Pima County Superior Courts when Jones's PCR proceeding was pending.
17   (Hrg. Tr. 11/3/17 p.m. at 23:19-25:3.) There is no basis to conclude that a properly
18   formulated funding request would have been arbitrarily denied by the state courts.

19   Competent PCR counsel would have obtained funding for a forensic pathologist
20   and would have discovered what Jones's federal habeas counsel have learned, that
21   Rachel's injuries could not be reliably dated to May 1st. This in turn would have
22   strongly suggested to competent PCR counsel that Rachel was not beaten in the van that
23   day and that there must be innocent explanations for the bloodstains found in the van
24   and on Jones's clothing. With the evidence that Rachel's injuries were not inflicted in
25   May 1, competent counsel "would have become skeptical . . . [they] would

---

26

27   [10] During the state PCR legal proceedings in the Arizona Supreme Court, the State
28   argued Hazel's funding requests were facially inadequate under A.R.S. § 13-4013(B).
     (State's Response to Petition for Review at 5-8, 5/15/01, Dkt. 4.)

1   unquestionably gone further to build a . . . case, [and [f]urther effort would presumably

2   have unearthed much of the material [Jones's habeas] counsel found." *Rompilla v.*

3   *Beard*, 545 U.S. 374, 390-91 (2005); *Couch v. Booker*, 632 F.3d 241, 247-48 (6th Cir.

4   2011) (entertaining presumption that evidence which *should* have been discovered by

5   constitutionally deficient trial counsel, would have led a reasonable attorney to

6   investigate further and to the discovery of additional evidence).

7       Demonstrably, a reasonable PCR attorney learning that Rachel's injuries did not

8   take place on May 1st would have investigated the implications of the bloodstain

9   evidence and would have enlisted expert assistance as part and parcel of a reasonable

10  investigation. The Respondents argue that no expert evaluation was needed to explore

11  possible innocent explanations for the blood evidence because trial counsel had

12  "highlighted alternative innocent explanations for the jury." (Resp. Br. at 8:25-9:2.)

13  This cannot be so. As explained in Section I.B above, trial counsel's investigation and

14  resulting performance with respect to the blood evidence was constitutionally deficient.

15      Hazel testified that if he had investigated and uncovered evidence that Rachel's

16  injuries did not occur on May 1st, and if he had investigated and discovered that the

17  bloodstain evidence had innocent explanations, he would have investigated possible

18  challenges to the Lopez children's eyewitness testimony. (ECF No. 288 at Finding of

19  Fact 214.) This is no doubt an honest appraisal of what any reasonable PCR counsel

20  would have done. *Wiggins*, 539 U.S. at 527 (with respect to an attorney's decision not to

21  investigate, the Court "must consider ... whether the known evidence would lead a

22  reasonable attorney to investigate further"); *Rompilla*, 545 U.S. at 390-91; *Couch,* 632

23  F.3d at 247-48. As the record shows, such an investigation would have demonstrated

24  that the children's reports were implausible based on the physical evidence and their

25  statements were untrustworthy and unreliable.

26      Accordingly, Respondents' arguments notwithstanding, Jones has established

27  PCR counsel Hazel's performance was deficient under *Strickland.* Jones has also

28  demonstrated the requisite prejudice to the PCR proceedings. (ECF No. 288 at

Conclusion of Law 11.)

**V.      Conclusion.**

Jones requests that the Court find that he has overcome procedural default of Claim 1D and grant relief on the merits, vacating his convictions and granting the writ of habeas corpus.

Respectfully submitted this 30th day of January, 2018.

Jon M. Sands
Federal Public Defender
District of Arizona
Cary Sandman
Karen S. Smith
Assistant Federal Public Defenders

*/s/ Cary Sandman*
Counsel for Petitioner

**Certificate of Service**

I hereby certify that on January 30, 2018, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrant(s):

Myles Braccio
John Todd
Lacey Stover Gard
J.D. Nielsen
Jeffrey Sparks
Assistant Attorneys General
Attorney General's Office

By: /s/ *Tamelyn McNeill*
Tamelyn McNeill
Legal Assistant
Capital Habeas Unit