1              IN THE UNITED STATES DISTRICT COURT                    14:01:20

2                   FOR THE DISTRICT OF ARIZONA

3    Barry Lee Jones,              )  4:01-cv-00592-TMB
                                   )
4              Petitioner,         )
                                   )
5    vs.                           )
                                   )  Tucson, Arizona
6    Charles L. Ryan, et al.,      )  March 2, 2018
                                   )  2:01 p.m.
7              Respondents.        )
     _____)

8

9

10      BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE

11

12                      Transcript of Proceedings
                             Oral Argument

13

14

15

16

17   Proceedings reported and transcript prepared by:

18        A. Tracy Jamieson, RDR, CRR
          Federal Official Court Reporter
19        Evo A. DeConcini U.S. Courthouse
          405 West Congress, Suite 1500
20        Tucson, Arizona 85701
          (520)205-4266
21

22

23

     Proceedings reported by steno machine shorthand;
24   transcript prepared using court reporting software.

25

```
 1                        APPEARANCES

 2   For the Petitioner:

 3       U. S. Federal Public Defender
         Cary Sandman, AFPD
 4       407 West Congress Street, Suite 501
         Tucson, AZ 85701
 5       (520) 879-7540

 6       U. S. Federal Public Defender
         Karen S. Smith, AFPD
 7       850 West Adams Street, Suite 201
         Phoenix, AZ  85007
 8       (602) 382-2706

 9

10   For the Respondents:

11       Arizona Office of the Attorney General
         Myles Braccio, AAG
12       1275 West Washington Street
         Phoenix, AZ 85007
13       (602) 542-4686

14       Arizona Office of the Attorney General
         Lacey Gard, AAG
15       400 West Congress Street, Suite S315
         Tucson, AZ  85701
16       (520) 628-6520

17
     Also Present:
18           Jim D. Nielsen, AZAG
             Jennifer Schneider, Paralegal with FPD
19           Daniel Vidal, Paralegal with AZAG

20

21

22

23

24

25
```

1                    INDEX OF COURT PROCEEDINGS

2
                                                          PAGE
3
      Argument by Petitioner - Mr. Sandman.....................   6
4
       Argument by Respondents - Mr. Braccio....................  26
5
       Rebuttal Argument by Petitioner - Mr. Sandman............  62
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                    UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S

 2               (On the record at 2:01 p.m.)

 3          THE COURT:  Good afternoon.                    14:01:21

 4          MR. BRACCIO:  Good afternoon, Your Honor.      14:01:24

 5          THE COURT:  So I take it you got the questions.  And   14:01:28

 6     so this is my proposal as to how we proceed.  I've got my timer   14:01:33

 7     set on 45 minutes for each of you.  My thought is petitioners   14:01:42

 8     will go first.  You can reserve some time for rebuttal if you   14:01:47

 9     want.  Do you want to manage your own clock or would you like   14:01:52

10     me to give you a warning when you reach a particular point?   14:01:55

11          MR. SANDMAN:  Your Honor, maybe around 30 minutes.  I   14:01:59

12     do want to reserve some time.  So if I start to go over --   14:02:04

13          THE COURT:  So you want to use 30 minutes.  You want a   14:02:07

14     warning at the 15-minute mark, is that what you're saying?   14:02:10

15          MR. SANDMAN:  No.  I'm sorry, Judge.  At the 30-minute   14:02:11

16     mark, I would like a warning if I am still --           14:02:15

17          THE COURT:  I think we've said the same thing in   14:02:15

18     different ways.                                       14:02:17

19          So when you have used 30 minutes, you would like me to   14:02:18

20     warn you that you've used 30 minutes.                 14:02:22

21          MR. SANDMAN:  Yes, sir.                          14:02:24

22          THE COURT:  Okay.  Now we're on the same page.   14:02:25

23       Then we'll hear from respondents.  You'll have your 45   14:02:27

24     minutes.                                              14:02:30

25       And then we'll go back to you for whatever rebuttal you   14:02:30
```

1    have.                                                              14:02:35

2        I do want to -- because I just provided those questions to   14:02:36

3    you and did not put them on the record, I am going to just read   14:02:39

4    the questions now so that they're questions that are on the      14:02:45

5    record.                                                          14:02:50

6        So I have, first, two questions for both parties.            14:02:51

7        One:  Does the trial record that the prosecutor argued to    14:02:55

8    the jury that even if they didn't find Jones guilty on counts    14:02:59

9    other than count four that the jury could nonetheless find       14:03:04

10   Jones guilty on count four, and, if so, on the basis of what     14:03:09

11   evidence?                                                        14:03:14

12       Question two:  Explain or further elaborate on how law       14:03:14

13   enforcement's investigation is relevant or irrelevant to the     14:03:19

14   ineffective assistance of counsel claim.                         14:03:23

15       And then three questions each for each side.                 14:03:25

16       First, for petitioners:                                      14:03:28

17       One, assuming Jones wasn't involved in causing any of        14:03:30

18   Rachel's injuries, and assuming others put him on notice that    14:03:34

19   she was ill on May 1, why wasn't he on notice that she needed    14:03:37

20   to go to the hospital?                                           14:03:43

21       Two:  Given that Jones does not dispute that he saw the      14:03:44

22   Lopez twins at the Choice Market on May 1 -- and I may need      14:03:49

23   some clarification on that issue -- why wasn't defense           14:03:55

24   counsel's investigation into the Lopez' twins testimony          14:04:01

25   minimally competent?                                             14:04:05

1      And three:  Can you please respond to respondent's argument    14:04:06

2    that the Court should presume the trial counsel did not follow    14:04:10

3    up with Dr. Keen after August 4, 1994, for strategic reasons?    14:04:14

4      And then for respondents, three questions:    14:04:20

5      One:  How do we know, given Arizona's non-unanimous jury    14:04:22

6    law, that any trial juror convicted Jones of felony murder    14:04:27

7    based on count four as the predicate?    14:04:32

8      Two:  Does count four satisfy the Enmund --   I think it    14:04:38

9    was misspelled on the sheet that I handed you.  It's    14:04:44

10   e-n-d (phonetic).   -- Tison standard?    14:04:47

11     And finally, three:  Why was it not deficient performance    14:04:51

12   of Jones' post-conviction counsel to request funding for an    14:04:58

13   investigator under the wrong rule and without supporting that    14:05:04

14   request?    14:05:08

15     So, those are the questions for counsel, and I am ready    14:05:09

16   when you are.    14:05:16

17        MR. SANDMAN:  Your Honor, I think what I'd like to do    14:05:39

18   is try to address your questions first.  And I may have some    14:05:41

19   things to interject while answering those questions, but I    14:05:46

20   think I'd like to work my way through those.    14:05:50

21        THE COURT:  Sure.    14:05:52

22        MR. SANDMAN:  Starting with question one, the answer    14:05:53

23   is no to question one.    14:05:55

24     In other words, the prosecutor never argued to the jury    14:05:58

25   that if they didn't find Jones guilty on the counts other than    14:06:02

1    count four that the jury could nonetheless find him guilty on        14:06:06

2    count four.                                                          14:06:10

3         The argument to the jury was that Mr. Jones had failed to       14:06:10

4    provide medical care or take Rachel to the hospital to conceal       14:06:19

5    his own wrongdoing as the rapist and person who assaulted            14:06:22

6    Rachel.  So the argument was Mr. Jones is the perpetrator, he        14:06:28

7    wanted to conceal his wrongdoing, and therefore withheld care.       14:06:35

8    So that was the argument.  There wasn't any kind of                  14:06:41

9    alternative.                                                         14:06:44

10        Number two, explain or further elaborate on how law             14:06:45

11   enforcement investigation is relevant or irrelevant.                 14:06:51

12        You know --                                                     14:06:55

13        THE COURT:  That's a pretty big question.                       14:06:56

14        MR. SANDMAN:  It is.  So let me just digress for a               14:06:59

15   moment to talk about the overall ability to impeach the state's      14:07:02

16   case, including the law enforcement investigation.                   14:07:07

17        But let's start with Dr. Howard, who testified at               14:07:10

18   Mr. Jones' jury trial.  He testified that all of the injuries        14:07:18

19   took place or gave -- basically provided testimony so the jury       14:07:22

20   would conclude that all the injuries took place on the day           14:07:27

21   prior.                                                               14:07:32

22        Dr. Howard had testified at the Gray trial just only a          14:07:34

23   couple weeks earlier, and he testified there in response to a        14:07:37

24   question:  How long would the scalp injury have been painful to      14:07:42

25   Rachel?  He said several days.                                       14:07:47

1      So we know in front of the Gray jury he is indicating that      14:07:49

2   that wound to the scalp had been there for several days before     14:07:55

3   her death.  Because obviously if it's painful, for several days    14:07:59

4   it exists.                                                         14:08:02

5          THE COURT:  Couldn't he have been talking, speaking        14:08:03

6   hypothetically, that type of wound could be painful for several    14:08:06

7   days?                                                              14:08:08

8          MR. SANDMAN:  He wasn't asked a hypothetical question.     14:08:10

9   It was Rachel's -- this wound to this child.  We pin cite that     14:08:12

10  in our brief.                                                      14:08:17

11         He was also asked on cross-examination at the Gray         14:08:18

12  trial questions about the timing of the small bowel injury, and    14:08:22

13  he said that the injury was most consistent with infliction 24     14:08:25

14  hours prior to death.  Which, of course, is prior to the Sunday    14:08:29

15  afternoon when Mr. Jones had sole care of her.                     14:08:35

16         He then was asked the same question by the prosecutor      14:08:38

17  at the Jones trial in front of that jury, and the question         14:08:42

18  was -- and this was at Page -- it's Exhibit 47 at Page 148:        14:08:48

19  What is the most consistent with when this blow to the small       14:09:00

20  bowel would have occurred to Rachel?                               14:09:05

21         There is only one truthful answer to that, given what      14:09:07

22  he's testified to two weeks earlier:  It was most consistent       14:09:10

23  with 24 hours.  But he doesn't say that, and he ends up            14:09:13

24  testifying that the injuries were consistent with the afternoon    14:09:17

25  prior, when the child was with Mr. Jones.                          14:09:20

1          And the same thing with the vaginal injury, you can          14:09:24

2   work through things.                                                14:09:28

3          So there's that impeachment of the state's case.            14:09:28

4          Now, they have a star witness at the trial, Becky, who      14:09:33

5   is Rachel's sister, who testifies that Mr. Jones went off on        14:09:39

6   three trips with Mr. Jones on Sunday afternoon and that she was     14:09:46

7   fine after the first two trips.  But then Becky says:  I didn't     14:09:52

8   see her after the third trip.  So that was the vehicle, that       14:09:55

9   third trip was the vehicle for when this assault occurs.            14:09:59

10         Once again -- and by the way, you know, Mr. Bruner,         14:10:06

11  the trial lawyer, had all the impeachment available to impeach     14:10:11

12  Dr. Howard with his changes in testimony.  He also had in his      14:10:15

13  file Becky's prior statements, including her sworn testimony at     14:10:20

14  her mother's trial, the Gray trial, two weeks earlier, where       14:10:23

15  she said:  On each and every occasion my sister went off with      14:10:27

16  Mr. Jones twice, she came back fine both times.                    14:10:30

17         Now, we all know she wasn't fine because she had a          14:10:35

18  small bowel injury that no one knew about, and she was dying,      14:10:39

19  would die from that in a number of hours.  But the point is, is    14:10:42

20  that there isn't any opportunity for this crime to have            14:10:44

21  occurred if she is impeached with those prior statements.          14:10:47

22         Then we get to Detective Pesquiera and the law              14:10:54

23  enforcement.  And we know, number one, when she testifies in       14:10:59

24  front of the grand jury, she is asked, you know, questions         14:11:02

25  about when Mr. Jones would have had the opportunity to do this,    14:11:06

 1   and she is asked how did Rachel look after the second trip in          14:11:11

 2   the van with Mr. Jones on that Sunday.  And she had Rachel --           14:11:14

 3   excuse me -- Becky's interviews.  In fact, she was using the           14:11:22

 4   interview to Detective Downing, that Becky gave to Detective           14:11:26

 5   Downing, to guide her grand jury testimony.  And rather than           14:11:30

 6   telling the grand jury the truth about what Becky saw                  14:11:33

 7   concerning Rachel after the second trip, which is Rachel was           14:11:39

 8   absolutely fine, she said, untruthfully:  Oh, Becky never saw          14:11:43

 9   her after the second trip.                                             14:11:47

10           That wasn't true.  So she was never impeached with            14:11:50

11   that.          And she was never impeached with respect to what       14:11:58

12   I would consider a fatal flaw in her entire investigation.            14:12:04

13       You know, she comes to the conclusion that these injuries         14:12:09

14   would had to have been inflicted on Sunday afternoon, some            14:12:12

15   short hours before the child died, based on her own assumption.       14:12:17

16           THE COURT:  Well, didn't she interview...was it a             14:12:22

17   Ms. Toley (phonetic)?                                                 14:12:29

18           MR. SANDMAN:  Ms. Tafe?                                       14:12:30

19           THE COURT:  Tafe.  Tafe.  And didn't Ms. Tafe tell her       14:12:32

20   that she thought that Rachel showed signs of illness on the           14:12:37

21   30th?                                                                 14:12:41

22           MR. SANDMAN:  On Saturday.                                    14:12:42

23           THE COURT:  Correct.  And my question then is this:          14:12:44

24   Was that in her report?                                               14:12:47

25           MR. SANDMAN:  Yes.                                            14:12:52

ARGUMENT BY PETITIONER                    11

1      But when I questioned -- I believe the answer is yes.          14:12:56

2      And when I questioned Ms. Pesqueira about that, she said:      14:13:00

3  Well, I disregarded that because I knew this assault happened     14:13:05

4  on Sunday, and so I assumed that Ms. Tafe was mistaken.          14:13:11

5      So why does she assume -- she assumes the witness is          14:13:16

6  mistaken because she's decided, without any independent medical  14:13:19

7  investigation, that these injuries had to have happened on that  14:13:23

8  Sunday afternoon.  She totally disregarded that.  She didn't     14:13:26

9  provide that information to Dr. Howard.                          14:13:29

10      Now, if the lawyers are playing with a full deck -- and I    14:13:32

11  think we already know they're not because they're not even       14:13:36

12  using available evidence to impeach Becky and Dr. Howard -- and 14:13:38

13  because they are not playing with a full deck, they don't know  14:13:44

14  that all these injuries did not occur on Sunday.                14:13:48

15      So my contention is when the lawyer knows, as I know         14:13:53

16  through expert evaluation from the likes of Dr. Ophoven and      14:13:59

17  McKay and Dr. Keen, I know these injuries didn't happen, and if 14:14:04

18  we were now in Mr. Jones' jury trial and I put on those          14:14:09

19  experts, I would have obviously impeached Ms. Pesquiera          14:14:13

20  regarding her medical investigation, which really never         14:14:18

21  existed.                                                         14:14:23

22      And you combine her failure to investigate with the fairly  14:14:23

23  loose dealings that the prosecutor had with Dr. Howard and      14:14:29

24  Becky to manipulate, you know, their testimony between these    14:14:32

25  two trials, then if I'm trying this case before Mr. Jones'      14:14:34

1    jury, I'm going to -- I'm really going to go after Detective          14:14:40

2    Pesquiera on her evaluation of the blood evidence.                    14:14:47

3         They charged Mr. Jones with a rape and assault on a Sunday       14:14:51

4    and the next day Rachel dies.  They know what he's wearing on         14:14:56

5    Monday, the day she dies.  They make no effort to identify            14:15:01

6    either the child's clothing or Mr. Jones' clothing.                   14:15:05

7         That's the sort of impeachment I would have done.  I did it      14:15:12

8    when she testified in these proceedings.  And she had to              14:15:15

9    concede that, for all we know, there could have been                  14:15:18

10   exculpatory evidence on the clothing Rachel wore, on the             14:15:22

11   clothing Mr. Jones wore on the day of the assault.                   14:15:26

12        So, for example, maybe there was no blood on the clothing       14:15:30

13   that Mr. Jones wore on Sunday, which would absolutely inform us      14:15:32

14   that the blood he had on his clothes on Monday came from             14:15:39

15   attending to what turned out to be a dead child that they were      14:15:41

16   getting to the hospital.                                             14:15:46

17        She could identify no case -- and she was in sexual assault    14:15:48

18   cases forever -- where there had been neglect to identify the       14:15:53

19   victim's clothing worn at the time of the alleged assault           14:15:56

20   except this case.  Because in this case she knew Mr. Jones was      14:16:00

21   guilty based on essentially nothing, and didn't need to             14:16:04

22   investigate anything.                                               14:16:06

23        Then if the trial lawyers were doing their job they would     14:16:10

24   have presented her with evidence, information, that Rachel's       14:16:24

25   mother was a serial abuser of her children; that she has had a    14:16:29

1   record of throwing them down stairs, hitting them in the      14:16:35

2   stomach -- of course, Rachel had a stomach injury -- and she   14:16:38

3   would have been queried as to:  Why didn't you -- shouldn't you 14:16:45

4   have investigated Rachel's mother as the perpetrator of these  14:16:48

5   assaults?  And she agreed when she testified at this hearing:  14:16:53

6   You know, if I had known all this, I would have investigated.  14:16:57

7   Well, Mr. Jones' trial lawyer should have made sure she knew   14:17:00

8   about it.                                                      14:17:05

9        THE COURT:  But we're talking about several types of    14:17:06

10  injuries now, so can you be a little more specific?  Because   14:17:09

11  we've got the laceration on the scalp, we've got the injury to 14:17:12

12  the small intestine, and then we have the sexual assault.      14:17:15

13       MR. SANDMAN:  So I was not referring to the sexual      14:17:19

14  assault injury.                                                14:17:21

15       THE COURT:  Okay.  Thank you.                            14:17:21

16       MR. SANDMAN:  But as we made Detective Pesqueira aware  14:17:23

17  of at the hearing, and the trial lawyers I think if they were  14:17:30

18  doing their job, should have done this:                        14:17:33

19       The defense lawyers obtained information that Rachel's  14:17:35

20  older brother, teenage brother, Johnny, had to be removed from 14:17:41

21  Rachel's bedroom because of suspicions of improper sexual      14:17:45

22  touching.  Now, not of Rachel.                                 14:17:49

23       We don't know that.  We only know that Barry built a little 14:17:52

24  add-on for Johnny and removed him from that room because there 14:17:57

25  was evidence that he had been touching Brandie, Barry's        14:18:01

1    daughter.                                                    14:18:06

2        But then we also know, from trial lawyers' notes, that   14:18:07

3    there were sexual issues between Johnny and Rachel that were 14:18:12

4    not -- apparently not ever investigated.                     14:18:16

5        But Detective Pesqueira admitted when she testified here 14:18:19

6    that she would have investigated these issues regarding Johnny 14:18:24

7    and Rachel if she had known about it.  Well, she should have  14:18:29

8    known about them, and defense counsel should have made her    14:18:32

9    aware of this information.                                    14:18:35

10           THE COURT:  What about Zolie?                         14:18:38

11           MR. SANDMAN:  You know, Zolie was still having contact 14:18:43

12   with these children.  He was at Rachel's birthday party.      14:18:45

13   Angela, in her interview, said that he was a frequent visitor 14:18:51

14   to the trailer where they were living.  Presumably not -- when 14:18:55

15   Mr. Jones wasn't there.  Certainly, he should have been        14:18:57

16   investigated, and, of course, we know that never happened.     14:19:00

17           So I think all those -- you know, when you look at the 14:19:03

18   state's case, everybody -- they could have impeached her.  You 14:19:07

19   know, Becky and Dr. Howard and the police investigation.       14:19:13

20       And then of course we get to the -- I'll come back to the  14:19:16

21   Lopez twins, because you have a question on that.              14:19:19

22       The next question:  Assuming Jones wasn't involved in      14:19:21

23   causing any of Rachel's injuries and others put him on notice  14:19:29

24   that she was ill on May 1st, why wasn't he on notice that she  14:19:32

25   needed to go to the hospital?                                  14:19:37

1      I want be careful on answering this question because....      14:19:40

2      Let me say it this way:  I think there wasn't really direct  14:19:49

3  testimony on that at the trial.  There was a lot of witness      14:19:56

4  statements, which the respondents have cited in their briefs,    14:20:01

5  where they report that people told the police that they had      14:20:06

6  told Jones that Rachel was ill and probably needed to get        14:20:11

7  medical treatment.                                               14:20:14

8      But it wasn't presented at the trial because -- I don't      14:20:15

9  know for sure "because."  But they didn't need to present it     14:20:18

10 because the theory was Jones was the killer, and he would have   14:20:21

11 known she needed to go to the hospital for that --               14:20:24

12         THE COURT:  Let me reframe the question for you a        14:20:26

13 little bit.                                                      14:20:29

14     Did the state ever argue at trial that even if Jones did     14:20:30

15 not commit these injuries, he still had a responsibility and     14:20:35

16 should have been on notice to take her to the hospital?          14:20:41

17         MR. SANDMAN:  No.  No.                                   14:20:43

18         THE COURT:  Was the theory of the state -- I just want   14:20:46

19 to make sure I understand correctly.  Was the theory of the      14:20:48

20 state at trial that these charges were all intertwined?          14:20:51

21         MR. SANDMAN:  The evidence was and the argument was he   14:21:00

22 did it.  He knew she obviously needed medical treatment but      14:21:02

23 concealed it to cover up his own crime.  It was as simple as     14:21:05

24 that.                                                            14:21:10

25     They didn't need to -- you know, they had him dead to        14:21:10

ARGUMENT BY PETITIONER

1   rights as being the rapist and the assaulter, you know, the            14:21:16
2   person who assaulted her.  And so that was the evidence.              14:21:21
3       There was never any kind of alternative, well, if he's           14:21:27
4   still guilty, it would be for these reasons.  It was all             14:21:30
5   intertwined with his guilt for the actual assault.                   14:21:33
6       I do want to say, Judge, on the topic of count four, you         14:21:39
7   know, the state alleges, well, there was no way to defend that,      14:21:51
8   other than arguing that Jones wasn't the legal custodian, and        14:21:53
9   he lost that legal argument.  But obviously we disagree with         14:21:57
10  that.  I mean, you had to defend count four the way you would        14:22:02
11  have defended counts one, two, three, and five.  I mean, the         14:22:06
12  defense is he is innocent.                                           14:22:11
13      Now, is there still an argument under count four that he is      14:22:14
14  criminally negligent?  Or, as in the case of Angela, that he         14:22:20
15  had a reckless mental state?  Because obviously that night her       14:22:24
16  head was bleeding, she was vomiting.                                 14:22:28
17      There is an issue there for the jury to decide.  They            14:22:34
18  weren't presented with that, with that alternative.  In other        14:22:37
19  words, it wasn't the case where there was, well, if he's not         14:22:41
20  guilty of this, he's guilty of that.                                 14:22:46
21      But I think, in all candor, Dr. McKay and Dr. Ophoven            14:22:49
22  thought there was medical neglect, but a negligence state of         14:22:55
23  mind.                                                                14:23:00
24      And the jury was actually instructed on lesser includeds.       14:23:00
25  They were instructed that "criminal negligence" means with           14:23:06

 1   respect to a result and -- excuse me.  "Criminal negligence"          14:23:09

 2   means, with respect to a result or circumstance, that a person        14:23:16

 3   fails to perceive a substantial and unjustifiable risk that the       14:23:19

 4   result will occur or that the circumstance exists.  The risk          14:23:24

 5   must be of such a nature and degree that the failure to               14:23:29

 6   perceive it constitutes a gross deviation from the standard of        14:23:33

 7   care that a reasonable person would observe.                          14:23:37

 8        So it's an objective test.  The risk must be of such a           14:23:39

 9   degree that the failure to perceive it constitutes a gross            14:23:47

10   deviation.                                                            14:23:50

11        So that's like he's going to be judged the way a reasonable      14:23:51

12   man would be judged.  Whereas -- and if he was found guilty of        14:23:53

13   that, it's a class four felony, and probation eligible, and           14:23:57

14   short prison term, or whatever.                                       14:24:01

15        So it's not a death penalty case or a murder case.  Because      14:24:02

16   a murder case, felony murder requires they prove intent, and          14:24:07

17   the jury was instructed that "intentionally" means a person's         14:24:11

18   objective is to cause the result.                                     14:24:16

19        So, you know, if Jones is the perpetrator and he's               14:24:19

20   withholding medical care, you know, it sounds to me like that's       14:24:23

21   intent, because he is motivated to hide, disguise his own             14:24:28

22   wrongdoing.                                                           14:24:33

23        I guess, in short, what I am saying is that maybe there's a      14:24:34

24   lesser included offense that the jury may have considered, but        14:24:40

25   I don't think there is any reasonable likelihood that the jury        14:24:43

1   convicts him of felony murder, and the more serious intentional   14:24:47

2   or knowing child abuse, if he is not the perpetrator.  I mean,   14:24:51

3   he's not the killer then.   14:24:59

4       I think they would probably say, if anything, you should   14:25:01

5   have known better to get her care.  And that's criminal   14:25:03

6   negligence or, at worst, recklessness, which would render him   14:25:07

7   not eligible for a felony murder charge.   14:25:13

8       The next question:  Given that Jones does not dispute that   14:25:15

9   he saw the Lopez twins at the Choice Market, why wasn't defense   14:25:20

10  counsel's investigation into the Lopez twins' testimony   14:25:25

11  minimally competent?   14:25:28

12      Now, in answering that question, I think you have to look   14:25:30

13  at the broader picture of what these lawyers knew.  Because,   14:25:36

14  sure, they know that Mr. Jones was at the Choice Market on the   14:25:43

15  late afternoon of Sunday.  But they also know that, according   14:25:49

16  to Becky, until Mr. Jones' trial, she insists that when   14:25:53

17  Mr. Jones came back from the market, Rachel looks fine.   14:25:57

18      Now, that's important.  Because, you know, part of what the   14:26:01

19  Lopez twins are saying that they allegedly saw was a child   14:26:05

20  crying, being beaten in the face, with red on her face.  Well,   14:26:10

21  he returns from the market and she doesn't look like she's been   14:26:15

22  beaten in the face.   14:26:21

23      And then a little after 5:00 o'clock that day, when Rachel   14:26:22

24  is found sick at Stephanie Fleming's house -- she's already   14:26:25

25  feeling the effects of the peritonitis -- she is seen by   14:26:30

1    Stephanie Fleming, Dawn Kopp, and another individual who was        14:26:34

2    with Ms. Kopp; they don't see any marks on her face that would      14:26:39

3    indicate she had a beating about the face earlier that              14:26:44

4    afternoon.                                                          14:26:48

5         They also don't notice, by the way, her head bleeding.         14:26:48

6    Which is very, very important.                                      14:26:52

7         Because, you know, this head injury, according to the          14:26:53

8    state's theory, happens at the same time she receives her other     14:26:57

9    injuries.  But when she is seen, already sick from peritonitis,     14:27:00

10   at 5:00 o'clock, her head is not seen bleeding.  And when           14:27:04

11   Detective Pesquiera interviewed Ms. Fleming, at the end of May,     14:27:09

12   '94, she specifically asked her:  Did you see her head              14:27:14

13   bleeding?  And she said:  I looked and it wasn't.                    14:27:18

14        Now, that's important.  Because now it sounds to me like       14:27:21

15   we're looking at an injury that Dr. Ophoven described, an older     14:27:25

16   injury that starts to rebleed later that day due to shock from      14:27:30

17   peritonitis, and actually would be consistent with Dr. Howard's     14:27:34

18   view at least the first few times, couple times he spoke about      14:27:38

19   it, that this injury was several days old and now it's              14:27:42

20   reopening later that day, much later after she gets sick, when      14:27:46

21   Mr. Jones brings her back from the Flemings' and he lays her        14:27:50

22   down and he finds blood on the pillow.                              14:27:55

23            THE COURT:  Is the premise of my question though,          14:27:57

24   question number two, correct?  That Mr. Jones doesn't dispute       14:28:02

25   seeing the Lopez twins?  I want to make sure I ask --               14:28:06

1          MR. SANDMAN:  He does -- well --                      14:28:10

2          THE COURT:  -- correct.                               14:28:10

3      Did he make a statement of some sort --                   14:28:10

4          MR. SANDMAN:  There is nothing -- there is a record in  14:28:14

5   the -- that I think Mr. Jones provided to Mr. Gruen or somebody  14:28:18

6   that he thought he saw them at another location in the parking  14:28:27

7   lot.  So there was -- it wasn't presented at the trial, but  14:28:30

8   there is -- to answer your question directly, there is that in  14:28:36

9   the record, where he said he saw them in a different location  14:28:39

10  in that same parking lot.                                    14:28:42

11         But part of the direction I was going is that the     14:28:45

12  lawyers know all these things that already suggest this child  14:28:48

13  has come back from the market, she is already sick from       14:28:52

14  peritonitis, her head is not -- her face doesn't indicate that  14:28:55

15  it's been beaten on.                                         14:28:59

16         And then on top of that, nobody ever goes to the      14:29:01

17  Choice Market to follow up on was Mr. Jones there at the same  14:29:09

18  time as these children.  He says he was, and that Rachel went  14:29:12

19  in the store.                                                14:29:15

20         I asked Detective Pesqueira about that.  This is more  14:29:17

21  impeachment.  I said that's someplace the police had to go on  14:29:21

22  May 2nd to check on Mr. Jones' story.  And she said:  We sure  14:29:26

23  did.  And I said maybe Detective Ruelas went there and he      14:29:30

24  actually found exculpatory information that Jones was there    14:29:36

25  doing -- not to beat her at the market, but he went in shopping  14:29:39

UNITED STATES DISTRICT COURT

ARGUMENT BY PETITIONER

1    with Rachel and she was fine.  And she pretty much had to          14:29:44

2    concede:  Well, we don't know now about that either.              14:29:47

3           But the bigger point is, is having all these flags         14:29:50

4    that the Lopez story doesn't add up.  That she doesn't look       14:29:54

5    like she's beaten in the face when she gets home.                 14:29:58

6        The lawyers testified in these proceedings that they never    14:30:00

7    believed that the Lopez children could see what they reported,    14:30:03

8    given the size of the children and the size of the van and the    14:30:06

9    six-foot-wide length between the doors, passenger and driver's    14:30:09

10   doors.  So that's their operating theory, is that the children    14:30:16

11   couldn't see it.                                                  14:30:22

12       And so my answer to your question is, if that's your theory   14:30:23

13   as a defense lawyer, you should investigate that.                 14:30:27

14       And they did.                                                 14:30:30

15       A few days before the start of the trial, they got George     14:30:35

16   Barnett, their investigator, to measure the van.  But that was    14:30:40

17   a partial, incomplete, useless investigation because it didn't    14:30:43

18   take into account the size of the children, Mr. Jones' reach,     14:30:46

19   the line of sight of the children.  I mean, they had nothing.     14:30:51

20   So they didn't even make use of those measurements.               14:30:55

21       So, you know, they did -- in *Strickland* parlance, they      14:30:59

22   didn't have a reason to stop investigating that.  Obviously,      14:31:05

23   they should have started investigating that months earlier.       14:31:09

24       And they knew about -- those missing components of the size   14:31:14

25   of the children were important.  Because when Ms. Bowman          14:31:17

1    interviewed Ray, she said:  How tall are you?  And he said:  I    14:31:22

2    don't know.  And she said:  We'll look into that.                 14:31:28

3        But they never did look into it.                              14:31:31

4        And similarly, Sean Bruner testified in these proceedings     14:31:33

5    he thought the children's statements were unreliable, perhaps     14:31:39

6    influenced by their mother, and no investigation to confirm       14:31:42

7    their own hypothesis.                                             14:31:46

8        Even though we had testimony from Dan Cooper and from         14:31:49

9    Dr. Esplin that at the time of this trial reasonable lawyers      14:31:55

10   knew that methods for investigating and interviewing children     14:31:59

11   were critical.  Dr. Esplin was testifying in cases back then,     14:32:03

12   giving seminars.  Mr. Cooper actually hired -- had hired          14:32:08

13   Dr. Esplin in that time frame.                                    14:32:12

14       And so I am judging what they didn't do based on their        14:32:14

15   failure to follow through on their own operating theories for     14:32:19

16   the defense.  I mean, what good is an operating theory if         14:32:22

17   you -- I don't think the kids could see but then I don't          14:32:27

18   investigate that?                                                 14:32:30

19       Just to make one final point.                                14:32:33

20           THE COURT:  Yes.                                          14:32:34

21           MR. SANDMAN:  That is, Mr. Bruner, when he had Ray        14:32:36

22   Lopez in front of the jury, he said:  Well, Ray, how -- he        14:32:41

23   again asked:  How tall are you?  Do you think you could have      14:32:44

24   seen in that van?  And Ray said:  Yep, I sure could.              14:32:47

25       That wasn't very effective because he wasn't prepared.        14:32:51

1          I don't know if you had a question, Judge.                14:32:55

2          THE COURT:  No.  Just, with the remaining time, you've   14:32:56

3   got a little over 17 minutes left, and I was hoping to have you  14:32:59

4   focus on the Dr. Keen question.                                  14:33:04

5          MR. SANDMAN:  Well, that is important, and I will do      14:33:08

6   that.                                                            14:33:10

7          Respondents cite a lot of AEDPA cases.  You know,        14:33:10

8   under the AEDPA, the limited -- which require this Court and     14:33:20

9   other federal courts to engage in a very limited review of      14:33:26

10  cases that have been decided in the state courts.                14:33:31

11      AEDPA doesn't apply in this case.  This is a de novo        14:33:35

12  hearing.  There was no prior state court decision.  So when      14:33:39

13  they cite *Richter* and *Pinholster* and these other cases, you     14:33:42

14  should ignore those, they have no application to a de novo       14:33:46

15  review by a federal judge.                                       14:33:50

16      That brings us back to the *Strickland* test, to answer your  14:33:51

17  question.                                                        14:33:55

18      Before you presume anything about strategy, the *Strickland*  14:33:59

19  question is, or the question the Court must ask is, whether      14:34:02

20  defense counsel conducted a reasonable investigation or made    14:34:09

21  reasonable decisions that make investigations unnecessary.       14:34:12

22      If they have done that -- because that's what *Strickland*    14:34:18

23  requires, reasonable investigation, or a reasonable decision     14:34:23

24  not to investigate -- they can have whatever strategy they       14:34:25

25  want.                                                            14:34:29

1          If they haven't done that, if they haven't conducted a                14:34:29
2     reasonable investigation, or made a reasonable decision not to            14:34:32
3     investigate, that's ineffective assistance.                              14:34:36
4          And in this case they couldn't conceivably have a strategy          14:34:40
5     to cut off Dr. Keen, or any other doctor, until they got an              14:34:44
6     answer to a fundamental question from somebody, and that was:            14:34:49
7     When did these injuries happen?                                          14:34:54
8          We know that they asked Dr. Keen that question.  We also            14:34:55
9     know that he never answered it.  For several reasons.                    14:34:58
10         Number one, we know the question was not answered because           14:35:02
11    if he had answered it he would have testified at Mr. Jones'              14:35:04
12    jury trial that these injuries -- I mean all of them -- didn't           14:35:08
13    happen the day prior.                                                    14:35:12
14         Dr. Keen testified at the hearing that the small bowel              14:35:15
15    injury didn't happen the day before; and the vaginal injury, he         14:35:21
16    agreed with Dr. Ophoven, was an older injury.                           14:35:24
17         So if they asked him -- and they did ask the right                  14:35:27
18    question; but if he answered it, we wouldn't be here today.             14:35:30
19         THE COURT:  Wasn't there some phone call between                    14:35:33
20    counsel and Dr. Keen?                                                    14:35:36
21         MR. SANDMAN:  There was a phone call.  But Dr. Keen                 14:35:38
22    testified that he couldn't have opined on the timing of the             14:35:42
23    injuries without reviewing the slides, the tissue slides from           14:35:49
24    the autopsy and the photographs.  And we know again, for two            14:35:53
25    reasons, that that never happened.                                      14:35:58

1        Number one, the medical examiner's file does not      14:35:59

2   contain a transmission to him of that information.  And it has   14:36:02

3   transmission, confirming transmission, to everyone else who's   14:36:06

4   looked at them.  And as Dr. Keen testified, at Maricopa County,   14:36:10

5   where he worked, they documented everywhere those tissue slides   14:36:14

6   went, and they did not go to Dr. Keen in this case.      14:36:19

7        Secondly, we know if he had reviewed the tissue      14:36:21

8   slides, again, we wouldn't be here.  We wouldn't have an   14:36:25

9   ineffective assistance claim.  Because when Dr. Keen looks at   14:36:28

10  the data, he's told us the prosecutor theory was wrong.   14:36:33

11       THE COURT:  So you're at 14 minutes.      14:36:37

12       MR. SANDMAN:  I do want to say something else about   14:36:39

13  why they had to investigate this medical injury.  They had to   14:36:44

14  get someone to answer that question.      14:36:48

15       The respondents have said, well, Dr. Keen didn't ask for   14:36:50

16  the slides.  Maybe he didn't ask for them.  But the lawyers   14:36:54

17  knew the slides had to be reviewed.  Because Mr. Bruner said   14:36:58

18  that at a July 1994 hearing, that he needed someone to review   14:37:02

19  the slides.  They had an article in their file, science article   14:37:06

20  in the file, saying the slides had to be reviewed.  Dr. Howard,   14:37:09

21  in his interview, pretrial interview, was basing all of his   14:37:13

22  timing opinions on review of the slides.      14:37:17

23       They knew that the slides had to be reviewed, and they   14:37:19

24  needed to ask him or someone to look at them.  It wasn't up to   14:37:22

25  them to sit back and wait for someone to ask a question about   14:37:26

1    needing to look at them.                                           14:37:30

2        For all we know, in that phone call they may have only        14:37:32

3    talked about the need for an additional autopsy.  Because at      14:37:36

4    that same July 1994 hearing, it's Exhibit 24D, Judge, there was   14:37:40

5    a big to-do about the fact that going on three months from the    14:37:44

6    child's death, Mr. Bruner had a hold on the body.  And the        14:37:49

7    judge was very upset and he said:  I want you to get somebody     14:37:54

8    and you tell us whether that autopsy needs to be redone.          14:37:57

9        So they had that August conversation with Dr. Keen, and       14:38:01

10   then you'll see -- we have exhibits that show that right after    14:38:06

11   that, Bruner released the body and then they didn't do anything   14:38:09

12   else.                                                             14:38:14

13       And not doing anything else was the story here.               14:38:15

14       Not impeaching Becky.  Not impeaching Dr. Howard.  Not        14:38:18

15   following up on their own theories of why the Lopez children      14:38:21

16   statements were unreliable.  Not following up with Dr. Keen.      14:38:25

17   Basically, you know, getting rid of their fact investigator       14:38:28

18   after just a few days, other than calling him back to measure     14:38:33

19   the van.  I mean, doing nothing is the operative theme in this    14:38:36

20   case.  They did nothing, and you can see what the result was.     14:38:40

21       I'll reserve the rest of my time.                            14:38:47

22           THE COURT:  Thank you.                                    14:38:49

23       All right.  Mr. Braccio.                                      14:38:50

24           MR. BRACCIO:  May it please the Court, opposing           14:38:54

25   counsel, Mr. Sandman, Ms. Smith, Myles Braccio on behalf of the  14:39:16

1    Arizona Attorney General's Office for respondents.          14:39:20

2        I'd like to thank the Court for coming down.  I know the   14:39:22

3    Court is very busy, and this is a lot of time and energy to   14:39:25

4    come all the way down here.  We sincerely appreciate it.   14:39:28

5        I'd like to begin by letting the Court know I've prepared a   14:39:30

6    PowerPoint presentation, and the first couple of slides, I   14:39:34

7    think, are going to get right to this Court's questions.  Or   14:39:37

8    question one for petitioner and respondent, as well as question   14:39:39

9    one for respondent.  I'll answer those questions directly.   14:39:43

10       The answer is the prosecutor absolutely did not intertwine   14:39:46

11   these, and I am going to show the Court.               14:39:49

12           THE COURT:  While you're doing that, do you want a   14:39:51

13   warning when you have a certain amount of time left?   14:39:54

14           MR. BRACCIO:  That would be great, Your Honor.  Maybe   14:39:56

15   at five minutes.                                        14:39:58

16           THE COURT:  You've got it.                      14:39:59

17           MR. BRACCIO:  Okay.  In this case there were three   14:40:00

18   predicates for the felony murder.  The first being the sex   14:40:03

19   assault of a minor under the age of 15, which was count one;   14:40:06

20   the second being the child abuse count for causing the ruptured   14:40:09

21   duodenum and internal injuries; and the third being the child   14:40:14

22   abuse for Jones' failure to seek medical aid for Rachel prior   14:40:17

23   to her death.                                           14:40:20

24           Now, Jones must prove, under *Gallegos*, a Ninth Circuit   14:40:21

25   law, that his trial counsel were constitutionally ineffective   14:40:26

1    for failing to investigate and present evidence undermining     14:40:27

2    each of these predicate felonies.     14:40:29

3         As we've argued, Jones has presented no evidence in     14:40:32

4    these proceedings whatsoever that his counsel were ineffective     14:40:34

5    for failing to investigate and challenge his child abuse     14:40:38

6    conviction for failing to seek medical care for Rachel.     14:40:40

7         This count is unrelated to the timing and nature of the     14:40:44

8    injuries, as well as the identity of the assailant.     14:40:47

9         Now, let me talk briefly just about what Bruner and Bowman     14:40:51

10   actually did to challenge this count.  Because I think the     14:40:57

11   supposition here is, well, they did nothing to challenge this     14:40:59

12   count, and that's absolutely not true.     14:41:02

13        So they challenged the legality of this felony charge in a     14:41:04

14   motion in limine, arguing that Jones did not have legal care     14:41:08

15   and custody of Rachel.  That's in the record on appeal at 63.     14:41:10

16        He told the jury in opening statements:  You will hear that     14:41:15

17   there is nothing obvious about the baby that day, about Rachel     14:41:17

18   that day, something that would have caused Barry to just think     14:41:20

19   he had to take her to the hospital.     14:41:23

20        They attempted to establish at trial that Jones did not     14:41:25

21   make medical decisions for Rachel.     14:41:27

22        After the state's presentation, they moved, under Rule 20,     14:41:30

23   to dismiss that count on the basis that he had no legal duty or     14:41:33

24   care.     14:41:36

25        He argued to the jury in closing arguments that Jones did     14:41:37

1   not have a legal duty to Rachel.                          14:41:40

2       The jurors were specifically instructed in this case to   14:41:42

3   consider each offense separately, quote, "uninfluenced by your   14:41:46

4   decision as to the other charges."                      14:41:52

5       They were also instructed to consider all lesser-included   14:41:54

6   offenses, as well as all mental states.                  14:41:58

7           THE COURT:  At the trial, did the state ever argue the   14:42:00

8   same question I posed to petitioners?                     14:42:04

9           MR. BRACCIO:  No.                                14:42:07

10           THE COURT:  Did the state ever argue -- well, you     14:42:07

11   don't know what my question is.                          14:42:09

12           MR. BRACCIO:  I'm sorry, Your Honor.  I thought you    14:42:11

13   were going to --                                        14:42:12

14           THE COURT:  You know.                            14:42:12

15           MR. BRACCIO:  Go ahead.  I apologize.            14:42:14

16           THE COURT:  Did the state ever pose or frame the issue   14:42:16

17   to the jury that, even if he did not commit the offenses in the   14:42:21

18   other charges, standing alone, they could find him guilty of   14:42:26

19   count four?  Or was the state's theory at trial that the   14:42:32

20   conduct contained in all these counts were essentially     14:42:37

21   inextricably intertwined?                               14:42:41

22           MR. BRACCIO:  The first.                        14:42:45

23       The state argued sequentially that Jones was guilty of all   14:42:46

24   of the charges, but there was nothing, there was no theory by   14:42:48

25   the prosecutor, that they were somehow so essentially       14:42:52

1  intertwined that they are interrelated and relied upon each        14:42:55

2  other.  That's absolutely not true.  The prosecutor argued each    14:42:59

3  individual count consistent with the jury instructions.            14:43:03

4       THE COURT:  Did the prosecutor ever argue -- my               14:43:05

5  question, I think, may be just a little bit different.             14:43:08

6       MR. BRACCIO:  Okay.                                           14:43:08

7       THE COURT:  Did the prosecutor ever argue that even if        14:43:11

8  they don't find him guilty of counts one through three and         14:43:13

9  five, they could find him guilty of count four because?            14:43:17

10      MR. BRACCIO:  Not that explicitly, but I think it's           14:43:21

11 there.  So let me show --                                          14:43:24

12      THE COURT:  Show me where it is.                              14:43:26

13      MR. BRACCIO:  Let me show you what the prosecutor --          14:43:27

14 so this is the record on appeal, this is transcript April 13th,    14:43:29

15 1995.  This is the closing argument of the prosecutor.             14:43:32

16      So, as she is discussing these counts, this is the           14:43:40

17 part in her closing argument where she addresses the failure to    14:43:43

18 render aid.  This is at Page 88.  She says:                        14:43:47

19      Count four.  That night -- well, actually start               14:43:51

20 earlier.  During that afternoon on Sunday, Rachel was bleeding     14:43:53

21 from her head.  Who's the only adult with her?  The defendant.     14:43:57

22 Does he take her anywhere to get that wound treated?  No, he       14:44:01

23 doesn't.  He was the only person who was -- who had -- who had     14:44:04

24 care of Rachel during those hours; and he didn't take care of      14:44:13

25 her, didn't get her the medical attention she needed, and he       14:44:16

1  compounded that omission by sitting silently by during the          14:44:20

2  night as Rachel suffered.                                           14:44:24

3          The defense counsel told you in opening you are going       14:44:26

4  to hear, ladies and gentlemen, there wasn't anything obvious        14:44:30

5  about Rachel that night that would have given anybody a clue        14:44:33

6  that anything was wrong with her.                                   14:44:36

7      Rebecca saw the bruises to her face and the bruises to her      14:44:37

8  fingers and her hands.  Rebecca saw that baby throwing up.          14:44:41

9  Where was she throwing up?  Do you remember Bruce Clark found a     14:44:44

10  pot?  Becky told you she had been throwing up in that pot.         14:44:48

11  Well, the pot was found in the bedroom, the defendant's           14:44:53

12  bedroom, the bedroom he shared with Angela.                       14:44:55

13      What are the symptoms of peritonitis?  What are the           14:44:58

14  symptoms that something was seriously wrong with this baby?       14:45:03

15  Setting aside the fact that she hadn't stopped bleeding hours     14:45:05

16  after her injury was incurred, she is throwing up.  Dr. Howard    14:45:08

17  and Dr. Seifert said she would have become dehydrated and want   14:45:12

18  to drink, but would continue to throw up, run a fever.  She       14:45:17

19  would be in pain.  She wouldn't even want to be able to lift      14:45:20

20  herself up or move around, the pain would be so great.           14:45:32

21      That's just from the internal injuries.                      14:45:36

22      Imagine how she was feeling having an untreated laceration   14:45:39

23  bleeding from her head?  Imagine how she was feeling bleeding    14:45:42

24  from the inside of ears?  Imagine how she was feeling with       14:45:45

25  blood seeping in under her scalp as a result of blows she        14:45:48

1   received to the side and front of her face.  Imagine how she        14:45:51

2   felt bleeding from the back of her neck, from the direct blow        14:45:53

3   to the back of her neck?  Imagine how she felt with her little       14:45:56

4   vagina bleeding into her little underpants?                          14:46:01

5       She was only four years old.                                     14:46:04

6       She even told Brandie her stomach hurt, depending on how         14:46:06

7   much to believe, how much Brandie had to say.                        14:46:09

8       Nothing obvious about Rachel?  Nothing that would give a         14:46:11

9   clue to the two adults who were supposed to be in charge of          14:46:16

10  her, who had care of her, that she needed medical attention?         14:46:19

11  Oh, there was lots obvious.                                          14:46:22

12      Angela Gray will have to deal with her responsibility for        14:46:23

13  her ignoring those obvious signs in another courtroom, in            14:46:26

14  another forum.  The defendant has to deal with his now.              14:46:30

15      He was the only person in that household who had a car.  He      14:46:33

16  was the only person in that household who had a means of             14:46:37

17  transportation.  He had the money.  He bought the groceries.         14:46:40

18  He built the children's bed.  He had care of her all that day.       14:46:44

19      If you find that he shared responsibility for making sure        14:46:47

20  that Rachel got the medical treatment that she needed, then he       14:46:52

21  is guilty of intentionally and knowingly failing to provide          14:46:55

22  that care.  And if you find that she died also as a result of        14:46:57

23  that, it was under circumstances likely to produce death or          14:47:01

24  serious physical injury.                                             14:47:04

25      And we know from Dr. Seifert's testimony surgical                14:47:06

1    intervention could have saved her, but he and the woman with          14:47:09

2    whom he was living at the time chose not to provide her with          14:47:12

3    that simple surgical intervention.  Instead, they wait until          14:47:15

4    she had been dead two or three hours before they decided to try       14:47:18

5    CPR and take her to the hospital.                                      14:47:22

6        Rachel Gray did not have to die.  Rachel Gray could have          14:47:24

7    celebrated her fifth birthday, but, because of all of this, she       14:47:28

8    will not.  Because of Barry Lee Jones, she will not.  And that,       14:47:32

9    of course, is the issue.                                              14:47:35

10           THE COURT:  So maybe on that same section of the             14:47:37

11   transcript, if you could turn back to Page 86 with me, please.        14:47:41

12           MR. BRACCIO:  Sure.  To which page?                          14:47:44

13           THE COURT:  Eighty-six.                                      14:47:47

14           MR. BRACCIO:  It starts at 88.                               14:47:48

15           THE COURT:  No, I know, but I'm looking at 86.  Do you       14:47:51

16   have 86?                                                              14:47:54

17           MR. BRACCIO:  I don't.                                       14:47:54

18           THE COURT:  Okay.  I do.                                     14:47:55

19       It says:  Even more importantly -- this is the prosecutor's      14:47:55

20   argument -- what's the defense in this case?  Not that Rachel        14:47:57

21   was not a victim of these crimes, but that "we got the wrong          14:48:01

22   guy."                                                                 14:48:05

23       So wasn't it ineffective of trial counsel, defense counsel,      14:48:05

24   not to look at the cause of the injuries?  Because my                 14:48:14

25   recollection of the evidentiary hearing were there were other        14:48:18

1   evidence proffered of how these injuries could have occurred.      14:48:23

2   Other than the state's theory, which is Mr. Jones did it.          14:48:30

3   Right?                                                             14:48:36

4          MR. BRACCIO:  Sure.                                         14:48:36

5          THE COURT:  So what follow-up was done?  What               14:48:37

6   follow-up was done by the state?                                   14:48:41

7          Because this statement says that the state's theory is      14:48:43

8   the state -- the prosecutor is summarizing what they believed      14:48:48

9   to be the defense at trial, which is you got the wrong guy.        14:48:52

10         MR. BRACCIO:  Mmm-hmm.                                       14:48:56

11         THE COURT:  Not that these injuries could have been         14:48:56

12  not crimes.                                                        14:48:58

13         MR. BRACCIO:  I'm not sure I follow.                        14:49:03

14         THE COURT:  So I am saying what -- wasn't it                14:49:04

15  ineffective assistance not to follow up on some of these other    14:49:09

16  causes of these injuries?                                          14:49:14

17         MR. BRACCIO:  No, I believe the counsel followed up on      14:49:16

18  all of these injuries.                                             14:49:18

19         THE COURT:  Okay.                                           14:49:20

20         MR. BRACCIO:  And I can take you through all of that.       14:49:20

21         So this is on the failure to seek aid.  I think to         14:49:22

22  answer Your Honor's first question for petitioner and             14:49:26

23  respondent:  Did the prosecutor argue to the jury that these      14:49:29

24  were so intertwined?  I think, very clearly, the answer to that   14:49:33

25  is in this transcript, the prosecutor did not argue that.  The    14:49:34

1    prosecutor stated very close to exactly what the jury      14:49:36

2    instructions were, which is to consider each count separately  14:49:39

3    and base the evidence in your conviction off of that.      14:49:43

4           And of course they've conceded essentially in this  14:49:51

5    hearing that their own experts agree that it was fatal neglect  14:49:53

6    for Jones not to take Rachel to the hospital.              14:49:57

7        I can show his own experts agreed.                    14:50:03

8        This is Dr. Ophoven's 2002 report:  In the hours before  14:50:09

9    Rachel and Barry went to bed, it would have been evident to  14:50:12

10   anyone with Rachel that she was in need of immediate medical  14:50:14

11   attention.  It is my opinion that the decision to withhold  14:50:17

12   medical care is consistent with fatal neglect.            14:50:21

13       And I would mention again, too, there's been a lot of  14:50:23

14   argument here about what Barry Jones knew, and whether he knew  14:50:28

15   to take her to the hospital and how serious his (sic) injuries  14:50:34

16   were.                                                      14:50:36

17          THE COURT:  Right.                                  14:50:36

18          MR. BRACCIO:  The jury already found that.  The jury  14:50:37

19   found that he intentionally failed to take her.           14:50:39

20          The Arizona Supreme Court affirmed that decision,   14:50:41

21   finding it was both sufficient evidence and a predicate felony  14:50:44

22   for felony murder, and of course those are entitled to     14:50:47

23   deference by this Court.  So Jones can't simply reargue the  14:50:50

24   trial evidence in his favor for this count.                14:50:54

25          Of course, Your Honor, I cited that the lawyer's    14:50:57

UNITED STATES DISTRICT COURT

1    arguments or theories are not evidence.                      14:51:04

2        The jury was properly instructed to consider each offense   14:51:06

3    separately.                                                  14:51:10

4        The jury's special verdicts found each offense separately.   14:51:16

5        This is for the child abuse count, count four.  By failing   14:51:21

6    to take the victim to the hospital, as alleged in count four,   14:51:24

7    the jury also specifically found that it was an objective    14:51:29

8    circumstance likely to produce death or serious physical     14:51:31

9    injury, and that he committed it intentionally or knowingly.   14:51:34

10       The prosecutor did not intertwine these crimes.          14:51:42

11       And Jones is also wrong on Arizona law.                  14:51:46

12       He also made an argument about comparing it to the Angela   14:51:51

13   Gray trial and verdict.  And, of course, this Court cannot   14:51:55

14   compare, legally, jury verdicts.  I cited this court a number   14:51:58

15   of cases:  -- *Powell*, *Dunn*, *Hart* -- for that proposition.   14:52:02

16           THE COURT:  But you also pointed out, you know, what   14:52:06

17   he's characterized as significant differences in the testimony   14:52:10

18   that was given in both trials.  So you're telling me that --   14:52:14

19   how does that factor?                                        14:52:17

20           MR. BRACCIO:  Let me bring that up, Your Honor.       14:52:26

21       I believe that's a mischaracterization of this record.  I   14:52:28

22   think Dr. Howard has consistently stated his opinion time and   14:52:30

23   time again.  And let me show you, let me turn to that.        14:52:34

24           THE COURT:  Sure.                                     14:52:34

25           MR. BRACCIO:  Trial counsel investigated every aspect   14:52:36

1    of this case that they have been accused of neglecting.        14:52:39

2        I mentioned a couple other additional things, like their   14:52:42

3    pretrial motion practice.  This is directly relevant.  If the  14:52:44

4    Court looks to the *Strickland* decision, it will see that that's  14:52:47

5    another factor.                                                 14:52:50

6        They challenged every legal aspect of this case that they  14:52:51

7    could.  Fourth Amendment, searches of the van, the trailer.    14:52:54

8    Fifth Amendment, his statements.  Severance, *Bruton* and       14:52:56

9    antagonistic defenses.                                          14:53:00

10       What I found startling was they were actually successful in  14:53:02

11   precluding Jones' violence towards his own children, as well as  14:53:06

12   Rachel's statements that he was the person who had inflicted    14:53:10

13   the injuries on her with the metal shoe bar.                    14:53:14

14       The trial court even noted on the eve of trial:  "One of    14:53:17

15   Bruner's strategies is to paper us to death. "                  14:53:18

16       I think the record clearly indicates that there was funding  14:53:21

17   challenges that Bruner and Bowman faced.  The Court wouldn't    14:53:24

18   even officially appoint second counsel, as well as funding for  14:53:30

19   experts.                                                        14:53:33

20       So let's talk about the medical investigation.             14:53:34

21       Both Bruner and Bowman had previously represented capital   14:53:36

22   defendants, and Bruner specifically had handled cases involving  14:53:40

23   medically-complex injuries.                                     14:53:44

24           THE COURT:  Wasn't he qualified as an expert?          14:53:46

25           MR. BRACCIO:  Yes.                                     14:53:48

1          THE COURT:  Not an expert.  But he had a --        14:53:48

2          MR. BRACCIO:  A specialist.                         14:53:48

3          THE COURT:  A specialist.                           14:53:48

4          MR. BRACCIO:  He was a criminal law specialist.     14:53:49

5          In preparation for the case, they read all the police   14:53:51

6     reports, the autopsy report, the medical hospital records, and   14:53:55

7     specifically an article about duodenal injuries.         14:53:58

8          The medical investigation, they immediately requested   14:54:02

9     funding for an independent medical examiner to review the   14:54:06

10    autopsy report and Dr. Howard's medical conclusions.     14:54:09

11         Bruner and Bowman contacted Dr. Phillip Keen.  He agreed to   14:54:12

12    consult with them.                                        14:54:17

13         After speaking with Dr. Keen, Bruner and Bowman drafted the   14:54:18

14    letter to him identifying the areas they wanted him to focus   14:54:23

15    on.  This letter in the record is the only evidence that speaks   14:54:25

16    to this, about where they were focused in terms of their   14:54:32

17    medical investigation.                                    14:54:35

18         Could you please tell me what kind of symptoms this child   14:54:37

19    would have experienced from a small bowel laceration?  How long   14:54:40

20    after the injury occurred could this child die -- would this   14:54:44

21    child die?  Can the injury be dated?  Can the time of death be   14:54:48

22    determined?  Could such an injury have been inflicted by   14:54:52

23    another small child?                                      14:54:55

24         These are all attempts to corroborate what they were   14:54:57

25    hearing from Barry Jones, and specifically the timing of these   14:54:59

1   injuries.  And that's a natural question, given these medical        14:55:03

2   injuries, because they're looking to find out who did this to        14:55:06

3   her and when did they do it.                                          14:55:08

4        So can the injury be dated?  If this injury occurs three        14:55:10

5   days earlier, I need to focus my investigation on three days.        14:55:13

6        In your opinion, are the multiple contusions and                14:55:15

7   lacerations consistent with child abuse, or could they be           14:55:21

8   within the normal range of injuries sustained by a rough or         14:55:25

9   clumsy child?                                                        14:55:28

10       Again, she is looking for all the ways in which the medical    14:55:29

11  evidence can help corroborate aspects of their defense.             14:55:31

12       And number seven:  Can the injury to the genitalia be           14:55:34

13  dated?  Is there explanation aside from sexual abuse?  And is       14:55:37

14  the hemorrhage behind the tympanic membranes consistent with a     14:55:41

15  fall that resulted in a bumped head?                                 14:55:45

16       This letter proves beyond any doubt in this record that        14:55:47

17  Bruner and Bowman were focused on the timing and nature of         14:55:50

18  these injuries.                                                      14:55:53

19            THE COURT:  Yeah, but what about the follow-through?       14:55:54

20            MR. BRACCIO:  Okay.  So they spoke with Dr. Keen the       14:55:56

21  following month, on August 18th, 1994.  Bruner, Bowman, and        14:55:59

22  Dr. Keen have no independent recollection of this conversation,    14:56:03

23  so this Court must presume by law that they acted competently     14:56:05

24  and they performed competently.                                      14:56:10

25            THE COURT:  Then how do you address the slide issue?      14:56:12

1          MR. BRACCIO:  What slide issue?  That he didn't look          14:56:14

2    at any of the slides?                                               14:56:18

3          THE COURT:  Correct.                                          14:56:19

4          MR. BRACCIO:  First of all, I don't know that we know         14:56:20

5    what he looked at, so we don't have specific evidence that says     14:56:22

6    the slides were sent to him and he reviewed them.                   14:56:25

7          THE COURT:  Well, I thought the -- correct me if I'm          14:56:29

8    wrong, but I thought the evidence at the evidentiary hearing        14:56:31

9    was that if the slides had been sent there would be a record of     14:56:34

10   the slides being sent, if the slides had been received by           14:56:38

11   Dr. Keen there would be a record that they were received, and       14:56:43

12   that there is an absence of either.  So how can I presume under     14:56:46

13   those circumstances that he reviewed the slides?                    14:56:52

14         MR. BRACCIO:  Maybe he did, maybe he didn't.  I think         14:56:58

15   that was --                                                         14:57:00

16         THE COURT:  Well, I know you would like to say                14:57:01

17   maybe --                                                            14:57:05

18         MR. BRACCIO:  Sure.                                           14:57:05

19         THE COURT:  But if the testimony at the hearing was if       14:57:06

20   we send slides there's a record --                                 14:57:09

21         MR. BRACCIO:  Sure.                                           14:57:11

22         THE COURT:  -- and if the testimony from Dr. Keen is         14:57:11

23   if we received slides there's a record, and there is no record     14:57:15

24   on either end --                                                    14:57:18

25         MR. BRACCIO:  Sure.                                           14:57:19

1        THE COURT:  -- how can I presume that he reviewed the    14:57:19

2  slides?                                                        14:57:23

3        MR. BRACCIO:  Okay.  And you don't have to presume       14:57:24

4  that he reviewed the slides.                                   14:57:26

5        So in the letter from Bruner and Bowman to Dr. Keen --   14:57:27

6        THE COURT:  The letter we were just looking at.          14:57:31

7        MR. BRACCIO:  Yes.  -- she said what we will do is       14:57:33

8  send you the autopsy report and speak with you about these     14:57:35

9  injuries, and if you need any additional follow-up or request  14:57:39

10 anything, we'd be happy to provide those to you.  Like the     14:57:42

11 tissue slides --                                               14:57:45

12       THE COURT:  But didn't he testify at the hearing that    14:57:46

13 he would not make a diagnosis absent looking at the slides?  Or 14:57:48

14 am I misremembering his testimony?  Didn't he say that he would 14:57:52

15 have to see the slides in order to form an opinion?            14:57:55

16       MR. BRACCIO:  I don't recall that testimony.  But I      14:57:59

17 would note for the Court still he hasn't reviewed the slides.  14:58:01

18 He still hasn't reviewed the slides.                           14:58:04

19       THE COURT:  So your argument is it's fair for me to      14:58:06

20 assume that he never reviewed the slides.                      14:58:10

21       MR. BRACCIO:  I think that's a fair assumption, that     14:58:12

22 he probably never reviewed the slides.                         14:58:14

23       I think what Dr. Keen did was he knew the nature of      14:58:15

24 this injury, the duodenal injury and the vaginal injuries, he  14:58:18

25 had the autopsy report, so he understood what Dr. Howard was   14:58:22

1    saying, and he can talk to Bruner and Bowman about the timing    14:58:26

2    of this type of injury.    14:58:29

3        All of the pathologists and all of the doctors in this case    14:58:31

4    specifically say:  We can't give you a precise determination of    14:58:33

5    the time in which this injury is inflicted, but we generally    14:58:36

6    know, in the pathology, that this injury can be from hours to    14:58:40

7    days.    14:58:43

8            THE COURT:  So I am misremembering his testimony at    14:58:43

9    the evidentiary hearing where I thought I recall him saying he    14:58:46

10   would need to have the slides and review the slides before he    14:58:48

11   could render an opinion?    14:58:51

12           MR. BRACCIO:  Your Honor, he still hasn't reviewed the    14:58:53

13   slides in this case.  I am not sure if he's rendered an opinion    14:58:55

14   in this case.  I have his testimony here, too, that we can go    14:58:59

15   through, and you may have remembered that correctly.    14:59:02

16           I think Dr. Keen did tell Bruner and Bowman about the    14:59:04

17   nature of this, and that he couldn't offer any specific    14:59:08

18   rebuttal to what Dr. Howard was saying, that Dr. Howard's    14:59:11

19   opinions were consistent with this injury being inflicted on    14:59:13

20   the Sunday before.    14:59:17

21           THE COURT:  Well, I understand what you're saying.    14:59:20

22           MR. BRACCIO:  Again, this Court must presume by law    14:59:23

23   that they performed competently.  Obviously, you have to    14:59:26

24   presume by law that they spoke with Dr. Keen about the case,    14:59:28

25   the autopsy and the medical records, and the timing and nature    14:59:33

 1   of the injuries.                                                14:59:35

 2          THE COURT:  So if they didn't send the slides, that      14:59:36

 3   would be competent?                                            14:59:38

 4          MR. BRACCIO:  Yes.  They sought out an independent       14:59:41

 5   medical pathologist to provide them with medical evidence about 14:59:43

 6   the nature of these injuries, and their letter speaks           14:59:47

 7   specifically to that so that they could understand.            14:59:51

 8          If they had met with Keen and Keen said, "oh, no, the    14:59:53

 9   nature of this injury is seven days to thirty days," they would 14:59:57

10   have called Dr. Keen.  So they clearly understood from Dr. Keen 15:00:01

11   the nature of the injury.                                      15:00:10

12          THE COURT:  If keen told them at the time that he        15:00:13

13   needed the slides in order to form an opinion and they didn't   15:00:17

14   send him the slides, your argument is that is still competent?  15:00:21

15   They were still -- they provided competent representation in    15:00:27

16   that case?  Is that your argument?                             15:00:30

17          MR. BRACCIO:  I think that's a closer call.  If          15:00:33

18   they --                                                        15:00:35

19          THE COURT:  Well, is it not a yes or a no?               15:00:35

20          MR. BRACCIO:  Well, I think seeking out an independent    15:00:38

21   medical pathologist under *Strickland* clearly satisfies the    15:00:40

22   standard.                                                      15:00:40

23      But I think I can also refer to Leslie Bowman's --          15:00:44

24          THE COURT:  Well, I can seek somebody out by calling     15:00:44

25   them on the phone; but if they tell me they need certain things 15:00:46

1    in order to render an opinion, am I not obligated to provide        15:00:48

2    them that information?                                              15:00:52

3            MR. BRACCIO:  You are.                                      15:00:53

4            THE COURT:  And if I didn't provide that information,       15:00:54

5    what kind of job am I doing?                                        15:00:56

6            MR. BRACCIO:  Sure.  And so, in that regard, I would        15:00:58

7    also refer the Court to Leslie Bowman's testimony at the            15:01:01

8    evidentiary hearing, in which she said:  If Dr. Keen would have     15:01:04

9    requested more evidence, including the tissue slides, I would       15:01:07

10   have sent it to him.  Bruner also testified the same way.  And      15:01:10

11   I even asked Ms. Bowman on the stand:  Have you ever in your        15:01:14

12   career had evidence that would have been helpful for a client       15:01:17

13   and you just refused to put it on or you dropped the ball?  And     15:01:20

14   she said:  Never in my career.                                     15:01:24

15           So we have specific testimony from the lawyers in this      15:01:26

16   case that said:  If Dr. Keen would have requested that              15:01:28

17   additional information, I would have provided it to him.            15:01:31

18           And as well, Dr. Keen, if he would have rebutted any        15:01:36

19   claim of the medical claim in Jones' favor, Bruner and Bowman       15:01:41

20   testified they would have called him as a witness.                 15:01:45

21           Thus, I think within three months -- and here's my         15:01:46

22   understanding of the record and why this is well beyond the         15:01:49

23   minimally competent standards of *Strickland*.                     15:01:52

24     Within three months of Rachel's death and Jones' arrest,         15:01:55

25   they had reviewed the autopsy report and medical records,          15:01:58

1    reviewed the police reports, spoke to Jones numerous times,        15:02:01

2    obtained an investigator and sent him out to the Desert Vista      15:02:05

3    Trailer Park, sought out an independent medical pathologist and    15:02:09

4    consulted with him about the nature and timing of those            15:02:13

5    injuries.                                                          15:02:16

6        If Dr. Keen offered no rebuttal, Bruner testified in this      15:02:16

7    case that he wouldn't keep shopping for an expert.  And I think    15:02:21

8    that's where we're drawing the line in this hearing.  I think      15:02:24

9    Jones' current counsel would suggest that in order to be           15:02:27

10   constitutionally efficient under the law, they need to call        15:02:31

11   experts, and that's simply not the law.                           15:02:34

12       THE COURT:  I understand your argument on this point.          15:02:38

13   Why don't you turn your attention to the second question, the      15:02:40

14   second question that I asked, which is the law enforcement         15:02:43

15   investigation.                                                     15:02:47

16       MR. BRACCIO:  Okay.                                           15:02:47

17       The law enforcement investigation, we have contended           15:02:55

18   all along, is simply not relevant in this case.  There is no       15:02:58

19   claim before the Court that law enforcement -- law enforcement     15:03:01

20   was deficient.                                                     15:03:04

21       As it's contained in an ineffective assistance of counsel     15:03:08

22   claim, again, what did the lawyers do?  Law enforcement has        15:03:13

23   nothing to do with this case.  What did the lawyers do or what     15:03:16

24   did they fail to do, and what have they presented now to show      15:03:19

25   that law enforcement was deficient, and what's the actual          15:03:22

ARGUMENT BY RESPONDENTS

1    prejudice?  What did law enforcement miss that they can      15:03:25

2    affirmatively show this Court now demonstrates reversible    15:03:28

3    prejudice?                                                   15:03:32

4        And there is nothing in this case --                     15:03:33

5        THE COURT:  We don't know if they didn't follow up on   15:03:34

6    important aspects of the investigation.  For instance,       15:03:38

7    Investigator Pesquiera, I thought her testimony was she      15:03:42

8    acknowledged she never followed up with interviewing Zolie.  15:03:46

9        MR. BRACCIO:  Sure.                                      15:03:49

10       THE COURT:  Am I remembering correctly?                  15:03:51

11       MR. BRACCIO:  You are, Your Honor.  Let me talk          15:03:53

12   about --                                                     15:03:58

13       THE COURT:  And if I recall correctly, wasn't that the   15:03:59

14   reason Angela took the children out of the living situation  15:04:02

15   with Zolie because she didn't feel safe there?  And then she 15:04:06

16   moved in with Mr. Jones?                                     15:04:13

17       MR. BRACCIO:  Yeah, let me be very careful about what    15:04:15

18   this record says.  Angela --                                 15:04:17

19       THE COURT:  I just want to make sure I understand the    15:04:18

20   record correctly.                                            15:04:19

21       MR. BRACCIO:  Yeah.  You know, let me start off by       15:04:20

22   saying this is Jones' burden.  He has access to Angela.  He's 15:04:21

23   been in contact with Angela.  He could call Angela in this   15:04:26

24   proceeding.  He can investigate and find Zolie.  He can      15:04:29

25   investigate and find other suspects.                         15:04:32

1          THE COURT:  In fairness, you're saying that, 23 years    15:04:34

2     after the fact, it was his burden to go find Zolie, when      15:04:38

3     Investigator Pesquiera said at the time she never followed    15:04:43

4     through and tried to find or interview Zolie?  Is that your   15:04:47

5     argument?                                                     15:04:51

6          MR. BRACCIO:  Yes.  That he has to affirmatively find    15:04:52

7     evidence to affirmatively show prejudice, and that Zolie was a   15:04:55

8     potential other suspect.                                      15:04:58

9          Let me talk to the Court about what the evidence about   15:05:01

10    Zolie was that directed the law enforcement investigation and 15:05:04

11    what the lawyers knew about who Zolie was.  Okay?             15:05:07

12         Angela told detectives that Zolie hit her when he was    15:05:10

13    drunk, but she repeatedly stated that he never abused any of  15:05:14

14    her children.  And I have all of those interviews here.       15:05:18

15    This is Exhibit 1, at Page 512.                               15:05:22

16         Question:  Was he abusive towards the kids?              15:05:25

17         No.                                                      15:05:28

18         Not at all?                                              15:05:29

19         No, not at all.                                          15:05:30

20    This is Zolie.                                                15:05:32

21    Let's go to the next interview.                               15:05:36

22         He has never, ever hit the kids, or me.                  15:05:38

23         No.  Oh, no, no, no.  Nobody has ever hurt my kids.      15:05:42

24    He used to slap me.                                           15:05:48

25         Okay.  So he never --                                    15:05:49

1          But never the kids, no.                              15:05:52

2      Let's go to her other interview.  Exhibit 66 at 5183.   15:05:54

3          I did have some problems with the way he treated me.  15:05:59

4      And this is to Your Honor's question, I think, about why  15:06:02

5  she moved out of his residence.                             15:06:04

6          What would he do to you?                            15:06:07

7          So he would -- he'd just get drunk and slap me      15:06:09

8  around.                                                     15:06:12

9          What -- would he do that to the children?           15:06:12

10          No.  No.                                           15:06:14

11          When was the last contact he had with the children?  15:06:15

12          Um.                                                15:06:18

13          And with Rachel?                                   15:06:18

14          He -- for -- for Rachel's birthday.  He came and saw  15:06:20

15  her on her birthday.                                       15:06:23

16      That's the last contact that Zolie had with Rachel or any  15:06:24

17  of the children, was April 7th, when he came by for Rachel's  15:06:28

18  birthday.                                                  15:06:32

19      Now this is Rebecca.  Rebecca told the defense attorneys  15:06:33

20  that Zolie never hit her or any of the children, so she's  15:06:42

21  corroborating Angela's statements.                         15:06:46

22          All right.  Did Zolie ever hit you?                15:06:48

23          No.                                                15:06:50

24          Did Zolie ever hit any -- ever hit Rachel?         15:06:51

25          No.                                                15:06:55

1        What about Johnny?                                    15:06:56

2        No.                                                   15:06:57

3        What about Angela, your mom?                          15:06:58

4        Yes.                                                  15:07:01

5     Amanda Gray also told detectives that she never saw any 15:07:05

6   bruising on the children before they moved in with Barry Jones. 15:07:08

7        And as I mentioned, Zolie stopped by shortly after Angela 15:07:13

8   and the children moved in with Jones.  Zolie and Jones got into 15:07:16

9   a fight, Jones took him to the ground, and Zolie never came 15:07:19

10  around again.  Zolie had no history of abuse to the children. 15:07:23

11     So this is what the lawyers knew:  They knew from the  15:07:30

12  statements to Pesquiera and to the lawyers that there was no 15:07:33

13  history of abuse by Zolie.  Zolie never hit any of the  15:07:37

14  children, he only slapped Angela.                         15:07:41

15        THE COURT:  But I seem to recall medical testimony at 15:07:45

16  the evidentiary hearing that the vaginal injuries could have 15:07:50

17  been much older --                                        15:07:55

18        MR. BRACCIO:  Yeah.                                  15:07:59

19        THE COURT:  -- than the day before.  That there was -- 15:08:00

20  there were certainly signs of fresh bleeding, which could have 15:08:04

21  been caused by yet another assault or could have been caused by 15:08:08

22  scratching, but that the vaginal injuries could have      15:08:13

23  occurred -- and I don't want to misstate the record -- but it 15:08:19

24  could have occurred up to weeks before.                   15:08:22

25        MR. BRACCIO:  Yeah.                                  15:08:24

1          THE COURT:  Am I remembering correctly?                15:08:24

2          MR. BRACCIO:  Yes, you are, Your Honor.                15:08:26

3          Let me walk you through that testimony.                15:08:28

4          THE COURT:  Okay.                                      15:08:29

5          MR. BRACCIO:  Okay.  And maybe if I can address both   15:08:31

6   the testimony on the abdominal injury, as well as the vaginal 15:08:33

7   injury.                                                       15:08:36

8          THE COURT:  Yeah, please.                              15:08:37

9          MR. BRACCIO:  This is very important.                  15:08:37

10         So, with these internal injuries, Jones called Drs.    15:08:41

11  Ophoven and McKay.                                            15:08:49

12     Dr. Ophoven, with the abdominal injury, repeatedly changed 15:08:50

13  her timeline.  In her first report, she indicated that this   15:08:53

14  abdominal injury was 24 to 48 hours, and perhaps longer, prior 15:08:55

15  to her death.                                                 15:08:58

16     Her postmortem weight is consistent with these abnormal    15:09:01

17  chemistries, and in my opinion represents an injury that had to 15:09:05

18  be present greater than 24 to 48 hours, and perhaps longer.   15:09:09

19         THE COURT:  Maybe I'm misremembering, but didn't she   15:09:13

20  testify at the last evidentiary hearing that -- wasn't it a   15:09:16

21  different stain that was used to helped refine her assessment? 15:09:18

22         MR. BRACCIO:  Yeah.  Very good memory on this.  For    15:09:22

23  the vaginal injuries.                                         15:09:24

24         Now, I want to be very clear about what I think the    15:09:25

25  record says in this case, because I think this is sort of an  15:09:27

1    open question about what she reviewed.                    15:09:31

2         My review, when you look at her -- let me go to the   15:09:33

3    vaginal injuries.  This is everything that Ophoven has to say   15:09:37

4    about the vaginal injuries.                               15:09:52

5         She dated the vaginal injuries shortly before death in her   15:09:54

6    first two reports.  This is her 2002 report, Exhibit 103.  Now   15:09:57

7    let me key in on this right here.                          15:10:04

8         My review of the autopsy included 13 H&E stain tissue   15:10:07

9    slides, 13 trichrome stain tissue slides, 13 iron stain tissue   15:10:13

10   slides, autopsy report, toxicology and chemistry results.   15:10:18

11        My reading of Dr. Ophoven's report is that she reviewed   15:10:24

12   these tissue slides with this staining: the H&E, the trichrome,   15:10:27

13   and the iron.                                             15:10:32

14        Now, the atlas that they subsequently admitted in this   15:10:33

15   hearing -- and Dr. Ophoven doesn't make it clear on the stand   15:10:36

16   what new type of staining she reviewed.  And I think from the   15:10:39

17   atlas that I subsequently reviewed prior to argument today, it   15:10:43

18   indicates a trichrome stain.                              15:10:45

19        Those are the only stains possible to put onto a tissue   15:10:48

20   sample to determine the age.                              15:10:51

21        So I can't conclude from the record before the Court that   15:10:53

22   she reviewed any new type of special staining that would have   15:10:57

23   given her any special insight into that, or why she didn't   15:11:00

24   review that prior to this 2002 report.                    15:11:04

25        Again, from her 2002 report here, she says she reviewed   15:11:07

1   tissue slides.  Section from vagina, labia minora, genital skin   15:11:11

2   shows acute hemorrhage less than six hours prior to death.  So   15:11:17

3   Dr. Ophoven is putting the vaginal injury less than six hours   15:11:22

4   prior to death.   15:11:25

5       In addition, in her report, she subsequently concludes, to   15:11:31

6   a reasonable degree of medical certainty, the presence of   15:11:34

7   genital trauma without evidence of ejaculate leaves only the   15:11:38

8   conclusion that the child suffered acute injuries, most   15:11:41

9   probably penetrating, shortly before her death.   15:11:44

10      She said the exact same thing in her subsequent report, in   15:11:47

11  2009, that the child suffered acute injuries, most probably   15:11:55

12  penetrating, shortly before her death.  She concluded this, to   15:12:00

13  a reasonable degree of medical certainty, after reviewing those   15:12:05

14  tissue slides.   15:12:09

15      Then Ophoven changed her opinion about the vaginal injury   15:12:10

16  in her February 2010 report.  And I want to pull up that report   15:12:13

17  for the Court.   15:12:18

18      She says now, in 2010:  The presence of genital trauma   15:12:20

19  without evidence of ejaculate leaves only the conclusion that   15:12:24

20  the child suffered acute injuries, most probably penetrating,   15:12:28

21  sometime -- and now she brackets the change in her report --   15:12:31

22  days, or perhaps longer, before her death.   15:12:37

23      Now Ophoven is completely changing course and saying, oh,   15:12:41

24  this is not six hours before death, now it's going to be days.   15:12:44

25      She has evidence of trauma -- again, in the same report,   15:12:49

1    she says she has evidence of trauma in the genital region        15:12:56

2    consistent with penetrating sexual injury of indeterminate age.  15:13:00

3        This injury is a disruption or laceration of the tissue.     15:13:03

4    It cannot be determined how or when this injury occurred.        15:13:07

5        So now Dr. Ophoven, in 2010, is saying, "I have no idea      15:13:11

6    when this injury occurred, I simply can't determine the date."   15:13:16

7        I think this shift is so important, I put side by side for   15:13:19

8    the Court to see, from the 2002 and 2009 reports to the 2010     15:13:26

9    report:  The presence of genital trauma without evidence of      15:13:30

10   ejaculate leaves only the conclusion that the child suffered     15:13:34

11   acute injuries, most probably penetrating, shortly before her    15:13:37

12   death; then, now, sometime days, or perhaps longer, before her   15:13:41

13   death.                                                           15:13:46

14       Then at the hearing -- and this is getting right to Your     15:13:50

15   Honor's question -- Ophoven opined that the injury was weeks      15:13:53

16   old.                                                             15:13:57

17       This is Dr. Ophoven's testimony from the hearing.  The       15:13:57

18   question is:  So just to make sure I understand, there is an     15:14:04

19   injury that's older, that's what you're saying.  Yeah, the       15:14:06

20   wound that's unhealing (phonetic), that's weeks old.  And then:  15:14:10

21   I can't say that she had -- that she had been sexually misused   15:14:13

22   multiple times, for instance.                                    15:14:18

23       And I am going to talk about that here momentarily.          15:14:19

24           THE COURT:  And I'm happy to hear that, but I don't      15:14:24

25   want you to forget some the other questions, because you've got  15:14:27

1    less than 10 minutes left.                                    15:14:30

2        MR. BRACCIO:  Okay.  Getting back to this.  I will        15:14:31

3    answer those questions.                                       15:14:31

4        There is no evidence in this record that Rachel ever      15:14:33

5    complained to anyone about this vaginal injury, which was     15:14:36

6    extraordinarily severe.  This was half-an-inch in length and  15:14:38

7    three-sixteenths deep, and there is nothing in the record to  15:14:42

8    indicate that she ever said to anyone that she was in pain.   15:14:45

9        All the evidence in the record before this Court is that  15:14:49

10   Rachel was playing with the other children, bathing, riding her  15:14:51

11   bicycle the weekend before her death.                         15:14:53

12       In fact, I think Jones' current counsel walked her into   15:14:59

13   some extraordinary positions.                                 15:15:02

14       They asked her:                                           15:15:05

15           Can you say anything about the age of the injury --   15:15:06

16   this is the vaginal injury -- based upon these slides?        15:15:08

17           Answer:  Weeks.                                       15:15:12

18           Weeks?                                                15:15:13

19           Yeah.  This injury, this wound --                     15:15:14

20           Yes.                                                  15:15:17

21           -- began weeks prior.                                 15:15:17

22           Is it possible that this wound would have predated    15:15:19

23   when Mr. Jones began living with Rachel Gray and her family,  15:15:21

24   which was just a few weeks before her death?                  15:15:24

25           Yeah, it's possible.                                  15:15:27

1     They were living with Jones in the weeks before.  The          15:15:29

2  undisputed evidence in this record is that they moved in with     15:15:33

3  Jones at the beginning of April and lived with him for at least   15:15:36

4  a month.  So even saying that the injury's weeks old doesn't      15:15:39

5  predate them living with Jones.                                   15:15:43

6     And I think this also gets to Your Honor's Point.  Ophoven     15:15:49

7  admitted that there could be a newer injury.  This is her         15:15:52

8  testimony:                                                        15:15:56

9          Do you recall at the time telling me that you            15:15:56

10         couldn't exclude a fresh trauma to the vagina?            15:16:00

11         No, I couldn't, but what I was answering to you --        15:16:04

12  and I believe I already said that direct -- I couldn't say that  15:16:06

13  somebody didn't reinjure her or didn't cause newer bleeding or   15:16:08

14  trauma.                                                          15:16:12

15     Ophoven is saying there is a newer injury, which does not     15:16:15

16  exclude Jones.                                                   15:16:19

17     Dr. Keen also said the exact same thing about the vaginal     15:16:23

18  injury.  He said that he saw evidence of a newer vaginal injury  15:16:27

19  superimposed on an older injury.                                 15:16:33

20         Staying on the topic though of the vaginal injury, I      15:16:36

21  think you had told us at your interview, do you recall saying    15:16:39

22  that you saw evidence of a new injury superimposed on that old   15:16:45

23  injury?                                                          15:16:46

24         Yes, you see that.  You see that when you actually        15:16:48

25  look at the gross photographs, you can draw that conclusion      15:16:52

1    from the character of the laceration that's occurring on the          15:16:56

2    floor of the vaginal vault there.  But when you look at it            15:16:59

3    microscopically, you're seeing older things.                         15:17:03

4         Question:  So there is some sort of combination of an           15:17:07

5    older healing injury and a more fresh injury.                        15:17:09

6              In the vaginal.                                            15:17:13

7              In the vaginal.                                            15:17:14

8              Yes.                                                       15:17:15

9              Can you tell how fresh that new bleeding is, when          15:17:15

10   that would have occurred?                                            15:17:18

11             I can't really.                                            15:17:19

12             You just know that it's more recent than the older.       15:17:20

13             Yes.                                                       15:17:23

14             So you agreed, I think, before that there is evidence      15:17:24

15   of repeat trauma to Rachel's vagina.                                 15:17:27

16             Repeat injury.  I think I chose "injury" as opposed        15:17:30

17   to "trauma."                                                         15:17:36

18        So Dr. Keen is also saying that there is a recent vaginal       15:17:37

19   injury to Rachel.  Thus, Dr. Keen cannot rule out Jones as           15:17:41

20   having committed the sexual assault.                                 15:17:41

21        None of this evidence from Drs. Ophoven, McKay, or Keen         15:17:41

22   established prejudice because they cannot exclude him as the         15:17:41

23   assailant.  To the contrary, they support Jones' convictions.       15:17:54

24        This is the eyewitness -- let me turn my attention to the       15:17:58

25   Court's other questions, I want to make sure I answer those.         15:18:01

1            THE COURT:  You have six minutes left.                    15:18:05

2            MR. BRACCIO:  Okay.                                       15:18:06

3        Law enforcement's investigation.                             15:18:07

4        I think there's been a lot of accusations that they didn't   15:18:08

5    follow through or anything.  I think, to step back and actually  15:18:11

6    look at the investigation, the day after this death occurs,      15:18:14

7    Jones' ex-wife shows up and tells the police that Jones          15:18:18

8    violently assaulted his own children.  And there's an order of   15:18:22

9    protection in the record before this Court supporting that, as   15:18:25

10   well as her statements in the interview.                         15:18:28

11       In addition, Rachel's own statements were that Jones "did    15:18:31

12   this to me."  He hit me with the metal shoe bar, or the metal    15:18:35

13   shoe horn.  So we have the victim in this case pointing out who  15:18:41

14   her attacker is.                                                 15:18:45

15       And when they go to interview Jones, they start to           15:18:47

16   understand that he's telling all kinds of lies about having      15:18:50

17   sought out medical care for Rachel.                              15:18:53

18       And I think this also gets back to the fatal neglect as      15:18:55

19   well.                                                            15:18:58

20       When it's, well, did Jones really know?  Everybody who came  15:18:58

21   into contact with this child on Sunday saw her gravely hurt.     15:19:01

22   They all told Jones:  You need to take her to the hospital.      15:19:05

23   And Jones said:  Oh, I will.  And then Jones takes her back and  15:19:09

24   puts her down for a nap.  And then Jones lies to everybody and   15:19:13

25   says:  Oh, I've had her medical evaluated already and they've    15:19:16

1    determined that she's fine.                                    15:19:19

2       So not only is Jones not seeking help for Rachel, he is     15:19:20

3    affirmatively dissuading multiple other people from actually   15:19:24

4    getting her the help that she needed.                          15:19:27

5       So that's the law enforcement investigation.  They focused  15:19:30

6    on Jones because the evidence overwhelmingly pointed to him    15:19:34

7    immediately.                                                   15:19:38

8       I hope I've answered the Court's questions on the Arizona   15:19:38

9    non-unanimous jury law that any trial juror convicted Jones of 15:19:44

10   felony murder.  The jury convicted him unanimously on each     15:19:48

11   predicate offense unanimously.  They convicted him unanimously 15:19:52

12   on each one of those predicates.                               15:19:56

13      Does count four satisfy the Enmund-Tison standard?  That's  15:19:58

14   a very good question.                                          15:20:05

15      It's premature at this point, I think.  We've thought about 15:20:06

16   this question, we've given it some consideration.  I think it  15:20:09

17   does.  We'd like more briefing certainly for the next phase,   15:20:12

18   for the sentencing, because I think this is a sentencing claim. 15:20:16

19      But certainly the Arizona Supreme Court's opinion -- and I  15:20:20

20   have the record cite for that.  It's 937 P.2d 310 at 321.  This 15:20:23

21   is head notes 20 and 21.                                       15:20:29

22      The Arizona Supreme Court found that he was a major         15:20:32

23   participant in all underlying felonies.  And, of course, that's 15:20:35

24   in part a factual finding, which is entitled the deference     15:20:41

25   under the AEDPA, under 2254(e)(1).  And that, under *Tison*, he 15:20:45

1   acted with reckless indifference and was a major participant in   15:20:56

2   the underlying felony, and the *Tison* finding alone can stand.   15:21:00

3        And finally, the Court:  Why was it not deficient   15:21:04

4   performance of Jones' post-conviction counsel to request   15:21:08

5   funding for an investigator under the wrong rule?   15:21:11

6        Very glad the Court asked this question.  I didn't get a   15:21:15

7   chance to squarely address this in my briefing.   15:21:18

8        Again, the standard is objective reasonableness.   15:21:21

9        We have to look at what was before the PCR counsel, before   15:21:24

10  Judge Hazel at that time.  And on the record before him, he saw   15:21:27

11  that Bruner and Bowman had sought out an independent medical   15:21:30

12  pathologist, they had run down some of these injuries, these   15:21:33

13  injuries were all consistent.   15:21:37

14       He looked at the record and found that there was no need to   15:21:39

15  conduct additional investigation and to essentially go expert   15:21:42

16  shopping for that.   15:21:45

17       He testified he reviewed the whole file.   15:21:46

18       He testified specifically that it didn't matter what rule   15:21:48

19  he would have cited to the Court at that time.  The practice in   15:21:52

20  Pima County in 1994 and '95, and a couple years afterwards, was   15:21:55

21  that they weren't given him funding.   15:21:59

22       So what he testified to in this hearing was that he   15:22:01

23  conducted his own investigation, and his claims were   15:22:03

24  successful, they were colorable, he achieved an evidentiary   15:22:07

25  hearing on several of them.   15:22:09

1        I also believe the record shows --                    15:22:11

2            THE COURT:  I shouldn't be concerned that he couldn't  15:22:13

3    even cite the right authority for making the request?    15:22:17

4            MR. BRACCIO:  No, I think that's -- I think that's  15:22:19

5    poor.  He should have cited the right rule.  But, again, his  15:22:21

6    testimony was it didn't matter what rule I cited to the  15:22:24

7    Court --                                                  15:22:27

8            THE COURT:  But then didn't the Court -- didn't I come  15:22:28

9    back and say he didn't provide supporting information?    15:22:29

10           MR. BRACCIO:  Yeah.                                15:22:31

11           THE COURT:  Isn't that a problem?                  15:22:31

12           MR. BRACCIO:  I think his testimony was that "I didn't  15:22:35

13   know what I needed to look for, absent an investigator.  So  15:22:36

14   until I --"                                               15:22:39

15           THE COURT:  So what is it, a Catch-22?             15:22:40

16           MR. BRACCIO:  You know, he should -- you know, I can't  15:22:42

17   speak to -- I don't think it was a Catch-22.  He said he  15:22:45

18   testified in this hearing that he did his own investigation.  I  15:22:49

19   think he was the first to obtain an interview with Angela Gray.  15:22:52

20       So I think he did do a sufficient job.                15:22:57

21       And I think for purposes of this hearing and what the Court  15:23:01

22   needs to be concerned about, this is *Detrich*, from the Ninth  15:23:03

23   Circuit.  This is -- we're just looking through what PCR  15:23:08

24   counsel did.  I think he did an objectively reasonable job in  15:23:11

25   the PCR, but essentially their claim is that it's grounded in  15:23:15

1   all the claims that they've raised about trial counsel.          15:23:18

2           THE COURT:  No, I understand that.                       15:23:21

3           MR. BRACCIO:  Yeah, so if they can prove that any of     15:23:21

4   the trial counsel claims had merit, then he probably was        15:23:23

5   ineffective for failed to having raise that claim.  I think     15:23:27

6   it's probably that simple.                                      15:23:31

7           THE COURT:  Forty-five seconds.                          15:23:31

8           MR. BRACCIO:  Okay.  Let me see if I can do it.          15:23:32

9       I do want to talk about Dr. Howard's statements.            15:23:34

10          THE COURT:  Start talking.                               15:23:37

11          MR. BRACCIO:  He were go.  Here were Dr. Howard's        15:23:40

12  statements about the small bowel duodenal injury.               15:23:47

13      In his defense pretrial interview, he stated:  This         15:23:49

14  inflammatory response is a matter of at least hours, perhaps a  15:23:52

15  day, hours to a day, progressively worsening.                   15:23:56

16      Angela Gray's trial, I'm going to hit the highlights here.  15:23:59

17  One day prior to death.  Twenty-four hours prior to death.      15:24:02

18  Findings are most consistent with that.  Several hours, perhaps 15:24:06

19  12 hours, to get the degree of inflammation, that's             15:24:09

20  conceivable.  He was asked:  It would be from 12 hours on up    15:24:14

21  to, say, 24 to 36 hours?  Answer:  Yes.                         15:24:16

22      Barry Jones' trial, what did he tell the Barry Jones jury?  15:24:20

23  Based upon the autopsy, the injury is typical of having         15:24:25

24  occurred about one day prior to death.  This typical one-day    15:24:28

25  approximation included the head laceration, genital injuries,   15:24:32

1   and external bruises.  He was asked:  Is this consistent with          15:24:35

2   having occurred between 2:00 and 5:30 or 6:00 o'clock on May           15:24:39

3   1st?  He testified:  Any time on the 24 hours prior to that            15:24:45

4   would be consistent, so that time would be possible.                   15:24:49

5          THE COURT:  All right.  We're going to have to end it           15:24:51

6   there.  You're over time.                                             15:24:53

7          MR. BRACCIO:  Thank you Your Honor.                             15:24:55

8          THE COURT:  Thank you, very much.                               15:25:00

9          MR. SANDMAN:  How much time do I have?                          15:25:18

10          THE COURT:  You have 11 minutes and 55 seconds.                15:25:20

11          MR. SANDMAN:  Let me quickly go back to question one,          15:25:23

12   where we started this afternoon.                                      15:25:26

13          Your Honor, you'll read the closing argument, I am             15:25:27

14   sure, and you will find that the answer to your first question        15:25:31

15   for both counsel, the answer is no.                                   15:25:36

16          The prosecutor never ever said to the jury "even if           15:25:39

17   you find him not guilty of this, then he's guilty of that."          15:25:45

18   It's not in there.                                                    15:25:50

19          Secondly, Mr. Braccio pointed out the verdict form            15:25:51

20   where the jury found him guilty.  But they found him guilty of        15:25:56

21   intentional and knowing child abuse.                                  15:26:00

22      The whole question now, in light of the fact that we have         15:26:01

23   evidence that Mr. Jones is not the perpetrator, there are other       15:26:04

24   boxes on the verdict that says negligent or reckless.  And my         15:26:08

25   contention is -- is to get from intentional to negligent, where       15:26:13

1    we want to be, or below negligent.  But we want to get away      15:26:18

2    from intentional or knowing.  To get there, the lawyers have to  15:26:22

3    prove he is not the killer, he is not the person who assaulted   15:26:26

4    the child; and to do that, they have to present medical          15:26:28

5    evidence.  They've got to do all those things to show it wasn't  15:26:34

6    him.                                                             15:26:38

7            THE COURT:  Because it's the -- him being the            15:26:38

8    perpetrator puts him on notice of the severity of the           15:26:42

9    injuries --                                                     15:26:45

10           MR. SANDMAN:  That gets you to intent.  And if he's      15:26:45

11   just -- I mean, you saw pictures of Barry Jones, you saw his     15:26:48

12   trailer.  If he just doesn't have it together and he's making   15:26:53

13   horrible decisions but is not the killer, then it's a lower     15:26:56

14   class of crime, it's not a murder case.                         15:27:00

15           Mr. Braccio failed to read to you -- after reading a    15:27:03

16   number of pages from the closing argument, he failed to read    15:27:06

17   this from Page 104, Line 21 through Page 105, 2.  Quote:  Only   15:27:09

18   the defendant knew how badly she was hurt.  Only the defendant  15:27:16

19   had the means of taking the baby to the hospital; but for       15:27:20

20   obvious reasons he could not, so he let her die.                15:27:24

21           And that's how they intertwined -- they got to the      15:27:27

22   mens rea they needed to get to.                                 15:27:33

23           In any event, I want to move on to another issue:       15:27:36

24   Dr. Keen.                                                       15:27:41

25           Your Honor, your recollection was correct.  When        15:27:44

1    Dr. Keen testified on October 31st, at Pages 71 and 73, he          15:27:49

2    reiterated that he would have needed to have reviewed the           15:27:55

3    slides to make any assessment, reliable assessment, of when the     15:27:58

4    injuries took place.                                                15:28:03

5         Dr. Keen is not the one to blame for not looking at            15:28:05

6    the slides.  As I said, on a more --                                15:28:08

7         THE COURT:  Isn't it conceivable though, if I                  15:28:10

8    understand the respondent's argument, that he could have, in        15:28:12

9    that telephone conversation with counsel, discussed it and said     15:28:17

10   you're barking up the wrong tree?                                   15:28:22

11        MR. SANDMAN:  The answer is no.                                15:28:27

12        THE COURT:  Which obviated the need to send the                15:28:28

13   slides?                                                             15:28:32

14        MR. SANDMAN:  Based on the evidence before this Court,         15:28:33

15   Dr. Keen testified that he would have told counsel that he          15:28:35

16   could not reliably -- and this is also in his declaration,          15:28:39

17   which is an exhibit:  I would have told the lawyers I could not     15:28:44

18   reliably date the injuries without looking at the physical          15:28:47

19   evidence.                                                           15:28:50

20        That's the testimony.                                          15:28:51

21        So I don't think, based on that uncontradicted record, that    15:28:52

22   we can presume that Dr. Keen said something else.                   15:28:56

23        It's pretty standard.                                          15:28:59

24        As I noted earlier, Mr. Bruner told Judge Carruth he needed    15:29:04

25   someone to look at the slides.  Dr. Howard was looking at           15:29:09

1    slides.  Everybody -- they knew that that had to be done, and         15:29:12

2    they did not do it.                                                   15:29:15

3        Dr. Ophoven.  Her 2010 report, consistent with her               15:29:19

4    testimony, indicates that she did apply additional standing to        15:29:26

5    the anogential tissues, and it indicated substantial healing,         15:29:31

6    not consistent with a fresh penetrating injury.  And then she         15:29:36

7    went on to say it didn't happen within the few days before her        15:29:41

8    death.                                                                15:29:45

9        And on the final page of her three-page report, which is         15:29:45

10   Exhibit 106, I am looking at now, she said that the injury to         15:29:48

11   the vagina shows evidence of healing.                                 15:29:59

12       Then when she testified, you asked her some questions about      15:30:01

13   this specifically.  And she said -- this was at Page -- I             15:30:06

14   believe Page 70.                                                      15:30:12

15       Your Honor, when you questioned her, she said there was no       15:30:14

16   retraumatizing to the point where there was a retear.  That           15:30:17

17   tear was old.  It certainly didn't happen on May 1st, 1994.           15:30:22

18   And she couldn't exclude the fact that somebody might have            15:30:29

19   stuck something in her on that Sunday.  But the point is that         15:30:33

20   tear is old; not as the jury at Mr. Jones' trial was told, that       15:30:40

21   it was all new.                                                       15:30:46

22       She said that was a healing injury and that bleeding might       15:30:49

23   be due to DIC.  Quoting her:  There was no retraumatizing to          15:30:51

24   the point where it was retorn.  The wound is unhealing and            15:30:55

25   weeks old.                                                            15:31:00

1      That's a far cry from what Mr. Jones' jury was told, that        15:31:05

2   the vaginal tear occurred on Sunday.  This injury, she said,        15:31:09

3   potentially goes back weeks.                                        15:31:13

4      And then Dr. Keen looked at the same slides and said that        15:31:14

5   it was not new, and that -- some of the hemorrhaging he related     15:31:18

6   to sanitary and hygiene.  And he didn't relate anything to --       15:31:23

7   he thought it could have been reinjured, he said, but not           15:31:29

8   retraumatized.                                                      15:31:33

9      That's an old injury.  And this case was not tried on the        15:31:36

10  theory that there was some old injury and she was touched by        15:31:41

11  Mr. Jones on Sunday.  That wasn't the case.                         15:31:46

12     There was a brief reference to Rachel's statements, which        15:31:49

13  of course were not presented to Jones' jury.  And they're not       15:31:54

14  appropriate to be -- they were excluded from the trial, the         15:31:58

15  jury never heard them, and they're not appropriate to be            15:32:01

16  considered here.                                                    15:32:04

17     As for Mr. Hazel, according to Mr. Cooper and Ms. Bowman         15:32:04

18  and Mr. Bruner, there was money to go around if you knew how to     15:32:14

19  ask for it, number one.  Number two, if Mr. Hazel thought that      15:32:17

20  he wasn't going to get money and that was a fait accompli, an       15:32:22

21  effective lawyer makes a record.  And Mr. Cooper testified          15:32:27

22  about this.                                                         15:32:29

23     Even without Mr. Cooper's testimony, it's obvious that if I      15:32:31

24  think, Your Honor, you're not going to give me money, I'm going     15:32:36

25  to make a super record about why I need that money for my           15:32:41

1    indigent client.  Otherwise I've kept it a secret, I'm not         15:32:45

2    going to try, and then we don't get any funding, I have nothing    15:32:50

3    to appeal.  I mean, an effective lawyer always makes a record      15:32:53

4    with respect to his needs.                                         15:32:57

5         Mr. Hazel testified that he had plenty of information in      15:33:01

6    front of him that would have warranted the request for a           15:33:04

7    medical expert.  He never asked for that.  He asked for an         15:33:07

8    investigator.                                                      15:33:11

9         So I think the record is clear that Mr. Hazel was anything    15:33:12

10   but effective (sic).  Ineffective.  Excuse me.                     15:33:18

11        I have a couple of extra seconds, so let me go back to        15:33:33

12   question one again on count four.                                  15:33:38

13        Mr. Braccio argued, and they argued in their briefs, that     15:33:39

14   somehow you're bound by the jury verdict that they found intent    15:33:42

15   and knowing conduct.  That is not true.                            15:33:45

16        Obviously, that mens rea determination was affected by the    15:33:47

17   ineffective assistance of trial counsel.  They don't               15:33:54

18   make the -- our contention is they don't make the intentional      15:33:57

19   and knowing finding when they find out Mr. Jones didn't do any     15:34:01

20   of this.                                                           15:34:03

21        So you're not bound by anything in the verdicts of this       15:34:03

22   jury.  That's the whole point of this proceeding.  If the          15:34:08

23   ineffective assistance reached the case and we've demonstrated     15:34:11

24   that, then that verdict doesn't stand.                             15:34:17

25        So I think, with that, Your Honor --                          15:34:20

REBUTTAL ARGUMENT BY PETITIONER

1          THE COURT:  What about the argument that Dr. Howard in    15:34:22

2    fact didn't testify inconsistently between Angela Gray's trial   15:34:26

3    and Mr. Jones' trial?                                            15:34:32

4          MR. SANDMAN:  Well, I mean, Judge, I believe that I       15:34:35

5    demonstrated unequivocally when Dr. Howard was on the stand     15:34:37

6    that he changed his testimony.  We cited in our briefs his      15:34:42

7    admission that his testimony was different.  The lawyers are    15:34:45

8    arguing that his testimony wasn't different, Dr. Howard         15:34:51

9    testified that it was.  That's in the record.  And I can't give  15:34:55

10   you the pin cite to that.  We've cited that in our briefs and   15:34:58

11   it's in the record and he acknowledged it.                      15:35:01

12        And you can't testify at the Gray trial that the injury is  15:35:05

13   most consistent with 24 hours before death and then show up in  15:35:08

14   front of Mr. Jones' jury and you're asked the same question and  15:35:12

15   you gave a different answer.                                    15:35:16

16        Now, I understand the argument they're playing around with  15:35:17

17   days; that he always said, well, it could have been a day here  15:35:20

18   or two days there.  But that's not the point.  He said the     15:35:24

19   injury was most consistent at a time when my client didn't have  15:35:27

20   care and custody of that child.  He said that both with respect  15:35:31

21   to the vaginal injury and the bowel injury.  And then the scalp  15:35:34

22   injury, he changes that testimony at the Gray trial from        15:35:38

23   several days the wound would have been painful, to, no, it      15:35:43

24   happened Sunday afternoon.                                      15:35:46

25        So I understand people can read things differently, but I   15:35:48

1    don't think it's reasonable to suggest that his testimony was          15:35:56

2    not different and that it did not ultimately mislead Mr. Jones'        15:35:58

3    jury.                                                                  15:36:03

4              THE COURT:  Thank you.                                       15:36:06

5              All right.  I will take this matter under advisement.        15:36:08

6    I'll be in touch.  You'll get my decision.  Thank you.                 15:36:14

7              MR. BRACCIO:  Judge, do you want a copy of our               15:36:18

8    PowerPoint presentation?  We sometimes file those with the             15:36:20

9    Court if it's helpful.                                                 15:36:22

10             THE COURT:  Well, you know, I think I am going to rely        15:36:25

11   on what was argued here today, because this hasn't really been         15:36:31

12   filed as an exhibit in this case.  But, thank you.                     15:36:36

13             (Proceedings concluded at 3:36 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3            I, A. TRACY JAMIESON, do hereby certify that I am

4    duly appointed and qualified to act as an Official Court

5    Reporter for the United States District Court for the District

6    of Arizona.

7            I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true and accurate transcript of the proceedings

9    contained herein, held in the above-entitled cause on the date

10   specified therein, and that said transcript was prepared by me.

11           Signed in Tucson, Arizona, on the 9th day of March,

12   2018.

13

14

15
                              s/A. Tracy Jamieson_____
16                            A. Tracy Jamieson, RDR, CRR

17

18

19

20

21

22

23

24

25