**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barry Lee Jones, | No. CV-01-00592-TUC-TMB |
|            Petitioner, | |
| v. | <u>DEATH PENALTY CASE</u> |
| Charles L. Ryan, et al, | |
|            Respondents. | |

## MEMORANDUM OF DECISION AND ORDER

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 3

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................ 4

III.  GOVERNING LAW ..................................................................................... 8

IV.   RELEVANT FACTS ................................................................................... 11

      A.   Trial Court Proceedings: The Evidence Presented at Trial ............................. 11

           1.   Rachel's Injuries and Cause and Time of Death ...................................... 13

           2.   Events of April 30–May 2, 1994 ........................................................... 20

      B.   Post-Conviction Relief Proceedings .................................................................. 26

      C.   Federal Habeas Proceedings ............................................................................. 27

           1.   Evidence Suggesting the Need for Further Investigation......................... 28

           2.   Evidence That Could Have Been Presented at Trial ............................... 46

V.    ANALYSIS .................................................................................................. 60

      A.   Ineffective Assistance of Trial Counsel: Deficient Performance ..................... 60

           1.   Medical Evidence .................................................................................. 60

           2.   Bloodstain Evidence .............................................................................. 66

           3.   Reliability of Eyewitness Testimony/Accident Reconstruction.............. 67

           4.   Funding ................................................................................................. 69

           5.   Trial Strategy ......................................................................................... 70

      B.   Ineffective Assistance of Trial Counsel: Prejudice ......................................... 72

           1.   Timing of Rachel's Injuries.................................................................... 72

           2.   Bloodstain Evidence .............................................................................. 76

           3.   Reliability of Eyewitness Testimony/Accident Reconstruction.............. 79

           4.   Conclusion ............................................................................................ 80

      C.   Ineffective Assistance of PCR Counsel: Deficient Performance ..................... 84

      D.   Ineffective Assistance of PCR Counsel: Prejudice .......................................... 90

VI.   CONCLUSION ............................................................................................ 90

## I.    INTRODUCTION

Petitioner Barry Lee Jones ("Petitioner") is a state prisoner under sentence of death. In 2001, Petitioner filed a Petition for Writ of Habeas Corpus ("Petition") alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. The Court denied the Petition. This matter is now before the Court on limited remand from the Ninth Circuit Court of Appeals. (*See* Doc. 158.)[1] The Court of Appeals has ordered this Court to reconsider Petitioner's claim of ineffective assistance of counsel ("IAC") in failing to conduct an adequate investigation at the guilt and penalty phases of trial ("Claim 1D"),[2] in the light of intervening law, including *Martinez v. Ryan*, 566 U.S. 1 (2012).

Following supplemental briefing (Docs. 167, 175, 180), the Court found that an evidentiary hearing would be necessary to determine whether Petitioner could establish cause to excuse the procedural default of Claim 1D. (Doc. 185.) On October 30, 2017, the Court held a seven-day evidentiary hearing on the guilt-phase portion of the IAC claim. Following the hearing, the parties submitted post-hearing briefs and responses. (Docs. 288–291.) After careful consideration of the trial record and the evidence and argument presented in these proceedings, the Court concludes that Petitioner has established cause to excuse the procedural default of his meritorious guilt-phase IAC claim, and grants the Petition.[3] Petitioner will be released from custody unless, within 45 days, the State initiates new trial proceedings against him.

---

[1] "Doc." refers to numbered documents in this Court's case file (prior to August 2005) and this Court's electronic case docket (beginning August 2005).

[2] This Court previously denied on the merits a narrow subset of Claim 1D—the allegation of ineffectiveness based solely on counsel's failure to meet with Petitioner a sufficient number of times to prepare an adequate defense. (Doc. 141 at 24.) That subset of Claim 1D is not at issue in this limited remand.

[3] The Court addresses only the guilt-phase portion of this claim because, in light of its disposition, the penalty-phase portion of the claim need not be reviewed. *See Hernandez v. Chappell*, 878 F.3d 843, 865 n.4 (9th Cir. 2017).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In April and early May 1994, Petitioner was sharing his trailer with Angela Gray ("Angela") and her three children, including the four-year-old victim in this case, Rachel Gray ("Rachel"), and her siblings, 11-year-old Rebecca Lux ("Becky") and 14-year-old Jonathon Lux ("Jonathon"). Petitioner's 11-year-old daughter Brandie Jones ("Brandie") also lived in the same trailer. At approximately 6:15 a.m. on Monday, May 2, 1994, Petitioner drove Rachel and Angela to Kino Community Hospital in Tucson, Arizona, dropped them off, and left. Rachel was admitted and pronounced dead on arrival. Her cause of death was determined to be homicide caused by a small bowel laceration due to blunt abdominal trauma. Rachel also had a laceration of her left scalp behind the ear, injuries to her labia and vagina, and multiple internal and external contusions.

Petitioner was arrested that same day and charged with knowingly and intentionally: (1) engaging in an act of sexual intercourse with Rachel, in violation of A.R.S. § 13-1406 (Count One); (2) causing physical injury to Rachel by striking her abdominal area causing a rupture to her small intestine under circumstances likely to produce death or serious physical injury, in violation of A.R.S. §13-3623(B)(1) (Count Two); (3) causing physical injury to Rachel by bruising her face and ear and causing a laceration to her head, in violation of A.R.S §13-3623(C)(1) (Count Three); (4) causing Rachel to be placed in a situation where her health was endangered under circumstances likely to produce death or serious physical injury, in violation of A.R.S. § 13-3623(B)(1) (Count Four); and felony murder, in violation of A.R.S. § 13-1105 (Count Five).[4] Angela was also charged under Counts Four and Five of the indictment, but was tried separately and  convicted under Count Four prior to Petitioner's trial. (ROA 2; Doc. 288, Supp. Ex. 1.)[5] Because the jury determined Angela acted recklessly, rather than intentionally or knowingly, in failing to

---

[4] Pima County Superior Court Judge James C. Carruth presided over Petitioner's trial and sentencing. Pima County Superior Court Judge John M. Quigley presided over Petitioner's petition for post-conviction relief proceedings.

[5] The Court takes judicial notice of the verdict and judgment against Angela Gray.

- 4 -

render care she was ineligible for conviction of felony murder and therefore acquitted on Count Five. (Doc. 288, Supp. Ex. 1.)

Petitioner was tried before a jury in April 1995. The gravamen of the prosecution's case against Petitioner was that Rachel was solely in Petitioner's care on the afternoon of May 1, 1994 when her injuries, including her fatal abdominal injury, were inflicted. The trial judge instructed the jurors that two of the child abuse charges—Count Two, alleging Petitioner struck Rachel in the abdomen rupturing her small intestine, and Count Four, alleging Petitioner endangered Rachel by failing to take her to a hospital—and the sexual assault charge—Count One—could be predicate felonies for the felony murder charge. The trial judge further instructed the jurors that the child abuse charges could only be predicate felonies if Petitioner committed them intentionally or knowingly under circumstances likely to produce death or serious physical injury. *See State v. Jones*, 188 Ariz. 388, 391, 937 P.2d 310, 313 (1997). Petitioner was convicted on all charges. *See Jones*, 188 Ariz. at 391, 937 P.2d at 313. The jurors found that both child abuse charges that qualified as predicate felonies were committed under circumstances likely to cause serious physical injury or death and that Petitioner's mental state was intentional or knowing.

During the penalty phase of trial, Judge Carruth found the existence of two aggravating factors: the murder was especially cruel and the victim was under the age of 15. Judge Carruth found no mitigating factors sufficiently substantial to call for leniency, and sentenced Petitioner to death for the first-degree murder conviction.

The Arizona Supreme Court affirmed the convictions and sentences, finding that evidence supported the conclusion that virtually all of Rachel's injuries occurred within a two-hour period:

> . . . Rachel's sister, Rebecca, testified that Rachel spent the morning with her and their brother watching cartoons. Rachel "seemed fine" when her siblings went out to ride their bikes, about 3:00 p.m. Additionally, Rachel "seemed fine" after the first two times that she returned with defendant. Rachel first accompanied defendant to the market. Rebecca saw Rachel standing at the door when they returned, and she seemed fine. The second time defendant returned with Rachel, Rebecca again saw her standing at the door, and Rachel appeared to be fine. If Rachel had already suffered genital

- 5 -

injuries, she would have been in pain. The examiner testified at the aggravation/mitigation hearing that the genital injuries would have caused pain at basically all times. The third time that defendant went out with Rachel, he told Rebecca that he was going to his brother's house. However, his brother's wife testified that defendant never visited their house on that day. During defendant's third trip with Rachel, two children saw defendant hitting Rachel while he drove. One of the children placed the time at 5:00 p.m. Blood spatter in the van likely was created by defendant hitting Rachel after she had already suffered a head injury. Additionally, blood spatter consistent with Rachel's blood type was found on defendant's jeans, along with traces of blood on defendant's shirt and boots. The next time that Rebecca saw Rachel, at about 6:30 p.m., Rachel was in a lot of pain. Many of the injuries that Rachel now had were consistent with defense against a sexual assault. Thus, substantial evidence was introduced to conclude that Rachel's physical assault and sexual assault all occurred within the two-hour time period during which she was alone with defendant in his van.

The evidence of the time period of Rachel's injuries, the testimony that defendant was seen hitting her, the fact that Rachel was fine before she went out with defendant the third time and was injured when she returned, and the fact that defendant told others that he had taken Rachel to see the paramedics when he had not, support the finding that defendant committed the sexual assault along with, and as part of, the overall physical assault.

*Jones*, 188 Ariz. at 397, 937 P.2d at 319.

Petitioner filed a petition for post-conviction relief ("PCR") with the trial court. After an evidentiary hearing, the PCR petition was denied in its entirety. (ROA-PCR 31.)[6] The Arizona Supreme Court summarily denied Petitioner's Petition for Review. (PR 7.)

---

[6] "ROA" refers to the 5-volume record on appeal from trial and sentencing. "APP" refers to the record on appeal from direct review to the Arizona Supreme Court. "ROA-PCR" refers to the docket numbers from the one-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-01-0125-PC). "PR" refers to the docket numbers of documents filed at the Arizona Supreme Court for that petition for review proceeding. "RT" refers to the reporter's transcripts from Petitioner's state court proceedings. The state court original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on December 12, 2001. (Doc. 16.) "EH RT" refers to the reporter's transcripts from Petitioner's evidentiary hearing in his federal habeas proceedings. "EH Ex. at ____" refers to the Bates stamped page number of exhibits admitted during Petitioner's evidentiary hearing in his federal habeas proceedings.

Petitioner initiated this federal habeas proceeding on November 5, 2001 (Doc. 1), and filed an amended petition on December 23, 2002, raising 21 claims (Doc. 58). In Claim 1D of the petition, he alleged, in part, that counsel was ineffective for failing to:

(1)  adequately investigate potential other suspects and crucial witnesses;

(2)  raise legal challenges to eyewitness identifications;

(3)  adequately challenge blood-spatter testimony; and

(4)  hire a forensic pathologist to challenge the State's evidence regarding the nature and timing of the victim's injuries.

(*Id.* at 37–66.) The parties briefed the claims (Docs. 69, 79) and motions for evidentiary development (Docs. 89, 90, 101, 102, 108, 109, 113). Petitioner asserted PCR counsel's ineffectiveness as cause to excuse the procedurally defaulted portion of Claim 1D. (Doc. 79 at 25, 60–62.) This Court determined, consistent with then-governing Supreme Court precedent, *see Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), that PCR counsel's purported ineffectiveness did not constitute cause for the procedural default because "there is no constitutional right to counsel in state PCR proceedings." (Doc. 115 at 9–11.) The Court ordered supplemental briefing regarding Petitioner's allegation that it would be a fundamental miscarriage of justice not to review the entirety of Claim 1D on the merits. (*Id.* at 40.) The Court denied relief on September 29, 2008, concluding that Petitioner had not satisfied the fundamental miscarriage of justice standard to overcome the default of Claim 1D. (Doc. 141 at 23.)

While Petitioner's appeal from this Court's denial of habeas relief was pending, the Supreme Court decided *Martinez*, holding that where IAC claims must be raised in an initial PCR proceeding under state law, failure of counsel in that proceeding to raise a substantial trial IAC claim may provide cause to excuse the procedural default of the claim. 566 U.S. 1, 17 (2012). Subsequently, Petitioner moved the Ninth Circuit to stay his appeal and grant a limited remand in light of *Martinez*. The Ninth Circuit granted the motion and remanded for reconsideration of Claim 1D, stating that "Claim 1D is for purposes of remand substantial." (Doc. 158) (citing *Martinez*, 566 U.S. 1; *Trevino v. Thaler*, 569 U.S. 413 (2013); *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc); *Dickens v. Ryan*,

740 F.3d 1302 (9th Cir. 2014) (en banc)).

In September 2015, the parties completed supplemental briefing in this Court. For purposes of the evidentiary hearing, the Court bifurcated Claim 1D into guilt-phase and penalty-phase subsections, and, on October 30, 2017, held an evidentiary hearing to determine if Petitioner could establish cause, under *Martinez*, to excuse the procedural default of the guilt-phase subsection.

## III.  GOVERNING LAW

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman*, 501 U.S. at 750. In such situations, federal habeas review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Id.* *Coleman* held that the ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court announced a new, "narrow exception" to the rule set out in *Coleman*. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino*, 569 U.S. at 423.

Accordingly, under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984)' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *see also Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by*

*McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc); *Dickens*, 740 F.3d at 1319–20; *Detrich*, 740 F.3d at 1245. A determination that a petitioner has shown cause and prejudice sufficient to overcome a procedural default allows a federal court to consider de novo "the merits of a claim that otherwise would have been procedurally defaulted." *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017) (quoting *Martinez*, 566 U.S. at 1) (internal quotation marks omitted).

In *Clabourne*, the Ninth Circuit summarized its *Martinez* analysis. To demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must make two showings:

> First, to establish "cause," he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland. Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different. *See Strickland*, 466 U.S. at 687, 694, 104 S.Ct. 2052. Second, to establish "prejudice," he must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S.Ct. at 1318.

*Clabourne*, 745 F.3d at 377.

The remand order in this case states that "the remanded claims are for purposes of remand substantial." (Doc. 140 at 2.) Because the Ninth Circuit has already found the remanded claim substantial, prejudice under *Martinez* has been established. The issue of cause remains—that is, whether post-conviction counsel's performance was ineffective under *Strickland*. The Court will address cause by assessing PCR counsel's performance and the strength of the underlying ineffective assistance of trial counsel claim. *See Clabourne*, 745 F.3d at 377–78. Determining whether there was a reasonable probability of a different outcome of the PCR proceedings "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* "PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to

trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689; *see also Wong v. Belmontes*, 558 U.S. 15, 17 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). The Court exercises a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. With respect to *Strickland*'s second prong, when a petitioner challenges a conviction, the court considers "the totality of the evidence" before the jury and "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. In other words, contrasting the evidence presented to the jury with that which could have been presented, the Court asks whether the omitted evidence would have created reasonable doubt in the mind of at least one reasonable juror. *Hernandez v. Chappell*, 878 F.3d 843, 852 (9th Cir. 2017) (quoting *Daniels v. Woodford*, 428 F.3d 1181, 1201 (9th Cir. 2005); *Rios v. Rocha*, 299 F.3d 796, 813 (9th Cir. 2002)).

With respect to the guilt-phase subsection of his claim, Petitioner alleges that his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's failure to conduct a sufficient trial investigation and adequately investigate the police work,

medical evidence, and timeline between Rachel's fatal injury and her death. Petitioner further alleges that post-conviction counsel performed deficiently within the meaning of *Strickland* when he failed to investigate and present this substantial IAC claim, thus excusing the procedural default of the claim under *Martinez*. Respondents assert that Petitioner has not shown that PCR counsel was ineffective in failing to raise the claim because PCR counsel raised multiple IAC claims and attempted to obtain additional resources. Respondents also argue that Claim 1D fails on the merits and that Petitioner therefore cannot establish cause under *Martinez* because he was not prejudiced by PCR counsel's performance as there was no "reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." (Doc. 175 at 14) (quoting *Clabourne*, 745 F.3d at 377).

In section IV below, the Court describes the proceedings and the relevant evidence as discussed at the trial, post-conviction relief, and federal habeas stages of Petitioner's case. In section V, the Court analyzes these facts in light of the above framework.

## IV.    RELEVANT FACTS

The following section describes (1) the trial proceedings and evidence presented at trial, (2) the proceedings at the post-conviction relief phase, and (3) the evidence presented during these federal proceedings that Petitioner asserts was available at the time of his trial that either suggested the need for further investigation by trial counsel or could have been presented at trial.

### A.    Trial Court Proceedings: The Evidence Presented at Trial

Attorney Sean Bruner[7] was appointed to represent Petitioner on May 3, 1994, the day after Petitioner's arrest. Bruner's partner Leslie Bowman, who at that time had been admitted to the bar for a little less than a year, also represented Petitioner as an informal "second-chair" attorney though she was never formally appointed by the trial court. (EH

---

[7] Bruner was admitted to the bar in 1981 and received a criminal law specialist certification in 1990. (EH Ex. 9 at 1.) Prior to Petitioner's case, Bruner had represented one death-eligible defendant at trial. (*Id.*)

RT 10/30/17 at 44; EH Ex. 9 at 1.) As Petitioner's court-appointed counsel, it was Bruner's sole responsibility to ensure Jones received competent representation.

At trial, the State sought to prove that (1) only an adult was capable of inflicting the fatal small bowel wound; (2) Rachel's fatal injuries were inflicted in the late afternoon on May 1, 1994, sometime after 2:00 p.m. when Petitioner woke up for the day; and (3) Petitioner was the only adult that had care of Rachel at that time and took her on several trips away from the trailer park in his van. The prosecutor summarized the State's theory in closing: "Who is her rapist? Who is her murderer? The answer to that question is simple. Who was with her all day on Sunday, May 1st." (RT 4/13/95 at 92.) In order to support the intentional or knowing infliction of the child abuse charge alleged in Count Four, the prosecutor argued that Petitioner beat Rachel in order to rape her, and when Petitioner failed to take her to the hospital, "[s]he died as a result of that beating because only the defendant knew how badly she was hurt." (*Id.* at 104.)

The State bolstered its theory by presenting the testimony of two neighborhood children who allegedly observed Petitioner abusing Rachel as he took her on one of three trips in his van on the day before her death. The State also presented testimony that the laceration on Rachel's scalp as well as some of the abdominal contusions and abrasions were consistent with having been inflicted between 2:00 p.m. to 5:30 p.m. on May 1, and with being hit with a pry bar found in Petitioner's van. Additionally, the State presented evidence that the blood found in Petitioner's van was Rachel's, and, based on bloodstain analysis, was consistent with an assault on Rachel that took place in the van.

Bruner acknowledged in opening statements that "[e]verything in this case is going to center around what happened on Sunday, May 1st. Specifically, a couple of disputed hours . . . ." (RT 4/6/95 at 60.) Bruner asserted that on May 1, there was nothing obvious about Rachel that would have caused Petitioner to think he needed to take her to the hospital. He asserted that nobody would testify that Rachel looked as she appears in the autopsy photos, suggesting the bruising on her body in the photos had something to do with lividity, or the pooling of blood after the heart stops beating. (*Id.* at 61.) Bruner further

asserted that the testimony of the neighborhood children, if believable, "is strong proof for the State," but "they couldn't possibly have seen what they claim now months later to have seen," then admitted he could not explain, exactly, why that was, suggesting that the jury should just decide for themselves if a "couple small children looking up at that van, whether they could have possibly seen what they now claim to have seen . . . ." (*Id.* at 64–65.)

The following is a summary of the testimony and evidence presented by the State at Petitioner's trial that established when Rachel was injured, who she was with when the injuries occurred, and where the injuries occurred. The State presented numerous witnesses who testified about the medical and physical evidence, as well as the events of the days immediately prior to and following her death. Defense counsel presented no witnesses to challenge the medical timeline from injury to death, and presented only one witness in total, Petitioner's 11-year old daughter Brandie, in support of his case.

### 1. Rachel's Injuries and Cause and Time of Death

The State presented critical evidence at Petitioner's trial from witnesses that established that most of Rachel's injuries, including the fatal injury, were consistent with infliction between 2:00 p.m. and 5:30 p.m. on May 1, 1994. Rachel's body was examined by Steven Siefert, an emergency room doctor at Kino Community Hospital; by Sergeant Sonia Pesquiera[8] of the Pima County Sheriff's Department ("PCSD"), the lead investigator of Rachel's death; and by Dr. John Howard, a forensic pathologist with the Pima County Medical Examiner's office.

#### a. *Time of Death*

Dr. Siefert was the first to examine Rachel, and testified that she was dead upon arrival at the hospital. (RT 4/6/95 at 77.) Based on temperature and the existence of rigor mortis, Dr. Siefert estimated that Rachel died sometime two to three hours before she arrived at the hospital at 6:16 a.m. on May 2, 1994. (*Id.* at 74, 76–77, 80.) This fact is not in dispute.

---

[8] Sergeant Sonia Pesquiera was known as Sonia Rankin at the time of the investigation.

b.      _External Bruising and Abrasions_

Sergeant Pesquiera examined Rachel's body at the hospital and, based on her training and experience with approximating ages of bruising based upon their color and appearance, testified that Rachel's body was covered with contusions and abrasions which were in varying stages of healing; some bruising appeared new, such as along her eyelid, and some appeared to be in the healing stage, such as on the bottom of her eyes. (RT 4/12/95 at 34, 37.) Over defense counsel's objection, Sergeant Pesquiera opined that the injuries were not accidental. (_Id._ at 35.)

Dr. Siefert testified that Rachel's body was covered with bruises and abrasions, primarily on the front of her body and across her face and forehead, but also on her back, arms, and legs. (RT 4/6/95 at 81.) He also observed that Rachel had a large bruise on each side of her forehead, as well as intense coloration on the outer edge of her right eye and discoloration below the eyes. (_Id._ at 95–96.) Dr. Howard assessed the purple coloration on Rachel's face as arising from an injury that probably occurred one day prior to death, but also noted some green discoloration which would have been present for several days. (RT 4/12/95 at 116.)

Dr. Siefert and Dr. Howard observed that Rachel had bruising around the left side of her face and behind her ear, as well as bleeding into both ear drums, consistent with a slap or blow to the side of the head. (RT 4/6/95 at 90–91; RT 4/12/95 at 140–41.) Dr. Howard noted that Rachel also sustained internal bleeding due to blunt force trauma to the back of her neck, as well as diffuse bleeding into the deep layers of her whole scalp. (RT 4/12/95 at 137–38.)

Rachel had four or five small bruises on her right forearm and several on her right hand, as well as six bruises on her left forearm and hand, injuries typically associated with trying to ward off an impact, known as defensive type wounds. (RT 4/6/95 at 85–87, 88–89; RT 4/12/95 at 39–40, 150–51.)

Dr. Howard opined that the bruises and abrasions on Rachel's hand and arm were inflicted approximately one day prior to death. (RT 4/12/95 at 113–14.) This included

swelling in her left middle finger that indicated injury to bone or ligaments; this injury would have been painful and noticeable within an hour of its infliction. (RT 4/6/95 at 89, 104–05; RT 4/12/95 at 114.)

Dr. Howard identified abrasions and contusions on Rachel's right and left thigh, both knees, and her right leg; he opined that they varied in appearance from less than a day old to approximately five days old. (RT 4/12/95 at 113.) He indicated that much of the bruising on Rachel's front side was consistent with having been inflicted by knuckles but he could not identify with any particularity what actually was used to inflict the injuries. (*Id.* at 126, 160.)

Rachel had contusions and abrasions on her back, her buttocks, and on the back of her left thigh, consistent with being dragged across a rough surface or with fingernail scrapes. (*Id.* at 112; RT 4/6/95 at 41, 93.) Based on the colors of the bruising, and the presence or absence of scab formation, Dr. Howard opined that these injuries occurred within one to two days prior to her death. On her front torso, Rachel had 20 to 30 bruises, large areas of abrasions, and a red bruise area under her right arm. (RT 4/6/95 at 93–94; RT 4/12/95 at 115.) Dr. Howard opined that some of these bruises were recent, occurring within the prior day to two days, while others were of a coloration indicating an origin of several days prior to death. (RT 4/12/95 at 115.) There was a linear bruise pattern to the right of her navel; Dr. Howard opined that this injury was consistent with the pry bar found underneath the driver's seat of Petitioner's van but could have been caused by many different objects. (*Id.* at 78, 128, 160.) Sergeant Pesquiera also testified that the linear contusions or bruises on Rachel's abdomen were consistent with the pry bar found in Petitioner's van. (*Id.* at 78.)

Dr. Siefert opined that Rachel's bruising would have begun to appear within a few hours of infliction, and assessed that 95 percent of Rachel's injuries had occurred within 12 to 24 hours before her death. (RT 4/6/95 at 121, 128, 103–108, 111, 127; RT 4/12/95 at 94.) Dr. Siefert noted that some of the bruises were a few days old, including the bruising beneath Rachel's eyes. (RT 4/6/95 at 103, 105, 111; RT 4/12/95 at 37.) Dr. Siefert

concluded that Rachel had suffered non-accidental trauma, possibly at multiple times by multiple mechanisms. (RT 4/6/95 at 128–29.) Similarly, Dr. Howard explained that the number and multiple locations of the injuries were not consistent with a simple childhood accident, but rather were consistent with Rachel having been beaten. (RT 4/12/95 at 137.) He concluded that all of the external injuries he documented, which he assessed as having been inflicted within one day of death, were consistent with having been inflicted between the hours of 2:00 p.m. and 5:30 p.m. on the day prior to her death. (*Id.* at 117.)

On cross-examination, defense counsel confirmed with Dr. Siefert that 95 percent of the bruises were formed within the 12 or 24 hours before death, but that this estimate was dependent on factors—such as the child's metabolism and the amount of force used to inflict the injury—that were unknown to Dr. Siefert. (RT 4/6/95 at 127–28.) Dr. Siefert agreed that some of the bruises, as well as the scalp injury discussed below, could have been caused by Rachel falling out of a van. (*Id.* at 129.) Dr. Siefert admitted on re-direct examination that there was "no way to really know" based on the appearance of the bruises how long each one took to develop after the blunt injury that caused it. (*Id.* at 134.) Dr. Siefert concluded that the totality of Rachel's injuries indicated that the trauma was nonaccidental and perhaps occurred at multiple times or by multiple mechanisms. (*Id.* at 135.)

### c.  *Scalp Injury*

Rachel had a head laceration, above and behind her left ear, which was one inch long and went down to the skull bone. Dr. Howard assessed it as consistent with having been caused by a blunt force object with a relatively straight edge, consistent with the pry bar found in Petitioner's van. (RT 4/12/95 at 121, 123.) Based on the injury's external and microscopic appearance, he opined that it was typical of having been inflicted one to two days prior to death but was consistent with occurrence between 2:00 p.m. and 5:30 p.m. on May 1. (*Id.* at 116–17.)

### d.  *Vaginal Injury*

Sergeant Pesquiera testified that upon examination of Rachel's body, she observed

discoloration on the outside of her labia and pooled, bright red blood on the inside. (RT 4/12/95 at 42.) Dr. Howard determined that Rachel had blunt force injuries to her labia, bruising and scrapes, and a half-inch tear to her vagina. (*Id.* at 134.) Dr. Howard concluded that the injury to Rachel's genitalia occurred about one day prior to her death, consistent with the time frame of "dozens" of Rachel's other injuries, (*id.* at 133, 136), and that these injuries were non-accidental, painful, and consistent with penetration or attempted penetration. (*Id.* at 134–36).

### e. *Fatal Small Bowel Injury*

Dr. Howard determined that Rachel died of blunt abdominal trauma that caused a laceration of the small bowel and that her death was a homicide. (RT 4/12/95 at 155.) Dr. Howard explained that, internally, Rachel had sustained blunt force injury to her abdominal organs causing a tear of the small bowel and bruising of the tissues around the small bowel, the wall of the large bowel, and the tissues connecting the intestine to the back of the abdominal wall. (*Id.* at 141–42.) The rupture of her bowel caused inflammation and irritation of the lining of the abdominal tissues, a condition called peritonitis. (*Id.* at 145.) When this type of damage is not repaired, Dr. Siefert explained it typically causes death over a period of hours to days, or sometimes weeks. (RT 4/6/95 at 115). The amount of force required to rupture a healthy bowel is equivalent to a fall from more than two stories, an automobile accident at greater than 35 miles per hour, or a forceful directed blow to the abdomen (*id.* at 113–14; RT 4/12/95 at 151, 153–54); Dr. Siefert did not believe enough force for such an injury could be inflicted by a child under the age of six. (RT 4/6/95 at 116.) Rachel would have experienced pain at the time of the blunt force injury; Dr. Howard indicated she would then have had continual abdominal pain while Dr. Siefert stated that the pain might decrease initially, but would not go away. (*Id.* at 119; RT 4/12/95 at 146.) Over the next several hours, a person with peritonitis would lose bowel function, causing nausea, vomiting, and dehydration. (RT 4/6/95 at 119–20; RT 4/12/95 at 146.) Dr. Howard opined that the "injury is typical of having occurred about one day prior to death," in the same age range as her other injuries, including the scalp, genital, and external injuries. (RT

4/12/95 at 148.) Dr. Howard opined that the fatal injury could have occurred in the 24 hours prior to her death, possibly in the time between the hours of 2:00 p.m. and 5:30 or 6:00 p.m. on May 1. (*Id.* at 148–49.)

Defense counsel cross-examined Dr. Howard and established that Rachel had no broken bones, and that if she had been hit hard enough with the pry bar, it might have resulted in fractures of the skull or ribs, depending on the amount of force used. (*Id.* at 158–59.) Dr. Howard agreed that while the pry bar was consistent with the injuries, any number of objects could also have caused the injuries. (*Id.* at 159–60.) Based on Dr. Howard's testimony, defense counsel argued that if the pry bar had been wielded by an adult, it would break ribs and fracture skulls, and would have done incredible damage to a small child. (*Id.* at 112.)

Defense counsel asked no questions of Dr. Howard regarding the timing of any of Rachel's injuries.

### f. *Bloodstain Evidence*

The State also presented testimony and evidence from Sergeant Pesquiera, Arizona Department of Public Safety Criminalist Edward Lukasik, and PCSD Detective Clark to support the State's theory that Rachel was assaulted in Petitioner's van. Blood consistent with having come from Rachel was found on a Circle K bag, on carpeting and the front passenger seat's upholstery in Petitioner's van, and on blue jeans worn by Petitioner at the time of his arrest. (RT 4/7/95 at 118, 120–21, 126–27; RT 4/11/95 at 106–7, 109; RT 4/12/95 at 55–59.) No blood was found on the tools collected from Petitioner's van, including the pry bar and the blue and metal pipes. (RT 4/11/95 at 100–01; RT 4/12/95 at 85–87.)

Rachel's pajamas and underwear were taken into evidence, and oral and vaginal swabs were also taken during Rachel's autopsy. (RT 4/12/95 at 43–47.) Serological testing revealed no presence of semen or seminal fluids on the vaginal swabs or on Rachel's pajamas or her underwear. (RT 4/11/95 at 90, 111–12.) A substance consistent with vomit was found on Rachel's pajamas and a sleeping bag. (RT 4/11/95 at 98–99; RT 4/12/95 at

45–46.)

Sergeant Pesquiera also collected clothing from Petitioner on the day of his arrest, testifying that she would expect to find blood on the clothing of a driver in the car at the time that Rachel was struck. (4/12/95 at 61, 74–75.) There was a trace of blood not further identified on the red T-shirt and boots, but not the denim jacket, worn by Petitioner at the time of his arrest. (RT 4/11/95 at 95, 108–09; RT 4/12/95 at 61–62.)

Sergeant Pesquiera testified that fingernail scrapings were taken from Rachel but there was nothing detected under her nails. (RT 4/12/95 at 90–91.) Despite some of Rachel's abrasions appearing as if she had been scratched, Sergeant Pesquiera explained that Petitioner's fingernails were not analyzed to determine if any of Rachel's blood or skin was present because there was a lot of oil and other things under his nails. (*Id.* at 90–91.)

Sergeant Pesquiera testified that she was not an expert in the field of bloodstain evidence, but "could appreciate what type of stains they were in relationship to where the victim could have been and the assailant could have been." (RT at 4/12/95 at 28, 63–65.) Sergeant Pesquiera explained that blood spatter is seen when an area of injury has static blood on it and then is struck or shaken in some way like a blow or blunt force trauma causing the blood to spatter out. (RT 4/12/95 at 73.)

Sergeant Pesquiera submitted samples of several items that appeared to be bloodstains taken from multiple locations in Petitioner's van: from carpet between the two front seats and partially behind the passenger seat, from carpet and wood chips located partially behind and underneath the passenger seat, from a cigarette package, from a Circle K bag located behind the driver's seat, and from the right front passenger seat. (RT 4/12/95 at 55–60.) Over defense counsel's objection, Sergeant Pesquiera testified that a bloodstain identified as Item V6 appeared to be "an impression stain or a stain where the blood has actually soaked through and has been in that position for quite a while to where it soaks down through the carpeting." (*Id.* at 72.) Sergeant Pesquiera distinguished the impression stain on the carpeting from the spatter stains found on the van's passenger seat and another portion of the carpet identified as Item V7, which she testified were consistent with a person

already bleeding being struck or shaken causing the blood to spatter out. (*Id.* at 72–73.) Because Dr. Siefert had testified that bleeding stops very quickly after death (RT 4/6/95 at 79), the State argued, based on the impression stain, that Rachel's "head was bleeding as she was laying in the back of that van because she had been beaten and hit with that pry bar as part of that sexual assault, and this is where the sexual assault occurred. . . . on the third trip away from the house." (RT 4/13/95 at 97.) The State also argued—based on the evidence of spatter stains found on the passenger seat, floor of the van, and the right sleeve of Petitioner's shirt—that after the assault, Petitioner put her in the passenger seat of the car and kept hitting her "trying to make her shut up" (*id.* at 97–100), and the blood could not have gotten in the van on the way to the hospital because Rachel was already dead and therefore was not bleeding anymore. (*Id.* at 137.) Defense counsel offered no expert testimony to challenge Sergeant Pesquiera's opinions, but rather argued that Sergeant Pesquiera was not an expert in blood spatter and the State could have presented an expert if they had wanted to. (*Id.* at 113.)

## 2. Events of April 30–May 2, 1994

The State presented evidence from several witnesses that supported its theory that Rachel was in the sole care of Petitioner during the afternoon of Saturday, May 1, when the fatal injuries allegedly were inflicted.

Becky testified that she had been living in Petitioner's trailer for a few months with her mother, Angela; her siblings, Jonathon and Rachel; and Petitioner's daughter, Brandie. (RT 4/11/95 at 18–19, 60.) Petitioner never hit Becky, and she never saw him hurt Rachel or her brother. (*Id.* at 65–66.) There was a week, however, when Rachel started "being scared" of Petitioner, and would not go to Petitioner when he called her over or when he asked her to go with him on a ride. (*Id.* at 25–28.) He did sometimes hit Rachel "[f]or play," which sometimes made her cry. (*Id.* at 43.) Becky testified that Rachel seemed fine and ate dinner on Saturday night, April 30, and was not sick or throwing up. (*Id.* at 29.) Becky stated she saw Petitioner leaving with Rachel in the van three times on May 1. (*Id.* at 37–38.)

Becky testified that on Sunday morning, May 1, Becky, Rachel, and Jonathon got up early, watched cartoons, and ate lunch until Petitioner got up around 2:30 or 3:00 p.m. when a friend of his stopped by to see him. (*Id.* at 30–33, 62.) Shortly after Petitioner's friend left, Petitioner gave Becky and her brother permission to ride their bikes. (*Id.* at 36.) After riding their bikes around the trailer court for an hour, Becky saw Petitioner leave in his van on the first trip with Rachel, telling Becky he was going to the store for food. (*Id.* at 37, 64.) He returned an hour and a half later with milk and corn dogs. (*Id.* at 63, 69.) Becky testified that Rachel seemed okay after this trip, she was not sick or crying. (*Id.* at 70.)

Becky described the first trip when questioned by the prosecutor and the second and third trips when cross-examined by defense counsel. Becky testified that approximately fifteen to twenty minutes after returning home from the store and putting away the groceries, Petitioner left again and was gone for about thirty minutes. (*Id.* at 70.) Becky saw Rachel again after this trip, and testified that she seemed "okay" at that time. (*Id.* at 70–71.)

When asked by defense counsel about the third trip in the van, Becky testified that Petitioner took Rachel to his brother's house. (*Id.* at 79.) Becky had no idea how long they were gone, but stated that they were back before Becky left for her friend's house, around 5:00 or 6:00 p.m. (*Id.* at 71, 79.) The State argued that it was during this third trip that Petitioner assaulted Rachel in the back of the van. (RT 4/13/95 at 93–94.)

Becky testified that when she was putting her bike away before going to her friend's house, she saw that Rachel was at home and that Rachel was standing and looked fine. (*Id.* at 41–43.) Around 6:30 p.m., when Becky returned from her friend's house, Becky testified that Rachel was on the couch; she was pale, her head was bleeding, she was vomiting, and she had bruises on her face, hands, and fingers. (*Id.* at 44–46, 49–50, 72.) This was the first time Becky saw her mother awake that day. (*Id.* at 41.) Petitioner left for a time, and when he returned, Angela took Rachel outside where Petitioner and Angela had an argument. (*Id.* at 48–49.)

The State presented evidence that the St. Charles family, who lived in a bus at a transient camp, got a visit from Petitioner sometime on May 1; Ron St. Charles ("St. Charles") thought Petitioner seemed angry. (RT 4/12/95 at 7–9, 17.) St. Charles testified that he did not know if anyone else was in the van with Petitioner, and that Petitioner did not get out of his van.

Michael Fleming ("Michael"), Petitioner's neighbor at the Desert Vista trailer park, testified that on May 1 he saw Rachel looking sick between 2:00 and 5:00 p.m.; she was pale with dark circles under her eyes, and she looked wet and like she wanted to vomit, but he did not see any blood, bruising, or scrapes. (RT 4/7/95 at 164–66, 168, 171–73.) Michael Fleming saw his wife, Stephanie Fleming ("Stephanie"), pick Rachel up and take her back to Petitioner's trailer. (*Id.* at 165–66.)

Petitioner's sister-in-law testified that Petitioner, Angela, and the children were supposed to attend Petitioner's nephew's birthday party on May 1, but they never showed up. (RT 4/11/95 at 119–24.)

Norma Lopez ("Norma") testified that on May 1 she sent her children—eight-year-old twins Ray and Laura Lopez—to the Choice Market on Benson Highway at 3:00 p.m. or 4:00 p.m. (RT 4/7/95 at 50.) When they returned, Ray told Norma he saw a yellow van with a man inside hitting a little girl. (*Id.* at 51.) The children described the man as a white man with messy brown hair driving a yellow van and the girl as little and blond-haired. (*Id.* at 51–53.) The twins saw him driving with one hand and hitting the girl in the face and chest with the other, and they could see the girl crying. (*Id.* at 51.) The next day on the news Norma heard that a man had been arrested in relation to the death of a little girl. (*Id.* at 53–54.) When she had the children watch the news, they identified that person as the man they had seen in the van. (RT 4/7/95 at 55.) One or two days later, Norma reported the twins' identification by calling 911. (*Id.* at 56.)

At Petitioner's trial, Ray testified that he had gone to the Choice Market with Laura around 5:00 p.m. on a Sunday. (RT 4/7/95 at 8–9.) He testified that, on his way home, he saw a white man with bushy hair in a yellow van, driving with one hand while hitting a

little, four-year-old white girl hard with his right hand and elbow. (*Id.* at 9–11, 14.) He demonstrated how the man hit her with the back of his right fist. (*Id.* at 12–12.) Ray testified that the man hit the girl three times. (*Id.* at 11–13.) He testified he could not see the girl's face, but that she was crying. (*Id.* at 13.) When pressed by the prosecutor, he agreed he did not know whether she was crying or not. (*Id.*) He also admitted that he had previously told the police that he saw her with her mouth open and could see that she was crying. (*Id.* at 13–14.) He did not see the driver's face, only his hair from behind. (*Id.* at 25–26.) He could not identify Petitioner in court, but was able to identify a picture of Petitioner from the day of his arrest. (RT 4/6/95 at 175; RT 4/7/95 at 18.) Ray was also unable to identify a picture of Petitioner's van as the yellow van he saw that day because it did not have windows in the side. (RT 4/7/95 at 29–30.) Bruner established, through cross-examination, that Ray did not see Petitioner's face or any facial hair, only his hair from behind, and questioned whether he could see up into the van given his height. (*Id.* at 25–27.)

Laura testified that she recalled seeing a white man driving a yellow van on her way home with Ray from the Choice Market. (*Id.* at 34–37.) She said she could see a little bit of the man's face, and he was ugly with puffy hair and was hitting a little, white blonde girl. (*Id.* at 36–38.) She testified she could not see the girl's face, but the man was hitting the girl on the left side of her face with his elbow. (*Id.* at 36–38.) The prosecutor asked Laura if she remembered telling the police she could see that the girl was crying and she could see her face; Laura agreed and remembered that she was crying. (*Id.* at 38.) Bowman established, through cross-examination, that Laura only saw them through the front window of the van and could see just "a little bit" of the side part of both the man and girl's faces. (*Id.* at 43–44.) Laura also admitted that the little girl's face was not higher than the windows. (*Id.* at 44.) She remembered seeing the man from the van on the news that same day. (*Id.* at 40, 45.)

Sara Petrilak, a clerk at the Quik-Mart on Benson Highway, testified that Petitioner went into the store on May 1, 1994 between 3:15 p.m. and 5:00 p.m. (RT 4/7/95 at 142, 144, 159.) She did not know Petitioner's name, but recognized him as a regular at the store.

(*Id.* at 145–46, 149.) The store clerk testified that Petitioner got ice and that he was with a little girl who sat on a ledge outside the store. (*Id.* at 147–48.) On cross-examination, Petrilak testified that the girl did not seem to be upset, and she would have heard the girl if she was crying, but she was not. (*Id.* at 150–51.)

Joyce Richmond (a.k.a. Rose Royer and Alice Knight) ("Richmond"), Petitioner's former girlfriend, testified that she spent Saturday night, April 30, at a friend's house with Petitioner until approximately 3:00 a.m. (RT 4/11/95 at 135–36.) Petitioner's daughter Brandie spent the weekend with Richmond from Friday after school until Sunday, May 1, when Brandie returned with Richmond to Petitioner's trailer sometime between 7:00 p.m. and 8:00 p.m. (*Id.* at 137–38, 141.) Richmond saw Rachel on the couch with a bleeding head; she said Rachel did not have bruises on her face or hands. (RT 4/11/95 at 141, 151–53.)

Richmond's adult son, Terry Richmond ("Terry"), was at Petitioner's trailer with his mother on the evening of May 1 and saw that there was blood on the pillow under Rachel's head. (*Id.* at 157.) Terry questioned Petitioner, who told him that he had taken Rachel to the fire department. (*Id.* at 157–58.) Terry testified that he had seen bruises on Rachel's face, but after he was asked if he saw bruises on Rachel's face *that night*, he could not remember whether he had. (*Id.* at 163.) Subsequently, after reviewing a transcript he was shown, he recalled telling defense counsel during an earlier interview that he did not see any bruises or marks on Rachel. (*Id.* at 164.) Terry further testified he had witnessed Angela previously strike Rachel on the side of her head. (*Id.* at 160.) He was not sure when that had occurred, but stated it was probably the week before May 1. (*Id.* at 161.) After reviewing the transcript from his interview with defense counsel, Terry admitted it might have occurred the night before. (*Id.* at 161–63.)

At trial, the State contended that Petitioner lied about having Rachel's head wound examined at the fire station by a paramedic. (RT 4/6/95 at 45–46.) Petitioner's counsel countered that Petitioner never said he went to the fire station but rather said that a Rural Metro EMT who happened to be at the Quik-Mart had examined Rachel's head wound.

(*Id.* at 71–72.) Captain Scott Ferguson, with the Rural Metro Fire Department, testified that there are four people, including himself, on duty during each 24-hour shift at the station located close to Petitioner's trailer and about a half block away from the Quik-Mart. (*Id.* at 187, 191.) If a crew member leaves the station to go the Quik-Mart, all four personnel have to go and they have to take the engine. (*Id.* at 191, 196–97.) If they encounter an emergency while they are out, they have to notify dispatch so they are placed out of service for purposes of receiving another emergency call, and it would be logged as well. (*Id.* at 197; RT 4/12/95 at 68–69.) Captain Ferguson testified there were no indications on the call log, and he had no independent recollection of treating a little girl on May 1 for a head laceration. (RT 4/11/95 at 199–200.) Captain Ferguson explained that it would be inappropriate to ever look at a child's head laceration and just send the child home because a spinal injury is always suspected in conjunction with a head injury. (*Id.* at 201; 4/12/95 at 70.) Petrilak testified that a lot of Rural Metro personnel regularly came into the Quik-Mart, but she did not notice an EMT treating the little girl outside the store and believed she would have been aware if that had occurred. (RT 4/7/95 at 148–49, 154, 158–59).

Becky woke early in the morning on May 2 and found Rachel in the bedroom doorway; she put her back in bed. Becky next woke to her mother yelling, and Petitioner took Angela and Rachel to the hospital. (*Id.* at 52-54.) Petitioner came back and took Becky and Brandie to the St. Charles camp around 7:30 a.m. (*Id.* at 55–56, 143; RT 4/12/95 at 10–11.) St. Charles testified that Petitioner was extremely upset, distraught, and crying. (4/12/95 at 22.) St. Charles's wife Rosemary reported Petitioner was unsteady on his feet and she and her husband put him to bed, where she heard him "moaning and saying I am very sorry Rachel, I love you." (RT 4/11/95 at 180–81.) She admitted on cross-examination that Petitioner was also crying with tears coming down his face. (*Id.* at 182.) Law enforcement located Petitioner at the St. Charles camp after 8:00 a.m. on May 2, 1994, and transported him to the Sheriff's Department. (RT 4/6/95 at 167, 169, 172.) On the way there, Petitioner was upset, said there was something wrong with his little girl, and asked if they would take him to see her. (*Id.* at 173.)

Petitioner presented evidence from only one witness: Petitioner's daughter Brandie. (RT 4/13/95 at 6.) Brandie testified that she saw a boy, about six years old, hit Rachel in the stomach with a metal bar. (*Id*. at 8.) She denied ever having told law enforcement that she saw Rachel fall out of the van on May 1, or that afterwards she saw her dad run Rachel over to the paramedics, stating first that she was home but did not see it happen, then later saying she was at Richmond's house and could not have seen it. (*Id*. at 13, 21–23.) The State impeached her testimony, pointing out numerous inconsistencies between her testimony at trial, interviews she gave to law enforcement, and her testimony at a deposition; Brandie also admitted lying to detectives and defense counsel. (RT 4/13/95 at 11–28.)

## B. Post-Conviction Relief Proceedings

On September 22, 1999, following an unsuccessful appeal, the Arizona Supreme Court appointed James Hazel to represent Petitioner in his state PCR proceedings. (EH Ex. 126.) The Arizona Supreme Court waived the requirements, pursuant to A.R.S. § 13-4041 and Rule 6.8(c) of the Arizona Rules of Criminal Procedure, for the appointment of experienced appellate counsel in capital post-conviction proceedings. (*Id.*) The Arizona Supreme Court also ordered counsel to "direct requests for the appointment of investigators and experts to the superior court pursuant to A.R.S. § 13-4013(B) and § 13-4041(J)." (*Id.*)

Despite the order directing counsel to make requests for investigators pursuant to A.R.S. § 13-4013(B), Hazel moved for the appointment of an investigator pursuant to Rule 706(a) of the Arizona Rules of Evidence. (EH Ex. 130.) The PCR court denied the motion without prejudice, stating that the motion failed to recite any specific reason to support the need for such appointment at the present time, or indeed, that counsel had even reviewed the record. (EH Ex. 131.) Hazel filed a motion for reconsideration, again pursuant to Rule 706(a) of the Arizona Rules of Evidence, stating that an investigator was needed to attempt to prove others may have caused the fatal injuries to the victim, including the mother and teenage brother, and to locate additional new defense evidence. (EH Ex. 132.) The PCR court denied the motion for reconsideration, again stating that nothing in the motion

established why the appointment of an investigator was reasonably necessary (EH Ex. 133)—a statutory requirement for the county-funded appointment of investigators, *see* A.R.S. § 13-4013(B).

Hazel filed Petitioner's PCR petition and supporting memorandum on March 28, 2000. (EH Ex. 134.) Hazel argued that Petitioner was entitled to a jury trial on the issue of aggravating factors. Hazel also argued that Bruner was ineffective for failing to: (1) move for a mistrial when jurors viewed Petitioner in shackles during the trial, (2) interview Angela, (3) follow up with the court on his motion for appointment of a second attorney to assist him, and (4) meet with Petitioner a sufficient number of times in order to discuss the case and trial preparation. (*Id.*)

The PCR court held an evidentiary hearing on Petitioner's ineffective assistance claim, at which Petitioner testified on his own behalf and Bruner testified as a witness for the State. (RT 9/18/00.) The PCR court denied the petition and, after being elected Gila County Attorney, a position for which he had campaigned during the course of representing Petitioner, Hazel withdrew from representation and attorney Michael Villareal was substituted as counsel. (EH Exs. 137–38; ROA PCR 31, 33, 40.) Newly-appointed counsel's motion for rehearing was denied. (ROA PCR 46–47.) On October 30, 2001, the Arizona Supreme Court summarily denied Petitioner's petition for review. (PR 7.)

### C.   Federal Habeas Proceedings

During the evidentiary hearing in these proceedings, the Court heard testimony from Sean Bruner and Leslie Bowman, Petitioner's trial counsel; James Hazel, Petitioner's PCR counsel; Sonia Pesquiera, the lead investigative detective; Dr. Philip Keen, Dr. Janice Ophoven, and Dr. John Howard, all forensic pathologists; Dr. Mary Pat McKay, an emergency medicine and trauma specialist; Paul Gruen, an expert on collision and accident reconstruction; Dr. Patrick Hannon, an expert on biomechanics and functional human anatomy; Dr. Philip Esplin, an expert in psychology and investigative interviews; Stuart James, a crime scene and bloodstain pattern analyst; and attorney Dan Cooper, a standard

of care expert.[9] The Court also admitted numerous exhibits proffered by the parties. (Docs. 268–69.)

### 1. Evidence Suggesting the Need for Further Investigation

In this section the Court reviews the evidence presented during these proceedings about which trial and PCR counsel either were aware as a result of their own investigations, or should have been aware because it was contained in the PCSD investigatory reports, that would have suggested the need for both trial counsel and PCR counsel to conduct further investigation into the medical timeline, blood evidence, and eyewitness testimony.

### a. *Timing of Rachel's Injuries*

Sergeant Pesquiera decided early on in the investigation that Rachel's injuries occurred on Sunday, May 1. (EH RT 11/6/17 at 64–65.) Dr. Howard, however, had not addressed the timing of Rachel's injuries in his autopsy report, and Sergeant Pesquiera never asked him to share with her his findings on the timing of Rachel's injuries. (*Id.* at 65–66.) Sergeant Pesquiera did not document any inquiry to a medical professional about the timing of Rachel's injuries and Dr. Howard reported to her only that the injuries were caused by a blunt trauma and that it was a homicide. (*Id.* at 68–70.) Sergeant Pesquiera agreed with counsel during the evidentiary hearing in these proceedings that, at the time she was conducting her investigation, she had no reason to believe that Rachel's injuries could have happened more than a day before her death. (*Id.* at 71–73.) If she had more precise medical information that showed the injuries could have happened several days earlier, as Dr. Howard's 2004 Declaration (EH Ex. 45) suggested, she would have expanded her investigation. (EH RT 11/6/17 at 73–74.)

Statements made by Dr. Howard in his pretrial interview and in testimony during Angela's trial suggested a larger window of time during which Rachel's injuries might have been inflicted, including potentially April 30.

---

[9] The parties stipulated to the expertise of Dr. Ophoven, Dr. McKay, Dr. Hannon, Mr. Gruen, Dr. Esplin, and Mr. James. (*See* Doc. 243 at 5–6.)

*(i)     External Bruising*

During his pretrial interview, conducted before either Angela's or Petitioner's trial, Dr. Howard stated that there were no tests available to determine the exact age of bruises, but he could provide approximations. (*Id.* at 4, 11–12.) Dr. Howard described the green bruising as having occurred several days before death, and the purple bruising as possibly occurring the same day up to four or five days before death. (*Id.* at 4.) Trial counsel failed to impeach Dr. Howard with these statements regarding the imprecise nature of Dr. Howard's attempt to date Rachel's bruises.

*(ii)     Scalp Injury*

During his pretrial interview, Dr. Howard said that he had microscopically examined tissue samples and determined the injury to Rachel's scalp was "[p]robably two days old . . . ." (EH Ex. 46 at 665.) Elsewhere during the interview, Dr. Howard made reference to the age of the scalp injury as being 72 hours or older. (*Id.* at 650, 657.) During Petitioner's trial, counsel did not impeach Dr. Howard with these earlier statements and testimony regarding the scalp injury.

*(iii)     Vaginal Injury*

In his pretrial interview, Dr. Howard stated that, based on microscopic examination of the cells, the vaginal injury had most likely occurred one or two days before death; he was not asked during this interview to clarify if one day meant 24 hours. (EH Ex. 46 at 668–69.) Dr. Howard testified at Angela's trial that the minimal age of the vaginal injury was 12 hours prior to death, but was more typical of around 24 hours. (EH Ex. 48a at 3472–73.) During Petitioner's trial, counsel failed to challenge Dr. Howard's testimony on the timing of the genital injury, and did not impeach Dr. Howard with these earlier statements and testimony finding the injury more typical of occurrence prior to the afternoon of May 1.

*(iv)     Fatal Small Bowel Injury*

During his pretrial interview, Dr. Howard was not asked if he could date the small bowel injury but did say it could take hours to a day to develop severe symptoms of the associated peritonitis, and then an unspecified number of hours after that to die. (EH Ex.

46 at 681–82.) Bowman, the least experienced attorney involved in this case, attended Angela's trial in preparation for Petitioner's trial, and obtained an order to have Dr. Howard's testimony from Angela's trial transcribed on the grounds that his testimony in Angela's trial was crucial to Petitioner's defense. (EH RT 10/30/17 at 56–57; EH Ex. 27.) During Angela's trial, Dr. Howard testified that the internal injury was "most consistent" with 24 hours prior to death. (EH Ex. 48a at 101.) Dr. Howard placed the minimum amount of time between injury and death at "many - - several hours. Perhaps 12 hours," and agreed that Rachel's injury could have occurred from 12 hours to 36 hours prior to death. (*Id.* at 101.) At Petitioner's trial, defense counsel failed to challenge or impeach Dr. Howard's testimony with his earlier testimony finding the injury "most consistent" with occurrence on April 30, and did not attempt to show that under Dr. Howard's 12-hour time frame, the injury would have had to be inflicted by 3:00–4:00 p.m., at a time when Rachel showed no signs of having just been beaten and raped.

On July 14, 1994, on defense counsel's motion, Judge Carruth authorized up to $1,000 for a defense expert to review Rachel's autopsy report or to conduct a second autopsy, if necessary. (EH RT 10/30/2017 at 74; EH Ex. 24D at 23; ROA 46.) Bruner explained to Judge Carruth that he did not necessarily want to have a second autopsy performed, but in the past had been able to get the slides released and then have the report and slides reviewed by somebody else, and he wanted that done. (RT 7/14/94 at 3.) Trial counsel's file contained a scientific article advising of the necessity of having the tissues examined in order to date the injuries. (EH RT 10/30/17 at 98–99; EH Ex. 35.) Bowman testified in these proceedings that, based on her pretrial interview with Dr. Howard, she knew a defense expert would have to examine the tissue slides in order to date the injuries. (EH RT 10/30/17 at 99–100.)

On July 20, 1994, Bowman sent forensic pathologist Dr. Keen a letter acknowledging Dr. Keen's agreement to review Rachel's autopsy report, and posing several questions for Dr. Keen to consider when reviewing the autopsy report, including whether Rachel's injuries could be dated and the amount of force necessary to inflict them.

(EH Ex. 58 at 4799–800.) Bowman confirmed in the letter that Dr. Keen had explained that his review of the autopsy "may involve obtaining access to photographs, slides and other physical evidence"; Bowman also confirmed that such access could "be arranged as necessary." (EH Ex. 58 at 4799.) Dr. Keen explained in these proceedings that he could not determine the timing of Rachel's injuries, other than a generic interpretation of "it's recent," just from the autopsy report; rather, he required access to slides to make a reliable determination in terms of hours or days. (EH RT 10/31/17 at 71, 73; EH Ex. 57 at 4101.) Dr. Keen explained he had no recollection of ever reviewing any photographs, slides, or other physical evidence at that time. (*Id.*) There was no record that he had ever received such evidence; if he had, it would have been recorded in two places: the county sending the evidence (Pima County), and the county receiving the evidence (Maricopa County). (*Id.* at 71–72.) The record would probably also contain a billing for expenses such as copying. (*Id.* at 72.)

Approximately one month later, on August 18, 1994, defense counsel and Dr. Keen spoke by telephone. (EH RT 10/30/2017 at 79–80; EH Ex. 12.) Neither defense counsel nor Dr. Keen can recall what was discussed during that call. (EH RT 10/30/2017 at 80; EH RT 10/31/17 at 74.) Four days later, on August 22, 1994, Rachel's body was released for burial with the consent of defense counsel and without a second autopsy being performed. (EH Ex. 36; EH RT 10/30/2017 at 81.) Dr. Keen did not testify at Petitioner's trial.

### (v) Physical Evidence

PCSD Detective Clark obtained and executed a warrant to search Petitioner's trailer on May 2. (EH Ex. 1 at 1673.) Detective Farrier assisted him in the search. (*Id.*) The record contains no report that anyone, neither law enforcement nor defense counsel, attempted to identify and locate the clothing worn by Petitioner or Rachel on May 1, the day Petitioner is alleged to have beaten and sexually assaulted Rachel. (*See* EH RT 11/06/17 at 87–89.) Sergeant Pesquiera could not remember any sexual assault case where there was not a documented effort to identify and locate the victim's clothing, and could not rule out the possibility that the clothing Rachel and Petitioner were wearing that day might have had

exculpatory value. (*Id.* at 88–89, 92.) Sergeant Pesquiera did not ask Angela to help identify the clothes Petitioner and Rachel were wearing on May 1. (*Id.* at 89–90.)

### b. *Events of April 30–May 2, 1994*

At the time of her death, Rachel had been living in Petitioner's small trailer at the Desert Vista trailer park in Tucson, Arizona. Angela and her children had moved into Petitioner's trailer approximately four weeks before Rachel's May 2 death. (EH RT 11/7/17 at 45; EH Ex. 1 at 472; EH Ex. 16[10] at 248, 255.)

Sergeant Pesquiera interviewed Isobel Tafe, a resident in the trailer park, on May 19. (EH Ex. 81 at 5142.) Tafe told Sergeant Pesquiera that she saw Rachel around 2:00 or 3:00 p.m. on Saturday, April 30, and that Rachel looked sick and had a pale grayish color; she was with her sister but was not being supervised by any adult. (EH Ex. 81 at 5142–43.) Sergeant Pesquiera prepared a report stating that Tafe had seen Rachel on Saturday, April 30. (EH Ex. 1 at 1852.)

During her testimony at the evidentiary hearing, Sergeant Pesquiera confirmed that it had always been her understanding that Becky had consistently reported, in pretrial interviews as well as her testimony at Angela's trial, that Petitioner and Rachel only went on two trips in the van on Sunday, May 1, before Rachel appeared sick. (EH RT 11/6/17 at 57–59.) Her investigation also suggested that Petitioner took a third trip with Rachel to the Quik-Mart after Angela woke up, around 6:30 or 7:00 p.m., after Rachel appeared sick at the Flemings's residence. (*Id.* at 35–36, 57.) When Rachel returned from this third trip, she had a bag of ice on her head. (*Id.* at 37)

Becky was first interviewed by Detective Ferrier on May 2, 1994. (EH Ex. 1 at 1111.) Becky stated that Petitioner first left with Rachel to go to the store in the afternoon,

---

[10] Exhibit 16 is an investigative report authored by Petitioner's trial investigator George Barnett, a retired Tucson Police Officer with 21 years of law enforcement experience and 5 years of independent investigative experience. (EH RT 10/31/17 at 17; EH Ex. 15 at 4369.) Defense counsel retained Barnett to assist with the trial investigation. Barnett was deceased at the time of the Court's evidentiary hearing in this matter, but filed two declarations during the course of these federal habeas proceedings. (EH Ex. 14–15, 19.)

around 1:00 or 2:00 p.m.; "the second place was to his friend's house." (*Id.* at 1116.) After the second trip, Becky saw Rachel "smiling and looking out the door." (*Id.* at 1117.) When Becky left to go to her friend's house at 5:15 p.m., Rachel was watching television and looked "ok," but when she returned, she saw Rachel lying on the couch. (*Id.*)

Detective Downing interviewed Becky on May 9. (EH Exs. 39 (transcript), 43 (videotape).) Becky stated that Petitioner woke up at 2:33 p.m. on Sunday, when his friend stopped by the trailer. (EH Ex. 39 at 1133.) Becky was outside riding her bike when Petitioner told her he was taking Rachel with him to his friend's house and left with her in the yellow van. (*Id.* at 1131–33.) Petitioner returned about 30 minutes later. (*Id.* at 1134.) Becky said Petitioner left again with Rachel, telling Becky he was going to the store. (*Id.* at 1134.) Rachel did not appear hurt when she left on that trip with Petitioner. (*Id.* at 1134.) After that, when Becky put her bike away to go to her friend's house, she saw Rachel standing in the living room, watching television; Becky did not know if Rachel was hurt, but when Becky left, Rachel was standing on the porch waving to her. (*Id.* at 1130, 1135– 36.) When Becky returned, Rachel was lying on the couch and Angela had placed a wash cloth on her head. (*Id.* at 1137.)

During Angela's trial, Becky testified that after Petitioner's friend visited the trailer around 2:30 or 3:00 p.m., Petitioner told Becky he was going to the store and left in the van with Rachel. (EH Ex. 41 at 6449–50.) After the trip to the store, Becky testified that Petitioner left again with Rachel, telling Becky he was going to his friend's house. (*Id.* at 6451–52.) When Petitioner got back, Becky asked permission to go to her friend's house. (*Id.* at 6453.) When Becky returned around 6:30 p.m., Rachel was lying on the couch; she looked sick and her head was bleeding. (*Id.* at 6454–55.) On cross-examination at Angela's trial, Becky was asked if she was "sure they left, they went and came back two separate times?" Becky responded "Yes." (*Id.* at 6493.) Petitioner's trial counsel did not impeach Becky with any of these statements from Angela's trial or from her pretrial interview.

Contrary to the State's theory that the assault occurred during a third trip in the van, witnesses to Rachel's third trip with Petitioner indicated this third trip occurred after Rachel

appeared sick. Detective Thomson interviewed Angela shortly after Rachel was brought to the hospital. (EH Ex. 1 at 414.) Angela stated that she slept all day on May 1, and when she woke up Rachel was taking a nap; Petitioner explained to Angela that Rachel was playing with some little boys and she had fallen out of the van. (*Id.* at 416, 418.) Angela left to make a phone call and to check on Brandie. (*Id.* at 416.) When she got back to the trailer, Petitioner was returning in the van. (*Id.*) He explained that when Rachel woke up there was blood all over her head so he took her to the paramedics who rinsed her head out and told him there was no need to stitch it. (*Id.* at 416.) Rachel told Angela she did not want any dinner because her stomach was upset. (*Id.* at 419.) Angela noticed some bruises on her chest and Rachel explained that "the little boy pushed her out of the van." (*Id.*)

Stephanie Fleming, Petitioner's neighbor, recounted the events she recalled from Sunday, May 1 in an interview with Sergeant Pesquiera. (EH Ex. 72 at 333.) Stephanie remembered seeing Rachel playing on her bike around 3:30 p.m. (*Id.* at 334–35.) She went to Petitioner's trailer at that time because Angela had previously asked her if she wanted to babysit. (*Id.* at 335.) Stephanie saw Petitioner in the kitchen and Angela was wide awake and told Stephanie she no longer needed her to babysit. (*Id.* at 335–36.) Stephanie saw Rachel outside riding her bike at that time, and she did not look sick. (*Id.*) Around 5:15 p.m., Rachel went into Stephanie's camper. Stephanie noticed she was soaking wet, but didn't have any bumps on her head, and no blood, but was "trying to get sick" though she never threw up. (*Id.* at 337–38.) Her face was a greenish color, and she had black under her eyes. (*Id.* at 338.) She was not wearing a shirt, but Stephanie saw no bruises or scratches on her, except on her arms. (*Id.* at 339, 341.) Stephanie picked her up to take her home and when they ran into Petitioner on his way to check on her, Rachel went willingly to him. (*Id.* at 341–42.) After that, Petitioner, Rachel *and* Angela drove away in the van. (*Id.* at 343–44.) Stephanie did not see the van return, but did see it leave again around 7:30 p.m., and it was gone until close to 9:30 p.m. (*Id.* at 346–47.)

Petitioner was first interviewed Monday morning shortly after he was brought in from the St. Charles camp. (EH Ex. 73 at 686.) Petitioner stated that he saw Rachel was

with two little boys her same age when she fell out of his van on Sunday afternoon. (*Id.* at 691–92, 695.) He said that he gave Rachel half of a Tylenol or aspirin and she went back out to play; he pushed her on her bike until she started playing with the boys again. (*Id.* at 691, 696.) Petitioner told the officers that after Rachel had fallen out of his van, he and Rachel went to visit St. Charles and then to the Choice Market to get dinner; Rachel went into the market and helped carry the milk. (*Id.* at 729, 735, 741–42.)

Petitioner said that, sometime after 5:00 p.m., neighbors Stephanie and Julian Duran waved for Petitioner to come over and told him Rachel was getting sick. (EH Ex. 73 at 702.) Petitioner stated he put her down for a nap and it was after that when he first noticed her head start to bleed. (*Id.* at 691, 696.) Around 5:30 p.m., he took Rachel to the Quik-Mart to get some ice for her head. (EH Ex. 73 at 703–06, 718, 749.) He did not stop at the Rural Metro Fire Department fire station as he later told Angela and others, but stated that he did encounter an EMT at the Quik-Mart who looked at the cut, shined a light in her eyes, commented that they were "reacting equal," and advised Petitioner to "keep the ice pack on it and it'll be okay." (*Id.* at 704–06, 718, 774.) Petitioner thought the EMT was on his way to or from work because there was no emergency vehicle there. (*Id.* at 719.) Petitioner stated he did not take Rachel to the Rural Metro Fire Department because he saw a police vehicle there and he did not have a driver's license. (*Id.* at 704, 774.) During Petitioner's pretrial statement, he never stated that Rachel was examined by a Rural Metro EMT, but maintained that he saw a man in a brown-shirted EMT uniform who was not driving an official vehicle. (EH Ex. 73 at 705–06, 749.) When Petitioner returned to the trailer, Angela, who used to be in nursing, said "head wounds bleed a little bit so no big deal." (EH Ex. 73 at 704.) Petitioner told the officers that he and Angela were up with Rachel much of Sunday night, and that Rachel would throw up anytime she drank something. (EH Ex. 73 at 705, 723.)

Detective Ruelas took a statement from Petrilak, the Quik-Mart clerk, who verified that Petitioner was in the store getting ice in a plastic bag, but did not bring his child in with him, and could not opine on Petitioner's actions outside or if she saw him talking with

anyone, stating that she "didn't watch him anymore . . . once outside the store I don't pay attention to them, especially when I have customers in the store." (EH Ex. 1 at 1877; EH Ex. 66 at 5072.) Because Petrilak had testified at trial that she believed she would have been aware of an EMT treating a little girl outside the store, but did not notice that happening, trial counsel could have impeached this statement with her statement to Detective Ruelas that she did not pay attention to him after he left the store. Despite these prior statements, trial counsel did nothing to impeach Petrilak's statement that she would have noticed Rural Metro personnel arriving in an official vehicle, or would notice any Rural Metro personnel looking at or talking to the little girl. Trial counsel did confirm the time of day Petrilak might expect Rural Metro personnel to be there, and obtained information from Petrilak that Rural Metro always parked in front where they could be seen.

Sergeant Pesquiera acknowledged during the evidentiary hearings in these proceedings that, despite verifying that Petitioner went to the Quik-Mart and to his friend Ron's house, and that he did not go to the Rural Metro Fire Department, there is no "indication anywhere in the sheriff's department record" that anyone attempted to verify and document that Petitioner went into the Choice Market around 4:00 or 4:30 in the afternoon and that Rachel was fine at the time. (EH RT 11/6/17 at 99–101; *see also* EH Ex. 66.)

Sergeant Pesquiera interviewed Rachel's mother Angela on May 2 and again with Detective O'Connor on May 3 after Rachel's autopsy. (EH Ex. 1 at 414–26, 472–517, 518–616.) Angela said that she slept all day on May 1 and did not wake up until 6:30 p.m. (*Id.* at 416, 418.) Angela said after she woke up and saw Rachel's head was bleeding, Rachel told her that a little boy had pushed her out of the van. (*Id.* at 419, 475.) Petitioner also told her that Rachel had fallen out of the van earlier while playing with some little boys. (*Id.* at 418.) Angela stated that at 7:00 or 7:30 that evening, after she returned from making a phone call, Petitioner was just returning in his van and told her that when Rachel woke up from a nap her head was bleeding; he took her to the fire station where they rinsed her head

out and informed Petitioner she was not in need of stitches. (*Id.* at 416.)

Angela reported that she asked Rachel if she had gone to see the firemen, and Angela reported that Rachel said she had seen a lot of them. (EH Ex. 1 at 506, 530.) Angela also stated during this interview that she and Petitioner discussed taking Rachel to the hospital on the night of May 1 but that she was "scared" that if she did so "they might take her away" because of the cut on her head and the bruises on her stomach. (*Id.* at 557.) She stated that she did not see bruises on Rachel's face until Monday morning. (*Id.* at 419, 476, 592.) Sergeant Pesquirea noted that Angela "was not emotionally upset, and showed very little emotion about her arrest or her child's death" in the May 3 interview. (*Id.* 66 at 5216.)

Angela told officers she put Rachel in bed with her that night because Rachel wanted to sleep between Angela and Petitioner. (EH Ex. 1 at 477.) Rachel, however, was not present in Angela's bed when Angela woke up at approximately 6:00 a.m. (*Id.* at 478.) Angela found Rachel in Rachel's bed and could not wake her up. (*Id.* at 478.) Petitioner transported Angela and Rachel to the hospital in his van while Angela held Rachel and performed CPR. (*Id.* at 482–84, 548–49.) Angela related that once Petitioner dropped her off at the hospital he was to return home to attend to the other children. (*Id.* at 418, 483, 549.) Angela was not sure, but thought Petitioner was going to return to the hospital, possibly bringing the other children with him or maybe after taking them to school. (*Id.* at 483, 549.) Angela said that Petitioner had never hit the kids. (*Id.* at 425, 576.) Angela advised Sergeant Pesquiera that Petitioner had protected her and was the "first guy that's made (her) feel safe." (*Id.* at 491.)

Richmond was interviewed on May 2 and August 30, 1994. She reported that she was with Petitioner most of the night on Saturday, April 30, into the early morning of Sunday, May 1. She was at Petitioner's trailer on Sunday evening May 1, sometime between 7:00 p.m. and 8:00 p.m., where she saw Rachel lying quietly on a pillow with her head bleeding. (EH Ex. 1 at 1302–03.) Petitioner and Angela told her that some kids playing in Petitioner's van had pushed Rachel out of the van. (*Id.* at 1303–04.) Petitioner told Richmond that he had taken Rachel to the paramedics at the fire station, and they said

she would be alright. (*Id.* at 1304.)

Richmond also stated that, on Monday morning, Petitioner, upset and hysterical, arrived at her house with Brandie and Becky. (EH Ex. 1 at 1306–08, 1311, 1327.) Richmond and Petitioner took the girls to his friend Ron St. Charles, and then Petitioner told Richmond to take Petitioner's van to go to the hospital to check on Rachel and Angela because Petitioner did not want to go to the hospital. (*Id.* at 1309–11.) Petitioner left in a truck with St. Charles, and Richmond was stopped by police officers on the way to the hospital. (*Id.* at 1307–08.) Petitioner was located at the St. Charles camp and transported to the Sheriff's Department.

From May 17 through May 27, Sergeant Pesquiera conducted other interviews of people who resided in or were at the trailer park on May 1, 1994. (EH Ex. 66 at 5218–23.) About two weeks later, a Pima County Sheriff's photographer was dispatched to the Choice Market to photograph the parking lot. (EH Ex. 65a at 4756–63.) Other than taking photographs, no additional investigation was conducted by the Sheriff's Department.

On the morning of May 3, 1994, Norma Lopez reported to PCSD Detective Bruce Clark that her children observed a person in a van striking a child. (EH Ex. 66 at 5083.) Norma told police that her eight-year-old twins walked to Choice Market at about 4:00 p.m. for soda. (EH Ex. 76 at 1050–51.) She reported that when the children returned home from Choice Market ten minutes later, they were "dying to tell her" that they had seen a man who "looks like Alonzo[11] in a yellow van . . . punching a little girl." (*Id.* at 1052.) The children stated he "was driving with one hand. . . . swerving like he was drunk" and was hitting the girl in the chest with his elbow and hitting her face with her fist. (*Id.*) The children also reported they could see and hear the girl crying. (*Id.* at 1052–53.) Norma then told Detective Clark that when she saw Petitioner on the news the following day, she "knew right away" that the same guy the kids saw in the van was "the same guy that was on the news." (*Id.* at 1052.)

_____

[11] Alonzo was a friend of the family. (EH Ex. 76 at 1051.)

The Lopez children, Ray and Laura, were interviewed in their mother's presence that afternoon by Detective Clark. (EH Exs. 77, 79.) There were several instances during the interview that Detective Clark corrected what he perceived to be incorrect answers, and provided Ray with the correct answer, or suggested the correct answer in the question he posed. For example, when Ray stated he went to the store in the afternoon after school, Detective Clark followed up with these leading questions:

Det. Clark: . . . What, do you go to school on Sundays?
Ray: No.
Det. Clark: . . . [W]hat did you do for the first part of the day? You did, you didn't go to school, what'd you do just playing?
Ray: Yes
. . .
Det. Clark: . . . It was light out right?
Ray: Uh huh (yes) yeah.
Det. Clerk: And it was kind of blue skies and sunny?
Ray: Yeah.

(EH Ex. 77 at 1057.)

Detective Clark also asked how far away the Choice Market is, "just a block away or ten blocks away?" (EH Ex. 77 at 1058.) When Ray responded that it was ten blocks away Detective Clark said: "No, no, no, no. Okay, we gotta, we gotta be real serious about this, okay? . . . So how far do you really think it is from here?" (*Id.* at 1058.) Ray responded with the other choice given by Detective Clark: a "[b]lock away." (*Id.*) Detective Clark continued asking leading questions. (*Id.* at 1058–59.) Ray told Detective Clark that when he went to the Choice Market around 5:00 p.m. on May 1, he saw a man with long, messed up, curly hair, wearing a blue shirt and a blue and white baseball cap hitting a little girl while driving a yellow van with one hand. (*Id.* at 1060–61, 1063.) Ray thought the van was swerving because the man was hitting the girl. (*Id.* at 1063.) Because Ray had stated he could see the man's hands, Detective Clark stated to Ray that "he was pretty close then, you could see his hands?" (*Id.*) Ray agreed he was. (*Id.*) Detective Clark asked if the distance was comparable to the distance between him and a "big football" that was in the room. (*Id.*) Ray agreed. (*Id.*) When Ray said that he could not estimate the man's age, his

mother, who had previously viewed Petitioner on the news, suggested that the man was around "Uncle David's" age, or around 30–35 years old, and Ray agreed. (*Id.* at 1060–61.) Ray told Detective Clark that he saw the man hitting the girl with his fist and elbow—twice in the face and once in the stomach with his fist, and in the mouth with his elbow. (*Id.* at 1064.) Later Ray said he saw the man hit the girl once with his elbow in the girl's stomach and hit her face five times with his fist. (*Id.* at 1065.) When confronted with his inconsistent responses, Ray said he could not picture exactly where the man hit the girl with his elbow. (*Id.* at 1066.) Although Ray said he could not hear anything because the van windows were closed, when Detective Clark asked if the girl looked happy or sad or crying or yelling, Ray said the girl was "kind of yelling" and crying. (*Id.* at 1064.) Clark then asked another leading question confirming that Ray could not hear anything but could see that she was yelling. (*Id.* at 1064.) When Ray said he could not see her bleeding, Detective Clark first responded ". . . you probably just didn't notice that . . ." then acknowledged that maybe it did not happen, but he was not "trying to put words in [Ray's] mouth." (*Id.* at 1067.)

Laura was interviewed after her brother. She told Detective Clark that when she went to the Choice Market with her brother between 3:00 p.m. and 4:00 p.m. on May 1, she saw a man with long, brown, messed up, curly hair driving a yellow van with one hand while hitting a little blonde girl with the elbow of his other arm. (EH Ex. 79 at 1012–16.) Laura was asked how far away she was from the van when she saw it, further than or closer to the football in the room. (*Id.* at 1115.) Laura responded without equivocation that it was further than the football, and was "all the way to the fence . . . ." (*Id.* at 1015.) Both Norma and Detective Clark talked her into agreeing it was the same distance as the football, but when Detective Clark followed up by asking if it was a little further or a little closer, Laura again, consistent with her first response, stated it was "a little further." Detective Clark, seemingly unhappy with the response, suggested maybe she was just unsure about her answer: "A little further, okay. And that's okay, if you're not sure . . . it's certainly okay for you to say I don't know or I'm not sure." (*Id.* at 1015.)

Laura told Detective Clark that the girl did nothing in response to getting hit; she

was not talking and Laura did not hear her say anything. (EH Ex. 79 at 1017.) Detective Clark then posed the question "could you see if the little girl was laughing or crying?" (EH Ex. 79 at 1017–18.) Laura responded this time that the girl was crying. (*Id.* at 1018.) When Laura stated she knew the girl was crying because her face was red and there were tears, Detective Clark disagreed with her: "I'm not sure you could see tears . . ." (*Id.* at 1018.) When Laura protested that she "saw her," Detective Clark responded: "Maybe you just, you know like when you cry, you know there's tears." (*Id.*)

Later in the interview, Detective Clark and Norma talked Laura into changing her initial negative response to an uncertain and then a positive response:

| Det. Clark: | . . . did you watch any television? |
| Laura: | Yeah, but cartoons. |
| Det. Clark: | Okay. Did you watch the news? |
| Laura: | No. |
| Det. Clark: | Okay, did you think your brother watched the news? |
| Laura: | No. |
| Det. Clark: | You don't, you don't know? |
| Laura: | No. |
| Det. Clark: | You don't know, okay. Mom, uh, let me just ask you, did they both watch the news? |
| Norma: | They both watched the news. Did we, yeah we watched the news. Remember I, I told you to come and watch the news? |
| Laura: | Yeah. |

(EH Ex. 79 at 1024–25.)

Defense counsel was on notice of the police reports and interviews of Ray, Laura, and Norma Lopez. (EH RT 10/30/17 at 125; EH RT 10/31/17 at 147.)  Defense counsel for both Petitioner and Angela, and a Pima County Sherriff's Office investigator, interviewed Ray and Laura in each other's presence, and in the presence of their mother, on January 20, 1995 at the Lopez home. (EH Exs. 78, 80.) During this pretrial interview, Ray admitted to defense counsel that he did not have an independent memory of many of the events of May 1, 1994; his answers in the interview derived from his reading of the transcript of his interview with Detective Clark months earlier. (*Id.* at 1075–76.) Contradicting his statement to Detective Clark that he had witnessed the incident on the way home from the

Market (EH Ex. 77 at 1059), Ray stated during his defense interview that on his walk *to* the market he saw a man in a van hitting a little girl. (EH Ex.78 at 1077.) He described the van as a scratched, old, solid yellow van without any windows on the sides.[12] (EH Ex. 78 at 1078–79.) Aerial photographs taken by the PCSD show an older model solid yellow van without any windows along the side panel, matching the description given by Ray Lopez, in the Choice Market parking lot. (EH Ex. 94.)

During the pretrial interview, Ray described the man as a white man with black curly hair, which he agreed was as curly as an "afro" (EH Ex. 78 at 1080–81), but did not describe the man as wearing a baseball cap (EH Ex. 77 at 1061). Ray testified the man hit the girl in the stomach and on her face with his hand, and she cried when she got hit, though he also said he did not actually see her cry. (*Id.* at 1082–84.) Ray stated he did not know how many times the man hit the girl. (*Id.* at 1082–83.)

Laura also spoke with defense counsel, but only after first listening to her brother's interview and his answers. (EH Ex. 80 at 1029.) Like her brother, Laura remembered that the van was solid yellow without any windows along the sides. (*Id.* at 1034.) Laura claimed to be able to see the driver of the van all the way down to the waist of his pants, but she was unable to recall what the driver wore or what he looked like. (*Id.* at 1037.) Again, like her brother, Laura described the man as having curly hair "[l]ike a black guy's." (*Id.* at 1038.) She saw the man hit the girl hard with his elbow, twice in the face. (*Id.* at 1041.) Laura told counsel that she only saw the back of the driver's head and she saw only some of the girl's face from the side, but she could tell that the girl was crying because "[h]er face was red" and her "eyes were watery." (*Id.* at 1038–39, 1041.) Initially, Laura stated that she was sure the man she saw on the news was the man she saw in the van, but after further questioning by defense counsel as to whether she was sure, or just "thought it could be," she responded that it "could be." (EH Ex. 80 at 1045–46.)

At the end of the interview, Bowman had Ray and Laura take the interviewers out

---

[12] Petitioner's van had side windows. (EH Ex. 65a at 4874–75.)

to the Choice Market parking lot to identify where they were standing when they observed the van traveling through the dirt lot. (RH Ex. 78 at 1099–1100; *see* RT 4/7/95 at 41.)

Counsel conducted no further investigation until the eve of trial when Petitioner's investigator, George Barnett, was directed to take photographs and measurements of the van. (EH Ex. 17, Ex. 18.) Barnett took photographs of the front and side of the windshield of Petitioner's van, as well as height measurements of the driver and passenger side door windows, attempting to cast doubt on Ray and Laura's ability to see. (EH Ex. 18 at 267–83). Defense counsel noticed Barnett as a witness at trial who would be expected to testify as to the various measurements taken from Petitioner's van. (EH Ex. 26.) Barnett prepared a summary of the results of the investigation on March 31, 1995, and defense counsel received the results a day before Petitioner's trial began. (*See* EH Ex. 17 (facsimile transmittal indicating report sent April 4, 1995). *But see* EH RT 10/30/17 at 120 (report received April 8, 1995); EH Ex. 17 (cover page signature line indicating report sent April 8, 1995).) Ultimately, Barnett did not testify at Petitioner's trial.

### c.    *Evidence of Other Potential Suspects*

#### (i)    *Angela Gray*

In an interview conducted with defense counsel in October 1994, Angela's aunt, Donna Marini, who had been taking care of Becky and Jonathon since Angela's arrest, stated that she believed the two children had been abused by Angela because of what the children said about being slammed up against the wall and thrown down the stairs by Angela. (EH Ex. 32 at 1271.) She was also generally concerned about the possibility of sexual abuse, but not from Petitioner; it had previously been reported to her by other family members that visiting the house in the past they had walked in to see Becky sleeping "with a bunch of drunk men" at the house and "things like that that went on all the time." (*Id.* at 1272–73.)

Petitioner's daughter Brandie told officers she had seen Angela hit both Becky and Jonathon in the time they were living in Petitioner's trailer. (EH Ex. 1 at 886–87, 890–91.) She also saw Angela hit Rachel, hard enough to leave a hand print on Rachel. (*Id.* at 891.)

Becky confirmed that Angela spanked Rachel hard enough to leave a hand print on her, and that before they moved in with Petitioner, Angela would kick Becky when she got into trouble. (EH Ex. 40 at 1165, 1171.)

On May 3, 1994, Terry Richmond called PCSD and told Detective Clark that he thought that Angela was the one "hitting on the kids." (EH Ex. 66 at 4946.) He reported seeing Angela spank the kids, "sometimes" in excess, and had also seen Angela smack Rachel in the face for not doing what Angela said. (EH Ex. 66 at 4946–47.) Petitioner's neighbors also reported that Angela screamed at the children threatening them with physical harm while Petitioner acted appropriately around children. (EH Ex. 16 at 249–50.)

### (ii) Other Children in the Trailer Park

In Becky's statement to Detective Ferrier on May 2, she indicated that when she returned from visiting her friend's house, Rachel was lying on the couch and she saw blood on the pillow. (EH Ex. 38 at 1112, 1118.) Becky heard Rachel tell their mother that a boy had pushed her out of the van and hit her with a metal bar in the stomach. (EH Ex. 38 at 1111–12, 1115, 1120.) Julian Duran and Dawn Kopp were at Stephanie Fleming's trailer around 5:00 p.m. on Sunday May 1. Kopp told Sergeant Pesquiera that Stephanie's son Patrick had supposedly told Stephanie that her other son Ryan hit Rachel in the stomach with a stick and that is when she went to the bathroom and tried to throw up. (EH Ex. 66 at 5161.) When Stephanie was interviewed, she acknowledged that her two-year-old son Ryan, still in diapers, was "mean" sometimes, and had struck some of the older children before, but not enough to cause a bruise or injury. (EH Ex. 72 at 340.)

Brandie was interviewed on May 2 and reported that a boy had hit Rachel in the stomach with a metal bar, and she thought the same boy, maybe one of Stephanie's kids, had pushed Rachel out of the van. (EH Ex. 1 at 796, 811.)

Petitioner told officers that, on Sunday when he saw Rachel fall out of the van, she told him one of the boys pushed her out of the van. (EH Ex. 73 at 691, 695.)

### (iii)    Becky

Angela reported that Becky could be overly rough with Rachel, saying once she pushed her in front of a moving car, and another time Angela was told that Rachel had fallen from a clothesline after Becky had put her up there. (EH Ex 1 at 494–495, 536.)

### (iv)    Jonathon

Bowman acknowledged in these hearings that evidence acquired during the investigation suggested that there may have been sexual problems between Rachel and her brother Jonathon, that Jonathon had been molesting other children, that Rachel was afraid of Jonathon when he was in the bedroom where Rachel slept, and that Jonathon had to be moved out of the girls' bedroom into separate sleeping quarters due to sexual behavior directed toward Brandie. (EH RT 10/30/17 at 106–09; EH Ex. 1 at 890, 892–95; EH Ex. 30.)

Sergeant Pesquiera could not recall if she or one of her investigators conducted a forensic interview about any improper touching happening among the children in the trailer. (EH RT 11/6/17 at 77.) Sergeant Pesquiera admitted that there was no reason she could think of why she would have ruled out such an investigation. (*Id.* at 78–79.)

### (v)    Zoly

Prior to moving in with Petitioner, about a month before Rachel's death, Angela and her children lived with her former boyfriend, "Zoly," for several years. (EH RT 11/7/17 at 45–46; EH Ex. 1 at 426, 472, 489.) Zoly was physically abusive toward Angela, and remained in frequent contact with the children, most recently for Rachel's birthday on April 7. (EH Ex 1. at 426, 472–73, 489–90, 576.) An entry in defense counsel's trial notes states: "Zol[y] - problems w/ Johnny & Rachel sexually in past." (EH RT 10/30/17 at 105–06; EH Ex. 30.) Angela provided Zoly's full name, as well as his address to Sergeant Pesquiera (*id.* at 512), but there is no documented report that law enforcement attempted to locate or interview Zoly. (EH Ex. 66; RT 11/7/17 at 54.) Though he was a "person of interest," he was never considered a possible suspect. (RT 11/7/17 at 54–55.) Sergeant Pesquiera testified at the evidentiary hearing that there would have been a note in the investigative

record if she had followed up with Zoly.

2. Evidence That Could Have Been Presented at Trial

In this next section the Court reviews the evidence presented during these federal habeas proceedings that Petitioner asserts a reasonable investigation would have uncovered.

a. *Medical Evidence*

(i) *Fatal Small Bowel Injury*

During the recent evidentiary hearing before this Court, the Court heard testimony from Dr. Janice Ophoven, Dr. Mary Pat McKay, and Dr. Keen, among other experts. The Court also heard testimony from Dr. Howard. (EH RT 11/7/17 at 63–133.) Dr. Ophoven, Dr. McKay, and Dr. Keen all agree that it is not possible that the injury to Rachel's small bowel occurred on the afternoon of May 1, 1994. (EH RT 10/31/17 at 82, 95, 107; EH RT 11/1/17 at 37–38; EH RT 11/2/17 (a.m.) at 9.) Both Dr. Ophoven and Dr. McKay, experts retained by Petitioner, concluded that the injury to Rachel's small bowel occurred at least 48 hours (and probably many more hours) before her death. (EH RT 11/1/17 at 29, 35–36; EH RT 11/2/17 (a.m.) at 20; EH Ex. 113 at 6634–31; EH Ex. 106 at 4275–76.)

Dr. Ophoven explained that the fatal injury to Rachel's duodenum occurred in the retroperitoneal space, which is just behind, but separated from, the abdominal cavity or peritoneum. (EH RT 11/1/17 at 11–13; EH Ex. 107 (sealed) at 6678–79.) The inflammatory response to an injury in this area is initially restricted to the tissue area of the retroperitoneum. (EH RT 11/1/17 at 14.) Retroperitoneal injuries do not manifest in the same kind of symptoms as an injury inside the peritoneum, such as appendicitis, where the inflammation spreads quite rapidly and symptoms develop quickly. (*Id.* at 11–15.) Individuals may experience discomfort—a bellyache, nausea, or a change in appetite—but would not necessarily look like they were suffering from an impending catastrophe. (*Id.* at 15.) As a result, the delay between injury and the time of onset of symptoms—let alone diagnosis of injury—in injuries to the duodenum like Rachel's is often three or four or more days. (*Id.*; Ex. 105 at 4272–73.) Individuals commonly do not know they have a

- 46 -

serious injury for several days until there is a catastrophic decompensation with the onset of peritonitis and, simultaneously, shock. (EH RT 11/1/17 at 15.)

Dr. Ophoven conducted a pediatric forensic pathology review of the autopsy records and supporting documentation, including photographs and tissue slides taken during Rachel's autopsy. (EH RT 11/1/117 at 10; EH Ex. 103 at 4243.) Based on her review of gross autopsy photos showing the extent of inflammation in Rachel's abdomen, Dr. Ophoven concluded that the development of this degree of peritonitis had taken at least 48 hours. (EH RT 11/1/17 at 27–29; EH Ex. 107 (sealed) at 6675.) Dr. Ophoven's analysis of the microscopic slides also showed evidence of an inflammatory response that would have taken days to develop. (EH RT 11/1/17 at 32, 35–36; EH Ex. 105 at 4272; EH Ex. 107 (sealed) at 6680.)

Addressing the evidence that there were eyewitnesses who saw Rachel being beaten by Petitioner on the afternoon of May 1, Dr. Ophoven rejected the idea that any additional blows to her abdomen on that afternoon could have caused Rachel's death as the inflammatory process would have started much earlier, she had already developed peritonitis, and was already on her way to dying at that time. (EH RT 11/1/17 at 88.) Dr. Ophoven testified that Isobel Tafe's statement that Rachel looked sick and "grayish" on Saturday was a symptom "specific to this sort of [disease] process." (*Id.* at 78.) Dr. Ophoven testified that based on her review of the physical evidence, including samples of tissue and chemical analysis from Rachel taken at the time of autopsy, "the key findings in this case of abdominal trauma of many days duration were not made clear" during Petitioner's trial. (EH RT 11/1/17 at 37–38; EH Ex. 106 at 4276.) The evidence demonstrates that "the fatal injuries to Rachel Gray could not possibly have been inflicted on the day prior to her death as suggested by the state at [Petitioner's] trial." (*Id.*) Dr. Ophoven concluded that the "veracity of this evidence is as scientifically precise as any forensic determination available in medical science." (*Id.*)

Dr. Mary Pat McKay, a board-certified emergency medicine practitioner specializing in trauma care with additional experience teaching and researching in the field

of injury care and trauma, testified regarding her personal experience treating duodenal injuries like Rachel's as well as an extensive literature review she undertook focused on pediatric injuries involving duodenal rupture, perforation, laceration, treatment, and outcomes. (EH RT 11/2/17 (a.m.) at 5–6, 9; EH Ex. 113.) In her review, Dr. McKay identified "more than 200 cases of intestinal injury in children over many decades, including at least 160 cases of duodenal perforation with the timeline described from injury through diagnosis to treatment and outcome." (EH Ex. 113 at 6634–27.) In her review of the literature, Dr. McKay did not find a single reported case in which a duodenal injury resulted in death within 48 hours after the known time of injury. (EH RT 11/2/17 (a.m.) at 9, 15.)

Dr. McKay suspected Rachel's injury was non-accidental due to the delay in seeking treatment, but could not rule out an accidental injury based on the evidence. (*Id.* at 10.) In her experience, she has seen duodenal injuries caused by bicycle handlebars and even rough play such as wrestling. (*Id.* at 11.) In one case, Dr. McKay treated a 17-year-old who suffered a duodenal tear due to a knee to the solar plexus while wrestling with a friend. Dr. McKay explained that the patient presented to the emergency room "perfectly healthy" with some abdominal pain. (*Id.* at 11.) The patient actually left the emergency room before he was diagnosed with a rupture in his retroperitoneum, and ate a submarine sandwich for lunch before returning for surgery the following day. (*Id.* at 11–12, 19.) Dr. McKay described the teen's delayed diagnosis as consistent with her experience and the medical literature, explaining that the inflammatory response in these types of injuries is a "smoldering process." (*Id.* at 12.) The correct diagnosis and medical treatment are often not undertaken for several days; Dr. McKay's literature review uncovered cases where the correct diagnosis was not reached for up to seven days. (*Id.* at 12.)

Dr. McKay explained that the laceration to Rachel's duodenum would initially cause inflammation within the retroperitoneal space, but not infection. (*Id.* at 12–13.) Eventually, if left untreated the inflammation spreads and infection sets in, resulting in overwhelming sepsis and death. (*Id.* at 13; Ex. 113 at 6634.29.) The progression from the

initial injury to increased inflammation and infection, and eventually death, takes a "very long period of time." (*Id.* at 17; Ex. 113 at 6624.29.) In her literature review, Dr. McKay found cases in which individuals suffered duodenal lacerations like Rachel's and survived, even though they did not receive treatment for four to seven days. (*Id.* at 15.)

Dr. McKay concluded that "Rachel's duodenal injury occurred no sooner than 36 hours prior to death and likely occurred much earlier. There is absolutely zero evidence to suggest it could have occurred in less than 24 hours." (EH Ex. 113 at 6634.31; *see also* EH RT 11/2/17 (a.m.) at 20.)

Dr. Ophoven and Dr. McKay agreed that there is nothing in Rachel's medical records that would suggest that her inflammatory response to the injury would deviate from the standard case. (EH RT 11/1/17 at 59; 11/2/17 (a.m.) at 19–20.) Dr. Keen likewise testified that his best estimate is that Rachel's abdominal injury occurred approximately two days prior to her death, but at a minimum not less than a day could have passed between time of injury and death. (EH RT 10/31/17 at 77, 107, 114–15.)

Dr. Howard testified that tissue slides of Rachel's duodenum showed "no sign of healing" and concluded the injury was "acute, could be a few hours, typical of a day or the same day as death." (EH RT 11/7/17 at 85.) On cross-examination, Dr. Howard maintained that the injury was typical of being at least a few hours to 24 or more hours old. (EH RT 11/7/17 at 105.) Dr. Howard agreed, however, that he testified in Angela's trial that the abdominal injury was most consistent with infliction 24 hours before death but could be as few as 12 hours old. (*Id.* at 106.) Dr. Howard testified that now his opinion was that the injury was most consistent with "being several hours to 24 hours" old, but also could have occurred in as little as 61 minutes prior to death. (EH RT 11/7/17 at 107–08.) Dr. Howard also agreed that he did not testify at Petitioner's trial that the injury was most consistent with 24 hours, but that it was "typical of having occurred about one day prior to death" and agreed that he never disclosed to the jury that the injury was most consistent with having occurred prior to May 1. (EH RT 11/7/17 at 109–10.) Dr. Howard explained that if he had been asked the right questions at Petitioner's trial, he would have testified truthfully that in

his judgment the injury was most consistent with having occurred prior to May 1, but admitted that he did not make this finding clear to Petitioner's jury. (*Id.* at 110.)

Dr. Howard also admitted that a description of Rachel looking sick and gray in color prior to May 1 could be compatible with the injury occurring before that date. (EH RT 11/7/17 at 112–13.)

### *(ii)    Vaginal Injury*

Dr. Ophoven conducted a microscopic examination of the physical evidence of Rachel's vaginal injury obtained during autopsy. Prior to her 2010 report, she requested a special "trichrome" stain be applied to the anogenital tissues which revealed evidence of "a mature vital reaction" indicated by low cell content material as a result of the body making new tissue to heal; "regeneration" or the replacement of surface epithelial cells; and "neovascularization" or new blood vessel growth that occurs when tissue is healing and growing. (EH RT 11/1/17 at 41–42; EH Ex. 106 at 4275.) Based upon her review of these slides, Dr. Ophoven concluded that Rachel had a vaginal injury that was weeks old, and possibly predated the time period in which Rachel lived with Petitioner. (EH RT 11/1/17 at 42–43.)

Dr. Keen also reviewed the photo micrographs of Rachel's vaginal injury and identified connective tissue in the trichrome staining, which indicated that the vaginal injury was multiple days, possibly weeks, old, and was older than the abdominal injury. (EH RT 10/31/17 at 92–94, 108.)

Both Dr. Ophoven and Dr. Keen agreed that the evidence of some fresher blood in Rachel's vaginal area indicated a newer injury in combination with the older injury, but did not necessarily indicate recent intentional sexual trauma. Rather, the more recent injury could result from irritation of an older injury, poor hygiene, itching or scratching, or reopening of an older wound during the death process. (*See* EH RT 10/31/17 at 94–95, 109; EH RT 11/1/17 at 43–45, 48, 78–79, 84.)

Dr. Howard concluded in his 2004 declaration that the "injuries to Rachel's vaginal area showed characteristics consistent with hours to perhaps days elapsing between the

time of her abdominal injury and her vaginal injury." (EH Ex. 45 at 4379.) However, during direct examination at the evidentiary hearing, Dr. Howard testified that, based upon his review of tissue samples, the vaginal injury was "an acute injury," consistent with a few hours to a day, and showed none of the characteristics consistent with an injury at least a week old. (EH RT 11/7/17 at 76–77.)

On cross-examination, Dr. Howard admitted that he testified at Angela's trial that Rachel's vaginal injury was more typical of 24 hours old, and that this would put the injuries outside of the 2:00 p.m. to 5:00 p.m. window on Sunday, May 1, the timeframe during which Petitioner allegedly assaulted Rachel. (*Id.* at 100–01.) Dr. Howard further testified that his current opinion is that the vaginal injury is "typical of an injury that predates the afternoon of Sunday, May 1." (*Id.* at 102.)  Dr. Howard admitted that his testimony at Petitioner's trial could have left the jury with the misimpression that the vaginal injury was most consistent with infliction between 2:00 and 5:00 on the afternoon of Sunday, May 1, while his findings were that the injury was most consistent with infliction on Saturday, April 30. (*Id.* at 103.) Dr. Howard agreed that even though he held to the belief that the injury was more typical of having occurred the day prior to May 1, he told Petitioner's jury that the injury was consistent with the afternoon of May 1, because "it was a correct response to the question asked" and he could "only answer in court the questions [he was] asked." (*Id.* at 103–04.)

### (iii) *Bruising*

Regarding the dating of bruises, Dr. Ophoven explained that "[i]nterpreting the age of bruises from physical appearance and color is recognized by the forensic community to be very inexact [i.e., inaccurate], and should not be done." (EH Ex. 105 at 4273.) Dr. Howard explained that "the timing of bruises, . . . like other injuries, is not precise," and agreed that you could not date a bruise, for instance, to 12 hours versus 48 hours. (EH RT 11/7/17 at 112.) Dr. Howard agreed, that, had the attorneys asked him at Petitioner's trial, he would have told them that you cannot really distinguish or date bruises to a specific day. (*Id.*) He further agreed that he could not distinguish between a bruise inflicted on April 29

from a bruise inflicted on May 1. (*Id.*)

Dr. Ophoven testified that some of the marks on Rachel's body, along with some of the wounds that were actively bleeding, could have been caused by metabolic changes at the cellular level that occur when the body is not getting enough oxygen and glucose. (EH RT 11/1/17 at 46–47.) Dr. Ophoven testified that, while many of the marks on Rachel's body were consistent with trauma, many of the marks appear to her to be more consistent with blotchy discolorations of the skin associated with disseminated intravascular coagulation ("DIC"), which is a cellular process the body experiences when in shock. (*Id.* at 47–49; 52–53.) This process, which occurs within a fairly short time after shock, perhaps as little as two or three minutes, renders the body unable to clot, and destabilizes the clots that have already formed, potentially causing bleeding from all orifices—from old wounds, the mouth and nose, the GI tract, and urinary tract—and also can cause marks to appear on the exterior of the body. (*Id.* at 47–49.) Dr. McKay also testified that Rachel could have suffered from DIC during sepsis. (EH RT 11/2/17 (a.m.) at 22–23.) Dr. Ophoven observed that photos from autopsy did not show evidence of bruising or bleeding on the underside of the tissue, which supports her theory that some of the marks may have appeared as a result of DIC during the death process and not as the result of an inflicted injury. (EH RT 11/1/17 at 49–50.) Dr. Ophoven concluded that while not all the evidence of bruising on Rachel's body was as a result of DIC, the autopsy photos legitimately suggest that all the marks may not be the result of abusive trauma. (*Id.* at 53.) Contrary to Dr. Siefert's opinion that bleeding ceases very shortly after death, both Dr. Ophoven and Dr. McKay agreed that it is possible for wounds to continue to bleed or ooze for a period of time after death. (*Id.* at 54; EH RT 11/2/17 (a.m.) at 24–25, 29.) Dr. Howard, however, disagreed with this assessment of the autopsy photos.

Dr. Ophoven further stated that it is possible that many of the bruises observed on Rachel's body at the time of her death could have been caused by falls or other injuries Rachel sustained while attempting to walk or otherwise move around while suffering from the final stages of sepsis and peritonitis. (EH RT 11/1/17 at 55–57.) Dr. Howard also agreed

Rachel could have sustained a bruise if she fell on a table that was just outside of her bedroom. (EH RT 11/7/17 at 115.) Dr. Ophoven and Dr. McKay testified that a circular mark on Rachel's chest was consistent with having been caused by skin slippage due to an electrical monitor being attached and then removed from Rachel's body after death. (EH RT 11/1/17 at 53–54; EH RT 11/2/17 (a.m.) at 23–24.) Dr. Howard also agreed that the round mark on Rachel's chest could have been caused by medical equipment such as a monitor pad. (EH RT 11/7/17 at 71.)

### (iv)    Scalp Injury

Both Rachel and Petitioner had independently reported to witnesses that Rachel had fallen from Petitioner's van on the afternoon of Sunday, May 1. Dr. Ophoven and Dr. Hannon opined that the scalp injury is consistent with a fall from a van involving the head striking a hard surface. (EH Ex. 106 at 4275; Ex. 119 at 3993.) Dr. Howard also agreed that the scalp injury is consistent with a fall onto a flat surface. (EH Ex. 45 at 4380.)

Dr. Howard testified in these proceedings that, after reviewing biopsies of tissue samples from the scalp, he concluded that the scalp injury was "acute"—showing no evidence of healing—and occurred "hours or a day prior to death." (EH RT 11/7/17 at 75–76.) On cross-examination, Dr. Howard admitted that in his pretrial interview, after reviewing the tissue slides from the scalp injury, he stated that the scalp injury was "probably two days old." (*Id.* at 94–96.) He further admitted that in his July 20, 2017 deposition, after reviewing the slides twice before the deposition, he testified that the scalp injury was, more probably than not, at least two days old. (*Id.* at 96–97.)

Dr. Ophoven reviewed gross photographs of the scalp injury and believed they were consistent with Dr. Howard's opinion given at his pretrial interview, based on his microscopic review of the scalp tissue at that time, that the injury was "probably two days old . . . ." (EH RT 11/1/17 45–46.) Dr. Ophoven explained that when DIC occurs during irreversible shock, the body loses its ability to clot, and an old wound could begin oozing or bleeding again. (*Id.* at 47–48.)

Finally, both Dr. Hannon and Dr. Ophoven concluded that Rachel's scalp injury was

not caused by the pry bar. (EH RT 11/1/17 at 57–58; EH RT 11/2/17 (a.m.) at 55–56; EH Ex. 106 at 4275; EH Ex. 119 at 3993–94.) Dr. Hannon and Dr. Ophoven also concluded that the pry bar found in the van was not used to cause the fatal injury to Rachel's bowel. (EH RT 11/1/17 at 57–58; EH RT 11/2/17 (a.m.) at 52–54; EH Ex. 119 at 3992–93.) Dr. Ophoven and Dr. Hannon agree that it is possible that Rachel's fatal abdominal injury could have been inflicted by another child. (EH RT 11/1/17 at 58–59, 82–83; EH RT 11/2/17 (a.m.) at 55.) In Dr. Hannon's opinion, the child would have to be "fairly large" (EH RT 11/2/17 (a.m.) at 55), and in Dr. Ophoven's opinion, the child would have to do something more than simply hit her in the stomach with a fist. (EH RT 11/1/17 at 82–83.)

### b.    *Bloodstain Evidence*

Petitioner offered the expert testimony of Stuart James, an experienced blood pattern analyst. James described three categories of bloodstain patterns: (1) passive stains that require little energy to produce, such as dripping blood; (2) spatter stains that take more energy to create and result in the blood source being broken up into smaller droplets; and (3) altered stains—stains caused by activities such as clotting or drying that affect the appearance of passive or spatter stains. (EH RT 11/3/17 (a.m.) at 12; EH Ex. 121a.) Spatter stains can be further categorized as: (1) "impact spatter" caused by mechanisms such as a beating or a gunshot; (2) "secondary spatter" caused by blood dripping which results in satellite spatters around the drip; and (3) "projected spatter" caused by mechanisms such as being "cast-off" of a surface through centrifugal force, for example blood flying off of a swinging hand or bloody hair that is flipped. (EH RT 11/3/17 (a.m.) at 12, 14–15, 22; EH Ex. 121a.) James testified that the principles used in his bloodstain analysis were available in 1994, at the time of Petitioner's trial. (EH RT 11/3/17 (a.m.) at 6–9, 40.)

James testified that bloodstains on the carpet of the van appeared to be the result of the passive dripping of blood. (EH RT 11/3/17 (a.m.) at 17–18; EH Ex. 121 at 4072.) James concluded that the stains indicated Rachel was actively bleeding and moving around while in the van and may have made contact with the carpet at some point in time. (EH RT 11/3/17 (a.m.) at 19–20; EH Ex. 121 at 4072.) James further testified that the bloodstains

on the front passenger seat had the appearance of a projected bloodstain pattern, specifically a cast-off pattern consistent with, for example, bloody hair swinging and causing blood to project onto the surface of the seat. (EH RT 11/3/17 (a.m.) at 20–22.) James testified that the bloodstains he observed in the van are consistent with Rachel being carried or moved within the van while she was bleeding from an open wound. (*Id.* at 22–23.)

James concluded that the bloodstains in the van were not typical of those produced during a beating because there was only a single laceration on Rachel's head. A single laceration often just produces blood flow and not impact spatter, because there is no blood already exposed that would spatter when struck by an object. (*Id.* at 25.) Upon further questioning by the Court, James conceded that his conclusion that the blood projection was from Rachel being carried in the van, and not from impact spatter, was based on the lack of physical evidence such as bruising that might indicate Rachel was struck after the laceration occurred. (*Id.* at 25–26.) James admitted that looking only at the bloodstain he could not distinguish whether it was as a result of Rachel being struck or a result of Rachel's hair swinging because of the movement of the van. (*Id.* at 27.) James did explain that if Rachel had been struck, either by overhead or lateral blows, he would expect to see a cast-off pattern in the underlining of the roof or on the dashboard and nearby surfaces. (*Id.* at 27–28.) James noted that there was no mention of these type of cast-off stains by the investigator who inspected the van, though James did not know if these other surfaces were ever inspected and believed that there were not a sufficient number of photographs taken. (*Id.* at 28–29.)

James further explained that the traces of blood on the clothing that Petitioner was wearing on May 2 (i.e., the red t-shirt, jeans, and work boots) indicated contact and proximity to a source of wet blood and are insufficient to conclude anything about whether or not a beating took place in the van. (EH RT 11/3/17 (a.m.) at 33–35.) James further testified that these stains could have occurred as the result of lifting or otherwise attending to Rachel while she was bleeding. (*Id.* at 35.)

c.        _Reliability of Eyewitness Testimony/Accident Reconstruction_

Paul Gruen, Petitioner's accident reconstruction expert, concluded in his report that Ray and Laura "could not have seen inside the van, nor observed any of the activities to which they testified, based on their angles of observation, visual obstructions, speed of the van, and the duration of the event." (EH Ex. 110 at 3929.) Gruen reached this conclusion based on his approximation of several variables used to reconstruct the scene and the viewing ability of the children.

Gruen established the approximate location of the Lopez children when they saw the van based on Ray's indication on a photograph during trial of where he and his sister were when they saw the van. (EH RT 11/1/17 at 99–100; EH Ex. 66 (Trial Exhibit 199).) Gruen estimated the van drove through the parking lot at a speed between 15 to 20 miles per hour based on what he believed was a reasonable speed after personally driving his vehicle through the lot and observing other cars drive through. (EH RT 11/1/17 at 105–06.) Gruen photographed the van by positioning his camera at the height of the children, which he determined to be 49 inches based on Ray's school records. (_Id._ at 107, 140.) Gruen determined the height of the top of Rachel's head in the passenger van based on reference material establishing the sitting height of children. (_Id._ at 108.)

Gruen summarized the factors contributing to the basis for his opinion that the children could not have seen what they reported:

- The children were too short in stature and thus, their viewing angle of the event was too acute to have accurately observed any activity inside the van. . . .

- A lower viewing angle also makes the van's interior appear dark, similar to window tint. . . .

- The van's relative angle to the children was constantly changing. The initial view would have only been through the front windshield. As the van traveled across the lot, view obstructions would have been created by the driver's side A pillar, and by reflections on the windshield and side window glass.

- The van was traveling between 15 and 20 miles per hour as it crossed the lot. The calculated distance of observation was between 70 and 80

feet, depending on when the children's attention was drawn to the van. This speed range would have only afforded the children a 2 to 4 second window of opportunity to see inside the van, had it even been possible to see inside the van.

- Petitioner's body dimensions would not have allowed him to reach across the van's interior compartment to perform any kind of assault and still maintain control of the van.

(EH Ex. 110 at 3933; *see* EH RT 11/1/17 at 127–28.)

On cross-examination, Gruen admitted that he did not have the best information about important data in this case used to conduct the line of sight analysis, including where the children were standing, their distance to the van, the speed of the van, and the distance and direction the van traveled. (EH RT 11/1/17 at 137–47, 151.) Gruen admitted that the measurement he used for one variable—how long the children had to observe the van—contradicted eyewitness statements. (*Id.* at 153.) Gruen also testified that his analysis did not account for any potential swerving of the van, as described by the Lopez children and as noted as an ongoing problem with the van by Joyce Richmond in her interview with the police. (*Id.* at 148–51.)

Gruen testified that his ultimate opinion would not change if many of the variables—the placement of the children, the speed of the van, the height of the children, and whether Rachel was sitting or standing—were altered because, based on his analysis, it was too dark inside the van to see the driver elbowing the passenger in the seat from further distances away given the darkness of the window. (*Id.* at 106, 113–14, 123.) Gruen explained that the interior of the van would appear darker to a shorter individual. (*Id.* at 128.) Gruen also opined that the fact that the van may have been swerving a little bit would not make that much difference. (*Id.* at 148–51.)

Gruen admitted on cross-examination that, disregarding the lighting conditions, and based only on the line of sight, the Lopez children could see both the passenger and the driver as shown in the computer animation demonstrated during the evidentiary hearing. (*Id.* at 163–64.) Gruen explained, however, that the children would not have been able to see the driver hitting the face or chest of the child. (*Id.* at 177.) Gruen never measured the

tint on the van windows, and was not able to confirm that there was any factory tint on the window, but believed there was some factory tinting on at least the side window. (*Id.* at 165–66.)

Patrick Hannon, Petitioner's biomechanics analyst, concluded that Laura and Ray's observations were not accurate, and the physical actions of Petitioner described by the children while he was driving the yellow van are extremely improbable from a functional anatomy/biomechanics perspective. (EH Ex. 119 at 3994; EH RT 11/2/17 (a.m.) at 50.) For his opinion, Hannon relied on some of the approximations produced by Gruen. (EH Ex. 119 at 3988.) For example, Hannon relied upon the speed of the van ("15 to 20 miles per hour") and the time of observation ("two to four seconds") estimations and calculations performed by Gruen, which, as discussed above, are contradicted by witness recollections in the record. (*Id.* at 3989.)

Hannon noted that reflected light contrast and the general lighting environment prevented a clear unambiguous observation by the Lopez children. (*Id.* at 3988–89.) Hannon opined that the children would have had the ability to observe Petitioner's upper torso, head, and neck as well as six inches of Rachel's head, a conclusion supported by the photographs Hannon took showing that the interior of the van was visible to an outside observer. (EH RT 11/2/17 (a.m.) at 40; EH Ex. 119 at 4001–11, 4014–23.) Hannon explained that several other factors such as visual acuity at 70 or 80 feet, perspective error, glare, lack of illumination inside the van, as well as physical obstructions such as the "A pillar" in the van door and Petitioner himself, would make it "questionable" whether the children could "see with any kind of surety or conviction." (EH RT 11/2/17 (a.m.) at 39–41.)

Hannon also simulated, through photographs, the position Petitioner would have been in while leaning over to strike or elbow Rachel from the driver's seat. (EH Ex. 119 at 3996, 4025–28.) Petitioner would have been able to hit the passenger with his elbow, but the steering wheel would move up or down while he was doing so, producing a change in direction, or a "swerve." (EH RT 11/2/17 (a.m.) at 73–74.) This is precisely what Ray

Lopez observed—he told his mother that the van was swerving as if the driver were drunk. (EH RT 11/1/17 at 148.) Joyce Richmond also pointed out that she had difficulty keeping the van from swerving while she was driving it, prompting an observer to report her as a drunk driver. (EH Ex. 1 at 1311.)

Regarding Rachel's injuries, Hannon concluded that Rachel did not suffer any injuries consistent with the actions that the Lopez children described. (EH RT 11/2/17 (a.m.) at 50.) Although there was evident bruising, Hannon believed that an elbow or backhand fist to Rachel's face would have fractured her nasal bones. (*Id.* at 50–51.) Hannon also opined that the fatal abdominal injury was not caused by the pry bar, explaining that if Rachel had been hit by the pry bar with enough force to cause the abdominal injury it would also have caused a very deep laceration, which was not present. (*Id.* at 52–53.)

Petitioner also presented evidence from Dr. Esplin, a forensic psychologist with experience in the area of child witness reliability. (EH RT 11/2/17 (p.m.) at 4–6.) Dr. Esplin testified that by the mid-1990s there was a scientific consensus regarding the general principles of investigative interviews that would substantially reduce the risk of obtaining unreliable information from child witnesses; he conducted trainings, presented scientific papers, and testified in cases on the subject in the early 1990s. (EH RT 11/2/17 (p.m.) at 7–9.)

Dr. Esplin reviewed the Lopez children's pretrial statements and trial testimony and concluded that the information the Lopez children provided was unreliable due to post-event contamination and the use of interview procedures that did not involve scientifically sound methods. (EH RT 11/2/17 (p.m.) at 14–15; EH Ex. 115 at 3828.) Dr. Esplin explained that post-contamination occurred when the children were exposed to television coverage and were interviewed in the presence of each other and their mother. (EH RT 11/2/17 (p.m.) at 15, 23–29) Dr. Esplin further explained that the reliability of the children's interviews was compromised through excessively leading and suggestive interviews containing forced-choice questions. (EH RT 11/2/ 17 (p.m.) at 15–18, 29.) Dr. Esplin opined that the children's statements were inconsistent over time. (EH RT 11/2/17

(p.m.) at 18.)

Dr. Esplin nonetheless believed that the Lopez children saw something happen in the van "that had some emotional significance." Moreover, Dr. Esplin agreed that several aspects of the Lopez children's testimony were reliable and consistent: they saw a yellow van in the Choice Market parking lot, the van was moving, they saw objects and movement in the van, and they saw the van swerve. (EH RT 11/2/17 (p.m.) at 38.)

## V.    ANALYSIS

### A.    <u>Ineffective Assistance of Trial Counsel: Deficient Performance</u>

#### 1.    Medical Evidence

"Deference to counsel is owed only to strategic decisions made after 'thorough investigation of law and facts relevant to plausible options.'" *Hernandez*, 878 F.3d at 850 (quoting *Strickland*, 466 U.S. at 690). Counsel's strategic decisions made after less than complete investigation may still be reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 562 U.S. 86, 108 (2011). *Strickland* "does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, 562 U.S at 111.

The Court recognizes that the American Bar Association ("ABA") standards are guidelines only, and no set of rules for counsel's conduct can take into account "the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89. The Supreme Court has, however, consistently relied upon relevant ABA Guidelines in effect at the time of trial when reviewing attorney conduct and examining reasonableness. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (referencing ABA Guidelines when considering ineffective assistance of counsel claim); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (referring to ABA Guidelines as "well-defined norms," and "standards to which we long have referred as 'guides to determining what is reasonable'" (quoting *Strickland*, 466

U.S. at 688)); *Williams*, 529 U.S. at 396 (citing ABA Guidelines to find "that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"). Under prevailing norms of practice as reflected in the American Bar Association standards, it was unreasonable for counsel to not conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case, and to secure the assistance of experts where necessary or appropriate. *See* ABA Standards for Criminal Justice Prosecution Function and Defense Function, Third Edition (1993), Section 4-4.1; ABA Guidelines for the Performance of Counsel in Death Penalty Cases (1989), Section 11.4.1.

A court errs if it relies on the ABA Guidelines without consideration for whether they reflect the prevailing professional practice at the time of trial. *See Van Hook*, 558 U.S. at 7 (finding appellate court erred by relying on ABA guidelines announced 18 years after petitioner's trial). In this case, however, Petitioner established through Cooper's testimony that, at the time of Petitioner's trial, the standards cited above from the ABA Guidelines were well-established under prevailing professional norms, both at the Pima County Defender's Office and by the private sector defense bar in Pima County. In Petitioner's case, under prevailing professional norms, the central focus of the defense should have been an investigation into when Rachel suffered her injuries.

More importantly, the scope of trial counsel's investigation was also unreasonable in light of what counsel actually knew or should have known. While counsel need not be prepared for "any contingency" and may not be faulted for a reasonable miscalculation or lack of foresight, *see Richter*, 562 U.S. at 110 (quotations omitted), the State's plan to introduce medical evidence to place Petitioner alone with Rachel during the time she was injured was not just a remote possibility. Bowman acknowledged during these proceedings that it would have been reasonable to anticipate that the State would present medical evidence dating Rachel's injuries to the afternoon of May 1. (EH RT 10/30/17 at 86.) Bruner testified that he *did* expect that at some point during the trial the State would present medical evidence tying Rachel's injuries to those couple of disputed hours. (EH RT

10/31/17 at 123–24).

Aside from counsel's admissions during these proceedings, there were several significant red flags that should have objectively and reasonably alerted counsel to the need to investigate the medical evidence regarding the timing of Rachel's injuries. Defense counsel should have been aware of the State's theory of the case, at a minimum, by reviewing the grand jury proceedings from May 13, 1994. The clear implications of Sergeant Pesquiera's testimony during the grand jury proceedings was that Rachel appeared to be fine until she took a trip with Petitioner, alone, to the store on the afternoon of May 1, where she was seen being beaten in the van by the Lopez twins. (EH Ex. 62.) That Bruner in fact recognized the importance of the State's evidence tying Rachel's injuries to the relevant time period is evident from Bruner's opening statement to the jury acknowledging that the events during "a couple of disputed hours" on the afternoon of May 1 would be central to the case. (RT 4/6/95 at 60.) Knowing the critical importance of the timeline, defense counsel acted unreasonably in failing to conduct his own investigation with respect to the dating of the injuries and in failing to challenge any of the State's evidence that suggested that all of Rachel's injuries were consistent with being inflicted on the afternoon of Sunday, May 1, when Rachel was alone with Petitioner in his van.

Additionally, the evidence implicating Petitioner was largely circumstantial, and Petitioner maintained his claim of innocence throughout the proceedings, giving no reason for counsel "to believe that pursuing certain investigations would be fruitless or even harmful . . . ." *Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Trial counsel also had evidence in his file—primarily from Becky's statements—that Rachel showed no signs of a physical beating and rape during the afternoon of May 1. Later, when Rachel was found sick at the Flemings's house at around 5:15 p.m. on Sunday evening, she was observed to go to Petitioner willingly.[13] (EH Ex. 72 at 342.) This evidence

---

[13] The record does not support Respondents' argument that Rachel was hiding from Petitioner and clung so tightly to Stephanie that she had to be "given" to Petitioner and did

should have suggested to counsel that perhaps Rachel had not been beaten or assaulted by Petitioner that afternoon.

Rachel also appeared ill to Isobel Tafe, a neighbor, on Saturday April 30. Rachel was out in the trailer park without apparent adult supervision and she looked "sick" and had a pale grayish pallor. Counsel knew that Rachel was observed to have a similar pallor on Sunday afternoon after she was discovered sick at the Flemings's camper. This evidence points to the possibility that Rachel was already suffering from peritonitis on April 30, suggesting the need to investigate the timing of Rachel's injuries more closely.

Dr. Howard made statements during his pretrial interview dating Rachel's scalp injury to April 30 or earlier, and he suggested the vaginal injury and small bowel injury might have been inflicted prior to May 1. This evidence from the State's expert significantly bolstered the need for a defense investigation of the medical timeline between injuries and death.

The possibility that others harmed Rachel also supported the necessity of investigating the medical timeline from injuries to death.[14] Evidence that others may have caused Rachel's injuries further substantiated the need to investigate the medical evidence and its association with the timing of Rachel's injuries. For example, trial counsel had evidence suggesting Jonathon may have been molesting other children and Rachel was afraid of him. Defense counsel's trial notes suggested trial counsel had reason to believe that Angela's former boyfriend "Zoly" may have had problems with Rachel sexually in the past. (EH RT 10/30/17 at 105–06, EH Ex. 30.) All of this evidence heightened the

not "willingly" go back to him. Though Stephanie did describe Rachel as clinging to her and not wanting to let go, so much so that she choked her, when Petitioner arrived and Stephanie "handed Rachel to him, she went . . . willingly." (EH Ex. 72 at 342.)

[14] The Court does not find that counsel was ineffective for failing to investigate other potential suspects; rather, law enforcement's failure to do so combined with evidence that Rachel may have been harmed by others contributed to the need for defense counsel to investigate the timing of Rachel's injuries more closely. It appears from the record that Sergeant Pesquiera did not conduct a thorough investigation because she thought Jones was the perpetrator.

plausibility that Rachel might have experienced sexual trauma before living with Petitioner, or at least before May 1, and, therefore, that the medical timeline between the vaginal injury and death needed to be fully investigated.

Additionally, trial counsel acquired evidence demonstrating that Angela had been physically abusive to her children. After moving into Petitioner's trailer, Angela had struck Rachel so hard that the next day a handprint was seen on Rachel, and Angela was also observed striking Rachel in the head. Angela also was reported to inflict blows on Becky's stomach, and throw her children down stairs and slam them against walls. Petitioner's neighbors also reported that Angela screamed at the children, threatening them with physical harm, while Petitioner acted appropriately around children. (EH Ex. 16 at 249–50.) All of this evidence strongly suggested that Angela could have caused one or more of Rachel's injuries, including her small bowel injury, and therefore an investigation was needed in order to determine if Rachel's injuries could be dated to sometime prior to that Sunday afternoon. Even if counsel were convinced that the Lopez children in fact witnessed some sort of beating that took place in the van, the evidence suggesting that others could have inflicted the fatal injury and sexual assault furthered counsel's need to further investigate the timeline.

Beyond this, defense counsel knew from Angela that Becky was possibly abusive toward her sister and had on one occasion hung Rachel high above the ground from a clothesline, an activity that could have resulted in injury.

All of these circumstances would have indicated to any reasonable attorney that a medical investigation into the timing of Rachel's injuries was necessary, but counsel in this case failed to conduct a reasonable investigation. The Court therefore finds that the failure to conduct such an investigation with the assistance of a medical expert was objectively unreasonable under prevailing professional norms. This finding, while not dependent on Petitioner's standard of care testimony, is further substantiated by the testimony of Petitioner's expert Dan Cooper regarding the prevailing professional norms at the time of Petitioner's trial.

The Court finds that defense counsel's brief consultation with Dr. Keen did not satisfy counsel's duty to investigate the timing of Rachel's injuries. Although Bowman initially posed a question to Dr. Keen as to whether Rachel's injuries could be dated, the evidence demonstrates that counsel failed to have Dr. Keen pursue the injury-dating investigation to its completion and that this failure was due to inattention and neglect, not reasoned strategic judgment. The Court finds its conclusion in this respect is supported by substantial evidence.

Dr. Keen needed to be supplied with autopsy tissue slides and photographs in order to reliably assess the age of the injuries. Defense counsel was aware of this but failed to take steps to have the necessary medical investigation completed. Bruner and Bowman's respective testimony that they "thought" or "hoped" they would have supplied the autopsy tissue slides does not reach the critical question. It was not Dr. Keen's responsibility to conduct a thorough investigation; rather, it was counsel's responsibility to ensure Dr. Keen conducted one. Counsel knew the slides were needed to make a reliable timeline assessment but failed to ensure they were provided to Dr. Keen. Thus, due to counsel's failure to follow through with this critical line of inquiry, Dr. Keen never examined the evidence needed to reliably date Rachel's injuries. If he had, it is reasonably likely this critical defense evidence would have been discovered and presented to the jury. The Court finds counsel's failure to have Dr. Keen examine the necessary evidence was objectively unreasonable, the product of inattention and neglect, and not reasoned strategic judgment.

Respondents' suggestion that defense counsel concluded his investigation because Dr. Keen reviewed the autopsy report with the time of injury questions in mind and agreed with the medical conclusions of Dr. Howard is not supported by the evidence. First, defense counsel's testimony does not support this claim. Although Bruner agreed that if Dr. Keen had reached this conclusion it would probably have ended the medical investigation and he would not have kept shopping for an expert until he found one that disagreed with Dr. Howard, neither Bruner nor Bowman had an independent recollection of discussing the case with Dr. Keen. (EH RT 10/31/17 at 26, 33, 127, 148–50.) Bowman conceded that it

is possible that Dr. Keen might have reached this conclusion, but stated that it is also possible that counsel simply "dropped the ball and didn't follow up properly." (*Id.* at 34.) Second, there is no evidence Dr. Keen was ever provided evidence of Dr. Howard's opinions with respect to the timing of Rachel's injuries—Dr. Howard's opinions regarding the injury were not stated in the autopsy report, but rather were provided to counsel in pretrial interviews and in testimony from Angela's trial. There is no evidence that counsel communicated in any way with Dr. Keen after Dr. Howard's timeline opinions became evident to counsel. Third, Dr. Keen's testimony in these proceedings establishes that, if he had been provided evidence of Dr. Howard's opinions with respect to the timing of Rachel's injuries and with the necessary evidence to evaluate these findings—namely, tissue slides and autopsy photographs—Dr. Keen would have disagreed with those opinions, taking into consideration the processes available to evaluate tissue slides microscopically in 1994. (EH RT 10/31/17 at 96–97.) Finally, the lack of documentation in the Pima County Medical Examiner's office indicating the transmission of tissue samples and autopsy photographs supports this conclusion. The Court finds that there is no evidence supporting Respondents' contention that Dr. Keen advised defense counsel that he agreed with Dr. Howard that Rachel's injuries could be reliably dated to the afternoon of May 1. Although the Court "presume[s]" that counsel "made all significant decisions in the exercise of reasonable professional judgment," the record with respect to Dr. Keen rebuts the presumption of competence. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 690).

### 2. Bloodstain Evidence

Because the evidence known to trial counsel rendered it plausible, as discussed above, that Rachel was not assaulted and raped by Petitioner on May 1 during the alleged third trip in the van, it was reasonably necessary to investigate the implications of the blood evidence presented at Petitioner's trial suggesting the rape and assault of Rachel took place in the van. The Court finds that trial counsel's failure to investigate the blood evidence was objectively unreasonable under prevailing professional norms.

Counsel knew before trial that there was going to be evidence presented with respect to the interpretation of blood evidence, but failed to consult with any bloodstain interpretation expert. Becky had reported that Petitioner and Angela took Rachel into the bathroom to do CPR, and then they rushed Rachel to the hospital on the morning of May 2. (EH Ex. 40 at 1234.) Thus, there was reason to believe that the trace amounts of blood on Petitioner's clothing might have been simply transferred from Rachel's bleeding head while Petitioner was attempting to administer aid or transport Rachel to the hospital. Similarly, counsel were on notice that the small stain of blood on the carpet of the van was located adjacent to the passenger seat, where Rachel was being held in her mother's arms on the way to the hospital on May 2. There was reason to expect that the carpet stain might be the result of blood dripping from Rachel's head during the trip to the hospital on May 2, and not a stain left from Rachel's head lying in the back of the van after her head was bleeding as a result of being beaten and hit during the sexual assault, as the prosecution argued at trial. (EH RT 4/13/95 at 95–96.) Moreover, trial counsel were on notice that that there was no attempt to either identify or recover the clothing worn by Petitioner or Rachel on Sunday, May 1. The State argued, based on the evidence of spatter stains found on the passenger seat, floor of the van, and the right sleeve of Petitioner's shirt, that after the assault, Petitioner put her in the passenger seat of the car and kept hitting her "trying to make her shut up." (*Id.* at 97–100.)

Defense counsel knew that the prosecution was going to present bloodstain interpretation evidence, but counsel failed to conduct any independent investigation of the blood evidence. The only reason counsel could think of for not doing so was that he had never consulted with such an expert previously.

The Court finds based on all of the foregoing that trial counsel's failure to investigate the blood evidence was objectively unreasonable under the prevailing professional norms.

### 3.    Reliability of Eyewitness Testimony/Accident Reconstruction

The Court finds that trial counsel's investigation into the reliability of the Lopez

children's eyewitness accounts was not objectively unreasonable. Bruner believed (1) it was not physically possible for the children to have witnessed what they described, (2) that the children's statements were unreliable and had been influenced by their mother, and (3) that the statements should have been suppressed. With these concerns in mind, the Court nonetheless finds that defense counsel conducted a reasonable investigation into the statements of the Lopez children.

As Bowman stated at the evidentiary hearing, the defense "did conduct an investigation into the Lopez children's account." (EH RT 10/31/17 at 23.) Bowman drove to the Lopez home and interviewed Ray, Laura, and Norma about their observations. Laura and Ray were questioned in depth about their observations and their statements in the police reports. At the end of those interviews, Bowman asked Ray and Laura to go outside and demonstrate where they had been standing in the Choice Market parking lot when they made their observations. After the interviews, defense counsel directed Barnett to take photographs and measurements of Petitioner's van in an attempt to discredit the accounts of Ray and Laura.

Ultimately, defense counsel made a reasonable decision, based on reasonable investigatory efforts, not to pursue further investigations. Counsel believed that, even if the Lopez children could not have seen all they claimed to have, that they at least had seen some memorable event that left a lasting impression on the children, a belief that was left intact following a reasonable investigation into the children's accounts of the incident as well as Petitioner's admission that he drove through the Choice Market parking lot on May 1 with Rachel in his yellow van. Furthermore, neither the Lopez children nor their mother knew Petitioner or Rachel, and there is no discernible motivation, aside from the impact the event made on them, for the Lopez children to report the incident to their mother. Counsel reasonably chose to challenge the children's accounts and ability to see into the van through cross-examination.

Defense counsel also determined that the Lopez accounts could not be impeached by the defense investigator and also apparently decided not to call Petitioner to testify, even

after preparing his script for trial. Counsel knew that it was Petitioner's word against the testimony of the Lopez family, and Petitioner had admitted that he was at the Choice Market that afternoon.[15] (EH Ex. 66 at 5330, 5357.) Moreover, had Petitioner testified, he may have been impeached with his prior felony conviction. (EH Ex. 1 at 2302–03.) Thus, the Court finds that Petitioner has not overcome the presumption that counsel did not call Barnett or Petitioner to testify "for tactical reasons rather than through sheer neglect." *Cullen v. Pinholster*, 563 U.S. 170, 191 (2011) (quoting *Strickland*, 466 U.S. at 690).

In sum, trial counsel rendered adequate performance by: (1) reviewing the police interviews of Norma, Ray, and Laura Lopez; (2) interviewing the three before trial; (3) recreating the event in the Choice Market parking lot with the Lopez children; (4) investigating Petitioner's van with the investigator, taking measurements and photographs in an attempt to disprove the observations of the Lopez children; (5) cross-examining Ray, Laura, and Norma at trial about their accounts; and (6) preparing Petitioner to testify in specific rebuttal to Ray and Laura's eyewitness accounts. (EH Exs. 76–80; RT 4/7/95 at 18–28, 41–46, 57–62; EH RT 10/30/17 at 125; EH RT 10/31/17 at 147; EH RT 11/1/17 at 157.)

### 4.    Funding

The Court rejects any suggestion by Respondents that trial counsel's deficient pretrial investigation be excused on the grounds that funding for investigators and experts was lacking or inadequate. Arizona recognizes a statutory and due process right to funding for experts and investigators. *See State v. Apelt (Michael)*, 176 Ariz. 349, 365–66, 861 P.2d 634, 650-51 (1993) (citing *State v. Knapp*, 114 Ariz. 531, 540–41, 562 P.2d 704, 713–14 (1977)). There is no evidence that the trial court denied any of Petitioner's funding requests, or that it would have if a proper request had been made. Bruner and Bowman

---

[15] There is also evidence that was presented in these proceedings suggesting Petitioner saw two children in the Choice Market parking lot on May 1 in the afternoon (*see* EH RT 11/1/17 at 142–43; EH Ex. 212), though it is not clear to the Court if this evidence was available to defense counsel before trial. Accordingly, the Court does not take this fact into account in determining whether counsel's performance was deficient.

acknowledged that they believed additional funding for experts would have been granted on a showing of reasonable need. (EH RT 10/31/17 at 16 ("I think if we wanted something and thought it was important, we could have done something about it through the Court."); *id.* at 145 ("[Y]ou'd have to go hat in hand to the judge to get any additional funding for experts . . . . But up to a certain point you never had real trouble getting experts. I don't think Judge Carruth would have denied us funding if . . . it was reasonable.")) Petitioner's standard of care expert Dan Cooper agreed with trial counsel's assessment. (EH RT 11/3/17 (p.m.) at 21–25.)

### 5. Trial Strategy

The Court considers, as its starting premise, that counsel's failure to investigate the medical timeline "might be considered sound trial strategy" under these circumstances. *See Pinholster*, 563 U.S. 170, 191 (2011) (quoting *Strickland*, 466 U.S. at 689). After a careful review of the state-court record and the evidence presented in these federal habeas proceedings, however, the Court finds that trial counsel's investigative failure was due to inattention and neglect, and not the result of reasoned strategic judgment. Bruner's trial strategy was to challenge the prosecution's evidence. Aside from having his private investigator conduct a handful of interviews, Bruner did not conduct any other independent investigation to advance that strategy. "Counsel cannot justify a failure to investigate simply by invoking strategy. . . . Under *Strickland*, counsel's investigation must determine strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017). Petitioner's counsel failed "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521–22 (citing *Strickland*, 466 U.S. at 690–91.)

There is no evidence that counsel made a strategic decision not to conduct further investigation of the injury timeline. The only explanation Bruner has offered for his limited investigation is from his 2002 declaration where he states he possibly just assumed Petitioner was guilty based on the State's version of the case. (EH Ex. 9 at 4391.) Additionally, Bruner's actions during the trial suggest that this was no strategic choice, but

rather an oversight. Bruner agreed during the evidentiary hearing in these proceedings that he missed an important issue with respect to the timing of Rachel's injuries and should have done more to determine the time of injuries. (EH RT 10/31/17 at 131.)

Finally, to the extent he recognized the need to investigate the injury timeline, counsel unreasonably abandoned his efforts to do so. Bruner retained a forensic expert, Dr. Keen, and Bruner's partner Bowman correctly posed a number of significant questions about the timing and nature of Rachel's injuries. Had counsel followed through on this investigation before abandoning further inquiry, his decisions may have been reasonable. As noted above, however, the record indicates that counsel did not make a strategic decision to forego answers to these questions, but simply abandoned efforts to do so.

Even without the aid of experts, however, it is difficult to establish ineffective assistance when counsel actively and capably advocates for a defendant and conducts a skillful cross-examination that draws attention to weaknesses in the conclusions of the State's experts. *Richter*, 562 U.S. at 111. Thus, counsel in this case could have made a reasonable strategic decision to rely on Dr. Howard's prior statements and testimony to challenge the State's theory that the injuries were inflicted during the afternoon of May 1. *See id.* ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). But the possibility that counsel made a reasonable strategic decision to forego investigation of the injury timeline—choosing instead to vigorously challenge the State's evidence through cross-examination—is dispelled by counsel's complete failure to cross-examine the State's witnesses on this issue. It is undisputed that, at Petitioner's trial, Bruner never challenged or disputed the critical injury timeline evidence. Bruner failed to impeach Dr. Howard with his earlier statements and testimony finding Rachel's injuries "most consistent" with infliction prior to May 1. Bruner admitted this failure was due to inattention and the fact that he simply did not recognize the importance of the dating of the injuries. (EH RT 10/31/17 at 132–33.) Bruner also failed to cross-examine Becky with her four prior statements after she offered testimony at trial, for the first time, that Petitioner took Rachel on a third trip in the van, affording the prosecution

an opportunity to argue that Petitioner committed the offenses on May 1 during this third trip in the van.

The Court finds that in this instance, invocation of the strategy of challenging the State's evidence does not alter the Court's findings that trial counsel's investigative failures were objectively unreasonable under prevailing professional norms. An investigation into the medical timeline and bloodstain evidence would not be inconsistent with Bruner's strategy to challenge the State's evidence. Bruner admitted in these proceedings that such an investigation would have been consistent with his chosen strategy.

Judging the reasonableness of counsel's conduct on the facts of this case, viewed as of the time of counsel's conduct, *see Strickland*, 466 U.S. at 690, the Court finds that counsel's decision to forego inquiry into the medical evidence regarding the time of injury was objectively unreasonable in light of the vast body of evidence pointing to the need to investigate the medical timeline between Rachel's injuries and her death.

**B.**     **Ineffective Assistance of Trial Counsel: Prejudice**

**1.**     **Timing of Rachel's Injuries**

Prejudice is shown by evidence of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694. If the Court determines that the new evidence presented in these proceedings would have created reasonable doubt in the mind of one juror, this Court must grant relief. *See Hernandez*, 878 F.3d at 852. When evaluating whether counsel's error prejudiced the outcome of the trial, "*Strickland* does not permit the court to reimagine the entire trial." *Hardy v. Chappell*, 849 F.3d 803, 823 (9th Cir. 2017.) The prosecution's case must be left undisturbed. *Id.*

Contrasting the evidence presented at trial with the evidence that could have been presented at trial by reasonably effective counsel, the Court finds that counsel's failure to conduct his own investigation with respect to the dating of the injuries and to challenge any of the State's evidence which suggested that all of Rachel's injuries were consistent

with infliction on the afternoon of Sunday, May 1—when Rachel was alone with Petitioner in his van—resulted in prejudice to Petitioner. The new evidence presented in these proceedings undermines considerably the confidence in the outcome of the trial court proceedings. Had counsel conducted an adequate investigation of the medical, physical, and eyewitness testimony, he could have presented an extremely different evidentiary picture than that shown to the jury at Petitioner's trial. Namely, trial counsel could have cast doubt on whether Rachel's injuries were actually inflicted on the afternoon of May 1, when she was in Petitioner's care.[16] Instead, counsel admitted to the jury during closing argument that "maybe [Petitioner] did take her out and murder her," but that the State had not shown any motive for him to have done so. (RT 4/13/95 at 130.)

Although Dr. Howard testified on direct examination that all of Rachel's injuries, including her scalp laceration, her abdominal injury, the vaginal injury, and the majority of the bruises on her body, appeared acute and consistent with infliction on the afternoon of Sunday, May 1, 1994 (EH RT. 11/7/17 at 89–90), the Court finds this testimony not credible. As he admitted on cross-examination, Dr. Howard may "potentially" have "different answers" depending on how a question is worded. (EH RT 11/7/17 at 91.) Dr. Howard admitted that, if he had been asked the right questions by the lawyers for Petitioner, he certainly would have testified truthfully that the injury was most consistent with having occurred prior to May 1. Dr. Howard's inconsistent answers are plain in the differing testimony he provided on direct examination, on cross-examination, and during

---

[16] Respondents suggest that the evidence presented in these proceedings was the result of the unlimited time and resources of Petitioner's federal habeas counsel, and that, at the time of Petitioner's trial, Petitioner would not have had similar resources available. The Court finds, however, that had counsel simply followed up with the medical timeline investigation by sending the autopsy slides to Dr. Keen, as was clearly contemplated and for which there would have likely been available funds, there is a reasonable probability that one juror would have found Dr. Keen's opinion that Rachel's injuries could not be reliably dated to May 1 convincing and would have had a reasonable doubt as to Petitioner's guilt. This conclusion would only be strengthened if counsel had also conducted an effective cross-examination of Dr. Howard with only the materials available to defense counsel before trial.

examination by the Court during the evidentiary hearing. The Court finds that counsel's failure to impeach Dr. Howard with his inconsistent statements left the jury unaware that Dr. Howard's "truthful" opinion was that Rachel's small bowel, scalp and vaginal injuries were "most consistent" or "typical" with having occurred prior to May 1. (EH RT 11/7/17 at 111–12.) If trial counsel had impeached Dr. Howard's testimony with his earlier inconsistent statements, as was done at the evidentiary hearing, the Court finds that the jury would likely have found Dr. Howard's testimony not credible or persuasive. *See Hernandez*, 878 F.3d at 858 (the proper inquiry for a court when considering prejudice is how the court believes the jury would have assessed the credibility of the witnesses); *Earp v. Davis*, 881 F.3d 1135, 1145 (9th Cir. 2018) (district court, as fact-finder in habeas proceedings, is tasked with weighing and making factual findings as to the credibility of witnesses) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)). Due to the inconsistent and imprecise nature of Dr. Howard's statements (*see, e.g.*, EH RT 11/7/17 at 105 ("[The abdominal injury is] certainly typical of being at least a few hours old. It could be also typical of what it looks like at 24 or more."); *see also id. at* 106–08, 121–23; 128–29), the Court gives little weight to his testimony in these proceedings that Rachel's abdominal injuries were consistent with having been inflicted within hours of or on the same day as death. (EH RT 11/7/17 at 88–89, 105, 107, 128.)

Similarly, the Court concludes that the statements made by Dr. Howard with respect to Rachel's vaginal injury at Petitioner's trial and on direct examination during the evidentiary hearing are entitled to little weight, as they are contradicted by statements he made in his pretrial interview, during Angela's trial, in his 2004 declaration, and on cross-examination at the recent hearing. The Court concludes that a jury would find more credible the testimony of Dr. Ophoven and Dr. Keen—that Rachel suffered from a vaginal injury that was one or more weeks old.

Additionally, in light of his inconsistent statements, the Court does not find credible Dr. Howard's recent testimony that based upon his more recent review of the slides, he has concluded that Rachel's scalp injury is more typical of having occurred within hours to a

day, rather than two days, before Rachel's death. (*See* EH RT 11/7/17 at 95, 120–21.)

Finally, Dr. Ophoven explained in her declaration that "[i]t has been well established that visual determination of the age of any bruise is scientifically unreliable," and that the only reliable method of assessing the age of a bruising injury is to take tissue samples and test them, which Dr. Howard failed to do. (EH Ex. 106 at 4277.) Dr. Howard admitted in his recent testimony that there is no reliable method to precisely date bruises, and that in this case he could not distinguish between a bruise inflicted on April 29 or May 1. (EH RT 11/7/17 at 112.) At trial, Dr. Howard and Dr. Seifert suggested to the jury that many of Rachel's bruises could be linked to the afternoon of May 1. However, this evidence, which went unchallenged at trial, turns out to be scientifically unsupportable and untrue.

Dr. Ophoven could have provided evidence to the jury that "[i]nterpreting the age of bruises from physical appearance and color is recognized by the forensic community to be very inexact [i.e., inaccurate], and should not be done." (EH Ex. 105 at 4273.) The Court concludes that had trial counsel presented evidence that the visual dating of bruises is unreliable, it would have called into question Dr. Siefert's conclusion that the bruising that he established had been inflicted within one day of death, which included 95% of the bruises, were consistent with having been inflicted between the hours of 2:00 p.m. and 5:30 p.m. on the day prior to Rachel's death, as well as Dr. Howard's suggestion that many of Rachel's bruises occurred within one to two days prior to her death.

Had trial counsel provided evidence to evaluate the potential cause and timing of Rachel's injuries to one or more medical experts at the time of Petitioner's trial, such an expert would have been able to testify that her injuries were not consistent with having been inflicted on the afternoon of Sunday, May 1—thus negating the very grounds on which the State relied to prove that Petitioner inflicted the fatal small bowel injury, vaginal injury, and scalp injury. (*See*, *e.g.*, EH RT 10/31/17 at 96–97; EH RT 11/1/17 at 37–38, 59; EH RT 11/2/17 (a.m.) at 20; *see also* RT 4/13/95 at 92 ("Who is her rapist? Who is her murderer? The answer to that question is simple. Who was with her all day on Sunday,

May 1st.").) Moreover, the evidence from the recent hearing casts reasonable doubt on the State's allegation at trial that the pry bar found in Petitioner's van was the implement that caused Rachel's injuries. The Court concludes that, had trial counsel presented medical testimony from an expert such as Dr. Ophoven, Dr. Keen, or Dr. McKay to rebut the State's medical evidence at trial, the jury would have found such evidence credible and relevant to its determination of guilt. Moreover, if trial counsel had impeached Dr. Howard's testimony with his earlier inconsistent statements, as was done at the evidentiary hearing, the Court finds that the jury would likely find Dr. Howard's testimony unpersuasive, and less credible than testimony offered by Petitioner's medical witnesses. *See Hernandez*, 878 F.3d at 858.

Finally, the evidentiary hearing in this case has demonstrated that the police investigation was colored by a rush to judgment and a lack of due diligence and thorough professional investigation; effective counsel would have brought this to the jury's attention, casting further doubt on the strength of the State's case.

The Court finds that counsel's deficient investigation pervaded the entire evidentiary picture presented at trial, resulting in a "breakdown in the adversary process that renders the result [of Petitioner's trial] unreliable." *Strickland*, 466 U.S. at 687; *see also Hardy*, 849 F.3d at 824 (finding that trial counsel's failure to investigate "altered the entire evidentiary picture"). The Court has considered the totality of the evidence—the evidence before the jury at trial and the evidence admitted in these proceedings—and finds that there is a reasonable probability that, absent counsel's failure to investigate and offer evidence regarding the timeline of Rachel's injuries, at least one reasonable juror would have had a reasonable doubt as to Petitioner's guilt. *See Strickland*, 466 U.S. at 695.

### 2. Bloodstain Evidence

Petitioner asserts that his convictions were sustained in part based on the interpretation of blood evidence, citing the Arizona Supreme Court's statement that "[b]lood spatter in the van likely was created by [Petitioner] hitting Rachel after she had already suffered a head injury." *Jones*, 188 Ariz. at 397, 937 P.2d at 319. Petitioner now

argues that he has presented evidence that demonstrates that there are credible innocent explanations for the blood found on Petitioner's clothing and in the van. The Court considers the claim that Petitioner suffered prejudice from counsel's failure to investigate the bloodstain evidence, and finds that, even if trial counsel's deficiency regarding the failure to investigate the bloodstain evidence alone would not be sufficiently prejudicial, the cumulative effect of counsel's deficiencies in this regard, together with the errors and prejudice addressed above, undermines the Court's confidence in the jury's verdict. *See Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002) ("[C]umulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel.")

Petitioner's expert reported that the bloodstains on the carpet of the van, including Item V6, described as an "impression stain" by Sergeant Pesquiera, appeared to be the result of passive dripping of blood, indicating that Rachel "may have made contact with the carpet with a bloody area at some point in time." (EH Ex. 121 at 4072; *see also* EH RT 11/3/17 (a.m.) at 19–20.) Thus, while Petitioner's expert might have established that Sergeant Pesquiera mischaracterized this bloodstain, his testimony would not have refuted the prosecution's assertion that Rachel's "head was bleeding as she was laying in the back of that van because she had been beaten and hit with that pry bar as part of that sexual assault." (*See* RT 4/13/95 at 97.) Furthermore, while James concluded that both bloodstains on the carpet (Items V6 and V7) appeared to be the result of the passive dripping of blood, rather than blood spatter, James opined that both of the carpet stains indicated that Rachel "was actively bleeding and *moving around* while in the van." (EH Ex. 121 at 4072; EH RT 11/3/17 (a.m.) at 19–20 (emphasis added).) Because James agreed that Rachel must have been bleeding and "moving around" in the van, his testimony would have conclusively refuted any argument by Petitioner that the blood was present in the van simply as a result of Petitioner and Angela's efforts to obtain medical care for Rachel on Monday morning while her head was still bleeding from the laceration. (*See* Doc. 288 at 62.)

Furthermore, James admitted that he could not determine whether the bloodstains

on the passenger seat were impact spatter as a result of Rachel being struck after blood collected in her hair from the laceration, or were, instead, a projected, "cast-off" bloodstain pattern as a result of her hair simply swinging because of the movement of the van. James conceded that his conclusion that the bloodstains on the passenger seat were not impact spatter was based on his assumption, refuted by the record in this case, that there was no other physical evidence, such as the presence of bruising, that Rachel had been struck after the laceration occurred.

The State's theory of the case, however, did not rest solely, or even primarily, on the bloodstain evidence presented at trial. As this Court has emphasized several times, the State's main theory of the case was that Rachel was solely in Petitioner's care when her fatal injuries were inflicted. In reviewing the evidence on appeal, the Arizona Supreme Court noted several factors that it relied on in reaching its conclusion that the physical and sexual assault of Rachel occurred within a two-hour time period during which Rachel was alone with Petitioner in the van. *See Jones*, 188 Ariz. at 397, 937 P.2d at 319. The likelihood that the bloodstains were evidence of Petitioner striking Rachel in the van after she had already suffered a head injury was one among several other more substantial factors which James's testimony would not have altered: (1) Becky testified that Rachel spent the morning with her and their brother watching cartoons and "seemed fine" when her siblings went out to ride their bikes, at about 3:00 p.m., (2) Rachel "seemed fine" after the first two times that she returned with Petitioner, (3) if Rachel had already suffered genital injuries, she would have been in pain, (4) the third time that Petitioner went out with Rachel, he told Becky that he was going to his brother's house but his brother's wife testified that Petitioner never visited their house on that day, (5) during Petitioner's third trip with Rachel, two children saw Petitioner at 5:00 p.m., hitting Rachel while he drove, (6) the next time that Becky saw Rachel, at about 6:30 p.m., Rachel was in a lot of pain, and (7), many of the injuries that Rachel now had were consistent with defense against a sexual assault. *Id.* James's testimony would not have altered any of these findings; at best it might have cast doubt on what the children may have actually seen, but would not have called into question

the relevant fact that Petitioner was alone with Rachel in his van during the critical two-hour period when her fatal injuries were inflicted.

In sum, a bloodstain expert would not have been able to rule out the possibility that Rachel was struck while in the van or refute the prosecution's theory of the case. At best, such testimony would have presented an alternative explanation for the presence of some of the bloodstains in the van, but Petitioner has offered no "innocent explanation" for the bloodstains on the carpet behind the passenger seat in the van. Accordingly, the Court finds that there is no reasonable probability of a different outcome had Petitioner presented a bloodstain expert at trial, as, in light of the evidence presented at trial, it alone would not sufficiently raise a reasonable doubt as to Petitioner's guilt. However, considered cumulatively with trial counsel's failure to investigate the medical timeline, the Court finds that the evidence of possible alternative and innocent explanations for some of the bloodstains in the van would strengthen, somewhat, the Court's finding of prejudice based on the failure to investigate the medical timeline alone.

### 3. Reliability of Eyewitness Testimony/Accident Reconstruction

Even if defense counsel's investigation of the Lopez children's statements was deficient, Petitioner has not established that it was prejudicial. There is no reasonable probability that a more thorough investigation of the Lopez children's statements would have resulted in a different outcome.

Neither Petitioner's accident reconstructionist nor his biomechanics expert provided reliable evidence that the children could not have seen Petitioner striking Rachel. As Gruen admitted during these habeas proceedings, his line of sight analysis was dependent on multiple variables which were either unknown or were inconsistent with the known evidence. To the extent his conclusion depended on "ever-changing light conditions," Gruen failed to substantiate this theory with evidence or analysis. (EH RT 11/1/17 at 164.) At most, Petitioner's experts might have been able to establish that it was physically improbable that the children could have observed some of the specific details about which they testified, or that the children's testimony was unreliable, in some part, as a result of

post-event contamination or suggestive questioning. But both Gruen and Hannon agreed that the children would have been able to see Petitioner and Rachel in the van.

Dr. Esplin's testimony—concluding that major aspects of the Lopez children's statements were reliable and independently corroborated, as well as his own opinion that the children saw something of "emotional significance"—did not disprove Ray and Laura's account of seeing Petitioner violently assaulting Rachel. Dr. Esplin conceded that significant portions of the Lopez children's testimony were reliable: the Lopez children could see into the yellow van driven by Petitioner, and they obviously saw some "important salient" event. His testimony does not support Petitioner's claim that his trial counsel were ineffective in failing to call such a forensic child psychologist.

Moreover, if Petitioner's trial counsel had presented the evidence from each of these experts, it may have actually been detrimental to his case. Each expert would have damaged Petitioner's defense by agreeing that portions of the Lopez children's account were credible.

Finally, had trial counsel more aggressively challenged the reliability of the testimony of the Lopez children, counsel might have opened the door for the State to present the rebuttal evidence that Petitioner had previously hit his own children with his elbow, similar to the Lopez children's description. (Ex. 1, at 916–37); *see e.g., State v. Woratzeck*, 134 Ariz. 452, 454, 657 P.2d 865, 867 (1982) (objections to admission of testimony may be waived when defendant opens door to further inquiry on a topic by introducing that topic while examining a witness); *State v. Mincey*, 130 Ariz. 389, 405, 636 P.2d 637, 653 (1981) ("We agree with the state that appellant opened the door to this line of questioning during his opening statement . . . ."). Defense counsel had already successfully defeated the State's motion to admit this evidence at trial. (ROA 102, 117, 124).

### 4.    Conclusion

Had Petitioner's counsel adequately investigated and presented medical and other expert testimony to rebut the State's theory that Petitioner beat and sexually assaulted

Rachel on the afternoon of May 1, 1994, there is a reasonable probability that the jury would not have unanimously convicted Petitioner of any of the counts with which he was charged. Count One (intentionally or knowingly engaging in an act of sexual intercourse with Rachel, in violation of A.R.S. § 13-1406), Count Two (intentionally or knowingly causing physical injury to Rachel by striking her abdominal area causing a rupture to her small intestine, under circumstances likely to produce death or serious physical injury, in violation of A.R.S. §13-3623 (B)(1)), and Count Three (intentionally or knowingly causing physical injury to Rachel by bruising her face and ear and causing a laceration to her head, in violation of A.R.S §13-3623) all depend upon the premise that Petitioner physically and sexually assaulted Rachel on May 1, 1994, when she was in his custody. The Court finds that, had defense counsel performed adequately, there is a reasonable probability that at least one juror would have had a reasonable doubt as to whether Petitioner was cause of Rachel's injuries.

Respondents assert, however, that Petitioner is not entitled to habeas relief because his conviction for child abuse on Count Four (intentionally or knowingly endangering Rachel by failing to take her to a hospital, in violation of A.R.S. § 13-3623(B)((1)), which does not depend on the timing of the fatal injury or the identity of the assailant, independently supports his felony murder conviction on Count Five. Respondents further argue that, as a matter of law, the factual and legal findings with respect to the convictions on these two counts are presumed to be correct. Finally, Respondents contend that Petitioner's own experts in these proceedings agree that Petitioner's failure to take Rachel to the hospital either caused or contributed to her death.[17]

---

[17] Respondents also argue that Petitioner has presented no evidence that counsel was deficient in failing to investigate and challenge Count Four, asserting counsel aggressively, but unsuccessfully, challenged that count by arguing to the jury and the Arizona courts that Petitioner did not have the requisite "care" or "custody" of Rachel under Arizona's child abuse statute, A.R.S. § 13-3623(B). The Court disagrees with this assessment. Petitioner has maintained throughout these habeas proceedings that counsel failed to adequately investigate the medical evidence and the medical timeline of Rachel's injuries as to Petitioner's convictions as a whole. Having already found that counsel was deficient in that

The Court agrees with Respondents that the jurors were properly instructed to consider all lesser-included offenses, as well as all mental states, and to return a verdict "uninfluenced by your decision as to the other charges." (EH RT 3/09/18 at 29.) The trial court instructed the jurors that the sexual assault charge in Count One and the charges of child abuse under circumstances likely to cause death or serious physical injury in Counts Two and Four could serve as predicate felonies to support the felony murder charge in Count Five.[18] The trial court instructed the jurors that the child abuse charges could only be considered predicate felonies if they (1) were committed intentionally or knowingly, and (2) if the circumstances were likely to cause death or serious physical injury. (RT 4/13/95 at 148–49.) The jury found Petitioner guilty of Count Five of the Indictment only after finding, with respects to Counts Two and Four, that the crimes were committed under circumstances likely to produce death or serious physical injury and that Petitioner committed these crimes with a knowing and intentional mental state. (ROA 139.) The Court disagrees with Respondents' assertion, however, that "there was no theory by the prosecutor, that [all these counts] were somehow so essentially intertwined that they are interrelated and relied upon each other." (EH RT 3/09/18 at 29–30.) The Court finds that Petitioner's conviction on Count Four, for failure to take Rachel to the hospital, was intertwined with the allegations that Petitioner had inflicted the injuries to Rachel discussed in Counts One, Two, and Three on May 1.

In evaluating prejudice under *Strickland*, the Court "may not invent arguments the prosecution could have made" at trial. *Weeden*, 854 F.3d at 1972 (quoting *Hardy*, 832 F.3d at 1141). In contrast to Respondents' assertions now, at trial the State argued explicitly that the conviction on Count Four depended on the timing of the fatal injury and the identity of the assailant by asserting that Rachel was the victim of a crime of sexual assault, and that

_____

regard, the question for the Court, which it answers in the affirmative, is whether this deficiency resulted in prejudice to Petitioner's convictions.

[18] The State withdrew its allegation of premeditation with regard to Count Five prior to submission of the count to the jury; thus, only the felony murder count was presented to the jury.

- 82 -

"when that sexual assault was committed" she became the victim of other crimes, including Count Four (RT 4/13/95 at 82). The State explained at trial that "Rachel died because she was beaten in order to be raped. *She died as a result of that beating both because the internal injuries killed her and because only the [Petitioner] knew how badly she was hurt, only the [Petitioner] had the means of taking that baby to the hospital, but for obvious reasons he could not, and so he let her die.*" (*Id.* at 104–05) (emphasis added). The State acknowledged in closing argument during trial that, of all the other witnesses who testified at trial that they saw Rachel sick in the late afternoon or evening of May 1, only Petitioner knew why and how badly she was hurt, and "to cover his own responsibility for what he had done" failed to take her to the hospital. If Petitioner was not responsible for the assault, under the State's own theory he would be less likely to have had reason to prevent Rachel from being taken to the hospital.

Moreover, to the extent Respondents assert that the arguments or theories of counsel are not evidence, and the jury was properly instructed to consider each offense separately, the evidence at trial that Petitioner committed the offense knowingly and intentionally was minimal. If Petitioner was not the perpetrator, if he did not cause the injuries, there was little evidence presented at trial that would suggest he was put on notice of the severity of the injuries, and thus could form the requisite intentional and knowing mental state. While there is evidence that Petitioner was concerned about getting Rachel care because he would be perceived as the perpetrator of child abuse, a reasonable juror could find he was concerned about law enforcement making such an assumption because she had been in his care, regardless of whether he had inflicted her injuries.

While Petitioner's own experts in these proceedings do agree that Petitioner's failure to take Rachel to the hospital either caused or contributed to her death, the experts' testimony does not show that Petitioner had the requisite mental state of "intentionally and knowingly" to support a conviction of the class 2 felony child abuse charge, a felony murder predicate, as opposed to a lesser charge of the class 3 felony, recklessly, or class 4

felony, negligently. *See* A.R.S. § 13-3623(B)(1)–(3).[19]

At a minimum, in light of the evidence presented at trial and in these proceedings, the Court finds that there is a reasonable probability that the jury would not have found that Petitioner acted with a knowing or intentional mental state in Count Four if the defense had put on evidence questioning the medical timeline and suggesting that he was not the actual perpetrator of the assault. For the reasons stated above, the Court finds a reasonable probability that, had counsel not performed deficiently, Petitioner's jury would not have convicted him of any of the predicate felonies and thus concludes that Petitioner has demonstrated prejudice with respect to the capital charge.

## C. Ineffective Assistance of PCR Counsel: Deficient Performance

The Ninth Circuit has already determined that Petitioner's claim of ineffective assistance of trial counsel (Claim ID) is a "substantial" claim, thus satisfying the prejudice prong of *Martinez*'s cause and prejudice inquiry. *See Clabourne*, 745 F.3d at 377. Petitioner must show that PCR counsel's performance was ineffective under the standards of *Strickland* to determine if the procedural default of Claim 1D (Guilt-Phase) can be excused. *Clabourne*, 745 F.3d at 377 (citations omitted). *Strickland*, in turn, requires Petitioner to establish that post-conviction counsel's performance was deficient and there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different. *Clabourne*, 745 F.3d at 377 (citations omitted).

To demonstrate PCR counsel's performance was deficient, Petitioner must show

---

[19] Although Respondents now point to Dr. Ophoven's opinion that "it would have been evident to anyone with Rachel that she was in need of immediate medical attention" in support of their argument that Petitioner cannot show prejudice with respect to Count Four, *see* Doc. 289 at 13, the prosecution at trial argued that Petitioner acted "intentionally and knowingly" in failing to obtain medical care based on the theory that he had inflicted and therefore knew the extent of Rachel's injuries. The prosecution did not independently contend that Petitioner had the requisite mental state based only on his observation of Rachel's physical appearance on May 1, and the Court "may not invent arguments the prosecution could have made if it had known its theory of the case would be disproved." *Hardy*, 832 F.3d at 1141.

that counsel's failure to raise the underlying IAC claim did not "fall[ ] within the wide range of reasonable professional assistance" and "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). The Court concludes that Petitioner has rebutted the presumption of reasonableness, and established that PCR counsel's failure to investigate and present a trial counsel IAC claim on the same grounds presented in this proceeding constitutes deficient performance under the standard of *Strickland*.

Although he lacked the experience to satisfy Arizona's requirements for the appointment of capital post-conviction counsel under A.R.S. § 13-4041 and Rule 6.8(c) of the Arizona Rules of Criminal Procedure, the Arizona Supreme Court appointed James Hazel to represent Petitioner in his state PCR proceedings. While Hazel's lack of qualifications to represent Petitioner does not, per se, establish ineffective assistance of counsel, the Court finds upon review of the record and the evidence presented in these proceedings that Hazel performed deficiently.

Arizona recognizes a statutory and due process right to funding for experts and investigators. *Apelt*, 176 Ariz. at 365–66, 861 P.2d at 650–51. However, funding requests must articulate grounds of reasonable necessity. *Id.* at 650. "'[U]ndeveloped assertions that the requested assistance would be beneficial' are not enough." *Id.* at 651 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985). As this Court summarized above in the analysis of trial counsel's performance, and as acknowledged by PCR counsel in these proceedings (EH RT 11/3/17 (a.m.) at 74), there was substantial evidence in the record that would have supported a request for appointment of an expert pathologist in pursuit of an investigation into the medical evidence bearing on the timing of Rachel's injuries. Hazel should have known, after reviewing the file in these proceedings, that the timing of Rachel's injuries was a central issue at Petitioner's trial, and that trial counsel's failure to challenge the state's timeline would give rise to a question whether trial counsel had adequately investigated the timing of the injuries. Hazel also should have been aware of

the discrepancies in Dr. Howard's testimony at the two trials, as well as Becky's inconsistent testimony. The record also should have raised questions about the adequacy of trial counsel's investigation of the bloodstain evidence. The Court finds that PCR counsel acted deficiently by failing to request investigatory assistance to develop these claims, or, lacking funding for investigatory resources, failing to attempt to develop these claims himself.

Respondents characterize Petitioner's claim of ineffective assistance of PCR counsel as a claim based solely on the assertion that, if Hazel had written a better-worded motion, the post-conviction court would have provided sufficient funding to re-investigate the case. (Doc. 289 at 7.) The Court disagrees. Petitioner has always maintained that PCR counsel performed deficiently by failing to conduct any outside investigation that would enable the prosecution's evidence to be tested in a meaningful way. To the extent PCR counsel may have reasonably limited his investigation due to a lack of resources, Petitioner maintains that the motion for funding for an investigator was not simply poorly-worded, but legally and factually insufficient and in disregard of the Arizona Supreme Court's directions for requesting resources.

Respondents argue that the record establishes that Hazel did not perform deficiently, noting that he: (1) reviewed the record, (2) spoke with trial and appellate counsel, (3) met with Petitioner, (4) repeatedly requested funding for an investigator, (5) requested a mitigation specialist, (6) interviewed Angela, (7) filed a post-conviction petition, and (8) obtained an evidentiary hearing on a claim of ineffective assistance of counsel.[20] "One of the purposes of Rule 32 proceedings in Arizona 'is to furnish an evidentiary forum for the establishment of facts underlying a claim for relief when such facts have not previously

---

[20] Respondents' argument is generous to PCR counsel. A review of Hazel's billing records indicate Hazel spent less than half an hour speaking with trial counsel just after his appointment, and this discussion related to obtaining the file; Hazel spoke with Petitioner twice during his representation—once approximately three months after his appointment, and once just before he filed the Rule 32 petition. (EH Ex. 128.) Additionally, as discussed below, competent counsel is not demonstrated by the repeated filing of legally and factually insufficient motions for investigatory resources.

been established of record.'" *State v. Watton*, 164 Ariz. 323, 328 (1990) (quoting *State v. Scrivner*, 132 Ariz. 52, 54, 643 P.2d 1022, 1024 (App. 1982)). Notably absent from the record is any indication, outside of a single interview of Angela a day *after* he prepared the final Rule 32 petition, that PCR counsel attempted to identify or investigate any potential claim that relied on the establishment of facts outside the record. Counsel spent 100 hours over three months doing little more than reviewing the record in this case. The petition he filed after that review, alleging four claims of ineffective assistance of trial counsel, is almost completely devoid of any assertion of prejudice, and it is apparent from the petition that counsel believed he was not obligated to prove prejudice. (*See* EH Ex. 135 at 13–14 (PCR Petition) (stating Petitioner was required to show he was prejudiced *or* that the result was unfair, and arguing Petitioner was entitled to relief because defense counsel's representation rendered the trial court proceedings fundamentally unfair); *see also* EH Ex. 136 at 4–5 (Reply to Response to PCR Petition) (disagreeing with the State's position that Petitioner must show he suffered actual prejudice)).[21] "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

Significantly, it is difficult to justify Hazel's decision to forego any investigation into the State's strongest evidence of guilt: the medical evidence tying Rachel's injuries to a narrow window of time during the afternoon of May 1 and Petitioner's opportunity to assault Rachel during the alleged third trip in the van. The Court finds that Hazel had more

---

[21] In making this argument, Hazel relied on an incorrect interpretation of the Supreme Court's decision in *Lockhart v. Fretwell*, 506 U.S. 363 (1993) (holding that *in addition to demonstrating that the outcome would have been different*, a defendant must also demonstrate that trial counsel's errors rendered the trial unreliable or fundamentally unfair in order to avoid granting windfalls to defendants). To the extent Hazel may have reasonably relied on this interpretation, by the time Hazel filed his reply to the response to the PCR, and well before the evidentiary hearing on Petitioner's PCR petition, the Court had made clear that the decision in *Fretwell* did not supplant the Court's well-established *Strickland* analysis regarding prejudice. *See Williams v. Taylor*, 529 U.S. 362, 391–92 (2000).

than reasonable grounds to investigate whether there were constitutional deficiencies in trial counsel's investigation of the timing of Rachel's injuries, as well as counsel's investigation of the bloodstain evidence. Having grounds to investigate these issues, he failed to do so.

Hazel agreed it would have been reasonable to attempt to interview Dr. Howard, but believed "it all starts with the investigator." Hazel also conceded he did not "absolutely" need an investigator, and, in fact, had conducted Angela's interview himself. Despite this acknowledgement, Hazel did not attempt to interview Dr. Howard or investigate Becky's inconsistent statements. Hazel also failed to point out the inconsistencies in Dr. Howard's testimony and his pretrial statements and testimony from Angela's trial. The Court finds that it would have been reasonable to attempt to interview Dr. Howard, or point out the inconsistent statements, and it would not have been necessary to have an investigator to do so.

Hazel's failure to investigate these issues cannot be excused for lack of funding. Hazel reviewed Petitioner's file and stated he "absolutely" questioned whether trial counsel had fully investigated Petitioner's case. (EH RT 11/3/17 (a.m.) at 59.) Despite this acknowledgement, PCR counsel requested no funding for a forensic investigation. Nor did PCR counsel attempt to contact Petitioner's consulting expert at trial, Dr. Keen.

Further, to the extent an investigator might have been necessary to pursue these issues, Hazel failed to file a properly supported request for one. Despite the direction provided by the Arizona Supreme Court to request the appointment of investigators and experts pursuant to A.R.S. § 13-4013(B) and § 13-4041(J), Hazel filed his requests for the appointment of an investigator pursuant to Rule 706(a) of the Arizona Rules of Evidence, a rule that has no application to indigent defense funding in criminal cases. The request for an investigator was denied because Hazel failed to provide any specific reason to support the need for the appointment of an investigator, a statutory requirement of A.R.S. § 13-4013(B). Hazel's motion for reconsideration was denied for the same reason. Hazel believed that facial compliance with the statute would not have helped because, in his

opinion, his funding requests would have been denied anyway. (EH RT 11/3/17 (a.m.) 61, 65–68, 73–74, 77–78, 80–81.) Hazel never attempted to formulate an application for funding that addressed the PCR court's concerns. Hazel spent approximately 100 hours working on Petitioner's state court petition for post-conviction relief. Nearly 100 percent of counsel's billed time was spent reviewing the file and drafting the petition. Hazel's own attempts at investigation consisted of talking with Petitioner and, after the petition was written, interviewing Angela.

The Court finds that Hazel's claim that his funding requests would have been arbitrarily denied are speculative and against the weight of the evidence. Trial counsel and Petitioner's standard of care expert uniformly agreed that properly grounded funding requests were routinely granted in Pima County. Hazel had before him extensive evidence that if presented in an application for funding would have conveyed to the PCR court that there was a well-founded reasonable need to investigate the central issue in Petitioner's case. Nonetheless, Hazel failed to inform the PCR court of any of the evidence which would have supported the need for funding, and he never requested funding for experts.

In *Hinton v. Alabama*, the Supreme Court found counsel's failure to request additional funding for an expert was unreasonable and constituted deficient performance because it was based, not on a strategic decision, but on counsel's mistaken belief that he would be unable to obtain additional funding combined with his failure to investigate the state's funding statute. 134 S. Ct. 1081, 1089 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance.") Similarly, Hazel's decision to forego a properly grounded request for an investigator or for experts to assist him with the investigation of the medical time of injury evidence and the bloodstain evidence was based on either ignorance of the requirements of the appropriate funding statute or on counsel's mistaken assumption of the Arizona courts' unwillingness to fund experts, and was not a reasonable strategic decision. *Cf. Hinton,* 134 S. Ct. at 1088.

In conclusion, the Court finds that Hazel's performance and his failures to

investigate fell below an objective standard of reasonableness under prevailing professional norms.

### D. Ineffective Assistance of PCR Counsel: Prejudice

As explained above in Section IV.A and IV.B, the Court finds Petitioner has already demonstrated trial counsel performed deficiently, and there was a reasonable probability that but for trial counsel's deficient performance the result of the trial proceedings would have been different. Accordingly, the Court finds that there is a reasonable probability that, absent PCR counsel's deficient performance, the result of the post-conviction proceedings would have been different. *See Clabourne*, 745 F.3d at 377–78 (when PCR counsel has performed deficiently, determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective.") Furthermore, as discussed above, the Court finds Petitioner's trial counsel guilt-phase IAC claim meritorious. Accordingly, the Court rejects Respondents' argument that even if PCR counsel's performance was deficient, Petitioner cannot establish prejudice from PCR counsel's failure to raise Claim 1D because the claim has no merit.

## VI. CONCLUSION

The Court finds that because Petitioner has met his burden under *Martinez* to establish ineffective assistance of post-conviction counsel as cause for the default of his substantial claim of ineffective assistance of trial counsel for failure to conduct an adequate pre-trial investigation, Petitioner has overcome the procedural default of Claim 1D. The Court further finds that Petitioner has demonstrated that trial counsel performed constitutionally deficiently when he failed to perform an adequate pretrial investigation, leading to his failure to uncover key medical evidence that Rachel's injuries were not sustained on May 1, 1994, as well as his failure to impeach the state's other physical and eyewitness testimony with experts who could support the chosen defense. Petitioner has shown that had counsel performed constitutionally adequately, there is a reasonable probability that his jury would not have convicted him of *any* of the crimes with which he

was charged and previously convicted. Accordingly, Petitioner has demonstrated prejudice due to counsel's failures with respect to all counts in the indictment.

Therefore,

(1)     Petitioner's Petition for a Writ of Habeas Corpus is **GRANTED** without reaching the merits of the remaining claim, Claim 1D (Penalty Phase);

(2)     the State of Arizona is directed to release Petitioner from custody unless it notifies this Court that (a) it has initiated new trial proceedings within 45 days of the filing date of this Order, and (b) actually commences Petitioner's retrial within 180 days of the filing date of this Order.

(3)     the Clerk of Court is directed to enter judgment and close the case.

IT IS FURTHER ORDERED that the Clerk of Court forward a copy of this Order to Janet Johnson, Clerk of the Arizona Supreme Court, 1501 W. Washington, Suite 402, Phoenix, Arizona, 85007-3329.

**IT IS SO ORDERED.**


Dated at Anchorage, Alaska, this 31st day of July, 2018.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE